**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------x
                                                      :
In re:                                                :    Chapter 11
                                                      :
HO WAN KWOK, *et al.*,[1]                             :    Case No. 22-50073 (JAM)
                                                      :
            Debtors.                                  :    (Jointly Administered)
                                                      :
------------------------------------------------------x

**MOTION OF CHAPTER 11 TRUSTEE FOR ENTRY OF ORDER, PURSUANT TO**
**BANKRUPTCY RULE 9019, APPROVING SETTLEMENT AGREEMENT WITH**
**CLARK HILL PLC**

Luc A. Despins, in his capacity as the Chapter 11 Trustee (the "Trustee") appointed in the

above-captioned chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor" or

"Plaintiff"), respectfully submits this motion (the "Motion"), pursuant to Rule 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9019-1(a) of the

Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court District of

Connecticut (the "Local Rules"), for entry of an order, substantially in the form attached hereto

as **Exhibit 1** (the "Proposed Order"), approving the settlement agreement (the "Settlement

Agreement"), attached as Exhibit A to the Proposed Order, between the Trustee, Thomas K.

Ragland, and Clark Hill PLC (collectively, the "Parties").  In support of this Motion, the Trustee

respectfully represents as follows:

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The
mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul
Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho
Wan Kwok (solely for purposes of notices and communications).

## JURISDICTION AND VENUE

1.       This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

2.       Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The bases for the relief requested herein are Bankruptcy Rule 9019(a) and Local Rule 9019-1(a).

## BACKGROUND

### I.   Clark Hill Litigation

4.       On September 19, 2019, the Debtor filed a complaint (the "Complaint") against his former counsel Clark Hill PLC ("Clark Hill") and Thomas K. Ragland, a Member of Clark Hill (together with Clark Hill, the "Defendants") in the Superior Court of the District of Columbia alleging malpractice and seeking damages arising from a cyber incident involving Clark Hill's computer server resulting in the alleged public dissemination of the Debtor's asylum application information on the internet (the "Action").[2]

5.       The Debtor alleged that in August 2017, when he engaged Clark Hill as his immigration counsel to assist him in applying for and obtaining political asylum in the United States, he warned Clark Hill of the potential risk of cyberattacks by the Chinese Communist Party (the "CCP") in connection with his status as a "prominent Chinese political dissident."[3] The Debtor alleged that the Defendants stated that they would take special precautions to prevent such an attack, but allegedly failed to do so, resulting in the Debtor's asylum application

---

[2]     The Debtor retained Ari Casper from The Casper Firm, LLC ("Attorney Casper") to represent him in the Action, and the Defendants retained Jenner & Block LLP ("Jenner & Block") as defense counsel.

[3]     Notice of Removal, Ex. 1, Compl. ¶ 31, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Oct. 24, 2019) [Docket No. 1], attached hereto as **Exhibit 2**.

containing personal information allegedly being publicly disseminated as a result of a cyberattack on Clark Hill's computer systems (the "Cyberattack").

6.     The Debtor alleged that, in connection with the Cyberattack and Clark Hill's subsequent withdrawal as his counsel, the Debtor sustained "damages, injuries, and wrongs . . . as the direct and proximate result and consequence of [D]efendants' multiple serious breaches of their duties to [P]laintiff arising from the firm's legal representation of [P]laintiff."[4]  Specifically, the Complaint brought the following claims for relief against the Defendants: (I) breach of fiduciary duties; (II) breach of contract representation; (III) legal malpractice; and (IV) punitive damages;[5] and sought compensatory and punitive damages relating to (i) reputational damages, (ii) risk to the Debtor's safety, (iii) delays to his asylum application, and (iv) lost business opportunities.

7.     On October 24, 2019, the Action was removed to the United States District Court for the District of Columbia (the "District Court").

8.     On November 25, 2019, Defendants filed a motion to dismiss (the "Motion to Dismiss"), seeking to dismiss all counts of the Complaint with prejudice.[6]  On February 20, 2020, the District Court issued its order granting in part and denying in part the Motion to Dismiss ("MTD Order").[7]  The MTD Order dismissed without prejudice count IV for punitive damages entirely, and dismissed the Debtor's claims in regards to counts I-III to the extent they rely on the theory that Defendants' withdrawal as counsel constituted a legally remediable

---

[4]    *Id.* ¶ 1.

[5]    *Id.* ¶¶ 62-65; 89-93.

[6]    *See* Mot. to Dismiss, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Nov. 25, 2019) [Docket No. 12], attached hereto as **Exhibit 3**.

[7]    *See* MTD Order, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Feb. 20, 2020) [Docket No. 17]. attached hereto as **Exhibit 4**.

wrong.  The dismissal reduced the scope and relief of the Action, as the Debtor's allegations that the Defendants had "breached their contractual, common law, and professional duties" by "improperly and wrongfully terminating their representation of [the Debtor]" for "no good, sufficient, or valid cause" could, but for dismissal, have constituted a meaningful basis for the damages sought by the Debtor in the Complaint.[8]  The District Court allowed the Debtor's claims and attendant damages surrounding the mishandling of the Debtor's confidential information to go forward.[9]

      9.      On March 19, 2020, Defendants filed their answer to the Complaint (the "Answer"),[10] after which discovery commenced in the Action.

      10.      On July 26, 2021, the Debtor stated that he was no longer seeking any economic damages in the Action and advised that the only damages he sought were for emotional distress and "reputational" harm insofar as they caused the Debtor distress.[11]  Economic damages had previously constituted a significant basis of the damages sought by the Debtor—as the Debtor asserted in the Complaint that he suffered damages to his business reputation and lost substantial income and business opportunities.[12]  With those claims dismissed, the Complaint now only sought damages arising from the alleged emotional distress purportedly caused by the Defendants' alleged mishandling of the Debtor's confidential information.

---

[8]    Ex. 2 ¶ 87.

[9]    *See* Mem. Op. at 2, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Feb. 20, 2020) [Docket No. 18], attached hereto as **Exhibit 5**.

[10]    Answer, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Mar. 19, 2020) [Docket No. 20], attached hereto as **Exhibit 6**.

[11]    *See* Summary Judgment Mot., Defs.' Local Rule 7(h) Statement of Undisputed Material Facts in Support of Summ. J. ¶ 246, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Feb. 15, 2022) [Docket No. 86] (filed under seal), attached hereto as **Exhibit 7**.

[12]    *See* Ex. 2 ¶ 56.

11.     On July 28, 2021, Clark Hill took the Debtor's deposition.  During his deposition, the Debtor refused, on Fifth Amendment grounds, to answer approximately 28 questions on a variety of issues, including those relating to the Debtor's purported relationship with ACA Capital Group Limited[13] and relating to the Debtor's wealth and assets.[14]

12.     On September 14, 2021, Clark Hill filed a motion to compel the Debtor to answer questions for which he asserted the Fifth Amendment at his deposition, or in the alternative, to permit a negative inference from the Debtor's refusal to answer.[15]

13.     In response, the Debtor's investigations counsel submitted an *ex parte, in camera* declaration outlining his reasons for advising the Debtor to invoke the privilege.[16]  The District Court subsequently held an *ex parte* telephonic hearing with the Debtor's investigations counsel where it asked for further explanation for why Defendants' questions, including those connected to the Debtor's financial connections, wealth and assets, would require answers that would violate the Debtor's Fifth Amendment rights.  Based on that declaration and hearing, the District Court denied[17] Defendants' motion to compel, concluding that the Debtor successfully established the possibility that his answers would be incriminating and thus the Fifth Amendment privilege attached.[18]  The District Court declined to decide on the Defendants'

---

[13] The Debtor had previously claimed that the Cyberattack had cost him a multi-million dollar contract with ACA Capital Group Limited.

[14] *See* Defs.' Mot. to Compel Dep. Test. or, in the Alternative, for a Negative Inference, ¶ 1, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Sept. 14, 2021) [Docket No. 67], attached hereto as **Exhibit 8**; Mem. in Supp. of Defs.' Mot. to Compel Dep. Test. or in the Alternative, for a Negative Inference, at 1 [Docket No. 67-1], attached hereto as **Exhibit 8**; Mem. Op. at 1-2, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Oct. 25, 2021) [Docket No. 78], attached hereto as **Exhibit 9**.

[15] *See* Ex. 8.

[16] *See* Ex. 9, at 2.

[17] Order, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Oct. 25, 2021) [Docket No. 77], attached hereto as **Exhibit 10**.

[18] *See* Ex. 9 at 5.

alternative request for an order for jury instructions ordering that a negative inference be drawn against the Debtor, as the District Court felt that would be premature to do so prior to having heard the parties' arguments and evidence, but the District Court nonetheless noted that that "[a]n adverse inference [against the Debtor] is likely warranted here."[19]

14.     On October 14, 2021, the Debtor moved to revise the District Court's order and reinstate the Debtor's claims related to the Defendants' withdrawal from the representation following the Cyberattack.  The District Court denied the Debtor's motion on November 9, 2021 citing his delay in bringing the motion (twenty months after the District Court's ruling on Defendants' motion to dismiss), and the prejudice to Defendants as discovery had closed.  The District Court held that prejudice to Defendants was "particularly true here where [the Debtor], after initially pursuing economic damages, has dropped that request in part apparently because he was obliged to assert Fifth Amendment in response to questions about his business."[20]

15.     On February 15, 2022, the Defendants moved for summary judgment [Docket No. 86] (the "Summary Judgment Motion").[21]

16.     The Summary Judgment Motion asserts that there is no genuine dispute as to any material fact as to the elements of damages, causation, and breach of duty in connection with the Debtor's claims.  Clark Hill contends that the Debtor cannot establish that the theft of his data is a legal cause of his emotional distress because, among other reasons: (i) he has already placed the relevant portions of the stolen information in the public domain; (ii) the majority of his symptoms relating to his emotional distress were occurring years before the Cyberattack; and

---

[19] Ex. 9 at 8

[20] Order, *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Nov. 9, 2021) [Docket No. 82], attached hereto as **Exhibit 12**.

[21] Ex 7.

(iii) the Debtor has filed thirteen other lawsuits alleging emotional distress, and thus, Clark Hill's acts cannot be the reasonable cause of any such alleged damages.  Clark Hill further argues that the Debtor cannot show that Clark Hill was negligent in its cybersecurity or that it breached its duty of care to the Debtor.  Finally, Clark Hill alleges that District of Columbia law does not allow recovery of emotional distress damages for breach of contract or for negligence from professionals as is sought by the Debtor in the Action, which, if such position is correct, eliminates all damages from the case.

17.     The Defendants additionally filed a motion *in limine* to exclude three of the expert witnesses whose testimony the Debtor had proffered to satisfy his burden of proving (i) Clark Hill owed a duty of care that it breached; and (ii) the alleged breach legally caused the Debtor emotional distress [Docket No. 85] (the "Motion *In Limine*").[22]

18.     The Motion *In Limine* seeks to exclude the testimony of the Debtor's cybersecurity expert, Dr. Shane D. Shook, for allegedly failing to employ reliable methodology in forming his opinions, and for failing to establish a standard of care; the Debtor's forensic psychiatrist, Dr. Eric Goldsmith (who the Debtor proffered to demonstrate his emotional distress and its cause), for allegedly failing to describe any methodology beyond using nebulous or abstract terms, and for failing to apply his methodology properly; and the opinions of law professor W. Bradley Wendel—who the Debtor offered to demonstrate that Clark Hill's conduct failed to comply with certain rules of professional conduct—as his proffered testimony allegedly was unreliable and unhelpful to the jury, and as they asserted he lacked the requisite experience to inform his opinions and applied no methodology in coming to his conclusions.

---

[22] Mot. in Lim., *Wengui v. Clark Hill PLC*, No. 1:19-cv-03195-JEB (D. D.C. Feb. 15, 2022) [Docket No. 85] (filed under seal), attached hereto as **Exhibit 11**.

19.     Neither the Debtor nor the Trustee has responded to the Summary Judgment

Motion or the Motion *In Limine* given the automatic stay, which was triggered by the Debtor's

chapter 11 filing on February 15, 2022.

## II.     Debtor Seeks Chapter 11 Relief

20.     On February 15, 2022 (the "Petition Date"), the Debtor filed with the Court a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), which relief includes the automatic stay of all judicial proceedings against

the Debtor, *see* Bankruptcy Code 362(a)(1), including the Action.

21.     On June 15, 2022, the Court entered a memorandum of decision and order

[Docket No. 465] (the "Trustee Order") directing the United States Trustee to appoint a chapter

11 trustee in the Individual Debtor's chapter 11 case.  Pursuant to the Trustee Order, the United

States Trustee selected Luc A. Despins as the Trustee.  On July 8, 2022, the Court entered an

order granting the appointment of the Trustee as the chapter 11 trustee in the Individual Debtor's

chapter 11 case [Docket No. 523].

22.     The Debtor listed litigation claims, with unknown value, including the Action, as

property of his estate.[23]  In his Statement of Financial Affairs, the Debtor listed the Action as an

active litigation in which he was a plaintiff. (*See* Docket No. 77 at 22).[24]

23.     Upon his appointment, the Trustee stepped into the Debtor's shoes with respect to

the Action.  Moreover, on August 10, 2022, the Court granted the Corporate Governance Rights

Order [Docket No. 717], which specifically confirms the Trustee's ownership of and authority

---

[23]     *See* Decl. of Mr. Ho Wan Kwok in Supp. of the Chapter 11 Case & Certain Mot. ¶ 32(b) (listing Clark Hill Claims under the "My Assets" section) [Docket No. 107].

[24]     Listing *Guo Wengui (a/k/a Miles Kwok) v. Clark Hill PLC and Thomas Ragland* as a lawsuit to which the Debtor was a party.

over, the Debtor's economic rights and directs the Debtor to "surrender to the Trustee **all property of the estate** . . . ." (Corporate Governance Rights Order ¶ 3) (emphasis added).

24.      On July 28, 2022, the Trustee filed a motion for Rule 2004 discovery as to various legal and financial advisors to the Debtor, including Clark Hill [Docket No. 637] (the "Professionals 2004 Motion").  On August 16, 2022, the Court granted the Trustee's Professionals 2004 Motion [Docket No. 756].  Pursuant to the Court's order, on August 19, 2022, Clark Hill was served with a Rule 2004 Subpoena and document requests attached thereto (the "Subpoena"),[25] which sought information necessary for the Trustee to both evaluate and exercise control over the Action, which is property of the estate. (*See* Subpoena, Request for Production of Documents).[26]

25.      Pursuant to the Subpoena, the Trustee received and reviewed pleadings, depositions, expert reports, and other documents from the Action, including the Summary Judgment Motion and the Motion *In Limine* (collectively, the "Case Documents").  The Trustee's counsel also spoke repeatedly and extensively with both Jenner & Block (counsel to Clark Hill) as well as Attorney Casper (counsel to the Debtor) regarding the Parties' positions, the merits of the case, the impact of the dismissal and/or withdrawal of certain damages or bases for the claims (including the lack of economic damages), and the potential settlement value of the Action.

---

[25]    The Subpoena is attached to Docket No. 1105 as Ex. B.

[26]    On November 2, 2022, the Debtor filed a motion for protective order (the "Asylum Application Protective Order") precluding the disclosure of the Debtor's asylum application (the "Asylum Application") to the Trustee (*See* Docket No. 637).  On November 16, 2022, the Trustee filed his response to the Asylum Application Protective Order.  (*See* Docket No. 1105).  On December 9, 2022, the Court issued its order granting in part the Asylum Application Protective Order (the "Asylum Application Order"), which ordered Jenner & Block to produce the Summary Judgment Motion to the Trustee and his counsel. (*See* Docket No. 1217).  On December 13, 2022, the Debtor filed a motion (the "Motion for Appeal") seeking leave to appeal the Asylum Application Order to the United States District Court for the District of Connecticut (the "Connecticut District Court").  On January 11, 2023, the Connecticut District Court denied the Motion for Appeal.

26.     On January 24, 2023, the Court issued an *Order Granting Motion to Hold Debtor in Contempt of Corporate Governance Order* [Docket No. 1372] (the "Contempt Order").  The Court found in the contempt order that Debtor has acted in bad faith as a result of his lack of cooperation with the Trustee and with court orders.

27.     On March 15, 2023, the Debtor was arrested by federal law enforcement in connection with an indictment of the Debtor alleging various federal crimes.

## THE SETTLEMENT

28.     Both Parties have undertaken independent and considered review of the merits of the Action.  The Defendants have been litigating these issues continuously since the inception of the Action, while the Trustee has reviewed the Case Documents and pleadings in the matter and considered what claims and damages remained to provide benefit for the Debtor's estate, and what evidence exists to support such claims.

29.     Based on their analysis of the relevant merits of their positions and the costs and risk attendant to the Action, the Parties engaged in extensive, good faith, arm's length negotiations over a prolonged period of time.  After numerous rounds of proposals and counterproposals regarding the value of the claim over a period of several months, the Parties have entered into the Settlement Agreement, attached as Exhibit 1 to the Proposed Order, in order to resolve the Action.  The salient provisions of the Settlement Agreement are as follows:[27]

     a.  Clark Hill will pay the Debtor's estate a total of $499,000 in connection with the relief sought in the Complaint (the "Settlement Payment");

     b.  The Trustee agrees to dismissal of the Action with prejudice; and

     c.  Subject to the Trustee's receipt of the Settlement Payment and the Bankruptcy Court's approval of the Settlement Agreement, the Parties agree to mutually

---

[27]  To the extent there are any inconsistencies between the summary description of the Settlement Agreement and the terms and conditions of the Settlement Agreement attached hereto, the terms of the Settlement Agreement shall control.

release all claims against each other as set forth in more detail in the Settlement Agreement § 5.

## **RELIEF REQUESTED**

30.     By this Motion, the Trustee seeks entry of an order pursuant to Bankruptcy Rule 9019(a) approving the Settlement Agreement in its entirety, and (b) authorizing the Parties to enter into and implement the Settlement Agreement in accordance with the terms thereof.

## **BASIS FOR THE RELIEF REQUESTED**

### I.     **Standards for Approving the Settlement**

31.     The Court may authorize the Trustee to enter into the Settlement Agreement pursuant to Bankruptcy Rule 9019.  Compromises and settlements are "a normal part of the process of, reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) (quoting *Case v. L.A. Lumber Prods. Co.,* 308 U.S. 106, 130 (1939)).  To approve a compromise and settlement under Bankruptcy Rule 9019, a bankruptcy court should find that the compromise and settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate.  *See, e.g.*, *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.),* 156 B.R. 414, 426 (S.D.N.Y. 1993.), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citations omitted); *In re Enron Corp.,* No. 02 Civ. 8489(AKH), 2003 WL 230838, at *2 (Bankr. S.D.N.Y. Jan. 31, 2003).

32.     The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).

33.     In exercising its discretion, the bankruptcy court must make an independent determination that the settlement is fair and reasonable.  *Id.* at 122.  The court may consider the opinions of the debtor in possession, or trustee, and its counsel that the settlement is fair and reasonable.  *Id.*; *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993).

This discretion should be exercised by the bankruptcy court "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *Shugrue*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above[.]").

34.     Importantly, the "settlement need not be the best that the debtor could have obtained." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (citing *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979)). Instead, the court needs only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Id.* (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); see also *Purofied Down Prods.*, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute][.]").

35.     In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following factors:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay" . . .; (3) the "paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007) ("*Iridium*").

## II.    Basis for Approving the Settlement

36.     The Trustee submits that the Settlement Agreement is fair and reasonable under the circumstances and in light of the applicable *Iridium* factors.

37.     Balance Between the Litigation's Possibility of Success and the Settlement's

Future Benefits: The Settlement Agreement strikes a fair balance between the litigation's

possibility of success and the settlement's future benefits, particularly given that many aspects of

the Debtor's Complaint have already been dismissed or limited.  Such dismissals and limitations

include: (i) the MTD Order, dismissing any punitive damages and any damages linked to Clark

Hill's withdrawal as the counsel to the Debtor, and (ii) the Debtor ceasing to seek any economic

damages, both of which limit the Debtor's remaining claims to emotional distress damages.  The

Debtor's ability to obtain such damages are uncertain and have been vigorously opposed by

Defendants legally and factually in their pending Summary Judgment Motion.  Most significant

here, the Debtor seeks putative emotional distress damages, which Defendants argue cannot be

recovered as a matter of District of Columbia law for breach of contract or negligent breach of

duty by a lawyer retained to perform legal duties.  *See Hedgepeth v. Whitman Walker Clinic*, 22

A.3d 789, 810-11 (D.C. 2011) (determining that emotional damages claims are inappropriate in

lawyer-client relationships where "the object of the engagement is to obtain a financial,

commercial or legal objection").  Moreover, emotional distress damages are inherently reliant on

the credibility of the Debtor, who was recently indicted and who has asserted the Fifth

Amendment to every substantive question asked of him at his most recent deposition.

Furthermore, Clark Hill has alleged credible evidence to support their position that the Debtor

disclosed much of the information in his Asylum Application to the public himself in his prior

social media postings, which could further undermine the Debtor's purported emotional distress

as a result of the Cyberattack.

38.     The Likelihood of Complex and Protracted Litigation: Absent Court authorization

to enter into and implement the Settlement Agreement, the Trustee would be required to spend

significant estate resources to respond to the Summary Judgment Motion and the Motion *In Limine*, each of which would require extensive legal research and factual investigations. To date, the Defendants have aggressively defended the claims against them. Then, if successful, the Trustee would need to engage in an expensive and time-consuming trial, the result of which would be far from certain both as to the liability and the extent of any damages.

39.     The Interest and Support of the Creditors and Parties-in-Interest: Creditors have been clear with the Trustee that they are eager to see recoveries in a timely manner and for the Trustee to move ahead expeditiously with his investigation. Continued litigation would be time consuming for the Trustee and costly to the Debtor's estate. The Settlement Agreement, with its recovery for the estate and its creditors, is in the best interest of the estate, as it will provide a meaningful realization on the Action, while eliminating the costs, risks and time associated with litigating the Action.

40.     Competency of Counsel and Experience of the Bankruptcy Judge: This Court is deeply knowledgeable about the Debtor's bankruptcy and the unique issues presented in it. As to the Parties, both are themselves sophisticated parties and are represented by sophisticated and experienced counsel.

41.     Arm's Length Bargaining: The Settlement Agreement is the product of extensive, arm's length and good faith negotiations between the Parties, which took place over the course of months of protracted discussions regarding the details of the case and the potential value it represents.

42.     The Settlement Agreement falls within the range of reasonableness, provides significant benefit to, and is fair and equitable to, the Debtor's estate and creditors. Moreover, the Settlement Agreement resolves the Action, thereby eliminating any additional litigation risk

and cost.  Accordingly, the Trustee believes the Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved.

## NOTICE

43.    Notice of this Motion has been given to (i) the United States Trustee, (ii) the Parties, (iii) the Debtor, (iv) the Committee, and (v) by electronic filing utilizing the Court's electronic filing ("CM/ECF") system, to all appearing parties who utilize the CM/ECF system. The Trustee submits that, under the circumstances, no other or further notice is required.

## NO PREVIOUS REQUEST

44.    No previous request for the relief sought herein has been made by the Trustee to this or any other court.

**WHEREFORE**, the Trustee respectfully requests that the Court approve the Settlement

Agreement and grant such other and further relief as is just.

Dated:    April 28, 2023               LUC A. DESPINS,
           New Haven, Connecticut      CHAPTER 11 TRUSTEE

By: */s/ Douglas S. Skalka*
    Douglas S. Skalka (ct00616)
    Patrick R. Linsey (ct29437)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut 06510
    (203) 781-2847
    dskalka@npmlaw.com
    plinsey@npmlaw.com

       *and*

    Nicholas A. Bassett (admitted *pro hac vice*)
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

       *and*

    Avram E. Luft (admitted *pro hac vice*)
    Douglass Barron (admitted *pro hac vice*)
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, New York 10166
    (212) 318-6079
    aviluft@paulhastings.com
    douglassbarron@paulhastings.com

    *Counsel for the Chapter 11 Trustee*

## EXHIBIT 1

### PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------------x
                                            :
In re:                                      :    Chapter 11
                                            :
HO WAN KWOK, et al.,¹                       :    Case No. 22-50073 (JAM)
                                            :
             Debtors.                       :    (Jointly Administered)
                                            :
-------------------------------------------------------x
```

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 APPROVING**
**SETTLEMENT AGREEMENT WITH CLARK HILL PLC**

Upon the Motion, dated April 28, 2023 (the "Motion"),² of Luc A. Despins, in his

capacity as the Chapter 11 Trustee (the "Trustee") appointed in the above-captioned chapter 11

case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"), for entry of an order, approving a

settlement agreement between the Trustee and Clark Hill PLC ("Clark Hill"), as more fully

described in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and the Trustee having stepped

into the Debtor's shoes with respect to the Action; and the Court having granted the Corporate

Governance Rights Order, which specifically confirms the Trustee's ownership of and authority

over the Debtor's economic rights; and the Trustee having the sole and exclusive right to bring

and control claims belonging to the Debtor's estate, including all claims asserted in the Action;

---

¹    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

²    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

and the Court having found and determined that (i) the relief sought in the Motion is in the best interests of the Trustee, the Debtor's estates, creditors, and all parties in interest, (ii) the settlement reflected in the Settlement Agreement is fair and equitable and reasonable under the circumstances, and (iii) that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is **ORDERED THAT**:

1.      The Motion is GRANTED.

2.      All objections to the Motion, if any, that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled.

3.      The settlement agreement, attached hereto as **Exhibit A** (the "Settlement Agreement"), is approved pursuant to Bankruptcy Rule 9019.

4.      The Trustee is authorized, pursuant to Bankruptcy Rule 9019, to execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the settlement reflected in the Settlement Agreement and to perform any and all obligations contemplated therein immediately upon entry of this Order.

5.      This Order shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h), and the Trustee shall have unfettered use of the Settlement Payment when received.

6.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order and to the Settlement Agreement.

## **EXHIBIT A**

## **SETTLEMENT AGREEMENT**

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("**Agreement**"), dated and effective as of April 28, 2023, is made between (a) Luc A. Despins, not individually, but solely in his capacity as the chapter 11 trustee (the "**Trustee**") for the estate of Guo Wengui a/k/a Miles Kwok a/k/a Ho Wan Kwok ("**Kwok**" or "**Debtor**"), and (b) Clark Hill PLC and Thomas K. Ragland (collectively, "**Clark Hill**"), on the other hand.  The Trustee and Clark Hill are each sometimes individually referred to herein as a "**Party**" and collectively as "**Parties**."  The Agreement shall become effective on the first day upon which it is executed by all Parties ("**Effective Date**").

## RECITALS

A.      WHEREAS, on February 15, 2022 ("**Petition Date**"), Kwok filed a voluntary petition for relief under chapter 11 of title 11 of the U.S. Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Connecticut (the "**Bankruptcy Court**") administered as *In re: Ho Wan Kwok*, No. 22-50073 (JAM) (Bankr. D. Conn.);

B.      WHEREAS, the Trustee is the duly appointed chapter 11 trustee for the Debtor's estate;

C.      WHEREAS, prior to the Petition Date, Clark Hill provided legal services to Kwok;

D.      WHEREAS, on or about September 19, 2019, Kwok filed a lawsuit against Clark Hill in Washington D.C. court, and, on October 24, 2019, the lawsuit was removed to United States District Court for the District of Columbia in an action captioned *Wengui v. Clark Hill PLC et al* (Case No. 1:2019-cv-03195) (hereinafter, the "**Lawsuit**"). The Lawsuit alleges claims arising out of Clark Hill's prior representation of Kwok, including: (1) breach of fiduciary duty, (2) breach of contract, (3) legal malpractice, and (4) punitive damage;

E.      WHEREAS, on or about November 25, 2019, Clark Hill filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which was fully briefed on January 14, 2020;

F.      WHEREAS, on or about February 20, 2020, Clark Hill's Motion to Dismiss was granted in part (dismissing Kwok's claims for punitive damages or claims for any injury resulting from Clark Hill's withdrawal of representation) and denied in part;

- 1 -

G.      WHEREAS, discovery occurred in the Lawsuit from February 2020 until December 2021;

H.      WHEREAS, on February 15, 2022, Clark Hill filed (1) a Rule 56 Motion for Summary Judgment and (2) Rule 702 Motion *in Limine* to Exclude Portions of Plaintiff's Proffered Expert Testimony under seal;

I.      WHEREAS, Clark Hill disputes and denies the claims that have been brought against them, and intends to defend vigorously and raise defenses at every stage;

J.      WHEREAS, the claims asserted in the Lawsuit are now property of the Debtor's bankruptcy estate;

K.      WHEREAS, Clark Hill has produced to the Trustee pleadings and discovery from the Lawsuit;

L.      WHEREAS, the Parties recognize the significant cost and risk associated with the continuation of ligation; and

M.      WHEREAS, the Parties have engaged in extensive arm's-length good faith negotiations and have each separately concluded that the execution and performance by them of this Agreement will avoid protracted and expensive litigation, while according them each a substantial and valuable benefit if the settlement embodied herein is consummated:

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

<u>**AGREEMENT**</u>

**1. Recitals.**  The recitals set forth above constitute an integral part of this Agreement and are incorporated into this Agreement, evidencing the intent of the Parties in executing this Agreement, and describing the circumstances surrounding its execution.  Accordingly, this Agreement shall be construed in the light thereof.

**2. Definitions.**  In addition to the defined terms above and hereafter, the following capitalized terms used in this Agreement shall have the meanings specified below:

(a)      "**Claims**" means any and all manner of claims, counterclaims, complaints, disputes, demands, rights, actions, potential actions, causes of action, liabilities, duties, obligations, damages, losses, diminutions in value, obligations, judgments, decrees, request for attorneys' fees or costs, matters, issues, suits, proceedings, and controversies of any kind or nature whatsoever, including without limitation all claims related to any legal

services by Clark Hill provided to Kwok, all claims for professional malpractice, all claims for breach of contract, all claims for breach of fiduciary duty, all claims for indemnification or contribution, and all other obligations or claims of any and all kinds of torts, fraud, negligence, errors and omissions, bad faith, defamation, accounts, expenses, attorney fees, economic losses, bodily injury or injury to property, reputation, Kwok's asylum application, privacy, breach of security, humiliation, mental anguish, emotional distress, and actual, compensatory, incidental, consequential, or indirect damages, lost profits, punitive or exemplary damages, whether known or unknown, asserted or unasserted, contingent or absolute, liquidated or not liquidated, accrued or unaccrued, suspected or unsuspected, disclosed or undisclosed, claimed or unclaimed, apparent or not apparent, foreseen or unforeseen, matured or not matured, secured or unsecured, which now exist, or heretofore or previously existed, or may hereafter exist, whether or not any such matter or claim was asserted or could have been asserted on or before the Effective Date including, but not limited to, any claims arising under federal, state or foreign law, common law, bankruptcy law, statute, equity, rule or regulation, or agreement, whether individual, class, direct, derivative, representative, on behalf of others, legal, equitable, regulatory, governmental or of any other type or in any other capacity.

(b)     **"Estate Releasees"** means, (i) the Debtor's estate; (ii) the Trustee; and (iii) any and all of the Trustee's attorneys, accountants, advisors, representatives or agents, in their respective capacities as such.

(c)     **"Clark Hill Releasees"** means, (i) in any capacity, Clark Hill; and (ii) with respect to any Claims arising from or related to the Lawsuit, any and all of Clark Hill's past or present, direct or indirect, parent entities, subsidiaries, divisions, member firms, affiliates, predecessors and successors of each and all such entities, and each and all of their respective past or present partners, members, directors, principals, officers, board members, executives, shareholders, employees, subsidiaries, affiliates, divisions, predecessors, successors, assigns, heirs, attorneys, stockholders, boards, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, co-insurers, reinsurers and agents, in their respective capacities as such.

(d)     **"Settlement"** means the settlement contemplated by this Agreement.

(e)      **"Settlement Motion"** means a motion made by the Trustee pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for entry of a Settlement Order.

(f)      **"Settlement Order"** means an order entered by the Bankruptcy Court approving the Settlement and the Trustee's entry into this Agreement.

**3.  Consideration**.

In consideration for the releases and other terms set forth in this Agreement, Clark Hill shall pay Debtor's estate a total of four-hundred-and-ninety-nine thousand (499,000) USD (the "**Settlement Payment**").  The Settlement Payment shall be made to the Trustee by wire transfer pursuant to instructions to be provided by the Trustee within 15 days after the date on which the Settlement Order is entered by the Bankruptcy Court; provided, however, that if a notice of appeal of the Settlement Order is filed, the Settlement Payment shall be made to the Trustee by wire transfer pursuant to instructions to be provided by the Trustee no later than 15 days after the date that the Settlement Order is no longer subject to appeal or *certiorari* proceedings and no such proceedings are pending.

**4.  Court Approval.**

 Promptly following execution of this Agreement, the Trustee shall submit to the Bankruptcy Court the Settlement Motion requesting entry of a Settlement Order, in a form that is mutually agreeable to the Parties, which shall include findings that the Claims being released are owned by the Debtor's estate and that the Trustee has the sole ability to assert these Claims, and further providing that the Bankruptcy Court retains jurisdiction to enforce the Agreement and Settlement Order and to address any violations thereof.  The Trustee will use good faith efforts to secure approval of the Settlement Order.  If this agreement is not approved by the Bankruptcy Court, Clark Hill is not required to make the Settlement Payment.

**5.  Releases.**

(a)      **Debtor Releases.**  Subject to the Trustee's receipt of the Settlement Payment and the Bankruptcy Court's approval of this Agreement, the Trustee, the Debtor's estate and the Estate Releasees hereby unconditionally, absolutely and irrevocably release and discharge the Clark Hill Releasees of all Claims which they now have or ever had against the Clark Hill Releasees upon or by reason of any manner, cause or thing whatsoever

- 4 -

on or at any time prior to the date of this Agreement, including but not limited to Claims concerning, arising out of, or relating to the facts, circumstances, events, transactions or transfers alleged or which could have been alleged in the Lawsuit or arising out of the subject matter of the Lawsuit, it being the intention of the Trustee to reserve nothing whatsoever hereunder and to assure the Clark Hill Releasees peace and freedom from each and every of the released Claims of whatever character and description and including any Claims that may be asserted derivatively by any creditor; provided, however, that nothing in this paragraph shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Agreement.  The Trustee acknowledges that he may discover facts after the Effective Date different from, or in addition to, those which the Trustee now knows or believes to be true.  The Trustee agrees that the releases contained in this paragraph shall be and remain effective in all respects notwithstanding the future discovery of such different or additional facts.

(b) **Clark Hill Releases**.  Subject to the Trustee's receipt of the Settlement Payment and the Bankruptcy Court's approval of this Agreement, the Clark Hill Releasees hereby unconditionally, absolutely, and irrevocably release and discharge the Estate Releasees of all Claims which they now have or ever had against any of the Estate Releasees based upon or by reason of any manner, cause or thing whatsoever on or at any time prior to the date of this Agreement, it being the intention of the Clark Hill Releasees to reserve nothing whatsoever hereunder and to assure the Estate Releasees, and each of them, their peace and freedom from each and every of the released claims of whatever character and description; provided, however, nothing in this paragraph shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Agreement. Clark Hill Releasees acknowledge that they may discover facts after the Effective Date different from, or in addition to, those which they now know or believe to be true.  Clark Hill agrees that the releases contained in this paragraph shall be and remain effective in all respects notwithstanding the future discovery of such different or additional facts.

(c) The Trustee represents and warrants that he is not aware of any claims they may have against any of Clark Hill Releasees other than the Claims asserted in the Lawsuit.

(d)    Clark Hill represents and warrants that they are not aware of any claims they may have against the Trustee or Debtor's estate other than Claims related to the Lawsuit.

**6. Dismissal of the Trustee Action.**

Within five (5) days following the Trustee's receipt of the Settlement Payment, the Trustee and Clark Hill shall file in the Lawsuit a notice of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii) dismissing the Lawsuit with prejudice, and shall take such other and further actions as may be reasonably necessary to cause the Lawsuit to be dismissed with prejudice.

**7. General Representations and Warranties.**

(a)    **Authority.**  Each of the undersigned covenants warrants that they have the power and authority to enter into and execute this Agreement and all releases, representations and warranties contained in this Agreement, on behalf of the Party on whose behalf this Agreement is so executed, subject in the case of the Trustee to Bankruptcy Court approval of this Agreement.

(b)    **Advice of Counsel.**  Each of the Parties acknowledges and warrants that they have consulted with its attorneys regarding the terms of this Agreement, and that the terms of the Agreement have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise, settlement and waiver of any and all claims as set forth herein.

(c)    **Due Diligence.**  Each of the Parties has investigated the matters set forth in this Agreement, and all other matters pertaining to this Agreement.  Each of the Parties represents and warrants that they have not relied upon any promises, agreements, representations, statements or warranties in entering into this Agreement that are not otherwise expressly provided for in this Agreement.

(d)    **No Assignment.**  The Trustee warrants and represents that, as of the Effective Date, he has not transferred or assigned, and will not transfer or assign, all or any part of the Claims released in this Agreement**.**

(e)    **No Admission of Liability**.   Nothing contained in this Agreement shall be deemed as an admission of any liability or lack of merit in any claim, by any party of any matter, claim or defense previously in dispute.

(f)     **Costs.**  The Parties shall bear their respective costs, fees, and expenses in connection with this Agreement and all other matters relating to or arising from the Debtor's bankruptcy case and the Lawsuit.   The Parties each waive any rights that any of them may have against the other to seek or recover any costs, fees, or expenses, including without limitation attorneys' fees related to or in connection with the Claims, this Agreement or the Lawsuit.

(g)     **Integration.**  This Agreement represents the full and complete agreement between the Parties.  Any representations, warranties, promises, or conditions, whether written or oral, not specifically incorporated into this Agreement, or in any other agreements, instruments, certificates, or documents delivered as required or contemplated under this Agreement, shall not be binding upon the Parties.  All other discussions, negotiations, and writings have been and are merged into this Agreement.

(h)     **Governing Law and Consent to Jurisdiction**.   This Agreement and all other documents required or contemplated hereby shall be governed by and construed in accordance with the laws of the state of New York applicable to contracts made and to be performed wholly within the laws of the state of New York but irrespective of its choice-of-law rules.  As specific inducement for the Parties to enter into this Agreement, each of the Parties hereby consents to the exclusive jurisdiction of the Bankruptcy Court for resolution of any disputes arising under or related to this Agreement, and waives any objection it may have to the laying of venue in any such court and any claim that such suit has been brought in an inconvenient forum.

(i)     **Notice to Parties.**

All notices given pursuant to this Agreement shall be delivered by hand delivery; overnight delivery by reputable overnight delivery service; or email with a copy by U.S. Mail, at the following addresses (or, if applicable, the most current address available for such Party):

Such notice must be sent to the following persons:

 If to Trustee:                              Paul Hastings LLP
                                             Attn: Avram E. Luft
                                             200 Park Ave
                                             New York, NY 10166
                                             + 212 318 6079

aviluft@paulhastings.com

If to Clark Hill:     Jenner & Block LLP
         Attn: John Storino
         353 N Clark Street
         Chicago, IL 60654
         + 1 312 840 8683
         JStorino@jenner.com

**8. Further Necessary Actions.**

Each Party agrees, without further consideration, to sign or cause to be signed, and to deliver to the other Party or its counsel any other documents and to take any other action as may be necessary to fulfill their respective obligations under this Agreement. The Trustee served Clark Hill with a subpoena pursuant to the Trustee's Rule 2004 investigation in the Bankruptcy Case. The Trustee acknowledges that Clark Hill produced documents responsive to the subpoena and the Trustee agrees to not seek further discovery from Clark Hill in the Bankruptcy Case.

**9. Proper Construction.**

(a)  The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any Party.

(b)  As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

(c)  The section headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify, or otherwise be used in the interpretation of any of the provisions hereof.

(d)  If a deadline under this Agreement falls on a weekend or court holiday, the deadline shall be extended to the next weekday that is not a court holiday.

**10. Survival of Representations and Warranties.**

All representations and warranties set forth in this Agreement shall be deemed continuing and shall survive the consummation of this Agreement.

**11. Waiver or Modification.**

(a)  No waiver shall be binding unless executed in writing by the Party making the waiver. No waiver of any of the provisions of this Agreement shall be

deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.

(b)      Neither this Agreement nor any term or provision may be changed, waived, discharged, or terminated except by an instrument in writing duly signed by both Parties.  No supplement, modification, or amendment to this Agreement shall be binding unless in writing and executed by both Parties.  This Agreement cannot be modified by oral or implied promises or representations.

### 12.  Execution in Counterparts.

This Agreement may be executed in counterparts, and the sum of each counterpart will constitute a single agreement.  Copies of the signatures of each Party's duly authorized signatory provided to the other Party via electronic means, including email and facsimile, shall be treated as original signatures.  A signature on a copy of this Agreement sent by facsimile or by email shall be accepted as binding on the Parties.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date specified below.

_____
LUC A. DESPINS, not individually but as chapter 11 trustee for the Debtor's estate

_____
**THOMAS K. RAGLAND**

_____
**CLARK HILL PLC**

By: _____
Its: _____

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date specified below.

**LUC A. DESPINS**, not individually but as chapter 11 trustee for the Debtor's estate

**THOMAS K. RAGLAND**

**CLARK HILL PLC**

By: _____

Its: _____

**<u>EXHIBIT 2</u>**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a HO WAN KWOK, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| CLARK HILL PLC and THOMAS K. RAGLAND, | ) ) ) | Removed from the Superior Court of the District of Columbia |
| Defendants. | ) ) ) | Superior Court of the District of Columbia Case No. 2019 CA 001614M |

## <u>NOTICE OF REMOVAL</u>

Pursuant to 28 U.S.C. §§ 1441(b) and 1446, Defendants Clark Hill PLC and Thomas K. Ragland (collectively, the "Defendants") hereby remove this action from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia. The Defendants' Notice of Removal is based on the following:

1.    On September 19, 2019, the Plaintiff Guo Wengui ("Plaintiff") filed a complaint against Defendants in the Superior Court of the District of Columbia, Case No. 2019 CA 006164M (the "Complaint"). A true and correct copy of the Complaint and a copy of all process, pleadings, and orders served on Defendants are attached as Exhibit 1.

2.    Clark Hill PLC accepted service of the Complaint on behalf of itself and Defendant Ragland on September 26, 2019. This Notice of Removal is timely because it was filed within 30 days of service of the summons and complaint. *See* 28 U.S.C. §1446(b).

3.      This court has original jurisdiction over this action pursuant to 28 U.S.C.
§1332(a)(2) because the defendants are citizens of various States and the plaintiff is a citizen of a
foreign state, and the amount in controversy exceeds $75,000, exclusive of interests or costs.

4.      In his Complaint, Plaintiff alleges that he is a "native" of the People's Republic of
China and is seeking asylum in the United States.  (Complaint ¶ 10).  Accordingly, for diversity
purposes Plaintiff is a citizen of the People's Republic of China.

5.      Defendant Clark Hill PLC is a professional limited liability company organized
under the laws of the State of Michigan, and with its principal place of business in Detroit,
Michigan.  (*See*, *e.g.*, Complaint ¶ 11; Exhibit 2).  Defendant Clark Hill PLC is comprised of
approximately 298 members, who are either individual attorneys working in Clark Hill PLC's
various offices, or professional corporations incorporated by individual attorneys through which
they hold their memberships in Clark Hill PLC.  (Exhibit 2).   For the purpose of diversity of
citizenship, the citizenship of a professional limited liability company is determined by the
citizenship of its members.  *See, e.g. Cunningham & Assocs., PLC v. ARAG, LLC*, 842 F. Supp.
2d 25, 27 n.2 (D.D.C. 2012).

6.      None of Clark Hill PLC's individual members are domiciled in or citizens of the
District of Columbia, and none of the professional corporations through which individuals hold
memberships are incorporated under the laws of the District of Columbia.  (Exhibit 2).
Accordingly, for diversity purposes Clark Hill PLC is not a citizen of the District of Columbia.

7.      All of Clark Hill PLC's individual members are citizens of the United States, and
they all reside and are domiciled in a State.  None of Clark Hill PLC's members reside or are
domiciled outside of the United States.  (Exhibit 2).  Accordingly, for diversity purposes, Clark
Hill PLC is not a citizen of a foreign state.

8.      Defendant Thomas Ragland is domiciled in the Commonwealth of Virginia. (Exhibit 3).  Accordingly, for diversity purposes, Thomas Ragland is a citizen of the Commonwealth of Virginia.

9.      Defendants believe in good faith that the amount in controversy exceeds $75,000. Plaintiff's Complaint seeks compensatory damages of $50 million, and also seeks punitive damages.  (Complaint ¶ 1).  Accordingly, the amount in controversy exceeds $75,000 and this action may have been brought in this court.

10.      As required by 28 U.S.C. §1446(d), written notice of the filing of this Notice of Removal will be provided to Plaintiff, together with all supporting papers.  In addition, as is also required by 28 U.S.C. §1446(d), a copy of this Notice of Removal and all supporting papers are being filed with the Superior Court of the District of Columbia.

11.      By filing this Notice of Removal, Defendants do not waive any objections they may have to this action, and reserve the right to timely assert all defenses and objections.

12.      Defendants reserve their right to amend or supplement this Notice of Removal.

13.      Defendants demand a trial by jury.

WHEREFORE, Defendants Clark Hill PLC and Thomas K. Ragland remove this action from the Superior Court of the District of Columbia to the United States District Court for the District of Columbia.

Dated: October 24, 2019                                     Respectfully submitted,

                                                          CLARK HILL PLC and
                                                          THOMAS K. RAGLAND

                                                          By: */s/   Jessica Ring Amunson*
                                                                One of their attorneys

Jessica Ring Amunson (#497223)
JENNER & BLOCK, LLP
1099 New York Avenue NW

Suite 900
Washington, DC 20001-4412
Tel: (202) 639-6000
JAmunson@jenner.com

**Certificate of Service**

     I, Jessica Ring Amunson, an attorney, hereby certifies that I served the foregoing Notice of Removal on the following by electronic mail and overnight delivery on this, the 24th day of October, 2019:

> Ari S. Casper
> Ralph S. Tyler
> The Casper Firm
> 400 E. Pratt Street, Suite 903
> Baltimore, MD 21202


        */s/  Jessica Ring Amunson*

# Exhibit 1

D.C. Superior Court
09/28/2019 08:45PM
Clerk of the Court

IN THE SUPERIOR COURT FOR THE
DISTRICT OF COLUMBIA

(Civil Division)

| | |
|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a HO WAN KWOK 162 E. 64th Street New York, NY 10065 | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) Case No. **2019 CA 006164 M** |
| CLARK HILL PLC 500 Woodward Avenue Suite 3500 Detroit, MI 48226, | ) ) ) ) ) |
| and | ) ) |
| THOMAS K. RAGLAND Clark Hill PLC 1001 Pennsylvania Avenue, NW Suite 1300 Washington, DC 20004, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |
| SERVE: | ) ) |
| John J. Hern, Jr. 500 Woodward Avenue Suite 3500 Detroit, MI 48226 | ) ) ) ) ) |
| Thomas K. Ragland 1001 Pennsylvania Avenue, NW Suite 1300 Washington, DC 20004 | ) ) ) ) ) |

**COMPLAINT
AND DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.      In this case, plaintiff Guo Wengui, a/k/a Miles Kwok a/k/a Ho Wan Kwok, ("plaintiff") seeks compensatory monetary damages of $50 million or more, jointly and severally, and punitive damages, also jointly and severally, against the defendant law firm Clark Hill PLC ("Clark Hill" or the "firm") and one of the firm's members, defendant Thomas K. Ragland, Esq. ("Mr. Ragland"), for damages, injuries, and wrongs which plaintiff has sustained as the direct and proximate result and consequence of defendants' multiple serious breaches of their duties to plaintiff arising from the firm's legal representation of plaintiff.  In addition to compensatory damages, plaintiff seeks punitive damages.  Punitive damages are warranted here because the wrongful conduct of Clark Hill and Mr. Ragland was reckless, oppressive, intentional, deliberate, and willfully disregarded plaintiff's rights.  (Clark Hill and Mr. Ragland are referred to herein collectively as "defendants" or the "firm.")

2.      Plaintiff was a client of Mr. Ragland and the Clark Hill law firm.  In the course of that representation, Mr. Ragland and the Clark Hill law firm breached a lawyer's/law firm's fundamental obligation to protect from improper unauthorized disclosure plaintiff's (a client's) confidential information.  The firm, specifically including Mr. Ragland, was reckless in its handling of plaintiff's confidential information and, as a direct result of that recklessness, plaintiff's confidential information was disclosed and widely disseminated, all to the great harm, detriment, and oppression of plaintiff.  Having failed to protect plaintiff's confidential information, the firm then proceeded to compound that breach by wrongfully, improperly, and without good cause terminating its representation of plaintiff.  This action, too, was reckless and in willful disregard of plaintiff's rights and in willful disregard of the firm's duties and obligations to plaintiff

2

as a client of the firm. The firm intentionally undertook a matter beyond its competence and capability and then intentionally, deliberately, and willfully, wrongly placed its interests above the firm's duties to its client. Plaintiff was damaged as a result of the firm's breaches of the duties which the firm and its lawyer (Mr. Ragland) owed to plaintiff as a client. The firm's actions were oppressive and were taken in willful disregard of plaintiff's rights.

3.     Plaintiff reasonably relied on the firm's assurances – both implicit and explicit – that the firm understood its ethical and legal obligations, including its fundamental obligation to protect plaintiff's confidential information, *and* that the firm actually had the capability to fulfill its obligations. In fact, however, Mr. Ragland failed to honor his assurances and, as a result, he recklessly exposed plaintiff's confidential information. Contrary to Mr. Ragland's representations, the firm did not have adequate and appropriate electronic security measures in place to protect plaintiff's information and Mr. Ragland failed to take appropriate actions to protect plaintiff's confidential information. The direct consequence of the firm's and Mr. Ragland's failures in this regard was that plaintiff's sensitive confidential information, which plaintiff disclosed to the firm in confidence and which the firm assured plaintiff would be protected, was disclosed broadly and disseminated over the internet on social media platforms. The firm's breaches of duty to plaintiff caused these unauthorized disclosures. These disclosures have harmed and damaged plaintiff and those harms and damages are continuous and ongoing. The firm's conduct here goes far beyond negligence and was conduct which was outrageous in its recklessness and in its willful disregard of plaintiff's rights.

4.     The firm's representation of plaintiff involved preparing and filing plaintiff's application for asylum in the United States. Plaintiff sought asylum in the United States after

fleeing from his native China to avoid further politically motivated harsh persecution, including fear of being tortured, incarcerated under extreme conditions, and potentially being murdered.

5.     The information which plaintiff disclosed to the firm and which, because of the firm's failures and breaches, was disclosed subsequently to the world, including to persons and interests in China committed to silencing, smearing, and potentially physically harming plaintiff, included information detailing plaintiff's political activities in China as well as other sensitive matters. This sensitive information, the public disclosure of which jeopardizes the life, safety, and welfare of plaintiff and others, lost its confidential status when it was displayed and published on social media platforms, and this occurred because of defendants' failures to properly protect the information from improper disclosure.   Agents and officials of the Chinese government are believed to be among the parties who gained access to plaintiff's confidential information, which, again, they were able to obtain because of defendants' manifest failures and breaches of duty, including defendants' improper and unlawful actions and inactions in not taking necessary actions to protect plaintiff's confidential information from disclosure.

6.     As plaintiff's counsel, Clark Hill owed plaintiff an undivided duty to act in his best interests. Here, the firm, in its representation of plaintiff and then in improperly terminating that representation, violated that obligation.  The firm knew from the outset of considering whether to undertake the representation of plaintiff that agents and officials of the Chinese government have been and are hostile to plaintiff and pose a genuine threat to plaintiff's life, liberty, and security. These Chinese agents and officials and the persons and interests on whose behalf they have acted in the past and were (and are) expected to act in the future pose, as defendants knew before and when they agreed to represent plaintiff, a direct threat to plaintiff.   Notwithstanding defendants' knowledge of the powerful interests hostile to plaintiff, knowledge which defendants had prior to

agreeing to represent plaintiff, defendants failed to protect plaintiff's confidential information from disclosure from these persons and interests with a known agenda deeply hostile and antagonistic to plaintiff. Defendants' conduct prejudiced plaintiff, caused him severe personal and financial damage, all of which could have, and should have, been avoided.

7.      Defendants then compounded their breaches to plaintiff when they wrongfully, unlawfully, improperly, without valid cause, and without any meaningful consultation with plaintiff unilaterally terminated their representation of him. When this matter got "hot," defendants did not stand with their client; rather, they "ducked and ran." Defendants abandoned their client (plaintiff), and they put their perceived interests above their obligation to act in the interests of their client (plaintiff). Defendants violated their legal and ethical duty of undivided loyalty to their client. Defendants' conduct was oppressive, intentional, and willfully disregarded plaintiff's rights.

8.      Plaintiff brings this action because defendants must be – and in this action will be – held accountable for their gross and intentional misconduct. Defendants are liable for both compensatory and punitive damages. Defendants' egregious failures to protect plaintiff's information from being exposed to potential "hackers," including failing to have in place and/or to maintain necessary and effective electronic security measures sufficient to protect plaintiff's sensitive and confidential information, violated the rules of professional conduct; constituted a serious breach of the firm's fiduciary duty to plaintiff as a client of the firm; violated the firm's contractual obligations to plaintiff; and violated the firm's obligation to provide plaintiff competent legal representation.

9.      The wide-spread and deeply harmful publication and dissemination of plaintiff's sensitive personal information on social media was the direct, proximate, and inevitable (albeit

entirely avoidable) result and consequence of the firm's breaches of its duties and obligations to plaintiff. The firm then intentionally, deliberately, and oppressively made matters worse when it terminated its representation of plaintiff, advancing a plainly pretextual, if not risible, "justification" for the firm's improper action. Defendants acted in willful disregard for the rights of plaintiff, and defendants' conduct was reckless and taken without regard to the safety or protection of the plaintiff, the firm's client, and in willful disregard of the firm's duties and obligations to plaintiff as a client. Because plaintiff has suffered and continues to suffer serious harm and injury as a result of defendants' actions and inactions, plaintiff seeks monetary damages to compensate him for the grievous harms which defendants have caused him. In addition, plaintiff seeks punitive damages because of the recklessness, wantonness, and oppressiveness of defendants' conduct.

## **PARTIES**

10.     Plaintiff, a native of China, currently resides in New York, NY. Plaintiff has a pending application for asylum in the United States. Plaintiff is a highly successful businessman and a political activist and well-known Chinese dissident. Plaintiff has fought vigorously for many years for the rule of law, human rights, and democracy in China. In early 2015, plaintiff was forced to escape from China as he justifiably feared being unlawfully arrested, detained, interrogated, tortured, and/or killed by the Chinese government and/or the Chinese Communist Party (the "CCP") because of his political activities and outspoken advocacy. (References herein to the "CCP" are inclusive of both the Chinese government and the Chinese Communist Party.)

11.     Defendant Clark Hill PLC ("Clark Hill") is a major law firm of approximately 650 attorneys and professionals, in 25 offices, and operates as a professional services limited liability company, organized and existing under the laws of the State of Michigan. Clark Hill does business

on a regular, constant, and substantial basis in the District of Columbia, specifically including having an office at 1001 Pennsylvania Avenue NW, Suite 1300, Washington, DC 20004, and Clark Hill's lawyers appear regularly before courts, agencies, and Congress in the District of Columbia.

12.     Defendant Thomas K. Ragland, Esq. ("Mr. Ragland") is an attorney licensed to practice law in the District of Columbia and is a member (partner or principal) of the Clark Hill law firm in the firm's District of Columbia office.  Mr. Ragland does business on a regular, constant, and substantial basis in the District of Columbia, including maintaining his office for the practice of law at the Clark Hill office at 1001 Pennsylvania Avenue, NW, Suite 1300, Washington, DC 20004, and appearing before agencies and tribunals in the District of Columbia. (As noted previously, Clark Hill PLC and Mr. Ragland are referred to collectively herein as "defendants" or the "firm.")

## JURISDICTION, VENUE, AND CONVENIENCE

13.     This Court has jurisdiction over this matter pursuant to D.C. Code § 11-921.  This Court has personal jurisdiction over defendants as they both regularly and constantly conduct business in the District of Columbia.  Defendants' actions and inactions giving rise to the matters alleged in this complaint took place in the District of Columbia, including meetings with plaintiff and/or his agents and authorized representative, Dr. Lianchao Han ("Dr. Han").

14.     Venue is proper in this Court and this Court is a convenient forum for this action. This case relates directly to actions and inactions of defendants in connection with their law office and law practice in the District of Columbia; defendants are very much present and engaged in doing business on a daily basis in the District of Columbia; and a substantial part of the events, actions, and inactions giving rise to plaintiff's claims in this complaint occurred in the District of Columbia. By way of illustration, meetings between the firm and plaintiff's authorized

7

representative, Dr. Han, during which the firm and plaintiff formed an attorney-client relationship, regularly exchanged information relating to plaintiff's asylum application, Mr. Ragland's preparation of that application, the firm's withdrawal from the representation, and other actions and inactions arising out of that relationship occurred in the District of Columbia at the firm's office in the District. Mr. Ragland was the firm's principal lawyer representing plaintiff and most of the work which Mr. Ragland did on behalf of plaintiff was done in the District of Columbia.

## STATEMENT OF FACTS

**I.   Plaintiff is a political activist and target of the Chinese government and the CCP.**

15.   For years, plaintiff has been a forceful, visible, and well-known advocate for the rule of law, human rights, and democracy in China. In connection with his political activities and advocacy, plaintiff has, for example, exposed systemic corruption in the CCP, as well as by senior officials of the Chinese government and family members of those officials. Plaintiff has also disclosed the widespread abuse of human rights in China, including the use of torture. Plaintiff has opposed Chinese governmental and party suppression of democratic movements in China. Plaintiff has also been involved in exposing the degree, extent, and effectiveness of China's covert cultural, political, economic, and intelligence operations in the United States and elsewhere in the West.

16.   Plaintiff has been effective in influencing international opinion with respect to China and the CCP. From the perspective of the CCP, plaintiff's activities and advocacy have affected adversely China's and the CCP's stature in the world community and, in response, the Chinese government has attempted to silence plaintiff. The Chinese government/CCP has employed various tactics, including coercion and offering bribes to attempt to silence plaintiff. Upon information and belief, the Chinese government/CCP has used its overseas intelligence

networks to seek to discredit, silence, and threaten plaintiff's personal safety or, at the very least, to cause plaintiff to have good reason to fear for his personal safety as well as fearing for the safety of family members and friends.

17.     Upon information and belief, the CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associated with it and acting on its behalf, including information relating to corruption, murder, hiding of illegally-gained money, and China's spy network.  For these and other reasons, the Chinese government and the CCP are highly motivated, to understate the matter, and engaged aggressively in seeking to silence plaintiff.  The Chinese government and the CCP are equally motivated and engaged in seeking to learn what plaintiff knows about improper activities undertaken by or on behalf of the Chinese government and the CCP.  And, perhaps most critically, the Chinese government and the CCP have the capabilities – the "operational reach" – to carry out aggressive hostile actions against plaintiff.

18.     In or about January 2015, for example, the CCP, through Bruno Wu Zheng, called plaintiff to request that plaintiff cooperate with the CCP and stop disclosing information regarding corruption on the part of senior CCP officials.  Plaintiff refused.  After several failed bribery attempts and threats, Bruno Wu Zheng directed the Central Commission for Discipline Inspection ("CCDI") and the Special Task Force to request (truly demand) that plaintiff cooperate with China and return any evidence he had of corruption among senior leaders.  Plaintiff was asked to hand over his evidence to the CCP and to stop acting against the CCP.  In return, Bruno Wu Zheng promised plaintiff, *inter alia*, that (1) none of plaintiff's assets or properties would be seized by the CCP; (2) all privileges would be returned to plaintiff and his family; (3) plaintiff's family members would not be arrested; and (4) plaintiff would not be physically threatened or killed.

9

Plaintiff refused this proposal. Plaintiff anticipated that this refusal would trigger the risk of serious persecution of plaintiff and his family.

19.     Plaintiff's political activities and his refusal to cease those activities, when coupled with the CCP's powerful interest in bringing those activities to a halt, including using brute force, made it dangerous for plaintiff to remain in China. Consequently, on or about January 2015, plaintiff fled from China. He rightly feared being arrested, detained, interrogated, tortured, and/or killed by the Chinese government and/or the CCP. At or around this same time, the CCP seized substantial sums of plaintiff's family's assets and questioned and arrested 18 of plaintiff's family members. The CCP also arrested or detained a number of plaintiff's colleagues and employees and prohibited others from leaving China.

20.     In May 2017, by which time plaintiff was residing in the United States, the CCP sent Liu Yanping and three other agents to New York City to speak with plaintiff in yet another effort to seek to silence him. Liu Yanping was then Secretary of the CCDI. Plaintiff refused this threat as he had refused previous threats. Instead of giving in to this latest threat, plaintiff disclosed a broad network of CCP spies operating in the United States. Upon information and belief, the United States government revoked the visas of these four officials, including Liu Yanping, because of their actions in the United States.

21.     The CCP also took another highly aggressive action to seek to silence plaintiff by issuing two International Criminal Police Organization ("INTERPOL") "red [arrest] notices." Plaintiff disputes the legitimacy of these notices.

22.     In or around October 2017, just prior to China's 19th National Congress, an event of great importance to the CCP, plaintiff's Twitter, YouTube, and Facebook accounts were abruptly and suspiciously suspended, all without explanation.

23.     Upon information and belief, beginning in 2017, the Chinese government and/or the CCP sent agents and officials to the United States to organize demonstrations aimed directly against plaintiff outside the building in New York City where plaintiff resides. Persons attending these CCP-staged demonstrations, literally on plaintiff's front steps, were provided with preprinted signs defaming plaintiff in vile language, calling him a rapist and a liar, and urging plaintiff to leave the United States.

24.     The CCP separately orchestrated a malicious negative propaganda campaign against plaintiff. The CCP formed a team of people, the "50-cent troll army," to manipulate public opinion on social media for the benefit of the CCP. The commentators created favorable comments or articles on popular Chinese social media networks intended to derail discussions that are unfavorable to the CCP and promote narratives that serve the government's interests, together with disparaging comments and misinformation about political opponents and critics of the Chinese government, such as plaintiff.

25.     Merely supporting plaintiff became a crime in China. One of plaintiff's supporters, Dong Qi, reportedly was arrested and sent to jail for wearing a T-shirt with plaintiff's slogan — "Everything is just beginning" — on it. Upon information and belief, plaintiff's followers have been questioned, restrained, and intimidated.

26.     Upon information and belief, the CCP perceives plaintiff as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP.

27.     Plaintiff's political actions and advocacy are known to and widely supported by many people in China and, indeed, around the world. The domestic Chinese and international support which plaintiff has and the related strong support for his political and advocacy activities are additional sources of anger, aggravation, deep displeasure, and frustration to the CCP.

11

II.     **Plaintiff retains the Clark Hill law firm to represent him in preparing and submitting an application for asylum in the United States.**

28.     Paragraphs 15-27 *supra,* describing plaintiff's political activities and advocacy and resulting persecution and justifiable fear of further retaliation after fleeing from China, provide background and context for plaintiff's seeking legal representation to assist him and advocate on his behalf in applying for and obtaining political asylum in the United States.  Plaintiff retained Mr. Ragland and the Clark Hill law firm to represent him in this regard.  Mr. Ragland holds himself out as a leading immigration lawyer.  Mr. Ragland and the firm represented to plaintiff that Mr. Ragland and the firm were qualified, capable, and competent to represent plaintiff and to protect his interests fully and professionally.  Plaintiff relied upon these representations; however, they turned out to be false.

29.     Clark Hill receives and expects to receive (as any large law firm would) a large amount of confidential client information, including financial records, trade secrets, sensitive personal communications and disclosures, and sensitive personally identifiable information (*e.g.,* addresses, contact information, social security numbers, and health information).  Receiving such information is a daily occurrence at Clark Hill (again, as it is at any law firm of comparable size).  Clients, specifically including the present plaintiff, disclose confidential information to Clark Hill reasonably and justifiably relying on the firm's professional ethical and legal obligations to protect and preserve the confidentiality of their information, while strictly limiting disclosure of such information to that information which the client authorizes the firm to disclose.

30.     Clark Hill has clear and undeniable ethical and legal obligations to preserve a client's (plaintiff's) confidential information. These obligations to preserve confidentiality include information provided to the firm electronically and/or stored electronically on the firm's computer network.  At all relevant times, Clark Hill and Mr. Ragland communicated to plaintiff, both

implicitly and explicitly, that the firm understood its obligations to preserve plaintiff's confidential information and, of equal importance, that the firm could and would do so (*i.e.*, that the firm had the requisite professional and technical knowledge, capability, and competence to protect plaintiff's information).

31.    On or about August 2017, plaintiff met with defendants in connection with plaintiff's potentially retaining the firm to represent him in preparing and filing his planned asylum application.  During that meeting, plaintiff explained his standing and visibility as a prominent Chinese political dissident who is perceived as hostile to the CCP and related interests in China. Plaintiff also explained the risks associated with and attendant to plaintiff's position as a prominent visible critic of the Chinese regime.  Plaintiff warned of the persistent and relentless cyberattacks that he and his associates had endured.  At that meeting and subsequently, plaintiff disclosed to the firm confidential information about plaintiff's political and advocacy activities and equally sensitive confidential information regarding plaintiff's knowledge of wrongful actions and activities of the CCP.  The firm knew from the very outset that plaintiff's asylum application was not "routine" and that in connection with that application plaintiff would necessarily be disclosing highly sensitive confidential information to Mr. Ragland and to the Clark Hill law firm.

32.    In meetings with the firm, plaintiff explained that any law firm preparing his asylum application had to expect to be subjected to sophisticated cyberattacks.  Having been so informed, with "eyes wide open," and with a full awareness and understanding of the cyber security and other potential risks involved, defendants agreed to move forward and agreed to undertake the representation of plaintiff.

33.    In agreeing to undertake the representation of plaintiff, Mr. Ragland and the firm agreed to take special precautions to prevent improper disclosure of plaintiff's sensitive

confidential information.  Such precautions would include not placing any of plaintiff's information on the firm's computer server as doing so would, as Mr. Ragland and the firm understood, make the information an easy target for a "hacker" interested in obtaining the information.  The firm also committed and agreed to have in place at all times the requisite security measures to protect plaintiff's confidential information and to otherwise provide plaintiff ethical and competent legal representation.  Had the firm not made these commitments and agreements, plaintiff would not have retained the firm.

34.     On or about August 28, 2017, plaintiff, through his authorized representative, Dr. Han, and defendants executed a letter of agreement (the "retention agreement") for legal services pertaining to plaintiff's asylum application.  That agreement created and formalized contractual, common law, and professional ethical and legal duties and obligations of defendants (as legal counsel) to plaintiff (as client), including the duties and obligations of undivided loyalty and the duties and obligations to maintain adequate and necessary security measures sufficient to safeguard plaintiff's sensitive personal and confidential information and documents.

35.     Whatever the firm's security protection obligations are or should be with respect to maintaining reasonable security measures to safeguard an "ordinary" client's sensitive personal information and confidential documents, the firm here was on full notice ("high alert") that the representation of plaintiff was in no sense an "ordinary" representation  with "ordinary" risks of unauthorized disclosure.  That is, the firm knew from the very outset, and prior to the firm's agreeing to undertake the representation of the plaintiff, that special care and attention to security measures were necessary, required, expected, and agreed-to by the firm.  In agreeing to represent plaintiff, the firm agreed to take the necessary steps and actions to protect plaintiff's confidential

information recognizing that meant the firm would take "more than ordinary" protective efforts. Had the firm not so committed and agreed, plaintiff would not have retained the firm.

36.  In accordance with the retention agreement, plaintiff paid defendants a retainer fee of $10,000, and the firm subsequently billed plaintiff (or his authorized representative) for its fees and the firm's fees were paid.

37.  The firm's retention agreement and its related standard terms of engagement state, among other things, that plaintiff, as a client, has the right to "expect competent representation by an attorney" of the firm; that the firm "will at all times act on your behalf to the best of our ability"; and that the firm's lawyers "are subject to the Rules of Professional Conduct governing attorneys in Washington, DC."[1] *See also* CLARK HILL, *About Us*, https://www.clarkhill.com/pages/about (last visited Aug. 29, 2019) ("Ethical [b]ehavior is [n]on-[n]egotiable. We believe in doing the right thing every time. We uphold our professional responsibilities and are accountable for our actions.").

38.  Plaintiff delivered sensitive personal information and confidential documents to defendants so they, as counsel, could complete plaintiff's asylum application. That application was prepared in the District of Columbia by Mr. Ragland in consultation with Dr. Han, plaintiff's authorized representative in the District of Columbia. The application was filed with the United States Department of Homeland Security in Washington, D.C. on September 5, 2017. As necessary and as appropriate and subject to appropriate protections (*e.g.*, under seal or *in camera*), plaintiff will identify the confidential information he disclosed to the firm.

---

[1]  Plaintiff certainly does not concede and expressly disputes that the retainer agreement's identification of certain rights is exclusive, and that plaintiff did not and does not have other rights.

**III.** **Defendants' failure to adequately protect plaintiff's confidential information led to the information being disclosed and disseminated widely and harmfully.**

39.    Notwithstanding (1) the firm's obligation to protect the confidentiality of plaintiff's information, (2) the firm's advance knowledge of the circumstances of plaintiff's case and the increased need for protection of plaintiff's information, and (3) defendants' agreement, by undertaking the representation of plaintiff and otherwise, that it would and could protect plaintiff's confidential information, the firm failed to do so.  Discovery is needed to determine the specific details of the firm's failures; however, it is beyond dispute that the firm failed as plaintiff's information was disclosed.  Plaintiff alleges that Mr. Ragland used the firm's server to store and transmit plaintiff's sensitive information, and used his firm email account to transmit plaintiff's confidential information to third parties, including to third parties not approved by plaintiff.  If, as plaintiff believes and here alleges, that Mr. Ragland used his firm email account to transmit plaintiff's confidential information to third parties, that reckless and wanton conduct "opened the door wide" to the firm's server to potential "hackers" and thoroughly compromised the confidentiality of plaintiff's information.

40.    The combination of Mr. Ragland's reckless conduct and the firm's  inadequate cybersecurity measures and infrastructure was fatal.  As a result, plaintiff's sensitive confidential information was not protected, but was disclosed to the world at large, and thus made available to the CCP and others with hostile intent to plaintiff and with the capacity to carry out that hostile intent.

41.    The firm has indicated that on or about September 12, 2017, the firm's computer system was "hacked" by a third party.  This third party, apparently without great difficulty, circumvented the firm's demonstrably inadequate (essentially porous) security and monitoring programs.  After doing so, the third party "hacker" was able to locate and exfiltrate (obtain)

16

plaintiff's asylum application and affidavit and, perhaps, other information and materials relating
to plaintiff. On September 12, 2017, Mr. Ragland wrote to Dr. Han, plaintiff's representative,
that "his computer is down – apparently it was attacked."

42. The firm's security measures, whatever they were, failed to "safeguard" plaintiff's
sensitive personal information and confidential documents. The firm's security measures were
inadequate, unreasonable, and fell woefully far short of defendants' promises, assurances,
obligations, and commitments to provide adequate security measures, given the circumstances of
this case, in violation of defendants' contractual, common law, and professional duties to plaintiff.

43. Because of defendants' failures, documents obtained by the third party included
plaintiff's and plaintiff's spouse's sensitive personal information – *e.g.*, plaintiff's passport
identification number; plaintiff's I-94 admission-number; plaintiff's spouse's passport
identification number; and plaintiff's spouse's I-94 admission-number. Beginning on or about
September 23, 2017, sensitive personal information and confidential documents obtained from
defendants' computer system relating to plaintiff began to appear on Twitter. The published
material included the following:

     a. A copy of plaintiff's application for political asylum;

     b. Plaintiff's passport identification number;

     c. Plaintiff's I-94 admission-number;

     d. Plaintiff's spouse's passport identification number; and

     e. Plaintiff's spouse's I-94 admission-number.

44. The information published and disseminated on social media included sensitive
personal information and confidential portions of plaintiff's asylum application and affidavit.
Plaintiff provided this and other highly sensitive information, including the entire contents of

plaintiff's asylum application, to defendants in connection with their representation of plaintiff. Plaintiff did not consent to nor did he authorize the disclosure of any of the information to any persons other than to those in the United States government with a direct "need to know" in connection with the review of plaintiff's asylum application. By law, asylum applications are strictly confidential. By virtue of the wrongful conduct of Mr. Ragland and the firm, plaintiff's asylum application became entirely public and was published on social media sites.

45. Defendants cannot properly, let alone reasonably, defend their undeniable failure to protect plaintiff's information on grounds of "impossibility" or some variation of that theme. If defendants lacked the will, the resources, or the technical capability or sophistication to protect plaintiff's information from being disclosed, defendants were duty-bound to disclose this limitation (whatever its cause and despite such disclosure being against the defendants' economic interest in gaining plaintiff as a client) to plaintiff *prior* to the firm's undertaking the representation of plaintiff, and thus afford plaintiff the opportunity not to retain the firm to represent him. The firm denied plaintiff this opportunity. The legal and ethical obligations of lawyers (here, Mr. Ragland) include the obligation to decline a representation when the matter is beyond the competence, capacity, or ability of the lawyer. Mr. Ragland and the Clark Hill law firm breached that duty and obligation because they undertook the representation of plaintiff when they lacked the competence and ability to do so professionally, properly, and without harming their client (plaintiff).

46. Since the "hacking," defendants have largely "stonewalled" and refused to provide plaintiff any meaningful information about what occurred. For example, defendants have refused to advise plaintiff of the scale of the attack, including whether materials of clients other than plaintiff were obtained and, if so, whether the firm withdrew from those representations, and

whether there is any discernible pattern in the materials seized; and defendants have likewise refused to advise plaintiff of how defendants first learned of the attack and what counter-measures, if any, defendants took.

47.     On or about May 14, 2019, Daniel S. Steinberg, Esq., as counsel for plaintiff, wrote to the firm's General Counsel, Edward J. Hood, Esq., to inquire regarding the cyberattack.  Mr. Steinberg requested answers to several specific relevant questions:

> a.  Have you been able to identify the source of the attack and the mechanism by which access was gained to your firm's information systems?
>
> b.  What records were obtained by the hacker, and were they obtained by unauthorized access to an email server or by direct access to a storage location?
>
> c.  How did the attacker circumvent the firm's security measures, or did the attack entail malicious software that gained control of the firm's computer system until [plaintiff's] information was transferred?

48.     On or about May 23, 2019, Mr. Hood, claiming, without explaining, that the investigation which was conducted of the "hacking" is privileged, provided only a limited response.  Mr. Hood failed to answer the direct question of "how did the attacker circumvent the firm's security measures."  Presumably, the investigative report, which, to date, the firm has steadfastly hidden from plaintiff as the victim of the attack, includes at least a preliminary answer to this question.

**IV.    The firm's improper withdrawal as plaintiff's counsel.**

49.     A week following the "hacking" of defendants' plainly inadequate system, on or about September 19, 2017, Mr. Hood, in his capacity as General Counsel of the Clark Hill law firm, wrote to plaintiff to inform him that defendants were terminating their representation of plaintiff:

I regret to inform you that, after careful consideration, the Firm has concluded it must withdraw as your legal counsel.

**\*\*\*\*\*\*\*\*\*\***

The cyberattack has presented several ethical complications with continuing to represent you. <u>A primary concern is that the cyberattack will require Mr. Ragland – and possibly other members of the Firm – to be a witness in your asylum proceeding.</u>  Under our Rules of Professional Conduct, a lawyer may not serve as an advocate in a proceeding where the lawyer is likely to be a material witness. Here, the cyberattack has placed Mr. Ragland in an untenable position of being a witness in your asylum case while simultaneously serving as your attorney.  At this point, Mr. Ragland must confine his role to that of witness, rather than legal advocate.  (Emphasis added.)

50.     The firm's stated "reason" for its extreme unilateral action that "it must withdraw" was that Mr. Ragland and perhaps others at the firm might be a witness in plaintiff's asylum proceeding.  This "reason" is without credibility or merit.

51.     For example, no hearing was pending when the firm unilaterally withdrew from and abandoned plaintiff (and none is pending as of this filing); plaintiff had not asked that Mr. Ragland be a witness were there a hearing; as the client, it would be plaintiff's decision, not Mr. Ragland's or the firm's decision, as to whether the value or necessity of Mr. Ragland's testimony at any hearing outweighed the firm's continuing as counsel (particularly in light of Mr. Ragland's claimed preeminence in immigration and asylum matters); the substance of Mr. Ragland's testimony at any hearing, were he to testify, would relate to uncontested matters, *i.e.*, that the firm's server had been "hacked" and plaintiff's information had been obtained; the firm never asked plaintiff's opinion on the matter; and the firm never so much as hinted, let alone explained, why Mr. Ragland's testimony was, supposedly, so "essential" at a then-non-existent hearing as to warrant the firm's unilaterally, precipitously, and without regard to the best interests of plaintiff terminating its attorney-client relationship with plaintiff when it did.

52.     The firm simply wanted "out" despite its clear contrary ethical obligations, including the duty of undivided loyalty to its client (plaintiff).  To accomplish its improper "fire the client" escape mission, the firm manufactured a plainly bogus "reason" to seek to justify its action.  Here, the firm's client had done nothing wrong and certainly had done nothing to warrant such brutal, unjustifiable, and unethical treatment.  Determining the firm's actual reason(s), as distinguished from its manufactured one, for its wrongful termination of its representation of plaintiff, including whether the firm yielded to pressure whether from the "hacker" or otherwise, will be an important area for discovery.

53.     Clark Hill has advised that it conducted (or had conducted on its behalf) an investigation of the cyberattack at issue in this case.  That investigation and any investigative report may address the topic of the firm's improper withdrawal from representing plaintiff.  To date, the firm has failed to provide plaintiff any investigative report produced as a result of the internal investigation of this matter despite the fact that the plaintiff's information was obtained, and perhaps the only successful target of the attack, and the firm terminated its representation of plaintiff because of that attack.  Plaintiff will seek this report in discovery.  Accordingly, defendants are hereby on notice to preserve the report and all related drafts, investigative notes, transcripts, exhibits, and materials.

54.     If defendants were unwilling or unable to protect plaintiff's sensitive confidential information, or lacked the competence or the capability to keep plaintiff's information off the firm's server, or to secure properly its computer system and network to protect plaintiff's information, defendants were duty-bound to disclose this critical limitation to the plaintiff at the outset and prior to committing to represent plaintiff to give the plaintiff an opportunity to make an informed judgment as to whether to retain the firm given its limitations.  The firm made no such

21

disclosure and thereby denied plaintiff the opportunity to make an informed decision on retaining the firm. Had the firm been forthright and candid about its limitations and lack of adequate security measures and protections, plaintiff would not have retained the firm as his counsel.

**V.   Defendants' breaches of duty have damaged plaintiff.**

55.    As a direct and proximate cause of defendants' multiple breaches of their duties and legal obligations to plaintiff, plaintiff's sensitive personal information and confidential documents were disclosed to third-parties, to the world at large, and to persons and institutions in China, including the Chinese government and CCP, to the great and severe injury, harm, and detriment of plaintiff.

56.    As a direct consequence of defendants' wrongful and unlawful conduct, plaintiff has suffered and continues to suffer damages to his personal and professional reputation; he has lost substantial business opportunities; plaintiff's personal safety and security have been put at risk; his efforts to obtain political asylum have been delayed; his family has been arrested and threatened; plaintiff's employees in China have been harassed; plaintiff has incurred costs and expenses; and plaintiff has been denied the benefit of defendants' claimed immigration law expertise in connection with pursuing plaintiff's asylum application. Defendants' breaches of their legal duties and obligations caused these and potentially other harms and damages to plaintiff. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

57.    As a direct and proximate cause of defendants' multiple breaches of their duties and legal obligations, the details and contents of plaintiff's asylum application and other materials have been disclosed widely on social media platforms and placed in the hands of third-parties hostile to plaintiff. There are powerful people and interests in China and elsewhere hostile to

plaintiff because of his political activities who now have – solely because of defendants' failures and breaches of duty – detailed information about plaintiff which they would not otherwise have. There is good cause to believe that these persons have used and will continue to use plaintiff's confidential information for purposes harmful to plaintiff.

58. The severe harm defendants have caused extends to limiting plaintiff's freedom and liberty to travel and jeopardizes his personal safety. Defendants' breaches of legal duties and obligations caused these harms and damages to plaintiff. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

59. The defendants' failure to safeguard plaintiff's sensitive personal information and confidential documents was the direct and proximate cause of the dissemination of plaintiff's sensitive personal information and confidential documents on social media, the publication of which has caused great harm to plaintiff by tarnishing his reputation and undermining his credibility and the credibility of his work in advancing the causes of bringing the rule of law, democracy, and justice to China. Defendants' breaches of legal duties and obligations caused these harms and damages to plaintiff. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

60. Defendants' improper and unjustified termination of its attorney-client relationship and attendant obligations has harmed and damaged plaintiff. Defendants' improper action in abandoning their client (plaintiff) denied plaintiff the benefit of counsel at a time when he needed counsel (because his confidential information had just been splayed all over social media); sent the message to the public that plaintiff was somehow untrustworthy or acted improperly in connection with the representation; denied plaintiff defendants' claimed expertise in immigration law; and has caused and/or will cause undue delay and complications in action on plaintiff's

asylum application. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

61. At trial, the jury will determine plaintiff's compensatory damages proximately caused by defendants. Plaintiff alleges that those damages are no less than $50 million and seeks a judgment in at least that amount.

## PUNITIVE DAMAGES

62. At trial, the jury will also be asked to award significant punitive damages in an amount the jury determines to be appropriate. Punitive damages are warranted here because defendants' actions, inactions, and breaches of duties and obligations were reckless, wanton, intentional, and taken in willful disregard of plaintiff's rights and of defendants' obligations and duties to protect plaintiff's rights.

63. Defendants were reckless in their handling of plaintiff's confidential information. Defendants' recklessness included failing to protect that information, putting it on the firm's computer server, either directly or indirectly by transmitting the information to third parties via the firm's email account, or otherwise. These actions were intentional, deliberate, and willfully disregarded plaintiff's rights and defendants' obligations and duties to protect plaintiff's rights.

64. Defendants knew and understood the importance of protecting plaintiff's sensitive and confidential information, and that the dissemination of such information would jeopardize the personal and professional interests of plaintiff, plaintiff's family, including putting plaintiff and his family at grave risk of harm. Defendants specifically knew and understood that the CCP would attempt to obtain plaintiff's sensitive and confidential information and use that information to harm plaintiff and his family. Nevertheless, defendants ignored these very real and present risks, and their conduct was accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful

24

disregard of the plaintiff's rights, his safety, his family's safety, and with other circumstances tending to aggravate plaintiff's injuries.

65.     Defendants' compounded their recklessness by abandoning plaintiff as their client, choosing self-interest over protecting their client. Defendants' unilateral withdrawal as plaintiff's counsel was intentional, deliberate, reckless, and unwarranted conduct, and conduct in willful disregard of plaintiff's rights and of defendants' obligations and duties to protect plaintiff's rights.

## CLAIMS FOR RELIEF

## COUNT I – Breach of Fiduciary Duties

66.     Plaintiff adopts and incorporates by reference ¶¶ 1-65 as if each were here fully set forth.

67.     Defendants formed an attorney-client relationship with plaintiff. As a consequence, defendants owed plaintiff all the fiduciary duties and obligations which a lawyer owes to a client. Rather than honor those duties and obligations, defendants breached them.

68.     At all relevant times, the fiduciary duties defendants owed to plaintiff included, but were not limited to, the duty not to undertake a matter beyond the professional and technical competence, capability, and capacity of defendants; the duty to maintain reasonable and adequate, in this case meaning heightened, security measures to safeguard plaintiff's sensitive personal information and confidential records; the duty not to expose plaintiff's confidential information to the risk of disclosure by allowing the information to appear on the firm's computer server; the duty to exercise at all times the utmost good faith and undivided loyalty toward plaintiff; the duty to provide competent professional legal representation; and the duty not to withdraw from representing plaintiff, effectively abandoning him, absent valid and appropriate cause.

69. Defendants breached their fiduciary duties to plaintiff. These breaches include defendants' failing to maintain reasonable security measures to safeguard plaintiff's sensitive personal information and confidential records by failing to maintain reasonable security measures, including placing information on the firm's computer server and/or allowing access to the firm's server, thus allowing unauthorized third-parties to gain access to electronic files and communications containing plaintiff's sensitive personal information and confidential documents.

70. Defendants further breached their fiduciary duties and obligations to plaintiff by improperly and without valid cause withdrawing from representing plaintiff, whether in response to a "ransom" demand or otherwise. Defendants acted to advance their interests and contrary to the interests of the firm's client (plaintiff) to whom the firm owed its primary duty of undivided loyalty.

71. Defendants had no valid or legally or ethically sufficient cause for terminating their representation of plaintiff. Plaintiff had satisfied his obligations as a client; defendants breached their obligations as counsel. The firm's stated reason for terminating its attorney-client relationship with plaintiff (that Mr. Ragland might be a witness in some unknown as-of-yet not scheduled hearing) was a transparent sham proffered to justify the defendants' improper unilateral decision to terminate the attorney-client relationship.

72. If defendants released plaintiff's sensitive personal information and confidential documents to regain control of their computer system, or engaged in any similar conduct (a topic plaintiff will pursue in discovery), defendants breached their primary duty of undivided loyalty to plaintiff as the firm's client by placing the interests of the firm above the interests of plaintiff.

73. Plaintiff has been harmed and damaged as a result of defendants' breaches of duty to plaintiff. The amount of plaintiff's damages will be determined at trial.

74.     In addition to compensatory damages, defendants are liable for punitive damages because defendants' actions willfully disregarded the rights of plaintiff, were intentional, deliberate, and reckless.  The amount of punitive damages will be determined at trial.

### COUNT II – Breach of Contract of Representation

75.     Plaintiff adopts and incorporates by reference ¶¶ 1-74 as if each were here fully set forth.

76.     Plaintiff entered into a written contract with plaintiff for the firm to represent the plaintiff.  Defendants breached their contractual obligations to plaintiff by undertaking a matter beyond defendants' professional or technical competence, capability, and competence; by failing to provide plaintiff competent representation; by neglecting to undertake reasonable security measures to safeguard plaintiff's sensitive personal information and confidential documents; and by improperly and wrongfully terminating the firm's representation of plaintiff.

77.     Defendants further breached the retention agreement and the associated terms of engagement if they delivered a "ransom" to unknown third parties that included ceasing to represent plaintiff and/or providing plaintiff's sensitive personal information and confidential documents (plaintiff will pursue this topic in discovery).  If defendants did so, they failed to provide competent representation and failed to act to the best of their ability and for the benefit of their client.

78.     The firm wrongfully placed its interests above the interests of its client (plaintiff) in violation of the firm's contractual and ethical obligations.  Defendants had no good or sufficient cause for terminating their representation of plaintiff.  Plaintiff had satisfied his obligations as a client; defendants breached their obligations as counsel.  The firm's stated reason for terminating its attorney-client relationship with plaintiff (that Mr. Ragland might be a witness in some

unknown as-of-yet not scheduled hearing) was a sham proffered to justify the defendants'
improper unilateral decision to terminate the attorney-client contractual relationship.

79.     Plaintiff has been harmed and damaged as a result of defendants' breaches of their
contractual duties and obligations to plaintiff.   The amount of plaintiff's damages will be
determined at trial.

## COUNT III – Legal Malpractice

80.     Plaintiff adopts and incorporates by reference ¶¶ 1-79 as if each were here fully set
forth.

81.     At all relevant times, an attorney-client relationship existed between plaintiff and
defendants.  Defendants owed plaintiff contractual, common law, and professional duties to use
the required degree of professional care and skill to represent plaintiff competently and
professionally and consistent with the applicable standard of care.  As detailed in this complaint,
the firm did not represent plaintiff with the required degree of professional care and skill.
Defendants breached their duties to plaintiff.

82.     The standard of care governing a lawyer's representation of a client is defined by a
combination of contractual, common law, and professional (ethical) duties and obligations.  In this
case, the firm breached the standard of care to represent plaintiff competently and professionally
as the firm's representation of plaintiff and its termination of that representation fell far short of
the required standard of care.

83.     Defendants breached their contractual, common law, and professional and ethical
duties and obligations to plaintiff by undertaking a matter beyond defendants' professional or
technical competence and capability; by failing to use the required degree of professional care and
skill in representing plaintiff, resulting in the global exposure and dissemination of plaintiff's

sensitive personal information and confidential documents; and by wrongfully and without valid cause terminating their representation of plaintiff.

84.     Defendants failed to take competent and reasonable measures to safeguard plaintiff's sensitive personal information and confidential documents by, *inter alia*, failing to maintain reasonable security measures to secure plaintiff's files and communications; failing to maintain reasonable security measures to secure email accounts and information systems, including the data contained within them, from unauthorized access by third parties; and failing to maintain reasonable security measures to prevent email accounts from being accessed by unauthorized third parties.

85.     Had Mr. Ragland done as he promised—not exposed plaintiff's sensitive confidential information—and had defendants maintained reasonable security measures to secure their computer system from unauthorized access, as required and promised to plaintiff, the cyber adversary would not have been able to gain access to plaintiff's sensitive personal information and confidential documents.  If defendants lacked the will, the competence, or the capability to properly secure the firm's computer system and network and thereby protect plaintiff's information from unauthorized disclosure, defendants were duty-bound to disclose this limitation to the plaintiff at the outset, prior to undertaking the representation, to give the plaintiff an opportunity to make an informed judgment as to whether to retain the firm given its limitations. The firm made no such disclosure and thereby denied plaintiff the opportunity to make an informed decision on retaining the firm.

86.     Defendants further breached their contractual, common law, and professional duties to plaintiff if they delivered a "ransom" to unknown third parties that included ceasing to

represent plaintiff and providing plaintiff's sensitive personal information and confidential documents.

87.    Defendants further breached their contractual, common law, and professional duties to plaintiff by improperly and wrongfully terminating their representation of plaintiff and by the manner in which defendants did so. Defendants had no good, sufficient, or valid cause for terminating their representation of plaintiff. Plaintiff had satisfied his obligations as a client; defendants breached their obligations as counsel. The firm's stated reason for terminating its attorney-client relationship with plaintiff (that Mr. Ragland might be a witness in some unknown as-of-yet not scheduled hearing) was a transparent sham proffered to justify the defendants' improper unilateral decision to terminate the attorney-client relationship.

88.    Plaintiff has been harmed and damaged as a result of defendants' breach of their duties and obligations of care and competence to plaintiff. The amount of plaintiff's damages will be determined at trial.

## COUNT IV – Punitive Damages

89.    Plaintiff adopts and incorporates by reference ¶¶ 1-88 as if each were here fully set forth.

90.    Because defendants' actions, inactions, failures, breaches of duties and obligations, and violations of plaintiff's rights were intentional, deliberate, outrageous, and in willful disregard of defendants' duties and obligations and in willful disregard of plaintiff's rights, defendants are liable to plaintiff for punitive damages, in addition to compensatory damages.

91.    Defendants' conduct at issue in this case is so far beyond the pale as to warrant punitive damages. Defendant's intentional, deliberate, wrongful conduct involves the failure to protect plaintiff's confidential information from deeply harmful public disclosure despite

defendants' specific knowledge of the acute need to do so followed by defendants' then immediately "running away" from its client (plaintiff) after the disclosure occurred, which occurred because of defendants' failures.

92. Defendants' intentional and deliberate failures made plaintiff's information accessible to "hackers" and then defendants' intentionally, deliberately, wrongfully, and without regard to their duties and obligation and in willful disregard for the rights of plaintiff abandoned plaintiff as their client.

93. The jury will determine the appropriate amount of punitive damages.

## PRAYERS FOR RELIEF

At trial or afterwards, plaintiff will seek a compensatory monetary judgment against defendants, jointly and severally, in an amount in excess of $50 million, plus interest at the legal rate, the costs and disbursements of this action, and such other relief as is just and proper.

In addition, plaintiff shall seek a judgment against defendants, jointly and severally, for significant punitive damages in an amount to be determined by the jury.

Respectfully submitted,

*/s/ Ari S. Casper*
Ari S. Casper (#471013)
Ralph S. Tyler (#357087)
The Casper Firm, LLC
400 E. Pratt Street, Suite 903
Baltimore, MD 21202
(410) 989-5097 – Phone
(410) 630-7776 – Facsimile
acasper@casperfirm.com
rtyler@casperfirm.com
Attorneys for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues.

*/s/ Ari S. Casper* _____

Ari S. Casper

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Guo Wengui a/k/a Miles Kwok a/k/a Ho Wan Kwok

vs

Clark Hill PLC and Thomas K. Ragland

Case Number: **2019 CA 006164 M**

Date: September 18, 2019

☐ One of the defendants is being sued in their official capacity.

| Name: *(Please Print)* Ari S. Casper | Relationship to Lawsuit |
|---|---|
| Firm Name: The Casper Firm | ☒ Attorney for Plaintiff |
| Telephone No.: 410-989-5097    Six digit Unified Bar No.: 471013 | ☐ Self (Pro Se) ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury    ☒ 6 Person Jury    ☐ 12 Person Jury

Demand: $ 50,000,000.00 _____    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge: _____ Calendar #:_____

Case No.:_____ Judge: _____ Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
      Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
      Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
      Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
      Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
      Under $25,000 Consent Denied

---

**B. PROPERTY TORTS**

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☒ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
      Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
      Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

---

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

---

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

---

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

---

| /s/ Ari S. Casper | September 18, 2019 |
|---|---|
| Attorney's Signature | Date |

CV-496/ June 2015

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

WENGUI GUO
  Vs.                                        C.A. No.       2019 CA 006164 M
CLARK HILL PLC et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to:  Judge HIRAM E PUIG-LUGO
Date:  September 19, 2019
Initial Conference: 9:30 am, Friday, December 20, 2019
Location:   Courtroom 317
        500 Indiana Avenue N.W.
        WASHINGTON, DC  20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Robert E. Morin



Superior Court for the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

**D.C. Superior Court**
**09/25/2019 13:55PM**
**Clerk of the Court**

Guo Wengui a/k/a Miles Kwok a/k/a Ho Wan Kwok
_____
Plaintiff

vs.

Case Number _____ **2019CA006164M**

**Clark Hill PLC**
_____
Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

**Ari S. Casper**
_____
Name of Plaintiff's Attorney

**400 E. Pratt Street, Suite 903**
_____
Address
Baltimore, MD 21202

**410-989-5097**
_____
Telephone

By _____
Deputy Clerk

Date **09/26/2019** _____

如需翻译, 请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오.    የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Guo Wengui a/k/a Miles Kwok a/k/a Ho Wan Kwok
_____
Plaintiff

vs.

Thomas K. Ragland                                       Case Number    **2019CA006164M**
_____
Defendant

### SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

**Ari S. Casper**
_____
Name of Plaintiff's Attorney

**400 E. Pratt Street, Suite 903**
_____
Address
Baltimore, MD 21202

**410-989-5097**
_____
Telephone

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오     የትርጉም አገልግሎት ከፈለጉ (202) 879-4828 ይደውሉ

Clerk of the Court

By _____
                              Deputy Clerk

Date **09/26/2019**

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a<br>HO WAN KWOK,<br><br>Plaintiff,<br><br>v.<br><br>CLARK HILL PLC and THOMAS K.<br>RAGLAND,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) No._____<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CITIZENSHIP OF CLARK HILL PLC

1.    My name is Kathleen M. Sullivan.

2.    I make this declaration based on personal knowledge, in support of Defendant Clark Hill PLC's Notice of Removal relative to *Guo Wengui v. Clark Hill PLC*, No. 219 CA 006164M, an action filed September 19, 2019 in the Superior Court for the District of Columbia.

3.    All statements in this declaration are true both as of the date this declaration was signed and as of September 19, 2019.

4.    I serve as the Chief Human Resources Officer of Clark Hill PLC, a professional limited liability company existing under and by virtue of the laws of the State of Michigan.

5.    The principal place of business of Clark Hill PLC is in Detroit, Michigan, which is the largest office of Clark Hill PLC and the office location for its Chief Executive Officer, Chief Operations Officer, and Chief Financial Officer. Clark Hill PLC's state of organization and its nerve center is in Michigan.

6.    Clark Hill PLC has 298 members among its nearly 570 attorneys. Some of its members are individuals, and some of its members are individuals who hold their memberships

through professional corporations. None of the professional corporations through which individuals hold memberships are incorporated under the laws of the District of Columbia.

7.  I have reviewed the personnel records relating to Clark Hill PLC's members to determine whether any member resides or is domiciled in the District of Columbia. I also requested confirmation from each member that he or she did not reside in the District of Columbia or were a citizen of a foreign state.

8.  Based on my investigation, every member of Clark Hill PLC is a citizen of the United States, and no member of Clark Hill PLC resides or is domiciled outside of the United States. Every member of Clark Hill PLC resides in, is domiciled in, and is a citizen of, a State.

9.  Based on my investigation, no member of Clark Hill PLC is a citizen of, resident of, or domiciled in the District of Columbia.

10.  Clark Hill PLC is not a citizen of the District of Columbia, nor is it a citizen of any foreign state.

11.  On September 26, 2019, Clark Hill PLC, through its general counsel, accepted service of the Complaint filed in this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746.

Executed on October 24, 2019

Kathleen Sullivan

2

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK a/k/a ) 
HO WAN KWOK, )
                                    )
              Plaintiff,            )
                                    )
       v.                           )      No._____
                                    )
CLARK HILL PLC and THOMAS K.        )
RAGLAND,                            )
                                    )
              Defendants.           )

## **DECLARATION OF CITIZENSHIP**

1.  My name is Thomas K. Ragland.

2.  I make this declaration based on my personal knowledge and in support of Defendant Clark Hill PLC's Notice of Removal relative to *Guo Wengui v. Clark Hill PLC*, No. 219 CA 006164M, an action filed September 19, 2019 in the Superior Court for the District of Columbia.

3.  All statements in this declaration are true both as of the date this declaration was signed and as of September 19, 2019.

4.  I am an attorney licensed to practice law in the State of Maryland and the District of Columbia. I reside and am domiciled in the Commonwealth of Virginia and am a citizen of the Commonwealth of Virginia. I am not a resident, citizen or domiciled in the District of Columbia, nor am I a citizen of any foreign state.

I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C.

§ 1746.


Executed on October 24, 2019

Thomas K. Ragland

## CIVIL COVER SHEET

JS-44 (Rev. 6/17 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a HO WAN KWOK | CLARK HILL PLC and THOMAS K. RAGLAND |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF New York County, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Wayne County, MI
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Ari S. Casper, Ralph S. Tyler, The Casper Firm, 400 E. Pratt Street, Suite 903, Baltimore, MD 21202

ATTORNEYS (IF KNOWN)
Jessica Ring Amunson (#497223), Jenner & Block LLP, 1099 New York Avenue NW, Suite 900, Washington, DC 20001-4412, (202) 639-6000

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
◉ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ◉ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

○ **A.  Antitrust**

☐ 410  Antitrust

◉ **B.  Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☒ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Product Liability

○ **C.  Administrative Agency Review**

☐ 151 Medicare Act

**Social Security**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.  Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.  General Civil (Other)**    OR    ○ **F.  Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 27 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**Other Statutes**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 462 Naturalization Application
☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced & Corrupt Organization
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/ Exchange
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ☉ **G.** *Habeas Corpus/ 2255* | ☉ **H.** *Employment Discrimination* | ☉ **I.** *FOIA/Privacy Act* | ☉ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |

| ☉ **K.** *Labor/ERISA (non-employment)* | ☉ **L.** *Other Civil Rights (non-employment)* | ☉ **M.** *Contract* | ☉ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

☉ 1 Original Proceeding  ☒ 2 Removed from State Court  ☉ 3 Remanded from Appellate Court  ☉ 4 Reinstated or Reopened  ☉ 5 Transferred from another district (specify)  ☉ 6 Multi-district Litigation  ☉ 7 Appeal to District Judge from Mag. Judge  ☉ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Diversity of Citizenship, 28 U.S.C. § 1332, and Removal of Civil Actions, 28 U.S.C. § 1441

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 ☐ | **DEMAND $** 50,000,000<br>**JURY DEMAND:** | Check **YES** only if demanded in complaint<br>YES ☒  NO ☐ |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐  NO ☒ | If yes, please complete related case form |

**DATE:** 10/24/2019  |  **SIGNATURE OF ATTORNEY OF RECORD** /s/ Jessica Ring Amunson

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

**I.** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

**III.** CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.** CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

**VI.** CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.** RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**<u>EXHIBIT 3</u>**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK a/k/a )
HO WAN KWOK, )
162 E 64th Street )
New York, NY 10065 )
  )
   Plaintiff, )
  )
    v. )
  ) Case No. 1:19-cv-3195-JEB
CLARK HILL PLC )
500 Woodward Avenue ) Hon. James Boasberg
Suite 3500 )
Detroit, MI 48226 )
  )
and )
  )
THOMAS K. RAGLAND, )
c/o Clark Hill PLC )
1001 Pennsylvania Avenue, NW )
Suite 1300 )
Washington, DC 20004, )
  )
   Defendants. )

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

   Defendants Clark Hill PLC and Thomas Ragland respectfully move this Court, pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiff Guo

Wengui's Complaint (Dkt. 1-1) with prejudice.  Defendants are filing herewith a memorandum

containing the specific points of law and authorities that support the motion and a proposed order.

Dated: November 25, 2019        Respectfully submitted,

                  CLARK HILL PLC and
                  THOMAS K. RAGLAND

                  By: */s/   John R. Storino*
                     One of their attorneys

John R. Storino
*(via pro hac vice)*
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
JStorino@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK, LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
Tel: (202) 639-6000
KBracey@jenner.com

**Certificate of Service**

I, John R. Storino, an attorney, hereby certifies that I served the foregoing Defendants'
Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), along with the attached Memorandum in
Support and Proposed Order on the following by electronic service on this, the 25th day of
November, 2019:

> Ari S. Casper
> Ralph S. Tyler
> The Casper Firm
> 400 E. Pratt Street, Suite 903
> Baltimore, MD 21202

> _/s/  John R. Storino_

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK a/k/a      )
HO WAN KWOK,      )
162 E 64th Street      )
New York, NY 10065      )
     )
         Plaintiff,      )
     )
         v.      )
     )    Case No. 1:19-cv-3195-JEB
CLARK HILL PLC      )
500 Woodward Avenue      )    Hon. James Boasberg
Suite 3500      )
Detroit, MI 48226      )
     )
and      )
     )
THOMAS K. RAGLAND,      )
c/o Clark Hill PLC      )
1001 Pennsylvania Avenue, NW      )
Suite 1300      )
Washington, DC 20004,      )
     )
         Defendants.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND .......................................................................................2

LEGAL STANDARD ..............................................................................................5

ARGUMENT ........................................................................................................6

I.    Plaintiff's Legal Malpractice Claim Fails Because He Can Not Allege That Defendants Breached A Duty To Plaintiff...............................................................6

    A.    Defendants' Withdrawal From The Representation Did Not Breach A Duty.............................................................................................................6

        1.    Withdrawal was necessary under Rule of Professional Conduct 3.7..........7

        2.    Withdrawal was necessary under Rule of Professional Conduct 1.7..........8

    B.    The Mere Fact A Cyber Incident Occurred Is Not Sufficient To Allege That Defendants Breached The Duty To Safeguard Confidential Information. ....................................................................................................10

II.    The Court Should Dismiss Plaintiff's Claim For Breach Of Fiduciary Duty..................12

III.    The Court Should Dismiss Plaintiff's Claim For Breach Of Contract. ...........................13

IV.    All Three of Plaintiff's Claims Should be Dismissed Because Plaintiff Does Not Allege (and Cannot Allege) That Defendants' Actions Caused Actual Damages.............15

    A.    All Plaintiff's Claimed Damages From The Cyber Incident Are Either Speculative Or Predated The Incident. ................................................................15

    B.    Plaintiff Also Does Not Properly Allege That Defendants' Withdrawal Caused Damages Because His Allegations Are Refuted by His Own Complaint...............................................................................................................19

V.    The Court Should Dismiss Plaintiff's Claim For Punitive Damages With Prejudice Because Plaintiff Does Not Meet The High Standard. ......................................21

CONCLUSION.........................................................................................................23

## TABLE OF AUTHORITIES[*]

**Page(s)**

CASES

*Anderson-Bey v. D.C.*, 466 F. Supp. 2d 51 (D.D.C. 2006) ............................................................6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................5, 10, 11

*Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1 (D.D.C. 2019) ............................................................15

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ............................................3

*Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575 (D.C. 2015) ............................................13

*Boynton v. Lopez*, 473 A.2d 375 (D.C. 1984) ............................................................22

*Caston v. Butler*, 718 F. Supp. 2d 87 (D.D.C. 2010) ............................................................22

*\*Chase v. Gilbert*, 499 A.2d 1203 (D.C. 1985) ............................................................6, 19, 21

*Dalo v. Kivitz*, 596 A.2d 35 (D.C. 1991) ............................................................22

*Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 297 F.R.D. 4 (D.D.C. 2013) ............22, 23

*Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013) ............................................ passim

*Hammerman v. Peacock*, 607 F. Supp. 911 (D.D.C. 1985) ............................................................22

*In re Lorazepam & Clorazepate Antitrust Litig.*, No. CV 03-1650 (TFH), 2004
WL 7081446 ............................................................ passim

*Marte v. Ltd. Brands*, No. CIV.A. 13-139 FSH, 2014 WL 1092503 (D.N.J. Mar.
18, 2014) ............................................................22

*Morrison v. MacNamara*, 407 A.2d 555 (D.C. 1979) ............................................................11

*Mount v. Baron*, 154 F. Supp. 2d 3 (D.D.C. 2001) ............................................................6, 15, 19, 21

*N. Am. Catholic Educ. Programming Found., Inc. v. Womble, Carlyle, Sandridge
& Rice, PLLC*, 887 F. Supp. 2d 78 (D.D.C. 2012) ............................................................13

*Nurriddin v. Bolden*, 818 F.3d 751 (D.C. Cir. 2016) ............................................................5

*O'Neil v. Bergan*, 452 A.2d 337 (D.C. 1982) ............................................................13

---

[*] Authorities upon which Defendants chiefly rely are marked with an asterisk.

*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018)............................................................5

*Park v. Reizes*, No. 06-CV-0843 GTS/GJD, 2009 WL 4893142, at *5 (N.D.N.Y. Dec. 15, 2009)............................................................................................................................7

*\*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697 (D.C. 2013) ..................................................................................................................5, 6, 19, 21

*\*Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702 (D.C. 2009)........................2, 12, 15, 16

*Rodriguez v. Lab. Corp. of AmericaHoldings*, 13 F. Supp. 3d 121 (D.D.C. 2014) .....................14

*Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122 (D.C. Cir. 2012) .................................................5

*Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739 (S.D.N.Y. 2017) ..................................12

*Scott v. Burgin*, 97 A.3d 564 (D.C. 2014).....................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...............................................2

*U.S. Telesis, Inc. v. Ende*, 64 F. Supp. 3d 65, 68 (D.D.C. 2014), *aff'd*, No. 14-7146, 2015 WL 653325 (D.C. Cir. Feb. 5, 2015) .....................................................13, 19, 21

*Williams v. Patterson*, 681 A.2d 1147 (D.C. 1996) .....................................................................19

## OTHER AUTHORITIES

*Affirmative Asylum Interview Scheduling*, U.S. Citizenship and Immigration Service, https://www.uscis.gov/affirmative-asylum-scheduling (last visited November 10, 2019) ...............................................................................................20

*Types of Asylum Decisions*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/humanitarian/refugees-asylum/asylum/types-asylum-decisions (last visited November 10, 2019)...................................................................7

*Form I-94, Arrival/Departure Record, Information for Completing USCIS Forms*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/I-94information (last visited Nov. 12, 2019)..........................................................17

*Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/(last visited November 10, 2019) ...............................................................................................20

*\*D.C. R. Prof. Conduct 1.16(a) .............................................................................................6, 8

*\*D.C. R. Prof. Conduct 3.7(a) ....................................................................................................7

*\*D.C. R. Prof. Conduct 1.7(b)(4)................................................................................................8

iii

D.C. R. Prof. Conduct 1.7, cmt. 11 .................................................................................. 9

Plaintiff Guo Wengui's Complaint against his former asylum lawyer (Thomas Ragland) and Mr. Ragland's law firm (Clark Hill PLC) (collectively, "Defendants") for legal malpractice, breach of fiduciary duty and breach of contract should be dismissed with prejudice because plaintiff fails to adequately plead numerous elements of his claim and, more importantly, cannot do so as a matter of law.  Indeed, in his thirty-page Complaint, Plaintiff has pled himself out of court because his own allegations demonstrate that he lacks any viable claims.  As outlined in his Complaint, Plaintiff has spent much of the last decade publicly criticizing the Chinese government. This public criticism has led the Chinese government to embark on alleged retribution, which has been ongoing for years.  Plaintiff eventually applied for asylum in the United States—yet continued his public campaign against the Chinese government, and publicly disclosed his applying for asylum.

This publicity—generated by Plaintiff—was quickly followed by a cyberattack by the Chinese government directed at Clark Hill, to obtain information relating to Plaintiff.  Plaintiff now attempts to manufacture three causes of action and a request for punitive damages from this turn of events—which began with Plaintiff's own publicity about the filing of his asylum petition. All three of his causes of action rest on the assertion that Defendants breached various duties to Plaintiff because of (1) the cyber incident itself, and (2) Defendants' subsequently withdrawing from the representation after the incident.  However, neither action supports a claim.  Specifically, Plaintiff offers no factual allegations regarding how Defendants allegedly breached their duties to safeguard Plaintiff's information.  Additionally, not only does the firm's withdrawing from the asylum matter not constitute legal malpractice, withdrawal was appropriate—and in fact, required—because Defendants immediately became witnesses to China's alleged persecution of Plaintiff in the asylum case when the law firm was attacked.

Furthermore, under controlling law, Plaintiff has not pleaded how either of these actions caused him any actual damages, a necessary element to sustain his claims. *See Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 708 (D.C. 2009) (affirming dismissal of claim based on negligent conduct arising from a data incident for failure to plead "actual harm"). Plaintiff has alleged no harm to his asylum proceedings resulting from the withdrawal—nor could he, as his application remains pending. In an insufficient effort to plead some damages, Plaintiff relies on vague and general allegations that are undermined by his complaint; for example, he complains that he has lost unspecified "business opportunities," and suffered unspecified limitations on his travel. Complaint ¶¶ 56, 58. By his own account, however, Plaintiff's alleged damages from the cyber incident recites the same harassment and oppression that he has been suffering long before he retained Defendants (as demonstrated by his seeking asylum in the United States). Because Defendants' actions cannot have caused these harms, the Court should dismiss Plaintiff's complaint with prejudice.

## FACTUAL BACKGROUND

Plaintiff is a well-known Chinese dissident. Complaint ¶ 10. He acknowledges that his methods of criticizing the Chinese government involves "exposing" various secrets held by the Chinese government and Chinese officials. *Id.* ¶ 15. As a result of these public activities, the Chinese government has allegedly targeted Plaintiff (and his family and businesses) with threats, harassment, and misinformation campaigns going back at least five years. *Id.* ¶¶ 10, 16-27. Plaintiff retained Defendants to represent him in his application for asylum in the United States, so he could escape this persecution. *Id.* ¶ 28. A true and correct copy of the engagement letter memorializing Defendants' representation of Plaintiff, which Plaintiff incorporated into his Complaint (*see* Complaint ¶¶ 37, 76) is attached as Exhibit A. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (for a Rule 12(b)(6) motion, courts must consider

"documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("The prototypical incorporation by reference occurs where a complaint claims breach of contract, and either party attaches to its pleading an authentic copy of the contract itself.").

Plaintiff's public criticism of the Chinese government could only earn such ire from the Chinese government if he had an audience—which he does. Plaintiff airs his criticisms on social media posts, interviews, and videos. *See Chun Han Wong and Felicia Schwartz, China Wants Fugitive Guo Wengui Back—but He's Applied for U.S. Asylum*, Wall St. J. (Sept. 7, 2017), (attached as Exhibit B); *see also Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles[.]"); *In re Lorazepam & Clorazepate Antitrust Litig.*, No. CV 03-1650 (TFH), 2004 WL 7081446, at *1 n.1, n.3 (D.D.C. May 18, 2004) (the Court may take judicial notice of matters of public record and newspaper articles). Plaintiff's YouTube page has nearly 800 videos, and he adds new ones nearly every day. *See* https://www.youtube.com/channel/UCO3pO3ykAUybrjv3RBbXEHw/videos (last visited November 10, 2019). The Complaint acknowledges all this publicity—Plaintiff notes that "the CCP [Chinese Communist Party] believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP[.]" Complaint ¶ 17. The CCP believes this because Plaintiff himself has said it—repeatedly.

In one of his videos, on September 7, 2017, Plaintiff announced that he had applied for asylum in the United States. Exhibit B (noting that Plaintiff announced asylum application in "live video broadcast"); *see also* https://www.youtube.com/watch?v=aGjBsAB46fI, at 15:25 (September 2, 2017 video announcing that in five days, Plaintiff will make "an important

announcement" relating to his "legal team" and his "visa"); https://www.youtube.com/ watch?v=xW5TzUkUjrw (video of September 7, 2017).

Less than a week later, on or about September 12, 2017, Clark Hill PLC was cyberattacked by actors sponsored by the Chinese government. *See* Complaint ¶ 41. Plaintiff himself contends that China had directed the cyber incident to obtain Plaintiff's asylum information. Philip Wen, *China denies links to alleged cyber attacks in United States targeting exiled tycoon Guo*, Reuters (Oct. 8, 2017) (attached as Exhibit C); *see also Farah*, 736 F.3d at 534 (regarding judicial notice); *In re Lorazepam*, 2004 WL 7081446, at *1 n.1, n.3 (same). After the incident, the Defendants timely notified the Plaintiff, orally and in a letter to Plaintiff—which Plaintiff also incorporated into his Complaint. *See* Complaint ¶ 49. In the letter, Defendants confirmed that the cyber incident was "related to [Defendants'] representation of [Plaintiff]." A true and correct copy of the Withdrawal Letter is attached as Exhibit D.

Defendants informed Plaintiff that they were withdrawing as Plaintiff's counsel, because the cyber incident had placed the Defendants in the position of being potential witnesses to China's efforts to target Plaintiff, and therefore to his asylum proceedings. Complaint ¶ 49; Exhibit D. Defendants assured Plaintiff that they would assist him in transitioning his asylum request to successor counsel (which has occurred). Exhibit D. Because the asylum petition had just been filed and it would take months (if not years) for the government to contact the Plaintiff regarding his application, Plaintiff did not suffer any prejudice or delay in his asylum proceeding. *See* Complaint ¶ 38, 49. Plaintiff's asylum request remains pending. *Id.* ¶ 51. Despite these undisputed facts, Plaintiff now seeks damages from Defendants, including punitive damages, for legal malpractice, breach of contract, and breach of fiduciary duty.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient facts "to state a claim to relief that is plausible on its face." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 129 (D.C. Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facts in the complaint must allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 130 (quoting *Iqbal*, 556 U.S. at 678). The Court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) (quoting *City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A plaintiff who alleges facts that render success on the merits impossible pleads himself out of court. *Nurriddin v. Bolden*, 818 F.3d 751, 757 (D.C. Cir. 2016). Similarly, failure to adequately plead an element of a claim requires dismissal. *See id.* (dismissing cause of action when plaintiff's allegations did not "give rise to an inference" that all elements of the claim were present).

For the purposes of this Motion only, Defendants accept as true all well plead allegations in the Complaint. *Iqbal*, 556 U.S. at 678. However, if it ever becomes necessary, the Defendants will demonstrate that many of the material assertions in the Complaint are inaccurate.

The law of the District of Columbia governs Plaintiff's claims. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013) (District of Columbia law applied to claims of alleged misconduct by attorneys located in the District of Columbia, the engagement letter came from the law firm's District of Columbia office, and the relationship centered around the District of Columbia). The Complaint acknowledges that the substantial part of the Defendants' work to represent Plaintiff occurred in the District of Columbia. Complaint

¶ 14.  Plaintiff does not allege that any other state has a connection to the dispute.  *Cf. Anderson-Bey v. D.C.*, 466 F. Supp. 2d 51, 67 (D.D.C. 2006) (the purpose of a choice of law analysis is to assess whether another jurisdiction has a competing interest that its laws should govern).

## ARGUMENT

### I. <u>Plaintiff's Legal Malpractice Claim Fails Because He Can Not Allege That Defendants Breached A Duty To Plaintiff.</u>

To state a claim for legal malpractice, a plaintiff must allege (1) an attorney-client relationship existed, (2) the attorney breached a duty to the client, (3) that breach caused the client injury, and (4) actual damages.  *See Chase v. Gilbert*, 499 A.2d 1203, 1211 (D.C. 1985); *Mount v. Baron*, 154 F. Supp. 2d 3, 8 (D.D.C. 2001).  As a matter of law, Plaintiff cannot allege Defendants breached any of their duties to the Plaintiff.  Moreover, as demonstrated in Section IV below, Plaintiff cannot allege that the Defendants' actions caused Plaintiff any actual harm as required to sustain a legal malpractice claim.

### A. Defendants' Withdrawal From The Representation Did Not Breach A Duty.

Plaintiff cannot show that Defendants breached any duty by withdrawing from the representation after the cyber incident.  Defendants' withdrawal was entirely proper under the District of Columbia Rules of Professional Conduct.  *Cf. Pietrangelo*, 68 A.3d at 710 (plaintiff could not state a claim for breach of fiduciary duty against attorney based on disclosing confidential information when attorneys did not violate rules of professional conduct).  An attorney must withdraw from representing a client if the attorney's ongoing representation would violate the Rules of Professional Conduct.  D.C. R. Prof. Conduct 1.16(a).  Once the cyber incident occurred, Defendants' ongoing representation would have violated multiple Rules, and therefore, they were required to withdraw from the representation.

### 1. Withdrawal was necessary under Rule of Professional Conduct 3.7.

The cyber incident put Defendants in the position of becoming witnesses in Plaintiff's asylum proceedings. An attorney "shall not" act as an advocate for a client when the attorney is "likely to be a necessary witness" in the proceeding. D.C. R. Prof. Conduct 3.7(a). The cyber incident meant that Defendants were now direct witnesses to Plaintiff's own persecution by China. Given that China's prior persecution of Plaintiff formed the basis of Plaintiff's asylum claim, Defendants now found themselves as the only witnesses to a particular aspect of China's targeting of Plaintiff. Because the facts surrounding the cyber incident support Plaintiff's asylum claim, Defendants became a necessary witness, and withdrawal was proper under the Rules of Professional Conduct.

This need for withdrawal was explained to Plaintiff in the withdrawal letter. Exhibit D. Plaintiff's response is that this stated reason is a "sham." Complaint ¶ 71. But Plaintiff's response attempts to force Defendants to sidestep their ethical obligations. For example, Plaintiff complains—two years after Defendants' withdrawal—that he had not asked Defendants to be witnesses, and that the matters relating to the cyber incident are uncontested, and thus fall into one of the limited exceptions to Rule 3.7(a). *Id.* ¶ 51. That is all pure speculation. Plaintiff may be required to undergo an asylum hearing or submit new evidence, and Plaintiff cannot predict what evidence he would want or need to submit in the future. *See Types of Asylum Decisions*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/humanitarian/refugees-asylum/asylum/types-asylum-decisions (last visited November 10, 2019) (noting that some asylum decisions require a court hearing or new evidence); *see also Farah*, 736 F.3d at 534 (regarding judicial notice); *In re Lorazepam*, 2004 WL 7081446, at *1 n.1, n.3 (same). Plaintiff cannot speak for the U.S. government, and has no basis to state with certainty what matters will be uncontested or what witnesses it will call. *Cf. Park v. Reizes*, No. 06-CV-0843 GTS/GJD, 2009 WL 4893142,

at *5 (N.D.N.Y. Dec. 15, 2009) (withdrawal was required because opposing party intended to call lawyer as witness). Similarly, it is the lawyer's obligation to assess whether continuing a representation will violate the Rules of Professional Conduct, *see* D.C. R. Prof. Conduct 1.16(a)— therefore, it is the lawyer who must assess whether he or she is "likely" to be a witness.

Notwithstanding Plaintiff's currently-stated desire not to call Defendants as witnesses, circumstances may change as asylum proceedings progress. Defendants' continued representation of Plaintiff would deprive him of the ability to make this decision if, as Plaintiff's asylum proceedings proceed, Plaintiff later decides that Defendants' testimony would be beneficial. Defendants' failure to withdraw would violate their duty to Plaintiff by depriving him of the ability to make that decision and to benefit from that testimony. As a result, withdrawal was not only appropriate, but required.

### 2. Withdrawal was necessary under Rule of Professional Conduct 1.7.

Withdrawal was also required under Rule 1.7(b)(4), which requires withdrawal if the lawyer's ability to represent a client "reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests." D.C. R. Prof. Conduct 1.7(b)(4). When the cyber incident occurred, Defendants immediately had its own interests in investigating and mitigating the incident—which conflicted with their representation of Plaintiff. Plaintiff's own allegations demonstrate this: Plaintiff complains that Defendants have not provided Plaintiff with sensitive information regarding the cyber incident, such as whether other client files have been compromised and the manner in which Defendants learned of the incident. Complaint ¶ 46.

Moreover, the Rules contemplate the same type of "prior work" conflict when a client raises questions about a lawyer's earlier conduct in an ongoing matter. The comments to the Rules explain that "if the probity of a lawyer's own conduct in a transaction is in serious question, it may

be difficult or impossible for the lawyer to give a client detached advice." D.C. R. Prof. Conduct 1.7, cmt. 11. That was the situation here—after the cyber incident, Plaintiff's questioning Defendants' conduct would have compromised Defendants' ability to provide objective advice on the same matter going forward. Withdrawal was necessary to avoid this risk.

Not only was the Defendant's withdrawal proper under the Rules of Professional Conduct, but it was expressly allowed and contemplated by the parties in the engagement letter. The engagement letter, which sets forth the scope of the representation and which Plaintiff incorporated into his complaint, expressly allowed Defendants to withdraw if Defendants "perceive that any conflicts arise that would compromise [Defendants'] ability to represent [Plaintiff]." Exhibit A at 3; *see* Exhibit A at 8. In other words, Defendants had the right, in their sole discretion, to withdraw if they perceived any conflict. As demonstrated above, Defendants were merely satisfying their professional obligations by withdrawing and ensuring Plaintiff received uncompromised representation going forward. Plaintiff cannot now raise this issue as part of his cause of action because he contractually agreed to allow Defendants to withdraw if they "perceived" any conflicts affecting Plaintiff's representation. Defendants have demonstrated such conflicts existed, or at the very least, Defendants perceived that such conflicts actually existed. Simply put, withdrawing from a representation does not constitute legal malpractice when it is done in an orderly fashion and the client has time to find replacement counsel. *Cf.* Complaint ¶ 51 (Plaintiff's asylum application has been pending since it was filed). That is exactly what occurred here.

Because the Rules of Professional Conduct mandated that Defendants withdraw from representing Plaintiff, and because withdrawal was consistent with the engagement letter, Plaintiff has not properly alleged that Defendants breached a duty by withdrawing from the representation.

**B.** **The Mere Fact A Cyber Incident Occurred Is Not Sufficient To Allege That Defendants Breached The Duty To Safeguard Confidential Information.**

Plaintiff also does not sufficiently allege that Defendants breached their duty of confidentiality to Plaintiff.  Plaintiff's allegations assume that the mere fact of a cyber incident—perpetuated by a foreign government, against an individual that it frequently and relentlessly targeted—is by itself enough to allege that Defendants' information security system must have been so deficient as to breach a duty to Plaintiff.  This reasoning has two fatal flaws.

First, Plaintiff ignores his own role in the incident.  Not only is Plaintiff a persistent and frequent critic of China—which has taken retaliatory actions against Plaintiff in the past—he personally announced the fact that he had applied for asylum in a video that he posted on the Internet.  Plaintiff himself drew attention to his asylum application and sought publicity regarding the asylum proceedings.  Plaintiff's actions alerted China to his asylum application.  This provocation shows that this cyber incident is different from the stereotypical hacker, who attacks multiple targets to obtain millions of consumers' private information to facilitate identity theft.  This hack, on the other hand, was perpetuated by a foreign government intent on targeting only Plaintiff (a very public individual).  *See* Complaint ¶¶ 15-27.

Plaintiff simply assumes that because there was a cyber incident, Defendants must have put up "porous" and "unreasonable" security measures.  *Id.* ¶¶ 41-42.  Such speculative and vague allegations are insufficient to maintain a cause of action.  *See Iqbal*, 556 U.S. at 678.  To the contrary, this was an incident carried out or perpetuated by an aggressive foreign government that has sophisticated capabilities and experience in cyber warfare.  Jack Stubbs et al., *China hacked eight major computer services firms in years-long attack*, Reuters (June 26, 2019) (Exhibit E); Kevin Collier, *Chinese spies stole NSA hacking tools, report finds*, CNN (June 15, 2019) (Exhibit F).  Indeed, after Plaintiff's yacht was allegedly hacked by China, also in September 2017, Plaintiff

publicly stated that China "can obtain private correspondence and information from each and every American citizen if it wishes, and can do that very easily almost without any cost." Bill Gertz, *Beijing Suspected in Hacking Yacht Owned by Chinese Billionaire*, Wash. Free Beacon (Sep. 8, 2017) (Exhibit G); *see* Exhibit C at 3 (noting that an organization scheduled to host a public appearance for Plaintiff announced it was the victim of a Shanghai-based cyber incident). Plaintiff must allege more than the simple fact that a cyber incident occurred to support a claim that Defendants' breached their duty.

Second, perhaps recognizing that he cannot adequately plead a breach of any duty by Defendants, Plaintiff engages in rampant and inaccurate speculation in a failing effort to maintain a cause of action. Specifically, Plaintiff argues that Defendants breached their duty "*if they delivered a 'ransom'*" of Plaintiff's information to third parties, in order to negotiate with the hackers. Complaint ¶¶ 77, 86 (emphasis added). But Plaintiff does not allege that Defendants actually ransomed Plaintiff's information because that did not occur. Similarly, Plaintiff hypothesizes that the cyber attackers hacked Defendants' information system "*apparently* without great difficulty." *Id.* ¶ 41 (emphasis added). These allegations attempt to disguise speculation as plausibility and are insufficient as a matter of law. *See Iqbal*, 556 U.S. at 678.

In fact, Plaintiff alleges that Defendants breached a duty because their security measures failed, "whatever they were." Complaint ¶ 42. This amounts to circular, after-the-fact logic: Defendants were attacked, therefore the security measures *must* have been so insufficient that Defendants breached their duty, no matter what security measures Defendants took. The mere fact of a cyber incident does not mean Defendants breached a duty; a relentless foreign government is always a cyber risk when focused on one individual's information even though Defendants took reasonable care. *See Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C. 1979) (noting that the

standard of care in legal malpractice cases is "that degree of reasonable care and skill expected of lawyers acting under similar circumstances").

Courts allow complaints based on data incidents to survive when they allege facts—not conclusory allegations—indicating that defendants did not take reasonable care. *See Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 748 (S.D.N.Y. 2017) (denying motion to dismiss when complaint alleged that defendant "failed to take reasonable steps to prevent the wrongful dissemination of Plaintiffs' [personally identifiable information]—including erecting a digital firewall, conducting data security training and adopting retention and destruction policies"). But here, Plaintiff does not attempt to explain how Defendants failed to act with reasonable care—he simply assumes that they did. By this logic, even the best possible security measures would be so deficient as to be unreasonable if a sophisticated and determined foreign government was able to overcome them. These allegations improperly focus solely on the outcome, not whether Defendants breached a duty.

For the same reason, Plaintiff's theory that Defendants breached a duty simply by taking on the representation also fails—Plaintiff does not explain how Defendants breached a duty by doing so. The mere fact of the cyber incident is insufficient to support an allegation that the matter was beyond Defendants' competence. *See* Complaint ¶ 45.

In sum, Plaintiff has not alleged that Defendants breached a professional duty to Plaintiff, through either their withdrawal from the representation or from the cyber incident. This Court should dismiss Plaintiff's malpractice claim with prejudice.

## II.   <u>The Court Should Dismiss Plaintiff's Claim For Breach Of Fiduciary Duty.</u>

Plaintiff's breach of fiduciary duty claim must be dismissed for the same reasons as the malpractice claim—Plaintiff does not sufficiently allege that Defendants breached a duty. *See Randolph*, 973 A.2d at 709 (finding that a breach of fiduciary duty claim must be dismissed "[f]or

much the same reason" as a dismissed negligence claim, when the fiduciary duty claim arose from the same facts and circumstances as the negligence claim).  "In a professional malpractice case, additional claims which are based on the underlying malpractice claim cannot survive if the professional malpractice claim fails."  *U.S. Telesis, Inc. v. Ende*, 64 F. Supp. 3d 65, 68 (D.D.C. 2014), *aff'd*, No. 14-7146, 2015 WL 653325 (D.C. Cir. Feb. 5, 2015) (quoting *Mawalla v, Hoffman*, 569 F. Supp. 2d 253, 257 (D.D.C. 2008)); *see Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 582 (D.C. 2015) ("[O]ur disposition of the claim of legal malpractice applies with equal force to the claim of breach of fiduciary duty." (quoting *Mills v. Cooter*, 647 A.2d 1118, 1120 n.6 (D.C. 1994))).

Moreover, the breach of fiduciary duty claim must be dismissed because the fiduciary duty claim and the legal malpractice claim are duplicative.  "[W]hen the basis for a claim of fiduciary breach arises from the same facts and seeks the same relief as a negligence claim, such a claim becomes redundant and therefore it should be dismissed."  *Bolton*, 110 A.3d at 582; *N. Am. Catholic Educ. Programming Found., Inc. v. Womble, Carlyle, Sandridge & Rice, PLLC*, 887 F. Supp. 2d 78, 83-84 (D.D.C. 2012) (collecting cases).  Here, the same facts underlie both the legal malpractice claim and the breach of fiduciary duty claim—both are based on Defendants' alleged failure to protect against the cyber incident and the withdrawal from representing Plaintiff, and allege the exact same damages.  *See* Complaint ¶¶ 68-74, 83-88.  The Court should dismiss Plaintiff's breach of fiduciary duty claim with prejudice.

## III.  <u>The Court Should Dismiss Plaintiff's Claim For Breach Of Contract.</u>

Plaintiff's breach of contract claim is also duplicative of the legal malpractice claim.  *See N. Am. Catholic Educ. Programming Found.*, 887 F. Supp. 2d at 83-84 (explaining that breach of contract claims, like breach of fiduciary duty claims, must be dismissed as duplicative "when arising from the same circumstances and seeking the same relief as a malpractice claim"); *O'Neil*

*v. Bergan*, 452 A.2d 337, 343 (D.C. 1982). The Court should dismiss the breach of contract claim for this reason alone.

Even if the Court were to examine the elements of a breach of contract claim, it must dismiss the claim because Plaintiff fails to adequately plead the cause of action. A claim for breach of contract under District of Columbia law requires "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Rodriguez v. Lab. Corp. of AmericaHoldings*, 13 F. Supp. 3d 121, 134 (D.D.C. 2014) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). Here, Plaintiff acknowledges that the parties entered into a written agreement—the engagement letter. *See* Complaint ¶ 76 ("[Defendants] entered into a written contract with plaintiff for the firm to represent the plaintiff."); ¶ 34 (alleging that the engagement letter "created and formalized contractual" duties); Exhibit A. By its terms, the engagement letter "sets forth the respective obligations and expectations" of the parties, and could be modified only in writing. Exhibit A at 1, 5. Accordingly, the engagement letter was the contract.

Plaintiff does not allege how Defendants breached the engagement letter, and without such an allegation, the claim must be dismissed. Perhaps recognizing this deficiency, Plaintiff attempts to allege that Defendants had a separate agreement to safeguard Plaintiff's information above and beyond the express requirements of the contract. Complaint ¶ 33. But Plaintiff alleges no facts about the formation of this additional "agreement" because it did not exist. Nor could he—the engagement letter expressly states that the contract between the parties can be modified only in writing. Plaintiff has not alleged that this purported separate agreement was in writing. For all of these reasons, the Court must also dismiss Plaintiff's breach of contract claim with prejudice.

## IV. All Three of Plaintiff's Claims Should be Dismissed Because Plaintiff Does Not Allege (and Cannot Allege) That Defendants' Actions Caused Actual Damages.

As an initial matter, Plaintiff claims damages of $50 million, but does not explain (in any way, shape, or form) how he arrived at that figure. Furthermore, Plaintiff has not alleged the actual damages necessary to sustain any of his tort claims. He complains of persecution at the hands of the Chinese government—but this persecution began long before the cyber incident. Plaintiff has not explained how the persecution has increased or worsened, or how the cyber incident caused any *new* tangible harm. Nor could he. This fatally dooms his complaint.

To sustain a tort claim for legal malpractice or breach of fiduciary duty, a plaintiff must show *actual* injury caused by the defendant. *Randolph*, 973 A.2d at 708-09 (regarding claims based on negligence); *Mount*, 154 F. Supp. 2d at 8 (legal malpractice requires "actual loss or damage resulting from [the attorney's] negligence" (quoting *Shapiro, Lifschitz & Schram v. R.E. Hazard, Jr.*, 24 F. Supp. 2d 66, 75 (D.D.C. 1998))). This same standard applies to breach of contract claims. *See Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 9-10, 12 (D.D.C. 2019).

### A. All Plaintiff's Claimed Damages From The Cyber Incident Are Either Speculative Or Predated The Incident.

Plaintiff alleges two types of speculative damages from the cyber incident: his fears of future harm resulting from the data incident, and the array of general and vague damages purportedly inflicted by the Chinese government, which has been ongoing for years. *See* Complaint ¶ 10. Neither of these can support his claims.

The District of Columbia Court of Appeals has squarely addressed the injury necessary to support a tort claim stemming from a data incident, and based on this controlling case law, Plaintiff's allegations are insufficient. In *Randolph v. ING Life Insurance and Annuity Co.*, burglars stole a laptop computer from an ING Agent's home containing—without any encryption or password protection—personal information of participants in a deferred compensation plan that

15

ING oversaw. 973 A.2d at 704-05. This personal information included addresses and Social Security numbers. *Id.* at 704, 706. The plaintiffs sued ING, alleging a number of tort claims, including negligence, gross negligence, and breach of fiduciary duty, alleging that they suffered (1) the risk of their identities being stolen, (2) the cost of credit monitoring and other security measures, and (3) the physical danger posed to some plaintiffs (who were police officers) by "those who may harbor ill-will toward police." *Id.* at 708-09.

The district court dismissed the complaint, and the court of appeals affirmed the dismissal of the complaint in its entirety. The court held that all three of the types of harm alleged amounted to a risk of future harm, and therefore did not sustain the plaintiffs' claims. *Id.* In doing so, the court explained that "[s]peculative harm, or the threat of future harm—not yet realized does not suffice to create a cause of action for negligence." *Id.* at 708 (quoting *In re Estate of Curseen v. Buchanan Ingersoll, P.C.*, 890 A.2d 191, 194 (D.C. 2006)).

It is the same here. Plaintiff's claims are far more speculative than those in dismissed in *Randolph* for three reasons. First, the only damages that Plaintiff attempts to link to the cyber incident are unspecified lost business opportunities, unspecified "costs and expenses," and unspecified "damages to his personal and professional reputation." Complaint ¶ 56. These allegations are so general, Plaintiff does not even identify his "business" or explain how it (a non-party) was harmed. He complains that his asylum application has surfaced on the Internet, but cannot explain how this has actually harmed him. Plaintiff's criticisms of China were well-known and widespread for years *before* the incident. *See id.* ¶ 10. Plaintiff has not explained how his asylum application contained any information or criticisms of China that Plaintiff himself had not already placed in the public sphere—indeed, asylum applications are necessarily based on recounting *past* persecution by the applicant's home country.

16

Plaintiff states only that the information has "lost its confidential status," and that there is unspecified "cause to believe" that others *might* have used this information to harm him. *Id.* ¶¶ 9, 57. This is precisely the kind of speculative damages rejected by *Randolph*. There, the fear of future harm generated by compromised Social Security numbers and addresses did not sufficiently allege actual damages. Similarly, Plaintiff complains only that information was hacked—he does *not* allege facts as to how this alleged disclosure has or will harm him. Indeed, it is unlikely that Plaintiff could ever show that any of the information he alleges was stolen could damage him at all—for example, an I-94 number, which Plaintiff alleges was in the information, is simply a number issued to any visitor to the United States. *See* Complaint ¶ 43; *Form I-94, Arrival/Departure Record, Information for Completing USCIS Forms*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/I-94information (last visited Nov. 12, 2019). Nor has Plaintiff alleged any damage from the publication of his passport number (again part of the information, *see* Complaint ¶ 43)—which would be unlikely, given that anyone attempting to travel under Plaintiff's name would face the well-publicized Interpol arrest notices. This contrasts with the information lost in *Randolph* (social security numbers), which could facilitate identity theft, and yet still was insufficient to state a claim.

Second, Plaintiff recites the litany of harm he has suffered at the hands of the Chinese government—but by his own admission, these harms have been ongoing for years before he hired Defendants. *See* Complaint ¶¶ 23-24. For example, as early as January 2015, Plaintiff alleges that he "rightly feared being arrested, detained, interrogated, tortured, and/or killed by the Chinese government and/or the CCP." *Id.* ¶ 19. Yet, after the cyber-incident, he complains that his personal safety is at risk—just as it was before. *Id.* ¶ 56. Prior to the incident, Plaintiff alleges that the Chinese government often arrested and detained his colleagues and his employees were arrested

17

and detained, and that he feared for the safety of his family and friends. *Id.* ¶¶ 16, 19. After the cyber-incident, he alleges that the Chinese government continues to detain his employees and harass his family—with no explanation how this has increased or worsened after the incident, or, more importantly, that the cyber incident caused any increase or worsening of such harm. *See id.* ¶ 56. Plaintiff complains that he has limited freedom to travel as a result of the incident, *id.* ¶ 58— but he acknowledges that the Chinese government issued an Interpol "red notice" limiting his ability to travel—before the cyber incident. *Id.* ¶ 21; *China says Interpol seeks arrest of tycoon Guo Wengui*, BBC News (Apr. 20, 2017) (Exhibit H) (Interpol red notice was issued in April 2017); *see also Farah*, 736 F.3d at 534 (regarding judicial notice); *In re Lorazepam*, 2004 WL 7081446, at *1 n.1, n.3 (same). More specifically, Plaintiff does not explain how the cyber incident limited his freedom to travel beyond the restrictions that already existed, or how to quantify any such limitation after the incident. As a result, Plaintiff does not allege any actual injury that began (or even worsened) after the cyber-incident. Without pleading facts to support damages caused by Defendants' conduct, Plaintiff's Complaint fails to state a claim.

Third, Plaintiff cannot sustain a claim based on damages to his businesses, or on behalf of his employees, even if he had alleged what those damages were. A legal malpractice claim based on damages to a third party requires that the third party be the intended beneficiary of the legal services. *See Scott v. Burgin*, 97 A.3d 564, 566 (D.C. 2014). That is not the case here—Plaintiff has not pleaded any facts that Defendants provided legal services to his businesses. *See* Exhibit A.

In sum, even if the Court were to determine that these ongoing damages inflicted by China represented "actual harm," Plaintiff does not allege that any of these harms were caused by the cyber incident. As explained above, by his own words, Plaintiff acknowledges that he has been suffering harm at the hands of the Chinese government for years—due to his own outspoken and

frequent advocacy. Indeed, that is why Plaintiff filed his asylum application in the first place. That all of Plaintiff's non-speculative harms have been ongoing since at least 2015 demonstrates that Plaintiff has not alleged, and cannot allege, that the cyber incident at Defendants' offices itself caused any actual harm. *Cf. Williams v. Patterson*, 681 A.2d 1147, 1150 (D.C. 1996) ("The law is settled that where an accident does not cause a diseased condition, but only aggravates and increases the severity of a condition existing at the time of the accident, such party could only recover for such increased or augmented sufferings as were the natural and proximate result of the negligent act." (quoting *Baltimore & Ohio Railroad Co. v. Morgan*, 35 App. D.C. 195, 200 (1910))).

### B. Plaintiff Also Does Not Properly Allege That Defendants' Withdrawal Caused Damages Because His Allegations Are Refuted by His Own Complaint.

Plaintiff complains of three types of damages he has suffered due to Defendants' withdrawal as his attorneys in the asylum case, but none of them show the actual harm needed to support his claims. A claim for legal malpractice requires that the "attorney's negligence caused a legally cognizable injury," and "more is required than speculation." *Chase*, 499 A.2d at 1212; *see Pietrangelo*, 68 A.3d at 713 ("Pietrangelo does not allege sufficient facts showing causation or resulting non-speculative harm from WilmerHale's breach of its professional duty."); *U.S. Telesis*, 64 F. Supp. 3d at 68 ("UST has not sufficiently pleaded that defendants' conduct caused it to lose its damage claims in the underlying case."); *Mount*, 154 F. Supp. 2d at 9-10 (dismissing complaint where "there is no basis to conclude from the complaint that the jury's verdict would have been any different had other law firms (and claims) been included").

Plaintiff first speculates that Defendants' withdrawal from representing him delayed his asylum proceedings. Complaint ¶ 56. Plaintiff pleads such vague and speculative damages because he concedes his asylum petition is still pending. But he offers no reason to infer that the

attorney representing an asylum seeker has any bearing on the speed with which the U.S. government schedules asylum proceedings. By the time Defendants withdrew, the asylum application was filed, at which point Plaintiff had to wait for the government to act by scheduling an initial asylum interview. Initial asylum interviews are known to take years to schedule. *See Affirmative Asylum Interview Scheduling*, U.S. Citizenship and Immigration Service, https://www.uscis.gov/affirmative-asylum-scheduling (last visited November 10, 2019) (noting that asylum interview scheduling was changed in January 2018 to a last-in-first-out basis, meaning that older filings like Plaintiff's will be addressed only after more recent filings); *see also Immigration Court Backlog Tool*, https://trac.syr.edu/phptools/immigration/court_backlog/ (last visited November 10, 2019) (showing average wait time of 761 days and over 100,000 pending cases for hearing location in New York City); *see also Farah*, 736 F.3d at 534 (regarding judicial notice); *In re Lorazepam*, 2004 WL 7081446, at *1 n.1, n.3 (same). Therefore, the change in counsel shortly after filing the application did not cause any delay.

Second, Plaintiff complains that he has been denied the benefit of Defendants' immigration law expertise. Complaint ¶ 56. But Plaintiff does not allege that he has been unable to obtain qualified successor counsel. Nor does he allege that Defendants are the only lawyers who could successfully handle his asylum application. Plaintiff acknowledges that his asylum application is still pending—meaning that successor counsel has had over two years to prepare for the interview and potential hearing. This is not a case of counsel causing prejudice by abandoning a client on the eve of trial.

Third, Plaintiff alleges that he suffered reputational harm because the withdrawal somehow indicates that Plaintiff is "untrustworthy." *Id.* ¶ 60. This is again purely speculative, and not the

type of "actual harm" required by the law.  Plaintiff has not plead who (if anyone) was aware of Defendants' withdrawal in this matter or how it changed their opinion of Plaintiff.

Plaintiff speculates that the outcome of his asylum proceedings will be worse than if Defendants had not withdrawn.  *See id.* ¶ 60.  But speculation about the outcome of legal proceedings is precisely the kind of allegation that cannot sustain a legal malpractice claim.  *See Pietrangelo*, 68 A.3d at 710 (dismissing causes of action that were based on abstract allegations that if the attorneys in the underlying action had acted differently, the court would have ruled in the plaintiff's favor); *Chase*, 499 A.2d at 1212 (affirming dismissal of legal malpractice counterclaim because counter-plaintiff's claim that outcome of underlying proceedings would have been different was speculative).  Plaintiff does not identify any adverse action in his asylum proceedings, much less one that was caused by Defendants' actions.  Obviously, if Plaintiff is ultimately granted asylum, he will have suffered no damages from the withdrawal as a matter of law. *See U.S. Telesis*, 64 F. Supp. 3d at 68; *Mount*, 154 F. Supp. 2d at 9-10.

Moreover, Plaintiff similarly has not adequately alleged that the withdrawal *caused* cognizable injuries to Plaintiff.  To sufficiently allege causation, Plaintiff must allege that Defendants' negligence caused him to lose a meritorious claim.  *See U.S. Telesis*, 64 F. Supp. 3d at 68.  By Plaintiff's own admission, his asylum claim remains pending, so he cannot allege any negative effect on his ability to obtain asylum.

Because Plaintiff cannot allege that the withdrawal caused him any harm, the claims based on the withdrawal must be dismissed with prejudice as a matter of law.

## V.      <u>The Court Should Dismiss Plaintiff's Claim For Punitive Damages With Prejudice Because Plaintiff Does Not Meet The High Standard.</u>

Plaintiff alleges that Defendants acted "intentional[ly]," "reckless[ly]," and committed "fraud," but alleges no facts—none whatsoever—to support these conclusory allegations.

Complaint ¶¶ 62-64.  These bare conclusions are wholly insufficient to meet the Rule 12(b)(6) pleading standard, and the court should dismiss the claim for punitive damages with prejudice. *See Caston v. Butler*, 718 F. Supp. 2d 87, 89 (D.D.C. 2010) ("conclusory claims" of "outrageous or reckless conduct do not provide a basis for [a punitive damages] award").  In essence, Plaintiff is asking the court to assume "reckless" conduct occurred without providing any basis for such conclusions.  This flips the pleading standard on its head.

Moreover, Plaintiff's allegations do not state a claim for punitive damages.  To recover punitive damages against an attorney, a defendant must act with actual malice or willful disregard of the plaintiff's rights.  *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 297 F.R.D. 4, 13 (D.D.C. 2013); *Dalo v. Kivitz*, 596 A.2d 35, 40 (D.C. 1991) ("[P]unitive damages are appropriately reserved only for tortious acts which are replete with malice." (quoting *Zanville v. Garza*, 561 A.2d 1000, 1002 (D.C. 1989))).  "[F]or punitive damages, actions do not become more egregious simply because of the professional obligations of the person committing them."  *Boynton v. Lopez*, 473 A.2d 375, 378 (D.C. 1984).  The Court can dismiss a claim for punitive damages under Rule 12(b)(6) when the Plaintiff does not allege facts that allow the Court to "infer the level of callousness necessary for punitive damages."  *Marte v. Ltd. Brands*, No. CIV.A. 13-139 FSH, 2014 WL 1092503, at *5 (D.N.J. Mar. 18, 2014); *see Hammerman v. Peacock*, 607 F. Supp. 911, 919 (D.D.C. 1985) (dismissing claim for punitive damages for common law tort and contract claims, and explaining that "punitive damages are awardable only where the defendant's conduct was particularly outrageous, demonstrating reckless disregard for the rights of others, and mere inadvertence or even gross negligence is insufficient").

This high standard is not even close to being met here; Plaintiff has not alleged any facts indicating that Defendants acted with malice or willfully disregarded the Plaintiff's rights, and, as

demonstrated above, he cannot do so. Courts have rejected punitive damages requests with far more egregious conduct. For example, in *Embassy of Federal Republic of Nigeria v. Ugwuonye*, a client sought punitive damages against its former attorney who had stolen the client's tax refund and deposited it in his law firm's account, while continuing to tell the client that the tax refund was forthcoming, and never returned the refund. 297 F.R.D. at 7. The Court declined to award punitive damages because the client had not shown that the attorney acted with the required malice. *Id.* at 14. Defendants' alleged behavior is nowhere near as egregious (indeed, it was all ethical and in the client's best interest), and thus Plaintiff has not adequately alleged facts to support a claim for punitive damages.

## CONCLUSION

Plaintiff does not sufficiently allege that Defendant's actions or inactions caused him any actual harm—the only harms he allegedly suffered are ones that have been ongoing for years before the cyber incident. Any "new" harm is totally speculative. Plaintiff also does not allege that Defendants breached any duty they owed to him—he simply blames them for acting in an ethical manner and for a data incident, precipitated by his own publicity, which has caused him no harm. All three of his alleged causes of action are duplicative of one another. Finally, he offers no facts that support his claim for punitive damages. The Court should dismiss the entire Complaint with prejudice.

Dated: November 25, 2019

Respectfully submitted,

CLARK HILL PLC and
THOMAS K. RAGLAND

By: */s/   John R. Storino*
           One of their attorneys

John R. Storino
*(via pro hac vice)*
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
JStorino@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK, LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
Tel: (202) 639-6000
KBracey@jenner.com

## <u>CERTIFICATE OF SERVICE</u>

       I, John R. Storino, an attorney, hereby certifies that I served the foregoing Memorandum in Support of Defendants' Motion to Dismiss on the following by electronic on this, the 25th day of November, 2019:

          Ari S. Casper
          Ralph S. Tyler
          The Casper Firm
          400 E. Pratt Street, Suite 903
          Baltimore, MD 21202

                                */s/ John R. Storino*

# Exhibit A

# CLARK HILL

Thomas K. Ragland
T 202.552.2360
F 202.772.0901
Email: tragland@clarkhill.com

Clark Hill PLC
1001 Pennsylvania Ave. NW
Suite 1300 South
Washington, DC 20004
T 202.772.0909

F 202.772.0919
clarkhill.com

August 28, 2017

**VIA ELECTRONIC MAIL:** spencerlee952@gmail.com

Initiatives For China
Attn: Lianchao Han, Esq.
1875 Connecticut Ave, Ste. 410
Washington, DC 20009

### Re:     Retention of Clark Hill

Dear Mr. Han,

Please allow the following to serve as a letter of agreement confirming that you have retained Clark Hill to represent Mr. Ho Wan Kwok in connection with legal matters. This agreement sets forth the respective obligations and expectations in our attorney-client relationship.

### A.     SCOPE OF REPRESENTATION

Clark Hill will represent Mr. Ho Wan Kwok in U.S. immigration matters.

### B.     PAYMENT OF FEES

Clark Hill will accept your case on an hourly basis. Our fees are based on the time spent and the regular hourly rates of each attorney, paralegal, and legal assistant performing work on your behalf. The hourly rates for each of our professionals are as follows:

| | |
|---|---|
| Thomas Ragland (Member) | $510 |
| Patrick Taurel (Associate) | $310 |
| Jennifer Cook (Senior Attorney) | $285 |
| Senior Paralegals | $235 |
| Lauren Barger (Paralegal) | $170 |
| Legal Secretaries | $100 |

These rates are subject to yearly increases (on January 1). Most of the work on your case will be handled by me and an associate attorney. To the extent possible, I will endeavor to have other

members of the staff handle appropriate tasks, at lower rates, and will delegate "legwork" to you as much as possible.

All of our attorney and other professional time is compiled in a computerized billing system. Our invoices will detail the hours, tasks accomplished, and rates for attorneys and other professionals who perform work on the matter. We will provide you with a bill on a monthly basis, sent to your attention. Payment is due upon receipt. Any balance unpaid after 30 days of the date of the invoice shall accrue interest at the rate of seven percent (7%) per annum. Payments shall be applied first to accrued interest, if any, and then to the unpaid principal balance.

It is further understood and agreed that you will reimburse the firm for costs advanced and expenses incurred which are related to this matter. With respect to disbursements that exceed $100, we may forward the bills to your attention and request that you pay the outside vendor directly.

## C. RETAINER

**A retainer fee of $10,000 is due upon execution of this agreement.**

## D. YOUR RIGHTS AS A CLIENT

As a client of the firm, you have the right to: (A) expect competent representation by an attorney; (B) determine the purposes to be served by the legal representation, so long as those purposes are legal and do not violate the attorney's obligation to the profession or to the judiciary; (C) be kept reasonably informed about the status of the matter and have the attorney respond promptly to reasonable requests for information; and (D) terminate the representation of the attorney at any time, with or without cause, subject to liability for payment of legal services provided and costs incurred by the firm.

## E. YOUR RESPONSIBILITIES AS A CLIENT

As a client of the firm, you have the responsibility to: (A) obey all orders issued by a court concerning your matter; (B) be candid and truthful with the attorney and the court; and (C) pay the firm as provided by this agreement and any other agreements regarding payment for legal services and expenses. As a client, you may not: (A) demand that the attorney use offensive tactics or treat anyone involved in the legal process with anything but courtesy and consideration; (B) demand any assistance from the attorney which violates the Rules of Professional Conduct; or (C) pursue or insist upon a course of action which the attorney reasonably believes to be illegal, fraudulent, offensive, or unwise. The attorney may terminate this agreement for reasons permitted under the Rules of Professional Conduct.

## F. COMMUNICATION WITH THE FIRM

During the course of this matter, we will promptly return your telephone calls, respond to your e-mails, and answer your letters. We request that you promptly return our telephone calls,

CLARK

respond to our e-mails, and provide information or documentation that we may request in a timely fashion.

All evidence of any nature that is arguably relevant to this matter, including but not limited to documents (whether hard copy or electronic) and other physical evidence, must be preserved. Moreover, scheduled routine destruction of any stored records (whether hard copy or electronic) must be suspended immediately until after this matter is concluded. Failure to do so may result in sanctions by a court or tribunal.

In order to preserve the attorney/client privilege that attaches to our communications, it is important that all future oral communications about this matter occur only in the presence of a Clark Hill attorney. Further, all written communications about the matter should be directed to a Clark Hill attorney.

## G.     OTHER MATTERS

If we perceive that any conflicts arise that would compromise our ability to represent you, we reserve the right to withdraw from representation.

Attached to this letter is a copy of our Standard Terms of Engagement for Legal Services, which will form a part of this letter and our agreement. We request that you review the enclosed document in its entirety, and contact us should you have any questions concerning the matters set forth therein. If the terms and conditions stated herein and in the attached Standard Terms of Engagement for Legal Services are satisfactory to you, please sign this letter where indicated and return it at your earliest convenience. In addition, please remit the initial payment of **$5,000,** to be applied toward the retainer.

Again, thank you for your confidence in selecting Clark Hill PLC to represent you in this matter. We look forward to working with you.

Very truly yours,

CLARK HILL PLC

Thomas Ragland
Member



## ACKNOWLEDGMENT

I, hereby acknowledge receipt of a copy of the foregoing letter and the accompanying Standard Terms of Engagement for Legal Services, and accept, and agree to be bound by, the terms stated therein.

Date: ___Avo. 28, 2017___

Mr. Lianchao Han, Esq.

PARK HILL

## STANDARD TERMS OF ENGAGEMENT
## FOR LEGAL SERVICES


This statement sets forth the standard terms of our engagement as your lawyers. Unless modified in writing by mutual agreement, these terms will be an integral part of our agreement with you. Therefore, we ask that you review this statement carefully and contact us promptly if you have any questions. We suggest that you retain this statement in your file.


## The Scope of our Work

You should have a clear understanding of the legal services we will provide. Any questions that you have should be dealt with promptly.

We will at all times act on your behalf to the best of our ability. Any expressions on our part concerning the outcome of your legal matters are expressions of our best professional judgment, but are not guarantees. Such opinions are necessarily limited by our knowledge of the facts and are based on the state of the law at the time they are expressed.

It is our policy that the person or entity we represent is the person or entity identified in our engagement letter and does not include any affiliates of such person or entity, such as parents, subsidiaries, employees, officers, directors, shareholders or partners of a corporation or partnership, or commonly owned corporations or partnerships; or, if you are a trade association, any members of the trade association.

It is also our policy that the attorney-client relationship will be considered terminated upon our completion of any services which you have retained us to perform, or upon notification by you that you desire to terminate such services. If you later retain us to perform further or additional services, our attorney-client relationship will be revived subject to these terms of engagement, as they may be supplemented at that time.


## Who Will Provide the Legal Services

Customarily, each client of the firm is served by a principal attorney contact. The principal attorney should be someone in whom you have confidence and with whom you enjoy working. You are free to request a change of principal attorney at any time. Subject to the supervisory role of the principal attorney, your work or parts of it may be performed by other lawyers and legal assistants in the firm. Such delegation may be for the purpose of involving lawyers or legal assistants with special expertise in a given area or for the purpose of providing services on the most efficient and timely basis.

## How Fees Will Be Set

In determining the amount to be charged for the legal services we provide to you we will consider:

- The time and effort required, the novelty and complexity of the issues presented, and the skill required to perform the legal services promptly;

- The fees customarily charged in the community for similar services and the value of the services to you;

- The amount of money or value of property involved and the results obtained;

- The time constraints imposed by you as our client and other circumstances, such as an emergency closing, the need for injunctive relief from court, or substantial disruption of other office business;

- The experience, reputation, and expertise of the lawyers performing the services.

Among these factors, the time and effort required are typically weighted most heavily. We will keep accurate records of the time we devote to your work, including conferences (both in person and over the telephone), negotiations, factual and legal research and analysis, document preparation and revision, travel on your behalf, and other related matters. We record our time in units of tenths of an hour.

The hourly rates of our lawyers and legal assistants have an important bearing on the fees we charge. These rates are adjusted annually to reflect current levels of legal experience, changes in overhead costs, and other factors.

We are often requested to estimate the amount of fees and costs likely to be incurred in connection with a particular matter. Whenever possible, we will respond to your request by furnishing an estimate based upon our professional judgment, but always with a clear understanding that – unless explicitly stated in the representation agreement – it is not a maximum or fixed fee quotation. The ultimate cost frequently is more or less than the amount estimated.

For certain well-defined services, for example, a simple business incorporation, we will quote a flat fee. It is our policy not to accept representation on a flat fee basis except in such defined-services areas or pursuant to a special arrangement tailored to the needs of a particular client. In all such situations, the flat fee arrangement will be expressed in a letter setting forth both the amount of the fee and the scope of the services to be provided.

In undertaking representation of a client with a personal injury or wrongful death claim, we will, in appropriate circumstances, provide legal services on a contingent fee basis. Any such contingent fee arrangement must be reflected in a written contingent fee agreement approved by our contingent fee review committee.

## Retainer and Trust Deposits

New clients of the firm are commonly asked to deposit a retainer with a firm. Typically, the retainer is equal to the fees and costs likely to be incurred during a two-month period. Unless otherwise agreed, the retainer deposit will be credited toward your unpaid invoices, if any, at the conclusion of services. At the conclusion of our legal representation or at such time as the deposit is unnecessary or is appropriately reduced, the remaining balance or an appropriate part of it will be returned to you. If the retainer deposit proves insufficient to cover current expenses and fees on at least a two-month basis, it may have to be increased.

Deposits which are received to cover specific items will be disbursed as provided in our agreement with you, and you will be notified from time to time of the amounts applied or withdrawn. Any amount remaining after disbursement will be returned to you.

All trust deposits we receive from you will be placed in a trust account for your benefit. By court rules, your deposit will be placed in a pooled account if it is not expected to earn a net return, taking into consideration the size and anticipated duration of the deposit and the transaction costs. Other trust deposits will also be placed in the pooled account unless you request a segregated account. By court rules in each of these jurisdictions, interest earned on the pooled account is payable to a charitable foundation established in accordance with such court rules. Interest earned on the segregated trust account will be added to the deposit for your benefit and will be includable in your taxable income.

## Out-of-Pocket Expenses

We typically incur and pay on behalf of our clients a variety of out-of-pocket costs and internal charges arising in connection with legal services. These include charges made by government agencies and service vendors. Whenever such costs are incurred, we will carefully itemize and bill you for them. Typical of such costs are courier and express delivery charges; outside printing and reproduction costs; filing fees; deposition and transcript costs; witness fees; travel expenses; charges made by outside experts and consultants, including accountants, appraisers, and other legal counsel (unless arrangements for direct billing have been made). Internal charges for items such as long distance telephone calls, facsimile, postage, internal copying, local messengers, and computerized legal research are included as part of our hourly rate and will not be billed to you. We incur outside costs as agents for our clients, who agree that these costs will always be paid on a regular basis.

We reserve the right to make, at your expense, and retain copies of all documents generated or received by us in the course of our representation.

## Termination

You may terminate our representation at any time, with or without cause, by notifying us. If such termination occurs, your papers and property will be returned to you promptly upon receipt of payment for outstanding fees and costs. Our own files pertaining to the case will be retained. Your termination of our services will not affect your responsibility for payment of legal services rendered or out-of-pocket costs and internal charges incurred before termination and in connection with an orderly transition of the matter.

We are subject to the Rules of Professional Conduct governing attorneys in Washington, DC, which list several types of conduct or circumstances that require or allow us to withdraw from representing a client, including, for example: persistence in a course of conduct which we reasonably believe to be criminal or fraudulent; insistence upon pursuing an objective which we consider to be repugnant or imprudent; failure of a substantial nature to fulfill an obligation after reasonable warning that it will result in our withdrawal; or other good cause. We try to identify in advance and discuss with our client any situation that may lead to our withdrawal and if withdrawal ever becomes necessary, we will immediately provide the client written notice of our withdrawal.

## Billing Arrangements and Terms of Payment

We will bill you on a regular basis, normally each month, for both fees and disbursements. You agree to make payment within 30 days of receiving our statement. We will give you prompt notice if your account becomes delinquent, and you agree to bring the account or the retainer deposit current. If the delinquency continues and you do not arrange satisfactory payment terms, we will withdraw from the representation and pursue collection of your account. We will also request permission of any court in which we have filed an appearance on your behalf to allow us to withdraw as your counsel, and you agree that non-payment of our fees is a valid basis for our request to so withdraw.

## Your Right to Arbitrate

If you disagree with the amount of our fee, we request that you first take up the question with your principal attorney contact or with the firm's managing partner. Typically, such disagreements are resolved to the satisfaction of both sides with little inconvenience or formality. In the event of a fee dispute which is not readily resolved, you have the right to request arbitration under the auspices of the bar associations for jurisdictions in which we practice, and we agree to participate fully in that process.

Exhibit B

YOU HAVE BEEN SELECTED    

WSJ wants to hear from you. Take part in this short survey to help shape The Journal. Take Survey

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/fugitive-chinese-businessman-seeks-u-s-asylum-1504805457

WORLD

# China Wants Fugitive Guo Wengui Back—but He's Applied for U.S. Asylum

Rich businessman lobs graft allegations at China's elite from his New York perch as Beijing seeks his extradition and trial



Businessman Guo Wengui in New York in April. **PHOTO:** BRENDAN MCDERMID/REUTERS

*By Chun Han Wong and Felicia Schwartz*

Updated Sept. 7, 2017 8:49 pm ET

BEIJING—An exiled Chinese businessman who has alleged corruption among China's political and corporate elites said he is seeking asylum in the U.S., as Beijing tries to discredit him and try him on criminal charges.

Guo Wengui, a property tycoon who has lived in the U.S. since 2015, said on a live video broadcast on Thursday that he applied for political asylum to protect himself from what he calls

the Chinese government's efforts to persecute and silence him.

"My home country wants to harm me, by any means necessary," Mr. Guo said in the video, filmed in his New York residence. A pending asylum application would allow him to remain in the U.S., potentially for years as the process unfolds. If approved, Chinese authorities "will not be able to take me back, no matter what method they use," he said.

In recent months, Mr. Guo has riveted many Chinese with salacious tales of allegedly corrupt ties between China's business elite and senior Communist Party officials. His disclosures, aired on social media and video interviews, have the potential to roil behind-the-scenes jostling among senior leaders seeking promotions at the party's twice-a-decade leadership shuffle in October.

The U.S. State Department, the U.S. Citizenship and Immigration Services, and China's Foreign Ministry didn't immediately respond to requests for comment. Reached via the WhatsApp messaging service, Mr. Guo referred to his online remarks and didn't respond to additional queries.

Though Mr. Guo has provided scant evidence to substantiate his allegations, many Chinese are paying attention. Beijing has responded by declaring him a criminal suspect and requesting an Interpol arrest notice that was issued in April.

A decision to grant Mr. Guo asylum could lead to diplomatic complications for the Trump administration, which is seeking China's cooperation in pressuring North Korea as Pyongyang ramps up its testing of missiles and nuclear technology. Beijing has indicated it wants Mr. Guo returned to China as a wanted exile, and his pending request will likely be an additional irritant between Beijing and Washington.

The U.S. and China don't have an extradition agreement.

Mr. Guo, who also uses the name Miles Kwok, filed his asylum application on Wednesday, said Thomas Ragland, the businessman's Washington-based immigration lawyer on the matter.

Mr. Guo is living in the U.S. on a tourist visa that expires within weeks, Mr. Ragland said. "In addition to the asylum claim, we may apply to extend that visa or to change to a different visa status," he said, adding that a visa would allow Mr. Guo more freedom to work in the U.S. and travel abroad, compared with a basic entitlement to remain in the country granted by an asylum application.

Asylum seekers usually must apply within one year of arriving in the U.S., though there are exceptions. Applicants undergo fingerprinting and a background check and after that, an interview with immigration officials, according to U.S. Citizenship and Immigration Services.

Applicants can wait for months or even years to undergo the interview, and are permitted remain in the U.S. as they go through the process. In most cases, decisions about asylum are made by immigration officials about two weeks after the interview, although decisions can be delayed if applicants are still undergoing security screening or if the case is referred to more senior officials.

Those denied asylum requests aren't allowed to appeal them, but can reapply, according to USCIS.

Mr. Guo has said he left China in late 2014 after receiving a tip about the imminent arrest of one of his "benefactors," a then vice minister of state security who was later detained for alleged corruption.

He then laid low before surfacing early this year with a series of video interviews and Twitter posts claiming he had detailed evidence of wrongdoing by senior party officials, their relatives and associates, and prominent Chinese businessmen.

Mr. Guo's disclosures has earned him a large following online—and a multipronged effort to discredit him.

China's Foreign Ministry has dismissed Mr. Guo's allegations as falsehoods. Chinese courts have jailed and fined a number of Mr. Guo's former associates and subordinates for crimes including fraud and embezzlement. Chinese media have published articles portraying him as unscrupulous. Several Chinese companies and individuals have sued Mr. Guo for defamation in U.S. courts.

In August, Chinese officials told the Associated Press that Mr. Guo was being investigated in at least 19 major criminal cases that involve bribery, kidnapping, fraud, money laundering and rape.

Mr. Guo has denied the allegations.

China's robust response underscores the stakes for the ruling Communist Party elite as it prepares for its October congress. Party insiders say President Xi Jinping wants to avoid controversies that could undermine his efforts to promote allies to leadership posts and sideline rivals before his second five-year term.

Mr. Guo has in the past claimed that he no longer possessed Chinese identification papers and holds passports from various jurisdictions, including the U.S. and Britain. However, documents from lawsuits Mr. Guo filed in New York in 2015 and 2016 show the tycoon identifying himself as a Chinese national with Hong Kong identification papers.

Mr. Ragland, the lawyer, said Mr. Guo doesn't have an American passport, and is residing in the U.S. with a valid passport and visa. He declined to comment on Mr. Guo's nationality.

**Write to** Chun Han Wong at chunhan.wong@wsj.com and Felicia Schwartz at Felicia.Schwartz@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# Exhibit C



**CYBER RISK**
OCTOBER 8, 2017 / 4:16 AM / 2 YEARS AGO

# China denies links to alleged cyber attacks in United States targeting exiled tycoon Guo

Philip Wen



BEIJING (Reuters) - China has denied responsibility for alleged cyber attacks in the United States appearing to target exiled tycoon Guo Wengui, who has levelled corruption allegations against senior Communist Party officials and applied for political asylum.

FILE PHOTO: Billionaire businessman Guo Wengui speaks during an interview in New York City, U.S., April 30, 2017. Picture taken April 30, 2017. REUTERS/Brendan McDermid/File Photo

The Ministry of Public Security said in a statement provided to Reuters on Sunday an investigation had found "no evidence" of Chinese government involvement in the alleged cyber attacks.

The law enforcement agency said China had also provided the U.S. government with evidence that Guo, who has applied for political asylum in the United States, fabricated documents used to support his claims. It said China would make an official request for U.S. authorities to investigate the matter.

"The falsified official documents and the false information he fabricated are sensational and outrageous," the ministry said in a rare English-language statement.

Guo denied the documents were forged and said the Ministry of Public Security's statement should not be believed.

The Washington-based Hudson Institute think tank was scheduled to host Guo last Wednesday in a rare public appearance, but canceled the event the day before without explanation.

The event would have coincided with the visit of an official Chinese delegation to the U.S. capital for a high-level law enforcement and cyber security dialogue between the two countries.

The Hudson Institute said it had detected a Shanghai-based attack aimed at shutting down access to its website several days earlier.

## POLITICAL ASYLUM

The suspected attack was raised by U.S. Attorney General Jeff Sessions during a meeting with China's Public Security Minister Guo Shengkun on Wednesday, a Department of Justice spokesman told Reuters on Sunday.

China had "pledged to cooperate", the spokesman said.

However, the New York-based Guo Wengui said: "Just because the Ministry of Public Security said China didn't do it doesn't make it true."

"Why did the U.S. raise it in their meeting?" he told Reuters.

Guo Wengui applied for U.S. political asylum in September, but said this week the law firm representing him, Clark Hill PLC, had backed out after being targeted by Chinese hackers.

Clark Hill lawyer Thomas Ragland, who lodged the asylum claim, confirmed he was no longer representing Guo Wengui, without elaborating.

Guo Wengui held a news conference at the National Press Club on Thursday, after his Hudson event was called off, where he produced what he claimed were "top secret" official documents showing China had sent secret agents into the United States.

China's Ministry of Public Security said the documents shown by him were "clumsily forged" and "full of obvious mistakes".

Guo Wengui has made wide-ranging corruption allegations against senior Communist Party leaders through a daily stream of Twitter and YouTube posts since the start of the year, which he says are aimed at disrupting a key five-yearly Communist Party congress that begins next week.

The Chinese government has been seeking to discredit Guo Wengui, who is the subject of an Interpol red notice issued at Beijing's request, as a criminal suspect who should not be trusted.

Reporting by Philip Wen in BEIJING; Additional reporting by Makini Brice and Sarah Lynch in WASHINGTON and Gui Qing Koh in NEW YORK; Editing by Michael Perry and Paul Tait

*Our Standards:*    *The Thomson Reuters Trust Principles.*

Exhibit D

# CLARK HILL

Clark Hill PLC
500 Woodward Avenue
Suite 3500
Detroit, MI 48226
T 313.965.8300
F 313.965.8252

Edward J. Hood
T 313.965.8591
F 313.309.6891
Email: ehood@clarkhill.com

clarkhill.com

September 19, 2017

## ATTORNEY-CLIENT PRIVILEGED COMMUNICATION / ATTORNEY WORK PRODUCT – NOT FOR DISTRIBUTION

Mr. Ho Wan Kwok
c/o Initiatives For China
Attn: Lianchao Han, Esq.
1875 Connecticut Ave, Ste. 410
Washington, DC 20009

### Re: Withdrawal of Clark Hill PLC as Your Attorneys

Dear Mr. Kwok:

I am writing in my capacity as the General Counsel of Clark Hill PLC (the "Firm"). Confirming communications from Mr. Thomas K. Ragland with Lianchao Han, Esq., I regret to inform you that, after careful consideration, the Firm has concluded it must withdraw as your legal counsel.

As you know, the Firm was the victim of a cyberattack related to our representation of you. In doing so it is quite possible that certain materials pertaining to our representation of you were viewed. The cyberattack was quickly identified and proactive measures were taken by the Firm. Our investigation regarding the nature and extent of the cyberattack is continuing.

The cyberattack has presented several ethical complications with continuing to represent you. A primary concern is that the cyberattack would require Mr. Ragland – and possibly other members of the Firm – to be a witness in your asylum proceeding. Under our Rules of Professional Conduct, a lawyer may not serve as an advocate in a proceeding where the lawyer is likely to be a material witness. Here, the cyberattack has placed Mr. Ragland in an untenable position of being a witness in your asylum case while simultaneously serving as your attorney. At this point, Mr. Ragland must confine his role to that of witness, rather than legal advocate.

We regret that we must withdraw from representing you but under the circumstances the Firm has concluded that it has no ethical or practical choice. Consistent with our professional obligations, the Firm will cooperate in the transition of your legal matters to successor counsel of your choice.

216211058.1 09999/09999-006680

September 19, 2017
Page 2

Please contact me if you have any questions or comments concerning the above.

Sincerely,

CLARK HILL PLC

Edward J. Hood
General Counsel

Cc:  Mr. Thomas K. Ragland
     Clark Hill Executive Committee

Exhibit E





CYBER RISK

JUNE 26, 2019 / 6:04 AM / 5 MONTHS AGO

# Exclusive: China hacked eight major computer services firms in years-long attack

Jack Stubbs, Joseph Menn, Christopher Bing

LONDON (Reuters) - Hackers working for China's Ministry of State Security broke into networks of eight of the world's biggest technology service providers in an effort to steal commercial secrets from their clients, according to sources familiar with the attacks.

FILE PHOTO - A man holds a laptop computer as cyber code is projected on him in this illustration picture taken on May 13, 2017. REUTERS/Kacper Pempel/Illustration

Reuters today reported extensive new details about the global hacking campaign, known as Cloud Hopper and attributed to China by the United States and its Western allies.

Read the full report here:

here

A U.S. indictment in December outlined an elaborate operation to steal Western intellectual property in order to advance China's economic interests but stopped short of naming victim companies. A Reuters report at the time identified two: Hewlett Packard Enterprise and IBM.

Now, Reuters has found that at least six other technology service providers were compromised: Fujitsu, Tata Consultancy Services, NTT Data, Dimension Data, Computer Sciences Corporation and DXC Technology, HPE's spun-off services arm.

Reuters has also identified more than a dozen victims who were clients of the service providers. That list includes Swedish telecoms giant Ericsson, U.S. Navy shipbuilder Huntington Ingalls Industries and travel reservation system Sabre.

HPE said it worked "diligently for our customers to mitigate this attack and protect their information." DXC said it had "robust security measures in place" to protect itself and clients, neither of which have "experienced a material impact" due to Cloud Hopper.

NTT Data, Dimension Data, Tata Consultancy Services, Fujitsu and IBM declined to comment. IBM has previously said it has no evidence sensitive corporate data was compromised by the attacks.

Sabre said it had disclosed a cybersecurity incident in 2015 and an investigation concluded no traveler data was accessed. A Huntington Ingalls spokeswoman said the company is "confident that there was no breach of any HII data" via HPE or DXC.

Ericsson said it does not comment on specific cybersecurity incidents. "While there have been attacks on our enterprise network, we have found no evidence in any of our extensive

investigations that Ericsson's infrastructure has ever been used as part of a successful attack on one of our customers," a spokesman said.

The Chinese government has consistently denied all accusations of involvement in hacking. The Chinese Foreign Ministry said Beijing opposed cyber-enabled industrial espionage. "The Chinese government has never in any form participated in or supported any person to carry out the theft of commercial secrets," it said in a statement to Reuters.

The Cloud Hopper attacks carry worrying lessons for government officials and technology companies struggling to manage security threats.

Chinese hackers, including a group known as APT10, were able to continue the attacks in the face of a counter-offensive by top security specialists and despite a 2015 U.S.-China pact to refrain from economic espionage.

Reuters was unable to detail the full extent of the damage done by the hacking and many victims are unable to tell exactly what was stolen. Yet senior Western intelligence officials say the toll was high.

"This was a sustained series of attacks with a devastating impact," said Robert Hannigan, former director of Britain's GCHQ signals intelligence agency and now European chairman at cybersecurity firm BlueVoyant.

Additional reporting by Gao Liangping, Cate Cadell and Ben Blanchard in Beijing. Editing by Ronnie Greene and Jonathan Weber

*Our Standards:*    *The Thomson Reuters Trust Principles.*

Exhibit F

 politics

# Chinese spies stole NSA hacking tools, report finds

By Kevin Collier, CNN

Updated 6:28 PM ET, Sat June 15, 2019

**New York (CNN)** — Chinese hackers acquired and used National Security Agency hacking tools in 2016 and used them to carry out cyberattacks, a new report has found.

In the report, the cybersecurity company Symantec claims that a Chinese hacker group associated with Chinese government intelligence conducted a hacking campaign using a tool that at the time was only known to be the property of the NSA.

Though Symantec doesn't name particular agencies in its report, the Chinese group in question was an arm of China's Ministry of State Security in Guangzhou, which went dark after the US Department of Justice indicted three of its members in November 2017.

While Chinese government hackers are prolific spies around the world, they apparently only used their NSA tool sparingly.

"When they were in action, they were pretty noisy, they hit a lot of targets," Eric Chien, a fellow at Symantec, told CNN.

"But the number of targets that we've been able to recover so far that used this exploit was very few. They saw it was high value and didn't want to use it everywhere," he said.

The New York Times was first to report the story.

**Related Article:** Pentagon says China's military using espionage to steal secrets

The findings muddy the timeline of an already strange episode in the NSA's recent history. In 2016, a group calling itself Shadow Brokers appeared online in 2016 and began leaking the agency's tools.

In April 2017 — after the last known incident in which the Chinese hackers used the NSA tool, but before the US indictment prompted that operation to go dark — Shadow Brokers released their most damaging set of NSA tools. That included one Windows exploit that both North Korea and Russian intelligence services used to create the two most damaging ransomware strains in history, prompting international condemnation.

But those were different variants of the NSA tools than the ones Symantec found that China was using.

It's unclear how the tool got into Chinese hands. The NSA didn't respond to request for comment.

"We're in a very murky place," John Hulquist, director of intelligence at FireEye, a company that extensively tracks Chinese hacking, told CNN.

"This report raises a lot of questions that are still unanswered."

In response to the claims, China's Ministry of Foreign Affairs echoed China's common refrain when it is accused of hacking US targets. Spokesperson Geng Shuang denied the

 politics

● **LIVE TV** ☰

Last week, the Pentagon published a report which alleged that China is using espionage to steal cutting edge technology for military purposes.

"China uses a variety of methods to acquire foreign military and dual-use technologies, including targeted foreign direct investment, cyber theft, and exploitation of private Chinese nationals' access to these technologies, as well as harnessing its intelligence services, computer intrusions, and other illicit approaches," the congressionally mandated Department of Defense report said.

*CNN's Steven Jiang and Ryan Browne contributed to this report.*

**Related Article:** US intelligence warns China is using student spies to steal secrets

🔍 Search CNN...

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Coupons

More

# Exhibit G

SUBSCRIBE TO OUR MORNING BEACON NEWSLETTER

SUBSCRIBE TO OUR BEACON EXTRA NEWSLETTER

# Beijing Suspected in Hacking Yacht Owned by Chinese Billionaire

## FBI investigating possible electronic sabotage against dissident's ship



Lady May

Bill Gertz - SEPTEMBER 8, 2017 5:00 AM

China is suspected of hacking the electronics of a yacht owned by a Chinese billionaire targeted by Beijing.

Guo Wengui, who uses the English name Miles Kwok, said several incidents involving his 152-foot motor yacht, Lady May, appear to be part of a Chinese government effort to threaten and intimidate him.

The suspicious hacking took place in July on the Hudson River near New York City and left the ship temporarily unable to turn and in danger of colliding with nearby freighter.

Guo, a real estate developer now living in New York City, said he believes a sophisticated intelligence service, likely the Chinese, disrupted the electronics on his high-tech yacht during several incidents beginning with the suspected ship hacking July 18.

"I hope to let the American people and government know that through this incident there exists a great and real threat from China," Guo said.

"I want every American and law enforcement agency to understand the Chinese government, through using the internet, cell phones, and modern communications technologies, can obtain private correspondence and information from each and every American citizen if it wishes, and can do that very easily almost without any cost," he added.

He urged the U.S. government to investigate the hacking and report the results to the American people.

The FBI was called in on the yacht hacking and has launched an investigation into the suspicious cyber incident, as well as a similar electronic disruption on the ship, and the buzzing of the vessel by a drone aircraft. Asked about the investigation, an FBI spokeswoman in New York declined to comment.

Guo has been a target of the Chinese government efforts to silence him since earlier this year when he began speaking out in online videos and interviews exposing corruption by senior Chinese leaders.

Among those named by Guo is Wang Qishan, a member of the Communist Party's seven-member Politburo Standing Committee, the collective dictatorship that rules China, and one of the nation's most powerful leaders. The allegations of corruption against Wang are explosive since he is the chief enforcer behind Chinese leader Xi Jinping's anti-corruption campaign that has ensnared thousands of officials.

The hacking of the ship's computerized steering controls was especially alarming. The incident was outlined in a report and PowerPoint presentation, including photos and videos, provided by Guo.

Disclosure of the suspected yacht hacking comes as the Navy is investigating with external electronic hacking who is involved in two similar collisions between U.S. Navy destroyers and commercial ships that killed 17 American sailors. One of the

warships, the USS John S. McCain had been involved in an operation to sail close to a disputed Chinese island in the South China Sea days before the collision.

The Lady May's captain, Gavin George Hurn, said in a statement in the report that the ship had sailed to the George Washington Bridge and was awaiting a harbor pilot to come aboard to guide the ship further north.

But after deciding to return instead to Chelsea Piers dock in lower Manhattan, the vessel's bow and stern thrusters suddenly shut down. "I was unable to take control of the thrusters in the bridge," Hurn said.

A technician then discovered that the thrusters were functioning but control over them had been disconnected from the bridge.

"We still had full control of the engine and steering on-board at all times," Hurn noted.

However, without the thrusters, the yacht was unable to turn around and was caught in a 2-knot current. The captain reversed the ship down river and was eventually able to direct the bow toward shore and a safer location.

At the time, a large liquefied natural gas ship was located around 300 feet from the Lady May, prompting fears of a collision.

The yacht was built in 2014 by the Dutch manufacturer Feadship Royal Dutch Shipyards and is equipped with advanced computerized controls and communications.

Radio Holland, a company specializing in shipping electronics, later investigated the ship's electronics and discovered "several errors that were not normal in the system," Hurn stated.

A system anomaly involving the ship's autopilot when placed in a certain configuration prevented using steering thrusters. Changes were made in the control system to prevent further mishaps, Hurn stated.

The report stated that the ship's controls were hacked by an unknown third party that gained access to the ship's computer system, possibly using a mobile phone.

Investigation into the incident indicated the malfunctioning of the Lady May's computer system was caused by unknown actors taking external control over the yacht's system and network, the report said.



Photos of the bridge displays during the incident showed propulsion failures on both sides of the ship and an alarm regarding a "radar target"—a possible collision.

The hacking also coincided with online threats against Guo both before and after the July 18 Hudson River incident, according to the report.

Several tweets from a supporter of Guo in China claimed that the Chinese government was targeting Guo and his yacht.

On July 28 the supporter tweeted that China planned to assassinate Guo using an unmanned aerial vehicle, and warned that the yacht, where Guo had produced a video broadcast a day earlier, was not safe.

"Your yacht is tracked," the supporter wrote. "There's no technical difficulty to attack the yacht from the air using unmanned aerial vehicles. They [the Chinese] are bribing New York Air Route Traffic Control Center."

The same supporter a day later said "detailed plans for eliminating Guo" included the use of weapons-equipped drones and plans to place explosive devices near the Lady May as it was underway.

"The [Chinese] base is at a few mechanic and chemical engineering companies with Chinese background in New Jersey," the supporter said. "Knowing the route of Guo's yacht in advance is the key to success."

The report stated that Guo conducted a security test in a bid to identify the source of the cyber attacks during a stay on the yacht July 26.

The Lady May's chief engineer, Craig Rehaume, said in a statement that as soon as Guo arrived on the yacht that day, the ship's Wi-Fi network went offline, apparently disrupted from an external source. The network service was eventually restored but operated intermittently.

In a bid to locate the source of the electronic disruption, the cell phones of all passengers on the yacht were moved to a small dingy away from the ship.

"The results show that my suspicion was right: My mobile phone was controlled by them," Guo stated, referring to the Chinese. "This proved that my mobile phone was hacked and installed with some controlling apps."

Rehaume, the Lady May's engineer, supported Guo's claim. He stated that he initially suspected Guo's phone to be the source of the Wi-Fi disruptions.

The engineer said the disruption continued after Guo's phone was powered off. Only when the sim card was removed and the suspect phone wrapped in metal foil, did the network begin operating properly, Rehaume said.

Then on July 29, according to Hurn, the yacht captain, the Lady May was intercepted by a quadcopter drone as the vessel sailed near the Bear Mountain Bridge along the Hudson. The drone aircraft followed the vessel upriver for about 20 minutes. The drone was "doing small loops around the vessel and coming very close to the vessel looking into the bridge and exterior window," Hurn said.

The captain noted that the drone operator demonstrated extreme confidence in flying the aircraft and was able to keep it very stable and within three to six feet from the ship.

Again on July 31 as the Lady May sailed down the river past the Bear Mountain Bridge another drone similar to the first one also followed the ship. Hurn said he believed the drone was controlled from land and flew off after around 20 minutes.

In early August, Guo said he received additional warnings from the Twitter supporter who stated that the electronic disruption plan "was executed by the [Chinese] military."

The supporter, identified as @FlightEagle2017, stated on Aug. 5 that after tweeting the warning about the disruption operation he was targeted by Unit 61398, the Chinese military hacking unit based in Shanghai.

The Chinese told him "we know who you are, you'd better mind your own business."

Guo said both electronic incidents and drone buzzing convinced him that the activities were "from my enemies who launched a series of national-level, organizational attacks against me."

"This time hackers hacked into the systems of the Lady May, to make it lose control, nearly causing fatalities," he said.

"Then they repeatedly cut off the yacht's networks and the unmanned aerial vehicle incident," Guo said. "All of this shows that the traitors are not merely intimidating, but rather really posing a threat to my life."

Guo said he believes the Chinese have set up sophisticated intelligence and covert action networks in the United States, posing threats to him, his family, Americans, and their property.

"This incident shows that the traitors have deployed spies and agents in the United States on a large scale, and hacker," he said. "They work hand in hand with the intelligence organizations controlled by the traitors in China.

Guo said he believes China is behind constant hacking attacks against his associates, including his security personnel, lawyers, and consultants.

"American bureaucracy and red tape have enabled Chinese hackers and property stealers not only to be able to steal American property, but to kill any American if they so wish," he said. "It is high time that this clear and present danger be understood and seen clearly and be changed."

In addition to disclosing Chinese high-level corruption, Guo has provided details of Chinese intelligence activities in the United States, including the dispatch of tens of thousands of intelligence collectors.

Guo has also revealed how China's intelligence services utilize Chinese businessmen, like Guo, for funding and supporting activities around the world.

Guo was once close to Ma Jian, the former No. 2 official at the Chinese intelligence service, Ministry of State Security, and ran secret intelligence operations against the United States for more than a decade. Ma was imprisoned last year on corruption charges that many analysts say were political retribution for gathering intelligence on leadership corruption.

# Exhibit H

| Home | News | Sport | Reel | Worklife | Travel | Future | M |

# China says Interpol seeks arrest of tycoon Guo Wengui

20 April 2017



AFP/GETTY IMAGES

**China says Interpol has issued a notice for the arrest of a billionaire who has criticised the government in Beijing.**

Property tycoon Guo Wengui is currently thought to be in the US.

Authorities did not give a reason for the notice, but state media outlets have claimed that Mr Guo bribed a vice-minister, which he has denied.

Mr Guo has recently made allegations regarding top Chinese officials and their families' businesses in interviews with overseas media.

## Politically motivated?

On Wednesday, a **Chinese foreign ministry spokesman** said Interpol had issued a "red notice" for Mr Guo, which seeks the arrest of a wanted person globally.

Asked about Mr Guo, Interpol said it did not "comment on specific cases or individuals except in special circumstances and with approval of the member country concerned".

Chinese news outlets said Mr Guo bribed the former vice-minister of state security, Ma Jian, with 60m yuan (£6.8m, $8.7m). Mr Ma has since been arrested and is being prosecuted for corruption.

But Mr Guo has denied such allegations and suggested that the notice for his arrest was politically motivated.

The tycoon, who says he is no longer a Chinese citizen, **said in a tweet** (in Chinese) on Wednesday that the move was initiated by "corrupt officials who are terrified that their criminal behaviour would be unmasked by me".

Mr Guo has recently given interviews to foreign Chinese-language media outlets, including Voice of America, making allegations regarding certain Chinese officials and their families who control business empires.

**VOA said** its journalists had been approached earlier by Chinese officials asking them to cancel their interview. The live broadcast on Wednesday was cut short, which VOA said was due to a "miscommunication".

**The South China Morning Post** noted that Mr Guo's interviews have coincided with what it called an "international publicity war" launched by China against him.

---

## Related Topics

| Interpol | China | China corruption |
|----------|-------|------------------|

---

## Share this story About sharing

---

## More on this story

### The mystery of a Chinese tycoon's disappearance
1 February 2017

### China laps up glossy TV corruption drama
8 April 2017

### China combats corruption within anti-corruption agency
9 January 2017

### 'One million' Chinese officials punished for corruption
24 October 2016

## China

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a | ) |
| HO WAN KWOK, | ) |
| 162 E 64th Street | ) |
| New York, NY 10065 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:19-cv-3195-JEB |
| CLARK HILL PLC | ) |
| 500 Woodward Avenue | ) Hon. James Boasberg |
| Suite 3500 | ) |
| Detroit, MI 48226 | ) |
| | ) |
| and | ) |
| | ) |
| THOMAS K. RAGLAND, | ) |
| c/o Clark Hill PLC | ) |
| 1001 Pennsylvania Avenue, NW | ) |
| Suite 1300 | ) |
| Washington, DC 20004, | ) |
| | ) |
| Defendants. | |

## ORDER GRANTING DEFENDANTS'
## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Upon consideration of Defendants' Motion to Dismiss, filed on November 25, 2019, and

good cause having been shown, it is hereby:

ORDERED, that Defendants' Motion to Dismiss is GRANTED; and it is further

ORDERED, that Plaintiff's Complaint is DISMISSED WITH PREJUDICE.


Date: _____          _____
                                 James Boasberg
                                 United States District Judge

## EXHIBIT 4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GUO WENGUI,

    Plaintiff,

       v.

CLARK HILL, PLC, *et al.*,

    Defendants.

Civil Action No. 19-3195 (JEB)

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1. Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART;

2. Counts I–III are DISMISSED WITHOUT PREJUDICE to the extent that they rely on

   Defendants' withdrawal;

3. Count IV is DISMISSED WITHOUT PREJUDICE; and

4. Defendants shall file an Answer to the Complaint by March 5, 2020.

IT IS SO ORDERED.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  February 20, 2020

**EXHIBIT 5**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GUO WENGUI,

     Plaintiff,

        v.

CLARK HILL, PLC, *et al.*,

     Defendants.

Civil Action No. 19-3195 (JEB)

<u>**MEMORANDUM OPINION**</u>

This case features an asylum-application process gone awry, accompanied by alleged
professional misconduct, foreign-government cyber hacking, and social-media propaganda
campaigns. After Plaintiff Guo Wengui, a Chinese businessman and prominent political
dissident, retained the services of the law firm Clark Hill, PLC to assist him with an asylum
petition, someone — whom the parties presume to be associated with the Chinese government —
hacked into the firm's computer servers. The hacker thereby gained access to Plaintiff's
confidential information and then published that information on the Internet. Compounding
Wengui's problems, the firm withdrew its representation in response to the attack. Plaintiff
asserts that in making his information vulnerable to a targeted hacking and subsequently
withdrawing from the matter, Defendants Clark Hill and its attorney Thomas Ragland are liable
for legal malpractice, breach of fiduciary duty, and breach of contract. Defendants now move to
dismiss all claims.

To succeed on his tort claims, Wengui must "point to an act (or omission)" that "resulted
in a loss" to him. See <u>Seed Co., Ltd. v. Westerman</u>, 840 F. Supp. 2d 116, 127 (D.D.C. 2012).

Plaintiff has successfully pleaded that the alleged mishandling of his information and subsequent cyber attack resulted in damages. The withdrawal, however, may have added insult, but it did not add <u>injury</u>. In addition, he cannot establish that the withdrawal breached Defendants' contractual obligations to him. The Court therefore will dismiss all of Plaintiff's claims to the extent they rely on the theory that Defendants' withdrawal constituted a legally remediable wrong, but it will permit those claims to go forward that allege misrepresentations surrounding and mishandling of his confidential information. Finally, it dismisses the demand for punitive damages, as Plaintiff has not satisfied the high bar necessary for seeking such relief.

## I. Background

### A. <u>Factual Background</u>

As it must at this juncture, the Court draws the facts from the Complaint. <u>See Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000). Plaintiff is a "highly successful businessman" and "well-known Chinese dissident." ECF No. 1 (Complaint), ¶ 10. While living in China, he exposed "systemic corruption" and "widespread abuse of human rights" being perpetrated by the Communist Party of China (CCP), China's ruling political party. <u>Id.</u>, ¶ 15. These activities naturally caught the attention of the CCP, which allegedly threatened his livelihood and that of his family in order to put an end to his subversive activities. <u>Id.</u>, ¶¶ 18–19. Fearing further persecution, Plaintiff fled his native country in 2015, and he now resides in New York. <u>Id.</u>, ¶ 10. Wengui's escape from China has not prevented further harassment. The Chinese government has, for example, sent emissaries to demonstrate against him outside of his home as part of a larger "malicious negative propaganda campaign" organized against him. <u>Id.</u>, ¶¶ 23– 24. In response to this cross-continental maltreatment, Plaintiff set about applying for political asylum in the United States.

The source of this dispute dates back to Plaintiff's negotiations with Defendant Thomas Ragland, an attorney and partner at Defendant Clark Hill, PLC — a firm comprising about 650 lawyers —— regarding potential assistance with his asylum petition.  Id., ¶¶ 11–12.  Hoping to secure Plaintiff as a client, Ragland assured him that both he and the firm more broadly "were qualified, capable, and competent to represent plaintiff and to protect his interests fully and professionally."  Id., ¶ 28.  At a subsequent meeting in August 2016, Wengui conveyed to Ragland and other Clark Hill attorneys "his standing and visibility as a prominent Chinese political dissident" and "the risks associated with and attendant to plaintiff's position as a prominent visible critic of the Chinese regime."  Id., ¶ 31.  Plaintiff also "warned of the persistent and relentless cyber attacks that he and his associates had endured."  Id.

In further meetings with the firm, Wengui continued to warn Defendants that they should "expect to be subjected to sophisticated cyber attacks."  Id., ¶ 32.  In taking on Plaintiff's case, Defendants accordingly agreed to "take special precautions to prevent improper disclosure of plaintiff's sensitive confidential information."  Id., ¶ 33.  These precautions would include distinct measures to impede or evade cyber attacks, by, for example, "not placing any of plaintiff's information on the firm's computer server," as doing so would make the information more vulnerable to hackings.  Id.  Relying on the firm's commitments regarding the protection of his confidential information, Plaintiff hired Defendants, executing a letter of retention and paying the firm a retainer fee of $10,000.  Id., ¶ 36.

Unfortunately for all parties involved, Plaintiff's warnings of a cyber attack, apparently as unheeded as Cassandra's, proved prescient.  On September 12, 2017, the firm's computer system was "hacked" — again, both parties assume that the hacking was orchestrated by the Chinese government — "apparently without great difficulty."  Id., ¶ 41.  The hacker obtained a

substantial amount of Plaintiff's and his spouse's personal information, such as their passport identification numbers, as well as Plaintiff's application for political asylum. Id., ¶ 43. This information, including the contents of Wengui's asylum petition, was then published and disseminated on social media. Id., ¶ 44.

Following the attack, the parties' relationship quickly dissolved. On September 19, Clark Hill's General Counsel, Edward Hood, informed Plaintiff that the firm was terminating its involvement with his case. Id., ¶ 49. Hood explained that the attack might require Ragland, along with other members of the firm, to serve as witnesses at Plaintiff's asylum proceeding, as the hacking provided evidence of the political persecution from which Plaintiff sought asylum in the United States. Id. Hood posited that because the Rules of Professional Conduct bar attorneys from playing the dual role of witness and advocate, Defendants were required to withdraw from the matter. Id., ¶¶ 49–50. At the time of that withdrawal, Plaintiff had filed an asylum application and was awaiting a hearing. Id., ¶ 51.

B. Procedural History

On September 19, 2019, Wengui filed this action against Defendants in the Superior Court of the District of Columbia. Defendants then removed the case to this Court on diversity-jurisdiction grounds. See ECF No. 1 (Notice of Removal) at 1–2. Plaintiff's Complaint asserts four counts: (1) breach of fiduciary duty; (2) breach of contract; (3) legal malpractice; and (4) punitive damages. See Compl., ¶¶ 66–93. Defendants now move to dismiss all counts, maintaining that they fail to state plausible claims for relief.

II. **Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." Although "detailed factual

allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted).

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow, 216 F.3d at 1113 (citation omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (citing Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993)). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation" nor an inference unsupported by the facts set forth in the Complaint. See Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Finally, even at the Rule 12(b)(6) stage, a court can review "documents attached as exhibits or incorporated by reference in the complaint" or "documents upon which the plaintiff's complaint necessarily relies." Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation marks and citations omitted).

## III. Analysis

In seeking dismissal here, Defendants argue that neither the cyber attack nor the withdrawal constitutes a ground for a viable claim of legal malpractice, breach of fiduciary duty, or breach of contract. In particular, they assert that their conduct surrounding these two events did not breach any duty owed to Plaintiff. They also argue that their actions, even if improper, did not cause him to suffer any actual damages. The Court will consider the two relevant events

in turn, examining the separate counts in that context, albeit slightly out of sequence.

A. The Cyber Attack

As recounted above, the Complaint alleges that: Plaintiff warned Defendants of the risk of an impending cyber attack; Defendants misrepresented the manner in which they would protect Plaintiff's confidential information from such an attack; and Defendants then failed to protect this information, allowing it to be retrieved and then publicly disseminated by a third-party hacker. Defendants dispute that they made such representations and argue that, in any event, the cyber attack did not actually harm Plaintiff. The Court, however, rejects Defendants' premature attempt to litigate disputed facts at the pleading stage and will deny their Motion to Dismiss as it pertains to the cyber attack.

1. *Breach of Fiduciary Duty*

Count I asserts that Defendants breached various fiduciary duties owed to Plaintiff, including the duty of good faith, the duty of loyalty, and the duty to protect Plaintiff's confidential records. See Compl., ¶ 68. To succeed on a claim of breach of fiduciary duty in the District of Columbia — the relevant jurisdiction here —— Plaintiff must establish "(1) the existence of a fiduciary duty and (2) a violation of that duty that (3) proximately causes injury." Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz, 82 F. Supp. 3d 344, 353 (D.D.C. 2015) (citing Shapiro, Lifschitz & Schram, P.C. v. Hazard, 24 F. Supp. 2d 66, 75 (D.D.C. 1998). It is axiomatic that the attorney-client relationship is fiduciary in nature. See Thomas v. Nat'l Legal Prof'l Assocs., 594 F. Supp. 2d 31, 34 (D.D.C. 2009) ("[T]here is an ever present fiduciary responsibility that arches over every aspect of the lawyer-client relationship.") (quoting Connelly v. Swick & Shapiro, P.C., 749 A.2d 1264, 1268 (D.C. 2000)). Defendants

argue, however, that they did not breach any recognized fiduciary duties owed to Plaintiff and, in any event, did not cause any actual injury to him.

First, as to breach of duty, Wengui does not allege, contrary to Defendants' assertion, simply that "because there was a cyber incident, Defendants must have put up . . . 'unreasonable' security measures." ECF No. 12 (Def. MTD) at 12. It is true that some courts have gone so far as to hold that corporations maintain a duty to consumers to "'protect against a criminal act of a third person,' which could include hacking into a private data system, 'if it is alleged that the entity had reason to anticipate the criminal act.'" Attias v. CareFirst, Inc., 365 F. Supp. 3d 1, 21 (D.D.C. 2019) (quoting In re Arby's Restaurant Group Inc., Litig., 2018 WL 2128441, at *5 (N.D. Ga. Mar. 5, 2018)). As a result, those courts have held that if a corporation fails to prevent a forseeable cyber attack, it thereby breaches fiduciary duties owed its customers. Id. This Court, however, need not go so far as to find that any corporation's failure to protect against any forseeable cyber attack, standing on its own, constitutes a breach of fiduciary duty.

A fiduciary relationship — like that between a lawyer and client — "is founded upon trust or confidence reposed by one person in the integrity and fidelity of another." Democracy Partners v. Project Veritas Action Fund, 285 F. Supp. 3d 109, 121 (D.D.C. 2018) (quoting Bolton v. Crowley, Hoge, & Fein, P.C., 110 A.3d 575, 584 (D.C. 2015)). The duty of loyalty in this context "has been described as one of 'uberrima fides,' which means, most abundant good faith, requiring absolute and perfect candor, openness and honesty, and the absence of any concealment or deception." Herbin v. Hoeffel, 806 A.2d 186, 197 (D.C. 2002) (emphasis added) (quotation marks omitted); see also Seed Co., 840 F. Supp. 2d at 126–27 (attorney breaches fiduciary duties when providing clients with "incorrect and misleading" advice); Herbin, 806 A.2d at 197 ("Disclosure of client confidences is contrary to the fundamental principle that the

attorney owes a fiduciary duty to her client and must serve the client's interest with the utmost

loyalty and devotion.") (quotation marks omitted).

Plaintiff has sufficiently pleaded that Defendants breached their duties of loyalty and

good faith by misrepresenting the manner in which they would protect his confidential

information in order to secure his business. Although they promised to take special precautions,

they placed that information, including his asylum application, on their server and conveyed it

via a firm email account — in direct contravention of his instructions — leaving Plaintiff

vulnerable to the precise sort of machinations he had forewarned counsel about. See Compl., ¶¶

2–3, 40–43. He further alleges that the firm breached the applicable duty of care in its treatment

of his information by utilizing security measures that were "inadequate, unreasonable, and fell

woefully far short of [D]efendants' promises, assurances, obligations, and commitments to

provide adequate security measures." Id., ¶ 42. Discovery may reveal that Defendants never

made any such misrepresentations to Plaintiff and were not negligent in their handling of his

confidential information, but the well-pleaded allegations in the Complaint preclude granting

Defendants' Motion to Dismiss.

Defendants argue in the alternative that even if they misled Plaintiff and were negligent

in handling his confidential information, the cyber attack did not actually cause him any

cognizable harm. Under D.C. law, not surprisingly, a breach of a fiduciary duty requires a

showing of injury or damages. See Headfirst Baseball LLC v. Elwood, 239 F. Supp. 3d 7, 14

(D.D.C. 2017) (canvassing D.C. caselaw; see also Becker v. Colonial Parking, Inc., 409 F.2d

1130, 1136 (D.C. Cir. 1969) ("A simple breach of duty having no causal connection with the

injury, we have admonished, cannot produce legal responsibility.") (quotation marks omitted).

In arguing that Plaintiff has not made such a showing, Defendants rely on Randolph v. ING Life

Insurance & Annuity Company, 973 A.2d 702 (D.C. 2009), where the District of Columbia

Court of Appeals held that an "increased risk of future identity theft" does not qualify as an

"actionable" injury "required to maintain a suit for common-law breach of fiduciary duty."  Id. at

708.

 Although this case, like Randolph, concerns a data breach, the similarities end there.  In

Randolph, an unknown burglar stole a laptop computer owned by the employee of an insurance

company, which contained the plaintiffs' insurance information, including their names,

addresses, and social-security numbers.  Id. at 704.  The DCCA reasoned that the plaintiffs had

failed to plead "actual harm" because they had not alleged that the burglar stole the laptop in

order to access their information or that their information had even been accessed since the

laptop was stolen.  Id. at 706–08.  Instead, they simply alleged "the anticipation of future injury

[identity theft] that has not materialized."  Id. at 708; see also In re Sci. Applications Int'l Corp.

(SAIC) Backup Tape Data Theft Litig., 45 F. Supp. 3d 14, 19 (D.D.C. 2014) (dismissing case

where plaintiffs' information, along with other items, was allegedly stolen from parked car

because "mere loss of data — without evidence that it has been either viewed or misused — does

not constitute an injury sufficient to confer standing").

 Plaintiff, however, has gone well beyond pleading the anticipation of future injury and

has instead alleged an actual injury resulting from Defendants' conduct.  According to the

Complaint, the Chinese government or someone associated with it hacked Defendants' server for

the express purpose of stealing Plaintiff's information.  The hacker then "published" the

confidential material, including Plaintiff's application for political asylum and passport

identification number, on social media.  See Compl., ¶¶ 43–44.  This chain of events occurred in

the context of a broader propaganda campaign orchestrated by the CCP, one that included

utilizing social-media platforms to spread information about Plaintiff and mobilizing

demonstrators to protest his presence in the United States. Id., ¶¶ 22–24. Wengui therefore does

not "speculate" as to potential uses of the stolen information; it has already been employed as

part of the CCP's persecution and harassment of him. The Court therefore rejects Defendants'

invitation to find that the cyber attack did not actually harm Plaintiff as a matter of law.

2. *Legal Malpractice*

Count III alleges legal malpractice, asserting that Defendants breached their "common

law" and "professional and ethical duties and obligations to plaintiff . . . by failing to use the

required degree of professional care and skill in representing plaintiff," and in failing to maintain

"reasonable security measures to secure their computer system from unauthorized access, as

required and promised to plaintiff." Id., ¶¶ 82–85.

The elements of a legal-malpractice claim are similar to, but slightly distinct from, those

for breach of fiduciary duty. See Hickey v. Scott, 738 F. Supp. 2d 55, 67 (D.D.C. 2010) (quoting

Shapiro, Lifschitz & Schram, 24 F. Supp. 2d at 74). As Justice O'Conner has commented,

"Lawyers are professionals, and as such they have greater obligations." Zauderer v. Office of

Disciplinary Counsel, 471 U.S. 626, 676 (1985) (O'Connor, J., concurring). To succeed on a

legal-malpractice claim in the District of Columbia, "the plaintiff must show that (1) the

defendant was employed as the plaintiff's attorney, (2) the defendant breached a reasonable duty,

and (3) that breach resulted in, and was the proximate cause of, the plaintiff's loss or damages."

Beach TV Props., Inc. v. Solomon, 306 F. Supp. 3d 70, 93 (D.D.C. 2018) (quoting Martin v.

Ross, 6 A.3d 860, 862 (D.C. 2010)).

For the reasons recounted above, this count may also proceed as to the cyber attack

because the Complaint identifies a breach of the duty of reasonable care owed by attorneys to

their clients and actual damages.  To be sure, attorneys cannot be held "liable for mistakes made

in the honest exercise of professional judgment."  Biomet Inc. v. Finnegan Henderson LLP, 967

A.2d 662, 665 (D.C. 2009).  Honest mistakes, however, are a far cry from the conduct alleged

here: misrepresentations made in order to secure a prospective client, the failure to follow

promised procedures to adequately secure confidential information, and damages.  See Swann v.

Waldman, 465 A.2d 844, 846 (D.C. 1983) (finding plaintiff's allegations that attorney lied to

him about attempting to obtain continuance and was negligent in failing to obtain expert witness

sufficient to withstand motion for summary judgment on legal-malpractice claim).

### 3. *Breach of Contract*

Plaintiff also brings a claim for breach of contract in Count II, alleging that the firm

violated its contractual obligation to provide "competent representation" by undertaking a matter

beyond its "professional or technical competence" and "neglecting to undertake reasonable

security measures."  Compl., ¶ 76.  "To prevail on a claim of breach of contract, a party must

establish (1) a valid contract between the parties; (2) an obligation or duty arising out of

the contract; (3) a breach of that duty; and (4) damages caused by breach."  United States

Conference of Mayors v. Great-W. Life & Annuity Ins. Co., 327 F. Supp. 3d 125, 129 (D.D.C.

2018), aff'd, 767 F. App'x 18 (D.C. Cir. 2019) (quoting Tsintolas Realty Co. v. Mendez, 984

A.2d 181, 187 (D.C. 2009)).  Defendants concede that the parties entered into a valid contract

(in this case, an engagement letter) that set forth their "respective obligations and expectations."

See Def. MTD at 14.  They dispute, however, that Plaintiff has alleged a breach of that contract.

Accepting the facts in the Complaint as true, Wengui has met his pleading burden — if

just barely — of establishing that Defendants did not meet their contractual obligations.  In

particular, he alleges that they violated their obligations to provide "competent representation"

and keep Plaintiff "reasonably informed about the status of the matter," Def. MSJ, Exh. A (Retainer Agreement) at 2, by misleading him as to the manner in which his information would be handled in the future, and then by failing to inform him when they eventually placed that information on their server. For the reasons stated in regard to the prior counts, this claim can proceed on the basis of failing to safeguard his information, which could amount to incompetent representation.

Going forward, however, Plaintiff may need to clarify this count because he appears to be exploring several different theories as to how Defendants breached the retainer agreement. First, he seems to be laying the groundwork for the introduction of extrinsic evidence. This evidence might demonstrate that Defendants orally amended the terms of the contract in making representations regarding higher-level protection of Plaintiff's personal information. See Segal Wholesale, Inc. v. United Drug Serv., 933 A.2d 780, 784 (D.C. 2007) (extrinsic evidence "consistent with the terms of a partially integrated agreement is permissible"); see also Stamenich v. Markovic, 462 A.2d 452, 455 (D.C. 1983) (extrinsic evidence permissible to demonstrate "a contemporaneous agreement in addition to and not inconsistent with or a variation of the written agreement between the same parties, which was an essential inducement of the written contract" or where "fraud, mistake, or duress is alleged").

Alternatively, Plaintiff also appears to be seeking to demonstrate that Defendants violated a general obligation to provide competent representation in providing insufficient protection of client materials. See Compl., ¶ 76. Or, finally, he may be asserting that Defendants breached the "implied duty of good faith and fair dealing" that D.C. courts have found to be contained within all contracts, one that prohibits "evad[ing] the spirit of the contract" or "willfully render[ing] imperfect performance." Murray v. Wells Fargo Home Mortg., 953 A.2d 308, 321 (D.C. 2008)

(internal quotation marks omitted).  Plaintiff will have to choose among these theories, and

provide much more substantial support for them, should he decide to defend this count against

further dispositive motions.

### 4.  *Duplicative Nature of Claims*

Finally, the Court rejects Defendants' argument that the three claims chronicled above

are <u>necessarily</u> "duplicative" of one other and thus that only one can proceed past the pleading

stage.  Under D.C. law, when a plaintiff's breach-of-fiduciary-duty claim rests on the same

factual allegations and requests the same relief as his professional-malpractice claim, a court "as

a matter of judicial economy, should dismiss" one of the claims as duplicative.  <u>See</u> <u>N. Am.</u>

<u>Catholic Educ. Programming Found., Inc. v. Womble, Carlyle, Sandridge & Rice, PLLC</u>, 887 F.

Supp. 2d 78, 84 (D.D.C. 2012) (collecting cases).  The same holds true for tort claims that arise

out of the same factual circumstances as a breach-of-contract claim.  <u>See</u> <u>Attias</u>, 365 F. Supp. 3d

at 18 ("Under D.C. law, for a plaintiff to recover in tort for conduct that also constitutes a breach

of contract, 'the tort must exist in its own right independent of the contract, and any duty upon

which the tort is based must flow from considerations other than the contractual relationship.'")

(quoting <u>Choharis v. State Farm Fire & Cas. Co.</u>, 961 A.2d 1080, 1089 (D.C. 2008)).

Down the line, Plaintiff may indeed have to choose among his three common-law claims.

At this early stage, however, it would be premature to dismiss any of the three as duplicative,

given the fact-dependent nature of such an inquiry.  While the counts all relate to the cyber attack

<u>generally</u>, they may be predicated on distinct wrongs surrounding the attack.  Defendants'

conduct may have, for example, violated a Rule of Professional Responsibility — potentially

creating liability for legal malpractice — which does not necessarily give rise to a breach of

fiduciary duty.  <u>See, e.g.</u>, <u>Hickey</u>, 738 F. Supp. 2d at 67–68 (finding fee-related fiduciary-duty

claim distinct from legal-malpractice claim concerning breach of Rule of Professional Responsibility in dispute over fees).

Finally, considerations of judicial economy do not weigh in favor of dismissal of any claims here. Allowing all three to proceed will not expand the scope of the case or potential avenues of discovery. At this juncture, therefore, the Court will decline Defendants' invitation to narrow Plaintiff's potential theories of relief. In sum, the Court will deny Defendants' Motion to Dismiss Counts I, II, and III to the extent that they rely on the theft of his personal information via cyber attack and Defendants' misrepresentations relating to protections from that attack.

### B. The Withdrawal

By contrast, Defendants' withdrawal from Plaintiff's asylum process — or, as Plaintiff labels the incident, their "firing" of him — does not provide grounds for a viable legal claim. As described above, Defendants terminated their representation of Wengui following the cyber attack. They explained in a letter to him that the attack had created "several ethical complications" related to their representation. See ECF No. 12-5 (Clark Hill Termination Letter) at 1. Defendants' "primary concern" was that "the cyberattack would require Mr. Ragland — and possibly other members of the Firm — to be a witness in [Plaintiff's] asylum proceeding" because they now had first-hand knowledge of China's prior persecution of Plaintiff, a factor relevant to that proceeding. Id.

In their Motion to Dismiss, Defendants argue that not only did their withdrawal not breach any duty owed to Wengui, but that it was in fact required by the Rules of Professional Conduct. See D.C. R. Prof. Conduct 1.16(a)(1) (D.C. Bar 2010) (attorney must withdraw from representing client if ongoing representation would violate Rule of Professional Conduct). Defendants again rely on Rule of Professional Conduct 3.7(a), which states that an attorney

"shall not" act as an advocate for a client when she is "likely to be a necessary witness" in the proceeding.  They also invoke Rule 1.7(b)(4), which requires withdrawal if the lawyer's ability to represent a client "reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests." Defendants explain that following the cyber attack, they had their "own interests in investigating and mitigating the incident — which conflicted with their representation of Plaintiff."  Def. MTD at 8.

Regarding Rule 3.7(a), Plaintiff counters that Defendants' withdrawal was premature at best, given that Wengui "did not have an asylum interview, let alone any hearing" and "had not asked that Mr. Ragland be a witness."  ECF No. 14 (Pl. Opp.) at 8.  Additionally, Plaintiff argues that Rule 1.7(b)(4) raises "inherently factual issues" as to whether the cyber attack created a conflict of interest, issues that cannot be resolved at this stage.  Id. at 21.

The Court need not settle these disputes because Wengui's fiduciary and malpractice claims run aground on a different shoal.  Plaintiff has not sufficiently pled that Defendants' conduct, even if improper, damaged or prejudiced him.  Both of these claims require a showing of damage or loss.  See, e.g., Seed Co., 840 F. Supp. 2d at 126 (plaintiff bringing malpractice claim "must point to an act (or omission) by the . . . [D]efendants that resulted in a loss" to him); Randolph, 973 A.2d at 708–09 (same regarding breach of fiduciary duty).  As one court in this district described the applicable test when considering legal malpractice, the claim "does not accrue until the plaintiff-client has sustained some injury from the malpractice[,]' and the 'mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm — not yet realized — does not suffice to create a cause of action for negligence.'"

Venable LLP v. Overseas Lease Grp., Inc., 2015 WL 4555372, at *2 (D.D.C. July 28, 2015)

(quoting Knight v. Furlow, 553 A.2d 1232, 1235 (D.C. 1989)).

    Plaintiff's claims predicated on the withdrawal do not plead damages that rise above the

"speculative" or "nominal" level. Wengui does not dispute, for example, that at the time of

Defendants' withdrawal, his asylum application had already been filed and he was awaiting an

initial interview, which can take years to schedule. See Def. MTD at 20. He also does not claim

to have experienced difficulties in finding a successor counsel with immigration-law expertise.

As a result, Wengui has failed to factually substantiate his conclusory allegations that

Defendants' withdrawal caused him "undue delay and complications," reputational harm, and

prejudiced the outcome of his case. See Compl., ¶ 60; see also Hinton v. Stein, 278 F. Supp. 2d

27, 33 (D.D.C. 2003) (rejecting legal-malpractice claim where "[a]lthough there was a brief

attorney-client relationship between the parties, defendant was justified in seeking to withdraw[,]

. . . [h]er motion to withdraw was filed promptly[,] and there is no indication that plaintiff

suffered any injury as a result of her withdrawal"). Put differently, the Complaint does not allege

that Plaintiff "suffered any injury because of Defendant[s'] failure to represent him," and the

Court will therefore dismiss his fiduciary-duty and malpractice claims to the extent that they rely

on the withdrawal as the purported harm. Id.

    Plaintiff's breach-of-contract claim based on the withdrawal is somewhat different, but

also merits dismissal. A party may prevail on such a claim even if he "fails to prove actual

damages," although he will be "entitled to no more than nominal damages." Wright v. Howard

Univ., 60 A.3d 749, 753 (D.C. 2013) (quoting Bedell v. Inver Housing Inc., 506 A.2d 202, 205

(D.C. 1986)). With regard to the withdrawal, however, Plaintiff has failed to even gesture at

provisions of the contract that Defendants breached in terminating their representation or at

extrinsic evidence that might support such a claim.  See Retainer Agreement at 2, 4 (attorney

may terminate agreement for reasons permitted under Rules of Professional Conduct or if any

conflict of interest arises).

    C.  Punitive Damages

The Court last tackles Count IV, which asserts a claim of punitive damages.  Specifically,

the Complaint alleges that Defendants violated Plaintiff's "rights" in an "intentional deliberate,

[and] outrageous" manner.  See Compl., ¶ 90.  To begin, punitive damages are a form of relief,

not a stand-alone cause of action.  Although the count cannot survive independently, the Court

considers whether such damages are available to Wengui at all.  "To recover punitive damages,"

a plaintiff must establish that "the tortious act was committed with 'an evil motive, actual malice,

deliberate violence or oppression' or in support of 'outrageous conduct in willful disregard of

another's rights.'"  Embassy of Nigeria v. Ugwuonye, 297 F.R.D. 4, 14 (D.D.C. 2013) (quoting

Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. 1988)).  The imposition of punitive damages thus

requires conduct that is "replete with malice."  See Dalo v. Kivitz, 596 A.2d 35, 40 (D.C. 1991);

see also Hendry v. Pelland, 73 F.3d 397, 400 (D.C. Cir. 1996) ("District of Columbia law

allows punitive damages only if the attorney acted with fraud, ill will, recklessness, wantonness,

oppressiveness, or willful disregard of the clients' rights.").

The Complaint does not plead such "outrageous" activity.  Instead, if true, Wengui's

allegations suggest that Defendants' failure to protect his information against hacking may mean

that the firm acted "imprudently or incompetently, but they fall far short of showing the blatant

wrongdoing necessary for a jury to infer that [Defendants] acted either with deliberate malice or

conscious disregard of [their client's] rights."  Hendry, 73 F.3d at 400; see also Embassy of

Nigeria, 297 F.R.D. at 14 (rejecting punitive-damages claim where attorney stole client's tax

refund and deposited it in firm's account).  Plaintiff does not allege, for example, that Defendants

<u>intentionally</u> left their server vulnerable to third-party hackings or stood to profit from such an

event in any way.  The Court therefore dismisses Count IV of the Complaint.

## IV.    Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Defendants'

Motion to Dismiss.  A separate Order consistent with this Opinion will be issued this day.


<u>/s/</u> *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>February 20, 2020</u>

**EXHIBIT 6**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK      )
                                        )
         Plaintiff,                 )
                                          )    Case No. 1:19-cv-3195-JEB
             v.                    )
                                          )    Hon. James Boasberg
CLARK HILL PLC and THOMAS K.      )
RAGLAND                                     )
                                          )
         Defendants.               )
                                          )
                                          )

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
## TO PLAINTIFF'S COMPLAINT

      Defendants Clark Hill PLC and Thomas K. Ragland (collectively, "Defendants") hereby

submit their Answer and Affirmative Defenses to Plaintiff Guo Wengui's Complaint.

1.      In this case, plaintiff Guo Wengui, a/k/a Miles Kwok a/k/a Ho Wan Kwok, ("plaintiff") seeks compensatory monetary damages of $50 million or more, jointly and severally, and punitive damages, also jointly and severally, against the defendant law firm Clark Hill PLC ("Clark Hill" or the "firm") and one of the firm's members, defendant Thomas K. Ragland, Esq. ("Mr. Ragland"), for damages, injuries, and wrongs which plaintiff has sustained as the direct and proximate result and consequence of defendants' multiple serious breaches of their duties to plaintiff arising from the firm's s legal representation of plaintiff. In addition to compensatory damages, plaintiff seeks punitive damages. Punitive damages are warranted here because the wrongful conduct of Clark Hill and Mr. Ragland was reckless, oppressive, intentional, deliberate, and willfully disregarded plaintiff's rights. (Clark Hill and Mr. Ragland are referred to herein collectively as "defendants" or the "firm.")

**ANSWER:**      Defendants admit that Defendant Thomas K. Ragland is a member of Defendant Clark Hill PLC. Defendants admit that, in this lawsuit, the plaintiff, Guo Wengui, a/k/a Miles Kwok, a/k/a Ho Wan Kwok ("Plaintiff"), has asserted claims against Defendants seeking compensatory damages. Answering further, Defendants note that the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages. Because the remaining allegations in Paragraph 1 constitute a legal conclusion, an answer by Defendants is neither required nor appropriate. To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 1.[1]

2.      Plaintiff was a client of Mr. Ragland and the Clark Hill law firm. In the course of that representation, Mr. Ragland and the Clark Hill law firm breached a lawyer's/law firm's fundamental obligation to protect from improper unauthorized disclosure plaintiff's (a client's) confidential information. The firm, specifically including Mr. Ragland, was reckless in its handling of plaintiff's confidential information and, as a direct result of that recklessness, plaintiff's confidential information was disclosed and widely disseminated, all to the great harm, detriment, and oppression of plaintiff. Having failed to protect plaintiff's confidential information, the firm then proceeded to compound that breach by wrongfully, improperly, and without good cause terminating its representation of plaintiff. This action, too, was reckless and in willful disregard of plaintiff's rights and in willful disregard of the firm's duties and obligations to plaintiff as a client of the firm. The firm intentionally undertook a matter beyond its competence and capability and then intentionally, deliberately, and willfully, wrongly placed its interests above the firm's duties to its client. Plaintiff was damaged as a result of the firm's breaches of the duties

---

[1] Defendants reserve (and expressly do not waive for any purposes) the arguments asserted in their Motion to Dismiss and supporting memoranda of law.

which the firm and its lawyer (Mr. Ragland) owed to plaintiff as a client. The firm's actions were oppressive and were taken in willful disregard of plaintiff's rights.

**ANSWER:**   Defendants admit that Dr. Lianchao Han of Initiatives For China retained Clark Hill PLC to represent Plaintiff in connection with Plaintiff's asylum application. Defendants deny the remaining allegations in Paragraph 2.

3.     Plaintiff reasonably relied on the firm's assurances — both implicit and explicit — that the firm understood its ethical and legal obligations, including its fundamental obligation to protect plaintiff's confidential information, *and* that the firm actually had the capability to fulfill its obligations. In fact, however, Mr. Ragland failed to honor his assurances and, as a result, he recklessly exposed plaintiff's confidential information. Contrary to Mr. Ragland's representations, the firm did not have adequate and appropriate electronic security measures in place to protect plaintiff's information and Mr. Ragland failed to take appropriate actions to protect plaintiff's confidential information. The direct consequence of the firm's and Mr. Ragland's failures in this regard was that plaintiff's sensitive confidential information, which plaintiff disclosed to the firm in confidence and which the firm assured plaintiff would be protected, was disclosed broadly and disseminated over the internet on social media platforms. The firm's breaches of duty to plaintiff caused these unauthorized disclosures. These disclosures have harmed and damaged plaintiff and those harms and damages are continuous and ongoing. The firm's conduct here goes far beyond negligence and was conduct which was outrageous in its recklessness and in its willful disregard of plaintiff's rights.

**ANSWER:**   Defendants deny the allegations in Paragraph 3.

4.     The firm's representation of plaintiff involved preparing and filing plaintiff's application for asylum in the United States. Plaintiff sought asylum in the United States after fleeing from his native China to avoid further politically motivated harsh persecution, including fear of being tortured, incarcerated under extreme conditions, and potentially being murdered.

**ANSWER:**   Defendants admit that they represented Plaintiff in connection with Plaintiff's asylum application, Defendants prepared and filed Plaintiff's application for asylum in the United States, Plaintiff is a Chinese national, and Plaintiff sought asylum based on purported threats, harms, and mistreatment of Plaintiff and his family by the People's Republic of China. Defendants deny the remaining allegations in Paragraph 4.

5.     The information which plaintiff disclosed to the firm and which, because of the firm's failures and breaches, was disclosed subsequently to the world, including to persons and interests in China committed to silencing, smearing, and potentially physically harming plaintiff, included information detailing plaintiff's political activities in China as well as other sensitive matters. This sensitive information, the public disclosure of which jeopardizes the life, safety, and

welfare of plaintiff and others, lost its confidential status when it was displayed and published on social media platforms, and this occurred because of defendants' failures to properly protect the information from improper disclosure. Agents and officials of the Chinese government are believed to be among the parties who gained access to plaintiff's confidential information, which, again, they were able to obtain because of defendants' manifest failures and breaches of duty, including defendants' improper and unlawful actions and inactions in not taking necessary actions to protect plaintiff's confidential information from disclosure.

**ANSWER:** Defendants admit that in or about September 2017, Clark Hill PLC was the victim of a cyber-incident related to the firm's representation of Plaintiff. Defendants deny that any purported disclosure of Plaintiff's information was caused by Clark Hill PLC's failure to take actions to protect Plaintiff's information from disclosure. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 5 and therefore deny the remaining allegations in Paragraph 5.

6. As plaintiff's counsel, Clark Hill owed plaintiff an undivided duty to act in his best interests. Here, the firm, in its representation of plaintiff and then in improperly terminating that representation, violated that obligation. The firm knew from the outset of considering whether to undertake the representation of plaintiff that agents and officials of the Chinese government have been and are hostile to plaintiff and pose a genuine threat to plaintiff's life, liberty, and security. These Chinese agents and officials and the persons and interests on whose behalf they have acted in the past and were (and are) expected to act in the future pose, as defendants knew before and when they agreed to represent plaintiff, a direct threat to plaintiff. Notwithstanding defendants' knowledge of the powerful interests hostile to plaintiff, knowledge which defendants had prior to agreeing to represent plaintiff, defendants failed to protect plaintiff's confidential information from disclosure from these persons and interests with a known agenda deeply hostile and antagonistic to plaintiff Defendants' conduct prejudiced plaintiff, caused him severe personal and financial damage, all of which could have, and should have, been avoided.

**ANSWER:** Defendants admit that, as Plaintiff's attorneys, they owed him the standard duties imposed by the common law and the District of Columbia Rules of Professional Conduct. Answering further, the Court's February 20, 2020 order dismissed Plaintiff's claims arising from the Defendants' withdrawal from the representation of Plaintiff. Defendants deny the remaining allegation in Paragraph 6.

7. Defendants then compounded their breaches to plaintiff when they wrongfully, unlawfully, improperly, without valid cause, and without any meaningful consultation with plaintiff unilaterally terminated their representation of him. When this matter got "hot,"

defendants did not stand with their client; rather, they "ducked and ran." Defendants abandoned their client (plaintiff), and they put their perceived interests above their obligation to act in the interests of their client (plaintiff). Defendants violated their legal and ethical duty of undivided loyalty to their client. Defendants' conduct was oppressive, intentional, and willfully disregarded plaintiff's rights.

**ANSWER:**  Defendants deny the allegations in Paragraph 7.  Answering further, the Court's February 20, 2020 order dismissed Plaintiff's claims arising from the Defendants' withdrawal from the representation of Plaintiff.

8.  Plaintiff brings this action because defendants must be — and in this action will be — held accountable for their gross and intentional misconduct.  Defendants are liable for both compensatory and punitive damages.  Defendants' egregious failures to protect plaintiff's information from being exposed to potential "hackers," including failing to have in place and/or to maintain necessary and effective electronic security measures sufficient to protect plaintiff's sensitive and confidential information, violated the rules of professional conduct; constituted a serious breach of the firm's fiduciary duty to plaintiff as a client of the firm; violated the firm's contractual obligations to plaintiff and violated the firm's obligation to provide plaintiff competent legal representation.

**ANSWER:**  Defendants deny the allegations in Paragraph 8.  Answering further, the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

9.  The wide-spread and deeply harmful publication and dissemination of plaintiff's sensitive personal information on social media was the direct, proximate, and inevitable (albeit entirely avoidable) result and consequence of the firm's breaches of its duties and obligations to plaintiff.  The firm then intentionally, deliberately, and oppressively made matters worse when it terminated its representation of plaintiff, advancing a plainly pretextual, if not risible, "justification" for the firm's improper action.  Defendants acted in willful disregard for the rights of plaintiff, and defendants' conduct was reckless and taken without regard to the safety or protection of the plaintiff, the firm's client, and in willful disregard of the firm's duties and obligations to plaintiff as a client.  Because plaintiff has suffered and continues to suffer serious harm and injury as a result of defendants' actions and inactions, plaintiff seeks monetary damages to compensate him for the grievous harms which defendants have caused him.  In addition, plaintiff seeks punitive damages because of the recklessness, wantonness, and oppressiveness of defendants' conduct.

**ANSWER:**  Defendants deny the allegations in Paragraph 9.  Answering further, the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages and Plaintiff's claims based on Defendants' withdrawal.

## PARTIES

10.     Plaintiff, a native of China, currently resides in New York, NY.  Plaintiff has a pending application for asylum in the United States.  Plaintiff is a highly successful businessman and a political activist and well-known Chinese dissident.  Plaintiff has fought vigorously for many years for the rule of law, human rights, and democracy in China.  In early 2015, plaintiff was forced to escape from China as he justifiably feared being unlawfully arrested, detained, interrogated, tortured, and/or killed by the Chinese government and/or the Chinese Communist Party (the "CCP") because of his political activities and outspoken advocacy.  (References herein to the "CCP" are inclusive of both the Chinese government and the Chinese Communist Party.)

**ANSWER:**     Defendants admit that Plaintiff is a Chinese national, lived in New York, NY on or about September 2019, and filed an application for asylum in September 2017. Defendants admit that Plaintiff left mainland China on or about December 2013 and left the Hong Kong Special Administrative Region, People's Republic of China, on or about January 2015. Defendants admit that Plaintiff sought asylum based, in part, on his purported political activities. Defendants are without knowledge or information sufficient to form a belief as to Plaintiff's state of mind and the remaining allegations in Paragraph 10, and therefore deny the remaining allegations in Paragraph 10.

11.     Defendant Clark Hill PLC ("Clark Hill") is a major law firm of approximately 650 attorneys and professionals, in 25 offices, and operates as a professional services limited liability company, organized and existing under the laws of the State of Michigan.  Clark Hill does business on a regular, constant, and substantial basis in the District of Columbia, specifically including having an office at 1001 Pennsylvania Avenue NW, Suite 1300, Washington, DC 20004, and Clark Hill's lawyers appear regularly before courts, agencies, and Congress in the District of Columbia.

**ANSWER:**     Defendants admit the allegations in Paragraph 11.

12.     Defendant Thomas K. Ragland, Esq. ("Mr. Ragland") is an attorney licensed to practice law in the District of Columbia and is a member (partner or principal) of the Clark Hill law firm in the firm's District of Columbia office.  Mr. Ragland does business on a regular, constant, and substantial basis in the District of Columbia, including maintaining his office for the practice of law at the Clark Hill office at 1001 Pennsylvania Avenue, NW, Suite 1300, Washington, DC 20004, and appearing before agencies and tribunals in the District of Columbia. (As noted previously, Clark Hill PLC and Mr. Ragland are referred to collectively herein as "defendants" or the "firm.")

**ANSWER:**     Defendants admit the allegations in Paragraph 12.

## JURISDICTION, VENUE, AND CONVENIENCE

13.    This Court has jurisdiction over this matter pursuant to D.C. Code § 11-921.  This Court has personal jurisdiction over defendants as they both regularly and constantly conduct business in the District of Columbia.  Defendants' actions and inactions giving rise to the matters alleged in this complaint took place in the District of Columbia, including meetings with plaintiff and/or his agents and authorized representative, Dr. Lianchao Han ("Dr. Han").

**ANSWER:**    Defendants admit that the United States District Court for the District of Columbia has subject-matter jurisdiction over this matter, as this lawsuit was timely removed to federal court on October 24, 2019, and has personal jurisdiction over Defendants.  Answering further, Defendants admit that Mr. Ragland met with Dr. Han in the District of Columbia, at Plaintiff's request, on multiple occasions in or around September 2017 for the purpose of discussing Plaintiff's asylum application.  Defendants further admit that they met with Plaintiff directly in or around September 2017 regarding Plaintiff's asylum application.  Defendants deny the remaining allegations in Paragraph 13.

14.    Venue is proper in this Court and this Court is a convenient forum for this action. This case relates directly to actions and inactions of defendants in connection with their law office and law practice in the District of Columbia; defendants are very much present and engaged in doing business on a daily basis in the District of Columbia; and a substantial part of the events, actions, and inactions giving rise to plaintiff's claims in this complaint occurred in the District of Columbia.   By way of illustration, meetings between the firm and plaintiff's authorized representative, Dr. Han, during which the firm and plaintiff formed an attorney-client relationship, regularly exchanged information relating to plaintiff's asylum application, Mr. Ragland's preparation of that application, the firm's withdrawal from the representation, and other actions and inactions arising out of that relationship occurred in the District of Columbia at the firm's office in the District.  Mr. Ragland was the firm's principal lawyer representing plaintiff and most of the work which Mr. Ragland did on behalf of plaintiff was done in the District of Columbia.

**ANSWER:**    Defendants admit that venue is proper in the United States District Court for the District of Columbia, as this lawsuit was timely removed on October 24, 2019, and Defendants admit that Mr. Ragland was the most senior attorney at Clark Hill PLC preparing and filing Plaintiff's asylum application.  Answering further, Defendants admit that Mr. Ragland met with Dr. Han in the District of Columbia, at Plaintiff's request, on multiple occasions in or around

September 2017 for the purpose of discussing Plaintiff's asylum application.  Defendants deny the remaining allegations in Paragraph 14.

## STATEMENT OF FACTS

15.     For years, plaintiff has been a forceful, visible, and well-known advocate for the rule of law, human rights, and democracy in China.  In connection with his political activities and advocacy, plaintiff has, for example, exposed systemic corruption in the CCP, as well as by senior officials of the Chinese government and family members of those officials.  Plaintiff has also disclosed the widespread abuse of human rights in China, including the use of torture.  Plaintiff has opposed Chinese governmental and party suppression of democratic movements in China. Plaintiff has also been involved in exposing the degree, extent, and effectiveness of China's covert cultural, political, economic, and intelligence operations in the United States and elsewhere in the West.

**ANSWER:**     Defendants admit that Plaintiff sought asylum based, in part, on Plaintiff's political activities, and Defendants state that the content of Plaintiff's asylum application speaks for itself.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15 and therefore deny them.

16.     Plaintiff has been effective in influencing international opinion with respect to China and the CCP.  From the perspective of the CCP, plaintiff's activities and advocacy have affected adversely China's and the CCP's stature in the world community and, in response, the Chinese government has attempted to silence plaintiff.  The Chinese government/CCP has employed various tactics, including coercion and offering bribes to attempt to silence plaintiff. Upon information and belief, the Chinese government/CCP has used its overseas intelligence networks to seek to discredit, silence, and threaten plaintiff's personal safety or, at the very least, to cause plaintiff to have good reason to fear for his personal safety as well as fearing for the safety of family members and friends.

**ANSWER:**     Defendants admit that Plaintiff sought asylum based, in part, on Plaintiff's political activities, and Defendants state that the content of Plaintiff's asylum application speaks for itself.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16 and therefore deny them.

17.     Upon information and belief, the CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associated with it and acting on its behalf, including information relating to corruption, murder, hiding of illegally-gained money, and China's spy network.  For these and other reasons, the Chinese government and the CCP are highly motivated, to understate the matter, and engaged aggressively

in seeking to silence plaintiff. The Chinese government and the CCP are equally motivated and engaged in seeking to learn what plaintiff knows about improper activities undertaken by or on behalf of the Chinese government and the CCP. And, perhaps most critically, the Chinese government and the CCP have the capabilities — the "operational reach" — to carry out aggressive hostile actions against plaintiff.

**ANSWER:** Defendants admit that Plaintiff sought asylum based, in part, on Plaintiff's political activities, including Plaintiff's claims to have information regarding Chinese officials, and Defendants state that the content of Plaintiff's asylum application speaks for itself. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 and therefore deny them.

18. In or about January 2015, for example, the CCP, through Bruno Wu Zheng, called plaintiff to request that plaintiff cooperate with the CCP and stop disclosing information regarding corruption on the part of senior CCP officials. Plaintiff refused. After several failed bribery attempts and threats, Bruno Wu Zheng directed the Central Commission for Discipline Inspection ("CCDI") and the Special Task Force to request (truly demand) that plaintiff cooperate with China and return any evidence he had of corruption among senior leaders. Plaintiff was asked to hand over his evidence to the CCP and to stop acting against the CCP. In return, Bruno Wu Zheng promised plaintiff, *inter alia,* that (1) none of plaintiff's assets or properties would be seized by the CCP; (2) all privileges would be returned to plaintiff and his family; (3) plaintiffs family members would not be arrested; and (4) plaintiff would not be physically threatened or killed. Plaintiff refused this proposal. Plaintiff anticipated that this refusal would trigger the risk of serious persecution of plaintiff and his family.

**ANSWER:** Defendants admit that Plaintiff attested to politically-motivated threats against himself and his family in support of his claim for asylum, including an incident involving Mr. Wu Zheng, and Defendants state that the content of Plaintiff's asylum application speaks for itself. Defendants are without knowledge or belief sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18 and therefore deny them.

19. Plaintiff's political activities and his refusal to cease those activities, when coupled with the CCP's powerful interest in bringing those activities to a halt, including using brute force, made it dangerous for plaintiff to remain in China. Consequently, on or about January 2015, plaintiff fled from China. He rightly feared being arrested, detained, interrogated, tortured, and/or killed by the Chinese government and/or the CCP. At or around this same time, the CCP seized substantial sums of plaintiffs family's assets and questioned and arrested 18 of plaintiffs family members. The CCP also arrested or detained a number of plaintiff's colleagues and employees and prohibited others from leaving China.

**ANSWER:** Defendants admit that Plaintiff, in support of his claim for asylum, attested that he left mainland China in 2013, and left Hong Kong in 2015, based, in part, on his political activities and on actions by the People's Republic of China toward Plaintiff. Defendants admit that Plaintiff further attested to asset seizures, detention, and investigation of Plaintiff's family members in support of his claim for asylum. Defendants further state that the content of Plaintiff's asylum application speaks for itself. Defendants are without knowledge or belief sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19 and therefore deny them.

20.   In May 2017, by which time plaintiff was residing in the United States, the CCP sent Liu Yanping and three other agents to New York City to speak with plaintiff in yet another effort to seek to silence him. Liu Yanping was then Secretary of the CCDI. Plaintiff refused this threat as he had refused previous threats. Instead of giving in to this latest threat, plaintiff disclosed a broad network of CCP spies operating in the United States. Upon information and belief, the United States government revoked the visas of these four officials, including Liu Yanping, because of their actions in the United States.

**ANSWER:** Defendants admit that Plaintiff was in the United States on or about May 2017. Defendants further admit that Plaintiff's claim for asylum rests in part on his attestation that Plaintiff assisted United States government officials, which Plaintiff himself has made public in this allegation, and further states that the content of Plaintiff's asylum application speaks for itself. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20 and therefore deny them.

21.   The CCP also took another highly aggressive action to seek to silence plaintiff by issuing two International Criminal Police Organization ("INTERPOL") "red [arrest] notices." Plaintiff disputes the legitimacy of these notices.

**ANSWER:** Defendants admit that Plaintiff has been the subject of INTERPOL "red notices." Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21 and therefore deny them.

22.   In or around October 2017, just prior to China's 19th National Congress, an event of great importance to the CCP, plaintiff's Twitter, YouTube, and Facebook accounts were abruptly and suspiciously suspended, all without explanation.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 22 and therefore deny them.

23.     Upon information and belief, beginning in 2017, the Chinese government and/or the CCP sent agents and officials to the United States to organize demonstrations aimed directly against plaintiff outside the building in New York City where plaintiff resides.  Persons attending these CCP-staged demonstrations, literally on plaintiff's front steps, were provided with preprinted signs defaming plaintiff in vile language, calling him a rapist and a liar, and urging plaintiff to leave the United States.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 23 and therefore deny them.

24.     The CCP separately orchestrated a malicious negative propaganda campaign against plaintiff. The CCP formed a team of people, the "50-cent troll army," to manipulate public opinion on social media for the benefit of the CCP.  The commentators created favorable comments or articles on popular Chinese social media networks intended to derail discussions that are unfavorable to the CCP and promote narratives that serve the government's interests, together with disparaging comments and misinformation about political opponents and critics of the Chinese government, such as plaintiff.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 24 and therefore deny them.

25.     Merely supporting plaintiff became a crime in China.  One of plaintiff's supporters, Dong Qi, reportedly was arrested and sent to jail for wearing a T-shirt with plaintiff's slogan "Everything is just beginning" — on it.  Upon information and belief, plaintiff's followers have been questioned, restrained, and intimidated.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 25 and therefore deny them.

26.     Upon information and belief, the CCP perceives plaintiff as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 26 and therefore deny them.

27.     Plaintiff's political actions and advocacy are known to and widely supported by many people in China and, indeed, around the world.  The domestic Chinese and international support which plaintiff has and the related strong support for his political and advocacy activities are additional sources of anger, aggravation, deep displeasure, and frustration to the CCP.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and therefore deny them.

28.     Paragraphs 15-27 *supra,* describing plaintiff's political activities and advocacy and resulting persecution and justifiable fear of further retaliation after fleeing from China, provide background and context for plaintiffs seeking legal representation to assist him and advocate on his behalf in applying for and obtaining political asylum in the United States.  Plaintiff retained Mr. Ragland and the Clark Hill law firm to represent him in this regard.  Mr. Ragland holds himself out as a leading immigration lawyer.  Mr. Ragland and the firm represented to plaintiff that Mr. Ragland and the firm were qualified, capable, and competent to represent plaintiff and to protect his interests fully and professionally.  Plaintiff relied upon these representations; however, they turned out to be false.

**ANSWER:**     Defendants reincorporate their answers to Paragraphs 15 through 27 above as though fully set forth herein.  Defendants admit that beginning in or about August 2017, they represented Plaintiff in connection with Plaintiff's asylum application.  Defendants further admit that Defendants' communication with Plaintiff about the representation occurred through communication between Defendants and Plaintiff's representative, Dr. Han, and that Defendants communicated with Dr. Han at Plaintiff's request.  Defendants further admit that the representation concerned U.S. immigration matters and that Mr. Ragland practices law in immigration matters.  Defendants deny the remaining allegations in Paragraph 28.

29.     Clark Hill receives and expects to receive (as any large law firm would) a large amount of confidential client information, including financial records, trade secrets, sensitive personal communications and disclosures, and sensitive personally identifiable information (*e.g.,* addresses, contact information, social security numbers, and health information).  Receiving such information is a daily occurrence at Clark Hill (again, as it is at any law firm of comparable size).  Clients, specifically including the present plaintiff, disclose confidential information to Clark Hill reasonably and justifiably relying on the firm's professional ethical and legal obligations to protect and preserve the confidentiality of their information, while strictly limiting disclosure of such information to that information which the client authorizes the firm to disclose.

**ANSWER:**     Defendants admit that Clark Hill PLC receives confidential client information in the context of legal representations on a regular basis, and that the common law and the District of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their representation of Plaintiff.  Because the remaining allegations in Paragraph 29

constitute a legal conclusion, an answer by Defendants is neither required nor appropriate. To the

extent an answer is required, Defendants deny the remaining allegations in Paragraph 29.

30.    Clark Hill has clear and undeniable ethical and legal obligations to preserve a
client's (plaintiffs) confidential information. These obligations to preserve confidentiality include
information provided to the firm electronically and/or stored electronically on the firm's computer
network. At all relevant times, Clark Hill and Mr. Ragland communicated to plaintiff, both
implicitly and explicitly, that the firm understood its obligations to preserve plaintiff's confidential
information and, of equal importance, that the firm could and would do so (*i.e.,* that the firm had
the requisite professional and technical knowledge, capability, and competence to protect
plaintiff's information).

**ANSWER:**    Defendants admit that the common law and the District of Columbia Rules

of Professional Conduct governed Defendants' obligations with respect to their representation of

Plaintiff. Answering further, Defendants deny that Plaintiff requested any specific, additional, or

extraordinary measures with respect to safeguarding his confidential information differently than

any other client of Defendants. Defendants deny the remaining allegations in Paragraph 30.

31.    On or about August 2017, plaintiff met with defendants in connection with
plaintiff's potentially retaining the firm to represent him in preparing and filing his planned asylum
application. During that meeting, plaintiff explained his standing and visibility as a prominent
Chinese political dissident who is perceived as hostile to the CCP and related interests in China.
Plaintiff also explained the risks associated with and attendant to plaintiff's position as a prominent
visible critic of the Chinese regime. Plaintiff warned of the persistent and relentless cyberattacks
that he and his associates had endured. At that meeting and subsequently, plaintiff disclosed to
the firm confidential information about plaintiff's political and advocacy activities and equally
sensitive confidential information regarding plaintiff's knowledge of wrongful actions and
activities of the CCP. The firm knew from the very outset that plaintiff's asylum application was
not "routine" and that in connection with that application plaintiff would necessarily be disclosing
highly sensitive confidential information to Mr. Ragland and to the Clark Hill law firm.

**ANSWER:**    Defendants admit that in or about August 2017, they began representing

Plaintiff in connection with Plaintiff's asylum application. Answering further, Defendants admit

that they met with Plaintiff and Plaintiff's representatives regarding Plaintiff's asylum application,

and, in those meetings, Plaintiff discussed his purported political activities and the alleged

harassment of Plaintiff by Chinese officials. Answering further, Defendants deny that Plaintiff

requested any specific, additional, or extraordinary measures with respect to safeguarding

confidential information differently than any other client of Defendants. Answering further, Defendants state that Plaintiff himself demanded, contrary to Defendants' advice, that Defendants publicize the fact the Plaintiff had applied for asylum. Defendants deny the remaining allegations in Paragraph 31.

32. In meetings with the firm, plaintiff explained that any law firm preparing his asylum application had to expect to be subjected to sophisticated cyberattacks. Having been so informed, with "eyes wide open," and with a full awareness and understanding of the cyber security and other potential risks involved, defendants agreed to move forward and agreed to undertake the representation of plaintiff.

**ANSWER:** Defendants admit that they formed an attorney-client relationship with Plaintiff in connection with Plaintiff's asylum application. Answering further, Defendants deny that Plaintiff requested any specific, additional, or extraordinary measures with respect to safeguarding confidential information differently than any other client of Defendants. Answering further, Defendants state that Plaintiff himself, contrary to Defendants' advice, demanded that Defendants publicize the fact the Plaintiff had applied for asylum. Defendants deny the remaining allegations in Paragraph 32.

33. In agreeing to undertake the representation of plaintiff, Mr. Ragland and the firm agreed to take special precautions to prevent improper disclosure of plaintiff's sensitive confidential information. Such precautions would include not placing any of plaintiff s information on the firm's computer server as doing so would, as Mr. Ragland and the firm understood, make the information an easy target for a "hacker" interested in obtaining the information. The firm also committed and agreed to have in place at all times the requisite security measures to protect plaintiff's confidential information and to otherwise provide plaintiff ethical and competent legal representation. Had the firm not made these commitments and agreements, plaintiff would not have retained the firm.

**ANSWER:** Defendants deny the allegations in Paragraph 33. Answering further, Defendants deny that Plaintiff requested any specific, additional, or extraordinary measures with respect to safeguarding confidential information differently than any other client of Defendants. Answering further, Defendants state that Plaintiff himself, contrary to Defendants' advice, demanded that Defendants publicize the fact the Plaintiff had applied for asylum.

34. On or about August 28, 2017, plaintiff, through his authorized representative, Dr. Han, and defendants executed a letter of agreement (the "retention agreement") for legal services pertaining to plaintiff's asylum application. That agreement created and formalized contractual, common law, and professional ethical and legal duties and obligations of defendants (as legal counsel) to plaintiff (as client), including the duties and obligations of undivided loyalty and the duties and obligations to maintain adequate and necessary security measures sufficient to safeguard plaintiff's sensitive personal and confidential information and documents.

**ANSWER:** Defendants admit that, on or about August 28, 2017, Defendants and Dr. Han entered into a written engagement letter with respect to Defendants' legal representation of Plaintiff in connection with Plaintiff's asylum application, and that the engagement letter set forth the parties' obligations with respect to the representation. Answering further, Defendants state that the common law and the District of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their representation of Plaintiff. Defendants deny the remaining allegations in Paragraph 34.

35. Whatever the firm's security protection obligations are or should be with respect to maintaining reasonable security measures to safeguard an "ordinary" client's sensitive personal information and confidential documents, the firm here was on full notice ("high alert") that the representation of plaintiff was in no sense an "ordinary" representation with "ordinary" risks of unauthorized disclosure. That is, the firm knew from the very outset, and prior to the firm's agreeing to undertake the representation of the plaintiff, that special care and attention to security measures were necessary, required, expected, and agreed-to by the firm. In agreeing to represent plaintiff, the firm agreed to take the necessary steps and actions to protect plaintiff's confidential information recognizing that meant the firm would take "more than ordinary" protective efforts. Had the firm not so committed and agreed, plaintiff would not have retained the firm.

**ANSWER:** Defendants deny the allegations in paragraph 35. Answering further, Defendants deny that Plaintiff requested any specific, additional, or extraordinary measures with respect to safeguarding confidential information differently than any other client of Defendants. Answering further, Defendants state that Plaintiff himself, contrary to Defendants' advice, demanded that Defendants publicize the fact the Plaintiff had applied for asylum.

36. In accordance with the retention agreement, plaintiff paid defendants a retainer fee of $10,000, and the firm subsequently billed plaintiff (or his authorized representative) for its fees and the firm's fees were paid.

**ANSWER:** Defendants admit the allegations in Paragraph 36. Defendants further answer that Plaintiff delayed paying Clark Hill PLC's final bill, which was ultimately paid by Initiatives For China on December 28, 2017.

37. The firm's retention agreement and its related standard terms of engagement state, among other things, that plaintiff, as a client, has the right to "expect competent representation by an attorney" of the firm; that the firm "will at all times act on your behalf to the best of our ability"; and that the firm's lawyers "are subject to the Rules of Professional Conduct governing attorneys in Washington, DC." *See also* CLARK HILL, *About Us,* https://www.clarkhill.com/pages/about (last visited Aug. 29, 2019) ("Ethical [b]ehavior is [n]on-[n]egotiable. We believe in doing the right thing every time. We uphold our professional responsibilities and are accountable for our actions.").

**ANSWER:** Defendants admit that the engagement letter between Plaintiff and Defendants incorporated Clark Hill PLC's Standard Terms of Engagement for Legal Services. Because the engagement letter, incorporated documents, and Clark Hill PLC's website speak for themselves, further answer is neither required nor appropriate.

38. Plaintiff delivered sensitive personal information and confidential documents to defendants so they, as counsel, could complete plaintiff's asylum application. That application was prepared in the District of Columbia by Mr. Ragland in consultation with Dr. Han, plaintiff s authorized representative in the District of Columbia. The application was filed with the United States Department of Homeland Security in Washington, D.C. on September 5, 2017. As necessary and as appropriate and subject to appropriate protections (*e.g.,* under seal or *in camera*), plaintiff will identify the confidential information he disclosed to the firm.

**ANSWER:** Defendants admit that Plaintiff provided Defendants with information relevant to complete Plaintiff's asylum application. Defendants deny that the application was filed with the United States Department of Homeland Security, and further state that the application was filed with the United States Citizenship and Immigration Services ("USCIS") Vermont Service Center in St. Albans, Vermont, in accordance with USCIS requirements. Defendants deny the remaining allegations in Paragraph 38.

39. Notwithstanding (1) the firm's obligation to protect the confidentiality of plaintiff's information, (2) the firm's advance knowledge of the circumstances of plaintiffs case and the increased need for protection of plaintiff's information, and (3) defendants' agreement, by undertaking the representation of plaintiff and otherwise, that it would and could protect plaintiff's

confidential information, the firm failed to do so. Discovery is needed to determine the specific details of the firm's failures; however, it is beyond dispute that the firm failed as plaintiff's information was disclosed. Plaintiff alleges that Mr. Ragland used the firm's server to store and transmit plaintiff's sensitive information, and used his firm email account to transmit plaintiff's confidential information to third parties, including to third parties not approved by plaintiff. If, as plaintiff believes and here alleges, that Mr. Ragland used his firm email account to transmit plaintiff's confidential information to third parties, that reckless and wanton conduct "opened the door wide" to the firm's server to potential "hackers" and thoroughly compromised the confidentiality of plaintiffs information.

**ANSWER:**     Defendants admit that on or about September 12, 2017, Clark Hill PLC's computer system was the subject of a cyber-incident. Answering further, Defendants deny that Plaintiff requested any specific, additional, or extraordinary measures with respect to safeguarding confidential information differently than any other client of Defendants. Answering further, Defendants state that Plaintiff himself, contrary to Defendants' advice, demanded that Defendants publicize the fact the Plaintiff had applied for asylum. Defendants further answer that Plaintiff's own representative, Dr. Han, advised Defendants to communicate with Dr. Han via email by requesting information about Plaintiff's asylum application via email. Defendants deny the remaining allegations in Paragraph 39.

40.     The combination of Mr. Ragland's reckless conduct and the firm's inadequate cybersecurity measures and infrastructure was fatal. As a result, plaintiff's sensitive confidential information was not protected, but was disclosed to the world at large, and thus made available to the CCP and others with hostile intent to plaintiff and with the capacity to carry out that hostile intent.

**ANSWER:**     Defendants deny the allegations in Paragraph 40.

41.     The firm has indicated that on or about September 12, 2017, the firm's computer system was "hacked" by a third party. This third party, apparently without great difficulty, circumvented the firm's demonstrably inadequate (essentially porous) security and monitoring programs. After doing so, the third party "hacker" was able to locate and exfiltrate (obtain) plaintiff's asylum application and affidavit and, perhaps, other information and materials relating to plaintiff. On September 12, 2017, Mr. Ragland wrote to Dr. Han, plaintiff's representative, that "his computer is down — apparently it was attacked."

**ANSWER:**     Defendants admit that on or about September 12, 2017, Clark Hill PLC's computer system was the subject of a cyber-incident. Defendants further admit that Mr. Ragland

informed Dr. Han of the cyber-incident, and that any correspondence between Mr. Ragland and

Dr. Han speaks for itself. Defendants deny the remaining allegations in Paragraph 41.

42. The firm's security measures, whatever they were, failed to "safeguard" plaintiff's sensitive personal information and confidential documents. The firm's security measures were inadequate, unreasonable, and fell woefully far short of defendants' promises, assurances, obligations, and commitments to provide adequate security measures, given the circumstances of this case, in violation of defendants' contractual, common law, and professional duties to plaintiff.

**ANSWER:** Defendants admit that on or about September 12, 2017, Clark Hill PLC's

computer system was the subject of a cyber-incident. Defendants deny the remaining allegations

in Paragraph 42.

43. Because of defendants' failures, documents obtained by the third party included plaintiff's and plaintiff's spouse's sensitive personal information — *e.g.*, plaintiff's passport identification number; plaintiff's I-94 admission-number; plaintiff's spouse's passport identification number; and plaintiff's spouse's I-94 admission-number. Beginning on or about September 23, 2017, sensitive personal information and confidential documents obtained from defendants' computer system relating to plaintiff began to appear on Twitter. The published material included the following:

    (a)    A copy of plaintiff's application for political asylum;

    (b)    Plaintiffs passport identification number;

    (c)    Plaintiff's I-94 admission-number;

    (d)    Plaintiff's spouse's passport identification number; and

    (e)    Plaintiff's spouse's I-94 admission-number.

**ANSWER:** Defendants admit that on or about September 12, 2017, Clark Hill PLC's

computer system was the subject of a cyber-incident. Answering further, Defendants admit that

Plaintiff's passport number, his spouse's passport number, Plaintiff's I-94 admission number, and

his spouse's I-94 admission number were stated in Plaintiff's asylum application, but deny that the

enumerated pieces of information are sensitive or confidential. Defendants are without knowledge

or information sufficient to form a belief as to the remaining allegations in Paragraph 43 and

therefore deny them.

44.     The information published and disseminated on social media included sensitive personal information and confidential portions of plaintiff's asylum application and affidavit. Plaintiff provided this and other highly sensitive information, including the entire contents of plaintiff's asylum application, to defendants in connection with their representation of plaintiff. Plaintiff did not consent to nor did he authorize the disclosure of any of the information to any persons other than to those in the United States government with a direct "need to know" in connection with the review of plaintiff's asylum application.  By law, asylum applications are strictly confidential.  By virtue of the wrongful conduct of Mr. Ragland and the firm, plaintiff s asylum application became entirely public and was published on social media sites.

**ANSWER:**     Defendants admit that 8 C.F.R. § 208.6 prohibits disclosure of asylum applications by the government in some, but not all, circumstances.  Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 44 and therefore deny the remaining allegations in Paragraph 44.

45.     Defendants cannot properly, let alone reasonably, defend their undeniable failure to protect plaintiff's information on grounds of "impossibility" or some variation of that theme.  If defendants lacked the will, the resources, or the technical capability or sophistication to protect plaintiff's information from being disclosed, defendants were duty-bound to disclose this limitation (whatever its cause and despite such disclosure being against the defendants' economic interest in gaining plaintiff as a client) to plaintiff prior to the firm's undertaking the representation of plaintiff, and thus afford plaintiff the opportunity not to retain the firm to represent him.  The firm denied plaintiff this opportunity.  The legal and ethical obligations of lawyers (here, Mr. Ragland) include the obligation to decline a representation when the matter is beyond the competence, capacity, or ability of the lawyer.  Mr. Ragland and the Clark Hill law firm breached that duty and obligation because they undertook the representation of plaintiff when they lacked the competence and ability to do so professionally, properly, and without harming their client (plaintiff).

**ANSWER:**     Defendants admit that the common law and the District of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their representation of Plaintiff.  Defendants deny the remaining allegations in Paragraph 45.

46.     Since the "hacking," defendants have largely "stonewalled" and refused to provide plaintiff any meaningful information about what occurred.  For example, defendants have refused to advise plaintiff of the scale of the attack, including whether materials of clients other than plaintiff were obtained and, if so, whether the firm withdrew from those representations, and whether there is any discernible pattern in the materials seized; and defendants have likewise refused to advise plaintiff of how defendants first learned of the attack and what counter-measures, if any, defendants took.

**ANSWER:**    Defendants state they have provided Plaintiff with the relevant information

concerning the cyber-incident, and other information regarding the cyber-incident is confidential

and protected by the attorney-client privilege and work product protection.  Defendants deny the

remaining allegations in Paragraph 46.

47.    On or about May 14, 2019, Daniel S. Steinberg, Esq., as counsel for plaintiff, wrote
to the firm's General Counsel, Edward J. Hood, Esq., to inquire regarding the cyberattack.  Mr.
Steinberg requested answers to several specific relevant questions:

(a)    Have you been able to identify the source of the attack and the mechanism
by which access was gained to your firm's information systems?

(b)    What records were obtained by the hacker, and were they obtained by
unauthorized access to an email server or by direct access to a storage
location?

(c)    How did the attacker circumvent the firm's security measures, or did the
attack entail malicious software that gained control of the firm's computer
system until [plaintiffs] information was transferred?

**ANSWER:**    Defendants admit that Daniel S. Steinberg communicated with Edward J.

Hood, the general counsel of Clark Hill PLC, by letter dated May 15, 2019.  Answering further,

Defendants state that the content of the letter speaks for itself.  Defendants deny the remaining

allegations in Paragraph 47.

48.    On or about May 23, 2019, Mr. Hood, claiming, without explaining, that the
investigation which was conducted of the "hacking" is privileged, provided only a limited
response.  Mr. Hood failed to answer the direct question of "how did the attacker circumvent the
firm's security measures."  Presumably, the investigative report, which, to date, the firm has
steadfastly hidden from plaintiff as the victim of the attack, includes at least a preliminary answer
to this question.

**ANSWER:**    Defendants admit that Edward J. Hood, as general counsel of Clark Hill

PLC, responded to prior communication from Daniel S. Steinberg by letter dated May 23, 2019.

Answering further, Defendants state that the content of the letter speaks for itself.  Defendants

deny the remaining allegations in Paragraph 48.

49.     A week following the "hacking" of defendants' plainly inadequate system, on or about September 19, 2017, Mr. Hood, in his capacity as General Counsel of the Clark Hill law firm, wrote to plaintiff to inform him that defendants were terminating their representation of plaintiff:

> I regret to inform you that, after careful consideration, the Firm has concluded it must withdraw as your legal counsel.
>
> **********
>
> The cyberattack has presented several ethical complications with continuing to represent you.  <u>A primary concern is that the cyberattack will require Mr. Ragland — and possibly other members of the Firm — to be a witness in your asylum proceeding.</u>  Under our Rules of Professional Conduct, a lawyer may not serve as an advocate in a proceeding where the lawyer is likely to be a material witness. Here, the cyberattack has placed Mr. Ragland in an untenable position of being a witness in your asylum case while simultaneously serving as your attorney.  At this point, Mr. Ragland must confine his role to that of witness, rather than legal advocate.  (Emphasis added.)

**ANSWER:**     Defendants admit that they withdrew from representing Plaintiff via a letter from Mr. Hood, in his capacity as general counsel of Clark Hill PLC, to Plaintiff, on or about September 19, 2017.  Answering further, Defendants state that the content of the letter speaks for itself.  Defendants deny the remaining allegations in Paragraph 49.

50.     The firm's stated "reason" for its extreme unilateral action that "it must withdraw" was that Mr. Ragland and perhaps others at the firm might be a witness in plaintiff's asylum proceeding.  This "reason" is without credibility or merit.

**ANSWER:**     Defendants admit that a reason for withdrawing from the representation of Plaintiff was that Mr. Ragland and others at Clark Hill PLC may be a witness in Plaintiff's asylum proceeding.  Defendants admit that they withdrew from representing Plaintiff via a letter from Mr. Hood, in his capacity as general counsel of Clark Hill PLC, to Plaintiff, on or about September 19, 2017.   Answering further, Defendants state that the content of the letter speaks for itself. Answering further, the Court's February 20, 2020 order dismissed Plaintiff's claims based on Defendants' withdrawal from representing Plaintiff.  Defendants deny the remaining allegations in Paragraph 50.

51.     For example, no hearing was pending when the firm unilaterally withdrew from and abandoned plaintiff (and none is pending as of this filing); plaintiff had not asked that Mr. Ragland be a witness were there a hearing; as the client, it would be plaintiff's decision, not Mr. Ragland's or the firm's decision, as to whether the value or necessity of Mr. Ragland's testimony at any hearing outweighed the firm's continuing as counsel (particularly in light of Mr. Ragland's claimed preeminence in immigration and asylum matters); the substance of Mr. Ragland's testimony at any hearing, were he to testify, would relate to uncontested matters, *i.e.,* that the firm's server had been "hacked" and plaintiff's information had been obtained; the firm never asked plaintiff's opinion on the matter; and the firm never so much as hinted, let alone explained, why Mr. Ragland's testimony was, supposedly, so "essential" at a then-non-existent hearing as to warrant the firm's unilaterally, precipitously, and without regard to the best interests of plaintiff terminating its attorney-client relationship with plaintiff when it did.

**ANSWER:**     Defendants admit that no asylum hearing or interview was pending when the firm withdrew from its representation of Plaintiff.  Defendants admit that Plaintiff had not, at that point, asked Mr. Ragland to be a witness in any proceeding.  Answering further, the Court's February 20, 2020 order dismissed Plaintiff's claims based on Defendants' withdrawal.  Because the remaining allegations in Paragraph 51 constitute legal conclusions, an answer by Defendants is neither required nor appropriate.  To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 51.

52.     The firm simply wanted "out" despite its clear contrary ethical obligations, including the duty of undivided loyalty to its client (plaintiff).  To accomplish its improper "fire the client" escape mission, the firm manufactured a plainly bogus "reason" to seek to justify its action.  Here, the firm's client had done nothing wrong and certainly had done nothing to warrant such brutal, unjustifiable, and unethical treatment.  Determining the firm's actual reason(s), as distinguished from its manufactured one, for its wrongful termination of its representation of plaintiff, including whether the firm yielded to pressure whether from the "hacker" or otherwise, will be an important area for discovery.

**ANSWER:**     Defendants deny the allegations in Paragraph 52.

53.     Clark Hill has advised that it conducted (or had conducted on its behalf) an investigation of the cyberattack at issue in this case.  That investigation and any investigative report may address the topic of the firm's improper withdrawal from representing plaintiff.  To date, the firm has failed to provide plaintiff any investigative report produced as a result of the internal investigation of this matter despite the fact that the plaintiff's information was obtained, and perhaps the only successful target of the attack, and the firm terminated its representation of plaintiff because of that attack.  Plaintiff will seek this report in discovery.  Accordingly, defendants are hereby on notice to preserve the report and all related drafts, investigative notes, transcripts, exhibits, and materials.

**ANSWER:** Defendants admit that Clark Hill PLC hired outside legal counsel to conduct an inquiry into the cyber-incident, that a report about the inquiry was prepared, and that such report is confidential and protected by the attorney client-privilege and work product protection. Defendants deny the remaining allegations in Paragraph 53.

54.    If defendants were unwilling or unable to protect plaintiff's sensitive confidential information, or lacked the competence or the capability to keep plaintiff's information off the firm's server, or to secure properly its computer system and network to protect plaintiff's information, defendants were duty-bound to disclose this critical limitation to the plaintiff at the outset and prior to committing to represent plaintiff to give the plaintiff an opportunity to make an informed judgment as to whether to retain the firm given its limitations. The firm made no such disclosure and thereby denied plaintiff the opportunity to make an informed decision on retaining the firm. Had the firm been forthright and candid about its limitations and lack of adequate security measures and protections, plaintiff would not have retained the firm as his counsel.

**ANSWER:** Defendants admit that the common law and the District of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their representation of Plaintiff. Answering further, Defendants deny that Plaintiff requested any specific, additional, or extraordinary measures with respect to safeguarding confidential information differently than any other client of Defendants. Answering further, Defendants state that Plaintiff himself, contrary to Defendants' advice, demanded that Defendants publicize the fact the Plaintiff had applied for asylum. Defendants deny the remaining allegations in Paragraph 54.

55.    As a direct and proximate cause of defendants' multiple breaches of their duties and legal obligations to plaintiff, plaintiff's sensitive personal information and confidential documents were disclosed to third-parties, to the world at large, and to persons and institutions in China, including the Chinese government and CCP, to the great and severe injury, harm, and detriment of plaintiff.

**ANSWER:** Defendants deny the allegations in Paragraph 55.

56.    As a direct consequence of defendants' wrongful and unlawful conduct, plaintiff has suffered and continues to suffer damages to his personal and professional reputation; he has lost substantial business opportunities; plaintiffs personal safety and security have been put at risk; his efforts to obtain political asylum have been delayed; his family has been arrested and threatened; plaintiff s employees in China have been harassed; plaintiff has incurred costs and expenses; and plaintiff has been denied the benefit of defendants' claimed immigration law expertise in connection with pursuing plaintiffs asylum application. Defendants' breaches of their

legal duties and obligations caused these and potentially other harms and damages to plaintiff. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

**ANSWER:** Defendants deny the allegations in Paragraph 56.

57. As a direct and proximate cause of defendants' multiple breaches of their duties and legal obligations, the details and contents of plaintiff's asylum application and other materials have been disclosed widely on social media platforms and placed in the hands of third-parties hostile to plaintiff. There are powerful people and interests in China and elsewhere hostile to plaintiff because of his political activities who now have — solely because of defendants' failures and breaches of duty — detailed information about plaintiff which they would not otherwise have. There is good cause to believe that these persons have used and will continue to use plaintiff's confidential information for purposes harmful to plaintiff.

**ANSWER:** Defendants deny the allegations in Paragraph 57.

58. The severe harm defendants have caused extends to limiting plaintiffs freedom and liberty to travel and jeopardizes his personal safety. Defendants' breaches of legal duties and obligations caused these harms and damages to plaintiff. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

**ANSWER:** Defendants deny the allegations in Paragraph 58.

59. The defendants' failure to safeguard plaintiffs sensitive personal information and confidential documents was the direct and proximate cause of the dissemination of plaintiff's sensitive personal information and confidential documents on social media, the publication of which has caused great harm to plaintiff by tarnishing his reputation and undermining his credibility and the credibility of his work in advancing the causes of bringing the rule of law, democracy, and justice to China. Defendants' breaches of legal duties and obligations caused these harms and damages to plaintiff. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

**ANSWER:** Defendants deny the allegations in Paragraph 59.

60. Defendants' improper and unjustified termination of its attorney-client relationship and attendant obligations has harmed and damaged plaintiff. Defendants' improper action in abandoning their client (plaintiff) denied plaintiff the benefit of counsel at a time when he needed counsel (because his confidential information had just been splayed all over social media); sent the message to the public that plaintiff was somehow untrustworthy or acted improperly in connection with the representation; denied plaintiff defendants' claimed expertise in immigration law; and has caused and/or will cause undue delay and complications in action on plaintiff's asylum application. These harms are continuous and ongoing, and there is a substantial risk, if not likelihood, of additional harm and damage in the future.

**ANSWER:** Defendants deny the allegations in Paragraph 60.

61.     At trial, the jury will determine plaintiff's compensatory damages proximately caused by defendants.  Plaintiff alleges that those damages are no less than $50 million and seeks a judgment in at least that amount.

**ANSWER:**     Defendants admit that Plaintiff has demanded a jury in this action.

Defendants deny the remaining allegations in Paragraph 61.

## PUNITIVE DAMAGES

62.     At trial, the jury will also be asked to award significant punitive damages in an amount the jury determines to be appropriate.  Punitive damages are warranted here because defendants' actions, inactions, and breaches of duties and obligations were reckless, wanton, intentional, and taken in willful disregard of plaintiff's rights and of defendants' obligations and duties to protect plaintiff's rights.

**ANSWER:**     Defendants admit that Plaintiff has demanded a jury in this action.

Answering further, the Court's February 20, 2020 order dismissed Plaintiff's request for punitive

damages.  Defendants deny the remaining allegations in Paragraph 62.

63.     Defendants were reckless in their handling of plaintiff's confidential information. Defendants' recklessness included failing to protect that information, putting it on the firm's computer server, either directly or indirectly by transmitting the information to third parties via the firm's email account, or otherwise.  These actions were intentional, deliberate, and willfully disregarded plaintiff's rights and defendants' obligations and duties to protect plaintiff's rights.

**ANSWER:**     Defendants deny the allegations in Paragraph 63.  Answering further, the

Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

64.     Defendants knew and understood the importance of protecting plaintiff's sensitive and confidential information, and that the dissemination of such information would jeopardize the personal and professional interests of plaintiff, plaintiff's family, including putting plaintiff and his family at grave risk of harm.  Defendants specifically knew and understood that the CCP would attempt to obtain plaintiff's sensitive and confidential information and use that information to harm plaintiff and his family.  Nevertheless, defendants ignored these very real and present risks, and their conduct was accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, his safety, his family's safety, and with other circumstances tending to aggravate plaintiff's injuries.

**ANSWER:**     Defendants deny the allegations in Paragraph 64.  Answering further, the

Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

65.     Defendants' compounded their recklessness by abandoning plaintiff as their client, choosing self-interest over protecting their client.  Defendants' unilateral withdrawal as plaintiff's counsel was intentional, deliberate, reckless, and unwarranted conduct, and conduct in willful disregard of plaintiff's rights and of defendants' obligations and duties to protect plaintiff's rights.

**ANSWER:**     Defendants deny the allegations in Paragraph 65.  Answering further, the

Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

## CLAIMS FOR RELIEF

## COUNT I — Breach of Fiduciary Duties

66.     Plaintiff adopts and incorporates by reference ¶¶ 1-65 as if each were here fully set forth.

**ANSWER:**     Defendants incorporate their answers to Paragraphs 1 through 65 above as

though fully set forth herein.

67.     Defendants formed an attorney-client relationship with plaintiff.  As a consequence, defendants owed plaintiff all the fiduciary duties and obligations which a lawyer owes to a client.  Rather than honor those duties and obligations, defendants breached them.

**ANSWER:**     Defendants admit that they formed an attorney-client relationship with

Plaintiff with respect to Plaintiff's asylum application, and that the common law and the District

of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their

representation of Plaintiff.  Defendants deny the remaining allegations in Paragraph 67.

68.     At all relevant times, the fiduciary duties defendants owed to plaintiff included, but were not limited to, the duty not to undertake a matter beyond the professional and technical competence, capability, and capacity of defendants; the duty to maintain reasonable and adequate, in this case meaning heightened, security measures to safeguard plaintiff's sensitive personal information and confidential records; the duty not to expose plaintiff's confidential information to the risk of disclosure by allowing the information to appear on the firm's computer server; the duty to exercise at all times the utmost good faith and undivided loyalty toward plaintiff the duty to provide competent professional legal representation; and the duty not to withdraw from representing plaintiff, effectively abandoning him, absent valid and appropriate cause.

**ANSWER:**     Defendants admit that they formed an attorney-client relationship with

Plaintiff with respect to Plaintiff's asylum application, and that the common law and the District

of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their

representation of Plaintiff.  Because the remaining allegations in Paragraph 68 constitute legal

conclusions, an answer by Defendants is neither required nor appropriate.  To the extent an answer

is required, Defendants deny the remaining allegations in Paragraph 68.

69.     Defendants breached their fiduciary duties to plaintiff.  These breaches include defendants' failing to maintain reasonable security measures to safeguard plaintiff's sensitive personal information and confidential records by failing to maintain reasonable security measures, including placing information on the firm's computer server and/or allowing access to the firm's server, thus allowing unauthorized third-parties to gain access to electronic files and communications containing plaintiffs sensitive personal information and confidential documents.

**ANSWER:**     Defendants deny the allegations in Paragraph 69.

70.     Defendants further breached their fiduciary duties and obligations to plaintiff by improperly and without valid cause withdrawing from representing plaintiff, whether in response to a "ransom" demand or otherwise.  Defendants acted to advance their interests and contrary to the interests of the firm's client (plaintiff) to whom the firm owed its primary duty of undivided loyalty.

**ANSWER:**     Defendants deny the allegations in Paragraph 70.

71.     Defendants had no valid or legally or ethically sufficient cause for terminating their representation of plaintiff.  Plaintiff had satisfied his obligations as a client; defendants breached their obligations as counsel.  The firm's stated reason for terminating its attorney-client relationship with plaintiff (that Mr. Ragland might be a witness in some unknown as-of-yet not scheduled hearing) was a transparent sham proffered to justify the defendants' improper unilateral decision to terminate the attorney-client relationship.

**ANSWER:**     Defendants deny the allegations in Paragraph 71.

72.     If defendants released plaintiffs sensitive personal information and confidential documents to regain control of their computer system, or engaged in any similar conduct (a topic plaintiff will pursue in discovery), defendants breached their primary duty of undivided loyalty to plaintiff as the firm's client by placing the interests of the firm above the interests of plaintiff.

**ANSWER:**     Defendants deny the allegations in Paragraph 72.

73.     Plaintiff has been harmed and damaged as a result of defendants' breaches of duty to plaintiff.  The amount of plaintiff's damages will be determined at trial.

**ANSWER:**     Defendants deny the allegations in Paragraph 73.

74.     In addition to compensatory damages, defendants are liable for punitive damages because defendants' actions willfully disregarded the rights of plaintiff, were intentional, deliberate, and reckless.  The amount of punitive damages will be determined at trial.

**ANSWER:**   Defendants deny the allegations in Paragraph 74.  Answering further, the Court's February 20, 2020 order dismissed Plaintiff's claim that Defendants improperly withdrew from their representation of Plaintiff and Plaintiff's request for punitive damages.

## COUNT II — Breach of Contract of Representation

75.     Plaintiff adopts and incorporates by reference ¶¶ 1-74 as if each were here fully set forth.

**ANSWER:**   Defendants incorporate their answer to Paragraphs 1 through 74 above as though fully set forth herein.

76.     Plaintiff entered into a written contract with plaintiff for the firm to represent the plaintiff.  Defendants breached their contractual obligations to plaintiff by undertaking a matter beyond defendants' professional or technical competence, capability, and competence; by failing to provide plaintiff competent representation; by neglecting to undertake reasonable security measures to safeguard plaintiff's sensitive personal information and confidential documents; and by improperly and wrongfully terminating the firm's representation of plaintiff.

**ANSWER:**   Defendants admit that Defendants entered into a written engagement letter with Initiatives For China with respect to Defendants' legal representation of Plaintiff in connection with Plaintiff's asylum application, and that the engagement letter set forth the parties' obligations with respect to the representation.  Answering further, Defendants state that the engagement letter set forth the entirety of the parties' obligations.  Defendants deny the remaining allegations in Paragraph 76.

77.     Defendants further breached the retention agreement and the associated terms of engagement if they delivered a "ransom" to unknown third parties that included ceasing to represent plaintiff and/or providing plaintiff's sensitive personal information and confidential documents (plaintiff will pursue this topic in discovery).  If defendants did so, they failed to provide competent representation and failed to act to the best of their ability and for the benefit of their client.

**ANSWER:**   Defendants deny the allegations in Paragraph 77.

78.     The firm wrongfully placed its interests above the interests of its client (plaintiff) in violation of the firm's contractual and ethical obligations.  Defendants had no good or sufficient cause for terminating their representation of plaintiff.  Plaintiff had satisfied his obligations as a client; defendants breached their obligations as counsel.  The firm's stated reason for terminating

its attorney-client relationship with plaintiff (that Mr. Ragland might be a witness in some unknown as-of-yet not scheduled hearing) was a sham proffered to justify the defendants' improper unilateral decision to terminate the attorney-client contractual relationship.

> **ANSWER:**    Defendants deny the allegations in Paragraph 78.

79.    Plaintiff has been harmed and damaged as a result of defendants' breaches of their contractual duties and obligations to plaintiff.  The amount of plaintiff's damages will be determined at trial.

> **ANSWER:**    Defendants deny the allegations in Paragraph 79.

### COUNT III — Legal Malpractice

80.    Plaintiff adopts and incorporates by reference ¶¶ 1-79 as if each were here fully set forth.

> **ANSWER:**    Defendants incorporate their answers to Paragraphs 1 through 79 as though fully set forth herein.

81.    At all relevant times, an attorney-client relationship existed between plaintiff and defendants.  Defendants owed plaintiff contractual, common law, and professional duties to use the required degree of professional care and skill to represent plaintiff competently and professionally and consistent with the applicable standard of care.  As detailed in this complaint, the firm did not represent plaintiff with the required degree of professional care and skill. Defendants breached their duties to plaintiff.

> **ANSWER:**    Defendants admit that they formed an attorney-client relationship with Plaintiff with respect to Plaintiff's asylum application, and that the common law and the District of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their representation of Plaintiff.  Defendants deny the remaining allegations in Paragraph 81.

82.    The standard of care governing a lawyer's representation of a client is defined by a combination of contractual, common law, and professional (ethical) duties and obligations.  In this case, the firm breached the standard of care to represent plaintiff competently and professionally as the firm's representation of plaintiff and its termination of that representation fell far short of the required standard of care.

> **ANSWER:**    Defendants admit that they formed an attorney-client relationship with Plaintiff with respect to Plaintiff's asylum application, and that the common law and the District of Columbia Rules of Professional Conduct governed Defendants' obligations with respect to their

representation of Plaintiff. The allegations concerning the law governing the standard of care constitute legal conclusions, and thus an answer by Defendants is neither required nor appropriate. To the extent an answer is required, Defendants deny the allegations concerning the standard of care. Answering further, Defendants deny the remaining allegations in Paragraph 82.

83. Defendants breached their contractual, common law, and professional and ethical duties and obligations to plaintiff by undertaking a matter beyond defendants' professional or technical competence and capability; by failing to use the required degree of professional care and skill in representing plaintiff, resulting in the global exposure and dissemination of plaintiff's sensitive personal information and confidential documents; and by wrongfully and without valid cause terminating their representation of plaintiff.

**ANSWER:**    Defendants deny the allegations in Paragraph 83.

84. Defendants failed to take competent and reasonable measures to safeguard plaintiff's sensitive personal information and confidential documents by, *inter alia,* failing to maintain reasonable security measures to secure plaintiffs files and communications; failing to maintain reasonable security measures to secure email accounts and information systems, including the data contained within them, from unauthorized access by third parties; and failing to maintain reasonable security measures to prevent email accounts from being accessed by unauthorized third parties.

**ANSWER:**    Defendants deny the allegations in Paragraph 84.

85. Had Mr. Ragland done as he promised—not exposed plaintiff's sensitive confidential information—and had defendants maintained reasonable security measures to secure their computer system from unauthorized access, as required and promised to plaintiff, the cyber adversary would not have been able to gain access to plaintiff's sensitive personal information and confidential documents. If defendants lacked the will, the competence, or the capability to properly secure the firm's computer system and network and thereby protect plaintiff's information from unauthorized disclosure, defendants were duty-bound to disclose this limitation to the plaintiff at the outset, prior to undertaking the representation, to give the plaintiff an opportunity to make an informed judgment as to whether to retain the firm given its limitations. The firm made no such disclosure and thereby denied plaintiff the opportunity to make an informed decision on retaining the firm.

**ANSWER:**    Defendants deny the allegations in Paragraph 85.

86. Defendants further breached their contractual, common law, and professional duties to plaintiff if they delivered a "ransom" to unknown third parties that included ceasing to represent plaintiff and providing plaintiff's sensitive personal information and confidential documents.

**ANSWER:**    Defendants deny the allegations in Paragraph 86.

87.     Defendants further breached their contractual, common law, and professional duties to plaintiff by improperly and wrongfully terminating their representation of plaintiff and by the manner in which defendants did so.  Defendants had no good, sufficient, or valid cause for terminating their representation of plaintiff.  Plaintiff had satisfied his obligations as a client; defendants breached their obligations as counsel.  The firm's stated reason for terminating its attorney-client relationship with plaintiff (that Mr. Ragland might be a witness in some unknown as-of-yet not scheduled hearing) was a transparent sham proffered to justify the defendants' improper unilateral decision to terminate the attorney-client relationship.

**ANSWER:**     Defendants deny the allegations in Paragraph 87.

88.     Plaintiff has been harmed and damaged as a result of defendants' breach of their duties and obligations of care and competence to plaintiff.  The amount of plaintiff's damages will be determined at trial.

**ANSWER:**     Defendants deny the allegations in Paragraph 88.

## COUNT IV — Punitive Damages

89.     Plaintiff adopts and incorporates by reference ¶¶ 1-88 as if each were here fully set forth.

**ANSWER:**     Defendants incorporate their answers to Paragraphs 1 through 88 above as though fully set forth herein.  Answering further, "punitive damages" is not an independent cause of action, and the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

90.     Because defendants' actions, inactions, failures, breaches of duties and obligations, and violations of plaintiffs rights were intentional, deliberate, outrageous, and in willful disregard of defendants' duties and obligations and in willful disregard of plaintiffs rights, defendants are liable to plaintiff for punitive damages, in addition to compensatory damages.

**ANSWER:**     Defendants deny the allegations in Paragraph 90.  Answering further, "punitive damages" is not an independent cause of action, and the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

91.     Defendants' conduct at issue in this case is so far beyond the pale as to warrant punitive damages.  Defendant's intentional, deliberate, wrongful conduct involves the failure to protect plaintiff's confidential information from deeply harmful public disclosure despite defendants' specific knowledge of the acute need to do so followed by defendants' then immediately "running away" from its client (plaintiff) after the disclosure occurred, which occurred because of defendants' failures.

**ANSWER:** Defendants deny the allegations in Paragraph 91. Answering further, "punitive damages" is not an independent cause of action, and the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

92. Defendants' intentional and deliberate failures made plaintiff's information accessible to "hackers" and then defendants' intentionally, deliberately, wrongfully, and without regard to their duties and obligation and in willful disregard for the rights of plaintiff abandoned plaintiff as their client.

**ANSWER:** Defendants deny the allegations in Paragraph 92. Answering further, "punitive damages" is not an independent cause of action, and the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

93. The jury will determine the appropriate amount of punitive damages.

**ANSWER:** Defendants admit that Plaintiff has demanded a jury in this action. Answering further, "punitive damages" is not an independent cause of action, and the Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages. Defendants deny the remaining allegations in Paragraph 93.

## <u>DEFENDANTS' AFFIRMATIVE DEFENSES</u>

Defendants, in addition to their responses above to the Plaintiff's specific allegations forming the basis of the claims asserted against Defendants, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that would otherwise rest with the Plaintiff, assert the following affirmative defenses to all claims asserted against Defendants:

### FIRST AFFIRMATIVE DEFENSE
### (Counts I-III: Failure to State a Claim)

All three of Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to state claims upon which relief can be granted, including for the reasons identified in Defendants' Motion to Dismiss and supporting memoranda of law.

## SECOND AFFIRMATIVE DEFENSE
### (Counts I-III: No Damages)

Plaintiff's claims are barred because he suffered no actionable damages.

## THIRD AFFIRMATIVE DEFENSE
### (Counts I-III: No Causation)

To the extent that Plaintiff can show that he suffered recoverable damages, those damages were not caused by the actions of Defendants.

## FOURTH AFFIRMATIVE DEFENSE
### (Counts I-III: No Breach of Duty)

Defendants did not breach any duty of care owed to Plaintiff.

## FIFTH AFFIRMATIVE DEFENSE
### (Counts I and II: Duplicative of Count III)

Counts I and II are barred as duplicative of Count III, because Plaintiff's claims for breach of fiduciary duty and breach of contract are based on the same operative facts and the same injury as Plaintiff's legal malpractice claim.

## SIXTH AFFIRMATIVE DEFENSE
### (Counts I-III: Unclean Hands)

Plaintiff's claims are barred by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE
### (Counts I-III: Contributory Negligence)

Plaintiff's claims are barred by his own negligence and the negligence of his actual or apparent agent.

## EIGHTH AFFIRMATIVE DEFENSE
### (Counts I-III: Failure to Mitigate)

Plaintiff has failed to mitigate his alleged damages.

## NINTH AFFIRMATIVE DEFENSE
### (Counts I-III: Superseding Cause)

The injuries alleged by Plaintiff were caused in whole or in part by the conduct of third parties for whom Defendants were not responsible or through forces over which Defendants had no control.

## TENTH AFFIRMATIVE DEFENSE
### (Counts I-III: Sole Proximate Cause)

To the extent that Plaintiff suffered any injuries, Defendants were not the sole proximate cause of those injuries.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Counts I-III: Ripeness)

Plaintiff's claims are not ripe and therefore should be dismissed or stayed.

## TWELFTH AFFIRMATIVE DEFENSE
### (Counts I-III: No Agreement)

Plaintiff's claims fail because Defendants did not agree to provide specific or extraordinary security measures with respect to Plaintiff's information.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Counts I-III: Assumption of Risk)

Plaintiff's claims are barred because he assumed the risk of any damages he sustained.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Count II: Waiver)

Plaintiff's breach of contract claims are barred by the doctrine of waiver.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Counts I-III: Economic Loss Doctrine)

Plaintiff's claims are barred, in whole or in part, by the economic loss doctrine.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Count IV: No Punitive Damages)

Plaintiff is not entitled to punitive damages under any act or theory that forms the basis of his claims. The Court's February 20, 2020 order dismissed Plaintiff's request for punitive damages.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Counts I-IV: State Law)

Defendants are entitled to the benefit of all defenses and presumptions contained in, or arising from, any rule of law or statute of any other state whose substantive law might control this action.

## EIGTHEENTH AFFIRMATIVE DEFENSE
### (Counts I-IV: Reservation of Additional Defenses)

Defendants reserve the right to assert any additional defenses that become apparent during the course of this case. Additional facts may become known during the course of discovery and investigation which will support affirmative defenses that currently are unknown to Defendants. To preserve such affirmative defenses, Defendants hereby incorporate by reference all of the affirmative defenses set forth in Federal Rule of Civil Procedure 8(c) and reserve the right to assert additional affirmative defenses as discovery proceeds.

## DEMAND FOR JURY TRIAL

Defendants demand a trial by jury on all issues.

## CONCLUSION

WHEREFORE, Defendants respectfully request that this Court enter judgment in favor of Defendants and against the Plaintiff and grant Defendants such other and further relief as the Court may deem just and proper.

Respectfully submitted,

CLARK HILL PLC and
THOMAS K. RAGLAND

Dated:  March 19, 2020

John R. Storino
(*via pro hac vice*)
Leigh J. Jahnig
(*via pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel.: 312 222-9350
JStorino@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
KBracey@jenner.com

By:    */s/  John R. Storino*
          One of their attorneys

## <u>CERTIFICATE OF SERVICE</u>

I, John R. Storino, an attorney, hereby certify that I served the foregoing Defendants' Answer and Affirmative Defenses to the Plaintiff's Complaint on all counsel of record by electronic service via CM/ECF on this, the 19th day of March, 2020.


 _/s/  John R. Storino_

## **Exhibit 7**

This exhibit has been filed under seal.

## EXHIBIT 8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a HO WAN KWOK, | ) ) ) |
| Plaintiff, | ) Case No. 1:19-cv-3195 |
| v. | ) ) |
| | ) Hon. James Boasberg |
| CLARK HILL PLC; THOMAS K. RAGLAND, | ) ) |
| Defendants. | ) ) ) |

## DEFENDANTS' MOTION TO COMPEL DEPOSITION TESTIMONY OR, IN THE ALTERNATIVE, FOR A NEGATIVE INFERENCE

Defendants Clark Hill PLC and Thomas K. Ragland ("Clark Hill"), through their counsel, respectfully move this Court for the entry of an order (1) compelling Plaintiff Guo Wengui to answer numerous deposition questions he refused to answer on Fifth Amendment grounds or, in the alternative, (2) authorizing a jury instruction permitting a negative inference from Guo's refusal to answer. In support of this motion, Clark Hill submits the accompanying memorandum of law and exhibits, and states:

1. On July 28, 2021, Clark Hill took Guo's deposition. During his deposition, Guo refused, on Fifth Amendment grounds, to answer approximately 28 questions on a variety of topics.

2. The questions that Guo refused to answer are centrally relevant to Clark Hill's defense to Guo's sole claim for damages, for emotional distress.

3. The Court should order Guo to answer the questions that he refused to answer because:

a. Guo waived any Fifth Amendment privilege by voluntarily raising, in his prior statements in his complaint and discovery answers, the subject matter of the questions.

b.     Guo has no basis to assert the Fifth Amendment privilege as he did because there is no reasonable apprehension that additional statements on the topics at issue will result in incremental risk of criminal prosecution in the United States.

4.   Alternatively, if the Court does not order Guo to answer further deposition questions, the Court should authorize the giving of a jury instruction permitting a negative inference to cure the prejudice that would result from Guo's refusal to answer the questions.  The precise parameters of that instruction can be determined closer to trial.

WHEREFORE, for the reasons set forth above and those set forth in the accompanying memorandum of law and exhibits, Clark Hill respectfully requests that the Court enter an order (1) compelling Plaintiff Guo Wengui to answer numerous deposition questions he refused to answer on Fifth Amendment grounds or, in the alternative, (2) authorizing a jury instruction permitting a negative inference from Guo's refusal to answer.

Dated:  September 14, 2021                                  Respectfully submitted,

*/s/ John R. Storino*
John R. Storino (*via pro hac vice*)
David Jimenez-Ekman (*via pro hac vice*)
Lindsey A. Lusk  (*via pro hac vice*)
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
JStorino@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK, LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
Tel: (202) 639-6000
KBracey@jenner.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, John R. Storino, an attorney, hereby certify that I caused to be filed the foregoing joint status report using the Court's CM/ECF filing system, which served a copy on all counsel of record on this, the 14th day of September, 2021.


*/s/ John R. Storino*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK,    )
                                )
            Plaintiff,          )        Civil Action No. 1:10-CV-3195-JEB
                                )
v.                              )        Judge Hon. James Boasberg
                                )
CLARK HILL PLC and THOMAS K.    )
RAGLAND,                        )
                                )
            Defendants.         )
                                )
                                )

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL DEPOSITION TESTIMONY OR, IN THE ALTERNATIVE, FOR A NEGATIVE INFERENCE

The Court should compel Plaintiff Guo Wengui to answer numerous deposition questions he refused to answer on Fifth Amendment grounds or, in the alternative, authorize a jury instruction permitting a negative inference from his failure to answer. At his July 28 deposition, Guo's personal counsel (not the counsel representing Guo in this matter) instructed him not to answer approximately 28 questions on a variety of topics in five broad categories, including (1) Guo's alleged consulting relationship with ACA Capital Group Limited ("ACA"), (2) Guo's past litigation with various third parties, (3) Guo's relationship with T&M Protection Resources (which Guo referred to in interrogatory responses), (4) Guo's asylum application that is at the heart of this case, and (5) Guo's wealth and assets. Guo's counsel declined to articulate the basis for asserting his Fifth Amendment privilege during the deposition or afterward during correspondence and a meet-and-confer. Defendants Clark Hill, PLC and Thomas K. Ragland ("Clark Hill") therefore file this motion to compel or for a negative inference.

The Court should order Guo to answer or, in the alternative, permit a negative inference for three reasons. **First**, Guo waived the privilege over some or all of these topics with his prior allegations and discovery answers. **Second**, even if he had not waived the privilege, Guo has articulated no basis for asserting it now, and some of the topics have no conceivable ability to incriminate him. **Third**, alternatively, if the Court determines that Guo is able to articulate a plausible basis for asserting the privilege, the Court should authorize the giving of a jury instruction permitting a negative inference from Guo's refusal to answer.

## BACKGROUND

The Court is familiar with allegations by Guo from prior motion practice in this case. Guo's alleged injury arises from the September 2017 theft by unknown cyber hackers of certain personal information of Guo's from Clark Hill's computer system, including Guo's asylum application, which Clark Hill filed on his behalf. Compl. ¶¶ 38, 41.

Guo's claimed damages have evolved over time. Guo initially contended in his complaint and early discovery responses that the theft from Clark Hill caused him various economic and out-of-pocket damages, but he now seeks exclusively non-economic damages for emotional distress. The relevant pleadings and discovery responses are as follows:

- October 24, 2019 Complaint: Guo alleged "damages to his personal and professional reputation," "lost substantial business opportunities," and incurred "costs and expenses" among other alleged damages to his "personal and professional reputation" and risk to his "personal safety and security." *Id.* ¶ 56.

- November 16, 2020 Interrogatory Response: Guo claimed his damages included the loss of his "consulting agreement with ACA Capital Group Limited ('ACA')." Ex. C, at ¶ 19.

- July 26, 2021 RFA and Interrogatory Responses: Guo officially dropped all of his economic damages and stated the only damages he now seeks are for emotional distress and "reputational" harm insofar as they caused Guo distress. *See generally,* Ex. D.

Clark Hill took Guo's deposition on July 28, 2021. Guo's personal counsel instructed Guo not to answer 28 questions. Exhibit A compiles the questions in a chart; Exhibit B is a copy of the complete deposition for any context the Court may need with the relevant questions and instructions highlighted. The questions fell into 5 broad categories:

- **Guo's alleged consulting relationship with ACA Capital Group Limited ("ACA"),** including Guo's familiarity with the agreement (which Guo produced), the date Guo signed the consulting agreement, and the services Guo rendered to ACA (*see* Ex. B. at pgs. 28, 31, and 161);

- **Guo's past litigation** where Guo alleged emotional harm during the same time period at issue in this case and **litigation Guo has pursued through his entities** (*see id.* at pgs. 45–46 and 86–87);

- **Guo's relationship with T&M Protection Resources ("T&M")** as it relates to Guo's claims that T&M, an entity associated with Guo, was also hacked by the Chinese government (*see id.* at pgs. 98–99, and 101)[1];

- **Guo's asylum application**, especially questions relating to the accuracy of its statements and his alleged identity as a "political dissident" (*see id.* at pgs. 127–128, 130-133, 161, 168–69, and 248–49); and

---

[1] On February 12, 2021, Guo filed a verified statement concerning instructions to "other fiduciaries." Feb. 12, 2021, Pl.'s Statement Concerning Instructions to "Other Fiduciaries", Ex. E. In this verified statement, Guo described T&M Protection as an entity that "provided personal protection services to Plaintiff" and asserted he asked it "to limit its use of email when communicating concerning confidential matters related to its work for him." *Id.* at pg. 2.

- **Guo's wealth and assets**, such as questions about Guo's net worth, his employees, and his residences (*see id.* at pgs. 184–86 and 245).

Guo's counsel declined to articulate any reason why answers to these questions could possibly implicate Guo's Fifth Amendment rights, either during the deposition or after. Ex. B at pg. 28; s*ee* Ex. F.

## ARGUMENT

Clark Hill brings this motion because the questions Guo refused to answer are centrally relevant to Guo's remarkably dubious damages claim in this case. Guo has narrowed his damages claim to an injury for emotional distress. Guo contends that he suffered a laundry list of physical symptoms because there was data in the information stolen from Clark Hill that was not already available online. Clark Hill disputes (a) that anything the thieves posted was not already available online, and (b) that Guo actually suffered any of the symptoms he claims. Questions about Guo's wealth, personal staff, and numerous high-end residences are directly relevant to his claimed symptoms and ability to mitigate them.

But even if he did suffer emotional distress, there is a panoply of other causes for that distress. Guo claims that he was persecuted and tortured by the Chinese Communist Party ("CCP") when he lived in China, that his brother was killed by the CCP, and that his wife and children were also imprisoned and mistreated. Ex. B at pgs. 124–125, 162, 234–35. Long before the Clark Hill theft, Guo began a highly public campaign critical of the CCP and began to suffer threats from the party. *See* Ex. B at pgs. 80–81. In the past 4 years, Guo has filed at least 10 lawsuits against various entities and individuals alleging that he suffered severe emotional distress as the result of

things ***those individuals did***, not the Clark Hill theft.[2]  Whenever Guo is upset with someone and is determined to punish them through litigation, Guo relies on allegations of emotional distress to sustain his cause of action.

In this context, Clark Hill has a right to vigorously probe Guo's fantastic damages claims, and Guo's prior actions have waived any privilege he might otherwise enjoy over these topics. But even if the Court finds Guo still has a privilege, Clark Hill is prejudiced by its inability to obtain discovery on these issues, and is entitled to a negative inference from Guo's assertion of the privilege.

## I.     The Court Should Order Guo To Answer The Questions He Refused To Answer.

### A. *Plaintiff Waived Any Fifth Amendment Privilege By His Prior Statements.*

Generally, "[o]nce [a] witness voluntarily raises an issue [, a witness] cannot refuse to fill in the details" by asserting his Fifth Amendment privilege. *S.E.C. v. Parkersburg Wireless Ltd. Liability Co.*, 156 F.R.D. 529, 535 (D.C. Cir. 1994) (quoting *Rogers v. United States*, 340 U.S. 367, 373 (1951)).  By raising the subject, the witness waives any Fifth Amendment privilege against self-incrimination "*unless* the related questions further incriminates the witness." *See id.* at 536 (emphasis added); *see Banco Intercontinental, S.A. v. Alvarez Renta*, No. 04-20727-CIV, 2007 WL 9761293, at *1 (S.D. Fla. Dec. 10, 2007), *aff'd*, No. 04-20727-CIV, 2008 WL 11502470 (S.D. Fla. Feb. 25, 2008) (compelling party-witness to testify when court already ruled that the

---

[2] Complaint, *Guo v. Li*, 18-cv-00259 (D. Md., Jan. 26, 2018), at ¶ 192; Complaint, *Guo v. Wu*, 18-cv-00845 (S.D.N.Y., Jan. 30, 2018), at ¶ 83; Complaint, *Guo v. Xiong*, No. 151430/2018 (N.Y., Feb. 14, 2018), at ¶ 144; Complaint, *Guo v. Xia*, 18-cv-00174 (E.D. Va., Feb. 14, 2018), at ¶ 223; Complaint, *Guo v. Teng*, 18-cv-02110 (D.N.J., Feb. 14, 2018), at ¶ 136; Complaint, Guo v. Chen, 18-cv-03800 (D.N.J., March 20, 2018), at ¶16; Complaint, *Guo v. Jianbin Yuan*, 18-cv-02276 (C.D. Cal., March 20, 2018), at ¶ 142; Amended Complaint, *Guo v. Stone*, 18-cv-20983 (S.D. Fla., May 21, 2018), at ¶ 35; Complaint, *Guo v. Lin*, 2018CP3203623 (S.C. Ct. Com. Pleas, Oct. 23, 2018), at ¶ 133; Complaint, *Guo v. Cheng*, A-18-779172-C (D. Nev., April 18, 2019), at ¶ 16.

witness waived his Fifth Amendment privilege in his interrogatory responses). The Court must make a particularized inquiry for each question opposing counsel asked to determine whether the privilege is well-founded. *S.E.C. v. Parkersburg Wireless Ltd. Liability Co.,* 156 F.R.D. at 535 (internal citations omitted). It is the **witness' burden** to demonstrate how the **additional** information is incrementally incriminating once the witness has raised the topic. *Id.* at 537.

Guo waived any privilege he may otherwise have had on each of the five areas he asserted the Fifth Amendment. **First**, Guo expressly detailed "enter[ing] into a consulting agreement with [ACA] in October 2016" and providing "his knowledge and expertise" with them until ACA terminated the consulting agreement in December 2017 within his discovery responses. *See* Ex. G at pgs. 13–16. **Second**, Guo waived his privilege as to questions concerning T&M Protection Resources when he filed a verified statement regarding the personal protection services T&M provided to him. *See* Ex. E at pg. 2. **Third**, Guo waived his Fifth Amendment privilege as to allegations about mental distress in other lawsuits by voluntarily raising his mental health during and after December 2017, the same time period relevant to the emotional damages that Guo has asserted in other lawsuits he has filed. *See* Ex. C at pgs. 11–12. **Fourth**, Guo waived the privilege as to his asylum application, its authenticity, and his identity as a political dissident throughout prior statements in his discovery responses. Plaintiff has repeatedly alleged damages related to the disclosure of his "sensitive information" contained within "his confidential asylum application." *See id.*; Ex. G at pgs. 16–17; Ex. H at pgs. 4-5. Guo also repeatedly identified himself as a political dissident seeking political refuge. Compl. ¶ 10 ("Plaintiff is a highly successful businessman and a political activist and well-known Chinese dissident."); *see also* Ex. I at pg. 13–14 ("Plaintiff believes that the CCP perceives him as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP.").

**B. Plaintiff Has No Basis To Assert His Fifth Amendment Privilege On The Topics For Which He Did.**

A witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—"his say-so does not of itself establish the hazard of incrimination." *S.E.C. v. Bankers Alliance Corp.*, No. C.A. 95-0428 (PLF), 1995 WL 590665 at *3 (D.D.C. May 5, 1995) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1950). A witness may not make blanket assertions of a Fifth Amendment privilege but rather must assert the privilege one question at a time. *District Title v. Warren*, 265 F. Supp.3d 17, 21 (D.D.C. 2017); *see also In re LeFande*, 919 F.3d 554, 559 (D.C. Cir. 2019) (upholding order holding witness in contempt for failing to attend his deposition and "assert . . . the Fifth Amendment privilege . . . on a question-by-question basis"). In evaluating a witness' assertions, the Court must determine whether there is a reasonable basis for believing that "answer[ing] a particular question would subject the witness to a real danger of incrimination." *District Title*, 265 F. Supp.3d at 21 (internal quotations and citations omitted). The "danger of self-incrimination must be real, not remote or speculative." *Id.* A Fifth Amendment right is unavailable for a witness in danger of possible ***foreign*** prosecution. *See HT S.R.L. v. Velasco*, No. 16-664 (RBW), 2015 WL 13759884 at *7, n. 10 (D.D.C. 2015) ("[T]he right against self-incrimination is unavailable if only based on a fear of prosecution by a foreign nation.") (citing *United States v. Balsys*, 524 U.S. 666, 669 (1998)).

Given the statements Guo has already made about each of the five broad topics over which he asserted privilege, he cannot show that ***additional*** statements would be incrementally incriminating. ***First***, Guo cannot show that questions asking for more information about allegations or assertions already made in this case present incremental jeopardy. Therefore, the "cat is out of the bag" on questions about Guo's relationships with ACA and T&M Protection

Resources (*see* Ex. B at pgs. 28, 31, 98, 101, 161); emotional damages related to the *Xia* case (*see id.* at 86-87); and employment information and identity as a political dissident contained within Plaintiff's asylum application (*see id.* at 127–31, 161)—all of which Plaintiff voluntarily raised in his discovery responses. The Court should order Guo to answer questions on these topics. *See* Questions 1–19. **Second**, there is no plausible basis for Guo to fear prosecution based on questions about his wealth, personnel, and residences. *See* Questions 20–25. **Third**, Guo cannot establish that questions concerning his activities in China could possibly implicate him in prosecution within the United States. *See* Ex. B at pgs. 248–249; Questions 26–28.

## II.   Alternatively, The Court Should Give A Jury Instruction Permitting A Negative Inference.

The Court "is free to draw" adverse inferences from a witness' continued assertions of the Fifth Amendment privilege in the face of probative evidence. *See Bankers Alliance Corp.*, 1995 WL 590665, at *5 (drawing adverse inferences from witness' continued Fifth Amendment assertions regarding the location of investor funds). Unlike in criminal proceedings, the Fifth Amendment does not preclude "adverse inferences against parties to civil action when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 333 (1976); *see S.E.C. v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 696 (D.D.C. 1991) (drawing an adverse inference "in light of the probative evidence" the defendant gathered against the witnesses).

A decision not to draw an adverse inference "should not obliterate another party's right to a fair proceeding." *Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir. 1996). This is especially true when the party invoking the privilege has direct control of the evidence. *See S.E.C. v. Whittemore*, 659 F. 3d 1, 7 (D.C. Cir. 2011) (denying a motion for reconsideration because district court was well within its right to draw an adverse inference from defendants refusal to provide

evidence especially when "the defendants control[led] the evidence"). The Court weighs the value of presenting evidence with the danger of unfair prejudice to the party asserting the privilege. *See Nationwide Life Ins. Co. v.* Richards, No. CV027583CASRNBX, 2006 WL 8452984, at *13 (C.D. Cal. Sept. 19, 2006), *aff'd,* 541 F.3d 903 (9th Cir. 2008) (reasoning that defendant-witness invoked Fifth Amendment privileges to a "central question in the case" and the plaintiffs provided "direct and circumstantial evidence" to substantiate an adverse inference).

Here, if the Court finds that Guo did not waive his privilege, and Guo is able to articulate *in camera* a sufficient basis for asserting it on any topic, the Court should give a jury instruction permitting negative inferences on that topic. **First**, questions about Guo's alleged relationship with ACA are central Clark Hill's defense of Guo's claims of reputational damages allegedly suffered from the theft from Clark Hill, and the Court should cure the prejudice from Guo's assertion of the privilege with a negative inference.

**Second**, questions about Guo's relationship with T&M are crucial to testing Guo's contention that he gave instructions to numerous fiduciaries about protecting his data, a claim which goes to the heart of Guo's breach of contract claim here.

**Third**, questions about Guo's past litigation and other litigation through his entities that allege emotional distress are key to the causation question that will be at the heart of Clark Hill's damages defense. *See* Ex. B. at pgs. 45–46 and 86–87. Guo alleged in other cases that other conduct that occurred at around the same time as the theft from Clark Hill caused him emotional distress, requiring Clark Hill to have an opportunity to question Guo or suffer extreme prejudice.

**Fourth**, Guo's refusal to answer questions concerning his asylum application warrants an adverse inference, because at the core of Guo's claim is his asylum application prepared by Clark Hill. Guo's alleged mental anguish is based on his identity as a political dissident. *See also* Ex. G

at pgs. 14–16.  Guo has sole control on issues concerning the accuracy of his asylum application and whether he understood the information contained in it, but Guo refused to answer questions about it.

*Fifth*, Guo's responses to questions concerning his wealth and assets are key to evaluating Guo's contentions that the theft from Clark Hill of his information harmed his reputation and business opportunities. *See also id.*  Guo has made public statements regarding his wealth and assets, and without Guo's own testimony, Clark Hill is unable to properly defend against Guo's alleged reputational harm and the "mental anguish" that allegedly occurred as a result.  Because Guo has inserted these issues into the litigation he instituted and then declined to be examined on them, Defendants are prejudiced in their defense of the case and are entitled to an adverse inference.

Respectfully submitted,

Date: September 14, 2021

*/s/ John R. Storino*
John R. Storino (*via pro hac vice*)
David Jimenez-Ekman (*via pro hac vice*)
Lindsey A. Lusk  (*via pro hac vice*)
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 222-9350
JStorino@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK, LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
Tel: (202) 639-6000
KBracey@jenner.com

*Counsel for Defendants*

# EXHIBIT A

**Plaintiff's Invocation of the Fifth Amendment Privilege**

| No. | Defendant's Question | Objections | Ex. B Pg. Ref. | Objection Sustained or Overruled |
|---|---|---|---|---|
| 1 | "You're familiar with the entity ACA Capital Group Limited. Right?" | Full objection | pg. 28 | |
| 2 | "Mr. Guo in October of 2016, you signed a consultancy agreement with ACA Capital Group Limited. Correct?" | Full objection | pgs. 28–29 | |
| 3 | "And in the time period between October of 2016 and December 2017, did you perform any services of any kind on behalf of ACA Capital Group Limited?" | Full objection | pg. 31 | |
| 4 | "What services did you provide on behalf—or for ACA Capital Group Limited?" | Full objection | pgs. 31–32 | |
| 5 | "What compensation, if any, did you receive from ACA Capital Group Limited during that time period or after?" | Full objection | pg. 32 | |
| 6 | "What other lawsuits have you or an entity that you're affiliated with been a plaintiff in?" | Partial objection; only object to any affiliation with any entity | pgs. 45–46 | |
| 7 | "Can you describe the harm to you personally from Mr. Xia's actions?" | Partial objection; objects to any economic or business-related harm | pgs. 86–87 | |
| 8 | *Referring to paragraph 105 of Exhibit 3/4*:<br><br>"That paragraph says: 'Guo's security company T&M Protection was hacked by China as well, which was unprecedented.'" | Full objection | pg. 98 | |
| 9 | "Do you have a security company named T&M?" | Full objection | pgs. 98–99 | |
| 10 | "How do you know that security company T&M Protection was hacked?" | Full objection | pg. 99 | |

**Plaintiff's Invocation of the Fifth Amendment Privilege**

| No. | Defendant's Question | Objections | Ex. B Pg. Ref. | Objection Sustained or Overruled |
|---|---|---|---|---|
| 11 | "And can you describe the nature of the information that T&M Protection had related to you?" | Full objection | pg. 101 | |
| 12 | *Referring to Exhibit 6:*<br><br>"Do you recall doing something to make sure you agreed with everything that was in the application before you signed it?" | Partial objection; not with respect to the signature but "with respect to the page with Bates Number Clark_Hill_000080 | pgs. 127–30 | |
| 13 | *Referring to Exhibit 6:*<br><br>"Do you recall doing something to make sure you agreed with everything that was in the application before you signed it under penalty of perjury?" | Partial objection; counsel advised Mr. Guo to exclude anything within Bates Number Clark_Hill_000080 | pg. 131 | |
| 14 | *Referring to Exhibit 6:*<br><br>"And do you recall doing something to make sure that you understood all the English words in Exhibit 6 before you signed it under penalty of perjury?" | Partial objection to material related to Clark_Hill_000080 | pg. 132–33 | |
| 15 | "Is that answer accurate? Is it true that you were not employed between January of 2016 and September of 2017?" | Full objection | pg. 161 | |
| 16 | "And isn't it true that you were actually employed or had a consulting agreement at least with ACA during that period?" | Full objection | pg. 161 | |
| 17 | *Referring to Exhibit 6:*<br><br>"Same question for the next three pages, -078, -079, and -080. Are those your initials?" | Partial objection to material related to Clark_Hill_000080 | pg. 168 | |
| 18 | *Referring to Exhibit 6:*<br><br>"And looking specifically at page -080 in Exhibit 6, is that your initials on the bottom of the page?" | Full objection | pg. 168 | |

**Plaintiff's Invocation of the Fifth Amendment Privilege**

| No. | Defendant's Question | Objections | Ex. B Pg. Ref. | Objection Sustained or Overruled |
|---|---|---|---|---|
| 19 | *Referring to Exhibit 6:*<br><br>"And asking specifically about the entries on that page on - 080 where you were listed as unemployed for two time periods, is that accurate?" | Full objection | pgs. 168–69 | |
| 20 | "Mr. Guo, you're a wealthy man. Is that accurate?" | Full objection | pgs. 184–85 | |
| 21 | "Can you describe your approximate net worth, Mr. Guo?" | Full objection | pg. 185 | |
| 22 | "And of that net worth, can you describe how much of it is accessible to you as opposed to frozen in some way by China?" | Full objection | pg. 185 | |
| 23 | "You—do you have a staff that works for you, Mr. Guo?" | Full objection | pg. 186 | |
| 24 | "Please describe how many people work for you and what their functions are." | Full objection | pg. 186 | |
| 25 | "Mr. Guo, do you, in fact, own residences in all the places identified in this article?" | Full objection | pg. 245 | |
| 26 | *Referring to Exhibit 15:*<br><br>"'In the preinterview, Mr. Guo explained that he paid for office rentals, private jets, surveillance systems, personnel, and many other expenses. In exchange, Guo officials would assist him in dealing with his business rivals.' Is that accurate Mr. Guo?" | Fulljection | pg. 248 | |

**Plaintiff's Invocation of the Fifth Amendment Privilege**

| No. | Defendant's Question | Objections | Ex. B Pg. Ref. | Objection Sustained or Overruled |
|-----|----------------------|------------|----------------|----------------------------------|
| 27 | *Referring to Exhibit 15:* <br><br> "He also said he was ordered by high-ranking Guo An officials to hire private investigators to dig up information on overseas properties owned by relatives of top Communist Party leaders. Mr. Guo said that he believed that the majority, if not all, business tycoons in China had similar agreement with Guo An." | Full objection | pgs. 248–49 | |
| 28 | *Referring to Exhibit 15:* <br><br> "To be clear, I don't think I asked a question. The question would have been is that, what the translator just read, accurate?" | Full objection | pg. 249 | |

# EXHIBIT B

# (Filed Under Seal)

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a HO WAN KWOK, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-3195 |
| v. | ) ) | Hon. James Boasberg |
| CLARK HILL PLC; THOMAS K. RAGLAND, | ) ) ) | |
| Defendants. | ) ) | |

### PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT THOMAS K. RAGLAND'S FIRST SET OF INTERROGATORIES

Plaintiff Guo Wengui (hereinafter "plaintiff"), through undersigned counsel, hereby supplements his answers to defendant Thomas K. Ragland's first set of interrogatories. Plaintiff hereby incorporates the general objections to Thomas K. Ragland's first set of interrogatories.

### INTERROGATORIES

1.      Identify all persons who have knowledge of any facts relating to any allegation in the Complaint and state what information/facts the identified individuals possess.

ANSWER: The following individuals have knowledge of the allegations in the complaint:

   a.  Plaintiff Guo Wengui
       162 E. 64th Street
       New York, NY 10065
       Plaintiff has knowledge of his reasons for retaining Clark Hill; his discussions with Mr. Ragland prior to engaging Clark Hill; the terms and conditions of the representations; plaintiff and his agent's requests that Clark Hill protect plaintiff's private and sensitive information; Clark Hill's failure to protect plaintiff's information; Clark Hill's termination of its representation of plaintiff; and the damages that arose out of Clark Hill's misconduct at issue in this litigation.

   b.  Defendant Clark Hill PLC

500 Woodward Avenue
Suite 3500
Detroit, MI 48226
Clark Hill PLC has knowledge of the defenses in its answer; the terms and conditions of Clark Hill's and Thomas K. Ragland's representation of plaintiff; the facts and circumstances surrounding the data breach that resulted in the wide-spread and public disclosure of plaintiff's sensitive and confidential personal information; and the facts and circumstances surrounding Clark Hill's and Thomas K. Ragland's decision to withdraw as counsel for plaintiff.

c. Defendant Thomas K. Ragland
   Clark Hill PLC
   10001 Pennsylvania Avenue, NW
   Suite 1300
   Washington, DC 20004
   Thomas K. Ragland has knowledge of the allegations in the complaint and defenses asserted in the answer; the terms and conditions of Clark Hill PLC's and Thomas K. Ragland's representation of plaintiff; the facts and circumstances surrounding the data breach that resulted in the wide-spread and public disclosure of plaintiff's sensitive and confidential personal information; requests to protect plaintiff's private and confidential information; and the facts and circumstances surrounding Clark Hill PLC's and his decision to withdraw as counsel for plaintiff.

d. Edward J. Hood
   Clark Hill PLC
   500 Woodward Avenue
   Suite 3500
   Detroit, MI 48226
   Edward J. Hood has knowledge of the allegations in the complaint and defenses asserted in the answer; the facts and circumstances surrounding the data breach that resulted in the wide-spread and public disclosure of plaintiff's sensitive and confidential personal information; correspondence with plaintiff's counsel about the nature of the data breach and how Clark Hill handle the breach; and the facts and circumstances surrounding Clark Hill PLC's and Thomas K. Ragland's decision to withdraw as counsel for plaintiff.

e. Dr. Lianchao Han
   Citizen Power Initiatives for China
   415 2nd Street NE
   Suite 100
   Washington, DC 20002
   Dr. Lianchao Han has knowledge of the allegations in the complaint and defenses asserted in the answer; the terms and conditions of Clark Hill PLC's and Thomas K. Ragland's representation of plaintiff, including requests to protect plaintiff's information; the facts and circumstances surrounding the data breach that resulted

in the wide-spread and public disclosure of plaintiff's sensitive and confidential personal information; damages to plaintiff's reputation.

f. Jianli Yang
Citizen Power Initiatives for China
415 2nd Street NE
Suite 100
Washington, DC 20002
Dr. Jianli Yang has knowledge of the terms and conditions of Clark Hill PLC's and Thomas K. Ragland's representation of plaintiff.

g. Joshua Schiller, Esq.
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Mr. Schiller has limited knowledge of the facts and circumstances of plaintiff's engagement with Clark Hill. The extent of his knowledge is unknown.

h. Persons involved in the post-hacking investigation, at both Clark Hill and third parties whose identities are unknown at this time, who would have knowledge, potentially, of what happened, why (cause), and how it might have been prevented.

SUPPLEMENTAL ANSWER:

i. William Je
ACA Capital Group Ltd.
1605-6, 16/F, Hua Qin International Building
340 Queen's Road Central
Hong Kong
Mr. Je has knowledge of Plaintiff's consulting agreement with ACA Capital Group and of ACA Capital Group's termination of that agreement.

j. Qu Guo Jiao
Current address unknown. Plaintiff believes she is living in China and is attempting to locate her.
Last known address:
ACA Capital Group Ltd.
1605-6, 16/F, Hua Qin International Building
340 Queen's Road Central
Hong Kong
Ms. Qu has knowledge of Plaintiff's consulting agreement with ACA Capital Group and of ACA Capital Group's termination of that agreement.

3

2.      Identify all persons who provided information used to prepare the responses to these interrogatories or the responses to Thomas K. Ragland's requests for production, and identify the respective interrogatory or request to which each person provided information.

ANSWER:  Plaintiff objects on the ground that the interrogatory seeks to invade the attorney-client privilege and work product privilege. Without waiving the objection, plaintiff and his in-house counsel, Daniel Podhaskie, provided information used to prepare the answers herein.

3.      Identify all persons who communicated with, interacted with, or directed Clark Hill on Plaintiff's behalf in connection with Clark Hill's representation of Plaintiff with respect to Plaintiff's asylum application, including, but not limited to, the discussions leading up to the representation.

ANSWER: *See* answer to interrogatory number 1. Plaintiff, Dr. Han, and Dr. Jianli.

4.      Identify all communications between Plaintiff and his representatives, employees, or agents (including without limitation Lianchao Han, any other employee at Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) about Clark Hill's representation of Plaintiff in U.S. immigration matters, the fact of Plaintiff's asylum application, or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify" all communications. Without waiving these objections, plaintiff has produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill. In addition, plaintiff states that Dr. Han and Dr. Yang had conversations with Mr. Ragland prior to retaining the firm about whether Clark Hill had adequate cyber security. Dr. Han expressly told Mr. Ragland that "he needs to be prepared" for a cyberattack. In response, Mr. Ragland told Dr. Han, among other things, that the firm had "first class state of the art" cyber technology and used "three outside"

4

cyber security firms to protect client information. Mr. Ragland also advised he would let the Clark

Hill "IT people know" about the potential for an attack. Dr. Han repeatedly continued to advise

Mr. Ragland that, in Dr. Han's his opinion, the firm did not take the threat serious.

5.      Identify each document or communication that you contend is relevant to the

determination of Clark Hill's obligations with respect to safeguarding the information pertaining

to Plaintiff's representation.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify

each document or communication." Plaintiff will produce trial exhibits in accordance with the

Court's scheduling order and governing rules. Without waiving these objections, plaintiff has

produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill.

6.      Identify and describe all contracts or agreements between Plaintiff, or Plaintiff's

representatives, agents, employees, or other parties acting for Plaintiff's benefit, and Clark Hill or

Thomas K. Ragland, including who made the agreement, when the agreement was made, and the

substance of the agreement.

ANSWER: Plaintiff entered into a legal services contract with Clark Hill. Plaintiff has produced

a copy of that agreement.

7.      Describe in detail the level of "necessary steps and actions" and "special care and

attention to security measures" (see Complaint ¶ 35) that Plaintiff contends Clark Hill agreed to

implement in order to safeguard the information pertaining to Plaintiff's representation.

ANSWER:  Plaintiff objects to this interrogatory as it calls for a statement or description of the

actions and steps required for Clark Hill to satisfy its "duty of care" which is a legal determination.

Clark Hill was required to provide adequate security measures to protect plaintiff's information.

Clark Hill knew that the representation of plaintiff was in no sense an "ordinary" representation

with "ordinary" risks of unauthorized disclosure. Please see answer to interrogatory number 4.
Clark Hill, through Mr. Ragland, agreed to take the necessary steps and actions to protect plaintiff's
confidential information recognizing that meant the firm would take "more than ordinary"
protective efforts, including not putting plaintiff's information on the server or using firm email
accounts. Plaintiff will supplement this answer in accordance with the scheduling order governing
expert disclosures.

8.    Describe in detail the "necessary and effective electronic security measures" that
Plaintiff contends are "sufficient to protect plaintiff's sensitive and confidential information" (*see*
Complaint ¶ 8).

ANSWER:  Please see objections and answer to interrogatory number 7.

9.    Identify all communications between Plaintiff or Plaintiff's representatives,
employees, or agents (including without limitation Lianchao Han, any other employee at Initiatives
for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner
LLP) and Clark Hill, including, but not limited to, any communications relating to any warnings
or risks of cyber-incidents or "hacks," any special security measures requested by Plaintiff,
Plaintiff's publicity of the existence of the asylum application, or any facts contained in the asylum
application.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify
all communications." Without waiving these objections, plaintiff has produced all relevant non-
privileged correspondence among plaintiff, his agent, and Clark Hill. Please see answer to
interrogatory number 4.

10.     State the basis for the allegation in paragraph 35 of the Complaint that Clark Hill "was on full notice" prior to agreeing to represent Plaintiff "that special care and attention to security measures were necessary, required, expected, and agreed-to by the firm."

ANSWER: See answer to interrogatory number 4. Plaintiff and Dr. Han informed Clark Hill that the CCP would try to hack the firm to obtain plaintiff's sensitive and confidential information. Mr. Ragland agreed not to use the firm's server to store or transmit plaintiff's sensitive information over the firm's email accounts, and even warned his IT group that such an attack was possible.

11.     State the basis for the allegation in paragraph 3 of the Complaint that Clark Hill "assured" Plaintiff that his confidential information would be "protected."

ANSWER: Mr. Ragland assured plaintiff and his agents that the firm had state-of-the-art cybersecurity, three different outside firms which protect client information, and would protect plaintiff's information by using a separate computer, not placing it on the firm server or using the firm's email accounts.

12.     Describe the circumstances around the decision to publicize, via social media and news media, the fact of Plaintiff's asylum application and the fact of Clark Hill's representation of Plaintiff, including who made the decision, when the decision was made, who was aware of the decision before the publicity took place, and the reasons for the decision.

ANSWER:  Plaintiff objects to the characterization that there was a decision to "publicize" the asylum application. Plaintiff further objects on relevance grounds and because this interrogatory invades the attorney-client privilege. Without waiving these objections, plaintiff was informed that others (presumably the CCP) knew he was seeking asylum. Plaintiff spoke to Mr. Ragland about making an announcement. Mr. Ragland thereafter gave interviews to numerous outlets regarding plaintiff's asylum application.

13. Identify any communication between Plaintiff or Plaintiff's representatives, employees, or agents (including without limitation Lianchao Han, any other employee of Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) and any third party regarding Clark Hill's representation of Plaintiff, including, but not limited to, the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects to this interrogatory on the grounds it is overly burdensome in that it seeks to have plaintiff "identify any communication." The interrogatory also is duplicative of several other interrogatories. Without waiving these objections, plaintiff has produced all relevant non-privileged communications.

14. Identify any posting or communication by Plaintiff or Plaintiff's representatives, agents, or employees on any internet or social media platform or outlet, including without limitation YouTube, Twitter, Facebook, Instagram, WhatsApp, SnapChat, or TikTok regarding the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects on relevance grounds. Without waiving the objection, plaintiff's twitter account was disabled, and he no longer has access to it. Plaintiff's YouTube account does not appear to reference his asylum application.

15. Identify any social media accounts or profiles, including without limitation YouTube usernames, accounts, or "channels," Facebook profiles, or Twitter "handles," currently used or previously used by Plaintiff, through which Plaintiff posted or disseminated, or caused to be posted or disseminated, any statements, postings, or opinions regarding the Chinese government, the Chinese Communist Party, the filing of Plaintiff's asylum application, Clark

8

Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Please see objections and answer to the previous interrogatory. Plaintiff further objects on the ground that this interrogatory is unduly burdensome. Without waiving those objections, plaintiff has a YouTube account and a GTV platform containing a substantial number of videos discussing the CCP and the Chinese government. Again, plaintiff is not aware of any reference on either of those two social media platforms of any reference to his asylum application.

16. Identify the persons to whom Plaintiff "disclosed a broad network of CCP spies operating in the United States," and when such disclosure took place, as alleged in paragraph 20 of the Complaint.

ANSWER: Plaintiff objects on relevance grounds, as plaintiff's disclosures are not reasonably calculated to lead to admissible evidence about defendants' failure to protect his confidential information.

17. Identify all information that was contained in Plaintiff's asylum application which Plaintiff contends was confidential before September 12, 2017 and state the basis for that contention.

ANSWER: The contents of plaintiff's asylum application were confidential, including names, identifying information, addresses, passport information, family information, information plaintiff had provided to the US government, and details of his commercial and other dealings. Clark Hill has these documents and plaintiff produced them as well.

18. Describe in detail the basis for the allegations, in paragraphs 3, 5, 9, 44, 57, and 59 of the Complaint, that information about Plaintiff or Plaintiff's asylum application published and

disseminated on social media after September 12, 2017 was acquired in the cyber-incident on or about September 12, 2017.

ANSWER: Plaintiff objects because the interrogatory is vague and confusing. Without waiving the objection, plaintiff's asylum application was published on social media after Clark Hill failed to adequately protect it.

19. Describe in detail the damages that Plaintiff has allegedly suffered as a result of Clark Hill's alleged breach of legal duties and obligations, including the allegations in paragraph 56 of the Complaint of "damages to his personal and professional reputation," "lost substantial business opportunities," and the "costs and expenses" he has incurred.

ANSWER: Plaintiff has suffered damages in a variety of contexts, including, but not limited to, the following: Plaintiff entered into a consulting agreement with ACA Capital Group Limited ("ACA") in August 2016 (the "Consulting Agreement"). ACA aims to serve as the bridge connecting world-class businesses and innovative ideas between Asia and the world, while optimizing financial returns for its investors. ACA hired plaintiff as a consultant because of his reputation in the Asian business community; his knowledge and expertise of doing business throughout the world, but in particular China and Hong Kong; and because plaintiff had the ability to make introductions to numerous business executives in China and Hong Kong. The Consulting Agreement provided that plaintiff would be paid approximately $2 million per year. The Consulting Agreement did not have a fixed term and was expected to be ongoing. In November 2017, ACA terminated the Consulting Agreement because it learned that Clark Hill was hacked and plaintiff's very private and sensitive information was spread throughout the internet on a world-wide basis. Plaintiff was informed by ACA that it terminated the Consulting Agreement

because of the company's fears that continuing its relationship with plaintiff would result in a loss of clients and future business and could result in ACA suffering a hack similar to Clark Hill.

Plaintiff had other contractual arrangements with ACA worth several million dollars which were negatively affected by defendants' conduct.

Plaintiff also suffered reputational damage, including followers on social media, which caused financial and other injury, and diminished plaintiff's earning capacity.

Plaintiff will supply additional information regarding these injuries.

SUPPLEMENTAL ANSWER:

Defendant's conduct has caused Plaintiff to suffer damages in a variety of contexts, summarized as follows:

Plaintiff entered into a consulting agreement with ACA Capital Group Limited ("ACA") in October 2016 (the "Consulting Agreement"). After Plaintiff stepped down as ACA's chairman, ACA hired Plaintiff as a consultant because of his reputation in the Asian business community, his knowledge of and expertise in doing business throughout the world, particularly in China and Hong Kong, and his ability to make introductions to business executives in China and Hong Kong. The Consulting Agreement provided for Plaintiff to be paid $2 million per year. The Consulting Agreement did not have a fixed term and was expected to be ongoing. In December 2017, ACA terminated the Consulting Agreement, citing the Clark Hill cyberattack.

Plaintiff also has suffered mental anguish as a result of the Clark Hill cyberattack. His asylum application contained sensitive details about his family members, family businesses, and the specifics of the assistance that he had provided to the U.S. government in order to expose CCP corruption. Soon after obtaining the information contained in Plaintiff's asylum application, the

CCP arrested and imprisoned Plaintiff's family members in China, causing Plaintiff and his family to live in extreme fear and constant anxiety.

Plaintiff's reputation has been damaged in a number of ways. Defendant's withdrawal as his counsel portrayed Plaintiff as a liar and a fraud, and created the impression that he had been dishonest with Clark Hill, and had done something wrong to justify his counsel's withdrawal from representation. He lost friends and business opportunities, and his family suffered tremendously. Plaintiff has suffered a loss of credibility in the United States and abroad both as a businessman and as a whistleblower. Further, in the wake of the Clark Hill cyberattack, law firms have refused to provide services to Plaintiff, and other entities have refused to conduct business with Plaintiff, citing a fear of being hacked by the CCP.

In addition to seeking compensation for the loss of income from the Consulting Agreement, for mental anguish, and for reputational harm, Plaintiff seeks recovery of fees paid to Clark Hill.

The categories other than the losses resulting from the termination of the Consulting Agreement (the only business opportunity for which Plaintiff is making a claim) and fees paid to Clark Hill are left to the jury's discretion; therefore, Plaintiff has not included specific dollar amounts.

This answer also supplements Plaintiff's answers to Clark Hill's interrogatories 2 and 8.

20. Identify all businesses associated with Plaintiff that Plaintiff alleges has experienced harm as a result of the cyber-incident that occurred on or about September 12, 2017, or as a result of Clark Hill's alleged misconduct, and describe in detail the nature of the harm, including the basis for the allegation in paragraph 56 of the Complaint that Plaintiff has "lost substantial business opportunities," and incurred "costs and expenses."

ANSWER: See answer to interrogatory number 19.

12

21.     Describe in detail what has occurred in any proceedings in connection with Plaintiff's asylum application since September 19, 2017, including without limitation the basis for the allegation in paragraph 56 of the Complaint that Plaintiff's efforts to obtain political asylum have been delayed or otherwise harmed as a result of Clark Hill's alleged breach of legal duties and obligations, including Clark Hill's withdrawal from representing Plaintiff.

ANSWER: The disclosure of plaintiff's confidential asylum application has created delay because of the negative publicity surrounding the incident, Clark Hill's withdrawal as counsel for plaintiff, and the publication of plaintiff's sensitive, confidential, and private matters, some of which involve sensitive national security issues.

22.     Describe in detail the alleged harm or persecution that Plaintiff has suffered as a result of actions by or on behalf of the Chinese government or the Chinese Communist Party before the cyber incident on or about September 12, 2017, including the basis for Plaintiff's "good reason to fear for his personal safety" as described in paragraph 16 of the Complaint, the basis for the allegation in paragraph 17 of the Complaint that "the CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associates with it and acting on its behalf," the basis for the allegations in paragraph 23 of the Complaint that demonstrations outside the building where Plaintiff resides were "staged" by the CCP, and the basis for the allegations in paragraph 26 of the Complaint that "the CCP perceives plaintiff as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP."

ANSWER: Plaintiff has been effective in influencing international opinion with respect to China and the CCP. From the perspective of the CCP, plaintiff's activities and advocacy have affected adversely China's and the CCP's stature in the world community and, in response, the Chinese

13

government has attempted to silence plaintiff. The Chinese government/CCP has employed various tactics, including coercion and offering bribes to attempt to silence plaintiff, including, using overseas intelligence networks to seek to discredit, silence, and threaten plaintiff's personal safety or, at the very least, to cause plaintiff to have good reason to fear for his personal safety as well as fearing for the safety of family members and friends.

The CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associated with it and acting on its behalf, including information relating to corruption, murder, hiding of illegally-gained money, and China's spy network. For these and other reasons, the Chinese government and the CCP are highly motivated, to understate the matter, and engaged aggressively in seeking to silence plaintiff. The Chinese government and the CCP are equally motivated and engaged in seeking to learn what plaintiff knows about improper activities undertaken by or on behalf of the Chinese government and the CCP. And, perhaps most critically, the Chinese government and the CCP have the capabilities – the "operational reach" – to carry out aggressive hostile actions against plaintiff.

The Chinese government and/or the CCP sent agents and officials to the United States to organize demonstrations aimed directly against plaintiff outside the building in New York City where plaintiff resides. Persons attending these CCP-staged demonstrations, literally on plaintiff's front steps, were provided with preprinted signs defaming plaintiff in vile language, calling him a rapist and a liar, and urging plaintiff to leave the United States.

Plaintiff believes that the CCP perceives him as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP.

23.     Describe in detail any harms that Plaintiff has suffered at the hands of or caused by the Chinese government that have occurred after the cyber-incident on or about September 12,

14

2017, including the basis for allegations in paragraph 56 of the Complaint, that "plaintiff's personal safety and security have been put at risk," "his family has been arrested and threatened," and "plaintiff's employees in China have been harassed," and the basis for the allegations in paragraph 58 of the Complaint that "plaintiff's freedom and liberty to travel" has been "limit[ed] and that "his personal safety" has been "jeopardize[ed]" as a result of Clark Hill's alleged breach of legal duties and obligations.

ANSWER: Objection. This interrogatory is duplicative. Without waiving this objection, see answer numbers 19, 22, and other information contained in prior interrogatories, of which this interrogatory is duplicative.

24.    Identify any person who, after September 12, 2017, has used Plaintiff's information that Plaintiff alleges was obtained in the cyber-incident, identify what specific information was used, and explain how the information was used.

ANSWER: See answer number 23.

25.    Describe in detail the process and methodology that Plaintiff utilized to search for, identify, and locate the documents that Ragland requested in his first request for production of documents, including the date that Plaintiff began preserving documents related and relevant to this litigation, the scope and method of preserving documents, all persons or custodians who were asked to search for and produce responsive documents, and the search terms used to search electronically stored information.

ANSWER:  Plaintiff searched his own information, and collected information from his agents which was thereafter produced to defendants.

SUPPLEMENTAL ANSWER:  Plaintiff directed his employees to search two computer hard drives maintained at the offices of Golden Spring (New York) Ltd.: (1) a hard drive where

documents related to Plaintiff's legal matters are maintained; and (2) a hard drive where data stored on cell phones previously used by Plaintiff is maintained. Plaintiff requested that employees gather from those hard drives any correspondence related to his asylum application and correspondence with Lianchao Han and Jianli Yang. Employees also searched the hard drives for other documents containing the following terms: asylum, tom, ragland, clark hill, spencer lee, schiller, and hack.

Plaintiff also requested that an employee search for social media postings and other public statements made by Plaintiff on the subjects of his asylum application, Clark Hill, or the hacking of Clark Hill's computer systems.

In addition, Plaintiff asked Lianchao Han to provide copies of any documents in his possession concerning Plaintiff's asylum application or Clark Hill's representation of Plaintiff.

Respectfully Submitted,

*/s/Ari S. Casper*
Ari S. Casper
Ralph S. Tyler
The Casper Firm, LLC
400 East Pratt St., Suite 903
Baltimore, MD 21202
Tel: 410-989-5097
acasper@casperfirm.com

*Attorneys for Plaintiff*

## VERIFICATION

The facts stated herein are true and accurate to the best of my knowledge, information, and

belief.

_____
Guo Wengui

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of November, 2020, the foregoing was served to the following by email:

John R. Storino
David P. Saunders
Leigh J. Jahnig
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654-3456
JStorino@jenner.com
dsaunders@jenner.com
ljahnig@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK, LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
KBracey@jenner.com

/s/ Ari S. Casper
Ari S. Casper

18

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUO WENGUI a/k/a MILES KWOK a/k/a HO WAN KWOK, | ) ) ) |
| Plaintiff, | ) Case No. 1:19-cv-3195 ) |
| v. | ) ) Hon. James Boasberg |
| CLARK HILL PLC; THOMAS K. RAGLAND, | ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S SUPPLEMENTAL RESPONSES TO CLARK HILL'S THIRD SET OF REQUESTS FOR ADMISSION TO PLAINTIFF

Plaintiff Guo Wengui ("Plaintiff"), through undersigned counsel, hereby responds with these supplemental responses to Clark Hill's third set of requests for admission. Plaintiff incorporates herein all general objections set forth in his responses to Clark Hill's first and second sets of requests for admission.

## RESPONSES TO REQUESTS FOR ADMISSION

REQUEST FOR ADMISSION NO. 1:

Admit that the only damages you are seeking in this action are (a) damages from your asserted mental anguish from the Cyber-incident, and (b) recovery of fees paid to Clark Hill.

RESPONSE:  Plaintiff admits that he is not seeking damages based upon any claimed economic harm.  Plaintiff further admits that in seeking damages for mental anguish/emotional distress, he is seeking damages for his mental pain and suffering, fear, nervousness, indignity, insult, humiliation, and embarrassment.  Plaintiff denies the request to the extent that the phrase "asserted mental anguish" is intended to somehow limit Plaintiff's proof at trial or right to

recover for all the types and categories of mental anguish/emotional distress recognized under District of Columbia law.   For further details, s*ee* Plaintiff's Answers to Clark Hill's Fourth Set of Interrogatories (hereby incorporated by reference).  Plaintiff admits that he is not seeking recovery of fees paid to Clark Hill.

REQUEST FOR ADMISSION NO. 2:

Admit that you are not seeking any category or element of damages in this action other than (a) damages from your asserted mental anguish from the Cyber-incident, and (b) recovery of fees paid to Clark Hill.

RESPONSE: Plaintiff admits that he is not seeking damages based upon any claimed economic harm.  Plaintiff further admits that in seeking damages for mental anguish/emotional distress, he is seeking damages for his mental pain and suffering, fear, nervousness, indignity, insult, humiliation, and embarrassment.  Plaintiff denies the request to the extent that the phrase "asserted mental anguish" is intended to somehow limit Plaintiff's proof at trial or right to recover for all the types and categories of mental anguish/emotional distress recognized under District of Columbia law.   For further details, s*ee* Plaintiff's Answers to Clark Hill's Fourth Set of Interrogatories (hereby incorporated by reference).  Plaintiff admits that he is not seeking recovery of fees paid to Clark Hill.

REQUEST FOR ADMISSION NO. 3:

Admit that the only out-of-pocket damages you are seeking in this action are the fees you previously paid to Clark Hill.

RESPONSE: Plaintiff admits that he is not seeking any "out-of-pocket damages."

REQUEST FOR ADMISSION NO. 4:

Admit that the only sum certain damages that you are seeking in this action are fees you

previously paid to Clark Hill.

RESPONSE: Plaintiff admits that he is not seeking "sum certain" damages. Plaintiff admits that he is not seeking damages based upon any claimed economic harm. Plaintiff further admits that in seeking damages for mental anguish/emotional distress, he is seeking damages for his mental pain and suffering, fear, nervousness, indignity, insult, humiliation, and embarrassment. Plaintiff denies the request to the extent that the phrase "asserted mental anguish" is intended to somehow limit Plaintiff's proof at trial or right to recover for all the types and categories of mental anguish/emotional distress recognized under District of Columbia law. For further details, s*ee* Plaintiff's Answers to Clark Hill's Fourth Set of Interrogatories (hereby incorporated by reference). Plaintiff admits that he is not seeking recovery of fees paid to Clark Hill.

REQUEST FOR ADMISSION NO. 5:

Admit that you are not seeking damages in this action for any lost business opportunity.

RESPONSE: Admitted.

REQUEST FOR ADMISSION NO. 6:

Admit that you are not seeking damages in this action for any lost opportunity to do business with ACA.

RESPONSE: Admitted.

REQUEST FOR ADMISSION NO. 7:

Admit that you are not seeking damages in this action for any lost business opportunity, including any opportunity to do business with ACA.

RESPONSE: Admitted.

REQUEST FOR ADMISSION NO. 8:

Admit that you are not seeking damages in this action for harm to your reputation.

RESPONSE: Denied. Plaintiff is seeking damages for harm to his reputation. In seeking recovery for mental anguish/emotional distress, Plaintiff is seeking, as he is entitled to do under District of Columbia law, recovery for, among other things, indignity, insult, humiliation, and embarrassment. As a result of the cyberattack, disclosure of Plaintiff's information, and defendants' withdrawal as his counsel, Plaintiff also has suffered stigmatic harm. *See* Plaintiff's Answers to Clark Hill's Fourth Set of Interrogatories (hereby incorporated by reference).

Respectfully Submitted,

/s/*Ari S. Casper*
Ari S. Casper
Ralph S. Tyler
The Casper Firm, LLC
400 East Pratt St., Suite 903
Baltimore, MD 21202
Tel: 410-989-5097
acasper@casperfirm.com

*Attorneys for Plaintiff*

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of July 2021, the foregoing was served to the

following by email:


      David Jimenez-Ekman
      John R. Storino
      Leigh J. Jahnig
      JENNER & BLOCK, LLP
      353 N. Clark Street
      Chicago, IL 60654-3456
      DJimenez-Ekman@jenner.com
      JStorino@jenner.com
      ljahnig@jenner.com


*/s/ Ari S. Casper*
Ari S. Casper

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GUO WENGUI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-cv-03195 |
| | ) | |
| v. | ) | |
| | ) | |
| CLARK HILL PLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S STATEMENT CONCERNING
## INSTRUCTIONS TO "OTHER FIDUCIARIES"

In a letter dated February 12, 2021, David Saunders, counsel to Defendants Clark Hill PLC and Thomas Ragland, demanded that Plaintiff provide a verified statement describing any special instructions he gave to fiduciary entities concerning the handling of confidential information he might provide to them.

Plaintiff objects to this request on the ground that it is not relevant to any matter at issue in this litigation. Plaintiff retained Clark Hill to represent him in connection with confidential asylum proceedings, in which he would be providing the law firm with highly sensitive information concerning, among other things, decades of persecution that he and members of his family experienced in China, as well as highly sensitive details of certain assistance that he provided to the U.S. government. The instructions that Plaintiff gave to other fiduciaries concerning the handling of other types of information are not probative of any matter at issue in this case. Further, while Plaintiff understands that Defendants deny that Plaintiff ever asked them to give heightened protection to his confidential information, Defendants have produced an email communication in which Mr. Ragland expressly acknowledged that Plaintiff had asked Defendants to do so. As such,

even if special instructions given by Plaintiff to another law firm representing him in connection with a business matter were somehow probative of whether he gave special instructions to the law firm representing him in connection with his highly sensitive asylum application, there is no genuine dispute of fact here on that issue. Plaintiff further objects that, contrary to the letter sent by Defendants' counsel, the information sought is not responsive to any interrogatory propounded by Defendants. All of the interrogatories cited by Mr. Saunders in his February 12 letter are contention interrogatories, and Plaintiff does not make any contention based on the information that Defendants are now seeking. Finally, Plaintiff objects on the ground that Defendants have already served an excessive number of interrogatories and requests for admissions.

Without waiving these objections, and for avoidance of a dispute concerning whether the Court's January 13, 2020 Minute Order had the effect of propounding a new interrogatory on behalf of Defendants, Plaintiff provides the following statement:

Plaintiff requested that the following law firms, when communicating regarding or transmitting his confidential information, avoid using email or cloud-based services where possible, and instead attempt to do so via in-person meeting, phone call, or the exchange of hard copy documents: Boies Schiller; Tucker Levin; Wasserman, Mancini & Chang; and Williams & Connolly.

Plaintiff asked the security firm T&M Protection, which has provided personal protection services to Plaintiff, to limit its use of email when communicating concerning confidential matters related to its work for him.

In connection with his providing confidential information to the Board of the Sherry-Netherland in 2015, Plaintiff asked that the Chairman of the Board review the information

2

independently and in confidence, and then report on the specifics of the information in person to the other members of the Board.

s/*Ari S. Casper*
Ari S. Casper
Ralph S. Tyler
The Casper Firm, LLC
400 East Pratt St., Suite 903
Baltimore, MD 21202
Tel: 410-989-5097
acasper@casperfirm.com

*Attorneys for Plaintiff*

February 19, 2021

# VERIFICATION

The facts stated above are true and accurate to the best of my knowledge, information, and belief.

Guo Wengui

# EXHIBIT F

353 N. CLARK STREET CHICAGO, IL 60654-3456

**JENNER &BLOCK** LLP

August 27, 2021

John Storino
Tel  +1 312 840 8683
JStorino@jenner.com

*VIA EMAIL*

Ari Casper
The Casper Firm
400 E. Pratt Street, Suite 903
Baltimore, MD 21202

Re:      *Wengui v. Clark Hill et al., No. 19-3195 (D.D.C.)*

Dear Ari,

I write in connection to Plaintiff Guo Wengui ("Plaintiff")'s July 28, 2021 deposition. We are available to meet and confer on the issues raised in this letter.

Following counsel's objections and advice, Plaintiff refused to answer 26 questions on Fifth Amendment privilege grounds. Defendants consider Plaintiff's Fifth Amendment assertions improper. Mr. Guo refused to answer a broad range of questions concerning Mr. Guo's current and previous allegations in this lawsuit; Mr. Guo's employment or business dealings; information concerning Mr. Guo's past lawsuits; Mr. Guo's wealth and assets; and Mr. Guo's activities in China. As you know, despite our requests at the deposition, Plaintiff's counsel refused to articulate why the answer to questions by Defendants' counsel could possibly implicate Plaintiff's Fifth Amendment rights. Guo Dep., July 28, 2021 at pg. 28. We reserve any and all of our rights under the Federal Rules of Civil Procedure and all local rules, including but not limited to our positions that Plaintiff waived his Fifth Amendment assertions, and that Plaintiff does not have a reasonable fear of possible prosecution. In the event the Court finds Plaintiff's assertions proper, Defendants further reserves the right to ask the Court to allow the jury to draw negative inferences from the Plaintiff's assertion of his Fifth Amendment privileges.

While the Fifth Amendment protects Plaintiff from serving as a witness against himself in his deposition testimony, Plaintiff must still possess a "reasonable basis for believing a danger to [Plaintiff] must exist in answering a particular question." *District Title v. Warren*, 265 F. Supp.3d 17, 20 (D.D.C. 2017). A witness who invokes the Fifth Amendment must demonstrate a "real danger and not a mere imaginary, remote or speculative possibility of prosecution." *S.E.C. v. Bankers Alliance Corp.*, No. C.A. 95-0428 (PLF), No. C.A. 95-0428 (PLF), 1995 WL 590665 at *3 (D.D.C. May 5, 1995) (holding defendant in contempt of court order for refusing to reveal details about investor funds because witness "has not expressed a nonfrivolous fear of self-incrimination or prosecution."). In demonstrating a real danger, a witness bears the burden of proving the danger of prosecution by providing credible reasons why revealing such information "presents more than a remote or speculative fear of incrimination." *Id.* (quoting *S.E.C. v. Parkersburg Wireless Ltd. Liability Co.*, 156 F.R.D. 529, 537 (D.D.C. 1994)).

Ari Casper
August 27, 2021
Page 2

     Plaintiff failed to identify a reasonable fear of prosecution when he objected to the 26 questions asked by Defendants' counsel. Please provide a basis for Plaintiff's Fifth Amendment assertions for each of the 26 questions Plaintiff declined to answer. We appreciate receiving a prompt response regarding Plaintiff's deficient Fifth Amendment invocations by Monday, August 30, 2021. If we do not receive such a response, we will move to compel, and/or move for other relief, for Plaintiff to complete answers on the topics he refused to address in his deposition.

     We reserve all of our rights, including but not limited to its rights under the Federal Rules of Civil Procedure and all local rules. As always, we are willing to confer about this, or any other discovery issues, at any mutually agreeable time.


Sincerely,

/s John R. Storino

John Storino

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK a/k/a ) 
HO WAN KWOK, )
                                )
        Plaintiff, )  Case No. 1:19-cv-3195
                                )
        v. )
                                )  Hon. James Boasberg
CLARK HILL PLC; THOMAS K. )
RAGLAND, )
                                )
        Defendants. )
                                )

## **PLAINTIFF'S SECOND SUPPLEMENTAL ANSWERS TO DEFENDANT THOMAS K. RAGLAND'S FIRST SET OF INTERROGATORIES**

      Plaintiff Guo Wengui hereby supplements his answers to Defendant Thomas K. Ragland's

first set of interrogatories. Plaintiff incorporates the general objections stated in his initial answers

to Mr. Ragland's first set of interrogatories.

## **INTERROGATORIES**

1.    Identify all persons who have knowledge of any facts relating to any allegation in

the Complaint and state what information/facts the identified individuals possess.

ANSWER: The following individuals have knowledge of the allegations in the complaint:

      a.  Plaintiff Guo Wengui
          162 E. 64th Street
          New York, NY 10065
          Plaintiff has knowledge of his reasons for retaining Clark Hill; his discussions
          with Mr. Ragland prior to engaging Clark Hill; the terms and conditions of the
          representations; plaintiff and his agent's requests that Clark Hill protect plaintiff's
          private and sensitive information; Clark Hill's failure to protect plaintiff's
          information; Clark Hill's termination of its representation of plaintiff; and the
          damages that arose out of Clark Hill's misconduct at issue in this litigation.

      b.  Defendant Clark Hill PLC
          500 Woodward Avenue

Suite 3500
Detroit, MI 48226
Clark Hill PLC has knowledge of the defenses in its answer; the terms and
conditions of Clark Hill's and Thomas K. Ragland's representation of plaintiff;
the facts and circumstances surrounding the data breach that resulted in the wide-
spread and public disclosure of plaintiff's sensitive and confidential personal
information; and the facts and circumstances surrounding Clark Hill's and
Thomas K. Ragland's decision to withdraw as counsel for plaintiff.

c.  Defendant Thomas K. Ragland
    Clark Hill PLC
    10001 Pennsylvania Avenue, NW
    Suite 1300
    Washington, DC 20004
    Thomas K. Ragland has knowledge of the allegations in the complaint and
    defenses asserted in the answer; the terms and conditions of Clark Hill PLC's and
    Thomas K. Ragland's representation of plaintiff; the facts and circumstances
    surrounding the data breach that resulted in the wide-spread and public disclosure
    of plaintiff's sensitive and confidential personal information; requests to protect
    plaintiff's private and confidential information; and the facts and circumstances
    surrounding Clark Hill PLC's and his decision to withdraw as counsel for plaintiff.

d.  Edward J. Hood
    Clark Hill PLC
    500 Woodward Avenue
    Suite 3500
    Detroit, MI 48226
    Edward J. Hood has knowledge of the allegations in the complaint and defenses
    asserted in the answer; the facts and circumstances surrounding the data breach
    that resulted in the wide-spread and public disclosure of plaintiff's sensitive and
    confidential personal information; correspondence with plaintiff's counsel about
    the nature of the data breach and how Clark Hill handle the breach; and the facts
    and circumstances surrounding Clark Hill PLC's and Thomas K. Ragland's
    decision to withdraw as counsel for plaintiff.

e.  Dr. Lianchao Han
    Citizen Power Initiatives for China
    415 2nd Street NE
    Suite 100
    Washington, DC 20002
    Dr. Lianchao Han has knowledge of the allegations in the complaint and defenses
    asserted in the answer; the terms and conditions of Clark Hill PLC's and Thomas
    K. Ragland's representation of plaintiff, including requests to protect plaintiff's
    information; the facts and circumstances surrounding the data breach that resulted
    in the wide-spread and public disclosure of plaintiff's sensitive and confidential
    personal information; damages to plaintiff's reputation.

f.   Jianli Yang
     Citizen Power Initiatives for China
     415 2nd Street NE
     Suite 100
     Washington, DC 20002
     Dr. Jianli Yang has knowledge of the terms and conditions of Clark Hill PLC's
     and Thomas K. Ragland's representation of plaintiff.

g.   Joshua Schiller, Esq.
     Boies Schiller Flexner LLP
     55 Hudson Yards, 20th Floor
     New York, NY 10001
     Mr. Schiller has limited knowledge of the facts and circumstances of plaintiff's
     engagement with Clark Hill. The extent of his knowledge is unknown.

h.   Persons involved in the post-hacking investigation, at both Clark Hill and third
     parties whose identities are unknown at this time, who would have knowledge,
     potentially, of what happened, why (cause), and how it might have been
     prevented.

SUPPLEMENTAL ANSWER:

i.   William Je
     ACA Capital Group Ltd.
     1605-6, 16/F, Hua Qin International Building
     340 Queen's Road Central
     Hong Kong
     Mr. Je has knowledge of Plaintiff's consulting agreement with ACA Capital
     Group and of ACA Capital Group's termination of that agreement.

j.   Qu Guo Jiao
     Current address unknown. Plaintiff believes she is living in China and is
     attempting to locate her.
     Last known address:
     ACA Capital Group Ltd.
     1605-6, 16/F, Hua Qin International Building
     340 Queen's Road Central
     Hong Kong
     Ms. Qu has knowledge of Plaintiff's consulting agreement with ACA Capital
     Group and of ACA Capital Group's termination of that agreement.

2.    Identify all persons who provided information used to prepare the responses to these interrogatories or the responses to Thomas K. Ragland's requests for production, and identify the respective interrogatory or request to which each person provided information.

ANSWER:  Plaintiff objects on the ground that the interrogatory seeks to invade the attorney-client privilege and work product privilege. Without waiving the objection, plaintiff and his in-house counsel, Daniel Podhaskie, provided information used to prepare the answers herein.

3.    Identify all persons who communicated with, interacted with, or directed Clark Hill on Plaintiff's behalf in connection with Clark Hill's representation of Plaintiff with respect to Plaintiff's asylum application, including, but not limited to, the discussions leading up to the representation.

ANSWER: *See* answer to interrogatory number 1. Plaintiff, Dr. Han, and Dr. Jianli.

4.    Identify all communications between Plaintiff and his representatives, employees, or agents (including without limitation Lianchao Han, any other employee at Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) about Clark Hill's representation of Plaintiff in U.S. immigration matters, the fact of Plaintiff's asylum application, or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify" all communications. Without waiving these objections, plaintiff has produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill. In addition, plaintiff states that Dr. Han and Dr. Yang had conversations with Mr. Ragland prior to retaining the firm about whether Clark Hill had adequate cyber security. Dr. Han expressly told Mr. Ragland that "he needs to be prepared" for a cyberattack.  In response, Mr. Ragland told Dr. Han, among other things, that the firm had "first class state of the art" cyber technology and used "three outside"

4

cyber security firms to protect client information. Mr. Ragland also advised he would let the Clark Hill "IT people know" about the potential for an attack. Dr. Han repeatedly continued to advise Mr. Ragland that, in Dr. Han's his opinion, the firm did not take the threat serious.

SUPPLEMENTAL ANSWER:

Plaintiff provides this supplemental answer in compliance with the Court's Minute Order dated January 13, 2021, in which the Court directed Plaintiff, among other things, to "supplement including with details on dates and times of what his agents told him that Defendants promised to do in safeguarding his materials," to "explicitly state that he does not use email," and to make a certification concerning his "communications with the two employees of Initiatives for China," whom Plaintiff understands to be Dr. Lianchao Han and Dr. Jianli Yang.

With respect to Defendants' promises to safeguard Plaintiff's materials, during meetings at Plaintiff's residence in New York, Mr. Ragland assured Plaintiff that he and Clark Hill would take certain affirmative steps to ensure the security of Plaintiff's asylum application and other confidential and sensitive information related to Plaintiff's asylum application, including, for example, that the firm would not store Plaintiff's materials on its server. The first of these meetings took place on or about August 23, 2017, and there were additional in-person meetings that took place in September 2017.

Between the August 23 meeting at Plaintiff's residence and the cyberattack during the second week of September, Plaintiff had several conversations with Dr. Han. During at least one of those conversations, Dr. Han told Plaintiff that Mr. Ragland had assured him (Dr. Han) that Clark Hill had "first class state of the art" cyber technology and used three outside cyber security firms to protect client information. Dr. Han also relayed to Plaintiff Mr. Ragland's assurance that he (Mr. Ragland) would let Clark Hill's information technology staff know about the potential for

a cyberattack, so that the firm could ensure that heightened protection would be given to Plaintiff's information. Plaintiff does not recall the exact dates of these conversations.

Plaintiff does not use email and communicates principally by phone. With respect to "communications with the two employees for Initiatives for China," Plaintiff certifies that his agents were not able to locate any documents containing communications between him and either Dr. Han or Dr. Yang on the subjects of (a) Plaintiff's representation by Clark Hill, (b) Plaintiff's decision to apply for asylum and the filing of his asylum application, or (c) information security at Clark Hill or the cyberattack at Clark Hill. Plaintiff does have in his possession a number of WhatsApp communications with Dr. Han and Dr. Yang. Plaintiff certifies, however, that none of those communications concern the subject matters of this case.

5.      Identify each document or communication that you contend is relevant to the determination of Clark Hill's obligations with respect to safeguarding the information pertaining to Plaintiff's representation.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify each document or communication." Plaintiff will produce trial exhibits in accordance with the Court's scheduling order and governing rules. Without waiving these objections, plaintiff has produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill.

6.      Identify and describe all contracts or agreements between Plaintiff, or Plaintiff's representatives, agents, employees, or other parties acting for Plaintiff's benefit, and Clark Hill or Thomas K. Ragland, including who made the agreement, when the agreement was made, and the substance of the agreement.

ANSWER: Plaintiff entered into a legal services contract with Clark Hill. Plaintiff has produced a copy of that agreement.

6

7.     Describe in detail the level of "necessary steps and actions" and "special care and attention to security measures" (*see* Complaint ¶ 35) that Plaintiff contends Clark Hill agreed to implement in order to safeguard the information pertaining to Plaintiff's representation.

ANSWER:  Plaintiff objects to this interrogatory as it calls for a statement or description of the actions and steps required for Clark Hill to satisfy its "duty of care" which is a legal determination. Clark Hill was required to provide adequate security measures to protect plaintiff's information. Clark Hill knew that the representation of plaintiff was in no sense an "ordinary" representation with "ordinary" risks of unauthorized disclosure. Please see answer to interrogatory number 4. Clark Hill, through Mr. Ragland, agreed to take the necessary steps and actions to protect plaintiff's confidential information recognizing that meant the firm would take "more than ordinary" protective efforts, including not putting plaintiff's information on the server or using firm email accounts. Plaintiff will supplement this answer in accordance with the scheduling order governing expert disclosures.

8.     Describe in detail the "necessary and effective electronic security measures" that Plaintiff contends are "sufficient to protect plaintiff's sensitive and confidential information" (*see* Complaint ¶ 8).

ANSWER:  Please see objections and answer to interrogatory number 7.

9.     Identify all communications between Plaintiff or Plaintiff's representatives, employees, or agents (including without limitation Lianchao Han, any other employee at Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) and Clark Hill, including, but not limited to, any communications relating to any warnings or risks of cyber-incidents or "hacks," any special security measures requested by Plaintiff,

7

Plaintiff's publicity of the existence of the asylum application, or any facts contained in the asylum application.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify all communications." Without waiving these objections, plaintiff has produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill. Please see answer to interrogatory number 4.

     10.    State the basis for the allegation in paragraph 35 of the Complaint that Clark Hill "was on full notice" prior to agreeing to represent Plaintiff "that special care and attention to security measures were necessary, required, expected, and agreed-to by the firm."

ANSWER: See answer to interrogatory number 4. Plaintiff and Dr. Han informed Clark Hill that the CCP would try to hack the firm to obtain plaintiff's sensitive and confidential information. Mr. Ragland agreed not to use the firm's server to store or transmit plaintiff's sensitive information over the firm's email accounts, and even warned his IT group that such an attack was possible.

     11.    State the basis for the allegation in paragraph 3 of the Complaint that Clark Hill "assured" Plaintiff that his confidential information would be "protected."

ANSWER: Mr. Ragland assured plaintiff and his agents that the firm had state-of-the-art cybersecurity, three different outside firms which protect client information, and would protect plaintiff's information by using a separate computer, not placing it on the firm server or using the firm's email accounts.

     12.    Describe the circumstances around the decision to publicize, via social media and news media, the fact of Plaintiff's asylum application and the fact of Clark Hill's representation of Plaintiff, including who made the decision, when the decision was made, who was aware of the decision before the publicity took place, and the reasons for the decision.

ANSWER: Plaintiff objects to the characterization that there was a decision to "publicize" the asylum application. Plaintiff further objects on relevance grounds and because this interrogatory invades the attorney-client privilege. Without waiving these objections, plaintiff was informed that others (presumably the CCP) knew he was seeking asylum. Plaintiff spoke to Mr. Ragland about making an announcement. Mr. Ragland thereafter gave interviews to numerous outlets regarding plaintiff's asylum application.

13.     Identify any communication between Plaintiff or Plaintiff's representatives, employees, or agents (including without limitation Lianchao Han, any other employee of Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) and any third party regarding Clark Hill's representation of Plaintiff, including, but not limited to, the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects to this interrogatory on the grounds it is overly burdensome in that it seeks to have plaintiff "identify any communication." The interrogatory also is duplicative of several other interrogatories. Without waiving these objections, plaintiff has produced all relevant non-privileged communications.

14.     Identify any posting or communication by Plaintiff or Plaintiff's representatives, agents, or employees on any internet or social media platform or outlet, including without limitation YouTube, Twitter, Facebook, Instagram, WhatsApp, SnapChat, or TikTok regarding the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects on relevance grounds. Without waiving the objection, plaintiff's twitter account was disabled, and he no longer has access to it. Plaintiff's YouTube account does not appear to reference his asylum application.

15.     Identify any social media accounts or profiles, including without limitation YouTube usernames, accounts, or "channels," Facebook profiles, or Twitter "handles," currently used or previously used by Plaintiff, through which Plaintiff posted or disseminated, or caused to be posted or disseminated, any statements, postings, or opinions regarding the Chinese government, the Chinese Communist Party, the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Please see objections and answer to the previous interrogatory. Plaintiff further objects on the ground that this interrogatory is unduly burdensome. Without waiving those objections, plaintiff has a YouTube account and a GTV platform containing a substantial number of videos discussing the CCP and the Chinese government. Again, plaintiff is not aware of any reference on either of those two social media platforms of any reference to his asylum application.

16.     Identify the persons to whom Plaintiff "disclosed a broad network of CCP spies operating in the United States," and when such disclosure took place, as alleged in paragraph 20 of the Complaint.

ANSWER: Plaintiff objects on relevance grounds, as plaintiff's disclosures are not reasonably calculated to lead to admissible evidence about defendants' failure to protect his confidential information.

17.     Identify all information that was contained in Plaintiff's asylum application which

Plaintiff contends was confidential before September 12, 2017 and state the basis for that

contention.

ANSWER:  The contents of plaintiff's asylum application were confidential, including names,

identifying information, addresses, passport information, family information, information plaintiff

had provided to the US government, and details of his commercial and other dealings. Clark Hill

has these documents and plaintiff produced them as well.

SUPPLEMENTAL ANSWER:

Plaintiff provides this supplemental answer in compliance with the Court's Minute Order

dated January 13, 2021, in which the Court directed Plaintiff, among other things, to "provide in

page-level detail more specificity regarding what information in his asylum application harmed

him by being released."

As an initial matter, however, Plaintiff states that his asylum application as a whole was

confidential and that he was harmed by Defendants' failure to protect his asylum application as a

whole, in at least two respects.  First, as explained in Plaintiff's Answer to Interrogatory No. 19,

Plaintiff lost his consulting contract with ACA, and other entities refused to provide professional

services to or conduct business with him, in large part because of the fact that, as a result of

Defendants' negligence and failure to follow his directions with regard to the safeguarding of his

information, Plaintiff had been the victim of a successful cyberattack.  Second, Plaintiff's

reputation was harmed not only by the disclosure of specific confidential information contained in

his asylum application, but also by the disclosure of an actual copy of his asylum application.  In

other words, apart from and in addition to the harm that Plaintiff experienced as a result of the

disclosure of specific items of confidential information contained in Plaintiff's asylum application,

Plaintiff's reputation was harmed by the basic fact that, as a result of Defendants' failure to protect his asylum application, agents of the Chinese government were able to disseminate on the internet a copy of the application, notwithstanding that the application is expressly made confidential by U.S. law.

With respect to specific information contained in his asylum application, Plaintiff was harmed by the disclosure of confidential information stated on pages 5 to 8 of his I-589 Form, as well as on pages 2 to 6 of the I-589 Addendum that Clark Hill prepared for him. Material at those pages describes, in a manner and at a level of detail not otherwise made public: (a) the persecution that Plaintiff, his family members, and his family's employees have experienced in China, including specific descriptions of interrogation and torture; (b) Plaintiff's travel and residence in other countries; (c) Plaintiff's confidential dealings with the governments of other countries; (d) Plaintiff's confidential relationships with officials in the Chinese government and the CCP; (e) specific measures taken by the Chinese government and the CCP to attempt to intimidate or coerce Plaintiff into remaining silent concerning their corruption and human rights abuses in China; and (f) the assistance that Plaintiff provided to the U.S. government.

Plaintiff also treated as confidential additional information contained in the I-589 Form and related materials that Defendants allowed to be disclosed, including (g) his home address, (h) his phone number, (i) his passport and I-94 numbers, (j) his dates of entry into the United States, (k) his prior residential addresses, (l) his employment history, (m) the names of his siblings and parents, (n) the immigration status of his spouse and children, and (o) the passport and I-94 numbers of his spouse and children. This information appears, among other places, at pages 1 to 4 of Plaintiff's I-589 Form, as well as at pages 1, 6 and 7 of the I-589 Addendum that Clark Hill prepared for him.

12

18.    Describe in detail the basis for the allegations, in paragraphs 3, 5, 9, 44, 57, and 59 of the Complaint, that information about Plaintiff or Plaintiff's asylum application published and disseminated on social media after September 12, 2017 was acquired in the cyber-incident on or about September 12, 2017.

ANSWER:  Plaintiff objects because the interrogatory is vague and confusing. Without waiving the objection, plaintiff's asylum application was published on social media after Clark Hill failed to adequately protect it.

19.    Describe in detail the damages that Plaintiff has allegedly suffered as a result of Clark Hill's alleged breach of legal duties and obligations, including the allegations in paragraph 56 of the Complaint of "damages to his personal and professional reputation," "lost substantial business opportunities," and the "costs and expenses" he has incurred.

ANSWER: Plaintiff has suffered damages in a variety of contexts, including, but not limited to, the following: Plaintiff entered into a consulting agreement with ACA Capital Group Limited ("ACA") in August 2016 (the "Consulting Agreement"). ACA aims to serve as the bridge connecting world-class businesses and innovative ideas between Asia and the world, while optimizing financial returns for its investors. ACA hired plaintiff as a consultant because of his reputation in the Asian business community; his knowledge and expertise of doing business throughout the world, but in particular China and Hong Kong; and because plaintiff had the ability to make introductions to numerous business executives in China and Hong Kong. The Consulting Agreement provided that plaintiff would be paid approximately $2 million per year. The Consulting Agreement did not have a fixed term and was expected to be ongoing. In November 2017, ACA terminated the Consulting Agreement because it learned that Clark Hill was hacked

13

and plaintiff's very private and sensitive information was spread throughout the internet on a world-wide basis. Plaintiff was informed by ACA that it terminated the Consulting Agreement because of the company's fears that continuing its relationship with plaintiff would result in a loss of clients and future business and could result in ACA suffering a hack similar to Clark Hill.

Plaintiff had other contractual arrangements with ACA worth several million dollars which were negatively affected by defendants' conduct.

Plaintiff also suffered reputational damage, including followers on social media, which caused financial and other injury, and diminished plaintiff's earning capacity.

Plaintiff will supply additional information regarding these injuries.

SUPPLEMENTAL ANSWER:

Defendant's conduct has caused Plaintiff to suffer damages in a variety of contexts, summarized as follows:

Plaintiff entered into a consulting agreement with ACA Capital Group Limited ("ACA") in October 2016 (the "Consulting Agreement"). After Plaintiff stepped down as ACA's chairman, ACA hired Plaintiff as a consultant because of his reputation in the Asian business community, his knowledge of and expertise in doing business throughout the world, particularly in China and Hong Kong, and his ability to make introductions to business executives in China and Hong Kong. The Consulting Agreement provided for Plaintiff to be paid $2 million per year. The Consulting Agreement did not have a fixed term and was expected to be ongoing. In December 2017, ACA terminated the Consulting Agreement, citing the Clark Hill cyberattack.

Plaintiff also has suffered mental anguish as a result of the Clark Hill cyberattack. His asylum application contained sensitive details about his family members, family businesses, and the specifics of the assistance that he had provided to the U.S. government in order to expose CCP

corruption. Soon after obtaining the information contained in Plaintiff's asylum application, the CCP arrested and imprisoned Plaintiff's family members in China, causing Plaintiff and his family to live in extreme fear and constant anxiety.

Plaintiff's reputation has been damaged in a number of ways. Defendant's withdrawal as his counsel portrayed Plaintiff as a liar and a fraud, and created the impression that he had been dishonest with Clark Hill, and had done something wrong to justify his counsel's withdrawal from representation. He lost friends and business opportunities, and his family suffered tremendously. Plaintiff has suffered a loss of credibility in the United States and abroad both as a businessman and as a whistleblower. Further, in the wake of the Clark Hill cyberattack, law firms have refused to provide services to Plaintiff, and other entities have refused to conduct business with Plaintiff, citing a fear of being hacked by the CCP.

In addition to seeking compensation for the loss of income from the Consulting Agreement, for mental anguish, and for reputational harm, Plaintiff seeks recovery of fees paid to Clark Hill.

The categories other than the losses resulting from the termination of the Consulting Agreement (the only business opportunity for which Plaintiff is making a claim) and fees paid to Clark Hill are left to the jury's discretion; therefore, Plaintiff has not included specific dollar amounts.

This answer also supplements Plaintiff's answers to Clark Hill's interrogatories 2 and 8.
SECOND SUPPLEMENTAL ANSWER:

Plaintiff provides this supplemental answer in compliance with the Court's Minute Order dated January 13, 2021, in which the Court directed Plaintiff, among other things, to "list friends he [] lost and firms who refuse to represent him because of the hack."

As a result of the September 2017 cyberattack enabled by Defendants' negligence and failure to follow Plaintiff's directions with regard to the safeguarding of his information, the following entities and people declined to do business with Plaintiff or discontinued their business relationship with Plaintiff: Shinsei Bank; China Construction Bank; HSBC Bank; China Agricultural Bank; and JP Morgan. In addition, immediately after and as a result of the September 2017 cyberattack, the Hudson Institute, a Washington think tank, abruptly cancelled an event at which Plaintiff would have been the featured speaker. The last-minute cancellation, coupled with news of the cyberattack itself, caused considerable harm to Plaintiff's reputation, at a critical point in Plaintiff's efforts to gather support in Washington for his pro-democracy and human rights advocacy.

20.     Identify all businesses associated with Plaintiff that Plaintiff alleges has experienced harm as a result of the cyber-incident that occurred on or about September 12, 2017, or as a result of Clark Hill's alleged misconduct, and describe in detail the nature of the harm, including the basis for the allegation in paragraph 56 of the Complaint that Plaintiff has "lost substantial business opportunities," and incurred "costs and expenses."

ANSWER: See answer to interrogatory number 19.

21.     Describe in detail what has occurred in any proceedings in connection with Plaintiff's asylum application since September 19, 2017, including without limitation the basis for the allegation in paragraph 56 of the Complaint that Plaintiff's efforts to obtain political asylum have been delayed or otherwise harmed as a result of Clark Hill's alleged breach of legal duties and obligations, including Clark Hill's withdrawal from representing Plaintiff.

ANSWER: The disclosure of plaintiff's confidential asylum application has created delay because of the negative publicity surrounding the incident, Clark Hill's withdrawal as counsel for plaintiff,

and the publication of plaintiff's sensitive, confidential, and private matters, some of which involve sensitive national security issues.

22.     Describe in detail the alleged harm or persecution that Plaintiff has suffered as a result of actions by or on behalf of the Chinese government or the Chinese Communist Party before the cyber incident on or about September 12, 2017, including the basis for Plaintiff's "good reason to fear for his personal safety" as described in paragraph 16 of the Complaint, the basis for the allegation in paragraph 17 of the Complaint that "the CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associates with it and acting on its behalf," the basis for the allegations in paragraph 23 of the Complaint that demonstrations outside the building where Plaintiff resides were "staged" by the CCP, and the basis for the allegations in paragraph 26 of the Complaint that "the CCP perceives plaintiff as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP."

ANSWER:  Plaintiff has been effective in influencing international opinion with respect to China and the CCP.  From the perspective of the CCP, plaintiff's activities and advocacy have affected adversely China's and the CCP's stature in the world community and, in response, the Chinese government has attempted to silence plaintiff.  The Chinese government/CCP has employed various tactics, including coercion and offering bribes to attempt to silence plaintiff, including, using overseas intelligence networks to seek to discredit, silence, and threaten plaintiff's personal safety or, at the very least, to cause plaintiff to have good reason to fear for his personal safety as well as fearing for the safety of family members and friends.

The CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associated with it and acting on its behalf,

17

including information relating to corruption, murder, hiding of illegally-gained money, and China's spy network. For these and other reasons, the Chinese government and the CCP are highly motivated, to understate the matter, and engaged aggressively in seeking to silence plaintiff. The Chinese government and the CCP are equally motivated and engaged in seeking to learn what plaintiff knows about improper activities undertaken by or on behalf of the Chinese government and the CCP. And, perhaps most critically, the Chinese government and the CCP have the capabilities – the "operational reach" – to carry out aggressive hostile actions against plaintiff.

The Chinese government and/or the CCP sent agents and officials to the United States to organize demonstrations aimed directly against plaintiff outside the building in New York City where plaintiff resides. Persons attending these CCP-staged demonstrations, literally on plaintiff's front steps, were provided with preprinted signs defaming plaintiff in vile language, calling him a rapist and a liar, and urging plaintiff to leave the United States.

Plaintiff believes that the CCP perceives him as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP.

23. Describe in detail any harms that Plaintiff has suffered at the hands of or caused by the Chinese government that have occurred after the cyber-incident on or about September 12, 2017, including the basis for allegations in paragraph 56 of the Complaint, that "plaintiff's personal safety and security have been put at risk," "his family has been arrested and threatened," and "plaintiff's employees in China have been harassed," and the basis for the allegations in paragraph 58 of the Complaint that "plaintiff's freedom and liberty to travel" has been "limit[ed] and that "his personal safety" has been "jeopardize[ed]" as a result of Clark Hill's alleged breach of legal duties and obligations.

18

ANSWER: Objection. This interrogatory is duplicative. Without waiving this objection, see answer numbers 19, 22, and other information contained in prior interrogatories, of which this interrogatory is duplicative.

24.     Identify any person who, after September 12, 2017, has used Plaintiff's information that Plaintiff alleges was obtained in the cyber-incident, identify what specific information was used, and explain how the information was used.

ANSWER: See answer number 23.

25.     Describe in detail the process and methodology that Plaintiff utilized to search for, identify, and locate the documents that Ragland requested in his first request for production of documents, including the date that Plaintiff began preserving documents related and relevant to this litigation, the scope and method of preserving documents, all persons or custodians who were asked to search for and produce responsive documents, and the search terms used to search electronically stored information.

ANSWER:  Plaintiff searched his own information, and collected information from his agents which was thereafter produced to defendants.

SUPPLEMENTAL ANSWER:  Plaintiff directed his employees to search two computer hard drives maintained at the offices of Golden Spring (New York) Ltd.: (1) a hard drive where documents related to Plaintiff's legal matters are maintained; and (2) a hard drive where data stored on cell phones previously used by Plaintiff is maintained.  Plaintiff requested that employees gather from those hard drives any correspondence related to his asylum application and correspondence with Lianchao Han and Jianli Yang.  Employees also searched the hard drives for other documents containing the following terms: asylum, tom, ragland, clark hill, spencer lee, schiller, and hack.

Plaintiff also requested that an employee search for social media postings and other public statements made by Plaintiff on the subjects of his asylum application, Clark Hill, or the hacking of Clark Hill's computer systems.

In addition, Plaintiff asked Lianchao Han to provide copies of any documents in his possession concerning Plaintiff's asylum application or Clark Hill's representation of Plaintiff.

Respectfully Submitted,

/s/*Ari S. Casper*
Ari S. Casper
Ralph S. Tyler
The Casper Firm, LLC
400 East Pratt St., Suite 903
Baltimore, MD 21202
Tel: 410-989-5097
acasper@casperfirm.com

*Attorneys for Plaintiff*

<u>VERIFICATION</u>

The facts stated herein are true and accurate to the best of my knowledge, information, and belief.

_____
Guo Wengui

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of February, 2021, the foregoing was served to the following by email:

John R. Storino
David P. Saunders
Leigh J. Jahnig
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654-3456
JStorino@jenner.com
dsaunders@jenner.com
ljahnig@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK, LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
KBracey@jenner.com

/s/ Ari S. Casper
Ari S. Casper

# EXHIBIT H
# (Filed Under Seal)

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK a/k/a )
HO WAN KWOK, )
                                      )
        Plaintiff, )  Case No. 1:19-cv-3195
                                      )
        v. )
                                        )  Hon. James Boasberg
CLARK HILL PLC; THOMAS K. )
RAGLAND, )
                                      )
        Defendants. )
                                      )

**PLAINTIFF'S ANSWERS TO DEFENDANT THOMAS K. RAGLAND'S**
**<u>FIRST SET OF INTERROGATORIES</u>**

      Plaintiff Guo Wengui (hereinafter "plaintiff"), through undersigned counsel, hereby answers defendant Thomas K. Ragland's first set of interrogatories.

**<u>GENERAL OBJECTIONS</u>**

      1.    Plaintiff objects to these interrogatories to the extent that they seek information not subject to discovery under the Federal Rules of Civil Procedure, or information protected by the Attorney-Client Privilege, the Work Product Doctrine, or any other rule of privilege or confidentiality.  Without waiving this objection, to the extent possible, plaintiff has construed every interrogatory as seeking only information not subject to any applicable privilege or immunity.

      2.    Plaintiff objects to these interrogatories to the extent they purport to impose a greater duty than set forth in the Federal Rules of Civil Procedure.  Plaintiff provides its answers solely within the dictate of those Rules.

3.      Plaintiff objects to these interrogatories to the extent that they seek information that is not in its custody or control, or that of its agents, employees and attorneys, or is in the custody or control of a person or entity that is not a party to this litigation, or is as equally accessible to defendants as to the plaintiff.

4.      Plaintiff objects to the interrogatories that seek identification or production of all information or documents "relating to" the subject matter of the inquiry on the grounds that such a request is vague and so broad that it can conceivably encompass anything.  Plaintiff further objects to these types of inquiries to the extent they call for legal conclusions regarding the relevance of particular documents to issues in this litigation and then to select documents on that basis.

5.       Plaintiff objects to the interrogatories on the ground that many of them are not limited in time or scope, are unduly burdensome, and meant to harass plaintiff.

6.      Plaintiff objects to these interrogatories in that they seek confidential information and that is not reasonably calculated to lead to admissible evidence.

7.      Plaintiff reserves the right to object on additional grounds, including the competency, relevancy, materiality, and admissibility of these and any future responses.

8.      These objections are continuing and are incorporated into plaintiff's objections to each and all of the particular and specific interrogatories and, therefore, may not be individually repeated.

## **INTERROGATORIES**

1.      Identify all persons who have knowledge of any facts relating to any allegation in the Complaint and state what information/facts the identified individuals possess.

ANSWER:  The following individuals have knowledge of the allegations in the complaint:

a. Plaintiff Guo Wengui
162 E. 64th Street
New York, NY 10065
Plaintiff has knowledge of his reasons for retaining Clark Hill; his discussions with Mr. Ragland prior to engaging Clark Hill; the terms and conditions of the representations; plaintiff and his agent's requests that Clark Hill protect plaintiff's private and sensitive information; Clark Hill's failure to protect plaintiff's information; Clark Hill's termination of its representation of plaintiff; and the damages that arose out of Clark Hill's misconduct at issue in this litigation.

b. Defendant Clark Hill PLC
500 Woodward Avenue
Suite 3500
Detroit, MI 48226
Clark Hill PLC has knowledge of the defenses in its answer; the terms and conditions of Clark Hill's and Thomas K. Ragland's representation of plaintiff; the facts and circumstances surrounding the data breach that resulted in the wide-spread and public disclosure of plaintiff's sensitive and confidential personal information; and the facts and circumstances surrounding Clark Hill's and Thomas K. Ragland's decision to withdraw as counsel for plaintiff.

c. Defendant Thomas K. Ragland
Clark Hill PLC
10001 Pennsylvania Avenue, NW
Suite 1300
Washington, DC 20004
Thomas K. Ragland has knowledge of the allegations in the complaint and defenses asserted in the answer; the terms and conditions of Clark Hill PLC's and Thomas K. Ragland's representation of plaintiff; the facts and circumstances surrounding the data breach that resulted in the wide-spread and public disclosure of plaintiff's sensitive and confidential personal information; requests to protect plaintiff's private and confidential information; and the facts and circumstances surrounding Clark Hill PLC's and his decision to withdraw as counsel for plaintiff.

d. Edward J. Hood
Clark Hill PLC
500 Woodward Avenue
Suite 3500
Detroit, MI 48226
Edward J. Hood has knowledge of the allegations in the complaint and defenses asserted in the answer; the facts and circumstances surrounding the data breach that resulted in the wide-spread and public disclosure of plaintiff's sensitive and confidential personal information; correspondence with plaintiff's counsel about the nature of the data breach and how Clark Hill handle the breach; and the facts and circumstances surrounding Clark Hill PLC's and Thomas K. Ragland's decision to withdraw as counsel for plaintiff.

e.  Dr. Lianchao Han
    Citizen Power Initiatives for China
    415 2nd Street NE
    Suite 100
    Washington, DC 20002
    Dr. Lianchao Han has knowledge of the allegations in the complaint and defenses
    asserted in the answer; the terms and conditions of Clark Hill PLC's and Thomas
    K. Ragland's representation of plaintiff, including requests to protect plaintiff's
    information; the facts and circumstances surrounding the data breach that resulted
    in the wide-spread and public disclosure of plaintiff's sensitive and confidential
    personal information; damages to plaintiff's reputation.

f.  Jianli Yang
    Citizen Power Initiatives for China
    415 2nd Street NE
    Suite 100
    Washington, DC 20002
    Dr. Jianli Yang has knowledge of the terms and conditions of Clark Hill PLC's
    and Thomas K. Ragland's representation of plaintiff.

g.  Joshua Schiller, Esq.
    Boies Schiller Flexner LLP
    55 Hudson Yards, 20th Floor
    New York, NY 10001
    Mr. Schiller has limited knowledge of the facts and circumstances of plaintiff's
    engagement with Clark Hill. The extent of his knowledge is unknown.

h.  Persons involved in the post-hacking investigation, at both Clark Hill and third
    parties whose identities are unknown at this time, who would have knowledge,
    potentially, of what happened, why (cause), and how it might have been
    prevented.

2.      Identify all persons who provided information used to prepare the responses to the

these interrogatories or the responses to Thomas K. Ragland's requests for production, and identify

the respective interrogatory or request to which each person provided information.

ANSWER:  Plaintiff objects on the ground that the interrogatory seeks to invade the attorney-

client privilege and work product privilege. Without waiving the objection, plaintiff and his in-

house counsel, Daniel Podhaskie, provided information used to prepare the answers herein.

4

3.      Identify all persons who communicated with, interacted with, or directed Clark Hill on Plaintiff's behalf in connection with Clark Hill's representation of Plaintiff with respect to Plaintiff's asylum application, including, but not limited to, the discussions leading up to the representation.

ANSWER: *See* answer to interrogatory number 1. Plaintiff, Dr. Han, and Dr. Jianli.

4.      Identify all communications between Plaintiff and his representatives, employees, or agents (including without limitation Lianchao Han, any other employee at Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) about Clark Hill's representation of Plaintiff in U.S. immigration matters, the fact of Plaintiff's asylum application, or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify" all communications. Without waiving these objections, plaintiff has produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill. In addition, plaintiff states that Dr. Han and Dr. Yang had conversations with Mr. Ragland prior to retaining the firm about whether Clark Hill had adequate cyber security. Dr. Han expressly told Mr. Ragland that "he needs to be prepared" for a cyberattack.  In response, Mr. Ragland told Dr. Han, among other things, that the firm had "first class state of the art" cyber technology and used "three outside" cyber security firms to protect client information. Mr. Ragland also advised he would let the Clark Hill "IT people know" about the potential for an attack. Dr. Han repeatedly continued to advise Mr. Ragland that, in Dr. Han's his opinion, the firm did not take the threat serious.

5.      Identify each document or communication that you contend is relevant to the determination of Clark Hill's obligations with respect to safeguarding the information pertaining to Plaintiff's representation.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify each document or communication." Plaintiff will produce trial exhibits in accordance with the Court's scheduling order and governing rules. Without waiving these objections, plaintiff has produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill.

6.     Identify and describe all contracts or agreements between Plaintiff, or Plaintiff's representatives, agents, employees, or other parties acting for Plaintiff's benefit, and Clark Hill or Thomas K. Ragland, including who made the agreement, when the agreement was made, and the substance of the agreement.

ANSWER: Plaintiff entered into a legal services contract with Clark Hill.  Plaintiff has produced a copy of that agreement.

7.     Describe in detail the level of "necessary steps and actions" and "special care and attention to security measures" (*see* Complaint ¶ 35) that Plaintiff contends Clark Hill agreed to implement in order to safeguard the information pertaining to Plaintiff's representation.

ANSWER:  Plaintiff objects to this interrogatory as it calls for a statement or description of the actions and steps required for Clark Hill to satisfy its "duty of care" which is a legal determination. Clark Hill was required to provide adequate security measures to protect plaintiff's information. Clark Hill knew that the representation of plaintiff was in no sense an "ordinary" representation with "ordinary" risks of unauthorized disclosure. Please see answer to interrogatory number 4. Clark Hill, through Mr. Ragland, agreed to take the necessary steps and actions to protect plaintiff's confidential information recognizing that meant the firm would take "more than ordinary" protective efforts, including not putting plaintiff's information on the server or using firm email accounts. Plaintiff will supplement this answer in accordance with the scheduling order governing expert disclosures.

8.      Describe in detail the "necessary and effective electronic security measures" that Plaintiff contends are "sufficient to protect plaintiff's sensitive and confidential information" (*see* Complaint ¶ 8).

ANSWER:  Please see objections and answer to interrogatory number 7.

9.      Identify all communications between Plaintiff or Plaintiff's representatives, employees, or agents (including without limitation Lianchao Han, any other employee at Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) and Clark Hill, including, but not limited to, any communications relating to any warnings or risks of cyber-incidents or "hacks," any special security measures requested by Plaintiff, Plaintiff's publicity of the existence of the asylum application, or any facts contained in the asylum application.

ANSWER: Plaintiff objects to this request as it is overly broad and unduly burdensome to "identify all communications." Without waiving these objections, plaintiff has produced all relevant non-privileged correspondence among plaintiff, his agent, and Clark Hill. Please see answer to interrogatory number 4.

10.     State the basis for the allegation in paragraph 35 of the Complaint that Clark Hill "was on full notice" prior to agreeing to represent Plaintiff "that special care and attention to security measures were necessary, required, expected, and agreed-to by the firm."

ANSWER: See answer to interrogatory number 4. Plaintiff and Dr. Han informed Clark Hill that the CCP would try to hack the firm to obtain plaintiff's sensitive and confidential information. Mr. Ragland agreed not to use the firm's server to store or transmit plaintiff's sensitive information over the firm's email accounts, and even warned his IT group that such an attack was possible.

11.     State the basis for the allegation in paragraph 3 of the Complaint that Clark Hill "assured" Plaintiff that his confidential information would be "protected."

ANSWER: Mr. Ragland assured plaintiff and his agents that the firm had state-of-the-art cybersecurity, three different outside firms which protect client information, and would protect plaintiff's information by using a separate computer, not placing it on the firm server or using the firm's email accounts.

12.     Describe the circumstances around the decision to publicize, via social media and news media, the fact of Plaintiff's asylum application and the fact of Clark Hill's representation of Plaintiff, including who made the decision, when the decision was made, who was aware of the decision before the publicity took place, and the reasons for the decision.

ANSWER:  Plaintiff objects to the characterization that there was a decision to "publicize" the asylum application. Plaintiff further objects on relevance grounds and because this interrogatory invades the attorney-client privilege. Without waiving these objections, plaintiff was informed that others (presumably the CCP) knew he was seeking asylum. Plaintiff spoke to Mr. Ragland about making an announcement. Mr. Ragland thereafter gave interviews to numerous outlets regarding plaintiff's asylum application.

13.     Identify any communication between Plaintiff or Plaintiff's representatives, employees, or agents (including without limitation Lianchao Han, any other employee of Initiatives for China, Jianli Yang, Josh Schiller, or any other attorney or employee of Boies Schiller Flexner LLP) and any third party regarding Clark Hill's representation of Plaintiff, including, but not limited to, the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

8

ANSWER: Plaintiff objects to this interrogatory on the grounds it is overly burdensome in that it seeks to have plaintiff "identify any communication." The interrogatory also is duplicative of several other interrogatories. Without waiving these objections, plaintiff has produced all relevant non-privileged communications.

14.     Identify any posting or communication by Plaintiff or Plaintiff's representatives, agents, or employees on any internet or social media platform or outlet, including without limitation YouTube, Twitter, Facebook, Instagram, WhatsApp, SnapChat, or TikTok regarding the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Plaintiff objects on relevance grounds. Without waiving the objection, plaintiff's twitter account was disabled, and he no longer has access to it. Plaintiff's YouTube account does not appear to reference his asylum application.

15.     Identify any social media accounts or profiles, including without limitation YouTube usernames, accounts, or "channels," Facebook profiles, or Twitter "handles," currently used or previously used by Plaintiff, through which Plaintiff posted or disseminated, or caused to be posted or disseminated, any statements, postings, or opinions regarding the Chinese government, the Chinese Communist Party, the filing of Plaintiff's asylum application, Clark Hill's representation of Plaintiff, the facts contained in the asylum application or the cyber incident on or about September 12, 2017.

ANSWER: Please see objections and answer to the previous interrogatory. Plaintiff further objects on the ground that this interrogatory is unduly burdensome. Without waiving those objections, plaintiff has a YouTube account and a GTV platform containing a substantial number of videos

discussing the CCP and the Chinese government. Again, plaintiff is not aware of any reference on either of those two social media platforms of any reference to his asylum application.

16.    Identify the persons to whom Plaintiff "disclosed a broad network of CCP spies operating in the United States," and when such disclosure took place, as alleged in paragraph 20 of the Complaint.

ANSWER: Plaintiff objects on relevance grounds, as plaintiff's disclosures are not reasonably calculated to lead to admissible evidence about defendants' failure to protect his confidential information.

17.    Identify all information that was contained in Plaintiff's asylum application which Plaintiff contends was confidential before September 12, 2017 and state the basis for that contention.

ANSWER:  The contents of plaintiff's asylum application were confidential, including names, identifying information, addresses, passport information, family information, information plaintiff had provided to the US government, and details of his commercial and other dealings. Clark Hill has these documents and plaintiff produced them as well.

18.    Describe in detail the basis for the allegations, in paragraphs 3, 5, 9, 44, 57, and 59 of the Complaint, that information about Plaintiff or Plaintiff's asylum application published and disseminated on social media after September 12, 2017 was acquired in the cyber-incident on or about September 12, 2017.

ANSWER:  Plaintiff objects because the interrogatory is vague and confusing. Without waiving the objection, plaintiff's asylum application was published on social media after Clark Hill failed to adequately protect it.

19.     Describe in detail the damages that Plaintiff has allegedly suffered as a result of Clark Hill's alleged breach of legal duties and obligations, including the allegations in paragraph 56 of the Complaint of "damages to his personal and professional reputation," "lost substantial business opportunities," and the "costs and expenses" he has incurred.

ANSWER: Plaintiff has suffered damages in a variety of contexts, including, but not limited to, the following: Plaintiff entered into a consulting agreement with ACA Capital Group Limited ("ACA") in August 2016 (the "Consulting Agreement"). ACA aims to serve as the bridge connecting world-class businesses and innovative ideas between Asia and the world, while optimizing financial returns for its investors. ACA hired plaintiff as a consultant because of his reputation in the Asian business community; his knowledge and expertise of doing business throughout the world, but in particular China and Hong Kong; and because plaintiff had the ability to make introductions to numerous business executives in China and Hong Kong. The Consulting Agreement provided that plaintiff would be paid approximately $2 million per year. The Consulting Agreement did not have a fixed term and was expected to be ongoing. In November 2017, ACA terminated the Consulting Agreement because it learned that Clark Hill was hacked and plaintiff's very private and sensitive information was spread throughout the internet on a world-wide basis.  Plaintiff was informed by ACA that it terminated the Consulting Agreement because of the company's fears that continuing its relationship with plaintiff would result in a loss of clients and future business and could result in ACA suffering a hack similar to Clark Hill.

Plaintiff had other contractual arrangements with ACA worth several million dollars which were negatively affected by defendants' conduct.

Plaintiff also suffered reputational damage, including followers on social media, which caused financial and other injury, and diminished plaintiff's earning capacity.

11

Plaintiff will supply additional information regarding these injuries.

20.     Identify all businesses associated with Plaintiff that Plaintiff alleges has experienced harm as a result of the cyber-incident that occurred on or about September 12, 2017, or as a result of Clark Hill's alleged misconduct, and describe in detail the nature of the harm, including the basis for the allegation in paragraph 56 of the Complaint that Plaintiff has "lost substantial business opportunities," and incurred "costs and expenses."

ANSWER: See answer to interrogatory number 19.

21.     Describe in detail what has occurred in any proceedings in connection with Plaintiff's asylum application since September 19, 2017, including without limitation the basis for the allegation in paragraph 56 of the Complaint that Plaintiff's efforts to obtain political asylum have been delayed or otherwise harmed as a result of Clark Hill's alleged breach of legal duties and obligations, including Clark Hill's withdrawal from representing Plaintiff.

ANSWER: The disclosure of plaintiff's confidential asylum application has created delay because of the negative publicity surrounding the incident, Clark Hill's withdrawal as counsel for plaintiff, and the publication of plaintiff's sensitive, confidential, and private matters, some of which involve sensitive national security issues.

22.     Describe in detail the alleged harm or persecution that Plaintiff has suffered as a result of actions by or on behalf of the Chinese government or the Chinese Communist Party before the cyber incident on or about September 12, 2017, including the basis for Plaintiff's "good reason to fear for his personal safety" as described in paragraph 16 of the Complaint, the basis for the allegation in paragraph 17 of the Complaint that "the CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associates with it and acting on its behalf," the basis for the allegations in paragraph 23 of the

Complaint that demonstrations outside the building where Plaintiff resides were "staged" by the CCP, and the basis for the allegations in paragraph 26 of the Complaint that "the CCP perceives plaintiff as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP."

ANSWER: Plaintiff has been effective in influencing international opinion with respect to China and the CCP. From the perspective of the CCP, plaintiff's activities and advocacy have affected adversely China's and the CCP's stature in the world community and, in response, the Chinese government has attempted to silence plaintiff. The Chinese government/CCP has employed various tactics, including coercion and offering bribes to attempt to silence plaintiff, including, using overseas intelligence networks to seek to discredit, silence, and threaten plaintiff's personal safety or, at the very least, to cause plaintiff to have good reason to fear for his personal safety as well as fearing for the safety of family members and friends.

The CCP believes plaintiff presently holds not publicly known proof of various types of improper conduct on the part of the CCP and those associated with it and acting on its behalf, including information relating to corruption, murder, hiding of illegally-gained money, and China's spy network. For these and other reasons, the Chinese government and the CCP are highly motivated, to understate the matter, and engaged aggressively in seeking to silence plaintiff. The Chinese government and the CCP are equally motivated and engaged in seeking to learn what plaintiff knows about improper activities undertaken by or on behalf of the Chinese government and the CCP. And, perhaps most critically, the Chinese government and the CCP have the capabilities – the "operational reach" – to carry out aggressive hostile actions against plaintiff.

The Chinese government and/or the CCP sent agents and officials to the United States to organize demonstrations aimed directly against plaintiff outside the building in New York City

where plaintiff resides.  Persons attending these CCP-staged demonstrations, literally on plaintiff's front steps, were provided with preprinted signs defaming plaintiff in vile language, calling him a rapist and a liar, and urging plaintiff to leave the United States.

Plaintiff believes that the CCP perceives him as a dangerous challenge to the stability, legitimacy, and credibility of the Chinese regime and the CCP.

23.   Describe in detail any harms that Plaintiff has suffered at the hands of or caused by the Chinese government that have occurred after the cyber-incident on or about September 12, 2017, including the basis for allegations in paragraph 56 of the Complaint, that "plaintiff's personal safety and security have been put at risk," "his family has been arrested and threatened," and "plaintiff's employees in China have been harassed," and the basis for the allegations in paragraph 58 of the Complaint that "plaintiff's freedom and liberty to travel" has been "limit[ed] and that "his personal safety" has been "jeopardize[ed]" as a result of Clark Hill's alleged breach of legal duties and obligations.

ANSWER: Objection. This interrogatory is duplicative. Without waiving this objection, see answer numbers 19, 22, and other information contained in prior interrogatories, of which this interrogatory is duplicative.

24.   Identify any person who, after September 12, 2017, has used Plaintiff's information that Plaintiff alleges was obtained in the cyber-incident, identify what specific information was used, and explain how the information was used.

ANSWER: See answer number 23.

25.   Describe in detail the process and methodology that Plaintiff utilized to search for, identify, and locate the documents that Ragland requested in his first request for production of documents, including the date that Plaintiff began preserving documents related and relevant to

14

this litigation, the scope and method of preserving documents, all persons or custodians who were asked to search for and produce responsive documents, and the search terms used to search electronically stored information.

ANSWER:  Plaintiff searched his own information, and collected information from his agents which was thereafter produced to defendants.

Respectfully Submitted,

/s/*Ari S. Casper*
Ari S. Casper
Ralph S. Tyler
The Casper Firm, LLC
400 East Pratt St., Suite 903
Baltimore, MD 21202
Tel: 410-989-5097
acasper@casperfirm.com

*Attorneys for Plaintiff*

## VERIFICATION

The facts stated herein are true and accurate to the best of my knowledge, information, and belief.

Guo Wengui

$\nu\partial\nu$ - 7.20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of July 2020, the foregoing was served to the

following by email:

John R. Storino (*via pro hac vice*)
Leigh J. Jahnig  (*via pro hac vice*)
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654-3456
JStorino@jenner.com
ljahnig@jenner.com

Kali N. Bracey (#458965)
JENNER & BLOCK, LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
KBracey@jenner.com

*/s/ Ari S. Casper*
Ari S. Casper

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GUO WENGUI a/k/a MILES KWOK,          )
                                      )
          Plaintiff,                  )
                                      )          Civil Action No. 1:10-CV-3195-JEB
          v.                          )
                                      )          Hon. James Boasberg
CLARK HILL PLC and THOMAS K.          )
RAGLAND,                              )
                                      )
          Defendants.                 )
                                      )
                                      )

## **PROPOSED ORDER**

The Court having considered the Defendants' Motion to Compel Deposition Testimony or, in the Alternative, for a Negative Inference hereby ORDERS that:

1.      Plaintiff answer the questions Plaintiff refused to answer at his July 26, 2021 Deposition on the basis of his Fifth Amendment rights.

2.      Or in the alternative, the Court will give the jury instruction permitting a negative inference to cure the prejudice that would result from Plaintiff's refusal to answer the questions.


IT IS SO ORDERED.



ENTERED this _____ day of September, 2021.

                                        _____
                                        Honorable James Boasberg
                                        United States District Judge

## **EXHIBIT 9**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GUO WENGUI,

    **Plaintiff,**

    **v.**

                         Civil Action No. 19-3195 (JEB)

CLARK HILL PLC, *et al.*,

    **Defendants.**

<u>**MEMORANDUM OPINION**</u>

Unknown hackers exposed Plaintiff Guo Wengui's personal information to the public after breaching the servers of Defendant Clark Hill PLC, the law firm that had been preparing his application for asylum in the United States. Guo is a prominent critic of the Chinese Communist Party, and both sides assume that the Chinese government was behind the attack. In this Motion, Defendants Clark Hill and firm attorney Thomas K. Ragland (jointly, Clark Hill) ask the Court to compel Guo to answer deposition questions for which he asserted his Fifth Amendment privilege. Because there is at least some possibility that Guo's responses could be incriminating, the Court will deny the Motion. While a negative inference may be available to Clark Hill at some point in this litigation, the Court will not decide that issue here.

**I. Background**

Clark Hill conducted a 10-hour deposition of Plaintiff, which is documented in a 286-page transcript with 16 exhibits. <u>See</u> ECF No. 69 (Pl. Opp.) at 1, 3. During that deposition, Guo's counsel in his ongoing investigations (as opposed to counsel in this lawsuit) advised him to refuse to answer a number of questions by asserting his Fifth Amendment right against self-

1

incrimination.  See ECF No. 67-1 (Def. Mot.) at 1.  Guo heeded that advice and withheld

answers to "approximately 28 questions on a variety of topics," which Defendants bundle into

five categories:

- Plaintiff's "alleged consulting relationship with ACA Capital Group Limited";

- Plaintiff's past litigation where he "alleged emotional harm during the same period at
  issue in this case and litigation Guo has pursued through his entities";

- Plaintiff's "relationship with T&M Protection Resources";

- Plaintiff's "asylum application"; and

- Plaintiff's "wealth and assets."

Id. at 3–4.  Plaintiff did not refuse to answer all questions in these categories, however.  For

some, he declined to answer only to the extent that they bore on his "affiliation with any entity"

or were "economic or business[ ]related."  ECF No. 67-2, Exh. A (Tbl. of Pl. Invocations of Fifth

Amend.), Nos. 6–7.

In moving to compel, Clark Hill asserts that Guo's testimony is not protected by the Fifth

Amendment and that his answers to the questions are "centrally relevant" to the issue of damages

in this case.  See Def. Mot. at 4; see also ECF No. 71 (Def. Repl.) at 1.  It asks the Court to

compel Guo to answer or, in the alternative, to "authorize the giving of a jury instruction

permitting a negative inference from Guo's refusal to answer."  Def. Mot. at 2.  Guo's

investigations counsel submitted an *ex parte*, *in camera* declaration outlining his reasons for

advising Guo to invoke the privilege.  The Court subsequently held an *ex parte* telephonic

conference with both Plaintiff's counsel in this suit and his investigations counsel, where it asked

for further explanation for why Defendants' questions would require answers that would violate

Guo's Fifth Amendment rights.

## II.    Legal Standard

Rule 37 of the Federal Rules of Civil Procedure entitles parties to "move for an order compelling an answer" in the event that "a deponent fails to answer a question asked under Rule 30 or 31." Rules 30(a)(2) and 31(a)(2) require a court to grant leave for oral and written depositions, respectively, "to the extent consistent with Rule 26(b)(1)." Rule 26(b)(1), in turn, sets the "scope of discovery . . . as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." The question here is whether Defendants' deposition questions "regard[] matter[s]" subject to the privilege of the Fifth Amendment.

## III.   Analysis

Clark Hill argues that the Fifth Amendment does not protect Guo's silence for two reasons. First, it maintains that he "articulated no basis for asserting" the Fifth Amendment privilege and that "some of the topics have no conceivable ability to incriminate him." Def. Mot. at 2. Second, it contends that even if the privilege applied, "Guo waived the privilege over some or all of the[] topics with his prior allegations and discovery answers." Id. The Court considers each of these two arguments before turning to Defendants' alternative request for a jury instruction permitting a negative inference from Guo's refusal to answer.

### A.    Fifth Amendment Privilege

The Fifth Amendment protects a witness from being forced to give testimony in a civil case when he "reasonably believes" that such testimony could be used against him "in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v. United States, 406 U.S. 441, 444–45 (1972); see also Ohio v. Reiner, 532 U.S. 17, 21 (2001). To successfully invoke the privilege, Guo has the burden of proving that he faces a threat of self-incrimination

3

that is "real" and "not remote or speculative." <u>District Title v. Warren</u>, 265 F. Supp. 3d 17, 21

(D.D.C. 2017) (citing <u>Zicarelli v. N.J. State Comm'n of Investigation</u>, 406 U.S. 472, 478

(1972)); <u>SEC v. Parkersburg Wireless Ltd. Liability Co.</u>, 156 F.R.D. 529, 535 (D.D.C. 1994); <u>see</u>

<u>also</u> <u>Hoffman v. United States</u>, 341 U.S. 479, 486 (1951) (more than witness's "say-so" is

required to establish that privilege applies).

     Nevertheless, because the Fifth Amendment privilege "must be accorded liberal

construction in favor of the right it was intended to secure," <u>Hoffman</u>, 341 U.S. at 486, the Court

may compel Guo to testify only if it "clearly appears" that he is at no risk of self-incrimination.

<u>Id.</u>; <u>cf.</u> <u>id.</u> at 488 (must be "<u>perfectly clear</u> . . . that the answer(s) <u>cannot possibly</u> have . . . [a]

tendency to incriminate"). With the above considerations in mind, the Court must use its

"personal perception[s] of the peculiarities of the case," <u>id.</u> at 487 (internal citation omitted), to

individually evaluate the applicability of the privilege for each question that Guo refused to

answer. See <u>Reese</u>, 561 F.2d at 900; <u>see also</u> <u>District Title</u>, 265 F. Supp. 3d at 22.

     After reviewing the *ex parte* declaration and hearing from Guo's investigations counsel,

the Court believes that Plaintiff has successfully carried the burden of establishing that there is a

possibility that his answers would be incriminating. Because the factual basis of that decision is

under seal, however, the Court may not elaborate further on the particulars of Guo's decision.

     Defendants' conclusory arguments that "there is no plausible basis for Guo to fear

prosecution based on questions about his wealth, personnel, and residences" and that "questions

concerning his activities in China" cannot possibly "implicate him in prosecution within the

United States" miss the mark. See Def. Mot. at 8. The Court is sympathetic to the fact that

"Clark Hill has no basis to understand why Guo thinks answering Clark Hill's questions would

incriminate him" because the details underlying his fear were submitted *in camera*. See ECF

No. 71 (Def. Repl.) at 2. That imbalance, however, stems from the nature of the Fifth

Amendment privilege. See Anton v. Prospect Cafe Milano, Inc., 233 F.R.D. 216, 218 (D.D.C.

2006) (citing Reese, 561 F.2d at 900) (courts may not force witness to testify to reasonableness

of his fear of persecution).

Clark Hill also fails in its attempt to frame the inquiry as a question of whether Plaintiff's

answers "would be incrementally incriminating" given his previous statements on related topics.

See Def. Mot. at 6. The "further incriminat[ion]" standard, which is less deferential to the party

invoking the privilege, only applies after waiver of the privilege has been established. See

Parkersburg Wireless, 156 F.R.D. at 535 & n.10 (explaining that Rogers v. U.S., 340 U.S. 367

(1951), intended wider scope of inquiry to be available after waiver than before) (internal

citations omitted). It, accordingly, has no bearing on the question of whether the privilege

attaches in the first place. Id. at 535 n.10 ("In determining whether a new question 'further

incriminates' [the] defendant, the Court should not apply the same rigid test used to determine

whether the privilege could be initially invoked.").

Having reviewed the individual questions at issue, the Court finds that each has a

sufficient nexus to topics where Guo has a reasonable fear that he could be exposed to criminal

liability. The Fifth Amendment privilege thus attaches, unless Defendants can prove waiver.

B.     Waiver

A witness waives his Fifth Amendment privilege by "voluntarily rais[ing]" an

incriminating issue. Id. at 535 (citing Rogers, 340 U.S. at 373). Federal courts "have universally

held that a 'testimonial waiver is not to be lightly inferred and the courts accordingly indulge

every reasonable presumption against finding a testimonial waiver.'" In re Vitamins Antitrust

Litigation, 120 F. Supp. 2d 58, 66 (D.D.C. 2000) (quoting Klein v. Harris, 667 F.2d 274, 287 (2d

Cir. 1981)); see also Smith v. United States, 337 U.S. 137, 150 (1949). "Traditionally, courts have only inferred a waiver of the Fifth Amendment's privilege against self-incrimination from a witness's prior statements if [both]: '(1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the Fifth Amendment's privilege against self-incrimination.'" In re Vitamins Antitrust Litigation, 120 F. Supp. 2d at 66 (quoting Klein, 667 F.2d at 287).

As discussed above, Clark Hill groups the unanswered questions into five categories: (1) Guo's relationship with ACA Capital; (2) his past litigation involving allegations of emotional harm; (3) his relationship with T&M Protection Resources; (4) his asylum application; and (5) his wealth and assets. See Def. Mot. at 3–5. Defendants posit that Guo voluntarily provided information in each of these categories. Id. at 5–6. They further assert that the unanswered questions "are highly relevant to [their] defense." Def. Repl. at 2. Because the questions implicate Guo's Fifth Amendment privilege, however, the inquiry is not whether his answers would be "relevant." Rather, for this Court to infer waiver, Guo's previous testimony must satisfy the two-part test outlined above. See In re Vitamins Antitrust Litigation, 120 F. Supp. 2d at 67. This is not the case here.

For questions in category (1), Defendants insist that they "must be able to challenge the notion that Guo's reputation was harmed and his relationship with ACA goes directly to that." Def. Repl. at 3. For category (4), they argue that "[t]o the extent Guo was untruthful on [his asylum] application or now gives statements inconsistent with it, that goes directly to his credibility and claims in the case." Id. Those are persuasive arguments that the unanswered questions would be relevant to Clark Hill's defense, but they do not establish that Guo's prior

statements will leave the factfinder with a distorted view of events. The Fifth Amendment often insulates details that would be helpful to a party's case, so Defendants must prove more. As for category (3), Guo's statements in different lawsuits cannot constitute waiver in this matter. See In re Vitamins Antitrust Litigation, 120 F. Supp. 2d at 66 ("[M]ost courts that have considered this issue have held that the waiver of the privilege against self-incrimination in one proceeding does not affect the right of a witness or accused to invoke the privilege as to the same subject matter in another independent proceeding, but is limited to the proceeding in which it occurs."). And for categories (2) and (5), Defendants point to nothing in Plaintiff's prior testimony that could be construed as a waiver for such broad categories as his "relationship with T&M Protection" or his "wealth and assets." See Def. Mot. 6–7.

A trial court must "'strive to accommodate a party's Fifth Amendment interests' while at the same time being careful to 'ensure that the opposing party is not unduly disadvantaged.'" In re Vitamins Antitrust Litigation, 120 F. Supp. 2d at 66–67 (quoting Serafino v. Hasbro, Inc., 82 F.3d 515, 518 (1st Cir. 1996)). Here, the balance of those competing considerations weighs in favor of preserving Plaintiff's constitutional right. The Court thus finds that his previous testimony did not waive his Fifth Amendment privilege.

C.    Negative Inference

As a fallback, Defendants argue that the Court must at the least order that the jury should draw a negative inference from Guo's invocation of the privilege. See Def. Mot. at 8–10; Def. Repl. at 5. Courts may indeed draw an adverse inference against a civil litigant who successfully invokes his Fifth Amendment privilege. SEC v. Whittemore, 659 F.3d 1, 12 (D.C. Cir. 2011), aff'g 691 F. Supp. 2d 198 (D.D.C. 2010). Such inference is appropriate when a party to a civil proceeding "refuse[s] to testify in response to probative evidence offered against [him]." SEC v.

7

Int'l Loan Network, Inc., 770 F. Supp. 678, 695 (D.D.C. 1991), aff'd, 968 F.2d 1304 (D.C. Cir. 1992) (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)).  Since Guo "control[s] the evidence" that Clark Hill seeks, an adverse inference may be particularly warranted.  See Whittemore, 691 F. Supp. 2d at 206.  A factfinder may also consider Guo's silence when later evaluating his credibility.  Latif v. Obama, 666 F.3d 746, 759 (D.C. Cir. 2011).  Such silence, however, "should be 'given no more evidentiary value than [i]s warranted by the facts surrounding his case.'"  Int'l Loan Network, Inc., 770 F. Supp. at 695 (alteration in original) (quoting Baxter, 425 U.S. at 318); cf. Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1266 (9th Cir. 2000) (rejecting adverse inference from party's refusal to provide results of unreliable medical test that would not have been admissible as evidence).  An adverse inference is thus likely warranted here.

While this may be so, the Court finds it premature to decide on the precise wording of a jury instruction at this stage.  The better course is to wait until hearing the parties' arguments and the evidence introduced.  In addition, if Defendants believe that a negative inference would be relevant and appropriate at summary judgment, they may so indicate in that briefing.

## IV.  Conclusion

Because Plaintiff has sufficiently shown that answering Defendants' questions could put him at risk of criminal liability, the Court will deny their Motion to compel his deposition testimony.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 25, 2021

**EXHIBIT 10**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GUO WENGUI,

    **Plaintiff,**

        v.

CLARK HILL PLC, *et al.*,

    **Defendants.**

Civil Action No. 19-3195 (JEB)

<u>**ORDER**</u>

    For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that Defendants' Motion to Compel is DENIED.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: <u>October 25, 2021</u>

1

## Exhibit 11

This exhibit has been filed under seal.

**<u>EXHIBIT 12</u>**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GUO WENGUI,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 19-3195 (JEB)** |
| **CLARK HILL PLC, *et al.*,** | |
| **Defendants.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Guo Wengui's suit alleges that Defendant Clark Hill PLC, a law firm, and its attorney Thomas Ragland are liable for legal malpractice, breach of fiduciary duty, and breach of contract stemming from the firm's failure to safeguard Plaintiff's asylum materials from hacking and its subsequent withdrawal as his counsel. See ECF No. 1-1 (Complaint). On February 20, 2020, the Court granted in part and denied in part Defendants' Motion to Dismiss, tossing Guo's counts "to the extent they rely on the theory that Defendants' withdrawal constituted a legally remediable wrong, but . . . permit[ting] those claims to go forward that allege misrepresentations surrounding and mishandling of his confidential information." Guo Wengui v. Clark Hill, PLC, 440 F. Supp. 3d 30, 33 (D.D.C. 2020). The Court so held because "Plaintiff ha[d] not sufficiently pled that Defendants' [withdrawal], even if improper, damaged or prejudiced him." Id. at 41. Armed with a recent psychiatrist's report purporting to show injury from the withdrawal, Guo now seeks twenty months later to reinstate his withdrawal-based claims. See ECF No. 72-1 (Motion to Revise Order). As discovery has since closed, Guo's delay and the resulting prejudice to Defendants dictate denial of the Motion.

## I.     Legal Standard

Because Plaintiff seeks reconsideration of an interlocutory order dismissing the case in part, Federal Rule of Civil Procedure 54(b) governs the Court's analysis.  See Prince George's Hospital Center v. Advantage Healthplan Inc., 985 F. Supp. 2d 38, 42 (D.D.C. 2013) ("Rule 54(b) is the appropriate procedural mechanism for reconsideration where, as here, the challenged order grants in part and denies in part a defendant's motion to dismiss, and therefore does not constitute a final judgment.").  "The standard of review for interlocutory decisions differs from the standards applied to final judgments under Federal Rules of Civil Procedure 59(e) and 60(b)."  Williams v. Savage, 569 F. Supp. 2d 99, 108 (D.D.C. 2008).  Plaintiff has a lower bar to clear, as "reconsideration of an interlocutory decision is available under the standard 'as justice requires.'"  Judicial Watch v. Dep't of Army, 466 F. Supp. 2d 112, 123 (D.D.C. 2006); accord Lemmons v. Georgetown Univ. Hosp., 241 F.R.D. 15, 21–23 (D.D.C. 2007).

The "as justice requires" standard may be met where, for example, the court "has patently misunderstood" the parties, strayed far afield of the issues presented, or failed to consider "a controlling or significant change in the law or facts . .  since the submission of the issue."  See Cobell v. Norton, 224 F.R.D. 266, 272 (D.D.C. 2004) (internal citations and quotation marks omitted).  "These considerations leave a great deal of room for the court's decision, and, accordingly, the 'as justice requires' standard amounts to determining 'whether [relief upon] reconsideration is necessary under the relevant circumstances.'"  Lewis v. Dist. of Columbia, 736 F. Supp. 2d 98, 102 (D.D.C. 2010) (quoting Cobell, 224 F.R.D. at 272).  A court's discretion under Rule 54(b), however, is "limited by the law of the case doctrine and subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  Singh v. George Washington Univ.,

383 F. Supp. 2d 99, 101 (D.D.C. 2005) (internal quotation marks omitted) (quoting *In re* Ski Train Fire in Kaprun, Austria, on Nov. 11, 2004, 224 F.R.D. 543, 546 (S.D.N.Y. 2004)).

## II.  Analysis

In asking the Court to revisit its prior ruling, Plaintiff cites "important new information which was not previously available."  Mot. at 2.  In particular, he notes that he "recently (on October 4, 2021) obtained a report from a board certified psychiatrist which details plaintiff's significant withdrawal-caused harm."  Id. (footnote omitted).  Defendants, in response, raise a bevy of objections.  The Motion is futile, they contend, as their "withdrawal cannot give rise to a claim because, under the D.C. Rule[s] of Professional Conduct, Clark Hill had a legal right to withdraw."  ECF No. 79-1 (Opp.) at 8–9.  In addition, they suggest that a plaintiff cannot recover emotional-distress damages in such a circumstance absent a physical injury.  Id. at 9–10.  Even if Guo's proposed new claims are facially plausible, they continue, his delay is reason enough to deny the Motion, the granting of which would also prejudice Defendants.  Id. at 10–14.  Agreeing with the last points, the Court need not pursue the merits.

As to delay, the Court issued its decision in February 2020, almost 20 months before Guo filed the instant Motion.  His only rejoinder to the delay accusation is to flag the psychiatrist's recent report.  While the report may be new, he has been aware of his distress since the onset of the suit.  After all, it is his own distress.  See Klayman v. Judicial Watch, Inc., 296 F. Supp. 3d 208, 215 (D.D.C. 2018) ("Plaintiff would have been intimately aware of the facts that caused his alleged distress at the time that the distress was caused.").  All discovery except that for experts has closed, furthermore, meaning that Guo's request comes at the eleventh hour.  Finally, if the route Guo had wanted to pursue was amending his Complaint, the deadline for that was July 1, 2020, over fifteen months before he filed his Motion.  See Minute Order of April 21, 2020.  The

delay alone strongly weighs against Plaintiff.  See Trudel v. SunTrust Bank, 924 F.3d 1281, 1288 (D.C. Cir. 2019) ("'[U]ndue delay' is a valid ground for denying leave to amend."); Elkins v. District of Columbia, 690 F.3d 554, 565 (D.C. Cir. 2012) ("Undue delay is a valid reason to reject a party's attempt to add a new theory of liability to a complaint").

In order to be dispositive, however, delay must frequently be coupled with prejudice, see Atchinson v. District of Columbia, 73 F.3d 418, 426 (D.C. Cir. 1996) (noting that courts "should generally take into account . . . the possibility of any resulting prejudice"), and it is here. Defendants explain that they have pursued discovery and shaped their case with the expectation that emotional-distress damages would only be recoverable for the hack, not the withdrawal.  To permit Plaintiff to suddenly reverse field and open up an entirely new category of damages would be unfair to them and the tactics they have chosen.  See 6 Charles A. Wright & Arthur R. Miller et al., Federal Practice and Procedure § 1487 (3d ed. 2021) ("[I]f the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial.").  The Court believes this particularly true here where Plaintiff, after initially pursuing economic damages, has dropped that request, in part apparently because he was obliged to assert the Fifth Amendment in response to questions about his businesses.  In addition, the Court has growing concerns about his ability to prove the cause of his distress damages given that he has filed no fewer than ten suits in the last few years seeking such damages from varied defendants in assorted incidents.  See Opp. at 12 n.1.

For all of these reasons, no expansion of his Complaint will be permitted here, and he shall proceed on damages from the hack alone.

## III. Conclusion

The Court, accordingly, ORDERS that Plaintiff's Motion for Reconsideration is DENIED.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: <u>November 9, 2021</u>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------x
                                                   :
In re:                                             :    Chapter 11
                                                   :
HO WAN KWOK *et al.*,                              :    Case No. 22-50073 (JAM)
                                                   :
                        Debtors.[1]                :    Jointly Administered
                                                   :
---------------------------------------------------x

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 28, 2023, the foregoing Motion, and all

declarations, exhibits and attachments thereto, was electronically filed.  Notice of this filing was

sent by e-mail to all parties to the above-captioned chapter 11 case by operation of the Court's

electronic filing ("CM/ECF") system or by mail to anyone unable to accept electronic filing as

indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's

CM/ECF system.

Dated:      April 28, 2023
            New Haven, Connecticut          By: */s/ Douglas S. Skalka*
                                                 Douglas S. Skalka (ct00616)
                                                 Patrick R. Linsey (ct29437)
                                                 NEUBERT, PEPE & MONTEITH, P.C.
                                                 195 Church Street, 13th Floor
                                                 New Haven, Connecticut 06510
                                                 (203) 781-2847
                                                 dskalka@npmlaw.com
                                                 plinsey@npmlaw.com

                                                 *Counsel for the Chapter 11 Trustee*

---

[1]   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
      Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
      Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The
      mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings
      LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok
      (solely for purposes of notices and communications).