```
                    UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF CONNECTICUT
                        BRIDGEPORT DIVISION

In Re                         *   Case No. 22-50073 (JAM)
                              *
HO WAN KWOK and GENEVER       *
 HOLDINGS CORPORATION,        *   Bridgeport, Connecticut
                              *   April 27, 2023
              Debtor.         *
                              *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

                         TRANSCRIPT OF
#1675   APPLICATION FOR APPROVAL TO/APPLICATION OF TRUSTEE,
        PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) and 328,
        BANKRUPTCY RULES 2014(a) and 2016 and Local Rule 2014
        FOR ENTRY OF ORDER AUTHORIZING EMPLOYMENT AND
        RETENTION OF EDMISTON AND COMPANY LIMITED AS BROKER
        FOR SALE OF LADY MAY AND LADY MAY II
#1696   MOTION OF CHAPTER 11 TRUSTEE, PURSUANT TO BANKRUPTCY
        CODE SECTION 363(b) FOR ENTRY OF ORDER AUTHORIZING
        (I) MOVING LADY MAY TO NAVIGABLE WATERS OF RHODE
        ISLAND AND (II) ENTRY INTO AND PERFORMANCE UNDER
        NEWPORT DOCKAGE AGREEMENT
#1704   AMENDED ORDER SETTING STATUS CONFERENCE
            BEFORE THE HONORABLE JULIE A. MANNING
               UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Chapter 11           G. ALEXANDER BONGARTZ, ESQ.
 Trustee:                    Paul Hastings, LLP
                             200 Park Avenue
                             New York, NY  10166

                             DOUGLAS S. SKALKA, ESQ.
                             Neubert Pepe & Monteith, PC
                             195 Church Street
                             New Haven, CT  06510




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES: (Cont'd)

| | |
|---|---|
| Chapter 11 Trustee: | LUC A. DESPINS, ESQ.<br>Paul Hastings<br>200 Park Avenue<br>New York, NY  10166 |
| For the U.S. Trustee: | HOLLEY L. CLAIBORN, ESQ.<br>Office of the United States<br>  Trustee<br>The Giaimo Federal Building<br>150 Court Street, Room 302<br>New Haven, CT  06510 |
| For the Debtor and<br> Plaintiff, HK<br> International and Mei Guo: | ERIC A. HENZY, ESQ.<br>Zeisler & Zeisler, PC<br>10 Middle Street, 15th Floor<br>Bridgeport, CT  06604 |
| For the Debtor: | WILLIAM BALDIGA, ESQ.<br>Brown Rudnick<br>601 13th Street NW, Suite 600<br>Washington, DC  20005 |
| For Rui Ma, Weican Meng,<br> Zheng Wu, and Official<br> Committee of Unsecured<br> Creditors: | KRISTIN MAYHEW, ESQ.<br>Pullman & Comley, LLC<br>850 Main Street, 8th Floor<br>P.O. Box 7006<br>Bridgeport, CT  06601 |

1          (Proceedings commenced at 1:05 p.m.)

2                THE COURTROOM DEPUTY:  No. 22-50073, Ho Wan Kwok.

3                THE COURT:  Good afternoon.  If we could have

4     appearances for the record starting with the Chapter 11

5     Trustee, please.

6                MR. DESPINS:  Good afternoon, Your Honor.  Luc

7     Despins, Chapter 11 Trustee.

8                MR. BONGARTZ:  Good afternoon, Your Honor.  Alex

9     Bongartz of Paul Hastings for the Chapter 11 Trustee.

10               MR. SKALKA:  Good afternoon, Your Honor.  Douglas

11    Skalka of Neubert, Pepe & Monteith as local counsel for the

12    Chapter 11 Trustee.

13               MS. CLAIBORN:  Good afternoon.  Holley Claiborn

14    for the U.S. Trustee.

15               MS. MAYHEW:  Good afternoon, Your Honor.  Kristen

16    Mayhew, Pullman & Comley, on behalf of the Creditors

17    Committee.

18               MR. HENZY:  Eric Henzy, Zeisler & Zeisler, for the

19    debtor and also for Mei Guo and HK.

20               MR. BALDIGA:  Good afternoon, Your Honor.  William

21    Baldiga, Brown Rudnick, special defense counsel to the

22    debtor.

23               THE COURT:  Good afternoon to everyone.  Okay.

24    There are three matters on the calendar today in the Kwok

25    and related Chapter 11 cases.

1          The first matter is an application for approval

2     for the Trustee to retain a broker to sell the Lady May and

3     the Lady May II.

4          The second is the motion of the Chapter 11 Trustee

5     for an order authorizing that the Lady May be moved to the

6     navigable waters of Rhode Island, and with regard to that

7     motion to enter into a dockage agreement.

8          And then an order setting a status conference on

9     issues that were addressed at a prior hearing with regard to

10    the debtor's assertion of his Fifth Amendment privilege in

11    response to discovery issues and an order for contempt.

12         So Trustee Despins, are we proceeding first with

13    the application to approve the retention of the broker?

14         MR. DESPINS:  Yes, Your Honor.  Mr. Bongartz, will

15    handle that.

16         THE COURT:  Okay.  Thank you.

17         MR. BONGARTZ:  Good afternoon, again.  Alex

18    Bongartz, of Paul Hastings, for the Chapter 11 Trustee.

19    I'll be addressing first the application to retain Edmiston

20    as the yacht broker to sell -- to market and sell the Lady

21    May and the Lady May II.

22         There have been no objections filed to the

23    retention application, but I want to note that we have

24    received informal comments from the United States Trustee

25    and did file a revised proposed order yesterday afternoon at

Docket No. 1713.

I'm happy to walk the Court through that blackline or we can -- I'll make a few introductory remarks.  I'm happy to proceed either way.

THE COURT:  Why don't you go ahead and make a few introductory remarks, please.

MR. BONGARTZ:  Yeah.  Of course.

So we filed this motion because we believe it is critical to engage a qualified and seasoned yacht broker to market the two yachts for sale.  Edmiston, we believe, is highly qualified and has substantial experience in marketing luxury super yachts of the type of -- like the Lady May.

One specific example to flag, and that makes Edmiston actually particularly suitable to market the Lady May, is that they have been marketing the sister ship of the Lady May for about a year and have an extensive list of interested parties through that process.  So they are already well steeped in this market for super yachts and in particular Feadship, which is the manufacturer of the Lady May.

THE COURT:  May I just stop you right there.  When you say the sister ship, what do you mean?

MR. BONGARTZ:  Yes.  I believe that at around the time that the Lady May was manufactured, the manufacturer being Feadship, they also manufactured a nearly identical

1  ship, same dimensions, same specifications, generally

2  speaking.  Definitely if you look at them in pictures they

3  look virtually identical.  And that ship I believe is called

4  K-I-S-S, KISS, and has been on the market for about a year

5  under the stewardship of Edmiston as the broker.

6              THE COURT:  And what's the sales price for that

7  boat that's been on the market, that yacht that's been on

8  the market for a year?

9              MR. BONGARTZ:  I believe the listing price is

10  somewhat over $30 million.  It was reduced to 29.  I'm

11  sorry.

12              THE COURT:  Okay.  Go ahead.

13              MR. BONGARTZ:  Okay.  So as we've explained in our

14  motion, Edmiston will be -- or would, if approved by this

15  court, would be marketing the Lady May as well as the Lady

16  May II.  That process would include creating marketing

17  materials, reaching out to their database of potential

18  buyers.  Marketing materials in this day and age are not

19  just print materials.  They would include video shoots.  And

20  then they would introduce the yacht to their extensive

21  database of potential buyers.

22              I should note that we've negotiated a couple of

23  provisions in the engagement letter that are not standard.

24  We specifically asked for them, for the benefit of the

25  estate.  For example, Edmiston -- we requested Edmiston and

1    Edmiston agreed to provide the Trustee on a monthly basis

2    with a log of all parties that they have contacted and

3    parties that contacted them either directly or through a

4    sub-listing broker.

5            We've also negotiated a provision that would allow

6    the Trustee to terminate the broker agreement after three

7    months, in which case, if that option is exercised, the

8    agreement would terminate ten days after such notice.

9            We believe that the fee structure that was agreed

10   upon is competitive.  Just in a nutshell, there's a five

11   percent commission that will come due if the buyer is sold

12   in house, meaning to an interested party that is in

13   Edmiston's internal database of contacts, and there would be

14   a six percent commission if the Lady May is sold to a buyer

15   that is introduced through a sub-listing broker.

16           In the case of the Lady May, in either event,

17   whether it's in house or through a sub-listing broker, the

18   commission would be five percent.

19           We've also negotiated provisions that require

20   Edmiston to come to this court and seek an application if it

21   desires or if it believes it is entitled to any payment

22   under the indemnity.  So that process would be funneled

23   through this court.

24           And, in addition to that, there is a carve out

25   from any claim for indemnity.  Specifically carved out are

1  fraud, fraud from misrepresentations, knowing or willful

2  violation of law, willful misconduct, et cetera.  All that's

3  detailed in our application.

4        So with these remarks, unless the Court has any

5  questions about what I've just said, I would turn to the

6  blackline that we filed yesterday afternoon.

7        THE COURT:  I do have a few questions.

8        So why does -- why would Edmiston need to work

9  with a sub-listing broker?

10        MR. BONGARTZ:  Well --

11        THE COURT:  Because that would increase the

12  commission by a whole percent.  So we're talking, you know,

13  right now, if they sell it for 26 million they get a

14  million-three.  But if they have to use another broker,

15  right, then that amount of money -- why would they need to

16  use -- I'm just trying to understand.

17        MR. BONGARTZ:  Understood.  The database, while

18  extensive in the case of Edmiston, there may be a buyer that

19  is already working with another broker and that is not

20  within the universe of Edmiston's potential clients.

21        THE COURT:  Okay.

22        MR. BONGARTZ:  And if such another broker

23  introduces the yacht to Edmiston -- sorry, is introduced to

24  the yacht through another broken, then I understand it is

25  customary in the industry that a sub-listing broker would

1    get a portion of the fee.

2            THE COURT:  How does it get split?  Because right

3    now if a sub-listing -- if you take my example and the sub-

4    listing broker brings forth the person, so it would be

5    another $260,000 that would be payable out of the sales

6    proceeds.  How does it get split between the two?

7            MR. DESPINS:  Your Honor, Luc Despins, for the

8    record.

9            It's a negotiation between the two brokers.  It's

10   not limited to the new broker getting the one percent.  It

11   could be more than that.

12           And, as Mr. Bongartz mentioned, we receive bids

13   from three different brokers.  They all have the same

14   structure except that the others had, or at least one other

15   had a higher percentage, 7.5 percent.

16           And so that it's a standard thing, which there are

17   some brokers that control buyers, if you will, they have a

18   relationship, and they're not going to bring them to the

19   table unless they're guaranteed to get a cut from the

20   existing broker.

21           THE COURT:  I understand that.  I'm not -- I'm not

22   asking that.  I'm asking how is it going to be split?

23           MR. DESPINS:  It's a -- it's a negotiation between

24   the two brokers.

25           From our point of view, where obviously we want

1    the lowest fee possible, but we're indifferent as to how the

2    six percent is split between the two brokers.

3              THE COURT:  What happens if there is a dispute?

4    Then I have to decide that?

5              MR. DESPINS:  Well, you have exclusive

6    jurisdiction to -- for any disputes relating to Edmiston.

7    So we're not -- if there's a dispute, we're not going to pay

8    Edmiston.  It would have to be resolved by this court

9    obviously.

10              THE COURT:  Okay.  All right.  That's the

11    question.

12              All right.  Go ahead, Counsel.

13              MR. BONGARTZ:  Okay.  Sorry.  I just want to make

14    sure --

15              THE COURT:  Oh, you don't have to go through the

16    blackline by the way.

17              MR. BONGARTZ:  Okay.

18              THE COURT:  I've looked at it.

19              MR. BONGARTZ:  All right.  All right.

20              THE COURT:  Okay.

21              MR. BONGARTZ:  So we believe that these -- we've

22    shared these comments and the blackline with the U.S.

23    Trustee's Office and we believe those comments were

24    acceptable.  Obviously, I defer to counsel if she has

25    anything else to add.

1            MS. CLAIBORN:  Thank you, Your Honor.  Holley

2     Claiborn for the U.S. Trustee.

3            I do want to point the Court to one material

4     change from the original proposal.  The original proposal

5     contemplated no fee application of any kind for Edmiston,

6     and the revised order that's been submitted to Your Honor

7     contains a methodology whereby the payment of the

8     compensation commission will be sought in conjunction with a

9     motion to sell that the Trustee files and not the subject of

10    a separate fee application.

11           THE COURT:  Okay.  Thank you.  I did see that.

12           MS. CLAIBORN:  Other than that, Your Honor, I have

13    one another comment.  And I would like to just tell the

14    Court that we are okay with the new proposed order that was

15    filed at ECF 1713.

16           THE COURT:  Okay.  Thank you.

17           I do have another question I failed to ask with

18    regard to -- first of all, I see the time line, right, that

19    the broker has submitted.

20           And, okay, so it doesn't detail necessarily

21    everything they're going to do, but I understand that

22    they're going to take videos and pictures and they're going

23    to put things on social media and they're going to have a

24    broker's open house and things like that.  I understand all

25    that.

1         But what I didn't see anywhere, and maybe I

2    missed, is how are they going to market the sale of these

3    two yachts?

4         UNIDENTIFIED:   (Indiscernible)

5         I have no idea who that is and why they're on the

6    phone.  Who is Doug White?  Oh, I'm sorry.  I apologize.

7    Forget it.  In any event, we should get that changed.  Okay?

8         My question is this.  Have you discussed -- have

9    you or the Chapter 11 Trustee discussed with the broker how

10   they're going to market the sale of these yachts?  Are they

11   going to -- is there going to be a possibility that someone

12   could buy both or someone could buy one or the other?

