**<u>Exhibit V</u>**

1

2        UNITED STATES BANKRUPTCY COURT

3         DISTRICT OF CONNECTICUT

4          BRIDGEPORT DIVISION

5       Chapter 11 Case No. 22-50073 (JAM)

6  -----------------------------------------x

7 In Re:

8      HO WAN KWOK

9          Debtor.

10  -----------------------------------------x

11

12 REMOTE VIDEOTAPED DEPOSITION OF MARGARET E. CONBOY

13       Tuesday, February 21, 2023

14

15

16

17

18

19

20

21

22 Reported by:

23 Amy A. Rivera, CSR, RPR, CLR

24

25 JOB NO. 222606

1

2              February 21, 2023

3              10:13 a.m.

4

5         REMOTE videotaped deposition of

6 MARGARET E. CONBOY held pursuant to Notice, before

7 Amy A. Rivera, Certified Shorthand Reporter,

8 Registered Professional Reporter, Certified LiveNote

9 Reporter, and a Notary Public of the State of New

10  Jersey.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2  R E M O T E   A P P E A R A N C E S:

3  Paul Hastings

4  Attorneys for TRUSTEE

5      200 Park Avenue

6      New York, NY 10166

7  BY:  Avram Luft, Esq.

8      Douglass Barron, Esq.

9

10   Whitman Breed Abbott & Morgan

11   Attorneys for the Witness

12      500 West Putnam Avenue

13      Greenwich, CT 06830

14   BY:  Michael Thomason, Esq.

15

16

17   ALSO PRESENT:

18      Jonathan Popham, Videographer

19

20

21

22

23

24

25

1          MARGARET E. CONBOY

2          VIDEOGRAPHER:  Good morning,

3     Counselors.

4          My name is Jonathan Popham.  I'm a

5     legal videographer in association with TSG

6     Reporting, Incorporated.

7          Because this is a remote deposition, I

8     will not be in the same room with the

9     witness.  Instead, I will record this video

10    deposition remotely.

11         The court reporter, Amy Rivera, also

12    will not be in the same room and will swear

13    the witness remotely.

14         Do all parties stipulate to the

15    validity of this video recording and remote

16    swearing and that it will be admissible in

17    the courtroom as if it had been taken

18    following Rule 30 of the Federal Rules of

19    Civil Procedure and the state's rules where

20    this case is pending?

21         MR. LUFT:  This is Avi Luft on behalf

22    of the Chapter 11 Trustee.

23         And we do.

24         MR. THOMASON:  Michael Thomason on

25    behalf of the witness.

1           MARGARET E. CONBOY

2      Sure.

3      VIDEOGRAPHER:  Okay.  This is the

4   start of Media No. 1 in the video deposition

5   of Margaret E. Conboy, in the matter of In

6   re:  Ho Wan Kwok, in the United States

7   Bankruptcy Court for the District of

8   Connecticut, Chapter 11 Case No. 22-50073

9   (JAM.)

10        This deposition is taking place at

11   multiple locations via video conference on

12   February 21, 2023 at approximately

13   10:13 a.m. Eastern Time.

14        Will counsel please introduce

15   themselves for the record.

16      MR. LUFT:  Sure.  My name is Avi Luft

17   of the law firm of Paul Hasting.  I

18   represent the Chapter 11 Trustee in the In

19   re:  Ho Wan Kwok Chapter 11 bankruptcy

20   pending before the Bankruptcy Court for the

21   District Court of Connecticut.

22      MR. THOMASON:  My name is Michael

23   Thomason, sitting to the left of the

24   witness, from Whitman Breed Abbott & Morgan.

25   Both of us are from Whitman Breed Abbott &

Page 6

1          MARGARET E. CONBOY

2     Morgan, and I'm here for Ms. Conboy.

3          VIDEOGRAPHER:  Okay.  Will the court

4     reporter please swear in the witness.

5   M A R G A R E T   E.   C O N B O Y, having been

6   duly sworn by the Notary Public, testified as

7   follows:

8          THE WITNESS:  Thank you.

9   EXAMINATION

10   BY MR. LUFT:

11     Q.    Good morning, Ms. Conboy.  How where

12   you?

13     A.    Good.  How are you?

14     Q.    I'm good.  Thank you for taking time

15   this morning.  I appreciate it.

16     A.    Thank you.

17     Q.    Ms. Conboy, as I said just a minute

18   ago, my name is Avi Luft.  I'm an attorney at Paul

19   Hastings, and I represent the Chapter 11 Trustee,

20   Luc Despins, in the In re:  Ho Wan Kwok

21   bankruptcy.

22          Let me -- I just want to go over a few

23   preliminaries, and I used the name "Ho Wan Kwok."

24   He is an individual also known as "Miles Kwok" and

25   "Miles Guo."

1          MARGARET E. CONBOY

2          Is he a person you're familiar with?

3     A.   I'm familiar with him.

4     Q.   And what name do you know him by?

5     A.   Miles Kwok.

6     Q.   Okay.  If I refer to him as "Miles

7  Kwok" or "Mr. Kwok" or the "debtor" throughout the

8  deposition, can we have an understanding that we

9  are referring to the same person?

10    A.   Right, yes.

11    Q.   Terrific.  Okay.

12         And, Ms. Conboy, my understanding is

13  you're appearing as the person most knowledgeable

14  on behalf of your law firm, Whitman Breed, today?

15    A.   Yes.  I was the closing attorney,

16  so...

17    Q.   Terrific.

18         Have you ever been deposed before,

19  Ms. Conboy?

20    A.   No.

21    Q.   Okay.  So despite you being a lawyer

22  and probably being more familiar with this than

23  most, let me just run through some preliminaries

24  just so we're all on the same page.

25         So basics are:  I'm going to ask you a

1              MARGARET E. CONBOY

2  question and then you'll answer it.  Is that okay?

3      A.   Yep.

4      Q.   I will try to make my question as

5  clear as possible, but if for any reason my

6  question is not clear to you, will you tell me?

7      A.   Yes.

8      Q.   Okay.  And if you don't clarify that

9  the question is unclear, can we have an

10  understanding that you do understand my question?

11     A.   Yes.

12     Q.   Okay.  And you understand you're

13  testifying under oath today?

14     A.   Yes, I do.

15     Q.   Okay.  Is there any reason why you

16  can't provide truthful testimony today?

17     A.   No.

18     Q.   Great.

19          From time to time, your counsel may

20  object to a question I ask on the ground of the

21  form of it, and that is his right and that is

22  fine.

23          Once he has made his objection, you

24  should go ahead and answer my question, if you

25  can.  Okay?

1                MARGARET E. CONBOY

2      A.   Okay.

3      Q.   If there is an issue of privilege or

4   you are concerned about it, you should let me know

5   and you can confer with your counsel.

6      A.   Okay.

7      Q.   If you need a break during the

8   deposition -- I will take them periodically

9   because this can take a while, but if for some

10  reason you feel like you need a break, will you

11  let me know?

12     A.   Sure.

13     Q.   I will then attempt to get a break as

14  soon as reasonably practicable given the

15  questions.  Okay?

16     A.   Okay.

17     Q.   The one thing I ask is that if a

18  question is pending, that we make sure we get an

19  answer to the question before we take a break.  Is

20  that okay?

21     A.   Yep, that's fine.

22     Q.   One other sort of housekeeping, even

23  though we are on Zoom and I can see you and the

24  court reporter can see you, the court reporter can

25  only take down audible answers.

1              MARGARET E. CONBOY

2              So shakes of the head or nods, despite

3    the fact that she can see it, she can't write down

4    yes or no based on a shake.  So I just ask that

5    all your answers be audible.  Okay?

6         A.    Right, yes.

7         Q.    Okay.  Are there any questions you

8    have before we get started with the questioning?

9         A.    I don't think so, no.

10        Q.    Okay.  Terrific.

11              Throughout the deposition, I am -- I

12   am going to show you some documents.  I've spoken

13   with your counsel about this a little.  We have

14   tried our best based on the production to

15   understand where a document starts and a document

16   ends.

17              If for some reason given your

18   familiarity with the documents you look at

19   something and you say, Hey, this isn't exactly

20   right or there's an extra page on here or

21   something, will you let me know?

22        A.    Yes, yes.

23        Q.    Okay.  Terrific.

24              MR. THOMASON:  Avi, can we just

25        clarify something?  With respect to

1        MARGARET E. CONBOY

2    privilege, it's our understanding that the

3    Trustee is the holder of the privilege here

4    and has waived that privilege.  Is that

5    correct?

6        MR. LUFT:  The Trustee has not waived

7    it.  But the Trustee holds Mr. Kwok's

8    privilege.

9        MR. THOMASON:  Okay.

10        MR. LUFT:  So just for clarity, any

11    privilege that was just ever held by the

12    debtor, unless there was some issue about

13    his personal safety, which I can't imagine

14    coming up in a real estate transaction, that

15    privilege is now controlled by the debtor.

16        And the reason I draw that distinction

17    as opposed to waived, live by the Trustee.

18    Thank you.

19        My colleague Doug Barron is here.

20        The reason I make that distinction,

21    meaning other people cannot invade that

22    privilege, just as they could not before,

23    but between Ms. Conboy and the Trustee at

24    this point, that is the same privileged

25    relationship where they could share

1           MARGARET E. CONBOY

2      information as existed previously between

3      Ms. Conboy or your firm and Mr. Kwok, their

4      client.

5           MR. THOMASON:  All right.  Thank you.

6           MR. LUFT:  Okay.

7    BY MR. LUFT:

8      Q.    Okay.  Ms. Conboy, prior to this

9    deposition, I sent your counsel a list of topics

10   which we hope to cover today.

11     A.    Okay.

12     Q.    Did you prepare for this deposition to

13   prepare for those -- to speak to those topics?

14     A.    No.

15     Q.    Okay.  Did you generally prepare to

16   familiarize yourself with regard to the work you

17   did to represent Mr. Kwok?

18     A.    No.

19     Q.    Okay.  What did you do to prepare for

20   this deposition?

21     A.    I just met with Mr. Thomason, and he

22   told me how the depositions are done and just

23   explained the process, and we met for maybe an

24   hour just to -- going through the process.

25     Q.    Okay.  All right.  Well, why don't we

1          MARGARET E. CONBOY

2  get started with the questioning and see what you

3  recall, and we can go back if there's some topic

4  for which you weren't able to review.

5          When -- when did you first hear of

6  Mr. Kwok?

7     A.   When -- I don't remember what year it

8  was, but I received a call from a firm in New

9  York, Hodgson Russ, and they asked me to be

10  Connecticut counsel for this family, you know, the

11  Golden Spring, Greenwich land, and to be -- to be

12  the Connecticut counsel for their real estate

13  purchases.

14     Q.   And do you recall who reached out to

15  you from Hodgson Russ?

16     A.   I think it was Bill, Elissa Brinn and

17  Valerie -- I don't remember Valerie's last name

18  now.  Valerie was a partner there, and I believe

19  it was both of them.

20     Q.   And what did they tell you about

21  Mr. Kwok?

22     A.   They just said that they represented

23  this -- this family and they were very interested

24  in buying property in Greenwich and a house in

25  Greenwich and, you know, that was -- it was -- you

1              MARGARET E. CONBOY

2    know, it was confidential.  They didn't want their

3    names out, which is not unusual.  I run into that

4    all the time with clients where they don't want

5    their names, and so they take property in their

6    LLCs.

7              And that was pretty much it.

8         Q.   And did -- were you told anything else

9    about Mr. Kwok?

10        A.   Not that I remember, no.

11        Q.   Okay.

12             When you were told about the family,

13   were you given any more details about who was in

14   the family?

