**Hearing Date and Time: June 27, 2023 at noon (ET) and, if necessary, June 28, 2023**
**Objection Deadline: June 23, 2023 at 4:00 p.m. (ET)**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

------------------------------------------------------x
:
In re:                                    :    Chapter 11
:
HO WAN KWOK, *et al.*,[1]                 :    Case No. 22-50073 (JAM)
:
Debtors.                          :    (Jointly Administered)
:
------------------------------------------------------x

### TRUSTEE'S MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363, BANKRUPTCY RULES 2002, 6004(c), AND 9014, AND LOCAL RULES 6004-1 AND 6004-2, SEEKING ENTRY OF ORDER: (I) AUTHORIZING AND APPROVING SALE OF THE LADY MAY FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING AND APPROVING PURCHASE AND SALE AGREEMENT, AND (III) GRANTING RELATED RELIEF

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case of Ho Wan Kwok (the "Debtor"), by and through his undersigned counsel,

hereby files this motion (the "Motion") seeking entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "Proposed Sale Order"), pursuant to sections 105, 363(b), and

363(f) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004(c), and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1

and 6004-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court

for the District of Connecticut (the "Local Rules"), (i) authorizing and approving the Trustee's

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

sale (the "Sale") of the Lady May[2] to Herb Chambers Yachting, LLC (the "Buyer") free and

clear of all liens, claims, interests, and encumbrances pursuant to that certain purchase and sale

agreement, dated May 30, 2023, by and among the Buyer and the Trustee, attached hereto as

**Exhibit B** (together with the related addendum, the "PSA"), (ii) authorizing and approving the

PSA, and (iii) granting related relief.  In support of the Motion, the Trustee relies upon and

incorporates by reference the declaration of Dirk Johnson (the "Johnson Declaration"), attached

hereto as **Exhibit C**.  In further support of the Motion, the Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Trustee is pleased to report that he has secured a winning bid for the Sale of

the Lady May to the Buyer for a purchase price of $24 million pursuant to the terms of the PSA.[3]

The PSA represents the highest and best bid obtained after an extensive marketing campaign

conducted by the Trustee's yacht broker, Edmiston and Company Limited ("Edmiston"),

followed by a competitive bidding process among multiple bidders, during which process the

proposed purchase price for the Lady May was substantially increased.  The Trustee submits that

the Sale of the Lady May to the Buyer pursuant to the PSA is in the best interest of the Debtor's

estate, and, accordingly, the Trustee requests authorization to proceed with the Sale.

2.      As detailed below and in the Johnson Declaration, Edmiston has actively

marketed the Lady May since its retention was approved by this Court on April 27, 2023.

Consistent with best industry practices for marketing a luxury superyacht such as the Lady May,

---

[2]    For purposes of the Sale under the PSA, the term "Lady May" consists all assets to be sold pursuant to the PSA, including all gear, machinery, equipment, furniture, fuel, consumables, all registered or unregistered tenders, toys, articles and appurtenances on board the Lady May and/or included on the Lady May's listing specification as of the date of the PSA (*i.e.*, May 30, 2023).  For the avoidance of doubt, the Lady May II is not included as part of the Sale.

[3]    Subject to approval of this Court, Edmiston's 5% sales commission (*i.e.*, $1.2 million) would be funded out of the purchase price.

Edmiston has actively canvassed the yacht market for potential buyers, both within its own network of potential buyers and through numerous other yacht brokers in the industry, as well as advertised the Lady May both online and in print.

3.     From the outset of the marketing process, there has been significant interest in the Lady May.  In fact, by May 20, 2023, five prospective buyers (the "Initial Bidders") had provided Edmiston with formal offers for the Lady May with proposed purchase prices ranging from $18 million to $20 million.  In response, the Trustee countered with $23 million, but (with the exception of one bidder who increased its bid to $20 million), none of the Initial Bidders responded to the Trustee's counteroffer.

4.     In order to stimulate a competitive bidding process, and as the Trustee had previewed with the Court at the May 23, 2023 status conference, the Trustee decided, after consultation with Edmiston, to set a deadline of **Tuesday, May 30, 2023, at 5:00 p.m. (ET)** to submit best and final bids.  This bid deadline was designed to maintain maximum momentum with the Initial Bidders and other interested parties.  As part of the bidding process, the Trustee also required that such best and final bids satisfy certain conditions, including that (a) the purchase price must exceed $20 million, (b) bids must be based on the Trustee's form of purchase agreement, (c) the winning bid must provide a 20% deposit of the purchase price within 48 hours after the bid has been selected as the winning bid, (d) the purchase agreement must be executed by June 9, 2023, and (e) while the purchaser may conduct a survey, the purchaser would only be able to reject the Lady May if the surveyor certifies that survey revealed a defect affecting the operational integrity of the Lady May or her machinery or her systems or renders the Lady May unseaworthy.  The Trustee also advised bidders that all bids would be subject to review and approval of this Court.

5.      As of the May 30, 2023 bid deadline, the Trustee received five formal bids (in addition to the initial bids), including two new bidders that had not previously submitted any bids.  Of these five bids, three exceeded the $20 million minimum, while two bids were below that minimum.  Following receipt of these bids, the Trustee engaged in further negotiations with the three bidders that had satisfied the minimum bid requirement, resulting in one of the bidders (namely, the Buyer) increasing its bid to $24 million.  Because the other two bidders did not further increase their bids, the $24 million bid submitted by the Buyer was the highest and best bid.  Accordingly, the Trustee determined to select the Buyer's final bid as the winning bid and request Court approval of the PSA.[4]

6.      The Trustee recognizes that the aforementioned bidding process was not pre-approved by the Court pursuant to a separate bidding procedures order and that the Trustee did not conduct a public auction.  Nevertheless, in light of the significant marketing to date, and the competitive bidding that resulted in a substantial increase in the purchase price over the initial bids, the Trustee believes that formal bidding procedures and/or a public auction would not result in higher bids.  Indeed, given the nature of the market for luxury superyachts and the small pool of high net-worth individuals having the financial wherewithal to purchase the Lady May, the Trustee, after consultation with Edmiston, determined not to pursue a formal auction process, as such a process would likely have deterred interested buyers and/or resulted in lower bids, including because of the delays associated with an auction process and bidders' concerns about overpaying in an auction.  This is especially so given that other luxury superyachts can be purchased through yacht brokers without having to go through an auction process.  In any event,

---

[4]     The Trustee notes that there should be no concerns about the Buyer's financial ability to close.  The ultimate beneficial owner of the Buyer is Herbert G. Chambers, an American billionaire businessman, who is the owner and president of The Herb Chambers Companies, a group of 60 car dealerships in the greater Boston, Massachusetts area.

there is no requirement, whether under the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules that estate property must be sold through a public sale.

7.     The Trustee also recognizes that the Local Rules require a "description of the means by which the movant determined the fair market value of the property to be sold." Local Rule 6004-2(b)(4). While under different circumstances this may have required a formal valuation by an appraiser, the Trustee submits that, in light of the extensive marketing and bidding process, the purchase price under the PSA reflects the best measure of the fair market value of the Lady May and, thus, no formal valuation is necessary.[5] Indeed, the competitive nature of the bidding process conducted here is perhaps best illustrated by the fact that while none of the bidders initially accepted the Trustee's counteroffer of $23 million, the purchase price under the PSA exceeds that amount. Moreover, during the process of selecting a yacht broker, the Trustee had received several indications of the price at which the Lady May could sell, which indications were lower than the purchase price obtained through the bidding process here.

8.     Another important consideration in selecting the Buyer as the winning bidder is that the Buyer has accepted all modifications the Trustee made to the standard form of purchase agreement published by the International Yacht Brokers Association (the "IYBA Form")— modifications that were designed for the benefit of the estate. Most importantly, and in contrast to the IYBA Form, the Trustee's form of purchase agreement limits a buyer's ability to reject the Lady May following the completion of a survey of the Lady May. In particular, the Buyer may

---

[5]    Even if the Trustee were to incur the expense of procuring a formal valuation, such valuation would not alter the results of the bidding process or increase the purchase price that the Buyer is willing to pay. Moreover, the ultimate purchase price in yacht transactions is not publicly available generally, and such information is often subject to confidentiality and non-disclosure restrictions, making a formal valuation more speculative and subjective than in other types of transactions such as real property.

only reject the Lady May (on or prior to June 20, 2023) if the surveyor (who must be a duly qualified marine surveyor) certifies in writing that it discovered defects that affect the operational integrity of the Lady May or her machinery or her systems or renders the Lady May unseaworthy. The Buyer may not reject the Lady May on other grounds. To be clear, to the extent that the survey were to reveal any such defects, the Trustee will update the Court and parties in interest regarding any such defects, including whether the Buyer has chosen to reject the Lady May or whether the parties were able to agree to a modification of the purchase price to reflect the reasonable cost of addressing any such defects.

9.      Finally, and to be clear, the Trustee is serving copies of this Motion on all parties that have expressed to Edmiston an interest in purchasing the Lady May, in accordance with Local Rule 6004-2(g). To the extent any additional superior offers are received before or at the hearing on this Motion, the Trustee understands that he is duty-bound to consider such offers.

10.     For all these reasons, and as further detailed below, the Trustee requests that the Court approve this Motion and authorize the Trustee to proceed with the Sale of the Lady May to the Buyer.

## JURISDICTION, VENUE, AND STATUTORY BASES

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

12.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The statutory bases for the relief requested in this Motion are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004(c), and 9014, and Local Rules 6004-1 and 6004-2.

**BACKGROUND**

A.    **Procedural Background**

14.    On February 15, 2022 (the "Petition Date"), the Debtor filed with the Court a voluntary petition for relief under chapter 11 of Bankruptcy Code.

15.    On March 21, 2022, the United States Trustee appointed an Official Committee of Unsecured Creditors ("Committee") in the Debtor's chapter 11 case (the "Chapter 11 Case"). No examiner has been appointed in the Chapter 11 Case.

16.    On June 15, 2022, the Court entered a memorandum of decision and order [Docket No. 465] (the "Trustee Order") directing the United States Trustee to appoint a chapter 11 trustee in the Chapter 11 Case.  Pursuant to the Trustee Order, the United States Trustee selected Luc A. Despins as the Trustee.

17.    On July 8, 2022, the Court entered an order granting the appointment of Luc A. Despins as the Trustee in the Chapter 11 Case [Docket No. 523].

B.    **Status of Lady May**

18.    On March 27, 2023, the Court entered an order [Docket No. 172 in Adv. Proc. No. 22-5003] (the "Lady May Order") finding, among other things, that the Lady May is the property of the Debtor's estate.[6]  On April 10, 2023, HK USA and Ms. Guo filed a notice of appeal to the United States District Court for the District of Connecticut from the Lady May Order, but did not seek a stay pending appeal.

19.    On April 5, 2023, the Trustee filed his motion [Docket No. 1637] (the "Yacht Maintenance Motion") seeking, among other things, authorization to enter into, and perform

---

[6]    On March 31, 2023, the Court entered the Amendment to Order Granting Motion of Chapter 11 Trustee for Estate of Ho Wan Kwok for Partial Summary Judgment [Docket No. 182 in Adv. Proc. No. 22-5003] to also include a finding that the Lady May II is property of the Debtor's estate.

7

under, the management agreement with Yachtzoo Sarl. As noted in the Yacht Maintenance Motion, the monthly operating expenses for the Lady May range from approximately $100,000 to approximately $300,000 (depending on when certain payments, such as insurance premiums, come due). On April 12, 2023, the Court entered an order [Docket No. 1662] granting the Yacht Maintenance Motion.

20.     On April 18, 2023, the Trustee filed his application [Docket No. 1675] (the "Edmiston Retention Application") to retain Edmiston as broker for the sale of the Lady May (as well as the Lady May II). As detailed in the Edmiston Retention Application, with respect to the sale of the Lady May, Edmiston is entitled to a fixed fee of (i) 5% in case of a transaction not involving any other broker, intermediary, or third-party commission agent (a "Sub-Listing Broker") or (ii) 6% in case of a deal with a Sub-Listing Broker. On April 27, 2023, the Court entered an order [Docket No. 1717] (the "Edmiston Retention Order") granting the Edmiston Retention Application.

21.     On April 24, 2023, the Trustee filed his motion [Docket No. 1696] (the "Relocation Motion") seeking, among other things, to (i) relocate the Lady May to the navigable waters of Rhode Island and (ii) enter into, and perform under, the dockage license agreement with the Safe Harbor Newport Shipyard in Newport, Rhode Island. On April 27, 2023, the Court entered an order [Docket No. 1718] granting the Relocation Motion. The Lady May was moved to the Safe Harbor Newport Shipyard on May 2, 2023.

22.     On May 4, 2023, the Trustee filed his motion [Docket No. 1758] (the "FTZ Transfer Motion") to transfer the Lady May into the foreign trade zone (the "FTZ") in Newport, Rhode Island. The monthly fee of docking the Lady May in the FTZ at the Safe Harbor Newport Shipyard in Newport, Rhode Island, is approximately $50,000. On May 10, 2023, the Court

8

entered an order [Docket No. 1779] granting the FTZ Transfer Motion.  On May 17, 2023, the Lady May was transferred into the FTZ in Newport, Rhode Island, and it remains currently docked at the Safe Harbor Newport Shipyard.

**C.    Marketing of Lady May**

23.    As set forth in detail in the Johnson Declaration, since approval of its retention on April 27, 2023, Edmiston has been engaged in an extensive marketing campaign to sell the Lady May to the highest bidder.  Consistent with best industry practices for marketing a luxury superyacht such as the Lady May, Edmiston has actively canvassed the yacht market for potential buyers, both within its own network of potential buyers as well as through numerous other yacht brokers in the industry, as well as advertised the Lady May both online and in print. These marketing efforts were initially focused on residents outside of the United States and, following the Lady May's transfer to Newport's FTZ, Edmiston expanded its efforts to also include U.S. residents.

