UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION


| | | |
|---|---|---|
| In Re | * | Case No. 22-50073 (JAM) |
| | * | |
| HO WAN KWOK and GENEVER | * | |
| HOLDINGS CORPORATION, | * | |
| | * | |
| Debtor. | * | |
| | | |
| HK INTERNATIONAL FUNDS | * | Adv. Proc. No. 22-05003 |
| INVESTMENTS (USA) LIMITED, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| LUC A. DESPINS, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | | |
| U.S. BANK NATIONAL | * | Adv. Proc No. 23-05012 |
| ASSOCIATION, as escrow | * | |
| agent, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | Bridgeport, Connecticut |
| HK INTERNATIONAL FUNDS | * | June 13, 2023 |
| INVESTMENTS (USA) LIMITED, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

TRANSCRIPT OF

#1453     MOTION FOR ORDER TO SHOW CAUSE WHY DEBTOR, MEI GUO
          and HK(USA) SHOULD NOT BE HELD IN CONTEMPT OF
          COURT FOR FAILURE TO COMPLY WITH ORDER COMPELLING
          COMPLIANCE WITH RULE 2004 SUBPOENAS AND
          SANCTIONS FOR SUCH CONTEMPT
#1649     MOTION FOR A LIMITED STAY OF ORDER GRANTING IN PART
          MOTION TO COMPEL COMPLIANCE WITH RULE 2004 SUBPOENA
# 227     MOTION TO STAY PENDING APPEAL
#  11     STATUS CONFERENCE

3

```
APPEARANCES:


Chapter 11 Trustee:            LUC A. DESPINS, ESQ.
                               Paul Hastings
                               200 Park Avenue
                               New York, NY  10166


For the Chapter 11 Trustee:    NICHOLAS A. BASSETT, ESQ.
                               Paul Hastings LLP
                               200 Park Avenue
                               New York, NY  10166

                               PATRICK R. LINSEY, ESQ.
                               Neubert Pepe & Monteith, PC
                               195 Church Street
                               New Haven, CT  06510

For HK International Funds      ERIC A. HENZY, ESQ.
 Investments, LLC and           JAMES M. MORIARTY, ESQ.
 Mei Guo:                       Zeisler & Zeisler, P.C.
                                10 Middle Street, 15th Floor
                                Bridgeport, CT  06604


For the Creditors Committee:    IRVE J. GOLDMAN, ESQ.
                                Pullman & Comley
                                850 Main Street
                                Bridgeport, CT  06601

Special Criminal Defense        WILLIAM BALDIGA, ESQ.
 For the Debtor:                Brown Rudnick
                                One Financial Center
                                Boston, MA  02111


For U.S. Bank National Assn,    LATONIA C. WILLIAMS, ESQ.
 as escrow agent:               Shipman & Goodwin, LLP
                                One Constitution Plaza
                                Hartford, CT  06103
```

1          (Proceedings commenced at 1:01 p.m.)

2              THE CLERK:  22-50073, Ho Wan Kwok and Genever

3      Holdings, LLC; 22-05003, HK International Fund Investment

4      (USA) Limited vs. Despins; 23-05012, U.S. Bank National

5      Association, as escrow agent vs. HK International Funds

6      (USA) Limited.

7              THE COURT:  Good afternoon.  If we could have

8      appearances for the record, please, starting with the

9      Chapter 11 Trustee.

10             MR. DESPINS:  Good afternoon, Your Honor.  Luc

11     Despins, Chapter 11 Trustee.

12             THE COURT:  Good afternoon.

13             MR. BASSETT:  Good afternoon, Your Honor.  Nick

14     Bassett from Paul Hastings on behalf of the Chapter 11

15     Trustee.

16             THE COURT:  Good afternoon.

17             MR. LINSEY:  Good afternoon, Your Honor.  Patrick

18     Linsey for the trustee.

19             THE COURT:  Good afternoon.

20             MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

21     Goldman, Pullman & Comley, for the creditors committee.

22             THE COURT:  Good afternoon.

23             MR. HENZY:  Eric Henzy for the debtor, Mr. Kwok.

24             THE COURT:  Good afternoon.

25             MR. MORIARTY:  Good afternoon, Your Honor.  James

1    Moriarty from Zeisler & Zeisler for HK International Funds

2    Investment (USA) Limited in both adversaries, 22-05003 and

3    05012.

4              THE COURT:  Thank you.

5              MR. BALDIGA:  Good afternoon, Your Honor.  William

6    Baldiga, Brown Rudnick, special criminal defense counsel to

7    the debtor.

8              THE COURT:  Good afternoon.

9              And then we have appearance on the -- on the

10   remote appearance of Attorney Williams.

11             MS. WILLIAMS:  Yes.  Good afternoon, Your Honor,

12   and thank you so much for the opportunity to appear

13   remotely.  Latonia Williams of Shipman & Goodwin LLP,

14   appearing on behalf of the interpleader plaintiff, U.S. Bank

15   National Association, as escrow agent.

16             THE COURT:  Good afternoon.

17             And as many of you may know, I was a partner at

18   Shipman & Goodwin for years.  I know Ms. Williams.  Does

19   any -- if anybody has a problem with me addressing these

20   issues, I'd like you to let the Court know.  Okay.  Hearing

21   nothing.

22             Then we'll proceed.  Trustee Despins, how would

23   you like to proceed?

24             MR. DESPINS:  I think the first matter would be

25   the stay pending appeal, Your Honor, which is the --

1      Zeisler's motion.

2              THE COURT:  Okay.  Go right ahead.  Attorney

3      Moriarty, are you handling that matter?

4              MR. MORIARTY:  Yes, Your Honor.

5              MR. BASSETT:  Your Honor, I did just want to --

6      apologies.  I did just want to note that in terms of process

7      and presentation of our position, I don't know if the Court

8      wants to hear oral argument at the end.  But we were

9      planning to present some evidence by having the trustee

10     provide testimony to the Court in support of the harm to the

11     estate and otherwise that would be suffered in the event the

12     Court were to grant a stay.

13             So I don't know if the Court wants to do the

14     evidentiary portion first or --

15             THE COURT:  Well, maybe you and Attorney Moriarty

16     need to discuss that for a second.  I mean, I can do it

17     either way.  We can have Attorney Moriarty make his

18     presentation, and then you can make your presentation.  And

19     that could include evidence.  However you'd like to proceed.

20             MR. BASSETT:  That would be fine with me, Your

21     Honor.  I just didn't want him to start without having --

22             THE COURT:  Does that work for you, Attorney

23     Moriarty, or do you want a moment?

24             MR. MORIARTY:  Your Honor, I'd like a moment,

25     because I was completely unaware that the trustee intended

1    to call a witness.

2              THE COURT:  Okay.  Well, then take a moment.

3              MR. MORIARTY:  Thank you.

4                        (Counsel confer)

5              MR. MORIARTY:  Your Honor, James Moriarty for HK

6    International.  So Attorney Bassett is going to present his

7    witness first.  I just want to note my objection.  I was

8    unaware that a witness would be presented today.  I had no

9    advance notice that evidence would be offered.  I will note

10   that in --

11             THE COURT:  Well, would you like to move to

12   continue the hearing?

13             MR. MORIARTY:  I would, Your Honor.  And just to

14   be fair, in their brief which was filed yesterday --

15             THE COURT:  Well, that was when it was ordered to

16   be filed.

17             MR. MORIARTY:  Correct.  I agree.  There was a

18   notation in the brief that there would be some information

19   offered that would show the amount of interest that's

20   currently being earned on the escrow versus what could be

21   earned if there was an investment in T-Bills.  I anticipated

22   that that would be some type of demonstrative exhibit.

23             And if that's all that they were going to offer, I

24   would be okay with that.  But my understanding is that it

25   will go beyond that.  So I would like to have the hearing

1    continued for a week.

2            THE COURT:  Attorney -- well, I'm not available in

3    a week, so.

4            Attorney Bassett?

5            MR. BASSETT:  Your Honor, as I explained to

6    Attorney  Moriarty, I would anticipate that Mr. Despins'

7    testimony would take 10, 15 minutes top.  And as I also

8    explained, the testimony that we intend to offer is going to

9    track almost exactly what we had stated in our papers are

10   the categories of harm that this estate will suffer in the

11   trustee's view if a stay were granted.

12           So it's really just the evidentiary basis for the

13   statements we've made.  I think it was transparent from our

14   filing that we would be offering evidentiary support for

15   what we had said in our objection.

16           MR. MORIARTY:  It would have been transparent in

17   the objection if they had said that they were going to be

18   offering Trustee Despins as a witness.  They could have

19   obviously attached an affidavit also, which I believe the

20   Court would have considered.  They didn't do that.

21           So now we're here for the hearing, oral argument,

22   and the trustee is offering to call a witness to provide

23   testimony with no advance notice at all.

24           THE COURT:  Well, if you'd like to continue the

25   hearing, that's fine, but I'm not available next Tuesday or

1    the following Tuesday.  So it'll have to be into the

2    beginning of July.

3            MR. MORIARTY:  Okay.

4            MR. BASSETT:  And, Your Honor, on that note, the

5    fundamental problem we have, which we've already addressed

6    with the Court, I think, at the status conference we had

7    last week and should be a fundamental component of the

8    argument before the Court today, is that we have appellants

9    who are, in our view, actively in defiance of the order of

10   the Court.  They're acting as if they are entitled to a stay

11   pending appeal until there is a hearing on a motion --

12           THE COURT:  There is no stay pending appeal.  So

13   they can act however they would like to act, but there's no

14   stay pending appeal until there is a stay pending appeal,

15   unless and until there is a stay pending appeal.  They're

16   saying they're not ready to proceed on their own motion.

17           MR. BASSETT:  But as --

18           THE COURT:  So there's no stay pending appeal.

19           MR. BASSETT:  The issue, Your Honor, though, of

20   course, is that their position is that these funds are in

21   escrow, and they can't be released.

22           THE COURT:  Well, didn't we just get pleadings

23   filed that the bank is willing to turn over the funds into

24   the Court?

25           MR. DESPINS:  Yes.

1          THE COURT:  I think that's what I just saw within

2    the last half an hour, right?  Attorney Williams is here.  I

3    think she can respond to those issues.

4          I mean, the -- it's still -- I understand your

5    concern in that you want the trustee to be in control of

6    those funds.  I understand that.  And I understand that the

7    trustee wants to be in control of those funds.  But I also

8    understand that there's an interpleader action that's been

9    filed.  The plaintiff in that interpleader is willing to

10   transfer the funds minus -- I think, I didn't read it all

11   thoroughly yet, so -- but I would assume minus any fees that

12   it was owed as the escrow agent to be paid into the Court's

13   registry.

14         And then we're going to have to have an issue --

15   the debtors clearly -- the debtor, HK, whomever, clearly

16   opposed that.  You're correct that if I continue this

17   hearing I'm, in fact, giving them -- you could argue that

18   I'm giving them a stay pending appeal.  So then we'll have

19   to have the hearing as soon as possible.

20         But I -- right now, it is what -- where it is.

21   And the earliest the Court could have a hearing -- continue

22   the hearing to is the 27th of June, which is two weeks from

23   today.

24         But, Mr. Moriarty, you got to be ready to go.  I

25   mean, it's your motion.  Otherwise, you are -- by not

1    turning over the -- your clients are in violation of this

2    order already.  That's clear.  It said that they were to

3    turn over the funds to the trustee.  You have filed an

4    appeal.  You haven't gotten a stay pending appeal.

5            Now you're saying -- and I understand that you

6    want a continuance, because you didn't know that the trustee

7    was going to testify.  Okay.  I'll agree to that for now.

8    But this is not -- you're going to either get a stay or

9    you're not going to get a stay.  And right now, there is no

10   stay.

11           So every day that there isn't a stay and that your

12   client is in violation of an existing order, your client is

13   risking further -- you know, further relief could be sought

14   against your client, even if you ultimately get a stay

15   pending appeal, because you're in violation of that order,

16   and you have been since June 2nd.

17           MR. MORIARTY:  I --

18           THE COURT:  So it's up to you.  Do you really want

19   to wait another two weeks, or do you want to go forward

20   today?

21           MR. MORIARTY:  Well, Your Honor, I -- let me --

22   let me confer with my -- with Mr. Henzy.  But before I do

23   that, I just want to address what the Court just said.  The

24   money is in escrow.  There is an escrow agreement.  The --

25           THE COURT:  I know all about that --

1      MR. MORIARTY:  So --

2      THE COURT:  -- Attorney Moriarty.

3      MR. MORIARTY:  My client is not in violation of a

4  court order, because my client doesn't have the unilateral

5  ability to get the funds to deliver them to the trustee.

6      THE COURT:  Well, I'm not sure I agree with you on

7  that, number one.  Number two, I entered an order finding

8  that those funds are property of the estate and directed

9  your client to turn them over.  So the escrow agent doesn't

10  have a problem.  You're not going to get sued by the escrow

11  agent.

12      Who's going to sue you if they get turned over

13  right now?  The only people that could sue you would be the

14  trustee or the escrow agent.  Neither one of them is going

15  to sue you.

16      MR. MORIARTY:  There is a --

17      THE COURT:  So what's the problem?

18      MR. MORIARTY:  There's a prior order that Your

19  Honor entered related to -- the stipulated order related to

20  bringing the Lady May to Connecticut, which includes the

21  escrow agreement.  The escrow agreement has specific

22  provisions as to when the money can be turned over, and it

23  includes a final, non-appealable order which we do not have

24  yet.

25      So there are competing orders that this Court

1    entered.  There's the stipulated order which has the escrow

2    agreement as an exhibit to it, and then there's the order

3    that was entered on summary judgment.

4            THE COURT:  And you could agree to turn over those

5    funds regardless of your argument about a final

6    non-appealable order.  You could agree to do that.  You

7    could direct it.  But you don't want to do that.  And I

8    understand that you don't want to do that.  But you're still

9    in violation of the order that found that the funds are

10   property of the estate.

11           MR. MORIARTY:  Okay.

12           THE COURT:  So that's where we are.  So you -- if

13   you want to take a few minutes to decide whether you want to

14   proceed today or two weeks from now, that's up to you.

15                    (Counsel confer)

16           MR. MORIARTY:  All right.  Your Honor, we'll go

17   forward today.

