Case 22-50073    Doc 1930-26    Filed 06/22/23    Entered 06/22/23 18:40:24    Page 1 of 11

**<u>Exhibit 26</u>**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

------------------------------------------------------x
                                            :
In re:                                      :   Chapter 11
                                            :
HO WAN KWOK, *et al.*,[1]                   :   Case No. 22-50073 (JAM)
                                            :
            Debtors.                        :   (Jointly Administered)
                                            :
------------------------------------------------------x

**DECLARATION OF DIRK JOHNSON IN SUPPORT OF TRUSTEE'S MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363, BANKRUPTCY RULES 2002, 6004(c), AND 9014, AND LOCAL RULES 6004-1 AND 6004-2, SEEKING ENTRY OF ORDER: (I) AUTHORIZING AND APPROVING SALE OF THE LADY MAY FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING AND APPROVING PURCHASE AND SALE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

I, Dirk Johnson, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a Yacht Broker at Edmiston and Company Limited ("Edmiston"), maintaining offices at (a) 2 Marina Plaza, Newport, Rhode Island, 02840, and (b) Burleigh Manor, Peel Road, Douglas, Isle of Man, IM1 5EP.

2.  I am duly authorized to make this declaration (this "Declaration") on behalf of Edmiston and submit this Declaration in support of the *Trustee's Motion, Pursuant to Bankruptcy Code Sections 105 and 363, Bankruptcy Rules 2002, 6004(c), and 9014, and Local Rules 6004-1 and 6004-2, Seeking Entry of Order (I) Authorizing and Approving Sale of the*

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

*Lady May Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing and Approving the Purchase and Sale Agreement, and (III) Granting Related Relief* (the "Motion")[2] in the chapter 11 case of Ho Wan Kwok (the "Debtor"), seeking an order approving and authorizing the sale of the Lady May to Herb Chambers Yachting, LLC (the "Buyer").

3. I am a Yacht Broker based in Newport, Rhode Island, since 1991, and have been employed by Edmiston for 2.5 years. I have approximately 15 years of experience in the superyacht brokerage industry. Edmiston is a luxury superyacht broker specializing in the sale of yachts. Edmiston currently is the broker for numerous yachts in the United States and worldwide. In addition, in the past 24 months, approximately, Edmiston has sold more than 70 yachts over 30 meters in length more than double the industry average of deals per broker. Edmiston also holds the industry record for the sale of the highest number of Feadships (which is the builder of the Lady May).

4. On April 18, 2023, Edmiston was retained by the Trustee to market and sell the Lady May, which retention was approved by order of the Court, dated April 27, 2023.[3] As set forth in the retention agreement, the agreed-upon list price for the Lady May is $26,500,000.

5. Unless otherwise indicated below, I have personal knowledge of the matters set forth below, and if called to testify, I could and would testify competently thereto.

**Marketing of Lady May**

6. Since its retention, Edmiston has engaged in an extensive marketing campaign to sell the Lady May to the highest bidder. Consistent with best industry practices for marketing a luxury superyacht such as the Lady May, Edmiston has actively canvassed the yacht market for

---

[2] Capitalized terms used but otherwise not defined herein shall have the meaning ascribed to them in the Motion.
[3] Edmiston is also marketing the Lady May II, which is not included in the Sale.

2

potential buyers, both within its own network of potential buyers as well as through numerous other yacht brokers in the industry, as well as advertised the Lady May both online and in print. These marketing efforts were initially focused on residents outside of the United States and, following the Lady May's transfer to the foreign trade zone in Rhode Island (the "FTZ"), Edmiston expanded its efforts to also include U.S. residents.

7. Among other things, as part of its marketing efforts:

   a. Edmiston created an electronic brochure of the Lady May, including photographs and listing its specifications, which brochure was included in industry-wide announcements to other yacht brokers as well as posted on Edmiston's website and social media;

   b. Edmiston engaged in a direct client email marketing campaign,[4] which featured the Lady May in its monthly mailer update (distributed to approximately 10,000 clients and other potentially interested parties);

   c. Edmiston used extensive digital advertising to market the Lady May on its website and social media accounts, including Instagram, Facebook, LinkedIn and YouTube;[5]

   d. Shortly after the Lady May was moved into the FTZ in Newport, Rhode Island, Edmiston issued further announcements regarding the Lady May on its website and social media.

