**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------x
:
In re:                                          :      Chapter 11
:
HO WAN KWOK *et al.*,                            :      Case No. 22-50073 (JAM)
:
Debtors.[1]                        :      Jointly Administered
:
------------------------------------------------------x

**REPLY OF CHAPTER 11 TRUSTEE TO G CLUB OPERATIONS LLC'S**
**SUPPLEMENTAL OBJECTION TO TRUSTEE'S MOTION TO COMPEL AND**
**REQUEST FOR RELATED RELIEF**

Luc Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

above-captioned chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"),

hereby submits this reply (the "Reply") in response to *G Club Operations LLC's Supplemental*

*Objection to Trustee's Motion to Compel and Request for Related Relief* [Docket No. 1924] (the

"Objection") to the Trustee's motion to compel and hold G Club Operations LLC ("G Club") in

contempt [Docket No. 1805] (the "Motion to Compel"),[2]  and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      G Club's Objection is disingenuous.  Despite dressing up its actions with empty

claims of acting in "good faith," asserting that the Motion to Compel was "unnecessary," and

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The
mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings
LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok
(solely for purposes of notices and communications).

[2]    Capitalized terms used but not otherwise defined in this Reply have the meanings set forth in the Motion to
Compel.

repeatedly stating that any delays, both to date and going forward, are tied to the independent

manager, G Club offers no plausible, much less acceptable, excuse for its past failures to comply

with the Subpoena, nor its continued refusal to produce plainly responsive documents to the

Trustee.  The reality is that G Club has acted in bad faith in refusing for seven months to comply

with the Subpoena, and continues to do so by unjustifiably delaying its production and insisting

on withholding key documents based on the specious argument this Court has already rejected

that the Trustee is not entitled to documents related to G Club's assets and operations based only

on the "allegation" that G Club is controlled by the Debtor.  This type of investigation, however,

is squarely within the scope and purpose of Rule 2004, especially given the findings of this Court

regarding the Debtor's control over G Club and related entities, the federal indictment for fraud

involving the Debtor and G Club, and the SEC complaint regarding the same fraud.

## BACKGROUND

2.      Based on the Motion to Compel and supporting declaration, and the statements

made at the June 6, 2023 hearing on the Motion to Compel, the Court is familiar with the facts

relating to this dispute up until the hearing date.  Accordingly, the Trustee will limit the facts to

only those arising subsequent to the June 6, 2023 hearing.

3.      Following the June 6, 2023 hearing, counsel for G Club made no attempt to meet

and confer or otherwise communicate with the Trustee.[3]  Instead, on June 21, 2023, G Club

served *G Club Operations LLC's First Amended Responses and Objections to Subpoena to*

*Produce Documents* (the "First Amended Responses and Objections"),[4] attached as **Exhibit A** to

---

[3]    On June 20, 2023, counsel for G Club did send a limited email asking if the Trustee would consent to a 60-day extension to complete its production. The Trustee declined.

[4]    Having previously served Responses and Objections in which it refused to produce any documents, and having not sought leave of the Court, it is not clear on what basis G Club believes it is entitled to amend its Responses and Objections six months later, nor does G Club offer any support for having a basis to do so.

the Objection, and made an initial production of documents apparently consistent therewith.  The First Amended Responses and Objections, while agreeing to produce documents in response to a number of the requests, notably refuse to produce key documents in response to Requests Nos. 1, 3, 14, 15, 16 and 17.[5]  These objections constitute a refusal to produce documents relating to assets and financial records of the Associated Entities (as defined in the Subpoena), documents sufficient to show G Club's assets and their source, how any of those assets valued over $50,000 were acquired, and if G Club personnel communicated with the Debtor or his family regarding them, G Club's tax returns, and documents sufficient to show G Club's bank accounts and investment accounts (and their balances and transfers).[6]

4.      On June 20, 2023 the United States Attorney's Office ("USAO") filed, in its criminal case against the Debtor, Yanping ("Yvette") Wang, and William Je, a *Memorandum of Law of the United States of America in Opposition to Defendant Yanping Wang's Motion for Pretrial Release* (the "USAO Memorandum"), attached hereto as **Exhibit B**.  In the USAO Memorandum, the USAO details with evidence Ms. Wang's deep connections to G Club, G Club's integral role in the Debtor's fraud, and how G Club's assets and bank accounts were used by the Debtor to launder G Club funds and to pay for the Debtor's opulent lifestyle.

---

[5]   There is also an objection to Instruction No. 2 requiring G Club to produce documents in the "possession, custody and control of anyone acting on [G Club's] behalf including [G Club's] counsel or other representatives and advisors."  First Amended Responses and Objections, at 7.  G Club stated that it would not comply with that instruction.  The Court has already addressed this same objection from counsel for the Debtor, and rejected it, ruling that documents in the possession of an agent or counsel must be produced.  *See Order Granting in Part Motion to Compel Compliance with Rule 2004 Subpoenas* [Docket No. 1353] (ordering Debtor to produce, among other things, "documents responsive to the Trustee's requests that are within his custody, possession, or control, ***including without limitation documents in the files of his current or former counsel and other agents and advisors***") (emphasis added).  The same should apply here.

[6]   Bankruptcy Rule 2004 G Club's statement that "[t]he Trustee has asked for every document and communication of G Club regardless of their relationship with the Debtor," Objection, at 3, is not only plainly not supported by even a cursory review of the Subpoena, but, when one considers what G Club is actually objecting to, it is apparent that G Club's burden claim is really just a straw man designed to obscure its real desire to continue to withhold core 2004 documents regarding its activities that have been shown to directly relate to the Debtor.

## ARGUMENT

5.      From December 21, 2022 (when G Club first requested an extension of its time to respond to the Subpoena) until June 21, 2023, G Club failed to produce a single document in response to the Rule 2004 Subpoena.  For more than the first three months of that period, G Club's management was firmly in place.  G Club did not refuse to produce documents because it had no management.  Rather, it made the spurious claim that the Debtor at most had a tangential relationship to G Club as an unpaid spokesperson, and thus requests for documents not directly referencing the Debtor were unreasonable.  G Club claimed its management was so "extremely troubled" by the reference to this Court's finding that G Club was an agent and business vehicle of the Debtor that it could not bring itself to participate in the Rule 2004 process.

6.      G Club's excuses then shifted in the following three months following the Debtor's indictment.  G Club at this time first blamed its lack of production on G Club allegedly being "busy understanding the charges that have been filed and how they impact the Trustee's request, the chapter 11 cases and appropriate next steps."[7]  That flimsy justification soon gave way, when G Club made the new claim that whichever unnamed executive had been "busy understanding" the alleged impact of the Debtor's indictment on the Trustee's request could not address the Subpoena at all, because G Club's management needed to be supplanted by a new independent manager,[8] who was supposed to be appointed and in place at the start of May.

7.      The independent manager was finally appointed on June 1, 2023—conveniently the day G Club's objection to the Motion to Compel was initially due—and not a single

---

[7]   *See* April 9, 2023 email from Ms. Fornos attached as Exhibit Q to the Luft Declaration [Docket No. 1805-43].

[8]   Notably, not only has the independent manager never been identified, but G Club has never disclosed who made the decision to appoint an independent manager, based on what authority, or why that individual who clearly had sufficient control to have an independent manager appointed could not have also directed counsel for G Club to comply with the Subpoena.

4

document was produced until June 21, 2023, the day before the Objection was filed.  G Club, in

its Objection and First Amended Responses and Objections, continues to refuse to produce its

key documents—documents relating to G Club's assets, bank accounts, the source of its assets,

and transfers—based on the demonstrably false assertion that there is not a basis to link G Club,

its assets, and financial activities to the Debtor.[9]

8.      Nothing about G Club's actions constitutes a "good faith effort[]"[10] to comply

with the Subpoena.  Nor is there any doubt that, far from being "unnecessary,"[11] absent the

Motion to Compel, G Club would not have produced a single document.  There is a mountain of

credible links between G Club and its assets and the Debtor—far in excess of any conceivable

threshold for seeking a Rule 2004 investigation.  ***Not only has this Court found that G Club***

***serves as a business vehicle for the Debtor,***[12] ***but G Club has also been alleged by the USAO to***

***be "functionally owned and controlled by Ho Wan Kwok."***[13]  Both the USAO and the SEC

have alleged that the Debtor and his co-conspirators fraudulently used G Club to obtain over

---

[9]      Similar arguments have been made before by the Debtor and related parties and have already been rejected by
this Court.  *See Order Granting in Part Motion to Compel Compliance with Rule 2004 Subpoenas* [Docket No.
1353].

[10]     Objection at 2.

[11]     *Id.*

[12]     Despite the Court explicitly telling Ms. Fornos that in relation to G Club it had made findings, G Club
implausibly claims that '[t]here is no basis to conclude that any findings have been made against G Club."
Objection, at 6.  The Court has made clear that there is no merit to G Club's position in its *Corrected
Memorandum of Decision Granting in Part Motion for Preliminary Injunction* [Adv. Proc. No. 22-05032,
Docket No. 133] (the "PI Decision").  G Club is explicitly listed as one of the entities comprising the G-Series.
*See* PI Decision. ¶ 2 (defining G-Series to include: "Himalaya Exchange, Gettr, GFashion, GMusic, GClubs,
GNews, and GEdu.").  The Court then found these entities served as the Debtor's business vehicles.  *Id.*  ¶ 7.
("The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve
as business vehicles for the Debtor, and their members are personally loyal to the Debtor.").  Moreover, the
order issued in connection with the PI Decision states explicitly (and it is completely ignored by G Club) that
the G-Series entities (and, thus, G Club) "are the Debtor's officers, agents, servants, employees, attorneys,
and/or other persons who are in active concert or participation with the Debtor, his officers, his agents, his
servants, his employees, and his attorneys.  *Corrected Order Granting in Part Motion for Preliminary
Injunction* ¶ 5 [Adv. Proc. No. 22-05032, Docket No. 134].

[13]      *See* Indictment ¶ 10, United States v. Kwok, No. 1:23-cr-00118-AT, (S.D.N.Y. Mar. 6, 2023) [Docket No. 2],
filed as Exhibit 24 to the Trustee's complaint in Adversary Proceeding No. 23-05013.

$250 million in victim funds, that they laundered G Club funds through bank accounts in other entities' names, and that they used over $45 million of G Club funds to outfit the Debtor with a 50,000 square foot mansion, luxury furnishings, and luxury cars costing in excess of $2-4 million.[14]  The USAO has further made public certain of Yvette Wang's notes showing how crypto currencies traded on the Himalaya Exchange "were used to launder G Clubs membership fees" and "has recordings in which Wang, unbeknownst to her, was recorded making financial decisions and directing others regarding how to process money from G Clubs members, including by proposing that the money be routed through various [Himalaya] Farms' bank accounts."[15]  The Court's findings and the USAO's allegations clearly lay out a rock solid basis to investigate the requested information as relating to the Debtor's assets, bank accounts, financial dealings and potential claims against the estate.  G Club's ongoing attempts to hide its assets and documents, behind the façade that any link between G Club and the Debtor is "erroneous," is plain bad faith.[16]

9.        Furthermore, the impact of G Club's recalcitrance and gamesmanship has been devastating.  Just this week, *the USAO Memorandum alleged that "between in or about January and March 2023, at least two individuals affiliated with the Kwok-controlled entity*

---

[14]    *Id.* ¶¶ 14-15.

[15]    USAO Memorandum, at 21, 24.

[16]    In the face of this substantial basis to allow the Rule 2004 investigation, G Club erects a strawman, claiming that because the Court's findings cannot constitute *res judicata*, they are irrelevant, and, accordingly, that document requests related to G Club should be struck down.  First, a factual finding by this Court need not constitute *res judicata* for it to be relied upon and considered in further proceedings in this case.  Second, G Club's assertion that for a Rule 2004 investigation to be warranted, the Trustee would first need "considered findings after discovery and a fully developed adversarial process," completely turns Rule 2004 on its head: Rule 2004 investigations are designed to inform whether an adversarial proceeding is warranted; they are not the prize for having already proven the point.  Third, and most tellingly, despite nakedly asserting that the "Basis for the Subpoena is an Erroneous Presumption About G Club" nowhere in G Club's Objection does it actually assert, much less offer a single piece of evidence, that the Court's findings are false, nor that any of the allegations made by the USAO or SEC regarding G Club are not supported by facts.

***HCHK Technologies, Inc.[17] spent more than approximately six weeks in the UAE to assist in moving the operations and money of G Clubs***."[18]  So, during the time that G Club was telling the Trustee that it would not produce any documents it supposedly was so offended by the notion that G Club was being linked to the Debtor's dealings, G Club was, according to the USAO, hurrying its assets and operations out of the jurisdiction.  In the view of the USAO, a "substantial amount of the fraud proceeds and operations of the fraud entities have already been moved abroad to the UAE."[19]

10.     Nor does it appear that G Club's nefarious actions ceased with the Debtor's and his co-conspirator Yvette Wang's indictment and incarcerations.  On April 11, 2023 counsel for the Trustee had its third meet and confer with counsel for G Club, where the Trustee requested that G Club comply with the Subpoena and asked that it prioritize responsive documents concerning G Club's bank accounts, assets and any transfers of funds or assets.  While this request was met by G Club with deaf ears, ***on the very same day, according to the USAO Memorandum, Wang's notes indicate that she sought information from a co-conspirator regarding the Debtor's businesses, and days later on April 18, 2023, directed that the co-conspirator have a G Club employee remove $7.1 million in G Club checks from a G Club P.O. Box (the check had been sent to the P.O. Box by a bank that had closed two G Club accounts due to suspected fraud)***.[20]  As described by the USAO, "[t]hese notes and communications reflect that Wang was coordinating with others to secure millions of dollars in

---

[17]    The USAO also alleged that at least one of these individuals was in fact a G Club employee. USAO Memorandum, at 38.

[18]    *Id.* at 4.

[19]    *Id.* at 32.

[20]    *See id.* 37-38.

G Clubs money, even after her arrest and detention."[21]  Thus, it again appears that while G Club was claiming that it was paralyzed to take any actions related to the Subpoena, it had no problem acting to continue its fraudulent activities.

11.    Had G Club produced documents related to its bank accounts, assets, and transfers in December and January in accordance with the Subpoena, the Trustee would have been on notice of G Club's attempts to abscond with the Debtor's controlled assets, and those presumed estate assets would not now be on foreign soil.  Instead, G Club abuses of the discovery process created a smoke screen, hiding its fraudulent activity.  This newly revealed information goes far beyond simply not complying with a Subpoena, but rather raises real questions that should be answered regarding whether G Club's actions in response to the Rule 2004 were really designed to further the Debtor's fraud.

12.    Finally, G Club's request that it be granted sixty additional days to comply with the Subpoena, subject to it seeking a further extension from the Court—thus allowing itself at least *nine months* to comply—should be dismissed out of hand.  Not only is it inconceivable how anyone can justify needing nine months to comply with a subpoena, but G Club cannot even be bothered to try to offer a justification.  Nowhere in G Club's Objection is there any explanation of any burden it faces or why it needs additional time, much less double the thirty days it would be permitted under the Subpoena, to say nothing of the preceding seven months.

13.    G Club should be ordered to produce all documents requested in the Subpoena and to complete its production within seven days.  Any further delay risks further undetected movement of assets and possible fraudulent activity.  If G Club fails to comply with the Subpoena within that time frame, it should be sanctioned for failing to comply with the

---

[21]    *Id.* at 38-39.

Subpoena.  Moreover, G Club should be ordered to give an accounting regarding its knowledge and participation in the moving of its assets to the UAE and the removal of the $7.1 million in checks from its P.O. Box, and whether those actions were in any way linked to G Club's actions in response to the Subpoena.  To the extent there is a link between the failure to respond to the Subpoena and fraudulent activity, G Club should be sanctioned.

Dated: June 23, 2023
       New Haven, Connecticut

                                   LUC A. DESPINS, CHAPTER 11 TRUSTEE

                              By: */s/ Patrick R. Linsey*
                                   Douglas S. Skalka (ct00616)
                                   Patrick R. Linsey (ct29437)
                                   NEUBERT, PEPE & MONTEITH, P.C.
                                   195 Church Street, 13th Floor
                                   New Haven, Connecticut 06510
                                   (203) 781-2847
                                   dskalka@npmlaw.com
                                   plinsey@npmlaw.com

                                       *and*

                                   Nicholas A. Bassett (admitted *pro hac vice*)
                                   PAUL HASTINGS LLP
                                   2050 M Street NW
                                   Washington, D.C. 20036
                                   (202) 551-1902
                                   nicholasbassett@paulhastings.com

                                       *and*

                                   Avram E. Luft (admitted *pro hac vice*)
                                   G. Alexander Bongartz (admitted *pro hac vice*)
                                   PAUL HASTINGS LLP
                                   200 Park Avenue
                                   New York, New York 10166
                                   (212) 318-6079
                                   aviluft@paulhastings.com
                                   alexbongartz@paulhastings.com

                                   *Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------x
                              :

In re:                           :    Chapter 11
                              :

HO WAN KWOK, *et al.*,[1]     :    Case No. 22-50073 (JAM)
                              :

           Debtors.       :    (Jointly Administered)
                              :

------------------------------------------------------x

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 23, 2023, the foregoing Motion was electronically filed. Notice of this filing was sent by e-mail to all parties to the above-captioned chapter 11 case eligible to receive electronic notice by operation of the Court's electronic filing ("<u>CM/ECF</u>") system. Parties may access this filing through the Court's CM/ECF system.

Dated:    June 23, 2023              LUC A. DESPINS, CHAPTER 11 Trustee
           New Haven, Connecticut

                                        By: */s/ Patrick R. Linsey*
                                          Douglas S. Skalka (ct00616)
                                        Patrick R. Linsey (ct29437)
                                        NEUBERT, PEPE & MONTEITH, P.C.
                                        195 Church Street, 13th Floor
                                        New Haven, Connecticut 06510
                                        (203) 781-2847
                                        dskalka@npmlaw.com
                                        plinsey@npmlaw.com

                                        *Counsel for the Chapter 11 Trustee*

---

[1]   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

**<u>Exhibit A</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re: | Chapter 11 |
| HO WAN KWOK, *et al.*, | Case No. 22-50073 (JAM) |
| Debtors. | (Jointly Administered) |

## G CLUB OPERATIONS LLC'S FIRST AMENDED RESPONSES AND OBJECTIONS TO SUBPOENA TO PRODUCE DOCUMENTS

Pursuant to Rules 26, 34 and 45 of the Federal Rules of Civil Procedure, made applicable here by Rules 7026, 7034 and 9016 of the Federal Rules of Bankruptcy Procedure, and pursuant to the Local Rules of Bankruptcy Procedure for the District of Connecticut (the "**Local Rules**"), non-party G Club Operations LLC ("**G Club**") hereby responds and objects to the Subpoena for Rule 2004 Examination of G Club (the "**Subpoena**") and Requests for Production of Documents (the "**Requests**") issued by Luc Despins, in his capacity as chapter 11 trustee of the above-captioned Debtors' estate (the "**Trustee**").  These responses and objections are an amendment to G Club's initial Responses and Objections to Subpoena to Produce Documents timely served on January 9, 2023.  As discovery in this matter is ongoing, G Club reserves the right to further amend, change or supplement its responses.  G Club is willing and prepared to meet and confer with the Trustee in an effort to narrow or eliminate these objections.

## G CLUB'S GENERAL OBJECTIONS AND RESERVATION OF RIGHTS

G Club hereby asserts the following General Objections on Scope or Form and Reservation of Rights ("**General Objections**") to the Trustee's Requests, which are incorporated in and made a part of each specific response set forth below.  The assertion of the same, similar, or additional objections in the specific response to these Requests does not waive, limit or modify any of G Club's General Objections.  G Club has undertaken good-faith and reasonable efforts to explain

the specific factual or legal reasoning for each General Objection and is willing to meet and confer to discuss them.

1.      G Clubs objects to each Request as overbroad, not proportional, unduly burdensome, oppressive, vague and ambiguous, because each Request assumes relation or affiliation with the Debtor and more than 60 identified and unidentified entities with *non-party* G Club.  All the Requests seek documents or information that are not proportional to the needs of the case, at least in part, because the documents or information should be available from others, including entities under the Trustee's control.[1]  *See* Local Rule 2004-1(a). *See* Fed. R. Civ. P. 26(b)(1); (b)(2)(C)(i); (g)(1)(B)(iii); *Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 96 (D. Conn. 2012) (refraining to order broad and costly search because plaintiff failed to show that it "either cannot obtain – or in fact *has not* obtained – ample discovery on the essential of her claim[s]" without subpoenaing a third-party); *Breaking Media, Inc. v. Jowers*, Civ. 1:21-mc-00194-KPF, 2021 WL 1299108, at *5-6 (S.D.N.Y. Apr. 7, 2021) (finding, among other things, that the subpoena was burdensome and respondent failed to establish that it could not reasonably obtain information from other available sources).  The Requests further exceed the scope of Rule 2004.

2.      G Club further objects to each Request as overbroad, not proportional, unduly burdensome, oppressive, vague and ambiguous, because they request a single non-party to produce, for example, ten years of documents (February 5, 2012 – present) from persons and entities that are vaguely and ubiquitously defined (*see* below objections to definitions).  The Trustee includes "Associated Individuals" and "Associated Entities" (including their affiliates)

---

[1] Pursuant to the Court's Order, Pursuant to Bankruptcy Code Sections 363, 521, 541, 1108, and 1505, (A) Confirming that Chapter 11 Trustee Holds all of the Debtor's Economic and Corporate Governance Rights in Debtor-Controlled Entities, (B) Authorizing Chapter 11 Trustee to Act in Any Foreign Country On Behalf Of Estate, (C) Granting Related Relief (Doc. No. 717), the Trustee effectively controls the entities or individuals which presumably would have documents responsive to the Requests.

within the definitions of the "Debtor's Son," "Debtor's Daughter," "Debtor's Purported Wife,"

and "Debtor's Family," which includes but is not limited to their alleged respective employees,

agents, counsel, advisors, or "anyone" acting on their behalf.  The breadth of these definitions

renders it impossible to know the persons and entities that the Trustee purports to include within

the Requests.  *See* Fed. R. Civ. P. 26(b)(1); (b)(2)(C)(i); Fed. R. Civ. P. 26(g)(1)(B)(iii).

3.     G Club objects to each Request that calls for "all" documents as unduly burdensome

and overbroad because requests for "all documents" are inconsistent with G Club's discovery

obligations – which are limited by principles of reasonableness and proportionality – and such

requests do not align with the mandate of specificity of Rule 34. *See Lutes v. Kawasaki Motors*

*Corp. USA*, Civ. No. 3:10CV1549 (WWE), 2014 WL 718546, at *7-8 (D. Conn. Dec. 16, 2014)

("All documents regarding any warnings, instructions, restrictions, or other limitations related to

the hazards of tow line or rope or safe handling or storage issues . . . is overbroad in both

substantive and temporal scope . . . ."); *Grigsby & Assocs., Inc. v. Rice Derivative Holdings, L.P.*,

No. 00 Civ. 5056 (RO), 2001 WL 1135620, at *4 (S.D.N.Y. Sept. 26, 2001) (plaintiffs' motion to

compel production of documents by non-party denied as subpoena contained "non-specific,

overbroad production requests").

4.     G Club objects to each Request that calls for identification of documents or

information subject to or protected by the attorney-client privilege, the work product doctrine, any

other applicable privileges or doctrines limiting discovery, and any applicable law or regulations.

G Club does not intend to waive any privileges or claims of confidentiality associated with

documents or information that are produced in response to the Subpoena.  *See In re von Bulow*,

828 F.2d 94, 100 (2d Cir. 1987) (the attorney-client privilege "belongs solely to the client, and

may only be waived by [the client]. . . .").

5.      G Club objects to each Request insofar as the Requests require G Club to comply with the Subpoena beyond the geographical limits specified in Rule 45(c)(2).

6.      Much of the information sought in the Requests is highly confidential and proprietary and consists of valuable commercial information, trade secrets, or business confidential materials, the disclosure of which would be highly prejudicial to G Club and the value of which cannot be calculated.  G Club objects to each Request that seeks documents or information that are protected as trade secrets by applicable law or include proprietary or confidential commercial information.  To the extent such documents or information are discoverable, production will be made pursuant to the confidentiality provisions of a Confidentiality or Protective Order applicable to this action and acceptable to G Club.  *See Uniroyal Chem. Co. Inc. v. Syngenta Crop. Protection*, 224 F.R.D. 53, 56-58 (D. Conn. 2004) (granting protective order and limiting disclosure of proprietary information to counsel).

7.      G Club objects to each Request to the extent it seeks discovery of information that only tangentially implicates the Debtor without regard to relevance and proportionality.  G Club further objects to each Request that is inconsistent with or enlarges the scope of permissible discovery under applicable law, including, but not limited to, the proportional scope of discovery mandated by the Federal and Local Rules, and the specificity requirements of Rule 34 and mandates of Rule 45(d)(1), made applicable by Fed. R. Bankr. P. 7034 and 9016.

8.      G Club objects to each Request to the extent it seeks documents or information not within G Club's possession, custody, or control.  *See* Fed. R. Civ. P. 45(a)(1)(A)(iii).  G Club also objects to each Request that seeks documents or information not kept by G Club in the ordinary course of business.  *See* Fed. R. Civ. P. 45(e)(1)(A).  G Club has no obligation to create documents or information that do not exist simply for the purposes of discovery. *See, e.g.*, *Boudreau v. Smith*,

Case No. 3:17-cv-589 (SRU), 2020 WL 532321, at 3 (D. Conn. Feb. 3, 2020) (finding that court cannot compel "documents that do not exist."); *A & R Body Specialty and Collision Works, Inc. v. Progressive Cas. Ins. Co.*, Civ. No. 3:07CV929 (WWE), 2014 WL 5859024, at *6 (D. Conn. Nov. 10, 2014) ("As a general rule, non-parties are not required to create documents that do not exist, simply for the purposes of discovery") (quoting *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 683 (N.D. Cal. 2006)).

9.       Any response to a Request that indicates that non-privileged documents will be produced is in no way to be construed as a representation that such documents exist, that the Request seeks Documents and Communications within the scope of Rule 2004, or as an admission of any legal or factual contention contained in any Request.

10.       G Club does not waive or intend to waive, by reason of its Responses and Objections to the Subpoena, its right to:

     a)  revise, amend or supplement these Responses and Objections;

     b)  object on any ground to the use of documents or information produced in response to the Subpoena for any purpose, in whole or in part, in this or any other proceeding, action, or matter;

     c)  object on any ground, at any time, to other discovery procedures or the Subpoena;

     d)  object on the grounds of admissibility of any documents or information produced in response to the Subpoena; and

     e)  file any appropriate motions with the court.

11.       In addition, to the extent that objections are resolved via a meet and confer, G Club will not produce any documents until a protective order is entered into by the parties and so ordered by the Court.

## <u>OBJECTIONS TO DEFINITIONS</u>

G Club objects to any "definition" that attempts to expand or alter its obligations in responding to discovery pursuant to the Federal Rules of Civil Procedure.

G Club objects to the definition "**You**" or "**Your**" or "**Yourself**" to the extent that it seeks information beyond G Club.

G Club objects to the definition "**Debtor**" because it is vague, overbroad, unduly burdensome, and that it is not possible to know all of the persons and entities that the Trustee purports to include within the definition because, among other things, the definition includes vague and ubiquitous qualifiers.

G Club objects to the definition "**Debtor' Son**" because it is vague, overbroad, unduly burdensome, and that it is not possible to know all of the persons and entities that the Trustee purports to include within the definition because, among other things, the definition includes vague and ubiquitous qualifiers.

G Club objects to the definition "**Debtor's Daughter**" because it is vague, overbroad, unduly burdensome, and that it is not possible to know all of the persons and entities that the Trustee purports to include within the definition because, among other things, the definition includes vague and ubiquitous qualifiers.

G Club objects to the definition "**Debtor's Purported Wife**" because it is vague, overbroad, unduly burdensome, and that it is not possible to know all of the persons and entities that the Trustee purports to include within the definition because, among other things, the definition includes vague and ubiquitous qualifiers.

G Club objects to the definition "**Debtor's Family**" because it is vague, overbroad, unduly burdensome, and that it is not possible to know all of the persons and entities that the Trustee

purports to include within the definition because, among other things, the definition includes vague and ubiquitous qualifiers.

G Club objects to the definition "**Associated Individuals**" because it is vague, overbroad, unduly burdensome, and that it is not possible to know all of the persons and entities that the Trustee purports to include within the definition because, among other things, the definition includes vague and ubiquitous qualifiers.

G Club objects to the definition "**Associated Entities**" because it is vague, overbroad, unduly burdensome, and that it is not possible to know all of the persons and entities that the Trustee purports to include within the definition, including affiliates of the Associated Entities because, among other things, the definition includes vague and ubiquitous qualifiers.

G Club objects to the definition "**Regarding**" because it is vague, overbroad and ambiguous as to the terms "supporting, favoring, opposing, bolstering, detracting from, located in, considered in connection with . . . ."

G Club objects to the definition "**Communication(s)**" because it is vague, overbroad and ambiguous as to the phrase "internally or with third parties."

G Club objects to the definition "**Asset(s)**" because it is vague, overbroad and ambiguous as to the phrase "any item that can be used to produce positive economic value."

## OBJECTIONS TO INSTRUCTIONS

G Club objects to any "instruction" that attempts to expand or alter its obligations in responding to discovery pursuant to the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure.

G Club objects to **Instruction No. 2** as overbroad, disproportionate and burdensome insofar as it seeks all documents in its "possession, custody, or control" or "in the possession, custody, or control of anyone acting on [G Club's] behalf including [G Club's] counsel or other representatives and advisors," and "[e]ach Document shall be produced in its entirety." G Club will only produce, once objections are resolved, either by agreement or a final court order, non-

privileged documents in its possession, custody, or control that can be located after a good faith and reasonable search and with reasonable diligence.

G Club objects to **Instruction No. 6** as overbroad, disproportionate and burdensome insofar as it seeks information beyond that required by the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure and Local Rules, and because it is not reasonably calculated to lead to the discovery of admissible evidence about documents that are no longer within G Club's custody and control.

G Club objects to **Instruction No. 8** as overbroad, disproportionate and burdensome insofar as it seeks to impose on G Club obligations to identify "each Person who received or saw the original or any draft, copy, or reproduction of the [privileged information]" and "whether [the privileged information] itself, or any information contained or referred to in the [privileged information] is in the possession, custody, or control of any other Persons, and if so, the identity of such Persons, as well as a statement addressing how the information came into their possession."

G Club objects to **Instruction No. 10** as incomplete, disproportionate and overbroad insofar as it seeks supplemental information beyond that required by Rule 26(e) and the Local Rules.

G Club objects to **Instruction No. 12** as overbroad, disproportionate and burdensome insofar as "all references to Entities includes all affiliates thereof" when it is not possible to know all of the entities and affiliates that the Trustee purports to include within the term "Entities."

G Club objects to **Instruction No. 14** as overbroad, disproportionate and burdensome insofar as it seeks information from February 5, 2012 to present, in excess of ten years with no effort to tailor the Requests to be proportional in nature.

## OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**

All Documents regarding any income or Asset of the Debtor, the Debtor's estate, or an Associated Entity.

**RESPONSE TO REQUEST NO. 1:**

G Club objects to Request No. 1 on each of the grounds stated in its Overarching Objections, Objections to Definitions and Objections to Instructions (collectively, the "**Overarching Objections**"), which are incorporated by reference herein.  G Club further objects that the term "Associated Entity," which refers to G Club itself, among other entities, is overbroad, disproportionate and unduly burdensome.  G Club further objects on the grounds that, upon information and belief, there are ongoing, unresolved disputes regarding what constitutes Assets of the Debtor's estate, and thus the request is vague, insufficiently defined or circumscribed, disproportionate and unduly burdensome requiring G Club to guess whether documents are responsive.

Subject to the foregoing objections, G Club agrees to produce all documents regarding any income paid to, or an Asset of the Debtor.

**REQUEST NO. 2:**

All Documents related to the Debtor's financial condition and obligations to his creditors, including without limitation all Documents related to any effort to avoid paying such obligations and All Documents related to this or any other actual or potential bankruptcy or similar insolvency proceeding.

**RESPONSE TO REQUEST NO. 2:**

G Club objects to Request No. 2 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects to Request No. 2 because it is vague and ambiguous as to the phrases "All Documents related to the Debtor's . . .

obligations to his creditors"; "any efforts to avoid paying such obligations"; "the Debtor's financial condition"; and "any other actual or potential bankruptcy or similar insolvency proceeding."

Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 2, but agrees to produce all documents responsive to Request No. 2.

**REQUEST NO. 3:**

All Documents regarding any balance sheet, bank statement, account statement, financial statement, statement of account, wire transfer instructions and/or confirmation, proof of funds, certificate of deposit, certificate of holdings, investment portfolio summary, or similar document relating to the Debtor, the Debtor's Estate, the Debtor's Family, an Associated Entity, or an Associated Individual, including without limitation all Documents sufficient to show all Transfers to any of the foregoing.

**RESPONSE TO REQUEST NO. 3:**

G Club objects to Request No. 3 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects to Request No. 3 because it is vague and ambiguous to the extent it seeks "all Documents sufficient to show all Transfers to any of the foregoing."  G Club further objects to Request No. 3 insofar as it seeks information that is publicly available.   G Club further objects that the terms "Associated Individual" and "Associated Entity," which refers to G Club itself, among other entities, are overbroad, disproportionate and unduly burdensome.

Subject to the foregoing objections, G Club agrees to produce any balance sheet, bank statement, account statement, financial statement, statement of account, wire transfer instructions and/or confirmation, proof of funds, certificate of deposit, certificate of holdings, investment portfolio summary, or similar document showing a Transfer relating to the Debtor, the Debtor's Estate, or the Debtor's Family.

**REQUEST NO. 4:**

All Documents regarding any investment, business dealing or transactions made by, with, or on behalf of the Debtor.

**RESPONSE TO REQUEST NO. 4:**

G Club objects to Request No. 4 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein. Subject to the foregoing objections, G Club agrees to produce all documents responsive to Request No. 4.

**REQUEST NO. 5:**

All Communications with the Debtor, and Documents related to Communications with the Debtor, related to the operation, management, or decision-making of any Entity, including without limitation the Associated Entities.

**RESPONSE TO REQUEST NO. 5:**

G Club objects to Request No. 5 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein. G Club further objects that the term "Associated Entity," which refers to G Club itself, among other entities, is overbroad, disproportionate and unduly burdensome.

Subject to the foregoing objections, G Club agrees to produce all communications with the Debtor and documents related to communications with the Debtor.

**REQUEST NO. 6:**

All Documents regarding any Transfer, investment, or other transaction or business dealing made to, by, or with the Debtor, the Debtor's Family, or an Associated Entity.

**RESPONSE TO REQUEST NO. 6:**

G Club objects to Request No. 6 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein. G Club further objects to Request No. 6 as overbroad, disproportionate and unduly burdensome. G Club further objects to Request No. 6 because it is duplicative of Request No. 4 to the extent it seeks documents relating to G Club and

the Debtor's business dealings and transactions made to, by, or with the Debtor.  G Club further objects to Request No. 6 because it is vague and ambiguous as to the meaning of the phrase "other transaction."

Subject to the foregoing objections, G Club agrees to produce all documents regarding any Transfer, investment, or other transaction or business dealing made to, by, or with the Debtor or Debtor's Family or an Associated Entity.

**REQUEST NO. 7:**

All Documents regarding any property ever occupied or used by the Debtor, including without limitation the *Lady May*; the Sherry Netherland Hotel / Condominium; the residential property located in Greenwich, Connecticut at 373 Taconic Rd.; the residential property located in Greenwich, Connecticut at 33 Ferncliff Rd.; and the residential property located in Wilton, Connecticut at 354 Nod Hill Rd.

**RESPONSE TO REQUEST NO. 7:**

G Club objects to Request No. 7 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects to Request No. 7 because it is vague and ambiguous as to the phrase "All Documents regarding any property ever occupied or used by the Debtor."

Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 7, except for a few documents relating to the *Lady May* which G Club will produce.  G Club agrees to produce all documents responsive to Request No. 7.

**REQUEST NO.  8:**

All Documents related to any investments or trading by the Debtor, the Debtor's Family, or an Associated Entity, in or around July 2020, or at any other time, in crude oil futures or any similar commodity, including without limitation Communications with Jiang Yunfu Be regarding any such investments or trading.

**RESPONSE TO REQUEST NO. 8:**

G Club objects to Request No. 8 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 8 as G Club was not created until October 2020, but agrees to produce all documents responsive to Request No. 8.

**REQUEST NO. 9:**

All Documents related to any aircraft owned, controlled, or used by the Debtor, including without limitation the aircraft bearing tail number T7-GQM and any other aircraft registered in San Marino, including without limitation copies of all registration documents and flight manifests showing flights taken by such aircraft and the individuals onboard such flights.

**RESPONSE TO REQUEST NO. 9:**

G Club objects to Request No. 9 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  Subject to the foregoing objections, G Club agrees to produce all documents responsive to Request No. 9.

**REQUEST NO. 10:**

All Documents regarding any gifts, benefits or loans, to, from or on behalf of the Debtor, the Debtor's Estate, the Debtor's Family, or the Associated Entities, including without limitation Documents sufficient to show the amounts of such gifts, benefits, or loans; the purposes for which such gifts, benefits, or loans were used; when the gifts, benefits, or loans were provided; and the terms of any loans, all representations and warranties made in connection with any loans, the interest rate on any loans, and all evidence of payments of any loans.

**RESPONSE TO REQUEST NO. 10:**

G Club objects to Request No. 10 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects to Request No. 10 because it is vague, disproportionate, overbroad, and unduly burdensome to the extent that it seeks

"All Documents regarding any gifts, benefits or loans, to, from or on behalf of the Debtor, the Debtor's Estate, the Debtor's Family, or the Associated Entities . . . ."  G Club further objects to Request No. 10 because it is vague and ambiguous as to the meaning of the phrase "other transaction."  G Club further objects to Request No. 10 because it is duplicative of Request No. 6.

Subject to the foregoing objections, G Club agrees to produce all documents responsive to Request No. 10.

**REQUEST NO. 11:**

All Documents concerning any trust or similar instrument set up by, on behalf of, or for the benefit of the Debtor, the Debtor's Estate, the Debtor's Family, or an Associated Entity, including without limitation Documents sufficient to show when the trust(s) was created, by whom it was created, for whose benefit it was created, and the corpus of the trust.

**RESPONSE TO REQUEST NO. 11:**

G Club objects to Request No. 11 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects to Request No. 11 because it is vague, overbroad, disproportionate and unduly burdensome to the extent that it seeks "All Documents concerning any trust or similar instrument set up by, on behalf of, or for the benefit of the Debtor, the Debtor's Estate, the Debtor's Family, or an Associated Entity . . . ."

Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 11, but agrees to produce all documents responsive to Request No. 11.

**REQUEST NO. 12:**

All Documents related to any obligation, claim, liability, or debt associated with any legal dispute involving the Debtor, including but not limited to those relating to any litigation before any local, state, federal, or international body, whether an administrative body, court, panel, or alternative dispute resolution entity.

**RESPONSE TO REQUEST NO. 12:**

G Club objects to Request No. 12 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein. G Club further objects to Request No. 12 because it is vague, overbroad, disproportionate and unduly burdensome to the extent that it seeks "All Documents related to any obligation, claim, liability, or debt associated with any legal dispute involving the Debtor . . . [including] any litigation before any local, state, federal, or international body, whether an administrative body, court, panel, or alternative dispute resolution entity." G Club further objects to Request No. 12 insofar as it seeks information that is publicly available.

Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 12, but agrees to produce all documents responsive to Request No. 12.

**REQUEST NO. 13:**

All Documents and communications between any of your outside counsel or other advisors and the Debtor.

**RESPONSE TO REQUEST NO. 13:**

G Club objects to Request No. 13 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein. G Club also objects to Request No. 13 because it is vague, overbroad, disproportionate and unduly burdensome. G Club further objects to Request No. 13 because it exceeds the scope of Rule 2004. G Club further objects to Request No. 13 because it is duplicative of Request No. 5.

Subject to the foregoing objections, G Club will produce documents responsive to Request No. 13.

**REQUEST NO. 14:**

Documents sufficient to show all of Your Assets and sources of income or funding.

**RESPONSE TO REQUEST NO. 14:**

G Club objects to Request No. 14 on each of the grounds stated in its Overarching

Objections, which are incorporated by reference herein.  G Club also objects to Request No. 14 because it is overly broad, vague, disproportionate and ambiguous.  G Club also objects to Request No. 14 because it is beyond the scope of a Rule 2004 request to ask all "[d]ocuments 'sufficient to show all Your [non-party G Club's] Assets and sources of income and funding").  G Club further objects to Request No. 14 because it exceeds the scope of Rule 2004.  G Club is amenable to meet and confer to narrow this request.

**REQUEST NO. 15:**

For all Assets identified in response to Request 14 having a value of more than $50,000, all (i) Documents related to Your acquisition of such Asset and (ii) Communications with the Debtor or the Debtor's Family regarding such Asset.

**RESPONSE TO REQUEST NO. 15:**

G Club objects to Request No. 15 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club also objects to Request No. 15 because it is overly broad, disproportionate, vague, ambiguous, and unduly burdensome.  G Club further objects to Request No. 15 to the extent production of "Asset" includes the phrase "any item that can be used to produce positive economic value" and "Communications with the Debtor or the Debtor's Family regarding such Asset" when it is not possible to know all of the persons and entities that the Trustee purports to include within the definitions of "Debtor" or "Debtor's Family."  G Club further objects to Request No. 15 because it exceeds the scope of Rule 2004.

Subject to the foregoing objections, G Club incorporates its response to Request No. 14.

**REQUEST NO. 16:**

Copies of Your tax returns.

**RESPONSE TO REQUEST NO. 16:**

G Club objects to Request No. 16 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects to Request No. 16

because it is overbroad, disproportionate and unduly burdensome.  G Club further objects to Request No. 16 because it exceeds the scope of Rule 2004.  G Club is amenable to meet and confer to narrow this request.

**REQUEST NO. 17:**

Documents sufficient to show all bank accounts and investment accounts within Your possession or control, including the balances of and transfers to and from each such account.

**RESPONSE TO REQUEST NO. 17:**

G Club objects to Request No. 17 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects to Request No. 17 because it is overbroad, disproportionate and unduly burdensome.  G Club further objects to Request No. 17 because it exceeds the scope of Rule 2004.  G Club is amenable to meet and confer to narrow this request.

**REQUEST NO. 18:**

All Documents regarding any credit cards used by You, including without limitation monthly statements or other procurements sufficient to show all purchases related thereto for the benefit of the Debtor or an Associated Entity.

**RESPONSE TO REQUEST NO. 18:**

G Club objects to Request No. 18 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.  G Club further objects that the term "Associated Entity," which refers to G Club itself, among other entities, is overbroad, disproportionate and unduly burdensome.  G Club further objects to Request No. 18 because it exceeds the scope of Rule 2004.

Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 18, but agrees to produce all documents responsive to Request No. 18.

**REQUEST NO. 19:**

All corporate governance and organizational Documents, including without limitation by-laws and certificates of incorporation and other Documents sufficient to show Your corporate structure, names of officers and directors, business purpose, and relationship to the Debtor or to any member of the Debtor's Family.

**RESPONSE TO REQUEST NO. 19:**

G Club objects to Request No. 19 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein. G Club further objects to Request No. 19 as overbroad, disproportionate and unduly burdensome. G Club further objects to Request No. 19 on the grounds that it is vague and ambiguous as to the phrase "other Documents . . . sufficient to show [its] . . . relationship to the Debtor or to any member of the Debtor's Family."

Subject to the foregoing objections, G Club agrees to produce all documents responsive to Request No. 19.

**REQUEST NO. 20:**

All Documents related to any pledge(s) of Your Assets to any other Entity.

**RESPONSE TO REQUEST NO. 20:**

G Club objects to Request No. 20 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein. G Club further objects to Request No. 20 as neither relevant to, nor discoverable in, the Debtor's chapter 11 case. G Club further objects to Request No. 20 as overbroad, disproportionate and unduly burdensome. G Club further objects to Request No. 20 because it is vague and ambiguous as to the meaning of the term "any pledge(s)" of its assets to any other entity. G Club further objects to Request No. 20 because it exceeds the scope of Rule 2004.

Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 20, but agrees to produce all documents responsive to Request No. 20.

**REQUEST NO. 21:**

All Documents related to Transfer(s) you made in January 2015 to Bravo Luck Limited in the approximate amount of $520 million.

**RESPONSE TO REQUEST NO. 21:**

G Club objects to Request No. 20 on each of the grounds stated in its Overarching Objections, which are incorporated by reference herein.

Subject to the foregoing objections, and although its search is still ongoing, G Club does not believe it has possession, custody, or control of documents responsive to Request No. 21, but agrees to produce all documents responsive to Request No. 21.  As previously noted, G Club was created in October 2020.

Dated:  June 21, 2023
        New York, New York

By:   _/s/ Carolina A. Fornos_
      PILLSBURY WINTHROP SHAW PITTMAN LLP
      Carolina A. Fornos
      31 West 52nd Street
      New York, NY 10019
      Tel: 212-858-1558
      carolina.fornos@pillsburylaw.com

      _Attorney for G Club Operations LLC_

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2023, I caused a copy of the foregoing to be served via First Class Mail to the addresses listed below. In addition, courtesy copies were sent via email to the email addresses listed below.

Mr. Patrick R. Linsey
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
plinsey@npmlaw.com

Mr. Avram E. Luft
Paul Hastings LLP
200 Park Avenue
New York, New York 10166
aviluft@paulhastings.com

Mr. Jonathon Kosciewicz
Paul Hastings LLP
71 South Wacker Drive Suite 4500
Chicago, IL 60606
jonathonkosciewicz@paulhastings.com

_/s/Carolina A. Fornos_
Carolina A. Fornos

**<u>Exhibit B</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S1 23 Cr. 118 (AT) |
| v. | |
| YANPING WANG,<br>   a/k/a "Yvette," | |
| Defendant. | |

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT YANPING WANG'S MOTION FOR PRETRIAL RELASE

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
   Of Counsel

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

RELEVANT BACKGROUND ..................................................................................... 1

PROCEDURAL HISTORY ............................................................................................ 2

    A.  Wang's Arrest and Apartment Search .............................................................. 2

    B.  Charges Against Kwok and Je ........................................................................ 3

    C.  Wang's Presentment and Initial Bail Hearing ................................................ 4

    D.  The Proposed Suretors (March 15, 2023 – March 21, 2023) ........................... 6

    E.  Conference Regarding Wang's Request for Reconsideration of Bail Conditions (March 22, 2023) .................................................................................. 6

    F.  Additional Proposed Suretors (March 22, 2023 – March 24, 2023) ................ 7

    G.  Wang's Bail Motion to Judge Lehrburger ...................................................... 7

    H.  Bail Hearing Regarding Wang's Motion (April 4, 2023) ................................ 8

    I.  Judge Lehrburger's Decision .......................................................................... 8

    J.  The Instant Motion ........................................................................................ 12

APPLICABLE LAW ................................................................................................... 13

ARGUMENT ............................................................................................................... 15

    A.  Wang Poses a Serious Risk of Flight ............................................................ 15

        1)  The Nature and Circumstances of the Offenses Charged ...................... 15

        2)  The Weight of the Evidence ................................................................... 19

        3)  The History and Characteristics of the Defendant ................................. 26

    B.  Wang Has, and Continues to, Engage in Obstructive Behavior .................... 31

        1)  Wang's Lies to Pretrial Services ........................................................... 31

        2)  Wang's Documented Failure to Obey Court Orders .............................. 33

        3)  Wang Maintains Continued Control Over Fraud Entities from Jail ...... 35

    C.  There Are No Conditions or Set of Conditions that Would Reasonably Assure Wang's Future Appearance or Prevent Wang from Further Obstruction ......................... 37

CONCLUSION ............................................................................................................. 42

# TABLE OF AUTHORITIES

*Despins v. HCHK Technologies, Inc. et al.,* 23-05013 (D. Conn.) (JAM) .................................. 35

*In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1110 (D. Conn.) (JAM) ............................... 34, 35

*United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988) ................................................................ 14

*United States v. Gotay*, 609 F. Supp. 156 (S.D.N.Y. 1985) ......................................................... 15

*United States v. Gotti*, 358 F. Supp. 2d 280 (S.D.N.Y. 2005) ...................................................... 16

*United States v. Kwok et al.*, S1 23 Cr. 118 (AT) ..................................................................... 2, 3

*United States v. Kwok*, No. 23-6421 (2d Cir. 2023) ....................................................................... 4

*United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000) .......................................................... 14

*United States v. Leon,* 766 F.2d 77 (2d Cir. 1985) ....................................................................... 16

*United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009) .................................................. 14

*United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020) .................................................................. 15

*United States v. Melville*, 309 F. Supp. 824 (S.D.N.Y. 1970) ........................................................ 9

*United States v. Mercedes*, 254 F.3d 433 (2d Cir. 2001) ............................................................. 14

*United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) ............................................................... 14

*United States v. Smith,* No. 02 Cr. 1399, 2002 WL 31521159 (S.D.N.Y. Nov.13, 2002) ........... 16

*United States v. Stanton*, No. 91-CR-889-CSH, 1992 WL 27130 (S.D.N.Y. Feb. 4, 1992) ........ 15

*United States v. Stein*, No. 05 Cr. 888 (LAK), 2005 WL 8157371 (S.D.N.Y. Nov. 14, 2005) .... 14

## PRELIMINARY STATEMENT

The Government submits this brief in opposition to the motion ("Mot.") and memorandum of law ("Mem.") filed on June 5, 2023 by Yanping Wang, a/k/a "Yvette" ("Wang" or the "defendant") (*see* Dkts. 81, 81-1), seeking revocation of the detention order that was entered in the United States District Court for the Southern District of New York on April 21, 2023, by the Honorable Robert W. Lehburger, United States Magistrate Judge. (Dkt. 56 ("Lehr. Op.").) The defendant also asks this Court for pretrial release. Wang presents both a serious risk of flight and a serious risk of obstruction.[1] Accordingly, for the reasons set forth below, this Court should order Wang detained pending trial.

## RELEVANT BACKGROUND

Wang played a key role in a sprawling and complex fraud spearheaded by Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("Kwok") and their co-conspirator, Kin Ming Je, a/k/a "William Je" ("Je"), that defrauded thousands of victims to invest more than $1 billion into Kwok's extensive, sophisticated, interrelated fraudulent offerings. The fraud relied on at least four interrelated parts: the GTV Media Group, Inc. ("GTV") Private Placement, the Farm Loan Program, G Club Operations, LLC ("G|CLUBS"), and the Himalaya Exchange. Kwok, Wang, Je, and their co-conspirators then laundered their fraud proceeds and misappropriated hundreds of millions of dollars of fraud proceeds for Kwok's and others' personal use. As described in charging documents and during prior court appearances in this case, Wang effectively served as the chief of staff for Kwok and managed the day-to-day operations of the various entities that Kwok controlled and used to operate

---

[1] While the Government previously sought Wang's detention on the basis of her risk of flight, based on additional information, detention is also warranted based on Wang's risk of obstruction.

the fraud. In that role, the defendant had access to, and signatory authority over, bank accounts that were used to obtain and launder fraud proceeds.

Wang presents a serious risk of flight based on her lack of ties to the United States, the nature of the charges, her central role in this serious offense conduct, her access to substantial financial resources, her ties to foreign jurisdictions, her relationship with co-conspirator and international money launderer William Je (who remains at large), her failure to be forthcoming regarding her assets and/or access to assets, the significant sentence that she faces, and the strong evidence of her guilt. Not only is Wang a serious risk of flight, but she has also disobeyed court orders and engaged in other obstructive behavior, including since her arrest and while incarcerated. There are no conditions that can reasonably assure this Court that Wang will appear as required and not further obstruct these proceedings.

## **PROCEDURAL HISTORY**

### A. **Wang's Arrest and Apartment Search**

On March 15, 2023, Wang was arrested at her Manhattan apartment on Criminal Complaint 23 Mag. 2007 (GWG), charging her with conspiracy to commit wire and securities fraud, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and money laundering, in violation of 18 U.S.C. §§ 1957 and 2.[2] (Dkt. 1 ("Compl."),)

That same day, the FBI conducted a judicially authorized search of Wang's apartment. During that search, the FBI recovered bulk U.S. and foreign currency from inside a safe;

---

[2] On March 29, 2023, a superseding indictment (the "Indictment") was filed, charging Kwok, Je, and Wang in various counts for their alleged participation in the fraud and money laundering conduct described therein. *United States v. Kwok et al.*, S1 23 Cr. 118 (AT) (Dkt. 19).

specifically, more than approximately $138,000 in U.S. currency, approximately £3,000, approximately 1180 Hong Kong dollars, and approximately 600 Chinese Yuan.  Additional items inside the safe included expired foreign passports for both Wang and Kwok from Vanuatu[3] and China.  (Lehr. Op. at 3-4.)  The FBI also recovered approximately 12 cellphones, two computers, and more than 25 USB flash drives from Wang's apartment.  One of the laptops was tucked between sweaters in Wang's closet.  (*Id.* at 4.)

### B.  Charges Against Kwok and Je

An indictment charging Ho Wan Kwok ("Kwok") and Kin Ming Je ("Je") was unsealed on March 15, 2023—the same day as Wang's arrest.  *United States v. Kwok et al.*, 23 Cr. 118 (AT) (Dkt. 2).  Kwok was arrested in Manhattan on March 15, 2023, and the FBI conducted judicially authorized searches of three of his residences—his Manhattan penthouse apartment, his Greenwich, Connecticut residence, and his Mahwah, New Jersey mansion.  During those searches, the FBI recovered, among other things, dozens of electronic devices, more than approximately $394,000 in U.S. currency, evidence of Kwok's foreign travel documents, and luxury vehicles that had been purchased with fraud proceeds.  The Government sought, and this Court ordered, Kwok's pretrial detention based on Kwok's risk of flight, danger to the public, and risk of obstruction. (Dkt. 51 ("Kwok Op.")); *see also* Dkts. 7, 23, 24, 26, 50.)   Kwok appealed this Court's opinion

---

[3] Vanuatu is a small island nation in the South Pacific.  It has been publicly reported that Vanuatu permits foreign nationals to acquire Vanuatu citizenship in exchange for investments in the country.  *See* "Citizenship for sale: fugitives, politicians and disgraced businesspeople buying Vanuatu passports," The Guardian, dated July 14, 2021 (available at https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports).  Wang obtained this passport after fleeing China.  (Mem. at 14.)

and order to the Second Circuit Court of Appeals. *United States v. Kwok*, No. 23-6421 (2d Cir. 2023). On June 14, 2023, the Second Circuit affirmed this Court's order detaining Kwok. (*Id.*)

On the same day Wang and Kwok were arrested, U.K. law enforcement attempted to arrest Je in London and executed a judicially authorized search of Je's London residence. During the search, law enforcement recovered, among other items, cellphones, bulk cash in various currencies, and two cryptocurrency hardware wallets. Kwok and Je have significant ties to the United Arab Emirates—they moved substantial proceeds of the fraud scheme into and through at least one of Je's UAE bank accounts, which received at least approximately $128 million in fraud proceeds that was subsequently misappropriated to Kwok, Je, and their family members or wired to Kwok- and Je-controlled entities. (*See* Dkt. 7 at 9-10.) Moreover, Wang, Kwok, and Je recently undertook efforts to move the Himalaya Exchange's operations, and its money, to the UAE so it will be beyond the "long arm jurisdiction of the U.S." (*See* Dkt. 7 at 19.) Indeed, between in or about January and March 2023, at least two individuals affiliated with the Kwok-controlled entity HCHK Technologies, Inc.[4] spent more than approximately six weeks in the UAE, to assist in moving the operations and money of G|CLUBS, the Himalaya Exchange, and other Kwok-controlled entities abroad. Je remains at large and is believed to be in the UAE, where G|CLUBS and the Himalaya Exchange maintain operations.

---

[4] As described herein, HCHK Technologies, Inc. and HCHK Property and Management, Inc. (together, "HCHK") were established in July 2021 and have facilitated the laundering of fraud proceeds through sham operating, services, and loan agreements with the instrumentalities of the fraud, including G|CLUBS. Wang held 99.9999% of the shares of the HCHK entities through her BVI-registered shell company, Holy City Hong Kong Ventures Ltd. While Wang has no formal employment with the HCHK entities, she controls them through her near-full ownership and manages the operations and employees of the HCHK entities.

### C.  Wang's Presentment and Initial Bail Hearing

Wang was presented on March 15, 2023, in the Southern District of New York before the Honorable Katharine H. Parker, United States Magistrate Judge.  During that proceeding, the Government presented then agreed-upon terms of a proposed bail package for Judge Parker's consideration, which included, among other conditions, a $5 million personal recognizance bond to be co-signed by two financial responsible persons approved by the Government and secured by $1 million in real property and/or cash.  (Lehr. Op. at 4-5.)  The Government then noted the following proposed conditions that were in dispute: (a) Wang's release to home detention, and (b) Wang's release only upon satisfaction of all bail conditions.  Pretrial Services recommended conditions of release consistent in all meaningful respects with the Government's proposed conditions, including home detention reinforced with electronic monitoring, that a bond be both secured in part and co-signed by two financially responsible persons, and that Wang remain detained pending satisfaction of all conditions.

Judge Parker heard arguments from the parties and determined that the Government had established by a preponderance of the evidence that the defendant posed a risk of flight.  Judge Parker imposed conditions that she stated were "the least restrictive I believe are necessary to" assure Wang's return to court and the safety of the community.  Those conditions included, among others, a $5 million bond co-signed by two financially responsible persons approved by the Government, and secured by $1 million in cash or property; travel restrictions; surrender of all travel documents; home detention enforced by location monitoring; disclosure of all assets to Pretrial Services and the U.S. Attorney's Office (including any accounts in her name or controlled by her or by companies in which she has an interest, any cryptocurrency, any cash and any other

property).  (Dkt. 10 Ex. C at 11; *see also* Lehr. Op. at 5-6.)  Judge Parker further ordered the defendant detained until all conditions were met.  (Dkt. 10 Ex. C at 11.)

### D.  The Proposed Suretors (March 15, 2023 – March 21, 2023)

On March 20, 2023 and March 21, 2023, the Government interviewed four proposed suretors and determined, among other things, that: (1) none exercised sufficient moral suasion over the defendant—in fact, most barely knew her at all; (2) three proposed suretors had invested in the charged fraud (and therefore were apparent victims of Kwok, Wang, and Je), and one was personally involved in the charged fraud (including as the listed purchaser and registrant of a 2021 Lamborghini and a 2021 Rolls Royce, both of which were purchased with funds traceable to the fraud and both of which the Government seized); and (3) the proposed suretors had insufficient assets to qualify as financially responsible persons for the purposes of the proposed $5 million personal recognizance bond.  The Government informed defense counsel that it could not approve any of the proposed suretors, for the reasons stated above.

### E.  Conference Regarding Wang's Request for Reconsideration of Bail Conditions (March 22, 2023)

On March 22, 2023, a conference was held before the Honorable Sarah Netburn, United States Magistrate Judge, at defense counsel's request.  During that conference, defense counsel asked Judge Netburn "to either [ap]prove the people we've proposed [as co-signers] or change the bail conditions in such a way that Ms. Wang can satisfy the bail conditions and be released."  Judge Netburn declined either to overrule Judge Parker's bail conditions or to direct the Government to accept Wang's proposed co-signers as suretors.   Judge Netburn set a briefing schedule and a conference before Judge Lehrburger.

**F. Additional Proposed Suretors (March 22, 2023 – March 24, 2023)**

On March 23, 2023, the Government interviewed three additional proposed suretors and determined, among other things: (1) that none exercised sufficient moral suasion over the defendant; (2) that all three proposed suretors had invested in the charged fraud (and therefore were apparent victims of Kwok, Wang, and Je); and (3) that the proposed suretors had insufficient assets to qualify as financially responsible persons for the purposes of the proposed $5 million personal recognizance bond. The Government informed defense counsel that it could not approve any of the three additional proposed suretors, for the reasons stated above.

**G. Wang's Bail Motion to Judge Lehrburger**

On March 24, 2023, the defendant filed a motion before Judge Lehrburger "For an Order Directing Defendant Has Complied with the Terms of her Bail Conditions." (Dkts. 8, 9.) The defendant argued that the Government's "refusal to approve [Wang's] bond co-signers has been arbitrary." (Mem. at 1.) The defendant claimed that each of her proffered sureties was "eminently qualified to serve" as a co-signer on the $5 million personal recognizance bond that Judge Parker imposed as a condition of Wang's release. (Dkt. 9 at 6.) The defendant asked Judge Lehrburger either to approve two of Wang's proposed co-signers (without identifying which two) or, alternatively, to modify the bail conditions "such that [Wang's] inability to secure co-signers . . . does not prevent her release"; that is, to set aside Judge Parker's bail finding and "eliminat[e] the use of co-signers altogether." (*Id.* at 10.)

The Government filed an opposition to Wang's motion on March 29, 2023. (Dkt. 10.) The Government's opposition detailed the reasons that it determined that each of the proposed suretors was not qualified to co-sign Wang's bond. The Government also argued that reconsideration of

7

Wang's bail conditions was unwarranted. On March 31, 2023, the Government filed a supplemental opposition that outlined then-newly reviewed evidence recovered from Wang's apartment during the March 15, 2023 search, which evidence demonstrated that the defendant misled Pretrial Services and the Government and attempted to evade compliance with the asset disclosure bail condition Judge Parker had imposed. (Dkt. 22.) Accordingly, the Government sought Wang's pretrial detention based on her risk of flight.

On March 31, 2023, Judge Lehrburger held a conference regarding the defendant's motion. During that conference, the Government presented evidence that the defendant did not disclose the approximately $138,000 in U.S. currency that was in the safe in her apartment to Pretrial Services during her March 15, 2023 interview. (Dkt. 22 at 2.) The defendant requested, and Judge Lehrburger granted, an adjournment of the bail hearing.

### H. Bail Hearing Regarding Wang's Motion (April 4, 2023)

On April 4, 2023, a bail hearing was held before Judge Lehrburger. The transcript of that hearing is attached hereto as Exhibit A. Following the hearing, Judge Lehrburger requested additional materials from the parties. (Dkt. 39.) Between April 6, 2023 and April 16, 2023, both parties made additional filings relating to Wang's bail motion. (Dkts. 37, 39, 42, 43, 47.)

### I. Judge Lehrburger's Decision

On April 21, 2023, Judge Lehrburger issued a written decision and order denying Wang's motion for pretrial release and ordering the defendant detained pending trial. (Lehr. Op.) Judge Lehrburger held that the conditions of release that Judge Parker previously imposed on the defendant had not been satisfied. (*Id.* at 12-17.) In addition, Judge Lehrburger found that the "co-signing of a bond by two financially responsible persons is a necessary component" of Wang's

8

conditions. (*Id.* at 16.) In considering possible conditions of release, including the modified conditions of release proposed by the defendant, Judge Lehrburger found that the conditions were not sufficient to reasonably assure Wang's presence at future proceedings. (*Id.* at 12.) Judge Lehrburger held that detention was warranted, because "there are no conditions that can reasonably assure Wang's attendance at future proceedings." (*Id.* at 23-24.)

*Conditions of Release Not Met*

Judge Lehrburger first addressed whether the conditions of release that Judge Parker imposed on Wang had been satisfied and found that they had not, "because Wang has not provided two financially responsible persons to co-sign the bond[] that are acceptable to the Government." (Lehr. Op. at 12.) Judge Lehrburger found that the "Government did not act arbitrarily in rejecting [Wang's] proposed co-signers" where "none of them have a relationship with Wang that would provide the necessary moral suasion; they did not have sufficient net worth to be financially responsible; and each of them was either a victim of or participant in the alleged fraud." (*Id.*)

Judge Lehrburger discussed the rationale for moral suasion and what it means; particularly, that the "function of bail is not to purchase freedom for the defendant but to provide assurance of his reappearance after release on bail." (*Id.* at 13 (quoting *United States v. Melville*, 309 F. Supp. 824, 826-27 (S.D.N.Y. 1970)).) And Judge Lehrburger agreed with the Government that "none of the individuals put forward by Wang as co-singers have any meaningful relationship with Wang that would incentivize Wang not to flee." (Lehr. Op. at 13.) In responding to the defendant's contention that the proffered co-signers "hold moral suasion over Wang because they support the anti-CCP cause to which she is devoted," Judge Lehrburger observed:

> [T]hat connection may demonstrate the proposed co-signers devotion to Wang; it
> does not suggest that Wang would have any serious reservation about causing them

9

financial loss to purchase her freedom. As noted above, Wang is alleged to have defrauded these very individuals. They may be loyal to her, but the reverse is by no means apparent. As the Government aptly notes, the deep devotion shown by the prospective co-signers potentially makes them less responsible in that they would be more likely to help Wang flee or go underground.

(Lehr. Op. at 15.) In considering all the circumstances, Judge Lehrburger found that the "co-signing of a bond by two financially responsible persons is a necessary component" of Wang's conditions. (*Id.* at 16.)

### Proposed Modified Conditions of Release Not Sufficient

As an alternative to determining that Wang's existing conditions of release had been met, Judge Lehrburger considered the modified bail package proposed by Wang—removing the co-signer requirement entirely and offering that the entire $5 million be secured by cash or property. (Lehr. Op. at 17.) Judge Lehrburger observed that Wang's proposed bond "terms suffer from the same flaw as set forth above." (*Id.*) Under Wang's proposal, the majority "of the bond would be secured by the property of persons who hold no moral suasion over Wang," and while the additional security might put the Government in a better position of recouping the $5 million bond in the event of Wang's flight, "it does nothing to materially change the absence of any suretor who has sufficient moral suasion over Wang to incentivize her not to do so." (*Id.*) Accordingly, Judge Lehrburger found that Wang's proposed modified bail conditions (which, as discussed herein, were *more* restrictive than the conditions Wang now proposes) were "insufficient" to replace the requirement of two co-signers. (*Id.*)

### Detention is Warranted

Judge Lehrburger then considered whether there were any conditions that could be set to reasonably assure that Wang would not flee and held that "there are no such conditions and that Wang should be detained." (Lehr. Op. at 17.) Judge Lehrburger evaluated the relevant Section

10

3142(g) factors, including the nature and circumstances of the charges, the weight of the evidence against Wang, and her history and characteristics. (*Id.* at 17-18.) In particular, Judge Lehrburger cited the following factors that pointed to Wang's risk of flight: (1) the massive scale of the alleged fraud in which Wang played a significant role; (2) the potential sentence of 24 to 30 years' imprisonment that Wang faces if convicted; (3) the Government's proffered strong evidence of Wang's guilt, including records reflecting her authorizing the $100 million transfer or misappropriation of GTV Private Placement funds and evidence of her knowledge that the transfer was improper (*see* Dkt. 19 at ¶ 32(b)); (4) Wang's history and characteristics, which "overwhelmingly demonstrate a serious risk of flight;" and (5) "strong indicia that Wang has considerable financial means at her disposal." (*Id.* at 17-19.)

Judge Lehrbruger then addressed information learned since Wang's initial bail hearing, which "only heightens the Court's concern." (*Id.* at 19.) Specifically, Judge Lehrburger viewed the fact that Wang had not been able to identify potential co-signers with moral suasion as "itself a substantial change in circumstances since conditions were set by Judge Parker," who assumed Wang would be able to satisfy that "least restrictive" condition of bail. (*Id.* at 19; *see also* Dkt. 10 Ex. C at 22-23.) Judge Lehrburger also found that Wang had "not been forthcoming in fully disclosing her assets." (Lehr. Op. at 20.) While Judge Lehrburger did not make a particular finding regarding whether or how much cryptocurrency Wang holds, he advised that the documentation the Government presented suggesting that Wang had received (purported) cryptocurrency holdings that she did not disclose "certainly gives the Court concern that there may be unaccounted-for assets to which Wang could have access," notwithstanding possible redemption restrictions associated with the Himalaya Exchange following the Government's seizures. (*Id.*) Judge

11

Lehrburger also noted that Wang "did not disclose to Pretrial Services the $138,000 cash that was seized from her residence" and reasoned that, regardless of the specific question asked, "it makes no sense" that Wang would have believed questions about assets she has to be "so limited" to cash on her person at the time of her arrest. (*Id.* at 21.) Finally, as to Wang's 2023 request to travel internationally and her remaining in the United States in the months prior to her arrest, despite knowing that the Government had an investigation into Kwok-controlled companies, Judge Lehrburger considered—and rejected—the defense's contention that those facts mitigated Wang's risk of flight. (Lehr. Op. at 21-22.) Acknowledging that "staying put while known to be under investigation can be indicative of someone who is not likely to flee (although merely being under investigation and actually being charged are quite different)," Judge Lehrburger noted that Wang actually sought leave to "not stay put" and expressed a willingness to travel internationally, which "provides no comfort that Wang actually planned to return." (*Id.* at 22-23.) Having considered potential conditions of release, Judge Lehrburger found "that the Government ha[d] met its burden to show by a preponderance of the evidence that no condition or combination of conditions can reasonably assure the Defendant's appearance at future proceedings" and ordered Wang detained. (*Id.* at 23.)

### J.  The Instant Motion

On June 5, 2023, Wang filed the instant motion, seeking pretrial release. (*See* Mem.) The defendant proposed the following conditions of release: (1) a $2 million personal recognizance bond, secured by $1 million in property, the cash in "one of her bank accounts,"[5] and the $138,000

---

[5] Wang does not identify which bank account or how much cash she proposes to post as security. At the time of her arrest on March 15, 2023, Wang represented that her two bank accounts held

12

in cash that was seized from the safe in her apartment; (2) restrictions on her use of her other bank account, requiring preapproval by Pretrial Services; (3) travel restricted to the Southern and Eastern Districts of New York; (4) surrender of all travel documents with no new applications; (5) strict supervision by Pretrial Services; (6) location monitoring as directed by Pretrial Services; (7) home confinement with GPS monitoring; (8) no contact with co-defendants, witnesses, or purported victims without attorneys present; and (9) home monitoring by a friend who will live with Wang and be responsible for reporting any violations.  (Mem. at 9-10.)  The defendant principally argues that the Government did not meet its burden to show that (1) Wang presents a serious risk of nonappearance, and (2) no combination of conditions would reasonably assure her appearance.[6]  Wang asserts that her proposed combination of bail conditions is sufficient and will make it "impossible for Ms. Wang to flee the U.S."  (Mem. at 3, 35.)

## APPLICABLE LAW

Under the Bail Reform Act, a defendant shall be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  In assessing a defendant's risk of flight and the danger to the community presented by her release, Congress has directed courts to consider several factors:  (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and

---

approximately $400,000 and $500,000, respectively, but she has provided no updated account balances.

[6] The defendant also argues that pretrial detention hinders her ability to prepare her defense. (Mem. at 38-39.)

seriousness of the danger to any person or the community that would be posed by Wang's release. 18 U.S.C. § 3142(g).

In seeking pretrial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community or risk of obstruction, and that no condition or combination of conditions can address those risks.  18 U.S.C. § 3142(f); *see also United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States v. Friedman*, 837 F.2d 48, 29 (2d Cir. 1988).  Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means.  *See* 18 U.S.C. § 3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (Government entitled to proceed by proffer in detention hearings).

"[O]bstruction [also] poses a danger to the community," and where there is a risk that such activities will continue, pretrial detention may be appropriate.  *United States v. Stein*, No. 05 Cr. 888 (LAK), 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14, 2005).  Indeed, the Second Circuit has been clear that "obstruction of justice has been a traditional ground for pretrial detention by the courts."  *LaFontaine*, 210 F.3d at 134.  Thus, where, as is the case here, there is "a *serious* risk of obstruction in the future," detention is appropriate where no court-imposed conditions can reasonably protect from that risk.  *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009); *see also* Kwok Op. at 7-11, 13 (holding that Kwok's obstructive conduct—which included failure to obey court orders, lies to Pretrial Services about his assets, his technological sophistication and ability to "delete, encrypt, or transfer electronic evidence and fraud proceeds if

released," and his moving fraud proceed abroad to evade U.S. jurisdiction—"demonstrate[s] that the Court does not have reasonable assurance that [Kwok] will abide by any conditions of pretrial release.").

"If the Government carries its burden, then the Court must determine whether there are reasonable conditions of release that can be set to ensure the defendant's appearance and the safety of any other person or the community." (Kwok Op. at 5); *see also* 18 U.S.C. § 3142(c)(1)(B). Even where the least restrictive set of conditions are imposed as conditions of bail, it is "not unique" for a defendant to be unable to meet those conditions and therefore to remain detained pending trial. *United States v. Stanton*, No. 91-CR-889-CSH, 1992 WL 27130, at *1 (S.D.N.Y. Feb. 4, 1992); *see also United States v. Gotay*, 609 F. Supp. 156, 156 (S.D.N.Y. 1985) ("if a defendant cannot meet economic conditions of release reasonably necessary to assure his appearance, he must remain in pre-trial detention"). If a court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court is instructed to order the pretrial detention of a defendant. *United States v. Mattis*, 963 F.3d 285, 290 (2d Cir. 2020); 18 U.S.C. § 3142(e)(1).

"A district judge must undertake a *de novo* review of a magistrate judge's decision to release or detain a defendant." *United States v. Gotti*, 358 F. Supp. 2d 280, 282 (S.D.N.Y. 2005); *see also United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985); *United States v. Smith*, No. 02 Cr. 1399, 2002 WL 31521159, at *1 (S.D.N.Y. Nov.13, 2002).

## ARGUMENT

The nature and circumstances of the offenses charged, the weight of the evidence against Wang, her individual history and characteristics, the serious risk of obstruction that would be posed

by Wang's release, and her substantial risk of nonappearance are all factors that strongly counsel in favor of Wang's pretrial detention

### A. Wang Poses a Serious Risk of Flight

##### 1) *The Nature and Circumstances of the Offenses Charged*

Wang played a central role in a more than $1 billion fraud and money laundering conspiracy that Kwok spearheaded. As this Court is now familiar, for more than four years, Kwok, Wang, Je, and others, conspired to defraud thousands of victims of more than $1 billion through a series of complex fraudulent businesses and fictitious investment opportunities that connected dozens of interrelated entities controlled by Kwok, many of which were managed by Wang. (Dkt. 19 at ¶¶ 1-5, 8.) The depth and breadth of the fraud is difficult to overstate. To carry it out, Kwok, Wang, Je, and their co-conspirators laundered fraud proceeds through foreign and domestic bank accounts and entities, layering the fraud funds to conceal their source, as well as using the fraud proceeds to further promote the ongoing criminal activities. Wang ensured the successful day-to-day operation of the entities that implemented the fraud and made sure that Kwok could misappropriate victim funds for his own personal use and for the use of his family members. For this work, Wang was paid $400,000 in cash plus $100,000 in "benefits" each year and stood to gain more through ownership of Himalaya Coin, which—but for the law enforcement's success in seizing hundreds of  millions of dollars traceable to fraud involving the Himalaya Exchange—

would have yielded her millions more in fraudulent proceeds.  (*See* Mem. Ex. N. at 5 (notes from Wang's counsel).)[7]

The conspiracy operated through four interrelated arms—the GTV Private Placement, Farm Loan Program, G|CLUBS, and the Himalaya Exchange.  As Kwok's chief of staff, Wang played roles in each of the arms and was particularly central to the GTV Private Placement and G|CLUBS.  Through the GTV Private Placement, Kwok, Wang and other coconspirators raised approximately $452 million by selling "common stock" in GTV, a purported media company.  In connection with the GTV offering, Kwok and others disseminated to victims offering documents—including a "Confidential Information Memorandum" ("PPM").  The PPM named Wang as an "executive director" and stated that the money raised through the GTV Private Placement would be used "to expand and strengthen [GTV's] business."  But that was a lie.  After selling approximately $452 million worth of GTV common stock to more than 5,500 victims, *see* Dkt. 19 at ¶ 12(e), in April and May 2020, the victims' money was funneled through a series of bank accounts that Wang controlled, and $100 million of the money raised was subsequently invested into an extremely high-risk hedge fund ("Fund-1").  Wang not only controlled the accounts that received hundreds of millions of dollars of victim money, but she also initiated the wire that sent $100 million of victim money to the hedge fund.

Specifically, on or about June 3, 2020, Wang signed a "Subscription Agreement" in her capacity as "President" of Saraca (the parent company of GTV).  By virtue of Wang's signature,

---

[7] Notes from Wang's own counsel severely undercut the defendant's claim that Wang's involvement in the fraud did not provide her "funds for personal use."  (Mem. at 12.)  To the contrary, Wang was lavishly rewarded for her criminal acts through an approximately $500,000 annual salary, including benefits (Mem. Ex. N), and the promise of earning millions through investments in purported cryptocurrencies.

Saraca agreed to invest $100 million into a high-risk hedge fund. Wang identified an account she opened, controlled, and which received more than $300 million of victim funds, as the account which would fund that $100 million investment ("Account-5601"). The same day, Wang transferred $100 million from Account-5601 to a different bank account she had opened ("Account-2038"), which had a $0 balance prior to the $100 million transfer. Bank records indicate that $100 million transfer was conducted online by the user "yvettewang2018." (*See* Compl. at ¶ 12.)[8]

On June 5, 2020, Wang authorized the $100 million wire transfer (consisting of entirely money raised through the GTV Private Placement) from Account-2038 to Fund-1.[9] The subscription agreement, which Wang signed, made clear that $100 million investment in Fund-1 was made on behalf of Saraca, whose ultimate beneficial owner is Kwok's son. That is, Wang herself spent $100 million of victim money, thereby violating the terms of GTV's PPM.

Over the next several months, banks closed GTV-related accounts and issued checks for the balances of those accounts. Wang received one such check in the amount of $137,999,970, made payable to GTV. In July 2020, Wang and others attempted to open a bank account in the name of GTV in which to deposit two checks representing victim funds—the nearly $138 million check and a second check for $100 million. To open this new bank account, Wang filled out an

---

[8] The defendant's motion argues that Wang's mention in 22 of 154 paragraphs in the Indictment somehow diminishes the serious nature of the charges. (Mem. at 11-12.) Not so. As described above, the Government is not limited to information in the Indictment during bail considerations; moreover, the Government also filed a criminal complaint that detailed Wang's specific criminal conduct. (*See* Compl.) Finally, the defense simply ignores that Wang is charged in the first Count of the Indictment, which identifies her as Kwok's "chief of staff" for the *entirety* of the four-year long conspiracy. (Dkt. 19 at ¶¶ 8, 26-32.)

[9] Although Wang identified Account-5601 as the source of the hedge fund investment, the money was transferred from her Account-2038.

"Enhanced Diligence Request," in which she stated that the initial deposit into the account would "be approximately $138 million that was raised from private placement in the form of a cashiers check." As Wang stated in that enhanced due diligence document, "Saraca Media Group was the recipient of [GTV] Private Placement funds on behalf of GTV . . . . [t]he funds in the account are funds of GTV Media Group and are strickly [sic] for operational purposes and acquisitions." (Compl. at ¶ 13.h.) Accordingly, Wang well knew that the funds raised from the GTV Private Placement could not be invested in a high-risk hedge fund for the benefit of Kwok's son.

Standing alone, Wang played a critical role in the GTV Private Placement, which undergirds Counts Two, Three, and Eleven. Even if her criminal acts stopped there—and they did not—she would be centrally involved in a $439 million theft from thousands of victims, which is an extraordinarily serious crime in and of itself.[10] But the conspiracy, and Wang's involvement in it, persisted for years and has continued even since her arrest. Wang served as a *de facto* G|CLUBS executive, had decision-making authority at the Kwok-controlled media platform, Gettr, was involved in money transfers to the Himalaya Exchange, and was active in transferring and consolidating assets of the various Kwok-controlled fraud instrumentalities abroad into a newly created UAE shell company. Thus, far from "lead[ing] a dissident movement" as the defense

---

[10] Wang's attempt to minimize the serious of the GTV Private Placement should be rejected. The defense attempts to reframe the GTV Private Placement as conduct that caused "$30 million [in] investment losses, no siphoning funds for personal use." (Mem. at 12.) As an initial matter, a $30 million loss is very substantial. More to the point, however, this was not a mere "investment loss[ ]." (*Id.*) Wang and her coconspirators promised investors that their money would be used for GTV business but, instead, Wang transferred *$100 million* of it into an investment for Kwok's son. That is quintessential fraud. That the Securities and Exchange Commission was able to successfully mitigate losses for victims should not inure to the benefit of Wang, whose acts caused $30 million in actual loss and attempted another $70 million. (Mem. at 12.)

contends, Mem. at 1, the evidence reveals that Wang worked—day in and day out—to ensure the successful operation of a broad and serious fraud enterprise.

The severity of Wang's criminal conduct thus weighs in favor of detention.  (*See* Lehr. Op. at 18 ("nature and circumstances of the charges . . . counsel against release").)

### 2)  *The Weight of the Evidence*

The weight of the evidence against Wang similarly "counsel[s] against release."  (Lehr. Op. at 18.)  The evidence against Wang is particularly strong.  It convincingly demonstrates the essential hands-on role Wang played in the GTV Private Placement, the operation of G|CLUBS and other fraud instrumentalities, and the layering and laundering of fraud proceeds.  The Government's evidence consists of, among other things:  bank records, email and cellphone communications, recorded phone calls, Wang's own writings about her activities in journals and datebooks, offering documents, and anticipated testimony from witnesses, including other individuals who worked in various arms of the fraud.  Collectively, the multitude of evidence establishes Wang's many activities in furtherance of the fraud; it also provides compelling evidence of Wang's state of mind—her intent and knowledge that she played an essential role in serious criminality.

As described above, and as attested to in the Criminal Complaint (Dkt. 1), documents from banks overwhelmingly demonstrate Wang's active and knowing involvement in the GTV Private Placement.  Those documents identify bank accounts that Wang opened as the accounts that received the vast majority of money fraudulently raised through the GTV Private Placement.  And Wang well knew the source of the money in those accounts was from GTV investors.  Many of the hundreds of deposits bear reference or memo information explicitly referring to the GTV Private Placement.  For example, memo lines state, among other things, in substance and in part:

20

"Capital Injection Infusion," "To Inves Stment [sic]," "Private Placement Investment," "Gtv Media Investment," "Gtv Inv," and "Additional Stock Purchase."

Moreover, the PPM establishes that Wang was an executive director of GTV. Wang therefore well knew that GTV investor money could not be used for a high-risk hedge fund investment for the benefit of Kwok's son. Indeed, Wang herself stated, in a signed document that she submitted to a bank, that the money raised from the GTV private placement is "strickly [sic] for operational purposes and acquisitions." (Compl. at ¶ 13.h.)[11] And there is little doubt that it was Wang (using her online user account, "yvettewang2018") who initiated the transfer (and misappropriation) of $100 million dollars in GTV Private Placement fraud proceeds.

The Government has also obtained numerous emails sent by Wang's encrypted email accounts.[12] Those emails demonstrate, *inter alia*, that Wang was an authorized signer on bank accounts held in the names of numerous entities used to launder fraud proceeds and Wang's involvement in G|CLUBS managerial decisions and meetings. Indeed, the Government has recordings in which Wang, unbeknownst to her, was recorded making financial decisions and directing others regarding how to process money from G|CLUBS members, including by proposing that the money be routed through various Farms' bank accounts. These recordings and documents corroborate the testimony of witnesses, who will establish that Wang had a leadership

---

[11] Any claim that Wang's language skills interfered with her understanding of the English-language documents should be summarily dismissed. The Government has several recordings of Wang fluently speaking English (and translating from Mandarin to English). Indeed, Kwok's counsel has identified Wang as one of Kwok's English translators. Messages recovered from Wang's cellphones are variously written in Mandarin and in fluent English. Finally, notes from a meeting between Wang and her own counsel indicates her "Languages: Mandarin[,] English[, and] French" and she has a bachelor's degree in "English." (Mem. Ex. N at 4, 5.)

[12] The defendant utilizes several email accounts hosted @protonmail.com; Proton Mail is an encrypted email service hosted in Switzerland.

21

role across the conspiracy. It was Wang who interviewed and hired individuals who worked for G|CLUBS and other Kwok-associated entities that helped carry out the fraud.

Beyond documents from banks and other entities, emails, and recordings, the Government has obtained significant additional evidence pursuant to search warrants that were executed on the day of Kwok's and Wang's arrests—including during the search of Wang's apartment. That search revealed multiple documents that further cement Wang's central role in all aspects of the wide-ranging conspiracy. For example, the Government obtained Wang's weekly planners from 2018 through 2023. Those planners each contain dozens of pages demonstrating—through Wang's own writings—her involvement in G|CLUBS and the Himalaya Exchange, as well as other entities associated with the fraud (*e.g.*, G Fashion, G Music, HCHK, and Gettr).

Indeed, Wang's notes reflect her involvement in Kwok's new "A10" offering in or about March 2023. Around that time, Kwok began promoting the A10, which has all the hallmarks of other arms of the fraud, as a purported stock offering for 5% of the Himalaya Exchange and 5% Gettr. (Dkt. 26 at 14.) The below excerpt from Wang's March 2023 planner (*i.e.*, just before

Wang's arrest) demonstrates, among other things, her involvement with the A10 offering, the HCHK and Golden Spring websites, and Himalaya Coin (HCN).



Despite the defense's claim that Wang was merely a volunteer fighting the CCP during this time, Wang's work—as reflected in this planner excerpt—is centrally connected to the conspiracy's fraudulent money-making activities and has little, if any, connection to pro-democratic work. Wang's planners contain meticulous notes about her activities in furtherance of the conspiracy. It appears that Wang's practice was to indicate completion of a task or meeting with a red check mark. The planners are mostly in Mandarin, and the Government's review and translation of their contents is ongoing.

As another example, an undated document found inside the 2023 planner illustrates Wang's knowledge that HCN and HDO (the purported digital currencies traded on the Himalaya Exchange) were used to launder G|CLUBS membership fees:



The Government also seized 12 cellphones from Wang's apartment and has reviewed some of the content of certain of those cellphones.[13] As an initial matter, Wang's electronic communications reflect her technological sophistication. Wang communicated with others primarily using encrypted messaging applications, including Signal (which offers a feature that allows for the automatic deletion of messages after a customizable time period) and WhatsApp (which offers a feature that allows for the scrambling of message content); she set up separate Apple IDs for different of her cellphones, rather than consolidating the data under one iCloud account (*e.g.*, Wang's device named "August's iPhone" is associated with the Apple ID

---

[13] The Government is aware of cellphone messages between Wang and Kwok; however, because Kwok has claimed that Wang translated attorney-client communications, the Government has not yet been able to review the substance of those messages. The Government's review of the evidence recovered from Wang's cellphones and her apartment is in its early stages.

"august[redacted]@icloud.com," whereas "March's iPhone" is associated with the Apple ID "march[redacted]@icloud.com"); and she deleted certain messages and call logs from her cellphones.[14]

Wang's electronic communications also corroborate that she was central to the conspiracy. Wang exercised control over finances and business decisions and continued in her critical role as Kwok's "chief of staff" through her arrest. (*See* Mem. at 15.) Wang's efforts to move the companies' operations to the UAE, beyond the jurisdiction of U.S. authorities, is reflected in Wang's communications with HCHK's Financial Controller ("Controller"), who was one of the U.S.-based employees spent several weeks in the UAE in early 2023. *See supra* at 4. Those communications—which were in English and took place via Signal—include the following, among others and in substance and part:

- On March 6, 2023, Controller wrote to Wang: "Notes : I was advised this morning; [another individual] came to me given feedback to boss[15] on Daily … plus monthly writing a report to boss about the office and all moving parts and observation."

- Approximately 20 minutes later, Controller wrote to Wang: "We have been approved FAB!!! / Account numbers tomorrow / Just opened another bank account NBF ! Should have account numbers soon too"[16]

- Later that day, Controller advised Wang that the entities were "Moving money into ADCB [*i.e.*, Abu Dhabi Commercial Bank PJSC]" and sent a screenshot of what appears to be a bank account balance screen reflecting several incoming deposits of $750,000 into an account that had grown to approximately $8.25 million as of March 6, 2023. Approximately two hours later, Controller sent Wang a screenshot of a UAE entity account at a fourth UAE financial institution, reflecting a balance

---

[14] Forensic extraction tools for cellphones and other electronic devices are sometimes able to successfully recover deleted data, including messages, call logs, and contacts; in those instances, the extraction indicates when data was deleted from the device.

[15] The Government has learned that "Boss" is another alias for Kwok.

[16] FAB, or First Abu Dhabi Bank, and NBF, or National Bank of Fujairah, are financial institutions located in the UAE.

of approximately 41,831,901 AED (UAE Dirham), or approximately $11,389,308 USD.

- On March 7, 2023, Wang directed Controller to secure funds associated with the Himalaya Exchange, writing, in part: "Stay calm, focus on what you can get from H Reserve's banks for now" and indicating that she was "working on adding [Controller] as an extra bank signer."

- On March 9, 2023, Wang asked Controller to "pls find out the SWIFT code for FAB [*i.e.*, First Abu Dhabi Bank] bank of [UAE entity]? I do have their IBAN here."[17] Controller provided the SWIFT code, and Wang responded, "I'll use this one for the sender bank."

- The next day, Controller reported back to Wang: "Good day lots of laughs a lot accomplished with [UAE entity] … / And gclubs".

- On March 11, 2023, Wang wrote to Controller: "I'm thinking: you probably better no[t] bring any uae devices back to us. Think about how to work as basic levels from here." Later that day, she added: "Yes, I thinking you come back home with less info better, or even zero info from there. Including devices. / Advise [another individual who was in the UAE ("Employee-1")] the same my advice also pls."[18]

These select messages, from just one encrypted chat on one of the defendant's cellphones, clearly establish that Wang managed the Kwok-controlled entities and their finances; that she had access to and control over substantial fraud proceeds; that she was directing employees to secure fraud proceeds and transfer those proceeds to UAE-based bank accounts held in the name of a newly formed foreign entity; and that she did not want the U.S.-based employees of Kwok-controlled entities to bring evidence of the new UAE-based operations back into U.S. authorities' jurisdiction. Wang's motivation is clear and undeniable: just a week before her arrest, she was knowingly

---

[17] A SWIFT code is a set of digits that represents a bank branch and is needed to send money internationally. An IBAN, or an international bank account number, is a standard international numbering system developed to identify an overseas bank account.

[18] Wang's instructions that these U.S.-based employees should not travel back to the United States with any information relating to the fraud instrumentalities' UAE operations cannot credibly be explained as a concern about the CCP or its alleged monitoring of the activities of Kwok's "movement." Rather, it is apparent from the face of these communications that Wang was concerned with the employees drawing the attention of U.S. criminal authorities.

continuing the fraud's operations, laundering fraud proceeds, obstructing the Government's investigation, moving cash abroad, and keeping evidence from entering the U.S.

The cumulative strength of the evidence means that, based solely on the present charges, Wang is exposed to a Sentencing Guidelines Range of 24 to 30 years. (Lehr. Op. at 18.) Given the weight of the evidence, the likelihood of Wang's conviction is very high, and thus a sentence of incarceration and accompanying immigration consequences is the expected outcome. With this backdrop, it is not credible for Wang to claim she has "no intention to flee." (Mem. 17-18.)

### 3) *The History and Characteristics of the Defendant*

Wang's history and characteristics "overwhelmingly demonstrate a serious risk of flight." (Lehr. Op. at 18.)

*First*, Wang has very limited connections to the United States. The defendant is a Chinese citizen who emigrated from China to the United States in approximately 2017. (Mem. at 14; Lehr. Op. at 3.) She has no family in the United States. Wang's only son lives in China, and she has not seen him since she immigrated to the United States. (Mem. at 14; Dkt. 10 Ex. D at 6-7.) She has virtually no ties to the community (other than her criminal conduct) and, by her own admission, no connections to any individuals unaffiliated either with the Kwok-controlled entities involved in the fraud or with Kwok's "movement."[19] (Dkt. 10 Ex. D at 7-8.) Further highlighting her lack of

---

[19] The defendant claims that Judge Lehrburger and the Government "criticized [Wang] for not having put down sufficient roots" and for not seeming to "have close friends other than Chinese people who are also members of the anti-CCP movement that she helps lead." (Mem. at 19.) This is meritless. It is not a criticism to examine a criminal defendant's connections to a jurisdiction when assessing risk of flight. (*See* Kwok Op. at 5 (this Court examining Kwok's connections to the United States and finding them to be "limited").) Moreover, as Judge Lehrburger correctly found, each of the proposed sureties "was either a victim of or participant in the alleged fraud," and the Government "did not act arbitrarily in rejecting" them. (Lehr. Op. at 12-15.)

27

connections to the U.S., none of the eight suretors the defendant proposed to the Government and to Judge Lehrburger has "any meaningful relationship with Wang that would incentivize Wang not to flee." (Lehr. Op. at 13.)

*Second*, Wang has substantial connections and resources abroad. Many of the Kwok-controlled entities the defendant effectively ran, in either a formal or informal capacity, have bank accounts, offices, and/or employees located in foreign jurisdictions—jurisdictions including the United Kingdom, the UAE, the British Virgin Islands, Kyrgyzstan, Switzerland, and Israel. As described above, Kwok and others have been moving the operations of the Himalaya Exchange and other Kwok-controlled entities to the UAE for the admitted purpose of evading the U.S. legal system. (*See* Kwok Op. at 5-6.) Her co-defendant, Je, is presently believed to be hiding in the UAE. (Kwok Op. at 5-6.) And, as evidenced by the information in her cellphones, Wang herself was central in moving money and operations to the UAE.

Wang also has access to, and the support of, an extensive network of her and Kwok's devoted followers dispersed throughout the world—followers who "are so loyal as to risk being liable for millions of dollars without knowing [Wang] well," and who therefore "could be a potential source of support and harbor for Wang if she were to flee." (Lehr. Op. at 18; *see also* Kwok Op. at 6 ("[Kwok] has an extensive network of devoted followers around the world").)

*Third*, Wang has considerable financial means at her disposal. At the time of her arrest on March 15, 2023, she maintained approximately $138,000 in cash in a safe in her apartment, and personal bank accounts with more than approximately $900,000 in liquid funds.[20] (Lehr. Op. at

---

[20] The conditions Judge Parker imposed included the requirement that Wang "disclose all assets to Pretrial Services and the U.S. Attorney's Office, *including any accounts* in her name or

19.) Wang contends that she has "nothing else" by way of assets or access to funds. (Mem. at 23.) However, this claim is belied by Wang's role in the fraud and her effective control over tens of millions of dollars, as described in greater detail herein.

Indeed, the charged fraud operated through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities. Wang, Kwok, and Je utilized more than approximately 500 accounts held in the names of at least 80 different entities or individuals to launder more than $1 billion in fraud proceeds. (Dkt. 19 at ¶¶ 1, 3.) By design, most of these shell companies were owned or operated by others on paper, but it was Kwok, Je, and the defendant who made the business decisions and controlled the flow of funds. Wang's responsibilities as Kwok's "chief of staff" include managing the day-to-day operations of the dozens of instrumentalities of the fraud; accordingly, she has access to substantial sums of money, including funds held by entities where she was not formally employed[21] or held in bank accounts for which she was not listed as an authorized signer.[22] (*See* Ex. A at 56-57.) This fact is apparent from certain documents recovered from Wang's apartment on the day of her arrest reflecting, among other things, the following: (a) the *defendant* authorized February 2023 payroll

---

controlled by her or *by companies in which she has an interest*." (Dkt. 10 Ex. C at 22-23) (emphases added).

[21] The Government's evidence reflects that Wang was formally employed only by the following Kwok family office entities during at least the following time periods: Golden Spring New York Ltd. between April 2019 and March 2021; and Lamp Capital LLC between March 2021 and April 2022.

[22] The Government's evidence reflects that Wang has been an authorized signer on bank accounts held in the names of at least the following entities that are alleged to be involved in the charged offenses: Saraca Media Group Inc.; GTV Media Group Inc.; Rule of Law Foundation III, Inc.; Rule of Law Society IV, Inc.; Leading Shine NY Ltd.; Lexington Property and Staffing LLC; Hudson Diamond NY LLC; Golden Spring New York Ltd.; Greenwich Land LLC; G Club Operations LLC; and G Fashion LLC.

expenses for employees of Kwok-controlled entities G Music, G Clubs, G Fashion, HCHK, Rule of Law Foundation, and Orbit Technology Corporation (Dkt. 42 at 3-4, Ex. F); and (b) the defendant had printed summaries of account balances for six bank accounts held in the names of Kwok-controlled GF Italy, GFNY, HCHK Technologies, and HCHK Property in her purse, which indicated that those six accounts alone held more than $55 million as of March 13, 2023. (Dkt. 42 at 3, Ex. E.)   In light of the above circumstances, the Court can have "no reasonable assurance . . . that there are not other substantial funds to which Wang has access." (Lehr. Op. at 19.)   Indeed, as described below, the defendant continues to oversee and effectively control fraudulent proceeds, even from jail.

*Fourth*, Wang has the means and know-how to flee.  She was able to obtain a passport from another jurisdiction shortly after leaving China.  Moreover, "a clever defendant with sufficient resources could figure out a way to leave the country without travel documents." (Kwok Op. at 6.)  Wang is the sole director of foreign entities used to facilitate the fraud, including her BVI-registered Holy City Hong Kong Ventures Ltd., which in turn owned the HCHK entities.  Indeed, the defense acknowledges that Wang "travelled a lot" after leaving China in 2015, before moving to New York in 2017 and seeking political asylum.  (Mem. at 13-14.)

Wang's motion relies on the claim that she will remain in the United States if released because she cannot travel, *at all*, because of security concerns due to the threat posed to her by the CCP.  (Mem. at 16-19.)  This argument does not withstand scrutiny.  As explained above, and as the defendant acknowledges, Wang "travelled a lot" after fleeing China.  This belies the claim that the CCP is in hot pursuit of her if she were to travel anywhere beyond U.S. borders.  Indeed, as recently as January 2023, the defendant sought authorization from the U.S. Department of

Homeland Security to make "multiple" international trips to the United Kingdom and the British Virgin Islands, for business purposes that she said would continue through "at least the remainder of 2023." (Dkt. 42, Ex. G.) As Judge Lehrburger found, the defendant's statement of intended foreign travel significantly undermines Wang's argument that she poses no risk of flight, because it shows that she *is* willing to travel internationally—even despite the CCP's purported efforts to monitor her location and possibly repatriate her. (Lehr. Op. at 22-23.)

Wang's claim that her remaining in the United States after becoming aware of the Government's investigation in 2022 is a "strong indication" that she is not a serious flight risk is equally flawed. To the contrary, the defendant renewed her request to obtain authorization to travel internationally, which allowed her to "preserve her asylum application rights" and "provides no comfort that Wang actually planned to return" to the U.S.—particularly if charged while abroad. (Lehr. Op. at 22-23.) Further, there is a fundamental difference between having some awareness of the existence of an investigation and actually being charged—especially where, as is the case here, the charges are serious, the evidence is strong, and the potential criminal consequences are severe. (*See* Lehr. Op. at 22.)

*Fifth*, the defendant has an extremely powerful incentive to flee. She is facing charges that, in total, carry a statutory maximum sentence of approximately 55 years in prison. A conservative estimate of her applicable Sentencing Guidelines range reflects an exposure of approximately 24 to 30 years in prison—"a lengthy sentence that could cause most anyone to consider alternative courses of action." (Lehr. Op. at 18.) Indeed, Wang fled her home country of China due to her political activities, leaving behind substantial connections to the community, including a "happy family" with whom she had "every reason to stay." (Mem. at 13.) Wang certainly has a strong

31

incentive not to appear in Court, given the severity of the present charges, the evidence against her, and the serious adverse consequences to her liberty and immigration status to which she is now exposed.

A substantial amount of the fraud proceeds and operations of the fraud entities have already been moved abroad to the UAE (with Wang's assistance, as discussed herein), where Wang's other co-defendant, Je, remains at large. Given the substantial evidence of Wang's guilt and the expected length of her potential sentence, any individual would be highly incentivized to flee; with Wang's lack of ties to the United States, her ties and resources abroad, and the prospect of likely deportation after serving her sentence, the incentives to flee are even greater. (*See, e.g.*, Lehr. Op. at 18; Kwok Op. at 7.)

### B. Wang Has, and Continues to, Engage in Obstructive Behavior

Wang has engaged in obstructive conduct, including disobeying court orders and making material misrepresentation to Pretrial Services, the Government, and the Court. Wang's obstructive behavior has continued since her arrest, even while she has been detained. The defendant's "history of obstructive behavior in prior cases and [her] conduct in this matter establish that [s]he is likely to continue this pattern if released." (Kwok Op. at 11.)

#### 1) *Wang's Lies to Pretrial Services*

The defendant deliberately concealed material information from Pretrial Services during her March 15, 2023 interview. (*See* Kwok Op. at 10 (characterizing false representations to Pretrial Services as "obstructive behavior").) As discussed herein, and as the defendant has conceded, she did *not* disclose during her Pretrial Services interview that she had approximately $138,000 in cash in her safe at the time of her arrest. (Ex. A at 20.) The defendant continues to equivocate regarding whether she "lied" about the cash. During the April 6, 2023 bail hearing, counsel argued:

32

> [T]he question that she was asked, the relevant question was did you have any money cash on you when you were arrested. She was arrested at 6:15 a.m., she was in her pajamas. The truthful answer to that question is no. We checked out notes, we don't see any other questions that would have elicited a different answer. *So did she disclose it voluntarily? No.* I don't know that she was asked about it.

Ex. A at 20:12-19 (emphasis added).

The defendant now contends that "[t]he idea that [Wang] would lie about cash stored in her safe at home . . . makes no sense whatsoever." (Mem. at 31.) Yet she did just that—she "answered the questions about her assets untruthfully." (Lehr. Op. at 21.) As Judge Lehrburger correctly observed, "it makes no sense that Pretrial Services, in seeking to learn what assets Wang has, would have asked only about cash 'on her,' or that Wang, in answering such questions, would have believed the question to be so limited." (*Id.*)

The defendant also falsely represented to Pretrial Services that she has been unemployed since September 2022, in a deliberate effort to mislead the Court and the Government and to distance herself from Kwok and the fraud-affiliated entities. (*See* Lehr. Op. at n.17.)

In effect, the defendant asks this Court to believe that in September 2022—notably, the same month the Government seized hundreds of millions of dollars in fraud proceeds from bank accounts held by Kwok-controlled entities—she had a change of heart and decided to transition from well-paid "employment" to "volunteering." (Ex. A at 67, 75-77; Lehr. Op. at n.17.) The defendant offers no explanation whatsoever for her purported decision to forego her nearly $400,000 annual salary plus $100,000 of benefits and transition to volunteer work, after years of being a formal employee of Kwok family office entities, without any apparent change to her daily responsibilities. And Wang's continued involvement with the Kwok-controlled entities is significant because, as described above, some of the purported "volunteer" work she engaged in

33

post-September 2022 included planned foreign travel as an "authorized representative" for a corporate matter involving $500 million; approving payroll expenses for entities with which she had no formal affiliation (*see supra* at 28; Dkt. 42 at 3-4, Ex. F); tracking the balances of bank accounts holding tens of millions of dollars in fraud proceeds; and ensuring the transfer of fraud proceeds to the UAE weeks before she was arrested. *See supra* at 4-5. None of these activities "gets rid of the communist party of China;"[23] they further the fraud. This Court simply cannot trust the defendant to obey its orders while on pretrial release. No conditions ameliorate that concern.

2) *Wang's Documented Failure to Obey Court Orders*

As the Court is aware, Kwok filed for bankruptcy in Connecticut in February 2022. *In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1110 (D. Conn.) (JAM). (*See* Dkt. 7 at 12-15.) Months into the bankruptcy proceeding, the Trustee filed a contempt motion, asserting that Kwok had failed to comply with Judge Manning's order regarding Kwok's transfer of beneficially owned assets to the bankruptcy estate. In connection with that motion, Judge Manning made findings relevant to Wang and her involvement with, and work at the direction of, Kwok. On November 17, 2022, Bankruptcy Judge Julie A. Manning issued a partial resolution order regarding Kwok's ownership of two particular entities—Ace Decade Holdings Ltd. ("Ace Decade") and Dawn State

---

[23] Ex. A at 66-67 (Statements of Defense Counsel to Judge Lehrburger).) Counsel further explained Wang's obfuscation to Pretrial Services by contending that Pretrial's questions was improperly constructed. (*Id.* ("what was the question that was asked? Are you currently employed? No. No. If the question were asked are you still a member of a revolutionary movement that does whatever it is that they try to do to get rid of the communist party of China, the answer to that is yes").) During the same hearing, defense counsel ultimately conceded that "[t]here's no dispute that [Wang] had input into various things that happened," but claimed she was only "volunteering" and was not paid for her work.

34

Limited (together, the "Ace Decade entities"). *In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1110 (D. Conn.) (JAM) (Ex. B). The Ace Decade entities are valued at approximately $500 million and have been engaged in civil litigation abroad.[24] Judge Manning found that Kwok "exclusively beneficially owned and controlled" the Ace Decade entities and further found that Wang—who is the nominee shareholder of the Ace Decade entities—"is not and has never been a beneficial owner of the shares in" those entities. (Ex. B at ¶ 1.) Accordingly, Judge Manning ordered that Kwok transfer the Ace Decade entities to the Trustee and "not in any way interfere with or impede the Trustee's exercise of ownership and control over" the Ace Decade entities. (*Id.* at ¶ 5.) Kwok was directed to serve a letter and attached share transfer documents (collectively, the "Letter") on Wang, directing her to transfer the corporate and economic rights of the Ace Decade entities to the Trustee.

Despite Judge Manning's clear order that Wang transfer the Ace Decades entities to the Trustee, months later, Wang deliberately obstructed Judge Manning's order and transferred Ace Decade—which is valued at approximately $500 million—beyond the reach of the bankruptcy estate and Kwok's creditors. *See Despins v. HCHK Technologies, Inc. et al.,* 23-05013, ECF No. 1 (D. Conn.) (JAM), at 9 (Ex. C) (Trustee's *ex parte* complaint seeking injunctive relief relating to the HCHK entities and another Kwok entity, which notes that "Yvette Wang, while the Ace Decade proceedings were ongoing (but after the Court found, on November 17, 2022, that [Kwok]

---

[24] The Government believes that Wang's travel request, in which she represented that she is "the authorized representative for two companies that have litigation seeking $500M USD in damages that is pending in the United Kingdom," relates to her role as nominee shareholder of the Ace Decade entities. (Dkt. 42 Ex. G.) *See* https://www.judiciary.uk/wp-content/uploads/2023/03/Kwok-Ho-Wan-v-UBS-AG-judgment-010323.pdf (last visited June 17, 2023).

exclusively beneficially owned and controlled Ace Decade as of the February 15, 2022 petition date), transferred the stock of Ace Decade that she nominally owned to an individual located in Switzerland (who, upon information and belief, is another associate of [Kwok] ).”); *see also In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1372 (Contempt Order) (Ex. D).

Notably, Judge Manning cited Wang’s obstructive behavior as the basis for her granting the bankruptcy Trustee’s request to proceed *ex parte* regarding additional assets of the bankruptcy estate (including the HCHK entities). Judge Manning found that “the allegation that Ms. Wang transferred Ace Decade Holdings Limited *after* this Court had already determined that Ace Decade Holdings Limited was property of the [bankruptcy] Estate is troubling.” *Despins v. HCHK Technologies, Inc. et al.,* 23-05013, ECF No. 18, at 5 (Ex. E.) (emphasis added). To be sure, it unambiguously demonstrates that Wang violated the order of a federal bankruptcy judge. Accordingly, Judge Manning concluded that the Trustee’s concern that a similarly obstructive dissipation of assets could occur with respect to the HCHK entities—which Wang controlled— was “justified.” Ex. E at 5.

If released, this Court can have no reasonable assurance that Wang will not violate this Court’s orders as well.

### 3) *Wang Maintains Continued Control Over Fraud Entities from Jail*

The Government’s contention that Wang continues to engage in obstructive conduct following her arrest is not speculative. Her post-arrest obstruction includes efforts to secretly obtain millions of dollars in fraud proceeds—assets over which she continues to exercise effective control, contrary to defense counsel’s claims that she has “nothing else” by way of financial means to flee, beyond her bank accounts and the value of her apartment—and to conceal those proceeds from the Government and Kwok’s bankruptcy Trustee. (Mem. at 23.)

36

Weeks after Wang's arrest, in April 2023, Wang directed a co-conspirator ("CC-1") to work with others to secure mail from a certain United States Parcel Service Post Office Box located in Manhattan (the "PO Box"). That PO Box, which was opened in the name of G Club Operations LLC on April 1, 2022, contained checks worth approximately $7.1 million of fraud proceeds obtained through G|CLUBS. On March 7, 2023 (one week before Wang's arrest), a certain U.S. bank closed two bank accounts held in the name of G Club Operations LLC for suspected fraud and issued checks for the approximately $7.1 million collective balance of those two G|CLUBS accounts, which funds represent proceeds traceable to the fraud. Subpoena returns reflect that those checks were sent to the mailing address on file for the accounts, which was the PO Box.

On June 15, 2023, pursuant to a judicially-authorized search warrant, the Government seized documents and electronic devices from CC-1. A preliminary review of the contents of a notebook recovered from CC-1 (which is in Mandarin and English) reflects that CC-1 was in communication with Wang and was engaged in extensive tasks at the direction of Kwok, Wang, and other co-conspirators since Wang's arrest and detention. For example, as shown in the images below, a task dated April 11, 2023 reflects that Wang directed CC-1 to provide her with information relating to the operations of the Kwok-controlled businesses:

 25

CC-1's notebook entries similarly reflect information requested by "Boss" (*i.e.*, Kwok) and what appears to be detailed tracking of finances and other operations of the various fraud

---

25 Informally translated to, "Yvette wants a ***detailed billing statement***" (bolded Italics indicate text translated from Mandarin to English).

37

instrumentalities. As relevant to the $7.1 million G|CLUBS checks in the PO Box, a notebook entry dated April 18, 2023 references locating Employee-1 (*i.e.*, a G|CLUBS[26] employee who had traveled to the UAE in 2023, *see supra* at 25). Employee-1 was in possession of a physical key to the PO Box. The notebook entry (shown below in redacted form) reads, in sum and substance and as informally translated:



    [Employee-1] → **have** HR [*i.e.*, Human Resources] **locate**

       **Tell** HR **to locate** [Employee-1] – **get the check in the NY** mailbox

                                HR **to locate** [Employee-1]

       **"Cherry Blossom"[27] authorized** [Employee-1] **to give the check to** 3C [*i.e.*, 3 Columbus Circle, where HCHK's offices are located]

From additional evidence the Government has collected, it is clear that *Wang* instructed CC-1 to secure the checks located in the "NY mailbox," *i.e.*, the G|CLUBS PO Box in Manhattan. One of CC-1's cellphones contained messages with Employee-1 from April 2023. Specifically, on April 27, 2023, Employee-1 wrote to CC-1: "Hi [CC-1], this is [Employee-1]. [The Senior Director of Human Resources at HCHK] asked me to connect with you *about Yvette's mailbox request*. Can I call you in the morning?" (emphasis added). These notes and communications reflect that Wang

---

[26] Employee-1 worked for G|CLUBS but was formally employed by HCHK.

[27] The Government has not been able to determine whether or not "Cherry Blossom" is a reference to Wang; however, for the reasons stated herein, the Government believes that Wang directed this outreach to Employee-1.

was coordinating with others to secure millions of dollars in G|CLUBS money, even after her arrest and detention and despite the fact that Wang has acknowledged no affiliation with G|CLUBS. (*See, e.g.*, Ex. A at 67:6-9.)

The above examples are deliberate and obstructive actions of an individual who continues to operate and direct Kwok's massive fraud and money laundering enterprise, who has access to substantial assets that could assist in her flight or nonappearance, has a network of people willing to assist her, and has zero respect for the judicial process.

Given the clear and convincing evidence that the defendant has engaged in obstructive behavior, including in her misrepresentations to Pretrial Services, the Government, and the Court on material matters, her efforts to thwart Kwok's bankruptcy proceeding and conceal assets from the Trustee, and her continued involvement in perpetrating the fraud and in laundering fraud proceeds, the Court and the Government "cannot have any confidence that Wang will abide by the terms of release or that she would not remove her electronic monitoring equipment." (Lehr. Op. at 23.)

### C. There Are No Conditions or Set of Conditions that Would Reasonably Assure Wang's Future Appearance or Prevent Wang from Further Obstruction

No conditions or combination of conditions would reasonably assure Wang's appearance or prevent her from further obstruction, and Wang's arguments to the contrary are meritless.

A bond secured by cash or property is insufficient, where, as here, the bond would be secured either by Wang's own assets (which may be subject to forfeiture) or by "the property of persons who hold no moral suasion over Wang." (Lehr. Op. at 17; *see also id.* at 13.) Here, Wang is proposing that the Court impose *no* suretors for any bond; nor would any suretors be sufficient here, where none of the individuals Wang previously identified was "unrelated to the alleged fraud,

who have sufficient ties to the United States such that the Government would have a meaningful ability to enforce the bond against those individuals, and who would have moral suasion over" Wang.  (Kwok Op. at 13; *see also* Lehr. Op. at 13-15.)  Further, given that Wang spent years engaged in meticulous and careful work to separate victims from their money, no amount of money any suretor posted would dissuade Wang from fleeing.

Wang's proposal of home detention reinforced by location monitoring is also insufficient, because "ankle monitors can be removed and ensure only a reduced head start should [Wang] decide to flee."  (*Id.*)  Nor can Wang's proposal that a "friend" live with her and report any violations provide the Court any comfort.  (Mem. at 3.)  Wang's past obstructive conduct in Kwok's bankruptcy proceeding and in this case—including her efforts to move the fraud's operations offshore to the UAE, her active involvement in transferring substantial fraud proceeds overseas, beyond the reach of U.S. authorities, and her apparent continued financial control over fraud proceeds even since her arrest and detention—demonstrates "that the Court does not have reasonable assurance that [Wang] will abide by any conditions of pretrial release."  (*Id.*; *see* Lehr. Op. at 23.)  Finally, Wang's continued pretrial detention will not deny her the ability to meaningfully participate in her own defense.  (Kwok Op. at 13; *see also* Dkt. 86 (order granting Wang access to a laptop in the MDC to facilitate her review of discovery).)

Wang's claim that Judge Lehrburger did not adequately consider possible conditions of release is utterly baseless and is flatly contradicted by Judge Lehrburger's opinion.  Judge Lehrburger considered in methodical detail potential conditions of Wang's release, including those Wang proposed, and held that "there are *no* conditions that can be set to reasonably assure Wang's presence at future proceedings." (Lehr. Op. at 17) (emphasis added.).  As a threshold matter, Judge

40

Lehrburger agreed with Judge Parker's finding that co-signers were part of "the least restrictive" set of conditions that could reasonably assure Wang's future appearance. (Lehr. Op. at 16; Dkt. 10 Ex. C at 22-23.) While the defendant argued to Judge Lehrburger (unpersuasively) that she had satisfied the co-signers' condition, in a tacit admission of her limited ties to this country, she has abandoned that argument in her present application and instead seeks to be released on a bond with *no* co-signers. (Mem. at 2-3.) In light of the foregoing, Wang's claim that Judge Lehrburger did not properly consider conditions of release is utterly baseless.

In any event, the bail package the defendant proposes here is woefully insufficient. The defendant proposes *lowering* the bond amount by more than half, from $5 million to $2 million, and eliminating entirely the co-signers condition—a tacit concession that she has not, and cannot, meet such a condition because of her limited connections to this country. (Mem. 2-3.) In exchange, the defendant offers additional property as security: "one of her bank accounts" (although Wang does not specify which, or the amount it holds), and "138,000 in cash" (*i.e.*, the cash that the Government seized from Wang's safe and that is already in the Government's possession and likely forfeitable). (Mem. at 2.) That additional "security" provides no comfort to reasonably assure Wang's future appearance—specifically, it in no way compensates either for the $3 million reduction in bond or the complete elimination of *any* co-signers who would be liable for the bond, be able to exercise moral suasion over the defendant, and be strongly incentivized to assure that she does not flee. Additionally, the defendant proposes the new condition that she be monitored at home "by a friend who will live with her and will be responsible for reporting any violations." (Mem. at 3.) Such monitoring by an unspecified "friend" is meaningless in any criminal case, but particularly so when it is proposed by a defendant who concedes that she cannot

find a single person who would exercise moral suasion over her and who is not a victim of, or co-conspirator in, her crimes.

## **CONCLUSION**

As described herein, the Government has established by a preponderance of the evidence that the defendant poses a risk of nonappearance. There is no combination of conditions that could reasonably assure her appearance at future proceedings if she were to be released pending trial. In addition, the Government has established that the defendant presents a serious risk of obstruction. She has defied court orders and has continued to engage in obstructive behavior since her arrest and detention, including her active efforts to secretly obtain millions of dollars in fraud proceeds and to continue to conduct the fraud and launder its proceeds. No conditions can mitigate the risk of further obstruction.

The defendant should be detained pending trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
(212) 637-2314 / 6612 / 2190

Enclosures

Cc:    Alex Lipman, Esq. (by ECF and Email)
       Priya Choudhry, Esq. (by ECF and Email)

# EXHIBIT A

```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                                   :
                                             Docket #23cr118/
 UNITED STATES OF AMERICA,               :   23m2007

                       Plaintiff,        :

  - against -                            :

 WANG, YANPING,                          :   April 4, 2023
                                             New York, New York
                       Defendant.        :

-----------------------------------: BAIL HEARING

                        PROCEEDINGS BEFORE
                THE HONORABLE ROBERT W. LEHRBURGER,
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
                      BY:  JULIANA MURRAY, ESQ.
                           RYAN FINKEL, ESQ.
                      One Saint Andrew's Plaza
                      New York, New York 10007

For Defendant:        LIPMAN LAW PLLC
                      BY:  ALEX LIPMAN, ESQ.
                      45 West 29th Street, Suite 303
                      New York, New York 10001

                      CHAUDHRY LAW PLLC
                      BY:  PRIYA CHAUDHRY, ESQ.
                      147 West 25th Street
                      New York, New York 10001

INTERPRETER PRESENT


Transcription Service: Carole Ludwig, Transcription Services
                       155 East Fourth Street, #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> | <u>Court</u> |
|---|---|---|---|---|---|
| None | | | | | |

<u>**E X H I B I T S**</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|
| None | | | | |

1

```
 1                        PROCEEDING                      3

 2          THE CLERK:  We're here in the matter for a bail

 3   hearing, U.S. v. Yanping Wang, 23cr118.  Attorneys,

 4   please state your name for the record starting with the

 5   Government.

 6          MS. JULIANA MURRAY:  Good afternoon, Your

 7   Honor, Juliana Murray and Ryan Finkel on behalf of the

 8   United States.  We're joined by Paralegal Specialist

 9   Jeffrey Merns (phonetic).

10          MR. RYAN FINKEL:  Good afternoon.

11          MR. ALEX LIPMAN:  Good afternoon, Your Honor,

12   Alex Lipman, Lipman Law PLLC, and with me is my co-

13   counsel Priya Chaudhry, Chaudhry Law PLLC.  We're here

14   for the defendant Yanping Wang.  And she's here present

15   and she's being assisted by a Mandarin interpreter.

16          THE COURT:  All right, thank you.  Good

17   afternoon.  Ms. Wang, can you hear and understand

18   everything the interpreter is saying?

19          MS. YANPING WANG:  Yes, I do.

20          THE COURT:  All right, terrific.  So when we

21   law saw each other, you were going to see Judge Torres

22   in regard to Mr. Kwok and also seek possibly her say so

23   on this matter.  I understand she has left it in my

24   hands.  So I guess I will hear from the parties as to

25   where we are and what can be done, should be done in
```

PROCEEDING                                    4

1

2   respect to the financial suretors that the Government

3   says are not sufficient to meet the obligation under the

4   conditions set by Judge Parker that two financially

5   responsible people be able to sign on to the bond.

6           And this is really defendant's application in

7   that they raised this concern, and so I'll hear from

8   defense counsel first.  But why don't you also let me

9   know if there's been any developments during the last

10  week that make any difference and/or whether anything

11  that happened before Judge Torres influences what

12  happens here.

13          MS. MURRAY:  Just briefly, Your Honor, I just

14  wanted to confirm that this is being recorded, this

15  proceeding, because I don't see a court reporter.  So

16  just for the record.

17          THE COURT:  It is being recorded

18  electronically.

19          MS. MURRAY:  Thank you.

20          MR. LIPMAN:  May I begin, Your Honor?

21          THE COURT:  Yes, please.

22          MR. LIPMAN:  Your Honor, in our view, from the

23  beginning, the Government never actually established by

24  preponderance of the evidence that the defendant is a

25  flight risk.  And I want to go – we actually agreed to

1

2  the bond conditions, but we agreed to the bond

3  conditions based on conversation that we had with the

4  Government that in which the Government made certain

5  representations about what was found in Ms. Wang's

6  apartment.  And so we were told that, we didn't have a

7  lot of time to discuss things with our client, but we

8  thought, all right, it seems reasonable, and then we

9  agreed that we were going to propose names of two co-

10  signers for the bond and, frankly, didn't think that

11  this was going to be an issue.

12          Then the Government made certain statements on

13  the record, and as we started having trouble having them

14  approve the people we proposed, we at some point asked

15  them for support for some of the things that they said

16  were the reasons that our client is a flight risk.  And

17  so then they eventually provided it to us, and what we

18  found is basically one of three things.  The Government

19  either made statements that are half true, and so we

20  need to actually fill in the blanks and realize that

21  what they said isn't really right.  They have made

22  statements that are contradicted by the evidence that

23  they gathered in Ms. Wang's apartment, and then they

24  made statements for which they're just conjectures.

25  They're not actually supported by any evidence.  So let

PROCEEDING                                        6

1  |
2  | me back up and start at the beginning.

3  |           THE COURT:  Okay.

4  |           MR. LIPMAN:  So Ms. Wang and her co-defendant,
5  | Mr. Kwok, knew that the Government was looking at them
6  | for a very long time, so much so that in September, and
7  | according to the indictment, in September and October of
8  | last year the Government seized a bunch of assets,
9  | according to the indictment it's something like on the
10 | order of $700 million, and the Government seized those
11 | assets.  It was a civil seizure, but it referenced, as
12 | specified (indiscernible).  Right?  So $700 million
13 | seized, I'm not sure that I can say for the Court that
14 | my client understood the full scale of what was seized,
15 | but she certainly understood that the Justice Department
16 | has seized a bunch of money, right.

17 |           And then there was an SEC settlement for the
18 | GTV case which is the one that's relevant to her, and
19 | GTV paid back something in the order of I want to say
20 | $500 million, which incidentally they didn't pay after
21 | the – they first paid the money and then the SEC issued
22 | a settlement order.  So it's in the reverse order from
23 | the Government says happened.  Okay?  So she knew, she
24 | knew that the Government was looking at her and that she
25 | was potentially in severe legal jeopardy.

1

2          Despite that, she didn't go anywhere, but

3   there's more.  The Government says she had the passport

4   from, a Chinese passport that she could've traveled on,

5   right, and that she, and she's an asylum applicant, and

6   because she's an asylum applicant, they say this is one

7   of the factors to consider in her not having ties to the

8   United States is somehow she count against her.

9          Well, because she's an asylum applicant and she

10  doesn't want to lose her asylum application, she did

11  want to go travel, and she applied to the United States

12  government for a furlough so that if she traveled, her

13  asylum application would not get denied.  So the

14  Government, and that happened, she received permission

15  to travel between December and January of last year, so

16  December '22 to January I want to say 27, I'm probably

17  wrong on the exact date, but something from mid-December

18  to the third week of January --

19          THE COURT:  And when was the seizure of the

20  money that you referred to?

21          MR. LIPMAN:  September and October according to

22  the indictment.  I think it's September 18 and October,

23  was it is, 24, 26.

24          So she put the government on notice that she

25  was going to go travel despite all of this going on.

1  She did not travel during that window. It expired. It

2  expired for reasons that have nothing to do with

3  anything other than she had a particular trip that she

4  had in mind to make, she couldn't get, it didn't work

5  out logistically. She then applied for another

6  application, and I believe that was, according to her

7  immigration counsel, that was on February 8, 2023. So a

8  month before she was arrested.

9

10          So the idea that she is a flight risk is, given

11  all of that, is a little far-fetched, but there is a

12  reason for it, and the reason is this. Ms. Wang is in

13  different times would be called a revolutionary. She

14  has put herself, her family, everything she's done at

15  risk because she is opposing the communist party of

16  China, and whatever it is that they say in the

17  indictment, there is no dispute, none whatsoever, that

18  she has put herself in jeopardy. Her son is in China,

19  her husband, the man, the one and only boyfriend she's

20  ever had, they're not allowed to have any communication

21  with her --

22          THE COURT: Right, but as I understand the

23  Government, I don't know if they've pivoted or whether

24  they always asserted this, but their concern is with

25  fleeing to other jurisdictions, be it the United Arab

1

2   Emirates where supposedly Mr. Je, a co-conspirator, is

3   or Vanuatu where she has an expired passport application

4   or wherever.

5           MR. LIPMAN:  So, Your Honor, let me take

6   Vanuatu first because that's easiest.  Okay?  Together

7   with the passport that's expired, they also found two

8   documents both for her and Mr. Kwok in her apartment

9   saying that she's renouncing Vanuatu citizenship.  So

10  that's not an issue.  The other thing is she got the

11  passport for Vanuatu I believe in 2016, if I have that

12  correctly, that was before she came to the United

13  States.  China and Vanuatu have since become good

14  friends, and it's a different situation now, and I don't

15  think it would be safe for her to go there.

16          As far as going to United Arab Emirates, the

17  United Arab Emirates does not, from what we heard this

18  morning from the Government in Mr. Kwok's hearing,

19  United Arab Emirates does not extradite its citizens to

20  the United States.  It does have an extradition treaty

21  with China.  She's not a citizen of United Arab

22  Emirates, nobody's suggesting that she is.  She's not,

23  she doesn't have a passport from there.  The only

24  passport that she had that was still live, they have

25  possession of that passport.  They found it in her

```
 1                        PROCEEDING                    10

 2   apartment.  So no, she cannot go somewhere else.

 3            Now let's talk about whether she --

 4            THE COURT:  Wait, wait, wait, I want to stop

 5   you there, just on the issue of the extradition with

 6   United, with the UAE.  What I heard you say was that

 7   they don't have an extradition agreement with respect to

 8   citizens of the UAE, and then I thought I heard you say

 9   that they have an extradition treaty with China which,

10   of course, she's not going to go back to, and this isn't

11   a proceeding in China.  What is their status with

12   respect to extradition of a citizen of a third-party

13   country, if you will, and extraditing to the United

14   States?  I'm sure the Government can tell me but I'm

15   wondering if you have an understanding.

16            MR. LIPMAN:  As far as I know, there is no

17   extradition treaty with the United States, but it's an

18   irrelevant issue rather because, first of all, she can't

19   get there.  Okay?  And, second, she's not concerned

20   about being extradited to the United States; she's

21   concerned about being extradited to China --

22            THE COURT:  I understand.

23            MR. LIPMAN:  -- where she's going to get

24   arrested and shot.  I mean there's a difference.  You

25   know, as bad as the MDC is, it's not exactly a Chinese
```

```
1                           PROCEEDING                    11

2    prison.

3             THE COURT:  But is your point if she shows up

4    at the UAE, she's going to get exported or extradited to

5    China automatically?

6             MR. LIPMAN:  Well, I don't know about

7    automatically, but she certainly is in great danger of

8    that happening.  That's absolutely true.  And, look, in

9    the hearing that we had earlier this morning, the

10   Government actually, it was discussed, all the efforts

11   that the Chinese government has undertaken to get Mr.

12   Kwok back to China, including bribing American

13   officials, there's a case going on now, a criminal trial

14   I believe is going on right now in D.C. in which several

15   government officials who've been bribed by China in

16   order to facilitate Mr. Kwok's deportation from the

17   United States to China.

18             Well, the Government, this woman, according to

19   the Government, is Mr. Kwok's chief of staff, whatever

20   that means.  Well, I don't think that they seriously

21   will dispute that she is in danger.  So --

22             THE COURT:  I'm sorry, that she's what?

23             MR. LIPMAN:  In danger.

24             THE COURT:  In danger.

25             MR. LIPMAN:  Meaning I don't think they
```

```
 1                    PROCEEDING                        12

 2    seriously dispute that if she went to China, got into

 3    China or that China wants her.

 4              THE COURT:  Right.

 5              MR. LIPMAN:  There can't be a serious dispute

 6    about that.  So now let's talk about what would happen

 7    if she were in the United States.  Basic reason, basic

 8    reason, she is Mr. Kwok's, according to the Government,

 9    chief of staff.  She's very recognizable.  Right?  She's

10    recognizable in the community of people who are here.

11    This is a community of thousands of people in the United

12    States.  So the Government says, oh, they will hide her.

13    Well, first of all, that's, forgive me, but that's just

14    an improper inference.  To think that thousands of

15    people who are on the U.S. soil will secret a fugitive,

16    is it because they're Chinese, is it because they speak

17    Mandarin --

18              THE COURT:  No, because they're, because they

19    potentially were victims of the fraud.

20              MR. LIPMAN:  Except for this.  If they are

21    victims of the fraud, they know what's going on, they're

22    adults, and so they could at any time become persuaded

23    that, in fact, she should be returned to the United

24    States government if she is a fugitive.

25              But there's more to this, and the more is this,
```

2   if the Chinese – we know from what I've read in the

3   paper, that the Chinese communist party has parking

4   Chinese communist officials from their police in their

5   United States consulate in New York.  For a second can

6   we think that they're not keeping tabs on her?  And that

7   if she showed up anywhere in any community where people

8   speak Mandarin as their primary language that she would

9   be spotted?  For a second can anybody conceive that the

10  Chinese communist party wouldn't find her and identify

11  her and tell the government exactly where she is?

12          Now let's take the alternative.  Let's assume

13  for a second that she decided to hide herself in, I

14  don't know, Utah among white people.  She speaks English

15  with a heavy accent, and her first language in Mandarin.

16  Would she not stick out like a sore thumb?  The idea

17  that this woman can hide is blatantly absurd.  It's

18  absurd.  And the idea that she could rely on people to

19  hide her in the United States.  So where are we?  She

20  can't leave and she can't hide.  That's not flight risk.

21          But there's more.  And the more is this.  The

22  Government said, and this is why we actually thought we

23  were okay with the bail package that they proposed.

24  They said we found stuff in her apartment that tells you

25  that she's a flight risk.  What is it?  We found twelve

```
1                        PROCEEDING                        14

2    phones.  Of these twelve phones, six of them were

3    secreted in boxes that were, that looked like brand new

4    boxes of iPhones and these were used – this is a

5    representation from the Government of the United States

6    to a court in the United States.  So we said, all right,

7    let's look at the pictures.  Send us the pictures.

8    Well.  May I approach, Your Honor?

9              THE COURT:  You may.

10             (pause in proceeding)

11             MR. LIPMAN:  This is the evidence log, Your

12   Honor, that was of collected items from her apartment.

13   This is what we got from the Government.  Okay?

14             THE COURT:  Uh huh.

15             MR. LIPMAN:  I'm going to assume that

16   everything on here is true and correct because it came

17   from the Government.  If it's not, they should tell Your

18   Honor.  Here's a list of phones and where they were

19   found.  On the first page.  Numbers 1, 2, 3, 4, 5, 6, 7.

20   These are all iPhones, and they were all found on the

21   kitchen table.  Now, Your Honor, if the Court would like

22   to see, I have pictures of them.

23             They were found on the counter in the kitchen,

24   three of them.  They were plugged in in plain view.

25   There was a phone that was on the side of the table,
```

```
 1
 2   there was another phone someplace on the side.  There's
 3   a description here.  On nightstand, right of bed.  On
 4   changing --
 5             THE COURT:  Right, well, those - all right, and
 6   they didn't say all of them were --
 7             MR. LIPMAN:  Your Honor --
 8             THE COURT:  -- secreted --
 9             (interposing)
10             MR. LIPMAN:  -- trust me, trust me --
11             THE COURT:  Let's just --
12             MR. LIPMAN:  I'm not bypassing --
13             THE COURT:  I didn't think you were, but we
14   don't need to go over the ones that are sort of obvious.
15             MR. LIPMAN:  Well, Your Honor --
16             THE COURT:  Okay.
17             MR. LIPMAN:  I wouldn't be talking to you if,
18   right?
19             THE COURT:  No.
20             MR. LIPMAN:  Okay.  So here we go.  On page 6
21   of 9 --
22             (pause in proceeding)
23             THE COURT:  Okay?
24             MR. LIPMAN:  Oh, I'm sorry.  I'm sorry, Your
25   Honor.  I apologize.
```

```
 1                         PROCEEDING                      16

 2              THE COURT:  Sure.

 3              MR. LIPMAN:  On page 7 of 9.

 4              THE COURT:  Okay.

 5              MR. LIPMAN:  Do you see where it says 56 --

 6              THE COURT:  Yes.

 7              MR. LIPMAN:  -- white phone, 57, white phone --

 8              THE COURT:  Yes.

 9              MR. LIPMAN:  -- 58, white phone --

10              THE COURT:  In bag in closet.

11              MR. LIPMAN:  In bag in closet.  Not in a box

12   pretending like it's new.  It's in a bag in closet.  I

13   have a picture of the closet.  I'm happy to show the

14   Court the bag that it was in.  There is, in fact, in

15   that picture one white box for an iPhone in that

16   picture.  One box.  And according to this none of these

17   phones came out of that bag, that box.  But even if one

18   did, that's one.

19              Now, also on this page you see, Your Honor,

20   where it says Mac book number 55 in between clothes?

21              THE COURT:  Uh huh.

22              MR. LIPMAN:  Okay, so one of the things that

23   they said is, oh, look, she's hiding stuff in between,

24   in her closet.  She's secreted a laptop in between her

25   clothes.  So a couple of things about that.  Number one,
```

PROCEEDING                                    17

1    as the Government well knows, Ms. Wang is not unfamiliar

2    with what happens when the FBI raids somebody.  They

3    raided Mr. Kwok previously.  She knows what happens when

4    that happens.  Okay?  So the idea that she could think

5    that she could hide a laptop in between her sweaters is

6    absurd.

7           But there's more now, Your Honor.  Here is the

8    - if I may - which is this?

9           ATTORNEY:  46.

10          MR. LIPMAN:  If I may approach, Your Honor.

11          THE COURT:  You may, and just, I want to

12   confirm something.  Are we looking at evidence and

13   material that was not available before the hearing

14   before Judge Parker?

15          MR. LIPMAN:  This was not available to us

16   before - we got this - so here's what happened.  We

17   asked them some of these questions about the phone,

18   right, we asked those questions I think it was on the

19   29th.  Do you have our letter?  But essentially, Your

20   Honor, we got these the night before we saw you.

21          THE COURT:  Okay, so that was well after Judge

22   Parker's ruling.

23          MR. LIPMAN:  If I may approach, Your Honor.

24          THE COURT:  Yes.

PROCEEDING                                           18

1

2           MR. LIPMAN:  Your Honor, this is the FBI

3    schematic of the apartment that Ms. Wang lives in.  By

4    the way, it's 740 square feet.  This is a woman who

5    apparently defrauded people up to, for something like a

6    billion dollars.  Anyway, so on this page, Your Honor, I

7    call the Court's attention on what is in the apartment

8    and what is not.  There is a bed in the bedroom, and

9    there's a side table.  There is a couch in the

10   livingroom, and there's something in front of the couch,

11   it's actually a (indiscernible).  There is nothing else

12   in this apartment.  There's no wardrobe, there's no

13   chest of drawers, there's no desk, there's nothing.  So

14   where does she keep her stuff?  In the closets.  All of

15   her stuff is in the closets.  Her old phones were in the

16   closet.  Right?  There's nothing nefarious about putting

17   stuff in the closet when you don't have any furniture.

18           So then, so then they say, okay, we found money

19   in her apartment.  We found money, we found $138,000.

20   Ms. Murray said in recent bills, she thought they were

21   recent bills.  Okay.  So then we thought, all right, can

22   we see the pictures of the money?  Why did we ask for

23   pictures of the money?  Because we had reason to think

24   that a bunch of that money was in red envelopes which

25   apparently in Chinese culture it is common on holidays

1

2  like Chinese New Year to give people gifts of money, and

3  they found red envelopes.  And so I wanted to see where

4  the money is, what it looks like, and how old it is.

5  Right?

6           So asked for the pictures.  That's actually,

7  truth be told, that's the thing that kind of prompted

8  this conversation to begin with.  (indiscernible) the

9  money.  Okay?

10           So what did we find?  (pause)  May I approach,

11 Your Honor?

12           THE COURT:  Yes, you may.

13           (pause in proceeding)

14           MR. LIPMAN:  This, Your Honor, is the pouch in

15 which the money was found.  Now, the Government says in

16 a letter to you, Your Honor, in their latest letter,

17 they said conveniently in a bag for easy retrieval.

18 Really?  Okay, let's look at it.  It's a bank bag.  This

19 is what money comes from when you get money from the

20 bank.  What else do we see here?  We see that there are

21 a bunch of this is in red envelopes.  Now there's other

22 cash in here, and, in fact, there's another picture.

23           THE COURT:  Look, you don't need to go in this

24 much detail on the cash.  And, you know, I agree with

25 you, I don't find the fact that it's in a bag

PROCEEDING                                    20

1
2  particularly persuasive that means someone's necessarily

3  going to run because it's in a bag.  It's organized.

4  But one thing maybe you can tell me is, and I realize

5  this is shifting time a bit, but I thought that in their

6  filing that, their last filing that prompted putting

7  this over, that they had indicated and represented that

8  Ms. Wang did not disclose this $138,000 to Pretrial, but

9  I was under the impression this had already been seized

10 a couple of weeks before.

11             MR. LIPMAN:  No, it was seized on the day of

12 her arrest, okay, and the question that she was asked,

13 the relevant question was did you have any money cash on

14 you when you were arrested.  She was arrested at 6:15

15 a.m., she was in her pajamas.  The truthful answer to

16 that question is no.  We checked out notes, we don't see

17 any other questions that would have elicited a different

18 answer.  So did she disclose it voluntarily?  No.  I

19 don't know that she was asked about it.

20             THE COURT:  Okay.

21             MR. LIPMAN:  Okay?

22             THE COURT:  I get it.

23             MR. LIPMAN:  But, Your Honor, even if she had

24 been asked about it, there were a dozen FBI agents in

25 her apartment ripping it up.  Okay, I mean she was, she

|  | PROCEEDING | 21 |

1   was beyond stressed.  She's sitting and talking, in a

2   situation that she's never encountered, she's being

3   asked these questions.  Is it crazy that, you know, the

4   question is have you, do you have any cash on you, and

5   she says – did you have any cash on you when you

6   arrested and the answer is no and she doesn't say

7   anything else?  I mean really?

8

9         All right.  Now, by the way, before – because

10  they're going to bring up another picture for you, Your

11  Honor, and I don't want to be accused of giving you

12  something less than the full picture.  And the full

13  picture is that when they made another picture of the

14  money – I apologize, Your Honor.  I've gotten so

15  excited, I lost the other picture of the money.  Here it

16  is.  May I approach?

17         THE COURT:  Yes.

18         (pause in proceeding)

19         MR. LIPMAN:  This is the picture that makes it

20  look as if more of this money is more recent because you

21  can see there are some old bills, some new bills.

22  However, with that said, as I told the Government,

23  there's a good explanation for why some of that money is

24  recent.  Okay?  And the explanation, and I told the

25  Government this, is that she had some pounds that she

PROCEEDING                                    22

1
2  brought over from, with her herself at some point in her
3  previous travels, and that those pounds, you know,
4  however they got to her, but those pounds needed to be
5  replaced because apparently when the Queen died, they're
6  exchanging their money for money that looks, that has a
7  picture of the King.  Okay, so over time she had that
8  replaced, so there's got to be something like $30,000,
9  $40,000 in there that's recent that has to do with that.
10          I asked to see the bills yesterday when it was
11 too late for me to go do it, they said you can come see
12 it.  I'll see them at some point.  But my point though,
13 Your Honor, the idea that this is money secreted so that
14 she can get out of Dodge, no, no, that doesn't make any
15 sense.
16          THE COURT:  No, but it is suggestive that she
17 has access to significant funds even if that particular
18 one wasn't what she was intending to use.
19          MR. LIPMAN:  Let's address that.  Okay?  The
20 Government says she didn't disclose all of the bank
21 accounts over which she had control.  I had a specific
22 conversation with the Government in which I said if
23 you're asking about accounts for which she can actually
24 transact, meaning no third people, right, in other
25 words, but my bank account, I can go and do stuff.  My

1

2   firm's bank account, not necessarily.  Well, in my case

3   yes, but, you know, if you work for a firm, you may be

4   able to direct somebody to do whatever, that's firm

5   business, but you can't take it and put it in your

6   pocket.  Okay?  So what I said to the Government is we

7   are aware of two accounts, right, that are hers.  We're

8   aware of another business account where she could have,

9   she could transact.  We gave them the account and the

10  number.  Right?  We're not aware of any other accounts.

11  That is not, we did not hide from the Government that

12  she owns this BBI entity.  That's not – the question was

13  --

14          THE COURT:  I understand, that's, of the list

15  of four things, three of them were business entities,

16  two of them weren't even hers directly.  What about the

17  Himalayan cryptocurrency?

18          MR. LIPMAN:  Good question.  So I've been

19  trying to figure out what happened with the Himalayan

20  thing, and there are two things about that.  Number one,

21  the document that they're referring to, remember how I

22  said there are some things where there's evidence, there

23  are some things that are half-truths, there are some

24  things that are contradicted, and then there are some

25  things were it's just a leap?  Right?

PROCEEDING                                24

2    So what are they looking at?  They're looking

3    at a schedule that says allocation, okay, allocation.

4    They're not looking at an account at H Coin.  They're

5    not looking – they're looking at an allocation.  I've

6    been trying to figure out what happened to that

7    allocation.  The best I can ascertain is that she has no

8    idea what happened.  I'm not saying that something

9    didn't happen with it.  I'm saying that she has no idea.

10   Okay?

11           THE COURT:  But which is --

12           (interposing)

13           MR. LIPMAN:  But there's more --

14           THE COURT:  The current value of that, right,

15   at least the Government says is something like $13

16   million.  I'm sure it was less than, well, maybe who

17   knows given the market.  But you would think that

18   someone – I'm going to assume it was a significant

19   amount of cyber currently at the time in that to her it

20   was significant, and you would think one would keep

21   track of that significant amount.

22           MR. LIPMAN:  If one thought that it was theirs,

23   then one would.  But, Your Honor, here's – so the

24   Government seized hundreds of millions of dollars,

25   including from the Himalayan exchange.  The Government

1

2  is alleging that it's all a fraud.  Out of one side of

3  their mouth they say it's worthless, and people can't

4  actually turn it into cash.  The SEC said, in its

5  complaint the SEC says people tried to turn it into cash

6  but couldn't.  Well, is it or isn't it?  Because if it

7  is, then maybe it's worth $13 million, though we don't

8  know how to access it.  But if it isn't, if their

9  allegations are correct, then I don't know what the

10  mechanism is for turning this into cash.  Okay?

11          So this is all to say that the presumption is

12  that she would be released or released pursuant to

13  conditions that are least restrictive to assure her --

14          THE COURT:  Right, but are we arguing anew?  I

15  mean this comes back to the question, Judge Parker

16  implemented or ordered conditions.  The crux of the

17  problem is that one of her conditions is not being

18  fulfilled because the Government has taken the position

19  that none of the persons offered to be financially

20  responsible are going to be sufficient suretors either

21  because they don't exercise moral suasion, because they

22  aren't financially responsible, or they are a victim or

23  a participant in the alleged fraud.  And there's a

24  question of, okay, what happens if they keep on not

25  accepting these people.  So I just want to be careful

1

2    about thinking of this as brand new when Judge Parker

3    has already set conditions.

4            MR. LIPMAN:  So, Your Honor, if I may.

5            THE COURT:  Yeah.

6            MR. LIPMAN:  So, first of all, according to

7    3142, 18 U.S.C. 3142(e)(iv)(3), "The judicial officer

8    may at any time amend the order to impose additional or

9    different conditions of release."

10           THE COURT:  Yes.  Understood.

11           MR. LIPMAN:  So that's number one.  Number two,

12   as I explained to the Court, we agreed to $5 million –

13   I'm sorry, Your Honor, I used to be in, you know, for a

14   brief time at the U.S. Attorney's Office.  When the

15   prosecutor says we found recent cash, we found stuff,

16   they told us they found stuff, documents hidden in her

17   cushions of her, the only piece of furniture she has.

18   So they said they found in the cushions of her loveseat

19   or whatever it is, okay.  Well, somewhere here is my

20   other exhibit that I'm going to, sorry, Your Honor, I

21   get excited.

22           Anyway, somewhere here, I'll get it for the

23   Court, yeah, this is fantastic, thank you.  This is

24   important.  So, first, let me finish the first thing.

25   Okay?  So the photographs, the log of the photographs

PROCEEDING                                          27

1    that were taken.  I was looking to see if I can find a

2    photograph or a log of a document hidden in the

3    cushions.  That doesn't exist.  You know what else

4    doesn't exist?  They said in their – this is a

5    representation to a court, they said we found a phone

6    hidden between mattresses in her bedroom.  I want to see

7    this picture.  I want to find it on the log of pictures

8    that are taken.  Where is it?  It doesn't exist.  Or at

9    least it hasn't been given to us.

10        Now, there is a picture like that that was

11   taken at Mr. Kwok's search, and – thank you.

12        (pause in proceeding)

13        MR. LIPMAN:  May I approach, Your Honor?

14        THE COURT:  Yes.

15        MR. LIPMAN:  So that's a picture of a phone

16   hidden between mattresses.  But it's not from her

17   apartment.  And I have yet to see the one from her

18   apartment.

19        One other thing, they said she has stuff in

20   her, in the pouch for easy retrieval, right, the money

21   was in the pouch for easy retrieval.  Everything was in

22   a pouch for easy retrieval.  You know what else was in

23   the pouch for easy retrieval?  I think every credit card

24   she's ever had.  I mean a bunch of old expired credit

1

2  cards, easy retrieval.  It doesn't make sense.

3         Now let me, Your Honor, let me just now switch

4  over to the other piece of this which is the proposed

5  co-signers, the Government's refusal to approve any, and

6  what this is about.  And I want to start with something

7  that I actually did not plan on doing because it only

8  happened in the courtroom this morning.  You see these

9  people here, many of these people here are here to

10  support her.

11        She got emotional in the courtroom and started

12  crying because she realized that all these people are

13  here to support her, and let me explain what that means.

14  The Government probably doesn't know this, but surely it

15  is actually unlawful for the Government to disclose that

16  somebody's an asylum applicant.  There's a regulation

17  that says that.  I didn't know.  I found out recently.

18  I'm sure they don't know.  I'm sure they didn't do it

19  deliberately.

20        But the reason is obvious.  Right?  If you have

21  somebody coming from a country, you identify them as

22  somebody who's seeking asylum somewhere else, that

23  immediately puts them in danger.  All of these people

24  simply by coming here, do you think there's no one here

25  from the Chinese communist party in this room right now

| | PROCEEDING | 29 |
|---|---|---|

1    monitoring this?  All these people simply by coming up

2    and standing up for her have exposed themselves, their

3    families --

5         THE COURT:  I don't think anyone questions

6    perhaps their intent.  The question does the --

7         MR. LIPMAN:  Does she care about them?

8         THE COURT:  -- does the defendant care enough

9    about these people that she's going to be concerned

10   enough about whatever monetary means they're putting on

11   the line versus taking flight, and one would paint the

12   picture, if you're the Government, saying she's alleged

13   to have committed fraud, you've got strong evidence.  So

14   why would she care about the people she defrauded?

15        MR. LIPMAN:  Fair amount, Your Honor, I was

16   about to address it.

17        THE COURT:  Okay.

18        MR. LIPMAN:  There are different ways to think

19   about moral suasion.  Right?  I think we all agree that

20   a brother can sign for a brother, and the first brother

21   is not going to care.  They're relatives, they're

22   brothers, but they're not going to care.  It's also true

23   that people can connect in some way, they could be

24   strangers, but they connected, right, and so somebody

25   can have moral suasion over somebody else who actually

PROCEEDING                                          30

1

2   they don't have all that much interaction.  They just

3   love each other.  Right?

4            But there's another kind, and the other kind is

5   this, if you are a member of a certain kind of community

6   and you're – and this community is important to you,

7   it's important to you what happens to the members of

8   this community.  Now, the Government's going to say, oh,

9   my God, a billion dollars, these people are victims.

10  Well, they're here, they don't think they're victims,

11  but that's another story.  Okay?

12           But here's the thing, look at the indictment,

13  Your Honor.  Mr. Kwok is alleged to have bought himself

14  a Lamborghini.  I would love one.  Okay?  But does she

15  have one?  No.  He apparently is living in a mansion and

16  has other mansions and boats and this and that and the

17  other thing.  Where in the indictment is there an

18  allegation that any of this money went to her?  The

19  closest they've come is this allocation of the coin

20  allocation.  Right?  And we don't know what happened to

21  that.  Okay.

22           So the question you have to ask yourself is why

23  is she doing this?  Why does she leave her family, her

24  son, her one true love, right, and moved to a foreign

25  country where she is basically exposing herself as a

PROCEEDING                                    31

1

2    revolutionary, why did she do this?  Okay.  There's an

3    answer, but that she's trying to enrich herself is not

4    the answer.  So then the question is would she, given

5    what the Government has alleged about her, not about her

6    co-defendants, but about her, because what happens to

7    the co-defendants is relevant but what matters really is

8    what happens to her.

9            And also the question, given the allegations

10   that the Government has made, right, is she the kind of

11   person who will stick one of these people with a $5

12   million debt?  And the answer to that is obviously no,

13   she lives in a 740 square foot apartment without

14   furniture, away from her family with whom she cannot

15   have anymore contact.  It's just beyond belief that we

16   have given them eight people, grownups, right, they

17   don't like all of them, that's fine.  They say we didn't

18   get enough documents with respect to certain people.

19   Really?  Somebody's willing to put up a $3 billion

20   house, what other documents do you want?  We couldn't

21   post that house unless we were able to prove to them

22   that that house existed and belongs to the person who's

23   posting it.  Right?  That person is an adult who

24   understands what's going on and thinks that she, that

25   that person has moral suasion over her and thinks that

PROCEEDING                                         32

1

2   she's not – there are three people, the co-signers who

3   are in this room today.

4          So where does the Government, forgive me, Your

5   Honor, but where does the Government get off making

6   those judgments for these people?

7          THE COURT:  Well, that's part of what, I mean

8   they get to form that judgment, and if you don't agree

9   with it, that's why we're here, but they, the Government

10  needs to be assured or feel assured that the financial

11  security that's being posted is sufficient to reasonably

12  assure that the defendant will not flee, and there is a

13  valid concern I think in theory that if you have folks

14  that are allegedly victims of a fraud that's being

15  committed, that the fraudster or alleged fraudster may

16  not be so incented as one might normally be,

17  theoretically.

18         MR. LIPMAN:  Your Honor, one cannot paint

19  everything with a broad brush.

20         THE COURT:  I agree.

21         MR. LIPMAN:  One really needs to look at the

22  particular circumstances, and the particular

23  circumstances is that the Government is not alleging

24  that she stole money.  It's just that simple.  They're

25  alleging that the other two stole money.  They're not –

1

2    meaning for herself.  They're going to get up and say,

3    well, you know --

4              THE COURT:  Yeah, she was allegedly

5    instrumental and in the middle of it.

6              (interposing)

7              MR. LIPMAN:  -- this and that.  You know, and,

8    by the way, forget the presumption of innocence like

9    whatever.  Anyway, the point is that they're not

10   alleging she enriched herself at the expense of these

11   people.  So then the question is what is the reasonable

12   conclusion, I mean a reasonable basis for concluding

13   that she will do so with respect to this bond.

14             But, Your Honor, but I tell you this, everyone

15   she knows falls into one of two categories.  They're

16   either friends (indiscernible) or a family, okay, or

17   they're members of this community.  You know, it's -

18   sometimes people say, well, how is this possible?  She's

19   lived in the country for seven years and she doesn't

20   have any friends.  Well, she doesn't because she's a

21   revolutionary, Your Honor, because she has a mission in

22   life, and her mission is something different than making

23   friends.

24             So my point is this, these people can only come

25   from one of these two groups, okay, and if the

1

2   Government cannot approve cosigners who belong to one of

3   these two groups because as a category they

4   (indiscernible), then, Your Honor, you have the

5   authority to change this, and, in fact, as the Court is

6   well aware, one of the provisions in here is that you

7   cannot have a financial condition that makes it --

8            THE COURT:  "The judicial officer may not

9   impose a financial condition that results in the

10  pretrial detention of the person."  18 U.S.C.

11  3142(c)(2).  And yet the Government seems to have found

12  cases that say that in the context of the statute, that

13  does not trump but rather what trumps is whether the

14  conditions will reasonably assure the presence of the

15  defendant at future proceedings.  And even a case you

16  rely on, U.S. v. Panaronda, says that too, and they said

17  the ultimate question is the Court should consider

18  whether that particular financial condition is a

19  necessary part of the bail conditions to provide

20  reasonable assurance of the defendant's appearance.  I

21  mean that's really what we have to decide.

22           MR. LIPMAN:  And, Your Honor, that case, I'm

23  going to mispronounce names so I apologize --

24           THE COURT:  Panaronda.

25           MR. LIPMAN:  Okay, what happened in that case

```
 1                                    PROCEEDING                     35
 2  is Judge Sweet, we'll change the conditions.  I mean and
 3  he said, look, there's $250,000 bail here, this person
 4  is never going to either meet it or get anybody who is
 5  good for $250,000.  I'm going to reduce it to something
 6  that people can meet and still satisfy the conditions.
 7            We proposed, just so that we're clear, in
 8  addition to posting, you know, property to secure the
 9  bond that would be more than enough, right, because, you
10  know, it says two.  There are three people who together
11  have more property than $5 million.  They can post it
12  all.  They're prepared to do it.  But separately.  She
13  has access, as far as I know, and the Government doesn't
14  actually know anything different, she personally only
15  has access at this point to two accounts that belong to
16  her and that she has value in her apartment, we already
17  posted that.  So her apartment, one of her accounts
18  completely --
19            THE COURT:  With $400,000.
20            MR. LIPMAN:  Well, I'm not sure exactly.
21            THE COURT:  Well, that was the one that you
22  offered up --
23            MR. LIPMAN:  Yeah, yeah.  And then the second
24  one monitor it.  I mean we're happy to have - in other
25  words, she --
```

1

2          THE COURT:  I get it.

3          MR. LIPMAN:  -- would have no money --

4          THE COURT:  Right.

5          MR. LIPMAN:  Now, the Government says, well,

6    you know, supporters, this and that, they can – that's

7    true in every case.  Your Honor, I'm going to sit down

8    because I've been going on, you've indulged me and I

9    appreciate that.  But, Your Honor, there's no reason why

10   this woman should spend another night in prison.

11   There's no reason.  She's not a flight risk.  She has

12   already put up her apartment.  We're happy to have the

13   three co-signers that are here are happy to go down and

14   sign the bond today.  We can post the – in fact, I will

15   take personal responsibility for the two accounts.

16   Thank you.  My much wiser co-counsel reminded me that

17   what these people have on the hook is not $5 million.

18   It's their lives and their families' lives because of

19   what they're proposing to do for Ms. Wang.

20          If that is not an indication that they think

21   they have moral suasion --

22          THE COURT:  That's not, it's not, I don't

23   question their thought process on it.  And I just want

24   to confirm something.  In terms of what you did propose

25   in terms of possibly modifying the conditions is you

1   wanted the Court to approve two of the eight that you

2   had offered.  You have three here now.  You were going

3   to, in addition to the security for the apartment, you

4   were going to put up the $400,000 account and the

5   $130,000 cash that was seized.  You were going to put

6   additional security through others that you now say I

7   think that you could get to an amount in total of $5

8   million.  Do I have that right?

9   MR. LIPMAN:  Yeah, we could.  I mean we have

10  three people willing to post their property, and one of

11  those houses is I think $3 million, one is 1.7 if I

12  remember correctly, but yes.

13  THE COURT:  And then you proposed also that the

14  Government monitor and approve any expenditures from the

15  $500,000 account.

16  MR. LIPMAN:  I'd rather Pretrial did it and not

17  the U.S. Attorney's Office, but yes.

18  THE COURT:  Yeah, again, one of the driving

19  concerns here is – I'm just looking for where this was

20  said, that, and this is from U.S. v. Melville I think.

21  "Bail is not for the purpose of providing funds to the

22  Government to seek the defendant should he go

23  underground or flee the jurisdiction.  Bail is intended

24  as a catalyst to aid the appearance of the defendant

1

2  when warranted."  So, again, I just want to emphasize

3  that we're talking about what is the defendant going to

4  be motivated to do.

5          MR. LIPMAN:  I appreciate that, Your Honor,

6  but, Your Honor, and I don't want to annoy you --

7          THE COURT:  No, no, you're not annoying me.

8          MR. LIPMAN:  -- with I've already said, but the

9  fact of the matter is that --

10          THE COURT:  And I'm not saying I think

11  necessarily that she won't be motivated.  I just want to

12  make sure we're all on the same page about what's

13  important.

14          MR. LIPMAN:  Your Honor, you and I are on the

15  same page, absolutely, but, again, when a woman starts

16  getting emotional because people come here to support

17  her, when the Government does not allege that her

18  participation in the scheme, even if true, was for the

19  purpose of benefitting her, I mean, really, she did all

20  this so that somebody else can drive in a Ferrari?

21  Really?

22          Anyway, they're not alleging that she did this

23  for personal gain, and this is as good an indication as

24  there is that what she's not going to do is stiff

25  somebody for the 2 million.

```
 1
 2              THE COURT:  Okay.
 3              MR. LIPMAN:  Okay.  So I already said that she
 4  is a revolutionary.  She believes in the cause.  If she
 5  didn't believe in the cause, if she didn't believe in
 6  these people – thank you.
 7              THE COURT:  The two are not mutually exclusive,
 8  fraud and belief in a cause.
 9              MR. LIPMAN:  Well, Your Honor, that's true,
10  but, again, you have to look at the individual and what
11  is it that they did --
12              THE COURT:  Of course.
13              MR. LIPMAN:  And so --
14              THE COURT:  I agree.
15              MR. LIPMAN:  -- they call each other, so I've
16  talked to a bunch of people --
17              THE COURT:  I think I get enough.
18              MR. LIPMAN:  You get it.  And they call each
19  other – just before I sit down, they call each other
20  brother and sister, okay, and I've talked to a bunch of
21  them, and I mean all I can say is that they're willing
22  to risk everything, and she has not done anything to
23  indicate that she would do, she would jeopardize them
24  at, jeopardize them personally for her own, for her own
25  personal gain.
```

PROCEEDING                                    40

1
2          THE COURT:  Understood.  Thank you.

3          MR. LIPMAN:  Thank you, Your Honor.

4          THE COURT:  All right, I will hear from the

5   Government.

6          MS. MURRAY:  Thank you, Your Honor.  Just one

7   brief point that Mr. Lipman just raised.  With respect

8   to the defendant's personal gain, the Government would

9   note that the defendant's living in a $1.1 million

10  apartment.  The defendant has nearly a million dollars -

11  -

12         THE COURT:  One might consider that poor in the

13  middle of New York, but, you know, nonetheless.

14         MS. MURRAY:  Has nearly a million dollars in

15  cash and her bank accounts, the two that were disclosed,

16  and I'll get to that point.  We have evidence that she

17  was allocated $7 million approximately of what was a

18  cryptocurrency or a purported cryptocurrency at the time

19  of the initial coin offering at a lower valuation.  So

20  that would be worth substantially more now.  And she had

21  over approximately $138,000 of cash in her safe.

22         But I would like to reset with respect today's

23  proceedings.

24         THE COURT:  Okay.

25         MS. MURRAY:  At the very outset, Your Honor

PROCEEDING                                                      41

asked about the status of the bail proceedings, and no,

there have no further discussions between the defense

and the Government regarding proposed suretors.  The

Government has not received any documentation additional

to the documents that the defense submitted in

connection with their motion that support the various

purported financial situation of the suretors that they

proposed even though they were on notice from the

Government's submission that we believe the

documentation to be incomplete or inadequate to make an

accurate determination or assessment.  The Government

has not successfully reached the eighth co-signer that

the defense had proposed and, therefore, has been unable

to interview that person.  So that's where we are today.

           Now, there are really three questions for the

Court today.  First, with respect to the defendant's

motion, whether the Court should direct that the

defendant has satisfied the conditions of her bond, the

conditions that Judge Parker imposed when she was

initially presented on March 15, several hours after her

arrest.  The answer is clearly no.

           The second question is whether the Court should

modify the conditions of that bond that Judge Parker

imposed to remove the co-signers requirement, which is

PROCEEDING                                    42

1   one of the first modification requests the defense is

2   asking for, or potentially in connection with or an

3   alternative various different modifications, be it

4   posting additional property or cash in support of the

5   bond, adding co-signers, aggregating co-signers.  Again,

6   with respect to modification, the answer is plainly no,

7   the Court should not do that.

8        And, finally, the third question, which was

9   raised in the Government's submission last Friday,

10  whether the defendant should be detained pending trial

11  because there are no conditions or set of conditions

12  that will reasonably assure her presence at future court

13  proceedings.  And, Your Honor, the answer to that is

14  yes.

15       So I'll take each of those points in turn.

16       First, with respect to the proposed co-signers,

17  the defense submitted documentation and names and

18  information about those co-signers to the Court.  That

19  is because they are not approved by the Government.  So

20  under the statute the basis for the Court to approve

21  unapproved co-signers is to evaluate documentation,

22  information about those co-signers, and then determine

23  whether they have a net worth with sufficient

24  unencumbered value to pay the full amount of the bond,

PROCEEDING                                      43

1  here $5 million.  And I'm not going to go over each of

2  the individuals, Your Honor, because we laid this out in

3  great detail in our initial submission.  We went through

4  each of the seven proposed co-signers that the defense

5  has presented to the Court here with documentation,

6  again, setting aside the eighth whom we were not able to

7  interview.

8

9          For each of those seven, based on the documents

10  that the defense is providing to Your Honor for your

11  consideration of whether those individuals meet the

12  standard of the statute, first of all, Your Honor, none

13  of them has appropriate moral suasion over the

14  defendant.  And, again, we laid this out but I would

15  like to make that point a bit more finely because it's

16  extremely important where here the defense is saying

17  that these individuals exercise moral suasion.

18          And, Your Honor, is correct, it's not a

19  question of whether the proposed co-signers believe that

20  they have influence or moral suasion over the defendant.

21  It's a question of how the defendant feels, and while we

22  can't put ourself in our head or in her heart, what we

23  can do is we can look at the evidence that's in front of

24  us.

25          These seven proposed co-signers for Your

PROCEEDING                                    44

1
2      Honor's consideration, some of them have never met Ms.
3      Wang, never spoken with her.  A handful of them have met
4      her at events, generally speaking.  Most do not know
5      where she works.  Most do not know where she lives.
6      They don't talk to her frequently.  They don't appear to
7      have a personal relationship.
8              Interestingly, and I'll get to this point, one
9      of the individuals actually believes that Ms. Wang works
10     at Gettir, which is one of the alleged entities involved
11     in the fraud and a potential instrumentality.  And
12     believes that because that individual met Ms. Wang in
13     connection with interviewing for a position at Gettir.
14     I'll talk about why that's relevant.  Another individual
15     believes that she works at a company called HCHK
16     Properties.  Again, one of these shell companies that's
17     used in the course of this billion dollar fraud.
18             And these proposed co-signers whom defense
19     argues exercise moral suasion, they don't know the
20     defendant well enough to even have personal relationship
21     with her, and, therefore, we have no comfort that Ms.
22     Wang would in any way be dissuaded by their signing a
23     bond from fleeing, from leaving them responsible for
24     paying the amount of the bond.
25             THE COURT:  Well, even if they don't have what

PROCEEDING 45

we think of as a traditional personal relationship or

family relationship or a deep friend relationship, why

can't they be bonded over a cause?

MS. MURRAY: They could be bonded over a cause,

Your Honor. In this particular situation, and this is

why the Government's argument about these individuals

being potential victims of the fraud or apparent victims

of the fraud is important, this fraud has been largely

perpetuated targeting that community. It is a fraud

that has focused on preying on and mobilizing people who

support Mr. Kwok's and Ms. Wang's and Mr. Je's movement

against the CCP. Those are the exact individuals who

have been identified and targeted to send hundreds of

millions dollars, over a billion dollars, of money to

line Mr. Kwok's pockets, Mr. Je's pockets, their

families, to reinvest in the companies that are the

instrumentalities of the fraud, companies that Ms. Wang

manages and works for, some on paper and some functional

control.

So there's no comfort that the Government can

derive from the argument that because an individual is a

member of the allegedly community that Ms. Wang has

supporters, that that will influence Ms. Wang to not

flee.

And, Your Honor, I just note, moral suasion factors vary, but some of the considerations include the strength of ties between the defendant and the proposed suretor. Again, here, with respect to all of the proposed suretors in front of this Court which the defendant provided to Your Honor, that factor doesn't exist.

Also, the defendant's roots in the community, we understand from defense counsel that Ms. Wang essentially works and then works within this community, but I would just note during the second attempt at this bail hearing for Ms. Wang Judge Netburn did note that Ms. Wang has lived in the country for seven years and is representing that she knows no one, no one who could potentially come forward as a co-signer who either isn't a potential victim within this community or a potential subject or co-conspirator of the fraud.

And then also the regularity of contact. And here, again, we don't have regular contact between these proposed suretors and Ms. Wang.

Now, turning to the second factor in evaluating the proposed suretors that are before the Court is financial responsibility. And, again, here, I don't want to belabor the point because we have gone through

1 | each of the proposed suretors, but these individuals do

2 | not have sufficient assets of an unencumbered value to

3 | support the full amount of the bond.  That is the

4 | statutory framework that we're working within at this

5 | point where conditions have been imposed, where the

6 | Government has unapproved suretors, and the defense has

7 | now moved to bring them before the Court --

8 | 

9 |        THE COURT:  Well, why I am hearing at least

10 | from the defense that with an entire package and the

11 | supposed three FRP's who are here, suretors, that they

12 | do have $5 million.  Let me just verify something,

13 | counsel for the defense, are you saying that that is

14 | unencumbered, 5 million?

15 |        MR. LIPMAN:  Yeah, we have three people who

16 | have unencumbered - well --

17 |        THE COURT:  Net unencumbered.

18 |        MR. LIPMAN:  Thank you.  Yes, net I think adds

19 | up to - let's put it this way, together with the million

20 | dollars that she has definitely, I know that one is $3

21 | million.  I'm sorry, I'm spacing on one of them, but I'm

22 | pretty sure that those three cover $5 million.  But that

23 | they do including the --

24 |        THE COURT:  Right, she's got the million, she's

25 | also got the 400, she's got the 138.  So we're good for

1   1.5 about.

2

3              MR. LIPMAN:  Right.

4              MS. MURRAY:  So a few responses to that, Your

5   Honor.

6              THE COURT:  Yeah.

7              MS. MURRAY:  First, this is the first kind of

8   question that I had mentioned that's before the Court

9   which is simply whether the Court should direct that she

10  has satisfied the conditions of her bond, the conditions

11  that were imposed.  And those are the conditions of two

12  co-signers.  And what defense has brought before Your

13  Honor in this motion are seven or eight specific names

14  with specific documentation they are purporting

15  justifies the Court directing that two of those co-

16  signers be approved.

17             Now, it's not clear which two the defense is

18  asking Your Honor to approve --

19             THE COURT:  No, but she has, look, there are

20  three here today that he's specifically proposing.  I

21  don't know who they are at the moment, but I think he

22  has one specifically in mind is my point, and one might

23  also take, might be offering to say, well, geez, we want

24  to but, you know what, the Government should pick the

25  ones they think are best.  Just saying there are ways to

1

2  deal with that.  But I understand.

3          MS. MURRAY:  Sure.  Yeah, and I understand,

4  Your Honor.  So then I guess I'll move to the second

5  question which is whether the Court should modify the

6  conditions of the defendant's bond, either to remove the

7  co-signer to alter in and adjust the bond so that

8  there's more cash or property securing the bond.  As I

9  said, the answer is plainly no to that as well.

10         And I just want to make a few points about the

11 representations that counsel has made --

12         THE COURT:  Before you do, let's assume for the

13 moment there are no financially responsible people in

14 your view because they don't know her personally except

15 for having maybe met her a couple of times, they're not

16 family, and the only thing they have in common is this

17 cause.  If I am to assess whether that particular

18 condition is necessary to reasonably assure the presence

19 of the defendant at future proceedings as opposed to

20 some other combination of provisions, putting aside, of

21 course, all the provisions that are already in place,

22 the home detention, electronic monitoring, etc., why

23 can't I then or why shouldn't I then consider other

24 things that are being offered insufficient to take that

25 place?  Why does it have to be two financially

PROCEEDING                                          50

1   responsible people as opposed to, you know, another

2   combination of what's being offered?

3        MS. MURRAY:  Your Honor can consider modifying

4   the conditions of the bond certainly if you determine

5   that there is a set of conditions that would reasonably

6   assure the defendant's appearance at future court

7   proceedings.

8        THE COURT:  And to be clear, I'm not saying

9   what I have in mind is anything less than what Judge

10  Parker would think, and I'm not pretending to put myself

11  in her shoes.  But I could imagine that given that the

12  Government and the defendant came to essentially an

13  agreement on most of the terms of a package, that Judge

14  Parker no doubt was assuming at the point that there

15  would be two financially responsible people.  And if she

16  was presented with an argument that said, well, the

17  Government's willing to agree to this, but we don't have

18  anybody we're going to approve, she might take a

19  different tact.  She might not, she might say, you know

20  what, it's the Government's prerogative, the Government

21  offered this package, they can't satisfy it, t's not

22  going to do it, then I'm going to detain.

23       So I'm not saying it should necessarily come

24  out differently, but I think it's a little too pat in

1 | some respects – well, again, why that condition as

2 | opposed to what else is being offered?

3 |

4 | MS. MURRAY:  Well, there are actually multiple

5 | conditions, and, Your Honor, the reason is that when the

6 | Government discussed a proposed bail package on consent

7 | with defense, it was hours after the defendant was

8 | arrested on March 15.  The Government had not had the

9 | opportunity to go through the evidence that was then

10 | being collected from the defendant's apartment in

11 | connection with the FBI's premises search.  And,

12 | frankly, the Government was not yet aware that the

13 | defendant was going to lie to this Court, to Pretrial

14 | Services --

15 | THE COURT:  I don't understand what the lies

16 | are.  I have to say I didn't, you know, in your letter

17 | you accuse the defendant of dissembling on this.  The

18 | only one that grabbed me as a possible dissembling would

19 | be the cryptocurrency.  But it's certainly plausible

20 | that you could have a cryptocurrency that was allocated

21 | in 2016 I think the date was and, you know, it may have

22 | never materialized into anything.  It certainly

23 | suggests, you know, where did that go, can't someone

24 | tell us, but right now she's saying she has no control

25 | over access to it because she doesn't even know where it

PROCEEDING                                    52

1      is or what it is.

2              MS. MURRAY:  So a few points there, Your Honor.

3      First, the defendant during her Pretrial Services

4      interview indicated she's been unemployed since

5      September of 2022.  Now, documents that the Government

6      reviewed late last week that had been seized from her

7      apartment and additional evidence that the Government

8      has, and, as you know, we can proceed by proffer in

9      detention hearings --

10             THE COURT:  Yes.

11             MS. MURRAY:  This is not a mini trial.  But the

12     Government's evidence is that the defendant was, in

13     fact, continuing to work in connection with her named

14     position with family offices of Mr. Kwok's family money

15     and also with some of the other entities that I

16     mentioned that are instrumentalities of the fraud up

17     until effectively the date that she was arrested.  We

18     have seen documents that lay out the financial position

19     of various of the different entities that are associated

20     with the fraud.  Those include Gettir which is, as I

21     mentioned, one of the proposed suretors believes Ms.

22     Wang formally works for.  They include HCHK Property

23     which another of the suretors believes Ms. Wang formally

24     works for, and the Government's evidence shows Ms. Wang,

PROCEEDING                                          53

1   in fact, is the 99.999 percent shareholder of HCHK

2   through her BBI entity.

3          They include G Clubs which is one of the arms

4   of the fraud that is outlined and alleged in the

5   Government's indictment.  They include the Rule of Law

6   Society and the Rule of Law Foundation which are

7   charities, purported charities that Mr. Kwok and others

8   founded in 2018 that laid the groundwork and the basis

9   for collecting all these monies through the different

10  arms of the fraud.

11          And, Your Honor, these are printouts of

12  balances of accounts, accounts raised through present

13  which, as reflected in the documents, was variously

14  February 2023 or March 13 of 2023, two days before the

15  defendant was arrested.

16          THE COURT:  But those are corporate funds,

17  right, but you're using it for the point about

18  employment.

19          MS. MURRAY:  I'm using it for the point about

20  employment, Your Honor, and also effective control.  Mr.

21  Lipman indicated he doesn't know what the Government

22  means when it uses the general phrase chief of staff.

23  What the Government is alleging by so characterizing Ms.

24  Wang is that she manages and controls these various

1

2  entities.  Now, like Mr. Kwok, she doesn't have her name

3  on each of the different companies that she is involved

4  with, but the Government has no question in light of the

5  evidence both found in Ms. Wang's apartment, the fact

6  that people associate Ms. Wang formally with these

7  companies because they interviewed with her for jobs at

8  some of these companies or they had contracts with her

9  in connection with their work with some of the

10 companies.

11         Ms. Wang runs the show with respect to these

12 instrumentalities.  She has done so up until the day of

13 her arrest contrary to what she told Pretrial Services.

14 And the Government would allege that part of the reason

15 that she lied to Pretrial Services was to disclaim

16 association with the various different instrumentalities

17 of the fraud.  To say that she took herself out of the

18 fraudulent entities, notably, Your Honor, right around

19 the time that the Government started to seize $630

20 million in fraud proceeds.

21         So in the Government's view, at the time of the

22 initial presentment and bail argument, we were not aware

23 that we were going to find concrete evidence in the

24 defendant's apartment that, in our view, proves what the

25 Government already alleged and believed to be true from

PROCEEDING                                                          55

1
2   its investigation which is Ms. Wang has continued
3   working for these companies up until the time of her
4   arrest.  So that is one point, Your Honor.  It's a
5   change in circumstances.  The Government has a change in
6   circumstances from where it was at the time of the
7   initial presentment.
8           Now, with respect to accounts, the allocation
9   of H coin or one of the purported cryptocurrencies that
10  is traded on the Himalaya exchange, again, another arm
11  of the fraud, the allocation document was found in Ms.
12  Wang's apartment with various other documents that seem
13  to support the fraud.  Your Honor is correct, defense is
14  correct, there's no way for the Government to prove that
15  Ms. Wang holds that money, and, in fact, the
16  Government's allegation is that it's not cryptocurrency,
17  but we're not alleging it's valueless.  We're alleging
18  that certain people have it and the people who are
19  quickest to redeem can basically have an exit scam and
20  get out with their money.
21          I would note while, again, we don't have access
22  to an account that Ms. Wang has where the money is held,
23  Your Honor correctly identified approximately $7 million
24  worth of a cryptocurrency asset would be something you
25  would want to keep track of.  The allocation indicates

 1  Yanping Wang, and then it has the allocation, it's in

 2  her name.

 3          I would note that some of the other individuals

 4  or entities who are allocated HCN in the document that

 5  the Government has include Ms. Wang's co-conspirator,

 6  William Je.  It says Sue Ming Je and family, that's one

 7  of his family members.  It includes Mr. Kwok's son, it

 8  includes friends of Mr. Kwok's son, all named by their

 9  names.  Ms. Wang is also named by her name.  Allocated 7

10  million.

11          Now, I don't know if she forgot or she just

12  didn't think it was relevant to disclose to Pretrial

13  Services, but this is a newly discovered fact the

14  Government found in the course of reviewing evidence

15  that was taken from Ms. Wang's apartment that gives us

16  serious pause, and it's something that's different from

17  when the Government first agreed to the conditions of

18  the proposed bond with defense counsel.

19          Another point I would like to note, with

20  respect to the accounts to which the defendant has

21  access, I understand that the way that the condition is

22  worded it could be read narrowly or broadly.  In the

23  Government's view it certainly imposes an obligation on

24  the defendant to be forthcoming.  And the condition

1

2  included the requirement that the defendant disclose

3  assets or accounts that she controls in her name or that

4  are in companies that she controls or is affiliated with

5  and, broadly speaking, cryptocurrency and other real

6  property.

7          The Government has found evidence, again, dated

8  as recently as a few days before the defendant's arrest

9  from her apartment, as I said, that show bank account

10  information, account information, Ms. Wang signing off

11  on payroll for some of the instrumentalities that she

12  doesn't control, but that the Government certainly

13  alleges that she manages and works for in her role as

14  Mr. Kwok's chief of staff.  So to the Government that

15  indicates effective control over those finances.

16          Even setting that aside though, Your Honor, Mr.

17  Lipman mentioned that there were credit cards and other

18  items in the safe.  The Government had indicated that

19  there was cash in one of the pouches, another pouch with

20  certain items that appeared to be and are ready to take

21  at the ready.

22          THE COURT:  You mentioned a safe.  Was there a

23  safe?

24          MS. MURRAY:  There was a safe.  Yes.  So the

25  bag with the cash and another bag that had credit cards

1

2  and other items, including the passports, those were all

3  concealed in a safe in defendant's apartment.

4          The credit cards notable that were taken from

5  one of those pouches in the safe, looking at the front

6  cover of those credit cards which were photographed and

7  we provided to defense counsel last week, there are

8  numerous cards that indicate accounts that are not yet

9  expired in the defendant's name that the defendant did

10 not disclose to the Government or to Pretrial Services.

11 And at this point, we have no way of determining what

12 assets are in those accounts, how the defendant

13 continues to control those accounts, but it's, again,

14 another layer, Your Honor, where we cannot derive

15 comfort that the defendant is being truthful with

16 Pretrial Services, with the U.S. Attorney's Office, or

17 with the Court.

18         And at a very high level, to talk through those

19 accounts, there is a Citibank account for one of the

20 Kwok family entities that the defendant controlled that

21 was active through last month when she was arrested.  So

22 it was active at the time.  There were two personal Bank

23 of America debit cards, different account numbers, both

24 in the defendant's name, in her name, personal accounts.

25 One which expired last month but, again, active when she

PROCEEDING                                      59

1
2  was arrested.  The next which expires next year.  There

3  is a Citibank personal account in the defendant's own

4  name which doesn't expire for another year.  There's a

5  DBS Treasures account at a Singapore Bank, and the

6  Government explicitly asked about foreign accounts as

7  well.  That card doesn't expire until January of 2025,

8  again, in the defendant's name.  And, finally, a China

9  Bank of Communications account, it's a Chinese bank.

10 That account, the card indicates it expires September of

11 2023, also in the defendant's name.

12          It's another example, Your Honor, of

13 indications to the Government that the defendant has

14 access to accounts, assets, funds that she could use in

15 order to flee.  And if they are funds that we needed to

16 rely on the defendant to disclose to satisfy another

17 condition of the bond that was imposed.  Separate and

18 apart from the question of co-signer, she was obligated

19 under the conditions imposed to disclose her assets, her

20 accounts, her cryptocurrency, her property to the

21 Government and to Pretrial Services.

22          She represented through counsel that she had

23 done that simply by disclosing two personal accounts,

24 one at Morgan Stanley Bank, one at TD Bank, and then

25 this account that was associated with one of the

1

2    companies.  She did not disclose in the Government's

3    view by any stretch the corpus of money that she has

4    access to.

5          These are examples of new circumstances that

6    gives the Government grave concerns.  Grave concerns

7    about the defendant's incentives to flee, about her

8    ability to flee, about the fact that we cannot trust

9    representations that the defendant is making.  And, Your

10   Honor, in those situations where we have so many red

11   flags and so many concerns that the Government would not

12   necessarily have identified if we hadn't found this new

13   information.  We simply do not have any assurances that

14   there are any conditions or set of conditions that will

15   assure the defendant's appearance at future court

16   appearances.

17         So that goes to the third prong, Your Honor.

18   It's the fact that the Government is now coming to the

19   Court saying we agreed on these proposed bail conditions

20   at the time of her arrest based on what we knew then.

21   The world has changed since then, and it has only gotten

22   more concerning for the Government which already had a

23   significant concern about the defendant's risk of flight

24   but believed that there may be certain conditions that

25   could assure her appearance.  We no longer feel that

| | PROCEEDING | 61 |

1

2  way.  We do not believe there are conditions or a set of

3  conditions that can reasonably assure her appearance.

4          THE COURT:  One clarification.  In regards to –

5  you referred to, I think you referred to, I don't know

6  if you were referring to the allegations of the

7  indictment or something else, but you referred to Mr.

8  Kwok and Mr. Je as being the ones who were sort of

9  lining their pocket and getting rich.  Are you in

10  agreement with defense counsel that the indictment

11  doesn't make allegations that the defendant here herself

12  was lining her pockets so to speak?

13          MS. MURRAY:  I guess to answer Your Honor's

14  question, the indictment does make allegations that the

15  defendant herself was personally responsible for a

16  hundred million dollar misappropriation of fraud

17  proceeds --

18          THE COURT:  I understand.

19          MS. MURRAY:  But that's to the point of

20  misappropriation.  Now, with respect to the indictment

21  which is a charging document that contains some

22  allegations, we haven't specifically outlined personal

23  money that the defendant herself misappropriated, but,

24  again, we don't believe that that is in any way germane

25  to her risk of flight and her access to money here and

PROCEEDING                                              62

1    to a network.

2           And another point that I would like to note is

4    with respect to travel documents and passports.  Mr.

5    Lipman said that the defendant had been seeking

6    permission to travel at the end of last year or

7    beginning of this year, and she was going to go I

8    believe to the U.K.  Travel internationally.

9           The Government recovered a Vanuatu passport and

10   a Hong Kong passport from her safe.  The Vanuatu

11   passport was expired, and we did see evidence which we

12   disclosed that that passport had been kind of not

13   revoked but that the defendant had removed her request

14   from the passport.  But she has the ability to obtain

15   travel documents as does her co-defendant Miles Kwok who

16   allegedly has had 11 passports at various points.

17          THE COURT:  Well, she's not Miles Kwok.

18          MS. MURRAY:  I understand --

19          THE COURT:  I understand she could be part of a

20   network where things like that can be made available is

21   what you're suggesting I think.

22          MS. MURRAY:  That's exactly right, Your Honor,

23   it's exactly right that she can both be part of the

24   network where things can be made available and she is

25   the one who is tasked with holding onto those travel

1

2  documents both for herself and Mr. Kwok.  She is a

3  trusted person who is entrusted with the responsibility

4  of having those travel documents --

5       THE COURT:  What do you make of the defense's

6  points that the defendant certainly would've been aware

7  in September or October of 2022 about the seizure of

8  phones and that something was afoot and then there was

9  the dealings with the SEC, together with the fact that,

10  again, as defense has represented, that she applied for

11  a furlough to be able to travel despite her asylum aps.

12  Aren't those, if true, sort of indicative of someone

13  who's not going to run?

14       MS. MURRAY:  Not necessarily, Your Honor, and I

15  would also note that while, you know, there may be a

16  question of whether those are at odds, and I'm happy to

17  address that in a moment, I would also note that the

18  defendant's willingness and, in fact, desire to travel

19  to the U.K. even though she has these serious concerns,

20  the CCP's persecution of repatriation, indicates that

21  those concerns are not so grave that she's not willing

22  to travel internationally.

23       But I don't know the circumstances of the

24  defendant's requested furlough.  I don't know what the

25  purpose was of her going on that trip.  I will say that

PROCEEDING                                                    64

1  there's no reason – if we're speaking in hypotheticals

2  in this instance, there's similarly no reason to believe

3  that she didn't request furlough to go to the United

4  Kingdom without any intention of returning after she was

5  aware the funds had been seized.  And, again, I'm

6  speaking in hypotheticals only because we were asked a

7  question by the Court, but I think you can draw various

8  different conclusions from these facts.  And at bottom,

9  her seeking to travel to the U.K., her willingness to

10 travel internationally, doesn't cut against the fact

11 that she poses a significant risk of flight.

12         And I'd also note, it's a risk of flight non-

13 appearance at future court appearances.  We don't need

14 to establish that she's going to go to a foreign

15 jurisdiction --

16         THE COURT:  No.

17         MS. MURRAY:  She could flee from the city, she

18 could flee from the several block radius.  She could cut

19 her bracelet.  And it could be that her vast network of

20 supporters enable and harbor her.  We don't know the

21 circumstances, but the bottom fundamental point is the

22 defendant poses a significant risk of flight.  The

23 Government sees no condition or set of conditions in

24 light of the strength of the evidence, the seriousness

1 | of the charges here, the defendant's personal

2 | circumstances, her access to substantial assets, foreign

3 | connections including her co-defendant William Je who is

4 | alleged to be in the UAE as a fugitive of where he has

5 | charges, her network of supporters, and the new

6 | information that we have found in the last two weeks,

7 | indicating that the defendant has not been forthcoming

8 | with the Court, Pretrial, or the Government.  We simply

9 | don't believe there are any conditions that can ensure

10 | her appearance at future court proceedings.

11 |      THE COURT:  All right.  I assume you want to

12 | respond some.

13 |      MR. LIPMAN:  Oh, yes, Your Honor.  Thank you.

14 |      THE COURT:  Just let me say to my 3:30, sorry,

15 | that we're going to be running late.  Just sit tight,

16 | and we'll eventually get there.  Go ahead.

17 |      MR. LIPMAN:  I'll do this as quickly as I can,

18 | Your Honor.  So I want to start with the following.

19 | Everything I said about what they misrepresented in

20 | their conversations with the Court and submissions

21 | apparently is true because none of it did they take

22 | issue with.  So all of that stuff about finding, you

23 | know, a phone between mattresses, phones secreted in

24 | whatever it that they were, a document hiding in between

PROCEEDING                                        66

1

2   the cushions, none of that apparently happened.  It is,

3   it was represented to the Court.

4            So now we get to the point of trust.  They said

5   trust.  You can't trust this defendant.  Really?  But

6   you can trust this Government?  Let's just see, let's

7   just parse through what Ms. Murray just said.  She said

8   that she found photographs of cards, some of those

9   showed that the card is not yet expired.  How do we go

10  from there to, oh, and there's an account that goes with

11  it?  What evidence does she have?  None.  None

12  whatsoever.

13           What she knows - by the way, Your Honor, I have

14  never, the words Great Britain never left my mouth.

15  Okay?  That means that they knew that she was about to

16  travel.  Why didn't they arrest her?  If they thought

17  that she was going to get out of Dodge and they were

18  concerned that she was a flight risk, well, when they

19  found out that she applied, well, arrest her.  What,

20  they didn't have a border watching her?  Really?

21  Because the Department of Justice has changed that much

22  since I was there?  I don't think so.

23           So now let's get to her employment.  Once

24  again, what was the question that was asked?  Are you

25  currently employed?  No.  No.  If the question were

1

2  asked are you still a member of a revolutionary movement

3  that does whatever it is that they try to do to get rid

4  of the communist party of China, the answer to that is

5  yes.

6         THE COURT:  Well, wasn't she working for one or

7  more of the companies?

8         MR. LIPMAN:  She was working for the family

9  office.

10        THE COURT:  Yeah.

11        MR. LIPMAN:  There's no dispute that she had

12 input into various things that happened.  I'm not taking

13 issue with what they say that she interviewed people for

14 whatever it is and this and that.  The Government knows,

15 yeah, the Government knows that she was the 99.999

16 percent owner of this entity that owns these three other

17 companies.  None of that is a secret.  Okay?

18        THE COURT:  But was she --

19        MR. LIPMAN:  But was she --

20        THE COURT:  Was she employed?

21        MR. LIPMAN:  No, she got, she was not getting,

22 drawing a salary anymore.  She was not employed.  She

23 worked, she continued to do certain kind of work, but

24 she did not get paid.  She was volunteering.  And the

25 reason she's volunteering, Your Honor, this goes back to

1

2   what we talked about before.  The reason she is

3   volunteering is because this is a political movement

4   that she --

5            THE COURT:  What was she doing for a source of

6   funds then?

7            MR. LIPMAN:  Well, she's still, she has --

8            THE COURT:  I understand she has accounts.

9            MR. LIPMAN:  And, by the way, Your Honor, the

10  house that she bought, her apartment, she bought before

11  any of these fraud allegations --

12           THE COURT:  Yeah, I understand.

13           MR. LIPMAN:  And, Your Honor, look, I'm sorry,

14  but the few things that the Government says, they say

15  change in circumstances.  What's the change in

16  circumstances again?  That she's volunteering whereas

17  she used to – of course.  So what?  So what?  The day

18  before her arrest, did she know she was about to get

19  arrested?  Because if she did know that she was about to

20  get arrested and she didn't get out of Dodge, then she's

21  not a flight risk.  So she was going about her normal

22  life.  What is so, what's the new – what is new about

23  that?  Absolutely nothing.

24           Now, and then what is they say – she lied to

25  disclaim that she had nothing to do with any of these

PROCEEDING                                                69

1  companies?  When?  To whom?  And I had a specific

2  conversation with the Government when they say, well,

3  Ms. Murray says, she says that, broadly speaking, the

4  question could be that broadly construed or narrowly

5  construed.  Well, first of all, nobody's taken my

6  client's Fifth Amendment (indiscernible), not that I

7  have heard, and when she was asked the question, she

8  gave an answer, the answer was truthful.  If they wanted

9  to know more, they should've asked.  And I specifically

10 had a conversation with the Government, and I said

11 excluding anything that she may have control over by

12 virtue of corporate ownership or whatever, these are the

13 accounts.

14       She's not a flight risk, Your Honor.  There's a

15 question that I keep asking myself is this.  Why?  Why

16 is the Government misrepresenting evidence?  Why is the

17 Government stretching stuff, stretching stuff?  Even if

18 they believe that, you know, there's more to this.  Even

19 – I'm sorry, I'm sorry, I'm reminded that on her

20 employment question, we actually invoked, she invoked

21 her Fifth Amendment right.  Okay?  Thank you.

22       Even – I lost my train of thought.  I

23 apologize.  I think I was responding to this idea that

24 she controls stuff.  There's no – we never hid that.

PROCEEDING                                          70

1

2    The only question is is she a flight risk?  What is it

3    about her that makes you think that she's not going to

4    show up?  She will show up, Your Honor.  She's got

5    nowhere to go.  Nowhere.  And the Government keeps –

6    this is where I was, thank you.

7              Why are they stretching it?  Why?  What is the

8    reason?  I mean, really, does she look dangerous?  What

9    is it --

10             THE COURT:  They're not moving on

11   dangerousness.

12             MR. LIPMAN:  I'm sorry, no --

13             THE COURT:  They're not moving on danger.

14             MR. LIPMAN:  There is a reason why they're

15   doing it.  They want her to cook.  They want her to get

16   a flavor of the MDC because she was the chief of staff,

17   Your Honor, and that is not okay.  That is immoral.  And

18   when the Government obtains that result by, among other

19   things, misrepresenting, saying that she's a flight risk

20   on the basis of things that they cannot support, that

21   contradict the evidence that's collected, that is – is

22   anybody other than me think that it's a little bit

23   peculiar or ironic that the Government is alleging that

24   she violated certain antifraud provisions that make it

25   unlawful to make a statement that in light of all

1

2  circumstances is materially misleading and yet this is

3  what the Government is doing?  Why?

4          Your Honor, this woman needs to be released.

5  She's not a flight risk.  She's not going anywhere.

6  She's going to have an ankle bracelet, she'll have GPS

7  monitoring.  We can have all of her money tied up so

8  that she can't breathe without Pretrial or somebody

9  giving her approval.

10          And one last thing, if she's not released, her

11  defense is going to be severely prejudiced.

12          THE COURT:  It's true for anybody who doesn't

13  get released.

14          MR. LIPMAN:  Except, except when that person

15  also has Mandarin as her first language, when the

16  Government asks for a disk to put 2 terabytes of data on

17  it.  This is not a case that's going to be resolved

18  quickly, and it is a case in which it's going to be very

19  important to have your client's assistance.

20          THE COURT:  Okay, thank you.  Ms. Murray, do

21  you want to have the last word here?

22          MS. MURRAY:  Yes, Your Honor, briefly.  I want

23  to start by saying there is nothing that the Government

24  has misrepresented to the Court.  The Government has not

25  reached on facts.  The Government has provided evidence

 1  
 2  substantiated information that it has presented to this

 3  Court and to the defense.  With respect to the credit

 4  cards Mr. Lipman mentioned, it's not a photo of the

 5  cards.  It's a photo of the cards that we have before

 6  the Court and the defense today.  They were the physical

 7  cards.  But we resent the claim that we are in any way

 8  acting other than --

 9          THE COURT:  I know --

10          MS. MURRAY:  --fully forthcoming and in good

11  faith.

12          THE COURT:  -- I have no doubt you're operating

13  in good faith.  But he did point out some things that

14  were discrepancies it seemed between what was

15  represented in terms of where certain pieces of evidence

16  were found in her apartment versus what was inventoried

17  and how it was inventoried.  Can you speak to that?

18          MS. MURRAY:  Sure, Your Honor.  There aren't

19  discrepancies.  What Mr. Lipman has done is he's pointed

20  to an evidence log that has a column where there are

21  certain notations made when the FBI is collecting

22  evidence that indicates where the item was recovered.

23  Typically, it indicates the room by letter based on the

24  map that Mr. Lipman provided to the Court and a brief

25  description.  It does not indicate in a detailed

1 | narrative where each and every item that is taken as

2 | evidence was recovered from, what condition it was in,

3 | how it was found.

4 

5 | So with respect the laptop between clothes,

6 | that is consistent with the Government's representations

7 | to Judge Parker at the initial presentment that the

8 | laptop was found between sweaters in the closet.  It

9 | doesn't say specifically what items of clothing --

10 | THE COURT:  No.

11 | MS. MURRAY:  -- or where, but it's consistent.

12 | With respect to the iPhones that the Government had

13 | indicated had been in boxes, yes, in a bag in the

14 | closet, and you can see those are the items that Mr.

15 | Lipman pointed Your Honor to in the 50's on the evidence

16 | log.  And you'll note that nearly each of them has the

17 | same PIN code or passcode.  So those are items that at

18 | first the FBI thought might not have any content, and

19 | then the FBI had technicians on site during the search

20 | warrant, they plugged them in, and they determined they

21 | had content.  There are no misrepresentations.

22 | Mr. Lipman is now, again, Your Honor,

23 | essentially trying to hold a trial on the merits of the

24 | Government's case here at a point of a detention hearing

25 | by, first of all, requesting information from the

PROCEEDING                                74

1

2  Government which we happily provided and would have so

3  provided in the course of discovery in this case as

4  well, and then trying to hold it against the Government

5  by claiming that because there isn't a photo of each

6  stage of every step of the process that evidence was

7  collected, then the Government can't be trusted.  It is

8  simply not true, and it's disrespectful, Your Honor.

9         With respect to a couple of other points, I

10 would just like to note the defendant lied.  She lied

11 about the cash in her apartment.  I have now heard the

12 defense during the course of this argument split hairs

13 on several topics, and that is another example of what

14 gives the Government pause.

15        THE COURT:  Well, how do we know – it is

16 important what was asked.  Do you have any money on you?

17 Do you have any money in your apartment?  There's a

18 difference.

19        MS. MURRAY:  I understand, Your Honor, and the

20 Government obviously is not privy --

21        THE COURT:  And particularly for someone of a

22 different language and culture, it might be all the more

23 important that there's nuance to what's asked.  I don't

24 know what was asked.

25        MS. MURRAY:  Sure, and nor do we because the

PROCEEDING                                              75

1

2   Government is not part of Pretrial Services interview

3   with the defendant.  She was assisted by a Mandarin

4   speaking interpreter during that interview.  The

5   Government is also aware from its investigation that Ms.

6   Wang is quite fluent in English.  We know that from

7   various different pieces of evidence we've collected,

8   including statements that she's made and her voice

9   during conversations.  She doesn't appear to have an

10  issue understanding.

11          But with respect to the questions that were

12  asked, again, I don't know, I was not there.  The

13  defendant is very much so splitting hairs on several

14  topics.  I will note that the Pretrial Services report

15  indicates that the defendant was asked about assets,

16  assets, not specific accounts that she is the sole

17  signatory on, not specific accounts that are active that

18  she has control over and log-in information to.  We're

19  not splitting hairs.  Pretrial Services asked about

20  assets, and she did not disclose $138,000 worth of cash

21  that was sitting in a safe in her apartment.

22          With respect to her employment, the defense

23  just indicated that she had invoked – the Pretrial

24  Services report with respect to employment history

25  indicates that the defendant advised she has been

1

2  unemployed since September 2022.  Now, with respect to

3  the source of additional money that she has since then

4  or that she is living on, the defendant declined to

5  answer, and that is her right.  But she did provide this

6  statement in response to Pretrial Services report, she's

7  been unemployed since September of 2022.

8         Now, Mr. Lipman says that the defendant has

9  been volunteering in various organizations that she

10 previously might have worked in a more formal employment

11 capacity.  I just want to go back briefly to the

12 personal gain point that Your Honor has asked about.

13 Yes, I understand $1.1 million might not be an expensive

14 apartment in Manhattan, but it's a $1.1 million

15 apartment purchased in cash.  The defendant has nearly

16 another million dollars in her accounts.  The defendant

17 was up until her purported decision to terminate her

18 employment and start volunteering was earning a salary

19 of approximately $250,000 from the Kwok entities that

20 she worked for formally, in a formal capacity.  That is

21 personal gain in the Government's view.

22         It is also inconsistent with now the claims

23 that September 2022, right when the Government started

24 seizing funds, the defendant stopped working in a formal

25 capacity.  She can't be held responsible for any of

PROCEEDING                                    77

```
 1                                    PROCEEDING                              77

 2   these bank accounts that she's signing off on payroll

 3   for, that she has access to the funds for.

 4           Your Honor, at bottom the defendant is a risk

 5   of flight.  There are no conditions that can reasonably

 6   assure her appearance.  She has lied.  The Government

 7   has not misrepresented itself to the Court.  And we have

 8   no comfort that we can believe that she will make

 9   accurate representations to the Court, that we will have

10   the ability to monitor her in any meaningful way that

11   would assure her appearance at future court proceedings.

12           THE COURT:  Thank you.  Mr. Lipman, I see you,

13   do you want to respond?  Go ahead.

14           MR. LIPMAN:  Your Honor, answering the question

15   that's posed truthfully is a complete answer.  It's not

16   splitting hairs --

17           THE COURT:  Look, the bottom line is we don't

18   know really what was asked and how it was asked --

19           MR. LIPMAN:  Well, we were there.

20           THE COURT:  Fine, but I'm saying we don't have

21   a record --

22           MR. LIPMAN:  But, Your Honor, there is no

23   record, and there is no proof of these things that the

24   Government says --

25           THE COURT:  I --
```

1

2          MR. LIPMAN:  -- which is what --

3          (interposing)

4          THE COURT:  I didn't say which way it cuts.

5          MR. LIPMAN:  No, but, Your Honor, they said we

6   found a credit card.  Well, that means she didn't

7   disclose an account.  No, you found a credit card.

8   Okay?  We found a statement that said that whatever,

9   that she was allocated some coin.  Yes, that's what you

10  found, that's what you have.  You don't have anything

11  else.  So to tell me that she needs to be detained and

12  she cannot be trusted because they found something that

13  they don't fully understand, I'm sorry, but that's a

14  bridge too far.

15          And, yeah, a bunch of her accounts, by the way,

16  as the Government knows, were closed, and the

17  Government's investigation kind of followed that.  So

18  like the Citi accounts, for example, were closed.  Other

19  accounts at other banks were closed recently, they were

20  closed.  And the other thing, Your Honor, when they say

21  she controls this or she controls that or whatever,

22  okay, she worked somewhere, she no longer works there,

23  she doesn't draw a salary.  What she does with her time

24  is her business.  It's not cutting - it's not lying to

25  anybody, it's not any of that.  Okay?

PROCEEDING                                    79

1

2          And the Government essentially conceded – no,

3    not essentially.  The Government conceded the key point

4    that this was not, her participating, according to their

5    indictment, was not for the benefit for her personal

6    monetary gain.  It was for some other reason.  And the

7    apartment was bought before any of the allegations with

8    other money.  She did make money, but she didn't spend

9    it.  I already described to the Court how she lived.

10   And so the key question is why does she do this and, if

11   she did it, did she do it to benefit herself, and if

12   not, then is that sufficient reason to think that she's

13   now going to hurt these people because she did not put

14   any money that came out of their pockets and put it into

15   hers.  There's no reason to believe that having not done

16   that, being around all this money and not putting any of

17   it in your pocket.  For all of these years she didn't do

18   that.

19          So what is going to make her do it now?  And

20   the answer is that this is a revolutionary movement,

21   okay, these people are her brothers and sisters.  They

22   together want to see the CCP overthrown.  And so she's

23   not going to put them in financial jeopardy that she

24   dedicated her life, her life to this cause.

25          THE COURT:  All right.

1

2          MS. MURRAY:  Your Honor, just a final point.  I

3   want to be clear the Government made no concession on

4   that point in any stretch, and a key question is whether

5   she poses a risk of flight, that is the question.

6          THE COURT:  All right, look, one thing that

7   I've been asked to do is to determine if the, or at

8   least order that some of the financial suretors that

9   have been offered are sufficient to meet the

10  requirements and conditions that were issued by Judge

11  Parker, and the defense has indicated here they have

12  three for which they believe that there's sufficient

13  property that can be offered as security along with the

14  enhanced package, if you will, of funds that were

15  offered on behalf of the defendant.

16          I don't have it in front of me information

17  about those three FRP's in terms of the property that's

18  being offered.  That is part of what I need to consider.

19  I realize I am also being asked by the Government for

20  detention anew in light of new material.  But it's

21  incumbent upon me to review whatever material the

22  defendant is going to provide to substantiate it's

23  offered financial suretors.

24          So I want a package of whatever it is that you

25  must or that you think is enough.  If there is

PROCEEDING                                          81

1   documentation you haven't provided the Government

2   already on others that you can provide, including the

3   so-called eighth or others, provide it.  And part of

4   what I'm going to do is assess that material.  It

5   doesn't mean I'm necessarily going to find obviously

6   that that is sufficient and that the conditions have

7   been met, but it is one of the things I am going to

8   consider in addition to considering whether a different

9   set of conditions should be imposed or whether the

10  defendant should be detained.

11          So she's going to continue to be detained

12  pursuant to Judge Parker's order of all conditions being

13  satisfied before she's released pending the submission

14  of this additional information and my review of it which

15  I will try to do as quickly as possible.

16          Let me ask Mr. Lipman, when can you get that

17  material to me and the Government?

18          MR. LIPMAN:  Your Honor, I will start working

19  on it as soon as I leave this courtroom.  I would ask

20  for 24 hours.

21          THE COURT:  Well, sure.

22          MR. LIPMAN:  Oh yes, yes.  Yes.  That's a good

23  point.  Your Honor has a lot of personal information,

24  rather than redacting it and filing it in various ways -

PROCEEDING                                          82

1

2   -

3              THE COURT:  You can file it under seal.

4              MR. LIPMAN:  Okay.  All right.

5              THE COURT:  And you'll provide it to the

6   Government obviously in unredacted form.

7              MR. LIPMAN:  Of course.  You know what, Your

8   Honor, I said 24 hours --

9              THE COURT:  Give yourself more time.

10             MR. LIPMAN:  Yeah.

11             THE COURT:  It's your call sort of because your

12  client is going to remain detained.  So you obviously --

13             MR. LIPMAN:  I understand.  But how about this,

14  we will provide it no later than 48 hours from now, but

15  we will attempt to provide it as soon as humanly

16  possible.

17             THE COURT:  Okay.  All right, I mean it's

18  important I think also if you need a little more time,

19  to be able to put together something stronger that might

20  assure the Government.  Grant it that they're saying

21  there are changed conditions and they want detention.

22  But anything you can do to make stronger the financial

23  suretor application would be helpful to me in being able

24  to review and its significance.  Okay?

25             MR. LIPMAN:  Thank you, Your Honor.

1

2          THE COURT:  All right.  Anything else from the

3   Government?

4          MS. MURRAY:  No, Your Honor.  Thank you.

5          THE COURT:  Anything else from the defense?

6          MR. LIPMAN:  No, Your Honor, thank you.

7          THE COURT:  All right, we're adjourned.  Thank

8   you all.

9          MS. MURRAY:  Your Honor, sorry.

10          THE COURT:  Oh, one administrative thing

11   actually.  I just want to note for the record that the

12   defense handed up exhibits marked 1, 45, 46, and 26, and

13   finally 27.

14          MS. MURRAY:  Your Honor, just briefly before we

15   adjourned.  To the extent the defense is going to submit

16   something to the Government and to the Court, we would

17   ask for a response date.

18          THE COURT:  Fair.

19          MS. MURRAY:  We can figure out the timing once

20   the defense has actually submitted the materials, and we

21   can coordinate with Your Honor on that if that makes

22   sense.

23          THE COURT:  All right.  Should we set a defined

24   time now?  I think it would be appropriate.

25          MR. LIPMAN:  Yes, please.

1

2          THE COURT:  So I would - I don't know about the

3  weekend.  So you're going to get to me and the

4  Government before the weekend it sounds like.

5          MR. LIPMAN:  Yes, I will get it to you as soon

6  as humanly possible.

7          THE COURT:  All right, well, I'm going to give

8  the Government, I was going to say five days --

9          MR. LIPMAN:  Your Honor.

10          THE COURT:  Too much?

11          MR. LIPMAN:  Five days at the MDC.

12          THE COURT:  Yeah, and the Government has

13  partial information on some of these already.  I'll give

14  the Government three days.  If for any reason something

15  turns out that is particularly complex that requires

16  more, let me know, but I'm giving the Government three

17  days --

18          MR. LIPMAN:  Your Honor, may I just for a

19  second, and I hear that, you know, I don't know why they

20  need three days.  I apologize --

21          THE COURT:  I don't know what's going to be in

22  the package.  Three days.

23          MR. LIPMAN:  Okay.  What I was going to say,

24  Your Honor, is this, what I would like to get to the

25  Court is evidence of real estate that is available.  It


1

2    is our position that if there's sufficient proof that

3    the person proposing to cosign actually owns this real

4    estate and the real estate has the value that they say

5    it does, that's really all that the Government needs.

6    In other words, right, because whether they make money

7    or not --

8          THE COURT:  I don't know what the Government

9    needs, but you need to assure the Court --

10         MR. LIPMAN:  I'm sorry?

11         THE COURT:  You need to assure the Court at the

12   very least.  I don't know exactly what that is you will

13   give to me.  Certainly, it'll be important to know who

14   is the owner, whether there are any other ownership

15   interests, what are the liens, what are the mortgages,

16   etc.  So I think you have an idea.

17         It's not going to necessarily take away from

18   whether someone is an alleged victim or has one of the

19   other faults, but at least I want a more complete

20   picture, and it's part of my obligation to make that

21   assessment.  And I don't want to make a sweeping

22   statement at the moment that just because anyone is an

23   alleged victim and is not a family tie in some way, that

24   necessarily makes them inadequate.  But that's why I

25   need to see it individually.

```
 1                        PROCEEDING                        86

 2            MR. LIPMAN:  Okay.

 3            MS. MURRAY:  Your Honor, with respect to the

 4  response date, assuming that the defense submits

 5  something on Thursday, that would make the Government's

 6  response due on Easter Sunday.  We would respectfully

 7  ask --

 8            THE COURT:  Monday.

 9            MS. MURRAY:  -- that we get until Monday.

10  Thank you.

11            THE COURT:  Yes, of course.  Okay, all right,

12  we are adjourned.  Thank you.

13            MS. MURRAY:  Thank you.

14            MR. LIPMAN:  Thank you, Your Honor.

15            (Whereupon the matter is adjourned.)

16

17

18

19

20

21

22

23

24

25
```

87

## C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, United States of

America versus Wang, Docket #23cr118/23m2007, was

prepared using PC-based transcription software and is a

true and accurate record of the proceedings.


Signature_____

               Carole Ludwig

Date:  April 5, 2023

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
### BRIDGEPORT DIVISION

------------------------------------------------------x
:
In re:                                    :    Chapter 11
:
HO WAN KWOK, *et al.*,                    :    Case No. 22-50073 (JAM)
:
Debtors.[1]                               :    Jointly Administered
:
------------------------------------------------------x

## ORDER REGARDING PARTIAL RESOLUTION OF
## TRUSTEE'S CONTEMPT MOTION

Upon the motion (the "Motion")[2] of Mr. Luc A. Despins, in his capacity as the chapter 11
trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"), for the
entry of an order (this "Order"), pursuant to section 105 of title 11 of the United States Code (the
"Bankruptcy Code") and Rule 9014 and 9020 of the Federal Rules of Bankruptcy Procedure (the
"Bankruptcy Rules"), holding Ho Wan Kwok (the "Debtor") in civil contempt for failure to
comply with the Corporate Governance Rights Order and imposing appropriate sanctions, all as
further detailed in the Motion; and this Court having jurisdiction to consider the Motion to
Compel and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the
*Standing Order of Reference* from the United States District Court for the District of Connecticut
(as amended); and consideration of the Motion and the relief requested therein being a core
proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in this Court pursuant to 28
U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under
the particular circumstances; and it appearing that no other or further notice need be given; and
upon all of the proceedings had before this Court; and upon consideration of and in reliance on
the evidence presented, including (a) the transcript of the April 6, 2022 meeting of creditors

---

[1]     The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595) (the "Debtor") and
Genever Holdings Corporation ("Genever BVI"). The mailing address for the Trustee and Genever BVI is Paul
Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho
Wan Kwok (solely for purposes of notices and communications).

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

under section 341 of the Bankruptcy Code [Trustee Exhibits 7 and 10][3] (the "Section 341 Meeting"), (b) the Particulars of Claims [Trustee Exhibit 6] (the "U.K. Complaint"), dated September 23, 2020, filed in the case styled as *Kwok Ho Wan & Ors. v. UBS*, Cl-2020-000345, High Court of Justice of England and Wales Queen's Bench Division Commercial Court, and (c) the Debtor's affidavit, dated February 5, 2016 [Trustee Exhibit 15] (the "Kwok Affidavit"), filed in the case styled as *Ace Decade vs. UBS AG*, Index No. 653316/2015 (N.Y. Sup. Ct.), which exhibits have been admitted into evidence (without objection); and the Debtor having not opposed or otherwise objected to entry of this Order; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      The Court hereby finds that (i) the Debtor exclusively beneficially owned and controlled Ace Decade Holdings Limited ("Ace Decade") on the February 15, 2022 petition date (the "Petition Date") and maintained such exclusive beneficial ownership and control up to and including immediately prior to the date of the Trustee's appointment, and (ii) Dawn State Limited ("Dawn State" and, together with Ace Decade, the "Ace Decade Entities") is Ace Decade's wholly-owned subsidiary and is exclusively owned and controlled by Ace Decade.  For the avoidance of doubt, Yanping "Yvette" Wang is not and has never been a beneficial owner of the shares in Ace Decade or Dawn State.  The Debtor does not contest the findings in this paragraph and will not appeal such findings.

2.      The Debtor represents that he has never transferred or purported to transfer any ownership or control of Ace Decade to any other person or entity since the Petition Date. Accordingly, the Court further finds that, but for the Trustee's appointment and his rights under the Bankruptcy Code and the Corporate Governance Rights Order, the Debtor would still exclusively beneficially own and control Ace Decade as of the date of this order.   The Debtor does not contest the findings in this paragraph and will not appeal such findings.

3.      The Court shall hold a hearing on November 17, 2022 (the "Compliance Hearing") on the unresolved portion of the Motion.   The parties reserve all rights as to the unresolved portion of the Motion, and, for the avoidance of doubt, the Trustee specifically reserves the right to request entry of a separate order requiring the Debtor to cause title to the shares in the Ace Decade Entities to be transferred to the Trustee by a date certain, and the

---

[3]      References to the Trustee Exhibits are to the exhibits filed with the *Amended Exhibits List*, dated November 15, 2022 [Docket No. 1096].

Debtor specifically reserves the right to request an order finding that the actions he has taken to comply with the Corporate Governance Rights Order and the Bankruptcy Code are sufficient not to be held in contempt.

4.      For purposes of the Compliance Hearing, the Debtor stipulates to the admissibility of Trustee Exhibits 13 (at page 3), 28-30, 34, 36-37, and 39 (at page 55:23-25) on the issue of the relationship between the Debtor and Yanping "Yvette" Wang. The Debtor reserves the right to represent through his counsel that the Debtor would testify that Ms. Wang is not his employee and does not take direction from him. The parties reserve all rights with respect to the weight, if any, the Court should give to the foregoing exhibits and representations.

5.      The Debtor shall not in any way interfere with or impede the Trustee's exercise of ownership and control over the Ace Decade Entities, nor shall the Debtor (a) argue in any setting or seek any order from any judicial or arbitral body that (i) the Debtor did not exclusively beneficially own and control, directly or indirectly, the Ace Decade Entities immediately prior to the date of the Trustee's appointment, (ii) the Trustee does not now exclusively beneficially own and control Ace Decade, or (iii) the Debtor ever transferred or purported to transfer any ownership or control of Ace Decade to any other person or entity (other than the Trustee) following the Petition Date; or (b) voluntarily assist, including by providing testimony or statements, any other party in advancing any of the positions set forth in items (a)(i) through (a)(iii) of this paragraph.  Notwithstanding the foregoing, nothing in this Order shall prevent the Debtor from testifying truthfully under oath in response to a valid subpoena or equivalent process from a court or other body having jurisdiction over the Debtor legally compelling him to provide testimony.

6.      Nothing in this Order shall preclude the Trustee, in the context of any further litigation against any third party, from arguing that any purported transfer by the Debtor of the ownership or control of either or both of Ace Decade or Dawn State was or is avoidable under any applicable law, or that any such purported transfer should be disregarded under applicable law.

7.      The Debtor has represented that he does not contest any findings in this Order and, accordingly, he will not appeal this Order.

8.      The Trustee is authorized and empowered to take all actions necessary to effectuate the relief granted in this Order.

3

9.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated at Bridgeport, Connecticut this 17th day of November, 2022.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------------x
                              :
In re:                         :     Chapter 11
                              :
HO WAN KWOK, *et al.*,[1]        :     Case No. 22-50073 (JAM)
                              :
             Debtors.      :     (Jointly Administered)
                              :
-------------------------------------------------------------x
                              :
LUC A. DESPINS, CHAPTER 11   :
TRUSTEE,                   :
                              :     Adv. Proceeding No. [_____]
            Plaintiff,       :
v.                         :
                              :     June 8, 2023
HCHK TECHNOLOGIES, INC.,    :
HCHK PROPERTY MANAGEMENT, INC., :
LEXINGTON PROPERTY AND STAFFING, INC.,:
HOLY CITY HONG KONG VENTURES, LTD., :
ANTHONY DIBATTISTA, YVETTE WANG, :
and BRIAN HOFMEISTER (in his capacity :
as assignee),              :
                              :
            Defendants.    :
-------------------------------------------------------------x

**COMPLAINT OF CHAPTER 11 TRUSTEE FOR ESTATE OF**
**HO WAN KWOK PURSUANT TO SECTIONS 105, 362, 363, 541, 542, 544, AND 549 OF**
**THE BANKRUPTCY CODE SEEKING (I) DECLARATORY JUDGMENT THAT**
**HCHK TECHNOLOGIES, INC., HCHK PROPERTY MANAGEMENT, INC., AND**
**LEXINGTON PROPERTY AND STAFFING, INC. ARE (A) ALTER EGOS OF**
**DEBTOR; OR, (B) IN THE ALTERNATIVE, AN ORDER THAT DEBTOR**
**EQUITABLY OWNS SUCH ENTITIES AND/OR THEIR PROPERTY; AND (II)**
**<u>INJUNCTIVE RELIEF</u>**

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the
chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor" or "Kwok"), files this
adversary complaint (the "Complaint") against defendants: (a) HCHK Technologies, Inc.
("HCHK Technologies"); (b) HCHK Property Management, Inc. ("HCHK Property"); (c)
Lexington Property and Staffing, Inc. ("Lexington Property," and, together with HCHK
Technologies and HCHK Property, the "HCHK Entities"); (d) Holy City Hong Kong Ventures,
Ltd. ("Holy City"); (e) Yvette Wang; (f) Anthony DiBattista; and (g) Brian Hofmeister, in his
capacity as assignee of the HCHK Entities (the "Assignee Defendant,"[2] and, together with the
HCHK Entities, Holy City, Yvette Wang, and Anthony DiBattista, the "Defendants").  In support
of this Complaint, the Trustee states as follows:

## NATURE OF ACTION

1.      The Trustee files this Complaint and his accompanying motion for a temporary
restraining order and preliminary injunction to bring valuable assets into the chapter 11 estate
and to urgently prevent those assets from being dissipated to the detriment of the Debtor's
creditors.  As this Court well knows, the Debtor has a history of using shell companies, family
members, and close associates to help keep his assets outside the reach of his creditors, such as
when he used Hong Kong International Investments (USA) Limited ("HK USA"), nominally
owned by his daughter, to create the fiction that his *Lady May* yacht and approximately $33
million in escrow funds were not property of this estate.  The Court rightfully ignored that fiction
in granting summary judgment for the Trustee on his alter ego claim against HK USA.

---

[2]     The Trustee, as of the time of the filing this Complaint, has no information regarding the Assignee Defendant's
actual  knowledge or lack of actual knowledge of the facts alleged in this Complaint.  However, the relief
sought in this complaint is amply justified, regardless of such actual knowledge by the Assignee Defendant.

2.      The Debtor and his associates are deploying the same tactics with the HCHK

Entities, using them to hold over $35 million in cash that should be property of the estate.  The

HCHK Entities are nominally owned by Yvette Wang, the Debtor's close associate and co-

defendant in the U.S. Government's billion-dollar criminal fraud and money-laundering case.

The reality, however, is that Ms. Wang takes direction from the Debtor, and the HCHK Entities,

just like HK USA and numerous of the Debtor's other shell companies before them, are mere

extensions of the Debtor himself, designed to conduct his business and keep his valuable assets

from creditors.

3.      While the Debtor's use of the HCHK Entities as mere alter egos is nothing new,

the circumstances at issue are even more troubling than they have been in the past because the

Debtor and his associates are ***presently engaged in a scheme to transfer the HCHK Entities'***

***valuable assets to other shell companies of the Debtor***.  Specifically, on April 20, 2023, the

Debtor's employees nominally in management positions at the HCHK Entities, executed Deeds

of Assignment with respect to each of the HCHK Entities purporting to assign all of their assets

to the Assignee Defendant.  The Assignee Defendant then filed an affidavit and petition with

respect to each of the HCHK Entities (each, an "Assignee Affidavit" and, together, the

"Assignee Affidavits") in the Supreme Court of the State of New York for New York County

(the "State Court").  The Assignee Affidavits requested the commencement of an assignment for

the benefit of creditors proceeding under the Debtor Creditor Law of New York (each, an

"Assignment Proceeding," and, together, the "Assignment Proceedings").  The documents filed

with the Assignee Affidavits include schedules of the purported creditors of the HCHK Entities

listing entities associated with the Debtor such as ACA Capital, Golden Spring, and Saraca

Media (each defined below), as well as unnamed individuals who, upon information and belief,

are associates or relatives of the Debtor.[3]  The Assignee Affidavits and related documents were

sent to the Trustee on May 30, 2023, accompanied, with respect to the Assignment Proceedings

for HCHK Technologies and Lexington Property, by orders to show cause why orders

commencing the Assignment Proceedings should not be entered, with response dates of **June 15,**

**2023** for HCHK Technologies, and **June 21, 2023** for Lexington Property.  On June 5, 2023, the

Trustee was sent an order to show cause why an order commencing the Assignment Proceeding

of HCHK Property should not be entered, with a response date of **June 27, 2023**.  These are

proceedings in which the Debtor and persons he controls are attempting to create their own

version of a chapter 11 case without the supervision and involvement of the Trustee and the

Court.

4.      Abundant evidence demonstrates that the HCHK Entities are alter egos of or

equitably owned by the Debtor[4] and, thus, the Assignment Proceedings are clear attempts to

divert the HCHK Entities' valuable assets from this chapter 11 estate.  At all relevant times, the

HCHK Entities (a) were nominally owned and staffed by the Debtor's employees; (b) were

affiliates of the Debtor's "G-Series" entities, such as Gettr, GTV, GClubs, GFashion, and

GMusic (the "G-Series Entities"), which this Court has already found to be controlled by or to

serve as business vehicles for the Debtor;[5] (c) paid the Debtor's expenses, including with respect

to the *Lady May* and the Debtor's Bombardier jet (which Mei Guo testified was sold in the

summer of 2022); and (d) were funded by the Debtor through associates, controlled entities, and

---

[3]      In other words, the Assignee Defendant, who was assigned the assets of the HCHK Entities "on behalf of
creditors," has ostensibly been assigned the assets of the HCHK Entities "on behalf of" a collection of the
Debtor's associates and controlled entities.

[4]      The Trustee's equitable ownership claims encompass equitable ownership of the HCHK Entities (i.e., the shares
representing the ownership interests in such entities) and/or the assets of the HCHK Entities.

[5]      The Court also found that: "The G in GSeries stands for Guo."  *Corrected Memorandum of Decision Granting
in Part Motion for Preliminary Injunction* ¶ 3 (Adv. Proc. No. 22-05032, Jan. 13, 2023) [Docket No. 133] (the
"PI Decision").

representatives. The U.S. Government, as part of its criminal prosecution of the Debtor and Yvette Wang, has similarly asserted that the Debtor controls HCHK Technologies and HCHK Property. The Debtor, for his part, has not disagreed, as he invoked the Fifth Amendment at his deposition when asked about his control and ownership of HCHK Technologies and HCHK Property.[6]

5. The Trustee seeks in this Complaint an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, that the HCHK Entities are alter egos of the Debtor and/or equitably owned by him, and an order, pursuant to sections 105, 362, 363, and 549 of the Bankruptcy Code, enjoining the Defendants and any party acting in concert with them from commencing or continuing the Assignment Proceedings, and enjoining any transfer or use of the assets, including cash, of the HCHK Entities, except as authorized by the Trustee or this Court. The requested injunction is warranted because the Assignment Proceedings will have an immediate adverse consequence for the Debtor's estate by effectively permitting the continued violation of the automatic stay so that the HCHK Entities and the Defendants may engage in parallel proceedings that are both duplicative of and decidedly inferior to this Chapter 11 Case. Allowing the Assignment Proceedings to continue will also encourage the Debtor to commence new assignment proceedings with his other alter ego entities as a strategy to bypass the scrutiny of the Trustee and this Court.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b).

---

[6] In his sworn declaration dated May 11, 2023, the Debtor invoked the Fifth Amendment when asked to state that he had control over Yvette Wang. *Debtor's Sworn Declaration Regarding Responses to Particular Questions*, ¶ 46 (invoking the Fifth Amendment in response to question regarding his control over numerous other entities and individuals), attached hereto as Ex. 1.

7.	This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. §157(a).

## THE PARTIES

8.	The Trustee is the chapter 11 trustee in the Chapter 11 Case pursuant to the Court's order entered on July 8, 2022 [Main Case Docket No. 523].

9.	HCHK Technologies is a Delaware corporation.

10.	HCHK Property is a Delaware corporation.

11.	Lexington Property is a Delaware corporation.

12.	Holy City is a British Virgin Islands corporation that nominally owns a 99.9999% equity interest in each of the HCHK Entities.  Holy City is nominally owned 100% by Yvette Wang.

13.	Yvette Wang is an individual who is the nominal 100% owner of Holy City.

14.	Anthony DiBattista is an individual who nominally owns a 0.0001% equity interest in each of the HCHK Entities.

15.	The Assignee Defendant is the managing partner of the law firm of Brian W. Hofmeister, LLC.  The Assignee Defendant is assignee in connection with a Deed of Assignment for the Benefit of Creditors executed by a purported representative of each of the HCHK Entities on April 20, 2023 and purporting to transfer all assets of each of the HCHK Entities to the Assignee Defendant.

## FACTS

### I.	Background: Debtor's Prolific Use of Shell Companies

16.	The Debtor is a prolific user of shell companies, purportedly owned by family members or business subordinates, to shield his assets and activities from creditors.  The

6

Debtor's "shell game" has allowed him to continue to deny ownership of assets, refuse to pay

debts, and—until his recent arrest by the FBI—live a life of luxury.

17.     Among other examples, shell companies purportedly owned by the Debtor's son

(specifically, Lamp Capital LLC and Golden Spring (New York) Ltd.) have paid the Debtor's

living expenses and legal fees; a shell company purportedly owned by his daughter Mei Guo

(HK USA), recently ruled by this Court to be the Debtor's alter ego,[7] has held title to the

Debtor's yacht, which this Court and Justice Ostrager had previously ruled was the Debtor's

property despite its nominal ownership by HK USA;[8] and another shell company purportedly

owned by the Debtor's wife (Greenwich Land LLC) holds title to the Debtor's Connecticut

residence.[9]  The Debtor also claims that his apartment at the Sherry Netherland Hotel is held in

trust for the benefit of yet another shell company (Bravo Luck Limited) purportedly owned by

his son.[10]  Similarly, the Debtor has used Anton Development Limited and Whitecroft Short

---

[7]    *Memorandum of Decision and Order Granting Motion for Partial Summary Judgment on Second Counterclaim*, at 35 (Adv. Proc. No. 22-05003, May 18, 2023) [Docket No. 221] ("HK USA is the alter ego of the Individual Debtor.").

[8]    *Supplemental Memorandum of Decision in Support of Oral Ruling Granting Motion for Partial Summary Judgment*, at 31 (Adv. Proc. No. 22005003, Mar. 30, 2023) [Docket No. 177] ("the issue of Individual Debtor's beneficial ownership and control of the Lady is decisive as to the First Counterclaim and the identical issue was necessarily decided by Justice Ostrager in the Final Contempt Decision, which found by clear and convincing evidence that the Individual Debtor beneficially owned and controlled the Lady May").

[9]    The Trustee has sought an alter ego judgment against this entity in adversary proceeding 23-05005, in connection with which the Court entered a prejudgment remedy and temporary restraining order against Greenwich Land LLC and the Debtor's wife.  *See Order Granting in Part Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction* (Adv. Proc. No. 23-05005, Mar. 28, 2023) [Docket No. 14]; *Order Granting Chapter 11 Trustee's Amended Application for Ex Parte Prejudgment Remedy* (Adv. Proc. No. 23-05005, Mar. 28, 2023) [Docket No. 15].

[10]   The Trustee has challenged Bravo Luck Limited's asserted interest in the Sherry Netherland apartment in his *Amended Adversary Complaint Against Bravo Luck and Qiang Guo Seeking (I) Invalidation of Purported Trust Agreement in Favor of Bravo Luck and, (II) in Alternative, Ruling that Debtor Effectuated Fraudulent Transfer in Favor of Bravo Luck and Qiang Guo Pursuant to Section 276 of New York Debtor and Creditor Law, Made Applicable by Section 544 of Bankruptcy Code* (Adv. Proc. No. 22-05027, Feb. 28, 2023) [Docket No. 40], in connection with which the Debtor's son, Qiang Guo, has defaulted.  *Motion of Chapter 11 Trustee for Estate of Ho Wan Kwok for Entry of Default Judgment against Qiang Guo* (Adv. Proc. No. 22-05027, June 2, 2023) [Docket No. 93].

Limited, entities purportedly owned by the Debtor's daughter, to hold title to the Debtor's private Bombardier aircraft (which Mei Guo testified was sold in the summer of 2022).[11]

18.    Previously, Judge Liman of the United States District Court for the Southern District of New York found, in a 2021 decision, that Eastern Profit Corporation Limited, another company purportedly held by the Debtor's daughter, was "in essence, a shell corporation" for the Debtor.[12]  Eastern Profit Corporation Limited was one of numerous purportedly independent entities whose financial accounts were identified by a 2018 Hong Kong court order to be "subject to the effective control" of the Debtor.[13]

19.    Relatedly, a confidential witness declaration filed by the Trustee under seal at Docket No. 1327 (the "Confidential Witness Declaration") and incorporated by reference as an exhibit in support of this Complaint, establishes, among other things ███████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████

20.    Most importantly, this Court has issued rulings that entities and individuals at issue in this adversary proceeding are under the Debtor's control.  Specifically, this Court found that numerous purportedly independent entities and organizations involved in the Debtor's recent social media and protest campaign, including G-Series Entities Gettr, GFashion, GMusic,

---

[11]    *Complaint of Chapter 11 Trustee for Estate of Ho Wan Kwok for (I) Declaratory Judgment, Pursuant to Sections 541, 542, and 544 of the Bankruptcy Code and Bankruptcy Rule 7001, that Property Held by Mei Guo is Property of Estate and (II) Related Relief* (Adv. Proc. No. 23-05008, May 16, 2023) [Docket No. 1].

[12]    *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631, at *1 (S.D.N.Y. June 22, 2021).

[13]    Ex. 2, Hong Kong Restraint Order, at 7-18.

GClubs, GNews, and GEdu,[14] were controlled by the Debtor,[15] led by the Debtor,[16] and/or served "the purposes of . . . and as business vehicles of" the Debtor.[17]

21.     This Court separately found, in its order holding the Debtor in contempt for violating the Court's corporate governance order, that the Debtor was the beneficial owner of Ace Decade Limited (and, through it, Dawn State Limited), and that the Debtor controlled and employed Ace Decade Limited's nominee owner, Yvette Wang.[18]  The Trustee has since learned that Yvette Wang, while the Ace Decade proceedings were ongoing (but after the Court found, on November 17, 2022, that the Debtor exclusively beneficially owned and controlled Ace Decade as of the February 15, 2022 petition date[19]), transferred the stock of Ace Decade that she nominally owned to an individual located in Switzerland (who, upon information and belief, is another associate of the Debtor).

## II.     HCHK Entities Are Alter Egos of or Equitably Owned by Debtor

### A.     HCHK Entities Nominally Owned and Staffed by Debtor's Employees

22.     Each of the HCHK Entities has the exact same ownership structure, which points directly to their control by the Debtor.  Each HCHK Entity is directly owned 99.9999% by Holy City and 0.0001% by a long-time employee of the Debtor, Anthony DiBattista, who is also

---

[14]  PI Decision ¶ 2 ("The GSeries includes the following entities: Himalaya Exchange, Gettr, GFashion, GMusic, GClubs, GNews, and GEdu.").
[15]  PI Decision ¶ 3 ("The Debtor also controls Saraca Media Group and a related entity 'GTV'").
[16]  *Id.* ¶ 7 ("The Debtor is the leader of The Whistleblower Movement, NFSC, ROLF, and Himalaya.").
[17]  *Id.* ("The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor.").
[18]  *Order Granting Motion to Hold Debtor in Contempt of Corporate Governance Order* ¶¶ 1, 4 (Jan. 24, 2023) [Main Case Docket No. 1372] (the "Corp. Governance Contempt Order").
[19]  *See Order Regarding Partial Resolution of Trustee's Contempt Motion* ¶ 1 (Nov. 17, 2022) [Main Case Docket No. 1110].

director and president of HCHK Property and Lexington Property.  Holy City is 100% owned by the Debtor's assistant, Yvette Wang.[20]

23.     This Court has already ruled that "[t]he Debtor has control over Ms. Wang" and that he "has employed Yvette Wang for several years, and has directed her to take actions on his behalf, including directing her to act on his behalf to purchase properties such as the Sherry-Netherland apartment."[21]  Ms. Wang has served the Debtor in numerous other roles, including as an officer and/or authorized signatory of Golden Spring, Hudson Diamond Holding LLC, Hudson Diamond NY LLC, Leading Shine NY Limited, Saraca Media Group, Inc., GTV Media Group, Inc., and Genever Holdings LLC.[22]  The Trustee in his investigation has learned that Ms. Wang was widely known to be the Debtor's personal assistant.  When asked at his deposition whether Ms. Wang was his employee, the Debtor asserted his Fifth Amendment right against self-incrimination.[23]

24.     On March 15, 2023, Ms. Wang was arrested in connection with charges that she had, among other things, conspired with the Debtor in connection with his criminal fraud and

---

[20]   Lan Mu (Ya Li), a purported director of Holy City who signed the Written Consent of Shareholders authorizing the Assignment for the Benefit of Creditors of HCHK Technologies is, upon information and belief, a close associate of the Debtor.  It is not clear at what point Lan Mu (Ya Li) became a director of Holy City given the U.S. Government's allegation that Yvette Wang was the sole director of Holy City.  *See* Ex. 3, Letter, at 4 n.2, *United States v. Kwok*, No. 1:23-cr-00118-AT (S.D.N.Y. Mar. 29, 2023) [Docket No. 10] (the "Kwok Criminal Case Letter").  ("The defendant is listed as the sole director of Holy City Hong Kong Ventures Ltd., and she signed various HCHK corporate documents, including shareholder resolutions, in that capacity on behalf of Holy City Hong Kong Ventures Ltd.").

[21]   Corp. Governance Contempt Order ¶ 4.

[22]   Ex. 4, Affidavit of Yan Ping Wang ¶ 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct. May 15, 2018) [Docket No. 182] ("I am the President of Golden Spring (New York) Ltd., and in that capacity serve as an administrator for the interests of [the Debtor] and his family."); Ex. 5, Hudson Diamond Holding LLC, Consent of Sole Member Without a Meeting, dated July 17, 2019 (rendering Ms. Wang signatory) (HR0010121); Ex. 6, Hudson Diamond Holding LLC, Consent of Sole Member Without a Meeting, (HR0020577); Ex. 7, Hudson Diamond NY LLC, Consent of Sole Member Without a Meeting, (HR0039240); Ex. 8, ███████████████ ███████████████; Ex. 9, Himalaya Coin Certificate of Assumed Name, dated March 14, 2020; Ex. 10, Himalaya Dollar Certificate of Assumed Name, dated March 14, 2020; Ex. 11, Complaint ¶ 9a, *United States v. Wang*, No. 1:23-mj-02007-UA (S.D.N.Y. Mar. 10, 2023) [Docket No. 1] ("Wang was an Executive Director of GTV"); *Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-2* ¶ 1, (Case No. 22-50592, Oct. 12, 2020) [Docket No. 1].

[23]   Ex. 12, Kwok Dep. Tr. at 33:11-13 (Mar. 2, 2023).

money-laundering activities.  According to the U.S. Government, Ms. Wang played an

"instrumental role" in the Debtor's fraud scheme as his "trusted chief of staff who is tasked with

managing operations at even those entities with which she has no formal affiliation."[24]

25.     Anthony DiBattista is also a long-standing employee of the Debtor, serving in various

roles at different Debtor-controlled companies.  Mr. DiBattista was employed at Golden Spring, and

has served the Debtor as a corporate officer of GTV,[25] GFashion,[26] and GClubs.[27]  When the Debtor

was asked at his deposition whether Mr. DiBattista was his employee, the Debtor asserted his

Fifth Amendment right against self-incrimination.[28]

26.     In addition to Mr. DiBattista, key personnel of the HCHK Entities are former

employees or officers of the Debtor's "family office," Golden Spring.  These other Golden

Spring personnel who moved to the HCHK Entities include Max Krasner,[29] Joe Wang,[30]

Bernardo Enriquez,[31] and Alex Hadjicharalambous.[32]  Upon information and belief, the HCHK

Entities are merely a continuation of Golden Spring with new corporate letterhead.  Other HCHK

personnel include Elliott Dordick,[33] an individual this Court found to be an employee of Gettr,[34]

---

[24]   Ex. 3, Kwok Criminal Case Letter, at 18.
[25]   *See* PI Decision ¶ 3 ("The Debtor also controls Saraca Media Group and a related entity 'GTV,' which is
       commonly referred to collectively as GTV.").
[26]   *See id.* ("The Debtor created GFashion.").
[27]   The U.S. Government has alleged that GClubs "was functionally controlled by" the Debtor, Ex. 24, Indictment
       ¶ 10, *United States v. Kwok*, No. 1:23-cr-00118-AT, (S.D.N.Y. Mar. 6, 2023) [Docket No. 2], that the Debtor
       and William Je used GClubs to "fraudulently obtain[] more than $250 million," *id.* ¶ 14, and that GClubs funds
       were used to pay personal expenses of the Debtor and his family. *Id.* ¶ 15.
[28]   Ex. 12, Kwok Dep. Tr. at 87:6-8
[29]   Mr. Krasner, in addition to his work at the HCHK entities, was an employee of Golden Spring who also served
       the Debtor in numerous other roles, including as officer and/or authorized signatory of Hudson Diamond
       Holding LLC, Hudson Diamond NY LLC, Infinity Treasury Management Inc. (parent company of Lamp
       Capital LLC), and Rule of Law Foundation.
[30]   Mr. Wang is VP of Technology of HCHK Technologies and was formerly employed as Chief Technology
       Officer, or in a similar role, at Golden Spring.
[31]   Mr. Enriquez, in addition to his work at the HCHK Entities, worked at Golden Spring and served as Treasurer
       of Lamp Capital LLC, among other roles.
[32]   Mr. Hadjicharalambous, in addition to his work at the HCHK Entities, worked for several years at other Debtor-
       controlled entities such as Golden Spring, GClubs, and Freedom Media Ventures Ltd.
[33]   Elliot Dordick, Esq., LinkedIn, https://www.linkedin.com/in/elliot-dordick-esq-3639b5a0/
[34]   PI Decision ¶ 13.

an entity that is part of the G-Series Entities which this Court found "serve the purposes of the Debtor" and "serve as business vehicles for the Debtor."[35]  As the Court may recall, Mr. Dordick was involved in the Debtor's protest campaign against the Trustee and PAX.

### B.  HCHK Entities Are Affiliates of G-Series Entities

27.     The HCHK Entities are not, as the Assignee Defendant's filings with the State Court seem to suggest, independent businesses that simply happen to have done business with entities linked to the Debtor.[36]  They are affiliates of the Debtor's G-Series Entities that, together with such entities, comprised a single enterprise controlled by the Debtor and dedicated to promoting the Debtor's interests.

28.     As discussed in the Assignee's Affidavits, the HCHK Entities' business was located at 3 Columbus Circle, in New York City, where HCHK Property and Lexington Property sublet office space.  This is the location where associates of the Debtor, acting at the Debtor's behest, filmed videos in support of the Debtor, including videos in late 2022 calling for protests against the Trustee, PAX, and their counsel.  These activities led to the Court's issuance of its preliminary injunction decision [Docket No. 133 in Adv. Proc. No. 22-05032] where the Court found, among other things, that the Debtor controlled the G-Series Entities.  Upon information and belief, these videos attacking the Trustee and PAX were produced using the video and electronic equipment disclosed by the Assignee Defendant as purported assets of HCHK Technologies.[37]

---

[35]   PI Decision ¶ 7.

[36]   The Assignee Defendant's description of HCHK Technologies, for example, states that HCHK Technologies is an "emerging global technology and consulting firm that provides strategic solutions across multiple business lines.  Functioning comparably to a Professional Employer Organization (PEO), the Assignor offers its clients professional a la carte consulting services across Technology, Product Development, Engineering, Human Resources, Recruitment, Legal, Finance, and R&D."  Ex. 13, Order to Show Cause, Affidavit & Petition of Brian Hofmeister ¶ 4, *HCHK Tech., Inc. v. Hofmeister*, Index No. 510008/2023, (N.Y. Sup. Ct. May 18, 2023) (the "HCHK Tech. Aff.").

[37]   Ex. 13, HCHK Tech. Aff., Ex. B, Deed of Assignment for the Benefit of Creditors.

29.     Documents produced by the HCHK Entities' accounting firm, Marcum LLP, ("Marcum") show the degree to which the HCHK Entities and the G-Series Entities operated as a single business on behalf of the Debtor.  Among other things, the documents show that Marcum had no doubt who controlled the HCHK Entities and G-Series Entities.  As stated in an internal April 2021 email by one Marcum accountant, "[w]e are representing entities **indirectly owned by Miles Kwok**, owner of GTV media."[38]

30.     Moreover, a brief review of the Marcum documents (which require further examination) shows that the role of the HCHK Entities was, among other things, to serve as a "piggy bank" for the Debtor's businesses.  It was for this reason that Marcum's engagement letter provided that Marcum would provide services to Lexington Property "and Affiliates," and Marcum was explicitly tasked with preparing not only the tax returns of the HCHK Entities, but also those of other Debtor-controlled entities as well, including GFashion and GTV.[39]  Similarly, Marcum classified HCHK Technologies' assets to include bank accounts corresponding to Gettr, GFashion, and "FMV" (an acronym that, upon information and belief, refers to another Debtor-controlled company called Freedom Media Ventures).  This "piggy bank" role is consistent with the schedule of assets filed by the Assignee Defendant with respect to HCHK Technologies, which discloses accounts receivable of $12,559,423.06.  Upon information and belief, these accounts receivable include obligations purportedly owed to HCHK Technologies by G-Series Entities or other companies controlled by the Debtor.

### C.  HCHK Entities Pay Debtor's Expenses

31.     Financial documents in the possession of the Trustee also show that the Debtor used the HCHK Entities to pay a variety of his expenses.  While the Trustee's analysis of these

---

[38]     Ex. 14, Email to Keady from Hirschfeld, April 23, 2021.
[39]     Ex. 15, Marcum Engagement Letter, April 14, 2022, Attachment B.

documents is not complete, some examples of the HCHK Entities' payments on behalf of the

Debtor include, among others:

    a. In October 2022, HCHK Technologies paid $123,452.00 to Yachtzoo Ltd. (together with its affiliates, "Yachtzoo"). Yachtzoo is the management company for the *Lady May*, which Justice Ostrager and this Court ruled was the Debtor's yacht.

    b. In September 2021, HCHK Technologies paid $215,018.00 to ACASS Canada Ltd. (together with its affiliates, "ACASS"). ACASS was at that time the management company for the Debtor's Bombardier aircraft (which Mei Guo testified was sold in the summer of 2022).

    c. In November 2021, HCHK Technologies paid $2,788,680.00 to the aircraft manufacturer Cirrus Industries, Inc., or affiliates thereof. Upon information and belief, the purpose of this payment was to purchase a new private plane for the Debtor, the Cirrus SF50 jet that has been cited in filings in connection with the Debtor's criminal case.[40]

    32. Moreover, according to documents in the possession of the Trustee, Lexington

Property, though ostensibly only in the business of subleasing office space (at least according to

the Assignee's Affidavits[41]), has made numerous payments to entities and individuals associated

with the Debtor, which payments were made, upon information and belief, on behalf of the

Debtor. Recipients of these payments included, among others:

    a. Yvette Wang;

    b. Max Krasner (employee of the Debtor with numerous roles at Debtor-controlled companies);

    c. Scott Barnett (believed to be another driver and bodyguard of the Debtor);

    d. Aaron Mitchell (essentially the Debtor's general counsel);

---

[40] Ex. 16, Motion for Relief from Order Denying Pre-Trial Releases, at 20, *United States v. Kwok*, No. 23-6421 (2d Cir. May 5, 2023) [Docket No. 6.1].

[41] *See* Ex. 17, Order to Show Cause, Affidavit & Petition of Brian Hofmeister ¶ 5, *Lexington Prop. & Staffing, Inc. v. Hofmeister*, Index No. 510007/2023 (N.Y. Sup. Ct. May 25, 2023) (the "Lexington Aff.") ("Upon information and belief, the Assignor and HCHK Property were both formed, essentially, to function as the tenant (or subtenant) and as a property management companies with respect to their respective 3 Columbus Circle office spaces.").

e. Lawall & Mitchell, LLC[42] (Aaron Mitchell's law firm, and one of the "ordinary course professionals" proposed by the Debtor in March 2022 [Docket No. 119]);

f. Baker & Hostetler LLP (the Debtor's personal counsel in the litigation before Justice Ostrager, and one of the "ordinary course professionals" proposed by the Debtor in March 2022 [Docket No. 119]);

g. Morvillo Abramowitz Grand Iason & Anello PC and Cahill Gordon & Reindel LLP (law firms representing GTV[43]);

h. Phillips Nizer LLP (which served as counsel to Lamp Capital LLC in the litigation before Justice Ostrager);

i. Himalaya Ventures, LLC (an entity, upon information and belief, affiliated with one or more of the Debtor's "Himalaya Farm" organizations);

j. Beile ("Prince") Li (prominent associate of the Debtor and leading participant in protests against the Trustee and PAX);

k. Yan Yan Tsang (upon information and belief, an employee of the Debtor who, along with the Debtor, Yvette Wang, the Debtor's wife and daughter, and Han Chunguang (one of the Debtor's bodyguards), filed a lawsuit against United States Citizenship and Immigration Services in support of the Debtor's asylum application and their own asylum applications);

l. Yinying Wang (upon information and belief, the secretary of Qidong Xia, an individual who, upon information and belief, is currently acting as the Debtor's second-in-command with respect to multiple Debtor-controlled entities and organizations); and

m. An entity called 17 Miles LLC (recipient of $146,795.63 in 2021 and, upon information and belief, affiliated with the Debtor).

---

[42] The "Lawall" of Lawall & Mitchell is Dara Lawall, who, upon information and belief, is the daughter of Francis Lawall of Troutman Pepper Hamilton Sanders LLP, counsel to Bravo Luck Limited. Dara Lawall is also, upon information and belief, the wife of Aaron Mitchell, who is thus, upon information and belief, Mr. Lawall's son-in-law.

[43] Morvillo Abramowitz Grand Iason & Anello PC also represents Anthony DiBattista in connection with the Trustee's Bankruptcy Rule 2004 investigation.

### D. HCHK Entities Financed by Debtor

33.     The Assignee Defendant's filings in the State Court contain disclosures regarding the creditors[44] of the HCHK Entities which show that the HCHK Entities have received their funding from the Debtor through the Debtor's associates, controlled entities, and representatives.

### i. HCHK Technologies' Creditors

34.     The Assignee Defendant has disclosed that HCHK Technologies' financial creditors consist exclusively of multiple unnamed individuals (the "Undisclosed Creditors") owed a total of $51,684,947.50[45] (as compared to HCHK Technologies' disclosed assets of approximately $17,500,000 in value[46]), whose "names are being withheld for confidentiality purposes."[47]  The Assignee Defendant in his affidavit states, referring to these Undisclosed Creditors, that:

> Upon information and belief, aside from business revenues, [HCHK Technologies] has also received funding from certain individual investors, who are Chinese dissidents and identify as being part of a social network and movement to expose the alleged corruption and human rights abuses of the CCP . . . The [Undisclosed Creditors] are extremely sensitive about disclosing their names and personal contact information in connection with these proceedings out of fear for retribution by the CCP.  For this reason, [HCHK Technologies] has represented to me that the Investors have appointed six individuals, who are comfortable disclosing their names and contact information, to serve as their agents and representatives in this matter.[48]

35.     This description of the Undisclosed Creditors, which mirrors the arguments used by the Debtor to explain his own desire for secrecy, indicates that the Undisclosed Creditors are

---

[44]    The disclosures take the form of lists of creditors which, along with lists of assets, are attached to the Deeds of Assignment submitted with the Assignee Affidavits.  These lists were, according to the Deeds of Assignment, delivered by the HCHK Entities to the Assignee Defendant, and so apparently constitute representations made by the HCHK Entities (controlled by the Debtor and his associates), not the result of any analysis or investigation conducted by the Assignee Defendant.

[45]    Ex. 13, HCHK Tech. Aff., Ex. B, HCHK Technologies' list of creditors.  In addition to these financial creditors, the creditor list discloses vendors holding claims of $206,703.19, which amount includes a $51,000 claim owed to HCHK Property.

[46]    Ex. 13, HCHK Tech. Aff. ¶ 19.

[47]    Ex. 13, HCHK Tech. Aff., Ex. B HCHK Technologies' list of creditors, n.5.

[48]    Ex. 13, HCHK Tech. Aff. ¶ 8.

associates of the Debtor. That indication is confirmed by the identities of the six creditor representatives, which are disclosed on HCHK Technologies' list of creditors filed by the Assignee Defendant (the "Creditor Representatives").[49] These individuals are all, upon information and belief, associates of the Debtor.

36. Four of the six Creditor Representatives, Yumei Hao, Hao (Gavin) Li, Yongping Yan, and Yinying Wang, are particularly well known associates of the Debtor. Yumei Hao has, upon information and belief, worked for the Debtor at GClubs and other entities and organizations controlled by the Debtor. Hao (Gavin) Li and Yongping Yan both protested against the Trustee in Grand Central Station in New York City near the entrance to the offices of Paul Hastings, appeared in video broadcasts in support of the Debtor, and dined with the Debtor at the Sherry Netherland. Yinying Wang is, upon information and belief, the secretary of Qidong Xia, an individual who, upon information and belief, is currently acting as the Debtor's second-in-command with respect to multiple Debtor-controlled entities and organizations.

### ii. HCHK Property's Creditors

37. The situation with respect to HCHK Property is nearly identical. The Assignee Defendant has disclosed that HCHK Property has multiple "creditors and/or investors" owed a total of $48,187,299.77[50] (as compared to HCHK Property's disclosed assets of approximately $29,785,936 in value[51]) whose "names are being withheld for confidentiality purposes."[52] In

---

[49] The names of these Creditor Representatives are: Hao (Gavin) Li, Yinying (Aila) Wang, Chris Lee, Yongping Yan, Jintao Li, and Yumei Hao.

[50] Ex. 18, Order to Show Cause, Affidavit & Petition of Brian Hofmeister, Ex. B, HCHK Property's list of creditors, *HCHK Prop. Mgmt., Inc., v. Hofmeister*, Index No. 510006/2023 (N.Y. Sup. Ct. May 23, 2023) (the "HCHK Prop. Aff.").

[51] Ex. 18, HCHK Prop. Aff. ¶ 20.

[52] Ex. 18, HCHK Prop. Aff., Ex. B, HCHK Property's list of creditors, n.4.

other words, these are the Undisclosed Creditors, represented by the Creditor Representatives
who, as discussed above, are associates of the Debtor.

### iii. Lexington Property's Creditors

38.     Finally, the list of creditors of Lexington Property discloses total claims of at least

$32,183,837.03[53] (as compared to HCHK Technologies' disclosed assets of approximately

$2 million in value[54]) owed to the following Debtor-affiliated entities:

a.  ACA Capital Group Limited ("ACA Capital"), listed with a claim of
    $29,613,402.07. ACA Capital is an entity purportedly owned by the
    Debtor's alleged criminal accomplice, William Je, who currently remains
    at large. As the Court will recall from the litigation surrounding the *Lady
    May*, entities purportedly owned by William Je have a history of, among
    other things, providing funding to the Debtor as supposed "loans,"
    including Himalaya International Financial Group Ltd.'s $37 million
    alleged loan to HK USA, which the Debtor caused HK USA to use to fund
    an escrow account pursuant to a stipulation with the Court, and the
    $1 million alleged loan from ACA Capital to Eastern Profit Corporation
    Limited that Judge Liman found to be in fact a gift.[55] When asked at his
    deposition whether he owned and controlled ACA Capital, the Debtor
    invoked the Fifth Amendment.[56]

b.  Golden Spring, listed with a claim of $570,434.96. At this point, the
    Debtor's control of Golden Spring (whose president was Yvette Wang),
    and the Debtor's use of Golden Spring to pay for his expenses, is well
    known. When asked at his deposition whether he owned and controlled
    Golden Spring, the Debtor invoked the Fifth Amendment.[57]

c.  Leading Shine, with a claim listed as "TBD." Leading Shine is
    purportedly owned by Yvette Wang,[58] who has also served as the
    company's authorized signatory.[59] Among other things, Leading Shine
    was used by the Debtor to help fund Greenwich Land LLC.[60] When asked

---

[53]  Ex. 17, Lexington Aff., Ex. B, Lexington list of creditors.
[54]  Ex. 17, Lexington Aff. ¶ 19.
[55]  *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631, at *12.
[56]  Ex. 12, Kwok Dep. Tr. at 72:23-73:7.
[57]  Ex. 12, Kwok Dep. Tr. at 54:4-13.
[58]  Ex. 8,
[59]  *Id.*
[60]  *See* Ex. 19,

            Ex. 20

at his deposition whether he owned and controlled Leading Shine, the Debtor invoked the Fifth Amendment.[61]

d. Saraca Media, with a claim listed as "TBD." The evidence of the Debtor's control of this entity is voluminous, and this Court has already found that Saraca Media is controlled by the Debtor.[62] When asked at his deposition whether he owned and controlled Saraca Media, the Debtor invoked the Fifth Amendment.[63]

e. Savio Law LLC, listed with a claim of $2,000,000. The principal of Savio Law LLC is or was Nicholas F. Savio. Mr. Savio currently practices with Lawall & Mitchell, the law firm of the Debtor's general counsel, Aaron Mitchell.[64] Previously, Mr. Savio and Mr. Mitchell were colleagues at the law firm of Cohen & Howard, L.L.P., where they represented the Debtor in litigation before the federal district court in New Jersey.[65] In sum, upon information and belief, Savio Law LLC is a representative of the Debtor and any payments it made to Lexington Property were payments made on behalf of the Debtor.

### E. Government's Allegations Regarding Debtor's Control of HCHK Entities

39.     In pleadings filed in connection with its criminal prosecution against the Debtor and Yvette Wang, the U.S. Government has alleged, among other things:

a. **HCHK Technologies** is a "Kwok controlled company that . . . sent employees to the [United Arab Emirates] earlier this year to establish bank accounts that, as Kwok claimed, would be beyond the 'long-arm jurisdiction' of the United States."[67] These employees "spent more than approximately six weeks in the UAE, apparently to assist in moving Kwok's and [William] Je's operations abroad."[68]

---

[61]  Ex. 12, Kwok Dep. Tr. at 49:15-50:7.
[62]  PI Decision, ¶ 3 ("The Debtor also controls Saraca Media Group and a related entity 'GTV'").
[63]  Ex. 12, Kwok Dep. Tr. at 73:12-20.
[64]  Lawall & Mitchell, LLC, https://lmesq.com/attorneys/nick-savio/.
[65]  Ex. 21, Letter, *Guo v. Teng*, No.:3:18-cv-02110-MAS-TJB (D.N.J. Dec. 19, 2018) [Docket No. 32] (L&M(2) 0028986).
[66]  Ex. 22,
[67]  Ex. 23, Letter Response, at 7 n.7, *United States v. Kwok*, Case 1:23-cr-00118-AT (S.D.N.Y. April 12, 2023) [Docket No. 42] (the "Kwok Criminal Case Letter Response").
[68]  Ex. 3, Kwok Criminal Case Letter, at 3-4.

b. Gettr and **HCHK Technologies** are "Kwok- and [William] Je-controlled companies that are funded, in part, using fraud proceeds."[69]  Gettr "is a social media company that Kwok controls through a series of shell companies," and "Gettr and **the HCHK entities** . . . operate out of the same office location."[70]

c.  "Photographs of annotated documents located inside a folder in [Yvette Wang's] purse at her apartment appear to reflect, in substance and in part, certain transactions and balances for six bank accounts held in the names of **HCHK Technologies and HCHK Property Management** . . . GFNY, Inc. (i.e., GFashion), and GF Italy (i.e., GFashion Italy)."[71]

d. "A photograph of another document located inside the folder in [Yvette Wang's] purse at her apartment appears to reflect, in sum and in substance, that [Yvette Wang] signed payroll expenses associated with various Kwok-controlled entities . . . .  The document further indicates how certain payroll expenses were to be allocated among affiliated entities, **including HCHK**."[72]

## F. Debtor Asserts Fifth Amendment When Questioned About HCHK Technologies and HCHK Property

40.     In his deposition on March 2, 2023, the Debtor was asked whether he owned and controlled HCHK Technologies and HCHK Property.  The Debtor invoked the Fifth Amendment in response.[73]

## III.   Assignment for Benefit of Creditors Should Be Enjoined

### A. Assignment Proceedings

41.     On April 20, 2023, each of the HCHK Entities executed a Deed of Assignment purporting to assign all of their assets to the Assignee Defendant.

42.     On April 25, 2023, each of the Deeds of Assignment was filed with the clerk of the State Court.

---

[69]     Ex. 3, Kwok Criminal Case Letter, at 18.
[70]     Ex. 3, Kwok Criminal Case Letter, at 8 n.5.
[71]     Ex. 23, Kwok Criminal Case Letter Response, at 3.
[72]     Ex. 23, Kwok Criminal Case Letter Response, at 3-4.
[73]     Ex. 12, Kwok Dep. Tr. at 84:22-85:3.

20

43.    On May 10, 2023, the Assignee Defendant filed his Assignee Affidavit and related documents with respect to HCHK Technologies, and, on May 18, 2023, the State Court issued an order to show cause why an Assignment Proceeding should not be commenced with respect to HCHK Technologies, with an objection deadline of **June 15, 2023** and a hearing date of June 20, 2023 (on papers only, without oral argument).  The Trustee's counsel was emailed a copy of the order to show cause, Assignee Affidavit, and related documents on May 30, 2023.

44.    On May 23, 2023, the Assignee Defendant filed his Assignee Affidavit and related documents with respect to Lexington Property, and on May 25, 2023, the State Court issued an order to show cause why an Assignment Proceeding should not be commenced with respect to Lexington Property, with an objection deadline of June 21, 2023 and a hearing date of June 28, 2023 (on papers only, without oral argument).  The Trustee's counsel was emailed a copy of the order to show cause, Assignee Affidavit, and related documents on May 30, 2023.

45.    On May 23, 2023, the Assignee Defendant filed his Assignee Affidavit and related documents with respect to HCHK Property, and on May 31, 2023, the State Court issued an order to show cause why an Assignment Proceeding should not be commenced with respect to HCHK Property, with an objection deadline of June 27, 2023 and a hearing date of June 30, 2023 (on papers only, without oral argument).  The Trustee's counsel was emailed a copy of the order to show cause, Assignee Affidavit, and related documents on June 5, 2023 (after having been emailed these same materials, absent the entered order to show cause, on May 30, 2023).

### B.  Assignee Affidavits

46.    The Assignee Affidavits contain descriptions of each of the HCHK Entities.  The related documents filed with the Assignee Affidavits include schedules, prepared by the HCHK Entities, purporting to show the assets of each of the HCHK Entities and the claims of creditors

against them.  According to these documents, the HCHK Entities possess significant assets, including over $35 million in cash, but, assuming the validity of disclosed claims, are each insolvent: (a) HCHK Technologies possesses assets of approximately $17.5 million in value, of which $4.5 million is cash, as compared to financial creditor claims of $51,684,947.50 and vendor creditor claims of $206,703.19;[74] (b) HCHK Property possesses assets of approximately $29,785,936 in value,[75] the entirety of which consists of cash, as compared to creditor claims of $48,187,299.77;[76] and (c) Lexington Property possesses assets of approximately $2 million, the entirety of which consists of cash, as compared to creditor claims of at least $32,183,837.03.[77]

47.     The Assignee Affidavits describe the HCHK Entities using innocuous corporate jargon, implying that they are independent companies that simply happen to have as clients certain entities affiliated with the Debtor.[78]  For example, HCHK Technologies is described as "an emerging global technology and consulting firm that provides strategic solutions across multiple business lines" that "offers its clients professional a la carte consulting services across Technology, Product Development, Engineering, Human Resources, Recruitment, Legal, Finance, and R&D."[79]

48.     The Assignee Defendant notes Yvette Wang's ownership of the HCHK Entities and the fact that she and the Debtor were arrested and jailed, explaining that Ms. Wang's

---

[74]   Ex. 13, HCHK Tech. Aff., Ex. B, HCHK Technologie's creditor list.  These vendor creditor claims include a $51,000 claim owed to HCHK Property.

[75]   Ex. 18, HCHK Prop. Aff. ¶ 20.

[76]   Ex. 18, HCHK Prop. Aff., Ex. B, HCHK Property's list of creditors.

[77]   Ex. 17, Lexington Aff., Ex. B, Lexington list of creditors.

[78]   *See* Ex. 13, HCHK Tech. Aff. at 5 n.1 (noting that Club, G Music, GFNY, and G Fashion "are affiliated with Ho Wan Kwok . . . a Chinese dissident with a prolific online presence and large social media following, outspoken criticism of the Chinese Communist Party" and that "[o]n February 15, 2022, Kwok commenced a voluntary chapter 11 case in the United Bankruptcy Court for the District of Connecticut, which remains pending").

[79]   Ex. 13, HCHK Tech. Aff. ¶ 4.

imprisonment was a catalyst for the Deeds of Assignment.[80]  The Assignee Defendant does not mention Yvette Wang's employment by the Debtor (as found by this Court), or that she is the Debtor's "trusted chief of staff" (as described in the U.S. Government's filings).[81]  Similarly, the Assignee Defendant does not discuss the Debtor's links with Gettr, stating only that certain G-Series Entities other than Gettr are affiliated with the Debtor.

49.     The Assignee Defendant does not disclose the identities of the creditors of HCHK Technologies and HCHK Property, claiming that these Unnamed Creditors are individuals whose names cannot be revealed due to their fear of CCP reprisals.  While the Assignee Defendant does disclose the names of the Creditor Representatives, he does not point out that they include associates of the Debtor whose protest activities on behalf of the Debtor and at the Debtor's direction were subject to orders of this Court.

50.     Moreover, while the Assignee Defendant discloses that the creditors of Lexington Property consist of ACA Capital, Golden Spring, Leading Shine, Saraca Media, and Savio Law, he does not disclose the connections between these entities and the Debtor, many of which are matters of public record in this Chapter 11 Case, such as, for example, Yvette Wang's role as president of Golden Spring, or the Court's finding that the Debtor controls Saraca Media.[82]

51.     In sum, while the Assignee Affidavits and related filings submitted to the State Court provide important information regarding the HCHK Entities, they do not present a complete picture of the nature of the HCHK Entities and their connection to the Debtor.

---

[80]   *See, e.g.*, Ex. 13, HCHK Tech. Aff. ¶ 10 ("Following Yvette's incarceration, as well as the Assignor's loss of GETTR as its primary customer, the Assignor determined, in the exercise of its business judgment, that it was in the best interests of the Assignor and all of its stakeholders to assign all its assets to me, an independent fiduciary, for the benefit of creditors.").

[81]   Ex. 3, Kwok Criminal Case Letter, at 18.

[82]   PI Decision ¶ 3.

52.     What does come across from the Assignee Affidavits and related filings is that the HCHK Entities should be subject to a federal bankruptcy process.  Among other things, they are insolvent, require investigation with respect to their assets, liabilities, and financial condition, and the individual nominally in charge of the HCHK Entities, Yvette Wang, is now in prison.

### C. Assignee Defendant's Intentions with Respect to Assignment Proceeding

53.     The Assignee Affidavits and related documents filed by the Assignee Defendant, including proposed orders setting forth the relief sought by the Assignee Defendant from the State Court, make clear that the Assignee Defendant intends to commence what is essentially a separate state law chapter 11 process for the HCHK Entities, with the Assignee Defendant to play a role analogous to that of a bankruptcy trustee (except that he has been selected by the HCHK Entities, not the United States Trustee).

54.     According to the Assignment Affidavits, the Assignee Defendant intends to "investigate and analyze the [HCHK Entities'] books and records and potential claims and causes of action that may be brought on behalf of the [HCHK Entities'] estates and prosecute such claims as may be warranted," "pursue a sale of some or substantially all of the [HCHK Entities'] non-cash assets through a public sale or as otherwise ordered by the Court," and "after giving all creditors and stakeholders (including appropriate governmental authorities) due and proper notice and opportunity to submit claims, to verify, reconcile, and make distributions to provable claims against the [HCHK Entities'] estates in accordance with their respective legal priorities as set forth in the Deeds and applicable law."[83]  Under the Deeds of Assignment, the Assignee Defendant is given the power to "settle any and all claims against or in favor of Assignor, with the full power to compromise, or, **in Assignee's sole discretion**, to sue or be

---

[83]    Ex. 17, Lexington Aff. ¶ 12.

sued, and to prosecute or defend any claim or claims of any nature whatsoever existing in favor

of Assignor."[84]  In addition, the Assignee Defendant seeks authority from the State Court to

retain counsel and a financial advisor, including the law firm of McManimon, Scotland &

Baumann, LLC, which has represented the HCHK Entities in connection with the Trustee's

investigation in this Chapter 11 Case.[85]

### D.  Necessity of Injunction of Assignment Proceedings

55.     According to the Second Circuit Court of Appeals:

Section 105(a) is to be 'construed liberally to enjoin suits that might impede the
reorganization process'—or, as here, the process of liquidation.  Liberal
construction reflects 'the underlying principle of preserving the debtor's estate for
the creditors and funneling claims to one proceeding in the bankruptcy court.'
We have held that § 105(a) is properly used to enjoin creditors' lawsuits against
third parties where 'the injunction plays an important part in the debtor's
reorganization plan,' or where the action to be enjoined 'will have an immediate
adverse economic consequence for the debtor's estate.'

*In re Bernard L. Madoff Inv. Sec., LLC*, 512 F. App'x 18, 20 (2d Cir. 2013) (internal citations

removed).

56.     An injunction against the continuation of the Assignment Proceedings is

warranted pursuant to sections 105, 362, 363, and 549 of the Bankruptcy Code for a number of

reasons.

57.     First, allowing the Assignment Proceeding to continue would give a "green light"

to the violation of the automatic stay.  The Trustee asserts that the HCHK Entities are alter egos

of or equitably owned by the Debtor.  If the Trustee prevails on his alter ego claim, it will mean

that the HCHK Entities will be merged with the Debtor's estate and all of the assets of the

---

[84]    Ex. 17, Lexington Aff., Ex. B, Deeds of Assignment for the Benefit of Creditors ¶ 4(f).
[85]    *See e.g., HCHK Technologies, Inc., HCHK Property Management, Inc. and Lexington Property and Staffing,
Inc's Objection To Production Request, Motion To Quash and/or Motion to Modify 2004 Examination
Subpoenas* [Main Case Docket No. 1291].

HCHK Entities will constitute estate property as of the date of the Debtor's chapter 11 filing on February 15, 2022 (the "Petition Date"). In that scenario, the Deeds of Assignment represent null and void violations of the automatic stay committed by individuals who wrongfully transferred estate assets to the Assignee Defendant, or, at the very least, exerted control over the HCHK Entities.[86] If the Trustee instead prevails on his equitable ownership claim in connection with the HCHK Entities and/or their assets, it will similarly mean (a) that ownership interests in the HCHK Entities and related rights of corporate control constituted property of the estate as of the Petition Date, and the usurpation of these rights to execute the Deeds of Assignment would represent a null and void stay violation,[87] and/or (b) that the estate was the equitable owner of the assets of the HCHK entities, the transfer of which to the Assignee Defendant would be a clear stay violation.

58.     Second, the Assignment Proceedings represent duplicative proceedings that threaten to splinter the Debtor's Chapter 11 Case into separate pieces and create costly and time-consuming challenges to estate administration. Already, the Assignment Proceedings have created multiple and imminent filing deadlines with respect to which the Trustee must respond, and, if allowed to proceed, the Assignment Proceedings will result in the inevitable multiplication of pleadings, deadlines, and hearings. Unchecked, the Assignee Defendant will proceed with a duplicative investigation and claims allowance process; a recipe for disaster,

---

[86]     And, even if not null and void as stay violations, the Deeds of Assignment would represent transfers of estate property prohibited and avoidable under section 549(a) of the Bankruptcy Code and impermissible under section 363(b) of the Bankruptcy Code, which only allows estate assets to be used, sold, or leased outside of the ordinary course of business after notice and a hearing before this Court.

[87]     Moreover, putting aside the usurpation of corporate control, the Deeds of Assignment would violate the stay in the event that the HCHK Entities are equitably owned by the Debtor (as opposed to being the Debtor's alter egos), because the automatic stay would apply to the HCHK Entities as wholly-owned subsidiaries of the Debtor. *See Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287 (2d Cir. 2003) ("the stay applies to Queenie because it is wholly owned by Gardner, and adjudication of a claim against the corporation will have an immediate adverse economic impact on Gardner").

26

especially considering all the delay and cost the Debtor has already imposed on his creditors by creating hundreds of shell companies to hide his assets, something the Trustee is attempting to reverse by bringing assets into one insolvency process where all the Debtor's creditors can seek a recovery. Indeed, it is a core principle of our bankruptcy laws that there should be one forum in which a Debtor's financial affairs are resolved, militating strongly in favor of enjoining the Defendants and any party acting in concert with them from commencing or continuing the Assignment Proceedings.

59. Third, the Assignment Proceedings are not only duplicative, but decidedly inferior to the Chapter 11 Case before this Court. For one thing, the Chapter 11 Case provides a more robust legal framework: to give one example, state law cannot impose an automatic stay like the Bankruptcy Code can. More importantly, as practical matter, putting the Debtor's insolvency process before a State Court unfamiliar with the Debtor is completely nonsensical given the complexity of the Debtor's affairs. Only this Court has the benefit not only of its experience with the Debtor and his affiliated entities, but of key precedential rulings and findings (which the Debtor and his associates will surely seek to challenge or deviate from if they are in another forum). Moreover, it is this Court that already established and conducted a process for the filing of claims, including with expansive notice procedures and procedures for the confidential submission of claims, resulting in the filing of over a thousand claims by the Debtor's creditors. It is unclear how these creditors will be notified about, much less participate adequately in, the Assignment Proceedings. Indeed, it seems likely that these creditors will be shut out of the Assignment Proceedings and denied any recovery from the HCHK Entities' assets, thus suffering extreme prejudice. Even those creditors able to participate in the Assignment Proceeding will suffer unwarranted prejudice because they will have been forced to

undergo the effort and expense (and, without adequate confidentially procedures, significant personal risks) of submitting claims in a new and unfamiliar proceeding.

60. In addition, the Trustee is leaps and bounds ahead of the Assignee Defendant in connection with his investigation of the HCHK Entities, as demonstrated in this Complaint, which seeks to incorporate the HCHK Entities and their assets into the estate for the benefit of the Debtor's creditors based on voluminous evidence gathered in the Trustee's ongoing investigation (evidence that the Trustee will develop further in the course of this adversary proceeding). By contrast, the Assignee Defendant appears to not yet be aware of key facts in connection with the HCHK Entities, as demonstrated by the examples of important information omitted from the Assignee Affidavits, as discussed above. These omissions suggest that the HCHK Entities, under the control of the Debtor, chose to pursue the Assignee Proceeding as a way to avoid the Trustee and this Court and find a different court where they could "start afresh" and more easily craft a favorable narrative.

61. A key dynamic here is that the Debtor and his associates do not want to be scrutinized by this Court or investigated by the Trustee. The Debtor has continually opposed the Trustee's involvement and on two occasions sought to replace the Trustee with someone else. If the Assignment Proceedings are allowed to go forward, the Debtor and his associates will no doubt seek to avoid the Trustee and this Court by pursuing assignments for the benefit of creditors with respect to other entities that, like the HCHK Entities, are subject to the Trustee's investigation and facing imminent alter ego or other actions by the Trustee. The Debtor and his associates will seek to use such state court proceedings as a way to distribute assets to "friendly" creditors (such as the creditors listed in the Assignment Affidavits for the HCHK Entities) rather than allow those assets to be distributed to the Debtor's victims who have filed claims in the

Chapter 11 Case. In other words, allowing the Assignment Proceedings for the HCHK Entities to go forward is likely to result in even more assignment proceedings being commenced, resulting in an even greater multiplication of duplicative proceedings, expense, delay, and confusion. That is an outcome that would play directly into the hands of the Debtor and result in manifest injustice for the Debtor's numerous creditors who look to this Court and this Chapter 11 Case for some recovery on their claims.

## **FIRST CLAIM**

**(Declaratory Judgment that HCHK Entities are the Debtor's Alter Egos, that Assignment of HCHK Entities' Assets Violated Automatic Stay and Is Null and Void, and Ordering Turnover of HCHK Entities' Assets to Trustee)**

62.    The Trustee repeats and realleges the allegations contained in paragraphs 1-61.

63.    Delaware law applies to the alter ego claim because the HCHK Entities are Delaware entities.[88]

64.    Under Delaware's two-pronged test for piercing the corporate veil, a court applying Delaware's alter ego analysis to the Debtor's relationship with the HCHK Entities will focus on (1) whether the Debtor and the HCHK Entities operated as a single economic unit and (2) whether there was an overall element of injustice or unfairness. In determining whether entities operated as a single economic unit, a court applying Delaware law would consider a number of factors, including, among others, whether the HCHK Entities were adequately

---

[88]    *See, e.g., Universitas Education, LLC v. Benistar*, No. 3:20-cv-00738 (JAM), 2021 WL 965794, at *7 (D. Conn. Mar. 15, 2021) ("[B]ecause [defendant] is incorporated in Delaware, I must apply Delaware law to decide if it may be subject to an alter ego claim for reverse veil piercing liability.").

capitalized, observed corporate formalities, and were a facade for the Debtor.[89]  This "list of factors is not exhaustive and no single factor is dispositive."[90]

65.    The Debtor exercised control and dominion over the HCHK Entities such that the HCHK Entities had no independent existence from the Debtor and the Debtor used the corporate form to perpetrate a fraud and injustice.  The HCHK Entities are an alter ego of the Debtor, because, among other reasons, the HCHK Entities:

   a.   were nominally owned and staffed by the Debtor's employees;

   b.   are affiliates of the Debtor's G-Series Entities that this Court has already found to be controlled by or to serve as business vehicles for the Debtor, as part of a single enterprise controlled by and serving the interests of the Debtor;

   c.   paid the Debtor's expenses, including with respect to the *Lady May* and the Debtor's Bombardier jet (which Mei Guo testified was sold in the summer of 2022); and

   d.   were funded by the Debtor through the Debtor's associates, controlled companies, and representatives.

66.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

67.    Because the HCHK Entities were at all times alter egos of the Debtor, their assets were, following the Petition Date, assets of the Debtor's estate.  Therefore, the Deeds of Assignment represent null and void transfers of estate assets in violation of the automatic stay,

---

[89]   *Blair v. Infineon Tech., AG*, 720 F. Supp.2d 462, 470-71 (D. Del. 2010) (Noting the factors that the Third Circuit considers in determining whether a corporation operated as a single economic entity, which notably would not include whether the relevant individual is a shareholder of the entity, but would include "gross undercapitalization; failure to observe corporate formalities . . . [and] whether the corporation is merely a facade.").

[90]   *Id.* at 471.

which prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3), and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6).

68.     Accordingly, the Trustee seeks a ruling pursuant to sections 362, 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times the HCHK Entities were an alter ego of the Debtor; (b) any and all of the assets held by the HCHK Entities at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by the HCHK Entities at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, including the HCHK Entities' $35 million in cash, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; (2) declaring the Deeds of Assignment and assignments of assets pursuant thereto to be null and void; and (3) ordering the turnover of any and all of the assets of the HCHK Entities to the Trustee.

## SECOND CLAIM

### (In Alternative)

### (Declaratory Judgment that Debtor Is Equitable Owner of HCHK Entities, that Assignment of HCHK Entities' Assets Violated Automatic Stay and Is Null and Void, and Ordering Turnover of Ownership of the HCHK Entities and/or their Assets to Trustee)

69.     The Trustee repeats and realleges the allegations contained in paragraphs 1-61.

70.     The same facts, discussed above, establishing that the HCHK Entities are alter egos of the Debtor, also support the alternative conclusion that the Debtor is the equitable owner of the HCHK Entities and/or their assets.[91]

---

[91] *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (defendant that "exercised considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and ***acting as though [its] assets were his alone to manage.***") (emphasis added).

31

71.     At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

72.     Because the HCHK Entities were equitably owned by the Debtor, the ownership and corporate control rights over the HCHK Entities, and/or the assets of the HCHK Entities, were, following the Petition Date, property of the Estate.  The use of those ownership and corporate control rights in connection with the execution of the Deeds of Assignment and the purported assignment of the HCHK Entities' assets to the Assignee Defendant violated the automatic stay, which prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Therefore, the Deeds of Assignment and assignments of assets pursuant thereto are null and void.

73.     Accordingly, the Trustee seeks a ruling, pursuant to sections 362, 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in the HCHK Entities purportedly held by Holy City and Anthony DiBattista, and/or the assets of the HCHK Entities (including but not limited to assets purportedly transferred to the Assignee Defendant and/or held by the Assignee Defendant), are property of the Debtor's chapter 11 estate; (2) declaring the Deeds of Assignment and assignments of assets pursuant thereto to be null and void; and (3) ordering the surrender of ownership interests and related rights of corporate control in the HCHK entities, and/or the assets of the HCHK Entities, to the Trustee.

## **THIRD CLAIM**

### **(Injunctive Relief Under Section 105, 362, 363, and 549 of the Bankruptcy Code)**

74.     The Trustee repeats and realleges the allegations contained in paragraphs 1-61.

75. Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

76. Section 362's automatic stay prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

77. Section 363 of the Bankruptcy Code permits the use, sale, or lease of estate property, other than in the ordinary course of business, but only "after notice and a hearing." 11 U.S.C. § 363(b)(1).

78. Section 549 of the Bankruptcy Code provides for the avoidance of a transfer of property of the estate "that occurs after the commencement of the case" and "that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(1)(B).

79. An injunction against the continuation of the Assignment Proceedings is warranted pursuant to section 105, 362, 363, and 549 of the Bankruptcy Code because, if allowed to continue, the Assignment Proceedings will have an immediate adverse consequence for the Debtor's estate. Among other things, allowing the Assignment Proceedings to go forward would effectively permit the continued violation of the automatic stay, the Assignment Proceedings are both duplicative of and decidedly inferior to the Chapter 11 Case, and allowing them to continue will encourage the Debtor to commence new assignment proceedings with his other alter ego entities as a strategy to bypass scrutiny by the Trustee and this Court.

80. Accordingly, the Trustee seeks a ruling, pursuant to sections 105, 362, 363, and 549 of the Bankruptcy Code, enjoining the Defendants and any party acting in concert with them from commencing or continuing the Assignment Proceedings (or any other judicial,

administrative, or other actions or proceedings with respect to the HCHK Entities and/or their assets), enjoining any transfer or use of the assets, including cash, of the HCHK Entities (including but not limited to such assets purportedly transferred to the Assignee Defendant and/or held by the Assignee Defendant), or ownership interests in the HCHK Entities, except as authorized or directed by the Trustee or this Court, and requiring that the Defendants immediately notify the State Court of such injunction.

## **PRAYER FOR RELIEF**

<u>WHEREFORE</u>, for the foregoing reasons, the Trustee respectfully requests that judgment be entered as follows:

1.　　On the First Claim, an order pursuant to sections 362, 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times the HCHK Entities were an alter ego of the Debtor; (b) any and all of the assets held by the HCHK Entities at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by the HCHK Entities at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, including the HCHK Entities' $345 million in cash, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; (2) declaring the Deeds of Assignment and assignments of assets pursuant thereto to be null and void; and (3) ordering the turnover of any and all of the assets of the HCHK Entities to the Trustee;

2.　　On the Second Claim, an order, pursuant to sections 362, 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in the HCHK Entities purportedly held by Holy City and Anthony DiBattista, and/or the assets of the HCHK Entities, are property of the Debtor's chapter 11 estate; (2) declaring the Deeds of

34

Assignment and assignments of assets pursuant thereto to be null and void; and

(3) ordering the surrender of ownership interests and related rights of corporate control in the HCHK entities, and/or the assets of the HCHK Entities, to the Trustee;

3.      On the Third Claim, an order, pursuant to sections 105, 362, 363, and 549 of the Bankruptcy Code, enjoining the Defendants and any party acting in concert with them from commencing or continuing the Assignment Proceedings (or any other judicial, administrative, or other actions or proceedings with respect to the HCHK Entities and/or their assets), enjoining any transfer or use of the assets, including cash, of the HCHK Entities (including but not limited to such assets purportedly transferred to the Assignee Defendant and/or held by the Assignee Defendant), or ownership interests in the HCHK Entities, except as authorized or directed by the Trustee or this Court, and requiring that the Defendants immediately notify the State Court of such injunction;

4.      Reasonable attorneys' fees, costs, and expenses incurred in this action; and

5.      Such other and further relief as the Court may deem just, proper, or equitable under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

Dated:    June 8, 2023                   LUC A. DESPINS,
           New Haven, Connecticut      CHAPTER 11 TRUSTEE

By: */s/ Patrick R. Linsey*
     Patrick R. Linsey (ct29437)
     NEUBERT, PEPE & MONTEITH, P.C.
     195 Church Street, 13th Floor
     New Haven, Connecticut 06510
     (203) 781-2847
     plinsey@npmlaw.com

       *and*

     Nicholas A. Bassett *(pro hac vice* pending)
     PAUL HASTINGS LLP
     2050 M Street NW
     Washington, D.C., 20036
     (202) 551-1902
     nicholasbassett@paulhastings.com

       *and*

     Avram E. Luft *(pro hac vice* pending)
     Douglass Barron *(pro hac vice* pending)
     PAUL HASTINGS LLP
     200 Park Avenue
     New York, New York 10166
     (212) 318-6079
     aviluft@paulhastings.com

     *Counsel for the Chapter 11 Trustee*

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 22-50073 (JAM) |
| HO WAN KWOK, *et al.*, | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Re: ECF Nos. 717 and 913 |

**ORDER GRANTING MOTION TO HOLD DEBTOR
IN CONTEMPT OF CORPORATE GOVERNANCE ORDER**

## I.   INTRODUCTION

Before the Court is the motion of Luc A. Despins, in his capacity as the Chapter 11

trustee (the "Trustee") for the estate (the "Estate") of Ho Wan Kwok (the "Debtor"), to hold the

Debtor in civil contempt.  (ECF No. 913, the "Contempt Motion.")  The Contempt Motion

asserts that the Debtor has not complied with the Court's order regarding the transfer of

economic and corporate governance rights from the Debtor to the Trustee.  (ECF No. 717, the

"Corporate Governance Order.")  For the reasons stated below, the Court finds the Debtor in

civil contempt and will sanction him reasonable attorneys' fees and costs in the event he fails to

purge himself of contempt.

## II.   BACKGROUND

On February 15, 2022, the Debtor filed his voluntary Chapter 11 petition, commencing

this case.  (ECF No. 1.)  His individual case is jointly administered with two affiliated corporate

cases.  (ECF Nos. 970 and 1141.)  On June 15, 2022, after developments the Court has discussed

in a prior opinion, the Court ordered the appointment of a Chapter 11 trustee.  *In re Kwok*, 640

B.R. 514 (Bankr. D. Conn. 2022).  (ECF No. 465.)  On July 8, 2022, the Court appointed Mr.

Despins as the Chapter 11 Trustee.  (ECF No. 523.)

On July 23, 2022, the Trustee filed a motion to confirm that he held the Debtor's economic and corporate governance rights.  (ECF No. 598, the "Corporate Governance Motion.")  On July 29, 2022, the Debtor filed an objection to the Corporate Governance Motion, which he supplemented with a further objection on August 4, 2022.  (ECF Nos. 643 and 678.)  Also on August 4, 2022, the Trustee filed a reply in support of the Corporate Governance Motion.  (ECF No. 679.)  That same date, a hearing was held on the Corporate Governance Motion.  The Court granted the Corporate Governance Motion during the hearing and entered the Corporate Governance Order on August 10, 2022.  (ECF No. 717.)

On October 4, 2022, the Trustee filed the Contempt Motion asserting that the Debtor had failed to comply with the Corporate Governance Order and requesting that he be held in civil contempt of court.  (ECF No. 913.)  On October 25, 2022, the Debtor filed his objection to the Contempt Motion.  (ECF No. 1026, the "Objection.")  On November 14, 2022, the Trustee filed his reply.  (ECF No. 1092, the "Reply.")  The instant matter is fully briefed.

An evidentiary hearing (the "Hearing") on the Contempt Motion was held on November 16, 17, and 18, 2022.  On November 17, 2022, the Court entered an order partially resolving the Contempt Motion (ECF No. 1110, the "Partial Resolution Order"), which Order the Debtor insisted the Court enter prior to continuing with the evidentiary hearing.  During the Hearing, no testimony was heard but evidence, including excerpts from deposition testimony, was admitted.

## III.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This Court has authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984.  The instant proceedings are

statutorily core proceedings. 28 U.S.C. § 157(b)(2)(A), (E). This Court explicitly retained

jurisdiction over all matters all matters arising from or related to the implementation,

interpretation, and enforcement of the Corporate Governance Order. There is no constitutional

issue precluding the exercise of jurisdiction in the instant case. *Cf. Stern v. Marshall*, 564 U.S.

462, 487–99 (2011).

Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV. FINDINGS OF FACT

The Court has already made the findings of fact contained in paragraphs 1 and 2 below,

as set forth in the Partial Resolution Order:

1. The Debtor exclusively beneficially owned and controlled Ace Decade Holdings

Limited ("Ace Decade") on the February 15, 2022 petition date (the "Petition Date") and

maintained such exclusive beneficial ownership and control up to and including immediately

prior to the date of the Trustee's appointment, and (ii) Dawn State Limited ("Dawn State" and,

together with Ace Decade, the "Ace Decade Entities") is Ace Decade's wholly-owned subsidiary

and is exclusively owned and controlled by Ace Decade. For the avoidance of doubt, Yanping

"Yvette" Wang (hereinafter, Ms. Wang) is not and has never been a beneficial owner of the

shares in Ace Decade or Dawn State. (Trustee 6–7, 10, 15.)[1]

2. But for the Trustee's appointment and his rights under the Bankruptcy Code and the

Corporate Governance Order, the Debtor would still exclusively beneficially own and control

Ace Decade. (Trustee 6–7, 10, 15.)

---

[1] Exhibits submitted during the Hearing by the Trustee will be styled Trustee [No.] and exhibits submitted by the Individual Debtor will be styled Kwok [Letter].

3

From the evidence on the record and introduced during the Hearing, the Court makes the following additional findings of fact:

3.  Ms. Yvette Wang is the nominee owner of Ace Decade for the benefit of the Debtor. (Trustee 27.)

4.  The Debtor has control over Ms. Wang.  The Debtor has employed Yvette Wang for several years, and has directed her to take actions on his behalf, including directing her to act on his behalf to purchase properties such as the Sherry-Netherland apartment. (Trustee 29 and 30.)

5.  The Debtor did not sufficiently establish that the letter (the "Letter," Kwok B) and the purportedly attached share transfer instrument and share transfer resolution were delivered to Ms. Wang directing her to transfer the corporate and economic rights of Ace Decade to the Trustee.  The Debtor represented he does not believe he has any ability to take the actions he directs Ms. Wang to take in the Letter.  (Trustee 27, at 87:3–13.)  The Debtor represents he sent the Letter to Ms. Wang via personal delivery (Kwok B), and asserts this personal delivery was completed through his personal bodyguards.  However, the Debtor does not remember which bodyguard he directed to deliver the Letter, and "can never remember the names" of his security guards.  (Trustee 27, at 88:3–13.)  Beyond the Debtor's deposition testimony and the description "via personal delivery" on the Letter, there is no evidence to support the Letter was actually delivered.  The Letter does not contain an address.  (Kwok B.)  There is no receipt nor sworn affidavit regarding service or delivery of the Letter from the unidentified bodyguard.  (*Id.*)

6.  Even if the Letter was delivered, the language in it signals to its reader that the Debtor does not fully support executing the share transfer instrument.  Instead, the Letter states "The Trustee believes that I control Ace Decade and that I utilize that perceived control to direct you to execute the Share Transfer Instrument and Share Transfer Resolution." [emphasis added].

4

The Letter further states, ". . . in compliance with the Trustee's demands and to the extent that I may have any authority over Ace Decade, I hereby direct you to execute the attached Share Transfer Instrument and Share Transfer Resolution." (Kwok B.)

7.  The Debtor represents he has had no communications of any kind with Yvette Wang about the contempt motion. (Trustee 27, at 84:5–85:5.)

8.  The Trustee has been unable to service Yvette Wang with a subpoena. (Trustee 32–33).

## V.  DISCUSSION

### a.  Legal Standard

This Court has the power to hold parties in contempt of court under 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9020. *Taggart v. Lorenzen ex rel. Brown*, 139 S. Ct. 1795, 1801 (2019); *PHH Mortg. Corp. v. Sensenich ex rel. Gravel (In re Gravel)*, 6 F.4th 503, 512 (2d Cir. 2021); *Mar. Asbestosis Legal Clinic v. LTV Steel Co. (In re Chauteaugay Corp.)*, 920 F.2d 183, 187 (2d. Cir. 1990). Contempt may be sought to "'coerce the defendant into compliance'" with a court order or to "'compensate the complainant for losses'" resulting from noncompliance with a court order. *Taggart*, 139 S. Ct. at 1801 (citing *United States v. United Mine Workers*, 330 U.S. 258, 303–04 (1947)). A finding of civil contempt requires "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *see Gravel*, 6 F.4th at 512 (adding that the contemnor must have notice of the order). "A long recognized defense to a civil contempt citation is the cited individual's inability to comply with the court's order." *United States v. Wendy*, 575 F.2d 1025, 1030 (2d Cir. 1978).

Contempt "'should not be resorted to where there is [a] *fair ground of doubt* as to the

wrongfulness of the defendant's conduct.'" *Taggart*, 139 S. Ct. at 1801 (citing *Cal. Artificial*

*Stone Paving Co. v. Molitor*, 113 U.S. 609 (1885)).  This standard is generally objective – a

"party's subjective belief that she was complying with an order ordinarily will not insulate her

from civil contempt if that belief was objectively unreasonable." *Taggart*, 139 S. Ct. at 1802

(citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("The absence of

wilfulness [sic] does not relieve from civil contempt.")).  Nevertheless, a party's bad faith may

justify "placing 'the burden of any uncertainty in the decree . . . on [the] shoulders' of the party

who violated the court order," and "a party's good faith, even where it does not bar civil

contempt, may help to determine an appropriate sanction." *Taggart*, 139 S. Ct. at 1802 (citing

*McComb*, 336 U.S. at 192–93 and *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S.

787, 801 (1987)).

### b.  Conclusions of Law

#### 1.  The Debtor Had Notice of the Corporate Governance Order

The Court concludes that the Individual Debtor had notice of the Corporate Governance

Order.  *See Gravel*, 6 F.4th at 512.  As outlined above, he litigated its entry.  Furthermore, he did

not contest notice in his Objection or during the Hearing.

#### 2.  The Corporate Governance Order Clearly and Unambiguously Directs the Debtor to Cooperate with the Trustee

The Court concludes that the Corporate Governance Order is clear and unambiguous, s*ee*

*King*, 65 F.3d at 1058, and that there is no fair ground of doubt as to its meaning, *see Taggart*,

139 S. Ct. at 1801.  Under the Corporate Governance Order, the Debtor is required to cooperate

with the Trustee regarding the Trustee's control of the Ace Decade Entities and also required to

surrender the Ace Decade Entities, ownership interests in the Ace Decade Entities, and corporate governance documents relating to the Ace Decade Entities.

The Trustee argues that paragraph 2 of the Corporate Governance order needs to be read in concert with paragraph 3 and the underlying provisions of the Bankruptcy Code. In this context, the Trustee argues that the Debtor was clearly and unambiguously directed to cooperate with the Trustee and turn over assets of the Estate and related records to the Trustee. The Debtor argues that the Trustee obtained control over the Ace Decade Entities via operation of law under paragraph 2 of the Corporate Governance Order and, therefore, the Debtor need not do anything to comply with the Corporate Governance Order. The Debtor further argues that the Trustee can assert control over the Ace Decade Entities and the present dispute is manufactured and unnecessary.

The Court agrees with the Debtor that there is no fair ground of doubt that paragraph 2 of the Corporate Governance Order allows the Trustee to act of his own accord to assert control over corporate entities, including the Ace Decade Entities. Paragraph 2 provides in pertinent part:

> For the avoidance of doubt, the foregoing rights include the Trustee's asserted authority to replace any existing officer, director, manager, or similar person of the Debtor-Controlled Entities. As part of the foregoing, to the extent necessary, the Trustee is authorized to act, in his capacity as the chapter 11 trustee in this Chapter 11 Case, as any such officer, director, manager, or similar person who has been removed.

Paragraph 2 does allow the Trustee to issue new shares or membership interests and appoint new directors in the Debtor's corporate entities. However, paragraph 2 does not require the Trustee to do so. Even if the Trustee did issue new shares or membership interests or appoint new directors in the Ace Decade Entities, without the corporate documents and access to any

7

corporate accounts, it is unclear how the Trustee would operate the Ace Decade Entities. The

Trustee's desire for an orderly and complete transition is reasonable.

Moreover, recourse to self-help may be in contravention of applicable non-bankruptcy

law or existing governance documents and could create legal problems for the Trustee. The

Debtor raised this exact issue during the August 4th hearing on the Corporate Governance Motion

and noted that paragraph 2 would "give [the Trustee] authority that may not be provided for

under applicable non-bankruptcy law and the governing documents of particular entities." (ECF

No. 746, at 63:15–18.) The Trustee assured the Court that his intent was to act where he had

authority under applicable non-bankruptcy law and the governing documents. (*Id.* at 64:14–15.)

The Trustee stated

> The reason we asked for blanket authority is because we will not exercise that
> right unless we believe through due diligence we have the power to do it. And if
> we're doubtful, we'll come back to the Court. But we cannot be in a position
> where there's a satellite litigation open whether – what state law provides, what
> foreign law provides, because that's a – that's going to be another case basically.

(*Id.* at 64:19–65:1.) The Debtor then insisted that his intent was not to enter into litigation about

corporate governance, but that he was concerned about the Trustee acting contrary to applicable

non-bankruptcy law and the governing documents of particular entities. (*Id.* at 65:2–8.) In

response to the Debtor's concern, the Court inserted the word "asserted" into paragraph 2 of the

Corporate Governance Order to address this issue. (*Id.* at 65:11–21.) At that point, the Debtor

did not press his objection to paragraph 2. (*Id.* at 65:23–24.) The Court finds the Trustee's

desire to avoid "satellite litigation" about corporate governance is reasonable. However, despite

paragraph 2 of the Corporate Governance Order and the Debtor's stated intent not to engage in

satellite litigation, the Trustee has had to engage in litigation against the Debtor and the Ace

Decade Entities in the High Court of England and Wales, Chancery Division, regarding

recognition of these bankruptcy cases in the United Kingdom.  *See* Despins v Kwok (Re Cross-Border Insolvency Regulations 2006) [2023] EWHC 74 (Ch) (20 January 2023).  Ace Decade argued against the Trustee's application seeking recognition under the Cross-Border Insolvency Regulations 2006 (the "CBIR") of the Debtor's Chapter 11 case in that court.

      The Court also disagrees with the Debtor that the Trustee's rights in paragraph 2 end the analysis.  Simply because the Trustee has recourse to self-help under paragraph 2 of Corporate Governance Order, does not mean that the Trustee has no other recourse under its terms.

      With respect to paragraph 3 of the Corporate Governance Order, the Court concludes that it clearly and unambiguously directs the Debtor to cooperate with the Trustee.  There is no fair ground of doubt that paragraph 3 requires the Debtor's cooperation with the Trustee in locating the Debtor's nominee, Ms. Wang, and in effectuating turnover of her ownership interest in Ace Decade.

      Paragraph 3 clearly and unambiguously states, in pertinent part:

> In accordance with [section] 521(a)(3) . . . of the Bankruptcy Code, the Debtor is hereby directed to . . . (a) cooperate with the Trustee as necessary to enable the Trustee to perform his duties, including, without limitation, the Trustee's investigation into the assets of the Debtor . . .."

      Section 521 of the Bankruptcy Code is entitled "Debtor's duties."  Section 521(a)(3)'s language is almost identical to the language of the Corporate Governance Order: "The debtor shall . . . if a trustee is serving in the case . . . cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title."  The duty to cooperate under section 521(a)(3) is interpreted broadly.  *In re Cambridge Analytica LLC*, 596 B.R. 1, 8 (Bankr. S.D.N.Y. 2019) ("Section 521(a)(3) of the Bankruptcy Code similarly requires a debtor to 'cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties.' ''Cooperate' is a broad term, indeed, and must be construed that whenever the trustee calls upon

9

the debtor for assistance in the performance of his duties, the debtor is required to respond, at least if the request is not unreasonable.' 'Indeed, '[i]t is well settled that a trustee should not be required to drag information from a reluctant and uncooperative debtor. Because of the extraordinary relief offered under the Bankruptcy Code delay and avoidance tactics are inconsistent with, and offensive to, its purpose and spirit.'") (internal citations omitted); *see Beach v. Morris (In re Beach)*, 281 B.R. 917, 921 (B.A.P. 10th Cir. 2002) ("In addition to imposing affirmative duties on the Debtors, these provisions impress the policy that a debtor who voluntarily submits him or herself to the jurisdiction of the bankruptcy court to obtain the benefit of a discharge of debts, must fulfill certain duties to insure that estate assets are administered in accordance with applicable law."); *see also* 4 COLLIER ON BANKRUPTCY ¶ 521.15[5] (16th ed. 2022) ("The debtor's cooperation may involve informing the trustee of and assisting in locating property of the estate in the possession of third parties, executing documents necessary to convey property and assisting in the collection of accounts receivable."). Given the close resemblance of the text of the Bankruptcy Code and the explicit cite to section 521 in the Corporate Governance Order, it is clear and unambiguous that paragraph 3 should be read similarly broadly.

As set forth above and in the uncontested Partial Resolution Order, the Debtor has been found to have exclusively beneficially owned and controlled Ace Decade and, through it, Dawn State, as of the petition date and as of the appointment of the Trustee. Pursuant to paragraph 2 of the Corporate Governance Order, the Trustee "holds all of the Debtor's economic and governance rights, for the benefit of the Estate, with respect to all Debtor-Controlled Entities." Therefore, the Trustee holds the Debtor's economic and governance rights with respect to the Ace Decade Entities in furtherance of his duties to the Estate. The Debtor no longer contests this fact. The Debtor is required by the clear terms of paragraph 3 to cooperate with the Trustee as

necessary to realize this assertion of control and possession over the Ace Decade Entities for the benefit of the Estate, whether that furthers the Trustee's investigation of assets or some other duty to the Estate. *See Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 356 (W.D.N.Y. 2011) ("First, Global Crossing offers no authority, nor is this Court aware of any, to support its argument that the clause "including, without limitation" should be read as a limiting clause."); *Shugrue v. Cont'l Airlines*, 977 F. Supp. 280, 285 (S.D.N.Y. 1997) ("Even assuming there is some ambiguity as to what was actually attached to the first page of Schedule C, the language on that first page—'[a]ll of Eastern[ ]'s computer programs and software, including without limitation'—makes it clear that the attached list was not an exclusive list.").

The Court further holds that there is no fair ground of doubt under paragraph 3 of the Corporate Governance Order that the Debtor is required to surrender to the Trustee the Ace Decade Entities, including the ownership interests in the Ace Decade Entities and corporate governance documents relating to the Ace Decade Entities. Paragraph 3 clearly and unambiguously states, in pertinent part and in language closely mirroring § 521(a)(4):

> In accordance with [section] . . . 521(a)(4) of the Bankruptcy Code, the Debtor is hereby directed to . . . (b) surrender to the Trustee all property of the estate and any recorded information, including, without limitation, books, documents, records, and papers relating to property of the estate (including, without limitation, his shares in Genever (BVI) and all related corporate governance documents).

Section 521(a)(4) of the Bankruptcy Code, and the Corporate Governance Order based on its language, reaches all equitable interests a debtor may have, such as beneficial ownership in corporate entities. 11 U.S.C. § 541(a)(1). The Debtor is required under section 521(a)(4) and the Corporate Governance Order to promptly surrender assets and documents relating to assets upon request. *See Beach*, 281 B.R. at 921; 4 COLLIER ON BANKRUPTCY ¶ 521.16.

11

Because the Debtor exclusively beneficially owned and controlled the Ace Decade Entities as of the petition date and as of the appointment of the Trustee, under paragraph 2 of the Corporate Governance Order, the Trustee controls the Ace Decade Entities for the benefit of the Estate. As noted above, the Debtor does not contest this fact. The Debtor is required by the clear terms of paragraph 3 to surrender the Ace Decade Entities to the Trustee, which includes all recorded information relating the Ace Decade Entities, such as shares and corporate governance documents. *See Star Direct*, 272 F.R.D. at 356; *Shugrue*, 977 F. Supp. at 285.

The Debtor argued in the alternative that the Corporate Governance Order was unclear and ambiguous because paragraphs 2 and 3 of the corporate governance order were in conflict with each other, trapping the Debtor in a "Catch-22." The Debtor argues that paragraph 2 strips him of the economic and corporate governance rights required to comply with paragraph 3.

The Court holds, however, that paragraphs 2 and 3 of the Corporate Governance Order are not in conflict. While the Trustee came into *de jure* control of the Estate and the Debtor's economic and corporate governance rights by operation of law, the Bankruptcy Code – and the clear and unambiguous Corporate Governance Order – require turnover of *de facto* possession and control pursuant to the Trustee's rights under the Corporate Governance Order. Courts routinely provide remedies that bring parties' *de facto* rights in line with their *de jure* rights. There is nothing in this case to create a fair ground of doubt as to what conduct the Corporate Governance Order is requiring.

The Court further finds the Debtor's argument regarding a conflict between paragraphs 2 and 3 would render 11 U.S.C. §§ 521(a)(3)–(4) useless and cannot be correct as a matter of law. The Debtor is directed by the Bankruptcy Code and the Corporate Governance Order to cooperate with the Trustee and surrender assets of the Estate and related records, even if by

12

operation of law control has already passed to the Trustee. Complying would not have frustrated the provisions of the Bankruptcy Code and the Corporate Governance Order, but rather would have furthered them.

Although the Court finds the Corporate Governance Order clearly required the Debtor to cooperate with the Trustee, if a reviewing court were to find the Corporate Governance Order is unclear, the burden of that uncertainty is not upon the Trustee, but upon the Debtor, on account of the Debtor's bad faith. *See Taggart*, 139 S. Ct. at 1802. As detailed above, the Court is not persuaded by the Debtor's interpretation of the Order, and, since the burden has been shifted by the Debtor's bad faith, it is sufficient for the Court to find this element in the Trustee's favor.

The Court finds the Debtor has acted in bad faith for several reasons. Until the hearing, the Debtor's primary argument in his Objection and in his deposition testimony was that he did not own Ace Decade, beneficially or otherwise, as of the petition date and as of the Trustee's appointment. However, during the Hearing he abandoned this argument, sought the entry of the Partial Resolution Order prior to continuing the Hearing, and agreed not to appeal the Partial Resolution Order. Nevertheless, the Partial Resolution Order is not a consent order. The Debtor would not consent to findings in the Partial Resolution Order, which is in tension with his abandonment of his Objection file prior to the Hearing and his agreement not to appeal the order.

Furthermore, the Debtor's only alleged attempt to comply with the Corporate Governance Order came on November 10, 2022, several months after it entered, one month after the Contempt Motion was filed, and less than one week before the Hearing was scheduled to begin. In addition, the Debtor's alleged attempt to comply with the Corporate Governance Order obscured the location of his nominee – Ms. Wang – from the Trustee, who has been unable to serve her with a subpoena. During the Hearing, the Debtor highlighted the Trustee's lack of

13

communication with Ms. Wang despite only informing him she was the nominee owner of Ace Decade shortly before the Hearing. Finally, the Debtor has not sufficiently shown that the Letter was sent to Ms. Wang. The Letter contains no address for Ms. Wang and the Debtor could not remember which of his bodyguards purportedly personally delivered the Letter to Ms. Wang.

### 3. The Debtor Has Not Complied with Corporate Governance Order

The Court concludes, by clear and convincing evidence, that the Debtor has not complied with the Corporate Governance Order. *See King*, 65 F.3d at 1058. The Debtor has not surrendered the Ace Decade Entities, ownership interests in them, or their corporate governance documents to the Trustee. If he had, the Motion would be moot. The Debtor's only purported compliance was the Letter allegedly sent to Ms. Wang, which he failed to sufficiently establish was sent. The Debtor has not cooperated with the Trustee's attempt to locate Ms. Wang and effectuate a surrender. The Debtor only belatedly disclosed that Ms. Wang was the nominee owner of Ace Decade Entities. The Letter, which was produced to the Trustee and during the Hearing, lacks an address for Ms. Wang. The Debtor did not produce the bodyguard who purportedly knew how to find Ms. Wang or otherwise tell the Trustee how to locate Ms. Wang.

### 4. The Debtor Has Not Diligently Attempted to Comply

The Court further concludes that the Debtor has not diligently attempted to comply with the Corporate Governance Order in a reasonable manner. *See id.* As noted immediately above, the only alleged attempt to either cooperate or effectuate a turnover was the Letter. No evidence was introduced to establish that the Letter was sent to Ms. Wang. Nevertheless, assuming the Letter was sent, it was dilatory – not diligent – coming a month after the Contempt Motion was filed and several months after the Corporate Governance Order was entered. Furthermore, again assuming the Letter was sent, it was not sent in a reasonable manner. There is no address on the

14

Letter. There is no post-mark. There is no acknowledgment of receipt. The Debtor does not even know which of his bodyguards allegedly personally delivered the Letter.

### 5. The Debtor Could Have Complied

Finally, the Court concludes that it is not impossible for the Debtor to comply with the Corporate Governance Order. *See Wendy*, 575 F.2d at 1030. The Debtor abandoned his argument that he did not beneficially own or control Ace Decade and, through it, Dawn State, as of the petition date and the appointment of the Trustee. Therefore, it was not impossible for the Debtor to cooperate or to surrender the Ace Decade Entities to the Trustee for the reasons stated above.

The Trustee introduced into evidence email exchanges showing that Ms. Wang, the nominee owner of Ace Decade, acted under the direction of the Debtor in other transactions, including the New York litigation involving Ace Decade and also matters involving the Sherry Netherland Apartment. (Trustee 29 and 30.) On the basis of this evidence, the Court determines that the Debtor could cause her to turnover her ownership interest over to the Trustee. As of yet, he has not.

## VI. CONCLUSION & ORDER

For the reasons stated above, the Court finds the Debtor in civil contempt of court. It is hereby

**ORDERED:** The Debtor has until at or before 5:00 p.m. (17:00) on March 6, 2023, to purge himself of contempt; and it is further

**ORDERED:** If the Debtor does not purge himself of contempt at or before 5:00 p.m. (17:00) on March 6, 2023, he will be sanctioned reasonable attorneys' fees and costs that the Trustee has had to incur in pursuing compliance with the Corporate Governance Order as it

relates to the Ace Decade Entities, which reasonable fees will be determined by the Court, and will be paid to the Estate; and it is further

**ORDERED:** The Court may, upon notice, issue further sanctions to secure compliance with the Corporate Governance Order, should the Debtor persist in contempt.

Dated at Bridgeport, Connecticut this 24th day of January, 2023.

*Julie A. Manning*
*United States Bankruptcy Judge*
*District of Connecticut*

# EXHIBIT E

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HO WAN KWOK, *et al.*, | ) | Case No. 22-50073 (JAM) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
| LUC A. DESPINS, CHAPTER 11 TRUSTEE FOR THE ESTATE OF HO WAN KWOK, | ) | Adv. P. No. 23-05013 (JAM) |
|  | ) | Re: ECF No. 4 |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| HCHK TECHNOLOGIES, INC., HCHK PROPERTY MANAGEMENT, INC., LEXINGTON PROPERTY AND STAFFING, INC., HOLY CITY HONG KONG VENTURES, LTD., ANTHONY DIBATTISTA, YVETTE WANG, and BRIAN W. HOFMEISTER, ASSIGNEE FOR THE BENEFIT OF CREDITORS, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## ORDER GRANTING IN PART EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

[1]  The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

## I. INTRODUCTION

Before the Court is the Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction (in pertinent part, the "TRO Motion"), ECF No. 4,[2] filed by Mr. Luc A. Despins, in his capacity as the Chapter 11 trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Mr. Ho Wan Kwok (the "Individual Debtor"). For the reasons stated below, the Court **GRANTS IN PART** the TRO Motion and issues the Temporary Restraining Order set forth herein.

## II. BACKGROUND

The Individual Debtor filed a voluntary Chapter 11 petition in this Court on February 15, 2022. (Main Case ECF No. 1.) The Individual Debtor's case is jointly administered with two affiliated corporate Chapter 11 cases. (Main Case ECF Nos. 970 & 1141.) For the reasons set forth therein, on June 15, 2022, the Court entered a memorandum of decision and order appointing a Chapter 11 trustee. (Main Case ECF No. 465.) *In re Kwok*, 640 B.R. 514 (Bankr. D. Conn. 2022). On July 8, 2022, Mr. Despins was appointed as the Trustee. (Main Case ECF No. 523.)

On June 8, 2023, the Trustee filed the Complaint Pursuant to Sections 105, 362, 363, 541, 542, 544, and 549 of the Bankruptcy Code Seeking (I) Declaratory Judgment that HCHK Technologies, Inc., HCHK Property Management, Inc., and Lexington Property and Staffing, Inc. are (A) Alter Egos of Debtor; or, (B) in the Alternative, an Order that Debtor Equitably Owns Such Entities and/or Their Property; and (II) Injunctive Relief (the "Complaint"). (ECF Nos. 1 (redacted), 2 (sealed).) Twenty-four exhibits are attached to the Complaint.

---

[2] References to the docket in this adversary proceeding will be styled "ECF." References to the docket in the main case, *In re Kwok*, Case No. 22-50073, will be styled "Main Case ECF."

The Complaint alleges that HCHK Technologies, Inc., HCHK Property Management, Inc., and Lexington Property and Staffing, Inc. (the "HCHK Entities") are the alter egos of the Individual Debtor and/or the HCHK Entities are and/or their respective property is beneficially owned by the Individual Debtor. (Complaint ¶¶ 62–73.) Upon these bases, the Complaint seeks declaratory relief pursuant to 11 U.S.C. §§ 541, 542, and 544 that the property of and/or ownership interests in the HCHK Entities is/are property of the Estate, which must be delivered to the Trustee. (*Id.*) Holy City Hong Kong Ventures, Ltd. ("Holy City"), which is allegedly wholly owned by Ms. Yvette Wang, is the alleged record owner of a 99.9999% equity interest in each of the HCHK Entities, and Mr. Anthony DiBattista is the alleged record owner of the remaining 0.0001% interest in each of the HCHK Entities. (Complaint ¶¶ 12–14.) The Complaint alleges that Ms. Wang, Mr. DiBattista, and others involved in the management and operations of the HCHK Entities are employees and agents of the Individual Debtor and that through these employees and agents, the Individual Debtor beneficially owns and controls the HCHK Entities and/or their assets. (Complaint ¶¶ 62–73.)

The Complaint additionally alleges that, on April 20, 2023, a representative of each of the HCHK Entities executed a Deed of Assignment for the Benefit of Creditors (collectively, the "Deeds of Assignment"), assigning all of the HCHK Entities' assets to Mr. Brian W. Hofmeister, esquire (in his capacity as assignee for the benefit of creditors, the "Assignee Defendant," and together with the HCHK Entities, Holy City, Ms. Wang, and Mr. DiBattista, collectively, the "Defendants"). (Complaint ¶¶ 15, 41.) On April 25, 2023, the Complaint alleges the Deeds of Assignment were filed with the Supreme Court of the State of New York for New York County (the "State Court"), after which the State Court issued orders to show cause (each a "Show Cause Order," and together, collectively, the "Show Cause Orders") why an assignment for the benefit

3

of creditors proceeding (each an "Assignment Proceeding," and together, collectively, the "Assignment Proceedings") should not begin regarding each of the HCHK Entities.  (Complaint ¶¶ 42–45.)  The Complaint alleges the first responses to a Show Cause Order are due on or before June 15, 2023 with the relevant hearing on whether to initiate an Assignment Proceeding to be held, on the papers, on June 20, 2023.  (Complaint ¶ 43.)

To prevent the Assignment Proceedings from commencing or continuing, the Complaint seeks injunctive relief pursuant to 11 U.S.C. §§ 105, 362, 363, and 549 enjoining the Defendants from transferring or using the assets of the HCHK Entities and from continuing to prosecute the Assignment Proceedings.  (Complaint ¶¶ 74–80.)  The Complaint additionally seeks related declaratory relief pursuant to 11 U.S.C. §§ 362, 541, and 544 that the execution of the Deeds of Assignment and the commencement and prosecution of the Assignment Proceedings were and are violations of the automatic stay.  (Complaint ¶¶ 62–73.)

On June 8, 2023, the Trustee additionally filed the TRO Motion, ECF No. 4, and the supporting Affidavit of Chapter 11 Trustee (the "Trustee Affidavit"), ECF No. 5, and Certification of Douglass E. Barron (the "Barron Certification"), ECF No. 6.  In pertinent part, the TRO Motion seeks an *ex parte* temporary restraining order ("TRO") pursuant to 11 U.S.C. §§ 105, 362, 363, and 549 enjoining the Defendants from commencing or prosecuting the Assignment Proceedings and/or otherwise transferring or using the assets of the HCHK Entities. The Trustee Affidavit is sworn under the penalty of perjury and asserts, to the best of the Trustee's knowledge, the veracity of the core allegations of the Complaint and that the exhibits to the Complaint are true and correct copies of documents.  The Barron Certification is a declaration of counsel in support of issuing a TRO on an *ex parte* basis.  On June 9, 2023, the Trustee filed a supplements to the TRO Motion, Trustee Affidavit, and Barron Certification

4

regarding a particular facet of the Assignment Proceedings and a particular individual involved with the Defendants.  (ECF Nos. 14–16.)

## III.  JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This Court has authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984.  The instant proceedings are statutorily core proceedings.  28 U.S.C. § 157(b)(2)(A), (E), (O).

Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.  DISCUSSION

The Trustee requests *ex parte* relief because he is concerned that should the Defendants and/or their agents and those acting in concert with them learn of this adversary proceeding before receiving actual notice of a TRO issued by this Court, the Defendants and/or their agents and those acting in concert with them will seek to dissipate potential Estate assets through other means.  Unfortunately, upon the basis of the Trustee Affidavit and Barron Certification, the Court concludes the Trustee's concern is justified.  In particular, the allegation that Ms. Wang transferred Ace Decade Holdings Limited after this Court had already determined that Ace Decade Holdings Limited was property of the Estate is troubling.  Similarly, the apparent sale of the Ferncliff Mansion and the Bombardier jet – which are disputed assets of the Estate – during the pendency of these Chapter 11 cases and upon no notice to the Court and the parties-in-interest is also troubling.  Therefore, the Court considers the TRO Motion on an *ex parte* basis.

The "underlying purpose" of an *ex parte* TRO is "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974). "It is well established that in [the Second] Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (citing multiple cases); *see Ross v. Rell*, 398 F.3d 203, 204–05 (2d Cir. 2005) (applying preliminary injunction standard articulated in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.* 596 F.2d 70, 72 (2d Cir. 1979) in appeal regarding temporary restraining order). In addition to injunctive relief under the standard of *Jackson Dairy*, courts sitting in bankruptcy may issue injunctive relief under 11 U.S.C. § 105(a), with the "traditional [TRO] standard as modified to fit the bankruptcy context." *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (internal citations omitted); *see Marshall v. Picard (In re Bernard L. Madoff Inv. Securities LLC)*, 740 F.3d 81 (2d Cir. 2014) (affirming affirmance of *Securities Inv. Protection v. Bernard L. Madoff Inv. Securities LLC (In re Madoff)*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010)); *Lautenberg Found. v. Picard (In re Bernard L. Madoff Inv. Sec.)*, 512 F. App'x 18, 20 (2d Cir. 2013); *Ball ex rel. Soundview Elite Ltd. v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 115 (Bankr. S.D.N.Y. 2016); *Lyondell Chemical Co. v. CenterPoint Energy Gas Services (In re Lyondell Chemical Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009).

## A. *Jackson Dairy* Standard

The general standard for Fed. R. Civ. P. 65(a) preliminary injunctive relief in the Second Circuit is "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy*, 596 F.2d at 72; *see Citigroup Global Mkts., Inc. v. VCG Special Opportunities*

*Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010) (holding *Jackson Dairy* remained the law of the Second Circuit); *see also Mendez v. Banks*, 65 F.4th 56, 63 (2d Cir. 2023).

### i. Irreparable Harm

Irreparable harm is the most important element of a TRO. *See Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009). Irreparable harm must be "likely," not merely possible. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). While outside of bankruptcy proceedings, irreparable harm generally must be the sort that cannot be adequately compensated by legal remedies, *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (holding that a district court "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages"), this rule does not apply in bankruptcy proceedings because "[t]he law of fraudulent conveyances and bankruptcy was developed to prevent [the disposition of assets pending adjudication]," *Grupo Mexicano*, 527 U.S. at 322. *See Rubin v. Pringle ex rel. Focus Media Inc. (In re Focus Media Inc.)*, 387 F.3d 1077 (9th Cir. 2004); *Soundview Elite*, 543 B.R. at 115; *see also In re Owens Corning*, 419 F.3d 195, 208 n. 14 (3d Cir. 2005).

The automatic stay provided by section 362(a) is "'one of the fundamental debtor protections provided by the bankruptcy laws,' designed to relieve 'the financial pressures that drove [debtors] into bankruptcy.'" *E. Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir.1998) (citing H.R. Rep. No. 95–595, at 340 (1977)). Moreover, as House of Representative Report Number 95-595 additionally observes:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claim in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under

which all creditors are treated equally.  A race of diligence by creditors for the debtor's assets prevents that.

H.R. Rep. No. 95–595, at 340; *see In re Alyucan Interstate Corp.*, 12 B.R. 803, 806 (Bankr. D. Utah 1981) (citing *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir. 1976) (case under the Bankruptcy Act)).  A bankruptcy case is an all-encompassing action intended to equitably – and finally – liquidate, reorganize, or adjust the assets, affairs, and liabilities of the bankruptcy estate for the benefit of all creditors, providing an individual debtor or reorganizing corporate debtor with a fresh start.  *See Grogan v. Garner*, 498 U.S. 279, 286 (1991).

For this reason, the automatic stay, among other things, prevents (i)"the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, " 11 U.S.C. § 362(a)(1); and (ii) "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3). Under Second Circuit precedent, the automatic stay protects property of a non-debtor where "a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate," such as when a debtor owns a non-debtor.  *See Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003).  Willful violations of the automatic stay *shall* be sanctioned. 11 U.S.C. § 362(k).  Bankruptcy proceedings are undermined by violation of the automatic stay.

Here, the Trustee alleges that the property of the HCHK Entities is and/or the HCHK Entities themselves are property of the Estate.  (Complaint ¶¶ 62–73.)  Pursuant to the Second Circuit's ruling in *Queenie*, if the Trustee is successful on the merits, the Assignment Proceedings – or any other dissipation or exercise of control over the assets of the HCHK Entities – would have been found to have been violations of the automatic stay.  Furthermore, the

8

Trustee asserts that more than $35 million in alleged Estate assets could be dissipated through the Assignment Proceedings and, moreover, dissipated with the imprimatur of the State Court and distributed only to the creditors of the Individual Debtor who participate in the Assignment Proceedings. (Complaint ¶¶ 2, 3.) In the context of these Chapter 11 cases, where the scheduled assets are less than $4 thousand and the scheduled liabilities exceed $300 million, $35 million is not an insignificant sum. (Main Case ECF No. 78.) Finally, insofar as the Trustee is correct in his allegations, the Assignment Proceedings invite conflict with these Chapter 11 cases and this Court's bankruptcy jurisdiction, increasing the costs borne by the Estate and decreasing the recovery of creditors. The Court concludes that the Trustee has sufficiently alleged likely irreparable harm to support the issuance of an *ex parte* TRO to preserve the *status quo* pending a hearing on the request for a preliminary injunction.

### ii. Balance of the Hardships

Absent a TRO, the Assignment Proceedings will commence before this Court can conduct a hearing on the Trustee's request for a preliminary injunction, likely causing irreparable harm. The Defendants, however, will suffer minimal hardship by the imposition of an *ex parte* TRO – a delay of a few weeks of the commencement of the Assignment Proceedings should the Defendants prevail at the hearing on the Trustee's request for a preliminary injunction. Moreover, a TRO issued by this Court would prevent the dissipation of the HCHK Entities assets pending the hearing on the Assignment Proceeding. The *status quo* would be preserved both in relation to these Chapter 11 cases and the Assignment Proceedings. Therefore, the Court concludes that in the context of the request for an *ex parte* TRO, the balance of hardships tips decidedly in the Trustee's favor.

### iii. Likelihood of Success on the Merits or
### Sufficiently Serious Questions Going to the Merits

A likelihood of success on the merits is established where "the moving party is more likely than not to prevail on the merits of the underlying claims." *Citigroup*, 598 F.3d at 35. In *Citigroup*, the Second Circuit explained the alternate "serious questions" standard as permitting a court "to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* (internal citations omitted). The Second Circuit continued: "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id.* (internal citations omitted). Because the Court has determined that the balance of hardships tips decidedly in the Trustee's favor with regards to the imposition of an *ex parte* TRO, the Court need only find that the Trustee has established "serious questions going to the merits" to grant an *ex parte* TRO. *Jackson Dairy*, 596 F.2d at 72.

The Complaint alleges that each of the HCHK Entities are Delaware entities. (Complaint ¶¶ 9–11.) "Delaware courts use the terms 'piercing the corporate veil' and 'alter ego' theory interchangeably." *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 609 n. 4 (D. Del. 2018). Under Delaware law, alter ego or piercing the corporate veil has two elements: (i) the alleged alter egos are effectively one and the same economic entity and (ii) the corporate form causes an overall element of fraud or injustice. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) ("To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'") (internal citations omitted). Much the same standard is

10

applied to determinations of equitable ownership. *See LiButti v. United States*, 968 F. Supp. 71,

75 (N.D.N.Y. 1997) (determining whether an owner was a nominee for the purposes of tax levy),

*aff'd in part, rev'd in part on other grounds*, 178 F.3d 114 (2d Cir. 1999); *see Paloian ex rel.*

*Dordevic v. Dordevic (In re Dordevic)*, 633 B.R. 553, 558 (Bankr. N.D. Ill. 2021) (using

common law nominee factors in a bankruptcy proceeding) *aff'd by* 20 b 9807, 21 C5328, 2022

WL 19638995 (N.D. Ill. July 25, 2022), *aff'd by* No. 22-2500, 2023 WL 3113706 (7th Cir. April

27, 2023).

The Complaint advances six categories of allegations in support of the prayer for relief:

(i) the HCHK Entities are nominally owned by the Individual Debtor's alleged employees or

agents – Ms. Wang and Mr. DiBattista – and also staffed by the Individual Debtor's alleged

employees or agents, *e.g.*, Mr. Max Krasner, Mr. Joe Wang, Mr. Bernardo Enriquez, Mr. Alex

Hadjicharalambous, and Mr. Elliott Dordick, (Complaint ¶¶ 22–26); (ii) the HCHK Entities are

affiliated with Gettr GFashion, GMusic, GClub, GNews, GEdu, Saraca Media, and GTV Media

(the "G-Series Entities"), which are allegedly affiliated with the Individual Debtor, and the

corporate form of the HCHK Entities is disregarded for the benefit of the G-Series Entities,

(Complaint ¶¶ 27–30); (iii) the HCHK Entities have a history of paying what are allegedly the

expenses of the Individual Debtor, (Complaint ¶¶ 31–32); (iv) the purported creditors of the

HCHK Entities alleged in the Assignment Proceedings are either individual supporters of the

Individual Debtors or entities affiliated with the Individual Debtor, such as G-Series Entities,

(Complaint ¶¶ 33–38); (v) the United States Attorney for the Southern District of New York

alleges that the HCHK Entities are involved in a billion dollar fraud for the benefit of the

Individual Debtor, (Complaint ¶ 39); and (vi) the Individual Debtor asserted his fifth amendment

right against self-incrimination when questioned whether he beneficially owned and controlled

the HCHK Entities, (Complaint ¶ 40). The Trustee Affidavit asserts under penalty of perjury that key supporting allegations are true to the best of the Trustee's knowledge and that the exhibits supporting the Complaint are true and correct copies of documents to the best of the Trustee's knowledge.

As the Complaint observes, this Court has already found Ms. Wang to be an employee and/or agent of the Individual Debtor. (Main Case ECF No. 1372.) Ms. Wang is alleged to indirectly nominally control 99.9999% of the ownership interests in each of the HCHK Entities. Many, if not all, of the other names of owners or employees and affiliated entities of the HCHK Entities which the Complaint alleges demonstrate a close connection with the affairs of the Individual Debtor are familiar to the Court in connection with, *e.g.*, the social media and protest campaign, *see, e.g.*, *Pac. All. Asia Opportunity Fund L.P. v. Kwok (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 22-05032 (JAM) (Bankr. D. Conn. Jan. 13, 2023), ECF No. 133 (hereinafter, the "Social Media and Protest Decision"), or the involvement of Golden Spring (New York) Ltd. and Lamp Capital LLC in these Chapter 11 cases, *see e.g.*, Main Case ECF Nos. 1, 86, 117, 139, 197, 318, 760, 1709. Indeed, the Court has previously found that the G-Series Entities are business vehicles of the Individual Debtor, serve the purposes of the Individual Debtor, and have employees who are personally loyal to the Individual Debtor. (*See* Social Media and Protest Decision.) Moreover, attached to the Complaint are exhibits demonstrating the alleged connection to the G-Series Entities including, among others, the filings of the Assignee Defendant in the State Court, bank records, and emails from the HCHK Entities' professionals. For example, there is an email from an HCHK Entities' professional stating that "We are representing entities indirectly owned by [the Individual Debtor], owner of GTV media." (ECF No. 1 Ex. 14.) The Complaint also alleges that financial documents – not

12

attached, but in the Trustee's possession – indicate that the HCHK Entities have made several payments for the ultimate benefit of the Individual Debtor, *e.g.*, in connection with the Lady May, the Individual Debtor's yacht, *see HK Int'l Funds Invs. (USA) Ltd., LLC v. Despins ex rel. Kwok (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 22-05003 (JAM) (Bankr. D. Conn. Mar. 30, 2023), ECF No. 177, or payment of his employees, such as Ms. Wang. Similarly, the Assignee Defendant's filings suggest that the HCHK Entities' creditors are the G-Series Entities and related individuals. Finally, the Individual Debtor has asserted his fifth amendment right against self-incrimination regarding his control of not just HCHK Technologies, Inc. and HCHK Property Management, Inc. but also, *e.g.*, various G-Series Entities, Ms. Wang, and Mr. DiBattista. (ECF No. 1 Exs. 1, 12.)

Combined with the Trustee's affidavit sworn under penalty of perjury, the Court concludes that the Complaint has *at least* raised sufficiently serious questions going to the merits to support an *ex parte* TRO. Therefore, the Court concludes all *Jackson Dairy* elements are met and a TRO shall issue to maintain the *status quo* pending a trial on the request for a preliminary injunction.

### B. Section 105 Injunction

Even where the automatic stay does not apply – and here the Complaint asserts it does – the Court has authority under section 105(a) to stay suits that may impede an ongoing bankruptcy proceeding. *See McHale v. Alvarez (In re 1031 Tax Grp., LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008). Section 105(a) injunctive relief may enter if (1) there is a likelihood of successful reorganization; (2) there is an imminent irreparable harm to the estate in the absence of an injunction; (3) the balance of harms tips in favor of the moving party; and (4) the public interest weighs in favor of an injunction. *Calpine*, 365 B.R. at 409.

All of these factors except for (1) and (4) have been addressed above in the discussion of *Jackson Dairy*. The Trustee's investigation is proceeding and there will likely be *some* recovery for creditors, although the ultimate dividend is unknown. The recovery will likely at least be greater than that in a hypothetical Chapter 7 liquidation. The public interest supports the issuance of a TRO because the public has an interest, as enshrined in Article I, section 8 of the Constitution, in uniform, federal bankruptcy laws and an equitable distribution to all creditors. As discussed above, such a distribution is presently at risk due to a potential splintering of bankruptcy proceedings between these Chapter 11 cases and the Assignment Proceedings. Therefore, the Court concludes section 105(a) also supports the issuance of a TRO to maintain the *status quo* pending a hearing on the request for a preliminary injunction.

## V. CONCLUSION AND ORDER

Accordingly, upon review of the TRO Motion, the Complaint and exhibits attached thereto, the Trustee Affidavit, the Barron Certification, and the record in these Chapter 11 cases and this adversary proceeding and for the reasons stated above, the Court issues an *ex parte* TRO to preserve the *status quo* pending a hearing on the request for a preliminary injunction. Therefore, it is hereby

**ORDERED:** Upon receipt of actual notice of this TRO by personal service or otherwise, (i) the Defendants; (ii) the Defendants' officers, agents, servants, employees, and attorneys; and (iii) any person in active concert or participations with the Defendants and/or the Defendants' officers, agents, servants, employees, and attorneys including, without limitation, G-News Operations, LLC ("G-News") and Ms. Irene Feng, are temporarily restrained and enjoined from commencing or continuing the Assignment Proceedings (or any other judicial, administrative, or

other actions or proceedings with respect to the HCHK Entities and/or their assets), including

Interim Management Agreement ("IMA") with G-News; and it is further

ORDERED: Upon receipt of actual notice of this TRO by personal service or otherwise,

(i) the Defendants; (ii) the Defendants' officers, agents, servants, employees, and attorneys; and

(iii) any person in active concert or participations with the Defendants and/or the Defendants'

officers, agents, servants, employees, and attorneys, including, without limitation, GNews and

Irene Feng, are temporarily restrained and enjoined from any transfer or use of the assets,

including cash, of the HCHK Entities (including but not limited to such assets purportedly

transferred to the Assignee Defendant and/or held by the Assignee Defendant, and including but

not limited to any transfer or use of such assets effectuated pursuant to the IMA), or ownership

interests in the HCHK Entities, except as authorized or directed by the Trustee or this Court; and

it is further

ORDERED: Upon receipt of actual notice of this TRO by personal service or otherwise,

the Assignee Defendant shall immediately notify the State Court of the issuance of this TRO;

and it is further

ORDERED: Pursuant to this Court's discretion to set or waive the amount of any bond

to be posted under Fed. R. Civ. P. 65, the Trustee need not post a bond; and it is further

ORDERED: Any objection or response to the TRO Motion insofar as it requests a

preliminary injunction or this Order shall be filed on or before June 23, 2023 at 12:00 p.m.

(noon); and it is further

ORDERED: The Trustee and the Defendants shall submit lists of witnesses and exhibits

on or before June 23, 2023 at 12:00 p.m. (noon); and it is further

**ORDERED:**  The Trustee shall file any reply on or before June 24, 2023 at 12:00 p.m. (noon); and it is further

**ORDERED:**  A hearing on the TRO Motion insofar as it requests the issuance of a preliminary injunction, shall commence on June 26, 2023, at 10:00 a.m. in the United States Bankruptcy Court, 915 Lafayette Boulevard, Bridgeport, CT; and it is further

**ORDERED:**  This Court shall retain jurisdiction to hear and determine all matters arising from the implementation, interpretation, and/or enforcement of this TRO.

Entered at Bridgeport, Connecticut at 2:15 p.m. on June 12, 2023.

Dated at Bridgeport, Connecticut this 12th day of June, 2023.

*Julie A. Manning*
*United States Bankruptcy Judge*
*District of Connecticut*