UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In Re | * | Case No. 22-50073 (JAM) |
| | * | |
| HO WAN KWOK and GENEVER | * | |
| HOLDINGS CORPORATION, | * | |
| | * | |
| Debtor. | * | |
| | | |
| U.S. BANK NATIONAL | * | Adv. Proc No. 23-05012 |
| ASSOCIATION, as escrow | * | |
| agent, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | Bridgeport, Connecticut |
| HK INTERNATIONAL FUNDS | * | June 27, 2023 |
| INVESTMENTS (USA) LIMITED, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


#1805     SECOND OMNIBUS MOTION TO COMPEL COMPLIANT WITH
          RULE 2004 SUBPOENAS
#1912     MOTION TO QUASH SUBPOENAS BY HK PARTIES TO TRUSTEE
          AND TRUSTEE'S BROKER RE LADY MAY SALE MOTION
#  19     MOTION TO DEPOSIT FUNDS INTO THE REGISTRY OF
          COURT AND TO DISCHARGE PLAINTIFF FROM
          INTERPLEADER ACTION
#1858     TRUSTEE'S MOTION, PURSUANT TO BANKR. CODE SEC.
          105 and 363, BANKR. RULES 2002, 6004(c) and 9014
          AND LOCAL RULES 6004-1 and 6004-2 SEEKING ENTRY
          OF ORDER (I) AUTHORIZING AND APPROVING SALE OF THE
          LADY MAY FREE AND CLEAR OF LIENS, CLAIMS,
          INTERESTS and ENCUMBRANCES, (II) AUTHORIZING AND
          APPROVING PURCHASE AND SALE AGREEMENT and (III)
          GRANTING RELATED RELIEF


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

```
APPEARANCES:


Chapter 11 Trustee:              LUC A. DESPINS, ESQ.
                                 Paul Hastings
                                 200 Park Avenue
                                 New York, NY  10166


For the Chapter 11 Trustee:      NICHOLAS A. BASSETT, ESQ.
                                 Paul Hastings LLP
                                 200 Park Avenue
                                 New York, NY  10166

                                 PATRICK R. LINSEY, ESQ.
                                 Neubert Pepe & Monteith, PC
                                 195 Church Street
                                 New Haven, CT  06510

For HK International Funds        STEPHEN M. KINDSETH, ESQ.
 Investments, LLC and            Zeisler & Zeisler, P.C.
 Mei Guo:                        10 Middle Street, 15th Floor
                                 Bridgeport, CT  06604


For the Creditors Committee:     KRISTEN MAYHEW, ESQ.
                                 Pullman & Comley
                                 850 Main Street
                                 Bridgeport, CT  06601


For the U.S. Trustee:            HOLLEY L. CLAIBORN, ESQ.
                                 Office of the U.S. Trustee
                                 150 Court Street
                                 New Haven, CT  06510


For U.S. Bank National Assn.,    LATONIA C. WILLIAMS, ESQ.
 as escrow agent:                Shipman & Goodwin, LLP
                                 One Constitution Plaza
                                 Hartford, CT  06103


For G Clubs Operations, LLC:     JEFFREY M. SKLARZ, ESQ.
                                 Green & Sklarz, LLC
                                 One Audubon Street
                                 New Haven, CT  06511

                                 CAROLINA FORNOS, ESQ.
                                 Pillsbury Winthrop Shaw Pittman
                                 31 West 52nd Street
                                 New York, NY  10019
```

APPEARANCES:  (Cont'd)


For the Creditor, Pacific        STUART SARNOFF, ESQ.
 Alliance Asia Opportunity       O'Melveny & Myers LLP
 Fund L.P.:                      Times Square Tower
                                 7 Times Square
                                 New York, NY  10036

For the buyer:                   ROBBIE BOONE, ESQ.
                                 Alley, Maass, Rogers &
                                  Lindsay, P.A.
                                 340 Royal Poinciana Plaza
                                 Palm Beach, FL  33480

1              (Proceedings commenced at 12:06 p.m.)

2              THE COURTROOM DEPUTY:  22-50073, Ho Wan Kwok and

3     Genever Holdings, LLC; adversary proceeding 23-05012, U.S.

4     Bank National Association as escrow agent versus HK

5     International Funds Investments (USA) Limited.

6              THE COURT:  Okay.  Good afternoon.  If we could

7     have appearances for the record starting with the Chapter 11

8     Trustee please.

9              MR. DESPINS:  Good afternoon, Your Honor.  Luc

10    Despins, Chapter 11 Trustee.

11             MR. BASSETT:  Good afternoon, Your Honor.  Nick

12    Bassett from Paul Hastings on behalf of the Chapter 11

13    Trustee.

14             MR. LINSEY:  Good afternoon, Your Honor.  Patrick

15    Linsey, Connecticut counsel for the Trustee.

16             MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

17    Claiborn for the U.S. Trustee.

18             MS. MAYHEW:  Good afternoon, Your Honor.  Kristen

19    Mayhew on behalf of the Creditors Committee.

20             MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

21    Sklarz of Green & Sklarz for G Club Operations, LLC.  I'm

22    joined by our lead counsel, who's admitted pro hac vice,

23    Carolina Fornos, of Pillsbury Winthrop.

24             MS. FORNOS:  Good afternoon, Your Honor.

25             THE COURT:  Good afternoon.

1          MS. WILLIAMS:  Good afternoon, Your Honor.

2     Latonia Williams of Shipman & Goodwin, LLP on behalf of the

3     escrow agent, U.S. Bank National Association.

4          THE COURT:  Good afternoon.

5          All right.  So, Trustee Despins, we have a few

6     discovery matters on the calendar, as well as the

7     interpleader adversary, and then of course the motion to

8     sell, which was scheduled for noon.

9          Are we going to take the 11 o'clock matters first?

10          MR. DESPINS:  Well, just by way of update, Your

11     Honor, the interpleader action, I believe that for this

12     intermediate stage that we will have a consensual order.

13     It's being processed right now, that we're trying to file it

14     with the Court so you'll have it.

15          So that's good that we can adjourn that, but that

16     should be very short once we have the final order on the

17     docket, or final, proposed order on the docket.

18          THE COURT:  And who are the parties to the consent

19     order?

20          MR. DESPINS:  Well, Mr. Kindseth representing Mei

21     Guo and HK, the Trustee, and the escrow agent.

22          THE COURT:  Okay.  Thank you.

23          MR. DESPINS:  So that's the first.

24          And then on the sale we're also working on the

25     consensual order.  There would still be evidence required,

1    but the sale motion would go forward on a much more

2    collapsed, you know, process that resolves the HK issues

3    basically.  But that's being drafted as well.

4             So I think that at this point it would make sense

5    to deal with the discovery dispute involving G Club.

6             THE COURT:  So that's fine, obviously.

7             So the motion to quash the subpoenas --

8             MR. DESPINS:  That also should be adjourned, Your

9    Honor.

10            THE COURT:  -- that's going to be part of the

11   resolution?  Okay.

12            MR. DESPINS:  Yes, Your Honor.

13            THE COURT:  All right.  So then what you'd like

14   the Court to address is the second omnibus motion with

15   regard to the 2004 discovery issues, and specifically

16   related to the G Club entity that I have to get the right

17   name of because there are several G Club Operations, LLC.

18            Correct, Counsel?

19            MS. FORNOS:  Yes, Your Honor.

20            THE COURT:  Okay.  Thank you.

21            All right.  So how are we proceeding with that

22   today?

23            We were here last, we talked about some possible

24   discussions between the parties.  I set this hearing.  I

25   believe I set a time frame to file a response, right?  So

1    where -- where do things stand as of today?

2              MR. BASSETT:  So, Your Honor, I'm happy to address

3    that.

4              I think the current state of play has been

5    summarized by the filing by G Club.  I don't have the date,

6    I apologize, or the ECF reference in front of me.  I guess

7    it was, sorry, docket 1924.  And then the Trustee filed a

8    reply to that, docket number 1934.

9              And essentially the dispute remains unresolved.

10             G Club is asking for a 60-day extension of time to

11   continue producing documents.  They have produced some

12   documents.  I guess approximately 300 in response to our

13   subpoena thus far.

14             They continue to take issue with the breadth of

15   the subpoena and have objected to many of the requests, but

16   we still are at a impasse in terms of -- certainly the

17   biggest ticket item from our perspective is the, well, two

18   things:

19             One, the time within which G Club will have to

20   continue complying or to finish complying with the subpoena.

21   I won't belabor my colleague, Mr. Luft's, lengthy recitation

22   of the history here at the last hearing, but we've been at

23   this for six months plus.  And suffice it to say the Trustee

24   is absolutely not willing to let this linger for another 60

25   days.

1          The other issue that we have is some of the

2     fundamental objections G Club has raised with respect to

3     what they believe to be the permissible scope of discovery.

4     I think these are issues that the Court has already covered.

5          These are issues concerning, you know, whether or

6     not they need to provide documents related to, you know,

7     assets and operations of G Club, or whether we first need to

8     prove a connection between G Club and the debtor through a

9     final order of this court.  We think that has it totally

10    backwards.

11         There's tons of allegations that I'm happy to run

12    through, both in this case, findings of this court,

13    allegations in the criminal case which are described in

14    detail, and the reply that we filed that are very, very,

15    very, very troubling.

16         I'm happy to go through all of that in as much

17    detail as the Court would like, but for all those reasons we

18    think that the subpoena that we served is well within the

19    scope of 2004 and we think there's no basis at all to let

20    this linger on for another 60 days.

21              THE COURT:  Okay.  Thank you.

22              Counsel?

23              MS. FORNOS:  Good afternoon, Your Honor.

24         First of all, I want to underscore that we have

25    started that production.

1          When I last appeared before the Court I

2     represented to the Court that we had an independent manager,

3     that we were working diligently, and we indeed produced

4     documents.  To be clear, those documents are corporate

5     organization documents, loan documents, transfer documents,

6     documents regarding assets, that they specifically

7     requested.

8          We're not sitting on this.  We are moving to

9     produce.  And all I am asking for is the 60 days.

10         And, Your Honor, I've discussed this with the

11    independent manager.  They're working as fast as they can to

12    deal with the day-to-day operations, preserve data,

13    understand assets.

14         That 60 days is what they're asking for to

15    continue to respond at least on a minimal weekly basis to

16    continue to supplement the production that has already been

17    made.

18         On this note, Your Honor, I'd like to address and

19    give the Court more transparency on the independent manager,

20    as well as the Trustee, because the filings made it indicate

21    there were some aspersions caught, alleged with respect to

22    the independent manager.

23         The independent manager is an organization.  It's

24    FFP.  It is known to step in when a corporation loses its

25    management, which is what we have here.  And I have

1    documentation I can provide to the Court and to the Trustee

2    providing more information on FFP and its experiences.

3    They're essentially acting like an independent fiduciary.

4           And I can represent to the Court that I've been in

5    daily contact with them trying to deal with this, trying to

6    address a number of issues that are facing the company when

7    all of their managers and directors left in March.

8           So we're working to produce documents.

9           I agree with the Trustee.  He is entitled, to be

10   clear, to the documents he's requested regarding the debtor.

11   We've produced those.  He is entitled --

12          THE COURT:  I just want to make sure I get

13   everything you say accurate.

14          MS. FORNOS:  Sure.

15          THE COURT:  So all the documents that you believe

16   that your client has regarding the debtor have been

17   produced?

18          MS. FORNOS:  That is what we have turned over, the

19   immediate stuff that relates to -- I don't -- we don't

20   believe that we have extensive information of the debtor

21   because the debtor was our consultant and our spokesperson.

22   We have produced that agreement.

23          We of course, to the extent there's more, we're

24   searching for that.  We're looking for that.  We have no

25   objection to provide every document that relates to the

1    debtor.

2            As the Court knows, one of the issues that we have

3    flagged from the beginning with the Trustee is that there is

4    an overbreadth in these Rule 2004.  And candidly we

5    understand why they're overly broad.  Because it was the

6    same Rule 2004 that was issued to over 100 parties.  It

7    wasn't tailored to any specific company.  But the way it

8    reads is they basically want every single document in our

9    possession.

10           And this is -- you know, the issue for today that

11   we're asking is just for a reasonable amount of time so that

12   FFP can continue to produce documents.

13           And we're also happy to facilitate a discussion

14   between the Trustee and FFP so that they can have more

15   transparency on what they're actually doing and what we're

16   trying to do to supplement the productions.

17           The Trustee wants this in seven days.  We're

18   asking for 60.  We need a reasonable time because of the

19   amount of things that the independent manager is dealing

20   with.

21           Last, a separate issue, which I see slightly

22   separate than today's issue for the Court, which is the time

23   frame, is the scope.

24           And at the last hearing I raised this issue.  And

25   our issue is they want, and they have requested, every

1    single document relating to the source of funding of G Club.

2           To be clear, the source of funding of G Club, Your

3    Honor, is thousands of member information that contains

4    personal identifying information, banking records of third

5    parties, of members.

