```
              UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF CONNECTICUT
                   BRIDGEPORT DIVISION


In Re                         *    Case No. 22-50073 (JAM)
                              *
HO WAN KWOK and GENEVER       *
 HOLDINGS CORPORATION,        *
                              *
              Debtor.         *

HK INTERNATIONAL FUNDS        *    Adv. Proc No. 22-5003
 INVESTMENTS (USA) LIMITED,   *
                              *
              Plaintiff,      *
     v.                       *
                              *
DESPINS,                      *
                              *
              Defendant.      *

LUC A. DESPINS,               *    Adv. Proc No. 22-5008
 Chapter 11 Trustee,          *
                              *
              Plaintiff,      *
                              *    Bridgeport, Connecticut
     v.                       *    July 18, 2023
                              *
GUO,                          *
                              *
              Defendant.      *
                              *
   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

```
              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JULIE A. MANNING
           UNITED STATES BANKRUPTCY JUDGE
```

```
Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

```
#1917       INTERIM APPLICATION FOR COMPENSATION FOR
            PULLMAN & COMPLY, LLC, CREDITOR COMM
            ATY FEE: $504,742.50 EXPENSES $709.53
#1921       INTERIM APPLICATION FOR COMPENSATION FOR EPIQ
            CORPORATE RESTRUCTURING, LLC, OTHER PROFESSIONAL
            FEE; $178,227.00; EXPENSES $11,673.79
#1893       ORDER REQUIRING GTV MEDIA, INC. SARACA GROUP, INC.
            AND ATTY AARON MITCHELL TO APPEAR AND SHOW CAUSE
            WHY GTV MEDIA, INC. AND SARACA MEDIA GROUP SHOULD
            NOT BE HELD IN CONTEMPT OF COURT
            PRETRIAL CONFERENCE
#2004       REVISED PROPOSED ORDER
#  55       REVISED PROPOSED ORDER
```

APPEARANCES:

| | |
|---|---|
| Chapter 11 Trustee: | LUC A. DESPINS, ESQ.<br>Paul Hastings<br>200 Park Avenue<br>New York, NY  10166 |
| For the Chapter 11 Trustee: | AVRAM E. LUFT, ESQ.<br>Paul Hastings LLP<br>200 Park Avenue<br>New York, NY  10166 |
| | PATRICK R. LINSEY, ESQ.<br>Neubert Pepe & Monteith, PC<br>195 Church Street<br>New Haven, CT  06510 |
| For HK International Funds<br> Investments, LLC and<br> Mei Guo: | JAMES MORIARTY, ESQ.<br>Zeisler & Zeisler, P.C.<br>10 Middle Street, 15th Floor<br>Bridgeport, CT  06604 |
| For the Creditors Committee: | IRVE J. GOLDMAN, ESQ.<br>Pullman & Comley<br>850 Main Street<br>Bridgeport, CT  06601 |
| For the U.S. Trustee: | HOLLEY L. CLAIBORN, ESQ.<br>Office of the U.S. Trustee<br>150 Court Street<br>New Haven, CT  06510 |
| For G Clubs Operations, LLC: | JEFFREY M. SKLARZ, ESQ.<br>Green & Sklarz, LLC<br>One Audubon Street<br>New Haven, CT  06511 |
| For the Assignee,<br> Brian W. Hofmeister: | RYAN T. JARECK, ESQ.<br>Cole Schotz P.C.<br>25 Main Street<br>Court Plaza North<br>Hackensack, NJ  07601 |
| | DEIRDRE A. O'CONNOR, ESQ.<br>Epiq Corporate Restructuring<br> LLC<br>777 Third Avenue<br>New York, NY  10017 |

4

```
APPEARANCES: (Cont'd)


For Various Creditors        MELISSA R. McCLAMMY, ESQ.
 Of HCHK Technologies:       Pastore, LLC
                             4 High Ridge Park, Third Floor
                             Stamford, CT  06905


For Joshua Sherman:          JOSHUA SHERMAN, ESQ.
                             HCHK Technologies, Inc.
                             303 5th Avenue #1705
                             New York, NY  10016


For Saraca and GTV:          AARON A. MITCHELL, ESQ.
                             Lawall & Mitchell, LLC
                             55 Madison Avenue
                             Suite 400
                             Morristown, NJ  07960
```

1          (Proceedings commenced at 12:03 p.m.)

2                THE COURTROOM DEPUTY:  No. 22-50073, Ho Wan Kwok

3     and Genever Holdings, LLC.

4                I can call them all?

5                THE COURT:  No.  Just call -- we're going to take

6     in the main case, then we're going to take the two

7     applications for compensation first, but first I'm going to

8     take appearances for the record.

9                THE COURTROOM DEPUTY:  Okay.

10                THE COURT:  So I'd start -- I'd like to take the

11     appearances starting with the Chapter 11 Trustee, please.

12                MR. DESPINS:  Good afternoon, Your Honor.  Luc

13     Despins, Chapter 11 Trustee.

14                THE COURT:  Good afternoon.

15                MR. LUFT:  Good afternoon, Your Honor.  Avi Luft

16     of Paul Hastings on behalf of the Chapter 11 Trustee.

17                THE COURT:  Good afternoon.

18                MR. LINSEY:  Good afternoon, Your Honor.  Patrick

19     Linsey of Neubert, Pepe and Monteith, Connecticut counsel

20     for the Trustee.

21                THE COURT:  Good afternoon.

22                MS. CLAIBORN:  Good afternoon.  Holley Claiborn

23     for the U.S. Trustee.

24                THE COURT:  Good afternoon.

25                MS. O'CONNOR:  Good afternoon, Your Honor.

1    Deirdre O'Connor, Senior Managing Director at Epiq as the

2    representative of the company.

3            THE COURT:  Good afternoon.

4            MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

5    Goldman, Pullman & Comley, for the Creditors Committee and

6    for may fee application.

7            THE COURT:  Good afternoon.

8            All right.  So we're going to take the fee

9    applications first.

10           And, Trustee Despins, I don't know what order

11   you'd like to go in, but you proceed whichever way you'd

12   like to proceed.

13           MR. DESPINS:  We can start with Epiq.

14           THE COURT:  Sure.

15           MR. DESPINS:  So, Your Honor, this is Epiq's first

16   interim fee application.  It was filed on June 21st at

17   docket 1921 and 1923, that's for the time detail at 1923.

18           And the relief sought here is a payment in the

19   amount of $178,227 for professional services Epiq rendered

20   to the debtors from December 1st, 2022 to February 28, 2023.

21   And also reimbursement of $11,673.79.

22           Your Honor, we have received no objections.  They

23   were I wouldn't say extensive, but there were several

24   questions posed by the U.S. Trustee, with information

25   provided nobody has filed an objection.

1           So unless anybody wants to be heard, we would ask

2      the Court to approve the application.

3           THE COURT:  Thank you.

4           Attorney Claiborn?

5           MS. CLAIBORN:  Your Honor, the U.S. Trustee has no

6      objection.

7           THE COURT:  Does anyone else wish to be heard on

8      the Epiq fee application?

9        (No response)

10          THE COURT:  Okay.  I appreciate that Ms. O'Connor

11     is here today from Epiq with regard to the fee application.

12          I have reviewed the fee application, the expenses

13     and the fees, and they appear to be reasonable and necessary

14     under the circumstances of the case.

15          Ms. O'Connor, I don't know if Trustee Despins has

16     talked to you about I think that most of Epiq's tasks will

17     probably have been completed by now.

18          I'm sure you'll have another fee application, but

19     the way that things are developing in the case is that all

20     of the proofs of claim have been filed, whether they're

21     confidential or public proofs of claim, and we're trying to

22     go through a process where we can assist the Trustee.

23          And I know Epiq is still keeping the claims

24     register, and I'm not sure what else, maybe the docket also

25     on the -- on your site, I'm not sure, but what I'm saying is

1  I think there isn't much more for Epiq to do because we're

2  not going to be doing service and things through Epiq at

3  this point.

4          There's a lot of issues with regard to service and

5  so we've had to have specific orders entered and things of

6  that nature.

7          So although I'm sure there'll be another fee

8  application --

9          MS. O'CONNOR:  Yes.

10         THE COURT:  -- it is the belief of the parties and

11  the Court that probably the majority of the work Epiq has

12  needed to do in this case is done.

13         So I just wanted to make sure that that's

14  understanding.  Or if you had any difference of

15  understanding that you wanted to note for the record.

16         MS. O'CONNOR:  Your Honor, that's my understanding

17  as well.  The heavy lifting, if you will, on the redactions

18  has been completed.

19         THE COURT:  Yes.

20         MS. O'CONNOR:  So we're in agreement that the

21  level of our work has tapered off and will continue to.

22         You are correct that there will be another fee

23  application, which will have some substantial fees, but that

24  would be the tail-end of that whole redaction process, so I

25  don't envision -- I might be up here again for the second

1    application, which would be my pleasure, but I don't see any

2    escalation in our fees whatsoever.

3            THE COURT:  Thank you.  I appreciate that.

4            And I just wanted to make sure you were aware just

5    because things change course, well, in this case, things

6    change course on a daily basis, so there -- but with regard

7    to the proof of claim issues, I think they're under control.

8    And even the redaction issues I think are all under control

9    at this point.

10           And, you know, obviously it was an unusual set of

11   circumstances, but I'm glad to hear that you and -- you

12   think -- what you think -- I'm glad to hear what you think

13   because that's what everyone's been talking about.  And so I

14   just wanted to make sure we were all on the same page.

15           MS. O'CONNOR:  Yes, Your Honor.  We are on the

16   same page.

17           And just so the Court knows I was involved in the

18   origination of this matter for Epiq and I've been shadowing

19   the case from its filing on every single email.  I talked to

20   the consultants frequently.  So, yes, I've been monitoring

21   the case and I will continue to do so.

22           THE COURT:  Okay.  Thank you.  I appreciate that.

23           MS. O'CONNOR:  Yes.

24           THE COURT:  Thank you.

25           MS. O'CONNOR:  My pleasure.

1          THE COURT:  And no one else wishes to be heard,

2     correct?  I didn't hear anyone else speaking on the Epiq

3     application?

4          Okay.  Thank you.

5          As Trustee Despins has said, no one has filed any

6     written objections.  There is no one participating in this

7     hearing today that is objecting to the application.  The

8     Office of the United States Trustee has filed a statement of

9     no objection.

10         And I have reviewed the fees and expenses and

11    understand why they were incurred, how they were incurred,

12    and find that they're reasonable and necessary under the

13    circumstances of this -- of these jointly administered

14    Chapter 11 cases.

15         So for all those reasons the application is

16    granted.

17         And I believe that the proposed order as

18    submitted, and I will look at it again, but I believe it's

19    fine, yes, and the proposed order as submitted is fine and

20    will enter.

21         MS. O'CONNOR:  Thank you so much, Your Honor.

22         THE COURT:  Okay.  Thank you very much.

23         MR. DESPINS:  Thank you, Your Honor.

24         THE COURT:  Attorney Goldman, I think your

25    application is the second application on this afternoon.

1          MR. GOLDMAN:  Yes.  Yes.

2          THE COURT:  So please proceed.

3          MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

4     Goldman.

5          THE COURT:  Good afternoon.

6          MR. GOLDMAN:  In support of my firm's first

7     interim fee application, which covers the period from our

8     effective date of our retention, which was March 29th, 2022,

9     to the end of April of this year, the application seeks an

10    allowance of fees in the amount of $504,724.50 and expenses

11    of $709.53.

12          As per the U.S. Trustee's statement of no

13    objection, we agreed to a voluntary reduction in the amount

14    of $1,329.50, so the allowance of fees would now be

15    $503,395.

16          No objections have been filed to the application.

17          Having myself reviewed the 165 pages of invoices

18    submitted with our fee application, I now have a new found

19    respect for whoever did that for Paul Hastings' fee

20    application, as well as fee examiners in larger cases.

21          I prepared and made part of the application a

22    rather detailed, six-page narrative of the services that we

23    performed for the committee since our retention.

24          In light of that and given the absence of

25    objections, and the Court's familiarity with the case and

1    our role in it, I don't think it's necessary to go chapter

2    and verse through what we did.

3              But I'll just remind the Court that there was a

4    period of about three months, April through the beginning of

5    July, of very intensive activity for the committee that was

6    pre-appointment of the Trustee dealing with the various

7    early case motions that the debtor filed opposing PAX's

8    motion to dismiss, negotiating the consent order for the

9    return of the Lady May, filing a number of Rule 2004 motions

10   for asset discovery, and serving subpoenas, negotiating the

11   consent order for the Lady May, was what filled that first

12   three months.

13             As well as getting our professionals in place,

14   which we never had the opportunity to use because almost

15   immediately after they were retained by the Court the

16   Trustee was appointed.

17             Once the Trustee was appointed, we recognized that

18   the role of the committee really should be reduced at that

19   point, recognizing that the Trustee has a fiduciary duty to

20   the creditors that we represent.

21             And we did, in fact, consciously undertake a

22   reduced role.  We moderated our work in the case and really

23   directed it to supporting the Trustee, consulting with the

24   Trustee, providing input on the various motions that were

25   filed for asset discovery and for the recovery of assets.

1           And I think we had a positive impact on the case

2      in that respect.  And I would submit it's all consistent

3      with our statutory duties to the committee under Section

4      1103.

5           So with that I would submit that the fees we've

6      requested are reasonable and compensable and would request

7      that the Court allow the fees and expenses with the

8      voluntary reduction that I mentioned.

9                THE COURT:  Thank you.

10               MR. GOLDMAN:  Okay.

11               THE COURT:  Does anyone else wish to be heard in

12     connection with the first interim fee application of the

13     Official Committee of Unsecured Creditors?

14               MS. CLAIBORN:  Your Honor, Holley Claiborn for the

15     U.S. Trustee.

16          The statement that I filed is at Docket No. 2001.

17     It reflects the reduction that Attorney Goldman outlined for

18     the Court.

19               THE COURT:  Thank you.

20               MR. DESPINS:  And, Your Honor, Luc Despins,

21     Chapter 11 Trustee.

22          Our team has reviewed the fee application and had

23     no issues with the fees submitted, Your Honor.  Thank you.

24               THE COURT:  Thank you.

25          And, Attorney Goldman, as you are, I am familiar

1    with what the committee did undertake from the beginning of

2    the appointment of the committee and now until the period of

3    time that you're seeking your fees and expenses through,

4    which is April 30, 2023.

5         I have reviewed the information and I agree that

6    you did consciously reduce the role of the committee's

7    involvement in the case once the Trustee was appointed,

8    which is something we talked about at the time and obviously

9    you honored that point that you made that you understood

10   that the committee's role would be reduced because of the

11   appointment of the Trustee.

12        All that being said, the committee has and

13   continues to play an important role in these cases.

14        And I agree that the paperwork demonstrating that

15   is extensive as it has been with the other fee applications

16   we've gone through, but necessary under the very specific

17   facts and circumstances of these jointly administered

18   Chapter 11 cases.

19        I appreciate the narrative that you included, not

20   only just for the Court, but for anyone looking at this case

21   that may come at different points in time and look at things

22   and not really understand specifically what has occurred,

23   and that narrative tells a very factual history, provides a

24   very good factual history of what has happened in the case,

25   and I think that's very important for anyone.  Because

1    obviously as you know, and we all know, the fee applications

2    have to be served and noticed to every creditor in case

3    anyone wants to file a written objection.

4            No one has filed a written objection.

5            And I go back and I look and make sure, as does

6    the clerk's office, that the service of these applications

7    have been made, which this has, and you filed a certificate

8    of service and it demonstrates that you've complied with the

9    requirement to serve everyone with regard to this fee

10   application.

11           And when I reviewed the time entries, I think they

12   are reasonable under the circumstances, very specific

13   circumstances of these jointly administered Chapter 11

14   cases.

15           I also think the expenses that you incurred were

16   less than $800.  And in a case of this -- with all the

17   issues like these cases have, I think that's very

18   reasonable, so I would be surprised if anyone had any

19   opposition or objection to the expenses.

20           And with regard to the fees you've taken a

21   voluntary reduction.

22           As I said with the Trustee's Paul Hastings'

23   application and the Neubert, Pepe application, I appreciate

24   the parties working together with the Office of the United

25   States Trustee.  Because it is one of the roles of the

1    United States Trustee's Office to review and analyze and

2    make determinations and tell the Court their position with

3    regard to fee applications, but I don't want all parties to

4    believe that there always has to be an agreed-upon reduction

5    in fees.

6            If there is an agreed-upon reduction, that's fine,

7    but I don't think that that should be an expectation.  And I

8    think we can all talk about any issues we might have or see

9    in a fee application and that's why we have a hearing.

10   Because if there are issues, it can -- they can be addressed

11   and then the Court can make the determination that it

12   ultimately needs to make, which is whether or not the fees

13   and expenses sought should be awarded.

14           So I do appreciate as I said the narrative.

15           I appreciate the detail that all the parties have

16   provided so far that have sought to be reimbursed for their

17   fees and expenses in these jointly administered Chapter 11

18   cases.  It's very important.  It's very helpful to the Court

19   when you go through the 165 pages or the, you know, 765

20   pages of invoices that had to be reviewed.

21           So for all of those reasons, including the fact

22   that no one has filed a written objection to the fee

23   application, there is no one present at this hearing that is

24   objecting to the fee application, the Office of the United

25   States Trustee has filed a statement of no objection in

1    connection with your agreed reduction, which is a minor

2    reduction in fees, then the first interim application for

3    fees and expenses is granted and the proposed order that you

4    submitted will enter.

5              So thank you very much.

6              MR. GOLDMAN:  Your Honor, I thank you.  I very

7    much appreciate the comments.

8              I may -- I probably should submit a revised order

9    reflecting the reduction if you'd like.

10             THE COURT:  Oh, the one that I looked at doesn't

11   have that included?

12             MR. GOLDMAN:  No.

13             THE COURT:  I thought it did.  But that might be

14   my -- that might be my mistake.

15             MR. GOLDMAN:  I don't think it does.

16             THE COURT:  It doesn't?  Okay.  Then, yes, if you

17   would.

18             MR. GOLDMAN:  We arrived at the --

19             THE COURT:  My mistake.  I thought it did.  But

20   then, yes.  If you could just get us a revised proposed

21   order by the end of the week, by the 21st.

22             MR. GOLDMAN:  Yes.  No problem.

23             THE COURT:  I know you'll probably get it today,

24   but --

25             MR. GOLDMAN:  Yes.

1          THE COURT:  -- I'd like to have a date for the

2    clerk's office.  It's helpful to them.

3          MR. GOLDMAN:  No problem, Your Honor.

4          THE COURT:  So the application is granted and the

5    revised proposed order will be submitted on or before July

6    21st.

7          MR. GOLDMAN:  Yes.

8          THE COURT:  Okay.  Thank you.

9          MR. GOLDMAN:  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         (Indiscernible) scheduled for ten more minutes

12   until 12:30, but, Trustee Despins, I did have a question or

13   two about things that are not on today's calendar.

14         And the first question I have just relates to an

15   order setting a deadline for Holy City to file a responsive

16   pleading in the adversary of 23-5013.

17         When you filed that motion, I understand what

18   you're seeking and that's not -- my question is are you

19   seeking another subpoena to issue or are you seeking to just

20   serve the complaint, the subpoena, and the order on Holy

21   City Hong Kong Ventures, Limited?  Because I don't think the

22   rules are clear to whether or not there should be another

23   subpoena.

24         MR. DESPINS:  No.  We're not seeking that.  We're

25   just seeking the entry of an order.

1          THE COURT:  Okay.

2          MR. DESPINS:  With a deadline.

3          THE COURT:  Okay.  And then you have some address

4    or something that you've served Holy City Hong Kong

5    Ventures.  Because it's not -- it's a foreign entity, so you

6    have some -- you'll have to demonstrate how you served them

7    obviously.

8          MR. DESPINS:  Correct.  Yes.  Yes.

9          THE COURT:  Okay.

10          MR. DESPINS:  Yeah.

11          THE COURT:  Because obviously the rules aren't as

12    clear on that as you would like them to be if you look at

13    the 7004 and Rule 4 of the Federal Rules of Civil Procedure.

14    It doesn't necessarily provide you with the exact steps that

15    you need to take.

16          And so that's why I'm asking the question about

17    whether or not you wanted another -- some people have in the

18    past asked for a different subpoena to be issued.  And I can

19    understand that because I don't -- because the rules do not

20    specify.  It just says that the Court shall determine the

21    time frame by which a responsive pleading has to be filed,

22    but it doesn't say whether you do that through order,

23    subpoena or otherwise.

24          So I'm fine.  If you're fine with moving for an

25    order --

1          MR. DESPINS:  At this time --

2          THE COURT:  -- that's fine.

3          MR. DESPINS:  At this time, we're fine with that,

4     Your Honor.

5          THE COURT:  Okay.  That's fine.

6          So then we will take -- after today's hearings,

7     we'll take a look at that.  I mean, we looked at it because

8     I have the question obviously, but we haven't gone beyond

9     that really other than you're seeking some date in the

10    future.

11         I guess I'd have to look at whether that date in

12    the future is a good date or should be extended by a few

13    days, or are you specifically looking for a date for a

14    reason that I'm not aware of?

15         MR. DESPINS:  I'm going to have Mr. Linsey answer

16    this.

17         THE COURT:  That's fine.

18         MR. LINSEY:  We just need a date certain for them

19    to have an answer date in order for them to be in default.

20         And our position is they've already been served

21    with the summons, but that under the rules there is no --

22    there is no answer deadline until the Court sets one.

23         So we will give them notice of that answer line

24    when the Court sets one.  If the Court disagrees with a

25    specific deadline, then obviously we'll defer to whatever

1      the Court believes would be proper.

2                    THE COURT:  Okay.

3                    MR. DESPINS:  But our position is they have

4      already received notice.

5                    MR. LINSEY:  For sure.  Yes.

6                    MR. DESPINS:  Yeah.

7                    THE COURT:  Your position is that they've already

8      been served?

