## Exhibit 1

1.  CHAN Sze-wing
2.  05.10.2018
3.  Secretary for Justice
4.  1st Affirmation

HCCP *595* /2018

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS (CRIMINAL) NO.        OF 2018

IN THE MATTER OF THE
ORGANIZED AND SERIOUS CRIMES ORDINANCE CAP. 455
AND
IN THE MATTER OF

The Secretary for Justice                                 Applicant

and

Male KWOK Ho-wan, alias GUO Wengui          Respondent 1 ("**R1**")
[Holder of Hong Kong Identity Card No. ████████,
Hong Kong Passport No. █████████]

Male GUO Qiang                                            Respondent 2 ("**R2**")
[Holder of Hong Kong Identity Card No█████████
Hong Kong Passport No. ████████]

Female QU Guojiao                                        Respondent 3 ("**R3**")
[Holder of Hong Kong Identity Card No. ████████,
China Identity Card No. ███████████,
Two-Way Permit No. ████████, China Passport No.
███████]

AAGV Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Respondent 4 ("**R4**")

BSA Strategic Fund I
[A company incorporated in the Cayman Islands,
Registration No. ▮]

Respondent 5 ("**R5**")

Insight Phoenix Fund
[A company incorporated in the Cayman Islands,
Registration No. ▮]

Respondent 6 ("**R6**")

Alfonso Global Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Respondent 7 ("**R7**")

Allied Capital Global Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Respondent 8 ("**R8**")

Creative Apex Investments Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Respondent 9 ("**R9**")

Crystal Breeze Investments Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Respondent 10 ("**R10**")

Elite Well Global Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Respondent 11 ("**R11**")

Globalist International Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Respondent 12 ("**R12**")

2

HR0090176
HR0090175

Infinitum Developments Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ███]

Respondent 13 ("**R13**")

Infinite Increase Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ███]

Respondent 14 ("**R14**")

Noble Fame Global Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ███]

Respondent 15 ("**R15**")

Eastern Profit Corporation Limited
[A company incorporated in Hong Kong, Company
Registration No. ███]

Respondent 16 ("**R16**")

Alfa Global Ventures Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ███]

Respondent 17 ("**R17**")

Ace Decade Holdings Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ███

Respondent 18 ("**R18**")

Hong Kong International Funds Investments Limited
[A company incorporated in Hong Kong, Company
Registration No. ███]

Respondent 19 ("**R19**")

Anton Development Limited
[A company incorporated in Hong Kong, Company
Registration No. ███]

Respondent 20 ("**R20**")

Bravo Luck Limited
[A company incorporated in the British Virgin Islands,
BVI Company No. ███]

Respondent 21 ("**R21**")

3

HR0090177
HR0090175

China Golden Spring Group (Hong Kong) Limited          Respondent 22 ("**R22**")
[A company incorporated in Hong Kong, Company
Registration No. ▮]

Rosy Acme Ventures Limited                             Respondent 23 ("**R23**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Leading Shine Limited                                  Respondent 24 ("**R24**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮]

Male HAN Chunguang                                     Respondent 25 ("**R25**")
[Holder of Hong Kong Identity Card No. ▮,
China Identity Card No. ▮
Two-Way Permit No. ▮, China Passport No.
▮]

Male ZHANG Wei                                         Respondent 26 ("**R26**")
[China Identity Card No. ▮,
Two-Way Permit No. ▮]

Female GUO Lijie                                       Respondent 27 ("**R27**")
[China Identity Card No. ▮,
Two-Way Permit No. ▮]

---

## FIRST AFFIRMATION OF SENIOR INSPECTOR CHAN SZE WING

---

I, Senior Inspector of Police, CHAN Sze-wing, of the Financial
Investigations Division, Narcotics Bureau ("FI NB") of the Hong Kong Police do
solemnly and sincerely affirm as follows: -

4

HR0090178
HR0090175

2.       I am attached to the Financial Investigations Division of the Hong Kong
Police Force, and involved in the investigation of the case and the financial affairs
of the Respondents.   I make this affirmation in support of an application by the
Secretary for Justice for a restraint order pursuant to section 15 of the Organized
and Serious Crimes Ordinance, Cap. 455 ("**OSCO**").

3.       The facts and matters deposed to in this affirmation are within my
personal knowledge having been obtained by me in the course of an investigation
into the criminal offence described below and the financial affairs of the above
named Respondents, and are also based on information received from police
officers involved in this investigation, which I verily believe to be true and correct.
I am an authorized officer pursuant to section 2 of OSCO and am duly authorized
to make this affirmation.

4.       Nothing disclosed in this affirmation or exhibited hereto should be taken
as a waiver of legal professional privilege which may attach to such information or
the contents of particular documents not disclosed or exhibited.   Nor should any
reference made herein in respect of any information or document within the
possession of the Hong Kong Police Force and/or the Department of Justice be
regarded as a concession over such subsisting claim, if any, of public interest
immunity, especially if the detection or investigation of any criminal conduct or
activity by the Hong Kong Police Force or otherwise may be prejudiced.

I.       **BACKGROUND OF CASE**

5.       This case stemmed from investigations into R1, his son (R2), his
financial manageress (R3) and other persons for "Fraud" and "Money Laundering"
offences.   In this affirmation, three core investigations would be outlined to show
that R1-3 have committed various criminal offences including "Conspiracy to
Defraud", "Fraud" and "Money Laundering" and have derived substantial financial
benefits.   The Police investigation would also reveal huge amount of assets, in
form of credit balances held in bank accounts and securities (listed shares in Hong
Kong and Shanghai) held by R1 to R27, cash seized from the office at 49/F, Bank
of China Tower, and a residential premises held in the name of R24 situated at No.
20 & 22 in South Bay Road ("the South Bay Property"), all of which are realisable

5

property of R1 and/or R2 and are to be restrained.

6.      The three core investigations and the offences involved are broadly
outlined as follows: -

> (a)  "Share Placement Fraud" – "Conspiracy to Defraud" offence
> committed by R1, R3 and other persons to defraud the Hong Kong
> Stock Exchange ("HKEX") to grant Haitong Securities Company
> Limited ("Haitong") with the approval for the issuance of the new
> H shares via a share placement taken place between December 2014
> and May 2015.   R1 is suspected to have made use of his controlled
> entities in committing the conspiracy to defraud and as a result, had
> obtained a financial benefit over **HK$ 9.5 billion** (derived from the
> discounted price in the said share placement).   R3 was a party to
> the conspiracy as she assisted R1 in moving funds;

> (b)  "Mortgage Loan Fraud" – A "Fraud" offence jointly committed by
> R1 and R2 for obtaining a mortgage loan of **HK$ 298 million** from
> a bank in Hong Kong for the purchase of the South Bay Property
> and two "Money Laundering" offences for dealing with respective
> sums of **HK$ 224.8 million and HK$ 26.6 million** known or
> believed to represent proceeds of an indictable offence for the
> partial settlement of the purchase price of the South Bay Property in
> March 2011;

> (c)  "Aircraft Loan Fraud" – A "Fraud" offence jointly committed by R1
> and R2 for obtaining from a bank in Hong Kong, in late 2012, an
> aircraft loan of **US$ 21 million** (approximately HK$162 million) in
> favour of a company solely owned by R2.

7.      On 2017-08-03, the Police operation turned overt and R3 was arrested for
the offences of "Money Laundering" and "Conspiracy to Defraud" in relation to
the "Share Placement Fraud" whilst R1 and R2 could not be located in Hong Kong.
The Police also searched the office situate at 49/F, Bank of China Tower and other
locations where voluminous business documents and agreements were seized.   R3
remained silent under caution and declined to answer any questions during her

HR0090180
HR0090175

cautioned interviews.

## II.    **BACKGROUND OF RESPONDENTS**

(A) <u>Individual</u>

8.      R1 was born in the Mainland and he used the name of GUO Wengui (郭
文貴) whilst he was in the Mainland.   From the records of the Registration of
Persons Office in Hong Kong, he first applied for his Hong Kong Identity Card via
one-way permit on 1997-09-18.   He is presently the subject of the INTERPOL
Red Notice issued by the Mainland on 2017-04-17 for bribing a Mainland official.
The INTERPOL Red Notice is still in force.

9.      R2 was born in the Mainland.   He is the son of R1.   From the records
of the Registration of Persons Office in Hong Kong, he first applied for his Hong
Kong Identity Card via one-way permit on 2008-06-26.

10.     R3 was born in the Mainland.   She is the financial manageress of R1.
From the records of the Registration of Persons Office in Hong Kong, she first
applied her Hong Kong Identity Card on 2015-10-06.   In the form submitted by
her to the Immigration Department of HKSAR, R3 claimed that she worked as a
manageress at a business address at 49/F, Bank of China Tower, No. 1 Garden
Road, Central.   Copy of the records is exhibited at **CSW-1**.

11.     R25 was born in the Mainland.   He is the bodyguard of R1.   From the
records of the Registration of Persons Office in Hong Kong, he first applied his
Hong Kong Identity Card on 2016-08-12.   In the form submitted by him to the
Immigration Department of HKSAR, R25 claimed that he worked in the field of
portfolio management at a business address at 49/F, Bank of China Tower, No. 1
Garden Road, Central.   Copies of the records are exhibited at **CSW-2**.

12.     R26 was born in the Mainland.   He is the husband of R1's niece.
According to information provided by R26 to the China Construction Bank (Asia)
Corporation Limited ("CCBA") during account opening on 2014-10-28, R26
claimed that he was the director of R7.   Copies of the account opening mandate

HR0090181
HR0090175

records of R26 are exhibited at **CSW-3**.

13.    R27 was born in the Mainland.   She is another niece of R1.   According to information provided by R27 to CCBA during account opening on 2014-10-28, R27 claimed that she was the director of R17. Copies of the account opening mandate records of R27 are exhibited at **CSW-4**.

(B)  Companies

14.    R4 is a BVI company incorporated on 2016-04-18.   R4 had opened a securities account with Haitong International Securities Company Limited ("Haitong International").   From Haitong International's account opening record, R3 was appointed as a director of R4 on 2016-04-27.   AA Global Ventures Limited (a BVI company previously named as Amtd Special Holdings Limited) was the sole shareholder of R4.   R4 used Flat C, 11/F, Lai On Building, No. 2 Water Street, Sai Ying Pun, Hong Kong as its correspondence address.   This address was known to be the previous residential address of R3 in Hong Kong. Copies of account opening mandate records of R4 are exhibited at **CSW-5**.

15.    R5 is a company incorporated in the Cayman Islands on 2015-01-05. The first director was Taiwanese male KUNG Chun-lin (龔俊霖) and the sole shareholder was BSA Capital Management Limited, a Cayman Islands company. R5 used Room 1102, 11/F, Beautiful Group Tower, No. 74-77, Connaught Road Central, Hong Kong as its correspondence address.   This address was known to be the office address of BSA Capital Management Limited's related company in Hong Kong.   Copies of the account opening mandate records of R5 are exhibited at **CSW-6**.

16.    R6 is a company incorporated in the Cayman Islands on 2015-01-13. The first director was a Mainland female ZHENG Shasha (鄭莎莎) and the sole shareholder was Phoenix Capital Management (Cayman) Limited, a Cayman Islands company.   R6 used Unit A, 16/F, Two Chinachem Plaza, No. 135, Des Voeux Road, Central, Hong Kong as its correspondence address. The office was known to be the office address of Phoenix Capital Management (Cayman) Limited's related company in Hong Kong.   Copies of the account opening mandate records of R6 are exhibited at **CSW-7**.

8

HR0090182
HR0090175

17.     R7 is a BVI company incorporated on 2014-10-08.   According to documents provided by R7 to China Minsheng Banking Corp., Ltd. Hong Kong Branch ("CMBC") during account opening on 2014-12-16, R26 had been the sole director and shareholder.   R7 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of R7 are exhibited at **CSW-8.**

18.     R8 is a BVI company incorporated on 2015-02-09.   According to documents provided by R8 to CMBC during account opening on 2015-03-12, Mainlander SU Yan (蘇晏) had been the sole director and shareholder.   R8 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened. Copies of the account opening mandate records of R8 are exhibited at **CSW-9.**

19.     R9 is a BVI company incorporated on 2014-10-23.   According to documents provided by R9 to CMBC during account opening on 2015-03-12, R3 had been the sole director and shareholder.   R9 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened. Copies of the account opening mandate records of R9 are exhibited at **CSW-10.**

20.     R10 is a BVI company incorporated on 2015-02-17.   According to documents provided by R10 to CMBC during account opening on 2015-03-12, Mainlander SUN Ailing (孫愛玲) had been the sole director and shareholder. R10 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of R10 are exhibited at **CSW-11.**

HR0090183
HR0090175

21.     R11 is a BVI company incorporated on 2015-02-23.   According to documents provided by R11 to CMBC during account opening on 2015-03-12, Mainlander SUN Li (孫莉) had been the sole director and shareholder.   R11 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of R11 are exhibited at **CSW-12**.

22.     R12 is a BVI company incorporated on 2015-02-12.   According to documents provided by R12 to CMBC during account opening on 2015-03-09, Mainlander SUN Yanfeng (孫豔峰) had become the sole director and shareholder. R12 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of R12 are exhibited at **CSW-13.**

23.     R13 is a BVI company incorporated on 2015-02-12.   According to documents provided by R13 to CMBC during account opening on 2015-03-09, Mainlander NIU Runze (牛潤澤) had become the sole director and shareholder. R13 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address. This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of R13 are exhibited at **CSW-14.**

24.     R14 is a BVI company incorporated on 2015-02-23.   According to documents provided by R14 to CMBC during account opening on 2015-03-10, Mainlander REN Meizi (任美子) had become the sole director and shareholder. R14 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of R14 are exhibited at **CSW-15.**

HR0090184
HR0090175

25.     R15 is a BVI company incorporated on 2015-02-23.   According to
documents provided by R15 to CMBC during account opening on 2015-03-10,
LIU Wuji (劉嫵及) had become the sole director and shareholder.   R15 used
Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong
as its correspondence address. This address was known to be the office address of a
solicitors firm and a secretarial company in Hong Kong when the account was
opened.   Copies of the account opening mandate records of R15 are exhibited at
**CSW-16.**

26.     R16 is a Hong Kong company incorporated on 2011-07-29.   On
2017-06-27, GUO Mei (郭美, R1's daughter) replaced HAN Chunguang (韓春光,
R25) and became the sole director and shareholder.   The instrument of transfer
dated 2017-06-27 showed that GUO Mei (郭美) had acquired all issued shares,
totaling 1,000 shares, from R25 at HK$ 1,000.   Copies of the instrument of
transfer are exhibited at **CSW-17.**   The details outlining the changes of directors,
shareholders and registered address since incorporation are tabled and exhibited as
**CSW-18.**   The last known registered office of R16 is Room 805-806, 8/F, Tai Yau
Building, 181 Johnston Road, Wan Chai which was known to be the office address
of a secretarial company in Hong Kong.

27.     R17 is a BVI company incorporated on 2014-10-15.   According to
documents provided by R17 to CMBC during account opening on 2014-12-16,
R27 had become the sole director and shareholder.   R17 used Room 1602 & 4/F,
5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its
correspondence address.   This address was known to be the office address of a
solicitors firm and a secretarial company in Hong Kong when the account was
opened.   Copies of the account opening mandate records of R17 are exhibited at
**CSW-19.**

28.     R18 is a BVI company incorporated on 2014-06-18.   According to
documents provided by R18 to CMBC during account opening on 2014-12-17,
Mainlander YU Yong (于泳) had become the sole director and shareholder.   R18
used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong
Kong as its correspondence address.   This address was known to be the office
address of a solicitors firm and a secretarial company in Hong Kong when the
account was opened. Copies of the account opening mandate records of R18 are

HR0090185
HR0090175

exhibited at **CSW-20.**

29.    R19 is a company incorporated in Hong Kong on 2006-10-12.   On 2006-10-03, R1 subscribed the first issued share.   On 2006-10-24, R1 became the first director.   On 2014-10-10, R3 replaced R1 as the sole director and shareholder.   On 2017-06-27, GUO Mei (郭美, R1's daughter) replaced R3 as the sole director and shareholder.   The instrument of transfer dated 2017-06-27 showed that R3 sold the only issued share to GUO Mei (郭美) at HK$1.   Copies of the instrument of transfer are exhibited as **CSW-21.**   The last known registered office of R19 is Room 805-806, 8/F, Tai Yau Building, 181 Johnston Road, Wan Chai which was known to be the office address of a secretarial company in Hong Kong.

