## Exhibit 3

L4MKEAS1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  EASTERN PROFIT CORPORATION
   LIMITED,
4
                Plaintiff,
5
           v.                          18 CV 2185 (LJL)
6
   STRATEGIC VISION US LLC,
7
                Defendant.
8
   ------------------------------x
9                                      New York, N.Y.
                                       April 22, 2021
10                                     9:37 a.m.

11 Before:

12                 HON. LEWIS J. LIMAN,

13                                     District Judge

14                      APPEARANCES

15 TROUTMAN PEPPER HAMILTON SANDERS LLP
        Attorneys for Plaintiff
16 BY:  CHRISTOPHER B. CHUFF
        JOANNA J. CLINE
17
   GRAVES GARRETT LLC
18      Attorneys for Defendant
   BY:  EDWARD DEAN GREIM
19      JENNIFER A. DONNELLI

20 ALSO PRESENT:

21 MELISSA FRANCIS, Eastern Profit Corporation Limited
   J. MICHAEL WALLER, Strategic Vision US LLC
22
   UNA WILKINSON, Mandarin Interpreter
23 LENNY YANG, Check Mandarin Interpreter

24 JOSHUA KLEIN, Attorney for Mr. Guo
   PETRILLO, KLEIN & BOXER, LLP
25

1        (Trial resumed)

2        THE COURT:  Good morning.

3        A couple of preliminary items:

4        First, I received an email -- actually, two emails

5    last night from somebody informing the Court that the

6    proceedings here were being rebroadcast.  First of all, I want

7    to ask the two counsel whether they are aware of who's doing

8    this.  Apparently, they were being rebroadcast on YouTube.

9        Ms. Cline, do you know anything about that?

10       MS. CLINE:  I do not, your Honor.

11       THE COURT:  Mr. Greim, do you know anything?

12       MR. GREIM:  No, no, your Honor.

13       THE COURT:  I'm issuing an order this morning that is

14   reminding all parties and all participants in this proceeding,

15   and all attendees, whether they are attending in person or are

16   attending virtually, remotely, that any rebroadcast or

17   retransmission of these proceedings is a violation of the court

18   order.  It can be punished, and will be punished, by civil or

19   criminal contempt.  That's a warning to anybody who might be

20   listening to these proceedings.  It also will be placed on the

21   Court's docket.

22       Second, I've got an objection by the defense to PX 11.

23   The objection is overruled, and the exhibit will be received,

24   largely for the reasons stated by Ms. Cline in her letter.  The

25   question of whether the document is authentic and whether

1    there's sufficient evidence, more particularly, the question of

2    whether there is sufficient evidence for a finder of fact to

3    determine that the document is authentic is different from the

4    question of whether I, as the finder of fact, will determine

5    that the document is authentic.

6            I find that the plaintiff has sufficiently established

7    that the document is authentic for purposes of it being

8    received into evidence.  My ruling should not be understood to

9    reflect a prejudgment as to whether the document is an

10   authentic loan agreement or not; that is an issue that I

11   presume I will address when it comes to the findings of fact.

12           Anything else from the plaintiff before we get

13   started?

14           MS. CLINE:  Yes, your Honor.  I was just wondering if

15   you might do a time check just for expectation setting

16   purposes?

17           THE COURT:  I'll give you that information.

18           Anything from defendant?

19           MR. GREIM:  Your Honor, just some housekeeping.

20   Exhibit DX 48, the substitution of counsel document was used

21   with Han Chunguang yesterday.  We didn't move it in, but we

22   just wanted to do that this morning.  We've conferred with

23   plaintiff's counsel and understand that there's no objection.

24           THE COURT:  Is that right?

25           MS. CLINE:  Yes, your Honor.

Case 22-50073 Doc 2032-3 JL Filed 07/25/23 Entered 07/25/23 13:27:53 Page 5 of 17
Case 22-50073 Doc 2038-1 Filed 07/25/23 Entered 07/25/23 13:43:58 Page 5 of 651
168

L4MKEAS1

```
 1              THE COURT:  DX 48 is received.

 2              (Defendant's Exhibit 48 received in evidence)

 3              THE COURT:  Anything else?

 4              MR. GREIM:  That's all, your Honor.

 5              THE COURT:  I'll give you the updated time amount.

 6         For Eastern, Eastern has used six hours and 49

 7   minutes.  For Strategic, Strategic has used nine hours and 29

 8   minutes.  It appears that we are coming to the end of the

 9   allotted time for each counsel.  When we approach the end, I'll

10   hear counsel with respect to whether an extension is

11   appropriate.  My intention is to run all day today.  I'll

12   address the issue with respect to Ms. Wang after the testimony

13   is over today, and also to finish today.

14         Anything else?

15              MR. GREIM:  Your Honor, I would just say we fully

16   anticipate being able to finish today with hours to spare.

17              THE COURT:  Good.

18         Mr. Guo, good morning.

19              THE WITNESS:  Good morning, your Honor.

20              THE COURT:  You're reminded that you are still under

21   oath, sir.

22              THE WITNESS:  Yes, your Honor.

23              THE COURT:  Counsel, you may inquire.

24

25
```

Case 22-557, Document 82-3, 07/25/2368, Page 6 of 652
Case 22-557, Document 82-3, 07/25/2368, Page 6 of 652
Case 1:22-cv-02132-JLP Document 53 Filed 07/25/23 Page 6 of 167

168

L4MKEAS1                          Guo - Cross

1    GUO WENGUI,

2   CROSS-EXAMINATION CONTINUED

3   BY MR. GREIM:

4   Q.  Mr. Guo, I'm going to show you what we've marked as

5   Exhibit 41.  This is a Wall Street Journal article that was

6   written on July 22nd, 2019, about this very case, and I'll tell

7   you this is one of the articles that form the basis for your

8   own lawsuit against Strategic Vision.

9           Do you recall that?

10          MS. CLINE:  Objection, your Honor.  At least the

11  document that I'm seeing is in English.  I'm not certain that

12  the witness can read it.  It's also been excluded, I believe.

13          THE COURT:  Your objection is overruled.  It's not

14  being offered, as far as I understand.

15          Is that correct, Mr. Greim, you're not offering it at

16  this time?

17          MR. GREIM:  We are not, your Honor.

18          THE COURT:  The objection is overruled.

19          MR. GREIM:  If you could scroll down to --

20          MS. CLINE:  Your Honor, objection as to the language

21  issue, though, as well.  It's in English.

22          THE COURT:  I assume that Mr. Greim will figure out a

23  way to show it to the witness either with him reading it in

24  English or it being translated.

25          MR. GREIM:  Yes, that's what we'll do.  We'll use our

L4MKEAS1                              Guo - Cross

1   translator we have right here with us to do that.

2               THE COURT:  Mr. Guo, do you read any English?

3               THE WITNESS:  (In English) No.

4   BY MR. GREIM:

5   Q.  Did you have a lawyer named Daniel Podhaskie?

6   A.  Yes.

7   Q.  And he was also the general counsel for Golden Spring

8   New York?

9   A.  What I wanted to say, actually, is that he's

10  Golden Spring's lawyer.

11  Q.  And do you see -- and Golden Spring New York is your family

12  office, correct?

13  A.  So, I'm invoking the Fifth Amendment.

14  Q.  Does Golden Spring's lawyer make statements on your behalf?

15  A.  Yes.

16  Q.  And do you recall Mr. Podhaskie stating on your behalf, in

17  response to the lawsuit, "Mr. Guo is the most wanted dissident

18  worldwide by the Chinese Communist Party and has been their

19  most outspoken and vitriolic critic since his arrival in the

20  United States"?

21               Do you recall that?

22  A.  Well, I don't know what is written in the article.  I only

23  heard the interpreter interpreting, but I know what that says.

24  Q.  My question is whether you recall that Mr. Podhaskie made

25  that remark?

Case 22-50073 Doc 2082-3 JLD Doc 1175-3 Filed 07/25/23 Entered 07/25/23 13:27:53 Page 8 of 654
Case 22-50073 Doc 2032-3 Filed 07/25/23 Page 8 of 167

168

```
 1   A.  I don't recall.

 2   Q.  Let's go up a few more paragraphs.

 3            MR. GREIM:  I would ask the interpreter to read the

 4   highlighted section, and I'm going to tell Mr. Guo that the

 5   interpreter is reading from this article.  She's going to read

 6   to you in your language.

 7            THE INTERPRETER:  I can read?

 8            (Pause)

 9            MR. GREIM:  There is no pending question yet.

10            THE INTERPRETER:  Hang on.

11            (Pause)

12            THE COURT:  Mr. Greim, let me suggest to you, I

13   appreciate the way you're trying to do it economically, but for

14   the purposes of a record, you either will have to read that

15   language out loud, or, alternatively, and assuming your

16   adversary agrees, you can mark up the exhibit and just put an A

17   next to it as what was read, and then that marked-up exhibit

18   will be the exhibit you use.

19            MR. GREIM:  Your Honor, I think I'll read it, just so

20   we can read the transcript and understand it.

21            THE COURT:  Okay.

22   BY MR. GREIM:

23   Q.  The section that the translator read is:  "Mr. Podhaskie

24   said in his statement that 'Certain of Mr. Guo's assets in

25   China, valued at approximately USD $30 billion, have been sold
```

1  for pennies on the dollar' by Chinese Communist Party officials

2  and that Mr. Guo 'has never taken a penny out of China or

3  Hong Kong since he began speaking out' against them."

4        Now, my question to you, Mr. Guo, is whether

5  Mr. Podhaskie made that statement on your behalf?

6  A.  I am invoking the Fifth Amendment.

7  Q.  Now, Mr. Guo, it's true, is it not, that you have alleged

8  the CCP retaliated against you by freezing your assets in

9  Hong Kong and on the Mainland?

10        THE INTERPRETER:  So let me interpret first.

11        MR. KLEIN:  Yes.

12        THE WITNESS:  I am invoking the Fifth Amendment.

13  BY MR. GREIM:

14  Q.  In fact, Mr. Guo, your claim that you have not taken a

15  penny out of China or Hong Kong since you began speaking out is

16  central to your claim for being a dissident, isn't it?

17  A.  I'm invoking the Fifth Amendment.

18  Q.  And, further, you told Dr. Waller and Ms. Wallop, when you

19  met with them in the fall of 2017, that you had not been able

20  to take a penny out of China or Hong Kong since you began

21  speaking out as a dissident, correct?

22  A.  I'm invoking the Fifth Amendment.

23        MR. GREIM:  I'm now going to read the very last quote

24  in this article, and after I read it for the record, I will ask

25  the translator to translate what you view on this to the

L4MKEAS1                          Guo - Cross

1    witness.  Okay?

2              THE COURT:  No.  I think the right way to do it is for

3    the translator to translate what you're saying, Mr. Greim.  So

4    you'll have to take it in pieces, let the translator translate

5    what you're saying, and then you'll lead up to the question.

6              MR. GREIM:  Well, your Honor, the only thing is I

7    wanted to make a record that the translator was not necessarily

8    saying what I'm saying, but she's actually reading what she

9    sees on the page.

10             THE COURT:  You'll read what you see on the page, and

11   then the translator will translate that.

12             MR. GREIM:  So we'll do it twice, she'll translate

13   what I say, and then she'll also read off the page to the

14   witness?  Because it seems that the translation, if the -- if

15   the question is what does the document say --

16             THE COURT:  That's fine for you proceed the way you

17   had intended.

18             MR. GREIM:  Okay.

19   BY MR. GREIM:

20   Q.   The document says:  "Mr. Podhaskie denied those allegations

21   and said Messrs. Guo and Bannon 'have a joint mission in

22   regards to China,' which is to 'get rid of the radical cadre

23   inside the Communist Party.'"

24             And you agree with what Mr. Podhaskie said, don't you?

25   A.   I don't recall.

1   Q.  And was -- I'm asking today if he agrees with it.

2           MR. KLEIN:  Your Honor, can I be heard?

3           THE COURT:  Yes.

4           MR. KLEIN:  To the extent that Mr. Guo is being asked

5   whether he agrees with the comment that he and Mr. Bannon have

6   a joint mission in regards to China, which is to get rid of the

7   radical cadre inside the Communist Party, I don't have any

8   issue with him responding to that.  To the extent the question

9   is whether he agrees that Mr. Podhaskie denied those

10  allegations, I'm not sure what that refers to.

11          THE COURT:  Why don't you reask the question, counsel.

12  BY MR. GREIM:

13  Q.  Mr. Guo, do you agree with Mr. Podhaskie's statement that

14  you and Mr. Bannon "have a joint mission in regards to China,"

15  which is to "get rid of the radical cadre inside the Communist

16  Party"?

17          THE COURT:  No, let me ask the question a somewhat

18  different way.

19          Mr. Guo, do you agree with the statement that you and

20  Mr. Bannon have a joint mission in regard to China, which is to

21  get rid of the radical cadre inside the Communist Party?

22          THE WITNESS:  I don't altogether agree.

23  BY MR. GREIM:

24  Q.  Do you agree that Mr. Podhaskie was speaking on your behalf

25  when he made those remarks to the Wall Street Journal?

```
 1              THE COURT:  Do you want to consult, counsel?
 2              MR. KLEIN:  I just have a question as to whether the
 3   question being posed is whether he made the remarks, meaning
 4   specifically what's in quotations?
 5              MR. GREIM:  Yes.  I'll rephrase.
 6   BY MR. GREIM:
 7   Q.  Do you agree that Mr. Podhaskie was speaking on your behalf
 8   when he said that you and Mr. Bannon have a joint mission in
 9   regards to China, which is to get rid of the radical cadre
10   inside the Communist Party?
11   A.  I don't recall.
12   Q.  Mr. Guo, you just testified yesterday, did you not, that
13   over 99 percent of the Communist Party members are decent
14   people?
15   A.  Yes, I recall.
16   Q.  In fact, I think you might have said 99.99 percent; is that
17   right?
18   A.  I actually don't recall whether I said 99 percent or
19   99.9 percent.
20   Q.  Well, because we have so many people in that party, let me
21   ask you:  Do you believe that 99.99 percent of the members of
22   the Chinese Communist Party are decent people?
23   A.  No.
24   Q.  Okay.  So closer to 99 percent, then?
25   A.  I don't know.
```

```
 1            Well, the thing is that I really cannot measure it
 2     with mathematics.  Every day, our mantra was to take down the
 3     CCP and change the structure.  I just cannot quantify that.
 4     Q.  Mr. Guo, when were your Hong Kong assets frozen?
 5            THE INTERPRETER:  Counsel, counsel.
 6            MR. GREIM:  I'm sorry.
 7            THE INTERPRETER:  Yes.
 8            THE WITNESS:  It is only an adjective that I use.
 9     BY MR. GREIM:
10     Q.  Mr. Guo, when were your Hong Kong assets frozen?
11     A.  I'm invoking the Fifth Amendment.
12     Q.  Were your Hong Kong assets frozen?
13            THE INTERPRETER:  Pardon, counsel?
14     Q.  Were your Hong Kong assets frozen?
15     A.  I'm invoking the Fifth Amendment.
16     Q.  Mr. Guo, I'm going to show you two exhibits.  One is in
17     English with some Chinese characters, and the other one is --
18     let's see, I thought we had it translated -- and the other one
19     is translated.
20            The first document we are displaying is D-126B, and
21     then halfway through, the same document has been translated
22     into Chinese characters.
23            Now, Mr. Guo, I will represent to you that the first
24     document, which was not translated, was filed in this case by
25     counsel for Eastern Profit, and Eastern Profit stated, in this
```

```
 1   case, in the letter that it attached to this document, that the

 2   assets of Mr. Guo and Eastern Profit that had been frozen in

 3   Hong Kong were frozen not by the CCP or Mainland China, but by

 4   the High Court of Hong Kong (see Exhibit B).  This is on

 5   Exhibit 126, the main document.

 6           And we've also had that section that was read to you

 7   translated into Mandarin, and it's highlighted on the screen

 8   that you see before you, which is the second half of

 9   Exhibit 126.  It's down at page 5 of the document, and it's the

10   last two paragraphs.

11           Could you take a moment to read that section to

12   yourself, Mr. Guo.

13           (Pause)

14   A.  I finished reading it, but I actually don't quite

15   understand, but I'm also invoking the Fifth Amendment.

16   Q.  Well, I don't have a pending question yet, but let me make

17   a record and ask you:  Do you agree with Eastern Profit's

18   counsel that your assets were frozen in Hong Kong, not by the

19   CCP or Mainland China, but by the High Court of Hong Kong?

20   A.  I'm invoking the Fifth Amendment.

21   Q.  Now, Mr. Guo, do you understand that Eastern Profit's

22   position in this case is actually being handled by Golden

23   Spring New York under a power of attorney?

24   A.  I'm invoking the Fifth Amendment.

25   Q.  Do you exercise control over Golden Spring New York,
```

 1  Mr. Guo?

 2  A.  I'm invoking the Fifth Amendment.

 3  Q.  Do you exercise control over Eastern Profit's conduct of

 4  this litigation, Mr. Guo?

 5  A.  I am invoking the Fifth Amendment.

 6  Q.  Now, Mr. Guo, you've given many interviews to Mirror Media,

 7  also called Mingjing, before, haven't you?

 8  A.  Yes.

 9  Q.  On an interview in August of 2017, you told the Mirror

10  Media host that your Hong Kong assets had been frozen, didn't

11  you?

12  A.  I'm invoking the Fifth Amendment.

13  Q.  Before we move on, let's go back to the very first page of

14  the Chinese version of 126B, which is the order itself.

15          There's a line for R1, Respondent 1.  Do you see your

16  name there?

17  A.  You mean Chinese version or English version?

18  Q.  I'm asking you to look at the version you can understand,

19  so I'm asking you -- I presume it's the Chinese version.

20  A.  What's the question again, counsel?

21  Q.  The question is:  Do you see your name in the first line as

22  Respondent 1?

23  A.  Yes.

24  Q.  And do you recall being served with an order from the High

25  Court of the Hong Kong Special Administrative Region?

```
1    A.  I'm invoking the Fifth Amendment.

2    Q.  Were you served with this order?

3              MR. KLEIN:  Can I confer for a moment?

4              THE COURT:  Yes.

5              (Pause)

6              THE COURT:  I think the record should reflect that the

7    witness is conferring with his personal counsel.

8              MR. GREIM:  Your Honor, may I address the Court in a

9    way that won't be translated by the interpreter while she's

10   occupied?

11             THE COURT:  Any objection to that?

12             MS. CLINE:  Yes, actually.  I think the witness should

13   be able to hear what's going to be said.

14             THE COURT:  I could hear you up at sidebar, so why not

15   hear you just within the safer way.  I'll hear you, counsel,

16   and I'll determine, after I hear you, whether it's something

17   that the witness should be informed of.

18             MR. GREIM:  Your Honor, one thing we've considered

19   with respect to this invocation of the Fifth Amendment,

20   obviously, we didn't know exactly what topics would trigger it

21   beforehand, but it's seemingly covering some core issues for us

22   in this case.  And so in a civil case, we would be asking for

23   an adverse inference.  Of course, the question is establishing

24   agency for the opposing party, but even the questions that go

25   to agency are also having the Fifth Amendment invoked.
```

1              And so I just want to make sure I do everything I can

2         here today, while we still have Mr. Guo, to lay that

3         foundation.  And I wonder if there could be some investigation

4         of exactly what the proceeding is or what the threat is that is

5         causing this, so that if the invocation of the Constitution can

6         be tailored more precisely, we may be able to lay some more of

7         that foundation.

8              THE COURT:  I'll think about that request, but,

9         meanwhile, you should ask your questions, and we'll take it

10        piece by piece.

11             MR. GREIM:  Thank you, your Honor.

12             MS. CLINE:  Your Honor, if I may?

13             THE COURT:  Yes.

14             MS. CLINE:  My understanding is that Strategic's time

15        has just expired.

16             THE COURT:  Do you have an application to extend time?

17             MR. GREIM:  Your Honor, frankly, I thought the

18        application would apply if we got to the end of the day, but

19        I'm prepared to apply right here.  I'm about a third of my way

20        into my cross.  We haven't been able to put on our case yet

21        with our witness.  We will have plenty of time to get done

22        today.  I don't think I've been wasting time.  I've been trying

23        to focus on the issues in the case.

24             THE COURT:  So, I'll grant the application to extend

25        the time because I think you haven't been wasting time, for the

L4MKEAS1                          Guo - Cross

 1    most part, and you have been confronted by witnesses who have

 2    denied things that they said in their deposition, forcing you

 3    to confront them with their deposition testimony.

 4              So, you may proceed.

 5              MR. KLEIN:  Your Honor, after conferring with Mr. Guo,

 6    my understanding is he's prepared to answer the last question

 7    regarding whether he was served with this document.

 8              THE COURT:  Very well.  Thank you, Mr. Klein.

 9              MR. GREIM:  Okay.

10    BY MR. GREIM:

11    Q.  Could I ask for an answer, then, to that question?

12    A.  Well, actually, I have never received any of such

13    documents, certainly by the Hong Kong High Court, but, however,

14    I have seen hundreds -- 150 different kinds of such documents

15    online purportedly charging me of being rapist, being killer,

16    and being gangster, but I have never seen an official paper

17    from the High Court.

18    Q.  And, Mr. Guo, in fact, you told Dr. Waller and Ms. Wallop

19    that your assets in Hong Kong had been frozen, didn't you?

20    A.  I'm invoking the Fifth Amendment.

21    Q.  Let's move forward here, Mr. Guo.

22              Since 2017, since you've been in the U.S., have you

23    been engaged in any kind of business or occupation for profit?

24    A.  I'm invoking the Fifth Amendment.

25              MR. GREIM:  I'm going to ask that we pull up

1   Exhibit 51, which I believe has also been translated.  And

2   let's go to the translated version.

3   BY MR. GREIM:

4   Q.  Actually, I'm going to first show you, Mr. Guo, the first

5   half of this document, and you will see it's a two-page

6   declaration.

7        MR. GREIM:  And let's scroll to the bottom, if we

8   could, to the signature.

9   Q.  Is this your signature, Mr. Guo?

10  A.  It looks like my signature.

11  Q.  Okay.

12       MR. GREIM:  Let's stick with the Chinese version,

13  please.  Scroll to the top, if you could.

14  Q.  Now, do you recognize this as an affidavit or a declaration

15  that you filed in a lawsuit against someone named Hongkuan Li?

16  A.  I'm invoking the Fifth Amendment.

17  Q.  Mr. Guo, did you sue Hongkuan Li in the U.S. District Court

18  for the District of Maryland?

19  A.  Yes.

20  Q.  Did you file a declaration in support of your lawsuit?

21  A.  I'm invoking the Fifth Amendment.

22       MR. GREIM:  Your Honor, I'm not entirely sure the

23  Fifth Amendment protects anyone from testifying as to whether

24  they made a public filing.

25       THE COURT:  I will hear, at first, a proffer from

1    Mr. Klein as to the good-faith basis for the exercise of the

2    Fifth Amendment with respect to these questions, and then we'll

3    decide whether to permit examination.

4         MR. KLEIN:  Your Honor, I think -- I don't have a

5    comprehensive understanding of the circumstances surrounding

6    the filing of documents in other lawsuits that I wasn't

7    involved in.  I don't know the precise involvement of my

8    client, I don't know the full context, and to the extent that

9    he's being asked whether he filed particular documents that are

10   speaking documents, that could be construed potentially as an

11   admission to certain things, it could be construed with regard

12   to the extent of his participation or his intent.  I just don't

13   have enough information to understand the context surrounding

14   these documents.

15        If I had more information, or if the question were

16   perhaps -- there are certain questions that I think he could

17   answer, to the extent that he has personal knowledge, but I

18   don't even know what he recollects about these documents, or

19   what he knows about these documents, or the circumstances

20   surrounding the creation and filing of those documents, and I

21   have not had time to consider what potential implications there

22   are, your Honor.

