**Exhibit 4**

L4JKEAS1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

EASTERN PROFIT CORPORATION
LIMITED,

                Plaintiff,

           v.                         18 CV 2185 (LJL)

STRATEGIC VISION US LLC,

                Defendant.

------------------------------x
                                      New York, N.Y.
                                      April 19, 2021
                                      9:30 a.m.

Before:

                  HON. LEWIS J. LIMAN,

                                      District Judge

                       APPEARANCES

TROUTMAN PEPPER HAMILTON SANDERS LLP
     Attorneys for Plaintiff
BY:  CHRISTOPHER B. CHUFF
     JOANNA J. CLINE

GRAVES GARRETT LLC
     Attorneys for Defendant
BY:  EDWARD DEAN GREIM
     JENNIFER A. DONNELLI

ALSO PRESENT:

Melissa Francis, Eastern Profit Corporation Limited
J. Michael Waller, Strategic Vision US LLC
```

```
 1                (Case called)
 2                THE DEPUTY CLERK:  Starting with counsel for
 3      plaintiff, please state your appearance for the record.
 4                MS. CLINE:  Good morning, your Honor.  Joanna Cline,
 5      Troutman Pepper, for the plaintiff.
 6                THE COURT:  Good morning, Ms. Cline.
 7                MR. CHUFF:  Good morning, your Honor.  Chris Chuff,
 8      Troutman Pepper, on behalf of Eastern Profit.
 9                THE COURT:  Good morning, Mr. Chuff.
10                MS. FRANCIS:  Good morning, your Honor.  Melissa
11      Francis, corporate representative on behalf of Eastern Profit.
12                THE COURT:  Good.  Good morning, Ms. Francis.  You may
13      be seated.
14                For the defendant?
15                MR. GREIM:  Your Honor, for the defense, you've got
16      Eddie Greim, from Graves Garrett, Jennifer Donnelli, from
17      Graves Garrett, and the corporate representative for
18      Strategic Vision is J. Michael Waller.
19                THE COURT:  Welcome.  Good morning.  You may be
20      seated.
21                Before we get started, just a couple of things on my
22      end, and then I'll ask the parties if they have anything to
23      raise with the Court.
24                A warning:  This case is being transmitted
25      telephonically to people who want to listen in, including
```

1    members of the public.  The courtroom, obviously, is a public

2    courtroom.  It is illegal and a violation of the court orders

3    for anybody to live stream or record the proceedings here

4    today.

5         Second, I've given the parties strict time limits with

6    respect to the trial, both with respect to openings, with

7    respect to testimony, and with respect to closings, when we get

8    to those.  My courtroom deputy will be keeping track of time.

9    I asked him, with respect to openings, to give each party a

10   warning when there's five minutes left for their opening.  If

11   any party doesn't want that, they should let me know that

12   before they begin the opening.

13        With respect to the length of the trial, it is my

14   intention to keep you to the time limits that I've laid out.

15   That said, if, at the end of the four days, the parties have

16   used their time efficiently and have not wasted time, and if

17   there is some good cause for why we need to keep the trial open

18   and figure out some additional day to offer testimony, I'll

19   hear the parties with respect to that.  That should be

20   understood, in part, as a warning to the parties to use their

21   time efficiently.  It's a bench trial.  I think I'm a fairly

22   quick study.  You don't need to belabor points.  Do the

23   cross-examination that you need to do, obviously, but you don't

24   need to always guild the lily.

25        Those are the things that I wanted to mention.  Is

1    there anything else from plaintiffs before we get started?

2                MS. CLINE:  No, your Honor.  Thank you.

3                THE COURT:  Mr. Greim, for defendant?

4                MR. GREIM:  Nothing for defendant.

5                THE COURT:  Okay.

6                Then we will begin with opening statements.

7    Ms. Cline, are you going to give the opening for the plaintiff?

8                MS. CLINE:  Yes.  Thank you, your Honor.

9                So mindful of the Court's comments about gilding the

10   lily, we understand that the Court is familiar with the facts,

11   and we'll just dive right in.

12               This is a contract case.  The parties' relationship

13   was short-lived, the number of relevant facts are limited, and

14   the issues before the Court come down to a few very, very

15   narrow issues:

16               Number one, was there an enforceable contract?

17               Number two, did the parties perform?

18               And, number three, can Strategic prove each element of

19   fraud by clear and convincing evidence?

20               Let's start with number one, whether the contract is

21   enforceable.  As a threshold issue, in our view, the contract

22   is void as a matter of public policy because Strategic

23   contracted to perform private investigation services that it

24   had no license to perform.  The plain language of the contract

25   calls for Strategic to perform research, quote, "for the

1  purposes of detecting, stopping, and preventing crimes or other

2  harm to innocent people."

3         The parties do not dispute that Virginia law prohibits

4  people from soliciting or engaging in a private investigation

5  business without a license, and they do not dispute that

6  neither Strategic, nor its principals, ever had a license.  But

7  the core on summary judgment held a question of fact remained

8  as to whether the research agreement at issue here related to

9  traditional private investigator activity aimed at crimes or

10  civil wrongs, such that it would fall within the scope of the

11  license requirement or whether it related to other more general

12  activity that would fall outside that scope.

13         The evidence will show, through the admissions of

14  Strategic's own witnesses, that undeterred by their lack of

15  training and ineptitude, they contracted for, and engaged in,

16  or attempted to engage in traditional private investigative

17  activity.  What Mr. Waller described as, quote, "good

18  old-fashioned detective type work."

19         An example of this is that they engaged in

20  surveillance.  If surveillance isn't a traditional private

21  investigative activity, we don't know what is.  Ms. Wallop made

22  an admission in her deposition that even though she has no

23  training or credentials to do so, she went to a resort in the

24  Turks and Caicos, and on Eastern's dime, and with her son

25  tagging along, as she put it, she went there to track, surveil,

1    and gather intelligence on two suspects that the parties had

2    agreed would be investigated under the contract.  She admitted

3    that she did that personally.  With all due respect, the public

4    policy behind the license requirement is designed specifically

5    to prevent unqualified people from doing things just like

6    this — charging other people money to play spy from an island

7    spot.

8          The evidence will show beyond that that Ms. Wallop and

9    Mr. Waller promised to do more than just surveillance.  They

10   said they would access subjects' private banking and financial

11   records, investigate subjects' alleged extramarital affairs,

12   and generally attempt to uncover, as Mr. Waller put it in his

13   deposition, anything that would cause them to be shown to be

14   breaking Chinese law, American law, and, by extension,

15   discrediting the party leadership.

16         By their own testimony, the defendants were

17   contracting to perform private investigative services, and, for

18   that reason, the contract is void, and Strategic should return

19   Eastern's $1 million deposit.

20         But let's put that aside, and let's move to issue

21   number two.  If we assume the contract is valid and

22   enforceable, the evidence will show the following facts as to

23   whether the parties performed.  Eastern retained Strategic to

24   investigate specific people who were high-level officials of

25   the Chinese Communist Party or had close ties to high level CCP

1    officials.  Strategic was to provide comprehensive written

2    investigative reports to be delivered on thumb drives related

3    to specific individuals, and, in turn, Eastern was to pay for

4    each research report in accordance with the pricing set forth

5    specifically in the contract.

6          The contract required that Eastern pay a deposit of

7    $1 million at the start of the contract, and then Eastern would

8    pay an additional amount per the terms of the contract as

9    Strategic completed the written reports delivered on thumb

10   drives.  The nature of the deliverables was detailed in the

11   contract.  There would be three types of reports — financial

12   forensic reports, current tracking reports, and social media

13   reports.

14         Eastern upheld its end of the bargain — it sent a

15   million dollars to Strategic Vision, and then it was

16   Strategic's turn to perform, and things immediately fell apart.

17   Strategic, by its own admission, never provided any of the

18   comprehensive reports that it expressly agreed to provide under

19   the contract.  Not a single one.

20         Wallop and Waller did not have the requisite licenses,

21   know-how, or resources to do what they had expressly promised

22   to do.  After several weeks had passed, when it became clear

23   that Wallop and Waller were in way over their heads and that

24   Strategic was not going to do what it had promised to do,

25   Eastern terminated the contract and asked for its money back.

L4JKEAS1                    Opening - Ms. Cline

1      But Strategic refused to return Eastern's money, and that's why

2      we're here.  Eastern is entitled, under a rescission measure of

3      damages, to its full deposit back.  Parenthetically, evenly if

4      Strategic were entitled to keep reasonable expenses incurred in

5      attempting to perform, the evidence will show that once you

6      eliminate claim costs, for which there is no support, and

7      eliminate costs for extravagant purchases from luxury retail

8      stores like Hermes, Tumi and Bloomies, among others,

9      Strategic's expenses were a very small fraction of a million

10     dollars.

11            Now, back to the merits:  Having admitted that it

12     didn't provide any of the reports required by the contract,

13     what's Strategic's side of the story?  Strategic has two basic

14     counters:  One, that Wallop and Waller were fraudulently

15     induced into entering the contract; and, two, that even if the

16     contract is valid, they get to keep the $1 million deposit

17     because it came from a lender on behalf of Eastern Profit and

18     not from Eastern itself.

19            Let's take the second theory first.  As to Strategic's

20     argument that Eastern can't recover its $1 million because it

21     came from a lender called ACA, Strategic is wrong as a matter

22     of law.  The parties specifically agreed in their contract that

23     Eastern, quote, "could direct other entities to pay Strategic"

24     and that "such payments would be deemed satisfactory

25     compensation by Strategic."

1          Strategic didn't insist that the money come directly

2     from Eastern, and, in fact, Strategic specifically contracted

3     for the opposite.  And, pretty tellingly, Strategic certainly

4     didn't refuse or return Eastern's $1 million deposit when it

5     came in from ACA.  They didn't call time out and say what's

6     going on here; they plunged ahead with a million bucks in the

7     bank.

8          The evidence will show that Eastern entered into a

9     loan agreement with ACA and that ACA expects to ultimately get

10    repaid.  But as we say in our papers, even if the loan from ACA

11    were never repaid, even if it were a gift from ACA to Eastern,

12    it is still money that, in good conscience, belongs to Eastern

13    and should be returned to Eastern.  It certainly doesn't belong

14    to Strategic.

15         Now let's take issue number three, as to whether

16    Strategic can prove fraud, each element of fraud, by clear and

17    convincing evidence.  It cannot, for several reasons.

18         Let's preview Strategic's theory.  A supposedly

19    sophisticated private investigation firm, a firm that holds

20    itself out as being steeped in international politics and being

21    able to track, surveil, and investigate people across the

22    globe, claims it was tricked into entering into the contract

23    because it was misled about the political views of Guo Wengui,

24    one of the agents of Eastern, who was a very prominent internet

25    presence.  Wallop and Waller argue that they can just keep

L4JKEAS1                         Opening - Ms. Cline

1   Eastern's 1 million bucks because they say -- they now say that

2   Mr. Guo supports the Chinese Communist Party, and they only

3   entered into the contract because they thought Mr. Guo was an

4   agent against the Chinese Communist Party.

5           There are lots of problems with this argument, each

6   one of which is dispositive.  For one, Strategic can't point to

7   a single material false statement made by Mr. Guo or Eastern on

8   which Strategic relied.  In fact, it was Strategic who

9   approached and solicited Mr. Guo initially to help him with

10  communications and his image, his strategic vision, so to

11  speak.  He did not solicit them or induce them to do anything.

12          Second, the contract says absolutely nothing about the

13  CCP, or communism, or being a dissident.  If it had really been

14  such an important part of their bargain, Wallop and Waller

15  would have written it into the contract, which they took the

16  lead in drafting, or they could have done a very simple Google

17  search before entering the contract and learned the same facts,

18  the same facts that they now claim would have been deal

19  breakers had they known about them before entering the

20  contract.

21          And, third, Strategic cannot prove that the alleged

22  representations about Mr. Guo's political allegiances were

23  false.  Politics is complicated, and we submit that whether one

24  is a dissident is not a fact capable of being proven true or

25  false.  But even if it were, you will hear directly from

1    Mr. Guo about his views and his contributions to the dissident

2    community.  He will tell you how ludicrous Strategic's position

3    is.  And the evidence will show that Mr. Guo is one of the most

4    outspoken anti-Communist activists in the world.  Strategic

5    simply cannot meet its burdens of proving each element of fraud

6    by clear and convincing evidence.  If the pretrial litigation

7    process in this case is any guide, you're going to hear a

8    highly convoluted and attenuated web of allegations from the

9    other side, and on Eastern's side, there will be language and

10   cultural barriers that may make internalizing the testimony

11   difficult or identifying the witness as challenging, and both

12   sides will present witnesses who will express strongly held and

13   passionate views.  But, in the end, Strategic's fraud theory

14   will come crashing down.  The so-called evidence regarding

15   Mr. Guo's CCP allegiances, regardless of its dubiousness, and

16   putting aside the little weight to which it's entitled, was all

17   over the internet before Strategic, an investigation firm after

18   all, entered the contract.  Strategic either knew or should

19   have known about it, and Strategic cannot establish reasonable

20   reliance.

21          And it's worth pointing out that that evidence was

22   still all over the internet when Strategic's first set of

23   lawyers filed its answer and counterclaims in this case, which

24   did not include the fraud claim.  And it was still all over the

25   internet when Strategic's second set of lawyers continued to

```
 1      litigate the case without a fraud claim, but somehow, a year

 2      after Strategic filed its first answer in this case, when

 3      Strategic retained its third set of lawyers, paid for by a yet

 4      to be disclosed outside funder, that's when Strategic suddenly

 5      seized upon its evidence that's supportive of a fraud

 6      counterclaim and challenged, for the first time, Mr. Guo's

 7      political beliefs.  The fraud claim is a sideshow.

 8              Now, finishing back where we started:  We ask you to

 9      sift through the evidence and the tangled webs of irrelevant

10      insinuations that you will hear and focus on the narrow issues

11      before the Court:

12              Number one, was there an enforceable contracted?

13              Number two, did the parties perform their obligations?

14              Number three, can Strategic prove each element of

15      fraud by clear and convincing evidence?

16              We ask you to find that no enforceable contract

17      existed or that, if it did, Strategic breached the contract.

18      In either event, Strategic has admitted it never delivered any

19      of the detailed reports expressly called for under the

20      contract.  And Strategic can't prove any of the elements of

21      fraud by clear and convincing evidence, let alone every single

22      one of them.

23              Strategic unjustly received a million dollars, and

24      Eastern got nothing in return.  We ask that you return a

25      judgment of $1 million plus interest in Eastern's favor and
```

1      throw out Strategic's claims.

2                  THE COURT:  Thank you very much.

3                  For the defense?

4                  MR. GREIM:  Your Honor, there is a short and straight

5      path to the right resolution of this case.  Eastern Profit's

6      damages claim — under whatever theory — is a sham because its

7      alleged loan with ACA was a sham.  The facts will show that it

8      had no basis for taking out a $1 million loan as a deposit on a

9      contract whose aim was supposedly to unfreeze a mere $80,000.

10     And to succeed, that contract required another several million

11     dollars over the next few months.  Yet Yvette Wang and Han

12     Chunguang, who you'll hear from from Eastern, testified to

13     those very facts.  Eastern is not a real business.  Eastern has

14     no real obligations and no real assets.  It has no obligation

15     to repay a loan to ACA.  Instead, it was, is, and ever shall

16     be, a frozen Hong Kong bank account.  It's a cutout for Guo and

17     for whomever else finances his U.S. operations.  The winding

18     path of every other fact for argument in this case, your Honor,

19     ultimately comes down to, and ends, at this point.

20                 Stepping back, though, for a minute to review the full

21     sweep of this case, the facts, though, will show three things:

22     First of all, as I just said, that Eastern Profit has no

23     damages claim; second, that the contract was legal, and that

24     Eastern Profit, not Strategic Vision, materially breached; and,

25     third, that Eastern Profit, through Guo, defrauded

1    Strategic Vision, either as a counterclaim or as a defense,

2    but, again, this entire case begins and ends, and could end,

3    with just point one.

4            We'll now turn to that first point in more detail.

5    This is not really Eastern Profit's case.  The only claim for

6    money in this case is for the return of a paid $1 million

7    deposit.  There's no dispute the money actually came from ACA.

8    The question, as this Court explained in its summary judgment

9    decision, is whether the loan EP claims to have taken from ACA

10   is a sham.  Can Eastern meet its burden of proving that there

11   is a real loan from ACA to Eastern, or do the facts show that

12   ACA's payment was an investment made at Guo's insistence?

13           This Hong Kong entity chose to come to New York, to a

14   New York court, to decide this question, and so New York law

15   will apply.  As we show in our proposed findings and

16   conclusions, New York courts will look to a variety of facts,

17   which I'll get into in a second:  The existence of collateral,

18   the amount borrowed in relation to the size of the borrower's

19   business, the contemplated use of the proceeds, payment

20   contingencies, and business and accounting records the company

21   itself treated -- whether it treated the transaction as a loan.

22   What will the facts here show, your Honor?

23           First, economics:  As the core of this is the

24   testimony of Yvette Wang.  For Eastern, she testified that its

25   assets were already frozen in June 2017 and remain so today.

1    All of its assets were frozen.  That amount in the bank was

2    550,000 Hong Kong dollars, or 80,000 U.S.

3            Your Honor, the contract called for an immediate

4    $1 million deposit at $750,000 a month for three years.  This

5    would have required another $750,000 in just a few weeks,

6    $2.2 million by the end of the initial contractual three-month

7    look-back period in mid-April, and $27 million over the term of

8    the contract.

9            Eastern Profit didn't have close to enough money to

10   fund the contract, and it was taking those steps to do so, as

11   you'll hear from their witnesses.  There's also the problem

12   that repayment of the loan hinged on the contract being

13   successfully performed in just five months, the repayment date,

14   June 2018.  Now, near the close of discovery, Eastern was

15   finally compelled to complete its corporate rep deposition

16   first attempted back in January 2019.  Its witness, Yvette

17   Wang, was the same.  Yet she gave completely different

18   testimony from her original deposition.  Wang, for the first

19   time, testified that the research was not for Guo after all;

20   instead, Eastern had its own purpose and use for the research —

21   to unfreeze its own funds.  This was never mentioned to

22   Strategic or in the case up to that point, which had been going

23   on for well over two years -- well, for about a year and a

24   half.  Eastern itself had been only slotted into the contract

25   just before signing.

L4JKEAS1                          Opening - Mr. Greim

1              Second, Eastern — let's pull that up — through

2       counsel's letter to this Court, made a binding and critical

3       admission on November 22nd, 2019.  At Docket 203-2 — this is

4       Exhibit 126B, which you'll see later — it introduced an order

5       from the Hong Kong High Court to prove that Eastern assets had

6       been frozen by that court.  Eastern is one of 27 respondents,

7       your Honor, listed in this order.  You can see the very first

8       one is Guo Wengui, who will be here later, the next one is Guo

9       Qiang, his son, and it goes on down.  There's a few other

10      witnesses in this case are even on here.  Han Chunguang is on

11      here later.  China Golden Spring is on here and some other

12      names you'll hear about later.

13             Your Honor, Eastern Profit's theory that Strategic was

14      going to dredge up research, it would cause a regime change on

15      the Mainland, this would then ripple through to Hong Kong and

16      cause release of its $80,000.  Yvette Wang will have to say it;

17      that was version two of her story from the very end of

18      discovery.  She'll have to admit to that here tomorrow.

19             But look at the research agreement.  It envisioned

20      three years and as many as 4,000 subjects.  Just the first few

21      months involved only 15 subjects.  There's not a thing in the

22      research agreement to suggest that the CCP was going to be

23      brought down and all the funds were going to be released by

24      June 2018, so they could pay back this million-dollar loan.

25      Plus, the other issue, even this wild success, your Honor,

1    would still have required monthly payments of $750,000 a month

2    just to keep Strategic on the job.  But Eastern hadn't even

3    begun to explore finding that money.  It never tried.

4            Yet, even if Strategic can work for free after getting

5    the million dollars, and had worked for the rest of the loan

6    period, interest payments alone on the deposit would have

7    depleted what Eastern Profit had in the bank by month four,

8    well before the maturity of the loan.

9            So, your Honor, just agreeing to the research

10   agreement ensured that Eastern Profit was bankrupt, but the ACA

11   loan, if it exists, was icing on the cake.  Perfect execution

12   and immediate world historical regime change in China would

13   still have meant the total loss of ACA's principal, as well as

14   a default on the interest payments.  It was not a loan.

15           Han Chunguang will admit that he didn't shop the

16   terms, but, realistically, no lender would have given an

17   unsecured loan, which this was, just for a deposit on a

18   speculative venture for an historical regime change, or the

19   borrower could never make interest payments and could not fund

20   the rest of the venture, let alone pay the principal on the

21   deposit.  Perhaps this is why Yvette Wang testified that ACA —

22   and she'll tell you again tomorrow — would get the research

23   from Eastern and that ACA would have forgiven the loan, as she

24   called it, if the research was successful.  Of course, it

25   would.  The loan should have been written off the moment it was

L4JKEAS1                         Opening - Mr. Greim

1    made by ACA.

2              Second, we'll hear that Eastern is a shell.  No

3    witness could say what its business was at deposition.  No

4    witness should be able to come here and create a new story.

5    Han Chunguang bought Eastern for about $200 in 2015 and sold it

6    to Guo Wengui's daughter for about the same amount,

7    conveniently just before its $80,000 in assets were frozen in

8    June 2017.  Dr. Lianchao Han, on whom Guo relied heavily

9    throughout negotiations and during performance of this

10   contract, had never heard of Eastern Profit until the lawsuit

11   was filed.  Had never heard of it.

12             Several witnesses, including Lianchao Han, a pro-Guo

13   witness, will testify that the so-called principal of Eastern,

14   Han Chunguang, appeared to everyone else as a servant of Guo's,

15   cooking meals for Guo and called Little Han by Guo.  This is

16   the person who supposedly was in charge of Eastern.

17             Finally, the source of the money:  William Je, as

18   Sasha Gong will tell you, was introduced by Guo as his money

19   man.  He is the one that ran ACA, and ACA has sent money for

20   other Guo causes.  That included the $100,000 to Bill Gertz,

21   who wrote a book that promoted Guo.  Your Honor, ACA is the

22   investor — quote, investor — that Yvette Wang said, in

23   contemporaneous text during the negotiations and performance,

24   was funding it.  Yvette Wang said repeatedly that investors

25   were funding this project, and we know that the only money came

1    from ACA.

2          Finally, the transaction itself is irregular.  The

3    facts will show the deal was not far advanced enough to have

4    allowed for days of in-person negotiations and signature on

5    this so-called loan agreement on December 29th.  And you will

6    hear an elaborate back story from Han Chunguang about how he

7    came into this, but it's not clear that Han Chunguang actually

8    had anything to do with Eastern.

9          Finally, there is the document itself.  Your Honor,

10   Eastern Profit didn't keep even keep its own copy of a loan,

11   and that loan has supposedly dwarfed its only asset.  It didn't

12   keep its own copy.  The loan wasn't pled in the lawsuit filed

13   just three months after all of this, and was first mentioned

14   almost a year into the case, when Eastern Profit's corporate

15   rep, again Yvette Wang, said that she had heard of a loan.  No

16   one can explain who kept the sole copy of the loan document and

17   how it came to be located and produced into this case long

18   after Eastern's corporate deposition.

19         ACA and Golden Spring worked to keep us from deposing

20   ACA.  They had their director resign within a 70-hour window

21   between notice of the subpoena and personal service.  So we

22   can't talk to the counterparty.  Your Honor, if this loan is a

23   sham, then Eastern Profit cannot recover under either a

24   restitution or a reliance theory.  It can't recover for breach

25   of contract or unjust enrichment.  The parties who could try to

1    recover from this Court have run from it, and they have evaded

2    discovery.  That is ultimately why this Court should enter

3    judgment against Eastern Profit on all of its claims.

4           But let's move to the other issues.  Second,

5    Strategic Vision should win on the contract-related claims.

6    First of all, Eastern breached, not Strategic.  The fundamental

7    question — and You heard this from opposing counsel just now —

8    is whether pricing was $750,000 a month or whether it was

9    a la carte, depending on which reports happen to come in every

10   week.  Does Eastern pay for its completed report, or does it

11   pay for Strategic Vision's honest hard work on each contractual

12   unit?  And you will see the term "unit" in the research

13   agreement.  The answer, the evidence will show, is that Eastern

14   pays for units of work, not for any particular completed

15   reports.

16          Now, the parties, you'll see, disagreed on this

17   payment issue.  Guo wanted an a la carte system.  Strategic

18   wanted a yearly flat rate.  The compromise was a guarantee that

19   Strategic would get a yearly flat rate, but it would constantly

20   have to work on 30 units of research for an entire year.  This

21   is the so-called fish tank concept that you're going to hear

22   about.  The key term here is a unit.  A unit is the work that

23   would be done by one subject, on one subject, on one of the

24   three topics, for a whole year, and so there would be 30

25   possible units in the year.  But here's the key point:  The

1   understanding was that both the subjects and the topics could

2   change.  What doesn't change is that at any one time, Strategic

3   should be working on 30 of them constantly throughout the year.

4   Strategic promises to do this work, and if it does, it gets

5   $750,000 per month, and $9 million a year.

6        Now, if that's true, what about reports?  Reports are

7   the method for getting the information to Eastern Profit.  The

8   total number of -- here's why that's true, another reason why

9   that's true — the total number of reports is unpredictable.  It

10  depends on the types of information Guo wants and also on how

11  many replacement subjects he uses.  If he replaces a subject

12  every three months, which he could do, there could be many,

13  many, many reports produced throughout the year.  If he keeps

14  the same subjects from the beginning, which he could also do,

15  there will be far fewer reports.  So it can't be tied to

16  physical reports that are made, it's got to be tied to the

17  work.

18       I expect the circumstances, of course, such as mixing

19  and matching could lead a number of reports to change as well.

20       Finally, it's the client's duty, that is, Eastern and

21  Guo's team, to provide a necessary basic information and decide

22  areas of focus for research.  If Strategic comes back and says

23  four names are fake, then it is up to Eastern to say, well,

24  here are four new names, or look at four names that are already

25  subcategories of the names you have.  They've got to replace

1    that.

2         And here's the other key point:  Strategic made a

3    concession to Eastern.  It said, okay, we'll change in whatever

4    you want, we'll put in new people or new subjects, and the

5    other thing is we won't charge you for the rent because all of

6    the cost, as you'll hear on this contract, is incurred in just

7    getting started with the subjects when they come in.  That's

8    where a lot of the time and cost occurs.  As they develop

9    familiarity with the subjects, it becomes much easier to come

10   up with them, but Eastern agreed to try to get a flat rate for

11   the year, that it would just charge $750,000 a month, assuming

12   it keeps working on 30 units all at one time.  That is the

13   best, and really the only possible, reading of the contract.

14        So, your Honor, this means that the question is not

15   what reports were delivered each week on the thumb drive, but,

16   rather, whether Strategic Vision was working on all 30 units

17   and delivering the reports that it could.  If so, Eastern

18   Profit had to keep paying, it had to keep paying.  Here, your

19   Honor, Eastern Profit breached because it did two things to

20   knee-cap Strategic's performance and materially breach.  First,

21   Dr. Waller will testify that on February 15th, Eastern skipped

22   its first monthly payment of $750,000, and EP -- and told

23   Strategic to hold off working with Team 1.  This was the team

24   of ten overseas researchers.  This meant Strategic could not

25   pay the 200,000 monthly fee for Team 1, and Strategic could not

1    keep performing.  Dr. Waller will also testify that between

2    January 6th and February 8th, about one and a half to three

3    weeks into the contract, he delivered a series of stunning

4    revelations to Guo's team and required a decision on whether to

5    go forward with the original 15 names or to replace them.

6    Guo's team refused to provide guidance or new names, making it

7    impossible for Strategic to continue its work.

8            This prior breach, your Honor — and that is our

9    primary theory on the contract side — yields about $200,000 in

10   damages to Strategic after crediting Eastern for ACA's payment

11   of the million-dollar deposit.

12           Now, is it really true Strategic did perform between

13   January 16th and February 15th when Eastern cut off payment?

14   Here is what Dr. Waller is going to tell you, and I will just

15   give a short summary on:  January 24th, just eight days after

16   the start date of the contract, he began making oral reports to

17   Lianchao Han and Yvette Wang.  What his team found was

18   surprising and required immediate input from Guo.  Three to

19   four of the names were misspelled, or wrong people, or fake.

20   Several of them had engaged in passport fraud, including fraud

21   involving a NATO ally.  Another Chinese relative in the file of

22   one of the 15 names had opened hundreds of Panamanian accounts

23   as shell companies using a Nebraska law firm.  They found that

24   other individuals were also monitoring these subjects, meaning

25   that either Team 1 for Strategic was being watched or that it

1    ran the risk of accidentally exposing other researchers who may

2    also have been dispatched by Guo or others.  They also found

3    that the names and reports, which Guo had given to Strategic,

4    Guo claimed cost $250 million, that was strictly proprietary

5    and confidential, were on the internet and could quickly be

6    sourced to Guo, endangering the team's security.  In response,

7    Wang simply demanded reports and refused to provide new names

8    or guidance on Waller's new team leads.  You'll learn about the

9    follow-up that Waller did in hiring ASOG, a second team, and

10   you will learn about the work that Strategic did flying back

11   and forth to Europe getting thumb drives and trying to produce

12   that material to Eastern.  You'll learn that they had 16 email

13   addresses and encrypted passwords for the team members and that

14   they had located the servers for CITIC, C-I-T-I-C, the main

15   financial institution used by the CCP.

16          Now, your Honor, the parties expressly recognized that

17   it might not be possible to immediately provide reports on some

18   of the subjects.  Guo knew this, but he unrealistically

19   expected immediately disclosable items.  That expectation was

20   impossible, Dr. Waller will show, because it would have

21   immediately revealed the entire operation.  Guo sabotaged his

22   own operation, and the reasons are still not clear, but we do

23   know that Strategic spent over $800,000 in startup and

24   operations costs — and, no, that does not include Tumi,

25   Bloomies, or a trip to monitor someone, which combined is less

1    than $4,000 — over $800,000, and Strategic's expectation

2    damages for Eastern's breach, crediting Eastern again with

3    ACA's payment, are $200,000.

4           Let me briefly turn to the declaratory judgment issue,

5    which is where Eastern began.  This claim is under Virginia

6    law, and Virginia prohibits engaging in the PI business without

7    a license, but that comes with a definition.  You have to be

8    investigating specific things.  The purpose of the

9    investigation is what matters there, which is what we argued on

10   summary judgment.  We do not look at the actual acts taken by

11   someone and ask whether that sounds like PI work; instead, you

12   have to apply the statutory definition.

13          Within that framework, the facts don't bear out

14   Eastern's theory.  The language of the research agreement is

15   equivocal because one of the provisions uses the word crimes,

16   while another provision mentions business research.  But the

17   rest of the agreement shows the research was not to be used to

18   help specific victims in a specific proceeding.  It envisions

19   long-term monitoring with as many as 4,000 individuals.  It

20   involves weekly or monthly reports, but it contains nothing

21   about the use or preservation of evidence.  It mentions no

22   proceedings, victims, or crimes.  In fact, the three subject

23   matters of the agreement seem to focus more on matters that

24   might embarrass individuals and CCP members than on any

25   specific crime or victim.

 1            Further, the testimony you will hear from the parties'

 2    negotiations bears that out.  There was never any indication

 3    from Guo, Yvette Wang, or Han Chunguang that any victims or

 4    proceedings were ever going to be held here or that it was

 5    going to be used in any specific proceeding.  Instead, this was

 6    to help Guo and his whistleblower campaign to bolster his image

 7    in the U.S. and purportedly oust the CCP from power.  This is a

 8    political, not a quasi-law enforcement goal.

 9            Finally, Guo, as Eastern's agent, defrauded Strategic.

10    The core of this claim tests whether Guo's truly a dissident.

11    It rests on three legs:  Guo's movement of money from Hong Kong

12    and ties to the Mainland, Guo's own statements about himself,

13    and Guo's attacks on other dissidents.  We'll turn to those in

14    a moment.  Other elements here, though, focus on

15    Strategic Vision.  Dr. Waller and Ms. Wallop will both testify

16    that they reasonably relied on long-time, widely respected

17    colleagues, Lianchao Han and Bill Gertz, both of whom are

18    witnesses who you'll see on video, not during these four days.

19    They will testify that they would not agree to provide research

20    to anyone who would use it to help the CCP.  In this, they were

21    not alone, as another prominent dissident and journalist, Sasha

22    Gong, also believed Guo's claims during this time period.  She

23    even served on the board of an entity that has now turned

24    around to attack her and other dissidents.  And Lianchao Han, a

25    native Mandarin speaker, will testify that his first time

1    seeing Guo's damning statements about himself that were

2    supposedly freely available on the internet was at his own

3    deposition in this case, despite the fact that Lianchao Han was

4    hired specifically to shepherd Guo's asylum application, which

5    was filed just two weeks after Guo made these statements.  Han

6    Chunguang did not know about the statements.

7              So now let me move to leg one, the movement of money

8    from Hong Kong and Mainland ties.  Guo's attorney and

9    spokesman, the attorney for Golden Spring, but not the attorney

10   who's here today, in response to Strategic Vision's claim in

11   this case, said not a penny of Guo's money was moved from

12   Hong Kong or the Mainland once he began speaking out.  But ACA

13   sent wires from Hong Kong to Strategic Vision, and Bill Gertz,

14   and even to Guo's own family office.  Sasha Gong, as I said

15   before, will testify that Guo introduced ACA's sole

16   shareholder, William Je, to her as his money man.  Guo claimed

17   under penalty of perjury in another federal case that during

18   the same time frame, 2017 to 2018, ACA paid him millions of

19   dollars through his family office, China Golden Spring, which

20   is in Hong Kong, to give the benefit of Guo's supposed Mainland

21   connections.  How could Guo be suing for lost payments from a

22   Hong Kong entity, which he was in that case, which was paying

23   him for his Mainland connections, when he was supposedly

24   China's number one dissident and unable to take a penny out of

25   either place?  It doesn't add up.

 1          The principal of ACA, William Je, was claimed by Guo

 2     to be a dissident, a long-time friend, and to have been even

 3     hospitalized from stress due to government harassment.  But Guo

 4     will be unable to explain why he tolerates such close ties to

 5     Je when many publicly available Chinese sources reveal Je to be

 6     intimately tied to CCP's sympathetic organizations in China.

 7     And we will hear about those.

 8          Further, Guo insisted that none of the Mandarin

 9     translators from Team 1 — that's the first research team that

10     Strategic hired — should be Chinese nationals or live in China,

11     purportedly for concern that they might be CCP agents.  Sasha

12     Gong will confirm how dangerous it is for dissidents to keep

13     open Mainland communications, yet Google business records will

14     show that several administrators of Guo's social media accounts

15     used Mainland phone numbers and email addresses.

16          Finally, Guo's family office, ACA and, even for a

17     time, Eastern Profit were all headquartered in Suite 49F of the

18     Bank of China Tower in Hong Kong.  Guo later admitted that Bank

19     of China buildings are used by China for espionage outside of

20     the Mainland.  That particular building was a peculiar choice

21     for housing the so-called dissident entities connected to Guo

22     that are all at issue in this case.

23          Leg two of our showing is Guo's statements in March

24     and August of 2017.  Han Chunguang, and perhaps other

25     witnesses, will authenticate Guo's voice in a March 2017

1    recording in which he lambastes U.S. dissidents for criticizing

2    Chinese leaders.  He says, "The operation is on now.  I have

3    absolute faith in the General Secretary Xi."

4            THE DEPUTY CLERK:  Five minutes.

5            MR. GREIM:  In recordings Guo himself made of May 2017

6    meetings of Politburo and other PRC officials in his apartment,

7    Guo takes credit for his work on behalf of the Ministry for

8    State Security and declares, "I strongly support President Xi."

9            And, finally, in August 2017, he signed a letter and

10   then joined a Chinese-language TV program in which he agreed to

11   limits on his so-called whistleblowing activities.  He noted

12   that his prior interviews had never crossed the so-called red

13   line, and he asked for new tasks to support Chairman Xi

14   Jinping.

15           Leg three:  Following through on his March 2017

16   promise to attack Chinese dissidents in the U.S., Guo's tried

17   to either buy or coerce local dissidents in U.S. conservatives.

18   The Court will hear recordings Guo has made threatening

19   dissidents who crossed him, such as Sasha Gong and Bob Fu.  Guo

20   encourages Chinese nationals living in the U.S. to stalk and

21   harass dissidents, asking them to approve their activities

22   through the New York nonprofits he has set up, the Rule of Law

23   Fund and Rule of Law Society.

24           So in conclusion, your Honor, the facts are going to

25   show that Guo and Eastern never hired someone else to gather

L4JKEAS1                          Opening - Mr. Greim

1    research and implement his plan after this contract folded.

2    Nothing else happened.  They never went to somebody else to

3    unfreeze these assets.  Those Hong Kong assets remain frozen,

4    purportedly because of CCP retaliation, but Guo somehow remains

5    free to fund dozens of lawsuits and continue his attacks on

6    U.S. dissidents.  For that reason, Strategic thinks the record

7    will show that Guo is not who he says he is and never intended

8    to use a contract to attack the CCP.

9            The evidence supports Strategic's fraud counterclaim,

10   but it also makes out an unclean hands defense to Eastern's

11   equitable claim for unjust enrichment.  It is inequitable for

12   Eastern to come to court seeking relief when, through Guo, it

13   has sanctioned this fraud.

14           Your Honor, in conclusion, over the next four days,

15   this Court will hear inconsistent stories from Eastern's

16   witnesses.  Eastern has spent very little time with them and is

17   actually calling them after Strategic's.  You may well see why.

18   That is, you will hear completely different stories regarding

19   the purpose of the research — was it for Guo's whistleblower

20   campaigns, as Eastern's witness all claim at the time, or, as

21   they say now, was it for Eastern's own views to unfreeze

22   assets?  Who was funding the agreement?  Was it investors in

23   Hong Kong, as Wong claimed at the time, or was it an ACA loan,

24   as EP eventually claimed very late in this case?  When in

25   doubt, this Court should go with the parties' statements at the

1    time and with their depositions earlier in the case.

2           Either way, we come back to where we started.  Eastern

3    Profit is a shell entity whose participation in this case hangs

4    by a thread.  It has to somehow prove that the supposed loan

5    with ACA — still a mystery to its main witness almost a year

6    into this case — was not a sham.  Because ACA's $1 million

7    payment to Strategic was not due to a loan, Eastern has no

8    restitution or reliance claim, and the parties should go home,

9    or Strategic should recover its own damages.  The facts will

10   show that the million-dollar deposit, like the rest of the

11   payments under this $27 million contract, were never going to

12   come from an entity with $80,000 in a frozen Hong Kong bank

13   account and that needed world historical regime change to even

14   access that pittance.  No person who paid the million-dollar

15   deposit on that contract could have expected it to be repaid by

16   Eastern in principal or in interest.

17          Your Honor, it is time for this charade to end, and

18   the results should be a judgment for Strategic.  Thank you.

19          THE COURT:  Thank you very much.

20          Plaintiff, call its first witness.

21          MS. CLINE:  Plaintiff calls French Wallop.

22          THE COURT:  During a break, would the parties work

23   with the court reporter.  If the court reporter didn't get any

24   of the names down, you might let the court reporter know.

25   Also, there are a lot of Chinese names.  It might be helpful,

 1   for the benefit of the court reporter, to give some kind of a

 2   glossary, so the court reporter has all of the names.

 3            Mr. Fishman, would you please swear the witness.

 4    FRENCH WALLOP,

 5        called as a witness by the Plaintiff,

 6        having been duly sworn, testified as follows:

 7            THE DEPUTY CLERK:  Please.

 8            THE WITNESS:  French, F-r-e-n-c-h, C. Wallop,

 9    W-a-l-l-o-p.

10            THE COURT:  Good morning, Ms. Wallop.  You may be

11    seated.

12            THE WITNESS:  Thank you, your Honor.

13            THE COURT:  I would ask you during the questioning to

14    please try to keep your voice loud and speak slowly for my

15    benefit and for the benefit of the court reporter.

16            THE WITNESS:  And we shall keep our masks on; is that

17    correct?

18            THE COURT:  Yes.

19            MR. GREIM:  That's what I was going to address.  I was

20    going to see if, given the distance I can now see, whether she

21    could take her mask off?

22            THE COURT:  Under the standing order in this Court, I

23    can't give the witness permission to take off the mask.  I can

24    see Ms. Wallop well, and if there are issues with respect to my

25    being able to judge her answers, I'll indicate.

L4JKEAS1                      Wallop - Cross

1              And, Ms. Wallop, if at any point, you feel like you're

2       uncomfortable with the mask and you need a break, just let me

3       know, and we'll take a break.

4              THE WITNESS:  Thank you, your Honor.  The only problem

5       is my glasses may steam up.

6              THE COURT:  Understood.  That happens with all of us,

7       I think.

8              Ms. Cline, you may proceed.

9              MS. CLINE:  Thank you, your Honor.

10      CROSS-EXAMINATION

11      BY MS. CLINE:

12      Q.  Good morning, Ms. Wallop.

13      A.  Good morning.

14      Q.  You are the founder of Strategic Vision, correct?

15      A.  I am, yes.

16      Q.  You founded it in 2005, give or take?

17      A.  Correct.

18      Q.  And it's an LLC?

19      A.  It is.

20      Q.  And you are the sole member of Strategic Vision, LLC?

21      A.  I am.

22      Q.  You have always been the sole member?

23      A.  Yes.

24      Q.  And Strategic Vision has never had any employees?

25      A.  No.

L4JKEAS1                         Warrop - Cross

1   Q.  Has Strategic Vision ever had any employees?

2   A.  None.

3   Q.  And it has no officers other than you, correct?

4   A.  Correct.

5   Q.  No other directors?

6   A.  No.

7   Q.  No other owners?

8   A.  No.

9   Q.  No other principals?

10  A.  No.

11  Q.  Strategic Vision is a strategic consulting firm that

12  assists companies in their internet growth expectations; is

13  that right?

14  A.  Correct.

15  Q.  And it provides consulting services in the area of

16  international political affairs?

17  A.  Correct.

18  Q.  It also performs research and analysis of political

19  intelligence?

20  A.  Correct.

21  Q.  Assists clients with commercial due diligence?

22  A.  Yes.

23  Q.  Sometimes assists clients with advice on real estate

24  holdings?

25  A.  Yes.

1   Q.  And investigatory research as well, correct?

2   A.  Correct.

3   Q.  And sometimes surveillance, right?

4   A.  No.  I wouldn't call it surveillance.  I'd call it due

5   diligence.

6   Q.  Is your testimony now that Strategic Vision does not engage

7   in surveillance?

8   A.  It is -- we do do due diligence and research.

9   Q.  I just need an answer to my question.  Is your testimony

10  now that Strategic Vision does not engage in surveillance?

11  A.  We do not directly personally, no.

12  Q.  Does Strategic Vision request that people perform

13  surveillance at its behest?

14  A.  Yes.

15  Q.  And, Ms. Wallop, you don't have a degree in international

16  political affairs, correct?

17  A.  No, I do not.

18  Q.  And you do not have a degree in political science, correct?

19  A.  No, I do not.

20  Q.  And you don't have any educational credentials that relate

21  to commercial due diligence, correct?

22  A.  No.

23  Q.  Sorry, let me ask that so the record is clear.

24        Do you have any educational credentials that relate to

25  commercial due diligence?

1   A.  No.

2   Q.  And you don't have an M.B.A.?

3   A.  No.

4   Q.  You don't have a J.D.?

5   A.  No.

6   Q.  You don't have a real estate license?

7   A.  I did.

8   Q.  When did that expire?

9   A.  Probably in about 1997, 1998.

10  Q.  Okay.  Well, before your involvement with Eastern Profit

11  and Mr. Wengui, correct?

12  A.  Yes.

13  Q.  You don't have a degree in intelligence, correct?

14  A.  No.

15  Q.  You don't have a private investigator's license, do you?

16  A.  No.

17  Q.  And you don't have any formal training in surveillance, do

18  you?

19  A.  No.

20  Q.  And your only degree in higher education is a degree in

21  languages and logistics; is that correct?

22  A.  Linguistics.

23  Q.  Excuse me, excuse me.  Linguistics?

24  A.  It's a simultaneous interpreter.

25  Q.  Okay.  And you did get a Bachelor's degree; is that right?

1   A.  Yes.

2   Q.  Before receiving the deposit of $1 million in connection

3   with the research agreement at issue in this case,

4   Strategic Vision had less than $20 in its bank account; isn't

5   that true?

6   A.  Directly, on purpose, yes.

7   Q.  And you operate Strategic Vision out of your home in

8   Virginia, correct?

9   A.  Currently, yes.

10  Q.  Did you do so in 2017 and 2018?

11  A.  Yes.

12  Q.  And since you founded Strategic, Strategic has conducted at

13  least five private investigations for its clients, correct?

14  A.  Due diligence, again, not private investigations.

15  Q.  You understand that in connection with the pretrial order

16  in this case, Strategic Vision submitted a Joint Statement of

17  Admitted Facts?

18  A.  Yes.

19  Q.  And did you review the joint -- the facts before your

20  counsel agreed to them?

21  A.  I did.

22  Q.  Okay.

23          MS. CLINE:  Chris, can you pull up the joint

24  statements of facts, please?

25  Q.  So Ms. Wallop --

L4JKEAS1                          Wallop - Cross

