**Exhibit 5**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------x

ACE DECADE HOLDINGS LIMITED, :
:
Plaintiff, : Index No. 653316/2015 (Bransten, J.)
:
-v.- : Motion Sequence No. 001
:
UBS AG, :
:
Defendant. :

---------------------------------------------------------------x

**AFFIDAVIT OF KWOK HO WAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

KWOK HO WAN being duly sworn, hereby deposes and says:

1. I am the employer of Yong Yu, the Director and sole shareholder of Ace Decade Holdings Limited ("Ace Decade").

2. I make this Affidavit based upon my personal knowledge.

3. I first began having discussions with UBS AG ("UBS") about potential investments in 2010. I have been a client of UBS since July 2012.

4. My main contact person at UBS has been Stephen Wong, who is a Managing Director of the Wealth Management and Swiss Bank Department at UBS.

5. I met Mr. Wong in May 2010. Since that time, Mr. Wong has advised me on numerous matters relating to investments and financing on projects such as aircraft acquisitions. Over the years, I have depended and relied upon Mr. Wong's and UBS's knowledge and expertise in making investment and financing decisions.

6. In addition, I have had an account at UBS since July 2012 for an investment vehicle that I control. Since then, I have opened other accounts at UBS for two other investment vehicles that I control and have obtained financing from UBS for two airplanes.

7. In early to mid-2014, I began discussions with UBS regarding an investment opportunity (the "Investment") in an upcoming placement of H-shares (the "Shares") of Haitong Securities Co., Ltd. ("Haitong").

8. From 2014, when I first began discussions with UBS, to May 13, 2015, when Ms. Yu and I authorized the final payment of HK $2 billion (approximately US $260 million) to enter into this Investment, Mr. Wong and I communicated frequently through telephone calls, in-person meetings, and electronic messages. Throughout this period, including after January 9, 2015 when I moved to New York, Mr. Wong made numerous misrepresentations, which I relied upon in deciding to make this Investment.

9. UBS was a joint global coordinator and placement agent for the Shares, and held itself out as knowledgeable and experienced in providing advice on this Investment.

10. At the outset, Mr. Wong assured me that if UBS got my business, it would protect my interests and provide the best possible terms for a loan to finance part of the Investment. Mr. Wong told me that because of the size of the Investment that I was planning to make, senior executives from UBS globally would participate in structuring the deal. Mr. Wong told me that he would serve as my personal contact and as UBS's representative throughout the Investment but that he would be acting under the instructions of senior executives from UBS offices in the United States, Switzerland, England, and Hong Kong.

11. Based on these representations that senior executives at UBS globally would be involved in structuring and overseeing this Investment and that UBS would act in my best interests, I entrusted UBS to act as my advisor for the Investment.

12. I have read Mr. Wong's affirmation submitted in support of UBS's motion to dismiss Ace Decade's complaint. In it, he affirmed under penalty of perjury that "[t]he first time I heard of Ace Decade was when I learned of this lawsuit in October 2015." (Affirmation of Stephen Wong ¶ 3.) I was astonished when I read this statement because it is false. To the contrary, Mr. Wong and UBS not only had previously heard of Ace Decade, but also they were the ones who advised me on which of my employees to appoint as sole shareholder and Director of Ace Decade, to utilize Ace Decade to enter into a side agreement with an intermediary entity that would hold legal title to the Shares, and how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account. In sum, Mr. Wong and UBS knew that the ultimate investor in the Investment was Ace Decade.

13. UBS advised that because the planned Investment comprised greater than 5% of the outstanding H-shares of Haitong, if I invested through Ace Decade directly, applicable disclosure requirements would require certain filings.

14. UBS advised that if I invested through an intermediary entity, with the intermediary entity holding legal title to the Shares, no such disclosure would be required.

