## Exhibit 61

L4KKEAS1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   EASTERN PROFIT CORPORATION
     LIMITED,
 4
                 Plaintiff,
 5
                 v.                        18 CV 2185 (LJL)
 6
     STRATEGIC VISION US LLC,
 7
                 Defendant.
 8
     ------------------------------x
 9                                         New York, N.Y.
                                           April 20, 2021
10                                         9:39 a.m.

11   Before:

12                   HON. LEWIS J. LIMAN,

13                                         District Judge

14                         APPEARANCES

15   TROUTMAN PEPPER HAMILTON SANDERS LLP
          Attorneys for Plaintiff
16   BY:  CHRISTOPHER B. CHUFF
          JOANNA J. CLINE
17
     GRAVES GARRETT LLC
18        Attorneys for Defendant
     BY:  EDWARD DEAN GREIM
19        JENNIFER A. DONNELLI

20   ALSO PRESENT:

21   Melissa Francis, Eastern Profit Corporation Limited
     J. Michael Waller, Strategic Vision US LLC
22

23

24

25
```

L4KKEAS1

```
1          (Trial resumed)
2          THE COURT:  Good morning, everybody.
3          COUNSEL:  Good morning, your Honor.
4          THE WITNESS:  Good morning.
5          THE COURT:  Before we resume testimony, I received a
6   couple of letters overnight from the defendant, and let me
7   address them.
8          First, there is an objection to one exhibit, it's
9   PX 67.  I understood that that was not being offered into
10  evidence; in fact, it wasn't offered into evidence, and so, to
11  the extent that there's an objection to PX 67, the objection is
12  moot because the exhibit is not in evidence.
13         With respect to the remainder of the exhibits that
14  were offered yesterday, which were received all subject to a
15  motion to strike, there was no motion to strike last night as
16  to any of the other exhibits, so all of those exhibits that
17  were offered yesterday are received without objection subject,
18  in some instances, they are received for the limited purpose
19  that was reflected in the record.
20         The second issue that I wanted to address is the issue
21  that was raised in the letter last night with respect to one of
22  the witnesses who sent a letter to the Court indicating that
23  the witness feared for his safety if he was going to testify in
24  this courthouse.  The parties should know -- well, first of
25  all, I understand that there's no request by either side for
```

L4KKEAS1

1    relief at this point with respect to that letter.  Is that

2    right, Mr. Greim?

3              MR. GREIM:  That is correct, your Honor.

4              THE COURT:  And, Ms. Cline, is that also correct?

5              MS. CLINE:  Yes, your Honor.

6              THE COURT:  So, the parties should know, I don't know

7    whether there's substance to the letter or not.  There are no

8    facts that are in evidence before me that indicate whether

9    there's substance to that letter or not, but there are a couple

10   of principles that should reassure the parties.

11             First of all, with respect to any testimony that takes

12   place in this courthouse, and in this courtroom, I've got

13   control over it, over the security here, we've got court

14   security officers, and the parties and the witnesses should be

15   reassured that they will not be harassed or threatened, at

16   least in this courtroom, for any of their testimony.

17             Second, I would instruct the parties — and, Mr. Greim,

18   I would ask you to convey it to the witness — that if there are

19   any specific threats rather than the generalized statement,

20   they should bring it to the attention of the Court, and there

21   are ways that the Court can address those, again, without

22   opining as to whether there's substance to the specificity of

23   the threat or not.

24             The third point — and this was raised with respect to

25   one of the witnesses that the plaintiff mentioned to me — where

Case 22-3050, Document 18, 05/25/23, 3516361, Page5 of 28
Case 1:18-cr-00032-JL Document 364 Filed 07/25/23 Page 5 of 242

243

L4KKEAS1

```
1    there was a request for a way to enter the court, especially
2    through the special entrance.  I denied that request, and I
3    denied it because there is no specificity, there was no
4    particular reason that I found convincing, for the need for
5    that witness to enter through a special entrance.  But if there
6    is a threat to somebody, or somebody feels threatened, entering
7    this courthouse, such that they would be deterred from
8    testifying, bring that to my attention, and we can deal with
9    it.  There are ways that people can enter the courthouse
10   without having to be confronted by people who they may believe
11   to be threatening to them.  This is not the first case in which
12   there are communications like the one that I received, it will
13   not be the last one, and if there is a courthouse in this
14   country that is capable of dealing with these issues, and
15   dealing with them in a way that should make the witnesses feel
16   comfortable, as comfortable as possible, it's this courthouse.
17           So, with that said, is there anything with respect to
18   that letter that we should addressing, Mr. Greim?
19           MR. GREIM:  No, your Honor, there really isn't.  I
20   just felt I should pass it along to the Court, but I think
21   things stand where they were before.
22           THE COURT:  Okay.  Very well.
23           Ms. Cline?
24           MS. CLINE:  Nothing from us, your Honor.
25           THE COURT:  And, Ms. Cline, anything else we should
```

L4KKEAS1                          Waller – Redirect

1    address this morning before we resume with the testimony?

2              MS. CLINE:  No.  We're prepared to proceed.

3              THE COURT:  Anything from the defense?

4              MR. GREIM:  No, your Honor.

5              THE COURT:  Okay.  Then we will resume.

6              Mr. Waller, you're reminded that you are still under

7    oath.

8              Mr. Greim, you may inquire.

9    REDIRECT EXAMINATION (Continued)

10   BY MR. GREIM:

11   Q.  Good morning, Mr. Waller.  I want to start where we were

12   just about to go yesterday, and I want to address your

13   testimony about Mr. Broidy.

14             Do you recall that at some point yesterday?

15   A.  Yes.

16   Q.  And do you recall testifying as to your understanding about

17   what Mr. Broidy had pled to?

18   A.  Yes.

19   Q.  Now, yesterday you were not presented with the actual

20   statement and facts to which Mr. Broidy pled to, were you?

21   A.  No.

22   Q.  Or the charging document?

23   A.  No.

24   Q.  Is your understanding of what he was charged with and pled

25   to based on media accounts?

L4KKEAS1                     Waller - Redirect

 1  A.  Yes.

 2  Q.  But, nonetheless, I assume that you have followed those?

 3  A.  Yes.

 4  Q.  Let me ask you, what is your understanding of when

 5  Mr. Broidy was charged relating to the matter you testified

 6  about yesterday?

 7  A.  My understanding is he was charged in the fall of 2020.

 8  Q.  Okay.  And what's your understanding about when he pled?

 9  A.  He pled shortly after that, in the fall -- later in the

10  fall of 2020.

11  Q.  Do you have any understanding about whether he was pardoned

12  for that?

13  A.  Yes, he was.

14  Q.  And it was a federal offense, correct?

15  A.  Yes.

16  Q.  So do you know who pardoned him?

17  A.  The president.

18  Q.  What is your understanding of the federal statute that he

19  was charged with violating?

20  A.  He was charged with violating the Foreign Agents

21  Registration Act.

22  Q.  Is that also known -- have you heard that called FARA, or

23  FARA?

24  A.  Yes.

25  Q.  Do you have some understanding of what FARA requires?

L4KKEAS1                          Waller - Redirect

```
 1   A.   Yes.

 2   Q.   What is that?

 3   A.   In general, in my layman's understanding, it's representing

 4   a foreign entity or person for the purposes of influencing the

 5   U.S. Government without registering with the Justice

 6   Department.

 7   Q.   Do you understand which foreign person Mr. Broidy was

 8   charged with representing without registration?

 9   A.   Yes.

10   Q.   Who or what was that?

11   A.   He was a national of Malaysia.

12   Q.   Do you understand whether Mr. Broidy was charged with or

13   pled to conspiring with the PRC?

14   A.   No.

15   Q.   Or the CCP?

16   A.   No.

17   Q.   Now, you also testified yesterday that -- well, actually,

18   let me take that back.

19        Were you present when Ms. Wallop testified that she

20   had conferred with you before taking on accepting third-party

21   funding in this matter?

22   A.   Yes.

23   Q.   And did she, in fact, confer with you?

24   A.   Yes.

25   Q.   And do you recall when that was?
```

L4KKEAS1                    Waller - Redirect

1   A.  That was in the early summer of 2019.

2   Q.  That was before this law firm was retained?

3   A.  Yes.

4   Q.  I'm going to ask you a few questions about that,

5   Mr. Waller, and I am just going to ask you -- these questions

6   are all designed not to elicit attorney-client privileged

7   communications, and so I will stop you if you do that, but that

8   is not my intent, we do not waive any attorney-client or work

9   product privilege.  I'm going to ask you solely about

10  communications with people who are not lawyers.  Okay?

11  A.  Yes.

12  Q.  Now, when Ms. Wallop asked for your advice, did you do

13  anything to -- well, let me ask you:  Did you ultimately make a

14  recommendation to Ms. Wallop?

15  A.  Yes, I did.

16  Q.  And did you do anything to inform yourself before making

17  that recommendation?

18  A.  Yes.

19  Q.  What did you do?

20  A.  I asked around about Mr. Broidy and his work, and I flew to

21  Los Angeles to meet with him in person.

22  Q.  What did you discuss generally with Mr. Broidy?

23  A.  Generally discussed a range of issues, but with relating to

24  this case.  I asked him about his controversial work in

25  relation to this Guo matter.

1    Q.  What did Mr. Broidy tell you he had done with respect to

2    just the overall Guo matter?

3    A.  He said that it was all in the context of getting three

4    American prisoners released from Communist China.

5    Q.  Was there anything about those prisoners that Mr. Broidy

6    said motivated him in particular?

7    A.  There was one -- there was a woman who was a prisoner, and

8    she was pregnant at the time.

9    Q.  Did Mr. Broidy tell you whether before doing the things

10   that he was charged with, or at least some of those things, did

11   he tell you whether he had himself investigated whether Mr. Guo

12   Wengui was a dissident?

13   A.  Yes.

14   Q.  What did he say he had done?

15   A.  He said that Guo Wengui was a part of the Chinese Communist

16   Chinese Party.

17            MR. CHUFF:  Sorry.  Objection; hearsay.

18            THE COURT:  I'm going to receive it not for the truth,

19   but for the fact that it was said as part of the due diligence

20   into Mr. Broidy.

21            You may proceed.

22            THE WITNESS:  Thank you.

23            Mr. Broidy told me that he found that Guo Wengui was

24   part of a losing battle in a Chinese Communist Party faction

25   fight, and this was a fight over the spoils and political

L4KKEAS1                        Walfer - Redirect

1   infighting, and that he was not indeed a dissident.

2   Q.  Did you ask Mr. Broidy whether he had done any

3   investigation into whether Mr. Guo Wengui was an asset to the

4   United States for intelligence purposes?

5   A.  Yes.

6   Q.  And what did he say he had done?

7   A.  Mr. Broidy said --

8           THE COURT:  Again, I'm receiving all of this not for

9   the truth, but for the fact that this conversation took place.

10  Q.  What did Mr. Broidy tell you he had done?

11  A.  He said that he checked with his U.S. Intelligence contacts

12  and said that he ascertained absolutely that Guo Wengui was

13  not, and had not ever been, an asset to the United States

14  Government.

15  Q.  Now, did you do any -- well, let me ask you this:  Were

16  Mr. Broidy's statements to you consistent with any other

17  investigation you had been doing up to that point?

18  A.  Yes, they were consistent with my own investigations of the

19  past -- of the previous 13 months or so.  I had found the exact

20  similar information.

21  Q.  Now, you said the past 13 months.  So, when did you start

22  your own efforts to dig into Mr. Guo Wengui's background?

23  A.  On a really solid scale, it was right after he filed suit

24  in May of 2019.  Pardon me, May of 2018.

25  Q.  Okay.  Just generally speaking — and, again, do not

```
 1    disclose communications with your attorneys, okay — I would
 2    like to ask you, just generally speaking, what categories of
 3    things you did to investigate Mr. Guo's background after you
 4    were sued?
 5    A.  I --
 6              THE COURT:  What's the purpose of this testimony?
 7              MR. GREIM:  Your Honor, I simply want to show the
 8    basis for Mr. Waller's recommendation on the third-party
 9    funding.  The whole relevance, the reason we got into this in
10    the first place, was that Strategic's decision to do this was
11    not credible, and that it --
12              THE COURT:  I'll receive it for that limited purpose.
13    I assume you're not going to spend all that much time on it?
14              MR. GREIM:  No, I'm not.  We're just about done,
15    actually.
16    BY MR. GREIM:
17    Q.  If you could, Dr. Waller — we'll get into other evidence
18    later — I just want to know the categories of the things that
19    you did.
20    A.  I had open source research done by Mandarin-speaking people
21    to look at -- to listen to recordings and watch videos of Guo
22    and recordings that Guo had made of himself threatening Chinese
23    dissidents in America.
24    Q.  Okay.  And what else did you do?
25    A.  The same with recordings of him meeting with senior Chinese
```

1  secret police officials in his home and statements of him --

2  recorded video statements of him supporting Xi Jinping, the

3  Chinese Communist Party leader, just two weeks before he sought

4  American political asylum.

5  Q.  Other than that investigation, did you make any contact

6  with the United States Government?

7  A.  Yes, I did.

8  Q.  What did -- generally, who did you contact?

9  A.  I contacted two FBI field offices and informed them that I

10 was a witness in a case --

11         MR. CHUFF:  Objection, your Honor.  At the deposition,

12 he refused to answer this question.

13         THE COURT:  Is that right, Mr. Greim?

14         MR. GREIM:  You know, actually, I can't remember, but

15 I'm happy to withdraw it.  I don't want to spend -- it's not a

16 critical issue.

17         THE COURT:  The question is withdrawn.

18 BY MR. GREIM:

19 Q.  So, is it fair to say, Dr. Waller, that as a result of all

20 this investigation, you made a recommendation to Ms. Wallop?

21 A.  Yes.  After I was conclusively convinced that Guo was not

22 an asset and that pursuing this case would not harm any U.S.

23 national interests.

24 Q.  Okay.  Let's go back now, Dr. Waller, to your relationship

25 with Strategic Vision.

```
 1              Had you done work with Strategic Vision before this
 2    project?
 3    A.   Yes.
 4    Q.   And what did you do?
 5    A.   I did two other projects with them.  One was ghostwriting,
 6    and the other one was research on a strategic issue.
 7    Q.   What is the nature of your relationship with French Wallop?
 8    A.   We have known each other for between 30 and 35 years
 9    once -- after I was sentenced after I knew members of her
10    husband's staff in the sentence.
11    Q.   Now let's skip ahead.  Did you come to learn at some point
12    from Ms. Wallop about a possible project for Guo Wengui?
13    A.   Yes.
14    Q.   When was that?
15    A.   That was in the fall of 2017, November.
16    Q.   Did you attend any meetings after that?
17    A.   Yes.
18    Q.   What was the first meeting you attended?
19    A.   The first meeting I attended was at her house with a
20    journalist, Bill Gertz, who I had also known for about 35
21    years, and with Lianchao Han.
22    Q.   Tell us about your background with Mr. Gertz.
23    A.   I first met Bill Gertz when he became a national security
24    reporter with the Washington Times in the mid-1980s, and I had
25    been a source of information for him, and we'd engaged on many
```

L4KKEAS1                        Waller – Redirect

1   projects together, including setting up the Blue Team on China
2   in the 1990s.
3   Q.  I'm sorry, what is "the Blue Team"?
4   A.  The Blue Team was a group of American policy experts and
5   strategists who had a common interest in undermining the
6   Chinese Communist Party.
7   Q.  Did you believe that Gertz was an honest person?
8   A.  Yes.
9   Q.  Did you believe that he was diligent?
10  A.  Yes.
11  Q.  Did you believe that he was a -- well, are you familiar
12  with the term "China hawk"?
13  A.  Yes.
14  Q.  What do you understand that to mean, just in common
15  parlance?
16  A.  Well, we were all China hawks.  That means we took a
17  hawkish aggressive stance towards the Chinese Communist Party
18  with sort of a very tough stance against the Chinese Communist
19  Party.
20  Q.  Did you understand whether Gertz was a China hawk?
21  A.  Yes.
22  Q.  Let's move to Lianchao Han, who you also mentioned.
23          Describe your relationship -- just tell me, did you
24  know Lianchao before this meeting?
25  A.  Yes.

1    Q.   What did you know about him?

2    A.   I knew -- I had met him numerous times.  I didn't know him

3    well at the time, but we shared the same China hawk and human

4    rights networks.  He had worked for a senator, who I knew for

5    years and had confidence in him and his judgment of people, but

6    most important, we had the same -- we found out we had the same

7    Chinese mentor, a man named Bernie Yo, who had fought the

8    Japanese in World War II and who fought Mao Zedong right after

9    the Chinese Communist Revolution.

10          So Bernie took me under his wing when I was a kid, and

11   he took Lianchao under his wing when Lianchao came to the U.S.

12   after Tiananmen Square.

13   Q.   Did you have trust in Lianchao Han as a China hawk?

14   A.   Yes.

15   Q.   Did you have trust in him as someone who was credible?

16   A.   Yes.

17   Q.   By the way, who was that senator that you mentioned?

18   A.   Senator Judd Gregg of New Hampshire.

19   Q.   In this initial meeting, what did Gertz say about Guo and

20   what Guo needed?

21   A.   He said that Guo Wengui was a dissident who broke with the

22   Chinese Communist Party, considered himself the number one

23   enemy of the Chinese Communist Party, and wanted to devote his

24   resources to undermining it and causing it to collapse.

25   Q.   Did he give you anything specific about what Guo wanted

1    from you?

2    A.   Yes.  He said that Guo was engaged in what he called a

3    whistleblowers revolution, or whistleblower campaign, which was

4    to expose the internal contradictions of the Chinese Communist

5    leadership to cause it to collapse under its own

6    contradictions.

7    Q.   What about Lianchao, did he tell you anything different?

8    A.   He told me essentially the same.

9    Q.   Did there come a time when you went to meet Guo?

10   A.   Yes.

11   Q.   And do you recall when that was?

12   A.   That was in late November 2017.

13   Q.   What did you do to prepare for that meeting?

14   A.   French Wallop and I worked with Lianchao to understand what

15   Guo wanted, what he needed done.  Lianchao was acting as a

16   helper to Guo and an advocate for Guo, so he knew what was in

17   Guo's mind.  So we fashioned together a vision statement of

18   what we thought could be done to assist him in taking down the

19   Chinese Communist Party.

20           MR. GREIM:  Can you put up Exhibit 38, Defense

21   Exhibit 38, please.

22   Q.   While we're doing that, Dr. Waller, I have another

23   question.  Before this meeting, did you learn of Mr. Guo's

24   connection with any other high-profile members in the China

25   hawk group?

1   A.  He had a connection with Steve Bannon.

2   Q.  How -- was that significant to you in any way?

3   A.  Yes, not because I personally trust Bannon's judgment, but

4   I knew Steve Bannon to be a China hawk who had an

5   influential -- he was an influential opinion shaper.

6   Q.  At this time, what did you know about Guo's connection with

7   Bannon?

8   A.  I knew there was a -- I knew vaguely that there was a

9   connection and that they were meeting, but I didn't know the

10  extent beyond that at the time.

11  Q.  Now let's turn to the exhibit we put in front of you.  This

12  is Defense Exhibit 38.  We received this yesterday as a

13  plaintiff's exhibit.

14          Do you recognize this document?

15  A.  Yes.

16  Q.  Is this the document you just told us about that you

17  prepared with Lianchao Han?

18  A.  Yes.

19          MR. GREIM:  I'll move to admit it, just so that we

20  have --

21          THE COURT:  It's in evidence.

22          MR. GREIM:  It's in?  Okay.

23  BY MR. GREIM:

24  Q.  You'll see in the first line, it says, "This is a vision

25  for Mr. G" -- did you mean Mr. Guo there?

```
 1   A.   Yes.
 2   Q.   -- "to remain safely in this country and accomplish his
 3   mission back home."
 4             Did I read that right?
 5   A.   Yes.
 6   Q.   Is that consistent with your understanding of what Guo
 7   wanted to do at this time?
 8   A.   Yes.
 9   Q.   Now, it says "remain safely in this country."  Let me ask
10   you, did you understand whether Guo had sought any kind of
11   permanent status here?
12   A.   Yes.
13   Q.   What had he done?
14   A.   He had sought political asylum in September of 2017.
15   Q.   And who told you that?
16   A.   Lianchao Han and Bill Gertz.
17   Q.   Did Lianchao Han tell you whether he had any role in that
18   asylum application?
19   A.   Yes.
20   Q.   What did he say he was doing?
21   A.   He said that he had a legal background, and as a native
22   speaker of Mandarin, was helping Guo to apply or had helped Guo
23   to apply.
24   Q.   Now, at this time, at this meeting, in late November, was
25   there any discussion about you being hired to do an
```

1   investigation?

2   A.  No.

3   Q.  Did Mr. Guo appear to disagree with any of the statements

4   listed in Exhibit 38?

5   A.  No.

6   Q.  And let me back up a second.  I didn't ask you this:  Who

7   was at this meeting with Mr. Guo?

8   A.  At that meeting were French Wallop, Lianchao Han, Mr. Guo —

9   we were in the meeting together — and Bill Gertz.

10          THE COURT:  Dr. Waller, was this document, DX 38,

11  provided to Mr. Guo in advance, or was it provided to him at

12  the meeting for him to read?  How was it disseminated to him?

13          THE WITNESS:  We handed it to him at the meeting in a

14  paper form.

15          THE COURT:  Did you see him read it at the meeting?

16  How was it used?

17          THE WITNESS:  Yes, he read it, but he needed help from

18  Lianchao Han to make sure that he understood everything that

19  was in there.

20          THE COURT:  Thank you.

21  BY MR. GREIM:

22  Q.  So, how did you -- was Lianchao Han acting, then, as a

23  translator at this meeting?

24  A.  Yes.

25  Q.  Now, did Guo appear to -- did you hear Guo speak English at

L4KKEAS1                    Walker - Redirect

1    this meeting?

2    A.  Yes.

3    Q.  And did he appear to understand when you spoke English to

4    him?

5    A.  Yes.

6    Q.  In what circumstances was it necessary, then, for Lianchao

7    to translate?

8    A.  Well, it was necessary because he didn't -- he spoke

9    English adequately in conversational English, but he would need

10   an interpreter's help for any enunciation of ideas, or to make

11   sure he understood something, or if I spoke too fast, or

12   something like that.

13   Q.  What did Guo say about himself in this meeting?

14   A.  He said he was the number one enemy of the Chinese

15   Communist Party and that he wanted to use his wealth, and his

16   influence, and his contacts back in China to bring out

17   information to expose the contradictions within the Chinese

18   Communist Party to bring it down.

19   Q.  Did he indicate to you that he still did have contacts back

20   in China?

21   A.  Yes.

22   Q.  Did he say that he had access to their information?

23   A.  Yes.

24   Q.  Did he tell you the nature of these contacts?

25   A.  Yes.  He said they were personal contacts that he knew, and

Case 1:18-cr-02032-1L Document 1 Filed 05/25/23 Page 245 of 243

1    he boasted how -- not boasted, but I guess explained, and

2    sometimes boasted, but how he knew everyone seemingly in the

3    Communist Party leadership from Xi Jinping, the general

4    secretary of the Communist Party, further down through the

5    ranks, including government ministers, Beijing city officials,

6    and MSS, or security and intelligence service officials, as

7    well as prominent Chinese businessmen who were tied to the

8    Communist Party.

9    Q.  Did he indicate that he could get information from these

10   individuals?

11   A.  Yes.

12   Q.  What did he say about his upbringing and his background?

13   A.  He said he was from a rural background, described it as

14   sort of a rags-to-riches story where he didn't have much

15   education, he had a large family, had many brothers, six or

16   seven brothers, and he suddenly became very wealthy — well,

17   over a short period of time — through the real estate and

18   construction building development business, real estate

19   development business.

20   Q.  Did he say how he became close, given his background, how

21   he became close to the CCP leaders?

22   A.  Yes.  There was a question of ours, how can someone who was

23   not a party member starting out become so wealthy so quickly,

24   and he said it was through relations he developed with a man

25   named Ma Jian, M-a J-i-a-n, and that Ma Jian then rose to

1    become the deputy minister of security, so it was the number

2    two official in the Chinese security and intelligence

3    apparatus.  So that's how Guo made his money, was on Ma Jian's

4    coattails.

5    Q.  Is that the agency you just mentioned?

6    A.  Yes.

7    Q.  Now, in this meeting, what help did Mr. Guo -- as he was

8    going through this document with you, what help did he say he

9    wanted?  Did he give you anything more specific?

10   A.  Well, this was our first presentation to him on what we

11   proposed to do based on our conversations with Lianchao Han.

12   He then fine-tuned it to more of what he was looking for.  He

13   liked a lot of these ideas, he expanded on them, we

14   brainstormed on a number of issues.  He mentioned that he had

15   other teams doing different kinds of work at the time, and so

16   we honed it down on what he was looking for and then advised

17   him on what we thought would be in his best interests to help

18   take down the CCP.

19   Q.  When you say he said he had other teams doing different

20   types of work, did he tell you what kind of teams and what kind

21   of work?

22   A.  Yes.  He said he had everything from public relations teams

23   to research teams in various places around the world.

24   Q.  Did he indicate any plans to you to use the media?

25   A.  Yes.  That was the center of the whole plan.

L4KKEAS1                     Waller - Redirect

1    Q.  And what did he say?  What was his media plan?

2    A.  He wanted -- he had a dual approach.  He wanted to address

3    Chinese language -- Mandarin language viewers inside the

4    People's Republic of China going past the great Chinese

5    firewall, and, also, the Chinese speaking diaspora worldwide.

6    So that was the one main group.  The other group was

7    English-speaking audiences, mainly in the United States, but

8    also worldwide, to bring about information from within the

9    Communist Party to discredit the Communist Party and its

10   officials, cause infighting in the Communist Party.  So that

11   was the first part of it.

12           The second part of it was to create his own media

13   machine, which he didn't have a name for then, but it would be

14   Guo Media, or Miles Media, or certain variations thereof, to

15   make himself sort of the number one personality, the go-to

16   person, for the international Chinese opposition to the

17   parties.

18   Q.  So how did this meeting come to an end?

19   A.  It was a favorable ending.  We resolved to go back and

20   refine this document into another document and to come back to

21   him in a few days.

22   Q.  Did you, in fact, do that?

23   A.  Yes, we did.

24   Q.  Do you recognize Exhibit 39?

25   A.  Yes.

1   Q.  Is this the follow-up document?

2   A.  Yes.  This is the one I just referenced before.

3   Q.  Who worked on this?

4   A.  I was the prime writer, and I worked on it with French

5   Wallop and Lianchao Han.  Lianchao was working in this capacity

6   now as Guo's liaison with us working for what Guo wanted and to

7   help us shape it according to the way he thought Guo would want

8   to see something.

9   Q.  Now, again, is there anything in this document about

10  Strategic doing investigations or research?

11  A.  No.

12  Q.  How, if anything, did this differ from the last proposal?

13  A.  It was more fine-tuned.  So the first one, we wrote before

14  we'd met Guo.  Now, after we had a better part of a daylong

15  meeting with him, got to know where his mind was, what his

16  intents were, his desires were, we wrote this to address those

17  interests.

18  Q.  By the way, had you met -- so this is the second meeting.

19  By this meeting, had you met Yvette Wang?

20  A.  Yes.  I didn't know who she was at first, I didn't know her

21  name at first, but I had seen her in and out of the first

22  meeting.

23  Q.  Did Guo come to introduce her at a particular meeting at

24  some point?

25  A.  At the first meeting, he just referred to her as like a

L4KKEAS1                    Walter - Redirect

1    servant.  In the second meeting, he introduced her as his

2    assistant.

3    Q.  Did he tell you her name at the second meeting?

4    A.  Yes.  Her English name, Yvette.

5    Q.  I see.

6    A.  French name.

7    Q.  I should have asked you before:  Did you see Han Chunguang

8    in either one of these first two meetings?

9    A.  Yes.

10   Q.  At which one, or at which meetings?

11   A.  I saw him at a couple of them.  The first time, he was part

12   of the waitstaff serving hors d'oeuvres, and then the second

13   time -- a second time, he served lunch, and Guo described him

14   as his chef.

15   Q.  Now, how did the second meeting end?

16   A.  The second meeting ended favorably, also, and we fine-tuned

17   things more.  Guo came closer to what he wanted.  We had

18   brainstormed on a wide range of issues, including research.

19   And then he asked to come back with another proposal to

20   fine-tune this more.

21          THE COURT:  Mr. Greim, can I ask the witness a

22   question?

23          Sir, on DX 39, on the fourth page, the first paragraph

24   under "Action," there's a sentence that reads, "Most can be

25   done through the foundation which eliminates any need to

1    register under FARA"?

2            THE WITNESS:  Yes.

3            THE COURT:  Can you explain to me what that sentence

4    related to and what the concern was?  Which foreign government

5    would there have to be registration for?

6            THE WITNESS:  Your Honor, this would be for a foreign

7    national, so it was not for any foreign government.  We wanted

8    to make sure that there was no political lobbying or policy

9    lobbying involved, and so doing it under a 501(c)(3)

10   educational foundation would allow funding for the project

11   without having to comply with FARA.

12           THE COURT:  Thank you.

13   BY MR. GREIM:

14   Q.  Let me follow up on that, Dr. Waller.  Why was -- who was

15   concerned with FARA?

16   A.  Strategic Vision and I were concerned with FARA.

17   Q.  Was the concern about the principal here, Guo Wengui?

18   A.  It was a concern with any foreign national, yes.

19   Q.  Did you understand him to be a foreign national?

20   A.  Yes.

21   Q.  What was Strategic's concern with registering for Guo

22   Wengui?

23   A.  Not a concern in principle, it's just the compliance with

24   registering under FARA was -- Strategic Vision had not done any

25   FARA relevant work before and neither had I.

L4KKEAS1                         Waller - Redirect

1   Q.  Now, when did the research project first begin to be
2   discussed in earnest?
3   A.  Right about the time of the second meeting with Guo, but it
4   was in the larger context of the ongoing work that he was
5   having done by other teams already and his ongoing
6   whistleblower campaign to expose the Chinese Communist Party
7   leadership.  So it was -- his effort was slowing down at that
8   time as if he was running out of inside information or he
9   needed different types of information.
10  Q.  Is this something that Guo said?
11  A.  Yes.
12  Q.  Did you ask Guo why he wasn't able to keep getting
13  information from his supposed inside connections?
14  A.  He said there was increasing danger to them, that he also
15  had his family back in China, and if memory serves, his wife
16  and two children were either back in China or back and forth
17  from China, and that the more information that was exposed, the
18  more the regime could hone in and figure out where the sources
19  were.
20  Q.  Did there come a time -- and I am not talking now about the
21  actual signing of the agreement, but did there come a time when
22  the outlines of the project coalesced into a definite proposal?
23  A.  Yes.
24  Q.  About when was that?
25  A.  This was around the third meeting.

