**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                              :
In re:                                        :        Chapter 11
                                              :
HO WAN KWOK, *et al.*,[1]                     :        Case No. 22-50073 (JAM)
                                              :
            Debtor.                           :        (Jointly Administered)
                                              :
-------------------------------------------------------x
                                              :
LUC A. DESPINS, Chapter 11 Trustee,           :        Adv. Proceeding No. 23-05017
                                              :
            Plaintiff,                        :
                                              :
v.                                            :
                                              :
TAURUS FUND LLC,                              :
SCOTT BARNETT, as trustee of TAURUS           :
FUND LLC, and                                 :
TAURUS MANAGEMENT LLC, as trustee             :
of TAURUS FUND LLC,                           :
                                              :
            Defendants.                       :
-------------------------------------------------------x

**MOTION OF CHAPTER 11 TRUSTEE, PURSUANT TO BANKRUPTCY RULE 9019,**
**FOR APPROVAL OF SETTLEMENT WITH UNITED STATES OF AMERICA**

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor" or "Kwok"), plaintiff in

the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby submits this

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtor is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

motion (the "Motion"),[2] pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9019-1(a) of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court District of Connecticut (the "Local Rules"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") approving the *Stipulation Between Chapter 11 Trustee and United States of America* (the "Settlement Agreement"), attached as **Exhibit 1** to the Proposed Order, reached between (a) the Trustee and (b) the United States of America (the "Government" and, together with the Trustee, the "Parties"[3]), represented by the United States Attorney's Office for the Southern District of New York ("USAO-SDNY").  In support of this Motion, the Trustee respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Parties have reached an agreement to resolve certain potentially complex issues raised both in this Adversary Proceeding and in the Government's ongoing criminal case against the Debtor currently being heard before the United States District Court for the Southern District of New York [Case No. 23 Cr. 118 (AT)] (the "Criminal Case"), with respect to the Debtor's Mahwah Mansion.

2.      The Mahwah Mansion has become a target for both the Trustee in the Chapter 11 Case (and related Adversary Proceeding) and the Government in the Criminal Case because, while the Trustee seeks a ruling that the Mahwah Mansion is property of the Debtor's estate so that it can be sold and its proceeds distributed to the Debtor's creditors, the Government alleges

---

[2]   Capitalized terms used but not defined herein shall have the meanings set forth in the Complaint of Chapter 11 Trustee for Estate of Ho Wan Kwok Seeking, Pursuant to Bankruptcy Code Sections 541, 542, and 544, (I) Declaratory Judgment that Debtor Is Equitable Owner of Mahwah Mansion and that such Property Is Property of Estate and (II) Related Relief [Adv. Proc. Docket No. 1] (the "Complaint").

[3]   References herein to the "Parties" and the "Trustee," include the respective attorneys, advisors, and/or professionals of the Parties, as applicable.

2

that the Mahwah Mansion is subject to forfeiture because it was purchased with the proceeds of the Debtor's alleged criminal schemes, and that its value should be distributed to the victims of such crimes as restitution.

3.      Of course, given the nature of the Debtor's activities, there is likely significant overlap between creditors who have filed proofs of claims (to the extent they have allowed claims) against the chapter 11 estate for whom the Trustee acts as fiduciary and the victims for whom the Government seeks to provide restitution.

4.      Complicating matters even further are the different tools that the Trustee and the Government have in their respective toolkits.  The Trustee is already empowered to collect estate assets such as the Mahwah Mansion and to liquidate them for the benefit of the estate, after which the value of such assets can be distributed to holders of allowed claims pursuant to a chapter 11 plan.  In furtherance thereof, the Trustee sought, and the Court granted, the setting of a bar date for creditors to file claims.  Indeed, more than 1200 creditors have filed claims, many of which raise of the same or similar facts as the basis of their claims as were alleged in the Indictment.  The Government, on the other hand, must obtain a conviction in the Criminal Case before it can obtain a forfeiture order that would allow it to distribute proceeds from the sale of the Mahwah Mansion to victims as part of a remission/restitution process outside the Chapter 11 Case.

5.      The interaction between bankruptcy law and criminal law in a case like this can, therefore, be a source of disputes between a trustee and the Government.  Indeed, this is not the first time that these types of issues have arisen in cases where individual debtors have been prosecuted for fraud or other crimes and, on past occasions, these issues have resulted in some cases in extensive and expensive litigation between bankruptcy trustees and the Government,

3

something that the Trustee obviously hopes to avoid here. *See United States v. Rothstein (In re Rothstein, Rosenfeldt, Adler, P.A.)*, 717 F.3d 1205, 1206 (11th Cir. 2013) (involving protracted dispute between chapter 11 trustee and Government regarding whether funds in certain bank accounts were proceeds of criminal conduct subject to forfeiture).

6.      Despite these complexities and potential sources of controversy, the Trustee and the Government are aligned both on the need to obtain control of and liquidate the Debtor's assets as quickly and efficiently as possible and the distribution of such assets to the Debtor's "victims."[4]  With that in mind, the Trustee and the Government negotiated the Settlement Agreement, which effectuates a preliminary resolution to the issues surrounding the Mahwah Mansion.  Critically, the Settlement Agreement[5] will ensure that any proceeds from an eventual sale of the Mahwah Mansion by the Trustee (if the Trustee prevails in the Adversary Proceeding) are used first to pay the estate's expenses (including reasonable legal fees related to the Adversary Proceeding) in connection with taking control of and selling the Mahwah Mansion, so that the estate will not be out of pocket even if future discussions between the Trustee and the Government regarding the distribution of sale proceeds of the Mahwah Mansion do not lead to a favorable settlement from the point of view of the estate.  The Trustee and the Government also agreed in the Settlement Agreement that $1 million of the proceeds of the Mahwah Mansion (over and above actual expenses, including attorney's fees) will be distributed to creditors of the chapter 11 estate with allowed claims who are also victims of the Debtor in the Criminal Case. In other words, the Mahwah Mansion will (if the Trustee prevails in the Adversary Proceeding)

---

[4]     The issue of exactly what types of creditors that are holders of allowed claims are "victims" or not "victims" of the Debtor in the Criminal Case can be highly subjective, and the Trustee is hopeful that it is one of the topics that he will be able to resolve in future discussions with the Government.

[5]     To the extent of any inconsistencies between the description of the Settlement Agreement in this Motion and the terms and conditions of the Settlement Agreement, the terms of the Settlement Agreement shall control.

not only fund the Adversary Proceeding but will be the source of tangible cash distributions to creditors. The Settlement Agreement provides this guaranteed benefit to the chapter 11 estate while resolving any potential disputes between the Trustee and the Government in this Adversary Proceeding and providing that the parties will discuss distribution issues in any potential restitution/remission process at a later date, in the event the Government secures a final conviction in the Criminal Case and a forfeiture order with respect to the Mahwah Mansion.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

8.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are Bankruptcy Rule 9019(a) and Local Rule 9019-1(a).

## BACKGROUND

10.      On or about March 29, 2023, pursuant to a Superseding Indictment (the "Indictment"),[6] the Government charged the Debtor, together with other defendants, with conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering (Count One); wire fraud (Counts Two, Four, Six, and Eight); securities fraud (Counts Three, Five, and Seven); money laundering (Counts Nine and Ten); and unlawful monetary transactions (Count Eleven).

---

[6]     A copy of the Indictment is attached hereto as **Exhibit B**. A previous version of the Indictment was made public on March 15, 2023 (the "Initial Indictment"). The Indictment is largely similar to the Initial Indictment except that it adds charges against the Debtor's co-defendant, Yanping Wang, a/k/a "Yvette," that were not included in the Initial Indictment, which focused on charges against the Debtor and Kin Ming Je, a/k/a "William Je."

