UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

--------------------------------------------------------x
                                           :
In re:                             :     Chapter 11
                                           :
HO WAN KWOK, *et al.*,[1]         :     Case No. 22-50073 (JAM)
                                           :
            Debtors.           :     (Jointly Administered)
                                           :
--------------------------------------------------------x

**GENEVER HOLDINGS LLC'S MOTION, PURSUANT TO BANKRUPTCY CODE
SECTION 363(b), FOR ENTRY OF ORDER AUTHORIZING GENEVER HOLDINGS
LLC TO OBTAIN SERVICES NECESSARY TO REMEDIATE AREAS OF SHERRY
NETHERLAND APARTMENT AFFECTED BY MARCH 15, 2023 FIRE**

       Genever Holdings LLC (the "<u>Debtor</u>" or "<u>Genever US</u>"), by and through its undersigned

counsel, hereby files this motion (the "<u>Motion</u>") seeking entry of an order, substantially in the

form attached hereto as **<u>Exhibit 1</u>** (the "<u>Proposed Order</u>"), pursuant to section 363(b) of title 11

of the United States Code (the "<u>Bankruptcy Code</u>"), authorizing Genever US to obtain the

services necessary to remediate the portion of the Sherry Netherland Apartment (as defined

below) affected by the March 15, 2023 fire (the "<u>Affected Area</u>"), including authorization for

Genever US to (a) enter into the architect consulting agreement, dated August 23, 2023 (the

"<u>Architect Agreement</u>") with Acheson Doyle Partners Architects, P.C. ("<u>Acheson Doyle</u>"), a

copy of which is attached hereto as **<u>Exhibit 2</u>**, (b) select and hire contractors, engineers,

consultants, and other third-party service providers in the ordinary course of the remediation

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The
mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul
Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho
Wan Kwok (solely for purposes of notices and communications).

project (including as it relates to the removal of any asbestos), as may be necessary to remediate the Affected Area, subject to certain procedures detailed below, and (c) pay such contractors, engineers, consultants, and other third-party service providers in the ordinary course of the remediation project (including as it relates to the removal of any asbestos).  To be clear, the proposed remediation project (the "Remediation Project") will be limited to (i) removing any asbestos in the Affected Area, (ii) "white-boxing"[2] the Affected Area, and (iii) ensuring that electrical, plumbing, and other systems in the Affected Area comply with the New York City building code, all for the purpose of bringing the Sherry Netherland Apartment into a marketable condition.

In support of this Motion, Genever US respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      As the Court is well aware, the principal objective in Genever US's chapter 11 case is to sell and/or rent the Sherry Netherland Apartment in a value-maximizing transaction for the benefit of Genever US's estate and its creditors.  Indeed, the Court previously entered an order extending (a) the sales process under the auspices of former bankruptcy judge Melanie L. Cyganowski as sales officer (the "Sales Officer") and (b) the retention of Sotheby's International Realty ("Sotheby's") as real estate broker for the Sherry Netherland Apartment.

2.      However, following the fire at the Sherry Netherland Apartment on March 15, 2023 (the "March 15 Fire"), the process to sell and/or rent the apartment has come to virtual halt. The March 15 Fire (including the fire department's efforts to extinguish the fire and law

---

[2]     A "white box", as that term is used in the construction industry, refers to a shell building space that has a finished ceiling and painted walls (usually white), but doesn't have finished flooring or other features.

[3]     Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them later in the Motion.

enforcement's investigation into the cause of the fire) has caused significant damage to an area of approximately 2,000 square feet of the apartment, *i.e.*, the Affected Area, representing approximately 28% of the total 7,300 indoor square footage of the Sherry Netherland Apartment. For illustrative purposes, the Affected Area has been shaded (in grey) in the following floor plan of the Sherry Netherland Apartment:



3.    The damage sustained in the Affected Area (including broken windows, the destruction of drywalls, AC units, hard-wood flooring, and other interior structures, as well as significant damage to electrical wiring, plumbing, etc.) has left the Sherry Netherland Apartment,

for all practical purposes, in an unmarketable condition.[4]  Moreover, it was recently discovered that certain portions of the Affected Area (such as pipe insulation) likely contains asbestos.  This damage needs to be remediated (and any asbestos removed) as soon as possible for Genever US to be able to market and sell the Sherry Netherland Apartment.

4.      Unfortunately, the insurer of the Sherry Netherland Apartment, *i.e.*, AIG Property Casualty Company ("AIG"), has not advanced funds to remediate the Sherry Netherland Apartment—other than to pay for minimal clean-up and removal of debris at a cost of approximately $220,000.  Because Genever US does not have any significant cash of its own, it has been essentially paralyzed in dealing with the much-needed remediation at the Sherry Netherland Apartment.  Nor did the Individual Debtor's estate have any significant cash until the closing of the sale of the Lady May yacht on June 30, 2023.

5.      To address Genever US's lack of liquidity, Genever US (together with the Trustee and Genever BVI) recently filed a motion [Docket No. 2110] (the "DIP Motion") seeking authorization for the Individual Debtor's estate to extend postpetition financing of up to $2 million to Genever US and Genever BVI on a revolving basis (all as further detailed in the DIP Motion).  Accordingly, upon the approval of the DIP Motion, Genever US anticipates that it will have sufficient resources to conduct the Remediation Project.

6.      For the avoidance of doubt, at this time, Genever US is ***not*** seeking to restore the Sherry Netherland Apartment to its condition prior to the March 15 Fire.  Instead, Genever US has determined that, at this time, the remediation will be limited to (a) removing any asbestos in the Affected Area, (b) "white-boxing" the Affected Area, and (c) ensuring that electrical, plumbing, and other systems in the Affected Area comply with the New York City building

---

[4]      In addition, a significant amount of soot covered virtually all surfaces in the Affected Area.

code, all for the purpose of bringing the Sherry Netherland Apartment into a marketable condition.

7.      That said, even the limited-scope Remediation Project proposed by Genever US will be no simple task—in no small part due to the fact that the Sherry Netherland Apartment is a cooperative apartment in a landmark quality building in the Upper East Side Historic District, which will require that the Remediation Project comply with the rules of the cooperative and numerous New York City regulations.  Moreover, removing asbestos from the Affected Area will require compliance with New York City health and environmental laws.  For these reasons, Genever US anticipates that it could take a total of six (6) months to complete the Remediation Project.

8.      As a threshold matter, it is critical for Genever US to obtain the services of a seasoned architect with extensive experience working in historic buildings (and the Sherry Netherland, in particular).  Acheson Doyle is the best choice in that regard, as they are already intimately familiar with the Sherry Netherland building and the various rules and procedures for conducting remediation work in that building.  In fact, Acheson Doyle has been the consulting architect for the Sherry Netherland since 1987, *i.e.*, it has acted as the Sherry Netherland's architect for all infrastructure projects in the building (such as exterior repairs, updates to electrical, plumbing, and steam systems, and modernization of the elevators), as well as reviewed proposed alteration to apartments of residents in the building.  In addition, on several occasions, Acheson Doyle has also been engaged directly by other residents in the Sherry Netherland to conduct renovations in their apartments.

9.      As detailed below, the services to be provided by Acheson Doyle include (a) due diligence and preparing a condition report,[5] (b) preparing architectural plans, (c) conducting a bidding process for general contractors to undertake the remediation work at the Sherry Netherland Apartment, (d) overseeing construction administration, (e) submitting architectural plans to pertinent regulatory agencies, and (f) receiving final sign-off from Sherry Netherland. As it relates to the compensation of Acheson Doyle, Genever US proposes a streamlined fee review process (detailed below) that would allow for Genever US to pay their fees and expenses if no party in interest objects to such fees and expenses within a 14-day review period.

10.      Once Acheson Doyle has prepared the architectural plans for the Remediation Project, Acheson Doyle will, under the supervision of Genever US, solicit bids from at least two (2) general contractors to conduct the remediation work.  As part of the Remediation Project, Genever US will also require the services of dozens of service providers, such as masons, carpenters, painters, mechanical trades, electricians, plumbers, engineers, and consultants—some of which will be hired by the general contractor, while others may need to be hired directly by Genever US.

11.      To be clear, by this Motion, Genever US is seeking Court authorization to engage the general contractor selected through this bidding process as well as pay such general contractor and related sub-contractors (such as plumbers and electricians), engineers, and/or consultants, in the ordinary course of the Remediation Project, subject to certain procedural safeguards detailed below, including that (a) Genever US will consult with the Sales Officer,

---

[5]     The due diligence to be conducted by Acheson Doyle will determine the scope of necessary repairs as well as what work is the responsibility of the Sherry Netherland as opposed to Genever US, as the owner of the Sherry Netherland Apartment.  By this Motion, Genever US is only seeking authorization to pay its share of the remediation work.

Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), the Committee,[6] the U.S. Trustee, and the Sherry Netherland (collectively, the "Consultation Parties") prior to the selection of the general contractor and (b) Genever US will file monthly status reports to update the Court and parties in interest as to the progress of the Remediation Project (including updates regarding Genever US's expenditures on the project).

12.     In addition, the Trustee, including as a holder of a proxy for Genever US, will supervise and monitor the Remediation Project, including so as to ensure that Genever US only pays for remediation that is, in fact, the responsibility of Genever US, as opposed to the Sherry Netherland.  Genever US understand that the cooperative has complex rules as to the allocation of responsibility, which will need to be closely monitored.  Moreover, once Genever US and the Sherry Netherland have come to an agreement as to the cost allocation, Genever US will enter into an "alteration agreement" with Sherry Netherland that will specify the relative responsibilities of the parties.  By this Motion, Genever US is *not* seeking Court approval of this alteration agreement; instead, Genever US will request Court approval of that agreement by separate motion at the appropriate time.[7]  To the extent the parties are unable to reach agreement as to the allocation of costs, Genever US will bring the matter to the Court for resolution.

13.     Furthermore, Genever US submits that due to the significant number of service providers (many of which are unknown at this time) that will likely need to be hired over the course of the Remediation Project, it is not feasible to seek separate Court approval each time an appropriate service provider is identified.  As a practical matter, having to seek separate Court

---

[6]     Genever US is aware that no official committee has been appointed in Genever US's chapter 11 case.  However, in the interest of full transparency, Genever US proposes to also consult with the Committee appointed in the Individual Debtor's chapter 11 case, solely because the funding under the DIP facility would be provided by the Individual Debtor's estate.  However, to be clear, the Committee shall not be deemed to have any other rights or interests in Genever US's estate by virtue of the Committee receiving consultation rights under this Motion.

[7]     US Genever intends to do so on shortened notice, subject to separate approval by this Court.

approval every time the services of contractors, engineers, and other service providers become necessary would cause substantial delays, as the remediation work would come to a standstill for several weeks each time Genever US prepares, files, and presents a motion to hire a new service provider.  Nor is it possible, at the outset, to know with certainty which types of services will ultimately be needed during the course of the Remediation Project, including because the precise scope of the project won't be known until after Acheson Davis has completed the condition report and the architectural plans—and even then, additional service providers may become necessary as the remediation work progresses.  In any event, by this Motion, Genever US is only seeking authorization to hire and pay service providers in the ordinary course of the Remediation Project.

14.     Finally, in order for the Affected Area to be "white boxed", any asbestos needs to be removed first.  To that end, Genever US seeks to hire (a) Gallagher Bassett Services, Inc., Technical Services Division ("GBTS") to conduct an asbestos survey in the Affected Area to assess the extent of the asbestos exposure and (b) ABF Environmental ("ABF") to handle the asbestos removal.  As detailed in Genever US's agreement with GBTS (the "GBTS Agreement"), a copy of which is attached hereto as **Exhibit 3**, GBTS will, among other things, collect and analyze samples from the Affected Area as well as prepare a report describing the results of their findings.  The report to be prepared by GBTS is critical because it is necessary for ABF to prepare its proposal for removing the asbestos.

15.     By this Motion, Genever US requests authority to engage not only GBTS but also ABF and any related sub-contractors (such as plumbers, electricians, testing companies, etc.).  Genever US submits that ABF is well-qualified to conduct the asbestos removal.  ABF has extensive experience in removing asbestos (including at the Sherry Netherland) and comes

highly recommended by the Sherry Netherland to conduct this work. The asbestos removal work will include filing for a permit, building a containment area, hooking up the containment area to the building's plumbing and electrical systems, removing pipe and other insulation containing asbestos, reinsulation of piping where insulation was removed, coordinating clearance testing, obtaining sign-off from the New York City Department of Environmental Protection, and removing the containment area. Given the need to move forward with the Remediation Project as soon as possible, Genever US is, at this time, requesting authorization to hire not only GBTS, but also ABF. That said, Genever US intends to file a copy of ABF's work proposal with the Court in advance of the hearing on this Motion.[8]

16.      For all these reasons, and as further detailed below, Genever US requests entry of an order (a) approving Genever US's entry into, and performance under, the Architect Agreement with Acheson Doyle, effective as of July 27, 2023, (b) authorizing Genever US to select and hire contractors, engineers, consultants, and other third-party service providers in the ordinary course of the Remediation Project (including as it relates to the removal of asbestos), as may be necessary to remediate the Affected Area, subject to certain procedures detailed below, and (c) pay such contractors, engineers, consultants, and other third-party service providers in the ordinary course of the Remediation Project (including as it relates to the removal of asbestos).

## JURISDICTION, VENUE, AND STATUTORY BASIS

17.      The United States Bankruptcy Court for the District of Connecticut (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order*

---

[8]      Given the *de minimis* cost of the asbestos survey (approximately $3,000 plus expenses), and the need to proceed with the asbestos survey because it is a gating item for the asbestos removal project, Genever US requested that GBTS proceed with the survey on Monday, August 21, 2023. The results of the survey are expected within the next 7 to 10 days, so that ABF should be able to prepare its work proposal in advance of the hearing scheduled on this motion.

*of Reference* from the United States District Court for the District of Connecticut. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

18.　　Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19.　　The statutory base for the relief requested in this Motion is section 363 of the Bankruptcy Code.

## **BACKGROUND**

### I.　**Chapter 11 Cases**

20.　　On October 12, 2020, Genever US filed its chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy Court") thereby commencing case number 20-12411 (JLG) (the "SDNY Bankruptcy Case"). The 18th floor apartment and auxiliary units (collectively, the "Sherry Netherland Apartment") in the Sherry Netherland Hotel located at 781 Fifth Avenue, New York, New York 10022, is Genever US's principal assets (in addition to the related security deposit).

21.　　On February 15, 2022, Ho Wan Kwok (the "Individual Debtor") filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Court.

22.　　On March 21, 2022, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Individual Debtor's chapter 11 case. No examiner has been appointed in the Individual Debtor's chapter 11 case.

23.　　On June 15, 2022, the Court entered a memorandum of decision and order [Docket No. 465] (the "Trustee Order") directing the United States Trustee to appoint a chapter 11 trustee in the Individual Debtor's chapter 11 case. Pursuant to the Trustee Order, the United States Trustee selected Luc A. Despins (the "Trustee") as the trustee. On July 8, 2022, the Court entered an order [Docket No. 523] granting the appointment of the Trustee as the chapter 11 trustee in the Individual Debtor's chapter 11 case. On August 10, 2022, the Court entered an

10

order [Docket No. 717] finding that the Trustee holds all of the Individual Debtor's economic and governance rights with respect to Genever BVI, which, in turn wholly owns Genever US.

24.    On September 30, 2022, the Trustee and Genever US filed a joint motion [Docket No. 211 in Case No. 22-50592] seeking an order from the SDNY Bankruptcy Court transferring the SDNY Bankruptcy Case to the Court.  On November 3, 2022, the SDNY Bankruptcy Court entered an order [Docket No. 225 in Case No. 22-50592] granting the motion and the SDNY Bankruptcy Case was transferred to this Court.

25.    On October 11, 2022, Genever Holdings Corporation ("Genever BVI") filed its voluntary chapter 11 petition in this Court.

26.    By order dated November 21, 2022 [Docket No. 1141], the Court approved the joint administration of the chapter 11 cases of Genever US, Genever BVI, and the Individual Debtor.

## II.    Sherry Netherland Apartment Sale Process

27.    On September 24, 2021, Genever US filed a motion [Docket No. 131 in Case No. 22-50592] (the "Settlement Motion") seeking approval of a settlement agreement (the "Settlement Agreement") between Genever US, PAX, and Bravo Luck Limited ("Bravo Luck"),[9] establishing, among other things, a framework for the sale of the Sherry Netherland Apartment with Melanie L. Cyganowski as Sales Officer to be employed by Genever US in accordance with an engagement letter dated September 24, 2021.  On October 8, 2021, the SDNY Bankruptcy Court entered (i) an order approving the Settlement [Docket No. 141 in Case No. 22-50592] (the

---

[9]    As the Court is aware, on August 4, 2023, Genever US, Genever BVI, and the Trustee filed their motion [Docket No. 2049] seeking approval of a settlement with Bravo Luck, pursuant to which, among other things, Bravo Luck and the Individual Debtor's son, Qiang Guo, relinquish any beneficial interest they may have in the Sherry Netherland Apartment, Genever US, and Genever BVI, such that Genever US is the full and exclusive owner of the Sherry Netherland Apartment.

"Settlement Order") and (ii) an order approving Genever US's hiring of Melanie L. Cyganowski [Docket No. 142 in Case No. 22-50592] (the "Sales Officer Order").

28.     On December 15, 2021, Genever US filed its *Application to Employ and Retain Sotheby's International Realty as its Real Estate Broker and Sales Agent* [Docket No. 160 in Case No. 22-50592] (the "Sotheby's Application"), in which Genever US sought to retain Sotheby's as Genever US's sales agent in accordance with the engagement agreement [Docket No. 162-1 in Case No. 22-50592]. On January 13, 2022, the SDNY Bankruptcy Court entered an order [Docket No. 168 in Case No. 22-50592] approving the Sotheby's Application.

29.     After the SDNY Bankruptcy Case was transferred to the Court, on December 12, 2023, the Trustee, Genever US, and Genever BVI filed a motion [Docket No. 1257] (the "Extension Motion") seeking to extend the sale process for the Sherry Netherland Apartment and retain Sotheby as broker. On February 1, 2023, the Court granted the Extension Motion (the "Sales Process Order"), extending the sale process through April 30, 2023.

30.     In accordance with the Sales Process Order, the parties to the Settlement Agreement agreed to a further extension of the sales process regarding the Sherry Netherland Apartment through October 31, 2023.

31.     Relatedly, the Trustee, Genever US, and Genever BVI also requested authority for the Sales Officer and Sotheby's to market the Sherry Netherland Apartment for rent. *See* Docket No. 1446. The Court granted that by order dated March 21, 2023. *See* Docket No. 1577.

III.    **Fire at Sherry Netherland Apartment and AIG Litigation**

32.     On March 6, 2015, Genever US executed a proprietary lease (the "Proprietary Lease") with the Sherry Netherland Inc., a cooperative housing corporation through which Genever US owns a number of shares that are assigned to the Sherry Netherland Apartment leased by Genever US.

