UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
HO WAN KWOK and GENEVER        *
 HOLDINGS CORPORATION,         *
                               *
            Debtor.            *

LUC A. DESPINS,                *   Adv. Proc. No. 23-05017
                               *
                               *   Bridgeport, Connecticut
            Plaintiff,         *   August 14, 2023
                               *
     v.                        *
                               *
TAURUS FUND, LLC, et al.,      *
                               *
            Defendants.        *
                               *
* * * * * * * * * * * * * * *   *

TRANSCRIPT OF EX PARTE MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff:            NICHOLAS A. BASSETT, ESQ.
                              AVRAM E. LUFT, ESQ.
                              Paul Hastings, LLP
                              200 Park Avenue
                              New York, NY  10166

                              DOUGLAS S. SKALKA, ESQ.
                              DENNIS M. CARNELLI, ESQ.
                              Neubert Pepe & Monteith, P.C.
                              195 Church Street
                              New Haven, CT  06510

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

APPEARANCES:  (Cont'd.)

Chapter 11 Trustee:              LUC A. DESPINS, ESQ.
                                 Paul Hastings, LLP
                                 200 Park Avenue
                                 New York, NY  10166


For the Defendants:              MICHAEL T. CONWAY, ESQ.
                                 Lazare Potter Giacovas &
                                  Moyle, LLP
                                 747 Third Avenue
                                 New York, NY  10017

1          (Proceedings commenced at 11:28 a.m.)

2                  THE COURTROOM DEPUTY:  Case No. 23-5017, Luc

3      Despins versus Taurus Fund, LLC, et al.

4                  THE COURT:  Good morning.  If we could have

5      appearances for the record, please.

6                  MR. DESPINS:  Good morning, Your Honor.  Luc

7      Despins, Chapter 11 Trustee.

8                  MR. BASSETT:  Good morning, Your Honor.  Nick

9      Bassett, from Paul Hastings, on behalf of the Chapter 11

10     Trustee.

11                 THE COURT:  Good morning.

12                 MR. LUFT:  Good morning, Your Honor.  Avi Luft, of

13     Paul Hastings, on behalf of the Chapter 11 Trustee.

14                 THE COURT:  Good morning.

15                 MR. SKALKA:  Good morning, Your Honor.  Douglas

16     Skalka, of Neubert, Pepe and Monteith, also on behalf of the

17     Chapter 11 Trustee.  And with me is my partner, Dennis

18     Carnelli, who filed an appearance this weekend.

19                 MR. CARNELLI:  Good morning, Your Honor.

20                 THE COURT:  Good morning.

21                 MR. CONWAY:  Good morning, Your Honor.  Michael

22     Conway, Lazare Potter Giacovas & (indiscernible).  I've just

23     been retained by Taurus Fund, LLC, and Taurus Management,

24     LLC.  And I understand this was set as an uncontested

25     hearing, but we are here.

1      THE COURT:  I think it was set as an uncontested

2  hearing, Counsel, just because no one had filed an

3  appearance.  But it's still an evidentiary hearing

4  obviously.  It's a preliminary injunction, so.

5      Did you have an opportunity to file a notice of

6  appearance this morning?

7      MR. CONWAY:  I did not, Your Honor.  I realized

8  when I tried that this morning that I haven't filed since

9  they changed over to the ECF system in this court.  And so I

10  made a request that they link my two accounts and they

11  hadn't done it by the time I had left the house.

12      THE COURT:  Okay.  And are you admitted in the

13  district court for the District of Connecticut?

14      MR. CONWAY:  I am.

15      THE COURT:  Okay.  All right.

16      MR. CONWAY:  I've been practicing in this court

17  since Judge Shipp was here.

18      THE COURT:  Okay.  Thank you.

19      THE COURTROOM DEPUTY:  I'm sorry.

20      THE COURT:  Go right ahead.

21      THE COURTROOM DEPUTY:  I'm sorry.  Your Honor, I

22  just didn't get who attorney Skalka said was with him.

23      MR. SKALKA:  I'm sorry.

24      THE COURTROOM DEPUTY:  I'm sorry.

25      MR. SKALKA:  Attorney Carnelli, Dennis Carnelli.

1          THE COURTROOM DEPUTY:  Okay.  Thank you.

2          MR. CONWAY:  Your Honor, if I may?

3          I will say I reached out to counsel on Friday,

4     night when I realized I was going to be retained, and asked

5     that we reach out to you and try and push this out so I

6     could actually come to an understanding of what the case was

7     about.  For obvious reasons, they were not interested in

8     doing that.  And I will just say that I just now got the

9     exhibits, so.

10          THE COURT:  Okay.  So Taurus Fund is an LLC, so

11     who retained you at Taurus Fund?  Who had the authority to

12     retain you?

13          MR. CONWAY:  Taurus Fund, LLC is a special purpose

14     vehicle of Taurus Fund S.A., and the director of Taurus Fund

15     S.A. retained me.

16          THE COURT:  And who is that?

17          MR. CONWAY:  It's a Mr. David Fallon.

18          THE COURT:  Fallon?

19          MR. CONWAY:  Yes.  Spelled the way it sounds.

20          THE COURT:  F-A-L-L-O-N?

21          MR. CONWAY:  Yes.

22          THE COURT:  Okay.  Thank you.

23          All right.  I understand that this morning there

24     were just some -- the clerk's office had wanted to make sure

25     that exhibits were in order.  And apparently there's -- the

1    flash drive has a different order of exhibits than the list

2    of exhibits.  Which is fine.  We can work that out as the

3    hearing progresses.

4           But is there anything else, Trustee Despins, you

5    wanted -- you want to let the Court know about before we

6    proceed with the preliminary injunction hearing?

7           MR. DESPINS:  No, Your Honor.

8           THE COURT:  Okay.  I also before -- in the last, I

9    don't know what time it was actually, well, I guess I do, it

10   was 9:55 a.m., received a letter which was docketed in this

11   adversary proceeding by Attorney Henzy.  Did you all see

12   that?

13          MR. DESPINS:  We did, Your Honor.

14          THE COURT:  Okay.  Okay.  All right.  So then

15   please proceed.

16          MR. BASSETT:  Your Honor, may I use the podium?

17          THE COURT:  Yes, please.

18          MR. BASSETT:  Again, Your Honor, good morning.

19   For the record, Nick Bassett from Paul Hastings on behalf of

20   the Chapter 11 Trustee.

21          What I'd like to do, Your Honor, is start by just

22   kind of giving the Court an overview of how we would like to

23   proceed with our evidence today.

24          I anticipate that we will have one witness, the

25   Chapter 11 Trustee, subject to, you know, the need to

1    potentially call other witnesses depending upon how the

2    hearing proceeds, but I anticipate just the Chapter 11

3    Trustee.

4              As the Court I think is aware, the Trustee

5    submitted an affidavit in support of the motion for a TRO

6    and preliminary injunction that is on the docket.  I'm happy

7    to do it when the Trustee takes the stand, but what we would

8    propose to do is, rather than have him repeat what has

9    already been submitted in a written form in his affidavit,

10   have him adopt that as part of his direct testimony on the

11   stand.

12             And then I have some additional, supplemental,

13   direct testimony that I would like to elicit from the

14   Trustee.  At that point obviously we would make him subject

15   to or available for any cross-examination.

16             After that, and I think during the Trustee's

17   examination, we would deal with several of the exhibits in

18   terms of presenting them to the Court and asking for their

19   admission.

20             After that, I anticipate there will be some

21   additional exhibits left on the exhibit list that I don't

22   think I need a witness on the witness stand to introduce.

23             And then I would, as we have in the past, you

24   know, publish those one by one or however the Court would

25   like me to do it, explain the relevance, deal with any

1    admissibility issues, et cetera.

2              And then after that I anticipate we would be

3    finished.  And then my colleague, Mr. Luft, would be

4    prepared to do a relatively brief closing.

5              THE COURT:  That's fine.  Thank you.

6              MR. BASSETT:  Thank you, Your Honor.

7              So with that, the Trustee would like to call the

8    Trustee himself.

9         (The trustee is sworn.)

10             THE COURTROOM DEPUTY:  State your name and address

11   for the record, please.

12             THE WITNESS:  Luc Despins, business address 200

13   Park Avenue, New York, New York.

14             THE COURTROOM DEPUTY:  Thank you.

15                  LUC DESPINS, Trustee's Witness

16                       DIRECT EXAMINATION

17   BY MR. BASSETT:

18   Q    Good morning, Mr. Despins.

19   A    Good morning.

20             MR. BASSETT:  Your Honor, may I approach the

21   witness to hand him a binder that contains a copy of the

22   affidavit that he filed in this case, which I believe is at

23   ECF 5.

24             THE COURT:  Certainly.

25             And counsel for Taurus Fund has all the documents

1    as well?

2              MR. BASSETT:  Sure, Your Honor.

3              MR. CONWAY:  Thank you.

4    BY MR. BASSETT:

5    Q    Mr. Despins, do you recognize this document as the

6    affidavit you filed in this adversary proceeding and that

7    you signed, dated July 11th, 2023?

8    A    Yes, I do.

9    Q    And if you go to the past page of that document, is

10   that your electronic signature that prepares there?

11   A    It is.

12   Q    That appears there?  I'm sorry.

13   A    It is.

14   Q    And, Mr. Despins, is everything that you said in this

15   affidavit true and accurate to the best of your knowledge?

16   A    It is.

17   Q    Is there anything, sitting here today, that you would

18   like to change in that affidavit?

19   A    No.

20             MR. BASSETT:  So, Your Honor, with that, and in

21   the name of efficiency, I would ask that the affidavit be

22   admitted as a portion of the Trustee's direct testimony for

23   today's hearing.

24             THE COURT:  Counsel?

25             MR. CONWAY:  No objection.

1          THE COURT:  Thank you.

2          With no objection with regard to that offer of

3     proof, so that we can proceed accordingly, Attorney Bassett.

4          MR. BASSETT:  Thank you very much, Your Honor.

5     BY MR. BASSETT:

6     Q    So, Mr. Despins, I have a few different topics I'd like

7     to cover with you today just to supplement a bit what you've

8     already said in the affidavit that you filed.

9          The first topic I'd like to cover is to ask you

10    some questions about some of the exhibits that have been

11    submitted to the Court.

12         MR. BASSETT:  And, Your Honor, may I approach the

13    witness to hand him a copy of the exhibit binder, which

14    opposing counsel also has?

15         THE COURT:  Yes, you may.

16         MR. BASSETT:  Thank you.

17         And, Your Honor, as we go through exhibits, based

18    on the way we have run hearings in the past, I assume that

19    the easiest and most convenient thing for the Court to do is

20    just to pull those up on the docket?

21         THE COURT:  Yes.

22         MR. BASSETT:  Okay.  Excellent.

23         THE COURT:  Yes, please.  Thank you.

24    BY MR. BASSETT:

25    Q    So in a moment, Mr. Despins, I want to ask you some

1    questions about some of the exhibits on the list that are

2    labeled as video exhibits, but before I do that, I would

3    like you to please direct your attention to the exhibit on

4    the list at Exhibit No. 11, if you would, please.

5    A    I'm there.

6              MR. BASSETT:  And, Your Honor, is it possible to

7    have that pulled up from the docket as we go?

8              THE COURT:  Is Exhibit 11 the Christie's

9    International Real Estate Group listing?

10             MR. BASSETT:  Yes, Your Honor.

11             THE COURT:  Yes, we can pull that up.

12             MR. BASSETT:  Thank you very much.

13   BY MR. BASSETT:

14   Q    So, Mr. Despins, based on your professional experience

15   or personal experience or both, do you have an understanding

16   of what Christie's is?

17   A    It's a real estate broker.  In this case, it's a real

18   estate broker.

19   Q    Okay.  And do you know where this particular image that

20   we're looking at was obtained?

21   A    From their website.

22   Q    Okay.  And this image has a picture of a home.  It's

23   got a description below that says, among other things,

24   quote, "One of the world's magnificent and rare estates,"

25   and goes on.  It also has at the top a sold price of $26

1    million.

2           The address that's listed here, Mr. Despins, 675

3    Ramapo Valley Road, are you familiar with that address?

4    A    Yes.  That's the mansion's address.

5    Q    That's the address of the mansion that's the subject of

6    the adversary proceeding before the Court?

7    A    That's correct.

8    Q    Thank you.

9           MR. BASSETT:  With that, Your Honor, we would

10   offer this into evidence.  And just to be clear and to be

11   helpful to the Court, the purpose of introducing this

12   particular exhibit is just so we have a picture of the

13   mansion in the record.

14          THE COURT:  That's fine.

15          Any objection, Counsel?

16          MR. CONWAY:  As long as it's limited to that

17   purpose, we have no objection.

18          THE COURT:  Thank you.

19          Then Exhibit 11, is Plaintiff's Exhibit, is

20   admitted as a full exhibit.

21          MR. BASSETT:  Thank you, Your Honor.

22       (Trustee's Exhibit 11 received in evidence)

23   BY MR. BASSETT:

24   Q    So as I said, Mr. Despins, I'd next like to ask you

25   some questions about certain of the exhibits that have been

1    identified as video exhibits.

2           Before I do that, I'd like you to briefly go back

3    and look at your affidavit, which is in front of you, which

4    again was at ECF 5.

5    A    I'm there.

6    Q    And in paragraph 4 of your affidavit, the second

7    sentence begins with, and here you're talking about exhibits

8    to the complaint, but you said I understand that certain of

9    the exhibits referenced in the complaint, and you say

10   specifically Exhibits 12, 13 and 16, which have been

11   provided to the Court on the video flash drive, as defined

12   in the complaint, are videos that were downloaded from the

13   internet at the direction of Paul Hastings personnel and

14   then supplemented with English translations provided by

15   counsel.

16          Do you see that?

17   A    Correct.  In paragraph 4, yes.

18   Q    So can you just maybe describe in a little bit more

19   detail for the Court what you meant it was that you did in

20   terms of directing Paul Hastings personnel to capture

21   certain videos?

22   A    Sure.  As Your Honor knows, in this case a lot of the

23   evidence comes in through social media postings by the

24   debtor or the debtor's affiliates or entities he controls,

25   so that that's often I wouldn't say the best source, but

1  probably the only source of evidence available in some

2  cases, and what I did is I directed the team to go and find

3  and look at internet postings regarding the mansion,

4  regarding the relationship between the debtor and the

5  mansion, or the debtor's satellite entities and the mansion,

6  and this is what is being referred to in here.

7  Q    And did the team do this on their own or did they have

8  the assistance of technology personnel?

9  A    Yes.  So they had -- there is a vendor that we use for

10  a discovery program.  It's called UnitedLex.  And they also

11  provide the same service that the -- if Your Honor will

12  recall the GuidePost people who came to testify in December

13  regarding the preliminary injunction, you know, the

14  gentleman who testified about how he's able to capture an

15  image of a URL, of a website, and authenticate that, in

16  fact, that the posting that's presented to Your Honor is the

17  same as the -- as what's available on the internet or was

18  available on the internet, depending on the exhibit.  So

19  that's -- so the team used and relied on UnitedLex to

20  achieve that as well.

21  Q    Now again, in paragraph 4, you're talking about certain

22  video exhibits that were submitted with the complaint.  Did

23  you have the associates work with United -- Paul Hastings

24  personnel work with UnitedLex to perform this same process

25  for any of the exhibits that are on the Trustee's Exhibit

1   List that's in front of you?

2   A    Correct.  Same exact process.

3   Q    Okay.  And if you look at Exhibits 21 through 27 on

4   that list, I believe each of those exhibits, if you look at

5   the title of it, starts with the words video exhibit?

6   A    That's correct.

7   Q    This process that you just described, was that followed

8   at your direction for each of those exhibits?

9   A    Yes, it was.

10  Q    Now, in addition to -- in addition to having personnel

11  at your direction capture the videos in the way that you

12  discussed, these videos also have corresponding URL links

13  that are available online, is that your understanding?

14  A    That's correct.  They're indicated below in every

15  exhibit number.

16  Q    In the exhibit list?

17  A    Correct.

18  Q    Have you personally visited those links and viewed the

19  videos on those links?

20  A    Yes, I have.  This morning.

21  Q    So you viewed each of the videos on Exhibits 21 through

22  27 this morning?

23  A    That's correct.

24  Q    You also mention in your affidavit that certain of the

25  videos attached to the complaint were accompanied by

1    translations performed by counsel.  What did you mean by

2    that?

3    A    We were fortunate in the sense that most of the videos

4    had an English translation provided by the party posting it

5    under the new State Federation of China or GETTR.

6             But in one case, if I remember correctly, in one

7    case, Exhibit 21, the video there was all in Mandarin.  And,

8    therefore, I asked a Mandarin-speaking associate at the firm

9    to translate -- to listen to it first so that we would know

10   what was said, but then to -- after she downloaded verbally

11   the content of the video, I asked her to translate certain

12   segments of the video in English so that, you know, the

13   Court and the parties in interest know what is being said

14   there.

15            And by the way, that translation was not in the

16   documents that I clicked on this morning because that's

17   something that's homemade essentially.

18   Q    Right.  Right.  And then were those translations then

19   placed on top of the video, or how did that work?

20   A    Yeah.  Exactly.  Yeah.

21   Q    So that when we watch, if you were to watch the videos

22   that were captured, it would have a translation over certain

23   parts of it?

24   A    Correct.

25   Q    Okay.  I'd like to direct your attention to Exhibit --

1    the Exhibit 21 slip sheet in your binder.

2              MR. BASSETT:  And if the Court could have that

3    displayed on the screen, we'd much appreciate it as well.

4              Oh, sorry.  I was -- in the first instance, I was

5    asking if we could just have the actual Exhibit 21 PDF slip

6    sheet displayed on the screen.  And then after that, we'll

7    go to the actual video clip.

8              THE COURT:  Meaning the sheet that says Exhibit

9    21?

10             MR. BASSETT:  Yes, Your Honor.

11             THE COURT:  So the cover sheet of the PDF

12   essentially?

13             MR. BASSETT:  On the docket.

14             THE COURT:  Yeah.

15             MR. CONWAY:  And, Your Honor, while that's

16   happening, not having seen any of the videos, I don't want

17   to interrupt the presentation, but I will say that when we

18   get to the obvious point of trying to play the videos, I'm

19   objecting for lack of foundation and hearsay.

20             THE COURT:  Okay.  Thank you.

21             MR. BASSETT:  If you could --

22             THE COURT:  All right.  There's the cover sheet,

23   Attorney Bassett, correct?  That's what you were looking

24   for?

25             MR. BASSETT:  Yes.

1          THE COURT:  Okay.

2          MR. BASSETT:  Yes, Your Honor.

3          And if we could go to the second page, please.

4     BY MR. BASSETT:

5     Q    So, Mr. Despins, is this the website that you were

6     taken to when you clicked on the link to Exhibit 21?

7     A    That's correct.

8     Q    And that square box or the rectangular box with the

9     picture, is that the video?

10    A    It is.

11    Q    Now, as the Court is well familiar with, we have talked

12    quite a bit about the GETTR website and GETTR accounts at

13    past hearings in this case.  What do you, Mr. Despins,

14    understand GETTR to be?

15    A    It's a social platform like, you know, it's called X

16    now.  What is it?

17    Q    The platform formerly known as Twitter?

18    A    Exactly.  Formerly known as Twitter, exactly.  It's a

19    social platform like Twitter.

20    Q    Got it.  And you have become familiar with GETTR based

21    on your experience in this case?

22    A    Correct.

23    Q    What does -- can you remind the Court, because this is

24    subject to past testimony and findings by the Court as well,

25    but where it says on here beneath the box that you said

1    represents the video where it says NFSCTV and then there's a

2    red check next to it, what's your understanding of what that

3    signifies?

4    A    It means New Federal State of China TV.

5    Q    That this is their like GETTR page?

6    A    Correct.  With the -- when the checked red check

7    indicates that it's the source, yes.  Verified source.

8    Q    And what is your understanding of what the New Federal

9    State of China is?

10   A    It's an organization.  I don't think it has a legal

11   status like a company or something like that, but it's an

12   organization founded by, as the Court held, founded by the

13   debtor, controlled by the debtor.

14        MR. BASSETT:  Okay.  At this point, Your Honor,

15   this is a, as you can see from the image, a 36-minute and

16   30-second video.  We are going to spare everyone in the

17   courtroom the 36 minutes of watching the entire video.

18        What we have done is created 11 separate clips,

19   which upon viewing them, I'll ask the Trustee if they are

20   indeed accurate portions of what he viewed when he viewed

21   the video online.

22        But we will play those for the Court.  I think the

23   relevance of the video will be self-evident when we play it.

24   And then after that, I would intend to introduce this --

25   these video clips into evidence along with this slip sheet.

1          I also am happy to respond to the arguments that

2     counsel has indicated he plans to raise concerning

3     admissibility.

4          THE COURT:  Counsel, go ahead and raise your

5     arguments, please.  Your objections.

6          MR. CONWAY:  So far, we have not heard anything

7     laying a foundation of the video, how it's made, who made

8     it.

9          I believe the Trustee's indicated that the

10    translation was created by somebody other than him, which is

11    not surprising, but I don't know who that was.  It sounds

12    like it was somebody from his office, not a certified

13    translator, so there's no foundation as to the accuracy of

14    the translation.

15         And obviously, whatever it is that's on this video

16    is an out-of-court statement which would constitute hearsay.

17         Again, I apologize, Your Honor, that I have not

18    seen any of the videos, so otherwise I might have been able

19    to stipulate to something, but I haven't seen them yet.

20         MR. BASSETT:  So, Your Honor, I'll respond to each

21    of those points.

22         I would start by I just want to make -- just

23    clarify for the record -- so I completely understand and

24    appreciate counsel's brand new to the case.  It sounds like

25    he was just retained.  He did reach out to us on Friday as

1    he indicated asking if we would be open to a continuance.

2    You know, he didn't reach out to the Court after that.

3          There's been no objection filed by his clients.

4    They were, as the Trustee will testify and as our

5    certificate of service will show, properly served in

6    accordance with the Federal Rules of Bankruptcy Procedure.

7    so in our view their time to respond has lapsed.

8          Obviously I understand counsel is being heard here

9    today, but I just want to be clear that there was no effort

10   on the part of the Trustee to surprise anyone.  The videos,

11   all of the videos, that we're going to be going through

12   today I believe were exhibits to the complaint, which again

13   we served, so I don't want there to be any confusion or lack

14   of clarity in the record regarding the notice that the

15   defendants have received of today's hearing.

16         As to the specific evidentiary items, first of

17   all, foundation.  I think what counsel said is there's been

18   no indication who created the video.

19         Your Honor, the Trustee just testified, there was

20   no objection to the testimony, as to -- and, again, this is

21   based on findings the Court has already made -- and I

22   understand counsel was not around at this point in the case,

23   but during the preliminary injunction hearing in the PAX

24   litigation concerning the protests, there was extensive

25   testimony concerning GETTR, what GETTR is, how it works.

1        The Trustee testified that he's familiar with it.

2    He's visited the page.  He knows what NFSCTV means.  He

3    knows that this is an account.

4        I think based on the process that he described of

5    how these videos were captured online and saved, coupled

6    with the fact that the image that the Trustee said he

7    personally visited, very clearly indicates that the owner of

8    the account who posted the video is the NFSCTV organization.

9    I think that is more than sufficient for purposes of today's

10   preliminary injunction hearing to lay a foundation.

11       Once the video is played, the contents will be

12   self-evident as to their relevance.

13       The second point I would make as to the

14   translation, which we can get to when we see the video, is

15   that the individual who did these translations at the

16   Trustee's direction is actually in the courtroom today.

17       If absolutely necessary, we could call her to the

18   witness stand to testify to the accuracy of the translations

19   on the videos and to answer any questions counsel may have.

20   She is a native Mandarin speaker who was born in China and

21   also speaks fluent English and is more than capable of

22   performing these translations.  So should that be necessary,

23   which we don't think it would be, we could put her on the

24   stand for that purpose.

25       Lastly as to hearsay, I think first of all the

1    Court would need to see the videos to understand whether or

2    not the statements made on the videos are, in fact, hearsay

3    statements being made for the truth of the matter asserted.

4         Setting that aside, regardless, it is well-

5    settled, I would say ironclad, law in the Second Circuit

6    that on a preliminary injunction the Court can consider

7    hearsay.  This is the *Mullins* case from, I'll get the

8    citation reference, *Mullins v. City of New York*, 626 F.3d.

9    47, Second Circuit 2010.  We cited to this case in past

10   hearings.

11        The Second Circuit concluded, given the summary

12   and nature of a preliminary injunction hearing, given that

13   it occurs at the outset of a litigation, the Court can

14   consider and can admit into evidence hearsay, period.

15        What the Court observed was that, at the

16   preliminary injunction stage, any hearsay that is admitted

17   into the record would go to the weight of the evidence, not

18   to its admissibility.

19        So I think for all those reasons, Your Honor, I do

20   think these videos are admissible.  I think the Court, once

21   it views them, will find them to be highly relevant.  And we

22   would ask to proceed on that basis, Your Honor.

23             THE COURT:  Okay.  Thank you.

24             Anything further, Counsel?

25             MR. CONWAY:  Just I would say, Your Honor, that I

1    certainly don't believe that they intentionally tried to

2    avoid giving me exhibits.  It was a matter of timing.

3           And I would also state that the -- the issue of

4    hearsay, if you have a lack of foundation, a failure of

5    foundation describing how these videos are made, that

6    fundamentally changes the issue of whether hearsay can come

7    in.

8           It's one thing to say we know that this person

9    made a statement and allow that in.  It's another thing to

10   say we have no idea whether this video is legitimate, has

11   any accuracy at all, and now we're going to let it in.  So

12   there is a connection between allowing hearsay.

13          I don't think it's admissible, period, as counsel

14   stated.  I think they have to lay a foundation for why the

15   hearsay testimony has some sort of legitimate foundation.

16          THE COURT:  Thank you.

17          Mr. Bassett, would you like to respond?

18          MR. BASSETT:  I would just say, Your Honor, that I

19   think I addressed the foundation issue independent of any

20   question of hearsay.  And again, we have dealt with this

21   extensively before in this case.

22          And for purposes of developing the record today, I

23   had the Trustee repeat some of the testimony that had

24   already been given about what GETTR is, what it means when

25   somebody posts something to a GETTR account, who NFSCTV is.

1          I think for purposes of today's summary proceeding

2     it is more than sufficient to lay a foundation for the

3     video, to do so with the testimony that the Trustee has

4     given.  I think we can play the videos.

5          To the extent counsel, you know, believes they may

6     be doctored, he can make that argument and that could go to

7     the weight, but I do not see any reason why the Court should

8     not consider these videos, just as it has done in identical

9     fashion in the past, including in particular at the PAX PI

10    hearing that I mentioned previously.

11          THE COURT:  Okay.  Anything further, Counsel?

12          MR. CONWAY:  No, Your Honor.

13          THE COURT:  Your objection is overruled.  And I

14    will note your objection for the record.

15          MR. CONWAY:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. BASSETT:  With that, if I could please ask the

18    Court, the courtroom deputy, to play clip one.  And this

19    would be --

20          Your Honor correctly noted that we did have some

21    inconsistency between the filed exhibit numbers and the

22    exhibits, the exhibit labels on the thumb drives that we

23    provided, so Exhibit 21 on the thumb drive is actually

24    labeled as Exhibit 9.  And there are 11 short clips of

25    Exhibit 9 that we would -- we would like to play.  And I'll

1   start with clip one.

