UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In Re | * | Case No. 22-50073 (JAM) |
| | * | |
| HO WAN KWOK and GENEVER | * | |
|  HOLDINGS CORPORATION, | * | |
| | * | |
|             Debtor. | * | |
| | | |
| U.S. BANK NATIONAL | * | Adv. Proc No. 23-05012 |
|  ASSOCIATION, as escrow | * | |
|  agent, | * | |
| | * | |
|             Plaintiff, | * | |
|     v. | * | |
| | * | |
| HK INTERNATIONAL FUNDS | * | |
|  INVESTMENTS (USA) LIMITED, | * | |
| | * | |
|             Defendant. | * | |
| | * | |
| | | |
| LUC A. DESPINS, | * | Adv. Proc. No. 23-05013 |
| | * | |
|             Plaintiff, | * | |
| | * | |
|     v. | * | Bridgeport, Connecticut |
| | * | July 11, 2023 |
| HCHK TECHNOLOGIES, INC., | * | |
|  et al., | * | |
| | * | |
|             Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

TRANSCRIPT OF
```
#1749      APPLICATION TO EMPLOY AFFILIATES ADJUSTMENT
           GROUP, LTD. AS PUBLIC ADJUSTER
#1805      MOTION TO COMPEL COMPLIANCE WITH RULE 2004
           SUBPOENAS (SECOND OMNIBUS)(INSOFAR AS IT RELATES
           TO THE HUDSON DIAMOND ENTITIES)
#1903      MOTION TO WITHDRAW AS ATTORNEY FILED BY A. ROMNEY
#  28      MOTION FOR SUMMARY JUDGMENT
#1936      MOTION TO COMPROMISE CONTROVERSY W/BRIAN W.
           HOFMEISTER AS ASSIGNEE FOR THE BENEFIT OF
           CREDITORS OF HCHK ENTITIES UNDER NY COURT
           ASSIGNMENT PROCEEDINGS
#  25      MOTION TO COMPROMISE CONTROVERSY W/BRIAN W.
           HOFMEISTER AS ASSIGNEE FOR THE BENEFIT OF
           CREDITORS OF HCHK ENTITIES UNDER NY COURT
           ASSIGNMENT PROCEEDINGS, 3131 PRINCETON PIKE
           BLDG. 5, STE 110, LAWRENCEVILLE, NJ 08648
```

3

APPEARANCES:


Chapter 11 Trustee:                     LUC A. DESPINS, ESQ.
                                        Paul Hastings
                                        200 Park Avenue
                                        New York, NY  10166


For the Chapter 11 Trustee:             NICHOLAS A. BASSETT, ESQ.
                                        AVRAM E. LUFT, ESQ.
                                        Paul Hastings LLP
                                        200 Park Avenue
                                        New York, NY  10166


                                        PATRICK R. LINSEY, ESQ.
                                        Neubert Pepe & Monteith, PC
                                        195 Church Street
                                        New Haven, CT  06510


For the U.S. Trustee:                   HOLLEY L. CLAIBORN, ESQ.
                                        Office of the U.S. Trustee
                                        150 Court Street
                                        New Haven, CT  06510


For the Creditors Committee:            IRVE J. GOLDMAN, ESQ.
                                        Pullman & Comley
                                        850 Main Street
                                        Bridgeport, CT  06601


For HK International Funds               ERIC A. HENZY, ESQ.
 Investments, LLC and                   JAMES M. MORIARTY, ESQ.
 Mei Guo and Hudson Diamond             AARON ROMNEY, ESQ.
 NY:                                    Zeisler & Zeisler, P.C.
                                        10 Middle Street, 15th Floor
                                        Bridgeport, CT  06604


For the Plaintiff,                      LEE VARTAN, ESQ.
 HK International Funds and             Chiesa Shahinian &
 Mei Guo:                                Giantomasi, PC
                                        105 Eisenhauer Pkwy
                                        Roseland, NJ  07068


For the Assignee,                       RYAN T. JARECK, ESQ.
 Brian W. Hofmeister:                   Cole Schotz P.C.
                                        25 Main Street
                                        Court Plaza North
                                        Hackensack, NJ  07601

APPEARANCES (Cont'd):


For Various Creditors            JOSEPH M. PASTORE, III, ESQ.
 Of HCHK Technologies:           MELISSA R. McCLAMMY, ESQ.
                                 Pastore, LLC
                                 4 High Ridge Park, Third Floor
                                 Stamford, CT  06905


For Joshua Sherman:              JOSHUA SHERMAN, ESQ.
                                 HCHK Technologies, Inc.
                                 303 5th Avenue #1705
                                 New York, NY  10016


For G Club News                  GREGORY F. ARCARO, ESQ.
 Operations, LLC:                GRAFSTEIN & ARCARO, LLC
                                 114 W. Main Street, Suite 105
                                 New Britain, CT  06051


For G Club Operations, LLC:      KELLIANE BARANOWSKY, ESQ.
                                 Green & Sklarz, LLC
                                 1 Audubon Street, 3rd Floor
                                 New Haven, CT  06511

                                 CAROLINA A. FORNOS, ESQ.
                                 Pillsbury Winthrop Shaw Pittman
                                 31 West 52nd Street
                                 New York, NY  10019

1          (Proceedings commenced at 12:33 p.m.)

2              THE COURTROOM DEPUTY:  Case Number 22-50073, Ho

3      Wan Kwok and Genever Holdings, LLC.  Adversary Number --

4      excuse me, 23-5012, U.S. Bank National Association vs. HK

5      Funds Limited.  And also, Case Number 23 -- Adversary Number

6      23-5013, Despins vs. HCHK Technologies, Inc.

7              THE COURT:  Okay.  Good afternoon.  If we could

8      have appearances for the record, starting with the Chapter

9      11 Trustee, please.

10             MR. DESPINS:  Good afternoon, Your Honor.  Luc

11     Despins, Chapter 11 Trustee.

12             MR. BASSETT:  Good afternoon, Your Honor.  Nick

13     Bassett from Paul Hastings on behalf of the Chapter 11

14     Trustee.

15             MR. LINSEY:  Good afternoon, Patrick Linsey,

16     Connecticut counsel for the trustee.

17             MS. CLAIBORN:  Good afternoon, Your Honor.  Holley

18     Claiborn for the U.S. Trustee.

19             MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

20     Goldman, Pullman & Comley, for the Creditors' Committee.

21             MR. MORIARTY:  Good afternoon, Your Honor.  James

22     Moriarty from Zeisler & Zeisler for the debtor and also for

23     HK International Funds Investments (USA) Limited, LLC in

24     Docket 23-05012.

25             MR. ROMNEY:  Good afternoon, Your Honor.  Aaron

1    Romney for the same parties as well as for Hudson Diamond

2    Holdings, LLC.  And I'm appearing today on behalf of myself

3    in response to the Court's order to show cause.

4           I also want to put on the record, Attorney Vartan

5    was stuck in very terrible traffic.  He should be here any

6    minute.

7           THE COURT:  Okay.  Thank you.

8           MR. MORIARTY:  Thank you.

9           MR. HENZY:  And Eric Henzy on behalf of the debtor

10   and also potentially on behalf of Mr. Romney.

11          THE COURT:  The debtor, Mr. Kwok?

12          MR. HENZY:  Correct, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          MR. HENZY:  Thank you, Your Honor.

15          THE COURT:  Attorney Vartan?

16          MR. VARTAN:  Good afternoon, Your Honor Lee Vartan

17   also on behalf of Mei Guo and HK USA.

18          THE COURT:  Good afternoon.

19          MR. VARTAN:  Good afternoon.

20          THE COURT:  All right.  Trustee Despins, there are

21   several matters on the calendar today.  We've just gone

22   through appearances.  How would you like to proceed today?

23          MR. DESPINS:  We had promised Mr. Romney that we

24   would start with his matter, so unless the Court has a

25   preference, we're okay with that order.

1          MR. ROMNEY:  If I may, Your Honor, just by further

2     way of explanation?  I have a 7:00 flight out of LaGuardia

3     for depositions in Atlanta tomorrow which I'm very much

4     trying to make.

5          THE COURT:  Okay.  Then we will proceed that way.

6          MR. DESPINS:  Actually, Your Honor, if I -- maybe

7     take five minutes to do the public adjustor retention.

8     Mr. Luft is also -- was also stuck in traffic.  He's on his

9     way.  Should be here.

10          MR. ROMNEY:  I think he'll be here in five minutes

11     or so.  If he's not here by the time we get through this,

12     somebody else can handle the motion to withdraw.  I'll

13     handle the motion to withdraw if Mr. Luft is not here.  But

14     this will take probably five minutes.

15          MR. DESPINS:  The public adjustor retention.

16          THE COURT:  Okay.  Does any -- Mr. Romney, do you

17     have any opposition if we --

18          MR. ROMNEY:  No, of course not.

19          THE COURT:  Okay.  Thank you.

20          MR. ROMNEY:  Thank you.

21          THE COURT:  All right.  Then let's address the

22     application to employ the public adjustor first which is in

23     the main case, ECF Number 1749.

24          MR. DESPINS:  Correct, Your Honor.  And you may

25     have noticed that we filed a amended retention order at

1    Docket Number 1992, because we had received comments from

2    the U.S. Trustee to -- so at 1992 you have both the clean

3    and the marked to show changes.  1992 at pages 10 and -- of

4    the 11 -- or, sorry, 10 of 11, yes?  You can see the

5    changes.  And, basically, it was to clarify their

6    compensation.

7            Just to give you a little bit of background, this

8    is regarding the fire at The Sherry Netherland.  Public

9    adjustors are often retained by companies or owners to

10   negotiate settlements with insurance companies.  And you

11   might say, well, but there's no settlement with the

12   insurance company.  Good point.

13           But there may come a time where there would be a

14   settlement mode.  And, here, this retention is purely on a

15   contingency basis.  So no settlement, no compensation.  And

16   this person actually has been very helpful in helping me

17   prepare things like a proof of claim.  You need to actually

18   submit to the insurance company a claim form.  And we did

19   that with respect to -- and he did that with respect to the

20   cleanup costs, et cetera, et cetera.

21           So even though at one point we thought we were

22   going to put this retention to the side for now, it's

23   becoming clear now that we need this person to do the

24   various -- you know, all the legwork that needs to be done

25   with respect to the evaluation of the claim.  And given

1     that, again, he doesn't get paid anything unless there's a

2     recovery from the insurance company, we believe it's --

3     that, you know, it's appropriate to go forward, because

4     there's no risk to Genever US, which is the entity retaining

5     him.

6              And just for the record, to state the

7     compensation, basically it's 5 percent on the first 3

8     million or less plus 4 percent on any settlement proceeds

9     recovered in excess of 3 million up to 15 million, plus 3

10    percent on any settlements recovered in excess of 15 million

11    up to 50 million.

12             And we also made a correction to state that the

13    public adjustor -- the acronym is AAGL -- will not hold any

14    settlement proceeds recovered under such insurance policies.

15    That's a change that the U.S. Trustee wanted to make, and so

16    we made that change.

17             So at this point, there had been an objection

18    filed by PAX.  It was withdrawn.  We have been working with

19    PAX on this, and we're happy that they withdrew the

20    objection.  And at this point, we would -- subject to any

21    comments Your Honor may have with respect to the order, we

22    would like to proceed with the retention.

23             THE COURT:  I have no comments or questions at

24    this time.

25             Attorney Claiborn, do you wish to be heard?

1          MS. CLAIBORN:  Thank you, Your Honor.  The order

2     as revised and filed at ECF 1992 resolves the U.S. Trustee's

3     concerns.

4          THE COURT:  Okay.  Thank you.

5          And I note, obviously, that the application is

6     both under 327(a) and 328 because of the setting of the

7     compensation at this time, the schedule of compensation.

8          Does anyone else wish to be heard on the

9     application -- the trustee's application to employ the

10    public adjustor, Affiliated Adjustment Group, LTD?  All

11    right.  Hearing nothing, I have seen no written objections

12    other than the objection of PAX, which I note for the record

13    was withdrawn.

14         The United States Trustee has just stated their

15    position that they are in support of the application in

16    connection with the revised proposed order that was filed on

17    the docket yesterday at ECF Number 1992 which resolves any

18    concerns that the U.S. Trustee has.

19         I understand the reason for the retention that you

20    are seeking, Trustee Despins, and it certainly seems to be

21    reasonable under the circumstances of the case.  And for all

22    those reasons, the application to employ Affiliated

23    Adjustment Group as a public adjustor is granted, and the

24    proposed order that is -- appears on pages 5, 6, and 7 of

25    ECF Number 1992 can enter.

1          MR. DESPINS:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. DESPINS:  So at this point, Your Honor, our

4     colleague is in route, but we shouldn't hold up the hearing

5     for him.  So we're ready to go forward.

6          THE COURT:  Okay.  Give me one second, please.

7          MR. DESPINS:  Okay.  All right.  The other -- the

8     next matter -- there are many matters on the calendar.  But

9     we -- Attorney Romney specifically requested and the trustee

10    and the trustee's counsel agreed to proceed next with the

11    motion to withdraw as attorney filed by Attorney Romney,

12    1903, on behalf of the Hudson Diamond entities from which an

13    appearance was filed.

14          I had indicated that the -- Attorney Romney and

15    Attorney Vartan needed to appear today to address the motion

16    to withdraw.  And I -- and both are in the courtroom.  So,

17    Attorney Romney, do you wish to proceed?

18          MR. ROMNEY:  I do, Your Honor.  One point of

19    clarification.  Your Honor just said a moment ago that it

20    was a motion to withdraw from representation of the Hudson

21    Diamond entities.  It's just the Hudson Diamond New York

22    entity, Your Honor.

23          THE COURT:  Okay.  That's true.  I did see that.

24    I'm sorry.  But I thought originally -- originally, I

25    thought it was all of the entities.  But you're correct.

1    Thank you for noting that for the record.

2          MR. ROMNEY:  Understood, Your Honor.  Your Honor,

3    as more further set forth in the affidavit submitted at the

4    request of the U.S. Trustee, this is a situation where we

5    became aware of a subpoena directed to the -- both Hudson

6    Diamond entities by virtue of the trustee's motion to compel

7    filed in May.  That motion to compel identified Hudson

8    Diamond Holdings, LLC as the sole member of Hudson Diamond

9    New York and had documentation supporting that proposition

10   attached to it.  The -- and sought contempt against both

11   entities.

12         I had been -- known as of that time that Ms. Guo

13   was -- is the sole member of Hudson Diamond Holdings.  And I

14   was under the very distinct impression for a number of

15   reasons, including the Chapter 11 trustee's pleading but

16   also conversations that I've had with Ms. Guo who was under

17   the impression, that Hudson Diamond New York was a

18   wholly-owned subsidiary of Hudson Diamond Holdings.

19         That is why I negotiated an extension on behalf of

20   both entities.  That is why I filed an appearance on behalf

21   of both entities.  And that is why both Attorney Vartan and

22   I following the negotiation of an adjournment in order to

23   allow compliance diligently attempted to locate documents on

24   behalf of both entities, neither of which were in the actual

25   physical possession of the natural human being that's our

1    client, Ms. Guo.

2            During the course of that investigation/process,

3    we were told by the general counsel of Hodgson Russ, LLP

4    that Ms. Guo was not the -- sorry, that Hudson Diamond

5    Holdings, LLC was not the sole member of Hudson Diamond New

6    York and, at that time, identified another individual who is

7    identified in my affidavit, the debtor's son, Mileson Guo,

8    was the member of that entity.

9            At that moment, as stated in my affidavit, I

10   immediately first sought the advice of firm's general

11   counsel who's with me today, Mr. Henzy.  The next thing I

12   did was call Attorney Luft to tell him that I had just been

13   informed that it appeared Hudson Diamond Holdings was not

14   the sole member and that it appeared I had made a mistake

15   and that I intended to withdraw, because I didn't believe I

16   had authority to represent the New York entity as

17   distinguished from the holdings entity which, to this -- am

18   positive that I have authority to represent.

19           My understanding is that under the rules of

20   professional conduct, Rule 1.16(b), I cannot represent an

21   entity unless I've been authorized by someone with actual

22   authority and, therefore, must withdraw.  And that's why I

23   filed a motion to withdraw, because at the time that I filed

24   the motion to withdraw, based upon the representation of the

25   general counsel of a very reputable firm who I believe to be

1    an honest person and upstanding member of the bar, led me to

2    believe that I had made a mistake.

3            Subsequent to filing that motion, further

4    questions have been raised that now, as I sit here today, I

5    do not know who the sole member of Hudson Diamond New York

6    is.  And as set forth in my affidavit, on -- I believe it

7    was June 25th, Attorney Luft brought a document to my

8    attention which was attached to their motion to compel and

9    for contempt that was consistent with our original

10   understanding that, in fact, Hudson Diamond Holdings was the

11   sole member of this New York entity -- of the Hudson Diamond

12   New York entity, and that Mei Guo was the sole member of

13   Hudson Diamond Holdings.

14           At that point, Attorney Vartan and I reached out

15   to Hodgson Russ that confirmed that they, in fact, had

16   prepared that document on which the Chapter 11 trustee

17   appears to have relied, which was entirely consistent with

18   Ms. Guo's original understanding that the holdings entity

19   was the parent of the New York entity.  They do not have any

20   explanation for why they have an operating agreement that

21   says the debtor's son or an entity he controls is the parent

22   of that entity, but they also prepared and are in possession

23   of a document that indicates Ms. Guo's entity is the parent

24   of this New York entity.

25           Because, as I stand here today, I have no

1   confidence that I have actual authority to represent the New

2   York entity, I believe that the Rules of Professional

3   Conduct require me to continue to pursue this motion to

4   withdraw.  Since the day that this issue has arisen, other

5   than what I say what I do every day, which is wake up and

6   make sure my family is okay, this has been my number one

7   priority to both gather documents or attempt to locate

8   documents and attempt to answer this question so that I

9   could come in here today and answer any questions the Court

10  has or anyone else.  I've done my best, but that's what I

11  have for the Court today.

12         Everything that I did was an attempt to further

13  this process to avoid a situation where it appeared that

14  either me, my firm, or Ms. Guo or any entity that she

15  controls was attempting to ignore a court order or do

16  anything other than attempt to comply with it.  And that has

17  at all times been my sole motivation for every action that I

18  have undertaken in connection with this entire process.

19         I'm prepared to answer any questions that the

20  Court or anybody else in the room has, but with that I rest

21  on my motion.

22         THE COURT:  Well, I'm going to ask other parties

23  to raise their issues, and then I'll see if I have any

24  questions.  Attorney Romney, you did file a -- an affidavit,

25  but I don't think -- and I may have missed -- Attorney

Ho Wan Kwok - July 11, 2023                     16

1    Vartan, did you file anything?

2              MR. VARTAN:  I did not, Your Honor.  But I've

3    obviously reviewed Attorney Romney's affidavit, and I --

4              THE COURT:  Well, that doesn't -- that's fine.  I

5    just wanted to know whether you filed anything.

6              MR. VARTAN:  Oh.  I have not, Your Honor.

7              THE COURT:  And why did you not file anything?

8              MR. VARTAN:  Because everything that Mr. Romney

9    cited in his affidavit is consistent with the record, and I

10   have nothing more --

11             THE COURT:  And don't you have an obligation to

12   make a statement to the Court and not through Attorney

13   Romney?  I mean, the issues that we've talked about in this

14   case at different times is who represents whom, who's acting

15   in what nature, you're local counsel, you're main counsel.

16   We've had these discussion before.

17             And the discussion -- what I don't understand

18   is -- I know you're here, and I appreciate that you're here,

19   but I don't understand why Attorney Romney is the only one

20   that filed an affidavit.  I would think you would have filed

21   an affidavit.  And Attorney Romney has stated, as have other

22   members from his firm, that they got involved and were

23   retained through discussions with you, that your -- you had

24   the contact with the client.

25             Attorney Romney didn't speak directly to Mei Guo.

1    That's not what your affidavit says.  You said you and

2    Attorney Vartan --

3              MR. ROMNEY:  We --

4              THE COURT:  -- spoke with Mei Guo.  And doesn't

5    Attorney Vartan have the relationship with Mei Guo?  Don't

6    you, sir?

7              MR. VARTAN:  Your Honor, I certainly do have a

8    relationship with the client, as does --

9              THE COURT:  Well, who retained you, Attorney

10   Vartan?

11             MR. VARTAN:  Ms. Guo did.

12             THE COURT:  Okay.  And who did she retain when she

13   retained you?  Did she retain you, or did she retain you and

14   Mr. Romney?

15             MR. VARTAN:  Both of us.

16             THE COURT:  Okay.  And there's --

17             MR. VARTAN:  Well, Mr. Romney had already been

18   retained, Your Honor.

19             THE COURT:  In connection with the motion for

20   contempt?

21             MR. VARTAN:  So in -- I was answering questions

22   with respect to Ms. Guo's retention of Mr. Romney and then

23   Ms. -- with me generally.  With respect to the Hudson

24   Diamond entities, Mr. Romney and I both spoke with Ms. Guo.

25             THE COURT:  And why didn't you file an appearance

1    on behalf of the Hudson Diamond entities?

2                MR. VARTAN:  I was planning on doing so, but

3    Mr. Romney put forward in his affidavit why I did not.

4                THE COURT:  Well, that's Mr. Romney's affidavit.

5    That's not your affidavit.

6                MR. VARTAN:  No, I understand, Your Honor.  But

7    there was nothing that I had to add to the record beyond

8    what Mr. Romney put forward in his affidavit.  And I'm also

9    happy to answer any questions that Your Honor may have or

10   anyone else may have.

11               THE COURT:  Well, I just asked you a question that

12   you didn't answer.  Why didn't you file an affidavit?

13               MR. VARTAN:  Because, again, I didn't have

14   anything more to add to the record.  And I didn't have an

15   understanding that we were under court order to file.

16               THE COURT:  Well, it says on an order entered on

17   June 20, 2023, that you were to appear and show cause why

18   the motion to withdraw should not be granted.  And then the

19   United States Trustee filed a response to the motion to

20   withdraw.  And, remember -- well, maybe you don't remember,

21   but I do -- that there was a hearing on the motion to compel

22   at which I was told on the record through counsel, and which

23   included you, that you were resolving -- or attempting to

24   resolve the motion for contempt, because you represented the

25   Hudson Diamond entities and that you would be producing

1    documents in accordance with the subpoena.

2          Immediately after -- no, that's not fair.  It's

3    not immediately after.  But shortly after that hearing,

4    Attorney Romney files a motion to withdraw the appearance.

5          Now, I've asked on many occasions, is Mr. Romney

6    taking direction from Ms. Guo, or is he taking direction

7    from you and Ms. Guo?  I've had that discussion.  Because

8    we've had a discussion about who's local counsel, who's main

9    counsel.

10         We're not going to do this where -- you're at two

11   different firms.  Either you're both counsel where you both

12   are bound and have to comply with court orders or you're

13   not.  But we're not going to have, oh, I'm not going to say

14   anything further because Attorney Romney already said it.

15         Otherwise, why would I put you in that order?  I

16   put you in that order, sir, because you're the person who's

17   come in and said you have the client contact and authority

18   with Ms. Guo.  That's what you've said on many occasions in

19   this court.  And you've said it in -- and the pleadings that

20   are filed are signed by you first and then Attorney Romney.

21         So the -- you have an obligation, a professional

22   obligation and ethical obligation, to the Court and all the

23   parties involved in the case.  So I don't understand why --

24   so that's fine.  If you're telling me you're going to rely

25   on Attorney Romney's affidavit, that's what you're telling

1   me.  I'm not sure that's showing cause why the motion to

2   withdraw shouldn't be granted.

3         But in any event, with regard to -- a couple of

4   questions with regard to Hodgson Russ.  You talk about --

5   first of all, I don't see how there's been any -- maybe

6   there has been.  But there's nothing in the record before me

7   right now that shows that there's been any compliance with

8   the motion for contempt even on behalf of the entity which

9   you say you still represent, which is Hudson Diamond

10  Holdings.

11        Has there been any compliance with the subpoena?

12        MR. ROMNEY:  Yes, there has, Your Honor.

13        THE COURT:  And what has that compliance been?

14        MR. ROMNEY:  The compliance on January -- excuse

15  me -- June 15th, which was the deadline for compliance,

16  Attorney Vartan sent a letter which the two of us prepared,

17  that explained that -- what we had done at -- as of that

18  time to attempt to locate documents.  It provided the

19  operating agreement that showed Ms. Guo controlled Hudson

20  Diamond Holdings, LLC.  It provided the articles of

21  organization that showed Hudson Diamond Holdings' creation.

22  It explained the efforts that we had undertaken to attempt

23  to locate documents.

24        We, as officers of the court and our client as a

25  natural human being, only have the ability to produce

1    documents that we can physically possess or that are under

2    the possession of people who we have the ability to control,

3    in other words that we constructively control.  We have

4    attempted every which way that we could to locate documents,

5    and we have produced what we could.

6              But we -- and we have also identified other

7    sources of documents where we believe to have them but will

8    not give them to us or Ms. Guo, such as Hodgson Russ and

9    Capital One Bank.  We have done everything we could, but

10   they will not give them to us.

11             The other two individuals who --

12             THE COURT:  Well, so let's slow down a little bit

13   on that.  Okay?  So there's a couple of things that you

14   said.  You said that you -- but Attorney Vartan signed a

15   letter and sent it to the trustee on June 15th saying you've

16   done all you can to comply.  Is that right?  I think I --

17   I'm just making sure I heard what you said.

18             MR. ROMNEY:  We didn't say we've done all we can

19   to comply.  We said that.  But also -- meaning, yes, that's

20   a fair summary of what we said.  And we produced the

21   documents I just described.

22             THE COURT:  Okay.  And tell me -- I apologize.

23   What are the documents that were produced on June 15th?

24             MR. ROMNEY:  It's the Hudson Diamond Holdings

25   operating agreement signed by Ms. Guo.

1          THE COURT:  Signed by -- so Exhibit T?

2          MR. ROMNEY:  No.

3          THE COURT:  The two -- the two-page document?

4          MR. ROMNEY:  No.

5          THE COURT:  So there's an operating agreement.

6          MR. ROMNEY:  There's a --

7          THE COURT:  How many pages is that document?  You

8     don't need to tell me exactly.  I'm saying like is it -- are

9     you talking about a 25-page document --

10          MR. ROMNEY:  I believe it --

11          THE COURT:  -- a 50-page document?

12          MR. ROMNEY:  I believe it's about a five-page --

13          THE COURT:  Okay.

14          MR. ROMNEY:  -- five or six-page document.

15          THE COURT:  And that operating -- that agreement

16     is an operating agreement of which entity?

