## **EXHIBIT C**
### **(Declaration in Support of Motion)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>HO WAN KWOK,<br><br>*Defendant.* | **FILED PARTIALLY UNDER SEAL**<br><br>Case No. 1:23-CR-118-1 (AT)<br><br>**DECLARATION OF SIDHARDHA KAMARAJU ACCOMPANYING DEFENDANT'S MOTION FOR AN ORDER AND WRIT STAYING BANKRUPTCY CASES** |

I, SIDHARDHA KAMARAJU, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner at the law firm Pryor Cashman LLP and counsel for Defendant Ho Wan Kwok in the above-captioned matter. I submit this declaration upon my personal knowledge in support of Defendant's Motion for an Order and Writ Staying Bankruptcy Cases.

2. A Proposed Order and Writ granting Defendant's Motion is attached hereto as **Exhibit 1**.

3. A true and correct copy of the Memorandum of Decision and Order Holding Individual Debtor in Contempt of Court and Denying Motion for Stay of Order Compelling Production dated July 26, 2023, and issued in the bankruptcy cases captioned *In re Ho Wan Kwok*, Case No. 22-50073(JAM) (Bankr. D. Conn) (Jointly Administered) (the "Bankruptcy Cases"), is attached hereto as **Exhibit 2**.

4. A true and correct copy of the Motion of Chapter 11 Trustee for Entry of Order Under Bankruptcy Rule 2004 and Local Rule 2004-1 Authorizing Examination of Ho Wan Kwok and Production of Documents filed on July 28, 2022 in the Bankruptcy Cases is attached hereto as **Exhibit 3**.

5. True and correct copies of photographs attached as exhibits to the Complaint in the Bankruptcy Case adversary proceeding captioned *Despins v. Taurus Fund LLC et al.*, Adv. Proc. No. 23-05017 (JAM) (Bankr. D. Conn.) (the "Mahwah Proceeding"), are attached hereto as **Exhibit 4**.

6. A true and correct copy of Luc A. Despins', as trustee in the Bankruptcy Case (the "Trustee"), Motion for Approval of Settlement with United States of America filed in the Mahwah proceeding on August 14, 2023, which attaches as Exhibit 1 a settlement agreement between the Trustee and the United States of America dated July 13, 2023, is attached hereto as **Exhibit 5**.

7. A true and correct copy of an email chain, excluding attachments, between and among Will Farmer, Nicholas Bassett and Avi Luft, counsel for the Trustee in the Bankruptcy Cases, and James Moriarty, Aaron Romney, and Eriz Henzy, counsel for Mr. Kwok in the Bankruptcy Case, beginning July 31, 2023 and ending August 17, 2023, is attached hereto as **Exhibit 6**.

8. A true and correct copy of the government's April 28, 2023 letter motion to stay the parallel proceeding brought by the United States Securities and Exchange Commission captioned *SEC v. Kwok*, 23 Civ. 2200 (PGG) (S.D.N.Y.), is attached hereto as **Exhibit 7**.

9. A true and correct copy of excerpts from the transcript of a December 12, 2022 hearing in the Bankruptcy Cases is attached hereto as **Exhibit 8**.

10. A true and correct copy of excerpts from the transcript of a May 2, 2023 hearing in the Bankruptcy Cases is attached hereto as **Exhibit 9.**

11. A true and correct copy of excerpts from the transcript of an August 14, 2023 hearing in the Mahwah Proceeding is attached hereto as **Exhibit 10.**

12.     A true and correct copy of an August 14, 2023 letter from Eric Henzy to the Honorable Julie A. Manning, United States Bankruptcy Judge, is attached hereto as **Exhibit 11**.

13.     A true and correct copy of a Consent Order Regarding Control of Attorney-Client Privilege and Work Product Protection Related to Rule 2004 Subpoenaed Documents and Information, dated September 14, 2022, is attached hereto as **Exhibit 12**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 30, 2023.

Sidhardha Kamaraju
*Counsel for Defendant*
*Ho Wan Kwok*

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:23-CR-118-1 (AT) |
| *Plaintiff,* | |
| | **[PROPOSED] ORDER & WRIT** |
| v. | |
| HO WAN KWOK, | |
| *Defendant.* | |

ANALISA TORRES, District Judge:

Upon Defendant Ho Wan Kwok's Motion for a Writ Staying Bankruptcy Cases, the Declaration of Sidhardha Kamaraju dated August 30, 2023, together will all exhibits annexed thereto, all prior papers and proceedings heretofore had herein, and pursuant to the Court's inherent supervisory authority and authority under the All Writs Act, 28 U.S.C. § 1651, the Court finds and orders as follows:

1.      The bankruptcy cases captioned *In re Ho Wan Gwok, et al.*, Case No. 22-50073(JAM) (Bank. D. Conn.) (Jointly Administered), including the jointly administered proceedings captioned *In re Genever Holdings Corp.*, Case No. 22-50542(JAM) (Bank. D. Conn.), and *In re Genever Holdings LLC*, Case No. 22-50592(JAM) (Bank. D. Conn.), and all related adversary proceedings[1] (collectively, the "Bankruptcy Cases"), concern issues that overlap in significant respects with the issues in the above-captioned criminal proceeding.

2.      Given the overlap between this criminal proceeding and the Bankruptcy Cases, and the substantial risk that permitting the Bankruptcy Cases to continue will violate Mr. Kwok's

---

[1] A list identifying the related adversary proceedings is attached to this Order as Schedule A.

constitutional right against self-incrimination and to exculpatory evidence, the Court finds that staying the Bankruptcy Cases during the pendency of this criminal proceeding is necessary to preserve Mr. Kwok's constitutional rights and ability to effectively mount a defense.

3.      Therefore, pursuant to the Court's inherent supervisory authority and its authority under the All Writs Act, 28 U.S.C. § 1651, the Court hereby ORDERS as follows:

  a.  the Bankruptcy Cases are STAYED pending the resolution of this proceeding, including all appeals as of right;

  b.  a copy of this order shall be filed with the Bankruptcy Court within five (5) days of the date of this order; and

  c.  a copy of this order shall be served on Luc Despins, Esq., the chapter 11 trustee of the Bankruptcy Cases, by email and Federal Express Overnight Delivery.

SO ORDERED:

Dated: New York, New York
              _____, 2023.

                                    _____
                                    THE HON. ANALISA TORRES
                                    UNITED STATES DISTRICT JUDGE

## SCHEDULE A

### Related Adversary Proceedings

| Case Name | Case Number | Judge | Bankruptcy Court |
|---|---|---|---|
| *HK International Funds Investments (USA) Limited, v. Despins* | 22-ap-05003 | Hon. Julie A. Manning | D. Conn. |
| *Cheng v. Kwok* | 22-ap-05010 | Hon. Julie A. Manning | D. Conn. |
| *Ma v. Kwok* | 22-ap-05011 | Hon. Julie A. Manning | D. Conn. |
| *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok* | 22-ap-05012 | Hon. Julie A. Manning | D. Conn. |
| *Wu et al v. Kwok* | 22-ap-05013 | Hon. Julie A. Manning | D. Conn. |
| *Meng et al v. Kwok* | 22-ap-05014 | Hon. Julie A. Manning | D. Conn. |
| *Nunberg v. Kwok* | 22-ap-05017 | Hon. Julie A. Manning | D. Conn. |
| *Zhang et al v. Kwok et al* | 22-ap-05018 | Hon. Julie A. Manning | D. Conn. |
| *Despins et al v. Bravo Luck Limited et al* | 22-ap-05027 | Hon. Julie A. Manning | D. Conn. |
| *Pacific Alliance Asia Opportunity Fund L.P. v. Kwok* | 22-ap-05032 | Hon. Julie A. Manning | D. Conn. |
| *Pacific Alliance Asia Opportunity Fund L.P. et al v. Ho Wan et al* | 22-ap-05034 | Hon. Julie A. Manning | D. Conn. |
| *Genever Holdings LLC et al v. Kwok et al* | 23-ap-05002 | Hon. Julie A. Manning | D. Conn. |
| *Despins, Luc A., Chapter 11 Trustee v. Greenwich Land, LLC et al* | 23-ap-05005 | Hon. Julie A. Manning | D. Conn. |
| *Genever Holdings LLC v. AIG Property Casualty Company* | 23-ap-05007 | Hon. Julie A. Manning | D. Conn. |
| *Despins, Luc A., Chapter 11 Trustee v. Guo* | 23-ap-05008 | Hon. Julie A. Manning | D. Conn. |
| *U.S. Bank National Association, as escrow agent v. HK International Funds Investments (USA) Limited et al.* | 23-ap-05012 | Hon. Julie A. Manning | D. Conn. |
| *Despins et al v. HCHK Technologies, Inc. et al* | 23-ap-05013 | Hon. Julie A. Manning | D. Conn. |

| Case Name | Case Number | Judge | Bankruptcy Court |
|---|---|---|---|
| *Despins et al v. Taurus Fund LLC et al* | 23-ap-05017 | Hon. Julie A. Manning | D. Conn. |
| *Despins, Luc A., Chapter 11 Trustee v. Golden Spring (New York) LTD et al* | 23-ap-05018 | Hon. Julie A. Manning | D. Conn. |
| *Ho Wan Kwok and Genever Holdings LLC* | 22-bk-50073 | Hon. Julie A. Manning | D. Conn. |

Case 3:23-cv-01586-AT   Document 30   Filed 08/30/23   Page 9 of 2   Page 10 of 200

# Exhibit 2

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 22-50073 (JAM) |
| HO WAN KWOK, *et al.*, | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Re: ECF Nos. 1453 and 1649 |

## APPEARANCES

Luc A. Despins (argued)
Avram E. Luft
G. Alexander Bongartz
Douglass Barron
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

    and

Nicholas A. Bassett (argued)
Paul Hastings LLP
2050 M Street NW
Washington, D.C. 20036

Douglass S. Skalka
Patrick R. Linsey
Neubert, Pepe & Montieth
195 Church Street, 13th Floor
New Haven, CT 06510

*Counsel for Movant and Cross-Respondent Mr. Luc A. Despins, Chapter 11 Trustee for the Estate of Mr. Ho Wan Kwok*

Stephen R. Cook
Brown Rudnick LLP
2211 Michelson Drive, 7th Floor
Irvine, California 92612

    and

Stephen A. Best (argued)
Brown Rudnick LLP
601 13th Street, NW, Suite 600
Washington, DC 20005

    and

Eric Henzy (argued)
James M. Moriarty
Zeisler & Zeisler, P.C.
10 Middle Street
Bridgeport, CT 06604

William Baldiga (argued)
Brown Rudnick LLP
Seven Times Square
New York, NY 10036

*Counsel for Respondent and Cross-Movant Mr. Ho Wan Kwok, Debtor[1]*

**MEMORANDUM OF DECISION AND ORDER
HOLDING INDIVIDUAL DEBTOR IN CONTEMPT OF COURT AND
DENYING MOTION FOR STAY OF ORDER COMPELLING PRODUCTION**

Julie A. Manning, United States Bankruptcy Judge

**I. INTRODUCTION**

Before the Court are the Motion for Order to Show Cause Why Debtor Should Not Be

Held in Contempt of Court (the "Contempt Motion"), (ECF No. 1453[2]), filed by Mr. Luc A.

Despins, in his capacity as Chapter 11 trustee (the "Trustee") for the bankruptcy estate (the

"Estate") of Mr. Ho Wan Kwok (the "Individual Debtor"), and the Motion for a Limited Stay of

Order Granting in Part Motion to Compel Compliance (the "Stay Motion," and together with the

Contempt Motion, each a "Cross-Motion" and, collectively, the "Cross-Motions"), (ECF No.

1649), filed by the Individual Debtor.  The Trustee seeks to hold the Individual Debtor in civil

contempt of court for failure to comply with the Order Granting in Part Motion to Compel

Compliance (the "Order Compelling Production").  (ECF No. 1353.)  The Individual Debtor

cross-moves to stay the Order Compelling Production in light of the criminal action *United*

*States v. Kwok*, Case No. 23 Cr. 118 (AT) (S.D.N.Y.) (the "Criminal Action") pending in the

United States District Court for the Southern District of New York (the "Criminal Court").  For

---

[1]  The attorneys at Brown Rudnick LLP have withdrawn their appearances since these matters
were argued.  (ECF No. 2034.)
[2]  Various pleadings and orders discussed in this memorandum of decision were omnibus in
nature.  For the sake of clarity and coherence, the titles of pleadings and orders have been set
forth only insofar as they concern the parties before the Court on the instant matters.

the reasons stated below, the Court holds the Individual Debtor in civil contempt of court and denies the Stay Motion.

## II. BACKGROUND

The Individual Debtor filed a voluntary Chapter 11 petition in this Court on February 15, 2022. (ECF No. 1.) The Individual Debtor's case is jointly administered with two affiliated corporate Chapter 11 cases. (ECF Nos. 970 and 1141.) For the reasons set forth therein, on June 15, 2022, the Court entered a memorandum of decision and order appointing a Chapter 11 trustee. (ECF No. 465.) *In re Kwok*, 640 B.R. 514 (Bankr. D. Conn. 2022). On July 8, 2022, Mr. Despins was appointed as the Trustee. (ECF No. 523.)

On July 28, 2022, the Trustee filed the Motion for 2004 Examination of the [Individual] Debtor, (ECF No. 636), which motion the Court granted, (ECF No. 757), on August 16, 2022. On August 19, 2022, the Individual Debtor was served with the Rule 2004 subpoena. (*See, e.g.*, ECF No. 1650 ¶ 7.) On October 28, 2022, the Trustee filed a Motion for Order Compelling Individual Debtor to Comply with Rule 2004 Subpoena (the "Motion to Compel"). (ECF No. 1046.) On November 14, 2022, the Individual Debtor filed an objection to the Motion to Compel. (ECF No. 1090.) On November 30, 2022, a hearing was held on the Motion to Compel. The Court took the Motion to Compel under advisement. On January 20, 2023,[3] the Court entered the Order Compelling Production. (ECF No. 1353.)

---

[3] Between November 16, 2022, and January 13, 2023, the Court was engaged with matters in an adversary proceeding related to these Chapter 11 cases styled *Pac. All. Asia Opportunity Fund v. Kwok (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 22-05032 (JAM) (Bankr D. Conn. Jan. 13, 2023) (hereinafter the "Social Media/Protest Adversary"). Pursuant to Fed. R. Civ. P. 65(b)(3), the Court was required to address the matters in that adversary proceeding "at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character."

On February 7, 2023, the Individual Debtor filed a declaration in response to the Order Compelling Production (the "Declaration"). (ECF No. 1444 Ex. A.) In the Declaration, the Individual Debtor stated under penalty of perjury that he invoked his "rights under the 5th Amendment to the United States Constitution, including under the act of production doctrine[,] with respect to the Subpoena dated August 17, 2022, in its entirety, including all requests for documents and information set forth therein." (*Id.* Ex. A.) On February 10, 2023, the Trustee filed the Contempt Motion, arguing that (i) the Individual Debtor needed to show cause why his invocation of the Fifth Amendment was proper and why he should not be held in contempt of court; (ii) even if the Individual Debtor's invocation was proper, he needed to assert it in response to each request for documents and information; and (iii) the Declaration did not comply with the Order Compelling Production because it did not detail the efforts undergone to search for documents and information responsive to the subpoenas. (ECF No. 1453.) On March 7, 2023, a hearing was held on the Contempt Motion. At the conclusion of the hearing, the Court set a briefing schedule on the issues raised by the Contempt Motion.

On March 15, 2023, at the start of an evidentiary hearing in a related adversary proceeding, the Individual Debtor's counsel informed the Court that an indictment against the Individual Debtor had been unsealed in the Criminal Action and the Federal Bureau of Investigation (the "FBI") had arrested the Individual Debtor earlier that morning. On March 22, 2023, the Court granted the Individual Debtor's motion for an extension of time to respond to the Contempt Motion. (ECF No. 1585.)

On April 10, 2023, the Individual Debtor filed an objection to the Contempt Motion. (ECF No. 1650.) The Individual Debtor's objection argues that he has complied with the Order Compelling Production because he has properly invoked his Fifth Amendment right against self-

incrimination.  (*Id.*)  Contemporaneously, the Individual Debtor, through his counsel in the Criminal Action appearing in these Chapter 11 cases as his special (criminal) counsel, filed the Stay Motion.  (ECF No. 1649.)  The Stay Motion argues that to preserve the Individual Debtor's Fifth Amendment right against self-incrimination, this Court must stay the Order Compelling Production pending resolution of the Criminal Action.  (*Id.*)  On April 14, 2023, the Trustee filed a reply to the objection to the Contempt Motion.  (ECF No. 1670.)  On April 19, 2023, the Trustee filed an objection to the Stay Motion.  (ECF No. 1680.)

On April 20, 2023, a hearing was held on the Cross-Motions.  At the conclusion of argument, the Trustee and the Individual Debtor seemingly reached a consensual resolution of the Cross-Motions.  However, on April 24, 2023, the parties filed competing proposed orders. (ECF Nos. 1698, 1699.)  On April 27, 2023, a Status Conference on the Cross-Motions was held to discuss the competing orders.  The parties agreed to proceed consensually where they could agree, but expressed disagreement as to the terms of the previous agreement.  On May 1, 2023, the Court entered a consent order requiring the Individual Debtor to make individual invocations of his Fifth Amendment right to each of two-hundred two (202) questions posed by the Trustee. (ECF No. 1740.)  Also on that date, the Individual Debtor filed a supplemental pleading in support of his interpretation of the April 20th agreement.  (ECF No. 1737.)

On May 2, 2023, a second hearing was held on the Cross-Motions resulting in an impasse as to the terms of the April 20th agreement.  The Trustee argued that the parties had agreed the Individual Debtor would file a motion in the Criminal Action seeking permission to share the prosecution's production to him with the Trustee, provided the Trustee complied with protective orders and other confidentiality orders and use restrictions issued in the Criminal Action.  The Individual Debtor argued that the parties had agreed that the Individual Debtor would seek,

potentially by motion, to have the prosecution agree to produce documents simultaneously to the Individual Debtor and the Trustee, provided the Trustee complied with protective orders and other confidentiality orders and use restrictions issued in the Criminal Action.  Citing the impasse, the Court concluded it had to rule on the Cross-Motions.  However, the Individual Debtor's bankruptcy counsel asked the Court to wait before ruling on the Cross-Motions to allow the Individual Debtor time to appreciate the nature of the prosecution's production to him in the Criminal Action.

Given the serious nature of the issues involved, the Court waited.  On June 13, 2023, a final hearing was held on the Cross-Motions.  The Court inquired whether the parties had made any progress toward a consensual resolution of the Cross-Motions.  The parties reported that the Individual Debtor had prepared a supplemental declaration (the "Supplemental Declaration"), wherein he invoked the Fifth Amendment on an individuated basis to each of the Trustee's questions.  (*See Despins ex rel. Kwok v. HCHK Techs., Inc. (In re Kwok)*, Case No. 22-50073, Adv. P. No. 23-05013 (Bankr. D. Conn. June 8, 2023), ECF No. 1 Ex. 1.)  Beyond the Supplemental Declaration, however, the parties reported that the impasse remained and asked the Court to rule on the Cross-Motions.  The Court took the Cross-Motions under advisement.

The Cross-Motions are ripe for decision.

## III.  JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This Court has authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984.  The instant proceedings are statutorily core proceedings.  28 U.S.C. § 157(b)(2)(A).  The Court concludes its exercise of

jurisdiction is not precluded by Constitutional concerns. *Cf. Stern v. Marshall*, 564 U.S. 462, 487–99 (2011). Moreover, the Trustee and the Individual Debtor have impliedly consented to this Court entering a final order on the Cross-Motions by filing dispositive motions without contesting this Court's authority to enter a final order. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015) (holding that parties may consent to entry of a final order by bankruptcy courts notwithstanding the holding in *Stern*); *True Traditions, LC v. Wu*, 552 B.R. 826, 838 (N.D. Cal. 2015) (holding that implied consent is given by filing a dispositive motion).

Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV. DISCUSSION[4]

The Cross-Motions present serious issues. The Trustee seeks to hold the Individual Debtor in contempt for failure to comply with the Order Compelling Production. The Individual Debtor argues that the invocation of his Fifth Amendment right against self-incrimination is compliance and must be protected by a stay of the Order Compelling Production. For the reasons stated below, the Court concludes that the Fifth Amendment right against self-incrimination does not apply under the specific facts and circumstances before the Court. Therefore, the Court holds the Individual Debtor in contempt of court and denies the Stay Motion.

### A. Is the Individual Debtor in civil contempt of court?

The Court first considers whether the Individual Debtor is in contempt of court for failure to comply with the Order Compelling Production. This Court has the power to hold parties in contempt of court under 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9020. *Taggart v. Lorenzen ex*

---

[4] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014(c).

*rel. Brown*, 139 S. Ct. 1795, 1801 (2019); *PHH Mortg. Corp. v. Sensenich ex rel. Gravel (In re*

*Gravel)*, 6 F.4th 503, 512 (2d Cir. 2021); *Mar. Asbestosis Legal Clinic v. LTV Steel Co. (In re*

*Chauteaugay Corp.)*, 920 F.2d 183, 187 (2d. Cir. 1990).  Federal Rules of Civil Procedure

37(b)(1) and 37(b)(2)(A)(vii), made applicable by D. Conn. L. Civ. R. 37 and D. Conn. Bankr.

L.R. 1001-1(a)(1) and 2004-1(a), provide further authority to hold parties in contempt of an

order compelling production of discovery materials.

Contempt may be sought to "'coerce the defendant into compliance'" with a court order

or to "'compensate the complainant for losses'" resulting from noncompliance with a court

order.  *Taggart*, 139 S. Ct. at 1801 (citing *United States v. United Mine Workers*, 330 U.S. 258,

303–04 (1947)).  A finding of civil contempt requires that "(1) the order the contemnor failed to

comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing,

and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *King v.*

*Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).  The contemnor must also (4) have notice

of the relevant order.  *Gravel*, 6 F.4th at 512.

### 1. Is the Order Compelling Compliance clear and unambiguous?

An order is clear and unambiguous where "'there is [no] *fair ground of doubt* as to the

wrongfulness of the defendant's conduct.'"  *Taggart*, 139 S. Ct. at 1801 (citing *Cal. Artificial*

*Stone Paving Co. v. Molitor*, 113 U.S. 609 (1885)).  A court generally applies an objective

standard – a "party's subjective belief that she was complying with an order ordinarily will not

insulate her from civil contempt if that belief was objectively unreasonable."  *Taggart*, 139 S. Ct.

at 1802 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("The absence of

wilfulness [sic] does not relieve from civil contempt.")).  Nevertheless, a party's bad faith may

justify "placing 'the burden of any uncertainty in the decree . . . on [the] shoulders' of the party

who violated the court order," and "a party's good faith, even where it does not bar civil

contempt, may help to determine an appropriate sanction." *Taggart*, 139 S. Ct. at 1802 (citing

*McComb*, 336 U.S. at 192–93 and *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S.

787, 801 (1987)).

The Order Compelling production states, in pertinent part, the following:

**ORDERED:** The Objection is **OVERRULED** as it relates to discovery requests directed to the [Individual] Debtor except as to the requests that seek documents dated earlier than June 1, 2014, and to the requests that seek the [Individual] Debtor's passport(s), to which extent the Objection is **SUSTAINED**, without prejudice to the Trustee to seek documents dated earlier than June 1, 2014, and the [Individual] Debtor's passport(s) at a later date as the investigation proceeds upon cause shown. The [Individual] Debtor shall, by 5:00 p.m. on January 31, 2023, search for and produce to the Trustee:

> (i)  documents responsive to the Trustee's requests dated June 1, 2014, or later, unless a particular request specifies a different time period that does not begin before June 1, 2014;

> (ii)  documents responsive to the Trustee's requests as to both assets he acknowledges he owns and assets allegedly belonging to persons or entities other than the [Individual] Debtor, including without limitation his family members and associated entities; and

> (iii)  documents responsive to the Trustee's requests that are within his custody, possession, or control, including without limitation documents in the files of his current or former counsel and other agents and advisors, unless such documents have already been produced by his current or former counsel and other agents and advisors but without consideration of any potential future production by his current or former counsel and other agents and advisors;

and it is further

**ORDERED:** The [Individual] Debtor shall, by 5:00 p.m. on February 7, 2023, file on the docket of this case a sworn declaration describing in detail the document collection, search, and review actions taken by him and his counsel in response to the subpoena, including without limitation a detailed description of the processes that he and his counsel performed to:

> (i)  identify all of the [Individual] Debtor's electronic devices; all online document repositories to which he has access; all social media, email, and other accounts associated with electronic documents; all bank accounts and related

account statements; and all other potential sources of responsive hard copy and electronic documents that may exist; and

    (ii)  search the foregoing sources for responsive documents, including without limitation for documents responsive to the requests related to expenses or money transfers, to assets or financial or business transactions or records related to the [Individual] Debtor's family or associated entities, and to business interests associated with the [Individual] Debtor . . .

(ECF No. 1353.)  The Individual Debtor did not raise any argument in pleadings or during oral argument that there is "a fair ground of doubt" as to the meaning of the Order Compelling Production.[5]  The Court concludes the Order Compelling Production is clear and unambiguous as it relates to the Individual Debtor.[6]

### 2.  Did the Individual Debtor comply with the Order Compelling Production?

Regarding the second element, the Trustee must prove by clear and convincing evidence that the Individual Debtor has not complied with the Order Compelling Production.  *King*, 65 F.3d at 1058.  The Trustee argues that because (i) the Individual Debtor has failed to produce documents or records and (ii) the Individual Debtor has failed to file a declaration identifying potential sources of documents or records as well as the efforts undertaken to search those sources, the Individual Debtor has not complied with the Order Compelling Production.

In response, the Individual Debtor makes two arguments.  First, the Individual Debtor argues that it is impossible for him to comply because he is presently being detained pending trial without the possibility of pre-trial release.  Second, the Individual Debtor argues that the

---

[5]  The Individual Debtor argues that there is a fair ground of doubt as to whether the Individual Debtor could invoke his Fifth Amendment right against self-incrimination in response to the Order Compelling Production.  The Court considers this argument below in the discussion of whether the Individual Debtor has diligently attempted to comply with the Order Compelling Production.

[6]  The Court has previously held that the Order Compelling Production is clear and unambiguous as to other parties.  (*See* ECF No. 1537.)

10

"act of production" doctrine permits him to invoke his Fifth Amendment right against self-incrimination in response to requests for the production of documents and records. On this basis, the Individual Debtor asserts that he has complied with the Order Compelling Production.

### i. Is it impossible for the Individual Debtor to comply?

While the Individual Debtor is correct that "[a] long recognized defense to a civil contempt citation is the cited individual's inability to comply with the court's order," *United States v. Wendy*, 575 F.2d 1025, 1030 (2d Cir. 1978), and that the proper time to assess impossibility of compliance is at the time of issuing the ruling on contempt, *United States v. Rylander*, 460 U.S. 752, 757 (1983), the Court concludes compliance remains possible for the Individual Debtor. While it is true that the prosecution has seized documents and records of the Individual Debtor in connection with the Criminal Action, the Individual Debtor has not established that (a) all of his documents and records have been seized and (b) he has no additional copies of the seized records. Moreover, based on the statements of his counsel, the Court understands the prosecution's production to the Individual Debtor in the Criminal Action should begin soon – if it has not already. While it is (i) likely that the Trustee would have to become a signatory to and comply with confidentiality requirements and use restrictions in the Criminal Action and (ii) possible that production to the Trustee may be opposed by the prosecution or not allowed by the Criminal Court, it is not impossible for the Individual Debtor to petition the Criminal Court to allow production to the Trustee. Although, the Individual Debtor is presently detained pending trial, his attorneys are not. The Individual Debtor may produce documents through his attorneys and/or other agents. Therefore, it is not impossible for the Individual Debtor to comply with the Order Compelling Production.

11

### ii.  Has the Individual Debtor properly invoked the Fifth Amendment?

### a. Does the act of production doctrine apply?

The Individual Debtor's argument that he has complied with the Order Compelling

Production relies on the "act of production" doctrine.  In *Fisher v. United States*, which held that

the act of production at issue in that case was not protected by the Fifth Amendment, the United

States Supreme Court nevertheless held that

> The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced.  Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer.  It also would indicate the taxpayer's belief that the papers are those described in the subpoena.

425 U.S. 391, 410 (1976); *see United States v. Hubbell*, 530 U.S. 27, 36–37 (2000).  In *Fisher*,

the Supreme Court held the test to determine if the act of production could be protected by the

Fifth Amendment is whether the "tacit averments" involved in the act of production are both

"testimonial" and "incriminating" under prevailing Fifth Amendment jurisprudence.  425 U.S. at

410–11.  In particular, the Supreme Court expressed concern regarding tacit averments as to: (i)

the existence of the documents or records; (ii) the producing party's possession or control over

the documents or records; and (iii) the producing party's belief that the documents and records

were those requested by the subpoena.  *Id.*  The act of production doctrine does not protect the

testimonial and incriminating contents of documents – it only protects testimonial and

incriminating *production*.  *Id.*; *Hubbell*, 530 U.S. at 40–41.

Under binding precedent of the United States Court of Appeals for the Second Circuit,

the act of production *may* entail testimonial tacit averments "(1) 'if the existence and location of

the subpoenaed papers are unknown to the government'; or (2) where production would

'implicitly authenticate' the documents."  *United States v. Doe (In re Grand Jury Subpoena)*, 1

F.3d 87, 93 (2d Cir. 1993) (hereinafter "*Grand Jury 1993*") (citing *United States v. Fox*, 721

F.2d 32, 36 (2d Cir.1983)).  If the Trustee can show (1) the existence and location; and (2) the

authenticity of the documents is a "foregone" conclusion or already established by other

evidence, then the production is not protected by the Fifth Amendment.  *Grand Jury 1993*, 1

F.3d at 93.  Moreover, even if the tacit averments involved in production are testimonial under

*Fox*, the Individual Debtor must also establish that revealing the existence, location, or

authenticity of the documents or records is incriminating.  *See Hoffman v. United States*, 341

U.S. 479, 486–87 (1951); *Fox*, 721 F.2d at 40; *In re Schick*, 215 B.R. 4, 9 (Bankr. S.D.N.Y.

1997); *cf. Martin-Trigona v. Belford (In re Martin-Trigona)*, 732 F.2d 170, 176 (2d Cir. 1984).

The Individual Debtor's burden to establish that the act of production is testimonial and

incriminating is less than a normal burden of proof: "To sustain the privilege, it need only be

evident from the implications of the question, in the setting in which it is asked, that a responsive

answer to the question or an explanation of why it cannot be answered might be dangerous

because injurious disclosure could result."  *Hoffman*, 341 U.S. at 486–87.  In determining

whether the Individual Debtor may invoke the Fifth Amendment, the Court must use its

"personal perception of the peculiarities of the case" as much as factual support submitted by the

Individual Debtor.  *Id.* at 487.  The act of production is incriminating if it could be "a link in the

chain of evidence" used to prosecute the Individual Debtor.  *Id.* at 486.

