**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------x
          :
In re:              :    Chapter 11
          :
HO WAN KWOK, *et al.*,[1]   :    Case No. 22-50073 (JAM)
          :
    Debtors.       :    (Jointly Administered)
          :
------------------------------------------------------x  **RE: Docket No. 2110**

**ORDER (I) AUTHORIZING CHAPTER 11 TRUSTEE TO EXTEND FINANCING PURSUANT TO BANKRUPTCY CODE SECTION 363, (II) AUTHORIZING GENEVER US AND GENEVER BVI TO OBTAIN POST-PETITION FINANCING PURSUANT TO BANKRUPTCY CODE SECTION 364, (III) GRANTING NON-PRIMING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM, (IV) MODIFYING AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion"[2]) of Genever Holdings LLC ("Genever US"), Genever Holdings Corporation ("Genever BVI") and Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") of Ho Wan Kwok (the "Individual Debtor"), debtors in these above-captioned jointly administered cases (the "Chapter 11 Cases"), seeking a final order (the "DIP Order") pursuant to sections 105(a), 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code, (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-3 of the Local Rules of the United States Bankruptcy Court for the District of Connecticut (the "Local Rules"), among other things (i) authorizing Genever US and Genever BVI (the "DIP Borrowers") to obtain secured

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

postpetition financing from Kwok's chapter 11 estate (the "DIP Lender" and, together with the DIP Borrowers, the "Movants") consisting of non-priming secured debtor-in-possession credit facility in an aggregate principal amount of up to $2,000,000 and in the form of the DIP financing credit agreement attached as Exhibit 1 hereto (such agreement, the "DIP Credit Agreement"); (ii) granting related liens and superpriority claims in favor of the DIP Lender as more fully described herein; (iii) modifying the automatic stay to the extent necessary; and (iv) authorizing the Trustee, as representative of the DIP Lender, to enter into the DIP Credit Agreement, all on the terms and conditions set forth in this DIP Order.

The Court having reviewed the Motion and arguments made at the hearing held on September 12, 2023 (the "DIP Hearing") to consider entry of this DIP Order, and due and sufficient notice of the DIP Hearing having been given in accordance with Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and all applicable Local Rules; and the DIP Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and that such relief is fair and reasonable and in the best interests of the Movants, their estates, their creditors and all parties in interest, and is essential for the preservation of the value of the DIP Borrowers' estates; and it appearing that the Movants' entry into the DIP Credit Agreement is a sound and prudent exercise of the DIP Borrowers' and the Trustee's business judgment; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.    *Petition Dates and Appointment of Trustee*.  Genever US filed its voluntary chapter 11 petition in the New York Bankruptcy Court on October 12, 2020.  On February 15, 2022, the Individual Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  By order dated July 8, 2022, the Court approved the selection of the Trustee.  On October 11, 2022, Genever BVI filed its voluntary chapter 11 petition in this Court.  Shortly thereafter, by order dated November 3, 2022, the New York Bankruptcy Court granted the Trustee and Genever US's joint motion to transfer venue of Genever US's chapter 11 case to this Court. By order dated November 21, 2022, the Court approved the joint administration of the chapter 11 cases of Genever US, Genever BVI, and the Individual Debtor.

B.    *Jurisdiction and Venue*.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Rule 4001-3 of the Local Rules.

C.    *Committee Formation*.  On March 21, 2022, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "<u>Committee</u>") in the Individual Debtor's chapter 11 case.  No examiner has been appointed in the Chapter 11 Cases.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

D.    *Notice and Service*    The DIP Hearing was held pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Proper, timely, adequate, and sufficient notice and service of the Motion and the DIP Hearing has been provided in accordance with Local Rule 4001-3(g)(7), and no other or further notice or service of the Motion or the entry of this DIP Order shall be required.

E.    *Findings Regarding the DIP Financing.*

(a)    <u>Cause Exists</u>.  Good and sufficient cause has been shown for the entry of this DIP Order and for authorization of the DIP Borrowers to enter into and borrow under the DIP Credit Agreement.

(b)    <u>Need for DIP Financing</u>.  The DIP Borrowers have an immediate and critical need to incur the DIP Financing in order to permit, among other things, the funding of expenses of administering their chapter 11 cases and other necessary expenses, such as essential remediation repairs to the Apartment, U.S. Trustee Fees, and professional fees.  The DIP Borrowers' access to sufficient liquidity through the incurrence of indebtedness under the DIP Facility provided under the DIP Credit Agreement is necessary and vital for the preservation and maximization of the value of the DIP Borrowers' chapter 11 estates.

(c)    <u>No Credit Available on More Favorable Terms</u>.  The DIP Facility is the best source of debtor-in-possession financing reasonably available to the DIP Borrowers at this time. The DIP Borrowers have determined that the DIP Borrowers are unable to obtain adequate credit on more favorable terms than those provided under the DIP Facility.

(d)    <u>Business Judgment and Entire Fairness</u>.  Based on the record established in the Motion and at the DIP Hearing, the terms of the DIP Financing pursuant to the DIP Credit Agreement (i) are in each case fair and reasonable, reflect the DIP Borrowers' and the Trustee's exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably

equivalent value and fair consideration, and represent the best financing available and (ii) to the extent applicable, satisfy the entire fairness standard.

(e)     Good-Faith Lender.    The DIP Financing is the result of (i) the DIP Borrowers' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain critical postpetition financing and (ii) good-faith considerations by the DIP Borrowers and the Trustee acting as the representative of the Individual Debtor's estate.    The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances. Further, no consideration is being provided to any party to the DIP Facility other than as described in the Motion.  The DIP Loans and any obligations of the DIP Borrowers owing to the DIP Lender, in accordance with the terms of the DIP Credit Agreement, have been extended by the DIP Lender in good faith, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Lender (and any successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     Use of Proceeds of the DIP Facility.    The DIP Borrowers will use the proceeds of the DIP Facility consistent with this Order and as provided in the DIP Credit Agreement and only for purposes that are permissible under the Bankruptcy Code.

(g)     Section 506(c) of the Bankruptcy Code.    The DIP Lender is entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code as provided herein.

(h)     Corporate Authority.    The DIP Borrowers and the Trustee (acting as the representative of the DIP Lender) each have all requisite power and authority to execute and deliver the DIP Credit Agreement to which it is a party and to perform its obligations thereunder,

including without limitation, the incurrence of the DIP Loans and the pledge of applicable DIP Collateral.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    *Disposition.*  The relief requested in the Motion is granted on a final basis as set forth herein.  No objections to the Motion have been filed.  This DIP Order shall become effective immediately upon its entry.

2.    *Authorization of the DIP Financing and the DIP Credit Agreement.*

(a)    The DIP Facility is hereby approved on a final basis as set forth herein.  The Movants, by this DIP Order, are authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Credit Agreement and such other acts as may be necessary, appropriate or desirable in connection therewith.  The DIP Borrowers are hereby authorized to borrow money pursuant to the DIP Credit Agreement, subject to any limitations therein, which shall be used for all purposes permitted by this DIP Order and under the DIP Credit Agreement and subject to the terms and conditions set forth herein and therein.  The DIP Lender (acting through the Trustee) is authorized to make the advances described in the DIP Credit Agreement directly to a payee or obligee of the DIP Borrowers, and any such advances will be considered advances under the Credit Agreement.

(b)    In furtherance of the foregoing and without further approval of this Court, the DIP Borrowers and the Trustee, acting as representative of the DIP Lender, are each authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates,

agreements, charges, deeds, and documents, and to pay the principal, interest, and other amounts described in the DIP Credit Agreement as such amounts become due and payable in accordance with the terms and conditions of the DIP Credit Agreement, and to take any other related actions that may be necessary, desirable or appropriate, all to the extent provided in this DIP Order or the DIP Credit Agreement.

3.    *Carve-Out.*  Carve-Out means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (ii) all reasonable and documented fees and expenses up to $40,000 incurred by a trustee under section 726(b) of the Bankruptcy Code and allowed by the Court; and (iii) to the extent allowed by this Court at any time, whether by interim or final order, all accrued and unpaid claims for fees, costs, and expenses of the kind specified in sections 327, 328, 330 and 331 of the Bankruptcy Code incurred by persons or firms retained by the DIP Borrowers after the Venue Transfer Date (the "Carve-Out Professional Fees").  The Carve-Out Professional Fees shall not exceed $350,000.  For the avoidance of doubt, the Carve-Out Professional Fees shall exclude any fees required to be paid to any real estate broker.  At no time may the total amount owed by the DIP Borrowers exceed the DIP Lender's Commitment less $350,000.

