**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
------------------------------------------------------x
                                              :
In re:                                        :      Chapter 11
                                              :
HO WAN KWOK et al.,                           :      Case No. 22-50073 (JAM)
                                              :
            Debtors.[1]                       :      Jointly Administered
                                              :
------------------------------------------------------x
```

**NOTICE OF CHAPTER 11 TRUSTEE AND GENEVER DEBTORS**
**REGARDING UPDATE WITH RESPECT TO DEBTOR'S MOTION IN CRIMINAL**
**CASE FOR AN ORDER STAYING THESE CHAPTER 11 CASES AND**
**ASSOCIATED ADVERSARY PROCEEDINGS**

By notice dated August 30, 2023 [Docket No. 2158], Luc A. Despins, as chapter 11

trustee (the "Trustee") for Ho Wan Kwok (the "Debtor"), informed this Court and parties in

interest that the Debtor had filed a motion in the criminal case pending against him in the United

States District Court for the Southern District of New York [Case No. 1:23-cr-00118-AT] (the

"Criminal Case") seeking to stay the above-captioned chapter 11 cases and all related adversary

proceedings.[2]

The Trustee, Genever Holdings LLC, and Genever Holdings Corporation wish to provide

an update to the Court and parties in interest with respect to the Debtor's Motion. In particular,

the following responses have been filed to the Debtor's Motion in the Criminal Case:

---

[1]     The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]     Attached to the August 30, 2023 notice were copies of (a) the *Debtor's Notice of Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative for Other Relief* [Criminal Case ECF No. 129] (the "Motion") and (b) the related memorandum of law [Criminal Case ECF No. 131].

1. Letter response of the United States Department of Justice, dated September 21, 2023 [Criminal Case ECF No. 148], a copy of which is attached hereto as **Exhibit 1**; and

2. *Response of Chapter 11 Trustee and Genever Debtors in Opposition to Defendant Ho Wan Kwok's Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative For Other Relief*, dated September 21, 2023 [Criminal Case ECF No. 145], and the related declaration of Nicholas A. Bassett [Criminal Case ECF No. 146], copies of which are attached hereto as **Exhibit 2** and **Exhibit 3**, respectively;

3. *Joinder of the Official Committee of Unsecured Creditors in Support of the Response of Chapter 11 Trustee and Genever Debtors in Opposition to Defendant Ho Wan Kwok's Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative For Other Relief*, dated September 21, 2023 [Criminal Case ECF No. 147], a copy of which is attached hereto as **Exhibit 4**;

4. Letter response of The Sherry-Netherland, Inc., dated September 21, 2023 [Criminal Case ECF No. 149], a copy of which is attached hereto as **Exhibit 5**.

Dated:    September 27, 2023
          New York, New York

By: */s/ G. Alexander Bongartz*
Avram E. Luft (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
aviluft@paulhastings.com
alexbongartz@paulhastings.com

*and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

   *and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for the Chapter 11 Trustee, Genever Holdings LLC, and Genever Holdings Corporation*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------------x
                                                       :
In re:                                                 :    Chapter 11
                                                       :
HO WAN KWOK, et al.,[1]                                :    Case No. 22-50073 (JAM)
                                                       :
                Debtors.                               :    (Jointly Administered)
                                                       :
-------------------------------------------------------x
```

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 27, 2023, the foregoing Notice was electronically filed. Notice of this filing was sent by e-mail to all parties to the above-captioned chapter 11 case by operation of the Court's electronic filing ("CM/ECF") system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Dated:    September 27, 2023
          New York, New York

                              By: */s/ G. Alexander Bongartz*
                              G. Alexander Bongartz (admitted pro hac vice)
                              PAUL HASTINGS LLP
                              200 Park Avenue
                              New York, New York 10166
                              (212) 318-6079
                              alexbongartz@paulhastings.com

                              *Counsel for the Chapter 11 Trustee, Genever*
                              *Holdings LLC, and Genever Holdings*
                              *Corporation*

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

**Exhibit 1**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 21, 2023

**VIA ECF**
Hon. Analisa Torres
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re: ***United States v. Ho Wan Kwok, et al.*, S1 23 Cr. 118 (AT)**

Dear Judge Torres:

The Government respectfully submits this letter brief in response to defendant Ho Wan Kwok's August 30, 2023 motion. (*See* Dkt. 131 ("Kwok Br.").

Kwok's motion principally seeks a stay of the bankruptcy proceedings that Kwok himself voluntarily initiated in February 2022. (*Id.*). Kwok's co-defendant Yanping Wang has joined in that motion. (*See* Dkt. 135 ("Wang Ltr.")).

In the event a stay is denied, Kwok also makes several requests in the alternative. (Kwok Br. 1, 28-30). First, Kwok requests a modification of the Protective Order in this case to allow production of criminal discovery to the bankruptcy Trustee. (*Id.* at 28-29). Second, Kwok seeks an order that Kwok's "defense team" have continued, unchaperoned access to the property located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "Mahwah Mansion"). (*Id.* at 29-30). Relatedly, Kwok moves to "preclude" the Government "from facilitating the sale" of the Mahwah Mansion until the conclusion of this case. (*Id.*). Lastly, Kwok requests an order that the Government not solicit or receive Kwok's privileged information or records from the Trustee. (*Id.*).

**A. The Government's Position on a Stay of the Bankruptcy Proceedings**

The Government presently takes no position on Kwok's motion to stay the bankruptcy proceedings.

**B. Kwok's Alternative Requests Should Be Denied**

If the Court declines to stay the bankruptcy proceedings, Kwok's alternative requests should also be denied for the reasons explained below.

**1. Two of Kwok's Requests Are Moot**

Kwok's first and last alternative requests should be denied as moot.

First, Kwok's request to modify the Protective Order should be denied as moot. Kwok's counsel submits there is not good cause for such a modification and is only seeking such a modification because the Trustee obtained an order requiring Kwok to do so. (Kwok Br. 29). The Trustee is no longer seeking to enforce the order at this time. (Dkt. 145 ("Trustee Br.") at 6, 23). Kwok's request is therefore moot.

Second, Kwok's request regarding potentially privileged materials should be denied as moot. The Government has neither solicited nor received Kwok's potentially privileged information or records from the Trustee does not presently intend to do so, and will not do so absent agreement from Kwok's counsel (or the appropriate holder) or an order of this Court finding that such materials are not privileged and/or subject to the crime-fraud exception. Thus, Kwok's request regarding potentially privileged materials is moot.

Accordingly, even if the Court reaches the alternative requests, both of these requests should be denied as moot.

## 2. Kwok's Request For Unfettered Access to the Mahwah Mansion Should Be Denied

Kwok's request for an order permitting his "defense team" unchaperoned access to the Mahwah Mansion through the conclusion of this case and any appeals should be denied for the reasons that follow.

As background, the Mahwah Mansion was purchased, renovated, and furnished with fraud proceeds, specifically G|CLUBS membership funds, after the funds were funneled through bank accounts in other entities' names. (Dkt. 19 ("Indictment") ¶ 16(b)-(c)). As alleged in the Indictment, G|CLUBS was used by Kwok and his conspirators to defraud victims by falsely promising them purportedly highly valuable stock in GTV (*i.e.*, using G|CLUBS as a vehicle to continue the unlawful private placement offering after the SEC intervened to stop the GTV offering) and falsely promising them "a full spectrum of services" once they became "members." (*Id*. ¶ 15). The Mahwah Mansion and furnishings that were purchased with misappropriated G|CLUBS membership funds were identified as specific property subject to forfeiture in the Indictment. (*Id.* ¶ 55(v)).

On March 15, 2023, agents of the Federal Bureau of Investigation ("FBI") executed a search warrant at the Mahwah Mansion. Multiple FBI photographers meticulously documented the premises and its contents, taking over 2,000 photographs in the course of the search, which have been produced to the defendants in discovery. The FBI also conducted aerial surveillance of the Mahwah Mansion prior to the search, which photographs and videos have been produced to the defendants. The Government also seized voluminous physical evidence from the Mahwah Mansion, including, for example, electronic devices, Kwok's personal items (*e.g.*, custom-designed Brioni suits), and certain of the extravagant furnishings purchased with misappropriated G|CLUBS membership funds.

Following Kwok's arrest, individuals claiming to be associated with the "New Federal State of China" ("NFSC"), a purported alternative government for the people of China founded by Kwok that is affiliated with the Himalaya Farm Alliance described in the Indictment, began using

the Mahwah Mansion as their new base of operations. (*See* Indictment ¶ 14). Based on the Government's investigation, NFSC members are fiercely loyal to Kwok, and individuals in the NFSC are also associated with entities that are part of Kwok's fraud enterprise. The NFSC's occupation of the Mahwah Mansion was documented in videos and broadcasts posted publicly on social media services, GNews, and other instrumentalities of the fraud controlled by the defendants. (*See, e.g.*, attached Exhibit A (Trustee's complaint against Mahwah Mansion) ¶¶ 41-42, 55-66 (documenting this evidence with citations)).[1] In other words, after Kwok's arrest, Kwok's followers and agents have sought to perpetuate Kwok's criminal enterprise—using as a base of operations the very same mansion Kwok and his co-conspirators purchased with fraud proceeds.

Subsequent to the Government's public filings regarding the Mahwah Mansion and the public broadcasts of the defendants' associates occupying the Mahwah Mansion, which threatened to diminish its value, the Trustee conferred with the Government regarding the disposition of the Mahwah Mansion. Unlike chattel or funds in a bank account, the Government generally cannot seize real property with a forfeiture-based seizure warrant prior to a final order of forfeiture—which order would come only after a criminal conviction, at the conclusion of the subsequent ancillary forfeiture proceeding. Given that the defendants' associates were using the Mahwah Mansion (itself purchased with fraud proceeds) and that their occupation of the Mahwah Mansion could dissipate the property's value, on July 6, 2023, the Government provided the Trustee with 12 photographs taken during the Government's March 15, 2023 search illustrating that Kwok used the Mahwah Mansion as a personal residence.[2]

On July 11, 2023, the Trustee filed an *ex parte* motion for a temporary restraining order and preliminary injunction regarding Kwok's associates' access to the Mahwah Mansion. *In re Ho Wan Kwok, et al.*, Case No. 23-05017, Dkt. 4 (D. Conn. Bankr.) (JAM). On August 1, 2023, Judge Manning granted the order in part. *See id.*, Dkt. 17. On July 13, 2023, the Government executed a proposed settlement with the Trustee that would permit the Trustee to secure the value of the Mahwah Mansion during the pendency of the criminal case. *In re Ho Wan Kwok, et al.*, Case No. 23-05017 (D. Conn. Bankr.) (JAM), Dkt. 24, Ex. 1; *see also id.* at Dkt. 53, 56. On August 31, 2023, following additional briefing and hearings, Judge Manning granted the Trustee's motion and issued a modified preliminary injunction to restrict access to the Mahwah Mansion to (a) the Security Services (as defined in the Preliminary Injunction); (b) the Trustee and his representatives and/or professionals; (c) the United States Department of Justice and its employees and representatives; (d) the FBI and its employees and representatives; (e) other federal, New Jersey state, or Mahwah municipal law enforcement agencies and their employees and

---

[1] The FBI conducted aerial surveillance of the Mahwah Mansion after the March 15, 2023 search on two occasions —once members of the NFSC and the defendants' enterprise began inhabiting and broadcasting from the Mahwah Mansion. Photographs and videos of this aerial surveillance have also been produced to the defendants.

[2] Kwok suggests that this was a violation of the Protective Order. (Kwok Br. 3, 21). Kwok is wrong. The Protective Order applies to the Government's "disclosure[s] to the defendants" of evidence pursuant to its discovery obligations and restricts *the defendants'* use of those materials acquired from the Government. (Dkt. 63 ¶ 1). It does not restrict the Government's use of its evidence. (*See id.*).

representatives; (f) any other persons expressly authorized by the Trustee in writing (which can include email); and (g) any other person expressly authorized by the United States District Court for the Southern District for New York or the bankruptcy court. *In re Ho Wan Kwok, et al.*, Case. No. 23-05017, Dkt. 58 (D. Conn. Bankr.) (JAM).

On September 1, 2023, the Trustee conducted a walkthrough of the Mahwah Mansion, which was video-recorded and photographed. After the instant motion from Kwok seeking to "preserv[e] the status quo" of the Mahwah Mansion (Kwok Br. 3), on September 12, 2023, the Trustee provided the Government with six photographs from the Trustee's September 1, 2023 walkthrough. Significantly, those photographs illustrate that the defendants' co-conspirators have been tampering with the interior of the property in an apparent effort to obstruct this criminal case by modifying the Mahwah Mansion to suit a defense narrative. Specifically, the defendants' co-conspirators posted placards at room entrances that appear to suggest that the rooms of Kwok's Mahwah Mansion are, in fact, NFSC and/or G|CLUBS[3] offices or rooms, as shown in the photographs below:

 

These after-the-fact placards were not present as of March 15, 2023, when the Government searched the Mahwah Mansion pursuant to a search warrant issued in this case.

In light of the foregoing, this Court should not credit Kwok's claim that a ruling against him would "permit the Trustee in the Bankruptcy Cases to control *and potentially alter an alleged crime scene of critical importance to this proceeding*." (Kwok Br. 4 (emphasis added)). In fact, it is *Kwok* and his associates who appear to have been doing what Kwok claims to seek to prevent, by materially altering the Mahwah Mansion to serve a defense narrative.

---

[3] Kwok's motion states the Mahwah Mansion was purchased "in furtherance of the business of *GTV*." (Kwok Br. 20 (emphasis added)). Kwok has not explained why then the placards denote "NFSC" and "G|CLUBS."

Simply put, the record provides no basis for permitting the "defense team[4]" unfettered and unchaperoned access to the property that the defendants and their associates have been using as an instrument to attempt to obstruct justice. Such access is unnecessary, particularly given the voluminous documentation—comprising *thousands* of photographs, as well as videos—of the Mahwah Mansion that already exists in the defendants' possession (with even further evidence forthcoming).[5] Contrary to Kwok's assertions, evidence regarding the condition and use of the Mahwah Mansion is not "beyond Mr. Kwok's reach." (Kwok Br. 20). Rather, that evidence is in the possession of Kwok's and Wang's counsel, and Kwok's attempt to analogize the circumstances here to thwarting access to a material witness is baseless. (*Id.* at 22). There is simply no need for Kwok's "team" to have ongoing and continual access, potentially for years, to the Mahwah Mansion. If granted, Kwok's requests could needlessly incur costs, diminishing the Mahwah Mansion's value at the expense of victims and creditors alike, and risk providing opportunity to NFSC members who seek to exploit a mansion purchased with fraud proceeds in furtherance of a scheme to obstruct this criminal prosecution on behalf of NFSC's leaders, the defendants.

Nevertheless, to the extent Kwok's or Wang's criminal defense attorneys of record seek to conduct a site visit to the Mahwah Mansion—as they were permitted to do with the Sherry Netherland apartment, with the Government's consent (*see* Dkt. 72, 78, 79)—the Government would not object to such a visit on similar terms to the visit of the Sherry Netherland. (*See also* Trustee Br. 6-7, 27, 29-30 (Trustee would not object to such a site visit "subject to potential safeguards surrounding [Kwok's] counsel's access to the Mahwah Mansion")).[6]

Finally, there is no need for this Court to "preclude" the Government "from facilitating the sale" of the Mahwah Mansion until the conclusion of this case. (Kwok Br. 29-30). It is unclear, as an initial matter, what that means. In any event, Kwok's request is at least premature, as there is no imminent sale, and any such sale would be subject to the ordinary course of the bankruptcy

---

[4] Kwok's brief does not define who the members of the "defense team" are, nor did either defendant submit a proposed order to the Court regarding this request.

[5] The Government has served a subpoena on the Trustee for the videos and photographs arising from his September 1, 2023 walkthrough, and will produce those materials to the defendants promptly after receipt. The Government produced to the defendants earlier today the six photographs from that walkthrough that the Trustee has already provided.

[6] Kwok did not confer with the Government regarding such a request prior to the filing of his motion.

process in which Kwok is participating.  (*See* Trustee Br. 7, 26, 30).

Accordingly, Kwok's requests should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
        Micah F. Fergenson
        Ryan B. Finkel
        Juliana N. Murray
        Assistant United States Attorneys
        (212) 637-2190 / -6612 / -2314

Cc:        All Counsel of Record (by ECF)

# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                    :

In re:                     :         Chapter 11
                    :

HO WAN KWOK, *et al.*,[1]     :         Case No. 22-50073 (JAM)
                    :

      Debtor.          :         (Jointly Administered)
-------------------------------------------------------x
                    :

LUC A. DESPINS, Chapter 11 Trustee, :        Adv. Proceeding [•]
                    :

      Plaintiff,      :         July 11, 2023
                    :

v.                      :
                    :

TAURUS FUND LLC,        :
SCOTT BARNETT, as trustee of TAURUS :
FUND LLC, and            :
TAURUS MANAGEMENT LLC, as trustee :
of TAURUS FUND LLC,      :
                    :

      Defendants.[2]    :
-------------------------------------------------------x

**COMPLAINT OF CHAPTER 11 TRUSTEE FOR ESTATE OF HO WAN KWOK**
**SEEKING, PURSUANT TO BANKRUPTCY CODE SECTIONS 541, 542, AND**
**544, (I) DECLARATORY JUDGMENT THAT DEBTOR IS EQUITABLE**
**OWNER OF MAHWAH MANSION AND THAT SUCH PROPERTY IS**
**PROPERTY OF ESTATE AND (II) RELATED RELIEF**

       Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor" or "Kwok"), files this

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtor is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    The trustees of Taurus Fund named as defendants will be served with the Complaint.

adversary complaint (the "<u>Complaint</u>") against defendants Taurus Fund LLC ("<u>Taurus Fund</u>"), Scott Barnett, as trustee of Taurus Fund, and Taurus Management LLC, as trustee of Taurus Fund ("<u>Taurus Management</u>" and, collectively with Taurus Fund and Scott Barnett, the "<u>Defendants</u>") and states as follows:

## <u>NATURE OF ACTION</u>

1.      The Trustee brings this Complaint to recover yet another multi-million-dollar asset the Debtor has hidden from his creditors with the aid of his seemingly endless web of shell companies.  The asset in question is one of the largest mansions in the United States, a 21 bedroom, 50,000 square foot, castle-styled private residence with 12.5-acre grounds located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "<u>Mahwah Mansion</u>").  This extremely valuable property is owned by the Debtor but held by or in the name of a shell company, Taurus Fund.  For the reasons set forth herein, the Mahwah Mansion and the fixtures and personal property located in the Mahwah Mansion should be turned over to the Trustee and incorporated into the chapter 11 estate for the benefit of the Debtor's creditors.

2.      The Mahwah Mansion was purchased in December 2021 for $26.5 million and has since been used by the Debtor personally.  Taurus Fund, the property's nominal owner, is, according to its Articles of Organization, a manager-managed LLC managed by (i) the Debtor's chauffeur and/or bodyguard, Scott Barnett, and (ii) another shell company, Taurus Management.

3.      As further discussed below, Taurus Fund is in administrative default under Nevada law.  Its charter was revoked and right to transact business forfeited.  As a result, as of January 1, 2023, Taurus Fund's managers, Scott Barnett and Taurus Management, have held all property and assets of Taurus Fund—including the Mahwah Mansion—in trust.

2

4. Despite holding nominal title to the Mahwah Mansion, Taurus Fund is, in reality, the owner in name only. The Debtor's control of the Mahwah Mansion is transparent, with the property's actual control and ownership disguised by only the smallest of fig leaves. Until his arrest and detention, the Debtor used the Mahwah Mansion as his residence, filling it with his own personal belongings and funding millions of dollars of renovations to the property through Taurus Fund. Meanwhile, the "management" of this historic mansion worth tens of millions of dollars is allegedly entrusted to the Debtor's driver and/or bodyguard, Mr. Barnett.

5. These and the other facts described herein show that the Debtor was (and remains) the equitable owner of the property at all relevant times. Because the Mahwah Mansion is equitably owned by the Debtor, it is property of the Debtor's chapter 11 estate.

6. Based on these facts, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (i) declaring that the Debtor is the equitable owner of the Mahwah Mansion and that the Mahwah Mansion is property of the Debtor's chapter 11 estate to be administered by the Trustee, and (ii) ordering the turnover of the Mahwah Mansion and the fixtures and personal property located in the Mahwah Mansion to the Trustee.

7. The Trustee separately asserts that (i) the Debtor equitably owns Taurus Fund itself or, alternatively, (ii) Taurus Fund is the Debtor's alter ego. In either case, Taurus Fund or its assets (or their value) should be brought into the Debtor's chapter 11 estate.

**<u>JURISDICTION AND VENUE</u>**

8. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. §157(a). Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

9.      The Trustee is the chapter 11 trustee in the Chapter 11 Case pursuant to the

Court's order entered on July 8, 2022 [Main Case Docket No. 523].

10.     Taurus Fund is a limited liability company formed in the State of Nevada and is

the purported nominal owner of the Mahwah Mansion.

11.     Scott Barnett is one of the two managers of Taurus Fund, and upon information

and belief, a trustee of Taurus Fund.  Barnett is also the Debtor's chauffeur and/or bodyguard.

12.     Taurus Management is a limited liability company formed in the State of New

Mexico.  Taurus Management is the other manager of Taurus Fund, and upon information and

belief, a trustee of Taurus Fund.

## FACTS

### I.      Debtor's Prolific Use of Shell Companies

13.     As the Court is well aware, the Debtor uses a seemingly inexhaustible stream of

shell companies, purportedly owned by family members or business subordinates, to shield his

assets and activities from creditors.  The Debtor's "shell game" has allowed him to continue to

deny ownership of his assets and refuse to pay his debts.

14.     For example, this Court has found, in its order holding the Debtor in contempt for

violating the Court's corporate governance order, that the Debtor was the beneficial owner of

Ace Decade Limited (and, through it, Dawn State Limited), and that the Debtor controlled and

employed Ace Decade Limited's nominee owner, Yvette Wang.[3]

---

[3]  *Order Granting Motion to Hold Debtor in Contempt of Corporate Governance Order*, ¶¶ 1, 4 (Jan. 24, 2023,
Docket No. 1372) ("Corp. Governance Contempt Order").

15.     Similarly, immediately prior to the filing of the Debtor's chapter 11 case in February 2022, in the Debtor's pre-petition litigation against PAX in New York state court, Justice Ostrager found that it was the Debtor's practice to use shell companies to shield his assets from creditors.[4]  Justice Ostrager also found that the Lady May yacht was beneficially owned and controlled by the Debtor, despite title to the yacht being nominally held by HK USA, purportedly owned by Mei Guo.

16.     Previously, Judge Liman of the United States District Court for the Southern District of New York found, in a 2021 decision, that Eastern Profit Corporation Limited, an entity originally owned by another of the Debtor's chauffeurs and then transferred to the Debtor's daughter, was "in essence, a shell corporation" for the Debtor.[5]  Eastern Profit Corporation Limited was one of numerous purportedly independent entities whose financial accounts were identified by a 2018 Hong Kong court order to be "subject to the effective control" of the Debtor.[6]

17.     Relatedly, a confidential witness declaration filed by the Trustee under seal at Docket No. 1327 (the "Confidential Witness Declaration") and incorporated by reference as an exhibit in support of this Complaint, establishes, among other things that: ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[4]     Ex. 1, Decision & Order, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022) [Docket No. 1181] (the "Final Contempt Decision").

[5]     *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631, at *1 (S.D.N.Y. June 22, 2021).

[6]     Ex. 2, Hong Kong Restraint Order, at 7-18.

5

18. Particularly relevant to this Complaint, this Court has found that the New Federal State of China (the "NFSC") and the GSeries Entities such as Gettr, GClubs, GNews, GFashion, GMusic, and GEdu (the "GSeries Entities")[7] are "led by the Debtor,"[8] "serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor."[9]

19. Finally, and also particularly relevant to this Complaint, the Debtor has—until his recent arrest by the FBI—used this shell game to fund his extravagant lifestyle and luxury residences. For example:

- Lamp Capital LLC and Golden Spring (New York) Ltd. (shell companies purportedly owned by the Debtor's son) have paid the Debtor's living expenses and legal fees;

- Bravo Luck Limited (another shell company purportedly owned by the Debtor's son and in which the Debtor had a direct ownership interest) has claimed beneficial ownership of the Debtor's $70 million luxury apartment at the Sherry Netherland Hotel;[10]

- Hong Kong International Investments (USA) Limited ("HK USA") (a shell company purportedly owned by the Debtor's daughter, Mei Guo, and recently

---

[7] The Court also found that: "The G in GSeries stands for Guo." *Corrected Memorandum of Decision Granting in Part Motion for Preliminary Injunction* ¶¶ 2, 3 (Adv. Proc. No. 22-05032, Jan. 13, 2023) [Docket No. 133] (the "PI Decision") ("The GSeries includes the following entities: Himalaya Exchange, Gettr, GFashion, GMusic, GClubs, GNews, and GEdu.").

[8] PI Decision, ¶ 7 ("The Debtor is the leader of The Whistleblower Movement, NFSC, ROLF, and Himalaya.").

[9] *Id.* ("The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor.").

[10] The Trustee has challenged Bravo Luck Limited's asserted interest in the Sherry Netherland apartment. See Amended Adversary Complaint Against Bravo Luck and Qiang Guo Seeking (I) Invalidation of Purported Trust Agreement in Favor of Bravo Luck and, (II) In Alternative, Ruling that Debtor Effectuated Fraudulent Transfer in Favor of Bravo Luck and Qiang Guo Pursuant to Section 276 of New York Debtor and Creditor Law, Made Applicable by Section 544 of Bankruptcy Code (Adv. Proc. No. 22-05027, Feb. 28, 2023) [Docket No. 40].

ruled by this Court to be the Debtor's alter ego[11]) has held title to the Debtor's yacht, the *Lady May*—which the Court ruled was property of the estate despite HK USA's nominal ownership;

- Greenwich Land LLC (a shell company purportedly owned by the Debtor's wife) holds nominal title to the Debtor's Connecticut residence;[12]

- Anton Development Limited (a shell company originally owned by one of the Debtor's chauffeurs and then transferred to the Debtor's daughter) held title to a Bombardier Global XRS private jet; and

- HCHK Technologies, Inc. (another shell company purportedly owned by the Debtor's employees) has paid fees associated with the management of the Lady May and of the Debtor's Bombardier aircraft, and has paid nearly $2.8 million to purchase a new private plane for the Debtor.[13]

20.     In sum, while this Complaint focuses on the Mahwah Mansion and Taurus Fund, the Trustee believes that context regarding the Debtor's wide-ranging strategy of using shell companies to shield assets from creditors will assist the Court in understanding the Trustee's position.  The Trustee also expressly reserves all rights to pursue actions asserting claims against other entities at the appropriate time.

---

[11]  *See Memorandum of Decision and Order Granting Motion for Partial Summary Judgment on Second Counterclaim*, at 36 (Adv. Proc. No. 22-05003, May 18, 2023) [Docket No. 221].

[12]  The Trustee has sought an alter ego judgment against this entity in adversary proceeding 23-05005, in connection with which the Court entered a prejudgment remedy and temporary restraining orders against Greenwich Land LLC and the Debtor's wife.  *See Order Granting in Part Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction* (Adv. Proc. No. 23-05005, Mar. 28, 2023, Docket No. 14) (the "Greenwich TR &PI Order"); *Order Granting Chapter 11 Trustee's Amended Application for Ex Parte Prejudgment Remedy* (Adv. Proc. No. 23-05005, Mar. 28, 2023) [Docket No. 15] (the "Greenwich PR Order").

[13]  The Trustee has sought an alter ego judgment against HCHK Technologies, Inc., HCHK Property Management, Inc., and Lexington Property and Staffing, In. in adversary proceeding 23-05013, in connection with which the Court entered a temporary restraining order and preliminary injunction against this entity.  *See Order Granting in Part Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction* (Adv. Proc. No. 23-05013, June 12, 2023, Docket No. 18) (the "HCHK TR & PI Order").  *See also Complaint of Chapter 11 Trustee for Estate of Ho Wan Kwok Pursuant to Sections 105, 362, 363, 541, 542, 544 and 549 of the Bankruptcy Code Seeking (i) Declaratory Judgment that HCHK Technologies, Inc., HCHK Property Management, Inc., and Lexington Property And Staffing, Inc., Are (A) Alter Egos of Debtor; or, (B) in the Alternative, An Order that Debtor Equitably Owns Such Entities and/or Their Property; and (II) Injunctive Relief* (Adv. Proc. No. 23-05013, June 8, 2023) [Docket No. 1].

## II. Nominal Ownership by Taurus Fund, Shell Company of Debtor

21.     On December 16, 2021 (the "Purchase Date"), Taurus Fund purchased the Mahwah Mansion from Crocker Mansion Estate LLC for approximately $26.5 million.[14]  The deed was recorded on the same date at Bergen County, New Jersey.[15]

22.     Taurus Fund was formed in Nevada on December 16, 2021, the same date as the Purchase Date.[16]

23.     Besides the Mahwah Mansion, Taurus Fund also holds title to a Bösendorfer grand piano designed by F.A. Porsche (the "Porsche Piano"), which is believed to be valued at over $250,000.  The Porsche Piano was previously located at the Debtor's GSeries offices at 3 Columbus Circle.  Upon information and belief, the Debtor's employees or agents have removed the piano and taken it to an unknown location.[17]  As of the time of this Complaint, while the Trustee's investigation is ongoing, other than the Mahwah Mansion and the Porsche Piano, the Trustee is not aware of any other assets held by Taurus Fund.[18]

24.     While its members remain unknown, Taurus Fund is managed by (i) the Debtor's chauffeur and/or bodyguard Scott Barnett and (ii) Taurus Management.[19]

25.     Scott Barnett is the Debtor's chauffeur and/or bodyguard, and as of the date of this Complaint, Barnett continues to be employed by and actively work for the Debtor.  In fact,

---

[14]  *See* Ex. 3, Deed of Mahwah Mansion.

[15]  *Id*.

[16]  *See* Ex. 4, Article of Organization of Taurus Fund LLC.

[17]  The Trustee has been advised by counsel for GNews, one of the GSeries entities controlled by the Debtor, that the Porsche Piano should be placed back in the Debtor's GSeries offices at 3 Columbus Circle, but the Trustee is not aware that this has been done.

[18]  To the extent that Taurus Fund has any other assets, they should also be incorporated into the Debtor's chapter 11 estate.

[19]  *See* Ex. 4, Article of Organization of Taurus Fund LLC.

8

on June 20, 2023, in an email to the Trustee, Aaron A. Romney, the Debtor's counsel, notified the Trustee that "*Scott Barnett, who worked security for Mr. Kwok at the Sherry [Netherland], will be picking up [certain] boxes*" from the Sherry Netherland containing the Debtor's and his family members' clothes and personal effects.[20]  Barnett is also listed as a covered driver under an insurance policy issued by AIG to Golden Spring (New York) Ltd.,[21] one of the Debtor's many shell companies.[22]  Barnett has also been paid by at least two other shell companies, Greenwich Land, LLC,[23] (which is purportedly owned by the Debtor's wife and which holds title to the Debtor's residence in Greenwich, Connecticut),[24] and Lexington Property and Staffing, Inc. ("Lexington Property")[25] (Lexington Property is 99.999% owned by Holy City Hong Kong Ventures, Ltd., an entity itself 100% owned by the Debtor's assistant, Yvette Wang).[26]

26.     Taurus Fund's other listed manager, Taurus Management, was formed on December 15, 2021, one day before the Purchase Date, as a limited liability company in the State of New Mexico.[27]

---

[20] *See* Ex. 5, Email from Aaron A. Romney to the Trustee, Stephen Kindseth and Eric Henzy (June 20, 2023 at 1:01 PM).

[21] *See* Ex. 6, New York Automobile Declarations Page, by and between AIG Property Casualty Company and Golden Spring (New York) Ltd., for the policy period between Apr. 1, 2022 and Apr. 1, 2023).

[22] As noted above, the Debtor has previously used his chauffeur and/or bodyguard to hold his shell companies.

[23] *See* Ex. 7, Check to Scott Barnett from Greenwich Land, LLC, on February 2, 2021, for an amount of $619.99.

[24] The Trustee has sought an alter ego judgment against this entity in adversary proceeding 23-05005, in connection with which the Court entered a prejudgment remedy and temporary restraining orders against Greenwich Land LLC and the Debtor's wife.  *See* Greenwich TR &PI Order; Greenwich PR Order.

[25] *See* Ex. 8, Lexington Property Expenses by Vendor Summary, January – December 2021, Scott Barnett was paid $115.08 by Lexington Property.

[26] The Trustee has sought an alter ego judgment against Lexington Property, HCHK Technologies, Inc., and HCHK Property Management, Inc. in adversary proceeding 23-05013, in connection with which the Court entered a temporary restraining order and preliminary injunction.  *See* HCHK TR & PI Order.

[27] *See* Ex. 9, Articles of Organization of Taurus Management LLC.

27.     The publicly available formation documents for Taurus Management indicate that Taurus Management is a manager-managed LLC.  However, the documents do not identify a manager or member.[28]

28.     Despite being a New Mexico entity, Taurus Management shares the same address as Taurus Fund in Nevada at 6628 Sky Pointe Drive, Suite 129-1071, Las Vegas, NV 89131.[29]

29.     Taurus Fund has ignored its obligations under Nevada law to file with the Secretary of State an annual list containing information such as names, titles and addresses of all of its managers, as well as a signature of the manager or authorized representative.  It is, accordingly, marked as "in default" on the website maintained by the Nevada Secretary of State.[30]

30.     Taurus Fund has also failed to comply with New Jersey law.  Under New Jersey law, Taurus Fund's ownership of property in New Jersey requires it to register as a foreign business entity with the New Jersey Secretary of State.  However, a review of public records indicates that no such filing has been made.

### III.     Scott Barnett and Taurus Management Became Trustees of Taurus Fund

31.     Under Nev. Rev. Stat. Ann. § 86.263(2), Taurus Fund's annual list of information was due on December 31, 2022.  Because it failed to timely file the list, Taurus Fund is deemed in default under Nevada law.

---

[28]   *Id.*

[29]   *Id.*

[30]   *See* Ex. 10, Taurus Fund LLC, Secretary of State of Nevada, Entity Search, https://esos nv.gov/EntitySearch/BusinessInformation.

32. On January 1, 2023, pursuant to Nev. Rev. Stat. Ann. § 86.274(2), Taurus Fund's company charter was revoked by the Nevada Secretary of State, and its right to transact business forfeited.

33. Upon revocation of Taurus Fund's charter and forfeiture of its right to transact business, under Nev. Rev. Stat. Ann. § 86.274(5), all of the property and assets of Taurus Fund, including the Mahwah Mansion, are required to be held in trust by its managers—namely Scott Barnett and Taurus Management—and the same proceedings may be had with respect to its property and assets as those apply to the dissolution of a limited liability company pursuant to Nev. Rev. Stat. Ann. §§ 86.505 and 86.521.

34. Upon information and belief, as of the date of this Complaint, Taurus Fund has not applied to reinstate its charter, and remains in default.

35. Upon information and belief, as of the date of this Complaint, Scott Barnett and Taurus Management remain as trustees of Taurus Fund and hold the Mahwah Mansion and all other assets of Taurus Fund in trust under Nevada law.

## IV. Debtor Equitably Owns Mahwah Mansion

36. Although Taurus Fund held nominal title to the Mahwah Mansion, the Debtor had full beneficial ownership and control over the property until his arrest on March 15, 2023. As of the date of this Complaint, the Debtor has been denied bail and remains in federal custody.

37. The Debtor's residence at, and his equitable ownership of, the Mahwah Mansion was revealed in the criminal indictment against him containing multiple charges of securities

fraud, wire fraud, and money laundering (the "Criminal Indictment").[31]  The Criminal Indictment identified the Mahwah Mansion as one of the Debtor's luxury residences in the United States, along with his apartment at the Sherry-Netherland and his residence in Greenwich, Connecticut.

38.     *In fact, a "public records" search under the Debtor's name lists the Mahwah Mansion as the Debtor's personal address*.[32]

A.     **Debtor Made Decision to Purchase Mahwah Mansion**

39.     Constructed in 1907, the castle-styled Mahwah Mansion, located within 25 miles of New York City, is described as one of the world's most magnificent and rare estates.  The mansion has 21 bedrooms, more than 19 bathrooms, a great hall, library, tea room, formal dining room, restaurant-style kitchen, movie theater, billiard room, indoor lap pool with spa, massage room, wine room, game room, gym, outdoor pool with cabana, majestic gardens with two fountains, tennis court, 8-car garage, and rare wood, stone work and craftsmanship throughout the castle.[33]  Additionally, the Mahwah Mansion has its own Wikipedia page and was listed on the National Register of Historic Places in 1997.[34]

40.     The grandeur and lavishness of the Mahwah Mansion is consistent with the Debtor's preference for extravagant residences, just like the $70 million Sherry Netherland apartment and the Debtor's multi-million dollar residence in Connecticut.

---

[31]  *See* Criminal Indictment of Ho Wan Kwok and Kin Ming Je, *United States v. Kwok et al.*, 23 Cr. 118, filed Mar. 6, 2023 [ECF No. 2].  A copy of the Criminal Indictment is attached as **Exhibit 11** hereto.

[32]  *See* Ex. 25, Lexis Public Record Comprehensive Person Report (listing Mahwah Mansion as the Debtor's address).

[33]  *See* 675 Ramapo Valley Road, Mahwah, New Jersey 07430, United States, CHRISTIE'S INTERNATIONAL REAL ESTATE GROUP, https://www.christiesrealestate.com/nnj/sold/detail/607-l-82287-f444400735/mahwah-nj-07430 (last visited July 6, 2023) (describing grandeur and lavish amenities of the Mahwah Mansion).

[34]  *See* Crocker-McMillin Mansion, WIKIPEDIA, https://en.wikipedia.org/wiki/Crocker-McMillin_Mansion (last visited July 6, 2023).

41.    On April 12, 2023, the NFSC, which, as this Court has found, is controlled by the Debtor and serves the purposes of the Debtor,[35] released a video on Gettr featuring a tour of the Mahwah Mansion hosted by Pamela Tsai, a/k/a Nicole ("Tsai")[36] and Qidong Xia, a/k/a Changdao Brother, or David Xia ("Xia") (the "First Video Tour").[37]  Xia is currently the Secretary General of the NFSC and Chairman of the Rule of Law Society and a person with whom the Debtor remains in contact.[38]  For example, on April 17, 2023, during a Gettr live stream by Tsai, Roy Guo,[39] and Xia, the Debtor allegedly made a fifteen-minute phone call to

---

[35]   PI Decision ¶7 ("The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor.").

[36]   This Court has found that Tsai is an associate of the Debtor and is associated with The Whistleblower Movement, NFSC, GSeries, Himalaya and/or ROLF.  *See* PI Decision ¶¶ 11-15.  The Court also found that Tsai actively participated in the protest campaign against the Trustee both outside of the Trustee's residence and at the entrance of Paul Hastings' office at Grand Central Terminal in New York, which were enjoined by this Court pursuant to the Court's *Order Granting In Part Motion for Preliminary Injunction* (Adv. Pro. No. 22-05032, Jan. 11, 2023) [Docket No. 129] (the "PAX PI Order").  Tsai also appeared in videos reposted by the Debtor on November 16 and 18, 2022, which were designed to threaten and harass the Trustee and his family members by identifying their names and employers and making baseless and outrageous attacks and comments. *See Motion for An Order (I) Preliminarily Enjoining the Debtor from Publishing Personal Information About Certain Parties and Their Relatives Online, (II) Directing the Debtor to Remove Any Such Existing Posts, (III) Granting A Temporary Restraining Order in the Event that the Court Orders a Hearing on This Motion; and (IV) Referring the Debtor's Conduct to the US Attorney's Office for the District of Connecticut* ¶¶ 27-28  (Adv. Pro. No. 22-05032, Nov. 22, 2022) [Docket No. 3] (the "PAX TRO Motion").

[37]   *See* NFSCTV (@chinatruth2022), *Nicole Looks at Brother Seven*, GETTR (Apr. 12, 2023), https://gettr.com/streaming/p2e8f16c734 (last visited July 6, 2023).  Contemporaneously with the filing of this Complaint, counsel for the Trustee has provided the Court with a flash-drive containing copies of each of the videos quoted in this Complaint (the "Video Flash-Drive"), with a translation prepared by counsel of the relevant segment of such videos.  The translated copy of the video referenced in this footnote is included in the Video Flash-Drive and is incorporated as **Exhibit 12** hereto.

[38]   *See, e.g.*, NFSCTV (@chinatruth2022), GETTR (June 5, 2023), https://gettr.com/post/p2ivret0048 (last visited July 6, 2023), identifying David Xia as the Secretary General of NFSC and Chairman of the Rule of Law Society.

[39]   This Court has found that Roy Guo is an associate of the Debtor and is associated with The Whistleblower Movement, NFSC, GSeries, Himalaya and/or ROLF.  *See* PI Decision ¶¶ 11-15.  The Court also found that Roy Guo actively participated in the protest campaign against the Trustee both outside of the Trustee's residence and at the entrance of Paul Hastings' office at Grand Central Terminal in New York, which were enjoined by this Court pursuant to the Court's PAX PI Order.

Xia while in federal custody.[40]  Pursuant to the phone call, the Debtor urged his followers to follow the lead of Xia.[41]

42.     During the First Video Tour, Xia and Tsai stated that the Debtor had the idea of buying a property in around 2020 and 2021; that the Debtor visited various properties in 2021; that the Debtor picked the Mahwah Mansion himself; that the Debtor decided to buy the Mahwah Mansion at the end of 2021; and that the Debtor instructed that everything related to the Mahwah Mansion be done in secrecy.[42]

43.     In sum, the Debtor decided to purchase the Mahwah Mansion on December 16, 2021, two months prior to the Debtor's voluntary filing of chapter 11 petition on February 15, 2022.  He also decided to hide his purchase and equitable ownership of the Mahwah Mansion (which, unsurprisingly, is not listed on the Debtor's schedules of assets and liabilities), which would have remained hidden if not for the Criminal Indictment by the U.S. government on March 15, 2023.[43]

---

[40]   *See* NFSCTV (@chinatruth2022), *Nicole Looks at Brother Seven*, GETTR (Apr. 17, 2023), https://gettr.com/streaming/p2enhu9b038 (last visited July 6, 2023) at 45:48-46:05 (video containing the Debtor's alleged phone call to his business associates where the Debtor asked his followers to "follow the arrangement of Changdao Brother") (Changdao Brother is Xia's nickname).  The translated copy of the video referenced in this footnote is included in the Video Flash-Drive and is incorporated as **Exhibit 13** hereto.

[41]   *Id.*

[42]   *See* Ex. 12, First Video Tour, https://gettr.com/streaming/p2e8f16c734 (last visited July 6, 2023) [video showing Xia and Tsai touring the Mahwah Mansion ], *e.g.*, at 2:10-2:20, 3:40-3:50, 6:25-6:30, 10:00-10:25, 14:20-14:25, 26:30-26:45, 28:55-29:40, 31:30-31:50, 32:41-33:48.

[43]   The Trustee and the Department of Justice are working on a stipulation to resolve their potential competing claims to the proceeds of an eventual sale of the Mahwah Mansion (*i.e.*, whether the proceeds should be distributed to victims/creditors through the chapter 11 process or pursuant to the forfeiture process in connection with the criminal charges against the Debtor).  The Trustee expects to present a stipulation to the Court in the near future.

### B.  Debtor Financed Purchase of and Renovation to Mahwah Mansion

44.  Despite Taurus Fund's nominal title to the Mahwah Mansion, the Debtor directed and was personally involved in the purchase of and renovations to the mansion, using money that was under his control.  Specifically, according to the Criminal Indictment, the Debtor "used fraudulently-obtained victim money to purchase, fund, or finance a $26.5 million purchase of [the Mahwah Mansion] for [the Debtor] and his family."[44]

45.  The Criminal Indictment also explained that the funds used to purchase the Mahwah Mansion were funneled through other shell companies.  Specifically, in or around November 2022, shortly before the Debtor's voluntary chapter 11 filing, the Debtor, acting through his co-defendant and alleged co-conspirator, William Je ("Je"),[45] directed the funneling of funds from G Club Operations, LLC ("G-Club") through bank accounts in other entities' names toward the purchase of the Mahwah Mansion[46] for the use and benefit of the Debtor, his wife (Hing Chi Ngok), his daughter (Mei Guo), and his son (Qiang Guo).[47]

46.  Based on the Trustee's investigation, Je, referred to by Mei Guo as "uncle William," and who is currently on the run from law enforcement, is a trusted family friend and

---

[44]  *See* Ex. 11, Criminal Indictment ¶ 4; *see also* Ex. 14, Order Denying Kwok's Motion for Release Pending Trial, at 3, *United States v. Kwok*, 23 Cr. 118-1 (AT) (S.D.N.Y. Apr. 20, 2023) [Docket No. No. 51] (noting that "[t]he majority of funds raised through the membership organization were used to pay [the Debtor's] and his family's personal expenses, and purchase high-priced goods and real property, such as [the Debtor's] mansion in New Jersey."

[45]  The Government believes that William Je remains at large and is believed to be in the UAE. *See Memorandum of Law of the United States of America in Opposition to Defendant Yanping Wang's Motion for Pretrial Release* (the "USAO Memorandum"), at 4, attached as Exhibit B in the *Reply of Chapter 11 Trustee to G Club Operations LLC's Supplemental Objection to Trustee's Motion to Compel and Request for Related Relief* (the "G-Club Reply") (June 23, 2023) [Main Case Docket No. 1934].

[46]  Ex. 11, Criminal Indictment ¶ 15b.

[47]  *See* Ex. 15, Complaint ¶ 104(b), *S.E.C. v. Kwok*, 23 Civ. 2200 (PGG) (S.D.N.Y. Mar. 15, 2023) [Docket No.1] ("SEC Complaint").

financial advisor of the Debtor. Je has been closely involved with the Debtor's real estate purchases, previously having been involved in the consideration of multiple potential property purchases by the Debtor. Je also arranged, under the Debtor's instructions, a transfer of $37 million to be held in escrow as a purported "loan" to cover the cost of the Lady May. As this Court has already found, both the Lady May and the $37 million escrow funds constituted and constitute, as applicable, property of the Debtor's chapter 11 estate [Adv. P. No. 22-05003, ECF No. 221].

47.     The Debtor not only funded the purchase of the Mahwah Mansion, he also funded significant improvements to the property. Between December 2021 and March 2022, he arranged for an additional $13 million to be transferred to an escrow account to pay for extravagant furnishings for, and renovations to, the Mahwah Mansion. These extensive expenditures include a wing for his son and daughter each, as well as various furniture and decorative items, such as Chinese and Persian rugs worth approximately $978,000, a $62,000 television, a $53,000 fireplace log cradle holder, a $59,000 watch storage box, and a $35,000 mattress.[48]

48.     In the First Video Tour, while touring the dining room of the Mahwah Mansion, Tsai commented on the various delicate pieces of Chinese calligraphy and paintings, which were "selected by Mr. Kwok himself."[49] Xia particularly emphasized that there are many pieces of important antiques in the Mahwah Mansion, which were purportedly "donated by [the Debtor's]

---

[48]     *See* Ex. 15, SEC Complaint ¶ 104(c). *See also* Ex. 11, Criminal Indictment ¶ 15(c).
[49]     *See* Ex. 12, First Video Tour, at 26:00-26:20.

family fund,"[50] that these antiques are "worth way more than the house itself,"[51] and that only the Debtor knows and is able to tell the story behind each antique.[52]  Upon information and belief, any funds from the Debtor's family fund are the Debtor's funds.

49.     These statements were repeated in another video tour of the Mahwah Mansion, given by Xia and Tsai on April 15, 2023 (the "Second Video Tour," and together with the First Video Tour, the "Video Tours").[53]

### C.     Debtor Resides at Mahwah Mansion

50.     Together with his apartment at the Sherry-Netherland Hotel and his residence in Greenwich, Connecticut, the Mahwah Mansion is one of at least three luxury residences owned by the Debtor in the United States.[54]

51.     During the search of the Mahwah Mansion, the Federal Bureau of Investigation (the "FBI") found a number of the Debtor's personal effects, including (i) prescription medication in his name,[55] (ii) an international driving permit and New York's learner's permit, both issued to the Debtor,[56] (iii) family pictures,[57] (iv) a certificate of authenticity for a Ferrari

---

[50]   *Id.*, at 33:08-33:25.

[51]   *Id*., at 33:25-33:29, 33:48-33:56.

[52]   *Id.*, at 33:29-33:33.

[53]   *See* NFSCTV (@chinatruth2022), *Nicole Looks at Brother Seven*, GETTR (Apr. 15, 2023), https://gettr.com/streaming/p2ehu86252d (last visited July 6, 2023), *e.g.*, at 21:55-22:20, 33:05-33:30, 35:20-35:35, 40:00-40:23.  The translated copy of the video referenced in this footnote is included in the Video Flash-Drive and is incorporated as **Exhibit 16** hereto.

[54]   *See* Ex. 17, USA Response in Opposition as to Wang's Motion for Bond, at 3, *United States v. Yanping Wang,* 23 Mag. 2007 (UA) (S.D.N.Y. Mar. 29, 2023 [Docket No. 10].

[55]   A picture taken by law enforcement of the medication (with personally identifiable information redacted) is attached as **Exhibit 18** hereto.

[56]   A picture taken by law enforcement of the driver's license (with personally identifiable information redacted) is attached as **Exhibit 19** hereto.

[57]   A picture taken by law enforcement of these family pictures is attached as **Exhibit 20** hereto.

automobile, addressed to the Debtor,[58] and (iv) in what appears to be the Debtor's personal dressing room, "approximately 30 Brioni custom-made suits, each of which bore the hand-stitched words 'Brioni for Miles Kwok' inside the jackets," [59]

52.     Besides personal items and luxury furniture and goods, the FBI also found inside the mansion a safe, located in a closet that was attached to what appears to be the Debtor's personal dressing room, containing "approximately $394,000, €5000, HK$188,050, and [RMB] 250 in cash, and approximately 156 gold coins (alongside a receipt, which indicated that the coins were valued at approximately $109,555)."[60]

53.     The FBI also recovered from the Mahwah Mansion evidence of the Debtor's foreign travel documents, including a copy of the Debtor's expired United Arab Emirates passport, as well as 10 computers or laptops, 16 external media storage devices (USB and hard drives), nine cellphones and a cell scrambler,[61] which the Debtor uses.[62]

54.     Prior to the Debtor's arrest on March 15, 2023, the Debtor had frequently conducted live streaming on social media platforms, including Gettr, from the Mahwah Mansion. Between January 11, 2023 and February 19, 2023, the Debtor held at least 11 live broadcast

---

[58]     A picture taken by law enforcement of the certificate is attached as **Exhibit 21** hereto.

[59]     *See* Ex. 22, USA Letter in Opposition to Brief in Support of Pretrial Release by Kwok, at 3, *United States v. Kwok*, S1 23 Cr. 118 (AT) (S.D.N.Y. Apr. 3, 2023) [Docket No. 26].  A picture taken by law enforcement of these custom suits is attached as **Exhibit 23** hereto.

[60]     Ex. 17, *id.*

[61]     Ex. 17, *id.* (noting in footnote 2 that a cellphone scrambler is an external device that attaches to a cellphone and is designed to defeat government wiretaps and other eavesdropping technologies by converting voice into non-interpretable analog noises for transmission over the phone network).

[62]     Ex. 17, *id.*, at 14 ("The defendant uses dozens of different cellphones and cellphone scramblers").

sessions using his personal account at Gettr, @milesguo, in the Mahwah Mansion on January 11,[63] 15,[64] 22,[65] 23,[66] and 29,[67] and on February 1,[68] 8,[69] 12,[70] 15,[71] 16,[72] and 19.[73]

### D. Debtor Made Mahwah Mansion Available to His Associates

55. Upon information and belief, in April 2023, following the Debtor's arrest and the disclosure of the Mahwah Mansion in the Criminal Indictment, in an effort to continue to shield valuable assets from his creditors, the Debtor directed his associates to claim the Mahwah Mansion as the new base of the NFSC.

56. On April 9, 2023, the NFSC held an event at the Mahwah Mansion, during which allegedly 500 followers went into the mansion and livestreamed their speeches on various internet platforms, including Gettr.[74]

---

[63] *See* GNews (@milesguo), GETTR (Jan. 11, 2023), https://gettr.com/live/milesguo?v=63bed46fc44fd9002eb34d8d.

[64] *See* GNews (@milesguo), GETTR (Jan. 15, 2023), https://gettr.com/streaming/p254ul5e418.

[65] *See* GNews (@milesguo), GETTR (Jan. 22, 2023), https://gettr.com/streaming/p25vkoyb00f.

[66] *See* GNews (@milesguo), GETTR (Jan. 23, 2023), https://gettr.com/streaming/p262fuwceb5.

[67] *See* GNews (@milesguo), GETTR (Jan. 29, 2023), https://gettr.com/streaming/p26ogg2bb78.

[68] *See* GNews (@milesguo), GETTR (Feb. 1, 2023), https://gettr.com/streaming/p271nur051e.

[69] *See* GNews (@milesguo), GETTR (Feb. 8, 2023), https://gettr.com/streaming/p27p5sp65ca.

[70] *See* GNews (@milesguo), GETTR (Feb. 12, 2023), https://gettr.com/streaming/p283fx773af.

[71] *See* GNews (@milesguo), GETTR (Feb. 15, 2023),https://gettr.com/streaming/p28ebpn47e0.

[72] *See* GNews (@milesguo), GETTR (Feb. 16, 2023), https://gettr.com/streaming/p28hzzn1a30.

[73] *See* GNews (@milesguo), GETTR (Feb. 19, 2023), https://gettr.com/streaming/p28sypo9110.

[74] *See* NFSCTV (@chinatruth2022), GETTR (Apr. 9, 2023), https://gettr.com/streaming/p2dxtede413 (last visited July 6, 2023) (full livestreaming video of approximately 3.5 hours showing followers lining up to enter the Mahwah Mansion and making speeches in the mansion).

57.     As the Court previously found, NFSC and Gettr "serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor."[75]

58.     Videos were also posted on the NFSC official homepage, showing followers entering and giving speeches in the Mahwah Mansion.[76]  In particular, the videos include captions transcribing statements of the NFSC followers after seeing the mansion, including that "*[the Debtor] has prepared a base for the NFSC members*,"[77] that "*everything [the Debtor] has prepared for the fellow fighters [at the Mahwah Mansion] is the best*,"[78] and that they wanted to "*leave their marks in the room where [the Debtor] used to live broadcast*."[79]

59.     Since April 9, 2023, Xia and other NFSC members have begun to conduct their affairs from an office in the Mahwah Mansion.[80]

---

[75]  PI Decision ¶ 7 ("The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor.").

[76]  *See NFSC Fellow Fighter Feels that the Air at the NFSC Base is Sweet,* NEW FEDERAL STATE OF CHINA (Apr. 12, 2023), https://nfscofficial.com/2023/04/12/nfsc-fellow-fighter-feels-that-the-air-at-the-nfsc-base-is-sweet/ (last visited July 6, 2023) (including livestream videos of followers entering the Mahwah Mansion on April 9, 2023).

[77]  *Id.*

[78]  *See Everything Mr. Miles Guo has Prepared for the Fellow Fighters in the NFSC Base is the Best*, NEW FEDERAL STATE OF CHINA (Apr. 19, 2023), https://nfscofficial.com/2023/04/19/everything-mr-miles-guo-has-prepared-for-the-fellow-fighters-in-the-nfsc-base-is-the-best/ (last visited July 6, 2023) (video showing followers making speech inside the Mahwah Mansion and title of the video is "Everything Mr. Miles Guo Has Prepared For the Follow Fighters In the NFSC Base Is The Best").

[79]  *See Fellow Fighters are Excited to Leave their Footprints on the Base of the NFSC*, NEW FEDERAL STATE OF CHINA (Apr. 16, 2023), https://nfscofficial.com/2023/04/16/fellow-fighters-are-excited-to-leave-their-footprints-on-the-base-of-the-nfsc/ (last visited July 6, 2023) (video showing followers making speech in the Mahwah Mansion with the caption stating that followers "think the mansion is very luxurious.").

[80]  *See* Ex. 16, Second Video Tour, at 2:05-2:30 (showing Xia sitting in the Mahwah Mansion office).

60.     On April 12, 2023, in the First Video Tour,[81] Xia noted that the Mahwah Mansion was also designated by the Debtor to be a premium lounge for G-Club members and place to hold conferences for various Himalaya organizations and the Farms.[82]

61.     As this Court knows, the G-Club and Himalaya are entities that (like the NFSC) "serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor."[83]

62.     As noted above, on April 17, 2023, in a livestreaming on Gettr by the Debtor's associates, Tsai, Roy Guo, and Xia (currently the Secretary General of the NFSC and Chairman of the Rule of Law Society), the Debtor allegedly made a 15-minute phone call to Xia while in federal custody.[84]  Pursuant to the phone call, the Debtor urged his followers to follow the lead of Xia.[85]

63.     Upon information and belief, the Debtor directed Xia to take residence at the Mahwah Mansion in an attempt to maintain control of it, while continuing to shield valuable assets from his creditors.

---

[81]  *See* Ex. 12, First Video Tour, at 6:35-7:00.

[82]  The Trustee is aware of no evidence that this was anything more than empty promises, consistent with the other GClub promises the Debtor employed as part of the fraud alleged against him.

[83]  PI Decision ¶ 7 ("The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor.").

[84]  *See* Ex 13, NFSCTV (@chinatruth2022), *Nicole Looks at Brother Seven*, GETTR (Apr. 17, 2023), https://gettr.com/streaming/p2enhu9b038 (last visited July 6, 2023) at 45:48-46:05 (video containing the Debtor's alleged phone call to his business associates where the Debtor says "follow the arrangement of Changdao Brother") (Changdao Brother is Xia's nickname).

[85]  *Id.*

64.     On May 5, 2023, Xia led a small group of the Debtor's associates to meet with U.S. Rep. George Santos[86] at the Mahwah Mansion, which was livestreamed on Gettr.[87]

65.     On May 19, 2023, in relation to a lawsuit *SEC v. Mountains of Spices et al.*, counsel for Mountains of Spices ("MOS"), William J. Quinlan, filed a letter, confirming, among other things, that Xia has resided at the Mahwah Mansion because he and others have been removed by the Government from NFSC's former offices.[88]

66.     On June 4, 2023, the NFSC held a gathering of more 100 guests at the Mahwah Mansion to celebrate its third anniversary, with more than 10 leaders of various Himalaya Farms present.[89]  The event was livestreamed on Gettr.  As this Court has found, Himalaya Farms are affiliated Himalaya entities, which are controlled by the Debtor.[90]  One farm leader commented

---

[86]  Eleven days later, on May 16, 2023, Rep. Santos spoke on the floor of the House characterizing the Debtor as a "harmless political target" and calling on (among others) the DOJ to "free Miles Guo."  *See* https://www.congress.gov/congressional-record/volume-169/issue-82/house-section/article/H2358-1 (last visited July 6, 2023).

[87]  *See, e.g.*, NFSCTV (@chinatruth2022), GETTR (May 5, 2023), https://gettr.com/post/p2g9qpt94c0 (last visited July 6, 2023) (showing the livestreaming of George Santos' visit to the Mahwah Mansion); *see also* NFSCTV (@chinatruth2022), GETTR (May 5, 2023), https://gettr.com/post/p2g9rwre9f6 (last visited July 6, 2023) (cover photo of the video shows Xia and Santos in the hall of Mahwah Mansion); *Congressman George Santos, visited the homebase of the New Federal State of China*, GNEWS (May 5, 2023 15:02:28), https://gnews.org/m/1278280?biz=75865469&eu=54367966&t=oiylYIS&gref= (article posted by Gnews discussing Santos visit to the Mahwah Mansion)..

[88]  *See* Ex. 24. MOS Letter in Response to DOJ's Objection to Lift Stay on MOS, at 2, *S.E.C. v. Mountains of Spices,* No. 1:23-cv-02200-PGG (S.D.N.Y. May 19, 2023) [Docket No. 49] ("Whether the 'leader of MOS' has streamed videos in a New Jersey residence is not relevant, and, regardless, he has only resided there because, on information and belief, the Government had a receiver appointed that removed the movement from its prior offices.").

[89]  *See* NFSCTV (@chinatruth2022), GETTR (June 4, 2023), https://gettr.com/streaming/p2isujs2847 (last visited July 6, 2023) (full streaming of the NFSC event at the Mahwah Mansion).

[90]  PI Decision ¶¶ 4, 7 ("NFSC is associated, affiliated, and/or connected with the Himalaya Global Alliance (together with affiliated Himalaya entities, such as Himalaya Exchange and Himalaya Farms, 'Himalaya')") ("The Debtor is the leader of The Whistleblower Movement, NFSC, ROLF, and Himalaya. The Whistleblower Movement, NFSC, ROLF, and Himalaya serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor").

on the lavishness of the Mahwah Mansion, stating that "what [the Debtor] has arranged for us is purely touching."[91]

67.     Abundant evidence demonstrates that, despite being nominally owned by Taurus Fund, even since his arrest the Debtor continues to utilize the Mahwah Mansion for his own benefit, including by making it available for the NFSC, G-Club and Himalaya, which the Court has already determined are used by the Debtor for his own purposes.

## First Claim

**(Declaratory Judgment that Debtor Is Equitable Owner of Mahwah Mansion and Ordering Turnover of Mahwah Mansion and Fixtures and Personal Property in Mahwah Mansion to Trustee)**

68.     The Trustee repeats and realleges the allegations contained in paragraphs 1-67.

69.     New Jersey law applies to the equitable ownership claim, because the Mahwah Mansion is located in New Jersey.[92]

70.     Courts have found that a debtor had an equitable interest in property upon one or more of the following grounds: (1) the debtor's funds were used to acquire the property; (2) the debtor represented that he had an interest in the property or used the property to obtain credit; or (3) they involved property that was once owned by the debtor and then transferred to a third party (usually in the face of creditor pressure).[93]  A court applying New Jersey's equitable ownership law has also found a debtor to be the equitable owner of property based on the

---

[91]    *See* NFSCTC (@chinatruth2022), GETTR (June 4, 2023), https://gettr.com/streaming/p2isujs2847, at 5:19:10 – 5:19:50 (last visited July 6, 2023) (full streaming of the NFSC event at the Mahwah Mansion).

[92]    *See Kartzman v. Beiman (In re Beiman)*, No. 15-10488 (JKS), 2018 WL 6978705, *3 (Bankr. D. N. J. Mar.19, 2018) (providing that in bankruptcy cases, state law generally determines what interest, if any, a debtor has in property) (citing *O'Dowd v. Trueger (In re O'Dowd)*, 233 F.3d 197, 202 (3d Cir. 2000); *see also Butner v. United States*, 440 U.S. 48, 55 (1979) (noting that property interests are created and defined by state law).

[93]    *In re Beiman*, at *4 (Bankr. D. N. J. Mar.19, 2018).

patterns and practices of the debtor's fraudulent behaviors, where the debtor, funding the purchase of properties, placed title to the properties in the name of third parties while maintaining *de facto* control and ownership.[94]

71.     As detailed above, the Mahwah Mansion is equitably owned by the Debtor. Among other things, the Debtor financed the purchase of and renovations to the Mahwah Mansion, resided there, and held it in a shell company managed by his chauffeur and/or bodyguard.  Public record also shows that the Debtor's address is at the Mahwah Mansion.  Even after his arrest and incarceration, the Debtor has continued to benefit from the property by using it as a base of operations for the NFSC, which, as the Court has already found, is under the Debtor's control.  Moreover, it is consistent with the Debtor's pattern and practice to have a shell company purchase and hold title to the Debtor's luxury residences, including without limitation, his apartment at the Sherry-Netherland and his residence in Greenwich, Connecticut.

72.     To the extent Taurus Fund held title to the Mahwah Mansion, it did so in name only, with the Debtor acting at all times as the mansion's true beneficial owner.

73.     Because the Mahwah Mansion was equitably owned by the Debtor, it is property of the Debtor's chapter 11 estate.[95]  Based on these facts and circumstances, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (i) declaring that the Mahwah Mansion constitutes property of the Debtor's chapter 11 estate to be administered by

---

[94]  *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, *8 (Bankr. D.N.J. June 29, 2006) (holding that the mere fact that title to a property is in the name of a third party does not mean that the debtor does not have an equitable interest in the property, however speculative that interest may be, to make it property of the bankruptcy estate).

[95]  To the extent that the Porsche Piano is not currently in the Mahwah Mansion, the Trustee requests its turnover wherever it may be.

the Trustee and (ii) ordering Taurus Fund (and/or Scott Barnett and Taurus Management, as trustees of Taurus Fund) to surrender the Mahwah Mansion and the fixtures and personal property in the Mahwah Mansion to the Trustee.

## **Second Claim**

### **(Declaratory Judgment that Debtor is Equitable Owner of Taurus Fund and Ordering Turnover of Taurus Fund and Its Assets to Trustee)**

74. The Trustee repeats and realleges the allegations contained in paragraphs 1-67.

75. Nevada law applies to the equitable ownership claim because Taurus fund is a Nevada entity.[96]

76. A court applying Nevada's equitable ownership analysis to the Debtor's relationship to Taurus Fund will focus on (1) whether the Debtor has active or substantial control of Taurus Fund, and (2) whether the Debtor is using and receiving benefits of Taurus Fund's assets.[97]

77. The Debtor is the equitable owner of Taurus Fund. First, the Debtor has active and substantial control over Taurus Fund, because, among other reasons:

    a. Taurus Fund was managed by the Debtor's chauffeur and/or bodyguard and another shell company under the Debtor's control;

    b. Taurus Fund has not followed any corporate formalities, including compliance with the business organization disclosure and registration laws of Nevada and New Jersey;

    c. Taurus Fund's purchase of the Mahwah Mansion, was funded by money controlled by the Debtor; and

---

[96] *See United States v. 74.05 Acres*, 428 F. Supp. 2d 57, 61 (D. Conn. 2006) ("Ownership interests are defined by the law of the State in which the interest arose.").

[97] *See In re Twin Lakes Vill., Inc.*, 2 B.R. 532 (Bankr. D. Nev. 1980).

      d.  The Porsche Piano owned by Taurus Fund was located in the offices of the GSeries entities, which, as this Court has found, were controlled by the Debtor.

78.    Second, the Debtor uses Taurus Fund's asset—the Mahwah Mansion—as his residence, public record lists the Mahwah Mansion as the Debtor's address, and Taurus Fund uses money funded and controlled by the Debtor to pay the Debtor's expenses in connection with such residence, including for construction and maintenance.

79.    Because Taurus Fund was equitably owned by the Debtor (prior to the revocation of its charter under Nevada law), the ownership and corporate control rights over Taurus Fund and the assets of Taurus Fund were, following the Petition Date, property of the Debtor's chapter 11 estate.

80.    Accordingly, the Trustee seeks a ruling pursuant to section 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times the Debtor has been the equitable owner of Taurus Fund; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of Taurus Fund and any and all of Taurus Fund's assets to the Trustee.

### Third Claim

**(Declaratory Judgment, in the Alternative, that Taurus Fund is Debtor's Alter Ego and Ordering Turnover of Taurus Fund and Its Assets to Trustee)**

81.    The Trustee repeats and realleges the allegations contained in paragraphs 1-67.

82.     Nevada law applies to the alter ego/veil piercing claim because Taurus Fund is a Nevada entity.[98]

83.     Under Nevada law, a court applying Nevada's alter ego analysis to the Debtor's relationship to Taurus Fund will focus on: (1) whether Taurus Fund is influenced and governed by the Debtor; (2) whether there is a unity of interest and ownership that Taurus Fund is inseparable from the Debtor; and (3) whether adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice.[99]  Factors that may indicate an alter-ego relationship include: (1) commingling of funds: (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities.[100]

84.     The Debtor had influence and exercised control over Taurus Fund such that Taurus Fund had no independent existence from the Debtor, and the Debtor used Taurus Fund's corporate form to perpetrate a fraud and injustice.  Taurus Fund is an alter ego of the Debtor, because, among other reasons:

    a. Taurus Fund was managed by the Debtor's chauffeur and/or bodyguard and another shell company under the Debtor's control;

    b. Taurus Fund has not followed any corporate formalities, including compliance with the business organization disclosure and registration laws of Nevada and New Jersey;

---

[98]     *See Hyundai-Wia Mach. Am. Corp. v. Rouette (In re Rouette)*, 564 B.R. 157, 174 (Bankr. D. Conn. 2017) ("In the absence of an overriding federal interest or policy, federal courts look to the law of the state of incorporation to determine whether to pierce a corporation's veil.") (citing *In re Carterhouse, Inc.*, 94 B.R. 271, 276 (Bankr. D. Conn. 1988).

[99]     *See Bermuda Rd. Properties, LLC v. EcoLogical Steel Sys., Inc.*, No. 2:12–cv–01579–JAD–GWF, 2017 WL 797092, *3 (D. Nev. Mar. 1, 2017) (citing *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 845 (Nev. 2000) and *Polaris Indust. Corp v. Kaplan*, 747 P.2d 884, 886 (Nev. 1987)).

[100]     *Id.*

    c.  Taurus Fund's purchase of the Mahwah Mansion was funded by money controlled by the Debtor;

    d.  The Debtor uses the Mahwah Mansion as his residence, and Taurus Fund uses money funded and controlled by the Debtor to pay the Debtor's expenses in connection with such residence, including for construction and maintenance; and

    e.  The Porsche Piano owned by Taurus Fund was located in the offices of the GSeries entities, which this Court has found were controlled by the Debtor.

85.    The Debtor has wrongfully and unjustly used his alter ego control over Taurus Fund to, among other things, cause Taurus Fund to hold assets for the Debtor's use and benefit, while purporting to keep such assets outside the reach of the Debtor's creditors, enabling the Debtor to live a life of luxury without paying his debts.

86.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

87.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times Taurus Fund was an alter ego of the Debtor; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of Taurus Fund's assets to the Trustee.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that judgment be entered as follows:

1.    On the First Claim, an order, pursuant to sections 541, 542, and 544 of the

Bankruptcy Code (1) declaring that: (a) the Debtor is the equitable owner of the Mahwah Mansion, and (b) that the Mahwah Mansion is property of the Debtor's chapter 11 estate to be administered by the Trustee; and (2) ordering Taurus Fund (and/or Scott Barnett and Taurus Management, as trustees of Taurus Fund) to turn over the Mahwah Mansion or its value and the fixtures and personal property in the Mahwah Mansion to the Trustee;

2.      On the Second Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that: (a) at all times the Debtor is the equitable owner of Taurus Fund; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of Taurus Fund and any and all of Taurus Fund's assets to the Trustee.

3.      On the Third Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times Taurus Fund was an alter ego of the Debtor; (b) any and all assets held by Taurus Fund at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Taurus Fund at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of Taurus Fund's assets to the Trustee.

4.      Reasonable attorneys' fees, costs, and expenses incurred in this action; and

29

5.     Such other and further relief as the Court may deem just, proper, or equitable under the circumstances.

[*Remainder of page intentionally left blank.*]

Dated: July 11, 2023         LUC A. DESPINS
        New York, New York       CHAPTER 11 TRUSTEE

By: */s/ Douglass Barron*  
     Avram E. Luft (admitted *pro hac vice*)  
     Douglass Barron (admitted *pro hac vice*)  
     PAUL HASTINGS LLP  
     200 Park Avenue  
     New York, New York 10166  
     (212) 318-6000  
     aviluft@paulhastings.com  
     douglassbarron@paulhastings.com

       *and*

     Nicholas A. Bassett (admitted *pro hac vice*)  
     PAUL HASTINGS LLP  
     2050 M Street NW  
     Washington, D.C. 20036  
     (202) 551-1902  
     nicholasbassett@paulhastings.com

       *and*

     Douglas S. Skalka (ct00616)  
     Patrick R. Linsey (ct29437)  
     NEUBERT, PEPE & MONTEITH, P.C.  
     195 Church Street, 13th Floor  
     New Haven, Connecticut 06510  
     (203) 781-2847  
     dskalka@npmlaw.com  
     plinsey@npmlaw.com

     *Counsel for the Chapter 11 Trustee*

**<u>Exhibit 2</u>**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA |
| -against- |
| HO WAN KWOK, |
| Defendant. |

Case No. 1:23-CR-118-1 (AT)

**ORAL ARGUMENT REQUESTED**

**RESPONSE OF CHAPTER 11 TRUSTEE AND GENEVER DEBTORS IN OPPOSITION**
**TO DEFENDANT HO WAN KWOK'S MOTION FOR AN ORDER AND WRIT**
<u>**STAYING BANKRUPTCY CASES OR IN THE ALTERNATIVE FOR OTHER RELIEF**</u>

Luc A. Despins
Adam J. Fee
G. Alexander Bongartz
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
lucdespins@paulhastings.com
adamfee@paulhastings.com
alexbongartz@paulhastings.com

*and*

Nicholas A. Bassett
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*Counsel for Luc A. Despins, as Chapter 11*
*Trustee, Genever Holdings Corporation, and*
*Genever Holdings LLC*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................. 7

    I.    Bankruptcy Cases ............................................................................ 7

    II.    Trustee's Investigation .................................................................... 8

    III.    Mahwah Adversary Proceeding ....................................................... 9

ARGUMENT ............................................................................................... 11

    I.    Bankruptcy Court Is Proper Forum to Decide Stay Motion ................... 11

    II.    Stay Motion Fails on Its Merits ...................................................... 15

        A.    Applicable Legal Standard for Stay Request ............................. 16

            i.    Balancing Test .............................................................. 16

            ii.    Other Considerations ...................................................... 17

        B.    Debtor Has Not Satisfied Burden for Obtaining Requested Stay ................................................................................ 18

            i.    Factor 1: Limited Overlap Between Bankruptcy Cases and Criminal Case ................................................ 18

            ii.    Factor 3: Global Stay of Bankruptcy Cases Would Unduly Prejudice Thousands of Creditors ..................... 19

            iii.    Factor 4: Allowing Bankruptcy Cases to Proceed Does Not Prejudice Debtor .............................................. 22

            iv.    Factor 5: Interests of the Bankruptcy Court Weigh Against Stay of Bankruptcy Cases .................................. 28

            v.    Factor 6: Public Interests Weighs Against Stay of Bankruptcy Cases ........................................................ 28

    III.    Respondents Do Not Object to Categories (i), (ii), and (iv) of Debtor's Proposed Alternative Relief .......................................... 29

    IV.    Court Should Deny Ms. Wang's Request for Global Stay of Bankruptcy Cases .................................................................... 30

CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*An v. Despins*,
    22-cv-10062 (VEC) (S.D.N.Y. Aug. 2, 2023) [Docket No. 29]..................................2

*In re Atlas*,
    183 B.R. 978 (Bankr. S.D. Fla. 1995) ...................................................................13

*In re Baldwin-United Corp.*,
    770 F.2d 328 (2d Cir. 1985)...................................................................................14

*In re Bame*,
    251 B.R. 367 (Bankr. D. Minn. 2000) ...........................................................23, 24

*Bernard v. Lombardo*,
    No. 16 CV. 863, 2017 WL 2984022 (S.D.N.Y. June 9, 2017)........................16, 19

*Citibank, N.A. v. Super Sayin' Publ'n, LLC*,
    86 F. Supp. 3d 244 (S.D.N.Y. 2015)........................................................14, 15, 16

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985).............................................................................................23

*Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*,
    No. 18-CV-2185 (LJL), 2021 WL 2554631 (S.D.N.Y. June 22, 2021) ...................2

*Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*,
    765 F.2d 343 (2d Cir. 1985)...........................................................................13, 14

*Gong v. Sarnoff*,
    23-cv-343 (LJL) (S.D.N.Y. Aug. 22, 2023) [Docket No. 72] ..................................3

*Gran Sabana Corp. N.V. v. Kossoff*,
    No. 21-CV-3154 (RA), 2021 WL 3666116 (S.D.N.Y. Aug. 17, 2021)..............16, 17

*Karimona Invs., LLC v. Weinreb*,
    No. 02CV1792WHPTHK, 2003 WL 941404 (S.D.N.Y. Mar. 7, 2003)..................14

*Layng v. Garcia (In re Garcia)*,
    569 B.R. 480 (Bankr. N.D. Ill. 2017) ...................................................................28

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012)................................................................15, 16, 17, 27

i

*Mango Labs, LLC v. Eisenberg*,
     No. 23-CV-00665 (LJL), 2023 WL 3510908 (S.D.N.Y. Apr. 12, 2023) ...............................14

*Nat'l Coal. on Black Civic Participation v. Wohl*,
     No. 20 CIV. 8668 (VM), 2021 WL 694557 (S.D.N.Y. Feb. 22, 2021)............................14, 16

*PAX v. Kwok*,
     Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022) [Docket No. 1181]..........................1, 2

*In re Randolph Hosp., Inc.*,
     No. 20-10247, 2022 WL 19298765 (Bankr. M.D.N.C. Apr. 25, 2022) ................................21

*S.E.C. v. Credit Bancorp, Ltd.*,
     93 F. Supp. 2d 475 (S.D.N.Y. 2000)..............................................................................11, 12

*In re Sturman*,
     No. 10 CIV. 6725 RJS, 2011 WL 4472412 (S.D.N.Y. Sept. 27, 2011) ................................12

*In re U.S. Lines Inc.*,
     262 B.R. 223 (S.D.N.Y. 2001)...................................................................................................21

*United States v. LaRouche Campaign*,
     682 F. Supp. 627 (D. Mass. 1987) .........................................................................3, 11, 13

*United States v. Simon*,
     373 F.2d 649 (2d Cir. 1967)..............................................................................................11, 18

*In re Walnut Hill, Inc.*,
     No. 16-20960 (JJT), 2018 WL 2672242 (Bankr. D. Conn. June 1, 2018).............................21

**Statutes**

11 U.S.C. §§ 108(a)(2); 546(a) .....................................................................................................21

Luc A. Despins, in his capacity as the chapter 11 trustee (the "<u>Trustee</u>") appointed in the chapter 11 case of Ho Wan Kwok (the "<u>Debtor</u>" or "<u>Mr. Kwok</u>"), and Genever Holdings Corporation ("<u>Genever BVI</u>") and Genever Holdings LLC ("<u>Genever US</u>" and, together with the Trustee and Genever BVI, the "<u>Respondents</u>")[1] hereby file this Response (the "<u>Response</u>") in opposition to (i) the Debtor's *Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative for Other Relief* [ECF No. 129] (the "<u>Stay Motion</u>") and the related memorandum of law [ECF No. 131] (the "<u>Memorandum of Law</u>") and (ii) the joinder of Yanping Wang ("<u>Ms. Wang</u>") in the Stay Motion [ECF No. 135] (the "<u>Joinder</u>").[2]  In support of this Response, the Respondents also submit the *Declaration of Nicholas A. Bassett in Support of Response of Chapter 11 Trustee and Genever Debtors in Opposition to Defendant Ho Wan Kwok's Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative for Other Relief* (the "<u>Bassett Declaration</u>"), filed contemporaneously herewith, and respectfully states as follows:

## <u>PRELIMINARY STATEMENT</u>

1.     The Debtor claims to need an unprecedented global stay of his chapter 11 case to protect his rights as a criminal defendant in this Court.  But the Stay Motion in reality has very little to do with this criminal case and everything to do with the Debtor's desire to obtain all the benefits of the bankruptcy process—including the worldwide automatic stay it imposes on civil litigation against him—while bearing none of its burdens.  The Debtor filed his chapter 11 case **voluntarily** in the Bankruptcy Court in February 2022 for the self-serving purpose of avoiding the enforcement of a New York state court judgment against him in excess of $250 million.[3]

---

[1]     The Debtor, Genever BVI, and Genever US are referred to, collectively, as the "<u>Debtors</u>".

[2]     Capitalized terms used but not defined in this Response have the meanings set forth in the Stay Motion.

[3]     Similarly, the Debtor chose to commence the chapter 11 case of Genever US, which he controlled at the time of its chapter 11 filing in October 2020.

Now that his chapter 11 case has gone exceedingly poorly for the Debtor and those close to him, he is trying desperately to make it stop.

2.       Before filing for bankruptcy, the Debtor had presented himself to the public as a billionaire who enjoyed all the trappings of a life of extreme luxury, including yachts, private jets, luxury cars, and multi-million dollar residences.  Yet, in the schedules of assets he filed in his chapter 11 case, the Debtor remarkably claimed to have a mere $3,850 in assets to his name.  As several courts have now observed, the Debtor was able to maintain his opulent lifestyle while professing to own virtually no assets by constructing a vast maze of shell companies in which he hid his wealth in the names of family members and close associates (such as Ms. Wang).[4]  The Trustee has spent months deconstructing the Debtor's "shell game" through an investigation of the Debtor's financial affairs and has already recovered tens of millions of dollars for the benefit of the estate.  Efforts to recover additional valuable assets are ongoing.

3.       The Debtor has responded by seeking to obstruct and interfere with the Trustee's investigation by any means possible, including by seeking (twice) to remove the Trustee, by refusing to comply with the Trustee's discovery requests, and even by rallying his followers across the globe to harass the Trustee, his counsel, members of his family, and one of the Debtor's largest unsecured creditors—which harassment was enjoined by the Bankruptcy Court.[5]

---

[4]     *See, e.g.*, Decision and Order on Motion, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022) [Docket No. 1181] ("Ostrager Contempt Decision") (describing Debtor as "a self-declared multi-billionaire [who has] secreted his assets in a maze of corporate entities and with family members."), attached as **Exhibit 1** to the Bassett Declaration; *see also Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631, at *1 (S.D.N.Y. June 22, 2021) (finding that that Eastern Profit Corporation Limited, an entity originally owned by one of the Debtor's chauffeurs and then transferred to the Debtor's daughter, was "in essence, a shell corporation" for the Debtor.)

[5]     *See Corrected Memorandum of Decision Granting in Part Motion for Preliminary Injunction* ¶ 7 (Adv. Proc. No. 22-05032, Jan. 13, 2023) [Docket No. 133] (the "Harassment PI Decision"), attached as **Exhibit 2** to the Bassett Declaration.  In addition, various individuals filed a lawsuit in this district alleging the Trustee and his counsel violated the Foreign Agents Registration Act by failing to register as agents of the People's Republic of China or the Chinese Communist Party.  The district court found that the Debtor, although not a party, was "at the center" of this lawsuit.  Op. & Order at 2, *An v. Despins*, 22-cv-10062 (VEC) (S.D.N.Y. Aug. 2, 2023)

The Stay Motion is but the Debtor's latest tactic to stymie, at all costs, the Trustee's ongoing investigation.

4. To conceal his true motivations in the Stay Motion, the Debtor fabricates nonexistent issues in his chapter 11 case that allegedly implicate his rights in this case. For example, the Debtor baldly asserts, among other things, that (i) the Trustee has disposed of personal property of the Debtor located at his former Sherry Netherland apartment, (ii) the Debtor's mansion in Mahwah, New Jersey, has been "turned over" to the Trustee for disposition, and (iii) the Trustee has failed to comply with orders of the Bankruptcy Court relating to the Debtor's privileges.[6] As explained in detail below, even a cursory review of the record in the Bankruptcy Court—with which the Debtor and his bankruptcy counsel should be intimately familiar—reveals that each of these statements is categorically untrue.

5. Despite his allegations having no basis, the Debtor doubled down on them in another filing with this Court on September 21, 2023. *See* ECF No. 143. Although this new filing is styled as a motion to compel the production of documents from the Government, it reads as a transparent effort by the Debtor to repeat and buttress the same false accusations he makes in the Stay Motion. For example, he repeats his erroneous allegation that the Trustee and the Government are collaborating to "fast track" the sale of the Mahwah Mansion, which is entirely

---

[Docket No. 29], attached as **Exhibit 3** to the Bassett Declaration. The district court dismissed the lawsuit and imposed Rule 11 sanctions. *Id.* at 13 ("[T]his lawsuit is just another part of a campaign of misbehavior designed to vex [the Trustee and Paul Hastings].") Other judges in this district have made similar findings, dismissing and sanctioning lawsuits brought under FARA against other participants in the bankruptcy case. *See* Op. & Order at 32, *Gong v. Sarnoff*, 23-cv-343 (LJL) (S.D.N.Y. Aug. 22, 2023) [Docket No. 72] ("The inescapable conclusion is that Zhang and Freeth are targeting those with interests opposed to Kwok's with the aim of chilling what they perceive as advocacy against him."), attached as **Exhibit 4** to the Bassett Declaration.

6 The Court should also reject the Debtor's self-serving rhetoric that he "attempted to resolve the Bankruptcy Cases through a potential global settlement." Mem. of Law at 5. The only source for this statement is the Debtor's own motion to remove the Trustee, *see* Bankr. ECF No. 1274, which no party in interest supported and which he withdrew. Moreover, as it relates to the Debtor's characterization of the Trustee's purported "thinly veiled threats" during a settlement conference with the Debtor, *see* Mem. of Law at 6, the Trustee refers this Court to the Bankruptcy Court's description of these events in its Harassment PI Decision.

untrue because no sale process can even be initiated unless and until the Trustee prevails on the merits of his pending adversary proceeding. Equally specious is the Debtor's assertion that the Trustee and Government were somehow improperly communicating about the indictment against the Debtor before it was filed. He makes this allegation by citing to time entries showing the Trustee had discussions with the Government about the indictment on March 16 and 18, 2023, which he says was two weeks before the filing of the indictment on March 29, 2023. The Debtor, however, carelessly refers to the superseding indictment dated March 29, 2023, which merely added Ms. Wang as a defendant, and fails to acknowledge that the initial indictment against the Debtor was unsealed on March 15, 2023. It was, of course, this original indictment that the Trustee discussed with the DOJ after the fact in mid-March.

6.      Stripped of its factual inaccuracies and exaggerated rhetoric, the Stay Motion has no merit and should be denied. However, as a threshold matter, the Respondents submit that the Stay Motion should be considered and decided by the Bankruptcy Court, which has exclusive jurisdiction over all property of the estate. The Stay Motion offers no authority in support of the extraordinary relief it requests of staying an entire bankruptcy case. To the contrary, in *United States v. LaRouche Campaign*, 682 F. Supp. 627, 628 (D. Mass. 1987), the district court was asked to stay a bankruptcy case involving two of the defendants in a criminal case before it, and the district court held that ***it lacked jurisdiction to do so***. Other case law—including cases in which the Second Circuit reversed an order that would have temporarily enjoined a debtor (or trustee) from taking certain, limited, actions within the larger bankruptcy case—shows the reluctance with which other courts have invaded a bankruptcy court's jurisdiction or impaired its ability to administer an estate.[7]

---

[7]     As the Trustee advised this Court on September 6, 2023, the Trustee previously filed in the Bankruptcy Court an emergency motion (and a related motion to expedite) seeking to enjoin the Debtor's prosecution of the Stay

7.     To the extent this Court is inclined to consider the merits of the Stay Motion, it should deny the motion because the Debtor has not come close to satisfying his burden for obtaining a stay under Second Circuit law.  The Debtor all but ignores the extreme prejudice to his creditors that would result from the global stay he requests.  Contrary to the Debtor's unsupported assertion, the Bankruptcy Cases are not being run for the benefit of one large hedge fund.  In fact, more than 1,400 proofs of claims have been filed in the Bankruptcy Cases, almost all by individuals, asserting billions of dollars in claims.  While the Trustee expects that many of these claims are subject to reduction or disallowance (and the Trustee's analysis in this regard is ongoing), it is already clear that these claims cover a wide spectrum, including tort claims (including allegations by one of the Debtor's former employees of sexual assault by the Debtor), defamation claims, breach of contract claims, and, of course, claims of counterparties to the Debtor's alleged fraudulent schemes (which, to be clear, are not limited to the allegations in this criminal case).  All these creditors have waited for years to obtain a recovery and now must look to the Trustee to collect estate assets, resolve their claims, and make distributions.

8.     The delay in distributions is not the only harm a stay would cause to creditors. Delaying the Trustee's investigation would substantially increase the risk that the Debtor, his family members, and his business associates will continue their efforts to move assets beyond the reach of the Trustee.  This is not mere speculation, as there are several examples of the Debtor, members of his family, and/or his associates transferring or disposing of significant assets without Bankruptcy Court approval, including after the Debtor's and Ms. Wang's indictment and subsequent confinement.  In addition, a global stay of the Bankruptcy Cases would, for all

Motion.  The Bankruptcy Court denied the motion to expedite, but noted that a hearing on the emergency motion would be scheduled, if needed, after this Court has acted on the Stay Motion.  At the hearing on the Stay Motion, the Trustee can, as necessary, address the comments made by Bankruptcy Judge Manning at the hearing on the motion to expedite, including comments related to extending the statute of limitation to bring avoidance actions.

5

practical purposes, eliminate the Trustee's ability to bring avoidance actions to recover valuable property of the estate, as the statute of limitation to commence such actions is set to expire on February 15, 2024, *i.e.*, well before the scheduled April 2024 trial in this case.

9.  While the Debtors' estates and their creditors will suffer immense harm from a stay, the Debtor has not credibly shown that the Bankruptcy Cases somehow prejudice his rights as a criminal defendant.  The Debtor asserts that the Trustee is pursuing litigation over issues that overlap with his criminal case, but the Trustee's objectives and arguments are entirely different from those of the Government.  The Trustee is seeking to recover assets (regardless of whether such assets are fruits of a crime), not prove criminal liability.  And the Debtor's concerns regarding privilege issues and other evidentiary matters are illusory because, ultimately, this Court, not the Bankruptcy Court, will decide what evidence is admissible in this case and, in any event, do not justify the extraordinary remedy sought here by the Debtor.

10.  Perhaps realizing the dubious nature of his requested global stay, the Debtor requests four categories of relief in the alternative, namely an order from this Court (i) authorizing the Debtor to disclose to the Trustee the information produced to him by the Government, (ii) permitting the Debtor to access the Mahwah Mansion, (iii) precluding the Government from facilitating the sale of the Mahwah Mansion in the Bankruptcy Cases, and (iv) prohibiting the Trustee from sharing with the Government any documents or information subject to privileges held by the Debtor.  These requests are mostly acceptable to the Trustee.  As to the first request, the Trustee no longer presently intends to seek disclosure of the information provided to the Debtor by the Government, and the Trustee will be asking for the Bankruptcy Court to modify the Contempt Order accordingly.  In principle, and subject to certain safeguards regarding category (ii), with respect to which the Trustee is willing to meet and confer with the

Debtor, the Trustee has no objection to an order granting the relief set forth in categories (ii) and

(iv).  Finally, with respect to category (iii), it is not clear to the Trustee what the Debtor means in

seeking to preclude the Government from "facilitating the sale."  That said, that requested relief

is premature, as the Mahwah Mansion has not yet been determined to be property of the estate,

let alone is it subject to any sale motion.

## **FACTUAL BACKGROUND**

### I.     **Bankruptcy Cases**

11.     On February 15, 2022, the Debtor filed a voluntary petition for relief under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy

Court.  Notably, the Debtor filed his petition four business days after one of his largest unsecured

creditors, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), obtained an order from a New

York state court (a) holding the Debtor in contempt for removing his luxury superyacht (which

PAX sought to use to satisfy a $116.4 million judgment) outside the jurisdiction of the court and

(b) imposing on the Debtor a contempt fine of $134 million, which fine was due five business

entry of such order.[8]

12.     On June 15, 2022, after the Debtor's failed effort to propose a chapter 11 plan, the

Bankruptcy Court entered a memorandum of decision and order [Bankr. ECF No. 465][9] (the

"Trustee Order") directing the United States Trustee to appoint a chapter 11 trustee.  On July 8,

2022, the Bankruptcy Court entered an order [Bankr. ECF No. 523] appointing the Trustee.

13.     Genever BVI, an entity wholly owned by Mr. Kwok, and its wholly owned

subsidiary, Genever US, are also chapter 11 debtors in cases that have been administratively

---

[8]     *See* Ostrager Contempt Decision, at 10, Ex. A to the Bassett Decl.

[9]     Attached as **Exhibit 5** to the Bassett Declaration.  Filings on the docket of the administratively consolidated Bankruptcy Cases, Case No. 22-50073, are referred to as "Bankr. ECF No. ____."

consolidated with the Debtor's chapter 11 case. Genever BVI's sole asset is the shares it holds in Genever US, whose principal asset is the 18th floor apartment at the Sherry Netherland in Manhattan (the "Sherry Netherland Apartment").[10]

## II.    Trustee's Investigation

14.    The Debtor's bankruptcy schedules, filed in March 2022, claimed only $3,850 in assets compared to hundreds of millions of dollars of liabilities.[11]  The Debtor asserted in the Bankruptcy Court that he was essentially penniless, and that his luxurious homes, the Lady May yacht, and his other publicly flaunted trappings of wealth did not belong to him, but to companies purportedly owned by his family members.[12]

15.    Since his appointment, the Trustee has been working diligently to identify and recover for the benefit of the estate the assets the Debtor has hidden.  To that end, in accordance with the Bankruptcy Court's directive, the Trustee has launched a complex and thorough investigation and litigation process, focusing on the Debtor's "shell game"—*i.e.*, his use of *alter ego* companies to hide his assets from creditors.  Broadly speaking, the process includes (a) discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and (b) litigation to recover specific property and assets.

16.    Because the Debtor and others have refused to comply with the Trustee's subpoenas, the Trustee has been forced to litigate a number of discovery disputes.  One such

---

[10]    The Stay Motion does not offer any basis for staying the chapter 11 cases of Genever BVI and Genever US. The motion should be denied as to these debtors for this reason alone.  Nor does the Debtor have any economic interest in Genever BVI, Genever US, or the Sherry Netherland Apartment.  Genever BVI was previously transferred to the Trustee (and, as noted, Genever BVI wholly owns Genever US), and any beneficial interest that had previously been asserted by Bravo Luck Limited (an entity purportedly owned by the Debtor's son) and/or the Debtor's son in Genever BVI, Genever US, or the Sherry Netherland Apartment has been relinquished as part of a settlement with Bravo Luck Limited and the Debtor's son.  *See* Bankr. ECF. 2153.

[11]    *See* Schedules of Assets and Liabilities at 1 [Bankr. ECF No. 78].

[12]    *See Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions* [Bankr. ECF No. 107].

dispute involved the Debtor's contention that he could prevent the Trustee from obtaining information from his counsel and other professionals by seeking to invoke the attorney-client privilege and other privileges or protections. This dispute was ultimately resolved when the Debtor, after extensive negotiations, consented to the entry of an order governing the passage of the privilege to the Trustee [Bankr. ECF No. 856] (the "Privileges Order").

17.     In response to another discovery dispute, the Debtor asserted that his Fifth Amendment rights justified his refusal to produce any documents to the Trustee or to provide any description of how he searched for documents.[13] The Trustee disagreed with the Debtor's blanket assertion of the Fifth Amendment. On July 26, 2023, the Bankruptcy Court issued a detailed and carefully reasoned 42-page decision agreeing with the Trustee and holding the Debtor in contempt of court [Bankr. ECF No. 2035] (the "Contempt Order").[14]

18.     Notwithstanding the non-compliance of the Debtor and others with the Trustee's discovery efforts, the Trustee has brought a number of adversary proceedings to recover specific assets for the benefit of the estate. To date, the Trustee has recovered over $60 million in assets, and stands to recover more as his investigation and recovery efforts continue.

## III.     Mahwah Adversary Proceeding

19.     In the indictment in this case, the Government included forfeiture allegations with respect to, among other things, a 21-bedroom, 50,000 square foot, castle-styled private residence

---

[13]   *See* Bankr. ECF No. 1444 (stating that Debtor is "invok[ing] [his] rights under the 5th Amendment to the United States Constitution, including under the act of production doctrine, with respect to the Subpoena dated August 17, 2022, in its entirety, including all requests for documents and information set forth therein"), attached as **Exhibit 6** to the Bassett Declaration.

[14]   Attached as **Exhibit 7** to the Bassett Declaration. In addition to the Contempt Order, the Bankruptcy Court has issued six (6) other contempt orders against the Debtor and entities related to the Debtor for failure to surrender estate property or comply with court-approved subpoenas issued by the Trustee. *See* Bankr. ECF Nos. 1372, 1537, 1709, 1892, 2009, and 2093.

with 12.5-acre grounds located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "Mahwah Mansion"), which was originally purchased for approximately $26.5 million.

20.     The Trustee has conducted an investigation into whether the Mahwah Mansion is property of the estate and, on July 11, 2023, commenced an adversary proceeding in the Bankruptcy Court (the "Mahwah Adversary Proceeding") against the purported owners of the mansion.[15] The complaint seeks an order declaring, among other things, that the Mahwah Mansion is property of the Debtor's estate to be administered by the Trustee. With the complaint, the Trustee filed a motion seeking to, among other things, preliminarily enjoin the Mahwah Defendants from encumbering, transferring, dissipating, or otherwise interfering with the Mahwah Mansion and restricting access to it. The Bankruptcy Court granted this motion in an order dated August 24, 2023 [ECF No. 47 in Adv. Proc. No. 23-05017][16] (the "PI Order").

21.     On August 30, 2023, after the Mahwah Defendants admitted that the Mahwah Mansion and its contents were uninsured,[17] the Trustee filed an emergency motion [ECF No. 57 in Adv. Proc. No. 23-05017] (the "Emergency Motion") requesting that the Bankruptcy Court immediately modify the PI Order to limit access to the Mahwah Mansion to certain security services, officials, and others with the consent of the Trustee or as approved by this Court or the

---

[15]   The defendants are Taurus Fund LLC ("Taurus Fund"), Scott Barnett (the Debtor's bodyguard and chauffer), and Taurus Management LLC (together with Taurus Fund, collectively, the "Mahwah Defendants").

[16]   Filings on the docket of the Mahwah Adversary Proceeding are referred to as "ECF No. _____ in Adv. Proc. No. 23-05017."

[17]   As part of the PI Order, the Bankruptcy Court ordered the Mahwah Defendants to file, by August 28, 2023, proof of insurance for all assets and property of Taurus Fund (including the Mahwah Mansion) and all personalty and/or fixtures in, on, or at the Mahwah Mansion. The Bankruptcy Court later extended the deadline to August 30, 2023, on which date the Mahwah Defendants filed a response revealing that Taurus Fund's property—including the Mahwah Mansion and its contents—were uninsured, *see* ECF No. 55 in Adv. Proc. No. 23-05017, and the Mahwah Mansion remains uninsured today.

Bankruptcy Court (collectively, the "<u>Authorized Parties</u>").  The Bankruptcy Court granted the

Emergency Motion on August 31, 2023.  *See* ECF No. 58 in Adv. Proc. No. 23-05017.[18]

      22.     The Trustee knew when he filed the Mahwah Adversary Proceeding that issues

could arise from the fact that the Mahwah Mansion is subject to both potential forfeiture in the

criminal case and potential recovery in the bankruptcy case.  The Trustee reached out to the

Government to address these issues in a manner that could allow the Mahwah Adversary

Proceeding to proceed without interruption.  This resulted in a settlement agreement dated as of

July 13, 2023 (the "<u>Settlement Agreement</u>").  Under the Settlement Agreement, (i) the Trustee

would proceed with the Mahwah Adversary Proceeding without objection or interference by the

Government and (ii) the Trustee and the Government reserved their rights regarding the

distribution of the net proceeds (after payment of the estate's expenses in connection with taking

control of and selling the Mahwah Mansion) from the disposition of the Mahwah Mansion.  The

Trustee has filed a motion seeking Bankruptcy Court approval of the Settlement Agreement, and

a hearing was held on August 30, 2023.  The Bankruptcy Court has not yet ruled on the motion.

## ARGUMENT

### I.    <u>Bankruptcy Court Is Proper Forum to Decide Stay Motion</u>

      23.     As a threshold matter, the Respondents respectfully submit that the Bankruptcy

Court is the proper forum to determine whether the Bankruptcy Cases should be stayed.  Under

28 U.S.C. § 1334(a), bankruptcy courts (through orders of reference from the applicable district

court) have exclusive jurisdiction over bankruptcy cases and property of a bankruptcy estate.

---

[18]    Attached as **Exhibit 8** to the Bassett Declaration.

11

24.     Notably, the Stay Motion does not cite a single case where a district court granted the extraordinary relief the Debtor seeks here, *i.e.*, staying an ***entire bankruptcy case***.[19]  In the *LaRouche* case, the district court was asked to stay a bankruptcy case involving two defendants in a criminal case before the court—and the district court held that ***it lacked jurisdiction to do so***. *LaRouche*, 682 F. Supp. at 628.  The court expressed skepticism "that a federal court having jurisdiction over a criminal case in one district has jurisdiction to enjoin the United States, or a United States Bankruptcy Judge, or others participating in a bankruptcy matter before that judge, to stay all proceedings in that matter." *Id.*  The court, therefore, "conclude[d] that there is no direct support in precedent for the exercise of such jurisdiction." *Id.*

25.     The Debtor notes that the All Writs Act "provides federal district courts with substantial authority to preserve their jurisdiction,"[20] citing to *S.E.C. v. Credit Bancorp, Ltd.*, 93 F. Supp. 2d 475 (S.D.N.Y. 2000).  The *Credit Bancorp* decision, however, supports the Trustee's position by demonstrating why it should be the ***Bankruptcy Court***, not this Court, that decides the Stay Motion.

26.     In *Credit Bancorp*, the SEC brought an enforcement action in the Southern District of New York against Credit Bancorp, its subsidiaries, and several individuals.  The district court appointed a receiver to, among other things, pursue insurance proceeds.  One of the individuals charged in the action filed his own civil case in the Eastern District of Kentucky against two of the insurers, and the court-appointed receiver moved in the New York case to stay the Kentucky case.  The court granted the stay, explaining that, "where a court has appointed a

---

[19]    The Memorandum of Law cites to *United States v. Simon*, 373 F.2d 649, 651-52 (2d Cir. 1967), in which the district court enjoined the bankruptcy trustee (for ninety days) from deposing certain individuals that were also named in a separate criminal matter.  But the district court did not stay the bankruptcy case itself.  Moreover, the Second Circuit ***reversed the district court***.  This case, therefore, offers the Debtor no support.  In fact, as discussed below, it strongly support the Trustee's position.

[20]    Mem. of Law at 14.

12

receiver and obtained jurisdiction over the receivership estate, as here, the power to stay competing actions falls within the court's inherent power to prevent interference with the administration of that estate." *Credit Bancorp*, 93 F. Supp. 2d at 477. Just like the Trustee here, the receiver in *Credit Bancorp* was appointed to "protect the estate property and ultimately return that property to the proper parties in interest," and was charged with "marshaling and preserving the assets of the estate in order to effectuate an orderly, efficient, and equitable administration of the estate." *Id.* at 476-77.

27.     In essence, *Credit Bancorp* stands for the proposition that where a court-appointed fiduciary is charged with the equitable administration of an estate, the power and duty to prevent interference with that estate—including enjoining parallel proceedings—lies with the court supervising the estate. Indeed, this principle applies even more forcefully in bankruptcy cases, where Congress has vested bankruptcy courts with exclusive jurisdiction over property of the debtor's estate, and the automatic stay prohibits interference with that jurisdiction. *See generally In re Sturman*, No. 10 CIV. 6725 RJS, 2011 WL 4472412, at *2 (S.D.N.Y. Sept. 27, 2011) (state court motion to "enjoin any further activity in the bankruptcy estates" was a clear violation of the automatic stay).[21]

28.     Based on these authorities, the Trustee respectfully submits that jurisdiction to decide the Stay Motion lies with the Bankruptcy Court, not this Court. But even if this Court *could* decide the Stay Motion, it should decline to do so and instead defer to the Bankruptcy

---

[21]     The Debtor's request that this Court decide the Stay Motion also violates the so-called *Barton* doctrine, which prohibits non-bankruptcy courts from ruling on issues that would interfere with the official duties of a bankruptcy trustee. As one bankruptcy court has explained, "[u]nder Supreme Court precedent more than one hundred years old, parties may not interfere with a trustee's official duties by seeking injunctive relief in another court, unless they have obtained leave from the bankruptcy court that appointed the trustee." *In re Atlas*, 183 B.R. 978, 980 (Bankr. S.D. Fla. 1995).

Court.  This was the alternative conclusion of the district court in the *LaRouche* case, which reasoned as follows:

> Even if jurisdiction does exist, I conclude that it would be inappropriate to exercise it in this instance.  The bankruptcy proceeding involves not only interests of the United States and some (or perhaps all) of the defendants before this court, but as well many other persons who may have claims as creditors in those proceedings.  It is not feasible or sensible to attempt to give them notice and an opportunity to be heard here, and it would be offensive to fundamental principles of adjudication to enter an injunction effecting a stay such as defendants seek without appropriate consideration of their interests.

*LaRouche Campaign*, 682 F. Supp. at 628-29.

29.     The *LaRouche* court's reasoning is consistent with compelling precedent from the Second Circuit.  *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*, 765 F.2d 343 (2d Cir. 1985), involved a multi-district securities fraud litigation pending in the Southern District of New York.  One of the broker-dealer defendants filed a proof of claim against Baldwin in its separate chapter 11 case pending in Ohio and also commenced a third-party complaint against Baldwin in the securities litigation.  The broker-dealer then sought, and the Southern District of New York issued, a TRO enjoining the debtor from seeking any relief against any of the defendants (including the broker-dealer) in the securities litigation, including seeking an order from the Ohio bankruptcy court to enforce the automatic stay.[22]  On appeal, the Second Circuit held that the district court did have jurisdiction "to determine the applicability of the automatic stay," *id.* at 347, but that "its issuance of the injunction challenged on this appeal

---

[22]     The Memorandum of Law cites another Second Circuit ruling in the Baldwin matter, *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985).  *See* Mem. of Law at 15.  In that opinion, the Second Circuit left in place a different TRO issued by the district court, which enjoined the 31 appellant states (and their attorneys general) from commencing any action against any of the defendants in the securities litigation.  It is telling that the Debtor cites this opinion, which has nothing to do with and does not discuss any proposed or ongoing actions in Baldwin's separate bankruptcy case, while ignoring the Second Circuit's ruling, issued only two months prior, that directly explored the exact issues relevant here, *i.e.*, the interplay between the authority of a bankruptcy court to administer its case and the authority of district court to manage a separate civil proceeding.

14

was a misuse of its equitable power." *Id.* The court explained that this injunction interfered with the Bankruptcy Court's jurisdiction because it prevented the debtor "from invoking the vital authority of the Bankruptcy Court" to carry out the provisions of the Bankruptcy Code (including the applicability of the automatic stay). *Id.* at 357-48. And while it was also true that the district court had the "power to issue all writs in aid of its jurisdiction," *id.* at 348, any conflict "between the authority of the Bankruptcy Court to administer this complex reorganization and the authority of the District Court to administer consolidated pretrial proceedings" should be resolved in favor of maintaining the "***unfettered authority of the Bankruptcy Court***." *Id.* (emphasis added).[23]

30.     The Respondents submit that, consistent with that precedent, this Court should defer consideration of the Stay Motion to the Bankruptcy Court.[24]

## II.     Stay Motion Fails on Its Merits

31.     If this Court is nevertheless inclined to consider the Stay Motion on its merits, the Court should deny the motion because the Debtor has failed to satisfy his burden of justifying the extraordinary remedy of a stay of the Bankruptcy Cases under Second Circuit precedent.

---

[23]    The *Baldwin* court also pointed to the procedural history in the lower courts, and observed that the movant's procedural "maneuver" and its "litigating stance with respect to the reach of the stay reveals few, if any, equities in its favor." 765 F.2d at 349. Similarly here, the Stay Motion is, at best, motivated by litigation tactics and strategy, not genuine concerns for the Debtor's constitutional rights.

[24]    This would also be consistent with the general (*i.e.*, not necessarily specific to bankruptcy) rule for such motions, pursuant to which motions to stay litigation are presented in the court in which such litigation is pending. *See, e.g.*, *Mango Labs, LLC v. Eisenberg*, No. 23-CV-00665 (LJL), 2023 WL 3510908, at *1 (S.D.N.Y. Apr. 12, 2023) (government moved "to intervene in this case pursuant to Rule 24 of the Federal Rules of Civil Procedure and for a full stay in this matter, including a stay of all discovery, until the conclusion of the parallel criminal case"); *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2021 WL 694557, at *1 (S.D.N.Y. Feb. 22, 2021) ("before the court is defendants' second motion for a stay pending resolution of the criminal proceedings against them"); *Citibank, N.A. v. Super Sayin' Publ'n, LLC*, 86 F. Supp. 3d 244, 245 (S.D.N.Y. 2015) ("defendants have moved to stay these two related civil actions pending the resolution of a related criminal investigation and prosecution"); *Karimona Invs., LLC v. Weinreb*, No. 02CV1792WHPTHK, 2003 WL 941404, at *1 (S.D.N.Y. Mar. 7, 2003) (in breach of contract and fraud action, denying defendant's "motion to stay his deposition pending the resolution of a related criminal matter"). Moreover, here, the Government sought a stay of the SEC litigation against the Debtor in the district court presiding over that litigation.

A. <u>Applicable Legal Standard for Stay Request</u>

32. The Memorandum of Law includes a lengthy discussion of what the Debtor characterizes as the "applicable law" for granting a stay request.[25] Yet, the Debtor fails to acknowledge that, in the Second Circuit, "a stay of a civil case to permit conclusion of a related criminal [proceeding]" is "an extraordinary remedy." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) (as modified) (internal quotation marks and citations omitted). The Debtor further fails to mention that "[i]n order to invoke this extraordinary remedy of staying a civil case until the conclusion of a related criminal proceeding, the defendant bears the burden of showing undue prejudice . . . or interference with his constitutional rights." *Citibank, N.A. v. Super Sayin' Pub., LLC*, 86 F. Supp. 3d 244, 246 (S.D.N.Y. 2015) (internal quotation marks and citation omitted). In fact, the U.S. Constitution "rarely, if ever, ***requires*** such a stay." *Louis Vuitton*, 676 F.3d at 98 (emphasis in original).[26] This is because a "defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." *Id.* (internal quotation marks omitted).

    *i. Balancing Test*

33. In determining whether to grant a stay of parallel proceedings, courts in the Second Circuit usually consider six factors:

1) the extent to which the issues in the criminal case overlap with those presented in the civil case;
2) the status of the case, including whether the defendants have been indicted;
3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay;
4) the private interests of and burden on the defendants;
5) the interests of the courts; and
6) the public interest.

---

[25]  *See* Mem. of Law at 14-17.

[26]  *See also id.* at 100 ("a plausible constitutional argument [requiring a stay] would be presented only if, ***at a minimum***, denying a stay would cause '***substantial prejudice***' to the defendant") (emphasis added).

*See Citibank, N.A.*, 86 F. Supp. 3d at 246-47. *See also Gran Sabana Corp. N.V. v. Kossoff*, No. 21-CV-3154 (RA), 2021 WL 3666116, at *2 (S.D.N.Y. Aug. 17, 2021); *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2021 WL 694557, at *3 (S.D.N.Y. Feb. 22, 2021); *Bernard v. Lombardo*, No. 16 CV. 863 (RMB), 2017 WL 2984022, at *2 (S.D.N.Y. June 9, 2017) (all applying six-factor test and denying stay).

34.     The Debtor seemingly asks this Court to discard this balancing test, based on the Second Circuit's description of the test as a "mechanical device."[27]  This mischaracterizes the Second Circuit's holding and guidance in *Louis Vuitton*.  In fact, courts in this Circuit overwhelmingly continue to apply the balancing test.  *Louis Vuitton* stands only for the unremarkable proposition that, when applying the balancing test, the trial court must not lose sight of the overall question, namely "whether the civil action should be stayed based on the particular facts before it and the extent to which such a stay would work a hardship, inequity, or injustice to a party, the public or the court."  *Louis Vuitton*, 676 F.3d at 99-100.

                    *ii.   Other Considerations*

35.     Another aspect of Louis *Vuitton* that the Stay Motion conveniently ignores is the Second Circuit's statement that the concerns relevant to a stay request can also be addressed through "alternative forms of relief, such as tailored stays, protective orders, quashing or modifying subpoenas, [or] sealing confidential material."  *Louis Vuitton*, 676 F.3d at 102.  In other words, "a blanket stay of the civil action is not the only means of safeguarding [the defendant]'s rights and assuaging the legitimate concerns he may harbor."  *Gran Sabana Corp.*, 2021 WL 3666116, at *3.

---

[27]     *See* Mem. of Law at 16 (citing *Louis Vuitton*, 676 F.3d at 99).

36.     The availability of less extreme measures leads directly to another consideration highlighted in *Louis Vuitton*, namely the true motivation or purpose behind the requested stay. Noting that there was "nothing in the record to indicate that the defendants ever pursued such alternative relief," the Second Circuit concluded that the defendants' "insistence that the civil proceedings be stayed" was really "part of a larger pattern of overall delay and obfuscation." *Louis Vuitton*, 676 F.3d at 102.  The Second Circuit further noted that the defendants' arguments for the requested stay "ring hollow in light of the defendants' plainly dilatory tactics . . . ***even prior to their indictments***."  *Id.* (emphasis added).

B.     <u>Debtor Has Not Satisfied Burden for Obtaining Requested Stay</u>

37.     Applying the balancing test and the other considerations espoused by *Louis Vuitton* to the facts here, it is abundantly clear that there is ***no basis whatsoever***—let alone extraordinary circumstances—to grant a global stay of the Bankruptcy Cases.  Indeed, other than the second factor (*i.e.*, that the Debtor has been indicted), all factors and considerations in evaluating a stay motion weigh in favor of denying the Stay Motion.

*i.  Factor 1: Limited Overlap Between Bankruptcy Cases and Criminal Case*

38.     Contrary to the Debtor's hyperbole, there is only limited overlap between the Trustee's efforts to identify and recover property of the estate and these criminal proceedings.

39.     In *United States v. Simon*, 373 F.2d 649 (2d Cir. 1967), the district court enjoined the bankruptcy trustee (for ninety days) from deposing certain individuals that were also named in a separate criminal matter.  Reversing the district court, the Second Circuit held that the district court's reliance on cases where the civil and criminal matters arise out of the same or related transactions was flawed because the trustee was "pursuing an independent cause of action on behalf of [the debtor]'s creditors and security holders, which was commenced more than one year before the indictment was found."  *Id.* at 653-54.

40. Like the trustee in *Simon*, the Trustee is acting solely to fulfill his fiduciary obligations to the bankruptcy estates and their creditors. The Trustee is not seeking to establish the Debtor's criminal liability, but rather his focus is on demonstrating that certain companies nominally owned by the Debtor's family members or business associates are, in reality, *alter egos* of the Debtor and/or that their assets are equitably owned by the Debtor. This does not require the Trustee to show that the Debtor committed any crimes or that the funds used to purchase the property in question were the proceeds of alleged fraudulent schemes. In any event, to the extent the Debtor believes that the Trustee's investigation infringes on his rights as a criminal defendant in certain instances, there is no reason that the Bankruptcy Court or the Connecticut District Court would not be capable of addressing those issues. The Debtor also remains free to seek specific relief from this Court, on a case-by-case basis.

> ii. *Factor 3: Global Stay of Bankruptcy Cases Would Unduly Prejudice Thousands of Creditors*

41. A global stay of the Bankruptcy Cases for the duration of these criminal proceedings would inflict great harm on the Debtors' creditors. A stay of the Bankruptcy Cases would substantially delay—potentially for years—the resolution of thousands of claims and any distribution from the Debtors' assets. Given the automatic stay, the Debtors' creditors have no alternative forum to resolve their claims against the Debtors or obtain a recovery from the Debtors' assets. This stands in stark contrast to the Debtor who **chose** to commence his chapter 11 case (notwithstanding his displeasure with how the case has unfolded).

42. A delay of distributions, however, is not the only harm to creditors. Staying the Trustee's investigation will substantially increase the risk that the Debtor, his family members, and his business associates will continue to attempt to move assets beyond the reach of the Trustee. *See Bernard*, 2017 WL 2984022, at *3 ("The risk to Plaintiffs is particularly great here

19

because the Court has already found, among other things, that Mr. Lombardo abused the

corporate form . . .").  This is no mere speculation, as the Debtor's family members and

associates have, on numerous occasions, already undertaken efforts to move or take control of

potential estate assets during the Bankruptcy Cases.  For example:

- As this Court already found in denying Ms. Wang's bail request, in January 2023, Ms. Yvette Wang transferred the shares of a Kwok-associated entity (Ace Decade Holdings Limited ("Ace Decade")) to another of the Debtor's associates in Switzerland.  *See* ECF No. 110.  This transfer occurred while the Bankruptcy Court was considering the Trustee's motion to hold the Debtor in contempt for failing to transfer Ace Decade to the Trustee (a motion that the Bankruptcy Court ultimately granted).  Worse, at the time of the transfer, the Debtor had already agreed (pursuant to an order entered by the Bankruptcy Court) not to contest the Bankruptcy Court's finding that he was, in fact, the beneficial owner of Ace Decade.[28]  *See* Bankr. ECF No. 1110.

- Similarly, this Court has found that, "[a]fter her arrest in this case, Wang continued directing co-conspirators to transfer funds from accounts associated with entities involved in the alleged fraud scheme."  *See* ECF No. 110.

- In the summer of 2022, Whitecroft Shore Limited, another shell company purportedly owned by the Debtor's daughter, transferred a private jet to an unknown third party for a purchase prices of over $10 million.  Incredibly, the Debtor's daughter has testified that she does not know the name of the buyer or the whereabouts of the proceeds from that sale.  The Trustee believes that the private jet was beneficially owned by the Debtor and has commenced an adversary proceeding to recover the proceeds of this unauthorized postpetition sale.

- In April 2022, Greenwich Land, an entity purportedly owned by the Debtor's wife, sold a property located in Greenwich, Connecticut, for $2.2 million.  The Trustee has commenced an adversary proceeding against Greenwich Land seeking determinations that, among other things, Greenwich Land is the *alter ego* of the Debtor and the Debtor is the equitable owner of Greenwich Land.  The April 2022 property sale is particularly egregious as it occurred in violation of a restraining notice issued in connection with New York state court litigation brought by one of the Debtor's creditors against the Debtor.[29]

---

[28]   The Trustee intends to bring an action against Ms. Wang for this blatant violation of the automatic stay.

[29]   The restraining notice notified Greenwich Land, among other things, that "we understand [the Debtor] may have direct, indirect, or beneficial ownership in, or the right or ability to direct or control, you and your assets," and that "you are hereby forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any property in which [the Debtor] has an interest, except as provided in [New York Civil Practice Law

43.     Based on the Trustee's investigation, the foregoing examples are just the tip of the iceberg of ongoing efforts by the Debtor and his associates to deprive the Debtor's creditors of their recoveries.  The Trustee is continuing to investigate millions of dollars of transfers made by various shell companies that, the Trustee believes, are beneficially owned by the Debtor.  If the Bankruptcy Cases are stayed, these transfers will be allowed to continue unabated.  Worse, the information regarding such transfers will become stale during the pendency of the global stay, and, once the stay is lifted, the Trustee would have to re-start his investigation at great cost and further delay to the estate.

44.     In addition, the requested stay would jeopardize the Trustee's ability to bring valuable avoidance actions within the applicable two-year statute of limitations, which expires in February 2024 (the second anniversary of the Debtor's chapter 11 filing).  *See* 11 U.S.C. §§ 108(a)(2); 546(a).  The Trustee acknowledges the Bankruptcy Court's statement that the Trustee could potentially seek to extend this deadline;[30] however, absent the consent of each defendant (which is impossible, especially if the Trustee's investigation is stayed) and/or equitable tolling (which is uncertain and would require expensive collateral litigation), the weight of the authority makes clear that this deadline ordinarily cannot be extended.  *See, e.g.*, *In re U.S. Lines Inc.*, 262 B.R. 223, 239 (S.D.N.Y. 2001) (holding that Bankruptcy Rule 9006, which ordinarily permits extensions of deadlines in bankruptcy, "by its text, does not authorize a court to extend such [statutes of limitations and 11 U.S.C. § 108(c)] deadlines.  The Rule only empowers a court to extend deadlines created 'by these rules or by a notice given thereunder or by order of court . . .' Bankr. R. 9006(b)(1)."); *In re Walnut Hill, Inc.*, No. 16-20960 (JJT), 2018

---

and Rules] § 5222(b)."  Restraining Notice, a copy of which was filed as part of ECF No. 1-47 in Adv. Proc. No. 23-5005, and which is attached as **Exhibit 9** to the Bassett Declaration.

30    *See* Sept. 12, 2023 Hr'g Tr. at 32:14-15.  Relevant excerpts of the hearing transcript are attached to the Bassett Declaration as **Exhibit 10**.

WL 2672242, at *2 (Bankr. D. Conn. June 1, 2018) ("Rule 9006(b) cannot apply to Section

546(a) without violating the separation of powers preserved in the Constitution.  Where the

legislature has spoken authoritatively, it is not within the province of the judiciary to modify its

determination."); *In re Randolph Hosp., Inc.*, No. 20-10247, 2022 WL 19298765, at *1 (Bankr.

M.D.N.C. Apr. 25, 2022) ("Federal Rule of Bankruptcy Procedure 9006(b) may not be used to

extend statutory deadlines such as those established under 11 U.S.C. §§ 108 and 546.").

45.      Given that the Trustee could challenge potentially millions of dollars of

prepetition transfers going as far back as 10 years before the Debtor's chapter 11 petition date,

the inability to assert estate causes of action would be highly detrimental to creditors.

> iii. *Factor 4: Allowing Bankruptcy Cases to Proceed Does Not Prejudice*
> *Debtor*

46.      In the Stay Motion, the Debtor raises a handful of recent developments in the

Bankruptcy Cases that, in his view, have infringed upon his constitutional rights as a criminal

defendant.  However, upon closer inspection, none of the developments (whether viewed in

isolation or in combination) are prejudicial to the Debtor.

> 1.  <u>Contempt Order Does Not Prejudice Debtor's Constitutional</u>
> <u>Rights and Is Now Moot In Any Event</u>

47.      Throughout the Bankruptcy Cases, the Debtor has had a full and fair opportunity

before the Bankruptcy Court to raise—and, in fact, did raise—his arguments in opposition to the

Trustee's discovery requests, including that he could refuse to produce documents on the basis of

the Fifth Amendment right against self-incrimination.  That the Bankruptcy Court ultimately

rejected the Debtor's arguments does not somehow mean he was prejudiced.  Nor was the

Bankruptcy Court doing the Trustee's bidding[31]—in fact, the Contempt Order rejected many of

---

[31]    The Debtor asserts that the Trustee somehow "procured" the Contempt Order from the Bankruptcy Court.
Mem. of Law at 2.

the Trustee's arguments, including as to the application of the Act of Production Doctrine.  It should be apparent from even a cursory review of the Contempt Order that Bankruptcy Judge Manning took very seriously her responsibility to consider the scope of the Debtor's constitutional rights.

48.     The Debtor contends his production to the Trustee of the disclosures he obtained from the Government in this case would somehow prejudice his rights as a criminal defendant. The Contempt Order, however, only required the Debtor to serve as a conduit for the production to the Trustee of information the Government provided to the Debtor, and thus the Debtor would not be authenticating the documents by producing them.  ***But this argument is now moot in any event because, as noted above, the Trustee is not presently pursuing these documents and will ask the Bankruptcy Court to modify the Contempt Order accordingly.***

49.     To the extent the Debtor is dissatisfied with any other aspect of the Contempt Order, he is, of course, free to seek appellate review in the Connecticut District Court and the Second Circuit, including on an expedited basis.  In fact, the Debtor has already filed a motion with the Connecticut District Court requesting leave to appeal the Contempt Order (which motion the Trustee has opposed).[32]  Notably, however, the Debtor has not sought expedited consideration of his request for leave to appeal or moved for a stay pending appeal.

## 2.   Privileges Order Provides No Support for Requested Stay

50.     The Debtor's assertion that the Trustee has somehow infringed upon the Debtor's attorney-client privilege is completely unsupported.  It is hornbook law that, upon the appointment of a trustee, the debtor's attorney-client privilege and work product protection that could otherwise be asserted by a debtor or its counsel under any applicable law pass to the

---

[32]   As of the filing of this Opposition, the Connecticut District Court has not ruled on the Debtor's motion.

trustee. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 353-54 (1985)

("[I]t is clear that the trustee plays the role most closely analogous to that of a solvent

corporation's management" and "vesting in the trustee control of the corporation's attorney-

client privilege most closely comports with the allocation of the waiver power to management

outside of bankruptcy without in any way obstructing the careful design of the Bankruptcy

Code.").  The Trustee recognizes, of course, that where the debtor is an individual, courts have

implemented the *Weintraub* ruling through a balancing test for prepetition[33] communications to

determine whether the privilege at issue relates most closely to a trustee's rights, obligations and,

allocation of responsibility under the Bankruptcy Code, or whether the privilege primarily

concerns the debtor's interests as an individual.  *See, e.g.*, *In re Bame*, 251 B.R. 367, 375 (Bankr.

D. Minn. 2000).  Indeed, all of these issues were briefed and argued in the Bankruptcy Court

shortly after the Trustee's appointment, with the Debtor vigorously opposing the Trustee's

request for an order confirming that the Debtor's privilege had passed to the Trustee (subject to

the aforementioned limitations).

51.    In the end, given the overwhelming authority in support of the Trustee's position,

the Debtor agreed to the consensual resolution reflected in the Privileges Order, which contains

several negotiated protections for the Debtor.  Among other things:

> the Trustee shall not be entitled to waive any Trustee Privilege (for
> example, by disclosing privileged documents or information in open
> court or on any public docket or by sharing such documents or
> information with a third party) absent the Debtor's written consent or
> further order of the Court, and all filings by the Trustee containing or

---

[33] For privileged documents created postpetition, but prior to the appointment of a trustee, courts do not apply a balancing test.  Rather, the privilege over such documents passes to the trustee automatically when the trustee takes over administration of the estate.  *See, e.g.*, *Bame*, 251 B.R. at 375 ("I find that the attorney-client privilege has passed to the Trustee with respect to communications between Kennedy & Graven and the Debtor during the period that the Debtor served as the DIP as to all matters having to do with administration of the estate, including, in particular, disclosure and recovery of assets.").

> describing documents or information covered by a Trustee Privilege
> shall be filed under seal.

Privilege Order ¶ 8. Moreover, the Privileges Order provided that nothing in the order would

prevent the Debtor "from asserting any and all privileges concerning legal matters unrelated to

the Investigation Topics, such as *unrelated* criminal allegations . . ." *Id.* ¶ 4 (emphasis added).

52. Given that the privilege has passed to the Trustee (as confirmed in the Privileges

Order), there is nothing inappropriate about the Trustee seeking documents from the Debtor's

counsel, even if all of those documents were privileged (which is, by no means, a forgone

conclusion). For these and other reasons, the Bankruptcy Court properly authorized the Trustee

to issue subpoenas upon the Debtor's counsel. Consistent with the Privileges Order, the

subpoenas do not seek privileged materials unrelated to the Investigation Topics.[34]

53. Moreover, the Trustee has *not* shared privileged communications with the

Government or otherwise violated his obligations under the Privileges Order. The Debtor's

suggestion that the Trustee would have no "compunction" of doing so is entirely unfounded.[35]

Although the Trustee did share with the Government his *conclusion* that the Mahwah Mansion

was equitably owned by the Debtor, he did not (as the Debtor asserts) share his legal analysis,

which, in any event, was not based on privileged information the Trustee obtained during

discovery.

54. To the extent the Trustee may seek to waive any privilege in the future, he will, of

course, comply with the terms of the Privileges Order—which, in the absence of the Debtor's

---

[34] As defined in the Privileges Order, the "Investigation Topics" concern "(i) assets (including actual or potential causes of action) that (A) are or were held by the Debtor, (B) are or were held by others that the Trustee is investigating pursuant to the Rule 2004 Subpoenas for purposes of determining whether they hold or may have information about assets in which the Debtor holds or may have held an interest, or (C) otherwise relate to, or could be brought into, the Debtor's estate, (ii) the Debtor's financial condition (including, without limitation, liabilities of the estate), or (iii) activities related to the administration of the estate . . ." Privileges Order ¶ 2.

[35] Mem. of Law at 25.

consent, would require relief from the Bankruptcy Court. That there may be "disputes" over the Trustee's ability to waive the privilege is meaningless.[36] If such disputes occur, they will be initiated on notice to the Debtor, and he will have the opportunity to be heard.

### 3. Mahwah Adversary Proceeding Does Not Adversely Affect Debtor's Rights as Criminal Defendant

55.    The Debtor's stated concern about losing access to evidence at the Mahwah Mansion due to the PI Order is another red herring. The Debtor has concocted this argument purely for strategic reasons. The Debtor rests his concern on the idea that the Mahwah Mansion has been turned over to the Trustee for disposition, but this is flatly untrue. The Bankruptcy Court will not determine whether the mansion is property of the estate until the Trustee's adversary proceeding has been litigated. Even then, assuming the Trustee prevails on the ownership question, he will need further Bankruptcy Court approval of any sale, on notice and hearing to all parties in interest. At that time, the Debtor will have the opportunity to raise any concerns he might have about the Trustee's proposed sale.[37] And before that time, nothing precludes the Debtor's criminal counsel from accessing the Mahwah Mansion or taking photographs or recording necessary video of it.

56.    The PI Order provides interim relief to protect the Mahwah Mansion and in no way prejudices the Debtor. If anything, the PI Order helps the Debtor insofar as it aims to preserve the mansion and its contents in their current condition. Nothing in the PI Order

---

[36]  Mem. of Law at 14.

[37]  The Court should also not give any credence to the Debtor's assertion that the Trustee has abandoned or sought to abandon property at the Sherry Netherland Apartment. This is demonstrably false. In fact, on April 14, 2023, the Trustee filed a motion seeking to limit notice with respect to a generic motion to abandon certain property [Bankr. ECF No. 1666]. Following the objection of Bravo Luck Limited (which raised the concern that such forthcoming motion would seek to abandon property at the Sherry Netherland apartment), the Trustee stated on the record at the hearing on April 20, 2023 that the property he sought to abandon has no impact on the Sherry Netherland Apartment, which statement was adopted by the Bankruptcy Court in its subsequent order. *See* Bankr. ECF No. 1809, attached as **Exhibit 11** to the Bassett Declaration.

prevents the Debtor or his counsel from visiting the property. In fact, the PI Order expressly states that anyone may enter the property with the approval of *this Court **or** the Bankruptcy Court*,[38] and it also allows parties to access the mansion with the Trustee's consent. The Trustee has no objection to the Debtor's counsel visiting the mansion, subject to appropriate safeguards, and does not contest the authority of this Court to grant such approval. To date, however, counsel for the Debtor has never made any such request to the Trustee, which further demonstrates that this argument has been concocted for strategic reasons.[39]

57. The Debtor's arguments related to the Settlement Agreement are also unfounded. The sole purpose of the Settlement Agreement is to address the fact that the Mahwah Mansion is both (i) an alleged asset of the Debtor's chapter 11 estate and (ii) a property identified by the Government for forfeiture in the event the Debtor is convicted. This agreement is not only appropriate, but necessary, to protect the rights of both the Debtor's creditors in his chapter 11 case and the victims of his alleged fraud. Nothing in the Settlement Agreement prejudices the Debtor's rights, nor does it reflect improper coordination by the Trustee and the Government.

58. Finally, the Debtor's purported outrage about the Trustee having attached certain photographs taken at the Mahwah mansion to his complaint in the Mahwah Adversary Proceeding is entirely misplaced. The Trustee redacted all private/personal information in these photographs before attaching them to his complaint. The Trustee did not, as the Debtor asserts, acknowledge that the photos were "inadvertently" filed on the public docket.[40] In reality, the

---

[38] The situation is no different than with respect to the Sherry Netherland Apartment, where the related order entered by the Bankruptcy Court permitted the Debtor to seek authorization from this Court to visit the apartment, which his counsel did. *See* ECF No. 79

[39] In any event, the Debtor's professed concerns about the rights of his alleged victims in an eventual forfeiture proceeding are particularly precious, as forfeiture will only occur if the Debtor has been convicted.

[40] Mem. of Law at 10 n. 4.

Trustee reached out to Debtor's counsel to coordinate the filing of a joint motion to seal certain exhibits of the Mahwah complaint,[41] and the Debtor's counsel never responded to the Trustee, which speaks volumes about the Debtor's "concerns" on this issue.

> ### iv. *Factor 5: Interests of the Bankruptcy Court Weigh Against Stay of Bankruptcy Cases*

59.     A bankruptcy court, like any court, has a "well-recognized interest in disposing 'of the causes on its docket with economy of time and effort for itself.'" *Louis Vuitton*, 676 F.3d at 104 (*quoting Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).  This interest is particularly acute here, given the numerous dilatory tactics of the Debtor, his family members, and his business associates to slow the Trustee's investigation.  The Debtor's chapter 11 case has already been pending for nearly 19 months, leading the Bankruptcy Court to express frustration on multiple occasions with the various delays initiated by the Debtor and others.  Staying the case in its entirety for months, if not years, would clearly run counter to the Bankruptcy Court's interests in finally resolving the Debtor's case and removing it from the court's docket.

> ### v. *Factor 6: Public Interests Weighs Against Stay of Bankruptcy Cases*

60.     The public has an interest in a well-functioning bankruptcy system.  The Stay Motion, however, seeks to put the Bankruptcy Cases on hold for an indeterminate amount of time; indeed, it may take years for all appeals to have been resolved in connection with these criminal proceedings.  The Debtor should not be able to enjoy the benefits of bankruptcy (including a worldwide automatic stay against creditor actions) while not having to comply with any of its burdens (including cooperating with the Trustee and surrendering property of the estate and any recorded information).  As one court aptly observed:

---

[41]     *See* E-mails to Eric Henzy regarding Motion to Seal Exhibit to Mahwah Complaint, attached as **Exhibit 12** to the Bassett Declaration.

> absent something more, it simply cannot be the case that protections
> afforded to an allegedly fraudulent debtor outweigh the need to protect
> creditors and the bankruptcy system as a whole. . . . [If that were the
> case,] . . . [d]ebtors would be entitled to hold their creditors in abeyance
> indefinitely while allegations of misconduct run their course.  To do so
> would frustrate the public interest in expeditious resolution of
> bankruptcy proceedings.

*Layng v. Garcia* (*In re Garcia*), 569 B.R. 480 (Bankr. N.D. Ill. 2017).  The stay the Debtor

requests would implicate these very concerns by allowing the Debtor to hold his creditors

hostage for an indeterminate amount of time while he and his assets remains insulated from civil

liability.  For this reason, the public interest weighs strongly against granting the Stay Motion.

III.   **Respondents Do Not Object to Categories (i), (ii), and (iv) of Debtor's Proposed Alternative Relief**

61.     Implicitly acknowledging that less drastic measures exist to address his stated

concerns than a global stay of the Bankruptcy Cases, the Debtor seeks four categories of relief in

the alternative.  Specifically, he asks this Court to:

> (i) modify the Protective Order to allow production of the discovery in
> this case to the Trustee; (ii) direct that Mr. Kwok's defense team
> continue to be permitted access to the Mahwah Facility through the
> pendency of this case and any resulting appeals; (iii) preclude the
> government from facilitating the sale of the Mahwah Facility in the
> Bankruptcy Cases through the pendency of this case and any resulting
> appeals; (iv) order that the government not solicit or receive from the
> Trustee any information or records that are subject to any privileges
> belonging to Mr. Kwok and identify any such materials already
> provided by the Trustee.[42]

62.     The Trustee generally takes little issue with these requests.  As to the first item,

the Trustee is withdrawing his request for this discovery, at this time, as noted above.

Accordingly, the Debtor's concern in this regard is addressed and this matter is now moot.  Items

(ii) and (iv) are generally acceptable to the Trustee, subject to potential safeguards surrounding

---

[42]   Mem. of Law at 30.

the Debtor's counsel's access to the Mahwah Mansion. Finally, item (iii) is a non-issue at present because any relief related to an eventual sale of the Mahwah Mansion is premature. The Bankruptcy Court has not determined that the Mahwah Mansion is property of the estate, and therefore it cannot be sold by the Trustee. Any concerns the Debtor may have regarding a sale of the mansion can be addressed later, if and when a proposed sale is presented to the Bankruptcy Court, or the Debtor can renew his request to this Court if appropriate.

## IV.   Court Should Deny Ms. Wang's Request for Global Stay of Bankruptcy Cases

63.   Finally, and for the same reasons set forth above, the Court should also reject Ms. Wang's request for a global stay. Indeed, her request stands on even weaker grounds than the Debtor's request, as she is *not* a debtor in the Bankruptcy Case, nor a defendant in any of the pending adversary proceedings in the Bankruptcy Cases. Because there is no proceeding pending against her in connection with the Bankruptcy Cases, there is no proceeding as to Ms. Wang that this Court could even stay.

## CONCLUSION

64.   For the reasons set forth above, the Stay Motion should be considered and decided by the Bankruptcy Court. To the extent this Court is inclined to consider the merits of the Stay Motion, the Respondents submit that the Stay Motion and the Joinder should be denied as to the request for a stay, but granted as to the requested form of alternative relief (subject to the modifications discussed herein).

*[Remainder of page intentionally left blank.]*

30

Dated:        September 21, 2023

By: */s/ Nicholas A. Bassett*
Nicholas A. Bassett
Paul Hastings LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*and*

Luc A. Despins
Adam J. Fee
G. Alexander Bongartz
Paul Hastings LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
lucdespins@paulhastings.com
adamfee@paulhastings.com
alexbongartz@paulhastings.com

*Counsel for Luc A. Despins, as Chapter 11
Trustee, Genever Holdings Corporation, and
Genever Holdings LLC*

**Exhibit 3**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

              -against-

HO WAN KWOK,

              Defendant.

---

Case No. 1:23-CR-118-1 (AT)

**DECLARATION OF NICHOLAS BASSETT IN SUPPORT OF RESPONSE OF**
**CHAPTER 11 TRUSTEE AND GENEVER DEBTORS IN OPPOSITION TO**
**DEFENDANT HO WAN KWOK'S MOTION FOR AN ORDER AND WRIT STAYING**
**BANKRUPTCY CASES OR IN THE ALTERNATIVE FOR OTHER RELIEF**

       1.       I am a partner at the law firm of Paul Hastings LLP, counsel to Luc A. Despins,

chapter 11 trustee (the "Trustee") in the above-captioned chapter 11 case (the "Chapter 11 Case")

of Ho Wan Kwok (the "Individual Debtor"). I make this declaration (the "Declaration") in support

of the *Response of Chapter 11 Trustee and Genever Debtors In Opposition to Defendant Ho Wan*

*Kwok's Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative for Other*

*Relief* (the "Opposition").

       2.       Attached hereto are true and correct copies of the following documents:

| Exhibit | Description of Exhibit |
|---------|------------------------|
| 1. | Decision & Order on Motion, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022) [Docket No. 1181] |
| 2. | Corrected Memorandum of Decision Granting in Part Motion for Preliminary Injunction (Adv. Proc. No. 22-05032, Jan. 13, 2023) [Bankr. ECF No. 133] |
| 3. | Opinion & Order, *An v. Despins*, 22-cv-10062 (VEC) (S.D.N.Y. Aug. 2, 2023) [Docket No. 29] |
| 4. | Opinion & Order, *Gong v. Sarnoff*, 23-cv-343 (LJL) (S.D.N.Y. Aug. 22, 2023) [Docket No. 72] |

| 5. | Memorandum of Decision and Order Denying Motion to Dismiss Without Prejudice and Granting Joinder to Motion for Appointment of Chapter 11 Trustee [Bankr. ECF No. 465] |
| 6. | Notice of Filing of Declaration of Mr. Ho Wan Kwok Concerning Invocation of 5th Amendment Privilege in Regard to Rule 2004 Discovery [Bankr. ECF No. 1444] |
| 7. | Memorandum of Decision and Order Holding Individual Debtor in Contempt of Court and Denying Motion for Stay of Order Compelling Production [Bankr. ECF No. 2035] |
| 8. | Order Granting Emergency Motion to Modify Preliminary Injunction [ECF No. 58 in Adv. Proc. No. 23-5017] |
| 9. | Restraining Notice [filed as part of ECF No. 1-47 in Adv. Proc. No. 23-5005] |
| 10. | September 12, 2023 Hearing Transcript (excerpts) |
| 11. | Order Denying Motion for Relief from Judgment/Order<br>[Bankr. ECF No. 1809] |
| 12. | August 2023 Emails regarding Motion to Seal Exhibit to Mahwah Complaint |

I declare upon penalty of perjury that the foregoing is true and correct.

By: */s/ Nicholas A. Bassett*
    Nicholas A. Bassett
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

**Exhibit 1**

# SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY

PRESENT:  **HON. BARRY R. OSTRAGER**                  PART       **IAS MOTION 61EFM**

*Justice*

--------------------------------------------------------------------------------X

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P.,

|  |  |
|---|---|
| **INDEX NO.** | 652077/2017 |
| **MOTION DATE** | |
| **MOTION SEQ. NO.** | 019 |

Plaintiff,

- v -

KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN-GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS LLC, and GENEVER HOLDINGS CORPORATION,

**DECISION + ORDER ON MOTION**

Defendants.

--------------------------------------------------------------------------------X

HON. BARRY R. OSTRAGER

In this 2017 case with 1,180 docket entries – almost all of which involve defendant Kwok Ho Wan's ("Kwok") efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members -- this Court is called upon to determine whether the plaintiff, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), has met the burden of establishing that the Court should enter a final Order of Civil Contempt against Kwok. For the reasons that follow, this Court is simultaneously issuing a final Order of Civil Contempt.

PAX secured a judgment against Kwok in the sum of $116,402,019.57 on February 3, 2021 (NYSCEF Doc. No. 716). Thereafter, PAX undertook a year's long effort to enforce its judgment by first identifying and then attempting to levy upon Kwok's assets in the United States. PAX encountered difficulty identifying assets over which Kwok exercised control because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members. This scheme has enabled Kwok to assert that he has no assets despite his lavish lifestyle, which plaintiff has catalogued with material from social

media clippings, photographs and videotapes showing Kwok living large and boasting of his

wealth, expensive homes, private plane, and yacht.  As noted in the transcript of proceedings of

February 2, 2022, this evidence is of little probative value, as the witnesses sponsoring this

evidence have no first-hand knowledge of the authenticity of this "evidence" other than that it is

accessible on various websites.

On February 2, 2022, this Court held an evidentiary hearing at which seven witnesses

submitted direct testimony by affidavit and were made available for cross-examination.  The

hearing followed protracted proceedings by PAX to locate and levy upon assets owned by

defendant Kwok.  Those proceedings established, among other things, that Kwok exercised

dominion and control over a yacht called the Lady May and resulted in a series of orders

restraining Kwok and/or the registered owners of the yacht called Lady May from removing the

Lady May from the Court's jurisdiction.  The first such Order was issued on September 30,

2020, as described in detail *infra,* and was followed by an October 15, 2020 Order that restrained

"Mr. Kwok and/or the registered owners of . . . the yacht, the 'Lady May'" from leaving the

jurisdiction.  (NYSCEF Doc. No. 630).  As detailed *infra*, Kwok spent much of July, August and

September of 2020 on the Lady May.  Contemporaneously with the proceedings resulting in the

September 30 and October 15, 2020 restraining Orders, Kwok and his cohorts made arrangement

for the Lady May to sail to Florida in early October 2020 and, thereafter, to the Bahamas.  On

March 16, 2021, the Court issued a conditional order of civil contempt which directed that if

Kwok failed to return the Lady May to the jurisdiction of this Court by May 31, 2021, he would

be subject to a $500,000.00 fine for each day that the Lady May remained outside the jurisdiction

of this Court.

The Appellate Division, First Department, affirmed this Court's order holding Kwok in

conditional civil contempt, finding that "the daily fine of $500,000.00 was intended to strongly

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM    INDEX NO. 652077/2017

NYSCEF DOC. NO. 1181    Case 22-cv-7333-DCC-2234-A Filed 09/27/23 Entered 09/27/23 09:40:34 Page 86 of 318    RECEIVED NYSCEF: 02/09/2022

encourage defendant to purge himself of the contempt, which, despite being permitted to

accomplish, he has shown no interest in doing. . .”  NYSCEF Doc. No. 953, 199 AD3d 423

(2021).  The Appellate Division further held:

> The motion court acted within its discretion in holding defendant in civil contempt, as
> plaintiff established by clear and convincing evidence that defendant violated a lawful,
> clear mandate of the court, of which he had knowledge, and that such violation resulted
> in prejudice to plaintiff's rights (*see El-Dehdan v El-Dehdan*, 26 NY3d 19, 29 [2015];
> Judiciary Law § 753). …  The motion court is instructed to proceed with an evidentiary
> hearing to resolve a dispute as to ownership and control of the yacht, and to assess
> appropriate penalties.

Pursuant to the Appellate Division's Order, this Court scheduled the February 2, 2022

evidentiary hearing to resolve the issue of whether Kwok beneficially owns and controls the

yacht.  Kwok failed to testify at the February 2, 2022 hearing, having previously invoked his

Fifth Amendment right to decline to testify or respond to discovery requests relating to the Lady

May in response to PAX's asset discovery efforts.  PX 27, 28, 29, 30.[1]  This invocation of the

Fifth Amendment notwithstanding, Kwok is an active litigant in multiple fora and he has given

prior testimony in this and other proceedings.

Kwok also filed a complaint in this court captioned *Guo Wengui a/k/a Miles Kwok v

Hong Zeng*, 157025/2020, which references a blog post from Freebeacon.com dated September

8, 2017 in which Kwok complains about “several incidents involving *his* 152-foot motor yacht,

Lady May...”  (Complaint ¶ 8, NYSCEF Doc. No. 001) (“the Zeng Complaint”).  The Zeng

Complaint describes Kwok as an “outspoken critic of the CCP” who has gone to great “lengths

to expose the rampant corruption within the CCP and the Chinese government.”  The

*Washington Post* reported that a former advisor to President Trump, Steve Bannon, was arrested

in 2020 while on board the Lady May, and described Mr. Bannon as a friend and business

---

[1] “PX” refers to Plaintiff's Trial Exhibits.

associate of Kwok, "a vocal online critic of the Chinese government who was once close with
that country's intelligence service but is now wanted by authorities in Beijing on charges of
fraud, blackmail and bribery." Other news outlets have reported that Mr. Bannon utilized
Kwok's private jet on more than one occasion to travel to political rallies.

The testimony adduced at the hearing out of the mouths of defendants' witnesses clearly
and convincingly demonstrated that Kwok beneficially owns and controls the Lady May and has
utter contempt for this Court and the judicial process.

Kwok once was the sole shareholder of Hong Kong Investments Limited ("HK
International"). The testimony adduced at the hearing established that in 2014 Kwok transferred
a 100% interest in HK International to one Qu Guo Jiao for no consideration. Ms. Qu was a
trusted business associate of the Kwok family. Thereafter, Kwok fled China and on February 23,
2015, HK International purchased the Lady May for £ 28 million GBP. No testimony adduced at
the hearing established the source of funds to purchase the Lady May, but the uncontradicted
testimony of Kwok's daughter Mei Guo established that Ms. Qu did not provide the funds to
purchase the yacht. Tr. 44.[2] Consequently, a reasonable inference is that Kwok provided the
funds to HK International which were used to purchase the yacht. It is undisputed that Ms. Qu
transferred the ownership of the Lady May to Kwok's daughter, Mei Guo, on or around June 17,
2017, for $1 or no consideration. Tr. 47. According to Ms. Guo's affidavit (NYSCEF Doc. No.
1162), Ms. Guo ultimately transferred ownership of the Lady May to the current title holder HK
International Funds Investments (USA) Limited, LLC ("HK USA"). Ms. Guo further avers that
she is the sole owner of HK USA, although all of the multi-million dollar annual expenses for the

---

[2] "Tr." refers to the transcript of the evidentiary hearing, efiled at NYSCEF Doc. No. 1179.

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
NYSCEF DOC. NO.: 1181

INDEX NO. 652077/2017
RECEIVED NYSCEF: 02/09/2022

Case 22-50073 Doc 2238-A Filed 09/27/23 Entered 09/27/23 09:40:36 Page 88 of
318

Lady May, including fuel, maintenance, and the captain and crew are paid by Golden Spring (New York) Ltd. ("Golden Spring."), which is allegedly the Kwok family office.

At the hearing Ms. Guo testified that her brother had bought the Lady May for her. Tr. 46. The Court cannot credit this testimony as there is no evidence that Ms. Guo's brother was involved with the corporate transactions leading to Ms. Guo's acquisition of the title to the yacht. And, indeed, in response to a question from the Court, Ms. Guo acknowledged that her brother was not involved in any of the transfers that occurred before she acquired the yacht. Tr. 47.

Other testimony adduced at the hearing established that Kwok was repeatedly on the yacht every summer and that Ms. Guo was infrequently on the yacht. Trial Tr. 88:8-20. The Lady May's captain testified that Kwok was aboard the yacht for a significant portion of the months of July, August and September in 2020 and that this was consistent with his usual practice in the summer. Trial Tr. 87:24-88:7. Subsequent to this Court's September 30, 2020 restraining Order, in October 2020 the Lady May was sent to Florida and then the Bahamas for repairs and was subsequently dispatched to Italy in October 2021, purportedly at the direction of Golden Spring. Ms. Guo acknowledged that she was aware of both this Court's September 30, 2020 restraining Order and this Court's subsequent March 16, 2021 Order directing that the Lady May be returned to the Court's jurisdiction Tr. 55; 57-60; 62.

Ms. Guo testified that on the one hand, she directed the Lady May's itinerary but, on the other hand, testified that security for Kwok was such a concern that there would be no memorialization of any itinerary. Tr. 52. She further testified that when her father was on the yacht unaccompanied by her he had the freedom to choose wherever he wanted to go. Tr. 50. The fundamental issue, however, is who directed the yacht to be removed from this Court's jurisdiction in October 2020. Ms. Guo claims that in early October 2020 she no longer wished to

use the yacht and relayed that instruction to Golden Spring which, in turn, relayed her directive to the then captain of the ship, Captain Heaslop. Tr. 53.

Upon further questioning, Ms. Guo admitted that it was Golden Spring that advised her that the yacht needed to be moved to a warmer place. Tr. 55. Ms. Guo then repeated her retracted testimony that her brother had given her the yacht, and she stated that her brother is the sole owner of Golden Spring. Tr. 56. This testimony is not credible given that on September 30, 2020 the Court entered a temporary restraining order restraining Kwok

> . . . from making or causing any sale, assignment, transfer, or interference with any property in which he has an interest, or from paying over or otherwise disposing of any debt now due or thereafter coming due to him, subject to the exceptions set forth in CPLR 5222 and in the ordinary course.

NYSCEF Doc. No. 591. Significantly, Captain Heaslop, the then Captain of the Lady May, testified that Mr. Kwok told Captain Heaslop that Kwok would no longer be a guest on the Lady May "a few days" before the Lady May departed for Florida in early October 2020 (and apparently after the issuance of this Court's September 30, 2020 Order). Tr. 89. Captain Heaslop also contradicted Ms. Guo's testimony that Ms. Guo gave Captain Heaslop instructions about the yacht's movement. Tr. 94.

Ms. Guo also acknowledged having subsequently read the Court's March 16, 2021 Order requiring the Lady May to be returned to the Court's jurisdiction by May 31, 2021 (NYSCEF Doc. No. 728). She further acknowledged that she had discussed the Order with her lawyer (whose services were paid for by Golden Spring) and that she had *ignored* the Order.

Russell Stockil, the Yacht Management Director for Yachtzoo SARL, testified that his company had a management contract with HK USA dated May 2021 and that he communicated with HK USA and Golden Spring, but never with Ms. Guo. Tr. 78. This was also the testimony of successor Captain Momchil Ivanov. Tr. 82. In short, Ms. Guo's testimony that she owns and

6

controls the Lady May cannot be credited in any respect.  Ms. Guo appears to be a woman in her twenties, has introduced no evidence that she exercised dominion and control of the Lady May, and provided no confirmation that she came into possession of the Lady May, other than as a ruse to shield the Lady May from being levied upon by her father's creditors.

The machinations associated with the shell game Kwok has orchestrated with respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has taken during the five years this litigation has been pending, which is why there are 1,180 docket entries in this case.

The Court has the authority to hold Kwok in civil contempt under Judiciary Law § 753—and "to punish [him], by fine and imprisonment"—where, as here, the Court "expressly find[s] that [Kwok's] actions were calculated to or actually did defeat, impair, impede, or prejudice the rights or remedies of a party to a civil proceeding." *Oppenheimer v. Oscar Shoes, Inc.*, 111 A.D.2d 28, 28 (1st Dep't 1985) (citing N.Y. Judiciary Law § 753).  Section 753 sets forth four requirements:

> [T]o find that contempt has occurred in a given case, it must be determined that [1] a lawful order of the court, clearly expressing an unequivocal mandate, was in effect. [2] It must appear, with reasonable certainty, that the order has been disobeyed . . . [3] Moreover, the party to be held in contempt must have had knowledge of the court's order, although it is not necessary that the order actually have been served upon the party . . . [4] Finally, prejudice to the right of a party to the litigation must be demonstrated.

*Fleetwood Fin. v Walter J. Dowd, Inc.*, 2016 WL 11546917, at *2 (N.Y. Sup. Ct. Sept. 14, 2016) (citing *McCormick v Axelrod*, 59 N.Y.2d 574, 583, *amended*, 60 N.Y.2d 652 (1983)).  The testimony adduced in this case satisfies each element of this standard.  Indeed, the Appellate Division intimated as such.  *See Pacific Alliance Asia Opportunity Fund L.P.*, 199 A.D.3d 423 (1st Dep't 2021) ("[PAX has] established by clear and convincing evidence that [Kwok] violated

Case 22-50073-JAM    Doc 228-A    Filed 09/27/23    Entered 09/27/23 09:40:39    Page 91 of
318

a lawful, clear mandate of the court, of which he had knowledge, and that such violation resulted in prejudice to plaintiff's rights. . .").

The extent of PAX's ongoing "prejudice" turns on whether PAX has demonstrated that it could ultimately levy on the Lady May to satisfy its now centi-million dollar judgment against Kwok.  Under CPLR § 5225, "money or other personal property" is leviable where the debtor holds the requisite "interest." To satisfy this requirement, "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient."  Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5225.09. "A beneficial interest is '[a] right or expectancy in something . . . as opposed to legal title to that thing.'"  *Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576, at *30 (S.D.N.Y. Mar. 13, 2013) (citing Black's Law Dictionary, Interest (9th ed. 2009)).  Kwok has much more than a beneficial interest in the Lady May.  Not only does Kwok control the yacht, it appears he provided the funds to purchase it and he is the person who principally enjoys the use of the yacht.

The key factor is whether "the property benefitted [the beneficial owner] as if he had received the property directly." *Id*. (quoting *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 120 (2d Cir. 2010); *see also Gliklad v. Chernoi*, 129 A.D.3d 604 (1st Dep't 2015) (upholding rejection of the judgment debtor's contention that he no longer held an interest in property because he transferred his interest to his daughters); *Colfin Bulls Funding B, LLC v. Ampton Invs., Inc*., 112 N.Y.S.3d 868 (Table), at *2, 6 (N.Y. Sup. Ct. 2018) (granting judgment creditor's turnover motion notwithstanding judgment debtor's assertion that he transferred property to a corporation, because even if true, the evidence showed that he "retained control and/or an interest" in the property).

8

FILED: NEW YORK COUNTY CLERK 02/09/2022 04:33 PM
INDEX NO. 652077/2017
NYSCEF DOC. NO. 1181
RECEIVED NYSCEF: 02/09/2022
Case 22-50073-jjt-Doc 2234-ATF Filed 09/27/23 Entered 09/27/23 09:40:30 Page 92 of
318

The evidence clearly and convincingly demonstrates that Kwok holds a beneficial interest in and controls the Lady May. In the latter connection, the Court takes notice of the filing of the Zeng case and draws an inference from all the record facts that Kwok has taken extraordinary steps to shield the yacht from his creditors. Moreover, Kwok's "family office" funds the yacht's day-to-day operations and maintenance.

The Court finds that Ms. Guo's testimony was not only internally inconsistent and dissembling, but also significantly undermined by the testimony of Captains Heaslop and Ivanov and Mr. Stockil, who stated that they have never taken yacht-related direction from Ms. Guo in the four and-a-half years that she directly or indirectly held title to the yacht.

In addition, it is established New York law that a party's invocation of the Fifth Amendment in a civil proceeding "may form the basis of an adverse factual inference." *DeBonis v. Corbisiero*, 155 AD2d 299, 300 (1st Dep't 1989). An adverse inference may be applied whenever a factual determination is necessary or permitted, including in the context of contempt motions. *S.E.C. v. Durante*, No. 01 Civ. 9056 (DAB) (AJP), 2013 WL 6800226, at *10 (S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *LiButti v. United States*, 107 F.3d 110, 120–25 (2d Cir. 1997).

Similarly, under the missing witness rule, "[a] trier of fact may draw the strongest inference that the opposing evidence permits against a witness who fails to testify." *Crowder v. Wells & Wells Equip., Inc.*, 11 A.D.3d 360, 361 (1st Dep't 2004) (applying adverse inference where defendant who failed to appear "would be knowledgeable about a material issue raised by the evidence").

PAX is entitled to an adverse inference under both of these avenues. Kwok has invoked his Fifth Amendment right against self-incrimination in response to PAX's post-judgment discovery, including in response to requests specifically about the Lady May. While Kwok

9

argues that an adverse inference is not appropriate here because "[o]nly after a threshold showing that a piece of evidence is authentic is a party obligated to respond to it," this contention fails of its own weight. PAX has proffered substantial admissible evidence that Kwok has the requisite beneficial interest in and control of the Lady May. *See People v. Primo*, 96 N.Y.2d 351, 753 N.E.2d 164 (2001) (explaining that evidence is probative if it "tends to prove the existence or non-existence of a material fact, *i.e.*, a fact directly at issue in the case").

As of February 7, 2022, the Lady May has remained outside the jurisdiction of the Court for 268 days. Based on the daily fine of $500,000 imposed by this Court and affirmed by the Appellate Division, the resultant fine would amount to $134,000,000.00, which is more than PAX's outstanding judgment of nearly $120 million and a multiple of the GBP £ 28 million purchase price of the Lady May. Nevertheless, if billionaire litigants can simultaneously seek to use Court process in New York and elsewhere in the United States while knowingly and intentionally violating Court orders, there is no rule of law. Kwok must remit $134,000,000.00 to PAX within five business days of the service of this Court's Order with Notice of Entry. The Court is prepared to exercise its full authority under Judiciary Law § 753 in the event the fine is not timely paid.

Dated: February 9, 2022

_Barry Ostrager_

BARRY R. OSTRAGER, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

10

**Exhibit 2**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 22-50073 (JAM) |
| HO WAN KWOK, *et al.*, | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |
| Pacific Alliance Asia Opportunity Fund L.P. and | ) | Adv. P. No. 22-05032 (JAM) |
| Luc A. Despins, Chapter 11 Trustee for the Estate | ) |  |
| of Ho Wan Kwok, | ) | Re: ECF No. 3 |
|  | ) |  |
| Plaintiffs | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Ho Wan Kwok, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## **APPEARANCES**

Stuart M. Sarnoff
Daniel Cantor
Mia N. Gonzalez
O'Melveny & Myers LLP
Seven Times Square
New York, NY 10036

Patrick M. Birney
Annecca H. Smith
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

    *and*

Peter Friedman
David V. Harbach II
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, D.C. 20006

*Attorneys for Plaintiff Pacific Alliance Asia Opportunity Fund L.P.*

Luc A. Despins
Paul Hastings LLP
200 Park Avenue
New York, N.Y. 10166

    *and*

Nicholas A. Bassett
Paul Hastings LLP
2050 M Street NW
Washington, D.C. 20036

Douglas S. Skalka
Nancy Bohan Kinsella
Patrick R. Linsey
Neubert Pepe & Montieth P.C.
195 Church Street
New Haven, CT 06510

*Plaintiff Luc A. Despins, Chapter 11 Trustee for the Estate of Ho Wan Kwok, and his Attorneys*

David S. Wachen
Wachen LLC
11065 Montague Court
Potomac, MD 20854

    *and*

Aaron A. Mitchell
Lawall & Mitchell, LLC
55 Madison Avenue, Suite 400
Morristown, NJ 07960

Jeffrey Hellman
Law Offices of Jeffrey Hellman, LLC
195 Church Street, 10th Floor
New Haven, CT 06510

*Attorneys for Defendant Ho Wan Kwok, Debtor*

## CORRECTED MEMORANDUM OF DECISION
## GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION

Julie A. Manning, United States Bankruptcy Judge

    Pursuant to Fed. R. Civ. P. 60(a) and Fed. R. Bankr. P. 9024, the Memorandum of

Decision issued on January 11, 2023 (the "Memorandum," ECF No. 128), is corrected to address

clerical mistakes and mistakes arising from oversight or omission in the Memorandum. The

corrected mistakes largely address typographical errors and citation formats. In one instance,

there is a correction to clarify which case in a string cite was quoted. *See* p. 36, *infra*. Also, to

address an issue raised to the Court during a Status Conference held on January 13, 2023, the

Court corrects the Memorandum to confirm the existence of two separate injunctions with regard

offices and workplaces—(i) a 36 ft. injunction around entrances; and (ii) a general 100 ft.

injunction at particular times of the day.  *See* p. 50, *infra*.; subparagraphs (d) and (f) of the

Corrected Order to be filed.

## I.  INTRODUCTION

Before the Court is Pacific Alliance Asia Opportunity Fund L.P.'s ("PAX") Application

for a Temporary Restraining Order and the Motion for Preliminary Injunction (the "Motion").

(ECF Nos. 3 (redacted) and 5 (sealed).)  PAX, *inter alia*, requests the Court enjoin Mr. Ho Wan

Kwok (the "Debtor" or "Defendant") from various acts relating to an alleged social media and

protest campaign allegedly organized by the Debtor.  Because of the nature of the evidence

presented in this adversary proceeding, the Court notes that the Debtor's Chinese name is

pronounced Guo Wengui in Mandarin Chinese and Kwok Ho Wan in Cantonese Chinese.[1]

Guo/Kwok is the Debtor's family name and Wengui/Ho Wan is his given name.[2]  The Debtor is

also known, among numerous aliases, as Miles Kwok or Miles Guo.[3]

Mr. Luc A. Despins, the Chapter 11 Trustee appointed in the Debtor's Chapter 11 case

(the "Chapter 11 Trustee," and together with PAX, the "Plaintiffs") has intervened in this

adversary proceeding and joined in the Motion.  (ECF No. 25.)

The claims asserted in this adversary proceeding and in the Motion present very

important, substantial, and serious issues.  These issues include the intersection of the integrity of

the bankruptcy court system with free speech protections contained in the Constitution.  After an

---

[1] ECF No. 97, at 97:4–8.
[2] Kwok Direct, ECF No. 97, at 133:23–25.
[3] Kwok Direct, ECF No. 97, at 107:20–21.

extensive review of applicable law, and upon consideration of the evidence presented and

arguments made during the Hearing, for the reasons set forth below, the Court grants in part the

Motion for Preliminary Injunction.

## II.    BACKGROUND

The Debtor filed a voluntary Chapter 11 petition in this Court on February 15, 2022.

(Main Case ECF No. 1.)[4]  The Debtor's case is jointly administered with two affiliated corporate

Chapter 11 cases.  (Main Case ECF Nos. 970 and 1141.)

Among early developments in the Debtor's Chapter 11 case, the Debtor's largest creditor,

PAX, filed a Motion to Dismiss or Convert the Debtor's case (the "Motion to Dismiss," Main

Case ECF No. 183).  Although the facts surrounding the Motion to Dismiss are complex and

more fully set forth in the Debtor's Chapter 11 case, on June 15, 2022, the Court entered a

Memorandum of Decision and Order Denying Motion to Dismiss Without Prejudice and

Granting Joinder to Motion for Appointment of Chapter 11 Trustee (the "Order Granting Motion

for Appointment of Chapter 11 Trustee," ECF No. 465).  *In re Kwok*, 640 B.R. 514 (Bankr. D.

Conn. 2022).  On July 8, 2022, Mr. Luc A. Despins was appointed as the Chapter 11 Trustee (the

"Order Granting Appointment of Chapter 11 Trustee," Main Case ECF No. 523).

Since the appointment of the Chapter 11 Trustee, the Debtor, PAX, the Chapter 11

Trustee, and other parties have filed numerous and extensive pleadings in the Debtor's Chapter

11 case.  A multitude of issues have been brought before the Court, including, in pertinent part,

numerous discovery issues relating to the Chapter 11 Trustee's investigation into the assets of the

Debtor, (*See* Main Case ECF Nos. 756–58, 856, 923, 995, 1046, 1184, 1303), issues relating to

---

[4] References to the docket in the Debtor's individual Chapter 11 bankruptcy case *In re Kwok*, Case No. 22-50073 (JAM) (Bankr. D. Conn.), will be styled "Main Case ECF," while references to the docket in this adversary proceeding will be styled "ECF."

4

the Debtor's Chapter 11 bankruptcy estate's (the "Estate") interest in certain properties (*See, e.g., HK Int'l Fund Invs. (USA) Ltd. LLC v. Despins ex rel. Kwok*, Adv. P. No. 22-05003 (JAM) (Bankr. D. Conn.) and *Despins ex rel. Kwok v. Bravo Luck Ltd.*, Adv. P. No. 22-05027 (JAM) (Bankr. D. Conn.)), and issues relating to the Chapter 11 Trustee's control of the Debtor's economic and corporate governance rights (*See* Main Case ECF No. 717, the "Corporate Governance Order").

On November 16, 2022, a hearing was held on, *inter alia*, the Trustee's motion to hold the Debtor in contempt of court for alleged failure to comply with his duties under the bankruptcy code and under the Corporate Governance Order (Main Case ECF No. 913). During the contempt hearing, the Chapter 11 Trustee first alerted the Court and the Office of the United States Trustee as to the subject matter of this adversary proceeding, namely an alleged social media and protest campaign to harass and intimidate the Plaintiffs relating to their involvement in these cases, the Chapter 11 Trustee's ongoing investigation of the Estate's assets, and PAX's multi-year pursuit of its claim against the Debtor which totals more than $200 million. (*See* Main Case ECF No. 1108.) On November 21, 2022, the Chapter 11 Trustee filed a statement, with attached exhibits, further detailing this alleged campaign. (Main Case ECF Nos. 1133 (redacted) and 1136 (sealed).)

On November 22, 2022, PAX commenced this adversary proceeding against the Debtor. (ECF No. 1, the "Complaint.") The Complaint makes additional allegations about the alleged social media and protest campaign. Along with the Complaint, PAX filed an Application for a Temporary Restraining Order and Motion for Preliminary Injunction. On November 22, 2022, the Chapter 11 Trustee moved to intervene as an additional Plaintiff in the adversary proceeding, which was granted. (ECF No. 25.)

5

On November 23, 2022, a hearing was held on the Application for a Temporary Restraining Order. Although the Debtor is represented by counsel in his Chapter 11 case, and that counsel appeared at the TRO hearing, the Debtor did not appear in this adversary proceeding through counsel until December 1, 2022. (ECF No. 47.)

At the conclusion of the TRO hearing, the Court granted a portion of the relief sought in the Motion and entered a temporary restraining order (the "TRO"). (ECF No. 26.) The TRO restrained the Debtor from (1) posting false and harassing materials about the Plaintiffs, their counsel, and their relatives; (2) publishing online the home addresses and other personal information of the Plaintiffs, their counsel, and their relatives; (3) encouraging, inciting, suggesting, or directly or indirectly financing protests at homes and offices of the Plaintiffs, their counsel, and their relatives; and (4) interfering with the integrity of these Chapter 11 cases. The TRO also directed the Debtor to take down social media posts that (a) published online home addresses and other personal information of the Plaintiffs, their counsel, and their relatives or (b) encouraged, incited, or suggested protests at homes and offices of the Plaintiffs, their counsel, and their relatives.

The TRO also scheduled an evidentiary hearing on the request for a preliminary injunction (the "Hearing") to begin on December 2, 2022. (ECF No. 39.) The Court continued the Hearing one business day to December 5, 2022, upon motion of the Debtor. (ECF No. 51.) On December 2, 2022, the Debtor filed his objection to the Motion. (ECF No. 58, the "Objection.") Under Federal Rule of Civil Procedure 65(b)(2), the TRO was due to expire at 6:00 p.m. on December 7, 2022. During the third day of the Hearing, while evidence was continuing to be presented, but before the expiration of the TRO, the Court issued an order at 5:57 p.m. on December 7, 2022, extending the TRO for good cause in accordance with Rule

65(b)(1)(2) (the "Order Extending the TRO," ECF No. 80). The Hearing concluded on

December 12, 2022. Counsel for PAX, the Chapter 11 Trustee and his counsel, and the Debtor

and his counsel, presented witnesses, evidence, and their respective arguments professionally and

respectfully.

In order to fully and fairly analyze and determine these complex issues, the Court has

had to consider and review voluminous evidence introduced during the four-day Hearing. Nine

witnesses were called to testify during the Hearing, including the Debtor, one expert witness, and

one of three interpreters who participated in the Hearing. The parties introduced 100 exhibits

during the Hearing, the majority of which were videos and other postings made on various

internet platforms. The ability to make specific findings of fact based on video evidence and

other evidence that is not in document form is challenging and requires not only additional time,

but additional technological resources. Although the parties were able to project the videos and

internet platform screen shots during the Hearing, that evidence then need to be provided to the

Court to become part of the official record of this adversary proceeding. After all of the

evidence became part of the official record, the Court was able to prepare findings and fact

conclusions of law as set forth below.

## III.  JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this

matter pursuant to 28 U.S.C. § 1334(b). This Court has authority to hear and determine this

matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District

Court for the District of Connecticut dated September 21, 1984. The instant proceeding is a

statutorily core proceeding concerning the ability of this Court to address matters concerning the

administration of the Estate, the liquidation of assets of the Estate, and the adjustment of the

debtor-creditor relationship in accordance with the provisions of Title 11.  28 U.S.C. §§ 157(b)(2)(A) and (O).

The Court finds that its exercise of jurisdiction is not unconstitutional under *Stern v. Marshall*, 564 U.S. 462, 487–99 (2011), because the Court is not determining the merits of a personal injury tort claim or a defamation claim as in *Stern*.  Although the Debtor disagrees, the Complaint does not assert a defamation cause of action, but rather asserts causes of action under 28 U.S.C. § 1651(a) and 11 U.S.C. § 105(a).  The Plaintiffs may assert such causes of action pursuant to 11 U.S.C. §§ 105(a) and 1109(b) and Fed. R. Bankr. P. 7001(7).  The Court concludes the Complaint is not pretextual.

The Debtor argues that the relief sought in the Complaint is an improper use of § 105(a). The Court disagrees, noting it is common practice in adversary proceedings.  *See, e.g.*, *Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*, 619 B.R. 38 (S.D.N.Y. 2020); *Roman Catholic Diocese v. Doe (In re Roman Catholic Diocese)*, 628 B.R. 571 (Bankr. N.D.N.Y. 2021); *Mgmt. Tech. Corp. v. Pardo (In re Mgmt. Tech. Corp.)*, 56 B.R. 357 (Bankr. D.N.J. 1985); Complaint, *Purdue Pharms. L.P. v. Commonwealth of Massachusetts (In re Purdue Pharms. L.P.)*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Sept. 9, 2018), ECF No. 1, *requested relief granted by* Order, *Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Oct. 11, 2019), ECF No. 82, *most recently amended by* Order, *Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Dec. 5, 2022), ECF No. 400.

Should a reviewing court disagree with this Court's exercise of jurisdiction, the Court submits this Memorandum of Decision as proposed findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Plaintiffs consent to the Court's jurisdiction over

the claims in this adversary proceeding, but the Debtor does not. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV. FINDINGS OF FACT

Based on the testimony and exhibits admitted during the Hearing, and upon taking judicial notice of pleadings filed in the jointly administered Chapter 11 cases and related adversary proceedings, the following are the Court's findings of fact:[5]

### *Entities Related to the Debtor*

1. The Debtor began what is known as "The Whistleblower Movement." He is the founder of the New Federal State of China (the "NFSC") and the Rule of Law Foundation (the "ROLF"). ROLF's mailing address is the same as the address the Debtor listed on his bankruptcy petition as his personal address. PAX 35[6], 40B, 55A, 64. Main Case ECF No. 1.

---

[5] Because of the nature of the testimony during the hearing, the Court notes that, in a civil proceeding such as this adversary proceeding, a fact finder may draw adverse inferences against a party when said party refuses to testify in response to probative evidence offered against him or independent evidence exists of the fact to which the party refuses to answer. *Mirlis v. Greer*, 952 F.3d 36, 47 (2d Cir. 2020) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.") (emphasis in original)); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("[A]n adverse inference can be drawn when independent evidence exists of the fact to which the party refuses to answer.")) Adverse inferences are appropriately admitted into evidence only if they are relevant, reliable, and not unduly prejudicial. *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983). *But see Woods v. Start Treatment & Recovery centers, Inc.*, 864 F.3d 158, (2d Cir. 2017) (finding a court improperly admitted into evidence a defendant's invocation of Fifth Amendment privilege against self-incrimination in her deposition because such invocation was irrelevant and unduly prejudicial to the proceeding). The Debtor did appear and testify during the hearing and invoked his Fifth Amendment privilege almost 200 times in response to questioning by the Plaintiffs' counsel.

[6] References to PAX's exhibits will be styled PAX [No.]. References to the Debtor's Exhibits will be styled Kwok [No.]. References to an exhibit where a witness wrote something down for the court will be styled [Witness's family name] [No.].

Kwok Direct,[7] ECF No. 97, at 106:10–25, 123:25–124:12, 124:15–21, 148:5–149:6, 149:17–151:19, 189:2–23, 190:4–11; Cheng Direct, ECF No. 98, at 432:21–25.

2. NFSC is associated, affiliated, and/or connected to the Debtor, ROLF, Farms, The Whistleblower Movement, Miles Guo Live Broadcast, and the GSeries. The GSeries includes the following entities: Himalaya Exchange, Gettr, GFashion, GMusic, GClubs, GNews, and GEdu. The Farms are also known as Himalaya Farms, which are social media groups used by members of the NFSC to communicate with each other. The NFSC home page directs visitors to The Farms via a hyperlink. PAX 34–36. Kwok Direct, ECF No. 97, at 187:8–18; 188:9–19; Jiao Cross, ECF No. 98, at 374:17–376:25.

3. The G in GSeries stands for Guo. The Debtor founded and controls GNews. GNews is connected to Saraca Media. The Debtor created GFashion. GFashion is connected to GNews, Gettr, and GCoin. PAX 34–36. Kwok Direct, ECF No. 97, at 187:8–18, 188:4–19, 192:24–193:2. The Debtor also controls Saraca Media Group and a related entity "GTV," which is commonly referred to collectively as GTV. Jiao Cross, ECF No. 98, at 377:11–16, 413:23–24. GTranslators provides translation services for GNews broadcasts. PAX 26B, 40B.

4. NFSC is associated, affiliated, and/or connected with the Himalaya Global Alliance (together with affiliated Himalaya entities, such as Himalaya Exchange and Himalaya Farms, "Himalaya"). PAX 6B.

5. Himalaya entities, such as Himalaya New World, organize against the CCP. Himalaya New World writes articles and creates social media content to expose the truth about China and the CCP. Jiao Bing Shang is the President of Himalaya New World, Inc. Jiao Cross,

---

[7] The Court will refer to testimony by [Witness's family name] [Type of testimony] followed by a cite to the redacted transcripts as they appear on the docket. The page number of the underlying transcripts, which are consecutively paginated for convenience, are used – not the page number on the Electronic Case Filling ("ECF") stamp.

ECF No. 98 at 373: 11–24, 397:25–398:6. Himalaya New World, Inc., also helps people to buy G-Club. Jiao Cross, ECF No. 98, at 413:25– 14:11.

6. The Whistleblower Movement, NFSC, ROLF, and Himalaya are involved in the protests. PAX 3B, 3D, 6B, 9, 10B, 11B, 19B, 20B, 23, 24B, 26B, 28B, 38B, 39B, 40B, 42, 43B, 45, 47B, 51B. Kwok 8. Jiao Cross, ECF No. 98, at 353:19–354:1, 357:18–21, 367:11–19, 373:8–374:3; Cheng Direct, ECF No. 98, at 434:17–435:13; Cheng Cross, ECF No. 98, at 465:12–15; Li Direct, ECF No. 98, at 475:3–476:18; Li Cross, ECF No. 98, at 490:8–12, 22–23.

7. The Debtor is the leader of The Whistleblower Movement, NFSC, ROLF, and Himalaya. The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve as business vehicles for the Debtor, and their members are personally loyal to the Debtor. PAX 6B, 34–36, 39B, 40B, 55A, 59, 64. Kwok Direct, ECF No. 97, at 106:10–25, 123:25–124:12, 124:15–21, 148:3–149:6, 149:17–151:19, 187:8–18, 188:4–19, 189:2–23, 190:4–11; 192:24–193:2; Jiao Direct, ECF No. 98, at 340:22–24; Cheng Direct, ECF No. 98, at 435:4–6; Cheng Cross, ECF No. 98, at 450:6–11; Li Cross, ECF No. 98, at 491:4–492:25. The Debtor's followers deny any association with the Debtor, but insist their motive behind protesting is: ". . . [The Debtor] is the spiritual leader, leader of the Chinese Whistleblowers, he is being followed by at least 500 million freedom-loving Chinese people . . . it is just like the Dalai Lama, of the spiritual leader of hundreds of millions of people from around the world. When he's under persecution or under attack by the CCP, people from around the world step forward . . .." Kwok 8.

8. The Debtor communicates with members of NFSC, The Whistleblower Movement, and Himalaya via, *inter alia*, group chats, including group chats on WhatsApp. For example, the Debtor referred to one of the witnesses who testified during the Hearing, Ms. Yaqin Li, as "great,

11

wise, beautiful sister" in a WhatsApp post commending her for her protest efforts. PAX 86. Li Cross, ECF No. 98, at 498:4–499:4, 503:9–505:19, 507:5–19.

9. The Debtor uses, *inter alia*, single use "burner" phones to communicate with members of NFSC, The Whistleblower Movement, and Himalaya. Kwok Direct, ECF No. 97, at 125:24–126:10, 126:17–127:2. The Debtor is aware of his duty to cooperate with the Chapter 11 Trustee regarding his communications. Kwok Direct, ECF No. 97, at 235:2–6. The Debtor has used burner phones for communications on matters related to his bankruptcy cases. Kwok Direct, ECF No. 97, at 125:24–126:10, 126:17–127:2, 235:7–10.

10. Associates of the Debtor have visited his office address at 3 Columbus Circle, New York, NY. PAX 85, 56, 57; Jiao Cross, ECF No. 98, at 418:15–419:20; Cheng Cross, ECF No. 98, at 463:8–19. GNews internet broadcasts, and the Debtor's October 2022 internet announcement made to his followers to stop protesting which was posted on NFSCTV's YouTube Channel, contain the same backdrop as a photograph taken at 3 Columbus Circle, New York, N.Y. PAX 39B, 40B, 67, 68. Associates of these entities that are closely affiliated with the Debtor also appear in photographs taken at the Sherry-Netherland apartment in which the Debtor has resided and/or resides. PAX 38A, 38B, 38D, 38E, 41B, 41C, 44, 58.

### *Persons Related to the Debtor*

11. The Debtor is familiar with the individuals named Fay Fay (a/k/a Fei Fei), Beile Li (a/k/a Xiao Wangzi, Prince Li, Prince, or Little Prince), Huo Lai (a/k/a Fire Lai), Pamela Tsai (a/k/a Meiling Pam or Nicole), Jiao Bing Shang (a/k/a Ah Bing), Shan Mu, Roy Guo, Elliot Dordick, and Yaqin Li. PAX 3B, 3D, 8, 38A, 38B, 38D, 38E, 41B, 41C, 42, 43B, 44, 45, 56–58, 67–79, 81, 85, 86, 94, 95A, 95B, 95D. Kwok Direct, ECF No. 97, at 163:23–166:9, 168:2–170:6, 171:13–173:1, 173:6–11, 173:16–174:23, 175:2–10, 177:24–178:7, 178:18–22, 180:21–

181:10, 187:19–24; 191:24–192:3, 192:13–15, 193:13–193:22, 194:22–195:9, 195:14–21, 195:25–196:11, 206:12–14, 206:20–207:1.  The Debtor invoked his Fifth Amendment against self-incrimination t in response to several questions about whether he recognized individuals in photographs and videos.  However, the Debtor stated in a video posted on either December 5 or 6, 2022, after the completion of his testimony during the Hearing, "The most important thing today is that comrades Prince, Huo Lai, Shan Mu, Nicole, and Luoyi were all there—they asked me to identify each—I spent the entire day looking at your faces." PAX 95B and 95D.

12.  Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Jiao Bing Shang, Shan Mu, Yaqin Li, Roy Guo, and Ziheng Cheng are associated with The Whistleblower Movement, NFSC, the G-Series, Himalaya, and/or ROLF.  PAX 3B, 3D, 8, 38B, 56–58, 67–79, 81, 85, 86, 93, 94, 95A, 95B, 95D.  Jiao Cross, ECF No. 98, at 353:19–354:1, 357:18–21, 367:11–19, 373:8–374:3; Cheng Direct, ECF No. 98, at 434:17–435:13; Cheng Cross, ECF No. 98, at 465:12–15; Li Direct, ECF No. 98, at 475:3–476:18; Li Cross, ECF No. 98, at 490:8–12, 22–23.

13.  Elliot Dordick is an employee of Gettr.  PAX 47B, 94.

14.  Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Jiao Bing Shang, Shan Mu, Yaqin Li, Ziheng Cheng, and Elliot Dordick are friends, employees, servants, associates, followers, and/or colleagues of the Debtor.  PAX 3B, 3D, 8, 38A, 38B, 38D, 38E, 41B, 41C, 42, 43B, 44, 45, 56–58, 67–79, 81, 85, 86, 94, 95A, 95B, 95D.  Kwok Direct, ECF No. 97, at 163:23–166:9, 168:2–170:6, 171:13–173:1, 173:6–11, 173:16–174:23, 175:2–10, 177:24–178:7, 178:18–22, 180:21–181:10, 187:19–24; 191:24–192:3, 192:13–15, 193:13–193:22, 194:22–195:9, 195:14–21, 195:25–196:11, 206:12–14, 206:20–207:1.

15.  Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Jiao Bing Shang, Shan Mu, Yaqin Li, Roy Guo, Ziheng Cheng, and Elliot Dordick are involved in the protests.  PAX 19B, 24B, 38B, 40B,

42, 43B, 45, 47B, 58, 86, 93, 94.  Kwok Direct, ECF No. 97, at 170:7–171:10.  Jiao Direct, ECF

No. 98, at 334:10–335:10; Cheng Direct, ECF No. 98, at 434:13–24; Li Direct, ECF No. 98, at

473:25–474:14.

### *Social Media Accounts Related to the Debtor*

16.  Mr. Brian Napierala, an intelligence analyst at Guidepost Solutions, LLC

("Guidepost"), was qualified as an expert witness during the Hearing to testify about open-source

intelligence and cyber investigations regarding social media postings.  Napierala Direct, ECF

No. 97, at 36:15–19.  Display names on Gettr can be changed at any time by anyone using the

associated Gettr account.  Napierala Direct, ECF No. 97, at 64:3–7.  Handles, also known as

usernames, are "a little more sticky" in that they require some form of dual authentication to

change.  Napierala Direct, ECF No. 97, at 64:19–65:2, 67:24–68:10.  While multiple accounts

may have the same display name, a handle is unique to an account.  Napierala Direct, ECF No.

97, at 65:3–15, 68:11–17.  Napierala Cross, ECF No. 97, at 80:11–13.  Gettr marks verified

accounts with a white "v" inside a red circle.  Napierala Direct, ECF No. 97, at 66:2–19.  Gettr

verifies accounts through a process to identify that the account holder is who they claim to be.

Napierala Direct, ECF No. 97, 66:2–19.  Gettr accounts are password protected with potential

dual authentication requirements in certain instances.  Napierala Direct, ECF No. 97, at 68:18–

70:8. Users can, *inter alia*, post, re-post others' posts, and like others' posts on Gettr.  Napierala

Direct, ECF No. 97, 73:1–74:1.

17.  Gettr generates the date of a posting or a measure of when a post/repost was posted

relative to when it was viewed.  Napierala Direct, ECF No. 97, at 74:2–17, 75:24–76:4.  When a

timestamp appears at the bottom of a post/repost, that timestamp is Gettr generated and it is

correct, except possibly with respect to the time zone.  ECF No. 97, at 90:8–91:2.  Internal

timestamps in videos are generated by the recording program. Napierala Direct, ECF No. 97, at 78:19–21. Guidepost recorded capture time where it could discern the time. Napierala Direct, ECF No. 97, at 75:7–19, 76:11–77:3.

18. The @Miles Gettr account is verified by Gettr. *See* Fact 16, *supra*. The @Miles Gettr account formerly used "MILES GUO Official" as its display name. *See* Fact 19, *infra*. The @Miles Gettr account used a photograph of the Debtor, which photograph is also used by the NFSC Website under a heading labeled "Who is Miles Guo," and is the profile picture of the @MilesGuo Gettr account. Kwok Direct, ECF No. 97, at 107:17–19. At the top of the @Miles Gettr account is a banner with the NFSC emblem and Rule of Law Foundation emblem. The account's description stated: "We are the Citizens of the New Federal State of China" and "Our Mission is to Take Down the EVIL Chinese Communist Party." The @Miles Gettr account reposts @NFSCSpeaks posts, @himalaya_mos posts, @gmusic posts, @QMAY007 (Display Name "QMAY") posts, which accounts are all verified by Gettr. The @Miles account posts its own original content, including "Miles Guo's Broadcast Highlights," as well as G-News video content, and Fay Fay Show (a/k/a Fei Fei Show) videos. Several posts and re-posts contain content related to the protests. PAX 8, 35, 61.

19. The @Miles account's display name was changed to "NFSCTV" on Gettr, and the profile picture was changed from a photograph of the Debtor to the NFSC emblem. It is unclear whether the description of the account remains unchanged. PAX 60.

20. The @MilesGuo Gettr account is verified by Gettr. *See* Fact 16, *supra*. The @MilesGuo Gettr account at the time of capture used "MILES GUO" as its display name, and the @MilesGuo Gettr account uses a photograph of the Debtor, which photograph is also used by the NFSC Website under a heading labeled "Who is Miles Guo," and was formerly the profile

15

picture of the @Miles account. Kwok Direct, ECF No. 97, at 111:12–14. At the top of the Gettr account is a banner with the NFSC emblem and Rule of Law Foundation emblem. The @MilesGuo account has "liked" posts from the @Miles account, and various accounts associated with NFSC and the term "Himalaya" in their handle that discuss the protests. PAX 8, 35, 53, 61. Kwok Direct, ECF No. 97, at 127:21–128:6.

21. The Debtor controls and at times personally uses the @Miles and @MilesGuo accounts. Others may also post on the accounts on his behalf. Kwok Direct, ECF No. 97, at 126:14–16. Although the Debtor did not necessarily go through a verification process regarding his Gettr accounts, Gettr, an entity associated with him as part of the GSeries, verified his accounts. *See* fact 16, *supra*. PAX 8, 34–36, 61. Kwok Direct, ECF No. 97, at 107:22–108:2, 111:17–19, 112:2–113:8, 117:22–118:12, 161:17–162:8; Jiao Cross, ECF No. 98, at 356:5–357:17; Cheng Cross, ECF No. 98, at 464:23–465:9.

22. The @MilesGuoLive Gettr account is verified by Gettr and includes a photograph of the Debtor as its profile picture. *See* Fact 16, *supra*. The @MilesGuoLive account reposts @NFSCSpeaks and @MilesGuo posts. PAX 50.

23. The Debtor controls @MilesGuoLive. PAX 50. Kwok Direct, ECF No. 97, at 132:6–8, 132:25–133:5, 135:25–137:4.

24. The Debtor uses Gettr to reach a wide audience. Kwok Direct, ECF No. 97, at 118:13–19.

25. The @NFSCSpeaks Gettr account is controlled by NFSC – it is verified by a related entity, namely Gettr. *See* Fact 16, *supra*. PAX 34–36.

26. NFSCTV's YouTube page prominently features an artist's rendition of the Debtor at the banner at the top of the page. Thumbnails of the videos available for viewing on the page

indicate the Debtor is a frequent subject of the videos posted on the NFSCTV YouTube page. PAX 59.

### Timeline of Relevant Events

*i. Events following the appointment of the Chapter 11 Trustee on July 8, 2022*

27. On July 8, 2022, the @Miles account posted a statement from the Debtor that "the entire process of changing the trustee and my personal bankruptcy case is among the greatest treasures of our New Federal State of China and is of immense significance." The Debtor believes the Chapter 11 Trustee should be removed from his case for alleged conflict of interest. PAX 30A. Kwok Direct, ECF No. 97, at 110:24–111:4, 243:2–11, 245:22–247:5.

28. On July 13, 2022, the @Miles Gettr account posted a statement of the Debtor that the Debtor and undisclosed other parties would do their best to investigate the Chapter 11 Trustee's past work as a bankruptcy trustee and as a lawyer working on IPOs. There was a video embedded in the posting showing the Debtor, in a GNews broadcast with subtitles by G Translators, making this same claim. PAX 28A and 28B.

29. On July 19, 2022, the @Miles Gettr account posted a statement about the Chapter 11 Trustee, stating "Please spread the words about the revelations of the CCP military intelligence and the truths about the trustee of my bankruptcy case. All the U.S. DOJ officials and lawyers from various law firms who want to deport me and harm me will be sent to prison. I have the most unique voice in the world because almost every part of my body that can voice has been tortured by the CCP." PAX 26A.

30. Mr. Stephen Kindseth, an attorney for the Debtor in his Chapter 11 case, testified that, after the Order Granting the Motion for Appointment of Chapter 11 Trustee entered on June 15, 2022, PAX and the Debtor engaged in settlement discussions. The settlement discussions

occurred between July 2022 and September 2022.  Kindseth Direct, ECF No. 111, at 844:1–844:19.  The Debtor would have paid money to PAX under the settlement.  Kindseth Cross, ECF No. 111, at 869:4–7, 870:9–15.  Settlement discussions started with the creditor's committee in September 2022 and continued through October 2022.  Kindseth Direct, ECF No. 111, at 844:17–21.  Mr. Kindseth requested throughout settlement discussions that the Trustee slow his investigation to give room for settlement talks.  Kindseth Cross, ECF No. 111, at 894:11–895:11.

31.  On October 21, 2022, the Debtor made a statement in a GNews broadcast posted on the NFSCTV YouTube Channel asking the audience, which included "fellow fighters," "friends of the New Federal State of China," and his personal supporters, to stop spreading the personal information of PAG's[8] executives and their families and counsel.  The Debtor stated he recognized this was a necessary condition for settlement and reconciliation.  The Debtor stated that numerous parties he had accused of supporting the Chinese Communist party may one day become friends of NFSC.  PAX had demanded the Debtor stop the doxing[9] of PAG's executives and their families as part of settlement discussions.  PAX 39B.

> Q [Attorney Friedman]: Okay. And do you-- do you recall Mr. Kwok making a statement on social media calling on people not to dox PAX, and not to dox people related to PAX made in connection with ongoing settlement discussions?
> A [Attorney Kindseth]: I recall that my client, at the request of PAX, complied with a term in the term sheet to post a video.  And he posted a video, as requested by PAX and PAX's counsel.
> Q: And do you recall that part of that was him saying he would call on supporters not to dox PAX?
> A: Yes.
> Q: And not to harass PAX and family members who worked at PAX?
> A: As best as I can recall, because that came across my email, the terms that should have been contained in the video.  I remember that request, and I believe

---

[8] PAG is the managing partner of PAX.

[9] Doxing is defined as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge" *See Dox*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/doxing (last visited January 10, 2023).

he satisfied the request. I've never seen the video, but based on conversations
with counsel, I thought he complied with that request.
Q: Okay. Do you recall him saying that it was necessary not to dox in order to
have an effective bankruptcy process in the United States?
A: Who would say that?
Q: Your client.
A: I don't recall that.

Kindseth Cross, ECF No. 111, at 870:16–871:14.

32.   On October 30, 2022, the Chapter 11 Trustee submitted a term sheet to the Debtor

and his counsel regarding a global settlement and negotiations stretched into November 2022.

Kindseth Direct, ECF No. 111, at 844:20–16.  In November, PAX also demanded further

financial security, but Mr. Kindseth believed things had been worked out with PAX by

November 16, 2022.  Kindseth Direct, ECF No. 111, at 845:17–23.

33.   On November 11, 2022, the Debtor was deposed by the Chapter 11 Trustee in

connection with the Chapter 11 Trustee's motion seeking to hold the Debtor in contempt of the

Corporate Governance Order.  During questioning on the involvement of Yvette Wang with the

entity known as Ace Decade Holdings, which is the subject of the contempt proceedings, the

Debtor's responses devolved into accusations that Paul Hastings was like the CCP.  Main Case

ECF No. 1096 Ex. 27.  In partial resolution of the Motion for Contempt, the Court later entered

an order in which the Debtor agreed not to appeal the finding that he was, at least prior to the

appointment of the Chapter 11 Trustee, the beneficial owner of Ace Decade Holdings.  Main

Case ECF No. 1110, the Partial Resolution Order.

34.   On November 15, 2022, the NFSC Gettr Page, @NFSCSpeaks, posted personal

home addresses of the Chapter 11 Trustee, the Chapter 11 Trustee's family members, the

chairman of PAG, family members of the chairman of PAG, and the law offices of the Chapter

11 Trustee's Counsel, and PAX's counsel.  The @NFSCSpeaks post called for a 90-day protest

at these locations.  The post also contained photographs of some of the individuals living at the

home addresses listed in the post.  PAX 6B.

*ii. Events surrounding the Contempt Hearing held on November 16–18, 2022, including
the Court being made aware of Call to Protest on November 16, 2022*

35.  On November 16, 2022, Mr. Kindseth transmitted to the Chapter 11 Trustee a letter

summarizing terms for a global settlement that were acceptable to the Debtor.  Kindseth Direct,

ECF No. 111, at 841:24–843:24.  The Chapter 11 Trustee called Mr. Kindseth's partner seeking

to meet, which the Debtor agreed to do.  Kindseth Direct, ECF No. 111, at 841:18–23, 846:19–

21.  Mr. Kindseth wanted to settle the case before the settlement fell apart on account of things

"heating up" inside and outside of this Court.  Kindseth Direct, ECF No. 111, at 845:24–846:18.

The contempt proceeding, the 2004 subpoenas, and the money paid by third parties to the

Debtor's lawyers to defend contempt and the subpoenas, were reasons things were "heated."

Kindseth Cross, ECF No. 111, at 874:3–13, 874:16–875:6.  Another reason things were "heated"

was the social media campaign.  Kindseth Cross, ECF No. 111, at 875:7–16.

36.  On November 17, 2022, there was a settlement meeting at the New York office of

Brown Rudnick.  Kwok Direct, ECF No. 97, at 230:17–20; Despins Cross, ECF No. 99, at

672:23–673:5; Kindseth Direct, ECF No. 111, at 849:2–5.  The Debtor, his attorneys Aaron

Mitchell and Mr. Kindseth, and his translator Ms. Wilkinson, were all present at the meeting.

The Chapter 11 Trustee and his attorney, Nicholas Bassett, were also present at the meeting.

Kwok Direct, ECF No. 97, at 230:21–231:20; Despins Cross, ECF No. 99, at 673:6–12; Kindseth

Direct, ECF No. 111, at 841:15–17, 848:24–849:1; Kindseth Cross, ECF No. 111, at 891:22–

892:1.  Prior to the meeting, the parties attending the meeting entered into a nondisclosure

agreement.  Kwok Direct, ECF No. 97, at 228:6–8; Kindseth Cross, ECF No. 111, at 892:2–893:2.

37.  During the meeting, the Chapter 11 Trustee spoke to the Debtor about the SEC and the IRS Proofs of Claim filed in the Debtor's Chapter 11 case, invoking Al Capone.  Despins Cross, ECF No. 99, at 673:16–18, 693:17–22, 739:6–25, 740:1–5; Kindseth Direct, ECF No. 111, at 862:18–863:15.  While Mr. Kindseth believed it was an unwarranted, thinly-veiled threat, he was aware that the SEC filed a Proof of Claim in the Debtor's Chapter 11 case, but was not aware of the contents of the SEC Proof of Claim.  Mr. Kindseth was also not aware of the Chapter 11 Trustee's duties to the SEC and IRS.  The Chapter 11 Trustee denied he was threatening the Debtor.  Despins Cross, ECF No. 99, at 693:17–19; Despins Redirect, ECF No. 99, at 744:12–745:10; Despins Recross, ECF No. 99, at 745:17–746:10; Kindseth Direct, ECF No. 111, at 868:5–9; Kindseth Cross, ECF No. 111, at 871:18–872:22, 876:24–877:6.  The Chapter 11 Trustee also told the Debtor that he believed the Debtor's legal arguments that various interests in property were not property of his bankruptcy estate were weak and he would lose in court.  Kindseth Cross, ECF No. 111, at 898:15–899:2.  The Chapter 11 Trustee asked for $250 million to resolve the Debtor's Chapter 11 case, which he meant – and Mr. Kindseth understood – was to be paid to the Estate as part of a settlement and not to the Chapter 11 Trustee personally.  Despins Direct, ECF No. 99, at 638:24–639:1; Despins Cross, ECF No. 99, at 692:5–20, 741:3–22; Kindseth Direct, ECF No. 111, at 864:24–865:4; 881:25–882:4; 888:8–14.  Mr. Kindseth found this demand outrageous because it deviated greatly from the global settlement he envisioned.  Despins Cross, ECF No. 99, at 740:11–741:2, 742:18–24; Kindseth Direct, ECF No. 111, at 866:1–8.  Mr. Kindseth called the demand "extortion" in the "heat of the moment".  Kindseth Direct, ECF No. 111, at 867:7–11, 867:25–868:4.  The Chapter 11 Trustee

21

made it clear to Mr. Kindseth that the Debtor – or whoever paid the $250 million – could retain the surplus if less than $250 million in claims were allowed.  Kindseth Cross, ECF No. 111, at 882:5–13.  Mr. Kindseth believes it his duty to make sure the Debtor understands settlement proposals.  Kindseth Cross, ECF No. 111, at 885:18–886:8.  The Debtor believed he was close to accord and satisfaction with PAX, but the Chapter 11 Trustee's request for $250 million destroyed the deal.  Kwok Direct, ECF No. 97, at 247:8–19.  Neither Mr. Kindseth nor his wife, with whom he discussed the issue, leaked the contents of the meeting on social media.  Kindseth Cross, ECF No. 111, at 893:3–14.

38.  The Debtor did not report the alleged extortion to any authority.  Kwok Direct, ECF No. 97, at 118:25–119:6, 244:2–245:21.  Mr. Kindseth did not report the alleged extortion to any authority.  Kindseth Cross, ECF No. 111, at 899:12–18.

39.  On November 19, 2022, two days after the meeting with the Chapter 11 Trustee, the Debtor recorded a video which was posted on November 20, 2022, on the NFSCTV@chinatruth2022 account,[10] a verified Gettr account.  In the video, the Debtor represents he "personally, strongly oppose[s]" such protests "in front of PAX office building and other places."  The video makes no mention of protests in front of the homes of the Chapter 11 Trustee and his family, the offices of Paul Hastings, nor the homes of the PAG chairman and his family.  The video also tells viewers "if you really want to protest . . . be sure to consult a lawyer first, within the perimeter of the law, act within the perimeter of the law, and be sure to observe your state ordinances and local police . . . I strongly oppose and absolutely do not support such protests."  Kwok 6A.  Kwok Direct, ECF No. 97, at 212:14–18.

---

[10] It is unclear if, at the time of posting, the handle of this account was @Miles and the display name MILES GUO Official, because while Gettr handles are unique, multiple accounts could have the display name NFSCTV.

40.  On or before November 20, 2022, a subpoena was served on Jiao Bing Shang as the President of Himalaya New World, Inc.  The subpoena was issued in accordance with an Order Granting a Motion for a Rule 2004 Examination of Himalaya New World, Inc. in the Debtor's Bankruptcy case.  Upon being served with the subpoena, Ms. Jiao did not contact an attorney, she contacted Fay Fay.  Jiao Cross, ECF No. 98, at 406:3–408:18, 409:3–5.  Receipt of the legal papers was "part of the reason" why Ms. Jiao organized the protests in Washington D.C. at the offices of PAX's counsel, O'Melveny & Myers.  Jiao Redirect, ECF No. 98, at 424:21–425:2.

41.  On November 20, 2022, the @NFSCSpeaks account posted a statement identifying the Chapter 11 Trustee's daughters and stating their father is aiding and abetting the CCP.  The post also contained photographs of the Chapter 11 Trustee and his daughters and identified where they work.  PAX 7.  Despins Direct, ECF No. 99, at 589:24–590:1.  The @Miles account reposted this @NFSCSpeaks post on its Gettr page.  PAX 8.

42.  On November 20, 2022, protests occurred directly in front of the Chapter 11 Trustee's home.  The protesters held signs which for the most part, were targeted directly at the Chapter 11 Trustee.  PAX 9 and 91.  Despins Direct, ECF No. 99, at 591:5–17.

*iii. Events following the filing by the Chapter 11 Trustee of a*
*Statement About Social Media Campaign November 21, 2022*

43.  On or before November 21, 2022, protesters at the Chapter 11 Trustee's home distributed leaflets to neighbors describing the Chapter 11 Trustee and his Counsel as enablers of the CCP and accusing the Chapter 11 Trustee of racism.  PAX 48 and 91.  Despins Direct, ECF No. 99, at 614:21–615:8.

44.  On November 21, 2022, the Debtor participated in an internet broadcast acknowledging the 2004 subpoenas issued in the Main Case and advised the audience to avoid

23

receipt of subpoenas by, *inter alia*, not going home. The Debtor told viewers that, if they are "stupid" and receive subpoenas, the Himalaya Global Alliance and the Rule of Law foundation would hire attorneys to help them contest the subpoenas. PAX 38A, 38B, 38D, 38E.

45. In the same internet broadcast described above, the Debtor stated, that the Chapter 11 Trustee and Paul Hastings would suffer "calamities" because of the 2004 subpoenas. The Debtor said "To deal with this rogue, we have our rogue's ways. In a few days you will see what would happen to him. Calamities, I can tell you guys. They will suffer calamities!" PAX 38B.

*iv. Events following commencement of the Adversary Proceeding on November 22, 2022, and the entry of the TRO on November 23, 2022*

46. The Debtor is aware of the TRO. Kwok Direct, ECF No. 97, at 105:10–105:17, 119:25–120:3.

47. On November 22, 2022, GNews conducted an internet broadcast from the protests outside O'Melveny & Myers New York, New York offices, stating that it was the third day of protests. The protesters held placards with stylized, inflammatory depictions of O'Melveny & Myers, attorneys as well as the Chapter 11 Trustee. PAX 45.

48. On November 23, 2022, the @NFSCSpeaks Gettr account posted a video of protests that occurred immediately in front of the home of a family member of PAG's chairman. Protesters displayed signs with photographs of PAG's chairman with the word "SPY" and "CCP" prominently displayed. PAX 16 and 17.

49. On November 24, 2022, a video was posted on YouTube, in which the Debtor personally called for "Comrades" to "persevere with the 90-day protest." He stated ROLF supports the Debtor's legal efforts and protests. He cited the Chapter 11 Trustee's 2004

subpoenas as a reason for the protests, stating the Chapter 11 Trustee's behavior was mafia-like and worse than that of the Chinese Communist Party. PAX 3B and 3D.

50. On November 24, 2022, the @MilesGuoLive account posted photographs of these protests occurring at the home of PAG's chairman's son with supportive emojis and stated "Comrades who have worked so hard to protest on the frontline, rain or shine, salute you!". The placards in the photograph are largely targeted at PAG's chairman. PAX 12 and 13.

51. On November 25, 2022, the TRO was discussed on the Fay Fay Show, an internet broadcast. PAX 43B.

52. On November 25, 2022, the @NFSCSpeaks account posted a video, with an internal timestamp of November 23, 2022, of protesters picketing and parading through the private lobby of 200 Park Avenue, New York, New York, the building which houses the New York Paul Hastings office. The protesters carried placards displaying inflammatory, edited photographs of the Chapter 11 Trustee, the Chapter 11 Trustee's counsel, and PAX's counsel. Several protesters wore hats with the G-Fashion logo. A large banner with the "New Federal State of China" emblem was carried by the protesters. Beile Li stated "To everyone at Paul Hastings . . . Millions of People that have been persecuted by the CCP with curse you, will curse your family, curse every single person in your life because there is blood on your hands" and "the people of the New Federal State of China, 500 million of us . . . .we stand against Paul Hastings, and we stand against O'Melveny. There is no going back, there is no recourse. You have committed a crime, and now you're going to suffer the consequences of your actions." PAX 19B and 91. Despins Direct, ECF No. 99, at 581:10–583:7; Despins Cross, ECF No. 99, at 650:4–651:1.

53. On November 25, 2022, the @Miles account posted an NFSCSpeaks broadcast, with an internal timestamp also of November 25, 2022, of protesters picketing in front of the Chapter

11 Trustee's home with signs accusing him of various things and standing behind an NFSC banner. PAX 10B and 91. Despins Direct, ECF No. 99, at 576:21–578:18.

54. On November 25, 2022, the @Miles account posted images of protests occurred at the home of relative of PAG's chairman. Protesters in front of the home carried signs with photographs of a targeted party. There are two NFSC flags displayed behind the protesters. PAX 15.

55. On November 25, 2022, the Chapter 11 Trustee received a series of emails at his work email from the same unknown ProtonMail email address with consecutive subject lines "I wish" and "i kill." The "I wish" email had the body text "hhhhhhhhhahahahaha." The "i kill" email had no body text. PAX 29 and 91. Despins Direct, ECF No. 99, at 603:20–606:19, 607:19–608:14; Despins Cross, ECF No. 99, at 654:7–15. The Chapter 11 Trustee believed these emails to be a threat. Despins Redirect, ECF No. 99, at 744:2–4.

56. On November 25, 2022, the @NFSCSpeaks account posted a video, with internal date stamp of November 25, 2022, depicting protests outside Paul Hasting's Tokyo office holding pickets directed at the Chapter 11 Trustee. PAX 20B and 91.

57. On November 26, 2022, the @Miles account posted an NFSCSpeaks internet broadcast, with an internal timestamp also of November 26, 2022, of protesters picketing in front of the Chapter 11 Trustee's home with signs accusing him of various things and standing behind an NFSC banner. PAX 11B and 91. Despins Direct, ECF No. 99, at 579:8–581:2.

58. On November 26, 2022, the @NFSCSpeaks Gettr account posted a link to a prfree.org article in support of a comment that stated "$250 Million Dollar EXTORTION OF THE CENTURY" and "DOJ Appointed Trustee Despins Blackmails $250 Million, Threatens to 'Tear Apart' Chinese Dissidents." The post included an inflammatory photograph of the Chapter

11 Trustee's face.  On November 30, 2022, the @MilesGuoLive Gettr account posted the same

text with a stylized image of the Chapter 11 Trustee.  PAX 21 and 33.

59.  The "$250 Million Dollar Extortion of the Century" article from prfree.org fueled

additional individuals to protest and/or organize protests. Jiao Cross, ECF No. 98, at 353:4–

354:14; Cheng Direct, ECF No. 98, at 434:13–435:13; Cheng Cross ECF No. 98, at 445:19–

446:22; Li Direct, ECF No. 98, at 477:23–478:6.

60.  On November 26, 2022, numerous Paul Hastings employees received emails from

multiple senders with the same body text and attachment.  The body of the email stated the New

Federal State of China and "Chinese whistleblowers" called upon Paul Hastings employees to

speak up against the Chapter 11 Trustee and/or leave the law firm.  The email included a link to a

prfree.com article on the alleged extortion, a Gettr post, and stated "if you have any question,

please contact NFSCspeaks@proton.me.  The attachment to the email speaks about the alleged

extortion and calls upon Paul Hastings employees to contact their elected officials and to

"request them to investigate Paul Hastings and Luc Despins."  PAX 22A, 22B and 91.  Despins

Direct, ECF No. 99, at 594:12–595:1, 595:15–18, 596:3–598:9.

61.  On November 26, 2022, an unknown caller left a voicemail on the Chapter 11

Trustee's work telephone number stating "Luc, you are CCP's running dog. You need to go to

Hell. You just did something so ridiculous and your end is so close. F-U-C-K."  PAX 23 and 91.

Despins Direct, ECF No. 99, at 587:13–19, 588:13–20; Despins Cross, ECF No. 99, at 654:16–

655:11.  The Chapter 11 Trustee believed this message to be a threat.  Despins Redirect, ECF

No. 99, at 743:23–744:1.

62.  On November 28, 2022, the @MilesGuoLive posted "NDA . . . (Non-disclosure

agreement)" with an image of a post from an unknown social media site including an image of

27

an NDA titled "Agreement Regarding November 17, 2022 Case Status Meeting" and including the caption of these Chapter 11 bankruptcy cases. PAX 32.

63. On November 28, 2022, the @Miles Gettr account posted a broadcast of protests occurring in front of the O'Melveny & Myers's office in Washington, D.C. and New York. Protesters carried signs targeting PAG chairman Shan Weijan. The protests were reported and broadcast by a program with the NFSC emblem displayed, and two individuals wearing G-Fashion labels. PAX 18C and 18D.

64. The Debtor was aware of protests at Grand Central Station on November 29, 2022, targeted at the Chapter 11 Trustee. PAX 50. Kwok Direct, ECF No. 97, at 137:17–138:2.

65. On December 3, 2022, the @Miles Gettr account posted a video of protesters picketing in front of PAX's counsel Attorney Sarnoff's apartment building in New York City. PAX 51B.

66. On December 3, 2022, a video was posted on Gettr depicting protesters placing a placard including a stylized image of Attorney Sarnoff at the door of Attorney Sarnoff's home and sliding a letter under his door. PAX 93.

67. On or before December 5, 2022, the protestors rented a home in California directly across from the home of a relative of PAG's chairman and placed on it with a billboard and signs targeting PAG's chairman. PAX 89. On December 5, 2022, on an internet broadcast hosted by Gettr, the Fay Fay Show discussed this activity. PAX 92.

68. On or before December 6, 2022, and after his testimony during the Hearing on December 5, 2022, the Debtor filmed a video discussing his testimony and the proceedings in this Court. In the video, the Debtor identified several individuals, whose images had been

presented to him during his testimony and about whom he had asserted his Fifth Amendment right against self-incrimination. PAX 95A, 95B, 95D.

69. On or before December 7, 2022, protests accusing the Chapter 11 Trustee of soliciting a bribe and seeking to destroy a Chinese dissident organization occurred at the Chapter 11 Trustee's daughter's and his ex-wife's homes. Despins Direct, ECF No. 99, at 621:8–622:2. The Chapter 11 Trustee hired a bodyguard for his daughter. Despins Cross, ECF No. 99, at 657:20–24. The protestors swarmed his ex-wife. Despins Cross, ECF No. 99, at 658:3–12.

70. On or before December 7, 2022, protests accusing the Chapter 11 Trustee of being an antisemite and profiting from antisemitism accompanied with images of the Chapter 11 Trustee as a Nazi officer occurred at Grand Central Station, which is adjacent to Paul Hastings's New York City office. PAX 90. Despins Direct, ECF No. 99, at 618:7–619:17.

71. On December 7, 2022, the Chapter 11 Trustee encountered protestors at his home when leaving for work in the morning at about 8:15 or 8:20 a.m. It was a peaceful encounter, but the protestors were trying to take photos of him. Despins Direct, ECF No. 99, at 592:17–594:1.

***Debtor's Involvement With Protests***

72. The Debtor has offered legal support to those individuals and entities served with subpoenas. PAX 38B. Kwok Direct, ECF No. 97, at 176:1–12, 207:6–24

73. The Debtor considers those protesting to be his comrades. PAX 3B and 3D. Kwok 6A. Kwok Direct, ECF No. 97, at 207:25–208:8, 211:16–212:9.

74. The Debtor, or someone the Debtor controls or directs, breached the NDA about the November 17, 2022, meeting for the purposes of creating the prfree.org article. PAX 21 and 33. Kwok Direct, ECF No. 97, at 230:21–231:20, 231:21–232:2; Despins Cross, ECF No. 99, at -

673:6–12; Kindseth Direct, ECF No. 111, at 841:15–17, 848:24–849:1; Kindseth Cross, ECF No.

111, at 891:22–892:1, 893:3–14.

75.   The Debtor has the alias Seventh Brother.  PAX 44, 95A.  Kwok Direct, ECF No. 97,

at 191:17–20.

76.   The Debtor supports the protests.  Facts 6–7, 14–15, 34–74, *supra*, and their

supporting evidence.  PAX 3B, 3D, 8, 86.  Kwok Direct, ECF No. 97, at 212:14–18, 215:17–

216:1.

77.   The Debtor supports, encourages, and is the leader of a social media and protest

campaign targeting the Plaintiffs, their counsel, and their relatives, at personal homes and

workplaces.  The social media campaign and protests are tied to the Plaintiffs' involvement in

the Chapter 11 cases, including the appointment of Chapter 11 Trustee which resulted in a

divestiture of the Debtor's control over his Chapter 11 case, discovery efforts of the Chapter 11

Trustee and his efforts to discover and recover Estate assets, and the efforts of PAX to satisfy its

claim which was reduced to judgment before the Debtor filed his Chapter 11 case.  The social

media and protest campaign accuses Plaintiffs and their counsel of, *inter alia*, being members or

agents of the Chinese Communist Party, supporting and financing genocide in Xinjiang, seeking

to destroy the NFSC and The Whistleblower Movement, anti-Chinese racism, and antisemitism.

Facts 1–76, *supra*, and their supporting evidence.  Kwok Direct, ECF No. 97, at 220:1–5.

### *Plaintiffs' Connections With China*

78.   Paul Hastings LLP has offices in China.  Despins Cross, ECF No. 99, at 640:17–18.

79.   The percentage of Paul Hastings LLP's revenue that comes from China is *de*

*minimis*.  Despins 1.  Despins Cross, ECF No. 99, at 640:23–643:9.  This revenue comes from

American companies doing business in China as well as from Chinese companies.  Despins

30

Cross, ECF No. 99, at 643:16–644:4.  As an equity partner, the Chapter 11 Trustee would

receive a portion of this revenue.  Despins Cross, ECF No. 99, at 643:13–15.  Paul Hastings LLP

has previously represented PAG.  Despins Cross, ECF No. 99, at 644:5–14.

80.  The Chapter 11 Trustee does not finance genocide.  Despins Direct, ECF No. 99, at

591:20–22.

81.  The Chapter 11 Trustee has never been retained by the Chinese Communist Party for

any purpose.  Despins Direct, ECF No. 99, at 592:1–3.

82.  The Chapter 11 Trustee is not racist against Asian Americans.  Despins Direct, ECF

No. 99, at 623:7–9.

83.  The Chapter 11 Trustee has not served as counsel to companies in China.  Despins

Direct, ECF No. 99, at 639:2–3.

84.  O'Melveny & Myers has represented China VAST, whose founder, executive

director, and president is a member and politician of the CCP.  Kwok 14 and 17.

### Effects of Debtor's Social Media and Protest Campaign on the Chapter 11 Trustee's Investigation

85.  The Chapter 11 Trustee plans his schedule around avoiding the protestors.  Despins

Cross, ECF No. 99, at 649:5–650:3.

86.  Because of the circumstances of these cases, Paul Hastings has neither billed for nor

received any fees and expenses incurred in the Debtor's Chapter 11 case and all related cases.

Despins Cross, ECF No. 99, at 647:19–24.

87.  The Chapter 11 Trustee is concerned that the Debtor's inflammatory rhetoric, and the

response to such rhetoric, is escalating and is directed not only to the Chapter 11 Trustee, but

also to others with no involvement in these cases.  In support of this concern, the Chapter 11

Trustee testified about an instance where a protestor chased and screamed at colleagues on their
way up the escalator into Paul Hastings's office.  The Chapter 11 Trustee is concerned that
"crazies" might come to the conclusion to "take out the Trustee."  Despins Direct, ECF No. 99,
at 622:3–20; Despins Cross, ECF No. 99, at 703:23–704:10, 704:24–705:9.

88.  Paul Hastings has had to hire multiple firms in relation to cyber security risks,
exposing the firm to potential liability, given the current social media and protest campaign.
Despins Direct, ECF No. 99, at 623:14–624:12; Despins Cross, ECF No. 99, at 707:12–708:6.

89.  Partners at Paul Hastings are concerned about how long the social media and protest
campaign will last and how much it will impact the firm.  Despins Direct, ECF No. 99, at
625:25–626:5.  The Chapter 11 Trustee has spent dozens of hours meeting with partners not
involved in these cases as a result of the current social media and protest campaign.  Despins
Direct, ECF No. 99, at 626:6–9.  There have been discussions at Paul Hastings about having the
Chapter 11 Trustee resign.  Despins Direct, ECF No. 99, at 626:20–23.

90.  The Chapter 11 Trustee's counsel are nervous about coming to work through the
gauntlet of protestors.  Despins Direct, ECF No. 99, at 636:18–637:12.  Hybrid work has slowed
down the Chapter 11 Trustee's investigation into the Debtor's Estate compared to working
together in person.  Despins Direct, ECF No. 99, at 637:13–638:2.

91.  The Chapter 11 Trustee has spent numerous hours arranging protection with the U.S.
Marshals and providing incoming evidence to the U.S. Marshals.  Despins Direct, ECF No. 99,
at 633:25–635:25.

92.  The Chapter 11 Trustee and Paul Hastings have been sued by Beile Li in the United
States District Court for the Southern District of New York for being unregistered foreign agents
for the Chinese Communist Party.  The Chapter 11 Trustee believes Li's lawsuit is related to this

32

case because the filings also talk about PAX despite PAX not being a party to the case. Despins
Direct, ECF No. 99, at 626:24–627:22.

93. Mr. Dordick has filed an ethics complaint against the Chapter 11 Trustee and several
of his counsel ostensibly because the Chapter 11 Trustee cited to an article about the Debtor in a
counterclaim in a related adversary proceeding, which article itself Dordick asserts has run in
papers that have also run allegedly antisemitic content. The Chapter 11 Trustee believes that
Dordick's action relates to the placards depicting the Chapter 11 Trustee as a Nazi officer.
Despins Direct, ECF No. 99, at 627:23–629:7.

94. The Chapter 11 Trustee believes this adversary proceeding is a damaging diversion
from his investigation into the assets of the Debtor – for both him and the Court – setting the
investigation back weeks. Despins Direct, ECF No. 99, at 629:15–630:6; Despins Cross, ECF
No. 99, at 708:7–709:3, 710:12–711:25. The process of attempting to recover assets of the estate
has been delayed. The delay is particularly harmful because there may not be an adequate
remedy at law to compensate for the delay. The Chapter 11 Trustee cannot hire professionals to
assist with the investigation without Estate assets and Estate assets may be being placed outside
the reach of creditors while the investigation continues to be delayed. Despins Direct, ECF No.
99, at 630:7–631:14.

> A [Despins]. . . we know that the assets that in front of us are, the Lady May, the
> Sherry-Netherland, the $37 million. Those Paul Hastings can see. We can deal
> with that. Up or down, the Court will rule, whether we prevail or not on that. So
> putting that aside, those assets are not sufficient to pay creditors. Far from it. So
> what we need to do is go after other assets, and Paul Hastings cannot do that on its
> own. It needs the assistance of forensic accountants. When you have a Debtor
> that testified that they're using burner phones, the only way to go after the cash
> that's in the system out there is through forensic investigation. That costs a lot of
> money. The only way to get there is to get money into the estate, and that's why
> it's so critical that we get to that point as soon as possible, or not, meaning the
> Court may rule that Mr. Kwok is right, and that—that will be the end of it. But

we—we need to get to that point, and without that, the passage of time –this
case—this is not, like, good wine. It doesn't get better with age. The data gets
stale. The funds can be moved all the time, and it's critical that we go forward.
And this is a huge distraction and a costly distraction at that.

Despins Direct, ECF No. 99, 630:18–631:14.

95.  The Chapter 11 Trustee's investigation has relied on unpaid informants who are very

concerned by the social media and protest campaign, fearing it could turn against them. Despins

Direct, ECF No. 99, at 631:15–633:12.

96.  The Chapter 11 Trustee is encountering creditor hesitancy to participate in the

Debtor's case due to the social media and protest campaign, fearing such actions could turn

against them. The Chapter 11 Trustee has had to devise methods for creditors to file confidential

claims, necessitating that he seek to employ a claims agent – another cost to the Estate. Despins

Direct, ECF No. 99, at 633:13–24; Despins Cross, ECF No. 99, at 703:17–22.

97.  The Chapter 11 Trustee feels obliged to fulfill his fiduciary obligations as Chapter 11

Trustee of the Debtor's Estate despite the difficulties presented by this case. Despins Direct,

ECF No. 99, at 638:9–23.

## V.  DISCUSSION

There are extremely difficult issues of law implicated by the Plaintiffs' requested relief

and the Debtor's opposition to that relief. Despite these obvious difficulties, for the reasons

stated below, the Court concludes that the law requires granting the Motion in part and,

therefore, a Preliminary Injunction will issue.

### A.  Section 105(a) Preliminary Injunction Standard

The Debtor argues that the Court should apply the Second Circuit's general standard for

injunctive relief under Fed. R. Civ. P. 65, which standard is articulated in *Jackson Dairy, Inc. v.*

34

*H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010) (holding *Jackson Dairy* remains the law of the Second Circuit). As set forth below, however, an alternate standard for injunctive relief is available in bankruptcy cases under 11 U.S.C. § 105(a). *See e.g., Ball ex rel. Soundview Elite Ltd. v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 115 (Bankr. S.D.N.Y. 2016) ("The Court issues a preliminary injunction under each of Fed. R. Civ. P. 65(a) and Bankruptcy Code section 105(a), each of which provides separate authority for such measures."). The Plaintiffs have asserted their claims under section 105(a) and seek injunctive relief under 11 U.S.C. § 105(a). The Court considers their request under that applicable standard.

The Second Circuit has "repeatedly emphasized the importance of the bankruptcy court's equitable power," stating that "[s]ection 105(a) should be 'construed liberally to enjoin [actions] that might impede the reorganization process.'" *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (upholding bankruptcy court equitably estopping debtor from objecting to claims) (internal citations omitted). While the Second Circuit clarified in *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 91–92 (2d Cir. 2003), that 11 U.S.C. § 105 cannot be used to "'create substantive rights that are otherwise unavailable under applicable law,'" the Court is not being petitioned to do so here. Rather, the Court is being asked to insure the proper administration of the Estate under the provisions of the bankruptcy code. Furthermore, the Plaintiffs also invoke 28 U.S.C. § 1651(a), the power of which "extends, under appropriate circumstances, to persons who . . . are in a position to frustrate the implementation of a court order or the proper administration of justice . . .." *United States v. N.Y. Tel. Co.*, 434 U.S.

35

159, 174 (1977) (holding that 28 U.S.C. § 1651(a) supported an order requiring telephone

company officials to provide technical assistance and facilities to law enforcement); *United

States v. Int'l Brotherhood of Teamsters*, 266 F.3d 45 (2d Cir. 2001) (in pertinent part, affirming

that district court could issue an injunction in furtherance of a consent decree under 28 U.S.C. §

1651(a)).

      While the Second Circuit has not articulated a standard for injunctive relief under 11

U.S.C. § 105(a), *see Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61 (2d Cir. 1986),

it has affirmed injunctions issued under 11 U.S.C. § 105(a), *see, e.g.*, *Securities Inv. Protection v.

Bernard L. Madoff Inv. Securities LLC (In re Madoff)*, 429 B.R. 423 (Bankr. S.D.N.Y.), *aff'd by

Marshall v. Picard (In re Bernard L. Madoff Inv. Securities LLC)*, 740 F.3d 81 (2d Cir. 2014).

The Ninth Circuit Court of Appeals, and courts sitting in bankruptcy within the Second Circuit,

have issued injunctive relief under 11 U.S.C. § 105(a), with the "traditional preliminary

injunction standard as modified to fit the bankruptcy context." *Nev. Power Co. v. Calpine Corp.

(In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (internal citations omitted); *see

Solidus Networks, Inc. v. Excel Innovations, Inc., (In re Excel Innovations)*, 502 F.3d 1085 (9th

Cir. 2007) (applying the Ninth Circuits preliminary injunction standard, modified to fit the

bankruptcy context); *Dunaway*, 619 B.R. at 38; *Roman Catholic Diocese*, 628 B.R. at 571;

*Soundview Elite*, 543 B.R. at 115; *Lyondell Chemical Co. v. CenterPoint Energy Gas Services

(In re Lyondell Chemical Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009); Complaint,

*Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Sept. 9, 2018), ECF No. 1,

*requested relief granted by* Order, *Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y.

Oct. 11, 2019), ECF No. 82, *most recently amended by* Order, *Purdue Pharms.*, Case No. 19-

08289 (SHL) (Bankr. S.D.N.Y. Dec. 5, 2022), ECF No. 400.

Section 105(a) injunctive relief may enter if (1) there is a likelihood of successful reorganization; (2) there is an imminent irreparable harm to the estate in the absence of an injunction; (3) the balance of harms tips in favor of the moving party; and (4) the public interest weighs in favor of an injunction. *Calpine*, 365 B.R. at 409; *see Soundview Elite*, 543 B.R. at 119; *Lyondell,* 402 B.R. 588–89. Injunctive relief may issue in a bankruptcy case without a showing of (2) imminent irreparable harm "'where the action to be enjoined is one that threatens the reorganization process'" and "'the threat to the reorganization process must be imminent, substantial and irreparable.'" *Calpine*, 365 B.R. at 409–10; *see Lyondell*, 402 B.R. at 590–91. Irreparable harm to the estate or the reorganization process must be "likely," not merely possible, to support a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## B. Application of § 105(a) Standard

### i. Likelihood of a Successful Reorganization

To establish the first element, there must be a "'*reasonable* likelihood of a successful reorganization,'" unless "the acts sought to be enjoined *cause* it to fail." *Lyondell*, 402 B.R. at 589–90 (internal citation omitted; emphasis in original). The Plaintiffs argue this element has been met. Aside from the Debtor's intransigence, the Plaintiffs contend the Debtor's Chapter 11 case is not complex or difficult. Since the Debtor's Chapter 11 case has been pending in this Court, PAX has consistently and forcefully argued that the Debtor has many undisclosed assets that are hidden in a maze of corporate entities held by family members and associates. The Chapter 11 Trustee was appointed to investigate these claims for the benefit of creditors. The Plaintiffs argue that it is likely that the Debtor has ample disclosed and undisclosed assets to fund a Chapter 11 plan, which assets the Chapter 11 Trustee will liquidate or his investigation will

37

uncover. The Debtor does not address this element, arguing as noted above, that the Court should instead be considering likelihood of success on the merits regarding an unasserted claim for defamation.

The Chapter 11 Trustee's investigation, which has been met with opposition at every step in the process, is likely to liquidate *disclosed* assets – such as the Debtor's malpractice action against Clark Hill PLC or the Debtor's U.K. action against UBS. The investigation is also likely to bring at least some of the currently *contested* assets – such as the Sherry-Netherland Apartment, subject to the outcome of the Bravo Luck Ltd. adversary proceeding, or the Lady May, subject to outcome of the HK International Funds Investments (USA) Ltd. LLC adversary proceeding– into the Estate for the benefit of creditors. The Court reaches this conclusion for several reasons. For example, despite his representations that he has no income or assets, the Debtor has demonstrated that he is able to marshal assets when he needs them. (*See, e.g.*, Main Case ECF Nos. 117 and 197.) Prior to the appointment of the Chapter 11 Trustee, the Debtor proposed a Plan of Reorganization in which the Lady May, a luxury yacht that the Debtor asserts he does not own or control, was pledged to the Estate for benefit of creditors. In addition, although the Debtor represented that he owned no assets and had no income when he filed his Chapter 11 case, he was able to obtain financing of more than $8,000,000.00 to fund the administration of the Estate. Furthermore, other courts that have entered a judgment against the Debtor have held that the Debtor hides assets in corporate entities and in the *de jure* ownership of family members and associates. *See, e.g.*, Decision & Order, *Pac. All. Asia Opportunity Fund, L.P. v. Kwok Ho Wan*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022), NYCEF No. 1181. The Court also notes that the Debtor has already asked the Court to enter the Partial Resolution Order of the contempt proceedings, which order finds he owns assets he previously

38

stated he did not own. For these reasons, the Court concludes it is likely that the Chapter 11 Trustee will bring *some* assets into the Estate. Importantly, moreover, the Court concludes that the Chapter 11 Trustee's investigation will be more fulsome than the investigation of a hypothetical Chapter 7 trustee. Therefore, the Court believes the Chapter 11 Trustee's investigation will liquidate and recover enough assets to fund a confirmable Chapter 11 plan. The Court would consider such a plan, if confirmed, a successful result for the Debtor's Chapter 11 case.

Furthermore, both the Debtor's own testimony and the testimony of his bankruptcy counsel support the Court's finding of fact that there was meaningful progress made towards reaching a settlement with PAX, by far the largest creditor in these cases. The Debtor's bankruptcy counsel believed a global settlement was within reach. Both the Debtor and his bankruptcy counsel blamed the Chapter 11 Trustee for the current lack of a global settlement. Regardless of that belief, the Court concludes that the Chapter 11 Trustee, an equity-partner and co-chair of the restructuring department at a large law firm with decades of experience in bankruptcy cases, is not at all opposed to reaching a settlement in this case. The Chapter 11 Trustee has fiduciary duties to creditors other than PAX, including those creditors who have not yet filed proofs of claim. Although the Debtor's bankruptcy counsel testified that he repeatedly asked the Chapter 11 Trustee to "stand down," the Court appointed the Chapter 11 Trustee precisely to fulfill those fiduciary duties. The Debtor, for his part, has declared his wish to fairly and equitably resolve the claims of his creditors in these cases. (*See* Main Case ECF No. 107.) The Court has every reason to believe, while this case may be fraught with litigation for some time, that there is a reasonable likelihood that some form of settlement will be reached and a Chapter 11 plan will be advanced that meets the best interest of creditors test.

As discussed more fully in the succeeding section on irreparable harm, "there is no reason to believe or suspect that [the Debtor's] reorganization will fail—unless, of course, the acts sought to be enjoined cause it to fail." *Lyondell*, 402 B.R. at 590. The Chapter 11 Trustee testified extensively about the effect of the Debtor's social media and protest campaign on his investigation. The Debtor's bankruptcy counsel testified regarding efforts to seek a settlement before things "heated up." This fact, coupled with the Defendant's October 21, 2022, video calling for cessation of agitation against PAX so that reconciliation could be reached, establishes that at least the Debtor believes such behavior is not conducive to reaching such a global settlement. The Court agrees. The issuance of a preliminary injunction will support the ability to successfully reorganize, through the Chapter 11 Trustee's investigation and/or any attempt to reach a global settlement. If the actions that are enjoined were allowed to continue, the ability to successfully reorganize—through the Chapter 11 Trustee's investigation, settlement, or some combination thereof—will be greatly diminished. *See Lyondell*, 402 B.R. at 590.

### ii. Irreparable Harm to the Estate or the Reorganization Process

The Plaintiffs argue there is irreparable harm to the reorganization process for several reasons, including that the Debtor's conduct is disruptive of the investigation efforts and has a chilling effect on potential witnesses and creditors. The Plaintiffs further argue that the Chapter 11 Trustee's investigation is being stymied and distracted by this adversary proceeding, and that ultimately the economic realities of the case may force the Chapter 11 Trustee to resign. The Debtor does not argue this element and instead argues that defamation damages are not irreparable as they can be adequately compensated by legal remedies.

The Debtor is correct that the general rule is that a harm, to be irreparable, must be the sort that cannot be adequately compensated by legal remedies. *Grupo Mexicano de Desarrollo*

40

*S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (holding that a district court "had no
authority to issue a preliminary injunction preventing petitioners from disposing of their assets
pending adjudication of respondents' contract claim for money damages"); *see CBS, Inc. v.
Davis*, 510 U.S. 1315, 1318 (1994)("Even if economic harm were sufficient in itself to justify a
prior restraint, however, we previously have refused to rely on such speculative predictions as
based on 'factors unknown and unknowable'. . . . If CBS has breached its state law obligations,
the First Amendment requires that Federal remedy its harms through a damages proceeding
rather than through suppression of protected speech.") (internal citation omitted).  Nevertheless,
the United States Supreme Court has held that this rule is not necessarily applicable in
bankruptcy.  *See Grupo Mexicano*, 527 U.S. at 322 ("The law of fraudulent conveyances and
bankruptcy was developed to prevent [the disposition of assets pending adjudication]."); *Rubin v.
Pringle ex rel. Focus Media Inc. (In re Focus Media Inc.)*, 387 F.3d 1077 (9th Cir. 2004); *see
also In re Owens Corning*, 419 F.3d 195, 208 n. 14 (3d Cir. 2005).

More importantly, however, as noted above, the Court does not agree with the Debtor's
framing of the issue.  The irreparable harm in this case is the harm to the Debtor's Chapter 11
Estate and the reorganization process itself.  As noted above, the Court credits the Chapter 11
Trustee's testimony that (1) the Chapter 11 Trustee's investigation is currently unfunded and it is
unsustainable unless it continues to press forward – this is about more than just cost: it is about
whether there is an investigation at all, which investigation this Court concluded was necessary;
(2) the Debtor's conduct is having a chilling effect on potential witnesses and creditors in these
cases; and (3) there is a very real risk that the Chapter 11 Trustee will ultimately be forced to
resign if the Debtor does not stop his conduct.

All of the Chapter 11 Trustee's testimony supports a finding of likely irreparable harm to the reorganization process or the Estate. *Calpine*, 365 B.R. at 409–10. As to (1), unnecessary delay is likely to lead to the dissipation of assets and reduced recoveries to creditors, which in bankruptcy, as discussed above, may be considered irreparable harm. *Cf. Grupo Mexicano*, 527 U.S. at 322. As to (2), any chilling of the investigation or of creditors coming forward would undermine the purpose of these proceedings, which were voluntarily initiated, as the Debtor states, to fairly and equitably bring finality to claims against him. As to (3), the Court granted a Motion to Appoint a Chapter 11 Trustee to investigate the affairs of the Debtor for the benefits of creditors. The resignation of the Chapter 11 Trustee, under these circumstances, is unlikely to lead to the appointment of a replacement Chapter 11 trustee and will thwart the Court's previous decision that a Chapter 11 trustee should be appointed in this case. Any replacement trustee would have to start over again and would likely face opposition from the Debtor immediately upon appointment, as the Chapter 11 Trustee has faced since his appointment. These enumerated harms establish that irreparable harm exists for which there is no adequate remedy at law.

Furthermore, as noted above, the Debtor believed that actions consistent with the current social media and protest campaign were harmful to a settlement with PAX. On October 21, 2022, the Debtor called for the members of his movements – the NFSC and The Whistleblower Movement – as well as his personal followers, to cease doxing PAX to allow for peace and settlement between the Debtor and PAX.

Although the Debtor argues that there is no evidence of irreparable harm to PAX, this objection is, again, working within the wrong framework. Nevertheless, the Court reinterprets the objection as an argument that the conduct leveled against PAX is not harm to the bankruptcy process.

42

The Court disagrees. PAX is a creditor in these cases. In fact, PAX is the largest creditor in the Debtor's case and has filed alter ego claims in the Corporate Debtors' cases. As discussed above, the Defendant is aware that his conduct damages the prospect of settlement with PAX. The Chapter 11 process provides a framework to encourage parties to settle and restructure debts within the guardrails provided by the confirmation requirements and the equitable powers of the Bankruptcy Court. Chilling the possibility of settlement is irreparable harm to the bankruptcy process and to the Debtor's Estate, particularly with respect to the Debtor's largest creditor, PAX.

The Court concludes, for all of these reasons, that the Debtor's conduct "embarrass[es], burden[s], delay[s] or otherwise impede[s] the reorganization proceedings," *Lyondell*, 402 B.R. at 490, in that, for all of the above reasons, it makes the equitable resolution of the Estate's affairs much less likely. The Court also notes that the United States Supreme Court has stated "'A State may protect against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow from the fair and orderly working of the judicial process.'" *Cox v. State of Louisiana*, 379 U.S. 559, 565 (1965). The Court believes that it may similarly protect these bankruptcy proceedings from the possibility of the public drawing the conclusion that their results were the product of intimidation rather than the fair and orderly working of the judicial process. Such a conclusion is likely if the Debtor's conduct continues and causes the Chapter 11 Trustee to resign.

Finally, the Court also notes that since the issuance of the TRO, the Plaintiffs have informed the Court that the social media and protest campaign is, at this point, still ongoing and in certain instances has escalated. The irreparable harm continues to occur, which is extremely alarming.

### iii. Balance of the Harms

The Plaintiffs argue that the above enumerated harms outweigh the harms to the Debtor's First Amendment rights, which they argue are limited upon the facts of this case. The Debtor argues that the harm to the Debtor's First Amendment rights grossly outweighs the likely harm, if any, to the Estate or the reorganization process.

The Debtor would be subject to a prior restraint on his speech if a preliminary injunction issues. The Debtor is generally correct that he would suffer a grave harm insofar as the speech is protected by the First Amendment. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931). However, the extent to which his speech is protected under the First Amendment must be determined by the Court. Therefore, the Court's balancing of the harms is guided by First Amendment precedent. Accordingly, the Court applies strict scrutiny to the provisions of the preliminary injunction to be issued.

### 1. Narrowly Tailored to Serve Compelling State Interests

As required by the United States Supreme Court, this Court's injunction must be looked at "as we look at a statute [or ordinance], and if on its face it abridges rights guaranteed by the First Amendment, it should [not issue]." *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576 (1971). Content-based injunctions, such as this injunction, which prohibits expression with particular valences, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Moreover, the injunction enjoins protesting in public streets – traditional public forums – also suggesting the application of strict scrutiny. *Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988).

Unlike in the plethora of cases cited by the Debtor, there are two established compelling

state interests supporting the present injunction.[11]

### a. Narrowly Tailored to Serve Quiet Enjoyment of Private Homes

In *Frisby*, the United States Supreme Court held regarding "'[t]he State's interest in

protecting the well-being, tranquility, and privacy of the home," 487 U.S. at 484, that

> The type of picketers banned by the Brookfield ordinance generally do not seek to
> disseminate a message to the general public, but to intrude upon the targeted
> resident, and to do so in an especially offensive way. Moreover, even if some
> such picketers have a broader communicative purpose, their activity nonetheless
> inherently and offensively intrudes on residential privacy. The devastating effect
> of targeted picketing on the quiet enjoyment of the home is beyond doubt: "To
> those inside . . . the home becomes something less than a home when and while
> the picketing . . . continue[s] . . .. [The] tensions and pressures may be
> psychological, not physical, but they are not, for that reason, less inimical to
> family privacy and truly domestic tranquility."

---

[11] *Compare Frisby*, 487 U.S. at 484 ("'The State's interest in protecting the well-being, tranquility, and privacy of
the home is certainly of the highest order in a free and civilized society.'"); *Picard v. Magliano*, 42 F.4th 89, 103–05
(2d Cir. 2022) (finding *Cox*, 379 U.S. at 562 ("There can be no question that a State has a legitimate interest in
protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are
committed to a government of laws and not of men, it is of the utmost importance that the administration of justice
be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our
courts is part of the very foundation of our constitutional democracy.") remains good law) *with, e.g.*, *Snyder v.
Phelps*, 562 U.S. 443 (2011) (no compelling state interest in allowing recovery for extreme emotional distress
arising from protests that occurred 1000 feet away from funeral, involved matters of public concern, were peaceful
and in accordance with law, and were overseen by the police); *Bartnicki v. Vopper*, 532 U.S. 514, 528–35 (2001)
(Neither the deterrence of antisocial conduct nor the preservation of privacy of communication, as it relates to issues
of public concern, is a compelling state interest supporting the punishment of the "publisher of information [who]
has obtained the information in question in a manner lawful in itself but from a source who has obtained it
unlawfully . . .."); *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989) (Against the state interest in protecting B.J.F.'s
privacy, "[w]e hold only that where a newspaper publishes truthful information which it has lawfully obtained,
punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order,
and that no such interest Is satisfactorily served by imposing liability under [statute prohibiting disclosure of sexual
assault victims' names by police] to the appellant under the facts of this case [namely their receipt of disclosed name
of a sexual assault victim, relating to a matter of public concern.]"); *Texas v. Johnson*, 491 U.S. 397 (1989) (no
compelling state interest in prosecuting a protester who, without breaking the peace, burned the American flag in
front of Dallas City hall); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (criminal defendant's right to an
impartial jury was not a compelling state interest sufficient to enjoin the press from publishing information of public
concern.); *N.Y. Times Co. v. United States*, 403 U.S. 670 (1971) (Government presented no compelling state interest
to prevent publication of the Pentagon Papers); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 429 (1971)
("Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to
support an injunction against peaceful distribution of informational literature of the nature revealed by this record,"
particularly where ". . . respondent is not attempting to stop the flow of information into his own household but to
the public."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) (absent finding of actual malice, no compelling state
interest in allowing public figures or officials from recovering for defamation.)

487 U.S. at 486. *Frisby* distinguished *Keefe*, the case the Debtor has repeatedly relied on and cited as the most similar case to the instant case. *Id.* However, as *Frisby* noted, *Keefe* itself observed in reaching its conclusion that "Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record," *particularly where* ". . . *respondent is not attempting to stop the flow of information into his own household but to the public*," *Keefe*, 402 U.S at 429 (emphasis added). *Frisby*, 487 U.S. at 486 (distinguishing *Keefe*).

Here, as in *Frisby*, the injunction is attempting to stop the flow of information into households. *Id.* To the extent the Chapter 11 Trustee, his counsel, his children, and his former spouse, as well as PAG's chairman and his family and PAX's counsel are subject to targeted protests at their personal homes, the Court finds *Frisby* is controlling law – not *Keefe* – and that the state has a compelling interest in protecting the "well-being, tranquility, and privacy of [their] home[s]." *Frisby*, 487 U.S. at 484. "The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt. . . *the actual size of the group is irrelevant; even a solitary picket can invade residential privacy*." *Frisby*, 487 U.S. at 486-87 (emphasis added).

Under *Frisby*, the Court may, in serving this compelling state interest, completely ban picketing "'before or about the residence or dwelling of any individual.'" *Id.* at 477. Like in *Frisby*, this restraint on speech is narrowly tailored. *Id.* at 487–88 ("Thus, the 'evil' of targeted residential picketing, ' the very presence of an unwelcome visitor at the home,' is 'created by the medium of expression itself.' Accordingly, the Brookfield ordinance's complete ban of that particular medium of expression is narrowly tailored.") The Court accordingly adopts a

complete ban on picketing "before or about" the residences at issue in this case, for the reasons stated in *Frisby*.

Although the Court is issuing a complete ban on picketing "before or about" the residences, the Court may not ban "'[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses,'" which would be accomplished if the injunction provided for a complete ban within a "300-foot zone around the residences." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 755 (1994) (internal citations omitted). Nevertheless, a court may issue "a limitation on the time, duration of picketing, and number of pickets outside a smaller zone." *Madsen*, 512 U.S. at 755. For this reason, the Court additionally imposes a ban on picketing within 200-feet[12] of the residences at issue during the hours the parties at issue are likely to be resting at home and traveling to and from work or school. The Court concludes that (a) the quiet enjoyment of the home includes quietude at night, which supports greater restriction on picketing at night,[13] and (b) the quiet enjoyment of the home is also destroyed when the home is turned into a bunker where ingress and egress are subject to protest, which supports greater restrictions on picketing when people are leaving for work or school and coming home.[14] The Chapter 11 Trustee testified as to his efforts to avoid leaving and returning to his targeted residence during protests. The Debtor could still picket or

---

[12] The Court chooses 200-feet because the United States Supreme Court has held that 300 feet is too expansive, *Madsen*, 512 U.S. at 755, and because 200 feet should provide enough room for cars to safely drive into and out of a neighborhood. It should also provide ample room as a noise buffer for most unamplified noises.

[13] The Court is concerned about noise at night. The Plaintiffs submitted into evidence photographs and videos which plainly displayed protesting, picketing, leafletting, and assemblage in front of residences in Connecticut, New York, Massachusetts, and California. The Court reviewed the codified ordinances in the relevant towns and cities for a survey of restrictions currently applicable in the area. All of the relevant towns and cities have nighttime noise ordinances.

[14] The Court enjoins from 3:00 p.m. to 10:00 a.m. because it has added the normal hours for commute to the 9:00 p.m. to 7:00 a.m. framework discussed in the previous footnote. This is extended to weekends because (a) many of the targeted parties are lawyers who are probably working at least Saturday and (b) it is normal to rest more on weekends.

parade within the relevant neighborhoods – but not "before or about" the relevant homes – at other times of day.

The Court also finds that *Frisby* justifies enjoining the Debtor from inciting the picketing the Court is enjoining, such as by posting or reposting on social media the home addresses of the Chapter 11 Trustee, his counsel, and his family members and of PAG's chairman, his counsel, and his family members or by calling for protests at their homes. The Debtor cannot evade the injunction through calling on or supporting others to act in his stead.

### b. Narrowly Tailored to Serve the Integrity of the Judicial Process

In addition, the United States Supreme Court in *Cox* stated

> There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy. . . There is no room at any stage of the judicial proceeding for such intervention; mob law is the very antithesis of due process.

379 U.S. at 562; *see Picard*, 42 F.4th at 103–05 (finding *Cox* remained good law as suggested by *Burson v. Freeman*, 504 U.S. 191 (1992) (upholding restrictions to electioneering near polling location)); *cf. Alix v. McKinsey & Co., Inc.*, 23 F.4th 196, 204 (2d Cir. 2022) ("More specifically (and more importantly) we believe the district court gave insufficient consideration to the fact that McKinsey's alleged misconduct targeted the federal judiciary. As a consequence, this case requires us to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes. Litigants in all of our courts are entitled to expect that the rules will be followed . . ..").

48

While in both *Cox* and *Picard*, the statutes in question were found unconstitutional as applied, they were found facially constitutional. *Cox*, 379 U.S. at 560–64 & 568–75 (finding statute facially constitutional but unconstitutional as applied because, while "near" was not unconstitutionally vague, the protesters relied in good faith on the sheriff's representation that they were allowed to protest where they did so); *Picard*, 42 F.4th at 101 & 103–05 (finding the statute facially constitutional but unconstitutional as applied because the protest was "general advocacy unconnected to any specific trial" in combination with the protest being "effected through leafletting rather than more overt and disruptive forms of communication").

The statute at question in *Picard* prohibits

On or along a public street or sidewalk within a radius of two hundred feet of any building established as a court house . . . call[ing] aloud, shout[ing], hold[ing] or display[ing] placards or signs containing written or printed matter, concerning the conduct of a trial being held in such courthouse or the character of the court or jury engaged in such trial or calling for or demanding any such specified action or determination by such court or jury in connection with such trial.

*Id.* at 95. The protests here, in contrast to the leafletting in *Picard* and in even starker contrast to *Keefe*, the Debtor's lead case, which did not involve protests targeting court proceedings, involve picketing and parading targeted at particular parties, namely, the Plaintiffs, including an officer of the Court, namely, the Chapter 11 Trustee, and at particular litigation, namely, these bankruptcy cases. This Preliminary Injunction and the TRO before it only enjoin future action (and only direct future action), so there is no issue of reliance as in *Cox*.

The Court concludes that this injunction's measures relating to personal homes, discussed above, are also narrowly tailored in service of the compelling state interest articulated in *Cox* – targeted picketing of fellow parties in interest, their counsel, and their families at their homes threatens to transform the legal process into "mob law" – or at least the appearance thereof. *Cox*,

379 U.S. at 562.  The Court further concludes that the protests at the homes of uninvolved relatives only serve to intimidate the Plaintiffs and may be completely banned under *Cox.*

*Cox's* concern about "mob law" also applies to the offices and other workplaces of the Chapter 11 Trustee and his counsel as well as PAX and its counsel.  The Court enjoins picketing and parading within 100 feet[15] during the likely hours of ingress and egress to these workplaces so as to avoid close encounters between protestors and workers, which encounters could, minimally, undermine the appearance that these bankruptcy cases are legal proceedings or, maximally, affect the outcome of these bankruptcy cases.  *See id.*

In addition, the Court concludes that the provision of a 36-foot access corridor at all times, modeled after similar corridors discussed in abortion cases, *see Madsen*, 512 U.S. at 768–770, burdens no more speech than is necessary to prevent the legal process from being dominated or appearing to be dominated by "mob law," *Cox*, 379 U.S. at 562.

The Debtor may picket and parade near the workplaces of the Chapter 11 Trustee and his counsel, as well as PAX and its counsel, at distances and at times other than those restricted by this preliminary injunction.  However, the Debtor may not, at any time, picket within 100 feet of the parties' relatives' offices and workplaces because the Court concludes that such picketing of uninvolved relatives only serves to intimidate the Plaintiffs and may be completely banned under *Cox*.

The Court also finds that *Cox* and *Picard* justify enjoining the Debtor from inciting the picketing it is enjoining, such as by calling for protests at the workplaces of the Chapter 11

---

[15] The Court chooses 100 feet because it concludes most pedestrian traffic – from parked cars, transit stops, and homes – destined for the offices should occur within this distance from the offices.

Trustee and his counsel or PAX and its counsel.  As noted above, the Debtor cannot evade the injunction through calling on or supporting others to act in his stead.

### 2.   Under the Specific Facts and Circumstances of These Cases, the Debtor's Speech Is Due Less Protection

While the above rationale is sufficient to support the injunction, there are also circumstances in this case lessening the protection due the Debtor's speech.  *See Gertz v. Robert Welch Inc.*, 418 U.S. 323, 345–48 (1974) ("Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery."); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–61 (1985) ("In contrast, speech on matters of purely private concern is of less First Amendment concern.").

### a.   Chapter 11 Trustee is Not a Public Official or Public Figure

Although the Debtor argues to the contrary, the Court concludes that the Chapter 11 Trustee is not a public official.  *See Obsidian Finance Grp., LLC v. Cox*, 740 F.3d 1284, 1292–93 (9th Cir. 2014).  Similarly, the Court concludes, despite the Debtor's contentions otherwise, that the Chapter 11 Trustee is not a public figure. *See Gertz*, 418 U.S. at 352 ("We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes.  Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.  It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy.").  The Chapter 11 Trustee appears in Court and meets and confers with parties in interest and professionals in these cases.  His role is not public facing. These cases are not widely covered by the bankruptcy press or any press, other than Debtor

affiliated media of limited reach. Because the Chapter 11 Trustee is neither a public official nor a public figure, the public has less of a vested interest in speaking about him than it would if he were a public figure. *Compare Gertz*, 418 U.S. at 339–48 *with Sullivan*, 376 U.S. at 269.

There was no argument and no evidence in the record establishing that any of the other targeted parties were public officials or figures. *Gertz*, 418 U.S. at 352. Therefore, the Debtor's speech is due less protection. *Id.* at 345–48.

### b. Debtor's Case Is Not a Matter of Public Concern

The Court also finds that the specific facts and circumstances in these cases are not an issue of public concern. Speech relates to public concerns "when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder*, 562 U.S. at 453.

In *Snyder*, in determining that the Westboro Baptist Church's protests were about an issue of public concern, the Supreme Court noted two factors that cut the other way in the instant case. The Supreme Court noted

> And even if a few of the signs – such as "You're Going to Hell" and "God Hates You" – were viewed as containing messages related to Matthew Snyder or the Snyders specifically, that would not change the fact that the overall and dominant theme of Westboro's demonstration spoke to broader issues.

*Id.* at 454. Here, the overall and dominant theme of the signs are inflammatory assertions about the targeted individuals along-side inflammatory stylized portraits of their faces – and the few

signs that are arguably targeted at broader issues do not change this fact. The personal nature of

the dispute is further underscored by the protests at uninvolved family members' homes.[16]

In addition, the Supreme Court noted

We are not concerned in this case that Westboro's speech on public matters was
in any way contrived to insulate speech on a private matter from liability.
Westboro had been actively engaged in speaking on the subjects addressed in the
picketing long before it became aware of Matthew Snyder, and there can be no
serious claim that Westboro's picketing did not represent its "honestly believed"
views on public issues.

*Id.* at 455. Here, the Court is very seriously concerned that the Debtor's speech on the only

matters arguably of public concern – the alleged extortion and alleged pension theft – are

contrived to insulate speech on a private matter. The other acknowledged issues animating the

protests - the Chapter 11 Trustee's motion to hold the Debtor is in contempt for alleged violation

of the Corporate Governance Order which the Debtor's bankruptcy counsel testified was

"heating up" these cases and the Court-approved 2004 subpoenas which are repeatedly referred

to in the Objection, several of the broadcasts, and Ms. Jiao's testimony – are not a matter of

public concern. They are issues about the administration and investigation of an individual

debtor's Chapter 11 bankruptcy estate relating to a bankruptcy that gets very little press other

than from Debtor affiliated outlets, such as GNews.

The pension theft and extortion claims, however, are alleged crimes, and crimes are

generally a matter of public concern. *Obsidian Finance*, 740 F.3d at 1291–92. However, the

Court concludes the alleged pension theft is not a matter of public concern. There is no

suggestion in the record that PAX is being investigated or prosecuted regarding its alleged

involvement with the pension fund. Furthermore, Ms. Jiao's testimony about the alleged pension

---

[16] The protests at the home and work addresses of relatives is afforded less protection under the First Amendment
for this reason.

53

theft was not supported any evidence. She could not explain how PAX was stealing monies of the fund by investing it. For his part, Mr. Cheng did not know why he was protesting O'Melveny & Myers – his stated rationale was directed at the Chapter 11 Trustee – not PAX – and he was not entirely sure how O'Melveny & Myers was involved in these cases.

The Court also concludes the alleged extortion is not a matter of public concern. The Court finds there is no evidence that there is a criminal investigation into the alleged extortion. While the Debtor initially testified that he had reported the Chapter 11 Trustee to the authorities, he could not, when pressed, specify to what authority he had reported the Chapter 11 Trustee, ultimately suggesting he had merely discussed it with his counsel – not an authority.

Also, although the Debtor testified that he believed the Chapter 11 Trustee had attempted to extort him, the Debtor's bankruptcy counsel testified that he knew that the Chapter 11 Trustee was not asking to be personally paid $250 million, but was rather asking for $250 million to be paid to the Estate as part of a global settlement. In the heat of the moment, the Debtor's bankruptcy counsel did accuse the Chapter 11 Trustee of extortion at the November 17th settlement meeting. Despite that exclamation, he understood that extortion had not actually occurred but rather a settlement offer was made. The Debtor's bankruptcy counsel also testified that it was his duty to the Debtor to explain settlement terms, such as the Chapter 11 Trustee's demand for $250 million for the Estate. The Court infers from this testimony that he informed the Debtor that, despite his exclamation during the meeting, the Chapter 11 Trustee had not tried to extort the Debtor.

Although the Debtor's testified that he was more afraid during the settlement meeting with the Chapter 11 Trustee than he was while he was in prison in China, that testimony is not persuasive. While the testimony suggests that the Chapter 11 Trustee made unfortunate

comments during the settlement meeting, the testimony did not establish the basis for such fear from the Debtor. Moreover, the Debtor's equivocation about whether he had reported the incident to the authorities and, if so, to whom, renders his testimony on this issue unpersuasive.

Finally, at the time of the alleged extortion, the uncontroverted testimony of the Debtor, the Chapter 11 Trustee, and Mr. Kindseth is that there were six people – the Debtor, Mr. Kindseth, Mr. Mitchell representing the Debtor, the Debtor's translator, the Chapter 11 Trustee, and Mr. Bassett representing the Chapter 11 Trustee – present at the meeting and that they were bound by a non-disclosure agreement. The Court infers, given the nature of the accusation and how it was utilized as part of the social media and protest campaign, that the article was not leaked by the Chapter 11 Trustee or Mr. Bassett, but rather some party connected to the Debtor.

Therefore, the Court concludes that neither the allegation of pension theft nor the allegation of extortion makes the present matter an issue of public concern. They are issues designed to cloak matters of private concern in the speech protection afforded matters of public concern. *Cf. Snyder*, 562 U.S. at 455. Therefore, the Debtor's speech is due less protection. *Greenmoss Builders*, 472 U.S. at 758–61.

### 3. Debtor Has No Standing Regarding Unnamed Parties

The Debtor also argues that the request for a preliminary injunction is overbroad because it contains language based on Fed. R. Civ. P. 65(d)(2), which states

> (2) Persons Bound. The order binds only the following who receive actual notice of it by personal service or otherwise:
>     (A) the parties;
>     (B) the parties' officers, agents, servants, employees, and attorneys; and
>     (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

As the Plaintiffs note, however, the Debtor, a named party does not have standing to make this objection. *Madsen*, 512 U.S. at 775–76.

 For all of the above reasons, the Court finds that the balance of harms tips in favor of granting the preliminary injunction. As the Court noted above in the preceding section, the harm to the Plaintiffs continues to occur despite the existence of the TRO, which is alarming.

### iv. Public Interest

Finally, the Court concludes that issuing injunctive relief vindicates the public's interest in the integrity of the bankruptcy process as well as court proceedings more generally. *Alix*, 23 F.4th at 204. Bankruptcy is a process through which a debtor's financial affairs are put in order and all claims against the debtor are treated fairly and equitably. Furthermore, in the case of an individual, such as the Debtor, a debtor gets a fresh start. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"). It is a benefit to the public to have such a system and for that reason, its integrity must be maintained.

Issuing injunctive relief also serves the public's interest in preserving the sanctity and privacy of the home and the rule of law, as discussed in the previous section. *Frisby*, 487 U.S. at 484; *Cox*, 379 U.S. at 562.

The Court further notes that the Chapter 11 Trustee is an "officer in or of" this Court for the purposes of 18 U.S.C. § 1503. *United States v. Crispo*, 306 F.3d 71 (2d Cir. 2002). The Court does not opine as to whether this statute has yet been violated, but the Court is concerned by the threats the Chapter 11 Trustee has received and the intensity of the rhetoric. *See United*

*States v. Turner*, 720 F.3d 411 (2d Cir. 2013). The Court is mindful of the escalating nature of

the situation. There is potential for conflict in the current situation. Given that both sides have

argued that the Debtor is the leader of the protesting movement – either as the Debtor's

supporters would have it, as a Dalai Lama-esque figure, or as the Plaintiffs would have it, as a

boss – the Court believes that efforts by the Debtor to pull back from the brink, in compliance

with this Preliminary Injunction, would be successful in lowering the temperature in these cases.

### C.  Parties Bound

Based upon the clear language in Fed. R. Civ. P. 65 and binding Second Circuit law,

"persons in active concert" is properly defined as a party who knowingly aids or abets the Debtor

to violate the injunction. *Doctor's Assocs., Inc. v. Reinert & Duree, P.C.* 191 F.3d 297, 303 (2d

Cir. 1999). While courts typically can bind only the parties to a proceeding, it is settled law that

"Rule 65(d) is designed to codify the common-law doctrine that defendants may not nullify a

decree by carrying out prohibited acts through aiders and abettors, although they were not parties

to the original proceeding." *Id.* (internal quotation marks omitted). The relevant inquiry under

65(d) is whether the nonparty aided or abetted the defendant's violation of the court's orders.

*Next Invs., LLC v. Bank of China* 12 F.4th 119, 134 (2d Cir. 2021) (Quoting *NML Cap. Ltd. v.

Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013)).

Non-parties to an injunction are in active concert with an enjoined party after receiving

actual notice of the injunction and the challenged action was taken for the benefit of, or to assist,

a party subject to a preliminary injunction. *Havens v. James*, 435 F. Supp. 3d 494, 504

(W.D.N.Y. 2020); *see also Artista Records, LLC*, 122 F. Supp. 3d 32, 35–36 (S.D.N.Y. 2015)

(finding a third-party internet service provider with knowledge of an injunction falls within an

injunction's reach if those services are knowingly used to facilitate injunction violations). In

*Havens*, a twenty-year permanent injunction was in place, enjoining protesters from protesting outside a specific abortion clinic, and protesters believed since they were not named in the injunction, they were not in active concert with the named parties. The court in *Havens* rejected this assertion, and found protesters were acting "in concert" with the named parties because: the non-parties had notice of the injunction, and both (1) coordinated efforts with the named parties in the injunction, and (2) shared the same common goal of deterring women from seeking abortion services at the facility providing those services. *Havens*, 435 F. Supp. 3d at 507.

Furthermore, a successor-in-interest may be bound by an earlier injunction. The Second Circuit has upheld a preliminary injunction enjoining a successor-in-interest to a named enjoined entity and found protesters who were not named as parties to the prior injunction were also bound by the injunction and could be held in contempt for violating its terms. *People v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) ("We are aware of the difficulties faced by a trier of fact in cases such as this, where similarly situated groups of individuals move fluidly between multiple unincorporated associations that share the same basic leadership and goals."). Under *Operation Rescue Nat'l*, the relevant inquiry for successors-in-interest to an enjoined party is whether there is substantial continuity of identity between two organizations, *Id.*, at 70, and whether they share the "same basic leadership and goals" with the named defendant. *Id.* at 71.

Additionally, lower courts within the Second Circuit have found an unnamed party to an injunction may be considered bound by the injunction if the party is "substantially intertwined" with the named enjoined parties. [17] *John Wiley & Sons v. Book Dog Books, LLC*, 327 F. Supp.

---

[17] Notably, in *Bank of China* 12 F.4th at 134, the Second Circuit briefly discusses the application of the "substantially intertwined" standard used in *John Wiley & Sons,* 327 F. Supp. 3d at 638, as applied in the district court, but opined "The ultimate answer to this question might also depend on the common-law understanding of

3d. 606 (S.D.N.Y. 2018) (quoting *In re Sledziejowski*, 533 B.R. 408, 424 (Bankr. S.D.N.Y. 2015) ("Where an enjoined party is substantially intertwined with a non-party, including the shared occupation of office space, payment of employee expenses between the non-party and enjoined party, considerable control by the enjoined party over the non-party's operations, and other substantial interconnections.")). However, such injunction must be limited to identified third parties and the parties the court finds to be "in active concert" with the defendant. *Spin Master Ltd. V. 158*, 463 F.Supp.3d 348 (S.D.N.Y. 2020) (Dismissing without prejudice the plaintiff's proposed permanent injunction, finding the language and effect of the injunction overbroad and beyond the Court's powers).

The persons named in the Preliminary Injunction are bound by it. Applying the "substantially intertwined" standard set forth in *John Wiley & Sons* as to individuals, the Debtor has "considerable control" over a number of individuals, but more significantly, has "substantial interconnections" with several individuals involved in organizing and planning protests and evading subpoenas. Here, the Debtor has used multiple social media accounts to broadcast his views and to communicate to his associates his advice and support. While the Debtor himself does not always personally post videos of himself using social media, others may do so on his behalf using accounts associated with the Defendant, including @Miles, @MilesGuo, @MilesGuoLive, @NFSCSpeaks, and @chinatruth2022. The Debtor also uses his varied media outlets, which are substantially controlled by the Debtor, to broadcast his views through news anchors on "GNews." These news anchors also appear at protests. The Debtor frequently appears on the Fay Fay Show, which show also appears on a GTV broadcast. The host of the

---

aiding and abetting, which would ask whether a nonparty's assistance is sufficiently 'substantial' to be proscribed by the Rule. . . . *but such an understanding is best uncertain and our sister courts have not adopted it.*" (emphasis added, internal citations omitted).

Fay Fay Show, Fay Fay, has been a contact to others in the GSeries web through WhatsApp.

Further, the Debtor appears with a small group of individuals at intimate gatherings at the

Sherry-Netherlands apartment. Some of the individuals seen at the protests in front in

individuals' private homes and the protests taking place at the Plaintiffs' counsels' office

buildings attend these intimate gatherings and meals. Others involved in the protests have met

the Debtor at 3 Columbus Circle, New York, NY and/or engaged with the Debtor via social

media as members of at least one, if not many, of the Debtor's many affiliated organizations.

Accordingly, based upon the evidence presented during the Hearing, the Court concludes that the

Debtor and the following individuals are "substantially intertwined:" Fay Fay, Beile Li, Huo

Lai, Pamela Tsai, Roy Guo, Jiao Bing Shang, Shan Mu, Yaqin Li, Ziheng Cheng, and Elliot

Dordick, as well as any persons or entities acting at their direction or on their behalf are the

Debtor's officers, are the Debtor's officers, agents, servants, employees, attorneys, and/or other

persons who are in active concert or participation with the Debtor, his officers, his agents, his

servants, his employees, and his attorneys.

In addition to the individuals, the entities named in the Preliminary Injunction are bound

by it. Applying the standards established by the Second Circuit in *Operation Rescue Nat'l*,

"substantial continuity of identity" and "same leadership and goals" to related entities, the

Himalaya entities, NFSC, GTV, GNews, and ROLF are all under the leadership of the Debtor

and share the same common goal of "taking down the CCP." There are numerous additional

entities which all share these qualities, and often an emblem for one entity will appear beside

another. The entities are substantially related, existing within the "GSeries." Accordingly, the

Court finds entities NFSC, Himalaya, ROLF, GSeries entities, including GTV and GNews, as

well as any persons or entities acting at their direction or on their behalf, are the Debtor's

officers, agents, servants, employees, attorneys, and/or other persons who are in active concert or participation with the Debtor, his officers, his agents, his servants, his employees, and his attorneys, and are bound by the preliminary injunction.

## VI. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion is **GRANTED IN PART** and a preliminary injunction will issue consistent with this Memorandum of Decision. The Debtor's cross-motion to dissolve the TRO is **DENIED** as moot, and the Debtor's cross-motion to dismiss is **DENIED**.

Dated at Bridgeport, Connecticut this 13th day of January, 2023.

Julie A. Manning
United States Bankruptcy Judge
District of Connecticut

**Exhibit 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/02/2023

-------------------------------------------------------------X

TAO AN, CHUNGANG GUAN, CUI   :
QINGYUN, HUIMIN LIN, BEILE LI,   :
YANMING WANG, TAO ZHENG, ZHENG HU,   :
YUAN CAO, LINWAN FENG,   :
  :
                Plaintiffs,   :
  :
      -against-   :
  :
LUC A. DESPINS and PAUL HASTINGS LLP,   :
  :
  :
                Defendants.   :

-------------------------------------------------------------X

22-CV-10062 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

Plaintiffs are various Chinese nationals residing in the United States who have sued Paul Hastings LLP ("Paul Hastings") and one of its partners, Luc A. Despins, for allegedly violating the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611–621, by failing to register as an agent of the People's Republic of China ("PRC") or the Chinese Communist Party ("CCP"). *See* Am. Compl., Dkt. 10. Defendants moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for failing adequately to allege subject matter jurisdiction and Rule 12(b)(6) for failing to state a claim. *See* Defs. MTD Mem., Dkt. 15 at 1–2. Defendants also moved to sanction Plaintiffs' counsel pursuant to Rule 11(b) for bringing frivolous claims and allegedly initiating the lawsuit for an improper purpose. Defs. Sanctions Mem., Dkt. 12 at 1, 4. Plaintiffs opposed both motions. *See* Pls. Sanctions Opp., Dkt. 23; Pls. MTD Opp., Dkt. 22. For the following reasons, Defendants' motion to dismiss and motion for sanctions are GRANTED, and the Court awards Defendants reasonable attorneys' fees and costs.

1

## BACKGROUND

Plaintiffs allege that they are the victims of a harassment campaign brought by the CCP and PRC.  Am. Compl. ¶ 24.  Plaintiffs further allege that because Paul Hastings provided legal services related to the global public offering of Jinshang Bank, a bank controlled and operated by the CCP, it is an agent of the CCP or PRC and required to register as a foreign agent under FARA.  *Id*. ¶¶ 39–49, 51–53.  Defendants also allege that Mr. Despins is an agent of the CCP or PRC and has violated FARA's registration requirement.[1]  *See id*. ¶¶ 3, 51.

At the center of this lawsuit is self-proclaimed billionaire Mr. Ho Wan Kwok, who is not a party to this action.  On February 15, 2022, Mr. Kwok filed for bankruptcy in the United States Bankruptcy Court for the District of Connecticut.  *See generally Pac. All. Asia Opportunity Fund L.P. v. Ho Wan Kwok* (*In re* Kwok), Ch. 11 Case Nos. 22-50073, 22-5032 (Bankr. D. Conn. 2022).  The Bankruptcy Court appointed Mr. Despins, represented by Paul Hastings, as the Chapter 11 trustee of Mr. Kwok's controlled entities.  *See* Orders, Dkts. 523, 668, *In re* Kwok, Ch 11 Case Nos. 22-50073, 22-5032.

Since at least November 2022, Mr. Kwok has weaponized his active social media presence to mobilize his supporters and launch a harassment campaign against Paul Hastings, Mr. Despins, and Mr. Despins's family.  *See* Order, Dkt. 133 ¶¶ 34, 41–45, 49, *In re* Kwok, Ch 11 Case Nos. 22-50073, 22-5032 (hereinafter "Bankr. Prelim. Inj. Mem.").  Mr. Kwok has threatened Mr. Despins with "rogue's ways," and promised that Defenands "will suffer calamities."  Bankr. Prelim. Inj. Mem. ¶ 45.

---

[1]     Defendants state that Mr. Despins was not involved in the Jinshang Bank transaction, and Plaintiffs do not allege any facts to suggest that Mr. Despins is in any other way connected to the People's Republic of China ("PRC") or Chinese Communist Party ("CCP").  Defs. MTD Mem., Dkt. 15 at 4.

Following Mr. Kwok's call to action, his supporters have protested outside the homes of Mr. Despins, his daughter, and his ex-wife, as well as near Paul Hasting's New York office. *See id.* ¶¶ 42–43, 52–53, 57, 69–71. They have distributed fliers that depict Mr. Despins with blood dripping from his eyes and mouth and a sickle and hammer emblazoned on his forehead, with text that refers to Defendants as "the CCP's running dog" and an "enabler" of the CCP. First Andres Decl. Ex. 22, Dkt. 13. They have also distributed materials that refer to Mr. Despins as an extortionist, an anti-Semite, and a "scumbag." *See* First Andres Decl. Exs. 15, 22–25.

The harassment campaign has also included numerous federal lawsuits alleging that those involved in Mr. Kwok's bankruptcy proceeding are agents of the PRC or CCP and have violated FARA's registration requirement. *See, e.g.*, Am. Compl., Dkt. 43 ¶ 60, *Gong v. Sarnoff et al*, No. 23-CV-343 (S.D.N.Y. Apr. 26, 2023); Compl., Dkt. 1 ¶¶ 74, 118–25, *Wyatt v. U. of Md.*, No. 23-CV-742 (D. Md. Mar. 17, 2023). Contemporaneously with filing this lawsuit, Plaintiffs sued Weijian Shan, the executive director and chairman of Mr. Kwok's largest creditor, and his son, in *An v. Shan*, No. 22-CV-10060 (S.D.N.Y. 2023), for allegedly violating FARA's registration requirement. Mr. Kwok has lauded Plaintiff Li as a "comrade[]" and posted photographs of this complaint on social media. *See* First Andres Decl. Ex. 5.

Richard Freeth, who represents the Plaintiffs in this case and in *Shan*, also represented the plaintiff in *Wyatt v. University of Maryland*, No. 23-CV-742 (D. Md. 2023). At issue in *Wyatt* was the decision of the University of Maryland, at which Mr. Shan's daughter is enrolled, to order Mr. Kwok's supporters to cease protesting on the college commons. Compl., Dkt. 1 ¶¶ 14, 16, *Wyatt*, No. 23-CV-742 (D. Md. Mar. 17, 2023). Mr. Freeth also represents the plaintiffs in *Gong v. Sarnoff*, No. 23-CV-00343 (S.D.N.Y. 2023), who accuse O'Melveny & Myers LLP and

its partner Stuart Sarnoff of "destroying the life of Ho Wan Kwok." [2]  Op., Dkt. 57 at 3, *Gong*,

No. 23-CV-343 (July 17, 2023) (internal quotation omitted).[3]

On January 11, 2023, the Bankruptcy Court enjoined Mr. Kwok and anyone "in active

concert" with him, including Plaintiff Beile Li, from harassing or "doxing" Defendants.  Order,

Dkt. 134 ¶ 5, *In re* Kwok, Ch 11 Case Nos. 22-50073, 22-5032 (hereinafter "Bankr. Prelim.

Inj.").  In its decision, Bankruptcy Court found that Beile Li is an agent of Mr. Kwok.  *Id.*

On December 15, 2022, Plaintiffs filed an amended complaint.  *See* Am. Compl.  On

January 19, 2023, Defendants moved to dismiss the amended complaint and also moved for

sanctions.  *See* Mot. to Dismiss, Dkt. 14; Mot. for Sanctions, Dkt. 11.

## DISCUSSION

### I.   The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims

#### A.  Legal Standard

A party who asserts that the Court has subject matter jurisdiction over a particular claim

"has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v.

United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Subject matter jurisdiction exists if the case

arises under federal law, *see* 28 U.S.C. § 1331, or if there is complete diversity between the

parties and the amount in controversy exceeds $75,000.00, *see id.* § 1332.  A court has federal

question jurisdiction if a claim "aris[es] under the Constitution, laws, or treaties of the United

States."  *Id.* § 1331.  To invoke federal question jurisdiction, a complaint must "establish[] either

that federal law creates the cause of action or that the plaintiff's right to relief necessarily

---

[2]      Judge Liman recently dismissed the complaint in *Gong v. Sarnoff et al.*, No. 23-CV-343 (S.D.N.Y. 2023),
for lack of subject matter jurisdiction.  *See* Op., Dkt. 57, *Gong*, No. 23-CV-343 (S.D.N.Y. July 17, 2023).

[3]      Although only Richard Freeth has filed a notice of appearance on behalf of Plaintiffs, Yongbing Zhang,
who represents plaintiffs in several of the parallel cases filed against Mr. Kwok's perceived adversaries, appears to
have been actively involved in this litigation. *See, e.g.*, *Wyatt v. Univ. of Md.*, No. 23-CV-742 (D. Md. 2023).  For
example, Mr. Freeth copied Mr. Zhang on his most recent letter to this Court. Letter, Dkt. 28.

depends on resolution of a substantial question of federal law." *Perpetual Secs., Inc. v. Tang*, 290 F.3d 132, 137 (2d Cir. 2002) (cleaned up).

Plaintiffs urge the Court to find that it has federal question jurisdiction by inferring a private right of action under FARA.[4] *See* Pls. MTD Opp., Dkt. 22 ¶¶ 48–54. FARA requires any "agent of a foreign principal" to register with the Attorney General unless the entity qualifies for an exemption, and the statute vests the Attorney General with the sole authority to prosecute FARA violations.[5] 22 U.S.C. § 612; *see also id*. § 618(f) (granting the Attorney General authority to seek injunctive relief prohibiting actions taken on behalf of a foreign principal or requiring registration).

As Plaintiffs concede, there is no private right of action under FARA. *See* Am. Compl. ¶¶ 5–6. FARA vests the Attorney General with the exclusive authority to prosecute violations of the registration requirement, and there is no indication that Congress intended to create a private right of action. *See* 22 U.S.C. § 618(f). FARA's purpose is "to provide [a] centralized reporting system to track activities of agents acting on behalf of foreign countries . . . and no language in [the] statute or its legislative history suggests that Congress intended to establish [a] cause of action in any entity other than [the] Federal Government." *See, e.g.*, *Weican Meng v. Xinhuanet Co.*, 2017 WL 3175609, at *3 (S.D.N.Y. July 25, 2017) (quoting *Comm'n for a Free Namibia v. S.W. Africa People's Org.*, 554 F. Supp. 722, 722 (D.D.C. 1982)).

---

[4]      Plaintiffs do not argue or allege any facts to suggest the existence of diversity jurisdiction.

[5]      An agent of a foreign principal is "any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or . . . whose activities are directly or indirectly . . . controlled . . . in whole or in major part by a foreign principal." 22 U.S.C. § 611(c). Agents of a foreign principal are exempt from FARA's registration requirement if they are "engaging . . . only (1) in private and nonpolitical activities in furtherance of the bona fide trade or commerce of such foreign principal; or (2) in other activities not serving predominantly a foreign interest." *Id*. § 613(d).

When a statute does not explicitly provide a private right of action, courts are reluctant to infer one. *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004) (noting that courts are hesitant to infer a private right of action, which "permit[s] enforcement without the check imposed by prosecutorial discretion"); *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 432 (2d Cir. 2002) ("Without congressional intent, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter . . . ." *Id.* (cleaned up)). Accordingly, district courts that have considered whether FARA provides an implied private right of action have uniformly held, as far as this Court can tell, that it does not. *See, e.g.*, *Henry v. Washington*, 2022 WL 9491957, at *2 (W.D. Wash. Sept. 16, 2022), *report and recommendation adopted*, 2022 WL 9372175 (Oct. 14, 2022); *Bey v. Epstein*, 2021 WL 8155603, at *4 (D. Conn. Aug. 6, 2021) ("As a private individual, plaintiff lacks standing to sue under this statute because a private right of action cannot be inferred from FARA."); *Waterhouse v. Cufi Church Ass'n Inc.*, 2014 WL 1745098, at *3 (D. Haw. Apr. 29, 2014).

Plaintiffs acknowledge that the text of FARA and caselaw counsel against finding a private right of action but nevertheless urge the Court to infer the existence of a private right of action due to an alleged lack of enforcement by the Attorney General. *See* Am. Compl. ¶¶ 5–6. The extent to which the Attorney General chooses to enforce FARA is irrelevant. The determinative issue is legislative intent, and Plaintiffs fail adequately to allege in their Amended Complaint or to present in their opposition to the motion to dismiss any facts about the statute or its legislative history that would suggest that Congress intended for there to be a private right of action under FARA.

Even if the Court were to infer a private right of action, however, the Court would still lack subject matter jurisdiction because Plaintiffs have not shown that they have standing. It is

6

black-letter law that to bring a claim, a plaintiff must show "(1) an 'injury in fact,' (2) a 'causal connection' between that injury and the conduct at issue, and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992)). Plaintiffs have alleged no facts that would permit the Court plausibly to infer that they have suffered an injury in fact that is "concrete and particularized," not "conjectural or hypothetical," let alone an injury that might conceivably be traced to Defendants' failure to register as an agent of a foreign government. *Lujan*, 504 U.S. at 560 (cleaned up).

Without subject matter jurisdiction, the Court must dismiss the case without prejudice. *See Bank v. U.S. Dep't of Health & Human Servs.*, 708 F. App'x 43, 44–45 (2d Cir. 2018) (summary order). The Court declines to grant Plaintiffs leave to amend. Plaintiffs have already amended their complaint once and failed to remedy the jurisdictional defect; granting Plaintiffs another bite at the apple would be futile.[6]

## II. Sanctions Are Appropriate Because Plaintiffs' Complaint Is Frivolous and Was Filed for an Improper Purpose

### A. Legal Standard

Federal Rule of Civil Procedure 11(b) requires an attorney presenting a filing to the court to certify that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the filing is not presented for an improper purpose, and the legal contentions are nonfrivolous and supported by the facts and law. Rule 11 also "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Int'l Shipping Co., S.A. v.*

---

[6] Because the Court dismisses the Amended Complaint for lack of subject matter jurisdiction, the Court does not reach the merits of Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6).

*Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir. 1989). Rule 11(c)(2)'s "safe harbor" provision states that a motion for sanctions "must not be filed . . . if the challenged paper . . . is withdrawn or appropriately corrected within 21 days after service." "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule . . . ." Fed. R. Civ. P. 11(c)(1). In addition to the authority provided by Rule 11, district courts have "inherent authority to sanction parties that appear before it acting in bad faith, vexatiously, wantonly, or for oppressive reasons." *Sassower v. Field*, 973 F.2d 75, 80–81 (2d Cir. 1992) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).

A district court also has "broad discretion in tailoring appropriate and reasonable sanctions under rule 11." *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990).[7] In determining whether sanctions are appropriate, courts consider, *inter alia*, whether the improper conduct was "willful[] or negligent," whether the conduct was "part of a pattern or activity," or whether the party had "engaged in similar conduct in other litigation."[8] *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *12 (S.D.N.Y. Sept. 24, 2008). "The sanction may include . . . reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

---

[7]     Even if a court lacks subject matter jurisdiction, it retains the authority to impose sanctions against Plaintiffs and their counsel. *See, e.g.*, *Willy v. Coastal Corp.*, 503 U.S. 131, 137–39 (1992); *Schlaifer Nance & Co., Inc. v. Est. of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999).

[8]     The Court may also consider whether the misconduct infected the entire pleading or only one particular count or defense; what effect the misconduct had on the litigation process in time or expense; and whether the responsible person is trained in the law. *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *12 (S.D.N.Y. Sept. 24, 2008).

### B. Plaintiffs' Claims Are Frivolous

A legal argument is frivolous pursuant to Rule 11(b)(2) if it is "clear" that there is "no chance of success and no reasonable argument to extend, modify or reverse the law as it stands" according to an "objective standard of reasonableness." *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) (internal quotation omitted). A reasonable inquiry would have revealed that Plaintiffs' FARA claim was patently untenable for numerous reasons, not least of which was failing adequately to allege standing.

Plaintiffs allege no facts to show that they have been "concretely harmed" by the Defendants' alleged violation of FARA as required to establish standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021); *see also Holcombe v. Ingredients Sols., Inc.*, 797 F. App'x 630, 632 (2d Cir. 2020) (injury-in-fact must be "concrete and particularized"). The Amended Complaint describes concrete harm experienced by only one Plaintiff, Cui Qingyun. According to the Amended Complaint, at some unspecified time[9] Mr. Qingyun and his wife's extended family lost their fortunes to the PRC and, in April 2022, the PRC "forcibly locked down" him and his immediate family and fed them only intermittently for two weeks. Am. Compl. ¶ 28. The Amended Complaint alleges no facts, however, that connect the purported mistreatment of Cui Qingyun and his family by the PRC to Mr. Despins or Paul Hastings acting as an unregistered agent of the PRC or the CCP.

As to the other nine Plaintiffs, there are no allegations of any injury suffered. Instead, Plaintiffs rely on conclusory allegations of generalized injuries, including that they were "subjected to an ongoing campaign of harassment by agents of the CCP and PRC." *Id*. ¶ 22. Conclusory statements of injury are insufficient adequately to allege standing. *See Gambles v.*

---

[9]     Although the Amended Complaint does not allege a date when these confiscations occurred, it was apparently decades ago when the CCP took control of China. *See* Am. Compl. ¶ 28.

*Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510, 516 (S.D.N.Y. 2017). "Article III grants federal courts the power to redress harms that defendants caused plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion LLC*, 141 S. Ct. at 2206 (internal quotation omitted).

Even if the Court found that Plaintiffs had plausibly alleged some concrete injury, Plaintiffs have alleged no facts from which the Court can reasonably infer that Paul Hastings' provision of legal services to Jinshang Bank is an activity "directly or indirectly . . . controlled . . . in whole or in part by a foreign principal" such that Paul Hastings qualifies as an "agent of a foreign principal" within the meaning of FARA. 22 U.S.C. § 611(c). As thin as the allegations are against Paul Hastings, they are even thinner against Mr. Despins. The Amended Complaint alleges *no* facts specific to Mr. Despins beyond the fact that he is a resident of Connecticut. Am. Compl. ¶ 20. And even if Plaintiffs had alleged facts from which it would be plausible to infer that either Defendant was an agent of the PRC or CCP that is required to register pursuant to FARA, they do not explain how whatever harm they experienced is "fairly traceable" to Defendants' failure to register. *Lujan*, 504 U.S. at 560. Plaintiffs allege that Defendants "intimidated [them] into refraining from exercising their rights," Am. Compl. ¶ 25, but fail plausibly to allege any specific facts in support of this conclusory allegation or explain how registering as foreign agents would have prevented Defendants from inflicting this harm.[10]

Because even a cursory inquiry would have shown that the facts as alleged in the Amended Complaint fell far short of the threshold required to establish standing, Plaintiffs'

---

[10]     Plaintiffs also seem to argue that, because Paul Hastings provided legal services to Jinshang Bank, Defendants are responsible for any harm caused by the CCP or PRC. *See* Am. Compl. ¶¶ 39–49, 51–53. This claim is so tenuous as to be absurd. Plaintiffs also do not allege that Mr. Despins is connected to the CCP or PRC at all.

counsel clearly failed to fulfill the "affirmative duty on each attorney to conduct a reasonable inquiry into the viability of the pleading before it is signed." *Int'l Shipping Co., S.A.*, 875 F.2d at 390 (internal quotation omitted). This is particularly true because Defendants notified Plaintiffs that Defendants believed that the complaint "plainly was filed for the improper purpose of furthering Ho Wan Kwok's ongoing campaign to harass and intimidate Defendants," and that Plaintiffs' complaint was frivolous because FARA does not provide for a private right of action. *See* First Andres Decl. Ex. 1 at 1–2.

The Court finds that sanctions are appropriate. Defendants complied with Rule 11's safe harbor provision: they gave Plaintiffs notice of their intent to file sanctions because the complaint Plaintiffs filed was frivolous and served the Rule 11 motion papers to the last known address of Plaintiff's office more than twenty-one days before moving for sanctions.[11] *See* Fed. R. Civ. P. 11(c)(2). Plaintiffs persisted by filing an Amended Complaint that cured none of the deficiencies Defendants had identified. *See* First Andres Decl. ¶ 2.

---

[11] In what itself may well be a sanctionable argument, Mr. Freeth argues that Defendants did not comply with Rule 11's safe harbor provision because Defendants' service of the motion for sanctions was defective. Pls. Sanctions Opp., Dkt. 23 ¶¶ 7–8. This argument reeks of gamesmanship. Defendants properly served Mr. Freeth. Federal Rule of Civil Procedure 11(c)(2) requires a motion for sanctions to be served in accordance with Rule 5, which permits service by several methods, including "mailing it to the person's last known address," "handing it to the person," or leaving it "at the person's office." Fed. R. Civ. P. 5(b)(2)(B). As long as the sender mailed the documents to the recipient's last known address, however, service is considered complete, even if the recipient did not receive the mail. *See, e.g.*, *Greene v. WCI Holdings Corp.*, 136 F.3d 313, 315 (2d Cir. 1998).

Mr. Freeth's last known address is his office address, which he has listed on all of the papers that he has filed in this case, on ECF, and which is on record with the First Judicial Department in connection with his registration to practice law in New York. *See* Second Andres Decl. Ex. 5, Dkt. 26. ECF Rule 20.6 requires attorneys to keep their addressees current. *See* ECF Rules and Instructions (July 24, 2023), available at https://www.nysd.uscourts. gov/rules/ecf-related-instructions. On December 27, 2022, Defendants served Mr. Freeth via mail and in-person service at the last known address of his office. *See* Second Andres Decl. ¶¶ 12–13. Defendants also requested that Mr. Freeth provide a new address, but he did not do so. *See id.* ¶ 15. Because Defendants complied with Rule 11's safe harbor provision, Mr. Freeth cannot argue that Plaintiffs did not have a reasonable opportunity to respond.

### C.  Plaintiffs Filed the Lawsuit To Harass Defendants

Pursuant to Rule 11(b)(1), an attorney cannot present a filing "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  Fed. R. Civ. P. 11(b)(1).  A court may infer an improper purpose if, in light of Plaintiffs' conduct during and outside of litigation, a complaint is so baseless as to suggest that there is an ulterior motive behind the lawsuit.  *See, e.g.*, *S. Pac. Shipping Co. v. Redi-Fresh Produce Inc.,* 2014 WL 6968039, at *10 (S.D.N.Y. Dec. 9, 2014) (holding that "the deficiency of [plaintiff's] claim, coupled with its behavior" in litigation in that and other courts "gives rise to an inference of improper purpose"); *see also Schlaifer Nance & Co, Inc.. v. Estate of Warhol*, 194 F.3d 323, 338 (2d Cir. 1999) (a court can infer bad faith when an action is "so completely without merit as to require the conclusion [it] must have been undertaken for some improper purpose," *id.* (cleaned up)).

In this case, the context of Plaintiffs' filing demonstrates Plaintiffs' complete disregard for "legal merit."  *Galonsky v. Williams*, 1997 WL 759445, at *4–5 (S.D.N.Y. Dec. 10, 1997).  Plaintiffs failed to withdraw their complaint after the Bankruptcy Court enjoined Plaintiff Li and those "in active concert" with him from making baseless claims that Paul Hasting was an agent of the CCP.  *See* Bankr. Prelim. Inj. at 60.  Plaintiffs continued to violate that injunction even after Defendants notified Plaintiffs' counsel of numerous deficiencies in the complaint, which Mr. Feeth failed to cure when he subsequently filed the Amended Complaint. *See id.*; First Andres Decl. Ex. 1 at 1–2.

Plaintiffs' papers reveal that their true preoccupation is with Mr. Kwok and trying to "defend" him by harassing those perceived to be his adversaries.  Plaintiffs contend that Mr. Kwok's bankruptcy proceeding is "irrelevant" but nevertheless devote roughly half of their opposition to Defendants' motion to dismiss discussing Mr. Kwok's supposed "fight against the

12

CCP." Pls. MTD Opp. ¶ 19; *see also See* Pls. Sanctions Opp. ¶ 16; Pls. MTD Opp. ¶¶ 13–47. Plaintiffs baselessly assert, with no factual allegations to support their conclusion, that Mr. Despins "has behaved thoroughly adverse to Mr. Kwok throughout the proceedings, rather than serving as trustee in a neutral manner," Pls. MTD Opp. ¶ 41, as though that somehow explains why people other than Mr. Kwok might have a cause of action against Mr. Despins.

The existence of similar litigation in other courts further supports the Court's finding that Plaintiffs filed this lawsuit in bad faith. Plaintiffs' counsel has a pattern of bringing meritless FARA claims against Mr. Kwok's adversaries — conduct that he has praised.[12] The copy-and-paste nature of these numerous lawsuits is evident from the fact that Plaintiffs' complaint contains an out-of-place paragraph that alleges "Defendant Bo Shan is also working as a spy for the CCP." Am. Compl. ¶ 50.

Together, Plaintiffs' legal contentions within this lawsuit, Plaintiff's counsel's history of meritless FARA claims against others, and the harassment campaign against Defendants as documented by the Bankruptcy Court lead the Court to conclude that this lawsuit is just another part of a campaign of misbehavior designed to vex Defendants, most likely by frustrating Mr. Despins's ability to perform his duties as trustee. As such, the Court finds that sanctions are appropriate.

Rule 11(c) enables courts to impose a sanction that "suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Attorneys' fees are an appropriate remedy to prevent harassment in the form of bad-faith litigation, especially when the sanctioned party has failed to comply with prior court orders. *See Pentagen Techs. Int'l Ltd. v. United States*, 172 F. Supp. 2d 464, 473–474 (S.D.N.Y. 2001)

---

[12] *See supra*, pp. 3–4.

13

(imposing sanctions and awarding attorneys' fees to punish plaintiffs for "engag[ing] in a pattern

of litigation designed to evade previous rulings" that was "frivolous and repetitive . . . [and]

intentionally so"), *aff'd*, 63 F. App'x 548 (2d Cir. 2003).  "It is well settled that Rule 11

empowers judges with discretion to award that portion of a defendant's attorney's fees thought

reasonable to serve the sanctioning purpose of the Rule."  *Int'l Shipping Co., S.A.*, 875 F.2d at

392.  The Court finds that an award of the full amount of reasonable attorneys fees is an

appropriate sanction and not more punitive than necessary in light of Plaintiffs' counsel's

complete disregard for the merits of Plaintiffs' claims, his gamesmanship, and both Plaintiffs'

and Plaintiffs' counsel's defiance of the Bankruptcy Court's injunction.

Rule 11 "authorizes assessment of a fee against counsel, a party, or both."  *Eastway

Constr. Corp. v. City of New York*, 821 F.2d 121, 124 (2d Cir. 1987).  Here, certain aspects of

Plaintiffs' lawsuit are "issue[s] over which counsel exercise[d] principal responsibility," *United

Republic Ins. Co., in Receivership v. Chase Manhattan Bank*, 315 F.3d 168, 171 (2d Cir. 2003),

like ensuring that the complaints filed met a minimum merit threshold and pled adequate facts to

establish subject matter jurisdiction.  Plaintiffs' behavior — including their decision to pursue

this lawsuit after the Bankruptcy Court's injunction — demonstrates, however, that Plaintiffs

also bear responsibility for the harassment and frivolity of this lawsuit.  In light of this, the Court

imposes the fee award jointly and severally upon Plaintiffs and Plaintiffs' counsel.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and motion for reasonable

attorneys' fees and costs as sanctions are GRANTED.  The Amended Complaint is DISMISSED

without prejudice.  Defendants must submit an application for attorney's fees and costs not later

than **August 11, 2023**.  The Clerk of Court is respectfully directed to terminate the open motions

at docket entries 11 and 14.


**SO ORDERED.**


**Date:   August 2, 2023**                                    **VALERIE CAPRONI**
**New York, New York**                                    **United States District Judge**

**Exhibit 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
　　　　　　　　　　　　　　　　　　　　　　　　　 :
JUNWU GONG, 　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　Plaintiff, 　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　　　　　 :
　　　　　-v- 　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　　　　　 :　　　23-cv-343 (LJL)
STUART M. SARNOFF, O'MELVENY & MYERS 　　 :
LLP, CARL M. STANTON, CITY OF NEW YORK, 　 :　　OPINION AND ORDER
OFFICER JOHN DOE 1, OFFICER JOHN DOE 2, 　 :
OFFICER JOHN DOE 3, OFFICER LAUREN A. 　　 :
DUFFY, 　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　Defendants. 　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　　　　　 :
------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/22/2023

LEWIS J. LIMAN, United States District Judge:

　　　Defendants Stuart M. Sarnoff ("Sarnoff") and O'Melveny & Myers LLP ("O'Melveny"

and, together with Sarnoff, the "Moving Defendants") move, pursuant to Federal Rule of Civil

Procedure 11, for an order granting them sanctions against Plaintiff's counsel, Yongbing Zhang

and Richard Freeth, and enjoining Plaintiff Junwu Gong ("Gong" or "Plaintiff") and his counsel

and those in active concert with them from filing other similar suits without leave of court.  Dkt.

No. 36.  The motion is granted in part and denied in part.

## BACKGROUND

　　　The Court assumes familiarity with the prior proceedings in this matter.  The following

facts are taken from the parties' submissions in connection with the motion for sanctions and the

Court resolves factual disputes as necessary for the disposition of the motion.  *See Chemiakin v.*

*Yefimov*, 932 F.2d 124, 130 (2d Cir. 1991) (suggesting that on Rule 11 motions courts should act

as fact finders and an evidentiary hearing is required when there are disputed facts).

## I.    The Allegations of the Complaint

Plaintiff initiated this action by complaint filed on January 18, 2023 (the "Complaint").[1] Dkt. No. 2.  Plaintiff is a foreign-born, ethnic Chinese U.S. Permanent Resident who has, on numerous occasions, joined with other ethnic Chinese individuals to protest against the Chinese Communist Party ("CCP").  *Id*. ¶¶ 15, 36–37.  He alleges that he has been subjected to an ongoing campaign of harassment by agents of the CCP.  *Id.* ¶ 70.  O'Melveny is a Delaware-registered limited liability partnership, which conducts business as a law firm and regularly transacts business in the State of New York.  *Id*. ¶ 50.  Defendant Sarnoff is a lawyer at O'Melveny, *id*. ¶ 45, and is a resident of the State of New York, *id*. ¶ 49.

The Complaint alleged that Moving Defendants violated the Foreign Agents Registration Act, 22 U.S.C. § 611(c)(1) ("FARA"), by acting as unregistered agents or representatives of the People's Republic of China ("PRC").  *Id.* ¶¶ 173–79.  It also alleges that Moving Defendants violated and conspired to violate Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, enforceable through 42 U.S.C. §§ 1983 and 1985(3).  *Id.* ¶¶ 126–55.

The Complaint's allegations grow out of a series of events from November 22, 2022 to December 20, 2022.  On November 22, 2022, Plaintiff participated in what he claims were peaceful protests at the offices of O'Melveny in New York, because of what he alleges to be O'Melveny's relationship with the CCP.  O'Melveny is alleged to have at least three offices in the PRC and to conduct work in the PRC that is "extremely lucrative."  *Id.* ¶¶ 42–43.  In 2013, it represented a China-based genomic research and sequencing company, BGI, in the first ever

---

[1] The complaint was initially filed on January 13, 2023 but was rejected for a filing error.  *See* Dkt. No. 1.

acquisition of a United States publicly traded company by a Chinese acquiror. *Id.* ¶¶ 25–26.[2]

Beginning on December 2, 2022, Plaintiff participated in regular protests at a location believed

to be near Sarnoff's home in New York City. *Id.* ¶ 68. Sarnoff is an O'Melveny lawyer, who is

allegedly "conspicuous[ly]" involved in the firm's China practice. *Id.* ¶ 45. On the morning of

December 20, 2022, Plaintiff again joined protests at a location believed to be near Sarnoff's

home. *Id.* ¶ 71.

Plaintiff alleged that he and other protesters were harassed at these protests by another

Defendant, Carl M. Stanton ("Stanton"); the only identifying information provided about him in

the Complaint is that he is alleged to be a resident of New York City and New York State. *Id.*

¶ 51. The Complaint focused on events that occurred on December 20, 2022, during which

Plaintiff was hit by an automobile driven by Stanton. *Id.* ¶ 96. Officers of the New York Police

Department ("NYPD") (one of whom is personally named in the Complaint) failed to file a

police report after Plaintiff summoned them to the scene. *See id.* ¶¶ 101–08. Later, after

Plaintiff had begun feeling ill and "went into shock" at a nearby restaurant, the protesters called

an ambulance to assist Plaintiff but NYPD officers obstructed Plaintiff's efforts to get medical

attention. *Id.* ¶¶ 112–19.

---

[2] In 2020, two BGI entities were allegedly added to the Entity List of the United States
Department of Commerce's Bureau of Industry and Security for "conducting genetic analyses
used to further the repression of Uyghurs and other Muslim minorities in the Xinjiang Uyghur
Autonomous Region," *id.* ¶ 27; in January 2021, Reuters allegedly reported that BGI has worked
with the PRC's military on efforts to enhance soldiers' strength and other projects, *id.* ¶ 28; in
July 2021, Reuters allegedly reported that BGI developed a prenatal test with the assistance of
the People's Liberation Army which is also used for genetic data collection, including to "single
out Tibetan and Uyghur minorities to find links between their genes and their characteristics," *id.*
¶ 29; and, in October 2022, the United States Department of Defense allegedly added a BGI
subsidiary to its list of Chinese military companies operating in the United States, *id.* ¶ 30.

The Complaint contained few, if any, allegations regarding the conduct of Moving Defendants and no allegations that tied Moving Defendants to any state action. It alleged that the December 20 protest occurred at a location believed to be near Sarnoff's residence. *Id.* ¶¶ 71–72. However, it does not allege that Sarnoff did anything during the protest or that he was even present in his residence at the time.[3] The Complaint also alleged that, during a prior protest outside O'Melveny's offices in New York City, Stanton was observed "on several instances" taking pictures from inside the property where the protesters and members of the public were not permitted and using a swipe card to enter through the security entrance. *Id.* ¶¶ 76–77. Plaintiff alleged, upon information and belief, that Stanton is not an officer of the NYPD, *id.* ¶ 82, although the Complaint alleged that Stanton represented that he was "with" the police or had some kind of connection with the NYPD, *id.* ¶¶ 80–81. Further, there are no allegations that O'Melveny, much less Sarnoff, have any relationship with Stanton, and there are no allegations that O'Melveny or Sarnoff had any involvement with the conduct of Stanton, the NYPD, or any state actor on December 20. It was Plaintiff, not O'Melveny, Sarnoff, or Stanton, according to the Complaint, who called the NYPD after he was hit by Stanton's car and the protesters who called the ambulance. *Id.* ¶¶ 85, 88, 114.

The Complaint did allege that Moving Defendants had a connection to the CCP. Plaintiff asserted that "O'Melveny is beholden to the CCP, and as such performs whatever acts are requested by the CCP—including acts within the United States that would require registration as foreign agents with the US Government," *id.* ¶ 47, and that the CCP's unregistered agents in the United States "are now believed to be Defendant Sarnoff, Defendant O'Melveny and Defendant

---

[3] The Complaint does not even allege that, as a matter of fact, the protest occurred near Sarnoff's residence.

Stanton," *id.* ¶ 64.  The only factual allegations made to support these claims were that

O'Melveny and Sarnoff performed legal work on behalf of a Chinese company, *id.* ¶¶ 25–26,

and that O'Melveny has offices in the PRC from which it conducts "lucrative" business with a

"potentially significant impact on the country," *id.* ¶¶ 42–43.  There are no factual allegations to

support that Stanton has any connection to the PRC or CCP.

## II.      Procedural History Relevant to the Rule 11 Motion

On March 23, 2023, Moving Defendants filed a motion to dismiss the Complaint,

pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  Dkt. No. 19.  In their

memorandum of law in support of the motion, Moving Defendants argued that Plaintiff failed to

allege any conduct by either of them directed toward Plaintiff, Dkt. No. 20 at 1–2, and that the

FARA claim was "just as meritless" because "[c]ourt after court has held that there is no private

right of action under FARA," Plaintiff had not alleged any injury traceable to Moving

Defendant's conduct, and Plaintiff did not allege facts that would require FARA registration, *id.*

at 2–3.

On March 28, 2023, Moving Defendants filed their motion for sanctions, along with a

supporting memorandum of law and a declaration.  Dkt. Nos. 26–28.  Moving Defendants,

however, withdrew the motion on March 29, 2023, because they had not complied "with the

requirements of Federal Rule of Civil Procedure 11(c)(2)" that the motion cannot be filed until

after the party against whom the motion is made has been given an opportunity to withdraw the

offending claim or papers.  Dkt. No. 29.

On April 14, 2023, the Court held an initial pretrial conference.  Dkt. No. 34.  At the

conference, the Court inquired whether Plaintiff's counsel had any additional factual "allegations

against either Mr. Sarnoff or O'Melveny that would suggest that they acted in collusion with the

police department."  *Id.* at 4.  Counsel responded that his allegations were based on supposition:

"[T]he firm and the individual defendants were not pleased with being the target of these protests," and "it would make sense that . . . the defendants in their position would send someone to . . . observe, get information." *Id.* at 7. Counsel admitted that he did not know or have factual allegations regarding Stanton's "mandate." *Id.*. He also admitted that he did not know whether Stanton hit Plaintiff "accidentally or on purpose." *Id.* at 8. As to the police, counsel claimed that the conduct of the officers was "peculiar," because the officers refused to file a report. *Id.* Plaintiff's counsel nonetheless claimed that there was factual information that counsel had that was responsive to a number of issues raised in Moving Defendant's motion to dismiss. *Id.* at 13–14. As a result, the Court stayed discovery pending a decision on the motion to dismiss and gave Plaintiff leave to file an amended complaint by April 21, 2023. *Id.* at 15–16. The Court also warned Plaintiff's counsel: "while I have not looked at the Rule 11 motion, I have looked at your complaint. And you should give it a second look because the motion does appear to be quite strong. And I will take the Rule 11 motion that is going to be filed very seriously." *Id.* at 16–17.

On April 26, 2023, Plaintiff filed the first amended complaint ("Amended Complaint").[4] The Amended Complaint contains eleven new paragraphs quoting a report of the Heritage Foundation regarding the threat posed to the United States by the PRC and citing a news article regarding the arrest in New York of two alleged operatives for the PRC. Dkt. No. 43 ¶¶ 11–21. It also includes an allegation that O'Melveny has "on several occasions yet discovered by Plaintiff," represented Chinese entities alleged to have tortured Chinese individuals or to have aided and abetted or ratified the same, *id.* ¶ 34, that "O'Melveny and Sarnoff have, with other counsel, been part of the CCP team charged with destroying the life of Ho Wan Kwok (aka Miles

---

[4] Plaintiff filed the Amended Complaint on April 21, 2023, but it was rejected for a filing error. *See* Dkt. No. 41; Clerk's Entry (Apr. 24, 2023). The parties agreed to an extension of time to May 1, 2023 for Plaintiff to file an amended complaint, which the Court granted. Dkt. No. 44.

Guo) and use whatever means necessary to have him returned to China for either additional jail and torture or execution," *id.* ¶ 55(f), and that the law firm represented a company named BYD America Corporation in *Jun Zhao v. BYD America Corp.*, in the United States District Court for the Central District of California, *id.* ¶ 35.[5]  In all other respects the Amended Complaint is identical to the Complaint.  It does not add any factual allegations with respect to the events of December 2020.  It levels the same allegations that Moving Defendants participated in civil rights violations and a violation of FARA, *see id.* ¶¶ 140–80, 187–93, without any additional factual allegations supporting either set of claims.

On July 17, 2023, the Court issued an Opinion and Order granting Moving Defendants' motion to dismiss the Amended Complaint against them with prejudice.  Dkt. No. 57.  The Court concluded that Plaintiff failed to allege facts to support any of the theories under which Moving Defendants could be held liable under Section 1983 for any of the injuries he alleged he suffered. *Id.* at 13.  The Court also concluded that Plaintiff had failed to plead any facts to support a conspiracy claim under Section 1985(3), including a failure to plead an agreement.  *Id.* at 20–21. Finally, the Court concluded that Plaintiff did not plead facts to establish standing for his FARA claim.  *Id.* at 21.  The Court, however, retained jurisdiction to address Defendants' motion under Federal Rule of Civil Procedure 11.  *Id.* at 24.

On April 20, 2023, before the Amended Complaint was dismissed, Moving Defendants refiled the Rule 11 motion for sanctions, memorandum of law, and declaration, along with a declaration attesting to their compliance with Rule 11(c)(2).  Dkt. No. 36–39.  Plaintiff filed his

---

[5] The Amended Complaint also refers to O'Melveny's work on two Hong Kong initial public offerings and a takeover of a biotech company, *id.* ¶ 56, and it attaches a blog post allegedly written by a former O'Melveny attorney accusing the firm of "monetizing" the relationships its partners have with the United States government, Dkt. No. 43-7.

memorandum in opposition to the motion on May 4, 2023, Dkt. No. 45. On May 17, 2023,

Moving Defendants filed their reply memorandum of law.[6] Dkt. No. 51. On July 27, 2023, the

Court issued an order scheduling oral argument on the motion for sanctions and indicated that

any party that desired to present evidence at the hearing should submit a letter to the Court on or

before August 7, 2023, indicating what evidence, if any, it wished to present and that, in the

absence of any additional evidence, the Court would decide the motion based on the evidence

submitted in connection with the Rule 11 moving and opposition papers. Dkt. No. 63. Moving

Defendants submitted a letter on August 7, 2023, indicating that they would not submit

additional evidence.[7] Dkt. No. 66. That same day, Plaintiff filed a letter indicating that he would

submit evidence at oral argument and that he would testify. Dkt. No. 67. The Court held oral

argument and the evidentiary hearing on August 16, 2023. *See* Minute Entry (Aug. 16, 2023).

Plaintiff failed to appear at the Evidentiary Hearing. Plaintiff's counsel, Richard Freeth, offered

a copy of his 2021 tax return, which was received without objection.

---

[6] Moving Defendants filed their motion for sanctions on April 20, 2023, Dkt. No. 36, after the
Court granted Plaintiff leave to file an amended complaint, *see* Dkt. No. 34 at 16, but before
Plaintiff actually filed his Amended Complaint, *see* Dkt. No. 43. On July 7, 2023, the Court
directed the parties to file letter briefs addressed to the question whether Moving Defendants'
Rule 11 motion is properly before this Court or whether the Rule 11 motion had to be re-served
on Plaintiff's counsel upon the filing of Plaintiff's Amended Complaint. Dkt. No. 54. Each
party filed a letter brief addressed to that issue on July 13, 2023. *See* Dkt. Nos. 55–56.
[7] Though the Court is not required to hold an evidentiary hearing if there are no disputes of
material fact, *see Chemiakin*, 932 F.2d at 130 ("Although appellants attempt to engraft onto Rule
11 a requirement that an evidentiary hearing be held prior to the imposition of sanctions, there is
no such requirement, absent disputed facts or issues of credibility."); *see also* Fed. R. Civ. P. 11
Advisory Committee's Note to 1993 Amendment ("The court must to the extent possible limit
the scope of sanction proceedings to the record."), the Court provided both parties with an
opportunity to present additional evidence given the nature of the hearing and its reliance on
facts outside the record.

## III.     Rule 11 Evidence

Moving Defendants argue that this lawsuit "is merely one in a series of abusive, harassing tactics undertaken at the behest of Miles Kwok (also known as Wengui Guo and Ho Wan Kwok)" against O'Melveny and Sarnoff arising from the assistance Moving Defendants provided their client, investment fund Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), in a lawsuit against Kwok in New York State court.  PAX obtained a $116.4 million judgment against Kwok and the state court-imposed contempt sanctions of $134 million against Kwok.  Dkt. Nos. 38-9, 38-10.

On April 18, 2017, PAX sued Kwok in New York State court for breaching a $30 million loan agreement.  Dkt. No. 38-11 ("State Court Complaint").[8]  PAX was represented by O'Melveny and Sarnoff.  The State Court Complaint alleged that Kwok owed approximately $88 million including contractual interest.  *Id.* at ECF p. 4.  After nearly four years of litigation, Justice Barry Ostrager of the New York Supreme Court issued a judgment in favor of PAX and against Kwok in the amount of $116,402,019.57, on February 3, 2021.  Dkt. No. 38-9.  One year later, on February 9, 2022, Justice Ostrager, in a decision and order, imposed contempt sanctions on Kwok, ordering Kwok to pay $134 million—$500,000 per day for 268 days in contempt fines—to be paid in five business days or the court would "exercise its full authority under New York Judiciary Law § 753."  Dkt. No. 38-10.[9]  Justice Ostrager's opinion was scathing.  He found that, in order to avoid PAX's judgment, Kwok had "park[ed] his substantial personal assets with a series of corporations, trusted confidants, and family members" and "secreted his

---

[8] The Court can take "judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"  *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (citation omitted).

[9] New York Judiciary Law gives the state court the power "to punish, by fine or imprisonment, or either" a contempt of court.  N.Y. Jud. Law § 753.

assets in a maze of corporate entities and with family members." *Id.* at 1.  After addressing

Kwok's violation of court orders with respect to his yacht, the Lady May, Justice Ostrager

concluded:  "The machinations associated with the shell game Kwok has orchestrated with

respect to the Lady May are of a piece with every other evasive and contemptuous act Kwok has

taken during the five years this litigation has been pending, which is why there are 1,180 docket

entries in this case." *Id.* at 8.

On February 15, 2022, on the eve of the contempt order's five-day deadline, Kwok filed

for personal bankruptcy in the District of Connecticut under Chapter 11 of the Bankruptcy Code.

Dkt. No. 38-15; *see also* Dkt. No. 45 at 9.  In that proceeding, Kwok listed O'Melveny's client,

PAX, as his largest creditor, to whom he owed approximately $254 million.  Dkt. No. 38-15 at

ECF p. 10; Dkt. No. 38-16.  On or about July 7, 2022, upon application of the United States

Trustee, Dkt. No. 38-17, and over Kwok's objection, the United States Bankruptcy Court in

Connecticut (the "Bankruptcy Court") appointed a trustee, Luc Despins from Paul Hastings LLC,

to administer Kwok's estate, *see* Dkt. No. 38-18; *see also* Dkt. No. 45 ¶ 38.[10]  On August 10,

2022, the Bankruptcy Court entered an order, upon the application of Despins, confirming that

Despins held all economic and governance rights, for the benefit of the bankruptcy estate, with

respect to all entities owned or controlled by Kwok.  Dkt. No. 38-19.  On August 16, 2022, the

Court granted the Trustee's Rule 2004 motion to serve subpoenas on various legal and financial

advisors to Kwok.  Dkt. No. 38-20.  That same day, the Court granted the Trustee's Rule 2004

---

[10] On June 30, 2022, the United States Trustee Program ("USTP") applied to appoint Joe
Whitley as the Chapter 11 Trustee, Dkt. No. 45 at 9, and then withdrew the application for the
appointment of Whitley, Dkt. No. 45-15.  Plaintiff asserts that the bankruptcy court "repeatedly
stat[es] its concerns about the violation of the removal process outlined in the Bankruptcy Code"
citing the notice of appointment, Dkt. No. 45-14, and withdrawal of the appointment application,
Dkt. No. 45-15, for support, but neither exhibit contains the "concerns" referenced by Plaintiff.

motion to serve subpoenas on various entities and individuals affiliated with Kwok.  Dkt. No. 38-21.

On November 22, 2022, PAX (represented by Moving Defendants) filed an application for a temporary restraining order ("TRO") and preliminary injunction in the Bankruptcy Court, seeking to restrain and enjoin Kwok and all persons in active concert or participation with him from (1) posting false and harassing online materials about Despins, PAX's or PAG's officers or employees, counsel to the Trustee or PAX, and of any respective relatives; (2) publishing online the home addresses and other personal information of those individuals; and (3) encouraging, inciting, suggesting, or directly or indirectly funding protests at the home or office of any of those individuals (including former spouses).  Dkt. No. 38-30 at 1–2.  The Bankruptcy Court held an expedited hearing the next day and, on that same day, entered the TRO granting PAX the full relief requested.  *See id.* at 6.[11]  The TRO extended to all "other persons who are in active concert or participation with [Kwok] . . . upon receipt of actual notice by personal service or otherwise."  *Id.* at 7.

Beginning on December 5, 2022, the Bankruptcy Court held a four-day evidentiary hearing on PAX's motion for a preliminary injunction.  *See* Dkt. No. 38-37 (transcript of the hearing for the motion for preliminary injunction).  On January 13, 2023, the Bankruptcy Court

---

[11] Moving Defendants repeatedly point to the Bankruptcy Court's findings of fact of its preliminary injunction decision throughout their briefing for the factual propositions contained therein.  *See, e.g.*, Dkt. No. 37 at 2, 6, 7, 8.  However, the Court is not able to take judicial notice of these findings, other than for the fact that they exist.  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (noting that the district court erred when it took judicial notice of orders of a bankruptcy court "to establish facts asserted therein" because "[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source").  The Court thus limits itself to the direct evidence that Moving Defendants submitted with their motion papers.

issued a preliminary injunction, among other things, "enjoining [Kwok] from protesting, picketing, parading, or displaying or distributing harassing material, at any time, within two hundred feet (200 ft.) of the homes [or residences, or the offices or workplaces, or entrance thereof] of relatives (including former spouses) of . . . counsel to . . . PAX" during certain time periods. Dkt. No. 38-3 at 3–4. The Bankruptcy Court noted that "harassing materials" include those that describe O'Melveny lawyers as "Communists, agents of the Chinese Communist Party, extortionists, anti-Semites, racists, supporters of genocide, or otherwise make[] similarly disparaging allegations regarding such parties' actions or beliefs." *Id*. at 5. The preliminary injunction also extends to those in active concert with Kwok upon actual notice of the order. *Id.* at 7.

Moving Defendants present additional evidence of the harassment against them and the connection between this harassment and New Federal State of China (the "NFSC"), and by association, Kwok—and they present evidence that this activity did not dissipate upon the Bankruptcy Court's issuance of the TRO or the preliminary injunction. The NFSC is closely associated with Kwok, who founded the organization. *See* Dkt. No. 38-5; Dkt. No. 38-22 at ECF p. 5. NFSC, according to a report published on GNews and seemingly authored by the news arm of NFSC, NFSC News, engaged in protests against Paul Hastings, O'Melveny, and lawyers for both firms for 80 days as of February 7, 2023.[12] Dkt. No. 38-38 at ECF p. 4. The article reported that the "NFSC . . . protests will continue for another 100 days after completing 90

---

[12] Plaintiff admits in his Complaint that he attended these protests and suggests that he did so in connection with involvement in NFSC. As Plaintiff pleads, on November 22, 2022, "the Plaintiff joined in peaceful protests at the office of Defendant O'Melveny," Dkt. No. 2 ¶ 67, and "commencing on December 2, 2022, the Plaintiff with a number of other people, joined in regular peaceful protests at a location believed to be in proximity to the home of Defendant Sarnoff," *id.* ¶ 68.

days." *Id.* at ECF p. 5. According to Moving Defendants, "[t]he protests . . . continued in violation of the preliminary injunction, culminating in a February 12, 2023, incident in which Kwok's followers assaulted one of Mr. Sarnoff's neighbors." Dkt. No. 37 at 10. Moving Defendants attached a security incident report signed by a reporting officer that reported on the alleged assault. *See* Dkt. No. 38-39.

Moving Defendants also submit videos of protests in front of Sarnoff's home. *See, e.g.*, Dkt. No. 38-32. Another video shows protesters with images of O'Melveny lawyers, including Sarnoff, juxtaposed next to slogans including "Supporters of Genocide" and "CCP's favorite lawyers." *See* Dkt. No. 33 at 5:20–5:50. And a video posted by GNews shows protesters outside of Sarnoff's home showing placards with a picture of Sarnoff juxtaposed next to hammers and sickles and the phrase "Chinese Communist Party's Running Dog." *See* Dkt. No. 38-34. This language is identical to language used on the NFSC account on Gettr, a social media website, which, on December 4, 2022, posted that Sarnoff was "a running dog paid for and owned by CCP to persecute Chinese dissidents." Dkt. No. 38-29. Finally, on November 29, 2022, NFSC supporters sent emails to 100 O'Melveny employees, calling out Sarnoff by name and "express[ing] deep disturbance at O'Melveny partners . . . [for] attempts to persecute some of the world's loudest whistleblowers attempting to take down the Chinese Communist Party." Dkt. No. 38-35.

Moving Defendants also present evidence of a relationship between Gong's counsel and Kwok. Yongbing Zhang, who signed the Complaint but not the Amended Complaint, *compare* Dkt. No. 2 at ECF p. 25, *with* Dkt. No. 43 at ECF p. 29, appears in numerous photos of NFSC-led protests circulating on social media, including a post on NFSC's Gettr account from November 20, 2022 showing Zhang picketing at the house of Despins' ex-wife in Westchester

County, New York, and holding a sign calling the trustee an "A-List Scumbag." Dkt. No. 38-24 ¶ 32. Zhang also appeared in photos with Kwok from June 4, 2022 at the NFSC Second Anniversary party. Dkt. No. 38-25.

Finally, within days of the TRO, the lawyers who filed this lawsuit on behalf of Plaintiff filed three other near-identical lawsuits, targeting those who either were affiliated with PAX or represented PAX or who assisted the Bankruptcy Court. *See* Dkt. Nos. 38-40–38-42. On November 28, 2022, Zhang and Richard Freeth filed a lawsuit in this District against Paul Hastings and Chapter 11 Trustee Despins on behalf of a purported Chinese-born U.S. resident. *See* Dkt. No. 38-40 ¶ 2 (Complaint in *An et al. v. Despins et al.*, No. 22-cv-10062 (VEC) (S.D.N.Y.)). That complaint alleges that Paul Hastings and Despins "operated covertly as unregistered agents of" either or both of the PRC or the CCP, *id.*, and makes nearly identical allegations of a FARA violation to those made here, *see, e.g.*, *id.* ¶ 39. On November 28, 2022, Zhang and Freeth filed a lawsuit on behalf of the same plaintiffs against Weijan Shan, the chairman of PAX's managing member, Pacific Alliance Group, and Shan's son, Bo Leilei Shan. *See* Dkt. No. 38-41 (Complaint in *An et al. v. Shan et al.*, No. 22-cv-10060 (ALC) (S.D.N.Y)). The plaintiffs there allege that Weijan Shan and Bo Leilei Shan also acted "as unregistered agents of either or both" of the PRC or the CCP. *Id.* ¶ 29. The principal allegation against Weijan Shan was that he was photographed with United States Senator Diane Feinstein, who it is alleged "has supported communist causes and more recently was revealed to have a CCP spy serving as her Senate office manager" and received "significant revenue from companies in China." *Id.* ¶ 72.[13] The allegation against the son related to FARA follows principally from the

---

[13] The allegations about Senator Feinstein are sourced from a website called "Discover the Networks." Dkt. No. 41 ¶ 72.

fact that he is Shan's son. *Id.* ¶ 79. Finally, on March 17, 2023, Zhang and Freeth (along with a third lawyer, Brian R. Della Rocca), filed a lawsuit in the District of Maryland against Weijan Shan and several other defendants, including the University of Maryland. Dkt. No. 38-42 (Complaint in *Wyatt et al. v. Univ. of Md.*, No. 23-cv-742 (JKB) (D. Md.)). The complaint contains identical FARA allegations against Weijan Shan. *Id.* ¶¶ 118–25. It also contains civil rights claims similar to the ones here, alleging violations of 42 U.S.C. § 1983 pursuant to the First, Fourth, and Fourteenth Amendments, *id.* ¶¶ 83–90; *id.* ¶¶ 101–10, and violations of 42 U.S.C. § 1985(3), *id.* ¶¶ 91–100. Plaintiffs allege that they were protesting at the University of Maryland where Weijan Shan's daughter is a doctoral student to inform other students about the "Shan family's CCP background and their influence at U.S. public schools," *id.* ¶ 26, when they "started experiencing some unexpected restrictions from Defendants" and "were instructed to discontinue holding signs, distributing flyers and conducting livestreaming online," *id.* ¶ 39. They also allege that, after the Bankruptcy Court issued its order and their permit was revoked, they were threatened with arrest if they continued protests at the University Commons. *Id.* ¶¶ 47, 55.

The Honorable Judge Valerie E. Caproni dismissed the complaint in *An et al. v. Despins et al.*, No. 22-cv-10062, without prejudice and sanctioned counsel and plaintiffs in that action under Rule 11. *See id.* Dkt. No. 29; *see also An v. Despins*, 2023 WL 4931832 (S.D.N.Y. Aug. 2, 2023). A motion to dismiss and motion for sanctions remains pending in *An et al. v. Shan et al.*, No. 22-cv-10060 (ALC) (S.D.N.Y). *See id.* Dkt. Nos. 22, 31. Finally, in *Wyatt et al. v. University of Maryland*, No. 23-cv-742 (JKB) (D. Md.), the Honorable Chief Judge James K. Bredar dismissed Counts I, II, III, and V against defendants the University of Maryland, Darryll Pines, Joel Dewyer, and Bruce Perry with prejudice for lack of jurisdiction, *id.* Dkt. No. 29, and

dismissed the case against the remaining defendants without prejudice for failure to serve under Federal Rule of Civil Procedure 4(m), *id.* Dkt. No. 34.

## LEGAL STANDARD

Rule 11 requires an attorney to certify that (1) a pleading or motion "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;" (2) "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;" and (3) "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). "The text of Rule 11 makes only 'attorney[s]' and 'unrepresented part[ies]' subject to Rule 11(b)'s strictures, which means that only those individuals can violate it." *Int'l Techs. Mktg., Inc. v. Cognyte Techs. Israel Ltd.*, 2022 WL 11280876, at *11 (S.D.N.Y. Oct. 19, 2022). However, Rule 11(c)(5) presents the only limitation on a court's ability to impose sanctions on represented parties: A court is prohibited from imposing monetary sanctions on a represented party for making frivolous legal arguments in violation of Rule 11(b)(2). Fed. R. Civ. P. 11(c)(5); *see also* Fed. R. Civ. P. 11(c)(1) ("[T]he court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."). "[T]here is no question that once a court finds that Rule 11(b) has been violated by an attorney or unrepresented party, sanctions may be awarded against any 'attorney, law firm, *or party* that violated the rule or is responsible for the violation.'" *Int'l Techs. Mktg., Inc.*, 2022 WL 11280876, at *12 (emphasis in original) (quoting Fed. R. Civ. P. 11(c)(5)).

Rule 11(c), in turn, permits a court to impose "appropriate sanctions" for violations of Rule 11(b). Fed. R. Civ. P. 11(c)(1). Sanctions imposed under Rule 11(c)

> must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c)(4). "When a court determines that Rule 11 sanctions are appropriate, it 'has significant discretion in determining what sanctions, if any, should be imposed for a violation.'" *E. Gluck Corp. v. Rothenhaus*, 2008 WL 2944624, at *3 (S.D.N.Y. July 31, 2008) (quoting Fed. R. Civ. P. 11(b)–(c), Advisory Committee Notes to 1993 Amendment).

"[T]he standard for triggering [sanctions] under Rule 11 is objective unreasonableness," *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000), and is "not based on the subjective beliefs of the person making the statement," *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012); *see also In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 265–66 (S.D.N.Y. 2010). Thus, an attorney files a pleading or motion in violation of Rule 11 if it is "frivolous, legally unreasonable, or factually without foundation, even though not signed in subjective bad faith." *Wechsler v. Hunt Health Sys., Ltd.*, 216 F. Supp. 2d 347, 356 (S.D.N.Y. 2002); *see also Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 167 (2d Cir. 1999).

## DISCUSSION

I. **Defendants Have Satisfied the Safe-Harbor Provision**

The threshold question presented by Moving Defendants' motion is whether they have satisfied the 21-day safe-harbor period of Federal Rule of Civil Procedure 11. Rule 11 provides that a motion for sanctions "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2). Therefore, if, during this twenty-one day "safe-harbor"

period, the adversary "withdraw[s] or appropriately correct[s]" the alleged violation, the adversary is insulated from Rule 11 liability for the offending filing. *Id*. If a Rule 11 motion is directed to a new filing, the moving party must re-notice the violation and give the alleged transgressor an additional twenty-one days to withdraw or correct. *See Lawrence v. Richman Grp. of CT LLC*, 620 F.3d 153, 158 (2d Cir. 2010) (per curiam) ("[W]e conclude that where, as here, a defective complaint is dismissed and a party is granted leave to replead, the filing of an amended pleading resets the clock for compliance with the safe harbor requirements of Rule 11(c)(2) before a party aggrieved by the new filing can present a sanctions motion based on that pleading to the district court.").

Moving Defendants have satisfied the 21-day safe-harbor provision and need not have re-noticed their motion after Plaintiff filed the Amended Complaint. Moving Defendants served their motion and supporting papers on Plaintiff on March 29, 2023. Dkt. No. 39 ¶ 2. That motion identified "the source of authority for the sanctions being considered; and . . . the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense," as required by the principles of due process. *See Star Mark Mgmt., Inc.*, 682 F.3d at 175. The papers challenged the Complaint as violating Rule 11 and specifically identified that the action was initiated to harass Moving Defendants and that neither the FARA claim nor the civil rights claims were supported by fact or by law or a well-founded argument for the extension of existing law. *See generally* Dkt. No. 37. Specifically, Moving Defendants charged that the civil rights and FARA allegations against them "consist[ed] entirely of unadorned conclusions without any supporting factual matter," *id.* at 12, that FARA "provides no private right of action, and there is no avenue for inferring one" or basis upon which Plaintiff would have standing, *id.* at 2, and that the FARA allegations were factually

"incoherent," *id.* at 21.  On April 20, 2023, twenty-one days after Plaintiff was served with the Rule 11 papers, Moving Defendants filed the sanctions motion.  *See* Dkt. No. 39.

The motion was not mooted by Plaintiff's filing of the Amended Complaint.  Plaintiff received leave to file the Amended Complaint on April 14, 2023, *see* Dkt. No. 34 at 16, and filed the Amended Complaint on April 26, 2023, *see* Dkt. No. 43.  Although the Amended Complaint added new and unrelated allegations to the original Complaint that is the subject of this motion, it did not "withdraw" the challenged pleading or otherwise "appropriately correc[t]" it.  Fed. R. Civ. P. 11(c)(2).  The purpose of the safe-harbor requirement is to provide "an opportunity to correct or withdraw the defective filing" and to "reduce, if not eliminate, the unnecessary expenditure of judicial time and adversary resource."  *Lawrence*, 620 F.3d at 158.  A pleading, including a complaint, is "withdrawn" either when it is dismissed, *see Hockley by Hockley v. Shan Enters. Ltd. P'ship*, 19 F. Supp. 2d 235, 241 (D.N.J. 1998) ("Since [third-party plaintiff] withdrew its position [in its third party complaint] when it voluntarily dismissed its claims, it is not subject to Rule 11 sanctions."); *Brown v. Pierce Mfg., Inc.*, 169 F.R.D. 118, 119 (E.D. Wis. 1996) (holding that Rule 11 sanctions cannot be imposed when plaintiff moved to dismiss deficient complaint within twenty-one days of being served with defendant's Rule 11 motion); 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1337.2 (4th ed., Apr. 2023 Update) ("[A] motion for sanctions will be rejected if the party subject to sanctions files for voluntary dismissal within the twenty-one day safe harbor period, because voluntary dismissal effectively constitutes a withdrawal of the offending paper for purposes of the safe harbor provision."), or when an amended pleading is filed that no longer asserts that claim, *see Team Obsolete Ltd. V. A.H.R.M.A. Ltd.*, 216 F.R.D. 29, 43 (E.D.N.Y. 2003) (holding that plaintiff "effectively withdr[ew]" sanctionable claims by dropping certain claims and certain defendants);

2 *Moore's Federal Practice* § 11.22(1)(b) ("Filing a motion for leave to amend a pleading *to eliminate challenged claims* constitutes effective withdrawal of those claims." (emphasis added)).

Plaintiff did not "withdraw" the challenged Complaint. Plaintiff continued to assert the same allegedly frivolous and harassing allegations and claims in the Amended Complaint as in the challenged Complaint. He reiterated his claims. Plaintiff also did not "appropriately correc[t]" the challenged Complaint. A pleading is "appropriately corrected" when the issues underlying a challenged claim or pleading are addressed. *See, e.g.*, *Rates Tech. Inc. v. Mediatrix Telecom, Inc.*, 2007 WL 1987787, at *4 (E.D.N.Y. June 29, 2007) (concluding that the relevant issue before the court was not whether the plaintiff sought leave to amend within the twenty-one-day safe harbor period but rather "whether the proposed First Amended Complaint corrects the alleged deficiencies in the original Complaint"). Moving Defendants did not seek sanctions on the basis that the Complaint lacked sufficient allegations of O'Melveny's and Sarnoff's legal work on behalf of Chinese entities or sufficient allegations of the threats that the PRC poses to United States interests, which were the topics addressed by the allegations added to the Amended Complaint. *See* Dkt. No. 43 ¶¶ 11–21, 35, 55. Moving Defendants sought sanctions because the Complaint itself was initiated to harass Moving Defendants, the FARA claim was legally and factually frivolous, and the Section 1983 and 1985(3) claims against Moving Defendants lacked any allegations that Moving Defendants were associated with the conduct of the NYPD on December 20, 2022. The Amended Complaint did not address any of those issues. Its very filing—and its failure to address the deficiencies of the Complaint—compounded the claimed injury to Moving Defendants. A party cannot escape Rule 11 sanctions by adding new

allegations or claims but at the same time still "insisting upon a position after it is no longer tenable." Fed. R. Civ. P. 11(b)–(c), Advisory Committee Notes to the 1993 Amendment.[14]

It follows further that Moving Defendants were not required to re-notice the defects in Plaintiff's pleading after Plaintiff filed the Amended Complaint or to give Plaintiff an additional twenty-one days to withdraw or correct its allegedly sanctionable claims. The twenty-one-day safe harbor time period has meaning. The longer a frivolous and harassing complaint remains outstanding the greater the harm. The twenty-one days corresponds with the time period under Rule 12(a)(1) to prepare and file an answer to a complaint, *see* Fed. R. Civ. P. 12(a)(1), and the time period under Rule 15(a)(1) to amend a pleading as of right, *see* Fed. R. Civ. P. 15(a)(1). If, within the time period the framers of the Federal Rules believed was sufficient to file a responsive or amended pleading, the offending party fails to correct a pleading whose defects have been identified to him, the offending party is not entitled to relief from a Rule 11 sanction. The damage has been done and remains.

Moving Defendants *would* have been required to re-notice Plaintiff if Moving Defendants sought sanctions based upon the Amended Complaint. A single Rule 11 motion does not function as an evergreen deposit serving as notice that whatever filings or papers follow are sanctionable without need of notice or an opportunity to be heard. The motion for sanctions is conduct specific; it "must describe the specific conduct that allegedly violates Rule 11(b)." Fed.

---

[14] The court in *Sacerdote v. Cammack Larhette Advisors, LLC*, 2022 WL 2078012, at *9 (S.D.N.Y. June 8, 2022), stated that "because Rule 11 is aimed at addressing particular defective or frivolous *documents*, a Rule 11 motion aimed at an initial complaint must be re-noticed upon the filing of an amended complaint." (emphasis in original) (citation and alteration omitted)). That language, however, is dicta in a case where the court held that the defendants never provided adequate notice as against the initial complaint and that, even if it had, its Rule 11 motion would have been meritless. *Id.* at *9–10. There is no reason to believe that the court would have reached the same result had proper notice been provided and the plaintiff—in the face of a Rule 11 motion—doubled down on its sanctionable conduct.

R. Civ. P. 11(c)(2).  But, here, Defendants do not seek sanctions based on the Amended Complaint; they seek to sanction the Complaint.[15]  Dkt. No. 38; Dkt. No. 56 at 3.  Therefore, the filing of an amended complaint did not "reset the clock," *Lawrence*, 620 F.3d at 158, and Moving Defendants' notice served on Plaintiff's two attorneys on March 29 and March 30, 2023 satisfies the dictates of Rule 11, *see* Dkt. No. 39.

## II.    Plaintiff's FARA Claim Was Frivolous

The Court has no difficulty concluding that Plaintiff's FARA claim is frivolous.  "An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an 'objective standard of reasonableness' . . . it is 'clear . . . that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands.'"  *Galonsky v. Williams*, 1997 WL 759445, at *3 (S.D.N.Y. Dec. 10, 1997) (quoting *Caisse Nationale de Credit Agricole–CNCA v. Valcorp, Inc*., 28 F.3d 259, 264 (2d Cir.1995)).  Although "Rule 11 provides room for litigants to make 'nonfrivolous argument[s] for extending, modifying, or reversing existing law,'" *Doe v. 239 Park Ave. S. Assocs., LLC*, 2022 WL 4592713, at *4 (S.D.N.Y. Sept. 30, 2022) (quoting Fed. R. Civ. P. 11(b)(2)), the Rule is violated "where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands," *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded on other grounds by rule*.  The standard is objective.  It is not a defense that the offending party acted with

---

[15] For this reason, *Lawrence v. Richman Group of CT LLC*, 620 F.3d 153, is distinguishable. There, the district court imposed sanctions on the plaintiff for filing a second amended complaint based on a Rule 11 motion noticed and filed with respect to the first amended complaint.  *See id.* at 157 (noting that "the sanctioned conduct was the filing of the second amended complaint" and that the panel was only reviewing the "safe harbor argument as it pertains to the filing of the second amended complaint," not the first amended complaint, which was properly noticed). Here, Moving Defendants seek sanctions with respect to the Complaint, not the Amended Complaint, and the Rule 11 motion is properly noticed with respect to that document.

a pure heart but an empty head. *See* Fed. R. Civ. P. 11(b)–(c), Advisory Committee Notes to the 1993 Amendment. "[T]he extent to which a litigant has researched the issues and found support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys" is taken into account in determining whether Rule 11 has been violated. *Id.*

Plaintiff's FARA claim here lacked any chance of success and was objectively frivolous. Plaintiff admitted that there is no "explicit 'private right of action' provision in the FARA statute," Dkt. No. 2 ¶ 178, and he relied on the notion that the court should imply that Congress intended to create such a right of action. But every court to have considered the issue, in this Circuit and elsewhere, has held that no private right of action can be implied in FARA. *See, e.g.*, *Dvoinik v. Rolff*, 2023 WL 3276398, at *5 (M.D. Fla. May 5, 2023) ("Nothing in the statutory scheme suggests an intent to create a private cause of action for FARA violations."); *Henry v. Washington*, 2022 WL 9491957, at *2 (W.D. Wash. Sept. 16, 2022), *report and recommendation adopted*, 2022 WL 9372175 (W.D. Wash. Oct. 14, 2022) ("[T]here is no private cause of action provided for in the act such that Plaintiff could sue for a violation of it."); *Bey v. Epstein*, 2021 WL 8155603, at *9 (D. Conn. Aug. 6, 2021) ("[A] private right of action cannot be inferred from FARA."); *Weican Meng v. Xinhuanet Co*., 2017 WL 3175609, at *5 (S.D.N.Y. July 24, 2017) (holding that FARA does not contain a private right of action); *Comm. for a Free Namibia v. S. W. Afr. People's Org.*, 554 F. Supp. 722, 725 (D.D.C. 1982).

Plaintiff's assertion that the Court was free to imply that Congress intended to fashion a private right of action because "the statute is silent on the creation of a private right of action," Dkt. No. 45 at 14 ¶ 66, only highlights counsel's abject failure to do any research into the basis of his claim before he filed it. The Supreme Court has been clear since at least its decision forty-four years ago in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979), where the Court

held that where Congress is silent as to its intent to create a private cause of action and there is

no basis to find one in the structure of the statute or in the legislative history, the courts are not

free simply to imply one. *See also Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 25 (1977)

(examining "legislative history to discern the congressional purpose underlying the specific

statutory prohibition" to determine "whether the creation by judicial interpretation of the implied

cause of action . . . is necessary to effectuate Congress' goals"). Indeed, twenty years ago, the

Court held that a court cannot imply a private right of action unless the federal law, on its face,

"manifests an intent 'to create not just a private right but also a private remedy.'" *Gonzaga

Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286

(2001)); *see also Olmsted v. Pruco Life Ins. Co*., 283 F.3d 429, 432 (2d Cir. 2002) ("A court . . .

cannot ordinarily conclude that Congress intended to create a right of action when none was

explicitly provided."). "[T]he Supreme Court has come to view the implication of private

remedies in regulatory statutes with increasing disfavor." *Republic of Iraq v. ABB AG*, 768 F.3d

145, 170 (2d Cir. 2014) (quoting *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286

F.3d 613, 618 (2d Cir. 2002)). The Supreme Court has "clarified in a series of cases that, when

deciding whether to recognize an implied cause of action, the 'determinative' question is one of

statutory intent." *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017) (quoting *Sandoval*, 532 U.S. at

286). Congress must have "'unambiguously conferred' 'individual rights upon a class of

beneficiaries' to which the plaintiff belongs." *Health & Hosp. Corp. v. Talevski*, 143 S. Ct.

1444, 1457 (2023) (quoting *Gonzaga Univ.*, 536 U.S. at 285–86). Thus, "implied rights of action

are disfavored." *Moya v. U.S. Dep't of Homeland Sec*., 975 F.3d 120, 128 (2d Cir. 2020)

(declining to find a private right of action under the Rehabilitation Act against executive

agencies). Since *Ziglar*, the Second Circuit has only found an implied right of action in one case,

and then only after determining that "[t]he text . . . unambiguously evinces Congressional intent to authorize a private action" and the statute "also identifies a 'class of persons'" who benefit from the availability of the right of action. *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105 (2d Cir. 2019).

Neither in his Complaint, nor in his opposition to the motion to dismiss, nor in his opposition to the Rule 11 motion, has Plaintiff identified any reason to believe that FARA would be an exception to the numerous regulatory statutes as to which the courts have held no private right of action exists. FARA was originally enacted "[t]o protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities for or on behalf of foreign governments, foreign political parties, and other foreign principals." *Meese v. Keene*, 481 U.S. 465, 469 (1987) (quoting Amendment to Foreign Agents Registration Act, Pub. L. No. 77-532, 56 Stat. 248, 248–49 (Apr. 29, 1942)). To that end, FARA requires a foreign agent as defined therein to file required documents with the Attorney General, 22 U.S.C. § 612(a), and it gives "the Attorney General [the authority to] make an application to the appropriate United States district court for an order enjoining such [violating] acts," 22 U.S.C. § 618(f). Moreover, Section 618(e) "criminalize[s] the failure to satisfy the requirements of . . . sections 612(a) and 612(b) [(*i.e.*, the failure to register)]." *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987). All of these rights of enforcement attach to the Attorney General, not private parties. And "[P]laintiff cannot point to any language in the statute or its legislative history which suggests that Congress intended to establish a cause of action in any entity other than the federal government." *Comm. for a Free Namibia*, 554 F. Supp. at 725.

The best that Plaintiff has been able to muster is to state that (1) "only District Courts have, as of yet, opined on the issue, and there has been no appellate or Supreme Court ruling," Dkt. No. 2 ¶ 178, and (2) "there has been a lack of enforcement action—resulting in the violation of constitutional rights, and a blatant disregard of the rule of law," *id*. ¶ 179. It is not necessary, however, for the Second Circuit or the Supreme Court to have explicitly rejected an argument for a district court to have the authority to conclude that the argument is frivolous. The number of issues that reach the appellate courts, much less the Supreme Court, is limited. Those courts do not have the resources to address every frivolous issue. Thus, that a claim has not previously been rejected by a circuit court does not alone give the plaintiff the license to make the claim, any more than the fact that an issue that previously has been addressed and rejected by a circuit court necessarily precludes a subsequent plaintiff from raising it. At all times, the critical question is not whether the circuit courts or Supreme Court has spoken directly on a particular issue—the question is whether the claim is "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). If the claim is warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law, a party can make that claim without violating Rule 11(b)(2). If it is not so warranted, the pleading is sanctionable.

Plaintiff's suggestion that he is entitled to enforce FARA because the United States government has not adequately done so fares no better; Plaintiff does not gain the right to step into the shoes of the United States Attorney General merely because he disagrees with his or her enforcement decisions. Plaintiff "did not come forward at any point with any authority or coherent explanation as to why he has" a private right of action, and the claim was "thus objectively frivolous." *Thompson v. Steinberg*, 2021 WL 3914079, at *7 (S.D.N.Y. Sept. 1,

2021), *aff'd*, 2023 WL 353359 (2d Cir. Jan. 23, 2023); *see also Biocad JSC v. F. Hoffman-La Roche Ltd.*, 2022 WL 268102, at *5 (S.D.N.Y. 2022) (imposing sanctions because "several courts . . . have previously" ruled against the legal argument, and yet plaintiff "did not cite a single case" explaining why the legal argument is still viable).

Moreover, even if the Court somehow found that FARA conferred a right of action on any private party, Plaintiff never articulated a basis upon which he could have asserted a FARA claim. As the Court concluded in its opinion dismissing Plaintiff's FARA claim in the Amended Complaint, Plaintiff did "not allege any harm associated with his allegation of Defendants' violation of" FARA and did not allege that any potential harm was "traceable to Defendants' failure to register under FARA or how a declaratory judgment compelling registration would redress his alleged injury." *Gong v. Sarnoff*, 2023 WL 4561800, at *11 (S.D.N.Y. July 17, 2023). The same conclusion applies with equal force to the Complaint.

Finally, Plaintiff's allegations lacked evidentiary support and there was no basis to believe that they would have evidentiary support. Plaintiff alleged that "O'Melveny is beholden to the CCP, and as such performs whatever acts are requested by the CCP—including acts within the United States that would require registration as foreign agents with the US Government." Dkt. No. 2 ¶ 47. Plaintiff further alleged that the CCP's unregistered agents in the United States "are now believed to be Defendant Sarnoff, Defendant O'Melveny and Defendant Stanton." *Id.* ¶ 64. However, the only factual allegations made to support these claims with respect to Moving Defendants are that they have performed legal work on behalf of a Chinese company, *id.* ¶¶ 25–26, and that O'Melveny has offices in the PRC from which it conducts "lucrative" business with a "potentially significant impact on the country," *id.* ¶¶ 42–43. However, FARA exempts from registration (1) "[a]ny person engaging or agreeing to engage only . . . in private and nonpolitical

activities in furtherance of the bona fide trade or commerce of such foreign principal," 22 U.S.C.

§ 613(d), and (2) "[a]ny person qualified to practice law, insofar as he engages or agrees to

engage in the legal representation of a disclosed foreign principal before any court of law or any

agency of the Government of the United State," *id.* § 613(g).  Further, "agent of a foreign

principal" is defined only to apply to activities performed by agents "within the United States."

*Id.* § 611(c).  There is no allegation of fact that O'Melveny or Sarnoff took any actions that

would fall within the ambit of FARA and not be reached by one of FARA's exemptions.

## III.    Plaintiff Initiated this Action with an Improper Purpose

Federal Rule of Civil Procedure 11 permits a court to impose sanctions when a pleading

has been filed "for any improper purpose, such as to harass, cause unnecessary delay, or

needlessly increase the cost of litigation."  Fed. R. Civ. P. 11(b)(1); *see also Fox v. Boucher*,

794 F.2d 34, 37–38 (2d Cir. 1986) (Federal Rule of Civil Procedure 11 "permits the imposition

of sanctions when an attorney signs a pleading that is interposed for an improper purpose without

reasonable inquiry or without grounds justifying the argument advanced.").  "There is a clear line

between zealous advocacy and abuse of the legal system that an attorney may not cross."

*Galonsky v. Williams*, 1997 WL 759445, at *1 (S.D.N.Y. Dec. 10, 1997) (citing *Baffa v.

Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 57 (2d Cir. 2000)).  But "[a] party should

not be penalized for or deterred from seeking and obtaining warranted judicial relief merely

because one of his multiple purposes in seeking that relief may have been improper."  *Sussman v.

Bank of Isr.*, 56 F.3d 450, 459 (2d Cir. 1995); *see also In re Firestar Diamond, Inc.*, 634 B.R.

265, 308 (Bankr. S.D.N.Y. 2021) ("While the 'improper purpose' and 'frivolousness' inquiries

are separate and distinct, they often overlap, and courts have found that a complaint is not filed

for an improper purpose if it is nonfrivolous.").  However, "[a] court may infer an improper

purpose if, in light of Plaintiffs' conduct during and outside of litigation, a complaint is so

28

baseless as to suggest that there is an ulterior motive behind the lawsuit." *An*, 2023 WL 4931832, at *6.

The Court also has no difficulty finding that Plaintiff here initiated this action for an improper purpose. The Complaint's allegations and claims against Moving Defendants are legally frivolous and factually flawed. Plaintiff's FARA claim is devoid of all factual and legal basis and is independently sanctionable. *See supra* Section II. Plaintiff's Sections 1983 and 1985 claims are similarly without merit.[16] Plaintiff alleged he was injured when he was hit by Stanton's car, Dkt. No. 2 ¶ 96, that no police report was filed, *id.* ¶ 108, and that the NYPD obstructed his ability to get medical attention, *id.* ¶¶ 112–19. However, Plaintiff never asserted any facts to support that Moving Defendants had any involvement in the events of December 20, 2022, exercised state authority, or acted in concert with the police. Nor did he assert any basis to believe that such evidence exists. *See Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998) (Rule 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed."). There was no reason to believe that either of Moving Defendants had any involvement in the offending conduct. The Complaint contains no non-conclusory allegations that either Moving Defendant was present at the scene when the offending conduct occurred or that Stanton or the NYPD was acting at the direction of the Moving Defendants.

In fact, when asked what his basis to believe that "Sarnoff and O'Melveny actually did collude with the police" during the initial pretrial conference, counsel for Plaintiff, Richard

---

[16] In its Opinion and Order on Moving Defendants' motion to dismiss Plaintiff's Amended Complaint, the Court dismissed with prejudice Plaintiff's 42 U.S.C. §§ 1983 and 1985(3) claims, which were supported by substantively identical allegations to those asserted in the Complaint, pursuant to Rule 12(b)(6) for failure to state a claim.

Freeth, responded with speculation and conjecture. *See Craig v. City of New York*, 2022 WL 2238451, at *6, *12 (E.D.N.Y. June 22, 2022) (complaint is sanctionable when it rests "on conjecture and speculation"); *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 661 (S.D.N.Y. 1996) ("The total lack of substance [of a complaint] gives rise to the inference that the action was filed for improper purposes."). Counsel stated that he "would imagine" that Moving Defendants had a connection with Stanton and that "it would make sense that, you know, the defendants [Sarnoff and O'Melveny] in their position would send someone to, at least, observe, get information." Dkt. No. 34 at 6–7. Imagination is guess work; it does not permit one to sue a party for violation of a law enforceable by criminal penalties. The Complaint is similarly devoid of allegations regarding Stanton's connection with the police; though it alleges that Stanton "indicated that he worked with or had some kind of connection [with the] NYPD," it concludes "[u]pon information and belief, [that] Defendant Stanton is not an officer with the NYPD." Dkt. No. 2 ¶¶ 80, 82. Moreover, pressed for clarification about what the state action in this case was, Freeth suggested that "it seems strange[,] [s]eems very, you know, suspect to me" that when Plaintiff fell "down in the street after making contact with a vehicle," the police didn't "do anything." Dkt. No. 34 at 8–9. In response to a question from the Court about whether "discovery would help [Plaintiff] sustain this complaint," Plaintiff's counsel responded, "Well, maybe it would, and maybe it would turn out to be that there isn't anything to support [the Complaint]. I don't know." Dkt. No. 34 at 9.

There is every reason to believe, and the Court finds, that the Complaint was filed not to redress any injury Plaintiff suffered on December 20, 2022, or to obtain judicial relief, but to harass Moving Defendants because of their representation of a client in litigation against Kwok and to deter others from doing the same. Plaintiff and his counsel Zhang are affiliated with

Kwok and sympathetic to him and his interests. *See supra* pp. 12–14. Plaintiff experienced his alleged injury at a protest outside Sarnoff's house. *See* Dkt. No. 2 ¶ 71. He previously attended protests outside O'Melveny's office. *Id.* ¶ 67. The Court rejects the notion that Plaintiff attended those protests solely or even primarily because of Moving Defendants' representation of Chinese clients or offices in China. Numerous other law firms represent Chinese clients in litigation in the United States and have (or until recently had) offices in China. The protests singled out Moving Defendants and they singled out Moving Defendants after they had assisted a client in litigation against Kwok. The inference is inescapable that Plaintiff attended the protests because of the assistance that Moving Defendants provided their client against Kwok and to deter and prevent Moving Defendants from continuing to do so.

The conclusion that the lawsuit was filed to harass Moving Defendants, to punish them for their representation of PAX, and to deter others from also representing clients with interests that are opposed to Kwok's is further reinforced by the language of Plaintiff's brief in opposition to the motion for sanctions. Plaintiff argues that Moving Defendants' accusations are "dismissive" because they "suggest that Plaintiff is simply an empty-headed follower of Mr. Kwok." Dkt. No. 45 ¶ 13. Nowhere in his opposition brief does he dispute that he is a follower of Kwok or make anything other than the most superficial and conclusory argument that the lawsuit was filed for reasons other than to harass Moving Defendants for their involvement in the PAX litigation and Bankruptcy Court litigation.[17] In fact, he spends 31 paragraphs of his opposition devoted to the argument Kwok has been unfairly targeted by the CCP and the United

---

[17] Plaintiff argues that he "has initiated this matter because his Constitutional rights have been violated [and] he feels threatened by the CCP, and its agents, facilitators and/or co-conspirators." *Id.* ¶ 52. However, that argument as against Moving Defendants is belied, as described in detail above, by the frivolousness of the claims brought against them.

States government, that the PAX litigation and bankruptcy proceedings were part of some broader conspiracy against Kwok, and that the CCP has "weaponize[ed]" the "U.S. Courts to target Mr. Kwok." *Id.* ¶¶ 15–46.

And if there is any doubt of the harassing purpose of this lawsuit, the history of lawsuits Zhang and Freeth have filed in this Court and elsewhere against PAX, persons associated with PAX, PAX's counsel, and those assisting the Bankruptcy Court settles that doubt. "Although a party should not be sanctioned for 'greater litigiousness' alone, a court may infer improper purpose where multiplicative filings are coupled with 'objectively unreasonable statements.'" *LCS Grp., LLC v. Shire LLC*, 2019 WL 1234848, at *14 (S.D.N.Y. Mar. 8, 2019) , *judgment aff'd, appeal dismissed in part sub nom. LCS Grp., LLC v. Shire Dev. LLC*, 2022 WL 1217961 (2d Cir. Apr. 26, 2022) (quoting *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 393 (2d Cir. 2003)); *see also* Fed. R. Civ. P. 11(b)–(c), Advisory Committee Notes to 1993 Amendment (noting that "whether *the person*"—and not specifically "the litigant"—"has engaged in similar conduct in other litigation . . . may in a particular case be [a] proper consideration[]" in determining whether and what kind of sanctions to impose). Plaintiff's counsel has engaged in repeated frivolous litigation in this Court and the District of Maryland. *See supra* pp. 14–16. These cases are unmistakably directed at parties and lawyers, who are either involved in Kwok's bankruptcy or in the PAX litigation. They contain similar allegations and similarly frivolous claims. The inescapable conclusion is that Zhang and Freeth are targeting those with interests opposed to Kwok's with the aim of chilling what they perceive as advocacy against him. The plaintiffs in the actions brought by Zhang and Freeth could have pursued relief from any number of individuals and entities engaged in similar activity in the PRC and for PRC companies for allegedly violating the registration requirements of FARA, but they did not. They only went

after individuals and entities who were involved in the Kwok bankruptcy or the PAX action.

Although not dispositive here, this conclusion adds force to the Court's finding that sanctions are

necessary and should be applied against Plaintiff's counsel.  *See Billewicz v. Town of Fair

Haven*, 2022 WL 4115966, at *13 (D. Vt. Aug. 11, 2022), *aff'd*, 2023 WL 3961437 (2d Cir. June

13, 2023) ("This repeated litigation suggests a pattern of abusive litigation and gives rise to an

inference of improper motives.").

Lastly, the inference that the litigation was not filed to obtain judicial relief but to harass

PAX's lawyers because they are PAX's lawyers is reinforced by the failure of Plaintiff and his

counsel to pursue—before the Court prompted counsel to do so—the persons Plaintiff alleges to

be those who inflicted harm against him by violating his constitutional rights: the NYPD and its

officers.  Plaintiff's Complaint was accepted for filing on January 18, 2023, *see* Dkt. No. 2, and

Plaintiff requested that summonses be issued as to Moving Defendants and Stanton

approximately a month later on February 23, 2023, *see* Dkt. Nos. 5–7.  Plaintiff did not then, or

within the requisite 90 days, serve or attempt to serve the City of New York or any of the officers

allegedly involved in the December 20 incident—who he alleges were the principal wrongdoers.

He served the summonses and Complaint on Moving Defendants and Stanton alone on March

20, 2023.  Dkt. No. 18.  Indeed, it was not until over four months later that Plaintiff served the

state actors named as defendants in this case, *see* Dkt. Nos. 59, 64, and even then, only after the

Court alerted Plaintiff to the defect and ordered Plaintiff to show cause why the case should not

be dismissed pursuant to Federal Rule of Civil Procedure 4(m) for failure to serve the City of

New York and the named police officer—Lauren A. Duffy—*see* Dkt. No. 58.  There is every

reason to believe that had the Court not issued the Order to Show Cause the City of New York

would *never* have been served.  And there is thus every reason to believe that Plaintiff did not

file this lawsuit as a result of some grievance he had with the City of New York as a result of the conduct of the NYPD or to obtain relief from an injury he alleges he suffered as a result of conduct by the NYPD. The inference is inescapable that he filed the lawsuit to harass and deter O'Melveny and Sarnoff for their conduct on behalf of a client who opposed Kwok's interests and not because of any injury Plaintiff suffered on December 20, 2020.

## IV. Sanctions Award

Rule 11 permits a court to "impose an appropriate sanction" if it finds the Rule 11(b) has been violated "after notice and a reasonable opportunity to respond." "A sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Still, "[u]nder Rule 11, a District Court retains broad discretion to fashion an appropriate sanction based on the facts and circumstances of a particular case." *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *15 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009); *see also Lawrence v. Wilder Richman Sec. Corp.*, 417 F. App'x 11, 15 (2d Cir. 2010) ("[A] district court has 'broad discretion' to 'tailor[ ] appropriate and reasonable sanctions under [R]ule 11,' including an award of attorney's fees where warranted." (internal citations omitted) (quoting *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990))).

A court considering sanctions must be sensitive to the concern that it is not chilling legitimate advocacy. There is nothing inherently wrong in pursuing those persons believed to be supporters of the PRC based on legitimate legal arguments or arguments based on a well-founded belief in the reversal of existing law. But Plaintiff here, and his attorneys, are not seeking to use the legal system to vindicate rights; they are seeking to use the legal system to chill legal advocacy and to harass Moving Defendants because of their association with a

particular client. It is this behavior, coupled with the frivolousness of Plaintiff's FARA claim, that merits sanctions.

Moving Defendants request that the Court require that Zhang and Freeth "pay all attorneys' fees and costs that Defendants Mr. Sarnoff and O'Melveny have incurred in defending against this action."[18] Dkt. No. 37. The Court finds that an award of attorneys' fees and costs for defending this action—but not for bringing the Moving Defendants' motion under Rule 11— is no greater than what is necessary to "deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). These costs and attorneys' fees are to be borne by Freeth, Zhang, and Plaintiff. *See An v. Despins*, 2023 WL 4931832, at *8 (concluding that sanctions should be imposed on plaintiff's counsel for "issue[s] over which counsel exercise[d] principal responsibility," like ensuring that the complaints filed met a minimum merit threshold and pled adequate facts to establish subject matter jurisdiction" (alterations in original) (quoting *United Republic Ins. Co., in Receivership v. Chase Manhattan Bank*, 315 F.3d 168, 171 (2d Cir. 2003))). Moving Defendants are directed to file an application for fees and costs within fourteen days of the date of this Order.

Freeth has pleaded that he lacks the ability to pay Moving Defendants' attorneys' fees and costs. It is appropriate to consider ability to pay at this stage. *See* Fed. R. Civ. P. 11(c)(4) ("A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."); *see also* Fed. R. Civ. P. 11(b)–(c),

---

[18] Although Zhang has not made an appearance in this action, he, along with Freeth, signed the Complaint and thus "certifie[d] [to the Court] to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstance." Fed. R. Civ. P. 11(b). Rule 11(c) permits a court to sanction "any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. C. P. 11(c)(1). It does not limit a court's ability to sanction attorneys to those who have made an appearance in a case. The Court finds that Zhang, alongside Freeth, is responsible for the violations of Rule 11 detailed in this Opinion and Order.

Advisory Committee Notes to 1993 Amendment (noting that "what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants . . . may in a particular case be proper considerations" in determining whether and what kind of sanctions to impose); *Star Mark Mgmt., Inc.*, 682 F.3d at 179 (noting that a "district court[ has] broad discretion to lower a sanctions award based on inability to pay"); *Oliveri v. Thompson*, 803 F.2d 1265, 1281 (2d Cir. 1986) ("[G]iven the underlying purpose of sanctions—to punish deviations from proper standards of conduct with a view toward encouraging future compliance and deterring further violations—it lies well within the district court's discretion to temper the amount to be awarded against an offending attorney by a balancing consideration of his ability to pay.").  Accordingly, within seven days of the date that the application for fees and costs is submitted, Plaintiff and his counsel may submit any information they desire the Court to consider in apportioning (or not apportioning) the fee award.[19]

Additionally, Zhang and Freeth are directed to pay the Court a fine of $2,500 each for the burden that litigating the Complaint placed on the Court and its personnel and to deter the two from filing such frivolous and harassing litigation in the future.  *See* Fed. R. Civ. P. 11(b)–(c), Advisory Committee Notes to 1993 Amendment (noting that the "court has available a variety of possible sanctions to impose for violations, such as . . . ordering a fine payable to the court").  Such payments shall be made to the Clerk of Court of the Southern District of New York within fourteen days of the date of this Opinion and Order and proof of payment shall be filed on the docket.

---

[19] Moving Defendants may request leave to submit a reply brief, if necessary, within two business days of any response by Plaintiff.

Moving Defendants also seek an order "enjoining Plaintiff, Plaintiff's counsel, and those in active concert with them from filing other similar suits without leave of court." Dkt. No. 37. "If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system." *Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) (internal quotation marks and citation omitted). Factors that a court should consider "in restricting a litigant's future access to courts" include:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*Iwachiw v. N.Y. State Dep't of Motor Vehicles*, 396 F.3d 525, 528 (2d Cir. 2005) (quoting *Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986)). "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Newman v. Jewish Agency for Isr.*, 2017 WL 6628616, at *6 (S.D.N.Y. Dec. 28, 2017), *aff'd sub nom. Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709 (2d Cir. 2019) (quoting *Safir*, 792 F.2d at 24).

The Court finds that an anti-suit injunction is not appropriate or necessary based on the current record. Although the Court has found that Plaintiff filed this suit to harass Moving Defendants and that he and his counsel did not have an objective good faith expectation of prevailing in this suit, Moving Defendants point to no other lawsuits that Plaintiff has filed for harassing purposes nor have they pointed to a real risk that Plaintiff himself will continue to file such harassing lawsuits if not enjoined. As to Plaintiff's counsel, while they appear to have engaged in repeated frivolous and harassing litigation over the course of several lawsuits, they have not, to the Court's knowledge, filed other actions since sanctions have been awarded

against them in the case currently before the Honorable Valerie E. Caproni, *see An et al. v. Despins et al.*, No. 22-cv-10062 (VEC) (S.D.N.Y.).  Moving Defendants themselves concede that they are not seeking referral to any disciplinary committee that would have the authority to restrict Moving Defendants' practice of law and the Court sees no such basis to do so on the present record.  That counsel proceeded in the face of accusations that they violated Rule 11 (prior to any judicial finding that they did so) is an insufficient basis to impose any restrictions on the ability of counsel to file cases on behalf of their future clients.

During Oral Argument, Moving Defendants requested that the Court order Plaintiff to strike the allegations against them from the Amended Complaint and, if he elects to pursue his claims against the other defendants, that he file an amended complaint before doing so. Plaintiff's counsel did not object to this request.  Moving Defendants are directed to identify in their memorandum in support of attorneys' fees and costs the paragraphs that should be stricken from the Complaint and the Amended Complaint.  Plaintiff may respond two weeks thereafter. *See* Fed. R. Civ. P. 11(b)–(c), Advisory Committee Notes to 1993 Amendment ("The court has available a variety of possible sanctions to impose for violations, such as striking the offending paper.").

Finally, the Court will require Plaintiff, Zhang, and Freeth to file a copy of this Opinion and Order in all future actions opened by them for a period of one year from the date of this Opinion and Order.

## CONCLUSION

The motion for sanctions is GRANTED IN PART and DENIED IN PART. Moving Defendants are directed to submit an application for reasonable costs and attorneys' fees by no later than fourteen days from the date of this Opinion and Order. If Zhang, Freeth, and Plaintiff wish to offer evidence not already received by the Court, they are directed to do so alongside any objections to Moving Defendants' application for reasonable attorneys' fees and costs within seven days of the filing of such application.

The Clerk of Court is respectfully directed to close Dkt. No. 36.


SO ORDERED.


Dated: August 22, 2023
      New York, New York                       LEWIS J. LIMAN
                                             United States District Judge

**Exhibit 5**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

|  |  |  |  |
|---|---|---|---|
| IN RE: | ) | | |
| | ) | CASE No. | 22-50073 (JAM) |
| HO WAN KWOK, | ) | | |
| | ) | CHAPTER | 11 |
| DEBTOR. | ) | | |
| | ) | RE: ECF No. | 183 |

### APPEARANCES[1]

Jeffrey L. Jonas
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
*Attorney for the Debtor*

Holley L. Claiborn
Office of the United States Trustee
150 Court Street, Room 302
New Haven, CT 06510
*Attorney for the United States Trustee*

Peter Friedman
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, DC 20006
*Attorney for Pacific Alliance Asia
Opportunity Fund, L.P.*

Irve J. Goldman
Pullman & Comley
850 Main Street, 8th Floor
Bridgeport, CT 06604
*Attorney for the Official Committee of
Unsecured Creditors*

Carollynn Callari
Callari Partners, LLC
One Rockefeller Plaza, 10th Floor
New York, New York 10020
*Attorney for Creditors Rui Ma, Weican Meng,
and Zheng Wu*

### MEMORANDUM OF DECISION AND ORDER DENYING
### MOTION TO DISMISS WITHOUT PREJUDICE AND GRANTING
### JOINDER TO MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

I.     **Introduction**

On February 15, 2022, Ho Wan Kwok (the "Debtor"), filed a voluntary Chapter 11

petition commencing this case.  Although the Debtor's case has been pending for only four

---

[1] William R. Baldiga and Bennett S. Silverberg for the Debtor, Laura Aronsson and Patrick M. Birney for PAX, and Kristin Mayhew for Creditors Ma, Meng, and Wu also appeared at the hearing on the Motion to Dismiss.

months, numerous motions and applications have been filed by the Debtor, the Office of the

United States Trustee, creditors, and entities or individuals related to the Debtor. Several

extensive hearings have been held, including the most recent evidentiary hearing on a motion to

dismiss the Debtor's case or appoint a Chapter 11 trustee.

The issues raised by the parties in the voluminous pleadings, and the information and

evidence presented during hearings held in this case, confirm that the Debtor's case is unusual,

complicated, and often contentious. Based on the specific facts and circumstances of this case,

including the review of the record, the evidence presented by the parties, and the complex factual

and legal issues that have been brought before the Court, pursuant to 11 U.S.C. § 1112(b), the

Court finds that it is in the best interests of creditors and the estate not to dismiss or convert the

Debtor's case at this time and to instead appoint a Chapter 11 trustee.[2]

## II.    Jurisdiction

This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This

is a core proceeding pursuant to 28 U.S.C. § 157(b). This Court has the authority to hear this

matter pursuant to the General Order of Reference entered on September 21, 1984 by the United

States District Court for the District of Connecticut.

## III.    History of Proceedings

It is essential to examine the events that have occurred in the Debtor's case to determine

whether dismissal, conversion, or the appointment of a Chapter 11 trustee is in the best interests

---

[2] Section 1112(b)(3) requires the Court to rule on a Motion to Dismiss within 15 days after
commencement of the hearing. During a June 9, 2022, status conference to address corrections
to the official transcript of the hearing on the Motion to Dismiss, the Court informed the parties
that a ruling on the Motion to Dismiss would likely be issued more than 15 days after the hearing
for several reasons, including the complexity of the Debtor's case and numerous hearings
scheduled to be held in other cases during the 15-day period.

of creditors and the estate. At the core of the Debtor's case is a luxury yacht known as the "Lady May," allegedly purchased for €41,000,000.00, and other assets that may belong to the Debtor including an apartment in the Sherry-Netherlands Hotel in Manhattan allegedly purchased for approximately $70,000,000.00 in 2015. When viewed as a whole, the circumstances surrounding the Debtor's case demonstrate why the appointment of a Chapter 11 trustee, as opposed to dismissal or conversion of the Debtor's case, is in the best interests of creditors and the estate.

### The Debtor's Motion to Extend Time to File Schedules and Statements

As noted above, the Debtor commenced this case on February 15, 2022, by filing a voluntary Chapter 11 petition. The Debtor filed the list of the twenty largest unsecured creditors with the petition and identified Pacific Alliance Asia Opportunity Fund L.P. ("PAX") as the Debtor's largest creditor with a debt of approximately $254,000,000.00. ECF No. 4 at p. 1.

The Debtor did not file the Schedules or the Statement of Financial Affairs with his petition, but did timely file a Motion to Extend Deadline to File Schedules or Provide Required Information to May 2, 2022 (the "Motion to Extend Time to File Schedules and Statements," ECF No. 27). In support of the requested extension of time, the Debtor states that his 'background is admittedly extraordinary" and additional time would allow him to retain professionals necessary to assist with the preparation and filing of the Schedules and Statements and to secure the financing to administer his Chapter 11 case. ECF No. 27 at p. 2.

On February 28, 2022, the Office of the United States Trustee (the "UST") and PAX filed strenuous objections to the Motion to Extend Time to File Schedules and Statements. In the objections, both the UST and PAX assert the Debtor's case was filed in direct response to a $134,000,000.00 contempt order entered against the Debtor arising out of his involvement in

secreting the Lady May out of New York to protect it from being seized. PAX's objection also asserts that the Debtor has flouted the New York state court orders and abused the judicial process in an attempt to evade enforcement of the $116,000,000.00 judgment PAX won against him. PAX notes that the New York state court found "Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members," and as a result of his elaborate schemes to avoid his creditors, the New York Supreme Court docket contains over 1,180 entries, "almost all of which involve . . . [Kwok's] efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members." PAX Objection, ECF No. 50 at p. 2. Furthermore, PAX asserts that there are at least three materially false and/or misleading statements in the Debtor's petition, including his sworn (mis)representation that he has less than $100,000.00 in assets which is completely incompatible with the New York state court's finding just days before that Kwok "holds a beneficial interest in and controls the Lady May." *Id*.

### PAX's Automatic Stay Motion

On March 1, 2022, just two weeks after the Debtor's case was filed, PAX filed a Motion for Entry of Order Confirming Inapplicability of the Automatic Stay or, in the alternative, Relief from the Automatic Stay (the "Automatic Stay Motion," ECF No. 57). The Automatic Stay Motion sets forth extensive, detailed, and serious allegations against the Debtor. PAX argues that the automatic stay did not apply in this case due to the imposition of sanctions entered against the Debtor in the pre-petition New York state court action. PAX states that the court's sanctions held the Debtor in civil contempt for failure to return the Lady May to New York in violation of its orders. The Debtor filed an Objection to the Automatic Stay Motion, in which the Debtor does not dispute the imposition of the sanctions, but instead argues that he does not

4

own or control the Lady May.  Debtor's Objection to Automatic Stay Motion, ECF No. 83 at p.

7.

### The Debtor's Schedules and Statement of Financial Affairs

On March 9, 2022, the Debtor filed his Statement of Financial Affairs, ECF No. 77, and

Schedules, ECF No. 78.  The Debtor asserts in the Schedules and Statement of Financial Affairs

that he owns assets valued at $3,850.00 and lists liabilities in the amount of $373,803,498.09.  In

global notes that limit and disclaim the Debtor's declarations made under penalty of perjury in

the Statement of Financial Affairs, the Debtor further asserts he: (i) has the use and occupancy

of, but not title to, real property in Greenwich, Connecticut owned by a limited liability company

wholly owned by his wife; (ii) wholly owns the membership interests in another limited liability

company that holds all of the cooperative shares in an apartment in the Sherry-Netherlands Hotel

in Manhattan in trust for a separate limited liability company owned by his son, Qiang Guo; and

(iii) had access to the use of the Lady May owned by HK International Funds Investments (USA)

Limited ("HK"), a limited liability company owned by his daughter, Mei Guo.  ECF No. 77 at p.

4-5.

### The UST Motion for Examiner or Chapter 11 Trustee

On March 18, 2022, less than two weeks after the Debtor filed his Schedules and

Statement of Financial Affairs, the UST filed a Motion for Order Directing the Appointment of

an Examiner, or in the alternative, Motion for Order Directing the Appointment of a Chapter 11

Trustee (the "UST Motion for Examiner or Chapter 11 Trustee," ECF No. 102).  The UST

argues that it is in the best interests of creditors and the estate to appoint an examiner or a trustee

because the Debtor, a public figure and a self-proclaimed billionaire living in exile from his

native China, claims that he has no regular income and virtually no assets yet seemingly has

access to significant funds, including the ability to procure a $1,000,000.00 retainer for his counsel in this case. The UST notes its concerns about the "odd combination of what appears to be artificial self-created 'poverty' by the Debtor to insulate himself from creditors" and the Debtor's filing of this case to "obtain protection from creditors owed millions." ECF No. 102 at p. 2. Furthermore, the UST states that its concerns are validated by: (i) "the Debtor's marginalization of his schedules and statement of financial affairs to the point of being meaningless;" (ii) the Debtor "brazenly disclaims any responsibility or liability for any of the information in the bankruptcy documents pursuant to self-serving, anti-fiduciary language in the 'Global Notes;'" and (iii) "the Debtor's inability and/or unwillingness to recognize and accept his obligations to provide full, complete and accurate information, to fulfill fiduciary obligations to his estate and his creditors, and to meet his obligations as a debtor in possession." *Id*.

### The Notice of Appointment of the Committee of Unsecured Creditors

On March 21, 2022, three days after the UST filed the Motion for Examiner or Chapter 11 Trustee, the UST filed a Notice of Appointment of Creditor Committee in this case (ECF No. 108). The members of the Official Committee of Unsecured Creditors (the "Committee"), who are among the largest unsecured creditors of the Debtor and have indicated a willingness to serve on the Committee, are the following creditors: (i) Rui Ma, (ii) Ning Ye, and (iii) Samuel Dan Nunberg.

### The DIP Financing Motion

On March 22, 2022, one day after the appointment of the Committee, the Debtor filed a Motion for Entry of Interim and Final Debtor in Possession Financing Orders (the "DIP Motion," ECF No. 117). In the DIP Motion, the Debtor seeks approval of a loan in the amount of $8,000,000.00 to be made to the estate on an unsecured basis, subordinated to the claims of the

Debtor's pre-petition creditors, without any administrative or priority repayment rights.  The loan would be available to pay the estate's professionals and would be repaid if, and only if, all allowed claims of the Debtor's creditors are paid in full or otherwise satisfied pursuant to the terms of a plan. The proposed lender, Golden Spring (New York) Ltd. (the "DIP Lender"), is an entity owned and controlled by the Debtor's son, Qiang Guo.

The DIP Motion asserts that the Debtor filed his Chapter 11 case to: (a) create a single forum to orderly address the various competing claims asserted against him; (b) afford stakeholders an efficient opportunity to investigate his assets, liabilities, and financial affairs; (c) establish what assets are estate property and, in turn, available for distribution to holders of allowed claims; and (d) reach consensus with his creditors on a fair and equitable resolution of claims and distribution of assets pursuant to a Chapter 11 plan.  DIP Motion, ECF No. 117 at p. 5.

### PAX's Motion to Dismiss and Joinder

On April 6, 2022, approximately three weeks after the UST's Motion for Appointment of Examiner or Chapter 11 Trustee and DIP Motion were filed, PAX filed a Motion to Dismiss or, in the alternative, Partial Joinder to the USTs Motion for the Appointment of a Chapter 11 Trustee (the "Motion to Dismiss or Joinder," ECF No. 183).   In support of the Motion to Dismiss or Joinder, PAX argues that the filing of the Debtor's case "is the latest, most strident gambit" of the Debtor to "delay, deceive, and defraud his creditors, and to continue to evade legitimate court orders" and that the Debtor's "*modus operandi* is to park, shield and secrete his assets through family members and shell companies to protect his fortune and to avoid repaying his debt to PAX."  ECF No. 183 at p. 7.  The Debtor, PAX argues, has "secreted his assets in a maze of corporate entities and with family members."  *Id*. at p. 7-8.

Along with the Motion to Dismiss or Joinder, PAX filed a Motion to schedule status on the Motion to Dismiss or Joinder. The Court granted PAX's motion in part and scheduled a Status Conference on the Motion to Dismiss or Joinder to be held on April 13, 2022, the same date of a hearing on several other matters in the case, including the continued hearing on the Automatic Stay Motion and the initial hearing on the Motion for Appointment of Examiner or Chapter 11 Trustee and the DIP Motion.

### The Debtor's Chapter 11 Plan

On April 10, 2022, the Debtor filed a proposed Chapter 11 Plan of Reorganization (the "Plan," ECF No. 197). Among other things, the Plan provides for the creation of a "Creditor Trust" for the benefit of all creditors with allowed claims. ECF No. 197 at p. 20-24. The Plan further provides that title to the Lady May will be transferred to the Creditor Trust for the benefit of all creditors with allowed claims. ECF No. 197 at p. 21.

### HK's Statement regarding the Automatic Stay Motion

On April 11, 2022, the day after the Debtor filed the Plan, HK (which as noted above is a limited liability company owned by the Debtor's daughter) filed a Statement regarding the Automatic Stay Motion (the "Statement," ECF No. 203). In the Statement, HK asserts that it is the registered agent of the Lady May and that it consents to the entry of a proposed order compelling it to transport and deliver the Lady May to the navigable waters of Connecticut under certain conditions. HK further asserts that it provided a copy of the Proposed Order to counsel for PAX, the Debtor, the UST, and the Committee for their respective comments and that entry of the proposed order compelling HK to return the Lady May to Connecticut would "moot" the Automatic Stay Motion. Statement at p. 2.

### The April 13, 2022 hearing

Several matters were scheduled to be heard on April 13, 2022, including the continued hearing on the Automatic Stay Motion and the initial hearing on the DIP Motion and the UST Motion for Examiner or Chapter 11 Trustee. At the conclusion of the lengthy hearing, the Court again continued the hearing on PAX's Automatic Stay Motion, continued the hearing on the UST Motion for Examiner or Chapter 11 Trustee, and scheduled an evidentiary hearing on the DIP Motion and the Debtor's Application to Employ Financial Advisor to be held on April 27, 2022.

### April 27, 2022 evidentiary hearing, the resolution of the Automatic Stay Motion, and the scheduling of an evidentiary hearing on the Motion to Dismiss or Joinder

The Debtor, PAX, the UST, the Committee, the creditors Rui Ma and Zheng Wu, Golden Spring, and HK appeared at the April 27th evidentiary hearing. At the start of the hearing, counsel for the Debtor reported to the Court that the parties had resolved the Automatic Stay Motion. The predominant terms of the resolution were that $37,000,000.00 would be posted by HK and held in escrow pending the return of the Lady May to the navigable waters of Connecticut. The parties agreed that a resolution of the Automatic Stay Motion had been reached subject to the review of and revisions to a stipulated order that would be submitted to the Court. Counsel for HK was then excused from the hearing to continue revisions to the draft of a stipulated order. The Court noted on the record, and ultimately on the docket, that the Automatic Stay Motion was resolved by agreement of the parties subject to an agreed upon order to be submitted to the Court on or before May 2, 2022.

Testimony, evidence, and arguments were also presented regarding the Debtor's Motion to Retain a Financial Advisor and the DIP Motion. At the conclusion of the evidentiary hearing, the Court took the Debtor's Motion to Retain a Financial Advisor under advisement and

continued the hearing on the DIP Motion to May 4, 2022. In addition, the provisions of a scheduling order regarding an evidentiary hearing on the Motion to Dismiss or Joinder were agreed to by the parties on the record. On April 28, 2022, the Court entered a Scheduling Order Regarding the Motion to Dismiss scheduling the evidentiary hearing for May 24, 2022.

### The Stipulated Order regarding the Lady May

On April 29, 2022, the Court entered the Stipulated Order Compelling HK International Funds Investments (USA) Limited, LLC to Transport and Deliver that Certain Yacht, the "Lady May," which was executed by and among HK, PAX, the Debtor, the Committee, and the creditors Rui Ma and Zheng Wu (the "Stipulated Order," ECF No. 299). Among other things, the Stipulated Order provides: (i) HK has deposited $37,000,000.00 into escrow; (ii) HK will deliver the Lady May to the navigable waters of Connecticut on or before July 15, 2022; and (iii) the captain of the Lady May and the purported yacht management company will submit a declaration that each shall be subject to the jurisdiction of this Court and are bound by the provisions of the Stipulated Order, including that they are restrained from removing the Lady May from the navigable waters of Connecticut until further order of this Court.

### The continued DIP Motion hearing,
### the Consent to Dismissal, and the Withdrawal of the DIP Motion

On May 3, 2022, the Debtor filed an amended proposed order regarding the DIP Motion. The amended proposed order contained a chart indicating when and in what amount the DIP funds would be spent. The amended proposed order provided that professional fees would be paid on a weekly basis, including the fees of the Debtor's counsel and counsel for the Committee.

On May 4, 2022, the continued hearing on the DIP Motion was held. The Debtor and the Committee argued that the DIP Motion should be granted and the amended proposed order should enter. PAX and the UST reiterated their respective objections to the DIP Motion. The Court then asked several questions about the asserted need to pay several million dollars of professional fees through the end of May, 2022. At the conclusion of the hearing, the Court stated that a ruling on the DIP Motion would issue which would determine the appropriate amounts to be spent through the end of May, 2022.

On May 11, 2022, one week after the conclusion of the DIP Motion hearing, the Debtor filed a Notice of Consent to Dismissal of Case (the "Consent to Dismissal"). In the Consent to Dismissal, the Debtor asserts that he consents to dismissal of his case due to the tremendous costs imposed on him from unrelenting litigation by PAX and others, and his inability to access funds to meet those costs. Also on May 11, 2022, while the DIP Motion was under advisement and the Court was preparing to rule on the motion, the Debtor filed a Withdrawal of the DIP Motion.

### The Evidentiary Hearing on the Motion to Dismiss or Joinder

On May 24, 2022, the evidentiary hearing on PAX's Motion to Dismiss or Joinder was held. At the start of the hearing, all of the parties acknowledged that the Consent to Dismissal changed the posture of the Debtor's case. In addition, all of the parties agreed that cause exists under section 1112(b) to dismiss or convert the Debtor's case or to appoint a Chapter 11 trustee. PAX and the Debtor argued that the Debtor's case should be dismissed. The Committee and certain creditors argued that conversion is most appropriate, but absent conversion, a Chapter 11 trustee should be appointed. The UST did not argue in favor of any one of the three alternatives, but urged the Court to decide the matter as quickly as possible.

11

IV.   **Analysis**

Section 1112(b) of the Bankruptcy Code provides:

[O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1); *see also In re Sillerman*, 605 B.R. 631, 657 (Bankr. S.D.N.Y. 2019); *In re TP, Inc.*, 455 B.R. 455, 457 (Bankr. E.D.N.C. 2011); *In re Products Intern. Co.*, 395 B.R. 101, 107 (Bankr. D. Ariz. 2008).

During the evidentiary hearing on the Motion to Dismiss or Joinder, all of the parties stipulated that cause exists to dismiss the case, convert the case to Chapter 7, or to appoint a Chapter 11 trustee.  The Debtor asserts that cause exists to dismiss his case under section 1112(b)(4)(A) because there was a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.  PAX argues that cause exists to dismiss the case under section 1112(b) for many reasons, including the Debtor's alleged bad faith in filing the case and the Debtor's gross mismanagement of the estate.  Because the parties stipulated that cause exists under section 1112(b), the Court does not need to determine the specific "cause."  The only issue the Court needs to decide is whether dismissal, conversion, or appointment of a Chapter 11 trustee is in the best interests of creditors and the estate.

Through a balancing test, a court must determine which of three alternatives—dismissal, conversion, or the appointment of a Chapter 11 Trustee—is in the best interests of creditors and the estate based on the record of the case.  *In re Products Intern. Co.*, 395 B.R. at 108.  In determining which option is in the best interests of creditors and the estate, a court should evaluate, among other things, the prospects for collection and payment of the claims of creditors.

12

*In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015). "When

considering appointing a trustee or converting the case to one under chapter 7, 'the

distinguishing factor . . . is the expanded possibility in Chapter 11 for a trustee using independent

judgment and good management to direct the affairs of the estate[] including on-going operations

(if any) in order to optimize recovery for the creditors and the estate.'" *In re NOA, LLC*, 578

B.R. 534, 541 (Bankr. E.D. Va. 2017).

      The appointment of a Chapter 11 trustee in this case is warranted because the record

suggests a prospect for collection and payment of creditors' claims.  During this case, the Debtor

has demonstrated he can obtain millions of dollars in funds, including the $8,000,000.00 that was

the subject of the DIP Motion.  The Debtor also proposed a Chapter 11 plan in the early stages of

this case which provided, among other things, the transfer of title to the Lady May to a creditor

trust for the benefit of all creditors.  In addition, during the four months that the case has been

pending, divergent parties heavily negotiated a stipulation resolving the Automatic Stay Motion.

The Stipulated Order resulted in $37,000,000.00 being placed in escrow in exchange for the

delivery of the Lady May to the navigable waters of Connecticut, something the Debtor opposed

to the point of having contempt sanctions entered against him in the New York state court action.

Performance of the most significant obligation in the Stipulated Order—the delivery of the Lady

May to the navigable waters of Connecticut—is not yet due.  However, there has been timely

compliance with other provisions of the Stipulated Order.  HK has filed progress reports

indicating that repairs to the Lady May have been made and that the Lady May may arrive in the

navigable waters of Connecticut ahead of the July 15, 2022 Stipulated Order delivery date.

Dismissal of the Debtor's case, or conversion of the Debtor's case to Chapter 7, would erase the

substantial progress made with respect to the Lady May.  A Chapter 11 trustee can serve as an

independent party to ensure continued compliance with the Stipulated Order and can assist with the development of a Chapter 11 plan with a reasonable likelihood of confirmation. The appointment of a Chapter 11 trustee will also uphold the policy of enforcement of settlements, avoid a race to the courthouse, and provide the opportunity for a pro rata distribution to creditors consistent with the priority scheme in the Bankruptcy Code. *See Corona Care*, 527 B.R. at 387 (appointing a trustee to uphold the policy of enforcement of settlements and avoid a race to the courthouse).

In several pleadings, the Debtor has stated that he filed this case to create a single forum to orderly address competing claims asserted against him and to afford stakeholders an efficient opportunity to investigate his assets, liabilities, and financial affairs. Dismissal of the Debtor's case would defeat the Debtor's stated reasons for filing this case. Similarly, conversion of this case to Chapter 7 will not allow for the orderly liquidation of competing claims asserted against the Debtor. The appointment of a Chapter 11 trustee is the most efficient and effective method to address competing creditor claims asserted against the Debtor, including contingent and unliquidated personal injury tort claims. The appointment of a Chapter 11 trustee will also allow for the effective investigation of the Debtor's assets, liabilities, and financial affairs. Accordingly, when balancing whether to dismiss, convert, or appoint a Chapter 11 trustee, the record supports the conclusion that the appointment of a Chapter 11 trustee in this case is in the best interests of creditors and the estate.

When faced with a similar choice under section 1112(b), bankruptcy courts have appointed a Chapter 11 trustee as opposed to dismissing or converting the case. For example, the *Sillerman* case concerned an individual debtor who was a serial entrepreneur. The debtor listed his interests in forty-seven limited liability companies in his schedules, had sold multiple

14

businesses for billions of dollars, and proposed a Chapter 11 plan that would be funded once the debtor was able to secure financing to invest in certain affiliated entities. *Sillerman*, 605 B.R. at 636. The *Sillerman* creditors first filed a motion for appointment of an examiner because they asserted that the "lack of independent managerial oversight" allowed the debtor to avoid disclosing the true nature and value of his assets and that the debtor's "use of multilayered transactions involving complicated corporate structures" made his assets difficult to find. *Id.* at 636-37. The Official Committee of Unsecured Creditors appointed later in the case instead moved for the appointment of a Chapter 11 trustee or, in the alternative, an order converting the case to a Chapter 7 case. Given the totality of the circumstances in the debtor's case, the *Sillerman* court held that the appointment of a Chapter 11 trustee, instead of conversion of the case, was in the best interests of creditors and the estate. *Id.* at 657.

Like the creditors in *Sillerman,* PAX, the Committee, and other creditors have argued that the Debtor and his family have interests in numerous limited liability companies that may obfuscate the true nature and value of the Debtor's assets. They also argue that the Debtor has engaged in multilayer transactions involving complicated corporate structures like Golden Spring, Genever Holdings, Lamp Funding, and HK that make it difficult to identify and locate the Debtor's assets. PAX cites to the findings of the New York Supreme Court that the Debtor had "secreted his assets in a maze of corporate entities and with family members" and that the thousands of docket entries "involve defendant Kwok's efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members." ECF No. 183 at p. 7-8. When balanced against dismissal or conversion, the complexity of the Debtor's financial affairs and lack of independent managerial oversight in this

case warrants the appointment of a Chapter 11 trustee who can investigate, identify, and locate the Debtor's assets for the benefit of creditors and the estate.

Bankruptcy courts have also appointed a Chapter 11 trustee rather than dismiss or convert a case in situations where a debtor has violated a stipulated order. In *NOA*, the debtor willfully violated a stipulated order between the debtor and creditors specifically restraining the debtor from shipping bulk clothing out of the United States until full payment for the goods was received. 578 B.R. at 537-40. The court appointed a Chapter 11 trustee because of the "expanded possibility in Chapter 11 for a trustee using independent judgment and good management to direct the affairs of the estate[] including on-going operations (if any) in order to optimize recovery for the creditors and the estate." *Id.* at 541. As was true in *NOA*, the parties in this case negotiated the Stipulated Order. As noted above, performance of the delivery of the Lady May to the navigable waters of Connecticut is not yet due. The appointment of a Chapter 11 trustee will enable that trustee to use independent judgment to ensure compliance with the Stipulated Order and to optimize recovery of assets for the creditors and the estate.

*Corona Care* is another case in which a bankruptcy court exercised its discretion to appoint a Chapter 11 trustee instead of dismissing or converting a case where a debtor defaulted under the terms of a stipulation. *Corona Care*, 527 B.R. at 387. In *Corona Care*, the debtors entered into a stipulation with the Official Committee of Unsecured Creditors and other parties-in-interest dismissing some of the jointly administered cases of the more profitable nursing facilities to allow the remaining debtors more time to confirm a plan of reorganization. 527 B.R. at 380. The debtors then defaulted under the terms of the stipulated agreement. *Id.* at 385. In evaluating the prospects for collection and payment of the claims to creditors, the *Corona Care* court found that a sale of the debtors' businesses offered some prospect of payment of creditors

16

because the assets would be monetized for the payment of their claims, which reflected the
bargain reached in the stipulation. *Id.* at 384-85. Likewise, delivery of the Lady May to the
navigable waters of Connecticut will result in the prospect of collection and payment of creditor
claims which may include the pledge of the Lady May to a Chapter 11 plan and/or a finding that
the Lady May is property of the Debtor's estate.

*TP, Inc.* is another bankruptcy case in which a Chapter 11 trustee was appointed as
opposed to dismissing or converting the debtor's case. 455 B.R. at 459. In *TP, Inc.*, Bank of
America had commenced a foreclosure proceeding in state court against TP, Inc., its principal,
and its principal's wife, and had obtained a judgment against the principal and principal's wife,
who were guarantors of the promissory note. *Id.* at 456. The debtor's principal leased Bank of
America's collateral during the pendency of the case without court approval and collected rents
attributable to that collateral. *Id.* The *TP, Inc.* court held that the debtor's misuse of numerous
parcels of real property that served as Bank of America's collateral, and the misuse of the cash
collateral rents derived from that collateral, warranted the appointment of a Chapter 11 trustee.
*Id.* at 459. The court pointed to its concerns about future instances of fraud, incompetence,
dishonesty, or gross mismanagement in deciding that the appointment of a Chapter 11 trustee
was in the best interests of creditors and the estate, as opposed to dismissal or conversion,
because a trustee could use independent judgment and good management to direct the affairs of
the estate. *Id.* In this case, a state court similarly entered a judgment against the Debtor based
on a default on a promissory note and a contempt order for contravention of a state court order
restraining the Debtor, among others, from removing the Lady May from the navigable waters of
New York. Like the decision in *TP, Inc.*, the appointment of a Chapter 11 trustee in this case
will address concerns about any future misconduct by the Debtor while bringing independent

17

judgment and good management to direct the affairs of the estate and optimize recovery for all creditors.

## V.     **<u>CONCLUSION</u>**

Because the parties stipulate that cause exists under section 1112(b) to dismiss this case, convert this case to a case under Chapter 7, or appoint a Chapter 11 trustee, the Court has evaluated, among other things, the prospects for collection and payment of the claims of all creditors.  The Court finds that the appointment of a Chapter 11 trustee is in the best interests of creditors and the estate because a Chapter 11 trustee can: (i) use independent judgment and good management to direct the affairs of the estate to attempt to satisfy the claims of creditors; (ii) determine whether a reasonable likelihood of rehabilitation exists for this Debtor, including whether a Plan of Reorganization can be proposed and confirmed; and (iii) optimize recovery for the creditors and the estate by, among other things, allowing the Chapter 11 trustee to investigate the Debtor's assets, liabilities, and financial affairs and to ensure compliance with the provisions of the Stipulated Order.

Accordingly, it is hereby:

**ORDERED:**  Pursuant to 11 U.S.C. §§ 1112(b), the Motion to Dismiss or Joinder is DENIED WITHOUT PREJUDICE to the extent it seeks to dismiss the Debtor's case at this time and is GRANTED to the extent that a Chapter 11 trustee shall be appointed in the Debtor's case; and it is further

**ORDERED:**  The Chapter 11 trustee shall perform all of the duties set forth in 11 U.S.C. § 1106; and it is further

**ORDERED:**  Within fourteen (14) days of the appointment of a Chapter 11 trustee, a Status Conference will be scheduled to discuss, among other things, the progress of the Chapter

11 trustee regarding the statements to be filed in accordance with 11 U.S.C. §§ 1106(a)(4) and

(a)(5), compliance with the Stipulated Order, the Chapter 11 trustee's proposed management of

the estate, and the continued administration of the Debtor's case.

Dated at Bridgeport, Connecticut this 15th day of June, 2022.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

# Notice Recipients

District/Off: 0205–5      User: admin      Date Created: 6/15/2022

Case: 22–50073      Form ID: pdfdoc1      Total: 108

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**

| | |
|---|---|
| 20 | Pacific Alliance Asia Opportunity Fund L.P. |
| cr | Zheng Wu |
| 20 | Rui Ma |
| 20 | Weican Meng |
| intp | Golden Spring (New York) LTD |
| crcm | Official Committee of Unsecured Creditors |
| intp | HK International Funds Investments (USA) Limited, LLC |
| intp | Mei Guo |
| cr | Baosheng Guo |
| cr | Yan Zhao |
| cr | Ning Ye |
| 9343402 | 22–50073 |

TOTAL: 12

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ust | U. S. Trustee | USTPRegion02.NH.ECF@USDOJ.GOV |
| aty | Aaron Romney | aromney@zeislaw.com |
| aty | Annecca H. Smith | asmith@rc.com |
| aty | Bennett Silverberg | bsilverberg@brownrudnick.com |
| aty | Carollynn H.G. Callari | ccallari@callaripartners.com |
| aty | David S. Forsh | dforsh@callaripartners.com |
| aty | David V. Harbach, II | dharbach@omm.com |
| aty | Dylan Kletter | dkletter@brownrudnick.com |
| aty | Holley L. Claiborn | holley.l.claiborn@usdoj.gov |
| aty | Irve J. Goldman | igoldman@pullcom.com |
| aty | Jay Marshall Wolman | jmw@randazza.com |
| aty | Jeffrey L Jonas | jjonas@brownrudnick.com |
| aty | John L. Cesaroni | jcesaroni@zeislaw.com |
| aty | Jonathan Kaplan | jkaplan@pullcom.com |
| aty | Kenneth Aulet | kaulet@brownrudnick.com |
| aty | Kristin B. Mayhew | kmayhew@mdmc–law.com |
| aty | Laura Aronsson | laronsson@omm.com |
| aty | Mia N. Gonzalez | mgonzalez@omm.com |
| aty | Patrick M. Birney | pbirney@rc.com |
| aty | Peter Friedman | pfriedman@omm.com |
| aty | Peter J. Zarella | pzarella@mdmc–law.com |
| aty | Sara Pahlavan | spahlavan@omm.com |
| aty | Scott D. Rosen | srosen@cb–shea.com |
| aty | Stephen M. Kindseth | skindseth@zeislaw.com |
| aty | Stuart M. Sarnoff | ssarnoff@omm.com |
| aty | Timothy D. Miltenberger | Tmiltenberger@cbshealaw.com |
| aty | William Baldiga | wbaldiga@brownrudnick.com |
| aty | William R. Baldiga | wbaldiga@brownrudnick.com |

TOTAL: 28

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | |
|---|---|---|
| db | Ho Wan Kwok | 373 Taconic Road    Greenwich, CT 06831 |
| cr | Logan Cheng | c/o Randazza Legal Group, PLLC    100 Pearl Street    14th Floor    Hartford, CT 06103 |
| ca | Stretto | 410 Exchange, Suite 100    Irvine, CA 92602 |
| dbaty | Brown Rudnick LLP | One Financial Center    Boston, MA 02111 |
| crcm | Pullman & Comley, LLC | 850 Main Street    Bridgeport, CT 06601 |
| 20 | Huizhen Wang | c/o TroyGould PC    1801 Century Park East, 16th Floor    Attn: Christopher A. Lilly    Los Angeles, CA 90067–2367 |
| cr | Chao–Chih Chiu | c/o TroyGould PC    1801 Century Park East, 16th Floor    Attn: Christopher A. Lilly    Los Angeles, CA 90067–2367 |
| cr | Yunxia Wu | c/o TroyGould PC    1801 Century Park East, 16th Floor    Attn: Christopher A. Lilly    Los Angeles, CA 90067 |
| cr | Keyi Zilkie | c/o TroyGould PC    1801 Century Park East, 16th Floor    Attn: Christopher A. Lilly    Los Angeles, CA 90067 |
| aty | Andrew M. Carty | Brown Rudnick LLP    Seven Times Square    New York, NY 10036 |
| aty | Steven E. Mackey | Office of the U.S. Trustee    The Giaimo Federal Building    150 Court Street, Room 302    New Haven, CT 06510 |
| 9343455 | Bi Hai Ge Lin | C/O Kevin Tung, Esq.    38th Avenue, Suite 3d    Flushing, NY 11354 USA |
| 9343450 | Chao–Chih Chiu | c/o TroyGould PC    1801 Century Park East, 16th Floor    Attn: Christopher A. Lilly    Los Angeles, CA 90067 |

| | |
|---|---|
| 9343406 | Cheng Jian Wu Jian She     c/o Kevin Kerveng Tung, P.C.     136–20 38th Avenue, Suite 3D & 3F     Flushing, NY 11354 USA     Attn: Kevin Tung, Esq. |
| 9343431 | Chenglong Wang     C/O HGT Law     250 Park Avenue, 7th Floor     New York, NY 10177 USA     Attn: Hung Ta |
| 9343452 | Chong Sheen Raphanella     C/O Wolf Haldenstein Adler Freeman & Her     270 Madison Avenue     New York, NY 10016 USA     Attn: Matthew Guiney |
| 9343457 | Fu Le Hong Ma     C/O Kevin Tung, Esq.     38th Avenue, Suite 3d     Flushing, NY 11354 USA |
| 9343408 | Gaosheng Guo     c/o Law Office of Ning Ye, Esq.     135–11 38th Avenue, Suite 1A     Flushing, NY 11354 USA     Attn: Ning Ye, Esq. |
| 9343404 | Golden Spring New York     162 E. 64th Street     New York, NY 10605 USA     Attn: Max Krasner |
| 9343410 | Hong Qi Qu     c/o Kevin Tung, P.C.     136–20 38th Avenue, Suite 3D & 3F     Flushing, NY 11354 USA     Attn: Kevin Tung, Esq. |
| 9343449 | Huizen Wang     c/o TroyGould PC     1801 Century Park East, 16th Floor     Attn: Christopher A. Lilly     Los Angeles, CA 90067–2367 |
| 9343421 | Jia Li Wang     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343435 | Jiamei Lu     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343412 | Jian Gong     C/O Kevin Kerveng Tung, P.C.     136–20 38th Avenue, Suite 3D     Flushing, NY 11354 USA     Attn: Kevin Tung, Esq. |
| 9343434 | Jianhu Yi and Qiuju Jia     C/O Arthur Angel, Esq.     1305 n. Poinsettia Place     Los Angeles, CA 90046 USA |
| 9343424 | Jonathan Young     141 Allenby Road     Wellington Point, QLD 4160     AUSTRALIA |
| 9343419 | Jun Chen aka Jonathan Ho     C/O Wayne Wei Zhu, Esq.     4125 Kissena Blvd, Suite 112     Flushing, NY 11355 USA     Attn: Wayne Wei Zhu |
| 9343436 | Jun Liu     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343430 | Kaixin Hong     C/O HGT Law     250 Park Avenue, 7th Floor     New York, NY 10177 USA     Attn: Hung Ta |
| 9343447 | Keyi Zilkie     c/o TroyGould PC     1801 Century Park East, 16th Floor     Attn: Christopher A. Lilly     Los Angeles, CA 90067 |
| 9343418 | Lamp Capital, LLC     Attn: Bernardo Enriquez     667 Madison Avenue     New York, NY 10065 |
| 9343415 | Liehong Zhuang/Xiao Yan Zhu     C/O Trexler & Zhang, LLP     224 West 35th Street, 12th Floor     New York, NY 10001 USA     Attn: Jonathan T. Trexler, Esq. |
| 9343437 | Linda Cheng     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343425 | Logan Cheng     c/o Randazza Legal Group, PLLC     100 Pearl Street, 14th Fl     Hartford, CT 06103 |
| 9343438 | Mao–Fu Weng     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343411 | Nan Tong Si Jian     C/O Kevin Kerveng Tung, P.C.     136–20 38th Avenue, Suite 3D & 3F     Flushing, NY 11354 USA     Attn: Kevin Tung, Esq. |
| 9343407 | Ning Ye     c/o Law Office of Ning Ye, Esq.     135–11 38th Avenue, Suite 1A     Flushing, NY 11354     Attn: Ning Ye, Esq. |
| 9343451 | Rong Zhang     C/O Wolf Haldenstein Adler Freeman & Her     270 Madison Avenue     New York, NY 10016 USA     Attn: Matthew Guiney |
| 9343439 | RuQin Wang     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9358088 | Rui Ma     Carollynn HG Callari, Esq/Callari Partne     100 Somerset Corporate Blvd., Suite 206     Bridgewater, NJ 08807 |
| 9343426 | SHI     C/O Thompson Hine     20 N. Clark St., Ste 3200     Chicago, IL 60602 USA     Attn: Steven A. Block, Esq. |
| 9348491 | Samuel Dan Nunberg     600 South Dixie Highway, Suite 455     West Palm Beach, FL 33401 |
| 9343417 | Samuel Nunberg     C/O Nesenoff & Miltenberg, LLP     363 Seventh Ave, 5th Floor     New York, NY 10001 USA     Attn: Andrew T. Miltenberg, Esq. |
| 9343440 | Teli Chen     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343422 | WA&HF, LLC/Ruizeng An     C/O AFN Law     41 Madison Avenue, 31st Floor     New York, NY 10010 USA     Attn: Angus Ni, Esq. |
| 9343427 | WANG     C/O Carmody Torrance Sandak & Hennessey     195 Church Street, P.O. Box 1950     New Haven, CT 6509 USA     Attn: David Grudberg |
| 9358089 | Weican "Watson" Meng and Boxun Inc.     Carollynn HG Callari, Esq/Callari Partne     100 Somerset Corporate Blvd., Suite 206     Bridgewater, NJ 08807 |
| 9343441 | Weiguo Sun     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343442 | Weixiand Ge     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343429 | Wen Lin     C/O HGT Law     250 Park Avenue, 7th Floor     New York, NY 10177 USA     Attn: Hung Ta |
| 9343433 | Xiaobo He     C/O HGT Law     250 Park Avenue, 7th Floor     New York, NY 10177 USA     Attn: Hung Ta |
| 9343453 | Xiaodan Wang     C/O Wolf Haldenstein Adler Freeman & Her     270 Madison Avenue     New York, NY 10016 USA     Attn: Matthew Guiney |
| 9343432 | Xiaoping Luo     C/O HGT Law     250 Park Avenue, 7th Floor     New York, NY 10177 USA     Attn: Hung Ta |
| 9343443 | Xingyu Yan     C/O Thompson Hine     335 Madison Avenue, 12th Floor     New York, NY 10017 USA     Attn: Brian P. Lanciault, Esq. |
| 9343454 | Xiong Xian Wei Ye     C/O Kevin Tung, Esq.     136–20 38th Avenue, Suite 3D & 3F     Flushing, NY 11354 USA     Attn: Kevin Tung, Esq |

| 9358703 | Xiqiu "Bob" Fu | c/o Irve J. Goldman | Pullman & Compley, LLC | 850 Main St., P O Box 7006 | Bridgeport, CT 06601 |

9343423 Xiqiu Fu c/o The Lanier Law Firm 10940 W. Sam Houston Pkwy N., Suite 100 Houston, TX 77064 USA Attn: Lawrence P. Wilson

9343444 Yan Gao C/O Thompson Hine 335 Madison Avenue, 12th Floor New York, NY 10017 USA Attn: Brian P. Lanciault, Esq.

9343413 Yan Zhao C/O Law Office of Ning Ye, Esq. 135–11 38th Avenue, Suite 1A Flushing, NY 11354 USA Attn: Ning Ye, Esq.

9343409 Yang Lan and Wu Zheng 900 Third Avenue, 18th Floor c/o Arkin Solbakken, LLP New York, NY 10022 Attn: Robert C. Angelillo

9343445 Yi Li C/O Thompson Hine 335 Madison Avenue, 12th Floor New York, NY 10017 USA Attn: Brian P. Lanciault, Esq.

9343446 Ying Liu C/O Thompson Hine 335 Madison Avenue, 12th Floor New York, NY 10017 USA Attn: Brian P. Lanciault, Esq.

9343414 Yua Hua Zhuang Shi C/O Kevin Kerveng Tung, P.C. 136–20 38th Avenue, Suite 3D & 3F Flushing, NY 11354 USA Attn: Kevin Tung, Esq.

9344053 Yue Hua Zhu Shi 136–20 38th Avenue, Suite 3D c/o Kevin Kerveng Tung, P.C. Flushing, NY 11354 Attn: Kevin Tung, Esq.

9343456 Zhen Yuan Jian Zhu C/O Kevin Tung, Esq. 38th Avenue, Suite 3d Flushing, NY 11354 USA

9358087 Zheng ("Bruno") Wu and Yang Lan Carollynn HG Callari, Esq/Callari Partne 100 Somerset Corporate Blvd., Suite 206 Bridgewater, NJ 08807

9343428 Zhengjun Dong C/O HGT Law 250 Park Avenue, 7th Floor New York, NY 10177 USA Attn: Hung Ta

9343448 yunxia Wu c/o TroyGould PC 1801 Century Park East, 16th Floor Attn: Christopher A. Lilly Los Angeles, CA 90067

TOTAL: 68

**Exhibit 6**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| HO WAN KWOK | § | CASE NO. 22-50073 (JAM) |
| | § | |
| Debtor. | § | |

**NOTICE OF FILING OF DECLARATION OF MR. HO WAN KWOK CONCERNING INVOCATION OF 5TH AMENDMENT PRIVILEGE IN REGARD TO RULE 2004 DISCOVERY**

The debtor, Ho Wan Kwok, hereby provides notice that attached hereto as Exhibit A is the February 6, 2023, Declaration of Mr. Ho Wan Kwok Concerning Invocation of 5th Amendment Privilege in Regard to Rule 2004 Discovery.

Dated at Bridgeport, Connecticut this 7th day of February, 2023.

**THE DEBTOR,**
**HO WAN KWOK,**

_/s/ James M. Moriarty_
Aaron A. Romney (ct28144)
James M. Moriarty (ct21876)
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Telephone: (203) 368-4234
Facsimile: (203) 368-5487
Email: aromney@zeislaw.com
      jmoriarty@zeislaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7th day of February 2023, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice ofElectronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ James M. Moriarty*
James M. Moriarty

# Exhibit A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HO WAN KWOK, | Case No: 22-50073 (JAM) |
| Debtor. | |

## DECLARATION OF MR. HO WAN KWOK CONCERNING INVOCATION OF FIFTH AMENDMENT PRIVILEGE IN REGARD TO RULE 2004 DISCOVERY

I, Ho Wan Kwok, hereby declare:

1.     I am the Debtor in the above-captioned Chapter 11 case and am in receipt of the Court's order on the Trustee's Motion to Compel, dated January 20, 2023, Doc. No. 1353. I hereby invoke my rights under the 5th Amendment to the United States Constitution, including under the act of production doctrine. with respect to the Subpoena dated August 17, 2022, in its entirety, including all requests for documents and information set forth therein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Greenwich, Connecticut on this _6_ day of February, 2023.

Ho Wan Kwok

**Exhibit 7**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 22-50073 (JAM) |
| HO WAN KWOK, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Re: ECF Nos. 1453 and 1649 |
| | ) | |

## APPEARANCES

Luc A. Despins (argued)
Avram E. Luft
G. Alexander Bongartz
Douglass Barron
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

and

Nicholas A. Bassett (argued)
Paul Hastings LLP
2050 M Street NW
Washington, D.C. 20036

Douglass S. Skalka
Patrick R. Linsey
Neubert, Pepe & Montieth
195 Church Street, 13th Floor
New Haven, CT 06510

*Counsel for Movant and Cross-Respondent Mr. Luc A. Despins, Chapter 11 Trustee for the Estate of Mr. Ho Wan Kwok*

Stephen R. Cook
Brown Rudnick LLP
2211 Michelson Drive, 7th Floor
Irvine, California 92612

and

Stephen A. Best (argued)
Brown Rudnick LLP
601 13th Street, NW, Suite 600
Washington, DC 20005

and

Eric Henzy (argued)
James M. Moriarty
Zeisler & Zeisler, P.C.
10 Middle Street
Bridgeport, CT 06604

William Baldiga (argued)
Brown Rudnick LLP
Seven Times Square
New York, NY 10036

*Counsel for Respondent and Cross-Movant Mr. Ho Wan Kwok, Debtor[1]*

**MEMORANDUM OF DECISION AND ORDER**
**HOLDING INDIVIDUAL DEBTOR IN CONTEMPT OF COURT AND**
**DENYING MOTION FOR STAY OF ORDER COMPELLING PRODUCTION**

Julie A. Manning, United States Bankruptcy Judge

**I.  INTRODUCTION**

Before the Court are the Motion for Order to Show Cause Why Debtor Should Not Be Held in Contempt of Court (the "Contempt Motion"), (ECF No. 1453[2]), filed by Mr. Luc A. Despins, in his capacity as Chapter 11 trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Mr. Ho Wan Kwok (the "Individual Debtor"), and the Motion for a Limited Stay of Order Granting in Part Motion to Compel Compliance (the "Stay Motion," and together with the Contempt Motion, each a "Cross-Motion" and, collectively, the "Cross-Motions"), (ECF No. 1649), filed by the Individual Debtor.  The Trustee seeks to hold the Individual Debtor in civil contempt of court for failure to comply with the Order Granting in Part Motion to Compel Compliance (the "Order Compelling Production").  (ECF No. 1353.)  The Individual Debtor cross-moves to stay the Order Compelling Production in light of the criminal action *United States v. Kwok*, Case No. 23 Cr. 118 (AT) (S.D.N.Y.) (the "Criminal Action") pending in the United States District Court for the Southern District of New York (the "Criminal Court").  For

---

[1]  The attorneys at Brown Rudnick LLP have withdrawn their appearances since these matters were argued.  (ECF No. 2034.)
[2]  Various pleadings and orders discussed in this memorandum of decision were omnibus in nature.  For the sake of clarity and coherence, the titles of pleadings and orders have been set forth only insofar as they concern the parties before the Court on the instant matters.

the reasons stated below, the Court holds the Individual Debtor in civil contempt of court and

denies the Stay Motion.

## II. BACKGROUND

The Individual Debtor filed a voluntary Chapter 11 petition in this Court on February 15,

2022.  (ECF No. 1.)  The Individual Debtor's case is jointly administered with two affiliated

corporate Chapter 11 cases.  (ECF Nos. 970 and 1141.)  For the reasons set forth therein, on June

15, 2022, the Court entered a memorandum of decision and order appointing a Chapter 11

trustee.  (ECF No. 465.)  *In re Kwok*, 640 B.R. 514 (Bankr. D. Conn. 2022).  On July 8, 2022,

Mr. Despins was appointed as the Trustee.  (ECF No. 523.)

On July 28, 2022, the Trustee filed the Motion for 2004 Examination of the [Individual]

Debtor, (ECF No. 636), which motion the Court granted, (ECF No. 757), on August 16, 2022.

On August 19, 2022, the Individual Debtor was served with the Rule 2004 subpoena.  (*See, e.g.*,

ECF No. 1650 ¶ 7.)  On October 28, 2022, the Trustee filed a Motion for Order Compelling

Individual Debtor to Comply with Rule 2004 Subpoena (the "Motion to Compel").  (ECF No.

1046.)  On November 14, 2022, the Individual Debtor filed an objection to the Motion to

Compel.  (ECF No. 1090.)  On November 30, 2022, a hearing was held on the Motion to

Compel.  The Court took the Motion to Compel under advisement.  On January 20, 2023,[3] the

Court entered the Order Compelling Production.  (ECF No. 1353.)

---

[3]  Between November 16, 2022, and January 13, 2023, the Court was engaged with matters in an
adversary proceeding related to these Chapter 11 cases styled *Pac. All. Asia Opportunity Fund v.
Kwok (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 22-05032 (JAM) (Bankr D. Conn.
Jan. 13, 2023) (hereinafter the "Social Media/Protest Adversary").  Pursuant to Fed. R. Civ. P.
65(b)(3), the Court was required to address the matters in that adversary proceeding "at the
earliest possible time, taking precedence over all other matters except hearings on older matters
of the same character."

On February 7, 2023, the Individual Debtor filed a declaration in response to the Order

Compelling Production (the "Declaration").  (ECF No. 1444 Ex. A.)  In the Declaration, the

Individual Debtor stated under penalty of perjury that he invoked his "rights under the 5th

Amendment to the United States Constitution, including under the act of production doctrine[,]

with respect to the Subpoena dated August 17, 2022, in its entirety, including all requests for

documents and information set forth therein."  (*Id.* Ex. A.)  On February 10, 2023, the Trustee

filed the Contempt Motion, arguing that (i) the Individual Debtor needed to show cause why his

invocation of the Fifth Amendment was proper and why he should not be held in contempt of

court; (ii) even if the Individual Debtor's invocation was proper, he needed to assert it in

response to each request for documents and information; and (iii) the Declaration did not comply

with the Order Compelling Production because it did not detail the efforts undergone to search

for documents and information responsive to the subpoenas.  (ECF No. 1453.)  On March 7,

2023, a hearing was held on the Contempt Motion.  At the conclusion of the hearing, the Court

set a briefing schedule on the issues raised by the Contempt Motion.

On March 15, 2023, at the start of an evidentiary hearing in a related adversary

proceeding, the Individual Debtor's counsel informed the Court that an indictment against the

Individual Debtor had been unsealed in the Criminal Action and the Federal Bureau of

Investigation (the "FBI") had arrested the Individual Debtor earlier that morning.  On March 22,

2023, the Court granted the Individual Debtor's motion for an extension of time to respond to the

Contempt Motion.  (ECF No. 1585.)

On April 10, 2023, the Individual Debtor filed an objection to the Contempt Motion.

(ECF No. 1650.)  The Individual Debtor's objection argues that he has complied with the Order

Compelling Production because he has properly invoked his Fifth Amendment right against self-

incrimination. (*Id.*) Contemporaneously, the Individual Debtor, through his counsel in the Criminal Action appearing in these Chapter 11 cases as his special (criminal) counsel, filed the Stay Motion. (ECF No. 1649.) The Stay Motion argues that to preserve the Individual Debtor's Fifth Amendment right against self-incrimination, this Court must stay the Order Compelling Production pending resolution of the Criminal Action. (*Id.*) On April 14, 2023, the Trustee filed a reply to the objection to the Contempt Motion. (ECF No. 1670.) On April 19, 2023, the Trustee filed an objection to the Stay Motion. (ECF No. 1680.)

On April 20, 2023, a hearing was held on the Cross-Motions. At the conclusion of argument, the Trustee and the Individual Debtor seemingly reached a consensual resolution of the Cross-Motions. However, on April 24, 2023, the parties filed competing proposed orders. (ECF Nos. 1698, 1699.) On April 27, 2023, a Status Conference on the Cross-Motions was held to discuss the competing orders. The parties agreed to proceed consensually where they could agree, but expressed disagreement as to the terms of the previous agreement. On May 1, 2023, the Court entered a consent order requiring the Individual Debtor to make individual invocations of his Fifth Amendment right to each of two-hundred two (202) questions posed by the Trustee. (ECF No. 1740.) Also on that date, the Individual Debtor filed a supplemental pleading in support of his interpretation of the April 20th agreement. (ECF No. 1737.)

On May 2, 2023, a second hearing was held on the Cross-Motions resulting in an impasse as to the terms of the April 20th agreement. The Trustee argued that the parties had agreed the Individual Debtor would file a motion in the Criminal Action seeking permission to share the prosecution's production to him with the Trustee, provided the Trustee complied with protective orders and other confidentiality orders and use restrictions issued in the Criminal Action. The Individual Debtor argued that the parties had agreed that the Individual Debtor would seek,

potentially by motion, to have the prosecution agree to produce documents simultaneously to the Individual Debtor and the Trustee, provided the Trustee complied with protective orders and other confidentiality orders and use restrictions issued in the Criminal Action. Citing the impasse, the Court concluded it had to rule on the Cross-Motions. However, the Individual Debtor's bankruptcy counsel asked the Court to wait before ruling on the Cross-Motions to allow the Individual Debtor time to appreciate the nature of the prosecution's production to him in the Criminal Action.

Given the serious nature of the issues involved, the Court waited. On June 13, 2023, a final hearing was held on the Cross-Motions. The Court inquired whether the parties had made any progress toward a consensual resolution of the Cross-Motions. The parties reported that the Individual Debtor had prepared a supplemental declaration (the "Supplemental Declaration"), wherein he invoked the Fifth Amendment on an individuated basis to each of the Trustee's questions. (*See Despins ex rel. Kwok v. HCHK Techs., Inc. (In re Kwok)*, Case No. 22-50073, Adv. P. No. 23-05013 (Bankr. D. Conn. June 8, 2023), ECF No. 1 Ex. 1.) Beyond the Supplemental Declaration, however, the parties reported that the impasse remained and asked the Court to rule on the Cross-Motions. The Court took the Cross-Motions under advisement.

The Cross-Motions are ripe for decision.

## III. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This Court has authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. The instant proceedings are statutorily core proceedings. 28 U.S.C. § 157(b)(2)(A). The Court concludes its exercise of

6

jurisdiction is not precluded by Constitutional concerns. *Cf. Stern v. Marshall*, 564 U.S. 462, 487–99 (2011). Moreover, the Trustee and the Individual Debtor have impliedly consented to this Court entering a final order on the Cross-Motions by filing dispositive motions without contesting this Court's authority to enter a final order. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015) (holding that parties may consent to entry of a final order by bankruptcy courts notwithstanding the holding in *Stern*); *True Traditions, LC v. Wu*, 552 B.R. 826, 838 (N.D. Cal. 2015) (holding that implied consent is given by filing a dispositive motion).

Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV. DISCUSSION[4]

The Cross-Motions present serious issues. The Trustee seeks to hold the Individual Debtor in contempt for failure to comply with the Order Compelling Production. The Individual Debtor argues that the invocation of his Fifth Amendment right against self-incrimination is compliance and must be protected by a stay of the Order Compelling Production. For the reasons stated below, the Court concludes that the Fifth Amendment right against self-incrimination does not apply under the specific facts and circumstances before the Court. Therefore, the Court holds the Individual Debtor in contempt of court and denies the Stay Motion.

### A. Is the Individual Debtor in civil contempt of court?

The Court first considers whether the Individual Debtor is in contempt of court for failure to comply with the Order Compelling Production. This Court has the power to hold parties in contempt of court under 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9020. *Taggart v. Lorenzen ex*

---

[4] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014(c).

*rel. Brown*, 139 S. Ct. 1795, 1801 (2019); *PHH Mortg. Corp. v. Sensenich ex rel. Gravel (In re Gravel)*, 6 F.4th 503, 512 (2d Cir. 2021); *Mar. Asbestosis Legal Clinic v. LTV Steel Co. (In re Chauteaugay Corp.)*, 920 F.2d 183, 187 (2d. Cir. 1990).  Federal Rules of Civil Procedure 37(b)(1) and 37(b)(2)(A)(vii), made applicable by D. Conn. L. Civ. R. 37 and D. Conn. Bankr. L.R. 1001-1(a)(1) and 2004-1(a), provide further authority to hold parties in contempt of an order compelling production of discovery materials.

Contempt may be sought to "'coerce the defendant into compliance'" with a court order or to "'compensate the complainant for losses'" resulting from noncompliance with a court order.  *Taggart*, 139 S. Ct. at 1801 (citing *United States v. United Mine Workers*, 330 U.S. 258, 303–04 (1947)).  A finding of civil contempt requires that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).  The contemnor must also (4) have notice of the relevant order.  *Gravel*, 6 F.4th at 512.

### 1. Is the Order Compelling Compliance clear and unambiguous?

An order is clear and unambiguous where "'there is [no] *fair ground of doubt* as to the wrongfulness of the defendant's conduct.'"  *Taggart*, 139 S. Ct. at 1801 (citing *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609 (1885)).  A court generally applies an objective standard – a "party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable."  *Taggart*, 139 S. Ct. at 1802 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("The absence of wilfulness [sic] does not relieve from civil contempt.")).  Nevertheless, a party's bad faith may justify "placing 'the burden of any uncertainty in the decree . . . on [the] shoulders' of the party

who violated the court order," and "a party's good faith, even where it does not bar civil

contempt, may help to determine an appropriate sanction."  *Taggart*, 139 S. Ct. at 1802 (citing

*McComb*, 336 U.S. at 192–93 and *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S.

787, 801 (1987)).

The Order Compelling production states, in pertinent part, the following:

> **ORDERED:**  The Objection is **OVERRULED** as it relates to discovery requests directed to the [Individual] Debtor except as to the requests that seek documents dated earlier than June 1, 2014, and to the requests that seek the [Individual] Debtor's passport(s), to which extent the Objection is **SUSTAINED**, without prejudice to the Trustee to seek documents dated earlier than June 1, 2014, and the [Individual] Debtor's passport(s) at a later date as the investigation proceeds upon cause shown.  The [Individual] Debtor shall, by 5:00 p.m. on January 31, 2023, search for and produce to the Trustee:

>> (i)  documents responsive to the Trustee's requests dated June 1, 2014, or later, unless a particular request specifies a different time period that does not begin before June 1, 2014;

>> (ii)  documents responsive to the Trustee's requests as to both assets he acknowledges he owns and assets allegedly belonging to persons or entities other than the [Individual] Debtor, including without limitation his family members and associated entities; and

>> (iii)  documents responsive to the Trustee's requests that are within his custody, possession, or control, including without limitation documents in the files of his current or former counsel and other agents and advisors, unless such documents have already been produced by his current or former counsel and other agents and advisors but without consideration of any potential future production by his current or former counsel and other agents and advisors;

> and it is further

> **ORDERED:**  The [Individual] Debtor shall, by 5:00 p.m. on February 7, 2023, file on the docket of this case a sworn declaration describing in detail the document collection, search, and review actions taken by him and his counsel in response to the subpoena, including without limitation a detailed description of the processes that he and his counsel performed to:

>> (i)  identify all of the [Individual] Debtor's electronic devices; all online document repositories to which he has access; all social media, email, and other accounts associated with electronic documents; all bank accounts and related

account statements; and all other potential sources of responsive hard copy and electronic documents that may exist; and

  (ii) search the foregoing sources for responsive documents, including without limitation for documents responsive to the requests related to expenses or money transfers, to assets or financial or business transactions or records related to the [Individual] Debtor's family or associated entities, and to business interests associated with the [Individual] Debtor . . .

(ECF No. 1353.)  The Individual Debtor did not raise any argument in pleadings or during oral argument that there is "a fair ground of doubt" as to the meaning of the Order Compelling Production.[5]  The Court concludes the Order Compelling Production is clear and unambiguous as it relates to the Individual Debtor.[6]

## 2.  Did the Individual Debtor comply with the Order Compelling Production?

Regarding the second element, the Trustee must prove by clear and convincing evidence that the Individual Debtor has not complied with the Order Compelling Production.  *King*, 65 F.3d at 1058.  The Trustee argues that because (i) the Individual Debtor has failed to produce documents or records and (ii) the Individual Debtor has failed to file a declaration identifying potential sources of documents or records as well as the efforts undertaken to search those sources, the Individual Debtor has not complied with the Order Compelling Production.

In response, the Individual Debtor makes two arguments.  First, the Individual Debtor argues that it is impossible for him to comply because he is presently being detained pending trial without the possibility of pre-trial release.  Second, the Individual Debtor argues that the

---

[5]  The Individual Debtor argues that there is a fair ground of doubt as to whether the Individual Debtor could invoke his Fifth Amendment right against self-incrimination in response to the Order Compelling Production.  The Court considers this argument below in the discussion of whether the Individual Debtor has diligently attempted to comply with the Order Compelling Production.

[6]  The Court has previously held that the Order Compelling Production is clear and unambiguous as to other parties.  (*See* ECF No. 1537.)

10

"act of production" doctrine permits him to invoke his Fifth Amendment right against self-incrimination in response to requests for the production of documents and records. On this basis, the Individual Debtor asserts that he has complied with the Order Compelling Production.

### i. Is it impossible for the Individual Debtor to comply?

While the Individual Debtor is correct that "[a] long recognized defense to a civil contempt citation is the cited individual's inability to comply with the court's order," *United States v. Wendy*, 575 F.2d 1025, 1030 (2d Cir. 1978), and that the proper time to assess impossibility of compliance is at the time of issuing the ruling on contempt, *United States v. Rylander*, 460 U.S. 752, 757 (1983), the Court concludes compliance remains possible for the Individual Debtor. While it is true that the prosecution has seized documents and records of the Individual Debtor in connection with the Criminal Action, the Individual Debtor has not established that (a) all of his documents and records have been seized and (b) he has no additional copies of the seized records. Moreover, based on the statements of his counsel, the Court understands the prosecution's production to the Individual Debtor in the Criminal Action should begin soon – if it has not already. While it is (i) likely that the Trustee would have to become a signatory to and comply with confidentiality requirements and use restrictions in the Criminal Action and (ii) possible that production to the Trustee may be opposed by the prosecution or not allowed by the Criminal Court, it is not impossible for the Individual Debtor to petition the Criminal Court to allow production to the Trustee. Although, the Individual Debtor is presently detained pending trial, his attorneys are not. The Individual Debtor may produce documents through his attorneys and/or other agents. Therefore, it is not impossible for the Individual Debtor to comply with the Order Compelling Production.

### ii. Has the Individual Debtor properly invoked the Fifth Amendment?

### a. Does the act of production doctrine apply?

The Individual Debtor's argument that he has complied with the Order Compelling

Production relies on the "act of production" doctrine.  In *Fisher v. United States*, which held that

the act of production at issue in that case was not protected by the Fifth Amendment, the United

States Supreme Court nevertheless held that

> The act of producing evidence in response to a subpoena nevertheless has communicative
> aspects of its own, wholly aside from the contents of the papers produced.  Compliance
> with the subpoena tacitly concedes the existence of the papers demanded and their
> possession or control by the taxpayer.  It also would indicate the taxpayer's belief that the
> papers are those described in the subpoena.

425 U.S. 391, 410 (1976); *see United States v. Hubbell*, 530 U.S. 27, 36–37 (2000).  In *Fisher*,

the Supreme Court held the test to determine if the act of production could be protected by the

Fifth Amendment is whether the "tacit averments" involved in the act of production are both

"testimonial" and "incriminating" under prevailing Fifth Amendment jurisprudence.  425 U.S. at

410–11.  In particular, the Supreme Court expressed concern regarding tacit averments as to: (i)

the existence of the documents or records; (ii) the producing party's possession or control over

the documents or records; and (iii) the producing party's belief that the documents and records

were those requested by the subpoena.  *Id.*  The act of production doctrine does not protect the

testimonial and incriminating contents of documents – it only protects testimonial and

incriminating *production*.  *Id.*; *Hubbell*, 530 U.S. at 40–41.

Under binding precedent of the United States Court of Appeals for the Second Circuit,

the act of production *may* entail testimonial tacit averments "(1) 'if the existence and location of

the subpoenaed papers are unknown to the government'; or (2) where production would

'implicitly authenticate' the documents."  *United States v. Doe (In re Grand Jury Subpoena)*, 1

F.3d 87, 93 (2d Cir. 1993) (hereinafter "*Grand Jury 1993*") (citing *United States v. Fox*, 721

F.2d 32, 36 (2d Cir.1983)).  If the Trustee can show (1) the existence and location; and (2) the

authenticity of the documents is a "foregone" conclusion or already established by other

evidence, then the production is not protected by the Fifth Amendment.  *Grand Jury 1993*, 1

F.3d at 93.  Moreover, even if the tacit averments involved in production are testimonial under

*Fox*, the Individual Debtor must also establish that revealing the existence, location, or

authenticity of the documents or records is incriminating.  *See Hoffman v. United States*, 341

U.S. 479, 486–87 (1951); *Fox*, 721 F.2d at 40; *In re Schick*, 215 B.R. 4, 9 (Bankr. S.D.N.Y.

1997); *cf. Martin-Trigona v. Belford (In re Martin-Trigona)*, 732 F.2d 170, 176 (2d Cir. 1984).

 The Individual Debtor's burden to establish that the act of production is testimonial and

incriminating is less than a normal burden of proof: "To sustain the privilege, it need only be

evident from the implications of the question, in the setting in which it is asked, that a responsive

answer to the question or an explanation of why it cannot be answered might be dangerous

because injurious disclosure could result."  *Hoffman*, 341 U.S. at 486–87.  In determining

whether the Individual Debtor may invoke the Fifth Amendment, the Court must use its

"personal perception of the peculiarities of the case" as much as factual support submitted by the

Individual Debtor.  *Id.* at 487.  The act of production is incriminating if it could be "a link in the

chain of evidence" used to prosecute the Individual Debtor.  *Id.* at 486.

 The Individual Debtor argues that producing documents and records under compulsion of

the Order Compelling Production would be testimonial because the production could be

construed as a tacit averment that he beneficially owns and/or controls various entities and assets

and that he has authority over various persons.  Such tacit averments, the Individual Debtor

argues, would be incriminating because the present Criminal Action and an alleged investigation

13

into bankruptcy crimes involve allegations about the Individual Debtor's beneficial ownership and control of entities and/or assets and the Individual Debtor's authority and/or control over certain individuals.

The Trustee raises numerous objections to the Individual Debtor's argument. The Trustee's primary objection is that the "required records" doctrine applies and is an exception to the act of production doctrine. In support of this argument, the Trustee asserts that the Individual Debtor, as a debtor in bankruptcy, cannot properly invoke the Fifth Amendment to avoid production of documents and records relating to his financial affairs, assets, and liabilities as required by the Bankruptcy Code – whether or not the act of production is testimonial and incriminating. The Trustee's required records argument involving the Individual Debtor's duties in his bankruptcy case will be addressed below. The Court will first address the Trustee's various objections as to whether the Individual Debtor has met his burden of proof to show that compliance with the Order Compelling Production would be both testimonial and incriminating.

### *The Supplemental Declaration*

The Individual Debtor and the Trustee have reached a resolution regarding one of the Trustee's objections. Before the Contempt Motion was filed and the hearings on it were held, the Individual Debtor's Declaration made a blanket assertion of his Fifth Amendment right against self-incrimination. The Trustee argued that this was improper because (a) such a blanket assertion did not evidence that the Individual Debtor had properly considered each of the Trustee's requests before invoking the Fifth Amendment; and (b) these Chapter 11 cases are civil proceedings, meaning that the Individual Debtor's invocation of the Fifth Amendment may, under proper circumstances, be admitted as evidence. However, the Individual Debtor has since provided the Supplemental Declaration pursuant to a consent order, wherein he answers each

question posed by the Trustee on an individual basis and asserts his Fifth Amendment right in response to each of the two-hundred two (202) questions. Although the Individual Debtor has now properly invoked his Fifth Amendment right to the Trustee's specific questions, issues related to the production of documents remain.

### Pre-indictment invocation of the Fifth Amendment

One of the Trustee's remaining objections to the Individual Debtor's proof of compliance with the Order Compelling Production is unpersuasive. The Trustee argues that the Individual Debtor was in contempt before the unsealing of the indictment against him and cannot now invoke the Fifth Amendment in light of the Criminal Action to avoid being held in contempt. However, the Individual Debtor is correct that the Fifth Amendment may be invoked prior to the commencement of a criminal action. *See United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958) (allowing a witness to invoke the Fifth Amendment where there was only a slight *possibility* of prosecution). Just as the Individual Debtor could assert his Fifth Amendment right during the evidentiary hearing in December 2022 and during his March 2023 deposition, he could do so in February 2023 so long as he had "reasonable cause to apprehend danger from a direct answer" and his Fifth Amendment right was otherwise applicable. *Hoffman*, 341 U.S. at 486.

### Documents in possession of the prosecution

A second argument of the Trustee also fails. The Trustee argues that there is no harm to the Individual Debtor because the prosecution is already in possession of his documents and records. The Trustee is correct insofar as the existence and location of these documents is known and, hence, the first prong of the *Fox* test fails. *Grand Jury 1993*, 1 F.3d at 93. Nevertheless, whether the act of producing the Individual Debtor's documents and records

already in the possession of the prosecution would result in authenticating those documents and records remains an issue. *Id.* The Individual Debtor is concerned that his act of production would authenticate the documents. The Court has not seen these documents and records. Nor has the Trustee. The Court recognizes the Trustee is in a difficult position because he is not a party to the Criminal Action. Nevertheless, the Trustee has not shown that it would be a foregone conclusion that the documents and records are authentic. Therefore, under the second prong of the *Fox* test, the tacit averment as to the authenticity of the documents and records in the possession of the prosecution may be testimonial. *Id.*

Moreover, because the documents and records seized by the prosecution may be used in the Criminal Action to prosecute the Individual Debtor, the Court finds the Individual Debtor's argument that his implicit authentication of those documents and records could be "a link in the chain of evidence" used to prosecute him is persuasive. *Hoffman*, 341 U.S. at 486. Therefore, unless the Trustee can show that it would be a foregone conclusion that the documents and records are authentic, the act of production doctrine applies to the documents held by the prosecution, unless an exception to the doctrine applies.

### *Documents not in the possession of the prosecution*

The Individual Debtor argues that the entire universe of documents and records the Order Compelling Production compels him to produce have been seized by the prosecution. The Court does not agree and, therefore, continues its discussion. As the Trustee contends, the blanket assertion that the Individual Debtor has no documents or records in his possession, custody, or control because he is now incarcerated is not convincing. The FBI apparently seized many documents, records, and electronic devices at the Individual Debtor's residences despite previous representations that the Individual Debtor maintained almost no documents, records, and devices.

Similarly, the Trustee is correct that there is no evidentiary basis to support the contention that there are no records within the Individual Debtor's possession, custody, or control that are not already among the documents and records seized by the prosecution. Given past descriptions of the efforts – or, as the case may be, the lack thereof – conducted by the Individual Debtor's counsel, the Individual Debtor has not established that a reasonably diligent search occurred. (*See* Order Compelling Production ¶ 9.) For both of these reasons, the Court concludes that the Individual Debtor has not established that all potentially responsive documents and records have been seized by the prosecution.

As to documents and records that were not seized by the prosecution, the Trustee has not shown that the location, existence, or authenticity of these documents is a foregone conclusion. Therefore, if the Individual Debtor establishes that they are incriminating, the act of production doctrine would apply. *Fox*, 721 F.2d at 36. The Trustee argues that the Individual Debtor has not met his burden to establish that the requested documents and records are incriminating. The Trustee is correct that even with the Supplemental Declaration, the Individual Debtor has not established that each requested production would be incriminating.

Nevertheless, the Court is mindful of the lessened burden the Individual Debtor must meet. The Court is also mindful that it must rely on its own perception of the facts and circumstances of these Chapter 11 cases and related adversary proceedings. *Hoffman*, 341 U.S. at 486–87. Moreover, as the Individual Debtor's counsel notes, "[t]he privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.* at 486. However, the Court's "personal perception of the peculiarities of the case" includes the observation that the Individual Debtor

has obstructed lawful inquiry into his assets, liabilities, and financial affairs in addition to his avowed desire to avoid self-incrimination. *Id.* at 487. (*See, e.g.*, Social Media/Protest Adversary, ECF No. 133.)

The indictment in the Criminal Action is not alone sufficient for the Individual Debtor to meet his burden with respect to the documents and records that the prosecution has *not* seized. The indictment alleges fraud going back to approximately 2018, whereas many of the assets of interest to the Trustee thus far – that certain yacht, the Lady May; the apartment at the Sherry-Netherland Hotel; the Ace Decade Holdings Limited cause of action – were allegedly acquired prior to 2018. While some of these assets, *e.g.*, the Lady May, are discussed in the indictment, the Court cannot, with its "personal perception of the peculiarities of the case" and the Individual Debtor's scant evidentiary showing, hold that the Individual Debtor has sufficiently supported his blanket assertion of the Fifth Amendment on the basis of the Criminal Action. *Id.* at 487. The Individual Debtor has not established that all of his assets, liabilities, and financial affairs relate to the alleged fraud or may somehow present a "link in the chain of evidence" regarding the alleged fraud. *Id.* at 486.

In support of his argument that he has complied with the Order Compelling Production, the Individual Debtor also presented a subpoena directed at the Trustee relating to an alleged investigation into potential bankruptcy crimes committed in these Chapter 11 cases. (ECF No. 1719, at *80:20–81:8.) As noted above, it does not matter if prosecution due to this investigation is likely when determining if production of the documents is incriminating. *Miranti*, 253 F.2d at 139.

Title 18 of the United States Code, sections 152, 156, 157, 1519, and 3284 set forth crimes related to the concealment of assets in a bankruptcy case. Sections 152, 156, 157, and

18

1519 require knowing, intentional, or fraudulent acts. Section 3284 requires "concealment." The tacit averments that the Individual Debtor has possession or control over documents or records responsive to the Rule 2004 subpoena and that such documents or records are authentic are not themselves incriminating because they do not establish that the Individual Debtor knowingly, intentionally, or fraudulently withheld assets – or documents and records pertaining to assets – from the Estate. Debtors routinely mistakenly overlook assets and liabilities and amend their statements and schedules and/or update their disclosures.

Nevertheless, the Court must consider whether such tacit averments are a "link in the chain of evidence" regarding a potential prosecution of the Individual Debtor for concealment of his assets from the Trustee, this Court, and his creditors. *Hoffman*, 341 U.S. at 486. The Trustee alleges that the Individual Debtor has a multitude of business interests and should have commensurate documents and records. While the Individual Debtor denies these allegations, it is the Court's "personal perception of the peculiarities of the case," on the basis of prior findings of this and other courts, that the Individual Debtor has at least *some* business interests beyond those he presently admits. *See Pac. All. Asia Opportunity Fund, L.P. v. Kwok Ho Wan*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022), NYCEF No. 1181; *E. Profit Corp. Ltd. v. Strategic Vision US LLC*, Case No. 18-cv-2185 (LJL), 2021 WL 2554631, at *1 (S.D.N.Y. June 22, 2021). (*See* ECF No. 1110; *HK Int'l Funds Invs. (USA) Ltd., LLC v. Despins ex rel. Kwok (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 22-05003 (JAM) (Bankr. D. Conn. May 18, 2023), ECF Nos. 177, 221; Social Media/Protest Adversary, ECF No. 133 ¶ 7.) The Court perceives that the Individual Debtor's production may be similarly expansive to the production at issue in *Hubbell*. *See* 530 U.S. at 40–43. Even though *Hubbell* was a case involving immunity granted to a party where the scope of the production was known and the burden had shifted to the

prosecution, it *may* be similarly necessary for the Individual Debtor "to make extensive use of 'the contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena" and essentially create a map of his assets, liabilities, and business interests. *See id.* at 43. Regarding the alleged investigation into bankruptcy crimes, such a map may aid in discovery of evidence of knowledge, intent, or fraud. Using its perception of the specific facts and circumstances of these Chapter 11 cases and related adversary proceedings, the Court finds that such admissions could be links in the chain of evidence because they could have a "derivative use." *See id.* at 41–43.

### *The Individual Debtor's production is testimonial and incriminating*

For the above reasons, the Court concludes that production in compliance with the Order Compelling Production would be testimonial and incriminating both with regards to the documents in the possession of the prosecution and the documents that have not been seized by the prosecution. *See Fisher*, 425 U.S. at 410–11. The Court notes, however, that the evidentiary record to date is not strong. If in the future the Trustee can (i) show that the location, existence, and authenticity of any document is a foregone conclusion; (ii) establish with regard to any document or category of documents that the Individual Debtor has not met his burden; or (iii) establish that he already has a map of the Individual Debtor's assets, liabilities, and business interests with respect to any documents or category of documents, this finding may be revisited upon a proper motion.

### b. Does the 'required records' exception apply?

Although the act of production doctrine applies, that does not end the Court's analysis or necessarily determine the result of the Contempt Motion. As noted above, the Trustee's primary argument is that the required records doctrine applies on the specific facts and circumstances

before the Court and presents an exception to the act of production doctrine. The Trustee

therefore argues that it does not matter whether the act of production doctrine would allow the

Individual Debtor to properly invoke his Fifth Amendment right against self-incrimination in

response to the Order Compelling Production because the required records exception applies in

this case.

    In support of his argument, the Trustee relies on *Baltimore City Department of Social*

*Services v. Bouknight*, 493 U.S. 549 (1990). In *Bouknight*, the Supreme Court restated and

reaffirmed the existence of the required records doctrine post-*Fisher*. 493 U.S. at 555–59.

Under the required records doctrine, "the Fifth Amendment privilege may not be invoked to

resist compliance with a regulatory regime constructed to effect the State's public purposes

unrelated to the enforcement of its criminal laws." *Id.* at 556; *see Grosso v. United States*, 390

U.S. 62, 67–68 (1968) (articulating factors to consider regarding required records doctrine);

*Shapiro v. United* States, 335 U.S. 1, 32 (1948) (originating the required records doctrine).

    The Individual Debtor asserts *Bouknight* does not describe an exception to the act of

production doctrine set forth in *Fisher* and that the required records doctrine does not provide for

the compelled testimonial and incriminating production of documents and records. The

Individual Debtor's assertion contradicts the clear text of *Bouknight* which states:

> The possibility that a production order will compel testimonial assertions that may prove
> incriminating does not, in all contexts, justify invoking the privilege to resist production.
> Even assuming that this limited testimonial assertion is sufficiently incriminating and
> "sufficiently testimonial for purposes of the privilege," Bouknight may not invoke the
> privilege to resist the production order because she has assumed custodial duties related
> to production and because production is required as part of a noncriminal regulatory
> regime.

*Bouknight*, 493 U.S. at 555–56 (discussing *Fisher*) (internal citations omitted). In addition to the

Supreme Court, the Second Circuit has also clearly rejected the Individual Debtor's assertion:

"[T]he required records doctrine is an exception to the Fifth Amendment privilege. As such, it necessarily overrides the privilege in instances in which the privilege would otherwise apply. *Fisher* was not concerned with required records and nothing in its analysis could be construed as weakening the required records exception."

*United States v. Doe (In re Grand Jury Subpoena)*, 741 F.3d 339, 346 (2d Cir. 2013) (hereinafter "*Grand Jury 2013*") (quoting *Doe v. United States (In re Doe)*, 711 F.2d 1187, 1192–93 (2d Cir. 1983)). Indeed, the Second Circuit has emphatically stated "[t]his Court has twice explicitly rejected the idea that the required records exception has been abrogated by the act of production doctrine." *Grand Jury 2013*, 741 F.3d at 346. This binding Supreme Court and Second Circuit precedent makes clear that the required records doctrine is an exception to the act of production doctrine.[7] Therefore, if the required records exception applies in this case, the Individual Debtor has failed to comply with the Order Compelling Production regardless of the conclusion that such production would be testimonial and incriminating.

In determining whether the required records doctrine applies, the Second Circuit turns to the *Grosso* factors. *Grand Jury 2013*, 741 F.3d at 345. In *Grosso*, the Supreme Court applied the following factors: "[F]irst, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents." 390 U.S.

---

[7] The Individual Debtor observes that one of the cases cited by the Trustee, *In re Ross*, 156 B.R. 272, 279 (Bankr. D. Idaho 1993), both found the production of the requested documents to be insufficiently testimonial and found that the required records doctrine applied. From this observation, the Individual Debtor concluded that the latter holding required the former. The Court concludes otherwise. The court in *Ross*, like many courts – particularly lower courts subject to review, advanced multiple bases for its conclusion that the debtor in that case could not properly invoke the Fifth Amendment. 156 B.R. at 281 ("Fifth, *even if the act of production involved here was both testimonial and incriminating*, the nature of chapter 7 as a regulatory regime directed toward society as a whole, and not toward inherently suspect criminal classes, renders the act of production outside the protection of the Fifth Amendment.") (emphasis added).

at 67–68. Here, the Trustee is seeking documents and records that the Order Compelling Production holds relate to "the acts, conduct, or property or to the liabilities and financial condition of the [Individual Debtor], or to any matter which may affect the administration of the [Estate]." Fed. R. Bankr. P. 2004(b). Hence, the Individual Debtor is obligated to produce the documents and records the Trustee seeks under sections 521(a)(3) and (a)(4). Therefore, the issue is whether the documents and records the Individual Debtor is obligated to produce under sections 521(a)(3) and (a)(4) are required records under the *Grosso* test.

### What is the purpose of Bankruptcy Code sections 521(a)(3) and 521(a)(4)?

In determining whether the first factor supports application of the required records doctrine, a court must consider whether the relevant "legislation is not 'directed at the public at large' and concerns 'an area permeated with criminal statutes.'" *Grand Jury 2013*, 741 F.3d at 347 (citing *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965)); *see Marchetti v. United States*, 390 U.S. 39, 57 (1968); *Haynes v. United States*, 390 U.S. 85, 99 (1968). A court must make this determination as to the specific statutory sections at issue, rather than in reference to the entire surrounding statutory context. *Grand Jury 2013*, 741 F.3d at 348 (citing *California v. Byers*, 402 U.S. 424, 430 (1971)).

Section 521 of the Bankruptcy Code is titled "Debtor's duties." Sections 521(a)(3) and 521(a)(4) provide, respectively, that, where a bankruptcy trustee is serving in the case, as here, a debtor must cooperate with the trustee in the performance of the trustee's duties and must surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate.

Section 109 of the Bankruptcy Code allows individuals or entities to file for bankruptcy under Chapters 7, 11, 11 Subchapter V, 12, or 13. In proceedings under Chapters 7, 12, and 13

as well as Chapter 11 Subchapter V, a bankruptcy trustee is automatically appointed upon the commencement of the case. 11 U.S.C. §§ 701, 702, 1183, 1202, 1302. Chapter 7 and Chapter 13 cases are the most common among the general public and always involve a bankruptcy trustee to whom the debtor owes obligations under sections 521(a)(3) and (a)(4).

While in a Chapter 11 case the appointment of a bankruptcy trustee is an extraordinary remedy, *see* 11 U.S.C. § 1112, the effect of this extraordinary relief is that a dispossessed Chapter 11 debtor has the same obligations under sections 521(a)(3) and 521(a)(4) as a Chapter 7 or Chapter 13 debtor. By operation of law, upon filing a Chapter 11 case a debtor is automatically deemed to be a debtor-in-possession and assumes the role of a bankruptcy trustee. 11 U.S.C. § 1107(a). However, a debtor in a Chapter 11 case may be 'dispossessed' of the estate through appointment of a bankruptcy trustee "for cause," provided it is in the best interest of the creditors and the estate. 11 U.S.C. § 1112(b)(1).

Chapter 11 is distinct because it is designed for debtors with complex business interests, assets, and liabilities, such as large corporations and high net worth individuals. *See* H.R. Rep. No. 95-595, at 220 (1977). As such, Chapter 11 is guided by three basic presumptions: (i) debtors with substantial business interests and operations have more value as a continuing economic entity than divided up and liquidated, (ii) debtors with complex financial affairs, assets, and liabilities are better equipped than an appointed trustee to manage their own affairs for the benefit of creditors, and (iii) allowing debtors with substantial business interests and operations to reorganize preserves the interests of debtors, owners, employees, etc. in addition to the interests of creditors. *See id.* Ultimately, however, Chapter 11 is properly used wherever its specific provisions maximize the distribution to creditors. *See Toibb v. Radloff*, 501 U.S. 157, 163–64 (1991). Many of the enumerated examples of "cause" to appoint a bankruptcy trustee –

or dismiss the case or convert the case to a proceeding under Chapter 7 – involve the rebuttal of the presumptions listed above or the debtor-in-possession's failure to comply with its obligations to manage the estate for the benefit of creditors.  11 U.S.C. § 1112(b)(4); *see* 7 COLLIER ON BANKRUPTCY ¶¶ 1112.04[6][b]–[k] (16th ed. 2023).

When one is appointed, the bankruptcy trustee is the representative of the debtor's estate. 11 U.S.C. § 323.  The purpose of sections 521(a)(3) and (a)(4) is to enable the bankruptcy trustee to administer the debtor's bankruptcy estate in accordance with the bankruptcy trustee's duties. *See* 11 U.S.C. §§ 704, 1106, 1116, 1183, 1202, 1302; 4 COLLIER ON BANKRUPTCY ¶¶ 521.15[5], 521.16.  The administration of the bankruptcy estate requires the debtor's disclosure, surrender, and cooperation with the trustee because a case in bankruptcy is an all-encompassing action intended to equitably and finally resolve, adjust, or reorganize myriad debtor-creditor relationships.  *See, e.g.*, 11 U.S.C. §§ 704(a)(5) ("The trustee shall . . . examine proofs of claims and object to the allowance of any claim that is improper . . . ."), 704(a)(7) ("The trustee shall . . . furnish such information concerning the estate and the estate's administration as is requested by a party in interest . . ."), 704(a)(8) ("The trustee shall . . . file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operations, periodic reports and summaries of the operation of such business . . . ."), 1106(a)(3) ("A trustee shall . . . investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and other matters relevant to the case or to the formulation of a plan . . . ."); 7 COLLIER ON BANKRUPTCY ¶ 1116.01 ("The trustee's investigation and reporting duties provide a mechanism for full disclosure of the debtor's state of

affairs so as to enable parties in interest to protect their rights and obtain the successful reorganization of the debtor.").

A debtor's failure to fulfill its obligations to (i) cooperate with the trustee, (ii) disclose financial affairs, assets, and liabilities, and (iii) surrender property of the bankruptcy estate and records relating thereto severely impedes a trustee's ability to administer the estate. *See United States v. Stone*, 282 F. 547, 553 (2d Cir. 1960) ("[T]he very purpose of the statement of affairs is to give dependable information without need of going further.") (upholding conviction in criminal action prosecuting debtor for bankruptcy crimes related to failure to properly disclose loan information on statement of financial affairs in proceeding under former Bankruptcy Act). This failure causes expense and delay to the estate's creditors which are cognizable injuries. *See Andrews v. McCarron (In re Vincent Andrews Mgmt. Corp.)*, 414 B.R. 1, 7 (D. Conn. 2009).

Furthermore, the broad and extraordinary nature of much of the relief provided by the Bankruptcy Code is premised upon proper disclosure and notice. *See, e.g.*, 11 U.S.C. § 1125(a)(1) (defining adequate information for the disclosure statement that must be served before plan solicitation may commence); *Till v. SCS Credit Corp.*, 541 U.S. 465, 475 n. 12 (2004) (finding that the "Bankruptcy Code's extensive disclosure requirements reduce the risk that the debtor has significant undisclosed obligations," undergirding a court's "authority to modify the number, timing, or amount of the installment payments from those set forth in the debtor's original contract"); *In re Motors Liquidation Co.*, 829 F.3d 135, 158–61 (2d Cir. 2016) (holding that failure to properly serve undisclosed known creditors with a sale motion rendered a sale order unenforceable against the creditors). A trustee, as the bankruptcy estate's representative, is the party tasked with; in the first instance, seeking much of this relief for: (i) the benefit of the estate, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352

(1985); and (ii) the debtor who may receive, upon exiting the gauntlet, a "fresh start," *see Grogan v. Garner*, 498 U.S. 279, 286 (1991).

The Court concludes that sections 521(a)(3) and (a)(4) are targeted at the general public. Bankruptcy trustees are automatically appointed in a wide range of cases. The duty to disclose and surrender property and records to the trustee is essential to the fundamental and required administrative duties of the trustee and the exercise of the trustee's powers under the bankruptcy code.

The remaining issue is whether sections 521(a)(3) and (a)(4) are concerned with an area "permeated with criminal statutes." *Albertson*, 382 U.S. at 79. Title 18, sections 151 *et sequitur*, 1519, and 3284 of the United States Code criminalize certain actions taken in relation to proceedings under the Bankruptcy Code. Among these "bankruptcy crimes" are several related to the concealment of assets of the bankruptcy estate to protect them from distribution to the estate's creditors. The issue before the Court is not, however, whether certain failures to fulfill a debtor's duty under sections 521(a)(3) and (4) leave a debtor vulnerable to criminal prosecution, but rather whether sections 521(a)(3) and (4) are "directed at a 'selective group inherently suspect of criminal activities.'" *Marchetti*, 390 U.S. at 57.

In *Grosso* and *Marchetti*, the problem was not the criminal laws enforcing the statutory requirement to file tax returns, which are akin to the bankruptcy crimes enumerated above. *Grosso*, 390 U.S. at 64–65; *see Marchetti*, 390 U.S. at 57. Rather, in both cases the Supreme Court determined that the requirement to file a federal wagering tax return squarely targeted conduct already criminalized by state law, namely gambling. *Grosso*, 390 U.S. at 64–65; *Marchetti*, 390 U.S. at 57. At issue in *Albertson* was the requirement that members of the Communist Party of America personally register with the Subversive Activities Control Board.

382 U.S. at 77–78. Affiliation with the Communist Party was criminalized at the time. *Id.* In *Haynes*, the issue was a requirement that persons who obtained firearms *other than in the normal course* – which the Supreme Court observed would be mostly persons acquiring firearms illegally – register their firearms. 390 U.S. at 95–97.

The facts before the Supreme Court in *Grosso*, *Marchetti*, *Albertson*, and *Haynes* are each dissimilar to the instant facts. First, all of those cases involved the creation of a new record rather than the production of existing documents and records. *Haynes*, 390 U.S. at 95–97; *Grosso*, 390 U.S. at 64–65; *Marchetti*, 390 U.S. at 57; *Albertson*, 382 U.S. at 77–78. More importantly, the routine administration of a bankruptcy case does not as a matter of course implicate criminal activity. The administration of the estate is intended to be separate from issues of criminal liability. *Compare* 11 U.S.C. §§ 323 (the trustee is the party to sue and be sued on behalf of the estate with regards to civil litigation), 362(a)(1) (generally, civil actions against the debtor or the estate are stayed by the filing of a voluntary bankruptcy petition) *with* 11 U.S.C. § 362(b)(1) (criminal actions against the debtor are not stayed by the commencement of a case under Title 11). Debtors are generally not exposed to criminal liability for the disclosures they are required to make in their bankruptcy cases. The intent of disclosure requirements in bankruptcy proceedings is to lay bare *civil liability* to allow for the equitable and final resolution of all claims against the debtor. *See Byers*, 402 U.S. at 430–31 (finding that, while the California Vehicle Code involved some criminal statutes, "it was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities arising from automobile accidents" and holding that the required records exception applied).

Therefore, the purpose of sections 521(a)(3) and (a)(4) is "essentially regulatory," which supports the applicability of the required records exception to the production of documents by

28

the Individual Debtor compelled by the Order Compelling Production. *Grosso*, 390 U.S. at 67–
68.

### *Are the purported required records customarily kept?*

As to the second factor, whether the purportedly required records are customarily kept,
the Trustee is seeking, *e.g.*, financial and banking records, money transfer records, records
relating to the Individual Debtor's business interests, etc. As the Second Circuit observed with
respect to foreign bank account information, common sense dictates that persons and entities
retain basic financial transaction and account information in order to manage their affairs and
access their accounts. *Grand Jury 2013*, 741 F.3d at 350 (citing *M.H. v. United States (In re
Grand Jury Investigation)*, 648 F.3d 1067, 1076 (9th Cir. 2011)). The Court finds this is
especially true regarding individuals and entities with complex financial affairs, assets, and
liabilities. Pointedly, the Second Circuit went on to say that although "some individuals engaged
in wrongdoing are advised not to keep even this basic information[,] . . . [w]e decline to look at
the custom of only the miscreants . . .." *Grand Jury 2013*, 741 F.3d at 350. Therefore, the Court
concludes that the records required by sections 521(a)(3) and (a)(4) are "customarily kept."
*Grosso*, 390 U.S. at 67–68.

### *Did the purported required records assume 'public aspects?'*

As to the third factor, whether the purportedly required records have assumed 'public
aspects,' the question is whether the overall regulatory context of section 521(a)(3) and (a)(4) –
requires the particular records be kept. *Grand Jury 2013*, 741 F.3d at 351–52.

The Bankruptcy Code requires disclosure both at the outset of a case and as a case
proceeds. Section 521(a)(1) requires any debtor – including the Individual Debtor – to file a list
of creditors, statement of financial affairs, and schedules of, *inter alia*, the debtor's assets,

liabilities, income, and expenses. *See* 4 COLLIER ON BANKRUPTCY ¶¶ 521.06[3][a] ("The
schedule is a statement of *all* property, both *real* and personal, within the broad definition of
property of the estate under section 541(a), which includes 'all legal or equitable interests of the
debtor in property as of the commencement of the case.'"), 521.06[3][b] ("The scheduling of
interests in property, both real and personal, is a very important duty."), 521.09 ("The purpose of
the requirement of filing a statement of financial affairs is to furnish the trustee and creditors
with detailed information about the debtor's financial condition, thereby saving the expense and
long and protracted examination for the purpose of soliciting information."). Section 341
requires any debtor to submit to an examination conducted by a trustee, in which its creditors
may participate. *See* 3 COLLIER ON BANKRUPTCY ¶ 341.01.

Regarding Chapter 11 in particular, section 1107 provides that while a Chapter 11 debtor
is a debtor-in-possession, such a debtor, as a fiduciary of the bankruptcy estate, would have
many of the same disclosure obligations of a trustee discussed above, including reporting
requirements. *See* 7 COLLIER ON BANKRUPTCY ¶¶ 1107.02[3]–[4]. A debtor's failure to properly
disclose financial affairs, assets, and liabilities in a Disclosure Statement required to be filed in
connection with a Chapter 11 Plan would prevent confirmation of that plan. 11 U.S.C. § 1125;
*see* 7 COLLIER ON BANKRUPTCY ¶¶ 1125.02 ("Disclosure is the pivotal concept in reorganization
practice under the Bankruptcy Code.") (citing H.R. Rep. No. 95-595, at 226–31 (1977)),
1125.02[2]. Failures to make appropriate disclosures can and do constitute cause to convert a
Chapter 11 reorganization case to a Chapter 7 liquidation case, dismiss the Chapter 11
bankruptcy case, or appoint a Chapter 11 trustee. 11 U.S.C. § 1112(b)(4)(f); *see* 7 COLLIER ON
BANKRUPTCY ¶ 1112.04[6][f].

Much like the mother in *Bouknight*, the Individual Debtor assumed these obligations upon voluntarily commencing his Chapter 11 case, submitting himself to the *in personam* jurisdiction of this Court, and submitting all of his legal and equitable interests in property – "wherever located and by whomever held" – to the *in rem* jurisdiction of this Court.  11 U.S.C. § 541(a)(1); *Bouknight*, 493 U.S. at 559 ("Bouknight submitted to the routine operation of the regulatory system and agreed to hold Maurice in a manner consonant with the State's regulatory interests and subject to inspection by BCDSS.").  Moreover, as in *Bouknight*, where the mother was required to produce her child to the Baltimore City Department of Social Services upon cause shown, the Bankruptcy Code requires the Individual Debtor to produce documents and records relating to property of the estate to the Trustee, because cause was shown to appoint a trustee.  11 U.S.C. §§ 521(a)(4), 1112; *Bouknight*, 493 U.S. at 555–56.  Because the Individual Debtor voluntarily filed his Chapter 11 case and became a debtor-in-possession, he assumed a bankruptcy trustee's duties to manage the Estate for the benefit of its creditors.  11 U.S.C. § 1107(a).  The Individual Debtor was a custodian of the Estate and its books and records while a debtor-in-possession.  *See Bouknight*, 493 U.S. at 555–56.  Although his status as a debtor-in-possession ended upon the appointment of the Trustee, his resultant obligation to provide information to the Trustee did not.

The Court concludes that the records required to be produced by the Individual Debtor pursuant to sections 521(a)(3) and (a)(4) have assumed "public aspects" because the Individual Debtor's case is a voluntary Chapter 11 case and because the specific facts and circumstances of these Chapter 11 cases and related adversary proceedings support this conclusion.  *See Bouknight*, 493 U.S. at 555–56; *Grosso*, 390 U.S. at 67–68.

### The 'required records' exception applies

All three factors of the *Grosso* test support the applicability of the required records exception to the Fifth Amendment right against self-incrimination under the specific facts and circumstances before the Court. 390 U.S. at 67–68; *see Bouknight*, 493 U.S. at 555–56; *Grand Jury 2013*, 741 F.3d at 345; *Ross*, 156 B.R. at 279–81; *In re Fairbanks*, 135 B.R. 717, 730–33 (Bankr. D.N.H. 1991).

Application of the required records exception is also supported by Supreme Court precedent relating to the former Bankruptcy Act. *In re Harris*, 221 U.S. 274 (1911) (holding Fifth Amendment did not protect a debtor from producing its books and records to the receiver in bankruptcy). *Bouknight*, in upholding the required records exception post-*Fisher*, cited *Harris* approvingly as an example of the required records doctrine, confirming the continuing vitality of *Harris* today despite the evolution of Fifth Amendment jurisprudence since *Harris* was decided. *Bouknight*, 439 U.S. at 556–57; *see Fisher*, 425 U.S. 411–13 (discussing *Harris* without calling into question its holding); *see also Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998) (holding that precedent under the Bankruptcy Act is not displaced unless there is a clear indication that Congress intended to do so); *Ross*, 156 B.R. at 279; 3 COLLIER ON BANKRUPTCY ¶ 344.03[4] ("[I]t is doubtful that a debtor, as opposed to other witnesses, may successfully refuse to turn over the property, books and records that every debtor under the Code is required to surrender to the trustee on the basis that this 'act of production' might itself tend to incriminate."); *but see Butcher v. Bailey*, 753 F.2d 465, 468 (6th Cir. 1985) (holding, pre-*Bouknight* and in an *involuntary* Chapter 7 case rather than a voluntary Chapter 11 case, that *Harris* was no longer good law after *Fisher* and section 521 did not require the production of documents to which the act of production doctrine applied).

The Individual Debtor objects that, nevertheless, *Harris* and the required records exception do not reach Rule 2004 subpoenas under *McCarthy v. Arndstein*. 266 U.S. 34 (1924). However, the Supreme Court in *Arndstein* distinguished its prior opinion in *Harris* on the basis that *Harris* concerned the surrender of documents and records and *Arndstein* concerned the issue of compelled *testimony*. 266 U.S. at 41–42. The Trustee is not objecting to the Individual Debtor answering interrogatories or questions during deposition or in-court testimony by invoking the Fifth Amendment. Instead, the Trustee is objecting to the Individual Debtor invoking the Fifth Amendment in response to requests for the production of documents and records. Therefore, *Arndstein* is inapposite.

The Court concludes that, both under an analysis of the *Grosso* factors and by application of Supreme Court precedent under the Bankruptcy Act, the required records exception applies.

### iii. The Individual Debtor did not comply with the Order Compelling Production

For all of the above reasons, the Court concludes that (i) it is not impossible for the Individual Debtor to comply with the Order Compelling Production and (ii) under the required records exception, the Individual Debtor may not properly invoke his Fifth Amendment right against self-incrimination in response to the Order Compelling Production. Therefore, the Trustee has established by clear and convincing evidence that the Individual Debtor has not complied with the Order Compelling Production.

### 3. Did the Individual Debtor diligently attempt to comply with the Order Compelling Production?

The Trustee must also establish that the Individual Debtor did not diligently attempt to comply in a reasonable manner with the Order Compelling Production. *King*, 65 F.3d at 1058. The Trustee argues that the Individual Debtor has made no attempt to comply with the Order Compelling Production. In response, the Individual Debtor argues that there is a fair ground of

33

doubt as to whether the Individual Debtor could properly assert his Fifth Amendment right against self-incrimination and that the Declaration and Supplemental Declaration represent his good faith efforts to comply with the Order Compelling Production.

The Individual Debtor's operative mistake is a mistake of law – not fact. Namely, the Individual Debtor has mistakenly concluded that the required records exception to the act of production doctrine does not apply and that he may invoke the Fifth Amendment in response to the Order Compelling Production. For the reasons stated above, whether producing each document or record would factually be testimonial and incriminating does not affect the outcome.

Generally, absent a requirement of willfulness or intention, mistake of law is not a defense to civil liability. *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–85 (2010). As noted above, "[t]he absence of wilfulness [sic] does not relieve from civil contempt." *McComb*, 336 U.S. at 191. Therefore, the Court concludes that the Individual Debtor's mistake of law is not a defense to civil contempt. *Cf. Yellin v. United States*, 374 U.S. 109, 123 (1963) (holding mistake of law was no defense to contempt of Congress); *United States v. Remini*, 967 U.S. 754, 758 (2d Cir. 1992) (holding mistake of law was no defense to criminal contempt of court). This conclusion accords with the Supreme Court's observation in *Taggert* that "a party's good faith, *even where it does not bar civil contempt*, may help to determine an appropriate sanction." 139 S. Ct. at 1802 (emphasis added). Therefore, the Trustee has established that the Individual Debtor did not diligently attempt to comply with the Order Compelling Production.

### 4. Did the Individual Debtor have notice of the Order Compelling Production?

The final element of civil contempt is notice of the relevant order. *Gravel*, 6 F.4th at 512. The Declaration admits the Individual Debtor had notice of the Order Compelling Production. (ECF No. 1444 Ex. A.) This element of civil contempt has been established.

### 5. The Individual Debtor is in civil contempt of court

All four elements having been established, the Contempt Motion is granted. The Court holds the Individual Debtor in civil contempt of court for failure to comply with the Order Compelling Production. As set forth in the decretal paragraphs below, the Individual Debtor will be afforded the opportunity to purge himself of contempt. In light of the serious nature of the circumstances facing the Individual Debtor and the good faith shown in answering the Trustee's two-hundred two (202) questions in his Supplemental Declaration, the Court will provide the Individual Debtor with ample time to purge himself of contempt. *Taggert*, 139 S. Ct. at 1802. However, if the Individual Debtor does not purge himself of contempt, the Trustee may request appropriate sanctions.

The Individual Debtor's counsel are reminded that "[c]ounsel have an obligation, as officers of the court, to assist in the discovery process by making diligent, good-faith responses to legitimate discovery requests." *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1486 (5th Cir. 1990). To that end, the Individual Debtor's counsel are further reminded that this Court has already found that "counsel to the [Individual Debtor and others] has not established that they were sufficiently diligent under the circumstances." (Order Compelling Production ¶ 9.) The Individual Debtor was ordered to comply with the Order Compelling Production at or before 5:00 p.m. on January 31, 2023, but did not do so. "[N]either

[counsel] nor [a party has] a unilateral right to decide whether or when to comply with discovery demands." *535 Broadway Assocs. v. Com. Corp. of Am.*, 159 B.R. 403, 405 (S.D.N.Y. 1993).

The Individual Debtor and his counsel are to take reasonable and diligent steps, whether or not this Court has articulated those steps directly, to bring the Individual Debtor into compliance with the Order Compelling Production. As the Individual Debtor's counsel has stated on the record, reasonable steps include filing a motion in the Criminal Court seeking to allow production to the Trustee of documents and records produced to the Individual Debtor by the prosecution which are responsive to the Rule 2004 subpoena, subject to the Trustee abiding by whatever conditions the Criminal Court may impose. In seeking to purge himself of contempt, the Individual Debtor would be acting under compulsion of the Order Compelling Production and, therefore, not waiving any Fifth Amendment right by moving in the Criminal Court to produce to the Trustee. *See Bouknight*, 493 U.S. at 561–62. In considering any sanctions motion, the Court will consider the diligence with which the Individual Debtor seeks relief in the Criminal Court.

### B.  Should the Order Compelling Production be stayed?

Having ruled on the Contempt Motion, the Court turns to the Stay Motion. The Individual Debtor argues that the Order Compelling Production must be stayed pending the end of the Criminal Action in order to preserve the Individual Debtor's Fifth Amendment right against self-incrimination. In response, the Trustee argues that there is no basis to impose a stay of the Order Compelling Production and that such a stay would substantially injure the Trustee.

The Court first notes that while the Stay Motion was filed by the Individual Debtor and seems to only concern the Individual Debtor, the attached proposed order would stay the Order Compelling Production entirely, including the decretal paragraphs relevant to the Individual

Debtor's daughter, Ms. Mei Guo, and the Individual Debtor's adjudged corporate *alter ego*, HK

International Funds Investments (USA) Limited, LLC. To the extent that the Stay Motion seeks

relief as to these additional parties, the Court denies the Stay Motion.

Turning to the merits, the Court must determine whether to stay the Order Compelling

Production within its sound discretion. *Kashi v. Grastos*, 790 F.2d 1050, 1057 (2d Cir. 1986).

There is no strict requirement that a court stay civil proceedings due to pending criminal

proceedings. *United States v. Kordel*, 397 U.S. 1 (1970); *Kashi*, 790 F.2d at 1057. In

considering whether to stay civil proceedings in light of criminal proceedings, courts consider,

*inter alia*:

> 1) the extent to which the issues in the criminal case overlap with those presented in the
> civil case; 2) the status of the case, including whether the defendants have been indicted;
> 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the
> prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the
> defendants; 5) the interests of the courts; and 6) the public interest.

*Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134,

1139 (S.D.N.Y. 1995).

The Court first considers the private interests of the Estate in proceeding expeditiously

weighed against the prejudice to the Estate caused by delay. There is substantial prejudice to the

Estate and the Individual Debtor's creditors in staying the Order Compelling Production. As

discussed above, a debtor's disclosure of his financial affairs, assets, and liabilities is

fundamental in bankruptcy proceedings. The Estate continues to incur enormous expense and

delay because the Individual Debtor has not cooperated with and has instead obstructed the

Trustee's investigation. Pursuant to section 521, the Trustee should have had all documents and

records relating to the Individual Debtor's financial affairs, assets, liabilities, businesses, etc.

immediately following his appointment more than a year ago. Instead, the Trustee has had to

identify other appropriate subpoena targets, issue countless subpoenas, and engage in ceaseless motion practice. While the Trustee's efforts have substantially benefitted the Estate, the Estate has also borne a heavy cost on account of these efforts.

Moreover, these heavy costs are incurred in the context of a bankruptcy proceeding. It is likely that there already is not enough money to satisfy the claims of creditors, and creditors are losing the time value of their ultimate recovery due to the ongoing, incomplete investigation into the Individual Debtor's affairs. 11 U.S.C. §§ 726(a)(5), 1129(a)(7)(A)(ii). Furthermore, Congress has determined that the ultimate goal of a Chapter 11 case – confirmation of a plan – must occur within a specified timeframe. *See* 11 U.S.C. §§ 1106(a)(5), 1121(a), 1121(d). Delay in confirmation of a plan, which must provide for the ultimate realization of creditor's claims, results in substantial injury to creditors and the Estate. *See Andrews*, 414 B.R. at 7. The Trustee should not be forced to operate without the Individual Debtor's required cooperation and disclosures. *See Stone*, 282 F.2d at 553.

The Court next considers the private interests and burden on the Individual Debtor. There is no cognizable interest in delaying or obstructing these lawful bankruptcy proceedings. There is also no cognizable burden on the Individual Debtor to comply with the Order Compelling Production. For the reasons stated above, he cannot properly invoke his Fifth Amendment right against self-incrimination. Moreover, in upholding the required records exception post-*Fisher*, the Supreme Court in *Bouknight* noted that

> The State's regulatory requirement in the usual case may neither compel incriminating testimony nor aid a criminal prosecution, but the Fifth Amendment protections are not thereby necessarily unavailable to the person who complies with the regulatory requirement after invoking the privilege and subsequently faces prosecution.

493 U.S. at 561–62; *but see Johnson v. United States*, 228 U.S. 457 (1913) (holding, pre-*Fisher*, that books and records produced under *Harris* could be used in a criminal proceeding).

Next the Court considers the status of the pending criminal inquiries and the interest of the Criminal Court.  There are two pending criminal inquiries to consider: the Criminal Action and the alleged investigation into bankruptcy crimes.  The Individual Debtor has been indicted in the Criminal Action.  There has been no evidence submitted to the Court that he has been indicted regarding any investigation into bankruptcy crimes.  These Chapter 11 cases and related adversary proceedings do overlap with the Criminal Action –  (a) many of the Individual Debtor's creditors are also his alleged victims in the Criminal Action, (b) some of the Individual Debtor's purported assets were alleged to have been bought with proceeds of the fraud alleged in the Criminal Action, and (c) some of the Individual Debtor's purported affiliates and corporate *alter egos* are alleged to be involved in the fraud alleged in the Criminal Action – but at the same time, there are incongruities – (d) there are creditors in these Chapter 11 cases that are not alleged fraud victims, (e) there are purported assets of the Estate that were purchased prior to the alleged fraud, and (f) there are purported affiliates and *alter egos* of the Individual Debtor *not* alleged to be involved in the fraud.  However, any issue implicated by any investigation into bankruptcy crimes are directly related to these Chapter 11 cases.

The Court concludes this Order does not substantially interfere with the Criminal Court's interest in the orderly administration of the Criminal Action.  The Individual Debtor raises the specter that requiring the Individual Debtor to produce documents to the Trustee would damage the prosecution's case against him and cause litigation about evidence in the Criminal Court. This argument is unpersuasive.  The Individual Debtor producing documents and records under compulsion in these proceedings does not change the reality that the prosecution apparently already possesses voluminous evidence.  While, as the Individual Debtor argues, the prosecution *may* not be allowed to use the Individual Debtor's production to the Trustee as evidence of the

Individual Debtor's control over or the authenticity of documents and records already in the prosecution's possession, the Individual Debtor's argument describes the *status quo*. Moreover, the Criminal Court will review and determine any motion to produce to the Trustee documents and records from the prosecution's production to the Individual Debtor.

Regarding any investigation into bankruptcy crimes, because (a) there is no evidence that the Individual Debtor has been indicted and (b) there is no evidence that there are proceedings in relation to it in any court, the Court concludes that the interests of any such investigation should be given less weight. As stated above, the Bankruptcy Code does not exist for the purpose of creating bankruptcy crimes. It exists for the purpose of equitably and finally resolving, adjusting, and reorganizing the assets, liabilities, and financial affairs of a debtor for the benefit of all creditors and, ultimately, the debtor itself. It is not proper to hobble the Trustee's investigation into the affairs, assets, and liabilities of the Individual Debtor for the benefit of some speculative prosecution of the Individual Debtor for bankruptcy crimes. Bankruptcy crimes are an enforcement mechanism to promote proper disclosure in bankruptcy proceedings. If the Individual Debtor complies with the Order Compelling Production, he would remedy the harm the bankruptcy crimes exist to prevent, while also allowing these Chapter 11 cases to be administered appropriately.

Finally, the Court concludes that the public's interest in "the expeditious administration of bankruptcy cases is impaired by obstructing a trustee's efforts to collect, liquidate and distribute assets to creditors of the estate." *In re MGL Corp.*, 262 B.R. 324, 330 (Bankr. E.D. Pa. 2001). The public has an interest in a well-functioning bankruptcy system. It benefits the economy, debtors, and creditors. Obstruction of that process and efforts at dilation of that process are not in the public interest. Moreover, as set forth above, the production of documents

and records by the Individual Debtor in accordance with the Order Compelling Production does not offend the Fifth Amendment.

Having considered the equities, the Court concludes within its sound discretion that a stay of the Order Compelling Production is not warranted. Accordingly, the Stay Motion is denied.

### C. Should monetary sanctions enter for discovery abuse?

Finally, Fed. R. Civ. P. 37(b)(2)(C), made applicable by D. Conn. L. Civ. R. 37 and D. Conn. Bankr. L.R. 1001-1(a)(1) and 2004-1(a), provides

> (C) *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Under the specific facts and circumstances, the Court concludes an award of expenses is not warranted at this time.

## V. CONCLUSION AND ORDER

For the reasons stated above, the Court (A) holds the Individual Debtor in civil contempt of Court for failure to comply with the Order Compelling Production, and (B) denies the Stay Motion and declines in its sound discretion to stay the Order Compelling Production pending the resolution of the Criminal Action. Accordingly, it is hereby

**ORDERED:** The Court holds Mr. Ho Wan Kwok (the "Individual Debtor") in civil contempt of court for failure to comply with the Order Granting in Part Motion to Compel Compliance (the "Order Compelling Production"), ECF No. 1353; and it is further

**ORDERED:** Should the Individual Debtor fail to purge himself of contempt by failing to bring himself into full compliance with the Order Compelling Production on or before September 29, 2023, Mr. Luc A. Despins, in his capacity as Chapter 11 trustee (the "Trustee")

for the bankruptcy estate (the "Estate") of the Individual Debtor, may move for whatever

sanctions are appropriate; and it is further

      **ORDERED:** The Motion for a Limited Stay of Order Granting in Part Motion to

Compel Compliance (the "Stay Motion"), ECF No. 1649, is **DENIED**.


      Dated at Bridgeport, Connecticut this 26th day of July, 2023.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

**Exhibit 8**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HO WAN KWOK, *et al.*, | ) | Case No. 22-50073 (JAM) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
| LUC A. DESPINS, CHAPTER 11 TRUSTEE FOR | ) | Adv. P. No. 23-05017 (JAM) |
| THE ESTATE OF HO WAN KWOK, | ) |  |
|  | ) | RE: ECF Nos. 47, 57 |
| Plaintiff, | ) |  |
| v. | ) |  |
|  | ) |  |
| TAURUS FUND LLC; SCOTT BARNETT, AS | ) |  |
| TRUSTEE FOR TAURUS FUND LLC; and | ) |  |
| TAURUS MANAGEMENT LLC, AS TRUSTEE | ) |  |
| FOR TAURUS FUND LLC, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## ORDER GRANTING EMERGENCY
## <u>MOTION TO MODIFY PRELIMINARY INJUNCTION</u>

On August 24, 2023, the Court issued the Memorandum of Decision and Order Granting

in Part Motion for Preliminary Injunction (the "PI"). (ECF No. 47.) In pertinent part, the PI

ordered that "[a]t or before 5:00 p.m. on August 28, 2023, the Defendants shall file proof of

insurance for (i) all assets and property of Taurus Fund, including the Mahwah Mansion; and (ii)

all personalty and/or fixtures in, on, or at the Mahwah Mansion . . .." (*Id.* at *23.)

On August 28, 2023, Defendant Taurus Fund LLC ("Taurus Fund") filed a Response re:

Preliminary Injunction (the "Response"). (ECF No. 52.) The Response indicated the Defendants

did not have the required insurance and had not managed to obtain insurance by 5:00 p.m. on

August 28, 2023, but were working diligently to do so. (*Id.*)

On August 29, 2023, a hearing was held in this adversary proceeding on another matter. During the hearing, the Court inquired about the insurance issue. The Defendants indicated that efforts were ongoing. The Plaintiff, Mr. Luc A. Despins, Chapter 11 trustee (the "Trustee") for the estate of Mr. Ho Wan Kwok, indicated he was concerned by the lack of insurance and orally moved the Court to amend the PI to prevent all access to 675 Ramapo Valley Road, Mahwah, NJ 07430 (the "Mahwah Mansion") except to certain personnel. The Court told the Trustee that it would consider a motion to amend the PI filed after 5:00 p.m. on August 30, 2023 should the Defendants fail to file proof of insurance as required by the PI.

On August 30, 2023, Taurus Fund filed an Amended Response re: Preliminary Injunction (the "Amended Response"). (ECF No. 55.) The Amended Response indicated that the Defendants had not yet acquired insurance, but were in meetings with insurance providers. (*Id.*) Also, the Defendants stated that as of the Amended Response, security for the Mahwah Mansion was presently not allowing entry to the Mahwah Mansion because of the ongoing insurance issue. (*Id.*) Later that day, the Trustee filed an Emergency Motion to Modify Preliminary Injunction (the "Emergency Motion"). (ECF No. 57.) The Emergency Motion continues to express serious concern that absent a Court order modifying the PI the Defendants may allow access to the Mahwah Mansion without acquiring insurance. (*Id.*)

Finding good cause to grant the Emergency Motion in light of the failure of Defendants to file proof of insurance and in consideration of the Amended Response, which tacitly acknowledges the Trustee's concerns regarding the present lack of insurance, it is hereby

**ORDERED:** The Motion is **GRANTED** as set forth herein; and it is further

**ORDERED:** Effective immediately, the PI is modified such that access to the Mahwah Mansion is restricted solely to (a) the Security Services (as defined in the Preliminary

Injunction); (b) the Trustee and his representatives and/or professionals; (c) the United States Department of Justice and its employees and representatives; (d) the FBI and its employees and representatives; (e) other federal, New Jersey state, or Mahwah municipal law enforcement agencies and their employees and representatives; (f) any other persons expressly authorized by the Trustee in writing (which can include email); and (g) any other person expressly authorized by the United States District Court for the Southern District for New York or this Court; and it is further

**ORDERED:** Upon a showing that the Defendants have obtained sufficient insurance coverage for property titled to Taurus Fund, including the Mahwah Mansion, and the all personalty and/or fixtures in, on, or at the Mahwah Mansion, and that such insurance coverage is in effect, the Defendants may move to modify the foregoing restriction to access to the Mahwah Mansion. The Trustee may respond or object to any such motion; and it is further

**ORDERED:** Except as expressly modified by this Order, the PI shall remain in full force and effect.

Dated at Bridgeport, Connecticut this 31st day of August, 2023.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

**Exhibit 9**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., | Index No: 652077/2017 |
| Plaintiff, | Hon. Barry R. Ostrager, J.S.C. |
| v. | |
| KWOK HO WAN, a/k/a KWOK HO, a/k/a GWO WEN GUI, a/k/a GUO WENGUI, a/k/a GUO WEN GUI, a/k/a WAN GUE HAOYUN, a/k/a MILES KWOK, a/k/a HAOYUN GUO, GENEVER HOLDINGS CORPORATION, and GENEVER HOLDINGS LLC, | **RESTRAINING NOTICE** |
| Defendants. | |

TO:  Greenwich Land, LLC
C/O Corporate Creations Network, Inc.
3411 Silverside Rd.
Tatnall Building Ste. 104
Wilmington, DE 19810

WHEREAS, in an action in the Supreme Court of the State of New York, County of New York, Index No. 652077/2017, between Pacific Alliance Asia Opportunity Fund L.P. ("Judgment Creditor") and Defendants Miles Kwok ("Judgment Debtor"), Genever Holdings Corporation, and Genever Holdings LLC, being all the parties to the action, on February 3, 2021, the Supreme Court of the State of New York, County of New York, entered judgment in favor of Judgment Creditor and against Judgment Debtor in the amount of $116,402,019.57. This amount, together with statutory interest, remains due and unpaid.

PLEASE TAKE NOTICE that pursuant to CPLR § 5222(b), which is set forth in full herein, you are hereby forbidden to make or suffer any sale, assignment or transfer of, or any

interference with, any property in which Judgment Debtor has an interest, except as provided in CPLR § 5222(b). We understand the Judgment Debtor may have direct, indirect, or beneficial ownership in, or the right or ability to direct or control, you and your assets.

<u>**CIVIL PRACTICE LAW AND RULES § 5222(b)**</u>

5222(b) Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

PLEASE TAKE FURTHER NOTICE that disobedience of this Restraining Notice is punishable as a contempt of Court.

DATED: May 4, 2021
New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP

By: _____

Stuart Sarnoff (ssarnoff@omm.com)
Edward Moss (emoss@omm.com)
7 Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Plaintiff Pacific Alliance Asia*
*Opportunity Fund L.P.*

**Exhibit 10**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
HO WAN KWOK and GENEVER        *   Bridgeport, Connecticut
 HOLDINGS CORPORATION,         *   September 12, 2023
                               *
           Debtor.             *
                               *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:


Chapter 11 Trustee:              LUC A. DESPINS, ESQ.
                                 Paul Hastings LLP
                                 200 Park Avenue
                                 New York, NY  10166

For the Chapter 11 Trustee:   G. ALEXANDER BONGARTZ, ESQ.
                                 Paul Hastings LLP
                                 200 Park Avenue
                                 New York, NY  10166


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, CT 06484 (203)929-9992**

1    overturning the sale of the Lady May.

2           The only change we'd need to make is just to add

3    the hearing date in the first paragraph of the proposed

4    order that appears on pages 5 and 6 of ECF 2186.

5           So for all those reasons, the second interim

6    application for compensation of Neubert, Pepe and Monteith

7    is granted, and the proposed order will enter with the

8    minor, with the very minor changes noted on the record.

9           MR. LINSEY:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          All right.  That concludes all the matters on

12   today's calendar, unless someone has something they have a

13   question about.

14          MR. DESPINS:  Yes, Your Honor.  If I may?

15          THE COURT:  Yes.  Go ahead.

16          MR. DESPINS:  I'm really duty bound to inquire

17   about the status of the criminal stay in our motion to stop

18   that the -- Kwok and Yvette Wang from pursuing that criminal

19   stay matter because we have a deadline coming up of

20   September 21st in that case.  And obviously we would want to

21   avoid that.  So I'm sorry.  I wanted to bring that up.

22          THE COURT:  Well, there was an objection filed to

23   your motion in this, in this court.

24          At the same time, my understanding is that, and

25   you can correct me if I'm wrong, that the district court in

1    the Southern District of New York criminal proceeding is

2    allowing you, as the Trustee of the estates, to file some

3    sort of repsonse, is that correct, to the motion --

4            MR. DESPINS:  That's correct, Your Honor.

5            THE COURT:  -- to the motion to stay filed by Mr.

6    Kwok's criminal counsel in the criminal proceedings,

7    correct?

8            MR. DESPINS:  That's correct.

9            THE COURT:  Okay.  So to -- so I'm going to wait

10   to see what the district court does.

11           This is -- this is not -- I don't know that the

12   bankruptcy court has any authority, and I haven't been able

13   to find any, that would allow a bankruptcy court to tell a

14   party in a criminal proceeding that they can't seek some

15   form of relief from the court in that criminal proceeding.

16   I haven't seen any authority that would provide this court

17   with the authority to do that.

18           MR. DESPINS:  Well, I -- I don't know if you've

19   had a chance to look at the joinder filed by --

20           THE COURT:  I did.  I did.

21           MR. DESPINS:  -- the committee in PAX because I

22   thought they cited a number of cases where --

23           THE COURT:  They cited -- they cited one case

24   which was helpful.  I think the committee cited one case

25   which held that the district court in the criminal

1    proceedings ruled on that motion, not the bankruptcy court.

2            If I'm, Attorney Mayhew, if I'm saying something

3    incorrect, please correct me, but my recollection of the

4    review of the joinder was -- I understand the committee

5    joins and they cited a case which was helpful, because I

6    don't think there were any cases cited before that, but I

7    think what that case said, well, my recollection of what

8    that case said, is that the district court made that, in the

9    criminal action made that determination, not the bankruptcy

10   court, and I think that is an important distinction with a

11   difference.

12           I'm not sure that the bankruptcy court has

13   authority, any authority, to enjoin anyone from doing

14   anything in a criminal proceeding that is not part of the

15   bankruptcy -- I don't know how a criminal proceeding could

16   be part of the bankruptcy case.

17           So I understand you may be frustrated.  And I

18   understand that, you know, you may feel that you would

19   rather this court address the issue, and maybe I'll still

20   have to address the issue after the district court rules,

21   but I don't see -- I am not convinced or persuaded that

22   there's any authority that exists that would authorize a

23   bankruptcy court to stay a debtor who is no longer in

24   possession, who is not only the subject of a criminal

25   proceeding, but, in fact, incarcerated, from seeking relief

1    in that criminal proceeding.  It doesn't mean he's going to

2    obtain that relief, but I don't -- I don't see how the

3    bankruptcy court has the authority to do that, any

4    bankruptcy court.

5          MR. DESPINS:  Your Honor, it's because this is an

6    attempt to control property of the estate.  I mean, if this

7    Chapter 11 case is stayed, the effect on property of the

8    estate would be huge.  You know.  It's just I can't even

9    conceive of it.

10         We had a deadline, for example, the two-year

11    statute of limitations is coming up in February.  If this

12    case is stayed, what's going to happen to all these

13    important questions?

14         THE COURT:  Well, you're going to have to move to

15    extend that statute of limitations, number one.  Number two,

16    the Mahwah mansion is not property of the estate at this

17    time.  That determination hasn't been made.

18         MR. DESPINS:  I know.  No.  But I want to be

19    clear, they're seeking a stay of the entire Chapter 11 case.

20         THE COURT:  No.  I understand.

21         MR. DESPINS:  Not only --

22         THE COURT:  I read it.  I understand.

23         MR. DESPINS:  Okay.

24         THE COURT:  I understand what they're seeking.

25         MR. DESPINS:  Okay.

1          THE COURT:  But the case that the committee cited,

2     the district court did not grant that relief.

3          MR. DESPINS:  Understood.

4          But I don't think there's any precedent.  Your

5     point is that there's no precedent where a bankruptcy court

6     has enjoined such a proceeding.

7          THE COURT:  Correct.

8          MR. DESPINS:  I hear that.  But I don't think

9     there's any case where the relief was sought, except for

10     that Boston District Court case, which sought in the

11     district court, usually sought in the court where the case

12     is pending.

13          But I understand your -- understand your views and

14     I appreciate the feedback, Your Honor.

15          THE COURT:  It may -- I have no idea what's going

16     to occur, but I understand your request.  And it doesn't

17     mean that your request might not be addressed in some way,

18     shape or form at some point, but I don't see any authority

19     to have a bankruptcy court enjoin a criminal defendant from

20     seeking relief in a criminal case.

21          MR. DESPINS:  Understood.

22          THE COURT:  Thank you.

23          MR. DESPINS:  Thank you, Your Honor.

24          THE COURT:  Is there anything further anyone would

25     like to add to the record this afternoon?

1      (No response)

2              THE COURT:  Okay.  That conclude the hearings in

3      the Kwok and Genever-related Chapter 11 cases this

4      afternoon.  Those are the last matters on the calendar, so

5      court is adjourned.  Thank you, all.

6              ALL COUNSEL:  Thank you, Your Honor.

7      (Proceedings concluded at 2:54 p.m.)

8              I, CHRISTINE FIORE, court-approved transcriber and

9      certified electronic reporter and transcriber, certify that

10     the foregoing is a correct transcript from the official

11     electronic sound recording of the proceedings in the above-

12     entitled matter.

13

14     *Christine Fiore*

15     _____        September 14, 2023

16         Christine Fiore, CERT

17

18

19

20

21

22

23

24

25

**Exhibit 11**

| | | | |
|---|---|---|---|
| | | 1809 | **ORDER DENYING MOTION FOR RELIEF FROM JUDGMENT/ORDER.** On April 17, 2023, an Order Granting Motion of Chapter 11 Trustee to Limit Notice and to Seal with Respect to Motion for Order Authorizing Abandonment of Property Pursuant to Bankruptcy Code Section 554 and Bankruptcy Rule 6007 (the "Order," ECF No. 1672). On April 18, 2023, a hearing and pre-trial conference were held in the cases jointly administered under the caption In re Kwok, et al, Case No. 22-50073 and in the adversary proceedings consolidated under the caption Despins, et al. v. Bravo Luck Limited, et al., Adv. Pro. No. 22-05027. During the hearing and pre-trial conference, counsel for Bravo Luck made an oral Motion for Relief from Judgment or Order pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024 (the "Motion") regarding the Order.On April 20, 2023, a hearing was held on the Motion. During the hearing, the Chapter 11 Trustee stated on the record that the property to be abandoned is not property of Bravo Luck, and has no impact on the Sherry-Netherland Apartment. Therefore, none of the grounds for relief set forth in Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024(b) exist to relieve Bravo Luck from the Order. Accordingly, it is hereby<br><br>**ORDERED:** The Motion for Relief from Judgment/Order pursuant to Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024 is **DENIED**. Signed by Judge Julie A. Manning on May 19, 2023. (rms) (Entered: 05/19/2023) |
| 05/19/2023 | | | |

**Exhibit 12**

**From:** Barron, Douglass E.
**Sent:** Friday, August 18, 2023 4:17 PM
**To:** Eric Henzy <ehenzy@zeislaw.com>
**Cc:** Despins, Luc A. <lucdespins@paulhastings.com>; Maza, Shlomo <shlomomaza@paulhastings.com>; Luft, Avi E. <aviluft@paulhastings.com>; Sutton, Ezra <ezrasutton@paulhastings.com>; 'mconway@lpgmlaw.com' <mconway@lpgmlaw.com>
**Subject:** Motion to Seal Exhibit to Mahwah Complaint

Eric:

Please see attached a draft of a joint motion to seal an exhibit to the Mahwah complaint, per your discussions with Luc. Please let us know if you have any comments.

Thanks
Doug

**Douglass Barron | Associate | Financial Restructuring Group**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6690 | Main: +1.212.318.6000 | Fax: +1.212.230.7690 | douglassbarron@paulhastings.com | www.paulhastings.com

**From:** Eric Henzy <ehenzy@zeislaw.com>
**Sent:** Tuesday, August 22, 2023 10:32 AM
**To:** Despins, Luc A. <lucdespins@paulhastings.com>; Barron, Douglass E. <douglassbarron@paulhastings.com>
**Cc:** Maza, Shlomo <shlomomaza@paulhastings.com>; Luft, Avi E. <aviluft@paulhastings.com>; Sutton, Ezra <ezrasutton@paulhastings.com>; mconway@lpgmlaw.com
**Subject:** [EXT] RE: Motion to Seal Exhibit to Mahwah Complaint

--- External Email ---

Yes, I have been tied up on another matter, I will try to get to it today.

*Eric Henzy, Esq.*
*Zeisler & Zeisler, PC*
*10 Middle St, 15th Fl*
*Bridgeport, CT 06604*
*Direct Dial: 203-368-5495*
*Main: 203-368-4234*
*Cell: 860-478-6763*
*ehenzy@zeislaw.com*

CONFIDENTIALITY NOTICE: This message is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law  If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited  If you suspect that you have received this communication in error, please notify us immediately by reply e-mail, separate e-mail to email@zeislaw.com, or telephone at 203-368-4234 (toll free 1-800-856-4234), and immediately delete this message and all its attachments

**From:** Despins, Luc A. <lucdespins@paulhastings.com>
**Sent:** Tuesday, August 22, 2023 10:29 AM
**To:** Eric Henzy <ehenzy@zeislaw.com>; Barron, Douglass E. <douglassbarron@paulhastings.com>
**Cc:** Maza, Shlomo <shlomomaza@paulhastings.com>; Luft, Avi E. <aviluft@paulhastings.com>; Sutton, Ezra <ezrasutton@paulhastings.com>; mconway@lpgmlaw.com
**Subject:** RE: Motion to Seal Exhibit to Mahwah Complaint

External E-mail - CAUTION: This email originated from outside the Firm. Do NOT reply, click links or open attachments, unless you recognize the sending email address and know the content is safe..

Eric, are we still doing this?



**Luc Despins | Partner | Financial Restructuring Group**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6001 | Main: +1.212.318.6000 | Fax: +1.212.230.7771 | lucdespins@paulhastings.com |

www.paulhastings.com

**From:** Eric Henzy <ehenzy@zeislaw.com>
**Sent:** Friday, August 18, 2023 7:37 PM
**To:** Barron, Douglass E. <douglassbarron@paulhastings.com>
**Cc:** Despins, Luc A. <lucdespins@paulhastings.com>; Maza, Shlomo <shlomomaza@paulhastings.com>; Luft, Avi E.
<aviluft@paulhastings.com>; Sutton, Ezra <ezrasutton@paulhastings.com>; mconway@lpgmlaw.com
**Subject:** [EXT] Re: Motion to Seal Exhibit to Mahwah Complaint

**--- External Email ---**

Thank you Douglass, I will review tomorrow.

Eric Henzy

**From:** Barron, Douglass E. <douglassbarron@paulhastings.com>
**Sent:** Friday, August 18, 2023 4:16:49 PM
**To:** Eric Henzy <ehenzy@zeislaw.com>
**Cc:** Despins, Luc A. <lucdespins@paulhastings.com>; Maza, Shlomo <shlomomaza@paulhastings.com>; Luft, Avi E.
<aviluft@paulhastings.com>; Sutton, Ezra <ezrasutton@paulhastings.com>; mconway@lpgmlaw.com <mconway@lpgmlaw.com>
**Subject:** Motion to Seal Exhibit to Mahwah Complaint

External E-mail - CAUTION: This email originated from outside the Firm. Do NOT reply, click links or open attachments,
unless you recognize the sending email address and know the content is safe..

Eric:

Please see attached a draft of a joint motion to seal an exhibit to the Mahwah complaint, per your discussions with Luc. Please let us
know if you have any comments.

Thanks
Doug

**Douglass Barron | Associate | Financial Restructuring Group**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6690 | Main:
+1.212.318.6000 | Fax: +1.212.230.7690 | douglassbarron@paulhastings.com | www.paulhastings.com

*********************************************************
This message is sent by a law firm and may contain informat on that is privileged or conf dential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal informat on including your name, business name
and other contact details, and IP address. For more informat on about Paul Hastings' informat on collection, privacy
and security principles please click HERE. If you have any quest ons, please contact Privacy@paulhastings.com.

*********************************************************
This message is sent by a law firm and may contain informat on that is privileged or conf dential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal informat on including your name, business name
and other contact details, and IP address. For more informat on about Paul Hastings' informat on collection, privacy
and security principles please click HERE. If you have any quest ons, please contact Privacy@paulhastings.com.

**Exhibit 4**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
:
UNITED STATES OF AMERICA,                  :
:
                         Plaintiff,        :          Case No. 1:23-CR-118-1 (AT)
:
            v.                             :
:
HO WAN KWOK,                               :
:
                         Defendant.        :
_____:

**JOINDER OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**IN SUPPORT OF THE RESPONSE OF CHAPTER 11 TRUSTEE AND GENEVER**
**DEBTORS IN OPPOSITION TO DEFEDANT HO WAN KWOK'S MOTION FOR AN**
**ORDER AND WRIT STAYING BANKRUPTCY CASES**
**OR IN THE ALTERNATIVE FOR OTHER RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

Chapter 11 bankruptcy case of Ho Wan Kwok (the "Debtor"), pending in the United States

Bankruptcy Court for the District of Connecticut (the "Bankruptcy Case"), by and through its

undersigned counsel, hereby submits this Joinder in Support of the Response of Chapter 11

Trustee and Genever Debtors in Opposition to Defendant Ho Wan Kwok's Motion for An Order

and Writ Staying Bankruptcy Cases or in the Alternative for Other Relief (the "Objection") and

respectfully represents in support thereof as follows:

1.      The Committee joins in and incorporates by reference the arguments made in the

Trustee's Objection and submits this statement and joinder to set forth additional reasons that

further support the denial of Defendant Ho Wan Kwok's Motion for an Order and Writ Staying

Bankruptcy Cases or in the Alternative for Other Relief (the "Motion").

2.      The Committee was appointed by the Office of the United States Trustee in the

Debtor's Bankruptcy Case on March 21, 2022.  The Committee is charged with representing the

interests of thousands of general unsecured creditors holding in excess of $30 billion dollars in

claims against the Debtor.

3.      Since the commencement of the bankruptcy proceedings, the Committee, as the

fiduciary on behalf of the unsecured creditor body, has been involved in every major aspect of

the Chapter 11 proceedings in order to protect the interests of the creditors.

4.      The Committee has sought to ensure that the rights of the creditors are protected

and to prevent the Defendant from avoiding his obligations under the Bankruptcy Code.

5.      As a result of the Committee's opposition to the dismissal of the Debtor's Chapter

11 case (Bankruptcy Case, ECF Nos. Nos. 346, 406, 408), which was sought by his single largest

creditor, Pacific Alliance Asia Opportunity L.P. ("PAX"), and consented to by the Debtor

(Bankruptcy Case, ECF No. 344), and after a hearing held on May 25, 2022 (Bankruptcy Case,

ECF No. 433), the Bankruptcy Court directed the appointment of a Chapter 11 Trustee by

Memorandum of Decision entered June 15, 2022 (Bankruptcy Case, ECF No. 465).  Thereafter,

the Chapter 11 Trustee was appointed on July 8, 2022.  The Committee strongly supported the

Chapter 11 Trustee's appointment in light of the clear abuses by the Defendant of his obligations

to his creditors and the Bankruptcy Court.

6.      Shortly after his appointment, the Defendant sought to have the Chapter 11

Trustee removed (Bankruptcy Case, ECF No. 1274). The Committee opposed the Defendant's

efforts (Bankruptcy Case, ECF No. 1313) on the basis that it was in the best interests of the

creditors for the Chapter 11 Trustee to thoroughly investigate the Defendant's financial affairs

and tenaciously pursue the recovery of the Defendant's assets that had been fraudulently

transferred or were otherwise held with family members or their companies that were alter egos of the Debtor or equitably owned by the Debtor. The Chapter 11 Trustee has been highly successful thus far in recovering such assets for the Chapter 11 estate and its creditors.

7. Any stay of the Defendant's Chapter 11 proceedings will cause significant harm to the creditors as the path to a potential recovery of their claims will grind to a halt for an undetermined period of time leaving open the possibility for the Defendant's family and associates to abscond with, and further dissipate, assets beneficially, if not legally, owned by the Defendant. The Committee thus strongly opposes a stay of the bankruptcy proceedings.

## A. The Bankruptcy Court Is the Proper Forum To Adjudicate The Debtor's Stay Motion

8. As the Trustee correctly points out in his Objection, pursuant to 28 U.S.C. § 1334(a), "the district courts shall have original **and exclusive** jurisdiction of all cases under title 11." (emphasis added). In turn, 28 U.S.C. § 157(a) provides that "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." Such a referral was made in the Connecticut District by the standing Order of the United States District Court for the District of Connecticut (Daly, J.), entered September 21, 1984, whereby the Connecticut District Court "referred to the Bankruptcy Judges of this District" "all cases under Title 11, U.S.C., and all proceedings arising under Title 11, U.S.C., or arising in or related to a case under Title 11, U.S.C., pending on June 27, 1984, or filed on or after June 28, 1984…."[1] Thus, by virtue of the foregoing, the Connecticut Bankruptcy Court has the exclusive jurisdiction over the Debtor's Chapter 11 case and is the only court that has the jurisdictional authority to stay same.

---

[1] The Standing Order may be found at https://www.ctd.uscourts.gov/sites/default/files/general-orders/1984_Standing_Order.pdf (last visited September 5, 2023).

9.      The Connecticut Bankruptcy Court's exclusive jurisdiction as it relates to staying proceedings in a bankruptcy case or other disputed litigation over which it is presiding is further confirmed by 11 U.S.C. § 305(a), which provides in pertinent part that a bankruptcy court "may dismiss a case …, or suspend all proceedings in a case under this title, at any time if — (1) the interests of creditors and the debtor would be better served by such dismissal or suspension." While a court also has the inherent power "to control the disposition of the causes on its docket," which is the source of its authority to stay a civil proceeding over which it is presiding "'when the interests of justice seem to require such action'," *Louis Vuitton Malletier S.A. v. LY USA, Inc.,* 676 F.3d 83, 96-97 (2d Cir. 2012) (quoting *United States v. Kordel*, 397 U.S. 1, 12 n. 7 (1970)), the prerogative to do so is with the court presiding over the proceedings for which a stay is requested – which in this case is the Connecticut Bankruptcy Court.  *See Matter of Nichols*, 615 B.R. 588, 593 (D. Ariz. 2020) (affirming bankruptcy court's denial of a stay of bankruptcy proceedings pending conclusion of parallel criminal proceedings against the debtors and observing that "[t]he bankruptcy court, being privy to the unique situation of its own proceedings, is the ultimate fact-finder as to which considerations are most appropriate" to support or deny such a stay request).

10.      The Second Circuit Court of Appeals has previously acknowledged that while a District Court has jurisdiction to decide whether the automatic stay of 11 U.S.C. §362 applies, it should not exercise such jurisdiction where to do so would interfere with the Bankruptcy Court's ability to oversee reorganization proceedings.

11.      *In re Baldwin-United, Corp. Litigation*, 765 F.2d 343 (2d Cir. 1985), is instructive on this issue, and provides guidance as to the appropriate exercise of jurisdiction by the District Court over matters involving the automatic stay under the Bankruptcy Code. At issue in that case was whether the Bankruptcy Court in the Southern District of Ohio or the District Court in the

4

Southern District of New York ought to be the first court to determine whether the automatic stay arising from the filing of the Chapter 11 proceedings applied to indemnity and contribution claims brought against the debtor after the bankruptcy filing. *Id.* at 345. The Second Circuit concluded that the Bankruptcy Court was the appropriate court to determine the applicability of the stay and reversed the order of the District Court enjoining the debtor from applying to the Bankruptcy Court for relief. *Id.*

12.     That case involved an involuntary Chapter 11 brought against Baldwin-United Corporation and its subsidiary ("Baldwin") in Ohio arising from the debtor's sale of Single Premium Deferred Annuities ("SPDAs") and subsequent state court insurance rehabilitation proceedings. *Id.* at 345. Shortly after the bankruptcy filing, holders of the SPDAs sued the broker-dealers, including Paine Webber, who had marketed the policies alleging securities fraud and other claims. *Id.* Over three dozen of these lawsuits were ultimately consolidated into multidistrict litigation by the Judicial Panel on Multidistrict Litigation pending in the Southern District of New York. *Id.* The District Court ordered that one consolidated complaint be filed against each broker-dealer and a class action against Paine Webber was ultimately filed. *Id.*

13.     Thereafter, Paine Webber filed a proof of claim in the Ohio bankruptcy proceedings against Baldwin asserting a claim for $700 million in damages for indemnity and contribution with respect to the class action. *Id.* It also filed a third-party complaint in the class action against Baldwin in the Southern District of New York. *Id.* Baldwin took the position that the filing of the third-party complaint violated the automatic stay and informed Paine Webber that it intended to put the issue before the Ohio Bankruptcy Court. However, before Baldwin took action in the Bankruptcy Court, Paine Webber obtained an *ex parte* temporary restraining order preventing Baldwin from applying to the Bankruptcy Court for relief. *Id.* The District Court subsequently

5

issued a preliminary injunction finding that the District Court, rather than the Bankruptcy Court, was the appropriate court to determine the scope of the automatic stay and that it would be an "unnecessary and improper intrusion on the jurisdiction" of the District Court if the Bankruptcy Court were to determine that the stay applied to Paine Webber's third-party complaint. *Id.* at 346.

14.     On appeal, the Second Circuit preliminarily noted that the "District Court has jurisdiction to determine the applicability of the automatic stay." *Id.*   Nevertheless, the Circuit Court held that the District Court's "issuance of the injunction challenged on this appeal was a misuse of its equitable power." *Id.* at 347.

15.     The Court stated, "[b]y prohibiting Baldwin from applying to the Bankruptcy Court in Ohio for any relief against any defendant in MDL No. 581 the injunction improperly interferes with the reorganization proceedings in two respects." *Id.* at 347.   First, the Court held that the injunction prevented "Baldwin from invoking the vital authority of the Bankruptcy Court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of the Bankruptcy Code." *Id.* at 348 *citing* 11 U.S.C. §105.  The Court further stated that under its Section 105 powers, the Bankruptcy Court can "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *Id.*

16.     While acknowledging that the District Court has the power to issue all writs in aid of its jurisdiction and its proceedings by virtue of the All Writs Act, 28 U.S.C. § 1651, the Second Circuit nevertheless stated, "to whatever extent a conflict may arise between the authority of the Bankruptcy Court to administer this complex reorganization and the authority of the District Court to administer consolidated pretrial proceedings, the equities favor maintenance of the unfettered authority of the Bankruptcy Court." *Id.*

17.     Second, the Circuit Court held that the injunction issued by the District Court
prevented Baldwin from applying to the Bankruptcy Court for a determination of whether the
automatic stay applied.  The Court found that this impermissibly prevented the Bankruptcy Court
from construing its own stay and reflected the District Court's implicit ruling that the stay was
inapplicable to the third-party complaint.  *Id.* at 348.  The Court held, "[i]n the circumstances of
Baldwin's Chapter 11 reorganization, the equities do not warrant either preventing the Bankruptcy
Court from construing its stay or determining in the District Court whether the stay applies."  *Id.*

18.     As in *Baldwin*, the Bankruptcy Court is the appropriate forum to adjudicate any
stay request made by the Debtor.  Second Circuit precedent dictates this result as do the equities
in this case.  The Bankruptcy Court has been overseeing the Chapter 11 proceedings for the past
19 months and is intimately familiar with the web of sham corporations established by the Debtor
and his close associates where he has hidden valuable assets from the creditors of his estate.

19.     Should this Court choose to reach the merits of the Motion because it is not viewed
as violative of the automatic stay, the Committee respectfully submits that it should be denied.
The Chapter 11 Trustee has successfully recovered (and in some instances, liquidated for the
benefit of creditors): (i) two luxury yachts; (ii) a $37 million dollar escrow fund; and (iii) the 100%
equity interest in an entity known as Genever BVI, which in turn is the sole owner of Genever US
which owns the Debtor's multi-million dollar apartment at the Sherry-Netherland hotel in New
York pursuant to a settlement with Bravo Luck Limited (a company ostensibly owned by the
Debtor's son, Mileson Guo a/k/a Qiang Guo and/or Guo Qiang) and Mileson Guo (both of whom
were claiming an equity interest in Genever BVI).  The Trustee is additionally pursuing recoveries
for the estate of a valuable home in Greenwich, Connecticut and a mansion in Mahwah, New
Jersey.  The creditors will greatly benefit from the recoveries already obtained by the Chapter 11

Trustee and those assets that he continues to pursue, and will be prejudiced by delay and further opportunity for dissipation of assets if the Motion is granted.

20.      Finally, to the extent the Court is inclined to consider the Debtor's request for alternative relief, the Committee acknowledges the jurisdiction of the Court to adjudicate same. Moreover, the Committee consents to the Debtor's request for alternative relief to the same extent and on the same basis as the Chapter 11 Trustee.

WHEREFORE, the Committee respectfully requests that the Court deny the Debtor's Motion for the reasons set forth herein and those set forth in the Trustee's Objection, and grant such other and further relief as is necessary and just.

Dated: September 21, 2023

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF HO WAN KWOK**

By:    */s/Kristin B. Mayhew*
Irve J. Goldman
Kristin B. Mayhew
PULLMAN & COMLEY, LLP
850 Main Street, 8th Floor, P.O. Box 7006
Bridgeport, CT 06601-7006
Telephone: (203) 330-2213
igoldman@pullcom.com
kmayhew@pullcom.com

Its Attorneys

8

**Exhibit 5**

# STROOCK

September 21, 2023

Sherry Millman
Direct Dial: 212.806.5434
Fax: 212.806.6006
smillman@stroock.com

The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re: *United States v Ho Wan Kwok, et al. No 23 Cr. 118 (AT)*

Dear Judge Torres:

This firm represents The Sherry-Netherland, Inc. (the "Sherry") as creditor in the chapter 11 bankruptcy case of Genever Holdings LLC ("Genever US") pending in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") which is jointly administered with the individual chapter 11 bankruptcy case of Mr. Ho Wan Kwok ("Kwok"). [1] The Sherry also holds a substantial claim in the Kwok bankruptcy based upon Kwok's guarantee of Genever US' obligations to the Sherry.

We recently became aware of Kwok's Motion for an Order and Writ Staying Bankruptcy Cases (which refer to, inter alia, the Genever US and Kwok bankruptcy cases as well as related adversary proceedings), or in the Alternative for Other Relief [ECF No. 129] (the "Stay Motion") made to this Court in Kwok's criminal case, and we write to respectfully request that Your Honor consider the position of the Sherry as an interested party which could be adversely impacted by the disposition of the Stay Motion.

The Sherry strongly objects to the proposed imposition of a stay with respect to the Genever US and Kwok bankruptcy cases (together the "Bankruptcy Cases") for the

---

[1] By order dated November 21, 2022, the Bankruptcy Court approved the joint administration of the Chapter 11 cases of Kwok, Genever US and its immediate parent, Genever Holdings Corporation, known as Genever BVI. For avoidance of doubt, these cases are jointly administered but are not substantively consolidated or otherwise tied together and proceed independently and at their own pace.

STROOCK & STROOCK & LAVAN LLP  New York • Los Angeles • Miami • Washington, DC
180 Maiden Lane, New York, NY 10038-4982 • T. 212.806.5400 • F. 212.806.6006 • www.stroock.com

NY 79747069v3

September 21, 2023

reasons set forth in the Response of Chapter 11 Trustee (of Kwok) and the Genever Debtors in opposition to the Stay Motion [ECF No. 145] (the "Opposition"), and joins in the Opposition. The Sherry takes no position with respect to the alternative relief sought in the Stay Motion.

Respectfully, the Sherry submits that the only court with jurisdiction to stay the Bankruptcy Cases is the Bankruptcy Court under 28 U.S.C. §1334. Accordingly, the Stay Motion should be denied as a matter of law. Further, the Bankruptcy Court alone has the benefit of access to the facts underlying the Bankruptcy Cases and of hearing from all interested parties when relief is sought.

Notwithstanding the foregoing, if Your Honor is inclined to consider the Stay Motion, the Sherry seeks to provide the pertinent facts to this Court, as they apply to the Genever US case, which are as follows:

Genever US purchased an apartment comprising the entire 18th floor, and related maids' quarters (the "Apartment") at the Sherry, which is a New York residential cooperative, from the Apartment's prior owner in 2015. More specifically, in accordance with New York State coop law, Genever US purchased the shares attributable to the Apartment and took an assignment as lessee under the proprietary leases appurtenant to the Apartment (together the "Proprietary Lease") which Proprietary Lease governs the rights and obligations of Genever US as lessee and the Sherry as lessor. The Sherry has an undisputed statutory and contractual first lien on the shares attributable to the Apartment to secure Genever US' obligations under the Proprietary Lease which obligations include payment of monthly maintenance and assessments to the Sherry.

In January of 2020, Genever US stopped paying its maintenance, assessment and other obligations and the Sherry was compelled to commence proceedings in New York state court to recover the amounts owed and to remove Genever US as owner of the Apartment. On October 12, 2020, when the Sherry was in the process of obtaining the relief to which it was entitled, Genever US, whose sole major asset is the Apartment, filed a voluntary petition under Chapter 11 in the Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy Court"), likely to stay the Sherry's efforts in state court. Notwithstanding that nearly four years have passed, the Sherry still has not been paid the money it was owed in January, 2020. As of the October, 2020 bankruptcy filing, the Sherry was owed $1,096,186.54 for maintenance, assessment, legal fees and other costs, all of which remains outstanding. In addition, the Sherry is owed not less than $1,462,881.84 for amounts incurred post-petition, which amount is subject to increase with time pursuant to the Proprietary Lease and as a matter of law.

To be clear, the Sherry is not a faceless corporate creditor- these unpaid obligations by Genever US burden the other shareholders at the Sherry, apartment owners who are simply trying to meet their own obligations and who, for the last four years and

STROOCK & STROOCK & LAVAN LLP  New York · Los Angeles · Miami · Washington, DC
180 Maiden Lane, New York, NY 10038-4982 · T. 212.806.5400 · F. 212.806.6006 · www.stroock.com                    2

NY 79747069v3

September 21, 2023

foreseeable future until the Apartment is sold through the Genever US bankruptcy case, are compensating out of their own pockets for monies owed by Genever US.

On October 8, 2021, the SDNY Bankruptcy Court approved a consensual arrangement among all parties in the Genever US case establishing a framework for the sale of the Apartment and for the appointment of a sales officer to undertake the process of marketing the Apartment for sale (the "Sale Order"). On January 13, 2022, the SDNY Bankruptcy Court approved the retention of Sotheby's International Realty as real estate broker to spearhead the marketing effort. The sale was recognized as a necessary step to provide a recovery to the Sherry and any other creditor, install a responsible financially sound party as the owner of the Apartment, and bring the Genever US bankruptcy to a conclusion. Notably, the filing of the Genever US bankruptcy and implementation of the sale process occurred prior to Kwok filing his individual Chapter 11 case in 2022 and certainly long before criminal charges were brought against him in 2023.

On February 15, 2022, Kwok filed his individual Chapter 11 before the Bankruptcy Court and on July 8, 2022, Luc Despins was appointed as the Chapter 11 Trustee of Kwok. Given that Kwok was the ultimate parent of Genever US, the Trustee took over the management of Genever US and on November 3, 2022, together with Genever US, obtained an order granting a transfer of venue of the Genever US bankruptcy to the Bankruptcy Court in Connecticut. The Trustee then asked the Bankruptcy Court to continue the sale process and honor the terms of the Sale Order, which the Bankruptcy Court did.

The sale process was on track in the Genever US bankruptcy (with the Apartment having been listed by the real estate broker) when a fire broke out at the Apartment on March 15, 2023, following Kwok's arrest at the Apartment earlier that day. The fire not only ravaged the Apartment, it caused substantial damage to the Sherry and displaced some fifty other apartment owners from their apartments for months. Some have yet to return. Because of the extensive damage to the Apartment, remediation measures needed to be implemented on an immediate basis. The Sherry has been working tirelessly to address the fallout from the fire and to assist the Trustee as he restores the Apartment for sale. Through the bankruptcy process, Genever US is pursuing litigation against its insurance carrier to recover under its policies for damages resulting from the fire. It has also obtained authority from the Bankruptcy Court to undertake the remediation process and approval for financing of that process while not releasing Genever US' insurance carrier of its liability therefor.

A stay of the Genever US bankruptcy would be devastating to the remediation process and the necessary sale of the Apartment. The delay would unfairly harm creditors, in particular, the Sherry and the shareholders of the Sherry who have waited years to recover from Genever US on its unpaid obligations and to have a suitable shareholder in the Apartment.

September 21, 2023

Equally important, a stay would do nothing for Kwok because there is no "overlap" between his criminal case and the Genever US bankruptcy case.  He has no economic interest in the Apartment; any funds in the Genever US estate will go first to pay creditors and then, if anything remains, to Genever US's parent and lastly, to the Kwok bankruptcy estate as the ultimate equity holder, not to Kwok himself.  Further, the path for Genever US to exit bankruptcy through a sale of the Apartment was well underway before Kwok was criminally charged such that there is no impact on Kwok's rights occasioned by continuing the Genever US bankruptcy on its long established path to conclusion.

We cannot speak to the underlying reason that the  Stay Motion was brought, but we submit that the Sherry and other creditors should not be collateral damage of a litigation and forum shopping strategy by Kwok in his criminal case that has no connection to the Bankruptcy Cases.

The Sherry and the undersigned as its counsel remain at this Court's disposal to address any inquiries Your Honor may have.

Respectfully submitted,

/s/ *Sherry Millman*

Sherry Millman

cc:  All Counsel of Record (by ECF)
     Nicholas Bassett, Paul Hastings LLP (by email)
     Irve J. Goldman, Pullman & Comley (by email)
     Taruna Garg, Murtha Cullina LLP, co counsel to the Sherry-
      Netherland, Inc. (by email)