**<u>Exhibit 1</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"

KIN MING JE,
    a/k/a "William Je," and

YANPING WANG,
    a/k/a "Yvette,"

                  Defendants.

S1 23 Cr. 118 (AT)

# THE GOVERNMENT'S MEMORANDUM OF LAW
# IN OPPOSITION TO MOTION TO COMPEL

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Micah F. Fergenson
Ryan B. Finkel
Juliana N. Murray
Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

BACKGROUND ....................................................................................................... 1

   I. The Mahwah Mansion ................................................................................... 1

   II. Kwok's Bankruptcy Stay Motion................................................................ 5

   III. The Instant Motion..................................................................................... 7

ARGUMENT ........................................................................................................... 7

   I. Kwok Has Failed to Establish a Valid Basis For His Discovery Requests ........................... 7

     A. Applicable Law ...................................................................................... 7

     B. Discussion ............................................................................................ 13

       1. Kwok's Request for SEC Communications Should Be Denied .................. 14

       2. Kwok's Request for Trustee Communications Should Be Denied............. 19

   CONCLUSION...................................................................................................... 25

## PRELIMINARY STATEMENT

Kwok's motion seeking beyond-Rule-16 discovery—the Government's communications with the Securities and Exchange Commission ("SEC") and with Kwok's bankruptcy trustee ("Trustee")—is wholly unfounded. At best, Kwok's extraordinary discovery request is based on facts that are decidedly ordinary. The Government and the SEC conducted parallel investigations, and Kwok identifies nothing unusual about the Government's interactions with the SEC whatsoever, much less the substantial showing of bad faith required to receive the sort of discovery that Kwok seeks. So too with the Trustee. It is common—indeed, it is a best practice—for criminal prosecutors to coordinate and reach agreements with trustees where, as here, there are forfeitable assets that may also fall within the trustee's estate. Kwok's claims of spoliation with respect to the property located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "Mahwah Mansion") are borderline frivolous. That is particularly true in view of the undisputed fact that Kwok's co-conspirators and associates, following Kwok's arrest and the unsealing of the Indictment's allegations regarding the Mahwah Mansion, tampered with the condition of the Mahwah Mansion to bolster Kwok's defense in this case—that is, they have fabricated evidence to obstruct justice in this very case. Kwok's other claims, regarding invasion of privilege (which has not happened, and simply would not happen) and a purported joint prosecution with the Trustee (for which there is no basis at all), are equally unfounded. There is simply nothing in the record indicative of any bad faith on the part of the Government. Kwok's motion should be denied without a hearing.

## BACKGROUND

### I. The Mahwah Mansion

The Mahwah Mansion was purchased, renovated, and furnished with proceeds of the fraud

1

charged in the Indictment—specifically, G|CLUBS membership funds that were funneled through bank accounts in other entities' names. (Dkt. 19 ("Indictment") ¶¶ 4, 16(b)-(c)). As alleged in the Indictment, Kwok and his conspirators used G|CLUBS to defraud victims by falsely promising them purportedly highly valuable stock in GTV (*i.e.*, using G|CLUBS as a vehicle to continue the unlawful private placement offering after the SEC intervened to stop the GTV offering) and falsely promising them "a full spectrum of services" once they became G|CLUBS "members." (*Id.* ¶ 15). The Mahwah Mansion and furnishings that were purchased with misappropriated G|CLUBS membership funds were identified as specific property subject to forfeiture in the Indictment. (*Id.* ¶ 55(v)).

As previously described (*see* Dkt. 148, at 2-4), on March 15, 2023, agents of the Federal Bureau of Investigation ("FBI") executed a search warrant at the Mahwah Mansion. Multiple FBI photographers meticulously documented the premises and its contents, taking over 2,000 photographs during the search, which photographs have been produced to the defendants in discovery. The FBI also conducted aerial surveillance of the Mahwah Mansion prior to the search, which photographs and videos have been produced to the defendants. The Government also seized voluminous physical evidence from the Mahwah Mansion, including, for example, electronic devices, Kwok's personal items (*e.g.*, custom-designed Brioni suits embroidered with Kwok's name), and certain of the extravagant furnishings purchased with misappropriated G|CLUBS membership funds.

Subsequent to the Government's public filing of the Indictment, which associated Kwok with the Mahwah Mansion, the defendants' associates and co-conspirators began to occupy the Mahwah Mansion. For example, on April 9, 2023, dozens of the defendants' associates went to the Mahwah Mansion to protest the defendants' detention, and on May 5, 2023, the defendants'

associates hosted another large gathering at the Mahwah Mansion. These activities threatened to
diminish the value of the Mahwah Mansion.

On or about June 28, 2023, the Trustee advised the Government that he had concluded that
the Mahwah Mansion is property of Kwok's chapter 11 estate; accordingly, the Trustee and the
Government conferred regarding the possible disposition of the Mahwah Mansion. Unlike chattel
or funds in a bank account, the Government generally cannot seize real property with a forfeiture-
based seizure warrant prior to a final order of forfeiture—which order would come only after a
criminal conviction, at the conclusion of the subsequent ancillary forfeiture proceeding. Given
that the defendants' associates were actively using the Mahwah Mansion (itself purchased with
fraud proceeds), and that their occupation of the Mahwah Mansion threatened to dissipate the
property's substantial value to both the Bankruptcy creditors and the victims of Kwok's fraud in
the Government's criminal case, on July 6, 2023, the Government provided the Trustee with 12
photographs taken during the Government's March 15, 2023 search, illustrating that Kwok used
the Mahwah Mansion as a *personal* residence.

On July 13, 2023, the Government and the Trustee executed a stipulation that would permit
the Trustee to secure the value of the Mahwah Mansion during the pendency of the criminal case.
*In re Ho Wan Kwok, et al.*, Case No. 23-05017 (D. Conn. Bankr.) (JAM), Dkt. 24, Ex. 1; *see also
id.* at Dkt. 53, 56. The stipulation further provided that the net proceeds from any sale of the
Mahwah Mansion (less certain fees and administrative costs and a deemed expense of $1 million
to be used to satisfy claims of allowed Bankruptcy creditors who are also victims in the criminal
case) would serve as substitute *res* for the Mahwah Mansion.

On July 11, 2023, the Trustee filed an *ex parte* motion for a temporary restraining order
and preliminary injunction regarding Kwok's associates' access to the Mahwah Mansion. *In re*

*Ho Wan Kwok, et al.*, Case No. 23-05017, Dkt. 4 (D. Conn. Bankr.) (JAM).  On August 1, 2023,

Judge Manning granted the order in part.  *See id.*, Dkt. 17.  On August 31, 2023, following

additional briefing and hearings, Judge Manning granted the Trustee's motion and issued a

modified preliminary injunction to restrict access to the Mahwah Mansion to: (a) the Security

Services (as defined in the Preliminary Injunction); (b) the Trustee and his representatives and/or

professionals; (c) the United States Department of Justice and its employees and representatives;

(d) the FBI and its employees and representatives; (e) other federal, New Jersey state, or Mahwah

municipal law enforcement agencies and their employees and representatives; (f) any other persons

expressly authorized by the Trustee in writing (which can include email); and (g) any other person

expressly authorized by the United States District Court for the Southern District for New York or

the bankruptcy court.  *In re Ho Wan Kwok, et al.*, Case. No. 23-05017, Dkt. 58 (D. Conn. Bankr.)

(JAM).

On September 1, 2023, the Trustee conducted a walkthrough of the Mahwah Mansion,

which was video-recorded and photographed.  Following an August 30, 2023 motion filed by

Kwok that sought to "preserv[e] the status quo" of the Mahwah Mansion (Kwok Br. 3), on

September 12, 2023, the Trustee provided the Government with six photographs from the Trustee's

September 1, 2023 walkthrough.  Significantly, those photographs illustrate that the defendants'

associates and co-conspirators have been tampering with the interior of the property in an apparent

effort to obstruct this criminal case by modifying the Mahwah Mansion to suit a defense narrative.

Specifically, the defendants' co-conspirators posted placards at room entrances that appear to

suggest that the rooms of Kwok's Mahwah Mansion are, in fact, NFSC and/or G|CLUBS offices

or rooms, as shown in the photographs below:

 

These after-the-fact placards were not present as of March 15, 2023, when the Government searched the Mahwah Mansion pursuant to a search warrant issued in this case.

## II. Kwok's Bankruptcy Stay Motion

Prior to the filing of the instant motion, on August 30, 2023, Kwok filed a motion in this Court to stay the bankruptcy proceedings that Kwok voluntarily initiated in February 2022 (the "Bankruptcy Stay Motion"). (Dkt. 131 ("Bankr. Stay Mot.)). In the event the Court denied his request for a stay, the Bankruptcy Stay Motion also sought alternative relief. (Bankr. Stay Mot. 1, 28-30). The alternative relief sought by Kwok included requests related to the Mahwah Mansion. In particular, Kwok requested that his "defense team" have continued, unchaperoned access to the Mahwah Mansion and sought to prevent the sale of the property in bankruptcy proceedings. The alternative relief also included a request for an order that the Government not solicit or receive Kwok's privileged information or records from the Trustee.

On September 21, 2023, the Government filed its response. (Dkt. 148). Whereas the Trustee filed a brief opposing a stay of the bankruptcy, the Government took no position. (Dkt. 148, at 1). With respect to Kwok's alternative requests, the Government explained first that

"Kwok's request regarding potentially privileged materials should be denied as moot," because the Government "has neither solicited nor received Kwok's potentially privileged information or records from the Trustee." (Dkt. 148, at 2). Further, the Government advised that it did not "presently intend to do so, and will not do so absent agreement from Kwok's counsel (or the appropriate holder) or an order of this Court finding that such materials are not privileged and/or subject to the crime-fraud exception." (Dkt. 148, at 2). Regarding Kwok's request for unfettered access to the Mahwah Mansion, the Government set forth the background also described above relating to the condition of the Mahwah Mansion. (Dkt. 148, at 2-4). In light of that, the Government explained, it was "*Kwok* and his associates who appear to have been doing what Kwok claims to seek to prevent, by materially altering the Mahwah Mansion to serve a defense narrative." (Dkt. 148, at 4). Moreover, Kwok already had "voluminous documentation—comprising *thousands* of photographs, as well as videos—of the Mahwah Mansion." (Dkt. 148 at 5). In that regard, "Kwok's attempt to analogize the circumstances" of the Mahwah Mansion "to thwarting access to a material witness is baseless." (Dkt. 148 at 5). Nevertheless, the Government stated it would not object to Kwok's or Wang's criminal defense attorneys conducting a site visit to the Mahwah Mansion. (Dkt. 148 at 5).

On October 5, 2023, Kwok filed a reply to the Government's response. (Dkt. 152). Kwok made several arguments in reply, none of which have merit. Most significant, however, was what Kwok did *not* argue about or dispute. Specifically, Kwok did *not* dispute that, since his arrest and the unsealing of the Indictment's allegations regarding the misappropriation of G|CLUBS funds to purchase, renovate, and furnish the Mahwah Mansion, Kwok's followers had materially altered the Mahwah Mansion by creating and posting placards suggesting that the Mahwah Mansion was a G|CLUBS facility. That is, nowhere did Kwok deny that the evidence he was purportedly

seeking to maintain had, in reality, already been tampered with by his co-conspirators to suit a defense narrative.

## III.  The Instant Motion

Before the Government filed its opposition to Kwok's Bankruptcy Stay Motion, Kwok filed the instant motion seeking discovery—beyond the discovery provided for in criminal law or procedure—of communications between the Government and the Trustee, and between the Government and the SEC.  (Dkt. 143 ("Br.")).

## <u>ARGUMENT</u>

## I.  Kwok Has Failed to Establish a Valid Basis For His Discovery Requests

### A.  Applicable Law

#### 1. *Brady* and Joint Prosecutions

"Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it."  *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). This duty extends to the prosecution team.  In other words, a prosecutor "is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'"  *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *accord United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022).

The Government's duty to obtain and produce Rule 16 and *Brady* material is limited to material in the possession of the prosecution team.  *Hunter*, 32 F.4th at 36 ("We have long rejected the notion that 'knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor.'" (quoting *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971))); *Avellino*,

136 F.3d. at 255 ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."); *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) (*Brady* is "not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense.").

Although "[t]he Second Circuit has not yet articulated a test to decide when knowledge of *Brady* material may be imputed from one agency to another," *United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 2392360, at *2 (S.D.N.Y. July 3, 2022), the Circuit has provided guidance, and courts within this District have articulated a number of factors for determining the scope of the prosecution team and whether a joint investigation occurred. The Circuit counsels that "the relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (summary order). "At bottom," the determination of who constitutes the prosecution team, "involves a question of agency law: should a prosecutor be held responsible for someone else's actions?" *United States v. Meregildo*, 920 F. Supp. 2d 434, 443-44 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015). "Generally, a principal is responsible for the knowledge of an agent when that agent has a duty to give the principal information or when the agent acts on his knowledge regarding a matter that is within his power to bind the principal. An agent's duty to disclose is thus linked to

his power to bind the principal." *Id.* In the context of a criminal investigation and prosecution, the individuals empowered to bind the prosecutor consist generally of those who "actively investigate[] the case, act[] under the direction of the prosecutor, or aid[] the prosecution in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 442; *see also United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether someone is a member of the prosecution team—in other words, whether the prosecution can be deemed to have constructive knowledge of information held by that individual—the Court considers the totality of the circumstances, including whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy."), *aff'd*, 628 F. App'x 36 (2d Cir. 2015).

Applying these principles, the Second Circuit and courts in this District have consistently rejected efforts to impose discovery obligations on the Government related to information held by entities that do not act as agents of the prosecution, including cooperating witnesses, expert witnesses for the Government, other government agencies, and even separate components of the Justice Department. *See, e.g.*, *Barcelo*, 628 F. App'x at 38 (holding that a cooperating witness was not a part of the prosecution team where he "played no role in the investigation or in determining investigation or trial strategy," and "did no more than provide information to the government and testify at trial"); *Stewart*, 433 F.3d at 299 (holding that a civilian employee of the Secret Service who testified as an expert witness for the Government was not a member of the "prosecution team" for Giglio purposes); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (holding that for Giglio and Jencks Act purposes, the Government had no discovery obligation related to information filed in an unrelated bankruptcy proceeding); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that the reports made by FBI agents in the course

9

of investigations unrelated to the defendants' prosecutions were not possessed by the prosecution team); *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir. 1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'"); *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation."); *Meregildo*, 920 F. Supp. 2d at 444 ("[I]n most cases, cooperating witnesses should not be considered part of the prosecution team."); *United States v. Merlino*, 349 F.3d 144, 154-55 (3d Cir. 2003) (holding that Government not required to obtain prison calls of cooperating witness to satisfy disclosure obligations).

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession, custody or control of another agency for *Brady* evidence only where the Government conducts a "joint investigation" with another state or federal agency. *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC v. Stanard,* No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding it was "clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody, or control); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE); *Ferreira v. United States*, 350 F. Supp. 2d 550,

556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same prosecutorial team"); *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (holding that the Government and FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal investigation); *United States v. Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the Government and the Government had no control over the material).

To determine whether the criminal prosecution conducted a "joint investigation" with another agency, such that the other agency should be considered part of the prosecution team, courts consider a number of factors, including whether the other agency "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F.Supp.3d 736, 741-42 (S.D.N.Y. 2018)); *see also United States v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019) (finding no joint investigation where SEC and Government participated in some joint interviews); *United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *Stanard*, 2007 WL 1834709, at *3 (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2

11

(S.D.N.Y. Jan. 15, 2008) (finding that parallel civil and criminal investigations were not "joint").

### 2. Discovery Beyond *Brady* or Rule 16

It has never been the case that any and all records or information in the Government's possession fall within the scope of its discovery obligations. Rather, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Similarly, Federal Rule of Criminal Procedure Rule 16(a)(1)(E)(i) requires the Government to produce, upon defense request, items "within the government's possession, custody, or control" that are "material to preparing the defense." An item is "material to preparing the defense" under Rule 16 "if it could be used to counter the Government's case or bolster a defense." *United States v. Stevens*, 985 F.2d 1175, 1180–81 (2d Cir. 1993). In other words, as the Supreme Court has said, Rule 16(a)(1)(E)(i), authorizes production only of items that tend to "refute the Government's arguments that the defendant committed the crime charged." *United States v. Armstrong*, 517 U.S. 456, 462 (1996); *see also United States v. Rigas*, 258 F. Supp. 2d 299, 306 (S.D.N.Y. 2003) ("Rule 16(a)(1)(E)(i) entitles a defendant to documents or other items that are material to preparing arguments in response to the prosecution's case-in-chief."); *United States v. Allen*, No. 14 Cr. 272 (JSR), 2016 WL 315928, at *3 (S.D.N.Y. Jan. 8, 2016) (relying in part on *Armstrong* to deny a request for discovery to support a *Kastigar* claim).

Moreover, the mere fact that an item may be "useful" to the defense does not render it "material" under Rule 16. *Rigas*, 258 F. Supp. 2d at 307; *see also United States v. Parnas*, No. 19-CR-725 (JPO), 2021 WL 2981567, at *8 (S.D.N.Y. July 14, 2021) (denying motion under Rule 16(a)(1)(E)(i) for documents that "may contain evidence relevant to [defendant's] selective

12

prosecution claim" because defendant had "failed to make the requisite showing for such a claim"). "There must be some indication that the pretrial disclosure of the disputed evidence would . . . enable[ ] the defendant significantly to alter the quantum of proof in his favor." *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (citation omitted). The defendant must make a prima facie showing of materiality, *United States v. Finnerty*, 411 F.Supp.2d 428, 431 (S.D.N.Y. 2006), and must "offer more than the conclusory allegation that the requested evidence is material," *Rigas*, 258 F. Supp. 2d at 307.

