## Exhibit 26



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 29, 2023

**VIA ECF & Email**
Hon. Robert W. Lehrburger
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:    *United States v. Yanping Wang, a/k/a "Yvette," 23 Mag. 2007 (UA)*

Dear Judge Lehrburger:

The Government respectfully submits this letter in opposition to the motion ("Mot.") and memorandum of law filed on March 24, 2023 by Yanping Wang, a/k/a "Yvette" ("Wang" or the "defendant") in support of her motion for an order directing that she has complied with the terms of her bail conditions ("Mem.") (Dkts. 8, 9).  For the reasons set forth below, the defendant's motion, which amounts to a second motion for reconsideration, should be denied.

I.    <u>Overview</u>

The defendant is charged with playing a key role in a sprawling and complex fraud spearheaded by Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("Kwok") and his and Wang's co-conspirator, King Ming Je, a/k/a "William Je" ("Je") that defrauded thousands of victims to invest more than $1 billion into Kwok's extensive, sophisticated, interrelated fraudulent offerings through material misrepresentations.  The fraud relied on at least four interrelated parts:  the GTV Media Group, Inc. ("GTV") Private Placement, the Farm Loan Program, G Club Operations, LLC ("G|CLUBS"), and the Himalaya Exchange.  Kwok, Je, Wang, and their co-conspirators then laundered their fraud proceeds and misappropriated hundreds of millions of dollars of fraud proceeds for Kwok's and others' personal use.  As described in charging documents and during prior court appearances in this case, the defendant effectively served as the chief of staff for Kwok and managed the day-to-day operations of the various entities that Kwok controlled and used to operate the fraud scheme. In that role, the defendant had access to, and signatory authority over, bank accounts that were used to obtain and launder fraud proceeds.

The defendant presents a serious risk of flight based on her lack of ties to the United States, the nature of the charges, her key role in this serious offense conduct, her substantial financial resources, the significant sentence that she faces, the strong evidence of her guilt, her ties to foreign jurisdictions, and her relationship with co-conspirator and international money launderer William Je, who remains at large.  The defendant is a Chinese citizen who emigrated from China to the United States in approximately 2017, filing an application seeking political asylum from the Chinese Communist Party ("CCP"), which remains pending.  As a general matter, if an asylee is charged with serious criminal conduct while in the United States, the criminal charges can serve

as a bar to a grant of asylum. The defendant has no family in the United States. (Mem. at 1.) Not only are the defendant's connections in the United States limited, but she also has substantial connections and resources abroad. She has held passports from various foreign jurisdictions and is the sole director of foreign entities used to facilitate the fraud, including at least one company registered in the British Virgin Islands. Her co-defendant, Je, lives in the United Kingdom and is presently believed to be hiding in the United Arab Emirates ("UAE"). The defendant also has access to and the support of an extensive network of Kwok's loyal followers dispersed throughout the world. The defendant's only son lives in China, and she has not seen him since she immigrated to the United States.

The defendant also has the financial means to flee. As described in greater detail below, the defendant has more than $1 million in cash in her personal bank accounts and had more than $130,000 in bulk cash in a safe in her apartment at the time of her arrest. The defendant also likely has access to assets secreted by co-conspirators abroad, including Je, who personally received millions from the fraud and is a fugitive. Moreover, the defendant has an extremely powerful incentive to flee. The defendant is facing charges that, in total, carry a statutory maximum sentence of approximately 55 years in prison. A conservative estimate of her applicable Sentencing Guidelines range reflects an exposure of approximately 292 to 365 months in prison. Given the substantial evidence of the defendant's guilt and the expected length of her potential sentence, any individual would be highly incentivized to flee; with the defendant's lack of ties to the United States, her ties abroad (including to Je, who is aware of the charges against him and yet remains at large), and the prospect of likely deportation after serving her sentence, the incentives to flee are even greater.

## II.     Procedural History

### A.  Criminal Charges Against the Defendant

On March 10, 2023, the Hon. Gabriel W. Gorenstein signed a sealed complaint (the "Complaint") charging the defendant with conspiracy to commit wire and securities fraud, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and money laundering, in violation of 18 U.S.C. §§ 1957 and 2. The Complaint is attached hereto as Exhibit A.

### B.  The Defendant's Arrest

The defendant was arrested on March 15, 2023 at her Manhattan apartment. That same day, the FBI conducted a judicially authorized search of Wang's apartment. During that search, the FBI recovered bulk U.S. and foreign currency from inside a safe; specifically, more than approximately $138,000 in U.S. currency, approximately £3,000, approximately 1180 Hong Kong dollars, and approximately 600 Chinese Yuan. Additional items inside the safe included expired foreign passports for both the defendant and Kwok from Vanuatu[1] and China. (Ex. C at 8:24-

---

[1] Vanuatu is a small island nation in the South Pacific. It has been publicly reported that Vanuatu permits foreign nationals to acquire Vanuatu citizenship in exchange for investments in the country. *See* "Citizenship for sale: fugitives, politicians and disgraced businesspeople buying Vanuatu passports," The Guardian, dated July 14, 2021 (available at

14:10). The FBI also recovered approximately 12 cellphones, two computers, and more than 25 USB flashdrives from the defendant's apartment. Many of the cellphones had been concealed inside original iPhone packaging, in an apparent attempt to conceal that they, in fact, contained data. Other electronics similarly were concealed; for example, a cellphone was found between the mattresses of the defendant's bed and a laptop was tucked between sweaters in the defendant's closet.

### C. Criminal Charges Against Kwok and Je

An indictment (the "Indictment") charging Kwok and Je was unsealed on March 15, 2023. *United States v. Kwok et al.*, 23 Cr. 118 (AT) (Dkt. 2). The Indictment is attached hereto as Exhibit B. Kwok was arrested in Manhattan on March 15, 2023, and the Federal Bureau of Investigation ("FBI") conducted judicially authorized searches of three of his residences—his Manhattan penthouse apartment, his Greenwich, Connecticut residence, and his Mahwah, New Jersey mansion. During those searches, the FBI recovered approximately 30 cellphones, approximately 25 computers, and dozens of hard drives and flash drives. One of the cellphones that was recovered from Kwok's Manhattan apartment was located between the mattresses in Kwok's bedroom (*i.e.*, concealed in the same manner as one of the defendant's cellphones had been, in her apartment). The FBI also recovered luxury furniture and goods that had been purchased with fraud proceeds. During the search of a safe located in the Mahwah mansion, the FBI recovered bulk U.S. and foreign currency; specifically, more than approximately $394,000 in U.S. currency, approximately €5,000, approximately 188,050 in Hong Kong dollars, and approximately 250 Chinese Yuan. The FBI also recovered evidence of Kwok's foreign travel documents from the Mahwah mansion, including a current Hong Kong passport and a copy of an expired UAE passport. The Government is seeking Kwok's pretrial detention and filed a detention letter in support of its position on March 15, 2023. *See* 23 Cr. 118 (AT) (Dkt. 7) ("Kwok Detention Ltr.").

That same day, U.K. law enforcement attempted to arrest Je in London and executed a judicially authorized search of Je's London residence. During the search, law enforcement recovered, among other items, cellphones, bulk cash in various currencies, and two cryptocurrency hardware wallets. While Je remains at large, he is believed to be in the UAE. Kwok and Je have significant ties to the UAE—they moved substantial proceeds of the fraud scheme into and through at least one of Je's UAE bank accounts, which received at least approximately $128 million in fraud proceeds that was subsequently misappropriated to Kwok, Je, and their family members or wired to Kwok- and Je-controlled entities. *See* Kwok Detention Ltr. at 9-10. For example, in January 2021, Kwok and Je arranged for the transfer of approximately $11 million in fraud proceeds from Je's UAE bank account to a bank account held in the name of one of the Kwok family office entities, which is purportedly owned by a close relative of Kwok. The defendant was the authorized signatory on the particular family office bank account that received the $11 million in fraud funds, which was misappropriated for personal lifestyle expenses (*e.g.*, flight crew services on a private jet, luxury automobiles, and yacht expenses). Moreover, as described in greater detail in the Kwok detention letter, Kwok recently undertook efforts to move the Himalaya Exchange's operations, and its money, to the UAE so it will be beyond the "long arm jurisdiction of the U.S." *See* Kwok Detention Ltr. at 19. Indeed, between in or about January and March 2023, at least two individuals who work for the Kwok-controlled entity HCHK Technologies, Inc. spent

https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports).

more than approximately six weeks in the UAE, apparently to assist in moving Kwok's and Je's operations abroad.  As of at least on or about May 23, 2022, the defendant was the 99.9999% shareholder of both HCHK Technologies, Inc. and HCHK Property Management, Inc. through a BVI-registered shell company called Holy City Hong Kong Venture Ltd.[2]

### D.  The Defendant's Presentment and Bail Hearing

The defendant was presented before the Honorable Katharine H. Parker on March 15, 2023. The transcript of that proceeding is attached hereto as Exhibit C.  During that proceeding, the Government presented the agreed-upon terms of a proposed bail package for Judge Parker's consideration, which included, among other conditions, a $5 million personal recognizance bond to be co-signed by two financial responsible persons approved by the Government and secured by $1 million in real property and/or cash.  (Ex. C at 6-7.)  The Government then noted the following proposed conditions that were in dispute: (a) the defendant's release to home detention, reinforced by GPS location monitoring, and (b) the defendant's release from detention only upon satisfaction of all bail conditions.  (Ex. C at 8:5-10.)  The Pretrial Services report recommended conditions of release consistent in all meaningful respects with the Government's proposed conditions, including home detention reinforced with electronic monitoring, that a bond be both secured in part and co-signed by two financially responsible persons, and that the defendant remain detained pending satisfaction of all conditions.

Judge Parker heard arguments from the Government and from the defendant's counsel on the two issues in dispute.  Regarding its basis for seeking home detention, the Government emphasized the defendant's significant risk of flight based on, among other things, the large dollar amount associated with the billion-dollar fraud scheme (including, in particular, the $100 million wire transfer of fraudulent proceeds that the defendant had sole authorization to conduct); the defendant's access to significant assets; the defendant's control of more than a dozen shell entities used to perpetrate the fraud; the defendant's lack of legal status in the United States; the defendant's access to an extensive worldwide network of Kwok followers and supporters who could facilitate the defendant's flight; the defendant's lack of ties to the United States; the strength of the Government's evidence against the defendant; and evidence that had been recovered from the defendant's apartment during the FBI's search earlier that day.

Defense counsel argued that, based on the defendant's personal background and the circumstances of her seeking political asylum in the United States, the defendant posed essentially no risk of flight to China or "anywhere China can get their hands on her again."  (Ex. C at 14:17-16:10).  Defense counsel further argued that releasing the defendant on her own signature "is easy to do without the Court really worrying that they will never see her again."  (Ex. C at 16:23-24). Judge Parker asked whether defense counsel had identified financial suretors; defense counsel advised that it had "offered some people not yet acceptable" but noted that the Government had "agreed to have a dialogue with" defense counsel regarding the evaluation of potential co-signers. 17:21-18:2.)

---

[2] The defendant is listed as the sole director of Holy City Hong Kong Ventures Ltd., and she signed various HCHK corporate documents, including shareholder resolutions, in that capacity on behalf of Holy City Hong Kong Ventures Ltd.

In response, the Government emphasized the defendant's connections to jurisdictions other than China, including the British Virgin Islands and the UAE, and the amount of bulk cash that was recovered from the defendant's apartment. (Ex. C at 18:15-19:21). The Government also confirmed that it would work with defense counsel regarding the approval process for potential co-signers, but noted for Judge Parker that the two co-signers defense counsel had proposed to the Government prior to the proceeding were individuals whom the Government alleged to be involved with the defendant in the charged fraud. (Ex. C at 20:15-21:3). Defense counsel then replied, in brief, that the defendant "ended up with a lot of cash in her safe" because "nearly a dozen normal banks" closed the defendant's accounts in the wake of banking issues arising from the GTV private placement civil enforcement action, and that the Government's suggestion that the defendant may have access to additional cash was speculative. (Ex. C at 21:5-22:4).

Following argument, Judge Parker ruled for the Government and determined that the defendant should not be released until all conditions were met. Specifically, Judge Parker stated that the following conditions were "the least restrictive I believe are necessary to" assure the defendant's return to court and the safety of the community:

> Ms. Wang will be released subject to meeting all of the conditions. In other words, she's going to be detained until all of the following conditions are met: $5 million bond co-signed by two financially responsible persons approved by the government, and it will be secured by $1 million in cash or property. Travel restricted to the Southern District, Eastern District of New York. Surender all travel documents and make no new applications. Pretrial supervision as directed by Pretrial Services. Home detention enforced by location monitoring technology as directed by Pretrial Services. Defendant will disclose all assets to Pretrial Services and the U.S. Attorney's Office, including any accounts in her name or controlled by her or by companies in which she has an interest,[3] any cryptocurrency, any cash and any other property. Ms. Wang shall have no contact with Mr. Kwok or Mr. Je or other co-conspirators outside the presence of counsel. She shall have no contact with any alleged victims or witnesses outside presence of counsel. She shall reside at the residence at 188 East 64th Street and may not relocate absent permission from Pretrial Services. Defendant shall not open any new bank accounts, lines of credit or loans without prior approval of Pretrial Services.

(Ex. C at 22:6-23:16.)

### E. Discussions with Defense Counsel (March 15, 2023 – March 21, 2023)

As described above, in magistrate court prior to the defendant's presentment on March 15, 2023, defense counsel proffered the Government the names of two potential co-signers—

---

[3] The defendant has disclosed three bank accounts to the U.S. Attorney's Office and Pretrial Services; specifically, she provided an estimate of the balances in her two personal bank accounts (although she has not provided account numbers or detailed account balances), and the account number for a bank account in the name of one of the Kwok family offices that employed the defendant. The defendant has not disclosed any bank accounts associated any other companies that she controls or in which she has an interest, including Holy City Hong Kong Ventures Ltd. *See supra* at 4 n.2.

███████████████ and ████████. The Government informed defense counsel that it was aware of both proposed co-signers through its investigation and, because it viewed both individuals as subjects, it did not anticipate that it could approve either ███ or ███ as a co-signer. As an example, the Government advised defense counsel that millions of dollars traceable to the fraud had been misappropriated to purchase luxury items for the benefit of Kwok and his family, including a Rolls Royce that was purchased in ████ name. *See* Ex. B at ¶ 54(x).

On Friday, March 17, 2023, defense counsel called the Government and provided the names and contact information for three other proposed co-signers: █████████████████, and ███████████████. That same day, the Government unsuccessfully attempted to call all three and left messages for two of them; ██████ voicemail was full. The Government updated defense counsel regarding its efforts and advised defense counsel that the potential co-signers needed to collect and provide the following documentation: (1) email address for contact; (2) proof of identity and address; (3) proof of citizenship or lawful residency; (4) most recent bank statements; (5) most recent pay stubs; and (6) most recent tax returns.

The morning of Monday, March 20, 2023, defense counsel called the Government to inquire into the status of its assessment of ███████████, and ██████. The Government advised that it had received documentation over the weekend and had scheduled telephonic co-signer interviews for that day. During that call, defense counsel proposed various modifications to the bond conditions that Judge Parker had imposed. For example, defense counsel offered that the defendant could secure the bond with additional cash from one of her bank accounts. Defense counsel also suggested that the bond could be modified to provide for five co-signers, in light of the fact that the defendant's proposed co-signers were unlikely to exercise a strong degree of moral suasion. Defense counsel also identified several individuals as potential moral suasion co-signers, including ████████, the defendant's purported best friend ████████████████████. The Government responded that it could not approve ██████████—an alleged co-conspirator who exercised control over various entities used to perpetrate the fraud scheme and who was alleged in the Indictment to have received millions of dollars in misappropriated fraud proceeds. *See, e.g.*, Ex. B at ¶ 13(f).

On March 20, 2023, the Government interviewed ████████████, and ██████ and determined that they were not qualified co-signers, for the reasons outlined below.

- ████████████: Insufficient moral suasion; not a financially responsible person; incomplete documentation; personal investment in the fraud scheme.

    Insufficient Moral Suasion
    - ██████ reported that he met the defendant approximately two years ago at an event.
    - ██████ reported that he knows the defendant socially, and estimated that he has seen her a few times a year in the two years since they met.
    - ██████ reported that the defendant "works for Mr. Guo" (*i.e.*, Kwok).
    - ██████ reported having texted the defendant one or two times and said he did not know her email address.

<u>Financial Responsibility Assessment</u>

o During ▮▮▮ interview with the Government, he reported having an annual salary of approximately $700,000. However, ▮▮▮ 2021 tax return reflects a gross income of approximately $63,583. (Def. Ex. G-4).

o ▮▮ reported having approximately $70,000 in his bank accounts, but he provided account statements that reflect a balance of only approximately $13,000. (Def. Ex. G-3).

<u>Status as an Apparent Victim of the Fraud Scheme</u>

o ▮▮▮ invested approximately $100,000 into GTV in 2020.

o ▮▮▮ invested approximately $50,000 into G|CLUBS in March 2021.

o ▮▮▮ invested approximately $12,000 in the Himalaya Exchange.wired money into a Himalaya Clearing FV Bank account (which the Government subsequently seized), including approximately $2,000 in July 2021 and $10,000 in October 2021.

- ▮▮▮▮: Insufficient moral suasion; not a financially responsible person; incomplete documentation; personal investment in the fraud scheme.

<u>Insufficient Moral Suasion</u>

o ▮▮ reported having first met the defendant at an "event" in June 2021.

o ▮▮ stated that he has seen the defendant approximately once or twice per month since mid-2022.

o ▮▮ reported that the defendant works at HCHK Technologies.[4]

o When asked where the defendant lives, ▮▮ replied, in sum and substance, "New York City not sure where."

<u>Financial Responsibility Assessment</u>

o ▮▮ reported having approximately $1.08 million in assets (in the form of properties and cash) and an annual income of approximately $150,000 per year. However, ▮▮▮ did not provide documentation sufficient to corroborate those purported assets (*e.g.*, most recent tax return; account statements or information for a second bank account; details regarding two purported properties).

<u>Status as an Apparent Victim of the Fraud Scheme</u>

o ▮▮▮ invested approximately $520,000 in GTV in May 2020.

o ▮▮▮ invested approximately $20,000 in G|CLUBS in November 2020.

o ▮▮▮ invested approximately $60,000 in the Himalaya Exchange in March 2022.

---

[4] As described above, the defendant is the 99.9999% shareholder of that company. *See supra* at 4 n.2. However, the defendant does not appear to hold any formal position at HCHK Technologies.