13        And then how is it going to be determined, I mean,

14   it's going to be the Trustee that will bring the sale

15   forward, but, you know, what is the highest and best offer

16   with regard the sale of -- I think the broker needs to

17   understand that at least from the Court's perspective there

18   could be a situation where the sale of both would be more

19   beneficial, but there also could be a situation where the

20   sale of one versus another could be more beneficial to the

21   estate.  Right?  We want to be able to obtain the highest

22   and best offer for the sale of these two yachts.

23        Now, from what I understand over the course of the

24   last month or so, the Lady May II wasn't anywhere near the

25   Lady May.  It was in -- it's in some -- I don't know if it

1    still is, but it was in a warehouse in I think somebody said

2    Mamaroneck.

3              And so I have -- and how is the Lady May II going

4    to be marketed if it's in a warehouse in Mamaroneck and the

5    Lady May is going to be in Newport, assuming that the order

6    enters allowing it to travel to Newport?

7              MR. BONGARTZ:  Let me take those questions in

8    order.

9              So we have maximum flexibility under the brokerage

10   agreement the boats can be sold together, they can be sold

11   separately, they will be marked --

12             THE COURT:  Does it say that?

13             MR. BONGARTZ:  Yes.

14             THE COURT:  Okay.  That's what I said.  I may have

15   missed it.  I don't recall seeing that, but I'd want to make

16   sure that that's clear to the broker.

17             MR. BONGARTZ:  Yes.  It's the last -- second to

18   last sentence of Section 2 of the Central Agency Sale

19   Agreement.

20             THE COURT:  Okay.  Let me get there, please.  So

21   I'm looking at the document that's signed by Trustee Despins

22   and Dirk Johnson on 4/18/2023?

23             MR. BONGARTZ:  That is correct.  If you --

24             THE COURT:  All right.  What provision am I

25   looking at?

1          MR. BONGARTZ:  If you look at -- it's page number

2     19 of 36 to go with the --

3          THE COURT:  Okay.  Yeah.  Let me get there.

4          MR. BONGARTZ:  -- docketed.

5          THE COURT:  Go ahead.

6          MR. BONGARTZ:  Yes.  It's the sentence towards the

7     top of that page, carryover paragraph, the yachts shall be

8     marketed and sold separately unless otherwise agreed by the

9     owner.  So we can --

10          THE COURT:  It says yacht number one will be

11     offered for sale at yacht number one price.  Yacht number

12     two will be offered at yacht number two price.  No other

13     prices shall be quoted without specific authorization from

14     the owner.

15          The broker shall submit all offers of any type to

16     the owner for his consideration.  The owner agrees to sell

17     yacht number one to any customer who's ready, willing and

18     able to purchase.  And yacht number two.  The yachts may be

19     marketed and sold separately unless otherwise agreed to by

20     owner.

21          But it doesn't say that the yachts may be marketed

22     and sold together.  Right?  I mean, all I'm saying is that

23     needs to be out there, both, right?

24          MR. DESPINS:  Yes, Your Honor.  Again, for the

25     record, Luc Despins.

1          We've had extensive discussions with the various

2     potential brokers about that.  The advice I got from all of

3     them is that if you sell it together, you will not get a

4     penny more for the Lady May II in the sense that people will

5     say --

6               THE COURT:  Well, let's hope.

7               MR. DESPINS:  No, no.  So there's no prohibition.

8               THE COURT:  We'll see if they're right.  We'll see

9     if they're right.

10              MR. DESPINS:  We'll make sure that it's clear that

11    they can be marketed together.  But generally people will

12    say fine, through that in and I'll pay X, but the maximum

13    price for the Lady May II is on a standalone basis.

14              But we -- there's no -- there's no prohibition

15    against doing it together, and we'll tell them, and we can

16    correct this to make sure that we can.

17              THE COURT:  We don't know what's going to happen.

18    Somebody may come in and offer to buy both of them for a

19    price that's equal to somebody who's buying them separately

20    but maybe has no contingencies and can pay in cash or

21    whatever the situation may be.  Right?

22              MR. DESPINS:  Right.

23              THE COURT:  So I need -- because I'm going to have

24    to -- the Court is going to have to approve whatever

25    happens, I mean, I want to make sure that the marketing of

1    the yachts is designed to produce the highest offer for the

2    estate.

3              So where is -- is the Lady May II still in a

4    warehouse in Mamaroneck?

5              MR. BONGARTZ:  It is currently in a warehouse.  It

6    needs to be re-commissioned and then put back in the water.

7    That is -- that process has not yet begun, but we are

8    planning to do so very soon, certainly during the month of

9    May.  And we will then move the Lady May also to Newport so

10   that it can be -- so that it's in the same location as the

11   Lady May I.

12             And just to be clear, we will come back to this

13   court to seek authorization to conduct any -- enter into any

14   new contracts or conduct any repairs to the extent necessary

15   in connection with the Lady May II.

16             THE COURT:  But the broker knows that the yacht is

17   -- that the Lady May II is in Mamaroneck?

18             MR. BONGARTZ:  Absolutely.  They are aware of

19   that.

20             THE COURT:  And they're going to start --

21             MR. BONGARTZ:  Yeah.

22             THE COURT:  -- they're going to start to sell it

23   from its location in Mamaroneck?

24             MR. BONGARTZ:  They can't market it while it is

25   currently under wraps.  It's under a plastic flow right now

1   in a storage facility.  But, in any event, it could not be

2   put immediately into the water unless it's first re-

3   commissioned.  The fluids need to be exchanged or filled up

4   again.

5            So there is a -- there's a process for that and it

6   is going to happen in the very near future.  So we are

7   expecting that the boat, Lady May II, will also be moved to

8   Newport during the month of May.

9            And I should note that the broker has actually

10  already visited the Lady May II in order to get a sense of

11  the need for what needs to be done in order to get it ready

12  for marketing and viewings.

13           THE COURT:  And if the broker, or the broker with

14  -- the sub-broker, whatever, I forget the term, brings forth

15  a buyer for one or both and there's a motion to sell to a

16  purchaser, are we -- are you contemplating that there's

17  going to be an auction of that boat or that that sale is

18  only going to be out on notice to people to object and

19  possibly make a counter offer?

20           MR. DESPINS:  Your Honor, it would be subject to

21  higher and better offer, but I don't think that it would be

22  best advised to announce that there will be an auction.

23           I mean, in the sense that we will give notice to

24  people, people who visited the ship and all that, so they

25  can -- they understand that it's subject to higher and

1    better offer in the Bankruptcy Court, but I don't think we'd

2    want to say that there will be an auction --

3                   THE COURT:  That's fine.  Does the broker

4    understand that though?

5                   MR. DESPINS:  I believe he does, that it's subject

6    to --

7                   THE COURT:  Well, we need to make sure he does,

8    right?

9                   MR. DESPINS:  We'll do that.

10                   THE COURT:  That the broker understands that when

11    someone comes and makes an offer for one or -- one or both,

12    either or both of the yachts, that that person needs to

13    understand that the Bankruptcy Court has to approve that and

14    that it's possible that someone could offer a higher amount

15    of money for that purchase.  Right?

16                   MR. BONGARTZ:  Yeah.

17                   THE COURT:  I didn't see that.  I'm not saying he

18    should have said this by the way in the -- his affidavit,

19    but I didn't see any indication that he was aware and I want

20    to make sure that that's clear.

21                   MR. BONGARTZ:  We will make sure that that is

22    clear.

23                   THE COURT:  Okay.  All right.  With regard to the

24    -- does anyone else wish to be heard before I just talk with

25    counsel about the order?

1    Go ahead, Attorney Henzy.

2         MR. HENZY:  Your Honor, for Mei Guo and HK, we do

3    reserve all rights as to whether or not the boat can be

4    sold.  As you know, your summary judgment decision has been

5    appealed.  But with respect to this application, we take no

6    position.

7         THE COURT:  You take no position?

8         MR. HENZY:  On this application.

9         THE COURT:  Okay.

10        MR. HENZY:  But I do want to be clear that that --

11   we are reserving all rights with respect to any sale of the

12   boat.

13        THE COURT:  Okay.  Thank you.

14        MR. HENZY:  Thank you, Your Honor.

15        THE COURT:  All right.  With regard to the order

16   that was submitted yesterday, at ECF 173, I'm just looking

17   at the clean copy, I'm not looking at the redlines --

18        MR. BONGARTZ:  Okay.

19        THE COURT:  -- so there's just a couple of things

20   in here that I just want to have changed.

21        So tell me, do you have it in front of you,

22   Counsel?

23        MR. BONGARTZ:  Yes, I do.

24        THE COURT:  Okay.  So on the top of the second

25   page of the order, after the reference to that it's a core

1    proceeding, you know, 28 USC 157(b)(2) --

2         MR. BONGARTZ:  Yes.

3         THE COURT:  -- I'm going to delete the language on

4    which the Court may enter a final order consistent with

5    Article 3 of the United States Constitution.  Because a

6    reviewing court may not agree with that, so I'm not going to

7    put that in there.  All right?

8         MR. BONGARTZ:  Okay.

9         THE COURT:  In that same paragraph, about six to

10   seven lines down, I don't have to find under 328(a) -- under

11   327(a) or 328 that the relief requested is in the best

12   interest of the debtor's estate.  That's if it was a 327(e)

13   application.  So I'm going to strike that language.

14        And the Court having found that the relief

15   requested in the application is in the best interest of the

16   debtor's estate, their creditors and parties in interest,

17   there's nothing that I can see in the code or the rules that

18   requires that that needs to be a finding in connection with

19   an application made under 327(a) or 328.  Okay?

20        MR. BONGARTZ:  Okay.

21        THE COURT:  Then with regard to the next provision

22   that appearing that proper and adequate notice of the

23   application has been given and that no further notice is

24   necessary, you need to establish that for me.  Right?  I

25   didn't go look at your service.

1          So you just need to tell me -- and I know we --

2     people use the word notice, but you really mean service, you

3     mean people have been served --

4               MR. BONGARTZ:  Yes.

5               THE COURT:  -- and they've had an opportunity to

6     object.  Right?

7               So do you want that language in there?  If you do,

8     you need to make a record.

9               MR. BONGARTZ:  We would like that language in

10    there.

11              THE COURT:  So go ahead.

12              MR. BONGARTZ:  And we have served the motion when

13    it was filed on April 18 via ECF.  And upon entry of the

14    order granting the motion to expedite, we have served it in

15    addition -- we have served both the order and the motion.

16              Well, first of all, the order was automatically

17    served via ECF.  But on the additional parties that have,

18    well, that have selected or chosen not to -- have requested

19    hard copy service, we have also then served the order and

20    the application on those parties as well.  And I believe the

21    certificate of service is on the docket to that effect.  I

22    unfortunately don't have the specific docket number handy.

23              THE COURT:  Okay.  That's fine.  I just want you

24    to make that record.  Okay?

25              MR. BONGARTZ:  Okay.

1          THE COURT:  And then the first ordered paragraph,

2     this is my final change by the way --

3          MR. BONGARTZ:  Okay.

4          THE COURT:  -- so it says the application is

5     approved as set forth herein.  All objections to the relief

6     requested in the application, whether filed or not, I'm not

7     going to say that.  I could say whether filed or not raised

8     during the hearing, right?

9          MR. BONGARTZ:  Okay.

10         THE COURT:  Then it's fine with me if that's fine

11    with you.

12         MR. BONGARTZ:  That is fine.  There were no filed

13    objections.  And I'm --

14         THE COURT:  Okay.

15         MR. BONGARTZ:  No objections were raised.  So I

16    would add the words or not raised --

17         THE COURT:  We can take of this.

18         MR. BONGARTZ:  Oh, okay.

19         THE COURT:  I'm not -- I'm just explaining to you

20    what it's going to look like when we're done.  All right?

21         MR. BONGARTZ:  Okay.

22         THE COURT:  So it's minimal changes, but there are

23    going to be changes to the form of the -- and I don't find

24    that they're -- that they in any way impact the ability of

25    the Trustee to retain the broker and, therefore, the

1  Trustee's application is going to be approved, it's just

2  certain language in the order that I'm not going to put in

3  that order.  Okay?

4          MR. BONGARTZ:  Understood.

5          THE COURT:  All right.  So for all the reasons

6  that have just been stated on the record, the Trustee's

7  application for approval to employ a broker to market and

8  attempt to sell the Lady May and the Lady May II is granted,

9  and the proposed order submitted by counsel at ECF 1713,

10 with the changes noted on the record, will enter.

11         MR. BONGARTZ:  Thank you, Your Honor.

12         THE COURT:  Okay.  Thank you.

13         Now are you proceeding?

14         MR. DESPINS:  Your Honor.

15         THE COURT:  You're going to take care of the next

16 motion?

17         MR. DESPINS:  No.  I just wanted to make just a

18 quick editorial comment regarding the sale process.

19         THE COURT:  Sure.  Sure.

20         MR. DESPINS:  Your Honor knows this because you've

21 been a bankruptcy judge for a long time, but some people,

22 potential buyers, will perceive that there's blood in the

23 water because a Trustee's involved.  And so they will be --

24 we will receive I'm sure very low bids from some of these

25 bottom fishers and that's par for the course.

1          Our public posture is that we're not in a rush to

2     sell this.

3          On the other hand, I'm well aware that the costs

4     of owning that boat is/are, sorry, my editorial comment,

5     insane, including $45,000 a month to moor the boat in

6     Newport.

7          So there's a balance that will have to be struck

8     here.  I'm sure that there will be interest.  The question

9     is where do we draw the line between what is a completely

10    unacceptable bid and and considering all the costs involved,

11    et cetera, et cetera, so that, you know, the story remains,

12    you know, to unfold.

13         The sister ship has been for sale for a year and a

14    half.  That's because they're asking $32 million for a year.