15        A.   No, no.

16        Q.   And was there a specific house that

17   they were already hoping to purchase or was this a

18   general retainer to work on real estate matters on

19   behalf of Mr. Kwok?

20        A.   They were already looking and I

21   believe making an offer -- maybe they had -- I

22   can't remember -- they may have had a contract out

23   for a property, I forget which property, Clapboard

24   Ridge, one of them, and Elissa had been working on

25   it and then they thought it was best to get

1        MARGARET E. CONBOY

2  Connecticut counsel, and so I came in on that.

3      Q.   And can you tell me a little bit about

4  the scope of the engagement?

5        Because my understanding is it wasn't

6  just one property that you ended up working on but

7  over time, there were multiple representations of

8  Mr. Kwok.

9      A.   Well, of the LLCs, I never spoke with

10  Mr. Kwok.  It was always his lawyer -- the family

11  lawyer who I spoke with.

12        And so he -- he did place offers on a

13  few properties and then they fell through for one

14  reason or another.  He didn't go through with them

15  or the family didn't go through with them.

16        The property that I eventually closed

17  on with him was on Ferncliff.  The others that I

18  represented him on never closed, and there were

19  maybe three or four of those.

20      Q.   You said you only spoke with the

21  family lawyer.

22        Do you recall the family lawyer's

23  name?

24      A.   Max Krasner.

25      Q.   Did Mr. Krasner represent to you that

1              MARGARET E. CONBOY

2   he was an attorney?

3      A.   Yes.

4      Q.   Did you ever speak to a woman named

5   Yvette Wang?

6      A.   I don't remember.  I don't remember

7   that name.

8      Q.   Did you understand that Mr. Krasner

9   was working on behalf of Mr. Kwok?

10     A.   Yes, and the family.

11     Q.   And when you say the "family," did you

12  ever speak to anyone else in the family other

13  than -- at all?

14     A.   No, no.

15     Q.   Did Mr. Krasner ever tell you he was

16  taking directions from anyone other than Mr. Kwok?

17     A.   No, he never told me who he was taking

18  directions from.

19     Q.   I've seen in the documents, your

20  e-mails, multiple references to the "Chinese

21  billionaire."

22          Is Mr. Kwok the Chinese billionaire?

23     A.   I just got that from when I did a

24  Google search.  So I don't really know, that just

25  if you Google his name, that's what comes up.  So

1           MARGARET E. CONBOY

2   I --

3       Q.   My question was -- sorry.

4           My question is not whether Mr. Kwok is

5   it a Chinese billionaire, but when you wrote --

6   referenced the "Chinese billionaire," were you

7   referring to Mr. Kwok?

8       A.   Yes, only because of the Google

9   searches.

10      Q.   Right.  Okay.

11          Did any of your colleagues work with

12  you on this matter?

13      A.   I don't -- maybe an associate helped,

14  but that's all I remember as being -- and my

15  paralegal, obviously.

16      Q.   When you spoke to Mr. Krasner on

17  behalf of Mr. Kwok, did you do so via e-mail?

18          MR. THOMASON:  Objection to form.

19          You can answer.

20      A.   Both e-mail and phone call.

21      Q.   Okay.  How many times would you say

22  you spoke with Mr. Krasner?

23          MR. THOMASON:  On e-mail or phone?

24      Q.   Either.

25      A.   You know, when we were working on a

1        MARGARET E. CONBOY

2  transaction, maybe a couple of times a day.

3       Q.   Did you ever go visit any of the

4  properties that Mr. Kwok was considering

5  purchasing?

6       A.   No.

7       Q.   Do you know which brokers Mr. Kwok was

8  working with for the properties he was looking at?

9       A.   I can't remember.  I remember the last

10  one, but I don't remember all the -- the other

11  brokers that he was working with.

12      Q.   Who was the last one?

13      A.   Martha Jeffreys.

14      Q.   Would it have been the brokers who

15  took Mr. Kwok around to see the properties?

16      A.   Yes.

17      Q.   Okay.  Have you ever spoken with

18  Mr. Kwok's son?

19      A.   No.

20      Q.   Did you ever -- how about his wife?

21      A.   No.

22      Q.   Or his daughter?

23      A.   No.

24      Q.   Okay.  Did you ever speak with anyone

25  representing the family who told you that the

1              MARGARET E. CONBOY

2    instructions were coming from either the son, the

3    wife, or the daughter?

4    A.    No.

5    Q.    When you were --

6              MR. LUFT:  I want to mark as Whitman

7         Breed Deposition Exhibit 1, the document at

8         Tab 1 in your binder.  It bears the Bates

9         stamp WBAM_001464 through 65.

10             (Whitman Breed Exhibit 1, letter dated

11        October 1, 2018, Bates stamped WBAM_001464

12        through 465, was marked for identification

13        at this time.)

14   A.    Yep.

15   Q.    When you have a second, just take a

16   look and tell me when you're ready.

17   A.    Okay.

18   Q.    What is this document?

19   A.    That's our engagement letter.  That

20   was the first engagement letter.  And we had taken

21   it out through Hodgson Russ.

22   Q.    So in this letter, the client is

23   Hodgson Russ on behalf of -- let me just make it

24   simple:  Is Hodgson Russ the technical client

25   here?

1              MARGARET E. CONBOY

2     A.   Yes.

3     Q.   Okay.  And the purchase is to be made

4  by an entity called "Hudson Diamond"?

5     A.   I believe so -- oh, yes, it says --

6  yep, it says:  "Hudson Diamond."

7     Q.   But this -- and this is the same

8  engagement where you were being told you were

9  representing the interest of Mr. Kwok and his

10  family, correct?

11         This is the 110 Clapboard Road --

12  Clapboard Ridge?

13     A.   Yes.

14         MR. LUFT:  Okay.  You could just put

15      that aside.

16     Q.   Let me ask you a few other people.

17  Did you ever speak to a man named Daniel

18  Podhaskie?

19     A.   No.

20     Q.   How about a woman named Melissa

21  Francis?

22     A.   No.

23     Q.   Aaron Mitchell?

24     A.   No.

25     Q.   Okay.  Terrific.

1           MARGARET E. CONBOY

2           All right.  Could we turn to -- I ask

3    you to turn to Tab 3, which is an e-mail from

4    October 3, 2019 from yourself to Kevin Walsh,

5    Bates stamped WBAM_10076.

6           Let me know when you have it.

7           MR. THOMASON:  Are you marking this as

8      Exhibit 2?

9           MR. LUFT:  Yes, please, Whitman Breed

10      Exhibit 2.

11           (Whitman Breed Exhibit 2, e-mail dated

12      October 3, 2019, Bates stamped WBAM_10076,

13      was marked for identification at this time.)

14    A.   Okay.

15    Q.   Okay.  It starts off -- this is an

16    e-mail from you to Kevin Walsh, correct?

17    A.   Right.

18    Q.   You start off:  "Kevin, my client, the

19    Chinese billionaire."

20           Is that a reference to your client

21    being Mr. Kwok?

22    A.   Yeah.  I mean, I should have -- it --

23    yes.  I should have --

24    Q.   And then you go on.  You say (as

25    read):  The seller accepted his offer of

1          MARGARET E. CONBOY

2   $35 million.  And then, furthermore, he is meeting

3   with architects.  He has an idea of what is

4   involved in building on the parcel.

5          The "he" and the "his" there are

6   Mr. Kwok, correct?

7     A.    Yes.

8     Q.    Did Mr. Kwok ever tell you what the

9   source of the $35 million he was using to offer

10  for 602 Indian Field was?

11    A.    No.  This was all through Max.  I

12  never spoke with Mr. Kwok.  It was all through

13  Max.

14    Q.    Did Mr. Krasner -- and I assume when

15  you say "Max," you're referring to Max Krasner?

16    A.    Right, Mr. Krasner.

17    Q.    That's fine.

18          Did Mr. Krasner ever tell you what the

19  source of the $35 million was for this offer?

20    A.    No, no.

21    Q.    Did he ever -- was he ever required to

22  provide any, for lack of a better term,

23  substantiation or basis to the seller to show that

24  he had the wherewithal to make a $35 million

25  offer?

1              MARGARET E. CONBOY

2    A.   I don't know.  I don't know.

3    Q.   Okay.  Is that something that would be

4  more for the broker than --

5    A.   Yes.

6    Q.   -- your part of the process?

7    A.   Right, yes.

8    Q.   Okay.  But this never went to

9  contract, correct?

10    A.   Correct.

11    Q.   Okay.  Okay.  Terrific.

12         MR. LUFT:  I want to ask you to look

13    at Tab 2.  I'm going to mark as Whitman

14    Breed Exhibit 3, it is a document Bates

15    stamped WBAM_000035 through 36, and it

16    appears to me to be an August 16, 2019

17    retention letter between Whitman Breed

18    signed by yourself and then by Max Krasner

19    on behalf of Golden Spring.

20         (Whitman Breed Exhibit 3, letter dated

21    August 16, 2019, Bates stamped WBAM_000035

22    through 36, was marked for identification at

23    this time.)

24  BY MR. LUFT:

25    Q.   Does that appear right to you?

1              MARGARET E. CONBOY

2      A.   That's right.

3      Q.   Okay.  And this is in connection with

4   the purchase of a property at 33 Ferncliff Road?

5      A.   That's right.

6      Q.   And here, you understood Mr. Krasner

7   to again be making this engagement on behalf of

8   Mr. Kwok, correct?

9      A.   Well, the family.

10     Q.   When you say the "family," just so I

11  understand, what is the distinction you're drawing

12  given that -- well, let me strike that.

13          My understanding is that you

14  understood instructions to be coming from

15  Mr. Kwok, that he's giving directions.

16          There's no one else in the family you

17  ever spoke with or received directions on behalf

18  of, correct?

19     A.   I never spoke with Mr. Kwok.  I never

20  spoke with anyone else.  No, I only spoke with Max

21  Krasner, and he would say that -- his words were

22  the family.

23     Q.   But when you wrote about, when we

24  looked at Exhibit 2, the Chinese billionaire and

25  his offer and he is meeting with architects, the

1                    MARGARET E. CONBOY

2   "he" there is Mr. Kwok, you understood, correct?

3        A.    Right, that's what I understood.

4        Q.    And you have no knowledge of anyone

5   else in the family ever meeting with architects or

6   engineers on behalf of these houses, correct?

7        A.    No, I don't know.  I don't know.  I

8   have no idea.

9        Q.    And no one else from the family ever

10  submitting an offer for the house other than

11  Mr. Kwok, correct?

12       A.    I don't know.  I don't know.

13       Q.    Okay.

14             Who paid -- in connection with the

15  work you did for 110 Clap Ridge Road, who paid

16  Whitman Breed's legal bills?

17       A.    I don't know.

18       Q.    How about with regard to 33 Ferncliff?

19       A.    I don't know.  I don't know.

20             MR. LUFT:  Okay.  You can put that to

21       the side for now.

22             I'm going to ask you to look at Tab 9.

23       I'm going to mark as Exhibit 4, a document

24       Bates stamped WBAM_002235 through 37.

25             (Whitman Breed Exhibit 4, e-mail

1          MARGARET E. CONBOY

2     chain, Bates stamped WBAM_002235 through

3     237, was marked for identification at this

4     time.)

5   BY MR. LUFT:

6     Q.   Do you have that in front of you?

7     A.   I do.

8     Q.   So this is an e-mail chain between

9   yourself, Valerie Stevens, Yvette Wang, and Elissa

10  Brinn.

11          Who is Valerie Stevens?

12    A.   She was a partner at Hodgson Russ.

13    Q.   And Ms. Brinn?

14    A.   And Ms. Brinn was also an attorney at

15  Hodgson Russ.

16    Q.   And then Yvette Wang?

17    A.   I don't remember her.  I really don't

18  remember her.