24.    Among other things, as part of its marketing efforts:

(1)    Edmiston created an electronic brochure of the Lady May, including photographs and listing its specifications, which brochure was included in industry-wide announcements to other yacht brokers as well as posted on Edmiston's website and social media;

(2)    Edmiston engaged in a direct client email marketing campaign, which featured the Lady May in its monthly mailer update (distributed to approximately 10,000 clients and other potentially interested parties);

(3)    Edmiston used extensive digital advertising to market the Lady May on its website and social media accounts, including Instagram, Facebook, LinkedIn and YouTube;

(4)    Shortly after the Lady May was moved into the FTZ in Newport, Rhode Island, Edmiston issued further announcements regarding the Lady May on its website and social media.

25.     Edmiston also connected the Lady May with its network of industry brokers through single and multi-yacht mailers and listed the Lady May on multiple brokerage listing pages and business-to-business search facilities, which centralize broker information for the yacht industry.  Further, Edmiston featured the Lady May as part of Edmiston's brand collateral (*i.e.*, marketing materials) in exclusive, private airports and aviation centers.

## COMPETITIVE BIDDING PROCESS

26.     As set forth in the Johnson Declaration, from the outset of the marketing process, there has been significant interest in the Lady May, but not at prices that the Trustee deemed acceptable.  A handful of potential buyers requested to be shown (and were shown) the Lady May, while several brokers visited the Lady May on behalf of prospective buyers.  By May 20, 2023, five prospective buyers (the "Initial Bidders") had provided Edmiston with formal offers for the Lady May with proposed purchase prices ranging from $18 million to $20 million.  In response to each of these offers, Edmiston advised the Initial Bidders that the Trustee determined to counter at $23 million.  In response to the Trustee's counteroffer, one of the Initial Bidders increased its bid to $20 million, while the other Initial Bidders did not increase their offer.

27.     In order to stimulate a competitive bidding process, the Trustee decided to schedule a deadline of Tuesday, May 30, 2023, at 5:00 p.m. (ET) to submit best and final bids.[7] This deadline was chosen to maintain maximum momentum with the Initial Bidders and other interested parties.  On May 24, 2023, Edmiston sent emails to the Initial Bidders and other parties that had expressed an interest in purchasing the Lady May, advising them of the May 30, 2023 bid deadline.  In that email, interested bidders were also advised that (a) due to the fact that

---

[7]     The Trustee previewed the following bidding procedures at the May 23, 2023 status conference before this Court.

the Trustee had received offers for the Lady May from several potential buyers, Edmiston was

inviting all interested parties to present their best and final offer prior to the May 30, 2023 bid

deadline and (b) any such bid would have to comply with the following requirements:

- Only bids with a purchase price in excess of $20 million would be considered by the Trustee;

- Offers must be based on the Trustee's form of purchase agreement (which was provided to interested parties on Thursday, May 25);

- To the extent the prospective buyer intended to modify the form of purchase agreement, mark-up of the agreement should be included as part of the bid (and advising the parties that such modifications, if any, would be evaluated in determining the highest and/or best offer);

- The winning bid must provide for a 20% deposit of the purchase price, which deposit must be received within 48 hours after such bid has been selected as the winning bid;

- The 20% deposit would be forfeited if the winning bidder fails to close on purchase of Lady May in accordance with terms of purchase agreement (subject to the right to reject the Lady May if the survey reveals a defect affecting the operational integrity of the Lady May or her machinery or her systems or renders the Lady May unseaworthy);

- The purchase agreement must be executed by June 9, 2023;

- The Lady May must be accepted or rejected (based on results of survey) by June 28, 2023;

- In the event the winning bidder does not close on the purchase at the price set forth in the purchase agreement, the Trustee may, at his option, purchase the survey from the buyer, at cost;[8]

- Closing would take place as soon as practical on or before July 20, 2023;

- All bids would be subject to bankruptcy court review and approval; and

- All bids had to be sent directly to the Trustee.

---

[8] The Trustee included this provision in order to avoid the delay of potential second survey in the event that the sale with the winning bidder does not close (for whatever reason) and the Trustee has to proceed with another purchaser. In that event, the Trustee would provide the survey results to such other purchaser, instead of such purchaser having to conduct another survey.

28.      In addition, also on May 24, 2023, Edmiston circulated emails to more than 1,857 other yacht brokers advising them of the deadline to submit best and final bids and that such bids would be subject to certain conditions, including a minimum bid of $20 million.  As with the email to the Initial Bidders, the email distribution advised the brokers that the Trustee was setting May 30, 2023 as the deadline to submit best and final bids due to multiple offers received to date.  Furthermore, on May 27, 2023, Edmiston updated the Yatco.com listing for the Lady May to advise interested parties of the bid deadline and the minimum bid requirement.

29.      As of 5:00 p.m. (ET) on May 30, 2023, five formal bids (in addition to the initial bids) were received from prospective buyers (the "Second Round Bidders"), including from both U.S. residents and non-U.S. residents.  Three bids exceeded the $20 million minimum, while two bids were below the minimum.  During this second round, two bidders that were not Initial Bidders submitted bids.  But not all bidders that participated in the initial round submitted a further bid by the May 30, 2023 deadline.  For example, one of the Initial Bidders who had previously offered $20 million did not submit any bid in connection with the May 20, 2023 bid deadline because the bidder did not want to participate in a competitive bidding process.

30.      Following receipt of these bids, the Trustee engaged in further discussions with each of the three bidders that had satisfied the minimum bid requirement.  Because the bidder that submitted the highest bid (which was substantially below $24 million) had modified the form of purchase agreement to add provisions that were not acceptable to the Trustee (including giving the buyer an absolute right to terminate the purchase process based on the results of a sea trial that would not take place for more than 10 days), the Trustee requested that the bidder remove these modification and/or further increase its bid.  Concurrently, the Trustee, through Edmiston, also reached out to the second and third highest bidders to explore whether they would

be willing to increase their bid.  Ultimately, one of these two bidders increased its proposed

purchase price to $24 million, thereby becoming the highest bidder.  Because that increased bid

(which was the one submitted by the Buyer) did not include any modifications to the Trustee's

form of purchase agreement (other than to move up the closing date to a date on or before June

30, 2023), the Trustee selected the Buyer as the winning bidder.  To be clear, neither of the other

two bidders further increased their bids, even though they were invited to do so.

## SUMMARY OF MATERIAL TERMS OF PSA

31.    The chart below sets forth the materials terms of the PSA[9] between the Trustee

and the Buyer for the Lady May.

| Provision | Summary Description |
|---|---|
| **Parties** | Seller: Luc A. Despins, solely in his capacity as chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity.<br><br>Buyer: Herb Chambers Yachting, LLC |
| **Purchase Price** | $24,000,000 |
| **Property to Be Sold** (PSA §1) | The Lady May and all gear, machinery, equipment, furniture, fuel, consumables, all registered or unregistered tenders, toys, articles and appurtenances on board the Lady May and/or included on the Lady May's listing specification as of the date of the PSA (*i.e.*, May 30, 2023).<br><br>For the avoidance of doubt, the Lady May II is not included as part of the Sale. |
| **Deposit** (PSA §2) | On May 31, 2023, the Buyer paid the deposit of $4,800,000 (20% of the Purchase Price) to the Trustee's account, as a deposit toward the Purchase Price to be held in escrow subject to the terms of the PSA. |

---

[9]    The terms of the PSA are summarized herein for the convenience of the Court and parties in interest.  To the extent that there are any discrepancies, the terms of the PSA shall govern.  Capitalized terms used in this summary that are not defined herein shall have the meanings ascribed to them in the PSA.

| Survey Option; Acceptance of Lady May (PSA §3) | Buyer's obligation to purchase the Lady May is subject to Buyer's satisfaction with a trial run and survey of the Lady May though Buyer may elect not to have the Lady May inspected; provided, however, that Buyer may only reject the Lady May if the surveyor (who shall be a duly qualified marine surveyor) certifies in writing that it discovered defects that affect the operational integrity of the Lady May or her machinery or her systems or renders the Lady May unseaworthy.  The Buyer may not reject the Lady May on other grounds.<br><br>The outside date for the Buyer to reject the Lady May based on the results of the survey (*i.e.*, the Accept/Reject Date) is June 20, 2023.<br><br>Whether or not the Buyer has inspected the Lady May, the Buyer will be deemed to have accepted the Lady May if it fails to give timely written notice of its rejection in accordance with the PSA.<br><br>If the Buyer rejects the Lady May in accordance with the PSA and is not otherwise in breach of the PSA, (i) the Trustee shall return the Deposit to the Buyer, (ii) the PSA will terminate, and (iii) the Trustee, the Buyer, and the Brokers will be released from any further liability under the PSA. |
| --- | --- |
| Closing (PSA §4) | The transfer of the Lady May's ownership (the "Closing") will occur on or before June 30, 2023 (the "Closing Date").  The Closing will occur in international waters off the coast of Rhode Island,[10] simultaneously with payment of all funds due from the Buyer and delivery of originals of all other documents necessary for transfer of good and marketable title to the Buyer.<br><br>At Closing, the Buyer will pay the balance of the Purchase Price (*i.e.*, $19,200,000) to the Trustee (subject to Paragraph 6 of the PSA) and the Deposit will be released to the Trustee, subject to deductions the Trustee owes to the Brokers for the commission, storage, insurance, repairs and/or other items (which are subject to approval of this Court). |
| Sellers Representations/ Requirements for Closing (PSA §6) | The Trustee represents and warrants that it will transfer to the Buyer good and marketable title to the Lady May, free and clear of all debts, claims, maritime or common law liens, security interests, encumbrances, excise taxes, and other applicable taxes, customs' duties, or tariffs due to any state, |

---

[10]   This is necessary to take advantage of the benefits provided by the FTZ.

|  | country, regulatory and/or taxing authority of any kind whatsoever (collectively the "Encumbrances").<br><br>No less than two (2) business days before Closing, the Trustee will deliver to the Buyer (a) satisfactory evidence of title, (b) proof of payment or removal of all Encumbrances (except for those encumbrances that will be paid in full at closing), which proof may be the order entered by the Bankruptcy Court approving the sale of the Lady May (and which order shall provide the Lady May is being sold to Buyer free and clear of any Encumbrances), and (c) copies of any other documents necessary for transfer of good and marketable title to Buyer. |
|---|---|
| **Risk of Loss**<br>(PSA §7) | The Trustee will bear the risk of loss of or damage to the Lady May prior to Closing.<br><br>If the Lady May is damaged subsequent to the Buyer's acceptance and the necessary repairs will cost less than five percent (5%) of the Purchase Price and require fewer than 30 days to complete, then, at the Trustee's option, the Trustee may repair the damage prior to Closing in accordance with sound marine practices to the standard of the Lady May immediately prior to the damage and the Buyer may inspect such repair, in which case (a) the Buyer shall pay the Balance and take delivery of the Lady May as repaired and (b) the Closing Date will be extended by the length of the repair period. If the Lady May is damaged to a greater extent subsequent to the Buyer's acceptance or the Trustee does not exercise the option in the foregoing sentence, either party may terminate the PSA with the same consequences as if the Buyer had rejected the Lady May. |
| **Default**<br>(PSA §8) | If Closing is not consummated due to the Buyer's non-performance, including, without limitation, failure to pay the Balance or execute all documents necessary for completion of the purchase by the Closing Date: (i) the Deposit will be retained by the Trustee as liquidated and agreed damages, as consideration for the execution of the PSA, in full settlement of all claims between the parties; (ii) the Selling Broker (*i.e.*, the broker for the Buyer) shall return to the Buyer any other funds received from the Buyer, and (iii) the parties will be relieved of all obligations under the PSA.[11] |

---

[11] The PSA also provides that in the event that, after this Court has approved the PSA, the Closing is not consummated due to the Buyer's non-performance, the Trustee shall pay to the Listing Broker (*i.e.*, Edmiston) an amount equal to $200,000 out of the Deposit, which amount will count against, and reduce, any commission

|  | If the Closing is not consummated due to the Trustee's non-performance (which, for the avoidance of doubt, shall not include this Court declining to approve the PSA), the Deposit, and any other money paid or deposited by the Buyer pursuant to the PSA, will be returned to Buyer upon demand. If the Closing is not consummated due to the Trustee's non-performance, the Trustee shall forthwith pay the Brokers the same commission otherwise payable had the transaction closed; provided, however, that the Bankruptcy Court declining to approve the PSA will not constitute non-performance on the part of the Trustee.<br><br>In the event this Court does not approve the PSA, the PSA will be deemed terminated with the same consequences as if the Buyer had rejected the Lady May in accordance with the PSA.<br><br>If the Closing is not consummated for any reason, the Trustee will have the option to purchase the survey from the Buyer at cost and, if the Trustee exercises this option, the Buyer will provide the complete survey to the Trustee immediately upon payment of the cost of such survey. |
|---|---|
| **Sales and Use Taxes** (PSA §9) | Sales or use taxes payable on the Buyer's purchase of the Lady May, if applicable, are the Buyer's responsibility, and the Buyer shall pay the taxes due to the Trustee at Closing. The Buyer will indemnify and hold harmless the Trustee and Brokers against and from any sales or use taxes for which the Buyer is responsible. |
| **Representations and Warranties** (PSA §10) | Upon Closing, the Buyer will be deemed to have accepted the Lady May in its "as is" condition, the Trustee and the Brokers have given no warranty, either expressed or implied, and make no representation as to the condition of the Lady May, its fitness for any particular purpose or merchantability, all of which are disclaimed. |
| **Financing** (PSA §11) | The Buyer's obligations are not contingent upon Buyer's obtaining financing. The Buyer represents that it will arrange financing, if necessary. The Buyer also represents and warrants that it has sufficient cash and/or financing to fund the Purchase Price at Closing. |
| **Reimbursement** (PSA §16) | In the event any dispute between the parties hereto arising out of the subject matter of the PSA, the prevailing party (including |

that the Listing Broker may earn (in accordance with its engagement letter with the Trustee) if a sale of the Lady May is consummated with a different buyer.