18           THE COURT:  You'll proceed today?

19           MR. MORIARTY:  Yes.

20           THE COURT:  So you're withdrawing your objection

21   with regard to -- that you've made on the record with regard

22   to the trustee going to be submitting some evidence in

23   response to your motion for relief from -- oh, your motion

24   for stay pending appeal?

25           MR. MORIARTY:  Correct.  Obviously subject to

1    objections that I may make as he testifies.

2              THE COURT:  That's fine.

3              MR. MORIARTY:  Okay.

4              THE COURT:  Okay.  It's your motion, though, so

5    are you -- oh, you both agreed that you're going to proceed

6    first?

7              MR. MORIARTY:  Yes.  Well --

8              THE COURT:  That the trustee is going to proceed

9    with the evidence first?

10             MR. MORIARTY:  So that I can then address it in my

11   argument.

12             THE COURT:  Fine.  That's fine.  That's fine.

13             MR. BASSETT:  And then he'll do his argument.

14   Then I'll respond and --

15             THE COURT:  That's fine.

16             MR. BASSETT:  Your Honor, the trustee would --

17             THE COURT:  Trustee Despins?

18             MR. BASSETT:  The trustee would -- or the --

19             THE COURT:  Could you please come to the stand?

20             MR. BASSETT:  The trustee would call the trustee

21   to the stand.

22             THE CLERK:  Please raise your right hand up.

23                  LUC DESPINS, TRUSTEE, SWORN

24             THE CLERK:  Please state your name and address for

25   the record.

1        THE WITNESS:  Luc Despins.  Address -- work

2    address is 200 Park Avenue, New York, New York, 10166.

3                       DIRECT EXAMINATION

4    BY MR. BASSETT:

5    Q    Mr. Despins, good afternoon.  Mr. Despins, as the

6    trustee appointed in this case, you are in the process of

7    conducting an investigation into the debtor's assets and

8    affairs.  Is that correct?

9    A    That's correct.

10   Q    And you also understand that we're here today on a

11   motion that has been filed by HK USA and Mei Guo for a stay

12   pending appeal of this Court's order ordering that funds

13   sitting in escrow, approximately $33 million, plus funds in

14   a reserve account are property of the estate.  You

15   understand that?

16   A    That's correct.

17   Q    Do you have a view, Mr. Despins, as to how your

18   investigation and/or the estate more generally would be

19   impacted if the Court were to grant the stay pending

20   appeal --

21   A    I do.

22   Q    -- that the HK parties are seeking?  And what is that

23   view?

24   A    That it would have a material impact on the progress

25   and continuation of our investigation.

Ho Wan Kwok - June 13, 2023                                16

1    Q    Why is that?

2    A    For several reasons.  The first one is, and I want to

3    be very clear about this, you know, we intend to use the

4    funds to pay Paul Hastings what -- well, whatever the Court

5    will allow in terms of its professional fees.  And without

6    that, we're going to have a material issue with the

7    continued involvement of certain attorneys working on the

8    case.

9    Q    What do you mean by that?  Has -- strike that.  To

10   date, has Paul Hastings been paid anything on account of the

11   services it's provided to the trustee in this case?

12   A    No, it has not.

13   Q    And how is it that that would impact the ability of you

14   to, I think, as you put it, retain the help of associates on

15   the case?

16   A    So basically we're in -- the group -- the financial

17   restructuring group, now we're in an over-capacity position.

18   That means that we have more work than we can handle so

19   that -- and I'm sure Your Honor in private practice has

20   experienced that.  We're trying -- everyone is trying to

21   staff their cases.

22        And, you know, we're -- as I often say jokingly, this

23   is not Paulhastings.org.  It's Paulhastings.com.  So it's a

24   profit-making enterprise.  And we cannot be in a position

25   where I'm going to continue to control a number of key

1    associates in the department to work on the case where we're

2    not getting paid.  Essentially, there'll be demands made

3    elsewhere, and I'll have to release them to other paying

4    clients, unfortunately.

5        And that -- and there's a huge prejudice to not only me

6    personally but to the case, because there's some associates,

7    and they're mid-level to senior associates, who have spent

8    the better part of last year working on this case.  Without

9    them, we're in a world of hurt, because they know every

10   aspect of the case.

11       So I know generally what's going on, and I think I know

12   a lot about it.  But they can tell you that there's a

13   document in this file that says XYZ, which there's no way

14   that I or, I'd venture say, even you would be able to do

15   that.  Because we're not, and we should not be, in the weeds

16   the way they are.  And so if I lose these people, there's a

17   really material impact on our work.

18   Q    And what you're saying is that you fear losing them to

19   work on matters with paying clients?

20   A    Correct.

21   Q    And is it -- I assume from what you're saying that it's

22   atypical for Paul Hastings to take on an engagement like

23   this where it's essentially on a contingency basis?

24   A    I've never seen -- I've never had a receivable of this

25   size.  I've never -- you know, we -- even at the firm, I

1   mean, I got probably three or four calls from the --

2   essentially the CEO of the firm about this receivable.  So

3   it's unprecedented in terms of what we -- what we have ever

4   experienced.

5   Q    Other than using some portion of the funds to pay fees

6   of counsel, of course, subject to the Court's approval, is

7   there anything else that you would do if you did have access

8   to the $33 million in escrow funds if there was not a stay?

9   A    Yes.  As I mentioned in court before during the

10  preliminary injunction trial, the -- we're at a phase in the

11  case where we've identified, although we get surprises all

12  the time.  But we've identified the hard assets.  So we know

13  there's a apartment.  We know there's a yacht, although we

14  now know there's another smaller yacht.  And we know there's

15  a house in Greenwich, et cetera, et cetera.

16      But what is unknown precisely is the cash that flowed

17  between these dozens, if not hundreds, of entities, and the

18  tracing of those funds.  And that is where our experience as

19  lawyers kind of ends in the sense that we know that there's

20  millions of dollars that flowed through these various

21  accounts, but we need a professional to do asset tracing.

22      And that's where we are in the case in the sense that,

23  yes, there are a lot of skirmishes regarding the hard

24  assets, but those, I venture to say, are progressing nicely.

25  But the -- what -- where we have not made progress yet is on

1    the tracing of the hundreds, if not thousands, of transfers

2    and to determine which account they ended up in.  Are these

3    accounts in the U.S.?  Are they abroad?  If they're abroad,

4    are they in the U.K., or are they in the United Arab

5    Emirates where our ability to recover those funds is maybe

6    more difficult?

7         So there's a whole panoply of issues that a financial

8    expert, which we have not retained to date, would need to

9    work on.  And, you know, these people will need to get paid.

10   They're not going to do this on a contingency basis.  The

11   reason being is that the only way they would do that, they

12   would say, okay, well, I'm first.  I'm going to be first as

13   to whatever recovery is obtained.

14        And of course we're going to say no, because we are

15   owed money.  And Mr. Linsey's firm is owed money.  And the

16   British Virgin counsel is owed money.  And the U.K. counsel

17   is owed money.  And, therefore, we don't have an asset to

18   give to these people on a contingency basis, and we don't

19   have cash to pay them on a regular basis unless we have

20   access to the funds.

21   Q    And if -- and I'm not going to ask you to reveal

22   anything that, you know, remains sort of nonpublic

23   information that's part of your ongoing, privileged

24   investigation.  But if you were able to hire the types of

25   professionals that you just described and pursue this type

1    of investigation, do you, as the trustee, have a ballpark

2    sense of whether you'd likely be successful in obtaining

3    recoveries for the estate?

4            MR. MORIARTY:  Objection.  Speculation.

5            THE COURT:  Overruled.

6            THE WITNESS:  So let me start with the stuff --

7    not the stuff, the assets that have been identified.  So we

8    know what they are -- those are, the yacht and all that and

9    the apartment, the house in Greenwich, the $10-million-plus

10   airplane proceeds.  And there's a -- you know, there's new

11   litigation that we have commenced where, you know, there's a

12   lot more money involved.

13           So just on that, there's going to be a lot, you

14   know, more money than the 33- or 37 million that's at stake.

15   But in terms of what has not been identified precisely, it's

16   obvious to me in my professional judgment that, you know,

17   the family -- the debtor and his family had a game plan here

18   which is to not disclose assets.

19           MR. MORIARTY:  Objection, Your Honor.  It's

20   outside the -- it's not responsive to the question.

21           THE COURT:  I'll overrule that part -- I'll strike

22   that part of the answer.  And he did -- I'll keep on the

23   record the part of the answer that Trustee Despins talked

24   about the hard assets, and he thinks that there's more than

25   $33 million out there than other -- than -- other than the

1   funds in the escrow.  And if Attorney Bassett wants to ask

2   another question, he can do so.

3   BY MR. BASSETT:

4   Q    Okay.  Trustee Despins, I don't need  you to elaborate

5   on all the specifics.  But in your professional judgment

6   based on the investigation that you've conducted this far,

7   are you optimistic that in addition to the hard assets that

8   you've identified, there are other potential assets that the

9   trustee may be able to recover if it conducts this type of

10  investigation?

11  A    Yes, I am.

12  Q    In addition to not being able to hire these types of

13  advisors to conduct the type of investigation that you have

14  described, is there anything else that you would do as

15  trustee if given access to the funds in the event there is

16  not a stay?

17  A    Well, we would invest the funds or the parts that's not

18  used to pay professional fees, buying treasury bills, for

19  example, something that is guaranteed by the United States.

20  Q    Do you know, by the way, what interest, if any, the

21  funds are earning in the escrow account that they're

22  currently in?

23  A    Yes.  They're earning half a percentage point.  So

24  that's like .5 -- .05 percent.  I'm sorry.

25  Q    And do you have an understanding based on publicly

1   available information that you researched prior to the

2   hearing what roughly a treasury bill would return?

3   A    Yeah.  About 5 percent, 5.1 right now for -- it depends

4   on the term.  It varies between six months and a year.  But

5   it -- it's about in the 5 percent range.

6   Q    And at the risk of asking you to do a little math,

7   which I know you've done, do you know if, for example, the

8   trustee on behalf of the estate were to invest $20 million

9   worth of the escrow funds over the next six months or a

10  year, you know, what that interest income would be?

11  A    It would be about -- the delta would be about a million

12  dollars over a period of a year.

13  Q    Over a year?  Okay.  And then to go back to the prior

14  question that I asked, I just want to make sure, is there

15  anything else that you haven't yet said that you would do on

16  behalf of the estate in the absence of a stay?

17  A    Yes.  Well, there are a number of, I would call,

18  projects that have not been fully started because of a lack

19  of funding.  But that would involve recovering assets in

20  certain jurisdictions -- I'm not going to say more than

21  that -- on that -- and also other types of claims with a

22  broader list of targets, just, you know, without elaborating

23  on that.

24  Q    And I think this may be the last question that I have

25  for you.  It's one I meant to ask earlier.  But you talked

Ho Wan Kwok - June 13, 2023

23

1    about the types of investigation that you would like to

2    pursue if you were able to retain the right professionals to

3    do that.  Is there any reason in your mind why you couldn't

4    just wait?  Let's say it takes the appeal three to six

5    months to run its course, conservatively.  Is there any

6    reason you couldn't wait until the end of then to conduct

7    this investigation, in your mind?

8    A    The problem with that approach is that the information

9    is getting stale.  We know that there are accounts that have

10   been opened  -- dozens of accounts that have been opened

11   over the last, you know, two years.  We know from -- and I'm

12   sorry to mention this but that from the Zeisler disclosure

13   as to whether they're getting paid, that there are new

14   entities all the time that are created with new names and

15   all that.  That's not speculation.  That's reality.

16        And so that means that in two months from now, the

17   information we have today will be completely stale.  So now

18   we have to restart it and at a huge cost to the estate.

19   Q    When you say the information could be stale, it's if

20   there's -- you know, if the information that you have would

21   show that money may exist in a particular account today,

22   that money may be in a different account later?  That's what

23   you're saying?

24   A    Yeah.

25        MR. MORIARTY:  Objection.  Leading.

Fiore Reporting and Transcription Service, Inc.

1          THE COURT:  Could you rephrase the question,

2     Attorney Bassett, please?

3     BY MR. BASSETT:

4     Q    Yeah.  Can you just explain what you mean by the

5     information being stale?

6     A    Well, we have that in a number of cases where we have

7     bank accounts and at the end the account was closed.  Or the

8     same thing with Golden Spring, you know, now which I had to

9     find documents regarding Golden Spring.  They're closed.

10    They don't exist anymore, because it went on to another

11    company.  And so it went to another account.

12         So we have to take the last entry in the account at

13    Chase or Citibank and see where it went and then find those

14    bank accounts and then hope that they're still open.  And I

15    would say that they don't have a long life span.  Usually

16    they don't stay open for more than six months or so.

17              MR. BASSETT:  Thank you.  I don't have any other

18    questions, Your Honor.

19              THE COURT:  Okay.  Thank you.

20              Cross-examination, Attorney Moriarty?

21              MR. MORIARTY:  Thank you, Your Honor.

22                         CROSS-EXAMINATION

23    BY MR. MORIARTY:

24    Q    Good afternoon, Trustee Despins.

25    A    Good afternoon.

1    Q    You became trustee -- the Court approved your

2    appointment on July 8, 2022?

3    A    That sounds right.

4    Q    And how much money was in the debtor's estate at the

5    time that your appointment was approved?

6    A    I forget, but de minimis.  You know, 10-, 15,000.

7    Q    Okay.  So at the time that your appointment was

8    approved, there was 10- to $15,000 in the estate, and there

9    was no guaranty that there was going to be additional assets

10   coming in, correct?

11   A    No guaranties.  That's correct.

12   Q    All right.  So there was a risk for you at the time

13   that you accepted this appointment that the professionals

14   you engaged could run up very high bills and not get paid,

15   right?

16   A    Yes.  Except that now we found the money.

17   Q    And at the time that you accepted the engagement and

18   even going forward months into that, there were no assets in

19   the estate, right?

20   A    I'm sorry.  Can you rephrase that?

21   Q    Sure.  So let's say August of 2022.  At that point in

22   time, had you on behalf of the debtor's estate recovered any

23   assets?

24   A    No.

25   Q    September of 2022, had you recovered any assets?

Ho Wan Kwok - June 13, 2023

1    A    Some but not a lot.

2    Q    Okay.  What was the date of the first material -- and

3    by material I'll say more than a million dollars -- asset

4    that you recovered on behalf of the estate?