8. In order to connect the Lady May with Edmiston's network of industry brokers, Edmiston emailed single and multi-yacht mailers for new yacht listings, sales updates, location updates, price reductions and yachting events. In addition, the Lady May has been featured in three business email distributions since Edmiston's retention, each of which was sent to approximately 1,850 brokers in the yacht industry. Furthermore, on May 3, 2023, the Lady May was also listed on Yatco.com and Yachtworld.com, which are online business-to-business (B2B) search facilities that centralize brokerage information for the yacht industry—similar to MLS

---

[4] The monthly mailer included a photo of the Lady May alongside a detailed description and the listing price.

[5] Edmiston.com ranks highly on search engines compared to its competition and is an effective tool in promoting the Lady May, with monthly website traffic averaging 30,000 per month.

3

(multiple listing service) for real estate sales. In addition, the Lady May has been featured on the brokerage listing page of Boatinternational.com and Superyachttimes.com, as well as in two print publication in Boat International US.

9. Edmiston is also the title sponsor of the London Heliport and used this platform to advertise the Lady May by featuring it in Edmiston's brand collateral (*i.e.*, Edmiston's branded marketing materials) that is deployed throughout the London Heliport. Similarly, the Lady May was featured in Edmiston's brand collateral deployed across private aviation terminals in the East Hamptons and Cabo St. Lucas. Edmiston has also teamed up with Europe's leading private jet airport, Farnborough, to provide a fully immersive experience for guests traveling through the airport and Edmiston utilized this platform to further advertise the Lady May.

10. In addition to all of the foregoing, I reached out, and received calls from, numerous other yacht brokers as well as prospective buyers about the Lady May.

**Bidding Process**

11. From the outset of the marketing process, there has been significant interest in the Lady May, but not at prices that the Trustee deemed acceptable. A handful of potential buyers requested to be shown (and were shown) the Lady May, while several brokers visited the Lady May on behalf of prospective buyers. By May 20, 2023, five prospective buyers (the "Initial Bidders") had provided Edmiston with formal offers for the Lady May with proposed purchase prices ranging from $18 million to $20 million. In response to each of these offers, the Edmiston advised the Initial Bidders that the Trustee determined to counter at $23 million. In response to the Trustee's counteroffer, one of the Initial Bidders increased its bid to $20 million, while the other Initial Bidders did not increase their offer.

12. After receipt of these initial bids and the bidders' refusal to further respond to the Trustee's counteroffer, I advised the Trustee that (in light of the offers in hand) a prolonged marketing process could cause some of the bidders to lose interest, and, therefore, the Trustee should set a deadline of Tuesday, May 30, 2023, at 5:00 p.m. (ET), for interested parties to submit their best and final bids.

13. On May 24, 2023, Edmiston emailed each of the five Initial Bidders as well as other parties that had expressed an interest in the Lady May to advise them that the deadline to submit their best and final bids was set for **Tuesday, May 30, 2023, at 5:00 p.m. (ET)**. This deadline was designed to maintain maximum momentum with the Initial Bidders and other interested parties. In that email, interested bidders were also advised that (a) due to the fact that the Trustee had received offers for the Lady May from several potential buyers, Edmiston was inviting all interested parties to present their best and final offer prior to the May 30, 2023 bid deadline and (b) any such bid would have to comply with the following requirements:

- Only bids with a purchase price in excess of $20,000,000 would be considered by the Trustee;

- Offers must be based on the Trustee's form of purchase agreement (which was provided to interested parties on Thursday, May 25);

- To the extent the prospective buyer intended to modify the form of purchase agreement, mark-up of the agreement should be included as part of the bid (and advising the parties that such modifications, if any, would be evaluated in determining the highest and/or best offer);

- The winning bid must provide for a 20% deposit of the purchase price, which deposit must be received within 48 hours after such bid has been selected as the winning bid;

- The 20% deposit would be forfeited if the winning bidder fails to close on purchase of Lady May in accordance with terms of purchase agreement (subject to the right to reject the Lady May if the survey reveals a defect affecting the operational integrity of the Lady May or her machinery or her systems or renders the Lady May unseaworthy);

5

- The purchase agreement must be executed by June 9, 2023;

- The Lady May must be accepted or rejected (based on results of survey) by June 28, 2023;

- In the event the winning bidder does not close on the purchase at the price set forth in the purchase agreement, the Trustee may, at his option, purchase the survey from the buyer, at cost;

- Closing would take place as soon as practical on or before July 20, 2023;

- All bids would be subject to bankruptcy court review and approval; and

- All bids had to be sent directly to the Trustee.