6           Our position is we'd like to have the time to give

7    them the documents related to associated entities, to the

8    associated individuals.

9           The ask is that we address the issue of

10   memberships, membership information and source of funds,

11   which is contained in the banking records, to a later date

12   because that is an objection that we have put forth to the

13   Trustee.

14          We probably need to have more discussions on this.

15   And maybe having some discussions with the independent

16   manager will facilitate this.

17          But, Your Honor, and I don't want to get ahead of

18   the Trustee or the Court's docket, but I want to also alert

19   the Court now that this issue of membership and membership

20   data is likely going to be an issue in the proposed

21   settlement that was filed on Friday by the Trustee regarding

22   HCHK.

23          HCHK Technologies has and is in possession of G

24   Club membership data, that is, third-party data that does

25   not belong to HCHK.

1        THE COURT:  How are you aware of that fact?

2        MS. FORNOS:  Because we have a contract with HCHK,

3   which we have turned over the Trustee so he is aware of that

4   contract.  And HCHK had a contract -- we're a customer of

5   HCHK because they hosted our data on iCloud.

6        So I don't want to get too far ahead on this issue

7   because it's an issue for the HCHK, which we just don't want

8   to surprise the Court, but it's an issue that is present in

9   the Rule 2004 because we have objected to producing our

10  member data.

11       I'm sure that there are ways that we can structure

12  a more narrow production to address the concerns that the

13  Trustee has.  And, again, I understand what the Trustee is

14  seeking, but what we want is more time.

15       And respectfully, Your Honor, those are -- those

16  are the issues that are present at the moment.

17       THE COURT:  Have you had discussions about a

18  protective order, confidentiality agreement?

19       MS. FORNOS:  Your Honor --

20       THE COURT:  Because there are already existing

21  orders in this case.

22       MS. FORNOS:  Understood, Your Honor.  And I have

23  signed that order.  And the Trustee was kind enough to

24  provide me a copy of that, so I had signed it and sent it

25  over to them.  But I still have concerns over producing

1  thousands -- we're talking more than 8,000 member

2  information and personal identifying information.

3          That is the -- that is the crux of the objection.

4          And we simply ask -- we can address it today, or

5  this could be an issue for a separate day, or we could have

6  more conversations with the Trustee so that we could figure

7  out a way around it.

8          THE COURT:  Well, why wouldn't the confidentiality

9  agreement address your concerns?

10          MS. FORNOS:  Your Honor, it's one thing to have a

11  confidentiality agreement, but another thing is to produce

12  the personal identifying information of members who don't --

13  have not consented to the release of that information.  I

14  have very serious concerns.

15          THE COURT:  You got information from members who

16  didn't -- who signed a document with your client that said

17  that their information couldn't be released to third

18  parties?

19          MS. FORNOS:  Your Honor, I'd have to look at all

20  of the underlying agreements.  I don't know the answer to

21  that question.  I would have to double-check.  That's an

22  excellent point the Court's making.  I apologize.  I should

23  have checked that earlier.

24          But we do have -- every member signs a membership

25  agreement.  And --

1    THE COURT:  And does the membership agreement have

2    a provision that says that their information can't be

3    disclosed?

4    MS. FORNOS:  I think it has a provision -- I need

5    to double-check.  I don't want to state anything that I'm

6    not clear on.

7    THE COURT:  No.  I understand.  But I think you do

8    need to check, right, because that's relevant.

9    MS. FORNOS:  Of course, Your Honor.

10    But the issue that is before the Court right now,

11    and I appreciate the Trustee's frustration, I truly do, but

12    we zeroed in on documents, we have produced them.  We are --

13    we have more to produce, documents that we don't object to.

14    And it's the bulk of the relationship that they're seeking

15    between our entity and other entities because that's what

16    they're trying to understand.

17    So we're happy to continue to do that production.

18    Again, we just need more time.

19    As to the scope, we can address it today.  We can

20    try to meet and confer.  We can save it for another day.

21    THE COURT:  Well, you've met and conferred on a

22    number of occasions.  I mean, that's the representations

23    that have been made to the Court on several occasions.  Not

24    just in court, but in documents, right, in pleadings.

25    So I agree that there's -- you know that there's

1    an ongoing obligation of all counsel to act appropriately in

2    connection with discovery requests, so I think we do need to

3    address it.

4              What is your -- what are your issues, and I'm

5    happy to hear them, with regard to the scope of the

6    subpoenas?

7              What are -- I need your specific objections with

8    regard to the scope please.

9              MS. FORNOS:  Gladly.  It's the same that we have

10   been saying from the beginning.

11             The Trustee has requested every single document.

12   I will draw the Court's attention specifically to document

13   request number 4 -- 14 --

14             THE COURT:  Okay.

15             MS. FORNOS:  -- which specifically asked --

16             THE COURT:  Document request number 14?

17             MS. FORNOS:  Yes.  It specifically asks for all

18   sources of income of our entity.  That request is not

19   proportional to what's at issue today and what's at issue

20   for the Trustee.

21             The Trustee wants, rightfully so, and, again, I

22   agree with the Trustee, the Trustee wants to understand the

23   relationship between our entity and other entities, no

24   objection.  We get that.  We will produce that.  We have

25   started that production.  We have more.

1          But the line, and what we absolutely feel needs to

2     not be the subject of this Rule 2004, at least at this time,

3     which is not proportional, are over 8,000 member information

4     and payment.

5          THE COURT:  Right.  And we just discussed that.

6     Okay?

7          MS. FORNOS:  Yes.

8          THE COURT:  You need to go figure out whether

9     there's some provision in this membership agreement that

10     says that the information can't be turned over.  Okay?

11          And if it can't be turned -- if there isn't that

12     provision in the membership agreement, then I'm not clear as

13     to how the confidentiality agreement doesn't protect that

14     issue.

15          MS. FORNOS:  Your Honor, I don't think that the

16     confidentiality, the protective order, covers the personal

17     identifying information and banking records of third

18     parties.  That's not -- we'll discuss it with the Trustee.

19     And I'll go back and double-check the protective order.  But

20     I am concerned about --

21          THE COURT:  Well, then it could be amended to do

22     that.  I mean, there's many ways this could be.

23          We're not -- I'm not going to kick this, and I'm

24     not suggesting you're saying kick, so let me just use a

25     better word --

1    MS. FORNOS:  Understood, Your Honor.

2    THE COURT:  -- but this -- the last hearing we

3    had, if my memory is correct, and I believe I asked you this

4    -- I know I asked you the question, but I might not know --

5    remember the exact words -- I asked you if you had any

6    quarrel with what Attorney Bassett said about the process

7    that had occurred with you being the counsel and Attorney

8    Bassett regarding production under the subpoena, including

9    going back to a period of time -- and I don't have it in

10   front of me, but the two of you will remind me --

11   MR. BASSETT:  It was Attorney Luft at that time,

12   Your Honor.

13   THE COURT:  Oh, Attorney Luft.  Okay.  That's

14   right.  It wasn't Attorney Bassett.  It was Attorney Luft.

15   -- that you were involved in this issue with the

16   subpoena back I believe the representation was in December

17   of 2022, and maybe even earlier, and there was this -- there

18   was a representation made that, you know, there will be no

19   production made at all back as far as December.

20   Now, I understand that for reasons that I don't

21   think are in the record of this case yet, but maybe they

22   are, there's quite a few things in this case, so it's not

23   always easy to remember everything that's occurred, the

24   officers and directors of your client departed.

25   And now as of June 1st this FFP, which sounds like

1    it's, you know, a professional organization to come in and

2    manage companies when necessary --

3            MS. FORNOS:  It is.

4            THE COURT:  -- has produced 300 documents.  That's

5    what I've heard.  And that's a good start, but that's not

6    where we should be as of now.

7            We had a hearing on June 6th.  It's June 27th.

8    And I'm sure you did, but I suggested to you that your

9    client needed to understand the seriousness of this issue.

10   And 300 documents in 21 days to me is not -- I would have

11   expected more than that, okay, especially given the fact

12   that there's a pending motion to compel, which could then

13   turn into a contempt order ultimately if the motion to

14   compel is granted, and so I expected to see more of a

15   production than 300 documents at this point.

16           What I'm hearing you say today, and I understand

17   it, it seems to me that, and I'd like you to correct me for

18   the record, that the biggest issue you see is this

19   membership information.  Okay.

20           So if you've only -- if you've produced 300

21   documents, and I think you said that they were documents

22   with regard to the corporate structure or the corporate

23   creation assets that the corporation owns, loan documents, I

24   would think there would be more than 300 documents with

25   regard to just the loan documents.

1      But if your -- if your biggest issue and your --

2   and it sounds like maybe, and I could be wrong, your only

3   issue is this membership information, then I think there's

4   absolutely ways that can be addressed.  And it can be

5   addressed now and it can be addressed in less than 60 days.

6          I don't think your client is entitled to 60 days

7   at this point.

8          I already provided additional time by setting a

9   new deadline for you to file your response, which you did

10  and I appreciate, but I don't think 300 documents is what I

11  was thinking we would be discussing today.

12          MS. FORNOS:  Understood, Your Honor.

13          The Court has it correct.  I think the issue here

14  is that we have more to produce.  We are working towards

15  that production.  But FFP needs time.  And if the Court

16  thinks --

17          THE COURT:  To do what?

18          MS. FORNOS:  To review.  To ensure that they

19  understand what's being produced.

20          Your Honor --

21          THE COURT:  Well, you're going to tell them that.

22  You're going to counsel them on that, Counsel.  That's what

23  you're doing, right?  You're not letting them blindly go

24  through those documents.

25          MS. FORNOS:  No.  But they still need time.

1          And if the Court will indulge me, this is not the

2    only issue that they have on their plate.  There are a lot

3    of things they're trying to address and we just need time.

4          We respect -- we understand the Court's position.

5    And candidly we truly appreciate the Trustee's frustration

6    as well.  But we just need a little bit of time to continue

7    produce what we're producing.

8          On the -- on the issue of where we object, the

9    membership information is also contained in our bank

10   statements because the deposits show the membership

11   information.

12         What we have objected to is this wholesale you get

13   to have everything, there's basically no limit, there's

14   restraint to the Trustee.

15         THE COURT:  But what if they subpoena the bank?

16   Did they subpoena the banks?

17         MS. FORNOS:  If they did, I'm not aware of it.

18         THE COURT:  Okay.

19         MS. FORNOS:  But they can certainly do that.

20   That's their prerogative.  But at -- and I'm sure they're

21   working with other counsel to do that.

22         But the issue we are asking for is time.

23         And if the Court wants to, for example, adjourn

24   the hearing so that we can come back to you and we can --

25   you could see the progress that's been made and the

1    production, and actually whittle down what's left to really

2    fight about, we're amenable to that as well.  We just need

3    time.  And that's -- I'm asking that on behalf of --

4            THE COURT:  No.  I understand.

5            MS. FORNOS:  -- the independent manager.

6            THE COURT:  And I think the only -- well, one of

7    the thoughts or concerns I have with that request is that

8    was what was asked on June 6th for 60 days.  Now we're at

9    June 27th and we're asking for another 60 days, you're

10   asking for an additional 60 days.  So we're not -- we're not

11   progressing, we're extending.

12           MR. BASSETT:  Your Honor, could I be heard on the

13   timing issue further, please?

14           THE COURT:  Yes.

15           MR. BASSETT:  So I just -- it's critically

16   important that some of the information we put in our reply

17   brief is not lost on the Court because I think it goes a

18   long ways to explain why we are extraordinarily concerned,

19   extraordinarily skeptical, about the suggestion that all we

20   need is more time.

21           And whether it's working out an issue with regard

22   to whether certain information about membership interests is

23   confidential and how we're going to sort through that, as

24   you said, they've only produced 300 documents.

25           Obviously this is an organization that's engaged

23

1    in any legitimate business.  They have way more than 300

2    documents to produce.  So there's a lot more that needs to

3    be done.

4            We've been at this for over six months.  Counsel

5    has been involved from the beginning.  She's now saying,

6    well, there's this new organization in place that's acting

7    as independent manager.

8            But we are absolutely not even close to

9    comfortable that all of a sudden we're going to get

10   compliance with our subpoena and that there's not going to

11   be spoliation of materials or things happening in the

12   background while we're trying to get discovery and that is

13   what I wanted to briefly walk the Court through which is in

14   our reply brief.

15           As I think we've explained previously, the premise

16   of so many of the objections that you're hearing from

17   counsel is that there's really no connection between G Club

18   and the debtor.

19           Your Honor, in the criminal indictment, the

20   Government alleged that G Club is quote, "Functionally owned

21   and controlled by Ho Wan Kwok."  That blows their scope

22   objection out of the water.  That is way more than enough

23   for 2004 purposes for us to get documents from G Club

24   related to their operations, finances, source of funding, et

25   cetera, way more than crossing that threshold.

1            But what gets really, really troubling is the fact

2       that during this entire prolonged meet and confer process,

3       where we were getting the runaround, we were being told at

4       one point, as Mr. Luft described to the Court the last time

5       we were here, that they were so offended by the suggestion

6       that there was a connection between the debtor and G Club

7       that they were just not going to produce documents at all.