9                    MR. DESPINS:  Yes.

10                   THE COURT:  Not received notice, but actually been

11     served.

12                   MR. DESPINS:  Correct, Your Honor.

13                   THE COURT:  Right.  But they need to have -- now

14     they need to be served with an order indicating which date,

15     by which date they must file or otherwise respond to the

16     complaint.

17                   MR. DESPINS:  Correct.  Correct.

18                   THE COURT:  Okay.  All right.  That was that

19     question I had.  And I think that's the only question I have

20     right now.

21                   So I don't know if you have anything you want to

22     add, but it's only 12:24 and the next hearing is not until

23     12:30.  So I don't know if we're -- do you have anything you

24     want to report before then or just take a recess and we'll

25     come back out at 12:30?

1          MR. DESPINS:  I think we can take a recess, Your

2    Honor.  Thank you.

3          THE COURT:  Okay.  Well, then the Court is in

4    recess until 12:30.

5          (Proceedings recessed at 12:25 p.m.)

6          (Proceedings resumed at 12:32 p.m.)

7          THE COURTROOM DEPUTY:  Court is in session after

8    recess.

9          THE COURT:  Please be seated.

10         All right.  We have one matter on the calendar at

11   12:30, and it's ECF 1893, an order requiring GTV Media,

12   Inc., Saraca Media Group and Attorney Aaron Mitchell to

13   appear and show cause why GTV Media Group and Saraca Media

14   group should not be held in civil contempt.

15         So how are we proceeding today?

16         Is Attorney Mitchell in the courtroom?  Okay.

17   Attorney Mitchell, please come forward.  Good morning, sir.

18         MR. MITCHELL:  Good morning.

19         THE COURT:  Could you please state your name for

20   the record.

21         MR. MITCHELL:  Aaron Mitchell from the Law Offices

22   of Lawall & Mitchell, LLC, Your Honor.

23         THE COURT:  Okay.  Good afternoon.

24         So, Attorney Mitchell, if we look at these cases,

25   and there was a motion to compel compliance and also to hold

1  certain parties in contempt filed by the Trustee sometime

2  ago, ECF, I think it's 1805, which was filed, if you give me

3  a moment --

4          MR. MITCHELL:  I believe based on the order, Your

5  Honor, it was May 18th.

6          THE COURT:  Correct.  I just saw it at the same

7  time.  May 18th.

8          So this was a motion to compel compliance with the

9  Rule 2004 subpoenas and it was directed to numerous parties.

10  And some of those issues have been resolved and some have

11  not.

12          And one of the issues that had been raised through

13  that motion to compel was that GTV Media and Saraca Media

14  Group had not complied with the subpoenas, the Rule 2004

15  subpoenas, and your name was one of the names, besides GTV

16  Media and Saraca Media, who were mentioned as parties that

17  would be able to be in possession or control of documents

18  that would be responsive to the subpoenas.  Okay.

19          And the contempt motion sought to compel GTV Media

20  and Saraca Media to produce the documents.

21          And during a hearing that was held on June 6th of

22  this year, the Trustee said on the record that he was

23  seeking an order to hold GTV Media and Saraca Media Group in

24  contempt, because although they initially responded to the

25  subpoenas, they have not responded since December of 2022,

1  and the Trustee asked that the Court enter an order

2  requiring you to appear and testify regarding GTV Media and

3  Saraca --

4           MR. MITCHELL:  I'm not --

5           THE COURT:  -- Media Group.

6           MR. MITCHELL:  I'm sorry, Your Honor.

7           THE COURT:  No, go ahead.

8           MR. MITCHELL:  I saw the order.  I represented

9  Saraca and GTV in a number of matters.  And up until April

10 20th of 2023, I was the lone remaining director of GTV.  I

11 resigned on April 20th, 2023, so I'm not quite sure.  Your

12 Honor, ordered me to be here, so I'm glad to be here.

13          THE COURT:  Right.

14          MR. MITCHELL:  I'm not sure what else I can do.

15          I produced as part of my firm's -- the subpoena to

16 my firm, I produced about 100,000 pages I believe of GTV

17 related documents that were in my possession, custody and

18 control, to Paul Hastings in response to the subpoena.

19 That's quite frankly what I have.  I don't know what else I

20 could produce.

21          THE COURT:  Well, I guess one of the things you

22 could do, and one of the reasons that the Trustee asked the

23 Court to order you to be here and testify, is to testify to

24 that, right?

25          MR. MITCHELL:  Sure.

1          THE COURT:  So what -- in a discovery dispute, and

2     that's obviously what this is, the Trustee's position is

3     that while you may have produced documents, you haven't

4     produced anything since December 20, 2022.

5          Your response to that is whatever your response to

6     that is, but I think they want it under oath, which I think

7     is fine.  I think that's a legitimate request.

8          I mean, sometimes people do it by the agreement of

9     a submission of an affidavit under penalty of perjury.  You

10    know, we've had -- I've had cases, not this case, I've had

11    cases where, you know, parties have had a disagreement.

12    They cannot come to a resolution of the discovery dispute.

13    They cannot submit to the Court that their issues are

14    resolved.  And then one party may submit an affidavit saying

15    I have produced everything I have in my possession and

16    control.  I asked this person for that.  I'm just giving you

17    an example --

18          MR. MITCHELL:  No.  Understood.

19          THE COURT:  -- of what they did to diligently

20    comply with the subpoena.  And sometimes that is all that's

21    needed.

22          Other cases I've had over the years, when those

23    affidavits have been filed, and then other documents have

24    been discovered after the fact, then that person who filed

25    that affidavit has a problem, right, because that person

1    that filed the affidavit and swore under penalty of perjury

2    that they produced everything that they had under their

3    possession and control, and diligently complied with the

4    request, have then, you know, they've then had to be

5    sanctioned unfortunately for -- because those statements

6    were not accurate.

7             So, Trustee Despins, are you asking that I order

8    Attorney Mitchell to testify under oath on questioning from

9    your counsel?

10            MR. DESPINS:  Mr. Luft is handling this, Your

11   Honor.

12            THE COURT:  Okay.  Attorney Luft?

13            MR. LUFT:  Yes, Your Honor.  We would like that.

14            THE COURT:  Okay.  So, Attorney Mitchell, you're

15   here regarding the -- to testify.  And that is -- it is what

16   --

17            The order to appear and show cause was issued on

18   June 7th.  And as I said it's ECF No. 1893.  And on the

19   second page of the order it says the Trustee also requested

20   that the Court order Attorney Aaron Mitchell to appear and

21   testify regarding GTV and Saraca.

22            Paragraphs 24 through 33 of the contempt motion

23   detail the Trustee's communications with GTV, Saraca, and

24   Attorney Mitchell regarding the Rule 2004 subpoenas directed

25   at GTV and Saraca.

1          Exhibits C-1, C-2, D-1, D-2, E and F to the

2    declaration of Avram Luft attached to the contempt motion

3    support the Trustee's assertion the contempt motion was

4    served on GTV and Saraca as evidenced by the Trustee's

5    certificate of service.

6          And then it -- then the order paragraphs say GTV,

7    through an officer, director, member, and Attorney Mitchell,

8    shall personally appear on July 18th at 12:30 and show cause

9    why the Court should not hold GTV and Saraca in civil

10   contempt for failing to respond or comply with the subpoenas

11   authorized by the Court.

12         So counsel is asking you to testify about the

13   issues.

14         And are you going to testify without counsel?

15         MR. MITCHELL:  I don't have counsel here, Your

16   Honor, so I guess so.  I was -- I was under the impression

17   that since it was not being opposed there was no need to

18   have any testimony, but.

19         THE COURT:  Well, then, are you saying that --

20   well, I'm not sure that's what the order says, but.

21         MR. MITCHELL:  Understood.

22         THE COURT:  Okay.  Well, I'm going to allow -- the

23   order does say that you should appear and testify.  Okay?

24   And to show cause.  So I'm going to ask you to take the

25   stand then.  And then you'll be sworn in by the courtroom

1  deputy and then I'll let Attorney Luft ask you some

2  questions.

3              AARON MITCHELL, SWORN

4          THE COURTROOM DEPUTY:  State your name and address

5  for the record.

6          THE COURT:  And you just need your business

7  address.

8          THE WITNESS:  Aaron Mitchell, 55 Madison Avenue in

9  Morristown, New Jersey, zip code is 07960.

10          THE COURTROOM DEPUTY:  Thank you.

11          THE COURT:  There should be some water there, Mr.

12  Mitchell.

13          THE WITNESS:  Thank you.

14          MR. LUFT:  Your Honor, may I approach?

15          THE COURT:  Yes, please.

16          MR. LUFT:  Thank you, Your Honor.

17              DIRECT EXAMINATION

18  BY MR. LUFT:

19  Q    Good afternoon, Mr. Mitchell.  My name's Avi Luft.  How

20  are you?

21  A    Doing well, thank you.

22  Q    Mr. Mitchell, I want to start with a somewhat

23  perfunctory question, but it gets to what the Court was just

24  reading you.  Are you appearing here just as an individual

25  today or are you also the representative of GTV and/or

1    Saraca?

2    A    I am appearing here individually.

3    Q    So no one has appeared pursuant to the court order for

4    GTV and Saraca to your knowledge?

5    A    Not to my knowledge, no.

6    Q    Okay.  Mr. Mitchell, let's just start with some

7    background just so I understand your role here.  What

8    entities do you currently represent in connection with this

9    case?

10   A    I don't understand your question.

11   Q    Okay.  Are you counsel to any individuals in this case?

12   A    Meaning the overall -- I'm just not sure of your

13   question.  It's very general.

14   Q    Yes, the main case.

15   A    So do you mean -- I'm sorry, from what I've seen on the

16   docket, there are tons of parties to this.  I represent in a

17   number of cases the debtor, Mr. Ho Wan Kwok.

18   Q    Mm-hmm.

19   A    I'm not sure if there -- in other cases I stated I

20   represented, and I believe I still represent GTV and Saraca

21   in a couple of cases.  I had represented previously Genever,

22   the entity that filed bankruptcy.  And there's a number of

23   adversary proceedings.  I'm just not quite sure.  I don't

24   want to be dishonest, but there's so many parties in this

25   case, I'm not trying to be evasive, that I'm just not sure

Aaron Mitchell - Direct - Avram Luft                    30

1    (indiscernible) --

2    Q    It's hard to keep track of everyone you're involved

3    with, right?

4    A    I represent a lot of individuals and entities, yes.

5    Q    Okay.  So let me help you and let's go through it.

6    A    Sure.

7    Q    Okay.  You say you still currently represent both GTV

8    and Saraca in connection with the bankruptcy case.  Can you

9    tell --

10   A    No, that's not correct.  I said I still represent them.

11   I don't represent them in the bankruptcy case.  That's why

12   the question was confusing.

13   Q    Ah.

14   A    The only thing -- the only person I represent in the

15   bankruptcy case, as counsel appearing in the bankruptcy

16   case, is Mr. Kwok.  I filed a notice of appearance.  So if

17   that's your question, it's just Mr. Kwok.

18   Q    How about Mei Guo?  She said -- she's testified that

19   you were her counsel in this case, is that true?

20   A    I'm her counsel.  I've not appeared in this case.  I've

21   given her advice, but I've not appeared, again.

22   Q    But you serve as her counsel in connection with the

23   bankruptcy, correct?

24   A    Yes.

25   Q    Okay.  For GTV, do you serve as GTV's counsel in

Aaron Mitchell - Direct - Avram Luft                    31

1    connection with the bankruptcy?

2    A    No.

3    Q    What do you serve as their counsel in connection with

4    currently?

5    A    There are a few cases, which are tangentially I guess

6    related to the bankruptcy, where investors have filed suit

7    in federal court and in state court and I represent GTV in

8    those -- in those matters.

9    Q    Do you recall their names?

10   A    One is Mr. Yee.  Another is -- there's several.  I'm

11   trying to think of the plaintiffs' names in the cases.  I

12   believe it's Huang, H-U-A-N-G.  I believe the Wang case is

13   resolved, W-A-N-G, that was based in Connecticut.  There are

14   a few more that aren't coming to mind.

15   Q    Okay.

16   A    I think there's about five or six of them.  Most of

17   they are stayed as a result of the bankruptcy.  I think the

18   Yee case and the -- and I think it's -- I think it's the

19   Huang case that's based in New York that is also not stayed.

20            THE COURTROOM DEPUTY:  Excuse me.  Attorney

21   Mitchell, could you just pull the mic a little.

22            THE WITNESS:  Is that better?

23            THE COURT:  Yeah.  That's better.

24            THE WITNESS:  Sure.

25            THE COURT:  That's better.

Aaron Mitchell - Direct - Avram Luft                    32

1          THE COURTROOM DEPUTY:  Thank you.

2          THE COURT:  Sometimes it -- yeah.  I should have

3    said that to you.

4          THE WITNESS:  Sorry.

5          THE COURT:  We have to --

6          THE WITNESS:  When I think I drift off too, I know

7    it's --

8          THE COURT:  We have to -- our record is audio

9    only.  So if the courtroom deputy can't hear, I do ask her

10   to make sure.

11         Because if someone wants a transcript, they're not

12   going to be able to hear what was said.  The person that

13   transcribes the record is not in the courtroom.

14         THE WITNESS:  Understood.  I apologize.

15         THE COURT:  Okay.  Thank you.

16   BY MR. LUFT:

17   Q    Okay.  Mr. Mitchell, let me ask you the same -- so you

18   said there's about five or six cases that you currently

19   represent GTV on?

20   A    Approximately, yes.

21   Q    How about Saraca Media?

22   A    The same cases, Saraca is named as a defendant as well.

23   Q    Okay.  Now, I heard you give an address as your

24   business address in Morristown, New Jersey?

25   A    That's correct.

1   Q    I have correspondence showing your business address as

2   162 East 64th Street in Manhattan.

3   A    Not anymore.

4   Q    When did that stop being your address?

5   A    Three years ago.

6   Q    Three years ago?

7   A    Give or take.  I'm not exactly sure.  Approximately

8   three years ago.

9   Q    Okay.  In fact, that was your business address after

10  the filing of the bankruptcy, right?

11  A    I believe so, yes.

12  Q    That's less than three years ago.

13  A    Maybe two years ago.

14  Q    As of at least June 2022, you were still operating out

15  of Mr. Kwok's offices?

16  A    I was not operating out of there.  I had an office

17  there and received mail.

18  Q    What is the difference in your mind between operating

19  out of an office and doing business there and receiving

20  mail?

21  A    The difference is I was not reporting to that office at

22  any time.  I didn't have a requirement that I go there.  But

23  I was using it.  I was using space there to be able to

24  receive mail related to Mr. Kwok's cases, because he can be

25  the target of threats and things of that nature, so I

1    thought it better to have that address for my representation

2    when I filed cases for him.

3    Q    So it was just a mailbox?

4    A    Essentially, yes.

5    Q    You never worked out of that office?

6    A    I would go there to meet with Mr. Kwok, but I never --

7    other than meeting with him and -- I mean, I guess really

8    that's it.

9    Q    It's also the business address for GTV and Saraca,

10   correct?

11   A    That's correct.

12   Q    So when you did work for them as clients, would you

13   meet with them there also?

14   A    No.

15   Q    Where would you meet with them?

16   A    Over the phone.

17   Q    Who did you speak with for them?

18   A    Well, over the last year or so, there's been no one to

19   speak to.  I was the director, so there was no one to speak

20   to.  There was no one else there.

21        Prior to that, at Saraca, I would speak to Dan

22   Podhaskie, and that's P-O-D-H-A-S-K-I-E, and Yvette Wang, W-

23   A-N-G.

24   Q    Okay.  Now, you said you resigned in April of 2023?

25   A    That's correct.

1    Q    Who's at Saraca and GTV now?

2    A    Not that I'm aware of anyone.

3    Q    In December of 2022, was there anyone at those entities

4    other than yourself?

5    A    I don't know.  December of 2022?  Not at GTV I don't

6    believe.  At Saraca, I don't know the answer to that.

7    Q    In connection with representing them, if you had to

8    speak to them in December at Saraca, who would you speak to?

9    A    There was no one to speak to.  I didn't have to speak

10   to anybody.  The cases were primarily stayed.  The only ones

11   that weren't stayed related to Saraca were the Huang case

12   and the Yee case and the -- there was nothing going on.

13   Q    Okay.  You also represent HK (USA) in connection with

14   the bankruptcy?

15   A    Yes.

16   Q    How about Mr. Quan (ph) Guo, do you represent him in

17   any way in connection with the bankruptcy?

18   A    I don't know who that is.  Mr.?

19   Q    The debtor's son.

20   A    Oh, Guo Qiang.  Yes.

21   Q    So you represented him in connection with the

22   bankruptcy also?

23   A    Yes.  Again, I've not appeared obviously as you know,

24   but I've given him advice, yes.

25   Q    Okay.  How about the debtor's wife, Hing Chi Ngok?

Aaron Mitchell - Direct - Avram Luft                                         36

1    A     No.

2    Q     How about Golden Spring?  Do you represent Golden

3    Spring in connection with --

4    A     Not --

5    Q     -- the bankruptcy at any point?

6    A     Not at all.  I haven't related to the bankruptcy.

7    That's why, I'm sorry, I cut you off.  I didn't mean to.  I

8    have represented them in the past in matters, but not in the

9    bankruptcy.

10   Q     In what matters have you represented Golden Spring in

11   connection with?

12   A     I don't recall.  There was a number of litigations

13   where Golden Spring was a defendant in employment issues and

14   the like.  Off the top of my head, I feel like the plaintiff

15   was in New York County.  I feel like the plaintiff was

16   Zhang, Z-H-A-N-G.  Or I could be confusing that with the

17   GTV.  We'll call them investor cases.  I believe in Arizona

18   it's Zhang, Z-H-A-N-G.  And the case with Golden Spring was

19   Zhuang, Z-H-U-A-N-G.

20   Q     Golden Spring has also not responded to discovery in

21   this case.  Do you know who is in charge there now?

22   A     I have no idea.  I have not spoken to anyone at Golden

23   Spring in well over a year.  I know there was an issue about

24   that time with getting in touch with anyone for advice.

25   Q     Golden Spring is run by Yvette Wang, correct?

1    A    It was.  I don't know -- I don't know what's going on

2    with it now.  I don't believe she runs it now, because I

3    asked her at one point for direction and she wasn't able to

4    give it to me.

5    Q    You've not spoken to Yvette Wang in over a year?

6    A    That's not what I said at all.

7    Q    Well, she's at Golden Spring, so?

8    A    She was -- she told me she was not at Golden Spring at

9    the time I spoke to her.

10   Q    Okay.  When was the last time you spoke to Yvette Wang?

11   A    I don't recall the last time I spoke to Yvette Wang.

12   Q    What's your best recollection?

13   A    Six months ago, maybe less.  I have not spoken to her

14   since she was arrested, which was three or four months ago,

15   so maybe five months ago.

16   Q    How about Max Krasner?

17   A    What about Max Krasner?

18   Q    When was the last time you spoke to him?

19   A    I think about four months ago.

20   Q    Do you know where he was at the time?

21   A    I have no idea where he was at the time.  He called me.

22   Q    Okay.  We'll just figure out the rest of the scopes of

23   your representation.  Have you ever provided legal services

24   to Lamp Capital?

25   A    No.

1    Q    Greenwich Land?

2    A    No.

3    Q    HCHK Technologies?

4    A    No.

5    Q    HCHK Property?

6    A    No.

7    Q    Lexington Property Management?

8    A    No.

9    Q    How about G-Club?

10   A    Yes.

11   Q    Okay.  What have you represented G-Club in connection

12   with?

13   A    I've given them advice related to an arbitration that

14   was filed, and just generally legal advice.

15   Q    And who did you speak to there?

16   A    I spoke to Carlos, I'm drawing a complete blank, their

17   CEO and their general counsel.  It's actually Carlo, not

18   Carlos.  Carlo, I don't recall his last name.  And who is

19   the CEO?  They both resigned.  I don't recall.  It was

20   woman.  I can't recall her name.

21   Q    Mr. Mitchell, are there any other entities affiliated

22   with the debtor that you provided legal advice in connection

23   with?

24   A    I don't have an answer to that question affiliated with

25   the debtor.

Aaron Mitchell - Direct - Avram Luft                           39

1    Q    He's family, entities he's involved with for business?

2    And I can keep naming entities, but I'm trying to move us

3    along.

4    A    Understood.  But it's a broad question.  I think you

5    understand.

6    Q    Sure.  How about G Fashion, did you ever provide legal

7    advice to them?

8    A    Yes.

9    Q    What did you do for them?

10   A    There was money that was -- a bank was -- removed from

11   their account and I was asked about helping them try and get

12   the money unfrozen or un-taken.  I don't know.  That was it.

13   We had a conversation and nothing ever happened with it.

14   Q    Who did you speak to at G Fashion?

15   A    A woman whose name is escaping me right now, Tia or Lia

16   something.

17   Q    How about G-Music?

18               THE COURT:  Could I just ask you again your

19   answer, just because I couldn't hear it.

20               THE WITNESS:  Sure.

21               THE COURT:  Tia or Lia?

22               THE WITNESS:  It either Tia, T-I-A, or Lia, L-I-A,

23   I believe.

24               THE COURT:  Okay.

25               THE WITNESS:  That's my recollection.

Aaron Mitchell - Direct - Avram Luft                                40

1              THE COURT:  That's helpful when you spell.  Thank

2     you.

3              THE WITNESS:  Sure.  Absolutely.  I'm sorry.

4              THE COURT:  It's very helpful.  Thank you.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  Yeah.

7              THE WITNESS:  G-Music?  I guess, yes.  I was asked

8     one time to see about helping them look at their -- some

9     agreement they wanted to enter into regarding something to

10    do with a song.  I don't recall exactly what, but, so I gave

11    them some advice there.

12    BY MR. LUFT:

13    Q    G-News?

14    A    No.  I don't believe -- I'm not even sure that G-News

15    is an entity.  Is it?

16    Q    I believe it just tried to buy HCHK Properties, so I

17    assume it is.