30.    R20 is a company incorporated in Hong Kong on 2015-05-07.   On 2017-06-27, GUO Mei (郭美, R1's daughter) replaced R25 and REN Meizi (任美子, R14's director) and became the sole director.   The instrument of transfer dated 2017-06-27 showed that GUO Mei (郭美) acquired the only one issued share from the sole shareholder R25 at HK$1.   Copies of the said records are exhibited as **CSW-22.**   The details outlining the changes of directors, shareholders and registered address since incorporation are tabled and exhibited as **CSW-23.**   The last known registered office of R20 is Room 805-806, 8/F, Tai Yau Building, 181 Johnston Road, Wan Chai which was known to be the office address of a secretarial company in Hong Kong.

31.    R21 is a BVI company incorporated on 2013-04-02.   On 2013-07-22, R2 became the sole director while R1 and R2 were the only two shareholders each holding one issued share according to documents received by UBS AG Hong Kong Branch ("UBS-HK") in February 2015.   R21 used 49/F, Bank of China Tower, No. 2 Garden Road, Hong Kong as its correspondence address. Copies of the account opening mandate records of R21 are exhibited at **CSW-24.**

32.    R22 is a company incorporated in Hong Kong on 2014-03-06 and R2 has become the sole director and shareholder since then.   Copies of the company records are exhibited as **CSW-25.**   The last known registered office of R22 is Room 805-806, 8/F, Tai Yau Building, 181 Johnston Road, Wan Chai which was known to be the office address of a secretarial company in Hong Kong.

HR0090186
HR0090175

33.     R23 is a BVI company incorporated on 2014-05-22.   According to the documents provided by R23 to the CCBA during account opening on 2014-10-27, R25 had become a director and sole signatory.   R23 used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of R23 are exhibited at **CSW-26.**

34.     R24 is a BVI company incorporated on 2010-01-25.   According to the documents provided by R24 to CCBA during account opening on 2011-03-18, R2 had become the sole director and shareholder.   R24 used 49/F, Bank of China Tower, No. 2 Garden Road, Hong Kong as its correspondence address.   Copies of the account opening mandate records of R24 are exhibited at **CSW-27.**

35.     Assets Sino Limited is a BVI company incorporated on 2014-10-15 and Mainlander GUO Lihong (郭麗紅) had become the sole director and shareholder according to records of CCBA during the account opening on 2014-10-28.   The company used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened. Copies of the account opening mandate records of Assets Sino Limited are exhibited at **CSW-28.**

36.     Auspicious Coast Limited is a BVI company incorporated on 2014-10-15 and Mainlander GUO Lichun (郭麗春) had become the sole director and shareholder according to records of CCBA during the account opening on 2014-10-28.   The company used Room 1602 & 4/F, 5/F, Central Tower, No. 28 Queen's Road, Central, Hong Kong as its correspondence address.   This address was known to be the office address of a solicitors firm and a secretarial company in Hong Kong when the account was opened.   Copies of the account opening mandate records of Auspicious Coast Limited are exhibited at **CSW-29.**

37.     To sum up, the persons mentioned in the above paragraph 9-36 are all related to R1, being either R1's relative or employee.   Details are as below:

| S/N | Person | Company held | Relationship with R1 |
| --- | --- | --- | --- |

13

HR0090187
HR0090175

| S/N | Person | Company held | Relationship with R1 |
|-----|--------|--------------|----------------------|
| 1. | R2 | R21, R22, R24 | Son of R1 |
| 2. | R3 | R9 | R1's manageress handling financial affairs in HK |
| 3. | GUO Mei (郭美) | R4, R16, R19, R20 | Daughter of R1 |
| 4. | R26 | R7 | Husband of R1's niece |
| 5. | SU Yan (蘇晏) | R8 | Employee of R1 in Henan |
| 6. | SUN Ailing (孫愛玲) | R10 | Employee of R1 in Henan |
| 7. | SUN Li (孫莉) | R11 | Employee of R1 in Henan |
| 8. | SUN Yanfeng (孫豔峰) | R12 | Employee of R1 in Henan |
| 9. | NIU Runze (牛潤澤) | R13 | Employee of R1 in Beijing |
| 10. | REN Meizi (任美子) | R14 | Employee of R1 in Henan |
| 11. | LIU Wuji (劉嫵及) | R15 | Employee of R1 in Henan |
| 12. | R25 | R23 | Bodyguard of R1 |
| 13. | R27 | R17 | Niece of R1 |
| 14. | YU Yong (于泳) | R18 | Employee of R1 |
| 15. | GUO Lihong (郭麗紅) | Assets Sino Limited | Niece of R1 |
| 16. | GUO Lichun (郭麗春) | Auspicious Coast Limited | Wife of R1's brother |

38.    R4 to R15, R17, R18, R21, R23 & 24 are foreign companies with no registration in Hong Kong.

## III.    POLICE INVESTIGATION

### Case One - Share Placement Fraud

39.    Haitong is a company incorporated in the Mainland.  It issued listed shares in the Shanghai Stock Exchange (as A Shares) and the HKEX (as H Shares). The then Chairman (from June 2007 to July 2016) was a Mainlander, WANG Kaiguo (王開國) ("WANG").  Police investigation revealed R1 expressed his interests to WANG in subscribing shares of Haitong during its Initial Public Offering in Hong Kong.  It was until May or June 2014 that R1 informed WANG he had about US$3 billion to inject into Haitong for becoming the largest shareholders, and that he intended to appoint his people as directors in future.  R1

HR0090188
HR0090175

wanted to use Haitong as a financial platform to obtain loans to support his businesses in future.   R1 would obtain an outright financial profit by subscribing shares at a discounted price via the share placement.

40.       Since Haitong was a Mainland incorporated securities company, the legal requirement in the Mainland as stipulated under "Regulation on the Supervision and Administration of Securities Companies"《證券公司監督管理條例》 required an approval from China Securities Regulatory Commission ("CSRC") if any person acquired or actually controlled more than 5% shareholdings of the total issued capital, commonly known as "the 5% rule".   Hence, R1's subscription of new issuance of shares with US$3 billion would trigger the requirement to obtain a CSRC's approval.

41.       R1 told WANG that he could evade CSRC's approval by arranging a few placees to subscribe the share placement to be listed in Hong Kong.   He specifically reminded WANG to include two investment banks, namely, UBS-HK and Macquarie Capital Securities Limited ("Macquarie") as joint placing agents for this share placement.   R1 represented that William JE (余建明) of Macquarie would act on his behalf and would arrange placees to subscribe Haitong shares for him so as to dilute the shareholding concentration to bypass the 5% rule.

42.       In July or August 2014, William JE (余建明) advised WANG that he was acting on behalf of R1.   In December 2014, Haitong eventually resolved and agreed to issue its H shares to seven placees.   Three of the placees were sourced from other joint placing agents having no connection to this share placement fraud.   Macquarie secured three placees and the UBS-HK secured one placee.   In May 2015, the total quantity of shares allocated to the four placees secured by Macquarie and UBS-HK was 1,438,265,220, which was over 12.51% of the total issued shares after placement.

Four Placees from Macquarie and UBS were under R1's effective control and were funded by R1

43.       From the public announcements dated 2014-12-21 made by Haitong via the HKEX, Haitong had entered into subscription agreements with 7 placees of an aggregate of 1,916,978,820 new H shares.   It was also the quantity of H shares

15

eventually allocated to all placees and listed for trading in the HKEX in May 2015. A copy of the said announcement is now exhibited at **CSW-30**. After the completion of share placement, the quantities of H shares allocated to four placees subject to R1's effective control are listed out in below table.

| Name of Placee | No. of New H Shares | Percentage of the total issued share capital (A Share & H Share) after Placement |
|---|---|---|
| Dawn State Limited | 569,427,620 | 4.95% |
| Maunakai Capital Partners (Hong Kong) Limited | 496,478,800 | 4.32% |
| Insight Capital Management (Hong Kong) Limited | 223,415,200 | 1.94% |
| Amtd Special Holdings Limited | 148,943,600 | 1.30% |
| **Total** | **1,438,265,220** | **12.51%** |

(A)  Subscription made by the Dawn State Limited

44.      Dawn State Limited subscribed 569,427,620 new H shares via UBS-HK. From records provided by UBS-HK, Dawn State Limited was a BVI company and a Mainlander LU Bo was the registered director, who signed all documents with UBS-HK.   Dawn State Limited was a wholly owned subsidiary of Haixia Industrial Investment Fund (Fu Jian) Limited Partnership Co. ("Haixia Fund') operated in the Mainland.

45.      To obtain funds for settling the consideration for the share placement, Dawn State Limited entered two facility agreements with UBS AG, London Branch ("UBS-London").   In gist, Dawn State Limited pledged its subscribed shares to UBS-London for obtaining a margin loan of HK$ 6,011,236,393.92 in May 2015. In early July 2015, the share price of Haitong dropped sharply.   As Dawn State Limited failed to provide funding to settle the margin call, UBS-London exercised its contractual rights to liquidate all subscribed shares held by Dawn State Limited at a substantial discount.

HR0090190
HR0090175

46.     From the documents seized from UBS-HK, court documents of a civil action (index number 653316/2015) before the Supreme Court of State of New York initiated by the Ace Decade Holdings Limited (R18) against the UBS (New York Office) ("UBS-NY") in the United States for the misrepresentation and deception made to R18, inducing R18 to obtain a loan from the bank for Dawn State Limited to subscribe 569,427,620 new H shares ("the NY Action"), were found.

47.     In the NY Action, YU Yong (于泳, the sole director of R18) and R1 had filed affidavits and other documentary exhibits with the Supreme Court of State of New York.   Copies of affidavits of YU Yong (于泳) and R1 are exhibited as **CSW-31** and **CSW-32**.   In view of the contents of the said affidavits which are summarized as follows, R18 and Dawn State Limited are in fact subject to the effective control of R1 in the share placement: -

    (a)   YU Yong (于泳) was the director and sole shareholder of R18. She was an employee of R1.   She worked for R1 to obtain the share placement of Haitong via her company R18;

    (b)   YU Yong (于泳) stated that R1 took advice from the UBS to use R18 as an intermediary to obtain the share placement to avoid disclosure requirement with an assurance that the bank would not liquidate the subscribed shares;

    (c)   R1 arranged the funds to settle the consideration of the share placement for Dawn State Limited;

    (d)   A co-investment agreement and a side letter signed between R18 and Haixia Fund was produced in the NY Action and is also now exhibited at **CSW-33**.   It showed that R18 would contribute US$ 500 million and Dawn State Limited would arrange loan finance of US$ 750 million to subscribe new issued shares of Haitong.   R18 would pay 0.65% of the co-investment amount to Haixia Fund as management fee.   After 2015-07-13, Haixia Fund would be required to transfer the entire share capital of Dawn State Limited upon the request of R18 to R18 or such other entity as may be

HR0090191
HR0090175

nominated by R18.

Source of Fund for Dawn State to subscribe share placement

48.     The Police investigation showed that Dawn State Limited settled the consideration of the share placement totaling HK$ 9,782,766,512 by obtaining a margin loan of HK$ 6,011,236,393.92 from UBS-London, and using its credit balances of HK$ 3,882,584,464 held in its bank accounts.   Fund flow analysis showed that the fund held in the bank accounts of Dawn State Limited was sourced from the bank accounts of R18.   Backward fund tracing of R18 revealed the money was originated from R7, R17 and R19, which are companies all subject to the effective control of R1.   A chart detailing the fund flow above is exhibited as **CSW-34.**

R7, R17, R18, R19 are companies subject to the effective control of R1

49.     R26 and R27 respectively owned R7 and R17 and they were both relatives of R1.   Police investigation revealed they were only stooges for opening bank accounts and signing documents for R7 and R17 at the request of R1 out of family relationship.   Pursuant to R1's instructions, they nominated R3 as the account signatory.   All related bank transactions slips were signed by R3.   R26 and R27 had no idea of the operation of the bank accounts of R7 and R17.   R7 and R17 at all material times are subject to the effective control of R1.

50.     From YU Yong (于泳)'s affidavits, R18 was only a vehicle to assist R1 to acquire the share placement allocated to Dawn State Limited.   She took advice from R1.   R3 was nominated as the account signatory of R18's account with CMBC.   R3 moved the funds from R18 to Dawn State Limited, which was then paid to UBS-HK for settling the consideration of share placement.

51.     R19 was incorporated on 2006-10-12 and R1 subscribed the only share and became the first director.   R1's position was replaced by R3 on 2014-10-10 and then further replaced by R1's daughter, GUO Mei (郭美) on 2017-06-27.   In May 2015, R3 was the sole director and shareholder.   R3 was also an account signatory and signed for the transfer from R19's bank accounts to R18 in settling the payment of HK$ 2,000,000,000 for share placement eventually conducted by

18

Dawn State Limited.   In view of the changes in shareholdings since R19's incorporation, the relationship of the respective shareholder with R1 and all relevant circumstances, R1, at all material times, had an effective control of R19.

(B)   Subscription made by Maunakai Capital Partners (Hong Kong) Limited

52.    Maunakai Capital Partners (Hong Kong) Limited ("Maunakai") was another placee which had subscribed 496,478,800 new H shares via the placing agent Macquarie.   Maunakai is a Hong Kong incorporated company principally engaged in asset management and advisory business.   The subscription was made for R5, a private investment fund.