23        THE COURT:  Let me ask counsel a question.  First,

24   Mr. Greim are you simply trying to establish a foundation for

25   admitting this document?

```
 1                MR. GREIM:  I am.
 2                THE COURT:  Is there any objection by Eastern as to
 3      the admissibility of DX 51 as a statement of Mr. Guo?
 4                MS. CLINE:  May I consult with Mr. Klein?  I
 5      apologize, your Honor.
 6                THE COURT:  Yes.
 7                (Pause)
 8                MS. CLINE:  So, on behalf of Eastern, I can say that
 9      we do not object to its admission.
10                THE COURT:  Okay.
11                Then DX 51 is received as a statement, prior
12      statement, of Mr. Guo.
13                (Defendant's Exhibit 51 received in evidence)
14      BY MR. GREIM:
15      Q.  Mr. Guo, did you accuse Hongkuan Li of defaming you?
16      A.  Yes.
17      Q.  What was the defamatory statement?
18                MR. KLEIN:  Your Honor, may I confer?
19                THE COURT:  Yes.
20                (Pause)
21                THE COURT:  Does the witness need the question back?
22                THE WITNESS:  (In English)  Yes, your Honor.
23                THE COURT:  Could the court reporter read back the
24      question.
25                (Record read)
```

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | THE WITNESS:  (Through Interpreter)  I don't need the                     |
| 2  | readback.  I can answer the question.                                    |
| 3  | Well, it is because Hongkuan, on YouTube, over the                       |
| 4  | YouTube channel, over 600 times in his broadcasting talking              |
| 5  | about raping my wife, my daughter, my mother and insulting them          |
| 6  | with words, so that I don't want to go into that, but then I             |
| 7  | need to invoke the Fifth Amendment, but if you have questions,           |
| 8  | I'll answer them.                                                        |
| 9  | BY MR. GREIM:                                                            |
| 10 | Q.  And so your argument in that case, Mr. Guo, was that that            |
| 11 | cost you business in Hong Kong and on the Mainland, correct?             |
| 12 | A.  I'm invoking the protection of the Fifth Amendment.                  |
| 13 | Q.  And you claim that you actually expected another year of             |
| 14 | work into the year 2019; is that correct?                                |
| 15 | THE INTERPRETER:  Counsel, I didn't get your question.                   |
| 16 | Q.  And you argued that the conduct by Mr. Li cost you another           |
| 17 | year of work into 2019, correct?                                         |
| 18 | A.  I'm invoking the Fifth Amendment.                                    |
| 19 | Q.  Who was the person at ACA who conferred with you about the           |
| 20 | Li posts?                                                                |
| 21 | A.  I'm invoking the Fifth Amendment.                                    |
| 22 | Q.  Mr. Guo, you, in fact, were receiving funds through China            |
| 23 | Golden Spring in 2017 and 2018 for work in Hong Kong and on the          |
| 24 | Mainland, correct?                                                       |
| 25 | A.  I'm invoked the Fifth Amendment.                                     |

```
 1    Q.  And you were hired by ACA in order to make introductions to

 2    numerous business executives in China and Hong Kong, correct?

 3    A.  I'm invoking the Fifth Amendment.

 4    Q.  And you expected to keep doing that into 2019 without Li's

 5    defamatory posts?

 6    A.  I'm invoking the Fifth Amendment.

 7    Q.  Mr. Guo, you testified, I think yesterday, that you had

 8    applied for asylum, and that the application is still pending;

 9    is that correct?

10    A.  Yes.

11    Q.  And Lianchao Han assisted you with this application, didn't

12    he?

13    A.  I don't quite understand what you mean that he helped me.

14    Q.  Did he advise you in preparing the application?

15    A.  I don't understand the standard of opinion.  What does it

16    mean?

17    Q.  Did he work on the application with you?

18    A.  Well, it is hard to say whether he did help to fill out the

19    application or not because he didn't do that in front of me,

20    but the thing is that through counsel, through lawyers, perhaps

21    they give him some advice that he helped.

22    Q.  Is Mr. Lianchao Han -- let me ask you this:  Did he discuss

23    your asylum application with you?

24            MS. CLINE:  Objection; relevance.

25            THE COURT:  Overruled.
```

1              THE WITNESS:  No.

2    BY MR. GREIM:

3    Q.  Mr. Guo, when is the last time you spoke with Lianchao Han?

4    A.  Around one and a half to two years ago.  I can't quite

5    recall.

6    Q.  You texted him just before your deposition in this case, to

7    get facts about the case, didn't you?

8    A.  I have never spoken to him about this case.  I was very

9    angry with him.

10   Q.  He advised you on whether to file this lawsuit, didn't he?

11   A.  He actually insisted against -- he was insisted of not to

12   proceed with this lawsuit.  In fact, I suspected that he may be

13   in league with these two liars.

14   Q.  Mr. Guo, Sasha Gong introduced you to Bill Gertz, didn't

15   she?

16   A.  Well, I don't -- I'm not sure that it was she alone who

17   introduced me to Bill Gertz.  A lot of people introduced Bill

18   Gertz to me.

19   Q.  Bill Gertz has many connections -- well, first of all, do

20   you know Bill Gertz?

21   A.  Well, many years.  In fact, that in China, we all read his

22   articles, and we are all his fans.

23   Q.  And you know that he has many connections in

24   Washington, D.C., don't you?

25   A.  That, I don't know.

1   Q.  You know him to be what's called a China hawk?

2   A.  I know that he was called -- he has a name called anti-CCP

3   hero.  I don't know what hawk he is.

4   Q.  Gertz wrote a book about you, didn't he?

5           THE INTERPRETER:  Counsel, can you repeat?

6           MR. GREIM:  Sure.

7   BY MR. GREIM:

8   Q.  Gertz wrote a book about you, didn't he?

9   A.  I don't know.

10  Q.  Did you know that Gertz wrote a book called "Deceiving the

11  Sky"?

12  A.  I know that he wrote a book that is about the anti-CCP.  In

13  Chinese, the name was "Deceiving the Sky Crossing the Sea."

14  That, I know.

15  Q.  Mr. Gertz asked you for an advance on his royalties on that

16  book, didn't he?

17  A.  You mean I pay him the royalty?

18  Q.  Yes.

19          The question is:  He asked you for an advance on the

20  royalties, didn't he?

21          MR. KLEIN:  Your Honor --

22          MR. GREIM:  I'm just going to withdraw it, so we can

23  move faster.  I'll just withdraw that question.

24  BY MR. GREIM:

25  Q.  Mr. Guo, you introduced Mr. Gertz to William Je, didn't

1    you?

2              THE INTERPRETER:  Counsel, did you say that he

3    introduced?

4              MR. GREIM:  Mr. Gertz to William Je.

5              THE INTERPRETER:  Okay.

6              MR. KLEIN:  Your Honor, can I confer?

7              THE COURT:  Yes.

8              (Pause)

9              THE COURT:  Mr. Guo, do you need the question back?

10             THE WITNESS:  No.  I'm invoking the Fifth Amendment.

11   BY MR. GREIM:

12   Q.  Mr. Guo, are you aware that William Je then advanced

13   $100,000 to Mr. Gertz?

14   A.  I'm invoking the Fifth Amendment.

15   Q.  Mr. Guo, you told Dr. Waller and Ms. Wallop, in your

16   December meetings, that you wanted to eliminate the CCP and Xi

17   Jinping; is that right?

18   A.  (In English) 100 percent.

19   Q.  You also told them that Yvette Wang was still a member of

20   the Communist Party, didn't you?

21   A.  Yes.

22   Q.  And was she still a member of the Communist Party, in fact,

23   in December of 2017?

24   A.  No.

25   Q.  So, did you lie to them?

```
 1    A.  So, what I said to them was that she had been a member of
 2    the CCP, but in December 2017 -- in December 2017, she was not
 3    a member of CCP, in fact, because if you are the member of CCP,
 4    you do need to pay the membership fee.  And, also, that she did
 5    not pay for the membership fee, and, also, that she was being
 6    with someone like me, who is anti-CCP, so she's no longer CCP
 7    member, your question is a deceiving question.
 8    Q.  Mr. Guo, do you remember giving a deposition in this case
 9    in August 2019?
10    A.  Yes.
11    Q.  I asked you questions, and you swore to the answers under
12    oath, under penalty of perjury, correct?
13    A.  Yes.
14          MR. GREIM:  I'm going to ask the witness to take a
15    look at a video of that deposition, which is Exhibit JX 4, and
16    this is lines 30, 19 to 32, 2.
17          (Video playback)
18          THE INTERPRETER:  I can't hear.  Are there subtitles?
19          MR. GREIM:  There are no subtitles.  You'll hear the
20    question from me, his response, and then you'll hear the
21    translation.
22          (Video playback)
23          (Continued on next page)
24
25
```

1    Q.  Mr. Guo, did you give that testimony?

2    A.  Yes.

3    Q.  And it was truthful?

4    A.  Yes.

5    Q.  And you intended to release the information from this

6    project to people of China via the media; is that right?

7    A.  I don't understand.

8    Q.  If Strategic Vision had produced what it is you were

9    looking for, would you have then released that information to

10   the people of China via the media?

11   A.  No.

12   Q.  I'm going to -- once again we are going to go to JX4.

13           THE DEFENDANT:  Your Honor, I would like to confer

14   with my counsel, Joanna.

15           THE COURT:  You can confer briefly.  Is it with

16   Ms. Cline or just with Mr. Guo's personal counsel?

17           THE WITNESS:  And Joanna.

18           THE COURT:  Okay.  Do it briefly.

19           (Pause)

20           THE WITNESS:  So am I going to say something or am I

21   going to answer something?

22           THE COURT:  No.

23   BY MR. GREIM:

24   Q.  So we are now going to show for you, Mr. Guo, this is from

25   JX4, your August deposition, lines 207:25 to 208:12.  Okay.

1          (Video being played)

2          Mr. Guo, that was your testimony on August 2nd, 2019,

3   wasn't it?

4   A.  Yes.

5   Q.  And it was truthful, wasn't it?

6   A.  Yes.

7   Q.  Mr. Guo, you never identified Eastern Profit to Strategic,

8   did you?

9   A.  Well, it was actually done by Yvette -- Wang Yan Ping and

10  Han -- well, I didn't know, identify Eastern Profit or Han

11  Chunguang to this company.

12  Q.  Mr. Guo, you were an agent of Eastern for the purposes of

13  negotiating the research agreement with Strategic, weren't you?

14  A.  I am the agent?

15  Q.  That's my question.

16  A.  But I have never been an agent to Eastern Profit.

17  Q.  Mr. Guo, you acted on behalf of Eastern in connection with

18  the negotiation of the research agreement, and your

19  representations to Strategic in that role are binding on

20  Eastern; isn't that right?

21          THE INTERPRETER:  Counsel, would you mind if I repeat

22  the interpreting?

23  A.  Well, I did not participate into the -- very much into the

24  discussion of the research agreement.  All the discussion was

25  conducted by Wang Yan Ping and including Han Lianchao.  I never

1   told the company I was representing whoever.

2   Q.  Mr. Guo, would it surprise you to learn that Eastern Profit

3   has taken the opposite position in this case?

4   A.  Not surprised.

5   Q.  In fact, just a moment ago you referred to Eastern Profit's

6   counsel as your attorney, correct?

7   A.  Who is representing Eastern Profit?

8   Q.  Well, the attorney sitting here to my left --

9           THE INTERPRETER:  Counsel, can you --

10          MR. GREIM:  Can you translate what the witness just

11  said?

12          THE INTERPRETER:  I actually didn't hear exactly what

13  he just said.  I was telling him not to speak.  Do you want me

14  to ask him?

15          MR. YANG:  He mentioned that it was misspoken.

16          THE COURT:  Let me ask you a couple of questions,

17  Mr. Guo.

18          THE WITNESS:  (In English)  Yes, your Honor.

19          THE COURT:  You see the lawyer, the female lawyer at

20  the first table in the front of me?  Do you see her?

21          THE WITNESS:  (In English)  Yes.

22          (Through Interpreter)  Yes.

23          THE COURT:  And you referred to her a moment ago, to

24  me, by her first name, right?

25          THE WITNESS:  Yes.

1          THE COURT:  And did you meet with her before your

2    testimony today?

3          THE WITNESS:  No.

4          THE COURT:  Let me ask a better question.  Before you

5    came here to testify, have you met with plaintiff's lawyers

6    here?

7          THE WITNESS:  No.

8          THE COURT:  How do you know her name?

9          THE WITNESS:  Well, if it's because prior to this, my

10   internal lawyer told me who was going to be present today.

11         THE COURT:  And he referred to her by her first name?

12         THE WITNESS:  Yes.

13         MS. CLINE:  Your Honor --

14         THE COURT:  No.

15         You may inquire, counsel.

16   BY MR. GREIM:

17   Q.  Mr. Guo, who is the internal lawyer you just referenced?

18   A.  Our internal lawyer, and they are not here, and also that

19   this is my lawyer.

20   Q.  What is the name of the internal lawyer you just

21   referenced?

22   A.  It was Daniel before.  He was Golden Spring's lawyer.

23   Q.  Daniel Podhaskie?

24   A.  Yes.

25         THE COURT:  He's the individual who told you about

1    Ms. Cline?

2             THE WITNESS:  Yes.

3    BY MR. GREIM:

4    Q.  I'm not going to ask beyond this question, but does

5    Mr. Podhaskie tell you things about this case, Mr. Guo?

6    A.  It was, yes, Mr. Podhaskie and my lawyer here.

7    Q.  And does he take instruction from you, Mr. Guo?

8    A.  No.

9    Q.  Does he do things that you ask him to do?

10   A.  No.

11   Q.  Do you know who he answers to?

12   A.  Golden Springs.

13   Q.  Who is his boss at Golden Spring?

14   A.  I'm invoking the Fifth Amendment.

15   Q.  Mr. Guo, do you know who the boss of Golden Spring is?

16   A.  The Fifth Amendment.

17   Q.  My question is whether only you know, Mr. Guo?

18   A.  I'm invoking the Fifth Amendment.

19   Q.  Mr. Guo, do you assert that your communications with

20   Mr. Podhaskie are privileged?

21   A.  Yes.

22   Q.  Does he provide legal advice to you?

23   A.  Yes.

24   Q.  And does he provide legal advice to you about this case?

25   A.  Yes.

1    Q.  Mr. Guo, I'm going to return to Lianchao for a moment.  Did

2    Mr. Han discuss with you that the research from this contract

3    would be shared with the media?

4    A.  We did have a discussion talking about that we will

5    investigate and then bringing charges against them in the

6    United States if there was investigation results, but we did

7    not talk about it in detail.

8    Q.  Mr. Guo, you remain --

9              THE INTERPRETER:  Counsel, you must --

10             MR. GREIM:  Oh, sorry.

11   A.  And I also mentioned that after the investigation process,

12   then we can share it with the media.

13   Q.  Mr. Guo, you remained on good terms with Lianchao Han all

14   the way up to your August 2019 deposition, right?

15   A.  No, in fact, that ever since the incident with this July

16   has happened, our relationship was not in good terms.

17   Q.  Mr. Han kept working on your asylum application at least

18   through March of 2018, didn't he?

19   A.  Well, ever since this happened, ever since this July, I'm

20   getting the USB with rubbish in there, that ever since that

21   happened, we were not in good terms.  So I don't have the

22   recollection at this moment that what he has done to help in

23   the asylum case, I don't have recollection.

24   Q.  But you did text with him right before your deposition

25   for -- to get facts, didn't you?

L4MPEAS2                                   Kwok - Cross

1    A.  I don't recall.

2    Q.  For the record, we're going to be playing JX4, lines 65:11

3    to 65:17.

4               (Video being played)

5               That was your testimony, wasn't it, Mr. Guo?  And it

6    was truthful?

7    A.  Yes.

8    Q.  Mr. Guo, you are the one who ordered the wires totaling $1

9    million to be sent to Strategic Vision on or about

10   December 29th, 2017, aren't you?

11              THE INTERPRETER:  Counsel, do you want to repeat the

12   date for me?

13              MR. GREIM:  December 29th, 2017.

14              MR. KLEIN:  Can I confer, your Honor?

15              THE COURT:  Yes.

16              (Pause)

17   A.  I'm invoking the Fifth Amendment.

18   Q.  Mr. Guo, are you aware that that is Eastern Profit's

19   position in this case?

20   A.  Can I ask --

21              THE COURT:  Do you need to confer, Mr. Klein?

22              MR. KLEIN:  Yes, your Honor, please.

23              (Pause)

24              THE COURT:  Do you need the question back?

25              THE WITNESS:  No, I'm invoking the Fifth Amendment.

1              MR. GREIM:  Your Honor, we want to make a record here

2    on what we think -- are starting to conclude is not a

3    good-faith invocation of the Fifth Amendment, and I don't say

4    that lightly, but I want to explain why.

5              Golden Spring New York's in-house counsel gives advice

6    to Mr. Wengui, and he gives him advice about this case.  Golden

7    Spring New York's in-house counsel is sitting right at counsel

8    table with Eastern Profit.  Golden Spring New York is acting in

9    this case as attorney under a power of attorney for Eastern

10   Profit.

11             All I'm asking is, is the witness aware of Eastern

12   Profit doing this, and we got the Fifth Amendment.  And it's

13   just hard to conceive of what sort of criminal matter might be

14   invoked by this, and as somebody who has looked at all the

15   facts, I can't think of what it is.

16             THE COURT:  Let me ask you a couple of questions.

17   First of all, is your objective to create a basis for me to

18   draw an adverse inference against Eastern Profit the same as if

19   Mr. Guo was himself a plaintiff in this case?

20             MR. GREIM:  Yes.

21             THE COURT:  All right.  So let me ask you, Ms. Cline,

22   do you dispute that I can draw an adverse inference against

23   Eastern Profit from the invocation of the Fifth Amendment the

24   same as if Mr. Guo was the plaintiff in this case?

25             I'm not saying that I will draw that inference, but

1   just that I can equate the two of them for the purposes of

2   deciding whether to draw an adverse inference?

3           MS. CLINE:  So, your Honor, my understanding is that

4   the imputation of the adverse inference is based on a number of

5   factors, one of which is akin to agency, as I understand it.

6   And if it helps, I can say that I believe my predecessor

7   counsel in this case has already conceded that Mr. Guo was

8   acting as an agent for Eastern Profit.  So that, I wanted to

9   concede.

10          I don't want to concede that there are other factors

11  in the analysis.  I'm just standing here not certain that I'm

12  prepared to concede those, but we certainly would concede

13  agency.

14          THE COURT:  That is enough for you, Mr. Greim?

15          MR. GREIM:  I think the factors -- I think there are a

16  few different ways to establish it, and there are a few

17  factors.  And I have a memo, which is not at my fingertips, but

18  I would say I think it's not quite enough.  The concession

19  regarding agency went to the negotiations and the

20  representations made in negotiating the contract.

21          But some of the statements that Mr. Guo is not

22  answering arguably aren't part of the negotiation of the

23  contract.  They go to things like the performance of the

24  contract or things that establish Guo's control more generally

25  over these parties, and so I'm not sure we're all the way

1   there.  I think we're very far along the way there, but we
2   might need more.
3           THE COURT:  Well, I'll hear from you, but I had
4   understood Ms. Cline to say not just that Mr. Guo was an agent
5   for the purpose of negotiation of the underlying contract, but
6   that with respect to that component of the analysis that I need
7   to do in terms of deciding whether to draw an inference against
8   Eastern by virtue of his testimony, she's conceded that that's
9   been satisfied.  But let me hear from you, Mr. Greim.
10          MR. GREIM:  The four factors are Guo's loyalty to
11  Eastern Profit, a degree of control by Guo over Eastern Profit,
12  the mutual interests in this litigation, and that Guo has a
13  sufficiently prominent role in this litigation.
14          And so I think Guo's loyalty to Eastern Profit is
15  established.  With respect to the fact that he admittedly
16  negotiated this on its behalf and is clearly trying to aid it
17  in this litigation --
18          THE COURT:  Let me cut you off, Mr. Greim.
19          MR. GREIM:  Yes.
20          THE COURT:  So, Ms. Cline, based upon those four
21  factors, are you agreeing that I can draw an adverse inference
22  against Eastern Profit to the same extent as if Mr. Guo was
23  himself a party to this litigation?
24          In other words, that all four of those factors have
25  been satisfied for the purpose of the adverse inference

```
 1   analysis?
 2              MS. CLINE:  May I consult with my client?
 3              THE COURT:  Yes.
 4              (Pause)
 5              MS. CLINE:  Your Honor, we're not prepared to concede
 6   anything other than the agency point that's already made.
 7              THE COURT:  Okay.  Let me ask you one more question,
 8   Ms. Cline, and then I'll turn back to Mr. Greim.  A moment ago
 9   in my courtroom, you conferred with Mr. Guo and his personal
10   lawyer.  Are you claiming a privilege with respect to that
11   conference?
12              MS. CLINE:  Yes.
13              THE COURT:  On what basis?  Put another way, isn't it
14   fair for me to assume that the basis is that he's got a common
15   interest between Eastern Profit and Mr. Guo?
16              MS. CLINE:  Yes, your Honor, and so he's a -- for
17   purposes of this litigation, we are aligned and we have
18   consulted about the litigation.
19              THE COURT:  For purposes of this litigation, you are
20   aligned, is that what you said?
21              MS. CLINE:  Yes, sir.
22              THE COURT:  And so you've got a common interest with
23   respect to this litigation; is that correct?
24              MS. CLINE:  I will agree with that, yes.
25              THE COURT:  Mr. Greim, what more do you need?  And
```

1   then I'll consider the question of what questions you want to

2   challenge the good-faith basis for the assertion of the

3   privilege.

4           MR. GREIM:  Well, your Honor, if they've got a common

5   interest in the outcome of the litigation, I think that's

6   stronger than the mutual interest that the test requires.  The

7   witness has a prominent role in the litigation.

8           THE COURT:  Again, let me cut you off.  I don't want

9   to right now make the decision as to whether I can draw an

10  adverse inference and, frankly, whether an adverse inference is

11  appropriate.  That will turn upon the questions and what

12  inferences I draw from the questions, and whether Guo is the

13  same as Eastern Profit for the purpose of drawing an inference

14  will depend upon the analysis of the case law.  I don't have

15  the case law in front of me.

16          All I'm trying to do at the moment is to see whether

17  we need to challenge the good-faith assertion of the privilege.

18  I'm trying to avoid having to do that because I think this

19  Court's understandably expressed reluctance, but if you need to

20  establish more of a record, then tell me what you think you

21  need to do and I'll determine whether you can do it.

22          MR. GREIM:  Your Honor, I think -- let me do this.  I

23  think the best thing to do is to simply forge ahead with the

24  questioning and see where this comes up again.  I'm just afraid

25  I'll take too long on this topic and I won't get done.

L4MPEAS2                         Kwok - Cross

```
 1              THE COURT:  Go ahead.  We'll leave that open.
 2     BY MR. GREIM:
 3     Q.  Mr. Guo, when -- did you recall hearing from Yvette Wang in
 4     late January of 2018 that, in her opinion, Strategic had not
 5     found sufficient information on the 15 subjects?
 6     A.  Well, I know that after I met with these two guys, that I
 7     did not get any information at all.  I don't recall what time
 8     that was.
 9     Q.  Do you recall being asked for new names by Strategic
10     because there were problems with the first set of 15 names?
11     A.  Well, I vaguely recall some such thing happened, but then
12     the first time or second time, the names I provided basically
13     were Wang Qishan and people related to him.  I don't recall
14     anyone else.
15     Q.  Do you recall, however, that Strategic Vision asked for new
16     names to replace some of the names in the original list?
17     A.  I don't recall.
18     Q.  Do you recall refusing to provide new names to Strategic
19     Vision?
20     A.  I don't recall.
21     Q.  Mr. Guo, I just want to make sure I understand.  When you
22     say "I don't recall," do you mean you may have and can't
23     remember, or that you didn't do it?
24     A.  Well, I don't really remember, and just like the two videos
25     before you show me, I don't recall, but the thing is I thought
```

 1   that was okay and that was what happened, and but I don't

 2   recall.

 3   Q.  Do you know who Han Chunguang is?

 4   A.  Yes.

 5   Q.  Who is he?

 6   A.  He's the boss of Eastern Profit.

 7   Q.  How do you know he's the boss of Eastern Profit?

 8   A.  Well, that family was very successful in China, had a lot

 9   of business; so they build this company.

10   Q.  Your daughter is the sole director of Eastern Profit,

11   though, isn't she?