```
 1              MS. CLINE:  Chris, turn to that first page for a
 2    second.
 3    Q.  Ms. Wallop, can you see -- first of all, is your screen
 4    working?
 5    A.  Yes.
 6    Q.  And so there's -- the first page here in this document
 7    says, "Joint Proposed Pretrial Order."  Do you see that?
 8    A.  I do.
 9    Q.  At the top, it says, "Document 299."  Do you see that?
10    A.  Yes.
11    Q.  Okay.
12              MS. CLINE:  And I'm going to ask Mr. Chuff to turn to
13    the Joint Statement of Admitted Facts, which was submitted in
14    connection with this joint pretrial order.
15    Q.  Do you now see a page that says "Joint Statement of
16    Admitted Facts"?
17    A.  I do.
18              MS. CLINE:  Mr. Chuff, we need to scroll to paragraph
19    15, please.
20    Q.  Do you see paragraph 15 there?
21    A.  I can, you highlighted it, yes.
22    Q.  Okay, great.  It says, "Since it was founded, Strategic has
23    conducted at least five private investigations for its
24    clients."  Do you see that?
25    A.  I do, but I think there's a difference between due
```

L4JKEAS1                          Warfop - Cross

 1  diligence and, quote, "private investigations."

 2  Q.  Sorry.  Could you tell me, please -- I'm going to read it,

 3  and then I just need to know whether I'm reading it correctly.

 4  Paragraph 15 says, "Since it was founded, Strategic has

 5  conducted at least five private investigations for its

 6  clients."

 7          Did I read that correctly?

 8  A.  You did read it correctly.

 9  Q.  In discovery, you couldn't tell us who these clients were

10  for whom Strategic had conducted investigations or due

11  diligence because they were all secret, right?

12  A.  Correct.

13  Q.  Michael Waller has assisted Strategic in a number of

14  investigations and due diligence projects, correct?

15  A.  Correct.  Research and due diligence, yes.

16  Q.  Including the research agreement with Eastern Profit?

17  A.  Correct.

18  Q.  And the investigatory research that Strategic provides for

19  its clients includes electronic research into the chosen

20  targets, correct?

21  A.  That's correct.

22  Q.  And physical surveillance of those targets, correct?

23  A.  Not by me.

24  Q.  But by Strategic, right?

25  A.  By Strategic and individuals that we hire as a sub, yes.

L4JKEAS1                          Warrop – Cross

1    Q.  As part of its investigations, Strategic seeks to uncover

2    information about crimes and civil wrongs, correct?

3    A.  Only on an international basis, not domestically.

4    Q.  Okay.  But internationally, you would agree that Strategic

5    seeks to uncover information about crimes and civil wrongs?

6    A.  We have, yes.

7    Q.  And information about location disposition and recovery of

8    stolen assets -- excuse me, stolen property, correct?

9    A.  Again, overseas, but not domestically.

10   Q.  Okay.  And it also seeks to uncover the cause of injuries

11   to persons or to property, correct?

12   A.  Overseas and -- but not domestically.

13   Q.  Okay.  The categories of services I just mentioned, those

14   are the types of services that Strategic sought to provide to

15   Eastern Profit, correct?

16   A.  Again, overseas and not domestically.

17   Q.  And to help conduct its investigations, Strategic sometimes

18   hires independent contractors to provide certain services,

19   correct?

20   A.  That's correct.

21   Q.  But you are involved personally in Strategic's

22   investigations to some extent, correct?

23   A.  I am involved to select the independent contractors, yes.

24   Q.  Sometimes you personally seek to obtain information about

25   the targets from your contacts in the intelligence community,

1     right?

2     A.  Yes.

3     Q.  And from your political contacts, correct?

4     A.  Yes.

5     Q.  And from your business contacts, also, right?

6     A.  Yes.

7     Q.  And you do that personally, right?

8     A.  Yes.

9     Q.  You do recall that I took your deposition in November of

10    2019, correct?

11    A.  Yes, I do.

12    Q.  In that deposition, do you recall testifying that you, from

13    time to time, performed surveillance yourself personally?

14    A.  I have, but outside of the U.S.

15    Q.  In this case, Strategic is currently represented by Graves

16    Garrett, correct?

17    A.  That's correct.

18    Q.  And prior to Graves Garrett entering its appearance,

19    Strategic was represented by Barton LLP; is that correct?

20    A.  For about two weeks.

21    Q.  And you're aware that Barton sought permission of the Court

22    to withdraw from representing Strategic, right?

23    A.  Yes.

24    Q.  One of the reasons they cited was lack of payment of fees,

25    correct?

1           MR. GREIM:  Your Honor, objection to the relevance of

2     this line of questioning.

3           THE COURT:  I'll permit it and see where it goes.

4           THE WITNESS:  Repeat the question, please.

5     BY MS. CLINE:

6     Q.  Yes.

7           One of the reasons that Barton cited for seeking

8     permission to withdraw was the lack of payment of fees,

9     correct?

10    A.  Incorrect.

11    Q.  Did Barton submit an application to this Court seeking

12    permission for relief to withdraw based on nonpayment of fees?

13    A.  We paid them a retainer fee.  The attorney took off two

14    weeks' vacation, was totally incommunicado, and then sent us a

15    bill for $80,000.  We had paid Barton --

16          THE COURT:  Ms. Wallop, let me advise you, I don't

17    want --

18          THE WITNESS:  Sorry.

19          THE COURT:  -- any privileged information or any

20    communications that you had with counsel.  Why don't you just

21    try to answer the questions asked by counsel --

22          THE WITNESS:  Yes, sir.

23          THE COURT:  -- who will be careful to avoid trenching

24    into anything involving attorney work product or

25    attorney-client communications.

 1           MS. CLINE:  Absolutely understood, your Honor.

 2   BY MS. CLINE:

 3   Q.  My question, Ms. Wallop, is:  You're aware that there was a

 4   publicly filed document pursuant to which Barton sought

 5   permission to leave, withdraw as counsel, in part because of

 6   lack of payment of fees?  You're aware of that, right?

 7   A.  I'm aware of it.

 8   Q.  And prior to being represented by the Barton firm,

 9   Strategic was represented by Phillips Lytle, correct?

10   A.  Correct.

11   Q.  And Strategic failed to pay Phillips Lytle its outstanding

12   fees, correct?

13   A.  Its outstanding fees, not previous fees.

14   Q.  Well, Phillips Lytle brought a suit against

15   Strategic Vision and won a judgment for over $115,000, right?

16   A.  I believe they did, yes.

17   Q.  And you were once the principal of a company called

18   Corporate Travel Services, right?

19   A.  I was.

20   Q.  That company was sued by its landlord for nonpayment of

21   rent?

22   A.  After we'd had a burglary, we sued them.  So it was a

23   countersuit.

24   Q.  But they sued you for nonpayment of rent, right?

25   A.  It was a countersuit.

L4JKEAS1                           Wallop - Cross

```
 1   Q.  They had a claim against you for --
 2   A.  They had a claim, and we had a claim.
 3   Q.  Okay.  And a law firm called Speight McCue sued you for
 4   nonpayment of fees in connection with the judgment, right?
 5            MR. GREIM:  Your Honor, objection to the relevance of
 6   these questions about past payment of fees years ago by
 7   Ms. Wallop.
 8            THE COURT:  What's the relevance?
 9            MS. CLINE:  I'm going to connect it right now, your
10   Honor, if I may.
11            THE COURT:  Okay.  Go ahead.
12   BY MS. CLINE:
13   Q.  So, over -- in the past, you or entities you've controlled
14   have been involved in payment disputes with three different law
15   firms and a landlord, but in this case, since Graves Garrett
16   entered its appearance in mid-2019, its fees have been paid
17   current, correct?
18            MR. GREIM:  Objection, your Honor.  I'm not sure what
19   the payment of our fees and whether we're current or not has to
20   do with this case.
21            THE COURT:  Yes, sustained.  If you want to -- if
22   you've got -- if this goes to litigation funding, and you can
23   satisfy the criteria laid out in my decision on the motion in
24   limine, then I'll permit it.
25            MS. CLINE:  Will do.
```

```
 1   BY MS. CLINE:

 2   Q.  So Graves Garrett is based in Missouri, right?

 3   A.  Yes.

 4   Q.  And they don't have a New York office?

 5   A.  No.

 6   Q.  And Strategic Vision's counterclaim for fraud in this case

 7   was not pled until after Graves Garrett was retained, correct?

 8   A.  When I finally had excellent attorneys, yes.

 9   Q.  Prior to Graves Garrett's retention, Strategic Vision never

10   made an allegation that Mr. Guo was a double agent, correct?

11              MR. GREIM:  Objection, your Honor, to the question.

12              THE COURT:  Overruled.

13              THE WITNESS:  It was known by the first law firm,

14   Phillips Lytle, to whom we paid a great deal of money, yes.

15   Q.  So my question is:  Just prior to the retention of Graves

16   Garrett, Strategic had never made an allegation in this case

17   that Mr. Guo was a double agent, correct?

18   A.  I wouldn't agree with that, no.

19              (Continued on next page)

20

21

22

23

24

25
```

1    Q.  So your understanding is that there's a pleading in this

2    case prior to the second amended complaint that contains an

3    allegation that Guo was a double agent?

4    A.  It wasn't a pleading.  It was a conversation --

5              THE COURT:  No, Ms. Wallop --

6              THE WITNESS:  I'm sorry.

7              THE COURT:  -- you're not to give --

8              THE WITNESS:  Okay.

9              THE COURT:  -- your communications with your counsel

10   unless the defendant is going to waive the privilege.  The

11   question is -- let me ask the question.

12             Prior to the second amended complaint, did Strategic

13   ever publicly accuse Mr. Guo of being a double agent?

14             THE WITNESS:  I don't believe so.

15   BY MS. CLINE:

16   Q.  How did Strategic Vision come to find Graves Garrett?

17             MR. GREIM:  Objection.

18             THE COURT:  Sustained.

19   Q.  Your counsel has admitted in this case, or you've admitted

20   in this case, that someone other than Strategic Vision is

21   paying your fees to Graves Garrett, correct?

22   A.  Correct.

23   Q.  And who is that person or entity?

24             MR. GREIM:  Okay, your Honor.  I now make the

25   objection and think we have to lay the foundation that was set

1    out in your order.

2              THE COURT:  I'll hear counsel at sidebar on this.

3              (Pause)

4              Ms. Wallop, why don't you step out of the courtroom

5    for a moment.

6              THE WITNESS:  Thank you, your Honor.

7              THE COURT:  Ms. Cline, do you want to make a proffer

8    as to what you expect the truthful answer to reveal?

9              MS. CLINE:  Yes.  So we don't know the site's

10   identity.  We have a line -- I understand the Court wants me to

11   lay a foundation.  I was trying to do that.

12             THE COURT:  All you have to do is lay a foundation

13   with me that you've got to support a good-faith belief -- and

14   I'm now reading my opinion -- that defendant has been funded by

15   a person or entity who is known, either generally or by

16   defendant specifically, as a current or former member of, or

17   was associated with or affiliated with the Chinese Communist

18   Party.  So this is your opportunity to tell me whether you do

19   have such a good-faith belief and what it's based on.

20             MS. CLINE:  Okay.  So there are several bases.  One is

21   sort of what I was trying to lay out already, which is that

22   Strategic couldn't pay its fees, nor did it assert a fraud

23   claim until Graves Garrett made an appearance in this case, and

24   then Graves Garrett proceeded to take a bunch of depositions,

25   issue a bunch of discovery letters, plead a fraud counterclaim

1  and so forth.

2          In addition to that, there are several law firms

3  pending in which counsel is -- there's the law firm called

4  Arkin Solbakken.  These are -- they represent plaintiffs in

5  several lawsuits against Mr. Guo, and they also represent

6  Strategic in a case that Mr. Guo filed against Strategic.

7          In the other two cases, the litigants in those two

8  cases have admitted, the litigants who are being represented by

9  Arkin Solbakken, have admitted that their fees are being paid

10 by a gentleman by the name of Bruno Wu.

11         THE COURT:  I'm sorry, what's the name?

12         MS. CLINE:  Bruno Wu.  And in this case, counsel, in

13 order to resolve the discovery dispute about this very issue,

14 counsel signed a stipulation representing that neither Bruno

15 Wu, nor anybody affiliated with or associated with the Chinese

16 Communist Party, was paying the fees of Strategic in this case.

17         So we think it's more than a coincidence that these

18 other law firms -- the litigants, who are represented by the

19 same firm that's been representing Strategic, are being paid by

20 Bruno Wu.  And so we wanted to ask those questions, and we want

21 to understand the foundation for which Strategic entered a

22 stimulation suggesting that neither Bruno Wu nor anybody from

23 the CCP is paying the fees here.

24         And, obviously, in our view, it goes right to the

25 heart of fraud claims.  Their claim is no way, no how would

1   they ever have entered a contract with someone who supports

2   communism, if right now their fees are being paid by someone

3   who supports communism.

4           THE COURT:  Is there a basis for believing that Bruno

5   Wu supports communism?  Link it up for me.

6           MS. CLINE:  Yes.  So there are media reports, and we

7   also have a registration report in which he's affiliated with

8   some organizations who are associated with the communist party.

9           THE COURT:  Let me hear from Mr. Greim.

10          MR. GREIM:  Your Honor, we've kind of been playing

11  Battleship with who the third-party payer is.  The Bruno Wu

12  issue was brought up earlier in the case.  We actually thought

13  they were heading towards somebody else.  As you can probably

14  see from our motion in limine, we thought they moved on to a

15  new theory involving some other individuals in Hawaii.

16          Now, it sounds like we're back to Bruno Wu again and,

17  your Honor, we just had a ruling on Bob Fu about having a case

18  within a case that would require proving that Bob Fu was a

19  dissident and that would be the relevance of Guo attacking that

20  person.  We're right back to the same place.

21          The problem is this.  I suppose the witness could be

22  asked -- If Bruno Wu is their theory, if they're willing to

23  commit to that as their good-faith basis, the witness can be

24  asked whether Bruno Wu is paying us.

25          What we object to is a game of Battleship, where we

| 1 | just rundown the list of everybody who Guo's side says must be |
| 2 | a communist agent because they opposed Guo, that becomes a |
| 3 | problem.  The representation made to the Court, your Honor, |
| 4 | that Arkin Solbakken represents Strategic Vision in another |
| 5 | case is incorrect.  The other case that was referenced there |
| 6 | involving this Arkin Solbakken firm was a defamation case that |
| 7 | Guo filed against, actually, me individually, Dr. Waller, Ms. |
| 8 | Wallop and I believe Strategic Vision as well in New York |
| 9 | Supreme Court.  Filed it based on the fraud counterclaim and |
| 10 | said that was defamatory.  That was dismissed by the State of |
| 11 | New York Supreme Court and then also by the Appellant division |
| 12 | because he didn't perfect his appeal. |
| 13 | But I don't believe, and I don't believe that Arkin |
| 14 | Solbakken represents Strategic Vision.  I think it actually |
| 15 | represented one of the defendants in that case but, your Honor, |
| 16 | they have to have evidence that Bruno Wu paid for the defense |
| 17 | in that case.  That would at least get them close, but they |
| 18 | can't. |
| 19 | So, look, I think that the easy way through this, and |
| 20 | we have stipulated that Bruno Wu is not paying for our fees in |
| 21 | this case.  We have stipulated that no member of the Chinese |
| 22 | Communist Party, no affiliate or no associate is paying our |
| 23 | fees in this case.  If she would like to ask, directly ask, the |
| 24 | witness if it's Bruno Wu or some friend of his or associate or |
| 25 | whatever, then we don't actually have an objection to that. |

1              Our problem is using this coincidence as a hook, and

2      then just running down and playing Battleship with every person

3      who Guo believes is an enemy of his and seeing if that person

4      is funding this, that would not be appropriate.

5              THE COURT:  Ms. Cline, I take it you're just going to

6      ask the witness who's funding, and then you're going to ask the

7      witness if that, to the witness' knowledge, that person has a

8      relationship or is a supporter of the Chinese Communist Party,

9      or if you've got information about whoever the funder is,

10     you'll ask the specific follow-up questions and ask whatever

11     the witness says.  But we're not going to go through a list of

12     potential litigation funders; is that correct?

13             MS. CLINE:  No.  We have no plans to go through the

14     list, your Honor.

15             THE COURT:  Okay.  I'm going to -- Mr. Greim, I'm

16     going to permit the testimony.  It is relevant, given the

17     issues that you've introduced into the case.  I've excluded

18     Mr. Fu because he was going to appear as a separate witness.

19     I've made it clear that I'm permitting some latitude with

20     respect to the examination of witnesses.

21             MR. GREIM:  Your Honor, if I could, though, one point?

22     The issue with the list is the same problem that just asking

23     the pointblank question of who is funding.  They should ask

24     about the person who supports their good-faith basis.  The

25     whole point of this and the shifting theory of why it's

1     relevant is just to find out who it is.

2              THE COURT:  Okay.  I've ruled.  Let's bring the

3     witness back in.

4              Ms. Wallop, you may be seated.  You are reminded that

5     you are still under oath.

6              THE WITNESS:  Of course.  Thank you, your Honor.

7              THE COURT:  Ms. Cline, you may proceed.

8     BY MS. CLINE:

9     Q.  Ms. Wallop, I think where we left off is I was asking

10    whether Strategic Vision in this case came to an agreement in

11    which a third party was paid for Graves Garrett's fees in this

12    case?

13    A.  Yes.

14    Q.  And with whom did you reach that agreement?

15    A.  With my attorneys.

16    Q.  Okay.  And who -- you understand that in order to have a

17    third party paying Strategic Vision's fees, you would need

18    consent for that, right?

19    A.  Yes.

20    Q.  And what was the entity as to which you gave consent that

21    they would pay Strategic Vision's fees, what person or entity?

22    A.  I believe it was a group called Ciranus.

23              THE COURT:  Can you spell that?

24              THE WITNESS:  Ciranus, C-i-r-a-n-u-s.

25    Q.  And you're aware that, in this case, your counsel entered a

Warrop - Cross

```
 1    stipulation attesting that your legal fees in this action were

 2    not being paid by any person or entity that is or ever was a

 3    member of, associated with or affiliated with the Chinese

 4    Communist Party or the People's Republic of China, correct?

 5    A.  That's correct.

 6    Q.  And what did you do to satisfy yourself, as to Ciranus,

 7    that that was the case?