15. UBS recommended that I select Haixia Huifu Asset Investment and Fund Management Co., Ltd. ("Haixia") as the intermediary for the Investment. UBS said that it recommended Haixia because Haixia was best qualified to act for Ace Decade. UBS further stated that Haixia was independent of UBS and would protect my and Ace Decade's interests. Relying on these representations, I selected Haixia as the intermediary for the Investment.

16. At no time did UBS disclose that Haixia was controlled by its joint venture partner, State Development & Investment Corp. ("SDIC"). Nor did UBS disclose that Lu Bo, who served as the principal contact between UBS and Haixia, was previously the CFO of the joint venture between UBS and SDIC. I did not become aware of Haixia's close relationship with UBS until July 21, 2015 (after Ace Decade had made the Investment and after UBS had liquidated the Shares), when Mr. Wong disclosed that relationship during a telephone call, which I took from my office in New York.

17. Mr. Wong initially said that if we chose Haixia as the intermediary to make the Investment, we would not need to undergo Haixia's Know Your Customer ("KYC") process. However, he later said that we needed to prepare some paperwork to undergo a background examination for Haixia, but he did not explain if this paperwork was for Haixia's KYC process. Mr. Wong asked to review the resumes of some of my employees to assess whose background would most likely satisfy Haixia's requirements so that such employee could be appointed as the Director and sole shareholder of Ace Decade. He reviewed these resumes and advised that Ms. Yu's resume and background was best suited to satisfy Haixia's requirements and thus, that I should appoint Ms. Yu as the Director and sole shareholder of Ace Decade. Mr. Wong said that he would provide comments on Ms. Yu's resume and asked her to send it to him. (*See* Ace Decade Exhibits 3 and 4.)

18. Mr. Wong subsequently gave comments on Ms. Yu's resume to make it more likely to satisfy Haixia's requirements.

19. Mr. Wong and I also discussed on multiple occasions potential financing for the Investment. Mr. Wong stated that Ace Decade should obtain financing for part of the Investment

through UBS rather than another bank because UBS would handle the financing on the most favorable terms to Ace Decade.

20.    During discussions about the loan financing, I told Mr. Wong that Ace Decade would not make the Investment unless the loan documents did not include any provisions that would permit UBS to demand repayment of the loan (a "margin call") based on short term price fluctuations of the Shares and unless UBS represented that it would provide Ace Decade with adequate time (for example, five business days to pay the first 25%, 10 business days to pay the second 25%, and 20 business days to pay the remaining 50%) to meet any margin calls.

21.    Mr. Wong stated on more than one occasion in 2014 that the loan financing documents would be consistent with my requirements, specifically that there was no repayment or margin call trigger based on short term price fluctuations.

22.    Mr. Wong also stated on several occasions in 2014 and 2015 that UBS would work with Ace Decade to allow it to meet any margin calls and UBS would not sell any of the Shares as a result of any margin call without giving Ace Decade adequate time.

23.    Mr. Wong also stated numerous times in 2014 and 2015 that UBS had made a loan to a large shareholder of Ping An Insurance Group ("Ping An"). Mr. Wong explained that the Ping An shareholder's loan was substantially larger than Ace Decade's, but that UBS had never sold off any of the shares owned by that shareholder following a margin call. Mr. Wong stated that when a margin call had been triggered, UBS had worked with the Ping An shareholder to resolve the situation without selling any of his shares. Mr. Wong said repeatedly that UBS would give Ace Decade the same treatment as it gave to the Ping An shareholder and would work cooperatively to allow Ace Decade to meet any margin calls but in any event would not sell the Shares following a margin call without giving Ace Decade adequate time.

24. Throughout our discussions about the Investment, Mr. Wong repeatedly stated that I could trust him and UBS, and that he and UBS were always working in my best interests.

25. On December 14, 2014, while discussing the Investment, Mr. Wong told me in a message on WhatsApp (a mobile messaging application for smart phones): "Once I've promised General Manager Guo, I'll definitely make utmost efforts; I'm only hoping General Manager Guo will trust me." Later that day, he told me in another message: "I have no reason not to strive for the best for General Manager Guo!" (General Manager Guo is what Mr. Wong called me.)