```
1          MR. GREIM:  Can we pull up PX 2.
2     Q.  Dr. Waller, take a look -- why don't you scroll through
3     that.
4          Dr. Waller, do you recognize this document?
5     A.  Yes.
6     Q.  Was this prepared before or after the basic outlines of the
7     project had coalesced?
8     A.  This was performed after, meaning after the two previous
9     documents in the exhibit.
10         MR. GREIM:  Let's see if you could go back to the page
11    where it says, "1.  Targeted Intelligence Collection."
12         There we go.
13    Q.  Did anyone else help you prepare this?
14    A.  I did it in consultation with Lianchao and French Wallop.
15    Q.  Do you recall what meeting this was discussed at?
16    A.  I believe it was the third meeting.
17    Q.  Do you recall roughly in December when that was?
18    A.  From memory, maybe the 18th of December, give or take.
19    Q.  Okay.  What document would you look at to determine that?
20    A.  I would look at my handwritten notes.
21    Q.  Okay.  Well, let's just keep moving.  Let's focus on -- I'm
22    going to have you take a look at this page here.
23         Does page 1 roughly summarize what became the research
24    project in this case?  Take a second if you need to read
25    through it.
```

 1   A.  Yes.

 2   Q.  You will see in the fourth little arrow, bullet point, it

 3   says, "Document, everything is leveraged to gain concessions,

 4   protect people, use as political weapon, or as aid in criminal

 5   prosecution and asset recovery."

 6            Did I read that right?

 7   A.  Yes.

 8   Q.  Now, do you recall yesterday you testified that one of the

 9   goals of this, or one thing you thought you might find, was

10   uncovering money stolen by CCP officials for their own benefit?

11   A.  Yes.

12   Q.  Is that related to this fourth bullet point?

13   A.  Yes.

14   Q.  Did Mr. Guo, or Lianchao, or Yvette ever tell you about a

15   particular criminal proceeding in which they wanted to use the

16   research?

17   A.  No.

18   Q.  Did they ever tell you, explain to you, how the research

19   was going to be used to recover a particular asset?

20   A.  No.

21   Q.  Did they ever tell you how the research was going to be

22   used in even a hypothetical criminal prosecution?

23   A.  No.

24   Q.  So, how did you understand the research was going to be

25   used?

1    A.  The research, as the title page of this presentation

2    showed, it was a psychopolitical campaign, meaning a

3    psychological warfare/political warfare campaign against the

4    Chinese Communist leadership.

5    Q.  And if you see the fifth bullet point, I think -- well, let

6    me just ask you:  Is that consistent with what Mr. Guo told you

7    was his goal here?

8    A.  Yes.

9    Q.  I see that the second to last point says, "Burrow into

10   commercial and political networks for business purposes."  Do

11   you see that?

12   A.  Yes.

13   Q.  Did Guo represent to you that that was another use of the

14   information?

15   A.  He said he wanted it for a wide range of reasons, but the

16   main reasons were for building him up as the number one go-to

17   person with all the knowledge.  He said he wanted to make his

18   enemies afraid of confronting him and show he could defend

19   allies and go after enemies.

20   Q.  Now, by this time, I see that there are ten targets

21   identified.  Is that consistent with what Guo or Lianchao told

22   you?

23   A.  At that time, yes.

24   Q.  And did Guo ever tell you that he actually had identified

25   the first ten targets?

1   A.  Yes.

2   Q.  Did he ever discuss any of them with you in these

3   pre-contractual meetings?

4   A.  Yes.

5   Q.  How did he do that?

6   A.  He said they were all members of -- either members of the

7   leadership of the Chinese Communist Party or immediate

8   associates, as in family members — brothers, sisters,

9   children — and then what he described as important in the

10  Communist system were children born out of wedlock.  Because

11  the Chinese Communist Party had a one-child policy, and for it

12  to be known that Chinese Communist Party leadership was

13  violating that policy left and right, it would show the

14  hypocrisy of the party.  Through those children born out of

15  wedlock, they were raised with different family names through

16  aunts, or uncles, or other family members, and through those

17  individuals, it was used to hide assets.  So they were running

18  these assets through these out-of-wedlock children.

19  Q.  Did Guo ever discuss party rules with you?

20  A.  Yes.

21  Q.  What did he say about party -- the CCP party rules?

22  A.  He said the party rules were very strict.  He described

23  them to me.  They were somewhat similar with the Soviet

24  Communist Party rules that I knew from years before, but they

25  had their own differences, and they were very strict, and

1    almost puritanical in certain ways.

2              So if you could find any violation of the party rules,

3    then by the party's own rules, those members had to be expelled

4    from the party.  So any information that could be dug up of

5    Chinese Communist Party members breaking the party's own rules

6    meant that members of the central committee and the pole bureau

7    de facto would have to expelled from the party, and if they

8    were not expelled, that would put the party leadership into a

9    crisis about expulsion or not expulsion and about the validity

10   of the party's rules in the first place.

11   Q.  Did that seem like a plausible plan to you?

12   A.  Yes.

13   Q.  Why so?

14   A.  It seemed like a great plan.  In my own experience in

15   divisive operations, and in my own experience working against

16   the Soviet Communist Party, and playing divisions among the

17   Soviet Communist Party system, we had a great historical

18   precedent to show it can work on such a very large target.

19             So, in this case, it made perfect sense.

20   Q.  As you considered the plausibility of that plan, over what

21   time period did you -- did you consider the time period over

22   which that would have to unfold?

23   A.  Yes.  I thought it would take five to ten years to do.  Guo

24   insisted it could be done in three.

25   Q.  Did anyone ever discuss doing it in one month?

Walter - Redirect

 1   A.  No.

 2   Q.  Did anyone ever discuss doing it in six months?

 3   A.  No.

 4   Q.  Did you actually see some of the names?

 5   A.  Yes.

 6   Q.  And this is before the contract was signed?

 7   A.  Yes.

 8   Q.  How did you see them?

 9   A.  Guo handed us a paper copy — I believe it's one of the

10   exhibits — with a list of 15 principal names among a total of

11   about 92 names of either party officials or their close

12   associates with, I think, one exception that he wanted

13   researched.

14   Q.  Did he give you copies that you could keep and take home

15   with you?

16   A.  No.  He showed us the paper copy at that time, and through

17   Lianchao and, I believe, Yvette, described each of the

18   individuals and the dynamics the reasons why he was interested

19   in that particular person or group of people.

20   Q.  Can you describe what it looked like?

21   A.  Oh, it was about this thick, but it looked about a quarter

22   inch thick stack.  It was a color printout of what appeared to

23   be a PowerPoint presentation.  There were individual names of

24   the 15 main people in Mandarin and English, color-coded in blue

25   or pinkish red for female or male, followed by, in most cases,

```
 1    sort of like a flow chart or a family chart to show their
 2    relations with party officials, and then other statistical or
 3    personal information about them.
 4    Q.  Did Guo tell you how he had gotten that information?
 5    A.  Yes.
 6    Q.  What did he say?
 7    A.  He said he spent a huge amount of resources, through
 8    international teams, synthesizing a colossal amount of
 9    information to boil down into that particular presentation.
10    Q.  Did he say whether he had spent the money to compile that?
11    A.  Yes.
12    Q.  Did he say what it had cost him?
13    A.  Yes.  He said he spent it personally.  He said it cost
14    $250 million.
15    Q.  Did you believe it could have cost him that much?
16    A.  No.
17    Q.  Did you believe, however, that he had spent some money to
18    compile it?
19    A.  Yes.
20    Q.  Did he identify who the contractor or team was, or teams
21    were, that had compiled the information?
22    A.  No.
23    Q.  Did he say whether those teams were still working for him?
24    A.  He was not specific, but I understood that some were still
25    working for him and some were not.
```

1    Q.  Did he explain why he even needed Strategic Vision if he

2    already had teams working for him?

3    A.  He said he wanted a U.S.-based effort that would coordinate

4    with the media campaign.

5    Q.  Did you ever come to learn whether any of the teams had

6    quit or stopped working for Guo?

7    A.  After the fact, I did.

8    Q.  Did there come a time, then, when Strategic Vision had to

9    decide definitively whether to go forward with this contract?

10   A.  Yes.

11   Q.  And did you confer with French Wallop about whether to do

12   so?

13   A.  Yes.

14   Q.  Did you think Strategic Vision should enter into this

15   agreement with Mr. Guo?

16   A.  Yes, because of the shared objective.  It was like we'd

17   worked all our lives for this opportunity, to go after the

18   Chinese Communist Party.

19   Q.  Did you rely on Guo's representations about himself and his

20   goals for the research in deciding whether to enter into the

21   contract?

22   A.  Yes.

23   Q.  Would you have entered into -- I should say, would you have

24   recommended entering into the contract with Guo if you thought

25   he was not a true dissident?

1   A.  No.

2   Q.  Would you have recommended entering into the contract with

3   Guo if you thought he did not intend to use the research to

4   undermine the CCP?

5   A.  No.

6   Q.  Did Guo's statements about himself seem reliable?

7   A.  They seemed reliable as Lianchao interpreted them for us,

8   but Lianchao did caution that sometimes Guo spoke in more

9   grandiose terms than practical, but even with Lianchao's

10  caveats, it made a lot of sense.

11  Q.  Did you take Lianchao's caution to you to indicate that Guo

12  may actually not be a dissident?

13  A.  No.  No, not at all.

14  Q.  Did you take Lianchao's caution to you meaning that Guo may

15  not actually use the research to undermine the CCP?

16  A.  No.

17  Q.  Why did his statements seem reliable to you?

18  A.  Why did Guo's statements?

19  Q.  Yes.

20  A.  Because he spoke with, looking at this now, from a scholar

21  of Communist political systems.

22  Q.  Let me caution you, Dr. Waller -- I don't mean to interrupt

23  you -- I want to ask you at the time why they did.  Don't tell

24  me your perspective now.

25  A.  Okay.  Because he had unique, fresh, inside information

1   from the Chinese Communist Party leadership.

2   Q.  Did he actually share some of that with you in your

3   meetings?

4   A.  Yes.

5   Q.  Why was that relevant to you?

6   A.  It was relevant because it was a unique, brand new, very

7   damaging source of extremely sensitive, valuable information

8   about the internal practices, and habits, and traits, and

9   actions of everybody from Xi Jinping on down within the Chinese

10  Communist Party.

11          THE COURT:  Can I ask you a question, Dr. Waller.

12  When you talk about being an opponent of the Chinese Communist

13  Party, I think you've described that there were factions inside

14  the Chinese Communist Party; is that right?

15          THE WITNESS:  Yes.

16          THE COURT:  Is there a Xi faction and then an anti-Xi

17  faction within the Chinese Communist Party?

18          THE WITNESS:  Yes.  At the time Xi Jinping was

19  consolidating control.  There was a big party congress coming

20  up, which would mark the consolidation -- I think it was late

21  2017 and another event in early 2018 that marked Xi's

22  consolidation of power, and there was a large purge going on

23  that Xi Jinping would stay above the purge, but he'd have a

24  second in command, Wang Qishan W-a-n-g Q-i-s-h-a-n, who was the

25  enforcer, who did all the work to assist -- to carry out the

```
 1    purge for Xi Jinping.

 2              THE COURT:  As you were thinking about it at the time,

 3    I take it that you were opposed to Xi; is that correct?

 4              THE WITNESS:  Yes.

 5              THE COURT:  In your thinking about it at the time, was

 6    the anti-Xi faction within the Chinese Communist Party

 7    potentially of help with respect to the anti-Xi campaign?

 8              THE WITNESS:  You know, at the time it was on -- it

 9    was severely on the decline, so I didn't see this as an effort

10    for helping one faction gain control over the next.  I saw this

11    as someone who was inside the Chinese Communist Party who was

12    so frustrated and disgusted with the system, that he just

13    wanted to make war on the whole system.

14              THE COURT:  You may proceed.

15    BY MR. GREIM:

16    Q.  Now, Dr. Waller, you also understood that Lianchao Han had

17    been working, I think you testified earlier, working with Guo

18    on his asylum application?

19    A.  Yes.

20    Q.  Do you understand what an asylum application entails

21    generally?

22    A.  Yes.

23    Q.  Is there -- you're making sworn statements to the federal

24    government?

25    A.  Yes.
```

1   Q.  So did that play any role in your crediting Guo's

2   statements about himself?

3   A.  Yes.

4   Q.  Were you aware that Mr. Gertz had generally been writing

5   articles about Mr. Guo for several months by this point?

6   A.  Yes.

7   Q.  And did you know whether Mr. Gertz had sat down and

8   actually interviewed Mr. Guo many times?

9   A.  Yes.

10  Q.  So did Mr. Gertz' involvement have any role in your

11  decision that these were reliable statements?

12  A.  Yes, a great deal.

13  Q.  Now, if these statements by Guo about himself and his plans

14  were so important to Strategic Vision, why not just insist that

15  they be inserted as representations or maybe warranties into

16  the research agreement?

17  A.  Well, the whole relationship with Guo was -- we all had a

18  common purpose, so you don't necessarily have to state a common

19  purpose in an agreement, a business agreement, so both sides

20  make money.  You don't necessarily put that in the agreement

21  because it's just implicit.

22          But, more importantly, we didn't mention Guo or China

23  in the agreement deliberately, so that there would never be an

24  issue of any traceability back to him because he still had

25  contacts and family back in China.

Q.  And at whose insistence was that?

A.  His.

Q.  In fact, was that research agreement ever emailed among the parties?

A.  No.

Q.  And why was that?

A.  It was because of concerns that the Chinese Secret Services were able to -- had already penetrated or monitored our -- America's email and electronic communication system, so he only wanted material to be handed to him in writing or by thumb drive.

Q.  Okay.  Did you, Dr. Waller, ever tell Guo, Yvette Wang, or Lianchao Han that you were a licensed private investigator under the laws of any state?

A.  No.

Q.  Did they ever ask you?

A.  No.

Q.  Was licensure ever discussed?

A.  No.

Q.  Have you ever been licensed as a PI?

A.  No.

Q.  Have you ever considered doing so?

A.  No.

Q.  Did Guo, Yvette, or Lianchao ever state that Strategic's research was going to be used by Eastern Profit for its own

1  benefit?

2  A.  No.

3  Q.  Did Lianchao ever mention Eastern Profit to you?

4  A.  No.

5  Q.  Even after the contract was signed?

6  A.  No.

7  Q.  Did Guo, Yvette, or Lianchao ever state that the research

8  would be used -- forget about Eastern Profit for a second --

9  but by any person or entity other than Guo?

10  A.  No.

11  Q.  Did they ever state the research was going to be used to

12  investigate any particular crime involving a particular victim?

13  A.  No.

14  Q.  Did they state the research was going to be used in any

15  particular case?

16  A.  No.

17  Q.  In mid-December, did you -- as the contract began to be

18  further discussed, did you begin to do any basic groundwork?

19  A.  Yes.

20  Q.  What did you do?

21  A.  We put together -- we wanted to make sure -- as Mr. Guo's

22  stated desires fleshed out, we wanted to make sure we had the

23  capability to assemble a team from scratch to do what he wanted

24  done.

25  Q.  Did you determine that you could do that?

L4KKEAS1                          Waller - Redirect

1    A.  It took a while, it took a week or so, but we did determine
2    that we could.
3    Q.  Who did you communicate that to?
4    A.  We communicated it to Lianchao Han.
5    Q.  Did there come a time after that communication when
6    Lianchao Han raised new demands by Guo?
7    A.  Lianchao Han?  There was back-and-forth.  I wouldn't call
8    them demands.  They were back-and-forth that Guo wanted to see
9    if we could do more for the -- in the contract.
10            MR. GREIM:  Pull up Exhibit 7.
11   Q.  Okay.  Dr. Waller — just scroll through here — do you
12   recognize this exhibit?
13   A.  Yes.
14   Q.  What does this appear to be to you?
15   A.  This is a single messenger correspondence between Lianchao
16   Han and myself from December 2017.
17   Q.  Okay.  And the opening one is on December 11th, and it goes
18   all the way through January 4th?
19   A.  Yes, I see December 11th.
20   Q.  You have to look electronically?
21   A.  Yeah, I can't scroll down.
22   Q.  We'll fix that on a break.
23            MR. GREIM:  If you could, Becka, just show him down to
24   the very bottom.
25            THE WITNESS:  Yes, till January 4th, 2018.

1   Q.  Which bubbles are you and which bubbles are Lianchao Han?

2   A.  Mine bubbles are the darker ones on the right; his are the

3   lighter ones on the left.

4   Q.  If I could direct you, let's go to the page -- page SVUS64.

5       Do you see here Lianchao Han making any request on

6   behalf of New York friend?

7   A.  Yes.  He's asking for more, quote, insurance.

8   Q.  Who did you understand, if anyone, New York friend to be?

9   A.  New York friend or, quote, NY in quotes, referred to Guo.

10          MR. GREIM:  Go to the next page, please.

11  Q.  And what was your response?

12  A.  I said I didn't think that Guo was serious.

13  Q.  And this is only two weeks before the contract was signed;

14  is that right?

15  A.  Yes.

16  Q.  Let's go on to SVUS66.

17          THE COURT:  I'm sorry, where it's not dark, that's

18  Lianchao Han; is that right?

19          THE WITNESS:  Yes, your Honor.

20          THE COURT:  And he responds to your comment, "I don't

21  think the New York guy is serious," by saying, "I have a mixed

22  feeling about it.  Wants to do it, but wants to do it as cheap

23  as possible."

24          What was the mixed feeling?  What did you understand

25  that to be?

1    THE WITNESS:  The way I understood it was that Guo
2    said he wanted to go ahead with it, but he was also unsure
3    about whether Guo actually would, and that price was an issue.
4    MR. GREIM:  Let's go -- any follow-up, your Honor?
5    THE COURT:  No.  No.
6    BY MR. GREIM:
7    Q.  If you go to page 66, do you see that Lianchao then got
8    back to you on Christmas Eve?
9    A.  Yes.
10   Q.  And it looks like the night of Christmas Eve.  Does he
11   report back to you on his conversation with Guo?
12   A.  Yes.
13   Q.  Do you recall Lianchao Guo communicating on behalf of Guo
14   that Guo wanted to negotiate a refund of the deposit provision
15   in the agreement?
16   A.  Yes.
17   Q.  What did Lianchao say was the reason for Guo wanting to do
18   that?
19   A.  He said that if he -- Guo wanted to put a clause in the
20   contract to say that if I failed to provide the deliverables as
21   defined in the scope, that Strategic Vision should return the
22   deposit.
23   Q.  Now, you say it's progress, so did you support that idea?
24   A.  No.  It was just a comment that at least Guo is moving
25   ahead on the issue, so we have at least some movement on the --

1  movement forward.

2  Q.  Did you have any concern about the kind of provision that

3  Lianchao was suggesting?

4  A.  Yes.

5  Q.  Why?

6  A.  Because in any deep dive research program, you simply don't

7  know what you're going to find until you find it.  So if we

8  can't go through the expense of setting up a whole research

9  operation and running it, and if nothing comes up at first, or

10  if it's inadequate information, or some other variable comes

11  up, we can't just refund funds just because the information

12  wasn't in that spot.  It's sort of like prospecting for oil, or

13  minerals, or something; you don't know until you find it.

14  Q.  Now, I see in your response -- actually, if you look at

15  your full response on page 68.

16  A.  Yes.

17  Q.  Is this your full response to Lianchao's comment?

18  A.  This one is, yes.

19  Q.  That's just the way this thing prints out.

20        Did you have any opinion about whether it would be

21  possible to make -- to produce deliverables within the scope

22  within the first 30 days?

23  A.  I said it probably would not be possible in the first 30

24  days because of startup work.

25  Q.  What did you suggest?

1   A.   I suggested a minimum of 90 days.

2   Q.   Now, at this point, were you negotiating the contract on

3   behalf of -- were you one of the people negotiating the

4   contract on behalf of Strategic Vision?

5   A.   Yes.

6   Q.   You were not like a back channel or anything to Lianchao,

7   were you?

8             I withdraw the question.

9             Were you communicating with French on a regular basis

10  about the negotiations?

11  A.   Yes.

12  Q.   And did either one of you have more responsibility than the

13  other at this time?

14  A.   At this time, because I knew the architecture of what to

15  look for, I was the one handling those details.

16  Q.   Now, you mentioned 90 days.  Did that concept make its way

17  into the research agreement?

18  A.   Yes.

19  Q.   Okay.  Where?

20  A.   I don't have the agreement in front of me.

21             MR. GREIM:  Can we pull up, I think it's probably --

22             THE WITNESS:  A minimum of 90 days.

23             MR. GREIM:  Let's pull up Exhibit 4.

24             THE COURT:  Are you offering DX 7?

25             MR. GREIM:  Thank you, your Honor.  I am offering

1     Exhibit 7.

2                   THE COURT:  Okay.  Any questions as to authenticity or

3     the timing of it?

4                   MR. CHUFF:  No, your Honor.

5                   THE COURT:  It's received subject to motion to strike.

6                   (Defendant's Exhibit 7 received in evidence)

7                   MR. GREIM:  This may be a good time, your Honor — I

8     know we did this yesterday — I wonder if I couldn't approach

9     the witness with one of the binders, so that he could just leaf

10    through and not have our person scrolling up and down for him?

11                  THE COURT:  Why don't you put a binder to the side,

12    then you'll walk away from where you're putting the binder, and

13    he will approach, and, that way, you will maintain the social

14    distancing rules in the courthouse.

15                  For future reference, what I will permit, in terms of

16    handing a witness the binder, is for a binder to be opened

17    approximately six feet from the witness, the lawyer who

18    presents the binder will then step away from the binder, and

19    the witness will be given leave to step out of the witness

20    chair, and grab the binder, and bring it back to the witness

21    chair.  So, that way, we will at all times maintain the social

22    distancing rules that are in effect by order of the court while

23    also being able to get the binder to the witness.

24                  MR. GREIM:  May the witness now approach the binder?

25                  THE COURT:  Yes.

1          MR. GREIM:  And, your Honor, is what I did okay for
2     future reference just now?
3          THE COURT:  Yes.
4          MR. GREIM:  Okay.
5     BY MR. GREIM:
6     Q.  All right.  Dr. Waller, I went ahead and opened it up for
7     you to Exhibit 4.
8     A.  Okay.
9     Q.  Does that appear to you to be a copy of the research
10    agreement?
11    A.  Yes.
12    Q.  All right.  Do you see whether this 90-day provision -- the
13    90-day issue got placed into the research agreement at any
14    place based on your understanding?
15          When you find it, if you do find it, tell us the page.
16    We'll put it up on the screen.
17    A.  There is a reference on page 2, the first full paragraph,
18    starting the contractor concerning a historical research report
19    within three months and updates each following month.
20    Q.  Okay.  Where else?  Or is that it?
21    A.  There is a second reference on the top of page 4,
22    stipulating through March and for the duration of the contract,
23    and then the top -- the second paragraph of page 4, "It is
24    agreed by both parties for the first three months of this
25    agreement" concerning payment.

1    Q.   Do you see any reference to an accounting recap?

2    A.   Yeah, I just saw it, but I lost it.

3              Yes, at the third paragraph on the top of page 4, "It

4    is also agreed by both parties that after the March reports,"

5    meaning third month reports, "and payments are made," after

6    that, "all parties will need to recap the accounting prior to

7    moving forward with the next quarter."

8    Q.   What was your understanding of the purpose of that meeting

9    where it says "recap the accounting"?

10   A.   The purpose was because this was a new project, it was a

11   very large project, and it was very complicated, given certain

12   of the other parameters involved, that there were -- there was

13   the startup phase, which was going to take some time, and then

14   there was the finding and validating the sources of information

15   phase as part of that startup that would take some time, so

16   there were unpredictable factors for starting up, so then we

17   would recap after month three to make sure we were all on the

18   same page as to how it was going to be working.

19             THE COURT:  I'm sorry, Dr. Waller, when it refers to

20   accounting in the phrase that says recap the accounting, what

21   accounting did you understand it to be referring to?

22             THE WITNESS:  This was the accounting, meaning the

23   so-called fish metaphor, how are we actually tracking the fish

24   or the separate information units that were spelled out in the

25   contract.

```
 1              THE COURT:  So what was to be accounted at the March
 2    or so meeting?
 3              THE WITNESS:  Well, let's say, did we find the proper
 4    information requested on target A and any of the couple of
 5    categories under target A, and did this make sense or should we
 6    stop and move on to a different target with a different
 7    parameter, and was this working properly.
 8              There were other opportunities that were brought up in
 9    our discussions, but not stipulated in the contract, that we
10    would find something completely new that no one was expecting
11    that would have value for the client, and then that would
12    satisfy certain of the client's expectations in lieu of
13    specific fish per individual, because the client was interested
14    in certain corporations, party-controlled corporations, that
15    were not individuals, per se, so they didn't fit into the fish
16    formula of the contract.
17              THE COURT:  So it wasn't financial accounting, for
18    example, of your costs?
19              THE WITNESS:  No.  That was all flat rate.
20              THE COURT:  You may inquire.
21    BY MR. GREIM:
22    Q.  You can turn to page 3, please.
23              And you will see -- you see a bolded paragraph called
24    the "Irregular Circumstances"?
25    A.  Yes.
```

1  Q.  "Both parties understand that occasionally unforeseen

2  challenges may arise that will slow or block comprehensive

3  research, and that there may be periods in which information is

4  irregular, unavailable, or incomplete.  The contractor will

5  endeavor to make all research and reports as complete as

6  possible in a timely scheduled manner."

7        Did I read that right?

8  A.  Yes.

9  Q.  Did you insist this provision be put into the contract?

10 A.  Yes.

11 Q.  Why is that?

12 A.  Because there were going to be irregular circumstances.  We

13 were not, and we never professed to be, a freestanding

14 organization.  We were putting together compartmented teams

15 with no corporate profile to keep the -- because we hadn't

16 built those teams yet and also to keep the -- not just the

17 privacy of the client, but the safety of the client, and his

18 interests, and his family in China.

19       So this would be very compartmented and, therefore,

20 much more challenging to manage, and then you never know where

21 you're going to -- and this is reflected elsewhere in the

22 contract where we never know where we're going to not find

23 information, or we'll find information that's not of sufficient

24 value to the client, and the client would direct us to go to a

25 different target that wasn't even on the principal list.

1  Q.  Now, Dr. Waller, you testified yesterday that you believed

2  it was important to have quality information in the first

3  month.

4  A.  Yes.

5  Q.  Do you recall that testimony?

6  A.  Yes.

7  Q.  Now, what did you mean by "quality information"?

8  A.  We had to show that our methods and our sources were

9  sufficient to produce information of a quality that would be of

10 value to the client.  So it wasn't supposed to be a quantity of

11 quality information, but just showing -- again, like mining for

12 mineral, the ore has to be of a certain quality to know it's

13 worth mining this and processing this to make it a worthwhile

14 venture.  So it's the same thing with information here.

15 Q.  Did you have an understanding that you were supposed to be

16 producing information that Guo could begin to publish in the

17 first week?

18 A.  No.

19 Q.  How about in the first three weeks?

20 A.  No.

21 Q.  Or in the first month?

22 A.  No.

23 Q.  Now, did that come to be your understanding, that he

24 expected that later?

25 A.  Yes.  In working with Lianchao, it was explicit in our

L4KKEAS1                        Waller - Redirect

1    conversations that we would put this together to make sure we

2    didn't jeopardize our sources, or our methods, or even Guo's

3    sources inside China.  So there would be a waiting period or

4    sorting-out stage where it would be guaranteed that the

5    information wouldn't endanger the source or ruin the methods.

6    Q.  But my question is:  Did you understand later that Guo did,

7    in fact, expect to have information he could publish within the

8    first few weeks?

9    A.  Yes.

10   Q.  We'll come to that later.

11            Now, you see your second paragraph in this response to

12   Lianchao, you say, "As it stands, the written contract gives

13   either party the right to terminate for any reason with 30

14   days' notice.  So if he gives 30 days' notice, we would prorate

15   the 30 days from the deposit and return the balance under any

16   normal circumstance."

17            Did I read that right?

18   A.  Yes.

19   Q.  And was that your understanding?

20   A.  Yes.

21   Q.  Did that understanding come to be reflected in the research

22   agreement?

23   A.  Yes.

24   Q.  Is it in the section that deals with the million-dollar

25   deposit?

L4KKEAS1                           Waller - Redirect

1    A.  Yes.  The second paragraph of page 5.

2              MR. GREIM:  Can you highlight that?

3    Q.  Now, where this prorating -- what part of this implements

4    your understanding here, Dr. Waller?

5    A.  What do you mean by what part of it?

6    Q.  Well, let me strike that.  It's a bad question.

7              You see the second sentence, it says, "The deposit

8    will be credited on a prorated basis to the final one and

9    one-third months of the contract"?

10   A.  Yes.

11   Q.  And so if Strategic -- I'm sorry.  If Eastern Profit had

12   decided to cancel the agreement in week two, what did you

13   understand would happen with your deposit?

14   A.  We would prorate for the first two weeks and return the

15   rest.

16   Q.  Well, what about the 30 days' notice?

17   A.  Well, no, there would be the 30 days -- you give the 30

18   days' notice, so you would subtract -- you would add 30 days to

19   two weeks, and then you'd prorate from those six weeks.

20   Q.  Is that what you indicate in your second paragraph to

21   Lianchao?

22   A.  Yeah, I don't see it.

23   Q.  I'm sorry, back to -- we've got to go back to -- there we

24   go.

25   A.  Yes.

1   Q.  Now, let's stick with this exhibit and go to the next page.

2              By the way, do you see Lianchao says, "I don't know

3   who will sign"?

4   A.  Yes.

5   Q.  Was that concerning to you?

6   A.  Yes, it was.

7   Q.  Why?

8   A.  Because we had confidence in Lianchao through -- for

9   reasons discussed earlier.  Based on our knowledge of him, we

10  were comfortable working with him, we trusted him, and he

11  shared the same vision, and having lived in Washington for such

12  a long time, he knew how things worked.  Guo had his ideas, but

13  he didn't necessarily understand how everything worked, and

14  Yvette Wang never gave any indication that she knew how it

15  worked.

16  Q.  Did you also have a concern about information being

17  released prematurely without Lianchao's involvement?

18  A.  Yes, I was concerned about that.

19  Q.  By the way, I see you mention in here, in dark, "Anybody

20  who is friends with Bernie and Judd is my kind of person."

21  A.  Yes.

22  Q.  What is "Bernie" referring to there?

23  A.  That was Bernie Yo, who was the Chinese warrior who fought

24  against the Japanese in World War II, and then fought against

25  Mao during the -- up to the 1949 revolution, and who lived in

57

```
 1  Washington, and he's the one who took me under his wing when I
 2  was in college, and he did the same thing for Lianchao when
 3  Lianchao came over after Tiananmen Square.
 4          Judd Gregg was the senator, Judd Gregg from New
 5  Hampshire.
 6  Q.  Now, moving forward from this time, did there come a point
 7  where Yvette Wang took over the final stages of the
 8  negotiation?
 9  A.  Yes.
10  Q.  Do you recall about when that happened?
11  A.  It was a couple of days after Christmas 2017.
12  Q.  Let's talk about her for a moment.
13          You've told us how Guo introduced her to you in your
14  meetings with Guo.  Were those in New York?
15  A.  How Lianchao?
16  Q.  I'm sorry, how Guo introduced her.
17  A.  Yes.
18  Q.  Okay.
19          Now I'd like to ask you about what Ms. Wang said about
20  her role.  Did she have a name for her role in this project?
21  A.  Yes.  First she said she was Guo's assistant, and then she
22  described herself as she would be the project manager.
23  Q.  Did she have any name for Guo or any term she used to
24  describe him?
25  A.  Yes.  She called him chief.  She gave him some military
```

Waller - Redirect

 1   ranks.  She called him the boss.

 2   Q.  Did you have any understanding as to whether things that

 3   she negotiated with you ultimately had to be approved by Guo?

 4   A.  Yes.

 5   Q.  And did they?

 6   A.  Yes.

 7   Q.  Do you recall that there came a time when Yvette Wang

 8   actually came to D.C.?

 9   A.  Yes.

10   Q.  Did you understand she was coming to sign the contract?

11   A.  Yes.

12   Q.  Was the contract actually signed?

13   A.  Not the first time she was there in late December.

14   Q.  When she left, did you have any understanding as to whether

15   a contract would ever be signed?

16   A.  We were not sure because the way it was originally written,

17   it was done -- negotiated with Guo through Lianchao Han.

18   Q.  Did you reach out to Lianchao after she went back to

19   New York?

20   A.  Yes.

21   Q.  And what did Lianchao say to you?

22   A.  He was uncertain of what his role would be.

23   Q.  If I could have you turn -- let's go to page 74 of

24   Exhibit 7.

25            Do you see in dark, is this your message to Lianchao

L4KKEAS1                        Waller - Redirect

1   after Yvette Wang had gone home?

2   A.  Yes.

3   Q.  And what was his response to you?

4   A.  He said, "I talked with F," meaning French Wallop.  "It's

5   better to wait a couple of days.  Miles, Guo, communicated with

6   me a few times today, but did not mention the failure."

7   Q.  Then he mentions something else about Japan in the next

8   one.  Is that relating to this matter?

9   A.  No.

10  Q.  Sir, were you working with Lianchao on other matters?

11  A.  He was -- we weren't working with him on other matters.  He

12  was raising other issues with us to helping bring down the CCP.

13  Q.  Did that further add to your confidence in Lianchao Han?

14  A.  Yes.

15          MR. GREIM:  I move to admit DX 7, if I haven't done so

16  already.

17          THE COURT:  I think you did, and I ruled that it was

18  received subject to a motion to strike.

19  Q.  By the way --

20          MR. GREIM:  Let's pull up DX 13.

21  Q.  Dr. Waller, I'm going to ask you to look at DX 13.

22  A.  Yes.

23  Q.  Do you recognize this document?

24  A.  Yes.

25  Q.  What is it?

L4KKEAS1                    Waller - Redirect

```
 1   A.  That is the first page of the multipage PowerPoint that I
 2   referenced earlier with the main 15 names who Guo wanted
 3   research on and a total of about 92 people within those pages
 4   that he was interested in.
 5   Q.  So this is a document that Guo actually brought out at one
 6   of your meetings with him in December?
 7   A.  Yes.
 8   Q.  And let's just be clear, were you able to take any portion
 9   of this with you?
10   A.  No.
11   Q.  Were you able to take notes on it and take it with you?
12   A.  No.
13   Q.  And --
14            THE COURT:  Did you recognize the names?
15            THE WITNESS:  Yes.
16            THE COURT:  Did you recognize all of them or most of
17   them?
18            THE WITNESS:  I didn't recognize any changes in them.
19   So the names that I saw, I recognized -- or the names that I
20   recognized, I had seen earlier, and the pictures of the people
21   associated with those names, I remembered.
22            THE COURT:  But when he handed it to you in December,
23   and you looked at the names, were they names that you had known
24   and that were known to you?
25            THE WITNESS:  No, with one exception.
```

```
 1              THE COURT:  What was the exception?

 2              THE WITNESS:  He was the son of former Chinese leader,

 3    Deng Xiaoping -- I believe it's Deng Xiaoping.  I might be

 4    mistaken.  Either Deng Xiaoping or Yuexiang.

 5              THE COURT:  Thank you.

 6              MR. GREIM:  Move to admit Exhibit 13.

 7              THE COURT:  Exhibit 13 is already in evidence.

 8              And this may be a good time for me to instruct the

 9    parties that after we're done with testimony, you are to meet

10    and confer and make sure that there's a schedule indicating a

11    single exhibit number for each of the documents.  And you might

12    even try to do that work tonight or during breaks, so we don't

13    have multiple different exhibit numbers attached to the same

14    document.

15              MR. GREIM:  Yes.  It's a bit of a challenge.  I

16    prepared a direct, and I wasn't quite sure whether it would be

17    used, so we'll cross-reference it and avoid this.