11.     The Indictment included forfeiture allegations with respect to, among other things, the Mahwah Mansion.

12.     On or about June 28, 2023, the Trustee advised the Government that he had concluded, after extensive analysis, that, among other things, the Mahwah Mansion is equitably owned by the Debtor and, therefore, is property of the Debtor's chapter 11 estate.  The Trustee also advised the Government of his intention to seek interim injunctive relief with respect to the Mahwah Mansion and to sell the Mahwah Mansion in the event this Court issues a ruling declaring the Mahwah Mansion to be property of the estate.  The Trustee and the Government engaged in extensive good-faith discussions regarding issues related to the Mahwah Mansion and the Adversary Proceeding.  As a result of these discussions, the Parties were able to successfully negotiate the Settlement Agreement.  The Parties executed the Settlement Agreement on July 13, 2023.[7]

13.     On July 11, 2023, the Trustee commenced the Adversary Proceeding, in which the Trustee seeks orders:

- declaring that: (a) the Debtor is the equitable owner of the Mahwah Mansion, and (b) that the Mahwah Mansion is property of the Debtor's chapter 11 estate to be administered by the Trustee; and (2) ordering Taurus Fund (and/or Scott Barnett and Taurus Management, as trustees of Taurus Fund) to turn over the Mahwah Mansion or its value and the fixtures and personal property in the Mahwah Mansion to the Trustee;

- declaring that: (a) at all times the Debtor is the equitable owner of Taurus Fund; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the

---

[7]     The descriptions in this Motion of the events leading to the execution of the Settlement Agreement or factors considered in the context of such settlement are solely those of the Trustee and do not purport to represent the Government's views.

turnover of Taurus Fund and any and all of Taurus Fund's assets to the Trustee; and

- declaring that: (a) at all times Taurus Fund was an alter ego of the Debtor; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of Taurus Fund's assets to the Trustee.

## <u>SETTLEMENT</u>

14.    The Parties have engaged in extensive good faith discussions with respect to the Mahwah Mansion. As a result of these discussions, the Parties reached the Settlement Agreement in order to resolve complex issues related to the Mahwah Mansion. The key provisions of the Settlement Agreement are as follows:

a.    **<u>Government Will Not Oppose Trustee in Adversary Proceeding</u>:** Under the Settlement Agreement, the Government has agreed not to oppose any of the Trustee's claims or requests for relief in the Adversary Proceeding, or any effort by the Trustee to obtain control of and/or sell the Mahwah Mansion. *See* Settlement Agreement ¶ 1.

b.    **<u>Use of Mahwah Mansion Proceeds to Pay Estate Expenses</u>:** Under the Settlement Agreement, the costs of taking control of and selling the Mahwah Mansion, including Paul Hastings' legal fees, as well as $1 million to be used for the payment of holders of allowed claims in the Chapter 11 Case that are victims of the Debtor, will be paid first from the proceeds of the sale of Mahwah Mansion. The Settlement Agreement thus guarantees that the Adversary Proceeding will benefit the estate, even if none of the net proceeds from the sale of the Mahwah Mansion end up being distributed to holders of allowed claims in the Chapter 11 Case as part of the Government's contemplated restitution and remission process, essentially guaranteeing that some portion of the value of the Mahwah Mansion will go to estate creditors, and eliminating the possibility that the estate could pay the cost of obtaining control of and selling the Mahwah Mansion but see all the value thereof made part of the Criminal Case and its forfeiture process. *See* Settlement Agreement ¶ 3.

c.    **<u>Escrow of Net Proceeds of Sale of Mahwah Mansion</u>:** Under the Settlement Agreement, only the net proceeds of the sale of the Mahwah Mansion (after payment of the estate's expenses, described in paragraph 3 of the Settlement Agreement, and $1 million to be used for the payment of holders of allowed

7

claims in the Chapter 11 Case) will be held in escrow pending the resolution of the Criminal Case and its forfeiture process.  *See* Settlement Agreement ¶ 2.[8]

d. **Post-Forfeiture Negotiations Regarding Distribution of Net Proceeds:**  The Settlement Agreement provides for future discussions between the Trustee and the Government regarding the distribution of net proceeds from the sale of the Mahwah Mansion if an order of forfeiture is entered in the Criminal Case, allowing the Parties to address those issues and any potential disputes about those issues later, consistent with the goal of the Parties to not have these issues become a source of contention in connection with this Adversary Proceeding. The Trustee's intention to seek to handle distributions to victims is based on precedent from past cases where bankruptcy trustees negotiated agreements with the Government to exercise such a role.[9]  *See* Settlement Agreement ¶ 4.

e. **Reservation of Rights**: Consistent with the goal of the Parties to address other distribution issues later, in the event of a final conviction and forfeiture order, the Parties have reserved their rights with respect to issues related to the distribution of the net proceeds from the disposition of the Mahwah Mansion, in the event the Trustee's discussions with the Government do not lead to a settlement.  *See* Settlement Agreement ¶ 5.

## RELIEF REQUESTED

15.     By this Motion, the Plaintiffs seek entry of an order pursuant to Bankruptcy Rule 9019(a) approving the Settlement Agreement in its entirety and authorizing the Parties to enter into and implement the Settlement Agreement in accordance with the terms thereof.

## BASIS FOR THE RELIEF REQUESTED

**I.     Standard for Approving the Settlement Agreement**

16.     To approve a compromise and settlement under Bankruptcy Rule 9019, a bankruptcy court should find that the compromise and settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate.  *See, e.g.*, *Air Line Pilots Ass'n, Int'l v.*

---

[8]     The escrow requirement will no longer apply, in the event of a final acquittal of the Debtor or his co-defendants, in which case the Government would be unable to initiate a restitution/remission process for crime victims; and the remaining proceeds funds would then be available for distribution by the Trustee in connection with the Chapter 11 Case.

[9]     *See e.g. Order Authorizing James Berman, Trustee, to Serve as Temporary Receiver for the United States of America, In re Goldberg*, Case No. 09-23370 (ASD) (Bankr. D. Conn. 2011), [Docket No. 424].

*Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.),* 156 B.R. 414, 426 (S.D.N.Y. 1993.), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citations omitted); *In re Enron Corp.,* No. 02 Civ. 8489(AKH), 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003).  The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).

17.     Importantly, the "settlement need not be the best that the debtor could have obtained." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (citing *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979)).  Instead, the court needs only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Id.* (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).  In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following factors:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay" . . . ; (3) the "paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007) (citation omitted) ("*Iridium*").

## II.     **Settlement Agreement Should Be Approved**

18.     The Settlement Agreement is an excellent outcome for the chapter 11 estate and, by extension, the creditors of the Debtor's estate, and it is a fair and reasonable compromise under the circumstances and in light of the applicable *Iridium* factors.

19.     The benefits to the estate from the Settlement Agreement are significant. Critically, the Settlement Agreement will ensure that any proceeds from an eventual sale of the Mahwah Mansion by the Trustee (if the Trustee prevails in the Adversary Proceeding) are used first to pay the estate's expenses (including legal fees related to the Adversary Proceeding) in connection with taking control of and selling the Mahwah Mansion, so that the estate will not be out of pocket even if future discussions between the Trustee and the Government regarding the distribution of sale proceeds of the Mahwah Mansion do not lead to a favorable settlement from the point of view of the estate.  The Trustee and the Government also agreed in the Settlement Agreement that $1 million of the proceeds of the Mahwah Mansion (over and above actual expenses, including attorney's fees) will be distributed to creditors of the chapter 11 estate with allowed claims who are also victims of the Debtor.  In other words, the Mahwah Mansion will (if the Trustee prevails in the Adversary Proceeding) not only fund the Adversary Proceeding but will be the source of tangible cash distributions to creditors.

20.     In addition, the Settlement Agreement, among other things, ensures that the Adversary Proceeding will not be delayed by any disputes between the Trustee and the Government, pushing back any thorny issues regarding how funds are distributed in a restitution/remission process to the future, to be discussed by the Parties in the event of a final conviction and order of forfeiture (as is appropriate given that trial in the Criminal Case is

presently scheduled to begin on April 8, 2024, at it is therefore unknown at this time whether the Debtor or his co-defendants will be convicted).

21.     The Settlement Agreement easily meets all the relevant *Iridium* factors, providing significant immediate and future benefits to the estate and its creditors, in particular, by ensuring that the estate will benefit from any sale by the Trustee of the Mahwah Mansion and eliminating the possibility of any disputes between the Parties in the context of the Adversary Proceeding. The Settlement Agreement was reached between the Trustee and the Government, with each side assisted by experienced counsel and negotiating at arms' length.