33.     Genever US holds certain insurance policies, purchased from AIG, providing Genever US insurance coverage in excess of $28 million to protect the Sherry Netherland Apartment and the valuable property therein, covering "all risk" of property loss subject to certain carve outs, and providing Genever US excess insurance of up to $11 million for liability coverage for claims arising out of its ownership of the Sherry Netherland Apartment, including damage to adjacent properties (such policies, together, the "AIG Policy").

34.     On March 15, 2023, the Individual Debtor was arrested by federal law enforcement in the Sherry Netherland Apartment.  Later that same day, the March 15 Fire broke out in the Sherry Netherland Apartment and damaged the Affected Area and the property therein.

35.     The March 15 Fire (including the efforts to extinguish the fire as well as law enforcement's investigation into its cause) has caused significant damage to an area of approximately 2,000 square feet of the apartment, *i.e.*, the Affected Area, representing approximately 28% of the total 7,300 indoor square footage of the apartment.  The damage sustained in the Affected Area has left the Sherry Netherland Apartment, for all practical purposes, in an unmarketable condition.

36.     Following the March 15 Fire, AIG has paid approximately $220,000 for minimal clean-up and removal of debris in the Affected Area.

37.     On April 25, 2023, AIG issued "Notices of Cancellation of Insurance" purporting to cancel the AIG Policy.

38.     On May 12, 2023, Genever US filed its *Complaint Under Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 7001 of Genever Holdings LLC Against AIG Property Casualty Company Under Various Insurance Policies for Breach of Contract and Declaratory Judgment* [Docket No. 1 in Adv. Proc. No. 23-05007], initiating litigation with

13

respect to breach of contract claims (including denial of coverage) in connection with the AIG

Policy (the "AIG Litigation").[10]

39.     On July 13, 2023, the Bankruptcy Court issued a preliminary injunction enjoining

AIG from cancelling the AIG Policy and directing AIG to rescind prior notice of cancellation.

(the "Preliminary Injunction Order").  *See* Docket No. 32 in Adv. Proc. No. 23-05007.  On July

27 2023, AIG filed a motion in the United States District Court for the District of Connecticut for

leave to appeal the Preliminary Injunction Order, which motion the District Court denied on

August 17, 2023.  *See* Docket No. 17 Case No. 3:23-cv-01003-KAD.

40.     For the avoidance of doubt, Genever US will seek reimbursement from AIG of all

expenses incurred in connection with the Remediation Project.

## IV.    Architect Agreement

41.     Genever US has entered into the Architect Agreement with Acheson Doyle,

subject to obtaining approval of this Court, to provide Genever US with architectural services in

connection with the remediation of the Sherry Netherland Apartment.

42.     The Sherry Netherland Apartment is a cooperative apartment in a landmark

quality building in the Upper East Side Historic District building, which will require that the

Remediation Project comply with the rules of the cooperative and various New York City

regulations.  For these reasons, it is critical for Genever US to obtain the services of a seasoned

architect with extensive experience working in historic buildings (and the Sherry Netherland in

particular).  Acheson Doyle is the best choice in that regard, as they are already intimately

familiar with the Sherry Netherland building and the various rules and procedures for conducting

remediation work in that building.  In fact, Acheson Doyle has been the consulting architect for

---

[10]    For the avoidance of doubt, Paul Hastings does not represent Genever US in the AIG Litigation.

14

the Sherry Netherland since 1987, *i.e.*, it has acted as the Sherry Netherland's architect for all

infrastructure projects in the building (such as exterior repairs, updates to electrical, plumbing,

and steam systems, and modernization of the elevators), as well as reviewed proposed alteration

to apartments of residents in the building.  Acheson Doyle is proficient at providing architectural

services during all phases of the design and construction process and brings extensive experience

in architecture, planning and preservation. It has worked on residential, commercial, institutional,

hospitality, and ecclesiastical projects all over the world.

43.     Pursuant to the Architect Agreement, Acheson Doyle will provide critical services

for the remediation of the Sherry Netherland Apartment (the "<u>Architectural Services</u>"),[11]

including, among other things, the following:

    a.  <u>Prepare Condition Report</u>: conduct due diligence and prepare a
condition report with a description of existing elements of affected
area and list of recommended minimum scope of work required to
meet NYC Code for purposes of code compliance of the affected
area for sale of Sherry Netherland Apartment as a "white box" space;

    b.  <u>Preparation of Plans</u>: prepare architectural plans for filing with New
York City Landmarks Preservation Commission ("<u>LPC</u>") and New
York City Department of Buildings ("<u>DOB</u>") and documents
suitable for contractor pricing for a minimum code compliance scope
of work at the affected areas to achieve a "white box" layout;

    c.  <u>Pricing Phase Services</u>: prepare and conduct the bidding process,
including preparing the invitations to bid for contractor pricing,
attend bidder walk-throughs, review bids, prepare bid summaries and
attend bid interview meetings;

    d.  <u>Construction Administration Phase Services</u>: prepare contractor
agreement and other related documents and oversee construction
administration;

    e.  <u>Prepare Filing of Plans for DOB & LPC Filing</u>: prepare and file
plans with DOB for approval with LPC; coordinate with appropriate
entities for plan filing and sign-off; and

---

[11]    The Architectural Services are further detailed on Exhibit A to the Architect Agreement.

      f.   <u>Sherry-Netherland Alteration Agreement</u>: prepare correspondence and review project sign-off documents as required by Sherry Netherland alteration agreement.

44.     For the Architectural Services to be provided under the Architect Agreement, Acheson Doyle charges the following fees:

| | Description of Services | Fees | Calculation of Fees |
|---|---|---|---|
| Scope A | Condition Report | $35,000 (capped) | Hourly Billing |
| Scope B[12] | Preparation of Plans | $145,000 | Lump sum per % completion |
| Scope C | Pricing Phase Services | $12,000 | Lump sum per % completion |
| Scope D | Construction Administration Phase Services | $20,000/month (capped) | Hourly Billing |
| Scope E | Prepare Filing Plans for DOB & LPC Filing; Coordination with Expeditor | $25,000 | Lump sum per % completion |
| Scope F | The Sherry-Netherland Inc. Alteration Agreement | $2,500 | Lump sum per % completion |

45.     The fees to be charged for services under Scope A and Scope D will be based on the number of hours times the applicable hourly rate, subject to a maximum amount (as indicated in the column labeled "Fees"). As detailed in the Architect Agreement, the hourly rates range from $120.00/hour to $400.00/hour. The fees to be charged for services under Scope B, Scope C, Scope E, and Scope F will be charged a fixed fee (to be invoiced based on the percentage completed at the time the invoice is issued). In addition, pursuant to the Architect Agreement, Acheson Davis is entitled to reimbursement of its expenses (including in-house reprographics, blueprints, messenger service, overnight mail, transportation, photography, and presentation materials), which expenses will be charged at a factor 1.1 times cost. While it is not possible to

---

[12]   <u>Scope B Fee Breakdown</u>: Schematic Phase ($22,000); Design Development Phase ($36,000); Construction Document Phase ($50,000); and Construction Bidding Plans Phase ($37,000).

give an exact estimate of the total fees and expenses to be incurred under the Architect

Agreement, Genever US anticipates that the total amount will be approximately $250,000.

**V.**    **Asbestos Removal**

46.    Before the Sherry Netherland Apartment can be "white boxed," any asbestos

needs to be removed first.  To that end, Genever US seeks to hire (a) GBTS to conduct an

asbestos survey in the Affected Area to assess the extent of the asbestos exposure, and (b) ABF

to handle the asbestos removal.  As detailed in GBTS's work proposal, GBTS will, among other

things, collect and analyze samples from the Affected Area as well as prepare a report describing

the results of their findings.  For their services, GBTS charges a fixed fee of $2,750, plus certain

reimbursable expenses (estimated to be approximately $4,490).  GBTS is well-qualified to

provide these services, having more than 35 year of experience in industrial hygiene, risk

assessment, remediation & decontamination.

47.    Once GBTS has prepared its report, ABF will prepare its proposal for the removal

of the asbestos.  ABF is well-qualified to conduct the asbestos removal.  ABF is an

environmental consulting and engineering firm that was established over 15 years ago.  The ABF

personnel has over 100 years of combined experience in the environmental industry and holds

multiple certifications.  ABF specializes in industrial hygiene services, including asbestos

services and provides systematic assessments and proactive management of asbestos containing

materials.

48.    ABF's services include filing for a permit, building a containment area, hooking

up the containment area to the building's plumbing and electrical systems, removing pipe and

other insulation containing asbestos, reinsulation of piping where insulation was removed,

coordinating clearance testing, obtaining sign-off from the New York City Department of

Environmental Protection, and removing the containment area.

VI.   **Other Service Providers**

49.     In connection with the Remediation Project, Genever US will also require the services of a general contractor as well as dozens of other service providers, such as masons, carpenters, painters, mechanical trades, electricians, plumbers, engineers, and consultants—some of which will be hired by the general contractor, while others may need to be hired directly by Genever US.

50.     Once Acheson Doyle has prepared the architectural plans for the Remediation Project, Acheson Doyle will, under the supervision of Genever US, solicit bids from general contractors to conduct the remediation work.  By this Motion, Genever US seeks Court authorization to engage the general contractor selected through this bidding process as well as pay the general contractor selected by Genever US and the related sub-contractors, engineers, and/or consultants, in the ordinary course of the Remediation Project, subject to the following procedures.

51.     Genever US will provide copies of the bids received from the general contractor (including as to the estimated costs of the Remediation Project) to the Sales Officer, PAX, the Committee, the U.S. Trustee, and the Sherry Netherland (*i.e.*, the Consultation Parties) and will consult with the Consultation Parties regarding the selection of the general contractor.  In addition, Genever US will provide the Consultation Parties with copies of all invoices received from the general contractor and any related subcontractors, engineers, or consultants in an amount greater than $25,000 before paying such invoices.  Moreover, Genever US will file monthly status reports to update the Court and parties in interest as to the progress of the Remediation Project (including as it relates to the selection of the general contractor, the estimated cost of the Remediation Project to be undertaken by the general contractor, and a summary of Genever US's expenditures with respect to the Remediation Project).

18

VII.    **Post-Petition Financing**

52.    Due to Genever US's lack of liquidity and AIG's refusal to advance funds to remediate the Sherry Netherland Apartment (beyond the $220,000 for an initial clean-up), on August 23, 2023, Genever US, Genever BVI, and the Trustee filed the DIP Motion seeking entry of an order (the "Proposed DIP Order") authorizing Genever US and Genever BVI to obtain secured postpetition financing from the Individual Debtor's chapter 11 estate through the Trustee (the "DIP Lender").  Pursuant to the Proposed DIP Order, the DIP Lender would make non-priming revolving loans in an aggregate amount up to but not exceeding $2,000,000 secured by Genever US's interest in the Sherry Netherland Apartment in order to remediate the Apartment and pursue the AIG Litigation.

## RELIEF REQUESTED

53.    Genever US respectfully requests authorization for Genever US to undertake the Remediation Project, including (a) entry into the Architect Agreement, effective as of July 27, 2023, (b) selecting and hiring contractors, engineers, consultants, and other third-party service providers in the ordinary course of the Remediation Project (including as it relates to the removal of asbestos), as may be necessary to remediate the Affected Area, subject to certain procedures, and (c) pay such contractors, engineers, consultants, and other third-party service providers in the ordinary course of the Remediation Project (including as it relates to the removal of asbestos).

## BASIS FOR RELIEF

54.    Section 363(b)(1) of the Bankruptcy Code provides in pertinent part, that a debtor in possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the

19

hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

55.     Genever US has a duty to maximize the value of its estate and has determined the best way to do that is by selling and/or renting the Sherry Netherland Apartment, its primary asset.  In fact, this is Genever US's key objective in its chapter 11 case.  However, the Affected Area of the Sherry Netherland Apartment has been severely damaged by the March 15 Fire, and the Sales Officer and Sotheby have informed Genever US that the Sherry Netherland Apartment is effectively unmarketable and selling or renting the apartment in its present condition would not maximize value.  Thus, Genever US has determined in its business judgment that the Affected Area of the Sherry Netherland Apartment must be remediated as soon as possible for Genever US to sell and/or rent the Sherry Netherland Apartment in a value-maximizing transaction.

56.     As detailed above and in the Architect Agreement, Genever US seeks to remediate the Sherry Netherland Apartment to turn it into a "white box", *i.e.*, the Sherry Netherland Apartment will have foundational components to bring it up to New York City building code, including air conditioning, venting, code compliant temporary lighting, electrical, plumbing, etc.  For the avoidance of doubt, Genever US is not seeking to restore the Sherry Netherland Apartment to the condition it was in before the March 15 Fire.

57.     Nevertheless, the Remediation Project will not be a simple task given that the Sherry Netherland Apartment is a cooperative apartment in a landmark quality building in the

Upper East Side Historic District.  The services of a professional architect with knowledge and experience in landmark quality buildings is required in order to plan and oversee the remediation of the Sherry Netherland Apartment to restore it.  Acheson Doyle is the best choice in that regard, as they are already intimately familiar with the Sherry Netherland building and the various rules and procedures for conducting remediation work in that building.  In fact, Acheson Doyle has been the consulting architect for the Sherry Netherland for decades and it has acted as the Sherry Netherland's architect for all infrastructure projects in the building (such as exterior repairs, updates to electrical, plumbing, and steam systems, and modernization of the elevators), as well as reviewed proposed alteration to apartments of residents in the building.

58.    As it relates to the payment of Acheson Doyle's fees and expenses, Genever US requests it be authorized to file a notice with the Court attaching Acheson Doyle's invoices for the Architectural Services.  Parties in interest will then have fourteen (14) days to object to such invoices.  If no timely objections are filed with the Court, Genever US is authorized to pay such invoices without further Court order.  If any timely objections are filed, (i) Genever US may file a response to such objection(s) within seven (7) days thereafter and (ii) pay the portion of the fees and expenses that are not subject to such objection.  To the extent that an objection cannot be consensually resolved among the parties, the Court will rule on the matter.

59.    In connection with the Remediation Project, Genever US will also require the services of dozens of other service providers, including electricians, plumbers, engineers, and consultants—some of which will be hired by the general contractor, while others may need to be hired directly by Genever US.  Once Acheson Doyle has prepared the architectural plans for the Remediation Project, Acheson Doyle will, under the supervision of Genever US, solicit bids from general contractors to conduct the remediation work.

60.      Genever US submits that, given the significant number of service providers that will likely need to be hired over the course of the Remediation Project, it is not feasible to seek separate Court approval each time an appropriate service provider is identified.  Seeking separate Court approval of each contractors, engineer, and other service provider would introduce several weeks of delay each time Genever US would have to prepare, file, and present a new motion.  It is also not possible, at the outset of the Remediation Project, to know with certainty which types of services will ultimately be needed, including because the precise scope of the project won't be known until after Acheson Davis has completed the condition report and the architectural plans—and even then, additional service providers may become necessary as the remediation work progresses.

61.      That said, Genever US will only engage and pay service providers in the ordinary course of the Remediation Project.  Moreover, as additional safeguards, (a) Genever US will file monthly status reports to update the Court and parties in interest as to the progress of the Remediation Project (including as it relates to the selection of the general contractor, the estimated cost of the Remediation Project to be undertaken by the general contractor, and a summary of Genever US's expenditures with respect to the Remediation Project) and (b) Genever US will provide copies of the bids received from the general contractor (including as to the estimated costs of the Remediation Project) to the Consultation Parties and will consult with them regarding the selection of the general contractor.  In addition, Genever US will provide the Consultation Parties with copies of all invoices received from the general contractor and any related subcontractors, engineers, or consultants in an amount greater than $25,000 before paying such invoices.  And, as noted, the Trustee, including as a holder of a proxy for Genever US, will supervise and monitor the Remediation Project.

62.     Finally, for obvious reasons, any asbestos in the Affected Area must be removed. To assess the extent of the asbestos exposure, Genever US seeks to hire GBTS to conduct a survey of the Affected Area and prepare a report.  That report, in turn, will determine the scope of the asbestos removal project to be undertaken by ABF.  As detailed above, ABF is well-qualified to perform this task.  Proper removal of any asbestos is critical to ensure compliance with New York City health and environmental laws.

63.     For all these reasons, Genever US submits that conducting the Remediation Project, including entry into the Architect Agreement and the hiring of contractors and other service providers to conduct the Remediation Process (including as it relates to the removal of asbestos) is a sound exercise of Genever US's business judgment.  In light of the foregoing, Genever US submits that the relief requested herein is appropriate and necessary and in the best interests of the estate

**WAIVER OF BANKRUPTCY RULE 6004(H)**

64.     Genever US requests a waiver of the fourteen-day stay requirements under Bankruptcy Rule 6004(h), such that the Proposed Order be effective immediately upon entry thereof.  For all the reasons set forth above, it is critical to begin remediating the Sherry Netherland Apartment as soon as possible to facilitate a value-maximizing transaction for the benefit of Genever US's estate.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the foregoing reasons, Genever US respectfully requests that the

Court enter the Proposed Order granting the relief requested herein.

Dated: August 23, 2023
      New York, New York

By: */s/ G. Alexander Bongartz*
Luc A. Despins (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
Douglass Barron (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
lucdespins@paulhastings.com
alexbongartz@paulhastings.com
douglassbarron@paulhastings.com

    *and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

    *and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for Genever Holdings LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------------------x
                                                           :
In re:                                                     :   Chapter 11
                                                           :
HO WAN KWOK, *et al.*,                                     :   Case No. 22-50073 (JAM)
                                                           :
            Debtors.[1]                                    :   Jointly Administered
                                                           :
---------------------------------------------------------------x

**NOTICE OF CONTESTED MATTER RESPONSE DATE**

Genever Holdings LLC ("Genever US") has filed the its *Motion, Pursuant to Bankruptcy Code Section 363(b), for Entry of Order Authorizing Genever Holdings LLC to Obtain Services Necessary to Remediate Areas of Sherry Netherland Apartment Affected by March 15, 2023 Fire* (the "Contested Matter") with the U.S. Bankruptcy Court for the District of Connecticut. Notice is hereby given that any response to the Contested Matter must be filed with the Court no later than September 13, 2023, in accordance with the Federal Rules of Bankruptcy Procedure 2002(a) and 9014.[2] In the absence of a timely filed response, the proposed order in the Contested Matter may enter without further notice and hearing. *See* 11 U.S.C. § 102(1).