2          (Exhibit 21, clip one, played)

3          MR. BASSETT:  All right.  So that, that is the end

4   of the first clip.

5   BY MR. BASSETT:

6   Q    And before I move on to the next clip, I would just ask

7   the Trustee was this, this clip that we just saw, was that

8   part of the video that you said you viewed this morning when

9   you went online by clicking the link in the exhibit?

10  A    It is.

11         THE COURT:  And I'd just note for the record that

12  it appears that that video clip, number one, is -- was one

13  minute and 51 seconds, Mr. Bassett, is that right?

14         MR. BASSETT:  That is correct, Your Honor.

15         THE COURT:  Okay.  Thank you.

16         MR. BASSETT:  And if I could ask the courtroom

17  deputy to please now play clip two.

18         (Exhibit 21, clip two, played)

19         MR. BASSETT:  And for the record, Your Honor, that

20  video, clip two, was 53 seconds.

21  BY MR. BASSETT:

22  Q    Trustee Despins, other than the translation that we saw

23  at the bottom of that video, during a portion of the video,

24  was that clip also one -- was that also part of the larger

25  36-minute video that you saw this morning when you clicked

1    on the link?

2    A    Yes, it was.

3              MR. BASSETT:  If we could have the next clip

4    played please, clip three.

5         (Exhibit 21, clip three, played)

6              MR. BASSETT:  And we would go on to clip four.

7              Your Honor, when I get finished with these clips,

8    what I would ask is for, because I don't think this has been

9    formally done yet, I would ask for Exhibit 21, the slip

10   sheet, as well as these video clips, to be admitted into

11   evidence.  I just wanted to note that now because I was

12   planning to do it at the end.  But if the Court would like

13   to do it after each clip, I could do that instead.

14             THE COURT:  I think you could do it at the end is

15   fine.

16             MR. BASSETT:  Okay.  Clip four, please.

17        (Exhibit 21, clip four, played)

18             MR. BASSETT:  That fourth clip, Your Honor, was a

19   minute and 27 seconds.

20             One thing I would like to note for the record is

21   all of these clips at the top, right-hand corner have a date

22   stamp of April 12th, 2023.

23   BY MR. BASSETT:

24   Q    Trustee Despins, is this clip also part of the video

25   that you viewed online this morning?

1    A    Yes, it is.

2    Q    Again, with the exception of the translations?

3    A    Correct.

4         MR. BASSETT:  Can we play clip five, please.

5         (Exhibit 21, clip five, played)

6    BY MR. BASSETT:

7    Q    Trustee Despins, is that also a clip, again aside from

8    any translations, that you saw when you viewed the video

9    online this morning?

10   A    Yes.

11        MR. BASSETT:  Could we play clip six, please.

12        (Exhibit 21, clip six, played)

13   BY MR. BASSETT:

14   Q    And again, same question, Trustee Despins, also part of

15   the video that you viewed online?

16   A    Yes.

17   Q    Thank you.

18        MR. BASSETT:  Clip seven, please.

19        (Exhibit 21, clip seven, played)

20   BY MR. BASSETT:

21   Q    And, Trustee Despins, was that video also a part of the

22   broader video that you viewed online this morning?

23   A    Yes.  Because I recall seeing all the art work around

24   the premises there.

25   Q    Thank you.

1        MR. BASSETT:  Clip eight, please.

2        (Exhibit 21, clip eight, played)

3   BY MR. BASSETT:

4   Q    Trustee Despins, that clip eight we watched, was that

5   also part of the video you watched online this morning?

6   A    Yes.

7   Q    Again, aside from the translations?

8   A    Correct.

9        MR. BASSETT:  Clip nine, please.

10       (Exhibit 21, clip nine, played)

11  BY MR. BASSETT:

12  Q    Trustee Despins, clip number nine, which we just

13  watched, was that also part of the video that you watched

14  online at the link to the exhibit list?

15  A    Yes.

16  Q    Again, without the translations?

17  A    Correct.

18       MR. BASSETT:  Clip ten, please.

19       (Exhibit 21, clip ten, played)

20  BY MR. BASSETT:

21  Q    Trustee Despins, clip ten which we just watched, again

22  aside from the translation, the translations, was that also

23  part of the video that you watched online at the link this

24  morning?

25  A    That's correct.

1      MR. BASSETT:  And finally clip eleven, please.

2      (Exhibit 21, clip eleven, played)

3      MR. BASSETT:  Your Honor, on this particular clip,

4  there were two things I just wanted to highlight for the

5  Court because they will tie into the relevance of certain

6  exhibits that we see later, and I just wanted to make sure

7  that was flagged for the record.

8      The first is there was a reference in the

9  translated portion of this video to antiques that were

10  purchased for the home.  I just wanted to flag that.  Again,

11  we'll come back to that later.

12      And then I also wanted to note that there was a

13  reference to a place in the home where Mr. Kwok himself had

14  done live streams in the past.  We'll also come back to that

15  later.  So I just wanted to flag that for the record.

16  BY MR. BASSETT:

17  Q    Trustee Despins, this clip eleven, is this also part of

18  the broader video that you viewed online?

19  A    Yes, it is.

20  Q    Again, minus the translations?

21  A    Correct.

22      MR. BASSETT:  So, Your Honor, those are all of the

23  clips that we intend to introduce as part of Exhibit 21.

24      As I had indicated previously, at this time, I

25  would like to move for the admission of Exhibit 21,

1   including the cover sheet which shows the original location

2   of the video on GETTR, as well as each of these 11 clips.

3           THE COURT:  Counsel?

4           MR. CONWAY:  Yes.  First, I want to renew a couple

5   objections.  But before I do, I'm not familiar enough with

6   the exhibits.

7           Did counsel say that he had prepared written

8   transcripts that were attached someplace, because I haven't

9   seen them and it would make a difference if they were

10  something other than what we've seen on the screen.

11          MR. BASSETT:  I did not say that, Your Honor.  We

12  do not have full translations of every video.

13          As I said, this entire video is 36 minutes long.

14  I'm happy to ask the Trustee to describe, you know,

15  generally what happens in the rest of the video.  I think

16  what he'll tell you is that it is a 36-minute tour of this

17  house.

18          We did not think it was a good use of time or

19  resources or necessary to have the entire transcript of the

20  video translated.  For among other reasons, is the fact that

21  we had understood that today's hearing was not going to be

22  contested given the fact that defendants who had notice did

23  not respond.

24          We do have our native Mandarin speaking colleague

25  in the courtroom if there are particular portions of the

1    clips that are played that counsel wants to have translated

2    that weren't translated.  We could do that exercise.  I

3    think that will prove for a lengthy hearing.

4           But I don't think it's necessary to demonstrate

5    that the portions of the video that we have played for the

6    Court and translated are clearly relevant to the hearing

7    before the Court today.

8           MR. CONWAY:  Counsel misunderstood me.  I'm not

9    accusing anybody of anything.

10          I wanted to know if there were any translations

11   being attached because all I saw was a portion of the

12   conversation being translated.  I thought maybe I missed

13   something.

14          Under the circumstances, I would ask that I be

15   allowed to ask maybe three questions of the witness of voir

16   dire on this exhibit.

17          THE COURT:  Of Mr. Despins?

18          MR. CONWAY:  Yes.

19          THE COURT:  Do you have an objection, Counsel?

20          MR. BASSETT:  I certainly don't have an objection

21   to counsel cross-examining Trustee Despins.  I don't know

22   what relevance the questioning would have.  I'm not

23   suggesting that Trustee Despins has any personal knowledge

24   of the content of these videos.  His testimony was that he

25   instructed Paul Hastings' personnel at his direction to take

33

1    and preserve these videos.  And the Court overruled the

2    objection that was raised earlier with respect to that

3    testimony.

4           So I don't know what counsel has in mind, but

5    again, I obviously have no problem with the witness being

6    cross-examined.

7           THE COURT:  Well, he doesn't want to cross-examine

8    him right now.  He wants to voir dire him.  There's a

9    difference, right?

10          So what are your questions?  What do you want to

11   ask Mr. Despins so I can understand what it is your point of

12   inquiry would be?

13          MR. CONWAY:  Thank you, Your Honor.

14          I have three questions.  Of course in this field,

15   it always turns out to be more.  But I wanted to ask three

16   questions.

17          One, does he know where the gentleman got his

18   information that he's conveying in the video?  Two, does he

19   know where the lady got her information she's conveying in

20   the video?  And three, why it is we didn't see a full

21   translation?

22          THE COURT:  I'm going to let -- I am going to let

23   counsel ask those three questions, Attorney Bassett.  Okay?

24          MR. BASSETT:  Sure.

25          THE COURT:  So go ahead.  Why don't you come to

1    the podium for a moment and then you can ask Mr. Despins

2    those questions, those three questions.  Okay?

3              MR. CONWAY:  Thank you, Your Honor.

4                    VOIR DIRE EXAMINATION

5    BY MR. CONWAY

6    Q    Sir, you've heard my three questions.  Let me start

7    with the first one.  Do you know where the gentleman in this

8    video got the information that he conveyed in the video?

9    A    From Mr. Kwok.

10   Q    And that's based on?

11   A    Because he's been appointed by Mr. Kwok.  The gentleman

12   on the left has been appointed by Mr. Kwok as his

13   representative in charge of his satellite entities while

14   Kwok is in jail.

15   Q    Okay.  And the lady in this video, do you know where

16   she got her information relating to this house?

17   A    I know that she's a spokesperson for Mr. Kwok because

18   I've seen her on many other videos where she comments on the

19   case, this case, comments on the activities of the Trustee

20   and all that.  So I know that she's -- that she's a de facto

21   representative of Kwok, but I don't know precisely whether

22   Kwok conveyed that information to her.

23   Q    In other words, you didn't interview these folks about

24   this video?

25   A    No, I did not.  No.

Luc Despins - Voir Dire - Conway                                    35

1    Q    And the third question was about the translation.  We

2    saw certain pieces of the video translated, but not others,

3    why was that?

4    A    Well, because I guess Mr. Bassett described it.  You

5    know, to do a full-blown translation of these things would

6    cost a fortune.  And so what I did ask our Mandarin speaker

7    to make sure that in one sentence they don't say yes, he

8    bought the house and in the next sentence he actually says

9    no, he did not buy the house.  So obviously I wanted to make

10   sure that the extracts were representative of the discussion

11   and not some outlier.  So that I asked.

12        But for her to do a full-blown translation of 36

13   minutes would cost thousands and thousands of dollars and

14   this estate has limited funds.

15        So as long as I can ensure -- I can be sure that

16   the video is representative of what they said, and it's not

17   like just sound bytes taken out of context, and that's the

18   representation she made to me, you know, for me, that's

19   sufficient.

20        Because otherwise if we -- in this case, if we

21   start translating everything that we get in Mandarin, this

22   case would last ten years.  I mean, we're getting Mandarin

23   documents, Mandarin emails, every day, so it would just be

24   impossible.  That's why we take some shortcuts.  Here the

25   shortcut is let's make sure that what we're talking about is

1    relevant.

2         There are many things in there that she told me

3    are irrelevant.  For example, they describe an office,

4    office space and all that.  You know, it's interesting, but

5    not really relevant to our issue.  So what she translated

6    was relevant to our issue of ownership, and making sure, as

7    well, negative assurances on our part that there was nothing

8    in there that was contrary to those clips that we played.

9         MR. CONWAY:  I can speak my objection from my seat

10   now?

11        THE COURT:  Certainly.  Thank you.

12        MR. CONWAY:  Your Honor, I'm going to renew the

13   objection on foundation grounds.  It seems that these

14   witnesses have not been interviewed.  He's not aware of

15   exactly how they came about their information.

16        But also, as we saw just now, multiple times, and

17   I can tell you it was in clips three, four, five, six,

18   seven, eight and ten, there was a translation of a question

19   or statement by one side with no translation of the

20   response.

21        And what we just heard from Mr. Despins is that he

22   asked that only those things relevant to the position of the

23   Trustee be translated.  We have no idea whether there are

24   things that were contrary to the position of the Trustee

25   which were not translated.

1    So that's my foundation objection, Your Honor.

2    THE COURT:  Thank you.

3    Attorney Bassett?

4    MR. BASSETT:  So a couple of responses, Your

5    Honor.

6    First of all, as to the translation issue, counsel

7    was free to bring his own translator to this hearing had he

8    wanted to to address any issues that arose.

9    Secondly, as I already said, if absolutely

10   necessary, we have the person who performed these

11   translations in the courtroom.

12   The last thing I would say on -- and, by the way,

13   I think also the characterization of the Trustee's testimony

14   was not -- was not accurate insofar as counsel was

15   suggesting that we were deliberately trying to withhold

16   information that would have been counter to the position

17   that we're taking in this litigation.  I think the Trustee

18   said the opposite.

19   THE COURT:  Well, I don't think that's what he

20   said.  I don't think he said that you were having

21   information that was counter.  I think what he said was, at

22   least what I heard was, that his objection, one of his

23   objections is because certain words spoken were translated

24   and certain words that were spoken were not translated.

25   Is that right, Counsel?

1          MR. CONWAY:  That's correct, Your Honor.  I

2    certainly did not mean to impugn the witness's character.

3          THE COURT:  I didn't take it as that.  But I think

4    that was the point that was being made.

5          And, you know, I think you may need to call the

6    translator because there are -- there are parts of these

7    videos that I did see some -- one of the two people, whom

8    haven't been identified yet, speaking and then the person,

9    the other person, says something and that doesn't seem, at

10   least to me, to be translated.

11         MR. BASSETT:  Sure.

12         THE COURT:  So I just want to understand.  If

13   we're going to use only these 11 clips, then I think they

14   need to be translated.

15         MR. BASSETT:  So, like I said, we have the person

16   who performed the translations in the courtroom.  She is

17   more than qualified to tell us what else is being said on

18   these videos, so we can -- we can certainly do that.

19         Before going there, I would just respond again to

20   the foundation argument that was -- that was raised.  These

21   individuals are not themselves being presented as witness to

22   the Court.  The rule for admissibility of a video is not the

23   person speaking has to be subject to cross-examination.

24         We already established, based on precedent in the

25   Second Circuit, that hearsay is admissible at a preliminary

1    injunction stage to the extent that information being

2    conveyed is being offered for the truth of the matter

3    asserted.

4           The other thing I would note and remind the Court

5    is that this court previously found at the preliminary

6    injunction hearing that the debtor controls the New Federal

7    State of China.

8           The testimony today has established in unrebutted

9    fashion that these videos were, in fact, posted on the GETTR

10   page of the New Federal State of China.  If you look

11   closely, you can see that the woman on the right is holding

12   a microphone bearing the New Federal State of China logo.

13          THE COURT:  I can't see that actually on mine, so

14   can you --

15          MR. BASSETT:  I think -- I think you would be able

16   to throughout the course of all these videos.

17          THE COURT:  At the bottom you're saying there's a

18   -- the box essentially says that?

19          MR. BASSETT:  That's --

20          THE COURT:  Is that what you're saying?

21          MR. BASSETT:  That is my understanding, Your

22   Honor.  If the Court --

23          THE COURT:  Right above her hand?

24          MR. BASSETT:  That's my understanding.  Obviously,

25   the Court can make its own observations in that regard.  If

1    you can't see it, you can't see it.

2           THE COURT:  Well, I think my video quality isn't

3    as good as that video quality.  That's all.  I think if I

4    look at it from that screen I might be able to see it

5    better.

6           MR. BASSETT:  So again, I don't think there is an

7    issue of foundation.  There's no question as to the

8    authenticity of these videos having been posted online.

9           Just to repeat one more time, there is essentially

10   precedent or law of the case, in this Chapter 11 case, we

11   have admitted these types of videos in exactly the same

12   fashion.

13          And again, we're now at a point where we have

14   findings by the Court that the New Federal State of China is

15   controlled by the debtor.  I think that's more than

16   sufficient, again given a summary nature of this hearing the

17   fact that hearsay is admissible, to allow for these videos

18   to come into evidence.

19          With that, we can have our Chinese Mandarin

20   speaking colleague take the stand.  My colleague, Attorney

21   Luft, would handle that examination.  And I think -- I'm

22   just trying to figure out the most efficient way to proceed.

23          THE COURT:  Well, that's -- I am as well.

24          MR. BASSETT:  Yeah.

25          THE COURT:  So is this the only video that has

1    language that needs to be translated?  I think that's what

2    you said at the beginning.

3              MR. BASSETT:  So just to be totally open and clear

4    about the other, the other video exhibits, so the Court will

5    see I believe three other videos and each of these other

6    videos that we show only has one clip.  They're much shorter

7    videos, so it's not going to be nearly as many as we've had

8    here.

9              There will be three other videos that are

10   relatively short that are posted on the New Federal State of

11   China website as opposed to the GETTR page and those, when

12   posted, have at the bottom Chinese characters and an English

13   translation of everything that's on there.  We didn't add

14   that.  Sorry.  We didn't add that.  That's already on those.

15             Then there are two other videos that were posted

16   by -- or they were posted to the debtor's, Mr. Kwok's, GETTR

17   page, and those are live streams of him speaking Mandarin to

18   his followers.  We don't translate those at all.  When the

19   Court sees them, we're just offering them for the fact that

20   he was posting from the house.  So I don't think we have an

21   issue with those because we're not asking for the substance

22   of what he's saying to be admitted into evidence.

23             So I do think that the only -- unless counsel

24   would want to ask questions about the other videos that have

25   already translated, which I don't think is necessary because

1    they're fully --

2              THE COURT:  Well, I don't think the translation

3    issue is necessary.

4              MR. BASSETT:  Right.  So I do think that now would

5    be the time.

6              THE COURT:  I do as well.

7              My question in reviewing these is I just -- it

8    seemed to me part of this, part of the statements that were

9    being made were translated and not all and I just would like

10   to understand that.

11             MR. BASSETT:  Understood, Your Honor.

12             MR. CONWAY:  Your Honor, if I may?

13             THE COURT:  Yes.

14             MR. CONWAY:  It's possible when we take a break

15   counsel and I can try and work together to figure out a

16   solution.  And part of this, again, is that we didn't have a

17   chance to do that before the hearing.  And it's possible we

18   can work something out.

19             THE COURT:  So are you saying you'd like to

20   discuss it now before we bring on another -- the witness to

21   testify about the translation?

22             MR. CONWAY:  We can do that, Your Honor.  But I'm

23   telling you that I don't want to interrupt the flow that

24   counsel has in mind, if we want to postpone this issue until

25   a convenient break time and try and come up with a solution.

1          And I'll also point out, Your Honor, when I first

2     reached out to counsel, I indicated that, you know, the

3     Taurus Fund, LLC would not object to an injunction

4     prohibiting it from transferring the asset here.

5          THE COURT:  Well, apparently it's not just the

6     asset though.  It's the asset and its contents, and what's

7     on the grounds and things of that nature, right?

8          MR. CONWAY:  And, Your Honor, and also we would

9     agree not to encumber.

10         The issue that was raised is that it's not a

11    matter of just agreeing not to transfer any of the property,

12    whether it be real or personal, the issue was that they

13    wanted to lock out the owners of the property.  That's the

14    only reason we're here.

15         I'm not sure whether this is going to go to that

16    issue or not, but we don't need to waste time on the issue

17    of whether or not this property should be restrained,

18    because that's an issue -- I think it already is restrained.

19         THE COURT:  It is.

20         MR. CONWAY:  I mean, not just in this court.

21         THE COURT:  But that expires tomorrow I think.

22         MR. CONWAY:  But I mean, I think the federal court

23    has restrained it as well.  I don't think there's any intent

24    to try and move property real or personal is all I'm saying.

25         THE COURT:  But the problem is, and you could be

1    right, okay, but the problem from what has been presented to

2    the Court through papers and complaints and exhibits is that

3    people are removing things from the -- from the house that

4    are not Mr. Kwok, or apparently the people you represent,

5    that there are other people that are in -- I don't know who

6    these people are, okay.  They're not --

7              Neither one of these people are your client,

8    correct?

9              MR. CONWAY:  I don't know who they are.

10              THE COURT:  Okay.  So there are -- there are

11    allegations, which have not been disputed yet at this point,

12    that people are going in and out of this mansion and taking

13    antiques and other art work and that is valuable and that

14    the Trustee asserts is Mr. Kwok's.  And if it is Mr. Kwok's,

15    then it's property of the bankruptcy estate and that's --

16    that can't happen when there's this case pending.  That's

17    the assertion.

18              So I hear what you're saying.  And you're saying,

19    okay, we'll agree to be restrained, and we'll agree that

20    the, you know, we can be enjoined, but that's not the

21    problem.

22              The problem is why wouldn't your -- if your client

23    would agree to that, then why wouldn't your client agree to

24    have people that don't reside in the home not be allowed to

25    have access to the home and/or remove things from the home?

1        MR. CONWAY:  Your Honor, the distinction between

2   this property and a personal residence is that this property

3   is used by a number of people for various reasons.  It was

4   never meant to be -- even as these videos show, it was meant

5   to be some sort of a clubhouse for the G Clubs and a place

6   for meetings for the New Federal State of China.

7        The idea that we can't, under the Constitution of

8   the United States, tell people you can't go into your own

9   home --

10       THE COURT:  Well, who says it's their home?

11  Where's the evidence it's their home?

12       MR. CONWAY:  Well, all I can say, Your Honor, is

13  the only evidence is that it's the Taurus Fund's property.

14  And the allegation --

15       THE COURT:  But you just said these people aren't

16  the Taurus Fund people.  You've just said that, right?  I

17  asked you that question directly are either one of those

18  people your client and you said you don't know who those

19  people are.

20       MR. CONWAY:  I don't know who those people are.

21       THE COURT:  Okay.

22       MR. CONWAY:  And this is not a --

23       THE COURT:  So where's your client?

24       MR. CONWAY:  -- this is not a two-bedroom house.

25       THE COURT:  I understand that.

1          MR. CONWAY:  This is like the White House.

2          THE COURT:  I think it's --

3          MR. CONWAY:  Joe Biden doesn't own the White

4    House.

5          THE COURT:  I understand that.  But the problem is

6    where's your client?

7          MR. CONWAY:  My client is a fund, Your Honor.

8          THE COURT:  I understand that.  But we all

9    understand how it works.  Your client has to have a person

10   to run that fund.

11         MR. CONWAY:  And given the time that I -- it would

12   normally take to prepare for this hearing and put in an

13   opposition, we could have witnesses here.  But given the

14   circumstances, I didn't have that time.

15         THE COURT:  But I don't understand why -- you say

16   -- you say in the -- on the one hand you'll agree to be

17   restrained, but on the other hand you're not going to stop

18   people who are not your client from going in and out of the

19   property.  And you don't have any evidence from your client

20   that says that other people can go in and out of that

21   property and remove things from that property.

22         Where is the -- there's nothing that I've seen

23   from your client, who are the defendants in this adversary

24   proceeding and who are restrained, from showing me that

25   they've allowed these people to be in here and/or remove --

1          You say the client owns the property.  Does the

2     client own all the art?

3          MR. CONWAY:  The client owns -- well, I don't know

4     what art is there.  I know that I've seen a list --

5          THE COURT:  I understand.

6          MR. CONWAY:  -- of all the property they've spent

7     money on.  I've seen -- I've seen a lot -- I mean, I don't

8     know --

9          THE COURT:  What does your client do?  What is

10    your client's business purpose?

11         MR. CONWAY:  You mean the fund?

12         THE COURT:  Yes.

13         MR. CONWAY:  The fund's investing in -- it depends

14    on which sub-fund you're talking about.  But this sub-fund

15    was created for the purpose of investing approximately $47

16    million that was recovered by G Clubs in an arbitration that

17    it had with -- it's a public arbitration.  I've got the

18    award where they get this money.

19         THE COURT:  Okay.

20         MR. CONWAY:  They take the money.  They put it in

21    the fund.  The fund then buys the house, uses the other

22    money to pay for the property that's in the house.

23         There's allegations of a piano that was moved out

24    during the renovations.  There's also an allegation in a

25    footnote that says they know where that is, but they just

1     didn't go look to see where it was.

2          So you heard in the video the renovations were

3     going to be complete sometime after this video and that's

4     when people are going to start coming in and using it.

5          The purpose of the property was never so that the

6     debtor could live there as a personal residence.  So the

7     idea now that, you know, everything in it is his, the house

8     is his, there's -- well, we'll let the Trustee put on his

9     proof.  But I've seen evidence to the contrary.

10         And I can't -- you don't know me, Your Honor.  I

11    mean, I've worked with the Trustee for decades.  We shared

12    former partners together.  I give you my word that I'm not

13    lying to you when I say the evidence shows that this house

14    belongs to the people whose money was used to buy it.

15         The request, the ask, is to prove a negative at

16    this stage without time to put together the exhibit list and

17    the witnesses.  It's asking too much.  So if we did have the

18    time, we'd be happy to try and do that for you, Your Honor.

19         THE COURT:  But the problem would be, even if you

20    agreed to restraint, the continuation of the restraining

21    order, or preliminary injunction for that matter, it doesn't

22    address the issues that the Trustee has raised, which are

23    people going in and out of this home.  Assuming it's

24    accurate, okay, they're going in and out of this home and

25    taking valuable property.  And I don't understand why your

1    client wouldn't agree to that?

2              MR. CONWAY:  Well, Your Honor, our client's not

3    aware of anybody taking property so we'll let the Trustee

4    prove that allegation.

5              THE COURT:  Okay.

6              MR. CONWAY:  I would say that my client will be

7    more than happy to have an order saying nobody could do

8    that, because frankly why would our client want the property

9    taken out?  It makes no sense.  So, you know.

10             But I'm trying to -- I'm trying to streamline the

11   process, not make it more difficult.  And it's just an

12   offer, Your Honor.  I'm trying to help.

13             MR. BASSETT:  Your Honor, can I respond briefly?

14             THE COURT:  Yes.

15             MR. BASSETT:  So counsel is correct that we had

16   that conversation.  He's also correct that we said simply

17   having an agreement or an order by the Court that the

18   property not be transferred or encumbered is not nearly

19   enough in the Trustee's view to protect this asset.

20             As the Court just noted in conversation with

21   counsel, Taurus Fund, LLC is not a natural person.  We've

22   not heard the name of a single person who stands behind

23   Taurus Fund, LLC.  The person who is listed as one of the

24   co-members, as the evidence will show momentarily, is a man

25   by the name of Scott Barnett, who the evidence will show is

1    the driver and security guard for the debtor.  There has

2    been no indication from counsel during his remarks today

3    that Mr. Barnett lives in this house.

4           He's suggesting that this was simply set up as

5    some sort of commercial base.  There's going to be documents

6    in the record showing that this is a residential building

7    and it was designated for that use.  It's not a commercial

8    property as is apparent from the listing and everything else

9    the Court has already seen.

10          Counsel referred to the sub-fund, the Taurus Fund,

11   that allegedly used G Club investments to buy this property.

12   Your Honor, the Department of Justice, in its criminal

13   indictment, has charged Mr. Kwok with a close to billion-

14   dollar fraud, a big part of which was his use of G Club

15   investments to fund his own personal expenditures including

16   specifically the acquisition of this house.