17          MR. ROMNEY:  Hudson Diamond Holdings, LLC signed

18     by Mei Guo as the sole member.

19          THE COURT:  Okay.  And you -- you're telling me,

20     and I'm just trying to make it clear for the record, that

21     Mei Guo retained you specifically to represent Hudson

22     Diamond Holding, LLC in this case in connection with the

23     motion for contempt?

24          MR. ROMNEY:  She directed me to represent Hudson

25     Diamond Holdings, LLC in connection with --

Ho Wan Kwok - July 11, 2023                    23

1          THE COURT:  So she didn't retain you?

2          MR. ROMNEY:  I don't understand the distinction.

3          THE COURT:  Well, I think there is a --

4          MR. ROMNEY:  But we do not have a separate

5     retention letter.

6          THE COURT:  You do not have a separate -- is that

7     what you said?

8          MR. ROMNEY:  With the entity.  That's correct.

9          THE COURT:  Okay.  So you don't have a separate

10    retention letter with regard to Hudson Diamond Holdings,

11    LLC.  And you believed at the time that she directed you to

12    represent the Hudson Diamond entities.  That included Hudson

13    Diamond New York, LLC, correct?

14         MR. ROMNEY:  No.  I know that she did.

15         THE COURT:  Okay.  Yeah.

16         MR. ROMNEY:  Yeah.

17         THE COURT:  Okay.  So then things progress.  You

18    file a notice of appearance, and you come to the Court and

19    you say at the hearing on the motion for contempt, which I'm

20    not saying it would have happened, okay, but the trustee's

21    counsel was pressing for an order of contempt against both

22    Hudson Diamond New York, LLC and Hudson Diamond Holding,

23    LLC.  You say --

24         MR. ROMNEY:  Yes.  And that matter is on the

25    calendar today.

1          THE COURT:  Right.  But at that original hearing,

2     you said we have an agreement to adjourn that hearing

3     because we're going to enter into a consent order about how

4     we're going to comply with the subpoenas essentially,

5     correct?

6          MR. ROMNEY:  I think we actually entered into it

7     on the record.

8          THE COURT:  No, you did.

9          MR. ROMNEY:  Yeah.

10         THE COURT:  I'm actually looking at it right now.

11         MR. ROMNEY:  Yeah.  Yeah.

12         THE COURT:  Okay.

13         MR. ROMNEY:  Meaning we entered into it orally on

14    the record and then submitted --

15         THE COURT:  But then you entered into an order

16    regarding the motion for entry, holding Hudson Diamond New

17    York, LLC, and Hudson Diamond Holdings, LLC in civil

18    contempt for failing to respond to the subpoenas.  And in

19    that order, the Hudson entities say that they have no reason

20    to and therefore do not dispute that they were properly

21    served with the 2004 subpoenas directed to each of them and

22    that they contend that the relevant individual of the Hudson

23    entities was not actually made aware of the subpoenas until

24    after the filing of the motion.  So who was the relevant

25    individual at the Hudson entities that was not made --

1   actually made aware of the subpoenas until after the filing

2   of the motion for contempt?

3            MR. ROMNEY:  Ms. Guo was the individual --

4            THE COURT:  Okay.

5            MR. ROMNEY:  -- I was referring to in that

6   statement.

7            THE COURT:  Okay.

8            MR. ROMNEY:  And what we meant by it was we have

9   no reason to doubt the veracity of the returns of service

10   that indicate that statutory service agents were signed.

11   But what I was reporting back was that as best I could tell,

12   Ms. Guo was learning about those subpoenas for the first

13   time when Attorney Vartan and I -- I think it was actually

14   me in that particular case that sent the email.  And then

15   the three of us had a phone call together.  But that it

16   appeared that we were informing her of those subpoenas.

17            THE COURT:  Why do you say it appeared that we

18   were informing her?  You know or didn't know?

19            MR. ROMNEY:  Well, I don't --

20            THE COURT:  She's told you she'd never seen the

21   subpoenas before?

22            MR. ROMNEY:  Without waiving privilege with

23   respect to any other statement, yes.

24            THE COURT:  Okay.  Well, I don't think it's

25   waiving privilege if you want to show cause as to why you

1    want to be -- withdraw as an attorney, right?  Otherwise,

2    you bring Ms. Guo in.  She can testify.  Right?  You could

3    bring her in.  She could support everything you've said.

4              MR. ROMNEY:  Your Honor, right now I'm the one

5    with the target on my back, and I'm not going to throw my

6    client under the bus.

7              THE COURT:  I don't understand what that statement

8    means, what you just said.

9              MR. ROMNEY:  The Court is obviously upset with

10   something I've done, and I'm here to explain my behavior.

11             THE COURT:  No, I didn't say -- I'm asking

12   questions.  You said -- I think you ended your presentation

13   by saying does the Court have any questions.  And, yes, I

14   do.  So I'm asking them.

15             MR. ROMNEY:  Understood.  And that -- and I'm here

16   to ease your concerns.  But I understand that you're

17   concerned.  And that's --

18             THE COURT:  Well, I am concerned, because there

19   was an agreement made on the record that there would be

20   compliance with a subpoena so that the Court would not rule

21   on the motion for contempt with regard to the Hudson Diamond

22   entities that you filed a notice of appearance on behalf of.

23   And in your affidavit and in your statements here -- and

24   Mr. Vartan's not disputing it -- it's with -- in

25   consultation with Mr. Vartan too.

1          So if you have a target on your back, it may be

2     placed by somebody else other than the Court.  Because

3     you're putting yourself out there, and I'm not sure why.

4     Because at this point, you're saying you believe that Mei

5     Guo didn't know about the subpoenas until the motion for

6     contempt was filed and you sent an email and then had a

7     phone call with Attorney Vartan and Ms. Guo.

8          MR. ROMNEY:  The typical practice when there's

9     matters of substance is for the three of us to have a phone

10    call and discuss matters concerning her or entities that she

11    controls.  And sometimes -- I mean, we can't jointly send an

12    email.  Sometimes one of us sends it.  And if there's a

13    ministerial update, either one of us could have the call.

14         But my point was, in this particular case, I have

15    a recollection of going through my emails where I was the

16    one that sent the subpoenas to her and then requested a call

17    with her and Attorney Vartan.  And then we had that call.

18         THE COURT:  Okay.  So who authorized you to file

19    the notice of appearance on behalf of Hudson Diamond, LLC

20    and Hudson Diamond New York, LLC?

21         MR. ROMNEY:  Just so we have a clear record, it's

22    Hudson Diamond Holdings, LLC and Hudson Diamond New York,

23    LLC.

24         THE COURT:  That's fine.  Hudson Diamond New York,

25    LLC and Hudson Diamond -- because the notice of appearance

1    was on behalf of both of those entities, correct?

2              MR. ROMNEY:  Correct.

3              THE COURT:  Okay.  And who authorized you to file

4    that notice of appearance?

5              MR. ROMNEY:  Mei Guo.

6              THE COURT:  Okay.  And in what capacity?

7              MR. ROMNEY:  As counsel for those entities

8    believing that --

9              THE COURT:  No, I'm sorry.  I didn't ask the

10   question properly.  I'm sorry.  How do you believe she had

11   authority to direct you to file an appearance on behalf of

12   Hudson Diamond New York, LLC and Hudson Diamond Holding,

13   LLC?

14             MR. ROMNEY:  Well, as stated, but apparently not

15   very clearly, the Chapter 11 trustee's motion for contempt

16   represents that Hudson Diamond Holdings, LLC is the parent

17   of Hudson Diamond New York and that Mei Guo is the sole

18   member of Hudson Diamond Holdings, LLC.  I knew that Mei Guo

19   was the sole -- was the parent -- sorry, the sole member of

20   Hudson Diamond Holdings, LLC.

21             I also believed based upon statements from

22   Ms. Guo, which I believe she was subjectively -- I believe

23   she believed she was the sole member of Hudson Diamond

24   Holdings and that Hudson Diamond Holdings was the sole

25   member of Hudson Diamond New York.  I believe the basis of

1    her belief, among other things, is that she had been asked

2    to sign documents on behalf of Hudson Diamond New York as

3    the member of Hudson Diamond Holdings which was New York's

4    sole member.

5           And the sole reason that caused us to believe that

6    Ms. Guo was mistaken, just like I may or may not have been

7    mistaken based upon what we know now, is that Hodgson Russ

8    informed Attorney Vartan and I when we called them together,

9    Attorney Kevin Kearney stated to us that Hudson Holdings,

10   LLC was not the sole member of Hudson Diamond -- Hudson

11   Diamond New York and that he was -- appeared to have been

12   reading an operating agreement that his firm had prepared

13   that indicated that the debtor's son was the sole member of

14   the New York entity.

15          THE COURT:  Of Hudson Diamond New York, LLC?

16          MR. ROMNEY:  Hudson Diamond New York, LLC.  Which

17   is what prompted me to immediately consult with Attorney

18   Henzy, immediately call Attorney Luft, and then the

19   following morning file my motion to withdraw the appearance

20   pursuant to what I believed I had to do under Rule 1.16(b)

21   of the Rules of Professional Conduct.

22          THE COURT:  With regard to the operating agreement

23   of Hudson Diamond New York, LLC, you may have done this --

24   I'm sorry, but there are, as you know, substantial amount of

25   documents in this case.  Have you filed that operating

1     agreement on the docket somewhere that indicates that the

2     debtor's -- the individual debtor's son is the member of

3     Hudson Diamond New York, LLC?

4                 MR. ROMNEY:  I don't have that operating

5     agreement --

6                 THE COURT:  Okay.

7                 MR. ROMNEY:  -- because Hodgson -- Hodgson Russ

8     would not provide any information concerning any of the

9     Hudson Diamond entities to me, Ms. Guo, or Attorney Vartan.

10    And in my affidavit -- declaration, excuse me, as well as

11    copied into the body of the declaration as well as the email

12    chain with the attachment evidenced that Hodgson Russ will

13    not give us any documentation concerning those entities.  So

14    I don't have it.  All I had was the word of the general

15    counsel of what I understand to be a highly reputable firm

16    telling me that the debtor's son was the member.

17                THE COURT:  So --

18                MR. ROMNEY:  He then subsequently amended his

19    statement to say that it was not the debtor's son in his

20    individual capacity but the debtor's son as an officer

21    and -- an officer in some other capacity of some third

22    entity, Hudson Diamond Holdings, Inc., which is a British

23    Virgin Island company, which I have no idea who actually

24    owns that entity, only I believe it -- I have no reason to

25    believe it's Ms. Guo.  Ms. Guo has no reason to believe it's

1   her.  And it appears to be the debtor's son based upon

2   statements that Hodgson Russ has made to us, because he

3   appears to be signing documents on behalf of that entity.

4            THE COURT:  So you filed a motion to withdraw your

5   appearance because Hodgson Russ told you that Hudson Diamond

6   New York, LLC's managing member is the debtor -- individual

7   debtor's son, but you never saw a document that confirmed

8   that?

9            MR. ROMNEY:  He would not give it to me, so that's

10  correct.

11           THE COURT:  Okay.  Okay.

12           MR. ROMNEY:  Which leaves me where I am right now,

13  because Hodgson Russ has also prepared a subsequent document

14  that indicates that it prepared a document for Ms. Guo to

15  sign as the member of Hudson Diamond Holdings, LLC as the

16  sole member of Hudson Diamond New York.  So where I stand

17  here right now is I don't know who the sole member of Hudson

18  Diamond New York is.  Hodgson Russ doesn't appear to know.

19           I've asked them for information concerning why

20  they prepared this document which is the only document they

21  first identified to Attorney Vartan and I at the time I

22  filed the motion to withdraw.  They have not explained to me

23  why they produced that document that referenced the debtor's

24  son and the debtor's -- and then subsequently prepared a

25  document identifying the debtor's daughter as the indirect

1   member of the New York entity.  And, therefore, I have

2   absolutely no idea which one it is.  And that's why I

3   believe I'm required to pursue my motion to withdraw my

4   appearance.

5          I will say that to the extent I was able to

6   determine that Ms. Guo directly or indirectly is, in fact,

7   the member, indirect member or person with the authority to

8   control or retain counsel for Hudson Diamond New York, I

9   would withdraw my -- well, I would withdraw my -- I would

10  withdraw my motion to withdraw my appearance, because I am

11  in no way trying to hide from this situation, run from this

12  situation, or try and pull a fast one on behalf of Hudson

13  Diamond New York, Hudson Diamond anything or Ms. Guo.  I am

14  simply trying to fulfill my ethical duties to this Court, my

15  sole natural client in this situation, Ms. Guo, and everyone

16  else in the room.

17         THE COURT:  Well, she's not your client in this

18  situation.

19         MR. ROMNEY:  No.  But she's my client in general.

20  I mean --

21         THE COURT:  No.  But she's not your client in this

22  situation.  The client -- and you've been very careful, and

23  I understand why.  The client -- the only client you

24  represent at this point -- or that you believe you represent

25  and had authority to represent is Hudson Diamond Holding,

1    LLC.

2            MR. ROMNEY:  Correct.  But my statement, Your

3    Honor, and maybe it wasn't precise enough, was that all I'm

4    trying to do is my best to fulfill my ethical obligations to

5    the Court, the Hudson Diamond entities, Ms. Guo, and

6    everybody else in the room.  I don't represent anybody else

7    in this room, but I have ethical obligations to them just

8    like I have ethical obligations to the Court.  And that's to

9    tell the truth and to do my best and to honor the agreements

10    that I make to the best of my ability.  And that's what I do

11    every day in every one of my cases.  And it's what I'm doing

12    right now.

13            THE COURT:  Well, let me ask one more question.

14    So the hearing on the motion to -- for contempt was held on

15    June 6th.

16            MR. ROMNEY:  Correct.

17            THE COURT:  There were a number of hearings held

18    on that day, but that was one of -- that -- the motion for

19    contempt directed against many parties, including the Hudson

20    Diamond New York, LLC and the Hudson Diamond Holdings, LLC

21    entities.  And at that hearing, you had filed a notice of

22    appearance before that hearing.

23            You had prepared -- appeared at that hearing and

24    said there was an agreement with regard to the production

25    and that the production would be completed, not just done

1    but completed, by June 15th on behalf of both entities.  And

2    then on June 8th, the consent order was filed that

3    memorialized the agreement made on the record on June 6th.

4    And the Court entered that order, I think.  I don't know if

5    it was the same day or the next day.  Apparently, it looks

6    like the same day.  And then -- which is June 8th.  And that

7    order is ECF 1896.

8            And so as of June 6th -- and, again, confirmed on

9    June 8th, you represented both Hudson Diamond -- excuse

10   me -- New York, LLC and Hudson Diamond Holdings, LLC.  And

11   you and Attorney Vartan represented that you were going to

12   complete the compliance with the subpoenas by June 15.  On

13   June 13, two days before -- you know, so five days after the

14   consent order entered but two days before the compliance was

15   due, you filed a motion to withdraw only as to Hudson

16   Diamond New York, LLC.

17           So you're saying -- I want to just make sure that

18   I understand.  You're saying from -- you have complied with

19   the consent order as far as Hudson Diamond Holdings, LLC is

20   concerned?

21           MR. ROMNEY:  That's correct.

22           THE COURT:  Okay.  And what about Hudson Diamond

23   New York, LLC?  They haven't complied, correct?

24           MR. ROMNEY:  I'll answer that, if I may, two ways.

25   I believe that's correct.  And I am not here to oppose and

1    do not intend to oppose and will not oppose an entry of an

2    order of contempt against the New York entity, because I

3    don't have authority to argue that one way or another.  Or

4    I'm not convinced that I do.

5         What I will say is that in the intervening period

6    between June 6th, when I entered into the stipulated order

7    that Your Honor just described, and the present, Attorney

8    Vartan and I and Ms. Guo have attempted to locate documents

9    concerning Hudson Diamond New York as well as Hudson Diamond

10   Holdings.  And we have just not been able to locate them.

11        We believe that there are documents at Capital

12   1 --

13        THE COURT:  I'm sorry.  Say that again.  You've

14   been attempting to locate documents for Hudson Diamond New

15   York, LLC?

16        MR. ROMNEY:  That's correct.

17        THE COURT:  Why if you don't represent them?

18        MR. ROMNEY:  Because during this intervening

19   period, I believed that I did.

20        THE COURT:  Okay.  So what did you do to try to

21   locate the documents?

22        MR. ROMNEY:  As set forth in my declaration,

23   the -- we did three things.  We contacted Hodgson Russ,

24   which we believed to have represented -- well, we knew

25   formed the New York entity, because we had the articles of

1   organization that confirmed it formed it.  So we attempted

2   to contact --

3           THE COURT:  That the articles of -- I'm sorry.

4   I'm not trying to interrupt you.  I just want --

5           MR. ROMNEY:  It's --

6           THE COURT:  -- to be very clear.  The Hudson

7   Diamond New York, LLC articles of incorporation.  Is that

8   what you're talking about?

9           MR. ROMNEY:  Yes.

10          THE COURT:  And those were signed by whom?

11          MR. ROMNEY:  They were filed by Hodgson Russ.

12          THE COURT:  Yeah.  But who signed them?  Who would

13  the -- who was the Hudson Diamond New York, LLC signatory?

14          MR. ROMNEY:  I don't believe there was a

15  signatory.

16          THE COURT:  Okay.  So you have articles of

17  incorporation that aren't signed?

18          MR. ROMNEY:  I don't believe New York law or

19  Connecticut, for that matter, requires a signatory.  But New

20  York --

21          THE COURT:  Well, who's the managing member?

22          MR. ROMNEY:  It's not identified in the -- there

23  is no natural person identified --

24          THE COURT:  Okay.

25          MR. ROMNEY:  -- in the articles --

1          THE COURT:  All right.

2          MR. ROMNEY:  -- of organization other than Hodgson

3    Russ as the "filing party."

4          THE COURT:  So you got that document from Hodgson

5    Russ?  Is that what you're telling me?  These articles of

6    incorporation?

7          MR. ROMNEY:  I got that document from Ms. Guo.

8          THE COURT:  Okay.  And it's not signed.  But she

9    had it?

10         MR. ROMNEY:  Correct.

11         THE COURT:  In her personal files?

12         MR. ROMNEY:  Which further -- which was further

13   support for my belief and her belief that it was her entity.

14   Correct.

15         THE COURT:  Okay.

16         MR. ROMNEY:  Yes.

17         THE COURT:  All right.  That's what I'm asking.

18         MR. ROMNEY:  Yes.

19         THE COURT:  All right.  So she had it in her

20   files, and she turned it over to you.  And Mr. Vartan or

21   just you or Mr. Vartan?

22         MR. ROMNEY:  She sent an email to Attorney Vartan

23   and I.  So she turned it --

24         THE COURT:  Okay.

25         MR. ROMNEY:  -- over to us --

1          THE COURT:  Okay.

2          MR. ROMNEY:  -- simultaneously.

3          THE COURT:  And what other documents did she turn

4     over with regard to Hudson Diamond New York, LLC?

5          MR. ROMNEY:  With regard to Hudson Diamond New

6     York, LLC?  Those were the only ones.

7          THE COURT:  Okay.  And did you -- and you may have

8     said this, okay, so I'm sorry.  I need to be clear.  Did you

9     supply that document to the trustee?

10          MR. ROMNEY:  That document had been supplied to

11     the trustee, I believe, in connection with earlier

12     production on the part of Ms. Guo.

13          THE COURT:  But you didn't produce it to the

14     trustee on behalf of Hudson Diamond New York, LLC, even

15     though Ms. Guo sent you an -- you and Attorney Vartan an

16     email with that document?

17          MR. ROMNEY:  I did not.  Because by the time of

18     the production date, I didn't believe I had authority to do

19     anything on behalf of Hudson Diamond New York, LLC,

20     because --

21          THE COURT:  When did you get the email from

22     Ms. Guo that had that agreement attached to it?

23          MR. ROMNEY:  I don't recall the date.  It was

24     before --

25          THE COURT:  Was it before you filed your motion to

1   withdraw as attorney?

2              MR. ROMNEY:  It was before I filed --

3              THE COURT:  Okay.

4              MR. ROMNEY:  -- my motion to withdraw as an

5   attorney.

6              THE COURT:  All right.  Now, with regard -- so you

7   have no opposition, because you can't -- you have no

8   authority to oppose an order entering against Hudson Diamond

9   New York, LLC to hold them in contempt.  Is that correct?

10             MR. ROMNEY:  That's correct.

11             THE COURT:  Okay.  With regard to Hudson Diamond

12   Holding, LLC, you believe -- and, Attorney Vartan, you're

13   going to be asked the same question -- that you complied and

14   you -- with the consent order for -- and what your terms are

15   in this consent order is that you've completed the

16   production to the trustee on behalf of Hudson Diamond

17   Holdings, LLC?  You -- by June 15th.  You believe you've

18   complied with that order?

19             MR. ROMNEY:  I do.

20             THE COURT:  Okay.  Attorney Vartan, you believe

21   you've complied with the order -- the consent order that

22   included Hudson Diamond Holdings, LLC, completing its

23   production of documents to the trustee by June 15th?

24             MR. VARTAN:  Yes, Your Honor.  We sought to obtain

25   all documents from all sources that we could and --

1        THE COURT:  What sources did you seek to obtain

2    them from?

3        MR. VARTAN:  So we sought to obtain documents from

4    Hodgson Russ.  We sought to obtain documents from Capital

5    One.  And we obviously also sought to obtain documents from

6    our client directly.  There were a number of other

7    individuals who could theoretically have had documents who

8    would not speak with us.

9        THE COURT:  Well, what does that mean?  I mean, I

10   don't know what that means, who would not speak with us.

11       MR. VARTAN:  So --

12       THE COURT:  What attempts did you make?

13       MR. VARTAN:  So we attempted to reach out through

14   our client to both --

15       THE COURT:  So you didn't reach out.  Your client

16   reached out?

17       MR. VARTAN:  Correct.

18       THE COURT:  So you have no knowledge as the lawyer

19   representing the Hudson Diamond entities at that time of

20   whether your client actually reached out to these other

21   sources?

22       MR. VARTAN:  Well, we have knowledge that our

23   client went to the bank, because we were on the phone with

24   her both before and after.

25       THE COURT:  But you don't know if she was at the

1    bank when she was --

2              MR. VARTAN:  We don't --

3              THE COURT:  You don't --

4              MR. VARTAN:  We have no reason to doubt our client

5    in any way.

6              THE COURT:  That's not my question.  You don't

7    know.  You're the lawyer, right?  Aren't you supposed to

8    know?

9              MR. VARTAN:  I know that she went to the bank

10   based upon --

11             THE COURT:  How do you know that?

12             MR. VARTAN:  -- based upon my conversations with

13   her.

14             THE COURT:  So based upon what she says, you know

15   that?

16             MR. VARTAN:  Again, I have no reason to doubt her,

17   Judge.

18             THE COURT:  I didn't say you have a reason to

19   doubt her.  I'm saying based upon what she says to you.

20             MR. VARTAN:  If you're asking me if I went to the

21   bank with her, I did not.

22             THE COURT:  That's -- okay.  So --

23             MR. VARTAN:  But we --

24             THE COURT:  What other sources -- what are you --

25   were you there when she went through the records of these

1  entities to see what was -- what would be responsive to the

2  subpoena?

3          MR. VARTAN:  I have been through Ms. Guo's records

4  with her previously in making --

5          THE COURT:  That wasn't my question.

6          MR. VARTAN:  -- prior productions.

7          THE COURT:  That wasn't my question.  My question

8  was a very direct question.

9          MR. VARTAN:  Not --

10          THE COURT:  Were you there when she went through

11  her records, reviewing documents that would be responsive to

12  the subpoenas served on the Hudson Diamond entities?

13          MR. VARTAN:  My understanding, Judge, is she has

14  no records beyond the records she and I had previously

15  reviewed.

16          THE COURT:  That still didn't answer my question,

17  Attorney Vartan.

18          MR. VARTAN:  So then --

19          THE COURT:  Listen to the question.  Were you

20  there when your client went through her records that --

21  to -- that would -- to determine whether she had records

22  that were responsive to the subpoenas issued and served,

23  which you acknowledge were served on the Hudson Diamond

24  entities?

25          MR. VARTAN:  I was not when she went through --

Ho Wan Kwok - July 11, 2023

43

1        THE COURT:  Okay.

2        MR. VARTAN:  -- documents right prior to June

3    15th.  Correct.

4        THE COURT:  So you were not there.  You did not

5    view, observe, or discuss what your client did with regard

6    to the review of the documents in her possession and control

7    that would be responsive to the subpoenas served on the

8    Hudson Diamond entities?

9        MR. VARTAN:  We absolutely did discuss.  So I

10   didn't view or observe her.

11       THE COURT:  Well, what discussions did you have

12   about responsive to subpoenas?  That isn't protected.  So

13   you can argue it's attorney/client.  It's not.

14       MR. VARTAN:  Well, I --

15       THE COURT:  You have a subpoena.  You've already

16   acknowledged the subpoena was appropriately served.  You

17   didn't oppose the subpoena.  You didn't file a motion to

18   quash.  You didn't file a protective order.  So there's no

19   opposition that you can raise right now that is in any way

20   privileged.

21       So what discussions did you have with regard to

22   documents that would have been responsive to the subpoenas

23   served on the Hudson Diamond entities?

24       MR. VARTAN:  Well, I would maintain that the

25   communications are privileged.

1          THE COURT:  Well, you can, but I -- you're wrong.

2     So go ahead.  What --

3          MR. VARTAN:  So, well, I'm not going to go into

4     privileged communications with my client, but certainly what

5     we --

6          THE COURT:  Well, then you're going to get held in

7     contempt, okay?  Because you have obligations, Attorney

8     Vartan.  You have obligations to the Court as an officer of

9     the court.

10          MR. VARTAN:  No doubt.

11          THE COURT:  Okay?

12          MR. VARTAN:  And not to interrupt --

13          THE COURT:  And you stated in a consent order and

14     on the record through Attorney Romney that you were going to

15     comply with these subpoenas.  And you have to demonstrate,

16     not just your client, you have to demonstrate what steps

17     you've taken to be in compliance with the subpoenas.  And I

18     haven't heard anything.  Not one thing.