The Individual Debtor argues that producing documents and records under compulsion of

the Order Compelling Production would be testimonial because the production could be

construed as a tacit averment that he beneficially owns and/or controls various entities and assets

and that he has authority over various persons.  Such tacit averments, the Individual Debtor

argues, would be incriminating because the present Criminal Action and an alleged investigation

13

into bankruptcy crimes involve allegations about the Individual Debtor's beneficial ownership and control of entities and/or assets and the Individual Debtor's authority and/or control over certain individuals.

The Trustee raises numerous objections to the Individual Debtor's argument. The Trustee's primary objection is that the "required records" doctrine applies and is an exception to the act of production doctrine. In support of this argument, the Trustee asserts that the Individual Debtor, as a debtor in bankruptcy, cannot properly invoke the Fifth Amendment to avoid production of documents and records relating to his financial affairs, assets, and liabilities as required by the Bankruptcy Code – whether or not the act of production is testimonial and incriminating. The Trustee's required records argument involving the Individual Debtor's duties in his bankruptcy case will be addressed below. The Court will first address the Trustee's various objections as to whether the Individual Debtor has met his burden of proof to show that compliance with the Order Compelling Production would be both testimonial and incriminating.

### *The Supplemental Declaration*

The Individual Debtor and the Trustee have reached a resolution regarding one of the Trustee's objections. Before the Contempt Motion was filed and the hearings on it were held, the Individual Debtor's Declaration made a blanket assertion of his Fifth Amendment right against self-incrimination. The Trustee argued that this was improper because (a) such a blanket assertion did not evidence that the Individual Debtor had properly considered each of the Trustee's requests before invoking the Fifth Amendment; and (b) these Chapter 11 cases are civil proceedings, meaning that the Individual Debtor's invocation of the Fifth Amendment may, under proper circumstances, be admitted as evidence. However, the Individual Debtor has since provided the Supplemental Declaration pursuant to a consent order, wherein he answers each

14

question posed by the Trustee on an individual basis and asserts his Fifth Amendment right in response to each of the two-hundred two (202) questions. Although the Individual Debtor has now properly invoked his Fifth Amendment right to the Trustee's specific questions, issues related to the production of documents remain.

### Pre-indictment invocation of the Fifth Amendment

One of the Trustee's remaining objections to the Individual Debtor's proof of compliance with the Order Compelling Production is unpersuasive. The Trustee argues that the Individual Debtor was in contempt before the unsealing of the indictment against him and cannot now invoke the Fifth Amendment in light of the Criminal Action to avoid being held in contempt. However, the Individual Debtor is correct that the Fifth Amendment may be invoked prior to the commencement of a criminal action. *See United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958) (allowing a witness to invoke the Fifth Amendment where there was only a slight *possibility* of prosecution). Just as the Individual Debtor could assert his Fifth Amendment right during the evidentiary hearing in December 2022 and during his March 2023 deposition, he could do so in February 2023 so long as he had "reasonable cause to apprehend danger from a direct answer" and his Fifth Amendment right was otherwise applicable. *Hoffman*, 341 U.S. at 486.

### Documents in possession of the prosecution

A second argument of the Trustee also fails. The Trustee argues that there is no harm to the Individual Debtor because the prosecution is already in possession of his documents and records. The Trustee is correct insofar as the existence and location of these documents is known and, hence, the first prong of the *Fox* test fails. *Grand Jury 1993*, 1 F.3d at 93. Nevertheless, whether the act of producing the Individual Debtor's documents and records

already in the possession of the prosecution would result in authenticating those documents and records remains an issue. *Id.* The Individual Debtor is concerned that his act of production would authenticate the documents. The Court has not seen these documents and records. Nor has the Trustee. The Court recognizes the Trustee is in a difficult position because he is not a party to the Criminal Action. Nevertheless, the Trustee has not shown that it would be a foregone conclusion that the documents and records are authentic. Therefore, under the second prong of the *Fox* test, the tacit averment as to the authenticity of the documents and records in the possession of the prosecution may be testimonial. *Id.*

Moreover, because the documents and records seized by the prosecution may be used in the Criminal Action to prosecute the Individual Debtor, the Court finds the Individual Debtor's argument that his implicit authentication of those documents and records could be "a link in the chain of evidence" used to prosecute him is persuasive. *Hoffman*, 341 U.S. at 486. Therefore, unless the Trustee can show that it would be a foregone conclusion that the documents and records are authentic, the act of production doctrine applies to the documents held by the prosecution, unless an exception to the doctrine applies.

### Documents not in the possession of the prosecution

The Individual Debtor argues that the entire universe of documents and records the Order Compelling Production compels him to produce have been seized by the prosecution. The Court does not agree and, therefore, continues its discussion. As the Trustee contends, the blanket assertion that the Individual Debtor has no documents or records in his possession, custody, or control because he is now incarcerated is not convincing. The FBI apparently seized many documents, records, and electronic devices at the Individual Debtor's residences despite previous representations that the Individual Debtor maintained almost no documents, records, and devices.

16

Similarly, the Trustee is correct that there is no evidentiary basis to support the contention that there are no records within the Individual Debtor's possession, custody, or control that are not already among the documents and records seized by the prosecution. Given past descriptions of the efforts – or, as the case may be, the lack thereof – conducted by the Individual Debtor's counsel, the Individual Debtor has not established that a reasonably diligent search occurred. (*See* Order Compelling Production ¶ 9.) For both of these reasons, the Court concludes that the Individual Debtor has not established that all potentially responsive documents and records have been seized by the prosecution.

As to documents and records that were not seized by the prosecution, the Trustee has not shown that the location, existence, or authenticity of these documents is a foregone conclusion. Therefore, if the Individual Debtor establishes that they are incriminating, the act of production doctrine would apply. *Fox*, 721 F.2d at 36. The Trustee argues that the Individual Debtor has not met his burden to establish that the requested documents and records are incriminating. The Trustee is correct that even with the Supplemental Declaration, the Individual Debtor has not established that each requested production would be incriminating.

Nevertheless, the Court is mindful of the lessened burden the Individual Debtor must meet. The Court is also mindful that it must rely on its own perception of the facts and circumstances of these Chapter 11 cases and related adversary proceedings. *Hoffman*, 341 U.S. at 486–87. Moreover, as the Individual Debtor's counsel notes, "[t]he privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.* at 486. However, the Court's "personal perception of the peculiarities of the case" includes the observation that the Individual Debtor

17

has obstructed lawful inquiry into his assets, liabilities, and financial affairs in addition to his avowed desire to avoid self-incrimination. *Id.* at 487. (*See, e.g.*, Social Media/Protest Adversary, ECF No. 133.)

The indictment in the Criminal Action is not alone sufficient for the Individual Debtor to meet his burden with respect to the documents and records that the prosecution has *not* seized. The indictment alleges fraud going back to approximately 2018, whereas many of the assets of interest to the Trustee thus far – that certain yacht, the Lady May; the apartment at the Sherry-Netherland Hotel; the Ace Decade Holdings Limited cause of action – were allegedly acquired prior to 2018. While some of these assets, *e.g.*, the Lady May, are discussed in the indictment, the Court cannot, with its "personal perception of the peculiarities of the case" and the Individual Debtor's scant evidentiary showing, hold that the Individual Debtor has sufficiently supported his blanket assertion of the Fifth Amendment on the basis of the Criminal Action. *Id.* at 487. The Individual Debtor has not established that all of his assets, liabilities, and financial affairs relate to the alleged fraud or may somehow present a "link in the chain of evidence" regarding the alleged fraud. *Id.* at 486.

In support of his argument that he has complied with the Order Compelling Production, the Individual Debtor also presented a subpoena directed at the Trustee relating to an alleged investigation into potential bankruptcy crimes committed in these Chapter 11 cases. (ECF No. 1719, at *80:20–81:8.) As noted above, it does not matter if prosecution due to this investigation is likely when determining if production of the documents is incriminating. *Miranti*, 253 F.2d at 139.

Title 18 of the United States Code, sections 152, 156, 157, 1519, and 3284 set forth crimes related to the concealment of assets in a bankruptcy case. Sections 152, 156, 157, and

1519 require knowing, intentional, or fraudulent acts. Section 3284 requires "concealment." The tacit averments that the Individual Debtor has possession or control over documents or records responsive to the Rule 2004 subpoena and that such documents or records are authentic are not themselves incriminating because they do not establish that the Individual Debtor knowingly, intentionally, or fraudulently withheld assets – or documents and records pertaining to assets – from the Estate. Debtors routinely mistakenly overlook assets and liabilities and amend their statements and schedules and/or update their disclosures.

Nevertheless, the Court must consider whether such tacit averments are a "link in the chain of evidence" regarding a potential prosecution of the Individual Debtor for concealment of his assets from the Trustee, this Court, and his creditors. *Hoffman*, 341 U.S. at 486. The Trustee alleges that the Individual Debtor has a multitude of business interests and should have commensurate documents and records. While the Individual Debtor denies these allegations, it is the Court's "personal perception of the peculiarities of the case," on the basis of prior findings of this and other courts, that the Individual Debtor has at least *some* business interests beyond those he presently admits. *See Pac. All. Asia Opportunity Fund, L.P. v. Kwok Ho Wan*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022), NYCEF No. 1181; *E. Profit Corp. Ltd. v. Strategic Vision US LLC*, Case No. 18-cv-2185 (LJL), 2021 WL 2554631, at *1 (S.D.N.Y. June 22, 2021). (*See* ECF No. 1110; *HK Int'l Funds Invs. (USA) Ltd., LLC v. Despins ex rel. Kwok (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 22-05003 (JAM) (Bankr. D. Conn. May 18, 2023), ECF Nos. 177, 221; Social Media/Protest Adversary, ECF No. 133 ¶ 7.) The Court perceives that the Individual Debtor's production may be similarly expansive to the production at issue in *Hubbell*. *See* 530 U.S. at 40–43. Even though *Hubbell* was a case involving immunity granted to a party where the scope of the production was known and the burden had shifted to the

prosecution, it *may* be similarly necessary for the Individual Debtor "to make extensive use of 'the contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena" and essentially create a map of his assets, liabilities, and business interests. *See id.* at 43. Regarding the alleged investigation into bankruptcy crimes, such a map may aid in discovery of evidence of knowledge, intent, or fraud. Using its perception of the specific facts and circumstances of these Chapter 11 cases and related adversary proceedings, the Court finds that such admissions could be links in the chain of evidence because they could have a "derivative use." *See id.* at 41–43.

### *The Individual Debtor's production is testimonial and incriminating*

For the above reasons, the Court concludes that production in compliance with the Order Compelling Production would be testimonial and incriminating both with regards to the documents in the possession of the prosecution and the documents that have not been seized by the prosecution. *See Fisher*, 425 U.S. at 410–11. The Court notes, however, that the evidentiary record to date is not strong. If in the future the Trustee can (i) show that the location, existence, and authenticity of any document is a foregone conclusion; (ii) establish with regard to any document or category of documents that the Individual Debtor has not met his burden; or (iii) establish that he already has a map of the Individual Debtor's assets, liabilities, and business interests with respect to any documents or category of documents, this finding may be revisited upon a proper motion.

### b. Does the 'required records' exception apply?

Although the act of production doctrine applies, that does not end the Court's analysis or necessarily determine the result of the Contempt Motion. As noted above, the Trustee's primary argument is that the required records doctrine applies on the specific facts and circumstances

before the Court and presents an exception to the act of production doctrine. The Trustee

therefore argues that it does not matter whether the act of production doctrine would allow the

Individual Debtor to properly invoke his Fifth Amendment right against self-incrimination in

response to the Order Compelling Production because the required records exception applies in

this case.

In support of his argument, the Trustee relies on *Baltimore City Department of Social*

*Services v. Bouknight*, 493 U.S. 549 (1990). In *Bouknight*, the Supreme Court restated and

reaffirmed the existence of the required records doctrine post-*Fisher*. 493 U.S. at 555–59.

Under the required records doctrine, "the Fifth Amendment privilege may not be invoked to

resist compliance with a regulatory regime constructed to effect the State's public purposes

unrelated to the enforcement of its criminal laws." *Id.* at 556; *see Grosso v. United States*, 390

U.S. 62, 67–68 (1968) (articulating factors to consider regarding required records doctrine);

*Shapiro v. United* States, 335 U.S. 1, 32 (1948) (originating the required records doctrine).

The Individual Debtor asserts *Bouknight* does not describe an exception to the act of

production doctrine set forth in *Fisher* and that the required records doctrine does not provide for

the compelled testimonial and incriminating production of documents and records. The

Individual Debtor's assertion contradicts the clear text of *Bouknight* which states:

> The possibility that a production order will compel testimonial assertions that may prove
> incriminating does not, in all contexts, justify invoking the privilege to resist production.
> Even assuming that this limited testimonial assertion is sufficiently incriminating and
> "sufficiently testimonial for purposes of the privilege," Bouknight may not invoke the
> privilege to resist the production order because she has assumed custodial duties related
> to production and because production is required as part of a noncriminal regulatory
> regime.

*Bouknight*, 493 U.S. at 555–56 (discussing *Fisher*) (internal citations omitted). In addition to the

Supreme Court, the Second Circuit has also clearly rejected the Individual Debtor's assertion:

> "[T]he required records doctrine is an exception to the Fifth Amendment privilege.  As such, it necessarily overrides the privilege in instances in which the privilege would otherwise apply.  *Fisher* was not concerned with required records and nothing in its analysis could be construed as weakening the required records exception."

*United States v. Doe (In re Grand Jury Subpoena)*, 741 F.3d 339, 346 (2d Cir. 2013) (hereinafter "*Grand Jury 2013*") (quoting *Doe v. United States (In re Doe)*, 711 F.2d 1187, 1192–93 (2d Cir. 1983)).  Indeed, the Second Circuit has emphatically stated "[t]his Court has twice explicitly rejected the idea that the required records exception has been abrogated by the act of production doctrine." *Grand Jury 2013*, 741 F.3d at 346.  This binding Supreme Court and Second Circuit precedent makes clear that the required records doctrine is an exception to the act of production doctrine.[7]  Therefore, if the required records exception applies in this case, the Individual Debtor has failed to comply with the Order Compelling Production regardless of the conclusion that such production would be testimonial and incriminating.

In determining whether the required records doctrine applies, the Second Circuit turns to the *Grosso* factors.  *Grand Jury 2013*, 741 F.3d at 345.  In *Grosso*, the Supreme Court applied the following factors: "[F]irst, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents."  390 U.S.

---

[7]  The Individual Debtor observes that one of the cases cited by the Trustee, *In re Ross*, 156 B.R. 272, 279 (Bankr. D. Idaho 1993), both found the production of the requested documents to be insufficiently testimonial and found that the required records doctrine applied.  From this observation, the Individual Debtor concluded that the latter holding required the former.  The Court concludes otherwise.  The court in *Ross*, like many courts – particularly lower courts subject to review, advanced multiple bases for its conclusion that the debtor in that case could not properly invoke the Fifth Amendment.  156 B.R. at 281 ("Fifth, *even if the act of production involved here was both testimonial and incriminating*, the nature of chapter 7 as a regulatory regime directed toward society as a whole, and not toward inherently suspect criminal classes, renders the act of production outside the protection of the Fifth Amendment.") (emphasis added).

at 67–68.  Here, the Trustee is seeking documents and records that the Order Compelling

Production holds relate to "the acts, conduct, or property or to the liabilities and financial

condition of the [Individual Debtor], or to any matter which may affect the administration of the

[Estate]."  Fed. R. Bankr. P. 2004(b).  Hence, the Individual Debtor is obligated to produce the

documents and records the Trustee seeks under sections 521(a)(3) and (a)(4).  Therefore, the

issue is whether the documents and records the Individual Debtor is obligated to produce under

sections 521(a)(3) and (a)(4) are required records under the *Grosso* test.

### *What is the purpose of Bankruptcy Code sections 521(a)(3) and 521(a)(4)?*

In determining whether the first factor supports application of the required records

doctrine, a court must consider whether the relevant "legislation is not 'directed at the public at

large' and concerns 'an area permeated with criminal statutes.'" *Grand Jury 2013*, 741 F.3d at

347 (citing *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965)); *see Marchetti*

*v. United States*, 390 U.S. 39, 57 (1968); *Haynes v. United States*, 390 U.S. 85, 99 (1968).  A

court must make this determination as to the specific statutory sections at issue, rather than in

reference to the entire surrounding statutory context.  *Grand Jury 2013*, 741 F.3d at 348 (citing

*California v. Byers*, 402 U.S. 424, 430 (1971)).

Section 521 of the Bankruptcy Code is titled "Debtor's duties."  Sections 521(a)(3) and

521(a)(4) provide, respectively, that, where a bankruptcy trustee is serving in the case, as here, a

debtor must cooperate with the trustee in the performance of the trustee's duties and must

surrender to the trustee all property of the estate and any recorded information, including books,

documents, records, and papers, relating to property of the estate.

Section 109 of the Bankruptcy Code allows individuals or entities to file for bankruptcy

under Chapters 7, 11, 11 Subchapter V, 12, or 13.  In proceedings under Chapters 7, 12, and 13

as well as Chapter 11 Subchapter V, a bankruptcy trustee is automatically appointed upon the commencement of the case. 11 U.S.C. §§ 701, 702, 1183, 1202, 1302. Chapter 7 and Chapter 13 cases are the most common among the general public and always involve a bankruptcy trustee to whom the debtor owes obligations under sections 521(a)(3) and (a)(4).

While in a Chapter 11 case the appointment of a bankruptcy trustee is an extraordinary remedy, *see* 11 U.S.C. § 1112, the effect of this extraordinary relief is that a dispossessed Chapter 11 debtor has the same obligations under sections 521(a)(3) and 521(a)(4) as a Chapter 7 or Chapter 13 debtor. By operation of law, upon filing a Chapter 11 case a debtor is automatically deemed to be a debtor-in-possession and assumes the role of a bankruptcy trustee. 11 U.S.C. § 1107(a). However, a debtor in a Chapter 11 case may be 'dispossessed' of the estate through appointment of a bankruptcy trustee "for cause," provided it is in the best interest of the creditors and the estate. 11 U.S.C. § 1112(b)(1).

Chapter 11 is distinct because it is designed for debtors with complex business interests, assets, and liabilities, such as large corporations and high net worth individuals. *See* H.R. Rep. No. 95-595, at 220 (1977). As such, Chapter 11 is guided by three basic presumptions: (i) debtors with substantial business interests and operations have more value as a continuing economic entity than divided up and liquidated, (ii) debtors with complex financial affairs, assets, and liabilities are better equipped than an appointed trustee to manage their own affairs for the benefit of creditors, and (iii) allowing debtors with substantial business interests and operations to reorganize preserves the interests of debtors, owners, employees, etc. in addition to the interests of creditors. *See id.* Ultimately, however, Chapter 11 is properly used wherever its specific provisions maximize the distribution to creditors. *See Toibb v. Radloff*, 501 U.S. 157, 163–64 (1991). Many of the enumerated examples of "cause" to appoint a bankruptcy trustee –

or dismiss the case or convert the case to a proceeding under Chapter 7 – involve the rebuttal of the presumptions listed above or the debtor-in-possession's failure to comply with its obligations to manage the estate for the benefit of creditors.  11 U.S.C. § 1112(b)(4); *see* 7 COLLIER ON BANKRUPTCY ¶¶ 1112.04[6][b]–[k] (16th ed. 2023).

When one is appointed, the bankruptcy trustee is the representative of the debtor's estate. 11 U.S.C. § 323.  The purpose of sections 521(a)(3) and (a)(4) is to enable the bankruptcy trustee to administer the debtor's bankruptcy estate in accordance with the bankruptcy trustee's duties. *See* 11 U.S.C. §§ 704, 1106, 1116, 1183, 1202, 1302; 4 COLLIER ON BANKRUPTCY ¶¶ 521.15[5], 521.16.  The administration of the bankruptcy estate requires the debtor's disclosure, surrender, and cooperation with the trustee because a case in bankruptcy is an all-encompassing action intended to equitably and finally resolve, adjust, or reorganize myriad debtor-creditor relationships.  *See, e.g.*, 11 U.S.C. §§ 704(a)(5) ("The trustee shall . . . examine proofs of claims and object to the allowance of any claim that is improper . . . ."), 704(a)(7) ("The trustee shall . . . furnish such information concerning the estate and the estate's administration as is requested by a party in interest . . ."), 704(a)(8) ("The trustee shall . . . file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operations, periodic reports and summaries of the operation of such business . . . ."), 1106(a)(3) ("A trustee shall . . . investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and other matters relevant to the case or to the formulation of a plan . . . ."); 7 COLLIER ON BANKRUPTCY ¶ 1116.01 ("The trustee's investigation and reporting duties provide a mechanism for full disclosure of the debtor's state of

affairs so as to enable parties in interest to protect their rights and obtain the successful reorganization of the debtor.").

A debtor's failure to fulfill its obligations to (i) cooperate with the trustee, (ii) disclose financial affairs, assets, and liabilities, and (iii) surrender property of the bankruptcy estate and records relating thereto severely impedes a trustee's ability to administer the estate. *See United States v. Stone*, 282 F. 547, 553 (2d Cir. 1960) ("[T]he very purpose of the statement of affairs is to give dependable information without need of going further.") (upholding conviction in criminal action prosecuting debtor for bankruptcy crimes related to failure to properly disclose loan information on statement of financial affairs in proceeding under former Bankruptcy Act). This failure causes expense and delay to the estate's creditors which are cognizable injuries. *See Andrews v. McCarron (In re Vincent Andrews Mgmt. Corp.)*, 414 B.R. 1, 7 (D. Conn. 2009).

Furthermore, the broad and extraordinary nature of much of the relief provided by the Bankruptcy Code is premised upon proper disclosure and notice. *See, e.g.*, 11 U.S.C. § 1125(a)(1) (defining adequate information for the disclosure statement that must be served before plan solicitation may commence); *Till v. SCS Credit Corp.*, 541 U.S. 465, 475 n. 12 (2004) (finding that the "Bankruptcy Code's extensive disclosure requirements reduce the risk that the debtor has significant undisclosed obligations," undergirding a court's "authority to modify the number, timing, or amount of the installment payments from those set forth in the debtor's original contract"); *In re Motors Liquidation Co.*, 829 F.3d 135, 158–61 (2d Cir. 2016) (holding that failure to properly serve undisclosed known creditors with a sale motion rendered a sale order unenforceable against the creditors). A trustee, as the bankruptcy estate's representative, is the party tasked with; in the first instance, seeking much of this relief for: (i) the benefit of the estate, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352

(1985); and (ii) the debtor who may receive, upon exiting the gauntlet, a "fresh start," *see*

*Grogan v. Garner*, 498 U.S. 279, 286 (1991).

The Court concludes that sections 521(a)(3) and (a)(4) are targeted at the general public.

Bankruptcy trustees are automatically appointed in a wide range of cases. The duty to disclose

and surrender property and records to the trustee is essential to the fundamental and required

administrative duties of the trustee and the exercise of the trustee's powers under the bankruptcy

code.

The remaining issue is whether sections 521(a)(3) and (a)(4) are concerned with an area

"permeated with criminal statutes." *Albertson*, 382 U.S. at 79. Title 18, sections 151 *et sequitur*,

1519, and 3284 of the United States Code criminalize certain actions taken in relation to

proceedings under the Bankruptcy Code. Among these "bankruptcy crimes" are several related

to the concealment of assets of the bankruptcy estate to protect them from distribution to the

estate's creditors. The issue before the Court is not, however, whether certain failures to fulfill a

debtor's duty under sections 521(a)(3) and (4) leave a debtor vulnerable to criminal prosecution,

but rather whether sections 521(a)(3) and (4) are "directed at a 'selective group inherently

suspect of criminal activities.'" *Marchetti*, 390 U.S. at 57.

In *Grosso* and *Marchetti*, the problem was not the criminal laws enforcing the statutory

requirement to file tax returns, which are akin to the bankruptcy crimes enumerated above.

*Grosso*, 390 U.S. at 64–65; *see Marchetti*, 390 U.S. at 57. Rather, in both cases the Supreme

Court determined that the requirement to file a federal wagering tax return squarely targeted

conduct already criminalized by state law, namely gambling. *Grosso*, 390 U.S. at 64–65;

*Marchetti*, 390 U.S. at 57. At issue in *Albertson* was the requirement that members of the

Communist Party of America personally register with the Subversive Activities Control Board.

27

382 U.S. at 77–78.  Affiliation with the Communist Party was criminalized at the time.  *Id.*  In *Haynes*, the issue was a requirement that persons who obtained firearms *other than in the normal course* – which the Supreme Court observed would be mostly persons acquiring firearms illegally – register their firearms.  390 U.S. at 95–97.

The facts before the Supreme Court in *Grosso*, *Marchetti*, *Albertson*, and *Haynes* are each dissimilar to the instant facts.  First, all of those cases involved the creation of a new record rather than the production of existing documents and records.  *Haynes*, 390 U.S. at 95–97; *Grosso*, 390 U.S. at 64–65; *Marchetti*, 390 U.S. at 57; *Albertson*, 382 U.S. at 77–78.  More importantly, the routine administration of a bankruptcy case does not as a matter of course implicate criminal activity.  The administration of the estate is intended to be separate from issues of criminal liability.  *Compare* 11 U.S.C. §§ 323 (the trustee is the party to sue and be sued on behalf of the estate with regards to civil litigation), 362(a)(1) (generally, civil actions against the debtor or the estate are stayed by the filing of a voluntary bankruptcy petition) *with* 11 U.S.C. § 362(b)(1) (criminal actions against the debtor are not stayed by the commencement of a case under Title 11).  Debtors are generally not exposed to criminal liability for the disclosures they are required to make in their bankruptcy cases.  The intent of disclosure requirements in bankruptcy proceedings is to lay bare *civil liability* to allow for the equitable and final resolution of all claims against the debtor.  *See Byers*, 402 U.S. at 430–31 (finding that, while the California Vehicle Code involved some criminal statutes, "it was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities arising from automobile accidents" and holding that the required records exception applied).

Therefore, the purpose of sections 521(a)(3) and (a)(4) is "essentially regulatory," which supports the applicability of the required records exception to the production of documents by

the Individual Debtor compelled by the Order Compelling Production.  *Grosso*, 390 U.S. at 67–68.

### *Are the purported required records customarily kept?*

As to the second factor, whether the purportedly required records are customarily kept, the Trustee is seeking, *e.g.*, financial and banking records, money transfer records, records relating to the Individual Debtor's business interests, etc.  As the Second Circuit observed with respect to foreign bank account information, common sense dictates that persons and entities retain basic financial transaction and account information in order to manage their affairs and access their accounts.  *Grand Jury 2013*, 741 F.3d at 350 (citing *M.H. v. United States (In re Grand Jury Investigation)*, 648 F.3d 1067, 1076 (9th Cir. 2011)).  The Court finds this is especially true regarding individuals and entities with complex financial affairs, assets, and liabilities.  Pointedly, the Second Circuit went on to say that although "some individuals engaged in wrongdoing are advised not to keep even this basic information[,] . . . [w]e decline to look at the custom of only the miscreants . . .."  *Grand Jury 2013*, 741 F.3d at 350.  Therefore, the Court concludes that the records required by sections 521(a)(3) and (a)(4) are "customarily kept."  *Grosso*, 390 U.S. at 67–68.

### *Did the purported required records assume 'public aspects?'*

As to the third factor, whether the purportedly required records have assumed 'public aspects,' the question is whether the overall regulatory context of section 521(a)(3) and (a)(4) – requires the particular records be kept.  *Grand Jury 2013*, 741 F.3d at 351–52.

The Bankruptcy Code requires disclosure both at the outset of a case and as a case proceeds.  Section 521(a)(1) requires any debtor – including the Individual Debtor – to file a list of creditors, statement of financial affairs, and schedules of, *inter alia*, the debtor's assets,

liabilities, income, and expenses. *See* 4 COLLIER ON BANKRUPTCY ¶¶ 521.06[3][a] ("The schedule is a statement of *all* property, both *real* and personal, within the broad definition of property of the estate under section 541(a), which includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'"), 521.06[3][b] ("The scheduling of interests in property, both real and personal, is a very important duty."), 521.09 ("The purpose of the requirement of filing a statement of financial affairs is to furnish the trustee and creditors with detailed information about the debtor's financial condition, thereby saving the expense and long and protracted examination for the purpose of soliciting information."). Section 341 requires any debtor to submit to an examination conducted by a trustee, in which its creditors may participate. *See* 3 COLLIER ON BANKRUPTCY ¶ 341.01.

Regarding Chapter 11 in particular, section 1107 provides that while a Chapter 11 debtor is a debtor-in-possession, such a debtor, as a fiduciary of the bankruptcy estate, would have many of the same disclosure obligations of a trustee discussed above, including reporting requirements. *See* 7 COLLIER ON BANKRUPTCY ¶¶ 1107.02[3]–[4]. A debtor's failure to properly disclose financial affairs, assets, and liabilities in a Disclosure Statement required to be filed in connection with a Chapter 11 Plan would prevent confirmation of that plan. 11 U.S.C. § 1125; *see* 7 COLLIER ON BANKRUPTCY ¶¶ 1125.02 ("Disclosure is the pivotal concept in reorganization practice under the Bankruptcy Code.") (citing H.R. Rep. No. 95-595, at 226–31 (1977)), 1125.02[2]. Failures to make appropriate disclosures can and do constitute cause to convert a Chapter 11 reorganization case to a Chapter 7 liquidation case, dismiss the Chapter 11 bankruptcy case, or appoint a Chapter 11 trustee. 11 U.S.C. § 1112(b)(4)(f); *see* 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][f].

Much like the mother in *Bouknight*, the Individual Debtor assumed these obligations upon voluntarily commencing his Chapter 11 case, submitting himself to the *in personam* jurisdiction of this Court, and submitting all of his legal and equitable interests in property – "wherever located and by whomever held" – to the *in rem* jurisdiction of this Court. 11 U.S.C. § 541(a)(1); *Bouknight*, 493 U.S. at 559 ("Bouknight submitted to the routine operation of the regulatory system and agreed to hold Maurice in a manner consonant with the State's regulatory interests and subject to inspection by BCDSS."). Moreover, as in *Bouknight*, where the mother was required to produce her child to the Baltimore City Department of Social Services upon cause shown, the Bankruptcy Code requires the Individual Debtor to produce documents and records relating to property of the estate to the Trustee, because cause was shown to appoint a trustee. 11 U.S.C. §§ 521(a)(4), 1112; *Bouknight*, 493 U.S. at 555–56. Because the Individual Debtor voluntarily filed his Chapter 11 case and became a debtor-in-possession, he assumed a bankruptcy trustee's duties to manage the Estate for the benefit of its creditors. 11 U.S.C. § 1107(a). The Individual Debtor was a custodian of the Estate and its books and records while a debtor-in-possession. *See Bouknight*, 493 U.S. at 555–56. Although his status as a debtor-in-possession ended upon the appointment of the Trustee, his resultant obligation to provide information to the Trustee did not.