4.    *DIP Claim.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Lender shall be granted an allowed senior secured superpriority administrative expense claim against each of the DIP Borrowers, on a sole and several basis, with priority over any and all other claims against the DIP Borrowers, now existing or hereafter arising, of any kind whatsoever, other than the Allowed SN Senior Debt Claim (as defined herein) and other SN Senior Debt to the extent allowed, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims

7

arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed senior secured superpriority administrative expense claim (the "DIP Claim") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Claim shall be payable from and have first recourse to (i) the DIP Collateral and all proceeds thereof, subject only to payment of the Carve-Out and the Allowed SN Senior Debt Claim and other SN Senior Debt to the extent allowed and (ii) any other asset of the DIP Borrowers, *provided, however*, that the DIP Claim will not have first recourse to proceeds of any actions under sections 502(d), 544, 545, 547, 548, 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code.  For the avoidance of doubt, except for the Carve-Out and the Allowed SN Senior Debt Claim and other SN Senior Debt to the extent allowed, the DIP Claim shall not be made subject to or *pari passu* with any claim heretofore granted or hereinafter granted or created in the chapter 11 cases or any successor case or cases under the Bankruptcy Code (including, without limitation, any case under chapter 7 of the Bankruptcy Code), and such DIP Claim shall maintain its priority as provided herein until all obligations hereunder and under the DIP Credit Agreement have been paid in full.  The DIP Claim shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

5.  *DIP Collateral*.  DIP Collateral shall mean and include the following property and the proceeds of such property: (a) Genever US's interest in (i) the proprietary lease dated March 6, 2015 by and between the Sherry Netherland, Inc., and Genever Holdings LLC for that certain apartment known as Apartment 1801 and the shares appurtenant to such lease; (ii) Genever US's

interest in the proprietary lease dated March 6, 2015 by and between the Sherry Netherland, Inc., and Genever Holdings LLC for that certain apartment known as Maid's Room 2219 and the shares appurtenant to such lease, (iii) Genever US's interest in the proprietary lease dated March 6, 2015 by and between the Sherry Netherland, Inc., and Genever Holdings LLC for that certain apartment known as Maid's Room 719 and the shares appurtenant to such lease (such leases and such shares, collectively, the "Coop Interest"); (b) the proceeds of litigation commenced or to be commenced by Genever BVI or Genever US (the "Borrowers' Litigation Claims"), including, without limitation, the adversary proceeding brought in the Bankruptcy Court by Genever US against AIG Property Casualty Company and stylized as *Complaint Under Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 7001 of Genever Holdings LLC Against AIG Property Casualty Company Under Various Insurance Policies for Breach of Contract and Declaratory Judgment*, and docketed as Docket No. 1 in Adv. Proc. No. 23-05007 (the "AIG Litigation"); (c) any and all funds held in deposit accounts in the name of the DIP Borrowers, including, without limitation, the Cash Deposit; and (d) Genever BVI's ownership interest in Genever US. For the avoidance of doubt, DIP Collateral shall not include any avoidance actions under sections 502(d), 544, 545, 547, 548, 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code, or the proceeds of such avoidance actions.

6. *DIP Liens*. As security for the DIP Loans, and subject only to the Carve-Out, effective and automatically and properly perfected upon the date of the entry of this DIP Order, and without the necessity of the execution, recordation, perfection, filings by the DIP Lender, or the possession or control by the DIP Agent of, or over, any DIP Collateral, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens are hereby granted to the DIP Lender (all such liens and security interests the "DIP Liens").

9

(a)      <u>Senior Liens</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first priority security interest in and lien upon the DIP Collateral that, on or as of the Petition Date, is not otherwise subject to a lien.  For the avoidance of doubt:

1. The Sherry Netherland First Lien and the Sherry Netherland's security interest in and first lien on the Cash Deposit (the "<u>Sherry Netherland Cash Deposit Lien</u>" and, together with the Sherry Netherland First Lien, the "<u>Sherry Netherland Senior Liens</u>") are valid and duly perfected and are senior to and have priority in all respects, including payment, to the security interests and liens granted to the DIP Lender with respect to DIP Collateral and the proceeds thereof.

2. Subject to the Carveout, the DIP Lender shall have a first priority security interest in all DIP Collateral (other than the Coop Interest and the Cash Deposit) including, without limitation, the Borrowers' Litigation Claims (including the AIG Litigation) and Genever BVI's ownership interest in Genever US.  Notwithstanding the foregoing, the Sherry Netherland shall have the right to assert solely an equitable lien in and over any proceeds of the AIG Litigation (but not any other Borrowers' Litigation Claim).  If such equitable lien is asserted, the validity, enforceability, and priority of such asserted equitable lien will be determined by a court of competent jurisdiction (with the Movants believing that the Bankruptcy Court

10

would have sole and exclusive jurisdiction and the Sherry Netherland reserving all rights) under applicable bankruptcy and non-bankruptcy law, and all parties' rights with respect thereto are preserved.

(b)  <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected junior security interest in and lien upon the DIP Collateral that (i) on or as of the Petition Date is subject to valid, perfected and unavoidable senior liens in existence immediately prior to the Petition Date or (ii) becomes subject to perfected liens as permitted by section 546(b) of the Bankruptcy Code.  For the avoidance of doubt, the DIP Liens shall be junior to the Sherry Netherland Senior Liens.

(c)  <u>No Cross-Collateralization</u>.  The DIP Liens granted in the property of each DIP Borrower will secure only the obligations of that borrower.

(d)  <u>No Default Under Proprietary Lease</u>.  The Sherry Netherland shall not raise any argument, in connection with the Motion or otherwise, that Genever US defaulted under the Proprietary Lease by granting the security interests and liens described herein.

7.  The DIP Liens shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that any of the DIP Orders or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

8.  *Protection of Rights under the DIP Facility.*  The automatic stay is hereby modified to the extent necessary to permit the DIP Borrowers and the Trustee, as representative of the DIP Lender, as applicable, to take any or all of the following actions, at the same or different time, in each case without further order or application of the Court: (i) file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to

11

validate and perfect the liens and security interests granted herein; (ii) grant the DIP Liens and

incur all liabilities and obligations set forth herein; and (iii) following a default, exercise all rights

and remedies of the DIP Lender in accordance with the DIP Credit Agreement.  For the avoidance

of doubt and as set forth in the DIP Credit Agreement, the DIP Lender will not take any

enforcement action whether by demand foreclosure or other enforcement action, to collect on any

obligations arising under the DIP Credit Agreement by realizing upon the whole or part of the

Coop Interest or Cash Deposit unless and until there is full payment of the Allowed SN Senior

Debt Claim and other SN Senior Debt to the extent allowed.

   9.  *Preservation of Rights Granted Under the DIP Orders.*

   (a)  Other than the Carve-Out and as permitted in the DIP Credit Agreement, no

claim or lien having a priority superior to or *pari passu* with the DIP Claim or the DIP Lien shall

be permitted while any of the DIP Loans remain outstanding and, except as otherwise expressly

provided in this DIP Order, the DIP Liens shall not be: (i) subject or junior to any lien or security

interest that is avoided and preserved for the benefit of the DIP Borrowers' estates under section

551 of the Bankruptcy Code; or (ii) subordinated to or made *pari passu* with any other lien or

security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

   (b)  As used in this DIP Order, the term "Event of Default" shall mean the

existence of (i) any Event of Default (as defined and under the DIP Credit Agreement) or (ii) any

material breach of any of the terms of this DIP Order by the DIP Borrowers.  Notwithstanding any

order entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code

or otherwise: (i) the DIP Claims and the DIP Liens, and any claims related to the foregoing, shall

continue in full force and effect and shall maintain their priorities until all DIP Loans shall have

been paid in full (and that such DIP Claim and DIP Liens, shall, notwithstanding such dismissal,

12

remain binding); (ii) the other rights granted by the DIP Order, including with respect to the Carve-Out, shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this DIP Order.

(c)     If any or all of the provisions of this DIP Order are hereafter reversed, modified, vacated or stayed, the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, the DIP Order, and the DIP Credit Agreement with respect to the DIP Loans.

(d)     Except as expressly provided in this DIP Order or in the DIP Credit Agreement, the DIP Liens and the DIP Claim and all other rights and remedies of the DIP Lender granted by the provisions of DIP Credit Agreement shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission; (ii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Borrowers waive any discharge as to any remaining DIP Loans.  The terms and provisions of the DIP Credit Agreement shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens and the DIP Claim and all other rights and remedies of the DIP Lender, granted by the provisions of the DIP Credit Agreement shall continue in full force and effect until the DIP Loans are paid in full, as set forth herein and in the DIP Credit Agreement.

10. *Loss or Damage to DIP Collateral.*  Nothing in this DIP Order, the DIP Credit Agreement, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the Trustee of any liability for any claims arising from the prepetition or postpetition activities of the DIP Lender or the DIP Borrowers in connection with their restructuring efforts.

11. *Allowed SN Senior Debt Claim.*  The Sherry Netherland's pre-petition claim for unpaid arrearages owed to the Sherry Netherland under the Proprietary Lease and other corporate documents is hereby allowed as a pre-petition secured claim in the amount of $1,096,186.54, which amount is not subject to challenge or objection by the Movants or amendment or supplementation by the Sherry Netherland (the "Allowed SN Senior Debt Claim").

12. *Authority to Pay Certain Post-Petition Fees.*  Genever US is authorized to agree to pay, and the DIP Lender, acting through and at the discretion of the Trustee is authorized to advance funds for the payment of, (i) reasonable post-petition fees of the Sherry Netherland's counsel and (ii) Genever US's professionals that have provided, or continue to provide, services to Genever US after the Venue Transfer Date.  Prior to making payments under this paragraph, Genever US shall file a notice with the Court attaching the applicable invoices.  Parties in interest will then have fourteen (14) days to object to such invoices.  If no timely objections are filed with the Court, Genever US is authorized to pay such invoices without further Court order.  If any timely objections are filed, (i) Genever US and the affected professional(s) may file a response to such objection(s) within seven (7) days thereafter and (ii) Genever US shall pay the portion of the

fees and expenses that are not subject to such objection(s).  To the extent that an objection cannot be consensually resolved among the parties, the Court will rule on the matter.

13. Nothing herein or in the Motion constitutes, or shall be construed as, a finding or waiver regarding the allowance or priority of any asserted post-petition amounts that have arisen, or may arise, under the Proprietary Lease and other corporate documents, including, without limitation, claims as a result of the fire in the Apartment, and all parties' rights with respect to such post-petition claims are fully preserved.

14. *DIP Order Governs*.  In the event of any inconsistency between the provisions of this DIP Order, on the one hand, and the DIP Credit Agreement or any other order entered by this Court, the provisions of this DIP Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to and any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this DIP Order and the DIP Credit Agreement.

15. *Binding Effect; Successors and Assigns*.  The DIP Credit Agreement and the provisions of this DIP Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Borrowers, the Trustee, the DIP Lender, the Committee, any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and their respective successors and assigns.

16. *No Waiver.*  No delay or failure of the DIP Lender in the exercise of its rights and remedies under the DIP Credit Agreement or this DIP Order, as applicable, shall constitute a waiver, in whole or in part, of any of the DIP Lender's rights hereunder or otherwise.