While Rule 16 does not authorize the production of materials that the defense seeks to "challenge the prosecution's conduct of the case," *Armstrong*, 517 U.S. at 462, courts sometimes authorize discovery on those issues. Before doing so, however, they require that the defendant make a substantial threshold showing that improper Government conduct in fact occurred. *See Wade v. United States*, 504 U.S. 181, 186 (1992) (defendant claiming that Government's refusal to file a 5K motion was based on an unconstitutional motive must make a "substantial threshold showing" before he can obtain discovery); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (defendant seeking discovery on a claim of selective prosecution must provide "some evidence tending to show the existence of the essential elements of the defense" before discovery authorized); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (same in the context of a claim of vindictive prosecution).

**B. Discussion**

Kwok's requests are baseless. To obtain discovery beyond what the criminal law provides, Kwok must make a substantial showing of bad faith. Kwok has merely identified commonplace, routine interactions between the Government and a regulatory agency with a parallel investigation or a trustee administering assets that are also criminally forfeitable, and has come nowhere close

13

to satisfying his burden. Kwok's motion should be denied without a hearing.

### 1. Kwok's Request for SEC Communications Should Be Denied

Kwok's request for the Government's communications with the SEC is unfounded, and his

motion to compel such discovery should be denied.

### a. The Government and the SEC Conducted Parallel Investigations

As an initial matter, while Kwok has not formally moved for a finding that the Government

and the SEC conducted a joint investigation, that contention undergirds his discovery request and

is equally meritless. The SEC is not part of the Government's prosecution team. Although the

Government and the SEC at times conducted joint interviews for the convenience of witnesses,

most aspects of the Government's investigation were conducted without any involvement of the

SEC:

- the SEC played no role in the Government's charging decisions or the development of the Government's prosecutorial strategy;

- likewise, the Government played no role in the SEC's charging decisions or the development of the SEC's litigation strategy;

- no one from the SEC was designated a special Assistant U.S. Attorney to work on the criminal investigation;

- at jointly conducted interviews, the SEC did not take notes during the interviews and does not have any notes from joint interviews;

- at jointly conducted interviews, witnesses were told that the agencies' investigations were separate, that the interviews were conducted together only as a matter of convenience, and that, if there were to be a proffer agreement, the witness would enter into a separate agreement with each agency;

- the SEC was not involved in presenting this case to the grand jury and did not receive grand jury transcripts;

- the SEC did not participate in the execution of search warrants or the responsiveness reviews of materials obtained pursuant to search warrants;

- the SEC did not obtain materials produced to the Government pursuant to grand jury subpoenas; and

- the SEC has not accompanied the Government to Court.

(*See* Ex. A ("Murray Decl.") ¶ 2).  *See Collins*, 409 F. Supp. 3d at 242 (citing many of these factors in support of a finding that the SEC and the Government did not conduct a joint investigation); *United States v. Alexandre*, No. 22 CR. 326 (JPC), 2023 WL 416405, at *6-8 (S.D.N.Y. Jan. 26, 2023) (same).  These factors, considered together, weigh heavily in support of a finding that the Government and the SEC engaged in separate investigations, notwithstanding their focus on overlapping subject material.

Even though the SEC is not part of the prosecution team, the Government has voluntarily requested from the SEC all documents that the SEC obtained from third parties, and has already turned over these documents to the defense.  In the event the SEC produces additional documents to the Government that it received from third parties, the Government will promptly produce those documents to defense counsel.

None of the facts cited by Kwok establish the existence of a joint investigation in this case.  Rather, Kwok seeks to paint as unusual or suspect facts that are routine in the parallel investigation context, such as the Government and the SEC bringing charges on the same date (Br. 21).  *See, e.g.*, *SEC v. Shkreli*, No. 15 Civ. 7175 (KAM), 2016 WL 1122029, at *7 n.6 (E.D.N.Y. Mar. 22, 2016) ("The court finds no fault in the SEC's commencement of the civil action at or around the time the criminal indictment was unsealed, given the SEC's independent mandate to enforce the securities laws and the need to commence an action before expiration of the statute of limitations."). Kwok also points to the fact that the Government obtained documents and information from the SEC that was cited in the Government's affidavits supporting search warrants (Br. 20), but that is entirely normal and appropriate.  The Government routinely obtains documents

15

and information from any number of individuals and entities in its investigations, and the Government is aware of no authority for the proposition that that bare fact transforms those sources of information into members of the prosecution team. To the contrary, courts have specifically rejected that proposition. *See, e.g.*, *Meregildo*, 920 F. Supp. 2d at 445-46 (holding that cooperating witness was not a member of the prosecution team); *United States v. Barcelo*, 628 F. App'x 36, 38-39 (2d Cir. 2015) (same); *Stewart*, 433 F.3d at 298-99 (holding that an expert witness who analyzed evidence, assisted the prosecution in preparing cross-examination questions, participated in a mock examination, and testified at trial was not a member of the prosecution team). Indeed, it would be highly unusual if the SEC refused to provide information to the Government in connection with an ongoing criminal inquiry into a massive fraud, such as the one perpetrated by Kwok. "Moreover, 'there is no general rule' prohibiting a civil enforcement agency such as the SEC from 'sharing . . . evidence acquired through civil discovery with criminal prosecutors.'" *United States v. Rhodes*, No. 18 Cr. 887 (JMF), 2019 WL 3162221, at *3 (S.D.N.Y. July 16, 2019) (quoting *United States v. Fiore*, 381 F.3d 89, 94 (2d Cir. 2004)). "Indeed, because '[s]ecurities fraud is a proper subject of both administrative and criminal investigations . . . SEC enforcement officials and prosecutors all expect coordination at some investigative level and perceive the various proceedings as integral to each other." *Rhodes*, 2019 WL 3162221, at *3 (quoting *Fiore*, 381 F.3d at 94). Kwok fails to cite any authority for the proposition that an independent agency becomes part of the prosecution team simply by complying with a voluntary information request.

Likewise, the fact that the Government and the SEC—both tasked with enforcing anti-fraud laws and protecting victims, and both investigating the same conduct perpetrated by the same individuals against the same victims—may have shared certain evidence and informed each other of anticipated investigative or enforcement steps is wholly unremarkable and routine. Such

16

"coordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and [a civil enforcement authority], on the other, is, in itself, unexceptional and unproblematic." *Rhodes*, 2019 WL 3162221, at *3.

In short, applying these facts and circumstances to well-settled legal standards makes plain that the SEC conducted a parallel investigation and was not part of the Government's prosecution team.

### b. Kwok's Discovery Request Is Meritless

In light of the foregoing, Kwok's request for internal communications between the Government and the SEC is baseless. No rule of criminal discovery mandates the production of materials simply because the defense speculates that the materials may be useful in making a defense motion. To the contrary, courts in this District have specifically rejected such requests. *See, e.g.*, *Parnas*, 2021 WL 2981567, at *8 (denying motion under Rule 16(a)(1)(E)(i) for documents that "may contain evidence relevant to [defendant's] selective prosecution claim" because defendant had "failed to make the requisite showing for such a claim").

Kwok's reliance on *Rhodes* is particularly misplaced. *Rhodes* directly rejected the defense suggestion made here that it is unusual or problematic for criminal and civil authorities to share information, instead holding that such "coordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and [a civil enforcement authority], on the other, is, in itself, unexceptional and unproblematic." 2019 WL 3162221, at *3. Judge Furman explained that such coordination is only problematic if it is done in "bad faith," such as where a government authority "made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case." *Id.* (quoting *United States v. Stringer*, 535 F.3d 929, 937 (9th Cir. 2008), and also citing *United States v. Kordel*, 397 U.S. 1, 11-12 (1970) and

17

*United States v. LaSalle National Bank*, 437 U.S. 298 (1978)).

In light of the "unexceptional and unproblematic" nature of coordination in parallel proceedings, *Rhodes* held that a criminal defendant is not entitled as a matter of course to internal communications between criminal and civil authorities. Rather, in order to obtain "even limited discovery" regarding a claim of improper coordination between civil and criminal authorities, a defendant must "make a substantial preliminary showing of bad faith." *Rhodes*, 2019 WL 3162221, at \*4 (quoting *United States v. Gel Spice Co.*, 773 F.2d 427, 434 (2d Cir. 1985)). Judge Furman determined that the defendant in *Rhodes* had failed to make that showing, and therefore denied his discovery request, a fact that Kwok omits from his brief. S*ee Rhodes*, 2019 WL 3162221, at \*5.

Kwok falls far short of satisfying his burden of making "a substantial preliminary showing of bad faith." Indeed, Kwok has failed to point to *any* facts tending to show that the coordination between criminal and civil authorities was exceptional or problematic. As discussed above, the coordination in this case was wholly routine. Kwok notes that Judge Furman required the Government in *Rhodes* to submit an affidavit concerning coordination with civil authorities, but that stemmed from an unusual fact uniquely present in the *Rhodes* case: the SEC did not bring parallel charges against the defendant in *Rhodes* despite issuing him a subpoena for documents (to which the defendant responded), and the fruits of that subpoena were used in the parallel criminal case. In other words, it was the *absence* of a simultaneous and parallel civil enforcement action that Judge Furman found unusual, and which led him to require an affidavit from the Government. By contrast, this case involves the standard fact pattern of parallel criminal and civil actions being filed at the same time, which undermines any assertion that the SEC action was brought solely for purposes of advancing a criminal case. In any event, this opposition is an accompanied by an

18

affidavit from a member of the prosecution team.  (*See* Murral Decl.).

In sum, Kwok has failed to articulate even a facially plausible theory of bad faith under the relevant legal standards. That is unsurprising given that any coordination between the SEC and the Government in this case was, at all times, "unexceptional and unproblematic." *Rhodes*, 2019 WL 3162221, at *3. Accordingly, and for the reasons set forth above, Kwok's motion for discovery concerning the Government's communications with the SEC should be denied.

### 2.  Kwok's Request for Trustee Communications Should Be Denied

Kwok's arguments with respect to the Trustee are equally meritless.  Kwok's strained attempts to discern Government misconduct through unexceptional interactions with a bankruptcy trustee are contrary to the record and the law.  Kwok comes nowhere close to meeting his burden to establish a "substantial preliminary showing of bad faith." *Rhodes*, 2019 WL 3162221, at *4.

*First*, Kwok has failed to show any basis for a claim of spoliation.  Simply put, there is absolutely no risk of spoliation of evidence due to the Settlement Agreement between the Government and the Trustee concerning the Mahwah Mansion.  Far from spoliating evidence of the Mahwah Mansion's condition, the Government has produced thousands of photographs of the Mahwah Mansion, from March 2023 and September 2023, as well as voluminous video surveillance recorded at various times between August 2022 and September 2023, as well as voluminous video of the Mahwah Mansion's interior from September 2023.  Kwok does not explain how that voluminous documentary record of the Mahwah Mansion's condition on multiple dates—which is in Kwok's possession—has been, or would be, somehow spoliated; nor does Kwok explain why a site visit by his criminal defense attorneys of record would be somehow

insufficient to satisfy any further defense needs.[1]  Instead, Kwok simply asserts here, as in the

Bankruptcy Stay Motion, that "the existing state of the Mahwah [Mansion] must be maintained."

(Br. 16).  But two problems with that assertion remain.  The first is that, in reality, Kwok's co-

conspirators are altering the state of Mahwah Mansion.  They are attempting to obstruct justice in

this case by tampering with the property's condition—following Kwok's arrest and the unsealing

of the Indictment's allegations regarding the Mahwah Mansion—to make Mahwah Mansion look

like a G|CLUBS facility.  Indeed, Kwok could not and did not even dispute, in connection with

the Bankruptcy Stay Motion, that his followers had tampered with the state of the Mahwah after

the Government's allegations about the Mahwah Mansion became known.  (*See* Dkt. 152).  The

second problem is that, as noted, Kwok does not explain why the voluminous evidence in his

possession (including photographs and videos) documenting the Mahwah Mansion on particular

dates has not "maintained" the state of the Mahwah Mansion.  Kwok fails to address these points

because this motion, like the Bankruptcy Stay Motion, is in fact an attempt for Kwok to obtain

control over the Mahwah Mansion for the conspiracy's *continued* use.  (*See* Br. 17-18 ("evidence

showing how the property was configured and used prior to Mr. Kwok's arrest *and how it*

*continues to be used—barring the Trustee's interference*—in service to the Chinese pro-

democracy dissident movement constitutes exculpatory evidence that Mr. Kwok is entitled to

present to the jury." (emphasis added))).  This Court should reject Kwok's attempts, reflected in

---

[1] In his reply to Bankruptcy Stay Motion, Kwok asserts that having supervision for such a site visit is "tantamount to condoning a government spy in the defense camp."  (Dkt. 152 at 8).  Rhetoric aside, the Government is willing to meet and confer with Kwok regarding the appropriate safeguards to ensure that there is no further tampering with the Mahwah Mansion by Kwok's associates and co-conspirators.  As already noted in the Government's response to the Bankruptcy Stay Motion, Kwok's attorneys did not contact the Government regarding a site visit to the Mahwah Mansion prior to filing either of his motions.  They still have not done so.

this motion and in the Bankruptcy Stay Motion, to have this Court greenlight the tampering of evidence—tampering that is being done to obstruct justice in this criminal case and to further a global conspiracy that already stole over a billion dollars from Kwok's followers.

Relatedly, there is nothing exceptional or improper about the Government's settlement agreement with the Trustee regarding the Mahwah Mansion. The Government has worked with the Trustee to try to efficiently allocate resources to secure and recover some of the more than a billion dollars that Kwok and his co-conspirators stole or misappropriated. The Government intends to return the hundreds of millions of dollars of cash and property that it has seized to victims of the defendants' crimes—an action that necessarily implicates the Trustee's responsibilities regarding claims to those assets by Kwok's bankruptcy creditors. With respect to the Mahwah Mansion in particular, the Government and the Trustee maintain potentially competing claims to that property, and the agreement will allow the value of that property to be preserved—ceasing, among other things, the modifications made to the property by the defendant's co-conspirators and associates in an effort to impede justice—pending resolution of issues related to forfeiture, restitution, and the bankruptcy estate.[2] There is absolutely nothing unusual about the Government working with a trustee regarding forfeitable assets in which the trustee also has an interest. The many precedents for such coordination—which the Trustee referenced during the bankruptcy court hearing that Kwok quotes repeatedly in his motion, albeit in a portion of the transcript that Kwok omits from his exhibit[3]—go back years in multiple

---

[2] In his reply to the Bankruptcy Stay Motion, Kwok states the Government sought improperly to "circumvent this Court" by entering the agreement with the Trustee. (*See* Dkt. 152 at 7-8). That is not just hyperbolic. It is false. The agreement merely preserves the value of this forfeitable asset, and this Court will address forfeiture issues, including with respect to the Mahwah Mansion, following trial and conviction, as in every case.

[3] See pages 28-29 of the complete transcript, attached as Exhibit B.

jurisdictions.[4]  For example, in the criminal case against Marc Dreier, Judge Rakoff approved of various settlement agreements involving the Government and bankruptcy trustees, including a "Coordination Agreement" between the Government and the Chapter 11 Trustee in that case. *United States v. Dreir*, 09 Cr. 86 (JSR), Dkt. 141 (S.D.N.Y. Feb. 5, 2010).  As another example, in the massive Bernie Madoff fraud, the Government worked *extensively* with the court-appointed trustee who oversaw the liquidation of Madoff's company under the Securities Investor Protection Act ("SIPA").[5]  In fact, that same trustee—who has also overseen Madoff's personal bankruptcy

---

[4] *See, e.g.*, *In re Maresca*, No. 20-11483 (KHK), Dkt. 244 (E.D. Va. Bankr. Sept. 9, 2021) (bankruptcy trustee's motion for approval of a Coordination and Settlement Agreement with the Government, which had forfeiture and restitution claims, regarding a property that was "the only significant asset of th[e] estate"); *United States v. Merrill*, No. 14-40028 (TSH), Dkt. 367 (D. Mass. July 11, 2017) (restitution order "provid[ing] for administration and payment of restitution to victims by the Trustee in the related Chapter 11 cases"); *In re Rothstein*, No. 09-34791 (RBR), Dkt. 5704 (S.D. Fla. Bankr. July 14, 2014) (motion to approve settlement between Government and bankruptcy trustee regarding forfeiture and restitution); *In re Goldberg*, No. 09-23370 (ASD), Dkt. 424 (D. Conn. Bankr. May 31, 2011) (motion for bankruptcy trustee to administer restitution in criminal case); *id.* at Dkt. 462 (order granting motion); *United States v. Brandau*, No. 99-8215 (DMM), Dkt. 734 (S.D. Fla. Apr. 25, 2000) (agreement between Government and bankruptcy trustee regarding the sale and maintenance of assets identified for forfeiture); *id.* at Dkt. 759 (order approving agreement).