- ███████: Insufficient moral suasion; not a financially responsible person; personal investment in the fraud scheme.

  <u>Insufficient Moral Suasion</u>

  o ████ reported having met the defendant when he "nearly started working with" the defendant at a company called Gettr.[5]

  o ████ reported having spoken with the defendant approximately 4-5 times during the Gettr interview process.

  o ████ reported that the defendant works at Gettr. However, the defendant does not hold any formal position at Gettr.

  o ████ reported that he speaks to the defendant approximately two to three times a year.

  <u>Financial Responsibility Assessment</u>

  o During ████ interview with the Government, he reported having an annual salary of approximately $159,000, which was generally corroborated by provided documents. (Def. Ex. A-3, A-4).

  o ████ has approximately $2,768 in two bank accounts. (Def. Ex. A-3).

  o ████ annual rent is approximately $36,851. (Def. Ex. A-5).

  o ████ reported having approximately $11,000 in credit card debt.

  <u>Status as an Apparent Victim of the Fraud Scheme</u>

  o ████ and his wife invested $34,000 into GTV in May 2020.

  o ████ also reported that he and his wife invested in the Himalaya Exchange.

The Government informed defense counsel that it could not approve ██████, or ████, for the reasons stated above.

On March 21, 2023, defense counsel called the Government to propose further modifications of the bond conditions that Judge Parker had imposed. During that call, defense counsel said a person ("Individual-1") may be able to post $2.2 million in equity in an unidentified property to further secure the bond. Only after the Government asked the identity of that person did defense counsel provide Individual-1's name. When the Government advised that it would need to interview Individual-1, defense counsel replied that Individual-1 was not a proposed co-signer, and therefore no interview was required. The Government stated that it would consider the

---

[5] As described in the Kwok Detention Letter, GETTR USA, Inc. ("Gettr") is a social media company that Kwok controls through a series of shell companies. *See* 23 Cr. 118 (AT) (Dkt. 7 at 10). Gettr and the HCHK entities described herein operate out of the same office location in New York, New York.

suggestion in good faith, but still needed additional information, including details about the property in question, to conduct its due diligence.

Approximately 90 minutes later—still having received no details regarding the property that could be posted by Individual-1—the Government informed defense counsel that it was not comfortable with the abstract proposal, including due to Individual-1's criminal history and involvement in certain core conduct underlying the fraud scheme. Defense counsel again put forth ███ as a potential co-signer with moral suasion and stated that its initial proposed co-signers (███ and ███), individuals who had personal relationships with the defendant, were additional moral suasion co-signers that the Government had rejected. The Government replied that, although it was skeptical that ███ and ███ would be approved, it was willing to interview them in good faith, based on counsel's representations regarding their personal connections to the defendant. Defense counsel asked the Government to proceed with those interviews without first receiving and reviewing ███ and ███ documentation. The Government advised that it needed to follow its normal procedures, but would interview ███ and ███ promptly after receiving and reviewing their documentation. Upon receiving the documentation that afternoon, the Government interviewed ███ and determined that he was not a qualified co-signer, for the reasons outlined below.[6]

- ███: Insufficient moral suasion; not a financially responsible person; incomplete documentation; personal investment and involvement in the fraud scheme.

  Insufficient Moral Suasion

  o ███ reported seeing the defendant "a few times a year."

  o ███ reported that he did not know where the defendant works.

  Financial Responsibility Assessment

  o At the time of ███ interview with the Government, ███ did not have an understanding of what it meant to be a co-signer. The Government explained the charges in the Complaint and the responsibilities of a co-signer.

  o During his interview, ███ provided three different addresses as his purported home address.

  o ███ stated that he is a student, but ███ reported approximately $93,738 in income on his 2021 taxes. (Def. Ex. C-2).

  o When asked about the source of his income during his interview with the Government, ███ claimed that he served as "director" for two departments

---

[6] The Government also attempted to interview ███ at that time, but determined that a Mandarin interpreter would be needed to assist with the interview. The Government scheduled an interview with ███ for March 28, 2023 at 11:00 a.m., but the call went directly to voicemail. The Government did reach ███ later that day, but by the time the Government called back with a Mandarin interpreter on the line, the calls again went to voicemail. To date, ███ has not responded to the Government's follow-up calls and emails (including a Mandarin-language email) attempting to reschedule the interview.



    at one of the Kwok family offices that the defendant manages. However, the Government has not identified payroll records indicating that ▓ is an employee of that company.

o   ▓ disclosed two cars as assets—a Mini Cooper and a Range Rover Defender—and reported having no further assets, beyond approximately $1,649 in a bank account.

o   When the Government asked about luxury cars that he owned or previously owned, ▓ initially stated that he had bought a Lamborghini and a Rolls Royce before the COVID-19 pandemic with his own money, which he generated selling stocks in China.

o   When the Government asked about luxury cars that had been purchased in ▓ name in 2021, registered to ▓, and delivered to ▓ at Kwok's Greenwich, CT residence—specifically, the 2021 Lamborghini and the 2021 Rolls Royce identified in the Indictment, *see* Ex. B at ¶ 54(x), (y)— ▓ said he was "not sure" if he knows anyone with those cars and did not know why those cars would be registered in his name. The 2021 Lamborghini registered to ▓ was seized from Kwok's Greenwich residence on March 15, 2023. ▓ was present at the Greenwich residence at the time the FBI executed the premises warrant and seized the 2021 Lamborghini.

<u>Involvement in the Fraud Scheme</u>

o   As described above, ▓ is the listed purchaser and registrant of a 2021 Lamborghini and a 2021 Rolls Royce, both of which were purchased with funds traceable to the fraud scheme.

o   In certain invoices, the billing address associated with ▓ is Kwok's Mahwah, New Jersey mansion, which was purchased in the name of an entity controlled by Je for approximately $26.5 million in funds traceable to the fraud scheme.

o   In April 2022, ▓ transferred $20,000 into a Himalaya Exchange bank account (which the Government has subsequently seized).

    The Government informed defense counsel that it could not approve ▓, and defense counsel replied that it was going to request that a "Nebbia" bail hearing be held the following day to address what counsel characterized as the Government's "unreasonable refusal" to approve any co-signers. The Government arranged for the defendant's production and secured a Mandarin-speaking interpreter.

### F. Conference Regarding the Defendant's First Request for Reconsideration of Bail Conditions (March 22, 2023)

    A conference was scheduled for 11:00 a.m. on March 22, 2023[7] before the Honorable Sarah Netburn. A transcript of that conference is attached hereto as Exhibit D. In advance of the

---

[7] At approximately 10:15 a.m. on March 22, 2023—less than approximately one hour before the scheduled bail hearing—defense counsel called the Government with another proposed modification of the bail conditions imposed by Judge Parker. Counsel stated that it had identified

conference, the Government provided Judge Netburn with the transcript of the presentment and bail argument before Judge Parker (*i.e.*, Ex. C), and Pretrial Services furnished its report. Defense counsel did not file any motions or other submissions in advance of that conference. At the outset, defense counsel informed Judge Netburn that it was asking Judge Netburn "to either [ap]prove the people we've proposed [as co-signers] or change the bail conditions in such a way that Ms. Wang can satisfy the bail conditions and be released." (Ex. D at 5:10-22). Judge Netburn then stated:

> I'm not really inclined to overrule my colleague [Judge Parker] who heard bail arguments and set a bail condition. So I'm not sure that's what I want to do, if that's what you're asking me to do. If you're asking me to consider the reasonableness of the proposed sureters I understand under the law, I can do that. I don't know anything about what that standard of review is, and I don't have any names or documents, so I don't know that that's something I can do from the bench.

(Ex. D at 6:3-13).

Defense counsel then proceeded to proffer information about the defendant's background, including that "the only people with whom [the defendant] has contact are people who are part of this [anti-CCP] movement or in some way related to the main defendant in this case. The Government is well aware of this. When we actually agreed to the $5 million bond and two cosigners, when we did that we understood that the Government understood . . . that the people who would cosign for her are not going to be her family members." (Ex. D at 7:9-20). Judge Netburn confirmed that the defendant had been living in the United States since 2017 and confirmed that defense counsel was representing that, "in those six years," the defendant had not "befriended anybody who's not within that movement." (Ex. D at 7:21-8:1). During the ensuing colloquy, defense counsel referenced the various proposed bail modifications that it had discussed with the Government. (Ex. D at 8:2-11:7).

The Government responded that the conference was premature, noted that Judge Parker had agreed with both Pretrial Services and the Government that all conditions—including the approval of two co-signers—needed to be met before the defendant could be released, and explained that the Government follows a process to evaluate potential co-signers' qualifications. (Ex. D at 11:10-23). Regarding defense counsel's proposed bail modifications, the Government noted that it had not received basic information from defense counsel (such as, for example, the address of Individual-1's property) sufficient to conduct the basic due diligence required to seriously consider those proposals. (Ex. D at 11:24-12:18). The Government summarized its efforts to evaluate the proposed co-signers and its rationale for concluding that those individuals were not qualified. (Ex. D at 12:19-14:20). The Government then outlined the legal standard for a court to consider the appropriateness of an unapproved surety under 18 U.S.C. § 3142(c)(1)(B)(xii), which requires a court to assess the surety's financial situation to determine

---

two (unnamed) individuals who were members of Kwok's anti-CCP movement who, although they did not know the defendant, were willing to post property with approximately $3 million in collectively equity. Defense counsel did not provide the individuals' names or any details regarding the purported properties, but nonetheless asked the Government to agree in the abstract to the proposal. The Government advised that it could not do so.

whether the surety has a net worth of sufficient unencumbered value to pay the amount of the bond. (Ex. D at 14:21-15:7).

After further discussion with defense counsel, Judge Netburn asked what relief the defendant was seeking. (Ex. D at 15:20-18:4). Defense counsel replied that it was asking the Court either to "direct" the Government to accept three of the individuals it had deemed to be unqualified as co-signers or, alternatively, to modify the bail conditions. (Ex. D at 18:5-19:12). In response, the Government reiterated its view that there was no issue ripe for the Court. (Ex. D at 19:13-20). The Government further noted that, even if the Government could get comfortable treating the three individuals in question as financially responsible persons, they were all victims of the fraud scheme and therefore exercised no degree of moral suasion over the defendant. (Ex. D at 19:21-20:12).

Judge Netburn agreed that there was no ripe issue before the Court and declined to "direct the Government to accept these miscellaneous John Does as sureties. That's not how this works." (Ex. D 21:9-17). Judge Netburn then inquired into the defendant's proposed timing for next steps and set a defense motion deadline of March 24, 2023, a Government response deadline of March 29, 2023, and a March 31, 2023 conference before this Court. (Ex. D at 22:5-18, 24:19-21, 25:24-26:14).

### G. Additional Proposed Co-Signers (March 22, 2023 – March 24, 2023)

In the evening on March 22, 2023, defense counsel provided contact information and certain supporting documentation for three additional proposed co-signers— ██████████ ██████████, and ██████████████. In the email, defense counsel expressed its view that the following proposed co-signers ██████████████████, and ██ all exercised moral suasion over the defendant.

The Government requested additional required documentation, reviewed that documentation, and interviewed ███████, and ██. The Government determined that they were not qualified co-signers, for the reasons outlined below.

- ███████: No moral suasion; not a financially responsible person (incomplete documentation); personal investment in the fraud scheme.

  <u>No Moral Suasion</u>

  o ██ reported that she does not know and has never spoken with the defendant.

  <u>Financial Responsibility Assessment</u>

  o ██ has approximately $209,408 in two bank accounts. (Def. Ex. E-3).

  o During ██ interview with the Government, she reported that she and her husband own a home in ███████████ worth approximately $1.7 million.

  o Defense counsel submitted a settlement statement (HUD-1) for the ███ property (erroneously filed under Ex. F-2), which appears to reflect that ██ and her husband took out a mortgage in the amount of approximately



$752,474 for the ▓ property in 2014. ▓ did not provide any documentation reflecting the current status of that mortgage.

o ▓ 2021 tax returns reflect that she and her husband generate $24,000 in rental income from that same property in ▓. (Def. Ex. E-4). From the provided documentation, it is unclear whether ▓ lives in that home (for which she is claiming rental income) or at some other unknown residence.

o During her interview with the Government, ▓ reported that she holds approximately $200,000 worth of Ethereum cryptocurrency. ▓ did not provide documentation corroborating her purported cryptocurrency holdings.

Status as an Apparent Victim of the Fraud Scheme

o ▓ invested approximately $50,000 in G|CLUBS in October 2020.

o ▓ invested approximately $12,000 in the Himalaya Exchange in July 2021.

• ▓: Insufficient moral suasion; not a financially responsible person (insufficient documentation); personal investment in the fraud scheme.

Insufficient Moral Suasion

o ▓ reported that she "came to know of" the defendant through Kwok in or about 2017.

o ▓ reported that she has met the defendant in person at "events."

o ▓ reported that she has spoken on the phone with the defendant, but "not often."

o ▓ does not appear to have a relationship with the defendant—for example, ▓ was unsure what the defendant does for work or where she lives.

Financial Responsibility Assessment

o ▓ has approximately $52,550 in two bank accounts. (Def. Ex. F-1).

o ▓ joint tax returns reflect that she and her husband had $18,452 in taxable income in 2021.

o ▓ provided several low-resolution image files that are illegible (which seems to show some sort of document, two checks, and tax returns). The Government requested, but did not receive, legible replacements for those files from defense counsel.

o During her interview with the Government, ▓ reported that she works as an accountant and has an annual salary of approximately $60,000. ▓ did not provide any recent paystubs or corroboration of her salary.

o During her interview with the Government, ▓ stated, in sum and substance, that she has family money that is not in her own accounts and that her mother and husband support her financially.



- o During her interview with the Government, ▮ reported that she has approximately $1.6 million in equity (and no debt) in her residence. ▮ did not provide any documentation corroborating the value of that property or her ownership of the property.

<u>Status as an Apparent Victim of the Fraud Scheme</u>

- o ▮ invested approximately $100,000 into GTV in 2020.

- o ▮ invested approximately $50,000 into G|CLUBS in October 2020.

- ▮▮▮▮▮▮▮▮▮▮: Insufficient moral suasion; not a financially responsible person (insufficient documentation); personal investment in the fraud scheme.

<u>Insufficient Moral Suasion</u>

- o ▮ relationship with the defendant is limited to his following her on social media.

- o ▮ reported that he met the defendant at an "event" two years ago. However, ▮ reported that he has not spoken with the defendant directly.

- o ▮ does not know where the defendant works or lives.

<u>Financial Responsibility Assessment</u>

- o ▮ has approximately $27,325 a joint bank account. (Def. Ex. D-3).

- o ▮ joint tax returns reflect taxable income of approximately $217,604 in 2021, which consists primarily of capital gains. (Def. Ex. D-4).

- o During his interview with the Government, ▮ reported that he owns two rental properties worth approximately $500,000 each. ▮ did not provide documentation regarding those properties.

- o During his interview with the Government, ▮ reported that he purchased his primary residence for approximately $1.9 million. Defense counsel provided a screenshot from Zillow.com reflecting the estimated home value of the property as purported corroboration of ▮ equity in the home, but no additional documentation. (Def. Ex. D-6).

<u>Status as an Apparent Victim of the Fraud Scheme</u>

- o ▮ invested approximately $290,000 into GDollar (relating to GTV).

- o ▮ invested approximately $100,000 into G|CLUBS.

On March 24, 2023, the Government informed defense counsel that it was unable to approve ▮, and ▮ as co-signers for the reasons explained above.

## H. The Defendant's Instant Motion

On March 24, 2023, the defendant filed the Motion, which was fashioned as a motion "For an Order Directing Defendant Has Complied with the Terms of her Bail Conditions." Mot. The defendant also filed a memorandum of law in support of that motion, which attached documentation for ▮, and ▮ as exhibits. *See* Dkts. 8, 9. The defendant argues that the Government's "refusal to approve [the defendant's] bond co-signers has been arbitrary." (Mem. at 1). The defendant claims that each of her proffered sureties

"is eminently qualified to serve" as a co-signer on the $5 million personal recognizance bond that Judge Parker imposed as a condition of the defendant's release. (Mem. at 6).

The defendant moves this Court either to approve two of the defendant's proposed co-signers (without identifying which two) or, alternatively, to modify the bail conditions "such that [the defendant's] inability to secure co-signers . . . does not prevent her release." Mem. at 3. Specifically, assuming the Court does not find that the proffered co-signers satisfy the requirements of financial responsibility and/or moral suasion, the defendant asks this Court to set aside Judge Parker's bail finding and "eliminat[e] the use of co-signers altogether." Mem. at 10.

### III.  Discussion

#### A.  Legal Standard

Under the Bail Reform Act, a defendant shall be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Court must consider a number of factors when deciding an application for bail, including: (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The Government bears the burden of proof as to risk of flight by a preponderance of the evidence, and as to danger to the community by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

Where the Court determines that pretrial release is appropriate, the Court should release the defendant subject to the least restrictive condition or combination of conditions, "which may include the condition that the person include the condition that the person . . . execute a bail bond with "solvent" sureties, with a "net worth which shall have sufficient unencumbered value to pay the amount of the bail bond"). 18 U.S.C. § 3142(c)(1)(B)(xii); *see United States v. Batista*, 163 F. Supp. 2d 222, 225-26 (S.D.N.Y. 2001). Regarding a determination regarding whether a proposed suretor is "financially responsible," courts have reasoned that "the relevant standard is 'the ability to pay the amount specified in the bond if [the defendant] fails to appear at trial.'" *Batista*, 163 F. Supp. 2d at 224 (quoting *United States v. Gotay*, 609 F. Supp. 156, 156 (S.D.N.Y. 1985)). "In addition to the requirement of financial responsibility, a defendant must show that the proposed sureties exercise moral suasion to ensure the defendant's presence at trial." *Batista*, 163 F. Supp. 2d at 224.

The Second Circuit has noted that "sureties are assessed for 'their ability to exercise moral suasion' over the defendant, 'should he decide to flee.'" *United States v. Baig*, 536 F. App'x 91, 93 (2d Cir. 2013) (describing and quoting *United States v. Martinez*, 151 F.3d 68, 71 (2d Cir.1998)) (emphasis added); *see also Christoffel v. United States*, 196 F.2d 560, 565 (D.C. Cir. 1951) (noting that "the reliability" of a co-signer is relevant "where he [is] promis[ing] to pay in the event of non-appearance of the defendant" and collecting cases).