15    And the broker told me that's clearly not achievable.  So

16    that tells you that these ships don't get sold on two-weeks,

17    three-weeks, or two-months notice.  It can be a long

18    process.  Obviously, we want to sell this as quickly as we

19    can.  So I want to make sure the Court knew about this

20    background.

21         THE COURT:  Understood.  Thank you.

22         All right.  Then we'll move on to the next, the

23    motion for the order to move the Lady May to the navigable

24    waters of Newport, Rhode Island.

25         Counsel, are you going to be handling that as

1    well?

2             MR. BONGARTZ:  Yes, I will.

3             THE COURT:  All right.  Please proceed.

4             MR. BONGARTZ:  Okay.  So the next matter is the

5    motion to move the Lady May to Newport, Rhode Island and

6    enter into a dockage agreement with the Safe Harbor Newport

7    Shipyard located in Newport, Rhode Island.

8             So this is -- this motion is probably best

9    understood as the first step in a two-step process.  We are

10   ultimately -- ultimately we intend to move the Lady May into

11   the foreign trade zone in Newport, Rhode Island, which is

12   also located at the same shipyard by the way.  But as an

13   initial step, we first need to move the boat there.

14            And as Your Honor is well aware, earlier in the

15   case a stipulated order was entered that required the Lady

16   May to be returned to the navigable waters of Connecticut

17   and remain in the navigable waters of Connecticut, so we

18   need relief from that restriction.

19            Now, as Your Honor will also recall, at the time

20   the restriction was put in place there were concerns that

21   given the track record of the Lady May having been moved

22   outside the jurisdiction of the New York Court in connection

23   with the New York State Court litigation, there were

24   concerns that the boat could potentially be moved out of

25   Connecticut waters again and, hence, as part of the

1    stipulated order, which the parties at the time and the

2    parties to that order agreed to, the Lady May would remain

3    in Connecticut waters.

4              Now, fast forward.  As you know, and the Court has

5    found that the Lady May is property of the estate, it's not

6    property of HK USA -- and over the last month -- and I point

7    to the management agreement and other agreements that this

8    court has approved, the Trustee has taken control of the

9    Lady May.  So we believe there is no longer a need to

10   continue the restriction that the Lady May remain in

11   Connecticut waters.

12             I should also note that we are -- we strongly

13   believe, and we have conferred with this -- on this point

14   with our -- with the yacht broker, that there are

15   substantial advantages to having the Lady May in Newport now

16   versus keeping it in Bridgeport.  Newport is a well-known

17   hub for marketing and selling super yachts.  Bridgeport is

18   not.

19             Edmiston, the broker, has a fully-staffed office

20   in Newport.  And, as I've indicated earlier, they want to

21   start marketing as soon as possible.  They need to be

22   liaising with the crew.  They need to be taking pictures,

23   videos.  They need to be around the boat.  Traveling back

24   and forth is just not practical.

25             Newport also has other significant brokerage

1    houses.  So to the extent a buyer is introduced through a

2    sub-listing broker, there are certain -- there are numerous

3    benefits from having access to those resources in Newport.

4           And as a purely practical matter, potential buyers

5    are obviously aware that Newport is a hub for buying and

6    selling super yachts, so they are more likely to frequent

7    that shipyard.  And, in particular, yeah, in particular the

8    Safe Harbor Shipyard where the Lady May would be docked.

9           And one final point.  Even though the Lady May

10   will not immediately be transferred into the foreign trade

11   zone, Edmiston will commence marketing right away.  This is

12   not -- they're not going to wait until then.  And my

13   understanding is, I'm not the expert on the foreign trade

14   zones' laws, but it can be marketed.  Even while it is not

15   yet in the FTZ, the foreign trade zone, it can be marketed

16   to non-U.S. residents.

17          So for all these reasons we believe there is --

18   that it is in the best interest of the estate to move the

19   Lady May now to Newport.

20          I am not going to hide anything here.  We fully

21   understand that the docking -- the dockage fee in Newport is

22   substantially higher than in Bridgeport.  That is just a

23   function of Newport being a hub for, again, the marketing,

24   selling and docking of yachts of the size like the Lady May

25   and there's just nothing we can do about that,

1    unfortunately.

2              We have, and this is the second part of the relief

3    we're seeking in this motion, we have entered into a dockage

4    agreement obviously subject to Your Honor's approval.  And

5    as part of that agreement, negotiated a series of

6    modifications similar to what we had agreed to with the

7    Bridgeport marina about a month ago, but with I would say

8    additional protections as it relates to the indemnity.

9              But let's just go just really quickly.

10             The Bankruptcy Court has exclusive jurisdiction

11   over any dispute that may arise out of the agreement.

12             And as far as the indemnity, to the extent that

13   the shipyard, I've been using the acronym SHM which stands

14   for Safe Harbor Marina, SHM, to the extent that they believe

15   there is a -- they have a claim for -- claim under the

16   indemnity, they must come to this court and file an

17   application.

18             And as is customary there are -- there's a series

19   of exclusions, including for fraud, willful misconduct,

20   gross negligence, et cetera.

21             So a couple of points.

22             While we have received informal comments from the

23   U.S. Trustee's Office, and we've tried to accommodate as

24   much as we could, those comments -- and I want to flag that

25   paragraph 4 was, which by the way we've, I apologize if I've

1    taken this out of order, but we did file a revised proposed

2    order earlier this morning.

3          And in that proposed order you will see that we

4    have added a paragraph 4 to make clear that the shipyard,

5    Safe Harbor Shipyard, would have to give notice three days,

6    three business days' notice, in advance that they believe

7    that a lien is being imposed as a result of nonpayment under

8    the dockage agreement.

9          And then to the extent they desire to exercise any

10   rights to liquidate that lien, they would have to come to

11   this court and seek approval of that.  That's a -- that was

12   something that the U.S. Trustee requested.  We have run this

13   by the shipyard.  They've agreed to that.  And my

14   understanding is that the language, as reflected in the

15   order filed this morning, is acceptable to the U.S. Trustee.

16         I should also note, and this was reflected in the

17   order we filed this morning, we made a few minor, clarifying

18   changes to the rider.  This was done at the request of the

19   shipyard.  I apologize.  For some reason, my hard copy

20   printout does not have the blackline of the rider attached

21   to it, so if I may have just another second and pick another

22   copy.  I apologize for that.

23         THE COURT:  That's fine.

24         MR. BONGARTZ:  The printout was just cut off one

25   page early.

1            So we have added that obviously, and this subject

2       to the Court approving obviously this motion, that the

3       Trustee's authorized to enter into the dockage agreement.

4       That was -- we added that provision at the request of the

5       shipyard.  Any claims would obviously -- can only be

6       asserted against the Trustee in its capacity, in his

7       capacity as Trustee.  There's no claims against Mr. Despins

8       in his personal capacity or Paul Hastings.

9            In paragraph 4 of the rider, we -- and this was at

10      the request of the shipyard, there's a -- it's not a carve

11      out, but it reflects the fact that any liens to the extent

12      it may arise is actually governed by the new language that

13      we -- that I just referenced and that was agreed upon with

14      the U.S. Trustee.  To the extent there are any liens, there

15      is a separate process to give notice and come to this court

16      to enforce or liquidate any lien.

17           And then the rest is just verbiage in the carve

18      out.  But as you can see, it covers basically the same

19      litany with the exception of breach of fiduciary duty and

20      self-dealing, which don't -- we don't believe apply in the

21      first instance because there are no fiduciary duties as

22      between the shipyard and the estate.  I mean, there's

23      duties, there's contractual obligations, of course, but the

24      reference to fiduciary duty didn't make much sense and

25      they've asked us to take that out.

1          So those are the changes to the rider.

2    And I'm also happy to briefly recap the changes that were

3    made to the proposed order.  And I have extra copies with me

4    in case folks want to take a look at this.  I'm not -- I

5    obviously apologize for not having filed it sooner than this

6    morning.

7          THE COURT:  Okay.  Does anyone else wish to be

8    heard on the Trustee's motion?

9          I may have some questions, Counsel, too, but I'd

10   like to hear from others first.

11         MR. BONGARTZ:  Okay.

12         MS. CLAIBORN:  Your Honor, Holley Claiborn for the

13   U.S. Trustee.  I do have a couple of comments to make.

14         First of all, I do want to echo the comments made

15   by Attorney Bongartz about the changes to the lien language.

16   Those were as a result of the U.S. Trustee's comments.  The

17   prior existing small print of the agreement provided that

18   the shipyard could simply impose a lien and then sell the

19   yacht exercising its lien rights and so we have scaled that

20   back.

21         Those lien rights would have been as a result of

22   any nonpayment under the agreement and now they are revised

23   and addressed properly so that the estate has an opportunity

24   to weigh in on any lien that may be imposed as to whether or

25   not they can exercise it or not.

1          And then with respect to Section 17 of the

2     agreement, that's another area of concern for the U.S.

3     Trustee.  That is the section that deals with the liability

4     and indemnity provisions.

5          And similar to Your Honor's hearing from me in

6     conjunction with the motion to enter into the agreement with

7     the Bridgeport marina, the language in this agreement is

8     similar, not as broad, but similar in that it disclaims

9     responsibility for a whole myriad of things and that puts

10    the estate at risk.

11         The changes that the Trustee negotiated to limit

12    the indemnification process and procedure are much

13    appreciated.

14         I just want to note that for the record there are

15    some exposures still to the estate under this agreement that

16    have not been addressed.  I understood the Court's comments

17    and concerns at the last hearing and I take those into

18    consideration.  I just want to make it clear to the Court

19    that we remain concerned about the scope of this agreement

20    and the protections that the shipyard has kept for itself at

21    the risk of the estate.

22         But the U.S. Trustee is not objecting to the

23    entering into this agreement.

24         THE COURT:  Okay.  Thank you.

25         Does anyone else wish to be heard?  Attorney

1    Henzy?

2            MR. HENZY:  Thank you, Your Honor.  Yeah.  For Mei

3    Guo and HK.

4            We did file a reservation of rights, Your Honor.

5    It's document No. 1712.  No position on the motion, but

6    again reserving rights with respect to any sale and also

7    with respect to funding under the various obligations the

8    U.S. Trustee, I'm sorry, that the Trustee is undertaking.

9            THE COURT:  Okay.  Thank you.

10           MR. HENZY:  Thank you, Your Honor.

11           THE COURT:  Anyone else wish to be heard?

12       (No response)

13           THE COURT:  All right.  I have a couple of

14   questions, Attorney Bongartz, with regard to the commercial

15   yard and dockage license and service agreements with Safe

16   Harbor Newport Shipyard.

17           The document that's attached to 1696, on page 20,

18   I think that's the agreement, right?  That starts the

19   agreement?

20           MR. BONGARTZ:  Correct.

21           THE COURT:  So it says that does the vessel have a

22   tender?  And it says yes.  But there isn't going to -- the

23   tender isn't going to be there for a while, right?  So is

24   the cost of docking at the -- at this marina, at the

25   shipyard, going to be the same whether the tender's there or

1   not?  Or is it going to increase once the tender gets there?

2          MR. BONGARTZ:  When we're referring to the tender,

3   when the Lady May -- I assume you're referring to the Lady

4   May II in this instance.  Yes.

5          THE COURT:  Well, that's what I've been told is

6   the tender.  Is it not?

7          MR. BONGARTZ:  There is another tender that is

8   actually the boat that goes inside the Lady May I.

9          THE COURT:  Okay.

10          MR. BONGARTZ:  That is currently in storage in

11   Florida I believe.

12          THE COURT:  So that's the length -- the 21 feet --

13   that's what that means?  That's the tender that goes inside

14   the boat?

15          MR. BONGARTZ:  Yes.  Because the actual Lady May

16   II is not -- it's more than 50 --

17          THE COURT:  Right.  It's 50.

18          MR. BONGARTZ:  It's 50 feet.

19          THE COURT:  Yeah.  Okay.

20          MR. BONGARTZ:  It's very large.

21          THE COURT:  That's why I'm asking the question.

22   So now there's another part of this Lady May that's

23   somewhere else.  It's in Florida?

24          MR. BONGARTZ:  Yeah.  It's in a storage pod I

25   understand in Florida.  But I don't know --

1    THE COURT:  Is it going to stay there or is it

2    going to go to Newport and become part of the Lady May?

3    MR. DESPINS:  It's going to become part.  That one

4    needs to be sold with the Lady May because it's a safety --

5    THE COURT:  So is it going to be inside the boat

6    so it shouldn't need additional dockage?

7    MR. BONGARTZ:  It fits inside the boat.  I've been

8    --

9    THE COURT:  Right.  But what I'm -- all I'm asking

10    is cost, right?  All I'm trying to drill down here is cost.

11    MR. BONGARTZ:  There is no --

12    THE COURT:  Is there -- is there an additional

13    cost with regard to the tender?

14    MR. BONGARTZ:  No.

15    THE COURT:  Okay.  Thank you.  All right.

16    Then with regard to -- assume that this motion is

17    granted, when -- and maybe, again, I could have missed this,

18    there's a lot of papers, as you know, in the case -- so when

19    will the Lady May leave Bridgeport to go to Newport and

20    who's going to get her there?  The crew that's here?  Or

21    how's that going to work?

22    MR. BONGARTZ:  The when is either Monday or

23    Tuesday next week.  There's a little bit of uncertainty

24    about the weather.  But we would like to move it as --

25    THE COURT:  If you rely on the weather, it doesn't

1    sound very good for the weekend.