19    Q.   Do you see in the middle of page

20  ending 236, October 11, 2018, 12:35, she writes an

21  e-mail to yourself and Elissa saying (as read):

22  Please still keep doing nothing as I advised

23  before.  I already had advised Kathy to withdraw

24  the offer on Monday.  The buyer didn't give any

25  instructions to reopen yet.  Thank you, Yvette.

1          MARGARET E. CONBOY

2          Do you see that?

3     A.   Yep.

4     Q.   The buyer -- the buyer there is

5  Mr. Kwok, correct?

6     A.   I don't know -- I mean, I don't know.

7     Q.   Who did you understand that --

8     A.   Like I said, it was the company that

9  was either Golden Spring or Greenwich Land, and

10  that's who was buying it.  I'm not sure -- I'm not

11  sure of that, who Yvette Wang -- I just don't

12  remember.

13    Q.   You don't remember what her role was?

14    A.   Right.

15    Q.   You understood Mr. Kwok to be a client

16  of the firm though, correct?

17    A.   No.  I understood the companies to be

18  a client of the firm.

19    Q.   You had a conversation with

20  Mr. Despins at one point with regard to issues

21  regarding conflicts of interest?

22    A.   Yes.

23    Q.   And in that, you told him that one of

24  the issues was that Mr. Kwok was a client of the

25  firm?

1          MARGARET E. CONBOY

2     A.    Well, I must have misspoke, and I

3  don't remember, but I just don't really remember

4  that.

5     Q.    Okay.  Who did you understand to

6  control Golden Spring?

7     A.    Like I said, I spoke with Max Krasner.

8  That was my contact.  I don't know.  I don't know

9  who controlled Golden Spring.

10    Q.    Did Mr. Krasner ever tell you he has

11  no legal license?

12    A.    No.

13    Q.    Okay.

14          When Ms. Wang referred to the "buyer,"

15  you did not understand her to be referring to

16  herself, correct?

17    A.    I don't know.  I really don't know.  I

18  didn't know -- I don't remember her.

19    Q.    Okay.

20          MR. LUFT:  Let's take a look at --

21          VIDEOGRAPHER:  Is it possible to turn

22     the camera a little bit more towards the

23     witness again, please, Counsel?

24          Thank you.

25          MR. LUFT:  Okay.  Let's take a look at

1    MARGARET E. CONBOY

2    Tab 13.  We're going to mark as Whitman

3    Breed Exhibit 5, I believe, a document Bates

4    stamped WBAM_001048 through 54.  This is an

5    e-mail chain at the top starting with an

6    e-mail from Ms. Yvette Wang to Elissa Brinn,

7    Ms. Conboy, and Valerie Stevens regarding

8    110 Clipboard agreement with Brown Harris

9    Stevens.

10       (Whitman Breed Exhibit 5, e-mail

11    chain, Bates stamped WBAM_001048 through 54,

12    was marked for identification at this time.)

13   BY MR. LUFT:

14       Q.    Do you see that top e-mail?

15       A.    Yep.

16       Q.    Did you see Ms. Wang again writes (as

17   read):  The inventory content list of this

18   property should be exactly the same as original,

19   the first time Kathy showed this house to the

20   buyer.

21       Did you understand Kathy showed the

22   house to an actual person, being the buyer?

23       A.    Yes, showed the house to the buyer.

24       Q.    Right.  And since Ms. Wang is

25   referring to it, that she's not referring to

1              MARGARET E. CONBOY

2  herself, she's referring to the buyer as another

3  person?

4      A.   Yes.

5      Q.   Does this help refresh your

6  recollection as to -- with regard to Ms. Wang?

7      A.   No.

8      Q.   All right.  Okay.  Let's look at

9  another -- what I believe is another property.

10         Do you recall doing work with regard

11  to 140 Wallacks Drive in January 2019?

12     A.   Yes.

13         MR. LUFT:  I'm going to show you a

14     document Bates stamped -- I'd like to mark

15     as Exhibit 6, a document Bates stamped

16     WBAM_002663 through 72.

17         MR. THOMASON:  Tab number?

18         MR. LUFT:  What's that?

19         MR. THOMASON:  Which tab number?

20         MR. LUFT:  It's Tab 14.

21         (Whitman Breed Exhibit 6, e-mail

22     chain, Bates stamped WBAM_002663 through

23     672, was marked for identification at this

24     time.)

25  BY MR. LUFT:

1              MARGARET E. CONBOY

2       Q.    Am I correct that this is an e-mail

3   chain between yourself and Robert Mowbray from

4   January 22, 2019?

5       A.    Yes.

6       Q.    And the property he references is

7   140 Wallacks Drive, Caritas Island, Stamford?

8       A.    Right.

9       Q.    Do you see your e-mail, you write:

10  "Hi, Bob.  I would like you to do the searches

11  because this is a high-end property on the water -

12  the Chinese billionaire has an accepted offer!

13  Thanks."

14          Do you see that?

15      A.    Yes.

16      Q.    The Chinese billionaire being

17  referenced is Mr. Kwok, correct?

18      A.    Right.

19      Q.    And that's who you were saying had an

20  accepted offer on the property?

21      A.    But actually, the offer was in the

22  name of Golden or either Golden Spring or

23  Greenwich Land.  I don't remember which one they

24  put -- the offer was put in.

25      Q.    Whichever entity legally they put the

1              MARGARET E. CONBOY

2   name in, what you understood was that Mr. Kwok had

3   an accepted offer, correct?

4       A.    From the e-mail, that's what I -- yep,

5   correct.

6       Q.    And you were being -- okay.  So at the

7   time, that's what you were telling Mr. Mowbray,

8   was that Mr. Kwok has an accepted offer?

9       A.    Right.

10      Q.    Prior to working with Mr. Kwok, did

11  you have to sign any type of NDA agreement?

12      A.    I don't remember.  I may have.  I

13  don't remember.

14      Q.    At any point does Mr. Kwok or one of

15  his associate entities had you sign an NDA

16  agreement?

17      A.    I don't remember.

18      Q.    Is the reason you refer to Mr. Kwok as

19  the "Chinese billionaire" because you were trying

20  to avoid using his name in communications?

21      A.    Right, correct.

22      Q.    When you wrote the "Chinese

23  billionaire" here, Mr. Kwok was the person you

24  were referring to?

25      A.    Yes.

1            MARGARET E. CONBOY

2    Q.    Okay.

3          Let me see.  Do you know a man named

4  Emile deNeree?

5    A.    No.

6    Q.    From Caldwell Banker maybe?

7    A.    I don't remember.

8          MR. LUFT:  I'm going to ask to mark as

9    Exhibit -- what are we up to, 7? -- a

10    document behind Tab 18, Bates stamped

11    WBAM_002803 through 08.

12          (Whitman Breed Exhibit 7, e-mail

13    chain, Bates stamped WBAM_002803 through

14    808, was marked for identification at this

15    time.)

16  BY MR. LUFT:

17    Q.    Ms. Conboy, do you recognize this

18  document?

19    A.    No, I don't remember it.

20    Q.    Can you review it and see if it

21  refreshes your recollection that this was an

22  e-mail also about 140 Walkins Drive?

23    A.    I don't remember the e-mail.  I mean,

24  I just don't remember -- I get thousands of

25  e-mails, though.

1              MARGARET E. CONBOY

2    Q.   Understood.

3         Do you see at the top, Ms. Brinn

4  writes to you, Mr. deNeree and yourself, and she

5  makes a reference as:  "Margaret - looks like a

6  septic update is needed as well"?

7    A.   Yep.

8    Q.   Are you the "Margaret" there?

9    A.   Yep, yes.

10    Q.   And so this chain would have been sent

11  to you, correct?

12    A.   Yes.

13    Q.   Okay.  And in this chain, you see that

14  they're talking about various inspections and

15  diligence that needs to be done?

16    A.   Yes.

17    Q.   If I ask you to turn to page 2806, do

18  you see that there's a January 25th e-mail from

19  Mr. deNeree or a Barbara Vogt at Sothebys Homes,

20  so this is between the two brokers, included in

21  the diligence sent to you.

22         It says that my client is prepared to

23  close by February 8.  We have requested a one-week

24  grace period in case they cannot complete due

25  diligence in times.  It goes on and then says:

1          MARGARET E. CONBOY

2  "Could you please ask your clients to agree to

3  these terms because Miles is ready to sign the

4  contract this afternoon as long as his attorney

5  receives the acceptable terms for due diligence."

6          Do you see that?

7      A.   Yep, yes, I do.

8      Q.   And do you recall if you ever received

9  those due diligence terms?

10     A.   I don't remember.

11     Q.   And the "Miles" here is a reference to

12  Mr. Kwok, correct?

13     A.   I didn't write the e-mail, so somebody

14  else wrote it.

15     Q.   I understand, someone else wrote it,

16  but you read it.

17          Did you understand the "Miles"

18  involved in this transaction to be Mr. Kwok?

19          MR. THOMASON:  Objection to form.

20          You can answer.

21     A.   Yes.

22     Q.   Okay.

23          MR. LUFT:  You can put that aside.

24     Q.   Did Mr. Kwok ever become interested in

25  potentially purchasing a property at 32 Chateau

1          MARGARET E. CONBOY

2   Ridge?

3      A.   Yes.

4      Q.   What do you recall about that property

5   and that attempted purchase?

6      A.   I recall that he put in an offer.  The

7   offer was accepted.  We did our normal due

8   diligence, and he -- he never signed a contract.

9   We were working on a contract and he never signed

10  the contract -- well, not he but the LLC never

11  signed the contract and so nothing came -- it was

12  never purchased.

13         MR. LUFT:  I'm going to ask you -- I'm

14      going to mark as -- to be asked as Whitman

15      Breed Exhibit 8, a document behind Tab 6,

16      WBAM_002172 through 2173, which appears to

17      be an October 1, 2018 e-mail chain between

18      Muffin Dowdle, Elissa Brinn, yourself, and

19      Kathy Sloane.

20         (Whitman Breed Exhibit 8, e-mail

21      chain, Bates stamped WBAM_002172 through

22      173, was marked for identification at this

23      time.)

24   BY MR. LUFT:

25      Q.   Do you see that?

1              MARGARET E. CONBOY

2      A.   Yep.

3      Q.   Do you see you are on all these

4   e-mails?

5      A.   Yes.

6      Q.   And this is in connection -- sorry.

7           This was in connection with

8   110 Clapboard Ridge?

9      A.   That's what it says on the top.

10      Q.   Yeah.  Let me see.

11           But then if we go to the middle

12   e-mail, Ms. Sloane says (as read):  With regard to

13   Chataeu Ridge, the contract is being sent out this

14   morning at the original offering prices.  The

15   furniture is being removed from the house today.

16   The house will be staged.  I suggest that Miles

17   see the house again after the staging is complete.

18           Do you see that?

19           MR. THOMASON:  Objection.

20      A.   Yes, I see that.

21      Q.   Okay.  So while there's a reference to

22   Clapboard Ridge, what is -- there is also -- these

23   e-mails are also discussing the Chateau Ridge

24   property, correct?

25      A.   Correct.

1              MARGARET E. CONBOY

2     Q.    And those are two distinct properties?

3     A.    Yes.

4     Q.    And do you recall Ms. Sloane being a

5  broker at Brown Harris Stevens?