|  | the Brokers) will be reimbursed for their reasonable costs and attorney's fees, at all pretrial, trial and appellate levels, unless such prevailing party is found, in a final non-appealable judgment of this Court, to have engaged in willful misconduct or acted with gross negligence. |
|---|---|
| **Bankruptcy Court Approval** (Addendum §2) | The PSA and all terms in the PSA are subject to approval of this Court. |
| **Exclusive Bankruptcy Court Jurisdiction** (Addendum §3) | Notwithstanding anything in the PSA to the contrary, this Court will have exclusive jurisdiction over any claim or dispute in respect of or arising out of the PSA, and the parties and the Brokers irrevocably submit to the exclusive jurisdiction of this Court, waive any objection they now or hereafter may have to venue or convenience of forum, agree that all claims relating to the PSA will be decided in this Court, and, further, not to bring any claim relating to the PSA in any other court. |

## COMPLIANCE WITH LOCAL RULE 6004-2(c)

32.      In accordance with Local Rule 6004-2(c), the Trustee further states:

| Local Rule 6004-2 Disclosure | Terms of Sale |
|---|---|
| **Sale to Insider** (Local Rule 6004-2(c)(1)) | The Buyer is not an insider within the meaning of section 101(31) of the Bankruptcy Code.  Indeed, the Buyer has represented and warranted that it is not affiliated with or related to the Debtor and/or is not acting on behalf of or at the behest of the Debtor.  PSA §11. |
| **Agreements with Management** (Local Rule 6004-2(c)(2)) | Not applicable. |
| **Releases** (Local Rule 6004-2(c)(3)) | The PSA contains no releases. |
| **Private Sale/No Competitive Bidding** (Local Rule 6004-2(c)(4)) | While the Trustee is not contemplating conducting an auction, the PSA reflects the result of a competitive marketing process (as detailed in this Motion).<br><br>Nor has the Trustee agreed not to solicit competing offers for the Lady May or otherwise limit shopping of the Lady May.  Indeed, the Trustee will consider any offers made at any prior to or at the hearing on the Sale Motion.  Moreover, in |

17

| | |
|---|---|
| | accordance with Local Rule 6004-2(g), the Trustee will serve a copy of this Motion on all parties that have expressed an interest in the Lady May during the marketing process. |
| **Closing and Other Deadlines** (Local Rule 6004-2(c)(5)) | The closing of the Sale will take place on or before June 30, 2023.<br><br>The deadline for the Buyer to accept or reject the Lady May in accordance with the PSA is June 20, 2023. |
| **Good Faith Deposit** (Local Rule 6004-2(c)(6)) | The Buyer has made a good faith deposit of 20% of the Purchase Price, which deposit is being held by the Trustee in escrow subject to the terms of the PSA. |
| **Interim Arrangements with Proposed Buyer** (Local Rule 6004-2(c)(7)) | There are no interim arrangements with the Buyer. |
| **Use of Proceeds** (Local Rule 6004-2(c)(8)) | The proceeds from the Sale will be deposited into the Trustee's account and will be used and/or distributed by the Trustee in accordance with the Bankruptcy Code.<br><br>To the extent there are any liens on the Lady May, such liens will attach to the proceeds.[12] |
| **Tax Exemption** (Local Rule 6004-2(c)(9)) | The Trustee is not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.<br><br>As noted above, sales or use taxes payable on the Buyer's purchase of the Lady May, if applicable, are the Buyer's responsibility, and the Buyer shall pay the taxes due (if any) to the Trustee at Closing. |
| **Record Retention** (Local Rule 6004-2(c)(10)) | Not applicable. |
| **Sale of Avoidance Actions** (Local Rule 6004-2(c)(11)) | The Trustee is not seeking to sell any avoidance actions. |

---

[12] The Trustee is not aware of any liens on the Lady May. The Trustee conducted a lien search with the Cayman Island registry, but no maritime liens have been registered against the Lady May. In addition, the Trustee conducted a UCC search with respect to HK USA, but that search also did not uncover any liens against the Lady May.

| | |
|---|---|
| **Requested Findings and Order as to Successor Liability** (Local Rule 6004-2(c)(12)) | The Trustee is not requesting any findings as to successor liability claims. |
| **Sale Free and Clear of Unexpired Leases** (Local Rule 6004-2(c)(13)) | The Trustee is not seeking to convey any real property. |
| **Credit Bid** (Local Rule 6004-2(c)(14)) | Not applicable. |
| **Relief from Bankruptcy Rule 6004(h)** (Local Rule 6004-2(c)(15)) | The Trustee seeks relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) to permit the sale to close immediately upon approval by this Court. |
| **Carve-Outs and/or "Gifts"** (Local Rule 6004-2(c)(16)) | Not applicable. |
| **Residual Assets** (Local Rule 6004-2(c)(17)) | The Sale is not a sale of substantially all of the assets of the estate. Additional assets will exist following the Sale Closing. |

## **RELIEF REQUESTED**

33.    By this Motion, the Trustee seeks entry of the Proposed Order, pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rules 6004-1 and 6004-2 (i) approving and authorizing the Sale of the Lady May, (ii) authorizing and approving the PSA, and (iii) granting related relief.

## **BASIS FOR RELIEF**

### A.    **Sale Should be Approved Pursuant to Section 363(b) of the Bankruptcy Code**

34.    Section 363(b) of the Bankruptcy Code authorizes a trustee to sell assets other than in the ordinary course of its business after notice and hearing. *See* 11 U.S.C. § 363(b). Additionally, Bankruptcy Rule 6004(f) authorizes a trustee to sell estate property outside of the ordinary course of business by private sale or public auction. Fed. R. Bankr. P. 6004(f).

35.     The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the trustee.  *See e.g. In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Security Holders v. Lionel Corp (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir 1983).  The trustee has broad discretion to determine the manner in which its assets are sold and private sales outside the ordinary course of business are permissible pursuant to section 363(b) of the Bankruptcy Code. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting trustee has authority to conduct a sale of estate property through private sale); *see, e.g., Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D. P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re MF Glob. Inc.*, 535 B.R. 596 608 (Bankr. S.D.N.Y. 2015) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met). Courts have approved private sales where the benefit of such outweighs the delay and expense of conducting a public sale.  *See In re Dewey & Leboeuf LLP*, No. 12-12321 MG, 2012 WL 5586278, at *6 (Bankr. S.D.N.Y. Nov. 1, 2012) (finding good business justification to sell property through a private sale where public sale would be more costly).

36.     A court-approved auction process is not required to establish a sale is within the business judgment of the trustee under the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules.  *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[T]here is no rule that . . . asset sales are . . . conditioned on such a requirement [a formal auction], which does not appear in the Bankruptcy Code or Bankruptcy Rules.") (internal citations and quotations omitted).[13]

---

[13]   The Local Rules only require a public sale process with respect to the sale of real estate, unless otherwise ordered by the Court.  Local Rule 6004-1(a) ("Unless otherwise ordered by the Court upon a showing of good cause, a party proposing to sell real property must do so by public sale.").

37.     Once a court is satisfied that there is a sound business justification for a proposed sale, the court must then determine whether (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012); *In re Betty Owens Sch., Inc*., No. 96 Civ. 3576, 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997).

38.     As detailed in this Motion, there is a strong business justification for the Sale of the Lady May to the Buyer.  The Trustee submits that, in light of the extensive marketing and the competitive bidding process, the proposed Sale to the Buyer is in the best interests of the Debtor's estate and should be approved.  There would have been no incremental benefit to first seeking approval of formal bidding procedures and running a public auction, in light of the nature of the property to be sold (*i.e.*, a luxury superyacht) and the small pool of potential buyers (*i.e.*, high net-worth individuals).  To the contrary, conducting an auction would likely have discouraged potential buyers from bidding and/or making their best offer.  Potential buyers would likely not have participated in a process that would have exposed them to the risk of overpaying (if selected as the winning bidder in an auction), and, to the extent they would have participated in such a process, they would likely have discounted their bids to reflect that risk.  In fact, two of the Initial Bidders withdrew from the process because of his dissatisfaction with the competitive process the Trustee was considering.

39.     Moreover, because an auction process would have required more time (including to seek Court approval of the auction procedures), many of the Initial Bidders would not have remained in the process, and otherwise motivated buyers would likely have been discouraged from participating out of a concern that they would have wasted a lot of time if they were

ultimately not selected as the successful bidder.  This is especially so given that other luxury superyachts can be purchased through brokers without having to go through an auction process.  Furthermore, given the fairly small pool of potential buyers, it is unlikely that an auction process would have attracted any additional interest beyond the parties that Edmiston (through its extensive network of clients and connections to other brokers) was able to attract.

40.     In addition, the delay associated with pursuing an auction process would also require the Trustee to continue incurring the substantial cost of maintaining the Lady May.  As the Court is aware, the maintenance costs for the Lady May are substantial and typically range between $100,000 and $300,000 per month (and these amounts do not even include the substantially higher dockage fee associated with docking the Lady May at the Safe Harbor Newport Shipyard, which are approximately $50,000 per month).  To be clear, the Trustee is not suggesting that these costs justify selling the Lady May below fair market value; however, the substantial cost of operating the Lady May needs to be considered as part of the overall cost/benefit analysis of proceeding with the Sale to the Buyer now compared to seeking approval of bidding procedures and pursuing a public auction.

41.     Moreover, as detailed above, the Sale is the result of a competitive bidding process (even if not pre-approved by the Court), which process resulted in a Purchase Price that the Trustee submits is fair and reasonable for the Lady May.  As part of that process, the Trustee also utilized a seasoned yacht broker (*i.e.*, Edmiston) that specializes in the sale of luxury superyachts.  In the end, the bidding process succeeded in eliciting higher bids, with the ultimate winning bid ($24 million) exceeding even the highest initial bid ($20 million) by $4 million.  In any event, in accordance with Local Rule 6004-2(g), the Trustee is serving copies of this Motion on all parties that have expressed to Edmiston an interest in purchasing the Lady May, and, if

superior bids are received before or at the hearing this Motion, the Trustee understands that he is duty-bound to consider such bids.

42.     Finally, as noted, the winning bid submitted by the Buyer did ***not*** modify the terms of the Trustee's form of proposed PSA (including the terms set forth in the addendum), other than to require the closing of the Sale to occur on or before June 30, 2023.  Accordingly, the PSA preserves ***all*** of the beneficial terms that the Trustee added to the IYBA Form.  For example, unlike the IYBA Form which would allow a buyer to reject a vessel for any reason until after the completion of the survey, the Buyer here may only reject the Lady May if the surveyor certifies in writing that it discovered defects that affect the operational integrity of the Lady May or her machinery or her systems or renders the Lady May unseaworthy.[14]

43.     For the reasons stated above, the Trustee submits that the Sale of the Lady May to the Buyer is in the best interest of the estate and should be approved under section 363(b) of the Bankruptcy Code.

**B.     Sale of Lady May Free and Clear of Liens, Claims, Interests, and Encumbrances Should Be Authorized Pursuant to Section 363(f) of the Bankruptcy Code**

44.     Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest

---

[14]   In the event that the surveyor certifies any such defects, the Trustee will update the Court, parties in interest, and potential bidders regarding such developments, including whether the Buyer has chosen to reject the Lady May or whether the parties were able to agree to a modification of the Purchase Price to reflect the reasonable cost of addressing such defect.

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of the five requirements will suffice to permit the sale of the Lady May "free and clear" of liens and interests.  *See In re Dundee Equity Corp.*, 1992 WL 53743 at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[S]ections 363(f) is in the disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of Section 363(f) have been met").

45.    The Trustee has conducted a search for maritime liens (with the Cayman Island registry) as well as any UCC filings with respect to HK USA, but neither search has revealed any liens or other encumbrances with respect to the Lady May.  However, to the extent there are any liens, claims, interests, or encumbrances against the Lady May, the Trustee submits that the Sale should be approved free and clear of any such liens, claims, interests, and encumbrances because one or more of the requirements under section 363(f) of the Bankruptcy Code are satisfied.  In this regard, the absence of an objection to the relief sought in this Motion is, or should be deemed, consent within the meaning of section 363(f)(2) of the Bankruptcy Code. *See Borders Group*, 453 B.R. 477, 484 (Bankr. S.D.N.Y. 2011) ("Under 363(f)(2), a lienholder who receives notice of a sale but does not object within the prescribed time period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear of liens.").

46.    Further, to the extent there is any lien holder, it will be adequately protected by having its lien attach to the proceeds of the Sale, subject to any claims and defenses that the Trustee may have with respect thereto.  *See, e.g.*, *In re Healthco Int'l, Inc.*, 174 B.R. 174, 177 (Bankr. D. Mass. 1994) ("I therefore conclude the Trustee may sell the property pursuant to section 363(f)(5), free of the County's lien, with the lien transferred to the sales proceeds. Transfer of the lien to the proceeds provides adequate protection for the lien."); 3 Collier on Bankruptcy P 363.06 (16th 2023) ("Section 363(f) permits a sale of property of the estate free

and clear of an interest in the property, including a lien, under a number of circumstances.  It has

long been recognized that the bankruptcy court has the power to authorize the sale of property

free of liens with the liens attaching to the proceeds, with or without the consent of the

lienholder.").

47.     For all these reasons, the Trustee requests that the Court authorize the Trustee to

sell the Lady May free and clear of any liens, claims, interests, and encumbrances.

**C.      Sale of Lady May Should Be Subject to Protections of Section 363(m) of the Bankruptcy Code**

48.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest

in property purchased from the estate notwithstanding that the sale conducted under section

363(b) of the Bankruptcy Code is later reversed or modified on appeal.  Specifically, section

363(m) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

49.     Although "good faith" is not defined in the Bankruptcy Code, the Second Circuit

has stated that:

> Good faith of a purchaser is shown by the integrity of his conduct
> during the course of the sale proceedings . . . A purchaser's good
> faith is lost by fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

*In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (internal quotations omitted).  Section 363(m) of

the Bankruptcy Code "fosters the 'policy of not only affording finality to the judgment of the

bankruptcy court, but particularly to give finality to those orders and judgments upon which third

parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting

*In re Abbots Dairies of Penn., Inc.*, 788 F.2d 143, 147); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990).

50.     The Buyer was selected by the Trustee as having submitted the highest and best bid following an extensive marketing effort by Edmiston and a competitive bidding process, including arms' length negotiations following the submission of bids on May 30, 2023.  The Trustee has no reason to believe that the Buyer colluded with other interested parties or otherwise attempted to obtain an unfair advantage over other parties in the process.  Moreover, the Buyer has no affiliation with the Debtor nor is the Buyer acting on behalf of or at the behest of the Debtor, all as reflected in the Buyer's representations and warranties in the PSA.  All payments to be made by the Buyer, and other agreements or arrangements entered into by the Buyer in connection with the Sale set forth in the PSA, have been disclosed.  Accordingly, the Trustee submits that the Buyer is a good faith purchaser entitled to the protections pursuant to section 363(m) of the Bankruptcy Code.