5    A    It would be the entry of summary judgment on the Lady

6    May.  And I forget the precise date, you know, but --

7    Q    We'll agree that it was in late March of 2023?

8    A    Something --

9    Q    Is that fair?

10    A    Something like that.

11    Q    And the fee application that Paul Hastings filed

12    recently, do you remember the date through which the

13    billings are sought?

14    A    Through February.

15    Q    Okay.  So February of 2023?

16    A    Correct.

17    Q    So all the way through February 2023, Paul Hastings

18    incurred more than $12 million in attorney's fees, right?

19    A    Correct.

20    Q    And there was no guaranty that they were getting those

21    paid, right?

22    A    That's correct.

23    Q    Now, this -- the $33 million that's in escrow with U.S.

24    Bank, and there's another 3- or so that you're holding in

25    the repair reserve, correct?

1    A    Correct.

2    Q    So let's say 36 million.  Is that fair?

3    A    Something around -- it's 35- and change or 36-.  Sure.

4    Q    And you as trustee obtained a prejudgment remedy of

5    attachment against HK USA, correct?

6    A    Correct.

7    Q    And have you attached the funds that are in the escrow

8    account?

9    A    I'm -- well, I'm not sure we've perfected this

10   attachment, but certainly that was the intent.

11   Q    Okay.  Did you attach the funds that you're holding,

12   the $3 million?

13   A    I'm not sure I would -- we would do that given that

14   we're -- I'm the account holder, but --

15   Q    Okay.  But you're not going to give anybody that money,

16   right?  I mean --

17   A    No.  That's correct.

18   Q    All right.  So there's $36 million.  33 million is in

19   escrow.  You're holding 3 million.  The 33 may or may not be

20   attached.  But we can agree that it will not be released at

21   least subject to the terms of the escrow agreement and court

22   order, correct?

23   A    Well, I'm not sure the escrow agreement governs, but it

24   will not be released without the Court directing that it be

25   released.

1    Q    Okay.  So would you agree with me that Paul Hastings

2    invoices, the fee application through February of 2023, to

3    the extent that you are successful on appeal of the Court's

4    order granting you summary judgment on the second

5    counterclaim, is secure?

6    A    Well, that depends as to the continuing burn rate

7    and -- for us and the other professionals in the case.

8    Q    Well, your counsel estimated three to six months

9    conservatively for the appeal to run its course.  From July

10   to February -- which you would agree with me is nine months?

11   A    Yes.

12   Q    I mean, maybe I'm off.

13   A    But that was before the district court.  But go ahead.

14   Yes.

15   Q    Actually, I am off.  It's not nine months.  It's eight

16   months.  So it's two-thirds of a year, right?

17   A    Okay.

18   Q    And so there's $12 million -- $12.6 million in fees.

19   So Paul Hastings has been incurring about $6.3 million every

20   four months, right?

21   A    I'm not sure you can do it like that, because there are

22   peaks and valleys.  But I'm not sure what your question is

23   precisely.  I can't tell you precisely how much would be

24   owed -- incurred during that time.  Because if there's a

25   trial, that's a lot more.  It depends on what's happening in

1    the case.

2    Q    All right.  So let's just assume that this appeal takes

3    six months for purposes of my question.  Okay?

4    A    So this is the appeal before the district court or the

5    Second Circuit?

6    Q    Correct.  So it's the -- what I'm asking you now about

7    is the appeal of the order granting summary judgment on the

8    second counterclaim --

9    A    Uh-huh.

10   Q    -- which found that HK is the debtor's alter ego.

11   That's what I'm asking you about.  Okay?  That appeal.

12   A    Correct.  Yeah.

13   Q    So if that appeal, which has already been filed, takes

14   six months, presumably it's done in December of 2023.  Okay?

15   You agree with me from June to December is six months?

16   A    Yeah.  I agree with that.  Yes.

17   Q    Okay.  Thank you.  So if you win that appeal, there's

18   $33 million, right?

19   A    Well, you're assuming that you're not going to appeal

20   to the Second Circuit?

21   Q    Even if we do, if you win that appeal, there's $33

22   million, correct?

23   A    I'm not sure that's correct.  Meaning if you appeal to

24   the Second Circuit, that could be another year.  And then

25   God knows -- another year plus.

1    Q    So do you believe -- and we have $36 million in total,

2    33- plus the 3- you're holding.  Okay?  Do you believe that

3    even if we appealed, we being HK, so HKI appeals, it loses

4    at the district court, it appeals to the Second Circuit, the

5    appeals take 18 months -- you currently have $12.6 million

6    in fees.  Okay?  Do you believe that within the next 18

7    months Paul Hastings will incur another $25 million in fees?

8    A    No.  But I don't agree with your premise that it's

9    going to be that short.  The Second Circuit -- I know of

10   cases that took a year-and-a-half to have a decision.

11   Q    Okay.  So you do agree with me that there is a pot of

12   money that Paul Hastings could look to, to get its fees at

13   some point in time, if it is successful on appeal, correct?

14   A    Again, it depends on the length of the appeal process.

15   Q    Well, it doesn't depend on the length of the appeal

16   process.  It just depends on you, the trustee, being

17   successful in the appeal, correct?

18   A    No, no.  But --

19   Q    I'm not asking you about the timing, Trustee Despins.

20   I'm asking you -- there's $36 million that could be used to

21   pay professional fees, assuming you win on appeal, right?

22   A    Yes.  But that doesn't mean I don't have the exposure

23   in the meantime, because the appeal process could last

24   years.

25   Q    So let's talk about the other -- you mentioned hard

1    assets.  So we have the Lady May, the Lady May II, correct?

2    And you're in the process of seeking bankruptcy court

3    approval to sell those assets, right?

4    A    Correct.

5    Q    And you have The Sherry-Netherland apartment.  And are

6    you seeking a buyer for that at this point in time?

7    A    Yes, we are.

8    Q    And do you have an estimate as to how much you think

9    you might be able to get for that?

10   A    That's unclear.  It depends on the insurance coverage

11   issue, meaning whether we prevail on that issue, it would be

12   a major differential in terms of recovery for that asset.

13   Q    Okay.  So the Lady May, the -- I believe the offer in

14   the motion to -- per the sale was $24 million.  Does that

15   sound right?

16   A    That's correct.

17   Q    Okay.  And so do you have a ballpark as to what you

18   think you might be able to get for the apartment?

19   A    As I said, it depends on the insurance coverage,

20   whether you sell it as is.  Because there's no insurance

21   coverage, or you can sell it to someone saying there is

22   insurance to rebuild it to the way it was or to the standard

23   that it was.  The price is -- the differential is massive.

24   Q    Okay.  So would it ever be zero, in your mind?

25   A    That's a complex question, because -- no, you would

1    never sell it for zero.  The question is, do you pocket more

2    than zero.  That depends on insurance coverage.

3    Q    What are the other hard assets that you're aware of?

4    A    Well, did we mention the Greenwich house?

5    Q    Not yet.

6    A    Okay.  So there would be that.  There would be the

7    claims against the daughter -- the debtor's daughter for the

8    airplane proceeds which are north of $10 million.

9    Q    Okay.  And the -- do you have an idea as to how much

10   you believe the Greenwich house is worth?

11          MR. BASSETT:  Just I'm going to lodge an objection

12   only because to the extent the trustee is going to be

13   selling these assets, I don't know in a non-confidential

14   setting if we want the trustee telling the world what he

15   thinks they're worth.

16          THE COURT:  First of all, Attorney Bassett, I

17   couldn't -- could barely hear you.

18          MR. BASSETT:  I'm sorry.

19          THE COURT:  But I did hear you, so that -- I did

20   hear you.  So just be --

21          MR. BASSETT:  I'm sorry.

22          THE COURT:  Just try to make sure that we can hear

23   you, number one.  Number two, I'm not sure how this is -- I

24   think this is beyond the scope of direct at this point.

25   We're not -- we didn't have a direct examination about what

1    the other assets would be worth.  The direct examination was

2    about what would the harm be that would -- what harm would

3    be suffered by the trustee and the estate if a stay is

4    issued.  So I think you got to wrap this up, Attorney

5    Moriarty.

6           MR. MORIARTY:  So, Your Honor, I agree with you.

7    That was the line of questioning.  And what I am trying to

8    elicit from the witness is there are a number of additional

9    assets that he's identified that have value.  So there's --

10          THE COURT:  But that's not what he talked about.

11   He talked about on direct examination the harm that would be

12   suffered was that he -- that his firm would not be paid for

13   the services that they had rendered.  This is what he

14   testified about.  And that it would impact the ability to

15   retain associates, because his firm is a for-profit-making

16   business, like everyone's firm in this courtroom is.  And

17   that he can't continue to be in control of the associates in

18   a case where attorneys are not getting paid.  And that the

19   associates know every aspect of the case.  And Paul Hastings

20   does not take on cases on a contingency basis.

21          And when Attorney Bassett asked him if there was

22   anything else that he would do with the money other than pay

23   the administrative expenses of the estate and possibly

24   retain a financial expert to trace the funds, then that --

25   Trustee Despins talked about that there were other assets --

1    he thinks there's other assets out there and what would he

2    do with the funds if he had them after the payment of

3    administrative expenses.  And he said he would invest them.

4            And he would invest them in treasury bills.

5    Because as of right now, they incur 5 percent interest.  And

6    the -- and the funds in the escrow account right now are

7    incurring -- are about .5 (sic) percent interest.

8            And that's what he talked about.  He talked about

9    going to other jurisdictions, maybe getting other assets.

10   He didn't talk about the value of any assets.  He didn't

11   talk about what it is that he thinks that the -- that those

12   assets could be sold for.  He talked about what he was doing

13   with regard to the investigation of the estate and how he

14   needs funds to do that.

15           So I do think you're -- I'll give you one or two

16   more questions, but then I think you're getting beyond the

17   scope of direct examination.

18           MR. MORIARTY:  All right.  And, Your Honor, I

19   heard Attorney Despins' testimony.  I give you credit for a

20   good summary of what he testified to.  But the theme of his

21   testimony was we need this money, because it's all we have.

22   And my questions go to the fact that there are other

23   potential assets.  He's in the process of selling those.

24   They're going to create additional cash.  So this is not the

25   only pot of money.

1    THE COURT:  How is that relevant to your stay

2    pending appeal?  The questions were all about what's the

3    harm.  He told you what his harm is.

4         You may disagree with his harm.  But that -- how

5    is it relevant to your getting a stay pending appeal?

6         MR. MORIARTY:  If there's other assets that can be

7    used, Your Honor, then there's no harm.  His harm is I don't

8    have the ability to pay --

9         THE COURT:  Well, you --

10        MR. MORIARTY:  -- which --

11        THE COURT:  The other assets that you're talking

12   about, including the Lady May, you've already -- that's on

13   appeal too, isn't it?

14        MR. MORIARTY:  It is on appeal.

15        THE COURT:  Yeah.  So then your argument doesn't

16   really make sense, because then you're going to make the

17   same argument when you come to the Lady May.

18        MR. MORIARTY:  Well, Your Honor, I don't know that

19   I could make the same argument continuously, because at some

20   point in time it becomes self-defeating.  But for now, it's

21   not.  But I will move on.  Okay.

22   BY MR. MORIARTY:

23   Q    So, Attorney Despins, the professionals that you

24   haven't hired yet, those would be, for example, accountants,

25   right?

Ho Wan Kwok - June 13, 2023                                        36

1    A    Yeah.  AlixPartners is something like that.

2    Q    Okay.  So has any professional that you have inquired

3    about to engage for the estate refused an engagement because

4    there's no cash immediately available to pay them?

5    A    Yes.

6    Q    Okay.  Who is that?

7    A    AlixPartners.

8    Q    Okay.  Anybody else?

9    A    No.  I have not had the discussion with anybody else.

10   Q    So was Alix -- what were you -- well, withdraw that.

11   Is AlixPartners the only professional firm that you've

12   spoken to about engagement for asset tracing?

13   A    To date, yes.

14   Q    Okay.  So no other firm has -- no other firm related to

15   asset tracing or accounting-type work has refused to perform

16   services because there's no cash immediately available in

17   the estate?

18   A    Well, I have not talked to any other firms, so --

19   Q    Okay.  And you testified that information gets stale.

20   Do you recall that testimony?

21   A    Correct.

22   Q    Okay.  But you've only spoken to one firm about taking

23   on the type of engagement where they would be tracing funds.

24   Is that correct?

25   A    Yes.

Fiore Reporting and Transcription Service, Inc.

1    Q    Okay.  And when you said the information gets stale,

2    you were referring to the fact that you need additional

3    professionals in order to avoid having that information get

4    stale, correct?

5    A    I was referring to I need money to hire

6    professionals --

7    Q    Okay.

8    A    -- to do that.

9    Q    Okay.  Mr. Linsey is your Connecticut counsel in this

10   case?

11   A    Yes, he is.

12   Q    Okay.  And has his firm refused to perform any tasks

13   that you've asked them to perform because they haven't been

14   paid yet?

15   A    No.

16   Q    Okay.  Have you asked Mr. Linsey's firm to perform any

17   additional services for the estate because your firm is

18   apparently making a decision that associates should be doing

19   other work for paying clients?

20   A    No, I have not had the discussion with Mr. Linsey about

21   that.

22   Q    And the associates at Paul Hastings that have been

23   working on this case, the junior mid-level associates who

24   may be pulled off of it, does Paul Hastings, the firm,

25   understand that you have obtained summary judgment on the

1    Lady May account and also on the escrow account and that

2    between the two of those it's -- if you're successful in

3    selling the Lady May and you're successful in getting these

4    funds, $60 million to the estate?

5    A    Well, they are aware of the progress of the case.

6    Q    Okay.  And they're aware that there's potentially $60

7    million that could be coming into the estate at some point

8    in time this year?

9    A    You mean if you're not getting a stay pending appeal

10   or -- I'm not sure I -- meaning -- the fact that it comes

11   into the estate doesn't help us if we can't get paid.