14. In addition, also on May 24, 2023, Edmiston circulated emails to more than 1,857 other yacht brokers advising them of the deadline to submit best and final bids and that such bids would be subject to certain conditions, including a minimum bid of $20 million.[6] As with the email to the Initial Bidders, the email distribution advised the brokers that the Trustee was setting May 30, 2023 deadline to submit best and final bids due to multiple offers received to date. Furthermore, on May 27, 2023, Edmiston updated the Yatco.com listing for the Lady May to advise interested parties of the bid deadline and the minimum bid requirement

15. As of 5:00 p.m. (ET) on May 30, 2023, five formal bids (in addition to the initial bids) were received from prospective buyers (the "Second Round Bidders"), including from both U.S. residents and non-U.S. residents. Three bids exceeded the $20 million minimum, while two bids were below the minimum. During this second round, two bidders that were not Initial Bidders submitted bids. But not all bidders that participated in the initial round submitted a further bid by the May 30, 2023 deadline. For example, one of the Initial Bidders who had

---

[6] This email distribution did not list all of the conditions, but advised the recipients to contact me for further details, including offer conditions.

previously offered $20 million did not submit any bid in connection with the May 20, 2023 bidding deadline because the bidder did not want to participate in a competitive bidding process.

16. Following receipt of these bids, the Trustee engaged in further discussions with each of the three bidders that had satisfied the minimum bid requirement. Because the bidder that submitted the highest bid (which was substantially below $24 million) had modified the form of purchase agreement to add provisions that were not acceptable to the Trustee (including giving the buyer an absolute right to terminate the purchase process based on the results of a sea trial that would not take place for more than 10 days), the Trustee requested that the bidder remove these modification and/or further increase its bid. Concurrently, the Trustee, through Edmiston, also reached out to the second and third highest bidders to explore whether they would be willing to increase their bid. Ultimately, one of these two bidders increased its proposed purchase price to $24 million, thereby becoming the highest bidder. Because that increased bid (which was the one submitted by the Buyer) did not include any modifications to the Trustee's form of purchase agreement (other than to move up the closing date to a date on or before June 30, 2023), the Trustee selected the Buyer as the winning bidder. To be clear, neither of the other two bidders further increased their bids, even though they were invited to do so.

17. I believe that the Buyer's bid (a) is the highest and best bid (including because the Buyer does not require any modifications to the form of purchase agreement proposed by the Trustee (other than that closing of the Sale occurs by June 30, 2023)), (b) satisfies the Trustee's bid conditions, and (c) is the product of an arms' length bidding and negotiation process. In addition, based on my interactions with the Buyer, I believe that the Buyer has proceeded in good faith during the entirety of the bidding and negotiation process.

7

18. Finally, I believe that the purchase price offered by the Buyer pursuant to the PSA is the best available price for the Lady May and that implementing formal bidding procedures and running a public auction process would not increase the purchase price, but rather would risk losing the Buyer, while undermining the momentum of the marketing and sale process to date. Accordingly, I believe that proceeding with the Sale under the PSA is in the best interest of the Debtor's estate.

**Auction Process Would Not Have Been Beneficial**

19. I believe that there would have been no incremental benefit to first seeking approval of formal bidding procedures and running a public auction, in light of the nature of the property to be sold (*i.e.*, a luxury superyacht) and the small pool of potential buyers (*i.e.*, high net-worth individuals). To the contrary, conducting an auction would likely have discouraged potential buyers from bidding and/or making their best offer. Potential buyers would likely not have participated in a process that would have exposed them to the risk of overpaying (if selected as the winning bidder in an auction), and, to the extent they would have participated in such a process, they would likely have discounted their bids to reflect that risk. In fact, two of the Initial Bidders withdrew from the process because of their dissatisfaction with the competitive process the Trustee was considering.

20. Moreover, because an auction process would have required more time (including to seek Court approval of the auction procedures), many of the Initial Bidders would not have remained in the process, and otherwise motivated buyers would likely have been discouraged from participating out of a concern that they would have wasted a lot of time if they are ultimately not selected as the successful bidder. This is especially so given that other luxury superyachts can be purchased through brokers without having to go through an auction process.

8

Furthermore, given the fairly small pool of potential buyers, it is unlikely that an auction process would have attracted any additional interest beyond the parties that Edmiston (through its extensive network of clients and connections to other brokers) was able to attract.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2023

Dirk Johnson
Broker
Edmiston and Company Limited