8            While we were getting those responses from them,

9       what we've come to learn from information filed in the

10      criminal case there were allegations that in January and

11      March of 2023, this is in the memorandum that we cite at

12      Exhibit 8 to our reply brief, January and March of 2023, two

13      individuals affiliated with HCHK spent more than

14      approximately six weeks in the UAE to assist moving the

15      operations and money of G Clubs.  January and March of 2023

16      while we were getting the runaround about getting documents

17      in response to our subpoena.

18            In April of 2023, while we were having our third

19      meet and confer with counsel for G Club, according to the

20      documents filed by the Government in the criminal case and

21      notes from Yvette Wang that were -- that accompanied that

22      filing in the criminal case, Ms. Wang directed a G Club

23      employee to remove $7.1 million in G Club checks from a G

24      Club P.O. box.  April 2023.  These are all allegations --

25            THE COURT:  Hold on a second.

1        MR. BASSETT:  -- in the criminal indictment.

2        THE COURT:  Just tell me where -- what you just

3    said again.  Ms. Wang did what on what date?  According to

4    this brief by the Government.

5        MR. BASSETT:  Right.  So what we say in our --

6        THE COURT:  Is that what you're telling me?

7        MR. BASSETT:  So what we say in our reply brief,

8    Your Honor, at paragraph -- at paragraph 10, and this is in

9    the --

10       THE COURT:  But I want to go directly to your

11   source, right?

12       MR. BASSETT:  Sure.

13       THE COURT:  What's your source?  Your source is

14   the -- a brief?

15       MR. BASSETT:  Exhibit B to our reply brief, Your

16   Honor.

17       THE COURT:  Okay.  Give me a moment to --

18       MR. BASSETT:  (Indiscernible) declaration attached

19   to?

20       THE COURT:  Give me a moment to get there, please.

21       All right.  I'm starting on the first page of

22   Exhibit B, this Memorandum of Law of the United States of

23   America in Opposition to Defendant Yvette Wang's Motion for

24   Pretrial Release.

25       What page do you want me to go to?

1          MR. BASSETT:  My colleague is getting my copy of

2     the document, but it's -- according to our reply brief it's

3     at pages 37 and 38.

4          THE COURT:  Of the Government's brief, right?

5          MR. BASSETT:  That's right.

6          THE COURT:  All right.  Hold on.  There's a lot of

7     different stamps on the top of this, so it's a little hard

8     to follow, but we'll get there.

9          Am I supposed to be looking at the transcript of

10    the proceeding?

11         MR. BASSETT:  No.  It's the memorandum that the

12    Government filed.

13         THE COURT:  Yeah.  The memorandum.  Okay.

14         MR. BASSETT:  Yeah.  It's regarding the continued

15    detention of Yvette Wang.

16         THE COURT:  Right.  So I've got the memorandum.

17    And it says it's 42 pages.

18         MR. BASSETT:  And it starts on page 34 of the PDF,

19    34 of 242.

20         THE COURT:  Right.  So what page am I going to?

21    Thirty-eight?  Thirty-seven and eight of 242, is that what

22    you're saying?

23         MR. BASSETT:  That's what I'm saying, Your Honor.

24         THE COURT:  Okay.  So this is the Government

25    saying that, okay, that Wang played a key role in the

1    sprawling and complex fraud spearheaded by Ho Wan Kwok.

2    Okay.  And then it said the fraud's relied on at least four

3    interrelated parts, the GTV Media Group Private Placement,

4    the Farm Loan Program, G Club Operations, LLC and Himalaya

5    Exchange.

6              Is that what you're talking about?

7              MR. BASSETT:  That's right, Your Honor.

8              And the particular language that we referenced in

9    our reply brief that I was referring the Court to is at the

10   bottom of page 37 where it talks about -- it's in the middle

11   of the second paragraph on page 37 -- for example, as shown

12   in the images below, the task dated April 11th, 2023, and it

13   goes on to talk about what Wang directed an unnamed

14   participant --

15             THE COURT:  Wait.  Wait.  I'm not following where

16   the line says per the images below.  I'm on page --

17             MR. BASSETT:  Page 37.

18             THE COURT:  -- of two -- of 242?

19             MR. BASSETT:  Page 37 at the bottom, Your Honor.

20   I apologize.  I can't see --

21             THE COURT:  So page 37 of the brief?

22             MR. BASSETT:  Yes.  Yes, Your Honor.

23             I guess it's 73 of 242 if you look at the PDF.

24             THE COURT:  Okay.  That will help because I don't

25   have page numbers, so.  Seventy-two?

1           MR. BASSETT:  Seventy-three of 242.

2           THE COURT:  Seventy-three.

3           MR. BASSETT:  And it's the second paragraph

4    starting with on June 13th, 2023.

5           THE COURT:  Okay.  There I am.  Okay.  I've got

6    you.

7           MR. BASSETT:  Right.

8           THE COURT:  So your now saying I'm looking at page

9    73 of 242 of your reply to the --

10          MR. BASSETT:  To Exhibit B.  To Exhibit B to our

11    reply.

12          THE COURT:  Right.

13          MR. BASSETT:  Exhibit B --

14          THE COURT:  Exhibit B to your reply.

15          MR. BASSETT:  -- being the memorandum filed by the

16    Government.

17          THE COURT:  And you're pointing me to a paragraph

18    that starts on June 15, 2023 pursuant to a judicially

19    authorized search warrant?

20          MR. BASSETT:  That's correct.

21          THE COURT:  The Government seized documents on

22    electronic devices from CC-1.  Preliminary review of the

23    contents of the notebook recovered from CC-1, which is in

24    Mandarin and English, reflects that CC-1 was in

25    communication with Wang and engaged in extensive tasks at

1  the direction of Kwok, Wang and other co-conspirators since

2  Wang's arrest and detention.

3          For example, as shown in the images below, a task

4  dated April 11, 2023 reflects that Wang directed CC to

5  provide her with information relating to the operations of

6  the Kwok-controlled businesses.  And then there's an image.

7          It says checklist April 11, 2023, Yvette wants a,

8  and then there is characters that are Mandarin I assume,

9  CC's notebook entries similarly reflect information

10  requested by boss and what appears to be a detailed tracking

11  of finances and other operations of various fraud

12  instrumentalities.

13          MR. BASSETT:  Yeah.

14          THE COURT:  And then it goes on about as to the --

15  as relevant to the 7.1 million G Club checks in the P.O.

16  box, a notebook entry dated April 18, 2023 references

17  locating Employee-1, i.e., a G Club's employee who had

18  traveled to the UAE in 2023.  See super at 25.  Employee-1

19  was in physical -- was in possession of a physical key to

20  the P.O. box.  The notebook entry shown below in a redacted

21  form reads in sum and substance and as in formally

22  translated.

23          So I'm looking at an image that has mostly

24  Mandarin characters I believe, but in English the word

25  mailbox, right?  That's what I'm looking at?

1          MR. BASSETT:  That's correct, Your Honor.

2          THE COURT:  And then it says Employee-1 have HR,

3    i.e., Human Resources locate.  Tell HR to locate Employee-1,

4    get the check in the N.Y. mailbox.  HR to locate Employee-1.

5    Cherry Blossom authorized Employee-1 to give the check to

6    3C, i.e., 3 Columbus Circle where HCHK offices are located.

7          MR. BASSETT:  That's right.

8          And that next -- that next line is kind of the

9    critical one that I --

10          THE COURT:  From additional evidence the

11    Government has collected it is clear that Wang instructed

12    CC-1 to secure the checks located in the N.Y. mailbox, i.e.,

13    the G Club's P.O. box in Manhattan.

14          MR. BASSETT:  And the point there being, Your

15    Honor, this is while we were in the midst of our obviously,

16    you know, well-reasoned investigation of G Club.  Obviously

17    we were pursuing these documents because we wanted to

18    explore exactly this type of connection and get information

19    regarding G Club's assets, the exact types of things that

20    are being talked about in this indictment.

21          To the extent that G Clubs had money in an

22    account, checks in a mailbox, all these types of things,

23    obviously, that's why we were not only pursuing our

24    investigation under 2004 of G Club, but we were trying to do

25    so as quickly as possible to make sure that information

1    wouldn't go stale.

2          And the entire time we are being told we're not

3    going to give you the documents.  We're so offended you

4    would suggest that there's a connection between G Club and

5    the debtor.  We're just -- we're not going to cooperate.

6    But now an independent manager's going to be appointed.

7          The entire time we were getting this constant

8    runaround and delay it now comes to light, based on the

9    Government's very detailed allegations in the papers that

10   it's filed in the criminal case to seek Ms. Wang's further

11   confinement, that things were happening in the background.

12   G Club's assets were potentially being dissipated, all while

13   we were trying to get these documents.

14         So I don't think I need to really explain why at

15   this juncture the Trustee does not have an appetite for a

16   further 60 days.

17         THE COURT:  This was the brief that was submitted

18   by the Government at a continued bail hearing for Ms. Wang,

19   is that correct?

20         MR. BASSETT:  Yeah.  She sought to be released and

21   the Government opposed it.  This is --

22         THE COURT:  And what did the Court do?

23         MR. BASSETT:  No ruling yet.

24         THE COURT:  No ruling on whether she is -- can be

25   released?  This pretrial release.  So she wants to be

1  released from pretrial detaining, is that right?

2          MR. BASSETT:  That's correct.  As far as we

3  understand, there has been -- there has been no ruling.

4          And obviously we're dealing in a world of

5  allegations.  We're not -- I think that's part of the

6  problem.  It's the idea that in order to obtain discovery we

7  first need to prove a connection or prove something.  It's

8  completely backwards.

9          It's like saying in order to get discovery in a

10  litigation you have to file your complaint and win and then

11  you get discovery.  That's completely backwards.  I mean,

12  there was a mountain of credible allegations pointing to G

13  Club's being a mere instrumentality of the debtor and

14  certainly have an extensive connection to him and the fraud

15  he is alleged to have engaged in based on the criminal case

16  in New York.

17          So there's -- if there was ever an entity within

18  this orbit of shell companies of Mr. Kwok's that was ripe

19  for investigation of a 2004 by the Trustee, without limit to

20  particular categories of assets or documents, its G Clubs.

21  And that's what we've been trying to get for six months now.

22          THE COURT:  Okay.  Anything further, Mr. Bassett,

23  at the moment?

24          MR. BASSETT:  No, Your Honor.

25          THE COURT:  Okay.  Thank you.

1    Would you like to respond?

2    MS. FORNOS:  Yes, Your Honor.

3    Because what Mr. Bassett has highlighted I don't -

4    - want to make sure the record is perfectly clear relates to

5    a detention matter that is presently before the Court in the

6    Southern District.  And the Trustee candidly would not have

7    known this, but Friday afternoon her lawyers asked for more

8    time to address all of this because this was new information

9    for them.

10    So I can't comment on the allegations, the

11    criminal allegations that are being made that relate to a

12    defendant.  It's not my place to comment on that.

13    We simply come back with a simple point that the

14    independent manager which has a fiduciary duty to the

15    company is working to produce the documents that we need.

16    I do object to any allegation or aspersion that I

17    somehow in part of discussing this was -- or that G Club was

18    enabling Ms. Wang to do whatever she allegedly was supposed

19    to be doing from -- from prison.

20    In April the management of G Club was no longer in

21    place, period.  FFP is now aware, and as a result of the

22    filing which was just last week, they're going to track down

23    and find out what's going on with the P.O. box.

24    Candidly, Your Honor, that's a matter that G Club

25    needs to take up with the U.S. Government and will likely do

1     so, but this is not an issue for the motion to compel and

2     the time frame that we are asking to comply.  We simply want

3     a reasonable time to continue to produce documents and

4     hopefully moot more hearings on this.

5               THE COURT:  Is there anything further you'd like

6     to add for the record?

7               MS. FORNOS:  Just, Your Honor, that if the Court

8     would like to issue an order for 60 days as of June 6th when

9     I first requested the 60 days, the Court's point was clear,

10    we are certainly amenable to 60 days from June 6th.

11              THE COURT:  Okay.  Thank you.

12              MS. FORNOS:  Thank you.

13              THE COURT:  Anything further, Mr. Bassett?

14              MR. BASSETT:  I don't believe so, Your Honor.

15              THE COURT:  Okay.  Thank you.

16              With regard to the Trustee's motion to compel

17    compliance with Rule 2004 subpoena ECF No. 1805 as it

18    relates to G Club Operations, LLC, and with regard to the

19    objection to the motion to compel and related relief filed

20    on behalf of G Club Operations, LLC, and the reply filed by

21    the Chapter 11 Trustee, the Court has heard argument on

22    these -- on the underlying motion, 1805, at a prior hearing,

23    and now has reviewed the documents filed that the Court

24    ordered the parties to file after that hearing on June 6th,

25    and now has looked at some of the information that was filed

1    by the Trustee on Friday, June 23rd, and -- the Court will

2    take the matter under advisement, although it is likely that

3    a ruling will be issued before the end of this week.