18    A    Oh, okay.  I've not advised them at all.  I knew it was

19    a website a long time ago, but.

20    Q    Okay.  Hudson Diamond?

21    A    No.

22    Q    All right.  Again, I can keep going, but are there any

23    other entity -- these are all entities that you know are

24    affiliated with the debtor, correct?

25    A    Again, I'm not comfortable with the word affiliated.

1  Q    What word would you like to use to connect, describe

2  their relationship?

3  A    I don't know.  I don't know that there is one.

4  Q    You don't believe there's a connection between the

5  debtor and all the entities I just mentioned?  Under oath?

6  A    I don't know some of the entities, so I can't answer

7  that.

8  Q    The ones you know?

9  A    The ones I know?  I don't know what you mean by

10 connection.  I don't feel comfortable testifying one way or

11 the other.  I mean --

12 Q    Fine.  How about affiliation?

13 A    Again, I don't know what you mean by that.

14 Q    How about association?

15 A    Again.

16 Q    These are all words you don't know?

17 A    I know the words, but I'm not comfortable -- it seems

18 like you're trying to make him somehow tied to these

19 companies where -- for example, let me give you an example.

20      If he were -- if he put a video on G-News, whether

21 he has any interest in that company or not, would you

22 consider that affiliated?  Just so I understand what you're

23 asking me.

24 Q    No.  If he just posted a video on G-News, I wouldn't

25 say he's affiliated.

1    A    Okay.

2    Q    Okay.

3    A    So your question is do I believe that he's --

4    Q    The entities that I've mentioned that you know --

5    A    Yes.

6    Q    -- they're all affiliated with the debtor, correct?

7    A    I don't know that I agree with that.

8    Q    How many years have you been Mr. Kwok's counsel?

9    A    Five, five or six.

10   Q    And you've been his counsel in connection with his

11   business dealings?

12   A    I don't believe he has any business dealings.  Mr.

13   Kwok?

14   Q    Yes, the debtor in this case, Ho Wan Kwok, you believe

15   he has no business dealings?

16   A    My understanding of a business dealing would be him

17   investing or owning a business.  Is that what you're saying?

18   Q    It could be investing.  It could be managing.  It could

19   running.  It could be providing funds.  All those things

20   would be involved with.

21   A    I've not seen him do any of that at any of the

22   companies we've mentioned.

23   Q    Okay.  Why don't we keep going.

24   A    Sure.

25   Q    And you've been a director and officer at GTV?

Aaron Mitchell - Direct - Avram Luft                    43

1   A    That's -- director.

2   Q    Okay.  And who are the other directors along with you?

3   A    Currently?  Currently I'm not a director.  When I was

4   for the last year it was only myself for a year and a half.

5        About the time that GTV entered into the

6   settlement with the SEC, the other directors resigned, and I

7   remained to try and -- in case the SEC needed any help in

8   getting the money back to the investors.

9   Q    Who were the directors before who resigned?

10  A    Max Krasner.  Yvette Wang.  Steve Bannon was at one

11  time a director.  Kyle Bass was at one time a director.

12  John Morgan was at one time a director.  There's another

13  gentleman whose name is escaping me.  He was a hedge fund

14  manager down in Texas.  I can't think of his name.  He was

15  also a director.

16  Q    Of GTV?

17  A    Yes.  And I believe that that is it.

18  Q    Okay.  And Ms. Wang was the president and the secretary

19  of GTV?

20  A    At one point, yes.

21  Q    Was there ever a different president of GTV?

22  A    I believe Max Krasner was president in GTV.

23  Q    Before or after Ms. Wang?

24  A    You know, the more -- now that you mention it, I don't

25  think Ms. Wang every was president.  I think it was Mr.

1    Krasner.  And I believe Ms. Wang was secretary is my

2    recollection.

3              MR. LUFT:  Your Honor, may I show the witness a

4    document?

5              THE COURT:  Yes.  But how many documents?  I mean,

6    where you don't have anything marked yet.  So are you going

7    to be moving for that document for admission into evidence?

8              MR. LUFT:  Well, right now I'm going to just use

9    it to see if it will refresh the witness's recollection --

10             THE COURT:  Okay.  All right.  That's fine.

11             MR. LUFT:  -- and we can discuss --

12             THE COURT:  If you're using it to refresh his

13   recollection, that's fine.

14             MR. LUFT  Okay.  I'm going to -- for marcation

15   purposes, I'll call this Mitchell 1, Your Honor.

16             THE COURT:  Well, I don't think we have to do

17   anything unless you're going to move it into evidence,

18   right?  Right now you're using it just to refresh his

19   recollection.

20             MR. LUFT:  Correct.  Just for the --

21             THE COURT:  So --

22             MR. LUFT:  Okay.

23             THE COURT:  -- if you could just state what it is

24   for the record.

25             MR. LUFT:  That's fine.

Aaron Mitchell - Direct - Avram Luft                    45

1          THE COURT:  Okay.

2     BY MR. LUFT:

3     Q    Mr. Mitchell, I'm going to show you a document titled

4     Saraca Media Group, Inc, Organizational Chart as of August

5     15th, 2020.  It comes -- I'll represent to you it comes from

6     the files of Hodgson Russ.

7     A    Can I ask you -- sorry, you were asking me about GTV

8     and you're going to show me a document related to Saraca?

9     Q    I think once you see it --

10    A    Okay.

11    Q    -- it will make sense to you.

12         THE COURT:  Right now it's only -- I'm only

13    letting counsel show you this because he's telling me that

14    it's going to refresh your recollection.

15         THE WITNESS:  Sure.  No.  I understood.

16         THE COURT:  Okay.  So that's --

17         THE WITNESS:  I just was confused because they are

18    two --

19         THE COURT:  Understood.  But I just want to be

20    clear that right now that's all that we're doing with this

21    document.  Okay?

22         MR. LUFT:  Your Honor, may I approach the witness?

23         THE COURT:  Yes, you may.

24    BY MR. LUFT:

25    Q    Mr. Mitchell, do you see this is an organizational

1    chart?

2    A     That's what -- yeah, that's what it says it is.

3    Q     And under Saraca Media Group do you if you look to the

4    left of the page it says GTV Media Group?

5    A     I do, yes.

6    Q     And under directors it says Steve Bannon, Aaron

7    Mitchell, John Morgan and Yvette Wang?

8    A     Yes, I see that.

9    Q     And then under officers it says Yvette Wang,

10   President/Secretary, Treasurer Anthony DeBatista?

11   A     I see that.

12   Q     Does this refresh your recollection that Ms. Wang was

13   the president of GTV?

14   A     It doesn't.  It doesn't mean it's not true.  I don't

15   dispute it one way or the other.  I don't recall Yvette

16   being president.  But it's possible.  Mr. Krasner resigned,

17   and I see that's noted on here, and perhaps Ms. Wang become

18   president.  I don't recall that.  I don't dispute it, but --

19   Q     You were on the board but you don't know who the

20   president of the company was?

21   A     I don't recall who it was.

22   Q     Okay.  While you have it there do you recall that Ms.

23   Wang was the President, Secretary and Treasurer of Saraca?

24   A     I don't know what her title was.  I know that she was

25   -- I thought she was a director, which it says there.  In

1    terms of what offices she held at Saraca, I don't -- I don't

2    recall.

3    Q    Then this statement here that he's the president,

4    secretary and treasurer doesn't refresh your recollection?

5    A    It doesn't.  But I don't have any basis to dispute it

6    one way or the other.

7    Q    Okay.

8    A    I'm sure if it came from Hodgson Russ, assuming it's

9    not a draft, it's likely accurate.

10   Q    Okay.  Do you recall who the owner of GTV was?

11   A    GTV's parent company was Saraca, and then also the

12   investors who received shares.

13   Q    Do you recall who the owner of Saraca was?

14   A    I don't.  But based upon this it says Hudson Diamond

15   Holding, Inc. if I'm reading this correctly.

16   Q    Do you recall who the owner of Hudson Diamond, Inc.

17   was?

18   A    I do not.

19   Q    So despite being a director --

20   A    I don't want to say I don't recall.  I don't think I

21   ever knew to be fair.  I don't -- Hudson Diamond Holding I

22   never represented and I never had any dealings with.

23   Q    GTV Media sold securities?

24   A    There was a private offering, yes.

25   Q    You were on the board at that time?

1    A    Yes.

2    Q    But despite that you never learned beyond what you just

3    told me what the -- who the ownership was ultimately of GTV?

4    A    It was Saraca.

5    Q    And the only thing you know about Saraca is that it was

6    owned by an entity called Hudson Diamond, Inc.?

7    A    That's correct.

8    Q    And you never found out who owned that entity?

9    A    I don't know who owned that entity, no.

10   Q    Despite selling securities about a company that

11   supposedly it was owned by?

12   A    I'm sorry.  I couldn't understand that question well.

13   Q    Sure.  I'm asking, as a director, when you were going

14   out into the public and selling securities, did you ever

15   bother to find out, other than a corporate name, who owned

16   the entity that you were going out to the public and selling

17   securities for -- about?

18   A    Your question has several points that are incorrect.

19   Nobody ever offers -- I never went out into the public to

20   sell securities.  The securities were a private offering.

21   They were never offered to the public.  So I can't answer --

22   the answer to that -- to your question is -- I guess there

23   is no way to answer it because it assumes several things

24   that untrue.

25   Q    So your point is that the securities weren't sold to

1  the public, they were -- because it was a private offering?

2  A    That's correct.

3  Q    And you had no role with regard to the sale?

4  A    In terms of?

5  Q    Were you listed in the materials as being a director?

6  A    Yes.  Yes.

7  Q    So the company was putting your name and representing

8  it with -- in connection with what it was -- its offering

9  memorandum?

10  A    Correct.

11  Q    But you still never bothered to find out who allegedly

12  owned the company other an unnamed corporate -- no

13  individual, just a corporate entity in the BVI?

14  A    Yes.  I didn't even know in truth they were in the BVI.

15  They weren't in the BVI.  It was Saraca Media Group was the

16  owner.

17  Q    Which was owned by Hudson Diamond Holdings, Inc., which

18  is in the BVI, correct?

19  A    Yes.  I didn't know they were in the BVI to tell you

20  the truth.

21  Q    Wasn't important to you to know?

22  A    No, it wasn't important.

23  Q    Okay.  Other than GTV, what other entities have you

24  served as a director of?

25  A    GETTR Media Group, Inc.

1    Q    Are you currently still --

2    A    I am.

3    Q    -- a member of GETTR?  Who owns GETTR?

4    A    GETTR is -- there's two shareholders, Hamilton and

5    Freedom Media Ventures, Inc.

6    Q    Both entities are affiliated with a man named William

7    Gee, correct?

8    A    No.  I don't believe so.

9    Q    Are you sure?

10    A    Yeah, I'm sure.  Hamilton I believe is.  I don't

11    believe Freedom Media is in any way.

12    Q    And Mr. Kwok is affiliated with the ownership of those

13    entities, correct?

14    A    Not that I'm aware of.  I know he -- I know he and

15    William are colleagues, but other than that I don't know of

16    any affiliation.

17    Q    When you say Mr. Kwok and Mr. Gee are colleagues, what

18    do you mean?

19    A    I know they know each other.

20    Q    Just like passing acquaintances or do they do business

21    together?

22    A    I don't believe they do business together.  I know that

23    they -- I don't know what their relationship is exactly.

24    Q    You know Mr. Gee lends Mr. Kwok money, right?  And his

25    family?

Aaron Mitchell - Direct - Avram Luft                    51

1   A    I know he lends the family money, yes.

2   Q    In fact, you helped arrange for Mr. Gee to send the $37

3   million when this court asked for a bond to be posted at the

4   April hearing in 2022, correct?  That was you?

5   A    It was me what?

6   Q    Who helped arrange for the $37 million to be sent over

7   from Mr. Gee to Ms. Guo?

8   A    I assisted?  I don't understand what that was you

9   means.

10  Q    I mean, when you say you assisted, I said you.

11  A    I didn't negotiate it.

12  Q    What's that?

13  A    I didn't negotiate it or anything of that nature if

14  that's what you're asking.

15  Q    So what did you do?

16  A    I made some calls to Mr. Gee.

17  Q    And what did Mr. Gee say?

18  A    That he would talk to Mei Guo and they would work

19  something out if he could help.

20  Q    And when you called Mr. Gee what did you tell him?

21  A    That the family -- that Mei needed to come up with some

22  money to help with the bankruptcy.

23  Q    Anything else?

24  A    No.

25  Q    So like I said you helped arrange the $37 million?

1   A    In that context, yes.

2   Q    Any other times you've communicated with Mr. Gee about

3   money to go to Mr. Kwok or his family?

4   A    I don't believe so, no.

5   Q    Any other times you've communicated with Mr. Gee about

6   money in general?

7   A    Yes.

8   Q    In what context?

9   A    I actually represent Mr. Gee.

10  Q    Oh, you represent Mr. Gee also?

11  A    Yeah.

12  Q    Okay.  And what do you represent Mr. Gee in connection

13  with?

14  A    Just general legal advice.

15  Q    About?

16  A    Just general.  If he has a question about law in the

17  U.S., I give him an answer.

18  Q    Okay.  I'm asking the subject matters that you've

19  represented Mr. Gee in connection with?

20  A    I'm not sure what -- again, general advice.  I'm not

21  sure what you're asking me.

22  Q    Like traffic tickets?  Matrimonial?

23  A    No, I've never advised him on a traffic ticket.  I've

24  never advised in matrimonial.

25  Q    Okay.  So think about what you have represented, given

Aaron Mitchell - Direct - Avram Luft                          53

1    him advice on, and please let me know.  What legal matters

2    do --

3    A    I don't know how --

4    Q    -- you represent him in?

5    A    I don't know how I can do that without filing a

6    privilege.

7    Q    I think it's common practice to give the general

8    subject matter on a privilege log as to what you provide

9    legal advice on.  I wouldn't ask -- I'm not asking for

10   anything more than that.

11   A    I don't think that's true.  If it's over the phone, I

12   don't believe you have to provide a privilege log for phone

13   conversations.

14   Q    I think you have to -- it's not a question of whether

15   you have to produce a privilege log.  I feel like I'm

16   debating this.  But quite frankly I think the privilege --

17   there is no disclosure of privilege to provide the general

18   subject matter upon which you provide legal advice.  That's

19   common and that's what I'm asking you.  I'm not asking you

20   to go further.

21   A    If he was looking to make an investment in the U.S., he

22   would ask me for legal advice in regards to potential ways

23   to acquire the -- ways to acquire either the business or the

24   property and I would give him advice.

25   Q    Did you ever have communications with Mr. Kwok in

Aaron Mitchell - Direct - Avram Luft                    54

1    connection with legal advice in the matters that you were

2    talking to Mr. Gee about?

3    A    I don't understand your question.

4    Q    Sure.  You said you've provided --

5    A    Can I -- sorry.  Can I ask what this has to do with the

6    order to show cause related to GTV and contempt?  I'm just

7    wondering how --

8              MR. LUFT:  I'm happy to explain, Your Honor.

9              THE COURT:  Yes.  You do need to explain because

10   we do need to focus back on the --

11             MR. LUFT:  Absolutely, Your Honor.

12             THE COURT:  -- the subpoena, please.

13             MR. LUFT:  Your Honor, the reason I'm asking about

14   this is because, as we're going to find out, Mr. Mitchell

15   was both the director and their counsel.  He is the person I

16   was directed to --

17             THE COURT:  Of whom, director and --

18             MR. LUFT:  Of GTV.

19             THE COURT:  Okay.

20             MR. LUFT:  And then of Saraca he is the person I

21   was directed to get information from whence counsel pulled

22   out literally on the day we asked them to finally produce

23   their documents.  And I think the connections between Mr. --

24   I want to understand because Mr. Mitchell then proceeded to

25   tell me he couldn't do it and he doesn't know about these

Fiore Reporting and Transcription Service, Inc.

1    things and how could he answer questions.

2            So I do want to understand his connections to all

3    of Mr. Kwok's entities because there's a lot of missing

4    documents and I'd like to understand which ones he's

5    involved with because I'm looking for them.

6            THE COURT:  I understand.  But right now what we

7    were talking about was -- you need to focus -- I think you

8    are telling me you're focusing on what you assert is Mr.

9    Mitchell's status as an officer and director of both GTV and

10   Saraca.  Is that correct?

11           MR. LUFT:  Officer and director of GTV.

12           My understanding is that he has been counsel for

13   Saraca.  And I'll find out.  He has told me that he is not a

14   director of Saraca.

15           THE COURT:  Okay.

16           MR. LUFT:  Okay.  But I'm happy to --

17           THE COURT:  And I'll allow you to proceed, but we

18   do need to focus on the subpoena.

19           MR. LUFT:  Terrific.  We'll move ahead.

20   BY MR. LUFT:

21   Q    Let me ask you, what's the current status of GTV?

22   A    I don't know what you mean by that.  There's --

23   Q    Is it operational?

24   A    No.

25   Q    But it has pending lawsuits that you still represent it

Aaron Mitchell - Direct - Avram Luft                                    56

1    in?

2    A    Well, all of them are stayed except for two, which

3    became -- one became unstayed, and the other, well, the

4    other was stayed as well.  And recently there's been some

5    activity that's caused them to become I guess -- is unstayed

6    a word -- no longer stayed.

7    Q    When was the -- when did GTV stop operating?

8    A    Quite frankly, several years ago.  Prior to the

9    settlement with the SEC, the company was no longer

10   operational.  The employees had all left.  The website had

11   shut down.  And then after that it was really just trying to

12   work with the SEC to get the money back to the investors.

13   Q    And what's the current status of Saraca Media?

14   A    I don't know.  I don't believe there's anyone there.  I

15   believe that Ms. Wang resigned.  That's the extent of what I

16   know about Saraca.

17   Q    When did that happen?

18   A    I don't know.  I found out somewhere between six to

19   nine months ago, maybe six months ago, not long before Mr.

20   Temkin resigned, the attorney referenced.  Shortly before

21   that was when I found out that there was no one at Saraca.

22   Q    Who told you?

23   A    Ms. Wang told me she had resigned.  And I believe --

24   I'm not sure if she told me or if I implied from that that

25   there's no one else there because she was I believe the only

1   person remaining at Saraca.

2   Q    Where did GTV keep its documents?

3   A    GTV's documents were at 162 East 64th Street.  And then

4   they were -- I have them now.  I don't -- but I didn't get

5   them in between.  And you have already received through my

6   production of Lawall & Mitchell I believe electronic copies

7   of all the documents.

8   Q    Mr. Mitchell, let's be very clear.  Have you ever told

9   me that you were representing GTV and making a production on

10  their behalf in connection with a subpoena?

11  A    No, I didn't make -- there was no -- I don't believe

12  there was a production made on behalf of GTV.

13           What I'm telling you is that you received

14  documents from me personally as I'm here testifying on my

15  own behalf that I provided to you from GTV which were the

16  documents that I had in my possession.  And I believe there

17  was about 100,000 pages.

18  Q    Of documents you produced based on a subpoena to you,

19  not any subpoena to GTV?

20  A    A subpoena to my firm, correct.

21  Q    Why didn't you represent GTV and produce the documents

22  when I -- that's when Mr. Temkin told me to speak to you

23  about it?

24  A    Why?  I don't even understand your question.  Why

25  didn't I give you documents I already gave you?

1    Q    No.  You didn't give them to me at the time, Mr.

2    Mitchell.

3    A    You already had -- you absolutely had the GTV documents

4    prior to -- from me, the ones that Lawall & Mitchell had,

5    you absolutely had those documents prior to you reaching out

6    to me on behalf of GTV.  Unequivocally.  And I can give you

7    the Bates stamps.

8    Q    Okay.

9    A    And the email if you'd like.

10   Q    We'll go through it, Mr. Mitchell.  Where's Saraca

11   Media -- where is Saraca Media's documents kept?

12   A    I don't know.

13   Q    You represented them as a -- in connection I think you

14   said currently for five or six cases.  You don't know where

15   they keep their documents?

16   A    I don't know where they keep their documents.

17   Q    How do you do discovery?

18   A    I don't -- what do you mean how do I do discovery?

19   Q    If you don't know where your client's documents are how

20   do you do discovery?

21   A    Discovery has been completed.

22   Q    When you did discovery, where were the documents?

23   A    They were -- they were on a platform, an electronic

24   platform.

25   Q    Where was that?

1   A   You mean the company?

2   Q   Yeah.  What electronic platform?

3   A   Terrace.

4   Q   Terrace.  They weren't kept on -- they weren't -- there

5   were no hard copied document files for Saraca Media?

6   A   I have no idea.

7   Q   You never searched them for discovery?

8   A   No, because it was all electronic.

9   Q   Where are the servers for Terrace?

10   A   I have no idea.

11   Q   How did you access documents that were on the Terrace

12   server?

13   A   Online.

14   Q   Through what?

15   A   Terrace.

16   Q   What?  How did you access them?

17   A   I don't understand your question.  I went -- I logged

18   in and accessed them.  I'm not very -- I'm not trying to be

19   evasive.  I'm not very computer savvy.  I log in.  I went on

20   the website.  I logged in and I had access to the documents.

21   I reviewed them and produced what was responsive and/or not

22   privileged.

23   Q   Okay.  Who maintained and kept the records for those --

24   for GTV?

25   A   Again, I'm not understanding.  You mean Terrace, is

Aaron Mitchell - Direct - Avram Luft                                    60

1    that what you're asking?

2    Q    No.  I mean who at the company was in charge of keeping

3    the records and files for GTV?

4    A    At what point in time?

5    Q    Prior to its ceasing operation.

6    A    I presume it would have been the secretary and/or an

7    employee of GTV.

8    Q    Okay.

9    A    I don't know definitively.

10   Q    I just want to be clear.  Is it your testimony that in

11   your personal production you've produced all of GTV's, the

12   entire universe of GTV's documents to us?