Investigation against the 11 Investors of R5

53.    From the records relating to R5 seized from Maunakai, it was revealed that the composition of investors in R5 and the consideration paid for subscribing new H shares are outlined in below table: -

| S/N | Name of Investor | Director / Shareholder | Subscription Amount (in US$) |
|---|---|---|---|
| 1. | Alfonso Global Limited (R7) | R26 | 183,769,932.90 |
| 2. | Allied Capital Global Limited (R8) | SU Yan (蘇晏) | 57,740,605.50 |
| 3. | Creative Apex Investments Limited (R9) | R3 | 57,740,605.50 |
| 4. | Crystal Breeze Investments Limited (R10) | SUN Ailing (孫愛玲) | 57,740,605.50 |
| 5. | Elite Well Global Limited (R11) | SUN Li (孫莉) | 57,740,605.50 |
| 6. | Globalist International Limited (R12) | SUN Yanfeng (孫豔峰) | 57,740,605.50 |
| 7. | Infinitum Developments Limited (R13) | NIU Runze (牛潤澤) | 57,740,605.50 |
| 8. | Infinite Increase Limited (R14) | REN Meizi (任美子) | 57,740,605.50 |
| 9. | Noble Fame Global Limited (R15) | LIU Wuji (劉嫵及) | 57,740,605.50 |
| 10. | Assets Sino Limited | GUO Lihong (郭麗紅) | 98,082.83 |
| 11. | Auspicious Coast Limited | GUO Lichun (郭麗春) | 98,082.83 |
| **Total: US$ 645,890,942.56 (approximate HK$ 5,000 million)** | | | |

19

HR0090193
HR0090175

54.    Police investigation revealed that the director of the above 11 investor companies ("the 11 Investors"), all BVI incorporated companies, were either the relative or the employee of R1, details as below:

| S/N | Name of Investor | Director / Shareholder | Relationship with R1 |
|---|---|---|---|
| 1. | R7 | R26 | Husband of GUO Lihong (郭麗红) |
| 2. | R8 | SU Yan (蘇晏) | Employee of R1 in Henan[1] |
| 3. | R9 | R3 | R1's manageress handling financial affairs in HK |
| 4. | R10 | SUN Ailing (孫愛玲) | Employee of R1 in Henan |
| 5. | R11 | SUN Li (孫莉) | Employee of R1 in Henan |
| 6. | R12 | SUN Yanfeng (孫豔峰) | Employee of R1 in Henan |
| 7. | R13 | NIU Runze (牛潤澤) | Employee of R1 in Beijing[2] |
| 8. | R14 | REN Meizi (任美子) | Employee of R1 in Henan |
| 9. | R15 | LIU Wuji (劉嫵及) | Employee of R1 in Henan |
| 10. | Assets Sino Limited | GUO Lihong (郭麗红) | Niece of R1 |
| 11. | Auspicious Coast Limited | GUO Lichun (郭麗春) | Wife of R1's brother |

55.    A summary of the information from opening mandates of bank accounts of the 11 investors and their travel movement records are outlined in the table at **CSW-35**.    Police investigation revealed the followings: -

(a)    The 11 Investors are Mainlanders and they were arranged to come to Hong Kong and opened the respective bank accounts under the instruction / at the request of R1.    After they came to Hong Kong, they were all received by R3.    R3 then escorted them to banks and accompanied them to open bank accounts;

(b)    The 11 Investors (except R3), did not have any knowledge about their BVI companies nor the bank accounts.    They just opened the accounts as arranged by R3 and instructed by R1;

(c)    The directors / shareholders of R7-R15 (except R9) were not the

---

[1]  R1's company in Henan is called Henan Yuda Real Estate Co. Limited
[2]  R1's company in Beijing is called Beijing Pangu Investment Company Limited

HR0090194
HR0090175

signatories of their bank accounts.    Instead, R3 had been the authorized signatory for all bank accounts of R7-R15 and was the one who transferred funds from the respective bank account for the settlement of the share placement in May 2015.    On 2015-05-25, YU Yong (于泳) and R25, who were R1's employee and bodyguard, became the account signatories of R7–R15;

(d)    For Assets Sino Limited and Auspicious Coast Limited, their directors did not operate the accounts.    They opened the bank accounts pursuant to R1's request/instructions and then passed the control of the accounts to R3 soon after they were opened.    These two directors did not have any knowledge about any transaction of the accounts.

### Source of fund for R5 to settle consideration of share placement

56.    To complete the subscription of 496,478,800 new H shares, Maunakai had to settle HK$ 8,529,505,784.    Maunakai arranged R5 to obtain a facility loan of HK$ 3,574,190,625 from the Morgan Stanley Bank N.A., R5 settled the balance purchase price by using its funds of HK$ 4,981,000,000 to Macquarie.

57.    The backward fund flow tracing into source of R5's own funds paid to Macquarie confirmed that the monies came from the local bank accounts of R5's investors outlined in table of paragraph 53.    Upon further tracing backwards, the money originated from R7 and R19, companies subject to the effective control of R1.

58.    A chart detailing the fund flow for settling consideration of share placement with Macquarie is exhibited as **CSW-36.**    The mandate and supporting vouchers of the accounts of the 11 Investors are now exhibited as **CSW-8 to 16, 28, 29, and 37.**    R3 was an account signatory of bank accounts of R7-15.    R3 signed on the related instruction slips for moving the funds for R7-15 to settle the payment for the share placement.    For Assets Sino Limited and Auspicious Coast Limited[3], R3, at all material times, had the sole control of the bank accounts and all

---

[3] Assets Sino Limited and Auspicious Coast Limited are not named as respondents as they no longer hold any

21

related transfers were believed to be made by R3 via e-banking.

(C)   Subscription made by Insight Capital Management (Hong Kong) Limited

59.      Insight Capital Management (Hong Kong) Limited ("Insight") was another placee which had successfully subscribed 223,415,200 new H shares via Macquarie.   Insight is a Hong Kong incorporated company principally engaged in asset management and advisory business.   The subscription was made for a private investment fund Insight Phoenix Fund (R6).

60.      The Police seized records relating to R6 from Insight which revealed the investors of R6 and consideration paid for subscribing those new H shares as outlined in below table: -

| S/N | Name of Investor | Director / Shareholder | Subscription Amount (in HK$) |
|-----|------------------|------------------------|------------------------------|
| 1. | Alfonso Global Limited (R7) | R26 | 444,544,255 |
| 2. | Allied Capital Global Limited (R8) | SU Yan (蘇晏) | 428,779,970 |
| 3. | Creative Apex Investments Limited (R9) | R3 | 428,779,970 |
| 4. | Crystal Breeze Investments Limited (R10) | SUN Ailing (孫愛玲) | 428,779,970 |
| 5. | Elite Well Global Limited (R11) | SUN Li (孫莉) | 428,779,970 |
| 6. | Globalist International Limited (R12) | SUN Yanfeng (孫豔峰) | 428,779,970 |
| 7. | Infinitum Developments Limited (R13) | NIU Runze (牛潤澤) | 428,779,970 |
| 8. | Infinite Increase Limited (R14) | REN Meizi (任美子) | 428,779,970 |
| 9. | Noble Fame Global Limited (R15) | LIU Wuji (劉熌及) | 428,779,970 |
| 10. | Assets Sino Limited | GUO Lihong (郭麗紅) | 10,679,970 |
| 11. | Auspicious Coast Limited | GUO Lichun (郭麗春) | 10,679,970 |
| Total: HK$ 3,896,143,955 | | | |

61.      The composition of investors in R6 was an exact mirror image as in R5, namely, the 11 Investors.   The only difference was the quantity of new H shares subscribed and consideration involved.   A chart detailing the fund flow for

realizable assets of R1.

22

HR0090196
HR0090175

settling consideration of share placement with Macquarie is exhibited as **CSW-38**.

<u>Source of fund for R6 to settle consideration of share placement</u>

62.    Investigation revealed that the funds of R6's investors (the 11 Investors) were originated from R7 and R19, companies subject to the effective control of R1. The e-banking transactions made by Assets Sino Limited and Auspicious Coast Limited were believed to be made by R3.   She also signed all instructions for the transfers of fund from accounts of R7-R15 to Insight for payment of the share placement.   Copies of the vouchers are exhibited as **CSW-39**.

<u>Director of R6 – ZHENG Shasha</u>

63.    The director of R6 is ZHENG Shasha (鄭莎莎).   She had become the director since its incorporation in January 2015.   The birth certificate retrieved from the Immigration Department showed that she and William JE (余建明) was the mother and father of a child JE Pui-hei.   To recap, William JE (余建明) was identified as the person in Macquarie acting for R1 to secure placees for this share placement.   Again ZHENG Shasha (鄭莎莎) being R6's director was more than a co-incidence.   It could be inferred that R6 was incorporated with ZHENG Shasha (鄭莎莎) as the director to conceal R1's effective control of R6 and for the purpose of the share placement.   R6 was a vehicle to hold assets for R1.   The new H shares and the bank balances of R6 and its investors were all subject to R1's effective control.

(D)   <u>Subscription made by Amtd Special Holdings Limited ("AMTD")</u>

64.    AMTD was a BVI company (Company No 1711552) incorporated on 2012-05-09.   Police investigation revealed that AMTD maintained a securities account with the Haitong International.

65.    On 2015-02-20, Blackpine Advisors Limited (BVI Company No. 1854374) ("Blackpine") became the director and shareholder of AMTD.   In late May 2015, the share placement was completed.   On 2015-06-05, AMTD changed its name to AA Global Ventures Limited.

23

HR0090197
HR0090175

66.     On 2016-04-26, Blackpine sold all issued capital of AA Global Ventures Limited (previously as AMTD) to Anton Development Limited (R20).    At that time, R3 was the sole director and shareholder of R20.

67.     On 2016-10-13, Haitong International received a notice signed by R3 on behalf of the directors' board of AA Global Ventures Limited, which resolved to delete the existing authorized signatories of all bank accounts and securities account maintained by AA Global Ventures Limited (or AMTD).    The notice also appointed R3 as the only authorized signatory of the securities account held by AA Global Ventures Limited with Haitong International.

68.     As a result, R3 assumed full control of AA Global Ventures Limited (previously as AMTD) including the new H shares subscribed via the share placement.    Copies of the company records are exhibited as **CSW-40.**

Source of fund for AMTD to settle consideration of share placement

69.     AMTD is another company successfully subscribed 148,943,600 new H shares via Macquarie.    AMTD had to pay Macquarie HK$ 2,558,851,048.    The backward fund flow tracing confirmed that the fund was originated from R17.    R17 was a BVI company incorporated upon the instructions of R1.    The shareholding was owned by R1's relative but in fact R17 was subject to the effective control of R1.    A chart detailing the fund flow for payment of subscribed shares to Macquarie is exhibited as **CSW-41.**    R3 was also account signatory of R17.    She signed all vouchers to transfer HK$ 2,579,517,900 from R17 to AMTD on 2015-05-22.    The sum was for settling share placement with Macquarie onwards.

Co-investment leading to transfer of all issued capital of AMTD to Anton (R20)

70.     On 2017-08-03 & 04, the Police conducted a search at 49/F Bank of China Tower.    Among other items, Police found a co-investment agreement and a side letter dated 2015-05-04 made between Blackpine and R17.    A copy of the co-investment agreement and the side letter is exhibited as **CSW-42.**

71.     The said co-investment agreement dated 2015-05-04 pinpointed that AMTD was wholly owned by Blackpine.    Blackpine had also entered a binding

24

HR0090198
HR0090175

share subscription agreement with a listed company in the Hong Kong Stock Exchange and extended a right to R17 (owned by R1's relative) to contribute HK$2,365M on the proposed investment.   AMTD also agreed that, at any time from the sixth month after the completion of the share subscription, it should transfer the entire issued capital of AMTD to R17 or other entity as might be nominated upon receiving a notice.   From a deed of settlement dated 2017-05-29 seized from R1's office at 49/F Bank of China Tower, it was confirmed that the entire issued capital of AMTD was transferred to R20 on 2016-04-26.   A copy of the deed of settlement is exhibited as **CSW-43**.

72.     At all times, R1 had an effective control of R17 and the fund for the share placement was also originated from R17.   R1 had exercised its control over R17 and instructed it to give a notice to AMTD to transfer all its issued capital to Anton (R20) pursuant to the terms of the said co-investment agreement.

Dissipation of subscribed shares from AMTD to AAGV

73.     The share placement completed in late May 2015 resulted in the allotment of 148,943,600 new H shares to AMTD.   The majority of shares were held in securities account of AMTD with Haitong International.   Since then, AMTD made use of the margin facilities of that securities account to buy H shares of Haitong in open market.

74.     On 2016-11-01, AMTD transferred 159,600,000 shares of Haitong to the securities account of AAGV Limited (R4) at Haitong International and received HK$734,656,191.19.   The said sum was used to settle outstanding margin and interest payments owed by AMTD to Haitong International.

AAGV (R4) subject to R1's effective control

75.     As set out in paragraph 14, the director of R4 at the time was R3. AMTD was also the sole shareholder of R4 as shown from the company records. Copies of the company records are exhibited as **CSW-5**.   In essence, R3 had assumed sole ownership of R4.   On 2017-02-03, R3 gave an instruction to Haitong International to appoint R25 as the sole authorized signatory of R4's securities account.   As R3 had previously moved funds to subscribe share placements on behalf of R1 while R25 was also R1's employee, the setting of R3

25

HR0090199
HR0090175

as R4's director and R25 as account signatory showed that the assets of R4 was subject to an effective control of R1.

76.     On 2017-07-03, R4 sold 150,000,000 shares of Haitong and received about HK$ 1.94 billion.    R25 was the only account signatory and he signed to authorize the sales of those shares.    After receiving the proceeds from sales of shares, R25 gave an instruction to the Haitong International for transferring HK$ 1.2 billion from R4 to the DBS account of Anton (R20).    A chart detailing the fund flow above is exhibited as **CSW-44**.

77.     As addressed in preceding paragraphs, R4 was subject to an effective control of R1.    The directors of R20 were intermittently changed among different employees of R1 and finally to R1's daughter.    A sum of HK$1.2 billion sourced from the sales of shares from R4 (subject to R1's effective control) was also paid into the DBS account of R20.    It showed that R20 was another company subject to an effective control of R1.    The assets of R20 are R1's realisable property.

The pre-requisites of HKEX's approval for listing of share placement

78.     The completion of the share placement in the HKEX is conditional upon the satisfaction of the conditions, which includes approval from (i) the shareholders; (ii) the China Securities Regulatory Commission ("CSRC"); and (iii) the HKEX.

The Shareholders approval in a special resolution

79.     The share placement required the approval of shareholders (or their proxies) holding an aggregate of two-third (2/3) of the total shares to vote for the special resolution at the Extraordinary General Meeting ("EGM") on 2015-02-09. A shares and H shares were counted in separate pools and the special resolution would not be adopted if Haitong failed to secure approval from either A or H shareholders.    The A shareholders who had participated at the EGM on 2015-02-09 and held shares of more than one-third over the EGM participants of A Share confirmed that had they been made aware of the facts that the same person had the effective control over the four questioned placees, they would not have voted for the special resolution on issuing new H shares.

26

The China Securities Regulatory Commission (CRSC)

80.    The CSRC confirmed that the acquisition of share placements by the questioned four placees in this setting would be considered as someone having an actual effective control over the placees.    As the total subscription was over 5% and this had not been submitted to the CSRC for an approval, it would contravene Article 14 of the "Regulation on the Supervision and Administration of Securities Companies" 《證券公司監督管理條例》 and Article 129 of the "Securities Law of the People's Republic of China" 《中華人民共和國證券法》 in the Mainland.    If the incident that the questioned four placees were subject to the effective control of the same person had been made known to the CSRC, CSRC would not have granted the approval Zheng Jian Xu Ke (證監許可) [2015] No. 811 dated 4th May 2015.    A copy of the said approval is exhibited at **CSW-45**.

The Hong Kong Stock Exchange (HKEX)

81.    HKEX has a statutory duty under s.21 of the Securities and Futures Ordinance (SFO), to ensure, as far as reasonably practicable, an orderly, informed and fair market in securities that are traded on the HKEX.    The Listing Division of the HKEX confirmed that had they known the approval from the CSRC is obtained by false or misleading representation, omission, fraudulent or deceptive means, which contravened the applicable laws, regulations and rules in the Mainland, the HKEX would not have granted the conditional listing approval for the issue of new H shares.

**Case Two – Mortgage Loan Fraud**

Background of the case

82.    R2 is the sole shareholder (and director) of Leading Shine Limited (R24) which purchased a house situates at Nos. 20 & 22 South Bay Road (hereunder as "South Bay Property") from the Higo Force Company Limited in early 2011 at a consideration of **HK$ 880 million.**

83.    Police investigation revealed that the payment for the purchase settled by

HR0090201
HR0090175

R24 came from:

    (a) An amount of about **HK\$ 251 million** of which came from the proceeds of a loan fraud occurred in the Mainland ("the Mainland Fraud"); and

    (b) A mortgage of **HK\$ 298 million** obtained from the China Construction Bank (Asia) Corporation Limited (CCBA) in Hong Kong was secured by a Standby Letter of Credit issued by the China Construction Bank in Beijing (CCB-Beijing), the fund of which came from the proceeds of the Mainland Fraud.