12   A.  I don't know.

13   Q.  When did you last see Han Chunguang, Mr. Guo?

14   A.  Well, yesterday when I was on the road here that I saw him,

15   and then I think several days ago I saw him too.

16   Q.  You see him frequently, don't you?

17   A.  I don't understand what the definition of frequency means,

18   but when I need to see him, I can see him.

19   Q.  When do you need to see him?

20   A.  Well, there were a lot of things asked about taking down

21   the CCP; so when I need to see him, I'll see him.

22   Q.  Do you request meetings with him?

23   A.  I don't understand what that means.

24   Q.  Do you ask him to meet with you?

25   A.  Well, it's quite normal and among us all that who are the

L4MPEAS2                          Kwok - Cross

| | |
|---|---|
| 1 | people supporting the taking down of the CCP that if we need to |
| 2 | discuss or we'll just meet.  There is nothing about who is |
| 3 | requesting who or who is inviting whom.  We have common |
| 4 | mission. |
| 5 | Q.  He comes to your apartment very frequently, doesn't he? |
| 6 | A.  I believe, in the last two years, that he did not come to |
| 7 | my place more than ten times or no more than five times. |
| 8 | Q.  I took your deposition in August of 2019, remember? |
| 9 | A.  Yes. |
| 10 | Q.  And you remember you said you had seen him just that |
| 11 | morning of your deposition? |
| 12 | A.  I really cannot recall what happened in that deposition.  I |
| 13 | don't remember. |
| 14 | Q.  We're playing JX4, page 115, 19 to 22. |
| 15 |         (Video being played) |
| 16 |         That was your testimony, wasn't it, Mr. Guo? |
| 17 | A.  Yes. |
| 18 | Q.  And it was truthful? |
| 19 | A.  Yes. |
| 20 | Q.  But then you testified that you didn't know why Han |
| 21 | Chunguang came to your building, didn't you? |
| 22 | A.  I just don't recall what I -- I just don't recall what I |
| 23 | said at the time.  I may have said that.  I just don't recall |
| 24 | that now, at this point.  When I'm in court now, I'm just |
| 25 | telling you what I feel.  At this moment, I don't recall. |

 1   Q.  And in August 2019, you said you didn't know who Han

 2   Chunguang worked for or who assigned him work, remember?

 3   A.  Well, I just don't recall what I said at that time because,

 4   like, I have 50 cases.  I don't recall what day and saying what

 5   and when.  Only I can tell you at this moment I'm in court, I

 6   don't recall.

 7   Q.  Okay.  Let's just -- we'll keep pressing ahead.

 8          Let me ask you this, Mr. Guo.  When did you learn that

 9   Han Chunguang was the boss of Eastern Profit?

10   A.  I don't recall the specific time.

11   Q.  Do you recall that I asked you at your deposition whether

12   Han Chunguang attended a meeting with Strategic to discuss the

13   contract and you laughed?  Do you recall that?

14   A.  Well, perhaps I thought, you know, just like before, maybe

15   I did say I recalled but that, we can base my answer on that

16   one, but at this moment, I don't recall.

17   Q.  Mr. Guo, we're going to play from JX4, line -- I'm sorry,

18   page 158, lines five to 15.

19          (Video being played)

20          Do you recall that testimony, Mr. Guo?

21   A.  Yes.  After I watch the video now, that my memory is

22   refreshed, now that I recall.

23   Q.  And were you being completely truthful and honest to your

24   answers to me in that deposition, Mr. Guo?

25   A.  Yes.

1   Q.  Mr. Guo, Han Chunguang is actually your man servant, isn't

2   he?

3   A.  Who says that?

4   Q.  That's my question.

5   A.  No.

6   Q.  He cooks for you?  Does he cook for you?

7   A.  Several times.  Well, several times, but the thing is that

8   in the Chinese tradition, men cooking was a virtue, and so we

9   cook for each other sometimes as friends and family.  I

10  actually cooked on the broadcasting too.

11  Q.  And he runs errands for you, doesn't he?

12  A.  No.

13  Q.  And he has cooked for you when you had guests over and

14  served that food to the guests, hasn't he?

15  A.  No.

16  Q.  Mr. Guo, if you're so sure that Han Chunguang is the boss

17  of Eastern -- let me ask you this -- strike that.

18          Have you ever talked to your daughter about Eastern

19  Profit?

20  A.  No.

21  Q.  Does she live in the area?

22  A.  No.

23  Q.  Do you see her very often?

24  A.  Very rarely.

25  Q.  She's in the U.S. though, correct?

 1    A.  Yes.

 2    Q.  So if Han Chunguang is the boss of Eastern Profit, why is

 3    he not sitting here with counsel for this lawsuit; do you know?

 4              MS. CLINE:  Objection.  Foundation.

 5              THE COURT:  Overruled.  I take it he's not at counsel

 6    table, right?  He's not in the courtroom with counsel?

 7              MS. CLINE:  That's correct, your Honor.

 8              THE COURT:  All right.  There's a foundation.

 9    Objection is overruled.

10    A.  I don't know.

11    Q.  Well, you said you saw him frequently.  Do you ever talk to

12    him about this case?

13    A.  No.

14              THE INTERPRETER:  Counsel, do you mind if I clarify

15    one thing with the witness?

16    A.  Okay.  So I emphasized by the end of 2019 to the present

17    time, Han Chunguang did not come to my 18th floor apartment

18    more than five times.

19    Q.  I see.  So after your deposition, he stopped coming to your

20    apartment so frequently; is that right?

21    A.  No.  I'm just referring to the question that you asked

22    before.  I'm just saying that I don't really talk to him every

23    day.

24    Q.  Who is William Je?

25    A.  The Fifth Amendment.

1   Q.  Mr. Guo, you testified in this case that William Je was a

2   friend of yours, right?

3            MR. KLEIN:  Your Honor, can I confer for a moment?

4            THE COURT:  Yes.

5            (Pause)

6            THE COURT:  All right.  Do you need the question,

7   Mr. Guo?

8   A.  Well, William Je probably is a director of ACA.

9   Q.  Okay.  And my question is whether he's a friend of yours

10  also?

11  A.  Yes.

12  Q.  And you've known him for a long time, haven't you?

13  A.  Well, I don't know what you mean by "long time."

14  Q.  Ten years?

15  A.  Yes.

16  Q.  Fifteen years?

17  A.  I don't recall quite clearly now.

18  Q.  And you trust him, yes?

19  A.  Yes.

20  Q.  And you believe he's anti-CCP, correct?

21  A.  Of course.

22  Q.  He's told you that, right?

23  A.  Yes.

24  Q.  And he sends money to places when you ask him to do so,

25  doesn't he?

1  A.  The Fifth Amendment.  I'm invoking the Fifth Amendment.

2  Q.  Do you recall earlier we looked at an affidavit that you

3  filed in your Hongkuan Li lawsuit; do you remember that?

4  A.  Yes.

5  Q.  Was the person from ACA who told you about the defamatory

6  posts William Je?

7  A.  Yes.

8  Q.  And was William Je the person that you were working to

9  introduce to executives in Hong Kong and on the mainland?

10  A.  I don't quite understand.

11  Q.  Well, do you recall that you declared to the Court in

12  Maryland that the purpose of your deal with ACA was for you to

13  introduce them to executives and business opportunities in Hong

14  Kong and on the mainland?

15  A.  I'm invoking the Fifth Amendment.

16  Q.  Now, you know that William Je already has many contacts on

17  the mainland, doesn't he?

18  A.  Yes.

19  Q.  And he developed those over many years writing the Greater

20  China Desk for Macquarie, correct?

21  A.  Perhaps.

22  Q.  And do you know that he was --

23          THE INTERPRETER:  Stop.  It should be "should be."

24  Q.  And you know that he was economic advisor to several

25  municipalities on the mainland, correct?

1    A.  I don't know.

2    Q.  Has he ever mentioned that to you?

3    A.  I don't recall.

4    Q.  How much do you -- let me ask you this.

5         Do you know about any connection that William Je has

6    to the City of Chongqing?

7    A.  Now, perhaps that he mentioned something like that, but

8    then, you know, in Hong Kong a lot of people talking about

9    that, about being Chinese Communist Party member.  But, you

10   know -- not communist party member, but then lots of people

11   saying they are relative --

12        THE INTERPRETER:  I'm sorry, I'm rambling.

13   A.  So I -- perhaps he said that, but I don't recall and I

14   won't take responsibility of that and --

15        (Pause)

16        But then he might have said that he is a member of

17   CPPCC, but lots of people in Hong Kong claim that.  And so he

18   might have said that, but I don't take responsibility for that.

19        THE COURT:  Mr. Greim, are you near a breaking point?

20        MR. GREIM:  I actually am, yes.

21        THE COURT:  Why don't you bring it to a close, and

22   then we'll take our mid-morning break.

23   BY MR. GREIM:

24   Q.  So, Mr. Guo, have you done any background research into

25   William Je?

1    A.  No.

2    Q.  But you're the one who ordered ACA to pay the million

3    dollars to Strategic Vision, correct?

4    A.  The Fifth Amendment.

5    Q.  And you introduced William Je to close associates as your

6    money man, haven't you?

7    A.  The Fifth Amendment.

8    Q.  Aren't you concerned with Mr. William Je being your money

9    man if he is associated with the CPPCC?

10   A.  The Fifth Amendment.

11   Q.  Mr. Guo, are you --

12            MR. GREIM:  Yes, we'll stop there.  Thank you, your

13   Honor.

14            THE COURT:  Okay.  It's now 11:44.  We'll break until

15   noon.  One thing counsel should focus on during the break is a

16   question raised by Mr. Greim with respect to the imputation of

17   the assertion of the Fifth and whether there's a good-faith

18   basis to challenge the assertion of the Fifth.

19            My understanding of the law, and I'm directing myself

20   to Ms. Cline on this as well, is that if there is a challenge

21   to the assertion of the Fifth, it really should proceed

22   question by question.  And it's for me, in the first instance,

23   to determine whether there's sufficient basis to question

24   good-faith assertion of the Fifth.

25            And so, Mr. Greim, you should be thinking about, if

1    you do intend to challenge it, which particular question.

2              All right.  We're adjourned.

3              (Recess)

4              THE COURT:  You may be seated.  Before we get

5    started -- I want this to be translated.

6              This morning I gave an order that retransmission and

7    rebroadcasting of this proceeding is a violation of a Court

8    order.

9              Would the interpreter please interpret that so that

10   the people who are listening on the phone can hear it.

11             That order applies to people who are in the courtroom

12   and people who are listening over the telephone.

13             My order has been violated.  I know that for a fact

14   because I have heard a transmission through YouTube of a

15   portion of the proceedings this morning.

16             In a moment, I will ask counsel if they know anything

17   about this.  For now, I am ordering the US Marshals to

18   investigate.  If this took place and we find out who did it, it

19   may constitute and will constitute civil contempt and may

20   constitute criminal contempt.

21             Anybody who retransmits or rebroadcasts the proceeding

22   going forward will subject themselves to civil or criminal

23   contempt.

24             Just so the record is clear, I have had a Chinese

25   interpreter speak loudly so that those over the phone will hear

1    what I have said both in English and in Chinese.

2              Ms. Cline, do you know anything about this?

3              MS. CLINE:  I do not, your Honor.

4              THE COURT:  Mr. Greim, do you know anything about

5    this?

6              MR. GREIM:  I do not, your Honor.

7              THE COURT:  All right.  Mr. Klein, I've been informed

8    that you wish to address the Court.

9              MR. KLEIN:  I do, your Honor.  May I?

10             THE COURT:  Yes.

11             MR. KLEIN:  There were some questions that were asked

12   of my client concerning meetings with Ms. Cline, Eastern's

13   counsel.  He has not met with Ms. Cline since the trial began,

14   but I think there was some confusion in how the dialogue

15   transpired, or at least the way his statements came out on the

16   record.

17             They should reflect that there were no meetings since

18   the trial began, but my understanding is that there were

19   meetings previously.  I've explained to my client that while

20   his discussions with counsel are privileged, that the facts of

21   his meeting with counsel or the fact that he had a discussion

22   with counsel is not privileged.

23             And if the Court or counsel wishes to inquire as to

24   the fact of meetings that occurred with Ms. Cline prior to the

25   trial, I wanted to -- certainly to the extent that the Court

168

1    directs that they can do so, that's fine with us, he'll answer

2    those questions.

3              And I just wanted to make sure that I clarified that

4    for the Court, and I thank the Court for indulging me.

5              THE COURT:  Is there anything that plaintiff's counsel

6    wishes to raise with the Court before we begin the examination

7    again?

8              MS. CLINE:  I consulted counsel about the Court's

9    request regarding imputation of the invocation and the adverse

10   inference exercise.  My understanding is that there are four

11   factors, and we are willing to stipulate to two of them if the

12   Court --

13             THE COURT:  I'll hear you, but you've already agreed

14   that there's a common interest between you and Eastern Profit

15   and the witness.  But I'll hear you with respect to the other

16   stipulations, and then we'll hear from defendant's counsel.

17             MS. CLINE:  Yes, so my understanding is that that's

18   one of the four factors, and the second one to which we're

19   willing to stipulate is the role of the non-party witness in

20   the litigation.  So we're willing to stipulate that Mr. Guo is

21   a key witness in this litigation.

22             THE COURT:  All right.  Mr. Greim?

23             MR. GREIM:  Your Honor, I think we're very close to

24   establishing the other two.  I would probably have a few more

25   questions to develop that.  As we go along, I'd like to kind of

1   fold them into my examination so I can do several things at

2   once.

3           THE COURT:  Why don't you ask the questions, and then

4   if it turns out that there are specific questions as to which

5   you wish to challenge the good faith of the assertion of the

6   privilege, we can address those at the conclusion of the

7   examination.

8           MR. GREIM:  And, your Honor, one other point.  Our

9   understanding is that challenging the good faith basis is the

10  first point, something we'd really need to do here because then

11  we'd have to maybe go back and get an answer, I suppose, based

12  on your ruling.

13          But then designating the statements for which we think

14  there should be adverse inference taken may not have to happen

15  right this moment.

16          THE COURT:  That's correct, and I should have made it

17  clear, if it wasn't clear before, that the question of whether

18  I should draw an adverse inference and which questions I should

19  draw an adverse inference with respect to and, frankly, whether

20  the factors are satisfied, are all things that I would expect

21  counsel to argue after we're done taking the evidence in this

22  case.

23          So each side should establish whatever evidence they

24  think they can establish and need to establish, and then we'll

25  answer what it all means.

```
 1              MR. GREIM:  May I continue the examination, your
 2    Honor?
 3              THE COURT:  Yes, you may.
 4    BY MR. GREIM:
 5    Q.  Mr. Guo, how frequently did you meet with Ms. Cline before
 6    this trial?
 7    A.  Who is Ms. Cline?
 8    Q.  Joanna, Joanna Cline sitting here.
 9    A.  So I did not meet Ms. Cline in person even once, but we met
10    over online twice or three times.
11    Q.  And did you play a role in the decision on whether to hire
12    Ms. Cline as replacement counsel in this litigation?
13    A.  No.
14    Q.  Do you know who did?
15    A.  I don't know.
16    Q.  Did you meet with Ms. Cline or Mr. Chuff before your second
17    deposition in this case, in December of 2019?
18              THE INTERPRETER:  Counsel, did you say before
19    December 2019?
20              MR. GREIM:  Yes.
21    A.  No.
22    Q.  You didn't meet with Ms. Cline during breaks at that
23    deposition or Mr. Chuff?
24    A.  You told me about the second time in 2019, right?
25    Q.  Yes.
```

1   A.  No.

2   Q.  You conferred with Mr. Podhaskie about information that he

3   passes on for Ms. Cline?

4   A.  I don't know whether it is a privileged information because

5   it is between lawyer and client.  Well, and also because I came

6   from China; so I don't know when or what to use these kind of a

7   law.  What is protected, I'm not sure.

8           THE COURT:  I think you can answer that question.

9   You're not being asked for the contents of the conversation.

10  You're just being asked for the subject.

11          THE INTERPRETER:  Counsel, do you mind to repeat your

12  question?  I forget.

13          THE COURT:  Let me ask the court reporter to repeat

14  the question, please.

15          (Record read)

16  A.  Do you mean Joanna?

17  Q.  Yes.

18  A.  Yes.

19  Q.  Now, you were represented by counsel when you were a party

20  in this case, correct, Mr. Guo?

21  A.  Yes.

22  Q.  And those attorneys continued to represent you in

23  discovery, right?

24  A.  Yes.

25  Q.  And those attorneys were Mark Harmon and Erin Teske from

1    the Hodgson Russ law firm?

2                THE INTERPRETER:  And?

3                MR. GREIM:  Erin Teske.

4    A.  Well, the thing is, I know that there were two lawyers, but

5    if you were talking about their names, I really cannot be sure

6    about the names.

7    Q.  Do you recall that your -- let me strike that.

8                Do you recall during breaks in the deposition, having

9    meetings with your lawyers and the lawyer for Eastern Profit?

10   A.  Well, what lawyers for Eastern Profit?  I don't know what

11   lawyers for Eastern Profit.  I only met with my lawyer.

12   Q.  Do you recall a lawyer for Eastern Profit named Zachary

13   Grendi, or Zack?

14   A.  Well, you see, I only met with -- you're talking about

15   Joanna, right?  The thing is, I only saw Joanna, but I didn't

16   meet her.  I only talked with my lawyer.

17   Q.  Mr. Guo, Joanna Cline and her firm are the fourth set of

18   lawyers for Eastern Profit in this case, correct?

19   A.  I don't know about this.

20   Q.  The lawyer before Joanna Cline was Zack Grendi, wasn't he?

21   A.  I don't recall clearly.  I really don't recall.

22   Q.  By the way, Mr. Podhaskie from Golden Spring was at your

23   first deposition, wasn't he?

24   A.  It seems so, but I cannot be sure.

25   Q.  And you certainly conferred with him during breaks, didn't

1   you?

2   A.   When was the break?

3   Q.   In your deposition.

4   A.   I suppose so, but then I cannot recall it's such a long

5   time ago.

6   Q.   You claim that those meetings were privileged?

7   A.   Yes.

8   Q.   Mr. Guo, have you invoked the privilege, the Fifth

9   Amendment privilege, here to harm Eastern Profit's interests in

10  this litigation?

11          THE INTERPRETER:  To harm or to hide, sorry?

12          MR. GREIM:  Harm, harm.

13          MR. KLEIN:  Your Honor, Mr. Guo was invoking on advice

14  of counsel.

15          THE COURT:  So I think he can answer the question.  I

16  don't think that there's anything improper about that question.

17          MR. KLEIN:  Okay.

18  A.   Of course not.

19  Q.   Because you want Eastern Profit to win this case, don't

20  you?

21  A.   Of course not, and I hope that Eastern Profit will win this

22  case.  Whether to win the case or not is decided by the judge.

23  I'm only here to be the witness.

24          THE COURT:  Mr. Guo, do you hope that Eastern Profit

25  wins this case?

1        THE WITNESS:  Very much hope so.

2    BY MR. GREIM:

3    Q.  Mr. Guo, is Golden Spring New York paying for your

4    attorney, Mr. Klein, with a K?

5    A.  I'm invoking the Fifth Amendment.

6    Q.  Mr. Guo, who is paying for Eastern Profit's attorneys in

7    this case?

8    A.  The Fifth Amendment.

9    Q.  Mr. Guo, you spoke with Mr. Je about repayment of a

10   supposed loan from ACA to Eastern Profit; is that right?

11   A.  Fifth Amendment.

12   Q.  Mr. Je -- you claim Mr. Je told you that he wanted that

13   loan repaid, right?

14   A.  The Fifth Amendment.

15   Q.  Mr. Guo, you want to do everything you can for Eastern

16   Profit to win this case, don't you?

17        THE INTERPRETER:  Do you mind if I repeat the

18   interpreting?

19   A.  Well, I'm only doing what I'm supposed to do as a witness.

20   I don't think about other things.

21   Q.  Mr. Guo, you have attempted to influence the outcome of

22   this case, have you not?

23   A.  No, I'm only here because I want to prove that I'm not a

24   double agent.

25   Q.  Mr. Guo, have you threatened other witnesses in this case?

1    A.  Absolutely not.

2    Q.  Mr. Guo, have you paid any individual to stand outside the

3    courthouse and protest?

4    A.  Fifth Amendment.

5    Q.  Have you paid any individual to come into this courtroom

6    and sit during the trial?

7    A.  The Fifth Amendment.

8    Q.  Have you threatened any witness that you will sue them if

9    they testify?

10   A.  No, never.  You see, the reason that I'm sitting here is

11   because that the -- because it is the result of a threat, the

12   threat caused me by the CCP.  Why should I do other things to

13   other people?

14   Q.  You're not here under subpoena, are you, sir?

15   A.  What do you mean by "subpoena"?

16   Q.  Did you receive an order from a Court requiring you to

17   appear?

18   A.  Well, I suppose I must have received a notice from the

19   Court, right?

20   Q.  That's my question to the witness.  Do you know?

21   A.  I think so.

22   Q.  Well, you were called in this case by Eastern Profit,

23   weren't you?

24   A.  Yes.

25   Q.  You didn't ask Eastern Profit to produce a subpoena before

1    you appeared, did you?

2    A.  Well, I would tell you that, in Chinese, right, and the

3    subpoena, if it is translated to Chinese, it is called

4    *Chuanpiao*, then I received some notice.  I do receive a notice

5    to tell me to be here, but whether it was a subpoena or not,

6    I'm not sure.  I don't know.

7    Q.  When Eastern asked you to appear as a witness, did you

8    agree to do so?

9    A.  Yes.

10   Q.  Mr. Guo, since coming to the U.S., you have claimed to have

11   access "at any time" to high-level CCP communications, correct?

12   A.  Yes.

13   Q.  And if you receive such information, you would certainly

14   provide it to the FBI or CIA, wouldn't you?

15             MR. KLEIN:  Your Honor, can we confer?

16             THE COURT:  Yes.

17             (Pause)

18             THE COURT:  Do you need the question back?

19             THE WITNESS:  (In English)  No, your Honor.  I have

20   the answer.

21             THE INTERPRETER:  No, your Honor, I have the answer.

22   A.  We, myself, provided some to the FBI, DOJ or CIA, but

23   probably not all.

24   Q.  And my question is, when you received such information, you

25   provide it to the FBI or CIA or DOJ, correct?

L4MPEAS2                          Kwok - Cross

1    A.  Yes.

2    Q.  And you provide all of the information you receive to the

3    FBI, CIA or DOJ, don't you?

4    A.  No.

5    Q.  I'm sorry, was that an answer "no" to my question, or was

6    that an invocation of the privilege?

7    A.  I did not provide all the information.

8    Q.  As I was sitting here, I may have misheard, but I thought I

9    saw Mr. Klein say no to Mr. --

10              THE COURT:  No, no, no.  We're not getting into

11   communications between Mr. Klein and his client.  If you want

12   the answer read back, you can have an answer read back, but

13   you're not going into what communications they had.

14   Q.  Mr. Guo, you had the opportunity to receive high-level CCP

15   communications, as you said, at least through 2019, didn't you?

16   A.  I can't say that I have all the information, some.

17   Q.  But by the time of your deposition in August of 2019, you

18   had never met with the FBI or CIA to share information, had

19   you?

20              THE INTERPRETER:  The witness ask that you repeat the

21   time.

22   Q.  August 2019.

23   A.  I don't -- I cannot be certain which month that we have met

24   or which month we have not met.  And also, that I was requested

25   by the FBI and CIA that any time that we met, that we cannot

1    actually say that we met.  And they also told me that if I say

2    that I met them, it was actually a bad thing to my family in

3    China.

4            In the fact that I'm sitting here, I wish I don't need

5    to answer this kind of question because it is very bad for my

6    family, friends in China.  It is because in China, if you are

7    having any connection with the partnership with the FBI or CIA,

8    it is actually a crime of betrayal, traitor; so it can be

9    sentenced to death.

10   Q.  However, you freely testified to that yesterday, didn't

11   you?

12   A.  Well, actually, even yesterday I felt about that.  I wanted

13   to say that yesterday.  It's just that, you know, I just cannot

14   be doing the right thing, perfect thing all the time; so that

15   is why I want to mention it here today.