 8    A.  I believe that my attorneys and Mike, Dr. Waller and

 9    myself, were satisfied that this group was very pro-American

10    and was determined to be protecting U.S. citizens.

11    Q.  Did you, or someone on behalf of Strategic Vision, do any

12    research into who owns or controls Ciranus?

13    A.  I did not.

14    Q.  Sitting here, you don't know who owns or controls it?

15    A.  I don't know who controls it.

16    Q.  So as far as you know, the person -- the people who control

17    Ciranus could, in fact, be supporting of the CCP, correct?

18    A.  I relied on my counsel and on Dr. Waller.

19    Q.  So you've never had any conversations yourself with

20    Ciranus?

21    A.  No.

22    Q.  And so you don't know one way or another whether Ciranus is

23    affiliated, in fact, with the CCP?

24    A.  I wouldn't do business with anybody that was affiliated

25    with the CCP.
```

```
 1   Q.  But you admit that you did no work or investigation or due
 2   diligence on your part, on behalf of Strategic Vision, to
 3   confirm that Ciranus is not affiliated with the CCP, right?
 4   A.  I confirmed that I trusted my attorneys and my business
 5   partner.
 6   Q.  Do you have an understanding of whether if Strategic Vision
 7   loses in this case, whether Ciranus will pay the judgment?
 8   A.  I have no idea.
 9   Q.  Do you have any idea whether there's a cap or limit on the
10   amount of fees that Ciranus will pay for Strategic Vision in
11   this case?
12   A.  I have no idea.
13   Q.  Do you have any information whether the discovery produced
14   in this case is being shared with Ciranus?
15   A.  I have no idea.
16   Q.  Do you have any idea whether Ciranus has been shown the
17   protective order in this case?
18   A.  I have no idea.
19   Q.  Do you have any idea whether Ciranus has a relationship
20   adversarial or otherwise, with Mr. Guo?
21   A.  No.
22   Q.  Did you ever see the invoices that Graves Garrett charges
23   Strategic Vision in this case?
24   A.  Yes.
25   Q.  And do you need to approve them before they're passed along
```

 1   to Ciranus?

 2   A.  No.

 3   Q.  And does Ciranus pay Graves Garrett directly, or does the

 4   money flow through Strategic Vision first?

 5            MR. GREIM:  Your Honor --

 6            THE COURT:  Sustained.

 7   Q.  At some point in November 2017, you and Mr. Waller were

 8   introduced to a man by the name of Guo Wengui; is that correct?

 9   A.  That's correct.

10   Q.  And you were introduced to Mr. Guo by William Gertz and

11   Lianchao Han?

12   A.  That's correct.

13   Q.  Mr. Gertz is an investigative journalist?

14   A.  Yes, among other things.

15   Q.  And Mr. Han is a pro-democracy activist?

16   A.  Yes.

17   Q.  And you had known Lianchao Han for a few years by that

18   time, correct?

19   A.  Easily 30 years, both of them.

20   Q.  And Mr. Han had worked for several years in the U.S.

21   Senate, including for your former husband?

22   A.  That's correct.

23   Q.  And you regarded Mr. Han as an excellent individual, right?

24   A.  Yes.

25   Q.  And you believed Mr. Gertz was one of the finest intellects

1   on Chinese corruption, right?

2   A.  I agree, yes.

3   Q.  And you understood from Mr. Han and Mr. Gertz that Mr. Guo

4   was a dissident with sufficient resources to make a strong

5   stand against the CCP, correct?

6   A.  Initially, yes, that was my understanding.

7   Q.  And after being introduced to Mr. Guo, you had a number of

8   in-person meetings with Mr. Guo and others over the course of

9   November and December 2017, right?

10  A.  That's correct.

11  Q.  And during one or more of those meetings, you and

12  Mr. Waller described various services that you could provide

13  him, correct?

14  A.  As a result of his request, yes.

15  Q.  Is it your testimony that Mr. Guo made a request of

16  Strategic Vision prior to your first meeting with him?

17  A.  Yes, to some degree, through Lianchao Han.

18  Q.  But you never met Mr. Guo until the meeting at which you

19  were introduced to him by Mr. Han and Mr. Gertz; is that right?

20  A.  That's correct.

21  Q.  Can we please pull up Exhibit DX38.

22          So, Ms. Wallop, hopefully on your screen, the first

23  page, the title says "Vision."  Are you seeing that okay?

24  A.  That's correct.

25  Q.  Okay.  And is that your handwriting in the upper right-hand

```
 1  corner that says "first meeting with Guo"?

 2  A.  Correct.

 3  Q.  And is Exhibit 38 a document that you presented to Mr. Guo

 4  in your -- in Strategic's first meeting with him?

 5  A.  It was per the request of Lianchao Han, who asked us to put

 6  this, a vision statement, together based on the conversation

 7  that Lianchao had with Dr. Waller and myself about the meeting,

 8  the purpose of the meeting.

 9  Q.  Okay.  I think my question was:  Did you, on behalf of

10  Strategic Vision, present this document to Mr. Guo in the first

11  meeting that Strategic Vision had with him?

12  A.  I did, or we did.

13  Q.  And you and Mr. Waller were involved in preparing the

14  document, correct?

15  A.  As was Lianchao Han, yes.

16  Q.  And this document describes the services that, at least

17  initially, that Strategic Vision was offering to perform for

18  Mr. Guo, right?

19  A.  At the request of Lianchao Han, who was Guo's emissary.

20  Q.  So I direct your attention to the second paragraph of the

21  first page here.

22          THE COURT:  Are you offering DX38?

23          MS. CLINE:  Oh, sure, your Honor.  Maybe a matter of

24  housekeeping.  I understood that you would just move everything

25  at the end of the --
```

```
 1            THE COURT:  I will, but just indicate for the record
 2    that you're going to be offering it, just so that we're clear.
 3            MS. CLINE:  Okay.  Fair enough.  Then plaintiffs offer
 4    DX38, the Vision exhibit.
 5            THE COURT:  I'll receive it subject to the motion to
 6    strike at the end.
 7            MS. CLINE:  Okay.
 8            (Defendant's Exhibit DX38 received in evidence)
 9    BY MS. CLINE:
10    Q.  So I direct your attention to the second paragraph of the
11    first page, the paragraph that starts with "Mr. G;" do you see
12    that?
13    A.  I do.
14    Q.  And the second sentence is really what I want you to focus
15    on:  "However, he has the image of just another exiled
16    billionaire, and some suspect he may simply represent a faction
17    in an internal leadership struggle."
18            Did I read that correctly?
19    A.  You did.
20    Q.  And you thought that statement was true at the time of this
21    meeting, correct?
22    A.  Yes.
23    Q.  But you didn't do any investigation at that point in time
24    to follow up on that point, correct?
25    A.  Bill Gertz and Lianchao Han had vouched for him, and we
```

1  felt those were very good references; so, no, we did not.

2  Q.  And part of what the vision, at least in this first

3  meeting, contemplated was that Strategic would help Mr. Guo

4  change his public image from exiled businessman to

5  international statesman; is that fair?

6  A.  This is what Lianchao Han had suggested that Mr. Guo wanted

7  to have happen with his image, yes.

8  Q.  So if you could be careful just to answer my questions

9  because there may be a hearsay problem, to the extent you're

10  talking about what other people are saying.  But I won't move

11  to strike your testimony, but if you could kind of keep it

12  limited to my question, that would be great.

13          So my question is, this vision -- after you

14  memorialize what Strategic Vision was proposing to do for

15  Mr. Guo in this very first meeting, correct?

16  A.  At the behest of Lianchao Han.

17  Q.  And this first meeting there was no offer by Strategic

18  Vision to perform investigative services, correct?

19  A.  No.

20          THE COURT:  I'm sorry, the question was asked in a way

21  that would have been unclear to me.

22          THE WITNESS:  Thank you, your Honor.

23          THE COURT:  At the first meeting, was there an offer

24  by Strategic to perform investigative services?

25          THE WITNESS:  No --

L4JPEAS2                        Wallop - Cross

 1                   THE COURT:  Thank you.

 2                   THE WITNESS:  -- your Honor.  That came later.

 3                   THE COURT:  Thank you.

 4     BY MS. CLINE:

 5     Q.  All right.  Now, let's move to Exhibit 39, please.  DX39.

 6     Are you able to see it, Ms. Wallop?  It should say "Three-year

 7     Timeline" at the top?

 8     A.  That's correct.

 9     Q.  And is that your handwriting up at the top, "second meeting

10     with Guo"?

11     A.  Correct.

12     Q.  And is this a document that you and Mr. Waller put

13     together?

14     A.  Yes, and also with Lianchao Han.

15                   MS. CLINE:  Your Honor, plaintiffs would offer DX

16     Exhibit 39.

17                   THE COURT:  Received subject to motion to strike.

18                   (Defendant's Exhibit DX39 received in evidence)

19     BY MS. CLINE:

20     Q.  And is this, in fact, a document that was presented to

21     Mr. Guo at Strategic's second meeting with him?

22     A.  Yes.  After the first set of conversations from, obviously,

23     the first meeting, these were the additional objectives that he

24     suggested that he wanted to have magnified, I guess is the best

25     word.

1   Q.  And so, for example, Strategic talks about ways Mr. Guo

2   could build a personal presence in Washington, D.C., correct?

3   A.  That's correct.

4   Q.  And you proposed helping him acquire a Washington, D.C.

5   residence, correct?

6   A.  He suggested that he wanted to find a very substantial

7   home, as well as an office building to set up his foundation.

8   Q.  And my question is, that's -- helping him find a home and

9   real estate for offices is one of the things that Strategic

10  suggested in this document; isn't that correct?

11  A.  At both Guo's request and Lianchao's request, yes, in order

12  to build his image in Washington.

13  Q.  And Strategic also proposed to connect him with people who

14  had the ear of U.S. policymakers, right?

15  A.  Yes, that's correct.

16  Q.  And Strategic proposed to charge anywhere from 30,000 to

17  $120,000 per month for the services described in Exhibit DX39,

18  right?

19  A.  Yes, I guess that's the -- yes, that's the figure; mmm,

20  hmm.

21  Q.  But as it turned out, Strategic did not end up providing

22  any of these communication or public interest-type services,

23  correct?

24  A.  That's correct.

25  Q.  And at some point, it became clear, from what Mr. Guo told

1    you and Mr. Waller, that he was interested in conducting an

2    investigation into members of the CCP, true?

3    A.   That's true.

4    Q.   At some point subsequent to this meeting, the services

5    Strategic offered to provide to Guo pivoted from public images

6    services to investigation services, right?

7    A.   It was at his behest, not our suggestion, yes.

8    Q.   So my question is, at some point subsequent to this, the

9    services that Strategic Vision offered pivoted from public

10   image-type services to investigation services; isn't that true?

11   A.   Yes.

12   Q.   Mr. Chuff, can we bring up PX2.

13          Are you seeing a document entitled "Time to get them"?

14   A.   Correct, I do.

15   Q.   Okay.  And this is a document that Strategic presented to

16   Mr. Guo in a meeting subsequent to that second meeting we just

17   discussed, right?

18   A.   Yes.  It appears to be -- yes, it does.

19   Q.   And you and Mr. Waller put this document together somewhere

20   at the end of 2017; is that accurate?

21   A.   That's correct, also with Lianchao's input.

22   Q.   And at some point in the end of 2017, Strategic presented

23   this document to Mr. Guo, correct?

24   A.   That's correct.

25          MS. CLINE:  Your Honor, plaintiffs offer PX2.

1          THE COURT:  Same ruling.

2          (Plaintiff's Exhibit PX2 received in evidence)

3    BY MS. CLINE:

4    Q.  But unlike the prior two exhibits we looked at, this

5    document, PX2, proposes certain investigation services.  I

6    guess my question is going to be, isn't that right?  But go

7    ahead.

8          Mr. Chuff, so the witness can see, maybe turn exactly

9    to page 3 there.

10   A.  Could I see the previous page?  Because it's been three

11   years; so I haven't seen it.  Thank you.  Thank you.

12   Q.  Okay.  And so turning now to page 3 of Exhibit PX2, so the

13   initial -- the heading of the page is called "Targeted

14   intelligence collection and analysis;" do you see that?

15   A.  Yes.  Could you give me the date, please, of this proposal?

16   Q.  I'm not certain there's a date on it.

17   A.  Well, it would help to know the sequence.

18   Q.  So I'll just ask you some questions and --

19   A.  Okay.

20   Q.  -- that will put it in context for you.  My question for

21   now is just, first of all, do you see the title of the page 3?

22   It's called "Targeted Intelligence Collection and Analysis."

23   A.  Right, I do.

24   Q.  And then the first bullet point down says -- excuse me.  It

25   says:  "Build and operate a secret system for micro-targeted

1    intelligence collection and analysis."  Do you see that bullet?

2    A.  I do.

3    Q.  And is that one of the services Strategic could perform for

4    Mr. Guo?

5    A.  Yes.

6    Q.  And that wasn't a research activity that one could just do

7    at the local library, right?

8    A.  No.

9    Q.  It was a sophisticated -- much more sophisticated than

10   that, right?

11   A.  Correct.

12   Q.  And as the next sentence says, it's an extremely sensitive

13   capability that must be handled with extreme care; is that

14   accurate?

15   A.  Yes, per Guo's instructions, yes.

16   Q.  And so those were the types of investigation services that

17   were ultimately memorialized in the research agreement, right?

18   A.  Sorry, I'm just reading.  Yes, it summarizes most of the

19   points.

20   Q.  And if you go down to the further bullet, it says:

21   "Document everything as leverage to gain concessions, protect

22   people, use as political weapon, or as aid in criminal

23   prosecution and asset recovery."  Do you see that?

24   A.  Yes, that was one of the instructions by Guo.

25   Q.  And that concept in that bullet ended up being memorialized

1   in the research agreement, right?

2   A.  Yes.  To some degree, yes.

3   Q.  And you understood that Mr. Guo wanted the investigation to

4   uncover corruption relating to members of the CCP, right?

5   A.  Yes.

6   Q.  Including crimes committed by members of the CCP?

7   A.  At his instruction, that was what he was requesting, yes.

8   Q.  And he also wanted information about funds stolen by the

9   members of the CCP and taken out of China illegally, correct?

10  A.  I believe he discussed it, but we were not sure whether or

11  not that could be accomplished.

12  Q.  Okay.  But you would agree that one of the services Mr. Guo

13  understood that Strategic would be performing was to get

14  information regarding funds that would have been taken out of

15  the country illegally, cash payments, all of the things that

16  were part of that, right?

17          MR. GREIM:  Objection, foundation.

18          THE COURT:  Overruled.

19  A.  No, not entirely, no.

20  Q.  So you and I, a few moments ago, talked about your

21  deposition in November of 2019.  You also were deposed in

22  February of 2019, correct?

23  A.  Yes.

24  Q.  We'll go ahead and pull up that deposition transcript,

25  please, Mr. Chuff.

1    And you see here on the screen this is the first page

2    of the transcript of your deposition in February of 2019?

3    A.  Yes.

4    Q.  All right.  Mr. Chuff, could you turn to the page that

5    contains pages 88 and 89.  Can you scroll up a bit, Chris?

6    That's good there.

7    Okay.  So I'm going to be reading from page 88, which

8    is in the top kind of right quadrant, and I'm going to start at

9    line 20.  With me so far, line 20?

10   A.  Yes, I see it.

11   Q.  Okay.  Well, the question is:

12   "Q.  And what control of corruption information does the

13   communist party have?

14   "A.  Well, Guo had said that the CCP, or the Communist Party of

15   China, there was a great deal of corruption within the

16   leadership, and as a result of that, he wanted to find as much

17   corruption as possible.  And he wanted us to investigate and

18   retrieve that kind of corruption.  In other words, funds that

19   would have been taken out of the country illegally, cash

20   payments, all of these things that were part of that."

21   Did I read that correctly?

22   A.  Yes, at his request.

23   Q.  And at some point in the end -- thanks, Chris.  We're good

24   with that.

25   At some point in the end of 2017, Strategic offered to

1  demonstrate its investigation capabilities to Mr. Guo, correct?

2  A.  I'm sorry, what was the date?

3  Q.  At the end of 2017.

4  A.  We discussed what he wanted to have done.  I'm just not

5  clear in the way you've asked the question.

6  Q.  At some point at the end of 2017, did Strategic offer to

7  provide some initial information about one of the targets that

8  Mr. Guo wanted to investigate?

9  A.  I think the answer is yes, to my recollection.

10  Q.  Okay.  Do you recall discussion of the target named Anita,

11  last name, S-u-e-n?

12  A.  I do because she was actually the first target on the

13  master list given to us by Guo.

14  Q.  And before Strategic entered into the research agreement,

15  you shared -- you and Mr. Waller shared a screenshot of Ms. --

16  I'm not sure how to pronounce it, might be two n's --

17  Ms. Suen's Civic Bank account information to Mr. Guo, right, to

18  prove that you could retrieve such information?

19  A.  Yes.

20  Q.  And I believe you testified that you were proving your

21  capabilities to, quote, peek into someone's bank account

22  information at this Civic Group Bank, right?

23  A.  I believe that Dr. Waller is better equipped to answer that

24  question.

25  Q.  But I guess I'm asking you.  Do you recall being at a

```
 1   meeting at which Strategic showed Mr. Guo?

 2   A.  Yes.

 3   Q.  A screenshot of someone's bank account?

 4   A.  Yes.  It was just a preliminary.  It was not into the

 5   account.

 6   Q.  But you testified you were able to see names and numbers,

 7   correct?

 8   A.  I do not remember -- well, it was not account information.

 9   It may have been the account number, and it may have been the

10   name on the account, but I don't remember seeing any other --

11   like a bank statement.  I don't remember anything like that.

12   Q.  And Strategic Vision is not licensed as a private

13   investigator anyway, right?

14   A.  No.

15   Q.  And it never has been?

16   A.  No.

17   Q.  And Mr. Waller never has been, to your knowledge, correct?

18   A.  Nope.

19   Q.  Strategic eventually entered into the research agreement as

20   of January 6th, 2018, correct?

21   A.  Yes.

22   Q.  Can you pull up PX1, please.  And, Mr. Chuff, can you just

23   kind of scroll through it to the end so the witness can see the

24   whole document.

25            (Pause)
```

 1              Okay.  Do you recognize PX1 to be a copy of the

 2    research agreement at issue in this case?

 3    A.   It appears to be.

 4    Q.   Okay.  And that's your signature at the end there, right?

 5    A.   On the left, yes.

 6    Q.   Okay.  And the date is January 6th, 2018?

 7    A.   That's correct.

 8              MS. CLINE:  Your Honor, plaintiffs offer PX1.

 9              THE COURT:  It is received subject to motion to

10    strike.

11              (Plaintiff's Exhibit PX1 received in evidence)

12    BY MS. CLINE:

13    Q.   And when you signed the agreement, you were at your home in

14    Arlington, Virginia, right?

15    A.   That's correct.

16    Q.   And Yvette Wang was present in your home when you signed?

17    A.   She was.

18    Q.   And you helped draft the agreement, correct?

19    A.   Yes.

20    Q.   And I'll direct your attention to the fourth paragraph of

21    the agreement.  I'll just read, and you can tell me if I'm

22    characterizing it accurately.  The fourth paragraph of the

23    agreement says:  "The contractor will conduct high-quality

24    original research and prepare reports on subjects chosen at the

25    client's discretion for the purpose of detecting, stopping and

1    preventing crime or other harm to innocent people."

2            You agree that the contract said that, correct?

3    A.  That's correct.

4    Q.  And Mr. Chuff, can you turn to page 3, please.

5            So directing your attention to the paragraph that says

6    "Criteria," and specifically, I'll direct you to the second

7    sentence:  Strategic agreed that it should make the most

8    diligent efforts to ensure the services rendered are of very

9    high quality, revealing a true and complete and full profile of

10   the subject; is that accurate?

11   A.  It is, yes.

12   Q.  And if you look up a couple of paragraphs to the paragraph

13   called "Deliverables," the last sentence of the paragraph

14   provides that "All deliverables shall be by USB drive only,"

15   correct?

16   A.  Yes.

17   Q.  And in terms of the types of deliverables, the contract

18   describes the deliverables, right there in the same paragraph,

19   as "financial forensic historical research reports, current

20   tracking reports and social media reports," correct?

21   A.  Yes, that's correct.

22   Q.  And as the financial forensic reports, those were intended,

23   in part, to uncover evidence of money laundering by members of

24   the CCP, correct?

25   A.  Well, we had no idea what it would turn up.

```
 1   Q.  But you agree that one of the purposes that you understood
 2   for the financial forensic reports was to uncover evidence of
 3   money laundering by members of the CCP, correct?
 4   A.  Yes, possibly.
 5   Q.  And the current tracking reports were to consist of
 6   detailed reports on movements to justify subjects by land, air
 7   and sea, right?
 8   A.  Yes.
 9   Q.  And social media reports were to include information
10   regarding the subject's court records and criminal records,
11   correct?
12   A.  Yes.  In the public domain, yes.
13   Q.  And also, information regarding extramarital affairs,
14   right?
15   A.  Yes.
16   Q.  And social media research was also to involve accessing
17   overseas accounts of Chinese Communist Party officials and
18   their close relatives, right?
19   A.  Where is that?
20   Q.  It's not in the contract, I don't believe.  I'm just asking
21   you if that was your understanding?
22   A.  Would you repeat the question, please?
23   Q.  Yes.  You understood that part of the social media research
24   that was contemplated was to involve accessing certain overseas
25   accounts of CCP officials?
```

1    A.  Possibly, yes.

2    Q.  And Strategic contemplated getting access to individual's

3    private passwords to their personal accounts, right?

4    A.  Yes, overseas.

5    Q.  Turning to the -- let's turn to page 3 of the exhibit, if

6    we could, and I just direct your attention to the paragraph

7    called "Prices" and take a moment to review that to yourself,

8    read that to yourself.

9    A.  Yes, I've read it.

10   Q.  Okay.  So you understood that the prices for each

11   deliverable, each of these reports that we mentioned, were to

12   be 300,000 each, per subject, per year, right?

13   A.  Yes.

14   Q.  And turning to page 5, please, I direct your attention to

15   the second paragraph of page 5.  The research agreement

16   provided that the client would pay the contractor a deposit of

17   $1 million upon signing, correct?

18   A.  Yes.

19   Q.  And the deposit was to be treated as a down payment, to be

20   credited on a prorated basis at the end of the contract,

21   correct?

22   A.  That's what it says.

23   Q.  And the research agreement -- scrolling down a bit to the

24   paragraph under the wire instructions, the research agreement

25   specifically said that it is understood that the client may

  1    direct other entities to pay the contractor and that such

  2    payments will be deemed satisfactory compensation by the

  3    contractor, correct?

  4    A.  Yes.

  5    Q.  As to the deposit -- Chris, I think we can take that down

  6    for now.

  7              On or about January 2nd of 2018, right before you

  8    signed the research agreement, Strategic received two $500,000

  9    wire transfers from a company called ACA Capital Group Limited,

 10    right?

 11    A.  We were not aware of it until the -- I think the 5th of

 12    January that the wires had been sent.

 13    Q.  Okay.  But you were aware of the wires before you signed

 14    the contract, right?

 15    A.  Yes, but we didn't know who ACA was.

 16    Q.  But you knew that the party that sent the wires was ACA,

 17    correct?

 18    A.  We did, but we didn't know who ACA was because we'd never

 19    been informed by Yvette or Guo as to how the funds were being

 20    sent.

 21    Q.  So I just need you to answer my question.  When the wires

 22    arrived prior to the time you signed the research agreement,

 23    you knew that the wires came in from ACA, didn't you?

 24    A.  I knew that two wires came from ACA, that's correct, but we

 25    did not know what they were for.

1  Q.  Well, Strategic accepted those two wires and put them into

2  its bank account, right, and didn't take them out?

3  A.  The wires were sent and went into the bank account.  When

4  we were notified that they were in the account, I believe it

5  was the -- probably, the 5th of January, but we didn't know

6  from whom -- what they were for.

7  Q.  You knew the wires that came in were in connection with the

8  research?

9  A.  No, we did not.  How could we?  We hadn't signed the

10  agreement.

11           THE COURT:  I'm sorry, Ms. Wallop.

12           THE WITNESS:  Sorry.

13           THE COURT:  Are you saying that you received a million

14  dollars, and you didn't know why you were getting a million

15  dollars?

16           THE WITNESS:  We presumed it was from Guo, but we did

17  not know who ACA was because nobody had informed us as to ACA.

18  We didn't know if it was a mistake by the wire department at

19  Citibank or what.  We did not know.  No one had told us about

20  ACA.

21           THE COURT:  You presumed it was in satisfaction of the

22  deposit requirement of the contract that was to be executed, I

23  take it?

24           THE WITNESS:  We would presume, but we all know that

25  presuming sometimes is dangerous.  So we believed that it could

Case 22-3118, Document 82-4, Filed 07/25/2023, Page 53 of 72    Case 1:22-cv-02386-JLR, Document 82, Filed 07/25/23, Page 76 of 225

225

1    have been, but we had never been informed either by Yvette or

2    by Guo that this was the sender, straight out of Hong Kong.

3              THE COURT:  Are you saying that, under the contract,

4    you thought you had a right to know who the sender was and what

5    the relationship was with Guo?

6              THE WITNESS:  Yes, sir, your Honor.

7              THE COURT:  Okay.

8              MS. CLINE:  Chris, can you pull the joint statement of

9    admitted facts?

10   BY MS. CLINE:

11   Q.  Ms. Wallop, returning back to the joint pretrial order that

12   we looked at previously.  I'm going to ask Mr. Chuff to scroll

13   through again to the joint statement of admitted facts.

14             And specifically, Mr. Chuff, if you could scroll to

15   paragraph 29.

16             Are you able to see paragraph 29, Ms. Wallop?

17   A.  Yes, I can see it.

18   Q.  Paragraph 29 says:  "The research agreement required that

19   Eastern provide a $1 million deposit on or about January 2,

20   2018.  Before the research agreement was signed, Strategic

21   received two $500,000 wire transfers from non-party ACA Capital

22   Group Limited."  Did I read that correctly?

23   A.  That's correct.

24   Q.  Turning to paragraph 30, paragraph 30 says:  "Strategic

25   understood that the $1 million payment from ACA was the deposit

 1    that the parties had previously discussed in relation to the

 2    research agreement then under negotiation."  Did I read that

 3    correctly?

 4    A.  Yes.

 5    Q.  Strategic did not return the deposit because it came from

 6    ACA, correct?

 7    A.  We didn't know who ACA was.  I'm sorry.

 8            THE COURT:  Just answer the question.  The question

 9    was --

10    A.  No, we did not.

11    Q.  So let's now shift to talk about what happened after the

12    agreement was signed.  On or about January 8th, Ms. Wang, on

13    behalf of Eastern Profit, delivered a list of 15 names of

14    individuals to you on USB drive to be investigated under the

15    research agreement, correct?

16    A.  On what date?

17    Q.  On or about January 8th.

18    A.  She did.

19    Q.  Mr. Chuff, can you pull up PX7, please.

20            Are you able to see the first page of Plaintiff's

21    Exhibit 7, Ms. Wallop?

22    A.  I do.

23    Q.  We can scroll through it, if you like.  The question is

24    going to be:  Do you recognize this document that contained at

25    least some of the names of the individuals to be researched

1    under the agreement?

2    A.  Well, I believe it was an exhibit; so therefore, it must be

3    accurate.

4    Q.  I mean, as you sit here today, do you recognize it as such?

5    A.  Yes.

6    Q.  And you understood that the individuals to be researched

7    were members of the CCP or closely -- people who were closely

8    related to high-ranking CCP members at the time?

9    A.  Yes, or their children living in the United States or

10   elsewhere.

11   Q.  And Strategic Vision did, in fact, set out to investigate

12   15 individuals, right?

13   A.  Yes, at Mr. Guo's request for those 15.

14   Q.  And Strategic retained a number of independent contractors

15   to investigate the subjects as well, correct?

16   A.  That's correct.

17   Q.  And is it your understanding that Strategic delivered a

18   total of two USB drives to Eastern under the research

19   agreement?

20   A.  Yes.

21   Q.  But you personally never saw the contents of either of

22   those two drives that were delivered to Eastern, correct?

23   A.  No.

24   Q.  Let me just clear that up.  Did you ever see the contents

25   of either of those two drives?

 1    A.  No, I did not.  I don't believe I did, no.

 2    Q.  So you don't have any personal knowledge as to what's on

 3    the USBs, correct?

 4    A.  Dr. Waller can best answer that because he was the person

 5    that returned with the USB keys to give them to Yvette.  So I

 6    never saw them.

 7    Q.  Right.  So my question is, you don't have any personal

 8    knowledge of what was on the USB keys, correct?

 9    A.  I do not.  To the best of my recollection, no, I never saw

10    them.

11    Q.  And you understand in this case that Strategic has admitted

12    that it did not deliver any of the reports called for under the

13    research agreement, correct?

14    A.  I don't believe that's true.

15    Q.  Chris, can we pull the joint statement up again, please,

16    and scroll, if you would, to paragraph 56 -- sorry, 54.

17              So, Ms. Wallop, returning to the joint statement of

18    admitted facts submitted with the pretrial order, I direct your

19    attention to paragraph 54.  54 reads:  "Strategic never

20    delivered to Eastern any financial forensic historical research

21    called for under the research agreement."  Did I read that

22    correctly?

23    A.  You did.

24    Q.  "55, Strategic never delivered to Eastern any current

25    tracking research called for under the research agreement."

1   Did I read that correctly?

2   A.  Yes.

3   Q.  "56, Strategic never delivered to Eastern any social media

4   research called for under the research agreement."  Did I read

5   that correctly?

6   A.  You read the three correctly.

7   Q.  And then just one more.  Paragraph "57, Strategic was

8   unable to prepare any detailed reports."  Did I read that

9   correctly?

10  A.  You did read it correctly.

11  Q.  And on February 23rd, 2018, Eastern delivered a termination

12  letter under the research agreement to Strategic, right?

13  A.  I'm sorry, what date was that?

14  Q.  February 23rd, 2018.

15  A.  Yes.  I believe I was out of the country, but yes.

16          MS. CLINE:  Okay.  Actually, as a matter of

17  housekeeping, your Honor, I think I was remiss as to PX7.  I

18  don't believe I asked that -- moved that in.

19          THE COURT:  That's received subject to motion to

20  strike.

21          (Plaintiff's Exhibit PX7 received in evidence)

22          MS. CLINE:  Apologies, your Honor, as well.

23          Back to the termination.  Mr. Chuff, could you pull up

24  DX8, please.

25  BY MS. CLINE:

 1    Q.  And, Ms. Wallop, we can scroll through if you need, but
 2    again, my question is going to be:  Do you recognize this to be
 3    the termination letter that Eastern sent to you in February of
 4    2018?
 5    A.  It appears to be.
 6    Q.  And you received this letter on behalf of Strategic Vision?
 7    A.  I did but some days later.
 8           MS. CLINE:  Your Honor, plaintiffs move for the
 9    admission of DX8.
10           THE COURT:  Same ruling.
11           (Defendant's Exhibit DX8 received in evidence)
12           MS. CLINE:  Mr. Chuff, could you please turn to page
13    2.
14    BY MS. CLINE:
15    Q.  So you understood that in this letter, Eastern demanded the
16    return of the deposit that had been sent to Strategic, right?
17    A.  It did, but I also noted that it said to return the funds
18    to Singapore and not Hong Kong.
19    Q.  So again, I just need you to answer my questions, but let's
20    take a look at the wire instructions.  The paragraph
21    immediately preceding the wire instruction says -- the last
22    sentence says:  "Eastern expects that Strategic Vision will
23    refund the $1 million deposit immediately.  Please send the
24    funds via wire transfer."  Do you see that?
25    A.  I do.

L4JPEAS2                        Wallop - Cross

1   Q.  And then if you scroll down to the beneficiary account

2   name, it says:  ACA Capital Group Limited, correct?

3   A.  Yes, in Singapore, not Hong Kong.

4           THE COURT:  Ms. Wallop --

5           THE WITNESS:  I'm sorry.

6           THE COURT:  -- let me instruct you again to just try

7   to answer the questions you're being asked.  You'll have an

8   opportunity to elaborate on Strategic's examination.

9           THE WITNESS:  Thank you, your Honor.

10  BY MS. CLINE:

11  Q.  But Strategic never did return the $1 million deposit,

12  right?

13  A.  No.

14  Q.  Now, turning to Strategic's fraud claim.  As part of the

15  claim, Strategic asserts that it wouldn't have entered into the

16  agreement if it had known that Mr. Guo, as you now allege, is a

17  supporter of the CCP, right?

18  A.  Correct.

19  Q.  But before the research agreement was entered into, you

20  were aware of reports that Mr. Guo had close ties to senior

21  Chinese Communist Party leaders, right?

22  A.  Not prior to the signed agreement, no.

23  Q.  So let's take a look at Exhibit DX43.

24          In the cross-folder, I think.

25          So we're showing you DX43.

 1              And yes, Chris, if you can scroll up.

 2              It's an article written by your friend, Bill Gertz; is

 3    that right?

 4    A.  Yes.  I've never seen this article.

 5    Q.  Did you read Mr. Gertz's articles prior to entering into

 6    the research agreement?

 7    A.  No, not all of them.

 8    Q.  You see this particular article was dated May 23rd of 2017,

 9    which is before the research agreement was entered into,

10    correct?

11    A.  Correct.

12    Q.  Mr. Chuff, let's go to page 2, please.

13              THE COURT:  I assume that there's no dispute,

14    Mr. Greim, as to the authenticity of this document or its date?

15              MR. GREIM:  No, your Honor.

16              THE COURT:  Okay, thank you.

17    BY MS. CLINE:

18    Q.  So just, Ms. Wallop, I direct your attention to page 2, the

19    fourth paragraph.  The first sentence says:  "Guo has close

20    ties to senior Chinese Communist Party leaders, including

21    government ministers and Politburo members."  Do you see that?

22    A.  I see it.

23    Q.  Your testimony is you weren't aware of this notion prior to

24    entering the research agreement?

25    A.  I've never seen this article.

1   Q.  Did you ever discuss this content with Mr. Gertz?

2   A.  No, not to my recollection.

3   Q.  Chris, can you keep scrolling down on that page, please.

4   That's good there.

5           There's a paragraph that starts "Guo's knowledge of

6   Chinese intelligence operations."  I'll highlight that for you.

7   The paragraph says:  "Guo's knowledge of Chinese intelligence

8   operations could provide an intelligence windfall for the CIA

9   and FBI, based on his access to Ministry of State security

10  operations overseas and in the United States."  Do you see

11  that?

12  A.  I do.

13  Q.  Were you aware of that before entering into the research

14  agreement?

15  A.  No.

16  Q.  You never talked to Mr. Gertz about that concept?

17  A.  No, not to my recollection.

18  Q.  So when Mr. Gertz offered to introduce you to Mr. Guo, you

19  never asked him if he had ever written anything publicly

20  available on Mr. Guo?

21  A.  No.  He vouched for him.  He came -- no.

22  Q.  And if we turn to the third page of this article, at the

23  top of the page there there's a sentence that says:

24  "Additionally, Guo's wife and daughter currently have been

25  allowed by Chinese authorities to visit him in New York but are

1  required to return to China after 20 days, where they can be

2  used for political leverage against Guo."

3          Were you aware of that prior to entering into the

4  research agreement?

5  A.  No.

6  Q.  You never spoke to Mr. Gertz about that fact?

7  A.  No, nor did he reveal it to me.

8  Q.  Chris, can you please pull up DX32.

9          MS. CLINE:  Sorry, your Honor, plaintiffs offer DX43?

10         THE COURT:  I assume you're just offering it for what

11 it says and not for the truth, correct?

12         MS. CLINE:  Correct.

13         THE COURT:  Okay.

14         (Defendant's Exhibit DX43 received in evidence)

15 BY MS. CLINE:

16 Q.  So turning now -- Mr. Chuff, can you pull up DX32.

17         I'll just ask you to take a look.  So this is another

18 article written by Bill Gertz.  This one dated October 9th,

19 2017.  Do you see that?

20 A.  I do.

21         THE COURT:  I take it, Mr. Greim, no dispute as to

22 authenticity or the date of the article?

23         MR. GREIM:  No, no, this is our own exhibit.  Or was.

24 BY MS. CLINE:

25 Q.  And, Chris, let's turn to the third page, please.  So I'll

L4JPEAS2                        Warrop - Cross

1    direct your attention to a paragraph that starts with "Guo

2    said."  "Guo said he maintains close ties to supporters within

3    the Chinese government and security system and is able to

4    obtain many internal documents."  Do you see that?

5    A.  Yes.

6    Q.  And again, even by October of 2017, this wasn't a topic

7    that you discussed with Mr. Gertz?

8    A.  No, because Mr. Gertz didn't come to see me until

9    mid-November.

10   Q.  And you just relied -- instead of doing your own due

11   diligence into Mr. Guo's background, you just relied on the

12   recommendation of Mr. Gertz and Dr. Han; you decided to enter

13   into the research agreement?

14   A.  That's not a very fair question, no.

15   Q.  So just -- so my question is -- well, you didn't do any due

16   diligence into Mr. Guo's background prior to entering into the

17   contract, correct?

18   A.  We did.  In December, and I think towards the end of

19   November, both Mr. Lianchao Han and Bill Gertz discussed what

20   it was that had been -- some of the stuff that had been

21   discussed in print and what they knew about him, but this was a

22   preliminary discussion.  You must remember they were talking

23   about creating a social profile in Washington and looking at

24   real estate.  It had nothing to do with the deeper dive.

25   Q.  Mr. Chuff, let's pull up the deposition transcript from

1   February.  Okay.  So Ms. Wallop, we're looking again from your

2   deposition transcript from February of 2019.  This is the first

3   page; do you see that?

4   A.  I do.

5   Q.  And I'll ask Mr. Chuff to turn, please, to page 90.  And

6   looking, for starters, at line 4, the interrogator says:

7   "Okay.  So you didn't do any work regarding Mr. Guo or his

8   business prior to the execution of the contract on or about

9   January 6, 2018?

10  "A.  No."

11              Do you see that?

12  A.  Yes.

13  Q.  "You didn't access your network to determine whether this

14  was someone you wanted to do business with or not, correct?"

15  I'm sorry, did I read that correctly?

16  A.  Yes, you read it correctly.

17  Q.

18  "A.  We had Bill Gertz, who was one of the finest intellects on

19  Chinese corruption and reporters, journalists and also

20  Lianchao, again, of the highest Sterling standards.  When they

21  asked us to look into it, that's what we did.  That was looking

22  into putting together a program that would help somebody that

23  we believed at the time was absolutely anticommunist."  Did I

24  read that correctly?

25  A.  Yes, and that's --