26. Also on December 14, 2014, Mr. Wong left me a voice message, stating that during the negotiations over the Investment "General Manager Guo's interests must be guaranteed," and that he had involved top UBS management from offices around the world to assist.

27. On December 15, 2014, Mr. Wong left me a voice message stating that he was working on the terms of the Investment in order to "protect [me]."

28. On December 19, 2014, Mr. Wong left me a voice message stating: "General Manager Guo, you can rest absolutely assured, and I will completely protect your interests."

29. As a result, I believed that Mr. Wong and UBS were acting in Ace Decade's best interests and I trusted that the representations Mr. Wong made about the loan financing documents were true and that UBS would not sell the Shares without working with Ace Decade to allow it to meet any margin calls.

30. On January 9, 2015, while I was still negotiating the terms of the Investment with UBS, I moved to New York with Ms. Yu and other employees with the intention of expanding my business projects to New York and to find investors interested in investing in Ace Decade.

31. I first discussed this plan to move to New York to find investors for Ace Decade with Mr. Wong in December 2014. I subsequently had multiple discussions with Mr. Wong about finding investors for Ace Decade by telephone from New York in March, May, and June 2015.

32. On February 9, 2015, Ace Decade signed a Memorandum of Understanding (the "MOU"), governed by U.S. law, with China Golden Spring Group (Hong Kong) Limited ("Golden Spring Hong Kong"). The MOU provided that Ace Decade would acquire Haitong Shares and Golden Spring Hong Kong would establish a branch in New York to find investors for projects relating to the Haitong Shares.

33. In furtherance of the MOU, Golden Spring Hong Kong formed a company called Golden Spring (New York) Ltd. ("Golden Spring New York"), which was incorporated in March 2015 in Delaware and registered to do business in New York. Golden Spring New York is wholly owned by Golden Spring Hong Kong.

34. Shortly thereafter, Golden Spring New York signed a lease for part of the 46th Floor of the General Motors Building at 767 Fifth Avenue, New York, NY 10153. Ms. Yu and I conduct business relating to Ace Decade from our offices at 767 Fifth Avenue.

35. Not only had I discussed with UBS my plans to move to New York and to operate my business projects out of New York in December 2014, I also asked for UBS's help in setting up my operations in New York. In March 2015, Mr. Wong and others at UBS, including Agnes Fu and Liz Lam, arranged to transfer funds from one of my accounts at UBS to my personal JPMorgan Chase account in New York.

36. In April 2015, Mr. Wong, Ms. Fu, and Ms. Lam assisted me with setting up Golden Spring New York by transferring funds from one of my accounts at UBS to Golden Spring New York's JPMorgan Chase bank account in New York.

37. UBS also submitted reference letters on my behalf in connection with my purchase of an apartment in a New York cooperative building. In a letter dated February 18, 2015 from Mr. Wong to the building's board of directors, Mr. Wong wrote, "I have known Miles for about five years since he first began working with UBS AG." (Miles is my English name.) Mr. Wong also stated, "Over the years, Miles has earned his credibility in our bank. He is very reliable and always fulfills his repayment obligations. For this reason, our bank is happy to have him as our long-term client." (Ace Decade Exhibit 1.)

38. Mr. Wong and Tommy Cheung, also a UBS Managing Director, submitted another reference letter on my behalf to the board of the apartment building on February 23, 2015, stating: "Kwok Ho Wan has been a client of ours through a personal investment company since July 2012." (Ace Decade Exhibit 2.)

39. On March 6, 2015, I purchased an apartment in this building. I, along with Ms. Yu and other employees and representatives of Ace Decade and Golden Spring New York, have lived in the apartment since the purchase.