18              THE COURT:  Thank you.

19    BY MR. GREIM:

20    Q.  Okay.  Dr. Waller, at some point, did you learn of Eastern

21    Profit before the agreement was signed?

22    A.  I believe, yes, right when Yvette went to meet with French

23    Wallop in late December.

24    Q.  Okay.  So it was the first meeting and not the second

25    meeting?
```

```
 1   A.  I believe so.  I wasn't present.

 2   Q.  So, who did you first hear about Eastern Profit from?

 3   A.  From French Wallop.

 4   Q.  And she told you that Yvette had told her the name?

 5   A.  Yes.

 6   Q.  Did you do anything to look into Eastern Profit when you

 7   learned that name?

 8   A.  Yes.

 9   Q.  By the way, had you heard of the name before?

10   A.  No.

11   Q.  What did you do to learn about it?

12   A.  Well, we had an arrangement with Mr. Guo that payment would

13   be run through companies, separate entities, so it couldn't be

14   traced back to him and then have an adverse effect on his

15   interests, and his family, and so forth.  So we were expecting

16   a different company name.

17           I looked up the -- after hearing about the name, I

18   looked it up.  I found it on the Hong Kong registry, and I

19   found it had been incorporated in Hong Kong and registered to

20   Guo Wengui's daughter, Mei Guo M-e-i G-u-o.

21   Q.  So did the results of that investigation have any

22   significance to you?

23   A.  Well, it assured me that it was a Guo family-controlled

24   company, but it was also disturbing because it went against our

25   understanding that this would be done circuitously so that the
```

1   Chinese Government couldn't find out about it.
2   Q.  So Strategic went ahead and signed the contract with
3   Eastern listed as the contracting party?
4   A.  Yes.
5   Q.  Now, did you further understand that the contracting party
6   may not be the party that actually paid Strategic?
7   A.  Yes.
8   Q.  And what was the reason for that?
9   A.  That was, again, to protect Guo Wengui's interests, so that
10  the funds could not be traced to him.
11  Q.  Did you have any understanding that the research results
12  were going to somehow be sent to Hong Kong?
13  A.  No.
14  Q.  Did putting Eastern Profit into the contract at all change
15  the purpose of the agreement, in your view?
16  A.  No.
17  Q.  And so as of signing — let's just recap — what did you
18  understand the purpose of this agreement to be?
19  A.  The purpose was simply to put down in writing a general
20  idea of what we would do, the time frame for doing it, what the
21  deliverables would ultimately be, and what the payment schedule
22  would be.
23  Q.  What did you understand the purpose of the research to be?
24  A.  The purpose was explicitly that Mr. Guo was to provide
25  information for his whistleblower media campaign.

1  Q.  Would it have changed your planning or work if Lianchao, or

2  Guo, or Yvette had ever said the research was going to be used

3  in a specific proceeding or to investigate a specific crime?

4  A.  No.

5  Q.  Would it have changed your planning or --

6  A.  Pardon me, would you repeat that question?

7  Q.  Sure.

8          Would it have changed your planning or work if

9  Lianchao, or Guo, or Yvette had ever said the research was

10  going to be used for a specific crime or a specific proceeding?

11  A.  Yes, it would have changed my entire -- I wouldn't have

12  been interested in the agreement.

13  Q.  Would it have changed your planning or work if any of those

14  three — Lianchao, Guo, or Yvette — had ever said the research

15  was going to be used to recover specific property?

16  A.  We wouldn't have been interested in the agreement.

17  Q.  Why is that?

18  A.  Because this was a risky undertaking to incur the wrath of

19  the Chinese Communist Party leaders.  Bad things happen to many

20  people who cross the party like this.  So it was very risky,

21  and it was never in my own personal professional history.  I

22  don't care about -- it's not of interest to me to recover

23  things or work on legal cases.  It's in my political -- my

24  policy or my personal interests if you can take down the Soviet

25  Communist Party in a big way, let's move on to do the same way

Waller - Redirect

1    to the Chinese Communist Party.  So that was my interest.

2    Q.  Let's shift gears now, Dr. Waller, and talk about the work

3    itself.

4          Were there certain basic areas of research that were

5    going to be conducted?

6    A.  Yes.

7    Q.  What were those?

8    A.  Those were outlined -- they were formally outlined in the

9    agreement.  There were three.  The first was financial forensic

10   historical research, the second was current tracking research,

11   and the third was social media research.

12   Q.  And were there any parameters or restrictions on your

13   research that were not written into the contract?

14   A.  Well, one of them was we would not violate U.S. law.

15   Q.  And who did you have that understanding with?

16   A.  With Guo specifically.

17         He said that he was happy to tangle with the Chinese

18   Communist Party, but he doesn't want to tangle with the

19   American legal system, and I wasn't interested in breaking the

20   law in any way.

21   Q.  Now, let's talk a little bit more about the physical

22   aspects of this.  Let's get into the details.

23         Who was going to be doing -- as of this time, as of

24   early January, after the contract was signed, who was going to

25   be doing the actual work?

L4KKEAS1                          Walrer - Redirect

1    A.  I was the manager for the bulk of the initial deep-dive
2    research, so my job was to assemble and manage what we called
3    Team 1, which was a team of computer engineers and data
4    analytics engineers who would set up -- it was a ten-person
5    engineer team, where we later added a subject matter expert and
6    linguists, to run a 24/7 research operation, where we would get
7    our primary raw material.
8    Q.  Okay.  What did this -- first of all, where was this
9    research team going to be based?
10   A.  It would be based in Europe.
11   Q.  Did you know all the members of this team?
12   A.  No.
13   Q.  Was there a certain person who actually went and hired
14   them?
15   A.  Yes.
16   Q.  What was that person's role?  What was their title?
17   A.  He was somebody I knew, he was American, and he had worked
18   for a long time in that country.  So he put together that team,
19   and he had a computer background.
20   Q.  Now, what exactly -- so you mentioned computers.  What did
21   the team need to do its work?
22   A.  It needed an acquired set of ten high-speed computers and
23   related software, and then the peripheral material for that
24   necessary to do a data mining operation aimed at this
25   particular number of targets at the same time.

L4KKEAS1                        Waller - Redirect

1    Q.  What is a data mining operation?

2    A.  Data mining is where you take large amounts of commercially

3    available data, like a marketing company would do in the United

4    States, and you, quote, mine that data to determine networks of

5    people, social desires, like what kind of things they like or

6    don't like, travel habits, where they go, what types of

7    establishments they frequent, even financial data that's

8    available by subscription commercially, and you mine that in

9    order to hone in on -- to identify the networks, in this case,

10   of the people on the target list and to develop visual

11   renditions of that data to show patterns of behavior and

12   association, where they do their banking, where they travel,

13   and move their money, and so forth.

14   Q.  So, it may be a basic question, but is this coming just off

15   the regular internet like we can get off of Google here and

16   begin to data mine?  How does that work?

17   A.  No, no, it's by subscription.  So let's say the credit card

18   companies and banks sell all of our personal data to whoever

19   wants to buy them.  Practically anytime we make an online

20   purchase, or credit card purchase, or a banking transaction,

21   that's all recorded somewhere.  Some of it is private, but much

22   of it is not, and most customers don't realize that they're

23   waiving their privacy when they click I accept on the user

24   terms.  So this data is then sold and packaged to really almost

25   anybody who wants to subscribe to it.

1   Q.  Are you familiar with the term "the dark web"?

2   A.  Yes.

3   Q.  What is that?

4   A.  The dark web is a term for information that is available on

5   the internet where a lot of illicit activity takes place.  Some

6   of it's just a privacy-oriented nature, some of it is of a

7   nefarious or criminal nature.  But on the dark web, there's a

8   lot of commercial exchange of information as well.

9   Q.  Did Team 1 look for any information on this dark web?

10  A.  Yes.

11  Q.  Was that part of the data mining operation, or was that a

12  separate deal?

13  A.  That was to verify -- to verify what was on data mining or

14  to follow up on leads produced by data mining.

15  Q.  So you got the team, you got the computers.  What are some

16  of the peripheral other things that had to be purchased and

17  assembled for them to start working?

18  A.  They -- your standard security measures, both electronic

19  and physical.  There was a lot of travel, because these were

20  cash purchases made in three separate countries to prevent any

21  electronic tracing of the serial numbers of the devices with

22  the purchaser, if it was on a charge card or a bank card, and

23  then brought back to another country to actually be set up, and

24  then there was activity in a fourth country to get some other

25  electronic material for the purposes of camouflaging where the

1   actual activity was taking place.

2   Q.  Now, could you just communicate with these folks by email

3   or -- let's just say encrypted email or encrypted phone?

4   A.  No.

5   Q.  How did you have to get information to and from this team?

6   A.  On instructions of Mr. Guo, we could only exchange

7   information in person by exchanging USB drives.

8   Q.  Were there any precautions that had to be taken to ensure

9   that this team could do its work?

10  A.  Yes.  There was compartmentation to make sure that if any

11  link in the chain was broken, that it couldn't betray the other

12  links in the chain.  Again, this was to defend the interests of

13  the client and the safety of his family members in China.

14          And there was -- well, just the actual travel itself

15  was very onerous because you would have to -- it would take two

16  or three days to do a round trip, to stop what you're doing,

17  meet in a third location, and then exchange the data, and then

18  return back to the respective places to continue.  So that was

19  a very cumbersome process, so it's not like everything could be

20  done online or even by encrypted text.

21  Q.  Now, could Strategic know in advance what information it

22  was going to be able to successfully obtain on each of these

23  individuals?

24  A.  No.

25  Q.  Why not?

```
 1   A.  Well, first, because you never know what you're going to
 2   find.  You know you're going to find something, but then our
 3   researchers encountered a problem --
 4              MR. CHUFF:  Objection.
 5              THE COURT:  What's the basis?
 6              MR. CHUFF:  Hearsay and relevance.  He's about to
 7   testify about Team 1's experience investigating, and they're
 8   not here to testify, and their identities haven't been
 9   disclosed in this litigation.
10              MR. GREIM:  The question was --
11              THE COURT:  I think the question is fine, so the
12   objection is overruled.
13              The question is:  From your understanding, sir, just
14   taking it from your understanding, why could Strategic not know
15   in advance what information it was able to successfully obtain
16   on the individuals?
17              THE WITNESS:  Yes, your Honor.  It's also like from my
18   own academic background, one writes -- or one does research or
19   writes a dissertation based on things we don't know, and so we
20   don't know what information we're going to find until we put it
21   together and synthesize it.  So like any other research
22   project, we wouldn't know what we're going to find in advance.
23   BY MR. GREIM:
24   Q.  Now, as this work got underway, did you have concerns about
25   confidentiality of Team 1's research?
```

L4KKEAS1                        Waller - Redirect

1   A.  About keeping the research confidential?

2   Q.  About keeping their activity confidential.

3   A.  Yes.

4   Q.  What was that concern?

5   A.  Well, there were a couple of concerns.  First was premature

6   public release of the information.

7   Q.  What would be the danger of that?

8   A.  It could reveal the fact that certain things are being

9   researched or certain people are being researched, so that if

10  you're looking at someone who's doing something illicit or

11  subversive, then they could be tipped off that this is

12  happening to them, and they would take measures to prevent --

13  they would take countermeasures to prevent exposure.

14  Q.  Did Guo ever tell you that you or Strategic Vision was

15  actually being watched by the Chinese?

16  A.  He said to assume that we were.

17  Q.  Did he indicate that the Chinese embassy was watching

18  anyone?

19  A.  Yes, he did.

20  Q.  Did Guo, Lianchao, or Yvette ever tell Strategic's --

21  actually, strike that.

22          Did they ever tell you that the information that

23  Strategic Vision obtained would be given to a company called

24  ACA?

25  A.  No.

```
 1              MR. GREIM:  Your Honor, I'm getting ready to move on
 2       to a new topic.  I just wonder if this isn't a good time.
 3              THE COURT:  Why don't we take our midmorning break.
 4       We'll take ten minutes.  We'll reconvene at 11:30.  You should
 5       be back in your seats by 11:30.
 6              (Recess)
 7              THE COURT:  Dr. Waller -- is it Dr. Waller or
 8       Mr. Waller?
 9              THE WITNESS:  Whichever the Court prefers.  I have a
10       doctorate.
11              THE COURT:  You're reminded, sir, that you are still
12       under oath.
13              You may inquire.
14       BY MR. GREIM:
15       Q.  Dr. Waller, let me ask you, was it your understanding that
16       the number of total reports given to Eastern Profit was
17       predictable?
18              Let me strike that.
19              The number of reports that Strategic would give to
20       Eastern Profit in a given year was predictable in advance?
21       A.  Yes.  Well, it was averaged.  It would be averaged out in
22       advance.
23       Q.  So for each area of research, were different reports
24       required?
25       A.  Yes.
```

1   Q.   Different timing?

2   A.   Yes.

3   Q.   And different number of reports?

4   A.   Yes.

5   Q.   And who chose what types of research were done for each

6   individual subject or fish?

7   A.   The client would ultimately choose which areas that were

8   outlined in the contract would be done, but at first we were

9   just to see what we could find based on the methods that we

10  were creating at that time.

11  Q.   If a fish or subject was removed from consideration, would

12  Strategic have to start again with a new one?

13  A.   Yes.

14        MR. GREIM:  Let's pull up the agreement.  Let's put up

15  Exhibit 4.

16  Q.   By the way, whenever Strategic would take on a new subject

17  or replacement subject, would that require more or less work

18  than just keeping the subject that had just been jettisoned?

19  A.   That's starting cold each time with each change.

20  Q.   So would that require more or less work?

21  A.   That would be more work.

22  Q.   Would Eastern Profit -- I'm sorry, would Strategic be able

23  to recover extra for that from Eastern?

24  A.   No.

25  Q.   Why not?

1    A.  Because we agreed on a flat rate.

2    Q.  And what was the flat rate per month?

3    A.  The flat rate was $750,000 per month.

4    Q.  Do you recall testifying --

5            MR. GREIM:  Let's go to -- yes, let's stay on this

6    page.

7    Q.  If you go to the fourth paragraph, do you see it says, "The

8    pricing for 30 units or deliverables per year remains a

9    constant $9 million per year, or 750,000 per month, for 12

10   months"?

11   A.  Yes.

12   Q.  Did you understand that the units -- that each individual

13   unit or deliverable was not set in advance at the start of the

14   year?

15   A.  Yes.

16   Q.  And so if a subject -- if subject A had research on

17   financial tracking information for the first six months, and it

18   changed to subject Z with social media tracking for the next

19   six months, was that still one unit?

20   A.  Yes.

21   Q.  Now, earlier -- yesterday, do you remember testifying at

22   some point that the flat fee was $300,000 per month?

23   A.  Yes.

24   Q.  Now, did you have the agreement in front of you when you

25   said that?

1    A.  No.  I misspoke.

2    Q.  Your testimony is that it is not $300,000 per month for

3    anything --

4    A.  Correct.

5    Q.  -- is that right?

6              MR. GREIM:  Let's go to page 3.

7    Q.  Now, under "Price," the very first line there says the

8    price for each deliverable, A, B, or and C, are $300,000 each

9    per subject per year.  Do you see that?

10   A.  Yes.

11   Q.  Do you recall being asked about that before?

12   A.  Something to that effect, yes.

13   Q.  Did you -- let me take you now to the very last paragraph.

14             MR. GREIM:  Well, the last two.  Let's highlight both

15   of those.

16   Q.  Do you see where it says, "Therefore, when a fish is

17   removed from consideration, a new fish will be put in its place

18   by the client, keeping the number of fish being monitored at

19   any time at 10"?

20   A.  Yes.

21   Q.  Did I read that right?

22   A.  Yes.

23   Q.  Was that your understanding?

24   A.  Yes.

25   Q.  And then for each of the ten, there would be how many

1   subject matters for each?

2   A.  Three.

3   Q.  For a total of how many?

4   A.  Thirty.

5   Q.  And then in the first month, you were given how many fish?

6   A.  Fifteen.

7   Q.  But how many subjects for each one?

8   A.  Two.

9   Q.  For a total again?

10  A.  Thirty.

11  Q.  Nice job.

12          If you go to the very final paragraph --

13          THE COURT:  I'm sorry, what are the two subjects for

14  the first month?

15          MR. GREIM:  Your Honor, that's not in this agreement.

16  That is -- let me clear that up.

17  BY MR. GREIM:

18  Q.  So the 15 initial subjects and the two areas per subject,

19  is that in the research agreement?

20  A.  That -- I would have to reread the agreement, but it's on

21  the tasking list that the client gave us, which we already

22  discussed in the previous exhibit or an earlier exhibit.

23  Q.  Do you see -- actually, if you go to page 4, do you see it

24  says, "The first month, January, this contract will include up

25  to 15 fish"?

1    A.  Yes.

2    Q.  For a total of 30 reports?

3    A.  Yes.

4    Q.  So is that your understanding of the deal that was reached?

5    A.  Yes.

6    Q.  And was this early or late in the negotiations when this

7    was added in?

8    A.  This was later.

9    Q.  Let's go back to the third page.  Let me take you to the

10   last paragraph.

11        So, we just discussed this idea of moving fish in,

12   taking fish out, and you will see the very bottom says,

13   "However, this solution does not provide for predictable

14   budgeting or workloads."

15        Do you see that?

16   A.  Yes.

17   Q.  Was that Strategic's concern?

18   A.  Yes.

19   Q.  And was that discussed with Guo?

20   A.  Yes.

21   Q.  And then it says, "To ensure the maximum workload for

22   predictability of the agreed price, we will measure the

23   deliverables as 30 units per year."  Did I read that right?

24   A.  Yes.

25   Q.  Ten fish times three reports — A, plus B, plus C — each,

1   right?

2   A.  Yes.

3   Q.  And then it has an equals sign, and it says, "30

4   jobs/reports at any given time."  Did I read that right?

5   A.  Yes.

6   Q.  Did you understand that that was Strategic's obligation, to

7   be working on 30 jobs/reports at any given time?

8   A.  Per year, over a year.

9   Q.  Well, over the course of the year, but at any given time as

10  well, right?

11  A.  Yes, but starting up, we'd have to -- it was an

12  unpredictable starting up.  So you don't know until you've

13  actually begun what the load would be.

14  Q.  Did you have any understanding as to whether the $750,000

15  per month had to be paid each month?

16  A.  Yes.

17  Q.  Did it depend based on -- did it depend on how many reports

18  were actually delivered to Eastern under any of the categories?

19  A.  No.

20  Q.  What did it depend on?

21  A.  Well, I would have to reread the exact wording.  So do you

22  want the exact wording or my understanding?

23  Q.  Well, I just want your understanding.

24  A.  We would do the job for a flat rate of $750,000 a month,

25  with the understanding that for the first 90 days or so, it

L4KKEAS2                        Walter - Redirect

1    would be irregular because of the nature of starting up a big

2    research project.

3    Q.  And let me take you now to the very last page, page 5.  We

4    looked at this paragraph earlier regarding the million-dollar

5    deposit.

6              MR. GREIM:  Let's highlight that.

7    Q.  You see it allows for a credit of the deposit at the end of

8    the contract?

9    A.  Yes.

10   Q.  And is that credit based on the number of reports that

11   Strategic Vision completes?

12   A.  No.

13   Q.  What's it based on?

14   A.  It's based on the number of months worked or the amount of

15   time that the work was done.

16   Q.  By the way, we saw your text already with Lianchao Han

17   regarding the issues in the first 30 days and 90 days of

18   starting up.  Did you express those views about the difficulty

19   of startup and reviewing the quality of work with anyone else

20   on Guo's team before the agreement was signed?

21   A.  I raised it with Guo himself, and with Lianchao Han, and

22   with Yvette Wang.

23   Q.  What was Guo's response to you?

24   A.  Guo's response was do it as quickly as you can.  Lianchao's

25   response was, he understands the complexities of starting

1   something like that.

2            By this time, he's acting as Guo's agent to us, not

3   simply a helper or an ally.  He was Guo's designated

4   representative to us, so the interlocutor.  So he was telling

5   us he understood the complexities of starting this up and just

6   to also do -- see what we could get in the first hauls of

7   information.

8            Yvette Wang seemed to not understand this at all.

9   Q.  Okay.  Thank you, Dr. Waller.

10           Let's now move on to a topic we started to explore

11  earlier.  The contract had been signed, we talked about the

12  initial work that had to be done.  When did you actually

13  receive -- or did there come a time when you actually received

14  the subject names on a thumb drive?

15  A.  French Wallop received those names in early January — she

16  testified to that yesterday — and the thumb drives contained

17  malware or were contaminated somehow electronically, and there

18  was -- she had to go back up to New York to get a fresh set of

19  thumb drives.

20  Q.  I'll just stop you.

21           Did there come a time when you got your hands on those

22  yourself?

23  A.  Yes.

24  Q.  And then what did you do with them?

25  A.  So to erase any electronic metadata, I put -- I had bought

1    a computer that had never been attached to the internet and a

2    printer that had never been attached, and then printed out the

3    contents of that thumb drive, which was only that list as

4    contained in this previous exhibit, printed it out and then

5    scanned it, and then put it on a new encrypted drive to send to

6    Europe, to deliver to Europe.

7    Q.  Is there a name for something like that, a laptop that's

8    never been on the internet?

9    A.  We referred to it as a virgin laptop.  I don't know if

10   that's a technical term or not, but that was the closest thing

11   we could -- we just called it a virgin laptop, so it was

12   completely clean.  And we paid cash for the laptop, so there

13   could be no tracing of the purchase.

14   Q.  Now, we heard yesterday that the initial start date for the

15   contract became January 16th.  Is that your understanding?

16   A.  Yes.

17   Q.  I take it you handed them over to Team 1?

18   A.  Handed one over to Team 1.

19   Q.  Right.  And that was handed over in the U.S. or overseas?

20   A.  In the U.S.

21   Q.  Did you begin to learn what Team 1 was finding?

22   A.  After a few days -- and, again, we couldn't get immediate

23   results because we couldn't have any electronic transfer of

24   information apart from the vaguest messages that, hey, we're

25   setting up or we're proceeding, that type of thing.  So, I had

1    to make a trip to Europe to get the first status report.

2    Q.  Okay.  When did you do that?

3    A.  It is in my handwritten notes, and it's contained in the

4    receipts, but it was around mid-January.  It was about a week

5    or so after the contract officially began.

6    Q.  Would it help you to look at those notes?

7    A.  Yes.

8    Q.  Why don't you do that.

9            MR. GREIM:  Your Honor, can the witness approach that

10   binder?

11           THE COURT:  Yes.

12           MR. GREIM:  We don't need to publish these.

13           THE COURT:  But we should indicate for the record by

14   an exhibit number what the witness is looking at.

15           MR. GREIM:  That's right.  The witness is looking at

16   Exhibit 57.

17           THE WITNESS:  Okay.  We delivered the drive to the

18   Team 1 leader on January 24th, 2018, in the Washington, D.C.

19   area.  And it does not appear in these notes, but I went to

20   Europe at the client's insistence several days later.

21   BY MR. GREIM:

22   Q.  Well, do you recall making -- let's talk about that.  Let's

23   maybe work backwards from there.

24           Do you recall when you delivered the first initial

25   thumb drive to Eastern Profit?

```
 1   A.  Yes.

 2   Q.  When was that?

 3   A.  That was -- I'm correcting myself.  I received the drive

 4   from team leader one on January 24th.

 5   Q.  Very good.

 6           And where was that?  Overseas?

 7   A.  That was at French Wallop's house.

 8   Q.  I see.

 9           And when did you then deliver that on to Eastern

10   Profit?

11   A.  I informed Lianchao Han that day that we had the drive and

12   then made arrangements to provide it to Yvette.

13   Q.  Did you ultimately do that a couple of days later?

14   A.  Yes.  In New York.

15   Q.  Let's talk about that meeting with the Team 1 leader on the

16   24th.

17           First of all, I think you corrected yourself.  You did

18   not give him the names on the 24th, you received information

19   from him on the 24th?

20   A.  That's correct.

21   Q.  And this is the information you ultimately relayed to

22   Yvette Wang?

23   A.  Yes.

24   Q.  Is there anything that Team 1 leader told you that you did

25   not pass on to Lianchao Han or Yvette Wang?
```

```
 1   A.  Nothing material, no.
 2   Q.  Did you learn that Team 1 had had any difficulties in their
 3   first week of review?
 4   A.  Yes.
 5           MR. CHUFF:  Objection, your Honor; calls for hearsay.
 6           THE COURT:  Yes, the objection is sustained.  The
 7   witness can testify as to what he said to Yvette Wang, but not
 8   what he learned.
 9           MR. GREIM:  Okay.
10   BY MR. GREIM:
11   Q.  What did you -- let's start with Yvette Wang.  What did you
12   tell Yvette Wang -- first of all, did you tell Yvette Wang the
13   things you were telling her you had learned from Team 1?
14   A.  Yes.
15   Q.  Did you tell Lianchao Han the things you learned from
16   Team 1?
17   A.  Yes.
18   Q.  What did you tell Yvette Wang?
19   A.  I told her that Team 1 reported to us that --
20           MR. CHUFF:  Objection, your Honor.
21           THE COURT:  I'm receiving it, but not for the fact
22   that Team 1 actually said it to the witness.  So it's not
23   coming in for the truth, but there is a question in terms of
24   whether there was frustration of purpose, et cetera, in this
25   contract.  So it's coming in for that limited purpose, but if
```

1    you want to introduce evidence with respect to the difficulties

2    of the research, you're going to have to introduce it from a

3    person who has direct percipient knowledge.

4                MR. GREIM:  Understood.

5                What we're trying to establish is what was told to

6    Eastern about the work that had been done.

7                THE COURT:  So it's coming in not for the truth, but

8    for the fact that that's what was said to Yvette Wang.

9    BY MR. GREIM:

10   Q.  So, Dr. Waller, the question is:  What did you tell Yvette

11   Wang that you had learned from Team 1?

12   A.  It was a status report at first for material that couldn't

13   be related through a USB drive.  It was to show that they found

14   information that they verified not by computer means about --

15   to give a status report on what they found.  One of them was

16   locations of certain offshore companies, one involved the

17   passwords to a computer server run by Chinese Government, the

18   server for CITIC, C-I-T-I-C, securities, and ways to access

19   that server or not to.  It also included -- and that was a real

20   huge, huge --

21   Q.  Dr. Waller, let's just list these, and we'll go back

22   through them, okay?

23   A.  Okay.

24   Q.  So number one, we've got location of offshore companies?

25   A.  Uh-huh.

1    Q.  Second, we've got passwords to computer servers?  And we'll

2    come back to that.

3    A.  Uh-huh.

4    Q.  And then what else?

5    A.  That they had started work -- the team was orienting itself

6    on all 15 targets by just researching what could be found

7    publicly.  So if the researchers themselves could understand

8    their targets, know who they are, know what they -- how they

9    operated, and basically anything necessary to understand what

10   you're researching.  So this was all open-source, social media,

11   or other types of media, public domain material, and then their

12   own social media or related accounts, or those of others.

13            They said that there are gaps in place, they are

14   finding gaps in some of the information that -- that Yvette

15   Wang had provided us with those 15 names in this exhibit, and

16   that some of the names, they said, were misspelled in Mandarin,

17   that there was a -- a mass of invalid data that was hard to

18   absorb and map, but they were doing it, and their mapping, they

19   expect to come up with a hundred names and links very soon, but

20   their challenge was that they were being given false names.  So

21   of those 15 names, three to four of them were inaccurate names

22   or led to the wrong people.  So that's a big differential in

23   research if 20 to 30 percent of your names are not accurate.

24   Q.  Dr. Waller --

25            THE COURT:  Is the witness reading from a document

1  that's not in evidence?

2          MR. GREIM:  I was just --

3          THE WITNESS:  Pardon me.

4          MR. GREIM:  -- going to establish that.

5  BY MR. GREIM:

6  Q.  Dr. Waller, I see that you are -- as you're testifying,

7  you're looking at DX 57.

8  A.  Yes.

9  Q.  So, my question is:  Are these notes that you made when you

10 were talking to the Team 1 leader in the January 24th meeting?

11 A.  Yes.

12 Q.  And then did you use those notes in conferring with Yvette

13 Wang a few days later?

14 A.  Yes.  And with Lianchao that day.

15 Q.  Okay.  So, just so we're clear, you conferred with Lianchao

16 about the January 24th meeting on January 24th; you conferred

17 with Yvette Wang about that a couple of days later?

18 A.  When I saw her in person.

19 Q.  Both times, you used those notes?

20 A.  Yes.

21 Q.  And in reviewing the notes now refreshing your recollection

22 about what you said to Yvette Wang and Lianchao Han?

23 A.  Yes.

24         MR. CHUFF:  Objection.  I'm sorry, your Honor, I just

25 want to make sure that your ruling as to the admissibility also

1    applies to these notes as well?

2              THE COURT:  The notes haven't been offered yet, and I

3    think they're just being -- I hear them being used to refresh

4    recollection.

5              MR. GREIM:  They may well be offered.  I just want to

6    keep going along.

7    BY MR. GREIM:

8    Q.  Dr. Waller --

9              THE COURT:  But, sir, if you're looking at a document

10   to refresh your recollection, your job, as a witness, is, if

11   you don't remember without looking at the document, you can, at

12   your counsel's instruction, look at the document to see if it

13   brings back a memory.  If it brings back a memory, you should

14   testify to your memory, whether or not the memory is identical

15   to what's written on the document.  If it doesn't bring back a

16   memory even if you see it written on the document, then it

17   means your recollection hasn't been refreshed, and your answer

18   is, I don't have a memory.

19             Do you understand that?

20             THE WITNESS:  Okay.  Thank you.

21   BY MR. GREIM:

22   Q.  And, Dr. Waller, let me be clear, then.  Maybe I didn't go

23   my final step here.

24             Is your memory of your discussion with the Team 1

25   leader, and with Yvette Wang, and Lianchao Han refreshed by

1    reviewing these notes?

2    A.  Yes.

3           MR. GREIM:  I will move for the admission of -- we've

4    got -- of Exhibit 57 in evidence.

5           MR. CHUFF:  And, your Honor, I just ask that your

6    ruling apply to those notes as well.

7           THE COURT:  I'm going to be consistent in that I'm

8    going to receive the exhibit subject to the motion to strike,

9    and counsel will be aware that if there is a motion to strike

10   as to this, the testimony about the testimony will be stricken

11   if the exhibit is stricken.  So you're proceeding at your peril

12   in terms of making sure you've established a record.

13          MR. GREIM:  Well, your Honor, in that case, I'm not

14   going to -- I'm going to withdraw my moving this into evidence.

15   We're going to rely on the witness' refreshed recollection as

16   he reviews the document.

17   BY MR. GREIM:

18   Q.  So, Dr. Waller, let's -- we talked about four things that

19   you reported to Lianchao Han and Yvette Wang, Wang on the 24th

20   Han on the 26th.

21          Did you report them any concerns about Chinese

22   translators?

23   A.  Yes.

24   Q.  What did you tell them?

25   A.  Well, that Guo had specifically instructed that we not have

1   any speakers of Mandarin on the research team, which, of

2   course, made it a huge challenge to understand information that

3   was being recovered by the people in Europe.  So I conferred

4   with Lianchao, and -- after Team 1, and Team 1 was able to get

5   some retired European diplomats who spoke fluent Mandarin who

6   were not of Chinese background, because Guo's idea was that so

7   many ethnic Chinese might be spies for the CCP.  That satisfied

8   Lianchao acting as Guo's agent, so the Team 1 went and retained

9   one and then a second linguist.

10  Q.  So two linguists were retained for Team 1 as a result?

11  A.  Yes.  And a subject matter expert who understood the

12  Chinese Communist Party's control structure and financial

13  networks.

14  Q.  When were those ultimately retained?

15  A.  Immediately following that meeting with the Team 1 leader

16  when he was still in town, I gave him instructions to go back

17  and to employ them.

18  Q.  When you told Lianchao Han that three to four of the names

19  were fake or misspelled, what did he tell you in response?

20  A.  He agreed that there were three or four names that were

21  wrong on that list.

22  Q.  How much time had already been spent, up to that point, on

23  data mining for those three or four names?

24  A.  A good week.  A good week anyway.

25  Q.  Let's go to the first issue here that you mentioned, the

1   location of offshore companies.

2          What about that did you tell Yvette?

3   A.  I said they located offshore companies that Mr. Guo had not

4   identified to us and asked if that would be of interest.

5   Q.  Where were they?

6   A.  The one I recall offhand was in Turkey.

7   Q.  Were they offshore companies of one of the subjects?

8   A.  Yes.

9   Q.  So, what was Yvette's response?

10  A.  She gave no instruction at all and just said this isn't

11  good enough.

12  Q.  Were there any other offshore companies that you reported

13  to Lianchao or Yvette in this first set of meetings?

14  A.  If I recall correctly, there were Cayman Islands companies

15  and other Caribbean companies, some of them which Guo had

16  identified to us in general in our personal meetings with him

17  and some of them that the Team 1 had discovered on its own, or

18  evidence of them that Team 1 had discovered on its own.

19  Q.  What was Yvette's response to that disclosure?

20  A.  It was all junk.

21  Q.  What about Lianchao Han?

22  A.  He said these are good leads, keep working on them.  They

23  were only leads.

24  Q.  Is there anything else in this first category that you

25  informed Lianchao or Yvette about in the first set of meetings?

1  A.  The first category of subjects or --

2  Q.  Yes.

3  A.  The biggest one was the access to the Chinese Government's

4  own, we call it, treasure house, they're CITIC.

5  Q.  We'll come to that.  That's our second category.

6          I take it, then, you can't recall anything else from

7  the first --

8  A.  Offhand, I can't.

9  Q.  Do you recall anything about Panamanian companies?

10  A.  Yes.

11  Q.  Was that in this first meeting or the later one?

12  A.  That was the later one.

13  Q.  We'll come back to that later.

14          Let's talk about -- you had indicated -- you said

15  CITIC.  Is that the Chinese Government itself or a separate

16  company?

17  A.  Yes, it's a 100 percent state-owned company of the Chinese

18  Government that's run by Chinese Communist Party officials.

19  Q.  So why did you have Team 1 looking at CITIC?

20  A.  That was a target of opportunity that we found.  We had

21  discovered it.  It was also an object of interest to Guo, but

22  it was not in the contract, but because of its colossal

23  importance, we went and reported back, hey, we have access to

24  this Chinese Government server, and then we asked for guidance.

25  Q.  Now, why did you have to ask for guidance?  Why not just go

L4KKEAS2                    Walfer - Redirect

1    in?

2    A.  Well, there were two ways to do it on a foreign -- if it

3    was -- first, if it was a private server, we wouldn't have done

4    this, but it's a government server.  The first one is to lay

5    low and wait until you can find a way to get in through one of

6    the people that you're watching.  You can watch them access

7    their email accounts on this server, and then get in.  And,

8    that way, you can go in without detection.

9          The second way is what's called a brute force attack.

10   It's a hacker's term, which is, you know, just the way it

11   sounds, but what that does is it sounds alarms on the server,

12   causes the system either to shut down or erects new security

13   protocols to prevent anyone from getting in, and then alerts

14   the leaders of the entity, or at least the IT security people,

15   to realize that someone's trying to access the server.  That

16   would defeat the whole purpose of trying to find out the

17   information that was in there by these targets.  So --

18   Q.  Let me stop you.

19         So did you advise Yvette Wang about those consequences

20   of each option?

21   A.  Yes.

22   Q.  Did you ask -- I take it you asked her for guidance on

23   which one to do?

24   A.  Yes.

25   Q.  And what did she say?

1   A.   She said go ahead and do the brute force attack.

2   Q.   Okay.  Did she go do it?

3   A.   No.

4   Q.   Why not?

5   A.   Because it was in -- in conferring with Lianchao, it was in

6   the interests of the client to -- to make sure you could get

7   the information, not to shut down the means of breaking --

8   breaking to get information.

9            I also went and asked permission for a legal review in

10  the country in question to make sure this was legal in that

11  country.

12  Q.   Did you pay for that legal opinion?

13  A.   Yes.

14  Q.   Is that the legal opinion that Ms. Wallop referenced

15  yesterday?

16  A.   Yes.

17  Q.   Ultimately, then, did you take any steps, after talking to

18  Lianchao, to go around Yvette and try the low-key approach with

19  the CITIC server?

20  A.   Yes.  Acting with his assent, Lianchao's assent, in the

21  interests of the client's longer term goals, we did not do what

22  Yvette insisted on.

23  Q.   Did you ultimately gain access to that before the contract

24  was terminated?

25  A.   No.

1  Q.  Let's go to the third category.  You indicated that social

2  media pages were pulled for all 15 targets?

3  A.  Yes.

4  Q.  And I probably didn't appropriately characterize your

5  testimony, but let me just ask you:  Were there any targets

6  left out of that review?

7  A.  There were some who didn't have social media accounts.  And

8  some, if you look at how social media is defined in the

9  agreement, it's not all social media as we understand the term,

10  it's other online media, some information was either

11  conflicting or unavailable.

12  Q.  Well, now, what about -- you testified that three or four

13  were fake names?

14  A.  Yes.

15  Q.  Was information found on them?

16  A.  On different people, with similar names or identical names.

17  Q.  I see.

18       Now, when you mentioned the fake names to Yvette, did

19  she promise to go back and get you replacement names or -- let

20  me just ask you, what was her response?

21  A.  She said our team was incompetent; she's not going to put

22  up with this garbage.

23  Q.  Now, this social media research, is that what was actually

24  on the thumb drive that you got from Team 1 the first time?

25  A.  The first time, yes.

1   Q.  And if you were to put it into a computer, how would it

2   display?  How would you be able to see it?

3   A.  Part of it was organized in folders, and part of it was

4   not, and it was so there were 15 folders of each of the

5   different individuals on the target list.  But this was the

6   only -- and I advised the client in advance, all it was was

7   advance research for the purposes of Team 1 understanding who

8   their targets were.  So it wasn't a deep-dive research that was

9   needed, but it was the foundation on which the social media

10  research would be built.

11  Q.  Now, you said you picked this up on the 24th from the

12  Team 1 leader in Virginia?

13  A.  Yes.

14  Q.  And he'd have to come here from oversees; is that right?

15  A.  Yes.

16  Q.  The contract started on the 16th, correct?

17  A.  Yes.

18  Q.  Did you have any understanding as to the cutoff date for

19  that first thumb drive?  In other words, when did it have to be

20  loaded onto the thumb drive for him to come over here and give

21  it to you on the 24th?

22  A.  It would have to be the day previous.

23  Q.  I'm sorry?

24  A.  It would have to be the day previous to his arrival in

25  Washington.

1   Q.  Well, when did he arrive in Washington?

2   A.  He arrived the day of that meeting.

3   Q.  Now, did Lianchao indicate whether he communicated this

4   information on to Guo?

5   A.  Yes.

6   Q.  Did he tell you what Guo's response was?

7   A.  Yes.  He said Guo was angry, and we're all incompetent and

8   trying to rip him off.

9   Q.  Did Lianchao give you at least replacement names for the

10  three or four that were fake or misspelled?

11  A.  No.  We requested them, but they never came.

12  Q.  You know, I forgot to ask you, going back to my question

13  about what was on the computer screen, so you said that some of

14  the information was arranged in folders for the different

15  subjects, but was there other information that was not in a

16  specific folder?

17  A.  Yes.  Some of the -- anytime you do a dive for information,

18  you're going to come up with things that are -- they still need

19  to be sorted out before you put them in folders.  The purpose

20  of the folders was to account for which, quote, fish would go

21  with which individual on the list, and that would establish the

22  accounting system for the work product ultimately.  This was

23  just the foundational part of it, to make sure the client

24  approved of the method of keeping track.

25  Q.  By the way, did you hang on to another copy of that USB

1   drive?

2   A.  No.

3   Q.  So you gave the only copy to Eastern?

4   A.  Yes.  That was at their request.

5   Q.  Did the information on this first drive include any of the

6   data mining results?

7   A.  No.

8   Q.  Is there anything else that you communicated to Yvette or

9   Lianchao in this first -- after this first meeting with the

10  Team 1 leader?

11  A.  Yes.

12  Q.  What else?

13  A.  One of the issues was that they discovered that the

14  passport of one of the people on the list, it was a non-Chinese

15  passport of a NATO ally, was a counterfeit passport, and this

16  was established through the checks that -- the electronic

17  research that Team 1 did, and then the Team 1 leader brought it

18  to the embassy of the country in question, and talked to their

19  intelligence station chief and said, hey, we found this

20  passport, we think it's false.

21          That developed intense interest by this allied

22  intelligence officer, who then thanked the Team 1 leader for

23  discovering what, indeed, was a false passport.  So I

24  referred -- I informed both Lianchao and Yvette Wang to this

25  effect, and, again, it's not something that you would get from

1  data mining, this was physically going to another embassy.  And

2  this was a great find because it shows how we've got a

3  Communist Party person violating Communist Party rules by

4  having a non-Chinese passport.

5  Q.  What was Lianchao's response?

6  A.  He thought it was great and thought we should keep moving.

7  Q.  Did you?

8  A.  Yes.

9  Q.  Now, is there anything else from this first meeting?

10  A.  I'm sure there are, but without referring to my notes, I

11  can't recall.

12  Q.  Well, this is our time right here, so I'm --

13          THE WITNESS:  May I?

14          THE COURT:  Yes.

15          The record should just reflect that the witness is

16  looking at his notes — you'll tell me the exhibit numbers — to

17  refresh his recollection.

18  BY MR. GREIM:

19  Q.  Mr. Waller, are you turning again to Exhibit 57?

20  A.  Yes.

21          Oh, pardon me, they found -- I don't see it here in

22  these notes yet, but I was just reminded, they found -- Team 1

23  found that there were other -- someone else online that seemed

24  like various individuals or groups were searching for the same

25  names at the same time, and some of these deep-dive searches.