22.     Put simply, the Settlement Agreement is a positive development for the chapter 11 estate, and the Trustee believes the Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved.

### NOTICE

23.     Notice of this Motion will be given to (i) the United States Trustee; (ii) the Debtor; (iii) the official committee of unsecured creditors; (iv) the Defendants; (v) by electronic filing utilizing the Court's electronic filing ("CM/ECF") system, to all appearing parties who utilize the CM/ECF system; and (vi) any party who requested notice in these chapter 11 cases, but is unable to accept electronic filing as indicated on the Notice of Electronic Filing.  The Trustee submits that, under the circumstances, no other or further notice is required.

### NO PREVIOUS REQUEST

24.     No previous request for the relief sought herein has been made by the Trustee to this or any other court.

*[Remainder of page intentionally left blank.]*

11

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests entry of the Proposed Order granting the relief requested in the Motion and such other relief as is just and proper.

Dated:    August 14, 2023                    LUC A. DESPINS,
          New Haven, Connecticut           CHAPTER 11 TRUSTEE

                                           By: */s/ Douglass Barron*
                                               Avram E. Luft (admitted *pro hac vice*)
                                               Douglass Barron (admitted *pro hac vice*)
                                               PAUL HASTINGS LLP
                                               200 Park Avenue
                                               New York, New York 10166
                                               (212) 318-6079
                                               aviluft@paulhastings.com
                                               douglassbarron@paulhastings.com

                                                   *and*

                                               Nicholas A. Bassett (admitted *pro hac vice*)
                                               PAUL HASTINGS LLP
                                               2050 M Street NW
                                               Washington, D.C., 20036
                                               (202) 551-1902
                                               nicholasbassett@paulhastings.com

                                                   *and*

                                               Patrick R. Linsey (ct29437)
                                               NEUBERT, PEPE & MONTEITH, P.C.
                                               195 Church Street, 13th Floor
                                               New Haven, Connecticut 06510
                                               (203) 781-2847
                                               plinsey@npmlaw.com

                                               *Counsel for the Chapter 11 Trustee*

## EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

--------------------------------------------------------x
                                             :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HO WAN KWOK, *et al.*,[1] | : | Case No. 22-50073 (JAM) |
| | : | |
| Debtor. | : | (Jointly Administered) |

--------------------------------------------------------x
                                             :

| | | |
|---|---|---|
| LUC A. DESPINS, Chapter 11 Trustee, | : | Adv. Proceeding No. 23-05017 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TAURUS FUND LLC, | : | |
| SCOTT BARNETT, as trustee of TAURUS | : | |
| FUND LLC, and | : | |
| TAURUS MANAGEMENT LLC, as trustee | : | |
| of TAURUS FUND LLC, | : | |
| | : | |
| Defendants. | : | |

--------------------------------------------------------x

**[PROPOSED] ORDER APPROVING, PURSUANT TO BANKRUPTCY RULE 9019,**
**MOTION OF CHAPTER 11 TRUSTEE REGARDING SETTLEMENT WITH UNITED**
**STATES OF AMERICA**

Upon the Motion,[2] of Luc A. Despins, in his capacity as the Chapter 11 Trustee (the

"Trustee") appointed in the above-captioned chapter 11 case (the "Chapter 11 Case") of Ho Wan

Kwok (the "Debtor"), for entry of an order, approving a settlement agreement between the

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtor is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    Capitalized terms used but not defined in this Order have the meanings set forth in the Motion.

Trustee and the Government, as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334; and this matter is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2); and due and sufficient notice having been given under the particular circumstances

and it appears that no other or further notice need be provided; and the relief requested being a

reasonable exercise of the Trustee's business judgment consistent with his duties and in the best

interests of the Debtor's estate and creditors; and after due deliberation and sufficient cause

appearing therefor, it is **ORDERED THAT**:

1.      The Motion is GRANTED.

2.      All objections to the Motion, if any, that have not been withdrawn, waived or

settled, and all reservations of rights included therein, are overruled.

3.      The settlement agreement, attached as **Exhibit 1** hereto (the "Settlement

Agreement"), is approved pursuant to Bankruptcy Rule 9019.

4.      The Trustee is authorized, pursuant to Bankruptcy Rule 9019, to execute, deliver,

implement, and fully perform any and all obligations, instruments, documents and papers and to

take any and all actions reasonably necessary or appropriate to consummate the settlement

reflected in the Settlement Agreement and to perform any and all obligations contemplated

therein immediately upon entry of this Order.

5.      This Order shall be effective and enforceable immediately upon entry pursuant to

Bankruptcy Rule 6004(h), and the Trustee shall have unfettered use of the Settlement Payment

when received.

6.      This Court shall retain jurisdiction to hear and determine all matters arising from

or related to this Order and to the Settlement Agreement.

2

# EXHIBIT 1

**Settlement Agreement**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                          :

   -v.-                                             :

                                         S1 23 Cr. 118 (AT)

HO WAN KWOK,                                        :
   a/k/a "Miles Guo,"
   a/k/a "Miles Kwok,"                            :
   a/k/a "Guo Wengui,"
   a/k/a "Brother Seven,"                         :
   a/k/a "The Principal,"
                                            :

                      Defendant.           :

                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

In re:                                             :    Chapter 11
                                     :

HO WAN KWOK, *et al.*,[1]                           :    Case No. 22-50073 (JAM)
                                     :

                  Debtors.               :    (Jointly Administered)
                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

1   The Debtors in the chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles
   Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification
   number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202)
   and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings
   LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New
   York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for
   purposes of notices and communications).

## STIPULATION BETWEEN CHAPTER 11 TRUSTEE
## AND UNITED STATES OF AMERICA

WHEREAS, on or about March 29, 2023, Ho Wan Kwok, a debtor in the above-captioned chapter 11 cases (the "Defendant"), was charged, together with other defendants, by the United States of America (the "Government"), represented by the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), before the United States District Court for the Southern District of New York (the "District Court"), in eleven counts of a twelve-count Superseding Indictment, S1 23 Cr. 118 (AT) (the "Indictment"), with conspiracy to commit wire fraud, securities fraud, bank fraud and money laundering, in violation of Title 18, United States Code, Section 371 (Count One); wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts Two, Four, Six, and Eight); securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.1 0b-5 (Counts Three, Five, and Seven); money laundering, in violation of Title 18, United States Code, Section 1956(a)(2) (Counts Nine and Ten); and unlawful monetary transactions, in violation of Title 18, United States Code, Section 1957 (Count Eleven);

WHEREAS, the Indictment included a forfeiture allegation as to Counts One through Eight of the Indictment, seeking forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts One through Eight of the Indictment, including but not limited to, the following property:

> All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and

2

easements, located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430, Parcel No. 3300021-03-00001-02 and described as Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality, Township: MAHWAH TWP

(the "Subject Property");

WHEREAS, on or about February 15, 2022, the Defendant filed for Chapter 11 bankruptcy, *In Re Ho Wan Kwok and Genever Holdings LLC*, 22-50073 (JAM) (Bankr. Conn.) (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court");

WHEREAS, on or about June 15, 2022, the Bankruptcy Court directed the appointment of a Chapter 11 bankruptcy trustee and thereafter Luc A. Despins, Esq. was appointed as the trustee for the Bankruptcy Case (the "Trustee");

WHEREAS, on or about June 28, 2023, the Trustee advised the Government that he had concluded, after extensive analysis, that, among other things, the Subject Property is equitably owned by the Defendant and, therefore, is property of the Defendant's chapter 11 estate;

WHEREAS, the Trustee is prepared to commence an adversary proceeding before the Bankruptcy Court, *Despins v. Taurus Fund* (the "Adversary Proceeding"), seeking, among other things:

(1) an order from the Bankruptcy Court (a) declaring that the Defendant is the equitable owner of the Subject Property and that the Subject Property is property of the Defendant's chapter 11 estate to be administered by the Trustee and (b) ordering the turnover of the Subject Property to the Trustee;

(2) an order from the Bankruptcy Court (a) declaring that (i) at all times the Defendant was the equitable owner of the entity that holds title to the Subject Property, Taurus Fund LLC ("Taurus Fund"); (ii) any and all assets held by Taurus Fund, including the Subject