---

[1]  The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]  Pursuant to Federal Rule of Bankruptcy Procedure 9006(f), if service is made by mail, three days are added after the response date set in this notice

Dated: August 23, 2023
     New York, New York

By: */s/ G. Alexander Bongartz*
Luc A. Despins (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
Douglass Barron (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
lucdespins@paulhastings.com
alexbongartz@paulhastings.com
douglassbarron@paulhastings.com

    *and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

    *and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for Genever Holdings LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------------x
                                           :
In re:                                     :    Chapter 11
                                           :
HO WAN KWOK, et al.,¹                      :    Case No. 22-50073 (JAM)
                                           :
             Debtors.                      :    (Jointly Administered)
                                           :
-------------------------------------------------------x
```

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on August 23, 2023, the foregoing Motion was electronically filed.  Notice of this filing was sent by e-mail to all parties to the above-captioned chapter 11 case by operation of the Court's electronic filing ("CM/ECF") system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

Dated:    August 23, 2023                   By: */s/ G. Alexander Bongartz*
          New York, New York                G. Alexander Bongartz (admitted *pro hac vice*)
                                            PAUL HASTINGS LLP
                                            200 Park Avenue
                                            New York, New York 10166
                                            (212) 318-6079
                                            alexbongartz@paulhastings.com

                                            *Counsel for Genever Holdings LLC*

---

¹   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

# **EXHIBIT 1**

## **Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                                        :
In re:                                          :    Chapter 11
                                                        :
HO WAN KWOK, *et al.*,[1]                       :    Case No. 22-50073 (JAM)
                                                        :
                    Debtors.                    :    (Jointly Administered)
                                                        :
-------------------------------------------------------x

**ORDER GRANTING GENEVER HOLDINGS LLC'S MOTION,  PURSUANT
TO BANKRUPTCY CODE SECTION 363(b), FOR ENTRY OF ORDER
AUTHORIZING GENEVER HOLDINGS LLC TO OBTAIN SERVICES
NECESSARY TO REMEDIATE AREAS OF SHERRY NETHERLAND
APARTMENT AFFECTED BY MARCH 15, 2023 FIRE**

Upon the motion (the "Motion")[2] of debtor Genever Holdings LLC ("Genever US"), for

an order (this "Order") authorizing Genever US to obtain the services necessary to remediate the

portion of the Sherry Netherland Apartment affected by the March 15, 2023 fire (the "Affected

Area"), including authorization for Genever US to (a) enter into the Architect Agreement with

Acheson Doyle, effective as of July 27, 2023, (b) select and hire contractors, engineers,

consultants, and other third-party service providers in the ordinary course of the Remediation

Project (including as it relates to the removal of asbestos), as may be necessary to remediate the

Affected Area, subject to certain procedures, and (c) pay such contractors, engineers,

consultants, and other third-party service providers in the ordinary course of the Remediation

---

[1]   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The
mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul
Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho
Wan Kwok (solely for purposes of notices and communications).

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

Project (including as it relates to the removal of asbestos), all as further detailed in the Motion; and the Court having reviewed the Motion and having considered the statements of counsel before the Court at a hearing held on _____, 2023 (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) good and sufficient notice of the Motion having been given; and no other or further notice being required; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested by the Motion, as modified by the terms of this Order is in the best interest of Genever US's estate and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Genever US is authorized to enter into, and perform under, the Architect Agreement with Acheson Doyle, effective as of July 27, 2023.

3.      As it relates to the payment of Acheson Doyle's fees and expenses, Genever US shall file a notice with the Court attaching Acheson Doyle's invoices for the Architectural Services.  Parties in interest will then have fourteen (14) days to object to such invoices.  If no timely objections are filed with the Court, Genever US is authorized to pay such invoices without further Court order.  If any timely objections are filed, (i) Genever US may file a response to such objection(s) within seven (7) days thereafter and (ii) pay the portion of the fees and expenses that are not subject to such objection.  To the extent that an objection cannot be consensually resolved among the parties, the Court will rule on the matter.

4.      Genever US is authorized to enter into, and perform under, the GBTS Agreement, including payment of GBTS's fees and expenses in the ordinary course of the Remediation Project, without further Court approval.

5.      Genever is authorized to select and hire contractors, engineers, consultants, and other third-party service providers in the ordinary course of the Remediation Project (including as it relates to the removal of asbestos), as may be necessary to remediate the Affected Area, subject to the procedures set forth in paragraphs 6 and 7 of this Order.  For the avoidance of doubt, Genever US is also authorized to (a) enter into, and perform under, an agreement with ABF to remove asbestos from the Affected Area, as detailed in the Motion, and (b) pay ABF's fees and expenses in the ordinary course of the Remediation Project, without further Court approval.

6.      Genever US shall provide copies of the bids received from the general contractor (including as to the estimated costs of the Remediation Project) to Sales Officer, PAX, the Committee, the U.S. Trustee, and the Sherry Netherland (the "Consultation Parties") and will consult with the Consultation Parties regarding the selection of the general contractor.  In addition, Genever US will provide the Consultation Parties with copies of all invoices received from the general contractor and any related subcontractors, engineers, or consultants in an amount greater than $25,000 before paying such invoices.

7.      Genever US shall file monthly status reports to update the Court and parties in interest as to the progress of the Remediation Project (including as it relates to the selection of the general contractor, the estimated cost of the Remediation Project to be undertaken by the general contractor, and a summary of Genever US's expenditures with respect to the Remediation Project).

8.      Genever US is authorized to pay contractors, engineers, consultants, and other third-party service providers utilized in the Remediation Project (including as it relates to the removal of asbestos) in the ordinary course of the Remediation Project.

9.      The Trustee, including as a holder of a proxy for Genever US, shall supervise and monitor the Remediation Project, including so as to ensure that Genever US only pays for remediation that is, in fact, the responsibility of Genever US, as opposed to the Sherry Netherland.  For the avoidance of doubt, this Order does not approve any "alteration agreement" as between Genever US and the Sherry Netherland related to relative responsibilities of the parties with respect to the remediation of the Sherry Netherland Apartment.  Genever US shall request separate Court approval of any such agreement by separate motion at the appropriate time.  To the extent the parties are unable to reach agreement as to the allocation of costs, Genever US will bring the matter to the Court for resolution.

10.      Notwithstanding the provisions of Bankruptcy Rule 6004(h) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rule 6004(h) is hereby expressly waived and shall not apply.

11.      Genever US is authorized and empowered to take all actions necessary to effectuate the relief granted in this Order.

12.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

13.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **EXHIBIT 2**

**Architect Agreement**



# AIA® Document B101® – 2017

## Standard Form of Agreement Between Owner and Architect

**AGREEMENT** made as of the  23nd  day of  August  in the year  2023
*(In words, indicate day, month and year.)*

**BETWEEN** the Architect's client identified as the Owner:
*(Name, legal status, address and other information)*

Genever Holdings LLC
c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok
Paul Hastings LLP
200 Park Avenue, New York, NY 10166
Attn: G. Alexander Bongartz, Paul Hastings LLP (via email:
alexbongartz@paulhastings.com)

and the Architect:
*(Name, legal status, address and other information)*

Acheson Doyle Partners, P.C.
226 W. 26th Street, 5th Floor
New York, NY 10001
Attn: David C. Acheson, AIA

for the following Project:
*(Name, location and detailed description)*

**Genever Holdings LLC Apt 1801 - Apartment Stabilization Project
The Sherry-Netherland, Inc.
781 Fifth Avenue, New York, NY 10022**

The Owner and Architect agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                              (1262844013)

**1**

## TABLE OF ARTICLES

1    INITIAL INFORMATION

2    ARCHITECT'S RESPONSIBILITIES

3    SCOPE OF ARCHITECT'S BASIC SERVICES

4    SUPPLEMENTAL AND ADDITIONAL SERVICES

5    OWNER'S RESPONSIBILITIES

6    COST OF THE WORK

7    COPYRIGHTS AND LICENSES

8    CLAIMS AND DISPUTES

9    TERMINATION OR SUSPENSION

10    MISCELLANEOUS PROVISIONS

11    COMPENSATION

12    SPECIAL TERMS AND CONDITIONS

13    SCOPE OF THE AGREEMENT

## ARTICLE 1    INITIAL INFORMATION

§ 1.1 This Agreement is based on the Initial Information set forth in this Section 1.1. For the avoidance of doubt, this Agreement shall include, and incorporates by reference, the terms set forth in Exhibit A hereto. In the event of any inconsistency, the terms set forth in Exhibit A shall control.
*(For each item in this section, insert the information or a statement such as "not applicable" or "unknown at time of execution.")*

§ 1.1.1 The Owner's program for the Project:
*(Insert the Owner's program, identify documentation that establishes the Owner's program, or state the manner in which the program will be developed.)*

Apartment 1801 Stabilization – creation of a "white box" code compliant apartment suitable for sale

§ 1.1.2 The Project's physical characteristics:
*(Identify or describe pertinent information about the Project's physical characteristics, such as size; location; dimensions; geotechnical reports; site boundaries; topographic surveys; traffic and utility studies; availability of public and private utilities and services; legal description of the site, etc.)*

Apt. 1801 (approximately 2,000 square feet) is a portion of a larger apartment on the 18th floor at The Sherry Netherland 781 Fifth Avenue, NY, NY 10022, Block 1374, Lot 1

§ 1.1.3 The Owner's budget for the Cost of the Work, as defined in Section 6.1:
*(Provide total and, if known, a line item breakdown.)*

Not available at this time.

§ 1.1.4 The Owner's anticipated design and construction milestone dates:

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                                                    (1262844013)

**2**

.1      Design phase milestone dates, if any:

.2      Construction commencement date:

.3      Substantial Completion date or dates:

.4      Other milestone dates:

**§ 1.1.5** The Owner intends the following procurement and delivery method for the Project:
*(Identify method such as competitive bid or negotiated contract, as well as any requirements for accelerated or fast-track design and construction, multiple bid packages, or phased construction.)*

Competitive Bid

**§ 1.1.6** The Owner's anticipated Sustainable Objective for the Project:
*(Identify and describe the Owner's Sustainable Objective for the Project, if any.)*

Not applicable

**§ 1.1.6.1** If the Owner identifies a Sustainable Objective, the Owner and Architect shall complete and incorporate AIA Document E204™–2017, Sustainable Projects Exhibit, into this Agreement to define the terms, conditions and services related to the Owner's Sustainable Objective. If E204–2017 is incorporated into this agreement, the Owner and Architect shall incorporate the completed E204–2017 into the agreements with the consultants and contractors performing services or Work in any way associated with the Sustainable Objective.

**§ 1.1.7** The Owner identifies the following representative in accordance with Section 5.3:
*(List name, address, and other contact information.)*

Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok  Paul Hastings LLP
200 Park Avenue
New York, New York 10166

**§ 1.1.8** The persons or entities, in addition to the Owner's representative, who are required to review the Architect's submittals to the Owner are as follows:
*(List name, address, and other contact information.)*

Luc A. Despins

**§ 1.1.9** The Owner shall retain the following consultants and contractors:
*(List name, legal status, address, and other contact information.)*

.1      Geotechnical Engineer:

Not applicable

**Init.**

/

AIA Document B101 – 2017. Copyright © 1974, 1976, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                                            (1262844013)

3

    .2    Civil Engineer:

        Not applicable

    .3    Other, if any:
        *(List any other consultants and contractors retained by the Owner.)*

**§ 1.1.10** The Architect identifies the following representative in accordance with Section 2.3:
*(List name, address, and other contact information.)*

David C. Acheson, AIA
Acheson Doyle Partners, PC
226 W. 26th Street, 5th floor
New York, NY 10001

**§ 1.1.11** The Architect shall retain the consultants identified in Sections 1.1.11.1 and 1.1.11.2:
*(List name, legal status, address, and other contact information.)*

**§ 1.1.11.1** Consultants retained under Basic Services:
    .1    Structural Engineer:

    .2    Mechanical Engineer:

    .3    Electrical Engineer:

**Init.**

*I*

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**

**4**

(1262844013)

**§ 1.1.11.2** Consultants retained under Supplemental Services:

**§ 1.1.12** Other Initial Information on which the Agreement is based:

**§ 1.2** The Owner and Architect may rely on the Initial Information. Both parties, however, recognize that the Initial Information may materially change and, in that event, the Owner and the Architect shall appropriately adjust the Architect's services, schedule for the Architect's services, and the Architect's compensation. The Owner shall adjust the Owner's budget for the Cost of the Work and the Owner's anticipated design and construction milestones, as necessary, to accommodate material changes in the Initial Information.

**§ 1.3** The parties shall agree upon protocols governing the transmission and use of Instruments of Service or any other information or documentation in digital form. The parties will use AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, to establish the protocols for the development, use, transmission, and exchange of digital data.

**§ 1.3.1** Any use of, or reliance on, all or a portion of a building information model without agreement to protocols governing the use of, and reliance on, the information contained in the model and without having those protocols set forth in AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, and the requisite AIA Document G202™–2013, Project Building Information Modeling Protocol Form, shall be at the using or relying party's sole risk and without liability to the other party and its contractors or consultants, the authors of, or contributors to, the building information model, and each of their agents and employees.

## ARTICLE 2   ARCHITECT'S RESPONSIBILITIES
**§ 2.1** The Architect shall provide professional services as set forth in this Agreement. The Architect represents that it is properly licensed in the jurisdiction where the Project is located to provide the services required by this Agreement, or shall cause such services to be performed by appropriately licensed design professionals.

**§ 2.2** The Architect shall perform its services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances. The Architect shall perform its services as expeditiously as is consistent with such professional skill and care and the orderly progress of the Project.

**§ 2.3** The Architect shall identify a representative authorized to act on behalf of the Architect with respect to the Project.

**§ 2.4** Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

**§ 2.5** The Architect shall maintain the following insurance until termination of this Agreement. If any of the requirements set forth below are in addition to the types and limits the Architect normally maintains, the Owner shall pay the Architect as set forth in Section 11.9.

**§ 2.5.1** Commercial General Liability with policy limits of not less than    ($   ) for each occurrence and   ($   ) in the aggregate for bodily injury and property damage.
Certificate of Insurance is available upon request

**§ 2.5.2** Automobile Liability covering vehicles owned, and non-owned vehicles used, by the Architect with policy limits of not less than   ($   ) per accident for bodily injury, death of any person, and property damage arising out of the

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                            (1262844013)

ownership, maintenance and use of those motor vehicles, along with any other statutorily required automobile coverage.
Certificate of Insurance is available upon request

§ 2.5.3 The Architect may achieve the required limits and coverage for Commercial General Liability and Automobile Liability through a combination of primary and excess or umbrella liability insurance, provided such primary and excess or umbrella liability insurance policies result in the same or greater coverage as the coverages required under Sections 2.5.1 and 2.5.2, and in no event shall any excess or umbrella liability insurance provide narrower coverage than the primary policy. The excess policy shall not require the exhaustion of the underlying limits only through the actual payment by the underlying insurers.

§ 2.5.4 Workers' Compensation at statutory limits.

§ 2.5.5 Employers' Liability with policy limits not less than    ($    ) each accident,    ($    ) each employee, and    ($    ) policy limit.
Certificate of Insurance is available upon request

§ 2.5.6 Professional Liability covering negligent acts, errors and omissions in the performance of professional services with policy limits of not less than    ($    ) per claim and    ($    ) in the aggregate.
Certificate of Insurance is available upon request

§ 2.5.7 Additional Insured Obligations. To the fullest extent permitted by law, the Architect shall cause the primary and excess or umbrella polices for Commercial General Liability and Automobile Liability to include the Owner as an additional insured for claims caused in whole or in part by the Architect's negligent acts or omissions. The additional insured coverage shall be primary and non-contributory to any of the Owner's insurance policies and shall apply to both ongoing and completed operations.

§ 2.5.8 The Architect shall provide certificates of insurance to the Owner that evidence compliance with the requirements in this Section 2.5.

## ARTICLE 3    SCOPE OF ARCHITECT'S BASIC SERVICES
§ 3.1 The Architect's Basic Services consist of those described in this Article 3 and include usual and customary structural, mechanical, and electrical engineering services. Services not set forth in this Article 3 are Supplemental or Additional Services.

§ 3.1.1 The Architect shall manage the Architect's services, research applicable design criteria, attend Project meetings, communicate with members of the Project team, and report progress to the Owner.

§ 3.1.2 The Architect shall coordinate its services with those services provided by the Owner and the Owner's consultants. The Architect shall be entitled to rely on, and shall not be responsible for, the accuracy, completeness, and timeliness of, services and information furnished by the Owner and the Owner's consultants. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any error, omission, or inconsistency in such services or information.

§ 3.1.3 As soon as practicable after the date of this Agreement, the Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services. The schedule initially shall include anticipated dates for the commencement of construction and for Substantial Completion of the Work as set forth in the Initial Information. The schedule shall include allowances for periods of time required for the Owner's review, for the performance of the Owner's consultants, and for approval of submissions by authorities having jurisdiction over the Project. Once approved by the Owner, time limits established by the schedule shall not, except for reasonable cause, be exceeded by the Architect or Owner. With the Owner's approval, the Architect shall adjust the schedule, if necessary, as the Project proceeds until the commencement of construction.

§ 3.1.4 The Architect shall not be responsible for an Owner's directive or substitution, or for the Owner's acceptance of non-conforming Work, made or given without the Architect's written approval.

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                           (1262844013)

Init.

/

6