17          There's going to be other evidence in the record

18   that shows that the one person who did live in this house,

19   and has all of his treasured personal belongings in the

20   house, is Mr. Kwok.  We don't think there's any doubt about

21   that.

22          What we do have, and this is very important, is

23   these videos.  The dates on them are, well, it's April 12th,

24   2023, after the debtor is incarcerated.  I don't think it's

25   any coincidence that this became the, quote/unquote, "Base

Despins v. Taurus Fund - August 14, 2023                    51

1    for the NFSC after the debtor had no physical ability to use

2    the property."

3         Your Honor, the other -- what we're also going to

4    show in some of these videos is there's going to be a video

5    where these same two individuals or their colleagues are

6    standing outside the front door of the property and it's

7    going to look like a college dorm with how many people are

8    coming in and out, constantly.  It's like basically open to

9    the public.  There is extremists.

10        It's not just that -- and there not need be

11   evidence that people are actually removing property from

12   this house, it's the fact that there's a real risk, an

13   eminent risk, that they would do so.  And why, why would

14   they do it?

15        Because these individuals who are members of this

16   movement clearly don't live in the house.  They're not the

17   owners of the house.  It's implausible.  It's illogical.

18   Counsel wasn't suggesting otherwise.  They, therefore, have

19   no reason to treat a house and its belongings like an owner

20   would to preserve value.

21        And if they think these members of the New Federal

22   State of China, who the Court have found in the past were

23   directing the protests at the home of the Trustee and have

24   done things like file proofs of claim in this case in order

25   to delay and disrupt this Chapter 11 case, if they think

1    they're going to lose this house to the Chapter 11 Trustee

2    as part of this litigation, then I think they'll have an

3    incentive that runs in the exact opposite direction, which

4    is to make sure it doesn't have value for the estate and for

5    creditors.

6         So not only potentially take extremely valuable

7    belongings such as antiques out of the home, and televisions

8    and other things like a $25,000 mattress, they may harm and

9    destroy the property.  And we'll have more testimony from

10   the Trustee as to his basis for that fear.

11        But that's what this is all about.  It is

12   absolutely not sufficient that this property, which is being

13   used in this manner and should be maintained for the benefit

14   of creditors of this estate, simply be preserved and that

15   it's not sold or encumbered.  We need the broader relief

16   that we're seeking in our preliminary injunction.

17        So that, that's my response.  And we'll get into

18   that more in closing argument later, but that doesn't work.

19        As to how we proceed, I'm happy to take a break on

20   this particular issue given that I think now we have agreed

21   that we're at a transition point where the Trustee would

22   momentarily step down from the stand and we would have or in

23   a manner in speaking colleague take the stand.

24        If there's a possible solution on that issue, I'm

25   happy to talk about that now.

1          But the broader solution suggested by counsel for

2     this hearing just doesn't work for the reasons that I've

3     suggested.

4          THE COURT:  All right.  Then we're going to take a

5     break and give the parties some time to talk.  It is 12:44.

6     We'll come back at 1:05.  All right.  So court is in recess

7     until 1:05.

8          And, Mr. Despins, obviously, as you know, you

9     remain under oath.

10        (Court recessed at 12:45 p.m.)

11        (Proceedings resumed at 1:07 p.m.)

12        THE COURT:  Please be seated.

13        All right.  We took a short recess and the parties

14    were going to discuss a few things I suppose, but certainly

15    with regard to the issue of Exhibit 21.

16        So, Attorney Bassett, do you have anything you

17    would like to report to the Court?

18        MR. BASSETT:  Your Honor, so we did speak with

19    counsel to Taurus Fund.  We were not able to come up with a

20    solution other than that we both agreed that we would just

21    try to put Ms. Song, we would call Ms. Song to the witness

22    stand and try to deal with any testimony that she needs to

23    provide as expeditiously as possible.

24        THE COURT:  Okay.  Go right ahead then.

25        MR. BASSETT:  And Mr. Luft is going to be handling

1      the examination, Your Honor.

2              THE COURT:  Go ahead, Attorney Luft.

3              MR. LUFT:  Your Honor, may Ms. Song approach the

4      bench?

5              THE COURT:  Yes, please.  Go to the witness box,

6      you mean?

7              MR. LUFT:  Yes.  Thank you.  I'm going to stand,

8      and she'll go to the box.

9              THE COURTROOM DEPUTY:  Raise your right hand,

10     please.

11         (The witness is sworn.)

12             THE COURTROOM DEPUTY:  State your name and address

13     for the record, please.

14             THE WITNESS:  My name is Lui Song, L-U-Y-I S-O-N-

15     G.  Address at 200 Park Avenue, New York.

16             THE COURT:  You know what, yeah, I think the

17     microphone didn't pick you up.

18             THE WITNESS:  Oh, I need to speak into the mic?

19             THE COURT:  I'm sorry.

20             THE WITNESS:  Okay.  Yeah.  My name is Luyi Song,

21     L-U-Y-I S-O-N-G.  Address is at 200 Park Avenue, New York.

22             THE COURTROOM DEPUTY:  Thank you.

23             THE COURT:  You can be seated.  Thank you.

24             MR. LUFT:  Thank you, Your Honor.

25             For the record, Avi Luft of Paul Hastings on

1    behalf of the Trustee.

2              Your Honor, if I may, I'm going to do a little bit

3    of background with Ms. Song and then get to the questions.

4              THE COURT:  Sure.

5              LUYI SONG, TRUSTEE'S WITNESS, SWORN

6                       DIRECT EXAMINATION

7    BY MR. LUFT:

8    Q    Ms. Song, where were you born?

9    A    I was born in China.

10   Q    Okay.  And what is your native tongue?

11   A    Jinan, Shandong Province.

12   Q    And what language did you speak growing up?

13   A    Chinese.

14   Q    Can you tell the Court a little bit about your

15   educational background?

16   A    Sure.  I went to primary school in China.  I went to

17   middle school in China.  Language of instruction for both

18   schools was primarily Chinese or actually only Chinese.  I

19   went to high school in Singapore, where the language of

20   instruction was English.  I went to college in Germany,

21   where the language of instruction is English.  I graduated

22   from the University of Minnesota Law School, where the

23   language of instruction was English.  And now I'm working at

24   Paul Hastings.

25   Q    And in what language do you do your work at Paul

1    Hastings?

2    A    In English.

3    Q    And in which departments do you work?

4    A    I work full time for the Bankruptcy M&A Department.

5    Q    In what languages are you fluent?

6    A    I'm fluent in English.  And Chinese is my native

7    language.

8    Q    Thank you, Song.

9         MR. LUFT:  Your Honor, at this point, I'm going to

10   turn to the work she did in this matter if that's okay with

11   the Court?

12        THE COURT:  Yes.  Go right ahead.

13   BY MR. LUFT:

14   Q    Ms Song, there was a video that was played and a number

15   of clips, were you here to see that?

16   A    Yes.

17   Q    I believe that was Trustee Exhibit 21, which on thumb

18   drive has been marked ast Exhibit 9.

19   A    Yes, correct.

20   Q    Okay.  Ms. Song, did you watch all of Exhibit 21?

21   A    Yes, I did.

22   Q    And you were asked to translate portions of it?

23   A    Yes, I did.  Yes, I was.

24   Q    Let me ask you, for the whole, all of what is at

25   Exhibit 21, marked as Exhibit 9, is there any portion of

1    that video that you did not translate that is inconsistent

2    with anything that you did translate?

3    A    No.

4    Q    Okay.  And why did you choose to translate the portions

5    that you did translate?

6    A    Because Mr. Kwok was referenced in those sections.

7    Q    And in the entirety of the other video, was any other

8    individual or entity referenced as being the owner of the

9    mansion at any time in the remainder of the video?

10   A    No.

11        MR. LUFT:  Your Honor, at this point, what I'd

12   really want to do is see how we could be helpful to the

13   Court.  There are a number of clips.  I know there was

14   issues about portions that were not translated.  Ms. Song is

15   available to translate those portions if that would be of

16   assistance to the Court.  She only asks that she be given a

17   pen and paper and that we pause it while we do it.

18        THE COURT:  Well, I'm going to ask counsel what

19   he's looking for as well.

20        But my point was -- and I can definitely give you

21   a piece of paper and a pencil --

22        MR. LUFT:  I have one, Your Honor.

23        THE COURT:  Okay.  Thank you.

24        I just, when I was looking at the video, there

25   were certain points where one of the two individuals was

1    speaking and that those words were not translated.  And I

2    just was curious as to why they were not translated?

3            THE WITNESS:  Understood.  I translated the

4    portion where Mr. Kwok's name was referenced.  And the other

5    ones that were not translated, they do not contain

6    substantive content.

7            THE COURT:  Okay.  And they don't contain Mr.

8    Kwok's name --

9            THE WITNESS:  No.

10           THE COURT:  -- so you didn't translate it?

11           THE WITNESS:  That's correct.

12           THE COURT:  Okay.  Counsel, there are parts of the

13   clips of the videos that you'd like to have Ms. Song

14   translate?

15           MR. CONWAY:  Yes, Your Honor.

16           What Mr. Bassett and I discussed was the numbers

17   of the clips that had, you know, questions translated, but

18   not answers, and so on.

19           And what we discussed was that, as the witness

20   indicated, as long as it have -- there be a pause each time

21   a portion was -- a portion of the testimony was given so

22   that it could be translated, that's the way we talked about

23   handling this here.

24           THE COURT:  All right.  So how would you want to

25   proceed?  Are we going through --

1           MR. CONWAY:  Playing the --

2           THE COURT:  You had mentioned three -- you had a

3      list it appeared to me of a few clips that you had questions

4      about.

5           MR. CONWAY:  Correct.  And I gave those numbers to

6      Mr. Bassett, who I assumed passed them on.

7           THE COURT:  Okay.  Okay.  So you're going to pulls

8      those up?  We're going to pull those up and we're going

9      through, okay.

10          MR. LUFT:  We will, Your Honor.

11          THE COURT:  So go ahead.  What clip are we going

12     to look at again first?

13          MR. LUFT:  My understanding the first clip Mr.

14     Conway wants to see is clip number three from Exhibit 21.

15          THE COURT:  Okay.

16          MR. LUFT:  So if I could ask that to be brought

17     up.

18          THE COURT:  Thank you.  That will happen

19     momentarily.

20       (Exhibit 21, clip three, played)

21          MR. LUFT:  And again, I'll ask that the witness be

22     allowed to just to ask that it be paused when she needs to

23     make sure that the translation is accurate and she has

24     sufficient time.

25          THE COURT:  Okay.  So we shall start again?

1          MR. LUFT:  Please, Your Honor.

2          THE COURT:  Okay.  Go right ahead.

3      (Exhibit 21, clip three, played)

4          THE WITNESS:  Please pause.

5          THE COURT:  Please pause.  Okay.

6          THE WITNESS:  So the man says the mansion is about

7   13 acres.  And the woman commented it's pretty big.  And the

8   man said it's pretty big.

9          THE COURT:  Okay.

10      (Exhibit 21, clip three, played)

11          THE WITNESS:  Please pause.

12          THE COURT:  Please pause.  Yeah.

13          THE WITNESS:  The woman says, sure, let's follow

14   (indiscernible) Brother and see the place.

15          THE COURT:  Say that again.  She's referring to

16   the gentleman?

17          THE WITNESS:  So the lady was saying, sure, let's

18   follow (indiscernible) Brother, which I believe is the

19   gentleman here in the video and see the place.

20          THE COURT:  Okay.  Thank you.

21      (Exhibit 21, clip three, played)

22          THE WITNESS:  The last bit that the woman was

23   saying is so this building.

24          THE COURT:  Okay.

25          MR. LUFT:  If Your Honor has no questions about

1   that, we can move to the next clip.

2             THE COURT:  Do you have any, Counsel?

3             MR. CONWAY:  No, Your Honor.  None.

4             THE COURT:  Okay.  Thank you.

5             Then let's move to the next clip.

6             MR. LUFT:  Thank you.

7             The next one is clip four.  Thank you.

8         (Exhibit 21, clip four, played)

9             THE WITNESS:  Please pause.

10            The woman says it has historical and cultural

11   values.

12        (Exhibit 21, clip four, played)

13            THE WITNESS:  Please pause.

14            She said this is the Palace of (indiscernible) the

15   United States.

16        (Exhibit 21, clip four, played)

17            MR. LUFT:  Can I ask for a pause.

18            THE COURT:  Pause, please.

19            MR. LUFT:  Your Honor, there had been a question

20   about reading the microphone.  I think this was a lot easier

21   to do at this point.

22            THE COURT:  Yeah.  I can see it.  I saw it a

23   minute ago as well.

24            MR. LUFT:  Okay.

25            THE COURT:  Thank you.

1          (Exhibit 21, clip four, played)

2                THE WITNESS:  Please pause.

3                He said inside the building we did a lot of

4     renovations.

5          (Exhibit 21, clip four, played)

6                THE WITNESS:  Please pause.

7                He said in the past year, the year of 2022, this

8     entire place has been renovated and was under renovation.

9          (Exhibit 21, clip four, played)

10               THE WITNESS:  Please pause.

11               He said now you can see some of the places are

12    still not done yet.  And we can see as we pass by that there

13    are still places under construction.

14         (Exhibit 21, clip four, played)

15               THE WITNESS:  Please pause.

16               So the lady says last time in April the 8th about

17    500 fellow (indiscernible) from 20 global farms went to see

18    this place for the first time.

19         (Exhibit 21, clip four, played)

20               THE WITNESS:  Please pause.

21               The last sentence she said before the translation

22    was, so they, meaning the fellow (indiscernible), they were

23    deeply touched.

24         (Exhibit 21, clip four, played)

25               THE WITNESS:  Please pause.

Luyi Song - Direct - Luft                                    63

1          So the man says this place is for the fellow

2     (indiscernible) to meet up.  The three C office was not big

3     enough.

4               THE COURT:  The what office?

5               THE WITNESS:  So I believe the three C office

6     they're referring to was the office at 3 Columbus Circle,

7     New York.

8               THE COURT:  Thank you.

9               MR. LUFT:  Your Honor, again, I'll turn to Mr.

10    Conway.

11              THE COURT:  Counsel, do you have any questions

12    about that?

13              MR. CONWAY:  I don't.  Thank you.

14              THE COURT:  Okay.  Thank you.

15              And what's the next clip?

16              MR. LUFT:  Clip five, Your Honor.

17              THE COURT:  Clip five.  Okay.

18         (Exhibit 21, clip five, played)

19              THE WITNESS:  Please pause.

20              I believe they were talking about the organ pipe

21    in the building and the man says last time a fellow

22    (indiscernible), I believe the name is Qmey, was playing it

23    and was able to produce a sound from the pipe.

24              THE COURT:  Could you spell that name Qmey,

25    please.

Fiore Reporting and Transcription Service, Inc.

1       THE WITNESS:  It's Q-M-E-Y.

2       THE COURT:  Thank you.

3    (Exhibit 21, clip five, played)

4       THE WITNESS:  And please pause.

5       The last sentence the man says was I believe he

6    was -- he meant the pipe was different from a piano.  So the

7    organ pipe is different from a piano.

8    (Exhibit 21, clip five, played)

9       THE WITNESS:  Please pause.

10       He said -- the man says this place for the past

11   few decades has been a seminary and it's a place of faith.

12   (Exhibit 21, clip five, played)

13       THE WITNESS:  Okay.  The last comment made by the

14   man was that this place is of historical importance and is a

15   historical relic.

16       THE COURT:  Anything further, Counsel?

17       MR. CONWAY:  Not on that, no.

18       THE COURT:  Okay.

19       MR. LUFT:  Your Honor, clip six is the next one

20   we've been requested to play.

21       THE COURT:  Clip six.  Okay.

22   (Exhibit 21, clip six, played)

23       THE WITNESS:  Please pause.

24       The party said before the translation starts was

25   the farms, the vegetable farms.

1          (Exhibit 21, clip six, played)

2                THE WITNESS:  The last part he says these have all

3     been -- I believe he meant to say under renovation or

4     construction.

5                MR. CONWAY:  Nothing from me.

6                THE COURT:  Nothing?  Okay.

7                MR. LUFT:  Okay.  Clip seven is the next one we've

8     been requested to play.

9                THE COURT:  Clip seven.

10         (Exhibit 21, clip seven, played)

11               THE WITNESS:  Please pause.

12               The man says this place for the past few decades

13    has been able to host two to 300 people, 100 to 200 people.

14    I'm sorry.

15         (Exhibit 21, clip seven, played)

16               THE WITNESS:  The last part he says, yes, 2000 to

17    3000 people in this place.

18               MR. LUFT:  Your Honor, Mr. Conway?

19               THE COURT:  Anything further?  Any questions,

20    Counsel?

21               MR. CONWAY:  No.  I appreciate the translation.

22               THE COURT:  Is that all the clips now?

23               MR. LUFT:  No, there's two more, Your Honor.

24               THE COURT:  That's fine.

25               MR. LUFT:  I apologize.

1              THE COURT:  That's fine.  That's not a problem.

2              MR. LUFT:  Clip eight is the next one we've been

3    asked to play.

4         (Exhibit 21, clip eight, played)

5              THE WITNESS:  Please pause.

6              He said the seminary, the old organ pipe, and

7    there's a sauna room here.

8         (Exhibit 21, clip eight, played)

9              THE WITNESS:  And the last word she said before

10   the translations start are entertainment facilities.

11        (Exhibit 21, clip eight, played)

12             THE WITNESS:  Please pause.

13             He said including how to receive these people, how

14   to manage the registration and sign up.

15             Would you mind going back maybe two or three

16   seconds?  I didn't catch the last part.  Thank you.

17        (Exhibit 21, clip eight, played)

18             THE WITNESS:  Please pause.

19             He said for G Club annual meeting for the premium

20   members and also for smaller groups of people.

21        (Exhibit 21, clip eight, played)

22             THE WITNESS:  Please pause.

23             He said how are we going to receive them?  There

24   will be plans in the future.

25        (Exhibit 21, clip eight, played)

1          THE WITNESS:  Please pause.

2          He said this place is where the G Club members can

3    enjoy.  And he also said the NFSC fellow fighters are also

4    welcome to come.

5       (Exhibit 21, clip eight, played)

6          THE WITNESS:  The last part she said, really,

7    (indiscernible) Brother, when I first joined the

8    whistleblower movement I never thought, and the clip ended.

9          THE COURT:  Thank you.

10          MR. CONWAY:  Thank you.

11          THE COURT:  And then we have the last?

12          MR. LUFT:  One more, Your Honor.

13          We've been asked to play clip ten.

14          THE COURTROOM DEPUTY:  I'm sorry.  You said clip

15    ten?

16          MR. LUFT:  Yes.

17          THE COURTROOM DEPUTY:  Okay.

18       (Exhibit 21, clip 10, played.

19          THE WITNESS:  Please pause.

20          So what the lady was saying before the

21    translations start was a group of Chinese people with dark

22    hair and yellow skin came to this place.

23       (Exhibit 21, clip ten, played)

24          THE WITNESS:  Please pause.

25          The last sentence the man says is in between this

1    place has been a seminary for a few decades.

2              THE COURT:  Anything --

3              MR. CONWAY:  Thank you.  That's it.  Are those the

4    clips?

5              MR. LUFT:  Your Honor, those are all the clips

6    we've been asked about.  If you have any questions for Ms.

7    Song, she's available.

8              THE COURT:  I don't have any further questions.

9    Thank you.  That was helpful to me.

10             So Counsel, do you have any further questions?

11             MR. CONWAY:  Just one, maybe two, depending on the

12   answer.

13             THE COURT:  Okay.  Go right ahead.

14             MR. CONWAY:  Thank you.

15                         CROSS-EXAMINATION

16   BY MR. CONWAY:

17   Q    Good afternoon.

18   A    Good afternoon.

19   Q    You mentioned that your native language is Chinese?

20   A    Correct.

21   Q    Which dialect?

22   A    Mandarin Chinese.

23   Q    And which dialect -- which dialect is being used in the

24   video?

25   A    Mandarin Chinese.

1    Q    Thank you.

2              THE COURT:  Anything further, Attorney Luft?

3              MR. LUFT:  No, Your Honor.

4              THE COURT:  Okay.  You can step down, Ms. Song.

5    Thank you very much.

6              THE WITNESS:  Thank you, Your Honor.

7         (Witness excused)

8              THE COURT:  All right.  Mr. Bassett?

9              MR. BASSETT:  Yes, Your Honor.

10             THE COURT:  You're now moving for the admission in

11   full of Exhibit 21?

12             MR. BASSETT:  Yes, Your Honor.

13             THE COURT:  Counsel, you stand on your objection?

14             MR. CONWAY:  Stand on the objection, Your Honor.

15             THE COURT:  Thank you.

16             All right.  I've considered the Exhibit 21 and the

17   objection from counsel, and I understand the objection, and

18   I understand the reasoning behind the objection, but I am

19   going to overrule the objection and admit Exhibit 21 as a

20   full exhibit.

21             And your objection is noted for the record.

22             MR. CONWAY:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24        (Trustee's Exhibit 21, with video labeled Exhibit 9 on

25   thumb drive, received in evidence)

1          MR. BASSETT:  Your Honor, at this point, if it

2     pleases the Court, we would continue the Trustee's

3     testimony.

4          THE COURT:  Yes, please.  Yes.  Thank you.

5          MR. BASSETT:  May the Trustee approach and --

6          THE COURT:  Yes.

7          MR. BASSETT:  Thank you.

8               LUC DESPINS, Previously Sworn

9               DIRECT EXAMINATION, Cont'd

10    BY MR. BASSETT:

11    Q    So, Mr. Despins, we have now talked about Exhibit 21 on

12    the Trustee's exhibit list.  We have a few more videos which

13    I think will go relatively quickly, at least more quickly

14    than Exhibit 21 did, that I'd like to -- additional video

15    exhibits that I would like to show you.

16         MR. BASSETT:  And if the courtroom deputy could

17    please pull up from the Trustee's exhibit list on ECF the

18    PDF exhibit page for Exhibit 24.  Thank you very much.  And

19    then if you can scroll to the page, please.

20    BY MR. BASSETT:

21    Q    So earlier, Mr. Despins, I asked you if you had clicked

22    on the links for each of Exhibits 21 through 27.  I believe

23    that you said you did.  Did you, for this Exhibit 24, did

24    you visit that link this morning?

25    A    Yes, I did.

Luc Despins - Direct - Bassett                                          71

1    Q    And does what is shown here on this Exhibit 24, is that

2    consistent with what you saw when you visited that website

3    this morning?

4    A    It is.

5    Q    And again, you see at the top it says the New Federal

6    State of China, is it your understanding that this is a

7    website associated with the New Federal State of China?

8    A    Yes, it is.

9    Q    And then this black, again this black box that has the

10   rectangle in the middle of the screen, with the April 9th,

11   2023 date on the left-hand side, is that to your

12   understanding a video?

13   A    Yes, that's a video I watched.

14   Q    You watched that video this morning?

15   A    Yes.

16   Q    Okay.  And you previously described a process by which

17   Paul Hastings' personnel, working with a vendor, preserved

18   and created slips of videos.  Is it your understanding that

19   they created a clip of this video too?

20   A    That's correct.

21        MR. BASSETT:  With that, I would like to play for

22   the Court what is marked on the thumb drive as I believe

23   Exhibit 22, which corresponds to Trustee's Exhibit 24.

24        (Exhibit 24, with video labeled Exhibit 22 on thumb

25   drive, played)

1    BY MR. BASSETT:

2    Q    Mr. Despins, is that the video that you saw when you

3    visited the link for Exhibit 24 earlier this morning?

4    A    Yes, it is.

5    Q    And do you recognize the building or structure that

6    appears in the background of this video?

7    A    Yeah.  The Mahwah mansion, yes.

8         MR. BASSETT:  And this, Your Honor, was the full,

9    this is not a clipped version, it's the full version of the

10   video for the record.  And that is not a translation that we

11   provided.  That's a translation, as I described to counsel,

12   that was actually on the video posted online.

13        With that, Your Honor, we would move for the

14   admission of Trustee's Exhibit 24.

15        THE COURT:  Thank you.

16        Counsel?

17        MR. CONWAY:  Thank you, Your Honor.

18        Similar to the last video, the foundation has not

19   been properly laid as to how this video was made, who the

20   speakers are, what their -- what their reason for saying the

21   things that they're saying on this video or the manner in

22   which this video was created or even preserved here for us

23   today.

24        And based on that, even though again this is a

25   preliminary injunction hearing, I believe that the hearsay

1    objection is also well taken.

2             THE COURT:  Thank you.

3             Attorney Bassett?

4             MR. BASSETT:  Your Honor, I won't repeat points

5    that have already been made.  The Court has already made

6    findings with respect to NFSC.

7             Your Honor will also recognize the G Translator's

8    logo in the upper, right-hand corner, which also was the

9    subject of prior testimony and evidence before this court.

10            I think we have laid the foundation for this

11   document by the Trustee having testified as to the process

12   by which it was preserved, the fact that it is located on

13   the NFSC website.

14            And as to the hearsay issue that counsel raised, I

15   would note that we are in large part introducing this

16   exhibit to show the level of activity that is occurring at

17   the Mahwah mansion, the people going in and out, which I

18   kind of alluded to earlier.  It almost looks like a building

19   on a college campus.  That's not hearsay.  That can plainly

20   be seen from the video itself.

21            And for all those reasons, Your Honor, we think

22   this video is admissible and we would ask for it to be

23   admitted into evidence.

24            THE COURT:  Okay.  Any response, Counsel?

25            MR. CONWAY:  Only that there's been a number of

1    references to other litigation where things had been proven

2    and I wasn't there and I don't think they relate to this

3    case.

4              I would agree though that this reminds me of my

5    college campus.

6              THE COURT:  Exhibit 24 and the video Exhibit 22 on

7    the thumb drive are admitted in full over objection.

8              MR. BASSETT:  Thank you, Your Honor.

9         (Trustee's Exhibit 24, with video labeled Exhibit 22 on

10   thumb drive, received in evidence)

11             MR. BASSETT:  At this point, I would like to go

12   back to the exhibit list itself.

13             And if the courtroom deputy could please pull up

14   the cover page for Exhibit 25.  Thank you.

15             You'll see there is a URL there like there has

16   been on the last exhibits.  And then if we scroll down to

17   the next page, please.

18   BY MR. BASSETT:

19   Q    Trustee Despins, did you also visit the link this

20   morning associated with this video?

21   A    Yes, I did.

22   Q    And did it take you to a webpage that looks like the

23   one that appears here on Trustee's Exhibit 25?

24   A    Correct.

25   Q    And again, this is the New Federal State of China

1    website like the last video?

2    A    It is.

3    Q    And you instructed your team with the assistance of a

4    vendor to preserve the video that appears on the screen?

5    A    We did.

6         MR. BASSETT:  With that, I would like to play this

7    video which is at, again, it's Trustee's Exhibit 25, but on

8    the thumb drive this one is labeled as Exhibit 23.

9         (Exhibit 25, with video labeled Exhibit 23 on thumb

10   drive, played)

11   BY MR. BASSETT:

12   Q    Mr. Despins, was this video that we just saw the same

13   video that you saw when you clicked on the link for Exhibit

14   25 this morning?