19          MR. VARTAN:  Well, Your Honor, first and foremost,

20     we had multiple conversations, both telephonic and email,

21     with Hodgson Russ who we understood to be the attorneys for

22     both the holdings entity --

23          THE COURT:  And you didn't get any documents from

24     them.  They told you they wouldn't produce them.  And what

25     did you do at that?  You just said, okay, they're not going

1    to produce them.  That's what you said.

2              I've seen it.  I mean, Attorney Romney has

3    attached to his declaration some -- one person from Hodgson

4    Russ who said I decline to talk to you.

5              MR. VARTAN:  Correct.  That was the attorney who

6    actually worked on the file.

7              THE COURT:  Okay.  And what did you do when he

8    said I --

9              MR. VARTAN:  So when he --

10             THE COURT:  -- decline to talk to you.

11             MR. VARTAN:  -- when he said I decline to speak

12   with you, we said it was incredibly important that we speak.

13   He then directed --

14             THE COURT:  I don't think I saw anything about

15   that.

16             MR. VARTAN:  Well, there was email communication

17   which --

18             THE COURT:  Well, it's not in the record.

19             MR. VARTAN:  Well, Your Honor, if I could finish.

20   All I was saying --

21             THE COURT:  You can finish, Attorney Vartan, but

22   you need to be very careful.  Okay?

23             MR. VARTAN:  I'm trying to be.

24             THE COURT:  Okay.  Go right ahead.

25             MR. VARTAN:  And after we spoke with Mr. Harmon

1   and he declined to speak with us, he then referred us to the

2   general counsel at Hodgson Russ.  So that's how we got to

3   the second attorney.  And Attorney Romney and I had multiple

4   conversations with him where we explained that we were

5   endeavoring to do our best to make a complete production on

6   behalf of both Holdings and on behalf of New York.

7          In the context of those conversations is when he

8   told us that he did not believe that Ms. Guo had anything to

9   do with New York.  And that is what precipitated the filing

10  of the motion to withdraw.

11         THE COURT:  Right.  But you've seen no documents

12  or have --

13         MR. VARTAN:  Well --

14         THE COURT:  And your client said just the

15  opposite.

16         MR. VARTAN:  But can --

17         THE COURT:  Wait.  Hold on.  Hold on.  You have no

18  documents to support the statement made by the attorney from

19  Hodgson Russ.

20         MR. VARTAN:  That's correct.

21         THE COURT:  You have no documents.

22         MR. VARTAN:  But can I --

23         THE COURT:  And -- hold on, please.

24         MR. VARTAN:  I'm sorry.  I apologize.

25         THE COURT:  And your client said just the

1   opposite, that she was the managing member of Hudson Diamond

2   New York, LLC.

3          MR. VARTAN:  So, Your Honor, if I could address

4   it?  The reason that we don't have documents from Hodgson

5   Russ is not for lack of effort on our part.  It's because

6   Hodgson Russ was representing that Hudson Diamond New York

7   had nothing to do with our client, had everything to do with

8   her brother who we don't represent.  And so, therefore,

9   there's a privilege between Hodgson Russ and the brother of

10  Hodgson Russ and Hudson Diamond New York that we certainly

11  can't abrogate.  So it's not for lack of effort on our part.

12         And the one thing, Judge, that I just want to

13  point out, I think it was implicit and explicit in what

14  Mr. Romney was saying, but we're not here in any way to hide

15  the ball from the Court or from the trustee.  The whole

16  reason that we made an appearance on behalf of both Holdings

17  and New York in this case was not to obfuscate in any way,

18  but it was to make as complete a production as possible to

19  the trustee.

20         We did not have an interest in either entity to

21  the extent that we believed at the time that Ms. Guo was

22  affiliated with them to have either entity held in contempt.

23  And I believe the trustee isn't looking to hold entities in

24  contempt.  The trustee is looking to get documents.

25         And so we were --

1          THE COURT:  Well, he's got a pending motion to

2     hold them in contempt, so I disagree with you.

3          MR. VARTAN:  But what I was saying is I assume the

4     trustee's preference would be to get documents --

5          THE COURT:  It may -- yeah, it would be his

6     preference.

7          MR. VARTAN:  -- as opposed to hold an entity in

8     contempt.  And that's what we were endeavoring to do no

9     more.  Had we continued to believe that we represented

10    Hudson Diamond New York in addition to Holdings, then we

11    would have made a production.  The only reason there was a

12    motion to withdraw with respect to New York was based upon

13    the conversations, based upon the due diligence we were

14    doing with respect to Hodgson Russ.

15         THE COURT:  Did you meet the Hodgson Russ lawyer

16    in person?

17         MR. VARTAN:  I did not, Your Honor.

18         THE COURT:  Did you have a video conference with

19    the person?

20         MR. VARTAN:  We had multiple telephone

21    conversations.

22         THE COURT:  So you don't even know who the person

23    is.  You don't even know what the person looks like, right?

24         MR. VARTAN:  From the website, I do.  But, no, I

25    did not have --

1        THE COURT:  Okay.

2        MR. VARTAN:  -- a video conference.

3        THE COURT:  So you had a telephone conversation in

4    which the person at Hodgson Russ who wouldn't produce any

5    documents to you told you that the son is the managing

6    member.  And based on that, you --

7        MR. VARTAN:  Of New York.

8        THE COURT:  Right.  Of New York.

9        MR. VARTAN:  Correct.

10       THE COURT:  And that you -- based on that, you

11   withdrew -- you moved -- well, you didn't file an

12   appearance, which is another whole issue.  So we're going to

13   talk about that at a different point.  We're not doing this

14   ping pong thing.  Okay?  I've had that conversation from the

15   beginning of this case.  You're either both in or you're

16   both out, or you're one in or you're one out.

17       I need to know who represents these entities.

18   This is not going to continue in this court.  Okay?  You

19   need to decide how that's going to work, and you need to

20   stick by that.

21       Because to have you sign some documents with

22   Attorney Romney's signature under them as -- which appears

23   as local counsel and then have Attorney Romney be the only

24   person that files a notice of appearance is not appropriate.

25   And it will not continue in this case.  So you'll all have

1     to figure that out.  You either both represent them or one

2     of you represents them, and that's it.

3             MR. VARTAN:  And I just wanted to clarify that for

4     the record.  So since I and my law firm have been involved

5     with the case it's very much been a co-counsel relationship

6     between CSG, my law firm, and --

7             THE COURT:  Then why didn't you file a notice of

8     appearance on behalf of both the Hudson Diamond entities?

9             MR. VARTAN:  Your Honor, by the time that I was

10    preparing to do that, there was an issue, obviously, which

11    we brought to the Court.

12            THE COURT:  That's not accurate.  That's not

13    accurate.  The motion to compel for contempt was pending.

14    And Mr. Romney filed an appearance well before the hearing

15    on the motion for contempt.  So, Mr. Vartan, that is not

16    accurate.  So I don't want to hear that, because that's not

17    accurate.

18            You made a choice.  And, fine, you made that

19    choice.  But you're not making that choice anymore.  You

20    either both represent the entities or one or the other of

21    you does.

22            We are not doing this anymore.  You are wasting

23    the Court's time, and I don't feel that you are being

24    accurate in your representations to this Court.  And so you

25    need to think long and hard about that.

1        Attorney Romney's the only one that filed an

2   affidavit or a declaration in connection with this motion to

3   compel.  You're going to argue, well, I didn't have to.  I

4   never filed the notice of appearance on behalf of the Hudson

5   Diamond entities.  But what do I hear?  Every conversation

6   that has to do with the motion for contempt and the notice

7   of appearance and the motion and the production of documents

8   has you involved in it, Attorney Vartan, not just Attorney

9   Romney.  That's not appropriate.

10        MR. VARTAN:  Understood, Your Honor.  And I am

11   truly not trying to hide anything from this Court or any

12   party in the courtroom.  Really, what we have endeavored to

13   do since the filing of the motion seeking to hold the Hudson

14   Diamond entities in contempt was to do our level best to

15   figure out which of the entities that we represent.  We

16   certainly --

17        THE COURT:  Well, you didn't do your level best to

18   figure out which one of the -- entities you represented when

19   Mr. Romney filed the notice of appearance.  He represented

20   both of them.

21        MR. VARTAN:  Your Honor, but, again, it was

22   done -- and I understand a mistake was made.  But what we're

23   saying here is it was done with the best of intentions.

24   Meaning we were not trying to hide anything from anyone.  We

25   were just --

1          THE COURT:  Whether it's done with the best of

2     intentions really doesn't matter, Attorney Vartan.

3          MR. VARTAN:  Well, I --

4          THE COURT:  What matters is what are your

5     professional obligations --

6          MR. VARTAN:  We were trying --

7          THE COURT:  -- under the applicable codes of

8     conduct and as a member of the bar of the State of New York

9     or New Jersey and practicing before this Court.  And that's

10     what your obligations are.  You can have whatever intent you

11     think.  It doesn't matter.

12          What matters is, what are your requirements?  What

13     are your obligations?  What are you obligated to do?

14          MR. VARTAN:  And, Your Honor, I believe that we've

15     met those obligations.

16          THE COURT:  Okay.  That's your belief.  That's

17     fine.

18          All right.  Attorney Romney, is there anything

19     else you'd like to add?

20          MR. ROMNEY:  Yes.  Very  briefly, Your Honor.  My

21     appearance on behalf of the Hudson Diamond entities -- I

22     actually don't have that with me, but I believe it was --

23          THE COURT:  I can -- we can put it up on the

24     screen if you'd like.

25          MR. ROMNEY:  If it's not too much trouble, that

1    would be helpful.

2              THE COURT:  All right.  We'll find it.  Give us a

3    minute, and we'll put it up on the screen.

4              MR. ROMNEY:  I believe it's June 1st, filed at

5    around 10-something p.m., if I recall correctly.

6              THE COURT:  1848 is the ECF number.  And it says

7    that you entered an appearance on behalf of Hudson Diamond

8    New York, LLC and Hudson Diamond Holding, LLC, parties in

9    interest.

10             MR. ROMNEY:  And I -- am I correct that it was

11   filed at 10-something p.m.?

12             THE COURT:  10:16 p.m.  Actually -- yes.  No.

13   8:16 p.m.

14             MR. ROMNEY:  8:16.  Okay.  I thought it was around

15   10.  But the -- perhaps it was the motion for an adjournment

16   that was filed at 10-something.

17             THE COURT:  That may be.  You want me to --

18             MR. ROMNEY:  No, no, no.

19             THE COURT:  Okay.

20             MR. ROMNEY:  The point I was making, Your Honor,

21   was that this was filed on the evening before the deadline

22   to respond for -- or the evening of --

23             THE COURT:  I understand.

24             MR. ROMNEY:  -- the deadline to respond.

25             THE COURT:  I understand.

1          MR. ROMNEY:  Attorney --

2          THE COURT:  The hearing wasn't until June 6th.

3          MR. ROMNEY:  I understand.  Attorney Vartan was --

4    is admitted in this Court pro hac vice on behalf of

5    HK International and Mei Guo.  I recall very specifically

6    why I am the one that filed this appearance was because

7    there wasn't time to get another pro hac vice application.

8          THE COURT:  I understand that.  But you could have

9    done that the next day.

10         MR. ROMNEY:  It could have.  And as --

11         THE COURT:  There was -- actually, you could have

12   done it that night, because it's all electronic filing.

13   It's very easy.

14         MR. ROMNEY:  We --

15         THE COURT:  You've done it very well on many other

16   occasions, as have other people in the court.

17         MR. ROMNEY:  I actually don't know how to E-file,

18   which is pretty sad in this day and age.  But I -- but we

19   have very good support staff, so that's a distinction

20   without a difference.

21         At the time that we filed this, nobody -- not me,

22   not Attorney Vartan, not Ms. Guo and nobody else that I've

23   had discussions with -- was expecting for anything other to

24   happen other than us to negotiate a brief extension in

25   exchange for our compliance.  And by compliance, I define, I

1    believe correctly so in connection with the case law -- but

2    if I'm mistaken, I apologize -- to attempt in good faith and

3    diligently to locate every document that is within the

4    client's control, actual and constructive.  And that is what

5    we intended to do.  That's what we agreed to do.  And that's

6    what we did do.

7              And nobody, between Attorney Vartan, myself, and

8    Ms. Guo, expected this to become anything worthy of having

9    another attorney file a pro hac -- another pro hac vice

10   application, another docket entry in this case, because we

11   all intended and did act in good faith to comply and get the

12   trustee everything that the trustee wanted concerning these

13   entities.  And I --

14             THE COURT:  Well, I don't have any declaration of

15   Ms. Guo, so I can't make any findings with regard to that.

16   The only thing I could make a finding with -- is with regard

17   to what you've said in your declaration under penalty of

18   perjury, which I appreciate that you filed.  Okay?

19             MR. ROMNEY:  Thank you.

20             THE COURT:  So I can't speak to what Ms. Guo's

21   intentions are.  I can't speak to what Attorney Vartan's

22   intentions are, because he hasn't filed anything.  All I can

23   speak to is what has happened in this case and what -- where

24   we are.

25             And we were at a point on June 6th where there was

1    going to be an order possibly entered against the Hudson

2    Diamond entities holding them in contempt.  And I was told

3    on the docket, on the record that there was agreement that

4    you represented both of them, that there was an agreement

5    that they would produce and they would do so by June 15th.

6           You've now stated, Attorney Romney, that you

7    believe that you complied with regard to -- that you've

8    complied on the -- with the subpoenas for the production of

9    the documents with regard to Hudson Diamond Holding, LLC.

10   That's your statement.  And the trustee will do with that

11   what the trustee's going to do with that.  And we'll hear in

12   a -- I'm sure soon.

13          With regard to Hudson Diamond New York, LLC, there

14   has been no compliance that I'm aware of.  And no one has

15   shown me that there is any compliance.  So if the trustee

16   moves for a contempt, then I'm going to consider that.

17          MR. ROMNEY:  And I will not oppose it.

18          THE COURT:  Well, as you said, I don't think you

19   have -- well, you --

20          MR. ROMNEY:  Correct.  That's --

21          THE COURT:  If you are consistent with your motion

22   to withdraw your attorney, you don't have any authority to

23   oppose it.

24          MR. ROMNEY:  Correct.

25          THE COURT:  So in any event, is there anything

1    else you wanted to add?

2              MR. ROMNEY:  No.  Thank you for --

3              THE COURT:  Okay.

4              MR. ROMNEY:  -- hearing us.

5              THE COURT:  All right.  Then I'd like to hear from

6    the trustee's counsel --

7              MR. VARTAN:  Thank you, Your Honor.

8              THE COURT:  -- and the Office of the United States

9    Trustee as well.

10             MR. LUFT:  Your Honor, do you have a preference as

11   to which you hear from first?

12             THE COURT:  I have no preference.

13             MR. LUFT:  Okay.  Your Honor, may I approach?

14             THE COURT:  Yes, please.

15             MR. LUFT:  Thank you, Your Honor.  Good afternoon,

16   Your Honor.  Avi Luft, Paul Hastings, on behalf of the

17   trustee.

18             Your Honor, I don't have any intention to speak

19   today as to what the intent was of counsel.  I wasn't part

20   of their conversations that they had with anyone else,

21   whether it be their client or Hodgson Russ.  And I have no

22   way to speak to that.

23             So what I do want to speak to, and hopefully

24   briefly, though, is with regard to this notion that no one

25   knows who runs Hudson Diamond New York and that all

1    documents that presumably exist in the world that could have

2    been responsive to our subpoena have been produced and,

3    thus, there has been compliance.  Because I don't think

4    either of those is quite that straightforward.

5           Look, as I understand it, Your Honor, they made

6    reference to the fact that we filed papers indicating that

7    Hudson Diamond New York appeared to be -- have a sole member

8    of Ms. Guo.  We did.  They're attached to my declaration

9    which is at Exhibit 1805.  And specifically, Your Honor, if

10   you look --

11          THE COURT:  Exhibit T.

12          MR. LUFT:  There is Exhibit T, Your Honor.  There

13   is also Exhibit U which --

14          THE COURT:  I may not have looked at Exhibit U.

15   Go ahead.

16          MR. LUFT:  -- as well as Exhibits G, H, and I,

17   Your Honor.

18          THE COURT:  Okay.

19          MR. LUFT:  And in brief, and this is why we

20   believed it, if you look at Exhibit G, it is a document

21   prepared by Hodgson Russ for Ms. Yvette Wang of Golden

22   Springs which sets out an -- sets out org charts of the

23   entities, which I can tell you from speaking to them they

24   believed were controlled by the debtor.  But be that as it

25   may, they had listed who is named.

1          And under the one for Hudson Diamond Holdings, you

2    can see Ms. Guo on the top directly above Hudson Diamond

3    Holdings, directly above Hudson Diamond New York, LLC.

4    Consistent with that, at Exhibit H is a document for Hudson

5    Diamond New York which lists Ms. Wang as the contact but as

6    the sole member says Hudson Diamond Holdings, LLC, 100

7    percent.  Not surprisingly, located at 162 East 64th Street

8    in Manhattan which is where most of the debtor's entities

9    are located.

10          And then if we go to Exhibit I, we see who owns

11    Hudson Diamond Holdings.  The member is listed as Ms. Guo,

12    100 percent interest, again with the 162 East 64th Street

13    address.

14          As Your Honor mentioned, and there is Exhibit T in

15    which we see Ms. Guo signing consistent in her role as the

16    sole member of Hudson Diamond Holdings.  And Exhibit U where

17    we see Ms. Guo again signing, this time as the sole member

18    of Hudson Diamond Holdings.  Based on that documentation,

19    that is why we understood Ms. Guo to be the person in

20    control of Hudson Diamond Holding and Hudson Diamond New

21    York.

22          We are not aware of any document which indicates

23    that anyone else is the named member.  I will tell you I

24    believe that the debtor actually controlled the entity based

25    on discovery and our investigation.  But in terms of who is

1   the member and who can -- should be responding to the

2   subpoena, that is what -- who we believe is in charge.

3          Now, I feel like I'm not sure why we have

4   confusion at this point, because my understanding is that

5   while there is no document anywhere that someone has seen

6   that indicates that someone other than Ms. Guo is the

7   member, there have been representations that there were

8   conversations in which Mr. Kearney of Hodgson Russ indicated

9   that the son may be the member.  That very well may have

10  happened.  I don't know.

11         What I do know is if we look at Mr. Romney's

12  declaration and Exhibit A, Mr. Kearney wrote to Mr. Romney

13  and Mr. Vartan saying that he questions whether he ever said

14  that but then more importantly says the documents indicate

15  that Holdings was the member, not Qiang Guo, who is the son.

16  And he goes on to say that the engagement concerning Hudson

17  Diamond New York was addressed to Ms. Wang.

18         So whatever may have been said on the call, and

19  very well there may have been a miscommunication, I think

20  Mr. Kearney has made clear at this point that there is not a

21  belief that Mr. -- the debtor's son, Mr. -- again, Mr. Guo

22  is the member of Holdings, in which case there is no reason

23  to believe that Ms. Guo, Mei Guo, is not the member of

24  Holdings, in which case they should be able to comply.

25         Why do I care about this, Your Honor?  Solely for

1    one reason.  We need to get documents.  We need someone who

2    we can speak to, who we can get from.

3           And that brings me to really the second point we

4    have here, which is you've heard today that they've said

5    that they've gotten all documents from all sources.

6    Mr. Romney in his declaration says I do not have any reason

7    to believe that New York or Holdings have any assets or the

8    ability to produce additional documents.

9           Well, Your Honor, I don't know how that could be

10   true.  I've had conversations with Mr. Vartan and

11   Mr. Romney.  And I've pointed them in particular to Exhibit

12   J of my declaration, which is an insurance agreement on

13   behalf of Hudson Diamonds New York with AIG indicating that

14   there's a Rolls-Royce in their name.  We don't have any

15   documents about that.  We received two documents total in

16   compliance from Holdings.  So J talks about a Rolls-Royce.

17          If you look at Exhibit V, that is the deposition

18   of Margaret Conboy.

19              THE COURT:  Exhibit -- which?

20              MR. LUFT:  V as in Victor.

21              THE COURT:  V?  Okay.  Hold on one second.

22              MR. LUFT:  Of course, Your Honor.

23              THE COURT:  All right.  So I'm looking at --

24              MR. LUFT:  So it's --

25              THE COURT:  -- Exhibit J to your declaration --

1          MR. LUFT:  Correct, Your Honor.

2          THE COURT:  -- which is attached to 1805 at

3    1805-36, page 1 of 5.  And there's a -- New York auto bill

4    declaration page.  It says there's a policy number, name of

5    insured, and mailing address, Hudson Diamond New York, LLC,

6    162 East 64th Street, New York, New York.  Name and address

7    of issuing company, AIG Property Casualty Company.

8    Description of your covered automobiles.  2019 Rolls-Royce

9    with a VIN number and an agreed-upon value of $283,712.

10          That's what you're referring to?

11          MR. ROMNEY:  Yes, Your Honor.

12          THE COURT:  And the description of the drivers are

13    two individuals who says are authorized and covered, Dean

14    Rabideau -- I'm not sure I'm pronouncing that right --

15    R-A-B-I-D-E-A-U -- and I -- Cao Defeng -- and again, I

16    probably did not pronounce that correctly -- C-A-O is the

17    first name.  D-E-F-E-N-G is the second name.

18          And there's a million-dollar coverage -- liability

19    coverage per occurrence.  Medical expenses coverages of

20    $50,000 person.  Uninsured motorist of a million per

21    occurrence.  Collision coverage for your damage to your

22    automobile up to the agreed value.  Personal injury

23    protection with a premium of $5,817.  That's a four-page

24    document, it looks like.

25          Okay.  Go ahead.  That's Exhibit G -- J as in jam.

1   Now we need to look at V as in Victor?

2            MR. LUFT:  Yes, Your Honor, which is a transcript

3   of a deposition of Margaret Conboy who is a lawyer at

4   Whitman Breed who represented on behalf of Hodgson -- Hudson

5   Diamond with regard to at least five real estate

6   transactions that Mr. --

7            THE COURT:  What page do you want me to go to in

8   this deposition?  I've opened up Exhibit V now.

9            MR. LUFT:  Your Honor, I can point you to Exhibit

10  21 -- page 21 where there is a discussion about Hudson

11  Diamond.  I don't -- just so you can see what it is.  I

12  don't intend to go through all of this.

13           THE COURT:  Do you want me to pull it up on the

14  screen, or do you just want to -- wait.  How do you want to

15  handle that?

16           MR. LUFT:  Your Honor, I'll make reference to it.

17  I think that'll just expedite things.

18           THE COURT:  Okay.  Go right ahead.

19           MR. LUFT:  But, specifically, it talks about the

20  purchase being made on behalf of an entity called Hudson

21  Diamond.  And then it says, "Is this the same engagement

22  where you were told you were representing the interests of

23  Mr. Kwok and his family, correct?  Yes."  And it goes on

24  from there.

25           I raise these, Your Honor, and I raised them with

1    Mr. Vartan and Mr. Romney previously to say we know about

2    the car, we know that there were real estate transactions,

3    we know there seems to be transfers related to the Hudson

4    Diamond entities, meaning there should be documents.  This

5    isn't a shell company that did nothing or that no one ever

6    did anything on behalf of.

7          But all we've received is the two documents you've

8    heard about from Holdings, and we've received nothing from

9    New York at this point.  And, unfortunately, it sounds like

10   we're being told there's no one we can even talk to about

11   that.  I really would rather much prefer to have the

12   information about where these assets are, whether some -- a

13   house was actually purchased.

14         Some of these houses that I looked up were worth

15   upwards of $35 million, Your Honor.  I don't know if

16   anything was ever consummated.  But I know that they must

17   have had funds if they were looking to buy it.  Or at least

18   that would be a reasonable assumption.

19         So that's what I'm trying to find out here.  And

20   at this point, it seems to me that this seems knowable.  Not

21   only do all the documents suggest it, but the idea that a

22   brother and a sister and a father can't speak and understand

23   who's the person that the debtor -- whose name the debtor

24   put on top of the company, that seems knowable, particularly

25   when two of the three entities are represented by the same

1    counsel.

2         So, Your Honor, that's really where we are with

3    regard to this.  I understand the idea that if they -- if

4    they say that they're not representing them then they

5    can't -- they need to withdraw, because they're not

6    representing them.  I can only speak to in terms of what we

7    know and we've presented to you in terms of why we believed

8    Ms. Guo was the person in charge.  That's where that is.

9         But what I do have to take issue with is the idea

10   that there has been compliance or we've received all the

11   documents related to Hudson Diamond, whether from Holdings,

12   which appears to us to wholly own New York, or from New

13   York.  I don't know which specific -- where all the assets

14   are or whatever else.  That's what the documents would tell

15   me.

16        But I don't believe we've had compliance.  And so

17   as to both, I would renew our motion for contempt, Your

18   Honor.

19             THE COURT:  Okay.  Thank you.

20             MR. LUFT:  Thank you.

21             THE COURT:  Attorney Claiborn?

22             MS. CLAIBORN:  Thank you, Your Honor.  Holley

23   Claiborn for the U.S. Trustee.  I want to circle back to

24   something Attorney Luft pointed out, and I think that that

25   is important to focus on, which is that based upon the

1    emails between Attorney Romney and Attorney Kevin Kearney at

2    Hodgson Russ, there appears to be a consensus that the last

3    document that exists that anyone's seen was actually signed

4    by Mei Guo in her capacity as the sole member of Holdings,

5    which is the same -- it's the same sole member of New York.

6    So that's the last document that's been before the Court and

7    the last document that's been talked about.

8         That document is consistent with what Attorney

9    Kearney is saying in the emails that are attached to

10   Attorney Romney's affidavit.  So based on that, there

11   doesn't seem to be any confusion, at least on paper, that

12   Mei Guo is the person in charge.

13        So if Mei Guo is the person in charge, then

14   Attorney Romney appears to have a direct connection to her,

15   because he represents her in her individual capacity as

16   well.  And then there seems to be no reason to do a

17   withdrawal of the appearance.

18        The other thing I wanted to say is that the

19   withdrawal of the appearance on behalf of Hudson Diamond --

20   sorry, Hudson Diamond New York, LLC appears to be

21   detrimental to the estate.  Because as Attorney Luft just

22   pointed out, there are a number of areas of documents that

23   should have been provided, haven't been provided, and are

24   delinquent.  The trustee has a pending motion for contempt

25   for the failure to comply with the subpoenas and allowing

1    Attorney Romney to withdraw from representing Hudson Diamond

2    New York, LLC would appear to be detrimental to the estate

3    and detrimental to the investigation that the trustee is

4    trying to pursue.  So at the end of the day, Your Honor, I

5    don't think that Attorney Romney has met his burden to

6    demonstrate that the withdrawal is appropriate.