The Court concludes that the records required to be produced by the Individual Debtor pursuant to sections 521(a)(3) and (a)(4) have assumed "public aspects" because the Individual Debtor's case is a voluntary Chapter 11 case and because the specific facts and circumstances of these Chapter 11 cases and related adversary proceedings support this conclusion. *See Bouknight*, 493 U.S. at 555–56; *Grosso*, 390 U.S. at 67–68.

*The 'required records' exception applies*

All three factors of the *Grosso* test support the applicability of the required records exception to the Fifth Amendment right against self-incrimination under the specific facts and circumstances before the Court. 390 U.S. at 67–68; *see Bouknight*, 493 U.S. at 555–56; *Grand Jury 2013*, 741 F.3d at 345; *Ross*, 156 B.R. at 279–81; *In re Fairbanks*, 135 B.R. 717, 730–33 (Bankr. D.N.H. 1991).

Application of the required records exception is also supported by Supreme Court precedent relating to the former Bankruptcy Act. *In re Harris*, 221 U.S. 274 (1911) (holding Fifth Amendment did not protect a debtor from producing its books and records to the receiver in bankruptcy). *Bouknight*, in upholding the required records exception post-*Fisher*, cited *Harris* approvingly as an example of the required records doctrine, confirming the continuing vitality of *Harris* today despite the evolution of Fifth Amendment jurisprudence since *Harris* was decided. *Bouknight*, 439 U.S. at 556–57; *see Fisher*, 425 U.S. 411–13 (discussing *Harris* without calling into question its holding); *see also Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998) (holding that precedent under the Bankruptcy Act is not displaced unless there is a clear indication that Congress intended to do so); *Ross*, 156 B.R. at 279; 3 COLLIER ON BANKRUPTCY ¶ 344.03[4] ("[I]t is doubtful that a debtor, as opposed to other witnesses, may successfully refuse to turn over the property, books and records that every debtor under the Code is required to surrender to the trustee on the basis that this 'act of production' might itself tend to incriminate."); *but see Butcher v. Bailey*, 753 F.2d 465, 468 (6th Cir. 1985) (holding, pre-*Bouknight* and in an *involuntary* Chapter 7 case rather than a voluntary Chapter 11 case, that *Harris* was no longer good law after *Fisher* and section 521 did not require the production of documents to which the act of production doctrine applied).

The Individual Debtor objects that, nevertheless, *Harris* and the required records exception do not reach Rule 2004 subpoenas under *McCarthy v. Arndstein*.  266 U.S. 34 (1924).  However, the Supreme Court in *Arndstein* distinguished its prior opinion in *Harris* on the basis that *Harris* concerned the surrender of documents and records and *Arndstein* concerned the issue of compelled *testimony*.  266 U.S. at 41–42.  The Trustee is not objecting to the Individual Debtor answering interrogatories or questions during deposition or in-court testimony by invoking the Fifth Amendment.  Instead, the Trustee is objecting to the Individual Debtor invoking the Fifth Amendment in response to requests for the production of documents and records.  Therefore, *Arndstein* is inapposite.

The Court concludes that, both under an analysis of the *Grosso* factors and by application of Supreme Court precedent under the Bankruptcy Act, the required records exception applies.

### iii.  The Individual Debtor did not comply with the Order Compelling Production

For all of the above reasons, the Court concludes that (i) it is not impossible for the Individual Debtor to comply with the Order Compelling Production and (ii) under the required records exception, the Individual Debtor may not properly invoke his Fifth Amendment right against self-incrimination in response to the Order Compelling Production.  Therefore, the Trustee has established by clear and convincing evidence that the Individual Debtor has not complied with the Order Compelling Production.

### 3.  Did the Individual Debtor diligently attempt to comply with the Order Compelling Production?

The Trustee must also establish that the Individual Debtor did not diligently attempt to comply in a reasonable manner with the Order Compelling Production.  *King*, 65 F.3d at 1058.  The Trustee argues that the Individual Debtor has made no attempt to comply with the Order Compelling Production.  In response, the Individual Debtor argues that there is a fair ground of

33

doubt as to whether the Individual Debtor could properly assert his Fifth Amendment right against self-incrimination and that the Declaration and Supplemental Declaration represent his good faith efforts to comply with the Order Compelling Production.

The Individual Debtor's operative mistake is a mistake of law – not fact.  Namely, the Individual Debtor has mistakenly concluded that the required records exception to the act of production doctrine does not apply and that he may invoke the Fifth Amendment in response to the Order Compelling Production.  For the reasons stated above, whether producing each document or record would factually be testimonial and incriminating does not affect the outcome.

Generally, absent a requirement of willfulness or intention, mistake of law is not a defense to civil liability.  *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–85 (2010).  As noted above, "[t]he absence of wilfulness [sic] does not relieve from civil contempt."  *McComb*, 336 U.S. at 191.  Therefore, the Court concludes that the Individual Debtor's mistake of law is not a defense to civil contempt.  *Cf. Yellin v. United States*, 374 U.S. 109, 123 (1963) (holding mistake of law was no defense to contempt of Congress); *United States v. Remini*, 967 U.S. 754, 758 (2d Cir. 1992) (holding mistake of law was no defense to criminal contempt of court).  This conclusion accords with the Supreme Court's observation in *Taggert* that "a party's good faith, *even where it does not bar civil contempt*, may help to determine an appropriate sanction."  139 S. Ct. at 1802 (emphasis added).  Therefore, the Trustee has established that the Individual Debtor did not diligently attempt to comply with the Order Compelling Production.

### 4. Did the Individual Debtor have notice of the Order Compelling Production?

The final element of civil contempt is notice of the relevant order. *Gravel*, 6 F.4th at 512. The Declaration admits the Individual Debtor had notice of the Order Compelling Production. (ECF No. 1444 Ex. A.) This element of civil contempt has been established.

### 5. The Individual Debtor is in civil contempt of court

All four elements having been established, the Contempt Motion is granted. The Court holds the Individual Debtor in civil contempt of court for failure to comply with the Order Compelling Production. As set forth in the decretal paragraphs below, the Individual Debtor will be afforded the opportunity to purge himself of contempt. In light of the serious nature of the circumstances facing the Individual Debtor and the good faith shown in answering the Trustee's two-hundred two (202) questions in his Supplemental Declaration, the Court will provide the Individual Debtor with ample time to purge himself of contempt. *Taggert*, 139 S. Ct. at 1802. However, if the Individual Debtor does not purge himself of contempt, the Trustee may request appropriate sanctions.

The Individual Debtor's counsel are reminded that "[c]ounsel have an obligation, as officers of the court, to assist in the discovery process by making diligent, good-faith responses to legitimate discovery requests." *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1486 (5th Cir. 1990). To that end, the Individual Debtor's counsel are further reminded that this Court has already found that "counsel to the [Individual Debtor and others] has not established that they were sufficiently diligent under the circumstances." (Order Compelling Production ¶ 9.) The Individual Debtor was ordered to comply with the Order Compelling Production at or before 5:00 p.m. on January 31, 2023, but did not do so. "[N]either

[counsel] nor [a party has] a unilateral right to decide whether or when to comply with discovery demands." *535 Broadway Assocs. v. Com. Corp. of Am.*, 159 B.R. 403, 405 (S.D.N.Y. 1993).

The Individual Debtor and his counsel are to take reasonable and diligent steps, whether or not this Court has articulated those steps directly, to bring the Individual Debtor into compliance with the Order Compelling Production. As the Individual Debtor's counsel has stated on the record, reasonable steps include filing a motion in the Criminal Court seeking to allow production to the Trustee of documents and records produced to the Individual Debtor by the prosecution which are responsive to the Rule 2004 subpoena, subject to the Trustee abiding by whatever conditions the Criminal Court may impose. In seeking to purge himself of contempt, the Individual Debtor would be acting under compulsion of the Order Compelling Production and, therefore, not waiving any Fifth Amendment right by moving in the Criminal Court to produce to the Trustee. *See Bouknight*, 493 U.S. at 561–62. In considering any sanctions motion, the Court will consider the diligence with which the Individual Debtor seeks relief in the Criminal Court.

### B. Should the Order Compelling Production be stayed?

Having ruled on the Contempt Motion, the Court turns to the Stay Motion. The Individual Debtor argues that the Order Compelling Production must be stayed pending the end of the Criminal Action in order to preserve the Individual Debtor's Fifth Amendment right against self-incrimination. In response, the Trustee argues that there is no basis to impose a stay of the Order Compelling Production and that such a stay would substantially injure the Trustee.

The Court first notes that while the Stay Motion was filed by the Individual Debtor and seems to only concern the Individual Debtor, the attached proposed order would stay the Order Compelling Production entirely, including the decretal paragraphs relevant to the Individual

36

Debtor's daughter, Ms. Mei Guo, and the Individual Debtor's adjudged corporate *alter ego*, HK International Funds Investments (USA) Limited, LLC. To the extent that the Stay Motion seeks relief as to these additional parties, the Court denies the Stay Motion.

Turning to the merits, the Court must determine whether to stay the Order Compelling Production within its sound discretion. *Kashi v. Grastos*, 790 F.2d 1050, 1057 (2d Cir. 1986). There is no strict requirement that a court stay civil proceedings due to pending criminal proceedings. *United States v. Kordel*, 397 U.S. 1 (1970); *Kashi*, 790 F.2d at 1057. In considering whether to stay civil proceedings in light of criminal proceedings, courts consider, *inter alia*:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995).

The Court first considers the private interests of the Estate in proceeding expeditiously weighed against the prejudice to the Estate caused by delay. There is substantial prejudice to the Estate and the Individual Debtor's creditors in staying the Order Compelling Production. As discussed above, a debtor's disclosure of his financial affairs, assets, and liabilities is fundamental in bankruptcy proceedings. The Estate continues to incur enormous expense and delay because the Individual Debtor has not cooperated with and has instead obstructed the Trustee's investigation. Pursuant to section 521, the Trustee should have had all documents and records relating to the Individual Debtor's financial affairs, assets, liabilities, businesses, etc. immediately following his appointment more than a year ago. Instead, the Trustee has had to

37

identify other appropriate subpoena targets, issue countless subpoenas, and engage in ceaseless motion practice. While the Trustee's efforts have substantially benefitted the Estate, the Estate has also borne a heavy cost on account of these efforts.

Moreover, these heavy costs are incurred in the context of a bankruptcy proceeding. It is likely that there already is not enough money to satisfy the claims of creditors, and creditors are losing the time value of their ultimate recovery due to the ongoing, incomplete investigation into the Individual Debtor's affairs. 11 U.S.C. §§ 726(a)(5), 1129(a)(7)(A)(ii). Furthermore, Congress has determined that the ultimate goal of a Chapter 11 case – confirmation of a plan – must occur within a specified timeframe. *See* 11 U.S.C. §§ 1106(a)(5), 1121(a), 1121(d). Delay in confirmation of a plan, which must provide for the ultimate realization of creditor's claims, results in substantial injury to creditors and the Estate. *See Andrews*, 414 B.R. at 7. The Trustee should not be forced to operate without the Individual Debtor's required cooperation and disclosures. *See Stone*, 282 F.2d at 553.

The Court next considers the private interests and burden on the Individual Debtor. There is no cognizable interest in delaying or obstructing these lawful bankruptcy proceedings. There is also no cognizable burden on the Individual Debtor to comply with the Order Compelling Production. For the reasons stated above, he cannot properly invoke his Fifth Amendment right against self-incrimination. Moreover, in upholding the required records exception post-*Fisher*, the Supreme Court in *Bouknight* noted that

> The State's regulatory requirement in the usual case may neither compel incriminating testimony nor aid a criminal prosecution, but the Fifth Amendment protections are not thereby necessarily unavailable to the person who complies with the regulatory requirement after invoking the privilege and subsequently faces prosecution.

493 U.S. at 561–62; *but see Johnson v. United States*, 228 U.S. 457 (1913) (holding, pre-*Fisher*, that books and records produced under *Harris* could be used in a criminal proceeding).

Next the Court considers the status of the pending criminal inquiries and the interest of the Criminal Court. There are two pending criminal inquiries to consider: the Criminal Action and the alleged investigation into bankruptcy crimes. The Individual Debtor has been indicted in the Criminal Action. There has been no evidence submitted to the Court that he has been indicted regarding any investigation into bankruptcy crimes. These Chapter 11 cases and related adversary proceedings do overlap with the Criminal Action – (a) many of the Individual Debtor's creditors are also his alleged victims in the Criminal Action, (b) some of the Individual Debtor's purported assets were alleged to have been bought with proceeds of the fraud alleged in the Criminal Action, and (c) some of the Individual Debtor's purported affiliates and corporate *alter egos* are alleged to be involved in the fraud alleged in the Criminal Action – but at the same time, there are incongruities – (d) there are creditors in these Chapter 11 cases that are not alleged fraud victims, (e) there are purported assets of the Estate that were purchased prior to the alleged fraud, and (f) there are purported affiliates and *alter egos* of the Individual Debtor *not* alleged to be involved in the fraud. However, any issue implicated by any investigation into bankruptcy crimes are directly related to these Chapter 11 cases.

The Court concludes this Order does not substantially interfere with the Criminal Court's interest in the orderly administration of the Criminal Action. The Individual Debtor raises the specter that requiring the Individual Debtor to produce documents to the Trustee would damage the prosecution's case against him and cause litigation about evidence in the Criminal Court. This argument is unpersuasive. The Individual Debtor producing documents and records under compulsion in these proceedings does not change the reality that the prosecution apparently already possesses voluminous evidence. While, as the Individual Debtor argues, the prosecution *may* not be allowed to use the Individual Debtor's production to the Trustee as evidence of the

Individual Debtor's control over or the authenticity of documents and records already in the

prosecution's possession, the Individual Debtor's argument describes the *status quo*.  Moreover,

the Criminal Court will review and determine any motion to produce to the Trustee documents

and records from the prosecution's production to the Individual Debtor.

Regarding any investigation into bankruptcy crimes, because (a) there is no evidence that

the Individual Debtor has been indicted and (b) there is no evidence that there are proceedings in

relation to it in any court, the Court concludes that the interests of any such investigation should

be given less weight.  As stated above, the Bankruptcy Code does not exist for the purpose of

creating bankruptcy crimes.  It exists for the purpose of equitably and finally resolving,

adjusting, and reorganizing the assets, liabilities, and financial affairs of a debtor for the benefit

of all creditors and, ultimately, the debtor itself.  It is not proper to hobble the Trustee's

investigation into the affairs, assets, and liabilities of the Individual Debtor for the benefit of

some speculative prosecution of the Individual Debtor for bankruptcy crimes.  Bankruptcy

crimes are an enforcement mechanism to promote proper disclosure in bankruptcy proceedings.

If the Individual Debtor complies with the Order Compelling Production, he would remedy the

harm the bankruptcy crimes exist to prevent, while also allowing these Chapter 11 cases to be

administered appropriately.

Finally, the Court concludes that the public's interest in "the expeditious administration

of bankruptcy cases is impaired by obstructing a trustee's efforts to collect, liquidate and

distribute assets to creditors of the estate." *In re MGL Corp.*, 262 B.R. 324, 330 (Bankr. E.D. Pa.

2001).  The public has an interest in a well-functioning bankruptcy system.  It benefits the

economy, debtors, and creditors.  Obstruction of that process and efforts at dilation of that

process are not in the public interest.  Moreover, as set forth above, the production of documents

and records by the Individual Debtor in accordance with the Order Compelling Production does not offend the Fifth Amendment.

Having considered the equities, the Court concludes within its sound discretion that a stay of the Order Compelling Production is not warranted. Accordingly, the Stay Motion is denied.

### C. Should monetary sanctions enter for discovery abuse?

Finally, Fed. R. Civ. P. 37(b)(2)(C), made applicable by D. Conn. L. Civ. R. 37 and D. Conn. Bankr. L.R. 1001-1(a)(1) and 2004-1(a), provides

> (C) *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Under the specific facts and circumstances, the Court concludes an award of expenses is not warranted at this time.

## V. CONCLUSION AND ORDER

For the reasons stated above, the Court (A) holds the Individual Debtor in civil contempt of Court for failure to comply with the Order Compelling Production, and (B) denies the Stay Motion and declines in its sound discretion to stay the Order Compelling Production pending the resolution of the Criminal Action. Accordingly, it is hereby

**ORDERED:** The Court holds Mr. Ho Wan Kwok (the "Individual Debtor") in civil contempt of court for failure to comply with the Order Granting in Part Motion to Compel Compliance (the "Order Compelling Production"), ECF No. 1353; and it is further

**ORDERED:** Should the Individual Debtor fail to purge himself of contempt by failing to bring himself into full compliance with the Order Compelling Production on or before September 29, 2023, Mr. Luc A. Despins, in his capacity as Chapter 11 trustee (the "Trustee")

for the bankruptcy estate (the "Estate") of the Individual Debtor, may move for whatever sanctions are appropriate; and it is further

ORDERED:  The Motion for a Limited Stay of Order Granting in Part Motion to Compel Compliance (the "Stay Motion"), ECF No. 1649, is **DENIED**.

Dated at Bridgeport, Connecticut this 26th day of July, 2023.



# Exhibit 3

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

------------------------------------------------------x
                         :

In re:                     :      Chapter 11
                         :

HO WAN KWOK,        :      Case No. 22-50073 (JAM)
                         :

        Debtor.[1]       :
                         :

------------------------------------------------------x

## MOTION OF CHAPTER 11 TRUSTEE FOR ENTRY OF ORDER UNDER BANKRUPTCY RULE 2004 AND LOCAL RULE 2004-1 AUTHORIZING EXAMINATION OF HO WAN KWOK AND PRODUCTION OF DOCUMENTS

Luc Despins, as the appointed Chapter 11 Trustee to the Debtor's estate (the "Trustee"), by and through his proposed undersigned counsel, Paul Hastings LLP, pursuant to Federal Rule of Bankruptcy Procedure 2004(a) (the "Bankruptcy Rules") and Local Bankruptcy Rule 2004-1 (the "Local Rules"), hereby applies (the "Application" or "Motion") to conduct the examination of Ho Wan Kwok ("Debtor"), in the above-captioned chapter 11 case (the "Case"). **Please take notice that the deadline to object to this Application is** <u>August 5, 2022,</u> **and in the absence of a timely filed objection, the proposed order filed herewith (the "Proposed Order") may enter without further notice and hearing.** In support of his Application, the Trustee respectfully states as follows:

---

[1] Although the Debtor's legal name is Ho Wan Kwok, he is also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases. The last four digits of the Debtor's taxpayer identification number are 9595.

## PRELIMINARY STATEMENT

1.     In authorizing the appointment of a chapter 11 trustee, the Court recognized that one of the trustee's key objectives would be to conduct an "effective investigation of the Debtor's assets, liabilities, and financial affairs." (*See* ECF. No. 465, at 14, hereinafter referred to as the "<u>Trustee Order</u>").  Such an investigation is imperative in this case to explore, among other things, the glaring inconsistency between the Debtor's assertion in his schedules that he owns assets valued at only $3,850 and the fact that he nevertheless has access to significant funds and resources, including for the purpose of paying his counsel in this case, and has for years lived a lavish and luxurious lifestyle as a self-proclaimed billionaire.  The Trustee needs to conduct, as expeditiously as possible, an extensive, comprehensive investigation into the Debtor's financial affairs to determine whether, despite the contents of his schedules, there may be significant assets—in the form of real and personal property, equity ownership in other legal entities, litigation claims, and other property interests—that constitute property of the estate.

2.     This Motion for Rule 2004 discovery—which is one of several the Trustee intends to file at the outset of his investigation—seeks an examination of the Debtor and the production of documents that could relate to potential assets of the estate.  The New York Supreme Court has already determined that the Debtor has engaged in efforts to hide his wealth through a network of shell companies and otherwise, and numerous news reports and other evidence support this conclusion.  Good cause therefore exists for the Trustee to seek extensive documents and testimony from the Debtor regarding his assets and affairs, including without limitation his sources of income and funding, his relationships with various affiliated entities and parties, and his business interests across the world.  The Trustee respectfully requests entry of an order in the form set forth in **Exhibit A** hereto authorizing such an investigation.

## **PROCEDURAL POSTURE**

3.      On March 19, 2022 the United States Trustee filed a Motion for an Order Directing the Appointment of an Examiner or, in the alternative, a Motion for Order Directing the Appointment of a Chapter 11 Trustee. (*See* ECF No. 102).

4.      On April 6, 2022, Pacific Alliance Asia Opportunity Fund L.P. ("<u>PAX</u>") filed a Motion to Dismiss Chapter 11 Case, or in the alternative, Joinder to the United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee. (*See* ECF No. 183).

5.      On June 15, 2022, this Court issued the Trustee Order.

6.      The Trustee Order held, in relevant part that, "[w]hen balanced against dismissal or conversion, the complexity of the Debtor's financial affairs and lack of independent managerial oversight in this case warrants the appointment of a Chapter 11 trustee who can investigate, identify, and locate the Debtor's assets for the benefit of creditors and the estate" and further held that "[t]he Chapter 11 trustee shall perform all of the duties set forth in 11 U.S.C. § 1106." (*See id.* at 15-16, 18).

7.      The Trustee Order further held that "[t]he appointment of a Chapter 11 trustee will also allow for the effective investigation of the Debtor's assets, liabilities, and financial affairs" and "allow[] the Chapter 11 trustee to investigate the Debtor's assets, liabilities, and financial affairs and to ensure compliance with the provisions of the Stipulated Order." (*See id.* at 14, 18).

8.      On July 7, 2022, a Notice of Appointment of Chapter 11 Trustee was filed by the Office of the United States Trustee appointing Luc Despins as Chapter 11 Trustee of the Debtor's estate. (*See* ECF No. 514).

## FACTUAL BACKGROUND

**I.  Petition and Debtor's Schedules**

9.      On February 15, 2022 (the "Petition Date"), the Debtor filed a voluntary petition
for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

10.     The Debtor's schedules list aggregate unsecured claims in the amount of
approximately $374 million (*See* ECF No. 78, at 1, hereinafter referred to as the "Debtor's
Schedules"). The asserted $254 million claim of PAX is the largest single claim identified among
the Debtor's scheduled unsecured claims. (*See id.*, Attached Schedule F).  The Debtor's Schedules
also list a secured claim in an unknown amount purportedly belonging to Golden Spring (New
York) Ltd. ("Golden Spring"), an entity purportedly owned by the Debtor's son, Qiang Guo (the
"Son" or "Qiang"), allegedly secured by "[c]ertain claims and recoveries thereto," and asserted to
have arisen in connection with a "Litigation Funding Agreement." (*See id.*, Attached Schedule D).

11.     Despite evidence from prior proceedings demonstrating the Debtor's lavish
lifestyle and luxurious accommodations, the Debtor's Schedules list assets of only $3,850.[2] (*See
id.* at 3-7). The Debtor contends that he earns no income, and that his expenses are paid for by
Golden Spring (*See id.* at 1; *see also* ECF No. 107 at ¶17, hereinafter referred to as the "Debtor's
Declaration").

**II.  Potential Assets Owned or Controlled by Debtor Not Identified in Schedules**

12.     Despite the Debtor's contentions in his Schedules, reports suggest he may own and
control significant real and personal property assets in New York and Connecticut, among other
locations, the title of which is held by business entities affiliated with the Debtor. Reports further
suggest that the Debtor also has a financial interest in myriad for-profit and purported not-for-profit

---

[2] The Debtor has scheduled certain assets with unknown values, including disputed unregistered copyrights and
litigation claims. (*See id.*, at 6).

entities. The Debtor has been found to display a pattern of manipulating ownership among those various business entities to hide assets, especially through entities owned by family members. (*See* Decision + Order on Motion, *Pacific Alliance Asia Opportunity Fund L.P. v. Ho Wan Kwok*, Index No. 652077/2017 (N.Y. Sup. Feb. 9, 2022), at 1, hereinafter referred to as the "<u>Final Contempt Order</u>" (finding that Debtor engaged "in efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members" and had "secreted his assets in a maze of corporate entities and with family members.")).[3]

### a. *Controlled Related Entities*

13.     Although a thorough investigation is necessary to identify all the various entities over which the Debtor may have ownership or control, the Trustee has reason to believe, based on publicly available information, including findings by other courts, that the Debtor has an extensive network of shell companies he uses to pursue business interests and store his wealth.

14.     For example, in June 2021, a $1 million dollar judgment was awarded to Eastern Profit Corporation Limited ("<u>Eastern Profit</u>"), an entity allegedly controlled by the Debtor's daughter, Mei Guo ("<u>Daughter</u>" or "<u>Mei</u>"), in a breach of contract action against Strategic Vision US LLC in the United States District Court for the Southern District of New York. (*See* ECF No. 77 at 12-13; *see also Eastern Profit Corp. v. Strategic Vision US LLC*, 2021 U.S. Dist. LEXIS 116334, at *98 (S.D.N.Y. June 22, 2021), hereinafter referred to as the "<u>Eastern Profit Lawsuit</u>"). In its Findings of Fact and Conclusion of Law issued in connection with the Eastern Profit Lawsuit, the District Court found that Eastern Profit was "in essence, a shell corporation for" the Debtor. (*See* the Eastern Profit Lawsuit at *4).

---

[3] The Final Contempt Order is attached as Exhibit A to the *Objection Of Chapter 11 Trustee to Debtor's Motion For Relief From Order Appointing Luc A. Despins as Chapter 11 Trustee* [Docket No. 575].

15.     Other entities that the Debtor potentially controls include: (i) Bravo Luck Limited ("Bravo Luck"), an entity purportedly owned by the Debtor's Son (*see* Debtor's Declaration, ¶ 33); (ii) Genever Holding LLC ("Genever NY"), a wholly-owned subsidiary of Genever Holdings Corporation ("Genever BVI"), whose equity is held by the Debtor in his individual capacity (*see id.*); (iii) Golden Spring, an entity purportedly controlled by the Debtor's Son (*see id.*, ¶ 17); (iv) Greenwich Land LLC ("Greenwich Land"), an entity purportedly owned by the Debtor's purported wife, Hing Chi Ngok ("Wife" or "Hing") (*see id.*); (v) Lamp Capital LLC ("Lamp"), an entity purportedly owned by the Debtor's Son (*see id.*, ¶ 51); and (vi) HK International Funds Investment (USA) Limited, LLC ("HK USA"), an entity purportedly owned by the Debtor's Daughter (*see id.*, ¶ 33).

16.     The Debtor has stated that these above-listed entities, perhaps along with others, fund the lavish lifestyle the Debtor flaunts to the media and on social media. (*See, e.g.*, *id.*, ¶ 17 (stating that his Son, through Golden Spring, "provides for [the Debtor's] needs"); *id.*, ¶ 23 (contending that his Daughter owns the *Lady May*, a luxury yacht allegedly purchased in 2015 for £41 million, and that his Son provides for *Lady May's* maintenance); and *id.*, ¶ 51 (noting that his Son, through Lamp, funded a $1 million retainer for the Debtor's initial chapter 11 bankruptcy counsel).  The Debtor does not explain, however, how these entities derive their income or what consideration, if any, he provides to these entities in exchange for the funding they provide him.

###     b.     *Real and Personal Assets Potentially Owned or Controlled by Debtor*

17.     In addition to this opaque network of controlled related entities, there are extensive real and personal assets—which the Debtor himself has bragged about owning to the media—that may also be property of the estate.

18.     For example, when asked in a 2017 interview whether he had any regrets over how

he has fought his campaign against the Chinese Communist Party, the Debtor said:

> I have absolutely no regrets for what I have done over the past nine
> months. I have the **wealthy life that everyone in the world dreams
> about**. I have the **biggest house in Hong Kong**, thousands of square
> meters. I have the **most luxurious apartment in London**. I have the
> **biggest place in Beijing**. I **have more than 10 properties in Pangu**.
> I have **two private jets**. I have the **most advanced yachts**. I have
> **hundreds of race cars**. I have **an apartment like this in New York**.
> I don't have any material needs anymore.

(*See, e.g.,* Vice News, Exiled Chinese Billionaire Uses YouTube to Wage A War On Corruption,

YOUTUBE, at 6:38-7:07 (Nov. 15 2017) (emphasis added) (available at

https://www.youtube.com/watch?v=LkOsgh5kcgQ), hereinafter referred to as the "Vice News

Interview")).[4] Notably, the Debtor has never offered a credible explanation of what has become

of these assets, or any proceeds from them – a central question the Trustee believes will be

answered through this 2004 examination.

19.     Consistent with the Debtor's own admissions, other courts have already found that

certain assets are effectively owned by the Debtor, despite his newfound contentions to the

contrary in this Case.

20.     **The *Lady May***.  Following an evidentiary hearing to determine who held beneficial

ownership of the *Lady May*, the New York Supreme Court found the Debtor beneficially owns

and controls the *Lady May*.  (Final Contempt Order at 9 ("The evidence clearly and convincingly

demonstrates that [Debtor] holds a beneficial interest in and controls the Lady May.")).

Specifically, the court, after considering all of the evidence, including lengthy testimony from the

Debtor's daughter and three other witnesses presented by counsel for HK USA on behalf of the

Debtor, found that "[t]he testimony adduced at the hearing out of the mouths of defendants'

---

[4] This quote was spoken by the Debtor in Chinese and translated into English by Vice News.

witnesses clearly and convincingly demonstrates that Kwok beneficially owns and controls the Lady May and has utter contempt for this Court and the judicial process." (Final Contempt Order at 4). The court went on to state that "[i]n short, Ms. Guo's testimony that she owns and controls the Lady May cannot be credited in any respect" and that, "[n]ot only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht." (*Id.* at 6-8).[5]

21.     **The Sherry Netherland Hotel Property**. The Debtor may similarly own and control a condominium in the Sherry Netherland Hotel in Manhattan, allegedly purchased in 2015 for approximately $70 million (the "Condominium").   The Debtor maintains that the Condominium is owned by Genever NY, and that Genever NY holds the Condominium in trust for his Son through Bravo Luck. (*See* Debtor's Declaration, ¶ 33).  As noted, *supra*, Genever NY is itself owned by Genever BVI, an entity owned by the Debtor. (*See id.*).