17. *Effectiveness*.  This DIP Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof.  Notwithstanding

Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this DIP Order.

18. *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this DIP Order.

19. *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

20. *No Third Party Rights*.  Except as explicitly provided for herein, this DIP Order does not create any rights for the benefit of any third party, creditor, or any direct, indirect or incidental beneficiary.

21. *Necessary Action*.  The DIP Borrowers, the Trustee and the DIP Lender are authorized to take all actions as are necessary or appropriate to implement the terms of this DIP Order.

22. *Notice.* Within three (3) business days after entry of this DIP Order, the DIP Borrowers shall serve copies of this DIP Order on the parties having been given notice of the DIP Hearing, to any party that has filed a request for notices with this Court, and to counsel for the Committee.

Dated at Bridgeport, Connecticut this 12th day of September, 2023.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

## **Exhibit 1**

DIP Credit Agreement

**MULTI-DRAW SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AND SECURITY AGREEMENT**

**dated as of August 23, 2023,**

**by and among**

**Genever Holdings LLC and Genever Holdings Corporation,**

**as Borrowers, and as Debtors and Debtors-in-Possession under the Chapter 11 Bankruptcy Code**

**and**

**Luc A. Despins,**

**in his capacity as the Chapter 11 Trustee under the Chapter 11 Bankruptcy Code,**

**as the Lender**

# **TABLE OF CONTENTS**

**Page**

**ARTICLE 1 DEFINITIONS** ................................................................................................. **2**
     Section 1.1    General Definitions ................................................................................ 2
     Section 1.2    Interpretation ......................................................................................... 5
     Section 1.3    Business Day Adjustment ...................................................................... 6
     Section 1.4    Officers ................................................................................................. 7

**ARTICLE 2 AGREEMENT FOR THE LOAN** .................................................................. **7**
     Section 2.1    Use of Proceeds .................................................................................... 7
     Section 2.2    Disbursements ....................................................................................... 7
     Section 2.3    Payments; Prepayments; Termination Prepayment ............................. 8
     Section 2.4    Payment Details .................................................................................... 8
     Section 2.5    Interest .................................................................................................. 8

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES** .............................................. **8**
     Section 3.1    Representations and Warranties of the Borrowers ............................... 8
     Section 3.2    Borrowers' Acknowledgment ............................................................... 9

**ARTICLE 4 CONDITIONS PRECEDENT** ....................................................................... **9**
     Section 4.1    Conditions Precedent to Closing Date and Initial Borrowing .............. 9
     Section 4.2    Conditions Precedent to all Borrowings ............................................. 10

**ARTICLE 5 PARTICULAR COVENANTS AND EVENTS OF DEFAULT** ................... **11**
     Section 5.1    Affirmative Covenants ........................................................................ 11
     Section 5.2    Negative Covenants ............................................................................ 11
     Section 5.3    General Acceleration Provision upon Events of Default ..................... 11
     Section 5.4    Remedies ............................................................................................. 12

**ARTICLE 6 MISCELLANEOUS** ..................................................................................... **13**
     Section 6.1    Notices ................................................................................................ 13
     Section 6.2    Waiver of Notice ................................................................................. 14
     Section 6.3    Cost and Expense Reimbursement ...................................................... 14
     Section 6.4    Governing Law; Venue; Jurisdiction; Service of Process; Waiver of Jury
                   Trial .................................................................................................... 14
     Section 6.5    Entire Agreement; Amendments ........................................................ 15
     Section 6.6    Severability ......................................................................................... 15
     Section 6.7    Counterparts ........................................................................................ 15
     Section 6.8    Survival ............................................................................................... 16
     Section 6.9    No Waiver ........................................................................................... 16
     Section 6.10   No Third Parties Benefited ................................................................. 17
     Section 6.11   No Third Parties Benefited ................................................................. 17
     Section 6.12   Binding Effect ..................................................................................... 17
     Section 6.13   Marshaling; Payments Set Aside ........................................................ 17
     Section 6.14   No Waiver; Cumulative Remedies ...................................................... 17
     Section 6.15   Right of Setoff .................................................................................... 17
     Section 6.16   DIP Order Controls ............................................................................ 18

**ARTICLE 7 DIP COLLATERAL** ..................................................................................... **18**

Section 7.1    Grant of Security Interest ................................................................... 18
Section 7.2    Limitations ...................................................................................... 18
Section 7.3    Further Assurances .......................................................................... 18
Section 7.4    Protection of DIP Collateral ............................................................ 18
Section 7.5    Defense of Title ............................................................................... 19

### Annexes

Annex A            Commitments

### Exhibits

Exhibit A            Form of Notice of Borrowing

## MULTI-DRAW SENIOR SECURED SUPER-PRIORITY

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This MULTI-DRAW SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT, dated as of [•], 2023, (as amended, amended and restated, supplemented or otherwise modified, this "Agreement"), is entered into by and among (i) Genever Holdings LLC, a New York limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases ("Genever US"), (ii) Genever Holdings Corporation, a corporation registered under the laws of the British Virgin Islands and a debtor and debtor-in-possession in the Chapter 11 Cases ("Genever BVI" and together with Genever US, the "Borrowers"), and (iii) the chapter 11 estate of Ho Wan Kwok (the "Individual Debtor"), acting through its representative, Luc A. Despins in his capacity as the chapter 11 trustee (the "Chapter 11 Trustee") of the Individual Debtor (such chapter 11 estate being the "Lender"; together with the Borrowers party hereto, the "Parties").

### W I T N E S S E T H :

WHEREAS, on October 12, 2020 (the "Genever US Petition Date") Genever US filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the Southern District of New York.

WHEREAS, on February 15, 2022, the Individual Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), and July 8, 2022, the Bankruptcy Court entered an order approving the appointment of Luc A. Despins as the Chapter 11 Trustee.

WHEREAS, on October 11, 2022 (the "Genever BVI Petition Date" and together with the Genever US Petition Date, the "Petition Date"), Genever BVI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (Genever US, Genever BVI, and the Individual Debtor each being a "Debtor" and, collectively, the "Debtors").  On November 3, 2022, the Bankruptcy Court for the Southern District of New York granted the Chapter 11 Trustee and Genever US's joint motion to transfer venue of Genever US's chapter 11 case to the Bankruptcy Court, and on November 21, 2022 (the "Venue Transfer Date"), the Bankruptcy Court approved the joint administration of the chapter 11 cases of Genever US, Genever BVI, and the Individual Debtor (collectively, the "Chapter 11 Cases");

WHEREAS, the Borrowers, in the exercise of their business judgment, have asked the Lender to provide the Borrowers with a senior secured super-priority debtor-in-possession credit facility (the "DIP Facility"), consisting of $2,000,000 of revolving Loans that will be made available to the Borrowers pursuant to the terms of, and subject to the conditions set forth in, this Agreement and the DIP Order;

WHEREAS, the Lender, in the exercise of its business judgment and acting through the Chapter 11 Trustee, is willing to make such revolving Loans to the Borrowers, subject to the terms and conditions set forth in this Agreement and in the DIP Order; and

WHEREAS, the Obligations of the Borrowers are subject to the Carve-Out and the Allowed SN Senior Debt Claim and other SN Senior Debt to the extent allowed and secured by Liens on the DIP Collateral, in each case, as set forth in, and subject to, the Loan Documents and the DIP Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby covenant and agree as follows:

# ARTICLE 1

## DEFINITIONS

### Section 1.1    General Definitions.

Wherever used in this Agreement, the Annexes or the Exhibits or the Schedules attached hereto, unless the context otherwise requires, the following terms have the following meanings:

"Affiliate" shall have the meaning given to such term in section 101 of the Bankruptcy Code. Unless expressly stated otherwise herein, the Lender shall not be deemed an Affiliate of any Borrower.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"AIG Litigation" shall mean the adversary complaint brought in the Bankruptcy Court by Genever US against AIG Property Casualty Company and stylized as *Complaint Under Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 7001 of Genever Holdings LLC Against AIG Property Casualty Company Under Various Insurance Policies for Breach of Contract and Declaratory Judgment*, and docketed as Docket No. 1 in Adv. Proc. No. 23-05007.

"Allowed SN Senior Debt Claim" shall have the meaning assigned to such term in the DIP Order.

"Apartment" shall have the meaning assigned to such term in the DIP Order.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" has the meaning set forth in the preamble to this Agreement.

"Borrowers" has the meanings set forth in the preamble to this Agreement.

"Borrowing" means any request to borrow, amount actually borrowed by the Borrowers, or Loan actually made under this Agreement.

"Borrowing Date" means the date that any Borrowing is funded by the Lender.

"Business Day" means a day other than Saturday or Sunday on which banks are open for business in New York, New York.

"Carve-Out" has the meaning assigned to such term in the DIP Order.

"Cash Deposit" means the cash security deposit held by the Sherry Netherland Inc. as cash collateral securing Genever US's obligations under the proprietary lease pursuant to security deposit agreements, dated as of March 6, 2015, between Genever US and the Sherry Netherland Inc.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Closing Date" means the date upon which all conditions precedent to the effectiveness of this Agreement set forth in Article 4 are satisfied or waived in accordance with the terms hereof.  For the avoidance of doubt, [•], 2023 constitutes the Closing Date.

"Commitment" shall mean the amount in U.S. Dollars set opposite the Lender's name under the heading "Commitment" as set forth on Annex A.

"<u>Debtor</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Default</u>" means any event which, with the giving of notice, lapse of time or fulfillment of any other applicable condition (or any combination of the foregoing), would constitute an Event of Default.

"<u>DIP Collateral</u>" has the meaning given to it in Article 7 hereof, the DIP Order and each other applicable Loan Document.

"<u>DIP Facility</u>" has the meaning set forth in the recitals to this Agreement.

"<u>DIP Lien</u>" has the meaning given to it in Article 7 hereof, the DIP Order, and each other applicable Loan Document.