[5] In Wang's letter supporting the Bankruptcy Stay Motion, she cites a letter filed by the Government in an SEC action against Madoff.  (*See* Dkt. 135 at 4).  While it is true that the DOJ opposed the initiation of bankruptcy proceedings for Madoff's estate in that case, Wang's letter omits a critical point.  Specifically, Wang omits the fact that the Government's letter concluded by noting that "[t]his Office also continues to work with the SIP[A] Trustee to maximize recovery for victims," and that "[g]iven this ongoing effort," the initiation of bankruptcy proceedings "is particularly inapt."  *SEC v. Madoff*, No. 08 Civ. 10791, Dkt. 50 at 5 (S.D.N.Y. Apr. 10, 2009).  Indeed, two months after the Government's letter, the personal bankruptcy estate of Madoff was consolidated into the SIPA proceeding being administered by the SIPA trustee who has coordinated so closely and effectively with the Government regarding forfeiture and restitution. *See Sec. Investor Protection Corp. v. Bernard L. Madoff Investment Sec. LLC*, No. 09-11893 (BRL) (S.D.N.Y. Bankr. June 9, 2009), available at https://www.madofftrustee.com/document/other/252_order.pdf.

estate since June 9, 2009[6]—was even simultaneously appointed as a Special Master in the criminal case "to oversee the process of remission or mitigation under the forfeiture laws." DOJ, *Manhattan U.S. Attorney Announces Agreement to Recover $7.2 Billion for Victims of Bernard L. Madoff's Ponzi Scheme from Estate of Jeffry M. Picower* (Dec. 17, 2010).[7] In connection with "the largest single forfeiture in U.S. history," of approximately $7.2 billion, to take one example, relevant settlement agreements stipulated that the trustee would administer approximately $5 billion of the funds "through the SIPA liquidation proceedings," while administering approximately $2.2 billion through DOJ's remission or mitigation process. *Id.* Precedent also refutes Kwok's suggestion here, and in the Bankruptcy Stay Motion, that there is something untoward about the Trustee's receipt of fees for his work recovering assets on behalf of Kwok's creditors. Like a bankruptcy trustee, a SIPA trustee's fees are compensated and, to date, the SIPA trustee in *Madoff* has received over $2.2 billion in fees (while recovering over $14.6 billion in assets). *See* The Madoff Recovery Initiative, *Recoveries to Report Fees Ratio: December 11, 2008 to September 20, 2023*.[8] Far from being improper or unusual, the Government coordinating with trustees, like the Trustee in Kwok's bankruptcy, is a best practice that prevents needless fighting over assets and results in maximal recovery in the aftermath of rampant frauds.[9]

---

[6] *See Sec. Investor Protection Corp. v. Bernard L. Madoff Investment Sec. LLC*, No. 09-11893 (BRL) (S.D.N.Y. Bankr. June 9, 2009), available at https://www.madofftrustee.com/document/other/252_order.pdf.

[7] Available at https://archives.fbi.gov/archives/newyork/press-releases/2010/nyfo121710.htm.

[8] Available at https://www.madofftrustee.com/recovery-chart-fees-00.html.

[9] Nor is there anything improper about the Government providing a set of photographs to the court-appointed Trustee here. In his Bankruptcy Stay Motion, Kwok attempted to suggest that the Government violated the protective order in doing so (Kwok Br. 3, 21), but, as already explained in the Government's response (Dkt. 148, at 3 n.2), Kwok is wrong. Moreover, the photographs were responsive to the Government's search warrant executed at the Mahwah Mansion. As an

*Second*, Kwok's argument regarding a supposed need to protect his privileged information residing with the Trustee is meritless. The Government has already explained that it has neither sought or received such information, and would do so only under appropriate circumstances. (Dkt. 148, at 2).[10]

*Third*, the interactions between the Government and the Trustee are unexceptional. Kwok's suggestion that the Trustee could be a member of the prosecution team is baseless based on the circumstances:

- the Government initiated its investigation independent of the Trustee, years before Kwok voluntarily filed for bankruptcy and the Trustee was even appointed;

- the Trustee played no role in the Government's charging decisions or the development of the Government's prosecutorial strategy;

- the Trustee has not participated in any of the Government's interviews;

- the Trustee was not involved in presenting this case to the grand jury and did not receive grand jury transcripts;

- the Trustee did not participate in the execution of search warrants or the responsiveness reviews of materials obtained pursuant to search warrants;

- the Trustee did not obtain materials produced to the Government pursuant to grand jury subpoenas; and

- the Trustee has not accompanied the Government to Court.

(Murray Decl. ¶ 3).

---

analogy, materials responsive to search warrants are regularly shared with regulatory agencies engaged in parallel investigations, and such sharing is entirely proper and, indeed, commonplace.

[10] Kwok's reply in connection with the Bankruptcy Stay Motion argues that the Government's inclusion, in its description of appropriate circumstances where it could obtain the privileged information of Kwok, of agreement from Kwok "or the appropriate holder [of the privilege]" had created some kind of "loophole." (Dkt. 152 at 8). Kwok is wrong. The Government included that parenthetical addition merely to encompass circumstances in which Kwok is not, in fact, the appropriate holder of the privilege, such as when a corporate entity, rather than an individual, actually holds the privilege.

To be clear, Kwok does not actually claim that the Trustee is part of the prosecution team. He seeks communications to "fully investigate whether the Trustee" is part of the prosecution team. (Br. 19). But, as set forth above, that is not a basis for obtaining discovery beyond what criminal law and procedure provides. Kwok identifies "coordination" and "information sharing" between the Government and the Trustee, but such coordination between the Government and another party is wholly "unexceptional and unproblematic" and provides no basis for the extraordinary discovery that Kwok seeks. *Rhodes*, 2019 WL 3162221, at *3; *see also Meregildo*, 920 F. Supp. 2d at 441-42 ("Interacting with the prosecution team, without more, does not make someone a team member.").

## CONCLUSION

It is plain that neither the SEC nor the Trustee are members of the prosecution team in this case. And in order to obtain discovery beyond what the criminal rules provide, a defendant must make a substantial showing of bad faith on the part of the Government. Kwok has not made that showing, because he cannot make that showing. The Government's interactions with the SEC and the Trustee have not only been in good faith, but such interactions are routine and unexceptional. To the extent there is anything exceptional about the circumstances presented here, it is that Kwok has filed two motions at least partly in pursuit of allowing his co-conspirators and associates to further obstruct justice and perpetuate his massive fraud by retaking possession of the Mahwah Mansion. Kwok's motion should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
    Micah F. Fergenson
    Ryan B. Finkel
    Juliana N. Murray
    Assistant United States Attorneys
    212-637-2190/-6612 /-2314

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"

KIN MING JE,
    a/k/a "William Je," and

YANPING WANG,
    a/k/a "Yvette,"

                *Defendants*.

---

**AUSA AFFIRMATION**

**S1 23 Cr. 118 (AT)**

STATE OF NEW YORK        )
COUNTY OF NEW YORK     :  ss.:
SOUTHERN DISTRICT OF NEW YORK )

      JULIANA N. MURRAY, pursuant to 28 U.S.C. § 1746, hereby affirms under penalty of

perjury:

      1.  I am an Assistant United States Attorney in the Office of Damian Williams, United

States Attorney for the Southern District of New York.  I submit this affirmation to provide the

Court with information concerning the nature and extent of the Government's[1] relationship with

the Securities and Exchange Commission ("SEC") during the Government's investigation of Ho

---

[1] References to the Government throughout this Affirmation refer to the United States Attorney's
Office for the Southern District of New York.

Wan Kwok, Kin Ming Je, and Yanping Wang (the "Kwok Investigation"). I am one of the Assistant United States Attorneys currently responsible for this matter, and I have been involved with the investigation since 2021.

2. Based on my participation in this investigation, my review of emails and text messages, my review of call notes, my conversations with attorneys for the SEC Enforcement Division team who conducted the parallel investigation of Kwok, Je, and Wang, and my conversations with other Assistant United States Attorneys who also participated in the Kwok Investigation, I have learned the following, among other things, about the Kwok Investigation:

a. The SEC played no role in the Government's charging decisions or the development of the Government's prosecutorial strategy.

b. Likewise, based on my discussions with attorneys at the SEC, I understand that the Government played no role in the SEC's charging decisions or the developments of the SEC's litigation strategy.

c. No one from the SEC was designated as a special Assistant U.S. Attorney to work on the criminal investigation.

d. The SEC participated in certain of the interviews conducted by the Government in the course of the Kwok Investigation. The SEC did not take notes during those interviews.

e. At interviews in which both the Government and the SEC participated, witnesses were told, in sum and substance, that the agencies' investigations were separate, that the interviews were conducted together only as a matter of convenience, and that, if there were to be a proffer agreement, the witness would enter into a separate agreement with each agency.[2]

---

[2] Where a witness was interviewed on multiple occasions, these statements were made at the initial proffer but were not necessarily repeated at each subsequent proffer.

f.   The SEC was not involved in presenting the criminal case to the grand jury and did not receive grand jury transcripts.

g.   The SEC did not participate in the execution of search warrants, or the responsiveness reviews of materials obtained pursuant to search warrants.

h.   The Government did not produce to the SEC any materials that the Government obtained pursuant to grand jury subpoenas.

i.   The SEC has not accompanied the Government to Court in the criminal case.

3.   Based on my participation in this investigation, my review of the docket in Kwok's chapter 11 bankruptcy case, my review of emails and text messages, my review of call notes, my conversations with the Trustee and his associates, and my conversations with other Assistant United States Attorneys who also participated in the Kwok Investigation, I have learned the following, among other things, about the Kwok Investigation:

a.   The Government initiated the Kwok Investigation in or about May 2020.

b.   Kwok filed a voluntary petition for chapter 11 bankruptcy on or about February 15, 2022.  The Trustee was appointed on or about July 7, 2022.

c.   The Trustee played no role in the Government's charging decisions or the development of the Government's prosecutorial strategy.

d.   The Trustee was not involved in presenting the Kwok Investigation to the grand jury and did not receive grand jury transcripts.

e.   The Trustee did not participate in the execution of search warrants, or the responsiveness reviews of materials obtained pursuant to search warrants.

f.   The Trustee has not participated in any of the Government's interviews.

g.   The Trustee did not obtain materials produced to the Government pursuant to grand jury subpoenas.

h.   The Trustee has not accompanied the Government to Court in the criminal case.

Dated:  New York, New York
        October 19, 2023

<span style="display:block; text-align:right;">
Juliana N. Murray<br>
Assistant United States Attorney<br>
(212) 637-2314
</span>

# EXHIBIT B

```
                  UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF CONNECTICUT
                      BRIDGEPORT DIVISION

In Re                          *   Case No. 22-50073 (JAM)
                               *
HO WAN KWOK and GENEVER        *
 HOLDINGS CORPORATION,         *
                               *
              Debtor.          *

LUC A. DESPINS,                *   Adv. Proc. No. 22-05027
                               *
              Plaintiff,       *
                               *
      v.                       *
                               *
BRAVO LUCK, LIMITED, et al.,   *
                               *
              Defendant.       *

LUC A. DESPINS,                *   Adv. Proc. No. 23-05017
                               *
                               *   Bridgeport, Connecticut
              Plaintiff,       *   August 29, 2023
                               *
      v.                       *
                               *
TAURUS FUND, LLC, et al.,      *
                               *
              Defendants.      *
                               *
  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JULIE A. MANNING
                UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:


Chapter 11 Trustee:            LUC A. DESPINS, ESQ.
                               Paul Hastings LLP
                               200 Park Avenue
                               New York, NY  10166




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

2

APPEARANCES:  (Cont'd)

For the Chapter 11 Trustee:    PATRICK R. LINSEY, ESQ.
                               Neubert Pepe and Monteith
                               195 Church Street,13th Floor
                               New Haven, CT  06510


For U.S. Trustee:              HOLLEY L. CLAIBORN, ESQ.
                               Office of U.S. Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510

For the Creditors Committee:   IRVE J. GOLDMAN, ESQ.
                               Pullman & Comley
                               850 Main Street
                               Bridgeport, CT  06601


For Bravo Luck:                FRANCIS J. LAWALL, ESQ.
                               Troutman Pepper Hamilton
                                Sanders, LLP
                               3000 Two Logan Square
                               18th and Arch Street
                               Philadelphia, PA  19103


For Hing Chi Ngok and          CHRISTOPHER J. MAJOR, ESQ.
 Greenwich Land, LLC:          Meister Seelig & Fein LLP
                               125 Park Avenue
                               New York, NY  10017


For Taurus Fund, LLC:          MICHAEL T. CONWAY, ESQ.
                               Lazare Potter Giacovas &
                                Moyle, LLP
                               747 Third Avenue
                               New York, NY  10017

3