Even where the least restrictive set of conditions are imposed as conditions of bail, it is "not unique" for a defendant to be unable to meet those conditions and therefore to remain detained pending trial. *United States v. Stanton*, No. 91-CR-889-CSH, 1992 WL 27130, at *1 (S.D.N.Y. Feb. 4, 1992). In *Stanton*, the Honorable Charles S. Haight noted that defendants confronted with

pretrial detention resulting from an inability to satisfy bail conditions "have invoked § 3142(c)(2), which provides: 'The judicial officer may not impose a financial condition that results in the pre-trial detention of the person.'" *Id.* The *Stanton* Court cited its prior analysis of § 3142(c)(2) in *Gotay*, where it viewed that provision "in the context of the Bail Reform Act and its legislative history and concluded that if a defendant cannot meet economic conditions of release reasonably necessary to assure his appearance, he must remain in pre-trial detention." *Id.* (citing *Gotay*, 609 F. Supp. at 156).

A party seeking reconsideration faces a high burden.[8] "Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources. A motion for reconsideration may not be used to advance . . . facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." *Jackson v. Goord*, 664 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) (internal quotations omitted). Under Title 18, United States Code, Section 3142(f), a detention hearing "[m]ay be reopened . . . if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." "A court may properly reject an attempt to reopen a detention hearing where the new information presented is immaterial to the issue of flight risk or danger to the community." *United States v. Petrov*, No. 15-CR-66-LTS, 2015 WL 11022886, at *2 (S.D.N.Y. Mar. 26, 2015), *aff'd*, 604 F. App'x 66 (2d Cir. 2015) (citing *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989)).

### B. Discussion

#### 1) The Government's Decision to Reject Proposed Co-Signers Was Not Arbitrary

The Government's determination that none of the eight proposed co-signers is qualified is both reasonable and supported by the record. The defendant's proposed suretors are neither financially responsible nor able to exercise moral suasion over the defendant. The Government's individualized assessments also appropriately considered whether any of the proposed co-signers was either a co-conspirator of the defendant and/or an apparent victim of Kwok's, Je's, and the defendant's fraud.

*First,* none of the eight proposed co-signers exerts moral suasion over the defendant sufficient to "reasonably assure" her presence at future court appearances, even if her non-

---

[8]    There is no specific rule providing for the reconsideration of a ruling on a criminal matter. *See, e.g.*, *United States v. James*, No. 02 CR 0778, 2007 WL 914242, at *3 (E.D.N.Y. Mar. 21, 2007). However, "[w]here the Rules of Criminal Procedure do not speak specifically to a matter, a court conducting a criminal case is permitted to draw from and mirror a practice that is sanctioned by the Federal Rules of Civil Procedure." *Id.* (citation and internal quotation marks omitted). In that regard, Federal Rule of Criminal Procedure 57(b), which is entitled "Procedure When There Is No Controlling Law," provides in part that "[a] judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." Fed. R. Crim. P. 57(b). "Thus, when deciding motions for reconsideration in criminal matters, courts in this district have resolved such motions according to the same principles that apply in the civil context." *Id.* (citations and internal quotation marks omitted).

appearance were to cause a second, financially responsible co-signer to owe the full amount of the bond. As described above, most of the proposed co-signers barely know the defendant, only recently met her, and have sporadic (if any) communications with her. Without sufficient moral suasion, the defendant is unlikely to be concerned that her flight would saddle individuals (with whom she does not have relationships) with debt.

*Second*, all of the defendant's proposed co-signers are involved in the very conduct with which the defendant has been charged, either as subjects of the Government's investigation or as apparent victims of the fraud. Either status renders these individuals unqualified to serve as co-signers who will exert moral suasion over the defendant. To the extent the co-signers are members of the criminal conspiracy, their interests lie just as easily in facilitating the defendant's flight and, given the staggering amount of funds collected involved in this international criminal conspiracy, even losses in the millions could be reimbursed. To the extent the proposed co-signers are victims of the fraud, their status as co-signers provides no assurance whatsoever that the defendant would be dissuaded from flight out of concern for their financial welfare. After all, the defendant is charged with defrauding this very same class of victims

*Third*, even if they had sufficient moral suasion over the defendant, the proposed suretors are not financially responsible. *See, e.g.*, *Batista*, 163 F. Supp. 2d at 225-26 (holding that the Government's decision to reject two proffered suretors was not arbitrary where the individuals reported low income and, in addition, were unable to provide credible documentation that they owned assets they claimed to own). For example, ███ failed to provide the Government with nearly all categories of requested documentation, including proof of address, proof of citizenship or lawful residency, most recent bank statements, and most recent paystubs; and the financial documentation ███ did provide (specifically, his recent taxes) is insufficiently detailed to corroborate or confirm the source of his reported income. Here, where each of the eight proffered sureties is "other than an approved surety," the sureties (or the defendant, on their behalf) is required to "provide the court with information regarding the value of the assets and liabilities of the surety . . . and the nature and extent of encumbrances against the surety's property" so the Court can determine whether such surety has "a net worth which shall have sufficient *unencumbered* value to pay the amount of the bail bond." 18 U.S.C. § 3142(c)(1)(B)(xii) (emphasis added). The defendant has not provided adequate documentation or information to the Court for it to make such an independent determination. However, even based on the documentation that was provided to this Court, none of the proposed suretors qualifies as a "financially responsible person," because none has "the ability to pay the [$5 million] bond if [the defendant] fails to appear at trial." *Gotay*, 609 F. Supp. at 156.

### 2) Reconsideration of the Defendant's Bail Conditions is Unwarranted

As described above, a party seeking reconsideration of a prior court order faces a high burden. The law is clear that a motion of reconsideration may not be used to relitigate issues already decided by the Court. *Jackson*, 664 F. Supp. 2d at 313. Yet that is precisely what the defendant is asking this Court to do: overrule Judge Parker's well-reasoned determination that the bail conditions the court imposed—including both the requirement of two approved co-signers and the defendant's continued detention until all conditions are satisfied—are the *least* restrictive conditions that can reasonably assure the defendant's presence at future court appearances. (Ex. C at 22:6-23:16.) The defendant goes even further, summarily rejecting Judge Parker's ruling by asserting, in a footnote, that the defendant's bail package would be sufficient to serve the ends of

18 U.S.C. § 3142 even without the requirement of *any* co-signers—a requirement Judge Parker specifically ruled on after hearing argument from both parties. (Mem. at 11, n.3).

The instant motion is not the defendant's first attempt to seek reconsideration of the bail conditions Judge Parker imposed. The defendant fails to acknowledge that she already attempted an improper motion for reconsideration of Judge Parker's bail determination, before Judge Netburn. During the conference on March 22, 2023, as here, defense counsel asked Judge Netburn to "change the bail conditions in such a way that Ms. Wang can satisfy the bail conditions and be released." (Ex. D at 5:10-22). Yet defense counsel pointed to no information that was not known to the defendant (*i.e.*, the movant) at the time of the initial bail argument before Judge Parker that may have material bearing on an evaluation of conditions of bail. 18 U.S.C. § 3142(f).

To the contrary, in the Government's view, new information that has come to light since the defendant's initial bail hearing that arguably may have justified *more* restrictive bail conditions. First, the Government did not previously know that the defendant apparently has no acquaintances (or even unacquainted financially responsible persons) to put forth as qualified co-signers. Second, since the defendant's initial appearance, the Government has learned that Je remains at large and is likely in the UAE, where he and Kwok have access to substantial resources and fraud proceeds and are believed to be establishing the new operational and financial base of their fraudulent operations. Je is the financier of the fraud scheme and an international fugitive with access to substantial funds and the ability to facilitate and fund Kwok's or the defendant's flight. Finally, as described above, various of the proffered co-signers understand the defendant to work for Gettr and/or HCHK Technologies—Kwok- and Je-controlled companies that are funded, in part, using fraud proceeds—despite the defendant disclaiming any formal affiliation or employment with those entities. That new fact further underscores not only the complexity of Kwok's shell game, but also the defendant's instrumental role as Kwok's trusted chief of staff who is tasked with managing operations at even those entities with which she has no formal affiliation.

## IV.    Conclusion

As described herein, the defendant poses an extraordinary risk of flight. During the defendant's initial presentment and bail hearing, Judge Parker carefully considered the recommendation of Pretrial Services and the arguments by the parties regarding what conditions of release, if any, could reasonably assure the defendant's future court appearances or the safety of the community. Judge Parker then made a ruling that the set of bail conditions currently imposed were the least restrictive and further ruled that the defendant needed to satisfy all those conditions before release. The defendant, having failed to do so, now attempts a second end-run around judicial process by asking this Court to approve unquestionably unqualified co-signers or, in the alternative, overrule bail-related decisions by both Judge Parker and Judge Netburn. The defendant has failed to provide any evidence to support her claim that the Government's evaluation of the proposed co-signers is arbitrary or unreasonable, and has presented no evidence sufficient

to warrant the "extraordinary" remedy of reconsideration of a bail determination.  Accordingly, the defendant's motion should be denied.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: _____
Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
(212) 637-2314 / 6612 / 2190

Enclosures

Cc:    Alex Lipman, Esq. (by ECF and Email)
       Priya Choudhry, Esq. (by ECF and Email)

Approved: _____
Ryan Finkel / Juliana Murray / Micah Fergenson
Assistant United States Attorneys

Before: THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge                **23 MAG 2007**
Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                        :

                                        :    **SEALED COMPLAINT**

UNITED STATES OF AMERICA         :

                                          :    Violations of
          - v. -                    :    18 U.S.C. §§ 371, 1343, 1957 and 2;
                                          :    15 U.S.C. §§ 78j(b) & 78ff; and
                                          :    17 C.F.R. § 240.10b-5
YANPING WANG,                :
   a/k/a "Yvette,"                    :    COUNTY OF OFFENSE:
                                          :    NEW YORK
          Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

     Special Agent Nicholas DiMarino, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

<u>**COUNT ONE**</u>
**(Conspiracy to Commit Wire Fraud and Securities Fraud)**

     1.     From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, YANPING WANG, a/k/a "Yvette," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) wire fraud, in violation of Title 18, United States Code, Section 1343; and (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

     2.     It was a part and an object of the conspiracy that YANPING WANG, a/k/a "Yvette," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, WANG conspired with others to obtain victims' money through the use of materially false information and misrepresentations transmitted over interstate wires, in connection with the unregistered offering

of common stock of GTV Media Group, Inc. ("GTV") via a private placement (the "GTV Private Placement).

3.     It was further a part and an object of the conspiracy that YANPING WANG, a/k/a "Yvette," the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, WANG conspired with others to fraudulently induce investors to participate in the GTV Private Placement by providing materially false and misleading information and representations in connection with purported shares of GTV's common stock.

4.     In furtherance of the conspiracy and to effect its illegal objects, YANPING WANG, a/k/a "Yvette," the defendant, and others known and unknown, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a.     On or about June 5, 2020, WANG, while located in the Southern District of New York, authorized a wire transfer of $100 million of fraud proceeds to a particular hedge fund.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Wire Fraud)

5.     From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, YANPING WANG, a/k/a "Yvette," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, WANG conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Securities Fraud)

6.      From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, YANPING WANG, a/k/a "Yvette," the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, WANG conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Unlawful Monetary Transaction)

7.      On or about June 5, 2020, YANPING WANG, a/k/a "Yvette," the defendant, in the Southern District of New York and elsewhere, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, WANG, while located in the Southern District of New York, authorized a wire transfer of $100 million of fraud proceeds to a particular hedge fund.

(Title 18, United States Code, Sections 1957 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.      I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, and my conversations with law enforcement officers, law enforcement employees, and witnesses, as well as a review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Case 22-3137, Document 29-26, 03/25/23, 3496410, Page 24 of 122

## Overview

9.     Based on my involvement in this investigation, my review of documents, conversations with witnesses, and other law enforcement officers, I have learned the following, in substance and in part:

a.     Between in or about April 2020 and in or about June 2020, YANPING WANG, a/k/a "Yvette," the defendant, and others known and unknown, fraudulently obtained approximately $452 million in victim funds through an illegal private stock offering related to GTV.  WANG was an Executive Director of GTV and was one of the key individuals responsible for transferring the money raised from the GTV Private Placement.  Rather than investing the funds raised through the GTV Private Placement as the defendant, and others, had promised to victim-investors, WANG, and others known and unknown, misappropriated approximately $100,000,000 into a high-risk hedge fund for the ultimate benefit of a close family relative of one of WANG's co-conspirators.    WANG well knew that funds from the GTV Private Placement could not be used to invest in a high-risk hedge fund.  Indeed, when WANG sought to open a bank account comprised of funds raised from the GTV Private Placement, WANG stated to a bank, in part, that such "funds of GTV Media Group [ ] are strickly [sic] for operational purposes and acquisitions."

## The GTV Private Placement

10.     Based on my review of documents, videos, conversations with witnesses, and other law enforcement officers, I have learned the following, in substance and in part:

a.     On or about April 21, 2020, a co-conspirator not named herein ("CC-1")[1] posted, and caused to be posted, a video on social media (the "Video") announcing the unregistered offering of GTV common stock via a private placement (the "GTV Private Placement").  CC-1 has a substantial online following, and the Video was viewed by thousands of individuals.

b.     Based on my review of the Video, I have learned that, in the Video, CC-1 described, in substance and in part, the investment terms for the GTV Private Placement and directed people to contact CC-1, via a mobile messaging application, with any questions about the GTV Private Placement.  The Video and GTV Private Placement materials—including the written "Confidential Information Memorandum" (the "PPM"), Subscription Agreement, and Investment Procedure Guidelines—were transmitted to thousands of potential investors, including those in the Southern District of New York, via mobile messaging applications, social media, and text messages.

c.     Based on my review of the PPM, I have learned that the PPM promoted GTV as the "first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and

---

[1] CC-1 has been charged in eleven counts in an Indictment filed in this District with conspiring to commit wire fraud, securities fraud, bank fraud, and money laundering; and committing wire fraud, bank fraud and money laundering in connection with, among other conduct, the GTV Private Placement discussed herein.

real-time interactive communication." The PPM also contained the following representations, in substance and in part, among others:

        i.      The GTV Private Placement was for investors who were "interested in evaluating an opportunity to invest capital into GTV";

        ii.      GTV planned to use the proceeds raised from the GTV Private Placement "to expand and strengthen the business;" and

        iii.      The PPM included a chart itemizing the "contemplated use of proceeds" raised from the GTV Private Placement:

| Description | Percentage of Proceeds |
| --- | --- |
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

    d.    The PPM identified three "Executive Directors" of GTV. The first Executive Director identified was "Yvette Y. Wang"— *i.e.*, YANPING WANG, a/k/a "Yvette," the defendant. The PPM described WANG as "experienced in management, financial investment and merger and acquisition" and "instrumental in building Saraca's media business." [2] Elsewhere in the PPM, WANG was described as "key personnel" for GTV. The PPM further stated, in part, that GTV's "success depends in part upon the continued services of [its] key executive officers, including Yvette Wang" and two other particular individuals, including another coconspirator not named herein ("CC-2").

    e.    Based on conversations with witnesses who previously worked for CC-1, I have learned, in substance and in part, that WANG has had a close personal relationship with CC-1. In particular, WANG has worked for CC-1 and CC-1's family for several years, since at least in or about 2018. Indeed, based on documents I have reviewed, I have learned that WANG is the President, Treasurer, and Secretary of an entity that manages CC-1's purportedly vast personal wealth.

---

[2] "Saraca" refers to "Saraca Media Group," which is identified in the PPM as GTV's parent company.

WANG Received and Transferred Fraud Proceeds

11.     Based on my review of videos and documents, including bank records and subpoena returns, my conversations with witnesses and other law enforcement officers, open-source research on the Internet, and my participation in this investigation, I have learned the following, in substance and in part:

      a.     On or about July 24, 2018, YANPING WANG, a/k/a "Yvette," the defendant, opened a particular bank account in the name of Saraca ("Account-5601"). Account opening documents for Account-5601, which I have reviewed, identify WANG as "Acting Secretary" for Saraca. On or about May 21, 2020, WANG signed an additional business signature card for Account-5601, in which WANG identified herself as "President" of Saraca. As of at least that date, Account-5601 was held in the name of "Saraca Media Group DBA Himalaya Dollar." There are no other authorized signatories on Account-5601.

      b.     On or about July 24, 2018, WANG opened another particular bank account in the name of "Saraca Media Group Inc." ("Account-2038"). Account opening documents for Account-2038 identity WANG as "Acting Secretary" for Saraca. On or about May 21, 2020, WANG signed an additional business signature card for Account-2038 and identified herself as "President." As of at least that date, Account-2038 was held in the name of "Saraca Media Group DBA Himalaya Dollar." On or about June 3, 2020, WANG signed an additional business signature card for Account-2038 and, again, identified herself as "President" of Saraca. There are no other authorized signatories on Account-2038.[3]

      c.     Both Account-5601 and Account-2038 are held by a particular bank, which is headquartered int Manhattan ("Bank-1").

      d.     Between on or about April 20, 2020, and on or about June 2, 2020, approximately $452 million worth of GTV common stock was purportedly sold to more than 5,500 investors located in the United States, including in the Southern District of New York, and abroad. Investors participated in the GTV Private Placement based, in part, on the belief that their money would be invested into GTV to develop and grow that business, as the PPM promised.

      e.     In or about April 2020, Account-5601 received approximately 291 deposits and transfers totaling approximately $32,543,000. Most of these deposits and transfers were investments made by individuals seeking to participate in the GTV Private Placement. The transfers appear to be from individuals located throughout the world, and many deposits and transfers bear reference or memo information referring to the GTV Private Placement. For example, memo lines state, among other things, in substance and in part: "Gtv Investment," "Stock Subscription," "Investment," "G- Tv Common Stock Subscription," "InvestmeNt [sic]," "Investment To G- Tv [sic]," and "Gtv Stockpurchase." On or about April 30, 2020, the balance of Account-5601 was approximately $32,474,000.

      f.     In or about May 2020, Account-5601 received approximately 2,450 deposits and transfers totaling approximately $291,899,000. Most of these deposits and transfers

---

[3] Based on bank records, CC-2 appears to have an online banking account with access to Account-5601 and Account-2038.

were investments made by individuals seeking to participate in the GTV Private Placement. Like the prior month's deposits and transfers, the transfers in or about May 2020 appear to be from individuals located throughout the world, and many bear reference or memo information referring to the GTV Private Placement. For example, memo lines state, among other things, in substance and in part: "Capital Injection Infusion," "To Inves Stment [sic]," "Private Placement Investment," "Gtv Media Investment," "Gtv Inv," and "Additional Stock Purchase." On or about May 29, 2020, the balance of Account-5601 was approximately $313,213,000.