2              MR. BASSETT:  But definitely as soon as possible.

3              THE COURT:  Okay.

4              MR. BONGARTZ:  Assuming this is approved.

5              In terms of who is going to move her?  It is the

6    current captain and the current crew that will stay with the

7    ship, and they will -- the captain will navigate the Lady

8    May up to Newport.

9              In fact, the proposed order includes a specific

10   provision to relieve the captain of his own duty to keep the

11   boat and the Lady May in Connecticut waters.  He'd asked for

12   that clarification and we've made sure that would be

13   included.

14             THE COURT:  And is he going -- he and the crew

15   going to stay with the boat --

16             MR. BONGARTZ:  Yes.

17             THE COURT:  -- until it's sold?

18             MR. BONGARTZ:  Yes.

19             THE COURT:  The yacht until it's sold?

20             MR. BONGARTZ:  Yes.

21             THE COURT:  Okay.  I just am trying to figure out

22   how it all works.  Okay.  All right.  Let me see if I had

23   any other questions.

24        (Pause.)

25             THE COURT:  So, again, it's just I'm just trying

1    to figure out how it works, right, and how the estate's

2    interest is protected.  So do you already have a slip or a

3    space that is designated for the Lady May when it arrives?

4              MR. BONGARTZ:  Yes.

5              THE COURT:  Okay.  I would assume so, but I don't

6    know that.

7              MR. BONGARTZ:  We have a reserved spot.

8              THE COURT:  Okay.  So this location, I think used

9    to be Newport Offshore, didn't it?  Do you know what Newport

10   Offshore was?  That was a company that went into Chapter 11.

11   They used to make and house yachts in Newport.  Not just

12   yachts.  I suppose they made other boats.

13             But it appears to me from what you've shown me

14   that this is, you know, I think that's the spot.  So it's --

15   where is the -- if you look, if you at all know how -- where

16   that is, that's closer to the Newport Bridge than to the

17   other end of Newport that goes out toward the ocean.

18             So you said a term that I had a question about.

19   Let me think about that for a second.  Oh, the foreign, the

20   sales zone.  So where's that in relation to, if you know, to

21   actually where the boat is going to be docked?

22             MR. BONGARTZ:  My understanding is it's not a

23   geographical location, but it's a legal designation.

24             THE COURT:  Okay.

25             MR. BONGARTZ:  Now, you have to be within Newport,

1    Rhode Island to take advantage of that.  But you can be both

2    -- there could be boats at the -- sorry, at the Safe Harbor

3    Newport Shipyard that are inside the foreign trade zone, and

4    then there could be a boat right next to it that is outside

5    the zone.  I mean, it's not like there's a --

6                THE COURT:  It's not like you have to be in a

7    specific --

8                MR. BONGARTZ:  -- line on the ground or --

9                THE COURT:  -- point of Newport Harbor.  I have no

10   idea.

11               MR. BONGARTZ:  No, no.

12               THE COURT:  I'm just asking the question.  I mean,

13   I'm just asking.  Because there's a benefit to it being in

14   this zone, correct?

15               MR. DESPINS:  Yes, there is a benefit.

16               THE COURT:  Yeah.

17               MR. BONGARTZ:  Yeah.  No.  The principal benefit

18   of being in the foreign trade zone is that you can show it

19   to non, sorry, you can show it to U.S. residents.  You can't

20   do it right now because the Lady May is in U.S. waters based

21   on a -- as a visiting boat.  It's not passed customs.

22               And then the other benefit is, in the event of a

23   sale, it allows the buyer to reduce and potentially avoid

24   customs duties.

25               THE COURT:  Okay.  Custom fees?

1          MR. BONGARTZ:  Custom.  Yeah.

2          THE COURT:  Yeah.  Right.

3          MR. BONGARTZ:  Duties.  Yeah.  Fees.  Yes.  Yes.

4          THE COURT:  Okay.  That's what I -- I mean, I

5     thought that's what I heard someone say at some point.

6          All right.  Then when the broker -- the boat gets

7     -- the yacht gets to Newport, it's at SHM and it's docked at

8     its slip, the broker agreement says they're going to do all

9     kinds of things.  They're going to have open houses, all

10    those kind of things.

11         But I assume that at some point, and I guess it

12    would have to work through the Trustee, but I'm not sure

13    this is true, someone's going to want to -- if they're

14    really going to want to buy it, they're going to want to

15    take it out, right?

16         MR. BONGARTZ:  Mm-hmm.

17         THE COURT:  For a sea trial.  So who's going to --

18    who's going to do that?  The captain and crew?

19         MR. BONGARTZ:  The captain.  The captain.

20         THE COURT:  Okay.

21         MR. BONGARTZ:  The existing captain and crew will

22    take the boat out.

23         THE COURT:  Okay.  But does the Trustee have to be

24    made aware of that or do they already have the authority to

25    do that?  When I say they, I mean the captain and the crew.

1           MR. BONGARTZ:  I don't -- I don't know if we've

2      had that specific discussion.

3           MR. DESPINS:  They do, Your Honor.

4           And I, for better or worse, I get a report every

5      day of the location of the Lady May -- of course, it's

6      always in Bridgeport -- but so I can see where it's been,

7      whether it has moved or not.  So they have to tell me in

8      advance whether they take it out.

9           THE COURT:  Okay.  I think that might make sense,

10     unfortunately, for you to get that information because it

11     will also help you understand -- I think it could help you

12     understand if things are progressing toward a sale.

13          So, okay.  Let me just see if I had any other

14     questions.

15          (Pause)

16          THE COURT:  I don't have any other questions at

17     the moment.  Okay?

18          MR. BONGARTZ:  I have one final thought I wanted

19     to communicate.

20          THE COURT:  Sure.

21          MR. BONGARTZ:  In circling back to what I said at

22     the beginning that this is the initial, the first step of a

23     two-step process, the second step will be to actually put

24     the Lady May into the foreign trade zone.

25          And we will come back to this court to request

1    approval to do so, but I just want to preview that there is

2    actually an application process that goes along with that

3    and we will need to post a bond called the FTZ Indemnity

4    Bond.  And there's some modifications I understand that will

5    have to then be made at that point to the dockage agreement.

6          So we'll come back.  I'm not asking for Your Honor

7    to approve anything in that regard right now, but I just

8    wanted to make sure that you are aware that that's

9    forthcoming and very likely in the near future.  This is not

10   something we're going to be doing months down the road.

11   This is going to happen in the next few weeks.

12         THE COURT:  But the foreign trade zone will be

13   where the boat is docked --

14         MR. BONGARTZ:  Yes.

15         THE COURT:  -- once that agreement is approved and

16   all whatever you need to do to be --

17         MR. BONGARTZ:  Yes, yes.

18         THE COURT:  -- considered part of it?

19         MR. BONGARTZ:  Yes.

20         THE COURT:  Okay.

21         MR. BONGARTZ:  The foreign trade zone, it will not

22   move to a different location.

23         THE COURT:  Okay.  All right.

24         Then I'm looking at the order that was submitted

25   today about 11:05 a.m.  I'm looking at the redline version.

1          MR. BONGARTZ:  Okay.

2          THE COURT:  And I understand the U.S. Trustee's

3     Office comments that certain of these additions are helpful

4     and address some of the concerns that the U.S. Trustee's

5     Office had, but the U.S. Trustee's Office still has concerns

6     about some other provisions in the boat -- in the boat, I'm

7     sorry, in the agreement that aren't completely addressed.

8     But I'm seeing only, and I could be, again, missing

9     something, that the agreement with the -- with SHM is -- has

10    its standard terms and it's, I think, nine pages without the

11    rider.  And then there's the rider that's going to be

12    attached to the agreement.  Correct?

13         MR. BONGARTZ:  That is correct.

14         THE COURT:  And the rider, so the amended rider is

15    really what's going to be part of the order, right, not the

16    -- there was I think an addition -- there was a rider at

17    first, but then it's been amended?

18         MR. BONGARTZ:  Correct.  That is exactly right.

19         THE COURT:  So I don't have any changes to the

20    redline version of the order that you submitted.  So I would

21    just like you to -- I'm going to grant the motion.  I'd like

22    you to submit -- does 1714 have a clean copy?

23         MR. BONGARTZ:  Yes.

24         THE COURT:  Oh, it does.

25         MR. BONGARTZ:  Yes, it does.

43

1          THE COURT:  It's the first part of the --

2          MR. BONGARTZ:  Yes.

3          THE COURT:  Okay.  All right.  So we'll have to --

4    we'll enter the clean version, the unedited version, so hold

5    on one second, please.

6          (Pause)

7          THE COURT:  All right.  So then for the reasons

8    that we just went through on the record and have been stated

9    on the record, the motion for the order filed by the Chapter

10   11 Trustee authorizing the Trustee to enter into -- to move

11   the Lady May to the waters, the navigable waters of Rhode

12   Island, and to enter in and perform under a Newport dockage

13   agreement is granted.

14          And the proposed order that was submitted earlier

15   today that we've just discussed on the record will enter.

16          MR. BONGARTZ:  Thank you, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          MR. BONGARTZ:  I don't have anything further.

19          THE COURT:  Okay.  Thank you.

20          MR. BONGARTZ:  So I think I'm going to pass the

21   podium on to Mr. Despins.

22          THE COURT:  Certainly.

23          MR. DESPINS:  Yes.  Your Honor, the other matters,

24   well, there is a contested issue regarding the proposed

25   order.

1          But before that, I believe Mr. Baldiga was going

2     to make a statement regarding the conflict issue that I

3     raised.  And I think we have a resolution.

4          THE COURT:  Okay.  Let me, before you do that --

5     that's fine, that's absolutely fine.

6          The clerk's office has pointed out to me, Mr.

7     Baldiga, that you have to file an appearance now.  I mean,

8     you're not debtor's counsel anymore.  You're counsel -- I'm

9     sorry, in the bankruptcy case, right?  You're here appearing

10    as counsel for the debtor in proceedings in New York,

11    correct?

12         MR. BALDIGA:  Yes.

13         THE COURT:  Okay.  So you don't have an appearance

14    on file in this -- in these Chapter 11 cases right now

15    because your prior appearance was withdrawn because you were

16    counsel to the debtor in possession, which was withdrawn.

17    And I understand that.

18         So you've got to file some kind of appearance on

19    the docket of this case.  And I think you say you're counsel

20    to the debtor in the criminal proceedings, whatever it is,

21    right, but it's got to be filed.

22         The clerk's office has correctly pointed out to me

23    that that is -- those are our rules.  So today or tomorrow

24    when you're back in your office, someone needs to do that

25    for you.  Okay?  And anybody else that's going to appear in

1        the case.

2                So, for example, if you were going to file some

3        pleading and there's some one of your colleagues is also

4        appearing, they've got to file a notice of appearance.

5        Okay?

6                MR. BALDIGA:  Yes.  Thank you.

7                THE COURT:  Okay.  That's all.  I just didn't want

8        to forget to say that before you went any further.  But if

9        you would like to speak then with regard to --

10               You're saying, Trustee Despins, that you two have

11       reached an agreement in connection with your concerns --

12               MR. DESPINS:  Correct.

13               THE COURT:  -- about the representation by Brown

14       Rudnick of the debtor, the individual debtor, in the

15       criminal proceedings and prior representation as debtor in

16       possession counsel?

17               MR. DESPINS:  That's correct, Your Honor.

18               THE COURT:  Okay.  Go ahead, Mr. Baldiga.  If you

19       would just state your name for the record, please.

20               MR. BALDIGA:  Sure.  William Baldiga, Brown

21       Rudnick.  And, Your Honor, just as per the discussion just

22       now, Brown Rudnick is special counsel for Mr. Kwok's

23       criminal defense in the pending criminal proceeding.

24               And I do appreciate the opportunity to talk to Mr.

25       Despins as to what we are doing, what we're not doing, and I

1    think this will, well, it has alleviated the concerns.  And

2    I think also any concerns that the Court may have.  And I am

3    making certain representations for the benefit of the Court

4    in that regard that I've already made to Mr. Despins.

5               THE COURT:  Okay.  Thank you.

6               MR. BALDIGA:  Our defense of Mr. Kwok in the

7    pending criminal case in the Southern District of New York,

8    which is Docket 23-CR-118, there's also a parallel SEC case,

9    which we expect to be stayed, as is customary in these, has

10   not and will not interfere with our continued full and

11   timely compliance with the discovery as propounded on our

12   firm in the Chapter 11 case, including any depositions.

13              You may remember that I was before you more times

14   than I think any of us would care to remember back in August

15   and September in that regard and I think you've heard and

16   saw that we've worked very hard to be compliant and we have.

17              But if there's more required of us, we will

18   continue to honor the subpoena served on our firm.

19              There appears, and I use that word intentionally,

20   to be a separate criminal investigation with respect to

21   possible bankruptcy crimes that may relate in some way to

22   the Kwok Chapter 11 case.

23              Neither Brown Rudnick nor the Trustee knows the

24   targets of that separate criminal investigation.  We don't

25   know what the subject matter of that investigation or don't

1  know whether the subject matters of that investigation

2  covers actions that date after our involvement in the

3  Chapter 11 case was terminated or charges may at some point

4  be brought.

5       Brown Rudnick has confirmed to the Trustee, and I

6  so confirm to the Court, that our engagement from Mr. Kwok

7  does not extend to that separate criminal proceeding,

8  whatever that is.

9       THE COURT:  And there isn't one that you're aware

10  of.  You're saying there may be?

11       MR. BALDIGA:  No.  There is one.

12       THE COURT:  Oh, there is one.

13       MR. BALDIGA:  Mr. Despins -- we found out about it

14  --

15       THE COURT:  Oh, because of the subpoena that you

16  showed -- okay.

17       MR. BALDIGA:  -- the subpoena upon the Trustee.

18  And because of a prior protective order entered by this

19  court, the Trustee was obligated to share that subpoena with

20  us to seek our consent or whether we had an objection to the

21  production of certain materials.  We said we had no

22  objection.  That's how we found out about this.