6     A.    Yes.

7     Q.    And she is writing to you and

8  Ms. Dowdle and Ms. Brinn suggesting that Miles see

9  the house again after the staging is complete,

10  correct?

11    A.    That's what she writes in the e-mail.

12    Q.    And the "Miles" being referred to

13  there is Mr. Kwok, correct?

14    A.    I think -- I mean, I didn't write the

15  e-mail, again, but that's who I think it would be.

16    Q.    Are you aware of any other Miles who

17  was involved in connection with the Chateau Ridge

18  property?

19    A.    No.

20    Q.    So it's fair to say when you read

21  that, you understood "Miles" to be Mr. Kwok,

22  correct?

23    A.    Correct.

24    Q.    You have to answer audibly.

25          And she writes (as read):  Let Miles

1          MARGARET E. CONBOY

2  see the house again after the staging is complete.

3          Did that suggest to you that Mr. Kwok

4  had already seen the house once before this?

5      A.   I don't know.  I wasn't -- I'm not

6  involved in that part of the transaction.  I have

7  no idea.

8      Q.   But when you read the e-mail that you

9  were copied on that said, "I suggest that Miles

10  see the house again after the staging is

11  complete," that would -- did that suggest to you

12  that Mr. Kwok had already seen the house once

13  before?

14     A.   I don't know.  I wasn't involved in

15  that.  I don't go around with them to the brokers

16  to see the house.  I don't know when he saw, if he

17  saw, I don't know.

18     Q.   I'm just asking what you understood

19  when you read that e-mail.

20     A.   I mean, from her e-mail, it sounds

21  like he must have, but I have no idea.

22     Q.   Okay.

23          Ms. Conboy, you understood that all

24  the documents Bates stamped with the "WBAM" stamp

25  come from the files of Whitman Breed, correct?

1          MARGARET E. CONBOY

2     A.    I think so, yes.  Yes.

3     Q.    And those are files that you keep --

4  the firm keeps in the ordinary course of its

5  business?

6     A.    Yes.

7     Q.    And they're created as part of the

8  ordinary business it conducts as a law firm,

9  correct?

10    A.    Correct.

11    Q.    Okay.  Do you recall a woman named

12 Louise Camuto was the owner of the Chateau Ridge

13 property?

14    A.    I don't know if she was the actual

15 owner.

16    Q.    Okay.  What did you understand

17 Ms. Camuto's position to be?

18    A.    I don't remember how the title was

19 held, but I don't think she owned it personally.

20 I don't remember exactly how title was held, but I

21 don't think she owned it personally.

22    Q.    Okay.  Do you recall that she was

23 negotiating the sale of the property with Mr. Kwok

24 and his representatives?

25    A.    I don't know if she was.  The only

1            MARGARET E. CONBOY

2  person who I negotiated with was the other

3  attorney.  I don't know who anyone else negotiated

4  with.

5      Q.    Do you know who Karin Maistrello is?

6  A.    No.

7            MR. LUFT:  What document are we up to

8  now?  It was seven --

9            MR. THOMASON:  You're at 9.

10            MR. LUFT:  Nine?

11            MR. THOMASON:  You're about to name 9.

12            MR. LUFT:  Terrific.  Let's mark as

13  Whitman Breed Exhibit 9, document behind

14  Tab 20, an e-mail chain with the Bates stamp

15  WBAM_003873 through 76.  Appears to be a

16  chain encompassing e-mails involving

17  Mr. Krasner, Ms. Camuto, Ms. Wang,

18  Ms. Maistrello, and Ms. Dowdle.

19            (Whitman Breed Exhibit 9, e-mail

20  chain, Bates stamped WBAM_003873 through

21  876, was marked for identification at this

22  time.)

23  BY MR. LUFT:

24      Q.    Ms. Conboy, do you see that this

25  document bears a Bates stamp of "WBAM"?

1              MARGARET E. CONBOY

2       A.    Yes.

3       Q.    Does that indicate to you that this

4    document comes from the files of Whitman Breed?

5       A.    I -- it must.  I guess it does.  I

6    don't remember seeing this document.  I'm not on

7    the -- I'm not on the e-mail chain at the top.  I

8    mean, I'm not on the e-mail.

9       Q.    Do clients when they negotiate through

10   e-mails sometimes provide those e-mails to counsel

11   for purposes of their work they're doing for them?

12      A.    I don't understand what your question

13   is.

14      Q.    My question is:  When clients have

15   communications with prospective buyers or brokers,

16   do they sometimes provide you with those

17   communications to evidence the negotiations they

18   conducted so that you can do your work on behalf

19   of them?

20      A.    Sometimes, yes, sometimes.

21      Q.    Can you turn to the page ending 3875.

22            Do you see there's an e-mail from

23   Ms. Camuto to Mary Muffin Dowdle?

24            Do you know Ms. Dowdle?

25      A.    No.  She's a broker, but I don't know

1              MARGARET E. CONBOY

2  her.  She was a broker.

3       Q.   Did you understand her to be the

4  broker working with Mr. Kwok?

5       A.   In the beginning, yes.  In the

6  beginning of when the transaction first started.

7       Q.   Do you see Ms. Camuto, while sending

8  her e-mail to Ms. Dowdle, addresses it actually to

9  Mr. Kwok, "Dear Miles."

10          She writes:  "Thank you for getting

11  back to me.  I look forward to concluding and

12  having you move into this amazing place which we

13  love so much and you seem to love it as much as we

14  do."

15          Do you see that?

16      A.   Yes.

17      Q.   And then they proceed -- Ms. Camuto

18  proceeds to write a message to Mr. Kwok regarding

19  certain furnishings he had asked to be kept,

20  correct?

21      A.   Yes.

22      Q.   And do you recall if this -- these

23  communications were transmitted to you so that you

24  would know which pieces of furniture to include in

25  the contractual agreements and which ones to leave

1              MARGARET E. CONBOY

2  out?

3      A.   I don't remember.

4      Q.   Let's look up a little bit.  Do you

5  see in response on page 3874, Ms. Wang writes back

6  to Mr. Camuto saying:  "Thank you for getting back

7  to Miles.  Kindly forgive him as he does better

8  with oral English than written."

9          Do you see that?

10     A.   Yes, yes.

11     Q.   Do you see she mentions that Miles

12  said he exactly shares the same love as you to

13  this fabulous home and that he hopes to come back

14  in the future to share the beautiful stories about

15  this place with him.

16     A.   Right, yes.

17     Q.   And that he -- it then goes on:

18  "Miles said he appreciates you agree to leave the

19  urns.  He does love them very much."  And then

20  says -- reflects what Mr. Kwok wishes to do with

21  regard to the blue chairs, correct?

22     A.   Right.

23     Q.   And then it concludes:  "On behalf of

24  Miles, thank you again for having this beautiful

25  home to him.  All the best."

1           MARGARET E. CONBOY

2     A.    Right.

3     Q.    And this information about how to

4  handle the urns for Mr. Kwok and how to handle the

5  chairs, that's all information which you as the

6  lawyer would codify in an agreement, correct?

7     A.    Correct.

8     Q.    And it's clear that Ms. Wang is

9  speaking on behalf of Mr. Kwok, correct?

10    A.    Again, you're asking me about an

11 e-mail that I didn't write.

12         They say, the family office, you know,

13 I wasn't -- I don't get -- the only way I would

14 get involved is to write the contract with the

15 terms about the urn and whatever personal

16 property.

17    Q.    But it's very clear here, right, this

18 is about Miles?  Miles is the person being

19 specifically referenced, correct?

20    A.    Miles was being referenced, yes.

21    Q.    And Miles is the one who is making the

22 decisions with regard to the urns?

23    A.    I don't know.  I have no idea.

24    Q.    (As read):  Miles says he appreciates

25 you agree to leave urns.  He does love them very

1              MARGARET E. CONBOY

2  much.  In the same spirit of cooperation, he would

3  like you to keep the set of four blue chairs.

4          You agree with me that it is Mr. Kwok

5  who is the one who is making the instructions with

6  regard to which property to be included in the

7  contract, correct?

8  A.    That's what the e-mail states, yes.

9          MR. LUFT:  Okay.  You can put that to

10      the side.

11          Mark as Exhibit -- Whitman Breed

12      Exhibit 10, a document behind Tab 22, Bates

13      stamped WBAM_003873 through 76, which is,

14      again, another e-mail chain between

15      Mr. Camuto, Ms. Wang, Mr. Krasner and

16      Ms. Maistrello.

17          (Whitman Breed Exhibit 10, e-mail

18      chain, Bates stamped WBAM_003873 through

19      876, was marked for identification at this

20      time.)

21  BY MR. LUFT:

22  Q.    And do you see, again, this is a

23  document with the Bates stamp "WBAM"?

24  A.    Yes.

25  Q.    And that suggests to you that this is

1              MARGARET E. CONBOY

2    a document coming from Whitman Breed's files,

3    correct?

4        A.    Yes.

5        Q.    So this is a document that would have

6    been provided to your law firm in connection with

7    your representation of -- with regard to this

8    property, correct?

9        A.    Yes.

10       Q.    And do you see, again, Ms. Camuto

11   writes to Ms. Wang, multiple places, specifically

12   says -- references Mr. Kwok:  "I am so glad Miles

13   will enjoy the fabulous urns that are, as you

14   know, quite rare and valuable.  They make the

15   room.

16            "Thank him for the chairs, and I will

17   leave Miles the cabinet on the third floor."  It

18   goes on:  "Thank you - and Miles, and please keep

19   the communication flowing.  I would be happy to

20   come visit him one day when he is all settled in."

21            It is clear Ms. Wang -- Ms. Camuto is

22   referring to Mr. Kwok as being the person who was

23   acquiring the home, correct?

24       A.    That's what her e-mail states, yep.

25       Q.    Okay.

1          MARGARET E. CONBOY

2          MR. LUFT:  You can put that aside.

3      Q.   Do you recall if -- having any

4  communications with regard to the Chateau Ridge

5  property related to anyone else in Mr. Kwok's

6  family having any negotiations or role in

7  connection with its purchase?

8      A.   I don't remember.  I think the only --

9  again, the only person who I dealt with was Max

10  Krasner.

11      Q.   Okay.

12          MR. LUFT:  We have been going about an

13      hour.  Do you want to take a quick break?

14          MR. THOMASON:  Yes, please.

15          THE WITNESS:  Sure.

16          MR. LUFT:  Terrific.  How long do you

17      want?

18          MR. THOMASON:  Ten minutes?

19          MR. LUFT:  That's great.

20          MR. THOMASON:  As my floor, but if you

21      want longer that's fine.

22          MR. LUFT:  Ten is fine with me.

23          MR. THOMASON:  Okay.

24          VIDEOGRAPHER:  We're going off the

25      record at 11:10 a.m.  This marks the end of

1          MARGARET E. CONBOY

2     Media 1.

3          (Recess.)

4          VIDEOGRAPHER:  We are back on the

5     record at 11:30 a.m.  This marks the

6     beginning of Media 2.

7    BY MR. LUFT:

8     Q.   Hi, Ms. Conboy.  How are you?

9     A.   Good.  How are you?

10     Q.   Good.

11          I want to turn to another property.

12   Do you recall that Mr. Kwok was also interested in

13   purchasing a property at 66 Sherwood in July or

14   August of 2019?

15     A.   Yes.

16     Q.   What do you recall about that

17   potential purchase?

18     A.   I don't think it went very far.  I

19   don't even think we got contracts.

20          So that's all I remember.  I don't

21   think it went far at all.

22     Q.   Do you recall when Mr. Kwok decided

23   not to purchase the property?