**D.       Trustee Should Be Authorized to Pay Commission to Edmiston**

51.     Pursuant to the Edmiston Retention Order, the Court previously approved Edmiston's compensation structure, including a fixed fee of 5% of the purchase price in the event of an in-house deal not involving a Sub-Listing Broker (as defined in the Edmiston Retention Application).  In light of Edmiston's substantial efforts in marketing the Lady May, which efforts culminated in the selection of the Buyer as the winning bidder, the Trustee submits that the Court should authorize the payment of such fee, in the amount of $1.2 million to Edmiston upon the Closing of the Sale.

52.     In addition, pursuant to the PSA, if following entry of the Proposed Sale Order, the Sale is not consummated due to the Trustee's non-performance, the Trustee is required to pay

the aforementioned Full Fee (as defined in the Edmiston Retention Order) to Edmiston.  The

Trustee submits that this provision is reasonable including because, in that event, Edmiston will

have performed the same services and the Closing would have occurred but for the Trustee's

non-performance.  Accordingly, the Trustee submits that it is reasonable for the Trustee to agree,

as part of the PSA, to pay the 5% fee to Edmiston in that scenario, and the Court should approve

the payment of such fee.  That said, and to be clear, the Trustee has no intention not to perform

his obligations under the PSA and proceed to consummation of the Sale to the Buyer (assuming,

of course, that this Court approves the Sale).

53.    Finally, the PSA provides that if, after the Court has approved the Sale, the

Closing is not consummated due to the Buyer's non-performance, the Trustee shall pay to

Edmiston an amount equal to $200,000 out of the Deposit, which amount will count against, and

reduce, any commission that Edmiston may earn (in accordance with its engagement letter with

the Trustee) if a sale of the Lady May is consummated with a different buyer.  The Trustee

submits that this provision is reasonable and should be approved as well, including because the

Trustee believes that, if the Sale fails due to the Buyer's non-performance, the Trustee will be

able to sell the Lady May to another interested buyer, for a purchase price that would result in a

commission to Edmiston well in excess of $200,000—and, accordingly, there would be no net

loss to the estate.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

54.    The Trustee requests that the Court waive any applicable stay imposed by

Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the

order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

55.     As noted, it is a condition to the proposed Sale to the Buyer that the Closing occur

on or before June 30, 2023.  Unless the default stay period set forth in Bankruptcy Rule 6004(h)

is waived, the Closing deadline could not be met and the Buyer may attempt to walk and

terminate the Buyer's obligations to purchase the Lady May, in which case the Trustee would

lose the highest bid on the Lady May, to the detriment of the Debtor's estate.  Accordingly, the

Trustee respectfully requests that the Court waive the fourteen-day stay imposed by Bankruptcy

Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### **WAIVER OF LOCAL RULE 6004-2 REGARDING VALUATION**

56.     Pursuant to Local Rule 6004-2(b), sale motions must include a description of the

means by which the movant determined the fair market value of the property to be sold, unless

otherwise provided by order of the Court.  The Trustee has determined that under the facts of this

case, the best evidence of the fair market value of the Lady May is the result of the marketing

process conducted by Edmiston and the subsequent competitive bidding process.  Accordingly,

the Trustee believes that it was not necessary to obtain (and pay for) a separate fair market

valuation from an appraiser.  Thus, to the extent necessary, the Trustee requests that the

requirements of Local Rule 6004-2(b) be waived.

### **NOTICE**

57.     Notice of this Motion will be served upon (i) the Office of the United States

Trustee for the District of Connecticut, (ii) the Buyer, (iii) counsel for the Debtor, (iv) the

Committee, (v) all entities and individuals, if any, known to have expressed to Edmiston an

interests in the Lady May, (vi) all parties who have requested notice in the Debtor's case

pursuant to Bankruptcy Rule 2002, and (vii) the creditor matrix.

58.     The parties identified in clauses (i) through (vi) will receive a full copy of the Motion and the parties identified in clause (vii) will receive only a copy of the sale notice[15] (appended to this Motion).

[*Remainder of page intentionally left blank.*]

---

[15] The sale notice is based on the Notice of Proposed Private Sale of Estate Property included in Appendix O to the Local Rules, but modified to also include the hearing dates scheduled by the Court on the Motion (*i.e.*, June 27, 2023 at noon and, if necessary, June 28, 2023) and the deadline to object to the Motion (*i.e.*, June 23, 2023).

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that the

Bankruptcy Court enter the Proposed Sale Order granting the relief requested herein.

Dated: June 2, 2023
New York, New York

By: */s/ Luc A. Despins*
Luc A. Despins (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
Douglass Barron (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
alexbongartz@paulhastings.com
douglassbarron@paulhastings.com

and

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

and

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for the Chapter 11 Trustee*

## EXHIBIT A

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                                       :
In re:                                                 :    Chapter 11
                                                       :
HO WAN KWOK, *et al.*,[1]                              :    Case No. 22-50073 (JAM)
                                                       :
                 Debtors.                              :    (Jointly Administered)
                                                       :
-------------------------------------------------------x

**ORDER, PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363,**
**BANKRUPTCY RULES 2002 AND 6004(c) AND LOCAL RULES 6004-1 AND**
**6004-2, (I) AUTHORIZING AND APPROVING SALE OF THE LADY MAY FREE**
**AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,**
**(II) AUTHORIZING AND APPROVING PURCHASE AND SALE**
**AGREEMENT, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Luc A. Despins, in his capacity as the chapter 11

trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"),

pursuant to pursuant to sections 105, 363(b), and 363(f) of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004(c), and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6004-2 of the Local Rules of

Bankruptcy Procedure of the United States Bankruptcy Court for the District of Connecticut (the

"Local Rules"), seeking entry of an order (i) authorizing and approving the Trustee's sale (the

---

[1]     The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]     Capitalized terms used but not defined herein shall having the meanings set forth in the Motion or the PSA, as applicable; provided, however, no capitalized terms used herein shall in any way be modified, amended, or supplemented in the PSA after this Order becomes final.

"Sale") of the Lady May[3] to Herb Chambers Yachting, LLC (the "Buyer") free and clear of all

liens, claims, interests and encumbrances pursuant to that certain purchase and sale agreement,

dated May 30, 2023, by and among the Buyer and the Trustee (together with the related

addendum, the "PSA"), (ii) authorizing and approving the PSA, and (iii) granting related relief,

all as further detailed in the Motion; and hearing on the Motion having been held (the

"Hearing"); and this Court having reviewed and considered the Motion, the declaration of Dirk

Johnson (the "Johnson Declaration") in support of the requested relief, and all objections thereto,

and the arguments made by counsel and evidence adduced at the Hearing; and it appearing the

terms of the PSA are in the best interests of the Debtor, the estate, creditors and other parties in

interest; and after due deliberation thereon, and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT**:[4]

### Jurisdiction and Final Order

A.      This Court has jurisdiction to hear and determine the approval of the Sale and the

PSA under 28 U.S.C. §§ 1334 and 157, and the *Standing Order of Reference* from the United

States District Court for the District of Connecticut.  This is a core proceeding under 28 U.S.C. §

157(b).  Venue of this case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

Notwithstanding Bankruptcy Rules 6004(h), and to any extent necessary under Bankruptcy Rule

---

[3]    For purposes of the sale under the PSA, the term "Lady May" consists all assets to be sold pursuant to the PSA, including all gear, machinery, equipment, furniture, fuel, consumables, all registered or unregistered tenders, toys, articles and appurtenances on board the Lady May and/or included on the Lady May's listing specification as of the date of the PSA (*i.e.*, May 30, 2023).  For the avoidance of doubt, the Lady May II is not included as part of the Sale.

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason to delay the implementation of this Order, and expressly directs entry of judgment as set forth herein.  The Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the PSA at any time after the entry of this Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h).

### Notice of Sale

C.      Actual written notice of the Motion, the Hearing, and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein, has been afforded to all known interested persons or entities.

D.      As evidenced by the certificates of service previously filed with this Court: (i) due, proper, timely, adequate and sufficient notice of the Motion, the Hearing, the entry of this Order, the Sale, and the relevant objection deadlines has been provided to all parties-in-interest; (ii) such notice was, and is, good, sufficient and appropriate under the circumstances of this chapter 11 case, provided a fair and reasonable opportunity for parties-in-interest to object, and to be heard, with respect thereto, and was provided in accordance with the Bankruptcy Code, Bankruptcy Rules, and the applicable Local Rules; and (iii) no other or further notice of such matters is necessary or shall be required.

### Business Judgment

E.      The Trustee has demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale and such action is an appropriate exercise of the Trustee's business judgment and in the best interests of the Debtor, his estate, and his creditors.  Such business reasons include, but are not limited to, the

facts that: (i) the Purchase Price and the other terms set forth in the PSA constitute the highest or

otherwise highest and best offer received for the Lady May; (ii) the Sale on the terms set forth in

the PSA presents an orderly and expeditious sale of the Lady May and the best opportunity to

maximize the value of the Lady May; and (iii) unless the Sale is concluded expeditiously as

provided for in this Order and pursuant to the PSA, potential creditor recoveries may be

substantially diminished.

### **Marketing Process**

F.      As demonstrated by the Motion, the Johnson Declaration, the testimony and other

evidence proffered or adduced at the Hearing, and the representations of the Trustee and his

counsel made on the record at the Hearing: (i) the Trustee and his broker, Edmiston and

Company Limited ("Edmiston"), engaged in a robust and extensive marketing and sale process;

(ii) the Trustee and his advisors conducted a fair and open sale process; (iii) the sale process was

non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to

make an offer to purchase the Lady May; and (iv) the process conducted by the Trustee obtained

the highest and best value for the Lady May for the Trustee and the Debtor's estate.

### **Fair Consideration; Highest or Best Value**

G.      The consideration to be provided by the Buyer under the PSA is fair and

reasonable consideration for the Lady May and constitutes (i) reasonably equivalent value under

the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Voidable

Transactions Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii)

reasonably equivalent value, fair consideration, and fair value under any other applicable laws of

the United States, any state, territory or possession or the District of Columbia.  Such

consideration constitutes the highest and best bid for the Lady May.  No other person or entity or

group of persons or entities has offered to purchase the Lady May for an amount that would give equal or greater value to the Debtor's estate than the value provided by the Buyer pursuant to the PSA. Prompt approval of the Sale is the only means to maximize the value of the Lady May.

### Good Faith

H.    The PSA and the Sale were negotiated, proposed, and entered into, and are being undertaken by the Trustee and the Buyer in good faith, without collusion, and from arms' length bargaining positions. Likewise, the value that the Debtor's estate will receive on consummation of the Sale is the product of arms' length negotiations between the Trustee, the Buyer, and their respective representatives and advisors.

I.    The Buyer is purchasing the Lady May in good faith, and is a good faith purchaser, within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full rights, benefits, privileges, and protections of that provision and any other applicable or similar bankruptcy and non-bankruptcy law.

J.    Neither the Buyer nor the Trustee have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code to the PSA or to the consummation of the Sale.

K.    The Buyer proceeded in good faith in all respects in connection with the Sale and this proceeding in that, among other things: (a) the Buyer's bid was the result of a competitive bidding process; (b) all payments to be made by the Buyer, and other agreements or arrangements entered into by the Buyer in connection with the Sale set forth in the PSA, have been disclosed; and (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.

L.      The Buyer is not an insider or an affiliate (as that term is defined in sections 101(2) and 101(31) of the Bankruptcy Code) of the Debtor.

### Section 363(f) of the Bankruptcy Code Is Satisfied

M.      The Trustee is authorized to sell the Lady May free and clear of liens, claims, interests, and encumbrances against the Debtor or his estate, because one of more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

N.      Those holders of liens, claims, interests, or encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Sale or the Motion have either consented to or are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  In addition, one or more of the other subsections of section 363(f) of the Bankruptcy Code apply and, therefore, holders of liens, claims, interests, or encumbrances in the Lady May are adequately protected by having their liens, claims, interests, or encumbrances in the Lady May attach solely to the proceeds of the Sale in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale.

O.      The Buyer would not have entered into the Sale and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtor's estate and his creditors, (i) if the sale of the Lady May was not free and clear of all liens, claims, interests, and encumbrances or (ii) if the Buyer would, or in the future could, be liable for any such liens, claims, interests, and encumbrances.  The total consideration to be provided under the PSA reflects the Buyer's reliance on this Order to provide it with title to and possession of the Lady May free and clear of all liens, claims, interests, and encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.

**Validity of Transfer**

P.      The transfer of the Lady May to the Buyer will be a legal, valid, and effective transfer of the Lady May, and will vest the Buyer with any legal, equitable and beneficial right, title, and interest of the Debtor in and to the Lady May, free and clear of all liens, claims, interests, and encumbrances.  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), and 363(m) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.  Subsequent to the Closing, the Debtor's estate will be relieved of all liability or other obligation of any kind with respect to claims arising from or related to the Buyer's post-Closing operation and/or ownership of the Lady May.

**Waiver of Bankruptcy Rules 6004(h)**

Q.      The sale of the Lady May must be approved and consummated promptly.  The Trustee and the Buyer intend to close the Sale on or before June 30, 2023.  The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale as contemplated by the PSA.  Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) with regard to the transactions contemplated by this Order.

**THE COURT HEREBY ORDERS, ADJUDGES, AND DECREES:**

1.      The Motion is GRANTED and approved in all respects, and any objections thereto that have not been otherwise withdrawn, waived, or settled are overruled.

2.      The PSA is hereby approved as set forth herein.

3.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Sale of the Lady May to the Buyer pursuant to the PSA free and clear of all liens, claims, encumbrances, and other interests is approved in all respects.