12   That's the issue.

13   Q    All right.  So you haven't -- have you had discussions

14   with anybody at Paul Hastings, a decision maker, the

15   chairman of the firm where you said I understand why you

16   want to move my associates off of this case --

17   A    By the way, I didn't say he -- let's be careful.  I

18   didn't say that he said that he was moving associates.  I

19   said what's going to happen if we don't get paid is

20   something along those lines, but --

21   Q    Okay.  And when is that going to happen?

22   A    Well, it's going to happen -- you know, the target was

23   to get paid by the end of June.  And if it doesn't happen, I

24   don't know what's -- you know, what's going to happen.  But

25   I know for a fact that -- because I'm in management of my

1    department that we -- I cannot argue with other people that

2    need associates that they should not get them when I have a

3    case on which they are where we're not getting paid.  It's a

4    losing argument for me to make that point.

5    Q    Okay.  But sitting here right now, you cannot put a

6    date as to when or even if these associates will be moved if

7    Paul Hastings doesn't get paid by the end of June, correct?

8    A    It's a matter of weeks.

9            MR. MORIARTY:  Okay.  I have nothing further.

10           THE COURT:  Thank you.

11           Any redirect?

12           MR. BASSETT:  No, Your Honor.

13           THE COURT:  Okay.  Thank you, Trustee Despins.

14   You can step down.

15           Any further evidence, Mr. Bassett?

16           MR. BASSETT:  No, Your Honor.  Thank you.

17           THE COURT:  Okay.  Thank you.  So then

18   Mr. Moriarty is going to argue the motion first, and then

19   you will respond.

20           MR. BASSETT:  Yes.

21           THE COURT:  Okay.  Thank you.

22           Go ahead, Attorney Moriarty.

23           MR. MORIARTY:  Thank you, Your Honor.  So as Your

24   Honor is aware, this is a motion for stay filed by HK

25   International Funds Investments (USA) Limited, LLC and

1    Ms. Guo to stay enforcement of the judgment that the Court

2    entered on the second count of the trustee's counterclaims.

3              THE COURT:  May I just stop you for one second?

4    And I don't mean to interrupt.  When you gave your

5    appearance, you only gave your appearance for HK

6    International.  Are you also appearing for Mei Guo in

7    connection with this motion?  I just want to be clear for

8    the record.

9              MR. MORIARTY:  Yes, Your Honor.  And if I did not

10   do that, that is obviously my fault --

11             THE COURT:  That's fine.

12             MR. MORIARTY:  -- and I apologize for that.

13             THE COURT:  And I could have misheard you.  But I

14   just want to be clear for the record.  Okay?

15             MR. MORIARTY:  I appreciate that.

16             THE COURT:  Thank you.

17             MR. MORIARTY:  Thank you.  And so, to be really

18   clear for the record, I announce my appearance in two

19   adversary proceedings.  Ms. Guo I do not believe is a

20   defendant in the U.S. Bank adversary proceeding.

21             THE COURT:  Okay.  All right.  Thank you.

22             MR. MORIARTY:  Yes.  So the Court, as Your Honor's

23   aware, entered a judgment on the second counterclaim finding

24   that HK USA is the alter ego of the debtor, and the trustee

25   is entitled to the property of HK USA.  And so what my

1    clients are seeking is a stay pending appeal.  The appeal

2    has already been filed.  My clients have filed their list of

3    the record, that's not the proper term, but as well as their

4    issues on appeal.

5            I believe the trustee's filing is due in about ten

6    days or so, give or take.  And then briefing will commence

7    within 30 days from that date.  So this appeal will probably

8    be fully briefed sometime -- assuming no extensions,

9    sometime in mid to late August.

10           So as Your Honor is aware from having heard in

11   this case and multiple other cases motions for stay pending

12   appeal, there are four factors that courts look to in the

13   Second Circuit in determining whether a stay should be

14   granted pending appeal.  The first factor is the probability

15   or possibility of success on the merits or serious legal

16   questions going to the merits.  And so in this particular

17   case, the crux of the decision is the debtor is the owner of

18   the Lady May and the Lady May II.  And I understand.  I read

19   the decision again this morning.  There are other facts in

20   there.  But everything flows from the finding on the first

21   counterclaim that the debtor is the owner of the Lady May

22   and the Lady May II.  Because if he wasn't, then none of the

23   other factors would be indicia of alter ego as it relates to

24   the debtor.  They might be indicia of alter ego, but the

25   debtor would have no connection to HK USA.

1          So if we are successful, and by we I mean my

2     clients, in convincing the district court that res judicata

3     should not have applied, because that was the sole

4     purpose -- or the sole basis for granting summary judgment

5     on Count 1, res judicata as it related to Justice Ostrager's

6     decision in New York, if res judicata was not applicable,

7     then summary judgment should not have entered on Count 2,

8     because  there would be, at least at a minimum, issues of

9     material fact.

10          The second factor is irreparable injury, and it's

11     the balances of the hardship tipping in favor of the

12     movement or injury to the movement if the stay is denied.

13     So in this case, we have, as you heard from Trustee Despins'

14     testimony, $36 million.  33- in escrow.  He's holding 3-.

15          And we know from Trustee Despins' testimony that

16     as soon as the trustee has access to that money, it is going

17     to be spent, $12.6 million, assuming the Court grants the

18     fee application in total.  Maybe it will be less.  But $12.6

19     million is what Paul Hastings has asked for.

20          I believe Mr. Linsey's firm has asked for

21     $550,000.  So that's already north of 13 million.  There's

22     other professionals that, to the extent they haven't, will

23     be submitting fee applications.

24          So immediately upon that money being released to

25     the trustee, without a stay, $13 million, plus or minus, is

1    going to be spent.  If HK USA is successful on appeal, that

2    money was never property of the estate, and it should not

3    have been spent to pay administrative fees.  So HK USA is

4    then in the position of having to come back and seek

5    disgorgement.

6              Now, maybe Trustee Despins' law firm immediately

7    pays it back.  Maybe they don't.  Maybe Mr. Linsey's firm

8    does.  Maybe they don't.  Other professionals, there could

9    be additional litigation, additional motion practice.  But

10   HK USA is going to be in the position of having successfully

11   appealed a judgment and now being able to recover, at least

12   initially, maybe two-thirds of that money, maybe a little

13   bit less.

14             So there will be harm to HK.  If everybody agrees

15   it can be disgorged, then maybe that harm's not irreparable.

16   But if we start to deal with creditor claims, if we have

17   other professionals who are coming in and they're doing

18   one-off projects -- Trustee Despins has retained counsel

19   down in the BVI.  So they file a fee application.  They get

20   paid.  Does HK then have to go to the BVI and chase them?

21             So there's a lot of factors that go into this.

22   And there will be harm, irreparable harm, to HK, because it

23   is going to have to chase its own money if it's successful

24   on appeal.  If it's not successful on appeal, then no harm,

25   no foul.  But that brings me to --

1            THE COURT:  Do you have a case that says that

2      irreparable harm exists when the remedy is money, when

3      there's --

4            MR. MORIARTY:  I do not, Your Honor.

5            THE COURT:  -- when there's a remedy at law?

6            MR. MORIARTY:  No, because that is not the law.

7      And I agree with Your Honor that that's not the law, that if

8      you can -- that if money damages can make you whole, then

9      you haven't be -- been irreparably harmed.

10           I will note for the Court that the trustee cited

11     in his opposition yesterday, and this is at page 12, In Re

12     Tribune Company, which is 477 B.R. 465.  It's a Bankruptcy

13     District of Delaware 2012.

14           THE COURT:  Yep.

15           MR. MORIARTY:  And in that case, the Court

16     discusses the fact that other courts have held, and it

17     wasn't the holding in this case, because it wasn't

18     necessarily at issue, but other courts have held that if a

19     stay is not granted, and as a result additional litigation

20     is likely to occur if the appellant is successful, that

21     could be irreparable harm.

22           So in this case, if HK is successful and HK has to

23     come back, and it has to file lawsuits, it has to engage in

24     motion practice to get its money back which the estate

25     should have never had in the first place, that would be

1    irreparable harm.

2            The third point is substantial injury to the party

3    opposing a stay.  We just heard Attorney Despins' testimony

4    as far as retention of other professionals.  There was a lot

5    of argument in the opposition brief that Attorney Despins

6    was unable to hire other professionals, because there's no

7    money in the estate.  He told us that there was one firm

8    that refused an engagement.  And he hasn't sought to retain

9    anybody else.

10            And to the extent that evidence is really getting

11   stale and these professionals are that important, he should

12   be talking to others.  Nobody else has said, no, there's $33

13   million in an escrow account that the Court has held is

14   property of the estate.  There's the Lady May that the Court

15   has held is property of the estate.  There's tens of

16   millions of dollars potentially coming into this estate.

17            I find it hard to believe that the trustee cannot

18   find a professional firm to work with him in this bankruptcy

19   case.  And we know from his testimony that he's only spoken

20   to one.

21            As far as the associates at Paul Hastings, you

22   know, maybe they're going to be taken off the case.  Maybe

23   they're not.  We don't have a date.  We don't know whether

24   there's other associates that can come in and work.

25            You know, I don't doubt Attorney Despins'

1    testimony that Paul Hastings would like to be able to

2    recover the money that its associates are billing, because

3    it's paying its associates.  But he didn't tell us this is a

4    drop-dead date.  He even said towards the end of his

5    testimony I don't know.  And if the Court goes back and

6    reads the transcript, you will see that.

7            Mr. Linsey's firm has not refused to do any work.

8    Trustee Despins has not asked Attorney Linsey's firm to take

9    on any additional responsibilities, even though we know from

10   the fee application that Attorney Linsey's fees firms (sic)

11   are 20 times less than the trustee's fees.

12           The trustee testified on direct that he's

13   optimistic about recovery of other assets.  Certainly he

14   could sell that to professionals that he's looking to hire.

15           As far as the amount of interest on the money that

16   the trustee could make if it was invested in T-Bills as

17   opposed to with U.S. Bank, I would have to ask my client,

18   but I would venture to guess that my clients would not be

19   opposed to that money being put into a product that was

20   riskless.  Because we're not defaulting on the debt anymore

21   and was earning 5 percent interest.

22           So we could address that issue by agreement.  I am

23   confident of that.  The last factor, Your Honor, is --

24           THE COURT:  Well, let me stop you right there on

25   that.

1          MR. MORIARTY:  Sure.

2          THE COURT:  So you're saying your clients would

3     agree for the money to come out of escrow and be put in some

4     form of an investment that would earn 5 percent?

5          MR. MORIARTY:  I'm saying that my -- I'm saying

6     that I would recommend to my clients --

7          THE COURT:  Okay.

8          MR. MORIARTY:  -- that subject to --

9          THE COURT:  Have you done that yet?

10         MR. MORIARTY:  I haven't, because I haven't had a

11    chance to have the discussion.  I'm not going to tell Your

12    Honor what the discussions were, but there were discussions

13    between --

14         THE COURT:  I'm not asking for you to tell me what

15    the --

16         MR. MORIARTY:  -- my office and the trustee this

17    morning.

18         THE COURT:  -- the discussions were.

19         MR. MORIARTY:  So --

20         THE COURT:  I'm asking, have you asked your

21    client.  You just made a representation on the record during

22    your oral argument that you think you could work out an

23    arrangement, that's what you just said, that the $36 million

24    or 33 -- I don't know if you put the 3 in, whatever -- your

25    clients would agree, that's what you just said, to put that

1   into some form of a product that would earn 5 percent.

2   Which you've already said you don't want the money out of

3   escrow.  Now you're saying you will do that with an

4   agreement.  So I need to understand.  What's your position?

5             MR. MORIARTY:  Okay.  And I will explain it, Your

6   Honor.  And if I haven't articulated it well, I apologize to

7   the Court.

8             THE COURT:  It's okay.

9             MR. MORIARTY:  I believe I started by saying, and

10  if I didn't, I should have said, that I haven't had this

11  discussion with my client yet, but I would recommend to my

12  client that subject to the terms of the escrow agreement

13  that the money could be put into a

14  higher-interest-rate-earning product that is safe, which is

15  what the --

16            THE COURT:  Well, I don't understand that, subject

17  to the terms of the escrow agreement.  It's either going to

18  be in escrow, or it's not.

19            MR. MORIARTY:  But it could be in escrow earning a

20  higher rate of return, or it could be with the Court.  It

21  could be with the trustee.  But it could still be subject to

22  the terms of the escrow agreement.

23            In other words, the money is sitting somewhere

24  other than with the escrow agent, but the terms of the

25  escrow agreement as to when and -- when and if it comes out

1    would still be applicable.

2            THE COURT:  Well, that doesn't --

3            MR. MORIARTY:  That's what I'm saying.

4            THE COURT:  I don't think that works.  So you can

5    have that conversation, but I don't see how that could

6    possibly work.

7            MR. MORIARTY:  Okay.  So the public interest is

8    the last factor.  And in this particular case, what we're

9    talking about is do we have a stay pending appeal.  The

10   appeal is done in hopefully six months, give or take.  We

11   have an order.  And the money gets disbursed, either back to

12   HK or to the trustee.  Or do we do this in a piecemeal

13   fashion where the trustee gets access to the funds, the

14   trustee then spends them down.  HK is successful on appeal,

15   and HK then has to come back to the Court, seek disgorgement

16   of fees that were paid to the professionals of the trustee.

17           So the public interest here is in finality and

18   efficiency.  Enter a stay.  Let's let the appeal play out.

19   If the trustee is successful, the trustee gets paid.  If the

20   trustee is not successful, that was never money of the

21   estate in the first instance to pay the trustee.

22           If the Court has any questions, I'm happy to

23   answer them.

24           THE COURT:  I don't have any at the moment.  Thank

25   you.

1        MR. MORIARTY:  Thank you.

2        THE COURT:  Attorney Bassett?

3        MR. BASSETT:  Yes, Your Honor.  Again, Your Honor,

4   for the record, Nick Bassett from Paul Hastings on behalf of

5   the Chapter 11 Trustee.

6        Your Honor, I think it is critically important

7   that we reorient and start from the baseline proposition

8   that a stay pending appeal from this Court is extraordinary

9   relief for which the appellant seeking the stay bears a

10  heavy burden.  I think the case law is clear in that regard.

11  We cite it in our objection.

12       What this means is that the general rule for

13  purposes of establishing finality and certainty in

14  bankruptcy cases is that an order of the Bankruptcy Court is

15  immediately enforceable, and the Court should only deviate

16  from that rule in extraordinary circumstances.

17       Now, I would submit that in this case the stay

18  that the appellants are seeking of the May 18th summary

19  judgment order is especially extraordinary given all the

20  facts and circumstances of this bankruptcy.  We talk about

21  this a lot when we're before the Court, and we talk about

22  the history of these cases, where we started, how we got

23  here.