4            Okay.  So that concludes 1805 for this afternoon.

5            MR. BASSETT:  Thank you, Your Honor.

6            MS. FORNOS:  Thank you, Your Honor.

7            THE COURT:  Thank you.

8            So with regard to the other matters on at 11 a.m.,

9    Trustee Despins, are we at a position to talk about a

10   consent order or are we moving toward the sale?  How are we

11   proceeding?

12           MR. DESPINS:  If we could, with your permission,

13   proceed with the interpleader --

14           THE COURT:  Yes.

15           MR. DESPINS:  -- I believe that counsel for the

16   escrow agent has filed on the docket a proposed order.  I

17   don't know the docket number.

18           MS. WILLIAMS:  Good afternoon, Your Honor.

19   Latonia Williams, for the record again, of Shipman &

20   Goodwin, LLP on behalf of U.S. Bank as escrow agent.

21           Yes, that is correct.  So the parties have all

22   agreed to the consent order that has been entered on the

23   docket as docket item number 38.

24           THE COURT:  I see.  I haven't opened it yet, but I

25   see that it was filed.  Thank you.  I'll take a look at it.

1          (Pause)

2          THE COURT:  Okay.  It says it's a consent order,

3    but I don't see anybody consenting.  I mean, I want to know

4    who's consenting to this order either by saying

5    affirmatively that the parties consent -- oh, I'm sorry,

6    it's at the -- it didn't say -- here it is, page 2.

7          And with the consent of the parties to this

8    adversary proceeding namely the escrow agent HK, the

9    Committee and the Trustee.

10          Now, what's HK?  Who's HK?  Are we talking -- it's

11    just HK Funds Investments (USA), not Ms. Guo, correct?

12          Oh, it's not -- I don't think that's Attorney

13    Williams' answer -- question to answer.

14          MR. KINDSETH:  Good afternoon, Your Honor.

15          THE COURT:  That's the whole point.  They're in

16    the middle.

17          MR. KINDSETH:  Good afternoon, Your Honor.

18    Stephen Kindseth, for the record, for HK USA and Ms. Guo.

19          That is correct.  It is HK that is the party to

20    the escrow agreement that is consenting to the relief set

21    forth in this order.

22          THE COURT:  I'm looking at some documents so that

23    I make sure I understand this.

24          (Pause)

25          THE COURT:  So if this stipulated order, Trustee

1   Despins, is -- or consent order is entered, then this

2   adversary proceeding should be closed, correct?  Why would

3   it remain open?

4         The funds are going to be -- going to be turned

5   over to you to be held in a trustee account.  So what would

6   be the purpose of keeping this adversary proceeding open?

7         MR. DESPINS:  Because it is the view of the -- of

8   Mei Guo and HK that they're doing this as an accommodation

9   to the Trustee to invest the funds, but they're not

10  conceding that we can have the funds, and they want to rely

11  on the terms of the escrow agreement to argue the point.  So

12  that issue remains --

13        THE COURT:  Well, Mei Guo isn't a party in this

14  adversary proceeding, nor is she a party to the escrow

15  agreement.

16        MR. DESPINS:  Okay.  Well, again, it's hard for me

17  to explain their position, but their position is that HK

18  International, although we think we should be controlling

19  it, but their point is that they want to maintain that the

20  escrow agreement continues to govern --

21        THE COURT:  Well, they've done that through an

22  appeal of the second counterclaim, haven't they?

23        MR. DESPINS:  You know what?  I shouldn't be

24  arguing this because I agree with you.

25        THE COURT:  No.  But I don't understand why this

1   adversary proceeding needs to be open, Mr. Kindseth.

2           If you're agreeing to this consent order, then why

3   does this adversary proceeding need to remain open?  It's an

4   interpleader action.  It's been resolved by the -- by the

5   monies being removed from escrow and being placed in the

6   possession and control of the Trustee.

7           MR. KINDSETH:  Your Honor, an interpleading --

8   interpleader action actually has two phases.

9           The first phase is with respect to the escrow

10  party who seeks to complete that party's obligations by

11  depositing those funds with the Registry of the Court.

12          THE COURT:  But that's not happening.

13          MR. KINDSETH:  Actually, correct.

14          But the way we're trying to resolve this, and if

15  we can't resolve it this way, so be it, we won't resolve it

16  this way --

17          THE COURT:  I didn't say you couldn't.  I'm asking

18  a question.

19          MR. KINDSETH:  Okay.

20          THE COURT:  Why does this adversary proceeding

21  need to remain open?

22          MR. KINDSETH:  For the second phase, Your Honor.

23          THE COURT:  What second phase?

24          MR. KINDSETH:  All interpleader actions have two

25  phases.

1              The first is with --

2              THE COURT:  Not if they're resolved, they don't.

3              MR. KINDSETH:  Actually, the first phase of the

4      interpleader action is for the escrow agent to deposit the

5      funds with the Registry.

6              THE COURT:  Not --

7              MR. KINDSETH:  What this consent order does, Your

8      Honor, if I may be heard please, what this consent --

9              THE COURT:  You may be heard, Counsel, but I can

10     ask questions.  So you need to be respectful of the Court.

11             So go right ahead.

12             MR. KINDSETH:  I'm trying to answer the question,

13     Your Honor.  And I apologize that I'm not doing so, but I

14     would like to try.

15             An interpleader action inherently has two phases.

16     The first phase is what to do with the escrow agent.  And

17     the second is what to do with the funds.

18             And what we're agreeing, as an accommodation to

19     the Trustee, is to permit the Trustee to have the funds held

20     by the estate and the Trustee and permitting those funds to

21     be invested.

22             And what the consent order provides is that vis-a-

23     vis the Court in the interpleader action it will be treated

24     as though it is in the Registry of the Court and, therefore,

25     our rights as to the second phase of the interpleader action

1    are not being defeated.

2              The second phase of the interpleader is where the

3    parties interplead, meaning assert claims against each other

4    with respect to what happens with those funds.  And, in

5    fact, the Trustee has done that in terms of filing the --

6    his answer and also filing the motion for summary judgment.

7              So the motion for summary judgment is the

8    Trustee's argument as to phase two of the interpleader

9    action as to what should happen with the funds.

10             Our argument in response is going to be that the

11   escrow agreement specifically required that although the

12   Court could enter a judgment with respect to the property

13   of, whether it is property of the estate, the escrow funds.

14             The escrow agreement, which this court authorized

15   and ordered as part of the stipulated order, specifically

16   required that such bankruptcy order shall be final and no

17   longer appealable.

18             And so our argument in phase two in opposition to

19   the Trustee's motion for summary judgment will be that the

20   escrow agreement, as authorized by this court, governs the

21   proceeds in escrow and requires a final and no longer

22   appealable order in order for their disbursement, and so

23   we're simply dealing with by agreement phase one of the

24   interpleader action.

25             And now on an expedited basis I may add the

1    summary judgment motion can be heard.

2            Our brief is due I believe either July 5th or 7th

3    and the hearing is scheduled I believe for July 12th which

4    is the second aspect of the interpleader action.

5            Thank you, Your Honor.

6            THE COURT:  There are many provisions in the

7    stipulated order that relate to the escrow agreement that

8    the HK parties have not abided by as well, Counsel.

9            And when you say we are agreeing, who's we?

10           MR. KINDSETH:  I apologize.  I meant HK.

11           THE COURT:  HK.

12           MR. KINDSETH:  You're right.

13           THE COURT:  Okay.  Thank you.

14           Anything further, Mr. Bassett or Trustee Despins?

15           MR. DESPINS:  Yes, Your Honor.

16           I just want to talk about paragraph 2, that's the

17   paragraph that allows the Trustee to invest the money in

18   treasury securities.

19           There are ghosts, what I refer to as ghosts, in

20   there that we need to fix.  There are references to a term

21   called custodial accounts which is -- was in the prior

22   draft, should not be there again.  And we -- because the new

23   language should be in treasury securities and not in the

24   custodial account, so we need to fix that.

25           And I want to tell Your Honor about the background

1     of this.  It's that we wanted to invest this in treasury

2     securities and deposit the treasury securities in a

3     custodial account at a financial institution.

4          The U.S. Trustee had concerns about that approach

5     and said that their experience is that other trustees or

6     other debtors in possession that have a lot of cash go and

7     buy treasury securities directly from the Treasury so we put

8     that in that order relying on that.  We hope that we can do

9     that.  And apparently you can buy it in traunches of up to

10    $10 million.

11         If we're able to do that, the order will work

12    fine.  If that doesn't work, we'll need to come back to the

13    Court and modify this so that we, in fact, can have a broker

14    buy the securities, transfer it to a custodial account.

15         But hopefully we won't have to deal with that

16    issue because we can buy the treasury securities at a high

17    interest rate directly from the Treasury, which accomplishes

18    our goal of maximizing returns to the estate.  We're talking

19    about potentially a million plus a year here in interest.

20    So I wanted to mention that.

21         So, one, we need to fix, in paragraph 2, the

22    references to custodial account should be removed.  And

23    other than that I think that that -- so we would need to

24    file a supplemental order to reflect those deletions.

25         Other than that I think, Your Honor, we would be

1    done with this.  Thank you.

2              THE COURT:  Attorney Williams?

3              MS. WILLIAMS:  Thank you, Your Honor.  Again for

4    the record, Latonia Williams of Shipman & Goodwin on behalf

5    of U.S. Bank as escrow agent.

6              Your Honor, thank you for indulging all of the

7    parties.  We worked really hard to try to get a consent

8    order together in advance of appearing before Your Honor.

9    And I think because of that there were items that we need to

10   address.  I think that that's something that we can do very

11   quickly.

12             What I would propose is that my office can

13   circulate an amended version of the consent order to all of

14   the parties to the interpleader action.  And hopefully this

15   afternoon we can get any typos or items that we need to

16   clear up cleared up and then submit it again to the Court.

17             And we're happy to do that either in the context

18   of filing another supplemental docket reflecting the consent

19   order on the docket, or if the Court would prefer we can

20   also submit it directly to chambers CC'ing all of the

21   parties on the email, whichever one.

22             MR. DESPINS:  But if I may, I want to make sure

23   that the only issue that's been identified is the use of the

24   term custodial account that should be removed.

25             But are there other issues other than that?

1            MS. WILLIAMS:  Not that I am aware of.

2            MR. DESPINS:  Okay.  Thank you.

3            MS. WILLIAMS:  I think that we did was we filed

4     the document that had been circulated amongst the parties --

5            MR. DESPINS:  Okay.

6            MS. WILLIAMS:  -- and that just was missed in the

7     process probably.

8            MR. DESPINS:  Thank you.

9            THE COURT:  Yeah.  Just give me one moment.  I

10    understood what you said.  Thank you.

11           I'm just -- as you noted, this document was filed

12    while we were in court so I haven't had the opportunity to

13    fully read it and make sure that I understand it fully which

14    is why questions were asked.

15        (Pause)

16           THE COURT:  So this order says that the, and I

17    understand why, that the escrow agent is dismissed from the

18    action.

19           So then who's the plaintiff?  We have two

20    defendants against each other, that's what we're -- that's

21    what this is going to be?

22           MR. DESPINS:  I think so, Your Honor.

23           THE COURT:  All right.  Attorney Williams, if you

24    would please do as you suggest which is submit the revised

25    proposed order to all parties through email or however you'd

1    like to do that.

2            And then since it appears that the changes are

3    very minimal, you don't have to docket the order again.  You

4    can submit it to the courtroom deputy email box, the

5    Bridgeport Courtroom Deputy Email Box which is kind of a

6    generic email address.  And it's on the website somewhere.

7            I'm looking at the courtroom deputy.  Just give me

8    a little help there where it is so that it's easily -- we

9    tried it to make it more prominent, but I don't know if it

10   is or not.

11           MR. DESPINS:  We can provide it, Your Honor.  It

12   shouldn't be a problem.

13           THE COURT:  Okay.

14           MS. WILLIAMS:  Yes.  We'll take care of that, Your

15   Honor.

16           THE COURT:  Okay.  Thank you.

17           Then with regard to the motion to deposit funds

18   into the Registry of the Court and to discharge the

19   plaintiff from the interpleader action, ECF 19, that matter

20   is resolved by consent order which will be substantially in

21   the form of a consent order that was filed on the docket

22   today at ECF No. 38 at 12:09 p.m.

23           The parties will submit a revised consent order in

24   the manner just discussed on the record.  And once that

25   consent order is submitted it will be signed and entered in

1     the adversary proceeding.

2            So that resolves the motion to deposit the funds

3     in to the Registry of the Court, ECF No. 19.

4            So are we now moving on to the sale, Trustee

5     Despins?

6            MR. DESPINS:  Yes, Your Honor.

7            I believe that there is an agreement on an

8     amendment to the proposed order.  And of course, Your Honor,

9     you'll decide how you want to proceed.