13   A    You mean in my firm's production?

14   Q    Well, I served it on you, so.

15   A    For the record, you served it on Lawall & Mitchell.

16   Q    Okay.

17   A    Correct?  Well, you know, I have to testify, but you

18   served it on Lawall & Mitchell and I responded in my

19   capacity at the firm.

20   Q    Okay.

21   A    You didn't serve me personally one, no.

22   Q    Okay.  And did Lawall & Mitchell produce the entire

23   universe of GTV's documents?

24   A    I don't know if they did or not.  They produced -- I

25   went on and reviewed the documents that were available on

Aaron Mitchell - Direct - Avram Luft                                    61

1    Terrace and produced all of the documents that were stored I

2    guess on the site that were responsive.

3    Q    So are GTV's documents also --

4    A    Correct.

5    Q    -- stored on Terrace?

6    A    Yes.  Yes.  They were all stored on Terrace in response

7    to the SEC's subpoena.

8    Q    Well, Mr. Temkin told me that your documents were not

9    included in the -- in that database.  You told me,

10   specifically told me that that database does not include all

11   of GTV's documents.  Is that -- when you talk about the

12   Terrace database, are you referring to the one created for

13   the SEC?

14   A    That's correct.

15   Q    Okay.  So that's -- Mr. Temkin has told me that's not

16   all of GTV's documents.  Where are the remainder of GTV's

17   documents?

18   A    That's all the documents I'm aware of.

19   Q    Okay.  How about Saraca?

20   A    Just to be fair there, I do have a couple of emails as

21   a director to the stock transfer company, V Stock.  I'm

22   sorry, the V Stock are Equity.

23        THE COURT:  Do you know how to spell that?

24        THE WITNESS:  I'm trying to remember which one it

25   is, if it was V Stock.  One of them we referred to and we

Aaron Mitchell - Direct - Avram Luft

62

1    didn't use them.  We used the other.  I believe it Equity,

2    E-Q-U-I-T-Y.  But there are -- whomever the stock transfer

3    agent was I personally as director of GTV have an exchange

4    of emails with them that has not been produced because it's

5    not -- again, it wasn't responsive to Lawall & Mitchell's

6    subpoena.

7              THE COURT:  The word that -- the name you used

8    before though was it V, like Victor, Stock?

9              THE WITNESS:  V, like Victor, Stock.

10             THE COURT:  Victor Stock.

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.  V Stock.  Okay.  Thank you.

13   That will just be helpful to know.  Thank you.

14             THE WITNESS:  Sure.

15   BY MR. LUFT:

16   Q    Was it responsive to GTV's subpoena?

17   A    I don't believe so.

18   Q    Have you reviewed GTV's subpoena for relevance?

19   A    Not really, no.

20   Q    How about Saraca, have you produced the entire universe

21   of Saraca's documents in connection with the Lawall &

22   Mitchell production?

23   A    All the -- all the documents that I have, yes.

24   Q    Well, what documents do you have of Saraca?

25   A    The ones that were produced to you.  I believe there

1    were some ownership documents that were produced.  Or

2    organizational documents is probably a better term.  And

3    whatever other documents that were included in the

4    production that were provided initially.  I don't recall

5    what it was exactly.

6    Q    So you're not representing that your production from

7    Lawall & Mitchell covered the universe of documents that we

8    requested from Saraca Media, correct?

9    A    No.  No.  I can't imagine that it did.

10   Q    Okay.  Let's turn --

11   A    I don't know definitively to be clear, but I would

12   assume there are more documents than what I produced.

13   Q    Okay.  Let's turn to Mr. Temkin who's a -- he was a

14   lawyer at Morvillo, correct?

15   A    Correct.

16   Q    And did you hire him to represent GTV and Saraca in

17   connection with the 2004 subpoena?

18   A    I did not hire him to represent Saraca.  He did

19   represent Saraca, but I didn't hire him.

20   Q    You hired him to represent GTV?

21   A    Well, I was on the board at GTV so I think that is

22   fair.

23   Q    You were the person who was served with the subpoena,

24   the 2004 subpoena, correct, on behalf of GTV?

25   A    I don't recall if that's sure.  I think you served it.

Aaron Mitchell - Direct - Avram Luft                    64

1    If you represent that, I don't have any reason --

2    Q    I could show you the email to Mr. Linsey.

3    A    I have no reason to dispute it.  I sincerely don't

4    recall.  But if you represent that, I will accept your

5    representation.

6    Q    And when you got that subpoena, what did you do?

7    A    I believe -- thank you -- I believe that I gave it to

8    Mr. Temkin to respond to.

9    Q    Okay.  And how did Mr. Temkin come to be -- represent

10   Saraca at the exact same time?

11   A    He was already representing Saraca during the SEC -- in

12   response to the SEC subpoena and the settlement there,  Mr.

13   Temkin was representing Saraca.  Cahill was representing

14   GTV.  And Brad Bondi, who's now with your firm, was counsel

15   for GTV.  He was terminated.  And then Mr. Temkin -- at that

16   point, the settlement had essentially been negotiated and

17   Mr. Temkin represented both GTV and Saraca in finalizing the

18   settlement.

19   Q    In connection with the 2004, who contacted Saraca to

20   represent -- who contacted Mr. Temkin to represent Saraca?

21   A    I don't recall.  I may have forwarded him the subpoena.

22   I sincerely don't recall one way or the other.

23   Q    Okay.  On November 28th, my colleague, John Kashuwicz,

24   emailed Mr. Temkin's firm telling him that given the months

25   of non-production we were requesting that they finally make

Aaron Mitchell - Direct - Avram Luft                    65

1    their production on December 2nd.

2            We received a response back advising us that as of

3    that day Morvillo was no longer going to represent GTV.

4            Were you involved in that decision for Morvillo to

5    cease representing GTV on the same day that we demanded that

6    production be made?

7    A    That decision would have been made by Morvillo.

8    Q    Why did Morvillo withdraw as counsel?

9    A    I presume, and you'd have to ask Mr. Temkin, but I

10   presume it had to do with the fact that they weren't being

11   paid.

12   Q    You had no discussions with Mr. Temkin regarding his --

13   A    That's why I presume is because he had asked several

14   times about payment and I had informed him that there were

15   no more funds at GTV to pay him.  So I believe that that is

16   it.  But, again, you'd have to ask him.  I'm speculating a

17   little bit, but I -- that would be the reason I would resign

18   if I were him.

19   Q    Okay.  So it's your testimony that you had no

20   conversations with Mr. Temkin and Morvillo about their

21   decision to withdraw as counsel on the eve of having to make

22   a production to us?

23   A    That's not what I said.  What I said was I presume that

24   it's because they weren't paid.  He told me -- he asked me

25   about being paid several times so there were conversations

1    where he said I need to get paid or I'm going to have to

2    resign.  Ultimately he resigned.  He didn't say I'm going to

3    resign today because you have not paid -- because he has not

4    paid me.  And it is the day in which the subpoena is due, he

5    said to me, we're not getting paid, we're going to have to

6    stop working.

7    Q    At the time Mr. Morvillo, sorry, Mr. Temkin of Morvillo

8    withdrew as counsel for GTV and Saraca you were aware that

9    there were pending 2004 subpoenas from the Trustee, correct?

10   A    Yes.

11   Q    And you're aware that Mr. Temkin had told us that if we

12   had any inquiries with regard to GTV and Saraca we were to

13   contact you, correct?

14   A    Yes.  That's what you had said in your email to me.

15   Q    Right.  And you told us that you would tell us who

16   GTV's new counsel was?

17   A    I don't recall, but that would make sense at the time.

18   I would have tried to get new counsel.

19   Q    In fact, you told me specifically that you -- before

20   you could answer any of my questions you first wanted to

21   speak to Mr. Temkin?

22   A    That would make sense because, again, you had informed

23   me that he had said I was the person to speak to and so I

24   was trying to speak to him.

25        Also you had said that I was the director of

1    Saraca and I wanted to find out why he would say something

2    like that when it was untrue.

3    Q    Mr. Mitchell, I want to be very clear.  I'm not asking

4    what you think would make sense.  I'm just going to ask you

5    for your recollection.

6    A    Well, that's my recollection is that you had identified

7    me as a director of Saraca and I told you that was

8    inaccurate.  You had told me that's what Mr. Temkin had told

9    you.  So I said I wanted to speak to Mr. Temkin because I

10   don't know why he would say something that was untrue.

11   Q    Did you speak to Mr. Temkin?

12   A    I did.  I asked him why he said that I was a director

13   of Saraca?  He said he never said that.

14   Q    Did you have any -- speak about anything else about the

15   subpoenas?

16   A    I don't recall.  That was the thing that I was most

17   concerned with because I didn't like the idea that anyone

18   was saying something that was inaccurate, and quite frankly

19   could arguably cause me to do more work.  So that's my

20   recollection of my conversation with Mr. Temkin.

21   Q    In fact, you told me that you were going to put me in

22   contact with GTV's new counsel once retained, correct?

23   A    You told me you only wanted me to answer definitively.

24   Q    Okay.

25   A    That sounds correct, but that would make sense.

1  Q    Do you want me to show you the email?

2  A    No.  I accept your representation.  I'm not disputing

3  it.  You had said not as you think about it, you know, not

4  to tell you I was thinking something, only what I

5  definitively knew.  And I don't specifically recall that,

6  but it sounds accurate.

7  Q    You never told me the name of GTV's new counsel, did

8  you?

9  A    GTV never retained new counsel.

10 Q    And as to Saraca, I asked you to tell me the name of

11 their new counsel or the name of an individual at the

12 company who I could speak to to find out who was the right

13 counsel, the right person to speak to, correct?

14 A    I don't recall that.  Again, if you're representing

15 that, I'll take it as true, but.

16 Q    Maybe I'll say the words and see if it refreshes your

17 recollection.  Do you recall me writing to you on December

18 21st saying has GTV retained new counsel?  If so, please let

19 me know who it is.

20      As to Saraca, am I correct that as of now it is

21 neither represented by you or Morvillo?  If so, do you know

22 if it is represented by anyone?  If not, who is the person

23 at Saraca that we should be speaking to as Morvillo directed

24 us to speak to you regarding our request to Saraca.

25      Does that refresh your recollection about what I

1   asked you?

2   A    No.  But I'll accept it as true.

3   Q    You never gave me any information about who to speak to

4   at Saraca regarding the subpoenas, correct?

5   A    That would be -- that would be correct.  I don't

6   believe I had any information as I testified hereto today.

7   Q    Did you ever call Ms. Wang and say, hey, we have

8   subpoenas?  You're the president of Saraca.  You're the

9   director of Saraca.  What are we going to do to respond to

10  this?

11  A    She was not the president and director.  As I testified

12  she already said she had resigned.

13  Q    In December she resigned from Saraca, that's your

14  testimony?

15  A    I don't recall when she resigned was my testimony, but

16  I know she wasn't there at that point.

17  Q    Who was there?

18  A    I don't believe anybody, but I could be wrong.

19  Q    So you -- I'm emailing you about who to speak to at

20  Saraca and you know that there's no one at Saraca and you

21  never tell me that?

22  A    Yeah.  I don't believe I responded to that email.  I

23  don't think you followed up either.  But I don't recall.  I

24  don't recall responding to it.

25  Q    In fact, I sent you multiple emails before that one

Aaron Mitchell - Direct - Avram Luft                    70

1   trying to find out who to speak to at Saraca and GTV, didn't

2   I --

3   A    I don't (indiscernible) --

4   Q    -- me and Mr. Kashuwicz?

5   A    I don't know if that's true.

6   Q    You want me to --

7   A    On multiple -- I guess there's two at least, so, yes,

8   multiple.

9   Q    There was more than two emails between me and Mr.

10  Kashuwicz and you, correct?

11  A    Regarding my subpoena, I believe so.  Regarding GTV and

12  Saraca, I don't know.  There could be, but I don't recall.

13  Q    Okay.

14  A    By my subpoena, I mean Lawall & Mitchell just for the

15  record, my firm.

16  Q    Okay.  I want to ask you, as a board member and an

17  attorney for GTV, you were aware that you had pending valid

18  subpoenas and you made the decision to not hire any counsel

19  for GTV?

20  A    There was no money to hire any counsel for GTV.

21  Q    Could you have done it?

22  A    I suppose I could have done it.  I don't think that

23  that's my obligation to do it.  I don't think I have to take

24  on pro bono clients.

25  Q    As a board member, do you think you have an obligation

1    to respond to the company that you're a board member of that

2    the company has an obligation to respond to subpoenas?

3    A    I resigned from the board.

4    Q    Oh, when did you resign from the board?  April 2023?

5    A    That's correct.

6    Q    How about between December and April, did you have an

7    obligation then?

8    A    I suppose there was an open subpoena.  You know, if

9    there had been a request for information, if there had been

10   a request for documents from you, a follow-up or something,

11   I suppose, yes.

12   Q    There wasn't -- the subpoena wasn't a request for

13   documents?

14   A    It was, but there was nothing further from you that was

15   heard regarding, hey, I need documents.  And then --

16   Q    You didn't take my multiple emails following the fact

17   that asking you who can I speak to, tell me anyone, you

18   didn't take that as me trying to find out who to get

19   documents from?

20   A    That's not what you said.

21   Q    You're right.  I didn't say tell me anyone.  I said who

22   is the person at Saraca who we could speak to as Morvillo

23   directed us to speak to you regarding our requests?  You

24   didn't take that as me asking who to speak to?

25   A    I did, but I didn't have an answer for you.  I didn't

Aaron Mitchell - Direct - Avram Luft                    72

1    -- there was no one I could tell you because there was no

2    answer to be had.  For my -- there was no answer that I had

3    for you, let's put it that way.

4    Q    And with regard to Saraca, the same thing, you were

5    aware that there was a pending --

6    A    Your question was about Saraca the first one.

7    Q    The first one was about GTV as a board member because

8    you're not a board member of Saraca, correct?

9    A    But you asked me about Saraca, but --

10   Q    So fine.

11   A    -- (inaudible) response --

12   Q    Then we'll do it as to GTV.

13   A    I just want to make sure my response is clear on the

14   record.

15   Q    Fine.

16   A    That was my response.

17   Q    As to GTV as a board member, you were aware that there

18   was a pending subpoena and that the company had an

19   obligation and that you -- and the company was not

20   responding to the subpoena, correct?

21   A    The company, correct.

22   Q    Okay.  How can I get the Saraca documents now?

23   A    I don't know.

24   Q    Who would I speak to about getting -- who would be the

25   person who would know where I could get the Saraca

Aaron Mitchell - Direct - Avram Luft                    73

1    documents?

2    A    I don't know.

3    Q    How about the GTV documents?

4    A    Well, I've given you, on behalf of Lawall & Mitchell,

5    the GTV documents.

6    Q    Well, I asked you.  You told me that you don't know if

7    you have all the GTV documents.

8    A    (Indiscernible).

9    Q    You told me you responded to the GTV documents that

10   were responsive to your subpoena.

11   A    Sorry, is there a question there?

12   Q    Yes.  Where can I get the GTV documents?

13   A    Again, the ones -- the ones that I am aware of were

14   produced.  I suppose Terrace would still have them.

15   Q    Do you have the login information for that?

16   A    I don't.

17   Q    Who does?

18   A    Terrace would.

19   Q    So every time you wanted to log in you called the

20   platform and said how do I log in?

21   A    Well, I haven't logged in since I responded to your

22   subpoena nine months ago.

23   Q    And no one has the login information for all the data

24   that's stored on this platform?

25   A    Again, Terrace would be able to -- Terrace has the

1   access to that.

2   Q     How about someone who worked for GTV or Saraca?  Who

3   has access to those documents on a platform?

4   A     Nobody I believe.

5   Q     No one has access to those documents?

6   A     Not that I'm aware of.

7          MR. LUFT:  Okay.  Your Honor, I have no further

8   questions on this.

9          THE COURT:  Okay.  You can step down, Mr. Lawall.

10   Thank you.

11       (Witness excused)

12          THE COURT:  All right.  With regard to the order

13   requiring GTV Media and Saraca Media Group --

14          Mr. Lawall, I still need you to come to the table

15   though.

16          MR. MITCHELL:  Oh, sorry.

17          THE COURT:  Okay.  That's okay.  I mean, Mr.

18   Mitchell.  Because you were appearing here to show cause.

19          I think I heard you say, but I want to be clear,

20   that you -- you have -- you don't have any authority to

21   oppose the entry of a civil contempt order against GTV Media

22   and Saraca Media Group, is that correct?

23          MR. MITCHELL:  I believe that's correct, Your

24   Honor.  I just want to make sure that I fairly represent to

25   you I have not been retained and I'm not an officer, so I

1    don't believe I do, Your Honor.

2              THE COURT:  Okay.  I think that's what you said.

3              MR. MITCHELL:  Yeah.  That's --

4              THE COURT:  So I just wanted to be clear about

5    that.  Okay?

6              So this order to show cause was requiring someone

7    -- the order to show cause required GTV Media through an

8    officer, director, member or manager, and Saraca Media Group

9    through an officer, director, manager or member, to appear

10   and show cause.  In addition to you appearing.

11             I'm just -- and there has been no officer,

12   director, member or manager of GTV Media, Inc. appearing at

13   this hearing today.

14             And I want to be clear that you are not here as an

15   officer, director, member or manager of GTV Media, correct?

16             MR. MITCHELL:  That's correct, Your Honor.

17             THE COURT:  Okay.  And you are not here, Attorney

18   Mitchell, as an officer, director, member or manager of

19   Saraca Media Group, correct?

20             MR. MITCHELL:  No, I'm not, Your Honor.

21             THE COURT:  Okay.  So you're not here to respond

22   to or show cause on behalf of GTV Media or Saraca Media

23   Group with regard to the contempt motion that was served on

24   those two entities, is that correct?

25             MR. MITCHELL:  That's correct, Your Honor.

Ho Wan Kwok - July 18, 2023                                    76

1          THE COURT:  Okay.  Thank you.

2          All right.  So, Attorney Luft --

3          MR. LUFT:  Yes, Your Honor.

4          THE COURT:  -- what we need -- what I'm going to

5    give you the opportunity to do today is I'm going to give

6    you an opportunity to supplement your motion and your

7    declaration with what occurred here today, the order to show

8    cause, Mr. Mitchell testified, you're going to want to tell

9    me what you think I need to listen to or consider about Mr.

10   Mitchell's testimony, and I'm going to --

11         MR. LUFT:  Yes, Your Honor.

12         THE COURT:  How much time would you like to

13   supplement the motion as it -- as it applies to GTV Media

14   Group and Saraca Media Group?

15         MR. LUFT:  Your Honor, if I may, I want to make

16   sure that I'm accurate in what I tell -- in what I say.

17   Usually it takes about a week for us to get a copy of the

18   transcript.

19         THE COURT:  That's fine.  Yeah.  I'm not --

20         MR. LUFT:  So I want to just make sure we have the

21   transcript before we do it.

22         THE COURT:  I agree.  You're going to need a

23   transcript.

24         MR. LUFT:  Right.

25         THE COURT:  I mean, none of us are going to

1    remember what was said without a transcript, right?

2                   MR. LUFT:  Exactly.

3                   THE COURT:  So you're definitely going to need --

4    so how much?  Do you want three weeks?  A month?  How much

5    time?

6                   MR. LUFT:  Three weeks would be more than enough,

7    Your Honor.

8                   THE COURT:  Okay.

9                   MR. LUFT:  And I'll try to expedite it if I can do

10   it faster.

11                  THE COURT:  Well, I'll set a date of three weeks.

12   And if you get it filed earlier, you get it filed earlier.

13                  MR. LUFT:  Exactly.

14                  THE COURT:  Okay.  It needs to be served --

15   whatever you file, whatever supplemental document you file,

16   will need to be served on Attorney Mitchell.

17                  And, Attorney Mitchell, in the main case you have

18   an appearance, so you'll get it electronically.  Okay.

19                  MR. MITCHELL:  Yes, Your Honor.

20                  THE COURT:  You will get whatever Mr. Luft files

21   electronically.

22                  So three weeks from today is August 8th, but I can

23   give you to August 11th, which is the Friday.  Is that fair

24   or do you need more time?

25                  MR. LUFT:  No, Your Honor.  That's more than

1    sufficient.

2              THE COURT:  Okay.  So August 11th you can,

3    Attorney Luft, supplement your motion for contempt against

4    Saraca Media and GTV Media with whatever you think is

5    appropriate.  Okay?

6              MR. LUFT:  Thank you, Your Honor.

7              THE COURT:  But it's got to be served on Attorney

8    Mitchell.

9              Now, Attorney Mitchell, you're not here on behalf

10   of either one of those entities, so I'm not going to give

11   you a time to reply because you're not representing them.

12   Okay?

13             MR. MITCHELL:  That's fair, Your Honor.

14             THE COURT:  So I'm -- once Attorney Mitchell files

15   whatever, I mean, excuse me, Attorney Luft files whatever he

16   is going to file, then I will review that, and then I will

17   make a determination as to whether anything further needs to

18   be done or the matter would be ripe for a decision.  Okay?

19             MR. LUFT:  Thank you, Your Honor.

20             THE COURT:  And I think that's the best way to

21   proceed with regard to the order to show cause.

22             Does anyone have anything else they'd like to

23   state for the record with regard to the order to show cause?

24             MR. LUFT:  Nothing on my behalf, Your Honor.

25             MR. MITCHELL:  No, Your Honor.

1          THE COURT:  Okay.  All right.  So then I'm

2    ordering on the record -- and whether I -- whether we issue

3    a virtual order to confirm it, that any supplemental

4    documents that moving counsel, which is counsel for the

5    Trustee, wishes to file in connection with the motion for

6    contempt as it is directed to GTV Media, Inc. and Saraca

7    Media Group, Inc. shall be filed on or before August 11th.

8    Okay?

9          MR. LUFT:  Thank you, Your Honor.

10         THE COURT:  All right.  Thank you.

11         So that concludes the hearing on the order to show

12   cause with regard to GTV Media Group and Saraca Media Group.