## (A)    The Mainland Fraud (vs R1 and YANG Ying)

84.    At all material times, R1 had the effective control over the Mainland company Beijing Pangu Investment Company Limited (北京盤古氏投資有限公司) (hereunder referred as 'Pangu'). LU Tao (呂濤) worked in Pangu as Deputy General Manager while YANG Ying (楊英) was Financial Controller.

85.    Police investigation revealed that in 2010, R1 instructed LU Tao (呂濤) and YANG Ying (楊英) to arrange for borrowing a loan of RMB\$ 3.2 billion from the Agricultural Bank of China Limited (Beijing) for the purportedly purpose of a renovation project of different properties owned by Pangu. In order to support the loan application, Pangu signed a construction contract with Beijing Chengjian Wu Construction Engineering Company Limited (北京城建五建設工程有限公司) ("Chengjian Wu"), but in fact no such renovation work existed.

86.    R1 instructed YANG Ying (楊英) to submit the false contract to the Agricultural Bank of China Limited (Beijing), and the loan was granted in around December 2010.

87.    Pursuant to R1's instructions, YANG Ying (楊英) channeled more than RMB\$ 600 million of the loan obtained to Hong Kong via underground remittance exchanges agencies.

88.    The Agricultural Bank of China Limited (Beijing) confirmed that had

HR0090202
HR0090175

they known the renovation contracts provided by Pangu were false, the bank would not have approved the RMB\$ 3.2 billion loan.

89.     In June 2017, LU Tao (呂濤), YANG Ying (楊英) and another employee were convicted before the Dalian Xigang People's Court in Liaoning Province (遼寧省大連市西崗人民法院) in the Mainland for the Mainland Fraud.   A copy of the court judgment is exhibited as **CSW-46**.

The flow of Mainland Fraud proceeds to Hong Kong for South Bay Property Purchase

90.     A chart detailing fund flow of the Mainland Fraud is exhibited as **CSW-47**.   YANG Ying (楊英), the Financial Controller working for R1, took instructions from R1 to channel proceeds of the Mainland Fraud to Hong Kong. To facilitate the channeling of such crime proceeds to Hong Kong, R1 introduced his friend HAN Zijing (韓子勁) ("HAN") to YANG Ying (楊英).

91.     Police investigation revealed that YANG Ying (楊英) approached HAN's (韓子勁) accountant who had business connections with remittance exchanges in both Mainland and Hong Kong.   For moving funds from the Mainland to Hong Kong, the accountant would give instructions to YANG Ying (楊英) to transfer money into designated accounts in the Mainland.   The accountant would sort out with the remittance exchanges in the Mainland and Hong Kong, and arrange the funds to bank into the designated beneficiaries in Hong Kong.

92.     Furthermore, HAN (韓子勁) had once received RMB\$ 20 million from R1 to remit the said amount to Hong Kong.   The beneficiary account was Sail Victory Limited ("Sail Victory") in Hong Kong.   After having received RMB\$ 20 million from R1 in the Mainland, HAN (韓子勁) released some **HK\$ 26 million** from his Hong Kong company account held by White Horse Holdings Limited ("White Horse") to Sail Victory.   Copies of the mandate and records are exhibited as **CSW-48** and **CSW-49** showing three cheques from White Horse totaling HK\$ 26,587,500 was made into the account of Sail Victory.

93.     The said RMB\$ 20 million provided by R1 to HAN (韓子勁) was originated from the Mainland Fraud.   The HK\$ 26,587,500 was the amount of

HR0090203
HR0090175

crime proceeds arranged by R1 to launder into Hong Kong, which would support a criminal charge against him.

94.     R1 via Sail Victory, received the funds of HK$ 26,587,500 known or believed to represent proceeds of indictable offence and which was later used for purchasing South Bay Property in Hong Kong.   They also used HAN (韓子勁)'s accountant to facilitate money remittance to Hong Kong.

The investigation into Sail Victory accounts

95.     Given that the account of Sail Victory was involved in receiving fraud proceeds, investigation was made into the transactions.   Sail Victory had an account with Bank of China (Hong Kong) Limited.

96.     Sail Victory is a BVI company solely owned by R2 and he was also the only signatory.   Copies of opening mandate and transaction records are exhibited as **CSW-50** and **CSW-51**.   Between 2010-12-30 and 2011-03-30, the said account received a total deposit of about **HK$ 851,369,598** from over 70 entities.

97.     The withdrawal transactions in HK currency and US currency accounts are outlined in below table: -

| S/N | Date | Amount (HK$) | Beneficiary |
|---|---|---|---|
| 1 | 2011-01-19 | 83,000,000.00 | New Dynamic Development Limited (A company solely owned by R1) |
| 2 | 2011-01-19 | 28,000,000.00 | Mortgage Account of the Vendor |
| 3 | 2011-01-19 | 37,400,000.00 | HKSAR Government (Stamp Duty for the South Bay Property) |
| 4 | 2011-03-18 | 421,713,387.00 | Leading Shine Limited (R24) |
| 5 | 2011-03-30 | 118,500,000.00 | Mortgage Account of the Vendor |
| | **Total** | **688,613,387.00** | |

| S/N | Date | Amount (US$) | Beneficiary |
|---|---|---|---|
| 6 | 2011-01-26 | 7,589,470.29 | N/A |
| 7 | 2011-02-02 | 10,500,036.00 | Airbus (BNP Paribas U.S.A – New York) |

HR0090204
HR0090175

| 8 | 2011-03-29 | 2,910,580.00 | Leading Shine Limited (R24) |
|---|---|---|---|
| | **Total** | **21,000,086.29** | **(Approx. HK$ 162,750,668.7)** |

98.    The fund flow analysis revealed the majority of withdrawals of about HK$ 628,170,382 (HK$ 605,613,387.00 + US$ 2,910,580.00) were used to settle the purchase of South Bay Property.   The nature of outgoings reinforced that the Sail Victory account was used to settle a property purchase.   Police investigation showed the money of Sail Victory was sourced from the RMB$ 3.2 billion fraud occurred in the Mainland.

99.    The Police conducted enquiries into the depositors (over 70 entities) that paid funds into the Sail Victory account.   While some depositors were out of reach or failed to recall details due to lapse of time, 8 depositors were entities controlled by a local major remittance exchange.

100.    The local major remittance exchange explained the procedure for remitting money between Mainland and Hong Kong.   Whenever a customer asks for remitting money from the Mainland to Hong Kong, that customer will only need to deposit the amount into a designated Mainland account.   Once the fund was received in the Mainland, they would transfer money from their accounts in Hong Kong to the beneficiary as provided.   This is an offset mechanism commonly adopted to conduct exchange remittance business between Mainland and Hong Kong.

101.    The said 8 depositors controlled by the local major exchange had made 64 deposits of **HK$ 224,755,830** into the Sail Victory account after receiving RMB$ 188,700,000 in the Mainland at an average exchange rate of RMB$ 1 to HK$ 1.19.   The local remittance exchange also provided the names of Mainland company accounts that handled the remittances, and it was identified that those were the Mainland company accounts having received crime proceeds of the RMB$ 3.2 billion fraud to make remittance.   It revealed that R1 had conspired with YANG Ying (楊英) to launder this total sum of HK 224,755,830 known or believed to represent proceeds of indictable offence.

(B)    The Mortgage Loan Fraud in Hong Kong ("hereunder as HK Mortgage

HR0090205
HR0090175

Fraud") (vs R1 and R2)

102.   To settle the payment for the purchase of South Bay Property, R2 applied to CCBA for a **HK$ 298 million** mortgage loan.   Considering R2 was a businessman in the Mainland and R24 was a shell company with no genuine business conducted in Hong Kong, CCBA imposed the following conditions when considering R24's application:

> (a) R2 to provide an unlimited personal guarantee;
> (b) R24 to provide an initial deposit to R24's Charge Over Account;
> (c) The First Legal Charge of the South Bay Property;
> (d) The HK$ 79 million (equals to RMB$ 70 million) Standby Letter of Credit issued by CCB-Beijing.

103.   To fulfill requirement (d), an application for a Standby Letter of Credit has to be made. R1 and R2 instructed YANG Ying (楊英) to arrange RMB$ 50 million from the crime proceeds of the Mainland Fraud and RMB$ 20 million from other sources to be deposited into CCB-Beijing, to support the issuance of a Standby Letter of Credit of HK$ 79 million (equals to RMB$ 70 million) to CCBA for guarantying R2's application of mortgage loan in Hong Kong.

104.   Upon fulfilling the above conditions, CCBA in Hong Kong approved the mortgage loan on 2011-03-30.   R2, as sole director and shareholder, signed the facility letter on R24's behalf.   On 2011-03-31, the loan of **HK$ 298 million** was drawn down and paid to the Vendor's account.

105.   CCBA in Hong Kong confirmed that had they known the deposits used for applying the Standby Letter of Credit originated from crime proceeds, CCBA in Hong Kong would not have approved the HK$ 298 million mortgage loan.

The settlement of consideration of the South Bay Property

106.   The Agreement for Sale and Purchase dated 2011-01-19 and the land search of the South Bay Property are exhibited as **CSW-52** and **CSW-53**.

107.   Among other things, the consideration of HK$ 880 million were settled

HR0090206
HR0090175

as follows: -

    (a)  An initial deposit in the sum of HK$ 60 million shall be paid to the Vendor's solicitors Baker & McKenzie upon signing of the Provisional Agreement, i.e. 2011-01-05;

    (b)  A further deposit in the sum of HK$ 28 million shall be paid to the Vendor within 14 days on or before 2011-01-19;

    (c)  The balance of the purchase price in the sum of HK$ 792 million shall be paid to the Vendor upon completion of sale and purchase of the Property.

<u>Settlement of Initial Deposit of HK$ 60 million</u>

108.    New Dynamic Development Limited is a solely owned company of R1 at the time being.   Copies of company records are exhibited as **CSW-54**.

109.    The said company had an account at the Standard Chartered Bank with R1 as the sole signatory.  On 2010-12-31 and 2011-01-05, R1 drew two cashier orders totaling HK$ 60 million for settling the initial payment of HK$ 60 million. Copies of bank mandate and records are exhibited as **CSW-55 and CSW-56**.  It showed R1 had involved in the property transaction and had an interest over the South Bay Property.  The monthly repayment of loan of about HK$ 62 million was also made from this account between March 2012 and October 2014.

<u>Further deposit HK$ 28 million to the Vendor</u>

110.    R2 was the sole shareholder of Sail Victory and the company had an account with Bank of China (Hong Kong) Limited.  On 2011-01-19, the account issued a cashier order of HK$ 28 million and paid into Vendor's mortgage account. This is transaction No. 2 in paragraph 97.

<u>HK$ 792 million balance of Purchase Price</u>

111.    The composition for settling balance of the purchase is outlined below:

HR0090207
HR0090175

| S/N | Transaction date | Depositor | Fund Receiver | Amount (HK$) |
|-----|------------------|-----------|---------------|--------------|
| 1 | 2011-03-31 | CCBA | Vendor's mortgage account | 298 million |
| 2 | 2011-03-30 | Stevenson, Wong & Co. | Vendor's mortgage account and various reimbursement | 375.5 million |
| 3 | 2011-03-30 | Sail Victory's BOC account | Vendor's mortgage account | 118.5 million |
| Total | | | | 792 million |

112.    Police investigation confirmed that the **HK$ 298 million** mortgage loan was fraudulently obtained by R1 and R2.   The said whole sum was therefore crime proceeds.   In relation to the **HK$ 224,755,830** arranged by YANG Ying (楊英) on R1's instructions to Hong Kong (see paragraph 101) and **HK$ 26,587,500** by HAN (韓子勁) at R1's directions (see paragraph 93) into the Sail Victory account, they were also crime proceeds from the Mainland Fraud.   These two sums were ultimately used for settling the purchase price of the South Bay Property by direct payment to Vendor designated account or via the solicitors account.   Copies of the transaction records are exhibited as **CSW-57**.

113.    In July 2015, CCBA terminated the client relationship with R24 in view of the adverse news against R1.   On 2015-07-22, R24 settled the outstanding loan of HK$ 314,191,551.50.   The source of repayment originated from a margin loan of HK$ 310 million drawn down from Haitong Securities International Company Limited ("Haitong International") on pledge of Haitong share held by AMTD. The money channeled via layers of accounts of AMTD, Ace Decade (R18) and eventually to R24.   To recap, the share in AMTD was obtained as a result of conspiracy to defraud in the share placement committed by R1 and R3.

114.    The proceeds of R1 and R2 are **HK$ 549,343,330** (HK$ 298 million + HK$ 224,755,830 + HK$ 26,587,500), which were used to settle the consideration of the South Bay Property, amounts to about 62% of the purchase price of HK$ 880 million.

115.    R1 had paid an initial deposit of HK$ 60 million; made monthly loan

34

repayments of about HK$ 62 million; made arrangement to defraud the HK$ 298 million mortgage loan; arranged to channel HK$ 251 million proceeds of Mainland Fraud to settle the purchase price, and made use of the crime proceeds obtained in share placement fraud to repay the HK$ 310 million outstanding mortgage.   R1 had provided the majority funding for the South Bay Property, which indicated that he has beneficial interest in the South Bay Property.

## Case Three – Aircraft Loan Fraud

### Police investigation

116.   This is another case of "Fraud" showing R1-R2 and their syndicate members had defrauded the China Construction Bank (Asia) Corporation Limited ("CCBA") in Hong Kong for an aircraft loan of **US$ 21 million** obtained in 2012.

117.   In around October 2012, R1-R2 purchased an aircraft (Model Green Airbus ACJ 319) ("the Aircraft") via R2's solely owned, Well Origin Limited ("Well Origin"), a BVI company incorporated on 2010-04-01.   R2 was appointed as its sole director and shareholder on 2010-05-11.   Copies of the company records are exhibited as **CSW-58.**

118.   In October 2012, R2 approached CCBA for a loan of US$21 million for the purchase of the aircraft ("the Aircraft Loan").   As Well Origin had no business in HK, CCBA requested Well Origin to prove its financial capacity for loan repayment.   Therefore, R1-R2 directed their staff members LU Tao (呂濤) and JIE Honglin (解洪淋) to create the false "Chartered Flight Agreement (飛機共同使用協議)" to show that Well Origin had aircraft rental business with a Mainland company "China Minzu Securities Co. Ltd" (中國民族證券有限責任公司) ("Minzu Securities") with an annual receivable rental income of US$ 12 million.

119.   As it was later found out that remittance of money to BVI company Well Origin would attract an extra tax surcharge of 17%, upon R1's instructions, R2 incorporated World Century Limited ("World Century"), solely-owned by Well Origin, in Hong Kong.   R2 signed the Chartered Flight Agreement on behalf of World Century with Minzu Securities.   There was, in fact, never any rental business between Minzu Securities and World Century/Well Origin.   Copies of

HR0090209
HR0090175

the company records of World Century are exhibited as **CSW-59**. The false Chartered Flight Agreement is exhibited as **CSW-60**.

120.    CCBA requested further documentary proof showing remittance derived from the aircraft rental had been wired from the Mainland to Hong Kong.

121.    As Minzu Securities was not a company working in foreign investment, it was not eligible to purchase foreign exchange remittance. Thus, R1 & R2 used Beijing Mileson Investment Inc. ("Mileson") which was another company under the effective control of R2, to purchase foreign exchange remittance to proceed with the transaction.

122.    R1 instructed his employee to apply to the State Administration of Foreign Exchange ("SAFE") in name of Mileson to remit monies to HK by falsely representing that it related to genuine aircraft rental payments.

123.    However, the procedure of approval for remittance of such purpose (that was to settle aircraft rental payment) had unexpectedly taken a long vetting process and R1 could not wait. The employees, upon R1's instructions, then submitted four false contracts, purportedly claiming Mileson had purchased furniture from World Century, and applied to the Bank of Communications (Beijing) for such remittance. Four remittances totaling US$ 13.5 million were successfully remitted into a Hong Kong bank account of World Century between 2012-12-20 and 2013-10-22. Copies of false contracts entered between Mileson and World Century for furniture trading are exhibited as **CSW-61**.