16   Q.  Mr. Guo, we're going to show you from JX4 your first

17   deposition, page 152, line 13 to 25 and 153, line 3 to 7.

18           (Video being played)

19           Mr. Guo, that was your testimony in your August 2019

20   deposition, correct?

21   A.  Yes.

22   Q.  And it was truthful, right?

23   A.  Well, it was at the request that the CIA and FBI told me

24   that I should not have said that.  Well, on the one hand,

25   because the deposition, after we had finished the deposition,

L4MPEAS2                         Kwok - Cross

1    all the proceeding have been uploaded to the internet.  It can

2    be viewed; so for the safety, I need to say that.  And also, I

3    made a promise to the FBI and CIA; so I have to say that.

4    Q.  Mr. Guo, did you -- were you less than truthful in your

5    deposition because the deposition was uploaded to the internet?

6            MR. KLEIN:  Your Honor, can I confer?

7            THE COURT:  Yes.

8            (Pause)

9            Why don't I ask you to stay apart from one another a

10   little more, counsel, staying away.

11           MR. KLEIN:  Understood.

12           (Pause)

13           THE COURT:  Mr. Greim, while they're conferring, how

14   much longer do you think you have?

15           MR. GREIM:  Your Honor, I'm sorry to say I think I've

16   got another hour.  I've got to go through some other clips.

17           THE COURT:  Since it's 12:58, we're going to reconvene

18   at 1:55, and that way, Mr. Klein can confer with his client

19   socially distanced.  And we'll see you a little before 2:00.

20   Make sure you're all ready to go at 1:55.

21           MR. KLEIN:  Thank you, your Honor.

22           (Luncheon recess)

23

24

25

L4MKEAS3

                        AFTERNOON SESSION

1

2                         2:00 PM

3           (Trial resumed)

4           THE COURT:  Welcome back.

5           As an initial matter, I'd like to ask the interpreter

6    to interpret in Chinese, and in a way that can be heard over

7    the phone, what I'm about to say.

8           I'd like to remind every participant in this

9    proceeding, both those in court in front of me and those

10   listening over the telephone, of one important point:  It is

11   illegal for anybody to rebroadcast, or retransmit, or record

12   the proceedings in court today.  I have issued an order to that

13   effect.  Anybody who violates it will be subject to penalties

14   for civil or criminal contempt.  I have ordered the marshals to

15   investigate those who were retransmitting and recording the

16   proceedings earlier today.

17          Does plaintiff's counsel have anything for the Court

18   before we start again with Mr. Guo's testimony?

19          MS. CLINE:  No, your Honor.

20          THE COURT:  Mr. Greim, anything for the Court?

21          MR. GREIM:  No, your Honor.

22          THE COURT:  Okay.

23          Mr. Guo, you're reminded that you are under oath.

24          THE WITNESS:  (In English)  Yes, your Honor.

25          THE COURT:  Mr. Greim, you may inquire.

```
1              MR. GREIM:  As an initial matter, I actually thought
2    we had a pending question, and I had actually forgotten what it
3    was.  I wonder if we could have -- your Honor, with your
4    permission, can we have it read back?
5              THE COURT:  Would the court reporter read back the
6    pending question.
7              (Pause)
8              THE COURT:  I've got it in front of me.
9              Mr. Guo, before the break, you were asked a question,
10   and then there was a break for you to consult with your
11   counsel.
12             Here is the question:  Were you less than truthful in
13   your deposition because the deposition was uploaded to the
14   internet?
15             MR. KLEIN:  Your Honor, can I be heard briefly?
16             THE COURT:  Yes.
17             MR. KLEIN:  I'm just letting the Court know that --
18             THE COURT:  Well, no, let me interrupt you.
19             MR. KLEIN:  Yes.
20             THE COURT:  If it's a matter of asserting the
21   privilege --
22             MR. KLEIN:  Yes.
23             THE COURT:  -- you can assert the privilege.
24             MR. KLEIN:  That's all I was going to suggest, your
25   Honor, that on this line of questioning, he's going to assert
```

L4MKEAS3

1   the privilege.  I was just letting the Court know.

2              THE COURT:  It's up to the witness whether to assert

3   the privilege.

4              THE WITNESS:  Yes, your Honor.

5              THE COURT:  What's your answer to the question?

6              THE WITNESS:  Okay.  I am asserting my privilege.

7              MR. GREIM:  Thank you, your Honor.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     GUO WENGUI,

2    CROSS-EXAMINATION CONTINUED

3    BY MR. GREIM:

4    Q.  Mr. Guo, have you had -- first of all, is your apartment at

5    the Sherry-Netherland Hotel?

6    A.  I'm invoking the Fifth Amendment.

7    Q.  Mr. Guo, do you live on Fifth Avenue?

8    A.  I invoke the Fifth Amendment.

9    Q.  Okay.  I'm not going to ask you what you own or anything

10   about the ownership.  I'm just asking, do you live in an

11   apartment at the Sherry-Netherland?

12   A.  Yes.

13   Q.  Have you had cameras and microphones installed in that

14   apartment?

15   A.  Well, it's installed in the entire hotel building.  It's

16   their own facility.

17   Q.  So you have the capability to record audio and visual in

18   your apartment, don't you?

19   A.  No.

20   Q.  You've never had the capability of recording audio and

21   video in your apartment at the Sherry-Netherland?

22   A.  I don't quite understand what you mean, "capability."  What

23   does it mean?

24   Q.  Have you been able to make video and audio recordings?

25   A.  Well, it really depends on under what kind of circumstances

 1   and also what kind of equipment, so I really can't answer that

 2   question.

 3   Q.  T&M Security installed the microphones and cameras in your

 4   apartment, didn't they?

 5   A.  What company?

 6   Q.  T&M Security.

 7   A.  Where is this company?  Where is this company?

 8   Q.  The question -- Mr. Guo, I'm asking you a question.  My

 9   question is:  Is T&M Security the company that installed

10   cameras and microphones in your apartment?

11   A.  Well, I don't know about the name of the company; however,

12   I do know that it was before the true owner of this

13   apartment -- prior to the true owner of this apartment, they

14   have already installed the microphone and the camera.  I myself

15   did not.

16   Q.  Have you had audio and video recordings made in your

17   apartment?

18   A.  You mean I myself?

19   Q.  Have you caused them to be made, either by yourself or by

20   someone else?

21   A.  I did not myself, and I did not cause -- I did not ask

22   other people to do that either.

23   Q.  Did you fortuitously find that recordings, video and audio

24   recordings, had been made of meetings in your apartment?

25            THE INTERPRETER:  I'm sorry, counsel, I --

1               MR. GREIM:  I'll just rephrase.

2     BY MR. GREIM:

3     Q.  Did you find that video and audio recordings had been made

4     of meetings in your apartment at sometime?

5     A.  Yes.

6     Q.  And were these recordings of your meetings with Liu

7     Yanping?

8     A.  Yes.

9     Q.  And you actually shared the video and audio recordings with

10    some journalists at the Wall Street Journal, didn't you?

11    A.  I actually found it from online, and then I shared them

12    with the journalists.

13    Q.  So, the video and audio recordings you did not make in your

14    own apartment appeared online; is that correct?

15    A.  Well, it was at the beginning, actually.  At the very

16    beginning, they appeared on some Twitter that's from the CCP or

17    some of the videos in China.

18    Q.  And so you then discussed those videos and showed them to

19    journalists at the Wall Street Journal, right?

20    A.  I showed them the portion, a small portion of it, that

21    downloaded from online.

22              MR. GREIM:  Let's pull up Exhibit 34.

23    Q.  I'm showing what's been marked as Exhibit 34.

24              MR. GREIM:  Could you enlarge it even further to show

25    that picture?

1          I'm going to ask the interpreter to please read to the

2     witness the caption to the picture that I am about to read.

3          "Chinese Businessman Guo Wengui, at his apartment at

4     the Sherry-Netherland Hotel in Manhattan, where he says he was

5     visited by officials from Chinese Ministry of State Security."

6     Then there is a photo credit from the Wall Street Journal.

7     BY MR. GREIM:

8     Q.  My question is:  Mr. Guo, do you recall meeting with the

9     journalist?

10    A.  Yes.

11    Q.  And is this a picture of you at your meeting with the

12    journalist?

13    A.  Yes.

14          MR. GREIM:  Let's go to the next picture.

15          Please enlarge it a little bit.  That's about as good

16    as it can get.  There we go.

17          Once again, I'm going to read the caption, and I am

18    going to ask the translator to interpret it.

19          "Mr. Guo shows a video he says he made of the visit to

20    his home by Chinese state security officials."  That's the

21    caption, and then the photo is credited to the Wall Street

22    Journal.

23          THE WITNESS:  So, you were saying that I show a video

24    to whom?

25

1    BY MR. GREIM:

2    Q.  Mr. Guo, I was reading the caption, and I asked the

3    interpreter just to read it back to you.  That's all that's

4    happened so far.

5             Mr. Guo, my question is:  Is this a picture of you

6    showing a video to the journalists?

7    A.  Yes, that is the video I downloaded from online.

8    Q.  Well, Mr. Guo, the caption says that you said you made this

9    video of the visit.  Do you deny that?

10   A.  I'm not denying that now.  The video that I was showing

11   here, I downloaded it from online, and that video was made in

12   my apartment.

13   Q.  Mr. Guo, where is the video now?

14   A.  I don't know.  I actually have never seen the entire video.

15   Q.  Mr. Guo, you received a subpoena, didn't you, for every

16   audio or video recording you had of meetings with Chinese

17   officials?  Do you recall that?

18   A.  Yes.

19   Q.  And you produced nothing in response to that subpoena,

20   correct?

21   A.  I believe that we have provided everything.

22   Q.  I guess, I take it, you did not keep a copy of the video,

23   did you?

24   A.  No.

25   Q.  This was a pretty important meeting that you wanted to

Case 22-3118, Document 2032-3, Filed 07/25/23, Page 53 of 187 Case 22-5007, Document 283-3, Filed 07/25/23, Page 72 of 18

168

L4MKEAS3                          Guo - Cross

1    publicize, though, wasn't it?

2    A.  Well, I did not want to publicize it, and, in fact, I did

3    not know that there was such a video.  That day, we had a

4    meeting several hours all day, and I did not know that -- why

5    that it would appear on the internet, I did not know why it was

6    actually the CCP would have it, and, even today, I did not see

7    the entire video.  That's all I know.

8    Q.  Mr. Guo, is this the meeting in which you say that Chinese

9    officials tried to kidnap you and take you back to China?

10   A.  Well, you know, that day, we had the meeting for many

11   hours.  What you said is really just a little bit of what

12   happened.  They have mentioned many times during that meeting

13   that they have a lot of resources in the United States, and

14   they have a lot of business, a lot of organizations, and a lot

15   of businesses that can have me kidnapped and have me killed, so

16   that I need to work with them.  And during that meeting, they

17   had me sign a lot of blank paper and guarantee letter, and,

18   also, that I need to make sure that my wife and daughter return

19   to China at the end of August.  So, many things happened during

20   that meeting.

21   Q.  Well, Mr. Guo, do you deny now that they actually tried to

22   take you out of the building?

23   A.  I don't quite understand what you mean.

24   Q.  Mr. Guo, isn't it true that, in this meeting, your wife

25   made dumplings for the officials.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L4MKEAS3                          Guo - Cross

```
 1    A.  Yes.

 2    Q.  And then you walked the group out of the building, correct?

 3    A.  Yes.

 4    Q.  Now, you testified yesterday that a transcription of what

 5    we called -- well, first of all, a document that we've called

 6    video 8 was an accurate recording of part of the meeting, and

 7    then you walked through the transcript of video 8, which was

 8    Exhibit 114B, starting at page 1362, with Eastern Profit's

 9    counsel.

10          Do you recall that?

11    A.  Yes.

12    Q.  And just to refresh your memory, I'm going to bring up at

13    least the first page.  This is a bit of a long transcription.

14    Here we go.

15          As you can see, it started right here.  It comes from

16    a YouTube link that you had actually viewed at your deposition.

17    Do you recall that?

18    A.  Yes.

19    Q.  At your deposition, you also viewed a second clip, which

20    was video 9, and it was also transcribed.  It starts at page

21    1377.

22          MR. GREIM:  Can you go there, Becka.

23    Q.  Do you recall that?

24    A.  Yes.

25    Q.  So, Mr. Guo, I'm going to ask you a few questions both
```

1    about video 8 and also about video 9, the transcription of

2    which starts at SVUS 1377.

3              And you will see, Mr. Guo, the very beginning remarks

4    that were recorded in this clip, at least, come from Liu

5    Yanping, and he begins the conversation by talking about the

6    19th National Congress.

7              Do you see that?

8    A.  Yes.

9    Q.  And then he says, "Let's get this thing over with.  Why

10   have many cases?  Besides, it's not a big issue.  I calculated

11   your assets.  After you pay the debts, you'll still have some

12   assets left."

13             Did I read that right?

14             THE INTERPRETER:  Counsel, where is it?  I actually

15   don't --

16             MR. GREIM:  Okay.  Let me back up and be a little more

17   careful here.

18   BY MR. GREIM:

19   Q.  So, do you see, Mr. Guo, on the far left-hand column, there

20   is a timestamp that tells you the section of the video that the

21   transcriber and interpreter is quoting from?  Do you see that?

22   A.  Yes.

23   Q.  The next column has the speaker?

24   A.  Yes.

25   Q.  The third column has just a transcription of what was said

1   in Chinese, correct?

2   A.  Yes.

3   Q.  And then the fourth column has the English translation,

4   right?

5   A.  Yes.

6   Q.  And yesterday, you spoke with Eastern Profit's attorney

7   using this transcription, right?

8   A.  Yes.

9           MR. GREIM:  So I would just ask the interpreter to

10  just interpret what I say from English into Chinese.

11  Q.  So, Mr. Liu Yanping, at the 30-second mark, says, "The

12  conditions of your capital and asset are still very good.  Your

13  company is one of the private enterprises.  To write it this

14  way, to be honest, it's rare in China they do that."

15          Do you see that?

16  A.  Yes, I see that.

17  Q.  And then you responded, "That's too little.  See, how is it

18  possible my debt is only making up 20 percent of my assets."

19  Correct?

20  A.  I don't understand.  Are you asking me a question?

21  Q.  Yes.  I'm asking you whether you said that.

22  A.  I'm invoking the Fifth Amendment.

23          MR. GREIM:  Now, yesterday, this witness answered

24  questions off of this exhibit.  I don't understand -- well, let

25  me state that differently.  I think I do have to object to the

1    good-faith basis here, because, otherwise, we can't do anything

2    else with this exhibit.

3              THE COURT:  Mr. Klein, what's the basis?  He did

4    answer questions about this precise transcript and this precise

5    meeting.

6              MR. KLEIN:  I believe, your Honor, he indicated that

7    he sees his initials there.  He was asked whether he saw his

8    name on the first page; I think he said he did.  I think the

9    original question that was asked, I think, do you see this.  I

10   don't have any problem with him answering that he sees that,

11   that he sees his initials there.  The document is what it is,

12   it speaks for itself, and he can certainly confirm what he sees

13   on the document.

14             I think if he's being asked today to affirm whether he

15   did or didn't say something that is in the document, I think he

16   has a right to invoke if he doesn't want to make that

17   affirmation in court, but I understand that, certainly, if he's

18   asked about whether certain things appear on the document next

19   to his name, he can certainly answer that.

20             THE COURT:  Do you have the testimony from yesterday?

21             MS. DONNELLI:  Yes.

22             MR. GREIM:  We do.

23             THE COURT:  If somebody can tell me where it is, I'll

24   pull it up.

25             MR. GREIM:  Your Honor, it seems to be on page 630.

1              THE COURT:  Okay.  My law clerk is helping me find it.

2              MR. GREIM:  He does seem to have answered whether

3     those things were said to him.

4              THE COURT:  Just give me a moment.

5              (Pause)

6              THE COURT:  Mr. Klein, he was asked, at page 629 of

7     this transcript, whether it reflects a conversation back and

8     forth between Mr. Liu and then the witness, is that his

9     understanding.  He answered that question yes.  So he didn't

10    just subscribe to his name being on it, but he said it was the

11    conversation.

12             And then on page 630, after being read a portion of

13    the transcript, he was asked the question did he, referring to

14    Mr. Liu, say those things to you, and he answered yes.  I don't

15    see how this is anything other than a selective invocation and

16    impermissible invocation of the Fifth, but why don't you

17    explain it to me, how he can agree that a portion of the

18    conversation -- actually, the whole -- that whole segment was a

19    conversation he had, but then when Strategic's counsel asks the

20    question, refuse to answer the question.

21             MR. KLEIN:  Your Honor, I think we've been -- I don't

22    have the transcript in front of me, I don't see exactly what

23    the portion is that he was asked about, but I believe that --

24    can I just -- I'm not clear on -- when someone is asked about a

25    transcript and says, you know, I see that my name appears

 1      there, I'm not denying my name is there, or that this was a

 2      conversation between us, and then answers a question to

 3      indicate that the transcript reflects that something was

 4      said -- maybe I'm splitting a hair too finely --

 5              THE COURT:  No, I understand the distinction.

 6              MR. KLEIN:  Yes.

 7              THE COURT:  And I will have somebody give you the

 8      transcript, but when the question is did he say those things to

 9      you, full stop, he's not being asked the question, do you see

10      your name on the document; he's being asked an historical

11      question, did he say those things to you.  He was represented

12      by counsel, by you, he invoked a whole bunch of times; he did

13      not invoke to that question and the preceding question.

14              MR. KLEIN:  Right.

15              THE COURT:  So I'll ask the transcript be given to

16      you, I'll let you confer with your client --

17              MR. KLEIN:  Okay.

18              THE COURT:  -- but you're going to have a tough burden

19      to explain to me why there's a good-faith invocation.

20              MR. KLEIN:  Understood, your Honor.

21              THE COURT:  Can somebody give Mr. Klein pages 629 to

22      630?

23              (Pause)

24              MR. KLEIN:  I took a look at those pages, your Honor.

25              I understand -- your Honor's correct, he was

1    recollecting a portion of the conversation.  It's a portion of

2    the conversation that related to a totally different topical

3    area.  It related to questions or a discussion about

4    safety-related issues.  I think the portion of the transcript

5    that they're asking about now is a portion -- it's a different

6    topical area, and it's a question about his assets.  That's

7    something that we have been invoking on across the board.

8             I understand what the Court is saying, that this is

9    the same conversation that he had with a particular individual,

10   but it touched upon many topics, and we're invoking with

11   respect to certain topical areas.  And even with respect to

12   those topical areas, I don't have a problem with him confirming

13   that it's obviously on the page, but the invocation is -- I

14   don't view it as selective because I view it as tethering

15   consistently to certain topical areas that we've been invoking

16   on.

17            THE COURT:  Let me see the limits of your invocation.

18            Will he invoke as to questions about whether he, in

19   fact, said the things that the transcript reflects that he

20   said?

21            MR. KLEIN:  I think with respect to certain select

22   areas, the intention is for him to invoke across the board with

23   regard to those select areas.  And I'm leery of starting to try

24   to slice the bread thinly, and maybe I'm mistaken, your Honor,

25   but to the extent that he starts answering any questions about

1   those topical areas, we now veer towards a scenario where an

2   argument can be made that we're creeping towards waiver, and I

3   think it's cleaner to stay away from that.

4          To the extent that there are questions about topics

5   that we're not invoking, I'm letting him answer freely.  And

6   we're not denying that the page says what it says, but I think

7   we're in a little bit -- I understand what the Court is saying,

8   which is that the text is obviously on the page, but from my

9   perspective, it's on the page, it's there, no one is denying

10  it's there, and the witness has certain constitutional rights

11  that I'm seeking to protect.

12         THE COURT:  All right.

13         Mr. Greim, here's what I'm going to do:  You're going

14  to have to ask the questions, the witness will invoke as to

15  what the witness invokes, and if you ask me to at the end of

16  his testimony, I will leave his testimony open to address

17  whether there's a good-faith invocation of the Fifth.  If

18  there's not a good-faith invocation, we'll come back, and he

19  will answer the questions that you've posed to him as to which

20  he's invoked, and if there is, and I determine that there is a

21  good-faith invocation, then that will be it.

22         But this is too delicate a matter for me to resolve

23  right here.  Mr. Klein is right, to the extent that he says

24  that when you run the risk of trenching on constitutional

25  rights, you have to proceed with care.

1   BY MR. GREIM:

2   Q.  Now, Mr. Guo, yesterday, you testified to a portion of

3   this -- a small portion of this meeting in which your family

4   was discussed, correct?

5   A.  Yes.

6   Q.  But most of your conversation with Liu Yanping was about

7   your assets, correct?

8   A.  No.  So I need to -- no, I need to clarify one thing here.

9   You know, from that conversation that we had, there was a term

10  here, it says, "write like this."  I want to point out to you

11  where it is.

12       So, there was a term here, it says, "write like this."

13  That is to say that he had me writing multiple guarantee

14  letters according to his thought.

15       And, also, I want to tell you that there is this

16  transcript recording the audio that we've seen, but the thing

17  is that there is a large portion of time during the interview

18  that he took me out to the restroom, to the elevator, and had

19  conversation over there, and those conversations were actually

20  not being recorded.

21  Q.  Mr. Guo, let's turn to page 1363.  If you look down at

22  minute 3:30, you'll see Liu Yanping says, "It comes after

23  solving the matters.  After solving the problems, I can here to

24  assure you that first resolve the problems.  Second, after the

25  problem is solved, if you are still willing to make

1     contributions to our nation."

2              Is that what he said to you?

3     A.  Yes.

4     Q.  And then you responded, "Of course, I'm very willing to do

5     it, if conditions allow me to do so," didn't you?

6     A.  But I did not see this in the Chinese.

7     Q.  You have to go to the next page.

8     A.  Well, yes, I said that, but the thing is that it's also

9     said if the conditions allowed.  The condition I mention here,

10    I always insisted, was that CCP does not equal to China.  The

11    China, the nation that I recognize, is a China that has one

12    person, one vote, and that is a China -- my nation.

13             THE COURT:  Mr. Guo, I'm going to direct you to just

14    answer the questions that are asked.  You'll have an

15    opportunity, when Eastern's counsel asks you questions, to

16    clarify or add anything that you want to.

17             Go ahead, Mr. Greim.

18             THE WITNESS:  (In English)  Yes, your Honor.

19    BY MR. GREIM:

20    Q.  Now, Mr. Guo, by this time, your whole family was back in

21    New York, weren't they?

22    A.  When you're talking about the whole family, what does it

23    mean?  Who does it include?

24    Q.  Okay.  Let me be more specific.  Your wife, your son, and

25    your daughter were all back in New York by this time, weren't

1   they?

2   A.  No.  My son wasn't here.

3   Q.  He wasn't in China, though, was he?

4   A.  That's correct.

5   Q.  He was in London, wasn't he?

6   A.  Yes.

7   Q.  Mr. Guo, please turn to page 1387.

8          MR. GREIM:  Now, I'm going to read a long comment from

9   Mr. Guo, so I am going to break it in half, and I'm going to

10  ask Mr. Guo each time whether he said it.

11  Q.  Mr. Guo, you said, did you not, "He said, but Wengui, don't

12  go to extremes.  He was trying to persuade me not to go against

13  the Communist Party and Xi yesterday.  He asked me to admit

14  publicly that I'm not against the party.  I said I have never

15  said I'm against the party, neither have I said that I love the

16  party, but I hope I will be given a reason in the future not to

17  go against the party.  I hope one day I can close my Twitter

18  account and go back to my normal life without speaking up in

19  videos.  I will not make any decisions before the 19th National

20  Congress.  I want to see if after the 19th National Congress,

21  Meng Jianzhu and Wang Qishan have any positions.  If so, it's

22  impossible that they will let me off.  I know this too well."

23         That's what you said to Liu Yanping, isn't it,

24  Mr. Guo?

25         THE INTERPRETER:  So, I read it.

 1              THE WITNESS:  Yes.

 2   BY MR. GREIM:

 3   Q.  That's what you said, isn't it, Mr. Guo?

 4   A.  It was I repeating someone's phone call to me, and I was

 5   actually repeating what he said over the phone to someone, so

 6   that is why I said here "he said."