```
 1              THE COURT:  I'm sorry, what did you say?  I didn't
 2     hear what you said.
 3              THE WITNESS:  I said yes, your Honor.  Something has
 4     happened to my microphone.
 5              THE COURT:  Did you --
 6              THE WITNESS:  I didn't touch anything.
 7              (Pause)
 8              Thank you.
 9              THE COURT:  I think we solved the problem.
10              Ms. Wallop, were you asked those questions and did you
11     give those answers in your deposition?
12              THE WITNESS:  I'm sorry.  May I ask to have that
13     question repeated?
14              THE COURT:  Sure.  Were you asked those questions?
15              THE WITNESS:  Yes, I was.
16              THE COURT:  And gave those answers?
17              THE WITNESS:  Yes, I did.
18              THE COURT:  Were they truthful?
19              THE WITNESS:  Yes.
20              THE COURT:  Okay.
21              (Continued on next page)
22
23
24
25
```

 1   BY MS. CLINE:

 2   Q.  And then just to finish up the line, starting at line 22 of

 3   page 90, it says:

 4   "Q.  Strategic Vision relied upon the recommendation of Bill

 5   Gertz and Lianchao Han in terms of deciding to do business with

 6   or deciding to enter into the research agreement?

 7   "A.  Correct."

 8           Did I read that correctly?

 9   A.  Yes.

10           THE COURT:  I take it that was your answer and it was

11   truthful?

12           THE WITNESS:  Yes, sir.

13   BY MS. CLINE:

14   Q.  But you were, by the way, aware of an allegation, before

15   entering the agreement, that Mr. Guo had defrauded a family in

16   the United Arab Emirates of over $2 billion?

17   A.  Yes.

18   Q.  And you entered into the research agreement notwithstanding

19   awareness of that allegation, correct?

20   A.  I didn't know the details.

21   Q.  You were aware of the allegation, and you, nevertheless,

22   entered into the research agreement, correct?

23   A.  Correct, without knowing the details, yes.

24           THE COURT:  Ms. Cline, are you at a convenient

25   breaking point, or will you be at a convenient breaking point

1   soon?

2              MS. CLINE:  Yes.  Two more minutes, Judge, if that's

3   okay?

4              THE COURT:  Absolutely.

5   BY MS. CLINE:

6   Q.  You didn't actually know what Eastern was going to do with

7   the investigation results; is that correct?

8   A.  That's correct.

9   Q.  And you even thought that Mr. Guo might, quote, "run it

10  both ways" against and in favor of the Chinese Communist Party,

11  right?

12  A.  It was Guo who hired us, essentially, via Eastern Profit,

13  and I can't answer that yes or no.

14  Q.  But you knew, didn't you, that Mr. Guo -- you thought that

15  maybe he was going to run it both ways; isn't that true?

16  A.  I made that statement, yes.

17  Q.  It was accurate at the time you made it?

18  A.  Yes.

19  Q.  And Strategic did not require Eastern to make a written

20  representation in the research agreement that Mr. Guo was a

21  Chinese dissident who opposes the CCP, correct?

22  A.  Correct.

23             MS. CLINE:  Okay.  Now, your Honor, would be a good

24  time, if it works.

25             THE COURT:  Why don't we take ten minutes.  It's now

 1    11:55.  We'll reconvene at 12:05 and go to about 1:00 o'clock.

 2              MS. CLINE:  Thank you.

 3              (Recess)

 4              THE COURT:  Ms. Cline, you may inquire.

 5              Ms. Wallop, you're reminded that you're still under

 6    oath.

 7              THE WITNESS:  Yes, sir.  Thank you, your Honor.

 8    BY MS. CLINE:

 9    Q.  Ms. Wallop, I just wanted to start with a housekeeping

10    matter.

11              When you mentioned the name of the litigation funder,

12    I think you spelt it C-i-r-a-n-u-s.  Is it possible it's

13    actually C-y-r-a-n-u-s?

14    A.  It could be, yes.

15    Q.  Do you know whether it's located out of Tennessee?

16    A.  I don't.

17    Q.  In connection with its fraud claim, Strategic takes the

18    position that it sustained over $763,000 in reliance damages;

19    is that correct?

20    A.  That's correct.

21              MS. CLINE:  Mr. Chuff, can we pull up Strategic's

22    findings of fact.

23    Q.  Ms. Wallop, you're aware that in connection with sort of

24    the pretrial preparation, Strategic submitted a proposed

25    findings of fact and conclusions of law to the Court?

1   A.  Yes.

2            MS. CLINE:  Mr. Chuff, could you please turn to

3   footnote 140 on page 23.

4            You're there.  Is there any way you could make the

5   font a little bigger?

6            MR. CHUFF:  Yes.

7   BY MS. CLINE:

8   Q.  So, directing your attention to footnote 140 of Strategic's

9   proposed findings of fact, does footnote 140 set forth

10  Strategic's allocation of fraud damages in this case?

11  A.  Yes.

12  Q.  So the first category is a $200,000 allocation for your own

13  business expenses; is that correct?

14  A.  Correct.

15  Q.  Then there are two allocations for Mr. Waller's personal

16  allocations which totaled 250,000, right?

17  A.  Yes.

18  Q.  25,000 in travel expenses attributed to Mr. Waller, right?

19  A.  Correct.

20  Q.  And then there's a $200,000 payment made to Team 1.  Is

21  that one of the subcontractors that Strategic Vision contracted

22  with?

23  A.  Yes.

24  Q.  And then Team 2, is that another subcontractor?

25  A.  Yes.

 1   Q.  And that was a payment there of a little over $5,400,

 2   right?

 3   A.  Yes.

 4   Q.  And then Team 1's search cost for $17,686, do you see that

 5   there?

 6   A.  Yes.

 7   Q.  And that was a payment made to a company called Fletcher,

 8   right?

 9   A.  In the U.K., yes.

10   Q.  Okay.  And then there was one more disbursement to

11   Georgetown Research in May of 2018 for $15,000, right?

12   A.  Yes.

13   Q.  And Georgetown Research is owned by Mr. Waller, right?

14   A.  Dr. Waller, yes.

15            MS. CLINE:  Chris, I don't know if this is possible,

16   but could you pull up our chart sort of simultaneously.

17   Q.  While he's doing that, Ms. Wallop, by any chance, in your

18   prep for trial, did you ever come to realize that the amounts

19   contained in footnote 140 were $50,000 short of $763,000?

20   A.  In addition to, I believe.  We did find that there were

21   some additional monies that had been paid.

22   Q.  Okay.  So, what we've tried to do here on the right-hand

23   side is just kind of put in a chart form what you're saying

24   that -- what Strategic is saying in footnote 140 and that I

25   think we caught the amount error, which we'll walk through it,

1    and you can tell me if we're right or wrong.

2              So, again, comparing footnote 140 to PDX 1, see

3    category 1 is your business expenses for $200,000, so we're

4    square on that one, right?

5    A.  Yes.

6    Q.  Okay.  And then Mr. Waller's personal allocation is 250, as

7    reflected in 140, correct?

8    A.  Yes.

9    Q.  And then his travel expenses were 25,000, correct?

10   A.  At least, yes.

11   Q.  Okay.  And then this category, this fourth category, in the

12   amounts paid to Team 1, is this where you discovered an error?

13   Because it looks like, in footnote 140, it attributes a

14   $200,000 payment to Team 1.  We think it might be 250.  Does

15   that sound right to you?

16   A.  It does, but I honestly have to rely upon my counsel

17   because we worked on making sure that the numbers were correct.

18   Q.  Okay.  We'll get into some detail.  I'm just trying to get

19   the big picture.

20             Category 5 is the amount paid to Team 2, right,

21   $5,412?

22   A.  Yes.

23   Q.  And category 6 is Fletcher for $17,686?

24   A.  Yes.

25   Q.  And then category 7 is another amount to Georgetown

1    Research for $15,000?

2    A.  Yes.

3    Q.  And if you total all of those up, they total $763,098,

4    which is consistent with what Strategic claims in the findings

5    of fact, correct?

6    A.  Yes, I'm sure that's correct.

7    Q.  Now I'd like to move to another chart we've made that takes

8    this information and just displays it a little differently.

9              MS. CLINE:  So, Chris, can you pull up slide 5.

10   Q.  I'll go through all of these with you.

11             At the top is the million dollars that went into

12   Strategic Vision.  Do you see that?

13   A.  Yes.

14   Q.  Let's start on the right-hand side, there's the 200,000 for

15   your business expenses.  Does that make sense?

16   A.  Yes.

17   Q.  And the 17,686 to Fletcher, do you see that?

18   A.  Yes.

19   Q.  And then the $50,000 for Team 1.  I'll show you in an

20   exhibit related to that in a second.

21             And, then, is it your understanding that the remainder

22   of the disbursements made for which Strategic was claiming

23   damages were made to Mr. Waller or entities owned or controlled

24   by Mr. Waller; is that accurate?

25   A.  It appears to be so.

L4JKEAS3                    Warrop - Cross

 1   Q.  And, then, your understanding is that with respect to the

 2   amounts distributed to Mr. Waller, he kept some of those for

 3   himself and -- a portion of those for himself, but also

 4   allocated some of those to subcontractors, correct?

 5   A.  Yes.

 6   Q.  So let's start -- what I didn't put on here is the $5,412

 7   allegedly paid to Team 2.

 8           Is your understanding that that amount was actually

 9   paid directly by Georgetown Research?

10   A.  Yes.

11   Q.  So that amount of money didn't come directly from

12   Strategic Vision, it came out of one of Mr. Waller's

13   allocations, correct?

14   A.  Yes.

15   Q.  And Team 2 was comprised of an entity called Allied Special

16   Operations Group; is that correct?

17   A.  Yes.  Known as ASOG, yes.

18   Q.  And ASOG -- this is a yes-or-no question.  ASOG never

19   provided any research results to Strategic; isn't that true?

20   A.  No.

21   Q.  Let me ask it differently.  Did ASOG ever provide any

22   research results to Strategic?

23   A.  Yes.

24   Q.  Is your testimony that Allied Special Operations Group

25   provided a report to Strategic Vision?

225

1    A.  They gave us an oral report.

2    Q.  It's correct to say that ASOG never provided a written

3    report, correct?

4    A.  That's correct.

5    Q.  And you're not able to identify any benefit that was

6    achieved by Eastern Profit in exchange for the $5,412 that went

7    to ASOG, are you?

8    A.  Benefit?  Is that your question?

9    Q.  That's correct.  I'm asking what -- you're not able to

10   identify anything that Eastern Profit got in exchange for that

11   $5,412, are you?

12   A.  We relayed the information we'd gotten from ASOG to

13   Lianchao, and, therefore, he relayed it to Guo, so it was

14   verbal.

15   Q.  And there were no reports -- there were no written reports

16   passed along to Eastern Profit, correct?

17   A.  There were not allowed to be.

18   Q.  But the answer is there were no written reports?

19   A.  Correct.

20        MS. CLINE:  Mr. Chuff, could you pull up — and, again,

21   I'll see if we can simultaneously — PX 23 and PX 22.

22   Q.  So, Ms. Wallop, hopefully appearing on your screen

23   simultaneously are two exhibits.  PX 22 is on the left.  That

24   is a compilation of Strategic Vision's bank account statements,

25   right?

1    A.  Correct.

2    Q.  And PX 23 is a damages chart that you put together,

3    correct?

4    A.  An allocation of the expenses.  I don't know how it was

5    defined.

6    Q.  Okay.  But Exhibit 23 is a document that you prepared in

7    connection with --

8    A.  Yes.

9    Q.  -- Strategic's damages calculation in this case?

10   A.  Yes.

11   Q.  What I'd like to do is start with Exhibit PX 23.  You've

12   got a color code there pursuant to which things marked in red

13   are for wires out; is that right?

14   A.  Correct.

15   Q.  And that's for wires of payments made via wire going out of

16   Strategic Vision's bank account, correct?

17   A.  Correct.

18          MS. CLINE:  And, actually, Chris, instead of PX 22,

19   can you pull up the PDX one, the fifth slide again, and do that

20   side by side.

21          Okay.  So, Mr. Chuff, if you could turn to page 2 of

22   Exhibit 23.

23          Just for the Court's edification, PX 23 has three

24   colors on it — green, yellow, and red — and at least in the

25   paper copies, I'm not certain that the yellow highlighting came

 1    through, but you can see it on the screen.  So I just wanted

 2    everyone to be aware of that.

 3    BY MS. CLINE:

 4    Q.  So, Ms. Wallop, going back to PX 23, the colors that are

 5    highlighted here correspond to the color code that you put on

 6    the first page of the document, right?

 7    A.  That's correct.

 8    Q.  And so the column on the right-hand side represents wires

 9    going out, and that's marked in red, correct?

10    A.  Correct.

11    Q.  Going back to the mistake we thought we'd identified in

12    footnote 140, do you see your first entry under the "Wires Out"

13    category is a $50,000 wire where it says "Hill invoice"?  Do

14    you see that?

15    A.  Yes.

16    Q.  And Hill is affiliated with Team 1; is that correct?

17    A.  Correct.

18    Q.  Is it fair to say that that $50,000 was an allocation for

19    Team 1?

20    A.  Yes.

21    Q.  And then the next wire out is $200,000 to Cyber Solutions.

22    Do you see that?

23    A.  Yes.

24    Q.  And that was another entity that was owned by Mr. Waller;

25    is that right?

1   A.  Yes.

2   Q.  So, just to take a step back, the $50,000 wire that went to

3   Hill, that went directly from Strategic to Hill, correct?

4   A.  Yes.

5   Q.  The $200,000 went to Cyber Sol, and then from Cyber Sol, to

6   Team 1; is that correct?

7   A.  I think, and it's been some time ago, but I believe that

8   the 200,000 to Cyber Sol went to -- well, it was to one of

9   Mike's companies to Mike for his participation, and then the

10  next two figures went out to Team 1, and I may have had those

11  reversed.  I just can't remember at this point.

12          MS. CLINE:  Chris, if you would, could you bring back

13  up the findings of fact, footnote 140.

14          Is there any chance, Chris, that you can put that next

15  to the -- Mr. Chuff, could you put the footnote 140 next to the

16  exhibit that talks about wires out.

17  BY MS. CLINE:

18  Q.  Ms. Wallop, sort of comparing the two to try to get the

19  dates right, if you look at footnote 140, there's a

20  disbursement, but the $50,000 to Hill isn't in 140, correct?

21  A.  I'm sorry, I've lost track.  Where is it -- it's not here

22  on the left-hand, page 23?

23  Q.  Our understanding is that the $50,000 that was wired to

24  Hill is not accounted for in footnote 140.  I'm asking if you

25  agree with that.

Warrop - Cross

1   A.  No, it doesn't appear to be.  I'm not sure why not.

2   Q.  Okay.  And then in your wires out chart on the right-hand

3   side, there's an entry, $200,000 to Cyber Solutions.  Do you

4   see that?

5   A.  Yes.

6   Q.  And this page we're looking at on PX 23 is for the wires

7   that went out in January of 2018, correct?

8   A.  Yes.

9   Q.  And the $200,000 Cyber Sol entry on PX 23 corresponds with

10  the notation in footnote 140 for Team 1, Cyber Solutions,

11  200,000, in January 2018, correct?

12  A.  Yes, that's correct.

13  Q.  All right.

14          And then going back to Exhibit 23, there's a $25,000

15  disbursement to GRG.  Do you see that?

16  A.  Yes.

17  Q.  And if you compare that back over to footnote 140, that's

18  the amount that was disbursed to Mr. Waller for his travel

19  expenses in January of 2018?

20  A.  Yes.

21  Q.  And then the $200,000 wire to GRG, that goes to Michael

22  Waller's personal allocation, correct?

23  A.  Yes, that's correct.

24          MS. CLINE:  Chris, can you pop back up the chart --

25  yes, perfect.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  So, you see on the chart on the left-hand side, there's a

2   wire that goes directly from Strategic Vision to Team 1 for

3   $50,000.  Do you see that?

4   A.  Yes.

5   Q.  And then at the bottom on the left, there's the payment for

6   $200,000 to Team 1 that goes through Cyber Sol to Team 1,

7   correct?

8   A.  Yes.  Yes.

9           MS. CLINE:  Mr. Chuff, could you turn to page 7 of

10  Exhibit PX 23.

11  Q.  Again, we're going to be focusing just on the wires out

12  column.  I'm just trying to make sure you and I are on the same

13  page, Ms. Wallop.

14          MS. CLINE:  Chris, can you scroll down, so we can see

15  the date at the top.

16  Q.  So this page 7 of PX 23 on the right-hand side shows the

17  wires going out of Strategic Vision in May of 2018, right?

18  A.  Yes.

19  Q.  And the 17,686, that goes to Fletcher, correct?

20  A.  Yes, for work done in February.

21  Q.  And there's another $15,000 disbursement to Georgetown

22  Research, correct?

23  A.  Yes, that's correct.

24  Q.  That was for Mr. Waller's personal allocation, correct?

25  A.  Not personal allocation.  It was for legal costs.

1    Q.  It was for, I'm sorry?

2    A.  It was for a legal cost relating to this contract.

3    Q.  Okay.  This is the first time we're hearing that.

4         What was the nature of the legal cost?

5    A.  To give us a legal opinion on the work that we were doing

6    overseas.

7    Q.  Did Strategic submit any invoices or receipts in connection

8    with that legal cost?

9    A.  No, I don't know, I don't remember, but you would have to

10   ask Dr. Waller.

11        MS. CLINE:  Chris, can you scroll to the next page in

12   PX 23.

13   Q.  And then page 8 of PX 23, in the wires out column, it shows

14   a wire of $50,000 to OE.  Do you see that?

15   A.  Yes.  And that's my handwriting.  It should be OA, not OE.

16   Q.  It's an abbreviation for Oceanic Advisors, correct?

17   A.  Yes, that's correct.

18   Q.  That's another entity owned by Mr. Waller?

19   A.  Yes.

20   Q.  So now that we have kind of the lay of the land, I'd like

21   to talk through each of the categories.  So let's start first

22   and talk about the monies wired to Team 1.

23        So, between the 50,000 that Strategic sent directly

24   and the 200 that went through Cyber Sol, Team 1 was paid

25   $250,000; is that right?

1   A.  Yes, I believe -- yes, at least.  It could have been more,

2   but I was not privy to that.  It could have been more from --

3   sorry.  It could have been more from -- through Georgetown

4   Research.  We had to compartmentalize a number of things where

5   he was aware of some things and I was aware of some things.

6   Q.  But in terms of the damages allocation or claim in this

7   case in footnote 140, Strategic is claiming -- in footnote 140,

8   Strategic is claiming $200,000, and in your own damages chart,

9   you're claiming $50,000 on top of that, right?  That's what --

10  with respect to Team 1, Strategic is claiming a total of

11  $250,000?

12  A.  Yes.  I believe that's true, yes.

13  Q.  And Team 1 supposedly submitted an invoice in connection

14  with its work on this case, right?

15  A.  Yes.

16  Q.  And the invoice was for $200,000; isn't that right?

17  A.  Yes.

18          MS. CLINE:  Chris, could you please bring up PX 24.

19  Q.  Do you recognize this to be the invoice that was submitted

20  on behalf of Team 1?

21  A.  Yes.

22  Q.  There are a bunch of redactions.  Can you tell us the

23  reason for those redactions?

24  A.  Because they were the identity of Team 1 overseas.

25  Q.  The identity?  The identity --

1    A.  Team 1's invoice.

2    Q.  I'm just --

3    A.  I'm not sure.  You'll have to ask Dr. Waller.  He was the

4    one that was most familiar with this.

5    Q.  Okay.  But, to your knowledge, this is the only invoice

6    ever attributed to Team 1, correct?

7    A.  I'm not sure.  Dr. Waller would know best.

8              THE COURT:  Are you offering PX 24?

9              MS. CLINE:  Yes, please, your Honor.

10             (Plaintiff's Exhibit 24 received in evidence)

11             MS. CLINE:  Let's go, please, Mr. Chuff, to

12   Exhibit 22.

13   BY MS. CLINE:

14   Q.  We're going now, Ms. Wallop, to Strategic's bank

15   statements.

16             MS. CLINE:  Mr. Chuff, if you could please scroll to

17   page 2.

18   Q.  If we look at the top of the page, on January 9th, there is

19   a -- that signifies the wire that went out to Team 1?

20   A.  Yes.  That was the initial payment for computers and

21   telephones, laptops, the work that we were preparing to do.

22   Q.  And that invoice number there matches the one on Exhibit 24

23   that was supposedly submitted by Team 1, right?

24   A.  I presume so.  I don't know.

25   Q.  Did you ever come into possession of the computers and

L4JKEAS3                              Warrop - Cross

1    other equipment for which this supposedly paid?

2    A.  It wasn't supposedly.  They did pay them overseas.

3    Q.  Did you get receipts, invoices?

4    A.  I personally did not.

5    Q.  Has Strategic Vision ever seen any proof of payment as to

6    what this $50,000 went to?

7    A.  You'd have to ask Dr. Waller.

8    Q.  Scrolling down again, so we're at -- by your color coding

9    system, we're focusing now on the things in red that match the

10   wires out?

11   A.  Correct.

12   Q.  So there's a wire out on January 12th for $200,000?

13   A.  Yes.

14   Q.  And the information as to that wire has been redacted.  Do

15   you see that?

16   A.  Yes.

17   Q.  And why is that?

18   A.  That was to Team 1.

19   Q.  I guess my question is:  So why is the information related

20   to Team 1 redacted?

21   A.  Because it was compartmentalized, and we were very careful

22   about having the PRC looking into the work we were doing.

23   Q.  Well, right now, you're not compartmentalizing it from

24   anyone other than us, right?

25               Is there any evidence on this document as to whom that

1     $200,000 went to?

2     A.  Again, you'd have to discuss it with Dr. Waller.

3     Q.  Team 1 never delivered any written reports in connection

4     with its $250,000 price tag, did it?

5     A.  We delivered USB keys and -- with data on it.  That's how

6     Guo wanted it to be done.  He didn't want anything in writing

7     as far as reports.

8     Q.  So the information that you didn't see that came in on the

9     USB drive, your understanding is that that was from Team 1?

10    A.  Yes, it was from Team 1.

11    Q.  But those two USB drives didn't contain any of the reports

12    called for under the research agreement, right?

13    A.  I can't -- I would say they did.  I was not privy to them

14    because Dr. Waller had to fly overnight to pick them up, and

15    bring them back, and deliver them to Yvette Wang in the train

16    station.

17              THE COURT:  Ms. Wallop, I think you testified before,

18    you don't know what was on the USB drives?

19              THE WITNESS:  Yes, I don't know.

20    BY MS. CLINE:

21    Q.  Let's move now and talk about the money that was paid to

22    Fletcher.

23              MS. CLINE:  Mr. Chuff, could you pull up PX 29.

24              Before I forget, your Honor, we're going to -- I'm

25    still using them, but we're going to move the admission of 22

1   and 23.

2          (Plaintiff's Exhibits 22 and 23 received in evidence)

3   BY MS. CLINE:

4   Q.  Ms. Wallop, is this the invoice that Strategic received in

5   connection with the payment to Fletcher?

6   A.  Yes.

7   Q.  But there was no written contract with Fletcher as to the

8   services it was going to perform, right?

9   A.  No, because it was highly sensitive, and we did produce the

10  report.

11  Q.  Yes.

12         So the report that you received from Fletcher was

13  provided to Strategic on March 21st, 2018; isn't that right?

14  A.  It was, but it was contracted in February.

15  Q.  But my question is just Strategic received the report on

16  March 21st of 2018, right?

17  A.  I guess so.

18  Q.  And Eastern had terminated the contract a month earlier;

19  isn't that true?

20  A.  Yes.

21  Q.  And you didn't call up Fletcher and say pencils down, the

22  contract has been terminated, did you?

23  A.  No, because we were still in negotiations with Lianchao,

24  and we'd already contracted with Fletcher to do the work on two

25  individuals in the file.

1   Q.  Ms. Wallop, I just really need you to answer my question.

2          So you agree that Eastern terminated the research

3   agreement on February 23rd?

4   A.  Yes, they did.

5   Q.  And Fletcher didn't deliver its report until March 21st,

6   right?

7   A.  Yes.

8   Q.  You did nothing in the interim to stop Fletcher from

9   continuing to accrue money that you're now claiming as damages

10  in this case; isn't that true?

11  A.  No.

12  Q.  I'm sorry, I thought I'd asked this:  Upon receipt of the

13  termination notice from Eastern, did you call up Fletcher or

14  otherwise communicate with him and ask them to stop incurring

15  costs?

16  A.  It was already in play; it was already being done.

17          THE COURT:  Ms. Wallop, would you please answer the

18  question.

19          THE WITNESS:  I apologize.

20          THE COURT:  The question, as I think it is, is:  Did

21  you call them up and tell them stop all work?

22          THE WITNESS:  No, I did not, your Honor.

23          MS. CLINE:  Chris, can you pull up slide number 5.

24          Sorry, your Honor.  We would move the admission of

25  PX 29.

1           THE COURT:  Okay.

2           (Plaintiff's Exhibit 29 received in evidence)

3    BY MS. CLINE:

4    Q.  So just sort of looking at this chart, and we're getting

5    stakes in the ground, we've talked about Team 1, we've talked

6    about Fletcher, we talked about some of the amounts that went

7    to Mr. Waller and his entities.  We'll ask Mr. Waller about

8    some of those as well.

9           Let's turn now to the box in yellow, the $200,000 in

10   business expenses that Strategic is claiming with respect to

11   your business expenses.

12          MS. CLINE:  Chris, let's go back to Exhibit 22.

13   Q.  So following the color code on your Exhibit 22, Ms. Wallop,

14   is it correct that the amounts highlighted in yellow are what

15   comprise the business expenses attributable to you?

16   A.  Yes.

17          MS. CLINE:  I'm sorry, Chris, can you also pop up 23

18   just for a second.

19          Chris, can you go to January?

20   Q.  Just so we're all understanding what you did, for each

21   month, you tallied all of the business expenses in your bank

22   account statement, and then you came up with a total for the

23   month; is that right?

24   A.  In yellow, yes.

25   Q.  So, in January, at the bottom of the yellow column, I think

L4JKEAS3                          Wallop - Cross

1    it goes on to the next page -- well, sorry, page 2, at the

2    bottom, it's hard to see, but there's an amount for $5,856?

3    A.   Correct.

4    Q.   And then if you go to February, I think February leaks over

5    into the next page, and there's a total for February of

6    business expenses of -- scroll that up a bit -- $14,325?

7    A.   Yes.

8    Q.   And so on, you did that in Exhibit 23 for every month,

9    correct?

10   A.   Yes, I did.

11           MS. CLINE:  Chris, can you go to PDX -- the slide that

12   has Ms. Wallop's monthly tallies.

13   Q.   So, originally, when you put the damages calculation

14   together, you had put in amounts for every month, and it

15   totaled something like approximately $175,000, right?

16   A.   Yes.

17   Q.   But then when we took your deposition, and we had a

18   discussion around these damages, your counsel conceded that

19   Strategic was only going to claim damages for January,

20   February, and March, correct?

21   A.   Which counsel?

22   Q.   Mr. Greim, on behalf of Strategic.

23   A.   All right.  Yes.

24   Q.   So now instead of claiming $175,000 in business expenses,

25   if you turn to the next page, Strategic's -- just in terms of

1    your business expenses, Strategic's just claiming an amount no

2    greater than $39,251, right?

3    A.   Of whatever my counsel has agreed to, yes.  Yes.

4    Q.   Okay.  Now let's go back to Exhibit 22.  I just want to go

5    through some of these examples of the expenses.

6             MS. CLINE:  So, Chris, can you turn back a page,

7    please.

8    Q.   So there is a charge for $36.99 on January 4th.  Do you see

9    that?

10   A.   Yes, for the Wall Street Journal.

11   Q.   It's for the Wall Street Journal.  You're claiming that as

12   a business expense?

13   A.   Yes.

14   Q.   And then there's -- the next entry is for $123 of a cash

15   withdrawal.  Do you see that?

16   A.   Yes.

17   Q.   Do you have any invoices or receipts supporting what you

18   spent that $123 on?

19   A.   No.

20            MS. CLINE:  Turn to the next page, please, Mr. Chuff.

21   Q.   Just by way of example, on January 10th, there's a payment

22   for $2,000.  That was, I think you told me in your deposition,

23   in connection with your own personal income taxes, right?

24   A.   Yes.  Strategic Vision's, yes.

25   Q.   Well, it was for your income taxes, wasn't it?

1   A.  Yes, it's one and the same thing.

2   Q.  And then if you look down further, on January 10th, there's

3   an expense for $1,315 that was spent at Hermès, right?

4   A.  Yes.  But then I made it green and not yellow.

5   Q.  Oh, okay.  So that one comes out, you agree?

6   A.  Yes.  It was a gift for Yvette.

7   Q.  Okay.  That's quite a gift.

8   A.  She likes Hermès.

9   Q.  Well, she paid for it.

10          January 12th, there's another ATM withdrawal for

11  $102.50?

12  A.  I have no idea what that was for.  Taxies, I don't know.

13          MS. CLINE:  Let's turn the page, again, just by way of

14  example only, Mr. Chuff.

15  Q.  So now I'd like to look at the exhibit -- sorry, the

16  calendar date of January the 19th.  There's a purchase at Tumi

17  for $206.71?

18  A.  Yes.

19  Q.  You charged that as a business expense, right?

20  A.  I did.

21  Q.  That was a laptop envelope, right?

22  A.  Yes.

23  Q.  Going down a little bit, there's entries for 1446 and 3796.

24  Those are Amazon purchases, right?

25  A.  Yes.

1    Q.  Do you have any idea what those were for?

2    A.  No.  Not three years later, no.

3    Q.  And then there's a restaurant receipt for $263.58.  Do you

4    see that?

5    A.  Yes.

6    Q.  Cafe Milano, the place to see and be seen, right?  Isn't

7    that how they advertise themselves?

8    A.  I have no idea.  It's a restaurant.

9    Q.  Did you submit an invoice with the name of the people you

10   dined with and the business justification for the expense?

11   A.  I would have, yes.

12   Q.  Would you have produced it in this case?

13   A.  I wasn't asked to.

14          MS. CLINE:  Let's scroll down.

15   Q.  There's an entry for $249 on January the 25th.  That's a

16   subscription to the Financial Times.  You're claiming that as a

17   business expense?

18   A.  Yes.

19          MS. CLINE:  Now, Chris, if you could pop up 22 and 23

20   simultaneously.

21          On PX 22, Mr. Chuff, could you please go to PX 22 at

22   5.

23   Q.  So on the left-hand side, PX 22, there's an entry for

24   199.95.  Do you see that?

25   A.  Yes.

L4JKEAS3                        Wallop - Cross

1    Q.   That's another restaurant bill, right?

2    A.   Yes.

3    Q.   And you didn't submit any invoices including the name of

4    the person and the business reason?

5    A.   I wasn't asked to.

6              MS. CLINE:   Scrolling down -- the next page of PX 22,

7    please, Chris.   That's good there.

8    Q.   So at the top of PX 22, there are entries for 38.89 --

9    there are several entries that appear to have been yellow, but

10   then they're green, but my understanding is that those numbers

11   appear in the business expense column in the PX 23, right?

12   A.   They should.

13   Q.   So you're including -- everything there --

14   A.   Yes.

15   Q.   -- is being included as a business expense in Strategic's

16   damages calculation, right?

17   A.   Yes.

18   Q.   So you're seeking reimbursement for Whole Foods and Trader

19   Joe's, right?

20   A.   Yes.

21   Q.   And a donation to the Swiss Foundation?

22   A.   Yes.

23   Q.   That's a business expense?

24   A.   Yes.

25   Q.   And Sheridan Press, that's a newspaper, right?

 1   A.  Yes.

 2   Q.  And how about the OSS Society, that's a business expense?

 3   A.  Yes.

 4   Q.  And the $575, if you continue to scroll down, for a

 5   LinkedIn subscription, Strategic Vision didn't already have

 6   one?

 7   A.  It did, but it was probably the updated -- I mean the

 8   annual one.

 9   Q.  Okay.  And then --

10   A.  The premium account.

11   Q.  At the bottom of the page, $418.70, that's another trip to

12   Tumi, right?

13   A.  It wasn't another trip, as you put it.  It was a briefcase.

14   Q.  And it's a briefcase for you, right?

15   A.  Yes.

16   Q.  Tumi --

17   A.  For business.

18   Q.  It's a high-end luxury store, right?

19   A.  No.  It's an airport shop.

20   Q.  And Strategic is including --

21           THE COURT:  These days, those two are not necessarily

22   inconsistent with one another.

23           THE WITNESS:  I know, your Honor.  You're right.

24   BY MS. CLINE:

25   Q.  But Strategic is seeking reimbursement for your Tumi