40. During this period of time after I had moved to New York, Mr. Wong and I communicated frequently through telephone calls and voice and instant messages. Mr. Wong spoke to me by telephone while I was in New York dozens of times and sent numerous electronic messages to me while I was in New York. Ms. Yu joined me on some of the calls with Mr. Wong. At a minimum, Mr. Wong spoke to me by telephone while I was in New York on the following dates:

- January 26, 2015 (three calls)
- January 28, 2015 (two calls)
- March 2, 2015
- March 4, 2015 (three calls)
- March 5, 2015
- March 13, 2015
- March 15, 2015
- March 16, 2015 (six calls)
- March 17, 2015 (two calls)
- March 18, 2015 (two calls)
- March 24, 2015
- March 31, 2015
- April 28, 2015 (three calls)
- April 30, 2015 (five calls)
- May 6, 2015 (two calls)
- May 11, 2015 (three calls)
- June 23, 2015 (two calls)
- July 21, 2015

41. During these calls in 2015, which I participated in from New York, Mr. Wong and I discussed the Investment and the UBS loan on numerous occasions. On one or more of these calls, Mr. Wong and I also discussed my concerns about the loan, including a margin call trigger based upon the loan-to-value ratio ("LTV ratio"), the size of the loan, the interest rate on

the loan, and the issuance price of the Haitong shares. Mr. Wong and I also discussed the status of my efforts to seek investors in New York for Ace Decade.

42. During this period of time in 2015, I did not raise with Mr. Wong again my concerns about repayment triggers conditioned on short term price fluctuations of the Shares because Mr. Wong had previously told me that there were no such triggers.

43. However, during several of these calls in March, April, and May 2015, Mr. Wong and I discussed the topic of margin calls generally, and specifically the LTV ratio trigger. Mr. Wong said that I did not have to worry because UBS would act in my best interests, that UBS would give Ace Decade adequate time to meet any margin calls, and that UBS would make every effort to work with Ace Decade to allow it to meet any margin calls. He also reminded me several times during this period that UBS had never sold the shares of the Ping An shareholder following a margin call on its loan, and stated that Ace Decade would receive the same treatment as the Ping An shareholder.

44. While I was in New York, Mr. Wong also sent me numerous WhatsApp messages about the Investment and the UBS loan. For example, on March 21 and 22, 2015, Mr. Wong and I exchanged a series of WhatsApp messages in which we discussed the UBS loan for the Investment. I told Mr. Wong that some of UBS's proposed conditions, such as the margin call trigger based upon the LTV ratio for the UBS loan, were "definitely not okay" and "we would rather not do it than agree to your clauses." Had I not been relying upon Mr. Wong's prior representations that the loan financing documents did not contain repayment triggers based on short term price fluctuations of the Shares, I would have raised that issue again with Mr. Wong and not focused our discussions solely on the margin call trigger based on the LTV ratio.

45. Mr. Wong replied that he understood my concerns about potential margin calls, and told me: "You rest assured!. . . I'm working for General Manager Guo! Don't worry." I relied upon Mr. Wong's representations that he and UBS were looking out for my interests. All of these discussions occurred while I was in New York.

46. On May 8, 2015, Haitong announced that it had obtained the shareholder and regulatory approvals necessary (in February and May, respectively) to issue the Shares, which was expected to occur on May 15. Haitong also announced that because the trading price of Haitong's shares during the 30 trading days prior had surpassed a pre-agreed threshold, the subscription price would be increased.

47. After this announcement, I had several discussions with Mr. Wong, by telephone and WhatsApp messages, in order to finalize the terms of the Investment. Among the topics we discussed were the fact that the loan would have to be increased to reflect the increase in the per share price of Haitong's shares, the amount of the payment required, the LTV ratio, the interest rate, and the method by which we should exchange U.S. dollars for the Hong Kong dollars required for the payment.

48. During one of our discussions after May 8, Mr. Wong stated yet again that Ace Decade would receive the same treatment as the Ping An shareholder with respect to any margin calls.