```
 1          So Team 1 was concerned of two things:  First, are

 2     they -- they asked are there competitive teams to -- that are

 3     part of this project, and because if Team 1 persisted in its

 4     searches, it would risk detection or it could risk

 5     electronically compromising those other research teams if the

 6     Chinese intelligence services were looking for this type of

 7     research to be done.

 8          They stopped their research to ask for instructions to

 9     make sure it would be safe and not compromise Mr. Guo's project

10     for them to go ahead.

11     Q.  Did you convey that question on, then, to Yvette and

12     Lianchao?

13     A.  Yes.

14     Q.  What was Yvette's response?

15     A.  She said to go ahead.

16     Q.  What was Lianchao's response?

17     A.  He -- I don't recall his exact response.  I remember him

18     saying he would check, but I don't remember if he also told us

19     to go ahead.

20     Q.  Did either of them confirm whether Mr. Guo did, in fact,

21     have other competing teams looking into the same subjects at

22     the same time?

23     A.  Mr. Guo had told us personally in advance that he had other

24     teams.

25     Q.  But did either Yvette or Lianchao confirm when you raised
```

Waller - Redirect

1   the question?

2   A.  Well, I believe Lianchao said he thought he did.  I mean,

3   there was room for caution in the response, but Yvette said to

4   go ahead anyway.

5   Q.  So, did you instruct Team 1, then, to go ahead and keep

6   reviewing?

7   A.  Yes.

8   Q.  Do you know how long Team 1 was down in their research

9   because of that?

10  A.  Well, it would take at least two days for the Team 1 leader

11  to return -- get the answer from here, return back to the

12  country, and then convey that to the team.

13  Q.  Okay.  Dr. Waller --

14  A.  There was one other piece of data that was important as

15  well, and that was that Team 1 detected who the client was.

16  Q.  I'm sorry, Team 1 detected who the client was?

17  A.  Yes.

18  Q.  And by client, who do you mean here?

19  A.  They detected Guo Wengui.

20  Q.  How did they do this?

21  A.  Well, we took measures to make sure that no one knew who

22  the client was, again, to protect Mr. Guo's identity and his

23  interests.  They found that they -- and it was explicit with

24  Team 1 that we would not say who the client was.  The team

25  leader came back and said:  Is your client a guy named Guo

1    Wengui, or Miles Kwok, or Miles Guo?

2              We said:  Why do you want to know?

3              They said:  A lot of the information already exists

4    online, and it traces exactly back to him and his operation.

5    Q.  Did that concern you?

6    A.  It was very concerning because one of the items was a

7    portion of the very document shown in the exhibit with Anita

8    Suen's name on it.  The first person on that list of 15, that

9    exact image was already existing online as part of Guo's

10   previous media operations.

11   Q.  Now, you say the image.  Was it the full page or just her

12   picture?

13   A.  It was the full page with the text, the same text, the same

14   color, the same fonts, everything.

15   Q.  Now, what had Guo told you about this PowerPoint?

16   A.  Guo said it was extremely secret and it cost a fortune to

17   produce.

18   Q.  Did he tell that you it was okay to share that publicly?

19   A.  No, never.

20   Q.  So, after you learned this from Team 1, what did you do?

21   A.  I informed Lianchao, and I informed Yvette Wang.

22   Q.  And what was Yvette Wang's response?

23   A.  She said don't worry about it.

24   Q.  What about Lianchao?

25   A.  He was very concerned.

1  Q.  Based on his response, did you believe he had understood

2  the same as you about the confidentiality of the slides?

3  A.  Yes.

4  Q.  So, did you make any response to Team 1, then, after

5  talking to Lianchao and Yvette?

6  A.  I just said keep going.  I didn't confirm or deny who the

7  client was.

8  Q.  So, is there any other information you gave Yvette or

9  Lianchao after the first Team 1 meeting?

10  A.  May I refer to my notes?

11  Q.  Sure.

12          MR. GREIM:  The witness is looking at DX 57.

13          THE WITNESS:  They compared this to sucking up sand,

14  this information collection effort, which was not a complaint,

15  it was just an expression of how, instead of finding a mother

16  load of something of great value, right away you have to vacuum

17  up a whole lot of electronic sand.  They requested further --

18  BY MR. GREIM:

19  Q.  Now, hold on, Dr. Waller.  My question is about what you

20  told Yvette --

21  A.  Yes.

22  Q.  -- and Lianchao.

23  A.  Yes.  And they requested we ask the client for some more

24  specific data to help them narrow things down and speed things

25  up.

1    Q.  What more specific data did they say they needed?

2            Well, let me ask you this:  What more specific data

3    did you tell Yvette and Lianchao?

4    A.  They needed -- they requested an analytical document to

5    help them understand greater context of what they would be

6    looking for, so they wouldn't just be vacuuming up sand.

7    Q.  What was Yvette's response to that?

8    A.  Basically more of the same.  If this is such a great team,

9    why are they so incompetent.

10   Q.  And Lianchao?

11   A.  Lianchao understood exactly, and he kind of shrugged.

12   Q.  By the time you spoke with Lianchao, you had already spoken

13   with Yvette; is that right -- no, it's the other way around,

14   you spoke to Lianchao first?

15   A.  I spoke to Lianchao first.

16   Q.  Have we exhausted the first set of meetings with Yvette and

17   Lianchao to the best of your recollection here today?

18   A.  To the best of my recollection, yes.

19   Q.  Okay.  Did there come a time that you got a second USB for

20   delivery?

21   A.  Yes.

22   Q.  And when was that?

23   A.  That was just a few days later.  Yvette was very impatient,

24   wanted more information, and insisted that I go and retrieve

25   the next USB drive of information.  That was just within two or

L4KKEAS2                    Walter - Redirect

1   three days.

2   Q.  So what did you do to retrieve the second USB drive?

3   A.  So I flew to Ireland.

4   Q.  Okay.  And did you meet someone there?

5   A.  Yes.  I met the Team 1 leader there.

6   Q.  What did you get from him?

7   A.  I got a USB drive from him, where he had informed me, in

8   advance, of the basic nature, so we could communicate vaguely

9   on encrypted self-destruct text messages.  So he said we got a

10  lot of encrypted material that we haven't decrypted yet, so if

11  you come and get it, it's not going to be of value until we

12  decrypt it.  I informed this to Yvette Wang.

13  Q.  Were these the data mining results?

14  A.  This was -- no, they hadn't been completed yet because of

15  the nature of the time it takes to do.  This was about 80 lines

16  of encrypted code, computer code.

17  Q.  Where had it come from?

18  A.  It was from the dark web.

19  Q.  So did you inform Yvette Wang of this before you flew to

20  Dublin to get it?

21  A.  Yes.

22  Q.  And what was her response?

23  A.  She said she didn't care, she just wanted me to go get it.

24  Q.  So you did that?

25  A.  Yes.

1   Q.  Is this a drive you delivered to her in Penn Station?

2   A.  Yes.

3   Q.  On what date was that?

4   A.  It was one of the last couple of days of January.

5   Q.  Dr. Waller, what was on that drive?

6   A.  Yes.  It was only encrypted text that was illegible.

7   Q.  Now, were any lines or parts of that code potentially of

8   use?

9   A.  Yes.

10  Q.  What part?

11  A.  Team 1 told us that there were 16 lines of code among the

12  80,000 lines of code that would be usable.

13  Q.  And what did -- how did Team 1 convey to you it would be

14  usable?

15  A.  They consisted of encrypted email addresses and passwords

16  of Communist figures on Guo's list.

17  Q.  So among the subjects?

18  A.  Yes.

19  Q.  Now, you said there were 16.  We know that three or four of

20  the names were fake.  So, did you find the fake names as well,

21  or were there others?

22  A.  I don't know.  There were 16 lines of code, not 16 people.

23  Q.  So did you convey this to Yvette?

24  A.  Yes.

25  Q.  What was her response?

1  A.  She said to go and get it anyway.  So I went back --

2  Q.  I'm sorry, did you convey the 16-line information?

3  A.  Yes.

4  Q.  The 16 lines?

5  A.  Yes.

6  Q.  What was her response to that?

7  A.  She said it's all junk.

8          THE COURT:  How do you convey 16 lines of code?

9          MR. GREIM:  Well, your Honor, let me ask a better

10  question.

11  BY MR. GREIM:

12  Q.  Did you convey the information about the 16 lines of code

13  to her?

14  A.  Yes.

15  Q.  And you actually handed her the flash drive?

16  A.  Yes.

17  Q.  There was no -- was there any way that Yvette herself could

18  use the 16 lines of encrypted code?

19  A.  Not to my knowledge.

20  Q.  Did you tell her that Team 1 was working, though, on the 16

21  lines?

22  A.  Yes.

23  Q.  And did you tell her what they were doing with it?

24  A.  Yes.  I said they told me that it would take about,

25  roughly, six days each to decrypt each email address and

1    password.  So it was not six consecutive days for all six, but
2    they could all be done simultaneously, but it would take about
3    six days.
4    Q.  And you retrieved that information -- let me ask you this:
5    What was the actual day you retrieved the information in
6    Dublin?
7    A.  I want to say January 30th.  It might have been a day
8    before, but January 29th or 30th.
9    Q.  And the person who met you there had themselves traveled
10   from somewhere else in Europe?
11   A.  Yes.
12   Q.  So, do you know when the information had been -- let me ask
13   you this:  Did the Team 1 leader tell you when the information
14   had been loaded on to the drive?
15   A.  It would have been that morning, when I arrived in Europe.
16   Q.  So, at this point, we're, what, 13 days into the contract?
17   A.  Yes.
18   Q.  And did you express any concerns to the Team 1 leader that
19   they weren't working fast enough?
20   A.  I expressed the client's concerns that they weren't working
21   fast enough, and this person's a computer engineer, and he was
22   incredulous that it's simply not humanly or technically
23   possible to work faster.
24   Q.  Did you tell that to Yvette Wang?
25   A.  I conveyed -- yes, something to that effect, yes.

1    Q.  Is there anything else that you learned from the Team 1

2    leader on January 30th that was different from your

3    January 24th meeting?

4    A.  Different?

5    Q.  Or in addition to?

6    A.  Probably.  I don't recall.

7    Q.  Well, earlier you mentioned the Panamanian issue.  Is this

8    when you learned that information?

9    A.  No, this was -- they found a connection, but this related

10   to Team 2, where there was actual -- a large amount of

11   material, but they also did find a connection with a series of

12   Panamanian front companies.

13   Q.  Let me stop you.  We'll come back to that later.

14          Did you have messages with Yvette Wang about the work

15   that you conveyed to her with these first two drives?

16   A.  Yes.

17          MR. GREIM:  Can we put up -- let's start with

18   Exhibit 21.

19   Q.  And, Dr. Waller --

20          THE COURT:  Can I ask a question, Mr. Greim?

21          MR. GREIM:  Sure.

22          THE COURT:  On the research agreement, there's a

23   provision, remember, that says there will be a single line of

24   communication between the contractor and the client.  The

25   individuals through which such communication will be made will

1  be identified upon the initiation of the contract.

2            Who was it that Eastern identified as the line of

3  communication for them?  And how did they identify that person?

4            THE WITNESS:  It alternated between Lianchao Han, who

5  lived near us in the Washington, D.C. area, and so we could

6  just visit him that day within minutes, and Yvette Wang, up

7  here in New York.

8            THE COURT:  I mean, I understand those are the people

9  you communicated with.  My question goes to:  Who from Eastern

10  Profit conveyed who the line of communication was going to be,

11  and what did it say?  Or maybe there wasn't such a --

12            THE WITNESS:  Yes.  Yvette Wang said it in writing on

13  one occasion that I recall in a text.  But, previously, it was

14  dealing directly with Lianchao, who talked to Mr. Guo, where

15  Yvette Wang wasn't part of it.  So we were working directly

16  through that -- through Lianchao Han as the interlocutor with

17  Guo.

18            THE COURT:  And then Yvette Wang subsequently sent a

19  message that said what?

20            THE WITNESS:  Later on, we were instructed at a lunch

21  at Guo's house, at his residence, in roughly the third week of

22  January, that we would work only with Yvette Wang, and then

23  subsequently on the 30th or so of January, in a text message,

24  Yvette instructed me to only work with Lianchao.

25            THE COURT:  Okay.  Thank you.

1   BY MR. GREIM:

2   Q.  Let's talk about that.  Let's just pick up on that,

3   Dr. Waller, and cut forward here a little bit faster.  Let's

4   talk about that meeting at Mr. Guo's apartment.

5           What did Mr. Guo say at that meeting?

6   A.  At which meeting?

7   Q.  The meeting that you just referenced in response to the

8   Court's question.

9   A.  He --

10          THE COURT:  And when was this meeting?

11          THE WITNESS:  This was sometime in the third week of

12  January.  I want to say the 24th, roughly, but I'm not quite

13  positive of the date.

14          THE COURT:  Okay.

15          THE WITNESS:  I'm sorry, could you --

16  BY MR. GREIM:

17  Q.  What did Mr. Guo say at this meeting?

18  A.  It was at a lunch with French Wallop, Mr. Guo, Yvette Wang,

19  and myself, and she related the instruction in Mr. Guo's

20  presence that she would be the sole interlocutor.

21  Q.  What did Mr. Guo say about the results at that meeting?

22  A.  He was very upset.  It was during that meeting, he was very

23  upset that we hadn't come up with the mother load of material

24  right away.

25  Q.  And what did you tell him?

1   A.  We tried to explain to him the way that it was all being

2   set up.  We hadn't expressed -- we hadn't told him face to face

3   before, we only had through Lianchao or Yvette, and he was

4   still very angry and said that he wanted the information now.

5   Q.  Let's look now at Exhibit 21.  If you look at -- I'm sorry,

6   Exhibit 20.  I apologize.

7          If you look at -- first of all, do you recognize

8   Exhibit 20?

9   A.  20 is -- it looks like a text exchange.  That's my handle

10  on Signal, Pyratz.  And I don't see the other pages, but it

11  looks like the communication with Yvette.

12         MR. GREIM:  I would ask the witness, it may be easier

13  with these exhibits to use the binder in front of you, so you

14  can flip back and forth.

15         THE WITNESS:  Which exhibit number again?

16  BY MR. GREIM:

17  Q.  20.

18  A.  Okay.  Yes, this is communication between Yvette Wang and

19  me.

20  Q.  Do you recall trying to explain to Yvette the reason for

21  the reports that you had made to her so far?

22  A.  Yes.

23  Q.  And do you recall trying to explain to her that you

24  expected to find longer term, but not necessarily immediate

25  results?

1   A.  Yes.  That was understood from the very start.

2   Q.  Is that what you're communicating on the first page of

3   Exhibit 20?

4   A.  Yes.

5   Q.  And then you see her response the next day, she says -- or

6   the next message, "He said the biggest problem is that your

7   people didn't even find the door after ten days, not mentioned

8   about entering the door."

9           Do you see her concern there?

10  A.  Which page was this?

11  Q.  Just the very next page of Exhibit 20.  Her response to

12  your statement.  It should say 263 at the bottom.

13  A.  Yes.

14  Q.  By the way, did you understand who she's speaking on behalf

15  of here when she says "he"?

16  A.  Yes.  Guo Wengui.

17  Q.  That was not Han Chunguang, to your understanding, was it?

18  A.  No.

19  Q.  Did you have concern at this point about the relationship

20  of the parties?

21  A.  Yes.

22  Q.  What was your concern?

23  A.  Well, we had now -- we had two points of contact that

24  conflicted with one another, we had both designated by Mr. Guo.

25  One was Yvette Wang; the other one was Lianchao Han.

```
 1              Lianchao understood, really, everything.  He
 2    implicitly understood it, and he -- and he understood the
 3    details.  She seemed not to understand any of the details, but
 4    was just demanding information that we told them was literally
 5    impossible to produce in the startup time period.
 6    Q.  Did Ms. Wang tell you whether she had any experience with
 7    research projects like this?
 8    A.  No.
 9    Q.  Did she seem to have experience with research projects?
10    A.  Not at all.
11    Q.  Do you recall her, during this exchange at some point,
12    telling you that a big budget was ready, and that investors
13    could pay you even without a contract?
14    A.  Yes.
15              MR. GREIM:  Can you pull up Exhibit 21, please.
16    Q.  Unfortunately, we have a chain that was produced to us in
17    these clips like this, but I'm just going to direct you.  You
18    see in gray at least a clip of your response, one of your
19    messages to her?
20    A.  Yes.  Mine is light gray.
21    Q.  And then she's in dark gray?
22    A.  Yes.
23    Q.  And you see she tells you, "Yes, as you know, big budget is
24    ready for this long-term project.  The investors can even pay
25    your team without contract"?
```

1    A.  Yes.

2    Q.  What was your reaction to receiving that message from her?

3    A.   It was twofold, because a lot of our work with Guo was

4    understood in our conversations, and we would just go ahead and

5    do it, but we still needed it within the framework of a

6    contract to ensure payment.  This was the first time we had

7    heard anything about or that I had heard anything about

8    investors and something outside the contract.

9    Q.  Did you ever ask her who the investors were?

10   A.  Yes.

11   Q.  What did she say?

12   A.  She refused to say.

13   Q.  Let's go to the next page, the rest of her response.

14   You'll see, it says, "But the investors would not continue to

15   spend money on the things they don't need, for instance, the

16   things of today."

17          Now, Dr. Waller, was this the day you had given her

18   that second drive?

19   A.  Yes.

20   Q.  And then she says, "Checked with them.  We have 20 days to

21   update them two to three times, hopefully with the financial

22   and tracking results agreed in contract.  Even partly, but

23   please be correct.  Without above, the investors could not move

24   to second month with us, and hard to do future with us, I'm

25   afraid."

1   Do you see that?

2   A.  Yes.

3   Q.  What was your reaction to that?

4   A.  Well, first of all, it told me that she somehow understood

5   and accepted the complexities involved with the startup saying

6   we have another 20 days to update whoever it was that was being

7   updated.  But the second one was disturbing because she said

8   that without that precondition, quote, the investors could not

9   move to a second month, which put an end to something, but it

10  was just more of a hypothetical, but it was still a warning

11  sign.

12  And I accepted that as the client showing they

13  expected something more, but they were definitely giving us

14  another 20 days to begin producing more to their satisfaction.

15  Q.  When were you expecting the first payment on the contract?

16  A.  On the 15th of February.

17  Q.  And how much was that supposed to be under the contract, to

18  your understanding?

19  A.  That was supposed to be $750,000.

20  Q.  And so was Strategic Vision counting on that payment to

21  continue paying its teams?

22  A.  Yes.

23  Q.  I should say its team?

24  A.  Yes.

25  Q.  Did you have any concern that the contract may get

1    prematurely terminated around this time?

2    A.  No, we were not expecting it.  We were not expecting it to

3    be terminated because we expected to resolve the issues.

4    Q.  Let me take you to Exhibit 22 now.

5            Do you see there -- and, again, is this a message from

6    you to Ms. Wang?

7    A.  Yes.

8    Q.  And you say, "There was a disconnect we need to resolve.

9    Our understanding was that the first 90 days would be for

10   starting up and developing the data, with regular reports to

11   him, so he can: (1) see the progress, and (2) critique the work

12   so we can make necessary adjustments."

13           Did I read that right?

14   A.  Yes.

15   Q.  And was that your consistent understanding from negotiation

16   through performance?

17   A.  Yes.  Including face to face with Mr. Guo.

18   Q.  And do you see next, you say, "We did not understand that

19   he expected actionable data in the first days or week"?

20   A.  Yes.

21   Q.  "Had we understood this, we would have told him that that

22   is not how it works in our experience."

23           Did I read that right?

24   A.  Yes.

25   Q.  Was that true?

1   A.  Yes.

2   Q.  So you say, "So this is something that needs to be resolved

3   fast," right?

4   A.  Yes.

5   Q.  Now, was it resolved fast?

6   A.  No.  We addressed it fast, and we produced results fast,

7   but it wasn't resolved fast.

8   Q.  What did you -- did you make any changes in the

9   investigation work after this exchange?

10  A.  Yes.

11  Q.  What did you do?

12  A.  We retained a different group in the United States to

13  research using very different methodologies.

14  Q.  By the way, I'm sorry, I skipped ahead a little too fast,

15  Dr. Waller.

16         MR. GREIM:  Exhibit 23, please pull that up.

17         THE COURT:  I assume you're going to offer them at

18  some point?

19         MR. GREIM:  I will.  I'm just going to do the whole

20  sling here.

21  BY MR. GREIM:

22  Q.  Do you see in Exhibit 23, Ms. Wang says, "Once again, I

23  apologize for the straightforward translation of comments

24  above.  To be honest to each other, this is the only way to

25  make the project happen.  I hope you could share the same

1    feeling with us.  Thank you."

2              Did I read that right?

3    A.  Yes.

4    Q.  And then your response:  "Good to know.  The reports are

5    not actionable, but to show how the work is being executed,"

6    and then you go on?

7    A.  Yes.

8    Q.  Was that your belief at that time?

9    A.  Yes.

10   Q.  You indicated you were starting cold?

11   A.  Yes.

12   Q.  What did you mean by that?

13   A.  Meaning we had no corporate structure.  We were not an

14   existing -- we had no corporate structure to do this kind of

15   work, that we had to create the teams from the start, which is

16   what was part of our negotiations with Mr. Guo.

17   Q.  Did you then ask for a meeting with Guo after the 30th for

18   him to give guidance on whether to continue with the current --

19   on whether to provide guidance?

20   A.  Yes.

21   Q.  Did that meeting happen?

22   A.  No.

23              MR. GREIM:  Now I move the admission of Exhibits 21

24   through 23.

25              THE COURT:  I take it no objection as to the

1  authenticity or the timing of each of these?

2          MR. CHUFF:  None, your Honor.

3          MR. GREIM:  I'm sorry, I wanted to add 20.

4          THE COURT:  So, those are received subject to the

5  motion to strike.

6          MR. GREIM:  Just to be clear, I added 20.  I just

7  missed it.

8          THE COURT:  20 to 23 are received subject to the

9  motion to strike.

10          (Defendant's Exhibits 20 through 23 received in

11  evidence)

12  BY MR. GREIM:

13  Q.  So, Dr. Waller, what did you do, then, to change or to

14  supplement your research methods after this exchange?

15  A.  We hired a firm in Texas with a completely different set of

16  skill sets and methodologies to research names on the list.

17  Q.  What do you mean by that, "completely different"?

18  A.  So rather than do data mining and intrusive computer

19  capabilities, this organization was working with other

20  commercially available databases and contacts within the

21  federal government.

22  Q.  Was it your intent to keep using Team 1, but also to add

23  Team 2?

24  A.  Yes.

25  Q.  Do you recall when you first met with Team 2?