3

Property, are property of the Defendant's chapter 11 estate; and (b) ordering the turnover of Taurus Fund and any and all of Taurus Fund's assets, including the Subject Property, to the Trustee;

(3) an order from the Bankruptcy Court (a) declaring that (i) at all times Taurus Fund was an alter ego of the Defendant; (ii) any and all assets held by Taurus Fund, including the Subject Property, constitute property of the Defendant's chapter 11 estate; and (b) ordering the turnover of any and all of Taurus Fund's assets to the Trustee;

WHEREAS, upon entry of any of the orders listed in subparagraphs (1)-(3) above by the Bankruptcy Court, the Subject Property would be deemed to be an asset held directly or indirectly by the Defendant's chapter 11 estate;

WHEREAS, the Trustee will also seek, in the context of the Adversary Proceeding, interim relief from the Bankruptcy Court to obtain control over the Subject Property (the "Interim Relief") pending a definitive ruling by the Bankruptcy Court with respect to the claims asserted by the Trustee in the Adversary Proceeding;

WHEREAS, the Trustee intends, in the event the Bankruptcy Court issues a ruling pursuant to which the Subject Property is deemed to be an asset held directly or indirectly by the Defendant's chapter 11 estate, to sell the Subject Property; and

WHEREAS, the Government has agreed not to oppose the relief to be sought by the Trustee in the Adversary Proceeding, or any effort by the Trustee to obtain control of and/or sell the Subject Property;

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between United States of America, by its attorney Damian Williams, United States Attorney,

4

Juliana Murray, Micah Fergenson, and Ryan Finkel, of counsel, and the Trustee and his counsel, Paul Hastings LLP, that:

1.     The Government shall not oppose any of the Trustee's claims or requests for relief in the Adversary Proceeding, or any effort by the Trustee to obtain control of and/or sell the Subject Property;

2.     In the event the Subject Property is sold pursuant to an order entered in the Bankruptcy Case, the Trustee agrees that the net proceeds from the sale of the Subject Property shall be held in escrow pending the resolution of this criminal matter and will serve as a substitute *res* for the Subject Property (the "Substitute *Res*") in the above-captioned criminal case, with all claims and defenses of the Government applicable to the Subject Property, including any other action that may be brought by the Government for forfeiture of the Subject Property, to apply instead to, and be payable only from, the Substitute *Res*. Further, any claims or interests attached to or secured by the Subject Property shall be transferred to the Substitute *Res* and be satisfied, if at all, only from the Substitute *Res*. In the event that the Defendant is acquitted pursuant to a final order, or the entry of a forfeiture order is denied pursuant to a final order, the escrow requirement contained in this paragraph shall become automatically null and void.

3.     The net proceeds from the sale of the Subject Property will include all moneys realized from the sale of the Subject Property, except for the following which will be deducted from the sale proceeds: any costs of seizure, maintenance, marketing and sale of the Subject Property, including legal fees of Paul Hastings incurred in the Adversary Proceeding or as a consequence of the Adversary Proceeding, and expenses to ensure safekeeping and custody of the Subject Property (including security service at or around the premises), storage, or sale of the

5

Subject Property, all as allowed by the Bankruptcy Court; any outstanding mortgages; real estate commissions and/or fees; any other real estate, property, transfer, association or other tax, which is due and owing at the time of the sale; insurance costs; escrow fees; title fees and county transfer fees; as well as a deemed expense of $1,000,000, which shall be used to satisfy claims of holders of allowed claims in the Bankruptcy Case that are victims of the Debtor.

4.    In the event of the entry of an order of forfeiture in this criminal matter that includes the Subject Property, the Trustee and the Government shall negotiate in good faith with respect to the distribution of the net proceeds from the sale of the Subject Property to victims of the conduct charged in the Indictment (who may be holders of allowed claims in the Bankruptcy Case) and to holders of allowed claims in the Bankruptcy Case. At present, the USAO-SDNY anticipates requesting from the Department of Justice's Money Laundering and Asset Recovery Section that any assets forfeited in this criminal matter be distributed to victims of the conduct charged in the Indictment through the remission/restoration process. The Trustee intends to seek the Government's consent, as part of any such remission/restoration process, to handle the distribution of net proceeds from the Subject Property to victims (who may be holders of allowed claims in the Bankruptcy Case) and holders of allowed claims in the Bankruptcy Case, as determined and allowed by the Bankruptcy Court, and the Government has explained that it is not in a position, at this time, to consent to such proposal, absent the obtaining of certain regulatory approvals which may not be obtained at this time.

5.    In the event the Government and the Trustee do not reach an agreement with respect to the distribution of the net proceeds from the sale of the Subject Property, all rights of the Government and the Trustee are reserved.

6

6.      In furtherance of a sale of the Subject Property, the Government agrees to execute promptly any documents which may be required to convey clear title to the Subject Property and complete the sale of the Subject Property.

7.      Each party to this Stipulation shall bear its own costs and attorney's fees.

8.      This Stipulation may be executed in counterparts, each of which shall be deemed an original, and all of which, when taken together, shall be deemed the complete Stipulation.  PDF copies shall be treated as originals.

*[Remainder of page intentionally left blank.]*

7

Dated:  New York, New York
       July 13, 2023

STIPULATED TO:

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
United States of America

By:  _____          _7/13/2023_____
      JULIANA MURRAY                                Date
      MICAH FERGENSON
      RYAN FINKEL
      Assistant United States Attorneys
      One Saint Andrews Plaza
      New York, New York 10007
      (212) 637-2314/2190/6612

CHAPTER 11 BANKRUPTCY TRUSTEE

By:  _____          _7/13/23_____
      LUC A. DESPINS, ESQ.                          Date
      Trustee

By:  _____          _7/13/23_____
      DOUGLASS E. BARRON , ESQ.                     Date
      PAUL HASTINGS LLP
      Attorney for the Trustee

8

## EXHIBIT B

**Superseding Indictment**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL[1]

UNITED STATES OF AMERICA

v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"

KIN MING JE,
    a/k/a "William Je," and

YANPING WANG,
    a/k/a "Yvette,"

            Defendants.

**INDICTMENT**

S1 23 Cr. 118 (AT)

## COUNT ONE
**(Conspiracy to Commit Wire Fraud, Securities Fraud, Bank Fraud, and
Money Laundering)**

The Grand Jury charges:

### Overview

1.    From at least in or about 2018 through at least in or about March 2023, HO WAN

KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven,"

a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette,"

the defendants, and others known and unknown, conspired to defraud thousands of victims of more

than approximately $1 billion, including victims located in the Southern District of New York.

KWOK, JE, WANG, and their co-conspirators operated through a series of complex fraudulent

and fictitious businesses and investment opportunities that connected dozens of interrelated

entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds.

2.      HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, took advantage of KWOK's prolific online presence and hundreds of thousands of online followers to solicit investments in various entities and programs by promising outsized financial returns and other benefits.  The entities and programs used in the scheme included those known as GTV, G|CLUBS, G|MUSIC, G|Fashion, and the Himalaya Exchange, among others.  In truth and in fact, and as KWOK, JE, and WANG well knew, the entities were instrumentalities that KWOK, JE, and WANG created and used to perpetrate their fraud and exploit KWOK's followers.  The scheme allowed KWOK, JE, and WANG to enrich themselves, their family members, and their co-conspirators, and to fund KWOK's extravagant lifestyle.

3.      As part of the scheme, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, laundered hundreds of millions of dollars of fraud proceeds.  To conceal the illegal source of the funds, KWOK, JE, and WANG transferred, and directed the transfer of, money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals. Hundreds of millions of dollars of the fraudulent scheme's proceeds were transferred, either directly or indirectly, to bank accounts in the United States, Bahamas, and United Arab Emirates ("UAE"), among other places, and held in the name of companies owned or otherwise controlled by JE.