**§ 3.1.5** The Architect shall contact governmental authorities required to approve the Construction Documents and entities providing utility services to the Project. The Architect shall respond to applicable design requirements imposed by those authorities and entities.

**§ 3.1.6** The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

### § 3.2 Schematic Design Phase Services
**§ 3.2.1** The Architect shall review the program and other information furnished by the Owner, and shall review laws, codes, and regulations applicable to the Architect's services.

**§ 3.2.2** The Architect shall prepare a preliminary evaluation of the Owner's program, schedule, budget for the Cost of the Work, Project site, the proposed procurement and delivery method, and other Initial Information, each in terms of the other, to ascertain the requirements of the Project. The Architect shall notify the Owner of (1) any inconsistencies discovered in the information, and (2) other information or consulting services that may be reasonably needed for the Project.

**§ 3.2.3** The Architect shall present its preliminary evaluation to the Owner and shall discuss with the Owner alternative approaches to design and construction of the Project. The Architect shall reach an understanding with the Owner regarding the requirements of the Project.

**§ 3.2.4** Based on the Project requirements agreed upon with the Owner, the Architect shall prepare and present, for the Owner's approval, a preliminary design illustrating the scale and relationship of the Project components.

**§ 3.2.5** Based on the Owner's approval of the preliminary design, the Architect shall prepare Schematic Design Documents for the Owner's approval. The Schematic Design Documents shall consist of drawings and other documents including a site plan, if appropriate, and preliminary building plans, sections and elevations; and may include some combination of study models, perspective sketches, or digital representations. Preliminary selections of major building systems and construction materials shall be noted on the drawings or described in writing.

**§ 3.2.5.1** The Architect shall consider sustainable design alternatives, such as material choices and building orientation, together with other considerations based on program and aesthetics, in developing a design that is consistent with the Owner's program, schedule and budget for the Cost of the Work. The Owner may obtain more advanced sustainable design services as a Supplemental Service under Section 4.1.1.

**§ 3.2.5.2** The Architect shall consider the value of alternative materials, building systems and equipment, together with other considerations based on program and aesthetics, in developing a design for the Project that is consistent with the Owner's program, schedule, and budget for the Cost of the Work.

**§ 3.2.6** The Architect shall submit to the Owner an estimate of the Cost of the Work prepared in accordance with Section 6.3.

**§ 3.2.7** The Architect shall submit the Schematic Design Documents to the Owner, and request the Owner's approval.

### § 3.3 Design Development Phase Services
**§ 3.3.1** Based on the Owner's approval of the Schematic Design Documents, and on the Owner's authorization of any adjustments in the Project requirements and the budget for the Cost of the Work, the Architect shall prepare Design Development Documents for the Owner's approval. The Design Development Documents shall illustrate and describe the development of the approved Schematic Design Documents and shall consist of drawings and other documents including plans, sections, elevations, typical construction details, and diagrammatic layouts of building systems to fix and describe the size and character of the Project as to architectural, structural, mechanical and electrical systems, and other appropriate elements. The Design Development Documents shall also include outline specifications that identify major materials and systems and establish, in general, their quality levels.

**§ 3.3.2** The Architect shall update the estimate of the Cost of the Work prepared in accordance with Section 6.3.

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                         (1262844013)

§ **3.3.3** The Architect shall submit the Design Development Documents to the Owner, advise the Owner of any adjustments to the estimate of the Cost of the Work, and request the Owner's approval.

### § 3.4 Construction Documents Phase Services

§ **3.4.1** Based on the Owner's approval of the Design Development Documents, and on the Owner's authorization of any adjustments in the Project requirements and the budget for the Cost of the Work, the Architect shall prepare Construction Documents for the Owner's approval. The Construction Documents shall illustrate and describe the further development of the approved Design Development Documents and shall consist of Drawings and Specifications setting forth in detail the quality levels and performance criteria of materials and systems and other requirements for the construction of the Work. The Owner and Architect acknowledge that, in order to perform the Work, the Contractor will provide additional information, including Shop Drawings, Product Data, Samples and other similar submittals, which the Architect shall review in accordance with Section 3.6.4.

§ **3.4.2** The Architect shall incorporate the design requirements of governmental authorities having jurisdiction over the Project into the Construction Documents.

§ **3.4.3** During the development of the Construction Documents, the Architect shall assist the Owner in the development and preparation of (1) procurement information that describes the time, place, and conditions of bidding, including bidding or proposal forms; (2) the form of agreement between the Owner and Contractor; and (3) the Conditions of the Contract for Construction (General, Supplementary and other Conditions). The Architect shall also compile a project manual that includes the Conditions of the Contract for Construction and Specifications, and may include bidding requirements and sample forms.

§ **3.4.4** The Architect shall update the estimate for the Cost of the Work prepared in accordance with Section 6.3.

§ **3.4.5** The Architect shall submit the Construction Documents to the Owner, advise the Owner of any adjustments to the estimate of the Cost of the Work, take any action required under Section 6.5, and request the Owner's approval.

### § 3.5 Procurement Phase Services
### § 3.5.1 General
The Architect shall assist the Owner in establishing a list of prospective contractors. Following the Owner's approval of the Construction Documents, the Architect shall assist the Owner in (1) obtaining either competitive bids or negotiated proposals; (2) confirming responsiveness of bids or proposals; (3) determining the successful bid or proposal, if any; and, (4) awarding and preparing contracts for construction.

### § 3.5.2 Competitive Bidding
§ **3.5.2.1** Bidding Documents shall consist of bidding requirements and proposed Contract Documents.

§ **3.5.2.2** The Architect shall assist the Owner in bidding the Project by:
   .1   facilitating the distribution of Bidding Documents to prospective bidders;
   .2   organizing and conducting a pre-bid conference for prospective bidders;
   .3   preparing responses to questions from prospective bidders and providing clarifications and interpretations of the Bidding Documents to the prospective bidders in the form of addenda; and,
   .4   organizing and conducting the opening of the bids, and subsequently documenting and distributing the bidding results, as directed by the Owner.

§ **3.5.2.3** If the Bidding Documents permit substitutions, upon the Owner's written authorization, the Architect shall, as an Additional Service, consider requests for substitutions and prepare and distribute addenda identifying approved substitutions to all prospective bidders.

### § 3.5.3 Negotiated Proposals
§ **3.5.3.1** Proposal Documents shall consist of proposal requirements and proposed Contract Documents.

§ **3.5.3.2** The Architect shall assist the Owner in obtaining proposals by:
   .1   facilitating the distribution of Proposal Documents for distribution to prospective contractors and requesting their return upon completion of the negotiation process;

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                                                              (1262844013)

.2    organizing and participating in selection interviews with prospective contractors;

.3    preparing responses to questions from prospective contractors and providing clarifications and interpretations of the Proposal Documents to the prospective contractors in the form of addenda; and,

.4    participating in negotiations with prospective contractors, and subsequently preparing a summary report of the negotiation results, as directed by the Owner.

**§ 3.5.3.3** If the Proposal Documents permit substitutions, upon the Owner's written authorization, the Architect shall, as an Additional Service, consider requests for substitutions and prepare and distribute addenda identifying approved substitutions to all prospective contractors.

**§ 3.6 Construction Phase Services**
**§ 3.6.1 General**
**§ 3.6.1.1** The Architect shall provide administration of the Contract between the Owner and the Contractor as set forth below and in AIA Document A201™–2017, General Conditions of the Contract for Construction. If the Owner and Contractor modify AIA Document A201–2017, those modifications shall not affect the Architect's services under this Agreement unless the Owner and the Architect amend this Agreement.

**§ 3.6.1.2** The Architect shall advise and consult with the Owner during the Construction Phase Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement. The Architect shall not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, nor shall the Architect be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of, and shall not be responsible for, acts or omissions of the Contractor or of any other persons or entities performing portions of the Work.

**§ 3.6.1.3** Subject to Section 4.2 and except as provided in Section 3.6.6.5, the Architect's responsibility to provide Construction Phase Services commences with the award of the Contract for Construction and terminates on the date the Architect issues the final Certificate for Payment.

**§ 3.6.2 Evaluations of the Work**
**§ 3.6.2.1** The Architect shall visit the site at intervals appropriate to the stage of construction, or as otherwise required in Section 4.2.3, to become generally familiar with the progress and quality of the portion of the Work completed, and to determine, in general, if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of the site visits, the Architect shall keep the Owner reasonably informed about the progress and quality of the portion of the Work completed, and promptly report to the Owner (1) known deviations from the Contract Documents, (2) known deviations from the most recent construction schedule submitted by the Contractor, and (3) defects and deficiencies observed in the Work.

**§ 3.6.2.2** The Architect has the authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect shall have the authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not the Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, suppliers, their agents or employees, or other persons or entities performing portions of the Work.

**§ 3.6.2.3** The Architect shall interpret and decide matters concerning performance under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

**§ 3.6.2.4** Interpretations and decisions of the Architect shall be consistent with the intent of, and reasonably inferable from, the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions rendered in good faith. The

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**    (1262844013)

**9**

Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.

**§ 3.6.2.5** Unless the Owner and Contractor designate another person to serve as an Initial Decision Maker, as that term is defined in AIA Document A201–2017, the Architect shall render initial decisions on Claims between the Owner and Contractor as provided in the Contract Documents.

### § 3.6.3 Certificates for Payment to Contractor
**§ 3.6.3.1** The Architect shall review and certify the amounts due the Contractor and shall issue certificates in such amounts. The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's evaluation of the Work as provided in Section 3.6.2 and on the data comprising the Contractor's Application for Payment, that, to the best of the Architect's knowledge, information and belief, the Work has progressed to the point indicated, the quality of the Work is in accordance with the Contract Documents, and that the Contractor is entitled to payment in the amount certified. The foregoing representations are subject to (1) an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, (2) results of subsequent tests and inspections, (3) correction of minor deviations from the Contract Documents prior to completion, and (4) specific qualifications expressed by the Architect.

**§ 3.6.3.2** The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**§ 3.6.3.3** The Architect shall maintain a record of the Applications and Certificates for Payment.

### § 3.6.4 Submittals
**§ 3.6.4.1** The Architect shall review the Contractor's submittal schedule and shall not unreasonably delay or withhold approval of the schedule. The Architect's action in reviewing submittals shall be taken in accordance with the approved submittal schedule or, in the absence of an approved submittal schedule, with reasonable promptness while allowing sufficient time, in the Architect's professional judgment, to permit adequate review.

**§ 3.6.4.2** The Architect shall review and approve, or take other appropriate action upon, the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. Review of such submittals is not for the purpose of determining the accuracy and completeness of other information such as dimensions, quantities, and installation or performance of equipment or systems, which are the Contractor's responsibility. The Architect's review shall not constitute approval of safety precautions or construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**§ 3.6.4.3** If the Contract Documents specifically require the Contractor to provide professional design services or certifications by a design professional related to systems, materials, or equipment, the Architect shall specify the appropriate performance and design criteria that such services must satisfy. The Architect shall review and take appropriate action on Shop Drawings and other submittals related to the Work designed or certified by the Contractor's design professional, provided the submittals bear such professional's seal and signature when submitted to the Architect. The Architect's review shall be for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect shall be entitled to rely upon, and shall not be responsible for, the adequacy and accuracy of the services, certifications, and approvals performed or provided by such design professionals.

**§ 3.6.4.4** Subject to Section 4.2, the Architect shall review and respond to requests for information about the Contract Documents. The Architect shall set forth, in the Contract Documents, the requirements for requests for information. Requests for information shall include, at a minimum, a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested. The Architect's response to such

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                                                      (1262844013)

**10**

requests shall be made in writing within any time limits agreed upon, or otherwise with reasonable promptness. If appropriate, the Architect shall prepare and issue supplemental Drawings and Specifications in response to the requests for information.

**§ 3.6.4.5** The Architect shall maintain a record of submittals and copies of submittals supplied by the Contractor in accordance with the requirements of the Contract Documents.

**§ 3.6.5 Changes in the Work**
**§ 3.6.5.1** The Architect may order minor changes in the Work that are consistent with the intent of the Contract Documents and do not involve an adjustment in the Contract Sum or an extension of the Contract Time. Subject to Section 4.2, the Architect shall prepare Change Orders and Construction Change Directives for the Owner's approval and execution in accordance with the Contract Documents.

**§ 3.6.5.2** The Architect shall maintain records relative to changes in the Work.

**§ 3.6.6 Project Completion**
**§ 3.6.6.1** The Architect shall:
.1  conduct inspections to determine the date or dates of Substantial Completion and the date of final completion;
.2  issue Certificates of Substantial Completion;
.3  forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and received from the Contractor; and,
.4  issue a final Certificate for Payment based upon a final inspection indicating that, to the best of the Architect's knowledge, information, and belief, the Work complies with the requirements of the Contract Documents.

**§ 3.6.6.2** The Architect's inspections shall be conducted with the Owner to check conformance of the Work with the requirements of the Contract Documents and to verify the accuracy and completeness of the list submitted by the Contractor of Work to be completed or corrected.

**§ 3.6.6.3** When Substantial Completion has been achieved, the Architect shall inform the Owner about the balance of the Contract Sum remaining to be paid the Contractor, including the amount to be retained from the Contract Sum, if any, for final completion or correction of the Work.

**§ 3.6.6.4** The Architect shall forward to the Owner the following information received from the Contractor: (1) consent of surety or sureties, if any, to reduction in or partial release of retainage or the making of final payment; (2) affidavits, receipts, releases and waivers of liens, or bonds indemnifying the Owner against liens; and (3) any other documentation required of the Contractor under the Contract Documents.

**§ 3.6.6.5** Upon request of the Owner, and prior to the expiration of one year from the date of Substantial Completion, the Architect shall, without additional compensation, conduct a meeting with the Owner to review the facility operations and performance.

**ARTICLE 4   SUPPLEMENTAL AND ADDITIONAL SERVICES**
**§ 4.1 Supplemental Services**
**§ 4.1.1** The services listed below are not included in Basic Services but may be required for the Project. The Architect shall provide the listed Supplemental Services only if specifically designated in the table below as the Architect's responsibility, and the Owner shall compensate the Architect as provided in Section 11.2. Unless otherwise specifically addressed in this Agreement, if neither the Owner nor the Architect is designated, the parties agree that the listed Supplemental Service is not being provided for the Project.
*(Designate the Architect's Supplemental Services and the Owner's Supplemental Services required for the Project by indicating whether the Architect or Owner shall be responsible for providing the identified Supplemental Service. Insert a description of the Supplemental Services in Section 4.1.2 below or attach the description of services as an exhibit to this Agreement.)*

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                                                        (1262844013)

| Supplemental Services | Responsibility (Architect, Owner, or not provided) |
|---|---|
| § 4.1.1.1  Programming | Architect – Condition Report |
| § 4.1.1.2  Multiple preliminary designs | Architect – Condition Report |
| § 4.1.1.3  Measured drawings | Architect – Condition Report |
| § 4.1.1.4  Existing facilities surveys | Architect – Condition Report |
| § 4.1.1.5  Site evaluation and planning | N/A |
| § 4.1.1.6  Building Information Model management responsibilities | N/A |
| § 4.1.1.7  Development of Building Information Models for post construction use | N/A |
| § 4.1.1.8  Civil engineering | N/A |
| § 4.1.1.9  Landscape design | N/A |
| § 4.1.1.10  Architectural interior design | Architect – White Box |
| § 4.1.1.11  Value analysis | Architect – Review of Contractor Bids |
| § 4.1.1.12  Detailed cost estimating beyond that required in Section 6.3 | |
| § 4.1.1.13  On-site project representation | Architect – Construction Administration |
| § 4.1.1.14  Conformed documents for construction | Architect |
| § 4.1.1.15  As-designed record drawings | Architect |
| § 4.1.1.16  As-constructed record drawings | Architect |
| § 4.1.1.17  Post-occupancy evaluation | N/A |
| § 4.1.1.18  Facility support services | N/A |
| § 4.1.1.19  Tenant-related services | N/A |
| § 4.1.1.20  Architect's coordination of the Owner's consultants | N/A |
| § 4.1.1.21  Telecommunications/data design | N/A |
| § 4.1.1.22  Security evaluation and planning | N/A |
| § 4.1.1.23  Commissioning | N/A |
| § 4.1.1.24  Sustainable Project Services pursuant to Section 4.1.3 | N/A |
| § 4.1.1.25  Fast-track design services | N/A |
| § 4.1.1.26  Multiple bid packages | N/A |
| § 4.1.1.27  Historic preservation | N/A |
| § 4.1.1.28  Furniture, furnishings, and equipment design | N/A |
| § 4.1.1.29  Other services provided by specialty Consultants | N/A |
| § 4.1.1.30  Other Supplemental Services | N/A |

**§ 4.1.2 Description of Supplemental Services**
**§ 4.1.2.1** A description of each Supplemental Service identified in Section 4.1.1 as the Architect's responsibility is provided below.
*(Describe in detail the Architect's Supplemental Services identified in Section 4.1.1 or, if set forth in an exhibit, identify the exhibit. The AIA publishes a number of Standard Form of Architect's Services documents that can be included as an exhibit to describe the Architect's Supplemental Services.)*

Not applicable

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                                    (1262844013)

**12**

§ **4.1.2.2** A description of each Supplemental Service identified in Section 4.1.1 as the Owner's responsibility is provided below.
*(Describe in detail the Owner's Supplemental Services identified in Section 4.1.1 or, if set forth in an exhibit, identify the exhibit.)*

Not applicable

§ **4.1.3** If the Owner identified a Sustainable Objective in Article 1, the Architect shall provide, as a Supplemental Service, the Sustainability Services required in AIA Document E204™–2017, Sustainable Projects Exhibit, attached to this Agreement. The Owner shall compensate the Architect as provided in Section 11.2.

### § 4.2 Architect's Additional Services
The Architect may provide Additional Services after execution of this Agreement without invalidating the Agreement. Except for services required due to the fault of the Architect, any Additional Services provided in accordance with this Section 4.2 shall entitle the Architect to compensation pursuant to Section 11.3 and an appropriate adjustment in the Architect's schedule.

§ **4.2.1** Upon recognizing the need to perform the following Additional Services, the Architect shall notify the Owner with reasonable promptness and explain the facts and circumstances giving rise to the need. The Architect shall not proceed to provide the following Additional Services until the Architect receives the Owner's written authorization:

.1 Services necessitated by a change in the Initial Information, previous instructions or approvals given by the Owner, or a material change in the Project including size, quality, complexity, the Owner's schedule or budget for Cost of the Work, or procurement or delivery method;

.2 Services necessitated by the enactment or revision of codes, laws, or regulations, including changing or editing previously prepared Instruments of Service;

.3 Changing or editing previously prepared Instruments of Service necessitated by official interpretations of applicable codes, laws or regulations that are either (a) contrary to specific interpretations by the applicable authorities having jurisdiction made prior to the issuance of the building permit, or (b) contrary to requirements of the Instruments of Service when those Instruments of Service were prepared in accordance with the applicable standard of care;

.4 Services necessitated by decisions of the Owner not rendered in a timely manner or any other failure of performance on the part of the Owner or the Owner's consultants or contractors;

.5 Preparing digital models or other design documentation for transmission to the Owner's consultants and contractors, or to other Owner-authorized recipients;

.6 Preparation of design and documentation for alternate bid or proposal requests proposed by the Owner;

.7 Preparation for, and attendance at, a public presentation, meeting or hearing;

.8 Preparation for, and attendance at, a dispute resolution proceeding or legal proceeding, except where the Architect is party thereto;

.9 Evaluation of the qualifications of entities providing bids or proposals;

.10 Consultation concerning replacement of Work resulting from fire or other cause during construction; or,

.11 Assistance to the Initial Decision Maker, if other than the Architect.

§ **4.2.2** To avoid delay in the Construction Phase, the Architect shall provide the following Additional Services, notify the Owner with reasonable promptness, and explain the facts and circumstances giving rise to the need. If, upon receipt of the Architect's notice, the Owner determines that all or parts of the services are not required, the Owner shall give prompt written notice to the Architect of the Owner's determination. The Owner shall compensate the Architect for the services provided prior to the Architect's receipt of the Owner's notice.

.1 Reviewing a Contractor's submittal out of sequence from the submittal schedule approved by the Architect;

.2 Responding to the Contractor's requests for information that are not prepared in accordance with the Contract Documents or where such information is available to the Contractor from a careful study and comparison of the Contract Documents, field conditions, other Owner-provided information, Contractor-prepared coordination drawings, or prior Project correspondence or documentation;