15   A    It is.

16   Q    There were some -- if you were following along, there

17   were some mentions in the translated text to a Brother

18   Seven.  Based on your experience in this case or otherwise,

19   do you have an understanding of who that's a reference to?

20   A    Yeah.  That's an alias for Mr. Kwok.  It's referred to

21   in many documents.  And the indictment actually refers to

22   Brother Seven.

23        MR. BASSETT:  I would just note for the Court

24   again the date of this video is April 9th, 2023.  According

25   to the image on the screen there, there's a New Federal

1    State of China logo in the bottom left.  And then in the top

2    right, again, we see G Translators.

3              With that, the Trustee would move for the

4    admission of the video that appears at Trustee's Exhibit 25.

5              THE COURT:  Counsel?

6              MR. CONWAY:  Your Honor, if I may, may I

7    incorporate by reference my objection to Exhibit 24?

8              THE COURT:  Yes, you may.  Thank you.

9              MR. CONWAY:  Okay.  Same objection.

10             THE COURT:  Thank you.

11             Exhibit 25, that's just the cover page, and

12   Exhibit 23 on the thumb drive, which is the corresponding

13   video, are admitted in full over objection.

14             MR. BASSETT:  Thank you, Your Honor.

15        (Trustee's Exhibit 25, with video labeled Exhibit 23 on

16   thumb drive, received in evidence)

17             MR. BASSETT:  At this point, if we could do the

18   same exercise pulling up the PDF slip sheet for Trustee's

19   Exhibit 26.  Again, this exhibit slip sheet contains a URL

20   there.  And if you scroll down to the page.

21   BY MR. BASSETT:

22   Q    Trustee Despins, was this another URL that you clicked

23   on this morning?

24   A    Yes, it is.

25   Q    And again, it's to the New Federal State of China

1    website?

2    A    Correct.

3    Q    And there's a video on this page?

4    A    Yes, there is.

5    Q    Is this one of the videos that you asked your team to

6    preserve according to the process we talked about this

7    morning?

8    A    Yes, it is.

9         MR. BASSETT:  With that, I would like to play the

10   video associated with Trustee's Exhibit 26, which was

11   labeled as Exhibit 24 on the thumb drive.

12        (Exhibit 26, with video labeled Exhibit 24 on thumb

13   drive, played)

14   BY MR. BASSETT:

15   Q    Trustee Despins, the clip that we just watched, was

16   that the same video that you viewed this morning when you

17   clicked on the link associated with Trustee Exhibit 26?

18   A    Yes, it was.

19        MR. BASSETT:  With that, Your Honor, we would

20   similarly move for the admission of Trustee's Exhibit 26 and

21   the associated video clip at Exhibit 24 of the thumb drive

22   into evidence.

23        THE COURT:  Counsel?

24        MR. CONWAY:  Your Honor, may I incorporate by

25   reference my objection to Exhibits 24 and 25?

1          THE COURT:  Yes, you may.  Thank you.

2          MR. CONWAY:  Same objection.

3          THE COURT:  Exhibit 26 with the corresponding

4    video on Exhibit 24 are admitted in full over objection.

5          MR. BASSETT:  Thank you, Your Honor.

6      (Trustee's Exhibit 26, with video labeled Exhibit 24 on

7    thumb drive, received in evidence)

8          MR. BASSETT:  And we just have three more of

9    these.

10         If I could please ask the courtroom deputy at this

11   time to pull up on the screen the exhibit slip sheet

12   associated with Trustee Exhibit 27.

13         Like the other exhibits, there's a URL on the

14   first page of the exhibit, of Exhibit 27.  If you scroll

15   down to the second page, please.

16   BY MR. BASSETT:

17   Q    Trustee Despins, is that URL on the first page another

18   URL that you visited this morning?

19   A    Yes, absolutely.

20   Q    Did it take you to a webpage that looks like the one

21   that appears here on Exhibit 27?

22   A    Yes.

23   Q    We talked about this earlier, but do you understand

24   this to be the website GETTR?

25   A    Yes, I do.

1    Q    Again, we talked about this, but there's NFSCTV with a

2    red checkmark next to it, correct?

3    A    Correct.

4    Q    And you asked your colleagues to preserve a clip of

5    this video in the same way that we discussed earlier, your

6    team?

7    A    Yes.

8         MR. BASSETT:  With that, I'd like to please have

9    the courtroom deputy play if we can Exhibit 27, which is on

10   the thumb drive Exhibit 25.

11        And I would note for the Court at the bottom of

12   this it says NFSC third anniversary associated with the

13   caption of the video.

14        (Exhibit 27, with video labeled Exhibit 25 on thumb

15   drive, played)

16   BY MR. BASSETT:

17   Q    Trustee Despins, was that clip that you just saw part

18   of the video that you watched when you clicked on the link

19   associated with Exhibit 25?

20   A    Yes, it is.

21        MR. BASSETT:  With that, Your Honor, we would move

22   for the admission of Trustee's Exhibit 27.  Sorry.  I think

23   I referred to it as Exhibit 25.  It's Exhibit 25 on the

24   thumb drive, but it's Trustee's Exhibit 27.  We would move

25   for the admission Trustee's Exhibit 27, as well as the clip

1    appearing on the thumb drive at Exhibit 25 that we just

2    watched.

3              THE COURT:  Thank you.

4              Counsel?

5              MR. CONWAY:  Your Honor, may I incorporate by

6    reference my objection stated to Exhibit 24?

7              THE COURT:  You may.  Thank you.

8              MR. CONWAY:  Objection is foundation.

9              THE COURT:  Exhibit 27 with the corresponding

10   video on the thumb drive as Exhibit 25 are admitted in full

11   over objection.

12        (Trustee's Exhibit 27, with video labeled Exhibit 25 on

13   thumb drive, received in evidence exhibit)

14             MR. BASSETT:  Thank you, Your Honor.

15             At this point, there are just two more exhibits.

16   The first one is Trustee's Exhibit 22.

17             And again, if I could ask the courtroom deputy to

18   please bring up the exhibit slip sheet associated with that

19   exhibit.  Again, Exhibit 22 has a URL link.  If you scroll

20   down to the second page.

21   BY MR. BASSETT:

22   Q    Trustee Despins, is this the link that we just saw in

23   the first page of Trustee's Exhibit 22?  Is that another

24   link that you have clicked on this morning?

25   A    Yes, it is.

1    Q    And did you ask your team to preserve the video

2    appearing at that link in accordance with the process you

3    described this morning?

4    A    Yes, I did.

5    Q    And again, as we had discussed, this is a -- this link

6    is of a GETTR page, is that right?

7    A    That's correct.

8    Q    And here, instead of NFSCTV, it says Miles Guo with a

9    checkmark next to it, do you see that?

10   A    Yes, I do.

11   Q    What do you understand that signifies?

12   A    That it's -- it's his account, because with the red

13   check that means it's certified to be his account.

14          MR. BASSETT:  With that, I would ask the courtroom

15   deputy to please play the video on the thumb drive

16   associated with Trustee's Exhibit 22, which Exhibit 20 on

17   the thumb drive.

18          And just for the record and the Court, this

19   exhibit and the next one are in the language being spoken is

20   Mandarin.  We did not translate it because we're not

21   offering it for any substance of what's said.  We're just

22   offering it for the images that appear on the screen.

23      (Exhibit 22, with video labeled Exhibit 20 on thumb

24   drive, played)

25   BY MR. BASSETT:

1    Q     Trustee Despins, is that the video that you saw when

2    you clicked on the link associated with Trustee Exhibit 22?

3    A     Yes, it is.

4          MR. BASSETT:  And again, Your Honor, we're just

5    admitting this for the purpose of showing Mr. Kwok on the

6    post, which as the exhibit slip sheet indicated was a

7    January 11th, 2023 post.  We're just admitting this to show

8    that Mr. Kwok was filming the video as you can see from the

9    camera from the same location in the mansion that other

10   videos have been filmed that we have seen.

11          And with that, we would move for admission of

12   Exhibit 22 and the associated clip at Exhibit 20.

13          THE COURT:  Counsel?

14          MR. CONWAY:  Yes, Your Honor.  The same foundation

15   objection as raised to Exhibit 24.  If I may incorporate

16   that by reference?

17          THE COURT:  Yes, you may.  Thank you.

18          Plaintiff's Exhibit 22 with the corresponding

19   video at Exhibit 20 is admitted in full over objection.

20          MR. BASSETT:  Thank you, Your Honor.

21          (Trustee's Exhibit 22, with video labeled Exhibit 20 on

22   thumb drive, received in evidence)

23          MR. BASSETT:  The last and final video clip

24   appears at Trustee Exhibit 23,

25          And if I could please ask the courtroom deputy to

1    bring up the slip sheet for Exhibit 23.

2           Yet again, we see a link to a URL here.  If you

3    scroll to the second page, please.

4    BY MR. BASSETT:

5    Q    Trustee Despins, is this -- does this image on the

6    screen here, is that what you found when you clicked on the

7    link that we saw on the first page this morning?

8    A    Yes, it is.

9    Q    And you asked your team to preserve a video that was

10   contained on this post?

11   A    Yes, I did.

12          MR. BASSETT:  If we could please play the video

13   associated with Exhibit 23, which is on the thumb drive as

14   Exhibit 21.

15       (Exhibit 23, with video labeled Exhibit 21 on thumb

16   drive, played)

17          MR. BASSETT:  Could you please pause the video.

18          Your Honor, just to save us all a minute and 44

19   seconds, I was going to note that like the last video we are

20   simply introducing this for the purpose of showing that this

21   is a video with a date label of February 19th, 2023 with an

22   individual readily identified as Mr. Kwok on the screen

23   filming a video in what appears to be the same location in

24   the mansion.  There's nothing translated and we're not

25   offering it for the substance of what he's saying.

1          So I'm happy to play the whole thing, but if it

2    would speed things up we would at this point, subject to any

3    objections or issues the Court may have, we would offer

4    Exhibit 22 into evidence, which, I'm sorry, Exhibit 23 into

5    evidence, which his on the thumb drive Exhibit 21.

6          THE COURT:  Counsel, would you like to see the

7    whole video?

8          MR. CONWAY:  I don't need to see the whole video,

9    Your Honor.

10         I would ask -- I would still object on foundation

11   grounds for the same reasons I objected to Exhibit 24 and

12   22, if I can incorporate those objections by reference?

13         THE COURT:  Yes, you may.  Thank you.

14         Plaintiff's Exhibit 23 with the corresponding

15   video on the thumb drive as Exhibit 21 is admitted in full

16   over objection.

17         MR. BASSETT:  Thank you, Your Honor.

18         (Trustee's Exhibit 23, with video labeled Exhibit 21 on

19   thumb drive, received in evidence)

20         MR. BASSETT:  At this point, I would like to ask

21   the Trustee some questions about a few additional exhibits.

22   Thankfully these are not video exhibits, so I think these

23   will go more quickly.

24   BY MR. BASSETT:

25   Q    But, Trustee Despins, if you could please turn in your

1    exhibit binder to what is marked as Trustee Exhibit 13.

2              MR. BASSETT:  And if we could similarly have the

3    courtroom deputy please pull that exhibit up on the screen,

4    that would be much appreciated.  Please scroll up to the

5    first page.  Thank you.  Thank you.  And go back to the

6    other page.

7    BY MR. BASSETT:

8    Q    Trustee Despins, do you recognize what appears here as

9    Trustee Exhibit 13?

10   A    Yes, I do.

11   Q    What do you understand this to be?

12   A    It's the inside pocket of one of I believe 29 suits

13   that were found by the FBI when they did the search,

14   executed search warrant, at the Mahwah mansion on March

15   15th.

16   Q    How did you get a copy of this picture?

17   A    The Department of Justice prosecution of Mr. Kwok is

18   led by an Assistant U.S. Attorney, Juliana Murray, who -- I

19   called her in early July to get pictures of what the FBI had

20   found at the mansion when they executed their search

21   warrant, and she provided numerous pictures, and we selected

22   I guess, you know, ten best of and that would be one of

23   them.

24   Q    So Ms. Murray is the person you spoke to?

25   A    Correct.

Luc Despins - Direct - Bassett                                86

1    Q    And she communicated to you that this image was an

2    image taken by the FBI at the time they raided the mansion

3    on March 15th, 2023?

4    A    That's correct.

5    Q    Did she tell you anything else about where they found

6    it, for example?

7    A    Yeah.  It was found in a dressing room believed to be

8    the dressing room of Mr. Kwok in the mansion.

9    Q    And I think you said, I think you may have mentioned

10   like 29 other, did she say this was like an example of one

11   suit?

12   A    Yeah.  That's just a sample of one, yeah.

13   Q    What did she say about the other ones?

14   A    That they all have that label.

15           MR. BASSETT:  With that, Your Honor, we would move

16   for the admission of Trustee's Exhibit 13 into evidence.

17           THE COURT:  Counsel?

18           MR. CONWAY:  Foundation objection, Your Honor.

19   There's no foundation that this was actually something that

20   was found at a location, but I understand the testimony.

21           MR. BASSETT:  Your Honor, we've laid the

22   foundation through Mr. Despins' testimony of his

23   conversation with representatives of the U.S. Government

24   with direct knowledge of how these images were obtained

25   during the raid on March 15th.

1          Again, I will stress that in this circuit hearsay

2     testimony is admissible, hearsay evidence is admissible.

3     And to the extent that counsel would take issue with that

4     hearsay, it only goes to the weight of the evidence at this

5     stage, not to its admissibility.

6          THE COURT:  Anything further, Counsel?

7          MR. CONWAY:  Only to reiterate that my objection

8     is on foundation.  This photograph was apparently culled out

9     from photographs.  We don't know that this was a photograph

10    that was referred to by an FBI agent, what have you.  So

11    regardless of whether it's hearsay or not, my objection is

12    to foundation.

13         MR. BASSETT:  And just to be clear, Your Honor, my

14    position is that we have laid the foundation through Mr.

15    Despins's testimony, which was about his conversations with

16    the representatives of the Government.

17         To the extent that Trustee Despins' testimony

18    consists of hearsay, i.e., his conversations with

19    representatives of the Government, that is admissible at

20    this stage of this proceeding.

21         THE COURT:  Okay.  Trustee's Exhibit 13 is

22    admitted in full over objection.

23         MR. BASSETT:  Thank you, Your Honor.

24         (Trustee's Exhibit 13 received in evidence)

25         MR. BASSETT:  If I could please ask the courtroom

1    deputy to pull up the next exhibit, Exhibit 14.  And scroll

2    to the second page, please.  Thank you.

3    BY MR. BASSETT:

4    Q    And, Trustee Despins, Trustee's Exhibit 14, which has

5    images of documents, some of which are redacted, I think

6    everyone in the court can see that there's a learner's

7    permit from New York State that says Kwok Ho Wan on it, and

8    other documents also containing his name.

9           Trustee Despins, do you have an understanding of

10   where this document came from?

11   A    It's the same.  That's a picture provided to us by the

12   Department of Justice reflecting pictures taken by the FBI

13   on March 15th, except that we redacted personal information

14   about Mr. Kwok from these documents.

15   Q    Okay.  And when you say found during the raid, you mean

16   of the Mahwah mansion?

17   A    Yes, the execution of the search warrant.

18          MR. BASSETT:  So without belaboring it, Your

19   Honor, we would offer Trustee's Exhibit 14 into evidence.

20          THE COURT:  Counsel?

21          MR. CONWAY:  Without belaboring it, Your Honor,

22   I'd like to make the same foundation objection as I made to

23   Exhibit 13.

24          THE COURT:  Thank you.  So noted.

25          Trustee's Exhibit 14 is admitted in full over

1    objection.

2         (Trustee's Exhibit 14 received in evidence)

3         MR. BASSETT:  And there are five more of these,

4    Your Honor, Exhibits 15, 16, 17, 18 and 19.  Just to

5    expedite the course of the hearing today, I may ask if I

6    could just publish each exhibit one by one and then ask the

7    Trustee sort of to confirm that each of those additional

8    exhibits was obtained in the same way.  I think that may

9    make things move a little bit more quickly than asking the

10   same questions as to each exhibit if that's acceptable to

11   the Court.

12        THE COURT:  Counsel, do you have an opposition to

13   the suggestion that the Exhibits 15, 16, 17 and 18 be taken

14   together essentially, and then we can see what the answers

15   are to the questions?

16        MR. CONWAY:  I think that's a reasonable way to go

17   about this.

18        THE COURT:  Thank you.

19        MR. BASSETT:  Thank you.

20        THE COURT:  Go ahead, Attorney Bassett.

21        MR. BASSETT:  Thank you very much, Your Honor.

22        So if we could please pull up Exhibit 15 and

23   scroll to the second page.

24        I would just note for the record that you see

25   images that appear to contain, as the Court is aware, images

1  of the debtor and his family members.

2           If we could please go to Trustee's Exhibit 16.

3           On this exhibit I would note for the record,

4  although the font is fairly small, on the left-hand side of

5  the page, you see what says, I believe that's Italian if I'm

6  not mistaken at the top, and it says certificate of

7  authenticity in English underneath it.

8           And if you look at the English part of that page,

9  it says Ferrari certifies the authenticity of this Speed

10 Form.  And then it goes on.

11          If you look at the letter on the right, it says

12 Dear Mr. Guo.  And then there's a letter, which I won't read

13 in its entirety, but it begins with it is a great pleasure

14 for me to know that being one of our most affectionate

15 customers you have decided to purchase a Ferrari Speedform.

16          And then it goes on and it bears the signature of

17 somebody who has underneath their name senior vice president

18 for commercial and marketing.

19          And then there's, I would also note for the record

20 a piece of paper, at the bottom that's on the right-hand

21 side of the page, states among other things location found,

22 and it says Room E, and there's a reference to a buffet

23 cabinet, middle section.

24          With that, if the courtroom deputy could please

25 put up Trustee's Exhibit 17.

Luc Despins - Direct - Bassett                                    91

1           As to this image, I would note for the Court that

2     there is a prescription medication bottle bearing the name

3     Ho Wan Kwok.  Again, we've redacted sensitive, personal

4     information from the image.  I would note that there's a

5     piece of paper there which says, among other things,

6     location found, and it mentions a mirrored dresser near

7     window.

8           With that, if the courtroom deputy could please

9     bring up Trustee Exhibit 18.  You wouldn't mind zooming in.

10          And I think what can be seen on the screen here is

11    yet another document bearing what appears to be, although

12    it's up to the Court's judgment, an image of the debtor and

13    has his name Kwok Ho Wan on it.

14          With that, the last image is Exhibit 19.  If the

15    courtroom deputy could please pull that up.

16          This image I would note for the record, it says at

17    the top, Cedric DuPont Antiques.  It says certain things

18    were sold to Taurus Fund, LLC.  It's a little dark, but in

19    the upper, right-hand corner, you could see the date

20    2/11/2022, so February 11th, 2022.

21          And then if you scroll down, I would note that

22    February 11th, 2022 was, if I'm not mistaken, four days

23    before the Chapter 11 petition date in this case.

24          And if you look at this invoice, there are a

25    number of antique items listed.

1          First we have wrought iron and marble center

2     table.  Then we have what appear to be certain mirrors.

3     Then we have a magnificent pair of 19th century Italian

4     gilt-wood mirrors.  Next there's a beautiful Italian 18th

5     century, circa 1780, gilt-wood mirror from Tuscany.  And

6     you'll see below that one there's a checkmark and it says

7     boss's bedroom.  The next one below that is a reference to a

8     French mid 19th century, another mirror.  And if you look

9     under that one, it says -- there's the words Mei's

10    bedroom/bathroom.  And as the Court is aware, I would note

11    that the debtor's daughter's name is Mei Guo.  Last on this

12    is reference to a spectacular and elegant early 19th century

13    Italian mirror.

14         And all total, on this invoice, the apparent cost

15    of these items as invoiced is $218,078 according to what

16    appears at the bottom of the invoice there on the right-hand

17    side.

18         THE WITNESS:  And also I would add, Your Honor, on

19    the top, right-hand corner it says ship to and that says

20    ship to the mansion in Mahwah.

21         MR. BASSETT:  Thank you.

22         With that, Your Honor, that covers all of the

23    similar picture exhibits that's Trustee's Exhibits 15

24    through 19.

25    BY MR. BASSETT:

1   Q    Trustee Despins, having looked at Exhibits 15 through

2   19, were these images ones that you obtained from the

3   Department of Justice in the manner that you described for

4   Trustee Exhibit 13 and 14?

5   A    That's correct.

6          MR. BASSETT:  So with that --

7   BY MR. BASSETT:

8   Q    And your understanding is that these are images that

9   the DOJ told you were taken of items found in the Mahwah

10  mansion on the day of the raid on March 15th, 2023?

11  A    That's correct.

12         MR. BASSETT:  So with that, Your Honor, we would

13  move for the admission of Trustee Exhibits 15 through 19

14  into evidence.

15         THE COURT:  Thank you.

16         Counsel?

17         MR. CONWAY:  Similar objection on foundation

18  grounds that was made to Exhibits 13 and 14.  If I can

19  incorporate that by reference?

20         THE COURT:  Thank you.  Your objection is noted.

21         Trustee's Exhibits 15, 16, 17, 18 and 19 are

22  admitted in full over objection.

23         MR. BASSETT:  Thank you, Your Honor.

24     (Trustee's Exhibit 15 received in evidence)

25     (Trustee's Exhibit 16 received in evidence)

1        (Trustee's Exhibit 17 received in evidence)

2        (Trustee's Exhibit 18 received in evidence)

3        (Trustee's Exhibit 19 received in evidence)

4              MR. BASSETT:  At this point, I have just a couple

5    of questions for the Trustee about certain other exhibits.

6    BY MR. BASSETT:

7    Q    If you could please turn to Trustee Exhibit 4 that

8    appears in your binder.

9              MR. BASSETT:  If we could please also have Trustee

10   Exhibit 4 brought up on the screen.

11   BY MR. BASSETT:

12   Q    Trustee Despins, do you have an understanding of what

13   this exhibit is?

14   A    Yes.  It's a screenshot of the Secretary of State of

15   Nevada's website of a particular element of that website.

16   Not the whole website, but what's relevant to Taurus Fund.

17   Q    And do you have any understanding of how this was

18   obtained?

19   A    Yeah.  I've asked the team to go and pull from the

20   website whatever information could be derived about these

21   Taurus entities.

22   Q    And this screenshot is what they captured from the

23   Secretary of State website?

24   A    That's correct.

25              MR. BASSETT:  Your Honor, we are offering this

1    exhibit for the primary purpose of showing that the entity

2    status as reported by the Secretary of State website for

3    Taurus Fund, LLC is in default as appears about midway down

4    the page.  I don't think that's controversial.  But for that

5    purpose, we would offer Trustee Exhibit 4 into evidence.

6                THE COURT:  Counsel?

7                MR. CONWAY:  No objection.

8                THE COURT:  Thank you.

9                Admitted 4, excuse me, Exhibit 4 is admitted in

10   full.

11               MR. BASSETT:  Thank you, Your Honor.

12          (Trustee's Exhibit 4 received in evidence)

13   BY MR. BASSETT:

14   Q    If I could next direct your attention, Trustee Despins,

15   to Trustee Exhibit 12.  Trustee Despins, do you know what

16   this exhibit is?

17   A    Yeah.  It's a screenshot from a LexisNexis search.  So

18   obviously the Court is familiar with LexisNexis, but we use

19   it all the time to do searches.  And I had instructed the

20   team to do a search on Mr. Kwok and it produce this result

21   showing him having an address at the Mahwah mansion.

22   Q    And when was this search performed?

23   A    I want to say July.  I forget the precise.  I think it

24   -- yeah, July 11th.

25               MR. BASSETT:  With that, Your Honor, we would

1    offer Trustee Exhibit 12 into evidence.

2              THE COURT:  Counsel?

3              MR. CONWAY:  Subject to my examination, obviously

4    I have no objection.

5              THE COURT:  Thank you.

6              Exhibit 12 is admitted in full.

7         (Trustee Exhibit 12 received in evidence)

8              MR. BASSETT:  The last exhibit that I intend to

9    show the Trustee, and again, I think I can go through the

10   rest of our exhibits without requiring the Trustee in the

11   witness stand, the next one is Trustee Exhibit 6.

12             If I could please have that pulled up on the

13   screen.

14             THE WITNESS:  Yes.

15   BY MR. BASSETT:

16   Q    Take your time.  And, Trustee Despins, when you're

17   ready, I'm just going to ask you if you recognize this

18   exhibit?

19   A    I do.

20   Q    And what is this?

21   A    It's a certificate of insurance or a declaration page

22   of a policy issued by AIG to Golden Spring with respect to

23   certain luxury cars.

24   Q    And how did you obtain or do you know where this policy

25   was obtained from?

1    A    Yes, from Wolfson, our broker, or the broker for

2    Genever, what we call Genever U.S., because Mr. Linsey, who

3    is our counsel in Connecticut, was inquiring about the

4    insurance coverage for Genever U.S.

5         And the broker produced this and said basically

6    Genever U.S. is paying for insurance for these cars.  And

7    that's when he started asking, saying how can that be given

8    that the name of the insured is Golden Spring?  And that's

9    how we got -- that's what they sent us basically.

10   Q    Thank you.  And you had mentioned that this was for

11   certain luxury automobiles.

12        MR. BASSETT:  If you could scroll down to the

13   second page of this, please.

14        I just want to direct the Court's attention to the

15   bottom of the page where it has description of drivers.  The

16   second driver there listed is Gerald Scott Barnett.  And

17   above that you'll see the automobiles covered according to

18   this policy are three different Mercedes, each worth in

19   excess of $100,000 according to the decreed value stated

20   here.

21        With that, Your Honor, we would offer Trustee

22   Exhibit 6 into evidence.

23        THE COURT:  Counsel?

24        MR. CONWAY:  No objection.

25        THE COURT:  Thank you.

1          Exhibit 6 is admitted in full.

2              MR. BASSETT:  Thank you very much, Your Honor.

3          (Trustee Exhibit 6 received in evidence)

4              MR. BASSETT:  I now have a couple or a few

5      questions for the Trustee on a related topic.

6      BY MR. BASSETT:

7      Q    Mr. Despins, at the beginning of the hearing today we

8      took a look at the affidavit that you filed in this case.

9      And my recollection is that in that affidavit you spent a

10     fair amount of time explaining why you believe the estate

11     will be harmed if there's not an injunction.  I just wanted

12     to ask you a few additional questions on that topic.

13              And it's my understanding, Trustee Despins, that

14     some of the relief that you're seeking, there was a dialog

15     about this earlier, is not just to prevent the property from

16     being sold or encumbered, but you are seeking relief that

17     would require people occupying the property to vacate the

18     property, that the mansion be secured, and that the Court

19     authorize the assistance of the U.S. Marshal's Office.

20              And my question for you is why do you believe that

21     that type of relief is necessary?

22     A    Well, that's a multi-fold answer, but I would start

23     with what we saw today, which is there's -- there are a

24     number of art pieces, art work, in that -- in that house.

25     So those are not bolted down.  They're not -- they can leave

1    at, you know, they can be, you know, they can disappear.