7          The other thing I would say is that the U.S.

8    Trustee's response to the Court's order asked both Attorney

9    Romney and Attorney Vartan to provide answers to a number of

10   different questions.  As the Court has already noted,

11   Attorney Vartan did not file anything in response.  And I

12   would say that the response filed by Attorney Romney did not

13   address all of the points requested by the United States

14   Trustee.  And it appears based on not only the declaration

15   that was filed and the comments that are made today that

16   there is more information that could have been provided to

17   the Court about the series of events that led to the motion

18   to withdraw.  So, unfortunately, the U.S. Trustee's efforts

19   to try to get some more information about what's happened

20   and how we got here remain unfulfilled.

21      But getting back to the point I made a minute ago which

22   is that the last document anyone has that has been provided

23   demonstrates that Mei Guo is at the heart of all of these

24   entities and, therefore, based on that, it appears that

25   Attorney Romney has a basis to stay in this case.  Thank

1   you.

2          THE COURT:  Thank you.

3          Attorney Romney, do you wish to respond?

4          MR. ROMNEY:  Yes, I do.  On the first issue,

5   responding to Attorney Luft, the issue is not whether there

6   are documents in the world concerning the Hudson Diamond

7   entities.  I'm in no position to opine on that beyond what I

8   already have.

9          The issue is whether I or somebody I can control

10  can locate them.  The trustee has alleged in this case that

11  the two individuals that, as far as their investigation is

12  concerned with all of their resources, which is well beyond

13  what I can do -- and they have all of Hodgson Russ's files.

14  I don't.  The record is clear that I requested it.  I

15  demanded it, and I was told no.  That is in the record.

16         I cannot go to Hodgson Russ' office with a gun in

17  my hand, nor am I required to, and make them give me my

18  files.  I can ask.  I can demand.  But at the end of the

19  day, I was told no.  They were told yes.  They got the

20  files.  I didn't.  They have the information.

21         With that information, they have alleged,

22  consistent to what Ms. Guo has said or told us and what we

23  have represented, is that the two individuals who were

24  responsible for the management of these entities were Yvette

25  Wang, who is incarcerated and I have no access to

1    whatsoever, and Max Krasner, who we cannot locate, has had

2    no contact with Ms. Guo as far as we know for months.  And

3    we are unable to locate him.

4              So the individuals that have the information for

5    all that we know, all that the documents that are being

6    referred to by the trustee beyond the extent that they're

7    with Hodgson Russ and whoever else is cooperating with them

8    and not us are in the possession of the U.S. Department of

9    Justice.  I don't believe -- I have not taken it upon myself

10   to ask the U.S. Department of Justice for their files on

11   these entities, because I've never in my entire career, even

12   when I had clients that were cooperating with them, received

13   a document from the U.S. Department of Justice.

14             We have done what we can.  That's point number

15   one.  Second, Hodgson Russ, in the most recent communication

16   with us, is refusing under Ethical Rule 1.6 to communicate

17   confidential information with us, because he, as the general

18   counsel of the firm that prepared the document that the U.S.

19   Trustee's Office and Mr. Luft are saying is now conclusive,

20   but he, the general counsel to the firm that prepared this

21   so-called conclusive document is unsure enough as to what

22   that document is, why it was prepared that he won't give me

23   as counsel to Ms. Guo and Hudson Diamond Holdings any

24   information besides the fact that it was prepared at the

25   rest -- at the request of Max Krasner.

1          So I find that far from conclusive that Ms. Guo

2     controls these entities.  And, you know, if Ms. Guo controls

3     these entities, as I've said on the record, I will withdraw

4     my motion to withdraw the appearance, because my sole basis

5     for moving to withdraw is -- was because I do not know

6     whether Ms. Guo has the authority to direct me to appear on

7     behalf of it.  And the attorney who prepared the smoking gun

8     that she does doesn't know himself or the general counsel of

9     the firm.

10          So I don't know how this Court can require me to

11    stay in on behalf of this entity.  I would love to know all

12    of these facts and be able to stay in on behalf of this

13    entity and continue to do everything I can.  But I don't.  I

14    do not have sufficient information that I believe under the

15    ethical rules that I can continue to represent this entity

16    based on the facts that are available to me.

17          One point with respect to what Attorney Luft said

18    with respect to Attorney Kearney and Hodgson Russ's

19    comments.  Attorney Kearney did not say, contrary to the --

20    or despite the fact that in his email communication he does

21    not recall telling us -- telling Attorney Vartan and I that

22    it was the debtor's son.  That appears to be a distinction

23    without a difference, because he is clearly saying that it

24    was the debtor's son as signatory on behalf of Hudson

25    Diamond Holdings, Inc.

1          Hudson Diamond's Holding, Inc. (sic) per Hodgson

2     Russ, is a British Virgin Islands company.  It is not Hudson

3     Diamond Holdings, LLC.  The fact that they both have the

4     name Hudson Diamond Holdings in them does not make them the

5     same entity and does not make Ms. Guo the principal of the

6     British Virgin Island company.

7          And as best as I recall, I don't even think the

8     trustee has alleged in this case that Ms. Guo has anything

9     to do with Hodgson Diamond Holdings, Inc.  So whether

10    Attorney Kearney told us that it was Mileson Guo, the

11    debtor's son, which I am 100 percent sure he did, or told us

12    that it was Hudson Diamond Holdings, Inc., a British Virgin

13    Island company -- which the emails in the record do draw

14    distinctions between those two entities towards the, you

15    know, earlier part of the email chain, because he

16    specifically referred to Hudson Diamond Holdings, Inc.  And

17    I said Attorney Vartan and I represent Hudson Diamond

18    Holdings, LLC, a Delaware limited liability company.  Is

19    your answer that you do not represent the same with respect

20    to the Delaware LLC as it is with the BVI Inc.?  And his

21    response was, yes, it is.

22          So whether it's Mileson Guo in his individual

23    capacity or Mileson Guo as president of Hudson Diamond

24    Holdings, Inc., a BVI company, the answer with respect to --

25    that it was -- that it -- there's no connection that I can

1    ascertain with respect to Ms. Guo is the same.  And for that

2    reason, I believe I am required to withdraw.

3         The last thing, with respect to the U.S. Trustee's

4    contention or belief that I have not answered her questions

5    in response to the affidavit that she requested, was I went

6    through her questions.  I believed them to be largely

7    redundant, at least with respect to the two entities, but --

8    because many of these discussions were happening, all at the

9    same time with respect to both of them.  And I gave -- I did

10   my best to provide everything I could with respect to her

11   questions, my knowledge, and my diligent investigation with

12   respect to this matter.

13        And, in fact, what I did after I drafted this

14   declaration is I went back and I re-read the U.S. Attorney's

15   request for information.  And after I drafted, based upon

16   having reviewed her request three times, drafting this

17   document, I realized that the only question that I believed

18   I have not ascertained was the question of why I and not

19   Attorney Vartan -- or why my appearance was the only one.

20   And that's why that -- the answer concerning why I appeared

21   and Attorney Vartan did not.  And that involved the pro hac

22   vice motion as well as our understanding at the time that

23   this was a very minor matter that did not strike us as

24   prudent or efficient to involve multiple appearances in a

25   pro hac vice motion.

1          THE COURT:  Hold on one second.  With regard to

2     what you just said, so I'm clear, you believed that the

3     motion for contempt was a very minor matter?

4          MR. ROMNEY:  I believed that the motion for

5     contempt -- or the process of negotiating a brief extension

6     and doing everything possible to comply would be a minor

7     matter, because I did not -- I expected us to appear.  I

8     believed I could negotiate a brief -- actually, I take that

9     back.  By the time I appeared, I knew that Attorney Vartan

10    and Attorney Luft had reached an agreement for a brief

11    extension, and I knew that I was going to do everything I

12    could in conjunction with Ms. Guo and Attorney Vartan to

13    comply or -- and locate as many responsive documents as

14    possible.

15          As I've said earlier, my understanding of

16    responding to a subpoena is providing all documents that are

17    in the actual and constructive control of a client.  And I

18    do not believe that if I make a demand on a former law firm

19    or law firm that claims it never represented the client and

20    it tells me to go pound sand, I believe that that is -- the

21    documents in that firm's control are not under my or my

22    client's actual or constructive control.

23          Actual or constructive control under my

24    understanding is that it's under the control of somebody who

25    is acting under the direction of me or my client and that if

1   I tell them they have to comply.  Not that I have to take

2   legal action against someone to produce documents that my

3   understanding is the Chapter 11 trustee already has, because

4   their whole position -- notwithstanding that Hodgson Russ

5   doesn't know whether it was the debtor's son or the debtor's

6   daughter that owned these companies, it still produced all

7   of its files concerning these to the Chapter 11 trustee

8   despite the fact that it's not contending, as far as

9   anything that's been told to me, that it was the debtor's

10   entity.

11          And there's no objection to that.  The Chapter 11

12   trustee got the documents.  They have more information than

13   we do.  But we, as is evidence by these documents, tried and

14   tried again and tried again.  We told them it was important.

15   We told them why it was important.  I told them I had filed

16   a motion to withdraw based on their representation, and I

17   needed all information.  I made multiple demands in writing.

18          I do not know what else I can do with respect to

19   the Hodgson Russ firm.  I don't know what else I can do with

20   respect to Max Krasner.  And I told -- to the extent that

21   the Chapter 11 trustee wasn't aware of the Capital One bank

22   accounts, I told them about them so that they can get them

23   from Capital One.  And I tried -- I would have much rather

24   been the one to deliver them, so then I could have delivered

25   them.  But I can't.

1           The best thing I could do is tell them these

2    accounts exist.  And I know these accounts exist, because

3    they told Ms. Guo that -- according to what she told me,

4    they told her that these accounts existed, but they would

5    not give the documents to her.  So --

6           THE COURT:  You're saying -- just so -- you mean

7    the bank, Capital One?

8           MR. ROMNEY:  Capital One Bank.  Yes.

9           THE COURT:  And the documents existed that are the

10   Hudson Diamond entities accounts.  Is that what you're

11   saying?

12          MR. ROMNEY:  That's what I'm saying.

13          THE COURT:  Okay.  Go ahead.

14          MR. ROMNEY:  And the last thing I would like to

15   say is that if the Chapter -- if the U.S. Trustee or anybody

16   else in the room believes I have neglected to answer any

17   questions under oath, I am right here and prepared to answer

18   any questions under oath that anybody would like to ask me.

19   Thank you.

20          THE COURT:  Okay.  Thank you.  I just have a

21   question, though, that I didn't ask you before, because I

22   didn't focus on some of the exhibits that Attorney Luft

23   focused on.  So did you ask Ms. Guo to give you any

24   documents about this insurance policy with AIG between

25   Hudson Diamond New York and -- covering an automobile?

1          MR. ROMNEY:  I was not aware of a insurance policy

2      concerning an automobile.

3          THE COURT:  Well, except the only problem with

4      that is that exhibit was filed back with 1805, and that was

5      filed back sometime before you filed an appearance on behalf

6      of -- it was filed on May 18th.

7          MR. ROMNEY:  I understand that.  And, Your Honor,

8      as Your Honor has pointed out, there's a tremendous amount

9      of paper in this case.  There's a tremendous amount to do.

10     And --

11         THE COURT:  Right.  But this was directed to

12     Hudson Diamond.  This was -- remember, this is part of the

13     motion for contempt.

14         MR. ROMNEY:  This --

15         THE COURT:  And the motion for contempt

16     specifically laid out exhibits to support an assertion that

17     certain entities -- and there were many.  There weren't just

18     the Hudson.  I agree with you.  But they -- it had exhibits

19     attached to it that -- with regard to the Hudson Diamond

20     entities.

21         And it said this is why we want the documents.

22     Here's some exhibits that show you that, at least from what

23     we've been shown to this point, that Hudson Diamond New

24     York, LLC and/or Hudson Diamond Holdings, LLC had assets and

25     have assets in the present.  The policy covered a period of

1  time through May of 2023.  And then there was this -- the

2  deposition transcription of a prior counsel who talked about

3  the Hudson Diamond entities trying to purchase real estate.

4         I mean, there's Exhibits G, E, H, U, J, and then

5  T, which you refer to.  You refer to Exhibit T in your

6  declaration, which is one of the reasons I looked back at

7  it, because you refer to Exhibit T in your declaration.  And

8  I appreciate that you referred to that exhibit.

9         But there's other exhibits attached to that very

10  same motion in which Exhibit T appears that directly address

11  the existence of assets of Hudson Diamond New York, LLC or

12  Hudson Diamond Holdings, LLC.  And so my question is, did

13  you ask your client about those exhibits and those assets?

14         MR. ROMNEY:  I need to answer that question in two

15  ways.  And the -- phrased as did I ask them about those

16  exhibits, no.  Because prior to filing the motion for

17  adjournment -- you know, again, I didn't think there was any

18  dispute about the ownership.  I spoke to Attorney Luft --

19         THE COURT:  The ownership of --

20         MR. ROMNEY:  Of the New York entity.

21         THE COURT:  Who controlled the entities --

22         MR. ROMNEY:  Yes.

23         THE COURT:  -- not of specific assets?

24         MR. ROMNEY:  Yes.

25         THE COURT:  Okay.

1          MR. ROMNEY:  I spoke with Attorney Luft in the

2    conference room, as the Court directed, for purposes of

3    reaching our agreement.  He, in that meeting, mentioned a

4    Rolls-Royce, didn't mention a -- an exhibit or anything but

5    asked me about a Rolls-Royce.  I said I'd ask about it.  And

6    I -- that was when I first mentioned the -- what I was aware

7    of was a Capital One bank account that had been closed.

8          I did inquire about the Rolls-Royce with Ms. Guo.

9    I did not receive any response or any documentation

10   concerning it.  Had I done so, I would have turned it over.

11   I didn't --

12         THE COURT:  So she never responded to your

13   question about the Rolls-Royce?

14         MR. ROMNEY:  She didn't neglect to respond.  She

15   responded by indicating that she did not have any

16   documentation and --

17         THE COURT:  About the Rolls-Royce?

18         MR. ROMNEY:  About a Rolls-Royce.  And --

19         THE COURT:  See, none of that's in the record.

20   She didn't file any declaration.

21         MR. ROMNEY:  Well, again, she's not a party to

22   this.  It's --

23         THE COURT:  Well, she is a party if she's the

24   management member of Hudson Diamond Holdings, LLC, which the

25   documents indicate she is.  And you represent her.  You've

1    clearly said --

2              MR. ROMNEY:  I do.  I represent her.

3              THE COURT:  -- you -- as the managing member of

4    Hudson Diamond Holdings, LLC.

5              MR. ROMNEY:  I don't know that that's -- she was

6    the --

7              THE COURT:  Well, how else do you have authority

8    to --

9              MR. ROMNEY:  -- individual that directed me to --

10             THE COURT:  How else do you have authority to act

11   on behalf of Hudson Diamond Holdings, LLC?

12             MR. ROMNEY:  That is the only way.

13             THE COURT:  Okay.

14             MR. ROMNEY:  But I don't believe --

15             THE COURT:  So then --

16             MR. ROMNEY:  -- when I --

17             THE COURT:  So then you do represent her in her

18   capacity as the managing member of Hudson Diamond Holdings,

19   LLC.

20             MR. ROMNEY:  That's -- I look at it as

21   representing the entity.  But I also represent her in her

22   individual capacity.

23             THE COURT:  Yeah.  But you represent the entity.

24   That's who the appearance -- that's who the motion for

25   contempt is addressed against.

1          MR. ROMNEY:  That is.  And I believe that we -- I

2     don't believe --

3          THE COURT:  But she never answered your question

4     about the Rolls-Royce?

5          MR. ROMNEY:  I -- that's not what I said.

6          THE COURT:  Okay.  And --

7          MR. ROMNEY:  She answered my question in that she

8     did not have any documentation, and she could not get --

9          THE COURT:  And you specifically asked her about

10     the Rolls-Royce?

11          MR. ROMNEY:  I specifically asked her about the

12     Rolls-Royce.

13          THE COURT:  And you specifically asked her about

14     the real estate transactions that Hudson Diamond were

15     supposedly involved in?

16          MR. ROMNEY:  I don't believe I specifically asked

17     her about the -- I don't recall, is the answer.  And what I

18     was getting into was that I did not read Attorney Luft's

19     declaration or all of the exhibits.  When Attorney Luft

20     brought Exhibit T, I believe --

21          THE COURT:  It wasn't a declaration.  It was the

22     actual motion.

23          MR. ROMNEY:  I thought it was the --

24          THE COURT:  No.  That's the -- well, in support of

25     the motion.

1    MR. ROMNEY:  No.  Right.  The declaration --

2    THE COURT:  Right.

3    MR. ROMNEY:  -- attached -- I did not read the

4    declaration or the exhibits.

5    THE COURT:  In support of the motion for contempt.

6    Yeah.  Yeah.

7    MR. ROMNEY:  He brought the Exhibit T to my

8    attention, which I very much appreciated and expressed that

9    to him and called him.  I said both verbally and in writing

10   that we were willing to do anything that we could to help

11   the trustee locate documents on behalf of either entity.

12   And if he had any information available to him that would

13   assist me to locate documents for them, that I would do

14   anything I could with that information.  And I didn't

15   receive any additional information.

16       Perhaps that was foolish of me, and that is on me.

17   And I will own that.  I should have done that.  And with the

18   many moving parts of this situation and the other moving

19   parts of what goes on in any given day in the world that is

20   this case and the others that we all have to manage, I did

21   not go back to that declaration and see if there were any

22   other documents that could have helped me.

23       However, I was told among -- I was told and I

24   believe this is Hodgson Russ and -- but I am not positive.

25   And, frankly, I didn't think of it as very significant.  But

1   I believe I was told by Hodgson Russ's general counsel that

2   the New York entity explored real estate transactions but to

3   the best of their knowledge never consummated a single one.

4   And I am virtually certain that Attorney Luft told me the

5   exact same thing without referencing any particular

6   documents.

7          THE COURT:  Okay.

8          MR. ROMNEY:  Okay.  Thank you, Your Honor.

9          THE COURT:  Is there anything else you want to

10  add?

11         MR. ROMNEY:  No.  Other than renewing my offer to

12  answer any questions that anybody else has under oath.

13         THE COURT:  Does anybody have any questions that

14  they would like to place Attorney Romney under oath and ask

15  as part of this proceeding?

16         MR. LUFT:  None from me, Your Honor.

17         MS. CLAIBORN:  Your Honor, if I could take up the

18  opportunity to ask Attorney Romney to go through the U.S.

19  Trustee's pleading, which is ECF 1971.

20         THE COURT:  You're calling -- you'd like him to go

21  to the stand and be sworn in?

22         MS. CLAIBORN:  If I could.

23         THE COURT:  Yeah.

24         MS. CLAIBORN:  Because I --

25         THE COURT:  Mr. Romney offered, so --

1          MS. CLAIBORN:  There are a number of questions we

2     had that were not answered.

3          THE COURT:  Mr. Romney, come forward, please.

4          MR. ROMNEY:  Yep.  Mr. Henzy will be representing

5     me, Your Honor.

6          THE COURT:  Well, I don't know how that works,

7     actually.

8          MR. ROMNEY:  I believe as a witness I have the

9     right to counsel for the purpose of lodging objections.

10         THE COURT:  I understand that.  And I'm not

11    suggesting that.  But how are -- how is Mr. Henzy, who

12    represents the debtor and other parties, going to be your

13    counsel in connection with a motion to withdraw an

14    appearance?

15         MR. ROMNEY:  I don't believe that there's any

16    conflict in terms of -- Attorney Henzy has been my firm's

17    general counsel for years.  I don't believe there's any

18    conflict between representation of me and any of my clients.

19    I don't believe I have any adverse interest to any of my

20    clients.

21         I believe as a witness I'm not entitled to lodge

22    an objection to a question.  And I believe I'm entitled to

23    counsel to lodge an objection if there is one.

24         THE COURT:  I understand that you're entitled

25    to -- I'm not quarreling that you're entitled to counsel if

1   you want to have counsel and -- you offered to get on the

2   stand. Okay?

3            MR. ROMNEY:  I did.

4            THE COURT:  You offered.

5            MR. ROMNEY:  With my general counsel present.

6            THE COURT:  Okay?  But, I mean, I don't understand

7   how Attorney Henzy can be your lawyer in this situation.

8   You are partners in a firm together.  You both have

9   pecuniary interests in the firm.  How could it not be a

10  conflict?

11           How could it -- because he has to worry about him

12  as well.  Because whatever happens to you happens to him.

13  How could that not be a conflict?

14           MR. ROMNEY:  I would say that means our interests

15  are 100 percent aligned.

16           THE COURT:  Okay.  Well, guess what?  We're not

17  going to do this today until -- there is -- I mean, Trustee

18  Despins, United States Trustee's Office, do you really

19  believe that Attorney Henzy can represent Attorney Romney in

20  connection with a cross-examination of documents in this

21  case that relate to a motion for contempt that might enter

22  against Attorney Romney in addition to the client that

23  Attorney -- client or clients that Attorney Romney

24  represents?

25           Am I just on another planet here?  I mean, this is

1   insane.  How is that not a conflict?  No -- how is that not

2   a conflict?

3           MR. ROMNEY:  It is solely for the purpose of

4   lodging evidentiary objections.  I respectfully submit

5   that --

6           THE COURT:  It is not solely for the purpose of

7   lodging evidentiary objections.  It's Mr. Henzy is trying to

8   protect you, which he -- any lawyer would do who represented

9   you.  That's the point, right?  That's why you need a

10  lawyer.  You want to be protected.

11          How is it not a conflict?  I just -- I'm sorry.  I

12  just don't see it.  I don't -- I'm not saying you're not

13  entitled to counsel.  You offered to put yourself on the

14  stand.  You now want me to allow Attorney Henzy, your

15  partner with whom the -- all of you and your other partners

16  all have a pecuniary interest to help each other, you all

17  have -- you're involved in a partnership agreement.  I don't

18  know what your obligations are to each other.

19          And you might be found -- you could be -- I'm

20  talking now for the analysis of the conflict.  You could be

21  found personally held in contempt for which you'd have to

22  pay a fine, supposedly.  Okay?  I'm talking about for the

23  contempt purpose.  How is that not a conflict?

24          MR. ROMNEY:  I don't believe it is.

25          THE COURT:  We got 80 lawyers in the room.  How is

Ho Wan Kwok - July 11, 2023                                           86

1    this not a conflict?

2            MR. ROMNEY:  Well, if I have to pay a fine, then I

3    have to pay a fine.  If my firm has to pay a fine, my firm

4    has to pay a fine.  And I'd say my partners have the same

5    interest as I do, which are the same as my clients.

6            THE COURT:  I don't know that that's true.

7    Depends upon what your partnership agreement says.  I don't

8    even know what you have.  I have no idea, and I don't want

9    to know, because it's not relevant to the issue.

10           MR. ROMNEY:  Your Honor, I am trying to be as

11   transparent as possible.  I am --

12           THE COURT:  I'm not suggesting otherwise, Attorney

13   Romney.  I'm not suggesting any of that.  I just don't know

14   how Attorney Henzy can be your lawyer in this situation.

15   And I don't know why anyone else thinks that he can be.

16           MR. HENZY:  Well, I think I can be, so just --

17           THE COURT:  Well, I don't --

18           MR. HENZY:  -- just to be clear --

19           THE COURT:  I'm not asking you right now.

20           MR. HENZY:  -- just to be clear, there's at least

21   one other person in the courtroom who thinks that I can be,

22   but --

23           THE COURT:  Okay.  Well, that's good.  I'm glad

24   you think that.

25           MR. HENZY:  Okay.

1        THE COURT:  But I'm not asking you right now.

2        MR. HENZY:  Okay.

3        THE COURT:  I'm asking other people.

4        MS. CLAIBORN:  Your Honor, perhaps I can propose a

5   solution, which is that if you go back to what the U.S.

6   Trustee filed at 1971, it is very straightforward, with the

7   questions that are being asked.  But, for example, if you

8   just look at the first bullet point, which is little

9   (Indiscernible), that question never actually gets answered

10  in Attorney Romney's declaration.

11       So my suggestion was going to be that Attorney

12  Romney redo his declaration and actually respond to all the

13  questions that are asked or --

14       THE COURT:  Fine.  You know what?

15       MS. CLAIBORN:  -- assert that he -- or assert that

16  he can't.

17       THE COURT:  Actually, just get him on the stand.

18  Let Attorney Henzy represent him.  Nobody seems to think

19  it's a problem, so go right ahead.

20       MS. CLAIBORN:  I didn't say that, Your Honor.  I'm

21  just suggesting --

22       THE COURT:  Oh, well, I'm saying that.

23       Attorney Romney, get on the stand.

24       Trustee -- Attorney Claiborn, start asking your

25  questions.  Let Attorney Romney get sworn in.

1           THE COURTROOM DEPUTY:  Attorney Romney, please

2     stand and raise your right hand.

3                 AARON ROMNEY, WITNESS, SWORN

4           THE COURTROOM DEPUTY:  Can you please state your

5     name for the record?

6           THE WITNESS:  Aaron Romney.

7           THE COURTROOM DEPUTY:  Name and address.

8           THE WITNESS:  My business address --

9           THE COURT:  Yeah.  Just your business address.

10          THE WITNESS:  -- is 10 Middle Street, 15th Floor,

11    Bridgeport, Connecticut, 0604 -- 06604.  May I be seated?

12          THE COURT:  Yes, you may.

13          THE WITNESS:  Thank you.

14          THE COURT:  If you need -- there's water.  There

15    should be water there too.

16          THE WITNESS:  Thank you.

17          THE COURT:  All right.  Go ahead, Attorney

18    Claiborn.

19          MS. CLAIBORN:  Thank you.  Holley Claiborn for the

20    U.S. Trustee.

21                      DIRECT EXAMINATION

22    BY MS. CLAIBORN:

23    Q    Attorney Romney, can you please tell the Court when you

24    were first contacted by a representative of Hudson New York

25    with respect to the subpoena issued to Hudson New York?  And

1    I'm using that term as defined in my pleading with respect

2    to the subpoena issued by the trustee to Hudson New York.

3    A    Yes.  And I interpret that question as in the capacity

4    as somebody acting as behalf of Hudson New York.  And the

5    only reason -- point of clarification I draw there is that

6    obviously I've spoken to Mei Guo, the individual who was

7    that representative.  I've spoken with her consistently

8    since I began representing her in April of last year.