22.     Similar to the *Lady May*, the Condominium became subject to prepetition litigation in the separate chapter 11 bankruptcy that Genever NY filed in October 2020 in the Southern District of New York before the Honorable James L. Garrity Jr.  (*See* Case No. 20-12411 (Bankr. S.D.N.Y.)).  In that chapter 11 case, Genever NY and PAX entered into an agreement pursuant to which the Condominium will be sold and proceeds placed into escrow and distributed only upon further order of Judge Garrity.  (*See* Second Am. and Restated Settlement Agreement, *In re Genever Holdings, LLC,* No. 20-12411, (ECF 131-1, ¶5(g))).  The agreement also provided, among other things, that it would not prejudice the rights of the parties to proceed with litigation

---

[5] On March 1, 2022, PAX filed a Motion for Entry of an Order Confirming the Inapplicability of the Automatic Stay or, in the Alternative, Relief from the Automatic Stay Pursuant to Section 362(d)(2) of the Bankruptcy Code (ECF No. 57) (the "PAX Stay Motion").  The PAX Stay Motion was resolved pursuant to a stipulated order pursuant to which, among other conditions, HK USA agreed to return the *Lady May* to the United States, securing this obligation through the placement $37 million in an escrow account.  (*See* ECF No. 299).  The *Lady May* was returned to the navigable waters of Connecticut in early July 2022.

commenced by PAX against Bravo Luck and the Debtor in the British Virgin Islands, which challenges Bravo Luck's alleged beneficial ownership of the Condominium. (*Id.* ¶7(b)).

23.    The Trustee also has reason to believe that a security deposit in an amount of approximately $2 million may also remain in connection with the Condominium's acquisition. (*See* ECF No. 77 at 7).

24.    **Other Real and Personal Property**.  In addition to the foregoing, the Debtor has frequently referenced other significant real and personal property assets that he or his immediate family members own and control.  For example:

- The Debtor maintains that his Wife, through Greenwich Land, owns the Debtor's residential property located at 373 Taconic Road, Greenwich, Connecticut 06831. (*See* Debtor's Declaration, ¶¶ 6, 17).  Greenwich Land may also hold ownership rights to another residential property located in Greenwich, Connecticut at 33 Ferncliff Rd.[6]

- The Debtor has declared that he owns "billions" of "funds and property, including real estate in Hong Kong" which were frozen in 2019 by the High Court of the Hong Kong Special Administrative Region, Court of First Instance. (*See* Debtor's Declaration, ¶ 17).

- The Debtor is also a co-plaintiff in litigation in the United Kingdom that involves claims of approximately $500 million.[7]

- As noted above, in a 2017 interview, the Debtor bragged of owning, among other things, (i) the "biggest house in Hong Kong," (ii) the "most luxurious apartment in London," (iii) the "biggest place in Beijing," (iv) "more than 10 properties in Pangu," (v) two private jets,[8] and (vi) "hundreds of race cars."[9]

---

[6] (*See Supplemental Memorandum of Law of the Official Committee of Unsecured Creditors Addressing the Alternatives of Dismissal, Conversion or the Appointment of a Chapter 11 Trustee*, at 3 [ECF No. 408] (noting "other potential assets of the estate are two properties in Greenwich, Connecticut (373 Taconic Rd. and 33 Ferncliff Rd.) which [Debtor] claims are owned by [Greenwich Land].")).

[7] *See* Approved Judgment dated February 9, 2022, *Kwok Ho Wan & Ors v UBS*, Cl-2020-000345, High Court of Justice of England and Wales Queen's Bench Division Commercial Court, ¶ 30(i) ("The principal claim is for some US$495 million.").

[8] According to a press report, one of these private jets bears tail number T7-GQM.  *See* "Steve Bannon's Use of Private Jet Linked to Chinese Businessman Could Violate Campaign Finance Law," ProPublica, dated Feb. 26, 2020, (available at https://www.propublica.org/article/steve-bannon-guo-wengui-private-jet-campaign-finance-law) (last visited July 25, 2022).

[9] *See* Vice News Interview at 6:38-7:07.

The proposed examination will help determine whether—and likely confirm—that these various

property interests are property of the estate.

### c. Debtor's Potential Financial Interests in For-Profit and Purported Not-For Profit Business Entities

25.     In addition to the real and personal property assets that the Debtor may own or

control through business entities owned by his family members, the Debtor may also have

significant financial or ownership interests (or liabilities) in both for-profit and alleged not-for

profit business entities that may provide substantial value to the estate and creditors.

26.     For instance, it is reported that the Debtor has a financial interest in Gettr USA, Inc.

("Gettr"), a conservative social media platform. (*See* Will Sommer, Adam Rawnsley, A.

Suebsaeng, *Trumpworld App Is Bankrolled by Fugitive Chinese Billionaire,* THE DAILY BEAST,

https://www.thedailybeast.com/trumpworld-app-is-bankrolled-by-fugitive-chinese-

billionaire?ref=home (July 5, 2021, 12:19 PM) (last visited July 20, 2022) (reporting that "sites

associated with the billionaire have suggested that Gettr is [Debtor's] brainchild," and attributing

to a host on GTV, "a media outlet that serves as a mouthpiece for [Debtor]," the observation that

Gettr was "'the concentration of [Debtor]'s whole lifework'," and adding that "[Debtor] had come

up with the idea for Gettr's logo, a torch."); *see also* The New York Times: Sway, *Best Of: Jason*

*Miller*, at 30:15-30:35 (July 18, 2022) (downloaded using Apple Podcasts) (When asked who is

funding Gettr, Gettr CEO Jason Miller responded, "We have multiple international investment

funds that are putting into this . . . . The family foundation of Miles Kwok is one of the initial

funders, one of the initial sponsors of this. There's been over $50 million that's [been] put in the

platform so far. [We] have somewhere [near] $25-$30 million range that we currently have in the bank.")).[10]

27.    It has also been reported that Gettr's pay stubs list the same address as the "Himalaya Embassy," a property leased in Manhattan's Upper East Side, that is also associated with the New Federal State of China (the "NFSC"), a proclaimed "government in exile dedicated to overthrow the [Chinese Communist Party]" created by the Debtor and Steve Bannon, former chief strategist to former President Donald J. Trump. (*See* Dan Friedman, *A Fugitive Chinese Tycoon Met Steve Bannon. Misinformation Mayhem Ensued. The weird, wild, and scary tale of Miles Guo*, Mother Jones (March-April 2022 Issue) (last visited July 21, 2022), https://www.motherjones.com/politics/2022/02/guo-wengui-miles-guo-gettr-steve-bannon/).

28.    The Debtor also reportedly owns or controls a "web of more than 60 commercial, nonprofit, and online groups" collectively referred to as the "whistleblower movement." (*See id.*). At least two of these nonprofits—the Rule of Law Society and the Rule of Law Foundation—are said to fund the NFSC.  (*See id.*). It has been reported that as of summer 2021 the Rule of Law Society and Rule of Law Foundation had "combined receipts of about $15 million." (*Id.*).

29.    The Debtor's alleged "web" of for-profit and not-for profit commercial interests may also include entities or brands such as (i) "GCoin," a cryptocurrency allegedly created by the Debtor to serve as a monetary currency for NFSC; (ii) "GFashion," a clothing line designed by the Debtor; (iii) "GMusic," a music platform that promotes the Debtor's videos; (iv) "GClubs," a membership service which provides "'concierge customer service' and special access to [Debtor's] fashion collections, music releases, and an annual GSummit"; (v) "GTV," a Chinese-language

---

[10] Shortly after this exchange, Miller was careful to distinguish the "family foundation of Miles Kwok" with Miles Kwok, himself, saying, "Mr. Kwok doesn't have any direct financial investment in Gettr," instead calling the Debtor an "ally" to Gettr. (*See id.* at 30:51-31:11).

video platform; (vi) "GNews," a news website that "runs articles summarizing [Debtor's] pronouncements.";[11] (vii) Saraca Media Group Inc., the parent company of *GNews* that also reportedly paid Mr. Bannon at least $1 million in consulting fees in May 2018; and (viii) the Himalaya Supervisory Organization, which oversees a number of online chat groups that promote and idolize the Debtor, and which offered members of those chat groups "various mechanisms" to send the Debtor money, including through a loan program which allegedly "promised eventual repayment with interest and a chance to invest at a discount in other [Debtor] ventures" and through stock purchases of GTV. (*See id.*). It is alleged that the GTV stock opportunity raised $114 million and that the loan program raised "at least $90 million." (*See id.*).

30. These are just certain of the business interests and entities that either the Debtor has boasted about, or that have been reported in the media to date. It stands to reason that the Debtor may be affiliated with numerous other entities whose assets, liabilities and financial interests may be critical to the Trustee's administration of the Debtor's Estate.

31. Because the Debtor may be the true owner of the aforementioned assets and interests, among other potentially unknown assets and interests, it is critical that the Trustee examine and investigate fully the Debtor's estate assets, including the role that his family members, their business entities and other third parties, including the law firms representing the Debtor and his affiliated family entities, have with regards to the Debtor's financial positioning.

## **JURISDICTION AND VENUE**

32. The Court has jurisdiction to entertain this application under 28 U.S.C. §§ 157 and 1334. Venue to hear this Application is proper in accordance with 28 U.S.C. §§ 1408 and 1409.

---

[11] *See id.*

33. This Application is a core proceeding pursuant to, *inter alia*, 28 U.S.C. § 157(b)(2) (A), (E), and (F).

## RELIEF REQUESTED

34. The Trustee seeks entry of an order, in substantially the form of the Proposed Order, pursuant to Bankruptcy Rule 2004(a) and Local Bankruptcy Rule 2004-1, authorizing the Trustee to conduct the examination of the Debtor.

## BASIS FOR RELIEF REQUESTED

35. Pursuant to Rule 2004(a), on application of a party in interest, the Court may order the examination of any person or entity. The scope of an examination authorized under Rule 2004 is exceedingly broad and may relate to the "acts, conduct, or property or to the liabilities and financial condition of the Debtor, or to any matter which may affect the administration of the Debtor's estate." Fed. R. Bankr. P. 2004(b).

36. "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Transmar Commodity Group Ltd.*, 2018 WL 4006324, at *4 (Bankr. S.D.N.Y. Aug. 17, 2018) (internal quotation and citation omitted). This includes revealing the nature and extent of the estate and in discovering assets of the debtor that may have been intentionally or unintentionally concealed. *See In re Bennett Funding Group, Inc.*, 203 B.R. 24, 27-28 (Bankr. N.D.N.Y. 1996). *See also In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016) ("Legitimate goals of Rule 2004 examinations include discovering assets, examining transactions, and determining whether wrongdoing has occurred." (internal quotation and citation omitted)).

37.     In the declaration he submitted on March 20, 2022 in support of the filing of this case, the Debtor represented that among the purposes for filing his chapter 11 case were "to … (b) afford stakeholders an efficient opportunity to investigate [his] assets, liabilities, and financial affairs, given what [he] perceive[d] to be misunderstandings in that regard; [and] (c) establish what assets are estate property and, in turn, available for distribution to holders of allowed claims . . . ." (Debtor's Declaration, ¶ 3).  The investigation the Trustee seeks to perform is directly relevant to these stated purposes in that it will help the Trustee identify the Debtor's assets and liabilities in order to make distributions to creditors.

38.     The areas for initial inquiry pursuant to the requested examination of the Debtor are readily apparent.  Based on all the facts and evidence discussed above—including the Debtor's own numerous public statements and past findings by other courts—the Trustee has already identified various corporate entities and real and personal property assets of the Debtor that may provide significant value to the estate.  The Trustee needs, however, the investigative tools afforded by Rule 2004 to further establish the true ownership of these assets and to explore other potential assets about which the Trustee does not yet have knowledge.

39.     The Trustee requests that, in furtherance of his examination, the Court direct the Debtor to provide documentation to the Trustee's counsel, as requested in the form annexed hereto as **Exhibit B** and made a part hereof (the "Proposed Subpoena"), within thirty (30) days of the service of a subpoena, substantially similar in form and substance to the Proposed Subpoena, or such other time as agreed upon by the Trustee.  These requests seek documents and communications related to, among other things, (i) the specific assets and property interests discussed herein (e.g., the *Lady May*,[12] the Condominium, the Greenwich properties, and the

---

[12] The *Lady May* is among the topics and potential estate assets with respect to which the Trustee seeks discovery. The Trustee submits that such discovery is appropriate pursuant to Rule 2004 even though an adversary proceeding

various other homes, private jets, and other assets the Debtor has boasted about); (ii) the Debtor's interests in and relationships with other individuals, corporate entities and nonprofits, which may be a source of the Debtor's wealth; and (iii) the Debtor's communications with his counsel and other advisors, including communications with such advisors regarding corporate governance issues and the Debtor's finances and property interests.

40.     As to this latter category of document requests, bankruptcy courts routinely provide for Rule 2004 discovery against professional firms when the discovery may identify and aid the recovery of assets for the benefit of the estate and creditors. *See, e.g., In re Bame,* 251 B.R. 367 (Bankr. D. Minn. 2000) (finding trustee's request to waive privilege of individual debtor and seek discovery from prepetition advisors compelling when requested to recover assets); *In re Horvath*, No. 13-34137, 2015 WL 2195060 (Bankr. N.D. Ohio May 7, 2015) (discovery related to claims on schedule of assets permissible from individual debtor because trustee sought to potentially increase the value of debtor's estate). Any assertion by the Debtor that the attorney-client privilege or other applicable privileges may obstruct the Trustee's investigation into communications with counsel are without merit, because the "Trustee now controls any attorney-client privilege or attorney work product to the extent it relates to the identification of assets, liabilities or the financial state of the Debtor's estate." *In re Tarkington,* No. 10-00012-8-JRL, 2010 WL 1416813, at *3 (Bankr. E.D.N.C. Apr. 2, 2010) ("trustee's waiver of [individual debtor's] attorney-client

---

with respect to the ownership of the *Lady May* is presently pending. The Trustee's proposed discovery related to the *Lady May* relates to the overall pattern of conduct by the Debtor to evade his creditors and is therefore broader than discovery that will likely be sought in the adversary proceeding. It is also more efficient for all parties for the Trustee to take this discovery now given that the Trustee is otherwise seeking Rule 2004 discovery from the same parties on other topics—it would be inefficient for the Trustee to have to take discovery from these same parties twice. Moreover, this is not the classic situation where an adversary plaintiff, through Rule 2004, seeks to undermine the protections provided by the Bankruptcy Rules governing discovery in adversary proceedings. Finally, given the procedural posture of the adversary proceeding, the Trustee may not be able to obtain discovery in that proceeding at present. The Trustee needs its Rule 2004 discovery now, however, to adequately protect and preserve potential assets of the estate.

privilege is valid to the extent that questions asked during the examination pertain to the administration of estate property"); *see also In re Klein*, No. 2:11-BK-12718RN, 2013 WL 6253819, at *13 (Bankr. C.D. Cal. Dec. 4, 2013) (chapter 11 trustee controls privilege between debtor and his former counsel upon appointment).

41.     The Trustee submits that the facts set forth above constitute sufficient cause for the Court to order the examination of, and production of documents from, the Debtor pursuant to Rule 2004(a).  The Debtor himself is a necessary source of information and documents to help the Trustee uncover the Debtor's estate's true assets.  The Debtor's examination and response to document requests would be the first step in "afford[ing] stakeholders an efficient opportunity to investigate [his] assets." (Debtor's Declaration, ¶ 3).

42.     Authorization of this Application is critical for the Trustee to fulfill the duties contemplated in the Trustee Order effectively, including specifically his mandate to "locate the Debtor's assets for the benefit of creditors and the estate" and "investigate the Debtor's assets, liabilities, and financial affairs." (*See* Trustee Order at 15-16, 18).  No party in interest, including the Debtor, shall suffer undue prejudice upon the granting of the relief sought in this Application.

43.     In the event the relief requested by the Trustee is granted, the Trustee shall issue the appropriate subpoenas to compel deposition attendance and/or production of documents at the Rule 2004 examination in the form of the Proposed Subpoena.  Further, it is respectfully requested that the Rule 2004 deposition examination be held at the law offices of Paul Hastings LLP, counsel for the Trustee, located at 200 Park Avenue, New York, NY 10166 on not less than seven (7) days written notice or at such other time and location as the parties may otherwise agree.

## NO PRIOR REQUEST

44.     No prior application for the relief requested herein has been made.

## <u>OBJECTION DEADLINE</u>

45.     The deadline to object to this Application is **<u>August 5, 2022</u>**, and in the absence

of a timely filed objection, the Proposed Order may enter without further notice and hearing.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Trustee respectfully requests that the Court grant this Application and enter the Proposed Order, pursuant to Fed. R. Bankr. P. 2004(a), directing the examination of Ho Wan Kwok, and directing the production of certain documents as set forth in the Requests for Production of Documents attached to the Proposed Subpoena, and for such other and further relief as the Court may deem just and proper.

Dated:    July 28, 2022            LUC A. DESPINS,
         New Haven, Connecticut    CHAPTER 11 TRUSTEE

                               By: */s/ Patrick R. Linsey*
                                 Patrick R. Linsey (ct29437)
                                 NEUBERT, PEPE & MONTEITH, P.C.
                                 195 Church Street, 13th Floor
                                 New Haven, Connecticut 06510
                                 (203) 781-2847
                                 plinsey@npmlaw.com

                                     *and*

                                 Nicholas A. Bassett *(pro hac vice* pending)
                                 PAUL HASTINGS LLP
                                 2050 M Street NW
                                 Washington, D.C., 20036
                                 (202) 551-1902
                                 nicholasbassett@paulhastings.com

                                     *and*

                                 Avram E. Luft *(pro hac vice* pending)
                                 Douglass Barron (*pro hac vice* pending)
                                 PAUL HASTINGS LLP
                                 200 Park Avenue
                                 New York, New York 10166
                                 (212) 318-6079
                                 aviluft@paulhastings.com
                                 douglassbarron@paulhastings.com