"<u>DIP Motion</u>" means the motion and proposed form of DIP Order filed by the Parties with the Bankruptcy Court on or around the date hereof seeking approval, on a final basis, of (among other things) the DIP Facility.

"<u>DIP Order</u>" means an order of the Bankruptcy Court in the Chapter 11 Cases in connection with the DIP Motion, which order shall (a) be in form and substance, and on terms and conditions, satisfactory to the Lender, (b) subject to the foregoing, authorize and approve, on a final basis, among other things, the DIP Facility and all other matters set forth in, and transactions contemplated by, the DIP Motion (including, without limitation, the DIP Facility and the making of the Loans and the incurrence of all other Obligations in accordance with the terms hereof), (c) be in full force and effect, and (d) not have been reversed, vacated, stayed or amended, supplemented or otherwise modified (unless the Lender shall have previously consented thereto in writing).

"<u>DIP Order Date</u>" means the date on which the DIP Order is approved and entered by the Bankruptcy Court.

"<u>Event of Default</u>" has the meaning set forth in <u>Section 5.3</u>.

"<u>Governmental Authority</u>" means any nation, sovereign, government, quasi-governmental agency, governmental department, ministry, cabinet, commission, board, bureau, agency, court, tribunal, regulatory authority, instrumentality, judicial, legislative, fiscal or administrative or public body or entity, whether domestic or foreign, federal, state, local or other political subdivision thereof, having jurisdiction over the matter or matters and Person or Persons in question or having the authority to exercise executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, securities exchange, regulatory body, arbitrator, public sector entity, supra-national entity and any self-regulatory organization.

"<u>Interest Rate</u>" means 9.0% *per annum*, with no default interest rate and no prepayment penalty or similar premiums.

"<u>Lender</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Lien</u>" means any lien, pledge, preferential arrangement, mortgage, security interest, deed of trust, charge, assignment, hypothecation, title retention or other encumbrance on or with respect to property or interest in property having the practical effect of constituting a security interest.

"<u>Loan</u>" means each and any revolving loan made (or deemed made) hereunder or pursuant hereto from time to time.

"Loan Documents" means this Agreement, the DIP Order, each Notice of Borrowing, any mortgage delivered in connection with this Agreement, any written notices from the Borrowers with respect to request of Loans under Section 2.2, any other documents, agreements and instruments that are specifically designated or deemed a "Loan Document" pursuant to the terms thereof and dated as of the Closing Date or subsequent thereto, whether or not specifically mentioned herein or therein, in each case, as amended, restated, supplemented or otherwise modified from time to time.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, results of operations, financial condition, or assets of any Borrower, (b) the validity or enforceability of any provision of any Loan Document, (c) the ability of any Borrower to timely perform the Obligations, (d) the creation, perfection or priority of the Liens granted under the Loan Documents or the value of the Collateral (taken as a whole) or a material portion of the DIP Collateral, or (e) the rights and remedies of the Lender under any Loan Document, in each case, (other than as a result of the events and conditions related and/or leading up to the commencement of the Chapter 11 Cases, or any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases).

"Maturity Date" means the earliest to occur of (a) a sale of the Apartment, (b) the Debtors' filing of a plan of reorganization with the Bankruptcy Court, (c) the first business date that is 24 months from the Closing Date, or (d) the Payment in Full of all Obligations hereunder.

"Obligations" means all (a) principal of, and premium, if any, on the Loans, and, without limiting the foregoing, all obligations and indebtedness with respect to the Commitments, (b) interest (including interest accruing after the Termination Date or other maturity of the Loans), expenses, and other amounts payable by the Borrowers under Loan Documents, and (c) other indebtedness obligations and liabilities of any kind owing by the Borrowers pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any insolvency proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

"Parties" has the meaning set forth in the preamble to this Agreement.

"Payment in Full" means with respect to the Loans and all other Obligations (other than contingent obligations as to which no claim has been asserted), (a) the indefeasible payment thereof in full in cash in accordance with the Loan Documents or as otherwise consented to in writing by the Lender (including in connection with any transaction pursuant to which all or substantially all of the Debtors' property and assets are sold, transferred or otherwise disposed of (including pursuant to section 363 of the Bankruptcy Code)) and all interest and other amounts; provided, that, notwithstanding the foregoing, "Payment in Full" shall not be deemed to occur, and no Loans shall be deemed to have been paid in full, unless and until such time as all Commitments shall have irrevocably, permanently and finally expired, or shall have been so terminated, cancelled and discharged.  "Payment in Full" shall also include any reference to "payment in full", "paid in full", "repaid in full", "prepaid in full", "redeemed in full" or any other term or word of similar effect used in this Agreement or any other Loan Document.

"Person" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Proprietary Lease and Shares" shall mean, collectively, (A) the (i) proprietary lease dated March 6, 2015 by and between the Sherry Netherland, Inc., and Genever Holdings LLC for that certain apartment known as Apartment 1801, (ii) proprietary lease dated March 6, 2015 by and between the Sherry Netherland, Inc., and Genever Holdings LLC for that certain apartment known as Maid's Room 2219, and (iii) proprietary lease dated March 6, 2015 by and between the Sherry Netherland, Inc., and Genever Holdings LLC for that certain apartment known as Maid's Room 719, and (B) the shares to which such leases are appurtenant.

"SN Senior Debt" shall have the meaning assigned to such term in the DIP Motion.

"Stock" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests (or units thereof), joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting; and (b) all securities convertible into or exchangeable for any other Stock and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any other Stock, whether or not presently convertible, exchangeable or exercisable.

"Termination Date" means the earliest of the following: (a) the Maturity Date or (b) the occurrence of any Event of Default under this Agreement or the other Loan Documents.

"Transactions" means (a) the execution and delivery by the Borrowers of this Agreement and the other Loan Documents to which they are a party on the Closing Date, and the performance of the obligations and transactions hereunder, (b) the other transactions related to or entered into in connection with any of the foregoing and (c) the payment of fees, premiums, charges, costs and expenses in connection with any of the foregoing.

"UCC" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

**Section 1.2      Interpretation**.

In this Agreement and the other Loan Documents, unless the context otherwise requires, all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun. The division of this Agreement and the other Loan Documents into Articles and Sections and the use of headings and captions is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions. The words "herein," "hereof," "hereunder," "hereinafter" and "hereto" and words of similar import refer to this Agreement (or other applicable Loan Document) as a whole and not to any particular Article or Section hereof (or thereof). The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The term "documents" and "agreements" include any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced. The use in any of the Loan Documents of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. References to a specified Article, Annex, Exhibit, Section or Schedule shall be construed as a reference to that specified Article, Annex, Exhibit, Section or Schedule of this Agreement (or other

applicable Loan Document).   Unless specifically stated otherwise, any reference to any of the Loan Documents means such document as the same shall be amended, restated, supplemented or otherwise modified and from time to time in effect.   The references to "asset" (or "assets") and "property" (or "properties") in the Loan Documents are meant to mean the same and are used throughout the Loan Documents interchangeably, and such words shall be deemed to refer to any and all tangible and intangible assets and properties, including cash, securities, Stock, accounts and contract rights.   Unless otherwise specified herein or therein, all terms defined in any Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto or thereto.   The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.   Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.   In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."   If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, unless otherwise expressly stated, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.   References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and, except as otherwise provided with respect to FATCA, are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation, and any reference to any law or regulation, shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.   Whenever any reference is made in any Loan Document to any Person such reference shall be construed to include such Person's permitted successors and permitted assigns.   Any financial ratios required to be satisfied in order for a specific action to be permitted under any Loan Document shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein or therein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).   Unless otherwise specified, all references in any Loan Document to times of day shall be references to New York City time.   The terms "shall" and "will" are used interchangeably in this Agreement and the other Loan Documents and mean for the Borrowers to have an absolute obligation to perform or do (or not perform or not do) a certain action or event, as the context may require.   The payment, prepayment, redemption or repayment of any principal, interest, fees, amounts and/or other Obligations under this Agreement or the other Loan Documents shall be made in cash in Dollars unless expressly stated otherwise herein or therein.   Any action or event that is not permitted or is otherwise prohibited by the terms of the Loan Documents shall mean that such action or event is (y) not directly or indirectly permitted to be taken or consummated and (z) directly and indirectly prohibited.   No Person shall be permitted to take any action, or consummate any transaction, through a sublicense or a sublease (as applicable) that such Person is prohibited under (or by) the Loan Documents from taking, or consummating, through a license or a lease (as applicable).

Section 1.3   **Business Day Adjustment**.

Except as otherwise expressly stated herein or in any other Loan Document (and except on the Maturity Date or any date of acceleration of any of the Obligations, which in each such case, such payment or performance shall be due and payable or performed on or prior to such day regardless of whether such day is a Business Day), if the day by which any payment or other performance is due to be made is not a Business Day, that payment or performance shall be made by the next succeeding Business Day unless that next succeeding Business Day falls in a different calendar month, in which case that payment or other performance shall be made by the Business Day immediately preceding the day by which such payment or other performance is due to be made; underlined provided that interest will continue to accrue each additional day in connection therewith.

6

.

**Section 1.4**    **Officers**.

Any document, agreement or instrument delivered under the Loan Documents that is signed by an officer of a Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Borrower and such officer shall be conclusively presumed to have acted on behalf of such Borrower in such person's capacity as an officer of such Borrower and not in any individual or other capacity.

## ARTICLE 2

## AGREEMENT FOR THE LOAN

**Section 2.1**    **Use of Proceeds**.

The proceeds of the Loans shall, in each case, be permitted to be used by the Borrowers at the sole discretion of the Lender and only for necessary expenses, including: (a) essential remediation repairs to the Apartment, (b) fees and expenses owed to the U.S. Trustee and (c) fees and expenses of the kind specified in sections 327, 328, 330 and 331 of the Bankruptcy Code and incurred after the Venue Transfer Date.