```
#2049      MOTION TO COMPROMISE CONTROVERSY W/BRAVO
           LUCK LTD AND MILESON GUO a/k/a QIANG GUO AND/OR
           GUO QIANG, P.O. BOX 957 OFFSHORE INC CENTRE, ROAD
           TOWN, TORTOLA, BVI (BRAVO LUCK LTD); 5 PRINCESS
           GATE, G3, LONDON, UK (Qiang Guo)
# 111      MOTION TO COMPROMISE CONTROVERSY WITH BRAVO LUCK
           AND MILESON GUO a/k/a QIANG GUO AND/OR
           GUO QIANG, P.O. BOX 957 OFFSHORE INC CENTRE, ROAD
           TOWN, TORTOLA, BVI (BRAVO LUCK LTD); 5 PRINCESS
           GATE, G3, LONDON, UK (Qiang Guo)
#2083      MOTION OF CHAPTER 11 TRUSTEE, PURSUANT TO BANKR.
           RULE 9019 FOR APPROVAL OF SETTLEMENT WITH USA
#  24      MOTION OF CHAPTER 11 TRUSTEE, PURSUANT TO BANKR.
           RULE 9019 FOR APPROVAL OF SETTLEMENT WITH USA
#2079      MOTION FOR 2004 EXAM OF ADDITIONAL ENTITIES AND
           INDIVIDUALS AFFILIATED WITH DEBTOR AND RELEVANT
           BANKS (SIXTH OMNIBUS)
#2127      ORDER SCHEDULING STATUS CONFERENCE
```

1          (Proceedings commenced at 2:01 p.m.)

2          THE COURTROOM DEPUTY:  Case No. 22-50073, Ho Wan

3    Kwok and Genever Holdings, LLC, 22-5027, Despins, et al,

4    versus Bravo Luck Limited, et al, and 23-5017, Despins, et

5    al, versus Taurus Fund, LLC, et al.

6          THE COURT:  Okay.  Good afternoon.  If we could

7    have appearances for the record starting with the Chapter 11

8    Trustee, please.

9          MR. DESPINS:  Good afternoon, Your Honor.  Luc

10   Despins, Chapter 11 Trustee.

11         THE COURT:  Good afternoon.

12         MR. LINSEY:  Good afternoon, Your Honor.  Patrick

13   Linsey of Neubert, Pepe and Monteith for the Trustee.

14         THE COURT:  Good afternoon.

15         MR. GOLDMAN:  Good afternoon, Your Honor.  Irve

16   Goldman, Pullman & Comley, for the creditors committee.

17         THE COURT:  Good afternoon.

18         MS. CLAIBORN:  Good afternoon.  Holley Claiborn

19   for the U.S. Trustee.

20         THE COURT:  Good afternoon.

21         MR. LAWALL:  Good afternoon, Your Honor.  Fran

22   Lawall, Bravo Luck.

23         THE COURT:  Good afternoon.

24         MR. MAJOR:  Good afternoon, Your Honor.  Chris

25   Major, Meister Seelig & Fein.  We represent Hing Chi Ngok

1   and Greenwich Land, LLC.

2              THE COURT:  Good afternoon.

3              MR. CONWAY:  Good afternoon, Your Honor.  Michael

4   Conway here for Taurus Fund, LLC

5              THE COURT:  Good afternoon.

6              All right.  We have, as I mentioned, several

7   matters on the calendar this afternoon.

8              Trustee Despins, I've look at the matters insofar

9   as whether objections have been filed and things of that

10  nature.  And with regard to the Bravo Luck motion to

11  compromise, I see that no objections have been filed to

12  that.  Am I correct on that?

13             MR. DESPINS:  That's correct, Your Honor.

14             THE COURT:  All right.  So does it make sense to

15  proceed with the Bravo Luck matter first?

16             MR. DESPINS:  Yes, Your Honor.

17             THE COURT:  Okay.  Please proceed.  Thank you.

18             MR. DESPINS:  Thank you.  Good afternoon, Your

19  Honor.  Luc Despins, Chapter 11 Trustee.

20             This is actually a pretty straightforward motion

21  to settle the controversy between the various debtor's

22  estates and Bravo Luck and the debtor's son with respect to

23  the Sherry-Netherland.

24             And basically you'll recall that we had brought,

25  you know, three separate adversary proceedings against Bravo

1    Luck.  And also had objected to the claims of the son.  And

2    there had been no answer to that or no response to that.

3    And there was a lot of litigation and motions to dismiss,

4    amendments, et cetera, et cetera.

5           So to make a long story short, the parties have

6    reached an agreement to settle this.  And I believe it's

7    pretty straightforward in the sense that what I would call

8    the Bravo Luck parties, Bravo Luck and the son, are

9    abandoning any arguments that they have an interest in the

10   Sherry-Netherland apartment, directly or indirectly.

11   They're waiving claims, et cetera, et cetera.

12          We are withdrawing the litigation that was

13   commenced against them.  I mean everything I'm saying is

14   subject to the settlement agreement, which is much more

15   detailed, but that's, in a nutshell that's what's happening.

16   So it's pretty straightforward.

17          I would just point out that the releases are not

18   symmetric, so that's important in the sense that they are

19   releasing claims.  We're not releasing all our claims in the

20   world against them.  So that we are releasing the claims

21   asserted in the complaint.

22          And again, what I'm saying is subject to the terms

23   of settlement agreement, which is in much more detail, but

24   conceptually I wanted to make sure the Court understood this

25   is not a global release of claims.

1          THE COURT:  I think I -- that was my thought, that

2     it is not a global release of claims.

3          MR. DESPINS:  So unless the Court has questions,

4     and Mr. Lawall wants to be heard, but I have nothing else at

5     this time.

6          THE COURT:  I do want to hear from you, Counsel,

7     Mr. Lawall, when you have a moment.

8          I just -- there are many pending matters related

9     to a pending objection to claim and the adversary

10    proceedings that we haven't acted on because you've been

11    talking, right?

12         MR. DESPINS:  Right.

13         THE COURT:  And you've made representations to the

14    Court, even in pleadings or in court, that the parties have

15    been working together toward resolution of these issues.  So

16    obviously you've worked hard.  And you've come to a

17    resolution, which is appreciated.

18         That will mean, I think, assuming this is

19    approved, that you may see, because the clerk's office has

20    to do certain things, you know, motions terminated, or

21    you're going to withdraw adversary proceedings, right?

22    You're going to dismiss?  Or what are you do -- what is the

23    actual --

24         MR. DESPINS:  Yeah.  Frankly, I'm not sure of the

25    plumbing, but there is plumbing that remains to be done in

1  terms of probably withdrawing the adversary proceeding, or

2  perhaps the settlement (indiscernible).  I'll look at that.

3  But --

4              THE COURT:  Well, I've got it here.

5              MR. DESPINS:  Yeah.

6              THE COURT:  I don't recall exactly.

7              But what I'm saying is if you both see some

8  entries made because it appears that certain matters that

9  have been pending are resolved pursuant to an approval of

10  the settlement, then that will be ministerial.

11             MR. DESPINS:  Yes.

12             THE COURT:  I just want you to understand that.

13  Okay?

14             MR. DESPINS:  Yes.

15             The order provides that the plaintiff's authorized

16  to execute, deliver, implement all sorts of documents or

17  instruments necessary to implement this.

18             THE COURT:  Right.

19             MR. DESPINS:  I think that Mr. Lawall -- that

20  there were signatures provided.  There were signatures to

21  the settlement agreement provided by Bravo Luck.  There was

22  no signature provided by the son because that's held in

23  trust by Mr. Lawall.  They didn't want to provide the

24  signature --

25             THE COURT:  But you have it?

1          MR. DESPINS:  Yeah.

2          THE COURT:  I mean, you have the actual signature?

3          MR. DESPINS:  That's what we've been told.

4          THE COURT:  Okay.

5          MR. DESPINS:  So that when -- if the Court

6   approves the settlement, then the signature will be added.

7   But to the extent there are ministerial things that need to

8   happen, we will make those happen, Your Honor.

9          THE COURT:  Yeah.  I don't know that there's a lot

10  of things you need to do other than what you've just

11  discussed.  I just want you to be aware that when I looked

12  at this, and again, I'm looking at it again now to refresh

13  my recollection, but there are matters that are outstanding

14  in the adversary proceedings in the main case that I believe

15  now are resolved by this settlement.

16         MR. DESPINS:  Yes, they're all resolved.  Yes.

17         THE COURT:  So that's the way I view it.  And I

18  want to make sure that neither one of you view it

19  differently, because I don't want to make a mistake in my

20  view.

21         MR. DESPINS:  That's correct, Your Honor.  The

22  settlement agreement is pretty detailed in terms of --

23         THE COURT:  Yes, it is.

24         MR. DESPINS:  -- this claim is waived, that claim

25  is waived, so it's very precise.  I think these are self-

1    executing.  But to the extent we need to do more, we will do

2    that to implement the settlement.

3              THE COURT:  Okay.

4              MR. DESPINS:  So unless the Court has other

5    questions --

6              THE COURT:  I don't have any other questions at

7    the moment.

8              Again, I note for the record that no one has filed

9    any written objection to the settlement.  It's been on

10    notice.  It was served appropriately in accordance with the

11    Court's review of the service of the motion and the hearing

12    notice, so I don't see -- I should say it in the

13    affirmative.

14              There is nothing before the Court that would

15    concern me to -- with regard to approving the settlement.  I

16    mean, the parties have been working together.  You've come

17    and told the Court that many times.  And so I appreciate the

18    efforts obviously of the parties in resolving these issues.

19              And I do think the settlement agreement is

20    detailed, but I also agree that the releases are not -- they

21    are limited to the claims that were brought in these -- in

22    the main case and in the adversary proceedings.  So I'm fine

23    with that.

24              Attorney Lawall, would you like to be heard?

25              MR. LAWALL:  Yes, Your Honor.  Again, good

1    afternoon.  Fran Lawall, Troutman Pepper, on behalf of Bravo

2    Luck.

3              To answer, I guess, some of your procedural

4    questions, I think the way the settlement agreement is

5    structured is that the three adversaries will be dismissed

6    with prejudice.

7              THE COURT:  Right.

8              MR. LAWALL:  The proofs of claim that were filed

9    are deemed withdrawn.

10             By having the complaints withdrawn with prejudice,

11   that will obviously take off your calendar the motions to

12   dismiss.  This is in the form of a typical settlement.  None

13   of the defendants are admitting any of the -- any of the

14   assertions within the complaints.  And in fact, there are

15   specific denials.  But again, this is a settlement.

16             THE COURT:  Yes.

17             MR. LAWALL:  There are some things that will

18   happen in the Virgin Islands with litigation that was

19   ancillary to this, which will go away as well.

20             But again, I agree with Mr. Despins.  The

21   settlement agreement is sufficiently complex that we would

22   rely upon the four corners of that settlement agreement.

23   But generally I think your understanding of the essence of

24   it is largely correct.

25             THE COURT:  And I -- and again, I only raise the

1    issue about what you may see coming across dockets to let

2    you know that that would be ministerial from the clerk's

3    office point of view.

4            So for example, as you said, the adversaries will

5    be withdrawn -- dismissed, I'm sorry, dismissed.  So I don't

6    know, are you going to file a separate Rule 7041 dismissal

7    or is this document the stipulation of dismissal?

8            MR. LAWALL:  I think I can work that out with Mr.

9    Despins' team.

10            THE COURT:  Fine.

11            MR. LAWALL:  And we'll -- I think we can take that

12    off Your Honor.  And we'll -- if the clerk's office doesn't

13    automatically take care of that, we can sign whatever is

14    necessary to effectuate the settlement agreement.

15            THE COURT:  Okay.  That's helpful.

16            MR. LAWALL:  Okay.

17            THE COURT:  Thank you.

18            MR. LAWALL:  Okay.

19            THE COURT:  It may be unfortunately.  But you

20    know, it can be as simple as a stipulation, a two-line

21    stipulation, that under Rule 7041(a)(1), (a)(2), or whatever

22    it is the parties stipulate to dismissal of the adversary

23    proceeding with prejudice and then it's self-effectuating

24    and the clerk's office doesn't have to do anything other

25    than close that adversary proceeding in the ordinary course

1    of business.

2                    MR. LAWALL:  Understood, Your Honor.  Whatever the

3    clerk's office needs, we'll get it.

4                    THE COURT:  Okay.  Thank you.  I appreciate that.

5                    MR. LAWALL:  Thank you, Your Honor.

6                    THE COURT:  And then with regard to the motions to

7    dismiss, I don't even -- I think we've just continued the

8    hearings on those, right?

9                    MR. LAWALL:  Yes.  Yes.

10                   THE COURT:  Okay.

11                   MR. LAWALL:  They've all been pushed.  I forget

12   whether there were any ancillary motion practice.  But

13   again, my expectation is because they were all under the

14   consolidated adversary everything effectively falls off the

15   docket.

16                   THE COURT:  I agree with you.  Okay.  I just

17   wanted to make sure.  That's how I view it.  If there's any

18   issues from the clerk's office perspective, someone will

19   reach out and let you both know.  How's that?

20                   MR. LAWALL:  Not a problem.

21                   THE COURT:  Okay.  All right.  So again, I do

22   appreciate the efforts.  We've been talking about this for

23   some time.  And I do find that under the bankruptcy rule and

24   the standard that's been applied by courts in connection

25   with a settlement or compromise under Rule 9019, that the

1    settlement falls within the range of reasonableness.  I

2    think it's a -- it is a positive step.  Although I

3    understand, you know, no one's -- you're all doing what you

4    can under the circumstances to move things forward and I

5    think that's very positive.

6           No one has filed any written objections to the

7    motion to compromise.  And under our local rules the reason

8    it has to be -- the motion has to be filed not just in the

9    adversary proceedings, but in the main case, is so that all

10   parties are served.  And they were served and no one has

11   filed any written objections.

12          So for all those reasons, the motion to compromise

13   filed both in the main case and the adversary proceedings

14   are granted.

15          I have the proposed order here and it looks fine

16   to me.  It does attach the settlement agreement as Exhibit 1

17   to the order, which is absolutely fine.  I think that's

18   actually preferable to have it there so someone can look at

19   it if they need to.

20          And I think that I don't need to do anything else

21   at the moment unless you think otherwise, Attorney Lawall?

22          MR. LAWALL:  I think we're good, Judge.

23          THE COURT:  Okay.  Thank you very much.  I

24   appreciate that.

25          MR. LAWALL:  Your Honor, my business with the

1    Court is done today.  May I be excused?

2                    THE COURT:  Absolutely.  Thank you very much.

3                    MR. LAWALL:  Thank you, Your Honor.

4                    THE COURT:  All right.  So the first two matters

5    on the calendar, ECF 2049 in the main case, and ECF 111 in

6    the adversary, 22-5027, are granted for the reasons stated

7    on the record.  And the proposed orders will enter.

8                    Now, the other settlement agreement has an

9    objection, Trustee Despins.  And then there's also the

10   motion for 2004 examination, I think there's an objection.

11   I don't know if that's been resolved.

12                   MR. DESPINS:  That's correct, Your Honor.

13                   THE COURT:  That has an objection as well?

14                   MR. DESPINS:  Yes.

15                   THE COURT:  Okay.  And then the order scheduling

16   the status conference in connection with the motion to

17   remediate areas of the Sherry-Netherland, do you want to

18   talk about that now or do you want to --

19                   MR. DESPINS:  Sure, we can.

20                   THE COURT:  Okay.  That's ECF 2127 in the main

21   case.  The only reason that was set for a status conference

22   was because someone had brought to my attention that there

23   was -- there were two things, well, actually I guess three

24   things.

25                   The motion was filed under Section 363, so I

1    assume it was filed under, but I could be wrong, that it was

2    filed under 363 because you're talking about use of estate

3    property?

4              MR. DESPINS:  Correct, Your Honor.

5              THE COURT:  Okay.  Under our local rules, and it's

6    not as clear as it could be, but normally, any motion

7    seeking relief under 363 is automatically set for a hearing.

8              And this was filed under the contested matter

9    procedure.  So I don't know how you want to -- if you want

10   to wait for a response period to go by, that's fine.  Or it

11   can be automatically set for a hearing in which there will

12   be an objection deadline, but that -- that is one of the

13   reasons it was brought to my attention.

14             MR. DESPINS:  Thank you, Your Honor.  You're

15   correct.

16             And we had -- pursuant to that contested matter

17   rule, we had set forth as an exhibit an objection deadline

18   of September 13th.  And we're content with that --

19             THE COURT:  Okay.

20             MR. DESPINS:  -- as long as the hearing, if

21   there's no objection, takes place soonish thereafter.

22             THE COURT:  Well, we can -- we can do one of two

23   things.  We can issue a notice of hearing right now setting

24   an objection -- I don't mean right now, but today or

25   tomorrow -- setting an objection deadline of September 13

1   and then a hearing a few days after that.  Or we can wait

2   until the objection deadline and set a hearing.  But there's

3   going to be a hearing regardless, so to me it seems to make

4   sense to issue a notice of hearing with the objection

5   deadline of September 13.

6            MR. DESPINS:  That's right, Your Honor.

7            THE COURT:  Okay.

8            MR. DESPINS:  Better to do that.  Yes.

9            THE COURT:  Okay.  So we'll do that.  And let me

10  just look at the calendar as far as when the actual hearing

11  would be held.

12           I mean, we have matters on the calendar in the

13  afternoon of September 19th, but -- and I don't know how

14  long they would last, but it could last at least an hour or

15  more in the afternoon.  We could either do it later that

16  afternoon or we could do it on Wednesday the 20th, whatever

17  you prefer.

18           MR. DESPINS:  If we could do it on the 19th, that

19  would be preferable, Your Honor.

20           THE COURT:  Okay.  So I would schedule that.  I

21  probably wouldn't schedule it before 3:30 because the matter

22  on at 2:00 is either going to be contested or it's going to

23  last for two minutes.  I don't know.

24           So how -- or you can -- we can schedule it for

25  3:00.  Or we can schedule it for 2:00 and you just have to

```
 1    wait.

 2                MR. DESPINS:  That's fine, Your Honor.

 3                THE COURT:  So what time?  Would you like 2:00

 4    then?

 5                MR. DESPINS:  Two o'clock is fine, Your Honor.

 6                THE COURT:  All right.  So we'll schedule it at

 7    2:00, but there is another matter that would go forward

 8    first if it -- if it is not resolved.  Okay?

 9                MR. DESPINS:  That other matter is not in this

10    case.

11                THE COURT:  No.

12                MR. DESPINS:  Okay.

13                THE COURT:  No, it's not in this case.  That's

14    what I'm saying.