## The Misappropriation

12.     Based on my review of documents, conversations with witnesses, and other law enforcement officers, I have learned the following, in substance and in part:

a.      On or about June 3, 2020, YANPING WANG, a/k/a "Yvette," the defendant, signed a "Subscription Agreement" in her capacity as "President" of Saraca. Pursuant to the Subscription Agreement, Saraca agreed to invest $100,000,000 into a high-risk hedge fund ("Fund-1"). In the Subscription Agreement, WANG identified Account-5601 as the bank account from which Saraca's capital contribution would be wired. WANG further identified herself as the only "Authorized Signatory" of Account-5601. In or about the morning of June 3, 2020, an employee of the Fund-1 investment manager confirmed receipt of the signed subscription documents.

b.      Also, on or about June 3, 2020, $100,000,000 was transferred from Account-5601 to Account-2038. Prior to the transfer, the balance of Account-2038 was $0. Based on bank records, this $100,000,000 transfer was conducted online by the user "yvettewang2018," which is WANG's Bank-1 online banking user ID. While authorizing that transfer, WANG was logged into WANG's Bank-1 online account from an IP address that geolocates to Manhattan.

c.      On or about June 5, 2020, WANG authorized a $100,000,000 wire transfer from Account-2038[4] to a bank account associated with Fund-1. This $100,000,000 transfer to a Fund-1 bank account consisted of proceeds from investors in the GTV Private Placement. As described above, the PPM did not contemplate using investor funds to invest into a high-risk hedge fund. The PPM also did not contemplate using investor funds for the benefit of companies other than GTV, including Saraca, whose ultimate beneficial owner is a close relative of CC-1.

## WANG Transfers Additional Fraud Proceeds to Other Bank Accounts

13.     Based on my review of documents and videos, my conversations with witnesses and other law enforcement officers, and my participation in this investigation, I have learned the following, in substance and in part:

a.      On or about May 20, 2020, YANPING WANG, a/k/a "Yvette," the defendant, and CC-2 opened an account in the name of GTV ("Account-6691"). Account-6691 was opened at a particular FDIC-insured bank ("Bank-2"). WANG and CC-2 were the only

_____

[4] Although the Subscription Agreement identified Account-5601 as the source of the capital contribution, the transfer originated from Account-2038.

authorized signatories for Account-6691. In account opening documents, WANG was identified as "Director" of GTV. The account opening documents further stated that the intended balance of Account-6691 would be between $25,000 to $50,000.

b.     On or about June 3, 2020, Account-5601 transferred $200,000,000 to Account-6691. The reference line for this transfer read, in part, "Gtv Private Placement." Just prior to this transfer Account-6691's balance was $0.

c.     On or about June 9, 2020, Account-2038 transferred $38,000,000 to Account-6691. That $38,000,000 was made up of investor funds from the GTV Private Placement first sent to Account-5601 and another particular Bank-1 account, which were then transferred, from on or about June 3, 2020 through on or about June 9, 2020, to Account-2038. Thus, as of on or about June 10, 2020, the full $237,999,970[5] in Account-6691 was compromised of proceeds from the GTV Private Placement.

d.     On or about June 9, 2020, approximately $30,906 was wired from Account-5601 to a bank account in the name of "Yanping Wang." The reference line for this wire transfer stated, in part, "Director Fee."

e.     Starting in or about June 2020, domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV-associated bank accounts (including bank accounts held in the name of Saraca) because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced the unregistered GTV Private Placement. Banks closings were also due to concerns about money movements to and from GTV-associated and Saraca-associated accounts, which raised questions about the propriety of the incoming transfers.

f.     On or about July 10, 2020, Bank-2 closed Account-6691 and provided the account holders, including WANG, one check in the amount of $137,999,970 ("Check-1") and a second check in the amount of $100,000,000 ("Check-2").

g.     In or about July 2020, WANG and others known and unknown attempted to open a bank account in the name of GTV at a particular bank ("Bank-3"). In connection with that attempt, on or about July 20, 2020, WANG signed an "Enhanced Diligence Request" which contained information about the purpose for which the Bank-3 account would be used. WANG signed the "Enhanced Diligence Request" in her capacity as "Director" of GTV.

h.     In the "Enhanced Diligence Request," WANG stated, in substance and in part, that the initial deposit into the account would "be approximately $138 million that was raised from private placement in the form of a cashiers check." According to WANG, "Saraca Media Group was the recipient of [GTV] Private Placement funds on behalf of GTV (guided by [law firm] in [Bank-1]. Saraca Media Group transferred the funds to GTV ([Bank-2])." WANG further stated, in substance and in part, that "[t]he funds in the account are funds of GTV Media Group and are strickly [sic] for operational purposes and acquisitions." Accordingly, WANG well knew that the funds raised from the GTV Private Placement could not be invested in a high-risk hedge fund held for the benefit of CC-1's close relative.

---

[5] Bank-3 debited $30 from Account-6691 for the two incoming wire transfers.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of YANPING WANG, a/k/a "Yvette," the defendant, and that she be arrested, and imprisoned or bailed, as the case may be.

/s/ Nicholas DiMarino (sworn telephonically)
_____
Nicholas DiMarino
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this __10__ day of March, 2023.

_____
THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 23 Cr. ____ |
| HO WAN KWOK, <br>    a/k/a "Miles Guo," <br>    a/k/a "Miles Kwok," <br>    a/k/a "Guo Wengui," <br>    a/k/a "Brother Seven," <br>    a/k/a "The Principal," <br> <br> KIN MING JE, <br>    a/k/a "William Je," <br> <br>          Defendants. | **23 CRIM 118** |

**COUNT ONE**
**(Conspiracy to Commit Wire Fraud, Securities Fraud, Bank Fraud, and Money Laundering)**

The Grand Jury charges:

**Overview**

1.    From at least in or about 2018 through at least in or about March 2023, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, conspired to defraud thousands of victims of more than approximately $1 billion, including victims located in the Southern District of New York. KWOK, JE, and their co-conspirators operated through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds.

2.     HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators, took advantage of KWOK's prolific online presence and hundreds of thousands of online followers to solicit investments in various entities and programs by promising outsized financial returns and other benefits. The entities and programs used in the scheme included those known as GTV, G|CLUBS, G|MUSIC, G|Fashion, and the Himalaya Exchange, among others. In truth and in fact, and as KWOK and JE well knew, the entities were instrumentalities that KWOK and JE created and used to perpetrate their fraud and exploit KWOK's followers. The scheme allowed KWOK and JE to enrich themselves, their family members, and their co-conspirators, and to fund KWOK's extravagant lifestyle.

3.     As part of the scheme, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators, laundered hundreds of millions of dollars of fraud proceeds. To conceal the illegal source of the funds, KWOK and JE transferred, and directed the transfer of, money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals. Hundreds of millions of dollars of the fraudulent scheme's proceeds were transferred, either directly or indirectly, to bank accounts in the United States, Bahamas, and United Arab Emirates ("UAE"), among other places, and held in the name of companies owned or otherwise controlled by JE.

4.     HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, used more than approximately $300 million of the fraudulent scheme's proceeds for their and their families' benefit. For example, KWOK used fraudulently-obtained victim money

2

to purchase, fund, or finance a $26.5 million purchase of an approximately 50,000-square-foot mansion in New Jersey for KWOK and his family; luxury vehicles, including an approximately $3.5 million Ferrari for one of KWOK's close family members ("Relative-1"); an approximately $37 million luxury yacht that was used by KWOK and his family and purchased in the name of one of KWOK's close family members ("Relative-2"); a piano valued at approximately $140,000; an approximately $36,000 mattress; and a $100 million investment in a high-risk hedge fund for the ultimate benefit of Relative-1, among other things. For his part, , among other things, JE transferred at least $10 million of the fraud proceeds into his and his spouse's personal bank accounts.

5.     HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators, operated the scheme for years, and continued to do so at least through the date of this Indictment. They did so, among other things, by continually adapting the scheme's means and methods to evade the enforcement of investor-protection, anti-money laundering, and bankruptcy laws in the United States, and by retaliating against individual victims who complained or demanded the return of invested funds.

**Relevant Persons and Entities**

6.     At all relevant times, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, was the leader of, and directed, the scheme.

        a.   KWOK is an exiled Chinese businessman who fled to the United States in or about 2015 and purchased a penthouse apartment at a New York City hotel for approximately $67.5 million. Starting at least in or about 2017, KWOK, who then purported to be a billionaire,

3

garnered a substantial online following. KWOK granted numerous media interviews and posted on social media, claiming to advance a movement against the Chinese Communist Party.

b. In or about 2018, KWOK founded two purported nonprofit organizations, namely, the Rule of Law Foundation and the Rule of Law Society. The Rule of Law Society's website lists KWOK as its "founder, a promot[e]r, and a spokesperson." Both organizations feature photographs of KWOK on their websites. KWOK used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe KWOK's statements regarding investment and money-making opportunities. In truth and in fact, and as KWOK well knew, he and others provided false and materially misleading information to promote these "opportunities" and to defraud KWOK's followers and other victims.

7. At all relevant times, KIN MING JE, a/k/a "William Je," the defendant, was a dual citizen of Hong Kong and the United Kingdom who principally resided in the United Kingdom, while traveling to the United States and elsewhere. JE owned and operated numerous companies and investment vehicles central to the scheme and served as its financial architect and key money launderer.

8. At certain times relevant to this Indictment, Saraca Media Group, Inc. ("Saraca") was a corporation based in New York, New York. Relative-1 was its ultimate beneficial owner.

9. At certain times relevant to this Indictment, GTV Media Group, Inc. ("GTV") was a purported news-focused social media platform based in New York, New York. GTV was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at GTV. KIN MING JE, a/k/a "William Je," the defendant,

likewise held no formal position or title at GTV, but in fact exercised control over its finances. Saraca was the parent company of GTV.

10.    At certain times relevant to this Indictment, G Club Operations, LLC ("G|CLUBS") was a purported membership organization based in Puerto Rico and in New York, New York. G|CLUBS was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at G|CLUBS. KIN MING JE, a/k/a "William Je," the defendant, likewise held no formal position or title at G|CLUBS, but in fact exercised control over its finances.

11.    At certain times relevant to this Indictment, the "Himalaya Exchange" was a purported cryptocurrency "ecosystem" that KIN MING JE, a/k/a "William Je," the defendant, founded and operated through various entities he owned, which were based abroad. Entities functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, such as G|CLUBS and G|Fashion, had purported business relationships with the Himalaya Exchange. KWOK promoted the Himalaya Exchange and claimed to be the designer of its purported cryptocurrency, although KWOK held no formal position or title at the Himalaya Exchange.

### The Fraud

*The GTV Private Placement*

12.    Between in or about April 2020 and in or about June 2020, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and

unknown, fraudulently obtained more than $400 million in victim funds through an illegal private stock offering related to GTV (the "GTV Private Placement").

    a. On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV common stock via a private placement. In that video, KWOK described, in substance and in part, the investment terms for the GTV Private Placement, and directed people to contact him, via a mobile messaging application, with any questions about the GTV Private Placement. The video and GTV Private Placement materials—including the written "Confidential Information Memorandum" (the "PPM"), Subscription Agreement, and Investment Procedure Guidelines—were transmitted to thousands of potential investors, including those in the Southern District of New York, via mobile messaging applications, social media, and text messages.

    b. The PPM promoted GTV as the "first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication."

    c. According to the PPM's metadata, JE was the "author" of the PPM. The PPM disclosed the terms of the GTV Private Placement and identified KWOK as GTV's "Sponsor and Adviser." According to the PPM, among other GTV materials, neither KWOK nor JE held any formal management position with GTV.

    d. The PPM also contained the following representations, in substance and in part, among others:

        i. The GTV Private Placement was for investors who were "interested in evaluating an opportunity to invest capital into GTV;"

ii. GTV planned to use the proceeds raised from the GTV Private Placement "to expand and strengthen the business;" and

iii. The PPM included a chart itemizing the "contemplated use of proceeds" raised from the GTV Private Placement:

| Description | Percentage of Proceeds |
| --- | --- |
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

e. Between on or about April 20, 2020 and on or about June 2, 2020, approximately $452 million worth of GTV common stock was purportedly sold to more than 5,500 investors located in the United States, including in the Southern District of New York, and abroad. Investors participated in the GTV Private Placement based, in part, on the belief that their money would be invested into GTV to develop and grow that business, as the PPM promised.

f. The vast majority of the proceeds derived from investors in the GTV Private Placement were not used to develop and grow the GTV business, but instead were deposited directly into bank accounts held in the name of Saraca, GTV's parent company, which is beneficially owned by Relative-1.

g. The GTV Private Placement was not made pursuant to a registration statement filed with the U.S. Securities and Exchange Commission ("SEC"). Rather, the offering

7

was purportedly made pursuant to SEC regulations that permit the sale of unregistered securities subject to limitations on the type of investors to whom the securities are offered and the manner in which their investments may be solicited. To evade these limitations, however, KWOK, and others under his control, used at least one intermediary entity to purchase GTV stock on behalf of pools of investors who did not qualify to participate in the GTV Private Placement.

h. In or about early June 2020, and only days after the GTV Private Placement closed, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators, misappropriated approximately $100 million raised from investors in the GTV Private Placement and directed that those funds be placed with a high-risk hedge fund ("Fund-1") for the benefit of Saraca and its ultimate beneficial owner, Relative-1. This transaction was contrary to the PPM's representations to prospective GTV investors about how investments in GTV would be used. Indeed, the $100 million investment into Fund-1 was not made for the benefit of GTV, but rather for the benefit of Saraca. The victims who supplied the $100 million invested into Fund-1 did not own any shares of Saraca. Ultimately, the investment into Fund-1 lost approximately $30 million in value.

i. After directing $100 million of GTV victim funds into Fund-1, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, continued to promote GTV using false and misleading representations.

*The Farm Loan Program*

13. Beginning in or about June 2020—the same month that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The

Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators misappropriated money from the GTV Private Placement for the benefit of Saraca and Relative-1—KWOK, JE, and their co-conspirators fraudulently obtained more than approximately $150 million in victim funds through the "Himalaya Farm Alliance." The Himalaya Farm Alliance, which KWOK organized and promoted, was a collective of informal groups (each known as a "Farm") located in various cities around the world. KWOK, JE, and others working on their behalf and at their direction, obtained these funds by making further misrepresentations to the investors in the GTV Private Placement and fraudulently soliciting further investments, this time in the form of "loans" to a Farm, and promising that such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned (the "Farm Loan Program").

   a. Starting in or about June 2020, domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV-associated bank accounts because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced an unregistered stock offering.

   b. These bank account closures frustrated the ability of KWOK, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV.

   c. On or about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program. According to KWOK and those working on his behalf, individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program.

   d. After launching the Farm Loan Program, KWOK continued to promote GTV and to falsely represent the value of GTV. For example, on or about August 2, 2020, in a video distributed via social media, KWOK falsely stated, in substance and part, "How much is

GTV? . . . a market value of 2 billion US dollars."[1] In truth and in fact, and as KWOK well knew, GTV's market value was far less because, among other things, GTV was a new business that generated no revenue.

      e. Thousands of victims "loaned" money to the Farms by sending money to bank accounts controlled by the Farms (and not GTV). According to the "Loan Agreements," which the Farms frequently did not countersign, these funds were to be used for a Farm's "general working capital purposes."

      f. KWOK and JE misappropriated funds that were raised through the Farm Loan Program. For example:

      i. Approximately $20 million was transferred to Relative-1, approximately $950,000 of which was used to pay for flight crew services on a private jet;

      ii. Approximately $5 million was transferred to an entity owned by KWOK's spouse;

      iii. Approximately $2.3 million was used to cover maintenance expenses associated with an approximately 145-foot luxury yacht worth approximately $37 million, nominally owned by Relative-2 and used by KWOK; and

      iv. Approximately $10 million was transferred to personal bank accounts in the name of JE and/or JE's spouse.

*G|CLUBS*

    14. While making misrepresentations regarding the Farm Loan Program, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known

---

[1] All statements attributed herein to KWOK have been translated from Mandarin to English, unless otherwise noted.

and unknown, fraudulently induced KWOK's followers to transfer additional funds to a purported online membership club called G|CLUBS. From at least in or about October 2020 through at least in or about March 2023, KWOK, JE, and others known and unknown, fraudulently obtained more than approximately $250 million in victim funds through G|CLUBS.

      a. Starting at least on or about June 20, 2020, in a video distributed via social media, KWOK promoted and encouraged individuals to purchase what KWOK referred to as a "G Club . . . membership card."

      b. Formally launched in or about October 2020, G|CLUBS claimed, on its website, to be "an exclusive, high-end membership program offering a full spectrum of services" and "a gateway to carefully curated world-class products, services and experiences."

      c. To join G|CLUBS, a member was required to make a one-time payment to purchase a "membership," in addition to an annual membership fee. The cost of the membership varied based on the membership tier selected by the prospective member: Tier 5 Membership cost $50,000; Tier 4 Membership cost $40,000; Tier 3 Membership cost $30,000; Tier 2 Membership cost $20,000; and Tier 1 Membership cost $10,000.

      d. On or about July 5, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that there were "25,000 [G|CLUBS] member[s] . . . $100 million dollars, the cash [in] the bank account. Then we have the 111 million . . . [who] want to join." By contrast, G|CLUBS internal documents reflected approximately 5,900 active members as of in or about August 2021.

      e. In truth and in fact, and as KWOK and JE well knew, G|CLUBS provided nothing close to "a full spectrum of services" and "experiences" to its members. Despite collecting hundreds of millions of dollars in purported membership fees, G|CLUBS maintained a relatively

11

small number of employees and provided its members few to no discernable membership benefits. Indeed, G|CLUBS did not even make good on prizes it offered members for participating in contests. On or about February 14, 2021, G|CLUBS held a webcast and sweepstakes during which members were promised luxury prizes. On at least one occasion, instead of providing a BMW to a member who purportedly won a sweepstakes, G|CLUBS claimed to the member that the member had requested that the value of the BMW be applied toward an upgrade from a Tier 1 G|CLUBS Membership to a Tier 4 G|CLUBS Membership and partially credited toward annual membership fees for the next three years. As of on or about March 8, 2021—months after G|CLUBS launched and began to collect "membership" fees—G|CLUBS did not have a business plan or a board of directors.

f. KWOK and JE also used G|CLUBS as a mechanism to continue fraudulent private placement offerings. KWOK, and others known and unknown, told KWOK's online followers that their purchase of G|CLUBS memberships would entitle them to stock in KWOK-affiliated entities, such as GTV and G|Fashion.

i. In a conversation regarding G|CLUBS membership funds on or about May 4, 2021, JE stated, in substance and in part, that "first of all, [prospective members] are buying the G|CLUBS membership, but they are expecting they would probably receive some shares, you know, on, on, on the future GTV, I think this is their expectation."

ii. On or about July 30, 2021, KWOK stated in a video distributed via social media, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%. Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is

exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both."

        g.  KWOK, JE, and others known and unknown, asked investors to purchase multiple memberships in G|CLUBS, enabling KWOK and JE to increase the amount of money solicited. In this regard, the G|CLUBS website stated, in substance and in part, that members with multiple memberships would "receive additional benefits" when, in truth and in fact, and as KWOK and JE well knew, multiple memberships did not provide members with additional benefits.