23       THE COURT:  So the proceeding has actually been

24  brought?  It's not just seeking --

25       MR. BALDIGA:  It's a -- it appears to be a grand

1    jury proceeding.

2            THE COURT:  Okay.

3            MR. BALDIGA:  Whether you call that a proceeding

4    or not, I --

5            THE COURT:  I understand.  Okay.  Thank you.  Now

6    I understand what you're saying.  Go ahead.

7            MR. BALDIGA:  That's all we know.  And it's

8    conceivable that it's not a grand jury proceeding, it's

9    something else, but we don't know what that would be.  It's

10   not intended that, frankly, any of us know at this point.

11           THE COURT:  Okay.

12           MR. BALDIGA:  As far as we can tell.  In any

13   event, our engagement does not extend to that, whatever that

14   is.

15           THE COURT:  Okay.

16           MR. BALDIGA:  And we will not accept any

17   engagement as to that investigation just to obviate any

18   concerns as to potential conflicts of interest.

19           During the period of our representation of Mr.

20   Kwok as debtor in possession here, Brown Rudnick had no

21   knowledge of any criminal investigation of Mr. Kwok.

22           The only proceeding in this Chapter 11 case in

23   which we've advocated since the Trustee's appointment, other

24   than at the hearings last fall, which I already mentioned in

25   connection with our compliance with the Trustee's discovery

1    on us, is as to this request for a limited stay that we were

2    here last week to preserve Mr. Kwok's Fifth Amendment

3    rights.

4              And Brown Rudnick is not a necessary witness in

5    connection with that stay requested.  In fact, no one has

6    seen the need for any witnesses.  But there doesn't seem to

7    be a material fact in dispute.

8              And based on these representations, and of course

9    the continuing truth of them, the Trustee seeks no relief.

10    But I'll let Mr. Despins speak to that.  And Brown Rudnick

11    feels that there is no conflict.  But, again, Mr. Despins is

12    committing not to seek relief based on the continuing truth

13    of those representations.

14              THE COURT:  Okay.

15              MR. BALDIGA:  Thank you.

16              THE COURT:  Thank you.

17              MR. DESPINS:  For the record, Luc Despins, Chapter

18    11 Trustee.  That's correct, Your Honor.  That's accurately

19    stated.  Thank you.

20              THE COURT:  Okay.  Thank you, both.

21              Now, there's still an issue of this order, right?

22              MR. DESPINS:  Yes.

23              MR. BALDIGA:  Yes.

24              THE COURT:  Okay.  So go ahead.

25              MR. DESPINS:  So, Your Honor, Docket 1699, I

1   contain as Exhibit B a mark to show a changes version.  I

2   think that's probably the best order to look at.

3              THE COURT:  1699?

4              MR. DESPINS:  1699, correct.  At pages -- because

5   there's various exhibits, but at pages 11 of 30, that's

6   where -- the marked to show changes order.

7              THE COURT:  Okay.

8              MR. DESPINS:  But let me try to capture the

9   disagreement in a nutshell.

10             You know, memory is a fickle thing, but my

11  recollection, and I think Mr. Bassett's recollection from --

12  what had been agreed at the last hearing, and that's where

13  there's a disagreement because their recollection is

14  different, is that they would seek from -- permission from

15  the Department of Justice and from the criminal court

16  permission for them to give to us whatever is produced to

17  them by the Department of Justice in the criminal case.

18             Their understanding is, no, that's not what they

19  agreed to.  That they agreed that we could -- they would

20  seek permission from the DOJ and from the Court for the DOJ

21  to give to us directly documents.  And that doesn't work at

22  all.  The DOJ is not going to give us documents.

23             As I said before, when I was on Zoom, we don't

24  exist in that criminal proceeding.  There are two parties to

25  it.  The DOJ, the defendant.  The defendant is a debtor in

1    this court.  And the only portal for us to access to these

2    documents is through the defendant.

3          And, as we said before, there's no act of

4    production issue at all for them to turn over to us the

5    documents that the DOJ gives to them because these are not -

6    - you know, it's not a recognition by them that these

7    documents are accurate or they show anything.  The only

8    recognition is they got it from the DOJ.  That's all.  So

9    there's no act of production issue at all.

10         So all of the dispute with respect to the terms of

11   the order it really turns on that issue, because they would

12   like the DOJ to give us the documents.  That will never

13   happen.  I know that.

14         And remember that we are taking the risk that the

15   criminal court says no, we're not going to allow you,

16   defendant, to give the documents you get from the DOJ to the

17   Trustee.  It expressly says that in the order.

18         And so that's where we are.  Basically

19   there's a disagreement over what was agreed to.  That's my

20   recollection.  That's all.  Unfortunately, we have no

21   transcript.  Perhaps Your Honor has a transcript.  We

22   couldn't find the transcript.  It was not available.

23         THE COURT:  Was there a request made for a

24   transcript?

25         MR. DESPINS:  Perhaps by PAX.  Yes.  But I don't

1    think it's -- the transcript from the 18th was available,

2    but not from the 20th.  So we're kind of in a -- we're

3    guessing or we're relying on our memory.

4                So I'll let Mr. Baldiga, you know, address this.

5                MR. BALDIGA:  Again, Your Honor, Mr. Baldiga for

6    Mr. Kwok.

7                The proposed orders, again, before you, each have

8    been submitted.  The debtor's at Docket 1698 and the

9    Trustee's at 6699.  The Trustee then as part of 1699

10   redlined but against a different version.

11               So I just want to make it clear that the debtor's

12   suggested order is at 1698.  There's not too much difference

13   in what the Trustee redlined from, but there are a few

14   differences.

15               Your Honor, we actually have a very distinct

16   memory of what we agreed to and we think the Court will as

17   well.  We did not agree and we wouldn't have agreed and I'll

18   explain why.

19               But, in any event, we start from we're here to

20   have an order entered as to what was agreed.  And what we

21   agreed to, and there was an extensive discussion about this,

22   we will ask the Government and we will -- and then the

23   request was not just the Government but you also have to ask

24   the Court.

25               Well, we wouldn't have had to ask the Court if we

1    were just agreeing to turn over whatever we got from the

2    DOJ.  And we wouldn't have done that, Your Honor, for at

3    least five reasons.

4            Well, first of all, we didn't, but I'll go

5    further.  We shouldn't have to go further, but we wouldn't

6    have for several reasons.

7            We have no idea what DOJ may turn over to us.  No

8    idea.  There is -- our client would not be able to make a

9    knowing agreement in that regard because we have no idea.

10   The client has no idea what DOJ may turn over.  Our firm has

11   no idea what the DOJ may turn over.

12           No one, the Trustee, us, our client, this court

13   has any idea what rights there could be implicated by what -

14   - the Government has told us to expect several tetrabytes --

15   and I'm not a tech person, I have no idea what a tetrabyte

16   is, except it sounds like a lot -- several tetrabytes of

17   information.

18           Importantly, Your Honor, DOJ is obligated to turn

19   over this to counsel.  It's not, as the Trustee seems to now

20   maybe wish it were, that these are Mr. Kwok's materials.

21   That's not what we're talking about.  This is whatever DOJ

22   has taken in the course of its investigation from who knows

23   who.  So we're not even now talking about materials of Mr.

24   Kwok.

25           How could we ever make a commitment, and we never

1    would have made a commitment, to turn over something that we

2    haven't seen, are not our client's materials, and we have no

3    idea what they --[ what to even expect.

4            Next, there are Fifth Amendment issues here

5    perhaps.  There is -- and I'll come -- I'll come back to

6    that.

7            Then there's the issue, Your Honor, of privilege.

8    I think this court, certainly Mr. Henzy, and almost

9    certainly the Trustee thought that maybe they were done

10   debating the issue of privilege.

11           I know I sat in the back of the courtroom for more

12   hearings than anyone cared to admit about the so-called

13   consent order of Docket 856 about what is -- what the debtor

14   has a privilege to and what the debtor has assigned to the

15   Trustee.

16           But, Your Honor, there are three categories of

17   materials in that consent order, 856, which the debtor

18   assigned to the Trustee.  The three categories are assets of

19   the debtor.  Two, are the debtor's financial condition.  And

20   three, documents as to the administration of the estate in

21   between the petition date and when the Trustee was

22   appointed.

23           Of these tetrabytes of data that we may get from

24   DOJ, or we should get from DOJ, we have no idea what subset

25   of those may fall into any of those three categories.  But

1   the debtor, and Mr. Henzy can speak more to what, I mean, we

2   were not involved in the negotiation of that order, but the

3   debtor may or may not have attorney-client or any other

4   privilege as to some subsets of that data.  We have no idea.

5   And neither will anybody else until that data is reviewed.

6          THE COURT:  Right.  Let me just -- I'm a little

7   confused at the moment, so give me a second.

8          MR. BALDIGA:  Okay.

9          THE COURT:  But what is it that you're -- that

10  you, as special counsel to Mr. Kwok, are agreeing to do

11  aside from --

12         MR. BALDIGA:  Exactly what we have in our proposed

13  order, we will --

14         THE COURT:  Well, your proposed order says -- 1698

15  is your proposed order, correct?

16         MR. BALDIGA:  Yes, Your Honor.

17         THE COURT:  Okay.  So it says request -- you'll

18  promptly request that the Assistant United States Trustee

19  from the Southern District of New York assigned to the

20  criminal prosecution of the debtor, the Government,

21  including, if necessary, by filing a motion with the United

22  States Court of the Southern District of New York, to modify

23  any existing protective order, provide to the Trustee the

24  documents and materials the Government produces to the

25  debtor as part of the Government's disclosures to the

1   debtor.  And as part of such request, the debtor shall

2   inform the Government and the criminal court of this order.

3           MR. BALDIGA:  Yes.

4           THE COURT:  So what -- you keep talking about the

5   DOJ.

6           MR. BALDIGA:  That is the Government.

7           THE COURT:  So what is it --

8           MR. BALDIGA:  The Government acts in that

9   proceeding --

10          THE COURT:  -- that you're not agreeing to turn

11   over that the Trustee thought you were?

12          MR. BALDIGA:  I'm sorry?

13          THE COURT:  You said I would never agree to -- I

14   think you said I've never agreed to turn over what the DOJ

15   has because I don't know what they have.

16          MR. BALDIGA:  We're talking about at last week's

17   hearing --

18          THE COURT:  Yeah.

19          MR. BALDIGA:  -- we did not -- we had an

20   agreement.  Our agreement was that we would make a request

21   to the Government and a request to the Court that the

22   Government turn over to the Trustee whatever it was going to

23   turn over to us and leave it to them.

24          And you heard Mr. Best explain at length the

25   Government may impose restrictions on that, may do it, may

1    not.  The Court may have restrictions.  We don't know.  But

2    we're out of it.

3            We will do everything we can to facilitate by

4    making that request and then we step out of it.  It's

5    totally up to the Government.  That's the agreement that was

6    made.  And I'm confident that when there is a transcript it

7    will bear that out.

8            So we did not agree to produce anything, including

9    --  because the whole reason we're here is that the debtor

10   producing things may implicate his Fifth Amendment rights.

11           THE COURT:  So you're saying that the problem you

12   have is that it's not an act of production by the debtor.

13   It's an act of production by the Government.

14           MR. BALDIGA:  That's right.  If the Government

15   chooses to produce something to the Trustee, there's no

16   Fifth Amendment rights implicated.

17           THE COURT:  Well, it wouldn't be to the Trustee.

18   Isn't it -- it's not -- would it be directly to the Trustee

19   or it would it be to you --

20           MR. BALDIGA:  That's what we agreed to.

21           THE COURT:  Okay.  So it would be from the

22   Government --

23           MR. BALDIGA:  To the Trustee.

24           THE COURT:  You would make a motion.  You would

25   agree first at least to ask and then -- but also file a

1    motion in the --

2                MR. BALDIGA:  Southern District case.  Yeah.

3                THE COURT:  -- criminal proceedings that we've all

4    talked about in the past.  The indictment was handed down

5    and somebody showed it to me, whatever day of that hearing

6    it was.  Right?

7                MR. BALDIGA:  Yes.

8                THE COURT:  That case.  And you've already stated

9    on the record what its number is.  I don't remember what its

10   number is.

11               MR. BALDIGA:  Right.  And that's the only --

12               THE COURT:  Okay.  And so you're saying --

13               MR. BALDIGA:  -- proceeding in which we represent

14   the client.

15               THE COURT:  -- that you'll ask them to give that

16   information to the Trustee?

17               MR. BALDIGA:  Yes.

18               THE COURT:  But you're not producing any

19   information to the -- that Mr. --

20               MR. BALDIGA:  That's right.  As Mr. Best explains,

21   it takes our Fifth Amendment rights out of it.

22               THE COURT:  Okay.  I don't recall, sitting here,

23   exactly what was said, but I understand your position.

24   That's why I was asking.

25               MR. BALDIGA:  Okay.

1          THE COURT:  Your point is you can -- you, as

2     counsel to the -- to Mr. Kwok in the criminal proceedings

3     have not agreed to produce any documents, that any

4     production has to go from -- has to be had if at all through

5     the Government to the Trustee?

6          MR. BALDIGA:  That's right.

7          THE COURT:  Okay.

8          MR. BALDIGA:  And, again, for several reasons.

9     And I haven't even gotten to the -- one is the client

10    doesn't know what it is.  We don't know what it is.

11         And other than the Government, they -- but it's

12    certainly beyond the client's materials.  So it's not like

13    our client should know what's in there already.  We don't

14    know.  So how can you have an agreement as to something you

15    don't even know what it is?

16         Second, there may be Fifth Amendment rights

17    implicated by some of that, which you don't know until you

18    look at it, but we wouldn't know.