24     A.   I recall Max letting me know that they

25   weren't going to purchase it, but that was it.

1          MARGARET E. CONBOY

2      Q.   Okay.  And it never reached the

3   contract stage, right?

4      A.   I don't think so.

5      Q.   Okay.  Okay.  We can move on to

6   another property.

7           I know we spoke earlier about the

8   Indian Field property?

9      A.   Right, right.

10     Q.   Okay.  Do you recall anything else

11  about why -- let me strike that actually.

12          All right.  The next property that I'm

13  aware of that they looked at is -- or maybe not

14  sequentially, but do you recall a property at

15  11 Hurlingham Drive that was looked at in

16  December 2020?

17     A.   No, I don't remember that property.

18     Q.   Okay.  Let's me ask you to turn to

19  Tab 59.

20          MR. LUFT:  Are we up to 11?

21          MR. THOMASON:  I think so.

22          MR. LUFT:  Okay.  Let's mark as

23      Tab 11, a document Bates stamped WBAM_008335

24      through 339.

25          (Whitman Breed Exhibit 11, e-mail

1          MARGARET E. CONBOY

2      chain, Bates stamped WBAM_008335 through

3      339, was marked for identification at this

4      time.)

5   BY MR. LUFT:

6      Q.   Which I believe is an e-mail chain

7   between Mr. Krasner, a Mr. Frank Dong, and

8   yourself.

9          Do you see that?

10     A.   Yes.

11     Q.   And do you see Mr. Krasner writes at

12  10:25 a.m. on December 15, 2020:  "Hi, Frank and

13  Margaret.  I just spoke with Miles, and he advised

14  the team will not move forward on this property.

15  Thank you."

16     A.   Right.

17     Q.   Does that refresh your recollection

18  about Mr. Krasner informing you and Mr. Dong that

19  Mr. Kwok did not want to purchase the

20  11 Hurlingham Drive property?

21     A.   I don't remember this, but according

22  to the e-mail, it says Miles advised the team that

23  they're not going forward.

24     Q.   And the vehicle here that Mr. Kwok was

25  using to potentially make this purchase was --

1              MARGARET E. CONBOY

2   appears to be Hudson Diamond, correct?

3       A.   Correct.

4       Q.   And that's one of the shell companies

5   that Mr. Kwok would use to consider real estate

6   purchases, correct?

7           MR. THOMASON:  Objection to form.

8       A.   It was another LLC that they used to

9   purchase properties.

10      Q.   Right.  And here, it's Mr. Kwok,

11  correct, that's who Mr. Krasner spoke with?

12      A.   Well, that's who -- yeah, that's who

13  Mr. Krasner said in his e-mail advised him not to

14  go forward.

15      Q.   Okay.

16          MR. LUFT:  And let's mark -- turn to

17          Tab 57, and mark it as Whitman Breed

18          Exhibit 12, document Bates stamped

19          WBAM_008641 through 43, which I believe

20          you'll tell me is a December 14th, so one

21          day prior, e-mail chain between yourself and

22          Mr. Frank Dong with regard to 11 Hurlingham

23          purchased by Hudson Diamond.

24          (Whitman Breed Exhibit 12, e-mail

25          chain, Bates stamped WBAM_008641 through

1              MARGARET E. CONBOY

2       643, was marked for identification at this

3       time.)

4    BY MR. LUFT:

5       Q.    Do you see that?

6       A.    Yes.

7       Q.    Do you remember Mr. Dong?

8       A.    I don't remember Mr. Dong.

9       Q.    If you look at the first e-mail he

10   sends you in this chain, which is on 8642,

11   Mr. Dong writes you and says (as read):  Hi,

12   Margaret.  Nice to e-meet you.  I am the buy side

13   agent for the deal.  He goes on and says (as

14   read):  Boss came to see the house personally.

15   Sellers spent 11 million to renovate the property

16   but moved to Florida already.  Boss is willing to

17   finish the house himself.

18             Did you understand Mr. Dong to be

19   referring to Mr. Kwok when he referenced the

20   "boss"?

21      A.    I don't remember this, and I don't

22   know.  I don't remember this.  I don't remember

23   Mr. Dong.  I don't know.

24      Q.    But this is an e-mail you -- you have

25   no question that you received this e-mail from

Page 54

1            MARGARET E. CONBOY

2   Mr. Dong, correct?

3      A.   Yes, right, correct.

4      Q.   And you're not aware of any other

5   decision maker with regard to this property other

6   than Mr. Kwok, correct?

7      A.   You know, I don't know who else is

8   involved.  I mean, I don't know who else makes

9   decisions in the family, so, I don't know.

10     Q.   Are you aware of -- have you ever been

11  told that anyone in the family makes decisions

12  with regard to these properties other than

13  Mr. Kwok?

14     A.   I've never been told -- I never was

15  told who made any of the decisions.

16     Q.   Well, if we look back at Exhibit 11 --

17     A.   Right, in their e-mails.

18     Q.   In their e-mails, you're told that

19  Mr. Kwok is the one that's making the decision,

20  correct?

21     A.   Right.

22     Q.   Okay.  Mr. Krasner does tell you that

23  Mr. Kwok advised the team not to move forward.

24          And I want to be clear, you were never

25  told by Mr. Krasner that any other member of

1              MARGARET E. CONBOY

2  Mr. Kwok's family ever made a decision with regard

3  to the purchase or not purchase of any property,

4  correct?

5      A.    Correct, he never told me who made the

6  decisions.

7      Q.    Other than when he told you Mr. Kwok

8  was making decisions?

9      A.    Other than in that e-mail, from what I

10  remember, yep.

11      Q.    And we've seen other e-mails where

12  Mr. Kwok -- Mr. Kwok is referenced as negotiating

13  and making decisions, correct?

14      A.    Correct.

15      Q.    So to be clear, you were advised

16  periodically that Mr. Kwok was making decisions

17  with regard to properties, correct?

18      A.    Correct.

19      Q.    And you were never advised that any

20  other member of Mr. Kwok's family was making

21  decisions with regard to properties, correct?

22      A.    I don't remember.

23      Q.    Do you have any recollection of anyone

24  in the family ever making a decision with regard

25  to a property other than Mr. Kwok?

1                MARGARET E. CONBOY

2       A.   I don't remember.

3       Q.   Do you believe that you were ever told

4  that?

5       A.   I don't know.  I really don't remember

6  if anybody else -- I don't know.

7       Q.   I guess what I'm asking is:  When you

8  say you don't know, is that because you think that

9  someone may have and you can't -- you don't have a

10  specific recollection or --

11           MR. THOMASON:  Let's him finish the

12      question.

13           MR. LUFT:  Right.

14      Q.   Ms. Conboy, I know you're using your

15  best recollection and I appreciate that.  But I

16  just -- it's important, I just want to have a

17  clear record.

18           Do you have a recollection of any

19  member of Mr. Kwok's family, other than himself,

20  ever providing instructions either through

21  Mr. Krasner or directly or any other

22  representative with regard to whether to buy or

23  sell or how to handle any of the potential

24  purchases you were involved with?

25      A.   No, I have no recollection.

1          MARGARET E. CONBOY

2      Q.   Okay.  Okay.  Let's move on from that

3   property.

4          You recall that Mr. Kwok also involved

5   you with regard to the purchase of 33 Ferncliff

6   Road?

7          MR. THOMASON:  Objection to form.

8          You can answer.

9      A.   Yes.

10      Q.   Okay.  What do you recall about that

11   transaction?

12      A.   That transaction, he was -- or -- Max

13   said that -- I believe that it was going to be --

14   the property was going to be for a family member

15   or family members and that house -- he -- or I

16   think it was Golden Spring or Greenwich Land

17   purchased it and bought the property.

18      Q.   Do you recall which family member

19   Mr. Krasner said would be living in the property?

20      A.   No.

21      Q.   Did you ever visit the property?

22      A.   No.

23      Q.   Were you ever there when anyone from

24   the family visited the property?

25      A.   I've never been to the property.

1              MARGARET E. CONBOY

2      Q.    Do you know if any member of the

3   family ever visited the property prior to its

4   purchase?

5      A.    I don't know.

6      Q.    How would you compare the size of this

7   property to the other properties that Mr. Kwok had

8   been looking at?

9      A.    This property was less in value.  I

10  think it was around 2 million.

11          MR. LUFT:  Let's mark as Whitman Breed

12      Exhibit 12 --

13          MR. THOMASON:  Fourteen.

14          MR. LUFT:  Fourteen?  Thank you.

15          MR. THOMASON:  Thirteen.

16          MR. LUFT:  Thirteen?  Even better.

17          Okay.  It's Bates stamped WBAM_006317.

18      It's Tab 37.  It's an e-mail from -- it

19      appears to be an e-mail from Ms. Conboy to a

20      Joel Kaye, Gideon Fountain, and Martha

21      Jeffrey, August 19, 2019 regarding

22      33 Ferncliff.

23          (Whitman Breed Exhibit 13, e-mail

24      chain, Bates stamped WBAM_006317, was marked

25      for identification at this time.)

1              MARGARET E. CONBOY

2    BY MR. LUFT:

3        Q.   Ms. Conboy, do you recall this e-mail

4    that you wrote?

5        A.   I don't remember it, but I see I wrote

6    it to Joel.

7        Q.   Okay.  And who is Joel Kaye?

8        A.   Joel Kaye was the seller's attorney.

9        Q.   And you write:  "I reviewed the

10   changes with my client.  The only change he has is

11   with the five business-day grace period - he would

12   like to make it three business days because the

13   family is moving from California, their lease

14   ends, and they need to get the kids settled and

15   enrolled in school."

16            Do you see that?

17       A.   Yes.

18       Q.   And who is the "he" being referred to

19   in this e-mail?

20       A.   Max.  That would be Max.

21       Q.   Okay.  And do you recall Mr. Krasner

22   telling you that the family that was going to live

23   at 33 Ferncliff was moving from California?

24       A.   He must have since that's what I wrote

25   in the e-mail.

1              MARGARET E. CONBOY

2      Q.   And the suggestion I also assume is

3  that he told you that there were school-aged

4  children?

5      A.   Right.

6      Q.   So this -- the reference to the

7  "family" here is not Mr. Kwok's family, correct,

8  meaning his immediate family?

9      A.   Correct, correct.

10      Q.   This wasn't a house for his wife and

11  adult children, to your understanding?

12      A.   Not to my understanding.

13      Q.   Okay.  Do you recall what the source

14  of funds used to pay for this house was?

15      A.   I don't know.

16      Q.   Now, it says:  "My client is wiring

17  the funds to our trustee account."

18          Do you recall where they wired the

19  funds from?

20      A.   No, I don't remember.  I don't know.

21      Q.   Do you recall if they purchased the

22  house in cash or if they had financing?

23      A.   There was no financing.

24      Q.   Did they have to provide any type of

25  financial due diligence or representations to the

1          MARGARET E. CONBOY

2  seller prior to purchasing the house?

3      A.    I don't know.

4          MR. LUFT:  I'm going to ask to mark as

5  Exhibit 14, a document behind Tab 39.  It's

6  Bates stamped WBAM_010121, and it is an

7  August 20, 2019 e-mail from yourself to

8  Ms. Bruno, subject:  "Greenwich Land LLC."

9          (Whitman Breed Exhibit 14, e-mail

10      dated August 20, 2019, Bates stamped

11      WBAM_0101021, was marked for identification

12      at this time.)

13  BY MR. LUFT:

14      Q.    Do you see that?

15      A.    Yes.

16      Q.    Who is Ms. Bruno?

17      A.    My paralegal.

18      Q.    Okay.  Do you recall sending this

19  e-mail?