4.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Lady May in accordance with the terms of the PSA and this Order.  The transfer of the Lady May by the Trustee to the Buyer in accordance with the PSA shall: (a) be valid, legal, binding, and effective; (b) vest the Buyer with all right, title, and interest of the Trustee in and to the Lady May; and (c) be free and clear of all liens, claims, interests, and encumbrances against the Lady May, in accordance with section 363(f) of the Bankruptcy Code.

5.      Pursuant to section 363 of the Bankruptcy Code, this Order shall and does, as of the Closing, divest the Debtor and his estate of all right, title, and interest in and to the Lady May.

6.      The consideration provided by the Buyer for the Lady May under the PSA is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided or rejected, or costs or damages imposed or awarded against the Buyer, under section 363(n) or any other provision of the Bankruptcy Code.

7.      The Trustee is authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale concerning the transfer of the Lady May to the Buyer at a closing in accordance with the Motion, the PSA and this Order, (b) perform, consummate, implement, and close fully the PSA together with all additional instruments and documents that may be reasonably necessary or desirable to implement this Order, and the PSA, and (c) perform

the obligations contemplated by this Order, and the PSA, including all actions reasonably requested by the Buyer in regard thereto.

8.      The sale of the Lady May by the Trustee to the Buyer shall constitute a legal, valid and effective transfer of the Lady May, notwithstanding any requirement for approval or consent by any person, and vest the Buyer with all rights, title, and interests in the Lady May, subject to the terms of the PSA.

9.      All liens, claims, interests, and/or encumbrances in, on, or against the Lady May shall automatically attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Lady May, subject to any claims and defenses the Trustee or the Debtor's estate may possess with respect thereto.  This Order shall be effective as a determination that, on and as of the Closing, all liens, claims, interests, and/or encumbrances of any kind or nature whatsoever in, on, or against the Lady May have been unconditionally released, discharged, and terminated.  The provisions of this Order authorizing and approving the transfer of the Lady May free and clear of liens, claims, encumbrances, and other interests shall be self-executing, and neither the Trustee nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order and the PSA.

10.      Subject to the terms, conditions, and provisions of this Order, all persons and entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere, or that would be inconsistent (a) with the ability of the Trustee to sell and transfer the Lady May to the Buyer, (b) with the ability of the Buyer to acquire, take possession of, use and operate the Lady May in accordance with the terms of the PSA and this Order, and (c) with the ability of the Trustee and the Buyer to perform their respective obligations

thereunder; provided, however, that the foregoing restriction shall not impair the right of any party in interest with the requisite standing to appeal this Order in accordance with applicable law or opposing any appeal of this Order.

11.      The Purchaser is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.  The Sale contemplated by the PSA and this Order are undertaken by the Buyer in good faith, as that term is used in section 363(b) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale unless such authorization is duly stayed pending such appeal prior to the Closing.  For the avoidance of doubt, the pendency of an appeal of this Order, absent a stay of this Order pending appeal, shall not constitute a basis not to consummate the Sale.

12.      The failure specifically to include any particular provisions of the PSA in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the PSA and each and every provision, term, and condition thereof (including, for the avoidance of doubt, the addendum thereto) be, and therefore is, authorized and approved in its entirety; provided, however that the PSA may be modified, amended, or supplemented by the parties thereto, in a writing signed by all parties, without further notice to or order of this Court, provided that any such modification, amendment, or supplementation does not have a material adverse effect on the Debtor's estate, unless approved by order of this Court.

13.      The provisions of this Order, the PSA, and any actions taken pursuant hereto or thereto, shall survive entry of any order which may be entered confirming or consummating any chapter 11 plan, or which may be entered converting this chapter 11 case from chapter 11 to chapter 7 of the Bankruptcy Code or dismissing this chapter 11 case, and the terms and

provisions of the PSA, as well as the rights and interests granted pursuant to this Order, the PSA, shall continue in this chapter 11 case or any superseding cases and shall be specifically performable and enforceable against and binding upon the Trustee, the Debtor, his estate, all creditors, all holders of claim(s) (whether known or unknown) against the Debtor, all holders of liens, claims, interests, and/or encumbrances (whether known or unknown) against, in, or on all or any portion of the Lady May, the Buyer and its respective successors and permitted assigns, and any other trustee or other fiduciary hereafter appointed or elected as a legal representative of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code, including without limitation plan fiduciaries, plan administrators, litigation or liquidation trustees appointed during the pendency of, or upon confirmation of a chapter 11 plan in this chapter 11 case.

14.     This Order is and shall be binding upon and govern the acts of all persons and entities (including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, and secretaries of state, federal and local officials) who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Lady May.  Each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge, and terminate any of the liens, claims, interests, and encumbrances against the Lady May or to otherwise consummate the Sale contemplated by this Order, and the PSA.  All liens, claims, interests, and encumbrances of record as of the date of this Order shall be forthwith deemed removed and stricken as against the Lady May.  All persons and entities described in this

11

paragraph are authorized and specifically directed to strike all such recorded liens, claims, interests, and encumbrances against the Lady May from their records, official and otherwise.

15.     The terms and provisions of the PSA and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Trustee, the Debtor's estate and its creditors, the Buyer and its affiliates, successors, and assigns, and any affected third parties, including all persons asserting liens, claims, interests, or encumbrances in, on, or against the Lady May, notwithstanding any subsequent appointment of any other trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Trustee, the Debtor, his estate, his creditors or any such trustee, examiner, or receiver.

16.     Upon the Closing, the Trustee is authorized to pay the Full Fee (as defined in the Edmiston Retention Order) equal to 5% of the Purchase Price, *i.e.*, $1,200,000 to Edmiston.  In addition, (a) if the Closing is not consummated due to the Trustee's non-performance, the Trustee shall pay the aforementioned Full Fee to Edmiston and (b) if the Closing is not consummated due to the Buyer's non-performance, the Trustee shall pay to Edmiston an amount equal to $200,000 out of the Deposit, which amount will count against, and reduce, any commission that Edmiston may earn (in accordance with its engagement letter with the Trustee) if a sale of the Lady May is consummated with a different buyer.

17.     For the avoidance of doubt, no estate causes of action are being sold as part of the Sale.

18.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be

effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy

Rules 6004(h) is hereby expressly waived and shall not apply.  The Trustee and the Buyer intend

to close the Sale on or before June 30, 2023.  Any party objecting to this Order must exercise due

diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to

the Closing, or risk its appeal will be foreclosed as moot.

19.     Nothing in this Order shall modify or waive any closing conditions or termination

rights in the PSA, and all such conditions and rights shall remain in full force and effect in

accordance with their terms.

20.     As of the Closing, all agreements of any kind whatsoever and all orders of this

Court entered prior to the date hereof shall be deemed amended and/or modified to the extent

required to permit the consummation of the Sale, including, without limitation, the transfer of the

Lady May to the Buyer and the occurrence of the Closing.

21.     No bulk sales law or any similar law of any state or other jurisdiction applies in

any way to the Sale.

22.     To the extent necessary, the requirements of Local Rule 6004-2(b) are hereby

waived.

23.     To the extent that there is a conflict between the provisions of this Order and the

PSA, this Order shall prevail.

24.     This Court shall retain jurisdiction to, among other things, (a) interpret, enforce,

and implement the terms and provisions of this Order and the PSA (including all amendments

thereto, any waivers and consents thereunder, and of each of the agreements executed in

connection therewith) and (b) adjudicate disputes related to this Order and the PSA (including all

amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

# EXHIBIT B

**PSA**

 **INTERNATIONAL YACHT BROKERS ASSOCIATION**

## PURCHASE AND SALE AGREEMENT
## FOR BROKERAGE VESSEL

| BUYER: Herb Chambers Yachting, LLC or assigns | SELLER: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok |
|---|---|
| Address: 259 McGrath Hwy | Address: c/o Paul Hastings LLP, 200 Park Avenue |
| Somerville, MA 02143 | New York, New York 10166 |
| Nationality: | Nationality: U.S. |
| VESSEL NAME: Lady May | MANUFACTURER: Feadship |
| Model: Semi displacement motor yacht | Length Overall: 44.25m |
| Year: 2014 | ☐ Doc or ☑ Reg No.: 745195      Flag: Cayman Is. |
| Hull No.: 688 | Engine Description: Diesel (Caterpillar) |
| Selling Broker: Bruce Brakenhoff/Edmiston | Listing Broker: Edmiston & Company Limited |
| IMPORTANT DATES | PURCHASE PRICE |
| Offer Date: May 30, 2023 | Purchase Price: $24,000,000 |
| Offer Expiration Date: June 9, 2023 | Less Deposit: [20% of Purchase Price) $4,800,000 |
| Accept/Reject Date: June 20, 2023 | Less Trade Allowance (see Addendum): Not applicable |
| Closing Date: on or before June 30, 2023 | Balance: $19,200,000 |

| Delivery Location: International waters, off the coast of Rhode Island |
|---|
| *NOTE: If Vessel is to be moved to the Delivery Location, such location must be specified with precision. The mere listing of a port or city is insufficient.* |

| ADDITIONAL REGISTERED VESSELS INCLUDED ☑ Yes ☐ No |
|---|

1. **Agreement.** Buyer agrees to purchase, and Seller agrees to sell, all right, title and interest to and in the Vessel described above on the terms and conditions set forth in this Purchase and Sale Agreement ("PSA"). Capitalized terms used in this PSA refer to the corresponding terms in the table above unless otherwise defined herein. The "Effective Date" of this PSA is the date on which is has been signed by both parties. "Vessel" also includes all gear, machinery, equipment, furniture, fuel, consumables, and all registered or unregistered tenders, toys, articles and appurtenances on board the Vessel and/or included on the Vessel's listing specification as of the date of this Agreement, except for items listed on the Exclusions List provided by the Seller or Listing Broker on the earlier of (a) five days from the Effective Date or (b) the Accept/Reject Date, which items are not included in the sale. Buyer will be deemed to have accepted the Exclusion List if it accepts the Vessel. Listing Broker and Selling Broker shall be referred to herein as the "Brokers." If there is a Trade Allowance, the conditions of the trade-in shall be governed by the attached Trade-in Vessel Addendum. If either party fails to sign this PSA and deliver it to the other party on or before the Offer Expiration Date, this PSA will be ineffective.

2. **Deposit.** Within _____ business days (3 business days if left blank) following Seller's signature of this PSA, Buyer shall pay the Deposit to the Selling Broker's account, as acknowledged below, as a deposit toward the Purchase Price to be held subject to the terms of this PSA. Seller may refuse to permit Buyer to proceed with the trial run, survey and other inspections of the Vessel until the Deposit has cleared into the Selling Broker's escrow account.

3. **Survey Option; Acceptance of Vessel; Conditions of Survey.** Buyer's obligation to purchase the Vessel is subject to Buyer's satisfaction, in Buyer's sole discretion, with a trial run and survey of the Vessel though Buyer may elect not to have the Vessel inspected. If inspected: (a) Buyer will select the surveyor, (b) the surveyor, and not the Brokers, will be the sole party responsible for any errors or omissions with respect to the survey, notwithstanding that the Brokers may have provided information to and assisted Buyer with hiring the surveyor, (c) *Seller shall make the Vessel available and Buyer shall complete the trial run and survey as soon as practicable,* (d) Seller shall pay all running expenses for, and assume the risks associated with, the trial run, and Buyer shall pay *all* costs of the survey, including associated costs, e.g., haul-out, dry dock, and subcontractors' charges, (e) Buyer and its surveyor will be solely responsible for determining the scope of the survey and the trial run to assess the Vessel's conformity with Buyer's requirements and (f) Buyer shall deliver written notice of rejection or acceptance of the Vessel to Seller or the Listing Broker on or before the Accept/Reject Date. *Whether or not Buyer has inspected the Vessel, Buyer will be deemed to have rejected the Vessel if it fails to give timely written notice of its acceptance.* Upon Buyer's acceptance of the Vessel, Seller will not make any use of the Vessel pending Closing (defined in Paragraph 4) except to move the Vessel to the Delivery Location. If Buyer

Buyer's Initials: _____

Seller's Initials: _____

©2020 International Yacht Brokers Association. All rights reserved.    Rev.8.10.20

*This form was prepared for the exclusive use and benefit of the members of the IYBA. The parties and Brokers hereby release the IYBA from any liability for damages resulting from or related to its use. The IYBA expressly disclaims any and all warranties, including merchantability and fitness for a particular purpose, related to the use of this form.*

rejects or is deemed to reject the Vessel, after all expenses incurred on Buyer's behalf have been paid, (i) the Selling Broker shall return the Deposit to Buyer, (ii) this PSA will terminate, and (iii) the parties and the Brokers will be released from any further liability hereunder. The Brokers will not be responsible for the cost to correct any defects or deficiencies noted during the trial run and survey.

4. **Closing.** The transfer of Vessel's ownership ("Closing") will occur on the Closing Date at the Delivery Location simultaneously with payment of all funds due from the Buyer and delivery of originals of all other documents necessary for transfer of good and marketable title to Buyer. If the Vessel must move to the Delivery Location, Seller should not deliver Vessel to the Closing Location unless funds have been paid in full or are being held subject to an escrow conditioned only upon delivery of the Vessel to the Delivery Location and release of title documents to the Buyer. Closing may be facilitated by overnight courier or electronic means. Seller shall deliver the Vessel (as defined in Paragraph 1) to Buyer at the Delivery Location except for fuel consumed during the trial run and any voyage to the Delivery Location. On or before the Closing Date, Seller must deliver to the Selling Broker all documents necessary to transfer title to the Vessel (and all other items hereby required to be delivered) to Buyer. At Closing, Buyer shall pay the Balance to Seller (subject to Paragraph 6) and/or to the Selling Broker for onward transfer to Seller by wire transfer. Any funds Seller owes to (i) the Brokers for the commission, storage, insurance, repairs and/or other items or (ii) the holder of any other Encumbrance, will be deducted from the amount due Seller by the Selling Broker prior to disbursement of funds to Seller, which hereby irrevocably instructs any Deposit holder to pay the Commission from the Deposit to the Brokers pursuant to the terms hereof.