24       But, Your Honor, it really, in my view, cannot be

25  emphasized enough that this is a case involving a debtor who

1    filed Chapter 11 before this Court voluntarily, I think a

2    year and a half ago or so now, claiming, as we've been able

3    to demonstrate falsely, that he has zero dollars to his name

4    and essentially no assets or money to put on his schedules.

5    Instead, what you have is the debtor, with the assistance of

6    his associates and his family members such as the HK

7    parties, who have been withholding property that is

8    rightfully property of the estate and always should have

9    been from the moment this case was commenced.

10            So what does that mean?  It means effectively that

11    the HK parties and the debtor on whose behest they're acting

12    have effectively had a stay pending appeal for the duration

13    of this case, holding its professionals, Paul Hastings and

14    others, hostage, because there are allegedly no assets at

15    all in this estate.  Now, despite all the odds and despite

16    having to fight against obstruction in the investigation

17    that we've experienced over and over again, the trustee has

18    made progress.  And that progress became tangible when the

19    Court entered its orders on summary judgment in the HK USA

20    adversary proceeding as to the Lady May and as to the escrow

21    funds.

22            So to allow at this stage, a year and a half into

23    this case, after this case has never had a -- virtually a

24    dollar of funding, for the HK parties to say, you know what,

25    we want a further stay pending appeal, we want to further

1    deprive this estate from having any funding whatsoever to do

2    the types of things that Mr. Despins testified about, I

3    think, calls for the Court to apply extraordinarily high

4    scrutiny to the request that's being sought and to make

5    absolutely sure that before any stay is granted the

6    appellants have satisfied every element of their burden.

7           And I want to be clear as to the factors that

8    Mr. Moriarty went through.  The appellants bear the burden

9    on each one of those factors.  I think we often talk about

10   it and kind of reorient ourselves where it may seem like the

11   burden all of a sudden is on the trustee.  Yes, we chose to

12   put the trustee on the witness stand to talk about the harm

13   to the estate of a stay pending appeal, because we think

14   that's important and because we think it's important for the

15   Court to hear from the trustee.

16          But make no mistake.  It's still the appellant's

17   burden even as to that element to prove that this estate and

18   the other non-appellant parties will not be harmed by a stay

19   pending appeal.  And I submit they have not made their --

20   they have not met their burden on that factor, and they have

21   not met their burden on any of the other factors.

22          Now, to start with the likelihood of success on

23   the merits prong.  I won't belabor this point.  I think the

24   Court obviously knows its decision well.  I can't remember

25   exactly when we had the hearing on the second motion for

1    summary judgment and how long it took for the Court to issue

2    its decision, but it was certainly several weeks.  And the

3    result on May 18th was, what I would submit, a very

4    thoroughly reasoned decision supported by the law and an

5    abundant factual record based on undisputed facts, many of

6    which have been admitted by the HK parties.

7              And Mr. Moriarty in his brief remarks on

8    likelihood of success focused on this argument, which is

9    also the focus of their papers, that, you know, this

10   decision is likely to be overturned on appeal, because it

11   all rests on collateral estoppel.  Just two quick responses

12   to that.

13             First, that's a mischaracterization of Your

14   Honor's decision.  I went back and pulled it as Mr. Moriarty

15   was talking.  And on page 21 of the May 18th decision, the

16   Court starts a lengthy, detailed paragraph with the line:

17   "Beyond the application of collateral estoppel, the record

18   of this case supports the conclusion that the individual

19   debtor beneficially owns and controls the Lady May and the

20   Lady May II."  And goes on and talks about testimony that

21   the daughter has given, other admitted facts about HK USA

22   and its relationship to the debtor.

23             There is a robust factual record beyond collateral

24   estoppel.  But even as to the issue of collateral estoppel,

25   it was more than appropriate for the Court to rely on that

1    decision, because it's a critically important decision in

2    that it established that the Lady May is, in fact, owned and

3    controlled by the debtor, which of course is central to the

4    question of the alter ego relationship when HK USA

5    admittedly does nothing else other than own the Lady May.

6            And that decision itself, which is not subject, I

7    would note, to a parallel motion for stay pending appeal,

8    was also itself thoroughly reasoned based on applicable law

9    on collateral estoppel, based on the fact that Mei Guo

10   participated extensively in the proceedings before Justice

11   Ostrager.

12           So I think for all of those reasons, because both

13   decisions were thoroughly reasoned, because they're both

14   consistent with the law, because the factual record is

15   undisputed about the shell company nature of HK USA, the

16   inextricable ties between HK USA and everything it has ever

17   done, which is own the yachts, and Mr. Kwok, I think it is

18   exceedingly unlikely for the Court to be reversed on appeal.

19   And, again, the burden rests on the appellants to prove

20   otherwise.

21           As to the harm factor, Your Honor, and I'll start

22   with the harm to the HK parties, first of all, they need to

23   demonstrate to the Court, and the case law is clear on this

24   if you look at the cases we cite on page 10 of our

25   objection, paragraph 21, they need to show that the harm

1    that they would suffer absent a stay is irreparable and

2    actual and imminent, not merely speculative.  You know, the

3    mere prospect, as the case law says, of monetary loss is not

4    sufficient for a stay pending appeal.  So I think it's

5    important to put their arguments in the context of the

6    standard that applies and the burden that they need to meet.

7           And before I get to why I think their arguments

8    about not being able to recover the $33 million is

9    speculative, I want to point something out at the outset

10   which we mentioned in our papers, because I think it's

11   important.

12          And this is that the HK parties -- and I'll direct

13   the Court to a letter that Attorney Vartan, other counsel

14   for the HK parties, had sent to the trustee and which has

15   been previously submitted to the Court at Docket 1613.  I

16   believe it's Exhibit A to that filing.

17          The HK parties have taken the position, as made

18   clear in that letter, that the escrow funds are not an asset

19   of HK USA but a liability.  The letter states that point

20   blank.  The escrow funds are a liability of HK USA, not an

21   asset.

22          And, of course, the background for that is that

23   the HK parties had taken the position that they obtained a

24   loan in the amount of the escrow funds from Uncle William

25   and the Himalaya entity that he allegedly controls.  And so,

1    Your Honor, if it's really a liability, the party who's

2    going to be harmed by any dissipation of the $33 million

3    that may occur, if anyone, is Uncle William.  It's not HK

4    USA.

5              As to the arguments that the HK parties will be

6    harmed by the absence of a stay pending appeal, because the

7    $33 million and the repairs are maybe spent on compensating

8    counsel and otherwise, again, that is speculative at best.

9    And the requirement is not merely that they allege the

10   possibility of harm.  They need to show that it's actual and

11   imminent and not speculative.

12             The reason it's speculative is because you heard

13   the trustee testify about all the other assets that he is

14   presently investigating.

15             In fact, Attorney Moriarty was trying to emphasize

16   that for purposes of making another point in his

17   cross-examination of Mr. Despins.  And to the extent that,

18   as the trustee, you know, hopes will be the case, he in the

19   future is able to bring additional assets into these -- this

20   estate, and the appeal finally runs its course, however long

21   it might take -- it could be six months.  It could be 18

22   months.  It could be a very long time.  But at that point,

23   we don't know if there won't be assets in the estate to

24   repay the $33 million if that's the decision that the

25   appellate court reaches.  And that's why their argument to

1    the contrary is entirely speculative and not sufficient to

2    satisfy their burden.

3         The next factor, Your Honor, of course is the harm

4    and the injury to other parties in the event that the stay

5    is granted.  On that, I will refer the Court back to the

6    testimony of the trustee.  I won't repeat everything that he

7    said.  But I think the testimony is un-rebutted.  And also,

8    frankly, it's pretty obvious that any law firm that has been

9    doing this work for as long as Paul Hastings has without

10   being paid, there are eventually going to be issues with

11   proceeding down that path indefinitely.

12        And the trustee made clear he's concerned about

13   losing talented individuals.  And it's not about, you know,

14   if an associate is pulled off onto another case, you know,

15   can we replace that individual with something else.  We have

16   people on the team whose institutional knowledge cannot be

17   replaced, people who are absolutely indispensable.  And it's

18   critical that we continue to have them as part of the team.

19   And that's at serious jeopardy the longer we go, operating

20   in this world where this estate has no money with which to

21   pay any fees of counsel.

22        He also testified about hiring other

23   professionals.  That's real.  I think this -- it should go

24   without saying that in a case like this where we're

25   investigating the type of conduct that the debtor has been

1    accused of engaging in and the types of things that we've

2    already even uncovered and proven to the Court, there's

3    clearly a complex web of shell companies and associates and

4    bank accounts.  It's also clear from the criminal

5    indictment.  Those are all the kinds of things that we need

6    additional advisors to help us do, that lawyers cannot do

7    alone.

8         And the trustee said, which should go without

9    saying, you can't expect to hire those advisors without

10   paying them money.  And it's not just that they, you know,

11   would be -- are being asked to take a flyer and not be paid

12   right away.  They'd also have to sit behind other

13   professionals in the case.  So there are real reasons why it

14   is simply not realistic to believe that an AlixPartners or

15   somebody else would do this without getting paid.  And

16   that's what the trustee has been told.

17        I did want to cite to just -- on this -- on the

18   harm to the estate point, I wanted to cite to a couple of

19   cases that I think are helpful.  One is the In Re Taub case.

20   It's a Bankruptcy Eastern District of New York case from

21   October 2010.  The citation to it is 2010WL3911360.

22        The reason I'm citing to that case is because it's

23   a case where in the context of analyzing the effect of the

24   stay being sought in that case of retention applications to

25   employ professionals, the court acknowledged that the estate

1    would suffer harm by not having the access that it would

2    otherwise have to professionals to run the operations of the

3    estate and do the other things that those professionals

4    would be doing.  I think that is, while a different context,

5    a concept that is instructive here.

6            MR. MORIARTY:  And, Your Honor, I apologize for

7    interrupting Attorney Bassett.  Can I just ask the Court to

8    inquire if those cases are cited in the trustee's papers?

9            THE COURT:  I think he just said it was, but I

10   could be wrong.

11           MR. BASSETT:  The In Re Taub case, I don't know if

12   that case was.  But I think it was certainly cited by cases

13   that we had -- that we had cited.  And it's also something

14   that I looked --

15           THE COURT:  Well, you'll have to provide it to

16   counsel.

17           MR. BASSETT:  Sure.

18           THE COURT:  Okay?  It's --

19           MR. BASSETT:  I'll provide it to counsel.

20           THE COURT:  If it's not in your papers, counsel

21   has to have it.

22           MR. BASSETT:  Sure.  And we -- obviously, Your

23   Honor, we're -- in preparing for the argument today, after

24   having the benefit of the reply brief and the briefing being

25   concluded, we're doing some additional research.  So to the

1    extent we found that case, I wanted to make sure to bring it

2    to the Court's attention.  I will get a copy to

3    Mr. Moriarty.

4         The other -- and this is a general principle that

5    I think is found in a lot of cases, but courts have also

6    held that there is harm to the non-appealing parties, in

7    particular a bankruptcy estate, where as a result of the

8    requested stay creditors will not be paid.  I think that's a

9    concept that is very clearly articulated in the cases that

10   we cited in our papers, including, I believe, Tribune,

11   Adelphia, and others.

12        But there's another example of a case, which I'll

13   give to Mr. Moriarty, that talks about -- this is a 2015

14   decision from the Eastern District of New York, 29 Brooklyn

15   LLC vs. Chesley, 2015WL9255549.  And, again, that was a case

16   where the argument was made that there would not be

17   substantial harm to the estate, because there were funds

18   being held in escrow.  The response from the court was that

19   that argument disregards the well-settled precedent that

20   delay cause to creditors in receiving their payments is a

21   significant harm warranting the denial of a stay.  And,

22   here, Paul Hastings and the other professionals are

23   administrative creditors of this estate.

24        Your Honor, the last factor in the analysis is the

25   public interest.  I'd go back to the comments that I made at

1    the outset.  I think this case is extraordinary in a lot of

2    ways.  And it, to me, is, I think, clear that the public

3    interest does not support a further maintenance of the

4    status quo in this case, which is the debtor being allowed

5    and his associates in the HK parties being allowed to

6    withhold from the estate, from the trustee, from the

7    professionals of the estate that should be compensated by

8    funds, to withhold them from the estate indefinitely when

9    these are assets and property that really should have been

10   listed on the debtor's schedules.

11         And, you know, that's particularly, I think,

12   another -- another reason why this relief is not in the

13   public interest is because the HK parties who, as the Court

14   has found in HK USA is the alter ego of the debtor, and

15   then, of course, his daughter, they are, in effect, being

16   allowed to do the bidding of the debtor, which is to prevent

17   the trustee from getting the funding that he needs to

18   continue his investigation into the debtor's affairs.

19         So when you have a relationship like we have here

20   where the HK USA parties are so inextricably linked to the

21   debtor and have the relationship that they have, it is

22   entirely inequitable to allow them to prevent the trustee

23   from continuing to move forward to investigate the debtor's

24   assets and affairs and find the additional property that

25   he's seeking to locate.

1          The last point I would make, Your Honor, is the

2    point about the bond which Mr. Moriarty did not address but

3    which we addressed in our papers.  We actually talked about

4    this a little bit at the status conference that I believe

5    occurred last week.

6          But under Rule 8007 and the accompanying case law

7    in the Second Circuit, it is very clear that the ordinary

8    requirement for any stay pending appeal is that a bond be

9    posted.  And to the extent that there's going to be any

10   deviation from that requirement, it is the burden of the

11   appellant to argue why a bond is not appropriate.

12         We cite case law in our papers, including the

13   Tribune case and other cases, standing very clearly for the

14   proposition that a bond is appropriate to compensate the

15   estate for the lost opportunity cost involved in not having

16   immediate access to the funds or the immediate ability to

17   execute on whatever judgment has been rendered.

18         Here, the trustee testified about what he would be

19   able to do in terms of investing money from the escrow

20   account if he had access to it to earn a much greater rate

21   of return.  He also talked about using the funds to retain

22   professionals who could conduct the type of investigation

23   that's necessary to find additional material assets to bring

24   into the estate.  And what the trustee said was that based

25   on his experience to date, which involves already

1    identifying and pursuing tens of millions of dollars worth

2    of hard assets that he thinks there are substantial other

3    assets that could be located and could be brought in.