10           But the amendment is not too long.  But you may

11    want to -- we haven't -- we haven't docketed that order yet,

12    so you may want to take time to review that and then we

13    reconvene at your convenience.  It would be a much shortened

14    hearing I expect in light of that proposed amendment to the

15    order.

16           THE COURT:  So there's no opposition to the --

17    there's no longer any opposition to the sale?

18           MR. DESPINS:  Well, subject to that modification

19    being made, there would be -- there are two -- four pro se

20    people that have filed objection, but I don't think -- I

21    think they were confused about, you know, I think their

22    thinking is that it's a private sale orchestrated or for the

23    benefit of Mr. Kwok, but of course that's not what's

24    happening.  So those objections would remain outstanding,

25    but I don't believe they would be problematic.

1        But there would still be a need for short

2    testimony to make sure we have a record of good faith, fair

3    market value, et cetera, and that shouldn't be too long.

4    Because it wouldn't be -- there would no longer be the issue

5    of motion to quash a subpoena.  That issue would go away.

6        And we understand that subject to the order being

7    satisfactory to Your Honor that the HK parties would not

8    cross-examine witnesses or oppose the release.

9        I think it's probably important for you to look at

10   the order to make sure you're comfortable with it.

11       THE COURT:  The order that you're going to file

12   that you haven't filed yet?

13       MR. DESPINS:  Yeah.  Correct.  But I think --

14       THE COURT:  When is that going to be filed?

15       MR. DESPINS:  In less than ten minutes, Your

16   Honor.

17       THE COURT:  All right.  Well, then --

18       MR. DESPINS:  Shall we email it to the courtroom

19   deputy, is that the best way, or --

20       THE COURT:  Yes.

21       MR. DESPINS:  Okay.  That will be faster.

22       THE COURT:  The proposed order that was already

23   submitted --

24       MR. DESPINS:  The one attached to the reply?

25       THE COURT:  Right.  -- has extensive findings and

1      conclusions of law, which is fine, but that record's going

2      to need to be made in some way, shape or form.

3              MR. DESPINS:  Yes, Your Honor.  That's why there

4      will be testimony, but we don't expect it to be the same

5      process that if the HK parties opposed.

6              THE COURT:  So how -- I'm going to need to read

7      this order.  So if we take a recess until 2:00 p.m. is that

8      too long for you, Trustee Despins, or is that workable?

9              MR. DESPINS:  I think that's fine, Your Honor.

10             THE COURT:  Okay.  So I'm looking at you and

11     you're saying that probably within the next 10 to 15 minutes

12     the courtroom deputy is going to receive an order in the

13     courtroom deputy box that you'll show me so we can look at

14     it and come back -- before we come back out at 2 p.m.?

15             MR. DESPINS:  Yeah.  It should be five minutes,

16     Your Honor.

17             THE COURT:  Okay.  All right.  Then court is in

18     recess until 2 p.m.

19         (Proceedings recessed at 1:15 p.m.)

20         (Proceedings resumed at 2:24 p.m.)

21             THE COURT:  (Delay in start of audio) the Lady

22     May.

23             And then when we were about to come out, Trustee

24     Despins, I was told there was a second order with other

25     revisions, is that accurate?

1          MR. DESPINS:  That's correct, Your Honor.

2          THE COURT:  Okay.

3          MR. DESPINS:  Did you get a chance --

4          THE COURT:  So paragraph 9 was revised again?

5          MR. DESPINS:  That's correct, Your Honor.

6          THE COURT:  That's the only paragraph that was

7    revised again?

8          MR. DESPINS:  That's correct, Your Honor.

9          If I -- I can take the Court through or the intent

10   of the changes if you --

11         THE COURT:  Yes, please.

12         MR. DESPINS:  Okay.  It was just to make clear

13   that the HK parties rights, if they ever prevail on appeal,

14   final and non-appealable order, will apply to the proceeds

15   of the Lady May but also to estate assets to the extent the

16   proceeds from the Lady May have been used.

17         And before that it used to say that they had or

18   that any claim, interest or encumbrances would apply to the

19   proceeds of the sale and the debtor's estate.  And we

20   modified that to provide that that's only in the event that

21   they get a final, non-appealable order to satisfy their

22   claims.

23         So, for example, if we spend the entire 22

24   million, I guess that will be the net proceeds we would

25   receive, and -- but we have other estate assets, there's no

1     need for professionals to disgorge any funds because there's

2     estate assets to make them whole.

3              Again, to be clear, this only applies if they get

4     a final, non-appealable order that says that they own the

5     Lady May.  So this was --

6              THE COURT:  When you say they?

7              MR. DESPINS:  The HK parties.

8              THE COURT:  Well, isn't the --

9              MR. DESPINS:  HK USA --

10             THE COURT:  HK USA is the only party that's ever

11    asserted that they own the Lady May in this -- in this

12    court.  Isn't it?

13             MR. DESPINS:  I think that's correct, but --

14             THE COURT:  That's what the whole adversary

15    proceeding --

16             MR. DESPINS:  Yes.

17             THE COURT:  -- was about.

18             MR. DESPINS:  No.  You're right.

19             THE COURT:  That's the complaint that started the

20    adversary proceeding in April of 2022, a declaration.  They

21    wanted a declaratory judgment that they owned the Lady May.

22             MR. DESPINS:  That HK USA owned it.

23             THE COURT:  That HK USA, not Mei Guo.

24             MR. DESPINS:  Yeah.  So, again, I'm --

25             THE COURT:  So why is Mei Guo in there?

1           MR. DESPINS:  I'm not in a position to defend Mr.

2    Kindseth's position so I'll let him address this.

3           THE COURT:  Well, are you agreeing to that?

4           MR. DESPINS:  I frankly -- I think Your Honor is

5    correct that Mei Guo is not, has never -- has never argued

6    that she owns the Lady May, so you're probably correct, Your

7    Honor.

8           THE COURT:  Mr. Kindseth?

9           MR. KINDSETH:  Yes.  I don't have the adversary

10   proceeding before me.  I think that --

11          THE COURT:  We can pull it up.

12          MR. KINDSETH:  I think that --

13          THE COURT:  It will take us three seconds.

14          You filed the complaint and it's a declaratory

15   judgment.  I can read you the first paragraph that HK USA

16   owned the Lady May which was filed to stop the relief from

17   stay motion of PAX back in March of 2022.

18          There's no allegation in that complaint that Mei

19   Guo owned the Lady May.

20          So I don't understand why I would enter an order

21   that says that if HK and/or Mei Guo are entitled to receive

22   payment from the proceeds or the debtor, and/or the debtor's

23   estate, to the extent such finally determined -- of such

24   finally determined interest.

25          The only interest that's been sought to be

1    determined in this court, both through your complaint and

2    the counterclaim on which summary judgment was entered, was

3    whether or not HK USA owned the Lady May in connection with

4    your complaint.

5           And in connection with the counterclaim asserted

6    by the Trustee in the first counterclaim was whether or not

7    collateral estoppel would apply to the finding of Justice

8    Ostrager that Mr. Kwok was the beneficial owner of the Lady

9    May.

10          That's it.  There's no mention of Mei Guo in the

11   first counterclaim or in your complaint.

12          So if you two want to talk about that I'm happy to

13   give you a few minutes, but I don't understand why I would

14   enter an order that says what that -- in the middle of

15   paragraph 9 says.

16          I don't know why the HK parties are defined as HK

17   USA and Mei Guo, and/or Mei Guo I should say.  That's what

18   it says.  And/or.  Doesn't even say and.  It says and/or.

19   There's nothing in the record of this case that would

20   support that so I'm not sure why I would enter that language

21   in this order.

22          Do you want a few minutes to discuss it?

23          MR. KINDSETH:  We would not need that.  Thank you

24   for confirming, Your Honor.  We can take Mei Guo out of the

25   proposed language.

1          THE COURT:  Okay.  Thank you.

2          Then that line will say in the event of final and

3     no longer appealable order enters determining that the Lady

4     May and/or its proceeds are property of HK International

5     Funds Investments (USA) Limited, LLC, HK USA.

6          Take and delete together with HK USA, the HK

7     parties, in which case HK USA shall be entitled to receive

8     payment from the proceeds and/or the debtor's estate to the

9     extent of such finally determined interests.  And then again

10    three lines down satisfy HK USA.

11         Does anybody have any issue with that?

12         MR. KINDSETH:  No issue with that.

13         THE COURT:  Okay.  All right.

14         Trustee Despins, you now are going to present

15    evidence in support of the findings of fact and conclusions

16    of law you'd like the Court to make in connection with the

17    sale motion?

18         MR. DESPINS:  Yes.  Mr. Bassett will handle that,

19    Your Honor.

20         THE COURT:  Okay.  Please proceed.

21         MR. BASSETT:  Thank you, Your Honor.

22         So, Your Honor, to preview for the Court the

23    evidence that the Trustee intends to introduce, we have some

24    exhibits which have been filed on the docket as part of a

25    witness and exhibit list at ECF 1930.

1           And then I anticipate that we will have two

2   witnesses who will testify.

3           We will first have Dirk Johnson from Edmiston, the

4   broker, who was retained by the Trustee with the approval of

5   the Court to assist with the sale.  He submitted a

6   declaration along with the sale motion which is also at

7   Exhibit 26 in the witness and exhibit list that I mentioned

8   at ECF 1930.

9           We would propose to have Mr. Johnson adopt his

10  declaration as his direct testimony, obviously subject to

11  any objections that anyone may have.

12          And Mr. Johnson is in the courtroom in order to

13  answer any questions that the Court may have.

14          I don't anticipate that there would be cross-

15  examination, but he also would be available for that as

16  well.

17          And then we would have the Trustee take the stand

18  for some relatively brief testimony as well.

19          That's sort of the roadmap.

20          And I'm happy to start with the -- with the

21  exhibits if that pleases the Court.

22          THE COURT:  Well, I want to make sure that no one

23  has any objection to your proposed process to proceed.

24  Okay?

25          Does anyone have any objection to Attorney

1    Bassett's proposal of how he's going to proceed with

2    evidence in this matter?

3        (No response)

4            THE COURT:  All right.  Hearing no objection, then

5    go right ahead, Attorney Bassett.

6            MR. BASSETT:  Thank you, very much, Your Honor.

7            So as I mentioned the witness and exhibit list

8    that we submitted is at ECF 1930.  Exhibit B to that

9    document is the exhibit list.  I believe the exhibits

10   themselves have also been filed on the docket.  In fact, I

11   am confirming that they have, but -- because the copies that

12   I'm looking at have Bates or have ECF stamps at the top.

13           And the list consists of Exhibits 1 through 28.

14   These exhibits I would say generally fall into three

15   categories.

16           Exhibits 1 through 14 are online internet listings

17   and other documents evidencing Edmiston's marketing efforts

18   for the Lady May demonstrating what they did to attract

19   interest in the sale process, including, as I said, online

20   advertising, their social media posts, et cetera.  Those are

21   Exhibits 1 through 12.  Exhibit 13 is a sample email of the

22   type of outreach that was made to potential bidders.

23   Exhibit 14 is a marketing report prepared by the broker.

24           And then after that we get into what I would call

25   a kind of second bucket or category of documents on the

1    exhibit list.  Beginning with Exhibit 15 through Exhibit 25,

2    these are the letters of intent or bids that the Trustee

3    received from bidders in the sale process.  We have

4    identified them with letters to protect their

5    confidentiality which was agreed upon with them as part of

6    the process.

7            After Exhibit 25, Exhibit 26, as I mentioned

8    previously, is the declaration of Mr. Johnson.

9            And then after that, Your Honor, Exhibits 27 --

10   Exhibits 27 and 28 are the purchase and sale agreement, the

11   final purchase and sale agreement, and the addendum to that

12   agreement respectively.

13           I am happy to talk about any of the exhibits in

14   more detail as the Court would like, but at this stage,

15   absent objection, I would offer Trustee Exhibits 1 through

16   28 into evidence.

17           THE COURT:  Does anyone have any objection to the

18   introduction of Trustee Exhibits 1 through 28 into evidence

19   as full exhibits in connection with the motion to sell the

20   Lady May?

21       (No response)

22           THE COURT:  Hearing nothing, then Exhibits 1

23   through 28 are admitted in full.

24       (Trustee Exhibits 1 through 28 received in evidence as

25   full exhibits)

1            THE COURT:  Now, Mr. Bassett, you're going to have

2    to point me to what you want me to read.  I'm not going to

3    read all 28 of those exhibits.  Okay?

4            MR. BASSETT:  Understood, Your Honor.

5            THE COURT:  All right.

6            And with regard to Mr. Johnson's declaration we'll

7    -- when we take that up we'll make sure that no one wants to

8    cross-examine Mr. Johnson.  Okay?

9            MR. BASSETT:  And with the Court's permission I

10   would actually take that up now.

11           THE COURT:  Okay.

12           MR. BASSETT:  And as I said Mr. Johnson is in the

13   courtroom --

14           THE COURT:  Would Mr. Johnson stand up, please.

15           Okay.  Good afternoon, Mr. Johnson.  Mr. Bassett's

16   going to make some statements about your declaration and I'm

17   going to ask you if you agree with whatever he's saying.