13   Okay?  Thank you.

14         MR. MITCHELL:  Your Honor, does that mean I'm

15   free?  I was ordered to be here so --

16         THE COURT:  You can do whatever you think is

17   appropriate.  But as far as the order to show cause hearing,

18   that is -- it is concluded now.  Okay?

19         MR. MITCHELL:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         So we have a few other matters on the calendar at

22   1:30 and 2:00 p.m., but the Court is going to take a short

23   recess, so the Court will be back at 1:50 p.m.

24      (Proceedings recessed at 1:39 p.m.)

25      (Proceedings resumed at 1:51 p.m.)

1          THE COURT:  Please be seated.

2          All right.  We're back after recess and we have

3    two matters on the calendar at 1:30 and two matters on the

4    calendar at 2 p.m.

5          I would ask the courtroom deputy to call the

6    adversaries at 1:30 p.m. first, please.

7          THE COURTROOM DEPUTY:  Okay.

8          Case No. 22-5003, HK International Funds

9    Investments (USA) Limited versus Despins; Case No 23-5008,

10   Despins versus Guo.

11         THE COURT:  Okay.  Good afternoon.  If we could

12   have appearances in these adversary proceedings starting

13   first with the Chapter 11 Trustee.

14         MR. DESPINS:  Good afternoon, Your Honor.  Luc

15   Despins, Chapter 11 Trustee.

16         MR. LUFT:  Good afternoon, Your Honor.  Avi Luft

17   of Paul Hastings on behalf of the Chapter 11 Trustee.

18         MR. LINSEY:  Good afternoon, Your Honor.  Patrick

19   Linsey for the Trustee.

20         THE COURT:  Mr. Moriarty?

21         MR. MORIARTY:  Good afternoon, Your Honor.  James

22   Moriarty from Zeisler & Zeisler for HK International and Mei

23   Guo in 22-5003 and for Mei Guo in 23-5008.

24         THE COURT:  Good afternoon.

25         All right.  There are pretrial conferences in both

Ho Wan Kwok - July 18, 2023                                        81

1   of these adversary proceedings.  The first pretrial

2   conference in Adversary 22-5003 was set by the Court some

3   time ago after motions were filed for summary judgment and

4   different rulings were entered in this adversary proceeding.

5          The pretrial conference schedule was scheduled on

6   May 23rd when the Court had entered partial summary judgment

7   on the first and second counterclaims of the Chapter 11

8   Trustee.

9          HK International and Mei Guo have filed their

10  answers to the counterclaims, therefore, the Court set a

11  pretrial conference to be scheduled for today, July 18th at

12  1:30 p.m., and ordered the parties to meet and confer about

13  next steps in the adversary proceeding regarding the

14  complaint, and the answer and counterclaims in advance of

15  the pretrial conference.

16         So, Trustee Despins, you are the counterclaim

17  plaintiff, so where do things stand in connection with this

18  adversary proceeding in accordance with what the Court

19  ordered to occur in the order of May 23rd, 2023?

20         MR. DESPINS:  Thank you, Your Honor.

21         I believe we filed a request to adjourn this

22  because, on consent, because the status is you've ruled on

23  two counts already, both are on appeal, but we want to

24  maintain the other counts alive, but dormant for now, in the

25  event that for some reason there would be a reversal on

1    appeal.  So we need to keep them there, but there's no

2    activity that needs to take place in this adversary

3    proceeding at this point.

4              THE COURT:  Well, what about the third

5    counterclaim?  You're not going to proceed with the third

6    counterclaim at this point?

7              MR. DESPINS:  Not at this point.  We're --

8              THE COURT:  Because there's been arguments on both

9    -- which I don't understand of the parties.

10             At one point, at least, Mr. Moriarty, it wasn't

11   you that made the argument, but I think it was Ms. -- oh,

12   isn't that -- I'm going to forget her name -- Melissa

13   Wernick who made an argument that counts 002 and 003 were

14   different, counterclaims 002 and 003 were different relief?

15   And then there seems to be some argument that they're now

16   the same.  So I'm a little confused by that quite frankly,

17   number one.

18             Number two, I understand that the first and second

19   counterclaims are on appeal.  Obviously I understand that.

20             But I also understand that the answer in

21   counterclaims -- and, Mr. Moriarty, correct me if I'm wrong,

22   okay, because it's possible -- but I think in the answer in

23   counterclaims in response to the allegations that are

24   required to be made under the Federal Rules of Bankruptcy

25   Procedure regarding jurisdiction and core versus non-core

1    that your clients have stated that these are not core

2    proceedings.

3          Is that the allegation you're going to continue to

4    continue to make considering you started this cause of

5    action as a declaratory judgment action?

6          MR. MORIARTY:  Your Honor, standing here right

7    now, I do not know the answer to your question.

8          It was filed on behalf of HK International as the

9    claimant.  And the counterclaims -- the answer in the

10   counterclaims would have been filed by the Trustee.  We did

11   answer the counterclaims.

12         THE COURT:  Yeah.  That's what I'm talking about.

13         MR. MORIARTY:  Okay.  So my recollection is that

14   in the answer to the counterclaims, pursuant to I believe

15   it's either 7008 or 7012, we did indicated that we --

16         THE COURT:  It's 8 or 9, but anyway, go ahead.

17   It's not 12, but go ahead.

18         MR. MORIARTY:  We did include the required

19   statement stating that we opposed the bankruptcy court

20   making a final determination of the claims.

21         THE COURT:  Even though you -- your clients

22   commenced this cause of action in which the counterclaim was

23   asserted?

24         MR. MORIARTY:  Yes, Your Honor.

25         The counterclaims go much further than my client's

1    claim, my clients' claims.

2              THE COURT:  Well, I'm not sure that true.  You

3    know, the original claim was a declaratory judgment that

4    your client owned the yacht?

5              MR. MORIARTY:  Correct.

6              THE COURT:  And the counterclaims were in response

7    to that saying that your client doesn't own the -- you know

8    what they said in the first and second counterclaim so --

9              MR. MORIARTY:  Mm-hmm.

10             THE COURT:  -- I'm not sure that that's an

11   accurate statement.

12             However, I understand that the parties wanted to

13   adjourn this pretrial conference but I think that there are

14   things that everybody needs to think about, which is --

15   which are, I understand that there are matters on appeal,

16   but there's no stay pending appeal unless I missed

17   something.  Right?  There's no stay pending appeal of either

18   one of those decisions at this point in time.

19             MR. MORIARTY:  As of this point in time, that's

20   correct.

21             THE COURT:  Right.

22             But Judge Dooley definitely denied one of them.

23   She may be taking under consideration -- and I don't recall

24   which is which, okay -- I think she's taking into

25   consideration -- she already denied --

1          MR. DESPINS:  Number one.

2          THE COURT:  -- count 001.  And then she's taking

3    into consideration counterclaim 2.

4          MR. DESPINS:  Two, that's correct.

5          MR. MORIARTY:  Correct.

6          THE COURT:  So there's no stay pending appeal with

7    regard to count 001.

8          You have argued, and that's fine, that count 003

9    is different from count 002, and so I'm not sure that I

10   agree that nothing should happen.  All that being said,

11   let's put that aside for a moment.

12         There's also counts 004 and 005.  There also is

13   some argument that I should enter a judgment on -- you've

14   made -- you've said that things are different, but then you

15   want me to enter a judgment on counts 001 and 002 so that

16   there can be a final order under the Federal Rules of Civil

17   Procedure for which there would be an appeal with no issue

18   that it might be an interlocutory appeal, correct?

19         MR. MORIARTY:  Correct.  Correct.

20         THE COURT:  Okay.  So I haven't ruled on that.

21   That was recently filed I believe.

22         Has the Trustee responded to that?

23         MR. DESPINS:  I don't think we have.

24         THE COURT:  I don't think you have either.

25         So that's another issue of why I say I'm not sure

1    that I agree.

2          And I'm -- we can all work together as far as

3    timing, okay, but I'm not sure I agree that things are going

4    to be stayed or not -- anything happens during the appeal,

5    during the appeal of this, of these counterclaims.

6          And then the other -- the other thing that I -- in

7    that motion that you -- I don't remember, Mr. Moriarty, and

8    I apologize, whether your office filed it -- we're going to

9    look at it and I'll tell you in a minute when I find it --

10          MR. MORIARTY:  I don't believe it was a standalone

11    motion, Your Honor.  It may have been included in our

12    summary judgment opposition.  I do not recall a specific

13    standalone motion asking that the Court find that there was

14    no reason for delay and that it entered final judgment.

15          THE COURT:  It was in your opposition to summary

16    judgment, which is ECF 203.  Okay?

17          MR. MORIARTY:  Okay.

18          THE COURT:  And so in ECF 203 you talk about, you

19    ask the Court, even though you -- and when I say you, Mr.

20    Moriarty, I'm not speaking of you, I'm speaking of the

21    clients that you and others represent -- have stated that

22    you think counterclaims 002 and 003 are different.

23          And then Ms. Wernick made a whole argument about

24    that --

25          MR. MORIARTY:  Right.

1          THE COURT:  -- in response -- the oral argument on

2     summary judgment.

3          And now you say actually, no, enter judgment on

4     counts -- enter a final judgment on counts 001 and 002.

5     Three's disposed of because of 002.  Four's disposed of

6     because of 001.  And 005 is in the alternative.  And you

7     don't need to decide that because you've got 001 and 002.

8          MR. MORIARTY:  Mm-hmm.

9          THE COURT:  Okay.  So that's what you've said.

10         So the Trustee -- that document was filed on April

11    14.  I don't know that the Trustee's responded to that.

12    Whether the Trustee has to respond to that or not we'll talk

13    about that.

14         But then in addition, in that very same brief, and

15    in this adversary proceeding -- this brief was filed on

16    behalf of HK International Funds only, not Mei Guo, so Mei

17    Guo didn't oppose summary judgment, not in writing.  It's

18    not anywhere in writing that she opposed summary judgment.

19    Okay?  On the second counterclaim.

20         MR. MORIARTY:  Yeah.  I don't -- Your Honor, I

21    don't believe that that second counterclaim was asserted

22    against her.  I could be incorrect, but that's my

23    recollection --

24         THE COURT:  Okay.

25         MR. MORIARTY:  -- which is why she wouldn't have

1  opposed it.  I believe the only counterclaim that was

2  asserted against her, and inartfully, was counterclaim 005,

3  which was (indiscernible) --

4          THE COURT:  Well, I'm not sure that's true, but

5  you can have an -- you two can talk about that.

6          MR. MORIARTY:  Okay.

7          THE COURT:  I'm not sure I agree with you, but I

8  don't have to.  I'm not making a ruling or anything.  I'm

9  just saying.

10          MR. MORIARTY:  Yeah.

11          THE COURT:  So that the record clear, the only

12  party that opposed the summary judgment on the second

13  counterclaim was HK International, not Mei Guo.

14          MR. MORIARTY:  Correct.

15          THE COURT:  So in this, in this brief that you

16  filed on April 14th, ECF 203 in this adversary proceeding,

17  there's also -- and I think it was signed by -- I believe

18  this brief, and let me say, let me make sure I'm right

19  before I say something incorrect, no, I am correct, was

20  signed by Mr. Vartan with Mr. Della Fera, and Ms. Wernick's

21  name under his, and then your name and Mr. Romney's name.

22  Okay?  But it's filed by Mr. Vartan.

23          MR. MORIARTY:  Mm-hmm.

24          THE COURT:  In that brief, you also say that the

25  PJR and preliminary injunction, should -- must be dissolved

1    as moot because of the argument that you're making that I

2    should enter a final order and judgment on counts 001 and

3    002, 003 is put aside because of 002, so I don't -- 004 is

4    gone because of 001, and 005 is an extra claim for relief.

5          So in that brief there's a whole section asking

6    the Court to deny the motion for preliminary injunction as

7    moot, excuse me, dissolving them, PJR and the preliminary

8    injunction, as moot.  So that's 203.

9          Then you filed also a motion for an order

10   dissolving the PJR and the PI as moot for Mei Guo two days

11   later.  Okay.

12         The motion to dissolve the PJR that was filed only

13   on behalf of Mei Guo, not on behalf of HK International, but

14   HK International said in its brief in response to summary

15   judgment that it wanted -- that it -- it took the same

16   position that Mei Guo took two days later in a motion that

17   the -- this court should dissolve the PJR and the

18   preliminary injunction because of the rulings on the first

19   counterclaim and the second counterclaim and because of your

20   argument that the rest of the complaint goes away.  Okay.

21         Which I don't agree that the rest of the complaint

22   goes away, but that's fine.

23         And that motion by Mei Guo to terminate the

24   prejudgement remedy and dissolve the preliminary injunction,

25   both dissolve and terminate, was denied without prejudice.

1    It says without prejudice.  That's actually in the title of

2    the order.  Okay.

3          But then I find out the last -- at our last

4    hearing, which I don't recall how many -- exactly the date,

5    but we can go back and make the record completely accurate,

6    that a writ of mandamus has been filed in the district court

7    directing the district court to direct this court to

8    dissolve the PJR and the preliminary injunction because you

9    didn't have a chance to ask the Court to do that.

10          And I think that's not accurate.

11          MR. MORIARTY:  Well, I don't -- I don't think that

12    the representation that that's the basis for the writ of

13    mandamus is accurate either.

14          THE COURT:  Well, the basis for the writ, what

15    else would it be?  You're asking the district court to

16    direct me to do something that you said I didn't give you

17    the opportunity to be heard to do.

18          MR. MORIARTY:  That's not what it says, Your

19    Honor.  It says that --

20          THE COURT:  Okay.  So what does it say?

21          MR. MORIARTY:  It's asking the district court to

22    direct you to do something that you declined to do.

23          THE COURT:  Well, isn't that an appeal?

24          MR. MORIARTY:  It is not an appeal because it's

25    not an appealable order.

1          THE COURT:  So you're using a writ of mandamus

2     because it's not an appealable order?

3          MR. MORIARTY:  It's an alternative, Your Honor,

4     yes.

5          THE COURT:  But you also say in that writ of

6     mandamus that HK never had the opportunity to ask for the

7     dissolution or termination of the preliminary injunction and

8     the PJR, but yet your brief filed two days before Mei Guo

9     filed her motion does exactly that.

10         MR. MORIARTY:  So, Your Honor, I don't recall all

11    of the words of the writ of mandamus standing here.

12         THE COURT:  Okay.

13         MR. MORIARTY:  I don't remember anything in there

14    specific as to HK because HK is not a movant, only Mei Guo

15    is.

16         THE COURT:  Well, no, because you actually cross-

17    moved in your brief on summary judgment for this court to

18    dissolve the PJR and the preliminary injunction.

19         MR. MORIARTY:  Yeah.  When I said movant, I meant

20    the writ of mandamus is only as to Mei Guo, not as to HK.

21         THE COURT:  But one of the bases in the writ of

22    mandamus, my understanding is, that you're saying that the

23    district court should direct this court to do something

24    because -- because I didn't consider it on HK's behalf as

25    well.

1          MR. MORIARTY:  I don't believe that's correct,

2     Your Honor.

3          THE COURT:  Okay.  Well, in any event, the point

4     is, from this court's perspective, both parties have asked

5     for the same relief and that relief was denied without

6     prejudice.

7          So how that writ of mandamus plays into this

8     adversary proceeding I don't know.  Has it been assigned to

9     a judge yet?

10          MR. MORIARTY:  It's before Judge Dooley.

11          THE COURT:  Okay.  So then -- so then Judge Dooley

12     will decide how to deal with that.

13          But that doesn't mean that this adversary

14     proceeding shouldn't go forward, because there is no stay

15     pending appeal at this point in time.  Okay?

16          MR. MORIARTY:  I agree, Your Honor.

17          THE COURT:  So we need to -- what I'm going to ask

18     you to do, the parties to do, is to do what I said in my

19     prior order setting today's pretrial conference, to meet and

20     confer and discuss how we are proceeding with this adversary

21     proceeding and the remaining counts in this adversary

22     proceeding, which are 003, 004 and 005.

23          If there is a stay pending appeal issued by the

24     district court with regard to the second counterclaim

25     because that's -- she's already denied the stay pending

1   appeal on the first, then let me know, just let me know, and

2   we'll go from there.  Okay?

3         But at this point there is no stay pending appeal.

4   There are what I would say conflicting positions taken with

5   regard to the remaining counts in the complaint.  And I just

6   don't know where we're going to go from here.

7         So what I would -- what I will -- what I propose

8   to do and will do is I'm going to continue this pretrial

9   conference to August 15th at 12:30 p.m.

10         Now, if you all have a report or something that

11   you can agree to file before that date, that's fine.  I'll

12   take a look at it.  And whether we have an additional

13   pretrial conference will be determined upon what, if

14   anything, the parties file.

15         But with regard to the summary judgment

16   opposition, I note that HK International asked in that brief

17   affirmatively that the Court -- if the Court grants summary

18   judgment, it should dismiss the third and fifth

19   counterclaims, as they are pled in the alternative to the

20   second counterclaim, and should also dismiss the fourth

21   counterclaim as it is admittedly moot.

22         Well, I don't think anyone's admitted that it's

23   moot.

24         But in any event the dismissal of the third,

25   fourth and fifth counterclaims coupled with the judgment in

1     the Trustee's favor on the first and second counterclaims

2     would resolve all of the Trustee's claim for the -- for

3     relief.

4            In the alternative the Court should find pursuant

5     to Federal Rules of Civil Procedure 54 that there is no just

6     reason for the delay of the entry of a final judgment on the

7     second counterclaim and the first counterclaim to the extent

8     judgment is not already filed and enter final judgment.

9            The Court should find that there is no reason for

10    a delay, just reason for delay and enter final judgment

11    because granting the Trustee's summary judgment on the

12    second counterclaim, coupled with having obtained summary

13    judgment on the first counterclaim, will result in the

14    Trustee having obtained all the relief he seeks and could

15    obtain by his counterclaims and, therefore, there would be

16    nothing left for the Court to decide vis-a-vis the

17    counterclaims.

18           Which I'm not sure I agree with that, but in any

19    event, I haven't heard from the Trustee about whether they

20    agree with that.

21           Moreover, without any pending claim for relief,

22    the PJR order and preliminary injunction are similarly moot

23    and should be dissolved.

24           So that was an affirmative request for relief on

25    behalf of HK International in response to its opposition to

1    summary judgment.

2           So I would like the Trustee to respond to that

3    part of the request that has been made by the HK

4    International counter-defendant.

5           And how much time would you like to respond to

6    that?

7           MR. DESPINS:  Ten days, Your Honor, is sufficient.

8           THE COURT:  Okay.  Ten days from today is Friday,

9    July 28th.  Does that work for the -- does that work for the

10   Trustee?

11          MR. DESPINS:  Yes, Your Honor.

12          THE COURT:  Okay.  So I would like you to file a

13   response to that request for relief in -- set forth in the

14   HK International's opposition to summary judgment.

15          And then I'm going to continue this pretrial

16   conference as I said to August 15th and I believe I said

17   12:30 p.m.

18          There are other matters scheduled in the case that

19   day in another adversary proceeding that day, that is why I

20   am continuing it to that day.

21          Does anyone have any other questions with regard

22   to this adversary proceeding?  If not, I believe that this

23   pretrial conference in this adversary proceeding is

24   concluded for today.

25          (No response)

1      THE COURT:  Nothing further?  Okay.  All right.

2      The pretrial conference is concluded.

3      The Trustee's going to file a response to relief

4  sought by HK on or before August 28th, excuse me, July 28th,

5  and the pretrial conference is continued to August 15 at

6  12:30 p.m.

7      All right.  Now, turning to the second adversary

8  proceeding on for pretrial conference today, which is

9  Despins versus Guo, 23-5008.

10      So where do things stand in -- this I think is the

11  -- I could be wrong, but is this the original pretrial

12  conference that was set in the summons?

13      MR. LUFT:  Yes, Your Honor.  It is.

14      THE COURT:  Okay.  All right.  And I understand

15  that there's been an answer and affirmative is asserted by

16  Ms. Guo.

17      And again, Mr. Moriarty, the answer denies the

18  Court's ability to enter a final judgment?

19      MR. MORIARTY:  It objects to it, Your Honor, yes.

20      THE COURT:  Okay.  All right.  So this adversary

21  proceeding was commenced on 5/16/2023, so two months ago, so

22  what initial disclosures have the parties made to each other

23  under the Federal Rules of Civil Procedure?

24      MR. LUFT:  Your Honor, we have worked out a -- we

25  have not filed our initial disclosures as of yet.  We have

1    worked out a schedule which I believe was filed.  It's at

2    Docket No. 23.  It was filed just hours ago, in which part

3    --

4              THE COURT:  Okay.  Well, then, let me take a look

5    at that.

6              MR. LUFT:  Okay, Your Honor.

7              THE COURT:  So it was filed when we were in court

8    today?

9              MR. LUFT:  Or right before we sat is my

10   understanding.

11             THE COURT:  It was filed when we were in court

12   today, which is fine, so I have to take a look at it.

13             MR. LUFT:  Of course, Your Honor.

14        (Pause)

15             THE COURT:  There's a blank in the order for a

16   filing of the joint pretrial statement.  Are you

17   anticipating filing that, I would assume, joint pretrial

18   statement after discovery including expert discovery is

19   completed?

20             MR. LUFT:  Yes, Your Honor.  My understanding --

21   the reason it was left blank was quite frankly because we

22   hadn't had a chance to speak to the Court yet about its

23   calendar and figured that setting a pretrial date without

24   knowing where the Court's availability for trial was would

25   maybe be a little bit presumptuous.

1        But I think the idea would be -- we tried to make,

2   as I think Your Honor may see, the schedule very consistent

3   in terms of timing with what was entered in Bravo Luck and

4   Greenwich Land with the idea being that this was a similar

5   schedule and a similar type of case.

6        Using that timing, I would say that effectively

7   you could -- we could have guessed that the pretrial

8   schedule would have been at around 145 days out from now.

9   With the trial at about 160, I think that's almost to the

10  day consistent with how you did the other two.