124.    To provide documentary proof for CCBA showing that the remittances to HK was aircraft rental payments, R1 instructed his employee in Mainland to forge aircraft fee remittance receipts purportedly issued by the SAFE. The false receipts were then submitted to CCBA. A copy is exhibited as **CSW-62**.

125.    A chart detailing this aircraft loan fraud is exhibited as **CSW-63**. CCBA confirmed that it would not have approved the US$ 21 million loan to Well Origin if it knew that the aircraft rental business had never existed. In the nutshell, R1 and R2 obtained the Aircraft Loan of US$ 21 million from CCBA by fraud, namely by submitting false remittance receipts and false chartered flight agreement. The

HR0090210
HR0090175

proceeds of the offence of R1 and R2 were **US$21 million**.

## IV.      SEARCH OF R1's OFFICE AT 49/F BANK OF CHINA TOWER

126.      Police investigation showed that the documents of various companies under the effective control of R1 were stored at 49/F, Bank of China Tower.      On 2017-08-03, the Police arrested R3 at the lift lobby of 1/F, Bank of China Tower. R3 then led the Police to her office at 49/F Bank of China Tower.      Upon entry, the Police noted that the said office had a conference room into the middle and linked up two zones respectively on left hand and right hand side.      Upon enquiries with the persons therein, the Police confirmed that William JIE and R3 separately occupied two zones for operating their own businesses.

127.      The Police then executed search warrants to search the whole floor. Among other items, some of the seizures relating to other respondents were found inside the zone occupied by R1 and R3, which are outlined in below table:-

| Respondent | Description |
|---|---|
| R1 | ➢ US individual income tax return of R1 |
| | ➢ One set of letter from the Department of Treasury for R1 |
| | ➢ A Notarial Certificate of R1 |
| | ➢ Transaction history from personal Chase account of R1 |
| | ➢ One certificate of amendment of date of birth and name |
| | ➢ Bank statements of American Express card of R1 |
| R2 | Bank statements of American Express credit card of R2 |
| R4 | ➢ One set of confirmation of account balances issued by Haitong International to R4 dated 2017-01-04 |
| | ➢ Letter to Commerce Overseas Limited from R4 for change of director |
| R7 | 94 copies of remittance advices and bank documents of R7 (including 49 advices related to the Share Placement Fraud) |
| R8 | 17 copies of remittance advices and bank documents of R8 (including 7 advices related to the Share Placement Fraud) |
| R9 | 10 copies of remittance advices and bank documents of R9 (including 7 advices related to the Share Placement Fraud) |
| R10 | 10 copies of remittance advices and bank documents of R100 |

HR0090211
HR0090175

| | |
|---|---|
| | (including 7 advices related to the Share Placement Fraud) |
| R11 | 9 copies of remittance advices and bank documents of R11 (including 7 advices related to the Share Placement Fraud) |
| R12 | 10 copies of remittance advices and bank documents of R12 (including 7 advices related to the Share Placement Fraud) |
| R13 | 10 copies of remittance advices and bank documents of R13 (including 7 advices related to the Share Placement Fraud) |
| R14 | 10 copies of remittance advices and bank documents of R14 (including 7 advices related to the Share Placement Fraud) |
| R15 | 10 copies of remittance advices and bank documents of R15 (including 7 advices related to the Share Placement Fraud) |
| R16 | 46 copies of remittance advices and bank documents of R16 |
| R17 | ➢ 15 copies of remittance advice and bank documents of R17 (including 3 advices related to the Share Placement Fraud)<br>➢ A deed of settlement and indemnity among R17, R20, Blackpine Advisors Limited and CHU Sheung-yu Lawrence, a written resolution of R17 for appointing R3 as agent and authoring signatory |
| R18 | 28 copies of remittance advice and bank documents of R18 (including 8 advices related to the Share Placement Fraud) |
| R19 | 99 copies of remittance advice and bank documents of R19 (including 12 advices related to the Share Placement Fraud) |
| R20 | ➢ Aircraft sales and purchase agreement between Head Win Group Limited and R20 signed by R1 and R3<br>➢ 13 copies of bank documents / applications signed by R25<br>➢ One application form signed by R26 for Well Origin |
| R21 | 3 copies of bank documents of USB-HK of R21 |
| R22 | ➢ List of Staff Welfare of R22<br>➢ One set of petty cash claim form of R22 |
| R23 | ➢ One instrument of transfer signed by R25 and QUO Mei<br>➢ Six sets of claims form issued by R23<br>➢ Two sets of confirmation issued by an engineering company to R23<br>➢ Bundles of unused cheque book of R23 signed by R25 |
| R24 | ➢ One set of order issued by the Building Authority against |

HR0090212
HR0090175

| | | |
|---|---|---|
| | | South Bay Property |
| | ➤ | One invoice issued by an engineering company to R24 |
| | ➤ | One contract and payment relating to South Bay Property owned by R24 |
| R25 | ➤ | One staff contact list containing R25's name |
| | ➤ | One copy of chat application signed by R25 for R20 |
| | ➤ | A copy of resolution for R3 to appoint R25 as agent and authorized signatory of R20 |
| R26 | | An aviation consultancy service contract signed by R26 for Well Origin |
| R27 | | A resolution signed by R27 to appoint R3 as agent and authorized for R17 |

128.     The recovery of personal financial documents of R1, R2 and bank and company documents of other respondents showed that the office at 49/F Bank of China Tower was used by R1 to operate businesses by other respondents.   It also reinforced that other respondents were subject to the effective control of R1.

## V.     **PRESENT SITUATION OF THE RESPONDENTS**

129.     Since November 2014, there was adverse news against R1 showing that Mainland authority has initiated investigation against him.   In January 2015, the Mainland government official who was bribed by R1 was arrested in the Mainland.

130.     R1 last entered Hong Kong on 2014-11-30 and he departed Hong Kong via airport for an unknown destination on **2015-01-01**.   R1 had not returned Hong Kong since then.   A copy of R1's travel movement record is exhibited as **CSW-64**. Police investigation revealed that the last known address of R1 is at Unit 1801, the Sherry Netherland, 781, 5th Avenue, New York, US 10022.

131.     R2 last entered Hong Kong on 2015-01-09 and departed Hong Kong via airport for an unknown destination on **2015-01-10**.   R2 had not returned Hong Kong since then.   A copy of R2's travel movement record is exhibited as **CSW-65**. Police investigation revealed that the last known address of R2 is at Unit 1801, the Sherry Netherland, 781, 5th Avenue, New York, US 10022.

HR0090213
HR0090175

132.   R3 was arrested by the Police for "Money Laundering" and "Conspiracy to Defraud" on 2017-08-03.   On 2017-08-05, R3 was released on police bail.   R3 failed to report to police bail, and had left Hong Kong for the Mainland on 2017-08-14.   She has not returned since then.   The enquiries with the Public Security Bureau are unable to establish the current exact whereabouts of R3.   A copy of R3's travel movement record is exhibited as **CSW-66**.

133.   R25 departed Hong Kong on 2016-09-20 for an unknown destination at the Hong Kong Airport.   He had not returned since then and his current exact whereabouts are unknown.   A copy of R25's travel movement record is exhibited as **CSW-67**.

134.   R26 left Hong Kong for the Mainland on 2017-04-19 and had not returned since then.   His current exact whereabouts in the Mainland are known. A copy of R26's travel movement record is exhibited as **CSW-68**.

135.   R27 left Hong Kong for the Mainland on 2014-12-18 and had not returned since then.   Her current exact present whereabouts in the Mainland are known.   A copy of R27's travel movement record is exhibited as **CSW-69**.

## VI.   <u>CRIMINAL PROCEEDINGS</u>

136.   Legal advice was sought against R1 to R3's criminality in the three cases.

137.   On **2018-09-05** and **2018-09-28**, warrants of arrest were obtained against R1 to R3 for the following offences:

    (1)   Re Share Placement Fraud

        (i)   1 count of "Conspiracy to Defraud" contrary to Common Law and punishable under section 159C(6) of the Crimes Ordinance, Cap 200 **(against R1 and R3)**;

        (ii)   4 counts of "Dealing with Property known or believed to represent proceeds of an indictable offence" contrary to section 25(1) and (3) of Organized and Serious Crimes Ordinance

40

(OSCO), Cap 455 (**against R3**);

(2) <u>Re Mortgage Fraud Case</u>

    (i) 1 count of "Fraud", contrary to section 16A of the Theft Ordinance, Cap 210 (**against R1 & R2**);

    (ii) 1 count of "Conspiracy to deal with property known or believed to represent proceeds of indictable offence" contrary to section 25(1) and (3) of the Organized and Serious Crimes Ordinance and sections 159A and 159C of the Crimes Ordinance, Cap 200 (**against R1**);

    (iii) 1 count of "Dealing with property known or believed to represent proceeds of indictable offence", contrary to section 25(1) and (3) of Organized and Serious Crimes Ordinance (OSCO), Cap 455 (**against R1**);

(3) <u>Re Aircraft Loan Fraud</u>

    (i) 1 count of "Fraud", contrary to section 16A of the Theft Ordinance, Cap 210 (**against R1 & R2**).

## VII.    <u>RESTRAINT ORDER PROCEEDINGS AGAINST R1-2</u>

138.    The conditions for granting a restraint order under section 15(1) of OSCO are laid out in section 14 of OSCO, namely:

(i)    proceedings have been instituted in Hong Kong against the defendants for a specified offence;

(ii)    the proceedings have not been concluded; and

(iii)    there is reasonable cause to believe that the defendant has benefited from the specified offence and the benefit exceeds HK$100,000.

(A) <u>Institution of the proceedings:</u>

139.    Section 2(15) of OSCO defines "proceedings for an offence are instituted" as follows: -

HR0090215
HR0090175

(a) *when a magistrate issues a warrant or summons under section 72 of the Magistrates Ordinance (Cap. 227) in respect of the offence;*

(aa) *when a person has been arrested for the offence and released on bail or has refused bail;*

(b) *when a person is charged with the offence after being taken into custody without a warrant; or*

(c) *when an indictment is preferred by the direction or with the consent of a judge under section 24A(1)(b) of the Criminal Procedure Ordinance (Cap. 221)*

140.   Proceedings have been instituted against R1-R2 upon the issuance of warrants of arrest against them for the above mentioned offences, which are all specified offences as defined in the OSCO, and the proceedings have not been concluded.   Copies of arrest warrants issued against R1-R3 are exhibited as **CSW-70**.

(B)   <u>Reasonable cause to believe that R1 to R2 have benefited from the specified offences:</u>

141.   According to section 2(8) of the OSCO,

*For the purposes of this Ordinance, a person who has at any time (whether before or after the commencement of this Ordinance) received any payment or other reward in connection with the commission of an offence or an organized crime has benefited from that offence or organized crime, as the case may be.*

142.   Section 2(6) of the OSCO provides that a person's proceeds of a specified offence are:

(a) *a person's proceeds of an offence are –*
   (i) *any payments or other rewards received by him at any time (whether before or after 2nd December 1994) in connection with the commission of that offence;*

HR0090216
HR0090175

> (ii) *any property derived or realised, directly or indirectly, by him from any of the payments or other rewards; and*
>
> (iii) *any pecuniary advantage obtained in connection with the commission of that offence.*

> (b) *the value of the person's proceeds of that offence is the aggregate of the values of –*
> (i) *the payments or other rewards;*
> (ii) *that property; and*
> (iii) *that pecuniary advantage.*

143.    In these case, the evidence against R1-R2 is summarized as follows:

Re: Share Placement Fraud - Haitong

144.    R1 and R3 together with other persons were clearly involved of "Conspiracy to Defraud" relating to Share Placement Fraud as they had deceived the HKEX for granting the approval for listing of, and permission to deal in the new H shares of Haitong.   The evidence against R1 is as follows: -

(a)    The four placees Dawn State, AMTD, BSA Fund and Insight Fund were all effectively controlled by R1.   R3 actively moved funds from accounts of companies controlled by R1 pursuant to R1's instructions to fund the four placees, namely, R5, R6, Dawn State Limited and AMTD, for the subject share placement;

(b)    The arrangement was made to conceal R1 being the actual controller of the subscribed shares, in order to evade CSRC's legal requirement on reporting and seeking approval for subscribing more than 5% of the total issued shares;

(c)    CSRC confirmed that the said arrangement and channels of funds by R1 and other persons would have violated the 5% rule, and would not have issued the regulatory opinion, and approved the share placement;

43

(d) The substantial shareholders, who had voted for the share placement, confirmed that they would have overturned their decision should they learnt about that the 4 placees were all controlled and funded by one person;

(e) Without CSRC's approval (or if the CSRC approval was obtained by deceptive means) and the shareholders' consent, HKEX would not have approved the share placement.

## Re: The Mortgage Fraud – The South Bay Property

145.   R1 and R2 jointly committed the fraud on the CCBA in Hong Kong for the grant of a mortgage loan of **HK$ 298 million** to fund the purchase of the South Bay Road Property.   The evidence against R1 and R2 is as follows:

(a) RMB$ 3.2 billion is proved in the Mainland judgment and by Mainland witnesses to be crime proceeds obtained by defrauding the Agricultural Bank of China Limited;

(b) The conspirator YANG Ying (楊英) of the Mainland fraud channeled RMB$ 50 million out of the RMB$ 3.2 billion to CCB(Beijing) for applying a Standby Letter of Credit under instructions from R1 and R2;

(c) The Standby Letter of Credit led to the grant of mortgage loan of HK$ 298 million in Hong Kong in favour of R24 of which R2 was the sole shareholder;

(d) CCBA in Hong Kong would not have approved the said HK$ 298 million mortgage loan to R24 had the bank known that the Standby Letter of Credit was supported by crime proceeds.

146.   R1 committed "conspiracy to money laundering" as he, conspired with Yang Ying to the use of the bank account of Sail Victory, to receive a total of **HK$ 224,755,830,** known or believed to represent proceeds of an indictable offence, which were remitted from the Mainland to Hong Kong via remittance agencies

HR0090218
HR0090175

upon the instructions of R1.   R1 further committed another charge of "Money Laundering" by receiving, via the bank account of Sail Victory, a sum of **RMB$ 20 million (equivalent to HK$ 26,587,500)** known or believed to represent proceeds of an indictable offence, which were channeled from the Mainland to Hong Kong via HAN (韓子勁) and upon R1's instructions.   The evidence against R1 is as follows: -

(a)    R1 was the instigator of the Mainland Fraud of RMB$ 3.2 billion million;

(b)    The banking transactions of account of Sail Victory unveiled the identity of depositors.   Eight depositors were operated by a major remittance exchange, which confirmed 64 transactions totaling **HK$ 244,755,830** were the receiving ends of Mainland remittance exchanges in which YANG Ying (楊英) had made deposits for dissipating fraud based proceeds into Hong Kong.   All along, YANG Ying (楊英) took R1's instructions on those transactions;

(c)    For another transaction of **RMB$ 20 million** (equivalent to HK$ 26,587,500), R1 instructed HAN (韓子勁) to arrange the transfer of RMB$ 20 million proceeds of Mainland Fraud into the bank account of Sail Victory.

(d)    R1 and R2 are father and son.   Sail Victory is a shell company with no genuine business.   Though R2 is the sole shareholder of Sail Victory, it could be inferred that R1 is the ultimate beneficial owner of Sail Victory.