 7   Q.  Mr. Guo, this is a statement you made to Liu Yanping, isn't

 8   it?

 9   A.  I was repeating to someone what we said -- I said to Liu

10   Yanping.

11   Q.  And you say, Mr. Guo, in here that you told someone else,

12   "I have never said I'm against the party, neither have I said

13   that I love the party," right?

14   A.  But it's quite different from what you just said.  I said

15   I -- they want me to publicly admit that I don't go against the

16   Chinese Communist Party, so I said that I now did not say that

17   I am anti the CCP, but I did not say that I love the CCP

18   either.  That's what is said here.

19   Q.  And, Mr. Guo, you also said that if Meng Jianzhu and Wang

20   Qishan have any positions after that 19th National Congress,

21   it's impossible they will let you off.  That's what you said,

22   right?

23              THE INTERPRETER:  The interpreter was corrected.

24   A.  That's correct.

25   Q.  And then you went on:  "To be frank, I don't want to waste

L4MKEAS3                          Guo - Cross

1    your time.  If they're gone, and this generation comes into

2    power, people like you can still survive.  I will definitely

3    announce that I'm not against the party, President Xi, the

4    state, and the nation.  I will add that I'm not against the

5    Communist Party.  Then I will close my Twitter account, and

6    everything will turn around for the better, I'm sure.  I will

7    lead a normal life.  I'm happy about this."

8              You said that, didn't you?

9    A.  Well, you see, the thing is that I was on the phone with

10   someone else, so that is why it's mentioned here, if you are

11   here, and those people were no longer here, you, meaning the

12   person who's over the phone talking with me, and he's actually

13   someone of a high official in China.  So if he was here, and

14   those people were gone, that I will be willing to say I am not

15   against the Chinese Communist Party.  So I was repeating a

16   conversation I had with someone else.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  And, Mr. Guo, your concern was -- your ultimate concern was

2    whether Wang Qishan and his faction retained power after the

3    19th National Congress, correct?

4    A.  Yes, because over the phone, I said that those were the

5    people who were the dictators, and those were the people that

6    who were -- so they should not be our leader and that also they

7    were the corruption; so they should not be our leaders.

8    Q.  Now, Mr. Guo, you then told the Liu Yanping that if he

9    wanted to keep your son in custody, he could go ahead and do

10   it, didn't you?

11   A.  I don't see it here.

12   Q.  I'm sorry.  Let's go to page 1388.  Do you see at the top?

13   A.  So in here, I continue the conversation with the other

14   person over the phone, and it was actually talking about that

15   it was during May that my daughter and my wife came to

16   New York.  Liu Yanping took them to New York, my wife and my

17   daughter, in May, and he asked me to write this guaranteed

18   letter that my wife and my daughter will return to China in

19   August 27th, in fact, August 27th.  And so otherwise, they are

20   going to have my son detained.  And so I said, well, if my wife

21   and daughter, if they want to go back to China, let them go

22   back to China.  If they want to detain my son, let them do

23   that.  I would not compromise.

24   Q.  Mr. Guo, let's go to page 1394.  I want to direct your

25   attention to minute 31:30, and do you see, you say:  "They now

1   say that description was wrong.  If I have gotten into the

2   blind alley, I would not still be alive today.  I want to be

3   honest.  Today, I meet with you.  Let's not talk about grand

4   theories but just something practical.  Let's get down to

5   business."  Is that what you told Liu Yanping?

6   A.  What -- I did say something like that, but again, it was in

7   context with what I had said before.  It was -- I was repeating

8   something that was said.

9   Q.  Mr. Guo, you were bargaining with him over your assets,

10  though, weren't you?

11  A.  I am invoking the Fifth Amendment.

12  Q.  Well, Mr. Guo -- okay.  Let's just forge ahead.  Let's go

13  to page 1425.  As we're going there, let me just ask you a

14  couple of questions to clear up for the record.  Liu Yanping is

15  the Deputy Minister of State Security; is that correct?

16  A.  He is the Deputy Minister and then also the Secretary of --

17          THE INTERPRETER:  The Ministry?

18          (Pause)

19  A.  And then he is also the Secretary of the Disciplinary

20  Committee and also the Secretary of Law and Political

21  Committee.

22  Q.  Who was on the telephone with you at the same time as this

23  conversation?

24  A.  It was a general in the military in China who was arrested

25  already.

1     Q.   What was his name?

2     A.   Are you asking his name?

3     Q.   Yes.

4              MR. KLEIN:  Your Honor, can I confer with him?

5              THE COURT:  Yes.

6              (Pause)

7              How much more, Mr. Grimes?

8              MR. GREIM:  Your Honor, I think I have another half

9     hour.  I'm just going to withdraw the question to move on.

10             THE COURT:  Mr. Klein, your conference is done.  He's

11    withdrawing the question.

12             MR. KLEIN:  I'm sorry?

13             THE COURT:  Your conference is done.  The question has

14    been withdrawn.

15             MR. KLEIN:  Okay.

16    BY MR. GREIM:

17    Q.  Mr. Guo, on page 1425 now, I want to direct you to hour

18    one, minute 18 in the middle of the page, and do you see that

19    you -- or did you tell Liu Yanping:  "The first I have evidence

20    of Comrade Wang Qishan and his family holding huge amounts of

21    illegal acquired HNA shares, overseas real estate and also

22    evidence of his illicit relationships with women.  I will

23    report it to the party central committee."  You said that,

24    right?

25    A.  Yes.

```
 1  Q.  And we'll skip down a few lines.  You say:  "Secondly,
 2  besides Comrade Wang Qishan, I also have information about a
 3  few people in the Politburo and the former standing committee
 4  who hold large amounts of assets and illegal funds in sands
 5  deposits overseas."  Did you say that to Liu Yanping?
 6  A.  Yes.
 7  Q.  And you go on to say:  "They also have illicit sexual
 8  relations with woman and illegitimate children.  I want to
 9  report to the central committee in the spirit of supporting
10  President Xi's anticorruption campaign.  If President Xi
11  promotes them to the standing committee, I know two of them who
12  will enter the standing committee together.  Then President
13  Xi's life might be in danger."  Did you tell that to Liu
14  Yanping?
15  A.  Yes.
16  Q.  Isn't this the same type of information you asked Strategic
17  Vision to find a few months after this?
18  A.  Related.
19  Q.  And you wanted to use that information to oust Wang Qishan,
20  correct?
21  A.  No.
22  Q.  You wanted to oust his clique from within the CCP, didn't
23  you?
24  A.  No.
25  Q.  Let's pull up -- now we're going to switch gears, and let's
```

1    go to videos one and four.  We'll start video four.  For the
2    record, let's see, let's start with DX76A.  Frankly, you should
3    start with this.

4            MR. GREIM:  And, your Honor, this is DX76A, a
5    declaration by Xiaoping Chen, Sam Chen, executed on
6    January 17th, 2020.  That's the declaration for this Court, to
7    establish that two different YouTube links are true and correct
8    recordings of interviews that Mingjing, or Mirror Media, took
9    and kept in the course of its business as a TV station.

10           And so it's the very first of those items, the very
11   first YouTube link that he identifies on this August 31, 2017,
12   interview that we're going to be moving to next.  So I wanted
13   to begin with this declaration and move the declaration itself
14   into evidence.

15           THE COURT:  I'll take it subject to a motion to
16   strike, but what's the evidentiary basis for my receipt of
17   this?

18           MR. GREIM:  Well, your Honor, this is the custodial
19   affidavit to -- it's one of the ways to authenticate this video
20   which we're about to show the witness.

21           THE COURT:  Okay.

22           (Defendant's Exhibit DX76A received in evidence)
23   BY MR. GREIM:
24   Q.  Okay.  Let's now go ahead and pull up video four.  We're
25   going to put a video up that is transcribed at DX114B.  Don't

1    hit play just yet.  And the transcription begins at page 1320,

2    SBUS1320, of this video four, which is in Exhibit 114B.  I'm

3    not going to -- obviously, this is a 31-minute video.

4         Mr. Guo, you were shown this video at your deposition,

5    were you not?

6    A.  Yes.

7    Q.  And why don't we just play the first 30 seconds.

8         (Video being played)

9         Now, I had to find a good place to stop.

10        Mr. Guo, do you recognize this as the first page of a

11   letter that you wrote to Secretary Liu Yanping

12   A.  I must clarify one thing with you.  Some such letters I

13   have signed many times of the different versions of it, and

14   also, for the video that just played, there were many versions

15   of such video repeated online.  So I don't know whether this is

16   the real version, but anyway, this letter, it was I who

17   initiated it during the interview with Mirror Media.

18   Q.  So you came to Mirror to discuss the letter; is that

19   correct?

20   A.  No, not discuss this letter.  It was that because they

21   ask -- because my wife and my daughter, they want my wife and

22   daughter returned to China in three months, and I don't want my

23   wife and daughter returned.  So there was this letter, a

24   guarantee letter to exchange that.

25        And the premise of this letter that I show in Mirror

 1   TV is also because before that time, there were many versions

 2   of similar letters circulated around.  But if you were looking

 3   at this clearly, more carefully, the content of those letters

 4   were different.  Each page was different.  Some were saying

 5   this and some were saying that.  So I went to Mirror and showed

 6   them this is the letter.

 7   Q.  So, in other words, the letter that you brought to Mirror

 8   was the authentic letter, correct?

 9   A.  Well, the letter I brought to Mirror was the authentic one,

10   but I don't know the one that you're showing now, this one was

11   that one or not.  And I tell you that from March, April, all

12   the way to 27th of August, all together I have been made to

13   sign five different versions of such letter.

14          THE COURT:  Mr. Guo, please confine yourself to

15   answering the questions being asked.

16          THE WITNESS:  (In English)  Yes, sir, your Honor.

17          MR. GREIM:  Why don't we try to save a little time

18   here, and let's pull up -- rather than going through the video

19   version of this -- actually, let's go to the five-and-a-half

20   minute mark.

21          THE COURT:  Is there a transcript of this, Mr. Greim?

22          MR. GREIM:  There is.  This is the Exhibit 114B.  We

23   started on page 13:20 and now I'm flipping to page 13:21.

24   BY MR. GREIM:

25   Q.  So, Mr. Guo, we're going to look at a transcript as you

L4MPEAS4                          Kwok - Cross

1     walk through a letter page by page.  We'll try not to go

2     through your entire discussion to save time, but I want to

3     start at the very beginning of where you began to pick through

4     the letter.  So let's go to minute five-and-a-half.

5              (Video being played)

6              Okay.  We're going to have to pause because I'm afraid

7     we can't get it to go to a certain spot.  This is the only way

8     to do it.  I'm afraid we're going to have to go back to second

9     30.

10             And, Mr. Guo, the program actually does show each page

11    of the letter so that everyone can view it.  So we're just

12    going to have to go back and play it.

13             First of all, Mr. Guo, is this -- we paused it at, it

14    looks like, at about actually the 30-second mark is really what

15    that is.  Do you recognize your signature in the bottom

16    right-hand corner?

17    A.   Yes.

18    Q.   And is that the date, 8-26?

19    A.   Yes.

20    Q.   And let's go to the second page.  Just fast forward until

21    we get there.

22             (Video being played)

23             Okay.  This is the second page?

24    A.   Yes.

25    Q.   And does this appear to be the second page of the real

1   letter?

2   A.  Yes.

3   Q.  And that's your signature at the bottom, or your signature

4   at the bottom right-hand corner?

5   A.  Yes.

6   Q.  Let's go to the third page.

7           (Video being played)

8           Mr. Guo, please review that and let us know if this

9   appears to be the third page of the letter.

10  A.  Well, you see the top of this page is quite similar to some

11  of the versions circulated online, and so I don't quite

12  remember those several lines in the authentic letter right now.

13  So I cannot be so certain about the authenticity of this page

14  3.

15  Q.  Okay.  Let's go to page 4.  And do you recognize this page?

16  A.  I believe this is.

17  Q.  Okay.  Next page.  And do you recognize your signature on

18  this, the final page?

19  A.  This signature, it should be mine.

20  Q.  And, Mr. Guo, we didn't play it to save time, but while

21  each page showed on the program, you spoke about it and

22  discussed the contents, correct?

23  A.  We took most of it.

24  Q.  And in this letter you asked President Xi to assign you

25  tasks, didn't you?

1   A.  No, it wasn't what I wrote.  This is actually pre-written

2   by Liu Yanping.

3   Q.  Is it your testimony you did not say that in this letter?

4   A.  Well, the whole reason I went on to that program was to

5   tell that this is not a letter that I wrote, and what's inside

6   this letter was not my thought or my opinion.

7           You see, the thing is that it was pre-written, and so

8   I was asked to sign this letter under duress.  And as you can

9   also see, that at the end of this letter saying that Guo Wengui

10  submitted with reference -- with reverence.

11          The thing is, first of all, I couldn't have typed

12  those words.  I don't know how to type.  And also, that I had

13  already been applying for asylum; so this is just at the

14  juncture of the 19th of the Congress.  They asked me to sign

15  this letter they had written to show Xi Jinping faith.

16  Q.  I have no -- that was to be a "yes" or "no" question.

17          MR. GREIM:  Check interpreter, you can go ahead and

18  speak for the record so we can hear it.

19          MR. YANG:  I believe what the witness had said was the

20  asylum application was submitted on September the 9th -- I'm

21  sorry, September the 6th.

22          THE INTERPRETER:  The witness also says:  My asylum

23  case was submitted on September the 6th.

24  BY MR. GREIM:

25  Q.  Mr. Guo, you told President Xi that you never crossed the

1      red line in this letter, didn't you?

2                MR. KLEIN:  Your Honor, may I confer with my client?

3                THE COURT:  Yes.

4                (Pause)

5                Mr. Guo, do you need the question back?

6                THE WITNESS:  You mean the question just now?

7                THE COURT:  Yes.

8                THE WITNESS:  (In English)  Yes, your Honor.

9                THE COURT:  Would the court reporter read back the

10     question, please?

11               (Record read)

12     A.  No, because it was not written by me.

13     Q.  All right.  Let me rephrase the question.

14               On the third page of the letter that you signed, the

15     letter says:  "I didn't cross the red line," correct?

16     A.  I didn't write them.

17               THE COURT:  Mr. Guo, let me ask you a question.  Did

18     you sign a letter to President Xi saying "I didn't cross the

19     red line"?

20               THE WITNESS:  Yes, I did sign such a letter.

21     BY MR. GREIM:

22     Q.  And, Mr. Guo, "red line" meant that you didn't put out

23     videos and leak the national intelligence network, correct?

24     A.  No, that wasn't what I meant, and also, it wasn't my

25     meaning at all.  And none of these words were written by me.

1   Q.  But you explained, Mr. Guo, to the host exactly what that

2   meant, didn't you?

3   A.  So you see the thing is that I was exactly explaining the

4   opposite to the host.  You see, I -- this is the letter

5   prepared by Liu Yanping.  I could not have possibly written a

6   letter to Xi Jinping.

7           I was explaining to the host of the program that I was

8   forced to sign this letter, and then my -- what I thought is

9   completely the opposite of what is purported in this letter.

10  You see, I was forced to sign this letter because they want my

11  wife and my daughter returned to China after three months, and

12  also, at the time, I had already filed for asylum.  In China,

13  if I go back after I apply for the asylum, I would be sentenced

14  to death.

15  Q.  Okay.  So, Mr. Guo, is it your testimony that if we go

16  through this entire video, we have to find the place in here

17  where you tell Mr. Chen that you signed this letter under

18  duress?  You would have been very clear about that, right?

19          THE INTERPRETER:  Counsel, I'm not sure I understand.

20  You said where it's called and to find the place?  I didn't get

21  that.

22  Q.  Mr. Guo, we ought to be able to read through this entire

23  video, and we ought to be able to see somewhere in here where

24  you tell Mr. Chen that you signed this letter under duress,

25  correct?

1   A.  But I don't recall.

2   Q.  And so you would never have praised President Xi and say

3   that you wanted to have the opportunity to serve President Xi

4   in this interview, would you?

5   A.  Well, not necessarily because I may say that just to seek

6   to protect my family, and also, at the time, I was seeking

7   political asylum.  I was aware of the great danger that I was

8   in.

9   Q.  Now, you didn't actually apply for political asylum until

10  September.  You testified to that a few minutes ago, didn't

11  you?

12  A.  It was several days after I read this letter.  I saw this

13  letter, then I applied for asylum.

14  Q.  And because you signed this under duress, and you were

15  under such severe duress, you certainly would have shown this

16  letter -- you would have included this letter in your asylum

17  application, correct?

18  A.  Not necessarily because I have a lot of documents.  So it

19  may not have been included.

20  Q.  This maybe wasn't important enough to tell the U.S.

21  government about?

22  A.  Well, the thing is that I have provided a lot of documents

23  to the immigration lawyer; so whatever documents should be

24  submitted to the government, it was decided by the lawyer.

25  Q.  Including Lianchao Han, right?

1   A.  I don't quite understand what you mean by including

2   Lianchao Han.

3   Q.  We'll just move on.

4        Mr. Guo, when you -- you testified that you first

5   stayed in the U.S. permanently in early 2017; is that right?

6   A.  Yes.

7   Q.  I'm going to play a video for you.  This video is

8   transcribed at DX114B.  It's video one, and the transcription

9   goes from page 13:14 to 13:15.  I want you to listen carefully,

10  Mr. Guo.  Then I'll have a few questions for you about it.

11       (Video being played)

12       Now, for the record, there was a transcription playing

13  on the video because it came from YouTube.  Transcription of

14  the defendants, however, is done by the same -- by Jessica Chu,

15  who's transcribed everything.  That is what that 114B, page

16  13:14 to 13:15.

17       My first question to you, Mr. Guo, is:  Is that your

18  voice?

19  A.  I really cannot confirm that that is my voice because on

20  the internet there were a lot of imitations and then copy of my

21  voice.

22  Q.  Well, there were some very strong statements in that video,

23  don't you agree?

24  A.  So I can tell you a hundred percent what has been said

25  there was all fabricated.  They are all untrue, and even at the

1  end, he said the times three, times ten.  If such is true, then

2  why can't they say it out loud?  So it's all fabricated.

3  Q.  Mr. Guo, are you able to deny to us on the record, under

4  oath, that that is your voice in that recording?

5  A.  Well, first of all, whether that was my voice or not,

6  whether that was genuinely my voice or not is one problem.

7  Another thing is that it could be my true voice; however, they

8  could just have linked up different words of my voice and edit

9  it into this video.

10  Q.  Okay.  Let me ask a different --

11          THE COURT:  Mr. Guo, was that your voice on the video?

12          THE WITNESS:  Well, it's hard for me to identify

13  because there were so many of those things in circulation

14  online made like that.  I can't identify whether it was my

15  voice or not.

16  BY MR. GREIM:

17  Q.  Mr. Guo, you have many times attacked someone named Xi Nuo

18  online, correct?

19  A.  Well, I don't quite understood what you mean by attack.

20  Well, in fact, I was the one who had been attacked the most by

21  this Xi Nuo person.  But I don't know what you are saying when

22  you say attack.  What do you mean?

23  Q.  Do you have a nickname for this person, Xi Nuo?

24  A.  But it wasn't a nickname I gave him.  He was named Xi Nuo.

25  Q.  So that's what you call him?

1    A.  Yes.

2    Q.  Did you ever call him "Shit Nuo"?

3    A.  I am just a follower of what other people online called

4    him, but he called me something -- I'm not going into that

5    here.

6    Q.  Okay.  Is it fair to say you have a long-running dispute

7    with this man?

8    A.  He always -- he has been threatening me all along.

9    Starting from 2015, four years, five years now.  He always been

10   talking about it online, saying that having me killed, having

11   me captured to China.  He's been saying that.

12   Q.  Mr. Guo, you testified yesterday that you've done thousands

13   of online videos, correct?

14   A.  Yes.

15   Q.  Isn't one of your main activities attacking other Chinese

16   in the U.S.?

17   A.  But I have never initiated any attack to any Chinese

18   person.  Always it was that they who attacked me, then I

19   retaliate.

20   Q.  You have attacked many Chinese dissidents online, haven't

21   you?

22   A.  Well, the persons that I attacked, the persons they do

23   attack me, and the persons I have retaliation against, the

24   ratio in between these two numbers are very, very different.

25   Q.  Mr. Guo, you also used Guo Media to attack Chinese in the

1  United States?

2  A.  I have never attacked.  I was always on the side of

3  retaliation.

4  Q.  Do you own Guo Media?

5  A.  I'm invoking the Fifth Amendment.

6  Q.  Do you know who does own it?

7  A.  I'm invoking the Fifth Amendment.

8  Q.  Have you attacked Bob Fu online?

9  A.  I have never taken -- I have never initiated any attacks on

10  any person, only under attack under the natural protection do I

11  retaliate.  And also, there were millions of people or up to

12  million people online who were attacking me, and I wrote --

13  it's not possible that I would retaliate against every one of

14  them either.  So it is really the strategy of the Chinese

15  Communist Party, that unrestricted warfare; so it's containing

16  all of the government's reports.

17  Q.  Mr. Guo, have you encouraged your followers to harass Bob

18  Fu at his home?

19  A.  Impossible.

20  Q.  Have you encouraged your followers to harass Sasha Gong?

21  A.  Absolutely impossible.

22  Q.  Have you accused Sasha Gong of being a communist spy?

23  A.  It was after she called me a spy, then I retaliate.

24  Q.  What about Bob Fu, he's a pastor, isn't he?

25  A.  Absolutely not a pastor.  He's a communist party member.

1   Q.  Mr. Guo, isn't it a large portion of your activity since

2   that recording we saw in April 2017, to attack dissidents in

3   this country?

4   A.  It is purely lies.  So it is a complete lie because, as you

5   can see, that from April 19th that 99 percent of my activities

6   was engaged in activities against the communist party, exposing

7   them of the deeds that they have done in Hong Kong, Xin Jiang,

8   and Tibet.  I'm exposing the truth about the virus.  I would

9   not have time to engage in any of such activities on attacking

10  the dissidents or overseas dissidents.

11  Q.  Mr. Guo, in that recording we just listened to a few

12  moments ago, you said you wanted to go back to China after

13  showing merit, right?

14  A.  I don't recall that.

15  Q.  And, Mr. Guo, you wanted to get research in evidence in

16  order to take out the Wang Qishan faction of the CCP, correct?

17  A.  No.

18  Q.  And you wanted to do that so you could return to China and

19  resume your former way of life; isn't that right?

20  A.  Absolutely impossible.  If that is the case, CCP would not

21  have threatened or arrest my family.  So as long as CCP and Xi

22  Jinping exist, it's impossible for me to return to China.

23  Q.  And you've never stopped working with the MSS, have you,

24  sir?

25  A.  I don't really know what you're talking about.  It's

 1    absolutely rubbish.

 2              MR. GREIM:  I have no further questions.

 3              THE COURT:  Okay.  We'll take our afternoon break for

 4    ten minutes.  How long do you expect to have, Ms. Cline, on

 5    your redirect examination?

 6              MS. CLINE:  Probably about 15 minutes.

 7              THE COURT:  Okay.  And then we'll move to the last

 8    witness.

 9              Why don't you wipe off the podium.

10              We're adjourned.

11              (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Before we get started with testimony

2   again, I've got a warning that I want the Chinese interpreter

3   to repeat in Chinese out loud.

4        I have issued an order prohibiting any rebroadcast or

5   recording of these proceedings.  Anybody who violates that

6   order is subjecting themselves to the risk of penalties for

7   civil or criminal contempt.

8        Thank you.

9        Mr. Greim, you're standing up.  You have something for

10  the Court?

11       MR. GREIM:  Yes.  I just wanted to briefly say, before

12  I closed, I figured I better do it right this minute.  I failed

13  to move the entry of DX 114, video 9, translation and the

14  translation for videos 1 and 4; DX 37, which is actually videos

15  1 and 4; and DX 35, which is a translation of the letter.  I

16  understand that Eastern Profit's counsel reserves all

17  objections, including to authenticity.

18       THE COURT:  Okay.  Those will be received subject to a

19  motion to strike.