```
1    briefcase, right?

2    A.  Yes.

3              MS. CLINE:  Next page, please, Mr. Chuff.

4    Q.  There is a --

5              MS. CLINE:  And I'm almost done, your Honor.  A few

6    more minutes.

7    Q.  At the top of the page, there's a $1,534 purchase from

8    Bloomingdale's, right?

9    A.  Yes.

10   Q.  That was for a coat for yourself, correct?

11   A.  I think I actually found the receipt.  It was two suits, a

12   skirt, and a jacket, a coat, yes.

13             MR. GREIM:  Your Honor, I know it's in my opening, but

14   I stipulated we are not claiming the business expenses here.  I

15   let it go on for a while to have some fun, but I think, if

16   we're trying to use our time wisely, we are not seeking this

17   yellow category.  I've said --

18             THE COURT:  I know it's your time, counsel.  If it's

19   not being sought, think about how you want to spend your time.

20             MS. CLINE:  Yes, that's the first I've heard that,

21   your Honor.  So our understanding was that the stipulation was

22   that Strategic was claiming expenses subsequent to March of

23   2018.  If they're going to agree that they're not seeking any

24   of Ms. Wallop's business expenses, then I'll end the line.

25             THE COURT:  Mr. Greim, none of what's in yellow,
```

1   correct?

2           MR. GREIM:  That's right, your Honor.  And I probably

3   should have said in my opening, I would have said what's in

4   yellow, I gave a few examples, so I meant -- and I should have

5   cut it off to save her some time, but that is our stipulation.

6           MS. CLINE:  So there's -- in Eastern's -- sorry, in

7   Strategic's damages calculation, in footnote 140, there's a

8   claim for $200,000 of Ms. Wallop's personal business expenses.

9   Am I understanding Strategic is not claiming those?

10          MR. GREIM:  No, that's not correct.  The amount in

11  yellow equals something like $40,000.  That is not what the

12  $200,000 is.  That is for her time and effort.  It's nothing to

13  do with the yellow column.

14          MS. CLINE:  Okay.

15          MR. GREIM:  We will do this on direct or --

16          THE COURT:  You'll have time, counsel, over the lunch

17  break to figure out what you want to do on this line of

18  examination.  Why don't you go to your next line, unless this

19  is your last one.

20          MS. CLINE:  Yes, I'm just about done, your Honor.  If

21  we are all in agreement that Strategic is not claiming any of

22  the expenses illuminated in yellow, then I think we can stop

23  with this line of questioning.

24          Bear with me one moment.

25          May I just consult with my colleague for one second?

```
 1              THE COURT:  Absolutely.

 2              (Pause)

 3              MS. CLINE:  Okay, your Honor, we have no further

 4    questions right now.

 5              THE COURT:  Okay.

 6              It is about 12:53.  Why don't we take our lunch break

 7    until 1:55.  When we return, you'll still be under oath,

 8    Ms. Wallop.

 9              THE WITNESS:  Thank you, your Honor.

10              (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

L4JPEAS4

```
 1                   A F T E R N O O N   S E S S I O N

 2                          1:58 P.M.

 3            THE COURT:  Before we get started, Mr. Greim, as to

 4    any of the exhibits that were offered this morning, is the

 5    defense going to have an objection to any of them?  It didn't

 6    seem like any were objectionable.

 7            MR. GREIM:  I think -- your Honor, I think we'll be

 8    able to meet your deadline by tonight.  I think the answer is

 9    no, but we haven't actually pow-wowed to compare notes on that

10    question quite yet.

11            THE COURT:  Okay.  I would ask that if there are going

12    to be any objections as to the authenticity or the foundation

13    for a document, you let me know when the document is being

14    offered.  That way, the proponent of the exhibit can establish

15    the foundation.  That's fine for both.

16            MR. GREIM:  Actually, I will say this, just to make it

17    easier.  We have no objection to the authenticity or foundation

18    of any of the exhibits that we saw earlier, and I think, while

19    I'll look to see if we have something more substantive, but I

20    can say that right at this moment.

21            THE COURT:  Very well.  All right.  Counsel, you may

22    inquire.

23            Ms. Wallop, you're reminded that you are still under

24    oath.

25            THE WITNESS:  Thank you, your Honor.
```

```
 1    REDIRECT EXAMINATION

 2    BY MR. GREIM:

 3    Q.  Ms. Wallop, I'm going to run through sort of a quasi-direct

 4    examination of you, and I'm going to run through the same

 5    topics generally that you heard from Ms. Cline this morning,

 6    with a few others added in.

 7              First, I want to ask you just a little bit more about

 8    your background.  Where, again, did you get your degree from?

 9    A.  I was in school in Switzerland for many years, and I was at

10    Ecole d'Interpretes, in Geneva, and then transferred to

11    Georgetown University to the language and linguistics

12    department.

13    Q.  Okay.  And what was the degree that you got?

14    A.  Simultaneous interpreting.

15    Q.  And is that linguistics program part of a broader school

16    there?

17    A.  It is now.  It's part of the school for foreign service.

18    Q.  After you graduated, did you go into politics?

19    A.  I began to work on various campaigns some years later.  I

20    think it was 1972.

21    Q.  Okay.  And did you work on campaigns into the '80s, as

22    well?

23    A.  I did.  One of my companies, Corporate Travel Services,

24    managed all of the Reagan-Bush campaign travel, and logistics

25    for both campaigns, along with many associations and law firms
```

1   and corporations.

2   Q.  During the '80s, what was your career?  What did you do?

3   A.  Well, I had Corporate Travel Services and Corporate

4   Consulting International, and the travel services speaks for

5   itself.  The consulting firm did very similar things to what

6   I'm doing now, with a greatly reduced staff.

7   Q.  Okay.  Just so that's clear, the Corporate Consulting

8   International, that's the entity that Eastern mentioned on your

9   other examination?

10  A.  Yes.

11  Q.  I'm sorry.  Was that entity much smaller than Strategic

12  Vision?

13  A.  No, it was much larger.

14  Q.  Okay.  How many people worked there?

15  A.  We had, over a 20-some-year period, between 200 to 300, and

16  some were independent contractors.

17  Q.  Now, did you also marry a politician?

18  A.  I did.

19  Q.  Okay.  Who was that?

20  A.  I married Malcolm Wallace, who was the senior Senator from

21  Wyoming.

22  Q.  And --

23  A.  In 1984.

24  Q.  Did you meet many people through your prior political work

25  and your marriage to Senator Wallace?

1  A.  Yes.  My career in Washington had developed as a result of

2  my family's long-standing relationships in Washington and

3  Maryland, both politically, as well as in banking, as well as

4  investments and real estate.

5  Q.  Let me –- let's now talk about Strategic Vision.  You

6  talked about some of your typical work with –- on your last

7  examination, and you mentioned overseas investigations.  Can

8  you recall, sitting right here, any recent overseas

9  investigate –- or I'm sorry, overseas investigations that were

10  similar to what you were trying to do for Mr. Guo here?

11  A.  One of them would have been –- and there were several.  One

12  of them would have been for Mikhail Khodorkovsky.  He was one

13  of my clients in the United States, although he's based in

14  London, and we did some investigations, background in London on

15  his behalf and also in Russia.

16  Q.  Ms. Wallop, now I'm going to ask you about your work on the

17  Eastern Profit project.  Did Strategic investigate any crimes

18  or civil wrongs on the Eastern Profit project?

19  A.  No.

20  Q.  Did it do any investigation to recover stolen property?

21  A.  No.

22  Q.  Or to locate stolen property?

23  A.  No.

24  Q.  Did it do any investigation for asset recovery?

25  A.  No.

1    Q.  Now, you did testify that one of the things that you

2    thought you might have found was finding money taken out of

3    China by the CCP illegally.  Do you recall that testimony?

4    A.  Actually, I don't.

5    Q.  Okay.  Well, let me ask you.  Was one of the things you

6    thought you might find in this Eastern investigation, money

7    taken out of China by CCP members illegally?

8    A.  No.

9    Q.  Okay.

10   A.  I don't recall.

11   Q.  Okay.  Let me ask you.  Did Mr. Guo ever claim to you to be

12   a victim of the CCP taking money out of China illegally?

13   A.  No.

14   Q.  Did Mr. Guo ever identify for you other people who would be

15   victims of CCP officials sending money out of China illegally?

16   A.  No.

17   Q.  Did he ever -- and let me expand it out now, not to just

18   Mr. Guo, but Mr. Guo, Yvette Wang or Lianchao Han, did they

19   ever claim to you to be involved in or getting ready to start a

20   case for asset recovery?

21   A.  Not with us.

22   Q.  Did they ever tell you that they wanted to use the research

23   that you were going to find for some legal proceeding for asset

24   recovery?

25   A.  No.

```
1    Q.  Did they ever identify for you any victim of a crime?

2    A.  No.

3    Q.  Did Mr. Guo ever claim he wanted to use -- let me go back

4    out and run into all three.

5              Did Mr. Guo, Yvette Wang, or Lianchao Han ever claim

6    to you that they wanted to use your research to recovery some

7    specific asset of theirs that had been stolen?

8    A.  No.

9    Q.  Ms. Wallop, from even before the time you formed Strategic

10   Vision, through your time with Strategic Vision, have you ever

11   considered being licensed as a PI?

12   A.  Never.

13   Q.  Have any of your projects, including this one, been done at

14   a time when you knew your client was in an open law enforcement

15   investigation relating to that research project?

16   A.  No.

17   Q.  Let me now move to Mr. Gertz and Lianchao Han.  We'll talk

18   more about the circumstances here.  Now, I think you testified

19   before you'd known Mr. Gertz for some decades before he

20   approached you?

21   A.  Yes.

22   Q.  Where was your first meeting with Mr. Gertz, by the way?

23   A.  Regarding this project?

24   Q.  Yes.

25   A.  At my home.
```

1   Q.  So did he physically -- he physically came to your house?

2   A.  Well, he called me up and he said:  French, I'd like to

3   come see you about something, and I think it might be of

4   interest.  And I said:  Bill, it's great to hear from you.

5   Yes, come for lunch one day this week.  And since his office is

6   very close to my home, he walked over, and we had lunch that

7   week.

8   Q.  Ms. Wallop, in fact, had you worked earlier in 2017 with

9   Bill Gertz for one of your clients?

10  A.  Yes.

11  Q.  What was that?

12  A.  It was also for -- to give Bill Gertz an exclusive because

13  we're both very anticommunist, and it was for an exclusive

14  interview with Mikhail Khodorkovsky.

15  Q.  Do you know whether Mr. Gertz has authored books about

16  national security?

17  A.  Yes, he has.

18  Q.  Has he authored one on Guo?

19  A.  Yes, he has.

20  Q.  But that was after this contract; is that right?

21  A.  Yes.

22  Q.  Did you trust -- I'm sorry.  I know I keep drifting.  Did

23  you trust Mr. Gertz?

24  A.  Yes.

25  Q.  Let me ask you about Lianchao Han.  You told us a little

1    bit before about what you knew about him.  What did you know

2    about Mr. Lianchao Han's background?

3    A.  Well, I've known Lianchao many years, off and on.  He

4    was -- he worked on the Hill with several Senators, including

5    my late husband, and he -- my husband was then on the

6    Intelligence Committee, and Lianchao worked with Angelo

7    Codevilla, and then also with Lianchao.

8         They -- we were all very focused on Taiwan at the

9    time, and that's how I knew him, during Taiwan, as well as

10   other dissident organizations in Washington that he was

11   involved with, anticommunist, anti-CCP.

12   Q.  Did you have any understanding as to whether Lianchao

13   actually immigrated here from China?

14   A.  Yes, I knew he had.

15   Q.  Did you, yourself, consider him a dissident?

16   A.  Yes.

17   Q.  Let me ask you now about a name that's come up several

18   times.  We haven't heard from him yet, Dr. J. Michael Waller.

19   Was he at the first meeting with Gertz that had both Gertz and

20   Lianchao at it?

21   A.  Not the first -- oh, sorry.  Let me back up.  Bill Gertz

22   and I had lunch together, and then the subsequent meeting was

23   with Mike Waller and Lianchao and Bill Gertz at my home over

24   lunch.

25   Q.  Was he there at your invitation?

1    A.  Yes.

2    Q.  Why did you invite him?

3    A.  Because Bill Gertz suggested that he had been in touch with

4    Lianchao, and they apparently were close friends of Guo's, and

5    I didn't know the gentleman's name at the time as being Miles

6    Guo; so Bill suggested that I invite or include Lianchao, and

7    at that time, I also included Mike Waller.

8    Q.  And so my question is, why did you include Mr. Waller,

9    then -- Dr. Waller?

10   A.  Oh, because he is an expert on intelligence analysis.  He's

11   written substantially over the past 25 years on dissidents and

12   also on Russian, as well as Chinese or Asian scenarios, as well

13   as Central American tactics that are used to turn countries

14   from being democratic to being more communist, I guess, is the

15   best word.

16   Q.  I'm sorry, are you saying he was trying to make countries

17   more communist?

18   A.  No, he was trying to turn countries from being communist.

19   Q.  How long have you known Mr. Waller?

20   A.  Oh, 30, 35 years.

21   Q.  Had you worked with him before at a professional context?

22   A.  Yes.  When he was at the Institute of World Politics, John

23   Lenczowski was the head of it.  I was on the board of trustees

24   of Boston University, and I worked with John Silber, who was

25   chairman, to assist IWP in Washington to get their credentials.

1   And I met Mike, although I knew Mike, but I met Mike and spent

2   more time with him while he was at IWP.

3   Q.  Had he worked on Strategic Vision projects in the past

4   before this project?

5   A.  Yes, he had.

6   Q.  What was that?

7   A.  He worked on one Middle Eastern project with me, and then

8   he also worked on a Russian project.

9   Q.  Okay.  Let's talk about the first meeting with Mr. Guo.  Do

10  you recall when that was?

11  A.  Yes.

12  Q.  When was it?

13  A.  I believe it was November -- I'd have to look at the

14  calendar, but I think the 21st.

15  Q.  Okay.  Well, let's --

16  A.  It might have been earlier.

17  Q.  Let's put up Exhibit 62.

18          And, Ms. Wallop, I'm going to ask, do you have a

19  binder back there yourself?

20  A.  No, I do not.

21          MR. GREIM:  Your Honor, is it possible to let the

22  witnesses also have a hard copy binder?

23          THE COURT:  I'm fine with that.  Do you have a copy

24  for the witness?

25          MR. GREIM:  It's somewhere in here.  We'll get to it.

```
 1    I don't want to take a pause.

 2              THE WITNESS:  That's all right.  I'm good.

 3              MR. GREIM:  Take up our time.

 4              THE COURT:  I can look at the exhibits from my video.

 5    You can borrow my binder.

 6              MR. GREIM:  Thank you.  We won't take it from you

 7    right this second.  I'll just forge ahead.  If we take a break,

 8    we'll try to find it.  We'll find it around here somewhere.

 9    BY MR. GREIM:

10    Q.  Okay.  Let's look at exhibit -- if you could scroll through

11    that, please.

12    A.  November.

13    Q.  Okay.  Do you recognize this document?

14    A.  Yes.

15              THE COURT:  What exhibit number are we on?

16              MR. GREIM:  We're on Defendant's Exhibit 62, DX62.

17    Q.  Do you recognize this document?

18    A.  I do.

19    Q.  What is it?

20    A.  It's a calendar, one of my calendars.

21    Q.  Is it a calendar that you kept during the course of the

22    events that are indicated here?

23    A.  Yes.

24    Q.  Is that your general practice to do that?

25    A.  Yes.
```

1               MR. GREIM:  We move the Court for its admission.

2               THE COURT:  Received, subject to objections.

3               (Defendant's Exhibit DX62 received in evidence)

4    BY MR. GREIM:

5    Q.  All right.  Ms. Wallop, from looking at this exhibit, can

6    you tell when that first meeting was?

7    A.  Yes, it was the 21st of November 2017.

8    Q.  Who all was in attendance there?

9    A.  It was myself and Mike and Miles and Lianchao.

10   Q.  Okay.  You said Miles, who is that?

11   A.  That's Guo, sorry.

12   Q.  All right.  Guo Wengui?

13   A.  Yes.

14   Q.  Does he go by another name?

15   A.  He goes by about eight different names.  Let's just call it

16   Miles Guo, or Miles Kwok.

17   Q.  Miles Kwok.  By the way, was Han Chunguang there?

18   A.  Yes, he introduced us.

19   Q.  Did you observe what Han Chunguang was doing?

20   A.  I'm sorry.  I thought you meant Lianchao, excuse me.

21   Q.  I'm sorry.  Not Lianchao.  This is Han Chunguang.  Was he

22   there?

23   A.  Yes, he was there.

24   Q.  Was he introduced to you?

25   A.  No.

1    Q.  How do you know it was him?

2    A.  Well, I recognized him when we finally had the deposition

3    for the signature, the faked, forged signature on the contract.

4    Q.  Ms. Wallop, what was he doing at the meeting?

5    A.  He was serving lunch.

6             THE COURT:  Was there a motion with respect to that

7    prior answer, the "faked, forge signature"?

8             MS. CLINE:  Yes, your Honor.  Objection, lack of

9    foundation.

10            THE COURT:  I'll strike the language "faked, forged

11   signature" for foundation and outside the scope.

12   BY MR. GREIM:

13   Q.  Was Yvette Wang at this meeting?

14   A.  She was.

15   Q.  Did she actually participate in it?

16   A.  No.

17   Q.  What did you see her doing there?

18   A.  She was serving tea, or she was in and out of the room at

19   Guo's request.

20   Q.  How did you understand Lianchao Han's role at this meeting?

21   A.  Lianchao was a close advisor to Guo, and he was the one

22   that introduced us to Guo, via Bill Gertz as well.

23   Q.  Did he ever translate on behalf of Guo?

24   A.  Yes, he did.

25   Q.  What was your initial impression of Guo?

1    A.  I thought he was a very suave, sophisticated, show-off-y

2    individual who liked to boast about how much money he had and

3    how much influence he had.

4    Q.  Could he speak English?

5    A.  Yes, his English was pretty good.

6    Q.  Did he appear to understand when you spoke English to him?

7    A.  Yes, he did.

8    Q.  But did he still require Lianchao's services, to some

9    degree, as far as you could tell?

10   A.  I think "to some degree" is a fair assessment, yes, when

11   the conversation became a bit more complex.

12   Q.  Can we put up Defense Exhibit 38.

13           Now, Ms. Wallop, do you recognize this as the same

14   exhibit that the plaintiff showed you --

15   A.  Yes.

16   Q.  -- before the break?

17   A.  I do.

18   Q.  And you testified that Lianchao Han helped in its

19   preparation?

20   A.  He did.

21   Q.  Were you present for that?

22   A.  Yes.

23   Q.  Counsel showed you a few statements in here.  I'm going to

24   ask you to take a look at the very first part that was skipped

25   over here.  Do you see where it says:  "This is a vision for

1   Mr. G to remain safely in this country and accomplish his

2   mission back home"?

3   A.  Yes.

4   Q.  Did you understand that, at this time, that that was what

5   you were supposed to be trying to do for Mr. Guo?

6           MS. CLINE:  Objection, leading.

7           THE COURT:  This is a bench trial.  Overruled.

8   A.  I'm sorry, that was part of what he was looking for us to

9   consider.

10  Q.  Yes.  And actually, I should have asked a better question

11  anyway; so let me ask you.  Did you understand whether Mr. Guo

12  had any goals, other than those two main goals, at this time?

13  A.  Oh, no.

14  Q.  And so did Mr. Guo represent to you in this meeting that he

15  was concerned about being sent back to China?

16  A.  Yes.

17  Q.  And what did he say his mission back home was?  Or let me

18  ask you, did he indicate what his mission back home was?

19  A.  Yes, to dismantle the CCP in China and overturn the

20  government.

21  Q.  What did Guo tell you about himself?

22  A.  Well, he told us a little bit about his growing up, his

23  childhood in a rural area, and he had a number of brothers and

24  sisters.  He didn't have much in the way of education; that he

25  had made his way to, I guess, must have been Beijing and became

1    friends with a number of people within the hierarchy through

2    different activities.

3    Q.  Did Mr. Guo mention an asylum application in this meeting?

4    A.  I know it was mentioned.  I'm not entirely sure if it was

5    in this meeting, but it probably wasn't.  I'm sure he mentioned

6    that he had applied for asylum.

7    Q.  Did you have any understanding as to whether Lianchao Han,

8    or anyone else, was working with Guo on that application?

9    A.  So this -- this particular meeting would have been the 21st

10   of November, if I'm correct.  Is that what -- yes, it would

11   have been the first meeting; so 2017.  And I think Lianchao was

12   the attorney, he told us, to file the asylum paperwork for

13   Mr. Guo.

14   Q.  Let's fast forward.  We won't go through all of the

15   different meetings you had, but I will ask you actually if you

16   can pull up Exhibit 62 again.  I'm going to ask you, do you see

17   any other meetings, or can you tell us when you had follow-up

18   meetings with Mr. Guo?

19   A.  Yes.  This is the December 2017 calendar.  My calendar.  It

20   appears 20 -- I'm sorry, the 4th of December Yvette and

21   Lianchao, myself and Mike and, obviously, Guo.

22          And then there was another meeting with Mike, myself,

23   Lianchao on the -- sorry, on the 10th.  And then we had

24   another --

25          THE COURT:  And was that one where Mr. Guo was present

1   also?

2          THE WITNESS:  Yes, it was on the 11th.  We arrived for

3   meetings on the 10th, and then we met with Guo on the 11th.

4   I'm sorry, your Honor.

5          MR. GREIM:  If I can clear that up, your Honor.

6   BY MR. GREIM:

7   Q.  So was the meeting on the 10th without Guo?

8   A.  Yes.

9   Q.  Only with Lianchao?

10  A.  Yes.

11  Q.  And then the following day you all met with Guo?

12  A.  That's correct.

13  Q.  All right.  And then do you see any other meetings in

14  New York with Guo?

15  A.  Yes.  On the -- sorry, on the 21st.

16  Q.  Okay.  And again, Lianchao was present for that?

17  A.  Yes, he was.

18  Q.  And then yourself and -- let me ask you.  Who was present?

19  A.  Well, Lianchao, myself and Michael, Dr. Waller.

20  Q.  Was Yvette Wang at that meeting?

21  A.  Yes, she was.  Yes.

22  Q.  And I'm sorry, how are you able to tell that by looking at

23  your calendar?

24  A.  Because I put a "Y" down there in the corner; so it must

25  have meant Yvette.

1   Q.  Very good.  Okay.  We won't try to run through each of

2   those meetings.  I want to ask you, though, did there come a

3   time when Guo or Lianchao proposed a research project to you?

4   A.  It was sort of done in stages.  So yes, it would have been

5   on the 4th of December, and then subsequently on the 11th of

6   December, during those meetings.

7   Q.  Did Guo tell you anything about whether he, himself, had

8   any goals from that research project?

9   A.  He did.  We were initially having the conversation about

10  identifying real estate in Washington, substantial homes or

11  home, as well as for substantial office building.

12          The home budget, he said, would go anywhere from 65 to

13  80 million, and the office building complex for his foundation

14  would be in downtown Washington and there was a budget for

15  that --

16  Q.  Mrs. Wallop, I'm going to stop you there.  I'm going to

17  focus you on the question of what he said to you, or whether he

18  told you he had any goals for the research project.  I

19  understand you're trying to give some background, but just try

20  to focus on the answer.

21  A.  Okay.  I'm sorry.  Yes.

22  Q.  Okay.  And what did he say his goals were?

23  A.  He wanted to establish a presence in Washington.  He wanted

24  to have a sort of social and political presence of power and

25  influence, and he was looking for a team that would be able to

1  do that for him.

2  Q.  My question, though, is about the research project.

3  A.  Right.

4  Q.  Okay?  So what did he say to you were his goals about the

5  research project?

6  A.  So that began on the 11th and the 21st by saying he wanted

7  to create a research project that would expose a number of the

8  CCP hierarchy and their children in the United States, as well

9  as in the mainland.

10 Q.  Did he tell you why he wanted to do that?

11 A.  Because he felt at the time that that would help topple the

12 regime that he felt was corrupt.

13 Q.  Now, did you -- sometime in mid to late December, did you

14 reach an agreement in principle with Guo that you would try to

15 undertake that kind of a project?