49. Relying on these representations, I decided to make the Investment. I discussed with Mr. Wong during telephone conversations on May 11 how best to transfer the funds necessary for the Investment from one of my UBS accounts to the Ace Decade account. Mr. Wong said that I first needed to exchange the funds from U.S. dollars to Hong Kong dollars in my UBS account. He also gave instructions not to transfer the funds from my UBS account

directly to the Ace Decade account, but rather to transfer the funds from my UBS account to an account at another bank and then to transfer the funds from that account to the Ace Decade account.

50.  Relying upon Mr. Wong's advice, I decided to transfer the funds from my UBS account first to an account at China Minsheng Banking Corp., Ltd. Hong Kong Branch ("China Minsheng Account") and then to transfer the funds from the China Minsheng Account to the Ace Decade account.

51.  On May 11, 2015, Ms. Fu sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Lam, and asked Ms. Yu to obtain my signature on a payment instruction document that UBS had prepared. The document contained a request to transfer HK $860 million (approximately US $111 million) from my UBS account to the China Minsheng Account that Mr. Wong had instructed me to use.

52.  In reliance upon Mr. Wong's representations about the Investment and the UBS loan, I signed the document authorizing the wire transfer.

53.  Later that day, Ms. Lam sent an e-mail to Ms. Yu, copying Mr. Wong and Ms. Fu, attaching a confirmation of the outgoing transfer from my UBS account.

54.  Following Mr. Wong's instructions, I then authorized the transfer of the funds from the China Minsheng Account to the Ace Decade account.

55.  After the funds reached the Ace Decade account, on May 13, 2015, Ms. Yu and I authorized a payment of HK $2 billion (approximately US $260 million) from Ace Decade's account to an account held by Dawn State Limited ("Dawn State"), a special purpose vehicle and wholly-owned subsidiary of a Haixia fund, to fund the Investment of the Shares to be issued on May 15. Prior to this, I had authorized an initial down payment of approximately US $250

million from Ace Decade's account, through Dawn State, to a UBS security account. That payment would have been returned to Ace Decade had the Investment not been completed.

56.     All of the steps I took to make the Investment, including requesting the wire transfers of approximately HK $860 million (approximately US $111 million) from one of my UBS accounts to the China Minsheng Account and ultimately to the Ace Decade account and authorizing the payment of HK $2 billion (approximately US $260 million) from the Ace Decade account to Dawn State's account on May 13, 2015, occurred from my office or my apartment in New York.

57.     I would not have made the Investment or authorized this payment in May 2015 had I known that UBS had lied that the loan financing documents did not contain repayment triggers based on short term price fluctuations of the Shares and that UBS would refuse to work with Ace Decade to meet any margin calls and would sell off Ace Decade's Shares immediately if a margin call were made.

58.     Under the terms of an agreement between Ace Decade and Haixia, Haixia was required to transfer Dawn State (the entity that held legal title to the Shares) to Ace Decade after July 13, 2015 upon Ace Decade's request.

59.     However, on the morning of July 6, 2015 New York time—just a week before Haixia would have had to transfer Dawn State to Ace Decade—I learned that UBS was demanding that I repay approximately US $200 million in less than 24 hours due to short-term price fluctuation of the Shares.

60.     Had I known that it was possible for UBS to demand payment in such a short period of time and that UBS had lied about providing adequate time to meet any margin calls, I would have ensured that Ace Decade had sufficient funds available to make such payment.

61.     Before UBS's deadline, Ace Decade informed UBS that we could obtain the necessary funds quickly, but not before UBS's deadline.

62.     However, on July 6, 2015, Mr. Wong stated that UBS would not give Ace Decade any additional time.  Mr. Wong stated that UBS had already identified buyers for the Shares and would make a substantial profit by selling the Shares instead of allowing Ace Decade to make the payment.