```
 1   A.  It was just a couple of days after the meeting with Yvette
 2   Wang, so the first couple of days of February 2018.
 3   Q.  Where were they?
 4   A.  In Dallas, Texas.
 5   Q.  Did you fly down there to see them?
 6   A.  Yes.
 7   Q.  What did you discuss at that first meeting?
 8   A.  I presented them with that list of research names that were
 9   in the exhibit, so the 15 names with the 92 total, and then
10   asked them to research a selection of those names to see what
11   they do come up with using their own methods.
12   Q.  Did you feel comfortable hiring this Team 2?
13   A.  Yes.
14   Q.  Why?
15   A.  I had known members associated with the team for several
16   years, and they came recommended through a colleague who I had
17   worked with on China issues for, I had worked with him for many
18   years, and he lived in Dallas.
19   Q.  Did ASOG get back to you on the research?
20   A.  Yes.  ASOG was the company we retained to do research, and
21   they got back to us within a week.
22   Q.  How did they -- did they provide the information to you?
23   A.  Yes.  We flew down to Dallas to meet with them.  They gave
24   us -- we met with their entire research staff and management,
25   we met for several hours, and they showed us the data that they
```

L4KKEAS2                        Waller - Redirect

1    came up with, and they explained to us the context of all that

2    data, but they would not provide us physical copies of the

3    data.

4              MR. GREIM:  Let's pull up Exhibit 56.

5    Q.  Do you recognize this document?

6    A.  Yes.

7    Q.  What is it?

8    A.  That's the invoice that what we called Team 2, ASOG,

9    presented to us for the services rendered.

10   Q.  And it looks like it came to Georgetown Research, Michael

11   Waller?

12   A.  Yes.

13   Q.  That's you?

14   A.  Yes.

15   Q.  Do you see on the first page, under "Description," does

16   this reflect the work that they told you that they did?

17   A.  Yes.

18   Q.  Now, I see there on the third bullet point, it says, "Track

19   misinformation to the source to verify"?

20   A.  Yes.

21   Q.  Did they indicate to you what they meant by that?

22   A.  Yes.

23   Q.  What did they say?

24   A.  They said some --

25              MR. CHUFF:  Objection, your Honor.  Statements by

L4KKEAS2                          Waller - Redirect

1    Team 2 has already been recognized as hearsay in your Honor's

2    motion in limine ruling, and it's irrelevant to go to the state

3    of mind of ASOG.

4              THE COURT:  Do you have the cites of my in limine

5    ruling?

6              MR. CHUFF:  Yes.  It's Docket 310, page 2 -- page 1

7    and 2.

8              THE COURT:  Mr. Greim, do you want to respond?

9              MR. GREIM:  Sure.

10             Your Honor, I'm doing the same thing I did before.

11   The motion was on this record's protected designation.  I'm

12   trying to get from the witness what ASOG told him it did and

13   found, and we're going to have testimony shortly — and I can

14   lay that foundation first — that he conveyed this on to Yvette

15   Wang and Lianchao Han.

16             THE COURT:  But how is it anything other than hearsay

17   with respect to -- if it's received from what ASOG did?

18             MR. GREIM:  Well, it will be received for -- again, I

19   can work backwards, as I did before with Team 1's results, but,

20   no, this goes to what was communicated by ASOG, and the

21   instructions that were then asked for from Yvette Wang and

22   Lianchao Han, that because -- well, I won't say what the

23   testimony will be.

24             THE COURT:  Sorry, I cut you off.  Go ahead.

25             MR. GREIM:  The Court, in its ruling, said defendant

1   should be prepared to address whether the statements have any

2   relevance taken only for the purposes of state of mind.  Well,

3   it's not coming in for the statement of ASOG's mind, it's

4   coming in to explain what was learned and passed on to Lianchao

5   Han and Yvette Wang about those names independent of whether

6   ASOG actually did this work.  The point is that it was passed

7   on to Yvette Wang and questions were asked of her.

8           THE COURT:  So, if that's the purpose for which you

9   are trying to elicit this testimony, then I think the question

10  is irrelevant, because whether ASOG said it to Mr. Waller or

11  not, the question -- what you want to elicit is what Mr. Waller

12  said to Yvette Wang.  For all I know, and you won't ask this

13  question, whether -- what Mr. Waller said to Yvette Wang is

14  what Mr. Waller was told by ASOG, you'll just ask whether this

15  is what he said.

16          MR. GREIM:  Okay.  I will ask that question, then.

17          THE COURT:  Is there any objection to testimony with

18  respect to what Mr. Waller said to Yvette Wang?  That is, I

19  assume, part of the deliverables.  Maybe it doesn't satisfy the

20  contract, but it's relevant to that question.  Counsel?

21          MR. CHUFF:  As long as it's not offered for the truth

22  of the matter asserted.

23          THE COURT:  Okay.

24          So, the objection to the question about what ASOG said

25  to Mr. Waller is sustained.  You can move on.

1  BY MR. GREIM:

2  Q.  So I'm not going to ask you about what ASOG said to you,

3  okay?  I'm now going to ask you what -- I probably should have

4  raised this a second ago.  I'm going to ask you what you saw,

5  what you saw, if you can recall that, and, again, you cannot

6  tell me what ASOG told you.

7          What did you see in the second meeting at ASOG?

8  A.  I saw a great deal of information, so I can't reconstruct

9  all of it, but it included the tracking information, very

10  detailed tracking information, it included that certain

11  subjects on the list shared the same U.S. Social Security

12  number, showing Social Security fraud and arguably tax fraud in

13  the United States, it showed evidence of forged U.S. documents,

14  official U.S. documents --

15  Q.  Let me stop you.

16          Did they show you -- did you see photocopies?

17  A.  Printouts, yes.

18  Q.  Printouts.

19          Was it a printout on a piece of paper, or did you look

20  on a computer screen?

21  A.  They were printed out in color on paper.

22  Q.  Were they presented to you in some sort of organized

23  fashion?

24  A.  Yes.

25  Q.  And this was in a meeting?

L4KKEAS2                      Waller – Redirect

1    A.   Yes.

2    Q.   Again, do not tell us -- as you're going through here, do

3    not tell us what ASOG told you.

4    A.   Okay.

5    Q.   What else did you observe?

6    A.   That they had a great deal of very useful, usable, and

7    actionable information, which was exactly what Mr. Guo wanted.

8    Q.   Why did you not take that information with you?

9    A.   They would not -- ASOG would not allow me to.

10   Q.   Did they tell you why they would not allow you to?

11   A.   Yes.

12   Q.   What did they say?

13               MR. CHUFF:   Objection, your Honor.

14               THE COURT:   Sustained.

15   BY MR. GREIM:

16   Q.   Well, at any rate, you were not able to remove it and bring

17   it back; is that right?

18   A.   Yes, but it is stated on this --

19   Q.   We can't --

20   A.   Okay.

21   Q.   By the way, did you ever show this invoice to Yvette Wang

22   or Lianchao Han?

23   A.   By that time, I had been instructed by Yvette Wang to not

24   have any more contact with her — this was on or about

25   January 30th — and to work solely with Lianchao Han.

1   Q.  So by this point, you're back to working with Lianchao Han?

2   A.  Yes.

3   Q.  Did you show this invoice to Lianchao Han?

4   A.  I believe I did.  This was dated later than this immediate

5   time.  This was dated a couple of weeks later.

6   Q.  Okay.

7   A.  The invoice was dated a couple of weeks later.

8   Q.  Now, ASOG was prepared to charge you about $105,000?

9   A.  Yes.

10  Q.  And they only charged you $5,412?

11  A.  Yes.

12  Q.  Do you have any understanding as to why that is?

13  A.  Yes.

14  Q.  Is it based on something ASOG told you?

15  A.  I mean, I'd be happy to freely answer the question, but I

16  understand the restrictions.

17  Q.  It's just a yes or no.  If it's yes --

18  A.  I understand why.

19  Q.  Is it based on something ASOG said to you?

20  A.  Yes.

21  Q.  All right.

22          Did you report the results of this to Lianchao, then,

23  and not Yvette Wang?

24  A.  Yes.

25  Q.  What did you tell Lianchao Han?

```
1   A.  I told him that I was told that it was illegal to obtain
2   this information under federal law, given the nature of what
3   was found.
4   Q.  Did you tell him why it was illegal?
5   A.  Yes.
6   Q.  What did you tell him?
7   A.  I was told that the five subjects on --
8   Q.  No, no, I'm sorry.
9       Did you tell him -- don't tell us what you were told;
10  tell us what you told Lianchao.
11  A.  I told Lianchao Han that ASOG told me that it would be a
12  federal crime to investigate the five subjects any further
13  because the U.S. Government had classified those individuals
14  as, quote, RP, or records protected.
15  Q.  Did Lianchao appear to understand what "records protected"
16  meant?
17  A.  He didn't know what it meant, but when I explained to him
18  what it meant, he agreed.
19  Q.  Did you tell Lianchao anything about any federal agency
20  that would have designated them records protected?
21  A.  Yes.
22  Q.  What did you tell him?
23  A.  I told him that it was designated records protected by the
24  NCS.
25  Q.  What is the NCS?
```

1   A.   That's the National Clandestine Service of the CIA.

2   Q.   Now, did you independently know what that was?

3   A.   Yes.

4   Q.   What is the National Clandestine Service of the CIA?

5   A.   It used to be called Directorate of Operations.  That's the

6   unit of the CIA that handles foreigners who have been recruited

7   as human agents for the CIA.

8   Q.   Did you tell Lianchao what the significance of records

9   protected was?

10  A.   Yes.

11  Q.   What did you tell him?

12  A.   I told him that there's a classification called records

13  protected to protect foreign subjects from these types of

14  database searches for the purpose of protecting their records,

15  their personal records, against intrusion, either because they

16  were subjects of a criminal or a national security

17  investigation, or because they were not subjects of a pending

18  criminal or national security investigation, to make it so that

19  no one would know whether or not they were, and also to protect

20  foreigners who had agreed to cooperate covertly with the United

21  States Government.

22  Q.   What was Lianchao's response?

23  A.   He understood immediately, said we'll have to come up with

24  some new names, and then we discussed how we would do that.

25  Q.   You say we discussed how we'd do that.  What did you

1  discuss?

2  A.  Well, I said we can't search these names.  I don't know the

3  legality of it at all.  This was this firm that had said it

4  would be illegal for the firm to do.  I obviously wasn't going

5  to anything to undermine the U.S. Government's interests, so we

6  had to brainstorm to figure out let's pull these fish out and

7  put more fish in, to use the metaphor from the contract.

8  Q.  Did you tell Lianchao about the kind of information that

9  ASOG had showed you, but not let you take with you?

10  A.  Yes.

11  Q.  And what was that information?

12  A.  That consisted of flight records, of certain financial

13  records, meaning not the bank account statements themselves,

14  but the fact that there were accounts at certain banks and

15  financial institutions around the world.  They included

16  residences, properties.  There was one person who was on the

17  list, but not one of the 15, someone related to Anita Suen, who

18  had retained an attorney in, I believe, Nebraska, who had set

19  up scores, if not hundreds, of Panamanian front companies.

20  Q.  And so did you ask Lianchao whether you could follow up on

21  that lead?

22  A.  He was enthused.  He said this is exactly the kind of stuff

23  we're looking for.  It looked -- it was obvious that somebody

24  was setting up huge numbers of Panamanian front companies,

25  Chinese nationals doing it through Nebraska.  That shows that

1    there's something wrong going on, and if it's against Communist
2    Party rules, and we can expose it, let's do so.
3           So Lianchao agreed there was a lot of potential
4    information from this haul.
5    Q.  Now, did you understand that if you were able to get new
6    names, that ASOG would continue to work or would work on the
7    new names?
8    A.  They were reluctant to continue work because they demanded
9    to know who the client was.
10   Q.  Did you tell them?
11   A.  No, I was not allowed to, but they figured it out on their
12   own.
13   Q.  Well, we can't go into that.
14          So, did Lianchao go back and get new names from Guo?
15   A.  No.
16          Pardon me.  He went back to Guo, but he did not come
17   back to us with new names.
18   Q.  When did he come back to you?
19   A.  Well, we kept talking throughout this whole time.
20   Q.  Do you recall, did you end up having an in-person meeting
21   with Lianchao in February?
22   A.  Yes.
23   Q.  When was it?
24   A.  We met several times then, but we met with French Wallop at
25   her home later, a couple of weeks later, to just go over where

1    we stand and what we do.  He had told us, meanwhile, to stand

2    down activities until he could resolve things with Guo.  He was

3    still acting as Guo's agent with us, but he gave us no further

4    instructions.

5    Q.  Now, by February 16th, had you received the first $750,000

6    payment?

7    A.  No.

8    Q.  Did you ever receive that?

9    A.  No.

10   Q.  What was -- how did that affect your investigative

11   operations?

12   A.  That prevented us from continuing with Team 1 because we

13   were paying them one month in advance, and so we had no way to

14   plan ahead for anything.

15   Q.  So, by this point, how much had you paid Team 1?

16   A.  We had paid them 200 -- it was discussed yesterday

17   specifically, but, roughly, between 200 and $250,000.

18   Q.  And --

19        THE COURT:  Mr. Greim, when you come to the end of

20   this line of examination, we'll take a break.

21        MR. GREIM:  Okay.

22        I'm sorry, I wanted to be done.  We're almost there.

23   BY MR. GREIM:

24   Q.  What was their monthly fee?

25   A.  $200,000.

1    Q.  So was their next 200,000 due in mid-February?

2    A.  Yes.

3    Q.  Were you counting on the $750,000 to pay them?

4    A.  Yes.

5    Q.  Did you ask Lianchao whether you should go forward and try

6    to come up with the money?

7    A.  Yes.

8    Q.  What did he say?

9    A.  He said, just wait, let me try to work it out.

10   Q.  And what's the next thing you heard from Guo's side?

11   A.  Apart from through Lianchao?

12   Q.  Well, let's say from Lianchao, what's the next thing you

13   heard?

14   A.  Lianchao was very upset.  He was upset that the project

15   wasn't going ahead.  He seemed more upset for us than anything

16   else because he himself was personally very enthused about the

17   project, and he had no answers to give us of any kind.

18   Q.  So, did you then recall receiving a termination letter?

19   A.  Yes.

20   Q.  When was that?

21   A.  That was on February 23rd, 2018.

22   Q.  So just a week after this meeting with Lianchao?

23   A.  Yes.

24          MR. GREIM:  Your Honor, I do just have a question for

25   the witness about -- well, I actually -- it's kind of a new

L4KKEAS3

1    area.  It might take ten or fifteen minutes.

2              THE COURT:  Okay.  Let's reconvene at 2:00 o'clock.

3    We'll take a break at this time for lunch.

4              Everybody, make sure to be back in your seats well

5    before 2:00 o'clock, so we can get started on time.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          AFTERNOON SESSION

 2                              2:01 PM

 3              (Trial resumed)

 4              THE COURT:  Dr. Waller, you're reminded that you're

 5      under oath.

 6              Mr. Greim, you may inquire.

 7      REDIRECT EXAMINATION

 8      BY MR. GREIM:

 9      Q.  Dr. Waller, we just spent a good part of the day talking

10      about what you received and what you passed on to Yvette Wang

11      and Lianchao Han.  I now want to show you the final page of the

12      parties' stipulation.  These are our joint proposed findings.

13      I want to focus you on 54 through 57.

14              So, you'll see, 54 through 56 are all similar; they

15      relate to "financial forensic historical research, current

16      tracking research," and then 56 is "social media research."

17              Do you see that?

18      A.  Yes.

19      Q.  Each one of them says, "Strategic never delivered to

20      Eastern any," then they name the research, "called for under

21      the research agreement."  Do you see that?

22      A.  Yes.

23      Q.  Do you agree with that statement?

24      A.  Yes.

25      Q.  Under the research agreement, we saw that -- we saw, in
```

1    fact, that research could only be delivered on a USB drive?

2    A.  Yes.

3    Q.  And we saw some other requirements, including that there

4    was a tight time frame for the provision of the different kinds

5    of research, correct?

6    A.  Yes.

7    Q.  And we saw that, at least as it's called for under the

8    research agreement, Strategic wasn't able to deliver those

9    things to Eastern, right?

10   A.  Yes.

11   Q.  And Strategic was unable to prepare any detailed reports,

12   as we see in paragraph 57, right?

13   A.  Yes.

14   Q.  What was Strategic able to give Eastern?

15   A.  We were able to give Eastern the very best information we

16   could under very extreme circumstances.

17   Q.  I want to move now, Dr. Waller, to damages.

18          MR. GREIM:  Let's pull up Exhibit 64, which you'll get

19   in the Waller set.  And if you could, go to page 2.

20   Q.  Dr. Waller, you sat here throughout yesterday as Ms. Wallop

21   testified to these funds coming out from the Strategic Vision

22   account?

23   A.  Yes.

24   Q.  And if you look at the right-hand column of her chart, you

25   see that 200 went to Cyber Sol?

Wal/er – Redirect

1   A.  Yes.

2   Q.  And that came to Cyber Solutions, right?

3   A.  Yes.

4   Q.  That was your entity?

5   A.  Yes.

6   Q.  And then 25,000 to GRG?

7   A.  Yes.

8   Q.  And then 200,000 to GRG?

9   A.  Yes.

10  Q.  Now, which of those wires did you send along to Team 1?

11  A.  I sent the 25,000 to GRG and the 20,000 to GRG.

12  Q.  If we keep going --

13  A.  Pardon me, the 200 to GRG.

14  Q.  The 200,000.

15          If we go to the May --

16          THE COURT:  That's Team 1?

17          THE WITNESS:  Yes.

18  BY MR. GREIM:

19  Q.  And the Cyber Solutions --

20  A.  GRG was the cutout to pay Team 1.

21  Q.  And the Cyber Solutions, you did not disburse to others,

22  correct?

23  A.  Yes.

24  Q.  What was that to pay for?

25  A.  That was for my own time and effort in the program and

1    risk.

2    Q.   That was not just pure profit for you, was it?

3    A.   No.

4    Q.   And then if you go to June 2018 --

5             MR. GREIM:   Could you flip forward?  Actually, I went

6    too far.  Go to May.

7    Q.   Do you see 15,000 to GRG?

8    A.   Yes.

9    Q.   Where did that money go?

10   A.   That was to pay an outstanding bill.

11   Q.   Was this the legal bill we talked about earlier?

12   A.   Yes.

13   Q.   And now we can go to June.

14            50,000 to what Ms. Wallop wrote as OE.  Did you

15   receive 50,000 for OA at that time?

16   A.   Through an LLC I had at the time called Oceanic Advisors.

17   Q.   What was that money spent for?

18   A.   That was to wrap up Team 1, to satisfy them that that was

19   the end of the contractual arrangement.

20   Q.   I'm sorry, why did you have to pay Team 1 at that time?

21   A.   Because we had an abrupt end -- there was going to be no

22   payment, all of a sudden, for the second month.  They were very

23   upset and disgruntled.  They felt they had been cheated.  So

24   this was settling their claim, so that they would not expose

25   the existence of the project.

1   Q.  Let me ask you now -- I'm going -- thank you, Dr. Waller.

2   I just want to move very briefly to your testimony regarding

3   the fraud claim that Mr. Chuff asked you about.

4           Do you recall testifying yesterday that close ties

5   between a person in the U.S. and China are not enough alone to

6   raise concerns about their dissident status?

7   A.  Yes.

8   Q.  Did I portray that accurately just now?

9   A.  Yes.

10  Q.  You indicated there was something more needed.  Do you

11  recall that?

12  A.  Yes.

13  Q.  What is that something more?

14  A.  That's the nature of the relations and the intent behind

15  the relations.

16  Q.  So, I don't want to go through all of our evidence, I just

17  want to use one example, Dr. Waller.

18          You recall being asked about the May 2017 meeting

19  between Guo Wengui and some members of the CCP policy row and

20  PRC?

21  A.  Yes.

22  Q.  How did you know about that before the contract was

23  executed?

24  A.  Mr. Guo had told me about it.

25  Q.  And had there been press written about it, too?

```
1    A.  Yes.

2    Q.  What did Mr. Guo tell you about that meeting?

3    A.  He said that the senior party and secret police officials

4    came to him to threaten him with kidnapping.

5    Q.  This is at his own apartment in New York City?

6    A.  Yes.

7    Q.  And have you seen that he's made that claim many, many

8    times?

9    A.  Yes.

10   Q.  Now, before you entered the contract, you had just heard

11   Guo's version of the story, correct?

12   A.  Yes.

13   Q.  Did you come to find out that -- and, by the way, do you

14   recall Guo saying he had some recordings of it?

15   A.  Yes.

16   Q.  Did you come to actually find some of the recordings and

17   view the transcriptions of them?

18   A.  Yes.

19   Q.  When you say something more was required, did you find the

20   something more in reviewing those recordings?

21   A.  Yes.

22   Q.  What was it?

23   A.  That it wasn't a threat against Guo, that he had stated in

24   his own voice that he had cut a deal with the Communist Party,

25   and that he would limit his whistleblower campaign to certain
```

```
 1  targets, and that he had not stepped beyond a certain
 2  agreed-upon line that he had previously made with the
 3  communists.
 4  Q.  And did you -- sticking with the theme of something more,
 5  did you see any other recording by Guo after May 2017 in which
 6  he said something similar?
 7  A.  Yes.  In late August of 2017, he had a written statement,
 8  and then a video that he made of himself, proclaiming his
 9  loyalty to the Chinese Communist Party and to Chairman Xi
10  Jinping personally.
11          MR. GREIM:  Thank you.  No further questions,
12  Dr. Waller.
13          THE COURT:  Any reexamination?
14          MR. CHUFF:  Yes, your Honor.
15          THE COURT:  You may proceed.
16  RECROSS EXAMINATION
17  BY MR. CHUFF:
18  Q.  Good afternoon, Dr. Waller.
19          Now, earlier today, you testified that you trusted
20  Lianchao Han; is that correct?
21  A.  Yes.
22  Q.  And that he was credible?
23  A.  Yes.
24  Q.  And you were at Lianchao's deposition; isn't that right, in
25  this case?
```

1    A.  Pardon?

2    Q.  You attended Lianchao Han's deposition in this case; isn't

3    that right?

4    A.  Yes.

5    Q.  Now, a number of times earlier today, you characterized

6    Lianchao Han as Guo's helper.  Do you remember that?

7    A.  Yes.

8    Q.  And you called him his agent?

9    A.  Yes.

10   Q.  Now, do you remember that Lianchao actually testified that

11   he was merely serving as an intermediary between the two

12   parties, not Guo's agent?

13   A.  Yes.  Well, let me correct that.  I would have to see the

14   actual wording first.

15   Q.  Well, do you remember that?

16   A.  I can't recall specifically to give you a yes or no.

17   Q.  Sure.  Okay.

18          MR. GREIM:  So let's pull up Lianchao Han's deposition

19   transcript of August 28, 2019, and turn to page 160.

20   Q.  So Lianchao Han was asked:  "What was your role here?  Did

21   you see yourself as an intermediary between the two sides or as

22   a representative of Guo?"

23          Lianchao answered:  "I think I'm a person to

24   facilitate this project.  I'm a friend on both sides.  I have

25   no financial interest in there.  My entire thing is driven by

1 | political agenda.  So I just want to get the things done, you

2 | know, achieve what we said we're going to do.  That's it."

3 |        Did I read that correctly?

4 | A.  Yes.

5 | Q.  Now, you also testified that Lianchao told you that the USB

6 | drives that Strategic delivered to Eastern were "good leads";

7 | is that correct?

8 | A.  Yes.

9 | Q.  And, in fact, you testified that he said they were great;

10 | isn't that correct?

11 | A.  No.  He said that the information -- the leads that we were

12 | developing were great.  He wasn't specifically referring to

13 | information on a drive.

14 | Q.  I want to refer you back to Lianchao Han's deposition

15 | transcript, this time page 275.  I'm going to start with line

16 | 15.  Mr. Han was asked:  "Let me try it again.  Looking at this

17 | first full paragraph on the second page, it says, 'The

18 | contractor will produce a progress report on the financial

19 | forensic research each week in the first month, one preliminary

20 | report in the first month, and one comprehensive historical

21 | research report within three months, and with update reports in

22 | each following month.  The client may require reports per

23 | individual subject to the client within a specified time frame

24 | as well as all relevant data.'  Do you see that?"

25 |        He responded:  "Yes."

```
1              Then he was asked:  "I'll ask you again.  Did

2     Strategic Vision deliver weekly reports within the first month

3     of the agreement?"

4              He responded:  "No."

5              Then he was asked:  "If you look further down the

6     page, it says, 'The contractor will produce social media

7     research per individual subject to the client on a weekly basis

8     for the first month and on a monthly basis except under

9     circumstances that require more frequent reporting (weekly or

10    fortnightly) as the client directs or irregular emergencies

11    that the contractor may discover.'  Do you see that?"

12             Mr. Han responded:  "Uh-huh."

13             Then he was asked:  "Did Strategic Vision deliver

14    weekly reports during the first month of the agreement

15    concerning social media research?"

16             And he responds:  "No."

17             Further down, he is asked:  "And if you look in the

18    middle of the page there again, we're on page number 6, the

19    middle paragraph says, 'The contractor will produce concurrent

20    tracking research per individual subject to the client on a

21    monthly basis except in the first month.  That weekly report

22    shall be delivered under circumstances that require more

23    frequent reporting (weekly or fortnightly) as the client

24    directs up to six-month period.'  Do you see that?"

25             He responds:  "Yes."
```

1            Then he's asked:  "Did Strategic Vision deliver weekly

2     reports on tracking research per individual subject during the

3     first month of the agreement?"

4            He responds:  "No."

5            Then he's asked:  "Okay.  Did there come a time when

6     Strategic Vision delivered a 60-gigabyte hard drive of data to

7     Eastern Profit?"

8            He responds:  "Yes."

9            Now we're on page 278.  He's asked:  "And what was on

10    the hard drive?"

11           He responds:  "It's lots of junk information."

12           Then he's asked:  "Was any of that information the

13    kind of useful reporting that Eastern Profit would have

14    expected under this agreement?"

15           He responds:  "No."

16           Dr. Waller, did I read all of that correctly?

17    A.  Yes.

18    Q.  Changing topics here a little bit:

19           Earlier today, you testified that you told Lianchao

20    Han that individuals on the subject list were not able to be

21    investigated by Allied Special Operations Group, or ASOG,

22    because they were so-called record protected status; is that

23    right?

24    A.  Yes.

25    Q.  And if I refer just to Team 2, will you understand that I'm

1   referring to ASOG?

2   A.  Yes.

3   Q.  Now, before Team 2 told you that the individuals on the

4   subject list were records protected, you'd never heard of that

5   term before; isn't that right?

6   A.  Correct.

7   Q.  And you don't know the legal source of the records

8   protected status other than what ASOG, Team 2, told you; is

9   that correct?

10  A.  No.

11  Q.  You didn't first learn of the records protected status and

12  its legal origins from ASOG?

13  A.  I first learned of it from ASOG.

14  Q.  And you don't have any documentation evidencing the

15  so-called records protected status of the subjects, right?

16  A.  Yes.

17  Q.  Yes, you don't have documentation?

18  A.  Yes, I do.

19  Q.  Was that documentation produced in this litigation?

20  A.  Yes, it was.

21  Q.  What document is that?

22  A.  It was on the ASOG invoice of February --

23  Q.  Okay.  I'm sorry, Dr. Waller, I jumped in.

24          THE COURT:  The witness was still giving an answer.

25  Q.  You can finish.  I'm sorry.

1    A.  It was on the ASOG invoice, on page 2, of February 2018.

2    Q.  So, other than what ASOG wrote in its invoice, do you have

3    any other documentation of the records protected status

4    designation?

5    A.  Only what they told me, that I was directed not to repeat

6    in court.

7    Q.  Right.

8         So we're just talking about documentation here.  So

9    other than that invoice, any other documentation?

10   A.  That's the sole documentation.

11   Q.  But it's your contention that it was illegal to obtain this

12   information, right?

13   A.  That is what we were told.

14   Q.  Yet, Team 2 somehow amassed a treasure trove of all of this

15   actionable information; isn't that right?

16   A.  Yes.

17   Q.  So, did ASOG violate the law?

18   A.  No.

19   Q.  Well, you testified it was illegal to obtain this

20   information, did you not?

21   A.  It was illegal to -- it was illegal to pass it on.  They

22   obviously obtained it legally; they just could not pass it on

23   legally.

24   Q.  Sir, you testified earlier that these individual subjects

25   were records protected, and it was illegal to obtain

1   information about them; isn't that right?

2   A.  It was illegal to obtain it if you knew they were RP.  They

3   obtained it, and then they were warned that the people were RP.

4   So, as far as I'm concerned, I don't know of any illegality.

5           It would have been illegal for them to pass it to me,

6   and it would be illegal -- I don't know if it would have been

7   illegal any further.  So I went back to the client and said,

8   it's illegal, please give me instructions on what to do.

9   Q.  So let's just break that apart.

10          You just confirmed that it was illegal to obtain

11  information on records protected parties; is that right?

12  A.  The way it was explained to me, it was illegal for them to

13  pass me the RP designated material.

14  Q.  I know.  And we went over this a few seconds ago.

15          You testified that you confirmed that it was

16  illegal -- to your understanding, that it's illegal to obtain

17  information about records protected designated subjects?

18  A.  It is illegal for that firm to pass me, meaning to allow me

19  to obtain, RP information.

20  Q.  Okay.  Do you have a citation to this record protected

21  status designation?

22  A.  No.

23  Q.  Do you know a statute that sets forth this records

24  protected designation?

25  A.  No.

1  Q.  Codified federal regulation?

2  A.  No.

3  Q.  And despite the fact that ASOG, apparently, somehow

4  obtained all this treasure trove of information and provided it

5  to you, it didn't charge you for it?

6  A.  It charged just a nominal fee for it.

7  Q.  But despite having all of this information that it showed

8  you?

9  A.  Yes.

10  Q.  And it didn't charge you $200,000 of setup costs either,

11  did it?

12  A.  No.  It was a freestanding research organization that had

13  already had its own team and its own methods.

14  Q.  Now, earlier today, you also testified that you told Yvette

15  Wang that Team 1 told you of various problems that Team 1 had

16  while investigating.  Do you recall testifying that?

17  A.  Yes.

18  Q.  You spent a lot of time on that today, right?

19  A.  Yes.

20  Q.  But at your deposition, you testified that Team 1 did not

21  encounter any problems that were not standard.  Do you recall

22  that?

23  A.  Yes.  It's always standard to have irregularities.

24  Q.  I'm sorry, there's no question pending.

25          THE COURT:  Now, you can complete your answer,

1  Dr. Waller.

2       THE WITNESS:  Thank you, your Honor.

3       The answer is that it is standard, it's to be

4  expected, that you're going to -- you're likely to encounter

5  substantial difficulties when initiating a complicated research

6  project.

7  BY MR. CHUFF:

8  Q.  Okay.  Standard is not irregular, is it?

9  A.  Yes, it is.  It's an irregularity in terms of scheduling.

10 Q.  Standard is the same thing as irregular?

11 A.  It is considered normal to find difficulties when you're

12 doing a complex research project, just as it would be if you're

13 developing a legal case.

14 Q.  Okay.

15 A.  Okay.  So you -- however, it is irregular in terms of the

16 schedule.  It will create irregularities in the schedule.

17 Q.  Okay.  My question is:  Is standard the equivalent of

18 irregular?

19 A.  Not in the sense that you're trying to imply.  It is

20 standard to expect irregularities.

21 Q.  Also, earlier today, you testified that the deposit in the

22 research agreement was nonrefundable; is that correct?

23 A.  Yes.

24 Q.  But the research agreement does not say that anywhere, does

25 it?

1    A.  It says that the -- well, I'd have to see the research

2    agreement in front of me.

3    Q.  We can bring it up in a second, but do you recall --

4    A.  I don't want to rely on memory for the document.  I'd

5    rather see the document.

6    Q.  Sure.  We can bring it up.

7             MR. CHUFF:  Can we please pull up PX 01.

8    Q.  So, take as much time as you want.  Please point to the

9    provision where it says the deposit is nonrefundable.

10   A.  It says, "The client will pay the contractor a deposit of

11   U.S. $1 million upon signing of the contract.  The deposit will

12   be credited on a prorated basis to the final one and one-third

13   months of the contract."

14   Q.  And credited for work done?

15   A.  For the final one and one-third months of the contract.

16   Q.  For work that's done?

17   A.  The sentence says what it's says.

18   Q.  Okay.  That doesn't say nonrefundable, does it?

19   A.  It says it's going to be credited for the final one and

20   one-third months of the contract.

21            THE COURT:  You really need to be spending time

22   cross-examining the witness on what a document says?  Why don't

23   you move on.

24   Q.  And the research agreement doesn't anywhere provide that

25   for payment of startup costs?

1   A.   I'm sorry, what do you mean by the question?

2   Q.   Does the research agreement provide that startup costs are

3   to be paid to Strategic?

4   A.   That was our specific explicit understanding with Mr. Guo,

5   which is why Strategic required the initial $1 million deposit.

6   Q.   Just not explicit in this agreement?

7   A.   Mr. Guo's name isn't even in the agreement.

8   Q.   And you admitted yesterday that the deposit was not a

9   signing bonus; isn't that correct?

10  A.   Yes.

11  Q.   Now, you also testified earlier today that the research

12  agreement provided for a flat $750,000 fee regardless of

13  performance; isn't that correct?

14  A.   Let's see the document again.

15  Q.   Well, isn't that what you testified today?

16  A.   Let's see the document again.

17  Q.   No.  I'm just asking, is that what you testified?

18  A.   It's a flat $750,000 per month fee.  It's a flat rate to

19  absorb any anomaly.

20  Q.   Now, yesterday, you testified that the payment was tied to

21  deliverables and that no payment would be due unless the

22  deliverables were provided.  Do you recall testifying that way?

23  A.   No, I don't recall testifying that.

24          MR. CHUFF:  If we could turn to the trial transcript

25  from yesterday, page 194.

L4KKEAS3                           Waller – Recross

```
 1              THE COURT:  Could you please try to make sure your
 2      mask is adjusted, so it stays on, counsel.
 3              MR. CHUFF:  Yes.
 4              194.
 5      BY MR. CHUFF:
 6      Q.  So, yesterday, I asked:  "Now, if a deliverable was not
 7      provided to Strategic, no payment would be due under the
 8      research agreement"; is that correct?
 9      A.  I believe I corrected that this morning in testimony.  I
10      was saying this from faulty memory yesterday, not from reading
11      directly from the agreement.  So my testimony from earlier this
12      morning addresses this precisely.
13      Q.  Okay.  So let's put this down, and we'll go to another
14      document.
15              MR. CHUFF:  Let's take a look at PX 19.  Actually,
16      PX 18, I'm sorry.
17      Q.  Now, Dr. Waller, you testified earlier that these are your
18      handwritten notes, correct?
19      A.  Yes.
20      Q.  And they detail your experience with this research
21      agreement; is that correct?
22      A.  They detail the meetings that led to the development of the
23      agreement and then later the execution.
24      Q.  Okay.
25              MR. CHUFF:  If we could turn to page 9, please.
```

```
 1    Q.   Now, Dr. Waller, I direct your attention just to the top
 2    line there.  You see it says December 10th?
 3    A.   Yes.
 4    Q.   Is that December 10th, 2017?
 5    A.   Yes.
 6    Q.   Shortly before the research agreement was signed?
 7    A.   Yes.
 8             MR. CHUFF:  If you can scroll down for me towards the
 9    bottom of the page.  Right there, that's good.
10    Q.   Now, on this page, you just generally describe certain of
11    the terms that are being negotiated; is that correct?
12    A.   There are certain ideas that were being discussed.  I don't
13    recall that they were all terms being negotiated.
14    Q.   Okay.  Do you see the fifth line up on this page?
15    A.   Uh-huh.
16    Q.   You wrote, "Down payment one time.  Future is based on
17    deliverable."  Did I read that correctly?
18    A.   Yes.
19             MR. CHUFF:  If we can go to the next page, page 10.
20             THE WITNESS:  That was December 10th?  Was that -- I
21    can't see the date of the document.
22    Q.   Yes.
23    A.   Okay.
24    Q.   That's what it says at the heading.  On the top line,
25    rather.
```

1        Do you see that?

2   A.  Yeah.

3   Q.  Okay.

4           MR. CHUFF:  And then if we could go to page 10.  A

5   little bit down.  Right there.