4.      HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, used more than approximately $300 million of the fraudulent scheme's proceeds for their and their families' benefit.  For example, KWOK used fraudulently-obtained victim money to purchase, fund, or finance a $26.5 million purchase of an approximately 50,000-square-foot mansion in New Jersey for KWOK and his family; luxury vehicles, including an approximately $3.5 million Ferrari for one of KWOK's close family members ("Relative-1"); an approximately $37 million luxury yacht that was used by KWOK and his family and purchased in the name of one of KWOK's close family members ("Relative-2"); a piano valued at approximately $140,000; an approximately $36,000 mattress; and a $100 million investment in a high-risk hedge fund for the ultimate benefit of Relative-1, among other things.  For his part, among other things, JE transferred at least $10 million of the fraud proceeds into his and his spouse's personal bank accounts.

5.      HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, operated the scheme for years, and continued to do so at least through  at least March 2023.  They did so, among other things, by continually adapting the scheme's means and methods to evade the enforcement of investor-protection, anti-money laundering, and bankruptcy laws in the United States, and by retaliating against individual victims who complained or demanded the return of invested funds.

**Relevant Persons and Entities**

6.    At all relevant times, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok,"
a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, was the leader
of, and directed, the scheme.

a.    KWOK is an exiled Chinese businessman who fled to the United States in
or about 2015 and purchased a penthouse apartment at a New York City hotel for approximately
$67.5 million.  Starting at least in or about 2017, KWOK, who then purported to be a billionaire,
garnered a substantial online following.  KWOK granted numerous media interviews and posted
on social media, claiming to advance a movement against the Chinese Communist Party.

b.    In or about 2018, KWOK founded two purported nonprofit organizations,
namely, the Rule of Law Foundation and the Rule of Law Society.  The Rule of Law Society's
website lists KWOK as its "founder, a promot[e]r, and a spokesperson."  Both organizations
feature photographs of KWOK on their websites.  KWOK used the nonprofit organizations to
amass followers who were aligned with his purported campaign against the Chinese Communist
Party and who were also inclined to believe KWOK's statements regarding investment and money-
making opportunities.  In truth and in fact, and as KWOK well knew, he and others provided false
and materially misleading information to promote these "opportunities" and to defraud KWOK's
followers and other victims.

7.    At all relevant times, KIN MING JE, a/k/a "William Je," the defendant, was a dual
citizen of Hong Kong and the United Kingdom who principally resided in the United Kingdom,
while traveling to the United States and elsewhere.  JE owned and operated numerous companies
and investment vehicles central to the scheme and served as its financial architect and key money
launderer.

4

8. At all relevant times, YANPING WANG, a/k/a "Yvette," the defendant, was a citizen of China who principally resided in New York, New York and has had a close relationship with HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant. In particular, WANG has worked for KWOK and KWOK's family for several years, since at least in or about 2018, and has operated as a "chief of staff" for KWOK. In that capacity, WANG has held titles in a variety of entities that were instrumentalities of the fraud described herein. For example, WANG has served as the President, Treasurer, and Secretary of entities that purportedly managed KWOK's money.

9. At certain times relevant to this Indictment, Saraca Media Group, Inc. ("Saraca") was a corporation based in New York, New York. Relative-1 was its ultimate beneficial owner.

10. At certain times relevant to this Indictment, GTV Media Group, Inc. ("GTV") was a purported news-focused social media platform based in New York, New York. GTV was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at GTV. KIN MING JE, a/k/a "William Je," the defendant, likewise held no formal position or title at GTV, but in fact exercised control over its finances. Saraca was the parent company of GTV. YANPING WANG, a/k/a "Yvette," the defendant, was an "Executive Director" of GTV.

11. At certain times relevant to this Indictment, G Club Operations, LLC ("G|CLUBS") was a purported membership organization based in Puerto Rico and in New York, New York. G|CLUBS was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at G|CLUBS. KIN MING JE, a/k/a "William Je,"

5

the defendant, likewise held no formal position or title at G|CLUBS, but in fact exercised control over its finances. .

12.    At certain times relevant to this Indictment, the "Himalaya Exchange" was a purported cryptocurrency "ecosystem" that KIN MING JE, a/k/a "William Je," the defendant, founded and operated through various entities he owned, which were based abroad.  Entities functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, such as G|CLUBS and G|Fashion, had purported business relationships with the Himalaya Exchange. KWOK promoted the Himalaya Exchange and claimed to be the designer of its purported cryptocurrency, although KWOK held no formal position or title at the Himalaya Exchange.

### The Fraud

*The GTV Private Placement*

13.    Between in or about April 2020 and in or about June 2020, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, fraudulently obtained more than $400 million in victim funds through an illegal private stock offering related to GTV (the "GTV Private Placement").

a.    On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV common stock via a private placement.  In that video, KWOK described, in substance and in part, the investment terms for the GTV Private Placement, and directed people to contact him, via a mobile messaging application, with any questions about the GTV Private Placement.  The video and GTV Private Placement

materials—including the written "Confidential Information Memorandum" (the "PPM"), Subscription Agreement, and Investment Procedure Guidelines—were transmitted to thousands of potential investors, including those in the Southern District of New York, via mobile messaging applications, social media, and text messages.

      b.  The PPM promoted GTV as the "first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication."

      c.  According to the PPM's metadata, JE was the "author" of the PPM. The PPM disclosed the terms of the GTV Private Placement and identified KWOK as GTV's "Sponsor and Adviser." According to the PPM, among other GTV materials, neither KWOK nor JE held any formal management position with GTV. YANPING WANG, a/k/a "Yvette," the defendant, was identified in the PPM as an "Executive Director" of GTV.

      d.  The PPM also contained the following representations, in substance and in part, among others:

        i.  The GTV Private Placement was for investors who were "interested in evaluating an opportunity to invest capital into GTV;"

        ii.  GTV planned to use the proceeds raised from the GTV Private Placement "to expand and strengthen the business;" and

        iii.  The PPM included a chart itemizing the "contemplated use of proceeds" raised from the GTV Private Placement:

| Description | Percentage of Proceeds |
|---|---|
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

e. Between on or about April 20, 2020 and on or about June 2, 2020, approximately $452 million worth of GTV common stock was purportedly sold to more than 5,500 investors located in the United States, including in the Southern District of New York, and abroad. Investors participated in the GTV Private Placement based, in part, on the belief that their money would be invested into GTV to develop and grow that business, as the PPM promised.

f. The vast majority of the proceeds derived from investors in the GTV Private Placement were not used to develop and grow the GTV business, but instead were deposited directly into bank accounts held in the name of Saraca, GTV's parent company, which is beneficially owned by Relative-1.

g. The GTV Private Placement was not made pursuant to a registration statement filed with the U.S. Securities and Exchange Commission ("SEC"). Rather, the offering was purportedly made pursuant to SEC regulations that permit the sale of unregistered securities subject to limitations on the type of investors to whom the securities are offered and the manner in which their investments may be solicited. To evade these limitations, however, KWOK, and others

8

under his control, used at least one intermediary entity to purchase GTV stock on behalf of pools of investors who did not qualify to participate in the GTV Private Placement.

        h. In or about early June 2020, and only days after the GTV Private Placement closed, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, misappropriated approximately $100 million raised from investors in the GTV Private Placement and directed that those funds be placed with a high-risk hedge fund ("Fund-1") for the benefit of Saraca and its ultimate beneficial owner, Relative-1. This transaction was contrary to the PPM's representations to prospective GTV investors about how investments in GTV would be used. Indeed, the $100 million investment into Fund-1 was not made for the benefit of GTV, but rather for the benefit of Saraca. The victims who supplied the $100 million invested into Fund-1 did not own any shares of Saraca. Ultimately, the investment into Fund-1 lost approximately $30 million in value.

        i. After directing $100 million of GTV victim funds into Fund-1, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, continued to promote GTV using false and misleading representations.