.3 Preparing Change Orders and Construction Change Directives that require evaluation of Contractor's proposals and supporting data, or the preparation or revision of Instruments of Service;

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                                              (1262844013)

    .4    Evaluating an extensive number of Claims as the Initial Decision Maker; or,

    .5    Evaluating substitutions proposed by the Owner or Contractor and making subsequent revisions to Instruments of Service resulting therefrom.

**§ 4.2.3** The Architect shall provide Construction Phase Services exceeding the limits set forth below as Additional Services. When the limits below are reached, the Architect shall notify the Owner:

    .1    2  ( Two ) reviews of each Shop Drawing, Product Data item, sample and similar submittals of the Contractor

    .2    **2 per week** ( two per week ) visits to the site by the Architect during construction

    .3    1  ( One ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents

    .4    1  ( One ) inspections for any portion of the Work to determine final completion.

**§ 4.2.4** Except for services required under Section 3.6.6.5 and those services that do not exceed the limits set forth in Section 4.2.3, Construction Phase Services provided more than 60 days after (1) the date of Substantial Completion of the Work or (2) the initial date of Substantial Completion identified in the agreement between the Owner and Contractor, whichever is earlier, shall be compensated as Additional Services to the extent the Architect incurs additional cost in providing those Construction Phase Services.

**§ 4.2.5** If the services covered by this Agreement have not been completed within  12  ( Twelve ) months of the date of this Agreement, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as Additional Services.

## ARTICLE 5   OWNER'S RESPONSIBILITIES

**§ 5.1** Unless otherwise provided for under this Agreement, the Owner shall provide information in a timely manner regarding requirements for and limitations on the Project, including a written program, which shall set forth the Owner's objectives; schedule; constraints and criteria, including space requirements and relationships; flexibility; expandability; special equipment; systems; and site requirements.

**§ 5.2** The Owner shall establish the Owner's budget for the Project, including (1) the budget for the Cost of the Work as defined in Section 6.1; (2) the Owner's other costs; and, (3) reasonable contingencies related to all of these costs. The Owner shall update the Owner's budget for the Project as necessary throughout the duration of the Project until final completion. If the Owner significantly increases or decreases the Owner's budget for the Cost of the Work, the Owner shall notify the Architect. The Owner and the Architect shall thereafter agree to a corresponding change in the Project's scope and quality.

**§ 5.3** The Owner shall identify a representative authorized to act on the Owner's behalf with respect to the Project. The Owner shall render decisions and approve the Architect's submittals in a timely manner in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

**§ 5.4** The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; designated wetlands; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions, and other necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

**§ 5.5** The Owner shall furnish services of geotechnical engineers, which may include test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, seismic evaluation, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with written reports and appropriate recommendations.

**§ 5.6** The Owner shall provide the Supplemental Services designated as the Owner's responsibility in Section 4.1.1.

**Init.**

/

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                          (1262844013)

**14**

**§ 5.7** If the Owner identified a Sustainable Objective in Article 1, the Owner shall fulfill its responsibilities as required in AIA Document E204™–2017, Sustainable Projects Exhibit, attached to this Agreement.

**§ 5.8** The Owner shall coordinate the services of its own consultants with those services provided by the Architect. Upon the Architect's request, the Owner shall furnish copies of the scope of services in the contracts between the Owner and the Owner's consultants. The Owner shall furnish the services of consultants other than those designated as the responsibility of the Architect in this Agreement, or authorize the Architect to furnish them as an Additional Service, when the Architect requests such services and demonstrates that they are reasonably required by the scope of the Project. The Owner shall require that its consultants and contractors maintain insurance, including professional liability insurance, as appropriate to the services or work provided.

**§ 5.9** The Owner shall furnish tests, inspections and reports required by law or the Contract Documents, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

**§ 5.10** The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

**§ 5.11** The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including errors, omissions or inconsistencies in the Architect's Instruments of Service.

**§ 5.12** The Owner shall include the Architect in all communications with the Contractor that relate to or affect the Architect's services or professional responsibilities. The Owner shall promptly notify the Architect of the substance of any direct communications between the Owner and the Contractor otherwise relating to the Project. Communications by and with the Architect's consultants shall be through the Architect.

**§ 5.13** Before executing the Contract for Construction, the Owner shall coordinate the Architect's duties and responsibilities set forth in the Contract for Construction with the Architect's services set forth in this Agreement. The Owner shall provide the Architect a copy of the executed agreement between the Owner and Contractor, including the General Conditions of the Contract for Construction.

**§ 5.14** The Owner shall provide the Architect access to the Project site prior to commencement of the Work and shall obligate the Contractor to provide the Architect access to the Work wherever it is in preparation or progress.

**§ 5.15** Within 15 days after receipt of a written request from the Architect, the Owner shall furnish the requested information as necessary and relevant for the Architect to evaluate, give notice of, or enforce lien rights.

## ARTICLE 6    COST OF THE WORK

**§ 6.1** For purposes of this Agreement, the Cost of the Work shall be the total cost to the Owner to construct all elements of the Project designed or specified by the Architect and shall include contractors' general conditions costs, overhead and profit. The Cost of the Work also includes the reasonable value of labor, materials, and equipment, donated to, or otherwise furnished by, the Owner. The Cost of the Work does not include the compensation of the Architect; the costs of the land, rights-of-way, financing, or contingencies for changes in the Work; or other costs that are the responsibility of the Owner.

**§ 6.2** The Owner's budget for the Cost of the Work is provided in Initial Information, and shall be adjusted throughout the Project as required under Sections 5.2, 6.4 and 6.5. Evaluations of the Owner's budget for the Cost of the Work, and the preliminary estimate of the Cost of the Work and updated estimates of the Cost of the Work, prepared by the Architect, represent the Architect's judgment as a design professional. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials, or equipment; the Contractor's methods of determining bid prices; or competitive bidding, market, or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's budget for the Cost of the Work, or from any estimate of the Cost of the Work, or evaluation, prepared or agreed to by the Architect.

**§ 6.3** In preparing estimates of the Cost of Work, the Architect shall be permitted to include contingencies for design, bidding, and price escalation; to determine what materials, equipment, component systems, and types of construction are to be included in the Contract Documents; to recommend reasonable adjustments in the program and scope of the

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                        (1262844013)

**15**

Project; and to include design alternates as may be necessary to adjust the estimated Cost of the Work to meet the Owner's budget. The Architect's estimate of the Cost of the Work shall be based on current area, volume or similar conceptual estimating techniques. If the Owner requires a detailed estimate of the Cost of the Work, the Architect shall provide such an estimate, if identified as the Architect's responsibility in Section 4.1.1, as a Supplemental Service.

**§ 6.4** If, through no fault of the Architect, the Procurement Phase has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, the Owner's budget for the Cost of the Work shall be adjusted to reflect changes in the general level of prices in the applicable construction market.

**§ 6.5** If at any time the Architect's estimate of the Cost of the Work exceeds the Owner's budget for the Cost of the Work, the Architect shall make appropriate recommendations to the Owner to adjust the Project's size, quality, or budget for the Cost of the Work, and the Owner shall cooperate with the Architect in making such adjustments.

**§ 6.6** If the Owner's budget for the Cost of the Work at the conclusion of the Construction Documents Phase Services is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall
- .1      give written approval of an increase in the budget for the Cost of the Work;
- .2      authorize rebidding or renegotiating of the Project within a reasonable time;
- .3      terminate in accordance with Section 9.5;
- .4      in consultation with the Architect, revise the Project program, scope, or quality as required to reduce the Cost of the Work; or,
- .5      implement any other mutually acceptable alternative.

**§ 6.7** If the Owner chooses to proceed under Section 6.6.4, the Architect shall modify the Construction Documents as necessary to comply with the Owner's budget for the Cost of the Work at the conclusion of the Construction Documents Phase Services, or the budget as adjusted under Section 6.6.1. If the Owner requires the Architect to modify the Construction Documents because the lowest bona fide bid or negotiated proposal exceeds the Owner's budget for the Cost of the Work due to market conditions the Architect could not reasonably anticipate, the Owner shall compensate the Architect for the modifications as an Additional Service pursuant to Section 11.3; otherwise the Architect's services for modifying the Construction Documents shall be without additional compensation. In any event, the Architect's modification of the Construction Documents shall be the limit of the Architect's responsibility under this Article 6.

## ARTICLE 7    COPYRIGHTS AND LICENSES
**§ 7.1** The Architect and the Owner warrant that in transmitting Instruments of Service, or any other information, the transmitting party is the copyright owner of such information or has permission from the copyright owner to transmit such information for its use on the Project.

**§ 7.2** The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service, including the Drawings and Specifications, and shall retain all common law, statutory and other reserved rights, including copyrights. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and the Architect's consultants.

**§ 7.3** The Architect grants to the Owner a nonexclusive license to use the Architect's Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, provided that the Owner substantially performs its obligations under this Agreement, including prompt payment of all sums due pursuant to Article 9 and Article 11. The Architect shall obtain similar nonexclusive licenses from the Architect's consultants consistent with this Agreement. The license granted under this section permits the Owner to authorize the Contractor, Subcontractors, Sub-subcontractors, and suppliers, as well as the Owner's consultants and separate contractors, to reproduce applicable portions of the Instruments of Service, subject to any protocols established pursuant to Section 1.3, solely and exclusively for use in performing services or construction for the Project. If the Architect rightfully terminates this Agreement for cause as provided in Section 9.4, the license granted in this Section 7.3 shall terminate.

**§ 7.3.1** In the event the Owner uses the Instruments of Service without retaining the authors of the Instruments of Service, the Owner releases the Architect and Architect's consultant(s) from all claims and causes of action arising

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2022 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                                                (1262844013)

**16**

from such uses. The Owner, to the extent permitted by law, further agrees to indemnify and hold harmless the Architect and its consultants from all costs and expenses, including the cost of defense, related to claims and causes of action asserted by any third person or entity to the extent such costs and expenses arise from the Owner's use of the Instruments of Service under this Section 7.3.1. The terms of this Section 7.3.1 shall not apply if the Owner rightfully terminates this Agreement for cause under Section 9.4.

**§ 7.4** Except for the licenses granted in this Article 7, no other license or right shall be deemed granted or implied under this Agreement. The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

**§ 7.5** Except as otherwise stated in Section 7.3, the provisions of this Article 7 shall survive the termination of this Agreement.

## ARTICLE 8   CLAIMS AND DISPUTES
### § 8.1 General
**§ 8.1.1** The Owner and Architect shall commence all claims and causes of action against the other and arising out of or related to this Agreement, whether in contract, tort, or otherwise, in accordance with the requirements of the binding dispute resolution method selected in this Agreement and within the period specified by applicable law, but in any case not more than 10 years after the date of Substantial Completion of the Work. The Owner and Architect waive all claims and causes of action not commenced in accordance with this Section 8.1.1.

**§ 8.1.2** To the extent damages are covered by property insurance, the Owner and Architect waive all rights against each other and against the contractors, consultants, agents, and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in AIA Document A201–2017, General Conditions of the Contract for Construction. The Owner or the Architect, as appropriate, shall require of the contractors, consultants, agents, and employees of any of them, similar waivers in favor of the other parties enumerated herein.

**§ 8.1.3** The Architect and Owner waive consequential damages for claims, disputes, or other matters in question, arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement, except as specifically provided in Section 9.7.

### § 8.2 Mediation
**§ 8.2.1** Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to binding dispute resolution. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by binding dispute resolution.

**§ 8.2.2** The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation, which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of this Agreement. A request for mediation shall be made in writing, delivered to the other party to this Agreement, and filed with the person or entity administering the mediation. The request may be made concurrently with the filing of a complaint or other appropriate demand for binding dispute resolution but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order. If an arbitration proceeding is stayed pursuant to this section, the parties may nonetheless proceed to the selection of the arbitrator(s) and agree upon a schedule for later proceedings.

**§ 8.2.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

**§ 8.2.4** If the parties do not resolve a dispute through mediation pursuant to this Section 8.2, the method of binding dispute resolution shall be the following:

Init.

/

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                              (1262844013)

17

*(Check the appropriate box.)*

[ ]    Arbitration pursuant to Section 8.3 of this Agreement

[ ]    Litigation in a court of competent jurisdiction

[ X ]    Other: *(Specify)*

Section **8.2** is deleted in its entirety, and the Bankruptcy Court shall have exclusive jurisdiction to resolve any claim, dispute or other matter in questions between the parties arising out of or related to the Agreement.

If the Owner and Architect do not select a method of binding dispute resolution, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, the dispute will be resolved in a court of competent jurisdiction.

### § 8.3 Arbitration
**§ 8.3.1** If the parties have selected arbitration as the method for binding dispute resolution in this Agreement, any claim, dispute or other matter in question arising out of or related to this Agreement subject to, but not resolved by, mediation shall be subject to arbitration, which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of this Agreement. A demand for arbitration shall be made in writing, delivered to the other party to this Agreement, and filed with the person or entity administering the arbitration.

**§ 8.3.1.1** A demand for arbitration shall be made no earlier than concurrently with the filing of a request for mediation, but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the claim, dispute or other matter in question would be barred by the applicable statute of limitations. For statute of limitations purposes, receipt of a written demand for arbitration by the person or entity administering the arbitration shall constitute the institution of legal or equitable proceedings based on the claim, dispute or other matter in question.

**§ 8.3.2** The foregoing agreement to arbitrate, and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement, shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**§ 8.3.3** The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

### § 8.3.4 Consolidation or Joinder
**§ 8.3.4.1** Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

**§ 8.3.4.2** Either party, at its sole discretion, may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent.

**§ 8.3.4.3** The Owner and Architect grant to any person or entity made a party to an arbitration conducted under this Section 8.3, whether by joinder or consolidation, the same rights of joinder and consolidation as the Owner and Architect under this Agreement.

**§ 8.4** The provisions of this Article 8 shall survive the termination of this Agreement.

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                       (1262844013)

## ARTICLE 9   TERMINATION OR SUSPENSION

**§ 9.1** If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, the Architect shall give seven days' written notice to the Owner before suspending services. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services. Before resuming services, the Owner shall pay the Architect all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

**§ 9.2** If the Owner suspends the Project, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

**§ 9.3** If the Owner suspends the Project for more than 90 cumulative days for reasons other than the fault of the Architect, the Architect may terminate this Agreement by giving not less than seven days' written notice.

**§ 9.4** Either party may terminate this Agreement upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**§ 9.5** The Owner may terminate this Agreement upon not less than seven days' written notice to the Architect for the Owner's convenience and without cause.

**§ 9.6** If the Owner terminates this Agreement for its convenience pursuant to Section 9.5, or the Architect terminates this Agreement pursuant to Section 9.3, the Owner shall compensate the Architect for services performed prior to termination, Reimbursable Expenses incurred, and costs attributable to termination, including the costs attributable to the Architect's termination of consultant agreements.

**§ 9.7** In addition to any amounts paid under Section 9.6, if the Owner terminates this Agreement for its convenience pursuant to Section 9.5, or the Architect terminates this Agreement pursuant to Section 9.3, the Owner shall pay to the Architect the following fees:
*(Set forth below the amount of any termination or licensing fee, or the method for determining any termination or licensing fee.)*

   .1    Termination Fee:

          Payment of all invoices up to the date of termination

   .2    Licensing Fee if the Owner intends to continue using the Architect's Instruments of Service:

          No fee, however a CAD indemnification form will be required to be signed prior to use by a third party

**§ 9.8** Except as otherwise expressly provided herein, this Agreement shall terminate one year from the date of Substantial Completion.

**§ 9.9** The Owner's rights to use the Architect's Instruments of Service in the event of a termination of this Agreement are set forth in Article 7 and Section 9.7.

## ARTICLE 10   MISCELLANEOUS PROVISIONS

**§ 10.1** This Agreement shall be governed by the law of the place where the Project is located, excluding that jurisdiction's choice of law rules. If the parties have selected arbitration as the method of binding dispute resolution, the Federal Arbitration Act shall govern Section 8.3.

**Init.**

/

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                                        (1262844013)

**19**

**§ 10.2** Terms in this Agreement shall have the same meaning as those in AIA Document A201–2017, General Conditions of the Contract for Construction.

**§ 10.3** The Owner and Architect, respectively, bind themselves, their agents, successors, assigns, and legal representatives to this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to a lender providing financing for the Project if the lender agrees to assume the Owner's rights and obligations under this Agreement, including any payments due to the Architect by the Owner prior to the assignment.

**§ 10.4** If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. If the Owner requests the Architect to execute consents reasonably required to facilitate assignment to a lender, the Architect shall execute all such consents that are consistent with this Agreement, provided the proposed consent is submitted to the Architect for review at least 14 days prior to execution. The Architect shall not be required to execute certificates or consents that would require knowledge, services, or responsibilities beyond the scope of this Agreement.

**§ 10.5** Nothing contained in this Agreement shall create a contractual relationship with, or a cause of action in favor of, a third party against either the Owner or Architect.

**§ 10.6** Unless otherwise required in this Agreement, the Architect shall have no responsibility for the discovery, presence, handling, removal or disposal of, or exposure of persons to, hazardous materials or toxic substances in any form at the Project site.

**§ 10.7** The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project. This Section 10.7 shall survive the termination of this Agreement unless the Owner terminates this Agreement for cause pursuant to Section 9.4.

**§ 10.8** If the Architect or Owner receives information specifically designated as "confidential" or "business proprietary," the receiving party shall keep such information strictly confidential and shall not disclose it to any other person except as set forth in Section 10.8.1. This Section 10.8 shall survive the termination of this Agreement.

**§ 10.8.1** The receiving party may disclose "confidential" or "business proprietary" information after 7 days' notice to the other party, when required by law, arbitrator's order, or court order, including a subpoena or other form of compulsory legal process issued by a court or governmental entity, or to the extent such information is reasonably necessary for the receiving party to defend itself in any dispute. The receiving party may also disclose such information to its employees, consultants, or contractors in order to perform services or work solely and exclusively for the Project, provided those employees, consultants and contractors are subject to the restrictions on the disclosure and use of such information as set forth in this Section 10.8.

**§ 10.9** The invalidity of any provision of the Agreement shall not invalidate the Agreement or its remaining provisions. If it is determined that any provision of the Agreement violates any law, or is otherwise invalid or unenforceable, then that provision shall be revised to the extent necessary to make that provision legal and enforceable. In such case the Agreement shall be construed, to the fullest extent permitted by law, to give effect to the parties' intentions and purposes in executing the Agreement.

## ARTICLE 11   COMPENSATION
**§ 11.1** For the Architect's Basic Services described under Article 3, the Owner shall compensate the Architect as follows:

.1   Stipulated Sum