2    And the testimony, well the testimony, the colloquy between

3    the two people doing the visit was that the art work is more

4    -- is worth more than the house itself.  That's not

5    evidence, but I know that that art work is worth hundreds of

6    thousands of dollars, if not millions, because we see that

7    from the receipt of the mirrors used in Mei Guo's room and,

8    et cetera, et cetera.  So the point is we know there is very

9    expensive art work.

10        So to say that the house won't be sold and that's

11   protection. or people will not dispose of any of those

12   assets is, you know, that's a nice statement of intent, but

13   practically that's not enforceable.  And let me explain what

14   I mean by that.

15        The company Taurus, LLC, Taurus Fund, LLC, that's

16   a company that was created the day this property was

17   acquired.  It doesn't have any other assets as far as we

18   know except for the piano, we'll come back to the piano

19   later, but it doesn't have any other assets other than the

20   Mahwah mansion.

21        Our theory of the case is that the Trustee,

22   because Mr. Kwok as the owner, or the Trustee, owns that

23   property.

24        So to have that entity give us some sort of

25   commitment or agreement not to do bad things is -- I don't

1   want to be rude about this, but it's worthless because

2   that's me giving a representation to myself.  Meaning that

3   if they don't do that, if bad things happen, the claim is

4   against that entity whose sole asset is the Mahwah mansion.

5   So it's kind of circular.

6           If there are some individuals that are -- that

7   have money, real money, that are willing to sign a

8   guarantee, personal guarantee, to guarantee the protection

9   of the property, I'm all ears.

10          But to have the company that owns it in theory,

11  when we clearly believe that they don't own it and believe

12  that there's strong evidence that they don't own it, is, you

13  know, doesn't solve the problem.

14          So there are very expensive assets in there that

15  can be removed.  The property itself could be damaged.

16          And you have, what we've established here, is

17  there's transient, the people -- it's like a college dorm.

18  People are walking in.  And they may have the best of

19  intentions, I don't know that.

20          But I know one thing is that once they know that

21  we're coming after the property, and now they do know, they

22  hadn't known that before, but now they do know that we're

23  coming after the mansion, and if they think that they're

24  going to lose that battle, then it's a different ball game

25  completely, because it's not the same incentive to protect

1    their, what they call their sanctuary, because they're very

2    likely to lose the sanctuary.

3          And those people are not accountable.  We don't

4    know who they are.  We don't know who goes in, who goes out,

5    what governs that.

6          And the fact that Taurus itself, the alleged

7    owner, is fighting to give -- to continue to give access to

8    all these people tells you everything you need to know.

9          Meaning why would -- if the company is owned by

10   Warren Buffett, he wouldn't care about who's in the

11   property, he would want to protect the property.

12         But Taurus wants these people to go in there

13   because Taurus is Kwok.  That tells -- you know, that's the

14   -- that's the whole premise of this.

15         So there's a real risk here.  And we know of

16   assets being secreted.

17         So you might say the mansion is not going to move

18   itself.  Fine.  Could be damaged.  But we know from many

19   examples.

20         We know recently, and based on what happened in

21   the criminal case involving Yvette Wang, and a release on

22   bail, that the Government submitted evidence that Ms. Wang

23   was giving instructions from jail on how to empty P.O. boxes

24   for G Club containing millions of dollars in checks or

25   currency.  So that's one item.  So meaning that people will

1    not hesitate to do things like that.

2           Then we know that the, you know, that Ms. Wang

3    transferred the title to Ace Decade to a Swiss resident

4    because that makes it very hard for us to go and grab that

5    asset.  Well, not grab the asset, but to serve that person

6    in Switzerland, because all sorts of rules involving

7    international service of process in Switzerland.

8           We know that the debtor's daughter has, you know,

9    sold an airplane during the case that clearly as a 29-year-

10   old she doesn't own a Bombardier Jet that's worth, you know,

11   probably $15 million.  She sold it for more than $10

12   million.  And when we asked her who holds the funds, the

13   only answer is a guy.

14          So there's a pattern here that -- and there are

15   many other examples throughout the case of assets being

16   secreted away.

17          And you might say, well, that's Mei Guo, that's

18   not them.

19          The point is that at this point it's clear that

20   they're acting as a team.  And it is incredibly dangerous

21   for the estate to maintain this state of play where people

22   that are not owners, as far as I know, they're not paying

23   rent, they don't have a lease, to have access to this

24   property.  It's really --

25          And I'm sure there's other examples of funds being

1    secreted I'm forgetting, but the point is that there's a

2    pattern, there's a huge risk, this is a real asset, there's

3    personal property there that's worth millions of dollars,

4    and with people, again, that are not the owners, that are

5    not lessors, that are not paying rent, it's really a bad

6    place to be from the point of the estate.

7    Q    And we've seen videos earlier today that showed that

8    there were representatives of the New Federal State of China

9    who were at -- at the house.  Have you had any experience

10   with members of the New Federal State of China throughout

11   this case previously?

12   A    Extensive experience.  And this is not a personal

13   issue, but we know that they're acting at the debtor's

14   behest because, you know, they came to picket at my house,

15   at my daughters' houses, and also there's a whole process.

16           For example, the filing of these claims, these,

17   what I refer to as the bogus claims, for hundreds of

18   millions of dollars that was done to impede the trustee

19   process and make sure it would cost a fortune to deal with

20   that.  Of course, that's done at the behest of Mr. Kwok.

21           And the people who are filing these claims are

22   associated with the New Federation of China and so,

23   therefore, there is a, you know, it's not speculation, they

24   are directly involved in these activities to impede the

25   trustee process.

1    Q    So what you just described, those observations and

2    experiences that you've had with members of the NFSC in this

3    case, based on that, what does that lead you to believe

4    about what may happen if they think you are going to prevail

5    in this adversary proceeding and obtain ownership and

6    control over the Mahwah mansion?

7    A    I hesitate to speculate on that.  I just don't.  To me

8    it's clear that really bad things could happen, and that

9    it's -- the estate could be in a world of hurt if it turns

10   out that we own this property and bad things happen to it or

11   to its contents.

12        And that's why, you know, I know that, for

13   example, the use of U.S. Marshals may be perceived as heavy

14   handed by some, but the point is that we need to stop this

15   complete free access that's going on there because -- forget

16   whether there are bad intentions, there's no control.  We

17   have no idea who took what or didn't take.

18        So I'm not saying that, in fact, other than the

19   piano, which apparently disappeared or is missing, I'm not

20   saying that they actually stole things.  The point is that

21   there's just no control.  There are hundreds of people that

22   are there.  There are some exhibits that we haven't gone

23   through, but we show people at these events where there's

24   hundreds of people in the room.  And god knows what could

25   happen.

1    Q    Trustee Despins, we talked earlier about some

2    communications that you've had with the Department of

3    Justice, and I believe also there was a reference in the

4    motion for preliminary injunction that you filed to the fact

5    that you had been coordinating with the Department of

6    Justice on reaching a potential settlement or agreement

7    related to the Mahwah mansion, do you have an update on that

8    for the Court?

9    A    Yes.  As Your Honor pointed out, there was a filing at

10   9:55 this morning of a motion to approve a settlement.  And

11   we're not seeking approval of that today.  And as we pointed

12   out in the motion seeking a TRO and a preliminary

13   injunction, in a footnote somewhere we said that we're

14   having discussions regarding the Mahwah mansion because the

15   Mahwah mansion is on the list of assets that the DOJ is

16   seeking a forfeiture of.  They cannot, however, obtain

17   forfeiture today because there's no criminal conviction.

18         And it was necessary to have a dialog with them

19   about this asset because I didn't want to be in a position

20   where we're doing all this legwork to get the Mahwah

21   mansion, and at the end they say thank you very much, we'll

22   take it from you.  And then the estate is out, you know, a

23   lot of money prosecuting this, or obtaining security, and

24   doing all this work to obtain the house.  So basically I

25   told them that.

1      And they realized that that was an issue.  And

2  they said, well, we cannot have an agreement with the

3  Trustee now regarding the final disposition of the Mahwah

4  proceeds if there's ever a sale, but we can make sure that,

5  one, all the expenses that the Trustee incurs, and it's not

6  only Paul Hastings, it's all expenses, security guard,

7  insurance, sales broker, again, that's if the Court

8  eventually grants the motion to sell the property, but all

9  these expenses would be coming off the top of the Mahwah

10  property.  So it's certainly worth north of 20 million.  And

11  so the estate would be no worse off.

12      But on top of that, the DOJ agreed we'd negotiate

13  a provision saying that on top of the actual expenses coming

14  off the top, there will be a million dollar deemed expense.

15  So it's not a -- so it's a deemed expense.  It's on top of

16  actual expenses that would come to the estate for the

17  benefit of victims of the debtor, victims to be defined

18  later in this case.

19      So, therefore, the estate is not only not going to

20  be exposed for fees and expenses, but also would -- is

21  guaranteed a million on top of that.

22      But more importantly, that's not a limit.

23      There is a -- there's a discussion to be had with

24  the DOJ, Your Honor, regarding this property, but other

25  assets.  For example, the $630 million that's sitting in

1    accounts that are frozen.

2          As you know from, I forget the name of the case

3    that you handled where there was a partner at Zeisler that

4    was appointed as the receiver, and I think he was the

5    Chapter 11 Trustee as well, or, again, mixing the stories a

6    little bit, but the point is that in the past, in cases

7    involving fraud, meaning if there's a conviction, the

8    Chapter 11 Trustee was authorized by the DOJ to handle the

9    distribution of assets to the debtor's creditors pursuant to

10   a process to be approved by the bankruptcy court.

11         So we're far away from that, but the point to be

12   made is that this is a blueprint potentially or a beachhead

13   in that direction and, therefore, I wouldn't look at this

14   as, oh, we're doing this for a million.  No.  This is an

15   attempt to work with them because we believe that the most

16   efficient way of handling all of this is through a

17   bankruptcy court process where these assets are distributed

18   to the holders of allowed claims.  That's again to be

19   determined who holds an allowed claim and who doesn't.  But

20   that's something that would add a lot of value to the estate

21   because you're dealing with a much larger pot.

22         So the settlement motion, which is not before the

23   Court, I wanted the Court to be aware of it and to be aware

24   that we filed it so that you know that that's happening in

25   the background.  It does not deal with the main event at the

1    end of the case.  It just deals with the issue of this

2    property.

3           And again, to be clear, there's an agreement with

4    the DOJ that they will not interfere with what we're doing

5    here with respect to the property.  Because they could have,

6    saying, wait a minute, this is an asset in the criminal case

7    and we're going to oppose that.  So they are not doing that.

8           They've agreed that all expenses will come off the

9    top from the sales proceeds if there's a sale.  And they've

10   also agreed to a million dollars on top of that that would

11   be distributed to victims of the debtor in this case

12   pursuant to an order of this court eventually.

13          Sorry for the long, but it's important for the

14   Court to know that this is going on in the background.

15   Q    Thank you.

16          MR. BASSETT:  And, Your Honor, there was one other

17   exhibit that I meant to show the Trustee earlier.  Subject

18   to that, I think I don't have any other questions at this

19   time.

20          But if I could please have the courtroom deputy

21   pull up what's marked as Trustee Exhibit 5.

22   BY MR. BASSETT:

23   Q    So I'll just note for the record that this document

24   appears to be an email chain between you and some attorneys

25   at Zeisler & Zeisler, as well as a representative of the

1    Sherry-Netherland, and somebody from the Struck Law Firm, is

2    that right, Trustee Despins

3    A    That's correct.

4    Q    It's June 20th, 2023?

5    A    Correct.

6    Q    And then can you just very, very briefly, what's the --

7    A    Yeah.

8    Q    -- what's the context for this email?

9    A    So the context is that the debtor had personal effects

10   at the Sherry-Netherland.  They wanted -- the family wanted

11   to recover it.  And we had no problems with that so we boxed

12   them 21 boxes, or 20, 21, yeah, 21 boxes.  And so here Mr.

13   Romney was telling me who would come and pick up these

14   boxes.  And it's Mr. Barnett, who's the manager of Taurus,

15   one of the Taurus entities here, who was the driver and

16   bodyguard.  He identifies him as security personnel of Mr.

17   Kwok.

18          MR. BASSETT:  Yeah.  For the record it says Scott

19   Barnett, who worked security for Mr. Kwok at the Sherry,

20   will be picking up the boxes.

21          Your Honor, we would offer Trustee Exhibit 5 into

22   evidence.

23          MR. CONWAY:  No objection.

24          THE COURT:  Thank you.

25          Exhibit 5 is admitted in full.

1    (Trustee Exhibit 5 received in evidence)

2              MR. BASSETT:  So, Your Honor, at this point, there

3    may be, I have to go through my list, five or so additional

4    exhibits that we would offer as part of our case in chief,

5    but I don't think I need the witness for that.  I think

6    those documents are all self-authenticating.

7              So at this juncture, I've finished with my

8    examination and would offer the witness for any cross-

9    examination.

10             THE COURT:  Cross-examination, Counsel?

11             MR. CONWAY:  Thank you, Your Honor.

12                         CROSS-EXAMINATION

13   BY MR. CONWAY:

14   Q    Good afternoon.

15   A    Good afternoon.

16   Q    Let me start from your most previous testimony and work

17   my way back because it's easier for everybody.

18             You mentioned that you had this deal with the DOJ

19   that's in the works where they're going to let you go after

20   this house even though it's a part of their claims in a

21   criminal matter.  What did you mean by their claims?

22   A    I was using shorthand.  It's not part of their claim.

23             There's a criminal prosecution of the debtor and

24   of Ms. Wang and then Mr. Je.  As part of that, the DOJ has

25   identified several assets as being subject to forfeiture.

1    And forfeiture cannot occur until there's a conviction, so

2    that's what I meant by part of their claim.  It's not a

3    current claim they're prosecuting, but they've identified

4    the Mahwah mansion as one of these assets that's subject,

5    that would be subject, according to them, to forfeiture.

6    Q    And this is something that you've had a conversation

7    with these folks at the FBI about?

8    A    No.  The U.S. Attorney, U.S. Assistant Attorney.

9    Q    Okay.

10   A    Yes.

11   Q    And did they tell you why the house was part of their

12   investigation and a potential forfeiture claim?

13   A    Because they think that there's proceeds of fraud

14   involved in there.

15   Q    What does that mean proceeds of fraud?

16   A    Proceeds of Kwok's -- you have to read the indictment,

17   but of the fraud that's alleged there, money laundering,

18   securities fraud, proceeds of that alleged crime, you know,

19   that's their allegation, was used to purchase the property

20   and to repair the property and improved it, improve it.

21   Q    Okay.  So if I understand you correctly, and tell me if

22   I get it wrong, the DOJ believes that the Mahwah mansion, as

23   you call it, was purchased and improved with proceeds of

24   some sort of a crime where individuals were tricked into

25   giving their money for this purpose?

1    A    I don't know the details.  You have to look at the

2    indictment.  But, you know, I think it speaks for itself in

3    terms of what they're alleging.

4    Q    Okay.  Well, let's -- let me back you up.  I told you I

5    was going to start from the end, and I'm going to go right

6    back to the beginning.

7         You did mention the New Federal State of China and

8    you were asked what was it, what did it do, and you said it

9    was an organization of Mr. Kwok's.

10        Let me ask you again what's your understanding of

11   what that entity is?

12   A    You used the word entity, I'm not sure -- I'm not sure

13   it's a -- I don't think it's a corporation.  It's a -- it's

14   an organization of some kind that he started and, you know,

15   made various statements about giving it millions of dollars,

16   et cetera.

17        What it does officially is to combat the Chinese

18   Communist Party.  That's their headline.  What it does

19   practically may be different than that, meaning that it's

20   used to serve his causes, for example, impede the Chapter 11

21   process or harass people that are part of the Chapter 11

22   process.

23   Q    The people we saw in some of these videos, and I can't

24   imagine you know the content of each video by exhibit

25   number, but let me just refer you back to a couple of them

1       that were very similar.

2               I believe it was Exhibits 25 and 26 you saw some

3       people standing behind a table with roses or flowers in

4       their hand, do you recall those videos?

5       A    Yes.

6       Q    Were those members of the New Federal State of China?

7       A    I think they were self-professed members of it, yeah.

8       Q    That's what it sounded like.

9       A    Yes.

10      Q    And they called themselves fellow fighters?

11      A    Correct.

12      Q    What's a fellow fighter?

13      A    You would have to ask them.  I assume that it's in the

14      context of fighting the Chinese Communist Party, but I don't

15      know precisely.  It's not the label we put on them.  They

16      describe themselves as fighters.

17      Q    Okay.  And that's -- that was sort of a theme in these

18      videos is that the self-proclaimed fellow fighters were

19      grateful to be able to show up at that Mahwah mansion as

20      sort of a base for their operations, is that what you got

21      from those videos?

22      A    Well, that's what they want other people giving money

23      to believe, that's correct.

24      Q    Okay.  When was the last time anybody gave money?

25      A    There's money being given as we speak.

1  Q    How do you know?

2  A    Because it's on the internet.  We get -- we get

3  informants, not criminal informants, but people who have

4  been defrauded saying, look, they're raising money here,

5  they're raising money there, for Yvette Wang's defense for

6  example.  Or for paying for counsel involved in these cases

7  representing satellite entities.

8  Q    Okay.  And are you aware of any of that sort of money

9  that's been raised by the fellow fighters that was used to

10 purchase the Mahwah mansion?

11 A    I don't know that.

12 Q    What about the articles of property in the Mahwah

13 mansion such as the articles that were listed on that piece

14 of paper we saw moments ago?

15 A    You're asking me whether the fellow fighters bought

16 this or paid for it?

17 Q    To your knowledge?

18 A    Well, I would have strong doubts about that.  Generally

19 these folks have very limited means, so that's why we see

20 these, through these bank accounts, these hundreds,

21 thousands of donations for $5,000, $2,000, and all that.

22 These people are not fortunate.  They don't have a large

23 funding.  They can't buy mirrors for $250,000.

24 Q    Right.  Right.  Now, you, in your complaint, allege

25 that the house was purchased by Taurus Fund, LLC, correct?

1    A    Well, the title, the alleged title owner, yes.  The

2    formal title owner is Taurus Fund, LLC.

3    Q    There's no dispute in your mind to that fact, is there?

4    A    No.  I think that's not the full answer, but

5    technically the titleholder is the Taurus Fund, LLC.

6    Q    Okay.  And I don't want to keep referring to it without

7    an exhibit.  Give me just a moment here.  Well, I'm going to

8    have to because I don't remember which exhibit was the

9    exhibit with the sort of an invoice for all those pieces of

10   art.  You recall that exhibit, correct?

11   A    Yes.  Yes.

12   Q    And you pointed out in your testimony that that was an

13   invoice that called for delivery to the mansion, correct?

14   A    Correct.

15   Q    And the purchaser of those goods was Taurus Fund, LLC,

16   correct?

17   A    That's what the invoice said.

18   Q    Okay.  Let's just get back to the heart of things.

19   You've been working this case for a little while now, right?

20   A    A bit, yes.

21   Q    Done a lot of investigation?

22   A    Yes.

23   Q    Spent a lot of attorney time on this?

24   A    Yes.

25   Q    And your attorneys have investigated a lot of bank

Luc Despins - Cross - Conway

116

1    records relating to this case, right?

2    A    We have.

3    Q    Okay.  Where did the debtor get the money to buy the

4    Mahwah mansion?

5    A    First, the debtor had funds before what the DOJ is

6    alleging occurred here, meaning the debtor was a billionaire

7    based on his investments or transactions in China, so I have

8    no doubt that he had the funds to pay for that.

9    Q    You have no doubt, but you have no evidence, correct?

10          MR. BASSETT:  Objection.

11          THE WITNESS:  Okay.

12          MR. BASSETT:  That misstates his testimony.

13          THE WITNESS:  Well, there are many links here, but

14   the indictment sets forth exactly what happened here,

15   meaning that there's a -- that his lieutenant, you know,

16   William Je, was involved in raising funds for people to

17   invest in these G Coins or Himalaya Coins, and that's part

18   of the way he got the money.

19          But also, I know for a fact that he had billions

20   of dollars at one point, based on a lot of evidence that we

21   have accumulated to date.

22   BY MR. CONWAY:

23   Q    Have you done any tracing analysis that shows that the

24   funds used to buy this house come from an account owned by

25   the debtor?

1  A    The debtor never owns an account, any account, that's

2  not the way it works.  It's always the cousin, the daughter,

3  the wife, or William Je, otherwise the debtor could not be a

4  debtor.  So that's the way he operates.  You'll never find

5  an account with his name on it.  Actually, there was one,

6  but in 2015.  But after that he knew he could not get

7  accounts.  So that doesn't stop him from owning all these

8  assets.  That's the whole point about equitable ownership is

9  that he lives there, he enjoys it, he owns it practically,

10  but he'll never have title to anything.  That's part of the

11  scheme.

12  Q    Okay.  Well, let's focus on this Mahwah mansion, the

13  subject of this case, because when we talk about the scheme,

14  it gets really confusing.  You can sort of say anything's

15  part of the scheme.

16       I want you to focus on the mansion now.  And we

17  heard you testify just moments ago that the Department of

18  Justice thinks that the funds that were used to purchase

19  that mansion came from victims of the debtor?

20  A    For some of the funds.  They're alleging that, that's

21  correct.

22  Q    Where are the rest of the funds coming from?

23  A    Well, I think from the debtor himself.

24  Q    Okay.

25  A    And as I said, you'll never find a wire transfer from

1    Kwok to anyone, because that doesn't exist, but it doesn't

2    mean that it's not his money.

3           Because when you have a driver like -- let's talk

4    about the driver being the managing member of this entity.

5    How can anyone rationalize that other than it's Kwok's

6    asset?  Who would let somebody's driver be in charge of a

7    $26 million mansion?  The only way that makes sense is if

8    the person who the person drives is the owner.

9           By the way, that's not the only factor, but that's

10   a pretty compelling one.

11   Q    Okay.  Well, you know, let's look at that.  Have you --

12   have you seen any evidence or some sort of video like you've

13   seen today on the internet that suggests that the -- Mr.

14   Kwok or the New Federal State of China is concerned about

15   interference from the People's Republic of China and their

16   agents?

17          MR. BASSETT:  Objection to relevance.  And I think

18   it's beyond the scope of the direct.  I don't know what that

19   has to do with any of the questions that I asked.

20          THE COURT:  I think it is beyond the scope of

21   direct, so I'm going to sustain that objection.

22          MR. CONWAY:  Your Honor, the witness just said

23   that the only rational -- there's no rational reason to have

24   Mr. Barnett associated with this property.

25          THE COURT:  But you asked a question that had to

1    do with interference from China, that was your question.

2    That has -- we haven't established anything about Mr.

3    Barnett, and certainly not that he's somehow connected to

4    China.

5              So you can ask a different question, but I'm

6    sustaining the objection to that question.

7    BY MR. CONWAY:

8    Q    Is Mr. Barnett listed in these documents you've

9    produced here today as security for Mr. Kwok?

10   A    So are you asking me whether he's a bodyguard for Mr.

11   Kwok?

12   Q    I'm asking you whether the documents you've asked the

13   judge to look at today show that the reason for him being

14   involved here is that he's security for Mr. Kwok?

15   A    I'm not sure I understand your question.  He's a

16   bodyguard or he was a bodyguard, although he doesn't need a

17   bodyguard now because he's in jail, so, but he was the

18   security guard.  But what, I'm not sure -- I'm not

19   complaining about him being a bodyguard.  I'm just pointing

20   out that there's no credibility whatsoever to having a

21   bodyguard being the manager of a $26 million mansion.

22   Q    Well, isn't it true that there was a concern about

23   listening devices being placed within the Mahwah mansion?

24   A    I know nothing about that.

25   Q    Have you investigated it at all?

1   A    That's not my jurisdiction.  Listening devices?

2   Q    So you don't know -- you don't know why Mr. Barnett

3   would be involved with Mahwah mansion, but you haven't

4   investigated the possibility as to why he would be involved

5   with the Mahwah mansion.  Is that true?

6   A    I will tell you that I'll bet big dollars that he has

7   no involvement with that mansion on a daily basis.

8   Q    Okay.  And he's not -- I think -- I don't know if you

9   meant to testify to this, but you didn't testify that Mr.

10  Barnett was an owner of the Mahwah mansion?

11  A    No.  He's a managing member of -- actually, he's now a

12  trustee because these companies are in default under Nevada

13  law.  What happens then is that the managing members become

14  the trustee for the -- for it's assets and so he's one of

15  the two trustees.

16  Q    The Taurus Management, LLC is the manager of the Taurus

17  Fund, LLC, isn't that correct?

18  A    I forget which one it is, but one of these entities is

19  in default.  And by that stated fact, under Nevada law,

20  Barnett becomes one of the co-trustees to that, to the

21  assets of the company that's in default.  I would have to

22  look at the exhibit to figure out which.

23  Q    Okay.  It's not necessary to look.  I'm sure within the

24  course of this case we'll figure out what Mr. Barnett does.

25  But he's not listed anywhere as being a managing member or

1    an owner of Taurus Management, LLC, is he?

2    A    He's listed -- I mean, we have -- I'm sure the

3    documents we filed are accurate on this.  I don't recall

4    precisely.  But he is the managing member of one of the

5    Taurus entities for sure because we didn't make that up.  I

6    mean, that's in the Nevada filing -- filings.  So we looked

7    at these.  I'm sure it will be there.  So he's definitely

8    involved as a -- as a managing member or now a trustee.

9    That's what we've alleged.

10   Q    What was the default that occurred in Nevada?

11   A    Failure to file some documents or, you know, to update

12   documents or something like that.

13   Q    Isn't it true it's just a failure to file a couple

14   hundred dollar filing fee?

15   A    That, I'm not sure that's the case.  I think that there

16   was a failure to file annual reports or something along

17   those lines.

18   Q    Okay.  It doesn't say that on the document you provided

19   the judge though, does it?  You want to take another look?

20   A    That document does not probably -- doesn't say that,

21   but I'm sure in our papers we actually describe exactly what

22   happened and why it's been -- why it's in default mode.

23   Q    Okay.  So you've indicated that you don't know whether

24   or not any of the debtor's money was used to buy this house,

25   the Mahwah mansion, correct?

1    A    No, that's not what I said.  I said that you will never

2    be able to show a wire or transfer from any bank account of

3    the debtor because the debtor owns nothing.  That's the

4    whole scheme.

5    Q    And the same is true with the possessions within the

6    house, you have no evidence to show that the debtor

7    purchased any of those articles, do you?

8    A    Well, when the invoice says this is going into Mei's

9    room, this is going in the boss's room, that's often how

10   they refer to him, as the boss, you know that it's for them.

11   It's not for some unnamed New Federation of China people.

12   It's for -- this is their house.  This is --

13   Q    Who wrote those notes?

14   A    That's on the invoice.  I mean, certainly we didn't

15   write the notes.  The FBI didn't write the notes.  So it

16   must have been -- this was taken from the Mahwah mansion.

17   Q    Do you know who wrote the notes?

18   A    No.  I don't know who wrote the notes.

19   Q    Now, you've -- you've testified that you've had these

20   conversations with the FBI.  You got these photos from the

21   FBI.  We've all seen these.  They're now admitted into

22   evidence.  And I assume that some of this property was

23   determined by the FBI to belong to Mr. Kwok, is that true?