9         But with respect to in her capacity as a representative

10   of Hudson Diamond New York, I believe I contacted her.  And

11   that was on, I believe -- it's stated in my declaration when

12   I did it.  I believe it was on April -- sorry, May 30th that

13   I sent her the subpoenas.  But we would have had to have

14   been discussing them prior to that.  So sometime in between

15   April 23rd and May 30th, I believe closer to May 23rd.  But

16   it was within that time frame.

17   Q    Do I understand your testimony correctly that Ms. Guo

18   did not know about the subpoena issued to Hudson Diamond New

19   York until you told her about it?

20   A    That is my correct -- that is my understanding.

21   Q    And what do you base that understanding from?

22   A    Because she told me.

23   Q    Do you know what the first point of contact was for

24   Attorney Vartan with respect to the Hudson Diamond New York

25   subpoena issued by the trustee?

1    A    I do.

2    Q    What was that?

3    A    It was the same as I just described.  In fact, I, on

4    May 23rd, read the motion to compel for the first time.  I

5    believe it was filed May 18th.  As I've mentioned several

6    times in court today, we have very case -- we have very busy

7    case loads right now, so I did not actually read that

8    document until May the 23rd.  At that point, I read the

9    portions with respect to Hudson Diamond.  I recognized the

10   names, and I emailed Attorney Vartan, and I said something

11   to the effect of we need to contact Ms. Guo about this

12   immediately.

13   Q    Who was the person on behalf of Hudson Diamond New York

14   who engaged your representation as their counsel?

15   A    Ms. Guo.

16   Q    Who were the members of Hudson Diamond New York as of

17   December 1, 2022?

18   A    I don't know the answer to that question for the

19   reasons stated in my declaration.

20   Q    Who were the members of Hudson Diamond New York as of

21   June 1, 2023?

22   A    I don't know the answer to that -- I'm sorry.  Did

23   you -- was that question about Hudson Diamond -- were either

24   of those questions about Hudson Diamond New York or

25   Holdings?

1    Q    They were both intended to be about Hudson Diamond New

2    York.

3    A    Okay.  That's what I thought, but I just -- I don't

4    know the answer to that question.

5    Q    Okay.  And who are the members of Hudson Diamond New

6    York as of June 13, 2023?

7    A    I don't know the answer to that question for the

8    reasons stated on the record today.

9    Q    Did you ever ask Mei Guo those questions as to those

10   memberships and those dates we just went over?

11   A    Specifically with respect to those particular dates, I

12   don't believe I specifically referenced those dates.  But if

13   your question is did I ever discuss with Mei Guo whether she

14   was -- whether Hudson Diamond Holdings was a -- was the

15   member of Hudson Diamond New York, the answer is yes.  And

16   her belief, as I've stated, was that Hudson Diamond Holdings

17   controlled the New York entity, which is why she directed me

18   to respond -- to attempt to negotiate a -- me and Attorney

19   Vartan to attempt to negotiate an extension and then do

20   everything that I could to provide the Chapter 11 trustee

21   with responsive documents that we were able to locate.  And

22   she offered to -- or she indicated, and I believe did,

23   assist Attorney Vartan or participate in that process with

24   us.

25   Q    With respect to Hudson Diamond Holdings, LLC, do you

1   intend to continue to represent that entity?

2   A    Of course.

3           MS. CLAIBORN:  Okay.  I have nothing further.

4   Thank you, Your Honor.

5           THE COURT:  Okay.  You can step down, Attorney

6   ROmney.

7           THE WITNESS:  Thank you, Your Honor.

8           THE COURT:  Anything further on the motion for

9   contempt, the motion to withdraw as attorney?  Okay.  I'll

10  take those matters under advisement.

11          Let's proceed to the next matter.

12          MR. ROMNEY:  Your Honor, I apologize.  May I be

13  excused?

14          THE COURT:  Yes, you may.

15          MR. ROMNEY:  I do have to catch a flight.  Thank

16  you very much, Your Honor.

17          THE COURT:  You're welcome.

18          MR. BASSETT:  Your Honor, if it pleases the Court,

19  I think the next matter we would propose to take up is the

20  motion for summary judgment in the Adversary Proceeding

21  23-5012, which involves the -- it's the interpleader action

22  with respect to the HK USA escrow funds.

23          THE COURT:  Go right ahead.

24          MR. BASSETT:  Thank you, Your Honor.  So I

25  apologize.  I think I may have started a past hearing with a

1    similar remark, and it's unfortunate, but I do feel like

2    there are several occasions in which we find ourselves

3    before Your Honor arguing motions that, in our view, just

4    are not necessary.  This is another one of those.

5            I think it will be brief.  And the reason for that

6    and the reason why this hearing is, in our view, necessary

7    is because the issue before the Court, which is whether or

8    not the funds sitting in escrow pursuant to the escrow

9    agreement should be released to the trustee, has already

10   been conclusively decided by this Court's summary judgment

11   decision issued on May 18th finding both that HK USA is the

12   debtor's alter ego and that all of its property, including

13   the escrow funds, are property of the estate.

14           And I'd like to cite to the Court the particular

15   language of the order.  And this May 18th order is at

16   ECF 221.  On page 36, the first two so-ordered paragraphs.

17   The first so-ordered paragraph says that "HK USA is and was

18   at all relevant times the alter ego of the debtor,

19   Mr. Kwok."  The very next paragraph says that "All property

20   of HK USA at all relevant times to the present is property

21   of the estate."

22           What this means, Your Honor, is that the

23   definition of property of the estate under Section 541 of

24   the Bankruptcy Code, which refers to all legal or equitable

25   interests in property, extends by virtue of the May 18th

1    summary judgment order to all of HK USA's property.  And it

2    is not subject to any reasonable dispute.  There's been no

3    suggestion to the contrary in the papers filed by HK USA

4    that the definition of property of the estate under Section

5    541 of the Bankruptcy Code includes contractual rights and

6    legal rights.

7          So therefore, by operation of the May 18th order,

8    any contractual right that HK USA ever could have hoped to

9    hold and to exercise under the escrow agreement is now a

10   right that belongs to the estate and is property of the

11   estate under the Bankruptcy Code.  So HK USA has no ability

12   to stand before the Court today and to obstruct in the way

13   that it has for the last several weeks or, I guess, since

14   the issuance of the summary judgment order and prevent the

15   funds from being released by purportedly hiding behind

16   contractual rights that it's trying to exercise.  Those

17   rights now belong to the estate.

18   They have no response to this point in their papers,

19   because there is not one.  This ends the analysis, and the

20   Court need not consider anything else.  Whether or not the

21   escrow funds are property of the estate has already been

22   decided, and it cannot be relitigated.  That's res judicata.

23          Now, HK USA in its opposition to the trustee's

24   motion for summary judgment spends a lot of time focusing on

25   paragraph 4 of the escrow agreement, which is attached as

1   Exhibit 1 to the complaint.  They also cite case law

2   purportedly standing for the unremarkable proposition that,

3   generally speaking, contracts should be enforced and public

4   policy concerns related to that principle.  But all of that

5   is irrelevant in this situation where the Court has already

6   decided that any contractual rights that HK USA held or

7   holds under the escrow agreement are, by virtue of the May

8   18th decision, property of the estate, exercisable by the

9   estate.

10         And not surprisingly, none of the cases they cite

11   which talk about enforcement of contractual rights generally

12   or enforcement of rights in escrow agreements have anything

13   to do with the finding that one entity is another's alter

14   ego and that, therefore, the rights that a party is

15   purportedly trying to exercise, under an escrow agreement or

16   otherwise, are actually rights that belong to another party.

17   They don't cite any case like that.  And it's not surprising

18   why, because it wouldn't make sense for there to be an

19   outcome in a situation like this other than the one we are

20   asking the Court to order.

21         What I would also point out, while we're on the

22   topic of looking at the language of the escrow agreement,

23   which HK USA is so intent on doing, is that if you look at

24   paragraph 16 of the escrow agreement, it specifically deals

25   with revisions, amendments, modifications to, changes to the

1    escrow agreement.  What it says is that the escrow agreement

2    may not be modified unless ordered by the bankruptcy court.

3          Now, this is significant, because even assuming HK

4    USA still had the ability to exercise its contractual rights

5    under the escrow agreement, which it does not for the

6    reasons I've already discussed, this paragraph 16 allows the

7    Court to modify it.  Now, they may say, well, you know, what

8    that really means is that if the parties agree then the

9    Court has to so order that agreement.  But they didn't --

10   that language doesn't appear in paragraph 16.

11         If it did, it would say in order to modify this

12   agreement, the parties have to agree on it, and then the

13   Court needs to so order it.  It doesn't say that.  It says

14   the Court can order a change to the agreement.  If they're

15   going to be held to the benefit of the bargain that they

16   seem so worried about, then it needs to apply to the entire

17   agreement.

18         The last point that I'll make, Your Honor, is the

19   one we make in our motion, which is with respect to the

20   overall purpose of the escrow agreement and the related

21   stipulation concerning the Lady May and the fact that there

22   is no question the purpose of the agreement has run its

23   course.  The agreement and the stipulation, and it's

24   undisputed, were designed originally, ostensibly, to secure

25   delivery of the Lady May yacht to the estate.

1          The Court recognized this in its recent decision

2    denying the HK USA or the -- I guess HK USA's motion for

3    stay pending appeal at ECF Number 24.  And there is no

4    genuine factual dispute about this purpose.  In their

5    opposition to the motion for summary judgment, they try to

6    erect the strawman argument that if we're talking about the

7    intent of the agreement it must be introducing questions of

8    fact.

9          There is no genuine factual dispute about the very

10   clear purpose of that agreement.  You can just look at

11   background paragraph D of the agreement which makes it very

12   clear that the entire purpose of the escrow agreement was to

13   complement the stipulation and secure delivery of the Lady

14   May to the estate.

15         Now, why is this significant?  Because, obviously,

16   that purpose has run its course.  As the Court again pointed

17   out in its decision denying the motion for stay pending

18   appeal, the HK certification was going to be submitted so

19   that the funds could be released to HK USA.  That was

20   postponed while the Court considered the trustee's pending

21   motion for preliminary injunction and a prejudgment remedy.

22         So but there's no question.  I mean, the yacht's

23   now been sold.  The purpose of holding the funds in escrow

24   has run its course and is no longer necessary.  You know, in

25   fact, if you were to ask counsel today or anytime in the

1    recent past whether they think that the escrowed funds

2    should be released to HK USA, I'm sure they would tell you

3    yes.  I don't think they could say with a straight face that

4    they don't think they should get the funds back.

5             The problem with that argument from their

6    perspective is the second that the funds are released to

7    them, they're our property.  Because all property of HK USA

8    under the May 18th order is property of the estate.  I say

9    this because it just highlights the absurdity of their

10   position.

11            They are not using the escrow agreement and its

12   provisions in order to fulfill its intended purpose of

13   holding the funds in escrow while there might be a dispute

14   resolved about whether or not the certification requirements

15   have been satisfied.  They're now using it to obtain a

16   de facto stay pending appeal and to hold hostage this

17   Chapter 11 case and the trustee's efforts to enforce the May

18   18th order.

19            So for those reasons, Your Honor, I think there's

20   no question in our mind.  This is an open and shut motion

21   for summary judgment.  There are no disputed issues of fact.

22   This issue has already been decided by the Court.  There's

23   no stay pending appeal.  The escrow funds should be

24   delivered to the trustee.  Thank you, Your Honor.

25            THE COURT:  Thank you.

1          Mr. Moriarty, you're going to respond?

2          MR. MORIARTY:  Yes.  Thank you, Your Honor.  And

3     for the record, James Moriarty for HK International Funds

4     Investments (USA) Limited, LLC.

5          So I will start, Your Honor, with Attorney

6     Bassett's point about paragraph 16 of the escrow agreement.

7     Obviously, I agree with what he says about it, because it

8     says what it says.  I do want to point out for the Court --

9     and as Your Honor remembers, the escrow agreement was for,

10    for lack of a better term, amended back in October of 2022.

11    At that point, $4 million were released from escrow to

12    create the repair reserve for the Lady May.

13         And the order that Your Honor entered is at Docket

14    Entry 932.  It's dated October 7, 2022.  And even with that

15    order, the first paragraph starting with order, that

16    actually refers to paragraph 42 of the escrow agreement.

17    And it says that as soon as reasonably practical after this

18    order becomes a final non-appealable order.  So even with

19    respect to the repair reserve, the order had to become final

20    and non-appealable before that $4 million was going to be

21    released.

22         So can the escrow agreement be amended by court

23    order?  Absolutely.  That's what the parties agreed to.

24    Does that order have to become final and non-appealable

25    before that modification of the escrow agreement would be

1    enforceable and applicable?  Yes.  And we see that in the

2    Court's order at Docket 932.

3              As far as the escrow agreement running its course,

4    HK cites in its opposition the case Netherberg vs. G.V.

5    Licensing (sic).  And I will give Your Honor the citation

6    for that in a second.  So that is at 1995 US Dist. LEXIS

7    11725 and also 1195WL491489.

8              And in that case, the Court was looking at an

9    escrow agreement, and the escrow agreement had been set up

10   in connection with the sale of some intellectual property.

11   And the escrow was designed to protect the seller post

12   closing for litigation that based on the decision was then

13   ongoing.

14             The seller settled its litigation.  The party with

15   whom it settled sought to either terminate the escrow or to

16   have released from escrow proceeds that were not disputed.

17   And one of the arguments that was made to the Southern

18   District in that case was, well, this escrow agreement is

19   now superfluous, because we've settled the litigation that

20   the escrow funds were intended to secure.

21             And what the court said -- and this is on PDF page

22   2 of 3, and it's at start 4 in my LEXIS printout -- even if

23   the reasons for the parties' execution of the escrow

24   agreement fail to have continued validity, that would not

25   void the amended escrow agreement which plaintiff agreed to

1    in its settlement agreement with Gitano.  Plaintiff's

2    argument that only GVTI, which was the buyer of the

3    intellectual property, has an interest in the escrowed funds

4    fails to state a legally recognized reason to override the

5    negotiated terms of a binding agreement.  And in that case,

6    the court -- it held that it was not going to alter the

7    terms of the escrow agreement and that one of the

8    contingencies that was required to occur before the funds

9    would be released had to occur, and it had not happened yet.

10       And that is our case.  We have in paragraph 4 of

11   the escrow agreement four contingencies.  And upon the

12   occurrence of one of those contingencies, the escrow funds

13   would be released.  This Court entered an order, and it

14   entered an order that HK USA is the debtor's alter ego.

15       We are not seeking to relitigate that issue here

16   at all.  What we are talking about here is we are talking

17   about timing and conditions precedent.  When are these funds

18   going to be released from escrow to the trustee, who, by the

19   way, has the proceeds right now.  And one of those

20   contingencies has to be satisfied.

21       And the contingency that we're focused on is that

22   we need a final, non-appealable order of this Court.  And

23   the order that the Court entered on May 18th is presently

24   being appealed.  The appeal is pending before Judge Dooley

25   in the district court, and so that contingency has not been

1    satisfied, and the funds should not be released pursuant to

2    the terms of the escrow agreement.

3            This is a summary judgment motion.  It's a

4    contract issue.  The contract with respect to the

5    contingencies is non-ambiguous.  And as a matter of law,

6    those conditions -- one of those conditions has to be

7    satisfied before the funds can be released.

8            Now, Attorney Bassett did argue that this

9    agreement was really all about returning the Lady May and

10   now the Lady May has been sold.  And as I just identified to

11   the Court, there's the Netherberg (sic) decision.  But if

12   we're talking about summary judgment, and that is what we're

13   talking about, if we're going to get into the intent of the

14   parties, what did the parties intend when they drafted this

15   language that there has to be a final, non-appealable order

16   of the bankruptcy court?  Did they intend it to apply solely

17   with respect to issues regarding the Lady May, or did they

18   expect it to apply more broadly?

19           If you read the plain language of the agreement,

20   it has to be applied more broadly.  But regardless, if we're

21   talking about what did the parties mean by this provision,

22   and we're not going to give it its plain meaning from the

23   agreement, then there's an issue of fact, and summary

24   judgment has to be denied based on the fact that there is an

25   issue of fact as to what the parties intended with the

1   escrow agreement.

2          And then lastly, Your Honor, with respect to

3   property of the estate, there is no dispute that HK's right

4   to receive the escrow proceeds is an asset of the estate.

5   But that right is contingent on the happening of a

6   contingency or a condition precedent, which has not happened

7   yet.

8          And in Your Honor's decision granting summary

9   judgment on the trustee's second counterclaim on May 18th,

10  Your Honor distinguished between Count 2 of the

11  counterclaim, which was alter ego, and Count 3, which I

12  believe was a fraudulent transfer claim, but I could be

13  mistaken on that.

14         But in distinguishing it, what Your Honor

15  distinguished was with respect to the alter ego claim, it

16  makes the assets of HK available to satisfy the claims of

17  the creditors.  If the trustee wanted to control the entity,

18  he would have to move under Count 3.  And if the trustee had

19  moved solely under Count 3 as Your Honor discusses in the

20  decision which is at page 25, then the trustee would control

21  the entity.  The entity would be property of the estate, an

22  asset of the estate.  But in order to get to the assets of

23  the entity, the trustee would still have to pierce the veil.

24         So the trustee does not control HK.  HK is an

25  independent entity whose assets have been made available to

1    the creditors.

2              And, Your Honor, if you have any questions, I'd be

3    happy to answer them.

4              THE COURT:  I have no questions.

5              MR. MORIARTY:  Thank you.

6              MR. BASSETT:  Just a few brief points in response,

7    Your Honor.  And I'll -- I guess I'll start where Attorney

8    Moriarty ended, which is the question of the passage of

9    property rights to the estate and what is the consequence of

10   that under the May 18th order.

11             The rights that it -- to the extent that what

12   Attorney Moriarty is arguing is that the only right that

13   passed to the estate is the right to receive the escrow

14   funds and that any contractual rights that HK holds to

15   prevent that from happening are not rights of the estate,

16   that is simply not the law.

17             The estate is now, pursuant to this Court's very

18   clear order -- and I want to make another point, which is

19   that when Attorney Moriarty was referencing the Court's

20   order, he's focused on the alter ego finding and what that

21   means.  And I will get to that in a second.  But he's

22   ignoring the very clear provision saying that all property

23   of HK USA, which includes contractual rights, is property of

24   the estate.

25             So to the extent -- and he's -- I don't think he's

1    arguing that HK USA does not have this ability, because it

2    obviously does.  To the extent that HK USA, as everybody

3    knows it could, could go to the escrow agent and say, hey,

4    we authorize you to release these funds, that right, that

5    ability now belongs to the trustee.

6           (Audio skip 2:46 p.m. to 2:49 p.m.)

7           MR. GOLDMAN:  At the time this contract was made

8    to which the committee was a party, no one certainly

9    envisioned the situation we are now dealing with right now,

10   which is that a trustee would later be appointed months

11   after the transaction took place and would end up freezing

12   and obtaining a PJR against the funds that were on deposit.

13   The purpose of that deposit, as articulated by Mr. Bassett,

14   was to secure the delivery of the Lady May.

15          Certainly, this situation was not envisioned by

16   any party at the time the escrow agreement was entered into.

17   And Your Honor ought to interpret the contract in light of

18   that purpose.  And it's specifically the situation of the

19   parties and the circumstances connected with the transaction

20   at the time, which means that it just simply is inapplicable

21   to the current situation right now.

22          And we otherwise fully support the arguments made

23   by Mr. Bassett.

24          THE COURT:  Okay.  Thank you.

25          Anyone else wish to be heard?  Okay.  The motion

1    for summary judgment is taken under advisement.

2            What's the next matter that the Court needs to

3    address this afternoon?

4            MR. DESPINS:  It's the HCHK settlements, Your

5    Honor.  And Mr. Luft is going to handle that matter.

6            THE COURT:  Okay.

7            MR. DESPINS:  Unless Your Honor wants to take a

8    break.

9            THE COURT:  No.  I think --

10            MR. DESPINS:  No?  Okay.

11            THE COURT:  -- we should continue.

12            MR. GOLDMAN:  Okay.  Thank you.

13            MR. LUFT:  Your Honor, may I approach?

14            THE COURT:  Yes, you may.

15            MR. LUFT:  Thank you, Your Honor.

16            THE COURT:  Please proceed.

17            MR. LUFT:  Thank you, Your Honor.  Excuse me.  Avi

18    Luft of Paul Hastings on behalf of the Chapter 11 trustee.

19    Your Honor, what I'm here is (sic) in connection with our

20    9019 motion to approve the settlement agreement between the

21    Chapter 11 trustee and the assignee for the HCHK entities.

22            Your Honor, the agreement we present to the Court

23    is highly beneficial to the estate for multiple reasons.  It

24    is the product of extensive good faith negotiation.  It will

25    immediately transfer on an interim basis pending the outcome

1    of the adversary proceedings over $38 million of the HCHK

2    entity's cash to the trustee's account.

3            Sum and agreement will resolve all open issues

4    between the trustee and the assignee, avoiding an expensive

5    and time-consuming disputed preliminary injunction

6    litigation.  It also helps pave the way for an expedited and

7    less costly resolution of the adversary proceeding.  The

8    assignee has agreed not to oppose the relief sought by the

9    trustee in the adversary proceeding which we believe should

10   clear the path.

11           The settlement agreement provides for continued

12   administration of the assignee, of the HCHK entities, the

13   Columbus Circle offices, and the Columbus Circle assets,

14   which will lessen the administrative burden on the trustee.

15   And, Your Honor, the settlement ensures that there is --

16   will be due process available to all.

17           Now, Your Honor, the 9019 standard the Court is

18   well aware of.  But in short, the settlement need not be the

19   best that the debtor could have obtained, but rather it must

20   be in the range of reasonableness and make sure it falls not

21   within the lowest point.  And one looks at the Iridium

22   factors to determine if that's the case.  When one looks at

23   the benefits we just discussed in light of the Iridium

24   factors, I think it's quite clear that the -- this

25   settlement is most assuredly in the best interests of the

1    estate.

2         With regard to possibility of success versus

3    future benefits, by securing the funds now, settlement

4    eliminates the risk and cost related to the PI litigation as

5    well as providing a more likely positive outcome with regard

6    to the adversary proceeding.

7         As to the second factor of the likelihood of

8    complex and protracted litigation, this would eliminate both

9    the PI -- the need for a PI evidentiary hearing as well as,

10   as I said, streamline the future adversary.

11        With regard to the interests of the creditors of

12   the estate, Your Honor, I'll note that not one creditor of

13   the estate has objected.  The UCC supports this.  And I'll

14   note that this -- by making sure that the assets are within

15   the trustee's control, it prevents the possible dissipation

16   of substantial assets of the trustee, which he hopes to

17   bring into the estate for the benefit of all creditors.

18        The fourth factor under _Iridium_ is support of

19   other parties in interest.  As I noted, the UCC is in

20   support.  There have been very few objections.  Notably, a

21   number of them that have been filed in fact make clear that

22   they do not dispute the terms of the settlement but rather

23   seek to make sure that their own claim can be added or with

24   regard to a very discrete issue in the case of the U.S.

25   Trustee.  I will deal with all those.  Which really leaves

1    only one substantial objection which is from the Himalaya

2    parties.  And I will deal with that shortly, but it -- I

3    think, clearly, on balance most parties support this

4    settlement.

5            With regard to competency of counsel and

6    experience of Judge, I will be modest here, but I will

7    certainly say that this Court is by far the most up-to-date

8    and aware of the issues related to this case and more than

9    appropriate to judge whether this is an appropriate

10   settlement.

11           As to the nature and breadth of releases of the

12   directors and officers, the former HCHK executives are not

13   getting releases.  There is the issue of the assignees'

14   exculpation provision, which will be addressed later.  But

15   with regard to the directors and officers of HCHK who

16   existed previously, they are not getting a release.

17           And as to whether this was an arm's length, I can

18   report to the Court that this was the product of extensive

19   negotiations following an emergency TRO in which the parties

20   very much were on -- had different interests at the start

21   but were able to reach resolution.

22           Your Honor, before I delve into the objections,

23   though, I think it would be helpful -- and if you're -- the

24   Court would appreciate, I would like to walk through how the

25   settlement will work.  Because there is, as we've outlined

1    in our papers, sort of three phases as to the settlement.

2            THE COURT:  Go right ahead.

3            MR. LUFT:  Thank you, Your Honor.  So this

4    proposed order with regard to the settlement will modify the

5    TRO order that exists, and it does so in three phases.  The

6    first is stage one.  As I referenced, there'll be initial

7    transfer of the HCHK funds to the trustee.  The amount will

8    be $38,835,734.27.

9            The trustee will invest those funds in treasury

10    securities pending a dispositive ruling.  Pending that

11    dispositive ruling, to be clear, the trustee will not be

12    authorized to use the HCHK funds for any purpose other than

13    set forth in the 9019 order.

14            Another part of the stage one will be the assignee

15    will make available to the trustee all HCHK non-privileged

16    corporate records and other documents in his possession.

17    The assignee has agreed to take no position in connection

18    with the adversary proceeding.  And I believe as indicated

19    in their papers that they were -- would not be in a position

20    to say otherwise.  Nor will they assist any party in

21    opposing such relief.

22            At the same time, Your Honor, this order would

23    make clear that this settlement and the fund transfers are

24    without prejudice of the rights of any party, other than the

25    assignee who for the reasons stated above, to file pleadings

1    and take positions subject to meeting standing requirements.

2    And the trustee notes that, of course, he has -- reserves

3    the right to oppose standing.  But in short, what that means

4    is if you qualify for standing and you have it, then you'll

5    have the opportunity.  And, of course, the trustee will have

6    the opportunity to challenge that.

7            That is stage one.  Stage two will be following

8    the entry of the proposed order, should it be entered, and

9    the occurrence of the initial HCHK fund transfer.  That

10   deals with in paragraph 9 of the order the authorized

11   assignee actions.  This allows the assignee, pursuant to the

12   terms of the order, to take certain actions related to the

13   Columbus Circle offices, HCHK's remaining employees, and

14   related issues to that which are procedural and

15   administrative, and that the trustee may advance portions of

16   the HCHK funds for payment of those expenses.  And this is

17   the administrative relief that I referred to, which is a

18   benefit to the estate.