                                 *Proposed counsel for the Chapter 11 Trustee*

**Exhibit A – Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------------x
                                    :
In re:                              :    Chapter 11
                                    :
HO WAN KWOK,                        :    Case No. 22-50073 (JAM)
                                    :
          Debtor.¹³                 :
                                    :
-------------------------------------------------------x
```

**[PROPOSED] ORDER GRANTING**
**CHAPTER 11 TRUSTEE'S APPLICATION FOR**
**RULE 2004 EXAMINATION OF HO WON KWOK**

Upon consideration of the Application seeking an order authorizing a Federal Rule of Bankruptcy Procedure 2004 examination of Ho Won Kwok ("Debtor") (the "Application", ECF No. _____), filed by Luc Despins, as the appointed Chapter 11 Trustee to the Debtor's estate (the "Applicant"), after notice and a hearing, see 11 U.S.C. § 102(1), it appearing that cause exists to grant the requested relief as conditioned hereafter; it is hereby

**ORDERED**: The Rule 2004 Motion is granted as set forth below.

**ORDERED**: Paul Hastings LLP and Neubert, Pepe & Monteith, P.C., as proposed counsel for the Trustee, are hereby authorized to sign a Subpoena, in a form substantially similar to the Subpoena attached to the Rule 2004 Motion as Exhibit B, and to serve the Subpoena along with a copy of this Order in accordance with Bankruptcy Rule 2004 requiring examination and the production of documents by the Debtor.

**ORDERED**: The Debtor is hereby directed to produce all documents within 30 days of the service of the Subpoena, or such other time as agreed upon by the Trustee. To the extent the Debtor does not produce any documents requested in the Subpoena on the basis of some privilege, the Debtor is hereby directed to produce the Trustee with a privilege log that comports with Fed. R. Civ. P. 45(e)(2), made applicable by Fed. R. Bankr. P. 9016, and D. Conn. L. Civ. R. 26(e), within 30 days of service of the Subpoena, or such other time as agreed upon by the Trustee.

**ORDERED**: The Debtor is hereby directed to ensure that that all documents and other information, including without limitation in any electronic format, requested in the Subpoena or otherwise relevant to the Debtor, his business, assets, liabilities, financial condition, or this Chapter

---

¹³ Although the Debtor's legal name is Ho Wan Kwok, he is also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases. The last four digits of the Debtor's taxpayer identification number are 9595.

11 case, are properly maintained, are available for production, inspection and copying, are not destroyed.

ORDERED: Paul Hastings LLP and Neubert, Pepe & Monteith, P.C., as proposed counsel for the Trustee, are hereby authorized, without further order of this Court, to take the testimony of the Debtor by examination under Bankruptcy Rule 2004 at the offices of Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, or at such other place that is mutually acceptable to the parties, on a date acceptable to the Trustee, which, at the election of the Trustee, shall be not less than 14 calendar days after the production of documents by the Debtor in compliance with the Subpoena and this Order pursuant to Bankruptcy Rule 2004, and such examination shall continue from day to day until completed.

Dated: _____, 2022

_____
Julie A. Manning,
United States Bankruptcy Judge

**Exhibit B – Subpoena and Document Requests**

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of Connecticut

In re Ho Wan Kwok

Debtor

Case No. 22-50073

Chapter 11

## SUBPOENA FOR RULE 2004 EXAMINATION

To:     Ho Wan Kwok

*(Name of person to whom the subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure. A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| Paul Hastings LLP<br>200 Park Avenue<br>New York, New York 10166 | |

The examination will be recorded by this method: court reporter/stenographer

☑ *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Requests for Production of Documents, attached hereto.

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: August __, 2022

CLERK OF COURT

OR

_____          _____
Signature of Clerk or Deputy Clerk                    *Attorney's signature*
                                                          Patrick R. Linsey (ct29437)

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Luc Despins, Ch. 11 Trustee        , who issues or requests this subpoena, are:

Patrick R. Linsey, Esq.; Neubert, Pepe & Monteith, P.C.; 195 Church Street, New Haven, Connecticut 06510
plinsey@npmlaw.com; 203-821-2000

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## Requests for Production of Documents

I. **INSTRUCTIONS**

    1.    Unless otherwise indicated, the requests for documents set forth below, (the "Requests," and each, a "Request"), must be responded to separately and specifically. Each Request shall be answered fully unless it is in good faith objected to, in which event the reason for Your objection shall be stated in detail, as set forth below. If an objection pertains only to a portion of a Request, or a word, phrase or clause contained within it, You are required to state Your objection to that portion only and to respond to the remainder of the Requests.

    2.    Electronically stored information must be produced in accordance with the following instructions:

    a.    <u>Images.</u> Black and white images must be 300 DPI Group IV single-page TIFF files. Color images must be produced in JPEG format. File names cannot contain embedded spaces or special characters (including the comma). Folder names cannot contain embedded spaces or special characters (including the comma). All TIFF image files must have a unique file name, i.e. Bates number. Images must be endorsed with sequential Bates numbers in the lower right corner of each image. The number of TIFF files per folder should not exceed 1000 files. Excel spreadsheets should have a placeholder image named by the Bates number of the file.

    b.    <u>Image Load File</u>

    a.    Concordance® Data File. The data file (.DAT) contains all of the fielded information that will be loaded into the Concordance® database. The first line of the .DAT file must be a header row identifying the field names. The .DAT file must use the following Concordance® default delimiters: Comma ASCII character (020) Quote þ ASCII character (254). Date fields should be provided in the format: mm/dd/yyyy. Date and time fields must be two separate fields. If documents includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments. An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES. Do not include the text in the .DAT file. For Documents with native files, a LINK field must be included to provide the file path and

name of the native file. The native file must be named after the FIRSTBATES.

    b.   Concordance Image® OR Opticon Cross-Reference File. The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following              format: ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,Box Break,PageCoun.

c.   <u>Document Text.</u> Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (OCRPATH) should be included in the .DAT file. It is recommended document level ANSI text files, named per the FIRSTBATES/Image Key. Extracted text files must be in a separate folder, and the number of text files per folder should not exceed 1,000 files. There should be no special characters (including commas in the folder names). Text files must be provided on a document level.

d.   <u>Native Production for Certain File Types.</u> File types that reasonably require viewing in their native format for a full understanding of their content and meaning must be produced in native format. These include, but are not limited to, spreadsheets, spreadsheet-like files (Microsoft Excel, comma separated values, tab separated values, etc.), Microsoft PowerPoint or other special presentation files, database files, and audio/visual files. Provide an image of a Bates numbered slip sheet indicating the presence of a native file, and include the path to the native as a field in the .dat file. Name the produced native file with the Bates number corresponding to the slip sheet for the file. Group native files within incrementally named "NATIVE" directories, separate from images directories.

e.   <u>De-duplication</u>. Produce a single copy of each electronic document for which exact duplicates exist. For email messages, consolidate duplicates based on MD5 hash generated from the BCC, Body, CC, From, IntMsgID, To, and Attach properties. For email attachments and standalone electronic files, consolidate duplicates based on MD5 hash of the entire file.

f.   <u>Metadata.</u> Produce extracted metadata for each document in the form of a Concordance compliant load file (.dat). The first line of the .DAT file must be a header row identifying the field names. The .DAT file must use the following Concordance default delimiters: Comma , ASCII character (020) Quote þ ASCII character (254)

Date fields should be provided in the format: mm/dd/yyyy. Date and time fields must be two separate fields. Required metadata listed below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email **The LASTBATES field should be populated for single page |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender Native: Author(s) of document **semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s) **semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent Native: (empty) |
| TIME_SENT/ TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion. |
| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
| FILE_EXTEN | MSG | The file type extension representing the Email or |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |

3

| TIME_CREATED | 10:25 AM | Email: (empty)<br>Native: Time the document was created<br>**This data must be a separate field and cannot be combined with the DATE_CREATED field |
|---|---|---|
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD | 07:00 PM | Email: (empty)<br>Native: Time the document was last modified<br>**This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty)<br>Native: Time the document was last accessed<br>**This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a0698aff95c2fcab58712467eab4004583eb8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

3.      Each Request operates and should be construed independently and, unless otherwise indicated, no Request limits the scope of any other Request.

4.      All Documents are to be produced as kept in the usual course of business or are to be organized and labeled to correspond with the categories in these Requests.

5.      Each Request contained herein extends to all Documents:  (a) in Your possession, custody, or control; or (b) in the possession, custody, or control of anyone acting on Your behalf,

including Your counsel or other representatives and advisors.  Each Document shall be produced in its entirety.

6.      If You are requested to produce a Document that is no longer in Your possession, custody, or control, then Your response must (a) describe in detail the nature of the document and its contents; (b) identify the person(s) who prepared or authored the Document (and, if applicable, the Person(s) to whom the Document was sent); (c) identify the date on which the document was prepared or created; (d) state whether such Document (i) is missing or lost, (ii) has been destroyed, (iii) has been transferred, voluntarily or involuntarily, to others, or (iv) was otherwise disposed of; (e) state the reason for, and the facts and circumstances surrounding, such disposition; (f) identify the Persons who authorized such disposition; (g) identify the date or approximate date of such disposition; (h) state when the Document was most recently in Your possession, custody or control; and (i) identify the Person, if any, presently in possession, custody, or control of such Document.

7.      If You are requested to produce a Document that has been destroyed, then Your response must state, in addition to the information required by the preceding Instruction:  (a) the reason for the Document's destruction; (b) the identity of the Person who destroyed the Document; and (c) the identity of the Person who directed that the Document be destroyed.

8.      If You claim that a requested Document is privileged or attorney work-product, then Your response must: (a) state (i) a description of the Document adequate to support Your contention that the Document is privileged, (ii) the title of the Document, (iii) the date of the Document, (iv) the author of the Document, (v) the addressee of the Document, (vi) the identity of each Person who received or saw the original or any draft, copy, or reproduction of the Document, (vii) whether the Document itself, or any information contained or referred to in the Document is in the possession, custody, or control of any other Persons, and if so, the identity of

such Persons, as well as a statement addressing how the information came into their possession, (viii) the claim of privilege under which the Document is withheld, and (ix) all of the circumstances upon which You will rely to support such claim of privilege; and (b) produce a privilege log containing all of the information requested in Part (a) of this Instruction for each Document withheld on the basis of a claim of privilege in accordance with D. Conn. L. Civ. R. 26(e).

9.     Document Request as to which a claim of privilege or work product is not made, responsive documents should be provided in full.

10.     If a portion of an otherwise responsive Document contains information subject to a claim of privilege, only that portion of the Document subject to the claim of privilege shall be deleted or redacted from the Document following the instructions above, and the rest shall be produced.

11.     The Requests are continuing in nature. You are hereby instructed to (a) supplement or correct any responses later learned to be incomplete or incorrect immediately upon learning that a prior response was incomplete or incorrect; and (b) produce any additional Documents that are called for under the

12.     If a Document is in a language other than English, You should provide that Document.  If a Document is in a language other than English, and an English translation exists, You should provide both Documents.

13.     All references to Entities includes all affiliates thereof.

14.     All references to individual names include all alternative names, aliased, or nicknames.

15.     Unless otherwise expressly indicated, the period of time covered by the Document Requests is the period from February 5, 2012 to the date responses to the Document Requests are due.

## II.    RULES OF CONSTRUCTION

16.     The use of (a) any singular noun shall be construed to include the plural, and vice versa, and (b) a verb in any tense shall be construed as the use of the verb in all other tenses.

17.     The terms (a) "and" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of any request all responses that might otherwise be construed to be outside of its scope, and (b) "each" and "any" shall be deemed to include and encompass the words "every" and "all."

## III.    DEFINITIONS

The definitions supplied by D. Conn. L. Civ. R. 26(c) and the rules of construction supplied by D. Conn. L. Civ. R. 26(d), as incorporated by D. Conn. Bankr. L.R. 2004-1(a), shall apply to the Document Requests. In addition, the following terms used in these Document Requests shall have the following meanings:

1.     "You" or "Your" or "Yourself" or "Debtor" means and refers to Ho Wan Kwok (a/k/a Miles Kwok, Miles Guo, Guo Wengui, Guo Haoyun, 郭文贵, or any other alias), together with any of his employees, agents, counsel, advisors, or anyone acting on his behalf.

2.     "Debtor's Son" means Qiang Guo (a/k/a Mileson Kwok, 郭强, or any other alias), together with any of his employees, agents, counsel, advisors, or anyone acting on his behalf.

3.    "Debtor's Daughter" means Mei Guo (a/k/a Mei Gui, 郭美, or any other alias), together with any of her employees, agents, counsel, advisors, or anyone acting on her behalf.

4.    "Debtor's Purported Wife" means Hing Chi Ngok (a/k/a Hing Chi Ng, a/k/a Yue Qingzhi, 岳庆芝, or any other alias), together with any of her employees, agents, counsel, advisors, or anyone acting on her behalf.

5.    "Debtor's Family" means, collectively, the Debtor, the Debtor's Son, the Debtor's Daughter, and the Debtor's Purported Wife, and any other familial relation to the Debtor.

6.    "Associated Individuals" means, individually and collectively, all individuals that (1) hold, control, have custody over, or discretion over assets owned, controlled, or enjoyed by the Debtor or the Debtor's Family; or (2) have been employees, directors, or otherwise are affiliated with one or more Associated Entities, together with the respective employees, agents, counsel, advisors, or anyone acting on behalf of any of the foregoing. Such Associated Individuals shall include, but are not limited to: Daniel Podhaskie, Jason Miller, Steve Bannon, Karin Maistrello, Melissa Francis, William Gertz, Arethusa Forsyth, Glenn Mellor, Jennifer Mercurio, Eduardo Eurnekian, Han Chunguang (a/k/a 韩春光), Qu Guojiao (a/k/a Qu Guo Jiao, 屈国姣), Guo Lijie (a/k/a 郭丽杰), Zhang Wei (a/k/a 张伟*), Lihong Wei Lafrenz (a/k/a Sara Wei, 魏丽红), Hao Haidong (a/k/a 郝海东), Ross Heinemeyer, Max Krasner, Kyle Bass, Melissa Mendez, Ya Li (a/k/a 李娅), Dinggang Wang (a/k/a 王定刚), An Hong (a/k/a 安红), Yvette Wang (a/k/a Yanping Wang, Yan Ping Wang, 王雁平), Fiona Yu, Je Kin Ming (a/k/a William Je, Yu Jianming, 余建明), Yaz Qingua, and Lao Jiang (a/k/a Jiang Yunfu, Jiang Yunfu Be, 姜云浮).

7.     "Associated Entities" means, individually and collectively, all organizations or Entities of any type that (1) have been owned, controlled, or invested in by the Debtor or the Debtor's Family; or (2) have an interest, whether directly or indirectly, in any assets owned, controlled, or enjoyed by the Debtor or the Debtor's Family, together with the respective employees, agents, counsel, advisors, or anyone acting on behalf of any of the foregoing.  Such Associated Entities shall include, but are not limited to: 7 Nod Hill LLC, AAGV Limited, ACA Investment Management Limited, ACA Capital Group Limited, Ace Decade Holdings Limited, AI Group Holdings Inc., Alfa Global Ventures Limited, Alfonso Global Limited, Allied Capital Global Limited, Alpine Fiduciaries SA, Anton Development Limited, Assets Sino Limited, Auspicious Coast Limited, Beijing Pangu Investment Co., Beijing Pangu Investment Co. Ltd., Beijing Pangu Investment Inc., Beijing Zenith Holdings Company Limited, Bravo Luck Limited, BSA Strategic Fund I, China Golden Spring (Hong Kong) Limited, Chuang Xin Limited, Crane Advisory Group LLC, Creative Apex Investments Limited, Crystal Breeze Investments Limited, Dawn State Limited, Eastern Profit Corporation Limited, Elite Well Global Limited, Empire Growth Holdings, G Club Operations LLC, G Fashion LLC, G News LLC, GETTR USA, Genever Holdings Corporation, Genever Holdings LLC, GFASHION MEDIA GROUP INC., GFNY, Inc., Globalist International Limited, GNews Media Group Inc., Golden Spring (New York) Ltd., Greenwich Land LLC, Guo Media, GTV Media Group, Inc., Hamilton Capital Holdings Inc., Head Win Group Limited, Henan Yuda, Himalaya Embassy, Himalaya Exchange, Himalaya Federal Reserve, Himalaya Supervisory Organization, HK International Funds Investments (USA) Limited LLC, Hong Kong International Funds Investments Limited, Infinite Increase Limited, Infinitum Developments Limited, Insight Phoenix Fund, Lamp Capital LLC, Leading Shine Limited, Leading Shine NY Limited, Long Gate Limited, Next Tycoon Investments Limited, New

Federal State of China (a/k/a NFSC), Noble Fame Global Limited, Rosy Acme Ventures Limited, Rule of Law Foundation III, Inc., Rule of Law Foundation IV, Inc., Rule of Law Fund, Rule of Law Society, Rule of Law Society IV, Inc., G-Translators PTY LTD, Saraca Media Group, Inc., Shiny Ace Ltd., Shiny Times Holdings Ltd., Spirit Charter Investment Limited, Stevenson, Wong & Co., Voice of Guo Media, Inc., Well Origin Ltd., World Century Limited, Worldwide Opportunity Holdings Limited, Whitecroft Shore Limited, and ZIBA Limited.

8.  "Including" or any variant thereof means "including without limitation."

9.  "And" and "or" mean "and/or," and shall be construed both conjunctively as well as disjunctively in order to maximize their scope.

10.  "Any" and "all" and "each" mean "each and every."

11.  "Each" and "every" mean "each and every."

12.  "Third Party" means a Person or Entity other than Yourself.

13.  "Transfer" shall have the meaning given to it by section 101(54) of the Bankruptcy Code.

14.  "Document" means any information or thing within the scope of Fed. R. Civ. P. 34, and includes, without limitation, each and every written, recorded, or graphic matter of any kind, type, nature, or description that is or has been in Your Possession, Custody or Control, including all printed and electronic copies of electronic mail, computer files maintained in electronic form, electronic communication, text message, social media post, tweet, meta-data, correspondence, memoranda, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, telegrams, photographs, minutes, contracts, agreements, surveys, computer printouts, data

10

compilations of any kind, telexes, facsimiles, voice messages, invoices, order forms, checks, drafts, statements, credit memos, reports, position reports, summaries, indices, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, CDs, computer disks, brochures, pamphlets, punch-cards, time-slips, Tweets, social media posts, or any written or recorded materials of any other kind, and all meta-data thereof, however stored (whether in tangible or electronic form), recorded, produced, or reproduced, and also including but not limited to, drafts or copies of any of the foregoing that contain any notes, comments, or markings of any kind not found on the original documents or that are otherwise not identical to the original documents.

15. "Person(s)" means an individual, corporation, proprietorship, partnership, association, or any other Entity. "Person" also includes any agent, representatives, or expert, including but not limiting to, attorneys or financial advisors.

16. "Entity" means any natural Person, corporation, partnership, subsidiary, sole proprietorship, firm, board, joint venture, association, agency, authority, commission or other business entity or juristic Person, as well as any affiliate, agent, parent including but not limited to legal counsel, financial advisors, or any other representative.

17. "Regarding" means concerning, describing, comprising, referring to, related to, supporting, favoring, opposing, bolstering, detracting from, located in, considered in connection with, bearing on, evidencing, indicating, reporting on, recording, alluding to, responding to, connected with, commenting on, in respect of, about, in relation to, discussing, showing, describing, reflecting, analyzing constituting, and being.

18. "Relating to," "relate(s) to" or "related to," when referring to any given subject matter, means, without limitation, any document that constitutes, comprises, involves, contains,

embodies, reflects, identifies, states, refers directly or indirectly to, or is in any way relevant to the particular subject matter identified.

19.     "Communication(s)" means, in the broadest possible sense, and without limitation, any transmittal of information or knowledge (in the form of facts, ideas, inquiries, or otherwise).  Communication(s) further refers to all conversations, agreements, inquiries, or replies, whether in person, by telephone, in writing, or by means of electronic transmittal devices, and includes, but is not limited to, all correspondence, emails, recordings, transmittal slips, memoranda, telephone communications, voice messages, telegrams, telefaxes, telecopies, telexes, instant messages, chats, text messages, telephonic notes, or notes transmitted internally or with third parties.

20.     "Asset(s)" means any item that can be used to produce positive economic value, including but not limited to any resource with economic value that is owned, controlled or is for the benefit of an entity, that is expected to provide a future benefit, including but not limited to, all real and personal property, intangible property, investments, rights to invest or to future revenue, cash, bank accounts, commodities, securities, claims, total or partial control of an entity, and  prospective economic opportunities

## IV.     DOCUMENTS TO BE PRODUCED

1.     All documents regarding any income or Asset of the Debtor, the Debtor's estate, or of an Associated Entity.

2.     Documents sufficient to show all entities or Assets that the Debtor or the Debtor's Estate holds or has ever held a legal, economic, or beneficial interest in, or total or partial control of, at any time from January 1, 2011 through the present.

3.      For any Asset identified in response to Request No. 2 in which the Debtor asserts he or the Debtor's Estate no longer holds such an interest, all Documents relating to the disposition of that Asset, including but not limited to, when the Debtor relinquished his interest, to whom, for what value, and if the Debtor has had any use of or other interaction with the Asset since the moment he asserts he or the Debtor's Estate no longer retained an interest.

4.      All Documents regarding the Associated Entities, including but not limited to their corporate structure, Assets, incorporation information, officers and directors, business purpose, and relationship to the Debtor or to any member of the Debtor's Family.

5.      All Documents regarding the *Lady May*; the Sherry Netherland Hotel / Condominium; the residential property located in Greenwich, Connecticut at 373 Taconic Rd.; the residential property located in Greenwich, Connecticut at 33 Ferncliff Rd.; the residential property located in Wilton, Connecticut at 354 Nod Hill Rd.; and any financial interest that the Debtor or the Debtor's estate possesses in any Associated Entity.

6.      All Documents related to the purported Declaration of Trust and Agreement, dated February 17, 2015, entered into by the Debtor, as Trustee, Genever Holdings Corporation, and Genever Holdings LLC, in favor of Bravo Luck Limited, as beneficiary.

7.      All Documents regarding any balance sheet, bank statement, account statement, financial statement, statement of account, wire transfer instructions and/or confirmation, proof of funds, certificate of deposit, certificate of holdings, investment portfolio summary, or similar document relating to the Debtor, the Debtor's Estate, the Debtor's Family, an Associated Entity, or an Associated Individual, including without limitation all Documents sufficient to show all Transfers to any of the foregoing.

13

8.      All Documents regarding any credit cards used by You, including without limitation monthly statements or other Documents sufficient to show all purchases, payments, and other transactions related thereto.

9.      All Documents related to any investments or trading by the Debtor, the Debtor's Family, or an Associated Entity, in or around July 2020, or at any other time, in crude oil futures or any similar commodity, including without limitation Communications with Jiang Yunfu Be regarding any such investments or trading.

10.     All Communications between You and, either, the Debtor's Family, or any Associated Individual, agent, employee, or individual acting on Your behalf, related to any business transaction relating to the Debtor, the Debtor's Estate, the Debtor's Family or the Associated Entities.

11.     All communications with counsel for the Debtor's Family or the Associated Entities.

12.     All communications with Qu Guo Jiao regarding any Assets, liabilities, financial interests, economic health, financial statements of the Debtor, the Debtor's Family, or any Associated Entity.

13.     All communications with Daniel Podhaskie regarding any Assets, liabilities, financial interests, economic health, financial statements of the Debtor, the Debtor's Family, or any Associated Entity.

14.     All Documents regarding any gifts, benefits or loans, to, from or on behalf of the Debtor, the Debtor's Estate, the Debtor's Family, the Associated Entities, or the Associated Individuals, including but not limited to, the amounts of such gifts, benefits, or loans, the

purposes for which such gifts, benefits, or loans were used, when the gifts, benefits, or loans were provided, the terms of repayment for any loans, all representations and warranties made in connection with any loans, the interest rate on any loans, and all evidence of payments of any loans.

15.     All Documents concerning any trust or similar instrument set up by, on behalf of, or for the benefit of the Debtor, the Debtor's Estate, the Debtor's Family, or Associated Entities, including but not limited to Documents showing when the trust(s) was created, by whom it was created, to whose benefit it was created, and the corpus of the trust.

16.     Tax returns for the Debtor, each Individual member of the Debtor's Family, and any Associated Entity from the years 2014 to the present.

17.     All Documents related to any sale, acquisition, disposition, purchase, investment, contribution, gift, extension of credit, loan, or Transfer involving the Debtor, the Debtor's Family, or any Associated Entity.

18.     All Documents related to any obligation, claim, liability, or debt associated with any legal dispute involving the Debtor, including but not limited to those relating to any litigation before any local, state, federal, or international body, whether an administrative body, court, panel, or alternative dispute resolution entity, and those related to the action before the High Court of Justice of England and Wales, Queen's Bench Division Commercial Court, styled *Kwok Ho Wan & Ors v UBS*, Cl-2020-000345, including those related to the basis for Your claim in such action.

19.     All Documents related to that certain U.S. Securities and Exchange Commission *Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order,* Release No. 10979/September

13, 2021, entered in Administrative Proceeding File No. 3-20537, *In the Matter of GTV Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc.,* including but not limited to those regarding the sources of funds for all payments to legal counsel to the respondent-Associated Entities subject to that administrative proceeding, the sources of funds for all payments of fines, disgorgement, prejudgment interest, and/or civil penalties paid to the U.S. Securities and Exchange Commission pursuant to such order, and those regarding the manner of payment used by respondent-Associated Entities to satisfy the obligations of such order.

20.     All Documents regarding the place, property, or location the Debtor resides in or inhabits, including but not limited to the location of such place or property; when and how often the Debtor is there; who owns or controls the place or property; who funds any expenses or payments related to the place or property; any terms relating to the Debtor's use of the property; and anyone else who is authorized to use the property.

21.     All Documents regarding the Debtor's use of any Assets belonging to, controlled by, or whose complete or partial ownership is held by the Debtor's Family, an Associated Individual, or an Associated Entity.

22.     All Documents regarding any Entity that the Debtor, the Debtor's Estate, the Debtor's Family, or an Associated Entity holds any interest or investment in, including but not limited to the nature and value of that interest or investment; any proceeds or benefits from the entity that the Debtor, the Debtor's Estate, or the Associated Entity receives; and all Documents relating to any financial reporting or data relating to such Entity, including but not limited to all books and records, financial statement or tax Documents.

23.     All Documents regarding any investment or business dealing made by, with, or on behalf of the Debtor or the Debtor's Family, on the one hand, and any Associated Entity, on the other hand.

24.     All Documents regarding the "billions" of "funds and property, including real estate in Hong Kong" which were frozen in 2019 by the High Court of the Hong Kong Special Administrative Region, Court of First Instance. (*See* ECF N0. 107 at ¶17).

25.     All Documents regarding each of the Assets the Debtor claimed to own during a 2017 interview with Vice News, including but not limited to, the "two private jets," the "most advanced yachts," and the "hundreds of race cars." (*See* Vice News Interview at   6:38-7:07 (Nov. 15 2017) (when asked whether he had any regrets over how he has fought his campaign against China, the Debtor said, "I have absolutely no regrets for what I have done over the past nine months. I have the wealthy life that everyone in the world dreams about. I have the biggest house in Hong Kong, thousands of square meters. I have the most luxurious apartment in London. I have the biggest place in Beijing. I have more than 10 properties in Pangu. I have two private jets. I have the most advanced yachts. I have hundreds of race cars. I have an apartment like this in New York. I don't have any material needs anymore.")).[14]

26.     All Documents related to any income, revenue, Assets or advertisement revenue generated from the YouTube channel(s) possessed or controlled by the Debtor, the Debtor's Estate, Debtor's Family, or an Associated Entity.

27.     Documents sufficient to show the identity, name, length of employment, and salary for each and every employee of the Associated Entities.

---

[14] This quote was spoken by Debtor in Chinese and translated into English by Vice News.

17

28.     All Documents related to any aircraft owned, controlled, or used by You, including without limitation the aircraft bearing tail number T7-GQM and any other aircraft registered in the Republic of San Marino, including without limitation copies of all registration documents and flight manifests showing flights taken by such aircraft and the individuals onboard such flights.

29.     All passports or similar Documents authorizing cross-border travel issued by any sovereign state, nation, city-state, or autonomous region to You, including but not limited to any expired or unused Documents, and all pages of such passports or similar Documents.

30.     All Documents related to any pledges of Assets of any Associated Entity, including Bravo Luck Limited, to any other Entity.

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on (*date*) _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------x
                                                 :
In re:                                           :   Chapter 11
                                                 :
HO WAN KWOK,                                      :   Case No. 22-50073 (JAM)
                                                 :
                Debtor.                          :
                                                 :
-------------------------------------------------x
```

## <u>NOTICE OF OBJECTION DEADLINE</u>

Luc Despins, as the appointed Chapter 11 Trustee to the Debtor's Estate (the "<u>Applicant</u>"),

has filed an Application for Rule 2004 Examination of Ho Wan Kwok (the "<u>Rule 2004</u>

<u>Examination</u>") with the U.S. Bankruptcy Court for the District of Connecticut.  Notice is hereby

given that any objection or response to the Rule 2004 Examination must be filed with the Court

no later than August 5, 2022, in accordance with Fed. R. Bankr. P. 2002(a) and 9014 and Local

Bankr. R. 2004-1(c).[1]  In the absence of a timely filed objection, the proposed order regarding the

Rule 2004 Examination ***may*** enter without further notice and hearing, <u>see</u> 11 U.S.C. section 102(1).

Dated:     July 28, 2022                  LUC DESPINS, as appointed Chapter 11 Trustee
           New Haven, Connecticut         for HO WON KWOK

                                          By: *<u>/s/ Patrick R. Linsey</u>*
                                              Patrick R. Linsey (ct29437)
                                              NEUBERT, PEPE & MONTEITH, P.C.
                                              195 Church Street, 13th Floor
                                              New Haven, Connecticut 06510
                                              (203) 781-2847
                                              plinsey@npmlaw.com

---

[1]    Although objections to a Rule 2004 application are due seven days after filing under the Local Rules, the
       Trustee submits that a one-day extension of the objection deadline is appropriate given that some notice parties
       will not be served with the Application until Friday, July 29, 2022.

*and*

Nicholas A. Bassett *(pro hac vice* pending)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*and*

Avram E. Luft *(pro hac vice* pending)
Douglass Barron (*pro hac vice* pending)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
aviluft@paulhastings.com
douglassbarron@paulhastings.com

*Proposed counsel for the Chapter 11 Trustee*

# Exhibit 4

## [Filed Under Seal]

# Exhibit 5

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
### BRIDGEPORT DIVISION

-------------------------------------------------------x
:
In re: : Chapter 11
:
HO WAN KWOK, *et al.*,[1] : Case No. 22-50073 (JAM)
:
Debtor. : (Jointly Administered)
-------------------------------------------------------x
:
LUC A. DESPINS, Chapter 11 Trustee, : Adv. Proceeding No. 23-05017
:
Plaintiff, :
:
v. :
:
TAURUS FUND LLC, :
SCOTT BARNETT, as trustee of TAURUS :
FUND LLC, and :
TAURUS MANAGEMENT LLC, as trustee :
of TAURUS FUND LLC, :
:
Defendants. :
-------------------------------------------------------x

## MOTION OF CHAPTER 11 TRUSTEE, PURSUANT TO BANKRUPTCY RULE 9019, FOR APPROVAL OF SETTLEMENT WITH UNITED STATES OF AMERICA

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor" or "Kwok"), plaintiff in

the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby submits this

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtor is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

motion (the "Motion"),[2] pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rule 9019-1(a) of the Local Rules of Bankruptcy Procedure for

the United States Bankruptcy Court District of Connecticut (the "Local Rules"), for entry of an

order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") approving

the *Stipulation Between Chapter 11 Trustee and United States of America* (the "Settlement

Agreement"), attached as **Exhibit 1** to the Proposed Order, reached between (a) the Trustee and

(b) the United States of America (the "Government" and, together with the Trustee, the

"Parties"[3]), represented by the United States Attorney's Office for the Southern District of New

York ("USAO-SDNY").  In support of this Motion, the Trustee respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Parties have reached an agreement to resolve certain potentially complex

issues raised both in this Adversary Proceeding and in the Government's ongoing criminal case

against the Debtor currently being heard before the United States District Court for the Southern

District of New York [Case No. 23 Cr. 118 (AT)] (the "Criminal Case"), with respect to the

Debtor's Mahwah Mansion.

2.      The Mahwah Mansion has become a target for both the Trustee in the Chapter 11

Case (and related Adversary Proceeding) and the Government in the Criminal Case because,

while the Trustee seeks a ruling that the Mahwah Mansion is property of the Debtor's estate so

that it can be sold and its proceeds distributed to the Debtor's creditors, the Government alleges

---

[2]    Capitalized terms used but not defined herein shall have the meanings set forth in the Complaint of Chapter 11
       Trustee for Estate of Ho Wan Kwok Seeking, Pursuant to Bankruptcy Code Sections 541, 542, and 544, (I)
       Declaratory Judgment that Debtor Is Equitable Owner of Mahwah Mansion and that such Property Is Property
       of Estate and (II) Related Relief [Adv. Proc. Docket No. 1] (the "Complaint").
[3]    References herein to the "Parties" and the "Trustee," include the respective attorneys, advisors, and/or
       professionals of the Parties, as applicable.

2

that the Mahwah Mansion is subject to forfeiture because it was purchased with the proceeds of the Debtor's alleged criminal schemes, and that its value should be distributed to the victims of such crimes as restitution.

3.     Of course, given the nature of the Debtor's activities, there is likely significant overlap between creditors who have filed proofs of claims (to the extent they have allowed claims) against the chapter 11 estate for whom the Trustee acts as fiduciary and the victims for whom the Government seeks to provide restitution.

4.     Complicating matters even further are the different tools that the Trustee and the Government have in their respective toolkits.  The Trustee is already empowered to collect estate assets such as the Mahwah Mansion and to liquidate them for the benefit of the estate, after which the value of such assets can be distributed to holders of allowed claims pursuant to a chapter 11 plan.  In furtherance thereof, the Trustee sought, and the Court granted, the setting of a bar date for creditors to file claims.  Indeed, more than 1200 creditors have filed claims, many of which raise of the same or similar facts as the basis of their claims as were alleged in the Indictment.  The Government, on the other hand, must obtain a conviction in the Criminal Case before it can obtain a forfeiture order that would allow it to distribute proceeds from the sale of the Mahwah Mansion to victims as part of a remission/restitution process outside the Chapter 11 Case.

5.     The interaction between bankruptcy law and criminal law in a case like this can, therefore, be a source of disputes between a trustee and the Government.  Indeed, this is not the first time that these types of issues have arisen in cases where individual debtors have been prosecuted for fraud or other crimes and, on past occasions, these issues have resulted in some cases in extensive and expensive litigation between bankruptcy trustees and the Government,

something that the Trustee obviously hopes to avoid here. *See United States v. Rothstein (In re Rothstein, Rosenfeldt, Adler, P.A.)*, 717 F.3d 1205, 1206 (11th Cir. 2013) (involving protracted dispute between chapter 11 trustee and Government regarding whether funds in certain bank accounts were proceeds of criminal conduct subject to forfeiture).

6.          Despite these complexities and potential sources of controversy, the Trustee and the Government are aligned both on the need to obtain control of and liquidate the Debtor's assets as quickly and efficiently as possible and the distribution of such assets to the Debtor's "victims."[4]  With that in mind, the Trustee and the Government negotiated the Settlement Agreement, which effectuates a preliminary resolution to the issues surrounding the Mahwah Mansion.  Critically, the Settlement Agreement[5] will ensure that any proceeds from an eventual sale of the Mahwah Mansion by the Trustee (if the Trustee prevails in the Adversary Proceeding) are used first to pay the estate's expenses (including reasonable legal fees related to the Adversary Proceeding) in connection with taking control of and selling the Mahwah Mansion, so that the estate will not be out of pocket even if future discussions between the Trustee and the Government regarding the distribution of sale proceeds of the Mahwah Mansion do not lead to a favorable settlement from the point of view of the estate.  The Trustee and the Government also agreed in the Settlement Agreement that $1 million of the proceeds of the Mahwah Mansion (over and above actual expenses, including attorney's fees) will be distributed to creditors of the chapter 11 estate with allowed claims who are also victims of the Debtor in the Criminal Case. In other words, the Mahwah Mansion will (if the Trustee prevails in the Adversary Proceeding)

---

[4]    The issue of exactly what types of creditors that are holders of allowed claims are "victims" or not "victims" of the Debtor in the Criminal Case can be highly subjective, and the Trustee is hopeful that it is one of the topics that he will be able to resolve in future discussions with the Government.

[5]    To the extent of any inconsistencies between the description of the Settlement Agreement in this Motion and the terms and conditions of the Settlement Agreement, the terms of the Settlement Agreement shall control.

not only fund the Adversary Proceeding but will be the source of tangible cash distributions to creditors. The Settlement Agreement provides this guaranteed benefit to the chapter 11 estate while resolving any potential disputes between the Trustee and the Government in this Adversary Proceeding and providing that the parties will discuss distribution issues in any potential restitution/remission process at a later date, in the event the Government secures a final conviction in the Criminal Case and a forfeiture order with respect to the Mahwah Mansion.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

8.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The bases for the relief requested herein are Bankruptcy Rule 9019(a) and Local Rule 9019-1(a).

## BACKGROUND

10.     On or about March 29, 2023, pursuant to a Superseding Indictment (the "Indictment"),[6] the Government charged the Debtor, together with other defendants, with conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering (Count One); wire fraud (Counts Two, Four, Six, and Eight); securities fraud (Counts Three, Five, and Seven); money laundering (Counts Nine and Ten); and unlawful monetary transactions (Count Eleven).

---

[6]     A copy of the Indictment is attached hereto as **Exhibit B**. A previous version of the Indictment was made public on March 15, 2023 (the "Initial Indictment"). The Indictment is largely similar to the Initial Indictment except that it adds charges against the Debtor's co-defendant, Yanping Wang, a/k/a "Yvette," that were not included in the Initial Indictment, which focused on charges against the Debtor and Kin Ming Je, a/k/a "William Je."

11. The Indictment included forfeiture allegations with respect to, among other things, the Mahwah Mansion.

12. On or about June 28, 2023, the Trustee advised the Government that he had concluded, after extensive analysis, that, among other things, the Mahwah Mansion is equitably owned by the Debtor and, therefore, is property of the Debtor's chapter 11 estate. The Trustee also advised the Government of his intention to seek interim injunctive relief with respect to the Mahwah Mansion and to sell the Mahwah Mansion in the event this Court issues a ruling declaring the Mahwah Mansion to be property of the estate. The Trustee and the Government engaged in extensive good-faith discussions regarding issues related to the Mahwah Mansion and the Adversary Proceeding. As a result of these discussions, the Parties were able to successfully negotiate the Settlement Agreement. The Parties executed the Settlement Agreement on July 13, 2023.[7]

13. On July 11, 2023, the Trustee commenced the Adversary Proceeding, in which the Trustee seeks orders:

- declaring that: (a) the Debtor is the equitable owner of the Mahwah Mansion, and (b) that the Mahwah Mansion is property of the Debtor's chapter 11 estate to be administered by the Trustee; and (2) ordering Taurus Fund (and/or Scott Barnett and Taurus Management, as trustees of Taurus Fund) to turn over the Mahwah Mansion or its value and the fixtures and personal property in the Mahwah Mansion to the Trustee;

- declaring that: (a) at all times the Debtor is the equitable owner of Taurus Fund; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the

---

[7] The descriptions in this Motion of the events leading to the execution of the Settlement Agreement or factors considered in the context of such settlement are solely those of the Trustee and do not purport to represent the Government's views.

turnover of Taurus Fund and any and all of Taurus Fund's assets to the Trustee; and

- declaring that: (a) at all times Taurus Fund was an alter ego of the Debtor; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of Taurus Fund's assets to the Trustee.

## SETTLEMENT

14. The Parties have engaged in extensive good faith discussions with respect to the Mahwah Mansion. As a result of these discussions, the Parties reached the Settlement Agreement in order to resolve complex issues related to the Mahwah Mansion. The key provisions of the Settlement Agreement are as follows:

   a. **Government Will Not Oppose Trustee in Adversary Proceeding:** Under the Settlement Agreement, the Government has agreed not to oppose any of the Trustee's claims or requests for relief in the Adversary Proceeding, or any effort by the Trustee to obtain control of and/or sell the Mahwah Mansion. *See* Settlement Agreement ¶ 1.

   b. **Use of Mahwah Mansion Proceeds to Pay Estate Expenses:** Under the Settlement Agreement, the costs of taking control of and selling the Mahwah Mansion, including Paul Hastings' legal fees, as well as $1 million to be used for the payment of holders of allowed claims in the Chapter 11 Case that are victims of the Debtor, will be paid first from the proceeds of the sale of Mahwah Mansion. The Settlement Agreement thus guarantees that the Adversary Proceeding will benefit the estate, even if none of the net proceeds from the sale of the Mahwah Mansion end up being distributed to holders of allowed claims in the Chapter 11 Case as part of the Government's contemplated restitution and remission process, essentially guaranteeing that some portion of the value of the Mahwah Mansion will go to estate creditors, and eliminating the possibility that the estate could pay the cost of obtaining control of and selling the Mahwah Mansion but see all the value thereof made part of the Criminal Case and its forfeiture process. *See* Settlement Agreement ¶ 3.

   c. **Escrow of Net Proceeds of Sale of Mahwah Mansion:** Under the Settlement Agreement, only the net proceeds of the sale of the Mahwah Mansion (after payment of the estate's expenses, described in paragraph 3 of the Settlement Agreement, and $1 million to be used for the payment of holders of allowed

7

claims in the Chapter 11 Case) will be held in escrow pending the resolution of the Criminal Case and its forfeiture process. *See* Settlement Agreement ¶ 2.[8]

d. **Post-Forfeiture Negotiations Regarding Distribution of Net Proceeds:** The Settlement Agreement provides for future discussions between the Trustee and the Government regarding the distribution of net proceeds from the sale of the Mahwah Mansion if an order of forfeiture is entered in the Criminal Case, allowing the Parties to address those issues and any potential disputes about those issues later, consistent with the goal of the Parties to not have these issues become a source of contention in connection with this Adversary Proceeding. The Trustee's intention to seek to handle distributions to victims is based on precedent from past cases where bankruptcy trustees negotiated agreements with the Government to exercise such a role.[9] *See* Settlement Agreement ¶ 4.

e. **Reservation of Rights**: Consistent with the goal of the Parties to address other distribution issues later, in the event of a final conviction and forfeiture order, the Parties have reserved their rights with respect to issues related to the distribution of the net proceeds from the disposition of the Mahwah Mansion, in the event the Trustee's discussions with the Government do not lead to a settlement. *See* Settlement Agreement ¶ 5.

## RELIEF REQUESTED

15.     By this Motion, the Plaintiffs seek entry of an order pursuant to Bankruptcy Rule 9019(a) approving the Settlement Agreement in its entirety and authorizing the Parties to enter into and implement the Settlement Agreement in accordance with the terms thereof.

## BASIS FOR THE RELIEF REQUESTED

### I.    Standard for Approving the Settlement Agreement

16.     To approve a compromise and settlement under Bankruptcy Rule 9019, a bankruptcy court should find that the compromise and settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate. *See, e.g.*, *Air Line Pilots Ass'n, Int'l v.*

---

[8]     The escrow requirement will no longer apply, in the event of a final acquittal of the Debtor or his co-defendants, in which case the Government would be unable to initiate a restitution/remission process for crime victims; and the remaining proceeds funds would then be available for distribution by the Trustee in connection with the Chapter 11 Case.