**Section 2.2**    **Disbursements**.

(a)    Subject to the entry, and the terms and conditions, of the DIP Order, effective immediately and automatically upon the Closing Date, and without any further action by any party to this Agreement or the other Loan Documents, the Bankruptcy Court or any other Person, the Lender will make, in its sole discretion, the following revolving Loans to the Borrowers (unless the Termination Date shall have occurred) in an aggregate amount up to but not exceeding the Lender's Commitment:

(i)    Revolving Loans to finance necessary expenses of the Borrowers (as permitted by Section 2.1) projected to be made during the four week period commencing with the date of the applicable draw; provided, that the aggregate amount of revolving Loans shall not exceed the remaining unfunded Commitments.

(ii)    Each Loan shall be made in an aggregate minimum amount of $10,000 and integral multiples of $5,000 in excess of that amount.

Amounts borrowed pursuant to this Section 2.2 may be repaid and reborrowed.

(b)    Requests for Borrowings.  In the case of a Borrowing, the applicable Borrower shall give the Lender at least one (1) Business Day's prior written notice (which writing may be in email) prior to 1:00 p.m. (EST) (the "Notice of Borrowing") in substantially the form of Exhibit A in the case of a Borrowing (or such shorter period of time as consented to by the Lender).  Such Notice of Borrowing shall specify (i) the aggregate principal amount of Loans to be borrowed, (ii) the date of the Borrowing (which shall be a Business Day) (the "Borrowing Date"), and (iii) the Borrowers' expected use of such funds.

(c)    Termination of Commitments; Voluntary Reduction of Commitments. Commitments (if any remain unused, after giving effect to any funding of Loans on such date) shall automatically terminate on the Termination Date.

Section 2.3     **Payments; Prepayments; Termination Prepayment**.

(a)     Notwithstanding anything else herein or elsewhere, the Obligations shall remain outstanding until such time as Payment in Full thereof shall have occurred.  The Borrowers shall pay in cash to the Lender the outstanding principal amount of the Obligations and all other Obligations on the Termination Date as necessary to constitute Payment in Full; provided that, notwithstanding anything to the contrary in the Loan Documents, to the extent the Termination Date would occur after such date, then the Termination Date shall automatically be moved to the same earlier date without any action or notice of any Person.

(b)     Loans may be prepaid from time to time, without penalty or premium.  The outstanding balance of the Loans (principal and interest) shall be paid in full on the Maturity Date.

(c)     Each payment, repayment, redemption and prepayment by the Borrowers shall be applied (i) first, to all fees, costs and expenses owed to the Lender under the Loan Documents, (ii) second, to accrued and unpaid interest owed to the Lender under the Loan Documents, (iii) third, to the principal amount of the Loans owed to the Lender, and, (iv) fourth, to all other Obligations owing to the Lender. Once paid, such payments shall not be refundable under any circumstances.

Section 2.4     **Payment Details**.

All payments of the Obligations by the Borrowers hereunder and under any of the other Loan Documents shall be made without setoff, counterclaim or defense of any kind, free of (and without deduction for) any taxes, and shall be paid in cash in U.S. Dollars in immediately available funds, in each case, (a) to the Lender and (b) applied in accordance with Section 2.3(c).  The Borrowers shall pay all and any fees, costs and expenses (administrative or otherwise) imposed by banks, clearing houses or any other financial institutions in connection with making any payments under any of the Loan Documents.

Section 2.5     **Interest**.

(a)     The outstanding principal amount of the Loans and any other amounts and Obligations shall bear interest at the Interest Rate (calculated on the basis of the actual number of days elapsed in each month based on a year of 360 days).  Interest shall become due and payable upon the Termination Date.

(b)     Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on demand in cash.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Section 3.1     **Representations and Warranties of the Borrowers**.

In order to induce the Lender to make the Loans pursuant to this Agreement and to induce the Lender to enter into this Agreement, the Borrowers, solely and severally, represent and warrant on (i) the Closing Date, (ii) each Borrowing Date, and (iii) each date such representation or warranty is remade or deemed remade in any Loan Document or otherwise, as applicable, in each case, that:

(a)    <u>Order.</u>  The DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Lender, amended or modified and no appeal of such DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(b)    <u>Bankruptcy Matters.</u>

(i)    The Chapter 11 Cases were validly commenced, and (x) proper notice under the circumstances of the DIP Motion has been given, and (y) the hearing for the approval of the DIP Order has been held by the Bankruptcy Court.

(ii)    After the entry of the DIP Order, each Borrower's Obligations will constitute a DIP Claim (as defined in the DIP Order) and the Liens securing the respective Obligations shall be senior secured, valid, enforceable, and automatically and properly perfected Liens on the respective DIP Collateral, having the priorities set forth in the DIP Order, subject in all respects to the Carve-Out and other exceptions set forth in the DIP Order and the Loan Documents.

(c)    <u>Security Interests</u>.  This Agreement and the DIP Order are effective to create, in favor of the Lender, a legal, valid, binding, enforceable Lien on and security interest in all right, title and interest of the Borrowers in their respective DIP Collateral, in each case, subject to the Carve-Out.  Pursuant to the terms of the DIP Order, no filings or other action (including the taking of possession or control) are or shall at any time be necessary to perfect, preserve or protect such Liens and security interests; <u>provided</u>, that, notwithstanding the foregoing, the Borrowers shall have made (or authorized the making by the Lender of) all filings, in each case, to the extent deemed reasonably necessary and/or appropriate, and requested, by the Lender.

**Section 3.2    Borrowers' Acknowledgment**.

The Borrowers acknowledge that they have made the representations and warranties referred to in <u>Section 3.1</u> with the intention of persuading the Lender to enter into the Loan Documents and that the Lender has entered into the Loan Documents on the basis of, and in full reliance on, each of such representations and warranties, each of which shall survive the execution and delivery of this Agreement, the other Loan Documents, the making of any Loan until (a) all of the Obligations have been repaid in full and (b) all of the Commitments are no longer available or terminated.

## ARTICLE 4

## CONDITIONS PRECEDENT

**Section 4.1    Conditions Precedent to Closing Date and Initial Borrowing**.

The occurrence of the Closing Date, and the effectiveness of this Agreement and of the Lender's obligations to make any Loans hereunder, are subject to the satisfaction (or waiver by the Lender, which such waiver may be communicated via e-mail by the Lender or its counsel) of the following conditions precedent, in addition to the conditions precedent set forth in <u>Section 4.2</u>:

(a)    the Lender shall have received a copy of this Agreement and each other Loan Document, in each case, duly executed and delivered to the Lender by each of the signatories thereto;

(b)    no Default or Event of Default shall have occurred or would result from such initial Borrowing or the use of the proceeds therefrom;

(c)     the DIP Order (i) shall have been entered by the Bankruptcy Court, (ii) shall be in full force and effect on the Closing Date, (iii) shall not have been vacated or reversed, (iv) shall not be subject to a stay, and (v) shall not have been modified or amended in any respect without the prior written consent of the Lender;

(d)     the DIP Order shall be effective to create, in favor of the Lender, valid, binding, enforceable and fully and automatically perfected Liens on the DIP Collateral, on the basis and with the priority set forth therein; and

(e)     such other conditions, documents and deliverables that the Lender may reasonably request.

**Section 4.2     Conditions Precedent to all Borrowings**.

The obligation of the Lender to make any Loan hereunder shall be subject to the fulfillment and satisfaction of all of the following conditions:

(a)     the Closing Date shall have occurred;

(b)     no Default or Event of Default shall exist at the time of, or immediately result from, the making of such Loan;

(c)     there shall not exist any proceeding, order, injunction or decree of any Governmental Authority or in any court restraining or prohibiting (or attempting to restrain or prohibit) the funding of the Loan hereunder;

(d)     the proceeds of such Loan shall be directed and requested for use in accordance with Section 2.1;

(e)     the payment by the Borrowers of all costs and expenses required to be paid on such Borrowing Date (including pursuant to Section 6.3) pursuant to this Agreement and the other Loan Documents (which amounts, at the sole option of the Lender, may be offset against the proceeds of such Loan);

(f)     the Lender shall have received a duly executed written notice from the Borrower complying with the requirements of Section 2.2(b);

(g)     the DIP Order (a) shall be in full force and effect, (b) shall not have been reversed, vacated or stayed, (c) shall not have become the subject of any appeal or challenge, and (d) shall not have been amended, supplemented or otherwise modified without the prior written consent of the Lender; and

(h)     there shall not have occurred since the Closing Date any development or event which, individually or in the aggregate with other such circumstances, has had or could reasonably be expected to have, a Material Adverse Effect.

Each Notice of Borrowing shall constitute a representation by the Borrowers that the foregoing conditions are satisfied (or, as applicable, have been waived) on and as of each of (i) the date of such Notice of Borrowing, (ii) the requested Borrowing Date and (iii) the date on which such Loan is funded or made (or deemed funded or made, as applicable).

**ARTICLE 5**

**PARTICULAR COVENANTS AND EVENTS OF DEFAULT**

**Section 5.1      Affirmative Covenants**.

Until Payment in Full, each Borrower shall—not later than 1:00 p.m. New York City time on the first day of each calendar month (commencing with the first calendar month after the Closing Date)—deliver to the Lender an operating report accounting for the receipt, administration, and disposition of all property over the prior month.  For the avoidance of doubt, the Borrowers' obligations under this Section 5.1 shall be satisfied by the timely filing by the Borrowers of the monthly operating reports required by, and containing the information described in, 28 C.F.R. § 58.8.

**Section 5.2      Negative Covenants**.

Until Payment in Full and as long as any Commitments or Obligations are outstanding, each Borrower shall not:

(a)      other than the claims and Liens of the Lender arising from this Agreement, and except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other claim which is *pari passu* with, or senior to, the claims and Liens of, the Lender;

(b)      make or permit to be made any amendment or change to the DIP Order, as applicable, without the consent of the Lender;

(c)      commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Lender with respect to any Loan Document, or any of the Liens, claims, rights, benefits or protections granted hereunder or thereunder, or any of the transactions contemplated hereby or thereby; and

(d)      subject to the DIP Order, object to, contest, delay, prevent, or interfere in any manner with, the exercise of any rights and remedies by the Lender with respect to the DIP Collateral following the occurrence and during the continuance of an Event of Default.