15                MR. DESPINS:  Okay.

16                THE COURT:  It's another case.  So I can either

17    schedule yours at 2:00 as well --

18                MR. DESPINS:  That's fine.

19                THE COURT:  -- and then you'll just have to wait.

20    Okay.  All right.  So let's do that.  We're going to

21    schedule what -- the underlying motion is ECF 2113.  We're

22    going to issue a notice of hearing on that motion for

23    September 19th at 2 p.m. with an objection deadline of

24    September 13.  That's all we need to do with that.

25                Then that -- then our status conference, we've
```

1    held the status conference with regard to that matter.

2              The only other thing the U.S. Trustee's Office may

3    want, I have no idea, Attorney Claiborn, but that motion

4    that's seeking to remediate different issues at the Sherry-

5    Netherland apartment also seeks the employment.  So I don't

6    know if you want the order to refer to Section 327 or

7    something too.  I have no idea.  But maybe you can all work

8    that out before we have a hearing.

9              And maybe if you all come in and there's no

10   problem, you'll go first at 2 p.m.  Okay?

11             MR. DESPINS:  That's a good incentive.

12             THE COURT:  All right.  So with regard to the

13   status conference that was held today that -- the status

14   conference has been held.  There's no need for any -- no

15   further status conferences will be scheduled and a notice of

16   hearing will issue on ECF No. 2113.  Okay?

17             So then how would you like to proceed next?

18             MR. DESPINS:  We'll go to Mahwah at this point.

19             THE COURT:  Go right ahead.

20             MR. DESPINS:  Thank you, Your Honor.

21             So Your Honor, this is a motion to approve a

22   settlement with the Department of Justice.  That's under

23   document 24 in the adversary proceeding.  And I have already

24   testified as to this, but I think it's important that we set

25   the stage again on this because last time that was not the

1   main focus.  I wanted the Court to know about it, but

2   clearly that was not the purpose of that hearing.

3           So the first question is why enter into a

4   settlement with the DOJ?  Second question is what does the

5   settlement do or not do?  And so let me try to address that.

6           The first question is why?

7           As we state in the motion, the DOJ has expressly

8   targeted the Mahwah mansion as a -- that's not a verb --

9   forfeitable asset and they've actually identified that

10  asset.  We did not know about it.  So we have to be candid

11  with the Court.  We did not know about that asset until the

12  indictment was released.

13          And, however, the Department of Justice, their

14  tools are sort of limited in the pre-conviction phase in the

15  sense that they cannot obtain title to this property now or

16  do much with it before there's a conviction, which is a

17  final conviction.  Given that the trial is not going to last

18  -- not going to start until April I think, at least until

19  April of next year, obviously, the DOJ and we were aware of

20  what was going there and we're really concerned about this

21  very valuable asset being left in limbo for lack of a better

22  term.

23          So, however, because they identified this asset as

24  a potentially forfeitable asset, we did not want to begin

25  any adversary proceeding which could be perceived as hostile

1     towards the DOJ because obviously it's important we believe

2     to work with them as cooperatively as possible.  Why?

3            Because they have all sorts of tools that we don't

4     have.  We don't want them to be fighting us and us being at

5     cross purposes with them with respect to this asset, and

6     this is where we came up with this idea of -- first of all,

7     we did our homework.  We believe that this asset through the

8     relief we're seeking in the adversary proceeding is an

9     estate asset.  We're convinced of that.  The Court will have

10    to determine if that's the case or not.  That's for another

11    day.

12           But we approached the DOJ and said we want to go

13    forward with this adversary proceeding to try to establish

14    that this is an asset of the estate.  And eventually, if the

15    Court rules in our favor, to sell this asset to liquidate it

16    for the benefit of holders of allowed claims.

17           And so we had this discussion about, okay, how is

18    that going to play out, because their view is that they have

19    superior claims.  And I'm not going to go into all the

20    details on this, but we pointed out and we cited in the

21    motion some case law, because there's a lot of cases on this

22    where Chapter 11 trustees or Chapter 7 trustees are battling

23    against the DOJ over issues like that as to who has first

24    dibs on an asset of the -- and I'm saying in those cases the

25    alleged wrongdoer -- and, you know, obviously we want to

1     avoid that.

2              And we also wanted to avoid the following, which

3     is we filed this adversary proceeding.  In my dreams, we

4     prevail.  We sell the assets and the DOJ comes in and says

5     thank you very much, we will take that money, and thank you

6     for your work, and that's the end of it.  We could not have

7     that.

8              This estate cannot be in a position where it's

9     financing any other activity.  It has to net neutral.  And I

10    believe move than net neutral, and I'll get to that piece in

11    a second.  So that we negotiated the fact that if we

12    prevail, that's very important, only if we prevail.

13             This settlement agreement does not dictate the

14    sale of the property because it provides that certain things

15    will happen if we prevail.

16             So if we prevail and we sell the asset, we can use

17    the net proceeds to pay all the expenses that the estate

18    will have incurred.  At that time, we thought we would incur

19    not only legal fees, but security fees, a broker to sell the

20    property, a mortgage if -- there's no mortgage on the

21    property, but if there are people that have mechanics liens

22    that need to be paid, that of course comes off the top.

23             So that creates a concept of net proceeds.  And

24    the net proceeds under that stipulation, we're kicking down

25    -- that down the road, which is to be determined.  And I'll

1    come back to why there's not more progress on that.  So the

2    net proceeds are very important.

3           And what I said is, okay, that's great.  We're

4    going to get all our expenses back.  That's good.  But this

5    case is not being run for the professionals for the case.

6    There has to be a benefit to the estate.  That's where we

7    came in with the deemed expense of a million dollars.

8           So that assuming for a second that we prevail, the

9    mansion is sold, we get all the expenses paid, and the DOJ

10   and us cannot agree on the distribution of the net proceeds,

11   we're getting a million dollars to the estate guaranteed.

12   And it says in there to be paid to the holders of allowed

13   claims, so an allowed claim in your court, so it has to be

14   an allowed claim, allowed claims of victims.  And, you know,

15   people pointed out, well, victims is not defined.

16          That's not an accident.  Meaning, I want to have a

17   shot at convincing the DOJ that the victims -- first of all,

18   you have to have an allowed claim.  You cannot receive a

19   penny of this unless you have an allowed claim as determined

20   by Your Honor.  But if you have an allowed claim, the issue

21   of who's a victim or not, that's -- I would like that to be

22   subject to further discussion.

23          But the bottom line is this estate will end up

24   with a million positive, if we're right that this property

25   is part of the estate.  And we feel pretty strongly that is

1    the case, but of course Your Honor will have to rule on

2    that.

3              So the estate is not worse off because the fees

4    and expenses are covered.  It's better off by a million

5    dollars.  And it can be better off by a lot more than that

6    if we are successful in convincing the DOJ that the

7    distribution of proceeds from this property -- and by the

8    way, we're going to try that with other -- you know, for

9    example, I've mentioned the cash that's being frozen right

10   now, $630 million we -- that's not today's issue, but the

11   game plan here, based on other cases where the DOJ has

12   sought and obtained forfeiture of assets, is for the Chapter

13   11 Trustee to wear two hats, Chapter 11 Trustee and

14   forfeiture receiver.  And it all comes back to this court

15   for distribution.

16             And I know there are issues there.  And they know

17   that too, meaning the DOJ.  They're not naive.  They know

18   that.

19             The question is, okay, who's a victim?  In their

20   book, a victim might be only the victim of certain alleged

21   schemes.  But, you know, I can see that there are other

22   people in this case that Mr. Goldman represents that also

23   are victims.

24             For example, Bru Ma(ph), you don't know her, but

25   I'm using her as an example, because if you ever read her

1    proof of claim, you'll see that there's really bad -- that

2    bad things are being alleged there.  Clearly she would say

3    I'm a victim.

4            So the point is, we're not asking the Court to

5    determine who's a victim today.  The only point is that this

6    would go to the victims of the debtor, TBD as to what that

7    means, but that's going to be a clear benefit to the estate

8    as long as they have an allowed claim, which Your Honor will

9    need to determine.

10           So you might say, well, if you're able to get the

11   million, why didn't you negotiate the full package?  And the

12   reason is very clear, and that's stated in the motion.  The

13   DOJ cannot have -- there's a very strict procedure for the

14   DOJ to do that.  There's a forfeiture team under the DOJ,

15   and they need to get the approval of the Attorney General to

16   agree to things like that have been done.

17           And I believe one of them was done before Your

18   Honor or a case that you may have inherited from another

19   judge, but this has happened before.

20           In that case, they went all the way to the

21   Attorney General and got the approval.  They're not going to

22   do that and cannot do that now until they have a finding of

23   guilt that is final against the debtor or the other

24   defendants.  So that is why we could not go further than

25   that.

1          but I would -- and I don't want to, you know,

2    oversell, but I think that this is a blueprint for future

3    discussions.  Of course there are no agreements as to that.

4    They have not given us any indication they would consider

5    that.  The point though is that I think it's very good for

6    the estate to have that in place, to have this as the first

7    step, to make sure that we are no worse off, and plus we're

8    better off by a million dollars.  Again, if we prevail.  If

9    we don't prevail, it's like any case that we bring.  If we

10   don't prevail, we don't prevail.  And so that's the risk we

11   take.

12         Now, this settlement agreement, when it says that

13   the extra million dollars, the deemed expense, will be

14   distributed to the holders of allowed claims that are

15   victims, you're not, I want to be clear about this, you're

16   not approving that distribution today, meaning that the

17   bankruptcy code needs to be complied with.

18         The objection by Taurus, which was kind of

19   confusing, said, oh, what about secured creditors?  If there

20   are secured creditors, one, if there are secured creditors

21   on the property, they will be paid off the top of that

22   property, meaning out of the proceeds.

23         Second, if there are secured creditors in the

24   case, and we know of none, I'm pretty sure of that, I mean,

25   at least none have been alleged to date, then, you know, you

1    cannot confirm a plan that provides that secured creditors

2    get paid after unsecured.

3            So we want to be clear that approval of the

4    settlement agreement is just approval of a way forward.

5    You're not signing off on any plan, any future plan, and all

6    that.

7            So if you want to put in that section subject to

8    applicable law, including the bankruptcy code, that's fine

9    with us.  We're not trying to prejudge that.  What we're

10   trying to prejudge is that this estate is going to get a

11   million dollars on top of the expenses so that it cannot be

12   said that we just did this, you know, to spin our wheels.

13   You know, there's a net benefit to the estate and that was

14   critical here.

15           So that's a long description, but I think that

16   covers the entire settlements.

17           I want to leave, you know, Your Honor, with the

18   following thought, right?

19           This is not an approval of any distribution to

20   anyone.  This is not the approval of a sale of the property.

21   That will happen only if we prevail on the alter ego or

22   inequitable ownership claims.  And, therefore, any objection

23   on that is premature, because if we lose on that, none of

24   this matters.

25           And also there's another benefit here, which is

1    that it's possible that the DOJ will not gain -- get a

2    conviction against Mr. Kwok.  That's not our -- it's not in

3    my domain.  I have no views on that.  I know nothing of it.

4    I'm not a criminal lawyer, so I'm not going to opine on

5    that, but that happens every day.  And, therefore, this

6    settlement, it says, you know, if they don't obtain a final

7    conviction and forfeiture, all this settlement goes away,

8    meaning it's all our money again if we prevail.

9             So that sets that into motion today and it allows

10   us to do what we did through the preliminary injunction,

11   which Your Honor granted, which is to protect the property

12   in the meantime, which is critical.

13            So I believe that for all these reasons this is

14   clearly to the benefit of the estate.  It's a blueprint for

15   future collaboration with the DOJ.  This has been done

16   before in other cases.

17            And by the way, the other cases where this has

18   been done, there's a clear order that says the bankruptcy --

19   when the DOJ's agreed to this, and they have not yet, to be

20   clear, agreed to any of this -- but there's a clear

21   procedure that says the bankruptcy court shall determine

22   holders of allowed claims.  Sometimes there's an allocation,

23   X dollars can only go to the following types of creditors,

24   that's a settlement with the DOJ.

25            We're not anywhere near that here, but I want to

1    make sure Your Honor knows that this is not the first time

2    that these types of agreements have been done, except that I

3    think this is the first time that it's been done prior to a

4    conviction and where they actually have obtained forfeiture.

5             In the other cases, generally, they won, they got

6    a conviction, they got a forfeiture order, and then there's

7    either a battle with the trustee or a negotiation with the

8    trustee and the estate to try to resolve things on a

9    consensual basis.

10            So unless Your Honor has questions, that would be

11   really my presentation on this.  I'm happy to answer any

12   questions.  Obviously, I want to cover any issues raised by

13   Taurus here.

14            THE COURT:  The only question I have at the moment

15   is, if, if this settlement is approved, does it -- does it

16   get filed in the criminal action?

17            I mean, how does this work as far as people?  Does

18   the judge in the criminal action know?  I mean, I don't know

19   if the judge in the criminal action cares.

20            MR. DESPINS:  Yeah.

21            THE COURT:  I'm just asking a question.

22            MR. DESPINS:  Yeah.  That's a good question.  I'm

23   not sure I know the answer other than to say that my

24   understanding is the DOJ was not going to seek approval of

25   this in the criminal court, so I'm not sure if they would

1    file something there or not.

2              THE COURT:  Okay.

3              MR. DESPINS:  They understood that we needed to do

4    that with Your Honor, but more than that, no.

5              THE COURT:  Okay.  Thank you.

6              MR. DESPINS:  Thank you, Your Honor.

7              THE COURT:  Attorney Conway, would you like to be

8    heard?

9              MR. CONWAY:  Thank you, Your Honor.  Michael

10   Conway, Lazare Potter Giacovas & Moyle, for Taurus Fund,

11   LLC.

12             Obviously you've read the papers, but I want to

13   just address the gaping hole that Mr. Despins just referred

14   to, and that is there has been no identification of the

15   victims here.

16             What the settlement calls for is creating a res

17   that certain creditors of the bankruptcy estate can claim

18   against, others cannot.  We don't know who can and who

19   can't.

20             And the fundamental question on any motion like

21   this is how is it fair and equitable?  We can't answer that

22   question now for the simple reason that we don't know which

23   creditors can or can't claim against it.  The obvious

24   solution would have been for them to come to an agreement on

25   who can claim against the res, who is a victim as they put

1    it?

2              You know, we obviously take the position that it's

3    premature to start divvying up our property, our client's

4    property, before there's been any finding, but that's not

5    really relevant here.

6              But the fundamental concept is that there are

7    people who put their money into this property and none of

8    them had any idea and still don't really think they have a

9    claim in the bankruptcy estate.

10             If Your Honor were to find at the end of this case

11   that the bankruptcy estate gets the house, then they'd have

12   a claim to file.  And there's no protocol which says, okay,

13   well, if that's the case, then people who invested their

14   money into this house can file a late-filed claim, what have

15   you.

16             There's no identification of whether somebody with

17   a personal injury claim -- I think I saw something on the

18   claims registration, I didn't read all the claims -- but I

19   saw something described as a personal injury claim.  Is that

20   person going to have a claim against this res?  We don't

21   know.  There's no protocol here in this settlement motion.

22   And there needs to be in order to determine whether it's

23   fair and reasonable to the creditors of this estate, whether

24   it's fair and reasonable to the Taurus Fund, for one.

25             But the Taurus Fund obviously is made up of the

1    people who funded the Taurus Fund.  Those people are going

2    to come in here in this case and they're going to tell you

3    don't take away my house.  You know, this is my money.  You

4    know.  I know that the Trustee and the Government want to

5    say, you know, you were defrauded by Mr. Kwok, but I don't

6    believe I was defrauded.  I don't think you should take away

7    my property.  And if you do take the property away, then how

8    are they going to be able to get their money back, because

9    they're then going to need a process.

10        So I guess the general conclusion, and again, we

11   rest on the papers that were filed, which point out that

12   there's a distinct prejudice against the loss of rights in

13   the forfeiture proceeding that Taurus Fund is suffering.

14   Because we no longer will have the right, if, as Mr. Despins

15   points out, there's no finding there against Mr. Kwok, and

16   the forfeiture doesn't go forward, they won't get their

17   house back, which they would be able to get if this process

18   played the normal course.

19        THE COURT:  I almost followed you until the end

20   there.  I'm sorry.  So you're saying your client's

21   prejudiced because if the Government doesn't succeed in its

22   charges it won't get their house back because Mr. Despins

23   will have -- the Trustee of the estate will have an interest

24   in the property?  But don't I have to make that

25   determination, which I haven't made yet?

1          MR. CONWAY:  Yes.  And it's -- it is -- this is

2     all -- we're all -- everybody's putting the cart before the

3     horse here in that the hypothetical is this, Your Honor.

4          This case gets finished first.  Mr. Despins sells

5     the house.  There's a fund of money that's sitting there.

6     Okay.  That sounds great to everybody but the people who

7     bought the house.

8          Now there's a finding in the criminal proceeding

9     that, you know what?  There was no fraud here.  That house

10    never should have been listed in the indictment.  Those

11    people who bought the house should get the house back.

12    There's no more house.  Now there's a fund of money.

13         THE COURT:  But you'd have the ability -- I

14    understand what you're saying, but you have the ability to

15    object to any -- what you're saying, and I -- you're saying

16    you're putting the cart before the horse, but I don't know

17    if that's accurate yet.  Because unless and until Mr.

18    Despins is successful in his claims, the house isn't an

19    asset of the estate.

20         What he appears to be doing, to me, and you can

21    disagree and I'm happy to hear you on it, is he's attempting

22    to have a mechanism in place to resolve what would be, what

23    could be, could be, competing interests between the

24    Government and this bankruptcy estate.

25         My understanding of the reading of the papers is

1    that this is really a settlement that -- whose provisions

2    won't go into effect unless and until certain things happen.

3           And if Mr. Despins loses, right, and he doesn't --

4    and he doesn't prevail, then the estate has no interest.

5           If the Government loses and they can't seek the

6    property in forfeiture, then the Government loses, and then

7    your clients haven't lost anything.

8           So while I understand your argument, I'm having a

9    little trouble with it insofar as I think your rights are

10   still being protected.  You still will have a right.

11          First of all, you're going to have a right to --

12   the preliminary injunction is issued, right?  You're going

13   to have a right to file a pleading.  You're going to have a

14   right to do discovery, do whatever you want to do in the

15   adversary proceeding, and then we still have to have a

16   trial, at which point you're going to represent the

17   defendants.  And you're going to, you know, argue that

18   Trustee Despins is wrong.  And you're to be able to present

19   all your evidence and do all that.  And then the Court's

20   going to have to rule.

21          You also have a right -- you'd also have a right

22   at some point, it seems to me -- right now, the Trustee's

23   claims are alter ego and beneficial equitable ownership,

24   right?

25          You're saying today that there's people that put