        15.  All told, investors purchased hundreds of millions of dollars' worth of G|CLUBS memberships. However, most of this money did not fund the business of G|CLUBS. Rather, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, misappropriated a substantial portion of the funds victims had paid G|CLUBS for "memberships," using, among other things, a complex web of entities and bank accounts to do so. For example:

        a.  G|CLUBS funds, which had been funneled through bank accounts in other entities' names, were used to pay personal expenses for KWOK and his family, including luxury purchases of an approximately \$2.6 million yacht and luxury automobiles that together cost more than \$5 million.

        b.  In or about November 2021, JE directed approximately \$26.5 million of G|CLUBS funds, which had been funneled through bank accounts in other entities' names, toward the purchase of KWOK's 50,000 square foot New Jersey mansion.

13

c. JE directed the transfer of an additional $13 million of G|CLUBS membership payments to an escrow account. The funds were subsequently used to pay for extravagant renovations to KWOK's New Jersey mansion, including to a wing for Relative-1 and to a wing for Relative-2, and to purchase various furniture and decorative items including, among other items, Chinese and Persian rugs worth approximately $978,000, a $62,000 television, and a $53,000 fireplace log cradle holder.

d. On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of G|CLUBS membership payments into a bank account that JE controlled.

e. G|CLUBS used membership fees to purchase luxury automobiles, including a custom-built Bugatti sports car for approximately $4.4 million. While the car's signed purchase agreement listed G|CLUBS as the customer, the initial specifications documentation for the custom-built car named Relative-1 as the customer. Relative-1 had no official position with G|CLUBS.

*The Himalaya Exchange*

16. From at least in or about April 2021 through at least in or about March 2023, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, fraudulently obtained more than approximately $262 million in victim funds through the Himalaya Exchange, a purported cryptocurrency "ecosystem" accessible on the internet. The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin"). The Himalaya Exchange claimed that the "stablecoin" was a digital asset with a fixed 1-to-$1 value

backed by reserves, and that the "trading coin" was a cryptocurrency with valuation based on supply and demand. JE was the founder and Chairman of the Himalaya Exchange.

17.     In videos distributed via social media, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, trumpeted the prospects and valuation of the Himalaya Exchange and both HCN and HDO, which he publicly described as cryptocurrencies. For example, in a video posted on the Internet on or about October 20, 2021, KWOK falsely stated the following, among other things, and in substance and in part:

      a.     "I am talking about your H Coins, 'Brother Seven' [*i.e.*, KWOK] designed it . . . .[I]t has the attribute of currency, why? It has 20% gold. Awesome[.] [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."

      b.     "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money. Or take all the value of 20% gold and ask everyone to unify it and make it yours."

      c.     "If anyone loses money, I can say that I will compensate 100%. I give you 100%. Whoever loses money, I will bear it."

      d.     "I can sell the H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money unit. . . . [A]nd you can buy anything immediately."

18.     The initial coin offering of HCN and HDO occurred on or about November 1, 2021. HCN began trading at 10 cents and, within approximately two weeks, the Himalaya Exchange website claimed that each HCN purportedly was worth approximately 27 HDO (*i.e.*, $27), which represented a 26,900% increase in value. That is, approximately two weeks after the initial coin

15

offering, the Himalaya Exchange website indicated that HCN purportedly had an approximately $27 billion valuation.

19.     At the time of the Himalaya Exchange launch, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, marketed HCN to his online followers and others. For example, on or about November 1, 2021—the day of the initial coin offering—KWOK released an official music video for an original song called "HCoin To the Moon" via social media. The phrase "to the moon" is popularly associated with cryptocurrencies and implies a sharp increase in value. The music video depicted KWOK in various luxurious locations and depicted imagery of gold and wealth.

20.     At times, including following the Himalaya Exchange launch, KIN MING JE, a/k/a "William Je," the defendant, misleadingly marketed the Himalaya Exchange. For example, in or about June 2022, JE attempted to create the impression that a €3,561,127 purchase of a Ferrari (the "Ferrari") from a particular auction house was completed with HDO. JE stated, in substance and in part, that he was "extremely pleased that [a] buyer decided to purchase [a] world-class car using HDO." Contrary to JE's claim, the Ferrari was not purchased using HDO. In truth and in fact, and as JE well knew, a Himalaya Exchange employee sent the auction house an international bank wire to cover the cost of the Ferrari, while also processing a corresponding "transaction" on the Himalaya Exchange to create the false appearance that the purchase had taken place using HDO. JE's statement was also misleading in that, among other things, the unidentified "buyer" of the Ferrari was, in fact, Relative-1.

21.     Contrary to representations of HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, HCN and HDO could not be

16

traded anywhere other than (purportedly) on the Himalaya Exchange. Moreover, unlike cryptocurrencies, HCN could not be traded for, or converted into, other currencies. HCN purportedly could be traded for only HDO (and only on the Himalaya Exchange), and HDO purportedly only could be converted to or from fiat currency (and only on the Himalaya Exchange).

           a. Indeed, the HDO and HCN Whitepapers, available on the Himalaya Exchange website, provided in fine print that, contrary to KWOK's representations, HCN and HDO were not cryptocurrencies. Rather, according to the HCN Whitepaper, the "operation of the Himalaya Exchange and associated applications and infrastructure will be facilitated through the use of 'Credits.'" Those credits (i) could "only be used on the Himalaya Exchange or within the Himalaya Ecosystem," and (ii) did "not carry any right to require their exchange for fiat currency or crypto-assets." Moreover, while Himalaya Exchange members could request to exchange their "HDO" credits for an equivalent payment in U.S. dollars, the HDO Whitepaper stated that the Himalaya Exchange had the "discretion" to deny any such request.

      22.    In or about April 2022, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, arranged for the transfer of approximately \$37 million in Himalaya Exchange funds from a Himalaya Exchange bank account to a particular escrow account. The \$37 million was structured as a purported "loan" to cover the cost of a luxury yacht that KWOK had previously purchased and used, which yacht was then-owned by an entity held in the name of Relative-2.

*Government Seizure of Fraud Proceeds*

      23.    On or about September 20, 2022 and September 21, 2022, U.S. authorities served judicially-authorized seizure warrants on several domestic banks, and subsequently seized

17

approximately $335 million of proceeds from bank accounts held in the names of Himalaya Exchange entities and other entities associated with HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants. Following the September 2022 judicially authorized seizures, JE attempted to transfer approximately $46 million from domestic bank accounts associated with the Himalaya Exchange, which had not yet been seized by the United States, to a bank account in the UAE that JE controlled.

    a.   Within approximately two days of the first judicially authorized seizures of Himalaya Exchange-related funds, on or about September 22, 2022, JE contacted the management of a domestic bank that held Himalaya Exchange bank accounts. JE sought to implement a wire transfer, which he and a Himalaya Exchange executive claimed to the domestic bank was needed to effectuate a "redemption" from HDO to U.S. dollars for an unnamed "VIP" (*i.e.*, very important client of the Himalaya Exchange).

    b.   In subsequent communications with the domestic bank, JE revealed that the VIP was, in fact, JE himself. JE provided the domestic bank with documents reflecting two purported HCN sales by JE on or about September 22, 2022—totaling 46 million HDO, which JE was attempting to "convert" into $46 million. JE twice emphasized to the domestic bank's management, in substance and in part, that the $46 million transfer needed to happen "today or it is meaningless."

24.    On or about October 16, 2022, pursuant to a judicially authorized warrant, U.S. authorities seized an additional approximately $274 million of proceeds from several Himalaya Exchange and G|CLUBS accounts at the domestic bank from which JE requested the $46 million transfer.

a. As a result of the judicially authorized September and October 2022 seizures, U.S. authorities seized more than approximately $609 million of fraud proceeds, including approximately $278 million from bank accounts held in the names of the Himalaya Exchange entities, including accounts that purported to hold its HDO cash reserves.

b. Following the seizures, the Himalaya Exchange website continued to represent that HDO was backed by a "Reserve consisting of USD and cash-equivalent assets" when, in truth and in fact, it was not.

c. Despite the seizure of the Himalaya Exchange's cash reserves, the purported price of HCN had not suddenly and sharply declined through the date of this Indictment.

## STATUTORY ALLEGATIONS

25. From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) wire fraud, in violation of Title 18, United States Code, Section 1343; (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (3) bank fraud, in violation of Title 18, United States Code, Section 1344; (4) international promotional money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and (5) international concealment money laundering, in violation of Title 18, United States Code Section 1956(a)(2)(B)(i).

26. It was a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal,"

and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KWOK and JE agreed to obtain victims' money by causing materially false information and misrepresentations to be transmitted over interstate wires, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

27.    It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE agreed to fraudulently induce investors to participate in the GTV Private

Placement, the Farm Loan Program, and G|CLUBS by providing materially false and misleading information and representations in connection with purported shares of GTV common stock and purported companies affiliated with GTV.

28.    It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, as defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, KWOK and JE agreed to participate in a scheme to mislead U.S. financial institutions through false and fraudulent pretenses, representations, and documents, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange, in order to obtain money of, or under the custody and control of, at least one financial institution.

29.    It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, the

offenses alleged in Counts Two through Eight of this Indictment in violation of Title 18, United States Code, Section 1956(a)(2)(A)(i).

30.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represent the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer is designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, the offenses alleged in Counts Two through Eight of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

## Overt Acts

31.     In furtherance of the conspiracy and to effect its illegal objects, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV stock via the GTV Private Placement.

b.      On or about June 5, 2020, a co-conspirator not named herein ("CC-1"), while located in the Southern District of New York, authorized a wire transfer of $100 million from Saraca to Fund-1.

c.      On or about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program.

d.      On or about August 2, 2020, in a video distributed via social media, KWOK stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."

e.      On or about May 28, 2021, JE transferred approximately $13 million from a bank account in the UAE that JE controlled to a bank account held by an entity (owned by Relative-2) at a particular bank in New York, New York.

f.      On or about July 30, 2021, in a video distributed via social media, KWOK stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G-Clubs membership?' 100%. Because I said that I have to promise that [to] anyone who buys G-Clubs membership before September 17 [they] must be allotted shares, which is exactly same. Because we said that anyone can choose whether to use your money to buy G-Clubs before September 17, G-Clubs and the stock shares. You'll get both."

g.      On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of funds victims had sent to G|CLUBS in exchange for "memberships" to a bank account that JE controlled.

h.      On or about October 20, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that KWOK "designed" HCN, that "[n]o matter how much it raises, 20% will turn into gold," and that "[i]f anyone loses money" on HCN, "I can say that I will compensate 100%."

23

i.      On or about September 22, 2022, JE texted a U.S. bank's management, in substance and in part, that a $46 million transfer to a JE-controlled bank account in the UAE needed to happen "today or it is meaningless."

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Wire Fraud – GTV Private Placement)

The Grand Jury further charges:

32.      The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

33.      From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Securities Fraud – GTV Private Placement)

The Grand Jury further charges:

34.  The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

35.  From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE conducted the GTV Private Placement to sell GTV stock and obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Wire Fraud – Farm Loan Program)

The Grand Jury further charges:

36.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

37.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE conducted the Farm Loan Program to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Securities Fraud – Farm Loan Program)

The Grand Jury further charges:

38.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

39.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE conducted the Farm Loan Program to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX
**(Wire Fraud – G|CLUBS)**

The Grand Jury further charges:

40.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

41.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE promoted and marketed G|CLUBS to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT SEVEN
### (Securities Fraud – G|CLUBS)

The Grand Jury further charges:

42.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

43.     From at least in or about June 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a

28

security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE promoted and marketed G|CLUBS to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Wire Fraud – The Himalaya Exchange)

The Grand Jury further charges:

44. The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

45. From at least in or about April 2021 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings,

29

signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE operated the Himalaya Exchange to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINE
### (International Promotional Money Laundering)

The Grand Jury further charges:

46.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

47.     From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, KWOK and JE directed and made international transfers of funds into, out of, and through the United States, with the intent to promote the fraud offenses in Counts Two through Eight of the Indictment.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

30

## COUNT TEN
### (International Concealment Money Laundering)

The Grand Jury further charges:

48. The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

49. From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, namely, the fraud offenses alleged in Counts Two through Eight of this Indictment, to wit, KWOK and JE conducted international financial transactions into, and out of, and through the United States involving fraud proceeds, including, among other transactions, transactions involving bank accounts held in the names of entities nominally owned by other individuals and by entities not overtly associated with the defendants, in order to conceal the ownership, control, and/or receipt of the proceeds of the fraud and the illegal nature and source of such proceeds.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

31

## COUNT ELEVEN
### (Unlawful Monetary Transactions)

The Grand Jury further charges:

50.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

51.     On or about June 5, 2020, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, KWOK and JE made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Two and Three to Fund-1.

(Title 18, United States Code, Sections 1957 and 2.)

## COUNT TWELVE
### (Obstruction of Justice)

The Grand Jury further charges:

52.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

53.     From at least on or about September 20, 2022 through the date of the filing of this Indictment, in the Southern District of New York and elsewhere, KIN MING JE, a/k/a "William Je," the defendant, corruptly obstructed, influenced, and impeded an official proceeding and attempted so to do, to wit, JE attempted to transfer money to the UAE, beyond the jurisdiction of the United States, to impede and interfere with a federal grand jury investigation in the Southern

32

District of New York of the offenses alleged in Counts One through Eleven of this Indictment, and proceedings before the United States District Court for the Southern District of New York concerning the seizure and forfeiture of criminally derived proceeds.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

## FORFEITURE ALLEGATIONS

54.     As a result of committing the offenses alleged in Counts One through Eight of this Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and, and the following specific property:

a.     $64,826.87 in United States currency formerly on deposit in Account Number 5090037713 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

b.     $75,000,000.00 in United States currency formerly on deposit in Account Number 5090037705 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

c.     $467,343.00 in United States currency formerly on deposit in Account Number 5090037754 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

d. $89,992,861.75 in United States currency formerly on deposit in Account Number 5090042770 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

e. $1,683,077.40 in United States currency formerly on deposit in Account Number 5090042762 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

f. $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

g. $48,230,709.62 in United States currency formerly on deposit in Account Number 5090030288 at Silvergate Bank held in the name of "Hamilton Investment Management" Ltd., seized by the Government on or about September 18, 2022;

h. $1,800,000.00 in United States currency formerly on deposit in Account Number 5090037739 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

i. $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

j. $4,643,744.70 in United States currency formerly on deposit in Account Number 7801000590 at FV Bank held in the name of "Himalaya International Reserves, Ltd.," seized by the Government on or about September 20, 2022;

34

k. $14,599,257.25 in United States currency formerly on deposit in Account Number 7801000254 at FV Bank held in the name of "Himalaya International Clearing, Ltd.," seized by the Government on or about September 20, 2022;

l. $11,538,579.87 in United States currency formerly on deposit in Account Number MBI10103-0000 at Mercantile Bank International held in the name of "G Club International Ltd.," seized by the Government on or about October 16, 2022;

m. $9,451,170.54 in United States currency formerly on deposit in Account Number MBI10133-0000 at Mercantile Bank International held in the name of "Himalaya International Clearing Ltd.," seized by the Government on or about October 16, 2022;

n. $2,823,642.39 in United States currency formerly on deposit in Account Number MBI10137-0000 at Mercantile Bank International held in the name of "Hamilton Capital Holding Ltd.," seized by the Government on or about October 16, 2022;

o. $249,000,115.46 in United States currency formerly on deposit in Account Number MBI10138-0000 at Mercantile Bank International held in the name of "Himalaya International Reserves Ltd.," seized by the Government on or about October 16, 2022;

p. $283,965.11 in United States currency formerly on deposit in Account Number MBI10139-0000 at Mercantile Bank International held in the name of "Himalaya International Financial Group Ltd.," seized by the Government on or about October 16, 2022;

q. $1,085,623.67 in United States currency formerly on deposit in Account Number MBI10171-0000 at Mercantile Bank International held in the name of "Hamilton Investment Management Ltd.," seized by the Government on or about October 16, 2022;

35

r.  $43,782.71 in United States currency formerly on deposit in Account Number MBI10172-0000 at Mercantile Bank International held in the name of "G Fashion International Limited," seized by the Government on or about October 16, 2022;

s.  $161,809.47 in United States currency formerly on deposit in Account Number MBI10183-0000 at Mercantile Bank International held in the name of "Himalaya Currency Clearing Pty Ltd.," seized by the Government on or about October 16, 2022;

t.  $2,745,377.75 in United States currency formerly on deposit in Account Number 9878904409 at Manufacturers & Traders Trust Co. held in the name of "GETTR USA, Inc.," seized by the Government on or about September 18, 2022;

u.  $9,899,659.19 in United States currency formerly on deposit in Account Number 157525208185 at US Bank held in the name of "G Fashion," seized by the Government on or about September 18, 2022;

v.  All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430, Parcel No. 3300021-03-00001-02 and described as Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality, Township: MAHWAH TWP

w.  A Bugatti Chiron Super Sport, bearing Vehicle Identification Number VF9SW3V3XNM795047;

x.  A Lamborghini Aventador SVJ Roads, bearing Vehicle Identification Number ZHWUN6ZD2MLA10393;

y.  A Rolls Royce Phantom EWB, bearing Vehicle Identification Number SCATT8C08MU206445;

36

z. A 46m 2014 Feadship superyacht "Lady May" (ex Como), bearing IMO Number 112359, MMSI Number 319059500, and Callsign ZGDQ9;

aa. A Bösendorfer 185VC Porsche #49539 piano with custom bench, purchased for approximately $140,938.69;

bb. A Railis Design Iceland Contemporary Poseidon Bed with Nightstands, Ebony Veneer, Brass, Velvet, purchased for approximately $31,413.71;

cc. A Hästens 2000T md mattress, purchased for approximately $36,590.00;

dd. A Hästens 2000T sf mattress, purchased for approximately $36,210.00;

ee. A Wembe watch storage box, purchased for approximately $59,392.91;

ff. A Samsung Q900 Series QN98Q900RBF 98" QLED Smart TV – 8K, purchased for approximately $62,787.54;

gg. A Louis XV Style French Ormolu-Mounted Mahogany Commode by Joseph Émmanuel Zweiner;

hh. A "K'ang Hsi" extension table in etched and patinated pewter and bronze with hand-painted enamel colors by Philip & Kelvin LaVerne, purchased for approximately $180,000.00; and

ii. A "Punto '83" table in stainless steel with mesh tabletop with adjustable height and adjustable petals by Gabriella Crespi, Italy 1982, purchased for approximately $180,000.00.