19         Third, there could be privilege issues or not.

20    There were certain privileges assigned to the Trustee.

21         THE COURT:  Well, privilege issues can be dealt

22    with.  So I understand what you're saying --

23         MR. BALDIGA:  Okay.

24         THE COURT:  -- but that can be handled.

25         MR. BALDIGA:  And then there are national security

1   restrictions.  We have been told --

2            THE COURT:  What does that mean?

3            MR. BALDIGA:  Well, we have been told, my firm,

4   that the Government intends to enforce a procedure under

5   CIPA, the Classified Information Procedures Act, 18 USC App

6   3, for very significant restrictions on the review of

7   certain of the materials that would require, for example,

8   any attorney at my firm that reviews any materials to obtain

9   top secret national security clearance, which takes a while.

10           We can't make any commitment as to what we do with

11  things that we ourselves have to get a national security

12  clearance for.  We would never purport to do it.  Now, I've

13  never done that.  I'm a bankruptcy lawyer.  But my partners,

14  Mr. Best and Mr. Crook, have done this before and they say

15  it's an elaborate process.

16           We can't -- we, ourselves, can't turn things over.

17  The Government has a process to make sure that the people

18  whose eyes are reviewing things have the necessary

19  clearances.  We can't administer that.  Our client can't

20  administer that.  So we can't produce anything.  We can't by

21  federal law.

22           And let me -- and then I don't think we have to go

23  back to the merits because, again, we're here to implement

24  an agreement that was made on the 20th and not to reargue,

25  but the Trustee went down the path again of saying that

1    there's no act of production with respect to a pile of

2    documents that none of us know about.

3              And to that another reason is the Trustee has a

4    subpoena to the debtor.  We have no idea.  And that's what

5    we're here all about, right, the enforcement of a subpoena

6    to the debtor.  There's no one, including this court, who

7    has any idea what portion of those documents may or may not

8    be subject to the Trustee's prior subpoena.  We don't know.

9              How could we ever make an agreement as to things

10   that have never even been subpoenaed from anyone?  Maybe

11   some of that is subpoena to the subpoena.  But until someone

12   looks at the documents and matches them up against the

13   subpoena, we're all just guessing.

14             That's why if they want to send a subpoena to the

15   Government, we said go ahead and we'll ask the Government to

16   comply.  We'll take the debtor out of it.

17             All of the Trustee's cases that he cites that we

18   talked about at the last hearing, *Harris*, *Baltimore*, *Ross*,

19   and so forth, are all Section 521(4) cases.  They have to do

20   with turnover of property of the estate.

21             And the cases are legion that those do not

22   implicate Fifth Amendment concerns because you're giving the

23   Trustee what the Trustee owns.  And you don't have Fifth

24   Amendment implications from that because it's not

25   testimonial.

1          Turnover and surrender.  Surrender is the key to

2     every one of those cases, including *Ross*, which Mr. Bassett

3     made much of at the hearing.  It's a -- those are surrender

4     cases or turnover cases.  We're not here talking about

5     turnover or surrender.

6          I can tell you what Mr. Kwok has today.  Nothing.

7     He's incarcerated and bail has been denied.  He can't --

8          THE COURT:  Did he turn over any documents to the

9     Government as part of this proceeding yet?

10         MR. BALDIGA:  Well, the Government didn't actually

11    ask him.  The Government seized it.  Whatever Mr. Kwok has -

12    -     THE COURT:  Okay.  So they have information is

13    what you're saying that otherwise might have been produced

14    by Mr. Kwok --

15         MR. BALDIGA:  The Government?

16         THE COURT:  -- because they seized it?

17         MR. BALDIGA:  Well, the Government seized, and

18    this is another point the Trustee has made, the Government

19    did a seizure, several seizures, in Greenwich, in New

20    Jersey, in New York, on the day of Mr. Kwok's arrest.  Mr.

21    Kwok was in shackles and handcuffs during the seizure.

22         We have an inventory, but it doesn't go into much

23    detail.  They seized a lot of things.  We haven't seen what

24    they seized.  We don't know.  It goes well beyond what Mr.

25    Kwok owns.  There was no requirement that they seize only

1    what Mr. Kwok has.

2           So they talk about all these devices, computers,

3    and so forth.  That's not limited to what Mr. Kwok --

4    whatever was -- the Government seized what they seized.  But

5    they -- it wasn't a process of asking Mr. Kwok to hand over

6    anything.  He was taken away.  And then the Government did

7    its seizure.

8           So there are three categories of possible

9    materials here that the Trustee wishes to have the Court

10   deal with.  It's what the debtor has.

11          Well, I can -- I can be clear in my representation

12   this debtor, incarcerated for at least the foreseeable

13   future with bail denied, has nothing.  Okay.  So that's

14   pretty clear.  That's the (indiscernible).

15          It's what the Government has seized from the

16   debtor's -- from the debtor and others.  We don't know what

17   that is.  It goes well beyond what the debtor had.  It could

18   be from hundreds of other parties.  We don't know.

19          So we can't even have an intelligent debate, and

20   no one can make intelligent rulings as to that until we know

21   what we're talking about, and only the Government can

22   administer that.

23          And third, then, and I think this is the key to

24   the whole contempt proceeding, what others have under the

25   debtor's control.  That goes exactly to the Fifth Amendment

1    concern because the heart of the indictment is that the

2    debtor controlled third parties with a tremendous overlap

3    between the Trustee's allegations in the Chapter 11 case and

4    Mr. Kwok's indictment.

5         So the Trustee has said we'd -- we want the debtor

6    to exercise his control and turn over things in the

7    possession of other third parties.  That's exactly what is

8    implicated by the Fifth Amendment and that he cannot do and

9    will not do.  That is testimonial.  And there is not a

10   single case that says that that type of thing is not

11   testimonial.  And that's the -- that's the nub of the issue.

12        And the Trustee's response at Docket 1670 to the

13   debtor's contempt response has six arguments.  And I think

14   it's instructive to go through those six.

15        The first argument is that the debtor prior to his

16   arrest had no reasonable apprehension of criminal risk and

17   so Fifth Amendment isn't implicated.  Well, if that was ever

18   a good argument, it certainly isn't today.  I mean, that's

19   mooted at best.

20        Second, the production of estate property is not

21   testimonial.  We agree.  Those are the one -- those are the

22   turnover cases, but that's not what we're arguing about here

23   because the debtor has nothing.

24        Third, that the debtor must assert the Fifth

25   Amendment in a particularized manner.  We've agreed.  In

1    both consent orders that you see, we've agreed to that, so

2    that's no longer an issue.

3           The Trustee can ask however many questions he

4    wants and the debtor will deal with each of those in turn,

5    one by one, and either assert his Fifth Amendment rights or

6    not.

7           THE COURT:  How is that going to occur?  I'm just

8    -- when and how is that going to occur?

9           So if you have an agreement that the Trustee needs

10   particularized findings, right, he needs to be able to

11   determine -- he needs to be able to ask questions, even to

12   which Mr. Kwok can assert his Fifth Amendment privilege,

13   right?

14          MR. BALDIGA:  Right.

15          THE COURT:  So when and how is that going to

16   happen?

17          MR. BALDIGA:  We have -- I think we'll have to ask

18   the Government.  The Government is -- that's the whole

19   reason we asked for a stay here, Your Honor.  This whole

20   thing is a little bit --

21          THE COURT:  Why would you have to ask the

22   Government?

23          MR. BALDIGA:  Well, because he --

24          THE COURT:  I'm just asking.

25          MR. BALDIGA:  -- he can't get visitors except for

1   his legal counsel.

2          THE COURT:  He can't get -- I have no idea, Mr.

3   Baldiga.

4          MR. BALDIGA:  No.  That's why this whole thing --

5          THE COURT:  I'm just asking the question.

6          MR. BALDIGA:  Again, we're all here as bankruptcy

7   lawyers talking about how the Fifth Amendment works.

8   Someone is going to have to --

9          THE COURT:  Well, it's not about the Fifth

10  Amendment.  It's about he's in jail.

11         MR. BALDIGA:  He's in jail.

12         THE COURT:  And can somebody come and ask him

13  questions?  I don't -- I mean --

14         MR. BALDIGA:  No.

15         THE COURT:  Okay.  That's what I'm asking.

16         MR. BALDIGA:  No.  You can't have a stenographer.

17  We can barely get in an interpreter.

18         Sometimes, after a very long clearance for

19  security purposes, it's -- and we, even our own ability to

20  access our client is very limited.

21         I mean, that's why the whole idea that a client

22  should be able to, well, look at all of these tetrabytes of

23  data so he can exercise his constitutional rights or not is

24  in the context of this criminal proceeding beyond

25  preposterous.  I just don't see how it would ever happen.

1     He can't -- he can't be on the internet, for example.

2                THE COURT:  Well, I don't know about -- I have no

3     idea about that.  But it seems like if you're in jail I can

4     --

5                MR. BALDIGA:  Well, I can.  I can represent that.

6                THE COURT:  -- that I could see how that could

7     happen.

8                But I was asking questions about whether some

9     party other than the Government could go ask him questions

10    while he's in jail, or present to him a list of questions to

11    which he could assert his Fifth Amendment privileges?

12               Because, at some point, and I'm not suggesting I

13    know the point, right, but at some point, I think the

14    Trustee is entitled to that record, right?  He needs to be

15    able to make that record even if -- because it has to be

16    specified in order for the Trustee to ask any court to make

17    some kind of inference.

18               So, for example, you're talking about the issues

19    in the cases that say it's not testimonial when you turn

20    over documents, which I've read those cases.

21               MR. BALDIGA:  Yes.

22               THE COURT:  You know, a week or so ago.

23               So the Trustee's asked for documents prior to when

24    -- and I think I asked this question last week, I think I

25    did, but maybe I didn't ask it well, I don't know -- that

1      about the assets of the estate, right, what assets do you

2      have?

3                  And that question's never been answered other than

4      what was in the debtor's schedules and statements, right?

5                  But, at some point, you know, you just mentioned

6      the New Jersey house -- I mean, that was never even

7      mentioned in the Chapter 11 proceedings at all.

8                  MR. BALDIGA:  And all -- and all we're talking is

9      the -- that's a location not owned by the debtor that was --

10     there were -- there were properties -- there was material

11     seized at that house.

12                 THE COURT:  But the debtor's never testified one

13     way or another whether he owned that property.  Doesn't the

14     Trustee have the right to the --

15                 MR. BALDIGA:  I wouldn't know that.

16                 THE COURT:  Well, in this court anyway?

17                 MR. BALDIGA:  Okay.

18                 THE COURT:  Okay.

19                 MR. BALDIGA:  I don't know.

20                 THE COURT:  I have no idea about anywhere else,

21     right?  I'm just focusing on this court.  Doesn't the

22     Trustee have the right to ask him that question?  Even if

23     Mr. Kwok asserts the Fifth Amendment.

24                 MR. BALDIGA:  And I will commit that we -- we

25     intend -- we've told the Trustee you draft up as many

1      questions as you want.

2              I fully expect Mr. Kwok to take the Fifth with

3      respect to each.  And I think it's implicit in the

4      commitment we've made to the Trustee to do our best here

5      without waiving constitutional protections.  We will -- we

6      will have translated those questions and we will take them

7      to Mr. Kwok.  We can access our client.  So we will do that.

8              THE COURT:  Well, okay.  Wouldn't that solve the

9      problem then?  At least in the short run for the Trustee.

10             MR. BALDIGA:  Well, that would take care of his

11     testimony.  Yeah.

12             THE COURT:  I mean --

13             MR. BALDIGA:  But the Trustee goes beyond that to

14     the documents the DOJ has in which we've thrown up hands and

15     say --

16             THE COURT:  Okay.  Well, why can't we separate the

17     two at least for now --

18             MR. BALDIGA:  Okay.

19             THE COURT:  -- until we figure this out.

20             MR. BALDIGA:  I think we have.

21             THE COURT:  Why can't we --

22             MR. BALDIGA:  And I think the --

23             THE COURT:  Okay.

24             MR. BALDIGA:  -- the Trustee and us have been

25     contemplating, which is the reason why they've drafted these

1  questions, is that it wouldn't just be for the fun of it, we

2  would take those questions to Mr. Kwok, and with the full

3  expectation, but, you know, until we talk to our client one

4  by one, with the full expectation though that he will invoke

5  his Fifth Amendment rights as to each.  That's what we would

6  expect.  And so the testimonial aspects will  be --

7       THE COURT:  But I think they need the record.  I

8  think they're entitled to a record.  You know, that's what

9  I'm suggesting is.  I mean -- and you're right.  We're in a

10 bankruptcy court.  But for good --

11      MR. BALDIGA:  But he can't --

12      THE COURT:  -- for good or for bad, we've had

13 Fifth Amendment issues come up in bankruptcy proceedings.

14      MR. BALDIGA:  Yeah.

15      THE COURT:  Okay?  And in every situation in which

16 they've come up, the person who has asserted the Fifth

17 Amendment privilege has had to answer specific questions,

18 even if the answer is I'm asserting my Fifth Amendment

19 privilege against self-incrimination, so that there's a

20 record established that whomever the party was, whether it's

21 a Trustee or creditor or whomever, then has established for

22 purposes of whatever it is that that person is trying to

23 prove, in whatever proceeding it is before the Court, right?

24      And so it sounds like you agree that that can

25 happen.

1          MR. BALDIGA:  Well, we agree that we will try to

2     make it happen.

3          I think the distinction, Your Honor, is we're

4     before the same court that granted bail to Sam Bankman-Fried

5     and Bernie Madoff that has denied bail to our client, which

6     I don't -- my partners at least -- and we do a lot of

7     bankruptcy crime work on both sides -- we can't remember a

8     case where there is indefinite incarceration and such

9     restrictions on access.