20      A.    I don't remember sending it, but I

21  sent it.  I don't remember.

22      Q.    Do you see you write:  "Can you check

23  who the members are of Greenwich Land LLC - I

24  would like to confirm that Max Krasner is a member

25  - it is a Delaware LLC."

1          MARGARET E. CONBOY

2          Do you recall if Ms. Bruno ever did

3   that search?

4      A.   I don't remember.

5      Q.   Do you recall if you ever asked

6   Mr. Krasner if he was a member of Greenwich Land

7   LLC?

8      A.   I don't remember.

9      Q.   Did Mr. Krasner ever inform you that

10  he was not a member of Greenwich Land LLC?

11     A.   Not that I remember.

12     Q.   Do you know -- or I should say, at the

13  time of the transaction, did you know who the

14  member -- who the member or members of Greenwich

15  Land LLC were?

16     A.   I don't remember.  I don't remember.

17     Q.   Do you have any recollection with

18  regard to this issue?

19     A.   No.

20          MR. LUFT:  Okay.  You can put that

21     aside.

22          I'm going to mark as Exhibit 15, a

23     document Bates -- behind Tab 40, Bates

24     stamped WBAM_006741, which is an August 30,

25     2019 e-mail between yourself Mr. Kaye and a

1              MARGARET E. CONBOY

2      number of cc's.

3            (Whitman Breed Exhibit 15, e-mail

4      chain, Bates stamped WBAM_006741, was marked

5      for identification at this time.)

6    BY MR. LUFT:

7      Q.    Do you see that?

8      A.    Yes.

9      Q.    It says (as read):  Joel, my clients

10   were at the house, the U-Haul truck hit the side

11   of the house.  My client is sending me pictures.

12   Brick will need to be replaced.

13            Do you recall anything about this?

14      A.    Just that Max called and said that I

15   guess this U-Haul truck hit the side of the house,

16   and I don't remember how we -- I don't remember

17   how we resolved it, if Joel's -- if the seller

18   gave a credit or -- or not.  I don't remember.

19      Q.    Do you recall who was specifically at

20   the house when the U-Haul truck hit it?

21      A.    No, I don't.

22      Q.    Okay.

23            Did Mr. Krasner ever tell you about

24   any members of Mr. Kwok's family other than

25   Mr. Kwok ever visiting this property?

1              MARGARET E. CONBOY

2    A.    Not that I remember.

3          MR. THOMASON:  Objection to form.

4    A.    Not that I remember.

5    Q.    Okay.

6          MR. LUFT:  Okay.  I ask to mark

7    Exhibit 16, Whitman Breed deposition

8    Exhibit 16, a document behind Tab 41, Bates

9    stamped WBAM_007160 through 64, which is an

10    e-mail chain between Ms. Bruno, Mr. Krasner,

11    and yourself.

12          (Whitman Breed Exhibit 16, e-mail

13    chain, Bates stamped WBAM_007160 through

14    164, was marked for identification at this

15    time.)

16   BY MR. LUFT:

17    Q.    And specifically, do you see that

18   document?

19    A.    Yes.

20    Q.    It appears to be an e-mail chain

21   described?

22    A.    Excuse me?

23    Q.    Does it appear to be an e-mail chain

24   between Mr. Krasner and Ms. Bruno and yourself

25   with regard to 33 Ferncliff's inspections?

1           MARGARET E. CONBOY

2     A.   Yes.

3     Q.   If you turn to the Bates stamp ending

4  161, there is an e-mail from Mr. Krasner to

5  Ms. Bruno and yourself on October 21st in which he

6  says: "Okay.  Thanks.  Let me know what date and

7  I will advise the tenant ahead of time."

8           Ms. Conboy, do you recall that the

9  33 Ferncliff property was going to be rented to a

10  tenant?

11     A.   I don't remember that.  I don't

12  remember that.

13     Q.   What -- as a real estate professional,

14  how would you understand when someone refers to

15  that there being a tenant, does that make you

16  understand there to be -- it's to be a rental?

17     A.   Well, that there's a -- that there

18  would be a lease and they're paying rent or the

19  people are living there and paying rent.

20           MR. LUFT:  I'm going to ask to mark as

21       Whitman Breed Exhibit 17, a document Bates

22       stamped WBAM_000002 through 05.

23           MR. THOMASON:  That's Tab 42, right?

24           MR. LUFT:  Yes, sir.

25           (Whitman Breed Exhibit 17, Trust

1        MARGARET E. CONBOY

2    Ledger, Bates stamped WBAM_000002 through 5,

3    was marked for identification at this time.)

4  BY MR. LUFT:

5    Q.    Ms. Conboy, do you recognize this

6  document?

7    A.    Yes.  It's a trust ledger for -- for a

8  trustee account.

9    Q.    Can you explain to me what that is?

10    A.    So when we represent anyone in a

11  purchase or sale, the money flows through our

12  trustee account, and this is -- and it shows what

13  goes in, what's wired out, what checks are --

14  are -- go out with a transaction or cut for a

15  transaction.

16    Q.    Could you walk me through this

17  document generally, what the flow of funds were

18  for this transaction?

19    A.    So the first part is the purchase of

20  Ferncliff.

21    Q.    And who's the party making the

22  purchase of -- it says:  "Golden Spring" --

23    A.    Golden Spring and Greenwich Land.

24  This is Greenwich Land.

25    Q.    So who's the one making the purchase

1              MARGARET E. CONBOY

2   here?

3      A.   Greenwich Land, it looks like.

4      Q.   But the first entry says:  "On behalf

5   of Golden Spring."

6          So can you just help me sort out how

7   this works because --

8          MR. THOMASON:  So can I just ask the

9      witness to test -- Avi, are you asking her

10     for her memory of the structure of the

11     transaction or are you asking her what the

12     document is saying?  Because I thought it

13     was what the document was saying.

14         MR. LUFT:  Well, look, if there is a

15     difference, I would like to know.  I'm just

16     really -- Ms. Conboy is -- as your

17     representative, I'm just asking her to

18     explain to me how -- how to understand this

19     ledger.

20         And I don't know if there's a

21     distinction between how she understands it

22     today, so I could ask that foundational

23     question.

24         MR. THOMASON:  Well, there might be

25     other documents -- if you want to know how

1             MARGARET E. CONBOY

2      it was structured or purchased or whatever,

3      there might be other documents that are, you

4      know, better for that than this.

5             MR. LUFT:  I just want to understand

6      how this document works.  This is -- well,

7      why don't we just take it in pieces.

8    BY MR. LUFT:

9      Q.   This is Whitman Breed's trust ledger,

10   correct?

11     A.   Right, right.  It's an accounting.

12   It's our accounting.  So for every sale we do

13   this.

14            So it looks like -- it looks like a

15   million two came in on August 27th on behalf of

16   Golden Spring.

17     Q.   Okay.

18     A.   And then it was Capital One, but then

19   it has Greenwich, so it was probably for the

20   benefit of Greenwich Land LLC.

21            And then these checks on the other

22   side are everything that's going out, like First

23   American Title Insurance, the balance due to the

24   other attorney, the down payment -- let's see --

25   the Town of Greenwich recording fees.  So those

1               MARGARET E. CONBOY

2    are all the items coming out.

3        Q.   And they all say:  "On behalf of

4    Golden Springs."  So if I'm following along, this

5    is Golden Spring paying the 1.24 million on behalf

6    of Greenwich Land, and then there's all the money

7    that goes out and that's all -- it says:  "On

8    behalf of" -- so those are payments being made on

9    behalf of Golden Spring out of the account,

10   correct?

11       A.   I don't know.  I can't say that for

12   sure because our accounting -- I don't know if

13   that's correct or not.  Because the accounting,

14   they just used -- those are numbers of how we

15   refer to matters.  I don't know if that's actually

16   how it -- how they -- how -- if Golden Spring -- I

17   don't know.  I don't know.

18       Q.   Well, what does it mean when it says

19   (as read):  Out:  J.P. Morgan Chase on behalf of

20   Golden Spring, just explain, how does that work?

21   What does that mean?

22       A.   I'd have to ask my bookkeeper.  I

23   don't know.

24            MR. THOMASON:  Form.

25       Q.   Does it indicate that this is a

1          MARGARET E. CONBOY

2  payment on behalf of anyone other than Golden

3  Spring?

4      A.   Or of Greenwich Land.  I don't --

5      Q.   There's no reference to Greenwich Land

6  there, right?

7      A.   Yes -- yeah, there is.

8      Q.   Where?

9      A.   Greenwich Land LLC purchased

10  33 Ferncliff.

11          These are questions that you'd have to

12  ask my bookkeeper, because I really don't know how

13  they label these things, but you've got Greenwich

14  Land LLC up there, too.

15     Q.   Well, under "In," they received money

16  from -- right, there's money coming in from Golden

17  Spring on behalf of Greenwich Land, that's what

18  you told me, right?

19     A.   That's what it says here.

20     Q.   For all the "out" entries, all the

21  outs just reference Golden Spring, not Greenwich

22  Land, correct?

23     A.   No.

24          MR. THOMASON:  Hey, Avi, do you want

25     to go off the record for a minute?

1          MARGARET E. CONBOY

2          If you want to go off the record, we

3     can probably explain it a little bit more

4     clearly.

5          MR. LUFT:  Sure, we can go off the

6     record for a second.

7          VIDEOGRAPHER:  We're going off the

8     record at 11:57 a.m.

9          (Recess.)

10          VIDEOGRAPHER:  We are back on the

11     record at 11:59 a.m.

12   BY MR. LUFT:

13     Q.   Ms. Conboy, a couple other questions.

14          In the middle, there's a grayed

15   outline which says:  "In:  Converted from tabs on

16   behalf of Golden Spring."  On the bottom, it says:

17   "Hudson Diamond."

18          Is that money coming in from Hudson

19   Diamond into this account?

20     A.   I'm not sure where you're looking.

21     Q.   Right in the middle, there's a big

22   gray box, it says:  "In."

23          Entry No. 795777?

24     A.   795777.

25          That was your receipts.  So it looks

1             MARGARET E. CONBOY

2  like -- oh, I see here.  There was a receipt for

3  $2,800.

4       Q.   Okay.  My question is just:  Is that

5  money coming from Hudson Diamond, because it says:

6  "In"?

7       A.   Again, I don't know.  It's not clear

8  to me if -- it's not clear.  I don't understand

9  how they're -- how this program was working.

10      Q.   Understood.

11      A.   Yeah.

12      Q.   Okay.  I guess we'll try to clarify it

13  later.

14           One other question, if you can answer

15  it:  If you turn to the next page, there's an

16  entry that says 1102379, and it's a distribution

17  of approximately 2.27 million on behalf of Golden

18  Spring, and it says:  "Bank:  The First Bank of

19  Greenwich."  Regarding net sale proceeds, 33 --

20  can you just -- is that the bank account from

21  which --

22      A.   That's the bank -- they told us to --

23  Max Krasner told us to wire the sales proceeds to

24  that account.

25      Q.   Got it.

1              MARGARET E. CONBOY

2         So this is money that --

3    A.   The sale proceeds.

4    Q.   This is from when the house, 33

5  Ferncliff, was sold?

6    A.   Right, correct.

7    Q.   So when 33 Ferncliff was sold again

8  and Mr. Kwok was the seller, this was the bank

9  account that the money was sent to, correct?  This

10  is First Bank of Greenwich?

11   A.   That's what Max advised me to wire it

12  to that account.

13   Q.   Okay.  There is a block over the

14  account number.

15        Is that a redaction you made or the

16  firm made?