5. **Brokers.** The parties acknowledge that the Selling Broker and Listing Broker are the only brokers that procured this PSA. If the Listing Broker and the Selling Broker are the same brokerage, the parties consent to that Broker acting as a dual-agent in this transaction, i.e., representing both Buyer and Seller, and the Broker may disclose to both parties facts known to the Broker materially affecting the Vessel's value or desirability; provided, however, that in such instance the Broker shall not, without Seller's consent, disclose to Buyer that Seller is willing to sell the Vessel for an amount less than the asking price or, without Buyer's consent, disclose to Seller that Buyer is willing to pay a price greater than the offering price. If the Listing Broker and the Selling Broker are different, the Listing Broker will represent Seller only and owe no duties, fiduciary or otherwise, to Buyer, and the Selling Broker will represent Buyer only and owe no duties, fiduciary or otherwise, to Seller (though paid by Seller). The Brokers are obligated to perform only the duties expressly set forth herein and no implied duties or obligations may be read into this PSA. Seller shall be solely responsible for payment of commission due to the Brokers in connection with the sale of the Vessel as set forth herein. Each party represents and warrants to the other that he has not employed or dealt with any other broker, agent or finder in carrying out the negotiations relating to the sale of the Vessel to Buyer and acknowledges that the Brokers are third-party beneficiaries to this PSA.

6. **Seller's Representations; Requirements for Closing.** Seller represents and warrants that it will transfer to Buyer good and marketable title to the Vessel, free and clear of all debts, claims, maritime or common law liens, security interests, encumbrances, excise taxes, and any other applicable taxes, customs' duties, or tariffs due to any state, country, regulatory and/or taxing authority of any kind whatsoever (collectively, "Encumbrances"). No less than two (2) business days before Closing, Seller shall deliver to Buyer (a) satisfactory evidence of title, (b) proof of payment or removal of all Encumbrances (except for those encumbrances that will be paid in full at closing), (c) a guaranty and indemnification from Seller guaranteeing Seller's representations and warranties in this Paragraph 6, (d) if Seller is a legal entity, a personal guaranty and indemnification from Seller's beneficial owner(s) guaranteeing Seller's representations and warranties in this Paragraph 6, and (e) copies of any other documents necessary for transfer of good and marketable title to Buyer. Any party which is a legal entity will provide to the other prior to Closing (i) proof that it is in good standing under the laws of the State or other jurisdiction under which the entity has been formed, (ii) a consent action or resolution demonstrating the entity's duly authorized decision to purchase or sell the Vessel as well as the authority of the individual delivering or accepting the Vessel and/or executing this PSA and/or purchase and sales documents,(iii) a power of attorney demonstrating the authority of the individual delivering or accepting the Vessel and (iv) as to Seller, its wire transfer information.

7. **Risk of Loss; Force Majeure.** Seller will bear the risk of loss of or damage to the Vessel prior to Closing. If the Vessel is damaged subsequent to Buyer's acceptance and the necessary repairs will cost less than five percent (5%) of the Purchase Price and require fewer than 30 days to complete, then (a) Seller must repair the damage prior to Closing in accordance with sound marine practices to the standard of the Vessel immediately prior to the damage and Buyer may inspect such repair, (b) Buyer must pay the Balance and take delivery of the Vessel as repaired, and (c) the Closing Date will be extended by the length of the repair period. If the Vessel is damaged to a greater extent subsequent to Buyer's acceptance, either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel. Either party's obligation to perform will be suspended to the extent required to accommodate unforeseeable events beyond that party's reasonable control ("Force Majeure Events"), including, without limitation, acts of God, acts of terrorism, strikes, lockouts, riots, acts of war, fire, communication line failures, computer viruses, power failures, accidents, tropical storms, hurricanes, earthquakes, or other natural disasters. If a Force Majeure Event occurs, the time periods referred to in this PSA, including, without limitation, the Closing Date, will be deemed extended by the time necessary to permit the affected party to perform in accordance with this PSA; provided, however, if the Force Majeure Event delays the Closing Date for a period of at more than 30 days, either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel.

8. **Default.** *Notwithstanding anything herein to the contrary, if the Deposit is not paid when due* or Closing is not consummated due to Buyer's non-performance, including, without limitation, failure to pay the Balance or execute all documents necessary for completion of the

Buyer's Initials: _____   Seller's Initials: _____

   ©2020 International Yacht Brokers Association. All rights reserved.   Rev. 9.10.20

purchase by the Closing Date: (i) the Deposit shall be retained by (or if the Deposit was not paid, Buyer shall pay a like amount to) Seller and the Brokers as liquidated and agreed damages, as consideration for the execution of this PSA, in full settlement of all claims between the parties, (ii) the Selling Broker shall return to Buyer any other funds received from Buyer, and (iii) the parties will be relieved of all obligations under this PSA. Buyer and Seller agree that the Deposit will be applied first to payment of any unpaid costs or expenses that Buyer or Broker incurred against the Vessel and then divided fifty percent (50%) to the Seller and fifty percent (50%) to the Brokers, which the Brokers shall divide in the same proportions as the commission would have been divided had a sale been consummated. If the Closing is not consummated due to Seller's non-performance, the Deposit, and any other money paid or deposited by Buyer, pursuant to this PSA will be returned to Buyer upon demand or Buyer will have the right of specific performance. Seller agrees that specific performance is reasonable in light of the uniqueness of the Vessel, difficulty of proof of loss, and the inconvenience or impossibility of otherwise obtaining an adequate remedy. On Seller's default, Seller shall forthwith pay the Brokers the same commission otherwise payable had the transaction closed.

**9.  Sales and Use Taxes.** Sales or use taxes payable on Buyer's purchase of the Vessel, if applicable, are Buyer's responsibility, and Buyer shall pay the taxes due to the Selling Broker at Closing. Buyer hereby indemnifies and holds harmless Seller and the Brokers against and from any sales or use taxes for which Buyer is responsible.

**10.  REPRESENTATIONS AND WARRANTIES.** SELLER AND THE BROKERS BELIEVE THAT ANY INFORMATION ANY OF THEM HAS PROVIDED ON THE VESSEL IS GOOD AND CORRECT AND OFFER THE INFORMATION IN GOOD FAITH, BUT DO NOT AND CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION. BUYER WARRANTS AND REPRESENTS, AS OF THE TIME OF CLOSING, THAT IT (A) WILL HAVE FULLY INSPECTED AND MADE A TRIAL RUN OF THE VESSEL (OR HAVE VOLUNTARILY WAIVED THESE RIGHTS) AND (B) IS NOT RELYING ON ANY ADVERTISEMENTS, PROMISES, DESCRIPTIONS, AFFIRMATIONS, OR REPRESENTATIONS (WHETHER ORAL OR WRITTEN, PRIOR TO OR CONTEMPORANEOUS WITH THIS PSA) PROVIDED BY THE SELLER OR BROKERS. UPON CLOSING, BUYER WILL BE DEEMED TO HAVE ACCEPTED THE VESSEL IN ITS *"AS IS"* CONDITION. SELLER AND THE BROKERS HAVE GIVEN NO WARRANTY, EITHER EXPRESSED OR IMPLIED, AND MAKE NO REPRESENTATION AS TO THE CONDITION OF THE VESSEL, ITS FITNESS FOR ANY PARTICULAR PURPOSE OR MERCHANTABILITY, *ALL OF WHICH ARE DISCLAIMED*.

**11.  Financing.** Buyer's obligations are not contingent upon Buyer's obtaining financing. Buyer represents that it will arrange financing, if necessary. Buyer and Seller acknowledge that the Brokers have made no representations or warranties with respect to Buyer's ability to obtain financing, Buyer's qualifications to obtain any type of mortgage on the Vessel, or Buyer's ability to document or register the Vessel in any jurisdiction.

**12.  Counterparts.** The parties may sign this PSA in any number of identical counterparts, each of which will be deemed an original (including signatures evidenced via facsimile, email or other electronic means) as if the signatures were upon the same instrument.

**13.  Binding Effect; Contemporaneous Contracts; Future Sales.** This PSA is binding on all parties, their heirs, personal representatives and/or assigns. Seller shall not sell the Vessel or enter into any contract for the sale of the Vessel while this PSA is in effect. If a sale is not consummated in accordance with the terms of this PSA, and Buyer and Seller enter into a contract between themselves for the sale of the Vessel, whether directly or through an entity under a party's ownership or control, within two years after this PSA is terminated, Seller agrees to pay the Brokers an amount identical to the commission the Brokers would have received had the transaction contemplated under this PSA closed.

**14.  Escrowed Funds.** The parties acknowledge that (a) the Selling Broker will not be responsible for the Deposit until the funds have cleared into the Selling Broker's account, (b) the Selling Broker shall hold the Deposit in escrow once the funds have cleared and any other funds received by either Broker from any party will be held in trust for that party, (c) the Selling Broker may retain the commission due the Brokers prior to disbursement of the Deposit or Balance to Seller, and (d) in any dispute involving any funds held by the Brokers, Buyer and Seller will indemnify the Brokers for legal fees and costs relating in any way to the dispute, including those incurred in any appeals (which obligation is secured by a lien on the escrowed funds) and those relating to a claim for a commission, except as to a Broker found, in a final non-appealable judgment, to have engaged in willful misconduct or acted with gross negligence.

**15.  Additional Terms.** See Addendum.
_____

**16.  Miscellaneous.** This PSA, including its exhibits and schedules, is the *entire agreement* between the parties pertaining to the subject matter hereof and *supersedes* all prior and contemporaneous negotiations, agreements, representations, warranties, and understandings pertaining thereto, be they in writing, oral, or otherwise. If a Broker becomes a party to any litigation involving this PSA, the Broker shall be reimbursed for their costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this PSA. In the event of any dispute between the parties hereto arising out of the subject matter of this PSA, the prevailing party (including the Brokers) shall be entitled to recover reasonable expenses, attorney's fees and costs for all pretrial, trial and appellate proceedings. If any term, condition, or provision of this PSA is held to be unenforceable for any reason, it shall be interpreted to achieve the intent of the parties to this PSA to the extent possible rather than avoided. In any event, all other terms, conditions and provisions of this PSA shall be deemed valid and enforceable. There are no other duties, obligations, liabilities, or warranties, implied or otherwise, except as set forth herein. This PSA may not be amended or modified, except in writing, signed by Buyer and Seller. Notice and delivery given by or to the attorney or Broker representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by personal delivery, overnight courier, facsimile, email, or other electronic means, and shall be effective upon delivery with proof of delivery retained. Buyer may assign this PSA to

Buyer's Initials: _____   Seller's Initials: _____

   ©2020 International Yacht Brokers Association. All rights reserved.   Rev. 3.10.20

any member(s) of Buyer's immediate family or any entity owned or controlled by Buyer and/or any member(s) of his immediate family. Otherwise, neither party may assign this PSA without the other party's consent, which consent shall not be unreasonably withheld. No claim or right arising out of this PSA can be waived or discharged by one party, in whole or in part, unless in writing, nor shall any waiver be applicable except in the specific instance for which it is given. Paragraph headings are informational and included only for convenience.

17. <u>Governing Law and Dispute Resolution</u>. Check (a), (b) or (c). If none checked, (a) will apply. Any dispute involving this Agreement will be resolved: (a) ☐ in the courts located in the State of _____ (Florida, if left blank), (b) ☐ by binding arbitration in the State of _____ (Florida, if left blank), (c) ☐ by binding arbitration in London, England. *If (a) or (b) is selected:* (i) this Agreement will be governed by and interpreted according to the law of the State of _____ (Florida, if left blank) regardless of its principles of conflicts-of-laws and (ii) the proceedings will be conducted in the county of the main office of the Selling Broker, or if the Selling Broker has no office in Florida, in _____ (Fort Lauderdale, Florida, if no other city indicated). *If (b) is selected*, the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in force when the arbitration is commenced will apply unless the following rules apply: _____. If the amount in controversy including counterclaims is not more than USD $1,000,000.00, the parties shall jointly select a single arbitrator from the list of arbitrators maintained by the International Yacht Brokers Association ("IYBA") within twenty (20) days of the giving of notice of arbitration. If the parties are unable to agree upon the arbitrator, the IYBA shall have the power to make the appointment of the single arbitrator. If the amount in controversy is greater, the parties shall each appoint one arbitrator and the two arbitrators will jointly appoint a third arbitrator. If they cannot agree on the third arbitrator within 14 days, either party may request that the IYBA appoint the third arbitrator from the list of arbitrators maintained by the IYBA. The decision of the single arbitrator, or if a three abitrator panel, any two of them will be final and binding on the parties. An action may be brought in any court of competent jurisdiction to enforce any arbitral award or compel arbitration. If (c) is selected: (i) this Agreement will be governed by and interpreted in accordance with English law regardless of its principles of conflicts-of-laws, (ii) the parties irrevocably agree that any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Paragraph, (iii) the arbitration shall be conducted in accordance with the rules of London Maritime Arbitrators Association ("LMAA") current when the arbitration is commenced, (iv) if the amount in dispute (including counterclaims) is less than USD$100,000, its Small Claims Procedure will apply, while if greater than or equal to USD$100,000 and less than USD$400,000, its Intermediate Claims Procedure will apply. Whatever option is selected, the parties irrevocably submit to the exclusive jurisdiction of such court or arbitral forum, waive any objection they now or hereafter may have to venue or convenience of forum, agree that all claims relating to the proceeding will be decided only in such court or arbitral forum and, further, not to bring any claim relating to this Agreement in any other court or arbitral forum. The parties, having had the opportunity to seek legal counsel, waive trial by jury for claims arising under this Agreement, whether against each other or any Broker.

**BUYER:** _[signature]_

Print: Herbert Chambers

Title: Member

Date: May 30, 2023

**SELLER:** _[signature]_

Print: Luc Despins as trust

Title: _____

Date: May 30, 2023

**SELLING BROKER  DEPOSIT CONFIRMATION (Subject to clearance of funds)**

Print: Luc A. Despins, as the

Title: chapter 11 trustee for the estate of Ho Wan Kwok

_[signature]_ Luc Despins, as trustee

Amount: $4,800,000

Date: May 31, 2023

Buyer's Initials: _[initials]_

Seller's Initials: _[initials]_

©2020 International Yacht Brokers Association. All rights reserved.