4           The issue, however, is that that information that

5    could lead to the recovery of those assets, in the trustee's

6    view, will or may very likely become stale, meaning that if

7    he waits and we're not able to conduct this type of

8    investigation, which we need the funding to conduct, until

9    after the appeal runs its course, all of those assets that

10   we may otherwise have been able to recover may be gone.

11          And we know that during this case, the debtor and

12   his close associates are, in fact, taking steps to continue

13   to make it more difficult for the trustee to recover assets

14   to which he is entitled, including Ms. Yvette Wang, as the

15   Court has been made aware, transferring her ownership in Ace

16   Decade to an individual in Switzerland after this Court

17   entered an order that that interest was property of the

18   estate.  It's that type of thing that we are very fearful of

19   continuing the longer we wait to conduct this investigation.

20          And while there's no exact science behind putting

21   a figure on a bond, based on everything that we know to

22   date, based on the optimism that the trustee has in its

23   investigation, in our papers we very, very conservatively

24   set that bond at $7 million.  Obviously, it's in the

25   discretion of the Court as to what level to set that.  But,

1    again, we think that particular bond would be imminently

2    defensible and reasonable.

3           But, again, it's only necessary if the Court were

4    even to grant a stay.  And for all the reasons that I've

5    articulated, I think the Court absolutely should not do

6    that, because the HK parties have not met their burden on

7    the four factors.

8           I think that's all I had, Your Honor, but

9    obviously I'm happy to answer any questions.

10          THE COURT:  Okay.  Thank you.  I do not have any

11   questions at this time.

12          MR. BASSETT:  Thank you.

13          THE COURT:  Thank you.

14          Attorney Moriarty, would you like to respond?

15          MR. MORIARTY:  Yes, Your Honor, briefly.

16   Starting, Your Honor, on the issue of the bond, if the Court

17   was going to condition any stay on HK or Ms. Guo posting a

18   bond, the Court would be denying the stay, because HK does

19   not have any assets and could not post a bond.  And

20   Ms. Guo's assets have been enjoined, so she cannot post a

21   bond.  So if the Court were to condition it on 7 million, 6

22   million with respect to HK USA $47.00, the Court would be

23   effectively denying the stay.

24          With respect to the Paul Hastings lawyers and

25   those lawyers -- associates, mid-level associates leaving

1    the team to go do work for other clients, Paul Hastings was

2    retained by the trustee.  Paul Hastings accepted that

3    retention.  Paul Hastings understood when it accepted that

4    retention that there was no money in the estate.

5          Paul Hastings has a duty to represent its client.

6    If Paul Hastings no longer wants to do that, it can

7    withdraw.  But Paul Hastings should not be threatening the

8    trustee with removing attorneys who have all of the

9    institutional knowledge from the case.

10          As far as who the loan is to, its harm to Uncle

11   Willy, first of all, I don't have the letter that Attorney

12   Bassett referred to.  To the extent there was a reference to

13   the loan being a liability of HK, obviously a loan is a

14   liability.  But on a balance sheet, you have to have a

15   corresponding entry.  You can't just have a $37 million

16   liability.  So there would have to be a corresponding entry.

17          But the fact is, is that if this is a legitimate

18   loan -- and until a trier of fact says it is not, it is --

19   there is harm to HK USA that is irreparable by this money

20   being released and spent, because HK USA still has the

21   obligation to pay this loan.

22          And that is all I have, Your Honor.  If you have

23   any questions, I'm happy to answer them.

24          THE COURT:  No, thank you, counsel.  Thank you.

25          Attorney Bassett, any reply?

1          MR. BASSETT:  Very briefly, Your Honor.  Just very

2     briefly on the point that Attorney Moriarty raised about the

3     HK USA loan.  And I -- so, again, this letter was filed on

4     the docket, as I understand it, and I gave the Court the

5     reference earlier.

6          THE COURT:  Well, we can pull it up if you'd like

7     to.

8          MR. BASSETT:  Sure.

9          MR. MORIARTY:  Your Honor, I'm not suggesting that

10    Attorney Bassett was misrepresenting it.  All I said was I

11    didn't have it.

12         THE COURT:  I understand.  But if you'd like to

13    see it, we can see it.

14         MR. MORIARTY:  If he believes it's necessary.

15    It's his argument.

16         MR. BASSETT:  I don't believe it's necessary to

17    pull it up, Your Honor.  I just wanted to --

18         THE COURT:  Okay.

19         MR. BASSETT:  I just wanted to quote directly from

20    it, which is the statement: "HK USA maintains that the

21    escrowed funds are not an asset of the company but a

22    liability which is to be repaid."  That was the position

23    that they took previously, because it suited their interests

24    at the time.  That's been their argument.  And, again, that

25    argument is based on the idea that these funds were loaned

Ho Wan Kwok - June 13, 2023                                    67

1   to HK USA by Uncle William.

2          The Court has now determined that the estate owns

3   HK USA, that HK USA is rather the alter ego of the debtor

4   and, therefore, is property.  And, correspondingly, its

5   liabilities are those of the estate.  So, presumably, Uncle

6   William, if he so chooses, would assert a claim against the

7   estate for whatever he thinks he is owed.

8          But what that does not establish in any way is how

9   the HK parties themselves would be harmed by the trustee

10  being allowed to expend the escrow funds and by there not

11  being a stay.  Mr. Moriarty said that HK USA would remain on

12  the hook.  Again, it's the estate who would be sued.  But I

13  guess if that order is reversed, then he would say that HK

14  USA would.

15         But he also just said that HK USA has no money.

16  So it's not clear to me how there would be any harm suffered

17  by there being a claim against it.

18         So, Your Honor, I don't have any other remarks to

19  add other than to just close by reminding the Court there's

20  a four-factor test.  They have to meet each factor of the

21  test to satisfy their burden.  And it's an extraordinary

22  one.  We don't think this is a close call, and we think the

23  stay should be denied.  Thank you.

24         THE COURT:  Thank you.

25         All right.  We have -- I've now listened to the

1    arguments of counsel.  I reviewed the papers briefly,

2    especially the papers that were just filed.  And now you've

3    both made some arguments that included cases that I -- at

4    least one case, Attorney Bassett, and possibly two that

5    you'd need to provide to opposing counsel.  The evidence

6    that you've submitted, there's no -- no further evidence

7    will be taken by the Court in connection with the motion for

8    stay pending appeal.

9            I'd like to go back and review what occurred today

10   and look again at the cases cited in the briefs.  So the

11   matter will be taken under advisement, and the Court will

12   rule accordingly.  So that addresses the matters on the

13   calendar with regard to the motion for stay pending appeal,

14   which is 227.

15           Now, the other matters that are on today's

16   calendar relate to the pending motion for an order to show

17   cause why the debtor, Mei Guo, and HK USA should not be held

18   in contempt for failure to comply with the 2004 orders; and

19   the motion of the debtor for a limited stay; and then, of

20   course, the status conference on the adversary proceeding

21   commenced by the escrow agent.

22           So how are we proceeding, Trustee Despins?

23           MR. BASSETT:  Your Honor, I think we would take

24   the contempt motion next.

25           THE COURT:  Okay.  Well, we've had argument on

1    both of these motions previously.  Attorney Baldiga, you've

2    argued your position before, correct?  And wasn't --

3              MR. BALDIGA:  Yes.

4              THE COURT:  Weren't we going to find out today

5    what, if anything, you -- the two parties have discussed

6    since our last hearing with regard to what could possibly be

7    an agreed-upon order with regard to this issue?

8              MR. BASSETT:  Approach, Your Honor?  May I

9    approach?

10             THE COURT:  Yes, please.

11             MR. BASSETT:  So just by way of status update, I

12   don't know that there is much else to report from the

13   trustee's perspective other than I can report -- and my

14   recollection is failing me.  I'm not sure if this was filed

15   on the docket or not.  But we did receive from the debtor

16   the response to the list of questions that was part of the

17   order the Court issued.

18             THE COURT:  Okay.  I recall that portion.

19             MR. BASSETT:  Right.  And from the trustee's

20   perspective, that was -- you know, what we received was

21   consistent with the order.  It was the debtor asserting his

22   fifth amendment rights in response to those questions.

23             THE COURT:  To the specific questions?  There

24   were, I thought, maybe a hundred of those or --

25             MR. BASSETT:  Maybe slightly less than that, Your

1    Honor.

2              THE COURT:  Okay.

3              MR. BASSETT:  But, yes.

4              UNIDENTIFIED SPEAKER:  202.

5              THE COURT:  202.

6              MR. BASSETT:  202.  Jeez.  Okay.

7              THE COURT:  Okay.  There you go.

8              MR. BASSETT:  I apologize.  I stand corrected.

9    But, yes, Your Honor.  So we did receive that.  Otherwise, I

10   think from the trustee's perspective we were awaiting any

11   additional --

12             THE COURT:  All right.

13             MR. BASSETT:  -- ruling from the Court.

14             THE COURT:  So the issue is still what, if

15   anything, you would like the Court to do -- well, you would

16   like the Court to have the debtor be compelled to file

17   something in the Southern District of New York criminal

18   proceeding to allow the production that's made to the debtor

19   in the criminal proceeding also be made to the trustee,

20   correct?

21             MR. BASSETT:  That's correct, Your Honor.

22             THE COURT:  Okay.  And, Attorney Baldiga, I think

23   at the last hearing you said that you would agree with most

24   of that but not quite all of that.  That if I -- if the

25   Court were to enter an order requiring you as counsel to the

1    debtor defendant to ask the Southern District of New York,

2    the United States Trustee's Office to produce that

3    information to the debtor that you would do that.  Is that

4    correct?

5              MR. BALDIGA:  We would facilitate and make that

6    request.  Yes, Your Honor.

7              THE COURT:  Okay.  And I think that's the same

8    place we are then with regard to this issue.  The

9    distinction being --

10             MR. BALDIGA:  Yes.

11             THE COURT:  -- the trustee would like me to order

12   that any production made to the debtor shall also be made to

13   the trustee.  And you, Attorney Baldiga, would agree to

14   filing a motion.  Or, well, maybe you didn't agree to that.

15   Maybe you just said you would facilitate.

16             MR. BALDIGA:  No.  We went further than that to

17   say that if that is what the Court so orders, we would both

18   facilitate and file a motion --

19             THE COURT:  Okay.

20             MR. BALDIGA:  -- with the district court, because

21   we do think the district court would need to weigh in on

22   that.

23             THE COURT:  All right.  Well, I obviously wanted

24   to hear from both of you today as to where things stood

25   given where we were at the last hearing.  And I -- and it

1    sounds -- I mean, more than sounds.  You're confirming,

2    Attorney Bassett, that as far as the agreement that we --

3    that you reached last hearing about the specific questions

4    and the invocation of the fifth amendment, you've taken --

5    that's been done, and the trustee is satisfied with that,

6    correct?

7            MR. BASSETT:  That's correct, Your Honor.

8            THE COURT:  Okay.  So I think the issue remains as

9    to whether or not the trustee -- I would agree with the

10   trustee that the Government would produce to the debtor and

11   the debtor would then produce to the trustee versus Attorney

12   Baldiga's argument that there be a waiver of the fifth

13   amendment if the debtor produced directly to the trustee,

14   correct?  That's still your position, correct?

15           MR. BALDIGA:  Yes.

16           THE COURT:  All right.  So then what I have to

17   decide is that issue.

18           MR. BALDIGA:  Yep.

19           THE COURT:  I have to decide whether or not I

20   would enter an order that the production of whatever

21   information in discovery the United States Attorney has that

22   would be provided to the debtor would then require the

23   debtor to produce that to the trustee or whether the

24   debtor -- whether I would require the debtor to file some

25   kind of motion asking -- and I know -- understand your

1    position, Attorney Bassett, that if I enter an order asking

2    or -- not asking, requiring the debtor to file a motion with

3    regard to this discovery issue, your position is, well,

4    they're just going to say I'm not going to do that.

5           MR. BASSETT:  Right.  We have very low confidence

6    in getting the information through that process.  And in our

7    view, if the debtor has access to the information, because

8    it's been produced to him through the disclosure process by

9    the Government in the criminal case, by far the best way for

10   the trustee to get that information and the way, frankly,

11   that we believe we are entitled to receive the information

12   is simply by the debtor then producing the information to

13   the trustee.

14          And I won't belabor the points we had already

15   made, but --

16          THE COURT:  No.  I understand.  I understand.

17          MR. BASSETT:  Yeah.  And --

18          THE COURT:  And Attorney Baldiga's argument is

19   that if he does that, that somehow that'll be a waiver of

20   his fifth amendment privilege.

21          MR. BALDIGA:  We have other arguments.  I guess --

22   Attorney Bassett and I were speaking before the hearing as

23   to whether today would end up being a re-argument of all the

24   things --

25          MR. BASSETT:  No.

Ho Wan Kwok - June 13, 2023                              74

1              MR. BALDIGA:  -- we've already argued and --

2              THE COURT:  No.  I don't want to reargue it.

3              MR. BALDIGA:  Okay.  I just --

4              THE COURT:  I think I understand your positions.

5              MR. BASSETT:  Yeah.

6              MR. BALDIGA:  Yeah.

7              THE COURT:  Right?

8              MR. BALDIGA:  Yes.

9              THE COURT:  And is there anything else you want to

10      tell me?

11             MR. BALDIGA:  Yeah.  I think also, in terms of --

12      we don't know what the Government would say to that.  We

13      think what the Government would say to the trustee's direct

14      request is functionally the same as to what the Government

15      would say as to our request.  So I think they get the same

16      stuff either way.  It's just one way it does implicate fifth

17      amendment rights, and we would not be able to do that.  The

18      other way it doesn't.  But --

19             THE COURT:  Well, what about -- it -- what -- I

20      understand your argument.

21             MR. BALDIGA:  Okay.

22             THE COURT:  So what -- to try to solve this

23      problem, if the Court were to order -- there's -- obviously,

24      there's a few ways this could happen.  But if the Court were

25      to order the debtor to file the motion and then, hopefully,

1    there'd be a response to that one way or another, that if

2    there is a production, Attorney Baldiga, you -- I think one

3    of the things that trustee needs to know is whatever is

4    turned over to the trustee would be the same thing turned

5    over to the debtor.  You don't want -- there doesn't want

6    to -- there -- you don't want to have a gap.