18   Okay?

19           MR. JOHNSON:  Yes, Your Honor.

20           THE COURT:  Okay.  Thank you.

21           Go ahead, Mr. Bassett.

22           MR. BASSETT:  So, Your Honor, we -- I'm trying to

23   figure out, I apologize, the most efficient and best way to

24   proceed.  We had intended on offering the entire declaration

25   into the record which I would propose to have Mr. Johnson

1    adopt as his testimony.

2           I'm happy to summarize for the Court or point the

3    Court to particular parts of it, in addition --

4           THE COURT:  I think you can summarize.  That's

5    fine.

6           MR. BASSETT:  Okay.

7           THE COURT:  Everyone, well, this document, this

8    exhibit has been on the docket.  I do think you can

9    summarize.  I don't think you need to go through every

10   paragraph.

11          MR. BASSETT:  Sure.

12          THE COURT:  I understand when Mr. Johnson was

13   retained, I mean, we went through his qualifications and his

14   experience, and he being a broker based in Newport where the

15   boat has been -- the yacht has been sold so I don't think we

16   need to go through that.  Okay?

17          MR. BASSETT:  Understood.

18          So by way of quick summary, then, you're correct,

19   Your Honor, I won't belabor the experience.

20          But Mr. Johnson is with Edmiston.  He's been there

21   for two and a half years, 15 years of experience in the

22   industry, as described in paragraph 3 of his declaration.

23   He's involved in -- he has been involved in many, many sales

24   of luxury yachts over the course of his lengthy career.

25          As the Court is aware, he was retained in April of

1    2023 by the Trustee to help market and sell the Lady May.

2    The agreed-upon list price at the outset of that engagement

3    for the Lady May was a list price of $26,500,000.

4           And I would proffer that Mr. Johnson would testify

5    that there is a strategy in setting a sale price, which is

6    to set a price that you hope will be obviously higher than

7    what you expect to get in order to, you know, follow the

8    concept of if you don't ask you don't receive.

9           Since Mr. Johnson was retained by the Trustee, he

10   immediately embarked upon a marketing process.  On the

11   Trustee's behalf, consistent with the practices that he

12   follows in the industry, he began reaching out to potential

13   buyers, both within his own network of people that he knows

14   from his extensive experience in the industry and working

15   with people and selling yachts in the past, as well as

16   reaching out to other brokers in the industry.

17          And then also engaging in an online advertising

18   and marketing campaign, as well as a print advertising and

19   marketing campaign, and that's where I would refer the Court

20   to those exhibits 1 through 12 on the exhibit list that were

21   already admitted into evidence.  These are examples of the

22   types of marketing efforts that Mr. Johnson engaged in.

23          And those marketing efforts are described in a bit

24   more detail in narrative fashion in paragraph 7 of his

25   declaration.

1        In addition to those marketing efforts, as I said,

2    he emailed many people in his industry of -- in his network

3    of industry brokers.

4        And ultimately the distributions that Edmiston has

5    for marketing purposes for the yacht were sent to

6    approximately 1850 brokers in the yacht industry.

7        As I said it was also -- the yacht was also listed

8    online at websites that are used to market property such as

9    the Lady May.

10        In terms of other marketing, Edmiston is the title

11    sponsor of the London Heliport.  He used that platform to

12    market the Lady May to potential buyers.  Also did marketing

13    within private aviation terminals that are frequented by the

14    people who have the means to potentially buy a yacht as the

15    Lady May.

16        In paragraph 11, and thereafter as Mr. Johnson

17    would testify there was initially a good amount of interest

18    in the Lady May.  There were a handful of potential buyers

19    who requested to be shown the property and, in fact, upon

20    request, were shown the yacht.

21        After that, by May 20th, that's when the Trustee

22    and Mr. Johnson began receiving actual bids.  At that time,

23    they received five potential bids with purchase prices of --

24    sorry, they received at that point five offers for the Lady

25    May with proposed purchase prices ranging from 18 million to

1    20 million.

2              In response to that, Edmiston at the Trustee's

3    direction countered those bids at $23 million.  In response

4    to that counter, one of the initial bidders increased its

5    bid to 20 million while the others did not increase their

6    offer.

7              After that what Mr. Johnson would say is that he

8    told the Trustee that he did not think a prolonged marketing

9    process, given the unique nature of this particular market,

10   would be helpful and he recommended and in consultation with

11   the Trustee decided to set a deadline of Tuesday, May 30th

12   at 5 p.m. for interested parties to submit best and final

13   bids.

14             That was communicated to these potential bidders

15   as well as other parties who did not previously make a bid

16   but had expressed interest in the Lady May.

17             That Tuesday, May 30th deadline came.  And at that

18   time the Trustee received five bids.

19             I would note that, as Mr. Johnson testifies in his

20   declaration, all of these interested bidders who were

21   informed of the May 30th deadline were given very clear

22   parameters about what the bids would have to look like and

23   what, you know, what qualifications they would have to meet

24   in order to be deemed acceptable.

25             The minimum purchase price, for example, was $20

1    million.  There was -- there was a requirement with respect

2    to a 20 percent deposit within 48 hours of the bid being

3    selected as the winning bid.

4            Also importantly there was a form purchase

5    agreement that the Trustee prepared that had to be used for

6    the basis for all the bids.  And to the extent there were

7    any modifications those had to be provided in blackline.

8            And also importantly there was a modification to

9    what would be a more typical requirement in the industry

10   that would allow a buyer to walk away following a survey of

11   the yacht after purchase.  The Trustee wanted that tweaked

12   to limit the buyer's rights in that regard.

13           So after that email went out with all the those

14   requirements and instructions, five bids, this is paragraph

15   15 of the declaration, were ultimately received.  Three of

16   these five bids exceeded the $20 million minimum.  Two were

17   below that.

18           It's important to note that during this what I

19   would call the second round of bidding two bidders that were

20   not initial bidders submitted bids, so two other people.

21           But then also not all bidders that participated in

22   the initial round were still interested and submitted a

23   further bid by the May 30th deadline so some of those

24   initial parties had dropped off already.

25           For example, as Mr. Johnson would testify, one of

1    the prior bidders who initially had submitted a bid for 20

2    million said he was not interested in bidding further

3    because he did not want to participate in a competitive

4    bidding process.

5            Once these bids were received on May 30th, the

6    Trustee then himself personally engaged in further

7    discussions with each of these bidders and employed a

8    process that the Trustee believed was designed to leverage

9    the most he could out of each potential bidder and hopefully

10   generate the best possible sale price.

11           One of the bidders who had submitted a bid by the

12   May 30th deadline ultimately increased his bid as a result

13   of this process deployed by the Trustee to $24 million

14   thereby becoming the highest bidder.  That individual who is

15   Mr. Chambers, the proposed buyer, was ultimately selected as

16   the winning bidder.

17           The other bidders who were in the process at that

18   point, the other two second highest bidders, were notified

19   and given an opportunity to submit a further better bid and

20   they both declined to do so.

21           Mr. Johnson further testifies, this gets into

22   paragraph 17 of his declaration and thereafter, that he

23   believes the proposed sale to the buyer is the highest -- is

24   for the highest and best bid for the Lady May, that is the

25   product of an arm's-length bidding and negotiation process,

1    and that he believes the buyer has proceeded in good faith

2    during the entirety of the bidding and negotiation process.

3          He further testifies in summary that he believes

4    the purchase price offered by the buyer pursuant to the PSA

5    is the best available price for the Lady May.

6          He also further testifies that he does not believe

7    that implementing formal bidding procedures and running a

8    public auction process would have increased the price, but

9    rather would have risked losing the transaction with the

10   buyer and undermining the momentum that had been established

11   in the process to date.

12         There's further testimony in paragraphs 19 and 20

13   about why he does not think a formal auction process would

14   have been beneficial, which is consistent with the remarks

15   that are already made in that regard.

16         So, again, Your Honor, that is I think perhaps a

17   more lengthy summary than you had envisioned of the

18   testimony, but that is still indeed just a summary.

19         And, again, we would -- we would propose to have

20   Mr. Johnson adopt the entirety of this declaration as his

21   direct testimony.  Again, obviously subject to questions

22   that the Court may have and subject to any cross-

23   examination.

24         THE COURT:  Okay.  Thank you.

25         Mr. Johnson, were you able to hear Attorney

1    Bassett?

2            MR. JOHNSON:  Yes, Your Honor.

3            THE COURT:  Okay.  Is there anything that Attorney

4    Bassett said that you disagree with?  Or is there anything

5    you'd like to add?

6            MR. JOHNSON:  No, Your Honor.

7            THE COURT:  Okay.  Thank you.

8            You can have a seat, sir.

9            Does anyone wish to cross-examine Mr. Johnson?

10       (No response)

11           THE COURT:  All right.  Hearing no response to

12   cross-examination, I agree that the declaration can be

13   adopted as Mr. Johnson's direct testimony.

14           I have no questions with regard to Mr. Johnson's

15   direct testimony.  Thank you.

16           MR. BASSETT:  Thank you, Your Honor.

17           At this time, the Trustee would call his next

18   witness which is the Trustee himself.

19           THE COURT:  Go right ahead.

20       (The witness is sworn.)

21

22           THE COURTROOM DEPUTY:  Please be seated.

23           State your name and address for the record.

24           THE WITNESS:  Luc Despins, 200 Park Avenue, New

25   York, New York.

DIRECT EXAMINATION

BY MR. BASSETT:

Q    Mr. Despins, in addition to serving as the Chapter 11
Trustee, you are a partner in the financial restructuring
group of Paul Hastings, is that correct?

A    That's correct.

Q    How many years have you been practicing bankruptcy law?

A    37 years.

Q    And during those 37 years of experience have you been
involved in overseeing sale processes of Chapter 11 estates
in any capacity?

A    Yes, I have.  On dozens of occasions.

Q    And what kinds of assets?

A    All sorts of assets.  Pipelines, entire companies, such
as Fruit of the Loom, software companies or software
products, leases for retail properties.  There's many --
there are many others that I can't recall, but, you know.

Q    And what types of roles have you personally performed
with respect to those types of asset sales?

A    I was either debtor's counsel or committee counsel that
was working jointly with the debtor selling the asset.

Q    And you've reviewed the declaration of Mr. Johnson,
correct?

A    I have.

Q    Is there anything in that declaration that you disagree

1   with?

2   A    No.

3   Q    Is what he said about the sale and marketing process

4   that occurred with respect to the Lady May, is that all

5   accurate based on your involvement in the process?

6   A    It is.

7   Q    And, Mr. Despins, can you just describe for the Court

8   what -- how would you describe your involvement in that

9   process in terms of your coordination with Mr. Johnson?

10  A    Well, obviously I relied primarily, because I'm not a

11  yacht expert, I rely on the expertise of Edmiston and Mr.

12  Johnson.

13       But when it comes to the actual bidding I wanted

14  to be hands-on and leading that process.

15  Q    And based on that process and the way it was described

16  in Mr. Johnson's declaration, and my summary of that, in

17  your view, does the proposed sale to the buyer that resulted

18  from that process maximize value for this Chapter 11 estate?

19  A    Absolutely.  This really represents the fair market

20  value of this asset.  It's been tested not only in the first

21  round, but the second round.

22       But even after the purchase price reduction I

23  contacted the sole remaining bidder that could have been

24  interested, that was the runner-up, to say you understand

25  that you can now buy this asset for more than 23,150,000 and

1    they declined.

2            So the point is that there's been several market

3    tests.  And the fact that there's nobody at the hearing here

4    today saying I want to bid more given the marketing process

5    that was used, you know, tells us that this is the value of

6    this asset.

7    Q    And stated differently, would you say that in your view

8    the proposed sale to the buyer represents the highest and

9    best offer for the property?

10   A    Absolutely.

11   Q    Based on your interactions with the buyer and his

12   representatives throughout the process do you believe the

13   buyer has acted in good faith?

14   A    Yes, he has.

15   Q    Do you believe that you and your representatives

16   throughout the process have acted in good faith?

17   A    Yes, I do.

18   Q    Are you aware of any bidding collusion or any other

19   conduct like that that may taint the process that has

20   occurred?

21   A    None at all.

22   Q    Do you have any understanding of whether or not the

23   buyer is an insider, affiliative, or otherwise connected to

24   the debtor?

25   A    He is not.  But more than that, we've had him make a

1    representation in the purchase agreement that he was not

2    connected in any way to Mr. Kwok.

3    Q    So as Mr. Johnson testified the buyer ultimately, after

4    the submission of bids on May 30th, agreed to pay $24

5    million for the yacht.  But then that price was later

6    reduced, right?

7    A    That's correct.

8    Q    So what happened?

9    A    Well, the purchase agreement contemplated a survey

10   process.  We knew this, had mentioned this to the Court in

11   status conferences before.

12        It's like buying a house.  When there's an

13   inspection there's a risk involved in that.