11       But, again, not knowing the Court's schedule we

12  didn't want to presume to tell you when you would hold the

13  trial.  That's why we left it blank.  For no other reason.

14       THE COURT:  All right.  Well, I'll have to take a

15  look at this because it looks like you are -- the parties

16  are -- the deadline for completion of all fact discovery is

17  October 18.  Motions for summary judgment were to filed on

18  or before November 17.  Well, it looks like expert testimony

19  is October 18th as well.

20       MR. LUFT:  It is, Your Honor.

21       THE COURT:  Okay.  Well, I don't know that it

22  makes sense for me to set a trial date in this order if

23  you're going to file motions for summary judgment, right?

24       MR. LUFT:  And that is our expectation of how this

25  will go, Your Honor.

1          THE COURT:  That you'll file motions for summary

2    judgment?

3          MR. LUFT:  That's our expectation at this point

4    that we will be filing for summary judgment.

5          THE COURT:  All right.  Well, let me take a look

6    at this order.  What we'll -- I mean, obviously I haven't

7    read it until now, so.  I mean, it looks fine for the most

8    part.

9          I've got to figure out timing, right?  And I have

10   to figure out whether or not it makes sense to just have a

11   pretrial -- another pretrial conference versus a trial date

12   specifically because it appears a motion or motions for

13   summary judgment may be filed.

14         So maybe what we need to do is have a pretrial

15   conference shortly after the summary judgment deadline and

16   see whether or not the motions have been filed and get them

17   set up for a hearing.

18         MR. LUFT:  That seems quite reasonable, Your

19   Honor.

20         I will note that it was drafted as a deadline for

21   summary judgment with the parties' clear understanding, at

22   least between them, that if a party wants to move for

23   summary judgment earlier they would be permitted to do so.

24         THE COURT:  Oh, yeah.  Anybody can do whatever

25   they want, but they're not going to move for it after

1    November 17th.

2              MR. LUFT:  Exactly.

3              THE COURT:  Okay.  So I don't know that I want you

4    to file a joint pretrial statement yet.  I think I may just

5    have a pretrial conference after November 17th and then

6    we'll see where we go.  I think that's my -- that is my

7    initial reaction.  I haven't read it all.

8              What I think we can do is we can -- do either of

9    you oppose if I take out all of the information about the

10   pretrial statement, the remaining part of that pretrial

11   order?

12             Because I don't think it's necessary if we're just

13   going to have another pretrial conference and deal with the

14   motions for summary judgment first.

15             If we're going to have motions for summary

16   judgment, they're either going to be granted or denied, and

17   then we have to figure what's actually going to be tried,

18   right?

19             So it seems to me putting all these other -- this

20   other information in here right at this time does not make

21   sense under the circumstances of this adversary proceeding.

22             MR. MORIARTY:  Agreed, Your Honor.

23             And I created this document.  I copied it from the

24   order that was entered in Greenwich Land.  That's why all of

25   that is in there because it was in that order.

1          But I don't -- I agree --

2          THE COURT:  Does Greenwich Land have counsel?  I

3   don't remember.

4          MR. MORIARTY:  Yes.

5          MR. LUFT:  They do.

6          THE COURT:  They do?

7          MR. LUFT:  Mr. Major, Your Honor.

8          THE COURT:  Okay.  So are you -- so maybe I

9   shouldn't delete it then.  Maybe I should enter the same

10  order that was entered in the other case.  I'll take a look

11  and we'll let you know.  How's that?

12         MR. MORIARTY:  That's fine.

13         THE COURT:  Okay.  We'll take a look after today's

14  hearings obviously since I haven't seen this until now.  And

15  I don't remember what the Greenwich Land pretrial order

16  looks like, so I'll have to go back and look.  Okay?

17         MR. MORIARTY:  Fair enough.

18         THE COURT:  All right.  But otherwise is there

19  anything else that we can address in this adversary

20  proceeding pretrial conference today?

21         MR. LUFT:  Nothing that I can think of on behalf

22  of the Trustee, Your Honor.

23         MR. MORIARTY:  Nothing on behalf of the defendant,

24  Your Honor.

25         THE COURT:  All right.  So I don't know whether

1   I'm going to schedule another pretrial conference or just

2   schedule a trial and have the same kind of framework that's

3   in the Greenwich Land matter.

4          And you'll know either because I'll enter the

5   pretrial order that you submitted with dates in it or you'll

6   get some correspondence from the courtroom deputy that says

7   unless you object by X amount of time the pretrial -- the

8   order will enter without the submission of a joint pretrial

9   order, I'm sorry, a joint pretrial statement, and there will

10  be a pretrial conference set.  It will be one or the other.

11  Okay?

12         MR. LUFT:  Thank you, Your Honor.

13         MR. MORIARTY:  Yes, Your Honor.  Thank you.

14         THE COURT:  All right.  All right.  Thank you.

15         So that concludes the pretrial conference in 23-

16  05008.

17         All right.  Now we can turn to the 2 p.m. matters,

18  so I would ask the courtroom deputy to call the main case

19  and the adversary proceeding, please.

20         THE COURTROOM DEPUTY:  Okay.  Case No. 22-50073,

21  Ho Wan Kwok and Genever Holdings, LLC; and Case No. 23-5013,

22  Despins versus HCHK Technologies, Inc., et al.

23         THE COURT:  Okay.  Good afternoon.  If we could

24  have appearances for the record starting with the Chapter 11

25  Trustee, please.

1          MR. DESPINS:  Good afternoon, Your Honor.  Luc

2   Despins, Chapter 11 Trustee.

3          MR. LUFT:  Good afternoon, Your Honor.  Avi Luft

4   of Paul Hastings on behalf of the Chapter 11 Trustee.

5          MR. LINSEY:  Good afternoon, Your Honor.  Patrick

6   Linsey, Neubert, Pepe and Monteith, Connecticut counsel for

7   the Trustee.

8          MS. CLAIBORN:  Good afternoon.  Holley Claiborn

9   for the U.S. Trustee.

10          MR. JARECK:  Good afternoon, Your Honor.  Ryan

11   Jareck, Cole Schotz, P.C., on behalf of Mr. Hofmeister, the

12   assignee.  Good afternoon.

13          MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

14   Goldman, Pullman & Comley, appearing for the Creditors

15   Committee.

16          MS. MCCLAMMY:  Good afternoon, Your Honor.

17   Melissa McClammy from Pastore, LLC for the HCHK creditors.

18          THE COURT:  Good afternoon.

19          MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

20   Sklarz, Green & Sklarz, for G-Club Operations, LLC.

21          THE COURT:  Good afternoon.

22          MR. SHERMAN:  Good afternoon, Your Honor.  My name

23   is Joshua Sherman.  I'm an objector in the adversary

24   proceeding.

25          THE COURT:  Yes.  Good afternoon.

1          Okay.  We continued the hearing on the Trustee's

2    motion to compromise filed in the main case and in this

3    adversary proceeding to today for the purpose of seeing

4    what, if any, further agreed-upon revisions to the order

5    that was submitted with the motion to compromise could be

6    made and agreed to by the parties and any objecting parties,

7    understanding that the objections were still being

8    considered by the Court and not ruled upon until this

9    revised proposed order was submitted.

10          So, Trustee Despins, Attorney Luft, you want to

11    explain -- would you please explain where things stand with

12    regard to the revised proposed order.

13          I know some parties have filed, as they were

14    allowed to do, further comments with regard to the order

15    which were filed by Friday.

16          So where do things stand as of today?

17          MR. LUFT:  Your Honor, may I approach?

18          THE COURT:  Please.

19          MR. LUFT:  Thank you.  Good afternoon, Your Honor.

20    Avi Luft of Paul Hastings.

21          So let me -- as Your Honor noted, we have filed an

22    amended order.  I think if it's helpful I can highlight what

23    I think are what I would call the substantive changes to the

24    order.

25          THE COURT:  Go right ahead.

Ho Wan Kwok - July 18, 2023

1           MR. LUFT:  And then we can talk about what --

2      where we stand with it.

3           The first substantive change is with regard to

4      paragraph 6.

5           And, Your Honor, I think the revised order is at

6      Docket No. 55.  And this is the paragraph regarding

7      corporate records.

8           Quite frankly, Your Honor, this was intended to

9      not be much of a substantive change at all.  In fact, all

10     that happened is we added a line, a second line, making

11     clear, per the Court's comment -- Your Honor had noted that

12     there is a protective order in this case and to the extent

13     there were confidentiality concerns there was a protective

14     order that was there -- we just wanted to make it explicit

15     that it existed.

16          And then our proposal in the interest of

17     expediting things was that since people had already stated

18     that they were concerned the documents were confidential

19     that we would designate those documents as confidential as a

20     de facto, so effectively to deal with that.  And that's all

21     that change is.

22          We had hoped that that would address the

23     confidentiality concern such that they would now all be

24     treated that way.

25          With regard to paragraph 9, Your Honor, the

1  addition is in the last sentence, which is on the bottom of

2  page 5, if you're following along, where this is paragraph

3  9, and it notes that we'll file monthly reports on the 21st

4  day following the month, and it sets a limit at $50,000.

5       As we'll talk about, there is still some

6  disagreement with the U.S. Trustee who continues to suggest

7  that it should be at $25,000, but we still believe our

8  proposal was at 50 and we think it's appropriate, which I

9  can discuss.

10      The next substantive change is on paragraph 11,

11  which is the approval of the settlement payment, and it

12  provides for the Official Committee of Unsecured Creditors

13  to also have access to the documentation supporting the ask

14  of these professional fees and rights to review those fees.

15  That's just at the last sentence of paragraph 11.

16      With regard to paragraph 13, Your Honor, this is

17  in place -- in the previous order, there had been an

18  exculpation provision, now there is the debtor release.

19      Trustee Despins had basically outlined this to the

20  Court at the last hearing.  This is the attempt to put that

21  down on paper.

22      Effectively in the event that there is a

23  dispositive ruling in favor of the Trustee the Trustee is

24  offering a release and a discharge on behalf of the debtor

25  and his estate and it's set forth here.  And that is in

1    place of where there was an exculpation provision.

2         Then, Your Honor, if you turn to paragraph 14,

3    previously there had been a channeling injunction.

4         Your Honor will recall also Trustee Despins

5    outlined the idea of what is set forth in paragraph 14,

6    which is now termed a gatekeeping function with the idea

7    being that to the extent there are claims brought by third

8    parties that they first come to this court so that the Court

9    can determine if, in fact, it is a claim of the estate or if

10   it is truly a third-party claim.  And that is what's set for

11   there.

12        And those are what I would deem the substantive

13   changes.

14        I will note that in paragraph 2 there is what I

15   understood to basically just be a conforming change, which

16   was because it was now -- the settlement agreement was now

17   either being modified or it being resolved by being

18   overruled that language changed a little just because we've

19   gone through the objection process, but substantively there

20   is not intended to be any other change, substantive change

21   with regard to that.

22        So, Your Honor, those are the changes.

23        THE COURT:  On paragraph 2, just let me ask you a

24   question.

25        MR. LUFT:  Sure, Your Honor.

1          THE COURT:  You say -- it reads, the order reads

2  right now all objections to the motions have been resolved

3  by modifications to the original proposed order as set forth

4  in this order or have been overruled, including all

5  assertions of reservations of rights.

6          So your -- all assertions of reservations of

7  rights have been overruled?  That's the intent?

8          MR. DESPINS:  Well, no.

9          MR. LUFT:  With regard --

10          THE COURT:  No.  Okay.  What is the intent?

11          MR. DESPINS:  Your Honor, Luc Despins, Chapter 11

12  Trustee.

13          The intent there is that reservation of rights as

14  to what is being sought today.  But the other parties'

15  rights to object to entry of a dispositive order are

16  preserved.

17          THE COURT:  Okay.

18          MR. DESPINS:  So that was not -- we were not

19  intending to cut them off.  We're trying to cut them off

20  today for the purpose of this order, but not for the purpose

21  of the dispositive order.  Their reservation of rights in

22  that regard are preserved.

23          THE COURT:  So how about including all assertions

24  of reservations of rights with respect to this order?

25          MR. LUFT:  That would be a fine edit.

1          THE COURT:  Okay.  Because I wasn't certain what

2     that meant.

3          MR. LUFT:  Thank you, Your Honor.  It was not

4     intended to be anything else.

5          THE COURT:  No, that's fine.  That's why I asked

6     the question.  Okay.

7          MR. LUFT:  It's a good edit.  Thank you.

8          THE COURT:  Okay.

9          MR. LUFT:  So, Your Honor, that's what we had

10    filed.

11          In response, we have received three -- there were

12    three objections filed.

13          One was filed by the U.S. Trustee whose objection

14    as I touched on this issue of the $25 versus the $50,000;

15    but I think probably more centrally focused on the language

16    with regard to the gatekeeping function, and I'll let Mr.

17    Jareck from Cole Schotz focus on that issue.

18          The other two objections were filed by the

19    Himalaya entities and by G-Club.

20          I am happy to handle this however Your Honor would

21    like.  I can either let the issue for the U.S. Trustee

22    raised go first and let Mr. Jareck address that, and then I

23    can come back and discuss the other two.

24          THE COURT:  I would like to do that.  I would like

25    the U.S. Trustee to be heard first, and then Mr. Jareck can

1    respond to it.  And then we can talk about the other

2    parties' opposite pleadings as well.

3            MR. LUFT:  Thank you, Your Honor.  Thank you.

4            THE COURT:  Thank you.

5            MS. CLAIBORN:  Thank you, Your Honor.  Holley

6    Claiborn for the U.S. Trustee.

7            The U.S. Trustee's supplemental objection was

8    filed on the docket in the main case at ECF 2006.  And as

9    previewed by Attorney Luft it highlights issues with two

10   paragraphs of the proposed revised order.  Those paragraphs

11   are 9 and 14.

12           Nine is straightforward in that the U.S. Trustee

13   continues to maintain that it's appropriate that the Trustee

14   have to come back to the U.S. Trustee and to the committee

15   before he wants to spend more than 50,000, sorry, more than

16   $25,000 of the settlement monies.

17           The Trustee would like that to be 50,000.  And the

18   U.S. Trustee's position is that it's appropriate to have a

19   lower threshold because we need to know what's going on with

20   the monies, and there seems to be a need to have greater

21   understanding about what's going to be happening with the

22   monies and that's what it was designed to do.

23           The $50,000 threshold doesn't appear to be a

24   particular number.  The U.S. Trustee's number was smaller

25   and intentional in that there doesn't seem to be a need for

1    -- that had been identified to the U.S. Trustee for anything

2    in particular that's going to hit the $50,000 mark and,

3    therefore, the $25,000 mark made more sense because it's a

4    lower figure.

5        With respect to paragraph 14, the U.S. Trustee is

6    continuing to oppose that paragraph.  It requires that

7    parties have to come back to this court in order to exercise

8    their rights.

9        The parties who are restricted by paragraph 14 are

10   not necessarily parties who are here today.  They include

11   some who are here today, but they also include those who are

12   not before the Court in part of this case and part of the

13   adversary proceeding.

14       And it's a paragraph that while intentional and

15   understandable on a certain level doesn't appear to have any

16   support in case law or in the statutes, so the U.S. Trustee

17   is asking that the Court strike and/or remove paragraph 14.

18       If Your Honor has any questions, I'm happy to

19   respond to them.  Or perhaps I can respond after Attorney

20   Jareck makes his presentation.

21       THE COURT:  Why don't we do that.  Thank you.

22       I don't have any questions at the moment, so we'll

23   let counsel speak to your -- to the U.S. Trustee's Office

24   position.  And then if you would like to respond, I'll

25   obviously give you the opportunity to respond.

1          MS. CLAIBORN:  Thank you.

2          THE COURT:  Thank you.

3          MR. JARECK:  Good afternoon, Your Honor.  For the

4    record, Ryan Jareck, Cole Schotz, P.C., on behalf of Mr.

5    Hofmeister.

6          Your Honor, I'm just going to address that

7    paragraph 14 if that's acceptable.

8          THE COURT:  Yes.

9          MR. JARECK:  If Your Honor has further questions

10   of me I'm happy to address them at the conclusion of my

11   presentation, if that's okay.

12         THE COURT:  Go right ahead.

13         MR. JARECK:  Thank you.

14         So, Your Honor, as noted by counsel to the

15   Trustee, paragraph 13 provides for a debtor release, right?

16   So it's a release of estate claims that the Trustee has

17   exclusive standing to assert and settle.

18         Paragraph 14 is meant simply to provide a

19   mechanism for this court to interpret, enforce and implement

20   that release.  It's nothing more than that.

21         Nothing in the proposed order at paragraph 13

22   concerns the exercise of this court's jurisdiction over

23   independent claims of third parties.  It's actually to the

24   contrary, Your Honor.

25         If the Court determines a claim is independent,

1  meaning it does not fall within the debtor release, then

2  such third-party claimant may proceed with prosecuting its

3  claim in its desirable form.  It's simply just -- it's

4  simply meant to cover what Your Honor is granting in

5  paragraph 13.

6       Numerous courts have ordered and affirmed a

7  bankruptcy court's gatekeeping role as a mechanism to

8  enforce and implement releases issued in its prior orders.

9       And I cite this court to the case of *Motors*

10 *Liquidation Corp.*, that's 568 B.R. 217.  It's a Bankruptcy

11 Court decision from the Southern District of New York, 2017.

12      There the bankruptcy court was entering in an

13 order approving the sale of substantially all of the assets

14 of G.M. to, quote/unquote, "New G.M., free and clear of

15 various liens, claims and encumbrances."

16      The G.M. sale order provided the bankruptcy

17 court's exclusive jurisdiction to interpret and enforce the

18 sale order.  The bankruptcy court assumed a gatekeeping role

19 in connection with third-party claims asserted against New

20 G.M.

21      The bankruptcy court in that decision, and this is

22 at page 222, said as follows, and I quote:  "A bankruptcy

23 court's role is a gatekeeper role.  It should be the court

24 to decide what claims and allegations should get through the

25 gate under the sale order and the bankruptcy court's prior

1     decisions.  If a complaint violates an enforceable provision

2     of the sale order, it may not proceed as currently drafted.

3     If it does not violate the sale order, the complaint passes

4     through the gate for the appropriate non-bankruptcy court to

5     decide whether it's actionable."

6          Your Honor, I also cite this court to the *Gawker*

7     *Media* case, which is 588 B.R. 337.  Again, Your Honor, a

8     bankruptcy court decision, Southern District of New York,

9     2018, where Judge Bernstein, in addition to Judge Glenn in

10    *Motors Liquidation*, discussed the Court's gatekeeping role.

11         That was in the context of plan confirmation where

12    the plan included a broader injunction provision than the

13    actual release provision in the plan.  And the purpose of

14    that would be to force entities whose claims were not

15    released to nonetheless seek relief from the injunction in

16    this court before asserting a claim.

17         Again, Your Honor, without this gatekeeping

18    function, the release has no teeth.

19         After entry of a dispositive ruling, assuming the

20    Trustee can get it, they can go anywhere.  They could go to

21    state court in New York and ask that court for what Your

22    Honor's release actually means.

23         We believe there's ample support in case authority

24    and that this is meant solely to be an exclusive

25    jurisdiction provision and not for Your Honor to oversee

1    third-party claims.

2            We believe the bankruptcy court has both

3    jurisdiction and authority to enter the gatekeeping

4    paragraph in paragraph 14 in the order and we most

5    respectfully believe it should be approved.

6            And I'll pause there to the extent Your Honor has

7    any questions.

8            THE COURT:  I do not have any questions.  Thank

9    you.

10           MR. JARECK:  And also I want to apologize with

11   having to put out citations.  We didn't have a reply right.

12   Normally I would have put this in a brief for Your Honor.

13           But to the extent Your Honor has any questions,

14   we'd be happy to supply those cases to the Court.  I'd also

15   be happy to repeat the case citations.

16           THE COURT:  I think I know both of those cases.

17   But I took down the cites, so I'll take a look at them.

18   Thank you.

19           MR. JARECK:  Thank you, Your Honor.

20           THE COURT:  Attorney Claiborn, did you want to

21   respond?

22           MR. LUFT:  Your Honor, do you first want to hear

23   -- finish that, or do you want to hear about just the --

24           THE COURT:  I just want to have the U.S. Trustee's

25   Office --

1          MR. LUFT:  Sure.

2          THE COURT:  -- respond if she'd like to because

3    she did ask for the opportunity to do so.

4          MS. CLAIBORN:  Thank you, Your Honor.  Holley

5    Claiborn for the U.S. Trustee.

6          I think the point that we need to actually focus

7    on in this debate is what types of claims we're talking

8    about.

9          We're not talking about claims against the estate.

10   We're talking about claims held by third parties against

11   other third parties.

12         And the injunction, gatekeeping, whatever you want

13   to call it, requires that this is the first place that

14   people have to come in order to assert claims.

15         There is no exclusive jurisdiction of this court

16   over the universe of third-party claims that might be

17   tangentially connected to this settlement.

18         And so that's the extent to which the U.S. Trustee

19   is opposing the gatekeeping function as provided for in the

20   order.

21         THE COURT:  Thank you.

22         MR. DESPINS:  Your Honor, I love the U.S. Trustee,

23   but, you know, the institution, but I think that's wrong.

24         The *General Motors* case, the third party is New

25   G.M.  They're a third party to the estate.  They're not part

1  of the estate.  They're buying the assets of Old G.M., but

2  New G.M. is a third party.  They're getting the benefit of

3  this gatekeeper function to allow the Court to make sure

4  that when people want to sue New G.M. they really have a

5  direct claim that's not been released by Old G.M. in favor

6  of New G.M.

7       So this argument that the Court doesn't have

8  jurisdiction it's purely maintaining your jurisdiction in a

9  sense that in theory if you approve the release you want to

10  make sure people don't go around the release because that

11  would be inappropriate.

12       And that's the sole function we're asking you to

13  play here, the gatekeeper function.

14       Because if it's a direct claim, you're going to

15  send them to wherever they want to go, New York or other

16  courts.