Re: The Aircraft Loan

147.    R1 and R2 had obtained a loan of US$21 million from CCBA by fraud. The evidence against R1 and R2 is as follows:

(a)    R2 is the sole director and shareholder of Well Origin, which is the sole shareholder of World Century at the material period. Moreover, R2 is the director of World Century.   Therefore, R2

45

assumed the full control of these two companies;

(b) In 2012, Well Origin obtained a loan facility of US$ 21 million from CCBA as it presented a false and non-existing flight leasing contract to it, purportedly showing World Century had received recurring aircraft rental;

(c) The syndicate members (at R1's instructions) submitted a forged copy of the remittance receipt purportedly issued by SAFE to CCBA in Hong Kong. It led CCBA to believe that there were recurring rental payments and therefore granted the loan;

(d) CCBA confirmed that the bank would not have granted the US$ 21 million loan to Well Origin had it known that the Chartered Flight Agreement or the receipt from SAFE was false;

(e) The conspirators, LU Tao (呂濤) and JIE Honglin (解洪淋), who made the Chartered Flight Agreement admitted their wrongdoings and stated that they worked under the instructions of R1.

148.    In view of the above, R1 to R2 have respectively benefited from the specified offences as listed in the warrants of arrests.

149.    The amount of R1's proceeds of the Share Placement Fraud was **HK$ 9,585,606,603.4,** being the price difference between the prevailing market price when the shares were listed and the discounted price offered to the places (i.e. HK$ 17.18). Details of the calculation are as below:

| Name of Placee | No. of New H Shares subscripted | Placement completion date | Closing market price per share of the immediately preceding business date (benefit per share) | Benefit (HK$) (calculated by the benefit per share x share subscripted) |
|---|---|---|---|---|
|  |  |  |  |  |

46

HR0090220
HR0090175

| | | | | |
|---|---|---|---|---|
| Dawn State Limited | 569,427,620 | 2015-05-15 | HK$ 23.15 (HK$ 5.97) | 3,399,482,891.4 |
| Maunakai Capital Partners (Hong Kong) Limited | 496,478,800 | 2015-05-29 | HK$ 24.30 (HK$ 7.12) | 3,534,929,056 |
| Insight Capital Management (Hong Kong) Limited | 223,415,200 | 2015-05-29 | HK$ 24.30 (HK$ 7.12) | 1,590,716,224 |
| Amtd Special Holdings Limited | 148,943,600 | 2015-05-29 | HK$ 24.30 (HK$ 7.12) | 1,060,478,432 |
| **Total** | **1,438,265,220** | / | / | **9,585,606,603.4** |

150.    For Mortgage Fraud case, the benefit jointly obtained by R1 and R2 was HK$ 298 million obtained from the HK Mortgage Fraud, and HK$ 224,755,830 plus HK$ 26,587,500 channeled into Hong Kong sourced from the Mainland Fraud. The subtotal of benefits obtained for **R1 was HK$ 400,343,330** [HK$ 298 million/2 + HK$ 224,755,830 + HK$ 26,587,500] whilst the benefits for **R2 was HK$ 149,000,000** [HK$ 298 million/2].

151.    Police investigation revealed HK$ 549,343,330 [HK$ 298 million + HK$ 224,755,830 + HK$ 26,587,500] out of the HK$ 880 million sourced from crime proceeds had been used for settling the purchase price of the South Bay Property, about 62% of the purchase price of HK$ 880 million.    The value of the South Bay Property has appreciated to HK$2.224 billion (as at 2018-07-31).

152.    For the Aircraft Loan Fraud, the proceeds of R1 and R2 were **US$ 21 million (~HK$ 162.75 million)** received.

153.    The benefits obtained by R1 and R2 from the three cases are tabled at below.    R1 benefited from **HK$10,067,324,933.40** whilst R2 benefited from **HK$230,375,000.**

HR0090221
HR0090175

| Offences | R1 | R2 |
|---|---|---|
| Share Placement Fraud | HK$ 9,585,606,603.40 | / |
| South Bay Road Property mortgage loan fraud Case | HK$ 400,343,330 | HK$ 149,000,000 |
| The Aircraft loan | HK$ 81,375,000 | HK$ 81,375,000 |
| **Total** | **HK$10,067,324,933.40** | **HK$230,375,000** |

## VIII.   REALISABLE PROPERTY OF RESPONDENT

154.    Property that may be restrained under a restraint order made under section 15(1) of OSCO is laid out in section 15(2) which states, *inter alia*, that a restraint order may apply to all realisable property held by a specified person.

155.    Realisable property is defined under section 12(1) of OSCO and includes, inter alia: -

> (a)  *any property held by the defendant;*
> (b)  *any property held by a person to whom the defendant has directly or indirectly made a gift;*
> (c)  *any property that is subject to the effective control of the defendant.*

## (A) R1's realisable Properties

(a)   Chose in action represented by credit balances held in the following bank accounts held by **R1**

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 1 | The Hongkong and Shanghai Banking Corporation Limited | ▇▇▇▇▇▇ | HK$ 651,977.46<br>HK$ 647,424.32<br>US$ 304,442.45<br>JPY 497 |
| Total: | | | HK$ 3,658,865.56 |

(b)   Chose in action represented by credit balances held in the following bank

48

account held by **R3** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 2 | DBS Bank (Hong Kong) Limited | ███████ | HK$ 4,338,167.19 |

Remarks:

156.      R3 reported to be a manageress of R22 earning approximate RMB$ 20,000 monthly income.   The monies in R3's personal account are funded by a one-off HK$ 8 million deposit from R20, which was incommensurate with R3's financial background.

(c)  Cash in the following amounts seized from the below premises which was subject to the effective control of R1

| S/N | Entity | Amount | Total Amount |
|-----|--------|--------|--------------|
| 3 | Cash (Seized inside 49/F, Bank of China Tower from the search operation in August 2017) | HK$ 1,244,730<br>GBP 70,000<br>US$ 100,000<br>EUR 57,877.60<br>JPY 3,119,300<br>AED 11,000<br>CHF 710.35 | HK$ 3,522,940.36 |

Remarks:

157.      During the search of the office at 49/F Bank of China Tower in August 2017, R3 possessed the keys to open two safes containing cash of different currencies.      Given R3's financial background and her position as being R1's financial manageress in Hong Kong, it is submitted that the approximate HK$ 3.5 million cash in the company's safes is R1's petty cash and under the effective control of R1.

(d)  Chose in action represented by credit balances held in the following account held by **R4** but subject to the effective control of R1[4]

---

[4] Paras. 75 to 77 refer.   At present, the director and shareholder of R4 was respectively R3 and AA Global Ventures Limited (previously as AMTD).

49

HR0090223
HR0090175

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 4 | Haitong International Securities Company Limited | | HK$ 40,691,385.46 |

(e)   Securities held in the following account held by **R4** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Shares Balance |
|-----|---------------------|----------------|----------------|
| 5 | Haitong International Securities Company Limited | | 9,600,000 shares Haitong Securities Company Limited ("Haitong") |
| **Total: 9,600,000 shares (Haitong)** | | | **HK$ 70,272,000.00** |

(As of closing price on 2018-09-24, Haitong (6837): HK$7.32 listed in Hong Kong,
Founder Securities listed in Shanghai (601901): RMB$ 5.54/ HK$ 6.371)

(f)   Chose in action represented by credit balances held in the following accounts held by **R5** but subject to the effective control of R1[5]

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 6 | DBS Bank Limited Hong Kong Branch | | US$ 53,418.00 |
| 7 | | | RMB$ 2,438,148.00 |
| 8 | | | HK$ 51,708,360.00 |
| 9 | Haitong International Securities Company Limited | | HK$ 4,885,665.63 |
| 10 | | | HK$ 8,053,387.33 |
| 11 | Oceanwide Securities Company Limited (previously known as Quam Securities Company Limited) | | RMB$ 18,649,277.26 |
| 12 | BOCOM International Securities Limited | | HK$ 17,411,817.04 RMB$ 51,937.81 |

---

[5] Paras. 53 to 55 refer.   The 11 investors of R5 opened the accounts for R1.

HR0090224
HR0090175

| 13 | | | HK$ 307,617.19 |
|---|---|---|---|
| | | | **HK$ 107,091,104.22** |

(g)  Securities held in the following accounts held by **R5** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Shares Balance |
|---|---|---|---|
| 14 | DBS Bank Limited Hong Kong Branch | | 101,844,000 shares (Haitong) |
| 15 | Haitong International Securities Company Limited | | 19,463,200 shares (Haitong) |
| 16 | | | 31,835,600 shares (Haitong) |
| 17 | Oceanwide Securities Company Limited (previously known as Quam Securities Company Limited) | (outstanding margin loan of HK$ 59,062,279) | 49,000,000 shares (Haitong)<br><br>6,204,909 shares Founder Securities (Founder) |
| 18 | BOCOM International Securities Limited | | 68,868,800 shares (Haitong)<br><br>5,799,834 shares (Founder) |
| **Total: 271,011,600 shares (Haitong) 12,004,743 shares (Founder)** | | | **HK$ 2,001,224,850.65** |

(h)  Chose in action represented by credit balances held in the following accounts held by **R6** but subject to the effective control of R1[6]

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 19 | Bank of China (Hong Kong) Limited | | HK$ 25,405,113 |
| 20 | | | US$ 103 |
| 21 | | | HK$ 2,885.05 |

---

[6] Paras. 60 to 61 refer.   The 11 investors of R6 opened the accounts for R1.

51

HR0090225
HR0090175

| 22 | | | RMB$ 153,296 |
|---|---|---|---|
| 23 | China Galaxy International Securities (Hong Kong) Co., Limited | | RMB$ 14.64 |
| **Total:** | | | **HK$ 25,585,103.54** |

(i)   Securities held in the following accounts held by **R6** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Shares Balance |
|---|---|---|---|
| 24 | Bank of China (Hong Kong) Limited | | 30,065,200 shares (Haitong) 17,032,900 shares (Founder) |
| 25 | GF Securities (Hong Kong) Brokerage Limited | (Outstanding Margin: HK$ 481,649,515.51) | 146,000,000 shares (Haitong) |
| 26 | China Merchants Securities (HK) Co., Ltd | (Outstanding Margin: HK$ 172,505,482) | 54,000,000 shares (Haitong) |
| **Total:   230,065,200 shares (Haitong) 17,032,900 shares (Founder)** | | | **HK$ 1,138,438,872.68** |

(j)   Chose in action represented by credit balances held in the following accounts held by **R7** but subject to the effective control of R1[7]

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 27 | China Construction Bank (Asia) Corporation Limited | | US$ 128.93 RMB$ 796.81 HK$ 50,018.37 |
| 28 | | | HK$ 1,000.00 |
| 29 | | | US$ 128.93 |
| 30 | | | RMB$ 796.88 |

---

[7] Para. 49 refers.   The company director and shareholder was R26.   The account signatory was R3.

HR0090226
HR0090175

| 31 | China Minsheng Banking Corp, Ltd Hong Kong Branch | | HK\$ 684,175.12 |
| | | | HK\$ 534,854.62 |
| | | | US\$ 51,924.30 |
| | | | RMB\$ 28,132.12 |
| **Total:** | | | **HK\$ 1,708,644.53** |

(k)  Chose in action represented by credit balances held in the following account held by **R8** but subject to the effective control of R1[8]

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 32 | China Minsheng Banking Corp, Ltd Hong Kong Branch | | HK\$ 33,449.01 |

(l)  Chose in action represented by credit balances held in the following account held by **R9** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 33 | China Minsheng Banking Corp, Ltd Hong Kong Branch | | HK\$ 33,929.24 |

(m)  Chose in action represented by credit balances held in the following account held by **R10** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 34 | China Minsheng Banking Corp, Ltd Hong Kong Branch | | HK\$ 32,517.16 |

(n)  Chose in action represented by credit balances held in the following account held by **R11** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|

---

[8] Para. 53-55, 60-61 refer.  For R8-R15, the company directors and shareholders of R1's employees and R3 was the authorized signatory signing the instruction slips to move funds for the share placement.

HR0090227
HR0090175

| S/N | | | |
|---|---|---|---|
| 35 | China Minsheng Banking Corp, Ltd Hong Kong Branch | ▉▉▉▉ | HK$ 32,517.16 |

(o)   Chose in action represented by credit balances held in the following account held by **R12** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 36 | China Minsheng Banking Corp, Ltd Hong Kong Branch Kong Branch | ▉▉▉▉ | HK$ 32,517.16 |

(p)   Chose in action represented by credit balances held in the following account held by **R13** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 37 | China Minsheng Banking Corp, Ltd Hong Kong Branch | ▉▉▉▉ | HK$ 32,517.16 |

(q)   Chose in action represented by credit balances held in the following account held by **R14** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 38 | China Minsheng Banking Corp, Ltd Hong Kong Branch | ▉▉▉▉ | HK$ 32,517.16 |

(r)   Chose in action represented by credit balances held in the following account held by **R15** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 39 | China Minsheng Banking Corp, Ltd Hong Kong Branch | ▉▉▉▉ | HK$ 32,517.16 |

HR0090228
HR0090175

(s)   Chose in action represented by credit balances held in the following accounts held by **R16** but subject to the effective control of R1[9]

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 40 | China Minsheng Banking Corp, Ltd Hong Kong Branch | ███████ | HK$ 381.25<br>RMB$ 502,615.69<br>US$ 0.74<br>EUR 0.52 |
| Total: | | | HK$ 578,399.78 |

Remarks:

158.   A copy of the mandate of R16 at CMBC is exhibited as **CSW-71**. A fund flow chart showing fund movement of R7, R16, R17, R18, R19, R21 is exhibited as **CSW-72**. From the transactions, it showed that R7, R16, R17, R18, R19, R21 are interrelated and the entire source of fund entering R16, R18, R19 and R21 came from R7 and R17, which are subject to effective control of R1.

(t)   Chose in action represented by credit balances held in the following accounts held by **R17** but subject to the effective control of R1[10]

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 41 | China Construction Bank (Asia) Corporation Limited | ███████ | US$ 128.93<br>RMB$ 797.00<br>HK$ 50,018.35 |
| 42 | | ███████ | HK$ 1,000.00 |
| 43 | | ███████ | US$ 128.93 |
| 44 | | ███████ | RMB$ 796.94 |
| 45 | China Minsheng Banking Corp, Ltd Hong Kong Branch | ███████ | US$ 79,916.27 |
| Total: | | | HK$ 674,200.89 |

(u)   Chose in action represented by credit balances held in the following accounts

---

[9] Para. 26 refers.   The director and shareholder was previously R25.   The account signatory was R3 and R25.

[10] Para. 49 refers.   The company director and shareholder was R27.   The account signatory was R3.

HR0090229<br>HR0090175

held by **R18** but subject to the effective control of R1[11]

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 46 | China Minsheng Banking Corp, Ltd Hong Kong Branch | █████ | HK$ 1,684.88 US$ 93,033.83 |
| Total: | | | HK$ 722,697.06 |

(v)  Chose in action represented by credit balances held in the following accounts held by **R19** but subject to the effective control of R1[12]

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 47 | China Minsheng Banking Corp, Ltd Hong Kong Branch | █████ | HK$ 145.37 US$ 20,760.73 RMB$ 30,709.64 |
| 48 | DBS Bank (Hong Kong) | █████ | HK$ 5,045 |
| 49 | Limited | █████ | US$ 448,662.78 |
| Total: | | | HK$ 3,678,538.66 |

(w)  Chose in action represented by credit balances held in the following accounts held by **R20** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 50 | | █████ | HK$ 15,500,000.00 |
| 51 | DBS Bank (Hong Kong) Limited | █████ | HK$ 829,698,403.54 US$ 93,025,947.02 |
| 52 | | █████ | RMB$ 3,007,078.10 |
| Total: | | | HK$ 1,569,607,632.76 |

Remarks:

159.    Since incorporation, R20's director and shareholder was R1's employees, and the account signatory was R3 and R25 since account opening.    On

---

[11] Paras. 46 to 48, 50 refer.   The company director and shareholder was R1's employee, and the account signatory was R3 during the share placement.