20       (Defendant's Exhibits 35, 37, and 114 received in

21  evidence)

22       THE COURT:  Mr. Greim, are you leaving open any

23  questions with respect to the invocation of the Fifth, or are

24  we beyond that issue?

25       MR. GREIM:  Your Honor, we're not going to raise any

L4MKEAS5                          Guo 168 - Redirect

```
 1 │ issues with the good-faith nature of the objections.  I think
 2 │ we probably will want to argue for an adverse inference on
 3 │ certain of those questions.
 4 │           THE COURT:  Very well.
 5 │           Ms. Cline, you may inquire.
 6 │ REDIRECT EXAMINATION
 7 │ BY MS. CLINE:
 8 │ Q.  Mr. Guo, Mr. Greim asked you some questions about
 9 │ statements you allegedly made in support of the CCP in 2017.
10 │           Did you, in fact, speak out publicly against the CCP
11 │ in 2017 and 2018?
12 │ A.  Yes.
13 │ Q.  Were there videos of your statements published on social
14 │ media?
15 │ A.  Yes.
16 │ Q.  I would like to show you a compilation of video clips in an
17 │ exhibit that we've marked as Plaintiff's Exhibit 52.  Before I
18 │ do so, I'd like to know whether you had an opportunity to
19 │ review the video compilation in advance of your testimony
20 │ today?
21 │ A.  Yes, I did.
22 │ Q.  Does the compilation contain accurate excerpts of the
23 │ videos actually posted on social media in 2017 and 2018?
24 │ A.  Yes.
25 │           MS. CLINE:  Can we please play PX 52.
```

1            (Video playback)

2            MS. CLINE:  Can we look now at PX 53, please.

3            THE COURT:  Are you offering PX 52?

4            MS. CLINE:  I was just going to tie it together with

5    53, if I may, your Honor?

6            THE COURT:  Okay.

7    BY MS. CLINE:

8    Q.  And, Mr. Guo, as to PX 53, are the YouTube links for this

9    Exhibit 53 reflective of where the full-length videos shown in

10   the clip were actually posted?

11   A.  Yes.

12           MS. CLINE:  Your Honor, plaintiffs offer PX 52 and 53.

13           MR. GREIM:  No objection, your Honor.

14           THE COURT:  Okay.  Received.

15           (Plaintiff's Exhibits 52 and 53 received in evidence)

16   BY MS. CLINE:

17   Q.  Mr. Guo, I have one more video to show, and it's shorter.

18   This is a video of you.  It's a single video, but it's an

19   excerpt from a video you made in July of 2018 in an exhibit

20   we've called Exhibit 70A.

21           Did you have an opportunity to review that in advance

22   of your testimony today?

23   A.  Yes.

24   Q.  Other than being shortened, so that we could play it in

25   court, is it an accurate reflection of a video that was posted

1   on YouTube?

2   A.  Yes.  My answer is yes.

3           MS. CLINE:  Can we please play Exhibit 70A.

4           (Video playback)

5           MS. CLINE:  Your Honor, plaintiffs offer

6   Exhibit P 70A.

7           THE COURT:  That's received subject to the motion to

8   strike.

9           (Plaintiff's Exhibit 70A received in evidence)

10  BY MS. CLINE:

11  Q.  Mr. Guo, what do you think of the implication that you're

12  really a supporter of the Chinese Communist Party posing as a

13  dissident?

14  A.  Well, if I were truly the supporter of the Chinese

15  Communist Party, then the registered spy in the United States,

16  Elliott Broidy and Bruno Wu, they did not need to spend so much

17  money and then to lobby a president or like Higginbotham from

18  the DOJ to send me back into China.

19          MS. CLINE:  No further questions.

20          THE COURT:  Anything further?

21          MR. GREIM:  No, your Honor.

22          THE COURT:  Okay.

23          You are excused, Mr. Guo.

24          THE WITNESS:  So I don't need to say anything more?

25          THE COURT:  No.

L4MKEAS5

1          Thank you, Mr. Klein.

2          MR. KLEIN:  Thank you, your Honor.

3          THE WITNESS:  Thank you, your Honor.  Thank you,

4   everybody.

5          (Witness excused)

6          THE COURT:  Next witness?

7          MR. GREIM:  Your Honor, I think the next witness is

8   the only witness being called by -- I know the next witness is

9   the only witness being called by Strategic Vision.  We've made

10  special arrangements for her, and so they are bringing her in

11  as we speak.

12         THE COURT:  Very well.

13         Mr. Greim, for planning purposes, how long is your

14  direct of her?

15         MR. GREIM:  I will tell you I've radically pared it

16  back, and so I think it may be about 30 minutes.  That's my

17  goal.  There should be few, if any, exhibits.

18         THE COURT:  We're going to finish her today.

19         And, Mr. Greim, that will be the last witness; is that

20  right?

21         MR. GREIM:  That's right, your Honor.

22         THE COURT:  And, Ms. Cline, I take it, you don't have

23  any further witnesses?

24         MS. CLINE:  Correct.

25         MR. GREIM:  Your Honor, I discussed one thing with

```
 1    Ms. Cline during a break.  I wonder if we could use this quiet
 2    time to cover that issue about the 8:00 o'clock?
 3                THE COURT:  Sure.
 4                MR. GREIM:  We wanted to know whether the Court would
 5    maybe extend tonight's 8:00 o'clock deadline to a time
 6    tomorrow?
 7                THE COURT:  That's fine.  What time would you suggest
 8    tomorrow?  Did the two of you talk about it?
 9                MR. GREIM:  Actually, it may need to be a bit later
10    tomorrow because we will be in the air on the way to Missouri.
11    Maybe --
12                THE COURT:  Do you want to make it 8:00 o'clock
13    tomorrow?  Does that work for you?
14                MR. GREIM:  That would be great.
15                THE COURT:  Does that work for plaintiff?
16                MS. CLINE:  Yes.  Thank you, your Honor.
17                THE COURT:  Has the witness entered the courtroom?
18                THE WITNESS:  Yes.
19                THE COURT:  Ma'am, you can step forward, please.
20                THE WITNESS:  Sure.
21                THE COURT:  You'll have a seat in the jury box.
22    That's what we're using as the witness box.
23                THE WITNESS:  Thank you.
24                THE COURT:  You'll keep your mask on; you'll sit
25    there.  Keep your mask on.
```

```
 1                THE WITNESS:  Question:  Do I need to keep a double
 2   mask or just one?
 3                THE COURT:  Is it a KN95?
 4                THE WITNESS:  It's not.
 5                THE COURT:  I think you need to keep both masks on.
 6                THE WITNESS:  Okay.  Thank you.
 7                MS. CLINE:  Your Honor, I'm sorry, may I correct
 8   something I said?  I just wanted to remind the Court, we still
 9   have the outstanding issue of Ms. Wang's testimony.
10                THE COURT:  Yes, that's correct.  I forgot about that.
11                Mr. Greim, I think, for the record, you should
12   formally indicate the name of the witness you're calling, and
13   then call the witness, and then we'll swear her in.
14                MR. GREIM:  Your Honor, the defendants call Sasha
15   Gong, G-o-n-g.
16                THE COURT:  Good afternoon, Ms. Gong.
17                Matt, would you please swear the witness.
18                THE WITNESS:  Good afternoon.
19    SASHA GONG,
20        called as a witness by the Defendant,
21        having been duly sworn, testified as follows:
22                THE WITNESS:  Sasha Gong, Dr. Sasha Gong, last name
23   G-o-n-g, first name S-a-s-h-a.
24                THE COURT:  Mr. Greim, you may inquire.
25
```

1  DIRECT EXAMINATION

2  BY MR. GREIM:

3  Q.  Ms. Gong, what is your profession?

4  A.  I'm a journalist, a scholar, and a writer, now a filmmaker.

5  Q.  How long have you been a journalist?

6  A.  Twenty-five years.

7  Q.  And you said you were a scholar.  How long have you been a

8  scholar?

9  A.  For decades.

10  Q.  Do you know Guo Wengui?

11  A.  Yes.

12  Q.  How do you know him?

13  A.  I interviewed him on April 17 -- April 17, 2017.

14  Q.  And you also conducted an interview of him before the

15  formal interview, correct?

16  A.  The 17th was the formal interview, it's about a day and a

17  half, and I formally interviewed him on TV on April 19, 2017.

18  Q.  We'll come to that in a moment.  We'll get into the details

19  later.

20         Have you also been an intermediary introducing Guo to

21  other people?

22  A.  Yes, to other journalists.

23  Q.  And did you eventually join the board of an entity promoted

24  by Guo?

25  A.  Yes, I did.

1   Q.  What was that entity?

2   A.  Rule of Law Society.

3   Q.  Did you become an acquaintance of Guo's after your Voice of

4   America interview in the spring of 2017?

5   A.  Yes.

6   Q.  Let's talk a little bit about your background, and we'll

7   take just a few minutes here.

8           Where were you born?

9   A.  Beijing, China.

10  Q.  When?

11  A.  1956.

12  Q.  Just as a youth growing up in China, what was your

13  relationship with the government?

14  A.  My family was persecuted.  In fact, I'm fourth generation

15  of American.  I have two great grandfathers who came to this

16  country as railway workers, and later they were sent back to

17  the States.  And my grandfather also used to be American

18  citizen and came back to China, stayed 20 years -- 20 years in

19  jail as accused of being an American agent.

20  Q.  Ms. Gong, were you yourself ever imprisoned?

21  A.  Yes.

22  Q.  When was that?

23  A.  1977 to 1978.

24  Q.  What for?

25  A.  For antigovernment speech.

1   Q.  Did you have any higher education in China?

2   A.  In China, it's a little difficult to explain.  I have three

3   years of education before -- from '62 to '65, my family got

4   into political trouble.  We were sent to countryside.  I worked

5   as a peasant, a farm laborer, and later I worked as a worker, a

6   factory worker.

7   Q.  Dr. Gong, I want to fast forward and focus.  Did you go to

8   university in China?

9   A.  Yes.  I went to -- I took an exam after I was released from

10  jail.  The political situation change, and I took exam, and I

11  got to picking university, the top university, in China.  I got

12  two degrees there, a Master's and a B.A.

13  Q.  Did you immigrate to the U.S. at some point?

14  A.  Yes.  In 1987.  I came here first as a visiting scholar,

15  and then I enter the Ph.D. program at Harvard University.

16  Q.  Did you end up getting your Doctorate at Harvard?

17  A.  Yes.  I got my Doctorate degree in 1995.

18  Q.  In what?

19  A.  Sociology.

20  Q.  Did you ever become a U.S. citizen?

21  A.  Yes.  2001, March 29.  And that day, I was lucky.  I was in

22  a big dinner with President Bush with TV journalists.  I got

23  the personal congratulations from President Bush, which is on

24  C-SPAN.

25  Q.  Dr. Gong, after graduating from Harvard, just if you could

1    very briefly walk us through your career?

2    A.   Yeah.  I taught a few years at UCLA, and after that, I took

3    a job.  I entered journalism, I took a job at Radio Free Asia.

4    And after that, I actually work as -- work for AFL-CIO as a

5    China expert, and quickly after a few years at AFL-CIO, I took

6    some time off and campaigned for Hillary Clinton for her

7    presidential campaign.  And after that, I joined Voice of

8    America as its China director.

9    Q.   What is Voice of America's mission?

10   A.   Voice of America is a federal agency established in 1942 to

11   promote truth, news, freedom, and democracy around the world.

12   Q.   Now, do you still work there?

13   A.   No.  I was terminated.

14   Q.   And why was that?

15   A.   Because I conducted the Guo interview live, and the

16   interview was interrupted by Voice of America.  They thought I

17   should not have that interview, and so they thought that was

18   insubordination.  Also, that interview was approved by my

19   supervisors.

20   Q.   Dr. Gong, are you still in litigation with Voice of

21   America?

22   A.   Yes.

23   Q.   So, aside from your -- well, so you're no longer there.

24   What are you doing professionally today?

25   A.   I'm making films.  I'm making -- I'm finishing one film,

1  which is five episodes, almost five hours' story, of dissident

2  movements around -- under communism.  So I interviewed people

3  like Lech Walesa, Landsbergis was the first president of free

4  Lithuania, and other founders of movements.

5  Q.  Dr. Gong, are you involved in any policy organizations

6  relating to China?

7  A.  Yes.  I'm a founding member of the committee for present

8  danger — China, which is a policy group in -- based mostly in

9  Washington.

10  Q.  I'm sorry, a partisan group?

11  A.  No, a policy group.

12  Q.  Oh, policy group?

13  A.  Policy.

14  Q.  What is the goal of that group?

15  A.  To warn the United States of America the danger of China,

16  of Communist China intervening with our -- well, economy,

17  politics, and everywhere.

18  Q.  Dr. Gong, have you stayed in contact with dissidents in the

19  U.S. since immigrating and becoming a citizen?

20  A.  Oh, yes, a lot.  And although I have to say I participate

21  in fewer -- I rarely participate in dissident movement events

22  because as a journalist, I kept a little distance, but I know

23  most people.  They know me.

24  Q.  Do you know Chen Guangcheng?

25  A.  He's a very dear friend.

L4MKEAS5                         Gong - Direct

1   Q.  Is he a dissident?

2   A.  Yes.  And he was, what people called him, the blind lawyer.

3   He spent years while helping people to fight the one-child

4   policy and force abortion policy, and he was imprisoned more

5   than once for a few years, and they tortured him.  And later,

6   he escaped to the United States, and the Time Magazine put him

7   on the cover page.

8   Q.  How about Bob Fu, do you know him?

9   A.  Bob Fu is also a good friend.  And Bob Fu escaped from

10  China as a Christian, and he became a pastor in the United

11  States, and he also got a Doctorate degree, and he started an

12  organization called China Aid, which helps Christians to escape

13  dictatorship.

14  Q.  Dr. Gong, have you done anything to help dissidents when

15  they first come to the U.S.?

16  A.  Oh, a lot.

17  Q.  What do you do?

18  A.  Well, besides helping them to tell their stories in the

19  press and help to -- well, driving, translating, helping them

20  to get college application or whatever, all sort of things.

21  Q.  Have you observed that many dissidents, once they get here,

22  stay in contact with each other?

23  A.  Yes.

24  Q.  Over the decades, have you observed that there is any such

25  thing as a dissident -- Chinese dissident community in the

 1   United States?

 2   A.  Yes.

 3   Q.  In your line of work, do you continue to closely follow

 4   events in China?

 5   A.  Yes, very much.

 6   Q.  And let me ask you about communication with China for a

 7   moment.

 8          Do you still have communication electronic

 9   communications over email or phone with anyone on Mainland

10   China?

11   A.  I'm trying to do as little as possible because -- as little

12   as possible.

13   Q.  Why is that?

14   A.  Because the Chinese government monitor everything.  This is

15   what happened:  When the --

16   Q.  Dr. Gong, I just want to -- we'll try to do more of a

17   Q&A --

18   A.  Sure.

19   Q.  -- as we move into some more details, okay?

20   A.  Sure.

21   Q.  By the way, what's the country code for China?

22   A.  86.

23   Q.  And let me ask you about the email address with qq.com.

24   Are you familiar with that?

25   A.  Very much.

1    Q.  Is that a particular email provider?

2    A.  QQ is owned by Tencent the biggest telecommunication

3    company in China, which have already reach the monopoly status.

4    And Tencent is the company, you know, totally controlled by the

5    Chinese government, with a lot of Chinese internet police stage

6    on there.  This is not my imagination, this is the press China

7    proudly announce they have ordered internet police stage there.

8    Q.  Dr. Gong, do you know anyone in China who would dare to use

9    open phone lines and QQ email addresses to administrate web

10   pages for true dissidents?

11   A.  No, unless they want to commit suicide.

12   Q.  Okay.  Let's just move on.

13        Dr. Gong, in your line of work, do you have to make

14   your own personal judgments about which Chinese living in the

15   U.S. are reliable dissidents and which have some degree of

16   loyalty to Beijing?

17   A.  Yes.

18   Q.  Okay.  Why?

19   A.  Dissidents usually -- all the dissidents have a track

20   record.  The track record's that what you have done in China,

21   what make you a dissident in China.  You can't suddenly become

22   a dissident without any track record, without incidents, stuff

23   like that.  I can quickly make, you know, China -- I always

24   joke, China is like a small country, everybody knows everybody

25   else; if you graduate from certain school, like which school,

1    and you have schoolmates, and people can vouch for you, and you
2    have done something.  Mostly, dissidents are helped in the
3    States; they have done a lot within China.  So I say, which
4    county, which city, what you have done?  We have a record, the
5    press report, people report, court cases.  It's not that
6    difficult to trace.
7    Q.  Dr. Gong --
8                THE COURT:  Ms. Cline?
9                MS. CLINE:  Your Honor, objection.  To the extent I
10   think part of the answer was based on personal knowledge and
11   part sounded like expert testimony on what a dissident is, we
12   just object; Ms. Gong was not offered as an expert witness.
13               THE COURT:  Yes, I will receive that subject to a
14   motion to strike.
15               I don't know how much more you have on the line that
16   trenches into expert testimony.
17               MR. GREIM:  No, we're not offering her as an expert.
18   We don't offer any expert.  We're offering -- to the extent she
19   has a lay opinion, it is intended to be based on her personal
20   experience and not on any special method or expertise.
21               THE COURT:  That, I think, will be the question if
22   there's a motion to strike.
23   BY MR. GREIM:
24   Q.  Dr. Gong, when did you first become aware of Guo Wengui?
25   A.  February 2017.

1  Q.  There were a series of interactions.  Did he come to

2  request an interview with VOA?

3  A.  Yes.  My senior correspondent came to me asking me for

4  approval to interview Guo.

5  Q.  And, ultimately, did you grant approval?

6  A.  I told him I need to do some study, and it took me a couple

7  of weeks to study and gave him my approval.

8  Q.  And so did Mr. Guo have any requests for the interview?

9  A.  Yes.  Mr. Guo came back and told the senior correspondent

10  that he wanted me to interview him in person.

11  Q.  And so what did you do to prepare for that interview?

12  A.  I spent days to read the news reports and the various

13  reports, and to listen to his previous interviews, and to ask

14  around of that.  So I thought I understood the situation before

15  I went to interview him.

16  Q.  Did you then first interview Mr. Guo off the record?

17  A.  Yes.  I gave him the precondition if he wants to be on my

18  live interview, I have to preinterview him for a lengthy time.

19  Q.  How long did that go?

20  A.  Altogether, it's between 16 to 18 hours, I believe.

21  Q.  Where did you do that?

22  A.  In Guo's apartment.

23  Q.  And where is that?

24  A.  Sherry-Netherland Hotel.

25  Q.  Did you meet Yvette Wang there?

```
1   A.  Yes.

2   Q.  How did Guo -- or did Guo introduce her?

3   A.  Guo introduce her as his assistant.

4   Q.  Did you meet Chunguang Han there?

5   A.  Yes.

6   Q.  How did Guo introduce him?

7   A.  He introduce me as his cook.

8   Q.  Did you see him cooking?

9   A.  He cook us some noodles, yes.

10  Q.  Did Guo use any nickname to refer to Chunguang Han?

11  A.  Not a nickname; that's a Chinese way to addresses to young

12  person, is that Little Han.

13  Q.  Did the interview -- did the live interview ultimately

14  occur?

15  A.  Yes.

16  Q.  And did the Chinese government do anything that was

17  significant to you leading into that interview?

18  A.  Yes, several.  First, on April 17, two days before the

19  interview, the Chinese Foreign Ministry summoned VOA Beijing

20  correspondent and talk them blanket, if you do the interview --

21  we have two people there, and some of them, he said, you

22  should -- you cannot do the interview, if you do this, it will

23  severely harm the relationship between VOA and the Chinese

24  government.

25              THE COURT:  I'm sorry, they summoned you and somebody
```

1    else?

2              THE WITNESS:  Not me.  Actually, my Beijing

3    correspondent.  So that's the Chinese Foreign Ministry, two

4    officials, came to our Beijing office.

5    BY MR. GREIM:

6    Q.  Dr. Gong, what impact did that have on you?

7    A.  Oh, yeah, in that case, if a Communist government wants you

8    not to do something, perhaps you should do it.  And the next

9    day, on the 18th, April 18th, the Chinese embassy in Washington

10   called my home office, VOA, for perhaps two or three dozens of

11   times, every several minutes, demanding us to stop the

12   interview.  And on that evening, April 18th, on the evening --

13   the Interpol Beijing office issued a red notice against

14   Mr. Guo.

15   Q.  And this certainly made it appear to you -- well, let me

16   strike that.

17              So, Dr. Gong, the interview happened.  Did it go to

18   its full completion?

19   A.  No.  It was supposed to be one hour formal interview and

20   two hours of internet chat, which is very popular format,

21   internet chat.  So it was supposed to have a chat happen in two

22   hours.  But when the interview entered its second hour, on

23   minute 15, and I got a call from Washington, I got a text

24   message from Washington, ordering me to immediately stop it.

25   Meanwhile, my producer in Washington, the remote producer in

1   Washington, was ordered to pull the plug so we could not
2   broadcast.
3   Q.  Dr. Gong --
4            THE COURT:  Hold on for a second.
5            Ms. Gong, when you're answering questions, please try
6   to slow down a little bit just so the court reporter can get
7   your words down.  It's very important for us.
8            THE WITNESS:  No problem.  I apologize.  And I --
9   also, English is my third language, so I will try to be more --
10           THE COURT:  No need to apologize.  Just take your
11  time.
12           THE WITNESS:  Sure.
13           MR. GREIM:  I'll try to be fast; you take your time.
14  I'm afraid my own hurriedness is bleeding over a little bit.
15  BY MR. GREIM:
16  Q.  Dr. Gong, what did Guo do immediately after the interview
17  was cut short?
18  A.  Immediately when it's cut, Guo clapped his hands like this,
19  great, great, great.  And he said, well, the interview may not
20  be the news but the shortcut of the interview is the great
21  news.  He was very happy with it.
22  Q.  What did you see him do next?
23  A.  And then he took off his phone and made a long phone call.
24  Q.  Did he come back to you after the phone call?
25  A.  About an hour later, yes.

Gong - Direct

1    Q.  What did he say?

2    A.  He said someone -- someone inside the intelligence service

3    in Beijing, his friend, told him the shortcut was caused by an

4    agent in -- within the Voice of America who has a name and --

5    should I disclose that name?

6    Q.  No, we're not asking for that Dr. Gong.

7    A.  No.  So he came back to tell that's the name, that's the

8    person.  I was sitting with my -- five of my reporters; we have

9    six people there together.  Immediately, I did this:  I said,

10   no, let's not talk about it because I know my duty; my duty was

11   to report back to the federal government.

12   Q.  Dr. Gong, remember, my question is just simply what Guo

13   did.  So, I understand you have a lot, but just to move through

14   quickly, though, try to just answer my question, if you could.

15   A.  Yes.

16   Q.  Did Guo, when he came back from the long phone call, did he

17   appear happy, distraught?  What was his appearance?

18   A.  He appeared quite happy.

19   Q.  Did he indicate to you he had just spoken to his parents at

20   all?

21   A.  No, he said he spoke to someone who's high-ranking official

22   in the intelligence -- in the Chinese intelligence.

23   Q.  Did he say that he had just heard from his parents while

24   someone was holding a gun to their heads?

25   A.  No, not at all.  I had five other reporters with me.

1   Q.  Did he appear shaken?

2   A.  No.

3   Q.  Let's talk about your interactions with Guo after the

4   interview.

5          Did you introduce him to anyone else?

6   A.  Yes.  A bunch of reporters from time to time.

7   Q.  Did you introduce him to Bill Gertz?

8   A.  Yes, I did.

9   Q.  How many times after the interview have you spoken with him

10  in person?

11  A.  You mean face to face?

12  Q.  Yes.

13  A.  Well, more than ten, less than twenty.

14  Q.  How often did you speak with him just either way, in person

15  or over the phone?

16  A.  Well, I would say a few times a month.

17  Q.  Do you feel you developed a friendship with him?

18  A.  Yes, I did.

19  Q.  In fact, did he give you anything, any materials from this

20  case?