16 A.  Yes, after the 21st of December, we had done a PowerPoint

17 presentation to him on the foundation.  We waited about a week,

18 until we had heard back one way or the other from Lianchao Han

19 as to working on an agreement.

20 Q.  Now, that agreement, we already heard, was finally signed

21 on January 6th, correct?

22 A.  That's correct.

23 Q.  Before deciding whether to finally enter into this

24 agreement, did you rely on Guo's representations about himself?

25 A.  I did.

```
1   Q.  Did you rely on Guo's representations about how he wanted

2   to use the research you were going to provide?

3   A.  Yes.

4   Q.  Would you have entered into the contract with Guo if you

5   thought he was not a true dissident?

6   A.  Never.

7   Q.  Would you have entered into the contract if you thought he

8   did not intend to use the research to undermine the CCP?

9   A.  No.

10  Q.  Now, did Guo's statements about himself seem reliable to

11  you?

12  A.  Yes.

13  Q.  Why is that?

14  A.  He had Lianchao and Bill Gertz as sort of references, and

15  he seemed initially to be very committed to being a dissident

16  and anti-CCP.

17  Q.  With Lianchao -- let me ask you.  You said he had Lianchao

18  as a reference.  Do you have any understanding as to whether

19  Lianchao would also be working on the project with you?

20  A.  Yes.  He was the -- the correspondent and the advisor to

21  Guo during the entire time, up until the last part of December.

22  Q.  Now, in your last examination, we noticed -- we pulled up a

23  research agreement and saw that there was no reference to Guo

24  or to the CCP or even to China within the research agreement.

25  Do you recall that?
```

1   A.  Yes.

2   Q.  Why not ask that Guo's statements about himself and his

3   plans to use the research be put into the research agreement as

4   representations?

5   A.  Because he was adamant about keeping this secret and away

6   from prying eyes and the CCP working knowledge as to the

7   project.

8   Q.  By the way, did you ever tell Guo, Yvette Wang or Lianchao

9   that you were a licensed private investigator in the laws of

10  many states?

11  A.  No.

12  Q.  Was licensure ever discussed with them?

13  A.  No.

14  Q.  Have you ever had a client ask you whether you are a PI

15  before you can begin the work?

16  A.  Never.

17  Q.  Have you ever had a client demand that you be a PI before

18  you do the work?

19  A.  No.

20  Q.  Have you ever heard from Virginia that you were out of

21  compliance with its licensure law?

22  A.  No.

23  Q.  Have you ever heard that from any state?

24  A.  Never, no.

25  Q.  Now, did there come a time when Lianchao Han was replaced

1   by anyone else as the main point of contact with Guo?

2   A.  Well, at the end of the negotiations of the contract,

3   Yvette became -- Yvette Wang became the -- I guess, the liaison

4   with Guo.

5   Q.  Okay.  When was that?

6   A.  That would have been about the 28th -- 28th, 29th of

7   December.

8   Q.  Did you personally meet with Yvette around that time?

9   A.  Yes, I did.

10  Q.  Where was that?

11  A.  In Washington.

12  Q.  So what day did she actually arrive in DC?

13  A.  She arrived on the 29th, according to my calendar.

14  Q.  I'm sorry, I'm going to ask you to take a closer look at

15  your calendar, Ms. Wallop.  Are you certain --

16  A.  Well, it was the 28th.  She arrived on the night of the

17  28th, as I understood it, and then we met on the 29th.

18  Q.  Very good.  And did anyone accompany her -- I'm sorry, let

19  me back up.  What did you do with Yvette in DC?

20  A.  Well, Lianchao and Yvette and myself drove around with

21  Yvette and Lianchao in the back seat of my car, and I drove her

22  to a number of estates or larger properties in Washington, in

23  Georgetown and Kalorama, Spring Valley and so forth, to give

24  her an idea about some of the homes that may be -- it might be

25  possible to buy under a private listing or pocket listing, as

1  they call it in the real estate business.

2          And then also, we looked at several large office

3  buildings, including the one that Guo wanted, which was the old

4  Riggs Bank Building across from the U.S. Treasury.

5  Q.  Now, Ms. Wallop, you didn't show any of those properties to

6  them?

7  A.  I didn't get out and walk them through the houses, no, but

8  I drove them around to see them from the outside.  And we could

9  have had access.  That was not a reason -- we would have had

10  access if they liked them.

11  Q.  Okay.  So at some point, did the discussion turn to the

12  research agreement?

13  A.  It did.

14  Q.  When was that?

15  A.  That was also on the 29th of December.

16  Q.  Okay.  And did you have any understanding as to why Yvette

17  had come down to talk about the research agreement?

18  A.  Because they kept changing the terms after we would agree

19  to certain things in the agreement.

20  Q.  Let me ask you this.  Did you have any understanding as to

21  whether the agreement was supposed to be signed on that day?

22  A.  Yes, it was supposed to be signed on the 29th.

23  Q.  And was it signed on the 29th?

24  A.  No.

25  Q.  Why not?

1   A.  Because Yvette Wang got into some sort of argument with Guo

2   and another individual on the phone about the payment.

3   Q.  Let's take a step back just for a second.  We didn't really

4   talk much about Yvette Wang to this point.  I actually also

5   didn't ask you whether Guo formally introduced you to her.  Did

6   he do that at some point?

7   A.  He did at his apartment in New York.

8   Q.  Okay.  So is this back earlier in December?

9   A.  Yes, it would have been the 4th of December.

10  Q.  Okay.  December the 21st?

11  A.  No, the 4th.

12  Q.  Oh, the 4th.  Okay.  Fourth day, not the fourth week?

13  A.  Right.

14  Q.  Did he introduce her in any way -- let me ask you this.

15  What did he introduce her as?

16  A.  Well, originally as his assistant.

17  Q.  Did he say anything else about what she did for him?

18  A.  He said that she did, you know, what personal assistants do

19  and -- but he sent her from the room.

20  Q.  Okay.  When he formally introduced her, did he say anything

21  else about her role to you?

22  A.  Not at that time.

23  Q.  Okay.  Now, I'm going to ask you what Yvette Wang told you

24  about her role.  So what did Yvette Wang tell you was her role

25  with respect to this contract?

1   A.  Well, first of all, she said:  Guo is my boss.  I am

2   project manager, and I will be handling this project moving

3   forward.

4   Q.  Now, did she tell you that she had sole authority on the

5   project?

6   A.  She did.

7   Q.  Did she tell you whether things had to be approved by Guo

8   ultimately?

9   A.  Ultimately by Guo, yes.

10  Q.  Was that something that she said to you?

11  A.  Yes, but there were others.

12  Q.  Now, you say "but there were others."  Did there come a

13  time when she mentioned that she had to report to other people

14  as well?

15  A.  She did.

16  Q.  Okay.  Who did she say she was reporting to?

17  A.  She refused to tell me.  There were three or four other

18  "investors," as she called them.

19  Q.  When did she tell you that she was reporting to other

20  investors?

21  A.  Probably during that time, the 28th and 29th of December.

22  Q.  Did she indicate whether those investors, those three or

23  four other investors, had any role in deciding whether to

24  approve the contract?

25  A.  My understanding was that Guo was the final go-ahead on

1  approval, but that the others had some kind of sway internally,

2  and I think there's some text messages that refer to that.

3  Q.  By the way, were you still conferring with Lianchao during

4  this time, even after Yvette took over as the main point of

5  contact?

6  A.  Yes.  I believe so.  I mean, he wasn't doing the

7  negotiating by that time, but we were, obviously, all supposed

8  to be on the same team.

9  Q.  And so my question is, were you still conferring with him?

10  A.  Yes.

11  Q.  About the contract?

12  A.  Yes.

13  Q.  By the way, did Lianchao ever mention Eastern Profit to you

14  before the contract was signed?

15  A.  No, we never heard of it.

16  Q.  Did he ever mention Eastern Profit to you?

17  A.  No.

18  Q.  And did there come a time when you just quit talking to

19  Lianchao for good?

20  A.  No.  In what time sequence, I'm sorry?

21  Q.  Let me ask you.  Were you still talking to Lianchao about

22  the contract in January?

23  A.  I'm sure we were, yes.

24  Q.  In February?

25  A.  Yes.  I'm sure we were, even though he was not the

1    negotiating person for the contract by that time.

2    Q.  Now we're in the performance time.

3    A.  That's right.

4    Q.  Did you still talk to Lianchao about the contract in

5    February?

6    A.  Yes.

7    Q.  And in March?

8    A.  Yes.

9    Q.  At any point did he ever mention Eastern Profit to you?

10   A.  He never knew about Eastern Profit.  He never mentioned it.

11   Q.  Well --

12   A.  Never mentioned it as far as -- no, not to my knowledge.

13   Q.  Okay.  And did he ever mention to you that there was some

14   entity in Hong Kong trying to use the contract to recover

15   frozen assets?

16            MS. CLINE:  Objection.

17   A.  No.

18            THE COURT:  Hold on just a second.  There's an

19   objection.

20            What's the basis of your objection?

21            MS. CLINE:  Leading, your Honor.

22            THE COURT:  I'll permit it.  Overruled.

23   A.  I think the answer was "no."

24   Q.  When did you first hear of Eastern Profit?

25   A.  We heard about Eastern Profit in the -- probably either the

 1   29th of December or the following week, which would have been

 2   the 6th of January -- 5th of January, 5th or 6th.  It must have

 3   been the 6sixth of January.

 4   Q.  Did anyone ever suggest to you -- and by "anyone," I mean

 5   anyone at all, we're not limiting it to Lianchao here -- did

 6   anyone ever suggest to you that Eastern Profit was itself going

 7   to use the research?

 8   A.  No.

 9   Q.  By the way, who told you the name Eastern Profit?

10   A.  Yvette.

11   Q.  Did she tell you anything else about Eastern?

12   A.  No, I asked her.  She wouldn't tell me.

13   Q.  Did Yvette tell you who was going to be using the research?

14   A.  No.

15   Q.  Did Lianchao tell you who was going to be using the

16   research?

17   A.  Let me rephrase that on that.  Guo was going to be using

18   the information, but we didn't know if he was passing it on to

19   anyone else.

20   Q.  Did you make any assumptions about what Eastern was before

21   you signed the contract?

22   A.  We felt it was probably one of his many shell companies.

23            MS. CLINE:  Objection.

24   Q.  Guo's?

25            MS. CLINE:  Objection, lacks foundation.  Move to

 1  strike.

 2          THE COURT:  It's asking for understanding, her

 3  understanding.  Overruled.

 4  A.  We understood that it was one of his shell companies, one

 5  of many.

 6  Q.  So I take it you said this before Yvette's December 29th

 7  visit ended without the contract being signed?

 8  A.  That's correct.

 9  Q.  And it finally was signed when?

10  A.  It was signed on the 6th of January.

11  Q.  When did you hear that the contract was back on?  When did

12  you first hear that?

13  A.  Well, it was, I guess, during that weekend, and then Mike

14  and Lianchao came to discuss the contract on, looks like, the

15  2nd of January at my home to try to figure out what was going

16  on with these changes that were being made after we had had

17  verbal agreements, and then they would change it again.

18  Q.  And so do you recall when the date -- let me ask you this.

19          Did there come a time when Yvette told you, yes, I can

20  sign the agreement after all?

21  A.  Yes.

22  Q.  Do you recall when that was?

23  A.  I believe that must have been -- and, again, there are text

24  messages to it; so I think it was about the 4th or 5th of

25  December -- I'm sorry, January.  Excuse me.

L4JPEAS4                        Warrop - Redirect

1   Q.  Let's pull up Defense Exhibit 16.  All right.  Do you

2   recognize -- why don't you scroll through it so she can see all

3   three pages?

4   A.  Okay.

5   Q.  And I might tell the witness, this might not be a bad time

6   to go ahead and pick up one of the binders in front of you.

7   A.  Oh, where, 38?

8   Q.  Yes, we're at Exhibit 16.  These are text messages, and a

9   lot of times you have to do a lot of flipping back and forth

10  that the computer might not be good for.

11          MR. GREIM:  Your Honor, can I approach the witness?

12          THE COURT:  I'm not so sure.  Why don't we let her

13  find it.

14          MR. GREIM:  I think she may have the wrong binder.

15          THE WITNESS:  I have the wrong binder.  I'm sorry,

16  your Honor.

17          THE COURT:  Take your time.

18  A.  DX16 or 32?

19  Q.  16.

20  A.  16.

21          THE COURT:  Mr. Greim, I don't want you to approach

22  the witness because of all of the restrictions in the

23  courthouse.

24          THE WITNESS:  Thank you, your Honor.  I think I've got

25  it.  Okay.  I've got it.

1  BY MR. GREIM:

2  Q.  Okay.  Now, do you recognize Exhibit 16?

3  A.  I do.

4  Q.  What is it?

5  A.  It is a text message between Yvette and myself on the, it

6  looks like, the 5th of 2018, January 5th, 2018.

7  Q.  Okay.  And is one color Yvette and one you?

8  A.  Yes.  The darker color, which is normally blue, is Yvette's

9  in this case.

10  Q.  Does reviewing this document refresh your recollection

11  regarding the time that Yvette reached out to you to say that

12  she could sign the contract?

13  A.  Yes.

14  Q.  When was it?

15  A.  When we met or --

16  Q.  When did she reach out to you?

17  A.  This was the 5th of January.

18  Q.  And do you see she says:  "Hi, both L and M advised me that

19  we supposed to meet again"?

20  A.  Yes.

21  Q.  Did you understand who "L" was when that abbreviation was

22  used?

23  A.  Yes, it was Lianchao.

24  Q.  And who was "M"?

25  A.  That was Miles Guo or Guo.

1   Q.  And so did you, in fact, meet her the following day?

2   A.  Yes.

3   Q.  Before you got to that point, did you have one last

4   discussion with Ms. Wang about what exactly the terms of the

5   agreement were going to be?

6   A.  Yes.

7   Q.  And is that discussion reflected on --

8   A.  Yes.

9   Q.  -- pages -- well, this is an Eastern production; so Eastern

10  page 209 to Eastern page 213?

11  A.  Yes, that's correct.

12  Q.  And do you recall that Ms. Wang gave you her understanding

13  of what the monthly payments were supposed to be?

14  A.  That's correct, for the three months' initial term.

15  Q.  All right.  And do you see she says:  "I was advised that

16  you agree with 15 fish and monthly 750,000 for January,

17  February, March.  From April to December you agree with the

18  adjustable monthly payment based on what we actually buy"?  Do

19  you read that?

20  A.  Correct.

21  Q.  Now, is that consistent with your recollection of your

22  discussions with her?

23  A.  Yes.

24  Q.  Now, did you actually agree with her comment here?

25  A.  Yes.

L4JPEAS4                        Warrop – Redirect

1   Q.  She says:  "The waterline of monthly 750,000 won't be

2   written in the contract, please confirm."  Did you agree with

3   that?

4   A.  Yes.

5   Q.  Did you respond to her by text?

6   A.  Yes.

7   Q.  Okay.  Is your response right below?

8   A.  Yes.

9   Q.  And you respond:  "The agreement for three months is

10  correct"?

11  A.  Correct.

12  Q.  "January we have allowed 15 fish," is that what you say?

13  A.  Yes.

14  Q.  Now, was it going to be 15 fish for all the first three

15  months?

16  A.  We were supposed to back down to 10 per month because of

17  the circumstances, the complications of these additional five

18  fish, as we were calling them, five units, but that -- go

19  ahead.

20  Q.  Go ahead.

21  A.  That was part of the reason they couldn't get their

22  agreement coordinated, because we had always agreed to having

23  ten units per month, not 15, and at the last minute they said,

24  well, we need to have five more.  We need to put five more in,

25  and I agreed to that.

```
 1    Q.  Now, let me ask you.  First of all, we never really laid
 2    the groundwork for this.  The Court may have seen this in all
 3    of our briefing, but what's a fish?
 4    A.  It was a -- an individual to be researched.
 5    Q.  And then for the 15 fish, how many of the three subjects of
 6    research were to be done for each of those 15; do you recall?
 7    A.  No.
 8    Q.  Okay.  Did you agree with Yvette Wang that the waterline
 9    wasn't even written into the contract?
10    A.  Well, I mentioned it, and we had agreed that we'd always
11    have a 10-fish minimum, which was the waterline.
12    Q.  And did you believe that was, in fact, written into the
13    agreement?
14    A.  It was certainly our understanding.
15    Q.  Did you have a follow-up discussion with -- well, actually,
16    it turns out -- let's put up Exhibit 17.  We're going to flip
17    back and forth because, for some reason, this discussion was
18    split.
19    A.  Yes.
20    Q.  Let me ask you, first of all, do you recognize Exhibit 17?
21    A.  I do.
22    Q.  What is this?
23    A.  She says I'm --
24    Q.  I'm just asking you what it is first.
25    A.  Oh, I'm sorry.  It's a text between Yvette Wang and myself.
```

1    Q.  Okay.  And once again, did each of you have a certain color

2    here?

3    A.  Yes.  She was the darker color in this case, and I was the

4    white color.

5    Q.  Okay.  So let's go back.  I'm going to ask you to go back

6    and forth between the two of them.

7              THE COURT:  Are you offering 16 and 17?

8              MR. GREIM:  I will be.  I thought I would just, for

9    the extent, and then just go to the foundation I thought I'd

10   wait on that.

11             THE COURT:  Okay.

12   Q.  So do you see kind of the -- later on the 5th, it looks

13   like the evening of the 5th, does she ask you or do you recall

14   whether she sent you to or asked you to send her the contract?

15   A.  I remember that conversation.  Let me just find it here.

16   And I told her we couldn't send it.  So what page was that?

17   Q.  Let me ask you to take a look at the last page of

18   Exhibit 16.

19   A.  Oh, okay.  Sorry, sorry.  Yes.  "Could you please send the

20   contract here?  I get the right person to do."  This is from

21   Yvette.  Thank you.

22   Q.  Now, did you actually e-mail her the contract?

23   A.  No.

24   Q.  Why not?

25   A.  Because both Guo and ourselves had emphatic instructions

L4JPEAS4                    Warrop - Redirect

1   never to e-mail anything regarding this contract.

2   Q.  And then below that, you see she says:  "There is, of

3   course, no impasse here.  I work with several people -- M is

4   one of them -- saying for this project, he is not the only

5   boss."  Do you see that?

6   A.  Yes, I do.

7   Q.  Now, did you ask her who the other people she was working

8   for were?

9   A.  Not in this communique, but when I saw her on Saturday.

10  Q.  And then if you look at the beginning of 17, at the very

11  top --

12  A.  Yes.

13  Q.  -- you see this actually continues on:  "So I'm luckily the

14  sole communicator on behalf of all of them"?

15  A.  Yes.

16  Q.  "Looking forward to working with you"?

17  A.  Yes.

18  Q.  Now, did that concern you?

19  A.  It should have, had we not believed that Guo was the one

20  that was in charge, which is what he was telling us.

21  Q.  Did you tell her who you thought the only people who should

22  be privy to the contract were?

23  A.  Yes.

24  Q.  Who were those people?

25  A.  Lianchao, myself, Dr. Waller and Guo and herself, I guess,

L4JPEAS4                          Wallop - Redirect

1     obviously.

2     Q.  Did Yvette Wang confirm to you that your understanding was

3     correct?

4     A.  Yes.

5     Q.  Do you remember when she did that?

6     A.  It must have been -- it must have been on the 5th, 5th and

7     6th.

8     Q.  Okay.  If you look at page 217 on Exhibit 17 --

9     A.  Yes.  Sorry, yes.

10    Q.  Okay.  Look for page 217 on Exhibit 17.

11    A.  Yes.

12    Q.  Do you see a long, dark --

13    A.  Yes.

14    Q.  -- box?

15    A.  Yes.

16    Q.  Now, the dark boxes are from Yvette?

17    A.  Yes.

18    Q.  And do you see where -- does she indicate in there who she

19    believes the exclusive communicants on the contract are?

20    A.  Yes.  She says:  "To sign tomorrow, are exclusively between

21    New York" -- meaning Guo -- "you" -- meaning myself -- "Mike

22    and me."

23    Q.  "Me" is Yvette?

24    A.  And "me" is Yvette.  Sorry.

25    Q.  So did you -- I think you testified you met the next day

1    and you signed the contract, right?

2    A.  Yes.

3    Q.  Did Eastern or Yvette or Guo ever tell Strategic Vision

4    that the information from the research project would be given

5    to ACA Capital?

6    A.  Never.

7    Q.  How would it have changed your plan and work if Guo or

8    Lianchao or Yvette had communicated that the research from this

9    project was meant to be used on specific crimes to recover

10   specific property or for specific proceeds?

11   A.  We would have never taken the client.

12   Q.  Why is that?

13   A.  Because it's not what we do.

14   Q.  Let me forge ahead here.  Now, the contract was signed the

15   6th.  Was there a negotiated new start date for the contract?

16   A.  Yes, there was.

17   Q.  What was that date?

18   A.  It would have been, I think, the 16th of January.

19   Q.  Were there any issues in getting the research, sort of the

20   starter information for the research, to get out to the

21   researchers in Europe?

22   A.  Yes.

23   Q.  What were those issues, just if you could walk through

24   quickly?

25   A.  The first set of flash drives that she brought to my home

1   on the 6th of January, there were three flash drives, I put all

2   three into one of my laptops.  They were all corrupted.  They

3   were all bad flash drives.  So I said:  Just a minute, Yvette.

4   I'll be right back.

5           So I went down the street to a neighbor, who has an

6   extensive operation with computers and so forth, plenty of

7   screens and such, and I asked him if he would mind testing

8   these three flash drives.  And he said:  Sure, fine.  I've got

9   fire walls.  It should be okay.

10          So we inserted all three into several of his

11  computers, and we got a massive amount of, I don't know another

12  word for it, but sort of garbled trash across.  There were no

13  files in it.  There was nothing that could be decoded or

14  downloaded, and at that point, we began to pull the plugs

15  immediately from the computers that were digesting this flash

16  drive.  We yanked the flash drives out, of course.

17  Q.  Let me stop you there, Ms. Wallop.  Did you ultimately get

18  replacements for those flash drives?

19  A.  I did that --

20  Q.  Wait.  Let's try to do more of a Q and A.  I want to try to

21  move this along, make sure we don't have a narrative.

22  A.  I know.

23  Q.  So, Ms. Wallop, did you have to travel to get the new ones?

24  A.  Yes.

25  Q.  Where did you go?

1   A.   That was Saturday when we got the bad ones.  Went to

2   New York in Monday.  Met Yvette there in the lobby.  She gave

3   me three more flash drives.  Out of those flash drives, only

4   one worked.

5   Q.   Ms. Wallop, let me stop you.  Who gave those to you?

6   A.   Yvette.

7   Q.   So ultimately, was the one that worked, were you able to

8   duplicate those?

9   A.   Yes.

10  Q.   And then what happened to those -- that information?  Where

11  was it sent next?

12  A.   I brought it back to Washington, or Virginia, and we then

13  had set up some printers to -- that were not connected to the

14  internet, to download the files that were part of this entire

15  research project.

16  Q.   Now, and so then those files were sent out to Team 1; is

17  that right?

18  A.   Team 1 came and collected them that week.

19  Q.   What else had to be done with Team 1 to -- let me withdraw

20  that question.

21       Did you stay in touch with Yvette Wang during the

22  first few weeks after January 16th?

23  A.   Oh, yes.

24  Q.   Okay.  If we could, let's pull up Exhibit 19.  Do you

25  recognize Exhibit 19, Ms. Wallop?

1    A.   Yes.

2    Q.   Before I do this, the Court prompted me, and then I

3    promptly forgot.

4            MR. GREIM:  I would like to move the admission of

5    Exhibits 16 and 17.

6            THE COURT:  Those are received subject to motion to

7    strike.  I take it there's no objection as to the authenticity

8    or the time of those documents, correct?

9            MS. CLINE:  Correct.

10           (Defendant's Exhibits DX16 and DX17 received in

11   evidence)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

L4JKEAS5                          Wallop – Redirect

1   BY MR. GREIM:

2   Q.  Ms. Wallop, I'm sorry, maybe I didn't hear you, do you

3   recognize Exhibit 19?

4   A.  I do.

5   Q.  What is this?

6   A.  This is, again, from Yvette to me on the 9th of January.

7   Q.  During this time, did Yvette ever tell you that she was now

8   reporting to someone other than Guo?

9   A.  Well, she did on the 6th.

10  Q.  Okay.

11  A.  I'm sorry.

12  Q.  Right.  We're moving now into the 9th.

13  A.  I know.

14  Q.  So from the 9th, let's say, to the end of January, did

15  Yvette tell you that she was getting research for someone other

16  than Guo?

17  A.  Not to my knowledge, unless it's in here.

18  Q.  Well, take a second if you need to look through to be sure.

19  A.  I don't see that in here, and if I'm missing it, if you

20  would kindly point out to which page I should be looking at.  I

21  don't see it.

22  Q.  Ms. Wallop, did Yvette work to schedule a lunch between

23  you, and Mr. Waller, and Guo?

24  A.  Yes.

25  Q.  And she started those efforts in mid-January?

L4JKEAS5                        Wallop - Redirect

1    A.   She did.

2    Q.   Did she refer to Guo in any particular way in these

3    messages?

4    A.   Yes.  She either called him captain, or boss, or chief.

5    Q.   If you look on exhibit-- I'm sorry, page 229 of this

6    exhibit, the dark color --

7    A.   Yep.

8    Q.   -- on January 16th, you see she says, "Good morning.  No

9    worries at all.  Totally understood about the food.  I'll let

10   the captain and chef know."  Do you see that?

11   A.   That's right.

12   Q.   Is this what you were referring to?

13   A.   Yes.

14   Q.   Was this meeting ultimately set up?

15   A.   Yes, it was.

16   Q.   Did Yvette tell you that the purpose of the meeting was for

17   Guo to review the research?

18   A.   Yes, but that was only five days after the signing of the

19   contract.

20   Q.   Well, if you look at -- I'm sorry, page 231, can you go

21   there?

22   A.   Yes, I have that.

23   Q.   You see that's on the 16th, that was the negotiated first

24   starting day of the contract?

25   A.   That's correct.

1   Q.  And she says, "Check with the captain"?

2   A.  Yes.

3   Q.  Then "He suggested to meet next week to review the weekly

4   result together with you, plus the private part."  Do you see

5   that?

6   A.  Correct.

7   Q.  What was "the private part"?  Do you have an understanding

8   of what that was?

9   A.  I would have to refer to Dr. Waller on that.  Right now,

10  I'm not quite sure.

11          MR. GREIM:  Move to admit Exhibit 19.

12          THE COURT:  Received subject to later motion to

13  strike.

14          I take it no questions as to authenticity?

15          MS. CLINE:  Correct.

16          THE COURT:  Very well.

17          (Defendant's Exhibit 19 received in evidence)

18  BY MR. GREIM:

19  Q.  You ultimately did meet with Mr. Guo, correct?

20  A.  Yes, that's correct.

21  Q.  That was at the end of January?

22  A.  Yes.

23  Q.  What did Mr. Guo say at that meeting?

24  A.  That he wanted to have the reports right away, and he

25  needed everything by the 26th for some reason, so -- well...

1   Q.  Did he tell you why he needed them on the 26th?

2   A.  He did not.

3   Q.  Did he tell you that he had a case or a lawsuit and he

4   needed to use it for that?

5   A.  No, he did not.

6   Q.  I want to fast forward a little bit here, Ms. Wallop, and

7   go to the period where the agreement was terminated.

8   A.  Okay.

9   Q.  Do you recall the date of that termination letter?

10  A.  The date on the termination letter was the 23rd of

11  February.

12  Q.  Did that come to your home?

13  A.  I didn't receive it.  It went to the Las Vegas office, the

14  registered agent's office.

15  Q.  When did you finally receive that letter?

16  A.  I think it was at the very end of February.

17  Q.  Could you look at something to help refresh your

18  recollection?

19  A.  If I could see your -- yes.

20  Q.  Your calendar?

21  A.  Possibly.

22          MR. GREIM:  Let's put up Exhibit 62.

23  Q.  What month should we be looking at?

24  A.  February, I guess.

25  Q.  Were you in the country when this letter was sent?

1   A.  I guess -- yes -- no, I was not.  I was in London.

2   Q.  Why were you in London?

3   A.  I was working with Fletcher and others to retrieve some

4   information.

5   Q.  We heard about Fletcher on your last examination.  What was

6   Fletcher being used for again?

7   A.  For two of the fish that were in the file.

8   Q.  Why did you go to Fletcher for those two fish?

9   A.  First of all, because it's the sort of thing he does, and

10  he is an expert or they are an expert at retrieving

11  information, particularly in the U.K., on individuals.

12  Q.  When did you first make contact with Fletcher?

13  A.  Oh, I've known him for many years, but --

14  Q.  I'm sorry.  On this matter?

15  A.  Okay.  On this matter, I think I called him around the

16  12th, I would say the 12th of February, to let him know that I

17  was probably headed to London.

18  Q.  So you met with Fletcher.  Your meeting with Fletcher,

19  then, that week of February looks like it starts with Monday

20  the 19th?

21  A.  19th, that's correct.

22  Q.  Okay.

23  A.  But I had given him sort of a heads-up during that

24  conversation, not on the background reasons, but on the names.

25  Q.  Ms. Wallop, the Foley Hoag termination letter terminates

1    the contract immediately, right, or purports to do so?

2    A.  I guess it did, yes.

3    Q.  Now, did the research agreement allow for immediate

4    termination of the contract?

5    A.  No.

6    Q.  What did it require?

7    A.  It required a 30-day notice --

8    Q.  What was the purpose --

9    A.  -- by both parties.

10   Q.  What was the purpose for that?

11   A.  So that we could dismantle our teams and sort of wrap

12   things up either way.

13   Q.  Did it have any other purpose, 30 days' notice?

14   A.  Well, we also wanted to make sure that we had the time to

15   perhaps -- I wouldn't say renegotiate, but discuss whatever the

16   issues were.  And, in fact, we had been having conversations

17   with Lianchao --

18   Q.  Let's make sure we keep our answer -- I was going to ask

19   you, though, did you, in fact, attempt to confer with Guo after

20   receiving the Foley Hoag letter?

21   A.  Oh, we did through Lianchao.

22   Q.  Was that effort successful?

23   A.  In contacting him, yes.

24   Q.  Were you successful at getting through to Guo?

25   A.  Yes, through Lianchao.

1   Q.  Did you continue trying to do what work was still possible

2   to do in February after receiving that letter?

3   A.  Yes.

4   Q.  I want to ask you now about damages.  I know we spent some

5   time with some color charts before, and I want to see if we can

6   clear a few things up.

7        MR. GREIM:  So why don't we put up what was marked as

8   Exhibit-- well, it's actually our Exhibit 64 and 65,

9   Defendant's 64 and Defendant's 65.

10        Very good.  Let's actually focus on 64.

11   Q.  Now, Ms. Wallop, I understand you were walked through this

12   using a footnote in the proposed findings and conclusions.  My

13   question to you -- I'm going to focus just on this exhibit,

14   okay -- there are two different $200,000 wires for Guo in the

15   month of January; is that correct?

16   A.  That's correct.

17   Q.  And where did they go?  Where were the two different

18   entities?