63.     On July 7th, I sent Mr. Wong a WhatsApp message telling him that UBS's margin call was "illegal."  Mr. Wong did not disagree with me or deny that he had told me that there were no repayment triggers based upon short term price fluctuations of the Shares.  Instead, he said that he had told senior management to cancel the sale of the Shares and said that he would ask UBS to return the Shares to me.  Mr. Wong told me that the Shares were still under UBS's control and he promised to come up with a plan for their repurchase.  Mr. Wong reassured me: "I've always been standing by General Manager Guo."

64.     On July 9th, Mr. Wong stated that the decision to sell the shares was made by UBS executives outside of Hong Kong and China.

65.     On July 17th, I reminded Mr. Wong that he had said on numerous prior occasions that "there would never be" a margin call based on short term price fluctuations of the Shares and the many times he had stated that UBS had not sold off the shares of a large Ping An shareholder following a margin call.

66.     In another message on July 17, I said to Mr. Wong: "I told you, it was since last year that I've come to the U.S. for better opportunities, didn't I?  All the information I sent you from the U.S., my requirements, you know them all. . . .  Under these circumstances, all were

handed over to you, [I] all listened to you. It was you who introduced Haixia . . . . It turned out to be messed up like this now."

67. Mr. Wong did not deny that he had made these misrepresentations and in fact replied that he understood.

68. In another message on July 17, I said to Mr. Wong: "You told me several times that you UBS would not liquidate assets like that; otherwise how I would trust you." I also told him: "If it weren't for you to tell me that margin call was like Ping An, it would not be like that. There would be reasonable time to get some assets to deal with it."

69. On July 17, I also said to Mr. Wong: "You said UBS signed the agreement with them [Haixia] to permit UBS to sell all the shares within 24 hours of the margin call. How was that signed? How did they implement that? It's not fair. You told me back then that was not the case."

70. Mr. Wong replied "I've always been firmly opposing them, but they ignored me and told me it was an order by the Swiss CEO." He did not deny my assertion that he had previously stated that the loan agreement would not permit UBS to sell the Shares within 24 hours of the margin call.

71. At no point during any of our discussions did Mr. Wong deny that he had stated that UBS would treat Ace Decade the same as the Ping An shareholder.

72. At no point during any of our discussions did Mr. Wong deny that he had stated that the loan documents would not contain repayment triggers based on short-term price fluctuations of the Shares.

73. At no point during any of our discussions did Mr. Wong deny that he had stated that UBS would work with Ace Decade and provide it adequate time to meet any margin call.

74. At no point during any of our discussions did Mr. Wong deny that UBS had engaged in misconduct.

75. Mr. Wong told me that on July 7, 2015, UBS sold all of the Shares belonging to Ace Decade at HK $11.12, a 20% discount off the closing price of Haitong stock on July 7.

76. As a result of losing the Haitong shares, Ace Decade lost New York investors, whom I had met with after I had relocated to New York in 2015 and who had been interested in investing in Ace Decade. For example, on four occasions in New York in April through June 2015, my representatives and/or I met with a co-founder of a private investment firm based in New York. The firm expressed significant interest in investing in Ace Decade. However, following UBS's sale of the Haitong Shares belonging to Ace Decade, Ace Decade lost this potential investor.

I swear that the foregoing is true and correct.

[Signature of Kwok Ho Wan on Chinese version]<br>Kwok Ho Wan

[Notarization on Chinese version]

CITY OF __Meservey__         )
                             )    ss.:
COUNTY OF __Cerro Gordo__    )


I, __Liming Pals__, being duly sworn, depose and say that I am fluent in both the English and Chinese languages. I hereby certify that the attached document is an accurate translation of the Chinese version of "Affidavit of Kwok Ho Wan."

_____
[Name]


Sworn to before me this

5 day of ~~May 2015~~ February 2016

_____
Notary Public



PAT FISHER
COMMISSION NUMBER 720993
MY COMMISSION EXPIRES:
2-19-18