6   Q.  So, up from the part that's been redacted, four lines up,

7   you see the line that says, "Will pay"?

8   A.  Yes.

9   Q.  So you wrote, "Will pay down payment first.  Remainder upon

10  delivery.  Give a line item for A, B, and C."

11          Did I read that correctly?

12  A.  Yes.

13  Q.  And that's exactly what happened in the contract, right?

14  There was a line item, A, B, and C; isn't that correct?

15  A.  Well, there are two different things in what you're -- in

16  this section that you're asking me about.

17  Q.  I'm just asking you right now:  In the research agreement,

18  there were three lines, A, B, and C, for pricing?

19  A.  Yes, three line items.

20          MR. CHUFF:  Could we pull up PX 01, please.

21          And could we go to page 4, the sixth paragraph.

22  Q.  So here is the A, B, C line items, right?  And they say --

23  A.  I can't see the hole on the top.

24  Q.  I'm sorry?

25  A.  Where the cursor was or where the letters are?

L4KKEAS3                          Waller - Recross

1   Q.  The three letters, they're highlighted.

2   A.  Okay.

3   Q.  Do you see that?

4        And these are the three line items that were just

5   referred to in the notes, right?

6   A.  Yes.

7   Q.  And they say, "Comprehensive" --

8   A.  Well, let me make a correction.  They might or might not be

9   the three line items in the notes because we were just still

10  talking about putting this together in the notes.  So I cannot

11  say conclusively whether these correspond directly with the

12  hypotheticals we were still discussing in the notes.

13  Q.  Okay.  The notes said have a line item for A, B, and C?

14  A.  Correct.  But I don't know if A, B, and C in the notes

15  correspond to A, B, and C here on this exhibit.

16  Q.  And then the contract says A, B, and C?

17  A.  Yes.

18  Q.  And the first one, it says, "Comprehensive historical

19  reports:  300,000 per report, tracking reports"?

20  A.  Or report equivalent per year.  Let's be complete about

21  that.

22  Q.  Sure.

23        "B.  Tracking reports:  $300,000 per report or report

24  equivalent per year."  Did I read that correctly?

25  A.  Yes.

1    Q.  "Social media reports:  $300,000 per report (or

2    report-equivalent) per year."  Did I read that correctly?

3    A.  Yes.

4    Q.  Now, if the financial arrangement was simply $750,000 per

5    month, no matter what, for 30 units, why would this language be

6    in the contract?

7    A.  This was to give an idea of what the client was looking for

8    in terms of the nature of the reporting to be done over a

9    one-year period.

10   Q.  The nature of the reporting?

11   A.  Yes.

12   Q.  But it says $300,000 per report?

13   A.  Yes, per report per -- as it's stipulated here elsewhere in

14   the contract.

15           MR. CHUFF:  Okay, we can depublish that.

16           THE WITNESS:  To be paid monthly on a flat rate.

17   BY MR. CHUFF:

18   Q.  Now, you also testified this morning regarding the timing

19   of the research results.  Do you recall that?

20   A.  Yes.

21   Q.  And you testified that no one expected actionable research

22   in the first month.  Do you recall that?

23   A.  I'd like to see the words written rather than have you

24   paraphrase what I said.

25   Q.  Well, then you could use your own words.  What did you

L4KKEAS3                    Waller – Recross

1   testify about there wouldn't be in the first month?

2   A.  I testified what I testified about, but there would be --

3   why don't you try rewording the question.

4   Q.  Sure.

5        So you testified that no one expected there to be

6   quality information in the first month?

7   A.  Complete quality information, correct.

8   Q.  But yesterday --

9        THE COURT:  What's the distinction you're drawing

10  between complete quality information and quality information?

11       THE WITNESS:  It's quality versus quantity.  So if

12  we're finding that we hit, say, a vein of gold in the digital

13  space, that we know we've hit a quality target, but we haven't

14  been able to mine sufficient quantity that would constitute the

15  amount of quality material that we were wanting to bring out.

16  So it showed we developed promising leads that we could then

17  mine.

18       THE COURT:  Thank you.

19       THE WITNESS:  Thank you.

20  BY MR. CHUFF:

21  Q.  But you understood that Mr. Guo wanted actionable

22  information in the first month; isn't that correct?

23  A.  No.  He wanted a three-year campaign that he could use the

24  information on, and it would take time to build up, but he

25  would have something within the first 90 days.

L4KKEAS3                        Waller – Recross

1           MR. CHUFF:  Okay.  Can we go back to PX 18.

2           And just a matter of housekeeping, I offer PX 18 into

3    evidence.

4           THE COURT:  Any objection as to the authenticity of

5    the notes?

6           MR. GREIM:  Your Honor, I'm sorry, I hate to say it,

7    but I don't have it immediately at hand.  I usually see it

8    published.  Is PX 18 the notes?

9           THE COURT:  I take it no objection?

10          MR. GREIM:  No, no objection to authenticity or

11   foundation.

12          THE COURT:  Okay.  Received subject to a motion to

13   strike.

14          (Plaintiff's Exhibit 18 received in evidence)

15          MR. CHUFF:  Your Honor, I recall yesterday, I didn't

16   formally offer DX 23.  It was a text message exchange between

17   Dr. Waller and Yvette.  I just offer that now.

18          THE COURT:  That's, again, received subject to motion

19   to strike.

20          (Defendant's Exhibit 23 received in evidence)

21          MR. CHUFF:  Now if we could turn to page 1 of PX 18,

22   please.

23   BY MR. CHUFF:

24   Q.  So, Dr. Waller, I direct your attention up top of the page

25   there.  It says, "11/21 [MG]," Miles Guo.  Did I read that

L4KKEAS3                              Waller - Recross

1    correctly?

2    A.  Yes.

3    Q.  If you go down to point number 1, you write in quotes, "I

4    want now immediately information."

5    A.  Yes.

6    Q.  Is that something that Mr. Guo told you, right?

7    A.  That's a verbatim quote in quotation marks.

8              MR. CHUFF:  Can we also turn to page 15 of this

9    document, please.  And towards the bottom of the page.

10   Q.  You wrote, "First month is critical for quality of

11   information"; is that correct?

12   A.  Yes.

13             MR. CHUFF:  We can depublish PX 18.

14             THE WITNESS:  Quality.  Not quantity, but quality.

15   BY MR. CHUFF:

16   Q.  The contract itself contemplated reports in the weeks in

17   the first month and also at the end of the month, did it not?

18   A.  Yes.  Now, these were specifically raw data reports, in

19   quotes, not analytical or narrative reports.

20   Q.  But that met the terms of the contract?

21   A.  Yes.

22   Q.  And they were to be delivered USB drive only, correct?

23   A.  Yes.

24             MR. CHUFF:  Could we pull up DX 20, at page 1.

25   Q.  Now, Dr. Waller, this is a document that you spent some

L4KKEAS3                    Waller - Recross

1   time with Mr. Greim earlier this morning.  Do you recall that?

2   A.  Yes.

3   Q.  It's a text message between, I believe, you and Yvette

4   Wang; is that correct?

5   A.  Yes, it appears to be.

6   Q.  We don't have to reference it specifically, but in here,

7   you talk about sort of the delays that the research teams

8   apparently experienced in this document, and you relay that to

9   Yvette Wang; is that correct?

10  A.  Yes.  We had already discussed it verbally, and then this

11  was just written down after a different discussion.

12  Q.  Okay.  And this is dated January 30th, 2018?

13  A.  Yes.

14  Q.  Now, by that time, you were already preparing for the

15  termination of the contract by Eastern Profit, were you not?

16  A.  No.

17  Q.  No?

18          MR. CHUFF:  Could we turn to PX 18, please.

19          Could we scroll to page 25.  And I think it's about in

20  the middle of the page.

21  Q.  So, Dr. Waller, I direct you to the underlined text there.

22  You'll see, it says, "1/26."  That's January 26th, 2018,

23  correct?

24  A.  Yes.

25  Q.  And you say, "Prep for termination on train"; is that

1    correct?

2    A.  No.

3    Q.  What does that say?

4    A.  "Prep for transcription on train."

5    Q.  Transcription?  That doesn't say termination?

6    A.  It says transcription.

7    Q.  Well, underneath that line --

8    A.  T-r-a-n-s-c-r-i-p-t-i-o-n.

9    Q.  Okay.  Well, transcription of what?

10   A.  The transcription of whatever verbal material that we had.

11   Q.  Okay.  So, underneath that line, that apparently says

12   transcription, there's a list of all the problems that you

13   contend occurred in this research investigation; isn't that

14   correct?

15   A.  Yes.

16   Q.  So, you are mapping out excuses for why Strategic didn't

17   perform this agreement; isn't that correct?

18   A.  No.

19   Q.  Reasons?

20   A.  Reasons.

21   Q.  Okay.  And this is dated January 26th, before the text

22   message to Yvette Wang that we just looked at a moment ago?

23   A.  Yes.

24   Q.  Now, yesterday, you admitted that the research agreement

25   does not contain a representation that Mr. Guo is anti-CCP.  Do

1    you recall that?

2    A.  It says nothing about China, the Communist Party, or

3    Mr. Guo.

4    Q.  Okay.  And today, you testified that the reason for that

5    was confidentiality concerns, correct?

6    A.  Yes.

7    Q.  You didn't want the contract getting out?

8    A.  Right.

9    Q.  Right.

10           But the contract was not made public, right?

11   A.  We did not make the contract public.

12   Q.  You typed up the contract and then deleted the electronic

13   version, right?

14   A.  I maintained an electronic version on an encrypted external

15   drive.

16   Q.  An encrypted external drive?

17   A.  Yes.

18   Q.  And it was not sent over email?

19   A.  No.

20   Q.  And so there's no decrypted electronic copy anywhere?

21   A.  Not that I know of.

22   Q.  But the reason you didn't insist on a representation that

23   Mr. Guo was anti-CCP was because of confidentiality concerns,

24   that the contract was going to get out?

25   A.  No, it was just second nature to what we both wanted.  We

1    both wanted to achieve the same objective.

2    Q.  Second nature is to not insist on a rep that you deemed

3    material to the agreement?

4    A.  Would you repeat the question?

5            MR. CHUFF:  Yes, I'm sorry, could you repeat

6    Dr. Waller's previous answer?

7            (Record read)

8    Q.  So it was second nature to not insist upon a representation

9    that you claim was material to the entire arrangement?

10   A.  Right.  When you're sharing a common cause, you don't

11   necessarily state the same common cause.  It's kind of silly.

12   Q.  Now, Dr. Waller, do you recall earlier this morning that

13   you and Mr. Greim were talking about Elliott Broidy?

14   A.  Yes.

15   Q.  And Mr. Greim referenced the guilty plea, but did not show

16   it to you?

17   A.  Did not what?

18   Q.  Show it to you?

19   A.  Yes.

20   Q.  Now, is it your sworn testimony that Elliott Broidy is not

21   associated or affiliated with the CCP?

22   A.  It's my sworn testimony that I know of no improper

23   association of Elliott Broidy or affiliation with the CCP.

24   Q.  Okay.  I'm asking any association.

25   A.  I just told you.

1  Q.  No.  You said "improper."  I'm asking, are you aware -- is

2  it your sworn testimony that you're unaware of any -- strike

3  that.

4          Is it your sworn testimony that Elliott Broidy is not

5  associated or affiliated in any way with the CCP?

6  A.  It's my sworn testimony I have no knowledge of any of

7  Elliott Broidy's associations with anyone from the CCP.

8  Q.  And affiliation?

9  A.  It's -- let me tell you why it's a tricky question to

10 answer, because when you're in the international business or

11 political spheres, you meet lots and lots of people, and it's

12 like saying I must be in league with Guo Wengui because I'm

13 talking to his attorney.  It's just a matter of the nature of

14 the relationship.  So I really can't honestly comment on what

15 you're trying to get to.  I can't straightforwardly do it in

16 the way that you're asking.

17 Q.  I'm asking you on the record, under oath, whether you know

18 whether Elliott Broidy is in any way associated or affiliated

19 with the CCP?

20 A.  Correct, I do not know.

21 Q.  And the same question, but this time with the People's

22 Republic of China, PRC?

23 A.  Correct.

24 Q.  The same answer?

25 A.  Yes.

1    Q.  Now, yesterday, you testified that you were aware that

2    "Elliott Broidy" — and I'm quoting — "pled guilty to working

3    with China to have Guo Wengui deported," closed quote.  Do you

4    remember that?

5    A.  Yes.

6    Q.  But you said that you didn't know of the nature of the

7    CCP's involvement.  Do you recall saying that?

8    A.  Yes, I did not have any of the documentation in front of

9    me, and I was just relying on my memory from press reports that

10   might have varied with one another.  So I didn't have the

11   documentation to view.

12   Q.  Okay.  But you remember testifying to that?

13   A.  Yes, I remember saying that, but I would correct my

14   comments today.

15   Q.  Understood.

16           MR. CHUFF:  Could we please pull up DX 71.  Actually,

17   I'm sorry, I think it's PX 71.

18   Q.  Now, Dr. Waller, this is Elliott Broidy's guilty plea.  If

19   you could go to page 1, and I believe you testified to this

20   today, but under heading 1 -- actually, you know, I'm sorry,

21   let's go up to the top.

22           THE COURT:  Counsel, it looks like this is a plea

23   agreement signed by Mr. Broidy, not his actual guilty plea

24   transcript; am I correct?

25           MR. CHUFF:  Let me just confirm, your Honor.

L4KKEAS3                         Waller - Recross

1          THE COURT:  I think you should identify the document

2    correctly for the record and for the witness.

3          MR. CHUFF:  Yes.  Sorry, your Honor.

4    BY MR. CHUFF:

5    Q.  This is Elliott Broidy's plea agreement; is that correct?

6    A.  You're asking me?

7    Q.  Yes.

8    A.  I don't know.  I've never seen this document before.

9    Q.  Okay.  Well, if we can go to page 1, do you see the first

10   line, it says, "This letter sets forth the full and complete

11   plea offer to your client, Elliott Broidy (hereinafter referred

12   to as your client or defendant)"?

13   A.  Yes.

14   Q.  So you'll understand that if this letter refers to your

15   client or defendant, it will be to Elliott Broidy?

16   A.  Yes.

17   Q.  If you go to heading 1, it says, "Your client agrees to

18   plead guilty to an information charging your client with

19   conspiracy to serve as an unregistered agent of a foreign

20   principal, in violation of 18, U.S.C., Section 371."

21          Do you see that?

22   A.  Yes.

23   Q.  This is what you were testifying about this morning,

24   correct?

25   A.  Well, I have not seen this document, so I was not

Walker – Recross

1     testifying about this document.

2     Q.   You were testifying about his guilty plea?

3     A.   Yes.

4     Q.   And that it was a plea guilty of this statutory section,

5     correct?

6     A.   I didn't know the name of the statutory section.

7     Q.   That he violated FARA?

8     A.   Yes, I knew that, but I didn't know the number of the

9     section.

10    Q.   Okay.  And then if we can turn to page 2, under heading 2,

11    "Factual Stipulations," it says, "Your client agrees that the

12    attached statement of offense fairly and accurately describes

13    your client's actions and involvement in the offense to which

14    your client is pleading guilty."

15          Do you see that?

16    A.   Yes.

17    Q.   And if we could turn to page 12, you see there Elliott

18    Broidy signed this and he accepted this plea offer?

19    A.   Yes.

20    Q.   And then if we can just go to page 13, paragraph 2 --

21    actually, before we get there, let me ask you:  The CCP is the

22    political party that's in charge of the PRC right now, right?

23    A.   Yes.

24    Q.   And it has been since before the research agreement was

25    signed?

1    A.  Yes.

2    Q.  So government ministers, during this time period, are

3    necessarily CCP members; isn't that correct?

4    A.  Yes.

5          MR. CHUFF:  If we could turn to page 13, please.  Yes,

6    that's right.

7    Q.  And at paragraph 2, I'm just going to read it into the

8    record:  "During the same approximate period" --

9          MR. CHUFF:  And I guess we should go up to

10   paragraph 1.

11   Q.  So paragraph 1 says, "From no later than March 2017 to at

12   least in or about January 2018."  Did I read that correctly?

13   A.  It was scrolling too fast.

14         MS. CLINE:  Sorry.

15   Q.  I'll read it again.  "From no later than March 2017 to at

16   least in or about January 2018."  Did I read that time period

17   right?

18   A.  Yes.

19   Q.  Okay.  If we scroll down to paragraph 2, it says, "During

20   the same approximate period, Broidy, Davis, and Person A also

21   agreed to lobby the administration and the DOJ to arrange for

22   the removal and return of People's Republic of China (PRC)

23   National A, a citizen of the PRC living in the United States,

24   on behalf of Foreign National A."

25         Do you see there -- first, did I read that correctly?

1   A.  Basically, yes.

2   Q.  Did I get something wrong?

3   A.  There might have been a word or two, but I don't object to

4   the way you read it.

5   Q.  Okay.

6        Do you see that People's Republic of China is defined

7   as PRC?

8   A.  Yes.

9   Q.  The next sentence, it says, "This involved, among other

10  things, advocating for meetings between PRC Minister A and

11  United States Government officials"?

12  A.  Yes.

13       MR. CHUFF:  And then if we could go down to

14  paragraph 20 -- 28, I'm sorry, two-eight.

15  Q.  The paragraph reads, "On or about May 18, 2017, Broidy,

16  Davis, and Person A traveled to the PRC where they met with

17  Foreign National A and PRC Minister A.  PRC Minister A asked

18  Broidy to use his influence with high-ranking United States

19  Government officials to advocate for PRC National A's removal

20  and return to the PRC.  PRC Minister A also stated that he

21  would be visiting Washington, D.C. soon and was having trouble

22  scheduling meetings with certain high-ranking United States

23  Government officials."

24       Did I read that correctly?

25  A.  Yes.

1  Q.  Now, it refers to multiple times PRC Minister A; is that

2  correct?

3  A.  Yes.

4  Q.  And it refers to Broidy's traveling to meet PRC Minister A,

5  correct?

6  A.  Yes.

7  Q.  And you just admitted a moment ago that to be a government

8  minister of the PRC, you necessarily are a member of the CCP;

9  is that correct?

10  A.  Yes.

11  Q.  And this doesn't say -- I think you testified earlier

12  before that he was only meeting with someone from Malaysia.

13  PRC --

14        MR. GREIM:  Objection, your Honor.  The counsel is

15  misstating the witness' prior testimony.

16        THE COURT:  Why don't you just ask the questions

17  without referencing the prior testimony.

18        MR. CHUFF:  May I inquire of counsel to what I

19  misstated?

20        THE COURT:  No, you may not.  Just ask questions.

21        MR. CHUFF:  Okay.

22  BY MR. CHUFF:

23  Q.  PRC Minister A -- actually, to be a government minister,

24  given that the CCP has control of the PRC, to be a government

25  minister, that person has to be a CCP member, correct?

L4KKEAS3                          Waller - Recross

1   A.  Yes.

2   Q.  Now, is it your understanding that in paragraph 8, the PRC

3   Minister A that's referred to is Yanping Liu?

4   A.  I have no idea.  I've never seen this document before.

5           MR. CHUFF:  Let's pull up the stipulation of fees in

6   this case, dated -- Actually, before I do that, can I offer

7   DX 71, please?

8           THE COURT:  Okay.  Any objection as to authenticity?

9           MR. GREIM:  Not as to authenticity, but as to

10  foundation, your Honor, we do.

11          THE COURT:  Do you want to do more to try to lay a

12  foundation?  Otherwise, I'll receive it subject to motion to

13  strike.

14          MR. CHUFF:  May I confer with my colleague?

15          THE COURT:  Yes.  You're on the clock.  Go ahead.

16          (Pause)

17          MR. CHUFF:  No, we'll rest on the record.

18  BY MR. CHUFF:

19  Q.  So, Dr. Waller, we've put up a stipulation that the

20  parties, Eastern Profit and Strategic Vision, reached in this

21  case.  I will direct your attention to paragraph 2.

22  Paragraph 2 says, "Strategic Vision U.S., LLC's legal fees in

23  this action are not being paid by any person or entity that is

24  or ever was a member of, associated with, or affiliated with

25  the Chinese Communist Party or the People's Republic of China."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              Did I read that correctly up until the comma?
 2   A.  Yes.
 3   Q.  I'm sorry, did you say yes?
 4   A.  Yes.  This gets back to what I was referring to before by
 5   association and intent.  So you just can't have guilt by
 6   association just because someone met with someone else.
 7   Q.  Well, he pled guilty to a federal offense for meeting with
 8   that person?
 9   A.  I don't believe that to be the case.
10              MR. GREIM:  Objection, your Honor.  I object to the
11   improper --
12              THE COURT:  The objection is sustained.
13   Q.  Now, Strategic calls itself out as a company specializing
14   in due diligence; isn't that correct?
15   A.  That's one of the things it does, yeah.
16   Q.  And you had a lot of experience doing research?
17   A.  Yes.
18   Q.  Are you aware that Circinus is not a litigation funder?
19   A.  Is not a what?
20   Q.  Litigation funder?
21   A.  No.
22   Q.  You're not aware of that?
23   A.  No.
24              MR. GREIM:  Your Honor, I'm sorry, I was slow on the
25   uptake there.  I object as vague — litigation funder.
```

L4KKEAS3                        Waller - Recross

```
 1            THE COURT:  The objection is overruled, but I would
 2   suggest that you move off from this line of examination pretty
 3   quickly, because as the fact finder, unless you're coming up
 4   with something great, I don't think that this is your most
 5   powerful line of examination.
 6            MR. CHUFF:  Okay.  Thank you, your Honor.
 7   BY MR. CHUFF:
 8   Q.  So I would just ask:  What diligence did you do to verify
 9   whether Elliott Broidy was or was not associated or affiliated
10   with the CCP or the PRC?
11   A.  Well, first, I asked Mr. Broidy myself what the nature of
12   his work was, and he said that in the context of meeting with
13   the Malaysian individual, whose name I saw during the scrolling
14   of that previous exhibit, he was trying to free three American
15   captives inside China, including a pregnant woman.  And in the
16   course of trying to free those three American captives, he met
17   that official, who I believe was the one mentioned in that
18   document.
19            So, as far as I'm concerned, that doesn't show
20   association with the Communist Party, it shows he's trying to
21   bring American citizens home.
22   Q.  Yes.  Dr. Waller, I'm just asking, what diligence did you
23   do to make sure that there was no association?
24   A.  First thing was I asked him to his face.  The second thing
25   was I researched his background and his company's background,
```

L4KKEAS3                    Waller – Recross

1   and I found a number of people who know him personally.

2   Q.  Okay.  And --

3           THE COURT:  Dr. Waller, just one question for you:

4   When you were describing the conversation with Mr. Broidy, did

5   he tell you that in the course of trying to free the three

6   American captives, he met with the individual who was mentioned

7   in the -- whom you now see as being mentioned in the plea

8   agreement?

9           THE WITNESS:  He did not.

10          MR. CHUFF:  And just last on this line.

11          THE COURT:  Go ahead.

12          MR. CHUFF:  PX 67, if we could pull that up very

13  quickly.

14  BY MR. CHUFF:

15  Q.  I don't want to belabor the point here.  This is a New York

16  Times Article entitled, "Seeking Foreign Money, GOP Donor

17  Pushed for Trump To Golf with Malaysian Premier."  Do you see

18  that?

19  A.  Yes.

20  Q.  Do you see the fourth paragraph, it says, "Mr. Broidy also

21  explored separate plans to force the exit from the United

22  States of a Chinese billionaire and dissident, Guo Wengui,

23  evidently to please Chinese allies in Malaysia"?

24          Do you see that?

25  A.  Yes.

1   Q.  And Chinese is -- "Chinese allies" is referring to people

2   within the PRC?

3   A.  It doesn't say --

4           MR. GREIM:  Objection, your Honor.

5           THE COURT:  The objection is sustained.

6   BY MR. CHUFF:

7   Q.  Dr. Waller, did you read this document before that

8   January 1st, 2018 stipulation was signed?

9   A.  No, because this is from June 2018 -- April 2018.

10  Q.  I'm sorry, the stipulation was January 31st, 2020.

11          Did you read that article before -- this article,

12  PX 67, before January 31st, 2020?

13  A.  I believe I read this article at the time it was published.

14  Q.  Okay.

15          MR. CHUFF:  May I just confer with my colleagues and

16  see that there's nothing else?

17          (Pause)

18  BY MR. CHUFF:

19  Q.  Just one more question on this, and we'll change gears.

20          Did you ever read the criminal indictment of Elliott

21  Broidy?

22  A.  No.

23  Q.  Now, earlier, you testified that you incurred $15,000 in

24  expenses for legal bills in May 2018; is that correct?

25  A.  I paid the bills then.  They were overdue.

L4KKEAS3                        Waller - Recross

1    Q.  When was the legal advice obtained, without disclosing --

2    A.  It was sought in very late January or very early February.

3    Q.  Who was the law firm that --

4    A.  It was a law firm in the country where Team 1 was based.

5    Q.  Do you have the name of the law firm?

6    A.  I don't know it off the top of my head.

7    Q.  You incurred $15,000 to the law firm, but you don't know

8    its name?

9    A.  That's right.

10   Q.  Do you have an invoice for that legal bill?

11   A.  I do.

12   Q.  Did you introduce it in this litigation?

13   A.  No.

14          MR. CHUFF:  Nothing further, your Honor.

15          THE COURT:  Mr. Chuff, would you please wipe down the

16   podium and replace the microphone cover.

17          MR. CHUFF:  Yes.

18          THE COURT:  And, Mr. Greim, any further examination?

19          MR. GREIM:  Your Honor, I have one.

20          THE COURT:  Okay.  Why don't you wait until the podium

21   is wiped off, unless you want to do it from counsel table.

22          MR. GREIM:  Your Honor, I can do it right from this

23   microphone.

24          THE COURT:  Okay.  Why don't you wait for a moment for

25   Mr. Chuff.

1          And let me give the instruction that going forward,

2    it's a reminder, each counsel, when they leave the podium,

3    needs to wipe it down.

4          You may inquire.

5    REDIRECT EXAMINATION (Continued)

6    BY MR. GREIM:

7    Q.  Just one question, Mr. Waller.

8          We won't pull it up again, but you saw the very first

9    page of your notes from November 1, 2017.  And do you recall

10   there were statements on there about wanting immediate

11   information?

12   A.  Yes.

13   Q.  Now, this was from your very first meeting with Mr. Guo,

14   correct?

15   A.  Yes.

16   Q.  And was Mr. Guo telling you at that meeting about

17   information he wanted you to find?

18   A.  He just wanted it found in general.

19          MR. GREIM:  No further questions.

20          THE COURT:  Okay.  Next witness.

21          Dr. Waller, you're excused.  Thank you very much.

22          THE WITNESS:  Thank you, your Honor.

23          (Witness excused)

24          MS. CLINE:  Plaintiffs call Yvette Wang.

25          THE COURT:  Ms. Wang may take the stand.

```
 1              I have in front of me defendant's trial exhibits for

 2    Ms. Wang.  I also have a binder that says "Y. Wang Outline and

 3    Exhibits."  I haven't looked at the binder, but it doesn't look

 4    like it is intended for me.  I also don't have plaintiff's

 5    trial exhibits for Ms. Wang.

 6              MS. CLINE:  So, your Honor, the only exhibit we intend

 7    to use with Ms. Wang is Plaintiff's Exhibit 1.

 8              THE COURT:  Okay.  Very well.

 9              Is this your binder, Mr. Greim?

10              MR. GREIM:  It probably is because I have the same

11    label on one of my binders.

12              THE COURT:  Okay.  We'll hand it back to you.

13              Ms. Wang, you may take a seat in the jury box.

14              THE WITNESS:  Yes.

15              THE COURT:  The witness stand in the jury box.  And I

16    am going to ask you to remain standing and raise your right

17    hand.

18              Mr. Fishman, would you please swear the witness.

19     YAN PING WANG,

20         called as a witness by the Plaintiff,

21         having been duly sworn, testified as follows:

22              THE DEPUTY CLERK:  Please state your full name for the

23    record.

24              THE WITNESS:  Yan Ping Wang, Y-a-n P-i-n-g W-a-n-g.

25              THE COURT:  Ms. Wang, you may be seated.  You may be
```

L4KKEAS3                          Wang - Direct

1   seated.  Sit down.

2                THE WITNESS:  Thank you.

3                THE COURT:  Let me ask you to try to please keep your

4   voice up because it's sometimes difficult to hear witnesses

5   through the mask.  Also, try to speak slowly and clearly for my

6   benefit and for the benefit of the court reporter.

7                THE WITNESS:  Yes, your Honor.

8                THE COURT:  Just give us one moment.

9                Is that white binder in front of the witness something

10  that is needed?

11               MS. CLINE:  It's not ours.

12               THE COURT:  You can step away, Ms. Cline.  I'm going

13  to ask my courtroom deputy to remove the white binder.

14               MR. GREIM:  I'll take that white binder.

15               THE COURT:  Which goes back to defense counsel.

16               Ms. Cline, you may inquire.

17               MS. CLINE:  Thank you, your Honor.

18  DIRECT EXAMINATION

19  BY MS. CLINE:

20  Q.  Ms. Wang, were you born here in the United States?

21  A.  No.

22  Q.  When did you leave China to come to the United States?

23  A.  In April 2015.

24  Q.  Are you a citizen of the United States?

25  A.  No, I'm not.

1    Q.  Have you applied for asylum in the United States?

2    A.  Yes, I did.

3    Q.  When did you apply?

4    A.  In late 2017.

5    Q.  And what's the current status of your asylum application?

6    A.  It's pending approval.

7    Q.  Tell us a little bit about your educational background.

8    A.  I graduated in France with two Master degrees.

9    Q.  And in what subjects were your Master degrees?

10   A.  One is for the American culture and civilization; another

11   one is China-U.S. relationship.

12   Q.  Do you know a man by the name of Guo Wengui?

13   A.  Yes, I do.

14   Q.  When did you first meet Mr. Guo?

15   A.  In 2008.

16   Q.  How did you meet him?

17   A.  I met him in the company for business.

18   Q.  In whose company?

19   A.  In his family's company.

20   Q.  Did you work for him?

21   A.  I worked for the family.

22   Q.  Have you been working for his family since then?

23   A.  Yes.

24   Q.  Currently, how frequently would you say you interact with

25   Mr. Guo?

1   A.  I met him or talk with him as needed, yeah.

2   Q.  Like ten times a day, once a year, about how often?

3   A.  Like several times per week, yeah.

4   Q.  How would you describe the -- sorry.  Are you familiar with

5   the nature of the work Mr. Guo does?

6   A.  Yes, I am.

7   Q.  How would you describe Mr. Guo's work to someone who didn't

8   know him?

9   A.  Can you repeat your question?

10  Q.  Sure.

11          How would you describe what Mr. Guo does every day to

12  someone who doesn't know him?

13  A.  Oh, yes.  He is the leading -- he is leading the entire

14  anti-Chinese Communist Party whistleblowing movement.  Since

15  the beginning of 2017, he's pretty much doing that every day,

16  every day.

17  Q.  When you say "whistleblower movement," tell us what you

18  mean by that.

19  A.  This is a movement which was initiated by Mr. Guo in

20  January of 2017.  He started to expose and whistleblowing the

21  Chinese high-level governmental official, their corruption, and

22  their illegal assets in the overseas.  So he try to

23  whistleblowing their corruption and wake up the Chinese regime,

24  including wake up the Western world.  It has been continuing

25  until now for four years.

L4KKEAS3                          Wang - Direct

1    Q.  Have you personally witnessed Mr. Guo's efforts to expose

2    corruption within the CCP?

3    A.  Yes, I do.

4    Q.  Can you describe those efforts a little more -- in a little

5    more detail, starting from 2017?

6    A.  Yeah.  Starting from January 2017, Mr. Guo, for his entire

7    life, first time he started to stand in front of a camera and

8    then to take interview, Livestream interview broadcast.  And

9    then he has been doing all of this radio, broadcasting,

10   Livestream for four years, pretty much more than 10,000 hours

11   on his social media.  Like before it was on Twitter, on

12   YouTube, then Twitter and YouTube shut him down, and then he

13   started -- his family started a second social media platform,

14   and then he's broadcasting on that pretty much like every week.

15   Before it was every day, now it's every week, yeah, like two,

16   three times every week.

17   Q.  And what is it that he's broadcasting?

18   A.  He's merely talking about translate or interpret, expose,

19   the inside Information about Chinese regime, the high-level

20   governmental Communist Party corruption, their deals, their

21   tricks, and then to explain how they play around the world, and

22   then the corruption governmental official, how they corrupted

23   the entire West world, also.

24   Q.  Do you have any reason to believe that Mr. Guo actually

25   supports the CCP?

 1   A.  No.  It's already --

 2             MR. GREIM:  Your Honor, I object asking this witness'

 3   opinion.

 4             THE COURT:  Overruled.

 5   BY MS. CLINE:

 6   Q.  Let me try it again.  Do you have any reason to believe

 7   that Mr. Guo actually supports the CCP?

 8   A.  No, I never believe.  This is ridiculous.

 9   Q.  Why do you say that?

10   A.  Because Mr. Guo had been the biggest dissident of the

11   Chinese regime, and he is leading the entire whistleblowing

12   moment.  He literally is sacrificing -- his family sacrifice

13   more than -- his family has been sacrificing more than a

14   billion of assets in Mainland China.  His family had been in

15   jail, and then his colleague, his family's colleague, employee

16   have been in jail.

17             THE COURT:  Ms. Wang, let me caution you to please

18   speak slowly, okay?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  I am admitting that line of testimony

21   about the opinion as lay opinion testimony because I think an

22   adequate foundation has been laid to provide lay opinion

23   testimony, but keep within the confines on it, and, obviously,

24   I'm going to permit cross-examination with respect to the

25   foundation for that opinion.

1            Go ahead, Ms. Cline.

2    BY MS. CLINE:

3    Q.   What are your own views on the CCP?

4    A.   They are evil.

5    Q.   Why do you say that?

6    A.   They block entire rule of law, democracy, and the freedom

7    of speech to the 1.4 billion people of Mainland China.

8    Q.   Were you yourself ever affiliated with the CCP?

9    A.   I was before, but I cut off from them completely.

10   Q.   Why?

11   A.   There are more than 90 million Chinese -- Mainland Chinese

12   people.  They are the Chinese Communist Party members, 90

13   million, nine-zero.  And then most of the great students in

14   college, in university, and then they are encouraged or even

15   requested to join the party without knowing too much about

16   Chinese Communist Party.  So 90 million of Chinese Communist

17   Party member, 99.9 percent of them, they are good people, they

18   are common workers, they are average people.  They are just the

19   workers, just the workers, yeah.  They are salary people, and

20   only very tiny small group of Chinese high-level governmental

21   official, they are very corrupted, and then they are kidnapping

22   entire Chinese people and China, this country, to damage them

23   and that hurt the entire world.

24            So, as long as I was outside of this regime, and I

25   start to realize that, and I got a wake up, so I cut off with

```
 1    them completely.