### The Farm Loan Program

14.     Beginning in or about June 2020—the same month that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators misappropriated money from the GTV Private Placement for the benefit of Saraca and Relative-1—KWOK, JE, and their co-conspirators fraudulently obtained more than approximately

$150 million in victim funds through the "Himalaya Farm Alliance." The Himalaya Farm Alliance, which KWOK organized and promoted, was a collective of informal groups (each known as a "Farm") located in various cities around the world. KWOK, JE, and others working on their behalf and at their direction, obtained these funds by making further misrepresentations to the investors in the GTV Private Placement and fraudulently soliciting further investments, this time in the form of "loans" to a Farm, and promising such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned (the "Farm Loan Program").

a. Starting in or about June 2020, domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV-associated bank accounts because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced an unregistered stock offering.

b. These bank account closures frustrated the ability of KWOK, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV.

c. On or about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program. According to KWOK and those working on his behalf, individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program.

d. After launching the Farm Loan Program, KWOK continued to promote GTV and to falsely represent the value of GTV. For example, on or about August 2, 2020, in a video distributed via social media, KWOK falsely stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."[1] In truth and in fact, and as KWOK well knew, GTV's market value was far less because, among other things, GTV was a new business that generated no revenue.

---

[1] All statements attributed herein to KWOK have been translated from Mandarin to English, unless otherwise noted.

e. Thousands of victims "loaned" money to the Farms by sending money to bank accounts controlled by the Farms (and not GTV). According to the "Loan Agreements," which the Farms frequently did not countersign, these funds were to be used for a Farm's "general working capital purposes."

f. KWOK and JE misappropriated funds that were raised through the Farm Loan Program. For example:

i. Approximately $20 million was transferred to Relative-1, approximately $950,000 of which was used to pay for flight crew services on a private jet;

ii. Approximately $5 million was transferred to an entity owned by KWOK's spouse;

iii. Approximately $2.3 million was used to cover maintenance expenses associated with an approximately 145-foot luxury yacht worth approximately $37 million, nominally owned by Relative-2 and used by KWOK; and

iv. Approximately $10 million was transferred to personal bank accounts in the name of JE and/or JE's spouse.

*G|CLUBS*

15. While making misrepresentations regarding the Farm Loan Program, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, fraudulently induced KWOK's followers to transfer additional funds to a purported online membership club called G|CLUBS. From at least in or about October 2020 through at least

11

in or about March 2023, KWOK, JE, and others known and unknown, fraudulently obtained more than approximately $250 million in victim funds through G|CLUBS.

    a. Starting at least on or about June 20, 2020, in a video distributed via social media, KWOK promoted and encouraged individuals to purchase what KWOK referred to as a "G Club . . . membership card."

    b. Formally launched in or about October 2020, G|CLUBS claimed, on its website, to be "an exclusive, high-end membership program offering a full spectrum of services" and "a gateway to carefully curated world-class products, services and experiences."

    c. To join G|CLUBS, a member was required to make a one-time payment to purchase a "membership," in addition to an annual membership fee. The cost of the membership varied based on the membership tier selected by the prospective member: Tier 5 Membership cost $50,000; Tier 4 Membership cost $40,000; Tier 3 Membership cost $30,000; Tier 2 Membership cost $20,000; and Tier 1 Membership cost $10,000.

    d. On or about July 5, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that there were "25,000 [G|CLUBS] member[s] . . . $100 million dollars, the cash [in] the bank account. Then we have the 111 million . . . [who] want to join." By contrast, G|CLUBS internal documents reflected approximately 5,900 active members as of in or about August 2021.

    e. In truth and in fact, and as KWOK and JE well knew, G|CLUBS provided nothing close to "a full spectrum of services" and "experiences" to its members. Despite collecting hundreds of millions of dollars in purported membership fees, G|CLUBS maintained a relatively small number of employees and provided its members few to no discernable membership benefits. Indeed, G|CLUBS did not even make good on prizes it offered members for participating in

contests. On or about February 14, 2021, G|CLUBS held a webcast and sweepstakes during which members were promised luxury prizes. On at least one occasion, instead of providing a BMW to a member who purportedly won a sweepstakes, G|CLUBS claimed to the member that the member had requested that the value of the BMW be applied toward an upgrade from a Tier 1 G|CLUBS Membership to a Tier 4 G|CLUBS Membership and partially credited toward annual membership fees for the next three years. As of on or about March 8, 2021—months after G|CLUBS launched and began to collect "membership" fees—G|CLUBS did not have a business plan or a board of directors.

        f. KWOK and JE also used G|CLUBS as a mechanism to continue fraudulent private placement offerings. KWOK, and others known and unknown, told KWOK's online followers that their purchase of G|CLUBS memberships would entitle them to stock in KWOK-affiliated entities, such as GTV and G|Fashion.

        i. In a conversation regarding G|CLUBS membership funds on or about May 4, 2021, JE stated, in substance and in part, that "first of all, [prospective members] are buying the G|CLUBS membership, but they are expecting they would probably receive some shares, you know, on, on, on the future GTV, I think this is their expectation."

        ii. On or about July 30, 2021, KWOK stated in a video distributed via social media, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%. Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both."

g.  KWOK, JE, and others known and unknown, asked investors to purchase multiple memberships in G|CLUBS, enabling KWOK and JE to increase the amount of money solicited.  In this regard, the G|CLUBS website stated, in substance and in part, that members with multiple memberships would "receive additional benefits" when, in truth and in fact, and as KWOK and JE well knew, multiple memberships did not provide members with additional benefits.

16.  All told, investors purchased hundreds of millions of dollars' worth of G|CLUBS memberships.  However, most of this money did not fund the business of G|CLUBS.  Rather, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, misappropriated a substantial portion of the funds victims had paid G|CLUBS for "memberships," using, among other things, a complex web of entities and bank accounts to do so.  For example:

a.  G|CLUBS funds, which had been funneled through bank accounts in other entities' names, were used to pay personal expenses for KWOK and his family, including luxury purchases of an approximately $2.6 million yacht and luxury automobiles that together cost more than $5 million.

b.  In or about November 2021, JE directed approximately $26.5 million of G|CLUBS funds, which had been funneled through bank accounts in other entities' names, toward the purchase of KWOK's 50,000 square foot New Jersey mansion.

c.  JE directed the transfer of an additional $13 million of G|CLUBS membership payments to an escrow account.  The funds were subsequently used to pay for extravagant renovations to KWOK's New Jersey mansion, including to a wing for Relative-1 and

to a wing for Relative-2, and to purchase various furniture and decorative items including, among other items, Chinese and Persian rugs worth approximately $978,000, a $62,000 television, and a $53,000 fireplace log cradle holder.

        d. On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of G|CLUBS membership payments into a bank account that JE controlled.

        e. G|CLUBS used membership fees to purchase luxury automobiles, including a custom-built Bugatti sports car for approximately $4.4 million. While the car's signed purchase agreement listed G|CLUBS as the customer, the initial specifications documentation for the custom-built car named Relative-1 as the customer. Relative-1 had no official position with G|CLUBS.

<em>The Himalaya Exchange</em>

        17. From at least in or about April 2021 through at least in or about March 2023, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, fraudulently obtained more than approximately $262 million in victim funds through the Himalaya Exchange, a purported cryptocurrency "ecosystem" accessible on the internet. The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin"). The Himalaya Exchange claimed that the "stablecoin" was a digital asset with a fixed 1-to-$1 value backed by reserves, and that the "trading coin" was a cryptocurrency with valuation based on supply and demand. JE was the founder and Chairman of the Himalaya Exchange.

        18. In videos distributed via social media, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant,

trumpeted the prospects and valuation of the Himalaya Exchange and both HCN and HDO, which he publicly described as cryptocurrencies. For example, in a video posted on the Internet on or about October 20, 2021, KWOK falsely stated the following, among other things, and in substance and in part:

         a.    "I am talking about your H Coins, 'Brother Seven' [*i.e.*, KWOK] designed it . . . .[I]t has the attribute of currency, why? It has 20% gold. Awesome[.] [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."

         b.    "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money. Or take all the value of 20% gold and ask everyone to unify it and make it yours."

         c.    "If anyone loses money, I can say that I will compensate 100%. I give you 100%. Whoever loses money, I will bear it."

         d.    "I can sell the H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money unit. . . . [A]nd you can buy anything immediately."

    19.    The initial coin offering of HCN and HDO occurred on or about November 1, 2021. HCN began trading at 10 cents and, within approximately two weeks, the Himalaya Exchange website claimed that each HCN purportedly was worth approximately 27 HDO (*i.e.*, $27), which represented a 26,900% increase in value. That is, approximately two weeks after the initial coin offering, the Himalaya Exchange website indicated that HCN purportedly had an approximately $27 billion valuation.