     *(Insert amount)*

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                          (1262844013)

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

.2   **Percentage Basis**
*(Insert percentage value)*

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23   (  ) % of the Owner's budget for the Cost of the Work, as calculated in accordance with Section 11.6.

.3   **Other**
*(Describe the method of compensation)*

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

**§ 11.2** For the Architect's Supplemental Services designated in Section 4.1.1 and for any Sustainability Services required pursuant to Section 4.1.3, the Owner shall compensate the Architect as follows:
*(Insert amount of, or basis for, compensation. If necessary, list specific services to which particular methods of compensation apply.)*

Not applicable

**§ 11.3** For Additional Services that may arise during the course of the Project, including those under Section 4.2, the Owner shall compensate the Architect as follows:
*(Insert amount of, or basis for, compensation.)*

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

**§ 11.4** Compensation for Supplemental and Additional Services of the Architect's consultants when not included in Section 11.2 or 11.3, shall be the amount invoiced to the Architect plus     percent (   %), or as follows:
*(Insert amount of, or basis for computing, Architect's consultants' compensation for Supplemental or Additional Services.)*

Not applicable

**§ 11.5** When compensation for Basic Services is based on a stipulated sum or a percentage basis, the proportion of compensation for each phase of services shall be as follows:

*(Table deleted)*
Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

**§ 11.6** When compensation identified in Section 11.1 is on a percentage basis, progress payments for each phase of Basic Services shall be calculated by multiplying the percentages identified in this Article by the Owner's most recent budget for the Cost of the Work. Compensation paid in previous progress payments shall not be adjusted based on subsequent updates to the Owner's budget for the Cost of the Work.

**§ 11.6.1** When compensation is on a percentage basis and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.

**§ 11.7** The hourly billing rates for services of the Architect and the Architect's consultants are set forth below. The rates shall be adjusted in accordance with the Architect's and Architect's consultants' normal review practices.
*(If applicable, attach an exhibit of hourly billing rates or insert them below.)*

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

**Init.**

/

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                   (1262844013)

21

| Employee or Category | Rate ($0.00) |
|---|---|

### § 11.8 Compensation for Reimbursable Expenses

§ **11.8.1** Reimbursable Expenses are in addition to compensation for Basic, Supplemental, and Additional Services and include expenses incurred by the Architect and the Architect's consultants directly related to the Project, as follows:

.1 Transportation and authorized out-of-town travel and subsistence;

.2 Long distance services, dedicated data and communication services, teleconferences, Project web sites, and extranets;

.3 Permitting and other fees required by authorities having jurisdiction over the Project;

.4 Printing, reproductions, plots, and standard form documents;

.5 Postage, handling, and delivery;

.6 Expense of overtime work requiring higher than regular rates, if authorized in advance by the Owner;

.7 Renderings, physical models, mock-ups, professional photography, and presentation materials requested by the Owner or required for the Project;

.8 If required by the Owner, and with the Owner's prior written approval, the Architect's consultants' expenses of professional liability insurance dedicated exclusively to this Project, or the expense of additional insurance coverage or limits in excess of that normally maintained by the Architect's consultants;

.9 All taxes levied on professional services and on reimbursable expenses;

.10 Site office expenses;

.11 Registration fees and any other fees charged by the Certifying Authority or by other entities as necessary to achieve the Sustainable Objective; and,

.12 Other similar Project-related expenditures.

§ **11.8.2** For Reimbursable Expenses the compensation shall be the expenses incurred by the Architect and the Architect's consultants plus   percent (   %) of the expenses incurred.
Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

§ **11.9 Architect's Insurance.** If the types and limits of coverage required in Section 2.5 are in addition to the types and limits the Architect normally maintains, the Owner shall pay the Architect for the additional costs incurred by the Architect for the additional coverages as set forth below:
*(Insert the additional coverages the Architect is required to obtain in order to satisfy the requirements set forth in Section 2.5, and for which the Owner shall reimburse the Architect.)*

Certificate of Insurance is available upon request

### § 11.10 Payments to the Architect
### § 11.10.1 Initial Payments

§ **11.10.1.1** An initial payment of   ($   ) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account in the final invoice.
Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

§ **11.10.1.2** If a Sustainability Certification is part of the Sustainable Objective, an initial payment to the Architect of ($   ) shall be made upon execution of this Agreement for registration fees and other fees payable to the Certifying Authority and necessary to achieve the Sustainability Certification. The Architect's payments to the Certifying Authority shall be credited to the Owner's account at the time the expense is incurred.

### § 11.10.2 Progress Payments

§ **11.10.2.1** Unless otherwise agreed, payments for services shall be made monthly in proportion to services performed. Payments are due and payable upon presentation of the Architect's invoice. Amounts unpaid  30 Days ( Thirty Days   ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of monthly or annual interest agreed upon.)*

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                            (1262844013)

% Prime Rate

**§ 11.10.2.2** The Owner shall not withhold amounts from the Architect's compensation to impose a penalty or liquidated damages on the Architect, or to offset sums requested by or paid to contractors for the cost of changes in the Work, unless the Architect agrees or has been found liable for the amounts in a binding dispute resolution proceeding.

**§ 11.10.2.3** Records of Reimbursable Expenses, expenses pertaining to Supplemental and Additional Services, and services performed on the basis of hourly rates shall be available to the Owner at mutually convenient times.

**ARTICLE 12    SPECIAL TERMS AND CONDITIONS**
Special terms and conditions that modify this Agreement are as follows:
*(Include other terms and conditions applicable to this Agreement.)*


**ARTICLE 13    SCOPE OF THE AGREEMENT**
**§ 13.1** This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both the Owner and Architect.

**§ 13.2** This Agreement is comprised of the following documents identified below:
    .1    AIA Document B101™–2017, Standard Form Agreement Between Owner and Architect
    .2    AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, dated as indicated below: N/A
        *(Insert the date of the E203-2013 incorporated into this agreement.)*


    .3    Exhibits:
        *(Check the appropriate box for any exhibits incorporated into this Agreement.)*

        [   ]    AIA Document E204™–2017, Sustainable Projects Exhibit, dated as indicated below:
              *(Insert the date of the E204-2017 incorporated into this agreement.)*

        Not applicable


        [   ]    Other Exhibits incorporated into this Agreement:
              *(Clearly identify any other exhibits incorporated into this Agreement, including any exhibits and scopes of services identified as exhibits in Section 4.1.2.)*

Exhibit A – proposal of Acheson Doyle Partners PC dated 8/18/23. In the event of any inconsistency, the terms set forth in Exhibit A shall control.


    .4    Other documents:
        *(List other documents, if any, forming part of the Agreement.)*

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                          (1262844013)

Init.

/

This Agreement entered into as of the day and year first written above.

OWNER *(Signature)*                                    ARCHITECT *(Signature)*

Luc A. Despins, as proxy holder for                    David C. Acheson, AIA
Genever Holdings LLC                                   New York State Architect's License: 015257
*(Printed name and title)*                             *(Printed name, title, and license number, if required)*

**Init.**

**/**

AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                                          (1262844013)

**24**

## Additions and Deletions Report for

*AIA® Document B101® – 2017*

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note: This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 20:30:54 ET on 08/22/2023.

**PAGE 1**

**AGREEMENT** made as of the  23nd day of  August  in the year  2023

...

*(Name, legal status, address and other information)*

 Genever Holdings LLC
c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok
Paul Hastings LLP
200 Park Avenue, New York, NY 10166
Attn: G. Alexander Bongartz, Paul Hastings LLP (via email: *alexbongartz@paulhastings.com*)

...

Acheson Doyle Partners, P.C.
226 W. 26th Street, 5th Floor
New York, NY 10001
Attn: David C. Acheson, AIA

...

 *Genever Holdings LLC Apt 1801 - Apartment Stabilization Project*
*The Sherry-Netherland, Inc.*
*781 Fifth Avenue, New York, NY 10022*
**PAGE 2**

**§ 1.1** This Agreement is based on the Initial Information set forth in this Section 1.1.  For the avoidance of doubt, this Agreement shall include, and incorporates by reference, the terms set forth in Exhibit A hereto.  In the event of any inconsistency, the terms set forth in Exhibit A shall control.

...

Apartment 1801 Stabilization – creation of a "white box" code compliant apartment suitable for sale

...

Apt. 1801 (approximately 2,000 square feet) is a portion of a larger apartment on the 18th floor at The Sherry Netherland 781 Fifth Avenue, NY, NY 10022, Block 1374, Lot 1

...

Additions and Deletions Report for AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                              (1262844013)

Not available at this time.
**PAGE 3**

Competitive Bid

...

Not applicable

...

Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok  Paul Hastings LLP
200 Park Avenue
New York, New York 10166

...

Luc A. Despins

...

Not applicable
**PAGE 4**

Not applicable

...

David C. Acheson, AIA
Acheson Doyle Partners, PC
226 W. 26th Street, 5th floor
New York, NY 10001
**PAGE 5**

Certificate of Insurance is available upon request
**PAGE 6**

Certificate of Insurance is available upon request

...

Certificate of Insurance is available upon request

...

Certificate of Insurance is available upon request
**PAGE 12**

| § 4.1.1.1 | Programming | Architect – Condition Report |
|-----------|-------------|------------------------------|
| § 4.1.1.2 | Multiple preliminary designs | Architect – Condition Report |
| § 4.1.1.3 | Measured drawings | Architect – Condition Report |
| § 4.1.1.4 | Existing facilities surveys | Architect – Condition Report |
| § 4.1.1.5 | Site evaluation and planning | N/A |
| § 4.1.1.6 | Building Information Model management responsibilities | N/A |

Additions and Deletions Report for AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017>. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are trademarks of The American Institute of Architects. This draft was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                          (1262844013)

**2**

| | | |
|---|---|---|
| § 4.1.1.7 | Development of Building Information Models for post construction use | N/A |
| § 4.1.1.8 | Civil engineering | N/A |
| § 4.1.1.9 | Landscape design | N/A |
| § 4.1.1.10 | Architectural interior design | Architect – White Box |
| § 4.1.1.11 | Value analysis | Architect – Review of Contractor Bids |
| § 4.1.1.12 | Detailed cost estimating beyond that required in Section 6.3 | N/A |
| § 4.1.1.13 | On-site project representation | Architect – Construction Administration |
| § 4.1.1.14 | Conformed documents for construction | Architect |
| § 4.1.1.15 | As-designed record drawings | Architect |
| § 4.1.1.16 | As-constructed record drawings | Architect |
| § 4.1.1.17 | Post-occupancy evaluation | N/A |
| § 4.1.1.18 | Facility support services | N/A |
| § 4.1.1.19 | Tenant-related services | N/A |
| § 4.1.1.20 | Architect's coordination of the Owner's consultants | N/A |
| § 4.1.1.21 | Telecommunications/data design | N/A |
| § 4.1.1.22 | Security evaluation and planning | N/A |
| § 4.1.1.23 | Commissioning | N/A |
| § 4.1.1.24 | Sustainable Project Services pursuant to Section 4.1.3 | N/A |
| § 4.1.1.25 | Fast-track design services | N/A |
| § 4.1.1.26 | Multiple bid packages | N/A |
| § 4.1.1.27 | Historic preservation | N/A |
| § 4.1.1.28 | Furniture, furnishings, and equipment design | N/A |
| § 4.1.1.29 | Other services provided by specialty Consultants | N/A |
| § 4.1.1.30 | Other Supplemental Services | N/A |

...

Not applicable
**PAGE 13**


Not applicable
**PAGE 14**

    .1    2 ( Two ) reviews of each Shop Drawing, Product Data item, sample and similar submittals of the Contractor
    .2    2 per week ( two per week ) visits to the site by the Architect during construction
    .3    1 ( One ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents
    .4    1 ( One ) inspections for any portion of the Work to determine final completion.


...


**§ 4.2.5** If the services covered by this Agreement have not been completed within 12 ( Twelve ) months of the date of this Agreement, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as Additional Services.
**PAGE 18**

Additions and Deletions Report for AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017>. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are trademarks of The American Institute of Architects. This draft was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:    (1262844013)

3

[ X ]    Other: *(Specify)*

Section 8.2 is deleted in its entirety, and the Bankruptcy Court shall have exclusive jurisdiction to resolve any claim, dispute or other matter in questions between the parties arising out of or related to the Agreement.

**PAGE 19**

Payment of all invoices up to the date of termination

...

No fee, however a CAD indemnification form will be required to be signed prior to use by a third party

**PAGE 21**

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

...

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23    (   ) % of the Owner's budget for the Cost of the Work, as calculated in accordance with Section 11.6.

...

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

...

Not applicable

...

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

...

Not applicable

...

| | | | |
|---|---|---|---|
| ~~Schematic Design Phase~~ | ~~percent (~~ | | ~~%)~~ |
| ~~Design Development Phase~~ | ~~percent (~~ | | ~~%)~~ |
| ~~Construction Documents Phase~~ | ~~percent (~~ | | ~~%)~~ |
| ~~Procurement Phase~~ | ~~percent (~~ | | ~~%)~~ |
| ~~Construction Phase~~ | ~~percent (~~ | | ~~%)~~ |
| ~~Total Basic Compensation~~ | ~~one hundred~~ | ~~percent (~~ | ~~100~~ | ~~%)~~ |

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

...

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23
**PAGE 22**

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

...

Additions and Deletions Report for AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017>. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are trademarks of The American Institute of Architects. This draft was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                                    (1262844013)

4

Certificate of Insurance is available upon request

...

Refer to 'Exhibit A' attached – proposal of Acheson Doyle Partners PC dated 8/18/23

...

§ **11.10.2.1** Unless otherwise agreed, payments for services shall be made monthly in proportion to services performed. Payments are due and payable upon presentation of the Architect's invoice. Amounts unpaid  30 Days ( Thirty Days   ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
**PAGE 23**

%    Prime Rate

...

.2    AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, dated as indicated below: N/A

...

Not applicable

...

Exhibit A – proposal of Acheson Doyle Partners PC dated 8/18/23.  In the event of any inconsistency, the terms set forth in Exhibit A shall control.

...

**PAGE 24**

Luc A. Despins, as proxy holder for              David C. Acheson, AIA
 Genever Holdings LLC                             New York State Architect's License: 015257

Additions and Deletions Report for AIA Document B101 – 2017. Copyright © 1974, 1978, 1987, 1997, 2007 and 2017>. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are trademarks of The American Institute of Architects. This draft was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
**User Notes:**                                                                                            (1262844013)

## Certification of Document's Authenticity
AIA® Document D401™ – 2003

David C. Acheson AIA

I, ~~Michael F. Doyle, FAIA~~, hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 20:30:54 ET on 08/22/2023 under Order No. 4104242772 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document B101™ – 2017, Standard Form of Agreement Between Owner and Architect, other than those additions and deletions shown in the associated Additions and Deletions Report.


_____
(Signed)

Principal
_____
(Title)

8-23-23
_____
(Dated)

AIA Document D401 – 2003. Copyright © 1992 and 2003. All rights reserved. "The American Institute of Architects," "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are trademarks of The American Institute of Architects. This document was produced at 20:30:54 ET on 08/22/2023 under Order No.4104242772 which expires on 05/30/2024, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail docinfo@aiacontracts.com.
User Notes:                                                                                                                              (1262844013)

1

Acheson
Doyle
Partners Architects
ARCHITECTURE DESIGN PLANNING PRESERVATION

EXHIBIT A

August 4, 2023, **Revised 8/18/2023**

Genever Holdings LLC
c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok
Paul Hastings LLP
200 Park Avenue, New York, NY 10166
Attn: G. Alexander Bongartz, Paul Hastings LLP (via email: alexbongartz@paulhastings.com)

**Re:     *Genever Holdings LLC Apt 1801 - Apartment Stabilization Project***
***The Sherry-Netherland, Inc.***
***781 Fifth Avenue, New York, NY***
***ADP Project No. 52302.10***

Dear Mr. Despins:

Acheson Doyle Partners Architects, P.C. submits the following proposal for architectural consulting services regarding restoration of Apt. 1801 due to fire damage. This agreement is effective as of July 27, 2023 when a walk-through at Apt. 1801 was performed with myself and Alex Bongartz.

I.     <u>Scope of Services</u>:

    A.     **Prepare Condition Report**
        1.   Site review and verification of dimensions at affected area of plan, slab heights, shaft and vertical riser locations, points of entry of MEP infrastructure, locations of existing non-bearing metal partitions and masonry partitions, windows, and other pertinent features of affected areas; photo document conditions.
        2.   Make recommendations for probe locations to access damaged areas that are not immediately visible.
        3.   Prepare Condition Report indicating description of existing elements of affected area and list of recommended minimum scope of work required to meet NYC Code for purposes of code compliance of affected area for sale of 18th floor apartment as a "white box" space.
        4.   Review insurance company reports/scope/pricing.
        5.   Attend meetings as required.

    B.     **Preparation of Plans**
        1.   Prepare plans for filing with New York City Landmarks Preservation Commission (LPC) and New York City Department of Buildings (DOB); prepare plans and Specification documents suitable for contractor pricing and construction for code compliance scope of work at the affected areas to achieve a "white box" layout.

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 2 of 9

**Preparation of Plans** shall include the following:

- Schematic Phase: prepare measured AutoCAD plan template for floor plan and ceiling plan, prepare AutoCAD elevation templates all at ¼" = 1'-0" scale and larger. Attend walk-throughs with interested parties, prepare Meeting Minutes, prepare interim Reports and Memos, attend in-person and teleconference meetings.

- Design Development Phase: develop drawing set with required information such as Title Sheet, FEMA Map, DOB notes, formatted sheets, fully dimensioned, all at ¼" = 1'-0" scale and larger. Attend walk-throughs with interested parties, prepare Meeting Minutes, prepare interim Reports and Memos, attend in-person and teleconference meetings.

- Construction Document Phase: complete scope of work notes, details, schedules, specifications, all drawings fully dimensioned, all at ¼" = 1'-0" scale and larger. Attend walk-throughs with interested parties, prepare Meeting Minutes, prepare interim Reports and Memos, attend in-person and teleconference meetings.

- Construction Bidding Plans Phase: complete trade scope depictions on Plans, Ceiling Plans and Elevations, fully dimensioned, all at ¼" = 1'-0" scale and larger, including trade scope tables with trade notes and materials reasonably quantified.

C.   **Pricing Phase Services**
1. Prepare Invitation to Bid for contractor pricing.
2. Attend Bidder walk-throughs at premises.
3. Review contractor Bids after Bid opening by Owner.
4. Prepare Bid Summary and Bid Leveling Summary;.
5. Attend Bid interview meetings.
6. Prepare Meeting Minutes, prepare interim Reports and Memos.
7. Attend in-person and teleconference meetings.

D.   **Construction Administration Phase Services**
1. Prepare draft and final Owner/Contractor Agreement; incorporate Attorney comments.
2. Provide base AutoCAD plans to contractor's *Temporary Protection Plan* (TPP) as required by DOB.
3. Attend job meetings; prepare Meeting Minutes; prepare interim Reports and Memos, and attend Owner and interested parties in-

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 3 of 9

        person and teleconference meetings.
4. Review contractor Requests for Information, Change Orders, Applications for Payments; close-out documents.