24   A    Well, his prescription pills.

25   Q    That's a yes or no question.

1    A    Yeah.  I would think so.  Yeah.  His driver's license.

2    All the stuff that has his name on it.  That's his family

3    pictures, yeah.

4    Q    I'm not really focused on pieces of paper here.

5    A    Okay.

6    Q    I'm really just saying they found things, property at

7    the location that they think belong to the debtor, correct?

8    A    Well, it's more than that that show that this was his

9    house.  Like the 29 suits with his name embroidered in them.

10   Q    Okay.  Let's focus on those.  I'm trying to get you to

11   answer a yes or no question.

12   A    I'm sorry.  Okay.

13   Q    But we'll focus on the suits if that makes you happy.

14   What happened to those suits after the FBI found those

15   suits?

16   A    I have no idea.

17   Q    Did they inventory them?

18   A    Well, I know they counted them.  What the process is

19   when there's a FBI raid as to what the -- once they're

20   inventoried the property and take these pictures, I don't

21   know what they do.  So, no.  The answer is I don't know

22   whether they took them or left them there.

23   Q    What about the rest of the property that we've seen

24   pictures of that relates to the debtor, did they take them

25   or leave it there?

1    A    I think that they took cars that were there.  But more

2    than that, I'm not sure.

3    Q    Did they tell you that they thought that the property,

4    not the pieces of paper, but the valuable property that they

5    found on the premises was likewise property purchased with

6    inappropriate funds?

7    A    They haven't said that.  Beyond what's in the

8    indictment, so you would have to read what they are saying

9    in there, but we haven't had a discussion about actual items

10   other than the mansion itself.

11   Q    Okay.  Would your answer be the same if I asked you

12   about the suits, there's no way of knowing whether Mr.

13   Kwok's own money was used to purchase those suits?

14   A    It's impossible.  He has no money.  By the way, those

15   suits are worth probably five, $10,000 each.  So the whole

16   point is that you'll never find a bill that -- well, you'll

17   find his name all over the place, but he never pays for

18   anything directly.

19   Q    Now, how often did Mr. Kwok sleep at the Mahwah

20   mansion?

21   A    We think that based on the video, we just showed you a

22   sample, but based on the live streaming that we see with

23   these golden columns, he slept there and at the Sherry-

24   Netherland quite a bit, meaning not -- it was not like once

25   every month or something like that.

1    Q    And for the record, what's the Sherry-Netherland?

2    A    That's an apartment in New York City that the debtor

3    had the right use.

4    Q    And did you determine how often he was there?

5    A    Not precisely.  Except we know it from the videos in

6    the sense that we know the background now.  We know this is

7    the Sherry-Netherland background.  This is the Mahwah

8    background.  And he was in both places a lot.  And I would

9    say in the Mahwah mansion, you know, there are tons of

10   videos of him broadcasting from the room with the golden

11   pillars if you will.

12   Q    Okay.  You don't know for a fact that he spent the

13   night at the location every time he made a video, do you?

14   A    Well, based on the stuff that he left behind, I would

15   say yes.

16   Q    Why?

17   A    Because a guy my age doesn't live -- leave his

18   prescription drugs in a place where you don't sleep.

19   Meaning you don't like go to various places and leave

20   prescription drugs there.  That's your home.  That's your

21   house.

22   Q    So you know -- we know that he was there at least one

23   night because he left prescription drugs there?

24   A    No.  But it's just not only that, the family pictures,

25   everything is --

1    Q    That leads you to believe that he spent the night there

2    on a regular basis?

3    A    Many times.  Meaning who leaves family pictures in a

4    hotel?  I mean, if that's the concept that he's there for

5    once a month, you don't leave family pictures there.  That's

6    in essence of using that place a lot.

7    Q    Okay.  Now, did -- what we saw in the videos, the --

8    let's see, I believe it was when we got the translation of

9    the clips, we heard that in clip eight of Exhibit 21 there

10   was a reference to the fact that G Club owned the house and

11   was allowing the fellow fighters to use it.

12   A    I don't think I heard G Club owning the house.  They

13   mentioned G Club, meaning that people from G Club can come

14   and visit the house, but I didn't hear anyone saying G Club

15   owned the house.

16   Q    Okay.

17   A    Maybe you heard that.  I didn't hear that.

18   Q    Did you investigate whether G Clubs has any ownership

19   interest in the house?

20   A    G Club is Kwok.  I mean, that's just -- that would not

21   change my views for one bit.

22   Q    Yeah.  That's a pretty general statement G Club is

23   Kwok.  You know.  So would it change your view if, for

24   instance, a reputable third-party company audited every

25   dollar that came into G Clubs and determined that Mr. Kwok

1   was not one that put money into G Clubs?

2   A    As I said, he never puts money -- you'll never be able

3   to show that he put the money directly.  That's not the way

4   this thing works.

5        But I'd like to see -- I'd like to see what you're

6   talking about.  I'd like to understand what they knew when

7   they issued those financial reports if such reports exist.

8   Q    Okay.  But generally speaking, the only way we're going

9   to figure out whether Mr. Kwok had an ownership interest

10  here is if there was some sort of a audit of where the money

11  came from, correct?

12  A    Well, we just hired a forensic accounting firm that's

13  going to do a tracing analysis of all these accounts, so

14  eventually we'll have more information on that.  But at the

15  end of the day, I don't think it's going to change the

16  fundamental premise which is all these satellite companies,

17  Golden Spring, G Club, et cetera, it's all governed by Kwok,

18  controlled by him, and used for his purposes.

19  Q    Well, governing a business doesn't necessarily mean

20  that it's his business, does it?

21  A    It depends what the -- what the business is used for

22  and who gets the profit, who gets to dip in it.  If you get

23  to dip in it and buy a jet, well, that would be a form of

24  ownership even though you don't own it.  But if the -- if

25  that company sends $2.5 million in England to buy a jet, and

1   who's using the jet, like the New Federal State of China,

2   no.  It's him or his son, et cetera.  So it's -- that's a

3   form of ownership.  That's what we have here.

4   Q    That's what you have here.  It's essentially he uses

5   it, therefore, it's his?

6   A    No.  It's not only he uses it.  It's that he controls

7   it.  He enjoys -- he controls it.  He enjoys all the

8   benefits of it or most of the benefits of it, meaning the

9   members of the New Federation of China are not getting

10   airplanes.  They're not getting a yacht.  They're not

11   getting the apartment, the Sherry-Netherland.  Only he gets

12   that.  So that's -- and the lifestyle is millions of dollars

13   a year.  That money gets taken out.  So that's a form of

14   ownership, not legal ownership, but he's able to dip into

15   those companies and use those funds to buy a house, or to

16   buy cars, to buy, you know, $5,000 cigars.  That's a form of

17   ownership.

18   Q    I didn't know they --

19   A    Equitable ownership.

20   Q    I didn't know they had $5,000 cigars.

21   A    I didn't know either, but that's what he says that

22   they're worth.

23   Q    So again, let's focus on the asset here --

24   A    Yes.

25   Q    -- because I don't know anything about all those other

1   assets you're referring to.  I'm only focusing on the Mahwah

2   mansion.  Twenty-one bedrooms, correct?

3   A    I think that's correct, but I don't -- I don't know if

4   it's 21 or 22.

5   Q    Call it approximately.

6   A    Lots of bedrooms.

7   Q    Okay.

8   A    You know.

9   Q    If anybody else spends a night there, are they the

10   owner?

11   A    No.  No.

12   Q    But he is because he spent the night there?

13   A    If that were the only factor, I would say, no, that's

14   wrong.  But the -- he controls the asset.

15          I don't know if you noticed, but the New

16   Federation of China didn't have access to that house until

17   he went to jail.  At that point, he can just leave the

18   building empty or tell his followers I bought this for you.

19   This is all for you.

20          So the point is that before that, there was not

21   like -- there were not hundreds of people traipsing in and

22   out.  I guarantee you that.  He has bodyguards.  He would

23   not allow all these hundreds of people to go in and out of

24   the building.  So it's not only that he slept there, it was

25   his house before he went to jail.

1    Q    Well, I think we've seen in your exhibits that the

2    house cost $28 million, correct?

3    A    That's correct.

4    Q    And there's been about $17 million worth of

5    renovations, correct?

6    A    It's something like that.  But that, I don't know

7    precisely the amount of the improvements.

8    Q    Okay.  In the video that we saw at the outset today,

9    Exhibit 21, they make repeated reference to the fact that it

10   still wasn't ready.  It was still being refurbished,

11   correct?

12   A    Mm-hmm.  That's so they can explain to people why they

13   cannot all come.

14   Q    Well, when it was -- the refurbishment were completed,

15   that's when people started coming, correct?

16   A    They'll never be completely refurbished, because that

17   way -- remember that he explained that there will be a plan.

18   We will tell you when you can come.  Send more money, then

19   you can come.  And that's the way these things work.

20   Q    Well, you say that, send more money and then you can

21   come, but the fact of the matter is that the money that was

22   collected from these defrauded folks that the DOJ's

23   supposedly protecting, that was collected years ago, wasn't

24   it?

25   A    Define years ago.

1    Q    Within the last two years?

2    A    Well, that's not years ago.

3    Q    Two years?

4    A    Yes.  Which portion are we talking about, the G Club,

5    the Himalaya Coins, or other schemes?

6    Q    Only focusing on this house, the money used for this

7    house?

8    A    Yes.

9    Q    That money was collected obviously before the house was

10   purchased, correct?

11   A    Well, yeah.  But again, there's an assumption that the

12   full amount was collected from these people.  Some money he

13   already controlled through other sources.

14   Q    Okay.  And frankly, you're the Trustee here, so let me

15   just come right out and ask you, it's really the judge's

16   call, but let me ask you, if you saw a piece of paper that

17   showed you where the money came from and all came from one

18   source, would that satisfy you, or is there nothing that

19   could satisfy you that the money didn't come from the

20   debtor?

21   A    That's a fair question.  I would tell you let's not be

22   naive in the sense that there are a lot of people who can

23   act as fronts to pay and make it look legit.  It doesn't

24   mean that you stop there.  You have to understand where did

25   they get the money?  It depends.  I'd like to understand the

1    history of that company.

2            I know a company was created the day of the

3    closing.  Okay.  So that company didn't have a past.  So

4    we'd like to understand where did the money come from?

5            And that company that provided the money or the

6    people, I'd like to understand how they got money?  And so

7    you can't really -- you always have to scratch below the

8    next level.

9            I understand you're going to say, well, when do

10   you stop?  That's a good question.

11           But I think we know enough here to know that these

12   transfers are going fast and furious every day for thousands

13   and thousands of dollars with bank accounts being opened,

14   closed, all the time.  All the time.  We know -- we know

15   much more now about the transfer to pay law firms, how they

16   pay them.  How some companies that sold property that they

17   shouldn't have sold.  That money went to law firms involved

18   in this case and all that.  We just know a lot more now.

19           So you have to -- I have to apologize for my

20   degree of skepticism, but I would want to understand the

21   full picture before telling you it's okay.

22   Q    Fair enough.  And I think that's what we're here for.

23   We're trying to show the judge the full picture before

24   anybody takes anybody's property away.

25   A    Well, we're not -- this is not about taking the

1   property.  This is about protecting the property right now.

2   Any owner should be happy with what we're trying to do,

3   which is to protect the property.  Nobody goes there.  There

4   are security guards there.  The property is safe.  That

5   should be a goal that anyone shares.

6   Q    Right.  The testimony you gave just a moment ago sort

7   of -- there was some sort of an inference that because the

8   Nevada corporation was formed the day of the real estate

9   transfer, that there was something nefarious.  You don't

10   mean to say there was something nefarious about that, did

11   you?

12   A    No.  What I mean by that is there's no history in there

13   and it's hard to believe it has other assets.  It goes back

14   to the point I made about having that entity give me an

15   assurance that they won't do anything wrong doesn't get me

16   where I need to be to protect the estate.

17   Q    You've been doing this a long time.  You know that LLCs

18   are crated for the purposes of purchasing real estate --

19   A    Sure.

20   Q    -- all the time?

21   A    Sure.  I'm not -- there's no point about -- the point

22   there is that there's no track record of an entity with

23   other assets that could -- you know, if there's -- as I

24   said, if somebody wants to stand behind what happens to the

25   property from now until there's a ruling in this case, I'm

1    all ears.  But a real party with real money, not a company

2    that we think we own.

3    Q    And before I get off those videos, again, without

4    trying to make you remember which video goes with which

5    exhibit number, there were -- there were approximately four,

6    it appeared to me anyway, four videos relating to events

7    that took place at the Mahwah mansion, not including the

8    live streams of Mr. Kwok, just the events.  Was that -- was

9    that your understanding, because you produced this?

10   A    Yeah.  Yes.

11   Q    Okay.  And do you recall what those events were for?

12   A    Yeah.  They're fundraisers essentially without calling

13   it a fundraiser.  It was the third or fourth-year

14   anniversary of the New Federation of China.  So they bring

15   Bannon there.  They bring Santos.  And they make speeches

16   and ask people to send more money because Brother Guo was in

17   jail.  We need to help him.

18   Q    Okay.  So that's not an everyday occurrence.  Those

19   were actual events where those videos were taken?

20   A    Yes.  But there's an implication that other days

21   there's nobody in the property, that's not right.

22   Q    I wouldn't suggest that.  My point is that the, and

23   forgive me, I'm so new to the case, I have to keep looking,

24   the New Federal State of China, they've only had, from what

25   we can see here, four events, you know, formal events, that

1    you're aware of and got videos relating to all?

2    A    No.  I know they live stream from there all the time.

3    At least once a week on Saturdays, so that means that people

4    go in.  The people that we saw, the, quote/unquote,

5    "Journalists," the ten journalists that are there.  The

6    video people and all that.  So there's -- there are many

7    activities.

8            And remember, in these things, they are inviting

9    the followers to come and visit, so that there's just no

10   control over what -- who goes in there.

11   Q    Yeah.  And I promised you I'd get to the live stream

12   separately, but the event videos, those were -- those were

13   only four events, large events, that you're aware of during

14   the past year, correct?

15   A    Well, first of all, these are all taken post March

16   15th, so that's -- that's a very short track record of four

17   events since March 15th.  Big events?  Yes.

18           But I know that there's live streaming that goes

19   on all the time.  I know George Santos was there with a

20   bunch of people.  So there's this constant flow of people

21   going in there.

22           So I would hesitate to say four events only.  I

23   don't think I can say that.

24   Q    But you can't say there was more?

25   A    Well, I know Santos was there.  I know they live stream

1    at least once or twice a week from there.  So that involves

2    a bunch of people.

3    Q    Okay.  And the live streaming that took place after Mr.

4    Kwok was incarcerated, who does that live streaming?

5    A    You know, it's the federation people and GETTR,

6    probably GETTR, or people affiliated with them, or some HCHK

7    people, or ex-HCHK people.  So that's -- that's not like a

8    company like HBO who does this.  It's a -- it's the same

9    group that does this.

10   Q    But you know that these events are happening because

11   you see them on GETTR?

12   A    Yeah.  We see them.  I know that Ms. Song monitors

13   those and she sees them and gives us reports periodically

14   about what is being said there and who's there, et cetera,

15   et cetera.

16   Q    Okay.  And about how many of those events have occurred

17   on the premises since the incarceration of Mr. Kwok?

18   A    I think at least two a week, plus the other events.

19        And again, as I said, I don't know and I don't

20   think that the mansion is closed.  Many people show up there

21   and get in maybe.  Every time they have a live stream, I

22   shouldn't say every time, often when they have a live

23   stream, there's a new guest, somebody who just stopped by

24   from Kansas or from Florida.  So there are people getting in

25   there all the time.

Luc Despins - Cross - Conway

137

1   Q     Are you aware of the purpose of G Clubs?

2   A     The legitimate purpose of G Club?  In theory, it's to

3   sell clothes.

4   Q     To sell clothes?

5   A     Well, to sell fashion, you know, G Fashion, G Club.

6   There's also the -- the aspect of G Club which is to give

7   access to people to events or things like that.

8   Q     Or to show their 9,000 members what it's like to be in

9   a free, democratic society and have possessions?

10  A     No.  There's a cynical answer to that, but I'm not

11  going to go there.  I don't know what the -- if that's the

12  purpose of G Club, I don't know if that's really the purpose

13  of G Club.

14  Q     Okay.  So I just want to focus you back really to where

15  we started, you and I, this afternoon.  You talked about the

16  FBI going to the mansion and finding some property there.

17  And we talked about the vehicles.  You thought the vehicles

18  were taken by the FBI?

19  A     Yes.

20  Q     Okay.  And do you know where they are now?

21  A     No.

22  Q     Okay.  I'm really more focused on, again, what is your

23  understanding from your conversations with the U.S.

24  Attorney's Office about who the debtor's victims are with

25  respect to the Mahwah mansion?

1          MR. BASSETT:  Objection.  I think we covered this

2     previously, and the witness already answered these questions

3     and testified to this topic.

4          THE COURT:  I'm going to allow the question and

5     overrule the objection.

6          THE WITNESS:  So can you repeat the question?

7     BY MR. CONWAY:

8     Q    Without getting into the prefatory --

9     A    Yes.

10    Q    -- what is your understanding after you've had your

11    conversations with the U.S. Attorney's Office about who the

12    victims are with respect to the Mahwah mansion?

13    A    Well, there's -- you're conflating two things here.

14    The Mahwah mansion is a target of a forfeiture, a future

15    forfeiture proceeding.  But I'm not sure that you have to

16    have victims with respect to the Mahwah mansion to get

17    there, meaning that there may be victims of crimes.  And if

18    the proceeds are used to buy part of the Mahwah mansion,

19    then they can seek forfeiture.  So when you ask me victims

20    of the Mahwah mansion, I'm not sure I can testify to that.

21    Q    Can you testify to anything about what -- who may be a

22    victim of the debtor where the monies that were obtained

23    from these victims ended up being used to purchase the

24    Mahwah mansion?

25    A    As I said, that's the Government's theory for

1  forfeiture.  I don't need to prove that.  I just need to

2  prove that it's equitably owned by Kwok.

3  Q    I've asked you something specific.  Are you aware of

4  there being any victims who somebody, whether it's the

5  Government or you, alleges gave their money, and that money

6  was obtained for some sort of fraud, and then used to

7  purchase the Mahwah mansion?

8  A    Well, there --

9         MR. BASSETT:  I'm just going to lodge a relevance

10  objection, Your Honor.  I mean, this is not -- this is not a

11  criminal case.  We're not trying to prove victims.  We're

12  trying to prove ownership of the home.

13        THE COURT:  Your response, Counsel?

14        MR. CONWAY:  We're having -- we can't have it both

15  ways, Your Honor.  Either there's some sort of a victim here

16  and Mr. Kwok somehow got their money and purchased the

17  mansion, or somebody else purchased the mansion and Mr. Kwok

18  doesn't own it.

19        So I'm asking -- I'm giving the Trustee an

20  opportunity to come out and say, yeah, I think that the

21  monies that belong to somebody else were used, but they were

22  swindled from them by Mr. Kwok.  And if so, who were they?

23        THE COURT:  Well, there's an objection pending, so

24  you just asked a second question.

25        MR. CONWAY:  Well, I --

1          THE COURT:  But there's an objection pending to

2     the first question, which is you said who are the victims,

3     right?  Isn't that your question?  Who are the victims?

4          MR. CONWAY:  There's a lot more prefatory

5     language, but it was something along those lines, yes.

6          THE COURT:  Okay.  And, Mr. Bassett, your

7     objection is that it -- you're talking -- that the question

8     is irrelevant because it goes to the criminal proceeding?

9          MR. BASSETT:  My objection is that it is not an

10    issue in this adversary proceeding who the, quote/unquote,

11    "Victims" --

12         THE COURT:  I think Mr. Despins already answered

13    that, that was the last answer he gave.

14         So I guess I'm not sure what your question is,

15    Counsel, insofar as in addition to what Mr. -- Mr. Despins,

16    I think I just heard him say that I don't need to prove what

17    the Government needs to prove.  I just need to prove that

18    it's an asset of this estate somehow.  I think that's what

19    he said.

20         And so I'll let you ask the question one more

21    time, but I'm not sure if I understand what your question

22    is.  I think I understand it, but I'm not sure I do.  So why

23    don't you try it one more time.

24         MR. CONWAY:  I'll rephrase the question, Your

25    Honor.

Luc Despins - Cross - Conway

1    BY MR. CONWAY:

2    Q    And the theory here, and I apologize, this question is

3    prefatory and rehashes what we've been over, but it seems

4    necessary at this point.  The theory here is that this house

5    belongs to the debtor or the debtor's estate, correct?

6    A    Correct.

7    Q    But you don't have any evidence as to where the debtor

8    got the money to purchase this house, do you?

9    A    No.  We have evidence from the indictment.  And also,

10   as I told you, the debtor had billions of dollars before

11   these very schemes were started.  So we have no doubt that

12   the debtor, the debtor's, you know, funded this directly or

13   indirectly.

14         But as I told you, you can never prove that

15   there's a bank account that has his name on it that made the

16   transfer.  So if you're asking me that, I cannot prove that.

17   But I am sure that it's -- he controls the funds that went

18   in there and that he owns them because he has access to them

19   and he's using them.

20         So I -- that's, I think that's -- I'm repeating

21   myself, but that's really the point.

22   Q    Okay.  And so if, in fact, in this case, if you're

23   shown evidence of where the funds came from, and it's not

24   from a debtor controlled account, does that mean that it has

25   to come from a victim?

1          MR. BASSETT:  Objection.  I don't even understand

2     the question or its relevance.

3          THE COURT:  I understand.  I think -- I think Mr.

4     Despins can answer that question actually.  I'm going to

5     overrule your objection.

6          THE WITNESS:  So the question is if it doesn't

7     come from a debtor controlled account, controlled defined

8     loosely because he never actually has documented control --

9     BY MR. CONWAY:

10    Q    I'll take your word for that.

11    A    -- at least that's our view of the world at this point,

12    does that mean it comes from a victim?  Probably.  Probably.

13         MR. CONWAY:  Okay.  I think I'm done for the

14    moment, Your Honor.

15         THE COURT:  You're done with this witness until --

16         MR. CONWAY:  This witness.

17         THE COURT:  We're going to redirect, Counsel?

18         MR. CONWAY:  I assume there will be, so.

19         THE COURT:  Right.  Okay.  That's fine.  Thank

20    you.

21         Mr. Bassett?

22         MR. BASSETT:  Thank you, Your Honor.

23         Again, Your Honor, Nick Bassett from Paul Hastings

24    on behalf of the Trustee.  Just a few questions on redirect.

25    I hope to be fairly brief.

REDIRECT EXAMINATION

BY MR. BASSETT:

Q    Trustee Despins, you were asked some questions during
cross-examination about what you had or had not learned in
your investigation about sources of funding of the home, et
cetera.  When were you appointed as Trustee in this case?

A    In July of last year.

Q    And you've been conducting an investigation since then.
But when did you first become aware of the Mahwah mansion?

A    On March 15th I'm embarrassed to say.

Q    How did you become aware of it on March 15th?

A    Because we saw the indictment.  We had had no idea
before then.

Q    So at this point in the case, have you finished your
investigation into the Mahwah mansion, including how it was
acquired and all the other facts that may be relevant to
this adversary proceeding?

A    No.  It's ongoing.

Q    Do you intend to seek discovery as part of this
adversary proceeding?

A    Absolutely.

Q    Now, is it your understanding that the FBI has
conducted an investigation of the debtor and his affairs
including the Mahwah mansion?

A    Yes, they have.

1    Q    And when did they file the indictment?

2    A    It became public on March 15th, but I -- they may have

3    filed it before.  But I'm not on top of that, but around

4    that time.

5    Q    And you mentioned during your cross-examination that

6    you understand that in the indictment the Department of

7    Justice has alleged that the Mahwah mansion was purchased

8    with proceeds of fraudulent conduct by the debtor?

9    A    Correct.

10   Q    That occurred after the FBI completed their

11   investigation?

12   A    That's correct.

13   Q    Do you have all of the documents and information from

14   the FBI and the DOJ that that they obtained in their

15   investigation?

16   A    No.  The debtor has been resisting providing us that,

17   so we're trying to get that.

18   Q    Have you gotten any discovery at all of documents that,

19   aside from these pictures that we saw today, that relate to

20   the Government's investigation that they conducted prior to

21   the indictment?

22   A    No.

23   Q    You were asked some questions about the managers or

24   members of Taurus Fund, LLC, do you recall that?

25   A    Yes.

1    Q    I'd like you take a look at Trustee Exhibit 3 if you

2    could.

3              MR. BASSETT:  And if we could please have that

4    pulled up on the screen.  If you could scroll down.

5    BY MR. BASSETT:

6    Q    And, Trustee Despins, do you recognize this as a

7    document obtained from the State of Nevada Office of the

8    Secretary of State as the document appears to indicate?

9    A    Yes, I do.

10   Q    And if you go to, it would be the fourth page of this

11   document, so four pages down, sorry, next page, on this

12   page, it says formation limited liability company and then

13   there's a checkmark next to articles of organization, do you

14   see that?

15   A    Yes.

16   Q    Then the name being registered in Nevada, the Taurus

17   Fund, LLC, do you see that?

18   A    Yes.

19   Q    Taurus Fund, LLC, that's the defendant and the nominal

20   owner of the Mahwah mansion, correct?

21   A    That's correct.

22   Q    Now, if you go down further, sorry, sorry, just the

23   bottom of that last page, where it says number six, it says

24   name and address of each manager or managing member, do you

25   see that?

1    A    Yes.

2    Q    Then there are two names listed in the box to the

3    right, can you list those off for the Court?

4    A    Yeah.  Taurus Management, LLC and Scott Barnett.

5    Q    And Scott Barnett's the individual that you were

6    questioned about during cross-examination, right?

7    A    Correct.

8    Q    All right.  If you go to the next page of the document,

9    please, this page of the limited liability company formation

10   form has a spot in box 12 for the name and signature of

11   manager or member, do you see that?

12   A    Yeah.

13   Q    And whose -- whose signature and name appear there?

14   A    Scott Barnett again.

15        MR. BASSETT:  Your Honor, I would at this point

16   offer Trustee's Exhibit 3.  This is a document that I think

17   is self-authenticating so I was going to do it separately,

18   but because it came up during cross-examination, I would

19   offer it at this time into evidence.

20        THE COURT:  Counsel?

21        MR. CONWAY:  No objection.

22        THE COURT:  Okay.  Thank you.

23        Exhibit 3 is admitted in full.

24        MR. BASSETT:  Thank you, Your Honor.

25        (Trustee's Exhibit 3 received in evidence)

BY MR. BASSETT:

Q    And do you have copy of the pleadings binder there in

front of you, Mr. Despins?  It should be the one that says

--

A    Power papers?

Q    Power papers.  There you go.

A    Yes.

Q    And there should be an index in the front that has a

reference to the complaint, do you see that?

A    Yes.

Q    Could you turn to that document for me?

A    Yes.

Q    Before I direct you to a particular paragraph in the

document, do you recall you were asked some questions during

cross-examination about exactly what had happened that, as

you testified, led to the managers of Taurus Fund, LLC

becoming trustees?

A    Yes.