19           Paragraph 10 notes that the New York court relief

20   is not -- will not be binding, which brings us to stage

21   three which arises upon dispositive ruling on the alter ego

22   and the equitable ownership claim.  To the extent that there

23   is a favorable ruling on the trustee's adversary proceeding,

24   it does provide -- paragraph 11 of the order provides for

25   settlement payments.  It sets out the amounts.

1          Paragraph 12 deals with a modification of the bar

2     date where the trustee is authorized to seek the Court to

3     modify the bar date to allow HCHK entities' creditors, to

4     the extent there are any, to now file under the debtor's

5     Chapter 11 case, because to the extent an alter ego or

6     equitable ownership is granted, those creditors will now

7     become creditors of the debtor's estate to the extent they

8     exist.

9          Paragraph 13 deals with the channeling injunction

10     which we will speak about later.  Paragraph 14, the

11     exculpation provision.

12          And then, Your Honor, I'll turn to what happens to

13     the extent there is a final order ruling against the trustee

14     and the adversary.  Paragraph 15 explicitly provides for the

15     return of funds to the trustee -- from the trustee to the

16     assignee.

17          So that is the three stages of how the order would

18     work and what we would propose under the settlement.  Your

19     Honor, before I turn to the objections, I'll ask if you have

20     any questions.

21          THE COURT:  I have no questions.  Thank you.

22          MR. LUFT:  Thank you, Your Honor.  Okay.  In which

23     case, let me turn to the objections.  So I started off by

24     speaking about why we believe the Iridium factors have been

25     met.  I will note that, overall with regard to the

1    objections, the Iridium factors have largely been not

2    addressed.  Rather, they seem to be a mishmash of things

3    that people would like, attempts to jump ahead on the claims

4    process, or in the case of Himalaya, who I will turn to,

5    frankly, a person who is not happy with how the assignment

6    process has worked out for them but not one who has actual

7    basis to be objecting here.

8         So the Himalaya parties who, as we detail in our

9    reply brief, Your Honor, are largely made up of entities

10   that this Court has either directly found the debtor to

11   control -- the Himalaya farms, Himalaya -- or other entities

12   that the debtor has been involved with, has filed an

13   objection.  And I think the heart of it is effectively

14   saying we would have preferred to be in New York state

15   court; we thought that's where the assignment was going to

16   go.

17        Everyone's entitled to their preferences, but

18   that's not a basis to object to the settlement.  And it's

19   certainly not a basis to claim that this is not in the best

20   interest of the debtor's estate, which is what the 9019

21   motion is about.

22        Now, the Himalaya parties spend a good part of

23   their papers contesting the alter ego and equitable

24   ownership claims in the adversary proceeding.  That's not

25   what's before us today, Your Honor.  They -- to the extent

1    they have standing, they will have an opportunity to raise

2    whatever objections they have to the trustee's adversary

3    proceeding.  But nothing about the settlement precludes them

4    from that.

5           Similarly, Your Honor, the assignee is the party

6    who makes the decisions.  That's what happens when he was

7    appointed.  None of these entities objected to the

8    assignment, to my knowledge.  Nor did any of them intend --

9    to my knowledge intend -- file any objections to date of the

10   idea of -- when the assignee was considering selling these

11   entities to another party, a G News party.

12          The assignee made the decision that this was --

13   this settlement is in its best interest.  It's not the place

14   for purported creditors or the assignee to take issue with

15   it.

16          This Court clearly has jurisdiction as set forth

17   in the TRO order.  And accordingly, any -- the arguments

18   about its jurisdiction are really just a collateral attack

19   on that.  I don't think they're appropriate.

20          Finally, Your Honor, the Himalaya entities raise

21   issues with regard to the channeling injunction and the

22   exculpation provision.  Counsel from Cole Schotz is going to

23   focus on those issues.  But I will say that the trustee

24   agreed to those provisions and supports them.  But I will

25   let counsel from Cole Schotz address those as they focus

1    more directly on their issue and their papers.

2              Finally, Your Honor, the only other issue I

3    believe the Himalaya parties raise is with regard to

4    authority.  Again, counsel for Cole Schotz will focus on

5    this.  But I will note that under the deeds of assignment,

6    which not only weren't objected to but were entered, it is

7    my understanding that the assignee has full authority to

8    settle any and all claims against it.  And I would certainly

9    think that this would fall within that.

10             If Your Honor has any questions with regard to the

11   Himalaya parties' objection, I'll answer them.  Otherwise,

12   I'll move on to the next one.

13             THE COURT:  I have no questions.  You may move on

14   to the next objection.

15             MR. LUFT:  Thank you, Your Honor.  The next one is

16   the U.S. Trustee's limited objection with regard to the

17   channeling and exculpation issues.  As I said, counsel for

18   Cole Schotz is going to focus on that.  I will -- it's, I

19   think, a very similar issue.  I'll leave that there.

20             Otherwise, there's a question about the notice.

21   The U.S. Trustee's office has indicated that they'd like

22   three days' notice and a $25,000 cap.  The trustee has

23   proposed a $50,000 cap just given the costs in the case in

24   an effort to decrease administrative burden.  And it's our

25   view that raising it to 50,000 would not harm the interests

1   of people interested in understanding what expenses were

2   being made and, at the same time, would make it much more

3   manageable for the trustee to handle to have a slightly

4   higher cap.  So that is the only difference there to my

5   knowledge.

6           With regard to G News' limited objection and the

7   objection from Attorney Sherman, both of them raise a very

8   similar issue, which is they believe they have what I think

9   they would term an administrative claims.  They have monies

10  that they -- either in the case of Mr. Sherman who he

11  believes is owed to him pursuant to a severance agreement.

12  In the case of G News, they outlaid a limited amount of

13  money when they thought their transaction was going to go

14  forward for rent and other expenses.

15          I don't believe the -- an objection to the 9019

16  motion is the appropriate procedural vehicle for raising

17  these claims.  Certainly don't speak to the interests of the

18  estate.  I don't believe moving forward with this settlement

19  would in any way prejudice either parties' rights.  If they

20  have -- if these claims are valid, they'll be dealt with in

21  a number of ways.  And there'll be more than enough time to

22  deal with them.  But there's no reason to hold up the

23  settlement for it or to change the settlement to add other

24  people's claims into it.

25          I believe, Your Honor, that leaves us with the G

1    Club -- what it refers to as its notice and not an

2    objection.  I should pause and say does Your Honor have any

3    questions before I turn to that last one?

4              THE COURT:  I do not.

5              MR. LUFT:  Thank you, Your Honor.  Your Honor

6    is -- I think we've been talking about G Club for a while

7    recently in this Court.  This is the same G Club entity that

8    we have been having the discovery issues with.  And this, of

9    course, involves documents again.

10             G Club has in its notice made clear that they are

11   not objecting but that they claim that there is a master

12   services agreement, which is not attached, nor is any

13   provision cited.  But they say that there is now a master

14   services agreement -- which there may be, I don't know --

15   that provides -- pursuant to which all documents and emails,

16   in fact, for G Club, they say, in fact, were being

17   administered by HCHK.

18             Now, Your Honor will recall that previously we

19   were told that there was, at best, a tangential relationship

20   between the debtor and G Club, and that's why they couldn't

21   produce their documents.  That, you know, he was an unpaid

22   spokesperson.  After that, we were told that because

23   executives left, documents couldn't be produced, because the

24   relevant people had left.

25             Now, we've sort of taken a 180, and now G Club is

1   saying not only is there a relationship with the debtor but,

2   in fact, it's so close that it -- an entity which we believe

3   we will show to be its alter ego had a management service

4   agreement with it and that the emails were, in fact, sitting

5   in Manhattan, available at HCHK this whole time.

6           Be that as it may, they now have a new argument

7   for why the trustee should not be able to get documents.

8   They ask for a modification of the order to say that the

9   trustee should only be allowed to see HCHK documents that

10  only relate to HCHK.  Now, the impact of that, Your Honor,

11  quite likely is to create a null set of documents because,

12  by HCHK's own papers, the -- what they did was they provided

13  services for all the different debtor entities.  So to the

14  extent you can only talk about documents only related to

15  HCHK, they would have carved it out such that I would -- my

16  guess is that almost all their documents would once again be

17  pulled out from the grasp of the trustee, and we would once

18  again not have them.

19          The second thing that they claim is that these

20  documents are confidential and, thus, must be returned to

21  them.  And here, Your Honor, I will note that the assignee,

22  when he was appointed, G Club didn't come forward and say

23  these are -- you have confidential documents; you can't be

24  looking at them.  They've certainly never argued that any of

25  these are privileged.

1          And then when the assignee was going to sell all

2     the assets to G News, another entity which would have

3     included these same files, again, to my knowledge, no

4     objection to it.  It seems that G Club only has an objection

5     when the trustee is going to gain access to the documents.

6          I don't think there's any basis for it, Your

7     Honor.  I think the settlement should stand as it is.  I

8     think, to the extent there are responsive documents from G

9     Club, we will be able to see them.  I think the agreement

10    that the trustee be able to see HCHK's documents who also

11    had a pending 2004 against it at the time is completely

12    appropriate.

13         I think, for all those reasons and what I've said

14    before, Your Honor, G Club's objection shouldn't stand.

15         The final thing I'll just mention, Your Honor,

16    there are -- I did mention that fees will be paid.  To be

17    clear, the trustee has done an initial review of the

18    documentation.  The fees that are listed in the order appear

19    to be reasonable in the trustee's view.  But I do note that

20    the trustee does have an opportunity to do a further review

21    to the extent there is any question to make sure that the --

22    any such fees are reasonable.

23         Your Honor, if you have any questions, I'm happy

24    to answer them.  Otherwise, I'll -- I have nothing further

25    at  this time.

1      THE COURT:  Okay.  Thank you.  I have no

2  questions.  Thank you.

3      MR. LUFT:  Thank you, Your Honor.

4      Who wishes to be heard in response to the

5  trustee's motion to compromise?

6      MR. LUFT:  Your Honor, I believe this is the

7  attorney from Cole Schotz.

8      THE COURT:  Okay.  Yes.  Come forward, sir.  So if

9  you'd just state your name again for the record, please.

10      MR. JARECK:  For the record, Your Honor, Ryan

11  Jareck, Cole Schotz PC, on behalf of the assignee,

12  Mr. Hofmeister.  And, Your Honor, just by way of

13  introduction, Mr. Hofmeister is in the room.

14      THE COURT:  Okay.

15      MR. JARECK:  I just wanted to briefly introduce

16  you to him.

17      THE COURT:  Good afternoon, Mr. Hofmeister.

18      MR. HOFMEISTER:  Afternoon, Judge.

19      MR. JARECK:  Your Honor, I don't know if you have

20  a preference if I address the U.S. Trustee's objection first

21  or the Himalaya objection as it relates to the authority

22  issue.

23      THE COURT:  You can -- you should proceed in any

24  way you think is appropriate.  Okay?

25      MR. JARECK:  Thank you, Your Honor.  I'll start

1    with the U.S. Trustee's objection.  So, Your Honor, the U.S.

2    Trustee objects to the 9019 motion on two bases.  First, the

3    U.S. Trustee objects to the proposed channeling injunction

4    which is paragraph 13 of the proposed order.  And it

5    secondly objects to the proposed exculpation provision,

6    which is paragraph 14 of the order.

7         Your Honor, we put in a response on Friday to sort

8    of put the -- put some context as to why these are critical

9    components of the settlement for the assignee, and I would

10   just like to hit on a couple of points.  The assignee is

11   currently enjoined under the TRO from prosecuting the

12   assignment proceedings.  If the settlement is approved, the

13   assignment essentially will be wound down in an orderly

14   fashion.

15        If the trustee obtains a dispositive ruling, the

16   HCHK estates will essentially be folded into the Kwok

17   estates before this Court.  Accordingly, as part of the

18   settlement discussions, it was important that any and all

19   claims arising from the assignment proceedings be decided by

20   this Court, be channeled to this Court as opposed to having

21   piecemeal litigation in multiple forums.  And that's the

22   reason why the assignee requested a channeling injunction.

23        The channeling injunction is solely intended to be

24   a forum mechanism, and it will not -- is not intended to

25   affect any parties' rights.  If Your Honor actually has

1   paragraph 13 of the order or can pull it up, please.

2                   THE COURT:  Of the temporary restraining order?

3                   MR. JARECK:  No.  Of the proposed 9019 order.

4                   THE COURT:  Oh, okay.  Hold on a minute.

5                   MR. JARECK:  Thank you, Your Honor.

6                   THE COURT:  No, I don't have that.

7                   MR. JARECK:  It's Case 23-05013, Docket Entry 25.

8                   THE COURT:  Just give me a moment, and I will do

9   that.

10                  MR. JARECK:  Absolutely, Your Honor.

11          (Pause)

12                  THE COURT:  Oh, good.  We've just pulled it up.

13  What page do you want me to go to?

14                  MR. JARECK:  Page 24 of 28, paragraph 13.

15                  THE COURT:  Thank you.

16                  MR. JARECK:  So, Your Honor, you see paragraph 13,

17  the channeling injunction?

18                  THE COURT:  Yes.

19                  MR. JARECK:  It says in sum and substance, in the

20  event of a dispositive ruling -- so in other words, assuming

21  you're -- the -- Your Honor agrees with the trustee and

22  finds that there is an alter ego, all creditors and equity

23  holders shall be barred and enjoined from asserting claims

24  and causes of action.  And as you continue to scroll down,

25  it then says, "except as raised through the appropriate

1      pleadings filed in this court."

2              This is not, as the United States Trustee asserts,

3      whether it's a non-consensual, non-debtor, third-party

4      release, this is solely a forum mechanism.  This is simply a

5      mechanism to ensure that any and all claims following a

6      dispositive ruling be filed in this court under the Court's

7      supervision.  And, in fact, we actually thought the U.S.

8      Trustee's Office would prefer this.

9              When speaking with Attorney Claiborn over the

10     weekend and as most recently as yesterday, we circulated

11     language to make it even more clear that this was a forum

12     mechanism.  And, in fact, we proposed -- after the words

13     "except as raised through the appropriate pleading filed in

14     this court," we proposed "(it being expressly understood

15     that the foregoing provision is solely intended to be a

16     forum mechanism and not affect any parties' rights)".  That

17     proposed revision as part of more global settlement

18     discussions, unfortunately, was rejected.

19             Similarly, Your Honor, the exculpation provision

20     is very important.  All right?  You may have the opportunity

21     to -- excuse me.  The exculpation provision is also not a

22     release of third-party claims.

23             The provision, which is found in paragraph 14

24     right below the channeling injunction provision, is

25     contingent upon the Court issuing a dispositive ruling in

1    favor of the trustee.  Once that ruling is made, the claims,

2    if any, against the assignee for purposes of the assignment

3    proceedings and the settlement agreement become estate

4    causes of action.  So any claims for mismanagement, breach

5    of fiduciary duty, to the extent they exist, they're no

6    longer direct claims of any creditor.  They are not estate

7    causes of action.

8         In other words, the exculpation provision is more

9    in the nature of a debtor release, not a third-party

10    release.  The Second Circuit is very clear that a debtor is

11    authorized to release estate causes of action under Rule

12    9019.  And I'm happy to provide the Court with citations to

13    the extent that the Court is interested.  I think it's

14    pretty well known that debtors and trustees can compromise

15    claims under 9019.  That's what the rule's actually for.

16         Therefore, although it is styled as an

17    exculpation, it's more in the nature of a limited debtor

18    release for certain acts in favor of the assignee.  This is

19    not a Purdue Pharma third-party release issue whatsoever.

20    And to the extent the language is not clear, we're open to

21    any modification to make sure that the intent of the

22    assignee is explicit in the order.

23         Your Honor, just to put it more in perspective, if

24    the U.S. Trustee is successful and the other creditors are

25    successful in knocking out the exculpation provision and the

1    channeling injunction, after a dispositive ruling, again

2    assuming these provisions are not approved, the assignee may

3    be subject to claims in multiple forums without any

4    resources to defend against them.  That is simply

5    inequitable based on the services that the assignee

6    performed and his professionals for these estates and the

7    value derived therefrom.

8          Your Honor, I'll stop there and ask if you have

9    any questions on our position as it relates to the

10   channeling injunction and the exculpation.

11         THE COURT:  I do not have any questions.  Thank

12   you.

13         MR. JARECK:  So, Your Honor, I'm then going to

14   shift to the Himalaya creditors' objection and focus on the

15   authority issue that has been raised by them, which I think

16   is more appropriate that it be addressed by the assignee and

17   his counsel.

18         THE COURT:  Okay.

19         MR. JARECK:  Thank you, Your Honor.  First, the

20   objectors cite to numerous provisions of the deeds, New York

21   debtor/creditor law.  Those provisions are simply not

22   applicable to what we're proposing to do by way of this

23   settlement.  And I'll just give you a few examples.

24         First, the objectors challenge the assignee's

25   authority to enter the settlement agreement, and they cite

1    to -- and, I'm sorry, in paragraphs 57 and 60.  They cite to

2    the deeds.  They cite to New York debtor/creditor law which

3    require the state court approval of any sale or disposition

4    of personal property.

5          The settlement agreement is not a sale of the

6    assignor's assets.  The settlement agreement simply

7    contemplates the transfer of the HCHK funds from one

8    fiduciary to another fiduciary under the express supervision

9    of this Court.  The funds will sit in a trustee custodial

10   account pending this Court's decision on the trustee's alter

11   ego claims.

12         Similarly, the objectors in paragraph 58 cite to a

13   provision of New York debtor/creditor law concerning the

14   authorization of the assignee to sell, compromise, or

15   compound any claim or debt belonging to the estate.  Again,

16   Your Honor, the assignee is not selling or compromising any

17   claims belonging to the assignors.  And, in fact, to the

18   contrary.

19         There's no release provision.  As part of the

20   agreement, the assignee made it required that all interested

21   parties of the estates received notice of the proposed

22   settlement, and all parties' rights are expressly reserved

23   and preserved pursuant to the no-prejudice paragraph in

24   paragraph 8.

25         In addition, in paragraph 61, the objectors

1    criticize the assignee for not providing notice and

2    opportunity to be heard.  The assignee certainly provided

3    creditors with the opportunity to be heard in this Court.

4    Following entry of the expedited hearing order, notice to

5    these creditors were provided and a certificate of service

6    was filed to that effect.

7         Lastly, Your Honor, I want to note, consistent

8    with counsel previous brought up, that the authority issue

9    is actually addressed in the deeds and at Section 4F which

10   says that the assignee has the right to settle any and all

11   disputes.  That's precisely what we're doing here, Your

12   Honor.

13        There's been several discussions with the trustee

14   and his counsel following entry of the TRO.  As a result of

15   those discussions, the assignee determined in his business

16   judgment to enter into this settlement as opposed to

17   litigating the request for an injunction and the issues

18   raised in the adversary complaint, provided that the

19   transfer of the funds to the control of the trustee would be

20   subject to this Court's ultimate adjudication of the issues

21   raised in the adversary complaint.

22        Your Honor, the assignee believes that the

23   settlement agreement should be approved and is beneficial to

24   creditors as the issues raised by the trustee in his

25   complaint has to be resolved or adjudicated in one form or

1   another.  The settlement avoids costly litigation but at the

2   same time preserves parties' rights to contest the trustee's

3   claims should they wish to do so.

4          For these reasons, the assignee respectfully

5   submits that the 9019 motion should be approved.  And I'll

6   stop there and ask if the Court has any questions about my

7   presentation this afternoon.

8          THE COURT:  I do not have any questions.  Thank

9   you.

10          MR. JARECK:  Thank you, Your Honor.

11          MR. PASTORE:  May I approach, Your Honor?

12          THE COURT:  Yes, you may.

13          MR. PASTORE:  Thank you, Your Honor.

14          THE COURT:  Could you just state your name --

15          MR. PASTORE:  Yeah.

16          THE COURT:  -- for the record, please?

17          MR. PASTORE:  Of course.  My name is Joseph

18   Pastore from Pastore LLC.  With me today is my colleague,

19   Melissa McClammy.  We also have some summer associates in

20   the room in the back.

21          We represent several of the creditors of the HCHK

22   entities.  And if Your Honor would like, I could read it.

23   They're difficult to pronounce in numbers.  Or if the record

24   is fine with our brief --

25          THE COURT:  The record is fine.  Thank you.

1          MR. PASTORE:  Great.  Thank you.  Your Honor, I

2     represent creditors who, despite innuendo and statements,

3     believe that they're bona fide creditors of these entities,

4     loaned money, and are legitimate creditors.  I have no

5     personal relationship with them, no history with them, no

6     history with the movement, no relationship to anything

7     that's gone on here.

8          I'm dropping into a play that I know has had many

9     acts, and I only see a piece of it.  And I respect that and

10    understand it.  But from our perspective, I'm here because

11    there's creditors whose rights are being abridged by a

12    settlement that we think is ultra vires or illegal.

13         I think counsel for the assignee highlighted it.

14    This is a motion to compromise.  And the New York law makes

15    clear, we just read it, that the assignee is not free to

16    compromise -- paragraph 58, I believe, of our objection --

17    without court approval under New York law.

18         And there's a reason for that.  The assignee is

19    not a creature unto himself.  The assignee operates under

20    the direction of the New York court.  Very respectful of the

21    TRO.  I understand the need to freeze the money.  I

22    understand the need to be very careful.

23         But someone has to supervise and legitimatize the

24    assignee's compromise.  He does not get to unilaterally act

25    on his own belief.  He has to seek approval in New York

1    court.  And because of that, this settlement agreement is

2    unlawful, because no such approval was sought.

3           And from our perspective, someone has to validate

4    the assignee's belief that he could disenfranchise these

5    creditors without any investigation, any information, simply

6    disenfranchise creditors that he has a fiduciary obligation

7    to serve and protect under the New York law.

8           Now, let's be clear.  When I say disenfranchise,

9    the creditors of the HCHK entities, assuming they're bona

10   fide -- and I have to assume it.  And I've investigated it.

11   Best I know, they're legitimate creditors.  Good faith

12   claims.  Good faith monies loaned.  Are being completely

13   disenfranchised by this arrangement.

14          And the assignee has had to report to no one as to

15   why he's doing that.  He's getting immunized for doing it.

16   He's getting $550,000 for doing it.  His counsel is getting

17   $400,000 for doing it.  And under what theory can anyone

18   suggest he's acted in the best interest of the creditors

19   he's sworn to protect?

20          As a result, the agreement as structured by the

21   trustee and the assignees is illegal, ultra vires.  This

22   Court has authority to stay the New York action.  But I

23   don't think this Court has the authority to tell the New

24   York court you must approve this assignment in this action

25   by the assignee.

1          I think that's for the New York court to

2    determine.  And if the New York court so determines it, the

3    settlement could proceed.  But absent that, someone has to.

4    It can't -- the assignee is not free to do this under New

5    York law simply on its own volition.

6          With respect to the, you know, someday maybe we'll

7    have a finding of alter ego, maybe we will, maybe we won't.

8    But I don't think that's strong enough for this Court simply

9    to ignore the plain strictures of the New York law.  There

10   may be a finding someday of alter ego, and if that's the

11   case, ultimately, these monies will be transferred.  But

12   until then, it doesn't justify just ignoring the law.

13          So our view, Your Honor, is that this settlement

14   should not be approved as it's structured.  It's ultra

15   vires.  It's illegal.  And that the stricture should be

16   followed.

17          We intend, if the case proceeds, to intervene in

18   the case and protect our creditors' rights.  They're

19   good-faith creditors of this entity and this money.  And we

20   intend to try to hold the assignee to his sworn duty to

21   protect the rights of the creditors, my clients.

22          If you have any questions, Your Honor, I'm happy

23   to answer them.  That's the position of the creditors that

24   we represent.

25          THE COURT:  I do not have any questions at the

1    moment.

2            MR. PASTORE:  Okay.

3            THE COURT:  Thank you.

4            MR. PASTORE:  Thank you, Your Honor.

5            THE COURT:  Does anyone else wish to be heard on

6    the motion to compromise?

7            MR. SHERMAN:  Your Honor, may I be heard?  My name

8    is Joshua Sherman.  I filed a limited objection.

9            THE COURT:  Yes.

10            MR. SHERMAN:  I just wish to state that --

11            THE COURT:  Why don't you come up to this podium,

12    please --

13            MR. SHERMAN:  Thank you, Your Honor.

14            THE COURT:  -- so it'll be easier.  Thank you.

15            MR. SHERMAN:  Your Honor, I just wish to state

16    that I agree with the arguments made by the Himalaya

17    creditors.  But in addition, I just wanted to state that my

18    own claim, I believe, is administrative in nature.  I

19    described it in my letter to the Court.  The trustee and the

20    assignee have not argued otherwise.

21            Therefore, if the Court is inclined to approve the

22    settlement, my claim should be included among the authorized

23    assignee actions in a proposed order.  Thank you.

24            THE COURT:  Okay.  Thank you.

25            MR. ARCARO:  Your Honor, good afternoon.  Gregory

1    Arcaro appearing on behalf of G News Operations, LLC.

2    Similar to counsel's objection, my client entered into a

3    management agreement with the assignee and prepaid rent and

4    other expenses pursuant to that management agreement.  The

5    proposed order and settlement agreement provides for the

6    termination of that management agreement but does not

7    provide for the fallout of that, which is the recoupment of

8    the funds outlaid by my client.

9            I heard trustee's counsel say that the objection

10   to a motion to compromise is not the proper place to assert

11   claims, but the trustee put that issue squarely before the

12   Court when it proposed a payment of certain

13   administrative -- what I would consider to be administrative

14   claims as part of the settlement but does not propose a

15   mechanism to pay my client, simply requesting that a

16   mechanism be included so that my client can submit a claim

17   and, if proved up, be paid along with other administrative

18   claims and asserts that it stands on equal footing to all

19   the other proposed payments in the settlement agreement,

20   specifically in phase three, but could also come in phase

21   two when the trustee is authorized to advance the assignee

22   to pay certain expenses, could come either way in either

23   section of the settlement agreement but should be a specific

24   reference to how that claim is to be addressed.

25            Thank you, Your Honor.

1          THE COURT:  Thank you.

2          MS. BARANOWSKY:  Good afternoon, Your Honor.

3  Kelliane Baranowsky with Green & Sklarz on behalf of G Club

4  Operations, LLC.  And I'm joined with Carolina Fornos from

5  Pillsbury Winthrop on behalf of the same entity.

6          MS. FORNOS:  May I approach, Your Honor?

7          THE COURT:  Yes, please.

8          MS. FORNOS:  Thank you.

9          THE COURT:  Good afternoon.

10         MS. FORNOS:  Good afternoon, Your Honor.  Carolina

11  Fornos of Pillsbury Winthrop on behalf of G Club Operations.

12  Your Honor, we had filed a notice, and the frame -- the way

13  that the trustee has framed that notice is all about

14  avoiding producing documents.  To be clear, G Club

15  Operations has produced documents, not just the 300 that we

16  mentioned when we were last before the Court but also over

17  100,000 documents that we produced this morning.  And there

18  are more that we will produce because we will comply with

19  the Court's order prior to July 14th.