[9]     *See e.g. Order Authorizing James Berman, Trustee, to Serve as Temporary Receiver for the United States of America*, *In re Goldberg*, Case No. 09-23370 (ASD) (Bankr. D. Conn. 2011), [Docket No. 424].

*Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.),* 156 B.R. 414, 426 (S.D.N.Y. 1993.), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citations omitted); *In re Enron Corp.,* No. 02 Civ. 8489(AKH), 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003). The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).

17.    Importantly, the "settlement need not be the best that the debtor could have obtained." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (citing *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979)). Instead, the court needs only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Id.* (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)). In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following factors:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay" . . . ; (3) the "paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007) (citation omitted) ("*Iridium*").

## II.     **Settlement Agreement Should Be Approved**

18.     The Settlement Agreement is an excellent outcome for the chapter 11 estate and, by extension, the creditors of the Debtor's estate, and it is a fair and reasonable compromise under the circumstances and in light of the applicable *Iridium* factors.

19.     The benefits to the estate from the Settlement Agreement are significant. Critically, the Settlement Agreement will ensure that any proceeds from an eventual sale of the Mahwah Mansion by the Trustee (if the Trustee prevails in the Adversary Proceeding) are used first to pay the estate's expenses (including legal fees related to the Adversary Proceeding) in connection with taking control of and selling the Mahwah Mansion, so that the estate will not be out of pocket even if future discussions between the Trustee and the Government regarding the distribution of sale proceeds of the Mahwah Mansion do not lead to a favorable settlement from the point of view of the estate.  The Trustee and the Government also agreed in the Settlement Agreement that $1 million of the proceeds of the Mahwah Mansion (over and above actual expenses, including attorney's fees) will be distributed to creditors of the chapter 11 estate with allowed claims who are also victims of the Debtor.  In other words, the Mahwah Mansion will (if the Trustee prevails in the Adversary Proceeding) not only fund the Adversary Proceeding but will be the source of tangible cash distributions to creditors.

20.     In addition, the Settlement Agreement, among other things, ensures that the Adversary Proceeding will not be delayed by any disputes between the Trustee and the Government, pushing back any thorny issues regarding how funds are distributed in a restitution/remission process to the future, to be discussed by the Parties in the event of a final conviction and order of forfeiture (as is appropriate given that trial in the Criminal Case is

10

presently scheduled to begin on April 8, 2024, at it is therefore unknown at this time whether the Debtor or his co-defendants will be convicted).

21.     The Settlement Agreement easily meets all the relevant *Iridium* factors, providing significant immediate and future benefits to the estate and its creditors, in particular, by ensuring that the estate will benefit from any sale by the Trustee of the Mahwah Mansion and eliminating the possibility of any disputes between the Parties in the context of the Adversary Proceeding. The Settlement Agreement was reached between the Trustee and the Government, with each side assisted by experienced counsel and negotiating at arms' length.

22.     Put simply, the Settlement Agreement is a positive development for the chapter 11 estate, and the Trustee believes the Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved.

## NOTICE

23.     Notice of this Motion will be given to (i) the United States Trustee; (ii) the Debtor; (iii) the official committee of unsecured creditors; (iv) the Defendants; (v) by electronic filing utilizing the Court's electronic filing ("CM/ECF") system, to all appearing parties who utilize the CM/ECF system; and (vi) any party who requested notice in these chapter 11 cases, but is unable to accept electronic filing as indicated on the Notice of Electronic Filing.  The Trustee submits that, under the circumstances, no other or further notice is required.

## NO PREVIOUS REQUEST

24.     No previous request for the relief sought herein has been made by the Trustee to this or any other court.

[*Remainder of page intentionally left blank.*]

11

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests entry of the

Proposed Order granting the relief requested in the Motion and such other relief as is just and

proper.

Dated:    August 14, 2023                    LUC A. DESPINS,
          New Haven, Connecticut             CHAPTER 11 TRUSTEE

                                             By: /s/ Douglass Barron
                                                 Avram E. Luft (admitted *pro hac vice*)
                                                 Douglass Barron (admitted *pro hac vice*)
                                                 PAUL HASTINGS LLP
                                                 200 Park Avenue
                                                 New York, New York 10166
                                                 (212) 318-6079
                                                 aviluft@paulhastings.com
                                                 douglassbarron@paulhastings.com

                                                     *and*

                                                 Nicholas A. Bassett (admitted *pro hac vice*)
                                                 PAUL HASTINGS LLP
                                                 2050 M Street NW
                                                 Washington, D.C., 20036
                                                 (202) 551-1902
                                                 nicholasbassett@paulhastings.com

                                                     *and*

                                                 Patrick R. Linsey (ct29437)
                                                 NEUBERT, PEPE & MONTEITH, P.C.
                                                 195 Church Street, 13th Floor
                                                 New Haven, Connecticut 06510
                                                 (203) 781-2847
                                                 plinsey@npmlaw.com

                                                 *Counsel for the Chapter 11 Trustee*

12

# EXHIBIT A

## Proposed Order

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

---------------------------------------------------x
:
In re:                                             :        Chapter 11
                                                   :
HO WAN KWOK, *et al.*,[1]                          :        Case No. 22-50073 (JAM)
                                                   :
            Debtor.                                :        (Jointly Administered)
---------------------------------------------------x
                                                   :
LUC A. DESPINS, Chapter 11 Trustee,                :        Adv. Proceeding No. 23-05017
                                                   :
            Plaintiff,                             :
                                                   :
v.                                                 :
                                                   :
TAURUS FUND LLC,                                   :
SCOTT BARNETT, as trustee of TAURUS                :
FUND LLC, and                                      :
TAURUS MANAGEMENT LLC, as trustee                  :
of TAURUS FUND LLC,                                :
                                                   :
            Defendants.                            :
---------------------------------------------------x

## [PROPOSED] ORDER APPROVING, PURSUANT TO BANKRUPTCY RULE 9019, MOTION OF CHAPTER 11 TRUSTEE REGARDING SETTLEMENT WITH UNITED STATES OF AMERICA

Upon the Motion,[2] of Luc A. Despins, in his capacity as the Chapter 11 Trustee (the

"Trustee") appointed in the above-captioned chapter 11 case (the "Chapter 11 Case") of Ho Wan

Kwok (the "Debtor"), for entry of an order, approving a settlement agreement between the

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtor is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    Capitalized terms used but not defined in this Order have the meanings set forth in the Motion.

Trustee and the Government, as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334; and this matter is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2); and due and sufficient notice having been given under the particular circumstances

and it appears that no other or further notice need be provided; and the relief requested being a

reasonable exercise of the Trustee's business judgment consistent with his duties and in the best

interests of the Debtor's estate and creditors; and after due deliberation and sufficient cause

appearing therefor, it is **ORDERED THAT**:

1. The Motion is GRANTED.

2. All objections to the Motion, if any, that have not been withdrawn, waived or
settled, and all reservations of rights included therein, are overruled.

3. The settlement agreement, attached as **Exhibit 1** hereto (the "Settlement
Agreement"), is approved pursuant to Bankruptcy Rule 9019.

4. The Trustee is authorized, pursuant to Bankruptcy Rule 9019, to execute, deliver,
implement, and fully perform any and all obligations, instruments, documents and papers and to
take any and all actions reasonably necessary or appropriate to consummate the settlement
reflected in the Settlement Agreement and to perform any and all obligations contemplated
therein immediately upon entry of this Order.

5. This Order shall be effective and enforceable immediately upon entry pursuant to
Bankruptcy Rule 6004(h), and the Trustee shall have unfettered use of the Settlement Payment
when received.

6. This Court shall retain jurisdiction to hear and determine all matters arising from
or related to this Order and to the Settlement Agreement.

2

# **EXHIBIT 1**

## **Settlement Agreement**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      :

   -v.-                      :

                             S1 23 Cr. 118 (AT)

HO WAN KWOK,           :
   a/k/a "Miles Guo,"
   a/k/a "Miles Kwok,"    :
   a/k/a "Guo Wengui,"
   a/k/a "Brother Seven,"   :
   a/k/a "The Principal,"

                          :

          Defendant.   :

                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

--------------------------------------------------x
                          :

In re:                  :    Chapter 11
                          :
HO WAN KWOK, *et al.*,[1]    :    Case No. 22-50073 (JAM)
                          :
         Debtors.      :    (Jointly Administered)
                          :
--------------------------------------------------x

---

1   The Debtors in the chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles
Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification
number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202)
and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings
LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New
York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for
purposes of notices and communications).

## STIPULATION BETWEEN CHAPTER 11 TRUSTEE AND UNITED STATES OF AMERICA

WHEREAS, on or about March 29, 2023, Ho Wan Kwok, a debtor in the above-captioned chapter 11 cases (the "Defendant"), was charged, together with other defendants, by the United States of America (the "Government"), represented by the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), before the United States District Court for the Southern District of New York (the "District Court"), in eleven counts of a twelve-count Superseding Indictment, S1 23 Cr. 118 (AT) (the "Indictment"), with conspiracy to commit wire fraud, securities fraud, bank fraud and money laundering, in violation of Title 18, United States Code, Section 371 (Count One); wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts Two, Four, Six, and Eight); securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.1 0b-5 (Counts Three, Five, and Seven); money laundering, in violation of Title 18, United States Code, Section 1956(a)(2) (Counts Nine and Ten); and unlawful monetary transactions, in violation of Title 18, United States Code, Section 1957 (Count Eleven);

WHEREAS, the Indictment included a forfeiture allegation as to Counts One through Eight of the Indictment, seeking forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts One through Eight of the Indictment, including but not limited to, the following property:

> All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and

2

easements, located at 675 Ramapo Valley Road, Mahwah, New
Jersey 07430, Parcel No. 3300021-03-00001-02 and described as
Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality,
Township: MAHWAH TWP

(the "Subject Property");

WHEREAS, on or about February 15, 2022, the Defendant filed for Chapter 11

bankruptcy, *In Re Ho Wan Kwok and Genever Holdings LLC*, 22-50073 (JAM) (Bankr. Conn.)

(the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Connecticut

(the "Bankruptcy Court");

WHEREAS, on or about June 15, 2022, the Bankruptcy Court directed the

appointment of a Chapter 11 bankruptcy trustee and thereafter Luc A. Despins, Esq. was appointed

as the trustee for the Bankruptcy Case (the "Trustee");

WHEREAS, on or about June 28, 2023, the Trustee advised the Government that

he had concluded, after extensive analysis, that, among other things, the Subject Property is

equitably owned by the Defendant and, therefore, is property of the Defendant's chapter 11 estate;

WHEREAS, the Trustee is prepared to commence an adversary proceeding before

the Bankruptcy Court, *Despins v. Taurus Fund* (the "Adversary Proceeding"), seeking, among

other things:

(1) an order from the Bankruptcy Court (a) declaring that the
Defendant is the equitable owner of the Subject Property and that
the Subject Property is property of the Defendant's chapter 11 estate
to be administered by the Trustee and (b) ordering the turnover of
the Subject Property to the Trustee;

(2) an order from the Bankruptcy Court (a) declaring that (i) at all
times the Defendant was the equitable owner of the entity that holds
title to the Subject Property, Taurus Fund LLC ("Taurus Fund");
(ii) any and all assets held by Taurus Fund, including the Subject

3

Property, are property of the Defendant's chapter 11 estate; and (b) ordering the turnover of Taurus Fund and any and all of Taurus Fund's assets, including the Subject Property, to the Trustee;

(3) an order from the Bankruptcy Court (a) declaring that (i) at all times Taurus Fund was an alter ego of the Defendant; (ii) any and all assets held by Taurus Fund, including the Subject Property, constitute property of the Defendant's chapter 11 estate; and (b) ordering the turnover of any and all of Taurus Fund's assets to the Trustee;

WHEREAS, upon entry of any of the orders listed in subparagraphs (1)-(3) above by the Bankruptcy Court, the Subject Property would be deemed to be an asset held directly or indirectly by the Defendant's chapter 11 estate;

WHEREAS, the Trustee will also seek, in the context of the Adversary Proceeding, interim relief from the Bankruptcy Court to obtain control over the Subject Property (the "Interim Relief") pending a definitive ruling by the Bankruptcy Court with respect to the claims asserted by the Trustee in the Adversary Proceeding;

WHEREAS, the Trustee intends, in the event the Bankruptcy Court issues a ruling pursuant to which the Subject Property is deemed to be an asset held directly or indirectly by the Defendant's chapter 11 estate, to sell the Subject Property; and

WHEREAS, the Government has agreed not to oppose the relief to be sought by the Trustee in the Adversary Proceeding, or any effort by the Trustee to obtain control of and/or sell the Subject Property;

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between United States of America, by its attorney Damian Williams, United States Attorney,

Juliana Murray, Micah Fergenson, and Ryan Finkel, of counsel, and the Trustee and his counsel, Paul Hastings LLP, that:

1.      The Government shall not oppose any of the Trustee's claims or requests for relief in the Adversary Proceeding, or any effort by the Trustee to obtain control of and/or sell the Subject Property;

2.      In the event the Subject Property is sold pursuant to an order entered in the Bankruptcy Case, the Trustee agrees that the net proceeds from the sale of the Subject Property shall be held in escrow pending the resolution of this criminal matter and will serve as a substitute *res* for the Subject Property (the "Substitute *Res*") in the above-captioned criminal case, with all claims and defenses of the Government applicable to the Subject Property, including any other action that may be brought by the Government for forfeiture of the Subject Property, to apply instead to, and be payable only from, the Substitute *Res*.  Further, any claims or interests attached to or secured by the Subject Property shall be transferred to the Substitute *Res* and be satisfied, if at all, only from the Substitute *Res*.  In the event that the Defendant is acquitted pursuant to a final order, or the entry of a forfeiture order is denied pursuant to a final order, the escrow requirement contained in this paragraph shall become automatically null and void.

3.      The net proceeds from the sale of the Subject Property will include all moneys realized from the sale of the Subject Property, except for the following which will be deducted from the sale proceeds: any costs of seizure, maintenance, marketing and sale of the Subject Property, including legal fees of Paul Hastings incurred in the Adversary Proceeding or as a consequence of the Adversary Proceeding, and expenses to ensure safekeeping and custody of the Subject Property (including security service at or around the premises), storage, or sale of the

5

Subject Property, all as allowed by the Bankruptcy Court; any outstanding mortgages; real estate commissions and/or fees; any other real estate, property, transfer, association or other tax, which is due and owing at the time of the sale; insurance costs; escrow fees; title fees and county transfer fees; as well as a deemed expense of $1,000,000, which shall be used to satisfy claims of holders of allowed claims in the Bankruptcy Case that are victims of the Debtor.

4.      In the event of the entry of an order of forfeiture in this criminal matter that includes the Subject Property, the Trustee and the Government shall negotiate in good faith with respect to the distribution of the net proceeds from the sale of the Subject Property to victims of the conduct charged in the Indictment (who may be holders of allowed claims in the Bankruptcy Case) and to holders of allowed claims in the Bankruptcy Case. At present, the USAO-SDNY anticipates requesting from the Department of Justice's Money Laundering and Asset Recovery Section that any assets forfeited in this criminal matter be distributed to victims of the conduct charged in the Indictment through the remission/restoration process. The Trustee intends to seek the Government's consent, as part of any such remission/restoration process, to handle the distribution of net proceeds from the Subject Property to victims (who may be holders of allowed claims in the Bankruptcy Case) and holders of allowed claims in the Bankruptcy Case, as determined and allowed by the Bankruptcy Court, and the Government has explained that it is not in a position, at this time, to consent to such proposal, absent the obtaining of certain regulatory approvals which may not be obtained at this time.

5.      In the event the Government and the Trustee do not reach an agreement with respect to the distribution of the net proceeds from the sale of the Subject Property, all rights of the Government and the Trustee are reserved.

6.  In furtherance of a sale of the Subject Property, the Government agrees to execute promptly any documents which may be required to convey clear title to the Subject Property and complete the sale of the Subject Property.

7.  Each party to this Stipulation shall bear its own costs and attorney's fees.

8.  This Stipulation may be executed in counterparts, each of which shall be deemed an original, and all of which, when taken together, shall be deemed the complete Stipulation.  PDF copies shall be treated as originals.


*[Remainder of page intentionally left blank.]*

Dated:  New York, New York
       July 13, 2023


STIPULATED TO:

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
United States of America

By:      _____          7/13/2023
         JULIANA MURRAY              Date
         MICAH FERGENSON
         RYAN FINKEL
         Assistant United States Attorneys
         One Saint Andrews Plaza
         New York, New York 10007
         (212) 637-2314/2190/6612

CHAPTER 11 BANKRUPTCY TRUSTEE

By:      _____         7/13/23
         LUC A. DESPINS, ESQ.        Date
         Trustee

By:      _____         7/13/23
         DOUGLASS E. BARRON , ESQ.   Date
         PAUL HASTINGS LLP
         Attorney for the Trustee

8

**EXHIBIT B**

**Superseding Indictment**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL[1]

UNITED STATES OF AMERICA

v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"

KIN MING JE,
    a/k/a "William Je," and

YANPING WANG,
    a/k/a "Yvette,"

           Defendants.

**INDICTMENT**

S1 23 Cr. 118 (AT)

## COUNT ONE
### (Conspiracy to Commit Wire Fraud, Securities Fraud, Bank Fraud, and Money Laundering)

The Grand Jury charges:

### Overview

1.    From at least in or about 2018 through at least in or about March 2023, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, conspired to defraud thousands of victims of more than approximately $1 billion, including victims located in the Southern District of New York. KWOK, JE, WANG, and their co-conspirators operated through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated

entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds.

2.  HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, took advantage of KWOK's prolific online presence and hundreds of thousands of online followers to solicit investments in various entities and programs by promising outsized financial returns and other benefits.  The entities and programs used in the scheme included those known as GTV, G|CLUBS, G|MUSIC, G|Fashion, and the Himalaya Exchange, among others.  In truth and in fact, and as KWOK, JE, and WANG well knew, the entities were instrumentalities that KWOK, JE, and WANG created and used to perpetrate their fraud and exploit KWOK's followers.  The scheme allowed KWOK, JE, and WANG to enrich themselves, their family members, and their co-conspirators, and to fund KWOK's extravagant lifestyle.

3.  As part of the scheme, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, laundered hundreds of millions of dollars of fraud proceeds.  To conceal the illegal source of the funds, KWOK, JE, and WANG transferred, and directed the transfer of, money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals. Hundreds of millions of dollars of the fraudulent scheme's proceeds were transferred, either directly or indirectly, to bank accounts in the United States, Bahamas, and United Arab Emirates ("UAE"), among other places, and held in the name of companies owned or otherwise controlled by JE.

2

4.     HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, used more than approximately $300 million of the fraudulent scheme's proceeds for their and their families' benefit. For example, KWOK used fraudulently-obtained victim money to purchase, fund, or finance a $26.5 million purchase of an approximately 50,000-square-foot mansion in New Jersey for KWOK and his family; luxury vehicles, including an approximately $3.5 million Ferrari for one of KWOK's close family members ("Relative-1"); an approximately $37 million luxury yacht that was used by KWOK and his family and purchased in the name of one of KWOK's close family members ("Relative-2"); a piano valued at approximately $140,000; an approximately $36,000 mattress; and a $100 million investment in a high-risk hedge fund for the ultimate benefit of Relative-1, among other things. For his part, among other things, JE transferred at least $10 million of the fraud proceeds into his and his spouse's personal bank accounts.

5.     HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, operated the scheme for years, and continued to do so at least through at least March 2023. They did so, among other things, by continually adapting the scheme's means and methods to evade the enforcement of investor-protection, anti-money laundering, and bankruptcy laws in the United States, and by retaliating against individual victims who complained or demanded the return of invested funds.

**Relevant Persons and Entities**

6.  At all relevant times, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, was the leader of, and directed, the scheme.

a.  KWOK is an exiled Chinese businessman who fled to the United States in or about 2015 and purchased a penthouse apartment at a New York City hotel for approximately $67.5 million. Starting at least in or about 2017, KWOK, who then purported to be a billionaire, garnered a substantial online following. KWOK granted numerous media interviews and posted on social media, claiming to advance a movement against the Chinese Communist Party.

b.  In or about 2018, KWOK founded two purported nonprofit organizations, namely, the Rule of Law Foundation and the Rule of Law Society. The Rule of Law Society's website lists KWOK as its "founder, a promot[e]r, and a spokesperson." Both organizations feature photographs of KWOK on their websites. KWOK used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe KWOK's statements regarding investment and money-making opportunities. In truth and in fact, and as KWOK well knew, he and others provided false and materially misleading information to promote these "opportunities" and to defraud KWOK's followers and other victims.

7.  At all relevant times, KIN MING JE, a/k/a "William Je," the defendant, was a dual citizen of Hong Kong and the United Kingdom who principally resided in the United Kingdom, while traveling to the United States and elsewhere. JE owned and operated numerous companies and investment vehicles central to the scheme and served as its financial architect and key money launderer.

4

8.     At all relevant times, YANPING WANG, a/k/a "Yvette," the defendant, was a citizen of China who principally resided in New York, New York and has had a close relationship with HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant.   In particular, WANG has worked for KWOK and KWOK's family for several years, since at least in or about 2018, and has operated as a "chief of staff" for KWOK.   In that capacity, WANG has held titles in a variety of entities that were instrumentalities of the fraud described herein.   For example, WANG has served as the President, Treasurer, and Secretary of entities that purportedly managed KWOK's money.

9.     At certain times relevant to this Indictment, Saraca Media Group, Inc. ("Saraca") was a corporation based in New York, New York.   Relative-1 was its ultimate beneficial owner.

10.     At certain times relevant to this Indictment, GTV Media Group, Inc. ("GTV") was a purported news-focused social media platform based in New York, New York.   GTV was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at GTV.   KIN MING JE, a/k/a "William Je," the defendant, likewise held no formal position or title at GTV, but in fact exercised control over its finances. Saraca was the parent company of GTV.   YANPING WANG, a/k/a "Yvette," the defendant, was an "Executive Director" of GTV.

11.     At certain times relevant to this Indictment, G Club Operations, LLC ("G|CLUBS") was a purported membership organization based in Puerto Rico and in New York, New York. G|CLUBS was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at G|CLUBS.   KIN MING JE, a/k/a "William Je,"

5

the defendant, likewise held no formal position or title at G|CLUBS, but in fact exercised control over its finances. .

12.     At certain times relevant to this Indictment, the "Himalaya Exchange" was a purported cryptocurrency "ecosystem" that KIN MING JE, a/k/a "William Je," the defendant, founded and operated through various entities he owned, which were based abroad. Entities functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, such as G|CLUBS and G|Fashion, had purported business relationships with the Himalaya Exchange. KWOK promoted the Himalaya Exchange and claimed to be the designer of its purported cryptocurrency, although KWOK held no formal position or title at the Himalaya Exchange.

### The Fraud

#### *The GTV Private Placement*

13.     Between in or about April 2020 and in or about June 2020, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, fraudulently obtained more than $400 million in victim funds through an illegal private stock offering related to GTV (the "GTV Private Placement").

a.     On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV common stock via a private placement. In that video, KWOK described, in substance and in part, the investment terms for the GTV Private Placement, and directed people to contact him, via a mobile messaging application, with any questions about the GTV Private Placement. The video and GTV Private Placement

materials—including the written "Confidential Information Memorandum" (the "PPM"), Subscription Agreement, and Investment Procedure Guidelines—were transmitted to thousands of potential investors, including those in the Southern District of New York, via mobile messaging applications, social media, and text messages.

b. The PPM promoted GTV as the "first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication."

c. According to the PPM's metadata, JE was the "author" of the PPM. The PPM disclosed the terms of the GTV Private Placement and identified KWOK as GTV's "Sponsor and Adviser." According to the PPM, among other GTV materials, neither KWOK nor JE held any formal management position with GTV. YANPING WANG, a/k/a "Yvette," the defendant, was identified in the PPM as an "Executive Director" of GTV.

d. The PPM also contained the following representations, in substance and in part, among others:

i. The GTV Private Placement was for investors who were "interested in evaluating an opportunity to invest capital into GTV;"

ii. GTV planned to use the proceeds raised from the GTV Private Placement "to expand and strengthen the business;" and

iii. The PPM included a chart itemizing the "contemplated use of proceeds" raised from the GTV Private Placement:

| Description | Percentage of Proceeds |
|---|---|
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

e. Between on or about April 20, 2020 and on or about June 2, 2020, approximately $452 million worth of GTV common stock was purportedly sold to more than 5,500 investors located in the United States, including in the Southern District of New York, and abroad. Investors participated in the GTV Private Placement based, in part, on the belief that their money would be invested into GTV to develop and grow that business, as the PPM promised.

f. The vast majority of the proceeds derived from investors in the GTV Private Placement were not used to develop and grow the GTV business, but instead were deposited directly into bank accounts held in the name of Saraca, GTV's parent company, which is beneficially owned by Relative-1.

g. The GTV Private Placement was not made pursuant to a registration statement filed with the U.S. Securities and Exchange Commission ("SEC"). Rather, the offering was purportedly made pursuant to SEC regulations that permit the sale of unregistered securities subject to limitations on the type of investors to whom the securities are offered and the manner in which their investments may be solicited. To evade these limitations, however, KWOK, and others

under his control, used at least one intermediary entity to purchase GTV stock on behalf of pools of investors who did not qualify to participate in the GTV Private Placement.

h.  In or about early June 2020, and only days after the GTV Private Placement closed, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and their co-conspirators, misappropriated approximately $100 million raised from investors in the GTV Private Placement and directed that those funds be placed with a high-risk hedge fund ("Fund-1") for the benefit of Saraca and its ultimate beneficial owner, Relative-1.  This transaction was contrary to the PPM's representations to prospective GTV investors about how investments in GTV would be used.  Indeed, the $100 million investment into Fund-1 was not made for the benefit of GTV, but rather for the benefit of Saraca.  The victims who supplied the $100 million invested into Fund-1 did not own any shares of Saraca.  Ultimately, the investment into Fund-1 lost approximately $30 million in value.

i.  After directing $100 million of GTV victim funds into Fund-1, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, continued to promote GTV using false and misleading representations.

*The Farm Loan Program*

14.  Beginning in or about June 2020—the same month that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators misappropriated money from the GTV Private Placement for the benefit of Saraca and Relative-1—KWOK, JE, and their co-conspirators fraudulently obtained more than approximately

9

$150 million in victim funds through the "Himalaya Farm Alliance." The Himalaya Farm Alliance, which KWOK organized and promoted, was a collective of informal groups (each known as a "Farm") located in various cities around the world. KWOK, JE, and others working on their behalf and at their direction, obtained these funds by making further misrepresentations to the investors in the GTV Private Placement and fraudulently soliciting further investments, this time in the form of "loans" to a Farm, and promising that such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned (the "Farm Loan Program").

a. Starting in or about June 2020, domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV-associated bank accounts because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced an unregistered stock offering.

b. These bank account closures frustrated the ability of KWOK, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV.

c. On or about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program. According to KWOK and those working on his behalf, individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program.

d. After launching the Farm Loan Program, KWOK continued to promote GTV and to falsely represent the value of GTV. For example, on or about August 2, 2020, in a video distributed via social media, KWOK falsely stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."[1] In truth and in fact, and as KWOK well knew, GTV's market value was far less because, among other things, GTV was a new business that generated no revenue.

---

[1] All statements attributed herein to KWOK have been translated from Mandarin to English, unless otherwise noted.

10

e. Thousands of victims "loaned" money to the Farms by sending money to bank accounts controlled by the Farms (and not GTV). According to the "Loan Agreements," which the Farms frequently did not countersign, these funds were to be used for a Farm's "general working capital purposes."

f. KWOK and JE misappropriated funds that were raised through the Farm Loan Program. For example:

i. Approximately $20 million was transferred to Relative-1, approximately $950,000 of which was used to pay for flight crew services on a private jet;

ii. Approximately $5 million was transferred to an entity owned by KWOK's spouse;

iii. Approximately $2.3 million was used to cover maintenance expenses associated with an approximately 145-foot luxury yacht worth approximately $37 million, nominally owned by Relative-2 and used by KWOK; and

iv. Approximately $10 million was transferred to personal bank accounts in the name of JE and/or JE's spouse.

### *G|CLUBS*

15.     While making misrepresentations regarding the Farm Loan Program, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, fraudulently induced KWOK's followers to transfer additional funds to a purported online membership club called G|CLUBS. From at least in or about October 2020 through at least

11

in or about March 2023, KWOK, JE, and others known and unknown, fraudulently obtained more than approximately $250 million in victim funds through G|CLUBS.

   a. Starting at least on or about June 20, 2020, in a video distributed via social media, KWOK promoted and encouraged individuals to purchase what KWOK referred to as a "G Club . . . membership card."

   b. Formally launched in or about October 2020, G|CLUBS claimed, on its website, to be "an exclusive, high-end membership program offering a full spectrum of services" and "a gateway to carefully curated world-class products, services and experiences."

   c. To join G|CLUBS, a member was required to make a one-time payment to purchase a "membership," in addition to an annual membership fee. The cost of the membership varied based on the membership tier selected by the prospective member: Tier 5 Membership cost $50,000; Tier 4 Membership cost $40,000; Tier 3 Membership cost $30,000; Tier 2 Membership cost $20,000; and Tier 1 Membership cost $10,000.

   d. On or about July 5, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that there were "25,000 [G|CLUBS] member[s] . . . $100 million dollars, the cash [in] the bank account. Then we have the 111 million . . . [who] want to join." By contrast, G|CLUBS internal documents reflected approximately 5,900 active members as of in or about August 2021.

   e. In truth and in fact, and as KWOK and JE well knew, G|CLUBS provided nothing close to "a full spectrum of services" and "experiences" to its members. Despite collecting hundreds of millions of dollars in purported membership fees, G|CLUBS maintained a relatively small number of employees and provided its members few to no discernable membership benefits. Indeed, G|CLUBS did not even make good on prizes it offered members for participating in

contests. On or about February 14, 2021, G|CLUBS held a webcast and sweepstakes during which members were promised luxury prizes. On at least one occasion, instead of providing a BMW to a member who purportedly won a sweepstakes, G|CLUBS claimed to the member that the member had requested that the value of the BMW be applied toward an upgrade from a Tier 1 G|CLUBS Membership to a Tier 4 G|CLUBS Membership and partially credited toward annual membership fees for the next three years. As of on or about March 8, 2021—months after G|CLUBS launched and began to collect "membership" fees—G|CLUBS did not have a business plan or a board of directors.

f. KWOK and JE also used G|CLUBS as a mechanism to continue fraudulent private placement offerings. KWOK, and others known and unknown, told KWOK's online followers that their purchase of G|CLUBS memberships would entitle them to stock in KWOK-affiliated entities, such as GTV and G|Fashion.

i. In a conversation regarding G|CLUBS membership funds on or about May 4, 2021, JE stated, in substance and in part, that "first of all, [prospective members] are buying the G|CLUBS membership, but they are expecting they would probably receive some shares, you know, on, on, on the future GTV, I think this is their expectation."

ii. On or about July 30, 2021, KWOK stated in a video distributed via social media, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%. Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both."