**Section 5.3      General Acceleration Provision upon Events of Default**.

If one or more of the events specified in this Section 5.3 shall have happened or occurred (each, an "Event of Default"), the Lender may, by written notice to the Borrowers (subject to Section 5.4(a), which, for the avoidance of doubt, shall not require any such notice and shall occur automatically), declare the principal of, and accrued and unpaid interest on, all of the Loans and other Obligations or any part of any of them to be, and the same shall thereupon become, immediately due and payable and shall immediately terminate all of the remaining Commitments, in each case, without any further notice and without any presentment, demand or protest of any kind, all of which are hereby expressly waived by the Borrowers, and take any further action available at law or in equity or that are provided in the Loan Documents, including the sale or transfer of the Loan and other Obligations and all other rights acquired in connection with the Loan or the other Obligations or under the Loan Documents:

(a)      the Borrowers shall have failed to pay within three business days when and as required to be paid herein or in any other Loan Document any amount or Obligation payable hereunder or pursuant to any other Loan Document;

(b)       any authorization of a Governmental Authority necessary for the execution, delivery or performance of any Loan Document or for the validity or enforceability of any of the Obligations under any Loan Document is not given, is withdrawn or ceases to remain in full force or effect;

(c)       (A) any provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Borrower thereto; (B) any Borrower shall so state in writing or bring an action to limit its obligations or liabilities under any Loan Document; (C) the DIP Order shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the DIP Collateral; or (D) any of the Obligations of any Borrower shall cease to be secured by all of such Borrower's DIP Collateral; or

(d)       there shall have occurred any of the following in the Chapter 11 Cases:

(i)       other than the claims and Liens of the Lender arising from this Agreement, and except for the Carve-Out, any Borrower shall incur, create, assume, suffer to exist or permit, or file any motion seeking, any other claim which is *pari passu* with, or senior to, the claims and Liens of the Lender;

(ii)       the Bankruptcy Court enters an order or the Borrowers file any motion or any request for relief—in each case without the support, or over the objection, of the <u>Chapter 11</u> Trustee— to (a) dismiss any of the Chapter 11 Cases, (b) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appoint a trustee or examiner (other than the <u>Chapter 11</u> Trustee) with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; or (d) confirming a plan that does not provide for Payment in Full, not later than the effective date, of all Obligations hereunder;

(iii)       the Bankruptcy Court enters an order granting relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) to authorize any party to proceed against any material asset worth in excess of $50,000 of the Borrowers or in such a manner that would adversely affect the Borrowers' ability to operate their businesses in the ordinary course; or

(iv)       the failure of the Borrowers to comply with any provision of the DIP Order, which remains uncured for a period of two (2) Business Days after the receipt of written notice of such event or is not otherwise waived in accordance with the terms thereof; <u>provided</u>, <u>however</u>, that the DIP Lender will not take any enforcement action, whether by demand, foreclosure or other enforcement action, to collect on any obligations arising hereunder by realizing upon the whole or part of the Coop Interest or Cash Deposit unless and until there is full payment the Allowed SN Senior Debt Claim and other SN Senior Debt, to the extent allowed.

**Section 5.4       Remedies**.

(a)       If any Event of Default exists, subject to the DIP Order, the Lender may in its discretion do any one or more of the following from time to time (in addition to any and all other things as provided elsewhere in this Agreement):

(i)       terminate, reduce or condition any Commitment;

(ii)       require the Borrowers to cash collateralize the Obligations; and

(iii)       exercise any other rights, remedies, powers and privileges afforded under the Loan Documents or any other agreement, pursuant to the DIP Order and any other order of the

Bankruptcy Court, by law (including under the Bankruptcy Code and other applicable law), at equity and otherwise, including the rights and remedies of a secured party under the UCC.

Notwithstanding the foregoing, upon the occurrence and continuance of any Event of Default, the Lender may waive such Event of Default, in its sole discretion, subject to the terms of this Agreement, the DIP Order and applicable law.

## ARTICLE 6

## MISCELLANEOUS

**Section 6.1    Notices**.

Any notices or other information (including any financial information) required or permitted to be given under the terms hereof shall be sent by certified or registered mail (return receipt requested) or delivered personally or by courier (including a recognized overnight delivery service) or by facsimile or by electronic mail and shall be effective five (5) days after being placed in the mail, if mailed by regular United States mail, or upon receipt, if delivered personally or by courier (including a recognized overnight delivery service) or by facsimile or when received by electronic mail in each case addressed to a party as follows (or such other address, facsimile or electronic mail address provided by such party to such other parties pursuant to the below (or such later address, facsimile or electronic mail address provided in accordance herewith):

If to any Borrower:

>   Paul Hastings LLP
>   200 Park Avenue
>   New York, NY 10166
>   Attention:  Doug Barron and Alex Bongartz
>   Email:  dougbarron@paulhastings.com; alexbongartz@paulhastings.com

If to Lender:

>   Luc A. Despins in his capacity as the chapter 11 trustee
>   c/o Paul Hastings LLP
>   200 Park Avenue
>   New York, NY 10166
>   Attention:  Luc Despins
>   Email:  lucdespins@paulhastings.com

With a copy to (which shall not be deemed to constitute notice):

>   Pullman & Comley, LLC
>   850 Main Street
>   Bridgeport, CT 06601
>   Attention: Irve Goldman
>   Email:  igoldman@pullcom.com

**Section 6.2     Waiver of Notice**.

Whenever any notice is required to be given to the Lender or the Borrowers under any of the Loan Documents, a waiver thereof in writing signed by the Person or Persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 6.3     Cost and Expense Reimbursement**.

Each Borrower agrees to pay on or prior to the Closing Date and, within one (1) Business Day after delivery of an invoice therefor, after the Closing Date, (a) all fees, costs and expenses of creating and perfecting Liens in such Borrower's DIP Collateral in favor of the Lender pursuant to any Loan Document, including filing and recording fees, expenses and taxes, search fees, title insurance premiums, (b) all costs and expenses incurred by the Lender in connection with the custody or preservation of any of such Borrower's DIP Collateral, (c) all fees, costs and expenses, incurred by the Lender and its professionals relating to efforts to protect, evaluate, assess or dispose of any of such Borrower's DIP Collateral, and (d) all fees, costs and expenses incurred by the Lender and its professionals in enforcing any of the Loan Documents or any Obligations of, or in collecting any payments due from, such Borrower hereunder or under the other Loan Documents (including in connection with the sale of, collection from, or other realization upon any of such Borrower's DIP Collateral or the enforcement of the Loan Documents). Without limiting any of the foregoing provisions of this <u>Section 6.3</u>, any action taken by any Borrower under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Lender, shall be at the sole expense of such Borrower, and the Lender shall not be required under any Loan Document to reimburse any Borrower therefor.  The obligations and provision contained in this <u>Section 6.3</u> shall survive the termination of this Agreement and the repayment of the Obligations.

**Section 6.4     Governing Law; Venue; Jurisdiction; Service of Process; Waiver of Jury Trial**.

All questions concerning the construction, validity, enforcement and interpretation of this Agreement and, unless otherwise expressly stated therein, the other Loan Documents shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed in such State.  Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court and, solely to the extent that the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over any matter, the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or under the other Loan Documents or in connection herewith or with the other Loan Documents or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, or that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding; <u>provided</u> that nothing in this Agreement or in any other Loan Document shall limit the right of the Lender to commence any suit, action or proceeding in federal, state or other court of any other jurisdiction to the extent the Lender determines that such suit, action or proceeding is necessary or appropriate to exercise its rights or remedies under this Agreement or any of the other Loan Documents. Each Party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such Party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION

CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE. EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY AND NO AGENT, REPRESENTATIVE OR OTHER PERSON AFFILIATED WITH OR RELATED TO ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS, AS APPLICABLE, BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 6.4</u>.

**Section 6.5      Entire Agreement; Amendments**.

(a)      The Loan Documents contain the entire understanding of the Parties with respect to the matters covered thereby and supersede any and all other written and oral communications, negotiations, commitments and writings with respect thereto.

(b)      No amendment, restatement, modification, supplement, change, termination or waiver of any provision of this Agreement or the other Loan Documents (other than any landlord agreement or bailee or mortgagee waiver, each of which may be amended, restated, supplemented, changed, terminated or waived in accordance with the terms thereof), and no consent to any departure by any Borrower therefrom, shall in any event be effective without the written concurrence of the Borrowers and the Lender; <u>provided</u> that no such amendment, restatement, modification, change, termination, waiver or consent shall, without the consent of the Lender, do any of the following: (i) reduce any Loan; (ii) postpone or accelerate the Maturity Date or other scheduled final maturity date of any Loan, or postpone or accelerate the date or reduce the amount of any scheduled payment of principal of any Loan; (iii) postpone the date on which any Obligation is payable; (iv) decrease the interest rate borne by any Loan  or the amount of any Obligation payable hereunder; (v) amend this Section 6.5 or any provision of this Agreement or any other Loan Documents providing for consent or other action by all Lender; (vi) change in any manner any provision of this Agreement that by its terms, expressly requires the approval or consent of the Lender; (vii) release or subordinate any Lien granted in favor of the Lender with respect to all or substantially all of any Borrower's DIP Collateral, other than in accordance with the terms of the Loan Documents; or (viii)(A) change or have the effect of changing the priority of any payments (including voluntary and mandatory prepayments), Liens or proceeds of DIP Collateral (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement, the other Loan Documents or otherwise, of new loans or other indebtedness having any priority over any of the Obligations in respect of payments, Liens, DIP Collateral or proceeds of DIP Collateral, in exchange for any Obligations or otherwise), or (B) advance the date fixed for, or increase, any scheduled installment of principal due to the Lender under any Loan Document.