1    money into the house that have a right to recover

2    essentially that money.  You might be right.  I don't know.

3    But you'd have to put that information forward, right?  We

4    don't have any of that information at this point.  And the

5    only information that we have is the information that was

6    found in the preliminary injunction, right, those findings

7    that were in the preliminary injunction.

8            So I'm not sure how this is negatively impacting

9    your clients at this moment.

10           MR. CONWAY:  If I may, Your Honor?

11           THE COURT:  Yes.

12           MR. CONWAY:  And I -- the point where you said

13   that you were confused, when we draft briefs, you know, we

14   put our best arguments first and our lesser important

15   arguments last, that was our last argument because we felt

16   there was a hypothetical problem.

17           The more important one was the one I started with,

18   was the fact that the victims have, you know, have not been

19   identified.

20           What the Trustee is attempting to do here is

21   identify a res and saying that allowed claims will be

22   allowed to recover from that res.

23           What we're suggesting here is that in order to

24   satisfy the fair and reasonable requirement, they're going

25   to have to say what would you have to do to bring an allowed

1    claim in this situation?

2              And if you did that, I think you'd also, in

3    whatever order you would issue, have to include a procedure

4    which allows for the people who determine they have a claim

5    at the end of our case, would have a right, for instance, to

6    file a proof of claim of that --

7              THE COURT:  Well, that's easy.  That part is easy.

8              MR. CONWAY:  It certainly is, if it was in the

9    order.

10              THE COURT:  But the part of setting a deadline for

11    filing claims with regard to an asset that was not deemed to

12    be an asset of the estate, that's easy.  I mean, that part,

13    when you talked about that initially, I said, okay, well,

14    that's a -- that's a valid point, but that's easy.  I mean,

15    that can be done.

16              MR. CONWAY:  That's the easiest part of what I'm

17    suggesting.

18              The second part is not hard.  I think the Trustee

19    has indicated that they haven't reached an agreement because

20    it's difficult.  It's not difficult to identify who would

21    have an allowed claim.  I think it's a simple matter of

22    saying anybody who is claimed to have given money to the

23    debtor that was used for the purpose of buying this house

24    would have an allowed claim.  But the other claimants in the

25    bankruptcy who may have a personal injury claim against the

1   debtor do not.

2          THE COURT:  I hear what you're saying.  But again,

3   why would I need to do that now?  Why would I need to do

4   that before the, before and if, because there may not be a

5   determination that this property is property of the estate.

6   So why would I need to go through that process now?

7          MR. CONWAY:  Because I don't think that the code

8   allows for this motion to be granted until it's shown that

9   it's fair and reasonable, and --

10         THE COURT:  Well, it's -- I'm not sure -- the

11  standard is does it fall below the range of reasonableness,

12  that's the compromise standard that the courts all talk

13  about.  And what I -- why I'm not hearing from you why your

14  client is being harmed at the moment is because nothing's

15  really happening right now.

16         What's happening is this settlement agreement is

17  conditioned upon events happening in the future which may or

18  may not happen.  So if Mr. -- if Trustee Despins loses, then

19  there's no settlement agreement.  Nothing's going to happen.

20  There isn't going to be a million dollars in the estate.

21  There aren't going to be repayment of fees.  There isn't

22  going to be a res from which certain creditors could assert

23  a claim that this court would have to determine is an

24  allowed claim.  I wouldn't have to go through all that,

25  right, if he loses?

1      So I'm still -- I'm struggling a little bit with

2      how is this harmful to you at the moment?  When I say you,

3      I'm talking about your clients obviously.

4           MR. CONWAY:  Understood.  I've done the same thing

5      today myself.

6           Your Honor, I guess maybe the easiest way to do

7      this would be for me to suggest my objection is a limited

8      objection then, that's nothing in any order that's issued

9      from this motion that would prejudice the rights of the

10     various parties who may have an allowed claim relating to

11     that property, and nothing that would allow -- nothing in

12     the order that would allow people that don't have a claim

13     relating to that property to claim against any res that's

14     created, and nothing that would prevent a late claim from

15     being filed.

16          Those protections, if they -- if they were in

17     place --

18          THE COURT:  Well, it wouldn't be a late claim,

19     right, because we'd set up a process for the claims to be

20     filed, number one.

21          Number two, the claims will have to be filed.  And

22     so like any proof of claim in a bankruptcy case, they'll

23     have to be supported by evidence saying that it would

24     establish it to be a claim, to which the Trustee or any

25     other party could file an objection, and then there still

1    might have to be a determination made by this court whether

2    or not that claim is an allowed claim or a disallowed claim.

3    That's the process, right?

4              So I don't -- there wouldn't be an issue of a

5    late-filed claim with regard to this specific asset because

6    it hasn't been -- it wasn't an asset of the estate yet.  And

7    it may never be.

8              MR. CONWAY:  It may never be.  And that's why I'm

9    suggesting that I rephrase my objection to a limited

10   objection suggesting that as long as there's nothing in an

11   order that's contrary to what you just said, then perhaps

12   nothing is being decided here that we have to worry about

13   today.

14             THE COURT:  Well, maybe you and Trustee Despins

15   can take a look at that order and see whether or not you can

16   come to agreeable language.

17             But what I'm -- what I understand that I'm being

18   asked to do is approve a process that is -- an agreement

19   between two parties that has certain conditions in the

20   future that have to be met.  Those conditions haven't been

21   met yet.

22             So what my understanding, and if you look at the

23   case law where there has been this tension between a

24   bankruptcy estate and a forfeiture action, it usually does

25   occur after the fact, and then it becomes -- it has a lot --

1    no matter when it happens, it has issues.

2              However, this process is saying, look, we don't

3    know if it's going to happen.  But if it is, this is how it

4    will play out.  And these are what these two parties have

5    agreed to.  I think that fits within the range of

6    reasonableness at this point in time.

7              I don't think that you, your clients lose any

8    rights to contest -- well, I know they don't.  Your clients

9    don't lose any rights to contest the claims that Trustee

10   Despins has to prove to this court and get a judgment in

11   order for that asset to be an asset of the estate.  He has

12   to do that.

13             There is a preliminary injunction in effect, but

14   there still hasn't been a trial on the merits.  So we still

15   have to have that happen, number one.

16             Number two, with regard to the claims issues,

17   there is -- I don't see an issue from a bankruptcy court

18   perspective of setting up a process for claimants to file

19   claims in this, you know, in the -- in the case, in the --

20   against the estate with regard to an asset that was never an

21   asset but now is.  Okay?

22             But it still flows through the same process, just

23   like all the other claims that's already -- that are already

24   filed in this case, which is -- which are the process is as

25   follows.

1      Just because someone files a, and I think you know

2   this, just because they file a proof of claim doesn't mean

3   that that claim is an allowed claim.  It still has to go

4   through the process.  And if someone objects to it, then the

5   Court has to make a determination as to whether that claim

6   is a claim that's allowed under Section 502 of the code or

7   disallowed under Section 502 of the code.  So that comes

8   down to the distribution issues, not -- because you have to

9   have an allowed claim to receive a distribution.

10      So I understand what you're saying, but I'm not

11   convinced right now that your client is being harmed at this

12   point in time.  So I don't know if there's anything else

13   that you want to say.

14      But if you want to take a moment to talk to

15   Trustee Despins about it?

16      I mean, you know, the preliminary injunction had

17   some requirements associated with it.  And I saw the

18   document I think that you filed last night --

19      MR. CONWAY:  Yes.

20      THE COURT:  -- about there's no insurance on the

21   property.  Well, in a bankruptcy case, you know, the United

22   States Trustee's Office would immediately move to dismiss a

23   case where there's no insurance over estate assets.

24      Now, there hasn't been a determination that this

25   is an estate asset yet, but, but, the preliminary injunction

1    in connection with your -- the arguments that you made that,

2    you know, the Taurus Fund shouldn't be -- should be able to

3    use the property in the manner in which the Taurus Fund

4    believes it is allowed to, it doesn't seem to me in the

5    context of the preliminary injunction that the Taurus Fund

6    can have a property worth -- I don't know what it's worth,

7    right?  People have thrown around numbers.  I didn't have to

8    make a finding of a value, but somebody did and said it's,

9    you know, I don't know --

10               MR. DESPINS:  Twenty-nine.

11               THE COURT:  -- how many millions?

12               MR. DESPINS:  Twenty-nine.

13               MR. CONWAY:  They paid high 20s, but we're trying

14    -- the insurance policy that we've asked for is 40, covers

15    40.

16               THE COURT:  Okay.  So, you know, I think you need

17    to have insurance.

18               MR. CONWAY:  Oh, yeah.  And, Your Honor, you'll be

19    --

20               THE COURT:  And I think that is, you know, with

21    regard to the property and its contents.  I mean, that --

22    there are issues there.

23               MR. CONWAY:  And, Your Honor, this obviously

24    doesn't directly affect the motion, but just for your own

25    benefit, the holdup was that your injunction order is being

1    incorporated into this so that anybody who uses the property

2    has to agree that they'll do it pursuant to your injunction

3    order.  The insurance carrier wants that, and proof that

4    anybody managing the property has separate liability

5    insurance, which is all apparently being provided to the

6    carrier today, so that they can write the property.  Forty-

7    million dollars --

8              THE COURT:  Good.

9              MR. CONWAY:  -- I understand for the liability and

10    then $10 million for property.  So I think we're -- I think

11    everything will happen and be satisfactory to Your Honor and

12    to the Trustee.

13              THE COURT:  And when you say satisfactory, I just

14    want to be clear about that, it's not my satisfaction.  It's

15    the satisfaction of the bankruptcy code and the rules and

16    the need to protect assets, right?

17              I mean, one of the reasons the Trustee was

18    appointed in this case was because of allegations that have

19    been made by many parties that there were all these assets

20    out there that were never disclosed.

21              And that's why trustees are appointed in a Chapter

22    11 case to investigate those affairs and see whether or not

23    those assets can be brought into an estate for the benefit

24    of creditors.

25              Trustee Despins filed this adversary proceeding,

1    sought a temporary restraining order and preliminary

2    injunction, which were granted in part.  Not every form of

3    relief that was requested was granted, but a substantial

4    part of the relief requested was granted.

5         The reason that the insurance was part of that

6    injunction is I don't know how you can protect the status

7    quo if there isn't insurance.  You could say, well, there

8    wasn't insurance.  That's not protecting the status quo.

9    Well, then somebody could go burn down the house tomorrow,

10   right, and that's not protecting the status quo.

11        So in any event --

12        MR. CONWAY:  We're on the same page.

13        THE COURT:  -- that sounds like you've made great

14   progress on that.

15        MR. CONWAY:  We're on the same page.

16        THE COURT:  And hopefully you've been talking with

17   the Trustee about security services and things of that

18   nature as well.

19        MR. CONWAY:  We did have a conversation about that

20   and, you know, there's been a security service team on site

21   since before the hearing.  And, you know, security protocol

22   is in place, so I'm not overly concerned about that either.

23   We're discussing that now.

24        THE COURT:  Well, from your filing, it -- not

25   yesterday, but the previous filing, where you did comply by

1    filing what was in the contents of the house, the mansion, I

2    mean, there's obviously substantial sophisticated security

3    equipment throughout the whole place.  I mean --

4                   MR. CONWAY:  Yes.

5                   THE COURT:  -- I don't even know what it is, but I

6    think I said 59 cameras or something.  I mean, there was

7    substantial security equipment at the property, so it didn't

8    seem to be burdensome for -- and I'm not saying you said it

9    was burdensome --

10                  MR. CONWAY:  No.

11                  THE COURT:  -- I'm just saying it doesn't seem to

12   be burdensome for the Taurus Fund to make sure --

13                  MR. CONWAY:  We wanted it and still want it.

14                  THE COURT:  -- that this property is secure.

15                  MR. CONWAY:  We wanted it before and we still want

16   it now, Your Honor.  So, yeah, it's not burdensome.  It's

17   what we want.

18                  THE COURT:  Okay.

19                  MR. CONWAY:  So, you know, I think we're all on

20   the same page.

21                  Again, I don't have anything more to say about the

22   motion that's on right now other than to say that I'm happy

23   to try and talk to the Trustee about the form of an order.

24                  But if he's not willing to talk to me, as long as

25   it does not prejudice the rights down the road as

1    articulated by me today, I want to make sure that anybody

2    who claims through the Taurus Fund to have an interest here

3    can make it, file a proof of claim, and say that person with

4    a personal injury claim should not take from this res.

5              So as long as those issues are not prejudiced,

6    those rights are not prejudiced, I have nothing more to say,

7    Your Honor.

8              THE COURT:  Okay.  Thank you.

9              Trustee Despins?

10             MR. DESPINS:  Yes, Your Honor.

11             So conceptually you're absolutely right, Your

12   Honor, that if we prevail there should be a bar date.  And

13   we have not done that yet, but we will have to do that for

14   various pockets that we're finding.

15             For example, HCHK.  If we prevail on that, these

16   folks, without prejudging whether they have claims or equity

17   or not, they should have a right to try to file a claim.  So

18   they will be -- unfortunately, there's going to be, there's

19   going to be a lot of work, but we'll need to have a new bar

20   date for -- and that's why I'm putting that to the side for

21   now -- but if we prevail on this, people should be able to

22   file a claim if they have a claim and their claim be

23   processed by the Court.

24             But if we prevail on this, people are not going to

25   have a claim against the res.  The finding by the Court

1     would be this is an asset owned by the debtor.  If that's

2     the case, everyone is in the soup together, meaning that

3     they all share.

4           And I'm not trying to have Your Honor prejudge

5     that, but the point is I'm not going to put in an order

6     something that says, oh, and they'll have a right to file a

7     claim and they will be the only ones who have a right to

8     file a claim against that res.  No.

9           If the asset is owned by the debtor, as we believe

10    it is, the proceeds will be shared among all unsecured

11    creditors that have allowed claims, including the people

12    who, and I'm not even buying that for a second that they

13    invested in the house, but let's pretend that that's what

14    happened, including those people, if they have allowed

15    claims.  So that's not an issue at all.

16          Also, I question, you know, Mr. Conway's standing.

17    It shows you what's going on here.  It's like, oh, the

18    victim.  You know, he represents the technical owner of this

19    property, but he's talking on behalf of the people he's

20    interfacing with, which are Kwok people.

21          So I want to be very -- I'm sorry to be strident

22    about this, but this insurance thing is a huge issue.  They

23    don't have insurance.  That tells you that the owner that I

24    bet you didn't even know they didn't have insurance because

25    Kwok runs it.  And, you know, this whole thing about Taurus

1    being the owner is just, we'll prove that.

2            But the point is there should be no one on that

3    property right now other than security guards when there's

4    no insurance, zero.  These Kwok people who are going there

5    to have, to do whatever, they should not be in there when

6    there's no insurance.

7            Because remember the Lady May, Your Honor, we

8    forget sometimes the parts of the case, but remember that

9    they tried to get insurance and nobody would -- yeah, they

10   had very good conversations with insurance companies, but at

11   the end insurance companies said, Kwok, no insurance.  This

12   happened after March 15th.

13           So god bless Mr. Conway if he's able to get

14   insurance with full disclosure of what's going on, but I'm

15   not comforted by the fact he's having good conversation,

16   that's great, but until there's -- until there's insurance,

17   no one should be in that house.  No one.  And I'm sorry to

18   be strident about this, Your Honor, but this was part of the

19   relief we sought.  You said you did not deny it.  You would

20   -- but this is a critical issue.

21           If he gets insurance tomorrow, god bless him, then

22   they can go back.  But in the meantime, there should be no

23   one on that property when there's no insurance in place.

24   And also the fact there's no insurance tells you everything

25   you need to know about the case.  It's just this is

1    insanity.

2              And so, Your Honor, this is part of our

3    preliminary injunction.  I know that's not before you, but

4    you did reserve the right under your preliminary injunction

5    order to order the relief that you did not grant.  This

6    relief should be granted today.

7              If he gets insurance tomorrow, fine, they can all

8    -- not all by the way.

9              We're having a dispute over the way your order

10   should be read.  You know, Mr. Conway is of the view that

11   all these friends can come in 20 at a time only and then

12   they can come out and another 20 can come in an hour later,

13   and then another 20 an hour later as long as there's no more

14   than 20 at a particular time.  This is exactly what we were

15   concerned about, the college dorm syndrome.

16             If they can pick the 20 people that they want to

17   have access, god bless those people.  Again, that's if they

18   have insurance.  But it's the 20 and that we're going to

19   stick to that.  We cannot have a rotation where people come

20   in, 20 come in one day, leave, another 20 come in the next

21   day.  The owner has no interest in that.  This is all to

22   protect the Kwok regime and that should not be happening,

23   Your Honor.

24             I want to make sure this point is clear.  I

25   thought it was clear in the order that there was a 20

1   person, not on a rotating 20, because then it becomes like

2   uncontrollable.  Who are all these people?

3            But certainly today, when there's no insurance in

4   place, there should be no one on the premises.  I would

5   really urge Your Honor to order that relief immediately.

6   Thank you.

7            THE COURT:  Thank you.

8            Any response, Attorney Conway?

9            MR. CONWAY:  Yeah.  A couple of points there.

10  Both offensive.

11           The property was purchased and then went through a

12  major rehabilitation.  It hasn't been finished yet.  It

13  stopped because of all this.  Every contractor that's gone,

14  set foot there, has had to provide insurance.  There's been

15  insurance for every person that's done work at that

16  property.  I don't know if the security company has its own

17  certificate of insurance.  I haven't seen that, but I would

18  imagine they probably do.

19           You know, it's not a matter of, oh, well, there's

20  no consideration of insurance.  The property is not ready

21  yet for its intended purposes.  It's intended purpose, and

22  this goes to the second point, was to be used by the

23  putative owners of Taurus Fund.

24           THE COURT:  Then why are people coming and going?

25           MR. CONWAY:  They're not coming and going.  That's

1    just coming out of his mouth.  That's not what's --

2          THE COURT:  Well, no.  We saw some evidence about

3    that during the hearing.  I mean, we saw people coming in

4    and out of the, which wasn't controverted, coming in and out

5    of the house in numbers.  And we saw two people talking

6    about the fact that it's -- well, we saw more than two

7    people.

8          We saw several video clips where different people

9    from different parts of the country talked about using the

10   house, the mansion, as their base, and that they were

11   thanking the debtor for making that available to them.  And

12   there were people coming and going.

13         And if there are people -- if there are people

14   coming and going who are not these people that are working

15   that you say are insured, then that is a problem.

16         And I understand everything you're saying, but

17   there's no evidence in the record right now to support

18   anything you're saying.

19         The only evidence in the record supports the fact

20   that people are coming and going from this house.  That they

21   -- that the evidence established that the individuals who

22   started talking about using the mansion for a clubhouse or a

23   base didn't even know about the mansion until April 9th.