(a) through (ii), collectively, the "Specific Property."

55. As a result of committing the money laundering offenses alleged in Counts One, Nine, Ten and Eleven of this Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE,

37

a/k/a "William Je," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the Specific Property.

## Substitute Assets Provision

56.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON
3/6/2023

_____
DAMIAN WILLIAMS
United States Attorney

3/6/23    Indictment filed under seal
Arrest warrant issued        USMJ Gorenstein
                                                    MG

38

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------:

UNITED STATES OF AMERICA,          : Case No.:23-MJ-2007

                            Plaintiff,   :

     -against-                    :

YANPING WANG,                      : New York, New York

                       Defendant.   : March 15, 2023

--------------------------------: Conference

PROCEEDINGS BEFORE

THE HONORABLE KATHERINE H. PARKER

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
                   SOUTHERN DISTRICT OF NEW YORK
                   BY:  Juliana Murray
                       Ryan B. Finkel
                       Micah F. Fergenson
                   One St. Andrew's Plaza
                   New York, New York 10007

For Defendant:       CHAUDHRYLAW PLLC
                   BY:  Priya Chaudhry
                   147 West 25th Street
                   New York, New York 10001

For Defendant:       Lipman Law PLLC
                   BY:  Alex Lipman
                   147 West 25th Street
                   New York, New York 10001


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                    THE DEPUTY CLERK:  Calling Case

 2      23-MG-2007, U.S. versus Yanping Wang.

 3                    MS. MURRAY:  Good afternoon, Your Honor.

 4      Juliana Murray, Ryan Finkel and Micah Fergenson on

 5      behalf of the United States.

 6                    THE COURT:  Good afternoon.

 7                    THE DEPUTY CLERK:  And counsel for

 8      Ms. Yang, can you -- Ms. Wang, can you state your

 9      appearance for the record.

10                    MS. CHAUDHRY:  Good afternoon,

11      Your Honor.  Priya Chaudhry of ChaudhryLaw, along

12      with Alex Lipman of Lipman PLLC.  We are

13      representing Yvette Wang, who is present, seated

14      between us, and being assisted by a Mandarin

15      interpreter.

16                    THE COURT:  Good afternoon.

17                    MR. LIPMAN:  Good afternoon, Your Honor.

18                    THE COURT:  Good afternoon, Ms. Wang.

19      I'm Judge Parker.  Can you clearly hear the

20      interpreter?

21                    THE DEFENDANT:  Yes.

22                    THE COURT:  Okay.  Great.

23                    You've been arrested based on charges

24      filed against you in a complaint.  The purpose of

25      the proceeding today is to inform you of certain
```

 1   rights that you have, inform you of the charges

 2   against you, consider whether counsel should be

 3   appointed for you, and decide under what conditions,

 4   if any, you shall be released pending trial.

 5            Can I please have the date and time of

 6   arrest.

 7            MS. MURRAY:  Yes, Your Honor.  The

 8   defendant was arrested this morning at approximately

 9   6:00 a.m.

10            THE COURT:  I'm now going to explain

11   certain constitutional rights that you have.

12            You have the right to remain silent.

13   You're not required to make any statements.  Even if

14   you've already made statements to the authorities,

15   you're not required to make any further statements.

16   Any statements you do make can be used against you.

17            You have the right to be released with or

18   without conditions imposed pending trial, unless I

19   find that there are no conditions that would

20   reasonably assure your presence at future court

21   appearances and the safety of the community.  If you

22   are not a U.S. citizen, you have the right to

23   request that a government attorney or a

24   law-enforcement official notify a consular officer

25   from your country of origin that you've been

1    arrested.  And in some cases, a treaty or other

2    agreement may require the U.S. government to give

3    that notice, whether you request it or not.

4            You have the right to be represented by

5    an attorney during all court proceedings, including

6    this one, and during all questioning by the

7    authorities.  You have the right to hire your own

8    attorney, but if you cannot afford one, the Court

9    will appoint one to represent you.

10            Do you understand your rights as I've

11    just explained them?

12            THE DEFENDANT:  I understand.

13            THE COURT:  Okay.  Now, I understand

14    you've retained counsel, so there's no -- is that

15    correct?  I don't have any financial affidavit.

16            THE DEFENDANT:  That's correct.

17            THE COURT:  Yes, right.  Okay.

18            So now I'm going to review the charges in

19    the complaint.  The complaint charges you with

20    conspiring with others to commit wire fraud and

21    securities fraud in violation of Title 18 of the

22    United States Code § 371.

23            Count II charges you with committing wire

24    fraud in violation of Title 18 of the United States

25    Code § 1343 and § 2.

```
 1              Count III charges you with committing
 2    securities fraud in violation of Title 15 of the
 3    United States Code §§ 78j(b) and 78ff, as well as
 4    Title 17 of the Code of Federal Regulations
 5    § 240.10(b)(5) and Title 18 of the United States
 6    Code § 2.
 7              Count IV charges you with engaging in an
 8    unlawful monetary transaction in violation of
 9    Title 18 of the United States Code §§ 2 and 1957.
10              And these charges all relate to your
11    involvement with GTV and a private placement in
12    connection with GTV, and transfer of money
13    associated with that.
14              Counsel, have you reviewed the complaint
15    with your client with the aid of a Mandarin
16    interpreter?
17              MS. CHAUDHRY:  Your Honor, we have.
18              THE COURT:  And does she waive its public
19    reading?
20              MS. CHAUDHRY:  She does.
21              THE COURT:  Okay.  Ms. Wang, do you
22    understand what you're being charged with?
23              THE DEFENDANT:  Yes, I understand.
24              THE COURT:  Okay.  Now, in addition to
25    the rights that I've already told you about, you
```

```
 1    have the right to a preliminary hearing at which the
 2    government will have the burden of showing that
 3    there is probable cause to believe that the crime
 4    for which you're being charged has been committed
 5    and that you're the person who committed it.  At the
 6    hearing, you and your counsel would be entitled to
 7    cross examine any witnesses and introduce evidence.
 8              If you're held in custody, you have the
 9    right to a preliminary hearing within 14 days.  If
10    you're not in custody, you have the right to a
11    preliminary hearing in 21 days.  But a preliminary
12    hearing will not be held if you are indicted by a
13    grand jury before the date of a preliminary hearing.
14    I'll set the date for a preliminary hearing in a
15    moment.
16              What is the government's position as to
17    bail, detention or release?
18              MS. MURRAY:  Just, first, one note for
19    the record, Your Honor, the defendant is a citizen
20    of China, and consular notification was made this
21    morning of her arrest.
22              THE COURT:  Okay.  That's noted for the
23    record.  Thank you.
24              MS. MURRAY:  The government has spoken
25    with defense counsel, and we have a largely
```

1    agreed-upon bail package.  There are two key

2    differences.  So I'm happy to address the

3    differences first, if Your Honor would like, and

4    then we can talk through the conditions, or I can

5    take it in the inverse order.

6              THE COURT:  Let's start with what you do

7    agree with, and then you can tell me what you don't

8    agree with.

9              MS. MURRAY:  The government would agree

10   to a personal recognizance bond of $5 million

11   co-signed by two financially responsible persons

12   approved by the government and secured by $1 million

13   in real property and/or cash; an agreement on travel

14   restriction to the Southern and Eastern Districts of

15   New York; the surrender of any travel documents, and

16   that the defendant make no new applications for any

17   travel documents; that the defendant disclose all

18   assets to Pretrial Services and the U.S. Attorney's

19   Office, including any assets over which she has

20   possession, custody or control; and to include any

21   joint or business accounts and any cash,

22   cryptocurrency or digital assets; that the defendant

23   not open any new bank accounts or lines of credit

24   without approval of Pretrial Services; that the

25   defendant have no contact with Ho Wan Kwok, also

1    known as Miles Guo or Kin Ming Je, J-E, also known

2    as William Je, or any alleged victims or witnesses

3    outside the presence of counsel; and any other

4    conditions recommended by Pretrial Services.

5            And then, Your Honor, the two points that

6    the parties are not in agreement on -- first, the

7    government would seek home detention, reinforced by

8    GPS location monitoring, and the government would

9    seek that the defendant be detained until all

10   conditions are met.

11           THE COURT:  Okay.  Now, am I correct that

12   the crimes for which Ms. Wang is charged are not

13   ones that carry a presumption of detention?

14           MS. MURRAY:  That is correct, Your Honor.

15           THE COURT:  And under the Bail Reform

16   Act, I'm required to release the defendant on the

17   least restrictive means necessary to reasonably

18   assure the defendant's return to court and the

19   safety of the community.

20           So I'd like to understand first why you

21   believe that home detention with GPS is the least

22   restrictive means necessary to achieve those

23   purposes.

24           MS. MURRAY:  Sure.  So with respect to

25   this defendant's risk of flight, the government

1    certainly thinks there's more than a preponderance

2    of the evidence that the defendant poses a

3    significant risk of flight.  The defendant -- even

4    though these are not charges that carry presumption

5    of detention, the defendant is charged with crimes

6    that carry a very large dollar amount.  She's

7    charged with a $100 million wire transfer.  That's a

8    sole transfer of money that the government alleges

9    is fraud proceeds over which she had sole authority

10   to authorize that wire transfer in addition to the

11   securities fraud and the wire fraud conspiracy.

12          The defendant has access to significant

13   assets.  Some of those are known to the government.

14   Some of them, frankly, may not be known to the

15   government because the defendant and others that she

16   has conspired with operate through the use of

17   extremely sophisticated and complicated shell

18   companies.

19          So as a few examples for Your Honor, the

20   defendant's apartment was purchased in the name of

21   an LLC that she fully owns.  I'm not suggesting that

22   there's anything questionable about that

23   necessarily, but I'm using it as an example of one

24   of more than a dozen entities that we are aware that

25   the defendant either has or had control over,

1    including financial control.  And some of those

2    entities, whether the defendant is the primary

3    shareholder of the entities or has access

4    necessarily to the bank accounts, the defendant

5    certainly has decisive control at least in the

6    corporate documentation over those companies.

7         The defendant also is not a resident of

8    the United States.  There's a pending application

9    for asylum, but the universe within which the

10   defendant and Miles Guo and William Je and others

11   operate is an extensive network that is bolstered by

12   hundreds of thousands of online followers throughout

13   the globe, so it's not limited to the New York area.

14        We are aware that there are people who

15   support Mr. Guo and Ms. Wang and their comrades, as

16   they call them, throughout, as I mentioned, this

17   global network known as the Himalaya Farm Alliance,

18   and so we have serious reason to believe that there

19   are people in other jurisdictions who would be

20   supportive to Ms. Wang were she to flee and that she

21   has significant assets to be able to flee.

22        And then I would also note, with respect

23   to risk of flight, the strength of the government's

24   evidence in this case.  The Court has before it a

25   complaint, but just to represent to the Court, the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  complaint is supported by bank records, bank records
2  the defendant signed. IP logs that indicate that
3  the defendant was the person who authorized the
4  transfer of the $100 million, that she did so from
5  her apartment here in Manhattan, that she had sole
6  authority for numerous bank accounts that were
7  involved in, as alleged, hundreds of millions of
8  dollars worth of fraud.
9          Another point that we would note for Your
10 Honor are the circumstances of the defendant's
11 arrest this morning. The defendant was arrested in
12 her apartment in Manhattan. She is the -- per the
13 Pretrial Services report, the sole occupant of that
14 apartment. During the search of the apartment,
15 pursuant to a judicially authorized search warrant,
16 the FBI found $138,000, approximately, in cash, that
17 was in a safe, largely in $100 bills. They appeared
18 to be new bills. In that safe, they also found what
19 appeared to be old passports of both Ms. Wang and
20 Miles Guo, or Ho Wan Kwok. So she was holding the
21 old, but the travel documents for both herself and
22 for Mr. Guo, or Mr. Kwok.
23         They recovered more than, approximately,
24 12 iPhones. And I think it's important for the
25 Court to note the circumstances that these items

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1     were found in.  But more than approximately
2     12 iPhones, several laptops, and then documents that
3     relate to, among other things, entities involved
4     with the fraud.
5              The 12 iPhones or so, as an example, were
6     not all in plain view.  They weren't all plugged in.
7     Some of them were in what appeared to be original
8     packaging.  They appeared to be new.  They were
9     inside bags or luggage inside of a closet.  And yet,
10    when the FBI searched those phones to determine
11    whether they were, in fact, fresh out of the box or
12    whether they had data, all of those phones had data
13    on them, which, to the government, is powerful
14    evidence of concealment and hiding evidence that we
15    would allege to be certainly evidence of the crimes.
16             Similarly, laptops and documents were
17    found concealed within the apartment.  So, as an
18    example, a laptop was between two sweaters on a
19    shelf in the back of a closet.  Documents were found
20    between couch cushions or between the mattress and
21    the bed.
22             In terms of luxury items, and, again, we
23    would allege it's not consistent with, at least, the
24    defendant's reported income, as we understand it
25    from our evidence, 15 to 20 boxes of Hermes scarves
```

1     that seemed to be new, several Hermes wallets, a

2     large Hermes bag.  And then additional electronics

3     that we don't yet know what they contain, but

4     multiple terabyte hard drives, multiple flash

5     drives.  And then also within the space was

6     contained a pouch that had seven to eight SIM cards.

7            In light of those circumstances and the

8     defendant's deep connection with numerous shell

9     entities, for lack of ties to the community in the

10    sense of any status within the U.S., her extensive

11    connections to a network of very supportive

12    followers throughout the country and the world.  And

13    then also the defendant's role in the charged

14    offenses.  She was a signatory, as I mentioned, of

15    numerous accounts, not just the account from which

16    the $100 million was transferred, but the head of

17    the various entities that make up the Kwok or Guo

18    family offices.  She had control over those

19    entities.  She had authority.  She was essentially

20    the chief of staff to Miles Guo or Miles Kwok.

21           She ran the operations.  At certain

22    points when he was operating various of his

23    controlled companies out of a townhouse on the Upper

24    East Side, right near Ms. Wang's apartment, there

25    were several different purported businesses working

```
 1    out of the same townhouse, and Ms. Wang was the
 2    command center.  It didn't matter which business.
 3    If someone was asking for approval for a wire,
 4    approval for a business decision, they would go to
 5    her.  So she was the one who was tasked with being
 6    the primary right-hand person for this billion
 7    dollar fraud.
 8            Those are the reasons the government
 9    thinks that home detention with GPS monitoring is
10    appropriate.  And we also believe that it's
11    important for the conditions to be met and for the
12    government to get comfort that the conditions are
13    met, including the financial bond and the co-signers
14    before the defendant is released.
15            THE COURT:  Okay.  Thank you.
16            I'll hear from defense counsel next.
17            MS. CHAUDHRY:  Thank you, Your Honor.  I
18    think the government missed a very big point in
19    their risk of flight argument, which is that
20    Ms. Wang is unique.  She's not just a citizen of
21    China that is in the U.S., she is a political
22    refugee.  The idea that she would flee to China --
23    whatever she's looking at in terms of the
24    government's proof in the government's case, what
25    she is looking at if she were to go back to China
```

1    ever in this lifetime is much worse, which is why

2    she's seeking political asylum.  Going to China is

3    not an option for her.  So there is no risk of

4    flight to China in this lifetime for Ms. Wang.

5    That's one.

6              Two, these passports that were found are

7    old and expired passports.  And as the government

8    conceded, Ms. Wang was the chief of staff to Miles

9    Kwok, so having her an his expired passport is not

10   out of the ordinary, since she's also handling their

11   immigration asylum application.

12             In addition, while the government says

13   that she does have followers, this case, especially

14   Mr. Kwok's case, is going to get so much publicity

15   that it would be very unusual for Interpol to not

16   notice that one of the three very high-profile

17   defendants in this case has crossed a border.  She

18   doesn't have any travel documents anymore.