10         So, yes, there are bankruptcy cases in which the

11    Fifth is invoked at an examination because arrest doesn't

12    stop on its own a deposition necessarily.  But this is

13    different.

14         Being incarcerated in -- under these conditions

15    with extremely limited access, and then that's even before

16    you get to the national security concerns, it's a challenge,

17    which is why a stay was we thought the obvious way to go.

18         And we understand bankruptcy estates have to be

19    administered, but we're trying to do that consistent with

20    the Fifth Amendment rights.  But even with that, we're

21    trying to be cooperative.

22         I commit if it's not -- I think it's implicate in

23    both orders, but I commit on top of that that we will take

24    those questions and I believe that we will come back with

25    the invocation of Fifth Amendment to each of them, or maybe

72

1    answers to some of them.  But we just don't know.

2           THE COURT:  I understand.

3           So I'm trying to -- so there's two issues.  The

4    issues of the questions that the Trustee has, would like

5    answers to, even if it's an assertion of a Fifth Amendment

6    privilege, and/or the request for production of a document

7    that the -- because I looked at -- I'm not saying I studied

8    it, okay, but I understand that -- today's what, the 27th,

9    so the other day, I guess I don't know what day it was, but

10   --

11          MR. BALDIGA:  A week ago I think.

12          THE COURT:  Well, no.  I think the order that was

13   submitted was on Monday, the 24th.

14          MR. BALDIGA:  Yes.

15          THE COURT:  And it -- by the Trustee.  And --

16          MR. BALDIGA:  I think by both of us.

17          THE COURT:  Oh, I don't know.  It's 1699 that has,

18   attached as Exhibit A, a request to debtor regarding

19   associated entities and associated individuals listed in the

20   2004 subpoena.  And there are 202 questions and/or requests.

21          MR. BALDIGA:  Yes.

22          THE COURT:  So what I'm trying to understand is,

23   and I think is, are you saying that you will produce -- you

24   will at some point soon have access to your client and will

25   be able to get a response to all 100 -- all 202 of these

1    questions or requests --

2              MR. BALDIGA:  Yes.

3              THE COURT:  -- set forth in Exhibit A?  Okay.

4              MR. BALDIGA:  Yes.

5              THE COURT:  So you're saying you'll do that?

6              MR. BALDIGA:  Yes.

7              THE COURT:  Okay.  So that's one issue.

8              Then the other issue is the production of

9    documents that are in the control of the United States

10   Attorney's Office for the Southern District of New York.

11   That's the second issue, correct?

12             MR. BALDIGA:  Yes.

13             THE COURT:  And your position -- when I say you,

14   I'm obviously speaking of you as counsel to Mr. Kwok --

15             MR. BALDIGA:  Understood.

16             THE COURT:  -- is that you'll request them through

17   the Assistant U.S. Attorney who's handling the matter.  And,

18   if you need to, you'll file a motion with the Court.  But

19   that you're not producing anything because you can't for

20   many reasons of the -- you recited five on the record.

21             MR. BALDIGA:  Yes.

22             THE COURT:  Okay.  So that's your position.  So --

23             MR. BALDIGA:  And then the third category is

24   documents under the control of third --

25             THE COURT:  Oh, right.

1          MR. BALDIGA:  -- parties.

2          THE COURT:  Okay.  That's fair.

3          MR. BALDIGA:  And that -- I don't think there's a

4     serious argument that that is not testimonial.  That is at

5     the heart of something that's testimonial.

6          Because the Trustee's allegations, as I understand

7     them from Mr. Henzy, in the bankruptcy case since we left it

8     and the criminal indictment have a tremendous amount of

9     overlap as to much of the bankruptcy case, as this court

10    knows more than anyone else, seems to be, from my read,

11    about what entities or alter egos or what does Mr. Kwok

12    control or not, and the indictment is frankly all about

13    that.

14         And so it would be the essence of a Fifth

15    Amendment violation to have Mr. Kwok compelled to admit that

16    he controls someone by instructing them to turn over

17    something when that's what he's indicted about.

18         THE COURT:  Okay.  I hear your point.  I'm not

19    sure the indictment is all about that when you say that.  I

20    mean, not from the Bankruptcy Court perspective.  Maybe it

21    is from the criminal court perspective.

22         What the bankruptcy court perspective is is the

23    Trustee was appointed to investigate the affairs, financial

24    affairs and -- of the debtor, and to locate assets that

25    belong to or are controlled by the debtor and turn them into

1    cash and pay claims, right?  That's what the Bankruptcy

2    Court's perspective is?

3            MR. BALDIGA:  Yeah.

4            THE COURT:  And the indictment is based on

5    criminal laws and things that aren't really relevant to the

6    Trustee trying to --

7            MR. BALDIGA:  No, not at all.

8            THE COURT:  -- exercise his duties and --

9            MR. BALDIGA:  No, just the opposite.  Most of the

10   claims in the case, as I understand it, are on account of

11   so-called victims of the alleged crimes.

12           THE COURT:  We haven't even gotten to the claims

13   yet.

14           MR. BALDIGA:  No.  But as I understand it --

15           THE COURT:  And who knows if any of those claims

16   are valid?  You know --

17           MR. BALDIGA:  No idea.

18           THE COURT:  -- I hear what you're saying, but I

19   don't think the two work in tandem.

20           MR. BALDIGA:  So the indictment in shortest hand

21   is that Mr. Kwok influenced or controlled securities

22   offerings or membership offerings by entities other than

23   himself, and that he was in control of them even though

24   technically not an officer, director or owner of any of

25   those.  And that is, as I understand it --

1          Again, there are a lot of docket entries since I

2     left the Chapter 11 case.  There are a lot of allegations,

3     including in the 202 -- really, the 202 questions that the

4     Trustee intends to put to Mr. Kwok are largely about do you

5     control this entity?  Do you control that entity?

6          And the heart of the criminal case is --

7          THE COURT:  Okay.  I see what you're saying.

8          But I still think that regardless of what you've

9     just said, you've said to the Court that those questions

10    will be provided to the debtor and he will answer them --

11         MR. BALDIGA:  Yes.

12         THE COURT:  -- even if the assertion is -- even if

13    the answer is I'm asserting my right against self-

14    incrimination under the Fifth Amendment?

15         MR. BALDIGA:  Exactly.

16         THE COURT:  Okay.  So I think that if we have to

17    do things in increments, maybe -- I don't know yet.  I have

18    to go back -- you all can continue to talk, right, about the

19    issue of how you want to try to get whatever information the

20    Government has.  It seems to me that you've made some

21    progress, but you haven't made complete progress.

22         But you do have an agreement on these 202

23    questions, so let's just get that started.  Right?

24         MR. BALDIGA:  Fair enough.

25         THE COURT:  Why don't we get that started.

1          Then with regard to -- so the other two issues

2     would be the process from which, through which on agreement,

3     if there is an agreement, that the Trustee could attempt to

4     obtain documents from the Government in the criminal

5     proceeding and the issues related to documents or

6     information that would be in the control of third parties.

7               MR. BALDIGA:  Yes.

8               THE COURT:  That's what we have left?

9               MR. BALDIGA:  Yes.

10               THE COURT:  Right?  Okay.

11               So, Trustee Despins, what --

12               And you don't have to leave Attorney Baldiga, just

13     in case there's questions.

14               So can't we start with the 202 issues?

15               I mean, I have to go figure out what you both

16     said.

17               MR. DESPINS:  Yes.

18               THE COURT:  I don't know sitting here.

19               MR. DESPINS:  Exactly.

20               THE COURT:  I'm not going to -- I can't remember

21     everything you said.  Right?  And it does appear that there

22     was a request for a transcript entered, excuse me, filed,

23     but, you know, the hearing was seven days ago.  If it wasn't

24     requested on any expedited manner, there isn't going to be a

25     transcript in an expedited manner.  So I'm going to have to

1      figure out what you both said on the issue of --

2            I recall the discussion, no question, about how

3      there was going -- there was going to be an attempt to get

4      information out of the criminal proceedings, but I don't

5      remember what was said.  I can't -- I just can't remember.

6            MR. BALDIGA:  Fair enough.  And I think, you know,

7      as we've reflected, we're all, as we've said, Mr. Despins

8      and I have both said, we're doing this from memory.  We all

9      have good notes.  We all have good colleagues who took

10     notes.  But the record will reflect it.

11           THE COURT:  And then the, you know, the issue of

12     the third parties, again, I don't know how we deal with that

13     at the moment.

14           Do your 202 questions, I have no idea, I mean,

15     Trustee Despins, I've looked at them.  But have I looked at

16     them from the perspective of what you're seeking to obtain

17     as information that would be responsive to your discovery?

18           MR. DESPINS:  This certainly goes a long way on

19     the issue of control.  So basically we're asking directly

20     did you control so-and-so, that company?  And I assume he's

21     going to plead the Fifth.

22           We're going to get a document back from them that

23     presumably will be sworn to by Mr. Kwok and they will say I

24     assert my Fifth Amendment rights and off we go from there.

25     So I think that -- we can submit an order that really boxes

1      that in that should be not controversial.

2              The question is how much time?  We would think

3      that just to get that 30 days should be sufficient.  We know

4      he's going to take the Fifth with regards to all of them so

5      there's not a lot of need to spend a lot of time on this.

6              So 30 days should be sufficient so we can have a

7      return from them which will be a sworn statement with the

8      answers to these questions.  And we all know what the

9      answers will be, but.

10             THE COURT:  Well, I do think that they're entitled

11     to that record, specifically with regard to the questions.

12     And you have no quarrel with that, so fine.

13             MR. DESPINS:  Yeah.

14             THE COURT:  So you'll produce an order.  You know,

15     today's what?  Thursday.  I don't know if you're going to

16     have an order by tomorrow.

17             MR. DESPINS:  Yes, we will.

18             THE COURT:  Okay.  So then you both can talk about

19     that.

20             With regard to the issues of obtaining documents

21     from the Government, I'm going to have to go back and figure

22     that out.

23             Do we have hearing -- you know, I'm saying this,

24     and I'm not saying it in a flippant manner, I'm not trying

25     to, but don't we have hearings on Tuesday in this case?  I

1    think we do.  Let me take a look.  Yes, we do.

2              MR. DESPINS:  Yes, we do.

3              THE COURT:  And some of them are about the

4    discovery issues.  Just one actually.

5              But, you know, either you'll have an agreement at

6    that time or you won't with regard to the issues that we've

7    just discussed this afternoon, which are the -- which is the

8    -- how do you get the information from the Government?

9              Is there an agreement that it's going to be done

10   by the debtor requesting it through the U.S. Attorney's

11   Office and/or the Court, or is it going to be that the

12   documents are produced to the debtor and then turned over?

13   I think that's the issue, isn't it?

14             MR. DESPINS:  That is the issue, Your Honor.

15             MR. BALDIGA:  Yeah.

16             THE COURT:  Okay.

17             MR. BALDIGA:  May I ask?  I have a personal

18   commitment at 4 o'clock in Boston.  And Mr. Best is on

19   trial, which is why he's not here.  And it will be next week

20   as well.

21             MR. DESPINS:  Zoom.

22             THE COURT:  Yes, you could appear remotely if

23   that's your request.

24             MR. BALDIGA:  Or if it's in the morning, I could

25   be here.

1          THE COURT:  It's not in the morning unfortunately.

2     It starts at 1:00 p.m.

3          MR. BALDIGA:  Then, if I could, Your Honor, that

4     would it --

5          THE COURT:  Well, if you have an agreement, you

6     don't have to appear.

7          MR. BALDIGA:  I understand.  But it would be a

8     terrible thing to make an agreement because I'd have to

9     drive --

10          THE COURT:  This is what I'm going to do though.

11     I'll make -- I'll continue this to -- we'll continue this,

12     what is a status, a status conference, right, until -- I

13     mean, there's four matters on at 1:00 and one matter on at

14     2:00.  I try to space them out because obviously it takes

15     long to discuss these issues.  Right?  I don't know if you

16     want to join at 1:00 or you want to join at 2:00.

17          MR. BALDIGA:  It doesn't really matter.

18          THE COURT:  Okay.  All right.  I'd like to try to

19     address, if there isn't an agreement between the two of you,

20     which there may not be, I'd like to try to address the other

21     matters first because --

22          MR. BALDIGA:  Of course.  So why don't I plan to

23     join at 2:00.

24          THE COURT:  Yeah.  I mean --

25          MR. BALDIGA:  Okay.

1        THE COURT:  -- I think that we'll continue this

2    hearing until 2:00.  All right?

3        Some of the other matters, looking at them on a

4    calendar, that's all I'm doing right now, look as though

5    they may not be controversial or take a lot of time.

6        MR. BALDIGA:  You do have things in this, in this

7    case that are not controversial?

8        THE COURT:  Yes, we do.  Some we do.

9        MR. BALDIGA:  Very good.

10        THE COURT:  But I don't know that.  So that's why

11    I don't want you to be sitting on the phone for an hour if

12    you don't have to be.

13        MR. BALDIGA:  Understood.

14        And can I just on the issue of the transcript,

15    because I think everybody agrees that we all need a

16    transcript, were you going to request that on an expedited

17    basis?

18        THE COURT:  It was the creditor PAX that ordered

19    the transcript.

20        MR. DESPINS:  PAX requested it.

21        MR. BALDIGA:  Oh, PAX and the debtor are good

22    friends.  Could we have a copy when you get it?

23        THE COURT:  Well, you all have to work that out.

24    I'm not getting involved in that.

25        MR. BALDIGA:  Okay.

1          THE COURT:  But I don't know if it was ordered on

2     an expedited basis or not.  And if it wasn't then it will --

3     you know, we have no control over the court reporters.