17   A.   Yeah.

18        MR. LUFT:  Okay.  We'd ask that you

19     provide us with the full account number.

20        So, Michael, maybe that's something

21     maybe you can get accounting to provide us

22     as well.

23   Q.   Okay.  Did Mr. Krasner tell you whose

24  bank account that was?

25   A.   No.

1           MARGARET E. CONBOY

2      Q.    And that's not the bank account from

3  which the funds were given to originally purchase

4  the house, correct?

5      A.    I don't know.  I don't know.

6      Q.    If we look at the trust ledger, that

7  was a Capital One account?

8           MR. THOMASON:  You have to answer

9      "yes" or "no."

10     A.    Yes, yes.

11     Q.    Okay.  So the money to purchase

12  33 Ferncliff came from a Capital One account but

13  the proceeds from selling that home in 2022 went

14  to a First Bank of Greenwich account, correct?

15     A.    Correct.

16     Q.    And you were never told in whose name

17  that First Bank of Greenwich bank account

18  belonged, correct?

19     A.    Correct.

20     Q.    Do you have any other information

21  about who received the proceeds of 33 Ferncliff

22  other than the fact that it was sent to this First

23  Bank of Greenwich account?

24     A.    No.

25          MR. LUFT:  Are we up to 18, I believe?

1              MARGARET E. CONBOY

2         Does that sound right to everyone?

3         MR. THOMASON:  Yes.

4         MR. LUFT:  I ask to mark as Whitman

5    Breed Deposition Exhibit 18, a document

6    behind Tab 60, Bates stamped 008330 through

7    34, which is an e-mail chain between

8    Mr. Krasner and Ms. Conboy regarding

9    33 Ferncliff dated February 10, 2021.

10         (Whitman Breed Exhibit 18, e-mail

11    chain, Bates stamped WBAM_008330 through

12    334, was marked for identification at this

13    time.)

14         MR. THOMASON:  Are you saying 8330 to

15    334?

16         MR. LUFT:  Yes.

17   BY MR. LUFT:

18    Q.   Ms. Conboy, do you recognize this

19   e-mail chain between you and Mr. Krasner?

20    A.   I don't remember it, but it's an

21   e-mail chain between us, but I don't remember.

22    Q.   Do you see Mr. Krasner in February of

23   2021 talks about gifting 33 Ferncliff to a Qing

24   Cai?

25         Do you see that?

1            MARGARET E. CONBOY

2      A.    Yes.

3      Q.    What do you recall about any

4  discussions regarding the gifting of 33 Ferncliff

5  to a Qing Cai?

6      A.    I don't remember anything about that.

7  I don't remember gifting it.  I don't remember if

8  we ever even filed the deed quitclaiming it to

9  that person.

10     Q.    And ultimately, that wasn't done

11  because in fact --

12     A.    Title is still in Greenwich Land.

13     Q.    Right, because they sell it

14  landlocked?

15     A.    Yeah, so I don't remember.

16     Q.    Do you have any recollection about who

17  Qing Cai was?

18     A.    No.

19     Q.    Do you see from Exhibit 18, it appears

20  that Qing Cai was the person -- the tenant living

21  at 33 Ferncliff Road?

22     A.    That the -- Max has her -- has his or

23  her address as 33 Ferncliff.

24     Q.    Do you recall any discussion about

25  Mr. Kwok wanting to gift the property to Ms. Cai

1          MARGARET E. CONBOY

2 or to anyone else?

3     A.    As I said, I haven't talked to -- I

4 never talked to Mr. Kwok.  It was Max.  So I don't

5 remember Max telling me about gifting it.

6     Q.    But you understood Mr. Krasner worked

7 for the owner, not that Mr. Krasner was the owner,

8 correct?

9     A.    Right, correct, correct.

10     Q.    Do you have any recollection about why

11 the decision was made not to gift it and, in fact,

12 to hold onto the property?

13     A.    No, I don't.

14     Q.    Okay.  Do you recall -- we've talked a

15 little bit about this -- that in April of 2022, in

16 fact, 33 Ferncliff Road was sold?

17     A.    Right.

18     Q.    When was the first time you heard that

19 the owner of 33 Ferncliff wanted to sell the

20 property?

21     A.    I -- I don't remember.  It would

22 either be from Max or the broker.  I don't

23 remember which one.

24     Q.    Did they ever tell you anything about

25 why they wanted to sell the house?

1              MARGARET E. CONBOY

2      A.   No.

3      Q.   Did they ever discuss with you the

4  fact that there was an order from a New York State

5  Court restraining sale of assets of Mr. Kwok?

6      A.   No.

7      Q.   Or that they had been served process

8  with regard to not selling this house?

9      A.   No.

10     Q.   That's not something Mr. Krasner told

11 you, correct?

12     A.   No, correct.

13     Q.   How long do you recall the process

14 being from when the house -- when you were first

15 told that they were thinking of selling the house

16 to when it was sold?

17     A.   I don't remember the dates.  I

18 don't -- I don't know.  I don't remember the

19 dates.

20     Q.   Do you recall it being a relatively

21 quick process?

22     A.   No.  I don't remember.  I don't

23 remember it being relatively quick.  I don't

24 remember how long it took.

25     Q.   Given the fact that at some point you

1           MARGARET E. CONBOY

2  were told that the property was going to be

3  gifted, do you recall ever being surprised to hear

4  that now they were -- now the property was to be

5  sold?

6      A.   No, I -- no, I wasn't surprised.

7      Q.   And other than the fact that the

8  proceeds or the money were sent to the First

9  Greenwich bank account, do you have any knowledge

10  as to where the proceeds for 33 Ferncliff went

11  once they were transferred?

12     A.   No, no.  No.

13     Q.   Did you ever speak with Mrs. Kwok?

14     A.   No.

15     Q.   Do you know the name of Mr. Kwok's

16  wife?

17     A.   I have no idea, no.

18     Q.   Have you ever had any communications

19  with her?

20     A.   No.

21     Q.   If I said the name Hin Chi Nok, would

22  that refresh your recollection?

23     A.   Nope.

24     Q.   Were you ever given any instructions

25  from someone on behalf of Mr. -- Ms. Nok with

1              MARGARET E. CONBOY

2  regard to any of the properties?

3      A.   Not that I'm aware of.

4      Q.   Do you know if Ms. Nok had any

5  involvement whatsoever in connection with the sale

6  of 33 Ferncliff?

7      A.   I have no idea.

8      Q.   How about the debtor's son, Miles'

9  son, Guo?

10     A.   I don't know, no.

11     Q.   Have you ever heard that name before?

12     A.   No, I haven't.

13     Q.   Have you ever heard the name Chen Guo?

14     A.   No.

15     Q.   Did you ever receive any instructions

16  with regard to 33 Ferncliff that you were told

17  were being given on behalf of Mr. Chen Guo --

18     A.   Yeah, not that I'm aware of.

19     Q.   And the same question:  Were you ever

20  given any -- were you ever told -- are you aware

21  of any involvement that Mae Guo had with -- in

22  connection with 33 Ferncliff?

23     A.   No.

24     Q.   In all your communications with

25  Mr. Krasner, did he ever tell you that he needed

Page 81

1              MARGARET E. CONBOY

2  to get approval from Mr. Kwok's son prior to

3  making any decisions?

4      A.   No.

5      Q.   Did Mr. Krasner ever tell you that he

6  needed to get approval from Mr. Kwok's wife,

7  Ms. Nok, prior to making any decisions?

8      A.   No.

9      Q.   Did he ever tell you he needed to get

10  approval from Mr. Kwok's daughter, Ms. Mae Guo,

11  prior to making any decisions?

12     A.   No.

13     Q.   Is that true for all properties that

14  you looked at on behalf of Mr. Kwok?

15     A.   Yes.

16     Q.   Okay.

17         MR. LUFT:  We can put that to one

18  side.

19     Q.   Now, there was another property that

20  involved Mr. Kwok where you did not represent him,

21  right, 373 Taconic Road?

22     A.   That's right.

23     Q.   And you represented the seller when

24  Mr. Kwok was the buyer of that property, correct?

25     A.   Correct.

1              MARGARET E. CONBOY

2      Q.    And did you get a waiver such that you

3    could represent the seller in that property even

4    though Mr. Kwok was to be the buyer?

5      A.    Yes.

6      Q.    What do you recall about that

7    transaction?

8      A.    I don't recall anything unusual in the

9    transaction, nothing out of the ordinary.

10     Q.    Okay.  Do you recall receiving

11   financial due diligence from the potential buyer

12   prior to completing -- entering into a contract?

13     A.    No, I don't.

14     Q.    How about once a contract was entered

15   into?

16     A.    No, I don't.

17     Q.    Do you recall if there was financing

18   for this home?

19     A.    Excuse me?

20     Q.    Do you recall if there was any

21   financing for this home?

22     A.    I don't -- I don't remember.  I don't

23   know.

24     Q.    Do you recall what funds Mr. Kwok used

25   to purchase 3073 Ferncliff -- Taconic Road --

1           MARGARET E. CONBOY

2  excuse me?

3      A.   I don't know.

4      Q.   Okay.  And your client was a

5  Mr. Augustine, correct?

6      A.   Correct.

7      Q.   And you had represented Mr. Augustine

8  previously?

9      A.   Yes.

10     Q.   Do you remember Mr. Emile deNeree was

11  the broker on behalf of the buyer for that

12  transaction?

13     A.   I don't remember.

14         MR. LUFT:  Let's mark as Whitman Breed

15     Deposition Exhibit 19.  Is that right?

16         MR. THOMASON:  Yep.

17         MR. LUFT:  Great.

18         Document behind Tab 55.  Document

19     Bates stamped WBAM_009051 through 53, which

20     I believe you'll tell me is an e-mail chain

21     between yourself, Mr. deNeree, Mr. Krasner

22     and Ms. Bruno regarding 373 Taconic Road.

23         (Whitman Breed Exhibit 19, e-mail

24     chain, Bates stamped WBAM_009051 through 53,

25     was marked for identification at this time.)

1                MARGARET E. CONBOY

2    BY MR. LUFT:

3        Q.    Do you see that?

4        A.    Yes.

5        Q.    And, in fact, there's an earlier

6    e-mail in the chain also from a Ms. Julie Burke to

7    Mr. deNeree that starts this all off, right?

8        A.    Yes.

9        Q.    And she has questions regarding funds

10   still being held in escrow, correct?

11       A.    Yes.

12       Q.    And then Mr. deNeree writes to you on

13   August 19th, and he says:  "Dear Margaret and

14   Max" -- that's you and Mr. Krasner, correct?

15       A.    Correct.

16       Q.    "The sellers for 373 Taconic" -- and

17   that's Mr. Augustine, your client, right?

18       A.    Yes.

19       Q.    "Which was bought by Miles under

20   Greenwich Land" -- and that's Mr. Kwok purchasing

21   it through Greenwich Land, correct?

22       A.    I -- yeah, that's what it says.

23   That's what the e-mail says.

24       Q.    Did you have any different

25   understanding about the transaction?

1            MARGARET E. CONBOY

2      A.   I don't remember how they purchased

3  it.  I really don't remember.

4      Q.   Okay.  "Are asking that the escrow

5  accounts be released."

6           Do you see that?

7      A.   Yes.

8      Q.   And you inform Mr. deNeree that you

9  represented Mr. Augustine, so either Mr. Krasner

10  or the purchasing attorney would be the one that

11  needed to be contacted, correct?

12     A.   Correct.

13     Q.   And Mr. deNeree was the broker for

14  the buyer, not the seller, correct?

15     A.   I don't remember, but it looks like

16  that from the e-mail.