Rev. 3.10.20

This form was prepared for the exclusive use and benefit of the members of the IYBA. The parties and Brokers hereby release the IYBA from any liability for damages resulting from or related to its use. The IYBA expressly disclaims any and all warranties, including merchantability and fitness for a particular purpose, related to the use of this form.

<u>**Addendum to Purchase and Sale Agreement for Brokerage Vessel, executed on May 30, 2023, Between (i) Luc A. Despins, as the Chapter 11 Trustee for the Estate of Ho Wan Kwok and (ii) Herb Chambers Yachting, LLC or assignee (the "Addendum")**</u>

Capitalized terms used but not defined herein have the meanings set forth in the Purchase and Sale Agreement for Brokerage Vessel, executed on May 30, 2023, with respect to the Lady May (the "<u>PSA</u>"). For the avoidance of doubt, any reference to the PSA (whether in this PSA or the Addendum) shall be to the PSA as modified by this Addendum.

1.  Luc A. Despins is party to the PSA solely in his capacity as the chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity. Accordingly, no claim whatsoever may be asserted by Buyer against Mr. Luc A. Despins in his personal capacity or Paul Hastings LLP.

2.  The PSA and all terms in the PSA are subject to approval of the United States Bankruptcy Court for the District of Connecticut (the "<u>Bankruptcy Court</u>"), in which court the chapter 11 case of Ho Wan Kwok, Case No. 22-50073 (the "<u>Chapter 11 Case</u>"), is pending.

3.  Notwithstanding anything in the PSA to the contrary, the Bankruptcy Court shall have exclusive jurisdiction over any claim or dispute in respect of or arising out of the PSA, and the parties and the Brokers irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court, waive any objection they now or hereafter may have to venue or convenience of forum, agree that all claims relating to the PSA will be decided in such court, and, further, not to bring any claim relating to the PSA in any other court. For the avoidance of doubt, all provisions in Section 17 of the PSA regarding the arbitration of any dispute involving the PSA are hereby deleted.

4.  Notwithstanding anything in the PSA to the contrary, the PSA is governed by and interpreted according to the law of the State of New York regardless of its principles of conflicts-of-laws.

5.  The fourth and fifth sentences in Section 1 of the PSA are hereby modified as follows:

    "Vessel" also includes all gear, machinery, equipment, furniture, fuel, consumables, and all registered or unregistered tenders, toys, articles and appurtenances on board the Vessel and/or included on the Vessel's listing specification as of the date of this <u>PSA. **There will be no** <u>**Exclusions List.**</u>~~Agreement, except for items listed on the Exclusions List provided by the Seller or Listing Broker on the earlier of (a) five days from the Effective Date or (b) the Accept/Reject Date, which items are not included in the sale. Buyer will be deemed to have accepted the Exclusion List if it accepts the Vessel.~~ **For the avoidance of doubt, the** **Lady May II is not included as part of the sale of the Vessel** **pursuant to this PSA.**</u>

6.  The eighth sentence in Section 1 of the PSA is hereby modified as follows:

1

~~There shall be no~~ If there is a Trade Allowance **in connection with the sale of the Vessel pursuant to this PSA,** ~~the conditions of the trade-in will be governed by the attached Trade-In Vessel Addendum.~~

7. Section 2 of the PSA is hereby modified as follows:

~~Within____ business days (3 business days if left blank)) following Seller's signature of this PSA.~~**On [**May 31, 2023, Buyer ~~paid~~shall pay the Deposit to the **Seller's**~~Selling Broker's~~ account, as acknowledged below, as a deposit toward the Purchase Price to be held **in escrow** subject to the terms of this PSA. Seller may refuse to permit Buyer to proceed with the trial run, survey and other inspection of the Vessel until the Deposit has cleared into the **Seller's**~~Selling Broker's~~ escrow account.

8. Section 3 of the PSA is hereby modified as follows:

Buyer's obligation to purchase the Vessel is subject to Buyer's satisfaction~~, in Buyer's sole discretion,~~ with a trial run and survey of the Vessel though Buyer may elect not to have the Vessel inspected**; provided, however, that Buyer may only reject the Vessel if the surveyor (who shall be a duly qualified marine surveyor whose day-to-day business is occupied with surveying of vessels of a similar quality to and value of the Vessel) certifies in writing that it discovered defects that affect the operational integrity of the Vessel or her machinery or her systems or renders the Vessel unseaworthy. For the avoidance of doubt, Buyer may not reject the Vessel on any other grounds.** If **the Buyer decides to have a survey conducted**~~inspected~~: (a) Buyer will select the surveyor, (b) the surveyor, and not the Brokers, will be the sole party responsible for any errors or omissions with respect to the survey, notwithstanding that the Brokers may have provided information to and assisted Buyer with hiring the surveyor, (c) Seller shall make the Vessel available and Buyer shall complete the trial run and survey as soon as practicable**, such that the survey is completed prior to the Accept/Reject Date,** (d) Seller shall pay all running expenses for, and assume the risks associated with, the trial run, and Buyer shall pay all costs of the survey, including associated costs, e.g., haul-out, dry dock, and subcontractors' charges, (e) Buyer and its surveyor will be solely responsible for determining the scope of the survey and the trial run to assess the Vessel's conformity with Buyer's requirements and (f) Buyer shall deliver written notice of rejection or acceptance of the Vessel to Seller or the Listing Broker on or before the Accept/Reject Date. Whether or not Buyer has inspected the Vessel, Buyer will be deemed to have **accepted**~~rejected~~ the Vessel if it fails to give timely written notice of its **rejection**~~acceptance~~ **in accordance with this PSA.** Upon Buyer's acceptance of the Vessel, Seller will not make any use of the Vessel pending Closing (defined in

2



Paragraph 4) except to move the Vessel to the Delivery Location. If Buyer rejects or is deemed to reject the Vessel **in accordance with this PSA and is not otherwise in breach of this PSA**, ~~after all expenses incurred on Buyer's behalf have been paid~~, (i) the **Seller**~~Selling Broker~~ shall return the Deposit to Buyer, (ii) this PSA will terminate, and (iii) the parties and the Brokers will be released from any further liability hereunder. The Brokers will not be responsible for the cost to correct any defects or deficiencies noted during the trial run and survey.

9. The sixth sentence in Section 4 of the PSA is hereby modified as follows:

At Closing, Buyer shall pay the Balance to Seller (subject to Paragraph 6) **and the Deposit shall be released to Seller, subject to the deduction in the immediately following sentence**~~and/or to the Selling Broker for onward transfer to Seller by wire transfer~~. Any funds Seller owes to ~~(i)~~ the Brokers for the commission, storage, insurance, repairs and/or other items **(which are subject to approval of the Bankruptcy Court)**~~or (ii) the holder of any other Encumbrance,~~ will be deducted from the ~~amount due Seller by the Selling Broker prior to disbursement of funds to Seller, which hereby irrevocably instructs any Deposit holder to pay the Commission from the Deposit to the Brokers pursuant to the terms hereof~~**Deposit and paid to the Brokers prior to the release of the Deposit to Seller. For the avoidance of doubt, the order of the Bankruptcy Court approving the sale of the Vessel to Buyer shall provide that the Vessel is being sold free and clear of any Encumbrances, with any Encumbrances attaching to the proceeds of the sale.**

10. The second sentence of Section 5 of the PSA is hereby modified as follows:

If the Listing Broker and the Selling Broker are the same brokerage, the parties consent to that Broker acting as a dual-agent in this transaction, i.e., representing both Buyer and Seller~~, and the Broker may disclose to both parties facts known to the Broker materially affecting the Vessel's value or desirability~~; provided, however, that in such instance **(a)** the Broker shall not, without Seller's consent, disclose to Buyer that Seller is willing to sell the Vessel for an amount less than the asking price **and (b) the Broker have no duties to the Buyer in connection with the sale of the Vessel**~~or, without Buyer's consent, disclose to Seller that Buyer is willing to pay a price greater than the offering price~~.

11. The second sentence of Section 6 of the PSA is hereby modified as follows:

No less than two (2) business days before Closing, Seller shall deliver to Buyer (a) satisfactory evidence of title, (b) proof of payment or removal of all Encumbrances (except for those encumbrances that will be paid in full at closing)**, which proof may be the order entered by the**

3



**Bankruptcy Court approving the sale of the Vessel (and which order shall provide that the Vessel is being sold to Buyer free and clear of any Encumbrances),** (c) ~~a guaranty and indemnification from Seller guaranteeing Seller's representations and warranties in this Paragraph 6, (d) if Seller is a legal entity, a personal guaranty and indemnification from Seller's beneficial owner(s) guaranteeing Seller's representations and warranties in this Paragraph 6,~~ and (c~~e~~) copies of any other documents necessary for transfer of good and marketable title to Buyer.

12. The second and third sentences of Section 7 of the PSA are hereby modified as follows:

If the Vessel is damaged subsequent to Buyer's acceptance and the necessary repairs will cost less than five percent (5%) of the Purchase Price and require fewer than 30 days to complete, then**, at the Seller's option,** (a) Seller may~~must~~ repair the damage prior to Closing in accordance with sound marine practices to the standard of the Vessel immediately prior to the damage and Buyer may inspect such repair, **in which case** (a~~b~~) Buyer shall~~must~~ pay the Balance and take delivery of the Vessel as repaired~~,~~ and (b~~e~~) the Closing Date will be extended by the length of the repair period. If the Vessel is damaged to a greater extent subsequent to Buyer's acceptance **or Seller does not exercise the option in the foregoing sentence,** either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel.

13. Section 8 of the PSA is hereby modified as follows:

Notwithstanding anything herein to the contrary, if ~~the Deposit is not paid when due or~~ Closing is not consummated due to Buyer's non-performance, including, without limitation, failure to pay the Balance or execute all documents necessary for completion of the purchase by the Closing Date: (i) the Deposit shall be retained by ~~(or if the Deposit was not paid, Buyer shall pay a like amount to)~~ Seller ~~and the Brokers~~ as liquidated and agreed damages, as consideration for the execution of this PSA, in full settlement of all claims between the parties, (ii) the Selling Broker shall return to Buyer any other funds received from Buyer, and (iii) the parties will be relieved of all obligations under this PSA**, provided, however, that in the event that, after the Bankruptcy Court has approved this PSA, the Closing is not consummated due to Buyer's non-performance, Seller shall pay to the Listing Broker an amount equal to $200,000 out of the Deposit, which amount shall count against, and reduce, any commission that the Listing Broker may earn (in accordance with its engagement letter with Seller) if a sale of the Vessel is consummated with a different buyer.** ~~Buyer and Seller agree that the Deposit will be applied first to payment of any unpaid costs or expenses that Buyer or Broker incurred against the Vessel and then divided fifty percent (50%) to the Seller and fifty percent (50%) to the Brokers, which the Brokers shall divide in the same~~

4





~~proportions as the commission would have been divided had a sale been consummated.~~ If the Closing is not consummated due to Seller's non-performance **(which, for the avoidance of doubt, shall not include the Bankruptcy Court declining to approve this PSA)**, the Deposit, and any other money paid or deposited by Buyer~~,~~ pursuant to this PSA, will be returned to Buyer upon demand ~~or Buyer will have the right of specific performance. Seller agrees that specific performance is reasonable in light of the uniqueness of the Vessel, difficulty of proof of loss, and the inconvenience or impossibility of otherwise obtaining an adequate remedy.~~ **If Closing is not consummated due to Seller's non-performance**~~On Seller's default~~, Seller shall forthwith pay the Brokers the same commission otherwise payable had the transaction closed**; provided, however, that the Bankruptcy Court declining to approve this PSA shall not constitute non-performance on the part of Seller. In the event the Bankruptcy Court does not approve this PSA, this PSA shall be deemed terminated with the same consequences as if Buyer had rejected the Vessel in accordance with this PSA. Notwithstanding anything in this PSA to the contrary, if the Closing is not consummated for any reason (including (a) due to the Buyer's non-performance of its obligations under this PSA, (b) the Bankruptcy Court does not approve this PSA, or (c) the Buyer rejects the Vessel in accordance with this PSA), Seller shall have the option to purchase the survey from Buyer at cost and, if the Seller exercises this option, Buyer shall provide the complete survey to Seller immediately upon payment of the cost of such survey.**

14. The first sentence of Section 9 of the PSA are hereby modified as follows:

    Sales or use taxes payable on Buyer's purchase of the Vessel, if applicable, are Buyer's responsibility, and Buyer shall pay the taxes due to the **Trustee**~~Selling Broker~~ at Closing.

15. The following sentence is hereby added after the first sentence of Section 11 of the PSA:

    **Buyer represents and warrants that it has sufficient cash and/or financing to fund the Purchase Price at Closing. Buyer also represents and warrants that it is not affiliated with or related to Ho Wan Kwok and/or is not acting on behalf of or at the behest of Ho Wan Kwok.**

16. Section 14 of the PSA are hereby modified as follows:

    The parties acknowledge that (a) the **Seller**~~Selling Broker~~ will not be responsible for the Deposit until the funds have cleared into the **Seller's**~~Selling Broker's~~ account, (b) the **Seller**~~Selling Broker~~ shall hold the Deposit in escrow once the funds have cleared and any other funds received by either Broker from any party will be held in trust for that

5





party, (c) the Seller~~Selling Broker~~ **shall pay, in accordance with this PSA,**~~may retain~~ the commission due the Brokers prior to **the** release~~disbursement~~ of the Deposit ~~or Balance~~ to Seller, and (d) in any dispute involving any funds held by the Brokers, Buyer and Seller will indemnify the Brokers for legal fees and costs relating in any way to the dispute, including those incurred in any appeals (which obligation is secured by a lien on the escrowed funds) and those relating to a claim for a commission, except as to a Broker found, in a final non-appealable judgment **of the Bankruptcy Court,** to have engaged in willful misconduct or acted with gross negligence.

17. The second and third sentences of Section 16 of the PSA are hereby modified as follows:

> If a Broker becomes a party to any litigation involving this PSA, the Broker shall be reimbursed for their reasonable costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this PSA**, unless such Broker is found, in a final non-appealable judgment of the Bankruptcy Court, to have engaged in willful misconduct or acted with gross negligence**. In the event of any dispute between the parties hereto arising out of the subject matter of this PSA, the prevailing party (including the Brokers) shall been titled to recover reasonable expenses, attorney's fees and costs for all pretrial, trial and appellate proceedings**, unless such prevailing party is found, in a final non-appealable judgment of the Bankruptcy Court, to have engaged in willful misconduct or acted with gross negligence**.