7            I mean, there is a situation if -- you -- you're

8    saying I don't want to turn over to the trustee whatever the

9    Government turns over to us, because it's going to be a

10   waiver of the privilege.  But you'd agree that the

11   Government can turn it over to the trustee.  Well, how do --

12   how does the trustee know that whatever the Government's

13   turning over to the trustee is everything the Government

14   turned over to you?

15           MR. BALDIGA:  I guess the Government could confirm

16   that or not.  I mean --

17           THE COURT:  Or you could confirm that or not,

18   right?

19           MR. BALDIGA:  I don't know -- well, I guess

20   conceivably.  I didn't think that we would be involved in

21   the government's production.

22           THE COURT:  No, no.  I'm not saying in the

23   production.  I'm saying in what you received and what the

24   trustee would receive, right?  The way that -- the argument

25   is, the trustee wants it directly.  You don't want it -- to

1    give it to him directly, because you're worried about

2    waiving a fifth amendment privilege.

3                MR. BALDIGA:  And there are other issues as well.

4    We cannot, for example -- some of the materials that the

5    Government has we can't even see.

6                THE COURT:  And no one -- I don't think anybody's

7    arguing about that.  I haven't heard the trustee -- the

8    trustee just wants --

9                MR. BALDIGA:  Some the debtor cannot see.

10                THE COURT:  -- to have whatever you have.

11                MR. BALDIGA:  Well, but --

12                THE COURT:  Isn't that what you want?

13                MR. BALDIGA:  But, Your Honor --

14                MR. BASSETT:  That is --

15                MR. BALDIGA:  -- I just want to make it very

16    clear.  There are some things that the Government will

17    deliver to my firm that the debtor cannot see.  There's no

18    subpoena for those materials.  In fact, there's no subpoena

19    for anything that we're talking about.  And we have this

20    issue if we don't do this cooperatively, I just don't see

21    how a subpoena gets served.  But we can -- we could deal

22    with that down the road, because we have a long ways to go.

23    That's why we are trying to suggest a consensual way through

24    this.

25                But the debtor will not see what the Government

1    tells us is a very substantial portion of what the

2    Government will produce to us by way of grand jury

3    materials.  The debtor will never see it.  So, no, there

4    won't be a complete overlap.  I don't even think it would be

5    close.

6          MR. BASSETT:  I'm not sure what Attorney Baldiga

7    is suggesting, but I don't know why the debtor having access

8    to the documents or not impacts whether the trustee could

9    have access to the documents.

10         MR. BALDIGA:  Well, because your discovery request

11   is of the debtor.

12         MR. BASSETT:  But if his counsel has the

13   documents, his agents have the documents.  So I don't think

14   that's --

15         MR. BALDIGA:  Well, that's not --

16         MR. BASSETT:  I don't think --

17         MR. BALDIGA:  That's a whole different issue.

18         MR. BASSETT:  I don't think that is a real issue,

19   Your Honor.  But what I do think is the -- what really kind

20   of highlights the issue is that it has never and continues

21   to not make any sense to the trustee that he has this

22   concern about the fifth amendment that applies if the debtor

23   physically gives us the documents or his counsel physically

24   gives us the documents, but that same concern is nonexistent

25   if they are just consenting sight unseen for the Government

1    to provide us the exact same documents.  That's --

2            THE COURT:  Well, they're not going to do that,

3    obviously.

4            MR. BALDIGA:  That's the height of form over

5    substance.

6            THE COURT:  They're not going to consent, though.

7    I mean, that's clear.

8            MR. BASSETT:  Well, no.  I think he's saying they

9    do consent to the Government giving us the documents, which

10   then --

11           MR. BALDIGA:  We're saying --

12           MR. BASSETT:  -- which makes no sense in my mind

13   as to the fifth amendment concern, Your Honor.

14           MR. BALDIGA:  No.  We are satisfied that the fifth

15   amendment is not implicated if the Government were to

16   provide things directly to the trustee.  There could be

17   other issues the Government has, but we would not stand in

18   that way.  And we would ask the Government to do that just

19   as this Court suggested two months ago.

20           MR. BASSETT:  In which case I don't understand the

21   argument.  Because if they're allowing it to happen, it's

22   form over substance.  How could it be any different?  The

23   fact that it's physical --

24           THE COURT:  Well, now we are rearguing what --

25           MR. BALDIGA:  Yeah.

1          MR. BASSETT:  Yes.

2          THE COURT:  -- we've already argued.

3          MR. BALDIGA:  That's right.

4          MR. BASSETT:  Agreed, Your Honor.

5          THE COURT:  Okay?  So I understand where you

6     stand.  There's no real -- there has been some progress in

7     that the questions -- the specific questions have been

8     presented to the debtor, and he's specifically invoked his

9     fifth amendment privilege with regard to every one of those

10    questions, correct?

11         MR. BALDIGA:  Yes.

12         THE COURT:  Okay.  So that's some progress.  I'll

13    have to take the matter under advisement and rule on what

14    I'm going to do.  There is no further progress on that -- on

15    the issues and the positions that you've taken.  So I'll

16    have to rule on it.

17         MR. BALDIGA:  I think so, Your Honor.  I think

18    that's where we are.

19         MR. BASSETT:  Thank you, Your Honor.

20         MR. BALDIGA:  And I think we've had good-faith

21    discussions about this.  It's not for lack of trying.  But I

22    think it is before the Court.

23         THE COURT:  Okay.  Thank you.

24         MR. BALDIGA:  Thank you, Your Honor.

25         THE COURT:  Thank you both.

1          MR. BASSETT:  Thank you.

2          THE COURT:  All right.  The only --

3          MR. BALDIGA:  Your Honor, may I be excused?

4          THE COURT:  Yes, you may.

5          MR. BALDIGA:  Thank you.

6          THE COURT:  Thank you.

7               So the final matter on the calendar today then is

8     the status conference in the adversary proceeding, the

9     interpleader action that's been brought by the escrow agent.

10    Attorney -- Trustee Despins, do you wish to be heard?

11          MR. DESPINS:  Yes, Your Honor.  And basically --

12    let me very transparent about this.  I don't want that

13    proceeding to become a de facto stay that the HK parties

14    get.

15               So I know that Shipman & Goodwin just filed before

16    the hearing a motion regarding what we call the first stage

17    of the interpleader, as Your Honor knows, which is, is the

18    interpleader appropriate or not.  And we -- I've looked at

19    that order, and we're fine with it.  We may have some

20    tweaks.  But, conceptually, we're fine with it.

21               It basically says that they've incurred $45,000 or

22    so in fees.  They want to keep that.  You know, that's the

23    standard language.  And they're out of the case after this.

24    So, basically, it's the first stage of any interpleader.

25               We're okay with that.  We've told that to the

1    Shipman & Goodwin firm from the beginning.

2           So what I do want, though, is the next stage --

3    and I -- and, by the way, I would hope that the debtor is

4    not going to oppose -- or not the debtor or -- the HK

5    parties will not oppose that first stage, the entry of that

6    order discharging U.S. Bank from the case and having the

7    money come into the Court funds.

8           So the next stage is really the -- what do we need

9    to progress towards?  And that's where my argument about I

10   don't want that case to become a de facto stay.  I want -- I

11   would like that to move very quickly.  We're going to --

12   we're ready -- we're going to be ready tomorrow to file a

13   motion for summary judgment on the merits.

14          And they're not -- you know, just to telegraph it

15   to the Court, it's not very complicated, which is Your Honor

16   has already found that this is property of the estate and

17   also directed the HK parties to do everything to transfer

18   the asset.  And it's very simple.  There are two parties to

19   that agreement other than U.S. Bank: the creditors'

20   committee -- and Mr. Goldman is here, and he will tell you

21   that he's prepared to send directions to anyone to give the

22   money to the trustee.  And the other party is HK USA, and

23   they were directed by Your Honor to do whatever is in their

24   power to transfer the money.

25          So they will say, oh, no, no, we have to wait for

1    a final order under Article 4 and all that.  But the point

2    is, the two parties to the agreement can agree together

3    and -- to say we don't want the escrow agreement anymore

4    and, by the way, there's no escrow agreement anymore,

5    because the funds are being put -- placed with the Court.

6          And so, therefore, we want to file a motion for

7    summary judgment to get access to the funds, and we would

8    like -- and we want to discuss the scheduling of that, Your

9    Honor, today.

10          THE COURT:  Well, what about the motion of the --

11    of the  -- of U.S. Bank --

12          MR. DESPINS:  U.S. Bank.

13          THE COURT:  -- by Shipman & Goodwin?  I mean,

14    can't that just be set for a hearing with objection deadline

15    as well?

16          MR. DESPINS:  Well, I would hope that we wouldn't

17    have -- even have to do that, because the -- it's really --

18    the issue is only is the interpleader appropriate.  The

19    trustee agrees with that.  I'm sure the creditors' committee

20    agrees that the interpleader is appropriate.  The only other

21    parties are Mei Guo and the --

22          THE COURT:  Right.  But if the -- if I set a

23    scheduling order that they have to respond to the motion,

24    and then we have a hearing, and I decide one way or

25    another --

Ho Wan Kwok - June 13, 2023                                    83

1              MR. DESPINS:  Yes.

2              THE COURT:  -- that may or may not happen more

3     quickly than a motion for summary judgment process.

4              MR. DESPINS:  Well, the motion for summary

5     judgment would not be on that point.  It would be on the

6     ultimate --

7              THE COURT:  Well, right.  You're going to have to

8     do that anyway.

9              MR. DESPINS:  Yeah.

10             THE COURT:  But right now, we're talking about the

11    money being in escrow, correct?

12             MR. DESPINS:  Correct.  And so I would think that

13    first phase should not be complicated.  Again, it's not

14    opposed by the trustee.  It's not opposed by the creditors'

15    committee.  I would hope that the HK parties don't oppose

16    it.  But if not, there should be a very short scheduling

17    for --

18             THE COURT:  Well, I'm going to require a response

19    from the HK parties.  I mean, I'm going to -- to the motion

20    that was filed by -- everyone on -- everyone other than

21    the -- unless the HK parties are going to stand up right now

22    and tell me they have no opposition to the monies being

23    deposited into the registry of the Court and to discharge

24    the plaintiff from the interpleader action, then I'm going

25    to require a written response.

1          MR. MORIARTY:  So I will stand up, Your Honor, on

2     behalf of the HK parties, and I will tell you that I cannot

3     make that representation right now, because I do not have

4     authority to do so.

5          THE COURT:  Okay.  Well, that's fine.  Then the --

6     there's going to be a short time frame for a response.  This

7     is an adversary proceeding.  The Court can set deadlines in

8     an adversary proceeding with or without a hearing for --

9     under our local rules with regard to motions.  And there's a

10     motion right now that's been filed to deposit the funds into

11     the registry of the Court.  And so that's how we'll proceed.

12          With regard to your summary judgment, go right

13     ahead.  Do you have suggested dates?

14          MR. DESPINS:  Other than as soon as possible, Your

15     Honor.  Because, again, it becomes a de facto stay --

16          THE COURT:  Well, you need to tell me when you're

17     going to file the motion.

18          MR. DESPINS:  Tomorrow.  We'll be ready to file it

19     tomorrow, Your Honor.  By close -- by midnight tomorrow,

20     we'll file our summary judgment motion.

21          THE COURT:  All right.  I need to look at the

22     calendar.

23          MR. DESPINS:  Any chance we could squeeze that in

24     for the 29th?  I know we're already squeezing --

25          THE COURT:  Well, I think I have to give

1    appropriate time frames for a response to summary judgment

2    under the local district court rules and our local rules.

3              MR. DESPINS:  But I thought we could shorten that,

4    Your Honor.

5              THE COURT:  Well, you'd have to file a motion to

6    shorten it, and you'd have to establish why it should be

7    shortened.  And then opposing counsel will have a right to

8    object to your motion for shortening time.  Okay?

9              MR. DESPINS:  We'll do that with our motion for

10   summary judgment then.

11             THE COURT:  All right.  Counsel, so you've heard

12   how they're going to proceed.  You'll be able to file

13   whatever you think is appropriate in response to it.

14             MR. MORIARTY:  Yes, Your Honor.  And just a couple

15   things.  There was some communications between Attorney

16   Despins and Attorney Kindseth in my office this morning

17   regarding this issue and potentially working out a

18   consented-to order that would get us past phase one of this.

19   And, you know, hopefully those discussions will continue.

20             We understand this is an interpleader action, and

21   phase one is really perfunctory.  So we are not going to

22   stand in the way of phase one, assuming the papers are in

23   order.  But if we can get a consented order, it would make

24   this move more quickly.

25             The one thing that I do want to say is I

1    understand Attorney Despins wants to move this, but I

2    believe that the motion to approve the sale of the Lady May

3    is on the 29th.

4              MR. DESPINS:  No.  It's the 26th.

5              MR. MORIARTY:  The 26th?

6              THE COURT:  That's the 26th, I believe.

7              MR. MORIARTY:  Okay.  So between --

8              THE COURT:  I'll check for you.  Hold on.

9              MR. DESPINS:  It's on the 26th, Your Honor.  And

10   on the 29th is the fee application hearing.

11             THE COURT:  Actually, the motion to sell the Lady

12   May is on the 27th.

13             MR. DESPINS:  27th and 28th.  Yeah.

14             THE COURT:  The 26th is the motion to compel a --

15   one of the many motions to compel.  And then the 29th is

16   compensation hearings.

17             MR. MORIARTY:  Yeah.  So I believe today is the

18   13th, but I could be mistaken.  So we're talking about a

19   motion for summary judgment that the HK parties will then

20   have to respond to at the same time that their counsel is

21   addressing motions to compel the sale of HK's asset, the

22   Lady May and the Lady May II, and the fee application are

23   all in the same week.  And now we're going to add a summary

24   judgment motion to the mix.

25             I get that he wants to do this quickly, but --

1           THE COURT:  Well, you don't --

2           MR. MORIARTY:  -- it's just too quick.

3           THE COURT:  I understand what you're saying.  And

4    we haven't seen any motions yet.  So until I see some

5    motions, no dates are going to be set yet.

6           MR. MORIARTY:  Thank you.

7           THE COURT:  Okay?  Thank you.

8           So with regard --

9           MS. WILLIAMS:  Your Honor, may I be heard?

10          THE COURT:  Yes.  Attorney Williams, I was going

11   to ask you to be heard in one second.