14        And we negotiated in the purchase and sale

15   agreement a provision that basically the price could only be

16   reduced if there was a certification by the surveyor that

17   there were defects with respect to the systems or the

18   machinery of the yacht.

19        And, in fact, what happened is that there was a

20   survey.  A reputable firm from Florida, you know, handled

21   the survey.

22        Because I did not want to take their word for it,

23   we -- I've asked our expert, Mr. Dexter White, to shadow

24   their work, to be there on the yacht when they did the sea

25   trial.  But also to follow what they were doing and to

1   verify whether any defects they would identify were real.

2   And, in fact, he did, and reported all this to me.

3   Q    So how ultimately was the issue resolved as it relates

4   to these defects or other items that the buyer identified

5   following the survey?

6   A    Yeah.  The survey identified, you know, four main

7   items, issues with the yacht.

8        And not to get too technical but the first one was

9   the black water processing system.  That was defective,

10  really defective.

11       The second one was the electrical converter

12  system.  This is a European made yacht, operates on a

13  European current.  Must be converted to U.S. current.  And

14  so there is a machinery to do that.  It's called a -- I

15  forget the exact term, but it's a converter, and that

16  converter apparently had been exposed to salt water and was

17  not operating correctly.  So that was the second item.

18       The third item were the generators.  I guess the

19  way to look at is like a battery.  But those had been used

20  extensively, probably because of the first problem, meaning

21  that there was an inability to rely on current that you can

22  use at the dock.  And the practical effect of that is that

23  the generator had a very limited time life.  And so that's

24  the third issue.

25       And the fourth issue was the fact that this yacht

1    was operating on Windows XP.  And you might think, well,

2    let's go to Office Depot and get a new software.  But I

3    learned that you can't just change the software.  You need

4    to change the -- a lot of the programing and that allows you

5    to download.

6         Because Windows XP, by the way, is very old and

7    Microsoft does not provide updates to that, you cannot

8    download all the maps and all the programs you need to

9    operate this yacht along the U.S. coastline.  And basically

10   you needed to replace that.  And so it was not like a 300 or

11   $2,000 job.  It's something like, just on that item alone,

12   was between 25 and 50,000 to replace.

13   Q    So did the buyer make a demand for how much he thought

14   it would cost to fix these issues and, therefore, how much

15   he wanted to reduce the purchase price by?

16   A    Yes.  The initial demand was 2.5 million.

17   Q    Did you do anything to try to get an understanding for

18   your benefit of what -- as to what you think the, you know,

19   appropriate cost of fixing those issues would be?

20   A    Yes.  I had extensive discussions with Mr. White, our

21   expert, who concluded that, you know, the range of costs for

22   all these issues would be in the 750 to $850,000 range.

23        But I think it's important to point out that the

24   way this works in the purchase agreement, if the buyer

25   identifies or if the survey identifies a defect, at that

1    point the buyer can walk and that really reverses the

2    leverage that I have.

3            Because, you know, the brokers were very specific

4    about this.  They said if the buyer walks based on a defect

5    in the survey this boat will be or this yacht will be

6    considered toxic in the marketplace and it will take you

7    months to sell it and you'll never get more than $20 million

8    because the buyer is a well-known person in the industry.

9    He owns several yachts.  Good for him.  And a seal of

10   approval from him is very valuable, but a reject from him

11   would be, in the words of the brokers, would be deadly to

12   our process.

13   Q    You referred to this party in your answer, to Mr.

14   White, who you I think characterized as your expert.  Can

15   you tell the Court more about who Mr. White is?

16   A    I think the Court may be familiar.  He's with a company

17   called I think EOS.  We retained them to -- when there were

18   repair -- we had established a repair reserve.  Initially

19   retained by PAX.  Then he became our expert.  So he has been

20   on the yacht several times before in the context of looking

21   at establishing a repair reserve and I decided to use him

22   for this process because he was already very familiar with

23   the yacht.

24   Q    So after talking to him and, you know, getting from him

25   his estimate of what these repairs would cost, did you then

1    go, try to negotiate resolution with the buyer?

2    A     Yes, I did.

3    Q     And what happened?

4    A     Well, this is where he made the demand for 2.5 million

5    and I said that's not reasonable.  So we had a back-and-

6    forth over that.  And I initially offered 750 which he

7    rejected.  And then we resolved it at 850.  Which, you know,

8    I, to be honest, this is like it's my own money.  I felt

9    devastated about that.  But it -- that was the -- it was

10   that in closing the deal or rolling the dice with other

11   bidders that were bidding in the 16, 17 million dollar

12   range.

13          And also we have to remember that the cost of this

14   toy is ridiculous.  We have to pay the crew.  We have to pay

15   docking fees.

16          And so the -- so it was painful to accept that

17   reduction, but that was the best way to maximize the estate

18   in my judgment.

19   Q     And now this, the purchase and sale agreement with the

20   buyer, does that have a date by which the transaction must

21   close?

22   A     Yeah.  June 30th.

23   Q     What's the -- what do you understand the reason for

24   that date is?

25   A     Because the buyer wants to use the boat during the July

1    4th holiday.  I mean, he had this whole plan of bringing

2    another yacht of his back from Italy to the U.S. but he

3    changed that based on this purchase.

4              And as recent as this morning I talked to his

5    counsel and the June 30th date is a real date that they

6    insist on.

7    Q    I think those were the specific questions that I have

8    for you.

9              But before I conclude is, as we're asking the

10   Court to approve the sale today, is there anything else that

11   I've omitted that you think the Court should know?

12   A    No.  I would say generally that I think this is really

13   the best price that could be obtained.

14             The assessments I had gotten from other brokers

15   and this broker about what this could sell for were in the

16   low 20s, $21,000 million.  And I said I'm rejecting that.

17   Let me do our bankruptcy magic and we'll create value.  And

18   they laughed at me and said, no, it's going to sell for 21-

19   22.  So I'm very happy with the result.

20             But, you know, I think that this is really the

21   best value for this.  And I believe that we would have heard

22   because the whole marketplace knows about this purchase.

23   There are yacht publications.

24             And actually Mr. Chambers, the buyer, told me that

25   he was very upset that his name was mentioned.  I said,

1    well, it's a court process, we need to identify your name as

2    the purchaser.

3            But apparently his name was plastered in all these

4    yacht publications, so everyone knows about this

5    transaction.  And so, therefore, the market knows that this

6    is being sold today if the Court approves it for 21, sorry,

7    23,150.

8            So I derive a lot of comfort from that that this

9    is the best value out there.

10           MR. BASSETT:  No further questions, Your Honor.

11           THE COURT:  Thank you.

12           So as part of this deal, Mr. Despins, the motion

13   to quash is resolved as well?

14           THE WITNESS:  That's correct, Your Honor.

15           THE COURT:  Okay.  And that is because the

16   objectors are withdrawing their objection to the sale?

17           THE WITNESS:  Subject to --

18           THE COURT:  I'm sorry.  Let me be clear about

19   that.

20           There were four written objections, three in the

21   form of a letter.  I'm not talking about those objections.

22           I'm talking about objections of the HK USA party.

23   And I don't recall right now, I'd have to look back, whether

24   Ms. Guo also filed an objection.

25           But the motions to quash that were also scheduled

1    for hearing today, my read of that is that there was

2    discovery served on you in connection with the sale process,

3    that was served on you by HK USA and maybe Ms. Guo.  I don't

4    remember.  You'd have to enlighten me.

5            But those issues are resolved?  The Court doesn't

6    have to address that?

7            THE WITNESS:  That's correct, Your Honor.

8            THE COURT:  And the -- and so the objections that

9    were -- the only objection I know of was, other than the

10   letters that I just spoke about that were submitted by

11   parties and filed on the docket, was by -- was on behalf of

12   Ms. Guo and HK International I believe.  I think it's ECF

13   1939.

14           So that's resolved?  That's going to be withdrawn,

15   Mr. Kindseth, that objection?

16           MR. KINDSETH:  Based on the agreement to include

17   the revisions to the sale order, we will withdraw our

18   objection.  And we're withdrawing the subpoenas.  So those

19   have been resolved based upon the revisions to the sale

20   order.

21           THE COURT:  All right.  So the motion to quash

22   will become moot assuming the sale is approved.  But we

23   haven't gotten there yet, but I want to make sure I'm not --

24   I'm understanding this clearly.

25           All right.  I don't have any further questions,

1    Trustee Despins.

2            Does anyone wish to cross-examine Trustee Despins?

3        (No response)

4            THE COURT:  Okay.  Hearing nothing, then you may

5    step down.

6            THE WITNESS:  Thank you.

7            THE COURT:  Thank you.

8        (Witness excused)

9            THE COURT:  Mr. Bassett?

10           MR. BASSETT:  Your Honor, that will conclude the

11   Trustee's presentation of evidence in support of the sale

12   motion.  At this time I'm happy to proceed with some brief

13   closing remarks.

14           THE COURT:  Let me just make sure I don't have any

15   other questions.  I think I do not, but I'd like to take a

16   moment to make sure.

17           MR. BASSETT:  Of course.

18       (Pause)

19           THE COURT:  Go right ahead, Mr. Bassett.

20           MR. BASSETT:  Thank you, Your Honor.

21           So just briefly by way of closing I think the

22   evidence that has been presented, the 28 exhibits that have

23   been moved into the record, the declaration of Mr. Johnson,

24   the broker, and the testimony by the Trustee, as well as

25   the, you know, the final purchase and sale agreement itself,

1   I think all of those strongly support a finding by this

2   court that this sale is the product of a robust process run

3   by the Trustee, with the assistance of experienced

4   professionals, including the broker and Mr. White, the

5   marketing process occurred according to industry standards

6   and consistent with the unique nature of this particular

7   market for this particular asset as described by Mr. Johnson

8   in his declaration based on his years of experience.

9          Ultimately the sale process has culminated in a

10  sale -- culminated in a sale as of May 30th for $24 million,

11  which in the eyes of the broker and the Trustee is a

12  resounding success.

13         As Mr. Despins -- as the Trustee testified in

14  detail that $24 million was of course thereafter reduced by

15  $150,000, that reduction I'll submit, based on the record

16  before the Court, was appropriate, was in the best interest

17  of the estate.  That type of negotiation post closing

18  following a, sorry, not post closing but following a survey

19  is something that happens routinely.

20         And in this case the Trustee with the assistance

21  of Mr. White resolved that situation in a way that was

22  beneficial to the estate and preserved for the estate this

23  value-maximizing transaction.

24         I would like to note that I think it speaks

25  volumes that there, other than the few pro se objections,

1    which I will touch on, there are no other pending objections

2    by any party in interest to this sale.  The sale has the

3    full support of some of the largest constituencies with the

4    largest economic stakes in these cases, namely PAX and the

5    committee.

6           So I think, Your Honor, based on the absence of

7    any objection, based on the robust record that the Trustee

8    has presented today, we would submit that the sale should be

9    approved pursuant to Section 363 of the Bankruptcy Code.

10           And we believe that all of the findings and the

11    provisions of the proposed order are both supported by the

12    record that has been established based on today's evidence

13    and are otherwise appropriate under the Bankruptcy Code and

14    the Bankruptcy Rules, we would ask that the sale among other

15    things be free and clear under Section 363 of the Bankruptcy

16    Code, obviously subject to the reservation of rights

17    language that has been included in the proposed order with

18    respect to the proceeds of the sale that was discussed with

19    Mr. Kindseth.

20           We also believe the buyer should be entitled to

21    the protections of Section 363(m) of the Bankruptcy Code.

22    The testimony supported a finding that the buyer acted in

23    good faith.

24           We also request as part of our proposed order that

25    the 5 percent fee to the broker be approved.  I think it is

1    clear from Mr. Johnson's testimony and from the Trustee's

2    that he added substantial value and played an integral role

3    in this process.

4           We would further ask that -- there was some

5    reference in some of the papers to Local Rule 6004-2.  To

6    the extent, and we put this in our motion, but to the extent

7    that that rule could be read to suggest that there needs to

8    be a separate formal appraisal accompanying a sale motion,

9    we would request a waiver of that because here the process

10   itself, as demonstrated by the testimony of the Trustee and

11   Mr. Johnson and the other evidence demonstrates the fair

12   market value of the yacht.

13          Finally, Your Honor, we would request a waiver of

14   the stay under Bankruptcy Rule 6004(h) which would

15   ordinarily apply for 14 days.

16          Here there has been testimony by the Trustee of

17   the need to close by June 30th.  And Mr. Johnson also

18   touches on that in his declaration.

19          So with that, Your Honor, we would respectfully

20   request an order, the proposed formal order that we've

21   submitted, we propose that that be entered approving the

22   sale.

23          Absent any questions, that's all I have by way of

24   closing, Your Honor.

25          THE COURT:  Does anyone else wish to be heard?

1            MR. SARNOFF:  Yes, Your Honor.  May I briefly be

2      heard?  Stuart Sarnoff.

3            THE COURT:  Could you come forward please so we

4      can hear you?