17       But if it's a disguised direct claim, sorry,

18  disguised derivative claim, meaning a claim that we've

19  released, you should not allow those to forward.  And the

20  only way to make sure that this won't happen is for you to

21  keep jurisdiction over that, to play that gatekeeper

22  function.  So I think that's very important.

23       And I think that the *General Motors* case is

24  perfectly on point because New G.M. in that case is a third

25  party to the estate, the same way here the assignee is a

1   third party to the estate.

2          But the Trustee is releasing claims against it and

3   we don't want people to get around that through asserting,

4   you know, alleged direct claims that are not direct claims.

5   Thank you.

6          THE COURT:  Thank you.

7          So, Attorney Claiborn, when we talked last week

8   the United States Trustee's Office was also objecting to the

9   release, but that objection has been resolved by the Trustee

10  saying that the release is limited to the estate releasing.

11  Is that correct?

12         MS. CLAIBORN:  Correct.

13         THE COURT:  Okay.  All right.

14         So then the issue still is with regard to this

15  gatekeeping function, so I'm fine.  I just wanted to make

16  sure that I wasn't missing anything with regard to --

17         MS. CLAIBORN:  Yes.

18         THE COURT:  -- your release, the Office of the

19  United States Trustee's argument about the release.  All

20  right.

21         So does anyone else wish to be heard on -- I'm

22  going to let you talk too, don't -- I am going to let the

23  parties talk.

24         I just want to make sure with regard to what the

25  U.S. Trustee's Office has stated, does anyone else wish to

1    be heard?

2         (No response)

3              THE COURT:  Okay.  All right.

4              So then we need to talk about the other parties

5    who have filed an objection.

6              And in addition to the existing objections, I'm

7    talking about the specific objections addressed to the

8    revised proposed order.

9              So, Counsel, would you like to proceed?

10             MS. McCLAMMY:  Yes, Your Honor.  Thank you.

11             May I approach?

12             THE COURT:  Yes, please.

13             MS. McCLAMMY:  Thank you.  Your Honor, Melissa

14   McClammy for the HCHK creditors.

15             I will be brief.  I don't have very much to add to

16   what Ms. Claiborn said for the United States Trustee.

17             We agree that paragraph 14, the gatekeeping

18   function, is inappropriate.  As she said it affects our

19   clients.  We are here.  We are third parties who may wish to

20   bring claims against not the debtor but the assignee,

21   another third party.

22             And this proposed order would burden those claims,

23   prejudice those claims, without clients' consent, without

24   any consideration for our clients, and until just this

25   moment without any offer of any authority for the Court's

Ho Wan Kwok - July 18, 2023

120

1     ability to enter that order.

2          I note that the Trustee said, well, this is the

3     only way to ensure that the Court's release is enforced and

4     without this particular paragraph the release has no teeth.

5          I'll note that when the Trustee made his original

6     motion and he sought a channeling injunction and he sought a

7     broad exculpation clause he said those clauses were

8     necessary.  He said those were key terms of the settlement.

9          And when there were objections, he came back and

10    he said, okay, we can do it another way.

11         And I would submit that without written briefing

12    and an opportunity to study whether this court has the

13    authority it's not clear that there is no other way for the

14    Court to exercise its jurisdiction or protect the

15    settlement.

16         And so because the showing hasn't been made that

17    the Court has authority to enter this order, we would

18    request that the Court reject -- deny the motion and reject

19    the proposed order.

20         THE COURT:  Question.

21         MS. McCLAMMY:  Yes.

22         THE COURT:  So the issue -- the issues as I review

23    them and understand them is that the settlement has

24    different components to it.

25         And there is a possibility at this -- you know,

1    who knows what's going to happen, right, but there is a

2    possibility that the Trustee is not successful.  And if he's

3    not successful, then all the money that would come into this

4    -- these jointly administered Chapter 11 cases would be

5    returned to the assignee and that the case would continue in

6    New York.  Correct?

7               MS. McCLAMMY:  Yes.  Yes.

8               THE COURT:  Okay.  So that's one of the things I'm

9    trying to understand.  It's not that I don't understand your

10   argument, but I'm not sure if your argument is ready to be

11   heard yet insofar as if the Trustee loses you have all your

12   claims against whomever you have them outside of this court.

13   Right?  That's what will happen.  Number one.

14              Number two, one of the other things I see that

15   you've talked about is, in the briefs or in the documents

16   that you filed, is that your concerned, and I understand the

17   concern about your clients' claims being diluted.

18              But if the Trustee is successful, now we'll take

19   the other side, if the Trustee is successful, then all

20   creditors' claims would be diluted, not just your creditors.

21   Right?

22              MS. McCLAMMY:  Yes.

23              THE COURT:  Because the pot will be what the pot

24   is and it's just a matter of how many people get to be a

25   part, dip into the pot, right, for lack of better term.

1        So what -- while I understand your argument, I'm

2   not sure if it, at this point, it carries the day.

3        Now, that doesn't mean that at some point it

4   couldn't carry the day.

5        Except on the -- if the Trustee wins on the, you

6   know, your creditors' claims being diluted, that's going to

7   happen.  I mean, if any kind of -- any kind of case, if a

8   party is successful in making these kinds of claims and

9   those -- and that success is upheld on appeal or whatever,

10  that's what's going to happen.

11       I mean, no creditor is going to be able to be --

12  get paid more than another creditor that's all on the same

13  level.  Right?

14       So that argument, while I understand it, I'm not

15  sure -- I am not sure at this moment that that is enough to

16  say that the Trustee's settlement as proposed should not be

17  approved.

18       Now, what I'm more intrigued by is the issue of

19  your claim that the Court doesn't have jurisdiction to do

20  this.

21       And I'm trying to -- you know, what is happening

22  here is that even though the Trustee hasn't proved, I

23  completely agree, we haven't gotten to the point of the

24  merits yet, right, but he's arguing, and the assignee's

25  agreeing, that at least for now, until there's some kind of

1    dispositive ruling, that these monies should become property

2    of the estate, of the bankruptcy -- the jointly administered

3    Chapter 11 cases.  Right?

4           So if the -- if the property is property of the

5    estate, then why wouldn't this court have jurisdiction over

6    the settlement as proposed to enter an order on that issue?

7           Why does the Court not have jurisdiction?

8           I understand you're saying they don't cite

9    anything that says they have jurisdiction, but I don't find

10   anything that you cite that says I don't have jurisdiction.

11          And the way that the matter has come before the

12   Court is that the assignment for the benefit of creditors

13   occurred at some point in the -- I think it was in the

14   beginning of June or something, you know, not --

15          MS. McCLAMMY:  Right.

16          THE COURT:  -- maybe a month and a half ago --

17          MS. McCLAMMY:  Yeah.

18          THE COURT:  -- and there I believe was an order to

19   show cause why certain things should or shouldn't happen in

20   that, in that proceeding.

21          And the Trustee responded -- well, I don't know

22   how, if at all, he responded in the New York case -- but in

23   this case by asking for a preliminary injunction stopping

24   that proceeding from happening.  And I found that there was

25   enough evidence at the preliminary injunction stage to have

1    that happen, right, to stop that proceeding.  All right.

2            And then I -- we get met with a -- the Court finds

3    out that there's a resolution with the assignee, at least

4    proposed, right, that says, all right, this is going to be

5    resolved in the bankruptcy court one way or another.

6            So there is still a complete possibility that the

7    Trustee doesn't win.  And if the Trustee doesn't win, then

8    all the money goes back to the assignee and this release

9    would become null and void essentially.  Wouldn't it?

10           MS. McCLAMMY:  Yes.

11           THE COURT:  Yeah.

12           MS. McCLAMMY:  Yes.

13           THE COURT:  So what I think you're quarreling with

14   is that you don't want your clients to have to come here if

15   the Trustee wins and determine whether or not their claims

16   are direct claims against third parties or derivative

17   against the estate.

18           Is that what your concern is?

19           MS. McCLAMMY:  Let me say it in my own words if I

20   could.

21           THE COURT:  Sure.

22           MS. McCLAMMY:  I agree entirely with Your Honor

23   that if the Trustee is successful, and if the assets are the

24   property of the HCHK entities become part of the estate

25   permanently, then my clients' claims as to those assets

1    become part of this Chapter 11 case and they are in whatever

2    priority they are with the debtor's other claimants.

3              The claims that, as I understand it, are the

4    subject of the gatekeeping function in Chapter 14 have to do

5    with claims -- are the claims that my clients would make not

6    against, you know, not on their loan agreements, not against

7    the debtor for a piece of the pool as Your Honor described

8    it, but claims against the assignee for his conduct and the

9    damage he's caused to them by behaving as he has so far.

10             So claims like a breach of -- a claim for a breach

11   of fiduciary duty, or a claim for gross negligence,

12   something like that, which wouldn't be part of the debtor's

13   estate and they wouldn't arise from -- or they wouldn't at

14   least arise directly from my clients' claims against the

15   HCHK entities.  They'd arise from what we would allege to be

16   misconduct and a breach of duty by the assignee to them.

17             And I don't think that those are analogous to

18   claims against the debtor or claims that would be part of

19   the administration of a bankruptcy estate.

20             THE COURT:  So your point is that the settlement

21   right now, if approved, stops your clients' rights from

22   suing the assignee --

23             MS. McCLAMMY:  Yes.

24             THE COURT:  -- and you don't want to have that

25   happen.  You want to have that right maintained regardless

1    of what happens with the underlying cause of action that the

2    Trustee has against HCHK's assets really being part of these

3    whole -- these estates.

4            MS. McCLAMMY:  Yes, Your Honor.

5            THE COURT:  Okay.  I understand.  I mean, I think

6    that's part of the settlement, but I understand that's your

7    point.

8            MS. McCLAMMY:  Okay.

9            THE COURT:  That's what I wanted to clarify.

10   Because some of the other things that you had said in your

11   papers I wasn't exactly sure were persuasive.

12           But what you're saying is -- what your argument is

13   is that you think that your clients' rights are -- if this

14   is approved, they don't ever have a right to bring a cause

15   of action against the assignee?

16           MR. MITCHELL:  They would be required --

17           THE COURT:  Unless the Trustee loses ultimately

18   and the release becomes null and void?

19           MR. MITCHELL:  Well, if the -- as I understand it,

20   Your Honor, the release as it's been rewritten in the

21   revised proposed order is not a release of the type of

22   claims that I'm talking about.

23           As I understand it that's not a release of claims

24   by my clients in their own capacity as opposed to claims

25   that might be derivative of the debtor's claims.

1    So my understanding is that if the settlement

2    agreement is approved, and then if the Trustee is successful

3    in the underlying adversary proceeding, if my clients wanted

4    to sue the assignee, they would be required to come to this

5    court and get this court's approval by some kind of motion,

6    the details of which are not spelled out in paragraph 14, to

7    bring those claims under state law in state court.

8        THE COURT:  I think you're right that that's how

9    it reads right now.

10        MS. McCLAMMY:  Okay.

11        THE COURT:  That's what it provides right --

12   that's my understanding of it.  Okay?

13        MS. McCLAMMY:  I'm glad we agree.

14        THE COURT:  That your clients would have to come

15   here.

16        But what I'm asking you -- what I'm saying to you

17   is is that your base -- is there anything other than -- and

18   I'm not saying that that's --

19        MS. McCLAMMY:  Mm-hmm.

20        THE COURT:  -- I just want to make sure I

21   understand.

22        Your objection is we shouldn't have to come here

23   and have you determine, Judge, whether or not we have a

24   direct claim or a derivative claim.  If we want to sue, we

25   should be able to sue.

1          MS. McCLAMMY:  Yes, Your Honor.

2          THE COURT:  Okay.  I understand.  Thank you.

3          MS. McCLAMMY:  Thank you.

4          THE COURT:  Attorney Sklarz?

5          MR. SKLARZ:  Good afternoon, Your Honor.

6          G-Club continues to take issue with paragraph 6.

7    Our opposition is ECF No. 2007 in the main case,

8    specifically on page 5 we suggest some language.

9          The issue -- this is a -- really more of a

10   technology issue.  HChK provided IT services including cloud

11   computing services, data hosting and email hosting.

12         There was a period -- there was a period of time

13   where G-Club did not have access to its data through HCHK,

14   so we need to have access to our data in order to A) run the

15   business, and B) search that data for documents that could

16   be responsive to the subpoena for which we've produced over

17   120,000 documents so far.

18         Additionally, the email servers contain emails

19   that would be subject to an attorney-client -- could, we

20   don't know since we haven't been able to look, could contain

21   emails containing attorney-client privilege material,

22   correspondence with the Pillsbury Winthrop firm, and

23   correspondence with my firm.

24         So we're just looking for protections for our data

25   and the attorney-client privilege.

1      We've set forth this information in our papers and

2   we would stand on our papers unless Your Honor has any

3   questions.

4          THE COURT:  So the paragraph 6 issue, I think the

5   attempt to resolve it was to indicate that -- to resolve the

6   issues you've raised with regard to confidentiality is to

7   specifically spell out that there's a confidentiality order

8   in place, but that's not helpful to you because your

9   concerned that you're not going -- your client isn't going

10  to be able to look at those records first to make these

11  determinations of whether or not there are other privileges

12  that could be asserted in connection with these documents?

13         MR. SKLARZ:  Yes.  That would be one.

14         And then also we just need the information to be

15  able to ensure data integrity, if you like, if any of our

16  respective businesses did not have access to email or

17  documents for some period of time.  We need to get --

18         THE COURT:  Well, you haven't had access for over

19  a month and a half, right?

20         MR. SKLARZ:  That's correct.

21         THE COURT:  Okay.  Well, let me ask you a question

22  about the first part of that as opposed to the access.

23         So the protective order in this case has different

24  qualifiers, not just confidential, but highly confidential,

25  which would limit the view of documents to I think attorneys

1   only, not clients.

2          MR. SKLARZ:  I think our client is not as -- me,

3   in particular, we're not as worried necessarily about

4   confidential information or highly-confidential information.

5   It's a lot more about privileged information.

6          Obviously if there's emails between and among

7   lawyers and clients that the Trustee could read, that would

8   be problematic.  And once that bell is rung it can't be

9   unsung.  So there should be a filtering mechanism.

10          The confidentiality stuff I'm sure we can, you

11   know, I'm sure Attorney Fortis who's been working with

12   Attorney Lutz to resolve the discovery disputes, I think

13   they're all essentially resolved.

14          We can certainly, you know, we can confer on that

15   issue, but it's really the access and the privilege

16   information that we're most concerned about.  And that's why

17   we've suggested the proposal we have on page 5, which is

18   essentially let us filter the information, and then --

19          THE COURT:  So how would you do that, just so I

20   know?  How would you filter -- you mean you'd have to get

21   from the assignee first before he turns it over to the

22   Trustee?  And then --

23          MR. SKLARZ:  Yes.  Get access to the information,

24   let us go through it like lawyers normally would with

25   respect to, you know, materials for discovery.  And then

1    turn over what needs to be turned over.  If there's a

2    privilege log for privilege materials, supply the privilege

3    log.  And then if there's further discovery issues, meet and

4    confer, and then if necessary come back to Your Honor.

5            But there's a service agreement in place.  The

6    Trustee has the service agreement.

7            It's G-Club's data.  And by virtue of a 9019

8    motion, data that was never the property of HCHK can't

9    transmogrify into data that is the -- in the possession of

10   the estate and the Trustee.  The property rights are set

11   through the contract.

12           THE COURT:  I'm looking at your proposed language

13   that you would like to have in paragraph 6 of the revised

14   proposed order, which is on page 5 of your reply, and I

15   think the language is -- I mean, I don't know if you and the

16   Trustee are going to reach any agreement on this, but it

17   says and other documents pertaining only to the HCHK

18   entities.

19           I don't think that's correct.  I think you need to

20   say and any and only documents pertaining to the G-Club

21   entities, right?

22           I mean, you don't get to go through everything.

23   You get to go through what's relevant to your client.

24           MR. SKLARZ:  Correct.  We only want G-Club

25   documents.

1          THE COURT:  Right.  Okay.  I just want to make

2     that clear.  Okay.

3          MR. SKLARZ:  Yeah.  Yeah.  Absolutely.

4          THE COURT:  And then if you get to do that, then

5     you're saying -- so let's talk about mechanics.

6          So say the assignee says -- somehow filters out

7     anything that says G-Club in it, right, and then he turns it

8     over to you, what are you going to do next?

9          MR. SKLARZ:  It would be reviewed for relevant

10    information pursuant to the subpoena that would then be

11    turned over to the Trustee as we've done with --

12         THE COURT:  Well, what do you mean relevant?  I

13    mean, I think the only information that you would be holding

14    back would be privileged communications.  Right?

15         MR. SKLARZ:  Well, if something was not in their

16    subpoena, then if they didn't ask for it, I suppose it

17    wouldn't be turned over.  But, yes.  The most -- the only

18    thing that's of true concern at this point is the privileged

19    information.

20         THE COURT:  Well, I think --

21         MR. SKLARZ:  I mean, to be clear, we're not

22    looking to hold up anything.  We're just trying to protect

23    --

24         THE COURT:  No, no, I'm not -- I'm trying to

25    figure out a way to solve --

1          MR. SKLARZ:  Yeah.

2          THE COURT:  -- if at all, to solve the issue,

3    right?

4          Your issue is definitely different from other

5    creditors' issues.

6          MR. SKLARZ:  Yeah.  It's a technology -- it's sort

7    of a technology issue, almost not even a legal issue.

8          THE COURT:  And so we're trying to see if that's

9    something that can be resolved and that's why I'm asking the

10   steps.

11         So I have no idea if the documents are in any form

12   that have been categorized or anything.  I have no idea.  I

13   would assume, well, I shouldn't assume, but I wouldn't be

14   surprised if I was told they're not, they're not in

15   categories.  They're just a whole document dump.

16         Is that -- is that what we have, Counsel?  Is that

17   what the documents are that are in your possession?

18         MR. JARECK:  We as counsel have a lot of documents

19   in our possession, but they're mostly banking and financial

20   records.

21         The actual corporate records my understanding are

22   held in the cloud and I would have no idea how to sort for

23   them.

24         But, Your Honor, I mean, we'll be guided by

25   whatever you direct us to do.

1          THE COURT:  Well, I don't know what to do either.

2     I mean, you know, I mean, I have ideas, but if you think I

3     understand how to, you know, do searches in the cloud, I'm

4     not -- that's not -- I'm sorry, but I don't have that

5     knowledge.

6          MR. SKLARZ:  And I don't either.  I mean, I think

7     there's technology people that need -- I mean, obviously G-

8     Club was accessing this information prior to the ABC being

9     commenced, so there's a way to do this.  I am not --

10          THE COURT:  And they can't access it now?

11          MR. SKLARZ:  They can't access it now.

12          THE COURT:  Why?

13          MR. SKLARZ:  Because of the ABC --

14          THE COURT:  The password doesn't work or whatever?

15          MR. SKLARZ:  Well, essentially because of the ABC

16     access has been shut down.  That's my understanding.

17          THE COURT:  Well, that's what I'm saying.

18          MR. SKLARZ:  Yeah.

19          THE COURT:  So they can't -- they don't have the

20     access --

21          MR. SKLARZ:  Correct.

22          THE COURT:  -- they had prior to the commencement,

23     prior to HCHK assigning everything to the assignee?  That's

24     what you're saying?

25          MR. SKLARZ:  That's my understanding, yes.

1          THE COURT:  Okay.

2          MR. SKLARZ:  And so if -- I would anticipate that

3    we would work with whoever the assignee's IT provider is

4    who's doing the hosting for the cloud and whoever our IT

5    person is to regain access and go through the process.

6          THE COURT:  That's assuming the assignee has

7    somebody that's working on hosting the cloud.

8          MR. SKLARZ:  Well, they must, otherwise the data

9    wouldn't go anywhere.

10         THE COURT:  I think I just heard they don't.

11         MR. JARECK:  We have one person in HR and two

12   people in security, that's it.

13         MR. SKLARZ:  Well, there's --

14         MR. JARECK:   Everyone else was terminated.

15         MR. SKLARZ:  But there's -- there are servers that

16   need to be maintained.  If they're shut off, then -- or if

17   they just got thrown away, that would be problematic.  I

18   assume that hasn't been the case.

19         THE COURT:  But thrown away by whom?

20         MR. SKLARZ:  It will be thrown away by the

21   assignee.

22         THE COURT:  Well, you don't know that if it wasn't

23   assigned to him.  How do you know?  You don't know, right?

24         The point is an assignment for the benefit of a --

25   of creditors, the company, the assignor, can assign what

1    they want.  They don't have to assign everything.  And I

2    don't know.  I have no idea, I mean, what has happened.

3            One of the reasons don't like assignments for the

4    benefit of the creditors is just for that reason, right?

5    That the party assigning decides what they're going to

6    assign.  They might not have assigned everything.  I have no

7    idea.  I have no idea.

8            MR. SKLARZ:  Nor do I.

9            THE COURT:  But I'm being told by counsel that

10   they don't have any access to the cloud.

11           So even if you're correct that you should have the

12   right to search it, I don't know how that's going to work.

13           MR. SKLARZ:  I mean, if -- it would be -- if all

14   the data is now unavailable --

15           THE COURT:  Well, I don't know if it's

16   unavailable, but it's not -- it hasn't been provided to the

17   assignee, so that's a different issue, right?

18           MR. SKLARZ:  Well, I'm not -- I apologize, Your

19   Honor.  Can counsel clarify as to whether they're holding

20   the data?

21           MR. JARECK:  Again, we do have some data, but I

22   believe the data that counsel's referring to again is in the

23   cloud.

24           Could we hire back IT people to pull the

25   information down, I assume that we could.  We haven't done

1    anything to destroy anything.  Everything has been

2    maintained.  You can put a key in the door and no one has

3    access to anything.  So everything has been maintained and

4    preserved.

5           But how to pull down information from the cloud,

6    that's specific to counsel's client, I wouldn't have -- I

7    couldn't even tell you how to start.

8           THE COURT:  Well, if it was in the old days,

9    right, when we were talking about documents, right --

10          MR. SKLARZ:  We'd go there and we could get them.

11          THE COURT:  -- you'd go and you'd go look at

12   everything, right?