[12] Para. 51 refers.   The company director and shareholder was changed to R1's daughter on 2017-06-27, and the account signatory is R3 and R1's body guard R25.   The account's source of fund came from R7 and R17.

HR0090230
HR0090175

2017-06-27, R25 sold the only one issued share to R1's daughter GUO Mei (郭美) at HK$1, which was a substantially undervalued price for no apparent reason. Details of the change of director and shareholder are tabled at below: -

| Date | Director | Shareholder |
|------|----------|-------------|
| 2015-05-15 | SU An (蘇晏) | A secretary company |
| 2015-10-07 | R3 | R3 |
| 2016-05-05 | R3 | R25 |
| 2016-11-25 | R3<br>REN Meizi (任美子) | R25 |
| 2017-03-03 | R25<br>REN Meizi (任美子) | R25 |
| 2017-06-27 | GUO Mei (郭美) | GUO Mei (郭美) |

160.    On 2017-07-03, R4 sold 150 million shares of Haitong, which was obtained during share placement, at HK$1.945 billion.   R25 then gave an instruction to transfer HK$1.2 billion from R4 to the DBS account of R20.   As R25 was R1's employee while R4 was also subject to an effective control of R1, it is submitted that R25 acted on R1's instruction to transfer funds to R20.   R20 is therefore subject to an effective control of R1.

(x)   Chose in action represented by the 1/2 share of credit balances held in the following account held by **R21** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|--------------------|----------------|---------|
| 53 | UBS AG<br>Hong Kong Branch | ▇ | US$ 15,393,793.48 |
| Total: | | | **HK$ 119,301,899.47** |

Remarks:

161.    R1 and R2 each hold one issued share of R21 and they were both authorized signatory.   It is submitted that they will each hold one-half of R21 including the above bank balance.   The half share is **HK$ 59,650,949.74.**

(y)   Chose in action represented by credit balances held in the following account

57

held by **R23** but subject to the effective control of R1[13]

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 54 | China Construction Bank (Asia) Corporation Limited | (Maintained in general ledger account ▮▮▮) | HK$ 8,672,215.81 |

Remarks:

162.     The account opening mandate of R23 is exhibited as **CSW-73**.

(z)   Real property held by **R24** but subject to the effective control of R1:

|  |  |  |
|---|---|---|
| LOT No | : | Rural Building Lot No. 1143 |
| Share of the LOT | : | / |
| Address | : | Nos. 20 and 22 South Bay Road, Hong Kong |
| Registered owner | : | R24 |
| Purchase price | : | HK$880,000,000 (as at 2011-03-31) |
| Estimated value | : | HK$2,224,000,000 (as at 2018-07-31) |

Remarks:

163.     Though this property is owned by R24 (R2 as sole director and shareholder), R1 paid the initial payment of HK$ 60 million and made monthly installments totaling HK$ 62 million, and settled the outstanding mortgage loan using new H shares obtained from the share placement.

164.     R1 also arranged to settle the consideration by using crime proceeds from the Mainland Fraud and Hong Kong Mortgage Fraud totaling HK$ 549,343,330, which amounted to 62% of the purchase price.   It is submitted that this property shall be wholly treated as R1's realisable property. Given the appreciation in market value, it is further submitted that 62% of the prevailing market value of the South Bay Property represented crime proceeds.

---

[13]  R25 had been the director and sole signatory of R23 since account opening.   Bundles of unused but signed cheque books of R23 were seized from the office at 49/F, Bank of China Tower.   R23 was actually a stooge account under the effective control of R1.

HR0090232
HR0090175

(aa)   Chose in action represented by credit balances held in the following bank
account held by **R25** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 55 | China Citic Bank International Limited | ███████████ | HK$ 212,316.94 |

Remarks:

165.      According to information provided by R25 to China Citic Bank
International Limited ("Citic") during account opening on 2015-12-10, R25
reported to be a manger working at Minzu Securities (a Mainland company
previously controlled by R1).   Copies of the records are exhibited at **CSW-74.**

166.      Between June 2016 and July 2017, R25's personal account at Citic
received total deposits of HK$435,710.   This account respectively received
totaling HK$382,000 from R23 (including a single deposit of HK$150,000 on
2016-08-15) and HK$42,000 from R3 on 2017-02-02.   The residual value
presently standing in the account was also sourced from transfer deposits from R23
and R3.   A copy of the transaction records is exhibited as **CSW-75.**   As R3 and
R23 were subject to R1's effective control and R23 was also a shell company to
facilitate fund movements, it is submitted that the residual balance in R25's
personal account is the realisable asset of R1.

167.      R23 and R25 had no records with the Inland Revenue Department and
R25 only stayed in Hong Kong for 31 days in 2016.   A copy of R25's TIC
movement records is exhibited at **CSW-67.**

(ab)   Chose in action represented by credit balances held in the following bank
accounts held by **R26** but subject to the effective control of R1[14]

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|

---

[14]  Police investigation revealed R26 and R27 were only stooges for opening bank accounts at the request of R1 out
of family relationship.

59

| 56 | China Construction Bank (Asia) Corporation Limited | | HK$ 55,020.11 RMB$ 796.94 US$ 128.93 |
|----|----|----|----|
| 57 | | | RMB$ 796.94 |
| 58 | | | US$ 128.93 |
| 59 | | | HK$ 850.00 |
| **Total:** | | | **HK$ 59,701.49** |

(ac) Chose in action represented by credit balances held in the following bank accounts held by **R27** but subject to the effective control of R1

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 60 | China Construction Bank (Asia) Corporation Limited | | US$ 128.93 |
| 61 | | | RMB$ 796.94 |
| 62 | | | HK$ 57,811.90 |
| 63 | | | HK$ 0.42 |
| **Total:** | | | **HK$ 59,728.01** |

(B) R2's Realisable Property

(a) Chose in action represented by the 1/2 share of credit balance held in following account held by **R21** but subject to the effective control of R2

| S/N | Name of Institution | Account Number | Balance |
|-----|---------------------|----------------|---------|
| 53 | UBS AG Hong Kong Branch | | US$ 15,393,793.48 |
| **Total:** | | | **HK$ 119,301,899.47** |

Remarks:

168. R1 and R2 each hold one issued share of R21 and they were both authorized signatory. It is submitted that they will each hold one-half of **R21** including the above bank balance. The half share is **HK$ 59,650,949.74.**

(b) Chose in action represented by credit balances held in the following accounts held by **R22** but subject to the effective control of R2

60

| S/N | Name of Institution | Account Number | Balance |
|---|---|---|---|
| 64 | China Citic Bank | ▋▋▋▋ | HK$ 2,014,055.96 |
| 65 | International Limited | ▋▋▋▋ | US$ 4,157.6 |
| | **Total:** | | **HK$ 2,046,277.36** |

169.    The estimated total value of R1's realisable assets of R1 is **HK$ 7,264,710,796.53** which is far less than his estimated total proceeds of **HK$10,067,324,933.40** (see paragraph 153).

170.    The estimated total value of R2's realisable assets is **HK$ 61,697,227.10** which is far less than his estimated total proceeds of **HK$230,375,000.**

## IX.    OTHER INFORMATION

171.    On **2017-07-10,** a letter of no consent was issued against the bank accounts of "Anton Development Limited" (R20) as it holds realisable property of R1.    On **2018-08-14**, R20's legal representative filed an application for leave to apply for a judicial review against the decisions of the police (i) to impose "No consent" regime on DBS's dealing with R20's account, and (ii) not to apply for a restraint order against R20.

172.    On **2018-09-12**, the Honourable Mr Justice CHOW made the following, *inter alia*, directions that: -

    (a)    There shall be a rolled-up hearing of (i) the application for leave to apply for judicial review, and (ii) the application for a judicial review;

    (b)    The Putative Respondent do file and serve its affidavit evidence in opposition to the Applicant's Leave Application (if any) and Application for JR (if any) on or before 23 November 2018;

    (c)    The Applicant do file and serve its affidavit evidence in reply (if so advised) by 14 December 2018.

HR0090235
HR0090175

173.    On **2018-10-02**, the judicial review has been fixed for hearing before the Honourable Mr. Justice Chow on **2019-06-27** (with 2 days reserved).

## X.    APPLICATION FOR LEAVE TO SERVE RESTRAINT ORDER OUT OF HONG KONG

174.    R5 and R6 are companies incorporated in the Cayman Islands.   R4, R7, R8, R9, R10, R11, R12, R13, R14, R15, R17, R18, R21, R23, R24 are companies incorporated in the British Virgin Islands.   All of the aforesaid companies have no registration in Hong Kong.   None of these companies has a place of business in Hong Kong.   The Companies Registry does not have any records of them.

175.    The last known address of R1 and R2 is in the United States of America, and those of R26 and R27 are in the Mainland.

176.    Leave is sought for the service of the restraint order and all court documents in these proceedings out of jurisdiction on R1, R2, R4 to R15, R17, R18, R21, R23, R24, R26 and R27 in accordance with the law of the jurisdiction in which such respondent in present.

177.    The exact whereabouts of R3 and R25 remain unknown. Leave is hereby sought for service on them by way of substituted service in accordance with the law of the jurisdiction in which she or he is present.

## XI.    APPLICATION FOR RESTRAINT ORDER

178.    In view of the information contained in the preceding para
179.    graphs, I verily believe that: -

(a)    Proceedings have been instituted against R1-R2 for various specified offence(s) as outlined in paragraph 137, which include "Conspiracy to Defraud", "Fraud", "Money Laundering" or "Conspiracy to Money Laundering" and the proceedings against R1-R2 have not been concluded;

HR0090236
HR0090175

(b)   There is reasonable cause to believe that the R1-R2 have benefited from the respective specified offence, and their benefits exceed HK$100,000;

(c)   A confiscation order will be applied for in respect of R1-R2 upon the conviction of R1-R2 of the specified offences, or under the absconder proceedings;

(d)   If a restraint order is not made in relation to the realisable property of R1 and R2, there is a risk that such property would be dissipated

180.   A restraint order is therefore applied for to prohibit the respondents or any other person from dealing with the realisable property of R1 and R2.   A copy of draft order is now produced and exhibited as **CSW-76**.

181.   And I solemnly and sincerely affirm that the contents of this affirmation are true.

( CHAN Sze-wing)

Affirmed at the Courts of Justice, of the Hong Kong Special Administrative Region this 5th day of October 2018

Before me,

LAM Lai-yu

Commissioner for Oaths
Judiciary

63

HCCP        /2018

IN THE HIGH COURT OF THE
HANG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS (CRIMINAL) NO.        OF 2018

IN THE MATTER OF THE
ORGANIZED AND SERIOUS CRIMES ORDINANCE CAP. 455

AND
IN THE MATTER OF

| | |
|---|---|
| The Secretary for Justice | Applicant |

and

| | |
|---|---|
| Male KWOK Ho-wan, alias GUO Wengui<br>[Holder of Hong Kong Identity Card No ▮▮▮▮<br>Hong Kong Passport No ▮▮▮▮ ] | Respondent 1 (**"R1"**) |
| Male GUO Qiang<br>[Holder of Hong Kong Identity Card No. ▮▮▮▮,<br>Hong Kong Passport No. ▮▮▮▮ | Respondent 2 (**"R2"**) |
| Female QU Guojiao<br>[Holder of Hong Kong Identity Card No ▮▮▮▮<br>China Identity Card No ▮▮▮▮,<br>Two-Way Permit No ▮▮▮▮, China Passport No.<br>▮▮▮▮ | Respondent 3 (**"R3"**) |
| AAGV Limited<br>[A company incorporated in the British Virgin Islands,<br>BVI Company No ▮▮▮▮ ] | Respondent 4 (**"R4"**) |
| BSA Strategic Fund I<br>[A company incorporated in the Cayman Islands, | Respondent 5 (**"R5"**) |

64

HR0090238
HR0090175

Registration No. ▮▮▮▮▮▮ ]

Insight Phoenix Fund                                         Respondent 6 (**"R6"**)
[A company incorporated in the Cayman Islands,
Registration No. ▮▮▮▮▮▮

Alfonso Global Limited                                      Respondent 7 (**"R7"**)
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮▮

Allied Capital Global Limited                               Respondent 8 ("**R8**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮ ]

Creative Apex Investments Limited                           Respondent 9 ("**R9**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮

Crystal Breeze Investments Limited                          Respondent 10 ("**R10**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮ ]

Elite Well Global Limited                                   Respondent 11 ("**R11**")
[A company incorporated in the British Virgin Islands,
BVI Company No ▮▮▮▮▮ ]

Globalist International Limited                             Respondent 12 (**"R12"**)
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮ ]

Infinitum Developments Limited                             Respondent 13 ("**R13**")
[A company incorporated in the British Virgin Islands,
BVI Company No ▮▮▮▮▮ ]

Infinite Increase Limited                                  Respondent 14 ("**R14**")
[A company incorporated in the British Virgin Islands,

65

HR0090239
HR0090175

BVI Company No. ▮

Noble Fame Global Limited                                    Respondent 15 ("**R15**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮ ]

Eastern Profit Corporation Limited                           Respondent 16 ("**R16**")
[A company incorporated in Hong Kong, Company
Registration No. ▮ ]

Alfa Global Ventures Limited                                 Respondent 17 ("**R17**")
[A company incorporated in the British Virgin Islands,
BVI Company No ▮

Ace Decade Holdings Limited                                  Respondent 18 ("**R18**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮ ]

Hong Kong International Funds Investments Limited             Respondent 19 ("**R19**")
[A company incorporated in Hong Kong, Company
Registration No. ▮

Anton Development Limited                                    Respondent 20 ("**R20**")
[A company incorporated in Hong Kong, Company
Registration No. ▮

Bravo Luck Limited                                           Respondent 21 ("**R21**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮

China Golden Spring Group (Hong Kong) Limited                Respondent 22 ("**R22**")
[A company incorporated in Hong Kong, Company
Registration No ▮

Rosy Acme Ventures Limited                                   Respondent 23 ("**R23**")
[A company incorporated in the British Virgin Islands,

HR0090240
HR0090175

BVI Company No. ▉▉▉▉

Leading Shine Limited                                      Respondent 24 (**"R24"**)
[A company incorporated in the British Virgin Islands,
BVI Company No▉▉▉▉

Male HAN Chunguang                                      Respondent 25 (**"R25"**)
[Holder of Hong Kong Identity Card No▉▉▉▉▉
China Identity Card No. ▉▉▉▉▉▉▉▉,
Two-Way Permit No. ▉▉▉▉, China Passport No.
▉▉▉▉

Male ZHANG Wei                                      Respondent 26 (**"R26"**)
[China Identity Card No▉▉▉▉▉▉▉,
Two-Way Permit No. ▉▉▉▉

Female GUO Lijie                                      Respondent 27 (**"R27"**)
[China Identity Card No. ▉▉▉▉▉▉
Two-Way Permit No. ▉▉▉▉

---

## FIRST AFFIRMATION OF SENIOR INSPECTOR CHAN SZE WING

---

Affirmed this the 5th day of October 2018
Filed this the          day of October 2018

Secretary for Justice
Department of Justice
4/F., Queensway Government Offices
66 Queensway
Hong Kong
Tel.    : 2867 1025
Fax    : 2536 8311