21  A.  Yes.

22  Q.  What did he give you?

23  A.  He gave me a very thick folder.  It's like -- like four

24  inches thick, materials, and give me several copies and asking

25  me to pass that to General Spalding and to Michael Pillsbury in

1   Hudson.

2   Q.  Did he explain what it was he was giving you?

3   A.  He said some case.  I had no idea at that time.  At the

4   time, it's about somewhere in early or mid-2019.

5   Q.  Dr. Gong, has Mr. Guo ever paid you for any of your work?

6   A.  No.

7   Q.  Have you asked him to pay you money for any of your work?

8   A.  No.

9   Q.  Do you have any running dispute with Mr. Guo about whether

10  he would pay you for something?

11  A.  No.

12  Q.  Do you have any running dispute with Mr. Guo about whether

13  he would help finance any of your projects?

14  A.  No.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Gong - Direct

1    Q.  Did Mr. Guo ever introduce you to a man named William Je?

2    A.  Yes.

3    Q.  When was that?

4    A.  November 20, 2018.

5    Q.  What was the occasion?

6    A.  In that morning, Mr. Guo and Mr. Bannon have the joint

7    press conference.  In that press conference, they announced

8    that they were up a Rule of Law Foundation.  So they announce

9    that at lunchtime.  I got a phone call from that one.  He said

10   Mr. Guo invite you and Lianchao Han and Bill Gertz, the three

11   of us, to go to his apartment for lunch.

12   Q.  Okay.  And so did you --

13           THE COURT:  Again, let me caution you.  Please slow

14   down because we've got to make sure the court reporters get it

15   down, and I understand that English is not your first language;

16   so just take it slowly.

17           THE WITNESS:  Okay.  In case they have problem, just

18   interrupt me.  I'm fine.  My student does that all the time.

19   Q.  Okay.  So who else -- I take it you then attended the lunch

20   at Mr. Guo's apartment?

21   A.  Yes.

22   Q.  Who else was there?

23   A.  Mr. Bannon and Mr. William Je.

24   Q.  Was he formally introduced to you?

25   A.  Yes.  Mr. Guo introduced him to me that -- jokingly, that

1    "He's my money man.  Anything ask him about money."

2    Q.  So did Mr. Je have any reaction to this?

3    A.  He smiled.

4    Q.  Did you then speak to Mr. Je?

5    A.  Yes.  I spoke with Mr. Je.  Because I listened to him, in

6    one sentence I recognized his Cantonese accent.  So I spoke to

7    him in Cantonese.  I am Cantonese and that's my first language,

8    my mother tongue.  So, you know, when you speak your mother

9    tongue to someone, you disclose information usually.  That

10   happens.

11   Q.  What did Mr. Je tell you about himself?

12   A.  Mr. Je told me that he been in the investment banking

13   industry, and he also he works with a lot of Chinese government

14   at provincial level.

15          MS. CLINE:  Objection, move to strike as hearsay.

16          THE COURT:  Let me ask the question.  Actually, is

17   there any further testimony to support the admissibility of

18   this testimony?

19          MR. GREIM:  I would ask for how it affected a decision

20   that she made later, but that will happen a little bit later.

21          THE COURT:  I'm going to strike the testimony.

22   BY MR. GREIM:

23   Q.  Dr. Gong, did you ever speak with Mr. Guo -- and I'm not

24   asking for any research or reporting that you did, writing, but

25   did you ever speak to him about his work for the MSS?

1    A.  Yes.

2    Q.  And what did he tell you about that?

3    A.  He told me when he was in China, he worked closely and for

4    the MSS, which is the Chinese version of KGB.  And he said he

5    paid up -- he's a rich man.  He paid their personnel.  He let

6    them use their office space and that he paid for vehicles, the

7    cars that they use, and also in his most prestigious hotel, The

8    Beijing Tongzhou.  That's the name of the hotel.

9    Q.  Did he say why he did that?

10   A.  I haven't finished the other part.

11   Q.  I see.

12   A.  He said the space he gave them, the MSS, occupied a whole

13   floor in his hotel, work with him all the time.

14   Q.  Did he say why he did that?

15   A.  Why?

16   Q.  Yes.  Why would he make those resources available to the

17   MSS?

18   A.  Oh, yes.  He said the MSS, in turn, helping him to fight

19   his -- help him to fight his business rivalry, and to the

20   extent that they would write letters for him.  They would help

21   him to, you know, fight back and to gain business.  So he work

22   with him -- he work with MSS for business reasons.  He had a

23   specific agency who he worked, which he worked with, which is

24   No. 17 Bureau -- oh, no.  No. 17 Bureau of the MSS.

25   Q.  What does that bureau do?

1    A.  The bureau specifically, my understanding is that the

2    bureau specifically works with large businesses.

3    Q.  Was there any particular person at the MSS that Guo said he

4    was close to?

5    A.  Several, yes.  Three names come to my mind specifically.

6    First is last name Ma, M-a, first name, J-i-a-n.  The last name

7    M-a.  And Mr. Ma was the executive minister of -- the secretary

8    minister of the MSS, minister of public security.  And Mr. Ma,

9    from my understanding from Mr. Guo, was in charge of

10   international espionage and investing -- no, investigating

11   corruption.  That's the first one.

12          And second one Mr. Guo told me is person named, first

13   name, Y-u-e, last name D-z-h-a-n-g.  And he's a very

14   high-ranking official in MSS.  And he was Guo's business

15   associate.  What he did was he was in charge of hunting down

16   the Chinese dissidents, and there are several people right here

17   in New York City who were arrested or interrogated or tortured

18   by Mr. Dzhang right here --

19   Q.  That's not -- before we go off on a new area, can you tell

20   us the third person?

21   A.  The third person's name is Hui Gao.  Last name -- first

22   name H-u-i, last name Gao, G-a-o. and that was a borough chief

23   of the MSS investigative -- bureau of investigation, something

24   like that.

25   Q.  I'm sorry.  Go ahead.

1   A.  And Mr. Guo told me he was very close to Mr. Gao, and

2   Mr. Gao follows Mr. Guo around like his little brother.  And

3   Mr. Gao was later --

4           THE COURT:  No, no.  You're just being asked about the

5   conversation with Mr. Guo.  If you just try to limit your

6   answers to exactly what is asked.

7           THE WITNESS:  That was my conversation with --

8           THE COURT:  And try to keep your answers short and let

9   counsel ask follow-up questions.

10          THE WITNESS:  Okay.  Thank you.

11  BY MR. GREIM:

12  Q.  Dr. Gong, I know there's probably much more you could say,

13  but I want to move on to another topic.  Okay?

14  A.  Yes.

15  Q.  Did Mr. Guo tell you whether he kept ties with anyone in

16  MSS after he came to the U.S.?

17  A.  Yes, he did.

18  Q.  And who did he keep ties with?

19  A.  He said lots of high-ranking officials, but he did not give

20  me names.

21  Q.  And did he tell you whether those high-ranking officials

22  were giving him information so that he could whistle blow with

23  it?

24  A.  Yes, he did.

25  Q.  Did you observe him actually whistle blow with any of the

1   information he received from those officials?

2   A.  I observed him whistleblowing, but whether or not from

3   those officials, I cannot testify.

4   Q.  Did Guo ever criticize dissidents when he was speaking with

5   you?

6   A.  At that time, not much.  Some, but not a lot.  Not like

7   today.

8   Q.  Okay.  And you say "at that time."  Is this, when, in 2017?

9   A.  2017.

10  Q.  And so did his criticism of dissidents increase over time?

11  A.  Yes.

12  Q.  What did he typically claim about these dissidents when he

13  would criticize them to you?

14  A.  They work for the Chinese Communist Party, CCP.

15  Q.  Now, did you, yourself, believe that he could be correct?

16  A.  I doubt it.

17  Q.  Dr. Gong, did Mr. Guo eventually begin to criticize you?

18  A.  Yes.

19  Q.  When was that?

20  A.  After I resigned from the board of the Rule of Law Society,

21  which is on August or September 2019.

22  Q.  Now, you had just joined the Rule of Law Society a few

23  months before you resigned; is that right?

24  A.  Yes, I did.

25  Q.  And when you resigned, what did Mr. Guo begin to do?

1    A.  He began to attack me on the Rule of Law Foundation and

2    Rule of Law Society YouTube channels.

3    Q.  What did he say about you?

4    A.  He did not attack me as CCP in the beginning.  He attacked

5    me that I slept with a lot of men, and he attacked me by

6    calling me all sort of names, and later he attacked me for

7    saying I took lots of money from the Chinese intelligence to

8    separate him from Mr. Bannon.  Specific amount is $10 million.

9    Q.  Did you, in fact, take $10 million from the Chinese to

10   separate Mr. Guo from Mr. Bannon?

11   A.  No.

12   Q.  Dr. Gong, have you ever received physical threats from

13   Mr. Guo?

14   A.  Yes.

15   Q.  What did he say?

16   A.  He publicized lists in his social media, in his

17   broadcasting, on his own social media platform.  He

18   specifically list names, dozens of names.  I thought, I

19   believe, I was No. 8.  He asked people to attack -- to wipe us

20   out from the face of earth.

21   Q.  Now, did you take him as just joking?  Is this just a slang

22   term for a joke?

23   A.  No.  I took it seriously.

24   Q.  And are you aware of anyone on the list actually receiving

25   harassment from other individuals?

1    A.  Yes.  And followers of Guo held demonstration in front of

2    many people's houses, the residents.  It happened to more than

3    a dozen dissidents.

4    Q.  Has Mr. Guo made threats against Chen Guangcheng?

5              THE COURT:  What's the evidentiary foundation for

6    this?  This is all involving hearsay.

7              MR. GREIM:  Well, if Mr. Guo is -- I don't think

8    Mr. Guo's statements -- threats are hearsay.

9              THE COURT:  No, the witness observed them.

10             MR. GREIM:  Oh, and I --

11             THE COURT:  But make sure you lay the foundation.

12             MR. GREIM:  Yes.

13   BY MR. GREIM:

14   Q.  Okay.  I'm going to be very clear.  I don't want to know

15   about threats you heard about.  I want to know about threats

16   that you, yourself, have observed.

17   A.  Okay.

18   Q.  So have you seen threats that Guo has made against Chen

19   Guangcheng?

20   A.  Let me spell.  First name, G-u-a-n-g-c-h-e-n-g; last name,

21   C-h-e-n.  Chen Guangcheng.

22             Yes, Guo sent out in his broadcasting indicating that

23   Mr. Chen was not a real dissident, was working for the Chinese,

24   things like that.  Of course, I don't listen to every word he

25   says, but that's what he said a few times I heard.

1   Q.  Did he do the same thing with Bob Fu?

2   A.  A lot.  He said Bob Fu was CCP spy and work for the Chinese

3   government a lot, and he deserve to be wiped out.  So

4   consequently, dozens of Guo's followers, who are paid,

5   according to themself, to demonstrate for like six weeks in

6   front of Bob Fu's house.  So Bob Fu has to move out of -- move

7   out of the house.

8   Q.  Dr. Gong, let's move along.  One final question.  Has he

9   made any threats against you regarding your testimony this

10  week?

11  A.  Yes.  On Monday, when the court case start, he broadcast

12  for a whole hour, and on his on GGB platform.  He personally

13  made me -- not only call me names and call me CCP spy and all

14  sorts of very, you know, dirty words, and said I was

15  uneducated, I was low-life and something, something like that,

16  and also basically nick-named me like a whore, something like

17  that.  And so on Monday, one of Guo's followers, who --

18          THE COURT:  I mean, how do you know that the person

19  was a Guo follower?  I'm going to let you testify to what you

20  observed Mr. Guo do over social media, if you actually saw him,

21  but not beyond that.

22          THE WITNESS:  The follower is because Guo took a

23  picture with him yesterday that you are doing great, and that

24  he's perhaps now right in front of the courthouse.

25  BY MR. GREIM:

1    Q.  Dr. Gong, if Mr. Guo did not himself make the threat to

2    you --

3    A.  Yes, he did.

4    Q.  Then I only want -- then, please, only testify as to the

5    threat Mr. Guo made and not this other person.

6    A.  Okay.  Mr. Guo spent a whole hour on his social media

7    platform attacking me Monday, on Monday, the day the court case

8    began.  And since I've become a witness of this case, I have

9    received so much harassment.

10   Q.  Dr. Gong, have Mr. Guo's threats made you more or less

11   likely to speak out about him?

12   A.  A lot less.

13   Q.  Why?

14   A.  Any normal person would not want that much trouble.

15   Q.  What effect have his threats had on the Chinese -- have had

16   on the Chinese dissident community?

17              MS. CLINE:  Objection.

18              THE COURT:  Sustained.

19              MR. GREIM:  No further questions.

20              THE COURT:  Any cross?

21              MS. CLINE:  Yes, your Honor.

22   CROSS-EXAMINATION

23   BY MS. CLINE:

24   Q.  Dr. Gong, you understand that this trial relates to a

25   dispute between two companies, Eastern Profit and Strategic

1   Vision, right?

2   A.  Yes.

3   Q.  You don't know anything about Eastern Profit, do you?

4   A.  No, nothing.

5   Q.  You don't know a thing about Strategic Vision, do you?

6   A.  I know the owner.

7   Q.  Do you know anything about the contract between Eastern

8   Profit and Strategic Vision?

9   A.  No.  I have nothing to do with it.

10  Q.  You would agree that Chinese politics are complicated,

11  right?

12  A.  Yes, all politics are complicated.

13  Q.  And I think you said if the communist government wants you

14  to do something, you should do it, right?

15  A.  When did I say?

16  Q.  I thought you said it earlier this afternoon.

17  A.  I said the Chinese government want me to do something, I do

18  it?  No, I did not do it.  Please refer to the record.  That's

19  not what I said.

20  Q.  You did say you still have some communications with

21  mainland China, right?

22  A.  Yes.  My mom is 91 years old.  I have to call her from time

23  to time.

24  Q.  Does that mean you're a communist?

25  A.  What do you mean?  I call my mom from time to time.  That's

```
 1    all.  I never said whoever call their mom and father and the
 2    relatives is a communist.
 3    Q.  You first met Mr. Guo in April of 2017, right?
 4    A.  Yes.
 5    Q.  And from that point until sometime in 2019, you were on
 6    good terms with him, right?
 7    A.  Yes.
 8    Q.  In fact, you considered him your friend?
 9    A.  It's a yes or no question.  Yes, before November 18th --
10    November 20, 2018.  After November 20, 2018, I developed my
11    doubts.
12    Q.  And did there come a time, and I think it was 2019, the
13    fall of 2019, that Mr. Guo made some statements about you in
14    the media that you felt were untrue?
15    A.  He made a lot of statements that were untrue.
16    Q.  And he discredited a movie you were trying to make, right?
17    A.  He did not.  He did not even know what movie I was making.
18    Q.  As to the Voice of America interview you describe in your
19    testimony, you wrote some articles on that subject, right?
20    A.  Yes, I did.
21    Q.  All right.  Let's bring up PX44, please.
22              THE COURT:  Ms. Cline, what binder is this in?
23              MS. CLINE:  You should have a separate bound binder,
24    your Honor.
25              THE COURT:  Okay.
```

1    BY MS. CLINE:

2    Q.  Can you scroll to the top, please.  Sorry.  We have to

3    scroll for you but, Dr. Gong, you can see an exhibit we've

4    marked as Plaintiff's Exhibit 44.  Is this a copy of an article

5    or an opinion piece that you wrote for the Wall Street Journal?

6    A.  Yes.

7    Q.  And the date of this is May 23rd, 2017, right?

8    A.  Yes.

9    Q.  Can you turn the page, please.  I direct your attention to

10   the first full paragraph, I guess, the first sentence -- the

11   second sentence.  There's a name there, Mr. Chen.  Is that the

12   lawyer you referred to earlier in your testimony?

13   A.  Yes.

14   Q.  Okay.  And what you've written here says -- you refer to

15   Mr. Chen, and you say:  "The blind lawyer and human rights

16   activist who escaped to the U.S. a few years ago estimates that

17   the Chinese government spent 10.5 million spying on Mr. Guo

18   alone."  Do you see that?

19   A.  Not Mr. Guo.  On Mr. Chen alone.  On him, that's Mr. Chen.

20   Q.  Okay.  Got it.  Next paragraph down it says -- the

21   paragraph that starts: "In the preinterview"?

22   A.  Yes.

23   Q.  And the sentence says:  "Mr. Guo explained that he paid for

24   office rentals, private jets, surveillance systems, personnel,

25   and many other expenses."  Did I read that correctly?

 1   A.  Yes.

 2   Q.  And that was paying for expenses for whom?

 3   A.  For the MSS.

 4   Q.  Okay.  And you reported this in May of 2017, right?

 5   A.  Yes.

 6   Q.  Can you turn to PX46, please.  And PX46 is another article

 7   that you've written, correct?

 8   A.  Yes.

 9   Q.  And this one was published in the Washington Times in April

10   of 2018?

11   A.  Yes.

12   Q.  And let's turn to PX47, please.  And this is another

13   article that you wrote, and this one was published, I believe,

14   in something called the Daily Caller, and this was in May of

15   2018; is that right?

16   A.  Yes.

17   Q.  And can we turn to the third page of this article, please.

18   I direct your attention to the paragraph that starts with

19   "Meanwhile;" do you see that?

20   A.  Mmm, hmm.

21   Q.  You have to answer orally.  Do you see it?

22   A.  Yes, I do.

23   Q.  The second sentence says:  "Ma Jian, the former Deputy of

24   Minister of China's State Security, who was arrested for

25   corruption, admitted that he took millions from Guo."  Do you

1    see that?

2    A.  Yes.

3    Q.  At the time of the Voice of America interview, you mention

4    that Guo had already made a name for himself exposing massive

5    corruption among top Chinese communist leaders, right?

6    A.  Yes.

7    Q.  You can take that down.  In late 2018, you became aware of

8    the fact that Elliott Broidy was working with the Chinese

9    government to extradite Mr. Guo from the United States,

10   correct?

11   A.  I was told by Guo, yes.

12   Q.  Let's pull up Exhibit PX50, please.

13           Exhibit PX50 is an article you wrote in December of

14   2018, or an opinion piece?

15   A.  Yes.

16   Q.  Is that right?

17   A.  Yes.

18   Q.  And in it you describe e-mails written by Elliott Broidy

19   that you reviewed yourself, correct?

20   A.  Yes.

21   Q.  And you personally reviewed these e-mails, and then you

22   reported a description of the fact that with the elections

23   coming up, the Chinese government wanted to silence Mr. Guo's

24   criticisms of Xi Jinping, correct?

25           MR. GREIM:  Objection to the foundation, unless she's

1    just asking whether she said those words.

2              THE COURT:  Overruled.

3    A.  Please refer the paragraph to me.

4    Q.  I'd be happy to.  Let's go to the second page.

5              So at the bottom of page 2 of PX50, you're quoting an

6    e-mail that you read that Mr. Broidy wrote, correct?

7    A.  Yes.

8              MR. GREIM:  Objection, foundation.

9              THE COURT:  Overruled.

10   Q.  And I'll just read it, and then I'll ask you if I've read

11   it correctly.  So there's an italicized, bolded quote that

12   starts at the bottom of page 2:  "The country involved has good

13   relations with China and the United States and offered a

14   lucrative opportunity.  China wants to extradite from the

15   United States Guo Wengui, who is very critical of President Xi

16   Jinping and now living as a fugitive in New York City.  Guo

17   defrauded many investors, including Abu Dhabi for $3 billion.

18   We elections coming up in China this fall, the Chinese want him

19   to be kept quiet.  I believe a negotiation can take place,

20   which includes Abu Dhabi receiving its $3 billion back and Abu

21   Dhabi extraditing Guo from the United States to Abu Dhabi.

22   Later, Abu Dhabi would allow extradition to China.  I was told

23   that China would pay us, and if the facts are indeed correct, I

24   assume Abu Dhabi would feel obligated to pay a fee as well."

25   Did I read that correctly?

1    A.  You read that correctly, but those are not my words.

2              THE COURT:  With respect to the prior objection, I'm

3    not receiving the statement about what Broidy wrote for the

4    truth, it's just to impeach the witness.

5    Q.  That's a quote from you that you reported in December of

6    2018, based on your review of Mr. Broidy's e-mails, correct?

7    A.  Yes.  That's a quote from me, but I did not wrote that

8    sentence, as you said before.

9    Q.  If you can turn the page to page 5 of PX50.  Keep scrolling

10   down to the bottom, please.  And on page 5 you report the

11   following:  "In the following month, the Chinese government

12   made some crucial moves to extradite Guo, who applied for

13   political asylum as a resident of Hong Kong."  That's a

14   sentence you wrote, correct?

15   A.  That's a sentence I wrote.

16   Q.  And your article also talks about officials from the

17   Chinese government who came to visit Mr. Guo in the United

18   States, right?

19   A.  Yes, that's the minister level, the head, one of the top

20   officials in MSS.  It's like No. 2 in KGB, something like that.

21   Q.  And you're aware that Mr. Broidy was later indicted in

22   connection with a scheme to extradite Mr. Guo, right?

23   A.  Yes.

24             MR. GREIM:  Objection, foundation.

25             THE COURT:  Sustained.

1      THE WITNESS:  Okay.  So should I -- I'm sorry.  I

2   missed that.

3      THE COURT:  So when I sustain as to an objection, that

4   means that you don't have to answer the question.

5      THE WITNESS:  Yes.

6      THE COURT:  When I say "overruled," it means you

7   should go ahead and answer.

8      THE WITNESS:  I understand.  I just did not -- you

9   know, I was paying attention -- sorry about that, your Honor.

10      THE COURT:  Oh, that's okay.  Go ahead.

11      MS. CLINE:  Apologies if I misstated, your Honor.  I

12   was trying to lay a foundation.

13   BY MS. CLINE:

14   Q.  So the question is:  Are you aware, in the course of your

15   work as a journalist who is steeped in Chinese politics, that

16   Mr. Broidy was essentially indicted for his role in a scheme to

17   deport Mr. Guo?

18   A.  That, I was not aware.  I thought he was indicted for not

19   register as a foreign agent.

20   Q.  Did you ever read his indictment?

21   A.  I don't remember.  I don't recall I did.

22   Q.  Did you ever read his guilty plea?

23   A.  For failing to register an agent, I read the news.  I did

24   not read his plea.

25   Q.  And so your testimony under oath is that you never read his

 1   plea agreement?

 2   A.   No.

 3   Q.   Even though you're a reporter who's very interested in

 4   Chinese American politics?

 5   A.   That's Malaysian politics.

 6   Q.   In March of 2018, you wrote a letter in favor of -- let me

 7   interrupt myself.

 8           MS. CLINE:  Your Honor, before I forget, plaintiff

 9   offers Exhibit PX44, 46, 47 and 50.

10           THE COURT:  Those are received subject to motions to

11   strike.  I take it there's no objection as to the authenticity;

12   is that right, counsel?

13           MR. GREIM:  I'm sorry, your Honor.  I don't -- I don't

14   have them in front of me.

15           THE COURT:  They're all articles.

16           MR. GREIM:  We have no objection on the authenticity

17   of any of those, correct.

18           THE COURT:  Those are received subject to a motion to

19   strike.

20           (Plaintiff's Exhibits PX44, 46, 47 and 50 received in

21   evidence)

22   BY MS. CLINE:

23   Q.   Dr. Gong, when we were looking at the articles, the three

24   articles that you'd written about the Voice of America

25   interview, did you in any of those -- let me take a step back

L4MPEAS6                    Going - Cross

1     for a minute.

2           You testified, when Mr. Greim was asking you

3     questions, that upon the interruption of the interview, Mr. Guo

4     clapped his hands.  Did I understand you correctly?

5     A.  Yes.

6     Q.  And are you suggesting that you believe Mr. Guo was happy

7     that the interview got cut short?

8     A.  Yes.

9     Q.  In any of the three articles that you wrote on the Voice of

10    America interview and its interruption, did you report on the

11    fact that Guo seemed happy that it had got cut short?

12    A.  I was not supposed to because when, at the interview end

13    and the conversation becomes off the record, what happens

14    that -- I will take --

15          THE COURT:  Ma'am, you're just being asked a simple

16    question.  The question pertains to the articles you wrote.

17          THE WITNESS:  Yes.

18          THE COURT:  Let me have the court reporter read back

19    the question beginning with "In any of the three articles."