19   A.  One went to Cyber Sol, and the other went to GRG.

20   Q.  Now, which one of those actually went on through to Team 1?

21   A.  The GRG, I believe.

22   Q.  Now, you understand you testified earlier today that it was

23   Cyber Sol?

24   A.  Yes.  I wasn't sure which was which.

25   Q.  Okay.

```
1    A.  But now I guess I am, looking at it more closely.

2    Q.  And, also, you testified that -- and, again, I understand

3    this was walking you through the footnote to the proposed

4    findings.  You testified that you paid yourself 200,000 for

5    your own efforts?

6    A.  I paid 250,000.

7    Q.  No, right.  Well, let's just do this:  So earlier today,

8    you testified you paid yourself 200,000, correct?

9    A.  Yeah, I wasn't sure what to do with that chart that the

10   counsel had.

11   Q.  Well, let me ask you, Ms. Wallop:  Did you carefully review

12   counsel's footnotes to the proposed findings of fact before it

13   was filed?

14   A.  No.

15   Q.  No?

16   A.  I did not.

17   Q.  I'm not blaming you, Ms. Wallop.  Okay?

18           Let me ask you --

19   A.  I should have.

20   Q.  -- based on Exhibit 54, how much did you reserve for your

21   own efforts here?

22   A.  It was 250,000.

23   Q.  Okay.

24           MR. GREIM:  All right.  I don't have any other

25   questions.
```

 1            THE COURT:  Any recross?

 2            MS. CLINE:  I'm sorry, your Honor, I didn't hear.

 3            THE COURT:  Any reexaminations?

 4            MS. CLINE:  Yes, please.

 5            THE COURT:  How long do you think your reexamination

 6   will be?

 7            MS. CLINE:  Probably 20 minutes, maybe.

 8            THE COURT:  Okay.  You may proceed.

 9            Excuse me for a moment.  I take it we've got the next

10   witness ready to go after we're finished with Ms. Wallop?

11            MR. GREIM:  He's right here, your Honor.

12            THE COURT:  Very well.

13            MS. CLINE:  Chris, can we pull up footnote 140,

14   please.

15   RECROSS EXAMINATION

16   BY MS. CLINE:

17   Q.  So, Ms. Wallop, I just want to just touch on this money --

18   the money that Strategic is claiming with respect to -- the

19   damages Strategic is claiming with respect to this payment to

20   you or the payment to you.

21            So you would agree there's nowhere in footnote 140

22   that makes reference to an allocation of $250,000 to you,

23   correct?

24   A.  Apparently so.

25   Q.  Okay.

```
 1              I think if I'm understanding the colloquy here,
 2    Strategic's not tying this now claimed payment of $250,000 to
 3    any particular business expense; is that correct?
 4    A.  That's correct.
 5    Q.  And so what is the basis of the claimed damages for
 6    $250,000 payment to you?
 7    A.  I don't really understand the question.
 8    Q.  You're asking my client to be on the hook for $250,000
 9    allocable to you, and I'm asking, what's the basis?
10    A.  Well, the basis would be, obviously, the 30 days' notice
11    that we were not given --
12    Q.  So you're not --
13    A.  -- in the contract.
14    Q.  So it has nothing to do with out-of-pocket expenses?
15    A.  No, it does have to do with out-of-pocket expenses, but,
16    you see, I think this is where it gets complicated, perhaps,
17    for some people.  I left the 250,000 in the account, and I drew
18    down from it because my own accounting person, lawyer, said
19    that I could, not this counsel.  I then set up the business
20    expenses, of which there are a number that really are allocated
21    to this particular contract, and I went through -- honestly,
22    through the bank account and highlighted what I felt were
23    legitimate business expenses, plus showing the wires out and to
24    whom the wires went.
25              THE COURT:  Excuse me for a moment.
```

```
 1              Are you saying that some of the expenses that were

 2     reflected in yellow on that list that we looked at form part of

 3     the $250,000?

 4              THE WITNESS:  No, they're not part of the 250,000,

 5     your Honor.  They're separate.

 6              THE COURT:  Okay.

 7              You may inquire.

 8     BY MS. CLINE:

 9     Q.  So is there anywhere in footnote 140, Exhibit PX 23, or

10     anywhere else, where we're to understood the basis for the

11     $250,000 allocable to you?

12     A.  I would refer to my counsel.  I don't know how to answer.

13     Q.  When Mr. Greim was questioning you about the notice

14     provision in the contract, part of your answer was that, in

15     your understanding, the 30 days would give the parties time to

16     work out their differences; is that right?

17     A.  Yes.

18     Q.  You would agree that there's no dispute resolution

19     mechanism in the contract, correct?

20     A.  Well, the 30 days would have normally done that, under

21     normal circumstances, yes.

22     Q.  There's no provision in the contract that requires the

23     principals of each side to meet, or go to mediation, or

24     anything like that, correct?

25     A.  We were doing that with Lianchao.
```

1  Q.  My question is:  Is there anything --

2  A.  Yes.

3  Q.  -- in the contract that requires particular dispute

4  resolution where the parties would get together, where they

5  would go to a settlement conference, or they would go to a

6  mediator, anything like that?

7  A.  Not that -- no, not directly, but certainly verbally.

8  Q.  You testified that the terms of the contract were

9  confidential, right?

10  A.  Yes.

11  Q.  And the subject matter of the contract was confidential,

12  right?

13  A.  Yes.

14  Q.  In fact, it was so secret, that you had to redact the names

15  of your subcontractors in connection with this litigation,

16  correct?

17  A.  Correct.

18  Q.  And you used the code name in your text exchanges, right,

19  the code name of Paris, right?

20  A.  Yes.  It was just my signal call.

21  Q.  And, in fact, there was such a concern about

22  confidentiality, that you didn't want to add representation to

23  the contract about Mr. Guo's dissident status, right?

24  A.  I'm sorry, you'll have to run that by me one more time.

25  Q.  I thought your testimony, upon a question from Mr. Greim as

 1      to why there wasn't representation built into the contract

 2      about the fact that Mr. Guo was a dissident, I thought your

 3      answer was because you wanted the contract to be very secret?

 4      A.  Yes, that's correct.

 5      Q.  Okay.

 6              But upon receipt of the thumb drive that contained the

 7      names of the subjects to be researched, you walked down to your

 8      neighbor's house and handed him a thumb drive?

 9      A.  Yes.  Since there was nothing on it, there was no problem.

10      Q.  When you signed the contract in January of 2018, the

11      counterparty name at the top of the contract was Eastern

12      Profit, correct?

13      A.  On January 6th, that's correct.

14      Q.  And you didn't refuse to sign the contract when you saw the

15      name Eastern Profit, correct?

16      A.  Yvette said it was a shell company.

17      Q.  You didn't refuse --

18      A.  No.  Obviously, I signed it; she didn't.

19              MS. CLINE:  Chris, can we bring up DX 16, please.

20              THE COURT:  The last portion of that answer, which

21      says "She didn't," will be stricken.

22              Ms. Wallop, you're instructed to please just answer

23      the questions that are asked.

24              THE WITNESS:  Okay.

25

1   BY MS. CLINE:

2   Q.  Your counsel was asking you questions about DX 16.  Do you

3   recall this text exchange used as an exhibit a few moments ago?

4   A.  What about it?

5   Q.  You recall that you and he were discussing this exhibit?

6   A.  Yes.

7           MS. CLINE:  Chris, can you scroll down to -- scroll a

8   little bit here.

9           Next page, please.  Page 3.

10  Q.  And you recall this portion of the text message in which

11  Ms. Wang tells you that she doesn't want the monthly fee to be

12  written -- the contemplated monthly fee to be written into the

13  contract, correct?

14  A.  That was on the 5th of January, yes.

15  Q.  Okay.

16          MS. CLINE:  And then, Mr. Chuff, can you scroll down

17  to page 5.

18  Q.  Later on in the text exchange, you represent that in order

19  to make sure that there is predictable pricing, that the

20  reports were going -- sorry, that the pricing was going to be

21  tied to units of reports per month, correct?

22  A.  Correct.

23  Q.  And then subsequent to this text exchange, the contract was

24  signed, correct?

25  A.  Yes.

1    Q.  And the contract contains language on pricing that we

2    looked at earlier, on page 3, that says the prices for each

3    deliverable are 300,000 each, correct?

4    A.  Correct.

5    Q.  Mr. Greim asked you if you had relied on certain

6    representations allegedly made by Mr. Guo when you entered into

7    the contract.  Do you recall that?

8    A.  Yes.

9    Q.  You did no due diligence with respect to those

10   representations you supposedly relied on, correct?

11   A.  When?

12   Q.  Before entering into the contract?

13   A.  We relied on Lianchao Han, and we relied on Bill Gertz's

14   reputation and affirmation.

15          THE COURT:  Ms. Cline, haven't we covered this

16   already?

17          MS. CLINE:  Yes.  I'm just cleaning it up after her

18   counsel's examination.  I'll move on.

19   BY MS. CLINE:

20   Q.  In your testimony this morning, I asked you about what the

21   contract itself said about its purpose, and then Mr. Greim this

22   afternoon asked you about what subjects Strategic Vision

23   actually investigated.

24          Do you recall that?

25   A.  Yes.

1   Q.  And you testified confidently that Strategic Vision didn't

2   investigate crimes or civil wrongs.  Do you remember that?

3   A.  Yes, in the United States.

4   Q.  So they did investigate crimes or civil wrongs overseas?

5   A.  No.  We didn't know what we would find until information

6   was given to us.  So we did not purposefully do that, no.

7   Q.  So purposefully or otherwise, did you investigate crimes or

8   civil wrongs overseas?

9   A.  No.

10  Q.  And, in fact, you testified that you had no idea what was

11  on the USB drives that were delivered, correct?

12  A.  Which time?

13  Q.  At the time the two USBs were delivered to Eastern Profit,

14  I thought your testimony was that you didn't see them, you had

15  no personal knowledge of what was on them, correct?

16  A.  Other than what Yvette told me was on them.  They were

17  supposed to be the files.

18  Q.  Sorry, I'm talking about the USBs that Mr. Waller delivered

19  to Eastern Profit.  Your testimony, I thought, was that you had

20  no --

21  A.  I'm sorry, you said Mr. Guo delivered to Eastern Profit.

22  Q.  Let me start over.

23  A.  Okay.

24  Q.  We all agree there were two USBs that Strategic delivered

25  to Eastern Profit, correct?

1   A.  Yes.  That was Dr. Waller.

2   Q.  And your testimony was that you had no personal knowledge

3   of what was on those USBs, correct?

4   A.  Other than what Dr. Waller had told me.

5   Q.  So you don't know, one way or the other, what Team 1

6   investigated; isn't that true?

7   A.  No.

8   Q.  Do you have any personal knowledge of what Team 1

9   investigated?

10  A.  Yes, because we met with them, and they told us later what

11  was on some of them.  I didn't have any direct visual because

12  we were told by Guo he only wanted one channel for this highly

13  sensitive information, and that was with Team 1, Dr. Waller

14  going to Europe to pick up the USB, return within 24 hours to

15  have the meeting with Yvette Wang.  So there was no way I could

16  see them because I was in Washington and he was in New York.

17  Q.  Mr. Greim asked you some questions about whether or not

18  Strategic -- the nature of Strategic Vision's investigation.

19          You recall in your deposition, your second deposition

20  where I deposed you, do you recall testifying that you had

21  engaged in some surveillance in Turks and Caicos?

22  A.  I wouldn't call it surveillance.  We were following up a

23  tip that somebody had said that one of the fish was going to be

24  in the Turks and Caicos, and we -- I went to the Turks and

25  Caicos to see if that was the case because we did not know who

L4JKEAS5                     Wallop - Recross

1    the person was meeting with.

2            MS. CLINE:  So let's take a look, Mr. Chuff, at

3    Ms. Wallop's second deposition, please.

4    BY MS. CLINE:

5    Q.  So, Ms. Wallop, this is the transcript from your deposition

6    in November 2019.

7            MS. CLINE:  Mr. Chuff, let's go to page 98, please.

8    Q.  So let's start, Ms. Wallop, at page 98, line 5, I ask:

9    "Q.  Why did you need to be in the Turks and Caicos?

10   "A.  Because that's where the two Chinese were those two

11   nights.

12   "Q.  And what did you do to investigate them?

13   "A.  I suppose that when you are tracking somebody, you are

14   trying to gather intelligence, and that's what I was doing.

15   "Q.  That's what I'm asking you about.  Were you surveilling

16   them?

17   "A.  Yes.  To some degree, yes."

18           Do you see that?

19   A.  I do, but I think there's --

20   Q.  My question is do you see it?

21   A.  Yes, yes, yes, I see it.

22   Q.  Did I read it correctly?

23   A.  You did.

24   Q.  Was that a truthful statement when you gave that testimony?

25   A.  Yes.

```
 1    Q.  And then down on page 99, I say:

 2    "Q.  Did you conduct any other surveillance yourself in

 3    connection with the Eastern Profit contract?

 4    "A.  Yes."

 5             Do you see that?

 6    A.  Yes.

 7    "Q.  Would you describe that?

 8    "A.  I wouldn't know where to begin."

 9             Do you see that?

10    A.  Yes.

11    Q.  Did I read that accurately?

12    A.  Yes.

13             MS. CLINE:  Your Honor, may I have one moment to

14    consult my colleagues?

15             THE COURT:  Yes.

16             (Pause)

17             MS. CLINE:  That's all I have, your Honor.  Thank you.

18             THE COURT:  Okay.  Reexamination?

19             MR. GREIM:  I do.  I just have one or maybe two

20    questions, your Honor.

21             THE COURT:  Okay.  Limit it to one or two.

22             MR. GREIM:  I was always told never to say that.

23

24

25
```

L4JKEAS5

1    REDIRECT EXAMINATION

2    BY MR. GREIM:

3    Q.  I have just one area for you, Ms. Wallop.  This goes back

4    again to our damages.

5              You recall that we just talked about the $250,000 and

6    what that was for, correct?

7    A.  Correct.

8    Q.  Now, did you pay yourself -- let me ask you first, did you

9    pay Mr. Waller some amount for the time and effort he put into

10   the matter?

11   A.  I did.

12   Q.  Did you pay yourself some amount for the time and effort

13   you put into the matter?

14   A.  I drew down on it, I didn't pay it out directly, no.

15   Q.  Is that amount the $250,000?

16   A.  Yes.

17             MR. GREIM:  No further questions.

18             THE COURT:  Okay.  Why don't we take a ten-minute

19   break now, just for -- Ms. Wallop, you're excused.

20             THE WITNESS:  Thank you, your Honor.

21             (Witness excused)

22             THE COURT:  And then we'll begin with the testimony of

23   Mr. Waller, and we'll go until 4:45.

24             Thank you very much, Ms. Wallop.

25             THE WITNESS:  Thank you, your Honor.

Waller – Cross

1              (Recess)

2              THE COURT:  Would you call the next witness, please.

3              MR. CHUFF:  Eastern calls J. Michael Waller to the

4    stand.

5              THE COURT:  Mr. Waller, you may have a seat in the

6    jury box, please.

7     J. MICHAEL WALLER,

8          called as a witness by the Plaintiff,

9          having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  Could you please state your full

11   name for the record and spell your last name.

12             THE WITNESS:  John Michael Waller, W-a-l-l-e-r.

13             THE COURT:  Mr. Waller, I would ask you to try to keep

14   your voice loud and speak slowly for the benefit of the court

15   reporter.

16             You may inquire.

17             MR. CHUFF:  Thank you, your Honor.

18   CROSS-EXAMINATION

19   BY MR. CHUFF:

20   Q.  Good afternoon, Mr. Waller.

21             You are acting as Strategic's corporate designated

22   representative for this trial; is that correct?

23   A.  Yes.

24   Q.  Could you please state the full legal name of the entity

25   that is paying Strategic's bills in this litigation?

1    A.  I do not want to surrender my right to privileged

2    conversation with counsel.

3            THE COURT:  If you know the name of the entity, you

4    have to answer the question, give the name of the entity.

5            THE WITNESS:  I do, okay.

6            Circinus.

7    BY MR. CHUFF:

8    Q.  How do you spell that?

9    A.  C-i-r-c-i-n-u-s.

10   Q.  And, Mr. Waller, is that its full legal name?

11   A.  I don't know.

12   Q.  Do you know what kind of entity it is?

13   A.  I don't know.

14   Q.  Do you know where it is based?

15   A.  Either in California or United Arab Emirates.

16   Q.  But you're not sure where it's based?

17   A.  I'm not sure.

18   Q.  Do you know who the owners of Circinus is or are?

19   A.  I know -- I don't know who the owners are.  I know who one

20   of the officials are, but I don't know the owners.

21   Q.  Do you know who the management of --

22   A.  Yes.

23   Q.  And who is that?

24   A.  That would be Elliott Broidy.

25   Q.  Do you know any other members of the management of

1   Circinus?

2   A.  No.

3   Q.  And Elliott Broidy was involved with a -- pled guilty to

4   conspiracy to try to get Guo Wengui evicted from the country;

5   is that correct?

6           MR. GREIM:  Objection, your Honor; foundation.

7           THE COURT:  I'll permit it.

8   BY MR. CHUFF:

9   Q.  Are you aware that Elliott Broidy was convicted -- excuse

10  me, pled guilty to conspiring with members of the CCP to have

11  Guo Wengui removed from the country?

12          MR. GREIM:  Your Honor, on this question, too,

13  foundation.

14          THE COURT:  Overruled.

15          THE WITNESS:  I'm aware he pled and that he was

16  pardoned.

17  Q.  You're aware that he pled guilty for conspiring with CCP

18  members to have Guo Wengui deported from this country?

19          MR. GREIM:  Your Honor, there has to be a good-faith

20  basis, and I object.

21          THE COURT:  I'll hear counsel as to the basis.  I

22  assume that you will offer the guilty plea and the indictment?

23          MR. CHUFF:  Yes.

24          THE COURT:  But I am aware I think it's generally

25  known that there's a good-faith basis Mr. Broidy pleaded

1    guilty.  What is the good-faith basis with respect to the

2    question?

3                MR. CHUFF:  So, I'm sorry, I was going to -- there are

4    a few exhibits.  There's a press release, and there are guilty

5    pleas.  So we can show them to the witness or, if you'd like,

6    we can show them to your Honor.

7                THE COURT:  Why don't you pass them up to me.

8                MR. CHUFF:  Okay.  They may be in your binder.

9    They're PX 67, PX 61.

10               THE COURT:  I'm sorry, 57?

11               MR. CHUFF:  No, I'm sorry.  Six-seven, PX 67.

12               THE COURT:  Can you hand them to my deputy?

13               MR. CHUFF:  And, your Honor, with respect to PX 67, I

14   direct you to paragraph 4.

15               THE COURT:  Okay.  What's the basis for the objection?

16               MR. GREIM:  Well, your Honor, the question is about --

17   first of all, the entire basis for this is that supposedly the

18   client is being paid by a CCP member or affiliate.  Now we've

19   come to an effort to lobby on behalf of -- it isn't mentioned

20   in this article, this is all hearsay.  This is actually about

21   someone else named Joe Blow, but the question assumes a

22   conspiracy directly with the CCP.  It's nowhere established,

23   even in these hearsay articles, and that's the basis for the

24   objection.

25               THE COURT:  Okay.  The objection is overruled.

L4JKEAS5                    Waller – Cross

1    There's a good-faith basis for the examination.

2              My courtroom deputy can hand you back the binder.  You

3    may inquire.

4    BY MR. CHUFF:

5    Q.  So, Mr. Waller, we've established that, one, part of the

6    management team of Circinus is Elliott Broidy, right?

7    A.  Circinus.

8    Q.  And part of the management team is Elliott Broidy?

9    A.  Yes.

10   Q.  He pled guilty to conspiring with CCP members to have Guo

11   Wengui deported from this country?

12   A.  I know that he pled guilty to working with China to have

13   Guo Wengui deported.  I don't know the nature of the CCP

14   members.

15   Q.  You're here to testify, in part, about a research agreement

16   between Eastern and Strategic Vision; is that correct?

17   A.  Yes.

18             MR. CHUFF:  I'd like to publish for the witness and

19   the Court PX 01.

20             MR. GREIM:  I'm sorry, while we're waiting, we were

21   given something by accident.  It looks like it's your trial

22   exhibits, not ours.

23   BY MR. CHUFF:

24   Q.  Mr. Waller, this is the research agreement between Eastern

25   and Strategic; is that right?

L4JKEAS5                        Waller – Cross

1    A.  Yes.

2    Q.  And you were involved in negotiating this agreement?

3    A.  Yes.

4    Q.  And you were involved in drafting this agreement, right?

5    A.  Yes.

6    Q.  And it was Strategic that actually typed up the words on

7    this page and delivered it to representatives of Eastern; is

8    that correct?

9    A.  Well, I typed up some of them and then passed it on, and it

10   was modified after that.  So, I typed some of them, and

11   Strategic would have typed some of them.

12   Q.  Okay.  Under this research agreement, Eastern Profit is the

13   client and Strategic is the contractor; is that correct?

14   A.  Yes.

15          MR. CHUFF:  We can depublish the research agreement,

16   PX 01, for now.  It's already been offered.

17   Q.  And Strategic was founded by Ms. Wallop; is that correct?

18   A.  Yes.

19   Q.  And Ms. Wallop is the sole member and manager of

20   Strategic Vision?

21   A.  Yes.

22   Q.  You're a long-time friend of Ms. Wallop's; is that correct?

23   A.  Yes.

24   Q.  You have known Ms. Wallop for approximately 35 years?

25   A.  Approximately, yes.

L4JKEAS5                         Waller - Cross

```
1    Q.  And you have worked with Strategic Vision on various

2    projects since 2016; is that correct?

3    A.  On two other projects besides the one in question.

4    Q.  So three total?

5    A.  Yes.

6    Q.  And the projects that you worked on with Strategic involved

7    investigation work, right?

8    A.  Involved research work.

9    Q.  Did it involve investigation work?

10   A.  Well, it depends on what you mean by "investigation."  As

11   a -- to some of the Ph.D.s who is an investigative journalist,

12   you can use the words pretty interchangeably, but I understand

13   the law views it differently.

14   Q.  Now, you used the word investigation at your deposition.

15   Do you recall that?

16   A.  Yes.

17   Q.  And you testified that this project and your other two

18   projects involved investigation work; is that correct?

19   A.  In the sense of research, not in the sense of certain

20   interpretations of law, yes.

21   Q.  You used the word investigation?

22   A.  Yes.

23   Q.  And that was truthful?

24   A.  Yes.

25   Q.  And that was accurate?
```

1   A.  It was accurate as I just explained with the caveat.

2   Q.  And that investigation work included good old-fashioned

3   detective type work; isn't that correct?

4   A.  May I see that in the transcript?

5   Q.  Just first answer the question.  Is that true?

6   A.  I'd like to see the transcript.

7           Was it something that I said, or is it --

8   Q.  I'm just asking you right now here today if the

9   investigation work that you did for the three projects for

10  Strategic Vision involved good old-fashioned detective type

11  work?

12  A.  No.

13  Q.  It did not?

14  A.  No, not for all three.

15  Q.  Do you recall testifying at two depositions in this matter?

16  A.  Yes.

17  Q.  Do you recall at the beginning of that -- of each of those

18  depositions, you were given -- you took an oath to tell the

19  truth, much like you did today?

20  A.  Yes.

21  Q.  And you told the truth at those depositions, correct?

22  A.  Yes.

23          MR. CHUFF:  If we could go to Mr. Waller's first

24  deposition.  If we could turn to -- yep, you're there, page 13.

25  Actually -- yes.

L4JKEAS5                        Waller - Cross

1    Q.  So page 13, if you look at line 12, you were asked:  "Other

2    than the project that we're going to discuss in this case with

3    Eastern Profit, how many other projects have you done for

4    Strategic Vision?"

5              You answered:  "Probably two."

6              Did I read that correctly?

7    A.  Yes.

8    Q.  And then on page 14, line 3, you were asked:  "So the three

9    total that you performed work for Strategic Vision?"

10             And you respond:  "This is the third one, yes."

11             Did I read that correctly?

12   A.  Yes.

13   Q.  If you scroll down to line 21, you were asked:  "So was it

14   investigation work?"

15             You respond:  "Yes."

16             Then you were asked:  "What kind of investigation

17   work?  Can you describe it?"

18             And you respond:  "Computer research, sort of academic

19   research, good old-fashioned detective type work."

20             Mr. Waller, were you asked those questions, and did

21   you give those answers at your first deposition?

22   A.  Yes, but this is out of context with the previous --

23   Q.  Mr. Waller, please, I just asked if you were asked those

24   questions --

25   A.  Yes.

1   Q.   -- and gave those answers at your first deposition?

2   A.   Yes.

3   Q.   And they were truthful?

4   A.   Yes.

5   Q.   So let's talk a little bit more about the research

6   agreement specifically.

7         So, in late 2017, you and Ms. Wallop were introduced

8   to a man by the name of Guo Wengui; is that correct?

9   A.   Yes.

10  Q.   After you and Ms. Wallop were introduced to Mr. Guo in late

11  2017, you had a number of meetings with him?

12  A.   Yes.

13  Q.   And during these meetings, you and Ms. Wallop outlined the

14  services that you could provide; is that correct?

15  A.   Yes.

16  Q.   And investigation work was among the services that was

17  offered, isn't it?

18  A.   I don't recall those words -- that word being used.

19        MR. CHUFF:   If we could bring up Mr. Waller's first

20  deposition again, and this time, we'll look at page 29.   Page

21  29, start with line 4.

22  Q.   You were asked:   "Did you or Ms. Wallop explain what either

23  your capabilities or Ms. Wallop's capabilities were in terms of

24  providing this research?"

25  A.   Yes.

1   Q.  And then after an objection, at line 10, you were asked:

2   "Did you explain what you could provide as a service in

3   connection with this research?"

4           You responded:  "Yes."

5           Then you were asked:  "And what did you explain to the

6   parties present?"

7           And you answered:  "That I would assemble the research

8   team and supervise the research team."

9           Then you were asked:  "That's the research team that

10  would perform investigatory research?"

11          You responded:  "Yes."

12          Mr. Waller, were you asked those questions, and did

13  you give those answers at your first deposition?

14  A.  Yes.

15  Q.  And were they truthful?

16  A.  Yes.

17  Q.  Now, at the time of the research agreement, you understood

18  that Mr. Guo's primary goal for the project was to uncover

19  information about members of the Chinese Communist Party, the

20  CCP; is that correct?

21  A.  Yes.

22  Q.  And it was your understanding that Mr. Guo wanted high

23  quality information, right?

24  A.  Yes.

25  Q.  You also understood that he wanted to uncover that

L4JKEAS5                     Waller - Cross

1    information very quickly?

2    A.  Yes.

3    Q.  And, in fact, you knew that it was critical that quality

4    information be uncovered within the very first month of the

5    contract, right?

6    A.  Within the very first phase of the contract, the very first

7    90 days, yes.

8    Q.  But you knew that -- and it happened in the first month;

9    isn't that right?

10   A.  Well, let's go over the wording of the contract, and we can

11   talk about it.

12   Q.  I'm just asking you your understanding.

13         Did you understand, at the time the research agreement

14   was signed, that it was critical to have quality information

15   within the first month?

16   A.  Yes.

17   Q.  And among that information, Mr. Guo wanted Strategic to

18   uncover evidence that the CCP members, various CCP members,

19   broke the law; is that correct?

20   A.  Yes.

21   Q.  And that included finding evidence of money stolen by CCP

22   officials for their own enrichment, right?

23   A.  Yes.

24   Q.  And you told Mr. Guo that you and Ms. Wallop could do that

25   type of work, right?

1   A.  Yes.

2            MR. CHUFF:  Your Honor, may I confer with my colleague

3   for one second?

4            THE COURT:  Yes.

5            (Pause)

6   BY MR. CHUFF:

7   Q.  Sorry, Mr. Waller.

8            And then the services that we were just describing,

9   you, and Ms. Wallop, and Strategic actually set out to conduct

10  those services, right?

11  A.  Yes.

12  Q.  But you are not licensed as a private investigator, are

13  you?

14  A.  No.

15  Q.  And you never have been?

16  A.  No.

17  Q.  Now let's talk a little bit more about the terms, the

18  specific terms of the research agreement.

19            Eastern -- and, first, I just want to confirm for the

20  record, Eastern and Strategic entered into the research

21  agreement on January 6, 2018; is that right?

22  A.  Yes.

23  Q.  And the explicit purpose of the research agreement was

24  detecting, stopping, and preventing crime; isn't that correct?

25  A.  This would require a complex answer.  It's not a yes-or-no

1    answer.

2    Q.  Doesn't it say in the research agreement itself that the

3    purpose of it is to detect, stop, and prevent crime?

4    A.  Yes.

5    Q.  And to accomplish that goal, Strategic was going to provide

6    detailed reports of a very high quality revealing the true,

7    complete, and full profile of the subjects; is that correct?

8    A.  Yes.

9    Q.  And specifically, Strategic was required to provide Eastern

10   with the following three types of deliverables — financial

11   forensic reports, current tracking reports, and social media

12   reports; is that accurate?

13   A.  Yes.

14   Q.  You mentioned the timing, so let's take a look at that.

15          The current tracking reports required weekly reports

16   in the first month and then another report at month's end, did

17   it not?

18   A.  I believe so.  It would help if I could look at the actual

19   wording, but I believe that to be the case, the way you said

20   it.

21   Q.  We'll go off your understanding for now.

22          And all the deliverables were to be provided by USB

23   only; is that correct?

24   A.  Yes.

25   Q.  And Eastern agreed to pay Strategic $300,000 for each

L4JKEAS5                         Waller - Cross

1  deliverable delivered on the agreement; is that correct?

2  A.  Averaged over the course of a year, yes.

3  Q.  So the contract provided that the price of each deliverable

4  was $300,000; is that correct?

5  A.  Yes, per month over a one-year period.

6  Q.  $300,000 per month over a one-year period for each

7  deliverable?

8  A.  Yes.

9       Now I'm doing this from memory, so if I can see the

10 wording, I can answer it conclusively.

11 Q.  Now, if a deliverable was not provided by Strategic, no

12 payment would be due under the research agreement; is that

13 correct?

14 A.  No.

15      MR. CHUFF:  Could we open PX 01.

16      First, can we scroll to B, current tracking.

17 Q.  Mr. Waller, just to confirm what we already went over, in

18 the second paragraph, you see B, "Current Tracking Research,"

19 it says:  "The contractor will produce concurrent tracking

20 research per individual subject to the client on a monthly

21 basis except in the first month when weekly reports shall be

22 delivered."

23      And so, again, weekly reports for the first month and

24 then a monthly report?

25 A.  Yes.

Waller - Cross

```
1    Q.  And now --
2    A.  There's another word, "weekly or report nightly to the
3    client direct," yes.
4    Q.  But that required more frequent reporting, right?
5    A.  Yes.
6    Q.  Now, if we could turn to page 3.  We'll get back to the
7    deliverables.
8    A.  Mmm, hmm.
9    Q.  So if you look at the paragraph, the second one from the
10   bottom on the screen, it says "Prices"?
11   A.  Yes.
12   Q.  And it says that prices for each deliverable, A, B and C,
13   are 300,000 each, per subject, per year?
14   A.  Correct.
15   Q.  So again, the price is for deliverable, right?
16   A.  Correct.
17   Q.  And then if you go to --
18   A.  I wish to amend my previous comment taken from memory.
19   This paragraph is correct.
20   Q.  All right.  The research also authorized the parties to
21   terminate the contract with 30 days' written notice; is that
22   correct?
23   A.  Yes.
24   Q.  And termination was permitted without cause?
25   A.  Yes.  By either party.
```

1   Q.  And the research agreement also required Eastern to provide

2   a $1 million deposit; is that correct?

3   A.  Yes.

4   Q.  And the $1 million deposit was not meant to be a signing

5   bonus, right?

6   A.  Yes, correct.

7   Q.  And the deposit, instead, was supposed to be treated by

8   Strategic as a down payment to be credited on a prorated basis

9   at the end of the contract, right?

10  A.  Yes.

11  Q.  And the research agreement authorized Eastern to direct

12  other entities to pay Strategic, and that such payments will be

13  deemed satisfactory compensation by Strategic; is that right?

14  A.  Yes.

15  Q.  And on or about January 2nd, 2018, Strategic received the

16  $1 million deposit from ACA Capital; is that correct?

17  A.  Yes.

18  Q.  And that was a few days before the research agreement was

19  signed?

20  A.  Yes.

21  Q.  Now, at that point, did Strategic say, oh, no, we can't

22  take this because it wasn't paid by Eastern?