 2              THE COURT:  Ms. Wang, once again, please try to speak

 3    slowly.

 4              THE WITNESS:  Yes, sir.

 5              THE COURT:  I realize that it's a little bit of an

 6    alien environment to be in a courtroom.  Just take your time.

 7    We've got the time.  Just take your time and answer the

 8    questions slowly.

 9              THE WITNESS:  Yes, your Honor, yes.

10              THE COURT:  Now, did you say 90 million or 19 million?

11              THE WITNESS:  90, nine-zero, million, your Honor.

12              THE COURT:  Thank you.

13    BY MS. CLINE:

14    Q.  Did there come a time when you were introduced to French

15    Wallop and Michael Waller?

16    A.  Yes.  That should be in the Autumn of 2017.

17    Q.  And what were the circumstances under which you were

18    introduced to them?

19    A.  The first time I was introduced to Ms. Wallop and

20    Mr. Waller in a meeting, which they were trying to introduce

21    and sell a real estate property to Mr. Guo.  That was the first

22    meeting.

23    Q.  Did you say a real estate property?

24    A.  Yes, a house.

25    Q.  Were you present at a meeting with them?
```

1   A.  Yes, I was present in that meeting.

2   Q.  Okay.  Were there any meetings subsequent to that in which

3   you participated?

4   A.  Yes, there were several other meetings after, yeah.

5   Q.  Could you sort of describe, as best you can remember, what

6   happened at the next meeting after that first one about the

7   real estate?

8   A.  After the first meeting, I remember I traveled to D.C. and

9   Virginia.  Ms. Wallop, she drove me around Virginia to show me

10  some house, some real estate property, and now we spent at

11  least more than half of a day to do the house tour.

12          And after that, I remember from certain point in time,

13  and then she start with Mr. Waller together to introduce their

14  investigation firm and their capabilities to Mr. Guo and me.

15  There were several other meetings about this, also.

16  Q.  What did Mr. Waller and Ms. Wallop say about their

17  investigation services business?

18  A.  They introduced themselves to Mr. Guo and me as one of the

19  best, most professional, qualified investigation firm in the

20  country.  They even referred they worked for the governmental

21  agencies, like CIA or other agency.  And then Ms. Wallop even

22  handwrote some names of their clients.  As far as what they

23  said, they are the royal family from Middle East or from

24  Russia, some big clients, as their reference to Mr. Guo and me.

25          So, long story short, they came to us and then

1    introduced themselves as the best -- one of the best

2    investigation firm in the country.

3    Q.  Why did you understand that they were discussing their

4    investigation capabilities?

5    A.  I understood they will like Mr. Guo or some other clients

6    from Mr. Guo to hire them.  They want to get the business.

7    That's my understanding.

8    Q.  For what purpose, though?  Did you have an understanding as

9    to why Mr. Guo might be interested in their services?

10   A.  I know for a long time, Mr. Guo tried very hard to

11   investigate the Chinese high-level governmental corrupted

12   officials and their assets.  So, in my understanding,

13   Ms. Wallop and Mr. Waller, they came to Mr. Guo trying to have

14   their firm retained by Mr. Guo or the clients related to

15   investigate the corruption of Chinese regime.

16   Q.  For what purpose?  What was the point of investigating the

17   corruption within the Chinese regime?

18   A.  The purpose is to investigate the Chinese high-level

19   governmental corrupted official and their illegal corrupted

20   assets, which they hide in the U.S. and worldwide, in order to

21   investigate them, found them, and then to report to authority,

22   and then to encourage or request the government, if they can,

23   take investigation official, or even indict them, or put them

24   in jail.  So that's the main target, to get them punished.

25   Q.  To get them punished?

L4KKEAS3                        Wang  Direct

```
1    A.   That's right.
2    Q.   Have you ever heard of a company called Eastern Profit
3    Corporation Limited?
4    A.   Yes, I do.
5    Q.   Does Eastern Profit have anything to do with the
6    investigation that you and Mr. Guo were discussing with
7    Ms. Wallop and Mr. Waller?
8    A.   Eastern Profit, this company, entered into this
9    investigation agreement at the end as the client.
10   Q.   Well, how did Eastern Profit become involved?
11   A.   Eastern Profit was produced as one of the company and their
12   principal, they were persecuted by the Chinese Communist Party,
13   also.  Their bank account and assets were frozen by Chinese
14   regime, also.
15   Q.   Was it you who reached out to Eastern Profit in connection
16   with this research -- contemplated research?
17   A.   Yes, that was me.
18   Q.   What did you do to contact Eastern Profit?
19   A.   I was introduced by Ms. Wallop and Mr. Waller with this
20   company, like investigation company, and then both me and
21   Mr. Guo, we felt this is a great company, right, and from very
22   reputable person and very presentable gentleman and lady from
23   Washington, right, and we feel we finally got the right
24   qualified investigation firm who is able to help us in our
25   movement.
```

 1          So I start to look around, and then I looked for some
 2   party, or some company, or some individual who is willing to
 3   join this investigation project, to be a part of that.  Then
 4   Eastern Profit came into our world.
 5   Q.  With whom at Eastern Profit did you communicate?
 6   A.  Mr. Hank Han.
 7   Q.  And what was your understanding of his connection to
 8   Eastern Profit?
 9   A.  In my understanding, Mr. Han is the principal and agent of
10   Eastern Profit.
11          THE COURT:  Can you spell his name for the record?
12          THE WITNESS:  Yes, your Honor.  Mr. Hank, H-a-n-k,
13   Han, H-a-n.  H-a-n is the family name, last name.
14          THE COURT:  Thank you.
15   BY MS. CLINE:
16   Q.  Ms. Wang, does he have a Chinese name as well rather than
17   Hank?
18   A.  Yes, he has.
19   Q.  Can you spell that as well for us?
20   A.  Sure.  Of course.
21          His Chinese name is Chunguang Han, spelled
22   C-h-u-n-g-u-a-n-g, last name H-a-n.
23   Q.  What was the first communication you had with Mr. Han about
24   the research proposal?
25   A.  I called him and briefly I told him we possibly got a great

1    firm, great investigation firm, and then they're very capable,

2    and they may be able to help us to investigate the Chinese

3    corrupted governmental official, and then do you have interest

4    to be part of that?

5         And Mr. Han, kind of he said, sounds like great,

6    right, you guys finally got someone who can help.  And then we

7    didn't share too many details on the phone call, and then we

8    decide to say let's meet in person to talk the details because

9    it's supposed to be confidential.

10   Q.  And did you and Mr. Han meet in person to discuss the

11   investigation?

12   A.  Yes, we did.

13   Q.  Can you describe that meeting for us, please?

14   A.  The meeting was in the lobby of my office building.

15   Mr. Han came, and we briefly chat in Mandarin, of course,

16   because he doesn't speak English.  So I introduce him, I

17   mentioned the two principal of this investigation firm, they

18   are from D.C., introduce by very reliable and trustful friend

19   of Mr. Guo, and we met them, these two principal, for several

20   times, and we believe this investigation firm, they are very

21   good, and then they can help us to investigate the Chinese

22   high-level governmental official, their corruption and their

23   corrupted assets.

24        And then Mr. Han, he trust us, of course, and he said,

25   let me figure out.  You go to continue, right, talk with,

L4KKEAS3                        Wang - Direct

 1   negotiate about a contract and a project, how you got proceed,

 2   and I need to figure out to get a party or a company, of

 3   course, including the fund deposit, because I did mention to

 4   him, say that the contract requests 1 million U.S. dollars as a

 5   deposit.

 6           So, Mr. Han, he said, no, let me figure out how to get

 7   the money for this project, and then you go ahead and get more

 8   details.  So that was the first conversation.

 9   Q.  Okay.  And then after that conversation, did he eventually

10   come back to you to discuss the research project again?

11   A.  Yes, he did.

12   Q.  And describe that conversation for us.

13   A.  He called me, and I forgot which day.  You know, like he

14   call me and pretty much said that they are onboard, so he told

15   me, say Yvette, you know, you're handling this along the way,

16   and you speak good English, right, you understand that, and

17   then you are authorized to proceed this contract, and then this

18   project, and I will take care of the payment, and then we're

19   onboard.

20   Q.  Okay.  So just so we're all clear, was it your

21   understanding that Mr. Han authorized you, on behalf of Eastern

22   Profit, to negotiate the agreement with Mr. Waller and

23   Ms. Wallop?

24   A.  Correct.

25   Q.  And so did you, in fact, do that?

1   A.  Yes, I did that.

2   Q.  Did Eastern Profit and Strategic Vision ultimately enter

3   into a contract?

4   A.  Yes, they did.

5          MS. CLINE:  Mr. Chuff, can we pull up PX 1, please.

6   Q.  Ms. Wang, the exhibit should appear on the screen in front

7   of you.

8          MS. CLINE:  Mr. Chuff, can we just scroll through the

9   agreement just to the end, so Ms. Wang can see it.

10  BY MS. CLINE:

11  Q.  And so, Ms. Wang, my first question for you is just:  Do

12  you recognize this to be the contract between Strategic Vision

13  and Eastern Profit?

14  A.  Yes, it is.

15         MS. CLINE:  Mr. Chuff, can we go back to page 1,

16  please.  And scroll down to the fourth paragraph.

17  Q.  So here, in the fourth paragraph, the contract says the

18  following:  "The contractor will conduct high quality original

19  research and prepare reports on subjects chosen at the client's

20  discretion for the purpose of detecting, stopping, and

21  preventing crime or other harm to innocent people."

22         Do you see where I read that?

23  A.  Yes, I do.

24  Q.  And what was your understanding of detecting, stopping, and

25  preventing crime or other harm to innocent people?  What was

1   that talking about, in your understanding?

2   A.  The purpose is to investigate and find out as much as we

3   can the evidence, the proof, and original investigation — high

4   quality, of course — information which related to the Chinese

5   high-level governmental official, their corrupted assets.  And

6   those assets, they hide them in the international, in U.S. and

7   in the rest of the world.  We want to find those information,

8   to report them, investigate them, request the government to

9   investigate and put them in jail, to save the Chinese people,

10  which is innocent people in here, we refer.

11            MS. CLINE:  Let's scroll to page 5, please.

12  Q.  Ms. Wang, in the second paragraph there, the contract

13  refers to a deposit of $1 million.  Do you see that?

14  A.  Yes, I do.

15  Q.  Was it your understanding that Eastern Profit had to pay a

16  deposit in connection with the agreement?

17  A.  Yes, it is.

18            MS. CLINE:  If we could scroll down to the third

19  paragraph.

20  Q.  So there's a paragraph that starts with the word

21  "subsequent."  Do you see that paragraph?

22  A.  Yes, I do.

23  Q.  And the second sentence says, "It is understood that the

24  client may direct other entities to pay the contractor, and

25  that such payments will be deemed satisfactory compensation by

1     the contractor."

2              Do you see that?

3     A.  Yes, I do.

4     Q.  Did that, in fact, happen?  Did another entity pay the

5     contractor on behalf of Eastern Profit?

6     A.  Yes, correct.

7     Q.  And do you know the name of the entity that paid the

8     deposit on behalf of Eastern Profit?

9     A.  It's a company called ACA.

10    Q.  Did you have anything to do with communicating with ACA

11    about securing the money from them?

12    A.  I was not involved in that part.

13    Q.  Do you know whether Strategic, in fact, received the

14    million dollars from ACA?

15    A.  Yes, I believe so.

16    Q.  Did Ms. Wallop or Mr. Waller ever ask you why the

17    $1 million was deposited by ACA rather than Eastern?

18    A.  No, they didn't ask.

19    Q.  Did they refuse to accept the payment when they saw it

20    didn't come from Eastern?

21    A.  No, they didn't refuse.

22    Q.  Did they ever tell you that Strategic wasn't going to

23    perform the contract because the deposit came from ACA?

24    A.  They didn't mention that.

25    Q.  Now, let's talk about the parties' performance under the

L4KKEAS3                        Wang - Direct

1   agreement.  Was it the case that there were certain people who

2   were to be the subjects of the investigation under the

3   agreement?

4   A.  I beg your pardon?

5   Q.  Yes, sorry, that was awful.

6            Was part of the point of the contract that

7   Strategic Vision would investigate particular people?

8   A.  Correct.

9   Q.  And did Eastern decide on the names of the people it wanted

10  to be investigated?

11  A.  No, it's not decided by Eastern Profit.

12  Q.  Okay.  Who decided that?

13  A.  Mr. Guo introduce some name, and I researched some name, we

14  put together the list.

15  Q.  And do you know whether a list of names was provided to

16  Strategic?

17  A.  Sorry, I beg your pardon again?

18  Q.  Yes.  The list -- the names that you and Mr. Guo put

19  together, was that list provided to Strategic?

20  A.  Correct.

21  Q.  And then what happened after the names were provided to

22  Strategic?

23            THE COURT:  Excuse me.  Were the names provided to

24  Eastern Profit?

25            THE WITNESS:  Sorry, your Honor, I beg your pardon.

L4KKEAS3                         Wang - Direct

1    What's your question?

2              THE COURT:  Was the list of names provided to Eastern

3    Profit?

4              THE WITNESS:  No.  The name of the list was only

5    provided to Strategic Vision, your Honor.

6              THE COURT:  Okay.

7    BY MS. CLINE:

8    Q.  So, after the names were provided to Strategic Vision, what

9    happened next?

10   A.  Strategic Vision was supposed to start to investigate those

11   names.

12   Q.  And did they start to investigate?

13   A.  No, they didn't.  Ms. Wallop, the second day, after me and

14   her, we sit down, I presented her the list of name.  She opened

15   that successfully on her laptop with the name list.  Me and her

16   we went through each of the name in her house in Virginia.  She

17   took over the name of the list, list of the name, and then

18   supposed to start to investigate it right away.

19             But, unfortunately, the second day, she called me,

20   told me that she was not able to open the file.  So she

21   requested a second copy of the name list.

22   Q.  Did you give her a second copy of the name list?

23   A.  Yes, I did.

24   Q.  Can you describe who — just generally, not necessarily by

25   name — but who were the types of people who were on the name

1  list?

2  A.  The name list including the vice president of Chinese

3  Government, the minister of national security of Chinese

4  ministry, and their family, including their wife, their kids,

5  and some of their mistress, and their illegal kids.

6  Q.  Now, after you provided the second list of names, was

7  Strategic ever able to provide a written report showing its

8  results of its investigation?

9  A.  No, they did not.

10  Q.  What did they provide?

11  A.  After me and Mr. Guo, we did several kind of, like, chase

12  follow-up and request, they finally came, Mr. Waller and

13  Ms. Wallop, they finally came to meet me and Mr. Guo and

14  presented with a folder, which is in another USB flash drive,

15  without the valuable high quality of content of reports in

16  there at all.  Basically it's nonsense in the first flash

17  drive.

18  Q.  How did you and Mr. Guo react when you saw the contents of

19  the first flash drive?

20  A.  The meeting happened in New York.  Ms. Wallop and

21  Mr. Waller, they came to visit me and Mr. Guo.  They brought a

22  laptop they called virgin laptop.  They told us this laptop was

23  never connect with any internet, which we never use internet,

24  and they used that laptop, open their flash drive, and they

25  start to open their -- I believe it's a PDF file, and Mr. Guo

1    was very disappointed, and even very shocked, because both me

2    and him, we found there is no investigation deliverable content

3    in there at all.  It's basically some structure how they plan

4    to build the work, with very limited words in there.

5              So Mr. Guo was very, very shocked and very, very

6    disappointed.  And Mr. Waller, literally he started to sweat,

7    he was sweating, and his face is turned to be very red, and

8    then he apologized, including Ms. Wallop apologized, also.

9    They apologized, they said they had miscommunication,

10   communication problem, with their team lead in Europe, and they

11   figured out this is not the report they should bring to us.  So

12   that was a lunch meeting.  Basically, both of them, they

13   apologized again, again sweating, and then they admitted they

14   made mistake with the investigation report.

15   Q.  Did they leave a copy of that first flash drive with you?

16   A.  No.  They just left the virgin laptop with us, and then

17   they took the first flash drive away.

18   Q.  What happened next?

19   A.  In that meeting, obviously, Mr. Guo and me, we were super,

20   super disappointed.  We were not expected this is a kind of,

21   like, deliverable which come from such a great, right,

22   professional investigation firm.  So, Mr. Waller and

23   Ms. Wallop, they apologized again, again.  They said they have

24   more data in their team's hands, and then Mr. Waller is

25   planning to fly in Europe to pick up the data, which is, he

```
 1    said, 60 gigabyte, something like that way, and then bringing
 2    that data back to us as soon as possible.  So, obviously,
 3    Mr. Guo and me, we could not wait any more.  We ask him right
 4    away, can we have that.  So, Mr. Waller flew to Europe, as he
 5    said, and then bringing a second flash drive back to New York.
 6    Q.  And did he deliver the second flash drive to you?
 7    A.  Yes, he did.
 8    Q.  And where did that take place?
 9    A.  That took place in the Penn Station.  That was three, four
10    days after our first meeting, the first disappointing meeting,
11    because he promised that he will fly to Europe right away and
12    then to pick up the data.  So, after three, four days, and then
13    he said he came back, he requested to meet me in person,
14    deliver the data in Penn Station.  He gave me a name called
15    Chuck Bar.  I believe there's a bar in Penn Station.  So I went
16    there and met him.  He gave me the second flash drive.
17    Q.  And did you and Mr. Waller look at the second flash drive
18    right there at the bar in Penn Station?
19    A.  We tried to open the second flash drive in the bar, but I
20    didn't remember we successfully open that because the format is
21    somehow, we couldn't open with the laptop we have in the Penn
22    Station in there.
23    Q.  Well, did there come a point in time in which you actually
24    were able to review the contents of the second flash drive?
25    A.  Yes.
```

1  Q.  And where did that happen?

2  A.  Obviously, I came back to meet with Mr. Guo right after I

3  got the second flash drive from Mr. Waller, and then Mr. Guo

4  couldn't wait anymore, so we use their virgin laptop, and that

5  opened the second flash drive.

6  Q.  Was there anything on the second flash drive?

7  A.  The second flash drive, we went through all the folders,

8  and some of them, they're empty.  Some of them, they do have

9  some content, but we went through each of them, they are either

10 the advertisement, or some Wikipedia, or some Google, some

11 public information, which anybody, anybody, they can research

12 from the internet.  Even some of them was, like, Russia

13 language or some language, which doesn't even related to the

14 people we want to investigate.

15        So, long story short, it's garbage, period.

16 Q.  Were there any financial forensic reports that were called

17 for under the contract on the drive?

18 A.  Nothing.

19 Q.  Were there any current tracking reports on the drive?

20 A.  Nothing.

21 Q.  Were there any social media reports on the drive?

22 A.  Nothing.

23 Q.  What, if anything, did you tell Strategic when you saw what

24 was on this second flash drive?

25 A.  Yes, I remember I Signal text Ms. Wallop right away with a

L4KKEAS3                          Wang - Direct

```
 1  very long text message, and we told them this is garbage, this
 2  is far away from what you promised to deliver as high quality
 3  original investigation deliverable reports, which defined in
 4  the contract.  It's nothing to do with that.  You didn't do
 5  your job.  We told them right away.
 6  Q.  And how did they respond?
 7  A.  They responded with many different text message by Signal,
 8  and I believe you have that.  Mainly they made a lot of excuse,
 9  and gave different reason, and then tried to go through with
10  this, which we don't buy anymore.
11  Q.  And then what happened next with the contract?
12  A.  The contract was terminated.
13  Q.  Did Strategic ever provide Eastern Profit or you and
14  Mr. Guo with any of the deliverables called for under the
15  agreement?
16  A.  Nothing, never.
17  Q.  And did Strategic ever return the deposit to Eastern Profit
18  or to ACA?
19  A.  No, they never did that either.
20          MS. CLINE:  I have no further questions.
21          THE COURT:  All right.  Why don't we take our
22  midafternoon break now for ten minutes, and then we will resume
23  with Ms. Wang on cross-examination.  So be back at 3:55.  Let's
24  expect to go until 5:00 o'clock today.
25          (Recess)
```

Case 22-3018, Document 61-1, Filed 07/25/23, Page 203 of 243
Case 1:22-cr-02032-61   Document 123   Filed 05/05/25   Page 203 of 243

L4KKEAS4                          Wang - Cross

```
 1              THE COURT:  Be seated.
 2              I had neglected to ask you, Ms. Cline, to make sure
 3     you cleaned off the podium.  I assume that that has been done.
 4              MS. CLINE:  I forgot, your Honor, I confess.
 5              THE COURT:  But I do want that to be done.
 6              (Pause)
 7              MS. CLINE:  I apologize.
 8              MR. GREIM:  I hadn't done it either, but I will.
 9              THE COURT:  Ms. Wang, you are reminded that you are
10     still under oath, and I am also going to give you the
11     instruction to keep talking slowly, please.
12              Mr. Greim, you may inquire.
13     CROSS-EXAMINATION
14     BY MR. GREIM:
15     Q.  Ms. Wang, good afternoon.
16              You testified on direct that you are now no longer a
17     CCP member, correct?
18     A.  Correct.
19     Q.  Do you have a letter of resignation or a notice of
20     expulsion from the CCP?
21     A.  There is no this kind of procedure in the Chinese Communist
22     Party.
23     Q.  When did you stop being a member of the CCP?
24     A.  From 2017.
25     Q.  When in 2017?
```

1    A.   From January.

2    Q.   Have you told anyone else that you were a member of the CCP

3    after January 2017?

4    A.   Nobody ask me.

5    Q.   Ms. Wang, what is your employment?  Where do you work?

6    A.   I work in New York.

7    Q.   Okay.  At what company do you work?

8    A.   I work for Mr. Guo's family office.

9    Q.   And that is what?

10   A.   Golden Spring New York Ltd.

11   Q.   What is your position within Golden Spring New York Ltd.?

12   A.   I am the president and the director of the company.

13   Q.   And, in this case, you have signed the interrogatory

14   responses for Eastern Profit as the president of Golden Spring,

15   correct?

16   A.   Correct.

17   Q.   And when we took the depositions of Eastern Profit in this

18   case in January 2019 and in October 2019, you were the witness

19   for Eastern Profit, correct?

20   A.   Correct.

21   Q.   Now, has Eastern Profit ever paid Golden Spring for its

22   services in this case?

23   A.   No.

24   Q.   Has it ever paid Golden Spring for its services in dealing

25   with the research agreement?

L4KKEAS4                          Wang - Cross

```
 1    A.  No.

 2    Q.  Why is that?

 3    A.  Eastern Profit's bank account were frozen.

 4    Q.  This is the Hong Kong bank account?

 5    A.  Correct.

 6    Q.  Is there a document that gives you authority as president

 7    of Golden Spring New York to act for Eastern Profit?

 8    A.  I believe there was a power of attorney.

 9    Q.  We'll put that up for you.

10    A.  Thank you.

11    Q.  That's DX 24.

12         MR. GREIM:  If we could scroll through.  I think it's

13    only a few-page document.  There we go.  We don't need the

14    translation.

15    Q.  Is this the power of attorney?

16    A.  Correct.

17    Q.  All right.  And whose signature appears on that document?

18    A.  Mr. Chunguang Han.

19    Q.  Is this the same man you called Hank Han before?

20    A.  Correct.

21    Q.  He signed that on August 30th, 2018, right?

22    A.  Correct.

23    Q.  And that was about, oh, what, maybe five months into this

24    lawsuit?

25    A.  Yes.
```

```
 1   Q.  Let's go back -- I don't want you to guess on this.  Let's
 2   go back to page 1.
 3          Is there a section of this -- let me just ask you:  Do
 4   you see in the middle of this agreement where it lays out what
 5   the power of attorney will cover?
 6   A.  You mean from the second paragraph?
 7   Q.  Yes, ma'am.
 8   A.  Yes.
 9   Q.  So it's negotiating a contract between Eastern and SV,
10   right?
11   A.  Yes.
12   Q.  Executing that contract?
13   A.  Correct.
14   Q.  And then the full enforcement and preservation of Eastern's
15   rights under any contract between Eastern and SV, right?
16   A.  Yes.
17   Q.  Is there any reference in here to any kind of a loan
18   agreement between ACA and Eastern Profit?
19   A.  I didn't see that.
20   Q.  That's not listed in 1, 2, or 3, is it?
21   A.  Correct.
22   Q.  And you testified that you had nothing to do with the ACA
23   payment to Eastern Profit?
24   A.  I was not involved in the beginning of about this loan.
25   Q.  Okay.  We'll come back to that topic in a little bit.
```

```
 1              Now, in your first deposition, you testified that you
 2    had met Han Chunguang before that deposition, right?  You
 3    recall that?
 4    A.  Yes.
 5    Q.  And you had met him in New York?
 6    A.  Correct.
 7    Q.  You said that he didn't explain to you what his
 8    relationship to Eastern Profit was.  Do you recall that?
 9    A.  Correct.
10    Q.  And you didn't know what his official title was or what his
11    duties were, did you?
12    A.  I did not know by then.
13    Q.  And that deposition was in January 2019, right?
14    A.  Correct.
15    Q.  And the contract here was negotiated at the end of 2017 and
16    signed in the beginning of 2018, right?
17    A.  Correct.
18    Q.  You said that you didn't talk to him for information about
19    Eastern to prepare for your first deposition, right?
20    A.  Correct.
21    Q.  And you said Mr. Guo is the one who told you Chunguang Han
22    was the principal of Eastern Profit?
23    A.  I believe that I said that in the first deposition.
24    Q.  Was that true?
25    A.  I misspoke.  By then is that I was not well prepared for my
```

1   first deposition.  My second deposition was by the end of

2   October of the same year, after ten years.  So, if I misspoke

3   anything, I apologize, with the chronology and the description

4   of details.

5   Q.  Well, your deposition in January 2019 was given under oath,

6   right?

7   A.  Correct.

8   Q.  And you were asked several questions about your own

9   personal knowledge, weren't you?

10  A.  Correct, Mr. Greim.

11  Q.  And did you make every effort to answer truthfully in that

12  first deposition?

13  A.  Mr. Greim, English is not my native language.  So my

14  English level by then, and compare with by the end of 2019 and

15  compare now, I can say I'm improving and growing.

16         THE COURT:  Ms. Wang, would you please answer the

17  question that you were asked.  The court reporter can read it

18  back.

19         THE WITNESS:  Yes, your Honor.

20         (Record read)

21         THE WITNESS:  Yes, I did.

22  BY MR. GREIM:

23  Q.  And, in fact, in your first deposition, weren't you asked

24  how it was that you came to get the information from Mr. Guo

25  about Chunguang Han being the principal of Eastern Profit?

1   A.  Yes.

2            MR. GREIM:  Why don't we go ahead and pull that up.

3   This is R5(a).

4            Okay.  Let's go up to page 97.  Just scroll up a

5   little bit.

6   BY MR. GREIM:

7   Q.  We're talking about Han Chunguang here, and you see you

8   were asked — and I know only part is highlighted, I want you to

9   start at 5 — you see you were asked a question:

10  "Q.  Is he an officer, director?

11  "A.  I don't know.

12  "Q.  Do you know what his duties and responsibilities are?

13  "A.  I don't know.

14  "Q.  How did you know he was a principal?

15  "A.  Mr. Guo told me."

16  Q.  And then the question is:

17  "Q.  If you look at Exhibit 3, and we can pull that up, would

18  you have personal knowledge of any of these answers?  Maybe you

19  can just point out the ones to which you would have personal

20  knowledge."

21  "A.  Personal knowledge about what?"

22            Did I read that correctly?

23  A.  Yes.

24  Q.  And that was your true and correct testimony in

25  January 2019?

L4KKEAS4                        Wang - Cross

```
 1    A.   That's my best knowledge by then.

 2    Q.   And you were asked again, on page 99, at line 20:

 3    "Q.   So you knew that Mr. Han, prior to seeing these

 4    interrogatories, was a principal of Eastern Profit?

 5    "A.   Which question?

 6    "Q.   Number two.

 7    "A.   Again, correct.  Here, yes, I was told he was a

 8    principal."

 9              Did I read that correctly?

10    A.   Yes.

11    Q.   And then you go on:

12    "A.   They explored this in some more detail.

13    "Q.   So you had to be told that when you saw the question, when

14    you verified it?  Somebody told you that information, right?

15    "A.   That's right.

16    "Q.   So you were educated on it.  Is that true with each of

17    these answers?  That's what I'm trying to get at.

18    "A.   Correct."

19              Did I read that right as well?

20              And then they pursue it further:

21    "Q.   So with each of these answers, somebody had to tell you --

22    with each of these questions, somebody had to tell you what the

23    answers were before you could verify it, right?

24    "A.   Yes."