    20.    At the time of the Himalaya Exchange launch, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the

defendant, marketed HCN to his online followers and others. For example, on or about November 1, 2021—the day of the initial coin offering—KWOK released an official music video for an original song called "HCoin To the Moon" via social media. The phrase "to the moon" is popularly associated with cryptocurrencies and implies a sharp increase in value. The music video depicted KWOK in various luxurious locations and depicted imagery of gold and wealth.

21. At times, including following the Himalaya Exchange launch, KIN MING JE, a/k/a "William Je," the defendant, misleadingly marketed the Himalaya Exchange. For example, in or about June 2022, JE attempted to create the impression that a €3,561,127 purchase of a Ferrari (the "Ferrari") from a particular auction house was completed with HDO. JE stated, in substance and in part, that he was "extremely pleased that [a] buyer decided to purchase [a] world-class car using HDO." Contrary to JE's claim, the Ferrari was not purchased using HDO. In truth and in fact, and as JE well knew, a Himalaya Exchange employee sent the auction house an international bank wire to cover the cost of the Ferrari, while also processing a corresponding "transaction" on the Himalaya Exchange to create the false appearance that the purchase had taken place using HDO. JE's statement was also misleading in that, among other things, the unidentified "buyer" of the Ferrari was, in fact, Relative-1.

22. Contrary to representations of HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, HCN and HDO could not be traded anywhere other than (purportedly) on the Himalaya Exchange. Moreover, unlike cryptocurrencies, HCN could not be traded for, or converted into, other currencies. HCN purportedly could be traded for only HDO (and only on the Himalaya Exchange), and HDO purportedly only could be converted to or from fiat currency (and only on the Himalaya Exchange).

17

a. Indeed, the HDO and HCN Whitepapers, available on the Himalaya Exchange website, provided in fine print that, contrary to KWOK's representations, HCN and HDO were not cryptocurrencies. Rather, according to the HCN Whitepaper, the "operation of the Himalaya Exchange and associated applications and infrastructure will be facilitated through the use of 'Credits.'" Those credits (i) could "only be used on the Himalaya Exchange or within the Himalaya Ecosystem," and (ii) did "not carry any right to require their exchange for fiat currency or crypto-assets." Moreover, while Himalaya Exchange members could request to exchange their "HDO" credits for an equivalent payment in U.S. dollars, the HDO Whitepaper stated that the Himalaya Exchange had the "discretion" to deny any such request.

23. In or about April 2022, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, arranged for the transfer of approximately $37 million in Himalaya Exchange funds from a Himalaya Exchange bank account to a particular escrow account. The $37 million was structured as a purported "loan" to cover the cost of a luxury yacht that KWOK had previously purchased and used, which yacht was then-owned by an entity held in the name of Relative-2.

*Government Seizure of Fraud Proceeds*

24. On or about September 20, 2022 and September 21, 2022, U.S. authorities served judicially-authorized seizure warrants on several domestic banks, and subsequently seized approximately $335 million of proceeds from bank accounts held in the names of Himalaya Exchange entities and other entities associated with HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants. Following the September 2022 judicially authorized

seizures, JE attempted to transfer approximately $46 million from domestic bank accounts associated with the Himalaya Exchange, which had not yet been seized by the United States, to a bank account in the UAE that JE controlled.

        a.  Within approximately two days of the first judicially authorized seizures of Himalaya Exchange-related funds, on or about September 22, 2022, JE contacted the management of a domestic bank that held Himalaya Exchange bank accounts. JE sought to implement a wire transfer, which he and a Himalaya Exchange executive claimed to the domestic bank was needed to effectuate a "redemption" from HDO to U.S. dollars for an unnamed "VIP" (*i.e.*, very important client of the Himalaya Exchange).

        b.  In subsequent communications with the domestic bank, JE revealed that the VIP was, in fact, JE himself. JE provided the domestic bank with documents reflecting two purported HCN sales by JE on or about September 22, 2022—totaling 46 million HDO, which JE was attempting to "convert" into $46 million. JE twice emphasized to the domestic bank's management, in substance and in part, that the $46 million transfer needed to happen "today or it is meaningless."

    25.  On or about October 16, 2022, pursuant to a judicially authorized warrant, U.S. authorities seized an additional approximately $274 million of proceeds from several Himalaya Exchange and G|CLUBS accounts at the domestic bank from which JE requested the $46 million transfer.

        a.  As a result of the judicially-authorized seizures, U.S. authorities seized more than approximately $634 million of fraud proceeds, including approximately $278 million from bank accounts held in the names of the Himalaya Exchange entities, including accounts that purported to hold its HDO cash reserves.

b. Following the seizures, the Himalaya Exchange website continued to represent that HDO was backed by a "Reserve consisting of USD and cash-equivalent assets" when, in truth and in fact, it was not.

c. Despite the seizure of the Himalaya Exchange's cash reserves, the purported price of HCN had not suddenly and sharply declined through the date of this Indictment.

## STATUTORY ALLEGATIONS

26.     From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) wire fraud, in violation of Title 18, United States Code, Section 1343; (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (3) bank fraud, in violation of Title 18, United States Code, Section 1344; (4) international promotional money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and (5) international concealment money laundering, in violation of Title 18, United States Code Section 1956(a)(2)(B)(i).

27.     It was a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent

20

pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KWOK, JE, and WANG agreed to obtain victims' money by causing materially false information and misrepresentations to be transmitted over interstate wires, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

28.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK, JE, and WANG agreed to fraudulently induce investors to participate in the GTV Private Placement, the Farm Loan Program, and G|CLUBS by providing materially false and misleading information and representations in connection with purported shares of GTV common stock and purported companies affiliated with GTV.

29.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette,"  the defendants, and others known and unknown, knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, as defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, KWOK, JE,,and WANG agreed to participate in a scheme to mislead U.S. financial institutions through false and fraudulent pretenses, representations, and documents, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange, in order to obtain money of, or under the custody and control of, at least one financial institution.

30.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, the offenses alleged in Counts Two through Eight of this Indictment in violation of Title 18, United States Code, Section 1956(a)(2)(A)(i).

22

31. It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represent the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer is designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, the offenses alleged in Counts Two through Eight of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

## Overt Acts

32. In furtherance of the conspiracy and to effect its illegal objects, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV stock via the GTV Private Placement.

23

b.       On or about June 5, 2020, WANG, while located in the Southern District of New York, authorized a wire transfer of $100 million from Saraca to Fund-1.

c.       On or about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program.

d.       On or about August 2, 2020, in a video distributed via social media, KWOK stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."

e.       On or about May 28, 2021, JE transferred approximately $13 million from a bank account in the UAE that JE controlled to a bank account held by an entity (owned by Relative-2) at a particular bank in New York, New York.

f.       On or about July 30, 2021, in a video distributed via social media, KWOK stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G-Clubs membership?' 100%. Because I said that I have to promise that [to] anyone who buys G-Clubs membership before September 17 [they] must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Clubs before September 17, G-Clubs and the stock shares. You'll get both."

g.       On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of funds victims had sent to G|CLUBS in exchange for "memberships" to a bank account that JE controlled.

h.       On or about October 20, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that KWOK "designed" HCN, that "[n]o matter how much it raises, 20% will turn into gold," and that "[i]f anyone loses money" on HCN, "I can say that I will compensate 100%."

     i.     On or about September 22, 2022, JE texted a U.S. bank's management, in substance and in part, that a $46 million transfer to a JE-controlled bank account in the UAE needed to happen "today or it is meaningless."

(Title 18, United States Code, Section 371.)