5. Prepare punch list.
6. Prepare Certificate of Substantial Completion and Final Completion.

E. **Prepare Filing Plans for DOB & LPC Filing; Coordination with Expeditor**
1. Prepare filing plan overlay information for DOB filing format; file plans with DOB for approval and LPC for interior work *Certificate of No Effect*; prepare separate LPC application for exterior window replacement.
2. Coordinate with expeditor for DOB plan filing, sign-off and *Letter of Completion*.
3. Coordinate Special Inspection Agency for TR1 filing and sign-off.
4. Coordinate PW3 *Owner Cost Affidavit* as required by DOB.

F. **The Sherry-Netherland Inc. Alteration Agreement**
1. Prepare Alteration Agreement correspondence as required.
2. Review project sign-off documents as required by The Sherry-Netherland, Inc.  Alteration Agreement.

II. **Compensation**:

| Scope A | Condition Report | $ 35,000 | Hourly Billing |
|---|---|---|---|
| **Scope B*** | Preparation of Plans | $ 145,000 | Lump sum per % completion |
| Scope C | Pricing Phase | $ 12,000 | Lump sum per % completion |
| Scope D | Construction Admin. | $ 20,000/month | Hourly Billing |
| Scope E | DOB/LPC/Expeditor | $ 25,000 | Lump sum per % completion |
| Scope F | SN Inc. Alt. Agreement | $ 2,500 | Lump sum per % completion |

**\*Scope B Fee Breakdown**

| Schematic Phase | $ 22,000 |
|---|---|
| Design Development Phase | $ 36,000 |
| Construction Document Phase | $ 50,000 |
| Construction Bidding Plans Phase | <u>$ 37,000</u> |
| | **$145,000** |

**Hourly Rates**

| Principal | $400.00/hr. |
|---|---|
| Project Manager | $320.00/hr. |
| Senior Project Architect | $280.00/hr. |
| Project Architect | $200.00/hr. |
| Administrative | $120.00/hr. |

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 4 of 9

Reimbursable Expenses shall be billed in addition to fee and shall include in-house reprographics, blueprints, messenger service, overnight mail, transportation, photography, presentation materials, and shall be billed at 1.1 x cost.

The fees listed above are based on a reasonable estimate of services, based on the scope of work inferred from the preliminary review of existing data. If the project requires additional services due to scope changes by the Owner, field conditions, or other reasons, ADP shall submit a written estimate of additional services.

Please note that the schedule for Landmarks Preservation Commission review is subject to Landmarks Preservation Commission internal docketing procedures.

**III.    Consultants:**

The following Consultants shall be engaged directly by the Owner on an as-required basis; fees for these Consultants shall be in addition to architectural fee and shall be billed directly to the Owner by the Consultant:

A.   New York City Department of Buildings (DOB) Filing Representative/Code Consultant.
B.   Hazardous Materials Engineer (required for materials testing and ACP-5 Form for filing with DOB).
C.   Accredited Special Inspections agency for required DOB Chapter 19 inspections of selected materials, equipment, installation, fabrication, erection or placement of components and connections; these inspections confirm compliance with approved construction documents and referenced standards.
D.   Mechanical/Electrical/Plumbing/Fire Protection Engineer.
E.   Structural Engineer.
F.   Acoustical Consultant.
G.   IT Consultant.
H.   Security Consultant.
I.   Land Use Attorney.

**IV.    Exclusions**

A.   Owner-direct consultants and associated fees per Item III above.
B.   Phasing not specifically described in this agreement.
C.   Removal of violations associated with the property.
D.   Close out of existing open City Agency Applications.
E.   Coordination or close-out of Plumbing, Electrical, Elevator, Fire Alarm, or other vendor/installer required close-outs.
F.   Coordination of site utilities including Electrical, Gas, Water, Cable TV, or Telecom.
G.   Custom furniture design.
H.   Preparation of a Builders Pavement Plan.
I.   Professional Cost Estimating or Cost Management.
J.   Scheduling and Coordination of Special Inspections during the construction process.

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 5 of 9

    K.    ACM Abatement (removal by certified abatement contractor engaged directly to Owner).

    L.    Fire Department of New York (FDNY) sign-off coordination shall be by MEP/FP Engineer, licensed electrician, and filing representative.

    M.    Temporary Certificate of Occupancy and Final Certificate of Occupancy shall be coordinated by filing representative and Department of Buildings.

**V.**     <u>**Terms & Conditions:**</u>

    Refer to attached which is part of this Letter Agreement.

If you find this proposal acceptable, please sign on authorization line below and return a copy to our office for record purposes. A signed proposal must be received before any work may commence. Once this proposal is executed, our office shall forward an AIA B101-2017 Owner/Architect Agreement.

Please contact our office if you have any questions concerning this proposal. We look forward to working with you.

Very truly yours,

David C. Acheson, AIA
Principal

Authorization                      Date   8/18/23

226 West 26th Street, 5th Floor New York, NY 10001-6700  |  tel 212.414.4500  |  email info@adparchitects.com
Acheson Doyle Partners Architects, P.C.  www.achesondoyle.com

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 6 of 9

## V.     Terms & Conditions

### A.     Form of Contract:

The Architect will begin substantive work on the Project only after (1) the Scope of Work is agreed by Owner and Architect; (2) the parties negotiate and sign a written Agreement on the standard form of AIA Owner-Architect Agreement B101-2017 edition, with any appropriate fill-ins, deletions, and additional provisions (the "Agreement").

The Agreement is subject to approval of the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), in which court the chapter 11 case of the Owner is currently pending.  For the avoidance of doubt, the "Owner" of the Apartment is Genever Holdings LLC.

The following paragraphs of this Proposal outline some, but not all of the provisions for inclusion in the Agreement to be signed by the parties.

### B.     Period of Service:

The fee schedules in Section II shall apply to an Agreement signed within ninety (90) days from the date of this Proposal.

If the services covered by the Agreement have not been completed within one (1) year of the date of the Agreement, through no fault of the Architect, the Architect shall be compensated for all services rendered after that time on an hourly basis in accordance with the rates and multiples of Direct Personnel Expense and multiples or Reimbursable Expenses then generally quoted by Architect in respect of similar projects initiated at that time.

Fee rates and multiples are subject to adjustment during the course of the Project in accordance with the Architect's normal salary review practices.

### C.     Additional Services:

The Agreement will provide for appropriate adjustments in the compensation of the Architect and the Architect's consultants in the event of changes in the scope of the Project, changes requested by Owner that necessitate revision in completed drawings or specifications, and other circumstances outside the control of the Architect.

### D.     Payment Schedule:

Payments are due within 30 days following receipt of invoices.  If payment is not received within 30 days, the Architect reserves the right to stop work.  Any invoice unpaid after 30 days shall be charged with interest at the rate of 2.0% per month until paid in full.

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 7 of 9

Notwithstanding the foregoing, payment shall be deemed timely if made in accordance with the terms of the Bankruptcy Court order approving the Owner's engagement of the Architect. For the avoidance of doubt, the Owner will request, as part of its motion seeking to approve the engagement of the Architect, that Owner is authorized to pay invoices to the extent that no objections are raised to such invoice within 14 days after such invoices have been filed on the Bankruptcy Court's docket.

**E.**     <u>**Hidden Conditions:**</u>

Unless specifically provided in the Agreement, neither the Architect nor its consultants shall be required to perform or to have others perform destructive testing or to investigate concealed or unknown conditions. In the event unanticipated or hidden conditions are uncovered, the Architect shall immediately notify the Owner of same. Any additional design requirements or other change in services or additional services of the Architect or its consultant's attendant to such conditions shall entitle the Architect and is consultants to additional compensation.

**F.**     <u>**Hazardous Materials:**</u>

Notwithstanding any provisions in the Agreement to the contrary, the Architect and its consultants are not responsible for the discovery, presence, handling, removal, disposal, or performance of any other services relating to, or the escape of or exposure of persons to ,any hazardous or toxic materials or pollutants, including but not limited to asbestos, asbestos-related materials, PCBs, petroleum, hazardous waste, radioactive material, mold, and lead-based paint that may be at, on, or under the Project site ("Hazardous Materials"). The Owner hereby agrees to directly retain an expert or experts to arrange for the promptly identification and/or removal or treatment of any Hazardous Materials discovered during the course of the Project. To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Architect and Architect's consultants and their principals, employees, agents and consultants from any claims, costs, damages, losses, demands, lawsuits, causes of action, injuries, or expenses (including attorney fees and other disputer resolution costs) caused by, arising out of or in any way related to the presence, discharge, release, or escape of Hazardous Materials.

**G.**     <u>**Standard of Practice:**</u>

Services performed by the Architect under the Agreement will be conducted in a reasonably skillful and prudent manner exercising that level of care and skill ordinarily exercised by members of the profession currently practicing in the same locality under similar conditions. No other representations expressed or implied, and no warranty or guarantee is included or intended in the Agreement, or in any report, opinion, document, or otherwise.

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 8 of 9

**H.**     <u>**Ownership of Documents:**</u>

Drawings, specifications and reports prepared by the Architect are instruments of professional service to be used only by Owner for the Project, and not for any other purpose. If Owner permits Architect's drawings, specifications or reports to be used for any purpose, Owner agrees to indemnify and hold the Architect harmless against all damages, claims and losses, including defense costs arising out of any reuse without written authorization of the Architect, including reasonable attorney's fees.

**I.**     <u>**Publication:**</u>

The Architect shall have the right to photograph the Project covered by the Agreement and to use the photos in the promotion of its professional practice through advertising, public relations, brochures or other marketing materials. The Owner also agrees to cite the Architect in its publicity, job site signage, presentation, and public relations activities when mentioning this Project.

**J.**     <u>**Relationship Between the Parties:**</u>

It is understood that the Architect is an independent contractor and that is professional relationship with Owner shall terminate for this specific Project at such time as the Architect's final invoice is delivered to the Owner. This shall not be construed to limit any remedies or rights the Owner may have at law or in equity arising out of Architect's performance of services under the Agreement.

**K.**     <u>**Insurance:**</u>

The Architect shall maintain Worker's Compensation, General Liability, and Professional Liability Insurance through the period of the Agreement. Certificates of Insurance are available on request.

**L.**     <u>**Claims:**</u>

The Bankruptcy Court shall have exclusive jurisdiction to resolve any claim, dispute or other matter in questions between the parties arising out of or related to the Agreement, The execution of the Agreement by a party shall constitute consent of said party to the jurisdiction of the **Bankruptcy Court** and waiver of any objection to the venue of such action in the Bankruptcy Court.

**M.**     <u>**Limitation of Liability:**</u>

To the fullest extent permitted by law, neither the Architect, Architect's consultants, nor their principals, agents or employees shall be jointly,

Proposal Letter to Genever Holdings LLC
August 4, 2023, **Revised 8/18/2023**
Page 9 of 9

severally or individually liable to the Owner for an amount (including attorney's fees) in excess of the total fees paid to the Architect under the Agreement by reason of any act or omission, including breach of contract or negligence not amounting to a willful or intentional wrong, regardless of the legal theory under which such liability is imposed.

**N.    <u>Termination</u>:**

The Agreement may be terminated by either party upon not less than seven (7) days' written notice should the other party materially breach the Agreement or fail substantially to perform in accordance with the terms of the Agreement through no fault of the party initiating the termination. The Owner's failure to pay the Architect any monies due pursuant to the Architect's invoices for more than 30 days after date of such invoice(s) shall be deemed a material breach of the Agreement. In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with reimbursable expenses then due.

**O.    <u>Suspension</u>:**

If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension.

**P.    <u>Americans with Disabilities Act</u>:**

The Architect shall use reasonable professional effort and judgments in interpreting and advising the Owner as to the necessary requirements for the Project to comply with the Americans with Disabilities Act (ADA). The Architect shall rely on the local building department for interpretations of the ADA at the time the service is rendered. The Architect does not warrant or guarantee that the Project will fully comply with interpretations of ADA requirements by regulatory or judicial bodies.

X:\Vol1_T\Sherry\2023 Sherry\52302.00_SN 2023 Tenant Alt Reviews\52302.10_Genever Holdings LLC Apt 1801\01.0 Proj Mgmt\1.3 Proposal to Client\52302.10_2023.08.18_Proposal Genever Holdings LLC Apt 1801.docx;

226 West 26th Street, 5th Floor New York, NY 10001-6700   |   TEL 212.414.4500   |   EMAIL info@adparchitects.com
Acheson Doyle Partners Architects, P.C.   www.achesondoyle.com

## **EXHIBIT 3**

**GBTS Agreement**



August 17, 2023

**Genever Holdings LLC**
**c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok**
**Paul Hastings LLP**
200 Park Avenue
New York, NY 10166
Attn: G. Alexander Bongartz, Paul Hastings LLP (via email: *alexbongartz@paulhastings.com*)

Re:    Limited Asbestos Survey
       781 Fifth Avenue, Suite 1801
       New York, NY 10022
       GBTS Proposal No. 23005-0251-P

Dear Mr. Bongartz:

Gallagher Bassett Services, Inc., Technical Services Division (GBTS) is pleased to submit this proposal to **Genever Holdings LLC c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok (Genever Holdings)** to conduct a limited investigation for the presence of asbestos which may be impacted by the proposed work in Suite 1801 at 781 Fifth Avenue, New York, NY 10022 (Subject Property).

## SCOPE OF WORK

There are several types of asbestos surveys with differing scopes of services based on the ultimate disposition of the particular site and local/state regulatory requirements. ASTM Standard E 2356-10 "Standard Practice for Comprehensive Building Asbestos Surveys" codifies and effectively differentiates hazard assessment, pre-demolition, and pre-asbestos abatement design surveys that have historically been described independently in:

➢ Asbestos Hazard Emergency Response Act (AHERA; 40 CFR Part 763), EPA's governing regulations asbestos management in schools;
➢ National Emission Standards for Hazardous Air Pollutants (NESHAPS; 40 CFR Part 61), EPA regulations for demolition and renovation;
➢ OSHA Asbestos in Construction Standard (29 CFR 1926.1101), OSHA's regulations requiring building survey to control asbestos exposure to construction personnel; and
➢ "Guidance for Controlling Asbestos-Containing Materials in Buildings" (EPA 560/5-85-024), EPA's guidelines prescribing minimal sampling and hazard assessment protocols.

In executing an asbestos survey, GBTS shall provide the following services:

➢ Conduct a walk-through of the planned renovation areas of the facility in order to become oriented with the Site and establish a comprehensive sampling program;

1350 Broadway, Suite 1904
New York, NY 10018
O: 212-631-9000
F: 212-631-8066
www.gallagherbassett.com

G. Alexander Bongartz
August 17, 2023
Page 2

➢ Field Inspectors shall meet the inspector training requirements of AHERA and all other Federal, State, and local requirements;
➢ Collect samples of suspected ACM in accordance with EPA, State, and OSHA regulations preventing airborne fiber exposure to the surveyor and facility personnel. Samples collected in spaces typically accessed by staff and existing/potential clientele will be collected in locations that minimize the visual impact of the resulting sample location. GBTS will collect samples in as discreet a fashion as possible (e.g. cores) and shall restore visible sample locations to a condition as close to original as possible in those areas;
➢ Collect general photographic documentation (as appropriate);
➢ Indicate sample locations on floor plans;
➢ Analyze suspect building samples by Polarized Light Microscopy (PLM) with dispersion staining in accordance with EPA Interim Method of the Determination of Asbestos in Bulk Insulation Samples, EPA-600/M4-82-020. Only where PLM analysis indicates that a sample is equal to or less one percent asbestos (including findings that a sample contains no asbestos), shall the sample be further analyzed by Transmission Electron Microscopy (TEM) to confirm the negative PLM result;
  • All bulk sample analysis shall be conducted by laboratories that are accredited under the National Voluntary Laboratory Accreditation Program (NVLAP); and
  • The bulk samples resulting from the survey shall be managed or disposed of by GBTS in accordance with established Federal and State rules and regulations.

Normally accessible suspect ACM materials will be inspected and sampled. Areas above drop ceilings, within access hatches, behind column enclosures; where accessible; and select areas below carpeting shall be inspected. Our field investigation will not include exploratory probes to identify normally inaccessible asbestos-containing materials.

**Reporting**
At the completion of the inspection, a formal report shall be prepared which will include:

➢ An executive summary;
➢ A description of the procedures/methodologies employed in the investigation;
➢ Summary of findings;
➢ Analytical results;
➢ Sample location plans;
➢ Photographs of typical conditions; and
➢ Certifications.

**COST**

GBTS proposes to perform the services outlined above on a lump sum basis for a labor fee of $2,750, plus reimbursable expenses, as outlined below:

| Description | No. Samples | Unit Cost | Extended Cost |
| --- | --- | --- | --- |
| PLM Bulk Samples – Friable (24-hr TAT) | 24 | $20 | $480 |
| PLM/NOB Bulk Samples – Non-Friable (24-hr TAT) | 18 | $25 | $450 |
| TEM/NOB Bulk Samples – Non-Friable (24-hr TAT) | 18 | $45 | $810 |
| Estimated Reimbursables: | | | $1,740 |
| **Total Estimated Cost for survey and reporting:** | | | **$4,490** |

G. Alexander Bongartz
August 17, 2023
Page 3

## ASSUMPTIONS AND CLARIFICATIONS

While we are confident in the level of effort required to execute this work, the precise number of samples can only be determined at the time of the inspection, based on the inspector's observations and the regulatory requirements which govern the number of samples to be collected. Should the laboratory budget be exceeded during the field investigation, **Genever Holdings** shall be advised prior to sample submission. Our invoice shall reflect the actual number of samples submitted for analysis.

Tasks that are based on time and materials/hourly rates are to be considered estimates and are based on an estimated not to exceed value without client authorization. Actual site conditions may affect the final cost. Tasks based on a lump sum value are specific to the scope of work described above. Additional work requested and approved by the Client shall be on an hourly rate basis. All work shall be performed in accordance with the attached Fee Schedule and Terms and Conditions.

In the event that we do not receive a Tax Exemption Notice or Certificate of Capital Improvement, invoices shall include the applicable NY Sales Tax. Payments are due 30 days from receipt of invoice. Payment is the sole responsibility of Genever Holdings LLC c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok and is not contingent upon third party funding, transactional closing, or insurance recovery.

## SCHEDULE

GBTS shall complete the field work within one working day, with verbal results within two business days, and a full report within 10 business days following receipt of the laboratory reports.

## AUTHORIZATION

We trust that this proposal will meet your expectations. These services shall be provided in accordance with the Gallagher Bassett Services, Inc. Standard Terms and Conditions, version 3/22/2023, attached hereto and made a part hereof. If the foregoing scope is in accordance with your understanding, please sign below to confirm your acceptance and agreement and return the original that will thereupon constitute the agreement between us. The Proposal and the Gallagher Bassett Services, Inc. Standard Terms and Conditions shall be deemed effective upon the earlier of (i) the effective date of this Proposal if expressly defined therein; or (ii) the date the Client executes the Proposal.

If you have any questions or comments, or require clarification on any item, please do not hesitate to contact me at 310.261.9727.

Respectfully submitted,
Gallagher Bassett Services, Inc.

Prepared by:                                    Reviewed by:

Greg Chomenko                                 Eric M. Telemaque
Senior Consultant                             Managing Director, Environmental Consulting

c.  Files
Enclosures

G. Alexander Bongartz
August 17, 2023
Page 4

**Accepted by the Authorized Representative of:**
**Genever Holdings LLC**
**c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok**

_Luc Despins, as proxy holder of Genever Holdings_

_Luc DESPINS_      _8/18/23_
Print Name and Title          Date

_Proxy holder Genever Holdings_



**GBTS TERMS AND CONDITIONS AND PROFESSIONAL RATE SHEETS**



GALLAGHER BASSETT | TECHNICAL SERVICES

**STANDARD CLIENT TERMS AND CONDITIONS**

**1.    SCOPE AND PERFORMANCE OF THE WORK**

As used herein, "Agreement" means the GBTS Proposal and these Standard Client Terms and Conditions. As used herein, the term "Client" refers to the party signing the GBTS Proposal. Client hereby retains Gallagher Bassett Services, Inc., Technical Services Division ("GBTS") to perform the services described in GBTS's Proposal ("Services"), attached hereto, and GBTS agrees to provide said Services. Any additional terms and conditions proposed by Client are objected to and will not be binding upon GBTS unless specifically assented to in writing by GBTS's authorized representative. The Services provided are not of a legal nature, and GBTS shall in no event give, or be required to give, any legal advice or legal representation to Client. This Agreement shall not create any rights or benefits to parties other than Client or GBTS. GBTS will have no authority over decisions or actions affecting project production, scheduling, quality, workmanship, or the correction of hazardous conditions and practices. Such responsibility, including the correction of hazardous conditions and practices will remain with the Client project superintendent, project manager and the appropriate contractor or subcontractor personnel. GBTS shall only have the authority to observe, advise and make recommendations.