Q    If you could turn to paragraph 31 of the complaint,

this is on page 10.

A    Yes.

Q    And it says there, under Nevada revised statute

annotated section 86.2632, Taurus Fund's annual list of

information was due on December 31st, 2022.  Because it

failed to timely file, Taurus Fund is deemed in default

1    under Nevada law.  Do you see that.

2    A    Yes.

3    Q    Is that your understanding as to how the entity became

4    to be in default --

5    A    Yes.

6    Q    -- and thus managers were converted into trustees?

7    A    Yeah.  That's my recollection.  Yeah.  Yes.

8    Q    Trustee Despins, you were also asked some questions

9    about G Club and its potential relationship between funds

10   raised through G Club and the Mahwah mansion, and I think

11   counsel had asked you whether you thought that those were

12   all in the past couple of years, but do you have an

13   understanding sitting here today whether or not G Club

14   remains an active vehicle?

15   A    No.  I think it's defunct.

16   Q    Have you heard of G Club premier members?

17   A    Vaguely, yes.

18   Q    Do you have any idea what those -- what those members

19   -- what that's about?

20   A    Yeah.  They paid more and they were promised something,

21   but I'm not sure they got it.

22   Q    And you mentioned G Club was, you said, defunct.  We've

23   had discovery in this case where you sought documents from G

24   Club, do you recall that.

25   A    Yes.

1    Q    And recently, have you had a dispute about trying to

2    get documents from G Club?

3    A    Sure.  And as the Court is aware, this is a hot issue

4    in the HCHK adversary proceeding where we wanted these

5    documents through HCHK and G Club was attempting to resist

6    that.

7    Q    And do you recall -- do you recall as part of that

8    discovery that went on, one of the issues being that there

9    was a change in leadership of G Club?

10   A    Yes.  They appointed an independent manager or

11   something like that.  Yeah.

12   Q    Because the prior managers left?

13   A    Had all resigned.  Yeah.

14   Q    And when -- do you know when that happened?  Was it

15   before or after the debtor's indictment?

16   A    After the indictment.

17           MR. BASSETT:  No further questions, Your Honor.

18           THE COURT:  Thank you.

19           Any recross, Counsel?

20           MR. CONWAY:  Not based on that, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           All right.  You can step down, Mr. Despins.  Thank

23   you.

24       (Witness excused)

25           THE COURT:  Mr. Bassett?

1          MR. BASSETT:  Yes, Your Honor.

2          So, Your Honor, as promised, at this time, there

3     are just a few additional exhibits that we have not yet

4     introduced into the record that I don't think I need the

5     Trustee for.  I'll just try to make sure I have a

6     comprehensive list of which ones I've already got, of which

7     ones already came into the record.

8          So, Your Honor, on the Trustee's Exhibit List, and

9     we can pull these up and look at them if we need to, we

10     don't have to, I think to the extent that they prove

11     relevant to the arguments that we're going to be making at

12     closing, my colleague, Mr. Luft, will address that, but the

13     first exhibit on the exhibit list that we would like to have

14     put in the record, really by way of sort of housekeeping and

15     just good order, is the Trustee's Certificate of Service for

16     serving the temporary restraining order on the defendants.

17     That appears at Trustee Exhibit 1.

18          I'm not going to, you know, direct the Court to

19     any particular parts of it.  It's already filed on the ECF

20     docket, but, again, we'd like that to be part of the record

21     and, therefore, would ask that that certificate of service

22     at Trustee Exhibit 1 be admitted into evidence.

23          THE COURT:  Counsel?

24          MR. CONWAY:  No objection.

25          THE COURT:  Okay.  Thank you.

1        MR. BASSETT:  Thank you, Your Honor.

2        Trustee's Exhibit 1 is admitted in full.

3        (Trustee's Exhibit 1 received in evidence)

4        MR. BASSETT:  The next exhibit is Trustee Exhibit

5    2, which we had not yet addressed.

6            If I could have that exhibit pulled up on the

7    screen, please.

8            This document at Trustee Exhibit 2, Your Honor, I

9    believe also is -- it's self-evident what it is and it's a

10   self-authenticating document.  This is a copy of the file

11   containing the deed that was pulled from the Bergen County

12   Office and it has the seal listed there.

13           If you scroll down to, well, on that first page, I

14   apologize, I just wanted to point out a couple of things

15   here.  If you scroll back up.  I'm sorry.

16           It has the recorded date of December 29th, 2021.

17   As the Court knows, that approximately two months prior to

18   the bankruptcy filing in this case.  Secondary name, which

19   is the name of the purchaser, you'll see is Taurus Fund,

20   LLC.  And then at the bottom of this first page, it has the

21   consideration paid which was $26 million.

22           If you go to page 12 of the PDF please, there's

23   one other thing I wanted to flag for the Court.

24           MR. CONWAY:  Your Honor, I would just say that

25   given the fact that it's not in evidence, he's sort of

1   testifying, but I won't object to it going into evidence, so

2   then he could then read the document.

3          THE COURT:  Okay.  Then Exhibit 2 is admitted in

4   full.  Thank you.

5          MR. BASSETT:  Thank you.

6      (Trustee's Exhibit 2 received in evidence)

7          MR. BASSETT:  And the only other thing I wanted to

8   identify for the Court was at page, is this page 12, yes,

9   property classification, which is in the middle of the page,

10  the mark, the checkmark there is Class 2 Residential.

11          The next exhibit, Your Honor, that is not yet into

12  evidence is Trustee Exhibit 9.  This exhibit, Your Honor, is

13  simply the articles of organization of Taurus Management,

14  LLC, which is one of the two managers of Taurus Fund, LLC.

15  The other one being Scott Barnett.  Absent any objection, we

16  would offer this document into evidence.

17          THE COURT:  What is this document?

18          MR. BASSETT:  This is the -- this is obtained from

19  the Secretary of State from the State of New Mexico.

20          THE COURT:  Okay.

21          MR. BASSETT:  As we -- as we saw with the, I think

22  it was Exhibit 2, no, Exhibit 3, which was the articles of

23  organization of Taurus Fund, LLC, Taurus Fund, LLC being the

24  nominal owner of the property, Taurus Fund, LLC, according

25  to its articles of organization, has two managers.  One

1   being Scott Barnett.  The other one being Taurus Management,

2   LLC.

3            This, in turn, is the document pulled from the New

4   Mexico Secretary of State website concerning Taurus

5   Management, LLC.  We wanted that document also to be part of

6   the record.  And, therefore, we would offer it into evidence

7   as Trustee Exhibit 9.

8            MR. CONWAY:  Well, I object to most of the

9   characterization, which wasn't true.  I don't object to the

10  admission of the document.

11           THE COURT:  Can you go to page, just page 1 of

12  this document.  I just didn't see it.  For whatever reason,

13  I was looking away when -- oh, it's just the cover sheet.

14  Okay.  I thought there was a different title or something.

15  All right.

16           So then the first page of the document is this,

17  right here with the seal at the top?

18           MR. BASSETT:  That's correct, Your Honor.

19           THE COURT:  Okay.  Okay.  Exhibit 9 is admitted in

20  full.

21       (Trustee's Exhibit 9 received in evidence)

22           MR. BASSETT:  I think just a couple more exhibits.

23           Trustee Exhibit 11 is the next one.  Oh, I'm

24  sorry.  I'm sorry.  That's incorrect.  Trustee Exhibit 10.

25           This is another, Your Honor, just public record

1    document.  I believe it's self-authenticating.  It comes

2    from the United States Department of the Interior National

3    Park Service, National Register of Historic Places.  It

4    contains information recorded with the National Register

5    about the property, including its historical nature.  I

6    don't think there's a dispute about that.

7              And this is a document that we also believe should

8    be admitted into evidence and I would ask that it be

9    admitted as Trustee Exhibit 10 at this time.

10             THE COURT:  Counsel, do you have any opposition to

11   the admission of Trustee Exhibit 10?

12             MR. CONWAY:  I don't, Your Honor.

13             THE COURT:  Okay.  Thank you.

14             MR. BASSETT:  One thing I would like to note about

15   this particular exhibit is on page 7 of the PDF.

16             If you scroll down further.  Sorry.  Up a little

17   bit.

18             The second paragraph on page 7, it says pursuant

19   to an agreement between the Township of Mahwah and

20   Darlington Associates, the owners, the mansion is to have

21   its exterior restored by the owners and to be used as a

22   single-family residence.  I just wanted to identify that for

23   the Court.

24             THE COURT:  Okay.  Thank you.

25             MR. BASSETT:  Your Honor, another document on the

1    exhibit list that I'd like to have pulled up on the screen

2    if possible is Trustee Exhibit 20.

3         Trustee Exhibit 20, Your Honor, frankly is a

4    document that I think the Court could just take judicial

5    notice of.  It is a decision from Your Honor in this case.

6    This is the corrected memorandum of decision granting in

7    part the motion for preliminary injunction in the PAX

8    litigation concerning the protests.

9         I'm happy -- I think it's been clear based on

10   comments made today, you know, why much of what the Court

11   found in issuing this decision is relevant.  We think it's

12   important that it become part of the record.

13        And again, this summary staged at the proceeding,

14   to the extent counsel would argue that it's hearsay because

15   he was not involved, hearsay does come in at this stage of

16   the proceeding.  So we would ask that Exhibit 20 be admitted

17   into evidence as well.

18        MR. CONWAY:  I have no idea what it is or how it's

19   relevant, so I'm going to object on relevance grounds.  I

20   assume that you can take judicial notice of it though.

21        MR. BASSETT:  As to the relevance issue, and we're

22   fine with the Court taking judicial notice of it, but I just

23   would be happy to point out, among other things, paragraphs

24   2 and 4 of the decision the Court found that NFSC is

25   associated, affiliated, and/or connected to the debtor.

1        In paragraph 6, the Court found that the NFSC is

2    involved in the protests that were at issue in that

3    litigation.

4        In paragraph 7, the Court found that the debtor is

5    the leader of the NFSC.  NFSC serves the purposes of the

6    debtor, it serves as business vehicles for the debtor, and

7    their members are personally loyal to the debtor.

8        Those are just a couple of the findings of this

9    order that are highly relevant.

10       THE COURT:  Okay.  Exhibit 20 is admitted in full.

11   (Trustee's Exhibit 20 received in evidence)

12       MR. BASSETT:  Just two more, two more exhibits,

13   Your Honor.

14       First is Exhibit 28 to the Trustee's Exhibit List.

15   This is another document of which the Court will be

16   familiar.  This is the decision and order of Justice

17   Ostrager of the New York Court in the PAX litigation from

18   February 9, 2022.  I think again the Court could take

19   judicial notice of this decision.

20       What I would note in terms of its relevance and

21   why we are offering it, we are simply asking the Court to

22   take notice of Justice Ostrager's findings in this decision,

23   with which the Court is very familiar, and which are

24   mentioned in the complaint in this adversary proceeding,

25   that the debtor has used legal entities to engage in what

1    Justice Ostrager called a, quote/unquote, "Shell game"

2    designed to keep his assets from creditors.

3             Again, that's the purpose for which we are asking

4    this to be introduced.  And, again, I think it's appropriate

5    for this document to come in at this stage of this

6    litigation given that we're here on a preliminary

7    injunction.

8             MR. CONWAY:  This one, again, I don't know that

9    it's relevant at all to these proceedings.  And I don't know

10   if this one is subject to being taken on judicial notice,

11   but Your Honor can tell me.

12            MR. BASSETT:  And again, Your Honor, I would just

13   add, you know, the relevance is for the limited purpose that

14   I mentioned.  We're not asking for all aspects of this

15   decision to come into evidence, just the finding that

16   Justice Ostrager made concerning the way the debtor

17   operates, which was the subject to extensive testimony by

18   the Trustee.

19            So I think -- and by the way, that testimony was

20   elicited on cross-examination so I think it is -- it's

21   certainly relevant.

22            THE COURT:  Trustee's Exhibit 28 is admitted in

23   full.

24            MR. BASSETT:  Thank you, Your Honor.

25        (Trustee's Exhibit 28 received in evidence)

1          MR. BASSETT:  The last exhibit on the Trustee's

2     exhibit list that we're seeking to have admitted into

3     evidence is Exhibit 29.  And this is a copy of the criminal

4     indictment that has been filed against Mr. Kwok and William

5     Je that has been the subject of much testimony here today.

6          We obviously understand that the statements in

7     here at this point, given that it is an indictment, are only

8     allegations.  But we do think the fact of the indictment's

9     allegations, the facts cited in the indictment, and the

10    conclusions that the Department of Justice has drawn is

11    relevant, highly relevant.

12         And I think given that the allegations are

13    unproven, the court obviously would just place whatever

14    weight it deems on this document at this time.

15         I can go through and point out particular

16    paragraphs to the extent helpful, but as the testimony has

17    already shown today, there's numerous statements in here

18    about the debtor having purchased the Mahwah mansion using

19    proceeds of fraudulent conduct.  And it's for that reason

20    that we're asking for Trustee Exhibit 29 to be admitted into

21    evidence.

22         THE COURT:  Counsel?

23         MR. CONWAY:  Your Honor, there's been no

24    foundation.  Counsel's indicated that he's not suggesting

25    that any of the allegations are true.  We don't even know

1  why the allegations are in here.  I'm not even sure what the

2  relevance is here because we've got a sealed indictment that

3  has a whole host of allegations that have been unproven and

4  we don't know where this information comes from.

5          So I'm objecting on foundation, Your Honor.

6          THE COURT:  Thank you.

7          MR. BASSETT:  Your Honor, first of all, the

8  indictment has been unsealed.  Counsel has --

9          THE COURT:  Counsel may not know that.

10          But it is unsealed at this point.  It's been

11  unsealed since March of this year.

12          But also, just to answer your objection why I'm

13  going to overrule your objection, in addition to the fact

14  that this document, there was a lot of testimony about this

15  document already today, and it's mentioned in, if not

16  numerous occasions in the complaint, and also the debtor's

17  counsel filed a letter in this adversary proceeding today at

18  9:55 this morning talking about that they somehow -- I'm not

19  exactly sure what the debtor's intending to do except that

20  in this letter, that's now ECF 25 in this adversary

21  proceeding that was filed at 9:55 this morning, a letter

22  from Attorney Henzy, talking about the mansion and

23  understanding that there was a hearing on a preliminary

24  injunction today.

25          And the letter says in paragraph 3, I write to

1    report to Your Honor that the debtor, through his criminal

2    counsel, intends to present a motion to the United States

3    District Court.  In so doing, the debtor intends to seek an

4    order providing continued -- providing continued access to

5    the property and to prevent any changes to it or its

6    contents pending resolution of or further orders in the

7    criminal case.

8             So I think it is relevant.  And there isn't a need

9    for a foundation in that it's a public document.  The debtor

10   himself has called it into question in this adversary

11   proceeding by filing this letter.  And the complaint refers

12   to the indictment.  And there was a great deal of testimony

13   regarding the indictment today.

14            So I'm overruling your objection.

15            And Trustee's Exhibit 29 is admitted in full.

16        (Trustee's Exhibit 29 received in evidence)

17            MR. BASSETT:  Thank you, Your Honor.

18            That is all I had by way of exhibits.

19            And with the Court's indulgence, I'll just check

20   with my colleagues to make sure we don't have anything else.

21            THE COURT:  Go right ahead,

22            MR. BASSETT:  Your Honor, that concludes the

23   presentation of the Trustee's evidence.  Thank you very

24   much.

25            THE COURT:  Okay.  Thank you.

1          Attorney Conway, would you like to present any

2     evidence?

3          MR. CONWAY:  I certainly would, Your Honor, but I

4     have not been around long enough to have been able to

5     organize that as I mentioned earlier today.

6          I guess I should suggest that I think Your Honor

7     said that the TRO expires tomorrow, is that what you said?

8          THE COURT:  It does.  It was -- it was entered on

9     the docket two, I don't remember, 2:06 or seven p.m. on

10    August 1st.  So under Rule 65, it expires, right?

11         Doesn't it expire tomorrow?  Or is it the next

12    day?  I don't know.  I have to look at the rules again, but.

13         MR. CONWAY:  Whether it's tomorrow or the next

14    day, I understand it's expiring soon.

15         THE COURT:  Yes.

16         MR. CONWAY:  And I guess that's probably the

17    reason why when I asked Mr. Bassett about an extension of

18    time he probably was reluctant.  It wasn't that he didn't

19    like me.  But I didn't know it at the time.

20         So obviously, Your Honor, given the facts we've

21    heard, we know that there are a lot of questions marks.

22    More than anything, there are questions marks here.  And I

23    would absolutely love to put on a case where we can answer

24    some of these allegations, you know, before Your Honor makes

25    a decision on a preliminary injunction.

1      And perhaps we can stipulate to an extension of

2  the TRO in order to provide me time to do the necessary to

3  accumulate the evidence I need, actually review the papers,

4  which I have to admit I only had a chance to scan.  I just

5  got most of them this morning.  So it would be nice to have

6  that time.

7      And to the extent that we can resolve the concern

8  about the expiration of the TRO by simply stipulating to

9  extending it, that would perhaps make it easier for this

10  court to make a decision based on full evidence.

11      THE COURT:  Well, you'll have to -- I'll take a

12  short recess if you'd like and you can talk about it, but I

13  don't know what the position is going to be obviously.

14      I'll take -- I'll give you some time to talk about

15  whether you'll extend, you'll agree to an extension under

16  Rule 65(b)(2).

17      Go ahead.  Go ahead.

18      MR. BASSETT:  Your Honor, I don't think --

19      THE COURT:  You're saying -- you're saying, I

20  think, Mr. Bassett, before you say it, there's no need for a

21  recess because you're not going to agree?

22      MR. BASSETT:  That's correct, Your Honor.

23      I think we had some discussion about this earlier

24  today.  We are here today seeking not merely a continuation

25  of the TRO that's in existence, but the further relief that

1    we have been discussing and that we're asking for in our

2    papers, which is to ensure that all the individuals that

3    we've seen coming in and out of the house, all of that

4    activity, that the house be secured, that we have the

5    assistance of the U.S. Marshal if necessary, everything that

6    Trustee Despins talked about.

7            And we're not willing, the Trustee is not willing,

8    to continue for any longer period of time simply by having

9    the existing TRO in place.

10           The other thing that I want to point out and

11   emphasize is that the Court is correct that we have set this

12   hearing for a preliminary injunction in accordance with the

13   rules.

14           And we have also served a TRO on the defendants to

15   this litigation in accordance with this court's order.  The

16   certificate of service at Trustee Exhibit 1, which I did not

17   cover in detail, makes clear that the Trustee served all of

18   the defendants, specifically in accordance with Federal of

19   Bankruptcy Procedure 4(b), by mailing documents to

20   registered agents.

21           Other exhibits in the record make clear that the

22   registered agents of Taurus Fund and Taurus Management are

23   the registered agents to whom we served these papers, so

24   there is no issue.

25           I understand counsel may not have been contacted

1  and been retained until recently, but his clients were

2  served.  That's what matters.  If they wanted to contest --

3         THE COURT:  It wasn't just by mail, Attorney

4  Bassett.  It was UPS overnight delivery too.  It says on

5  August 1st --

6         MR. BASSETT:  That's correct.

7         THE COURT:  -- Taurus Fund, LLC was served by

8  first class mail and UPS overnight delivery on its

9  registered agent G International which I think we just saw

10  that name --

11         MR. BASSETT:  That's correct.

12         THE COURT:  -- in the -- in what would have been I

13  think Trustee's 9, or Trustee's 3, either one of those were

14  the Secretary of State documents.  I can't remember which

15  one.

16         MR. BASSETT:  That's correct.  One of them was the

17  -- I think 9 was the Secretary of State document for Taurus

18  Management.  And that had listed in, within that document,

19  the registered agent we served for purposes of serving

20  Taurus Management.

21         The document at Trustee Exhibit 3 is the Taurus

22  Fund, LLC articles of organization.  And that had the other

23  agent that we served listed as the registered agent for that

24  entity.

25         We also attempted to -- we also I believe sent by

1    overnight mail service to Mr. Barnett himself.  We also, as

2    belt and suspenders, although not necessary, tried to serve

3    him personally.  And we tried to do that twice.

4          And then we filed another certificate of service

5    this morning reaffirming the second attempt whereby the

6    process server has indicated that he received confirmation

7    from a neighbor of Mr. Barnett that he, in fact, lives

8    there, but he was not able to catch him at home.  But

9    regardless, service under Rule 4(b) is sufficient if process

10   has been mailed.

11         So I don't think there's any question about the

12   defendants having had notice, timely notice, of the hearing

13   today and, therefore, I don't think there's any basis at all

14   for a continuance simply because those defendants decided to

15   take their time in retaining counsel.

16         So for all those reasons, and including most

17   importantly the fact that we are simply not willing to

18   adjourn this hearing based on a continuation of the current

19   TRO, we would, you know, continue to ask for the relief that

20   we're seeking, which is a broader relief than currently in

21   place without a continuance.

22         THE COURT:  I understand.

23         Counsel, any response?

24         MR. CONWAY:  Well, I would say that the

25   characterization that they had notice is improper.  The fact

1    that they got served under the code by mail to a post office

2    box is not the same as giving them notice.

3            And I can tell you that if it weren't for counsel

4    in another of your matters here having seen this on the

5    docket and making folks aware, I wouldn't have been

6    contacted on Friday.

7            So, you know, that said, I don't think it's --

8            THE COURT:  I don't think you're right about the

9    service though.

10           MR. CONWAY:  I'm not overly concerned about that.

11   I just want to make sure the record's clear that, you know,

12   those of us who practice bankruptcy law who take advantage

13   of the mail service option, should --

14           THE COURT:  Well, he did -- as I noted, it was

15   overnight mail UPS as well.  And there was attempted service

16   on Mr. Barnett --

17           Is that his name, I'm sorry, Barnett?

18           MR. BASSETT:  Yes, Your Honor.

19           MR. CONWAY:  Right.

20           THE COURT:  -- at his home in Long Island and he

21   wasn't there.

22           MR. CONWAY:  Yeah.  None of --

23           THE COURT:  I don't think you're correct.  I don't

24   think that statement that service notice is not proper.

25           It's a temporary restraining order.  The rules --

1  the rules prescribe how service should be made and service

2  was made on your clients in the way that they directed

3  service be made with the Secretary of State's Office of the

4  state in which they were incorporated.

5          So I don't think you can say that really.  I mean,

6  you can say it.  I'm not going to disagree with other things

7  that you say, but I am going to disagree with that because I

8  don't think that's a valid statement.

9          MR. CONWAY:  I didn't argue about service.

10         THE COURT:  Tell me how under Rule 4 and under

11  Rule 65 they didn't make service?

12         MR. CONWAY:  I didn't say that, Your Honor.  And I

13  apologize if I was unclear.

14         I said the exact opposite.  That while service was

15  made, you can't say that the parties got notice simply

16  because there were multiple mailings to post office boxes.

17  The only individual here that they claim they served, they

18  didn't actually make service on.

19         THE COURT:  I don't -- I don't agree with your

20  argument, Counsel.

21         MR. CONWAY:  I didn't mean to use the word

22  service.  I mean to say -- well, they didn't actually put it

23  in hand.  They didn't --

24         THE COURT:  There's no requirement that it be

25  served in hand.

1          MR. CONWAY:  And I'm not saying there is.  I'm not

2     arguing service.

3          THE COURT:  Well, then your argument is -- then

4     let's move on.  Because then nothing that you're saying is

5     persuasive to me right now with regard to service.  They did

6     exactly what they were supposed to do with regard to

7     service.

8          MR. CONWAY:  And my comment is limited.

9          THE COURT:  And so whether or not your clients

10     decided to not open up the package isn't their problem.

11     It's your clients' problems.  If they didn't open up the

12     package, and you're telling me there's somehow a notice,

13     there's now a standard for actual notice of the service in

14     the manner in which they made service that your client has

15     designated for service, show me a case that says that,

16     because I think you're going to lose on that one.

17          MR. CONWAY:  Yeah.  I wouldn't do that, Your

18     Honor.

19          I would only restate the fact that it's one thing

20     to say service was made.  It's another thing to say they

21     actually had notice.

22          THE COURT:  They don't have to actually have

23     notice.

24          MR. CONWAY:  It shouldn't say it.

25          THE COURT:  Your client made the choice.  They

1    either didn't open up the package or they threw the package

2    away or whatever.  Whatever they did.

3            You can't -- you can't escape the requirements of

4    service of a temporary restraining order by saying I didn't

5    open up the pleading so I didn't know what it said.  There's

6    no case law that supports that, Counsel.  There's just none.

7            MR. CONWAY:  And nobody here has made that

8    argument, Your Honor.

9            THE COURT:  Well, you are making that argument

10   because you just said they don't have notice.

11           MR. CONWAY:  No.  I said that while service was

12   good, it was improper for counsel to speculate that they had

13   notice.

14           MR. BASSETT:  Your Honor?

15           THE COURT:  I don't think that's what you said.

16   But I think let's move on.

17           MR. CONWAY:  That's what I intend.

18           THE COURT:  Let's move on.  It's irrelevant.

19   Service was properly made and I have no problem with the way

20   service was made.

21           And the fact that, you know, your -- Mr. Barnett

22   and/or your clients, whatever they chose to do, they chose

23   to do, nobody can control what they chose to do.

24           Service was properly made.

25           So they're not going to agree to an extension of

1    the TRO, Counsel.

2              So then is there anything else you want to tell

3    the Court?

4              Because then I have to make this ruling by 2:06

5    p.m. tomorrow in order for the -- before the restraining

6    order expires.

7              MR. CONWAY:  Are you inviting me to argue right

8    now or did you want --

9              THE COURT:  I'm inviting you to argue.  You're

10   here.  So go ahead.

11             MR. CONWAY:  Okay.

12             MR. LUFT:  Your Honor?

13             THE COURT:  I'm going to listen to argument,

14   Counsel.

15             MR. LUFT:  I'm saying I just ask that we ask to

16   respond with our argument after?

17             THE COURT:  Yeah.  Sure.  I'm going to give you

18   just -- I'm going to give you an opportunity to respond.

19   But he's here and I'm going to listen to him.

20             I'm not -- I'll give whatever weight -- I'm giving

21   whatever all of you say -- I have -- I'll give it whatever

22   weight it's worth when I go back and review it.  Right?

23   That's what I do.  That's supposedly what I'm here for.  So

24   that's what I'm going to do.  Okay?

25             So go ahead, Counsel.

1        CLOSING ARGUMENT FOR DEFENDANT

2            MR. CONWAY:  Thank you, Your Honor.

3            And, you know, my argument's going to be very

4    brief because I have very little understanding of the case

5    at this point.

6            I can tell you that I've listened to the evidence

7    here and the evidence is that we think that this may have

8    been a house purchased with funds that may have been

9    controlled by the debtor and, therefore, you should restrain

10   the property and lock out the owners of the property, titled

11   owners of the property, based on this testimony.

12           That's a mandatory injunction which requires a

13   little bit higher burden of proof.

14           You know, what we're talking about here is a, you

15   know, an allegation that may be that there's some property

16   there that's at risk of being taken and that's why they feel

17   that they should lock out the owners of the property.

18           Well, we would stipulate that they can go in and

19   get that property and move it.  Because if that's the only

20   concern, fine.