20         The issues that we are presenting to the Court is

21  that the trustee cannot simply walk in, assume alter ego,

22  assume substantive consolidation, and take hold of all

23  documents in the possession of HCHK.  To be very clear, HCHK

24  Technologies -- and there are multiple entities.  The only

25  issue for us is HCHK Technologies.  That had an

1    administrative and managerial position with respect to our

2    IT.

3              HCHK does not have the authority to transfer those

4    rights and documents to the assignee.  And the assignee does

5    not have rights to just turn that over to the trustee.  And

6    the trustee can't just do an end-run around discovery and

7    just say, oh, I'm just going to take all these documents,

8    ignoring privilege, ignoring contractual rights.

9              And that is the reason that we have filed the

10   notice.  We respectfully ask that the Court take notice that

11   we will produce documents, but G Club has to have access to

12   their documents, review them, account for privilege, and we

13   will produce what is responsive.  The trustee doesn't get to

14   just take everything irrespective of privilege rights and

15   responsiveness.

16             Does the Court have any questions on this issue,

17   Your Honor?

18             THE COURT:  I just -- the only thing I think you

19   said that I believe I knew but I want to make sure I

20   understand is your notice is only -- the notice that you

21   filed on behalf of G Club Operations relates only to the

22   HK -- HCHK Technologies entity, correct?

23             MS. FORNOS:  Yes, Your Honor.  That is correct.

24   And, Your Honor, we don't take a position -- we defer to

25   other counsel to address the settlement.  The issue is that

1    the proposed order as currently drafted bypasses a number of

2    rights and due process rights that affect G Club Operations.

3    Those rights start with the concept that the settlement

4    agreement assumes alter ego, assumes substantive

5    consolidation, and assumes that the trustee can just take

6    hold of all of our documents and do an end-run around the

7    discovery process.

8         That's the concern, and that's why we are flagging

9    that the proposed order should be modified.  To the extent

10   that the Court agrees with the settlement, the proposed

11   order should be modified to protect our rights.

12        THE COURT:  Let me just ask you about the HCHK

13   Technologies, though.  HCHK Technologies executed some

14   document that assigned all of their rights and title and

15   interest and claims and assets to the assignee, right?

16   We're not disputing that?  That happened?

17        MS. FORNOS:  Your Honor, yes.

18        THE COURT:  Okay.

19        MS. FORNOS:  But I want to clarify -- let me

20   clarify this.  The trustee made it sound as if no one

21   objected.  The TRO was entered before any dates would have

22   come up in state court to file position statements.  So the

23   TRO --

24        THE COURT:  No, no.  I understand that.  I'm

25   talking about even before the TRO, though.  The reason the

1    case was commenced in New York was because somebody in

2    control at HCHK Technologies signed a document assigning

3    over all of its everything to the assignee.  That occurred,

4    right?

5              MS. FORNOS:  Yes, Your Honor.  But I don't believe

6    that the process was finished.  But I will defer to --

7              THE COURT:  No, no.  I'm not suggesting that you

8    believe that.  I'm just saying that's what happened, right?

9    So the assignee comes into this case in New York and has

10   assigned to him as the assignee all of these entities,

11   assets and -- for the benefit of creditors, right?  So that

12   the assignee's role would be to take everything in the --

13   from those entities and turn them into cash and pay

14   creditors.  That's what was supposed to happen.

15             MS. FORNOS:  Your Honor, that was, I think, the

16   intent.  But to be clear, the assignee steps into the shoes

17   of -- if all of that is proper under New York law --

18             THE COURT:  Yeah.

19             MS. FORNOS:  -- and everything was supposed to be

20   done and everybody was afforded the opportunity to be heard

21   with that process, assuming all of that takes place, the

22   assignee takes the -- would arguably take the shoes of HCHK

23   Technologies and step into the shoes of those contracts.

24   And under those contracts, the assignee would still be bound

25   by those agreements.  And those agreements specifically

1     contain confidentiality provisions and specific provisions

2     that prevented the assignee or HCHK from just transferring

3     all documents --

4                 THE COURT:  Okay.

5                 MS. FORNOS:  -- irrespective of --

6                 THE COURT:  Did you point out in your notice --

7     and I apologize if you did, and I just didn't see it --

8     where in the agreements between G Club Operations and HCHK

9     Technologies there's this confidentiality provision?

10                MS. FORNOS:  Your Honor, we did not attach the

11    master services agreement.  We note for the record that

12    counsel for the trustee was provided not only with the

13    master services agreement originally in the original

14    production of the 300 documents, the Court may recall that

15    the Court specifically asked me about HCHK at the last

16    hearing and --

17                THE COURT:  I asked about the confidentiality

18    provisions, right, and whether the members had any -- I'm

19    not talking about HCHK.  I'm talking about G Club right now.

20    You were talking about -- I said is there any contractual

21    basis upon which a member would have a belief that their

22    information would remain confidential.

23                MS. FORNOS:  Your Honor, I will answer that.

24    There's two different --

25                THE COURT:  Sure.  Go ahead.

1          MS. FORNOS:  -- issues.  There's the membership

2    agreements and the membership rights.  And the Court

3    properly raised that issue last time, and we did look into

4    it and determined that we do have the ability to provide it

5    subject to the protective order, which is what we discussed

6    with the trustee and resolved that.

7          THE COURT:  Okay.

8          MS. FORNOS:  This confidentiality issue that we're

9    talking about is a separate issue.  This is our entire IT

10   system.  This is all of our email communications.  This is

11   Microsoft 365.

12         THE COURT:  Right.

13         MS. FORNOS:  This is --

14         THE COURT:  But you have to have some agreement

15   with HCHK regarding that.

16         MS. FORNOS:  And that contains a confidentiality

17   agreement with respect --

18         THE COURT:  Okay.  That's what I'm asking.

19         MS. FORNOS:  -- to all of our --

20         THE COURT:  Okay.

21         MS. FORNOS:  -- all of our information.  And that

22   does exist, and we have provided a copy of that agreement to

23   the trustee --

24         THE COURT:  Okay.

25         MS. FORNOS:  -- multiple times and have copied him

1    on communications with HCHK demanding this information back.

2            And accordingly, Your Honor, the way the proposed

3    order is structured right now does not take into account --

4            THE COURT:  Well, when you say this information,

5    what information are you talking about?  Isn't it all

6    software if they were controlling your systems?

7            MS. FORNOS:  It's IT.  It's emails and other

8    applications, Your Honor.

9            THE COURT:  Okay.  Okay.

10           MS. FORNOS:  And we simply ask that the Court take

11   notice that the trustee cannot just do an end-run and just

12   step in and say I'm going to just take everything.

13           THE COURT:  Well, whether or not that's what the

14   trustee's saying, I don't know.  That's what you're saying

15   the trustee's saying.  But my question was, what --

16   you're -- you are asserting on behalf of G Clubs (sic)

17   Operations that there is an agreement between G Club

18   Operations and HCHK Technologies in which there's a

19   confidentiality provision with regard to the information

20   that HCHK manages on behalf of G Club Operations?  That's

21   what you're --

22           MS. FORNOS:  Correct, Your Honor.

23           THE COURT:  Okay.

24           MS. FORNOS:  That's correct.

25           THE COURT:  And you've provided that information

1    to the trustee, is what you've said.

2            MS. FORNOS:  Yes.

3            THE COURT:  And you're saying that -- are you

4    saying that it should never be turned over, or you need it

5    back?  What are you saying with regard to the information

6    that is in the agreement between G Club and HCHK aside from

7    the members that we talked about already?

8            MS. FORNOS:  Yes.  That all information should be

9    returned to G Club so that G Club can perform review,

10   determine responsiveness, produce what's responsive, and

11   withhold privileged information.

12           THE COURT:  Okay.  Thank you.  That's what I

13   wanted to be clear about.

14           MS. FORNOS:  Thank you, Your Honor.

15           MS. CLAIBORN:  Again, Holley Claiborn for the U.S.

16   Trustee.  I think I'm the last of the objecting parties to

17   present to the Court today.  The U.S. Trustee filed a

18   limited objection to the settlement.  It's at ECF 1978, and

19   it takes issue with three things.

20           I'm going to take the easiest of it first, and I'm

21   going to go back into the more substantive discussion.  The

22   easy part has to do with the trustee's use of the funds that

23   he gets if the Court approves the settlement and what people

24   should know about that.  And the U.S. Trustee took the

25   position that we should have some greater transparency with

1    respect to that and some guard rails to know what's going to

2    happen.

3            The U.S. Trustee proposed that the monthly list of

4    what gets paid be filed by the trustee.  I think the trustee

5    is on board with that.  The U.S. Trustee also proposed that

6    for an expense that exceeded $25,000 that there be given an

7    opportunity for the U.S. Trustee and the committee to weigh

8    in on whether or not that that was an appropriate expense.

9    And the trustee has pushed back and asked for that be

10   increased to $50,000.

11           I don't think I heard any argument other than that

12   it's more efficient to have a threshold of $50,000.  I think

13   the problem really is, is that we don't really know what the

14   trustee's going to be doing with the money.  And we ought to

15   have some sort of mechanism to assure ourselves that an

16   expense that's significant is properly before the parties to

17   know what's happening before it happens.

18           So the U.S. Trustee thought that the $25,000

19   marker was a better threshold for what would be a reasonable

20   threshold for knowing what's going to happen in advance of

21   it happening.  So the U.S. Trustee would like that to be the

22   threshold at which the trustee has to take into

23   consideration the opinion of the U.S. Trustee and the

24   committee.  And to be clear, to the extent that the U.S.

25   Trustee has a problem with the proposed expense, it's the

1    U.S. Trustee's burden to come back to the Court to take it

2    up with the Court.

3            Going back to the other two issues that the U.S.

4    Trustee raised in the objection.  They are important issues.

5    And they are issues of some significance right now in courts

6    across the nation, including the Second Circuit.

7            The proposed settlement agreement includes two

8    provisions that work hand in hand with each other.

9    Paragraph 13 of the proposed order provides for a channeling

10   injunction, and paragraph 14 of the proposed order provides

11   for an exculpation.  And they are as broad as can possibly

12   be written.  And there is no dispute that they actually do

13   intend to protect the assignee and his professionals from

14   claims of others who are not the debtors, the debtor's

15   estate, or claims by the trustee.

16           The definition of who is protected is referred to

17   as the assignee, but it does, for clarification -- and --

18   reference not only the assignee, Mr. Hofmeister, but several

19   professionals.  So it's a group.  And it includes counsel

20   who made the presentation today on behalf of the assignee,

21   the firm of Cole Schotz.

22           The exculpation that is included in the order and

23   the settlement agreement is absolutely within the purview of

24   this Court to decide if it's appropriate.  And it's the U.S.

25   Trustee's position that it's not appropriate, because it's a

1   functional equivalent of an improper non-consensual release

2   of a third-party claim.

3          Stepping back from that for a minute.  If the

4   trustee were to be proposing that the trustee wants to

5   release the estate's claims against the assignee and his

6   professionals, the trustee has the capacity to do that.  But

7   that's not what the language proposed says.

8          The language proposed goes far beyond that.  It

9   talks about any liability to any person or entity and then

10  goes on to talk about the various different conduct.  And

11  included, for example, in that conduct that is not protected

12  and reserved is criminal conduct.  So, for example, if a

13  government agency wanted to take steps to pursue criminal

14  charges, those would arguably be barred by the exculpation

15  language that's in the proposed order.

16         The U.S. Trustee doesn't believe that the proposed

17  language for exculpation meets the standards that the Second

18  Circuit has articulated recently in the Purdue Pharma case.

19  None of the factors that are cited in that case, and there

20  are seven of them, appear to have been met by the proposed

21  motion and settlement terms.  And the Court has to evaluate

22  whether or not it actually has the ability to approve that

23  release, because it affects the claims of not just this

24  estate but of third parties who are not here and are not

25  subject to the subject matter of this Court and this

1    jurisdiction.  And you may have claims that have not been

2    articulated or presented to this Court.

3            Even to the extent that this Court determines for

4    some reason that the Purdue Pharma factors have actually

5    been met, the Purdue Pharma decision recently issued by the

6    Second Circuit makes it very clear that this Court does not

7    have the actual authority to finally approve the proposed

8    channeling injunction and the exculpation, because any

9    findings it would make would just be proposed findings that

10   would have to be approved and blessed and adopted by the

11   District Court.  And that's because this is a non-core

12   proceeding, and it violates the opinion of the United States

13   Supreme Court in Stern v. Marshall to the extent it's asking

14   this Court to just bypass and adopt full jurisdiction,

15   because it doesn't have it.

16           THE COURT:  So wait a minute.  Let me stop you on

17   that question, because I'm not sure I follow you.  The Court

18   doesn't have core jurisdiction to decide a motion to -- for

19   settlement under this -- in this case because why?

20           MS. CLAIBORN:  I'll be more specific.

21           THE COURT:  Okay.

22           MS. CLAIBORN:  The Court does not have

23   jurisdiction to approve the channeling injunction and the

24   exculpation because together they comprise a non-consensual

25   release of third-party claims that do not belong to this

1    estate.  That --

2              THE COURT:  So but --

3              MS. CLAIBORN:  That determination about

4    jurisdiction --

5              THE COURT:  But you're taking about jurisdiction,

6    so -- you're talking about jurisdiction, so we -- I just

7    want to be --

8              MS. CLAIBORN:  So my argument is --

9              THE COURT:  I just want to make sure I understand

10   your position clearly.

11             MS. CLAIBORN:  My argument is twofold.  One, that

12   we don't think that the factors articulated in the Purdue

13   Pharma decision --

14             THE COURT:  That I get.  I --

15             MS. CLAIBORN:  -- have been met.

16             THE COURT:  The Seventh Circuit -- the seven

17   factors haven't been met.

18             MS. CLAIBORN:  Correct.

19             THE COURT:  But even if they have, I can't decide

20   them anyway, because they're not core --

21             MS. CLAIBORN:  You don't have final approval

22   authority.

23             THE COURT:  -- they're not core proceedings, and

24   they'd have to be referred to the district court?

25             MS. CLAIBORN:  Correct.

Ho Wan Kwok - July 11, 2023

147

1          THE COURT:  But couldn't -- even if you're

2   correct, which I don't know if you are or not, because I

3   haven't studied what you just said until -- I didn't

4   appreciate what you're saying until now, can I enter

5   proposed findings of fact and conclusions of law under Rule

6   7052?

7          MS. CLAIBORN:  You can.  But the district court

8   has to ultimately weigh in on that.

9          THE COURT:  I understand.  Okay.  All right.

10          MS. CLAIBORN:  And that's --

11          THE COURT:  I'm just asking.

12          MS. CLAIBORN:  And that's with respect to just the

13   issues of the exculpation provision --

14          THE COURT:  Yep.

15          MS. CLAIBORN:  -- and the channeling injunction.

16          The other thing that I want to point out is that

17   there is no statutory authority for this Court to approve a

18   channeling injunction outside the confines of the plan.

19   That issue is a big issue, and it stops this channeling

20   injunction request in its tracks.  The only mechanisms --

21          THE COURT:  Doesn't that -- aren't people asking

22   for that all the time in -- I actually have -- the Chapter 7

23   trustee is asking for those, and no one's raising an issue

24   about channeling injunctions and no statutory authority.

25   And I -- and in Chapter 11 cases when there aren't plans

1    confirmed yet.

2              And where does 542(g), I think, say that it has to

3    be in connection with a plan?  I'm not sure it does.

4    There's been a lot of controversy over that, hasn't there?

5              MS. CLAIBORN:  There has been, Your Honor.  And

6    it's 524(g).

7              THE COURT:  What did I say, 42?

8              MS. CLAIBORN:  Yeah.

9              THE COURT:  I said it backwards?

10             MS. CLAIBORN:  That's okay.

11             THE COURT:  24(g).  Sorry.

12             MS. CLAIBORN:  So the point is that the authority

13   to impose that restriction on others is found only in that

14   section.  And courts have determined that that section does

15   authorize channeling injunctions outside the concept of the

16   specific language that's in there that refers to asbestos

17   cases.  That said, there is no case law that we're aware of

18   that authorizes the Court to impose this channeling

19   injunction outside the confines of a plan.  All of the case

20   law determines the appropriateness of a channeling

21   injunction in the confines of an actual plan.

22             THE COURT:  Okay.

23             MS. CLAIBORN:  So it's the U.S. Trustee's position

24   that this Court does not have authority to do --

25             THE COURT:  There's no statutory authority to --

1          MS. CLAIBORN:  Correct.

2          THE COURT:  -- to allow that.  Okay.

3          MS. CLAIBORN:  Correct.

4          THE COURT:  I -- that help -- that's helpful to --

5     for you to just articulate that.  I wasn't exactly sure.

6     But that -- now I understand what you're saying.

7          MS. CLAIBORN:  So circling back to the proposal,

8     if it were scaled back to the idea that the trustee wants to

9     release the assignee and his professionals for claims that

10    the estate may have against them, that's within the

11    trustee's purview.  But the trustee does not have the

12    authority to ask this Court to bless releases of claims held

13    by third parties against the assignee and his professionals.

14         And so we're asking the Court to deny that part of

15    the settlement agreement with respect to the two provisions,

16    because they have to be read in harmony with each other.  So

17    that's 13 and 14 in the proposed order, and we would ask

18    that those be stricken from the proposed order to the extent

19    that the Court approves the actual settlement agreement

20    that's before the Court.

21         THE COURT:  Okay.  Thank you.

22         MS. CLAIBORN:  Thank you.

23         THE COURT:  Any response from the trustee?

24         MR. DESPINS:  Yes, Your Honor.  The first response

25    is would it be possible to take a ten-minute recess, so we

1    can discuss --

2              THE COURT:  Yes.  But actually, before we do, is

3    there anybody else that has an objection that hasn't been

4    heard?

5              And who are you representing, Attorney Moriarty?

6              MR. MORIARTY:  The debtor, Your Honor.  And --

7              THE COURT:  Which debtor?

8              MR. MORIARTY:  Ho Wan Kwok.

9              THE COURT:  Mr. Kwok?

10             MR. MORIARTY:  Mr. Kwok.

11             THE COURT:  He's --

12             MR. MORIARTY:  I'm not objecting.

13             THE COURT:  He isn't --

14             MR. MORIARTY:  I just want to state for the record

15   that the debtor does not take any position on the settlement

16   agreement or the motion.

17             THE COURT:  Okay.

18             MR. MORIARTY:  And that is it.  Okay?

19             THE COURT:  Okay.  Thank you.

20             All right.  Yes, let's take a ten-minute break --

21   recess.  Court is in recess until 4 p.m.

22             MR. DESPINS:  Thank you.

23             THE COURTROOM DEPUTY:  All rise.  Court is in

24   recess until 4 p.m.

25             (Recess from 3:51 p.m. to 4:05 p.m.)

1      THE COURTROOM DEPUTY:  All rise.  United States

2  Bankruptcy Court for the District of Connecticut is back --

3  is now in session.

4      THE COURT:  Please be seated.

5      Okay.  We took a recess a little before -- around

6  3:50-ish, I guess, Trustee Despins.  So where do we stand

7  now?

8      MR. DESPINS:  I'm happy to report that we have

9  reached an agreement with the assignee which I think

10  resolves a lot of the issues that were raised regarding

11  exculpation and channeling.  And the agreement is as

12  follows.

13      The trustee will release any estate cause of

14  action against the assignee and/or his professionals.  And

15  we obviously -- you know, I don't have to tell you this.

16  You know it better than I do.  The trustee can do that

17  subject to Your Honor's approval.  We believe there are no

18  such claims, but we would be releasing them as part of the

19  settlement.

20      And as far as channeling, there wouldn't be a

21  broad channeling injunction that concerned the U.S. Trustee,

22  but rather there would be basically the Court being placed

23  into the gatekeeper function, meaning that anyone who wants

24  to assert a claim against the assignee or his professionals

25  with respect to his role as assignee and the assignment for

1    the benefit of the creditor must first file such claim

2    before this Court so that the Court can determine whether

3    that cause of action was released by the trustee pursuant to

4    the release that we would be giving.

5         And by the way, that release would only be given

6    if Your Honor approves, you know, the third stage of the

7    settlement, which is if Your Honor approves the alter ego or

8    equitable ownership claims that the trustee has brought

9    forward.  If that's not approved, all of -- all bets are

10   off.  There's no release.  There's no gatekeeper function by

11   the Court.  This would all be done in the third phase of

12   this process.

13        But, again, the trustee would release only estate

14   claims against the assignee and his professionals.  There

15   would be a provision and -- you know, the assignee is okay

16   with this subject to reviewing the language, his counsel

17   reviewing the language.  But the concept would be that any

18   claims against the assignee or his professionals must first

19   be brought before this Court so that the Court may determine

20   whether those claims are subject to the release.

21        Because this -- as you know, the issue whether

22   people have direct claims or not in this context is very

23   murky.  And we don't want people to be suing all over the

24   place until Your Honor determines, yes, that's a direct

25   claim not subject to the trustee release; go ahead and you

1     can sue whoever you want.  We hope that will not happen.

2     But the point is that that right is protected.

3          But the Court would play a gatekeeper function.

4     We believe there's plenty of support for giving the Court

5     jurisdiction to do solely that.  Because they're not being

6     precluded from bringing the other claims; they're just --

7     there's just one step, which is they need to start with this

8     Court so the Court can protect its jurisdiction, i.e. did --

9     are these claims derivative claims or are they claims that

10    are direct and not derivative.  And that determination must

11    be made by this Court, the Court that approved -- or if Your

12    Honor approves it, that would approve the settlement.

13         So that's the -- I think that resolves that issue.

14    My colleagues will address other issues raised by other

15    claim creditors or alleged creditors.  But that issue, to

16    me, I think that resolves a -- an issue in a way that's

17    favorable to the estate but also that should make the Court

18    comfortable that you have the jurisdiction and power and

19    that it's appropriate to issue such -- that type of order.

20         The only point -- before I cede the podium to my

21    colleague, I would just say, Your Honor, every time people

22    who -- whose name starts with a G -- and I don't mean a

23    first name, but a company starts with a G appears in court

24    here, putting themselves at -- or asking for -- the Court

25    for protection, I would be very concerned that we need to

1    see how the dust settles on these things.  We need to see

2    what's what, what happened.  And, you know, I would be very

3    concerned about any attempt to derail this or for people

4    saying, well, I want a special deal as well.

5            First of all, it's important to understand that

6    the relief that the assignee and his professionals are

7    getting, they're getting that only if Your Honor determines

8    that this -- these entities are alter egos of the debtor.

9    If not, they're not getting that.  And at that stage, people

10   will be free to say, oh, I'm an admin creditor of the

11   estate; let me explain to you why.  And we'll determine that

12   at that time.

13           But this is not today the proper (indiscernible)

14   or process to have the claims of people who would like to be

15   recognized as admin -- eventual admin claimants.  That's not

16   the proper context.

17           But I'll -- on that note, Your Honor, I'll cede

18   the podium to my colleagues.

19           THE COURT:  Let me ask you one question about what

20   you just explained as a resolution of the release issues and

21   the exculpation issues.  You're saying that you'll agree to

22   limit the release language to say that the trustee will

23   agree only estate claims against the assignee are released

24   and that if any --

25           MR. DESPINS:  And his professionals.  Yes.

1    THE COURT:  Go ahead.  I'm sorry.  What?

2    MR. DESPINS:  And his professionals.

3    THE COURT:  And his professionals.  Okay.  And

4    that if any party has a claim -- what they believe is a

5    claim against the assignee and his professionals, they have

6    to bring that claim before this Court?

7    MR. DESPINS:  Or file a motion before the Court

8    saying I want to be authorized to bring that claim in --

9    wherever they want to bring it, in New York state court, and

10   let me explain to the Court why that claim that I have --

11   this is the creditor speaking now -- is not covered by the

12   release that the trustee gave to the -- to these folks.

13   THE COURT:  Then how do these creditors know that?

14   How are they going to know that?

15   MR. DESPINS:  Well, in the notice that they would

16   get -- again, this only happens in the third phase.  If Your

17   Honor rules that these entities are alter egos of the

18   debtor, at that point there would be a notice given that

19   says that any -- and we can work on the language -- but that

20   any creditor that believes that they have such a claim need

21   to file first a motion with this Court to be authorized to

22   bring any such claim.

23   That's a minimum -- you know, frankly, in terms of

24   due process, it -- it's a very light impediment to them

25   exercising their rights and -- because, at the end of the

1    day, it's very likely that all these claims are derivative

2    claims and, therefore, that we own those claims.  And that's

3    why it's important to have that gatekeeper function, Your

4    Honor.

5            THE COURT:  How does the proposed -- let's -- if

6    you are successful and the motion to compromise is granted,

7    how does the proposed order at this point address that

8    issue --

9            MR. DESPINS:  We would --

10           THE COURT:  -- that you --

11           MR. DESPINS:  We need to submit new language to

12   Your Honor.  But, basically, I would say ignore the sections

13   that -- on exculpation on channeling that you have before

14   you now.  We will submit one provision that says the

15   trustee -- if the Court grants the relief, we call that

16   the -- in the dispositive motion, meaning the summary

17   judgment or whatever motion we bring -- the trustee will

18   release, add that point, all claims against the assignee and

19   his professionals.

20           And the Court will, at that point, enter an

21   order -- or, you know, of course, subject to Your Honor's

22   consent, would enter an order saying that any creditor

23   wishing to assert a claim against the assignee or his

24   professionals must first file a motion before this Court to

25   be authorized to do so, so that the Court can determine

1    whether the claims to be asserted are claims that are

2    derivative, meaning that are still owned by the estate, or a

3    direct claim of these creditors, something along those

4    lines.

5            Again, I hesitate to give too much language,

6    because counsel for the assignee has not reviewed this

7    language.  But those are the concepts, Your Honor.  So,

8    obviously, we need to submit a new order to Your Honor.  You

9    know, there's no doubt about that.

10           THE COURT:  All right.  But for right now, your

11   proposal addresses the United States Trustee's objections?