13

g. KWOK, JE, and others known and unknown, asked investors to purchase multiple memberships in G|CLUBS, enabling KWOK and JE to increase the amount of money solicited. In this regard, the G|CLUBS website stated, in substance and in part, that members with multiple memberships would "receive additional benefits" when, in truth and in fact, and as KWOK and JE well knew, multiple memberships did not provide members with additional benefits.

16. All told, investors purchased hundreds of millions of dollars' worth of G|CLUBS memberships. However, most of this money did not fund the business of G|CLUBS. Rather, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, misappropriated a substantial portion of the funds victims had paid G|CLUBS for "memberships," using, among other things, a complex web of entities and bank accounts to do so. For example:

a. G|CLUBS funds, which had been funneled through bank accounts in other entities' names, were used to pay personal expenses for KWOK and his family, including luxury purchases of an approximately $2.6 million yacht and luxury automobiles that together cost more than $5 million.

b. In or about November 2021, JE directed approximately $26.5 million of G|CLUBS funds, which had been funneled through bank accounts in other entities' names, toward the purchase of KWOK's 50,000 square foot New Jersey mansion.

c. JE directed the transfer of an additional $13 million of G|CLUBS membership payments to an escrow account. The funds were subsequently used to pay for extravagant renovations to KWOK's New Jersey mansion, including to a wing for Relative-1 and

14

to a wing for Relative-2, and to purchase various furniture and decorative items including, among other items, Chinese and Persian rugs worth approximately $978,000, a $62,000 television, and a $53,000 fireplace log cradle holder.

d. On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of G|CLUBS membership payments into a bank account that JE controlled.

e. G|CLUBS used membership fees to purchase luxury automobiles, including a custom-built Bugatti sports car for approximately $4.4 million. While the car's signed purchase agreement listed G|CLUBS as the customer, the initial specifications documentation for the custom-built car named Relative-1 as the customer. Relative-1 had no official position with G|CLUBS.

*The Himalaya Exchange*

17. From at least in or about April 2021 through at least in or about March 2023, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, fraudulently obtained more than approximately $262 million in victim funds through the Himalaya Exchange, a purported cryptocurrency "ecosystem" accessible on the internet. The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin"). The Himalaya Exchange claimed that the "stablecoin" was a digital asset with a fixed 1-to-$1 value backed by reserves, and that the "trading coin" was a cryptocurrency with valuation based on supply and demand. JE was the founder and Chairman of the Himalaya Exchange.

18. In videos distributed via social media, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant,

15

trumpeted the prospects and valuation of the Himalaya Exchange and both HCN and HDO, which he publicly described as cryptocurrencies. For example, in a video posted on the Internet on or about October 20, 2021, KWOK falsely stated the following, among other things, and in substance and in part:

        a.    "I am talking about your H Coins, 'Brother Seven' [*i.e.*, KWOK] designed it . . . .[I]t has the attribute of currency, why? It has 20% gold. Awesome[.] [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."

        b.    "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money. Or take all the value of 20% gold and ask everyone to unify it and make it yours."

        c.    "If anyone loses money, I can say that I will compensate 100%. I give you 100%. Whoever loses money, I will bear it."

        d.    "I can sell the H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money unit. . . . [A]nd you can buy anything immediately."

    19.    The initial coin offering of HCN and HDO occurred on or about November 1, 2021. HCN began trading at 10 cents and, within approximately two weeks, the Himalaya Exchange website claimed that each HCN purportedly was worth approximately 27 HDO (*i.e.*, $27), which represented a 26,900% increase in value. That is, approximately two weeks after the initial coin offering, the Himalaya Exchange website indicated that HCN purportedly had an approximately $27 billion valuation.

    20.    At the time of the Himalaya Exchange launch, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the

16

defendant, marketed HCN to his online followers and others. For example, on or about November 1, 2021—the day of the initial coin offering—KWOK released an official music video for an original song called "HCoin To the Moon" via social media. The phrase "to the moon" is popularly associated with cryptocurrencies and implies a sharp increase in value. The music video depicted KWOK in various luxurious locations and depicted imagery of gold and wealth.

21.     At times, including following the Himalaya Exchange launch, KIN MING JE, a/k/a "William Je," the defendant, misleadingly marketed the Himalaya Exchange. For example, in or about June 2022, JE attempted to create the impression that a €3,561,127 purchase of a Ferrari (the "Ferrari") from a particular auction house was completed with HDO. JE stated, in substance and in part, that he was "extremely pleased that [a] buyer decided to purchase [a] world-class car using HDO." Contrary to JE's claim, the Ferrari was not purchased using HDO. In truth and in fact, and as JE well knew, a Himalaya Exchange employee sent the auction house an international bank wire to cover the cost of the Ferrari, while also processing a corresponding "transaction" on the Himalaya Exchange to create the false appearance that the purchase had taken place using HDO. JE's statement was also misleading in that, among other things, the unidentified "buyer" of the Ferrari was, in fact, Relative-1.

22.     Contrary to representations of HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, HCN and HDO could not be traded anywhere other than (purportedly) on the Himalaya Exchange. Moreover, unlike cryptocurrencies, HCN could not be traded for, or converted into, other currencies. HCN purportedly could be traded for only HDO (and only on the Himalaya Exchange), and HDO purportedly only could be converted to or from fiat currency (and only on the Himalaya Exchange).

17

a. Indeed, the HDO and HCN Whitepapers, available on the Himalaya Exchange website, provided in fine print that, contrary to KWOK's representations, HCN and HDO were not cryptocurrencies. Rather, according to the HCN Whitepaper, the "operation of the Himalaya Exchange and associated applications and infrastructure will be facilitated through the use of 'Credits.'" Those credits (i) could "only be used on the Himalaya Exchange or within the Himalaya Ecosystem," and (ii) did "not carry any right to require their exchange for fiat currency or crypto-assets." Moreover, while Himalaya Exchange members could request to exchange their "HDO" credits for an equivalent payment in U.S. dollars, the HDO Whitepaper stated that the Himalaya Exchange had the "discretion" to deny any such request.

23. In or about April 2022, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, arranged for the transfer of approximately $37 million in Himalaya Exchange funds from a Himalaya Exchange bank account to a particular escrow account. The $37 million was structured as a purported "loan" to cover the cost of a luxury yacht that KWOK had previously purchased and used, which yacht was then-owned by an entity held in the name of Relative-2.

*Government Seizure of Fraud Proceeds*

24. On or about September 20, 2022 and September 21, 2022, U.S. authorities served judicially-authorized seizure warrants on several domestic banks, and subsequently seized approximately $335 million of proceeds from bank accounts held in the names of Himalaya Exchange entities and other entities associated with HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants. Following the September 2022 judicially authorized

18

seizures, JE attempted to transfer approximately $46 million from domestic bank accounts associated with the Himalaya Exchange, which had not yet been seized by the United States, to a bank account in the UAE that JE controlled.

      a. Within approximately two days of the first judicially authorized seizures of Himalaya Exchange-related funds, on or about September 22, 2022, JE contacted the management of a domestic bank that held Himalaya Exchange bank accounts. JE sought to implement a wire transfer, which he and a Himalaya Exchange executive claimed to the domestic bank was needed to effectuate a "redemption" from HDO to U.S. dollars for an unnamed "VIP" (*i.e.*, very important client of the Himalaya Exchange).

      b. In subsequent communications with the domestic bank, JE revealed that the VIP was, in fact, JE himself. JE provided the domestic bank with documents reflecting two purported HCN sales by JE on or about September 22, 2022—totaling 46 million HDO, which JE was attempting to "convert" into $46 million. JE twice emphasized to the domestic bank's management, in substance and in part, that the $46 million transfer needed to happen "today or it is meaningless."

25. On or about October 16, 2022, pursuant to a judicially authorized warrant, U.S. authorities seized an additional approximately $274 million of proceeds from several Himalaya Exchange and G|CLUBS accounts at the domestic bank from which JE requested the $46 million transfer.

      a. As a result of the judicially-authorized seizures, U.S. authorities seized more than approximately $634 million of fraud proceeds, including approximately $278 million from bank accounts held in the names of the Himalaya Exchange entities, including accounts that purported to hold its HDO cash reserves.

b. Following the seizures, the Himalaya Exchange website continued to represent that HDO was backed by a "Reserve consisting of USD and cash-equivalent assets" when, in truth and in fact, it was not.

c. Despite the seizure of the Himalaya Exchange's cash reserves, the purported price of HCN had not suddenly and sharply declined through the date of this Indictment.

## STATUTORY ALLEGATIONS

26.    From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) wire fraud, in violation of Title 18, United States Code, Section 1343; (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (3) bank fraud, in violation of Title 18, United States Code, Section 1344; (4) international promotional money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and (5) international concealment money laundering, in violation of Title 18, United States Code Section 1956(a)(2)(B)(i).

27.    It was a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent

20

pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KWOK, JE, and WANG agreed to obtain victims' money by causing materially false information and misrepresentations to be transmitted over interstate wires, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

28.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK, JE, and WANG agreed to fraudulently induce investors to participate in the GTV Private Placement, the Farm Loan Program, and G|CLUBS by providing materially false and misleading information and representations in connection with purported shares of GTV common stock and purported companies affiliated with GTV.

21

29.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette,"  the defendants, and others known and unknown, knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, as defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, KWOK, JE,,and WANG agreed to participate in a scheme to mislead U.S. financial institutions through false and fraudulent pretenses, representations, and documents, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange, in order to obtain money of, or under the custody and control of, at least one financial institution.

30.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, the offenses alleged in Counts Two through Eight of this Indictment in violation of Title 18, United States Code, Section 1956(a)(2)(A)(i).

31.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represent the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer is designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, the offenses alleged in Counts Two through Eight of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

### Overt Acts

32.     In furtherance of the conspiracy and to effect its illegal objects, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV stock via the GTV Private Placement.

23

b.  On or about June 5, 2020, WANG, while located in the Southern District of New York, authorized a wire transfer of $100 million from Saraca to Fund-1.

c.  On or about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program.

d.  On or about August 2, 2020, in a video distributed via social media, KWOK stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."

e.  On or about May 28, 2021, JE transferred approximately $13 million from a bank account in the UAE that JE controlled to a bank account held by an entity (owned by Relative-2) at a particular bank in New York, New York.

f.  On or about July 30, 2021, in a video distributed via social media, KWOK stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G-Clubs membership?' 100%. Because I said that I have to promise that [to] anyone who buys G-Clubs membership before September 17 [they] must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Clubs before September 17, G-Clubs and the stock shares. You'll get both."

g.  On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of funds victims had sent to G|CLUBS in exchange for "memberships" to a bank account that JE controlled.

h.  On or about October 20, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that KWOK "designed" HCN, that "[n]o matter how much it raises, 20% will turn into gold," and that "[i]f anyone loses money" on HCN, "I can say that I will compensate 100%."

i.      On or about September 22, 2022, JE texted a U.S. bank's management, in substance and in part, that a $46 million transfer to a JE-controlled bank account in the UAE needed to happen "today or it is meaningless."

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Wire Fraud – GTV Private Placement)

The Grand Jury further charges:

33.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

34.     From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK, JE, and WANG conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

25

## COUNT THREE
### (Securities Fraud – GTV Private Placement)

The Grand Jury further charges:

35.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

36.     From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK, JE, and WANG conducted the GTV Private Placement to sell GTV stock and obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

**COUNT FOUR**
**(Wire Fraud – Farm Loan Program)**

The Grand Jury further charges:

37.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

38.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE conducted the Farm Loan Program to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT FIVE**
**(Securities Fraud – Farm Loan Program)**

The Grand Jury further charges:

39.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

27

40.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE conducted the Farm Loan Program to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX
### (Wire Fraud – G|CLUBS)

The Grand Jury further charges:

41.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

28

42.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE promoted and marketed G|CLUBS to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SEVEN
### (Securities Fraud – G|CLUBS)

The Grand Jury further charges:

43.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

44.     From at least in or about June 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a

29

security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE promoted and marketed G|CLUBS to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Wire Fraud – The Himalaya Exchange)

The Grand Jury further charges:

45. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

46. From at least in or about April 2021 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings,

30

signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE operated the Himalaya Exchange to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT NINE
### (International Promotional Money Laundering)

The Grand Jury further charges:

47.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

48.     From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, KWOK and JE directed and made international transfers of funds into, out of, and through the United States, with the intent to promote the fraud offenses in Counts Two through Eight of the Indictment.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

31

## COUNT TEN
### (International Concealment Money Laundering)

The Grand Jury further charges:

49. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

50. From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, namely, the fraud offenses alleged in Counts Two through Eight of this Indictment, to wit, KWOK and JE conducted international financial transactions into, and out of, and through the United States involving fraud proceeds, including, among other transactions, transactions involving bank accounts held in the names of entities nominally owned by other individuals and by entities not overtly associated with the defendants, in order to conceal the ownership, control, and/or receipt of the proceeds of the fraud and the illegal nature and source of such proceeds.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

32

## COUNT ELEVEN
### (Unlawful Monetary Transactions)

The Grand Jury further charges:

51.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

52.     On or about June 5, 2020, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, KWOK, JE, and WANG made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Two and Three to Fund-1.

(Title 18, United States Code, Sections 1957 and 2.)

## COUNT TWELVE
### (Obstruction of Justice)

The Grand Jury further charges:

53.     The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

54.     From at least on or about September 20, 2022 through the date of the filing of this Indictment, in the Southern District of New York and elsewhere, KIN MING JE, a/k/a "William Je," the defendant, corruptly obstructed, influenced, and impeded an official proceeding and attempted so to do, to wit, JE attempted to transfer money to the UAE, beyond the jurisdiction of

the United States, to impede and interfere with a federal grand jury investigation in the Southern District of New York of the offenses alleged in Counts One through Eleven of this Indictment, and proceedings before the United States District Court for the Southern District of New York concerning the seizure and forfeiture of criminally derived proceeds.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

## FORFEITURE ALLEGATIONS

55. As a result of committing the offenses alleged in Counts One through Eight of this Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and, and the following specific property:

a. $64,826.87 in United States currency formerly on deposit in Account Number 5090037713 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

b. $75,000,000.00 in United States currency formerly on deposit in Account Number 5090037705 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

c.  $467,343.00 in United States currency formerly on deposit in Account Number 5090037754 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

d.  $89,992,861.75 in United States currency formerly on deposit in Account Number 5090042770 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

e.  $1,683,077.40 in United States currency formerly on deposit in Account Number 5090042762 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

f.  $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

g.  $48,230,709.62 in United States currency formerly on deposit in Account Number 5090030288 at Silvergate Bank held in the name of "Hamilton Investment Management" Ltd., seized by the Government on or about September 18, 2022;

h.  $1,800,000.00 in United States currency formerly on deposit in Account Number 5090037739 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

i.  $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

35

j. $4,643,744.70 in United States currency formerly on deposit in Account Number 7801000590 at FV Bank held in the name of "Himalaya International Reserves, Ltd.," seized by the Government on or about September 20, 2022;

k. $14,599,257.25 in United States currency formerly on deposit in Account Number 7801000254 at FV Bank held in the name of "Himalaya International Clearing, Ltd.," seized by the Government on or about September 20, 2022;

l. $11,538,579.87 in United States currency formerly on deposit in Account Number MBI10103-0000 at Mercantile Bank International held in the name of "G Club International Ltd.," seized by the Government on or about October 16, 2022;

m. $10,008,284.04 in United States currency formerly on deposit in Account Number MBI10133-0000 at Mercantile Bank International held in the name of "Himalaya International Clearing Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

n. $3,090,856.54 in United States currency formerly on deposit in Account Number MBI10137-0000 at Mercantile Bank International held in the name of "Hamilton Capital Holding Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

o. $272,350,313.76 in United States currency formerly on deposit in Account Number MBI10138-0000 at Mercantile Bank International held in the name of "Himalaya International Reserves Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

p. $310,594.31 in United States currency formerly on deposit in Account Number MBI10139-0000 at Mercantile Bank International held in the name of "Himalaya

36

International Financial Group Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

q. $1,187,278.87 in United States currency formerly on deposit in Account Number MBI10171-0000 at Mercantile Bank International held in the name of "Hamilton Investment Management Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

r. $43,782.71 in United States currency formerly on deposit in Account Number MBI10172-0000 at Mercantile Bank International held in the name of "G Fashion International Limited," seized by the Government on or about October 16, 2022;

s. $161,809.47 in United States currency formerly on deposit in Account Number MBI10183-0000 at Mercantile Bank International held in the name of "Himalaya Currency Clearing Pty Ltd.," seized by the Government on or about October 16, 2022;

t. $2,745,377.75 in United States currency formerly on deposit in Account Number 9878904409 at Manufacturers & Traders Trust Co. held in the name of "GETTR USA, Inc.," seized by the Government on or about September 18, 2022;

u. $9,899,659.19 in United States currency formerly on deposit in Account Number 157525208185 at US Bank held in the name of "G Fashion," seized by the Government on or about September 18, 2022;

v. All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430, Parcel No. 3300021-03-00001-02 and described as Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality, Township: MAHWAH TWP

w. A Bugatti Chiron Super Sport, bearing Vehicle Identification Number VF9SW3V3XNM795047;

x. A Lamborghini Aventador SVJ Roads, bearing Vehicle Identification Number ZHWUN6ZD2MLA10393;

y. A Rolls Royce Phantom EWB, bearing Vehicle Identification Number SCATT8C08MU206445;

z. A 46m 2014 Feadship superyacht "Lady May" (ex Como), bearing IMO Number 112359, MMSI Number 319059500, and Callsign ZGDQ9;

aa. A Bösendorfer 185VC Porsche #49539 piano with custom bench, purchased for approximately $140,938.69;

bb. A Railis Design Iceland Contemporary Poseidon Bed with Nightstands, Ebony Veneer, Brass, Velvet, purchased for approximately $31,413.71;

cc. A Hästens 2000T md mattress, purchased for approximately $36,590.00;

dd. A Hästens 2000T sf mattress, purchased for approximately $36,210.00;

ee. A Wembe watch storage box, purchased for approximately $59,392.91;

ff. A Samsung Q900 Series QN98Q900RBF 98" QLED Smart TV – 8K, purchased for approximately $62,787.54;

gg. A Louis XV Style French Ormolu-Mounted Mahogany Commode by Joseph Émmanuel Zweiner;

hh. A "K'ang Hsi" extension table in etched and patinated pewter and bronze with hand-painted enamel colors by Philip & Kelvin LaVerne, purchased for approximately $180,000.00; and

38

ii. A "Punto '83" table in stainless steel with mesh tabletop with adjustable height and adjustable petals by Gabriella Crespi, Italy 1982, purchased for approximately $180,000.00.

(a) through (ii), collectively, the "Specific Property."

56. As a result of committing the money laundering offenses alleged in Counts One, Nine, Ten and Eleven of this Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," KIN MING JE, a/k/a "William Je," and YANPING WANG, a/k/a "Yvette," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the Specific Property.

## Substitute Assets Provision

57. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

39

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON
3/29/23

_____
DAMIAN WILLIAMS
United States Attorney

SUPERSEDING
TRUE BILL, INDICTMENT
(S1)

- RWLL HABERGER
3-27-2022

40

# Exhibit 6

## [Filed Under Seal]

# Exhibit 7

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 28, 2023

**BY ECF**

The Honorable Paul G. Gardephe
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

    Re:    *Securities and Exchange Commission v. Ho Wan Kwok et al.*, 23 Civ. 2200 (PGG)

Dear Judge Gardephe:

    Pursuant to Your Honor's Individual Rules of Practice, the Government respectfully submits this letter seeking to intervene in the above-captioned case (the "SEC Civil Action") in order to seek a complete stay of this matter until the completion of the trial or other disposition in a parallel criminal case, *United States v. Ho Wan Kwok et al.*, S1 23 Cr. 118 (AT) (the "Criminal Case"). The Criminal Case arises from the same operative facts as this proceeding. Defendants Ho Wan Kwok and G Club Operations LLC, and Relief Defendant Mei Guo, consent to a complete stay of the SEC Civil Action,[1] and the SEC takes no position. An initial conference in this matter is currently set to take place on June 15, 2023 at 11:00 a.m.

    If this case were to proceed, there would be a risk of significant interference with the Criminal Case. A complete stay would prejudice no party that has appeared in the SEC Civil Action; would prevent the circumvention of important statutory limitations on criminal discovery; and would preserve the Court's resources, because many of the issues presented by the SEC Civil Action may be resolved in the Criminal Case. In these and similar circumstances, courts in this Circuit frequently grant stays of parallel civil proceedings. *See, e.g.*, *S.E.C. v. El-Khouri*, No. 19 Civ. 9744 (LAP), 2021 WL 601652 (S.D.N.Y. Jan. 26, 2021); *S.E.C. v. Carroll*, No. 19 Civ. 7199 (AT), 2020 WL 1272287 (S.D.N.Y. Mar. 17, 2020); *SEC v. Wey*, 15 Civ. 7116 (PKC) (S.D.N.Y. June 9, 2016); *SEC v. Durante et al.*, 15 Civ. 9874 (RJS) (S.D.N.Y. Mar. 23, 2016); *SEC v. Shkreli, et al.*, 15 Civ. 7175 (KAM), 2016 WL 1122029, at \*2-7 (E.D.N.Y. Mar. 22, 2016); *SEC v. One or More Unknown Purchasers of Securities of Global Indus., Ltd.*, No. 11 Civ. 6500 (RA), 2012 WL 5505738, at \*3 (S.D.N.Y. Nov. 9, 2012).

---

[1] Defendant Kin Ming Je (a/k/a "William Je") has not yet appeared in this case; counsel for Je advised that Je takes no position on the Government's request. Defendant Mountains of Spices LLC (d/b/a "New York Farm") would oppose a stay on discovery, because it indicated that it intends to move to "sever" itself as a defendant, but it noted that—should the Court be inclined to issue a stay—Mountains of Spices would request a complete stay. Relief Defendants Qiang Guo (a/k/a "Mileson Guo"), Hing Chi Ngok, and Sin Ting Rong have not yet appeared in this case.

Page 2

## Background

The parallel Criminal Case arises out of the same underlying events as this action. On March 15, 2023, the original Indictment in the Criminal Case was unsealed, charging Ho Wan Kwok and Kin Ming Je with, *inter alia*, conspiracy to commit wire fraud, bank fraud, and money laundering; wire fraud; securities fraud; and money laundering; arising from their operation of a scheme to defraud thousands of victims of more than $1 billion using a series of complex fraudulent businesses and fictitious investment opportunities that connected dozens of interrelated entities controlled by Kwok. Kwok was arrested by the FBI on March 15, 2023; Je remains at large and is believed to be in the United Arab Emirates. Also on March 15, 2023, the SEC filed the SEC Civil Action against Kwok and Je (among others).

As alleged in both the Criminal Case and the SEC Civil Action, from at least in or about April 2020 through March 2023, Kwok and Je engaged in scheme to defraud investors in the United States and throughout the world through fraudulent investment opportunities involving interrelated entities, which allowed Kwok, Je, and their co-conspirators to solicit, launder, and misappropriate victim funds. (S1 23 Cr. 118 (AT), Dkt. 19 ("Indict.") ¶¶ 1-5; 23 Civ. 2200 (PGG), Dkt. 1 ("Compl.") ¶¶ 1, 2). Both the Criminal Case and the SEC Civil Action allege the following:

- Kwok and Je launched an unregistered offering of common stock in a media company that Kwok founded called GTV Media Group, Inc. ("GTV"), which raised approximately $452 million. (Indict. ¶¶ 10, 13; Compl. ¶¶ 3, 54.) Both cases further allege that Kwok and Je claimed that the GTV private placement funds would be used for GTV's operations and business development, but that Kwok and Je instead misappropriated the investor funds, including through a $100 million transfer for the benefit of a company owned by Qiang Guo. (Indict. ¶¶ 13, 32; Compl. ¶¶ 3, 40-41, 45-46, 48, 56.)

- Kwok solicited further investments in GTV common stock through a convertible loan program operated by the so-called Himalaya Farm Alliance, a collective comprised of informal groups of Chinese expatriates purportedly dedicated to advancing the Chinese pro-democracy movement. (Indict. ¶ 14; Compl. ¶ 78.) Both cases further allege that Kwok and Je misappropriated a substantial portion of the more than $150 million raised through the convertible loan program for their and their families' benefit. (Indict. ¶ 14; Compl. ¶¶ 83, 86-93.)

- Kwok solicited investment in a purported membership concierge service called G|CLUBS (or G Club Operations LLC) and that Kwok represented that purchasing a G|CLUBS membership would entitle the purchaser to shares of GTV or G|Fashion stock. (Indict. ¶ 15; Compl. ¶¶ 94-96, 134.) Both cases further allege that G Club Operations LLC sold at least $250 million in G|CLUBS memberships to investors, much of which Kwok misappropriated for the purchase of, among other item, luxury automobiles and a $26.5 million mansion in Mahwah, New Jersey for the benefit of Kwok and his family. (Indict. ¶¶ 15-16; Compl. ¶¶ 98, 104.)

- Kwok made false and misleading statements to investors regarding GTV's valuation and the trading price of GTV stock. (Indict. ¶¶ 14; Compl. ¶¶ 4, 5, 74, 94.)

- Kwok and Je solicited investment in fraudulent cryptocurrency through the Himalaya Exchange, a purported cryptocurrency "ecosystem" that offered a purported trading coin (Himalaya Coin, or HCN) and a purported stablecoin (Himalaya Dollar, or HDO). (Indict. ¶¶ 17-21; Compl. ¶¶ 107-113.) Both cases further allege that Kwok and Je fraudulently obtained more than $260 million in investor funds through the Himalaya Exchange. (Indict. ¶ 17; Compl. ¶ 127.)

## Legal Standards

Rule 24 of the Federal Rules of Civil Procedure ("FRCP") provides for the intervention of parties in civil lawsuits either by right or by permission of the court. "[C]ourts in this Circuit have routinely allowed federal or state prosecutors to intervene in civil litigation in order to seek a stay of discovery." *SEC v. Treadway*, No. 04 Civ. 3464 (VM), 2005 WL 713826, at *2 (S.D.N.Y. Mar. 30, 2005).

This Court has the inherent power to stay a civil proceeding in the interests of justice pending the completion of the parallel criminal trial. *See Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) ("[A] court may decide in its discretion to stay civil proceedings . . . when the interests of justice seem . . . to require such action.") (internal citations and quotations omitted). "'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). In evaluating whether to grant such a stay, courts in this Circuit consider: (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interest of the court; and (6) the public interest. *Treadway*, 2005 WL 713826, at *2-*3 (quoting *In re Worldcom, Inc. Secs. Litig.*, 2002 WL 31729501, at *4 (S.D.N.Y. Dec. 5, 2002)); *see also Volmar Distrib., Inc. v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993). "Balancing these factors is a case-by-case determination." *Volmar Distrib.*, 152 F.R.D. at 39. Application of each of these factors here weighs in favor of the stay sought by the Government, with defendant Kwok's consent.

## Argument

The Government should be permitted to intervene under FRCP 24(b) because the Criminal Case involves claims and defenses that share common questions of law and fact with this case. Given the effect that this civil proceeding would have on the Criminal Case and the similarity of claims and facts between the parallel proceedings, the Government respectfully submits that its application would satisfy both the standard for intervention as of right under Fed. R. Civ. P. 24(a)(2) and permissive intervention under Fed. R. Civ. P. 24(b)(2).

The Court should also grant the motion seeking to stay discovery in this case, for the reasons outlined below.

### 1. The Extent of Overlap

The Criminal Case and the SEC Civil Action involve nearly identical facts and issues, weighing heavily in favor of a stay. "Courts have consistently recognized [the overlap of issues] as a particularly significant factor." *Shkreli*, 2016 WL 1122029, at \*4. *See, e.g.*, *Volmar Distrib.*, 152 F.R.D. at 39; *Parker v. Dawson*, 2007 WL 2462677, at \*4 (E.D.N.Y. Aug. 27, 2007) (same). Here, as described above, the Criminal Case and this case involve the same scheme involving the same entities (GTV, the Himalaya Farm Alliance convertible loan program, G|CLUBS, and the Himalaya Exchange), and similar facts, witnesses, and issues.

### 2. The Status of the Criminal Case

The status of the criminal case also weighs in favor of a stay. The defendant Kwok has already been indicted and the Government will produce voluminous Rule 16 discovery upon entry of a protective order. "The weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment." *In re Par Pharm., Inc. Secs. Litig.*, 133 F.R.D. 12, 13 (S.D.N.Y. 1990). As the Court explained in *Trustees of Plumbers and Pipefitters Nat'l Pension Fund, et al. v. Transworld Mechanical, Inc.*: "A stay of a civil case is most appropriate when a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved." 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995); *see SEC v. Tuzman*, No. 15 Civ. 7057 (AJN) (S.D.N.Y. Mar. 1, 2016), Dkt. No. 43 at 3 (noting that an indictment normally weighs heavily in favor of a stay absent particular facts indicting that the criminal case may not be resolved expeditiously); *Shkreli*, 2016 WL 1122029, at \*4.

### 3. The Plaintiff's Interests

The SEC has indicated that it takes no position on a stay. Therefore, there can be no argument that there would be prejudice to the plaintiff by staying this action. *See Shkreli*, 2016 WL 1122029, at \*5 (citing cases).

### 4. The Defendants' Interests

As noted above, Kwok and G Club Operations consent through counsel to a complete stay of this action. Moreover, a stay will prevent Kwok (who is a defendant in the Criminal Case) from having to choose between asserting his Fifth Amendment rights during civil discovery and thereby being prejudiced in the SEC Civil Action or asserting those rights and thereby being prejudiced in the Criminal Case. *See Shkreli*, 2016 WL 1122029, at \*3 n. 3 ("[C]riminal defendants frequently seek stays in parallel civil enforcement proceedings, often due to an adverse inference that can arise from a party's invocation of the Fifth Amendment privilege against self-incrimination."). Accordingly, the defendants will not be prejudiced by a stay.