**Section 6.6      Severability**.

If any provision of this Agreement or any of the other Loan Documents shall be invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.  The Parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

**Section 6.7      Counterparts**.

This Agreement may be executed in several counterparts, and by each Party on separate counterparts, each of which and any photocopies, facsimile copies and other electronic methods of

transmission thereof shall be deemed an original, but all of which together shall constitute one and the same agreement.

Section 6.8     **Survival**.

(a)     In addition to <u>Section 3.2</u>, this Agreement and all agreements, representations and warranties and covenants made in the Loan Documents, and in any document, certificate or statement delivered pursuant thereto or in connection therewith shall be considered to have been relied upon by the other Parties and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of the Loans hereunder or thereunder regardless of any investigation made by any such other Party or on its behalf, and shall continue in force until all Obligations and other amounts payable under the Loan Documents shall have been fully paid in accordance with the provisions hereof and thereof. The Lender shall not be deemed to have waived, by reason of making the Loans, any Event of Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lender may have had notice or knowledge of any such Event of Default or may have had notice or knowledge that such representation or warranty was false or misleading at the time such Loan was made.

(b)     All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive (and shall continue to be made in accordance with the terms hereof and thereof after) the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or Event of Default at the time of any Loan, and shall continue in full force and effect (and shall continue to be made in accordance with the terms of the applicable Loan Documents) as long as any Loan or any other Obligation hereunder or under the other Loan Documents shall remain unpaid or unsatisfied.

(c)     Notwithstanding anything to the contrary in the Loan Documents, the obligations of the Borrowers under <u>Section 2.5</u> and the obligations of the Borrowers and the Lender under this Article 6 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan and the other Obligations or the termination of this Agreement or any of the other Loan Documents or any provision hereof or thereof.

Section 6.9     **No Waiver**.

Neither the failure of, nor any delay on the part of, any Party in exercising any right, power or privilege hereunder, or under any agreement, document or instrument mentioned herein or under any other Loan Document, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder, under any other Loan Document or under any other agreement, document or instrument mentioned herein, preclude other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver of any right, power, privilege or default hereunder, under any other Loan Document or under any agreement, document or instrument mentioned herein, constitute a waiver of any other right, power, privilege or default or constitute a waiver of any default of the same or of any other term or provision. No course of dealing and no delay in exercising, or omission to exercise, any right, power or remedy accruing to the Lender upon any breach, Default or Event of Default under this Agreement, any other Loan Document or any other agreement shall impair any such right, power or remedy or be construed to be a waiver thereof or an acquiescence therein; nor shall the action of the Lender in respect of any such breach, Default or Event of Default or any acquiescence by it therein, affect or impair any right, power or remedy of the Lender in respect of any other breach, Default or any Event of Default.

16

All rights and remedies herein or in the other Loan Documents provided are cumulative and not exclusive of any rights or remedies otherwise provided by (or available at) law or in equity.

### Section 6.10    Several Liability.

Each Borrower shall be solely and severally liable for their respective obligations hereunder and under the other Loan Documents.

### Section 6.11    No Third Parties Benefited.

This Agreement is made and entered into for the sole protection and legal benefit of the Borrowers and the Lender, and their successors and permitted assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  The Lender shall not have any obligation to any Person not a party to this Agreement or the other Loan Documents.

### Section 6.12    Binding Effect.

This Agreement shall become effective when it shall have been executed by each of the Borrowers party hereto and the Lender party hereto and such executed counterparts have been delivered to the Lender pursuant to the terms of this Agreement.  Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of each Borrower hereto and the Lender and, in each case, their respective successors and permitted assigns.

### Section 6.13    Marshaling; Payments Set Aside.

The Lender shall not be under any obligation to marshal any property in favor of any Borrower or any other Person or against or in payment of any Obligation.  To the extent that the Lender receives a payment from the Borrowers from the proceeds of the DIP Collateral, from the exercise of its rights of setoff, from any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

### Section 6.14    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege under any Loan Document, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Borrower, any Affiliate of any Borrower or the Lender shall be effective to amend, modify or discharge any provision of any of the Loan Documents.

### Section 6.15    Right of Setoff.

The Lender is hereby authorized, without notice or demand (each of which is hereby waived by each Borrower), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other indebtedness, claims or other obligations at any time owing by the Lender or any of its Affiliates to or for the credit or the account of the

17

Borrowers against any Obligation of any Borrower now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured.  The rights under this Section 6.15 are in addition to any other rights and remedies (including other rights of setoff) that the Lender or any of its Affiliates may have.

**Section 6.16    DIP Order Controls**

The Borrowers and the Lender hereby expressly agree that, in the event of any conflict or inconsistency between this Agreement (or any other Loan Document), on the one hand, and the DIP Order, on the other hand, the DIP Order shall control.  Notwithstanding anything to the contrary herein, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of, the DIP Order, as applicable.  This Agreement is subject in all respects (including with respect to all obligations and agreements of the Borrowers provided for hereunder) to the terms of the DIP Order and, notwithstanding anything in the foregoing, the Borrowers shall not be required to undertake any obligation, make any agreement or take any action that is prohibited by the terms of the DIP Order.

## ARTICLE 7

## DIP COLLATERAL

**Section 7.1    Grant of Security Interest**.  To secure the prompt payment and performance of the Obligations, each Borrower hereby grants to the Lender a continuing security interest in and Lien upon (the "DIP Lien") all of the following property of such Borrower, and the proceeds of such property, whether now owned or hereafter acquired, and wherever located (the "DIP Collateral"): (a) Genever US's ownership interest in the Proprietary Lease and Shares (also referred to as the "Coop Interest"); (b) the proceeds of litigation commenced or to be commenced by Genever BVI or Genever US (the "Borrowers' Litigation Claims"), including, without limitation, the AIG Litigation; (c) any and all funds held in deposit accounts in the name of Genever US, including the Cash Deposit; and (d) Genever BVI's ownership interest in Genever US.

The DIP Liens shall include: (i) a fully perfected security interest pursuant to section 364(c)(2) in all DIP Collateral and the proceeds thereof that is not otherwise subject to a Lien, and (ii) a fully perfected junior security interest pursuant to section 364(c)(3) of the Bankruptcy Code in DIP Collateral subject to valid and perfected, and otherwise unavoidable liens at the commencement of the Chapter 11 Cases or that are perfected thereafter as permitted under section 546(b) of the Bankruptcy Code, subject, in each case, to the Carve-Out and the Allowed SN Senior Debt Claim and other SN Senior Debt to the extent allowed.

**Section 7.2    Limitations**.  The Lien on DIP Collateral granted hereunder is given as security only and shall not subject the Lender to, or in any way modify, any obligation or liability of the Borrowers relating to any DIP Collateral.

**Section 7.3    Further Assurances**.  Promptly, but in any event within three (3) Business Days after receipt of the Lender's written request, the Borrowers shall deliver such instruments and agreements, and shall take such actions, as the Lender deems appropriate under applicable law to evidence or perfect its Lien on any DIP Collateral, or otherwise to give effect to the intent of this Agreement.

**Section 7.4    Protection of DIP Collateral**.  All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any DIP Collateral of a Borrower, all taxes payable with respect to any DIP Collateral (including any sale thereof) of a Borrower, and all other payments required to be made by Lender to any Person to realize upon any DIP Collateral of a Borrower, shall be borne and paid by the applicable Borrower.  The Lender shall not be liable or responsible in any way for the safekeeping of any DIP Collateral, for any loss or damage thereto (except for reasonable care in its custody while DIP Collateral is in the Lender's actual possession), for any diminution in the value thereof, or for

any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at the applicable Borrower's sole risk.  If any tax, assessments or other charges by any Governmental Authority is or may be imposed, or if any claim shall be made which, in the Lender's reasonable judgment, may possibly create a valid Lien on the DIP Collateral, the Lender may with concurrent notice to the Borrowers pay or remit such taxes, assessments or other charges, and each Borrower hereby indemnifies and holds the Lender harmless in respect thereof.  The Lender will not pay or remit any taxes, assessments or charges to the extent that any applicable Borrower has properly contested such taxes, assessments or charges.  The amount of any payment by the Lender under this <u>Section 7.4</u> shall be payable by the applicable Borrower in cash on demand.

       **Section 7.5**     **Defense of Title**.  Each Borrower shall at all times defend its title to its DIP Collateral and the Lender's Liens thereon against all Persons, claims and demands whatsoever, except (i) properly perfected and non-avoidable pre-petition Liens, including such Liens in connection with the Apartment, including but not limited to, any mechanics' or tax Liens and (ii) Liens perfected post-petition under section 546(b) of the Bankruptcy Code.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the first day written above.