24   That was -- that was their words.  And no one else came in

25   here and said anything to the contrary.  No one.

1          You didn't -- I mean, I understand you appeared

2     the morning of and you --

3          MR. CONWAY:  I tried.

4          THE COURT:  Yeah.  But you didn't bring any

5     witnesses.  You didn't -- where's your people?

6          MR. CONWAY:  I tried to --

7          THE COURT:  Where's anybody from Taurus Fund that

8     has filed any kind of things that say I am the so-and-so of

9     Taurus Fund.  These are my responsibilities.  I make sure

10    that I have insurance, do not have insurance.  That I'm only

11    allowing this.  I mean, you've had time now.  You've had a

12    little bit of time.

13          And by the way, if you -- if you watched the

14    timing in this adversary proceeding, it was filed on July

15    11th.  It's August 29th.  And the temporary restraining

16    order didn't go in effect until August 1st, so there's been

17    time.  And we had a trial.

18          And as I said, you know, your clients, whoever

19    they are, made a determination not to pen the mail I guess

20    when they got served with these things.

21          And Mr. Bennett, now that you represent him, I

22    mean, his wife was served.  I haven't seen anything that

23    he's filed.  He's not here.  I don't see anybody else in the

24    courtroom.

25          Mr. Bennett, is Mr. Bennett here?

1          (No audible response)

2              THE COURT:  Your entity has to work through a

3      human being, at least one.  And so that human being has to

4      do something or not do something.

5              But to say there aren't people coming and going,

6      the evidence that's in the record right now does not support

7      that statement.  The evidence in the record supports the

8      statement that there are people coming and going and that

9      there's no insurance at the property.

10             MR. CONWAY:  Well, the evidence in the record was

11     about four events that took place long before the hearing.

12     The Trustee just said to you that this is a college dorm

13     with 20 people going in every hour.  That's not -- there's

14     no evidence to support that.  You've got to grant me that,

15     Your Honor.

16             THE COURT:  Well, he didn't say there were 20

17     people going in every hour.  He said he doesn't want 20

18     people going in every hour.  He doesn't want a group of 20

19     coming in, then leaving, and another group of 20 coming in,

20     then leaving.  That's what he was saying.

21             MR. CONWAY:  Nor does anybody else.

22             THE COURT:  He wasn't talking about the

23     interpretation of that provision of the preliminary

24     injunction.

25             MR. CONWAY:  Right.

1      THE COURT:  But all I'm saying to you is we need

2  to have someone responsible be responsible, right?

3      MR. CONWAY:  Absolutely, Your Honor.

4      THE COURT:  And --

5      MR. CONWAY:  And Your Honor issued an order saying

6  that nothing further should be filed with respect to the

7  injunction hearing the day after -- the night of the hearing

8  or the day after the hearing, so --

9      THE COURT:  Well, I also said that you could move

10  for -- you could file a motion if you wanted more than 20

11  people there.  You could.  It says that.  It says in the

12  order somewhere.  I can pull it up.

13      MR. CONWAY:  And if we do, I'm sure we will.

14      We have so far, right now, we're trying to get

15  everything settled.  We're not trying to have people there

16  at all right now.  We're trying to get this -- all the

17  administrative issues resolved here.  You know, to my

18  knowledge, there are not movement people going in and out

19  right now.  We're trying to make sure that everything gets

20  squared away.

21      The issue is not one where, you know, I've been

22  told, oh, my god, they want to have this event there.

23  You've got to get the judge's permission to do it.  There's

24  nobody that said that.  There's no reason to come to Your

25  Honor and make a motion to have more than 20 people there

1    right now.

2              But the fact of the matter is that if Your Honor

3    were to say, well, it has to be the same 20 people

4    throughout this case, what you've done is you've said I'm

5    giving the property to the Trustee in advance of the

6    decision in this case, because the people who invested in

7    this property are not 20 people.  There may be two people

8    who want to use it next month.  There might be ten people

9    who want to use it the following month.  But it's not going

10   to be used as a base of operations for a hundred people.

11             THE COURT:  What do you mean the people that

12   invested in this entity?  I mean, you're an entity.  So you

13   have -- you're out there -- your clients are out there fund-

14   raising or raising money for the operations of the LLC?

15             MR. CONWAY:  Your Honor, it shouldn't be that

16   difficult to visualize why the Taurus Fund, LLC was created

17   as a special purpose vehicle to buy a property by the fund

18   that was subscribed to by its investors.  The people who --

19             THE COURT:  But who are its investors?

20             MR. CONWAY:  The people who took the money and put

21   it into the fund.

22             THE COURT:  I understand.  But they have names I

23   would assume and identifies.

24             MR. CONWAY:  They certainly do, Your Honor.

25             THE COURT:  Okay.

1    MR. CONWAY:  And so they're the ones who want to

2    --

3          THE COURT:  So they need to come here and make

4    their case.

5          MR. CONWAY:  Well, they don't have to come here.

6    The fund can come here and say here's what we offered them.

7    We said if you -- if you want a -- us to go out and buy this

8    house so that you can use it, here's what we'll do.  We'll

9    buy the house with your money.

10         THE COURT:  But the evidence to the -- the

11   evidence that was submitted at the preliminary injunction

12   doesn't support what you just said, because the two people

13   that talked about and did the tour of the land, the lands,

14   the grounds, said they didn't even know about the mansion

15   until August, April 9th, excuse me, so how would they have

16   invested in something to use it as a clubhouse or a base?

17         MR. CONWAY:  Those people weren't members of G

18   Clubs.  Those people were members of the movement that were

19   making a video for the purpose --

20         THE COURT:  So you're saying G Club is the

21   investors?

22         MR. CONWAY:  G Club Internationals is the one that

23   invested money.

24         THE COURT:  In the Mahwah -- you mean it funded

25   the purchase of the Mahwah mansion?

1          MR. CONWAY:  Absolutely.

2          THE COURT:  Okay.

3          MR. CONWAY:  Specific people, specific

4    investments, it will all come out in this case.

5          THE COURT:  Okay.

6          MR. CONWAY:  I can't prove my case without being

7    specific.

8          THE COURT:  I agree.

9          MR. CONWAY:  To a point.

10          THE COURT:  I agree.

11          MR. CONWAY:  The Trustee should be held to the

12    same standard, but I certainly will be.

13          THE COURT:  Well, he put forth substantial

14    evidence that no one controverted.

15          MR. CONWAY:  Well, I asked him specifically where

16    did Mr. Kwok get the money to do this?  He said, well, Mr.

17    Kwok doesn't do it that way.  He just gets money from other

18    people and, therefore, it's his.  That's not evidence.

19    That's just speculation.

20          THE COURT:  That's not -- that wasn't --

21          MR. CONWAY:  That's exactly what he said.

22          THE COURT:  It may be your conversation, but

23    that's not what happened in the courtroom.

24          MR. CONWAY:  That's exactly what happened when he

25    was on the stand.  When I asked him where the money came

1    from, he said, I don't know.  That's just not the way Mr.

2    Kwok does business.  And I don't know where the money came

3    from.  He speculates.

4            I will put forth the actual evidence in this case.

5    We're not here to debate what the evidence will be.  We're

6    not here to try the case today, Your Honor.

7            The point is that the people who, when they put

8    the money in, thought that they would have the right to go

9    and sleep at the house shouldn't be prevented from going and

10   sleeping at the house.  And that's just the same as if --

11           THE COURT:  Then you'll have to file a motion and

12   they'll have to come to tell me why they should be able to

13   sleep at the house.

14           MR. CONWAY:  Well, then you might as well just

15   grant the motion in its entirety, because you're taking the

16   house away.

17           THE COURT:  No, I don't agree with you.  I don't

18   agree.  I gave that -- I don't agree with you.

19           What we -- what happened was the preliminary

20   injunction issued to attempt to preserve the status quo.

21   And according to the testimony and the evidence submitted,

22   none of these people that have been going in and out of the

23   mansion even knew about the mansion before April 9th.

24           MR. CONWAY:  It wasn't in use.  Why would they

25   know about it?  Everybody agrees and should agree because

1    the evidence is absolutely crystal clear that they bought

2    the house and started rehabbing it.  And that the house was

3    not ready.

4              THE COURT:  Who's they?  Who's they?  You keep

5    saying they.  I don't know who they is.

6              MR. CONWAY:  Well, Taurus Fund bought the house.

7              THE COURT:  Okay.

8              MR. CONWAY:  Taurus Fund hired contractor after

9    contractor after contractor.  I've seen the invoices.  I've

10   seen the work.  They were doing this work.  They haven't

11   even finished the work yet.

12             THE COURT:  Then why are people going in and out

13   if the work isn't finished?

14             MR. CONWAY:  Because the work that needs to be

15   done doesn't prevent people from going in and out.  They're

16   not having people in and out like we saw on the screen from

17   months ago.  They're having people right now going in and

18   out that are security, people staying there who are

19   security.  People who are going in and out now are people

20   trying to make sure that the house is secure and run

21   properly.  But right now --

22             THE COURT:  Are those people employees of the

23   Taurus Fund?

24             MR. DESPINS:  No.

25             MR. CONWAY:  Those people are employees of a

1    management company.

2              THE COURT:  And is the management --

3              MR. CONWAY:  The Taurus Fund is an LLC.

4              THE COURT:  I understand what the Taurus Fund is.

5    But they have obligations as an LLC.  They can't just --

6              MR. CONWAY:  To hire a management company.

7              THE COURT:  All right.  So who's the managing

8    company?

9              MR. CONWAY:  I'm going to give the Trustee by

10   September 1 all the information about the security company

11   and the management company.  We're trying to make sure now

12   that there is absolutely nothing that the Trustee or this

13   court can take issue with.  That everybody agrees to

14   everything that's in the preliminary injunction order.

15              It's all -- you know, Your Honor, we're trying our

16   best to do exactly what we were ordered to do and what --

17   exactly what the Trustee says he wants.

18              THE COURT:  I understand.  I understand that.  All

19   I'm saying is I raised -- you filed a document.  And I

20   appreciate you filed the document because it was required by

21   the preliminary injunction order, but it says there's no

22   insurance.  That's concerning.  Okay?  That's very

23   concerning.

24              As I said, the United States Trustee's Office, if,

25   if there had been a determination, which there is not at

1    this point, that this asset was an asset of the estate, the

2    United States Trustee's Office would run into this courtroom

3    and say you have to dismiss this case immediately.  There is

4    no insurance.  The rights of the estate aren't being

5    protected and this case cannot continue.

6            And we have that happen a lot.  I mean, that's one

7    of the requirements is that there has to be insurance.

8    Okay?

9            So you're now telling me you're going to get

10   insurance and you have to -- but Trustee Despins is saying,

11   well, until you get insurance, nobody should be able to come

12   in and out of the building.  You say, well, the only people

13   coming in and out of the building are people who are

14   insured.  Well, I don't know that.

15           MR. CONWAY:  No.  I'm saying that that's what has

16   been the case.  I don't think any of the contractors are

17   doing work right now.  I think right now the people who are

18   at the premises are security.

19           THE COURT:  Okay.

20           MR. DESPINS:  No.

21           THE COURT:  Well, that would be good.  And

22   hopefully they're keeping a log on all the things that the

23   preliminary injunction has asked them to do.

24           MR. CONWAY:  And I've asked whether that was being

25   kept before.  I was told it was.  I'm going to make sure

1    that the log is as detailed as possible going forward.

2              But, Your Honor, as Mr. Despins also said, this

3    case and all the stigma around it makes getting insurance

4    more difficult.  So asking for us to get a $40 million

5    policy in 24 hours, which is what would have happened

6    essentially, is difficult.  I think everybody can see that.

7              I think we're going to have that policy either

8    today, they may have it now, I've been here in court, but

9    the only -- the only stumbling blocks were that they wanted

10   the confirmation that this -- that the preliminary

11   injunction requirements were agreed to by the people who are

12   going to be on that premises.  They signed that.  I think

13   that that's something that both Your Honor and the Trustee

14   should welcome.  They also wanted the evidence of other

15   business insurance by the management company.

16             So I don't see how anything that has happened

17   here, this, you know, a matter of a couple of days since the

18   order issued, should be a concern.  We're doing our best.

19   And I think we're going to succeed.  If we can't, Your

20   Honor, I'm an officer of the court, I'll the Trustee, look,

21   I tried, I can't get it.  Let's go back to the judge and see

22   what we need to do.

23             THE COURT:  All right.  With regard to the

24   settlement with the United States, what I'd like you both to

25   do is I'd like you to confer on the form of a proposed

1    order.  And if you can't agree, then I'd like you to both

2    submit your proposed orders by 5 p.m. tomorrow.  And I'll

3    take a look at them.  And I'll decide which one, if either,

4    I'll enter.  Or I'll make, you know, comments to them and

5    tell you that's what the order is going to say.

6              As I stated already, the test is does this

7    settlement fall below the range of reasonableness?

8              And because I am not convinced or I'm not

9    persuaded at this point that there's any harm to your client

10   if this settlement agreement is approved under the terms and

11   conditions that exist right now, which is nothing's going to

12   happen unless and until Mr. Despins is successful on a trial

13   on the merits, and, you know, I guess I don't recall what it

14   says about that, but, you know, final, non-appealable order,

15   whatever the situation may be, then I don't see how your

16   client's being harmed.

17             So I do think that this settlement is within the

18   range of reasonableness.

19             I'm going to give you an opportunity -- and you

20   stated and I appreciate that maybe your objection is more

21   limited than you thought originally, because if the order

22   can provide for language that works for your clients, then

23   you might be okay with it, but you might not.  So I'm going

24   to let you both take the opportunity to figure that out.

25   And then you file on the docket of the case by 5 p.m.

1    tomorrow whether there's an agreed order or there's two

2    separate orders and we'll go from there.  Okay?

3              MR. CONWAY:  I think that's very fair, Your Honor.

4    Thank you very much.

5              THE COURT:  All right.  Thank you.

6              MR. DESPINS:  Your Honor?

7              THE COURT:  Yes.

8              MR. DESPINS:  This argument that somehow they're

9    working really fast in getting insurance, that's

10   interesting, but anybody that owns a $29 million house

11   should have insurance long before Your Honor told them to

12   show that they had insurance.

13             So, Your Honor, I renew my request until -- and if

14   he wants a 24-hour, you know, standstill on that, that's

15   fine, but there should be a very short fuse where there

16   should be a complete prohibition on anyone other than

17   security people and the Trustee representative to go to this

18   house until they have insurance.  It's just a fundamental

19   issue.  Thank you, Your Honor.

20             THE COURT:  Yes.  And I understand your concern

21   and I'm going to give him until 5 p.m. tomorrow to show you

22   and the United States Trustee's Office that the property is

23   insured.

24             And then if not, you'll have to file something,

25   Mr. Despins, after that time frame saying you want an

1    immediate order prohibiting people from going on the

2    property or in the property other than security until and

3    unless insurance is obtained.  Okay?

4            MR. DESPINS:  Thank you, Your Honor.

5            THE COURT:  All right.  Thank you.

6            MR. CONWAY:  Your Honor, may I be excused?

7            THE COURT:  Yes.  Thank you.

8            All right.  So then the only other matter on the

9    calendar is the Rule 2004 examination motion.

10           And I think, Attorney Major, you're here on that

11   as well, is that correct?

12           MR. MAJOR:  Yes, Your Honor.

13           THE COURT:  Okay.  All right.

14           Mr. Linsey, are you going to start?

15           MR. LINSEY:  Yes.  May I approach, Your Honor?

16           THE COURT:  Yes, you may.

17           MR. LINSEY:  Thank you.

18           The Trustee's sixth omnibus 2004 exam motion seeks

19   to extend the Trustee's Rule 2004 investigation to

20   additional relevant banks where the Trustee's investigation

21   suggests that relevant transactions have occurred and to

22   additional entities and individuals who were employed or

23   otherwise involved with the debtor's financial affairs via

24   certain associated entities.

25           To date, Rule 2004 has been one of the most

1    effective tools for the Trustee to investigate the debtor's

2    finances.

3              As the Court is aware, the debtor has pursued his

4    business activities through a complicated and convoluted web

5    of dozens, if not hundreds, of associated entities and

6    individuals.  Money and property have flowed through that

7    web to the point that there are tens of thousands, if not

8    hundreds of thousands, of individual transfers that are

9    reflected in financial records.

10             As such, it is imperative that the Trustee's Rule

11   2004 examination be able to undertake a holistic review of

12   the debtor's financial affairs.

13             The only objection to the sixth 2004 exam motion

14   is the objection that was filed by Greenwich Land and Hing

15   Chi Ngok, who I'll refer to as the Greenwich Land parties.

16   The basis for their objection is that the Trustee's Rule

17   2004 examination relates to issues relevant to the pending

18   adversary proceeding that Trustee has brought against the

19   Greenwich Land parties.

20             The Court has already considered Greenwich Land's

21   position and twice decided it against the position in favor

22   of the Trustee.

23             In the first instance, Mei Guo and HK USA made a

24   substantively and nearly identical objection to the

25   Trustee's second omnibus 2004 exam motion.  That was back in

1    December.  And the Court ruled that while the Trustee may

2    not seek Rule 2004 discovery from parties to pending

3    adversary proceedings, the Trustee is free to continue his

4    investigation with respect to non-parties, even to the

5    extent that matters may relate to pending adversary

6    proceedings.

7              That decision is at docket no. 1184 in the main

8    case.  So that means that this issue was decided almost ten

9    months ago.

10             Then several months ago, in May, Greenwich Land

11   and Hing Chi Ngok again objected on this identical basis

12   citing their own pending adversary proceeding.

13             At that time, Trustee's counsel explained to the

14   Greenwich Land parties that the Court has already ruled on

15   this issue, but the parties insisted on objecting anyway.

16   And so the Court decided that same issue again.

17   Unsurprisingly, the Court decided it the same way.

18             The Trustee may continue his 2004 investigation as

19   to non-parties even if some of the subject matter may bear

20   on a pending adversary proceeding.

21             The first point that the Trustee made in response

22   to Greenwich Land's last objection is the first point that

23   we make here, which is that this issue is law of the case.

24   The complexities of this Chapter 11 case are manifest.  The

25   number of docket entries exceeds many other Chapter 11 cases

1    in this district by an order of magnitude.

2            If this case is to proceed in an orderly manner,

3    parties should not be free to relitigate decided issues at

4    will, much less on multiple occasions.  Beyond that, the

5    Court was right the first time it ruled.  And the Court for

6    that matter was right the second time it ruled.

7            I hesitate to go too far down the rabbit hole here

8    because I don't want to take the Greenwich Land parties'

9    bait, but they have selectively quoted and cited authority

10   in their objection to stand for a proposition that simply

11   doesn't exist, that continuing a Rule 2004 investigation

12   with respect to non-parties that may have some subject

13   matter overlap with pending adversary proceedings is not

14   allowed.

15           The case law does not stand for that proposition.

16   In fact, the case law contradicts it and that's why Your

17   Honor has twice ruled what Your Honor ruled.

18           There's one more concerning feature of the

19   objection that was filed by the Greenwich Land parties and

20   that is the way that it discusses the investigation that is

21   sought to be continued by the sixth Rule 2004 motion.

22           Just looking at the summary of that investigation

23   as it's described, as it excerpts from the subpoenas and

24   requests for production, one would think that the Rule 2004

25   motion is being conducted solely to investigate Greenwich

1    Land parties' alleged assets.  In fact, looking at the RFPs

2    themselves, one finds that they implicate a range of assets