19             And when we talk about ties to the

20   community, Ms. Wang left China in April of 2015 and

21   has never gone back, ever.  Not even to see her

22   father before he died, not to see her own child, who

23   she cannot return to see.  She has been in New York,

24   and, in fact, in Manhattan since 2017.  And like

25   many New Yorkers, she doesn't drive.  She has lived

1     in this apartment that she owns since 2020.  And
2     before that, she rented an apartment in the same
3     building.  Pretrial Services has called the building
4     and confirmed that she does, in fact, live there.
5             And she does have her asylum application
6     in.  The interviews are done.  So she is actively
7     seeking to not only let the U.S. government know
8     she's here, but to let her stay.  This is not
9     someone who is risking going anywhere where China
10    can get their hands on her again.
11           GPS monitoring for Ms. Wang would assure
12    the government and the Court that we know where she
13    is.  It is used for defendants all over this
14    country.  It is incredibly effective.  I have had
15    clients who face charges in this district who have
16    lived all over the country, and they have faced
17    similar charges, and that was enough to keep them --
18    to -- sorry -- to secure their return to court.
19    That's something that, I think, Pretrial is able --
20    hopefully, able to do today before she leaves.
21           We are happy to agree to the rest of it,
22    but that is asking -- letting her out today, we
23    think is easy to do without the Court really
24    worrying that they will never see her again.  And
25    the government's request for home confinement, we

```
 1    think is also unnecessary, given the effectiveness
 2    of the GPS location monitoring.
 3              With the travel restrictions of the
 4    Southern and Eastern Districts of New York, that
 5    should keep us all aware of Ms. Wang's whereabouts.
 6    And, in addition, she has no intention of going
 7    anywhere.  She has known that the government has
 8    been investigating her, and the SEC has been
 9    investigating for quite a while, and she has not
10    fled.  And she has no intention of fleeing.  So for
11    that reason, we would agree to all of that with
12    those two requests for a change, and we would ask to
13    have ten days to get the rest of the conditions met,
14    but to release Ms. Wang on her signature today.
15              THE COURT:  So you don't object to an
16    ankle bracelet, you object to home detention?
17              MS. CHAUDHRY:  Correct.
18              THE COURT:  And Ms. Wang being held until
19    the conditions are met.
20              MS. CHAUDHRY:  That's right.
21              THE COURT:  And do you have financial
22    suretors?
23              MS. CHAUDHRY:  We are working on them.
24    The government has agreed to have a dialogue with us
25    in the next day or two to find people that they --
```

```
 1   we offered some people not yet acceptable.  We will
 2   find people that are acceptable.
 3              THE COURT:  What's the value of
 4   Ms. Wang's apartment, if anybody -- do you -- does
 5   any -- either side know?
 6              MS. CHAUDHRY:  It was purchased for just
 7   over $1 million.  It has no mortgage.  And that was
 8   in 2020.  It is in a desirable building on the Upper
 9   East Side, so I assume it's worth at least that
10   right now.
11              THE COURT:  Does the government have any
12   comments in response?
13              MS. MURRAY:  Yes.  Thank you, Your Honor.
14   Just briefly, a few points.
15              One, with respect to Ms. Chaudhry's point
16   about Ms. Wang not looking to go to China anytime
17   soon because of the danger that it poses in light of
18   her status as a political asylee applicant here, I
19   would just note there are other places that Ms. Wang
20   could go to.  At least one of her entities is a BVI
21   registered entity.  There are connections in this
22   case and with respect to bank account and money and
23   entities that Ms. Wang had access to, to the UAE,
24   including very recent activity in Dubai and the UAE
25   as recently as a couple of days ago, by people who
```

1    are involved in these entities and in this fraud

2    scheme.

3             So the expired passports in the safe, one

4    doesn't need a passport to flee somewhere and then

5    seek asylum in that location. So we would note that

6    we think that there is a significant risk of flight,

7    and Ms. Wang's relationship with China does not

8    mitigate that, particularly in light of her ties to

9    other jurisdictions, including other jurisdictions

10   that do not readily, or even at all, extradite to

11   the United States.

12           Another couple of points. $130,000 in

13   cash, that seems like an emergency flight fund.

14   That is a lot of cash to be having on hand and

15   indicates to us that, even setting aside the bank

16   accounts that she has control over and access to and

17   the entities that she has control and access to, she

18   has been storing cash for some reason in a safe in

19   her apartment. That gives us grave concerns about

20   potential motivation to flee and also ability to

21   flee on a moment's notice.

22           With respect to the location monitoring,

23   the GPS bracelet versus home detention reinforced by

24   GPS monitoring, I understand Ms. Chaudhry's point,

25   but a bracelet is relatively easy to cut. I

```
 1    understand that most people, you know, kind of,
 2    comply with the conditions.  Our concern here, where
 3    we have somebody who had all of that cash just
 4    within her apartment is there could be other
 5    locations she has access to where she has assets
 6    stored away to help her flee.  She could cut the
 7    bracelet.  It's another reason, Your Honor, why it
 8    is so important for us to firm up the conditions of
 9    the bond that the parties do agree on, including the
10    financial conditions, before Ms. Wang is released so
11    that we have some comfort that we have a sense of
12    what would actually be put up in this case as a
13    bond, and we would have a sense of what controls we
14    would have in place if Ms. Wang were to flee.
15            And, finally, with respect to the
16    co-signers that the defense counsel has proposed to
17    us, we are more than happy to work with the defense
18    counsel to find co-signers who would be satisfactory
19    to the government.  I would note that the two names
20    that were floated today are two people that the
21    government will not accept in light of their own
22    participation in the fraud scheme.  So not making
23    any claims about, you know, what Ms. Wang may or may
24    not know about the government's view of those people
25    or its evidence, but it's concerning to us that the
```

1      financially responsible persons that she presents

2      today are two people who have been alleged had

3      involvement in the fraud.

4              THE COURT:  Okay.  Anything further?

5              MS. CHAUDHRY:  Yes, Your Honor, just on

6      the $138,000 in cash.  It is a fact, and I think

7      it's publically known since the GTV cases have

8      gotten some notoriety, that lots of groups, whether

9      they're countries or companies, have taken political

10     stances in this, including various banks that have

11     closed Ms. Wang's bank accounts down, which is why

12     she ended up with a lot of cash in her safe.  She

13     has gone through nearly a dozen normal banks,

14     whether it is Bank of America or Santander or --

15     they just close her accounts down and make her come

16     get her money.  So that is one of the reasons that

17     she keeps cash on hand.

18         And the second thing is the government's

19     entirely speculative claim that there could be other

20     places where she has cash where she could go are

21     just that, they're just speculation.  They have been

22     investigating this for a long time.  They haven't

23     given the Court a particular place where they think

24     that there's cash.  I mean, either they think this

25     is somebody who has followers in the world who could

```
 1    disappear her or they think she doesn't, but, you

 2    know, GPS works for just about every other

 3    defendant, and so that -- that would be my response

 4    to that.

 5              THE COURT:  Okay.  Thank you.

 6              I've carefully considered the arguments

 7    of the government and defense counsel, and also I

 8    consider the recommendations of Pretrial Services.

 9    And based on this, I believe that there are

10    conditions that I can impose that will assure

11    Ms. Wang's return to court and the safety of the

12    community.  And the conditions that I'm going to

13    impose are the least restrictive I believe are

14    necessary to achieve that purpose.  So...

15              All right.  Ms. Wang will be released

16    subject to meeting all of the conditions.  In other

17    words, she's going to be detained until all of the

18    following conditions are met:  $5 million bond

19    co-signed by two financially responsible persons

20    approved by the government, and it will be secured

21    by $1 million in cash or property.  Travel

22    restricted to the Southern District, Eastern

23    District of New York.  Surrender all travel

24    documents and make no new applications.  Pretrial

25    supervision as directed by Pretrial Services.  Home
```

```
 1    detention enforced by location monitoring technology
 2    as directed by Pretrial Services.  Defendant will
 3    disclose all assets to Pretrial Services and the
 4    U.S. Attorney's Office, including any accounts in
 5    her name or controlled by her or by companies in
 6    which she has an interest, any cryptocurrency, any
 7    cash and any other property.
 8              Ms. Wang shall have no contact with
 9    Mr. Kwok or Mr. Je or other co-conspirators outside
10    presence of counsel.  She shall have no contact with
11    any alleged victims or witnesses outside presence of
12    counsel.  She shall reside at the residence at
13    188 East 64th Street and may not relocate absent
14    permission from Pretrial Services.  Defendant shall
15    not open any new bank accounts, lines of credit or
16    loans without prior approval of Pretrial Services.
17              Now, is there anything further from the
18    government?
19              MS. MURRAY:  If I may just clarify one
20    condition, Your Honor.
21              THE COURT:  Yes.
22              MS. MURRAY:  With respect to the home
23    detention being reinforced by location monitoring,
24    we would ask that it be reinforced by GPS location
25    monitoring so that it -- I understand that location
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    monitoring advises when the defendant leaves or
 2    returns.  We would like to know where she goes when
 3    she leaves as well.
 4              THE COURT:  Yeah, I'm going to -- I will
 5    also order the GPS, but location monitoring also can
 6    include standalone monitoring in the home -- at the
 7    home if Pretrial Services deems that to be
 8    appropriate, and so I'm including that within the
 9    bail conditions.
10              MS. MURRAY:  Okay.  Thank you, Your
11    Honor.
12              THE COURT:  Okay.  Now, Ms. Wang, I
13    assume you're going to be able to meet these
14    conditions at some point, and once you do and when
15    you are released, I need to warn you that failing to
16    appear in court as required can have serious
17    consequences.
18              If you violate any of the terms of your
19    release, a warrant will be issued for your arrest.
20    You and anyone who signs a bond will each be
21    responsible for paying its full amount.  You may be
22    charged with a separate crime of bail jumping, which
23    can mean additional jail time and a fine.
24              In addition, if you commit any new
25    offense while you're released, in addition to the
```

```
1   sentence prescribed for that offense, you'll be
2   sentenced to an additional term of imprisonment of
3   not more than ten years if it's a felony, and not
4   more than one year if it's a misdemeanor.  And this
5   term of imprisonment would be served after any other
6   sentence of imprisonment is completed.
7              And while you're awaiting trial, I also
8   must warn you not to have any contact with or engage
9   in any intimidation of potential or designated
10  witnesses or jurors, not to engage in any
11  intimidation of any court officer, and not to engage
12  in any conduct that would obstruct any investigation
13  by law enforcement.
14             What date shall I set for a preliminary
15  hearing?
16             Defense counsel, do you want to waive to
17  the 30th day for a preliminary hearing?  You want
18  the 14th day?
19             MS. CHAUDHRY:  14th.
20             THE COURT:  Okay.  Preliminary hearing is
21  set for March 29.
22             Anything further from the government?
23             MS. MURRAY:  No, Your Honor.  Thank you.
24             THE COURT:  Anything further from defense
25  counsel?
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                    MR. LIPMAN:  No.  Thank you, Your Honor.
 2                    MS. CHAUDHRY:  No.  Thank you,
 3       Your Honor.
 4                    THE COURT:  All right.  Thank you.  We're
 5       adjourned.
 6
 7                              0o0
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5        I, Adrienne M. Mignano, certify that the

 6   foregoing transcript of proceedings in the case of

 7   USA v. Yanping Wang, Docket No.: 23-MJ-2007 was

 8   prepared using digital transcription software and is

 9   a true and accurate record of the proceedings.

10

11
                   Adrienne M. Mignano
12   Signature _____

13                ADRIENNE M. MIGNANO, RPR

14

15   Date:        March 22, 2023

16

17

18

19

20

21

22

23

24

25


             AMM TRANSCRIPTION SERVICE - 631.334.1445
```

```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,         : Docket #23-mj-02007

                     Plaintiff,   :

     -against-                    :

YANPING WANG,                     : New York, New York
                                    March 22, 2023
                     Defendant.

--------------------------------:

                     PROCEEDINGS BEFORE
                THE HONORABLE SARAH NETBURN
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:         UNITED STATES ATTORNEY'S OFFICE
                       SOUTHERN DISTRICT OF NEW YORK
                       BY:  JULIANA N. MURRAY, ESQ.
                            MICAH F. FERGENSON, ESQ.
                       1 St. Andrew's Plaza
                       New York, New York 10007


For Defendant:         LIPMAN LAW, PLLC
                       BY:  ALEX LIPMAN, ESQ.
                       147 W. 25th Street, 12th Floor
                       New York, New York 10001


For Defendant:         CHAUDHRYLAW, PLLC
                       BY:  PRIYA CHAUDHRY, ESQ.
                       147 W. 25th Street, 12th Floor
                       New York, New York 10001



Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1
 2            THE DEPUTY CLERK:  Your Honor, this is
 3   matter of United States v. Yanping Wang.  Case is
 4   number 23-mj-2007.
 5            Starting with the Government, could you
 6   please state your appearance for the record.
 7            MS. MURRAY:  Good morning, Your Honor.
 8   Juliana Murray and Micah Fergenson on behalf of the
 9   United States.
10            THE COURT:  Thank you.
11            MR. LIPMAN:  Good morning, Your Honor.
12   Alex Lipman of Lipman Law PLLC and my colleague
13   Priya Chaudhry of ChaudhryLaw PLLC here for the
14   defendant, Yanping Wang.
15            THE COURT:  Thank you.  Ms. Wang, can you
16   sorry -- go ahead.
17            MS. CHAUDHRY:  The defendant is present
18   seated between us and being assisted by a Mandarin
19   interpreter.
20            THE COURT:  Thank you.
21            Ms. Wang, is your interpreter device
22   working okay?
23            THE DEFENDANT:  Yes.  It's okay.
24            THE COURT:  Okay.  If at any point you have
25   difficulty hearing through the interpreter, please
```

```
1    let us know.  Okay?
2              THE DEFENDANT:  Understood.
3              THE COURT:  All right.  So in preparation
4    for this proceeding, I've reviewed the pretrial
5    services report that was prepared about two weeks
6    ago, maybe a week ago, when the defendant was
7    initially here.  And I have the transcript from
8    March 15th when the defendant was presented before
9    Judge Parker, which I've reviewed.
10             I understand that Judge Parker set
11   conditions for the defendant's release, required
12   that the conditions be satisfied before she be
13   released.  And I understand that we are here
14   potentially for a Nebbia hearing.  Nobody has
15   submitted anything else to me, so I don't know
16   anything else than now what I've shared with you.
17             MS. MURRAY:  Yes, Your Honor.  So we
18   received a call last night from defense counsel,
19   yesterday evening.  They provided a number of
20   potential cosigners.  We've received documents for
21   five of those and interviewed four and had not
22   gotten to the point where we had two cosigners that
23   we approved.
24             So last evening, defense informed us that
25   they wanted what they referred to as a Nebbia
```

```
 1    hearing.  I understood the defense was going to file
 2    something for the Court overnight, but we just
 3    notified arraignment and arranged for defendant to
 4    be produced.  So I will leave it to defense what
 5    they want to cover here today.
 6              THE COURT:  Okay.  Can I ask you just to
 7    move the microphone --
 8              MR. LIPMAN:  I'm sorry.
 9              THE COURT:  -- directly in front of you.
10              MR. LIPMAN:  Your Honor, the reason we are
11    here is because the Government has unreasonably, in
12    our view, refused to approve the cosigners we
13    proposed.  So, as the Government said, we gave them
14    more than five names.  We gave them something like
15    nine names, and they interviewed -- they have
16    documents for five.  They interviewed four.  They've
17    rejected all of them.
18              And the reason we're here is because we are
19    going to ask Your Honor to either approve the people
20    we've proposed or change the bail conditions in such
21    a way that Ms. Wang can satisfy the bail conditions
22    and be released.  So if I may just start before, as
23    an initial map, right, since Your Honor has reviewed
24    the pretrial report, Your Honor can see that the
25    pretrial recommendation is much more -- much less --
```

```
 1                    THE COURT:  Let me stop you for one second.
 2                    MR. LIPMAN:  Yeah.
 3                    THE COURT:  I'm not really inclined to
 4       overrule my colleague who heard bail arguments and
 5       set a bail condition.  So I'm not sure that's what I
 6       want to do, if that's what you're asking me to do.
 7       If you're asking me to consider the reasonableness
 8       of the proposed sureters I understand under the law,
 9       I can do that.
10                    I don't know anything about what that
11       standard of review is, and I don't have any names or
12       documents, so I don't know that that's something I
13       can do from the bench.
14                    MR. LIPMAN:  Well, Your Honor, let me set
15       the stage for this, and maybe that'll help.
16                    THE COURT:  Okay.
17                    MR. LIPMAN:  Ms. Wang is a political
18       refugee from China.  She is a part of a movement of
19       people who are opposing the Chinese Communist Party.
20       And it's a pretty big movement.  And because of her
21       participation in the movement as a very senior
22       person, she cannot return to China.  If she did, she
23       would be arrested at the airport and probably
24       executed within days.
25                    So she's here.  She lost her family in
```

```
1    China.  Her husband was required to divorce her.
2    She has a son she hasn't seen in something like nine
3    years because she's not allowed to be in contact
4    with him.  Her father died without seeing her.  She
5    can't contact her brother anymore.  She used to, but
6    all of the family members have been arrested at one
7    point or another and told to cut off all contact
8    with her.  Okay?
9            So the only people with whom she has
10   contact are people who are part of this movement or
11   in some way related to the main defendant in this
12   case.  The Government is well aware of this.  When
13   we actually agreed to the $5 million bond and two
14   cosigners, when we did that we understood that the
15   Government understood, and we had a conversation
16   about it, that the people who would cosign for her
17   are not going to be family members.
18           Her only friends are people who are in this
19   circle, and they're willing to sign for her, and
20   they think that they have moral suasion over her.
21           THE COURT:  Sorry.  She's been living in
22   the United States since 2017; is that correct?
23           MR. LIPMAN:  She has.
24           THE COURT:  And in those six years, she
25   hasn't befriended anybody who's not within that
```

1   movement?

2          MR. LIPMAN:  What she does is she works,

3   and then she goes home, and then she works.  And her

4   entire life, during this entire time, has been

5   moving from her apartment to where she works and

6   back.  She actually -- the answer is that her entire

7   world is people -- people in this -- people in this

8   community.  We did have one person who is a very

9   well-known individual in the United States who is

10  not part of that -- is not Chinese, and he

11  volunteered to post a property worth two and a half

12  million dollars to secure her bond.

13          We proposed that if he were -- if he were

14  to do two and a half million dollars of his

15  property, and she confessed judgment on her

16  apartment, that's three and a half million dollars.

17  They have $130,000 in cash that they seized from her

18  apartment.  And then there is an account with

19  approximately, I want to say, 4- to 500,000 dollars

20  in it.

21          We proposed to put all of that together for

22  $4 million security for the bond and then so that

23  they could, you know, approve the people that they

24  had interviewed, and they refused.  So we are at a

25  point now where they won't approve the people we

1    proposed because they are either not connected to

2    her or too poor or connected with the main defendant

3    and that kind of short circumstance.  There's

4    nothing we can do.

5            THE COURT:  Sorry.  They rejected the

6    $2.5 million property from somebody else because

7    that person was not connected?

8            MR. LIPMAN:  No, not because he was not

9    connected.  He is a very well-known individual, and

10   he has his own legal problems.  He wasn't going to

11   cosign the bond.  He was just going to put up the

12   property to secure her bond, and they rejected him

13   because they said that he was a convicted felon,

14   which, frankly, that's not -- neither here nor

15   there.  There is no requirement that incapacitates

16   somebody who is convicted felon from securing

17   somebody else's bond.

18           THE COURT:  And that person was prepared to

19   basically hand over the deed to the Government?

20           MR. LIPMAN:  Correct, he was prepared to

21   confess judgment on his property.

22           Now, we now -- potentially, we might have

23   other people who might be willing to do something

24   like that, but the key issue here is this:  The

25   three people that they interviewed -- there are

1    three people they interviewed they have no issues

2    with, as far as I can tell, just as far as I can

3    tell.  And they won't approve them.

4         First, they told us that they won't approve

5    them because they don't have enough assets.  Okay?