4          MR. BALDIGA:  Okay.  I just, you know, we just

5     didn't want waste --

6          THE COURT:  We have no control, you know.

7          MR. BALDIGA:  -- but we'll work that out.

8          THE COURT:  Yeah.  You can work that out.

9          MR. BALDIGA:  Okay.

10         THE COURT:  Okay?

11         MR. DESPINS:  Well, we have the one from the 18th.

12    It was requested on the same basis, meaning non-expedited,

13    so.

14         THE COURTROOM DEPUTY:  It is a longer -- the 20th

15    was a longer --

16         MR. DESPINS:  The 20th was a longer transcript.

17         THE COURT:  Well, you can -- I mean, there's, you

18    know, you can contact the --

19         MR. HENZY:  There's no way to know.  There's no

20    way to know.  We've been giving the transcriber a lot of

21    business, Your Honor.  There's no way to know whether the

22    transcript --

23         THE COURT:  No, I know.

24         MR. HENZY:  -- will be available.

25         THE COURT:  Then you contact the reporter --

1              MR. HENZY:  Yeah.  Right.

2              THE COURT:  -- and you see what the reporter says.

3              MR. HENZY:  Okay.

4              THE COURT:  That's all you do.

5              MR. DESPINS:  We'll do that.

6              MR. BALDIGA:  We'll do that without bothering the

7      Court.

8              THE COURT:  Yeah.  You just contact the reporter

9      and find out what the status is.  That's all.

10             MR. BALDIGA:  We appreciate that very much, Your

11     Honor.

12             THE COURT:  All right.  So I think, unless I'm --

13             MR. BALDIGA:  And thank you for permission to

14     appear remotely.

15             THE COURT:  Yes.  That's fine.

16             MR. BALDIGA:  I know it's not the favored --

17             THE COURT:  Well, it's not --

18             MR. BALDIGA:  way to do it, but I appreciate it.

19             THE COURT:  -- because I think we make --

20             MR. BALDIGA:  I just wanted to express my

21     appreciation.

22             THE COURT:  And I appreciate that.

23             The reason it's not favored is because, as you

24     know, there's so much going on in this case.

25             MR. BALDIGA:  Yes.

1          THE COURT:  It's very difficult, no matter what

2    anyone says, to address these really serious issues looking

3    at people's faces on a black screen.  I'm sorry, but it is.

4    I think it's -- this is a very -- I mean, you know, you

5    could argue every case is a very important case no matter

6    who it is, whether it's a debtor trying to save a car or

7    this situation.

8          We -- this court, has been back in person since

9    February of 2022.  The Court is a place and it's a place for

10   a reason.  It has, as do all of you, serious obligations to

11   the public and to ensure that the laws are properly

12   followed.

13         And whether or not it's intentional, and I don't

14   think it is, I've never thought that it is, some people

15   argue that it is, there's a lot less formality and

16   understanding of the importance when I'm -- when people are

17   on a screen looking at each other.

18         I could tell you stories, which I'm sure you don't

19   want to hear about some of the things that have happened

20   when people are on a screen and think it's not a big deal.

21         MR. BALDIGA:  My wife is a college professor.  I

22   think her stories would top yours.

23         THE COURT:  I'm sure they would, actually,

24   unfortunately.

25         But all that being said, under specific

1    circumstances of a case, including what you've requested,

2    that your partner's on trial, you have to be in Boston, I'm

3    going to allow it.

4            But I do think that even in what people think are

5    routine matters, not in a -- not in this Chapter 11 case,

6    I'm just saying as a whole, the judges of this district have

7    decided and been encouraged to decide that people should be

8    in person in court.

9            MR. BALDIGA:  It is more effective.

10           THE COURT:  And it's not as if the three of us

11   made this decision without people who are, you know, in

12   authority suggesting that we should be in person.

13           MR. BALDIGA:  Understood.

14           THE COURT:  And so that's all I want to say about

15   that, except that I also do agree that a court is a place

16   for a reason and I think we can't -- none of us, and I'm not

17   suggesting any of you have, none of us, when I'm saying none

18   of us I mean the whole, should lose sight of that.  Because

19   the minute that we do lose sight of that, I think it can

20   undermine the system --

21           MR. BALDIGA:  Appreciate it.

22           THE COURT:  -- and don't want, we don't, none of

23   us want to do that.

24           So in any event, that was a long way of saying,

25   yes, you can appear.

1          MR. BALDIGA:  Okay.  And thank you for your --

2          THE COURT:  You'll have to contact the -- you'll

3    have to have someone from your office -- and Mr. Best is

4    going to have to file an appearance, you know, when I talked

5    about --

6          MR. BALDIGA:  We will.

7          THE COURT:  -- what are somewhat administerial

8    things, but they're not, they're important, you know, you'll

9    have to contact --

10          I guess Calendar Connect is that where Attorney

11    Baldiga and Attorney Best would get that information?

12          THE COURTROOM DEPUTY:   Yes.

13          THE COURT:  To get the information which hasn't

14    even been created yet, Mr. Baldiga, because we haven't

15    created any information for next week's hearings yet --

16          MR. BALDIGA:  Okay.

17          THE COURT:  -- because they're in person.  So the

18    clerk's office staff will have to do that.  And then they

19    will -- they'll get that information to you.

20          MR. BALDIGA:  Very good.

21          THE COURT:  Okay?

22          MR. BALDIGA:  Thank you very much.

23          THE COURT:  Thank you.

24          Is there anything further we need to address

25    today?

1          MR. DESPINS:  Your Honor, two minutes for an

2     update?

3          THE COURT:  Sure.  Go right ahead.

4          MR. DESPINS:  And I'll --

5          THE COURT:  Before you say anything.

6          So just so it's clear for the record, we're

7     continuing the status conference to next Tuesday, May 2nd at

8     2:00 p.m.  And Mr. Baldiga will be allowed to appear

9     remotely.

10          MR. BALDIGA:  Thank you.

11          THE COURT:  Okay.  Thank you.

12          Sorry, Trustee Despins.  I just need to make that

13     statement for the record.

14          MR. DESPINS:  No problem, Your Honor.

15          I'll start with the unusual good news.  I would

16     put the caveat that it's not done yet, but it appears as if

17     the Sherry-Netherland will agree to abate the $87,000 a

18     month maintenance, because the apartment is not useable, for

19     a period of -- to an amount that's about 12,000, so that's a

20     huge delta.  Not a done deal, but the early indication is

21     that they will do that.

22          Now, because I start with good news, I have to

23     give you the other news, which is that the insurance company

24     has cancelled the insurance for the Sherry-Netherland.

25          THE COURT:  Effective when?

1              MR. DESPINS:  End of May.

2              THE COURT:  Because there's no money to pay the

3      premium or because of the fire?

4              MR. DESPINS:  No, no, no.  Because they say that

5      there's been a change in circumstance.  Yes, there has been

6      a change in circumstance.  Actually the premium should be

7      reduced because there's nothing going on there.  But I'm

8      being facetious.  But they -- you'll hear more about this,

9      but there's no way we can let that terminate.

10             And the -- so there's a lot of pieces relating to

11     the apartment.

12             That company that owns the Sherry-Netherland

13     apartment has about $60,000 left in the bank account.  We

14     need to hire a law firm that is specialized on insurance

15     coverage disputes.

16             And so we'll come back to that because --

17             THE COURT:  Do you mean Genever USA?  Is that what

18     you're talking about?

19             MR. DESPINS:  Yeah.

20             THE COURT:  Okay.

21             MR. DESPINS:  Genever.

22             THE COURT:  Okay.  When you say company that owns,

23     I just --

24             MR. DESPINS:  Yeah.  Genever.

25             THE COURT:  Yeah.

1    MR. DESPINS:  Genever Holdings, USA.

2    THE COURT:  Genever, Genever, however --

3    MR. DESPINS:  And we call it USA.  Yeah.

4    THE COURT:  Okay.

5    MR. DESPINS:  That's the entity.  It has $60,000

6    left in the bank account.

7    So there's the issue of retaining, because this is

8    really a specialty.

9    First of all, we have a conflict with AIG.

10   But two, there's -- it's a real specialty to deal

11   with coverage disputes involving fires, so I've -- I'm in

12   the process of finalizing that.

13   There may be a need for inter-estate financing,

14   meaning --

15   THE COURT:  I understand, yeah.

16   MR. DESPINS:  -- the Kwok estate financing

17   Genever.  Of course that assumes that the Kwok estate would

18   have some money, but that's, you know, we don't have it now.

19   So there are a lot of complex issues here.

20   There are possibilities of selling this apartment

21   at the -- what I would call scavenger price.  But of course

22   that may not be optimal.  That depends also on insurance

23   coverage issues.  So there's guaranteed there will be an

24   insurance coverage dispute.  I say this always jokingly, but

25   insurance companies don't make money by paying on claims.

1    They make money by not paying on claims.  Sorry.  And so

2    they are doing that here.

3         So they've sent us a reservation of rights letter.

4    But we started fairly modestly by saying, look, you need to

5    clean up the dust, the soot, and the damage to the apartment

6    because it continues through the air conditioning system to

7    be sent to other apartments throughout the -- it's a hotel

8    actually -- and they responded saying suspicious

9    circumstances, we're not advancing a penny.

10        And of course that's not a basis to deny coverage.

11   They have to prove arson.  And my bet is they won't be able

12   to prove that.  And so there will be a -- there will be a

13   fight over that money, over getting money for that

14   apartment.  So spending a lot of time on that, Your Honor,

15   these days.

16        I wanted to make sure that you knew about this

17   because sometimes we hit you with things at the last minute

18   and there's been no warning.  So this issue is a complex and

19   hot issue and we will come back to the Court with more on

20   that I think soon.

21        THE COURT:  Has the sales process still -- I mean,

22   I understand, I haven't seen, I have no idea other than

23   representations, which are fine, but has the sales process

24   just been not proceeding because of the fire?

25        MR. DESPINS:  In a bizarre way, Your Honor, we

1    have gotten more interest that we've had in the last year --

2              THE COURT:  Okay.

3              MR. DESPINS:  -- but from scavengers.  Basically

4    people saying, oh, this is going to be a great unfortunately

5    to buy this for pennies on the dollar.

6              And, you know, just to, so you understand the

7    thinking there, is that, I'm not going to use real numbers,

8    but we have the ability under the policy, if there is

9    coverage, to sue the insurance company and to get the cost

10   of refurbishing the apartment, even though you haven't spent

11   a penny doing it.

12             So I want to make sure, it was not obvious to me,

13   that the policy says that you can get paid from the

14   insurance company the amount of repairs even though you have

15   not incurred those repairs.

16             So if -- and I have an expert that's doing this

17   now, if the repairs, for example, just round numbers, are --

18   would be $10 million, and I'm not saying that's the number,

19   but -- and if I can sell the apartment to what I call

20   scavengers for just to pick a number $17 million, well,

21   that's, in theory, $27 million.  We were selling the

22   apartment for 32.5.

23             So I'm not saying I'm selling it for the 27, but I

24   -- so these are the calculations that are going on right

25   now.

1          However, if the cost of repairs are only $3

2     million, you would never sell to a scavenger at 17, because

3     17 plus 3 gives you -- gets you to 20, and certainly that

4     apartment is worth more than 20, a lot more than 20 if there

5     is insurance coverage.

6          But the insurance coverage issue is an issue we

7     own anyway whether you sell to a scavenger or not.  The

8     insurance company will fight on coverage.  That's what they

9     do.  So more to come.

10          So the sale price has not started.  In fact,

11     that's why we modified -- remember, we modified the

12     emergency order to allow for visits to occur for potential

13     interested parties, and there are some people that have gone

14     to see the apartment.  So it's -- it's a complex process.

15          And the last piece that I didn't discuss is the

16     other owners in the building.

17          The apartment below it was completely destroyed by

18     water.  They gutted it.  And the insurance company for that

19     apartment is the same insurance company that we have.  So

20     this is going to be another interesting spy versus spy.  So

21     that's just for old people who love this stuff.  So it's

22     going to be AIG versus AIG.

23          But then there are other people in the building

24     above that are insured by CHUB.  And so CHUB is going to

25     assert probably a claim against Genever, so that this is an

1    -- endless permutations here.

2           We have $11 million of third-party coverage if

3    there is coverage.

4           So, you know, there would be a greater and more

5    fuller description, Your Honor, to Your Honor eventually of

6    this whole situation, but I wanted you to know that there's

7    a lot of work being done around there.  And, you know, there

8    are challenges.

9           One of them that the estate is facing now is the

10   lack of cash obviously for all sorts of reasons.  These toys

11   that he had cost incredible amounts of money.  They're just

12   -- and we know that now.

13          So that's the report I wanted to give Your Honor.

14          Also, I forgot to mention, the motion to abandon,

15   remember that we had scheduled, you had scheduled a hearing

16   for May 2nd or 5th, that motion has not been filed.  And so,

17   therefore, we will not need that hearing.  That hearing

18   should be pushed back probably 30 days.

19          THE COURT:  Okay.  I don't remember when it's

20   scheduled either, but I'll take a look at it.

21          MR. DESPINS:  It's the 2nd or 5th of May.

22          THE COURT:  Okay.

23          MR. DESPINS:  And that's it for today, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          Does anyone else wish to be heard on any matters?

1         (No response)

2              THE COURT:  Okay.  Then that is the last matter on

3    today's calendar, so court is adjourned.  Thank you.

4         (Proceedings concluded at 3:08 p.m.)

5

6

7         I, CHRISTINE FIORE, court-approved transcriber and

8    certified electronic reporter and transcriber, certify that

9    the foregoing is a correct transcript from the official

10   electronic sound recording of the proceedings in the above-

11   entitled matter.

12

13   *Christine Fiore*

14   _____        May 3, 2023

15      Christine Fiore, CERT

16

17

18

19

20

21

22

23

24

25