17     Q.   And he's saying -- as the broker for

18  the buyer, he's saying that the house was

19  bought -- he's telling you that the house was

20  bought by Mr. Kwok under the name of Greenwich

21  Land; correct?

22     A.   Right.

23     Q.   Okay.

24           When was the last transaction you

25  performed on behalf of Mr. Kwok, Greenwich Land,

1              MARGARET E. CONBOY

2   Golden Springs or any other entity affiliated with

3   Mr. Kwok?

4       A.    It was the sale of Ferncliff.

5       Q.    And otherwise, you were just -- you

6   were on the opposite side of the transaction with

7   regard to 373 Taconic Road, correct?

8       A.    Correct.

9       Q.    Have you ever been on the opposite

10  side of any other transactions involving Mr. Kwok?

11      A.    No.  Not that I'm aware of, no.

12      Q.    Since the Ferncliff property, has

13  Mr. Kwok or Mr. Krasner or anyone else affiliated

14  with Mr. Kwok ever reached out to you with

15  regard -- or your firm with regard to any other

16  potential work?

17      A.    I don't think so.  Not that I recall.

18      Q.    Are you aware of any other attorneys

19  that have represented Mr. Kwok in connection with

20  real estate dealings?

21      A.    No, not that I know of.  Just 373

22  but -- I don't -- that's it.

23      Q.    Other than finding out through Google

24  that Mr. Kwok is a billionaire of Chinese descent,

25  what else did you learn about Mr. Kwok in your

1                    MARGARET E. CONBOY

2  dealings with him?

3      A.    That was it.  I really didn't learn

4  too much about him.

5      Q.    Did any of the brokers ever tell you

6  anything about Mr. Kwok?

7      A.    No.  Not that I remember, no.

8      Q.    Did you ever come to learn anything

9  about the entity called "Greenwich Land" other

10  than what we've discussed today?

11      A.    No.

12      Q.    Do you know of any person other than

13  Mr. Kwok who has any interest or control over

14  Greenwich Land?

15      A.    I have no idea.

16      Q.    Were you ever told that there was

17  anyone other than Mr. Kwok who controlled

18  Greenwich Land?

19      A.    I wasn't told who, as I said,

20  controlled it.

21      Q.    Were you ever told who had controlled

22  Golden Spring?

23      A.    No.

24      Q.    Were you ever told that there was any

25  decision maker other than Mr. Kwok in connection

1             MARGARET E. CONBOY

2  with real estate transactions related to the work

3  you were doing for Golden Spring, Greenwich Land,

4  or Hudson Diamond?

5      A.   I was never told who was making the

6  decisions on any of them.

7      Q.   Except -- well --

8      A.   Yeah, except in the e-mails, whatever

9  was sent to me, but that was it.

10     Q.   And in those e-mails, the only person

11  referenced was Miles Kwok, correct?

12     A.   Correct.

13          MR. LUFT:  Okay.  Why don't we take a

14     quick break.

15          MR. THOMASON:  How long are you

16     thinking?

17          MR. LUFT:  Ten minutes?

18          MR. THOMASON:  Okay.  I'll go run over

19     to the accounting people and see if I can

20     get that question answered.

21          MR. LUFT:  Yeah, if you could check

22     for that account number, too, that would be

23     great.

24          MR. THOMASON:  Okay.  Thanks.

25          VIDEOGRAPHER:  We're going off the

1          MARGARET E. CONBOY

2      record at 12:23 p.m.

3          (Recess.)

4          VIDEOGRAPHER:  We are back on the

5      record at 12:38 p.m.

6    BY MR. LUFT:

7      Q.    Ms. Conboy, I'm going to ask you to

8    pull out Deposition Exhibit 17 again, which was

9    Bates stamped WBAM_00002 through 00005.

10          Do you have that in front of you?

11     A.    I do.

12     Q.    Okay.  Now, your counsel has told me

13   he's going to send me a non-redacted version with

14   regard to the account for First Bank of Greenwich,

15   so that will take care of that.  Okay?

16     A.    Right.  Sure, yep.

17     Q.    And then I believe -- and I just want

18   to clarify, because I believe you've done a little

19   digging, which is very helpful, which is to say

20   the entries with regard to which bank, whether it

21   be Capital One or First Greenwich, all those --

22   those are actual manual entries done by Whitman

23   Breed's accounting department based on the

24   information they know to be true, correct?

25     A.    That's right, yeah, correct.

1                 MARGARET E. CONBOY

2      Q.   Terrific.

3            MR. LUFT:  Okay.  You can put that

4      aside.

5            THE WITNESS:  Okay.

6      Q.   Okay.  All right.  Ms. Conboy, we've

7   talked about a number of properties today.  I

8   believe every one we've talked about, with the

9   exception of 373 Taconic, are properties that you

10  represented Mr. Kwok's interests in as potential

11  purchases.  I know -- is that correct?

12     A.   Correct, correct.

13     Q.   And for all of those, I believe you

14  interacted with Mr. Max Krasner as the

15  representative of Mr. Kwok, correct?

16     A.   Correct.

17     Q.   Okay.

18     A.   Right.

19     Q.   In your dealings with Mr. Krasner as

20  Mr. Kwok's representative in connection with the

21  purchase of 33 Ferncliff, was there any difference

22  in how you interacted with him with regard to that

23  property as opposed to the interactions you had

24  with Mr. Krasner in connection with any of the

25  other properties Mr. Kwok considered purchasing

1              MARGARET E. CONBOY

2   but did not purchase?

3   A.    No, no.

4   Q.    Great.

5        MR. LUFT:  Ms. Conboy, one last thing

6    of housekeeping we talked about is that as

7    we -- I've talked with your counsel, I

8    mentioned to you, we're going to work on an

9    affidavit or declaration with regard to

10   authentication and business record just so

11   we could save your time, but subject to

12   getting that wrapped up and getting a

13   declaration put in, I have no further

14   questions for you at this time.

15        Thank you very much.

16        THE WITNESS:  Thank you.  Thank you.

17        VIDEOGRAPHER:  Did you have anything,

18   Mr. Thomason?

19        MR. THOMASON:  No.

20        VIDEOGRAPHER:  Okay.  Are we all set

21   to go off the record, Counsel?

22        MR. LUFT:  We are.

23        VIDEOGRAPHER:  This concludes today's

24   testimony of Margaret E. Conboy.  We're

25   going off the record at 12:41 p.m.  This

Page 92

1

2      also concludes Media 2.

3          (Whereupon the proceedings were

4      concluded at 12:41 p.m.)

5               oOo

6          I, MARGARET E. CONBOY, the witness

7      herein, do hereby certify that the foregoing

8      testimony of the pages of this deposition to

9      be a true and correct transcript, subject to

10      the corrections, if any, shown on the

11      attached page.

12          _____

13          MARGARET E. CONBOY

14  Subscribed and sworn to before me this

15  _____day of _____,_____.

16

17  _____

18

19

20

21

22

23

24

25

Page 93

1

2                CERTIFICATE

3          I, AMY A. RIVERA, a Certified Shorthand

4  Reporter, Registered Professional Reporter,

5  Certified LiveNote Reporter, and Notary Public of

6  the State of New Jersey, do hereby certify that

7  prior to the commencement of the examination

8  MARGARET E. CONBOY, was duly sworn by me to testify

9  the truth, the whole truth and nothing but the

10  truth.

11          I DO FURTHER CERTIFY that the foregoing is

12  a true and accurate transcript of the testimony as

13  taken stenographically by and before me at the time,

14  place and on the date hereinbefore set forth.

15          I DO FURTHER CERTIFY that I am neither a

16  relative nor employee nor attorney nor counsel of

17  any of the parties to this action, and that I am

18  neither a relative nor employee of such attorney or

19  counsel, and that I am not financially interested in

20  the action.

21

22  _____

        Amy A. Rivera, CSR, RPR, CLR
23        Notary Public of the State of New Jersey
        My commission expires July 29, 2025
24        License No. XI00939

25  Dated:  February 21, 2023

1

2                    INDEX

3   WITNESS                          PAGE

4   MARGARET E. CONBOY

5   By Mr. Luft                        6

6

7                    EXHIBITS

8   NUMBER              DESCRIPTION        PAGE

9   Whitman Breed Exhibit 1  Letter dated October   19

10                  1, 2018, Bates

11                  stamped WBAM_001464

12                  through 465

13  Whitman Breed Exhibit 2  E-mail dated October   21

14                  3, 2019, Bates

15                  stamped WBAM_10076

16  Whitman Breed Exhibit 3  Letter dated August    23

17                  16, 2019, Bates

18                  stamped WBAM_000035

19                  through 36

20  Whitman Breed Exhibit 4  E-mail chain, Bates    25

21                  stamped WBAM_002235

22                  through 237

23  Whitman Breed Exhibit 5  E-mail chain, Bates    29

24                  stamped WBAM_001048

25                  through 54

1

2        EXHIBITS (Continued)

3  NUMBER                DESCRIPTION        PAGE

4  Whitman Breed Exhibit 6  E-mail chain, Bates    30

5                stamped WBAM_002663

6                through 672

7  Whitman Breed Exhibit 7  E-mail chain, Bates    33

8                stamped WBAM_002803

9                through 808

10  Whitman Breed Exhibit 8  E-mail chain, Bates    36

11                stamped WBAM_002172

12                through 173

13  Whitman Breed Exhibit 9  E-mail chain, Bates    41

14                stamped WBAM_003873

15                through 876

16  Whitman Breed Exhibit 10 E-mail chain, Bates    46

17                stamped WBAM_003873

18                through 876

19  Whitman Breed Exhibit 11 E-mail chain, Bates    50

20                stamped WBAM_008335

21                through 339

22  Whitman Breed Exhibit 12 E-mail chain, Bates    52

23                stamped WBAM_008641

24                through 643

25

1

2          EXHIBITS (Continued)

3   NUMBER              DESCRIPTION        PAGE

4   Whitman Breed Exhibit 13 E-mail chain, Bates   58

5                  stamped WBAM_006317

6   Whitman Breed Exhibit 14 E-mail dated August   61

7                  20, 2019, Bates

8                  stamped WBAM_0101021

9   Whitman Breed Exhibit 15 E-mail chain, Bates   63

10                 stamped WBAM_006741

11  Whitman Breed Exhibit 16 E-mail chain, Bates   64

12                 stamped WBAM_007160

13                 through 164

14  Whitman Breed Exhibit 17 Trust Ledger, Bates   65

15                 stamped WBAM_000002

16                 through 5

17  Whitman Breed Exhibit 18 E-mail chain, Bates   75

18                 stamped WBAM_008330

19                 through 334

20  Whitman Breed Exhibit 19 E-mail chain, Bates   83

21                 stamped WBAM_009051

22                 through 53

23

24

25

1

2          REQUEST FOR PRODUCTION

3   PAGE/LINE        DESCRIPTION

4    73   18       We'd ask that you provide us

5                  with the full account number

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads      Should Read  Reason

6  ___  ___ _____    _____  _____

7  ___  ___ _____    _____  _____

8  ___  ___ _____    _____  _____

9  ___  ___ _____    _____  _____

10  ___  ___ _____    _____  _____

11  ___  ___ _____    _____  _____

12  ___  ___ _____    _____  _____

13  ___  ___ _____    _____  _____

14  ___  ___ _____    _____  _____

15  ___  ___ _____    _____  _____

16  ___  ___ _____    _____  _____

17  ___  ___ _____    _____  _____

18  ___  ___ _____    _____  _____

19  ___  ___ _____    _____  _____

20               _____

21               Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 2023.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____