18. The ninth and tenth sentences of Section 16 of the PSA are hereby modified as follows:

> ~~Buyer may assign this PSA to any member(s) of Buyer's immediate family or any entity owned or controlled by Buyer and/or any member(s) of his immediate family. Otherwise, n~~Neither party may assign this PSA without the other party's consent~~, which consent shall not be unreasonably withheld~~.

19. In the signature block on page 4 of the PSA, the phrase "Selling Broker Deposit Confirmation (Subject to clearance of funds)" is hereby modified to read: "Seller Deposit Confirmation (Subject to clearance of funds)".

Seller

By: _____ 

Name: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok

Date: 5/30/2023

6



Buyer,

By: _____

Name: Herb Chambers Yachting, LLC or
assignee

Title: Member

Date: 5/30/2023

## EXHIBIT C

**Johnson Declaration**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

------------------------------------------------------x
                          :

In re:                      :   Chapter 11

                      :

HO WAN KWOK, *et al.*,[1]  :   Case No. 22-50073 (JAM)

                      :

        Debtors.    :   (Jointly Administered)

                      :

------------------------------------------------------x

**DECLARATION OF DIRK JOHNSON IN SUPPORT OF TRUSTEE'S MOTION,
PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363, BANKRUPTCY
RULES 2002, 6004(c), AND 9014, AND LOCAL RULES 6004-1 AND 6004-2, SEEKING
ENTRY OF ORDER: (I) AUTHORIZING AND APPROVING SALE OF THE LADY
MAY FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,
(II) AUTHORIZING AND APPROVING PURCHASE AND SALE AGREEMENT, AND
(III) GRANTING RELATED RELIEF**

       I, Dirk Johnson, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as

follows:

       1.     I am a Yacht Broker at Edmiston and Company Limited ("Edmiston"),

maintaining offices at (a) 2 Marina Plaza, Newport, Rhode Island, 02840, and (b) Burleigh

Manor, Peel Road, Douglas, Isle of Man, IM1 5EP.

       2.     I am duly authorized to make this declaration (this "Declaration") on behalf of

Edmiston and submit this Declaration in support of the *Trustee's Motion, Pursuant to*

*Bankruptcy Code Sections 105 and 363, Bankruptcy Rules 2002, 6004(c), and 9014, and Local*

*Rules 6004-1 and 6004-2, Seeking Entry of Order (I) Authorizing and Approving Sale of the*

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The
mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul
Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho
Wan Kwok (solely for purposes of notices and communications).

*Lady May Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing and Approving the Purchase and Sale Agreement, and (III) Granting Related Relief* (the "Motion")[2] in the chapter 11 case of Ho Wan Kwok (the "Debtor"), seeking an order approving and authorizing the sale of the Lady May to Herb Chambers Yachting, LLC (the "Buyer").

3.      I am a Yacht Broker based in Newport, Rhode Island, since 1991, and have been employed by Edmiston for 2.5 years.  I have approximately 15 years of experience in the superyacht brokerage industry.  Edmiston is a luxury superyacht broker specializing in the sale of yachts.  Edmiston currently is the broker for numerous yachts in the United States and worldwide. In addition, in the past 24 months, approximately, Edmiston has sold more than 70 yachts over 30 meters in length more than double the industry average of deals per broker. Edmiston also holds the industry record for the sale of the highest number of Feadships (which is the builder of the Lady May).

4.      On April 18, 2023, Edmiston was retained by the Trustee to market and sell the Lady May, which retention was approved by order of the Court, dated April 27, 2023.[3]  As set forth in the retention agreement, the agreed-upon list price for the Lady May is $26,500,000.

5.      Unless otherwise indicated below, I have personal knowledge of the matters set forth below, and if called to testify, I could and would testify competently thereto.

**Marketing of Lady May**

6.      Since its retention, Edmiston has engaged in an extensive marketing campaign to sell the Lady May to the highest bidder.  Consistent with best industry practices for marketing a luxury superyacht such as the Lady May, Edmiston has actively canvassed the yacht market for

---

[2]   Capitalized terms used but otherwise not defined herein shall have the meaning ascribed to them in the Motion.

[3]   Edmiston is also marketing the Lady May II, which is not included in the Sale.

potential buyers, both within its own network of potential buyers as well as through numerous other yacht brokers in the industry, as well as advertised the Lady May both online and in print. These marketing efforts were initially focused on residents outside of the United States and, following the Lady May's transfer to the foreign trade zone in Rhode Island (the "FTZ"), Edmiston expanded its efforts to also include U.S. residents.

7.    Among other things, as part of its marketing efforts:

   a.   Edmiston created an electronic brochure of the Lady May, including photographs and listing its specifications, which brochure was included in industry-wide announcements to other yacht brokers as well as posted on Edmiston's website and social media;

   b.   Edmiston engaged in a direct client email marketing campaign,[4] which featured the Lady May in its monthly mailer update (distributed to approximately 10,000 clients and other potentially interested parties);

   c.   Edmiston used extensive digital advertising to market the Lady May on its website and social media accounts, including Instagram, Facebook, LinkedIn and YouTube;[5]

   d.   Shortly after the Lady May was moved into the FTZ in Newport, Rhode Island, Edmiston issued further announcements regarding the Lady May on its website and social media.

8.    In order to connect the Lady May with Edmiston's network of industry brokers, Edmiston emailed single and multi-yacht mailers for new yacht listings, sales updates, location updates, price reductions and yachting events. In addition, the Lady May has been featured in three business email distributions since Edmiston's retention, each of which was sent to approximately 1,850 brokers in the yacht industry. Furthermore, on May 3, 2023, the Lady May was also listed on Yatco.com and Yachtworld.com, which are online business-to-business (B2B) search facilities that centralize brokerage information for the yacht industry—similar to MLS

---

[4]    The monthly mailer included a photo of the Lady May alongside a detailed description and the listing price.

[5]    Edmiston.com ranks highly on search engines compared to its competition and is an effective tool in promoting the Lady May, with monthly website traffic averaging 30,000 per month.

(multiple listing service) for real estate sales. In addition, the Lady May has been featured on the brokerage listing page of Boatinternational.com and Superyachttimes.com, as well as in two print publication in Boat International US.

9.      Edmiston is also the title sponsor of the London Heliport and used this platform to advertise the Lady May by featuring it in Edmiston's brand collateral (*i.e.*, Edmiston's branded marketing materials) that is deployed throughout the London Heliport. Similarly, the Lady May was featured in Edmiston's brand collateral deployed across private aviation terminals in the East Hamptons and Cabo St. Lucas. Edmiston has also teamed up with Europe's leading private jet airport, Farnborough, to provide a fully immersive experience for guests traveling through the airport and Edmiston utilized this platform to further advertise the Lady May.

10.     In addition to all of the foregoing, I reached out, and received calls from, numerous other yacht brokers as well as prospective buyers about the Lady May.

**Bidding Process**

11.     From the outset of the marketing process, there has been significant interest in the Lady May, but not at prices that the Trustee deemed acceptable. A handful of potential buyers requested to be shown (and were shown) the Lady May, while several brokers visited the Lady May on behalf of prospective buyers. By May 20, 2023, five prospective buyers (the "Initial Bidders") had provided Edmiston with formal offers for the Lady May with proposed purchase prices ranging from $18 million to $20 million. In response to each of these offers, the Edmiston advised the Initial Bidders that the Trustee determined to counter at $23 million. In response to the Trustee's counteroffer, one of the Initial Bidders increased its bid to $20 million, while the other Initial Bidders did not increase their offer.

4

12.     After receipt of these initial bids and the bidders' refusal to further respond to the Trustee's counteroffer, I advised the Trustee that (in light of the offers in hand) a prolonged marketing process could cause some of the bidders to lose interest, and, therefore, the Trustee should set a deadline of Tuesday, May 30, 2023, at 5:00 p.m. (ET), for interested parties to submit their best and final bids.

13.     On May 24, 2023, Edmiston emailed each of the five Initial Bidders as well as other parties that had expressed an interest in the Lady May to advise them that the deadline to submit their best and final bids was set for **Tuesday, May 30, 2023, at 5:00 p.m. (ET)**. This deadline was designed to maintain maximum momentum with the Initial Bidders and other interested parties. In that email, interested bidders were also advised that (a) due to the fact that the Trustee had received offers for the Lady May from several potential buyers, Edmiston was inviting all interested parties to present their best and final offer prior to the May 30, 2023 bid deadline and (b) any such bid would have to comply with the following requirements:

- Only bids with a purchase price in excess of $20,000,000 would be considered by the Trustee;

- Offers must be based on the Trustee's form of purchase agreement (which was provided to interested parties on Thursday, May 25);

- To the extent the prospective buyer intended to modify the form of purchase agreement, mark-up of the agreement should be included as part of the bid (and advising the parties that such modifications, if any, would be evaluated in determining the highest and/or best offer);

- The winning bid must provide for a 20% deposit of the purchase price, which deposit must be received within 48 hours after such bid has been selected as the winning bid;

- The 20% deposit would be forfeited if the winning bidder fails to close on purchase of Lady May in accordance with terms of purchase agreement (subject to the right to reject the Lady May if the survey reveals a defect affecting the operational integrity of the Lady May or her machinery or her systems or renders the Lady May unseaworthy);

5

- The purchase agreement must be executed by June 9, 2023;

- The Lady May must be accepted or rejected (based on results of survey) by June 28, 2023;

- In the event the winning bidder does not close on the purchase at the price set forth in the purchase agreement, the Trustee may, at his option, purchase the survey from the buyer, at cost;

- Closing would take place as soon as practical on or before July 20, 2023;

- All bids would be subject to bankruptcy court review and approval; and

- All bids had to be sent directly to the Trustee.

14.     In addition, also on May 24, 2023, Edmiston circulated emails to more than 1,857 other yacht brokers advising them of the deadline to submit best and final bids and that such bids would be subject to certain conditions, including a minimum bid of $20 million.[6] As with the email to the Initial Bidders, the email distribution advised the brokers that the Trustee was setting May 30, 2023 deadline to submit best and final bids due to multiple offers received to date. Furthermore, on May 27, 2023, Edmiston updated the Yatco.com listing for the Lady May to advise interested parties of the bid deadline and the minimum bid requirement

15.     As of 5:00 p.m. (ET) on May 30, 2023, five formal bids (in addition to the initial bids) were received from prospective buyers (the "Second Round Bidders"), including from both U.S. residents and non-U.S. residents. Three bids exceeded the $20 million minimum, while two bids were below the minimum. During this second round, two bidders that were not Initial Bidders submitted bids. But not all bidders that participated in the initial round submitted a further bid by the May 30, 2023 deadline. For example, one of the Initial Bidders who had

---

[6]   This email distribution did not list all of the conditions, but advised the recipients to contact me for further details, including offer conditions.

previously offered $20 million did not submit any bid in connection with the May 20, 2023 bidding deadline because the bidder did not want to participate in a competitive bidding process.

16.    Following receipt of these bids, the Trustee engaged in further discussions with each of the three bidders that had satisfied the minimum bid requirement. Because the bidder that submitted the highest bid (which was substantially below $24 million) had modified the form of purchase agreement to add provisions that were not acceptable to the Trustee (including giving the buyer an absolute right to terminate the purchase process based on the results of a sea trial that would not take place for more than 10 days), the Trustee requested that the bidder remove these modification and/or further increase its bid. Concurrently, the Trustee, through Edmiston, also reached out to the second and third highest bidders to explore whether they would be willing to increase their bid. Ultimately, one of these two bidders increased its proposed purchase price to $24 million, thereby becoming the highest bidder. Because that increased bid (which was the one submitted by the Buyer) did not include any modifications to the Trustee's form of purchase agreement (other than to move up the closing date to a date on or before June 30, 2023), the Trustee selected the Buyer as the winning bidder. To be clear, neither of the other two bidders further increased their bids, even though they were invited to do so.

17.    I believe that the Buyer's bid (a) is the highest and best bid (including because the Buyer does not require any modifications to the form of purchase agreement proposed by the Trustee (other than that closing of the Sale occurs by June 30, 2023)), (b) satisfies the Trustee's bid conditions, and (c) is the product of an arms' length bidding and negotiation process. In addition, based on my interactions with the Buyer, I believe that the Buyer has proceeded in good faith during the entirety of the bidding and negotiation process.

7

18.     Finally, I believe that the purchase price offered by the Buyer pursuant to the PSA is the best available price for the Lady May and that implementing formal bidding procedures and running a public auction process would not increase the purchase price, but rather would risk losing the Buyer, while undermining the momentum of the marketing and sale process to date. Accordingly, I believe that proceeding with the Sale under the PSA is in the best interest of the Debtor's estate.

### Auction Process Would Not Have Been Beneficial

19.     I believe that there would have been no incremental benefit to first seeking approval of formal bidding procedures and running a public auction, in light of the nature of the property to be sold (*i.e.*, a luxury superyacht) and the small pool of potential buyers (*i.e.*, high net-worth individuals). To the contrary, conducting an auction would likely have discouraged potential buyers from bidding and/or making their best offer. Potential buyers would likely not have participated in a process that would have exposed them to the risk of overpaying (if selected as the winning bidder in an auction), and, to the extent they would have participated in such a process, they would likely have discounted their bids to reflect that risk. In fact, two of the Initial Bidders withdrew from the process because of their dissatisfaction with the competitive process the Trustee was considering.

20.     Moreover, because an auction process would have required more time (including to seek Court approval of the auction procedures), many of the Initial Bidders would not have remained in the process, and otherwise motivated buyers would likely have been discouraged from participating out of a concern that they would have wasted a lot of time if they are ultimately not selected as the successful bidder. This is especially so given that other luxury superyachts can be purchased through brokers without having to go through an auction process.

Furthermore, given the fairly small pool of potential buyers, it is unlikely that an auction process would have attracted any additional interest beyond the parties that Edmiston (through its extensive network of clients and connections to other brokers) was able to attract.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2023

Dirk Johnson
Broker
Edmiston and Company Limited

10