12          I just wanted to say that in the courtroom when

13   we're discussing this adversary proceeding, there is a

14   motion for payment, Attorney Moriarty, of -- by the

15   interpleader of the -- and I know you said you don't have

16   authority.  But when you said you were talking about a

17   consensual -- I think you said -- now I apologize.  Who did

18   you say was -- at your office was discussing this?

19          MR. MORIARTY:  It was Attorney Kindseth.

20          THE COURT:  Attorney Kindseth is discussing this

21   with somebody at Paul Hastings?  Is that --

22          MR. MORIARTY:  The trustee.

23          THE COURT:  Okay.  And so there may be some form

24   of a consensual order with regard to the motion that

25   Attorney Williams has filed?

1        MR. MORIARTY:  I will say that there have been

2    discussions around parameters of a consensual motion.  And I

3    expect that those discussions will continue.  I can't -- you

4    know, I don't want to represent to the Court that it's going

5    to happen.  As I did say, to the extent that the

6    interpleader is in order, this is phase one, it's

7    perfunctory, we're not going to stand in the way of it.  If

8    we can agree to a stipulated order, it may move it more

9    quickly.

10        THE COURT:  Well, it certainly would move it more

11   quickly if we had a stipulated order.

12        So let me hear -- may I hear, please, from

13   Attorney Williams?

14        MS. WILLIAMS:  Thank you, Your Honor.  And I

15   apologize for interrupting.  My comment actually directly

16   went to the question regarding phase one.  So as the parties

17   are aware, U.S. Bank as escrow agent has filed a motion to

18   deposit the funds.  My understanding is that there are --

19   there may be discussions regarding a stipulated motion,

20   which it is unclear whether that is a motion to deposit, and

21   a potential consensual order regarding phase one.

22        Statutorily and procedurally, the process would

23   happen through this motion to deposit.  U.S. Bank, as the

24   escrow agent, filed the interpleader action.  We're the

25   interpleader plaintiff.  And, here, what we've essentially

1    done is filed the motion to deposit.

2             And so to the extent that there are any

3    discussions happening in the context of what the proposed

4    order would be as it ties to phase one, our understanding

5    would be that that order would tie directly to our motion to

6    deposit.  And so I didn't know if that was something that we

7    could clarify at this time during the status conference or

8    whether it was something that would be appropriate for the

9    parties to discuss otherwise.  But I just wanted to make

10   sure that this wasn't something that was happening apart

11   from our motion to deposit.

12            THE COURT:  Well, I completely agree.  And I think

13   I've already said that it has to be related to the motion

14   for deposit, which his why I asked Attorney Moriarty what

15   his client's position was.  And he says he doesn't have

16   authority right now but that there are some discussions

17   happening.

18            But I completely agree that U.S. Bank has to be

19   part of these discussions.  And whatever order, if there is

20   a stipulated order, has to be shown to and negotiated with

21   U.S. Bank.  So I -- if I didn't make that clear at the

22   beginning of the status conference, then that is my fault.

23   Because the escrow agent and the interpleader plaintiff is

24   ready, willing, and able to pay the monies over to the Court

25   registry.

1    Now, you all -- do you all understand how the

2    Court registry works?  I mean, just like anything else,

3    there's -- it's a deposit of funds into a registry where,

4    you know, there's some component of interest.  But I

5    don't --

6          MR. DESPINS:  Yes.

7          THE COURT:  But I believe that the Government

8    retains some of that interest.  I mean, I think that's what

9    happens when you deposit funds into the registry, so --

10   which is another reason why if there's some agreement along

11   the line, Attorney Moriarty, after the escrow agent --

12   assuming the escrow agent is out of the picture, that if

13   there's some agreement that there -- that -- where these

14   funds can be placed, even in the short term, that earns

15   money differently, you need to think about that.

16         I have no idea how you're all going to come out

17   with your discussions.  But I don't -- I would be -- it

18   would be hard for me to understand why there wouldn't be an

19   agreement with regard to the motion to deposit funds in the

20   registry in the very near future.  And I mean in the very

21   near future.

22         And then where things go from there would be

23   between the HK parties and the trustee and not -- and the

24   escrow agent would be removed from these issues.  But I

25   absolutely agree with Attorney Williams that whatever you're

1    doing right now has got to be keyed to the motion to deposit

2    funds into the registry of the Court.  Does anyone have any

3    questions or concerns about that?

4          All right.  So, Trustee Despins, what else is

5    there to address this afternoon?  I think we've addressed

6    everything that's on the calendar.

7          MR. BASSETT:  Your Honor, I had one more item to

8    raise kind of by way of a status update, I -- so to speak.

9    As the Court will recall, when we were before Your Honor

10   last Tuesday, I believe it was, one of the motions that we

11   addressed at that time was the trustee's motion to compel

12   2004 discovery from certain parties.  Two of the parties who

13   were subject to that motion were Hudson Diamond entities:

14   Hudson Diamond New York, LLC, and then another entity,

15   Hudson Diamond Holdings, I believe it was.

16         THE COURT:  Yes.  I saw the motion to withdraw the

17   appearance.

18         MR. BASSETT:  Yes.  So --

19         THE COURT:  Is that what you're -- why you're

20   raising the issue?

21         MR. BASSETT:  That's why I'm raising it, Your

22   Honor.  Because I believe the Court entered the order which

23   we had negotiated with Attorney Romney on behalf of both of

24   those parties, and then we learned earlier this week from

25   Attorney Romney that apparently there was a mistake or a

Ho Wan Kwok - June 13, 2023

92

1    miscommunication.  And Ms. Guo, they understand now, is

2    actually not the member of -- the sole member of Hudson

3    Diamond New York, LLC.  And, therefore, they're not her

4    counsel or should not have appeared on her behalf and did

5    not have the authority to enter into that stipulation.

6         I don't know if Attorney Moriarty has more he can

7    add to that, but that's what we understand to be the current

8    state of things.  And based on that, I think we need to

9    address what to do about the motion to compel.

10        THE COURT:  Well, it supposed to be compliance by

11   the 26th, right, or at least some -- or a continuation of

12   the hearing?

13        MR. BASSETT:  Yes.  It was continuation of the

14   hearing with an agreement based on conversations between

15   Mr. Luft and Mr. Vartan that both of these entities would,

16   in fact, fully comply --

17        THE COURT:  Right.

18        MR. BASSETT:  -- with the subpoenas in the

19   interim.

20        THE COURT:  I understand.

21        MR. BASSETT:  And now we've lost one of the

22   entities.

23        THE COURT:  I understand.

24        Attorney Henzy, I saw you stand up.

25        MR. HENZY:  Yeah.  Your Honor, my -- I guess what

Fiore Reporting and Transcription Service, Inc.

1    I'd ask or my suggestion would be that the motion to

2    withdraw that Attorney Romney filed be scheduled and that

3    that be -- that whatever the issues are that they be

4    addressed at that hearing.  But I am aware that motion was

5    filed.

6              THE COURT:  I think it was filed today.

7              MR. HENZY:  Yeah.  I'm aware the motion was filed,

8    and I'm aware that -- of the facts recited in the motion,

9    Your Honor.  But I don't think either Mr. Moriarty or I are

10   familiar with --

11             THE COURT:  I'm not suggesting you would.

12             MR. HENZY:  Yeah.

13             THE COURT:  Okay?  I'm --

14             MR. HENZY:  But I think I would just ask that it

15   be -- that this be addressed when Mr. Romney is here.

16             THE COURT:  Yeah.  I -- we're --

17             MR. HENZY:  Because --

18             THE COURT:  I think we're going to have to set it

19   for a hearing.

20             MR. HENZY:  Okay.

21             THE COURT:  I'm not going to grant it without

22   understanding --

23             MR. HENZY:  Yeah.

24             THE COURT:  -- what's going on and how it's

25   impacting what was an agreed-upon order with regard to

Case 22-50073   Doc 1929   Filed 06/22/23   Entered 06/22/23 16:11:59   Page 94 of 100

Ho Wan Kwok - June 13, 2023                                    94

1   compliance with outstanding discovery and subpoenas.

2            MR. BASSETT:  And, Your Honor, from -- and

3   that's -- obviously, we'll proceed in that manner if the

4   Court would like to do so.  The one thing I would just

5   observe is that I believe the current state of affairs is

6   that no one has appeared in response to our motion to compel

7   on behalf of Hudson Diamond New York, LLC.

8            THE COURT:  Well --

9            MR. BASSETT:  So there --

10           THE COURT:  -- I'm not sure you can say that yet

11   until his appearance is withdrawn.  I mean, court ordered

12   withdrawn.  He's moved to withdraw his appearance.

13           MR. BASSETT:  Understood.

14           THE COURT:  I suppose I could deny that motion.

15           MR. BASSETT:  Understood, Your Honor.  So we'll

16   address it --

17           MR. HENZY:  Yeah.  And I would ask -- just ask

18   that it be sorted out when Mr. Romney is here.  Because --

19           THE COURT:  I have to -- I -- but I understand

20   your point.  I saw the motion filed today.  And I have to do

21   something about it, obviously.

22           MR. BASSETT:  Okay.  Thank you, Your Honor.

23           THE COURT:  Okay?  All right.  Thank you.

24           MR. HENZY:  Thank you, Your Honor.

25           MR. MORIARTY:  The only thing, if I may, that I'll

Fiore Reporting and Transcription Service, Inc.

1    add, Your Honor, is that the motion wasn't filed blindly.  I

2    know I spoke with Attorney Romney this morning.  And he

3    spoke with Attorney Luft yesterday, and he explained to

4    Attorney Luft what had happened and that this motion was

5    going to be filed.

6              THE COURT:  Okay.  I understand that.  The problem

7    is, though, Attorney Romney entered into an agreement when

8    we already had a hearing on a motion for contempt or a

9    motion to -- I can't even keep it straight right now whether

10   we were compelling production or trying to hold him in

11   contempt at that point in time.  But in any event, he

12   entered into an agreement that Hudson -- the Hudson entities

13   were going to produce documents and comply with the subpoena

14   by the continued hearing date.

15             Well, it doesn't seem like that's going to happen

16   now.  And this isn't the first time that -- and I'm not

17   suggesting it's the same, but it's not the first time the

18   Court has been told that there's going to be a rolling

19   production or there's some agreement on production and then

20   there's no agreement on production, and we're set back

21   three, four, five weeks or months.

22             That's not how things are going to work.  And

23   that's -- unfortunately, it sounds like here we go again.

24             MR. HENZY:  Well, I don't -- Your Honor, again,

25   I'd ask that this be sorted out when Mr. Romney is here.

Ho Wan Kwok - June 13, 2023                                          96

1            THE COURT:  I understand your request.

2            MR. HENZY:  Because I don't know that it --

3            THE COURT:  But I've read the motion.

4            MR. HENZY:  Yeah.  I don't know that it is here we

5       go again.

6            THE COURT:  Well, the motion says --

7            MR. HENZY:  And Mr. --

8            THE COURT:  -- I made a mistake; I didn't really

9       represent the person that I told you, Your Honor --

10           MR. HENZY:  Right.

11           THE COURT:  -- and all the other counsel that I

12      swore to as a member of the bar that I represented.

13           MR. HENZY:  Yeah.  And, Your Honor, I'd ask that

14      this be addressed when Mr. Romney is here.

15           THE COURT:  It is going to be addressed when

16      Mr. Romney is here.  I'm just making --

17           MR. HENZY:  But, Your Honor, you're --

18           THE COURT:  -- my comments clear.

19           MR. HENZY:  -- you're making comments when

20      Mr. Romney is not here to defend himself, frankly.

21           THE COURT:  Well, he could be here, Attorney

22      Henzy.

23           MR. HENZY:  His --

24           THE COURT:  He's right across the street.

25           MR. HENZY:  His motion is not on the calendar.

1           THE COURT:  So if he chose not to be here, that's

2      not my problem.

3           MR. HENZY:  That's not true.  That's not correct.

4      He --

5           THE COURT:  You can't file a motion to withdraw an

6      appearance after you've already made an agreement that's

7      binding in the case and then say I'm not going to show up

8      and explain to the Court what happened.

9           MR. HENZY:  It's not on the calendar today, Your

10     Honor.

11          THE COURT:  It doesn't have to be on the calendar.

12          MR. HENZY:  It's -- okay.

13          THE COURT:  Where does it say it has to be on the

14     calendar in our local rules, Attorney Henzy?

15          MR. HENZY:  Your Honor, you schedule motions to

16     withdraw sometimes at least.  Sometimes you grant them

17     without hearing.

18          THE COURT:  And sometimes I do.

19          MR. HENZY:  And sometimes you --

20          THE COURT:  And sometimes I don't.

21          MR. HENZY:  Sometimes you don't.

22          THE COURT:  Right.

23          MR. HENZY:  But I don't know how Mr. Romney could

24     have known that you would take this up --

25          THE COURT:  I'm --

Ho Wan Kwok - June 13, 2023                          98

1              MR. HENZY:  -- today.

2              THE COURT:  I didn't take it up.  I made a

3      comment.  I'm not taking anything up.  I'm not ruling.  I

4      made a comment.

5              MR. HENZY:  Thank you, Your Honor.

6              THE COURT:  Okay?  Thank you.

7              All right.  Is there anything further we need to

8      address this afternoon?

9              MR. DESPINS:  Not from our point of view, Your

10     Honor.  Thank you.

11             THE COURT:  Anything from  your point of view?

12             UNIDENTIFIED SPEAKER:  No, Your Honor.

13             UNIDENTIFIED SPEAKER:  No, Your Honor.

14             THE COURT:  Okay.

15             UNIDENTIFIED SPEAKER:  Thank you.

16             THE COURT:  Then the matters in the Kwok case are

17     resolved for today, and we'll turn to the 3:00 matters on

18     the calendar.

19         (Proceedings concluded at 3:05 p.m.)

20

21

22

23

24

1

2

3        I, CHRISTINE FIORE, court-approved transcriber and

4    certified electronic reporter and transcriber, certify that

5    the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the

7    above-entitled matter.

8

9

10    _____        June 21, 2023

11        Christine Fiore, CERT

12

13

14

15

16

17

18

19

20

21

22

23

1                          INDEX

2        WITNESS

3        FOR THE

4        TRUSTEE:              Direct      Cross      Redirect    Recross

5        Luc Despins           15          24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24