5            MR. SARNOFF:  Sure.  Thank you.  Stuart Sarnoff,

6      O'Melveny & Myers, on behalf of Creditor PAX.

7            Mr. Bassett represented that, you know, we did not

8      object and, indeed, endorsed this.  And I just wanted to put

9      on the record that PAX has been through the sale materials

10      and all of the exhibits and, indeed, does support this sale.

11            And we've been waiting a long time for assets to

12      come into the estate.  And as the largest creditor do

13      support the sale at this price.

14            THE COURT:  Thank you, Attorney Sarnoff.

15            Does anyone else wish to be heard?

16            MS. MAYHEW:  Your Honor, Kristen Mayhew on behalf

17      of the committee.

18            We similarly support the sale.  We've reviewed all

19      of the materials and we believe that it does present the

20      highest and best offer for this -- for the yacht.  And we

21      believe that the sale motion should be approved.

22            THE COURT:  Thank you.

23            MS. MAYHEW:  Thank you.

24            THE COURT:  Does anyone else wish to be heard?

25            MR. BOONE:  Good afternoon, Your Honor.  Robbie

1    Boone on behalf of the buyer.

2            I'd like to confirm that the buyer agrees with all

3    the proposed changes to the order, and would also like to

4    thank Your Honor for accommodating me to appear via Zoom due

5    to the flight cancellations yesterday.

6            THE COURT:  Thank you.  Thank you for appearing.

7    Sorry your flight was cancelled due to the weather.  I

8    understand that's why you needed to appear remotely and that

9    is fine.

10            Attorney Bassett and I believe Trustee Despins

11    both have stated on the record that your client is ready,

12    willing and able to close this transaction, Attorney Boone.

13    Is that correct?

14            MR. BOONE:  Yes, Your Honor.  He is ready,

15    willing, and very much wants to close this as quickly as

16    possible.

17            THE COURT:  And you think it's going to close on

18    the 30th, on June 30th?

19            MR. BOONE:  On the 30th or before if we can

20    arrange all of the pieces that we need to arrange in terms

21    of getting it out of the free-trade zone and all the other

22    points that need to be checked off.

23            But, yes, the 30th would be the absolute latest

24    date that we would close.

25            THE COURT:  Okay.  Thank you.

1         The only -- does anyone else wish to be heard with

2    regard to the order?

3         I just have a couple of things.  I mean, I've

4    looked at this for -- I've looked at this just today as you

5    know.  Okay?

6         So if no one else wishes to be heard, the only

7    thing I would like to do and --

8         Attorney Claiborn, did you wish to be heard?

9         MS. CLAIBORN:  I apologize.  And I before I make

10   my comments, I apologize to all the parties, and I neglected

11   to raise this issue earlier.

12        I just wanted to add to the order a provision that

13   a closing sale statement be filed on the docket within ten

14   days of the closing happening so that the parties --

15        THE COURT:  That's required under our local rules.

16        MS. CLAIBORN:  It's just not part of the actual

17   order and I --

18        THE COURT:  No.

19        MS. CLAIBORN:  -- neglected to raise that issue.

20        THE COURT:  There's a couple of changes so, none

21   of which are substantial or substantive in my opinion, but I

22   would like them to be made to the order.

23        So I hope someone's taking notes, right?

24        MR. BASSETT:  Yes, Your Honor.

25        MR. DESPINS:  Yes, Your Honor.

1    THE COURT:  Okay.  So with regard to the order, on

2    the second page, before the defined term the hearing, does

3    everybody see where I am kind of the middle of the -- of the

4    -- of page 2?

5    All right.  So after where it says and hearing on

6    the motion having been held, do you see that, Counsel, where

7    I am?

8    MR. DESPINS:  Yes.

9    THE COURT:  On page 2?

10    MR. DESPINS:  Yes.

11    MR. BASSETT:  Yes.

12    THE COURT:  Okay.  So I'd like you to add the

13    following language:

14    Having been held on June 27th, 2023, during which

15    the Trustee's Exhibits 1 through 28 and the testimony of Mr.

16    Johnson and the Trustee were admitted into evidence in

17    support of the sale.  Okay?

18    MR. DESPINS:  Yeah.

19    MR. BASSETT:  Yeah.

20    THE COURT:  Does that make sense to you?

21    MR. DESPINS:  Yes, Your Honor.

22    THE COURT:  It does.  Okay.  All right.

23    Then same page, the Court hereby finds that,

24    footnote 4, I have no problem with the first sentence of

25    footnote 4, but I don't want to have the last two sentences

1    of footnote 4 because sometimes the district court finds

2    that confusing.  So that if someone were to appeal, I don't

3    want to have the district court say we have to another

4    hearing to tell me what our findings of fact and conclusions

5    of law.  Okay?

6              MR. DESPINS:  Yes, Your Honor.

7              THE COURT:  Mr. Bassett, we just were going to

8    talk about, but I don't know, think you have, I don't think

9    I let you let, we need to just -- I think we -- it does talk

10   about overruling objections, but I'd like to specifically

11   refer to the objections.

12             You can just say the objections filed to the sale,

13   ECF numbers.  I don't -- you don't need to recite every

14   single person's name.  But, again --

15             MR. BASSETT:  Understood.  And --

16             THE COURT:  -- if this is appealed.

17             MR. BASSETT:  Yes.

18             THE COURT:  -- I want the district court to

19   understand what we're talking about.

20             MR. BASSETT:  Absolutely, Your Honor.  And thank

21   you for reminding me.

22             THE COURT:  Okay.

23             MR. BASSETT:  Because I meant to raise that in my

24   comments and I forgot.

25             So as I understand it, outside of the objection

1   filed by HK USA, and I believe Mei Guo which has been

2   resolved and withdrawn based on the entry of the revised

3   proposed order, I think there are only four other

4   objections.

5           THE COURT:  Correct.  That's all that I've seen.

6           MR. BASSETT:  And I believe, I apologize, I have

7   the name, but I may be missing the ECF docket number for one

8   of them, but I --

9           THE COURT:  I have them all, so.

10          MR. BASSETT:  I have 1947, 1946, 1945, and then

11  there's one more.

12          THE COURT:  Nineteen, thirty-three.

13          MR. BASSETT:  Nineteen, thirty-three.

14          And I believe subject to being corrected by a

15  colleague or the Court that these objections are

16  substantively identical, if not entirely identical, but they

17  -- it's hard, a little bit hard for us to interpret exactly

18  the arguments that are being put forth, but they appear to

19  be some individual creditors who are a little bit confused

20  about the process being run in the motion before the Court.

21          They had taken issue with the idea of Mr. Kwok,

22  himself, personally selling the yacht in a private sale

23  without them first having been compensated for their claims

24  or grievances against Mr. Kwok.

25          Of course we actually -- the Trustee I believe

1    actually reached out one of them and said, look, that's not

2    what's going on here.  And I think there was just some -- it

3    is clear that there was some confusion.

4            But in any event those parties are not here today.

5    I don't think the objections have any merit.

6            Of course this is the Trustee selling the yacht

7    for the benefit of all creditors of the estate, including

8    these creditors to the extent that they have claims and,

9    therefore, we would ask for those objections to be

10   overruled.

11           THE COURT:  I have reviewed the objections that

12   were filed in letter format.  There are four as we just

13   stated:  1933, 1945, 1946 and 1947.  And they are

14   substantially the same.

15           They are asking the Court to not allow a sale by

16   the individual debtor of the yacht until they are

17   compensated for their claims.  None of the parties are here

18   in the court to prosecute their objections.

19           Their objections, while I understand why they feel

20   that they needed to make them, it appears they did not

21   understand that the Trustee is selling the Lady May and not

22   Mr. Kwok and that no funds from the Lady May are going to

23   Mr. Kwok which is what the -- what each of the objections

24   were concerned about.

25           So all of those objections are overruled for the

1    reasons stated on the record.  And I'd like that to -- I'd

2    like that to be stated in the order.

3            And I'd also like the objection filed by Mei Guo

4    and HK International, ECF 1939, to be -- to indicate in the

5    order that that objection is resolved by agreement because

6    of the language added to the order as requested by counsel

7    for HK International Funds and Mei Guo.

8            The change I already made to paragraph 9 stands.

9    We already went through that at the beginning of the

10   hearing.  And I think counsel probably understood that

11   change to paragraph 9.  There's three places in that

12   paragraph in the -- in the redline version that was

13   submitted around 2:10 or something along those lines where

14   that change needs to be made.

15           And then, Trustee Despins, I agree with the U.S.

16   Trustee's Office that there should be a provision made in

17   the order, and you can put it somewhere around -- it looks

18   like paragraph -- you can do whatever -- wherever you think

19   it's appropriate, but it might be appropriate in -- well,

20   let me see for example.  I don't know where it's -- it might

21   be paragraph 22, except that you say that the closing

22   statement will be filed on the docket of the case within ten

23   days after the closing occurs.  Okay?

24           MR. DESPINS:  Yes, Your Honor.

25           THE COURT:  I have no further changes to the

1   order.

2             MR. BASSETT:  Thank you, Your Honor.

3             THE COURT:  All right.  So for all the reasons

4   stated on the record, including in connection with the

5   record of this case and the record of the related adversary

6   proceedings, to the extent that they are relevant to the

7   sale of the Lady May, the motion to sell the Lady May to the

8   highest and best bidder as identified by the Trustee in the

9   proposed order and in testimony and in -- and through

10  counsel who's appeared on behalf of the highest bidder is

11  approved.

12            The motion is granted.  The proposed order with

13  the changes that I've noted on the record will enter.

14            I assume, Attorney Boone, you want that order as

15  soon as possible.

16            So we'll need to -- I mean, I'm sure you can make

17  these changes fairly quickly and we can try to execute the

18  order tonight.

19            MR. DESPINS:  That would be great, Your Honor,

20  because we need to send it to Europe for the closing and all

21  that.  So that would be great.

22            THE COURT:  Well, if you can get those -- well,

23  you made the other changes in a short order so I would

24  assume you can probably make these changes in less than 20

25  minutes.

1          MR. DESPINS:  Yes, Your Honor.

2          THE COURT:  And then submit the order to the

3     courtroom deputy email box again and then the order will

4     enter.  Okay?

5          MR. DESPINS:  Thank you, Your Honor.

6          THE COURT:  I know there was a lot of work that

7     went into this.  I appreciate Mr. Johnson being here today

8     in case anyone did have questions of him.

9          It was a -- it was necessary for you to be here,

10    sir, because we don't know whether anybody would have

11    questions.  And I did review your marketing efforts and all

12    of the exhibits that were submitted in general.  I saw what

13    your firm did.  I saw the letters of intent that were

14    received.

15         I saw your declaration obviously.  We talked about

16    that.

17         I had seen the purchase and sale agreement and

18    then ultimately the addendum, which are all the exhibits

19    that were introduced at today's hearing.

20         So I appreciate the efforts of all the parties

21    involved.

22         And I think that it is clear, I shouldn't say I

23    think, it is clear that the sale of the yacht is in the best

24    interests of the debtor's estate and creditors.

25         And the evidence submitted by the Trustee supports

1    the granting of the motion pursuant to Section 363 and with

2    the protections of 363(m) and the applicable rules, Federal

3    Rules of Bankruptcy Procedure.

4          I know the Trustee has also asked the order to

5    enter under Section 105.  And given the specific facts and

6    circumstances of this case and the record in this case and

7    the related adversary proceedings, the Court will include a

8    reference to Section 105 as a way -- in order to augment the

9    relief that is already set forth in the applicable sections

10   of the Bankruptcy Code under which the sale of the asset has

11   been sought and obtained.

12         Is there anything further we need to do this

13   afternoon?

14         MR. DESPINS:  Not on this matter, Your Honor.

15         THE COURT:  We have a 4 o'clock status conference.

16   I know.  I'm sorry.  I should have said with regard to the

17   motion to sell.

18         MR. DESPINS:  No, Your Honor.  Thank you.

19         THE COURT:  Okay.

20         MR. BASSETT:  Thank you, Your Honor.

21         THE COURT:  All right.  So I'll give you the time

22   to go do that now.  We'll take a recess until 4 o'clock.

23   And then maybe the order will even enter before the recess

24   if the changes can be made in that time frame.  Okay?

25         So thank you, all.

1        Court is in recess until 4:00 p.m.

2        (Court recessed at 3:25 p.m.)

3        I, CHRISTINE FIORE, court-approved transcriber and

4    certified electronic reporter and transcriber, certify that

5    the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9    *Christine Fiore*

10   _____        July 5, 2023

11       Christine Fiore, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2                                 INDEX

3

4                          DIRECT     CROSS

5    WITNESS FOR THE TRUSTEE:

6    Luc A. Despins                    66

7

8    EXHIBITS:                              PAGE

9    1-12   Online internet listings of sale      56

10   13     Sample email to interested parties    56

11   14     Broker marketing report               56

12   15-25  Letters of intent from bidders        56

13   26     Dirk Johnson's declaration            56

14   27     Purchase and sale agreement           56

15   28     Addendum to purchase and sale agreement   56

16

17

18

19

20

21

22

23

24

25