13          MR. SKLARZ:  Yes.

14          THE COURT:  And you'd determine, you'd say these

15   are all privileged and confidential, you can't turn them

16   over.

17          So are you saying that G-Club wants to hire

18   somebody to do that?

19          If you're saying that that might be a reasonable

20   request under the supervision of the assignee that you go

21   and you hire somebody to do that.  I don't know.

22          MR. SKLARZ:  I think that's a good idea, Your

23   Honor.  I was -- I did not know until counsel just indicated

24   that that there was no -- that they were not -- they did not

25   have access to the data.

1    I would just want to, you know, speak with my

2    client to see if that's acceptable.  But that sounds like a

3    good solution to have, you know, G-Club retain an IT

4    professional to work with the assignee to figure out a way

5    to access this data.

6             THE COURT:  Attorney Luft?

7             MR. LUFT:  Your Honor, when I restart I'd like to

8    approach and address this.

9             THE COURT:  Okay.  Yeah.

10            Are you done for the moment, Attorney Sklarz?

11            MR. SKLARZ:  Unless Your Honor has any other

12   questions.

13            THE COURT:  So just to be clear, your client's

14   objection to the revised proposed order is that it doesn't

15   address this technology issue that you have.  You want to be

16   able to review documents before they're turned over to the

17   Trustee to determine if, and if there is, if there are

18   privileged documents and to assert the privilege?

19            MR. SKLARZ:  That's correct, Your Honor.

20            THE COURT:  And if you did that, you'd have to

21   establish a privilege log anyway?

22            MR. SKLARZ:  That's correct, Your Honor.

23            THE COURT:  Okay.  All right.  Thank you.

24            MR. SKLARZ:  Thank you.

25            THE COURT:  All right.  Go ahead, Attorney Luft.

1          MR. LUFT:  Your Honor, may I approach?

2          THE COURT:  Sure.

3          MR. LUFT:  Thank you very much.

4          Your Honor, if it pleases the Court, I'll start

5     with G-Club and then I'll refer to the Himalayan entities.

6          Once again, this is Avi Luft of Paul Hastings on

7     behalf of the Chapter 11 Trustee.

8          So, Your Honor, I listened to this whole thing.

9     And to be honest I appreciate everyone trying to be creative

10    and to think how it is.  I'll explain to you why I don't

11    think there's any issue that requires this resolution, but

12    we'll see if I'm wrong.

13         The fact is, Your Honor, what G-Club writes in

14    their papers and what they claim is that their concern is

15    about confidentiality and to protect any privilege that may

16    exist.

17         And they say that they, quote, "Only seek the

18    implementation of a defined process that protects and

19    preserves rights and privileges."

20         But what's written down in their papers and what's

21    written down in the paragraph that Your Honor saw in their

22    revised Chapter 6 has little to nothing to do with what

23    they're talking about.

24         I want to start with a couple of things that were

25    said.

1          First of all, paragraph 6 of the settlement is an

2    important term.  G-Club keeps talking about their 2004

3    discovery.  And while I have been before you multiple times

4    to try to achieve that, that's not what paragraph 6 is

5    about.

6          Paragraph 6 is about allowing the Trustee access

7    to the documents.  And that's important because -- because

8    we're entering into the settlement, and because of how this

9    going to proceed with an adversary, we're effectively doing

10   away with discovery in that adversary and (indiscernible) --

11         THE COURT:  I don't agree with you on that one.

12         Because as I said to it, I hear your point, but as

13   I said to Attorney Sklarz, the way that he's drafting that

14   language to paragraph 6 is not going to work.

15         MR. LUFT:  I agree.

16         THE COURT:  If anything, if anything, it's going

17   to be limited to G-Club.  Okay?

18         So we're not doing away with discovery insofar as

19   if there is information to be provided the only thing that

20   might be set aside and dealt with in more than one step

21   belongs to G-Club.  If we get there.  Okay?

22         MR. LUFT:  Your Honor, I'm happy to hear that.

23         THE COURT:  Okay.

24         MR. LUFT:  I will go on to note --

25         THE COURT:  Well, that's what I said.  So if I

1    wasn't clear, I'm sorry.  But that's it.  I said to Attorney

2    Sklarz this is only applying to G-Club and it's only

3    applying to something that's privileged or confidential that

4    you can assert a privilege and that's it.

5            MR. LUFT:  And, Your Honor, to be clear, and I'll

6    jump ahead on this to that language, if you read the

7    language he proposes, it's not -- he's not saying only G-

8    Club's documents, he's saying pertaining -- documents

9    pertaining only to the -- to the HCHK entities.  And --

10           THE COURT:  And that's why I made that point.

11           MR. LUFT:  Right.

12           THE COURT:  That's a point I made.  That's not --

13   that's not going to happen.

14           MR. LUFT:  Correct, Your Honor.

15           And what I'm saying is even if I change that to G-

16   Club, if HCHK --

17           THE COURT:  No.  You take the only and you put it

18   in a different area.

19           MR. LUFT:  Right.

20           THE COURT:  It doesn't -- it doesn't pertain to

21   HCHK, it doesn't.  That word is incorrect.

22           MR. LUFT:  Your Honor --

23           THE COURT:  Because you're correct.  Then it would

24   apply to anything anybody could say, right?

25           MR. LUFT:  Correct.

1        THE COURT:  And no one else has said it.  So the

2  only person that's going to get any protection, if anyone,

3  is going to be G-Club.

4        MR. LUFT:  Right, Your Honor.

5        And the point I'm trying to make, and I think I'm

6  doing it inartfully, is what it's saying is even if it's

7  only G-Club that's a subject matter.

8        So if HCHK had documents about G-Club, under the

9  way they drafted it, even if only limited to G-Club, they

10  would exclude that also.

11        THE COURT:  No, they won't.  Because it will have

12  to be subject to a privilege that they'll have to assert and

13  then have to prove that they're entitled to that privilege.

14        MR. LUFT:  Great.  So now we're -- okay.

15        MR. DESPINS:  That's fine.

16        MR. LUFT:  So now we're talking about if there's a

17  privilege, and if it would make it their document, and I --

18  and I agree with you.

19        THE COURT:  And they'll have to prove it, right?

20        MR. LUFT:  Right.

21        THE COURT:  That's why you have a privilege log.

22        MR. LUFT:  Correct.

23        THE COURT:  You're going to look at it and you're

24  going to say that's not privileged, Judge.  You have to

25  figure out whether or not that's privileged, right?

1          MR. LUFT:  True.

2          THE COURT:  That's what I anticipate happening.

3          MR. LUFT:  Okay.  Good.  I agree with that.

4          Now, let's talk about this privilege.

5          Your Honor, they say that HCHK, they've held that

6     as a complete third party to G-Club.  They have given over

7     their documents to this third party.

8          Since then that third party has -- the documents

9     went -- the assignee took it over.  That's another third

10    party.

11         And then the assignee made a deal with G-News,

12    including letting them start up operations for a period,

13    that's a third, third party.

14         I don't know how anything is privileged anymore.

15         And to my knowledge, they never objected when it

16    went -- they didn't raise an issue with that.  They didn't

17    raise an objection when it went to the assignee.  And they

18    certainly didn't raise an objection to my knowledge when

19    that assignee then said that G-News could have access to it.

20    We now have three third parties who have access to

21    privileged information.  So I don't understand how --

22         THE COURT:  So you're saying that privilege has

23    been waived?

24         MR. DESPINS:  Correct.

25         MR. LUFT:  Exactly, Your Honor.  I don't

1    understand what privilege we're talking about.  And what

2    we're --

3           So while I can't see any privilege, what I can

4    imagine is the process of trying to go through all these

5    documents, which I have now been waiting for a considerable

6    period of time, to review and to go through all that just to

7    get to the conclusion that, oh, right, we waived them all, I

8    don't understand.

9           Now, maybe there's an argument that I'm not

10    seeing, but, Your Honor, I start with the fact that --

11           THE COURT:  Okay.  But we -- I hear what you're

12    saying.  I do.  We haven't -- we haven't addressed that

13    argument legally yet though, have we?

14           MR. LUFT:  We spoke about it --

15           THE COURT:  I mean, we haven't addressed the

16    argument that you're making legally, which, you know, you

17    could be right that the privilege has been waived.  But what

18    you've just said I don't think has been presented to the

19    Court to make that determination yet.  Right?

20           So you would be arguing with regard to G-Club and

21    their opposition to the entry of this -- approval of the

22    settlement and the entry of this order that their objection

23    should be overruled because there is no privilege?

24           MR. LUFT:  To the extent their objection is, as

25    I'm hearing it, which is that they now have a limited

1    concern about that they have privileged documents that are

2    at HCHK, I would say it should be overruled because those

3    documents, any such privilege to me seems that it would be

4    waived.  Yes, Your Honor.

5              THE COURT:  Okay.

6              MR. LUFT:  As with regard to confidentiality, if I

7    thought I heard him correctly, that it sounded like they're

8    not as concerned about that anymore.

9              THE COURT:  That's what he said.

10             MR. LUFT:  Okay.  So I'll assume that the language

11   we have there, there's no need to further discuss that

12   issue.

13             THE COURT:  Or any further discussions you both

14   can have, whether it's confidential or highly confidential,

15   there's a protective order in place that addresses those

16   issues.

17             MR. LUFT:  I agree, Your Honor.

18             THE COURT:  Okay.

19             MR. LUFT:  And I will -- so I think with that, and

20   with the modifications that has come out with which Your

21   Honor has discussed, I think that's really the only issue

22   before us is that privilege issue.  And like I said, I

23   believe there's a waiver, but that's where I think it is.

24             Other than that, I would assume that their other

25   arguments have been addressed based on the comments from

1    today.

2              THE COURT:  Yes.  We have to -- yes.  I have to

3    think about what, if anything, I want you to do with regard

4    to the waiver issue.

5              But I agree.  Attorney Sklarz has said that the

6    confidentiality is not their big issue.  And they understand

7    and will work with you to deal with the -- what would be the

8    application of the protections in the protective order to

9    confidential information.

10             MR. LUFT:  Okay.

11             THE COURT:  With regard to the privilege issues,

12   we'll talk about that, but I know where it stands.

13             MR. LUFT:  Thank you.

14             THE COURT:  So now let's turn to the other

15   parties.

16             MR. LUFT:  Okay.  And if I can just make one more

17   point?

18             THE COURT:  Sure.

19             MR. LUFT:  It's my understanding -- with regard to

20   the access and the access to the documents, I can't -- I

21   don't know whether or not -- speaking to Mr. Jareck it

22   doesn't seem like they were aware that there's been an issue

23   that people have been locked out of it.

24             But what I do have a concern about quite frankly,

25   Your Honor, is the idea of preservation spoliation.  To the

1    extent that access is already available or is restored, I

2    would not want G-Club changing any of the documents that

3    currently exist.  And that would be my only --

4           THE COURT:  Well, if they're in the cloud, how can

5    they change them?  They can copy them.

6           MR. LUFT:  Well, if they have access now, Your

7    Honor, or if they got access, if they had access --

8           THE COURT:  Well, I don't know what you -- I mean,

9    I don't know what I could possibly do about that unless and

10   until somebody brings somebody brings something forward

11   specifically.  I mean, I hear what you're saying.  But, you

12   know, you have a lawyer --

13          MR. LUFT:  I understand --

14          THE COURT:  -- representing -- two lawyers

15   representing an entity who have ethical obligations, right?

16   I'm sure that they've informed their clients that there's a

17   litigation hold or whatever they want to call it.  And if

18   their clients go ahead and destroy documents, then somebody

19   will have to show that and prove that and go from there.

20          At this point, I'm not going to solve this problem

21   with regard to documents in the cloud.

22          MR. LUFT:  Your Honor, I appreciate that.

23          I guess from our point of view through this

24   settlement by allowing the Trustee to have access that at

25   least ensures that we have the ability to see what was

1    there.  Whether they can have access to and read what was

2    there as well is a separate issue.

3         And I agree with you that's not for Your Honor to

4    decide.  I'm just saying one of the reasons this was an

5    important provision to this settlement is so that we can see

6    what's there and know that and have that information.  And

7    I'll stop with that.

8         THE COURT:  I understand.

9         MR. LUFT:  Your Honor, with regard to the

10   Himalayan entities, I will be very brief.  Unless Your Honor

11   has questions, I'm not going to go through all of it.

12        THE COURT:  No.  Go right ahead.

13        MR. LUFT:  Very quickly, there are multiple

14   arguments with regard to the idea of whether proper

15   consideration was given to the release.  I think we're

16   almost looking at this through a mirror.

17        Usually when a trustee gives a release, the

18   question as to whether there was adequate consideration is a

19   question of whether the estate got adequate consideration

20   for that release.

21        Yet, these people, the Himalayan entities, seem to

22   be talking about whether they got enough consideration for

23   the assignee receiving a release.  I just don't think that

24   is the question for a 9019.

25        The Trustee is granting the release and the

1    question is did we get enough back?

2              I think what I argued last time about why we think

3    this is a good settlement and the consideration that the

4    estate is receiving answers that question.  And I think that

5    solves that.

6              With regard to the suggestion that because there

7    was an exculpation provision and a channeling injunction,

8    and then we listened to the comments and accordingly we

9    tried to find a compromise and find some language that that

10   means that somehow we didn't think those first provisions

11   were important, I think is just a little disingenuous, Your

12   Honor.

13             That is the process of what we do here.  People

14   come, they make objections, we don't turn a deaf ear, we try

15   to listen, and where we can find a way to reach a

16   resolution, that's what we try to do.

17             I think it would be a terrible public policy if

18   effectively any time someone compromised you said that means

19   you must not have been serious in the first place.  I just

20   don't think that is reasonable.

21             Finally, with regard to the idea that -- the

22   gatekeeping, I'll leave that to Mr. Jareck.  I think he's

23   addressed what the basis of the concern is.

24             But I will touch on the fact that there have been

25   multiple references made to the fact that what we've put in

1   the revised order hasn't been, I believe, supported under

2   9013 or we didn't write -- give writing --

3           THE COURT:  Yeah.  The language about 9013 in the

4   brief is not correct by the way.  Ninety-thirteen doesn't

5   say anything about consideration.  It's a motion.  It's a

6   rule regarding motions.

7           MR. LUFT:  Correct, Your Honor.

8           THE COURT:  So I already looked at that, and the

9   language about what 9013 provides is not accurate.

10          MR. LUFT:  Thank you, Your Honor.

11          And I will just comment that to the extent there's

12  other comments that we haven't somehow provided or didn't

13  support, Your Honor didn't ask us to file a brief in

14  connection with a revised motion.  You asked us to put in or

15  changes to the protective order.

16          THE COURT:  Right.  I agree.

17          MR. LUFT:  So I think to take issue with the fact

18  that we didn't expand on it further I think is unfair.

19          THE COURT:  I'm not worried about that issue.

20          MR. LUFT:  Neither am I, Your Honor.

21          THE COURT:  Okay.

22          MR. LUFT:  I have no further questions -- I have

23  no comments.  Do you have any questions for me?

24          THE COURT:  What about your -- the U.S. Trustee's

25  final position with regard to paragraph 14?

1         MR. LUFT:  I'll let Mr. Jareck --

2         MR. DESPINS:  I'll address that.

3         MR. LUFT:  -- or Mr. Despins would like to speak

4    to that.

5         THE COURT:  Okay.

6         MR. DESPINS:  Your Honor, I wanted to address both

7    13 and 14.  Both of them start with in the event the Court

8    grants a dispositive ruling in favor of the Trustee.

9         None of this 13 -- 14 says in the event the

10   release set forth in 13 becomes effective.  So it's all

11   linked together.  None of these two paragraphs become

12   effective unless you've determined that we are correct and

13   that these entities are alter egos of the debtor.

14        If that's the case, they're not third-party

15   claimants.  "They're our claimant," quote/unquote, and we

16   certainly have jurisdiction over them.

17        Once that we've accomplished that, clearly the

18   Court has jurisdiction to say, in order to avoid claims that

19   would bypass my order, your order, that these claims are

20   released, I will force people to file a simple motion with

21   the Court to say I'm suing the assignee.  I have a direct

22   claim.

23        And Your Honor is going to call, you know, balls

24   and strikes and say, okay, that's a direct claim, go in

25   peace.  Or it's not a direct claim, it's been released.

1          You certainly have the jurisdiction to do that

2     because these two provisions don't kick in until you've

3     found that they are the alter ego.  At that point, they are

4     our creditors.  You clearly have jurisdiction over them.

5          So I want to make sure.  And you might say, so if

6     that's not kicking in now, why are you putting that in?

7     Because the assignee wants to know that if we win, he will

8     get the benefit of that.  So that's why it's in there now.

9          But today, these provisions, that's not happening

10    today.  It's happening if, automatically by the way, if Your

11    Honor rules that we prevail on the alter ego.

12         So the jurisdictional basis over them is covered

13    in spades.  And there's just no issue that the Court can

14    grant that.

15         And, gain, the *General Motors* case is on all fours

16    on that.  It was a sale, but the point is the same here.  If

17    it's a release or a sale, the point is the same.

18         So we believe that the Court can do that and has

19    jurisdiction to do it.

20         If there's something I didn't address, I'm happy

21    to address that.

22         THE COURT:  No.  I have no further questions at

23    the moment.  Thank you.

24         MR. DESPINS:  Thank you.

25         THE COURT:  All right.  Does anyone else wish to

1    be heard?

2              MS. McCLAMMY:  Very briefly, Your Honor?

3              THE COURT:  Sure.

4              MS. McCLAMMY:  May I approach?

5              THE COURT:  Certainly.

6              MS. McCLAMMY:  I just wanted to respond to Mr.

7    Luft's comments because it's not my habit to be disingenuous

8    and I don't want that to be the record.

9              We very much appreciate the changes to the release

10   and we, as you and I discussed earlier, agree that that

11   release no longer covers claims that my clients would bring

12   in their own capacity.

13             And there is no argument that my clients should

14   have received consideration for that release because that is

15   not a release that is binding on them.

16             The argument about consideration, and maybe it

17   wasn't artfully worded, was to say that this order,

18   paragraph 14 in particular, prejudices my clients and poses

19   burdens on them as we discussed, and as Ms. Claiborn, and it

20   does so without their getting any benefit in return.

21             So from their point of view this settlement is one

22   that's entirely one-sided.  It's a great result for the

23   estate, clearly.  It provides the assignee with things,

24   clearly.  It doesn't provide us with anything of value, but

25   at the same time it imposes burdens on us.  And that's the

1   argument I was trying to make.

2              THE COURT:  Okay.  Thank you.

3              MS. McCLAMMY:  Thank you.

4              THE COURT:  I appreciate that.

5              Anything further from anyone this afternoon?

6              MR. LUFT:  No, Your Honor.

7              THE COURT:  All right.

8              I'm sorry.  Go ahead, Attorney Luft.  Oh, you said

9   nothing?

10             MR. LUFT:  Nothing, Your Honor.

11             THE COURT:  Okay.  Given the arguments that have

12  been made this afternoon and some references to case law

13  that I haven't looked at, I have to take a look at this.  So

14  what I'm going to do is I'm going to take the matter under

15  advisement and I will rule accordingly.

16             If, if, for some reason while I take the matter

17  under advisement I think I need something additional from

18  the parties, we'll let you know, but I need to go back and

19  look at this.

20             I do think, as counsel just pointed out, there has

21  been progress made in the last week with regard to the

22  release issue.  I understand there are still concerns about

23  paragraph 14.  I understand the G-Club concerns about and

24  the Trustee's concerns about paragraph 6.  There are also

25  other pending objections just to the settlement as a whole

1    that have been made by parties, specifically with regard to

2    administrative claim issues.  And I'll have to look at all

3    those issues and make a decision.

4           As I said, if there is something else that the

5    Court needs, you'll be made aware of that.  And otherwise I

6    will -- if I can rule without asking for anything else, I

7    will.  And if I can't, then I will ask you and we'll proceed

8    from there.

9           I know the parties would like this to be resolved

10   sooner as opposed to later as would I and I will do my best

11   to do that.

12          We have other matters, other cases, other things,

13   but we will be taking a look at this and we'll try to

14   resolve as soon as we possibly can.

15          Does anyone have anything else this afternoon?

16          MR. DESPINS:  I just wanted to confirm, Your

17   Honor, our next hearing, if I'm not mistaken, is August 2nd.

18   Is that the same --

19          THE COURT:  I don't know at the moment.

20          MR. DESPINS:  Okay.

21          THE COURT:  But I suppose I could take a look.

22          MR. DESPINS:  Well, no, you don't need to.  I just

23   --

24          THE COURT:  I can take a look.  We can all take a

25   look.  I don't know.  Yes.  At least that's what the

1    calendar shows as of now.

2            MR. DESPINS:  For now, yeah.

3            THE COURT:  August 2nd in an adversary proceeding

4    only, motion to dismiss adversary proceeding.  That's what

5    the calendar shows.  At least what I'm looking at right now,

6    that's all I see.  Could I have missed something?

7    Certainly.  But it appears that the next hearing is August

8    2nd in adversary proceeding 22-5027 on motions -- on a

9    motion to dismiss the adversary proceeding.

10            MR. DESPINS:  All right.  Thank you, Your Honor.

11            THE COURT:  Okay?  All right.  That concludes our

12    hearings today.  And that is the last matter on today's

13    calendar, therefore, court is adjourned.  Thank you.

14            ALL COUNSEL:  Thank you, Your Honor.

15        (Proceedings concluded at 3:31 p.m.)

16

17

18

19

20

21

22

23

24

1    I, CHRISTINE FIORE, court-approved transcriber and certified

2    electronic reporter and transcriber, certify that the

3    foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7    *Christine Fiore*

8    _____        July 24, 2023

9         Christine Fiore, CERT

10             Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

INDEX

| WITNESS FOR THE DEBTOR: | DIRECT | CROSS |
|---|---|---|
| Aaron Mitchell | 28 | |