67

HR0090241
HR0090175

HCCP  /2018

IN THE HIGH COURT OF THE
HANG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS (CRIMINAL) NO.  OF 2018

IN THE MATTER OF THE
ORGANIZED AND SERIOUS CRIMES ORDINANCE CAP. 455
AND
IN THE MATTER OF

| | |
|---|---|
| The Secretary for Justice | Applicant |

and

| | |
|---|---|
| Male KWOK Ho-wan, alias GUO Wengui<br>[Holder of Hong Kong Identity Card No. ████<br>Hong Kong Passport No ████ ] | Respondent 1 ("**R1**") |
| Male GUO Qiang<br>[Holder of Hong Kong Identity Card No. ████<br>Hong Kong Passport No. ████ | Respondent 2 ("**R2**") |
| Female QU Guojiao<br>[Holder of Hong Kong Identity Card No. ████<br>China Identity Card No. ████ ,<br>Two-Way Permit No. W93528483, China Passport No.<br>████ ] | Respondent 3 ("**R3**") |
| AAGV Limited<br>[A company incorporated in the British Virgin Islands,<br>BVI Company No. ████ | Respondent 4 ("**R4**") |
| BSA Strategic Fund I<br>[A company incorporated in the Cayman Islands, | Respondent 5 ("**R5**") |

68

Registration No. ▮▮▮▮▮ ]

Insight Phoenix Fund                                          Respondent 6 ("**R6**")
[A company incorporated in the Cayman Islands,
Registration No. ▮▮▮▮▮ ]

Alfonso Global Limited                                       Respondent 7 ("**R7**")
[A company incorporated in the British Virgin Islands,
BVI Company No ▮▮▮▮▮ ]

Allied Capital Global Limited                                Respondent 8 ("**R8**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮

Creative Apex Investments Limited                            Respondent 9 ("**R9**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮ ]

Crystal Breeze Investments Limited                           Respondent 10 ("**R10**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮ ]

Elite Well Global Limited                                    Respondent 11 ("**R11**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮ ]

Globalist International Limited                               Respondent 12 ("**R12**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮ ]

Infinitum Developments Limited                               Respondent 13 ("**R13**")
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮▮▮▮▮ ]

Infinite Increase Limited                                    Respondent 14 ("**R14**")
[A company incorporated in the British Virgin Islands,

69

HR0090243
HR0090175

BVI Company No. [REDACTED] ]

Noble Fame Global Limited                                        Respondent 15 ("**R15**")
[A company incorporated in the British Virgin Islands,
BVI Company No. [REDACTED]

Eastern Profit Corporation Limited                              Respondent 16 ("**R16**")
[A company incorporated in Hong Kong, Company
Registration No. [REDACTED] ]

Alfa Global Ventures Limited                                    Respondent 17 ("**R17**")
[A company incorporated in the British Virgin Islands,
BVI Company No. [REDACTED] ]

Ace Decade Holdings Limited                                     Respondent 18 ("**R18**")
[A company incorporated in the British Virgin Islands,
BVI Company No. [REDACTED] ]

Hong Kong International Funds Investments Limited               Respondent 19 ("**R19**")
[A company incorporated in Hong Kong, Company
Registration No. [REDACTED]

Anton Development Limited                                        Respondent 20 ("**R20**")
[A company incorporated in Hong Kong, Company
Registration No. [REDACTED]

Bravo Luck Limited                                              Respondent 21 ("**R21**")
[A company incorporated in the British Virgin Islands,
BVI Company No. [REDACTED]

China Golden Spring Group (Hong Kong) Limited                  Respondent 22 ("**R22**")
[A company incorporated in Hong Kong, Company
Registration No. [REDACTED]

Rosy Acme Ventures Limited                                      Respondent 23 ("**R23**")
[A company incorporated in the British Virgin Islands,

HR0090244
HR0090175

BVI Company No. ▮

Leading Shine Limited                                    Respondent 24 (**"R24"**)
[A company incorporated in the British Virgin Islands,
BVI Company No. ▮

Male HAN Chunguang                                       Respondent 25 (**"R25"**)
[Holder of Hong Kong Identity Card No. ▮
China Identity Card No. ▮
Two-Way Permit No. ▮ , China Passport No.
▮

Male ZHANG Wei                                           Respondent 26 (**"R26"**)
[China Identity Card No. ▮
Two-Way Permit No. ▮

Female GUO Lijie                                         Respondent 27 (**"R27"**)
[China Identity Card No. ▮
Two-Way Permit No. ▮

---

## FIRST AFFIRMATION OF SENIOR INSPECTOR CHAN SZE WING

---

These are the exhibits as stated in the first affirmation of Senior
Inspector CHAN Sze-wing, affirmed herein on the 5th day of October 2018.

| Description | Exhibit No. | No. of page(s) | Page Nos. |
|---|---|---|---|
| Application for an identity card of R3 (QU Guojiao) on 2015-10-06 & 2016-02-17 | CSW-1 | 2 | CSW1 – 1(1) |
| Application for an identity card of R25 (HAN Chunguang) on 2016-08-12 | CSW-2 | 1 | CSW-2 |

HR0090245
HR0090175

| Description | Exhibit No. | No. of page(s) | Page Nos. |
|---|---|---|---|
| Opening mandate of R26 (ZHANG Wei) at CCBA dated 2014-10-28 | CSW-3 | 41 | CSW-3 – 3(40) |
| Opening mandate of R27 (GUO Lijie) at CCBA dated 2014-10-28 | CSW-4 | 39 | CSW-4 – 4(38) |
| Opening mandate of R4 (AAGV Limited) at Haitong International dated 2016-04-29 | CSW-5 | 33 | CSW-5 – 5(32) |
| Opening mandate of R5 (BSA Strategic Fund I) at Haitong International dated 2015-05-28 | CSW-6 | 38 | CSW-6 – 6(37) |
| Opening mandate of R6 (Insight Phoenix Fund) at China Merchants Securities (HK) Co Ltd dated 2016-06-30 | CSW-7 | 28 | CSW-7 – 7(27) |
| Opening mandate of R7 (Alfonso Global Limited) at CMBC dated 2014-12-16 | CSW-8 | 55 | CSW-8 – 8(54) |
| Opening mandate of R8 (Allied Capital Global Limited) at CMBC dated 2015-03-12 | CSW-9 | 63 | CSW-9 – 9(62) |
| Opening mandate of R9 (Creative Apex Investments Limited) at CMBC dated 2015-03-12 | CSW-10 | 58 | CSW-10 – 10(57) |
| Opening mandate of R10 (Crystal Breeze Investments Limited) at CMBC dated 2015-03-12 | CSW-11 | 60 | CSW-11 – 11(59) |
| Opening mandate of R11 (Elite Well Global Limited) at CMBC dated 2015-03-12 | CSW-12 | 60 | CSW-12 – 12(59) |
| Opening mandate of R12 (Globalist International Limited) at CMBC dated 2015-03-09 | CSW-13 | 57 | CSW-13 – 13(56) |
| Opening mandate of R13 (Infinitum Developments Limited) at CMBC dated 2015-03-09 | CSW-14 | 57 | CSW-14 – 14(56) |
| Opening mandate of R14 (Infinite Increase Limited) at CMBC dated 2015-03-10 | CSW-15 | 58 | CSW-15 – 15(57) |
| Opening mandate of R15 (Noble Fame Global Limited) at CMBC dated 2015-03-10 | CSW-16 | 57 | CSW-16 – 16(56) |

HR0090246
HR0090175

| Description | Exhibit No. | No. of page(s) | Page Nos. |
|---|---|---|---|
| Instrument of transfer of R16 (Eastern Profit Corporation Limited) dated 2017-06-27 | CSW-17 | 2 | CSW-17 – 17(1) |
| Changes of directors, shareholders and registered address of R16 (Eastern Profit Corporation Limited) | CSW-18 | 1 | CSW-18 |
| Opening mandate of R17 (Alfa Global Ventures Limited) at CMBC dated 2014-12-16 | CSW-19 | 46 | CSW-19 – 19(45) |
| Opening mandate of R18 (Ace Decade Holdings Limited) at CMBC dated 2014-12-17 | CSW-20 | 48 | CSW-20 – 20(47) |
| Instrument of transfer of R19 (Hong Kong International Funds Investments Limited) dated 2017-06-27 | CSW-21 | 2 | CSW-21 – 21(1) |
| Instrument of transfer of R20 (Anton Development Limited) dated 2017-06-27 | CSW-22 | 2 | CSW-22 – 22(1) |
| Changes of directors, shareholders and registered address of R20 (Anton Development Limited) | CSW-23 | 1 | CSW-23 |
| Opening mandate of R21 (Bravo Luck Limited) at UBS-HK dated 2014-01-20 | CSW-24 | 90 | CSW-24 – 24(89) |
| Companies registry record of R22 (China Golden Spring Group (Hong Kong) Limited) | CSW-25 | 42 | CSW-25 – 25(41) |
| Opening mandate of R23 (Rosy Acme Ventures Limited) at CCBA dated 2014-10-27 | CSW-26 | 15 | CSW-26 – 26(14) |
| Opening mandate of R24 (Leading Shine Limited) at CCBA dated 2011-03-18 | CSW-27 | 88 | CSW-27 – 27(87) |
| Opening mandate of Assets Sino Limited at CCBA dated 2014-10-28 | CSW-28 | 13 | CSW-28 – 28(12) |
| Opening mandate of Auspicious Coast Limited at CCBA dated 2014-10-28 | CSW-29 | 13 | CSW-29 – 29(12) |
| An announcement of Haitong dated 2014-12-21 | CSW-30 | 10 | CSW-30 – 30(9) |
| An affidavit of YU Yong dated 2016-02-05, filed in the NY Action | CSW-31 | 12 | CSW-31 – 31(11) |

73

| Description | Exhibit No. | No. of page(s) | Page Nos. |
|---|---|---|---|
| An affidavit of R1 date 2016-02-05, filed in the NY action | CSW-32 | 33 | CSW-32 – 32(32) |
| A co-investment agreement and side letter between R18 (Ace Decade) and Haixia Fund dated 2014-12-18 | CSW-33 | 16 | CSW-33 – 33(15) |
| A chart showing the source of fund for Dawn State Limited to subscribe share placement | CSW-34 | 1 | CSW-34 |
| Information in bank opening mandate & travel movement of the 11 Investors | CSW-35 | 4 | CSW-35 – 35(3) |
| A chart showing the source of fund for Maunakai Capital Partners (HK) Limited to subscribe share placement | CSW-36 | 1 | CSW-36 |
| Vouchers and transaction summary report supporting the fund payment to R5 (BSA Strategic Fund I) for share placement | CSW-37 | 39 | CSW-37 – 37(38) |
| A chart showing the source of fund for Insight Capital Management (HK) Limited to subscribe share placement | CSW-38 | 1 | CSW-38 |
| Vouchers and transaction summary report supporting the fund payment to R6 (Insight Phoenix Fund) for share placement | CSW-39 | 41 | CSW-39 – 39(40) |
| Opening mandate of AA Global Ventures Limited (previously as AMTD) at Haitong International dated 2013-06-27 | CSW-40 | 96 | CSW-40 – 40(95) |
| A chart showing the source of fund for AMTD to subscribe share placement | CSW-41 | 1 | CSW-41 |
| A co-investment agreement and side letter between AMTD and R17 (Alfa Global) dated 2015-05-04 | CSW-42 | 12 | CSW-42 – 42(11) |
| A deed of settlement and indemnity among R17, R20, Blackpine and Chu Sheng Yu Lawrence dated 2017-05-29 | CSW-43 | 8 | CSW-43 – 43(7) |

HR0090248
HR0090175

| Description | Exhibit No. | No. of page(s) | Page Nos. |
|---|---|---|---|
| A chart detailing stock movement and fund flow from AMTD (AA Global), R4 (AAGV) to R20 (Anton) | CSW-44 | 1 | CSW-44 |
| An approval from CSRC for Haitong share placement date 2015-05-04 | CSW-45 | 1 | CSW-45 |
| A Court Judgment for the RMB$ 3.2 billion Mainland Fraud dated 2017-06-11 | CSW-46 | 22 | CSW-46 – 46(21) |
| A chart detailing fund flow of the South Bay Property Purchase | CSW-47 | 1 | CSW-47 |
| Opening mandate of White Horse Holdings Limited at Nanyang Commercial Bank ("NCB") dated 1997-07-30 | CSW-48 | 37 | CSW-48 – 48(36) |
| Transaction vouchers of White Horse Holdings Limited at the NCB account | CSW-49 | 6 | CSW-49 – 49(5) |
| Opening mandate of Sail Victory Limited at Bank of China (HK) Limited ("BOC") dated 2010-05-26 | CSW-50 | 21 | CSW-50 – 50(20) |
| Transaction record of Sail Victory Limited at the BOC account | CSW-51 | 35 | CSW-51 – 51(34) |
| The agreement for sale and purchase for the South Bay Property dated 2011-01-19 | CSW-52 | 24 | CSW-52 – 52(23) |
| Land search record of the South Bay Property dated 2018-09-11 | CSW-53 | 5 | CSW-53 – 53(4) |
| Companies registry record of New Dynamic Development Limited | CSW-54 | 82 | CSW-54 – 54(81) |
| Opening mandate of New Dynamic Development Limited at Standard Chartered Bank ("SCB") dated 2009-02-20 | CSW-55 | 43 | CSW-55 – 55(42) |
| Transaction record and vouchers of New Dynamic Development Limited at the SCB account | CSW-56 | 20 | CSW-56 – 56(19) |
| Transaction record of R24 (Leading Shine Limited) at the CCBA account | CSW-57 | 13 | CSW-57 – 57(12) |

HR0090249
HR0090175

| Description | Exhibit No. | No. of page(s) | Page Nos. |
|---|---|---|---|
| Company record of Well Origin Limited at CCBA dated 2012-12-06 | CSW-58 | 31 | CSW-58 – 58(30) |
| Companies registry record of World Century Limited | CSW-59 | 40 | CSW-59 – 59(39) |
| The false Chartered Flight Agreement entered in 2012 | CSW-60 | 7 | CSW-60 – 60(6) |
| Four false contracts entered between Mileson and World Century Limited for furniture trading | CSW-61 | 8 | CSW-61 – 61(7) |
| Forged receipt purportedly issued by SAFE to Mileson | CSW-62 | 1 | CSW-62 |
| A chart detailing the Aircraft Loan Fraud | CSW-63 | 1 | CSW-63 |
| Travel movement record of R1 | CSW-64 | 5 | CSW-64 – 64(4) |
| Travel movement record of R2 | CSW-65 | 5 | CSW-65 – 65(4) |
| Travel movement record of R3 | CSW-66 | 4 | CSW-66 – 66(3) |
| Travel movement record of R25 | CSW-67 | 6 | CSW-67 – 67(5) |
| Travel movement record of R26 | CSW-68 | 1 | CSW-68 |
| Travel movement record of R27 | CSW-69 | 1 | CSW-69 |
| Arrest warrant of R1, R2 and R3 | CSW-70 | 3 | CSW-70 –70(2) |
| Opening mandate of R16 (Eastern Profit Corporation Limited) at CMBC dated 2014-12-12 | CSW-71 | 53 | CSW-71 – 71(52) |
| A fund flow chart showing fund movement of R7, R16, R17, R18, R19 and R21 | CSW-72 | 1 | CSW-72 |
| Opening mandate of R23 (Rosy Acme Ventures Limited) at CCBA dated 2014-11-03 | CSW-73 | 19 | CSW-73 – 73(18) |
| Opening mandate of HAN Chunguang (R25) at China Citic Bank International Limited dated 2015-12-10 | CSW-74 | 10 | CSW-74 – 74(9) |

HR0090250
HR0090175

| Description | Exhibit No. | No. of page(s) | Page Nos. |
|---|---|---|---|
| Transaction record of HAN Chunguang (R25) at the Citic account | CSW-75 | 44 | CSW-75 – 75(43) |
| Draft Restraint Order | CSW-76 | 32 | CSW-76 – 76(31) |

LAM Lai-yi

(Commissioner for Oaths)

Judiciary

77

HR0090251
HR0090175

HR0090252
HR0090175