20          (Record read)

21          THE WITNESS:  No, I'm not supposed to.

22          THE COURT:  I'm going to strike everything after "No."

23          You can inquire on further examination.

24    BY MS. CLINE:

25    Q.  In March of 2018, you wrote a letter to the United States

```
 1  government in support of Mr. Guo's asylum application, correct?
 2  A.  Yes.
 3  Q.  Let's pull up Exhibit DX123, please.  So, Dr. Gong, we're
 4  showing you an exhibit that's been marked as DX123.  The first
 5  couple of pages are an e-mail trail, and then if we can scroll
 6  to the -- I guess it's the third page.  There's a letter, and
 7  then just before I ask you to identify it, can you scroll all
 8  the way to the end and just can I verify that that's your
 9  signature there?
10  A.  That is my signature.
11  Q.  Okay.  And is this the letter that you wrote in support of
12  Mr. Guo's asylum application?
13  A.  Look like so.
14  Q.  And were the statements that you wrote in this letter to
15  the United States government true when you wrote them?
16  A.  It is true.  It's still true.
17  Q.  Let's turn back to the first page of the letter.  So I
18  direct your attention to the second paragraph of the letter,
19  the second sentence.  It says:  "Mr. Guo worked closely for
20  years with Chinese intelligence services and claims he even
21  financed their operations for investigating overseas corruption
22  by Chinese government officials."  Do you see that?
23  A.  Yes.
24  Q.  And you supported his asylum application notwithstanding
25  that fact, correct?
```

1    A.   That's correct.

2    Q.   And in paragraph 2, you refer to Mr. Guo's social media

3    campaign to expose corruption; do you see that?

4    A.   Yes.

5    Q.   And in it you describe that Mr. Guo's postings have

6    hundreds of thousands of views; is that right?

7    A.   Yes.

8    Q.   And you say:  "As a veteran journalist, I believe that

9    Mr. Guo has successfully created a 'we media' phenomenon,

10   proliferating do-it-yourself investigative journalism

11   particularly regarding the Chinese government"?

12   A.   Yes.

13   Q.   That was a true statement, right?

14   A.   It's still true.

15   Q.   Let me turn the page.  The third page here, in, I guess,

16   the third sentence, you point out that as an experienced

17   journalist, you personally verified some of his major stories

18   with independent sources; is that accurate?

19   A.   Yes, very accurate.

20   Q.   And the next paragraph you say that Mr. Guo has challenged

21   the legitimacy of the communist leaders in China with so much

22   convincing evidence from inside the government itself; is that

23   true?

24   A.   Yes, at the time.

25   Q.   And let's go to paragraph 5.  And in paragraph 5 you

```
 1  describe an incident in which Mr. Guo was supposed to speak at
 2  the Hudson interview and the interview was cut off; is that
 3  correct?
 4  A.   That's correct.
 5  Q.   And your understanding was that the interview was cut off
 6  at the behest of the Chinese government, correct?
 7  A.   I learned from Mr. Lianchao Han, yes.
 8  Q.   And then let's go down to the next paragraph.  You make
 9  reference to the fact that Mr. Guo's social media accounts were
10  suspended, right?
11  A.   Yes.
12  Q.   And then you also make reference to the fact that the
13  PRC -- and that's People's Republic of China, right?
14  A.   Right.
15  Q.   And they had hired a bot army with fake accounts to make
16  complaints about Guo on YouTube; is that right?
17  A.   That's what I believed at the time.
18  Q.   And did you ever come to know that, in fact, Twitter took
19  down thousands of accounts attributed to the PRC that were
20  targeting Mr. Guo?
21  A.   Repeat your question again?  I don't understand.
22  Q.   Yes.  Did you ever come to find out that Twitter, in fact,
23  took down many, many accounts that were attributed to be owned
24  by the PRC and were critical of Mr. Guo?
25  A.   That's not a simple yes-or-no answer because my account was
```

1    taken down overnight, for one night, and was resumed.  So I

2    can't say about Twitter's motivation.

3    Q.  Did you ever read any articles about the fact that Twitter

4    had taken down a bunch of accounts belonging to the -- strike

5    that.

6         Did you ever read any articles regarding the fact that

7    Twitter had taken down accounts set up by the Chinese

8    government?

9    A.  I read Twitter, not articles.  On Twitter social media, not

10   from a credible newspaper or that.

11   Q.  I'm sorry, I can't remember if I covered this or not.  Go

12   back to the first page of the letter, please.  In the fourth

13   paragraph down, when you're discussing the preinterview that

14   you had with Mr. Guo, you talked about -- I think we looked at

15   it the same context of another article.

16        I just want to confirm in this letter that when you

17   wrote a letter to the United States government supporting his

18   asylum application, you were aware of the fact that he had paid

19   for office rentals and other things for the Ministry of State

20   Security in China, right?

21   A.  Yes.  He paid for their operation.  He paid for the spy

22   agency's operation.

23   Q.  And even though you knew that, you supported his

24   application for asylum, right?

25   A.  Yes, because like any KGB spies in the States and if they

1   defect, we support their asylum.

2   Q.  And you referred to the government that, in exchange for

3   payments that Mr -- or purchases that Mr. Guo made for the MSS,

4   the MSS protected him from political attacks by his business

5   rivals, right?

6   A.  Yes, that's what he told me.

7   Q.  And that's what you reported to the United States

8   government, correct?

9   A.  Yes, I did.

10  Q.  Can we turn to Exhibit PX59, please.  Sorry, it should be

11  PX59.  So the first pages of this document are just a

12  certification, but I'd like to turn to page 3 of the article.

13  I'm sorry.  Let's just look at the cover page first.

14          So this is a -- just scroll to the top, please.

15          So this is an article put out by the Stanford Cyber

16  Policy Center.  In your role as a journalist, have you ever

17  come across the Stanford Internet Observatory Cyber Policy

18  Center?

19  A.  No.

20  Q.  Skip two pages, please.

21          And this is just the concept I was asking you about

22  before.  I just want to put some context around it.  The first

23  sentence of the article says:  "On June 11th, 2020, Twitter

24  announced the takedown of a collection of 23,750 accounts

25  attributed to the People's Republic of China, with technical

|     |                                                                              |
| --- | ---------------------------------------------------------------------------- |
| 1   | indicators linking the operation to the same actor responsible               |
| 2   | for the network of 200,000 suspended in August of 2019."  Do                 |
| 3   | you see that?                                                                 |
| 4   | A.  Yes, I do.                                                                |
| 5   | Q.  Before today, did you have any knowledge that that was the                |
| 6   | case?                                                                         |
| 7   | A.  No.                                                                       |
| 8   | Q.  And then just one more question on this.  Skip down to the                |
| 9   | second paragraph.  The first sentence, it says:  "This                        |
| 10  | June 2020, PRC-attributed operation had considerable topical                 |
| 11  | overlap with the August 2019 operation, particularly concerning              |
| 12  | the pro-democracy movement in Hong Kong and attacks on Chinese               |
| 13  | billionaire Guo Wengui now in exile in the United States."  Do                |
| 14  | you see the sentence that I just read?                                        |
| 15  | A.  I did.                                                                    |
| 16  | Q.  In your role as a journalist steeped in Chinese American                  |
| 17  | politics, did this fact relating to Twitter takedowns come to                 |
| 18  | your attention?                                                               |
| 19  | A.  Came to my attention a few years ago when my account was                  |
| 20  | suspended, and I wrote to Senator Rubio and he -- well, he -- I               |
| 21  | know he called the White House, and my account was recovered in               |
| 22  | like ten hours or something like that.  And I paid some                       |
| 23  | attention, but at the time, I did not pay that much attention                 |
| 24  | because I was not working as a journalist but a filmmaker.                    |
| 25  | Q.  But are you -- you were aware, though, that Twitter took                  |

1   down PRC accounts that had been set up to attack Mr. Guo,

2   right?

3   A.  No.  I wasn't aware.

4   Q.  Let's go back to DX123, please.  So in your -- at the time

5   you wrote this letter in favor of Mr. Guo's asylum application,

6   you knew that he had basically been bribing the -- or paying

7   money to the MSS in exchange for favors from them, right?

8   A.  Yes, he told me that.

9   Q.  But then can you turn to the last page of the letter.

10  Notwithstanding that fact and all of the other things that you

11  mentioned in your letter, you recommended to the United States

12  government that he should be given asylum because he is a

13  "whistleblower with valor to fight against the most powerful

14  dictatorship in human history," right?

15  A.  Yes, I did at the time.

16          MS. CLINE:  No further questions.

17          THE COURT:  Anything further?

18          MR. GREIM:  Very, very shortly, your Honor.  Very

19  quickly.

20  REDIRECT EXAMINATION

21  BY MR. GREIM:

22  Q.  Ms. Gong, you just were shown Exhibit 123.  Could you look

23  at -- please pull up Exhibit 124.  As we're doing that, let me

24  ask you, who did you work with to prepare these letters?

25  A.  Lianchao Han.

L4MPEAS6                     Gong - Redirect

1    Q.  And did you send an initial liter to Lianchao Han?

2    A.  Yes, I did.

3    Q.  It's not the same as the letter we just looked at, is it?

4    A.  He made changes.

5    Q.  The initial letter you sent is at Exhibit 124; is that

6    correct?

7    A.  I have to -- I haven't seen the letter.

8    Q.  Scroll through.

9    A.  The initial letter is much shorter.  Yes.  That's the

10   initial.  That's the first letter.

11   Q.  So did Lianchao Han add substantial information to the

12   letter you finally submitted?

13   A.  Yes.

14   Q.  And you still did agree with the information in the final

15   letter, correct?

16   A.  Yes, I did.

17   Q.  I think you testified that you supported Mr. Guo because he

18   thought he was a defector?

19   A.  I thought he was a defector from Chinese spy agency.

20   Q.  Would you still write this letter today based on what you

21   know today?

22   A.  I will not.

23   Q.  Why not?

24   A.  I think his role changed after that, and since then, he

25   became a dissident hunter.

```
1    Q.  Have you withdrawn this letter?

2    A.  I reported to FBI, and I explained to FBI, and I explained

3    to U.S. government, including members of the United States

4    Senate, Foreign Relations Committee, Intelligence Committee and

5    United States House Foreign Affairs Committee and Intelligence

6    Committee and FBI officials and some others.  I wrote letters

7    to explain to them.  I reported to them and had communications

8    with them.

9              MR. GREIM:  Move the admission of Exhibit 124.

10             THE COURT:  Any objection to that?

11             MS. CLINE:  No, other than to say I was remiss to

12   offer 123 as well.

13             THE COURT:  Any objection to 123?

14             MR. GREIM:  No.

15             THE COURT:  123 and 124 are received.

16             (Defendant's Exhibits 123 and 124 received in

17   evidence)

18             MR. GREIM:  No further questions.

19             THE COURT:  Are there any further exhibits --

20   directing myself to plaintiff, to Ms. Cline -- that you need to

21   offer?

22             MS. CLINE:  Sorry.  We'd like to offer as well PX59.

23             THE COURT:  Any objection to PX59?

24             MR. GREIM:  Yes, we do object to that.

25             THE COURT:  Okay.  59 is --
```

```
 1              MR. GREIM:  Oh, your Honor, we actually did object to
 2      that before, and I think we maybe did not get a ruling on that
 3      in that initial batch of exhibits.
 4              THE COURT:  Okay.  59 is received subject to a motion
 5      to strike.
 6              (Plaintiff's Exhibit PX59 received in evidence)
 7              THE COURT:  Ms. Gong, you're excused with the thanks
 8      of the Court.
 9              THE WITNESS:  Thank you.
10              (Witness excused)
11              THE COURT:  All right.  Before we address Ms. Wang, is
12      there anything else that the plaintiffs have to offer in their
13      case?
14              MS. CLINE:  No, your Honor.
15              THE COURT:  Is there anything else the defendants have
16      to offer in their case besides the issue with respect to
17      Ms. Wang?
18              MR. GREIM:  No, your Honor.
19              THE COURT:  Okay.  Let me direct the question to
20      Mr. Greim with respect to Ms. Wang.  Mr. Greim, there were two
21      questions that were open with respect to Ms. Wang.  My question
22      to you is, given everything else that we've done in this case,
23      do you really need to ask those two questions?
24              MR. GREIM:  Your Honor, I think I do.  And I have to
25      say, I'm not exactly sure I'd break it down exactly as I did
```

```
 1    but I just want to focus on the point that I want to make,

 2    which is, I would either like the witness to say that, yes, she

 3    agrees that Han Chunguang does not have information as to the

 4    million-dollar deposit, that that was really true, or I would

 5    like her to say that, you know, the reason that she didn't give

 6    it was for a reason that I think is not a valid one, but I

 7    think I want to get one or the other of those answers.

 8              THE COURT:  Don't you already have it in the record

 9    that Han Chunguang — I mispronounced the name — that Mr. Han's

10    name was mentioned elsewhere in the interrogatory responses and

11    not in response to the question about who knew about the

12    Strategic agreement?  I mean, I really question at this point

13    whether you need it.

14              MR. GREIM:  I suppose if we can, I mean if we can --

15    because, frankly, I don't believe that the witnesses -- I don't

16    believe that her testimony was true, that she thought he did

17    have information and withheld it.  The thing that would have

18    gotten her in trouble, and the direction she was headed, I

19    think was incorrect.  And so that's why it's a little ironic in

20    that I don't want to establish that she falsely swore to that;

21    I want to rely on that.  And I suppose we can let it stand

22    because we have her sworn answer to those interrogatories that

23    that does not name Han Chunguang, so I'm talking myself into

24    it.  I don't think we do need to pursue it, your Honor.

25              THE COURT:  Okay.
```

 1                 Is there anything plaintiffs have?

 2                 MS. CLINE:  Yes, if I may be heard, your Honor.  I

 3     just making sure we're all on the same page.  Is the

 4     interrogatory at issue No. 12, which is one that asks to

 5     identify each person with knowledge of Eastern's demand for the

 6     return of the $1 million deposit?

 7                 THE COURT:  No, I think it's --

 8                 MR. GREIM:  It's actually a few of them.

 9                 THE COURT:  Yes, it's a number of interrogatory

10     responses, and the interrogatories are in the record.  I left

11     the testimony open because there was a question pending where I

12     thought that the witness was at risk of incriminating herself

13     in a crime and, for that reason, thought that before she had

14     answered the question or answered the question further, that

15     she should get the advice of counsel.  But the interrogatories

16     themselves are in evidence.  Let me just look at my copy of the

17     interrogatories.

18                 (Pause)

19                 THE COURT:  Is it also DX5, Mr. Greim?

20                 MR. GREIM:  It is, your Honor.  And --

21                 THE COURT:  And I think the question went to the part

22     of Interrogatory No. 5:  "Identify each person with knowledge

23     of the agreement, including the negotiation of the same."

24                 MR. GREIM:  That's right.  I don't think I asked every

25     one of these, once we hit our roadblock, but it would really be

1   No. 5.  Let me just start, I'll just start from the beginning.

2   I can make a record now or we can just argue it later because

3   we've got this in the record, but I mean it would be No. 4, No.

4   5, No. 10, No. 11, No. 12, No. 13, No. 14 and No. 16.

5           THE COURT:  Yes, I think you're just convincing

6   yourself you don't need to ask that question.

7           MR. GREIM:  I'm even more convinced now.

8           THE COURT:  All right.

9           MR. GREIM:  And I would say No. 17.

10          THE COURT:  All right.  It's all in evidence.  If it

11  were not in evidence, I'd receive it.  In any event, it's the

12  admission of a party opponent.

13          Is there anything else that you've got to add?  I

14  don't need argument as to which version of the facts are

15  truthful right now.  You'll argue that to me when we do closing

16  arguments.  But, Ms. Cline, is there anything else?

17          MS. CLINE:  I just think we have a difference of

18  opinion as to whether the answers are accurate as drafted.  I'm

19  somewhat concerned that there's this allegation that Ms. Wang

20  has committed perjury and we haven't given her a chance to

21  clean up the responses and to lay a foundation as to why we

22  think they're accurate.  I understand that the responses are

23  what they are, but it just feels --

24          THE COURT:  I left the record open only because there

25  were questions that Mr. Greim was not permitted to ask that he

 1   wanted to ask and not for the proponent of the witness to clean

 2   up the testimony.  So I think you'll have to live with the

 3   record as the record is.  I think I was pretty clear that we

 4   concluded the testimony, you concluded your examination,

 5   Ms. Cline, and nobody asked further questions to clean up the

 6   interrogatories, unless there's something else I'm missing.  Am

 7   I missing anything?

 8              (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L4MKEAS7

 1          MS. CLINE:  May I have a moment?

 2          (Pause)

 3          MS. CLINE:  Yes, so we purposefully didn't address

 4     that on redirect because your Honor left it open with the

 5     understanding that she should retain counsel, which she's done,

 6     so that's why we didn't follow up.

 7          THE COURT:  All right.  Well, listen, then is she here

 8     right now?

 9          MS. CLINE:  She is.

10          THE COURT:  Mr. Greim, are you ready to examine her?

11          MR. GREIM:  Your Honor, I actually don't have any

12     questions for her.

13          The other concern I have is that the record has been

14     available to people listening to this outside — the witness may

15     well have heard much more about this, and now she's had

16     counsel, they may have been working with her — I don't want to

17     put on a witness who has got a set of things -- I've got my

18     responses here, I have nothing more to ask for that was.  It's

19     the only reason we kept it open.  I have nothing more to go

20     into.

21          THE COURT:  Let me ask the question:  Is she going to

22     take the Fifth as to any of the questions about the preparation

23     of the interrogatories?

24          MS. CLINE:  She's not.

25          THE COURT:  Because I left it open, I'll permit her to

L4MKEAS7

1      testify.  I will tell both sides that this witness is a witness

2      who has very, very, very serious credibility issues, and I

3      sincerely doubt that there's anything that will happen in the

4      couple minutes that I'm going to allow you, Ms. Cline, to

5      rehabilitate her, but if you want, give it a shot.

6             MS. CLINE:  All right, your Honor, we'll leave the

7      record as it is.

8             THE COURT:  All right.  I think the record is complete

9      then.

10            Ms. Cline, no further evidence on your case?

11            MS. CLINE:  I don't believe so, your Honor.  But if

12     it's okay with the Court, perhaps the parties could consult

13     each other and prepare an exhibit listing to which we've all

14     agreed and work out our motions to strike and so forth?

15            THE COURT:  Mr. Greim, I think that would be very

16     helpful.  Do you agree?

17            MR. GREIM:  Yes, absolutely.

18            THE COURT:  And I think the parties agreed that they

19     were going to get me some kind of document that indicated a

20     single exhibit number or which documents came in under several

21     different exhibit numbers.

22            MS. CLINE:  They're already in the works, your Honor,

23     yes.

24            THE COURT:  Good.

25            It might be helpful, if it's not too much work, if the

1   two of you could work together to give me a single set of the

2   exhibits that are in evidence or that have been shown to a

3   witness, and the exhibits where there is still a motion to

4   strike outstanding, in order, from PX 1 all the way through and

5   then to the DX, because right now I've got a lot of different

6   binders in front of me and instead of having to hunt around

7   different binders, it would be helpful to just have a single

8   set of exhibits.  You can let me know what timetable that you

9   will deliver it in but I think before closing statements might

10  be useful.

11          Is that too much to ask, Ms. Cline?

12          MS. CLINE:  I think we can handle it.

13          THE COURT:  Mr. Greim?

14          MR. GREIM:  Yes, we can do that, your Honor.

15          THE COURT:  Anything else, Ms. Cline, to raise with

16  the Court?

17          MS. CLINE:  No, your Honor.

18          THE COURT:  Mr. Greim?

19          MR. GREIM:  Do you want us to give you sort of a list

20  of the adverse inference points, maybe questions that we had

21  raised where we were asking for the inference?

22          THE COURT:  No, I don't think so.  I think you should

23  leave that for your closing argument.  I would be troubled that

24  there's a way in which that would give you an opportunity to

25  make an argument that I'm not giving the plaintiff a chance to

L4MKEAS7

1    make an argument with respect to.  I think I would have to give

2    them an opportunity not just to rebut what you're saying but to

3    highlight points that they want to highlight.

4          MR. GREIM:  Well, your Honor, knowing us, we probably

5    would do that, so we'll just make our points in our closing.

6    And if you want -- because I think this is this four-part test,

7    if you want additional on that, I suppose you'll ask us and we

8    can equally respond.

9          THE COURT:  I think that's a simple enough question

10   for me to do the research on.

11         There is one legal question that's come up in my work

12   on the case that it would be useful to get very short

13   supplemental briefs on.  The plaintiffs have raised an argument

14   that the research agreement is void under the Virginia Private

15   Security Services Statute.  There's very little law on that

16   specific statute.  There are two, I think, related questions

17   that it would be helpful for me to get briefs on.

18         Number one, I would be interested in briefs with

19   respect to the application of that statute to investigations

20   that are done outside of the Commonwealth of Virginia.  Several

21   of the witnesses made a point of saying that the investigative

22   work here was done outside of the State of Virginia, and if

23   there is any case law on that, whether the statute should be

24   interpreted to apply to conduct outside of the Commonwealth of

25   Virginia and whether there would be any constitutional issues

L4MKEAS7

1     under the Commerce Clause with the extension of it to activity

2     outside of the Commonwealth of Virginia, would be helpful.

3          The second thing that's somewhat related is, I believe

4     that there are similar statutes to the Virginia statute in

5     other states.  The interpretation by other courts of similar

6     statutes is not going to be binding on me, but it occurs to me

7     that the derth of case law under the Virginia statute might be

8     filled in a bit by looking at the laws of some of the other

9     states.  So if you could look to see if there's anything useful

10    to either of you in the law of other states and include that in

11    the briefs, that would be helpful.  I'm thinking that ten-page

12    double-spaced briefs would be helpful, filed simultaneously.

13         Ms. Cline, can you remind me when we've got closing

14    arguments in the case?

15         MS. CLINE:  Friday, your Honor.

16         THE COURT:  Is it too much to ask for it to be done by

17    Friday, next Friday, close of day, the ten-page briefs?

18         MS. CLINE:  So you don't need them before the

19    closings?

20         THE COURT:  I don't think so.

21         MS. CLINE:  Fine for plaintiffs.

22         THE COURT:  For defendant?

23         MR. GREIM:  We can do it, your Honor.

24         THE COURT:  All right.

25         I don't have anything else unless, Ms. Cline, you've

1    got anything?

2              MS. CLINE:  Nothing from us.

3              THE COURT:  Mr. Greim?

4              MR. GREIM:  Nothing, your Honor.

5              THE COURT:  I would say that I think the case was very

6    well tried on both sides, and I appreciate your efforts to get

7    it all done within this time frame and given the challenges

8    with COVID.

9              There was a point raised about the ability to judge

10   credibility and to manage this with masks on, and the

11   testimony, I think, has all come in well, and I have been able

12   to make credibility judgments.  So thank you, all, for helping

13   to make it work efficiently.

14             MS. CLINE:  Thank you, your Honor.

15             THE COURT:  Sure.

16             (Adjourned to April 30, 2021 at 1:00 p.m.)

17                               *  *  *

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 GUO WENGUI

Cross By Mr. Greim . . . . . . . . . . . . . 652

Redirect By Ms. Cline  . . . . . . . . . . . 752

 SASHA GONG

Direct By Mr. Greim  . . . . . . . . . . . . 758

Cross By Ms. Cline . . . . . . . . . . . . . 783

Redirect By Mr. Greim  . . . . . . . . . . . 800

                    PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 52 and 53  . . . . . . . . . . . . . . . . 753

 70A   . . . . . . . . . . . . . . . . . . . 754

 PX44, 46, 47 and 50  . . . . . . . . . . . 792

 PX59   . . . . . . . . . . . . . . . . . . 803

                    DEFENDANT EXHIBITS

Exhibit No.                                    Received

 48    . . . . . . . . . . . . . . . . . . . 651

 51    . . . . . . . . . . . . . . . . . . . 667

 DX76A  . . . . . . . . . . . . . . . . . . 736

 35, 37, and 114  . . . . . . . . . . . . . 751

 123 and 124  . . . . . . . . . . . . . . . 802