23  A.  No.

24  Q.  And then it signed the research agreement just days later?

25  A.  Yes.  This was an explicit work we had with Mr. Guo Wengui.

1   Q.  And to this day, Strategic has not returned the deposit; is

2   that right?

3   A.  Yes.

4   Q.  Now, let's talk a little bit about the events that occurred

5   after the research agreement was signed.  On January 8th, 2018,

6   Ms. Wang delivered to Strategic the USB drive containing the

7   names of 15 individuals to be investigated under the research

8   agreement; is that correct?

9   A.  Yes.

10  Q.  And can we bring up, publish for the witness and the Court

11  PX07.

12          And, Mr. Waller, do you recognize this document?

13  A.  Yes.

14  Q.  This is the list of 15 names to be researched under the

15  research agreement, right?

16  A.  Yes.

17  Q.  And all of the individuals on this list were members of the

18  CCP or closely related to members of the CCP; is that correct?

19  A.  That's what Mr. Guo told us, yes.

20  Q.  Is that your understanding?

21  A.  Almost all of them, at least, yes.

22  Q.  And do you -- can you point to any of the individuals that

23  are not CCP members or closely related to CCP members?

24  A.  Yes.  There is one on the list that I recall -- I'd have to

25  scroll through the list to see his page -- he was the senior

1    Hong Kong police official.

2    Q.  Okay.  But most of them -- it is your understanding that

3    most of them are CCP members?

4    A.  They or their immediate family or immediate associates are

5    CCP members, yes.

6    Q.  And you and Ms. Wallop did, in fact, set out to investigate

7    certain or all of the individuals on this list, right?

8    A.  We set out to research them, yes.

9    Q.  Now, your own word was investigate; wasn't that right?

10   A.  Okay.  As long as we keep in mind the different

11   understandings of the word "investigate," yes.

12   Q.  In early January 2018, you traveled to Europe and the

13   Middle East to retain certain private investigators; is that

14   right?

15   A.  I traveled to Europe, not the Middle East at that time.

16   Q.  Okay.  And Strategic claimed that it, in fact, retained

17   certain private investigators?

18   A.  Yes.

19   Q.  Now, you confirmed earlier that Strategic would provide the

20   research that Strategic would provide would be delivered by USB

21   drive?

22   A.  Yes.

23   Q.  And Strategic delivered a total of two USB drives; is that

24   correct?

25   A.  Yes.

L4JPEAS6                          Waller - Cross

1    Q.  And one of those drives was delivered on January 26, 2018;

2    is that correct?

3    A.  Yes, I believe it was the 26th.

4    Q.  And the other was delivered on January 30th, 2018?  I'm

5    sorry, I think I said 2016.

6    A.  Fine.  I understood it as 2018 also.

7    Q.  Okay.  So two drives, one on January 26th, 2018, and the

8    second, January 30th, 2018?

9    A.  Yes.

10   Q.  And the information on the first drive, the drive delivered

11   on January 26th, that was of no use to Mr. Guo or Eastern

12   Profit because it was nothing more than the researcher's work

13   to familiarize themselves with the 15 subjects, using open

14   source information; is that correct?

15   A.  Yes.

16   Q.  And the information on the second drive delivered on

17   January 30th, 2018, also contained data that was not of any use

18   or actionable by Eastern; isn't that right?

19   A.  That's not correct.

20   Q.  Okay.  Well, let's pull up DX23.  Mr. Waller, do you

21   recognize this document?

22   A.  Yes.

23   Q.  Is this a text message exchange between Yvette Wang and

24   you?

25   A.  I can't see this.  I can't read the Mandarin, but I think

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1   it is, yes.  Certainly it is mine.

 2   Q.  And who is Pyratz?

 3   A.  That's my name on the signal.

 4   Q.  All right.  And your text is in light gray, is the lighter

 5   of the two shades?

 6   A.  Yes.

 7   Q.  So the one on the bottom?

 8   A.  Yes.  This is from Yvette Wang, yes.

 9   Q.  And you respond to her inquiry by saying:  "The reports are

10   not actionable but to show how the work is being executed."

11   Did I read that correctly?

12   A.  Yes.

13   Q.  All right.  And then if we can turn to Mr. Waller's second

14   deposition, tab 11, and scroll to page 115.  So we'll look at

15   page 115, line 19.  Do you see that, Mr. Waller?

16   A.  No, not yet.

17   Q.  Oh, sorry.  Can you expand that, please.  Can you scroll

18   down just a little bit to line 2.

19        So you were asked:  And what was the nature of the

20   other USB deliverable?  You responded:  It was raw code.  Then

21   you were asked:  When was the delivery made?  And you

22   responded:  On or about January 30th of January 2018.

23        And then, if you go down to line 21 of the same page,

24   you're asked:  You see that there are three indented bullets,

25   financial, forensic, historical research, current tracking

1   research and social media research.  Do you see that?  And you

2   responded:  Yes.

3          Did I read that correctly?

4   A.  Yes.

5   Q.  And those are the three pieces of research that were owed

6   under the research agreement, right?

7   A.  Yes.

8   Q.  And then if you go to page 116, at the top, line 2, you're

9   asked:  And the second USB that was all code, does that relate

10  to any of those three subject matter areas?

11         And you respond:  It related to all three.  Let me

12  say, it potentially related to all three.

13         Did I read that correctly?

14  A.  Yes.

15  Q.  And then you were asked:  What do you mean by

16  "potentially"?  And you responded:  It was still encrypted

17  code, and Ms. Wang and Mr. Guo were insistent that we deliver

18  it regardless.  I said, it hasn't been decrypted yet, and they

19  essentially said, we don't care; we want it anyway.  We said,

20  it won't be of any use to you until it's decrypted.  So I went

21  and retrieved it from them anyway.

22         Did I read that correctly?

23  A.  Yes.

24  Q.  And, Mr. Waller, were you asked those questions, and did

25  you give those answers at your second deposition?

```
 1    A.  Yes.

 2    Q.  And were they truthful?

 3    A.  Yes.

 4    Q.  Now, was that code ever decrypted for Eastern Profit?

 5    A.  I don't know because they -- I don't know if it was.

 6    Q.  Did Strategic decrypt that code for Eastern Profit?

 7    A.  No, I gave them the USB drive.  I did not retain a copy.  I

 8    was never returned the USB drive for decryption.

 9    Q.  So the answer is no?

10    A.  Correct.

11    Q.  You can set that aside for now.

12             Okay.  Let's switch gears a little bit here.  Are you

13    aware that Strategic has asserted a fraud claim against Eastern

14    Profit in this action?

15    A.  Yes.

16    Q.  And Strategic claims that Mr. Guo represented that he was a

17    dissent who opposes the CCP, but in reality, he's a double

18    agent that supports the CCP.  Is that the nature of Strategic's

19    allegation?

20    A.  Not quite, not double agent because that would have meant

21    he was a recruited U.S. agent, who was turned by the Chinese

22    Communist or vice versa.  So I'm not familiar with the

23    double-agent allegation.

24    Q.  Supporter of the CCP?

25    A.  Yes.
```

```
 1    Q.  Okay.  So he represented that he was an opponent and a
 2    dissident, but you claim that he was actually a supporter of
 3    the CCP?
 4    A.  Correct.
 5    Q.  Now, as part of its fraud claim Strategic claims it would
 6    have never entered into the research agreement had it known
 7    that Mr. Guo was actually, as you claim, a supporter of the
 8    CCP; is that correct?
 9    A.  Yes.
10    Q.  Now, you say that Mr. Guo was part of an intra-party power
11    struggle within the CCP before he left China, and that that
12    fact is evidence that he is a supporter of the CCP; is that
13    correct?
14    A.  Yes, but that was after the fact, after the contract was
15    signed.  I didn't know that earlier.
16    Q.  Okay.  Well, in fact, you actually were aware before the
17    research agreement was signed that some believed Mr. Guo simply
18    represented a faction in an internal leadership struggle within
19    CCP, weren't you?
20    A.  I was aware others thought that, yes.  I did not think that
21    myself.
22    Q.  But you were aware that some suspected that?
23    A.  Some people did, yes.
24    Q.  And you were also aware, before the research agreement was
25    signed, that there were reports that Mr. Guo owed his fortune
```

1    to ties to the CCP; is that correct?

2    A.  Yes.

3    Q.  And you actually didn't see anything unusual about that?

4    A.  Not in my line of work, no.

5    Q.  So you actually thought that the fact that Mr. Guo

6    allegedly maintains ties after he left China as the evidence

7    that shows that he's still a supporter or he is a supporter of

8    the CCP you claim?

9    A.  No.

10   Q.  So it's not your position in this case that the fact that

11   Mr. Guo allegedly has ties to the CCP after he left China, is

12   evidence that he is pro-CCP?

13   A.  This is a complicated answer.  Your Honor, if I may

14   explain?

15          THE COURT:  I think so.

16   A.  Okay.  I've worked a lot with communist defectors over the

17   years, actually since I was an undergraduate at George

18   Washington University, and had some of them as professors.  I

19   learned over the years, as well as talking, learning through a

20   lot of people in U.S. intelligence and counter-intelligence,

21   that it's very hard to discern whether someone who has broken

22   with a communist system, whether it's Soviet or Chinese or

23   others, to discern conclusively whether or not they still

24   maintain a loyalty.

25          Now, many of them would still maintain ties because

1    they had families or other connections, and those ties would be

2    valuable if they were indeed dissidents or genuine opponents

3    because they could mine those ties for information that would

4    be useful to the United States, to do damage to their own

5    system.

6           So simply because someone has, quote, ties to the CCP

7    isn't relevant.  What's relevant is the intent of maintaining

8    those ties.  In Mr. Guo's case, he made it clear from the

9    beginning, and he was very public about it, that he rose up

10   through the Chinese Communist Party apparat and the NSS secret

11   police apparat.

12          So to get someone like him, with inside knowledge of

13   the entire leadership of the Chinese Communist Party and the

14   secret police was a valuable find to weaponize that against the

15   Chinese Communist Party, to bring them down.  That's why I

16   found it so appealing to work with him.

17   Q.  So you're saying the fact that there were ties with Mr. Guo

18   and members of the CCP is not evidence of fraud?

19   A.  I'm not trying to be difficult.  Evidence of what type of

20   fraud?

21   Q.  The fraud that you're claiming in this case, that Mr. Guo

22   represented that he was an opponent of the CCP, but he's

23   actually, as you claim, a supporter?

24   A.  Correct.  The fraud that we are alleging is that he

25   presented to us that he's a dissident of the Chinese Communist

1    Party and wants to bring the whole party down.  We subsequently

2    found, after the lawsuit was filed --

3    Q.  I'm sorry --

4    A.  -- that he supported Xi Jinping.  So that's the evidence of

5    the fraud.

6    Q.  All I'm asking is, I think what you just said was the fact

7    that Mr. Guo may have ties to CCP members is not evidence that

8    he's pro-CCP?

9    A.  It's not a "yes" or "no" answer.  It's the question of the

10   nature of those ties --

11   Q.  All right.

12   A.  -- and of his intent.

13   Q.  But either way --

14          THE COURT:  So are you saying that, on its own, the

15   evidence of a relationship that somebody has with people within

16   the Chinese Communist Party, on its own, isn't necessarily

17   indicative of the fact that they are a supporter of the Chinese

18   Communist Party; there needs to be something more?

19          THE WITNESS:  Yes.  Correct, your Honor.

20   BY MR. CHUFF:

21   Q.  Now, either way, you were aware before the research

22   agreement was signed that Guo maintained close ties with senior

23   CCP leaders even after he left China, right?

24   A.  Yes.

25   Q.  Now, I think you just alluded to this a moment ago.

1    Strategic also points to Mr. Guo's former -- or relationship

2    with Ma Jian, the former head of the Ministry of -- so

3    Strategic also points to Mr. Guo's relationship with Ma Jian --

4    M-a, J-i-a-n, he's the former head of the Ministry of State

5    Security in China -- as evidence that Mr. Guo is pro-CCP; is

6    that right?

7    A.  No, Ma Jian was Deputy Minister of State Security, not the

8    head of State Security.  So he was Deputy Minster of State

9    Securities in charge of foreign intelligence.

10   Q.  Okay.  But Strategic asserts that Mr. Guo's relationship

11   with him is evidence that he's pro-CCP; is that right?

12   A.  No.

13   Q.  It doesn't?

14   A.  No.

15   Q.  Could we turn to Mr. Waller's second deposition, and we'll

16   be looking at page 139.  So if you look at -- I direct your

17   attention to page 139, at line 18.  Counsel was reading from

18   Strategic's counterclaim, and you were asked:  Then drop down

19   to paragraph 53.  Paragraph 53 says:  Guo's protector,

20   beginning at about 2004, was Ma Jian, Vice Minister of the

21   Ministry of State Security, until Ma's arrest and expulsion

22   from the party in December 2014, after losing an intra-party

23   power struggle.  Do you see that?  And you responded:  Yes.

24          And then you were asked:  What is Strategic Vision's

25   basis for that allegation?  And you responded:  Guo told us

1   this personally himself, and it was widely recorded in the

2   press.  And I might add that -- excuse me.  I might add that

3   this intra-party power struggle is important because that was

4   another clue that he was not a real dissident.

5           So again, Strategic is citing Mr. Guo's relationship

6   with Ma Jian as evidence that he was pro-CCP; is that correct?

7   A.  No, this is not accurate.  We're looking at two different

8   time frames.  So he came up through the party apparatus with Ma

9   Jian.  Of course he was pro-CCP.

10          Ma Jian, who made his fortune for Guo, was then

11  arrested and, to my knowledge, expelled from the communist

12  party in or around 2014.  That was the trigger point for Guo to

13  start turning against the CCP.  That changed the nature of

14  Guo's relationship with the CCP from being a tool or a member

15  of an app or an ally, or whatever, to becoming an opponent.

16          That's where he -- it would be at that point, where he

17  would break with the CCP, that he would become of interest to

18  somebody like me, to want to help him to get his word out and

19  to get his agenda moved forward to take down the party.

20  Q.  Okay.  All right.  So the relationship with Ma Jian is not

21  evidence of fraud in this case?

22  A.  No.

23  Q.  Okay.

24  A.  Unless it was a continuing relationship, of course, and

25  then it would depend on the nature of that continuing

1    relationship.

2    Q.  But you're not alleging a continuing relationship?

3    A.  I don't have -- I believe there is one, but I don't think

4    it's part of the complaint.

5    Q.  Now, you also say that in a May 2017 meeting in which

6    Mr. Guo met with certain CCP members in his home is yet more

7    evidence that Mr. Guo is pro-CCP; isn't that correct?

8    A.  Yes.

9    Q.  But again, you knew about this meeting before entering into

10   the research agreement; isn't that right?

11   A.  No, I didn't know until after he filed the lawsuit.

12   Q.  All right.  Could we look at DX34?  Now, this document,

13   marked as DX34, it was on Strategic's exhibit list.  And you'll

14   see this is a Wall Street Journal article entitled "China's

15   pursuit of fugitive businessman Guo Wengui kicks off Manhattan

16   caper, worthy of spy thriller."  And as we scroll down a little

17   bit, the date is October 22nd, 2017.  So this article is dated

18   before the research agreement was signed, correct?

19   A.  Yes.

20   Q.  And it's available publicly?

21   A.  Yes.

22   Q.  Okay.  If we go to page 1 and we take a look at the first

23   paragraph:  Guo Wengui, a wealthy Chinese businessman, sat in

24   the sun room of his apartment on the 18th floor of the Sherry

25   Netherland Hotel, on New York's Fifth Avenue.  With him are

 1   four officials from China's Ministry of State Security, whom

 2   Mr. Guo had agreed to meet.

 3           And then if you go to paragraph 3, it says:  Liu Yen

 4   Ping, a league official, said they had come on behalf of

 5   Beijing to find a solution, according to Mr. Guo in a partial

 6   audio recording Mr. Guo said he made of the May encounter.

 7           You weren't aware of this before the research

 8   agreement was signed?

 9   A.  Yes, I was aware of this article, and actually, Mr. Guo

10   explained that visit to us.

11   Q.  Mr. Waller, I'm just asking, were you aware of this visit?

12   A.  Yes.

13   Q.  All right.

14   A.  But I will say this gets back to the nature of the

15   relationship because I knew of the meeting.  I didn't know --

16   Q.  Mr. Waller, Mr. Waller.  No question is pending, and you're

17   going to get your chance.

18   A.  Fine.

19   Q.  Now, despite knowing all this, Strategic still entered into

20   the research agreement with Eastern Profit; is that correct?

21   A.  Yes.

22   Q.  And Strategic did not require Eastern to make a written

23   representation in the research agreement that Mr. Guo was a

24   Chinese dissident that opposed to CCP, did it?

25   A.  No.

1    Q.  All right.  Let's change gears a bit here.  So from this

2    project, you and Ms. Wallop agreed that you would split the

3    profits made under the research agreement 50/50; is that

4    correct?

5    A.  Yes.

6    Q.  And your understanding of profits is revenue minus

7    expenses, right?

8    A.  Yes.

9    Q.  And you were also separately reimbursed for certain of your

10   expenses; is that correct?

11   A.  Yes.

12   Q.  And your half of the profits, to that extent, was $265,000;

13   is that right?

14   A.  No, that was not all profit.  There were expenses as part

15   of that.

16   Q.  So let's look at your deposition, your second deposition,

17   Waller 2, at page 66.  So if you look at page 66, line 20, you

18   were asked:  And ballpark, how much money was expended in costs

19   by Strategic with respect to this contract?  And you responded:

20   That question would be best put to my colleague, but I can tell

21   you by negative reasoning, my half of the residual was about

22   250.  And you were asked:  So your half of the earnings was

23   250,000?  You responded:  Yes.

24          Mr. Waller, do you recall being asked those questions

25   and giving those answers at your deposition?

1   A.  Yes.

2   Q.  And those were truthful?

3   A.  Those were truthful, but there's a -- there's an add on to

4   that.

5   Q.  That was a truthful statement?

6   A.  That was a truthful statement, but they were not all

7   profits.  It was not all residual.  I used some of my private

8   funds to settle certain outstanding matters.

9   Q.  Did you produce any documentation of these outstanding

10  matters?

11  A.  I ate those costs myself.

12  Q.  So there's no proof in the record that would show those

13  costs?

14  A.  I don't believe so.

15  Q.  Could we turn to same page 182 of this deposition.  After

16  further questioning, we came back to this issue, and you were

17  asked at line 8:  So the total amount of your personal payment

18  ended up being 275,000; is that correct?  And you responded:

19  Is that how it adds up? And you were asked:  Well, let's just

20  do it again.  So there's 200 from Psyber Solutions, right?

21  50,000 from Oceanic Advisors.  So we're at 250, correct?  And

22  you responded:  Yes, 265, that sounds better.

23          And then you were asked:  265, is that consistent with

24  your recollection?  And you respond:  Right.  That's why I had

25  corrected before when I said approximately 250.  That was the

1    approximation.

2              So you corrected that your half of the residual was

3    not 250, it was really 265; is that correct?

4    A.  Yes.

5    Q.  If we could open up the pretrial order binder.  Excuse me,

6    the Strategic's findings of fact, and we'll look at page 23,

7    paragraph -- yes, right there.  So there's seven categories

8    here.  First one, French allocation for business expenses, we

9    covered that this morning.  The second one, Michael Waller's

10   personal allocation, 200 in January 2018, and 50,000 in

11   June 2018.  Then there's a third category, travel disbursed to

12   Waller via Georgetown Research, that's $25,000.

13             And then if you look at the last category, Georgetown

14   Research, $15,000 in May 2018.  Do you see that?

15   A.  Yes.

16   Q.  So you have the second category, which is Michael Waller's

17   personal allocation, 200 and 250,000, that's 250,000, and then

18   Georgetown Research for 15,000 in May of 2018.  That's the 265

19   that we were just talking about, right?

20   A.  Yes.

21   Q.  And then the third category there, it starts with the word

22   "travel;" do you see that?

23   A.  Yes.

24   Q.  And so in addition to the 265, you were also disbursed

25   $25,000 for your travel expenses?

1    A.  Yes.

2    Q.  Now, in the record, you produced three invoices that

3    purport to detail your expenses in this matter; is that

4    correct?

5    A.  Yes.

6    Q.  Okay.  Let's take a look at those.  If we could open up

7    DX58.

8            MR. CHUFF:  And, your Honor, just a point of

9    housekeeping, I offer DX34 for the sole purpose of showing that

10   it says what it says, not for the truth of the matter asserted.

11   I hope to get to that point.

12           THE COURT:  Okay.  So that's received for that limited

13   purpose, subject to motions to strike.

14           I take it there's no objection to the authenticity or

15   the date of the article?

16           MR. GREIM:  None, your Honor.

17           (Defendant's Exhibit DX34 received in evidence)

18   BY MR. CHUFF:

19   Q.  And DX58, is this one of the invoices that you submitted,

20   you personally, Mr. Waller, submitted to Georgetown Research

21   for your expenses?

22   A.  Yes.

23   Q.  And the total down there, it says $3,037.50?

24   A.  Yes.

25   Q.  And but then it has minus $464.30?

L4JPEAS6                          Waller - Cross

1    A.  Yes.

2    Q.  Do you see that?

3    A.  Yes.

4    Q.  And was that because you were refunded some money from

5    Delta for a flight?

6    A.  It was a canceled airline flight, yes.

7    Q.  Right.  And so the total of that invoice is $2,573.20?

8    A.  Yes.

9    Q.  Is that right?

10   A.  Yes.

11   Q.  And then if we look at --

12            MR. CHUFF:  Actually, could we offer that into

13   evidence, your Honor?

14            THE COURT:  Received subject to motion to strike.

15            (Defendant's Exhibit DX58 received in evidence)

16   BY MR. CHUFF:

17   Q.  Now, if we can go to pull up DX59.  And, Mr. Waller, is

18   this a February 27th, 2018, invoice from you, personally, to

19   your company, Georgetown Research, for expenses?

20   A.  Yes.

21   Q.  And the total amount at the bottom there is $6,890.06?

22   A.  Yes.

23            MR. CHUFF:  Okay.  And I offer that into evidence as

24   well, your Honor.

25            THE COURT:  Same ruling.  It's received subject to

 1   motion to strike.

 2              (Defendant's Exhibit DX59 received in evidence)

 3   BY MR. CHUFF:

 4   Q.  And then can we open up DX60, please?  Again, this is a

 5   third invoice from you, personally, to your company, Georgetown

 6   Research; is that correct?

 7   A.  Yes.

 8   Q.  And this total is $1,053.79?

 9   A.  Yes.

10   Q.  Okay.  Now, we could do the math, but I'll just represent

11   that the total of that amount only amounts to $10,000 --

12   $10,517.05, and these are the only three invoices that you

13   produced to show your costs in this litigation; is that

14   correct?

15   A.  Yes.

16   Q.  So part of that 25,000, roughly, give or take, 15,000,

17   wasn't actually allocated to expenses, was it?  It was more

18   profit?

19   A.  No, that's not true.

20   Q.  Is there any document in the record that shows that it was

21   allocated to an expense?

22   A.  No, and, your Honor, if I may explain that, clarify that?

23   Otherwise, I'll wait.

24   Q.  No.

25              THE COURT:  You may.

L4JPEAS6                         Waller - Cross

1   A.  What we had, given the nature of the research team in

2   Europe and Asia, making sure there was no electronic signature

3   trails for certain electronic purchases that we were doing to

4   execute the contract, we paid for a lot of things in cash.

5          I ended up paying those out of these accounts in cash

6   but, of course, there's no records to show this.  So we would

7   take the cash spent, and have -- and take responsibilities for

8   paying the taxes on that, which would be the 32 percent of

9   that.  You have to add on the tax margin, and that covered the

10  cost of cash payments that we had to make in order to make sure

11  that certain electronics purchases were not traceable.

12  Q.  But you didn't maintain any receipts for those electronic

13  purchases?

14  A.  That would defeat the purpose of doing it that way.

15  Q.  Okay.

16         THE COURT:  I'm sorry, when you buy the electronics,

17  doesn't the vendor from whom you're buying generate a record?

18         THE WITNESS:  Yes, they generate a receipt.  But when

19  you do an electronic purchase, it goes into a database, and

20  there was concern that the Chinese intelligence services have

21  access to so many American databases, that there would be some

22  tracing linking up the transaction with the serial number on

23  the electronic devices that could then be traced to the

24  research teams doing the electronic research work.  So we

25  wanted to eliminate any possibility of that happening.

```
 1          THE COURT:  And that concern isn't raised when the

 2   vendor has a record of to whom they sold the electronics?

 3          THE WITNESS:  Not with -- they issued a receipt, but I

 4   didn't keep the receipt in order to prevent any paper trail.

 5   So this was part of a flat rate that Mr. Guo was paying, and we

 6   recovered those expenses out of the flat rate.

 7          MR. CHUFF:  So, your Honor, we don't have any more

 8   questions at this time.  We just reserve some time for recross.

 9          THE COURT:  Why don't we start with five minutes of

10   the examination, and then we'll break for the day.

11          Mr. Chuff, we're waiting, I don't think I received a

12   plaintiff's exhibit binder for Mr. Waller.  Obviously, I don't

13   need it now, but it would be useful to have it up at the bench.

14          Okay.  Mr. Greim, you may inquire.

15   REDIRECT EXAMINATION

16   BY MR. GREIM:

17   Q.  Dr. Waller, as we did with Ms. Wallop, I'm going to start

18   with a lit bit more about your background.  Can you tell us,

19   what's your educational background?

20   A.  I got a Bachelor's degree in international relations in

21   Soviet studies from George Washington University; a Masters in

22   international relations and communications from Boston

23   University, studying under a Soviet block defector; and then a

24   Ph.D in international security affairs from Boston University.

25   Q.  Did any of that education involve your actually going
```

1  overseas with work over there?

2  A.  Yes.

3  Q.  What was that?

4  A.  I was -- for the academic side of it, the graduate work, I

5  went to the Soviet Union frequently to write my dissertation on

6  the collapse -- what was becoming the collapse of the Soviet

7  Union, with a focus on the Soviet Security and Intelligence

8  Services.  And there, I started working with the democratic

9  underground opposition movement inside Russia.

10  Q.  Were you there when the Soviet Union fell?

11  A.  Yes.  I was in the Kremlin the day Boris Yeltsin seceded

12  Russia from the USSR.

13  Q.  What's your current employment?

14  A.  I'm senior analyst for strategy at Center for Security

15  Policy.

16  Q.  What is CSP, if we can call it that?

17  A.  It's a think tank based in Washington, D.C.

18  Q.  What does it focus on?

19  A.  It focuses on defense, national security, foreign policy,

20  counter-terrorism.

21  Q.  How long have you been employed there?

22  A.  Off and on for roughly 20 years.

23  Q.  Did you do anything outside of that, any teaching?

24  A.  Yes.  I was a full professor for 13 years.  I was the

25  Annenberg Chair, Professor of International Communications, at

1   the Institute of World Politics, which was a graduate school in

2   Washington.  And I ran a program on economic studies of

3   international propaganda and the psychological operation.

4   Q.  I'm sorry.  Go ahead.

5   A.  Pardon me.  And then I was a contract instructor for the

6   Naval Postgraduate School and for the U.S. Army, for

7   instructing pre-deployment teams in psychological operations

8   and information operations.

9            I then was a -- I developed a curriculum for the

10  Fourth Psychological Operations Group for the U.S. Army Special

11  Forces at Fort Bragg on divisive operations.  And I am

12  presently a contract instructor with the John F. Kennedy

13  Special Warfare Center and School.

14  Q.  So you said divisive operations, is that in any way related

15  to what you were discussing with Guo in December of 2017?

16  A.  Yes, this is exactly what I was doing.

17  Q.  Have you written any books or articles?

18  A.  I have.

19  Q.  What generally -- don't list them all for us, but just

20  generally, what have you written about?

21  A.  About the communist political systems, international

22  communist political systems, communist parties and

23  international organized crime, Russian and Chinese intelligence

24  services and operations, and in related areas of psychological

25  operations and information operations in political warfare.

1   Q.   Now, do you have any business entities of your own?

2   A.   Yes.  I have an LLC called Liberty Tree Partners, and I

3   still have Georgetown Research.

4   Q.   Okay.  What about -- we heard about Oceanic Advisors.  Do

5   you still have that entity?

6   A.   No.

7   Q.   What kind of work -- did they, all three, or I guess --

8   Oceanic is gone.  But did they all do the same type of work?

9   A.   No.  I had a number of LLCs as pass-throughs, to make it

10  more difficult for outsiders to see -- for example, in the case

11  of working with Mr. Guo, a set of pass-throughs, either

12  organizations that I either owned or owned by other people,

13  that I controlled, to anonymize payments, to protect clients.

14          Presently Liberty Tree Partners is just a general

15  purpose LLC, and Georgetown Research is a research company.

16  Q.   Okay.  You say it's a research company.  What kind of work

17  have you done for Georgetown?

18  A.   Well, we started to service this contract that we're

19  talking about right now.  I've done investigative research on

20  mining, on political opposition research, on certain

21  geopolitical issues of interest to private companies, and

22  certain western hemisphere issues, and issues relating to

23  threat analyses.

24  Q.   And did you do similar types of research under Liberty Tree

25  or Oceanic before you had Georgetown?

L4JPEAS6                          Waller - Redirect

```
 1    A.  Yes.

 2    Q.  Dr. Waller, have you ever gotten a PI license?

 3    A.  No.

 4    Q.  Have any of your clients ever asked for your licensure as a

 5    private investigator?

 6    A.  No.

 7    Q.  Have you ever considered getting a private investigator

 8    license?

 9    A.  No.

10    Q.  Let's talk real quickly about the Guo project here.  Did

11    you --

12         THE COURT:  Mr. Greim, it sounds like we're going on

13    to a new line of examination; so why don't we break for the

14    day, if that's okay, and we'll reconvene tomorrow morning at

15    9:30.

16         I would ask all parties to try to get here a little

17    bit before 9:30 or make sure you're in the courtroom, ready to

18    get started -- that includes you, Mr. Waller -- Dr. Waller --

19    so that we can start promptly at 9:30 tomorrow morning.

20         Very well.  Have a good evening, everybody.

21         (Adjourned to April 20, 2021, at 9:30 a.m.)

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     FRENCH WALLOP

 4    Cross By Ms. Cline . . . . . . . . . . . . . .33

 5    Redirect By Mr. Greim  . . . . . . . . . . . 120

 6    Recross By Ms. Cline . . . . . . . . . . . . 168

 7    Redirect By Mr. Greim  . . . . . . . . . . . 179

 8     J. MICHAEL WALLER

 9    Cross By Mr. Chuff . . . . . . . . . . . . . 180

10    Redirect By Mr. Greim  . . . . . . . . . . . 218

11                      PLAINTIFF EXHIBITS

12    Exhibit No.                              Received

13     PX2   . . . . . . . . . . . . . . . . . . .63

14     PX1   . . . . . . . . . . . . . . . . . . .69

15     PX7   . . . . . . . . . . . . . . . . . . .79

16     24    . . . . . . . . . . . . . . . . . . 104

17     22 and 23  . . . . . . . . . . . . . . . . 107

18     29    . . . . . . . . . . . . . . . . . . 109

19                      DEFENDANT EXHIBITS

20    Exhibit No.                              Received

21     DX38  . . . . . . . . . . . . . . . . . . .58

22     DX39  . . . . . . . . . . . . . . . . . . .60

23     DX8   . . . . . . . . . . . . . . . . . . .80

24     DX43  . . . . . . . . . . . . . . . . . . .84

25     DX62  . . . . . . . . . . . . . . . . . . 130
```

DX16 and DX17  . . . . . . . . . . . . . . . . 159

19  . . . . . . . . . . . . . . . . . . . . 162

DX34  . . . . . . . . . . . . . . . . . . . 214

DX58  . . . . . . . . . . . . . . . . . . . 215

DX59  . . . . . . . . . . . . . . . . . . . 216