25              Did I read that correctly still?
```

1    A.  Yes.

2    Q.  And then the question:

3    "Q.  Now, for example, who told you the answer to number 2?"

4    23, Answer:

5    "A.  Mr. Guo."

6              Did I read that right?

7    A.  You read it correctly.

8    Q.  So you answered several times in this deposition that it

9    was Mr. Guo who told you that Han was the principal of Eastern,

10   right?

11   A.  Correct.

12   Q.  Now, as of January 29, when you gave that deposition, you

13   had not met with or spoken with any employee, officer, or

14   director of Eastern Profit, had you?

15   A.  Correct.

16   Q.  And you didn't know whether Eastern Profit had an office,

17   correct?

18   A.  Correct.

19   Q.  And you didn't know whether Eastern Profit had any

20   employees, correct?

21   A.  Correct.

22   Q.  You did not know Eastern Profit at all before this project;

23   isn't that right?

24   A.  Correct.

25   Q.  Guo is the person who told you about Eastern, right?

1  A.  I couldn't remember by then.  If I testified Mr. Guo,

2  that's Mr. Guo.  I will stay with my testify.

3  Q.  And the first time you heard the name Eastern Profit was

4  from Mr. Guo, correct?

5  A.  I couldn't remember clearly.  If I testify and say Mr. Guo,

6  I will stay with that.

7  Q.  And Guo told you the name Eastern Profit before you went

8  down to Virginia to negotiate with French Wallop; is that

9  right?

10  A.  I couldn't remember that clearly.  If I testify Mr. Guo, I

11  will stay with that.

12          THE COURT:  No, Ms. Wang, what we're asking for, what

13  counsel is asking for, is your best recollection today, your

14  truthful answers today, not what you will stick with, but what

15  the truth is to your knowledge today.

16          THE WITNESS:  Understood, your Honor.

17          THE COURT:  Go ahead.

18  BY MR. GREIM:

19  Q.  So, let me ask you:  Is your best recollection today that

20  the first time you heard the name Eastern Profit was from Guo

21  Wengui?

22  A.  No.  My best memory, as my best knowledge today, right now,

23  first time I heard about Eastern Profit is from Mr. Han.

24  Q.  Now, again, you testified on January 31, 2019, as the

25  Eastern Profit corporate representative, correct?

1   A.  Yes.

2   Q.  And you swore to your testimony under oath, correct?

3   A.  Yes.

4         MR. GREIM:  Let's pull up R12.  And let's go up,

5   actually, to page 14.  We're going to have to use a couple of

6   pages here.

7   BY MR. GREIM:

8   Q.  So, on page 14, line 15, you were asked:

9   "Q.  What information did you request of Mr. Guo in order to

10  finish this project?

11  "A.  At least who is the client or who is the vendor."

12        Did I read that right so far?

13  A.  Yes, sir.

14  "Q.  So when you asked him who the client or the vendor was, he

15  said Eastern Profit; is that fair?

16  "A.  Correct."

17        Did I read that correctly?

18  A.  Yes, sir.

19  "Q.  When did he tell you about Eastern Profit -- or what did

20  he tell you about Eastern Profit at that time?

21  "A.  I don't remember."

22        Did I read that correctly?

23  A.  Correct.

24  Q.  Then let's skip down to page 16.  I'm sorry, page 15,

25  line 4:

1    "Q.  Up until that time, had you ever heard of Eastern Profit

2    before?

3    "A.  I don't remember I heard about that."

4            Line 7:

5    "Q.  Sitting here today, you think that may have been the first

6    time you ever heard of Eastern Profit?

7    "A.  You mean by then?  You mean by this time, December 2017?

8    "Q.  Yes.

9    "A.  Yes."

10           Did I read that correct so far?

11   A.  Yes, sir.

12   Q.  And, then, just to clear it up, line 18:

13   "Q.  So as far as you can recall, that's the first time you

14   ever heard of Eastern Profit?

15   "A.  Correct."

16           Did I read that correctly?

17   A.  Yes, sir.

18   Q.  Now, Guo told you this just before you went down to

19   Virginia, correct?

20   A.  Again, I don't remember clearly, as Mr. Guo and Mr. Han

21   told me, but as my best memory of today, right now, I did my

22   research, and my recollection, that was Mr. Han.

23           MR. GREIM:  Okay, let's put up C1.  Let's play that

24   before you click play.

25   Q.  Do you recall you were deposed, that we finished up the

1    Eastern Profit corporate representative deposition in October

2    of 2019?

3    A.  Correct.

4    Q.  And did you testify truthfully and under oath at that time

5    as well?

6    A.  Yes.

7    Q.  And do you recall we videotaped that deposition?

8    A.  I believe so.

9    Q.  Okay.  We're going to play you a clip now.

10   "Q.  You first learned of Eastern Profit's existence just

11   before going down to Virginia to sign the contract with

12   Ms. Wallop; isn't that right?

13   "A.  That's correct."

14          That was your testimony in October 2019, right?

15   A.  Correct.

16   Q.  You told us earlier that you thought you remembered many

17   things between January and October 2019, right?

18   A.  Yes.

19   Q.  And your English was much better in October than from

20   January 2019?

21   A.  I believe so.

22   Q.  By the way, when did you first begin to learn English?

23   A.  When I was back to my college.

24   Q.  And when was that?

25   A.  That was in France.  My first foreign language is French,

1    and the second language is English, mainly.

2    Q.  And how long have you been living in the United States?

3    A.  From 2015 until now.

4    Q.  Do you deal with English-speaking employees every day at

5    your office?

6    A.  Correct.

7    Q.  Ms. Wang, you've testified that you have no idea -- let me

8    just ask you.

9         Ms. Wang, you have no idea if Eastern Profit has

10   investors, assets, clients, investments, business activities,

11   or a bank account; isn't that right?

12        MS. CLINE:  Objection; relevance.

13        THE COURT:  Overruled.

14        THE WITNESS:  I did my research, and Eastern Profit

15   does have bank account and assets.

16   BY MR. GREIM:

17   Q.  So, you did not know that they had a bank account on

18   January 29 at your deposition?

19   A.  By then, I didn't know.

20   Q.  And that was eight months into this lawsuit.  You still

21   didn't know that they had a bank account?

22   A.  I didn't know by then.

23   Q.  Didn't you just testify about an hour ago that Han

24   Chunguang told you that Eastern Profit wanted to unfreeze its

25   assets?

1    A.  Correct.

2    Q.  He would have told you that back in 2017, correct?

3    A.  Back to 2017?  I don't remember that.

4    Q.  Well, let me just ask you:  What did Han Chunguang tell you

5    in December of 2017 that Eastern Profit wanted from this

6    agreement?

7    A.  By then, Mr. Han told me Eastern Profit could potentially

8    be the party of this investigation project because Eastern

9    Profit got their assets frozen by Chinese Government, also.

10   Q.  So you knew back in -- this conversation really occurred,

11   you knew back in December 2017 that Eastern Profit had assets,

12   right?

13            MS. CLINE:  Objection to form.

14            THE COURT:  Overruled.

15            THE WITNESS:  By the end of 2017, I was told Eastern

16   Profit had assets, but in my understanding, I'm not sure that

17   referred to bank accounts or some other assets.

18   Q.  Well, you were asked about all those things in

19   January 2019, weren't you?

20   A.  Correct.

21   Q.  And your answer was you didn't know at that time?

22   A.  I was not sure by then.

23   Q.  How are you confident that Han Chunguang had anything to do

24   with Eastern Profit when you spoke with him in December 2017?

25   A.  I'm pretty confident.

```
1    Q.  Okay.  My question is:  How why were you confident?
2    A.  Because he introduce me as he is represent --
3    representative of Eastern Profit.  So I trust him.
4    Q.  So the basis for your information was that he told you he
5    was a representative of Eastern Profit?
6    A.  Correct.
7    Q.  Did anybody else tell you he was a representative of
8    Eastern Profit --
9    A.  I believe --
10   Q.  -- at that time?
11   A.  Only Mr. Han.
12   Q.  Did you know Mr. Han Chunguang before then?
13   A.  Yes.
14   Q.  How did you know him?
15   A.  I know him back to Mainland China.
16   Q.  Do you know when he came to the United States?
17   A.  I beg your pardon?
18   Q.  Do you know when he came to the United States?
19   A.  You mean when, right?
20   Q.  Immigrated, do you know when he immigrated to the United
21   States?
22   A.  I know he came to the U.S. in 2015, also.
23   Q.  Did he come at the same time as you?
24   A.  Similar.
25   Q.  Eastern Profit was not assigned any of its claims in this
```

L4KKEAS4                          Wang - Cross

1    case, correct?

2    A.  What's your question?  Sorry.

3    Q.  Was Eastern Profit assigned any of the claims it is

4    asserting in this case?

5              MS. CLINE:  Objection to form.

6              THE WITNESS:  You mean signature, right?

7              THE COURT:  Overruled.

8              THE WITNESS:  You mean signature; am I correct?

9    BY MR. GREIM:

10   Q.  My question was:  Did anyone else assign the claims to

11   Eastern Profit that it is asserting in this case?

12   A.  I still don't understand your question.

13   Q.  That's okay.  Here's what we'll do.  Let's put up DX 68.

14   Okay.

15             First of all, do you recognize this document?

16             MR. GREIM:  Why don't you scroll through it, Rebecca,

17   just go slowly through.

18   Q.  You see it has several questions and answers, an attorney

19   named Zachary Grendi has an electronic signature — keep going —

20   and then there's a signature at the bottom.

21             MR. GREIM:  Is there another page?

22   Q.  Now, is that your signature?

23   A.  Yes.

24   Q.  That signature is Yvette Wang, correct?

25   A.  Correct.

1    Q.  And somebody else notarized it.

2            Did you sign this before a notary?

3    A.  Yes.

4    Q.  On August 20, 2019?

5    A.  Correct.

6    Q.  And then in the verification, you say, "I, Yvette Wang,

7    state that I have read the foregoing responses, that they were

8    prepared with the assistance of counsel, that the responses

9    are, subject to inadvertent and undiscovered errors, based on,

10   and therefore necessarily limited by, the records and

11   information I have reviewed, or by my knowledge of certain

12   facts, were so stated and by information thus far discovered in

13   preparing these responses."

14           You reserve the right to make changes.

15           And then, finally, you say, "Subject to these

16   limitations, I state, under the pains and penalties of perjury,

17   the responses are true to the best of my knowledge, information

18   and belief."

19           Did I read that right?

20   A.  Yes.

21   Q.  Okay.

22           MR. GREIM:  And let's go up to page 3.  Go up a little

23   higher.  It's page 2.  I'm sorry, you have to go down.  I guess

24   I was wrong.  Oh, there it is, the last one.

25   Q.  You see it says, "If one or more of Eastern Profit's claims

1    in the second amended complaint has been assigned, identify

2    each original owner of each claim and identify any assignee of

3    any claim."

4              Do you see that?

5    A.   Yes.

6    Q.   And then it says, "None of the claims in the second amended

7    complaint has been assigned."  Did I read that right?

8    A.   Yes.

9    Q.   And is that true?

10   A.   Correct.

11   Q.   Okay.  Let's move ahead, pick up some speed here.

12             Ms. Wang, you had never met French Wallop or Mike,

13   Dr. Mike Waller, before you were introduced to them?

14   A.   Correct.

15   Q.   Now, I thought I heard you to say that you first met French

16   Wallop on a trip to D.C.; is that right?

17   A.   That's not right.

18   Q.   No?  Okay, okay.

19             So, do you recall that you actually first met them in

20   Guo Wengui's apartment?

21   A.   I first time met them in New York.

22   Q.   Right; in Guo Wengui's apartment?

23   A.   In his family's apartment, yes.

24   Q.   I'm sorry, is that not his apartment?

25   A.   His family owns an apartment.

```
 1   Q.  What do you mean by his family owns the apartment?

 2            MS. CLINE:  Objection; foundation.

 3            THE COURT:  Overruled.

 4   Q.  What do you mean by his family owns the apartment?

 5   A.  Himself and his family, entire family, owns an apartment

 6   they live in there, all of them.

 7   Q.  I see.  I mean, who are the other people?  Who are the

 8   other members of the family who live in there?

 9   A.  His wife.

10   Q.  Okay.  Who else?

11   A.  I think that's it.

12   Q.  Okay, okay.  So he and his wife live in the apartment?

13   A.  Correct.

14   Q.  And they're the ones who own it?

15   A.  The family owns that.

16   Q.  Okay.  Well, I'm sorry, I don't want to belabor this, but I

17   do have to ask you:  Other than his wife, who else owns that

18   apartment?

19            MS. CLINE:  Objection; foundation.

20            THE COURT:  I'll permit it.

21   A.  His family's company own apartment.  He is the owner of the

22   family -- he's the owner of the company.

23   Q.  I see, okay.

24            So the company owned by his family owns the apartment?

25   A.  Correct.
```

L4KKEAS4                          Wang - Cross

1    Q.  And I wanted to get to this later; we'll just do it now.

2    Several times you mentioned Guo's family office or his family

3    company.  Do Guo's -- does he have a mother and father who own

4    these things with him?  Which relatives of his -- let me make

5    it specific.

6            Which relatives of his, for example, own the company

7    that owns his house?

8            MS. CLINE:  Your Honor --

9            THE COURT:  The objection is sustained unless you can

10   correct it.

11           MR. GREIM:  Well, you know what, I'll just move on.

12   This may be relevant to something later but I want to move

13   quickly through here.

14   BY MR. GREIM:

15   Q.  Now, was the meeting at the -- I'll just call it the Guo

16   apartment, the Sherry-Netherland, when was that?

17   A.  In fall of 2017.

18   Q.  Okay.  Now, do you recall -- it's true, isn't it, that you

19   don't actually know when the meetings between French Wallop,

20   Mike Waller, and Mr. Guo began?

21   A.  That was the first time I got to know them.

22   Q.  Okay.  But you don't know when the actual meetings began,

23   do you?

24   A.  I didn't know.

25   Q.  And Guo never told you why he was meeting with French and

1    Mike in New York, did he?

2    A.  By then, he didn't.

3    Q.  Okay.  You say by then.  What did you mean?

4    A.  Because I was introduced to that meeting, and then

5    Ms. Wallop and Mr. Waller was introducing Mr. Guo house in

6    Virginia.  So I step into that meeting; that was the first

7    time.

8    Q.  I'm sorry, did you say Mr. Guo's house in Virginia?

9    A.  No, Ms. Wallop and Mr. Waller were introducing a real

10   estate property located in Virginia, a house called Evermay

11   somehow.  They tried to sell their house to Mr. Guo.

12   Q.  Okay.  And so that was the first time you met Dr. Waller

13   and French Wallop?

14   A.  Correct.

15   Q.  Do you remember when that was?

16   A.  I couldn't remember clearly; like late October or November,

17   somehow 2017.  I couldn't remember clearly.

18   Q.  Is it your testimony that it was before December?

19   A.  Correct.

20   Q.  So, is it your testimony sometime before December you were

21   meeting with French Wallop and Mike Waller in Virginia?  Is

22   that right?

23   A.  Not correct.

24   Q.  Okay.

25   A.  In Virginia I only met with Ms. Wallop.  The first time I

```
 1   went there, she introduce me to see the real estate property.

 2   I only met her, she drove me.

 3   Q.  Okay, but that was not the first time you had met them,

 4   right?

 5   A.  That was the -- not first time, you're right.  First time,

 6   I was in New York, yeah.

 7   Q.  But the first time you met French in D.C., it was to look

 8   at real estate, right?

 9   A.  Correct.

10   Q.  And there was no discussion of the research project,

11   correct?

12   A.  By the first time?  No.

13   Q.  And you didn't even know about the research project at that

14   point; is that right?

15   A.  Correct.

16   Q.  And you didn't begin your involvement with the project

17   until late December, right?

18   A.  In December of -- I believe it's beginning of December, the

19   first or second week of December, yeah.

20   Q.  You had no conversations about the project during the

21   negotiation of the project other than with Guo, correct?

22   A.  I was negotiating with Ms. Wallop.

23   Q.  So, before -- okay, and you were doing that in late

24   December, right?

25   A.  Around mid- and late December, yes.
```

1   Q.  So, you were negotiating with Ms. Wallop in mid-December?

2   A.  Negotiating was the late December, which I couldn't

3   remember clearly, should be the third or fourth week of

4   December.

5   Q.  And before that, your only conversations on the project

6   were with Mr. Guo, correct?

7   A.  You mean the investigation project?

8   Q.  Correct.

9   A.  Correct.

10  Q.  And you never worked on this project with anyone else other

11  than Mr. Guo, correct?

12  A.  I worked with Mr. Guo, Ms. Wallop, and Mr. Waller also, of

13  course.

14  Q.  Okay.  Other than Ms. Wallop and Dr. Waller, you never

15  worked on this project with anyone else than Mr. Guo, correct?

16  A.  Correct.

17  Q.  And Guo is the person who had discussions with Strategic

18  about what would be valuable under the agreement, correct?

19  A.  I was involved in also.

20  Q.  Okay.  And you testified that you were involved in

21  mid-December?

22  A.  Yeah.

23  Q.  Guo identified the research subjects, correct?

24  A.  He identified some names.  I researched some name also.  We

25  put together.

L4KKEAS4                        Wang - Cross

1    Q.  Did Mr. Guo approve every research subject?

2    A.  He does not need to approve.

3    Q.  You recall you testified about this topic at your first

4    deposition?

5    A.  I couldn't remember that.

6            MR. GREIM:  Let's pull up R31.  Okay.

7    Q.  So, on 32 — let's start at 32 — line 5 you were asked:

8    "Q.  What did you understand fish to mean?

9    "A.  Target people, human being.

10   "Q.  But Strategic Vision wasn't identifying anyone to be

11   researched, that was Eastern Profit, right?

12   "A.  Correct."

13           Did I read that right so far?

14   A.  Yes.

15   Q.  Let's move down to 11 -- I'm sorry, there we go.  Now, on

16   page 33, line 11:

17   "Q.  And who identified these people?

18   "A.  Mr. Guo.

19   "Q.  And from where did Mr. Guo get his information?

20   "A.  I don't know.

21   "Q.  You never asked?

22   "A.  No."

23           Was that your testimony?

24   A.  Yes.

25   Q.  And Mr. Guo gave you the initial research packet in

L4KKEAS4                     Wang - Cross

1   December 2017, correct?

2   A.  You mean the names?  Yes.

3   Q.  And he told you to deliver it to Strategic if the agreement

4   was signed, right?

5   A.  Correct.

6   Q.  Guo is the one who told you to execute the research

7   agreement, correct?

8   A.  I executed the contract by myself.

9   Q.  I understand that you did.  What I am saying, though, is,

10  Guo directed you to execute the research agreement, didn't he?

11  A.  Direct?  I don't understand what you mean by direct.  He

12  instructed me?  No, he didn't instruct me.

13  Q.  Did he tell you to do it?

14  A.  No, I reviewed the contract, I negotiated the terms, I feel

15  this ready to go, I executed, I told him.  That was the

16  process.

17          MR. GREIM:  Let's put up R33.

18  Q.  Again, we're looking at the January 2019 deposition that

19  you testified, where you said you testified under oath.  Let's

20  take a look at page 176.  So you see:

21  "Q.  She didn't agree with the draft you had handed her?

22  "A.  Correct, correct.  So I had to leave Washington, D.C.,

23  because I have my schedule on Monday, that was a Sunday.  So I

24  left -- I was supposed to sign on contract with her by that

25  day, but I didn't.

```
 1              "So that's why I kind of, like, I didn't finish that
 2     project or that contract.  I had to leave, but later on I
 3     realized, and Mr. Guo told me, he was expecting me to sign the
 4     contract together, finalize the contract.  And same time
 5     simultaneously, it looks like he already arranged the payment.
 6     So by the end, payment hit your account but the contract didn't
 7     sign."
 8              Did I read that correctly?
 9     A.   Correct.
10              MR. GREIM:  Let's pull up DX 16.  Let's scroll through
11     here.  Just show her these pages.
12     Q.   Now, Ms. Wang, do you recognize this document?
13     A.   Yes.
14     Q.   What is it?
15     A.   It's the Signal text message between me and Ms. Wallop.
16     Q.   And what are the Chinese characters, by the way, under the
17     word "French"?
18     A.   I'm translating for you:  "Click here go to your setting."
19     Q.   Okay, all right.
20              Let's go to the very beginning of this document.  Do
21     you see you say to French — this is on January 5th at 11:05 —
22     "Hi.  Both L and M advised me that we are supposed to meet
23     again, I'll be available tomorrow at my hotel lobby or at your
24     convenience.  Just let me know if you like.  Thanks."
25              Did I read that correctly?
```

1   A.  Yes.

2   Q.  And who are L and M in this section?

3   A.  L is Mr. Lianchao Han.  M is Mr. Miles Guo.

4   Q.  Now, Lianchao Han is a name we didn't really hear in your

5   opening examination here.  Who is he?

6   A.  He is the gentleman introduced Ms. Wallop and Mr. Waller to

7   Mr. Guo.

8   Q.  And he was negotiating on behalf of Mr. Guo, wasn't he?

9   A.  I believe in the beginning, yes.

10  Q.  And he's one of the ones who advised you that you were

11  supposed to meet with French again, correct?

12  A.  Correct.

13  Q.  By the way, there's no mention of Han Chunguang here, is

14  there?

15  A.  No.

16  Q.  You came to French Wallop's home to sign?

17  A.  Yes, because Ms. Wallop doesn't want to meet me in the

18  public place.  She invited me to her home.

19  Q.  Now, before signing the agreement, you read each line to

20  Guo over the phone, didn't you?

21  A.  No, I didn't.

22          MR. GREIM:  Let's pull up Wang 1, R34.

23  Q.  You see it says:

24  "Q.  Was a translation of this document ever provided to

25  Mr. Guo?

1    "A.  I orally translated for him.

2    "Q.  And he speaks Mandarin?

3    "A.  Correct.

4    "Q.  So you read line by line and got his okay to the final

5    agreement, right?

6    "A.  Correct."

7            Did I read that correctly?

8    A.  Correct.  Here, I need the key terms --

9    Q.  I --

10   A.  -- not the entire agreement.

11   Q.  You'll have to raise that with your other counsel.

12           If Guo insisted on a term in the agreement, you just

13   let it go; is that right?

14   A.  What do you mean?  I don't understand your question.

15   Q.  Well, let me ask you this:  Were there some things -- when

16   you came down to sign the agreement, were there some things in

17   the draft agreement that you didn't agree with?

18   A.  Correct.

19   Q.  And did you discuss those with Mr. Guo?

20   A.  Yes, I did.

21   Q.  And were there some things that he insisted should just

22   stay in?

23   A.  Yes.

24   Q.  And when he insisted that they stay in, you had to just let

25   it go and sign, correct?

L4KKEAS4                    Wang - Cross

1    A.  Not really.

2    Q.  Okay.  Let's pull up Exhibit -- let's go to R35.  Do you

3    remember one of the issues was over the million dollar deposit?

4    A.  Correct.

5    Q.  So, you were asked about that again at your January 2019

6    deposition.  I'll read it to you.

7    "Q.  So, ultimately, you agreed to the million dollar deposit,

8    correct?

9    "A.  That's right.  As a project manager, you know, I pointed

10   out my concern, if he insisted, then I just let it go."

11           Did I read that correctly?

12   A.  Correct.

13   Q.  That was the truth, wasn't it?

14   A.  This is about the deposit, not about the contract.

15   Q.  Okay.  So, on the deposit, though, he insisted and you let

16   it go, right?

17   A.  I got to know this deposit was wired after it's done, so I

18   had to agree because it's already happen.

19   Q.  Well, you testified, "if he insisted, then I just let it

20   go," right?

21   A.  If he insisted, I need the deposit.  That's already happen,

22   before I sign the contract.  This is what I mean by that.

23           MR. GREIM:  Let's go up a little bit.  Let's go up, if

24   you can scroll up.  Do we have page 61?

25   Q.  Let me ask you:  What was the dispute that came up about

1   the deposit at the end of the agreement?  There was a question

2   about the amount of the deposit, wasn't there?

3   A.  Not about amount.  Amount was great.

4   Q.  Well, let's look at page 61, line 17.  We were trying to

5   talk about different issues with the agreement, and the

6   question was:

7   "Q.  What about the deposit?  Did he raise any issues with

8   respect to the deposit?

9   "A.  Oh, you reminded me.  Because I remember clearly when I

10  went through this draft with Mr. Guo, I pointed out, I said

11  that 1 million deposit in advance is a lot.  Because I am a

12  project manager, so I feel I should remind him, this is a huge

13  amount of money to pay as a deposit."

14          Did I read that correctly?

15  A.  Yes.

16          MR. GREIM:  Okay.  Let's go down.

17  Q.  And then you continue:

18  "A.  And I remember Mr. Guo said, Ms. Wallop and Mike, they are

19  respectful people and I trust them.  They are reliable, and

20  before they even asked 3 million as a deposit in this contract,

21  now they reduced by 1 million and let's just keep that.  I

22  remember that conversation."

23          Did I read that correctly?

24  A.  Correct.  This conversation happened in New York even

25  before I went to Virginia.  The first time I saw the draft of

```
 1     contract, I raise my question.

 2              MR. GREIM:  I just move to strike.  There's no pending

 3     question there.

 4              THE COURT:  I'll permit it.

 5              MR. GREIM:  Let's pull up the research agreement.  Now

 6     let's scroll through.  Keep going.  There, you can stop there.

 7     Let's keep it there.

 8     Q.  Now, Ms. Wang, I take it you've seen this agreement many,

 9     many times; am I right?

10     A.  Yes.

11     Q.  And this is the agreement you signed with Ms. Wallop,

12     right?

13     A.  Correct.

14     Q.  Let me ask you, we saw your signature earlier on a document

15     produced to Strategic in this case.  Is that your signature?

16     You don't -- actually, go ahead scroll on down.  Let's look at

17     it.  Let's look at -- this is Exhibit 68.

18              You said that was your signature, right?

19     A.  Correct.

20     Q.  Okay.  Now let's go back to the research agreement.

21              Now, you've testified that you signed this in

22     Ms. Wallop's presence, right?

23     A.  Correct.

24     Q.  Did you sign your own name to this agreement?

25     A.  Mr. Han authorized me to sign his name on agreement.
```

1   Q.  I see.  So, your testimony today is that you signed Mr. Han

2   Chunguang's name on the agreement?

3   A.  With his authorized, yes.

4   Q.  I take it this was an oral authorization, right?

5   A.  Correct.

6   Q.  Did you tell Ms. Wallop you were signing Han Chunguang's

7   name?

8   A.  I don't remember that.

9   Q.  Now, Ms. Wang, you insisted throughout this case that you

10  did not write Han Chunguang's name there, didn't you?

11  A.  You asked me many times.  I was afraid you claim me, say I

12  forge his signature.

13  Q.  Okay.

14  A.  Which I didn't.

15  Q.  You're telling me the truth today, though, correct?

16  A.  I'm telling the truth along the way.  Mr. Han authorize me

17  to sign his signature on the contract.

18  Q.  Now, in response to the Court's question earlier, you

19  testified that you never gave the 15 names to Mr. Han

20  Chunguang -- I'm sorry, actually you testified you never gave

21  them to Eastern Profit, correct?

22  A.  Correct.

23  Q.  So, did you ever give the information that Dr. Waller and

24  Ms. Wallop told you, did you ever give that information to

25  Eastern Profit?

Wang Cross

```
1   A.  What information?

2   Q.  Well, let me -- okay, fair enough.

3           Did you ever give any information that Dr. Waller or

4   Ms. Wallop may have told you about the contract, to Mr. Han

5   Chunguang?

6   A.  I told him some information.

7   Q.  Okay.  What did you tell him?

8   A.  For example, like the payment, right, deposit is 1 million.

9   Q.  Okay.  What else?

10  A.  And investigation the Chinese governmental official, which

11  is some name Mr. Han knows also, like the vice president of

12  country.

13  Q.  Well, now wait a second.  I thought you said you did not

14  provide the names to Eastern Profit.

15  A.  No, I didn't.

16  Q.  Okay.  Well, why do you say that Han Chunguang knows some

17  of the names also?

18  A.  Because they are public information.

19  Q.  Well, do you know that Han Chunguang knows the names also?

20  A.  I believe so.

21  Q.  Did you actually share the names with him, though?

22  A.  No, I didn't.

23  Q.  Now, didn't Dr. Waller and Ms. Wallop actually tell you

24  about the results of their research.  Unsatisfactory as I

25  understand it was, didn't they actually tell you about the
```

1    results of their research?

2    A.   In the first meeting, which is supposed to be the report

3    meeting, which they did tell us, they got miscommunication

4    problem with our team, they apologized for their failure.

5    Q.   Now, you didn't tell that information to Han Chunguang, did

6    you?

7    A.   No, I didn't.

8    Q.   Who's the actual owner of Eastern Profit, by the way?

9    A.   You mean now?

10   Q.   Let's go with now, yes.

11   A.   Yeah, it's Ms. Mei Guo.

12   Q.   Who is that?

13   A.   She's a daughter of Mr. Guo.

14   Q.   Who was the owner of Eastern Profit during the time this

15   contract was negotiated?

16   A.   I found out that was Ms. Mei Guo also.

17   Q.   And who was the owner of Eastern Profit during the time

18   that the contract was being be performed; same answer, Mei Guo?

19   A.   Correct.

20   Q.   Where does she live, by the way?

21   A.   She lives in U.S.

22   Q.   She doesn't live in Hong Kong?

23   A.   No.

24   Q.   She's also the sole director of Eastern Profit, isn't she?

25   A.   Correct.

```
 1   Q.  And she was the sole director at all times relevant to this

 2   contract, isn't she?

 3   A.  I believe so.

 4   Q.  Mr. Guo never told you whether the research from the

 5   contract would be reported back to China, did he?

 6   A.  We discussed about that.

 7        MR. GREIM:  Well, let's pull up R38.  This would be

 8   (a).  Let's go up a little higher.  Question, this is line 4:

 9   "Q.  What is your understanding, though, of what he is doing

10   and why he's researching these people?"

11        Answer line 9:

12   "A.  I don't understand.  What is your question?

13   "Q.  Well, what is your understanding?

14   "A.  My understanding?

15   "Q.  Of why he's investigating these people.

16   "A.  Oh, okay.  He needs the information about these people to

17   whistle-blow and disclose their crime.  So Chinese government,

18   and even other countries' authorities, they can take action to

19   this corrupted criminal, Chinese official."

20        Did I read it correctly so far?

21   A.  Yes.

22   Q.  Question:

23   "Q.  So your understanding was the research would be reported

24   back to China?

25   "A.  I don't know that."
```

| | |
|---|---|
| 1 | Did I read that correctly? |
| 2 | A.  Correct. |
| 3 | Q.  And you didn't ask, and didn't know, how Guo was going to |
| 4 | whistle-blow on the research subjects, correct? |
| 5 | A.  I didn't ask appropriately, purp -- purposefully. |
| 6 | Q.  Purposefully? |
| 7 | A.  Yes. |
| 8 | Q.  So you didn't ask Guo on purpose why he was or, I'm sorry, |
| 9 | how he was going to use the research? |
| 10 | A.  Correct.  That could be like a report to China or report to |
| 11 | the foreign authority or going to whistle-blowing. |
| 12 | Q.  But you didn't know? |
| 13 | A.  I didn't know by then.  It could be all of them.  I mean, |
| 14 | that was our -- his life.  It doesn't mean I ask what do you |
| 15 | deal with that specifically. |
| 16 | Q.  Well, you testified on direct about all this.  When did you |
| 17 | finally learn how Mr. Guo was going to whistle-blow on the |
| 18 | research subjects? |
| 19 | A.  The research was not successful.  There's no result to deal |
| 20 | with that. |
| 21 | Q.  I see.  Well, let's actually talk about that here. |
| 22 | So, after this contract was terminated, Eastern Profit |
| 23 | never hired anyone else to do research, correct? |
| 24 | A.  Correct. |
| 25 | Q.  And I take it, it sounds like Guo never hired anyone else |

```
 1   to do the kind of work that he tried to have Strategic do,
 2   correct?
 3   A.  I was not involve in that.  I don't know.
 4   Q.  Well, you're the president of Golden Spring New York,
 5   right?
 6   A.  Correct.
 7   Q.  His family office?
 8   A.  Guo family office.
 9   Q.  And so you don't have knowledge of any other effort by Guo
10   to do the kind of research Strategic Vision was supposed to do
11   in this matter after this contract was terminated?
12   A.  Correct.  I'm the president of family office; doesn't mean
13   that I should know all Guo's personal stuff and his personal
14   investigation.  That's it.
15   Q.  Golden Spring New York was put in charge of this project,
16   wasn't it?
17   A.  Correct.
18   Q.  Does Mr. Guo have other family offices that -- are other
19   Yvettes out there doing what you do?  I'll withdraw that, I'll
20   withdraw it.
21        Does Mr. Guo have other family offices that you're
22   aware of?
23   A.  I'm not aware.
24   Q.  How about China Golden Spring?
25   A.  That was a company in Hong Kong.
```

L4KKEAS4                    Wang - Cross

 1   Q.  You say "was."  Is it gone now?

 2   A.  It was frozen by the Chinese government also.

 3   Q.  Also, in 2017, like Eastern Profit?

 4   A.  Yes, around that time.

 5   Q.  Has it ever been unfrozen?

 6   A.  Nope.

 7   Q.  And, as president of Golden Spring New York, you report to

 8   Golden Spring Hong Kong, correct?

 9   A.  I report to the owner of Golden Spring Hong Kong.

10   Q.  And who is that?

11   A.  It was, and is, Mr. Qian Guo, Q-i-a-n-g G-u-o.

12   Q.  Okay.  Is this Mr. Guo's son?

13   A.  Correct.

14   Q.  He also goes by Mileson?

15   A.  Correct.

16   Q.  Do you know who he reports to?

17            MS. CLINE:  Objection; relevance.

18            THE COURT:  Overruled.

19   A.  I don't know.

20   Q.  Does he report to his dad?

21   A.  I don't know.

22            THE COURT:  Mr. Greim, whenever you're at a convenient

23   breaking point; we're now at about 5:00 o'clock.

24            MR. GREIM:  Okay, why don't we stop.

25            THE COURT:  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L4KKEAS4                    Wang - Cross

```
1          All right.  We will recess for the day.  We'll begin
2    again at 9:30 tomorrow morning.  Everybody should be in their
3    seats and ready to go at least by 9:30 because we'll begin
4    promptly then.  Good afternoon, everybody.
5          And please work on the exhibits to try to reconcile
6    them so that I don't have multiple copies of the same exhibit,
7    each bearing different exhibit numbers.
8          Thank you.
9          (Adjourned to April 21, 2021 at 9:30 a.m.)
10                              * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   Redirect By Mr. Greim  . . . . . . . . . . . 229

 4   Recross By Mr. Chuff . . . . . . . . . . . . 364

 5   Redirect By Mr. Greim  . . . . . . . . . . . 401

 6    YAN PING WANG

 7   Direct By Ms. Cline  . . . . . . . . . . . . 403

 8   Cross By Mr. Greim . . . . . . . . . . . . . 426

 9              PLAINTIFF EXHIBITS

10   Exhibit No.                         Received

11    18    . . . . . . . . . . . . . . . . . . 382

12             DEFENDANT EXHIBITS

13   Exhibit No.                          Received

14    7    . . . . . . . . . . . . . . . . . . . 271

15    20 through 23   . . . . . . . . . . . . . . 343

16    23    . . . . . . . . . . . . . . . . . . . 382

17

18

19

20

21

22

23

24

25
```