## COUNT TWO
**(Wire Fraud – GTV Private Placement)**

The Grand Jury further charges:

33.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

34.     From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK, JE, and WANG conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Securities Fraud – GTV Private Placement)

The Grand Jury further charges:

35.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

36.     From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK, JE, and WANG conducted the GTV Private Placement to sell GTV stock and obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Wire Fraud – Farm Loan Program)

The Grand Jury further charges:

37.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

38.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE conducted the Farm Loan Program to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Securities Fraud – Farm Loan Program)

The Grand Jury further charges:

39.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

40.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE conducted the Farm Loan Program to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX
### (Wire Fraud – G|CLUBS)

The Grand Jury further charges:

41.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

42.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE promoted and marketed G|CLUBS to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SEVEN
### (Securities Fraud – G|CLUBS)

The Grand Jury further charges:

43.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

44.     From at least in or about June 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a

29

security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE promoted and marketed G|CLUBS to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Wire Fraud – The Himalaya Exchange)

The Grand Jury further charges:

45.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

46.     From at least in or about April 2021 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings,

30

signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE operated the Himalaya Exchange to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINE
### (International Promotional Money Laundering)

The Grand Jury further charges:

47.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

48.     From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, KWOK and JE directed and made international transfers of funds into, out of, and through the United States, with the intent to promote the fraud offenses in Counts Two through Eight of the Indictment.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

31

## COUNT TEN
### (International Concealment Money Laundering)

The Grand Jury further charges:

49. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

50. From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, namely, the fraud offenses alleged in Counts Two through Eight of this Indictment, to wit, KWOK and JE conducted international financial transactions into, and out of, and through the United States involving fraud proceeds, including, among other transactions, transactions involving bank accounts held in the names of entities nominally owned by other individuals and by entities not overtly associated with the defendants, in order to conceal the ownership, control, and/or receipt of the proceeds of the fraud and the illegal nature and source of such proceeds.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

32

## COUNT ELEVEN
### (Unlawful Monetary Transactions)

The Grand Jury further charges:

51.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

52.     On or about June 5, 2020, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, KWOK, JE, and WANG made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Two and Three to Fund-1.

(Title 18, United States Code, Sections 1957 and 2.)

## COUNT TWELVE
### (Obstruction of Justice)

The Grand Jury further charges:

53.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

54.     From at least on or about September 20, 2022 through the date of the filing of this Indictment, in the Southern District of New York and elsewhere, KIN MING JE, a/k/a "William Je," the defendant, corruptly obstructed, influenced, and impeded an official proceeding and attempted so to do, to wit, JE attempted to transfer money to the UAE, beyond the jurisdiction of

33

the United States, to impede and interfere with a federal grand jury investigation in the Southern

District of New York of the offenses alleged in Counts One through Eleven of this Indictment, and

proceedings before the United States District Court for the Southern District of New York

concerning the seizure and forfeiture of criminally derived proceeds.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

**FORFEITURE ALLEGATIONS**

55.     As a result of committing the offenses alleged in Counts One through Eight of this

Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui,"

a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING

WANG, a/k/a "Yvette," the defendants, shall forfeit to the United States, pursuant to Title 18,

United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any

and all property, real and personal, that constitutes or is derived from proceeds traceable to the

commission of said offenses, including but not limited to a sum of money in United States currency

representing the amount of proceeds traceable to the commission of said offenses and, and the

following specific property:

a.     $64,826.87 in United States currency formerly on deposit in Account

Number 5090037713 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC,"

seized by the Government on or about September 18, 2022;

b.     $75,000,000.00 in United States currency formerly on deposit in Account

Number 5090037705 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC,"

seized by the Government on or about September 18, 2022;

34

c. $467,343.00 in United States currency formerly on deposit in Account Number 5090037754 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

d. $89,992,861.75 in United States currency formerly on deposit in Account Number 5090042770 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

e. $1,683,077.40 in United States currency formerly on deposit in Account Number 5090042762 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

f. $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

g. $48,230,709.62 in United States currency formerly on deposit in Account Number 5090030288 at Silvergate Bank held in the name of "Hamilton Investment Management" Ltd., seized by the Government on or about September 18, 2022;

h. $1,800,000.00 in United States currency formerly on deposit in Account Number 5090037739 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

i. $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

j. $4,643,744.70 in United States currency formerly on deposit in Account Number 7801000590 at FV Bank held in the name of "Himalaya International Reserves, Ltd.," seized by the Government on or about September 20, 2022;

k. $14,599,257.25 in United States currency formerly on deposit in Account Number 7801000254 at FV Bank held in the name of "Himalaya International Clearing, Ltd.," seized by the Government on or about September 20, 2022;

l. $11,538,579.87 in United States currency formerly on deposit in Account Number MBI10103-0000 at Mercantile Bank International held in the name of "G Club International Ltd.," seized by the Government on or about October 16, 2022;

m. $10,008,284.04 in United States currency formerly on deposit in Account Number MBI10133-0000 at Mercantile Bank International held in the name of "Himalaya International Clearing Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

n. $3,090,856.54 in United States currency formerly on deposit in Account Number MBI10137-0000 at Mercantile Bank International held in the name of "Hamilton Capital Holding Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

o. $272,350,313.76 in United States currency formerly on deposit in Account Number MBI10138-0000 at Mercantile Bank International held in the name of "Himalaya International Reserves Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

p. $310,594.31 in United States currency formerly on deposit in Account Number MBI10139-0000 at Mercantile Bank International held in the name of "Himalaya

International Financial Group Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

       q. $1,187,278.87 in United States currency formerly on deposit in Account Number MBI10171-0000 at Mercantile Bank International held in the name of "Hamilton Investment Management Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

       r. $43,782.71 in United States currency formerly on deposit in Account Number MBI10172-0000 at Mercantile Bank International held in the name of "G Fashion International Limited," seized by the Government on or about October 16, 2022;

       s. $161,809.47 in United States currency formerly on deposit in Account Number MBI10183-0000 at Mercantile Bank International held in the name of "Himalaya Currency Clearing Pty Ltd.," seized by the Government on or about October 16, 2022;

       t. $2,745,377.75 in United States currency formerly on deposit in Account Number 9878904409 at Manufacturers & Traders Trust Co. held in the name of "GETTR USA, Inc.," seized by the Government on or about September 18, 2022;

       u. $9,899,659.19 in United States currency formerly on deposit in Account Number 157525208185 at US Bank held in the name of "G Fashion," seized by the Government on or about September 18, 2022;

       v. All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430, Parcel No. 3300021-03-00001-02 and described as Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality, Township: MAHWAH TWP

w. A Bugatti Chiron Super Sport, bearing Vehicle Identification Number VF9SW3V3XNM795047;

x. A Lamborghini Aventador SVJ Roads, bearing Vehicle Identification Number ZHWUN6ZD2MLA10393;

y. A Rolls Royce Phantom EWB, bearing Vehicle Identification Number SCATT8C08MU206445;

z. A 46m 2014 Feadship superyacht "Lady May" (ex Como), bearing IMO Number 112359, MMSI Number 319059500, and Callsign ZGDQ9;

aa. A Bösendorfer 185VC Porsche #49539 piano with custom bench, purchased for approximately $140,938.69;

bb. A Railis Design Iceland Contemporary Poseidon Bed with Nightstands, Ebony Veneer, Brass, Velvet, purchased for approximately $31,413.71;

cc. A Hästens 2000T md mattress, purchased for approximately $36,590.00;

dd. A Hästens 2000T sf mattress, purchased for approximately $36,210.00;

ee. A Wembe watch storage box, purchased for approximately $59,392.91;

ff. A Samsung Q900 Series QN98Q900RBF 98" QLED Smart TV -- 8K, purchased for approximately $62,787.54;

gg. A Louis XV Style French Ormolu-Mounted Mahogany Commode by Joseph Émmanuel Zweiner;

hh. A "K'ang Hsi" extension table in etched and patinated pewter and bronze with hand-painted enamel colors by Philip & Kelvin LaVerne, purchased for approximately $180,000.00; and

ii. A "Punto '83" table in stainless steel with mesh tabletop with adjustable height and adjustable petals by Gabriella Crespi, Italy 1982, purchased for approximately $180,000.00.

(a) through (ii), collectively, the "Specific Property."

56.     As a result of committing the money laundering offenses alleged in Counts One, Nine, Ten and Eleven of this Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the Specific Property.

### Substitute Assets Provision

57.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty;

39

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON
3/29/23

DAMIAN WILLIAMS
United States Attorney

SUPERSEDING
TRUE BILL, INDICTMENT
(S1)

— RWLL HPB...
3 27 2022