**2.    PAYMENT TERMS**

Client recognizes that timely payment of GBTS's invoices is a material part of the consideration GBTS requires to perform the Services. For the performance of Services described in the GBTS Proposal and Section 1 herein, Client agrees to pay GBTS in accordance with these Terms and Conditions and the fees, rates, charges and reimbursement terms as set forth in GBTS's Proposal and/or COST AND FEE SCHEDULE, either of which is attached hereto. Each Proposal and/or Cost & Fee Schedule shall be effective for the period stated therein. Any additional services or work required by Client shall be performed on a time-and-materials ("T&M") basis, in accordance with the cost and fee schedule effective at the time of performance of such services or work.

GBTS may revise its pricing from time to time to the extent required by alterations in the services or changes in regulations and applicable law. The revised COST AND FEE SCHEDULE shall apply only to Services performed after the effective date. invoices will be submitted by GBTS on a monthly basis and shall be due and payable within thirty (30) calendar days of invoice date.

If Client objects to any portion of an invoice, Client shall notify GBTS within fourteen (14) calendar days from the date of the invoice, identify the cause of the objection, and pay when due the undisputed portion of the invoice. Payment of invoices is in no case subject to unilateral discounting or set-offs by Client. Payment shall not be conditioned on reimbursement or other recovery of funds from any third party, including insurance carriers.

GBTS shall provide the Services as an independent contractor. Nothing in this Agreement shall be deemed to be construed as creating an agency, partnership or joint venture relationship between GBTS and the Client**.**

**3.    CHANGE ORDERS**

Client and/or GBTS shall have the right to modify the scope of Services, specifications and time requirements set forth in the Proposal, along with an equitable adjustment of the cost and fees for such Services, as deemed appropriate and agreed to by the Parties hereto. Such modification of Services shall be in writing, attached hereto and incorporated by reference ("Change Order"). Any requests by Client for deviations from the Services specified in the Proposal involving increased time, costs or expenses to GBTS shall be performed only upon execution of a Change Order. Client will pay GBTS for all satisfactorily rendered Services set forth in GBTS's Proposal.

**4.    STANDARD OF CARE/WARRANTY**

While performing the Services under this Agreement, GBTS shall exercise that degree of care and skill ordinarily exercised under similar circumstances by members of the safety, environmental, construction, claims and risk management consulting profession performing the kind of services to be performed hereunder and practicing in the same or similar locality at the same period of time. GBTS will provide its best professional judgement, if required under the Proposal, concerning safety and risk management best practices. Reasonable people may disagree on matters involving professional judgment and, accordingly, a difference of opinion on a question of professional judgment shall not excuse Client from paying for services rendered or result in liability to GBTS. Except for the express promise set forth above, GBTS neither makes, nor offers, nor warrants to Client any express or implied warranties or guarantees with respect to GBTS's Services. Without limiting the foregoing and by way of example only, GBTS expressly makes no representation, guarantee, promise or other warranty that Client will not be issued any violations, citations, stop work orders or other governmental citations, fines or penalties. Client and

GALLAGHER BASSETT | TECHNICAL SERVICES

Client's contractors shall promptly notify GBTS of any actual or suspected defects in GBTS's Services to help GBTS take corrective measures to cure such defects and/or help minimize the consequences of any such defect. GBTS shall not be liable to Client for any damages without being given a reasonable opportunity to correct the Services.

## 5. CLIENT RESPONSIBILITIES

In addition to other responsibilities described herein, the Client shall: (i) provide all information and criteria as to the Client's requirements, objectives, and expectations for the project, including all numerical criteria that are to be met and all standards of development, design, or construction and all other information reasonably necessary for completion of the Services, prior to the commencement of the Services; (ii) provide prompt, complete disclosure of known or potential hazardous conditions or health and safety risks; (iii) provide to GBTS all previous studies, plans, or other documents pertaining to the project and all new data decisions pertaining thereto within a reasonable time so as not to delay the Services; (iv) furnish approvals, consents and permits from governmental authorities, third parties including but not limited to the owner, lender, etc. and notice to GBTS whenever the Client becomes aware of any development that affects said approvals and consents from other parties as may be necessary for completion of GBTS's Services; (v) give prompt written notice to GBTS whenever the Client becomes aware of any development that affects the scope and timing of GBTS's Services or any defect or noncompliance in any aspect of the project; and (vi) bear all costs incident to the responsibilities of the Client. The Client agrees that to the extent GBTS is required to perform intrusive and invasive activities as part of the Services, including but not limited to, intrusive soil & groundwater tests, dig test pits and clearing pathways of trees, etc., the Client takes responsibility for all such intrusive and invasive activities, and has made all disclosures and obtained all necessary permits, approvals and consents from all interested third parties, including but not limited to, the owner, lender or any financing party, government authority, etc. for GBTS's performance of such intrusive and invasive activities. GBTS will have the right to reasonably rely upon the accuracy and completeness of all disclosures made and information and approvals obtained by the Client.

Client shall provide all studies, reports, data and other information in its control which may be relevant to performance of the Services. GBTS shall be entitled to use and rely upon all such information. Client accepts sole responsibility for errors in Services resulting from information supplied to GBTS.

## 6. SAFETY

Client shall be obligated to inform GBTS of any applicable site safety procedures and regulations known to Client as well as any special safety concerns or dangerous conditions at the site. GBTS and its employees and/or subcontractors will be obligated to adhere to such procedures and regulations once notice has been given.

Unless specifically provided in the Proposal, GBTS shall not have any responsibility for overall job safety for others at the work site. Work site safety and authority to take corrective action and address dangerous work site conditions and dangerous worker practices shall remain the responsibility of the Client, the construction permit holder, and the trade contractors and subcontractors. If in GBTS's opinion, its field personnel are unable to access required locations or perform required Services in conformance with applicable safety standards, GBTS may immediately suspend performance, without any breach or liability hereunder, until such safety standards can be attained. If, within a reasonable time, site operations or conditions are not brought into compliance with such safety standards, GBTS may in its discretion terminate its performance in accordance with the termination provision found herein, in which event Client shall pay for Services and termination expenses as provided herein.

Unless specifically provided in the Proposal, GBTS has no authority to direct, supervise or control any of the trade contractors and trade contractor workers, including the means and methods employed by such trade contractors and trade contractor workers.

## 7. INSURANCE

If an owner-controlled insurance program ("OCIP") and/or contractor-controlled insurance program ("CCIP") is implemented on the project, GBTS shall be enrolled and afforded the coverages provided thereunder without any additional cost or expense to GBTS, and without giving credits for the cost of associated insurance program coverages.

GBTS shall procure and maintain, at its own expense, during the term of its engagement with Client, insurance of the following types and amounts or as legally required: commercial general liability, contractors' pollution liability, professional liability (Errors & Omissions) at limits of $1,000,000 per occurrence/$2,000,000 in the aggregate; automotive liability insurance with a combined single limit

GALLAGHER BASSETT | TECHNICAL SERVICES

of $1,000,000; workers' compensation and employer's liability insurance as required by state law (all 50 states). GBTS shall furnish Certificates of Insurance of such coverage to Client upon request. Additional coverages may be obtained on a project-by-project basis upon request by Client and at the sole cost and expense of Client.

## 8.  INDEMNIFICATION

GBTS shall defend (but only to the extent covered by GBTS's insurance), indemnify and hold harmless Client and its officers, directors, employees, agents, representatives, affiliates and successors from any and all third-party claims, demands, suits, causes of action, proceedings, judgments and liabilities for property damage and/or personal injury, damages, losses and expenses, including, but not limited to reasonable legal expenses and attorneys' fees connected therewith (collectively, "Claims"), sustained by Client, its officers, directors, employees, affiliates and successors resulting from or arising out of GBTS's negligent acts, errors or omissions in the performance of Services under this Agreement.

Client shall indemnify, defend and hold harmless GBTS and its officers, directors, employees, affiliates and successors from any and all Claims sustained by GBTS, its officers, directors, employees, affiliates and successors, resulting from or arising out of Client's direction or instruction, breach of the Terms and Conditions, and negligent acts, errors or omissions.

To the extent the Services include performance by GBTS of intrusive ground work, Client shall indemnify GBTS from and against any and all Claims, damages, losses and expenses (including reasonable legal expenses and attorneys' fees) resulting from or arising out of damages to subsurface or underground utilities or structures, including but not limited to, gas, telephone, electric, water or sewer utilities whose locations were not designated or identified to GBTS prior to performance of the Services.

## 9.  LIMITATION OF LIABILITY

In no event shall Client and GBTS and their respective officers, directors, employees, agents, representatives, affiliates and successors be liable to the other or any third party for any special, incidental, consequential, indirect or punitive damages including, without limitation, lost, delayed and/or diminished profits or revenue, loss of data, or interruption of business, whether arising under theory of contract, tort or other theory of liability, including negligence, and the Parties hereby mutually release and waive any and all such claims against the other. The indemnification obligations and mutual waiver and release herein shall survive termination or completion of this Agreement.

Under no circumstances will GBTS be liable to Client for any amount in excess of the total amount of fees paid by Client to GBTS for Services performed under this Agreement, or $100,000, whichever is greater. This limitation shall apply to any and all injuries, damages, claims, losses, expenses, or claim expenses (including attorney's fees and expert witness' fees) arising from or related to Services performed under this Agreement from any cause or causes. Such causes include, but are not limited to, GBTS's negligence, errors, omissions, strict liability, statutory liability, breach of contract, breach of warranty, negligent misrepresentation, or other acts giving rise to liability based on all types of legal theories, including but not limited to contract, tort, professional liability, product liability, warranty or otherwise.

Client agrees that any claim for damages filed against GBTS, by Client or by any contractor or subcontractor hired directly or indirectly by Client, will be filed solely against GBTS or its successors or assigns, and that no individual shall be held personally liable for damages, in whole or in part.

## 10.  DISPUTE RESOLUTION

If any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall occur, Client and GBTS shall endeavor to reach resolution through good faith direct discussions between representatives of the parties with authority to resolve the matter. If direct discussions do not result in resolution of the matter, the parties shall endeavor in good faith to resolve the matter via mediation. If the parties choose mediation, either party may terminate the mediation at any time after the first session by written notice to the other party and mediator. The cost of the mediation shall be shared equally by the parties. The parties agree that the sole proper venue for the determination of any litigation arising under this Agreement shall be in a court of competent jurisdiction which is located in Cook County, Illinois. Each party shall bear its own litigation costs and fees, including expert and attorneys' fees.

## 11.  NOTICE AND PURSUIT OF CLAIMS

Any claims of Client, whether based upon contract, tort, breach of warranty, or otherwise, shall be deemed waived

GALLAGHER BASSETT | TECHNICAL SERVICES

unless written notice of such claim is received in writing by GBTS within one (1) year after Client knew or reasonably should have known of its existence.

## 12.  COLLECTION

Should the Client's account, after payment default hereunder, be referred by GBTS to an attorney or collection agency for collection, then Client shall pay all of GBTS's expenses incurred in such collection efforts including, but not limited to, collection agency fees, court costs and reasonable attorneys' fees. Notwithstanding the above or any other terms provided herein, GBTS may institute proceedings to collect payment in any court of competent jurisdiction in the United States.

## 13.  USE OF REPORTS/NO THIRD-PARTY RELIANCE

Any documents provided by GBTS as part of the Services provided herein are provided for the use and reliance of Client. Any third-party use of or reliance on the documents is subject to the terms and conditions of this Agreement and GBTS's report. Client's payment of GBTS invoices, as provided for herein, shall not be made contingent upon GBTS's agreement to permit third-party reliance contrary to the terms and conditions agreed to herein.

## 14.  CONFIDENTIALITY

In connection with this Agreement, the parties acknowledge that it may be necessary for each of them to provide to the other information that is confidential to the disclosing party ("Confidential Information"). As used herein the term "Confidential Information" shall mean all business, technical or scientific data and information, in any form, not previously known to or generated by the receiving party that is of a confidential or competitively-sensitive nature, or information that is marked "Confidential" by the disclosing party. Without limitation, and by way of example only, Confidential Information shall include software, systems, processes, designs, plans, engineering files, price information, business plans, business methods, financial data, and any other competitively-sensitive information or data belonging to the disclosing party. Each party shall secure and maintain the Confidential Information of the other party in strictest confidence and shall not disclose or make available to others the Confidential Information of the other party without the express written consent, in advance, of that party. Confidential Information shall not include information which: (a) is or becomes a part of the public domain through no act or omission of the receiving party; (b) was in the receiving party's lawful possession prior to the disclosure and had not been obtained by the receiving party either directly or indirectly from the disclosing party; (c) is lawfully disclosed to the receiving party by a third party without restriction on disclosure; (d) is independently developed by the receiving party; or (e) is disclosed by operation of law. This provision shall not be interpreted in any way to restrict a party from complying with a legally enforceable order to provide such information or data, provided that notice of such obligation is promptly given, in advance, to the other party. Client agrees that GBTS may use and publish Client's name and a general description of services rendered under the Agreement for purposes of describing GBTS's experience and qualifications to others.

## 15.  NON-SOLICITATION

To the extent permitted under applicable law, without the prior written consent of GBTS, the Client agrees that it shall not solicit or hire employees of GBTS during the term of this Agreement or for a period of 6 months after termination of the Agreement. General solicitations of employment by means of recruiters, the internet, newspaper, periodical or trade publication advertisements not directed at employees of GBTS and its affiliates shall not be deemed to constitute "solicitation" for purposes of this provision. Further, nothing in this Agreement shall prohibit Client from hiring any person, including an employee of GBTS, who contacts Client on his or her own initiative without any direct or indirect solicitation by, or encouragement from, Client.

## 16.  DELAYS

If GBTS's Services are interrupted by circumstances beyond GBTS's control, Client shall compensate GBTS for the labor, equipment, and other costs GBTS incurs in order to maintain continuity of GBTS's project team for Client's benefit during the interruption. Alternatively, and at Client's option, Client shall compensate GBTS for the various costs GBTS incurs for demobilization and subsequent remobilization. GBTS's compensation shall be based upon GBTS's current prevailing COST AND FEE SCHEDULE. Except for the foregoing provision, neither party shall hold the other responsible for damages or performance delays caused by circumstances beyond the control of the other party, and which could not reasonably have been anticipated or prevented. For purposes of this Agreement, such circumstances include, but are not limited to: unusual weather; floods; epidemics; wars; riots;

GALLAGHER BASSETT | TECHNICAL SERVICES

strikes; lockouts or other industrial disturbances; protest demonstrations; unanticipated site conditions; inability (despite reasonable diligence) to supply personnel, equipment, or material to the project; or the action or inaction of government. Should such circumstances transpire, Client and GBTS shall exert a best effort to overcome the resulting difficulties and resume performance of the Services as soon as reasonably possible. Delays within the scope of this provision that cumulatively exceed forty-five (45) calendar days shall, at the option of either party, make this Agreement subject to renegotiation or termination.

## 17.    TERMINATION

This Agreement shall become effective on the date of Client's acceptance of GBTS's Proposal. Client may terminate this Agreement for convenience without penalty, by providing written notice to GBTS. Client or GBTS may terminate the Agreement for cause. The party initiating termination shall so notify the other party, and termination shall become effective fourteen (14) calendar days after receipt of the termination notice.  Irrespective of which Party effects termination or the  cause thereof, Client shall, within thirty (30) calendar  days from receipt of GBTS's termination invoice, pay  GBTS's fees for Services satisfactorily rendered and  costs incurred, in accordance with the COST AND FEE SCHEDULE. Client shall pay GBTS for costs reasonably  stemming from termination and post-termination  activities including, but not limited to, demobilization, equipment decontamination and/or disposal, and disposal and replacement of contaminated consumables.

## 18.    NOTICE

All notices, requests and other communications concerning termination or indemnification ("Formal Notice") under this Agreement shall be in writing and delivered: (i) personally; (ii) by certified mail, return receipt requested; or (iii) by nationally recognized express courier service. Notices will be deemed given as of the earlier of (i) the date of actual receipt when notice is given by personal delivery, (ii) three (3) days after mailing in the case of certified U.S. mail or (iii) the next business day when notice is sent via express courier. Any Formal Notice shall be addressed as follows:

**If to GB**
Legal Department
Gallagher Bassett Services, Inc.
2850 Golf Road
Rolling Meadows, IL 60008

With a copy to:
Carolyn Bailey
VP Administrative Operations
Gallagher Bassett Services, Inc., Technical Services Division
14361 Commerce Way, Suite 206, Miami Lakes, FL 33016


**If to Client:**

_____

_____

_____

_____

## 19.    SURVIVAL

Obligations arising before the expiration or termination of this Agreement, and all provisions of this Agreement allocating responsibility or liability between Client and GBTS, shall survive the completion of Services described herein and termination of this Agreement.

## 20.    GOVERNING LAW

Unless otherwise provided, the substantive law of the state in which the Services take place will govern the validity of this Agreement, its interpretation and performance, and remedies for contract breach or other claims  related to this Agreement.

Any litigation between Client and GBTS arising out of or relating to the Services, this Agreement or the breach thereof, shall be conducted via a bench trial, WITH THE PARTIES EXPRESSLY WAIVING ANY RIGHT THEY MAY HAVE TO A JURY TRIAL.

## 21.    ELECTRONIC SIGNATURES

Each Party agrees that the electronic signatures of the parties, whether digital or encrypted, are intended to authenticate this writing and have the same force and effect as manual signatures. Electronic signature means any electronic symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including, without limitation, Adobe e-signature, DocuSign, E-sign, facsimile, or e-mail electronic signatures**.**



GALLAGHER BASSETT | TECHNICAL SERVICES

**22.     ENTIRE AGREEMENT**

This Agreement shall serve as a continuing service agreement which shall apply to all services and work rendered to Client that fall within the general scope of Services described herein. This Agreement and all exhibits, appendices, and attachments, as well as all terms and conditions incorporated by reference, constitute the entire Agreement between Client and GBTS, by which all prior understandings and negotiations are superseded and replaced. This Agreement and all exhibits, appendices, and attachments may be amended, supplemented, modified or canceled only by a duly executed written instrument by the Parties. Terms and conditions, on the Client's internet site or included with a Purchase Order or other such document issued by Client, shall be null and void and of no legal effect on GBTS unless agreed upon in writing by both Parties.

Notwithstanding anything to the contrary tin the GBTS Terms and Conditions and Professional Rate Sheets, the United States Bankruptcy Court for the District of Connecticut (in which court the chapter 11 case of Genever Holdings LLC is pending [Case No. 22-50592]), shall have exclusive jurisdiction over any claim or dispute in respect of or arising out of this Agreement.