21           THE COURT:  You'll stipulate that they can go into

22   the mansion and take out all the property?

23           MR. CONWAY:  The property that they believe is the

24   debtor's.

25           THE COURT:  Well, they believe all of it's the

1    debtor's.  So you're going to let them to in and take it?

2             MR. CONWAY:  If we were able to put on our case --

3             THE COURT:  That's fine.

4             MR. CONWAY:  -- I could show them the -- I could

5    show Your Honor all the evidence that shows which property

6    belongs to the Taurus Fund, and that property belongs to the

7    Taurus Fund.

8             If there's no evidence that it belongs to the

9    debtor, they can't take it.  They can't take -- there's no

10   evidence that anything here other -- there's speculation

11   that because they don't know how Mr. Kwok does his business

12   that this must be ill-gotten gains, that this must be like

13   other assets that has been discussed in front of Your Honor,

14   somehow improperly controlled by Mr. Kwok.  There's no

15   evidence of that though.  And we need evidence here.

16            We need to have something to show that there is an

17   immediate need, there's some actual concern about changing

18   the status quo.

19            Your Honor, a preliminary injunction is to

20   maintain the status quo.  It's not meant to say we're going

21   to change the status quo, which right now is that the Taurus

22   Fund can use the property.  Right now, if we -- if we

23   maintain the status quo and have an injunction that says you

24   can't do anything with the asset, pending the outcome of

25   this litigation, that's well within the bounds of Rule 65.

1    But that's not what they're asking.

2         There asking that Your Honor change the status

3    quo, lock out the owners, mandatory injunction, and they

4    want you to do this based on evidence that consists of what?

5         Well, he did it before so we think that he did it

6    here.  That's not -- that's not sufficient, Your Honor.  It

7    is a high burden to have a mandatory injunction that changes

8    the status quo.  We haven't seen it here.

9         THE COURT:  Okay.  Thank you, Counsel.

10        Any response?

11        MR. LUFT:  Yes, Your Honor.  May I approach?

12        THE COURT:  Sure.

13        CLOSING ARGUMENT FOR THE PLAINTIFF TRUSTEE

14        MR. LUFT:  Good afternoon, Your Honor.  Avi Luft

15   of Paul Hastings on behalf of the Chapter 11 Trustee.

16        THE COURT:  Good afternoon.

17        MR. LUFT:  I want to get into my remarks, but I do

18   want to note, because it's come up a number of times,

19   Attorney Conway keeps representing that if he could just

20   show his evidence, he's seen all the evidence, and at the

21   same time has repeatedly told us today that he has

22   absolutely no time to see evidence or build a case.

23        That's the speculation we're talking about today,

24   Your Honor.  If he had evidence, he had every opportunity to

25   show up today and present it.

1           Now, the fact is he's also said he hasn't seen our

2      evidence and it's not there.  In fact, Your Honor, as I'll

3      walk through, there's extensive evidence that supports this

4      and reason to grant this preliminary injunction.

5           As our claims state, the debtor is the equitable

6      owner of the Mahwah mansion.  The Taurus Fund is also

7      equitably owned by him and we believe it to be the alter

8      ego.

9           How are we going to show this?  The evidence is

10     going to show that the mansion, its contents, and the Taurus

11     Fund are all estate assets and these assets have to be

12     preserved for the creditors before they can be dissipated,

13     damaged, liquidated, or moved to another unnamed shell

14     company.

15          So we are asking the Court to have the assets

16     freezed.  We are asking for access to the mansion to be

17     restricted to only those who need to be there, meaning law

18     enforcement, the Trustee, and who he designates as needing

19     to be there.  And, Your Honor, we also are going to need for

20     the assistance of the U.S. Marshals to the extent that it is

21     necessary.  Because the fact is right now the debtor has

22     called on hundreds of people to descend on the mansion.

23     This is a recipe for disaster.

24          Now, we've talked about the relief we seek.  We

25     ask to enjoin the defendants, which is the Taurus Fund, LLC,

1      Mr. Barnett, and Taurus Management, LLC, who are now the

2      trustee's of the Taurus Fund, for interfering with

3      encumbering and disposing of the assets of the Taurus Funds.

4              We've also asked in the order that this be made

5      applicable to high-ranking members of the NFSC as set out.

6      I'm not going to detail each one.

7              We're asking for the restriction of the access to

8      be limited and in such a way that keys can be changed,

9      passcodes, whatever else, to help secure the assets.

10             As the Trustee has said, anyone who cares about

11     the assets should support this.  It's about preserving the

12     assets, we believe for the creditors.  But even if we're

13     wrong, presumably any other owner would want this.

14             Now, the law is clear.  For us to get the PI, we

15     need to show a likelihood of success on the merits of one of

16     our three claims.  We believe we will be able to show it as

17     to all three.

18             Now, while there's been suggestions that we must

19     meet some type of criminal standard of beyond a reasonable

20     doubt, that is not the standard.  We only have to show a

21     likelihood of success greater than 50 percent how likely it

22     is.

23             Now, the equitable ownership found where property

24     is acquired, sorry, equitable ownership is found where the

25     property is paid for with debtor funds, where the debtor

Despins v. Taurus Fund - August 14, 2023                    176

1    represents that he has an interest in the property, or the

2    property is used to obtain credit.

3          The Bankruptcy Court in the District of New Jersey

4    has also found equitable ownership where they have found a

5    pattern and practice of a debtor's fraudulent behavior,

6    specifically where a debtor funds purchases and maintains

7    the fact of control but places the asset in another person's

8    name.

9          Now, with regard to Nevada equitable ownership

10   law, which is where the Taurus Fund is registered, where a

11   debtor has active or substantial control of a fund, or the

12   debtor is using or receiving the benefits of the fund's

13   assets, that establishes equitable ownership under Nevada

14   law.

15         Now, the evidence in this case supports all of

16   that.  The funds used to purchase and renovate, all evidence

17   suggests they come from the debtor.

18         I want to address the idea that before it was

19   asked the Trustee on cross, well, didn't the video say that

20   G Club owns the property?  There was no such statement.

21         In fact, I asked Ms. Song directly was there any

22   testimony -- was there any statements on those videos,

23   excuse me, in which anyone other than Mr. Kwok was indicated

24   as being the owner of the property?  And she testified, no,

25   nothing in Mandarin suggested that.

1          And if the Court had its own review it, they're

2     not going to be able to find it.  It's just not there.

3          Now, in terms of where these funds come from?

4          Part of the investigation, we can look certainly

5     where the FBI and the Department of Justice believes they

6     come from is that the money came from G Club, routed through

7     bank accounts to purchase the mansion.  The Government has

8     indicated that that is part of Mr. Kwok and Mr. Je's

9     fraudulent scheme to fund the purchase.

10          There have been allegations of, well, must the

11     money all come from a victim?

12          Of course, Your Honor, in this case, we know that

13     the defendant has money from many places.  He had money from

14     China, billions of dollars.  He has dealings with the UAE,

15     where we've had testimony where he has billions of dollars.

16     As well as the money, the billion dollars that the

17     Government has raised.

18          So the idea that it's a strawman to suggest that

19     if you can't show that from the victims, then it must not be

20     the debtor's money.

21          Now, let's talk about the residence itself and the

22     question of -- the statement earlier from Mr. Conway that

23     this was not -- no one is saying that this a personal

24     residence.

25          Of course all the evidence suggests that this is

1   the debtor's personal residence.  If you look at Exhibit 19,

2   it talks about the boss's bedroom and Mei's bedroom.  People

3   have bedrooms where they live, Your Honor.

4           If you look at Exhibits 14 and 18, we can see the

5   debtor's personal identifications with his picture on it.

6   His New York learners permit.  His Hong Kong permanent

7   identity card.

8           Exhibit 17, his own prescriptions.

9           Exhibit 13, suits with his name stitched in them,

10  which we now know is 29 suits.  No one brings 29 suits for a

11  one-night, overnight stay, Your Honor.

12          And of course Exhibit 15, the family's pictures.

13  That's Mr. Kwok with his family.  That's the type of thing I

14  have in my home and I believe it's the exact type of thing

15  that Mr. Kwok has in his home.

16          We've seen the debtor broadcasting.  He is using

17  the asset.  It's exactly -- where else have we seen that?

18  In the Sherry-Netherland, the other apartment that he lives

19  in.  And we see that at Exhibits 22 and 23.

20          What else do we see that we've seen before?

21          The entity is managed and in the name of someone

22  close to Mr. Kwok.  Here it is his bodyguard/chauffeur, Mr.

23  Barnett.  He manages the Taurus Fund.  And now that it's in

24  default, he's a trustee of the Taurus Fund.  Why is it

25  significant that we have it transferred to a trustee?  I'll

1  say it in two-fold, Your Honor.

2          First of all, the fact that the Taurus Fund is

3  defunct means under Nevada law it can no longer do business.

4  So the suggestion that they're the people who want to use

5  the asset or that they are still operating just legally is

6  not true.

7          Now, now that it's transferred into default and

8  leaves the trustees in control, it is of particular

9  important to secure these assets, because I believe under

10  Nevada law, those trustees now have the right to distribute

11  the assets of the trustee, sorry, of the Taurus Fund.  Well,

12  obviously we have to secure them before something like that

13  can happen.

14          Now, also with regard to the debtor's use of the

15  house, I want to make note of the letter from Mr. Henzy

16  today in which he talks about the debtor needs to have

17  continued ability to access the home.

18          Well, why would Mr. Kwok have to have access to

19  the home if it wasn't someplace where he was living in the

20  first place?  I mean, any suggestion that Mr. Kwok wasn't

21  deeply intertwined with this property went out the window

22  when Mr. Henzy wrote a letter today saying he needed special

23  relief so that the debtor can continue that access just like

24  -- and the access he wants is just like the Sherry-

25  Netherland.  The property where he has admitted that he was

1    living.

2         Now, we know that Mr. Barnett, through Exhibit 5,

3    the same lawyers from Zeisler & Zeisler have described to

4    (indiscernible) security for Mr. Kwok.

5         Exhibit 6 showed that he was a listed driver for

6    Mr. Kwok's cars.

7         And Exhibits 7 and 8 show that he received

8    payments from Greenwich Land, the entity that owns Mr.

9    Kwok's Connecticut residence, which is in the name of

10   Greenwich Land and Lexington Property, which is one of the

11   entities that we are having the HCHK litigation about.

12        These are all entities which the Trustee is

13   diligently and quickly moving through various adversary

14   proceeding Your Honor is well aware of that all have one

15   common factor, they're all owned by Mr. Kwok.  That's what

16   we're showing.

17        And quite honestly, the notion that Mr. Barnett

18   spends his days driving around Mr. Kwok and picking up his

19   boxes from places, and completely unrelated to that also

20   happens to have another job managing a $30 million mansion

21   that is allegedly not tied to Mr. Kwok, is just simply not

22   plausible.  He is just another person close to Mr. Kwok who

23   Mr. Kwok puts on the title and then proceeds to use the

24   asset.  And that's his practice.  We've seen this over and

25   over.

1            And case law talks about a pattern and practice.

2      Mr. Kwok uses shell companies that he does not put his name

3      on while retaining control of the assets.  Where have we

4      seen this?

5            Well, we've seen it with the Lady May where he

6      used his daughter.  We've seen it with the Taconic Road

7      properties where Greenwich Land, which is in the name of his

8      wife; Golden Spring's in the name of his son; HCHK and Ace

9      Decade, which are of course in the names of Ms. Wang; Mr.

10     Barnett is just another in this line.

11           And of course the property itself matches the

12     pattern of what the debtor buys.  It is opulent.  It is

13     expensive.  And it's filled with showy items intended to

14     show his wealth despite telling this court that he has none.

15           Now, even after his arrest, he has continued to

16     use this property for his benefit.  Another factor that the

17     courts look to when looking at equitable ownership, is he

18     getting a benefit?  He did it before.  And even after being

19     arrested for the first time, he said, well, now my

20     followers, the NFSC, you come in, you can use it, he is

21     gaining a benefit from that.  He's getting publicity.  It

22     appears he is using it through these sales of G Club premium

23     memberships to try to get more people to continue to fund

24     money to him.  This is something to his benefit.

25           We've seen the videos, Exhibits 21 and 26, where

1    his followers openly describe how it is the debtor who

2    picked out the property, purchased the property, went

3    through the property, made all the choices, that's not the

4    words of the Trustee.  Those are his followers.  That's what

5    is being put out there.

6           Now, the Taurus Fund, also it should be noted when

7    we're looking at the issue of alter ego, Your Honor, clearly

8    is not following corporate formalities.  It's in default.

9    Why did it go into default?  Because it failed to disclose

10   who its managers were, to provide any signatures.  Not

11   surprisingly, what don't they want people to know?  Who's

12   behind it.

13          But they're not following corporate formalities.

14   And if they not willing to do even that minimal thing, the

15   suggestion that they can be entrusted with this extremely

16   valuable asset I think really begs incredulity.

17          At this point, Your Honor, I want to turn to the

18   likelihood that the estate can suffer irreparable harm if we

19   don't get this relief.

20          Quite simply, this is a recipe for significant and

21   unrecoverable losses if this PI is not in place.  This is a

22   unique and valuable asset.  The home itself is a National

23   Historic Record.  Damage to this property -- while damage to

24   any property is significant, one on the historical record

25   raises significant issues of whether there is any way to

1    compensate that loss or whether it can be fixed.

2           More importantly, we see it is filled with

3    valuable assets, from the art work, from the claims that

4    there is allegedly antiques in there worth more than the

5    whole house.  Your Honor, I have never been in the house.  I

6    don't think anyone from our side has.  I can't tell you how

7    much they are.

8           What I do know is there's a quarter million

9    dollars in mirrors and a table in there.  And this is 21-

10   room, bedroom house.  They need a lot of mirrors and a lot

11   of tables for that house.  So ne can only begin to speculate

12   how much money is in these assets.

13          What's our second factor for a disaster here?  We

14   have unnamed and unnamed individuals who have been vested

15   with the control of the dissipated assets.  The only person,

16   human person, who anyone knows about tied to this is Mr.

17   Barnett, who I'll note, Your Honor, seems to be the one

18   person that Mr. Conway doesn't represent.

19          Instead, it is a fund, which is now defunct, which

20   has two managers, who are now trustees, one of whom is Mr.

21   Barnett who seemingly hasn't spoken to Mr. Conway about

22   this, and the other one is Taurus Management, who again no

23   one knows who's behind it.

24          The idea that someone could be held accountable or

25   someone can be responsible in that instance is just not

1    plausible.

2            Now, what's our third thing?  We have hundreds of

3    unknown and likely judgment-proof individuals to be honest

4    coming and going through the property.  They have -- they're

5    not owners.  They don't have a vested interest in

6    maintaining the property.

7            And as the Trustee has testified, quite frankly we

8    have a great concern that once they realize that -- fully

9    that the Trustee is coming for this property, their interest

10   may turn the opposite way, which is to primarily focus on

11   making sure the Trustee does not get anything valuable out

12   of it.

13           The chance of loss of assets is very real, whether

14   it's by accident, intentional, an unattended property is

15   ripe for loss.

16           You've heard no testimony from the other side that

17   Mr. Barnett is there every day making sure things are okay

18   or that there is anyone from this alleged owners, that

19   anyone from Taurus Fund, is on the site protecting this,

20   checking who's coming, looking at IDs.  It seems to be a

21   free-for-all and there's no indication that any of the

22   people who are alleged owners are there.

23           There's a reason construction projects are -- in

24   unattended and abandoned buildings are guarded, because

25   things can happen.  And this is far more valuable than

1    something like that.

2            Now, if there is a loss, the chance of recovery

3    quite honestly is minimal.  There is no reason to believe

4    that Mr. Barnett, a driver and security guard, has money to

5    reimburse the estate.  No one knows who Taurus Management

6    is.  And quite frankly, as the Trustee testified, it is our

7    belief that Mr. Kwok is the equitable owner of the Taurus

8    Fund.  So going after them for any damage that is done by

9    the people who are there doesn't help us in any way.

10           And as I said, because it is now in default, and

11   the fact that it is now under the care of trustees, my

12   understanding of Nevada law is that it can have the type of

13   distribution of assets and property proceedings one would

14   typically see with a limited liability company that's going

15   out of business, meaning they can just distribute them.

16   They have to be secured.

17       Now, I want to talk for a second about where -- there's

18   been questions about, well, where do we think this comes

19   from?  Why do we have any reason to suspect them?

20           Well, because we've seen it over and over, Your

21   Honor.  There has been a pattern of dissipation of assets

22   connected to Mr. Kwok.

23           The Ferncliff home that Greenwich Land had was

24   sold after the filing of the bankruptcy despite the fact

25   that they had been served with papers by PAX telling them do

1    not sell any property.

2              As the Trustee testified, Mei Guo, this summer,

3    while the case has been going on, sold a jet.  And when

4    asked where it is simply said I gave it to a guy.  I don't

5    know where it is.

6              G Club and HCHK employees have moved G Club assets

7    to the UAE according to the Department of Justice.  And as

8    the Trustee testified, Ms. Wang has emptied G Club mailboxes

9    of millions of dollars by having people at her direction do

10   that.

11             The idea that assets can be dissipated is not

12   speculation or mere worry, it is a very real concern.

13             Before I turn to the balance of the equities, Your

14   Honor, I do want to respond to a couple of comments made

15   that seemed to suggest that G Club is really in charge here

16   and we can feel secure.

17             All the dates on the videos you saw, all the

18   evidence that shows anyone from the NFSC on this property,

19   is all after the debtor's indictment.

20             Prior to him being indicted, there's no indication

21   that he wanted any of those people in his home.  It was his

22   home.  It's where he lived.  He wasn't interested in having

23   them as guests.  Once he was incarcerated, he had a

24   different use of the property.

25             Now, what else happened after the debtor was

1    incarcerated?

2            As we heard, G Clubs executives all resigned.

3    Your Honor knows this.  We've been here a lot about G Club.

4    And the reason they claimed that they couldn't produce

5    discovery to us in this case is because their CEO, their

6    general counsel, and all their senior management left.

7            So counsel's suggestion that it must be G Club

8    who's inviting all these people to come use the property at

9    the exact same time period that G Club's lawyers are coming

10   into this court saying there's no one from G Club with the

11   ability to make even the simplest decision of complying with

12   the subpoena is just incompatible.  They can't have it both

13   ways.

14           G Club has come to this court and said that there

15   was no senior leadership there who could do anything.

16   Counsel can't suggest that those people were there and

17   they're the ones who are managing the property and inviting

18   them in.

19           At this point, Your Honor, I want to turn to the

20   balance of the equities.

21           This is a valuable property that could provide --

22   help provide a real return for creditors.  It is not

23   someone's current home.  We are not kicking someone out of

24   where they reside full time.

25           Your Honor, we have a very clear example of how

1    that can differ.

2              Ms. Ngok, Mr. Kwok's wife, continues to reside in

3    the home that she has on Taconic Road despite the fact that

4    we have a proceeding going on against Greenwich Land.  We

5    have no concern that Ms. Ngok will destroy the home or steal

6    things from the home in which she's currently living.

7              This is not that.  The people in here don't live

8    there.  No one knows where they are.  And there's no ability

9    to seek recourse from them.  There's no prejudice to the

10   defendants in freezing the assets and excluding the NFSC and

11   them.

12             First of all, there's no indication that Mr.

13   Barnett lives in this home.  And an unnamed entity, a

14   corporate forum, doesn't need a home.  It's a corporate

15   forum.

16             Now, the NFSC members have no right to be in this

17   house.  They are there because Mr. Kwok on his own decided

18   to tell them they could go in.  Well, Mr. Kwok didn't have

19   the right to do that.  To the extent it was his asset, it is

20   now an asset of the estate.  And that was for Trustee

21   Despins to decide how to use that house.  But that's who's

22   told them.  You've seen no indication that G Club made an

23   announcement or some other -- or Mr. Barnett said please

24   come do this.

25             The only person who told all these people to come

1    there is Mr. Kwok.  He seems to have a harder time dealing

2    with the fact that he doesn't control the assets that were

3    in his estate, but he doesn't anymore, and it wasn't for him

4    to do it.

5            And again, Your Honor, I will note that there is

6    no indication that he had any interest in having anyone in

7    his house prior to his being incarcerated.  That was the

8    whole point of it.  You know.

9            We didn't realize, know about the Mahwah mansion

10   until we were sitting in front of you at that PI hearing the

11   day the indictment came down despite our investigation.

12           You could be sure that if Mr. Kwok was out there

13   broadcasting that he had this house or that he was inviting

14   all his members to be there, we would have known about it a

15   long time ago.

16           Rather, it was his secret.  That's where he lived.

17   It's where he kept his personal affects.  And he was hiding

18   it despite the fact that he was in a bankruptcy.

19           It is only now that he is caught and cannot use it

20   that he has decided the next ploy in trying to keep that

21   asset from his creditors is to rename it and say, oh, it is

22   a headquarters.  It's not.  All the documents you saw

23   indicate that it can only be used for a residential purpose.

24   No one ever intended for this to be a headquarters.  It was

25   intended to be what it says it is, a home, his home.

1        Finally, Your Honor, with regard to the factors,

2   whether this is in the public interest, I think that's

3   clear.  Providing that creditors be able to get a recovery

4   and that the assets that are available not be dissipated

5   clearly is in the public interest.  We have real reasons for

6   concern that something can happen to it.  We want to make

7   sure that doesn't happen.

8        Your Honor, before I finish, I just would like to

9   touch on the one difference between -- we had a TRO that

10  gave a great amount of the protection we needed.  We'd ask

11  that everything in the TRO be extended.

12       But I do want to also touch on some of the relief

13  that maybe wasn't appropriate at the time given the status

14  of a TRO, but for the PI, I think is.  Specifically that is

15  a direction to the Marshal Service to aid in the enforcement

16  of the preliminary injunction to the extent we need it.

17       We would love to work with counsel and get his

18  client's agreement to exclude these people and to agree that

19  they should -- that we don't have to use Marshals.  No one

20  wants to do that if we don't have to, Your Honor.

21       But if this is going to be a problem, it is just

22  not a good situation to ask the Trustee's attorneys or

23  agents to try to do this themselves.  We don't want fights.

24  We don't want conflicts.  We want this to move along

25  peaceably.  And we believe the presence of the U.S. Marshals

1   is the best way for that to happen.

2            That's why we similarly wish to have the keys

3   changed, the pads.  We just don't want any question about

4   who has access to it.

5            We ask that this proposed order be made applicable

6   to the high-ranking members of the NFSC, Pamela Si, who's

7   also known as Nicole, (indiscernible) Je, (indiscernible)

8   Brother.  These are the people we see on the video.

9            In the case of Nicole, it's someone Your Honor has

10  already made findings about in the PI that has been entered

11  into this record.

12           We believe these are persons who are -- act in

13  concert and participation with the debtor.

14           We believe rule 65 provides for this.

15           In sum, Your Honor, what we are asking for today

16  is not meant to be punitive.  It is meant to preserve

17  assets.  And we can't think of any reason why anyone who

18  cares about these assets would not want that to happen.

19           If Your Honor has any questions, I'm happy to

20  answer it.

21           THE COURT:  I do not have any questions.  Thank

22  you.

23           MR. LUFT:  Thank you, Your Honor.

24           THE COURT:  Anything further, Attorney Conway?

25           MR. CONWAY:  I would just note, Your Honor, that

1   in the event that you determine that it's appropriate to

2   enter the requested injunction that there should be a bond

3   posted by the Trustee in the amount of the value of the

4   property, which I believe we heard testimony was $26

5   million, plus the additional assets, which I believe we

6   heard testimony were about $17 million.

7          THE COURT:  So we don't know what assets are there

8   right now, Attorney Conway.

9          MR. CONWAY:  I would agree with that, Your Honor.

10          THE COURT:  Okay.  Number one.

11          Number two, the Trustee has requested that he not

12   be required to post a bond because he doesn't have money in

13   the estate to post a bond.  So I don't know if you're aware

14   of that, but I'm just letting you know that that's the

15   request that's been made.

16          I understand your request.  I'm just telling you

17   that's the request that's been made.

18          And at this point, I had -- I did not require the

19   posting of the bond in connection with the temporary

20   restraining order.

21          So in any event, anything further from anyone

22   else?

23      (No response)

24          THE COURT:  Okay.  So all the evidence has been

25   submitted.  I'll have to obviously look at the evidence and

1    rule accordingly.

2            Some form of a ruling will issue before 2 p.m.

3    tomorrow or right around 2 p.m. tomorrow, although we have

4    court in the morning too.  But we'll do what is -- I will do

5    what is appropriate under the rules and the law and upon a

6    review of the evidence.

7            So that is the only matter on today's calendar.

8    There's no other business that the Court needs to address

9    today, so court is adjourned.  Thank you, all.

10           ALL COUNSEL:  Thank you.

11        (Proceedings concluded at 4:39 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2              I, CHRISTINE FIORE, court-approved

3    transcriber and certified electronic reporter and

4    transcriber, certify that the foregoing is a correct

5    transcript from the official electronic sound recording of

6    the proceedings in the above-entitled matter.

7

8

9    _____        August 24, 2023

10      Christine Fiore, CERT

11         Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

3                    Direct    Cross    Redirect

4    WITNESSES FOR THE

5    PLAINTIFF TRUSTEE:

6    Luc Despins          8/70      110       143

7      Voir Dire          34

8    Luyi Song            55        68

9

10   PLAINTIFF TRUSTEE EXHIBITS:              ID      REC'D

11     1   Trustee Certificate of Service    151      151

12     2   Bergen County Deed                151      152

13     3   Nevada Taurus Fund, LLC Filing    145      147

14     4   Nevada Sec. of State Website Screenshot  94    95

15     5   Email Chain Regarding Kwok Boxes  109      110

16     6   AIG Insurance Declaration Page     97       98

17     9   New Mexico Taurus Management, LLC Filing 153  154

18     10  National Register of Historic Places  155

19     11  Christie's Real Estate Group Listing  11     12

20     12  LexisNexis Screenshot              96       96

21     13  Kwok Suit Label                    85       88

22     14  Kwok Personal ID Information       88       89

23     15  Family Photos                      90       94

24     16  Ferrari Papers                     90       94

25     17  Kwok RX Bottles                    91       94

Despins v. Taurus Fund - August 14, 2023

196

1 | EXHIBITS: (Cont'd)

2 | 18 | Photo of Kwok | 91 | 94

3 | 19 | Cedric DuPont Antiques Invoice | 91 | 94

4 | 20 | Judge Manning PAX Decision | 155 | 157

5 | 21 | Video Clips Labeled 9 | 15 | 70

6 | 22 | Video Clip Labeled 20 | 15 | 82

7 | 23 | Video Clip Labeled 21 | 15 | 84

8 | 24 | Video Clip Labeled 22 | 15 | 74

9 | 25 | Video Clip Labeled 23 | 15 | 76

10 | 26 | Video Clip Labeled 24 | 15 | 78

11 | 27 | Video Clip Labeled 25 | 15 | 80

12 | 28 | Judge Ostrager PAX Decision | 157 | 158

13 | 29 | Department of Justice Kwok Indictment | 158 | 161

14

15 | CLOSING ARGUMENTS:

16 | By Defendant | 171

17 | By Plaintiff | 174

18

19

20

21

22

23

24

25