12           MR. DESPINS:  Well, no.

13           THE COURT:  Oh, she's shaking her head.

14           MR. DESPINS:  No, I don't -- I said that we

15   resolved this with the assignee.

16           THE COURT:  It doesn't resolve it with the U.S.

17   Trustee.  Okay.

18           MS. CLAIBORN:  It does resolve the U.S. Trustee's

19   concerns with response to the release.  The estate is

20   authorized to propose a release of whoever it wants to

21   release.  And it's up to the Court as to whether or not

22   that's appropriate.

23           We're not arguing that point.  What we were

24   arguing about was whether or not you could release other

25   claims that belong to third parties who are not the estate

1    and not the debtor.  So that issue, I think, can be dealt

2    with by language and can be resolved.

3         The issue as to the proposed mechanism for the

4    Court to be a gatekeeper, I don't have any authority to

5    consent to that at this point.  I need to see the language

6    and discuss it with the U.S. Trustee and circle back to the

7    Court and to the parties.

8         MR. DESPINS:  But, again, I think that we're far

9    away from the channeling injunction where it was mandatory

10   that any claims be brought here for -- on the merits.

11   Basically, it's solely a gatekeeper function.  And I believe

12   that there are precedents for courts doing that, so.

13        But, anyway, if I could have my colleague address

14   other -- I mean, unless you have other questions, Your

15   Honor.  There are other objectors, and that raises -- raised

16   issues.  And I'd like my colleague to address these points

17   if possible.

18        THE COURT:  I'm just looking to see if I have any

19   other questions.  I don't have any other questions at the

20   moment, but that doesn't mean I might not, depending upon

21   what else is --

22        MR. DESPINS:  So I'll -- if -- I'll ask Mr. Luft

23   to come to the podium to address --

24        THE COURT:  Okay.  Thank you.

25        MR. LUFT:  Your Honor, may I approach?

1    THE COURT:  Yes, please.

2    MR. DESPINS:  Actually, Your Honor, there's one

3  point I -- this is purely procedural before Mr. Luft comes

4  up.  Mr. Goldman asked me whether the committee could have a

5  review right regarding the fees of the assignee's

6  professionals, and that was agreed to.

7    THE COURT:  With the assignee as well?

8    MR. DESPINS:  Just the assignee's professionals.

9  Because the assignee, there's nothing to review.  It's a --

10  meaning the --

11    THE COURT:  No, but you --

12    MR. DESPINS:  Yes.

13    THE COURT:  But the --

14    MR. DESPINS:  They agreed to that, Your Honor.

15    THE COURT:  Yeah.

16    MR. DESPINS:  I apologize.  I didn't understand

17  your question.  The second point is that Mr. Luft accurately

18  described the provision saying that the funds would be

19  invested in treasuries.  That's the current version.  But we

20  need to modify that -- and, again, the assignee has agreed

21  to this -- to provide that we can also keep it in the

22  trustee Section 345 accounts.

23    Because, to make a long story short, after we told

24  the bank that we were going to take the money and invest it

25  in treasuries, they said, well, you know, guess what, we'll

1    offer you 4.95 percent, which is just like a quarter point

2    or half a point less than treasuries.  And that's in a 345

3    account.  So we decided to --

4                THE COURT:  You mean U.S. Bank offered you that?

5    Is that what you're saying?

6                MR. DESPINS:  No.  A bank --

7                THE COURT:  Oh.

8                MR. DESPINS:  -- but not U.S. Bank.  Not this U.S.

9    Bank.  But the bank that holds the other trustee accounts in

10   the case.

11               THE COURT:  Okay.  Got it.

12               MR. DESPINS:  And they've agreed to give us --

13               THE COURT:  The estate trustee accounts.

14               MR. DESPINS:  -- 4.95 percent, which is pretty --

15   it's not marketing for them, but that's a pretty high

16   interest rate.  And it's a Section 345 account.  So the U.S.

17   Trustee is happy.

18               So the point is that we need to modify that

19   section to allow for the money to be deposited in such

20   accounts.  But that -- those are the only two procedural

21   points I wanted to make.

22               THE COURT:  Okay.  Thank you.

23               MR. LUFT:  Thank you, Your Honor.  Avi Luft again

24   from Paul Hastings on behalf of the Chapter 11 Trustee.  I

25   will try to be brief, because I realize it is getting late.

1          I will go in order in which it was discussed.

2    Your Honor, with regard to the comments made by the -- what

3    I've referred to as the Himalaya objectors, I want to focus

4    just on two things really.  The first is that nowhere in

5    there was there any discussion of the Iridium factors or

6    that, in fact, this is not in the best interest of the

7    debtor's estate.  And that's really what we're here for on a

8    9019 settlement.

9          In fact, I didn't hear that from anybody.  And to

10   be honest, I think that really is where the analysis should

11   be focused.

12         Beyond that, Your Honor, I do want to just

13   comment.  There was a lot of language thrown around about

14   people being "completely disenfranchised" and suggestions

15   that they won't be able to have claims.  That's just not how

16   this settlement is structured, Your Honor.

17         To the extent the trustee prevails in the

18   adversary proceeding with regard to either alter ego and/or

19   equitable ownership, to the extent people are valid

20   creditors of the HCHK entities, then they will have an

21   opportunity to bring claims in this case subject to the

22   trustee making his application to reopen the deadline for

23   filing claims, which is already provided for in the order.

24   And to the extent the trustee is to lose, then the money is

25   returned to the assignee.  In which case, they're in -- no

1      worse off.

2            So all this language with regard to people being

3      disenfranchised or losing claims just isn't true.  And I

4      think in the papers that they filed, the reality kind of is

5      there.  There's a reference to the fact that what they

6      really think is unfair is that in the New York state court

7      case they would have only been competing with other

8      creditors of HCHK, but if the trustee is to prevail on his

9      alter ego claims then they will be subject -- equal with the

10     other creditors of the debtor.

11           But that's actually quite fair, Your Honor.  If we

12     are right that HCHK entities are alter egos of the debtor,

13     then creditors of one -- of one aspect of the debtor's

14     estate is -- should be treated the exact same as creditors

15     of other aspects of the estate.

16           So with that, Your Honor, unless you have

17     questions, I'll move on to the others.

18           THE COURT:  I have no questions.

19           MR. LUFT:  Thank you.  With regard to

20     Mr. Sherman's statement, he made a brief reference that we

21     did not specifically disagree with him that his claim is an

22     admin claim.  Your Honor, what I said in my opening

23     statement was that I thought it was premature to deal with

24     what -- these claims.

25           And just so we're clear, I would not take the fact

1    that I did not get into the details as to whether or not it

2    is an admin claim as any type of agreement that it is.  I

3    think when the time and the place is right, it could be

4    submitted.  It could be considered.

5              THE COURT:  Well, when would the time and the

6    place be right?  I'm just asking.

7              MR. LUFT:  Yeah, Your Honor.  That's completely

8    fair.  I think, should we prevail on the adversary

9    proceeding and it is determined that we are -- that the HCHK

10   assets are part of the debtor's estate, then I think any

11   creditors of the debtor, whether through HCHK or otherwise,

12   here I think Mr. Sherman or whoever else, can come forward

13   and say I have a claim, and they can assert it.

14             THE COURT:  But what if it's an administrative

15   claim?

16             MR. LUFT:  Your Honor, in terms of the timing, I

17   still think that would probably be the right time just

18   because prior --

19             THE COURT:  Okay.  I'm just asking, because there

20   is --

21             MR. LUFT:  No, it's completely fair.

22             THE COURT:  Okay.  Go ahead.

23             MR. LUFT:  Look, Mr. Sherman's free to raise it to

24   us now.  We can talk about it.  I just don't think it has

25   any bearing on the settlement.

1           As I -- the only thing I'll finish with is, to the

2      extent we were to lose, then the money would go back to the

3      assignee, and then he would have to make the judgments,

4      which is why I time it to awaiting that judgment.

5           With regard to G News, I'll simply say, look,

6      there is no obligation because you settle a claim with one

7      party to settle all claims that any party may have.  Again,

8      this is a settlement that was reached -- with the assignee

9      and the trustee.  That's whose claims are being addressed.

10          I don't think the fact that that is happening in

11     any way prejudices G News.  Again, we will deal with their

12     claim at the appropriate time.

13          Finally, with regard to G Club, I just want to

14     make a few comments.  First of all, I'll note they're not a

15     creditor, Your Honor.  It's not exactly clear on what

16     grounds they are objecting to this settlement.

17          I will note specifically there was no mention with

18     regard to the language I highlighted which is in their

19     proposal in paragraph 6 of their notice that we may only

20     look at documents pertaining "only to the HCHK entities."

21     As I said, the inclusion of that language which they added

22     and which they did not address now very likely could create

23     a null set of what documents the trustee may see.  I don't

24     think it's appropriate.  Nor do they seem to have a response

25     with regard to it.

1    With regard to this idea that HCHK controls all

2    their emails and all their IT, I'll note that despite what

3    is now going on seven, perhaps eight, months this -- this

4    notice was the first time we've heard that HCHK -- or in the

5    last weeks the first time we've heard that HCHK's emails

6    were, in fact, all controlled by a third party and that HCHK

7    ran it all.  We've never heard that from G Club when they

8    had -- were asked to produce their documents for months.

9    They now raise privilege and confidentiality

10   issues.  I don't see how they can do that.  They didn't

11   object when the assignee was sent the documents.  They

12   didn't seem to have a problem with HCHK having their

13   documents.  And they didn't seem to have an objection to the

14   idea of the assignee selling it all to G News and letting

15   them have all their documents.

16   You know, I think to the extent there ever was any

17   privilege or confidentiality concerns, of which I have

18   questions, those are -- in my view have been waived.  It

19   seems that everyone else is allowed to see these documents.

20   It'd be appropriate for the trustee.

21   Finally, with regard to the notion your -- the

22   Court asked questions with regard to the MSA and what

23   provisions you asked.  It is quite possible that the MSA was

24   produced to us along with the other documents.  Certainly,

25   no provision in the MSA was highlighted to us.  No language

1    was shown to us.  Nor was any included in this agreement

2    indicating what was being allegedly violated or otherwise.

3            Again, I think the most appropriate thing is to

4    let the trustee, just like the assignee, put them in the

5    same position.  Let them have the documents of HCHK.  Let

6    them use it for -- to the extent they need to review it.  If

7    there are G Club documents included within that, then that

8    was always the case.  It didn't seem to be a problem before.

9    It shouldn't be a problem now.

10           Your Honor, if you have any questions, I'm happy

11   to answer them.

12           THE COURT:  I have no questions.  Thank you.

13           MR. LUFT:  Thank you, Your Honor.

14           THE COURT:  Anyone else wish to be heard?

15           MR. GOLDMAN:  Thank you, Your Honor.  Irve Goldman

16   for the committee.  I just wanted to express our support for

17   the settlement the trustee has proposed.  We appreciate the

18   alacrity and aggressiveness with which the trustee has been

19   able to halt the state court proceedings and bring the

20   assets that were subject to those proceedings when the --

21   within the protective umbrella of the Chapter 11 process.

22   And these are assets that could have been -- could have

23   evaded the reach of the estate.  Not that they've been

24   determined to be property of the estate yet, but at least

25   they've come before the Court for that determination.

1    Of course, this Court has the exclusive

2    jurisdiction over property of the estate, and I would submit

3    exclusive jurisdiction to determine what is property of the

4    estate.  And that's what this settlement does.  As the

5    assignee mentioned, this is just a forum-shifting settlement

6    which actually channels whatever claims there were in the

7    assignment proceedings into this Court, preserves all the

8    claims that could be asserted.  No one is getting

9    disenfranchised.

10    You know, we -- as to the estate release, that's a

11    business judgment standard.  And we are supportive of that

12    if it means approving the entire settlement.

13    On the gatekeeping function, I think it's a common

14    feature for courts to apply when a direct claim is dressed

15    up -- well, rather a derivative claim is dressed up as a

16    direct claim.  And so this type of gatekeeping function is

17    commonly utilized so that creditors aren't able to do that,

18    and the Court will be the ultimate arbiter of what is a

19    direct claim and what is a derivative claim so that those

20    derivative claims dressed up as direct claims can't just go

21    off in various courts filing suit until the Court at least

22    determines that they're legitimately direct claims.

23    So with that, the committee does support the

24    settlement as modified in the way that has been articulated

25    to the Court.

1          THE COURT:  Okay.  Thank you.

2          MR. GOLDMAN:  Thank you.

3          MR. PASTORE:  May I approach, Your Honor?

4          THE COURT:  Yes, you may.

5          MR. PASTORE:  I know it's late, so I'll be brief.

6     I have deep respect for my good friend, Mr. Goldman, and --

7     but I wanted to highlight one word he just used, which is

8     "halt."

9          THE COURTROOM DEPUTY:  I'm sorry.  I need your

10    name.  I didn't get that name.

11         MR. PASTORE:  Oh, I'm sorry.  Joseph Pastore for

12    the --

13         THE COURTROOM DEPUTY:  Thank you.

14         MR. PASTORE:  -- HCHK creditors.

15         THE COURTROOM DEPUTY:  Thank you.

16         MR. PASTORE:  Halt.  I think that's an important

17    word.  So what we have here is we have no finding of alter

18    ego, no finding that any of the creditors are worthy of

19    impugnment, but we're going to halt a proceeding in New York

20    without anyone finding that what -- the assignee was in the

21    best interest of those creditors he was assigned to protect,

22    which is the New York court's role, and then tell those

23    creditors that they can't bring any lawsuits against the

24    assignee for his actions unless it's approved by this Court.

25         I think always a fan of the due process clause,

1    always a fan of, you know, findings of -- conclusions of law

2    and findings of fact.  You have none of that here.  Yet, my

3    clients' rights are all being disenfranchised, clearly.

4           At a minimum -- we do appreciate the U.S.

5    Attorney's objections to the injunction.  I think that's --

6    had to be said for sure.  And I think I said it.  At a

7    minimum, we'd request the right to look at any proposed

8    order changing that language and comment on it if necessary.

9    Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. JARECK:  Your Honor, one final?

12          THE COURT:  Yes.  Yes.  Go right ahead.

13          MR. JARECK:  For the record, Ryan Jareck, Cole

14   Schotz PC, on behalf of the assignee.  Your Honor, it's

15   actually perfect timing, because my comment deals with what

16   Mr. Pastore said earlier in his presentation that this

17   settlement is ultra vires and violates New York law.

18          And when saying that, he cites to his own brief,

19   paragraph 58, which is, again, another section from the New

20   York debtor and creditor law.  And what that says is "The

21   judge may, upon application of the assignee, authorize the

22   assignee to sell, compromise, or compound any claim or debt

23   belonging to the estate of the debtor."

24          Again, Your Honor, this is a complete mis-cite.

25   This is not what we're doing.  We're not selling.  We're not

1    compromising.  We are simply shifting the funds to another

2    fiduciary under the control of this Court.  Thank you, Your

3    Honor.

4              THE COURT:  Thank you.

5              MS. FORNOS:  Your Honor, may I approach?

6              THE COURT:  Yes.

7              MS. FORNOS:  Just briefly, Your Honor.  G Club

8    Operations has not waived any of its rights.  As the Court

9    may recall, I specifically mentioned the issue of HCHK at

10   the last hearing.  I teed it up.  I also contacted

11   Mr. Jareck on June 19th regarding this issue and return of

12   our confidential information.  I also contacted Mr. Jareck

13   and Mr. Lutz as well on July 5th and provided them a copy of

14   the master services agreement.

15             Our position is very simple.  We can address the

16   proposed order in the way that the Court feels appropriate.

17   The issue is simply that the trustee cannot just do an

18   end-run around discovery and step into the shoes of a

19   company that hasn't even been determined to be an alter ego,

20   hasn't been substantively consolidated with this estate, and

21   all of a sudden step in and say these are all our documents

22   now, we can -- get to have them.

23             So we respectfully request that the Court consider

24   our request that they -- that the trustee does not get a

25   right to do that.  Rather, they should be returned to G Club

1    Operations so that G Club Operations can review for

2    responsiveness and privilege and produce accordingly.  Thank

3    you, Your Honor.

4              THE COURT:  Thank you.

5              MS. FORNOS:  Any other questions from the Court?

6              THE COURT:  No.  Thank you.

7              MS. FORNOS:  Thank you, Your Honor.

8              THE COURT:  So the motion to compromise

9    controversy was filed both in the main case at ECF Number

10   1936 and in the Adversary Proceeding 23-5013 at ECF Number

11   25.  And our local rules of bankruptcy procedure require

12   that any motion to compromise in an adversary proceeding

13   also be filed in the main case so that notice and service of

14   the motion to compromise is provided to all parties.

15             The motion -- the notice and service of the motion

16   and the hearing on the motion was properly made as

17   established by the record in the main case and in the

18   adversary proceeding and the certificate of services -- the

19   certificates, excuse me, of service that relate to the

20   motion in the main case and the motion in the adversary.

21             The parties -- certain parties filed objections to

22   the motion to compromise, all of whom have appeared at this

23   hearing today, including the Himalaya parties represented by

24   Attorney Pastore, Attorney Sherman representing himself with

25   regard to a claim of -- that he is entitled to an

1    administrative claim from the HCHK parties.  Counsel for G

2    News filed an objection again asserting that there is -- G

3    News has a right to an administrative claim and requests a

4    mechanism be implemented for administrative claims.

5         And then counsel for G Club Operations filed

6    notice which counsel has articulated, and the concern is

7    that the trustee is entering into this settlement agreement

8    in order to obtain documents through discovery that it might

9    not be able to obtain until G Club Operations has its

10   documents returned from the HCHK Technologies entities.  And

11   then G Club can undertake its review of those documents and

12   determine what, if any, of those documents can be produced

13   subject to whatever privilege G Club could try to assert.

14        But I remind G Club and the trustee that

15   apparently with regard to the other discovery sought against

16   G Club -- and I'm not saying that this settlement is

17   discovery, but that's the view of G Club Operations -- that

18   the protective order and confidentiality provisions and

19   orders already in place in the main case apparently have

20   addressed the issues that the Court raised with regard to

21   the pending motion to -- for contempt and to compel the

22   production of documents from G Club.

23        Also, the United States Trustee filed a limited

24   objection.  I understand the limited objections of the

25   United States Trustee.  And Mr. Kwok through his counsel,

1    Mr. Moriarty, has taken no position on the motion to

2    compromise.

3            Apparently -- it's more than apparent.  As stated

4    on the record, the trustee has agreed to limit the releases

5    set forth in the -- any order on the motion to compromise to

6    estate -- an estate release.  And that release will only

7    occur if the third stage of the settlement is reached.  And

8    that will only happen after the Court makes a ruling on

9    whether or not the alter ego claims and -- are decided in

10   favor of the trustee.

11           Because the discussions and representations and

12   suggestions made on the record by the trustee and other

13   counsel, including the Office of the United States Trustee

14   and the creditors' committee and counsel for the assignee,

15   are somewhat different than proposed before the hearing, I'm

16   going to continue this hearing but solely for a week and

17   only to see what the proposed order approving a settlement

18   looks like with the changes noted on the record today.  All

19   parties' objections have been noted for the record.  There's

20   no need for any further objection by any of the parties who

21   filed objections.  And the Court isn't going to consider any

22   further objections.

23           But I will order the trustee's counsel to revise

24   that proposed order along the lines that were stated on the

25   record today and serve it on all objecting parties.  And I'd

1    like that done by 5 p.m. on July 13th so that when we come

2    back here to a hearing next week I know what, if any,

3    problems there may be with regard to the provisions of a

4    proposed order approving the settlement.

5          I am not ruling on whether -- right at this moment

6    on whether this motion to compromise is granted or not

7    granted.  I am suggesting that the parties need to have some

8    discussions about the proposed order.  I'm going to take a

9    look at proposed order and, with it, the revisions as noted.

10         And then next week, I will either say that the

11   matter is ripe for decision, I will decide, or I will insist

12   that, I suppose, other things could be included in the

13   order.  But I'm not ruling at this time.  I will go back and

14   review everyone's pleadings, and I will review them in the

15   light of the arguments that were made during the hearing

16   today.

17         But the hearing itself with regard to the

18   substantive motion, the relief sought in the motion and the

19   objections, there'll be no need for any further hearing.  I

20   want to see what this order looks like, and I want to

21   understand it.

22         So, Trustee Despins, when your office serves the

23   order on everyone at 3 p.m. -- I'm sorry, 5 p.m. on the

24   13th, I'd like you to put it on the docket of the main case

25   and the adversary proceeding as well.  That'll give the

1    Court time to review it and prior to the continued hearing,

2    which we will schedule -- there are already other matters

3    scheduled in the case and the adversary proceedings on July

4    18th starting at 12 p.m.  And I will schedule this -- I will

5    continue the hearing solely with regard to the proposed

6    order.  And I will schedule it for 2 p.m.

7            And the reason I say 2 p.m. is because, right now,

8    on next week's calendar, the original pretrial conference in

9    the Genever Holdings vs. AIG Property Casualty adversary

10   proceeding is scheduled.  And given that we're going to have

11   two days of -- or possibly two days of evidentiary hearing

12   with the -- in the AIG adversary proceeding starting

13   tomorrow, there's no need for a pretrial conference next

14   week.  I'll know what's going on.  And I'm not going to

15   bring the parties into the court on a pretrial conference

16   when that's not necessary.

17           So this -- so the hearings on -- in the main case

18   on ECF 1936, the motion to compromise, and the hearing in

19   Adversary 23-5013 on ECF 25, motion to compromise, are

20   continued to July 18th at 2 p.m.  And I'm not going to enter

21   a formal scheduling order with regard to the filing and

22   service of the revised proposed order, because I'm ordering

23   it on the record.

24           Does anybody have any question about that?

25           MS. CLAIBORN:  Just one question, Your Honor.  If

1    a party has a problem with the proposed order, is there a

2    deadline by which the Court would like comments?

3         THE COURT:  We're going to talk about it at the

4    hearing next -- well --

5         MS. CLAIBORN:  No, I know.  For a written response

6    if one is --

7         THE COURT:  I would give everyone an ability to

8    file a written response by 5 p.m. on Friday, July 14th.

9         MS. CLAIBORN:  Thank you.

10        THE COURT:  Now, no other party that -- the only

11   parties that are -- I'm going to entertain any kind of

12   written response is going to be parties that have already

13   filed an objection.  Anybody that hasn't already filed an

14   objection is already beyond the deadline, number one.

15        Number two, this hearing next week is not -- we're

16   not going to go over the same issues we've already gone

17   over.  I've gone -- we've gone through them.  I understand

18   the parties' respective positions, and I'll rule based -- at

19   some point, whether it be at the hearing, after the hearing,

20   whatever I see with regard to your revised proposed order

21   and any responses.  But the hearing is going to be limited

22   to those issues.

23        Does anyone have any questions?

24        MR. PASTORE:  Just a quick statement.  I've got a

25   settlement conference in federal court in New Jersey at

1    2 p.m. that day.  Ms. McClammy can handle this hearing.  I

2    just wanted the Court to know.  No disrespect, but I will

3    be --

4              THE COURT:  That's fine.  Thank you.

5              MR. PASTORE:  Yeah.

6              THE COURT:  I appreciate that.

7              MR. PASTORE:  Yeah.

8              MR. DESPINS:  Your Honor, do you have any

9    flexibility as to the time?  For example, could it be later,

10   like maybe 3:30 or 4:00?

11             THE COURT:  Sure.  I mean, if that's what people

12   want to do.  But you've got to get everybody's agreement on

13   that.

14             MR. DESPINS:  Oh, well --

15             THE COURT:  If everybody agrees, that's fine.  I

16   mean, I'm not going to go later than 4 p.m., though.  The

17   court staff -- I have no idea what everybody's going to say.

18   Maybe they'll be -- maybe there won't be a problem.  But the

19   court staff -- I -- you know, I -- they like to go home at

20   night, which I can understand.

21             MR. ARCARO:  Your Honor, just one question for the

22   Court.

23             THE COURT:  Yes.

24             MR. ARCARO :  To the extent that the revised order

25   that's submitted to the Court -- we -- there's no --

1          THE COURT:  It's going to be docketed, so

2    everybody that has an appearance will get it via -- I'm not

3    sure if that was your question.  But you will get it via

4    CM/ECF.

5          MR. ARCARO:  My question is that Your Honor is

6    giving the opportunity to file a response to that proposed

7    order.

8          THE COURT:  By Friday at -- July 14th at 5 p.m.

9          MR. ARCARO:  If no response is filed, are

10   objections considered waived?

11         THE COURT:  No.  Your objections will still be

12   considered.  I haven't ruled yet, right?

13         MR. ARCARO:  Your Honor, thank you.  Thank you.

14         THE COURT:  So sorry if that wasn't clear.  I will

15   consider everyone's objections.

16         MR. ARCARO:  Very well.  Thank you.

17         THE COURT:  But I want to see how this revised

18   proposed order is going to look given what we all talked

19   about -- I didn't talk about it, but what you all talked

20   about today and what your presentations were on your

21   respective objections.

22         MR. ARCARO:  Thank you very much.

23         THE COURT:  So, no, it's not -- you're not waiving

24   any objection that has been timely filed.  They will be

25   considered.

1          MR. ARCARO:  Very well.

2          THE COURT:  But I want to see where we get on the

3     revised proposed order as well.

4          MR. ARCARO:  Very well.  Thank you, Your Honor.

5          THE COURT:  Okay?  Thank you.

6          All right.  So the courtroom deputy will note

7     probably later today or -- not today, tomorrow that that

8     pretrial conference next week in the AIG adversary will just

9     be continued to a date to be determined.

10          THE COURTROOM DEPUTY:  Okay.

11          THE COURT:  Okay?

12          THE COURTROOM DEPUTY:  Yes.

13          THE COURT:  And I believe we're starting with the

14     evidentiary hearing with the AIG adversary proceeding at 10

15     a.m. tomorrow.  Is that correct?

16          MR. DESPINS:  That's correct, Your Honor.

17          THE COURT:  Okay.  Then I -- we have concluded all

18     the matters on today's calendar.  For those reasons, court

19     is adjourned.  Thank you, all.

20          IN UNISON:  Thank you, Your Honor.

21          THE COURTROOM DEPUTY:  All rise.  Court is

22     adjourned.

23          (Proceedings concluded at 4:46 p.m.)

24

25

1        I, CHRISTINE FIORE, court-approved transcriber and

2    certified electronic reporter and transcriber, certify that

3    the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

8    _____                July 20, 2023

9        Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25