### 5. The Court's Interests

Considerations of judicial economy also weigh in favor of granting a stay. Issues common to both cases can be resolved in the Criminal Case, thereby simplifying and streamlining the SEC Civil Action. *See SEC v. Abraaj Inv. Mgmt. Ltd.*, No. 19 Civ. 3244 (AJN), 2019 WL 6498282, at

*3 (S.D.N.Y. Dec. 3, 2019) ("A stay of the civil action while the criminal case moves forward would avoid a duplication of efforts and a waste of judicial time and resources.") (internal quotation and citation omitted); *SEC v. Contorinis*, 2012 WL 512626, at *2 (S.D.N.Y. Feb. 3, 2012) ("Courts in this district have consistently found that a defendant convicted of securities fraud in a criminal proceeding is collaterally estopped from relitigating the underlying facts in a subsequent civil proceeding."); *SEC v. One or More Unknown Purchasers of Secs. of Global Indus.*, 2012 WL 5505738, at *4 (S.D.N.Y. Nov. 9, 2012) ("[T]he Civil Case is likely to benefit to some extent from the Criminal Case no matter its outcome.").

      6.  <u>The Public Interest</u>

      The Government and the public have an important interest in ensuring that civil discovery is not used to circumvent the restrictions that pertain to criminal discovery. Courts recognize this as an important factor that weighs in favor of a stay of parallel civil proceedings. *See, e.g., SEC v. Beacon Hill Asset Mgmt. LLC*, 2003 WL 554618, at *1 (S.D.N.Y. Feb. 27, 2003) (in context of request for civil stay of discovery due to pending criminal investigation, "[t]he principal concern with respect to prejudicing the government's criminal investigation is that its targets might abuse civil discovery to circumvent limitations on discovery in criminal cases"); *Phillip Morris Inc. v. Heinrich*, 1996 WL 363156, at *19 (S.D.N.Y. June 28, 1996) (without a stay, defendants "may have an opportunity to gain evidence to which they are not entitled under criminal discovery rules"); *SEC v. Town of Ramapo*, No. 16 Civ. 2779 (CS) (S.D.N.Y. June 30, 2016), Dkt. 90 at 38 ("There's a public interest in criminal defendants not gaining discovery via a civil case that they wouldn't otherwise have because of the obvious risk that evidence or testimony could be tailored . . . . Congress passed the Jencks Act and it passed Section 3500 because it was concerned generally about that problem in every case. And the rationale behind the Jencks Act would be undermined if criminal defendants would use the civil process to gain information to which they would not otherwise be entitled.").

          \*          \*          \*

      For the foregoing reasons, the Government should be permitted to intervene in this case, and the Court should stay this proceeding until the resolution of the Criminal Case.

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney

    By:  *Juliana Murray*
          Juliana N. Murray
          Ryan B. Finkel
          Micah F. Fergenson
          Assistant United States Attorneys
          (212) 637-2314 / 6612 / 2190

Cc:    All Counsel of Record (by ECF)

# Exhibit 8

```
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF CONNECTICUT
 2                        BRIDGEPORT DIVISION

 3                                      .
    IN RE:                              . Chapter 11
 4                                      .
    HO WAN KWOK,                        . CASE NO.: 22-50073 (JAM)
 5                                      .
 6               Debtors.              .
    . . . . . . . . . . . . . . . . . .
 7  PACIFIC ALLIANCE ASIA              .
    OPPORTUNITY FUND L.P.,              . Adv. Pro. No.: 22-05032
 8                                      .
                        Plaintiff,     .
 9        v.                            .
                                        .
10  HO WAN KWOK,                        .
                                        . Bridgeport, Connecticut
11              Defendants.             . December 12, 2022
    . . . . . . . . . . . . . . . . . .
12
13        TRANSCRIPT OF MONTION FOR PRELIMINARY INJUNCTION
              BEFORE THE HONORABLE JULIE A. MANNING
14               UNITED STATES BANKRUPTCY JUDGE

15                            (DAY 4)
    APPEARANCES:
16
    For the Plaintiffs:      PETER FRIEDMAN, ESQ.
17                           DAVID HARBACH, ESQ.
                             STUART SARNOFF, ESQ.
18                           DANIEL CANTOR, ESQ.
                             O'Melveny & Myers, LLP
19                           Times Square Tower
                             7 Times Square
20                           New York, New York 10036

21  Transcription Company:   Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email: gmatthews@reliable-co.com

24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

 1          MR. FRIEDMAN:  Thank you, Your Honor.

 2          THE COURT:  Overrule your objection.  Continue,

 3    counsel.

 4    BY MR. WACHEN:

 5      Q.   So --

 6          THE COURT:  I don't know if there -- I think you

 7    answered that question?

 8          MR. WACHEN:  Did --

 9          THE WITNESS:  Thank you.

10          MR. WACHEN:  -- did you finish your answer?

11          THE COURT:  Yeah, I think that -- that answer,

12    you're done, you should ask another question.

13          MR. WACHEN:  Okay.  Yeah.  Thank you, Your Honor.

14    BY MR. WACHEN:

15      Q.   And what was your response to having received that

16    email with a proposed agreement?

17      A.    We decided to -- that we were -- we were sitting

18    and listening.  And if -- you know, and we would comply with

19    the agreement, and we were going to sit and listen, even

20    though there were numerous red flags.

21      Q.   And the meeting was on the 17th of November,

22    right?

23      A.   Correct, November 17th.

24      Q.   And who was at the meeting?

25      A.   So the was me, Aaron Mitchell, Nicholas Bassett,

 1   the Trustee, my client Mr. Kwok, and a translator.

 2        Q.   Where was it?

 3        A.   It was at Brown Rudnick.

 4        Q.   In New York City, right?

 5        A.   In New York City, I'm sorry.

 6        Q.   Did you take notes during the meeting?

 7        A.   I did.

 8        Q.   Do you still have those notes?

 9        A.   I do.

10        Q.   And how did the meeting proceed?

11             MR. BASSETT:  Your Honor, I'm going to object

12   to -- as we objected --

13             THE COURT:  We can't hear you, Mr. Bassett.

14             MR. BASSETT:  I apologize.  For the record, Your

15   Honor, Nick Bassett from Paul Hastings, on behalf of the

16   trustee.  I'm going to raise the same objection that I raised

17   last week, when counsel attempted to inquire into the

18   substance of the meeting that occurred on the 17th.

19             Not only has counsel established that it took

20   place for the purpose of having settlement discussions, but

21   counsel has now acknowledged that he and everyone else in

22   attendance signed an NDA agreeing not to disclose the content

23   of the meeting.  I think it's entirely inappropriate for them

24   to disregard that all together, and to use it for a purpose

25   that suits their position in this matter.

1  Mr. Despins say at the meeting, and he's getting a narrative

2  response and is presumably is going to describe the entire

3  meeting, I don't see how that could possibly be consistent

4  with the ruling Your Honor just gave.

5          MR. WACHEN:  Well --

6          THE COURT:  Mr. Wachen, you need to ask the

7  question about -- maybe the way to ask it is to say, Mr.

8  Despins testified that he said X, is that what you heard Mr.

9  Despins say?

10         MR. WACHEN:  Well, unfortunately, Your Honor, I

11 don't have Mr. Despins testimony in front --

12         THE COURT:  I understand, but you've got notes,

13 you know what -- you asked the questions, you know what --

14 you know what he said.  In general you know what he said.

15         MR. WACHEN:  I know what he said in general, yes.

16 Okay.

17 BY MR. WACHEN:

18     Q.    Did Mr. Despins mention Al Capone at the meeting?

19     A.    He did.

20     Q.    And what did he say about Al Capone?

21     A.    He said was that -- he asked my -- Mr. Kwok if he

22 knew who Al Capone was, the gangster.  And he said, you know,

23 he went to jail for tax evasion.  And there was a series of

24 statements that that led to by the Trustee.  The first, with

25 respect to the whole implied tax issue, was to state that he

1  knows that there's this theory -- the -- he, meaning the

2  Trustee -- knows that there's this theory that the friends

3  and supporters of Mr. Kwok are supporting him financially.

4  And then, he said, I hope that they, or you, have declared

5  that in the United States.

6          He then proceeded to say that you, Miles, are --

7  have stated proudly that you have earned $500,000 of

8  consulting fees from one of these companies.  And again, he

9  said, you know, I assume that you've paid income tax or

10  you've declared that.  He immediately made the point that I

11  speak to the IRS and the SEC on a weekly basis, and you

12  better settle because soon it's going to be too late.

13          And so, that, among other statements that were

14  made by the Trustee -- we were perceiving that as, you know,

15  the threatening, intimidating behavior on his part.

16     Q.  Did he -- did he say at some point at the meeting,

17  pay me $250 million?

18     A.  Yes, he said, pay me $250 million.  Just to -- in

19  terms of the proposal, he described the proposal as -- to

20  Miles, you know, you keep the UBS claim, you keep the

21  share --

22          THE COURT:  Hold on, stop.  I said I didn't want

23  to hear about the terms and conditions of a settlement, so I

24  don't want to hear that.  That's not where we're going.

25          MR. WACHEN:  Okay, Your Honor.

1      Q.   And what was -- what was your reaction to his

2  request to pay him $250 million?  Without -- without going

3  into the terms of a proposal?

4      A.   Livid.  I was very upset, distraught.

5      Q.   And why was that?

6      A.   It deviated greatly from what was -- what I

7  believed a global settlement that was nearly imminent the day

8  before.

9      Q.   And do you know how Mr. Kwok perceived that

10  statement by Mr. Despins, pay me $250 million?

11      MR. BASSETT:  Objection.  Calls for speculation.

12  Calls for hearsay.

13      THE COURT:  Sustained.

14  BY MR. WACHEN:

15      Q.   At some point, did you respond to Mr. Despins in

16  his -- in his statement, pay me $250 million?

17      A.   Yes, I did.  There was two phases.  There was one

18  in the presence of everyone, and then there was a separate,

19  where I came back into the conference room, after showing my

20  client, and the translator, and Attorney Mitchell out and had

21  a response.  So --

22      Q.   Let's take them one at a time.

23      A.   Okay.

24      Q.   So what did you say in the room when everybody was

25  there?

1     A.   So my immediate response was -- I actually

2  responded to the threat that the Trustee was going to lock

3  Mr. Kwok out of his apartment.  That was the first response I

4  had, which came right after the $250 million demand.  And I

5  told him that that was illegal, he couldn't do that.  And he

6  said he was going to do it.

7       But then, I accused him of -- I said it was

8  outrageous, there was no legitimate basis for it, you know,

9  and at some point, I said that it was extortion.  I either

10  said that with everybody or separately after I had shown out

11  those other individuals and confronted Nick and Luc.

12     Q.   Okay.  So at some point the other -- Mr. Kwok, the

13  translator, Mr. Mitchell left?

14     A.   Right.  I showed them out at the door, and I

15  decided to go back and confront Attorney Bassett and the

16  Trustee.

17     Q.   And what -- what did you say at that point?

18     A.   So I -- as I said, again, it was a lot of -- I

19  mean, I was very upset because again, I thought we were there

20  after months and months, and he was blowing it all up.  And

21  at one point I said that Miles -- and when I said Miles, I'm

22  referring to his -- the support that he gets.  I said, Miles

23  is never going to pay the $250 million, and the Trustee said,

24  he will when he's about to go to jail.

25     Q.   And you stated that you thought that this was

# Exhibit 9

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                              *   Case No. 22-50073 (JAM)
                                   *
HO WAN KWOK and GENEVER            *
 HOLDINGS CORPORATION,             *
                                   *
            Debtor.                *
                                   *

GENEVER HOLDINGS LLC, et al.,      *   Adv. Proc.  No. 23-05002
                                   *
            Plaintiffs,            *
     v.                            *   Bridgeport, Connecticut
                                   *   May 2, 2023
                                   *
HO WAN KWOK, et al.,               *
                                   *
            Defendants.            *
                                   *
* * * * * * * * * * * * * * *      *

                      TRANSCRIPT OF
#1362     MOTION TO COMPEL COMPLIANCE WITH BK RULE 2004
          SUBPOENA BY UBS AG
#1495     INTERIM APPLICATION FOR COMPENSATION OF CHAPT. 11
          TRUSTEE AND HIS COUNSEL, PAUL HASTINGS, LLP, FOR
          REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM
          JULY 8, 2022 THROUGH OCTOBER, 2022
#1669     APPLICATION TO EMPLOY ENGINEERING OPERATIONS AND
          CERTIFICATION SERVICES, LLC AS EXPERT/CONSULTANT
#1674     INTERIM APPLICATION FOR COMPENSATION/ALLOWANCE
          AND REIMBURSEMENT FOR EXPENSES FOR NEUBERT, PEPE
          AND MONTEITH
#1704     AMENDED ORDER SETTING STATUS CONFERENCE
          PRETRIAL CONFERENCE #1 COMPLAINT 91(DECLARATORY
          JUDGMENT)
            BEFORE THE HONORABLE JULIE A. MANNING
              UNITED STATES BANKRUPTCY JUDGE


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1    transcript is very clear as to what transpired and what the

2    agreement was.

3            I, you know, don't want to do that -- you know,

4    spend too much of the Court's time, but starting on page 113

5    of the transcript, lines 10 through 15.  Mr. Best --

6            THE COURT:  Give me a second to get there, please.

7            MR. DESPINS:  Okay.  Sorry.

8            THE COURT:  113?

9            MR. DESPINS:  Yeah.  113.

10           THE COURT:  Lines what?

11           MR. DESPINS:  10 through 15.

12           THE COURT:  Okay.  Go ahead.

13           MR. DESPINS:  This is Mr. Best addressing the

14   Court.  "What they  -- what the problem which we need to

15   figure out is the Southern District has a protective order

16   or the use of that information.  I don't know how that can

17   be worked out with Your Honor and with counsel, but that

18   will come up whether it's directly to the Department of

19   Justice or through us, meaning that they would produce,

20   they, the defendant, would produce to us documents."  So

21   that's the teeing up of the issue.

22           Then I go next to page 123, lines 7 through 14. So

23   page 123, lines 17 through 14.  This is where I address the

24   court, and I said, "But the defendant, he has standing in

25   that court to say you know what, Judge -- criminal judge, we

1   would like a modification to the protective order, and that

2   modification would be that we," this is again the defendant,

3   "can provide to the Trustee, Chapter 11 Trustee, copies of

4   the documents that the Government gave us or gives us.  This

5   court, Your Honor, could direct the debtor to seek such a

6   modification of the protective order.  This is my proposal."

7          Then page 139, lines 7 through 19. So page 139,

8   lines 7 through 19.  Again, Mr. Best addressing the Court.

9   And it's more lines 13 through 19.  "But we are in agreement

10   in principle that's subject to the U.S. Department of

11   Justice and really most importantly the District Court Judge

12   agreeing to the disclosure of it.  I'm sure with many

13   limitations or qualifications that we won't stand in the way

14   of that.  The discussion really is what's the best way?

15   How's the best way to accomplish that?"

16          Then page 140, lines 4 through 6.  Again, Mr. Best

17   addressing the Court.  "There's a concern from the U.S.

18   Trustee's counsel," I guess that's a misnomer, it was -- is

19   the Trustee's counsel, that they don't have standing in the

20   Southern District for the subpoena.  I don't care how we get

21   home.  There are multiple ways of doing that."

22          And then lower down on that page, still page 140,

23   lines 20 to 23.  Again, Mr. Best.  "And so I want the help -

24   - to help the Court explore this and then help the Court in

25   fashioning an order that -- or a ruling or you don't -- or

1   you don't -- I mean, I don't even know if you need to assure

2   ruling, but I'd like clarity on the way forward."

3           And then page 141, lines 10 through 15.  This is

4   where I address the court and I say, "And so what should

5   happen is that I think the Court," meaning Your Honor,

6   "should enter an order saying that the debtor is directed to

7   seek a modification of any applicable protective order in

8   the criminal case to allow the Chapter 11 Trustee access to

9   the document produced by the Government to the debtor."

10  Couldn't be clearer.

11          Then on page 143, or sorry, the bottom of 142,

12  line 25, and the top of 143, lines 1 and 2.  Mr. Best, "I'm

13  fine with counsel proposing a draft order that we look at

14  and get to Your Honor if that's the easiest way of doing

15  it."

16          And then on lines, same page, 143, lines 7 through

17  9.  "So that I think there's an agreement to be -- to abide

18  by.  If the Southern District allows to use the information

19  subject to a protective order, them being part of the

20  protective order.  There's no mention that it has to come

21  directly from the Department of Justice to us."

22          Then, even the Court, although that was cut off,

23  this is on page 146, I was trying to correct the statement

24  that had been made, but on top of 146, it says the Court,

25  "The debtor will seek, but then share with you," meaning

1    with the Trustee, once their -- once their -- it's not --

2    it's cut off because Your Honor's -- I said "correct".  But

3    basically what you were saying is that once they get the

4    documents from the DOJ they'll share with you, the Trustee.

5            Page 149, lines 9 through 11.  I believe this is

6    the Court, nope, yeah, it is the Court.  "There's an

7    agreement.  We're going to proceed with that agreement.  I'm

8    going to hold Mr. Best and Mr. Despins to that agreement."

9            Then I go to page 149, 14 through 18.  "The Court:

10   All I would say about what you just said is that when you

11   say see your client, I understand -- I understand you have

12   to see your client.  But you've agreed that your client's

13   not going to oppose this.  Mr. Best:  I agree."

14           And so that's all I would cover, Your Honor.

15   There was never any discussion by Mr. Best saying, oh, we

16   can't, we can't turn over anything to them, it has to come

17   from the Department of Justice directly to the Trustee.

18           The reason they're proposing that, Your Honor, I

19   want to be very direct about this, is because that would

20   never happen.  The DOJ is never going to produce anything to

21   us.  We don't exist in their court.

22           So they're proposing something that essentially

23   defeats what we're trying to do, when, in fact, you know,

24   they said, oh, we have no problems with getting you the

25   documents.  You just need to get them from the DOJ.  But

# Exhibit 10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
HO WAN KWOK and GENEVER        *
 HOLDINGS CORPORATION,         *
                               *
             Debtor.           *

LUC A. DESPINS,                *   Adv. Proc. No. 23-05017
                               *
                               *   Bridgeport, Connecticut
             Plaintiff,        *   August 14, 2023
                               *
      v.                       *
                               *
TAURUS FUND, LLC, et al.,      *
                               *
             Defendants.       *
                               *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

            TRANSCRIPT OF EX PARTE MOTION FOR
   TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
         BEFORE THE HONORABLE JULIE A. MANNING
            UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff:              NICHOLAS A. BASSETT, ESQ.
                                AVRAM E. LUFT, ESQ.
                                Paul Hastings, LLP
                                200 Park Avenue
                                New York, NY  10166

                                DOUGLAS S. SKALKA, ESQ.
                                DENNIS M. CARNELLI, ESQ.
                                Neubert Pepe & Monteith, P.C.
                                195 Church Street
                                New Haven, CT  06510

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1    exhibit binder to what is marked as Trustee Exhibit 13.

2                MR. BASSETT:  And if we could similarly have the

3    courtroom deputy please pull that exhibit up on the screen,

4    that would be much appreciated.  Please scroll up to the

5    first page.  Thank you.  Thank you.  And go back to the

6    other page.

7    BY MR. BASSETT:

8    Q     Trustee Despins, do you recognize what appears here as

9    Trustee Exhibit 13?

10   A     Yes, I do.

11   Q     What do you understand this to be?

12   A     It's the inside pocket of one of I believe 29 suits

13   that were found by the FBI when they did the search,

14   executed search warrant, at the Mahwah mansion on March

15   15th.

16   Q     How did you get a copy of this picture?

17   A     The Department of Justice prosecution of Mr. Kwok is

18   led by an Assistant U.S. Attorney, Juliana Murray, who -- I

19   called her in early July to get pictures of what the FBI had

20   found at the mansion when they executed their search

21   warrant, and she provided numerous pictures, and we selected

22   I guess, you know, ten best of and that would be one of

23   them.

24   Q     So Ms. Murray is the person you spoke to?

25   A     Correct.

# Exhibit 11



**ZEISLER & ZEISLER, P.C.**

Attorneys at Law

10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Phone: (203) 368-4234
www.zeislaw.com

Eric Henzy, Partner
ehenzy@zeislaw.com

August 14, 2023

*VIA EMAIL AND ECF*
Honorable Julie A. Manning
United States Bankruptcy Court for the District of Connecticut
915 Lafayette Boulevard
Bridgeport, CT 06604

   Re: *In re Ho Wan Kwok*, Case No. 22-50073 (JAM); *Despins v. Taurus Fund LLC, et al.*, Adv. Proc. No. 23-05017 (JAM) (Bankr. D. Conn.)

Dear Judge Manning:

  As you know, we are counsel to debtor Ho Won Kwok ("Debtor") in the referenced Chapter 11 case. I write in connection with the referenced adversary proceeding commenced by the Chapter 11 Trustee in connection with the Chapter 11 case, which concerns a parcel of real property located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "Property").

  In particular, I write regarding the hearing scheduled today on the Chapter 11 Trustee's motion for the entry of a preliminary injunction regarding the Property. I am advised by the Debtor's criminal counsel that the Property is the subject of numerous allegations made against the Debtor by the United States of America in the criminal case entitled *United States v. Ho Wan Kwok*, Case No. 23-cr-118-AT (S.D.N.Y.) (the "Criminal Case"). We understand that in the instant motion proceeding, the Trustee seeks to take control of and restrict access to the Property pending further activity in the adversary proceeding. To the extent that any preliminary relief the Court may consider that restricts or prohibits the Debtor's access to the Property or otherwise permits the Chapter 11 Trustee to make any changes to the Property or its contents, the Debtor's federal constitutional rights may be adversely affected.

  I write to report to Your Honor that the Debtor, through his criminal law counsel, intends to present a motion to United States District Judge Analisa Torres in the Southern District of New York, the presiding judge in the Criminal Case, consistent with the process used previously for the Sherry-Netherland apartment. *See In re Ho Wan Kwok* Dkt. No. 1687; Criminal Case Dkt. Nos. 72; 77. In so doing, the Debtor intends to seek an order providing continued access to the Property and to prevent any changes to it or its contents pending resolution of, or further orders in, the Criminal Case.



Honorable Julie A. Manning
August 14, 2023
Page 2

  The Debtor reserves all rights and entitlements under applicable law. We appreciate the Court's consideration.

        Respectfully,


        Eric Henzy (ct12849)
        Zeisler & Zeisler, P.C.
        10 Middle Street, 15th Floor
        Bridgeport, CT 06604
        Telephone: 203-368-4234 X 245
        Facsimile: 203-549-0903
        Email: ehenzy@zeislaw.com


cc:  Sidhardha Kamaraju, Pryor Cashman LLP, Criminal Counsel for the Debtor

# Exhibit 12

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
### BRIDGEPORT DIVISION

```
------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11
                                              :
HO WAN KWOK,                                  :   Case No. 22-50073 (JAM)
                                              :
              Debtor.                         :   Re:  ECF No. 777
                                              :
------------------------------------------------------x
```

## CONSENT ORDER REGARDING CONTROL OF ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT PROTECTION RELATED TO RULE 2004 SUBPOENAED DOCUMENTS AND INFORMATION

Upon the motion (the "Motion") of Mr. Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"), for the entry of an order (this "Order"), pursuant to sections 323, 521, 541, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Court's orders granting the Trustee's motions for examination pursuant to Rule 2004, (a) confirming that the Trustee owns and controls the attorney-client privilege, work product protection and other privileges on issues related to the Debtor's assets and financial affairs and the administration of his estate, (b) directing that the Discovery Recipients not withhold documents from the Trustee on account of any such privileges in responding to the Rule 2004 Subpoenas,[1] or attempt to assert any such privileges that are properly owned by the Trustee and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested

---

[1] Capitalized terms not defined herein have the meanings given to them in the Motion.

1

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from

the United States District Court for the District of Connecticut (as amended); and consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the

Court having found that the relief requested in the Motion, as modified herein, is in the best

interest of the Estate, its creditors, and all parties in interest; and due and sufficient notice of the

Motion having been given under the particular circumstances; and it appearing that no other or

further notice need be given; and upon all of the proceedings had before this Court; and the

Trustee and the Debtor having consented to the relief entered herein and any other objections to

the relief requested herein having been withdrawn or overruled on the merits; and after due

deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

      1.      The Motion is granted to the extent set forth herein.

      2.      The Trustee has exclusive control of any attorney-client privilege or work product

protection that could otherwise be asserted by the Debtor or his counsel under any applicable law

(including, without limitation, any interests of the Debtor in any common interest or joint

defense privilege alleged to be held with other parties) (each, a "Trustee Privilege" and, together,

the "Trustee Privileges") concerning (i) assets (including actual or potential causes of action) that

(A) are or were held by the Debtor, (B) are or were held by others that the Trustee is

investigating pursuant to the Rule 2004 Subpoenas for purposes of determining whether they

hold or may have information about assets in which the Debtor holds or may have held an

interest, or (C) otherwise relate to, or could be brought into, the Debtor's estate,[2] (ii) the Debtor's

---

[2]      Forms of the Rule 2004 Subpoenas, including document requests, were attached to the Trustee's 2004
Motions as follows:  as to the Debtor 2004 Motion, Exhibit B; as to the Professionals 2004 Motion, Exhibits C-1

financial condition (including, without limitation, liabilities of the estate), or (iii) activities related to the administration of the estate (including, without limitation, the preparation of schedules and the preparation of the *Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions* to the extent the Declaration or preparation of the Declaration relates to assets, liabilities or the financial status associated with the Debtor or the Debtor's estate) during the period between the petition date and the issuance of the order appointing the Trustee on July 8, 2022 (topics (i) through (iii), collectively, the "<u>Investigation Topics</u>").

3.      Neither the Debtor nor his counsel (based on instructions from the Debtor or any person acting on behalf of the Debtor), nor any other examinee, is entitled to withhold any of the documents and information requested in the attachments to the Rule 2004 subpoenas on the basis of any Trustee Privileges concerning the Investigation Topics. Notwithstanding the foregoing, nothing in this paragraph shall be construed to preclude the Debtor from asserting any rights set forth in paragraph 7.

4.      Nothing herein shall prevent the Debtor from asserting any and all privileges concerning legal matters unrelated to the Investigation Topics, such as unrelated criminal allegations  or the Debtor's asylum application (other than documents related to the litigation styled as *Guo Wengui v. Clark Hill, PLC*, Case No. 19-cv-03195 (D. D.C.) that relate to the merits of the legal malpractice action, as distinguished from the merits of the Debtor's asylum application, subject to the balancing test incorporated herein, which does not relate to the substance of the asylum application).  The Trustee and the Debtor reserve all rights with respect to any privileges claimed over such other matters.

---

through C-14; and as to the Third-Party Motion, Exhibits C-1 through C-19.  They are incorporated herein by reference.

5.      To the extent the Trustee receives documents or information from the Debtor or his counsel or other advisors relating to facts, allegations, or issues arising in adversary proceedings against the Debtor asserting non-dischargeability, the Trustee will (i) not share such documents and information with the plaintiffs in such adversary proceedings, and (ii) keep such documents and information confidential as required by any confidentiality stipulation or protective order to be entered in this case.

6.      For the avoidance of doubt, it is presumed that the Trustee has exclusive control over all post-petition documents and files in the possession or control of Brown Rudnick LLP and Verdolino & Lowey, P.C. in connection with their representation of the Debtor in this case, subject to the terms set forth in paragraph 7.

7.      Notwithstanding anything herein to the contrary, to the extent the Debtor believes in good faith that particular documents or information that are covered by a Trustee Privilege and that concern the Investigation Topics could result in personal harm to the Debtor if disclosed to the Trustee, then (i) the Debtor's counsel shall, within 10 days of the applicable production deadline, subject to the right to make a motion in good faith to the Court for a reasonable extension of time,  log all such documents in accordance with the requirements of D. Conn. L. Civ. R. 26(e) and/or identify all such non-documentary information in a manner necessary to support the claim of privilege including with sufficient information to prima facie identify the basis for asserting the potential for personal harm,[3] and (ii) either party may file a motion with the Court to have the question of control of the privilege over any logged documents or other

---

[3]      Consistent with applicable discovery rules, the Debtor may withhold from production (using appropriate redactions as necessary) only that portion of such document or information that is subject to the Debtor's claim of privilege and good-faith belief regarding personal harm; all other portions of such document or information must be produced to the Trustee.

information adjudicated on an expedited basis, and the Debtor may request that the Court, in making such decision, undertake a further balancing analysis in accordance with applicable case law.  For purposes of this paragraph, "expedited basis" shall require a response to any motion within eight days, and any reply within four days thereafter; the Court shall then either rule on the papers or hold a hearing on the motion at its earliest convenience. The Court may as part of its consideration of any such motion require the production of logged documents and information to the Court for *in camera* inspection.  For the avoidance of doubt, that the disclosure of the documents or information in question could result in the Trustee identifying potential assets of the estate, or could constitute evidence relating to the ownership or control of assets by the Debtor, shall not constitute a "personal harm to the Debtor" sufficient to withhold documents or information pursuant to this paragraph, regardless of any position or opinion of the Debtor regarding the ownership or control of such assets.

8.     For purposes of this order only, the term "control" as used herein with respect to any Trustee Privilege shall mean that the Trustee is able to review, access, and otherwise use all documents and information subject to such privilege in carrying out his duties and responsibilities in this case, including without limitation in prosecuting actions to recover property of the estate; provided, however, the Trustee shall not be entitled to waive any Trustee Privilege (for example, by disclosing privileged documents or information in open court or on any public docket or by sharing such documents or information with a third party) absent the Debtor's written consent or further order of the Court, and all filings by the Trustee containing or describing documents or information covered by a Trustee Privilege shall be filed under seal. The parties reserve all their respective rights as to any future request by the Trustee to waive a

Trustee Privilege. Any such request to waive a Trustee Privilege may be made by motion on an expedited basis in accordance with the procedures described in paragraph 7.

9. Nothing herein shall be construed to impact, one way or another, the Debtor or the Debtor's counsel's rights, whatever they may be, to assert whatever privileges the Debtor may have under the laws of the United Kingdom in the litigation styled *Kwok Ho Wan v. UBS AG,* Claim No. CL-2020-000345 (High Court of Justice Business and Property Courts of England and Wales Commercial Court).

10. Nothing herein shall be construed to impact the Debtor's 5th Amendment Privilege under the United States Constitution.

11. Neither the Debtor nor his counsel (based on instructions from the Debtor or any person acting on behalf of the Debtor), nor any other examinee, shall interfere with, hinder, or delay the Trustee's exercise of the authority under this Order.

12. Nothing herein shall be construed to preclude the Trustee or the Debtor, including through their respective counsel, from disputing the application of this Order to particular documents or information.

13. The Trustee is authorized and empowered to take all actions necessary to effectuate the relief granted in this Order.

14. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

15. The terms and conditions of this consent Order constitute the complete, exclusive and fully integrated statement of the Order. As such, it is the sole expression of the parties' consensual agreement and the terms of the Order.

16.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated at Bridgeport, Connecticut this 14th day of September, 2022.

Julie A. Manning
United States Bankruptcy Judge
District of Connecticut