**BORROWERS:**

**GENEVER HOLDINGS LLC**, a New York limited liability company

By: */s/ Luc A. Despins*
Name:  Luc A. Despins
Title:  Proxy Holder of Genever Holdings LLC

**GENEVER HOLDINGS CORPORATION**, a corporation organized under the laws of the British Virgin Islands

By: */s/ Luc A. Despins*
Name:  Luc A. Despins
Title: Proxy Holder of Genever Holdings Corporation

**LENDER:**

**LUC A. DESPINS**, in his capacity as the Chapter 11 Trustee under the Chapter 11 Bankruptcy Code

By: */s/ Luc A. Despins*
Name:  Luc A. Despins
Title:  Chapter 11 Trustee

**ANNEX A**

**Commitments**

| Lender | Commitment |
|---|---|
| Luc A. Despins, in his capacity as U.S. Trustee under Chapter 11 of the Bankruptcy Code | $2,000,000.00 |
| **TOTAL** | **$2,000,000.00** |

<u>**EXHIBIT A**</u>

**Form of Notice of Borrowing**

_____ ___, 202_

To:    Luc A. Despins in his capacity as the chapter 11 trustee
c/o Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention:  Luc Despins
Email:  lucdespins@paulhastings.com

     Re:  <u>Genever Holdings LLC and Genever Holdings Corporation</u>

Ladies and Gentlemen:

Reference is made to the Multi-Draw Senior Secured Super-Priority Debtor-In-Possession Credit and Security Agreement, dated as of [•], 2023, by and among (i) Genever Holdings LLC, a New York limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases ("<u>Genever US</u>"), (ii) Genever Holdings Corporation, a corporation registered under the laws of the British Virgin Islands and a debtor and debtor-in-possession in the Chapter 11 Cases ("<u>Genever BVI</u>" and together with Genever US, the "<u>Borrowers</u>"), and (iii) the chapter 11 estate of Ho Wan Kwok (the "<u>Individual Debtor</u>"), acting through its representative, Luc A. Despins in his capacity as the chapter 11 trustee (the "<u>Chapter 11 Trustee</u>") of the Individual Debtor (such chapter 11 estate being the "<u>Lender</u>") (as may be amended, supplemented, restated or otherwise modified, renewed or replaced form time to time, the "<u>DIP Credit Agreement</u>").  Capitalized terms used and not defined herein shall have the meaning ascribed to them in the DIP Credit Agreement.

Borrower hereby gives notice, pursuant to <u>Section 2.2(b)</u> of the DIP Credit Agreement, that it requests a Loan under the DIP Credit Agreement, and that in connection therewith, sets forth below the terms on which such Loan is requested to be made:

(A)    Principal amount of Loan:        $[_____]

(B)    Date of Loan
        (which is a Business Day):     _____

(C)    Use of proceeds:     _____

The Borrowers hereby represent and warrant that all of the conditions contained in <u>Article 4</u> of the DIP Credit Agreement have been satisfied on and as of the date hereof.

*[Signature Page Follows]*

Very truly yours,

**GENEVER HOLDINGS LLC**, a Borrower


By:_____
Name:
Title:


**GENEVER HOLDINGS CORPORATION**, a Borrower


By:_____
Name:
Title:

## Exhibit B

**Checklist**

# CHECKLIST FOR MOTIONS AND ORDERS FOR USE OF
# CASH COLLATERAL AND POST- PETITION FINANCING

This is to certify that the following checklist information reflects the substantive content of the motion and proposed order for use of cash collateral or for post-petition financing pursuant to 11 U.S.C. §§ 363 and/or 364 as indicated below:

## 1. Identification of Proceeding:

a.   Preliminary motion/order ○ Yes ● No ○ N/A
b.   Final motion/order ● Yes ○ No ○ N/A
c.   Continuing use of cash collateral(§ 363) ○ Yes ○ No ● N/A
d.   New financing(§ 364) ● Yes ○ No ○ N/A
e.   Combination of§§ 363 and 364 financing ○ Yes ● No ○ N/A
f.   Emergency hearing (immediate and irreparable harm) ○ Yes ● No ○ N/A

## 2. Representations:

a.   Brief history of Debtor's businesses and status of Debtor's prior relationships with lender ● Yes ○ No ○ N/A
b.   Brief statement of purpose and necessity of financing ● Yes ○ No ○ N/A
c.   Brief statement oftype offinancing (i.e.) accounts receivable, inventory) ○ Yes ○ No ● N/A
d.   Are lender's pre-petition security interest(s) and liens deemed valid, fully perfected and non-avoidable? ○ Yes ○ No ● N/A
    (i) Are there provisions to allow for objections to above? ○ Yes ○ No ● N/A
e.   Is there a post-petition financing agreement between lender and Debtor? ● Yes ○ No ○ N/A
f.   If there is an agreement, are lender's post-petition security interests and liens deemed valid, fully perfected and non-avoidable? ● Yes ○ No ○ N/A
g.   Has lender's non-cash collateral been appraised? ○ Yes ○ No ● N/A
h.   Insert date of latest appraisal.
i.   Is Debtor's proposed budget attached? ○ Yes ○ No ● N/A
j.   Are all pre-petition loan documents identified? ○ Yes ○ No ● N/A
k.   Are pre-petition liens? ● Yes ○ No ○ N/A
l.   Are there pre-petition guaranties of debt? ○ Yes ○ No ● N/A

## 3. Grant of Liens:

a.   Do post-petition liens secure pre-petition debts? ○ Yes ● No ○ N/A
b.   Is there cross-collateralization? ○ Yes ● No ○ N/A
c.   Is the priority of post-petition liens equal to or higher than existing liens? ○ Yes ● No ○ N/A
d.   Do post-petition liens have retroactive effect? ○ Yes ● No ○ N/A
e.   Are there restrictions on granting further liens or liens of equal or higher priority? ● Yes ○ No ○ N/A
f.   Is lender given liens on claims under§§ 506(c), 544-50 and§§ 522? ○ Yes ● No ○ N/A
    (i)  Are lender's attorney's fees to be paid? ○ Yes ○ No ● N/A
    (ii) Are Debtor's attorney's fees excepted from § 506(c)? ○ Yes ○ No ● N/A
g.   Is lender given liens upon proceeds of causes of action under§§ 544, 547, and 548? ○ Yes ● No ○ N/A

**4. Administrative Priority Claims:**                                ◉ Yes  ○ No  ○ N/A
    a.      Is lender given an administrative priority?                   ◉ Yes  ○ No  ○ N/A
    b.      Is administrative priority higher than § 507(a)?
    c.      Is there a conversion of pre-petition secured claim to post-petition   ○ Yes  ◉ No  ○ N/A
               administrative claim by virtue of use of existing collateral?

**5. Adequate Protection(§ 361):**
    a.      Is there post-petition debt service?                           ○ Yes  ○ No  ◉ N/A
    b.      Is there a replacement/additional § 361 (1) lien?              ○ Yes  ○ No  ◉ N/A
    c.      Is the lender's claim given super-priority?                    ○ Yes  ○ No  ◉ N/A
    d.      Are there guaranties?                                          ○ Yes  ○ No  ◉ N/A
    e.      Is there adequate insurance coverage?                          ○ Yes  ○ No  ◉ N/A

**6. Waiver/Release Claims v. Lender:**
    a.      Debtor waives or releases claims against lender, including,
               but not limited to, claims under§§ 506(c), 544-550, 552, and
               553 ofthe Code?                                              ◉ Yes  ○ No  ○ N/A
    b.      Does the Debtor waive defenses to claim or liens of lender?    ○ Yes  ○ No  ◉ N/A
    c.      Is the proposed lender also the pre-petition lender?           ○ Yes  ◉ No  ○ N/A
    d.      New post-petition lender?                                      ◉ Yes  ○ No  ○ N/A
    e.      Is the lender an insider?                                      ◉ Yes  ○ No  ○ N/A

**7. Modification of Stay:**
    a.      Is any modified lift of stay allowed?                          ◉ Yes  ○ No  ○ N/A
    b.      Will the automatic stay be lifted to permit lender to exercise
               self-help upon default without further order?                 ◉ Yes  ○ No  ○ N/A
    c.      Are there any other remedies exercisable without further order
               of court?                                                     ◉ Yes  ○ No  ○ N/A
    d.      Is there a provision that any future modification of order shall not
               affect status ofDebtor's post-petition obligations to lender?  ◉ Yes  ○ No  ○ N/A

**8. Creditors' Committee**
    a.      Has creditors' committee been appointed?                       ◉ Yes  ○ No  ○ N/A
    b.      Does creditors' committee consent?                             ◉ Yes  ○ No  ○ N/A

**9. Restrictions on Parties in Interest:**

a.  Is a plan proponent restricted in any manner, concerning modification of lender's rights, liens and/or causes?

b.  Is the Debtor prohibited from seeking to enjoin the lender in pursuit of rights?  ○ Yes ○ No ◉ N/A

c.  Is any party in interest prohibited from seeking to modify this order?  ◉ Yes ○ No ○ N/A

d.  Is the entry of any order conditioned upon payment of debt to lender?  ○ Yes ◉ No ○ N/A

e.  Is the order binding on subsequent trustee on conversion?  ○ Yes ◉ No ○ N/A
    ◉ Yes ○ No ○ N/A

**10. *Nunc Pro Tunc:***

a.  Does any provision have retroactive effect?  ○ Yes ◉ No ○ N/A

**11. Notice and Other Procedures:**

a.  Is shortened notice requested?  ○ Yes ◉ No ○ N/A

b.  Is service requested to shortened list?  ◉ Yes ○ No ○ N/A

c.  Is time to respond to be shortened?  ○ Yes ◉ No ○ N/A

d.  If final order sought, have 15 days elapsed since service of motion pursuant to FRBP 4001(b)(2)?  ◉ Yes ○ No ○ N/A

e.  If preliminary order sought, is cash collateral necessary to avoid immediate and irreparable harm to the estate pending a final hearing?  ○ Yes ○ No ◉ N/A

f.  Is a Certificate of Conference included?  ○ Yes ○ No ◉ N/A

g.  Is a Certificate of Service included?  ◉ Yes ○ No ○ N/A

h.  Is there verification of transmittal to U.S. Trustee included pursuant to FRBP 9034?  ◉ Yes ○ No ○ N/A

i.  Has an agreement been reached subsequent to filing motion?  ○ Yes ◉ No ○ N/A

    i.   If so, has notice of the agreement been served pursuant to FRBP 4001 (d)(l)?  ○ Yes ○ No ◉ N/A

    ii.  Is the agreement in settlement of motion pursuant to FRBP 4001 (d)(4)?  ○ Yes ○ No ◉ N/A

    iii. Does the motion afford reasonable notice of material provisions of the agreement pursuant to FRBP 4001(d)(4)?  ○ Yes ○ No ◉ N/A

    iv.  Does the motion provide for opportunity for hearing pursuant to FRBP 9014?  ○ Yes ○ No ◉ N/A

Signed on  August 23, 2023 _____

By: /s/ Douglass Barron
_____