3    that go well beyond the Greenwich Land parties' claimed

4    assets.  For example, and these are just examples, the RFPs

5    also implicate the property at the Sherry-Netherland Hotel.

6    We just settled the Bravo Luck adversary proceedings today.

7            If this 2004 exam is really a substitute for

8    adversary proceeding discovery, why would we possibly be

9    seeking discovery, an investigation that implicates those

10   matters?

11           The same thing with the Lady May.  The Lady May is

12   listed in their RFPs.  The Lady May has already been sold.

13           We're not -- we're not listing things for fun.

14   We're not listing things as a substitute for Part 7

15   discovery under the Federal Rules of Bankruptcy Procedure.

16           The reality here is, and this court has lived with

17   this case long enough to know, the Trustee's finances or

18   rather the debtor's finances are an intricate, supremely

19   complicated spider web.  And to unravel his business and his

20   assets you can't hack chunks out of the web and expect

21   everything to fit together.  There has to be a holistic

22   review.  I think that the Court's two prior rulings have

23   recognized that.

24           Beyond that, the Greenwich Land parties argue

25   about issues that are related to discovery in the pending

70

1    adversary proceeding.  And while I want to be very clear,

2    the Trustee disagrees with the Greenwich Land parties'

3    position as to what they're entitled to and what they're not

4    entitled to in the adversary proceeding, the proper way to

5    litigate a discovery dispute in an adversary proceeding is

6    not to object to a 2004 exam motion.

7              Finally, I will just briefly note that even if the

8    Court overrules the Greenwich Land parties' objection,

9    there's already prejudice to the estate here.  The objection

10   will delay the granting of the 2004 exam motion and thus the

11   issuance of subpoenas by several weeks.

12             And this reminds me of being in high school when

13   my parents would say you've got to do your math homework

14   every week because what you learn next week builds on what

15   you do this week, the Trustee's investigation is the same

16   way.  The subject matter, the people that we're issuing

17   subpoenas to under this motion, the terms of the RFPs, the

18   subject matter, that's all -- a large portion of it is

19   subject matter that the Trustee has learned through his

20   existing 2004 exam investigation.  And to the extent that

21   that 2004 exam investigation is delayed, the delay builds on

22   itself, everything takes longer, everything's more

23   expensive, the docket entries continue to click, the

24   administrative expenses continue to build.

25             So we would ask that Your Honor grant the sixth

1    2004 exam motion, overrule the objection, and make clear

2    that this time Your Honor's ruling should be respected and

3    further objections in this -- in this respect should not be

4    -- should not be filed.

5              And I'm happy to answer any questions the Court

6    may have.

7              THE COURT:  Thank you.  I do not have any

8    questions at this time.

9              MR. MAJOR:  Thank you, Your Honor.  Chris Major,

10   Meister Seelig & Fein representing Hing Chi Ngok and

11   Greenwich Land, LLC.

12             I want to address the point that counsel for the

13   Trustee led and closed with, with the idea that we should be

14   prohibited from objecting to the motions.

15             And we didn't cost the Trustee weeks.  We filed

16   our objection on August 18th.  It's August 29th and the

17   matter is being heard.

18             We have not just the right, but the obligation to

19   make a record in the case.  Also I want to protect our

20   clients' rights to make future objections, for example,

21   evidentiary objections at trial.

22             If the Trustee tries to spring evidence that he's

23   collected in the 2004 about the issues in the adversary

24   proceeding, and he doesn't turn them over to us and then

25   tries to put them in at trial, I don't want the Trustee,

1    when I object to say, well, you didn't object to our sixth

2    omnibus motion.  So I think it's entirely appropriate that

3    we asserted our objection.

4           The issues are similar, not identical, but, and

5    for that reason I will be brief.  I'm mindful of what the

6    Court's prior orders are, but I have to make the record.  I

7    can't just say, well, the Court did this and, therefore,

8    we'll just acquiesce with it.  Because if we're in front of

9    an appellate tribunal or in front of any trial court and I

10   make an objection I don't want to hear a waiver argument.

11   So it's an objection that I felt we were obligated to make

12   and I think it's entirely appropriate.

13          As I said, I'll be particularly brief on the legal

14   issue.  I'm mindful of the Court's prior rulings.  There's

15   no dispute about the existence of the pending procedures

16   rule, which is this rule against taking discovery under 2004

17   for use in an adversary proceeding.  There's no dispute that

18   the discovery that is sought in this sixth omnibus motion

19   for 2004 discovery addresses issues in the Greenwich Land

20   adversary proceeding.

21          And counsel for the Trustee took exception to the

22   fact that our objection focuses on all of the discovery

23   requests relating to Greenwich Land and doesn't mention the

24   others, well, Your Honor, the filing, I believe, the omnibus

25   motion, when you include the subpoenas, it's like over 300

1    pages I believe.  It's at least over 200 pages.

2              So certainly we weren't going to spend a lot of

3    time talking about issues that are outside our very narrow

4    in this bankruptcy proceeding, which is the Greenwich Land

5    adversary proceeding.

6              So we were of course, and appropriately so,

7    focused on the request to the extent they mentioned

8    Greenwich Land.  And even in the body of the Trustee's sixth

9    omnibus motion, Greenwich Land is mentioned as the reason

10   for seeking discovery from one of the targets.

11             So I think that the key legal issue, and I'll be

12   very brief here, is, again, not the existence of the prior

13   pending proceeding rule, or that these subpoenas are seeking

14   information concerning the issues in the Greenwich Land

15   adversary proceeding, those are undisputed, but what the

16   Trustee says is, well, we can get discovery relating to the

17   adversary proceeding as long as we're not getting it from

18   you.

19             And I just want to put into the record two

20   quotations from cases that we cite.

21             Number one is *In re Bennett Funding Group, Inc.*,

22   which is 203 B.R. 24.  It's from the Northern Bankruptcy

23   Court in the Northern District of New York.  It's a 1996.

24   At page 29 of that decision the Court wrote, "Thus, a

25   Trustee like a creditor must look to Federal Rules of

74

1    Bankruptcy Procedure 7026 et seq. after an adversary

2    proceeding is commenced for discovery as to both entities

3    affected by the proceeding and issues addressed in this

4    proceeding."

5              The second case, *In re Southeastern Materials,*

6    *Inc.*, 2010 Westlaw 5128608, from the Middle District of

7    North Carolina.  It's a 2010 case.  At page 3 of that

8    decision, the Court wrote, "In order to prevent injustice

9    and to ensure the parties in bankruptcy adversary

10   proceedings have the same rights as parties to a federal law

11   suit in a non-bankruptcy context, it is important to ensure

12   the procedural safeguards of the discovery process provided

13   in Federal Rules of Civil Procedure 26 through 37,

14   incorporated by reference in Federal Rules of Bankruptcy

15   Procedure 7026 through 7037, are not avoided by permitting a

16   Rule 2004 examination while an adversary proceeding is

17   pending."

18             Your Honor, we also, with respect to that legal

19   argument, rest on the other case law that we cite and

20   discuss in our objection.

21             I want to touch on -- I mentioned at the top that

22   this situation is similar, but not identical, to where we

23   were back in June when we objected to the fifth omnibus

24   motion for Rule 2004 discovery.

25             There's another inequity here with what the

1    Trustee is proposing to do, which is discovery -- the

2    Trustee advocated for and achieved an extremely quick

3    discovery schedule in our adversary proceeding.  That's

4    coming to a close.  He's come into court now and said he

5    wants to take 2004 discovery relevant to the issues in the

6    Greenwich Land proceeding, adversary proceeding.

7              We're going to be cut off from being able to take

8    any discovery.  We're not -- we're not allowed to

9    participate in the discovery he's taking concerning the

10   issues in the adversary proceeding that we're defending, and

11   he'll be able to continue to do that.  I guess his position

12   is he can do that right up to the time through trial.  And

13   if he finds something he can try to use it, we will of

14   course object to that.

15             But what he's calling an investigation as it

16   relates to Greenwich Land is discovery for claims he's

17   already made and preliminary relief he's already obtained,

18   and so I think that the appropriate way to do this would be

19   discovery that the parties can participate in.

20             So, Your Honor, those are our arguments.  I'm

21   happy to answer any questions the Court has.

22             THE COURT:  Thank you.  No.  I don't have any

23   questions at the moment, but thank you.

24             MR. MAJOR:  Thank you, Your Honor.

25             MR. LINSEY:  Very quickly, Your Honor?

1          THE COURT:  Yes.

2          MR. LINSEY:  First of all, again, the adversary

3     proceeding discovery disputes are an issue for the adversary

4     proceeding.  We disagree with the characterization of

5     discovery on negotiations in the adversary proceeding, but

6     if there are disputes, then I expect either party has the --

7     any party has the ability to bring them there.

8          But with respect to the brief discussion of the

9     case law, Your Honor substantively considered this issue.

10    To the extent the *Bennett* case sounds familiar, it's because

11    it's one of the cases that Your Honor cited in Your Honor's

12    last decision, and Your Honor noted in the parenthetical

13    after that cite that that was a prohibition on 2004

14    discovery as to a party to the pending proceeding, not as to

15    a non-party.

16          With respect to the *Southeastern Materials* case

17    that was cited, it's easy to take a snippet from a case

18    without a context.  I'll take a snippet from the

19    *Southeastern Materials* case.  "A handful of decisions have

20    considered the allowable scope of a Rule 2004 examination

21    where it related civil or criminal proceedings are taking

22    place or are likely to occur in another court, the general

23    rule in these cases is that the existence of or a potential

24    for collateral litigation is insufficient reason to deny an

25    examination."  That's from that case, Your Honor.

1          Your Honor looked at these cases.  This is not a

2    -- there's not a Second Circuit ruling that's directly on

3    point here.  What the cases boil down to is the purpose of

4    the discovery examination to substitute for discovery --

5    rather the 2004 examination is to substitute for discovery

6    in an adversary proceeding under Part 7 of the rules to gain

7    some strategic advantage or are they a proper examination,

8    holistic examination, of a debtor's finances.

9          And I believe in this case, given the record that

10   has built up to date, it's exceptionally clear that what

11   we're undertaking is the latter.

12          THE COURT:  Thank you.

13          MR. LINSEY:  Thank you.

14          THE COURT:  Attorney Major, any response?

15          MR. MAJOR:  Your Honor, with respect to the case

16   law, we've accurately described what the courts have held.

17   And the two that I read are not the only cases.  We've cited

18   several cases in the brief that support our argument.

19          THE COURT:  And I understand that.  Thank you.

20   And I have seen that you've cited other cases, so I

21   understand that.

22          Okay.  With regard to this motion, the Court is

23   going to take the matter under advisement.  But I think the

24   ruling will not -- I mean, I'm not going to take a

25   substantial amount of time to rule, but I will rule after

1    going back and reviewing your arguments and looking at the

2    documents and the cases one more time.  Okay?

3           Is there anything further we need to address this

4    afternoon?  I think that's the last matter on the calendar.

5           MR. DESPINS:  That's correct, Your Honor.

6           THE COURT:  Nothing else from any party?

7           MR. DESPINS:  Actually, Your Honor, let me take a

8    chance at this.  And the question is, is there a procedure

9    before Your Honor to seek relief in the middle of a

10   deposition where there are issues that arise?  Because in

11   some courts --

12          THE COURT:  There's no -- we don't have a, you

13   know, a procedure that I could point to that says this is

14   what you do, but what has happened in the past is the

15   parties contact the courtroom deputy and ask the Court to

16   have an emergency hearing.

17          MR. DESPINS:  Okay.

18          THE COURT:  And if the Court's available, the

19   Court can do that.  Then if not, then what the Court has

20   said to parties is continue with as much of the deposition

21   as you can.  Hold whatever questions or issues there are

22   until the Court can actually conduct that hearing.

23          Now, that's not I know ideal because that means

24   you'd have to reconvene for a deposition or an examination,

25   but --

1              MR. DESPINS:  Okay.

2              THE COURT:  -- there is no time -- you know, the

3    Court isn't always available unfortunately.

4              MR. DESPINS:  Understood.  That's helpful.  Thank

5    you.

6              THE COURT:  So I don't know how you'd want to

7    proceed, but there have been occasions where both of things

8    has happened.  Parties have called, court was available,

9    able to have an emergency hearing.  But there's also been

10   occasions where the parties have called, the Court has not

11   been available, and then we'd have to have scheduled a

12   specific hearing to address that issue as soon as possible.

13   I think that's all I can tell you.  We don't have a process

14   in place in our local rules or anything like that.

15             MR. DESPINS:  Okay.  Thank you.  Very helpful.

16   Thank you.

17             THE COURT:  Okay.  Thank you.

18             There are some matters that are -- that are not on

19   the calendar today that are what I would say somewhat

20   ministerial.  Like, there's a motion to redact that's been

21   filed.  Redactions are usually granted, so that probably

22   will be addressed in the next few days.  Otherwise, I think

23   that the majority of matters in the main case and in the

24   adversary proceeding are either set for hearing or there are

25   response dates coming up.

1    Oh, that was the other thing I was going to say.

2    Mr. Major, you may not know this either.

3    But the district court in Connecticut, when a

4    motion is filed in what you would call a civil action,

5    plaintiff and defendant, has an automatic 21-day response

6    period that just gets set.  And so we follow that rule.  So

7    immediately upon a pleading in an adversary, the CM/ECF

8    system populates this language that says, I don't remember

9    what it says, but it says something like response due 21

10   days and then it calculates the date I think.

11   What I have said to people, and our local rules

12   don't address it, but we're in the process of looking at our

13   local rules again, is if someone believes that there should

14   be some other date for a response, or there's some emergency

15   issue, or an extension of that response date, then that

16   doesn't preclude anyone from filing something asking for

17   that relief.  Okay?

18   It's a -- I think, you know, in the bankruptcy

19   context it often is the 21 days cannot always apply as

20   neatly as it does in a district court action.  And I'm not

21   saying it applies neatly in a district court action all the

22   time either because I'm sure there are circumstances where

23   someone would want something either before that.

24   But I wanted to make that clear to the parties, is

25   that that 21-day period is automatically populated.  The

1    Court has nothing to do with that.  It's just it's there.

2    It's part of the program, and following the district court

3    rules, which we follow.

4             So there may be a circumstance where any party

5    could seek to change that date or get some form of a status

6    conference or something prior to that.  You're not -- no

7    party is precluded from seeking that.  Whether it's going to

8    be granted or not is a wholly different issue.

9             But I've noticed recently that there have been

10   some motions filed where, you know, I could understand why a

11   party would want some other form of relief and not have to

12   wait for the 21 days, but nothing's necessarily been filed,

13   so I just wanted parties to understand that.  Okay?

14            MR. LINSEY:  Your Honor, that reminded me of an

15   issue.  In the HCHK adversary proceeding, there is --

16   without getting in to the substance of it, there's a

17   recently filed motion for extension of time for a pleading

18   deadline.  It indicates that the Trustee has no objection.

19   We are planning to file a response.  That response should be

20   filed this week.  I say that only because I'm aware that,

21   you know, that has the same 21-day thing in the docket text

22   as Your Honor noted typically occurs, but also it is, you

23   know, typically or oftentimes we see motions for extension

24   granted in advance of the 21-day deadline.  So I just wanted

25   to mention to Your Honor there is going to be a response

1    forthcoming this week for the Trust --

2              THE COURT:  I thought there already was an

3    objection to that extension of time.

4              MR. LINSEY:  There's an objection that's indicated

5    in the motion, but we will be filing a substantive --

6              THE COURT:  Oh.  Okay.  I understand.

7              MR. LINSEY:  -- objection explaining the grounds.

8              THE COURT:  I understand.

9              MR. LINSEY:  And I just --

10             THE COURT:  I understand what you're saying.

11             MR. LINSEY:  We're not going to hold -- we're not

12   going to -- we're not going to string them out 21 days to do

13   that.  We're going to get that on file.

14             THE COURT:  I understand.  Okay.  I appreciate

15   that.

16             MR. LINSEY:  Thank you.

17             MR. DESPINS:  And, Your Honor, the issue you

18   raised in the leave to appeal context is kind of dangerous

19   in the sense that the docket will say you have 21 days, and

20   it gives you the date as you indicated, but the Bankruptcy

21   Rule, 8004, says you have ten days.

22             THE COURT:  I know.

23             MR. DESPINS:  So that's like --

24             THE COURT:  That's part of the problem.

25             MR. DESPINS:  Yeah.

1          THE COURT:  The box, everything doesn't fit into

2     the box.

3          MR. DESPINS:  Yeah.

4          THE COURT:  Right?  So that's part of the problem.

5          MR. DESPINS:  But we didn't take any chance.  We

6     applied that 10-day rule.

7          THE COURT:  No.  That is part of the problem.  And

8     we're going to review that.  And I've said that to the bar

9     -- not I, everyone that -- all the judges who are involved

10    with the standing committee on local rules have raised

11    issues saying, you know, a lot of times -- there isn't a

12    local rule that says anything about the 21 days because it's

13    a district court rule.  It just says the district court

14    rule's adopted.  But we might need to say something that

15    says unless provided by applicable statute or rule or order

16    or otherwise ordered by the Court, blah, blah, blah.  You

17    know.

18          I think that -- so you all think about that, make

19    your -- tell us what the rules should say and we'll try to

20    do that.  Okay?  But we are thinking about it is the point.

21          And I just wanted, you know, someone who, you're

22    not here all the time, you're not worrying about the

23    district court rules necessarily.  It doesn't preclude any

24    party from seeking something prior to that 21 days.  Whether

25    they'll get it or not is a wholly different question.  Okay?

1          MR. MAJOR:  Yeah.  Your Honor, I apologize if I've

2     made myself seem like an out of towner, but I've been

3     admitted in this district for --

4          THE COURT:  No.  I don't mean it like that.

5          MR. MAJOR:  -- a long time.

6          THE COURT:  I just mean I don't think you're

7     coming into the bankruptcy court very often and having to

8     worry about the interplay or our local rules and the

9     district court rules.  That's all.

10          MR. MAJOR:  I just want to make a point Your Honor

11     in response to your comment.

12          And I might be coming, appear to be coming out of

13     left field with this because this is not at all what you had

14     in mind, but because the Trustee complained about delay that

15     we caused by objecting, I just want to make sure that the

16     record's clear that the Trustee filed the sixth omnibus

17     motion on us Friday, August 11th.  The motion indicates that

18     the objections were due the next Friday, August 18th, and we

19     complied with that.  So we didn't take the 21 days to put

20     our objection in.

21          THE COURT:  I agree.  And I saw that you complied

22     with the objection deadline in the motion.

23          So we have some unfortunate, you know, there's an

24     unintended consequence of trying to have uniformity, because

25     it doesn't always work.  Everything doesn't fit into the

1      same box.  And, you know, we could probably spend weeks

2      going through the local rules figuring out all the things

3      that don't fit into the box.

4              But in any event, I just say that so parties are

5      aware that it -- I don't want anyone to think that that

6      means they couldn't seek relief in some way, shape or form

7      prior to the 21 days.  Whether or not you get it is a wholly

8      different issue.  Okay?

9              All right.  Well, that concludes the hearings

10     today, so --

11         (Proceedings concluded at 3:47 p.m.)

12             I, CHRISTINE FIORE, Certified Electronic Court

13     Reporter and Transcriber, certify that the foregoing is a

14     correct transcript from the official electronic sound

15     recording of the proceedings in the above-entitled matter.

16

17

18     *Christine Fiore*

19     _____          September 6, 2023

20         Christine Fiore, CERT

21             Transcriber

22

23

24

25