6    So then we had subsequent conversations in which

7    they said, well, the other problem is that they are

8    too remote from her.  They don't have moral suasion

9    over her.  Well, they think that they do, which is

10   why they're doing this.

11        And, by the way, Your Honor, even if they

12   don't have the $5 million to stand behind this bond,

13   they are financially responsible people.  They would

14   be ruined if the bond -- she defaulted on the bond.

15   One of them is a lawyer.  We offered another lawyer

16   who is -- who is a -- we gave them the name.  They

17   didn't run it down because they told us straight

18   away that he won't work.

19        But we offered an IT professional -- I

20   think two IT professionals, if memory serves.

21        THE COURT:  Two what professionals?

22        MR. LIPMAN:  IT.

23        THE COURT:  IT.

24        MR. LIPMAN:  We offered -- they interviewed

25   one of the lawyers.  He is not rich now, but he does

```
 1    have his own practice.  He is a financially
 2    responsible person, and the bond is secured with a
 3    confession judgment on her apartment.  She's going
 4    to be at home with an ankle monitor.  She's confined
 5    to her apartment.  She can't leave it unless she
 6    comes to visit us.
 7              How do we get out of this?
 8              THE COURT:  Okay.  Let me hear from the
 9    Government.  Thank you.
10              MS. MURRAY:  Your Honor, the Government's
11    view is that this proceeding is premature.  There is
12    a process for the Government to interview and
13    evaluate the qualifications of potential cosigners.
14    As Your Honor noted, a week ago, Judge Parker
15    imposed conditions, and she agreed with both the
16    Government and Pretrial that those conditions needed
17    to be met before Ms. Wang could be released.
18              One of those conditions was two qualified
19    cosigners on a $5 million bond.  The reason that
20    we're here today, as I understand, is because the
21    defense is unhappy with the Government's
22    determination that various of the names that they
23    provided are not qualified.
24              There are a couple of points I want to
25    make, and I don't want to get into the details of
```

1  the individual because Your Honor doesn't have the

2  information in front of you right now.  But as an

3  example, the individual who is willing to pledge the

4  2.2 million in property, defense never provided us

5  with the address for the property.  So we weren't

6  able to run it down to find out how much equity was

7  in the property, what was the mortgage, what was the

8  source of funds used for the property.

9        And that prominent individual who they said

10  owned the property is an individual who is very

11  involved in the fraud in this case.  And this is a

12  billion-dollar fraud that was spearheaded by an

13  individual known as Ho Wan Kwok or Miles Guo.  The

14  individual who was going to pledge the property has

15  been involved in several organizations that are

16  alleged to be instrumentalities of the fraud.  And

17  Ms. Wang is the chief of staff for Mr. Guo.  She

18  runs all of his companies.

19        A couple of the individuals, we did advise

20  defense counsel, we couldn't even in good faith

21  interview as potential cosigners.  One of the

22  lawyers that Mr. Lipman mentioned is the outside

23  counsel for three of the different entities that

24  operated this fraud scheme.  His law firm had an

25  escrow account that held tens of millions of dollars

 1    of fraud scheme funds over the course of the charged

 2    conspiracy.  That is not a person that we feel

 3    comfortable, even if he has the financial means to

 4    cosign a bond for the defendant.

 5          We have expressed a willingness to work

 6    with defense on potential cosigners, particularly in

 7    light of their claims.  Which we understand that

 8    Ms. Wang doesn't have family here, so the moral

 9    suasion angle might be different.

10          But we can't be in a position where Judge

11    Parker made a very reasoned judgment on the facts,

12    and the Government agrees that in light of the

13    substantial flight risk that Ms. Wang creates, in

14    light of both her political asylum status, the

15    strength of the Government's evidence, the amount of

16    time she's facing, and her global network of Miles

17    Guo supporters who clearly are willing to put their

18    necks out and sign a bond, even though some of them

19    have only met her once or twice or only speak with

20    her a couple of times.

21          In light of that substantial flight risk,

22    we need to be assured that we have qualified

23    cosigners on this bond.  That's all we're doing.  It

24    is a process wherein for every cosigner that we

25    evaluate, we request information, we request

```
1    documents, we conduct an interview, we make an
2    evaluation, and we engage in dialogue.  And if we
3    think that person isn't qualified, we ask for
4    another name.
5           In this case, we have been given names in
6    the abstract without even having their documents.
7    Defense has pushed us to approve them in the
8    abstract.  With respect to the $2.2 million property
9    that they proposed would secure the bond, for
10   example, we received a call.  They said they had an
11   individual, didn't name the individual at first, who
12   would put up 2.2 million in property.  We asked for
13   the address.  They said, "We'll get it to you.  Will
14   you just agree in principle today?"
15          Your Honor, again, we have a process of
16   going through this, and we are not slow rolling this
17   by any stretch.  We have spent a substantial amount
18   of time in the last week running down each of the
19   names and interviewing the people that defense
20   counsel has brought before us.
21          If defense is in a position where they want
22   to argue that the Government's assessment is
23   unreasonable, then under the statute under 18 U.S.C.
24   3142(c)(1)(B)(xii), for the Court to approve or
25   determine the appropriateness of an unapproved
```

1    surety, the Court needs to have before it all of the
2    documents and assets and evidence underlying that
3    surety's financial situation because the standard is
4    that the Court can, on its own, approve that surety
5    if such surety has a net worth which has sufficient
6    unencumbered value to pay the amount of the bail
7    bond.
8         So we're happy to keep working with
9    defense.  We would like to do that to see if there
10   are potentially qualified cosigners.  But if we get
11   to a point where defense feels there aren't, the
12   next step would be for the defense to gather
13   together the supporting materials for proposed
14   cosigners, submit them to the Court, and then if the
15   court makes its own independent evaluation that
16   those people have $5 million in unencumbered assets
17   sufficient to support the bond, then I think their
18   application would appropriately be before the Court.
19         THE COURT:  Thank you.
20         MR. LIPMAN:  Your Honor, what the
21   Government just said, essentially, is this:  We
22   interview these people, make a judgment about
23   whether they're appropriate or not, but the only
24   questions that they need to actually answer are,
25   number one, is this a financially responsible

1    person, and, two, do they have moral suasion over

2    the defendant.

3          THE COURT:  But why wouldn't the assessment

4    of whether somebody was a financially responsible

5    person include the responsible part?  Meaning if,

6    for instance, the lawyer that you proposed is, in

7    the Government's light, at least involved on some

8    level with the fraud, even if that person has

9    assets, then that person is not responsible in the

10    Government's light.

11          MR. LIPMAN:  Well, that person --

12          THE COURT:  And so if you want to make an

13    application to the Court, that's one thing.  But

14    that's not an unreasonable position for the

15    Government to take.

16          MR. LIPMAN:  Your Honor, in that situation,

17    regardless of what the Government thinks he did or

18    didn't do, he would be on the hook for $5 million.

19    And the idea of a financially responsible person is

20    a little bit of an interesting question.  The people

21    that they refuse to -- they interviewed three

22    people, one a lawyer, two -- I think they're both IT

23    professionals.  They don't have a problem with those

24    issues -- with those people.

25          What they said to us is, these people don't

```
 1    have enough assets.  Well, you know what?  They
 2    don't have enough assets.  But if Ms. Wang were to
 3    default on the bond, they would be in serious
 4    financial troubles.  And they understand that.
 5                THE COURT:  Right.  Unless they fled.
 6                MR. LIPMAN:  But there's no -- even they do
 7    not suggest that.  They're completely unrelated to
 8    her or to the main defendant.  I mean, they are
 9    people who know her and are willing to cosign a bond
10    for her, but even the Government doesn't claim
11    there's any issue with them, that they're going to
12    flee or anything like that.  One of them is a lawyer
13    practicing in Chicago.  He's not going anywhere,
14    Your Honor.  He's not making a ton of money, but
15    he's not going anywhere.
16                And one of them is an IT professional who's
17    actually not Chinese, and he's willing to cosign
18    bond.  Again, he's not a rich person, but his
19    financial life would be ruined if Ms. Wang were to
20    default on the bond.  And he understands that, and
21    he thinks that he's willing to sign.
22                And by the way, he spoke with his wife
23    before he agreed.  They both agreed to do so.  So
24    these people making serious, serious commitment,
25    they all understand what's going on.  They are
```

```
 1   financially responsible.  They're not related to the
 2   fraud in any way whatsoever.
 3          THE COURT:  And so what relief are you
 4   seeking today?
 5          MR. LIPMAN:  What I'm asking the Court to
 6   do is to do one of two things:  Either direct them
 7   to accept the three people being interviewed with
 8   whom they didn't have -- about whom they didn't
 9   have -- they didn't have an issue with them other
10   than they told us that these people were not
11   sufficiently rich, or alternatively, that you alter
12   the bail conditions in such a way that we could
13   actually reasonably meet.
14          Because if the requirement is that somebody
15   cosigns a bond over who has moral suasion over
16   Ms. Wang, all of those people are in Mr. Guo's
17   orbit, and none of them are going to work.  Her best
18   friend is his daughter.  She can't sign.  She can
19   sign for other reasons, maybe, but she can't sign.
20   We proposed her.  They rejected him.  They have good
21   reasons for doing it -- or I don't know if they are
22   good reasons.  They say they have good reasons for
23   doing it.
24          But they rejected her best friend's
25   boyfriend as a cosigner.  They rejected another
```

```
 1    person who works Mr. Guo as a cosigner.  We asked
 2    them.  There are people who -- she was a senior
 3    person in this organization.  She interacted with
 4    several senior people.  We asked -- we gave them the
 5    names, we said how about this person, that person.
 6    No, no, no, because they're involved in the fraud or
 7    they're involved in the movement or they're involved
 8    in this, involved in that.
 9            Well, what are we supposed to do?  We found
10    three people they interviewed who are financially
11    responsible, willing to sign, and did not even --
12    they don't claim are involved in defrauding anyone.
13            MS. MURRAY:  Your Honor, if I just may
14    briefly respond to that point.  I do want to note I
15    don't believe there's any issue that's ripe for the
16    Court at this point procedurally or under the law.
17    And I don't think that the first prong of relief
18    that Mr. Lipman suggested is appropriate, for the
19    Court to force the Government to approve cosigners.
20    That is not the legal standard.
21            The three individuals Mr. Lipman just
22    mentioned, I want to note, while we said we could
23    get comfortable with them as financially responsible
24    persons, all three of those individuals are victims
25    of the fraud.  They all invested in various of the
```

```
 1    different fraudulent arms of this scheme.  The fact
 2    that they are willing to sign a bond and they have
 3    potential means to support some portion, by no
 4    stretch, 5 million, but some portion of that bond is
 5    independent of the other prong of the assessment,
 6    which is moral suasion.
 7             If they sign the bond, what influence do
 8    they have over Ms. Wang appearing in future court
 9    appearances to protect the assets and the $5 million
10    debt that could be imposed on people she and her
11    coconspirators have already victimized in the course
12    of this fraud?
13             We have valid bases to have not accepted
14    the cosigners who have been presented.  We have a
15    process for reviewing and approving cosigners.  And
16    if there are certain people the defense wants to
17    bring to the Court's attention, they need to provide
18    the supporting documentation and make an argument,
19    and the Court can make an independent investment.
20             THE COURT:  Okay.  I think --
21             MR. LIPMAN:  Your Honor, just very briefly,
22    these people understand what they're doing.  They're
23    members of a movement of people who are dissidents
24    and are opposing Chinese Government, communist
25    party.  Ms. Wang is a very well-known person.  They
```

```
 1    know who she is.  They understand the allegations.
 2    One of them specifically asked me, before he agreed
 3    to do it, to send him the complaint, which I did.
 4    And he took time to review the complaint before he
 5    gave me permission to contact the Government.  Okay?
 6              So they know what they're doing.  They
 7    understand that the Government used them as victims.
 8    They are prepared to sign.
 9              THE COURT:  Okay.  I tend to agree with
10    Ms. Murray that there is not an issue before the
11    Court.  I'm certainly not going to direct people I
12    don't even know -- I haven't even had names, much
13    less any information.  I'm not going to direct the
14    Government to accept these miscellaneous John Does
15    as sureties.  That's not how this works.  And I
16    don't believe sufficient time has elapsed that
17    justifies revisiting Judge Parker's bail conditions.
18              What I'd like to do is, first, direct you,
19    Mr. Lipman.  It sounds like you haven't given all
20    the information to the Government specifically with
21    respect to this person who has property that they
22    might post.  You know, they need to do their job.  I
23    take Ms. Murray at her word that they are not slow
24    walking this.  They are making every effort to
25    locate somebody that the Government is comfortable
```

1     with.  But you do need to provide information so

2     that they can do their job too.  So you need to get

3     that information to the Government as soon as

4     possible.

5              I'd like to set a date for an appropriate

6     motion based on what you are proposing.  And I guess

7     the question, Mr. Lipman, is when do you want that

8     motion to be filed?  I think it does need to be

9     filed with supporting documents and all of the

10    information necessary, and I think it'll just be

11    assigned to the judge who's on duty here.  That

12    judge will need to review the information as well.

13             So I don't know how long it'll take you to

14    assemble the paperwork that you would need to

15    assemble to satisfy the Court that the person that

16    you're proposing that you allege the Government has

17    rejected is inadequate and the Court should order

18    the Government to accept that person.

19             So I want to give you enough time to make a

20    motion that's appropriate and supported, but also to

21    continue working with the Government, because I

22    don't hear the Government saying they don't see a

23    way out of this morass.  They just need additional

24    information.  And it may be as you began,

25    Mr. Lipman, you know, there's a million-dollar

```
 1    property.  There's a 2.2, 2.5 million dollar
 2    property of somebody else.  There's a half a million
 3    dollars in a bank that's frozen.  It may be that the
 4    Government can work with you to cobble something
 5    together.
 6            But, for instance, if you have a
 7    $2.5 million house in the Hamptons that has $100,000
 8    in equity in it, and the rest is owned by a bank,
 9    then that's not going to be helpful for your client.
10    You need to get that information to the Government.
11    They just have no idea.
12            MR. LIPMAN:  Your Honor, just to be clear,
13    in the case of this famous individual, the
14    Government says they didn't provide us the
15    information.  They knew who it was, and the question
16    was not what the property was.  The question was
17    were they going to approve him at all.  And they
18    didn't.  They said -- they told us they ran it up
19    the flag pole, couldn't do it.
20            It wasn't because the property wasn't
21    appropriate that they turned it down.  It wasn't
22    because there was not enough equity in it.  It was
23    because they don't like who it is.  And the problem
24    that we have and the reason we are in this courtroom
25    today, Your Honor, is because their criteria keeps
```

```
 1    shifting.  First, there was an understanding, an
 2    explicit understanding -- I told them right away,
 3    look, there are no sisters.  There are no brothers.
 4    There are no aunts.  Okay?  It's going to be
 5    somebody else.
 6           They said, "All right; we understand that."
 7    So we gave them names.  These people are not rich
 8    enough.  Okay.  Now they're telling you that they
 9    also don't have moral suasion.  Well, you knew that
10    before when I first gave you the names.  I feel like
11    we're not getting anywhere because things are
12    shifting.  And I think what they're doing is they're
13    deliberately trying to keep her in in order to put
14    pressure on her so that she becomes their friends,
15    your Honor.  I think that's what's really going on
16    here.
17           Friday.  We'll file on Friday or tee it up
18    on Friday?
19           MS. CHAUDHRY:  We'll file on Friday.
20           MR. LIPMAN:  We can file on Friday, Your
21    Honor.
22           THE COURT:  Okay.
23           MR. LIPMAN:  And, Your Honor, we will
24    continue working with them, but at a minimum, it
25    would be helpful to us if the Court could at least
```

```
 1    admonish them to work with us in good faith.

 2              THE COURT:  I'm not going to admonish them

 3    because I don't believe that they are not working

 4    with you in good faith.  So I'm happy to have your

 5    application.  I hope nothing that's in the

 6    application is information that you haven't provided

 7    to the Government, because what I'm hearing from the

 8    Government, and I don't really need to get into the

 9    sandbox to figure out who's right or who's wrong

10    here, is that they haven't received all the

11    information that they need from you.  So I hope that

12    you continue to provide that to them.

13              I'll direct the Government to expeditiously

14    respond to the proposals and to make a good faith

15    assessment of those folks.  I'm not going to

16    admonish you that you haven't done that yet, but

17    that's certainly your obligation, and I expect you

18    to do so.  So this motion is going to be filed on

19    Friday.

20              When would the Government like to file its

21    opposition?

22              MR. FERGENSON:  Without knowing what this

23    motion is going to look like, Your Honor, it's a

24    little difficult to say.

25              THE COURT:  How about if you file it
```

1    Wednesday, and we set a conference for the following

2    Friday?

3              MR. FERGENSON:  That seems reasonable, Your

4    Honor.

5              THE COURT:  Okay.  So there's going to be

6    something filed on Friday, which is March 24th.

7    There's going to be an opposition filed on

8    Wednesday, which, if my calculation is right, is

9    March 29th.

10             Is that right, Ms. Fletcher?

11             THE DEPUTY CLERK:  That's right.

12             THE COURT:  And then I will work with, I

13   believe, Judge Lehrburger, who will be hearing this,

14   for a date for the conference, which will be held on

15   March 31st.

16             If between now and March 31st, the parties

17   are able to work this out, which is my hope, you

18   should obviously notify the Court as soon as

19   possible.  And I do think the parties can figure out

20   a way to come up with a resolution here for this

21   issue.  This is not the first time the Government

22   has faced complications of this sort, so I'm

23   confident you can figure something out.  But

24   obviously, if you can't, then the Court will see you

25   the following Friday.

```
 1              All right.  Anything further?

 2              MR. FERGENSON:  No, thank you, Your Honor.

 3              MR. LIPMAN:  Thank you, Your Honor.

 4              MS. CHAUDHRY:  Your Honor, did we have a

 5    time for next Friday?

 6              THE COURT:  We don't.

 7              MR. LIPMAN:  Okay.

 8              THE COURT:  We'll set it once -- it's going

 9    to be Judge Lehrburger.

10              MS. CHAUDHRY:  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3        I, Marissa Mignano, certify that the foregoing

 4   transcript of proceedings in the case of

 5   UNITED STATES v. YANPING WANG, Docket #23-mj-02007,

 6   was prepared using digital transcription software and

 7   is a true and accurate record of the proceedings.

 8

 9

10   Signature  _____

11                    Marissa Mignano

12

13   Date:      March 27, 2023

14

15

16

17

18

19

20

21

22

23

24

25
```