**Exhibit 39**

Page 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF CONNECTICUT

BRIDGEPOINT DIVISION

---------------------------------------------------X

HO WON KWOK, et al.,

              Debtors,    CHAPTER 11

                      CASE: 22-50073 (JAM)

---------------------------------------------------X

LUC A. DESPINS, CHAPTER 11 TRUSTEE,

              Plaintiff,

              -against-

GREENWICH LAND, LLC and

HING CHI NGOK,         Adv Proceeding 23-05005

              Defendants.

---------------------------------------------------X

VIDEOTAPED DEPOSITION OF

EMILE DE NEREE

NEW YORK, NEW YORK

August 24, 2023

REPORTED BY:  KIARA MILLER

FILE NO.:  7808

Page 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPOINT DIVISION
--------------------------------------------------X
HO WON KWOK, et al.,
    Debtors,   CHAPTER 11
       CASE.: 22-50073 (JAM)
--------------------------------------------------X
LUC A. DESPINS, CHAPTER 11 TRUSTEE,
      Plaintiff,
    -against-
GREENWICH LAND, LLC and
HING CHI NGOK,
      Defendants.
--------------------------------------------------X

Deposition of EMILE DE NEREE, taken on behalf
of DEFENDANTS, at Remote Location, New York,
New York, commencing at 10:09 a.m., August 24,
2023, before Kiara Miller.

Page 3

APPEARANCES:

ON BEHALF OF LUC A. DESPINS, CHAPTER 11 TRUSTEE:
    PAUL HASTINGS
    200 Park Avenue
    New York, NY 10166
    EMAIL: nicholasbassett@paulhastings.com
    BY:   NICHOLAS BASSETT, ESQ.

ON BEHALF OF DEFENDANTS:
    MEISTER, SEELIG & FEIN, PLLC
    125 Park Avenue, 7th Floor
    New York, NY 10017
    EMAIL: CJM@MSF-LAW.COM
    ADK@MSF-LAW.COM

    BY:   CHRISTOPHER J. MAJOR, ESQ.
       AUSTIN KIM, ESQ.

ALSO PRESENT:
VIDEOGRAPHER, DEANE CARSTENSEN

Page 4

VIDEOGRAPHER:  We are now on the record.  Today's date is August 24, 2023.  The time right now is 10:09 a.m. Eastern time.  This is the video deposition of Emile de Neree.  In the matter of Luc A. Despins, Chapter 11 Trustee versus Greenwich Land, LLC, and Hing Chi Ngok, filed in the United States Bankruptcy Court, District of Connecticut, Bridgepoint Division.  This deposition is taking place via web via conference with all participants attending remotely.

My name is Deane Carstensen. I'm the videographer representing TransPerfect today.  Will counsel on the conference please identify yourselves and state whom you represent, beginning with the questioning attorney.

MR. BASSETT:  Good morning, everyone.  Nick Bassett from Paul Hastings on behalf of the Chapter 11 Trustee, Luc Despins, who is the

Page 5

plaintiff in this adversary proceeding.  I am joined by my colleague Luyi Song, also from Paul Hastings.

MR. MAJOR:  Good morning.  Chris Major, Meister, Seelig & Fein.  We represent Hing Chi Ngok and Greenwich Land, LLC., the defendants in this adversary proceeding.  And I'm joined by Austin Kim my partner at Meister, Seelig & Fein.

VIDEOGRAPHER:  Our court reporter today is Kiara Miller also representing TransPerfect.  The court reporter can now swear in the witness and then we may proceed.

EMILE DE NEREE, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

COURT REPORTER:  Please state your name and address for the record.

THE WITNESS:  Emile de Neree, D-E, N-E-R-E-E.  I'm a realtor with Compass in Greenwich, Connecticut.

2  (Pages 2 to 5)

Page 6

1          200 Greenwich Avenue, Greenwich,
2     Connecticut.
3     EXAMINATION BY
4     MR. BASSETT:
5          Q    Again, by way of introduction,
6     Mr. de Neree, I'm Nick Bassett.  As I said,
7     I represent Luc Despins as the Chapter 11
8     Trustee who's the plaintiff in this
9     litigation.  Thanks again for your time and
10    for being here today.  We all appreciate it.
11          Mr. de Neree, have you had the
12    pleasure of sitting for a deposition before,
13    or is this your first time?
14          A    First time.
15          Q    Okay.  In that case, I'll just
16    spend a couple of minutes kind of giving you
17    the lay of the land in terms of how today's
18    going to proceed.
19          To state the obvious, I will ask
20    you a series of questions.  Mr. Major, who's
21    also here on behalf of the defendants, may
22    have questions when I'm done.  As you know,
23    based on what just occurred, you're under
24    oath.  So we both ask that you answer our
25    questions truthfully.  If there is a

Page 7

1     question that I ask that you don't
2     understand, please let me know.  I'm happy
3     to try to rephrase or clarify, to the best
4     that I can.
5          I'm not sure how long we'll go
6     today, but if at any time you need a break
7     for any reason, don't hesitate to let us
8     know.  We want to make sure you're
9     comfortable and have any breaks that you
10    need.  The only thing we will both ask is
11    that if we have a question that's pending to
12    you, that we would just get an answer to
13    that question before we take a break.
14          There may be some objections by
15    counsel after questions today.  Generally
16    speaking you can just let the objection be
17    made and then you would still answer the
18    question after that.  You'll kind of see how
19    that goes as we get going.
20          Just for the record, are you alone
21    in that room today, Mr. de Neree?
22          A    Yes, I am.
23          Q    Do you have access to any email or
24    text or anything like that while we're on
25    the deposition?

Page 8

1          A    Email going back to the issue at
2     hand?
3          Q    No.  I just meant like on your
4     screen, your computer screen for example
5     your Outlook up, I would close that out just
6     so there's no issue about whether you're
7     receiving communication during the
8     deposition, that's all?
9          A    No, no it's not up.
10          Q    Okay, got it.  So, Mr. de Neree,
11    you are a licensed real estate broker; is
12    that correct?
13          A    Yes.  Salesperson.
14          Q    Salesperson, okay.  Do you
15    primarily focus on selling homes in
16    Connecticut or is your footprint broader
17    than that?
18          A    No.  Connecticut.
19          Q    How long have you been a real
20    estate salesperson?
21          A    Roughly since 2011, I believe '11
22    or '12.  It was '11.
23          Q    Okay.  Got it, and you work for
24    Compass; is that right?
25          A    I do now.  I worked for Coldwell

Page 9

1     Banker at that time and left Coldwell Banker
2     about a year and a half ago to go to
3     Compass.
4          Q    When have you say at that time
5     what do you mean?
6          A    Meaning from the beginning when I
7     had my real estate license until a year and
8     a half ago.
9          Q    Got it, understood.  And as a real
10    estate salesperson, do you represent both
11    buyers and sellers?
12          A    Yes.
13          Q    And if you can just describe for
14    me if you're representing a buyer who's
15    looking to purchase a home.  Can you just
16    kind of just tell me what are the services
17    that you provide for them?
18          A    Well, I basically search out a
19    property that is appropriate for them in
20    terms of their budget and preferences.
21          Q    So the perspective buyer would
22    tell you what type of property they're
23    looking for and then give you some direction
24    as to what to go find for them, you would go
25    out and do that and report back what you

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 10

```
 1    found.  Is that generally how it works?
 2       A   Yes.
 3       Q   And I assume typically before a
 4    buyer decides to make an offer on the home
 5    they may visit the property?
 6       A   Yes.
 7       Q   Okay.  I'll ask my colleague to
 8    put tab one on the screen or into the chat
 9    if she could.  And, Mr. de Neree, just let
10    me know once you have that open.
11       A   Social media, transactions, yes
12    sales.
13       Q   So you have the document up?
14       A   Yep.
15       Q   I'd ask the court reporter please
16    mark this document as de Neree Exhibit 1.
17          (Whereupon, Emile de Neree's
18          Compass Transactions was marked
19          as Exhibit 1 for identification
20          as of this date.)
21       Q   I believe, Mr. de Neree, this is a
22    profile of yours that we obtained from the
23    Compass website; does this look familiar to
24    you?
25       A   No.  I've never actually seen
```

Page 11

```
 1    this.  This looks like an assortment of
 2    sales that I've had over the years.
 3       Q   That's obviously you and your
 4    picture there on the first page?
 5       A   Yes.
 6       Q   And if you look it says that
 7    you're a water front and luxury property
 8    specialist, is that an accurate description
 9    of how you would describe your real estate
10    practice?
11       A   Yes.
12       Q   I guess, what does that mean to
13    you?
14       A   Well, luxury is obvious.  It's not
15    low priced homes.  And water front is
16    because of my background.  I'm a sailor and
17    I live on the water myself, I live in a
18    community of 100 homes all of which are on
19    the water.  So I've had a lot of local
20    transactions within the community and also
21    all over Greenwich and I tend to focus on
22    water front because of my expertise.
23       Q   Understood.  And then below it
24    says past sales and it lists a bunch of
25    properties.  Are these properties that
```

Page 12

```
 1    you've sold, bought, both, just trying to
 2    understand what that means?
 3       A   It is a combination of both.  Not
 4    just where I was on the sale side, but I
 5    believe it was some definitely here on the
 6    buy side, it's a combination of both, yes.
 7       Q   The second property is 323 Taconic
 8    Road in Greenwich, which is a property that
 9    we'll be talking more about today.  I'll
10    just ask you, did that property actually
11    sell for the $7.495 million?
12       A   No.  It did not.
13       Q   Are some of these list prices
14    instead of --
15       A   Those are probably original list
16    prices.
17       Q   Understood, okay.
18       A   Not even necessarily the list
19    price at the time of the transaction.
20       Q   Got it, got it.  So are you,
21    turning to the matter at hand, if you will,
22    are you familiar with, Mr. de Neree, with a
23    person named Ho Won Kwok who is the debtor
24    in this Chapter 11 case who has otherwise
25    gone by Miles Kwok or Miles Guo?
```

Page 13

```
 1       A   Yeah.  I only know him by Miles.
 2       Q   But if I say Ho Won Kwok, you'll
 3    understand now Miles to be Ho Won Kwok, who
 4    is the Chapter 11 debtor in this case,
 5    correct?
 6       A   Yeah.  I understand.  And also
 7    from social media that he went by several
 8    names.  I was only aware of one, Miles.
 9       Q   Understood.  I'll go ahead and
10    refer to him as Miles today, then.
11          Did you at some point develop a
12    professional relationship with Miles?
13       A   Yes.
14          MR. MAJOR:  Objection to form.
15       Q   Can you describe that relationship
16    to me?
17       A   I'm sorry.
18       Q   Would you please describe that
19    relationship?
20       A   Was that an objection?
21       Q   Yes.  Mr. Major said objection to
22    form, which is an objection you may hear
23    more than once today.  And as I said before,
24    that's something that the lawyers will deal
25    with later.  For your purposes, you just
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 14

1   answer the question.
2       A   I see.  Understood.  What was your
3   question again quickly?
4       Q   The question was just whether you
5   could please describe for me the nature of
6   that relationship with Miles?
7           MR. MAJOR:  Objection to form.
8       A   I showed him several properties
9   over about a one and a half year period.
10  And he would tell me what he liked, what he
11  didn't like, then there would be followup
12  from his assistant, Max Krasner, about
13  details if he wanted to see more, what he
14  liked a lot, what he didn't like as much.
15  He would sort of give me more feedback, if
16  you will.  And then I would set up other
17  showings as they came available, in other
18  words as properties were listed and I
19  thought he would be interested in them, I
20  would show those properties.
21      Q   Thank you.  So you said that this
22  was over, I believe approximately one year
23  period or was it longer than that?
24      A   It was a bit longer than that.  I
25  believe my first communication with Max,

Page 15

1   actually not with Miles, but Max first, was
2   around October of 2018 and the ultimate
3   transaction of this property we're talking
4   about didn't take place until February
5   of 2000.
6       Q   Understood.  And do you have some
7   documents there with you Mr. de Neree?
8       A   I do have some, yeah.
9       Q   Can you just let me know the
10  document that you were just looking at.  Is
11  that --
12      A   Well, one document -- just for
13  clarification, I do not have any emails
14  because my email account was taken away from
15  me.  Except for the important documents that
16  I would have made hard copy of from my file
17  because I was doing that at the time, I
18  don't have every email.  I have, I was able
19  to reconstruct some of my texts, but I don't
20  have emails and really all I have is some
21  key documents, like offer to purchase,
22  exclusive right to represent the buyer and
23  accepted offer on this property and
24  ultimately the contract to purchase real
25  estate, which is the closing document.  I

Page 16

1   have some documents regarding the inspection
2   of the property during the week that this
3   took place and that's about it.  And I have
4   a nondisclosure confidentiality agreement
5   that I signed around that date and that
6   would have been one of the first sort of
7   actions, that's why I refer to October 22,
8   2018.
9       Q   Understood, okay.  So I'm going to
10  show you some documents today, some
11  additional documents today.  And I think
12  once I've done that and finished that I may
13  ask you if there are any other documents you
14  have there that we have not shown, I think
15  we'll proceed that way.  And then we may ask
16  that those documents to be provided to us if
17  they have not been already.
18      A   Okay.
19      Q   So you said the relationship began
20  around roughly October 2018, that's your
21  recollection?
22      A   Yes.
23      Q   How did you first come in contact
24  with the Miles?
25      A   Max called me, asked for me and

Page 17

1   said I have a client who's interested in
2   looking at some properties, I understand you
3   have water front experience.  He likes the
4   idea of water front, he has a big boat, he
5   would like to live on the water in
6   Greenwich.  What can you show us.  And I
7   went through a bunch of things and I said I
8   could show this, this and this, but there
9   wasn't much water front available at that
10  time so we ended up looking at other
11  properties also.  So that's how the
12  relationship got started.
13      Q   So Mr. Krasner said he -- that
14  Miles was wanting to find a home for himself
15  in Connecticut, in Greenwich?
16          MR. MAJOR:  Objection to form.
17      A   Correct that's what he said, yes.
18      Q   Okay.  So you understood that
19  whatever property you might find it would be
20  one for Miles?
21          MR. MAJOR:  Objection to form.
22      A   Correct.
23      Q   I'd like my colleague to show
24  Tab 2, please?
25      A   Yeah, that's the one I was

Page 18

1  referring to, it's called Exclusive Right to
2  Represent Buyer Agreement.
3      Q   Thank you.
4          MR. BASSETT:  Just give me a
5      moment.  I'd like the court reporter
6      to please mark this document as de
7      Neree Exhibit 2.
8          (Whereupon, Exclusive Right to
9          Represent Buyer Agreement
10         (GREE002323) was marked as
11         Exhibit 2 for identification as
12         of this date.)
13     Q   And just for the record, this
14 document is Bates labeled at the bottom of
15 the first page GREE002323.
16     A   Yeah.
17     Q   So this is the exclusive right to
18 represent buyer agreement.  Is this a
19 standard agreement that you would execute
20 with a perspective buyer of property who is
21 retaining you for your services?
22     A   Yes.
23     Q   And the agreement is dated
24 January 13, 2019.  Do you see that?
25     A   Yeah.

Page 19

1      Q   And the buyer in the first line is
2  listed as Hudson Diamond.  Do you have any
3  understanding of who or what Hudson Diamond
4  is?
5      A   No.  I was told by Max that this
6  is one of the companies that they owned,
7  that's all.
8      Q   When you say they owned, what do
9  you mean?
10     A   Miles, that Miles owned.
11     Q   Okay.
12     A   Yes, that's what I was told at the
13 time, I'm just looking at the signature line
14 cause I can't remember, it basically says
15 Hudson Diamond and an unrecognizable name.
16 You know, there was an addendum to this.  I
17 don't know if you have that.
18     Q   When you say addendum, is that in
19 paragraph two where it says, "See Exhibit A
20 attached hereto"?
21     A   Yeah.
22     Q   We do not have that, to my
23 knowledge.  If you happen to have that,
24 that's another document.
25     A   The reason why is this.  Because

Page 20

1  they crossed out a whole section about
2  compensation, the whole thing.  And it
3  became rather narrow.  And they said, we
4  will only compensate you for properties that
5  you have shown Miles.
6          So I submitted a list of five
7  properties or four or five properties.  And
8  subsequently asked to have a few more added,
9  which I had also shown him, but they never
10 added it to the exhibit.  But the properties
11 were 125 Pecksland Road, which was the first
12 one I showed him.  586 Roundhill Road.  373
13 Taconic, which is the subject property.
14 Private island on Connecticut Gold Coast.
15 Wallacks Point was the actual address.  And
16 any additional properties in Connecticut
17 that Coldwell Banker presents to buyer and
18 buyer agrees to view.
19         So he added this for my
20 protection, call it, so that I would be
21 covered under this agreement.
22     Q   Okay.  Understood.
23         And back to Hudson Diamond.  So I
24 think what you just testified was that you
25 were told by Mr. Krasner, that was an entity

Page 21

1  owned by Miles, correct?
2      A   Correct.
3      Q   I think you also had testified
4  that Mr. Krasner had reached out to you in
5  order to find a property for Miles.
6          So my question is, I guess, how do
7  you sort of -- is it your understanding that
8  Miles was going to use Hudson Diamond to
9  acquire the property for him?  Is that the
10 relationship between the two?  I'm just
11 trying to understand.
12         MR. MAJOR:  Objection to form.
13     A   No.  I had no assumption like that
14 because I was under the impression that he
15 owned many different companies, and I had no
16 idea in which way he was going to purchase
17 the property at the time.
18     Q   Understood.
19     A   I was just representing Miles.
20 And I hoped that this Hudson Diamond was a
21 legitimate company.  I did not research it
22 or anything like that.  I was, at the time,
23 just hoping that he would have an interest
24 in one of those properties and proceed.
25     Q   As a real estate salesperson, in

6  (Pages 18 to 21)

Page 22

1    your experience, have you seen scenarios
2    where an individual will use a company or an
3    LLC to acquire a property?
4        A   Yes.  Many times.
5            MR. MAJOR:  Objection to form.
6        Q   Is that what happened here?
7            MR. MAJOR:  Objection to form.
8        A   Yes.  It happened here.
9        Q   So you spoke a little bit about
10   the compensation -- I guess, actually before
11   I go to that.  At the bottom, if you look at
12   the bottom right-hand corner of each page of
13   this agreement, it says, underneath buyer's
14   initials, in all caps, Miles Guo.
15           Do you see that?
16           It's small.  You may have to zoom
17   in.
18       A   I'm sorry, where do you say you
19   see this?
20       Q   The bottom right-hand corner of
21   every page of this.  If you --
22       A   Yeah.  I see it now.  I never saw
23   it before.  Let me make sure it's on the
24   original.  Yes.  It is on the original.  I
25   never saw that before.  Yes.

Page 23

1        Q   I was going to ask you if you had
2    any understanding of what that signifies?
3            MR. MAJOR:  Objection to form.
4        A   I mean, I knew Miles by his first
5    name, so I did not notice it before.  But,
6    yeah, that would have meant for me that this
7    was, in fact, for Miles.
8        Q   Understood.  Back to the
9    compensation provision that you mentioned, I
10   was going to ask you why that was crossed
11   out.  So thanks for that explanation.
12           As to the properties that you did
13   show, how was it agreed that you would be
14   compensated?
15       A   There is no promise of
16   compensation for any showings I do,
17   regardless of how man, short of a sale.  I
18   can only be compensated in the case of a
19   sale.
20       Q   Okay.  And in the case of a sale,
21   you would, of course, receive a commission;
22   is that right?
23       A   Correct.
24       Q   Understood.  If you look at the
25   part where it says buyer's obligations,

Page 24

1    that's paragraph six.  I wanted to ask you a
2    couple of questions about that.
3        A   Yeah.  Paragraph six you said?
4        Q   That's correct.  And I think,
5    Mr. de Neree, as difficult as it might be, I
6    think for the record, if you can just try to
7    use the one on your screen, zooming in if
8    possible, that way there's no -- I don't
9    want there to be any ambiguity about whether
10   we're looking at the exact same document.
11       A   No.  We're looking at the exact
12   same document.  And this is standard, call
13   it Coldwell Banker standard document.
14       Q   Understood.  And I just want to
15   ask you a couple of quick questions about
16   it.
17           So the first line in that says,
18   well, it says, "Buyer's obligations:  A,
19   buyer will cooperate with Coldwell Banker;
20   one, by providing all information necessary
21   to evaluate buyer's needs and
22   qualifications, including personal,
23   financial and confidential information."
24           Do you see that?
25       A   Yes.

Page 25

1        Q   My question for you is:  Did you
2    ever receive, in connection with this
3    engagement, any of the information
4    referenced here concerning buyer's needs and
5    qualifications, including personal,
6    financial and confidential information?
7        A   Not really.  No.  I mean, it
8    was -- very few details were given to me.
9    Other than what he liked, what he didn't
10   like, maybe why he didn't like it and that
11   was it.
12       Q   So you didn't receive any
13   information regarding Miles' financial --
14       A   No.
15       Q   -- situation?
16       A   No.  Never.
17       Q   The next line talks about buyer
18   being obligated to pay for out-of-pocket
19   expenses.
20           Do you see that?
21       A   Correct.
22       Q   Were there any out-of-pocket
23   expenses that you incurred in the engagement
24   that the buyer paid for?
25       A   No.  He paid directly for the

7  (Pages 22 to 25)

Page 26

1    inspection.  And I believe those were the
2    only out-of-pocket expenses incurred.  And
3    so, no, I did not.
4        Q    Okay.  Did this agreement ever
5    terminate at any time?  Did it terminate
6    upon a transaction, is it still open?
7        A    On this particular document, there
8    was no term limit.  Which, again, you know,
9    probably I could have nailed them, but at
10   the time, that wasn't my concern.  I was
11   just hoping to find something that they
12   would like and would be interested in
13   buying.
14       So, no, there's no limit to this.
15   It says term here.  It's not filled in.
16       Q    Okay.  And did you ever enter into
17   any other agreement like this one with
18   another entity related to Miles?
19       MR. KIM:  Object to the form.
20       A    No.  I did not.
21       Q    I believe you said you were
22   originally approached by Mr. Krasner about
23   this engagement.  Was Mr. Krasner the person
24   you most often communicated with concerning
25   this engagement?

Page 27

1        A    Yes.
2        Q    Did you ever communicate with
3    Miles himself?
4        A    No.  Not via email or text.  I
5    didn't have his phone number, nor an email
6    address.  So, no, all communication was with
7    Max, with the exception of communication I
8    had with him at the properties.
9        Q    So you met Miles in person when
10   showing properties?
11       A    Yes.
12       Q    We'll get to that in a little bit
13   more detail in a moment.
14       I'd like my colleague to put up
15   tab three.
16       A    Yes.  Got it.
17       Q    Thank you.
18           (Whereupon, Text Messages was
19           marked as Exhibit 3 for
20           identification as of this date.)
21       MR. BASSETT:  I'd like the
22   court reporter to please mark this
23   as de Neree Exhibit 3, please.
24       Q    Mr. de Neree, I understand the
25   document that has just been marked as

Page 28

1    Exhibit 3 shows your text images.
2        Is that your understanding?
3        MR. MAJOR:  Objection to form.
4        A    Yes.
5        Q    And where did you obtain -- is
6    this a document that you, to your
7    recollection, had produced to the Trustee in
8    response to our subpoena in this case?
9        A    Yes.
10       Q    And where did you get this
11   document?
12       A    From my phone.  Actually, I'm not
13   sure it was the phone.  It could have been
14   the computer.  But in either case, it's text
15   messages that came in, because my Mac also
16   shows text messages.  I can't remember
17   whether it was printed from the computer or
18   from the phone.
19       Q    At the top, it says, iMessage.  So
20   to be more accurate, would this be iMessages
21   using an Apple device?
22       A    Correct.
23       Q    Can you just try to orient me.  It
24   looks like there are some messages that are
25   aligned on the left-hand side of page and

Page 29

1    some that are kind of aligned more in the
2    middle.  Do you know what it is --
3        A    Yeah.  So what's on the left is
4    Max, and what is on the right is me.
5        Q    Okay.  So on the left-hand page,
6    these are messages sent to you by
7    Mr. Krasner?
8        A    Correct.
9        Q    And the ones that are oriented
10   toward the middle, those are your messages
11   to Mr. Krasner?
12       A    Correct.
13       Q    Is that true for this entire
14   document?  If you go through all of them, I
15   don't know how many pages there are here.
16       A    Yes.  Yes, it is.
17       Q    This consists only of text
18   messages between you and Mr. Krasner, with
19   Mr. Krasner on the left, and yours more to
20   the middle?
21       A    Yes.
22       MR. MAJOR:  Object to the
23   form.
24       Mr. de Neree, if I could ask
25   you to please allow some time for me

8  (Pages 26 to 29)

Page 30

1    to the object before you answer
2    questions. I know this is an
3    unnatural setting. And in
4    conversation it's often custom to
5    respond to someone before they
6    finish their question. But if you
7    could please let Mr. Bassett finish
8    his question and pause for just a
9    moment, in case I have an objection
10   to put in for the court reporter.
11   Thank you.
12        THE WITNESS: Absolutely.
13   Thank you.
14   Q   Mr. de Neree, at the very top, it
15   says, November 5, 2018.
16        Do you see that?
17   A   Yes.
18   Q   And then if you go to the very end
19   of the document, the last message, as far as
20   I can tell, and you correct me if I'm wrong,
21   is dated Tuesday, August 23, 2022.
22        Is that your understanding?
23   A   Yes.
24   Q   So outside of the text messages
25   that are shown in this document, are you

Page 31

1    aware of any other text messages you had
2    with Mr. Krasner that are not shown here?
3    A   No.
4    Q   And that's true before, you don't
5    recall having any text with him before
6    November 5, 2018?
7    A   Correct.
8    Q   And then just to be clear, no text
9    after August 23, 2022?
10   A   Correct.
11   Q   And, again, just so we're totally
12   clear, and to best of your knowledge,
13   between November 5, 2018 and
14   August 23, 2022, you aren't aware of any
15   other text messages with him that are not
16   included in the document?
17   A   Correct.
18   Q   Thank you. And you also said that
19   you no longer have access to your emails; is
20   that correct?
21   A   Correct.
22   Q   Can you just explain this a little
23   bit more detail -- strike that.
24        Before asking that question. Did
25   you have email communications with

Page 32

1    Mr. Krasner?
2    A   Yes.
3    Q   Did you have email communications
4    with anyone other than Mr. Krasner whom you
5    understood to be acting on behalf of Miles?
6        MR. MAJOR: Objection to form.
7    A   No.
8    Q   Do you have an approximate
9    understanding of what the date range would
10   have been for these emails that you had with
11   Mr. Krasner, would it have been similar to
12   these text messages?
13   A   Yes.
14   Q   What's the approximate volume of
15   emails that you may have had with
16   Mr. Krasner?
17        MR. MAJOR: Objection to form.
18   A   I generally used emails only to
19   send potential properties, to alert upcoming
20   open houses or appointments, but all the
21   details were generally covered in text.
22        And so if he sent me something
23   like a signed document of some sort, like
24   the ones you have shown, exclusive right to
25   represent, and the exhibit and things like

Page 33

1    that, that would have gone via email. But
2    the majority of the communication was on the
3    telephone or text.
4    Q   Understood. And when you say you
5    don't have access to these emails any
6    longer, what does that mean exactly?
7        MR. MAJOR: Objection to form.
8    A   When I left Coldwell Banker, they
9    literally froze my email account the same
10   day, and I had no access to those emails. I
11   did contact the legal department of Coldwell
12   Banker after I was first made aware that I
13   might have to be deposed. And they said,
14   yeah, they're gone. And it was well
15   after -- it was much more than a year after
16   I left. And they said, you know, we
17   generally get rid of them after nine months
18   or so.
19        But he did say that Coldwell
20   Banker had supplied whatever documents they
21   had in the file with regards to the
22   transaction, the official documents, in
23   other words, that I would have had and they
24   would have had.
25   Q   Understood. So focusing back to

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 34

```
1   Exhibit 3, the text message that you sent on
2   November 5, 2018.  It says here that:
3        "I am still waiting to get info on
4   other properties that may be perfect for
5   Miles but are not currently on the market."
6        Do you see that?
7      A   Correct.  Yes, I see that.
8      Q   And then you say:
9        "I will get back as soon as I hear
10  more.  In the meantime, does Miles have an
11  interest in seeing any of the listings that
12  I sent you last week."
13       Do you see that?
14     A   Yes.
15     Q   First of all, those listings that
16  you sent last week, those would have been
17  maybe listings that you sent via email?
18     A   Yes.  They would have come from
19  the MLS.  There is an email function in the
20  MLS that allows you to send properties as an
21  attachment, which are then openable and
22  reviewable by the clients, with all the
23  details of the listing.
24     Q   Got it.  And this message that you
25  sent here, where you're asking Mr. Krasner
```

Page 35

```
1   if Miles has an interest in seeing any of
2   the listings, is that generally consistent
3   with what you said before, that Mr. Krasner
4   was acting on Miles' behalf in this process?
5        MR. MAJOR:  Objection to form.
6      A   Yes.
7      Q   And then in the next text message
8   you say, and this is January 12, 2019, you
9   say:
10       "Max, we are confirmed for noon at
11  125 Pecksland.  Still working on others."
12       He responds and says:  "Okay.
13  Thanks."  And then in the next message from
14  Mr. Krasner on January 12, it says, driver
15  name is Warren, there's a phone number.  And
16  then it says, "They will meet you at 125
17  Pecksland Road at noon."
18       Do you see that?
19     A   Yes.
20     Q   I gather from this, correct me if
21  I'm wrong, that 125 Pecksland Road was one
22  of the properties you were showing Miles?
23     A   Yes.
24     Q   Was there a meeting that occurred
25  at that property?
```

Page 36

```
1      A   Yes.
2      Q   And this -- this message was dated
3   January 12, 2019, do you know when the
4   meeting occurred?
5      A   Probably January 12, but I would
6   have to look up to see if that was a
7   Saturday or -- or -- but -- but from the
8   text messages I would -- I would say it
9   happened on January 12, because that's the
10  morning where he confirmed that Miles was
11  going to look at the properties and that the
12  name of the driver was Warren.  And his cell
13  phone number in case I needed to get a hold
14  of him for a reason.  But that was
15  definitely the first time I met Miles.
16     Q   Okay.  And -- and as you look
17  forward, and I'll get to this in a second,
18  but the January 14, 2019 text messages says,
19  "Miles left his sunglasses in," it says
20  "bone."  But I think he corrected that to
21  say, "one, of the properties yesterday."
22       If that's the January 14 and it
23  refers to yesterday, would that suggest that
24  the meeting was on January 13th?
25     A   I don't know.  I can't -- I don't
```

Page 37

```
1   know.
2      Q   Okay.  The meeting whenever it
3   occurred, I think you already said this, but
4   Miles was present?
5      A   Yes.
6      Q   Did you look at just the 125
7   Pecksland Road property or did you look at
8   more properties?
9      A   I don't recollect the dates and so
10  forth, and so on of each individual showing.
11  It's possible I would have shown him one or
12  two more that day, but the one that sticks
13  in my mind is the Pecksland property.  If I
14  look at my -- at the list of properties that
15  I did show him over time; it was 125
16  Pecksland, 586 Round Hill, and 373 Taconic.
17  Those technically could have been around the
18  same time or even on the same date.
19       But I -- I don't have a strong
20  memory of exactly which property I showed
21  out on that -- on that day.
22     Q   Understood.  Can you just describe
23  for me what you recall about your
24  interactions with Miles on that day during
25  those visits?
```

Page 38

1         MR. MAJOR:  Objection to form.
2      A   He would go into each room and
3   view it like anyone else, and would make
4   comments as to what he liked about it or
5   didn't like about it.  And as I said, I
6   would then subsequently get more feedback
7   from Max as to, you know, what he liked and
8   why, or didn't like and why.
9      Q   And did Miles ask you any
10   questions at any point?
11      A   Yes.
12      Q   What types of questions?
13      A   About the property.  In almost
14   every case there was a listing agent
15   present.  So if he asked me a question and I
16   didn't know the answer, I would ask the
17   listing agent and give Miles the answer.
18      Q   Okay.  And what language was Miles
19   speaking during these conversations?
20      A   English.
21      Q   And based on these interactions,
22   what was your -- did you ever come to gain
23   an impression as to what would ultimately be
24   making the decision as to whether or not to
25   make an offer on a property?

Page 39

1         MR. MAJOR:  Objection to form.
2      A   Miles.
3      Q   So you're understanding was that
4   Miles would ultimately be making the
5   decision?
6         MR. MAJOR:  Objection to form.
7      A   Yes.
8      Q   The text message says:
9      "Miles left his sunglasses in one
10   of the properties yesterday.  He will pick
11   them up."
12      It goes on:
13      "Let me know if the glasses are
14   found, he'll pick them up next time."
15      Do you see that?
16      A   Yes.
17      Q   So just to confirm, I -- does that
18   refresh your recollection that there were,
19   in fact, multiple properties that would have
20   been shown at that time?
21      A   Yes.
22      Q   And then the January 14, 2019 text
23   message, that's the next one below that,
24   that Mr. Krasner sent to you says, "Offer
25   4 million on Taconic Road.  I confirmed."

Page 40

1      Do you see that?
2      A   Yes.
3      Q   And "on Taconic road," do you
4   understand that to be a reference to the 373
5   Taconic Road property?
6         MR. MAJOR:  Objection to form.
7      A   Yes.
8      Q   Did you ever show Miles any other
9   properties on Taconic Road?
10      A   No.  Not to my recollection.
11      Q   Mr. Krasner said "I confirmed,"
12   did you have an understanding of what he
13   meant there?
14         MR. MAJOR:  Objection to form.
15      A   That I was instructed to offer
16   $4 million for Taconic Road at the time.
17      Q   Instructed by whom?
18         MR. MAJOR:  Objection to form.
19      A   By Max at this point.
20      Q   Okay.  And from whom did you
21   understand Mr. Krasner was taking his
22   direction?
23         MR. MAJOR:  Objection to form.
24      A   Miles.
25      Q   If you go the next page of the

Page 41

1   document, at the top there's a January 19,
2   2019 text message.  It says:
3      "Emile, as we discussed, please
4   respectfully explain to the owners our
5   situation.  Miles said that it was a
6   pleasure to meet such a nice family.  Time
7   is of the essence and we are proposing the
8   following."
9      And then there's two proposals
10   listed.
11      Couple of questions about this
12   message.
13      First of all, do you recall which
14   property this message gives reference to?
15      A   Wallacks Point.
16      Q   Okay.  So was there a meeting that
17   took place at that property?
18      A   Yes.
19      Q   And Miles was present?
20      A   Yes.
21      Q   Was this at the -- on the same
22   date that we were already talking when the
23   other properties were shown or a different
24   date?
25      A   No.  Different.

Page 42

1     Q   Okay.  And to the best of your
2  recollection, can you describe your
3  interaction with Miles during that visit?
4     A   He came with the usual entourage;
5  driver, security, et cetera, et cetera.  And
6  I -- I believe his wife was there for this
7  visit.  If not the first visit, the second
8  visit.  I believe they had two visits to
9  this property.  One day and then the next
10  day or a -- a day in between.
11        And the asking price was
12  considerably higher.  I believe 12 million
13  was the number.  And they had some
14  interaction with the sellers, the family
15  that lived there, which I think the message
16  refers to.  And he was very much interested
17  in buying the property, but he wanted to do
18  it quickly and the family was not really
19  able to make those short deadlines.
20        So his offer was based on a quick
21  closing verses a slower closing for the same
22  property.  Subsequently, Miles decided
23  against buying and withdrew his offer.
24     Q   Okay.  And when it says "time is
25  of the essence" and you eluded to that, do

Page 43

1  you have an understanding of why time was of
2  the essence for Miles?
3        MR. MAJOR:  Objection to form.
4     A   No.  Other than -- other than that
5  he wanted it quickly, that's all.
6     Q   Okay.  And like -- like the last
7  visit he described, I assume Miles asked
8  questions about the property during this
9  visit, et cetera?
10     A   Yes.
11     Q   And, again, what was the language
12  that was being spoken?
13     A   English.
14     Q   In any of your interactions with
15  Miles, did he ever have an interpreter
16  present?
17        MR. MAJOR:  Objection to form.
18     A   No.
19     Q   So the language that was always
20  spoken was English?
21     A   Yes.
22     Q   I'd like to direct your attention
23  to the text message in the middle of the
24  page that's dated "February 11, 2020."
25        Do you see that?

Page 44

1     A   Yes.
2     Q   And given that it's on the
3  left-hand side, this would be a -- as you
4  discussed, a -- as you described, a message
5  from Mr. Krasner and it says:
6        "Also, if you think there are
7  other properties that might interest Miles,
8  please forward them and we will review
9  them."
10        Do you see that?
11     A   Yes.
12     Q   So, my first question is:  It -- I
13  take it from the sequence of the message
14  here, and correct me if I'm wrong, that
15  there was a -- basically, a more than
16  one-year gap in the text communications that
17  you had with Mr. Krasner from January 22,
18  2019 to February 11, 2020; is that right?
19     A   Correct.
20        MR. MAJOR:  Objection to form.
21     Q   What -- what was you understanding
22  for why the process or the communication at
23  least according to this, stopped for a year,
24  approximately?
25        MR. MAJOR:  Objection to form.

Page 45

1     A   My understanding was that he was
2  not interested, not looking, not going, not
3  focused on buying a house during that
4  period.  And it was out of the clear blue
5  sky that he -- or that Max approached me
6  again and said, "Remember that house that
7  you showed Miles at 373 Taconic, it's -- is
8  it still available, and what price, and can
9  we see it?"
10     Q   Got it.
11        And so your message back to him
12  says:
13        "Max, we are confirmed for noon
14  today at 373 Taconic Road."
15        And then it says, "Also, walking
16  property at 371."
17        So did a meeting occur on
18  February 11, at 373 Taconic Road?
19     A   Yes.
20     Q   And was Miles present at that
21  meeting?
22     A   Yes.
23     Q   And to the best of your
24  recollection, can you just describe to me
25  what occurred during that meeting at 373

12  (Pages 42 to 45)

Page 46

1   Taconic?
2          MR. MAJOR:  Objection to form.
3      A   The property price had been
4   lowered from my recollection, closer to
5   5 million and Max decided to make an offer
6   the same day.  And the price offered was
7   4.6 million, which was accepted by the
8   sellers, and the real estate person
9   representing the sellers acknowledged that.
10     Q   I think you just said that Max
11  decided to make an offer.  Was it your
12  understanding that Max was the
13  decision-maker?
14         MR. MAJOR:  Objection to form.
15     A   Yes.
16     Q   Max not Miles?
17     A   Sorry.
18         MR. MAJOR:  Objection to form.
19     A   No.  The decision-maker was never
20  Max it was always Miles, but the
21  communicator of Miles' intentions was
22  generally Max.
23     Q   Okay.  So who did you understand
24  had made the decision to make this offer on
25  373 Taconic Road?

Page 47

1          MR. MAJOR:  Objection to form.
2      A   Miles.
3      Q   And -- and, again, how -- how did
4   you come to have that understanding?
5          MR. MAJOR:  Objection to form.
6      A   Well, he told me what he was
7   willing to offer in English.
8      Q   Miles told you what he was willing
9   to offer?
10     A   Yes.  And it was confirmed, the
11  details were confirmed by -- by Max, in this
12  case.  But this was a transaction that went
13  unusually quick.  I mean, the offer was made
14  on Monday and the closing took place on
15  Friday of the same week.  And the moving
16  trucks were in the driveway waiting for the
17  money to clear and the lawyers to tell me
18  that they had closed.
19     Q   What was your understanding of why
20  this transaction occurred so quickly?
21         MR. MAJOR:  Objection to form.
22     A   I had no information, other than
23  that Miles generally wanted things done
24  quickly and, you know, and wanted it done as
25  fast as possible, that's it.  That's all.

Page 48

1          MR. BASSETT:  I think we've
2   been going about an hour.  I'd like
3   to take a quick break.  Why don't we
4   do that now for five or 10 minutes.
5          VIDEOGRAPHER:  We are now
6   going off the record.  The time is
7   11:11.
8          (Whereupon, a recess was taken
9          from 11:11 AM to 11:23 AM.)
10         VIDEOGRAPHER:  We are now back
11  on the record.  The time is 11:23.
12     Q   Mr. de Neree, I want to show you a
13  couple of additional documents.  If I could
14  have my colleague put Tab 4 into the chat,
15  please.
16         (Whereupon, Offer to Purchase
17         Real Estate (GREE02327) was
18         marked as Exhibit 4 for
19         identification as of this date.)
20     MR. BASSETT:  I'd like the
21  court reporter to please mark this
22  document as de Neree Exhibit 4.
23     For the record, this is a
24  document with the Bates Label
25  GREE002327, bottom of the right-hand

Page 49

1          corner, first page.
2      Q   Mr. de Neree, do you recognize
3   this document?
4      A   Yes.
5      Q   What is it?
6      A   It's an offer to purchase real
7   estate.
8      Q   Offer to purchase which real
9   estate?
10     A   373 Taconic Road.
11     Q   And prior to break, we were
12  discussing the offer that Miles made on this
13  property.  Do you recall that?
14     A   Yes.
15         MR. MAJOR:  Objection to form.
16     Q   Is this the formal offer related
17  to that offer for this property?
18         MR. MAJOR:  Objection to form.
19     A   Yeah, it's a nonbinding offer to
20  purchase, which generally becomes the deal
21  term for the lawyers to put together a
22  contract.
23     Q   Understood.
24         It's dated February 11, 2020; is
25  that right?

13  (Pages 46 to 49)

Page 50

1    A   Correct.
2    Q   Okay.  And it says -- where it
3  says "buyer" it says "Greenwich Land, LLC."
4    Do you see that?
5    A   Correct.
6    Q   Do you have any understanding of
7  why the buyer was Greenwich Land, LLC?
8    MR. MAJOR:  Objection to form.
9    A   No.  I mean, it, as I said, it's
10  not unusual for the buyers in the Greenwich
11  or elsewhere for that matter, to -- to buy a
12  property in an LLC.
13    Q   Did you ask what the relationship
14  was between Greenwich Land, LLC and Miles?
15    MR. MAJOR:  Objection to form.
16    A   No.  I didn't because I was
17  instructed by Max that would be the buyer.
18  They would put it in an LLC named Greenwich
19  Land.
20    Q   And before you testified that you
21  understood that Miles was the one making a
22  decision to the buy the property; is that
23  right?
24    MR. MAJOR:  Objection to form.
25    A   Correct.

Page 51

1    Q   And did that understanding change
2  based on the fact that the named buying
3  entity was Greenwich Land, LLC?
4    MR. MAJOR:  Objection to form.
5    A   Correct.
6    Q   You're understanding did not
7  change?
8    MR. MAJOR:  Objection to form.
9    A   Can you rephrase the question so
10  it's easier for me to answer.
11    Q   Earlier you testified that Miles
12  was the one who made the decision to buy the
13  property, correct?
14    A   Yes.
15    Q   This offer to purchase real estate
16  as a buyer in Greenwich Land, LLC., right?
17    A   Yes.
18    Q   So do you understand that
19  Greenwich Land, LLC., was the entity that
20  Miles was using to purchase the property?
21    MR. MAJOR:  Objection to form.
22    A   Yes.
23    MR. BASSETT:  Could my
24    colleagues please put our Tab 6 on
25    the screen, please.

Page 52

1    (Whereupon, Email (WBAM_009051)
2    was marked as Exhibit 5 for
3    identification as of this date.)
4    MR. BASSETT:  I'll have the
5    court reporter please mark this as
6    de Neree Exhibit 5.
7    Q   Mr. de Neree, before I ask you
8  questions about this document, when was the
9  first time you ever heard the name Greenwich
10  Land, LLC.?
11    A   On that day.  On that very day
12  that they instructed me to make an offer.
13    Q   So the email that -- sorry.  The
14  document that's been marked as de Neree
15  Exhibit 5, for the record, Bates label at
16  the bottom right-hand corner of the first
17  page WBAM_009051.  And you can take your
18  time to scroll through the whole thing, but
19  do you recognize this document, Mr. de
20  Neree?
21    A   Yes.
22    Q   And is it correct that this is an
23  email chain involving you, Mr. Krasner, a
24  Margaret Conboy and at times some other
25  individuals?

Page 53

1    A   Yes.
2    Q   And if you look at -- if you look
3  at the email from the Julie Burke, which is
4  at the bottom of the second page, dated
5  August 1, 2020 with the subject line 373
6  Taconic Road, this is an email from her to
7  you.  This would have been after the closing
8  of the purchase of 373 Taconic Road,
9  correct?
10    A   August 1, 2020, yes, absolutely.
11  I'm just reading the email.
12    Q   Yeah.
13    A   Yeah.
14    Q   Just to paraphrase he's
15  essentially saying that the sellers are
16  asking for certain funds that are still
17  being held in escrow to be released, is that
18  generally what she's saying here?
19    MR. MAJOR:  Objection to form.
20    A   Yes.
21    Q   Then if you go up to the next
22  email dated August 19, 2020 you say:
23    "Dear Margaret and Max, the
24  sellers for 373 Taconic, which was bought by
25  Miles under Greenwich Land, are asking that

Page 54

1  the escrow accounts be release."
2      Do you see that?
3      A  I'm looking.  Is it up above it.
4  Yeah, it's above this, yes, yeah.
5      Q  And you say 373 Taconic.
6      "Which was bought by Miles under
7  Greenwich Land."
8      I just want to focus on that.  Do
9  you see that?
10     A  Yeah.
11     Q  Was that an accurate statement
12 that you wrote in this email?
13     MR. MAJOR:  Objection to form.
14     A  Yes.
15     Q  So it's your understanding that
16 Miles bought 373 Taconic under Greenwich
17 Land, LLC.?
18     MR. MAJOR:  Objection to form.
19     A  That was my understanding.
20     Q  And again, how did you come to
21 that understanding?
22     MR. MAJOR:  Objection to form.
23     A  He was the one that told me that
24 he wanted it, how much he was going to offer
25 and all the details were handled by his

Page 55

1  assistant.
2      Q  I'd like to direct your attention
3  back the Exhibit 3, which are the text
4  messages.
5      A  Yeah.
6      Q  If you go to -- I'm sorry, we
7  don't have page numbers.  I'm going to a
8  text message that's dated February 15, 2020.
9      A  15, 2020, yeah.
10     Q  Actually, before, I apologize,
11 just sort of put a pin in that if we could.
12 Before we go there I want to just show you
13 one more document.  If my colleague could
14 please put into the chat our Tab 5.
15     (Whereupon, Residential Real
16      Estate Sales Agreement
17      (GREE02328) was marked as
18      Exhibit 6 for identification as
19      of this date.)
20     A  Got it.
21     MR. BASSETT:  And for the
22 record, I'll have this marked as de
23 Neere Exhibit 6.  Starts at the
24 bottom right-hand corner with the
25 first page with the Bates label

Page 56

1      GREE002328.
2      Q  We already just looked at, which
3  was de Neere Exhibit 4, the offer for the
4  property at 373 Taconic Road.  Is this the
5  formal sales agreement that followed?
6      A  Yeah.  That's the contract.
7      Q  Okay.  And this was dated
8  February 14, 2020; is that right?
9      A  Correct.
10     Q  Is that the same -- is that the
11 date of closing?  Actually, if you look at
12 next page closing it says February 21, 2020?
13     A  Yeah, that sounds right.
14     Q  Now back to Exhibit 3 -- or,
15 sorry, not Exhibit 3 -- yes, Exhibit 3, the
16 text messages, back to that
17 February 15, 2020 email, not email, text
18 message.  I think there's only one text
19 message on that date from you to Max Krasner
20 which says:
21     "Max, are we still on for noon
22 today at 373 Taconic?"
23     Do you see that?
24     A  Yes, correct.
25     Q  Then he says:

Page 57

1      "Yes, 373 Taconic.  Call Matthew,
2  the security."
3      Do you see that?
4      A  Yes.
5      Q  So this would have been after the
6  purchase agreement was executed before the
7  closing; is that correct?
8      A  Yes.
9      Q  And then the meeting in fact
10 occurred at the house February 15, 2020, to
11 your recollection?
12     A  Yes.
13     MR. MAJOR:  Objection to form.
14     Q  What was the purpose of that
15 meeting?
16     A  The purpose was to -- to the meet
17 with designers, in this case it was an
18 interior designer and an architect, someone
19 specializing in high-end renovations and he
20 wanted to meet them about some changes he
21 wanted to make to the house.
22     Q  You're saying he, who are you
23 referring to?
24     A  Miles.
25     Q  So Miles was at this meeting?

15  (Pages 54 to 57)

Page 58

1      A   Correct.
2      Q   And then architects or designers
3   were at this meeting?
4      A   Correct.
5      Q   You were there, too?
6      A   Yes, I wasn't in the meeting from
7   beginning to end, but I was present and
8   introduced them and so forth.
9      Q   The parts that you did observe,
10   can you describe generally the interactions
11   that occurred between Miles and the
12   designers and architects?
13         MR. MAJOR:  Objection to form.
14      Q   You said you were present for part
15   of the meeting, correct?
16      A   Correct.
17      Q   The parts that you were present
18   for, can you please describe generally, the
19   interactions that you observed between Miles
20   and the architects and designers?
21         MR. MAJOR:  Objection as to
22      form.
23      A   He talked about what he liked and
24   what he didn't like and what had changed and
25   how was that possible and so forth and so

Page 59

1   on, and he took them through the house and I
2   wasn't present in every discussion and every
3   aspect of the changes that he was talking
4   about.
5      Q   Okay.  After this
6   February 15, 2020 meeting, are you aware of
7   any other meetings that occurred at the 373
8   Taconic Road property?
9         MR. MAJOR:  Objection to form.
10      A   I'm trying to see the dates.
11   17th.  I believe at most of the meetings
12   that I had at the property were with
13   inspectors and property managers, previous
14   property managers and things like that.
15   Just for the purpose of a building
16   inspection report.
17      Q   Did you recall ever meeting Miles
18   at the property after that February 2020
19   meeting?
20      A   I'm just looking at my agenda to
21   see if I can find some clarification.  But
22   the closing itself -- so on the 17th it was
23   just me and the seller's agent.  On the
24   17th.  I have meeting with the moving
25   company on the 18th.

Page 60

1      Q   Mr. de Neree, are you looking at a
2   calender or a personal --
3      A   My own calender, yeah, I don't
4   write down everything, but a few things.  It
5   says moving company at 373 Taconic and I'm
6   only going by what I was doing that day.
7   But I don't have everything.
8      Q   And that's fine.  So Mr. de Neree,
9   I think, I don't think we have that document
10   and I believe to the extent that agenda or
11   calender of yours, to the extent that it
12   refer to meetings at the property, it
13   probably would be technically responsive to
14   our subpoena.  I would ask you to provide a
15   copy of that after this, but obviously we
16   can redact it so that you don't have
17   personal stuff in there or whatever, but we
18   can talk about that after the deposition
19   today.
20      A   Okay.
21      Q   If you could go to a couple of
22   pages in Exhibit 3, down from where we were
23   for the March 5th, 2020 text messages.  Text
24   message from you to Mr. Krasner, it starts
25   with:

Page 61

1         "Hi, Max I have a scheduled
2   showing at 429 Taconic."
3         Do you see that?
4      A   Yeah.
5      Q   Yes, it says:
6         "Hi, Max, I have scheduled a
7   showing at 429 Taconic at 2:00 p.m., Friday,
8   it's the horse farm property up the road
9   from Miles home and he wanted to see it."
10         Do you see that?
11      A   Yes.
12      Q   So what was this text message
13   about?
14         MR. MAJOR:  Objection to form.
15      A   Well, as it says, Miles had
16   expressed an interest either directly to me
17   or via Max, I do not remember because I sent
18   him information about this and it confirms
19   that I set up the appointment for 2:00 p.m.
20   on Friday.
21      Q   So after purchasing 373 Taconic,
22   Miles was interested in potentially buying
23   other nearby properties?
24         MR. MAJOR:  Objection to form.
25      A   Yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 62

```
 1        Q    And when you said up the road for
 2   Miles home, did you mean to say up the road
 3   from Miles home?
 4        A    Yes.
 5             MR. MAJOR:  Objection to form.
 6        Q    When you said Miles home, what
 7   were you referring to?
 8        A    373 Taconic.
 9             MR. MAJOR:  Objection to form.
10        Q    Also, you say here that when
11   you're referring to 429 Taconic that, this
12   is the last line of the second sentence that
13   quote:
14             "He wanted to see it."
15             Who is he in reference to?
16        A    Miles.
17        Q    How did you know that he wanted to
18   see the home?
19        A    Because he told me so.
20        Q    Miles?
21        A    Yes.  That's what I surmised from
22   the message because I don't remember whether
23   Max first said that Miles wanted to see it.
24   Or whether Miles told me directly that he
25   wanted to see it.  Again, I do not remember
```

Page 63

```
 1   the communication.
 2        Q    Okay.  If you can go to the next
 3   page, the May 21, 2020 text message it says:
 4             "Hi, Max.  Gladys reaches out to
 5   me to find office space or farm near Indian
 6   Harbor for Miles."
 7             Do you see that?
 8        A    Yes.
 9        Q    Who is Gladys?
10        A    Gladys introduced herself as
11   working for Miles and looking for office
12   space.
13        Q    Do you know her last name?
14        A    No.
15        Q    She said she worked for Miles?
16        A    Yes.
17        Q    What she told you was that Miles
18   was looking to acquire office space or farm
19   near Indian Harbor?
20        A    Yeah, that he had an interest in
21   it, yeah.
22        Q    Did you come to have any
23   understanding for what purpose he was
24   looking for this office space?
25        A    No.  I mean office space, to work
```

Page 64

```
 1   out of I imagine.
 2        Q    What about a farm, any
 3   understanding of why he was looking to
 4   acquire a farm?
 5             MR. MAJOR:  Objection to form.
 6        A    No.  He was looking for a good, I
 7   guess land investment that had a farm on it.
 8   Not necessarily working farm, he wasn't
 9   looking at that necessarily.  But he looked
10   at property that was beautiful and large,
11   multiple acres overlooking with good views
12   and nice stream through it and that was
13   about it.  That's the information I got.
14   And there weren't very many properties like
15   that available at the time except for the
16   one up the road, which I described was
17   14 million, he liked it, but he just thought
18   it was too much money.
19        Q    Understood.  Did you ever end up
20   helping Miles actually buy and close on the
21   purchase of any other properties?
22        A    No.
23             MR. MAJOR:  Objection to form.
24             MR. BASSETT:  Can we take
25   another five to 10 minutes again.  I
```

Page 65

```
 1   may not have any other questions at
 2   this time, but let me confirm that
 3   and then I'll let you know when we
 4   get back on.
 5             MR. MAJOR:  Okay.
 6             VIDEOGRAPHER:  We are now
 7   going off the record.  The time is
 8   11:50.
 9             (Whereupon, a recess was taken
10             from 11:50 AM to 12:04 PM.)
11             VIDEOGRAPHER:  We are now back
12   on the record, the time is 11:54.
13             MR. BASSETT:  So, Mr. de
14   Neree, thank you again for your time
15   this morning.  I do not have any
16   other questions right now, although
17   I do reserve the right to ask some
18   followup questions after Mr. Major
19   asks his questions.  So at this time
20   I will pass the witness.
21   EXAMINATION BY
22   MR. MAJOR:
23        Q    Good afternoon, Mr. de Neree, my
24   name is Chris Major.  I'm at the law firm
25   Meister, Seelig & Fein.  We represent the
```

17  (Pages 62 to 65)

Page 66

1    defendants in the adversary proceeding, Hing
2    Chi Ngok and Greenwich Land, LLC. I've got
3    some questions for you covering some of the
4    subject matter you've testified to today and
5    some other questions for you as well. So
6    that and the same ground rules will apply so
7    please let me finish my question before you
8    start your answer and Mr. Bassett, who's
9    representing the Chapter 11 Trustee in this
10   case, he may have objections to some of my
11   questions. Are those ground rules okay with
12   you?
13       A   Yes.
14       Q   Okay. I want to give you one
15   other very important instruction, which is
16   you have been called to testify at this
17   deposition as a fact witness and for that
18   reason, I want to ask you not to speculate
19   or assume things, but only testify to facts
20   that you actually know and know directly, is
21   that okay?
22       A   Yes.
23       Q   Okay. First of all, do you know
24   anything about what this case is about?
25           MR. BASSETT:  Objection to

Page 67

1    form.
2        A   I'm just closing that so I can
3    see, no, only that there's a bankruptcy
4    proceeding involving this property and
5    others, that's all.
6        Q   When you say there's a bankruptcy
7    involving this property, what do you mean by
8    that?
9        A   I -- just that there is a
10   bankruptcy involving Miles and that's what I
11   was told, and this property's involved and I
12   don't know what other properties could be
13   involved, I have no other knowledge of
14   anything else.
15       Q   Who told you that there was a
16   bankruptcy involving Miles?
17       A   I was told by Paul Hastings, I
18   believe at one point they contacted me.
19       Q   What is Paul Hastings?
20       A   The law firm Paul Hastings.
21       Q   Okay. Do you know who the
22   plaintiff is in the lawsuit in which you're
23   testifying?
24       A   I mean I don't know. No, I don't
25   know for sure. The state is it? I don't

Page 68

1    know. I do not know.
2        Q   You've been referring to someone
3    named Miles today. Do you know that
4    person's full name?
5        A   He was always referred to me as
6    Miles. He introduced himself as Miles. I
7    didn't know his full name. I found out that
8    he had a last name later, after I met him.
9    And did not know that he had other names
10   that he went by, and I did not know some of
11   the names that were mentioned earlier in the
12   deposition.
13       Q   You said you found out later that
14   he went by other names. Is that what you
15   just said?
16       A   Yeah. There were stories on the
17   internet and more recently stories that came
18   out about Miles, where he was named -- where
19   he had other names that he supposedly had
20   been using. But I did not know those names
21   and I never heard those before.
22       Q   Did you ever see any government
23   issued photo identification of the person
24   you knew as Miles?
25       A   No.

Page 69

1        Q   What, if anything, did you do to
2    confirm his identity during the time you had
3    in-person meetings with the person you refer
4    to as Miles?
5        A   I did not have any attempt to
6    identify him.
7        Q   Do you know whether the person
8    you've been referring to as Miles was
9    married?
10       A   Yes.
11       Q   Do you know whether he had
12   children?
13       A   Yes.
14       Q   Do you know the names of the
15   children?
16       A   I don't remember. I must have
17   known them at some point, but they may have
18   been introduced to me with their first
19   names. But I don't remember their names. I
20   met his wife twice. Once at Wallacks Point
21   during the negotiation about that property.
22   And the second time I believe was at 373
23   Taconic with her two, one daughter, one son.
24       Q   Do you speak Mandarin?
25       A   No. I do not.

18 (Pages 66 to 69)

Page 70

1    Q   So you would not understand a
2  conversation if it took place in front of
3  you but in Mandarin?
4        MR. BASSETT: Objection to
5  form.
6    A   I would not.
7    Q   You mentioned the law firm Paul
8  Hastings. When was the first time you spoke
9  with someone from Paul Hastings regarding
10 Miles or the bankruptcy or any property,
11 including but not limited to 373 Taconic
12 Road?
13   A   Well, I was approached at one
14 point by Luc, Luc, last name -- I think it
15 was Lapin [sic]. And he mentioned that he
16 was in charge of the bankruptcy. No details
17 on that, but just in case. And he said,
18 your name has come up as having done
19 business with this person Miles. And he
20 said, we may have to depose you sometime in
21 the future. And I said, fine. I mean, you
22 know, that was about it. So it was the
23 first I heard that there could be a
24 deposition.
25   Q   When did that conversation take

Page 71

1  place?
2    A   I do not recall.
3    Q   Was it during 2023?
4    A   We're in August, it could have
5  taken place in '23. Honestly, it was a
6  phone call. I had no notes of it or
7  anything, just to --
8    Q   Do you know whether anyone else
9  was on the line when Mr. Despins called you?
10   A   No.
11   Q   Have you spoken with anyone else
12 before today from Paul Hastings?
13   A   About this matter?
14   Q   Yes.
15   A   I believe all communication from
16 that point were in emails and notifications
17 like that. I got served a subpoena to
18 appear three times, I think. Once in
19 Bridgeport, once in Stamford, and once in
20 New York City. And none of them ever
21 happened. I even went to New York City when
22 I wasn't needed. It didn't happen, in other
23 words.
24   Q   Okay. Do you have the emails that
25 you've exchanged with Paul Hastings?

Page 72

1    A   I had no exchange. It was just
2  notified. I didn't get back. Oh, the only
3  ones were the most recent ones that I saw
4  you guys were copied on, just having to do
5  with the timing of the deposition and that
6  it was going to be a Zoom as opposed to an
7  in-person and exactly when. That's it.
8  That's the only communication that I have
9  about the -- and the other ones were just,
10 as I said, you know, official documents,
11 subpoena to appear and stuff.
12   Q   You mentioned that you were
13 subpoenaed to appear in Bridgeport. Was
14 that at a courthouse?
15   A   Yes.
16   Q   Did you go to the courthouse?
17   A   No. Everything was canceled prior
18 to, you know, everything was canceled.
19   Q   Have you ever looked at the docket
20 in this case?
21        MR. BASSETT: Objection to
22 form.
23   A   No. I have not. What do you mean
24 by "the docket"?
25   Q   Had you ever --

Page 73

1    A   I don't even know what --
2    Q   Sure. Are you a lawyer?
3    A   No. I'm not. I'm a realtor.
4    Q   Understood. The docket is just a
5  list of documents that have been filed in
6  the case and notices and things like that.
7    A   No, no. I have not.
8    Q   So presumably, someone had to tell
9  you that you were not needed at the
10 courthouse in Bridgeport as set forth in the
11 subpoena, right?
12   A   Correct.
13   Q   Was that someone from Paul
14 Hastings?
15   A   I believe so.
16   Q   Do you know what the name of that
17 person was?
18   A   Well, the most recent
19 communications were all with Avi Luft. I've
20 never met Avi Luft, but that's just a person
21 that from whom I got communication.
22   Q   Did the person from Paul Hastings
23 tell you why your presence was not required
24 at the Bridgeport courthouse?
25   A   No. Just that it was postponed

19  (Pages 70 to 73)

Page 74

1    canceled, whatever, push forward, timing,
2    whatever. No. No reason.
3        Q    When Mr. Despins called you for
4    the first time, what did he tell you about
5    the case?
6        MR. BASSETT:  Object to form.
7        A    As I said, he said, we've seen
8    your name on documents involving the
9    purchase of 373 Taconic, and it's involved
10    in a bankruptcy proceeding. No details
11    there, but --
12        And, as I said, he said, we may
13    have to subpoena you or you may have to
14    testify or something like that. I don't
15    recall what he said exactly, but something
16    along those lines. And I said, well, I hope
17    not. But other than that, you know.
18        Q    You mentioned that you were once
19    subpoenaed to show up in Stamford,
20    Connecticut, I believe, right?
21        A    Well, I would have to look at the
22    details. But, as I said, there were several
23    locations. The first one I believe was
24    Bridgeport. And the second one was a
25    location I thought in Stamford, but I would

Page 75

1    have to look that up. I don't know. Just
2    by memory.
3        Q    Okay. You also mentioned that you
4    received a subpoena to show up in New York
5    City, correct?
6        A    Yes.
7        Q    And I think you were starting to
8    say that you actually traveled to New York
9    City pursuant to that subpoena; is that
10    correct?
11        A    Yes. Because I think I was -- if
12    I recall, I was served, somebody came to my
13    house with a subpoena, I was served. The
14    date was whatever. I decided head into the
15    city. And then I called the firm to confirm
16    the details of timing and where to go and so
17    forth and so on. And they said no, no, no,
18    there's no deposition today, and there's
19    no -- so, apologies, but, no, it's not
20    happening today.
21        Q    Do you recall when that was?
22        A    When that was?
23        Q    Yes.
24        A    My best recollection, somewhere in
25    May or June.

Page 76

1        Q    Of 2023?
2        A    Yes. This year. Yeah. That was
3    the last one that was canceled, I believe.
4        Q    Do you have a copy of that
5    subpoena?
6        A    I must have somewhere, but I don't
7    know. Here it is. Yes. I'll show you the
8    document right here. It says 10:00 a.m. on
9    May 12, and the location is Paul Hastings.
10        Q    Can you determine from looking at
11    it who signed that subpoena on behalf of
12    Paul Hastings?
13        MR. BASSETT:  Objection.
14        A    No. It has a scratch. I mean,
15    you can tell for yourself.
16        Q    Could I ask you to hold that up
17    again, sir, please.
18        A    (Witness complies.)
19        Q    Did you contact anyone at Paul
20    Hastings after receiving that subpoena?
21        A    Yeah. As I said, I contacted
22    somebody to find out where to go and which
23    room and so forth and so on. And they said,
24    we're so sorry, but this was a mistake and
25    there is no deposition today. So I turned

Page 77

1    around and went home.
2        Q    Did you turn around after you got
3    to Grand Central?
4        A    Right. I took the next train back
5    to Stamford.
6        Q    Do you recall who at Paul Hastings
7    you spoke with?
8        A    No. I don't remember who I spoke
9    with. It could have been Avi or -- I don't
10    remember. Or it could have been Luc Lapin
11    (sic). But I don't remember the specific
12    conversation, other than, sorry, it's a
13    mistake and we're not having it.
14        Q    Before you traveled to New York
15    City that day, you had spoken with
16    Mr. Despins, right?
17        A    Yes. But that was a long time
18    before that.
19        Q    Had you spoken with Mr. Luft
20    before traveling to New York City that day?
21        A    I don't think so.
22        Q    And you can't determine from
23    looking at the subpoena that's in front of
24    you, who signed it on behalf of Paul
25    Hastings, right?

20  (Pages 74 to 77)

Page 78

1    MR. BASSETT: Objection.
2    A    Well, I mean, there's no names
3    printed. There's just a signature on it.
4    And, as I said, I believe I got this served
5    by someone who came from New York City to
6    serve me with this. And it was like on a --
7    it was maybe a week or two before the date
8    by memory.
9    Q    Have you spoken with anyone other
10    than Mr. Despins before traveling to New
11    York City that day?
12    A    No. I don't recall.
13    Q    Is it therefore likely that the
14    person you called at Paul Hastings while
15    traveling to New York City was Mr. Despins?
16    MR. BASSETT: Object to form.
17    A    Yes. It's possible. But I also
18    had communication from Avi and this other
19    person you referred to, Laff, Raft, or
20    something like that. But, no, I was not --
21    I don't remember speaking to anyone.
22    Q    What else did the person from Paul
23    Hastings tell you in addition to the fact
24    that you did not need to come to their
25    office that day?

Page 79

1    A    That was it. That was all.
2    Q    Well, didn't they ask you to send
3    documents to them?
4    MR. BASSETT: Object to form.
5    A    Yeah. Those documents were part
6    of a document request, right?
7    Q    I don't know. That's why I'm
8    asking.
9    A    Yeah. They were part of a
10    document request that I got where they said
11    we need all communication, this, that and
12    the other. And at some point I told them
13    that I had, you know, no emails because my
14    email account had been deleted according to
15    Coldwell Banker. And that I had supplied
16    everything that I had.
17    And at some point in time they
18    said, well, don't you have anything like
19    texts, and I said, yes, but I don't know how
20    you can copy texts. And at some point I
21    figured out how to do that. And I believe
22    it was on a computer, that you can copy and
23    print texts. And I scanned those and sent
24    them as part of the documents that I had.
25    Q    Do you recall when you provided

Page 80

1    documents to Paul Hastings?
2    A    I believe it was after the first
3    subpoena. I don't even know -- there is
4    one -- so this is the -- you can see the
5    size of this. This is the first thing that
6    I got in via FedEx. And it doesn't have a
7    date on it.
8    Q    Can you -- I think if you flip
9    through, and the first time you get to a
10    signature, whether that signature be an ink
11    signature or an electronic signature,
12    there's probably a date near it.
13    A    I mean, I got this, my firm got
14    this, and we all responded. I spoke to the
15    lawyer at Coldwell Banker, and he said, yes,
16    we got the same and we supplied whatever
17    information we had or they requested.
18    It's Luc Lapin, Chapter 11
19    Trustee, by S Patrick R Lindsay, of Neuberg
20    Pepe & Monteith, 196 Church Street, 13th
21    Floor, Newhaven, Connecticut. Counsel for
22    the Chapter 11 Trustee. I mean, this is a
23    very big document with a lot of questions.
24    I did not read the whole thing. I did not
25    read -- I read a couple of pages where I

Page 81

1    noticed there were a lot of other people
2    mentioned, and I was mentioned on one of
3    them, and that's all.
4    Q    Is there a date next to
5    Mr. Lindsay's signature?
6    A    I don't actually -- on that first
7    document that you mentioned, there -- yeah.
8    Dated March 24, 2023, Newhaven, Connecticut.
9    Q    How soon after that, did you send
10    documents to Paul Hastings?
11    A    Honestly, it -- I don't remember
12    the exact dates, but I do remember first
13    checking with my previous coworkers and
14    bosses at Coldwell Banker, and, ultimately,
15    with the chief legal counsel. Specifically
16    because a lot of the documents they
17    requested I didn't have access to. I didn't
18    have emails. I just had a file.
19    So I don't have a lot of documents
20    other than what you saw today, offer to
21    purchase, representation agreement,
22    ultimately a contract. And that was it. So
23    I didn't have much to offer. And I was told
24    that Coldwell Banker would -- 'cause they
25    would have the exact same documents, had

Page 82

```
1    already submitted those documents.
2        Q   When you -- on the day you
3    traveled to New York City, by that date had
4    you previously provided documents to Paul
5    Hastings?
6        A   Yes.
7        Q   How did you send the documents to
8    Paul Hastings?
9        A   Electronically, via email, as
10   attachments, I believe.
11       Q   So you could determine the date on
12   which you sent those documents by looking at
13   your email, correct?
14       A   Probably.
15       Q   And I may ask you to do that
16   during a break, just to check your sent
17   items to see when you sent those documents
18   to Paul Hastings.
19           Did you -- other than speaking
20   with former colleagues at Coldwell Banker
21   and with Paul Hastings, have you discussed
22   the subpoenas you received with anyone else?
23       A   No.  There was some broker at one
24   point who said, have you been subpoenaed,
25   and I said, yes, because of -- she said, I
```

Page 83

```
1    have also been subpoenaed.  But I don't even
2    remember the name of that broker.  It was
3    someone I didn't really know, but I didn't
4    discuss it.
5        Q   Was it Martha Jeffrey?
6        A   Sounds familiar, but I can't
7    confirm, but sounds familiar.
8        Q   And how did you come in contact
9    with the broker who asked you whether you
10   had been subpoenaed?
11       A   I just went to an open house.  She
12   had a listing and I was looking at the
13   house.  And she knew that -- what I found
14   out after Miles had purchased the house,
15   that even though I had an exclusive right to
16   be his broker, he worked with many other
17   brokers in Greenwich.  And that's all I
18   knew.
19           And I know of one other or two
20   other names that I heard, but I never
21   checked into it because I didn't care.  I
22   mean, it was not -- I never thought that I
23   would be the only person he would ever talk
24   to.  So it was irrelevant to me.
25       Q   You testified just now that you
```

Page 84

```
1    had an exclusive with Miles.  Do you have
2    any document signed by this person named
3    Miles where he agreed that you would be his
4    exclusive broker?
5        A   No.  In fact, they crossed that
6    out.  Even though it was not Miles who
7    obviously signed this, it was Max Krasner
8    who did.  And it said Hudson Diamond.  And
9    that was the document I got to represent
10   Miles in the transaction that ultimately
11   took place a year later.
12       Q   You say that you were representing
13   Miles, but the exclusive right to represent
14   buyer agreement, which I think is what
15   you're referring to; is that correct?
16       A   Right.
17       Q   And that was marked as Exhibit 2
18   to your deposition today, correct?
19       A   Right.
20       Q   And the buyer that's listed on
21   that the document is Hudson Diamond,
22   correct?
23           MR. BASSETT:  Objection to
24       form.
25       A   That's correct.
```

Page 85

```
1        Q   It's not anyone named Miles,
2    right?
3            MR. BASSETT:  Objection to
4        form.
5        A   Correct.
6        Q   And did you participate as a
7    broker in any transaction that Hudson
8    Diamond participated in?
9        A   No.
10       Q   Have you acted as a broker on any
11   transactions in which the buyer on the
12   contract was named Miles?
13           MR. BASSETT:  Objection to
14       form.
15       A   No.
16       Q   Are you aware of the person you
17   knew as Miles owning and having title to any
18   property in Greenwich, Connecticut?
19           MR. BASSETT:  Objection to
20       form.
21       A   No.  Other than -- I mean, he was
22   the person who showed up.  He was the person
23   who arranged the payment of the transfer of
24   funds.  He, through his assistant,
25   instructed me on -- on these matters.  But,
```

Page 86

1   no, I had no proof. As you earlier said, I
2   never asked for his official identification.
3       Q   You said he arranged for the
4   transfer of the funds. What did you do to
5   diligence the source of funds that were used
6   to purchase the property at 373 Taconic Road
7   in Greenwich, Connecticut?
8           MR. BASSETT: Objection.
9       Form.
10      A   That was not my function. Once we
11  have an accepted offer, all details are
12  negotiated and discussed between the two
13  lawyers. The selling or seller's attorney
14  and the buyer's attorney. And so I was left
15  out of any discussion as to where the funds
16  were coming from and how and all that stuff.
17      Q   Your prior firm received a
18  commission in connection with the purchase
19  of the 373 Taconic Road in the Greenwich,
20  Connecticut, right?
21      A   Right.
22      Q   And from that commission that your
23  prior firm received, you received a share of
24  that, right?
25      A   Right.

Page 87

1       Q   And did your prior firm, Coldwell
2   Banker, do anything to diligence the source
3   of the funds for its commission?
4           MR. MAJOR: Objection to form.
5       A   No.
6       Q   Did you do anything to diligence
7   the source of the funds for the commission
8   that was paid to your prior firm?
9       A   Just to clarify.
10          Commission is paid by the seller's
11  attorney. So the commission itself did not
12  come from the buyer.
13      Q   Well, is -- the seller's attorney
14  is not sending you its own funds, right
15  they're sending funds from the sale?
16          MR. BASSETT: Objection to
17      form.
18      A   Yes.
19      Q   So my question is: Did you or
20  your prior firm do anything to diligence the
21  source of the purchase proceeds for 373
22  Taconic Road in Greenwich, Connecticut?
23      A   No.
24      Q   No? You have no knowledge of who
25  provided the money to purchase that the

Page 88

1   property, correct?
2           MR. BASSETT: Objection to
3       form.
4       A   No.
5       Q   I just want to make sure the
6   record is clear.
7           You're agreeing that you have no
8   knowledge about the source of funds used to
9   purchase 373 Taconic Road in Greenwich,
10  Connecticut?
11          MR. BASSETT: Same objections.
12      A   No. The only evidence I would
13  have for that is that I arranged for the
14  funds to be there through Max and the
15  lawyer. And Max and the lawyer arranged for
16  the funds to purchase the home. And those
17  funds came through on time, but I had no
18  responsibilities to where those funds came
19  from and I had no knowledge either.
20      Q   You had no knowledge of where the
21  funds came from?
22      A   No. I mean, they came from the
23  buyer and that's, you know, as far as I was
24  concerned it was Miles.
25      Q   Mr. de Neree, as I said at the top

Page 89

1   of this -- of my questioning; I want to
2   avoid you speculating. So when you say as
3   far as you were concerned it was Miles, that
4   was your assumption, right?
5       A   Correct.
6           MR. BASSETT: Objection --
7       object to the form.
8       Q   In other words, you don't know
9   what bank account sent money to the seller's
10  lawyer at the closing?
11          MR. BASSETT: Same objection.
12      A   No.
13      Q   And you don't know the identity of
14  the account holder that sent money to the
15  seller's lawyer?
16          MR. BASSETT: Same objection.
17      A   No.
18      Q   You don't know if it was an
19  individual or an entity, right?
20          MR. BASSETT: Same objection.
21      A   I did not. Perhaps the attorney
22  would have known that.
23      Q   We're just -- this is your
24  deposition, Mr. de Neree. I just want to
25  know what you know.

23 (Pages 86 to 89)

Page 90

1           You don't know whether the --
2      A   No.
3      Q   -- holder of the account that sent
4  the purchase proceeds to the seller's lawyer
5  was an individual or an entity?
6           MR. BASSETT:  Objection to
7      form.
8      A   I don't know.
9      Q   And if it was an entity that owned
10 the account that sent the purchase proceeds
11 to the seller's lawyer, you don't know who
12 owns that entity?
13          MR. BASSETT:  Same objection.
14     A   No.
15     Q   Did Mr. Krasner attend any of the
16 showings that you arranged?
17     A   No.
18     Q   Did you ever meet Mr. Krasner in
19 person?
20     A   No.
21     Q   Did you do any diligence to
22 determine if the person you were speaking to
23 was really Mr. Krasner?
24          MR. BASSETT:  Objection.
25     A   No diligence, no.

Page 91

1      Q   Do you know how old Mr. Krasner
2  is?
3      A   I have no idea.  As I said, I have
4  not met him.  So, I would imagine that
5  he's -- he had --
6      Q   Well, don't imagine.  I just want
7  to know if you know how old he is?
8      A   No.  I don't.
9      Q   When was last time you spoke with
10 Mr. Krasner?
11     A   I think it's around the time that
12 the texts end.  Let me look that the date.
13          August 23, I would imagine that
14 was a year ago.  A year ago last
15 communication with him.
16     Q   Okay.  You were shown some text
17 messages earlier during the deposition by
18 Mr. Bassett.  And on at least one occasion,
19 perhaps more, you arranged for meetings
20 at -- at a property in Greenwich,
21 Connecticut by texting with Mr. Krasner; is
22 that correct?
23     A   That's correct.
24     Q   And you never texted with Miles,
25 right?

Page 92

1      A   That's correct.
2      Q   You testified in response to one
3  of my questions a little while ago, that at
4  373 Taconic Road in the Greenwich,
5  Connecticut you met Miles' wife and his son
6  and his daughter, correct?
7      A   Correct.
8      Q   I assume that meeting at Taconic
9  Road was something you arranged through
10 Mr. Krasner?
11     A   Yes.
12     Q   And having arranged it through
13 Mr. Krasner, Miles' wife and his son and his
14 daughter appeared at the property?
15     A   Yes.
16     Q   You testified earlier in a
17 response to a question by Mr. Bassett that
18 Miles paid directly for the inspection, was
19 that at 373 Taconic Road in Greenwich
20 Connecticut?
21     A   Yes.
22     Q   Do you recall who performed the
23 inspection?
24     A   An independent inspector.
25     Q   Was that inspector paid by check

Page 93

1  or wire transfer?
2           MR. BASSETT:  Objection as to
3      form.
4      A   Do not recall.  He was paid one
5  way or the other via Max.  Because Max was
6  instructed -- you know, I gave Max the
7  contact information and so on and so forth.
8      Q   Was the inspector paid in cash?
9      A   I do not --
10          MR. BASSETT:  Form.
11     A   -- know.
12     Q   Did you see Miles hand the
13 inspector cash?
14     A   No.
15          MR. BASSETT:  Objection to
16     form.
17     Q   Did can you see Miles hand the
18 inspector a check?
19     A   No.
20     Q   Did you witness Miles executing a
21 wire transfer to the inspector?
22          MR. BASSETT:  Objection.
23     A   No.
24     Q   Do you know how much the inspector
25 was paid?

24  (Pages 90 to 93)

Page 94

1      A   No, I don't recall.  But the
2   amount would have been under a thousand --
3   somewhere around $1,200, maybe for a house
4   that big.
5      Q   You're basing that on your
6   experience in the real estate industry,
7   correct?
8      A   Correct and having dealt with an
9   inspector before.
10      Q   Okay.  But you're not specifically
11   recalling what the charge was for this
12   particular inspection at 373 Taconic Road in
13   the Greenwich, Connecticut, right?
14      A   No.  I did not receive a copy of
15   the report.  I don't have a copy of the
16   report.  It was paid by the buyers via Max
17   Krasner.  And there was also -- there was an
18   inspection report of the building, there was
19   an inspection separately done of the septic
20   system by Bond, he was paid, also,
21   separately.  And there must have been
22   something about the water, the well, that
23   they inspected because I do have a copy of
24   that report.  I don't know for what reason
25   I've got it, but I found it in my file.  And

Page 95

1   it just said everything's fine.
2      Q   Do you know the source of the
3   funds that were for any payment to any
4   inspector regarding 373 Taconic Road in
5   Greenwich, Connecticut?
6      A   No.  I do not.
7      Q   I'm going to ask you, sir, if you
8   could look at Exhibit 3, which are the text
9   messages.
10      A   Tab 3, yeah.  Yeah.
11      Q   And if you could look at the text
12   message from January 22, 2019 at 3:38 p.m.?
13      A   What page are we on?  January,
14   what did you say?
15      Q   January 22, 2019.
16      A   Okay.
17      Q   And you looked at this with
18   Mr. Bassett earlier.  The next text jumps
19   more than a year ahead, to
20   February 11, 2020.  Do you see that?
21      A   Yeah.
22      Q   It says:
23          "Also, if you think there are
24   other options that might interest Miles,
25   please forward and we will review them."

Page 96

1          Do you see that?
2      A   Yes.
3      Q   It looks to me that there must
4   have been a proceeding message, right?
5   Because someone wouldn't write more than a
6   year later a sentence that starts "also,"
7   wouldn't there be some form of introduction
8   to recognize the passage of more than a year
9   between messages?
10          MR. BASSETT:  Objection to
11      form.
12      A   Yes.  Probably a telephone
13   conversation.
14      Q   Probably?
15          Do you remember a telephone
16   conversation?
17      A   No.
18      Q   Is there a chance that there are
19   messages that are missing from this text
20   chain?
21          MR. BASSETT:  Objection to
22      form.
23      A   No.  There is no reason to assume
24   that at all.
25      Q   I'm -- I'm not trying to assume

Page 97

1   it.  I'm just asking you that it's certainly
2   a possibility that there's a missing text
3   messages or missing text messages in this
4   chain?
5          MR. BASSETT:  Objection to
6      form.  Counsel, I'll remind you that
7      you took pains to ask him not to
8      speculate.
9      Q   You can answer the question, sir.
10      A   No.  I -- I have no reason to
11   assume that's possible.
12      Q   Well, the messages can be deleted
13   on your -- on your -- either on your phone
14   or on your Mac, correct?
15          MR. BASSETT:  Objection.  This
16      is getting ridiculous.
17      A   I have not deleted any messages.
18      Q   You're phone is capable of
19   deleting messages, correct?
20          MR. BASSETT:  Objection.
21      A   Yes.  But I -- I have had no
22   reason to delete messages.  I never delete
23   messages.  Messages are kept forever.
24      Q   Your Mac is capable of the
25   deleting text messages, correct?

25  (Pages 94 to 97)

Page 98

```
1              MR. BASSETT:  Objection.
2      A   I assume so.
3      Q   Do you know who owns Greenwich
4  Land, LLC?
5              MR. BASSETT:  Objection to
6      form.
7      A   Other than the lawyer who received
8  the funds to buy the purchase in the name of
9  Land, LLC, no.  I -- I can only assume that
10 the money came through and that the purchase
11 went through.  That's it.  I don't --
12     Q   So you don't know who owns
13 Greenwich Land, LLC?
14     A   No source of funds.  No source of
15 funds.  Well, I know that Miles instructed
16 the purchase and that's as far as I know.
17     Q   Okay.  Let's -- let's talk about
18 that.
19          When you say "Miles instructed the
20 purchase," were you privy to conversation
21 between Miles and any lawyer?
22             MR. BASSETT:  Objection to
23     form.
24     A   No.
25     Q   You testified that you -- that
```

Page 99

```
1  particular in Greenwich, but elsewhere, it's
2  not uncommon for residential properties to
3  be owned by limited liability companies,
4  right?
5      A   Correct.
6      Q   Do you understand that a limited
7  liability company is owned by its member or
8  members?
9      A   Yes.
10     Q   So a member in an LLC is analogous
11 to a stockholder of a corporation, right?
12     A   I guess.
13     Q   Do you know the identity of any
14 member of Greenwich Land, LLC?
15     A   No.
16     Q   Around the time of the purchase,
17 did you do anything to determine who the
18 member or members were of Greenwich Land,
19 LLC?
20     A   No.
21     Q   Do you know whether Miles' wife --
22 withdrawn.
23          Do you know what language or
24 languages Miles' wife speaks?
25             MR. BASSETT:  Object to form.
```

Page 100

```
1      A   I do not.  Chinese.  I don't even
2  know, Mandarin or Cantonese.  Chinese,
3  that's all I know.  Very limited English.
4      Q   Mr. de Neree, did you in your
5  capacity as broker receive a copy of the
6  purchase contract for 373 Taconic Road in
7  Greenwich, Connecticut?
8      A   Yes.
9      Q   And who was the buyer under that
10 contract?
11     A   Greenwich Land, LLC.
12     Q   Did you ever see any contract for
13 373 Taconic Road in the Greenwich,
14 Connecticut with a different buyer listed?
15     A   No.
16             MR. MAJOR:  I don't have too
17     much more.  Why don't we take a
18     10-minute break, Mr. de Neree, if
19     that's okay with you, and then we'll
20     come back on the record.
21          THE WITNESS:  Yeah.
22             VIDEOGRAPHER:  We are now
23     going off the record.  The time is
24     1:00 p.m.
25          (Whereupon, a recess was taken
```

Page 101

```
1      from 1:00 PM to 1:19 PM.)
2             VIDEOGRAPHER:  We are now back
3     on the record.  The time is 1:19.
4      Q   Mr. de Neree, do you understand
5  that you're still under oath?
6      A   Yes.
7      Q   Have you ever represented a
8  partner of Paul Hastings in connection with
9  a potential real estate transaction?
10     A   Yes, I have.  Tom Kruger, a partner
11 at the time is a friend and client.
12     Q   And I take it Mr. Kruger has
13 referred other potential clients to you?
14             MR. BASSETT:  Objection to
15     form.
16     A   I don't remember who specifically,
17 but yes he has definitely promoted me and
18 helped me get other listings or buyers.
19     Q   Do you ever work on any
20 transactions for his brother, Chip?
21             MR. BASSETT:  Object to form.
22     A   Yes.  I have.
23     Q   And did you get further referrals
24 from Chip Kruger?
25     A   Not that I can remember
```

26  (Pages 98 to 101)

Page 102

```
 1   specifically, but it wouldn't surprise me if
 2   I got recommended by him to someone else
 3   whom with I subsequently had some business.
 4        Q   I want to ask you some questions,
 5   Mr. de Neree, about the time you were at 373
 6   Taconic Road property when Miles' wife, son
 7   and daughter were there.  The first question
 8   is, I assume you greeted Miles's wife in
 9   some fashion notwithstanding the language
10   barrier?
11        A   Yep.
12        Q   Did you speak with Miles' son?
13        A   I don't remember a conversation
14   with his son.  I do remember a conversation
15   with his daughter.  She told me she was a
16   film student in New York and it happened to
17   be that my son was a film student not in New
18   York, but there was some commonalities so we
19   talked about the film business and the film
20   study that she was going through.
21        Q   Did they look at the house?
22        A   Yes.
23        Q   Did they go inside the house?
24        A   Yes.
25        Q   Did they walk around inside the
```

Page 103

```
 1   house?
 2        A   Yes.
 3        Q   Did you observe the son or the
 4   daughter communicating with Miles's wife?
 5        A   I'm sure -- no, I don't remember
 6   specifically, I don't have any specific
 7   recollection of that.
 8        Q   Did you walk around the house with
 9   Mile's wife, son and daughter?
10        A   Yes.
11        Q   Did you witness any conversation
12   taking place in a Chinese language whether
13   that be Mandarin or Cantonese?
14        A   Yes.
15        Q   But you don't understand what was
16   being said, right?
17        A   Correct.
18        Q   Was there anyone there translating
19   for you?
20        A   No.
21        Q   The conversation that was taken
22   place in a Chinese language, whether that be
23   Mandarin or Cantonese, that was a
24   conversation among Miles' wife, son and
25   daughter, right?
```

Page 104

```
 1        MR. BASSETT:  Object to form.
 2        A   Correct.  You mentioned all four,
 3   right, Miles, his wife, and his son, and his
 4   daughter, they spoke amongst themselves in
 5   Chinese at times.
 6        Q   While they were walking around the
 7   interior of the house?
 8        A   Correct.
 9        Q   And perhaps also on the grounds of
10   the property?
11        A   Yes.
12        Q   Can I just have a moment please,
13   sir.  Mr. de Neree, the meeting at 373
14   Taconic Road in Greenwich, Connecticut that
15   was attended by Miles's wife, the son and
16   daughter, did that happen before closing of
17   the purchase of 373 Taconic Road?
18        A   Yes.
19        MR. MAJOR:  Thank you very
20        much for your time, Mr. de Neree.
21        We have no further questions at this
22        time.
23        MR. BASSETT:  I do have a few
24        additional questions, Mr. de Neree.
25   EXAMINATION BY
```

Page 105

```
 1   MR. BASSETT:
 2        A   Okay.
 3        Q   So if I could have, we'll start by
 4   having my colleague please put another
 5   exhibit, which is a picture, into the chat.
 6   And this will be marked as de Neree
 7   Exhibit 7, I believe.
 8            (Whereupon, Picture of Miles Guo
 9            was marked as Exhibit 7 for
10            identification as of this date.)
11        A   Yes.  I have it.
12        Q   Mr. de Neree, do you recognize the
13   person in this picture?
14        MR. MAJOR:  Objection to form.
15        A   Miles.
16        Q   This is the person that you've
17   been referring to throughout your testimony
18   as Miles?
19        A   Yes.
20        Q   And you know that from having met
21   him on multiple occasions?
22        A   Correct.
23        Q   You testified again, during your
24   examination by Mr. Major about Mr. Krasner,
25   and I believe what you told me this morning
```

Page 106

1    is, the individual you've been referring to
2    as Mr. Krasner contacted you about helping
3    Miles find a property to buy, correct?
4         MR. MAJOR:  Objection to form.
5         A   That's correct.
6         Q   And based on your interactions
7    that you describe that you had with Miles,
8    do you have any reason to believe that the
9    person that you've been describing as
10   Mr. Krasner did not have authority to act on
11   behalf of Miles?
12        MR. MAJOR:  Objection to form.
13        A   No.
14        Q   In fact, during your discussions
15   that you had with Miles in person, he told
16   you to work with this person you've been
17   referring to as Mr. Krasner to help complete
18   the purchase of the property at Taconic
19   Road, right?
20        MR. BASSETT:  Objection to
21   form.
22        A   That's correct.
23        Q   And there were some text messages
24   we looked at when you wear talking about
25   showing properties and you were texting with

Page 107

1    Mr. Krasner about arranging times to see the
2    property; do you remember that?
3         A   Correct.
4         Q   And Mr. Krasner told you that
5    people would show up a certain time,
6    correct?
7         A   That's correct.
8         Q   And one of the persons who showed
9    up was Miles?
10        A   Yes.
11        Q   There's been some testimony about
12   Mile's wife, do you know her name?
13        A   No.  I don't.
14        Q   This meeting, and to be clear,
15   this meeting that you were describing where
16   the wife, the son and daughter were present,
17   was Miles also there?
18        A   Yes.
19        Q   You testified that you don't know
20   who the members who own -- member or
21   members, who own Greenwich Land, LLC., are,
22   do you remember that?
23        A   That's correct.
24        Q   But based on all of your
25   interactions with Miles and Mr. Krasner that

Page 108

1    you discussed, it was your understanding
2    that Miles ultimately was the one who was
3    making the decision as to buy the Taconic
4    Road property, right?
5         MR. MAJOR:  Objection to form.
6         A   That's correct.
7         Q   You also testified that people
8    use, in your experience as a realtor, LLCs
9    to complete their property purchases?
10        A   That's correct.
11        Q   And that is what you understood
12   was happening here with respect to Greenwich
13   Land and Miles, correct?
14        A   That's correct.
15        MR. MAJOR:  Objection to form.
16        Q   In all of your interactions with
17   Miles and Mr. Krasner, did you ever come to
18   have an understanding that anyone other than
19   Miles was making the decisions with respect
20   to the purchase of a Taconic Road property?
21        A   No.
22        MR. MAJOR:  Objection to form.
23        Q   Did Miles ever tell you that his
24   wife was the one who was purchasing the
25   Taconic Road property?

Page 109

1         A   No.
2         Q   You were asked some questions
3    about business relationship properties you
4    had sold for Mr. Tom Kruger, a partner at
5    Paul Hastings; do you remember that?
6         A   Yes.
7         Q   Do you know whether he is still a
8    partner at Paul Hastings?
9         A   No.  He retired in January of this
10   year.
11        Q   Okay.  And have you spoken to
12   Mr. Kruger about any of the substance
13   related to this case at all?
14        A   I did have a conversation with him
15   mentioning that I had been subpoenaed.  And
16   he said, you know, you better check with
17   your legal department at Coldwell Banker,
18   make sure that you're properly represented
19   and so forth and so on, that's all I
20   remember him advising me.
21        Q   Nothing about the substance of
22   this case, to your knowledge?
23        A   No.
24        Q   Has your relationship with
25   Mr. Kruger in any way impacted the

28  (Pages 106 to 109)

Page 110

1    truthfulness of your testimony here today?
2        A   No.
3            MR. BASSETT:  One moment,
4    please.
5            No more questions.
6            VIDEOGRAPHER:  Okay.  That
7    concludes today's deposition.  We
8    are going off the record at
9    1:34 p.m.
10           COURT REPORTER:  Mr. Bassett,
11   are you ordering a copy of the
12   transcript?
13           MR. BASSETT:  Yes.
14           COURT REPORTER:  Do you want a
15   rough?
16           MR. BASSETT:  What's the
17   turnaround time on the final?
18           COURT REPORTER:  Eight to
19   10 days.
20           MR. BASSETT:  Yeah.  We
21   probably should have a rough, just
22   in case.
23           (Whereupon, this examination was
24           concluded at 1:34 PM.)
25

Page 111

1
2    _____
3    EMILE DE NEREE
4
5
6    Subscribed and sworn to
     before me on this ـــــ  day
7    of _____, _____.
8
9
     _____
10   Notary Public
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 112

1              I N D E X
2    WITNESS: EMILE DE NEREE
3    EXAMINATION BY              PAGE
4        MR. BASSETT         6
5        MR. MAJOR          65
6        MR. BASSETT        104
7
8            E X H I B I T S
9    EXHIBIT    DESCRIPTION        PAGE
10   Exhibit 1    Emile de Neree's    10
              Compass Transactions
11
     Exhibit 2    Exclusive Right to    18
12            Represent Buyer
              Agreement (GREE002323)
13
     Exhibit 3    Text Messages       27
14
     Exhibit 4    Offer to Purchase Real    48
15            Estate (GREE02327)
16   Exhibit 5    Email (WBAM_009051)    52
17   Exhibit 6    Residential Real Estate   55
              Sales Agreement
18            (GREE02328)
19   Exhibit 7    Picture of Miles Guo    105
20
21
22
23
24
25

Page 113

1          C E R T I F I C A T E
2
3    I, KIARA MILLER,
4    A Shorthand Reporter and Notary Public of the
5    State of New York, do hereby certify:
6
7    That the witness whose examination is
8    hereinbefore set forth, was duly sworn or
9    affirmed by me, and the foregoing transcript is
10   a true record of the testimony given by such
11   witness.
12
13   I further certify that I am not related to any
14   of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17
18
19          _____
20              KIARA MILLER
21
22
23
24
25

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 114

```
 1
 2              E R R A T A  S H E E T
 3    NAME OF CASE:  KWOK v. GREENWICH LAND
 4    DATE OF DEPOSITION:  August 24, 2023
 5    NAME OF WITNESS:  EMILE DE NEREE
 6    Reason codes:
 7        1. To clarify the record.
          2. To conform to the facts.
 8        3. To correct transcription errors.
 9    Page _____ Line _____ Reason_____
      From _____ to_____
10
11    Page _____ Line _____ Reason_____
      From _____ to_____
12
13    Page _____ Line _____ Reason_____
      From _____ to_____
14
15    Page _____ Line _____ Reason_____
      From _____ to_____
16
17    Page _____ Line _____ Reason_____
      From _____ to_____
18
19    Page _____ Line _____ Reason_____
      From _____ to_____
20
21    Page _____ Line _____ Reason_____
      From _____ to_____
22
23
24              _____
25                 EMILE DE NEREE
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

**A**

**a.m** 2:19 4:4
76:8
**able** 15:18 42:19
**absolutely** 30:12
53:10
**accepted** 15:23
46:7 86:11
**access** 7:23
31:19 33:5,10
81:17
**account** 15:14
33:9 79:14
89:9,14 90:3
90:10
**accounts** 54:1
**accurate** 11:8
28:20 54:11
**acknowledged**
46:9
**acquire** 21:9
22:3 63:18
64:4
**acres** 64:11
**act** 106:10
**acted** 85:10
**acting** 32:5 35:4
**action** 113:14
**actions** 16:7
**actual** 20:15
**added** 20:8,10
20:19
**addendum**
19:16,18
**addition** 78:23
**additional** 16:11
20:16 48:13
104:24
**address** 5:21
20:15 27:6
**ADK@MSF-...**
3:12
**Adv** 1:13
**adversary** 5:1,9
66:1
**advising** 109:20

**affirmed** 113:9
**afternoon** 65:23
**against-** 1:11
2:11
**agenda** 59:20
60:10
**agent** 38:14,17
59:23
**ago** 9:2,8 91:14
91:14 92:3
**agreed** 23:13
84:3
**agreeing** 88:7
**agreement** 16:4
18:2,9,18,19
18:23 20:21
22:13 26:4,17
55:16 56:5
57:6 81:21
84:14 112:12
112:17
**agrees** 20:18
**ahead** 13:9
95:19
**al** 1:5 2:5
**alert** 32:19
**aligned** 28:25
29:1
**allow** 29:25
**allows** 34:20
**ambiguity** 24:9
**amount** 94:2
**analogous** 99:10
**answer** 6:24
7:12,17 14:1
30:1 38:16,17
51:10 66:8
97:9
**apologies** 75:19
**apologize** 55:10
**appear** 71:18
72:11,13
**appeared** 92:14
**Apple** 28:21
**apply** 66:6
**appointment**
61:19

**appointments**
32:20
**appreciate** 6:10
**approached**
26:22 45:5
70:13
**appropriate**
9:19
**approximate**
32:8,14
**approximately**
14:22 44:24
**architect** 57:18
**architects** 58:2
58:12,20
**arranged** 85:23
86:3 88:13,15
90:16 91:19
92:9,12
**arranging** 107:1
**asked** 16:25
20:8 38:15
43:7 83:9 86:2
109:2
**asking** 31:24
34:25 42:11
53:16,25 79:8
97:1
**asks** 65:19
**aspect** 59:3
**assistant** 14:12
55:1 85:24
**assortment** 11:1
**assume** 10:3
43:7 66:19
92:8 96:23,25
97:11 98:2,9
102:8
**assumption**
21:13 89:4
**attached** 19:20
**attachment**
34:21
**attachments**
82:10
**attempt** 69:5
**attend** 90:15

**attended** 104:15
**attending** 4:14
**attention** 43:22
55:2
**attorney** 4:21
86:13,14 87:11
87:13 89:21
**August** 1:19
2:19 4:3 30:21
31:9,14 53:5
53:10,22 71:4
91:13 114:4
**Austin** 3:14 5:10
**authority**
106:10
**available** 14:17
17:9 45:8
64:15
**Avenue** 3:4,10
6:1
**Avi** 73:19,20
77:9 78:18
**avoid** 89:2
**aware** 13:8 31:1
31:14 33:12
59:6 85:16

**B**

**B** 112:8
**back** 8:1 9:25
20:23 23:8
33:25 34:9
45:11 48:10
55:3 56:14,16
65:4,11 72:2
77:4 100:20
101:2
**background**
11:16
**bank** 89:9
**Banker** 9:1,1
20:17 24:13,19
33:8,12,20
79:15 80:15
81:14,24 82:20
87:2 109:17
**bankruptcy** 1:1

**attended** 104:15
**2:1** 4:10 67:3,6
67:10,16 70:10
70:16 74:10
**barrier** 102:10
**based** 6:23
38:21 42:20
51:2 106:6
107:24
**basically** 9:18
19:14 44:15
**basing** 94:5
**Bassett** 3:7 4:22
4:23 6:4,6 18:4
27:21 30:7
48:1,20 51:23
52:4 55:21
64:24 65:13
66:8,25 70:4
72:21 74:6
76:13 78:1,16
79:4 84:23
85:3,13,19
86:8 87:16
88:2,11 89:6
89:11,16,20
90:6,13,24
91:18 92:17
93:2,10,15,22
95:18 96:10,21
97:5,15,20
98:1,5,22
99:25 101:14
101:21 104:1
104:23 105:1
106:20 110:3
110:10,13,16
110:20 112:4,6
**Bates** 18:14
48:24 52:15
55:25
**beautiful** 64:10
**began** 16:19
**beginning** 4:20
9:6 58:7
**behalf** 2:17 3:3
3:9 4:24 6:21
32:5 35:4

76:11 77:24
106:11
**believe** 8:21
10:21 12:5
14:22,25 26:1
26:21 42:6,8
42:12 59:11
60:10 67:18
69:22 71:15
73:15 74:20,23
76:3 78:4
79:21 80:2
82:10 105:7,25
106:8
**best** 7:3 31:12
42:1 45:23
75:24
**better** 109:16
**big** 17:4 80:23
94:4
**bit** 14:24 22:9
27:12 31:23
**blood** 113:14
**blue** 45:4
**boat** 17:4
**Bond** 94:20
**bone** 36:20
**bosses** 81:14
**bottom** 18:14
22:11,12,20
48:25 52:16
53:4 55:24
**bought** 12:1
53:24 54:6,16
**break** 7:6,13
48:3 49:11
82:16 100:18
**breaks** 7:9
**Bridgepoint** 1:3
2:3 4:11
**Bridgeport**
71:19 72:13
73:10,24 74:24
**broader** 8:16
**broker** 8:11
82:23 83:2,9
83:16 84:4

85:7,10 100:5
**brokers** 83:17
**brother** 101:20
**budget** 9:20
**building** 59:15
94:18
**bunch** 11:24
17:7
**Burke** 53:3
**business** 70:19
102:3,19 109:3
**buy** 12:6 50:11
50:22 51:12
64:20 98:8
106:3 108:3
**buyer** 9:14,21
10:4 15:22
18:2,9,18,20
19:1 20:17,18
24:19 25:17,24
50:3,7,17
51:16 84:14,20
85:11 87:12
88:23 100:9,14
112:12
**buyer's** 22:13
23:25 24:18,21
25:4 86:14
**buyers** 9:11
50:10 94:16
101:18
**buying** 26:13
42:17,23 45:3
51:2 61:22
—————
**C**
**C** 3:1 113:1,1
**calender** 60:2,3
60:11
**call** 20:20 24:12
57:1 71:6
**called** 16:25
18:1 66:16
71:9 74:3
75:15 78:14
**canceled** 72:17
72:18 74:1

76:3
**Cantonese** 100:2
103:13,23
**capable** 97:18
97:24
**capacity** 100:5
**caps** 22:14
**care** 83:21
**Carstensen** 3:19
4:15
**case** 1:7 2:7 6:15
12:24 13:4
23:18,20 28:8
28:14 30:9
36:13 38:14
47:12 57:17
66:10,24 70:17
72:20 73:6
74:5 109:13,22
110:22 114:3
**cash** 93:8,13
**cause** 19:14
81:24
**cell** 36:12
**Central** 77:3
**certain** 53:16
107:5
**certainly** 97:1
**certify** 113:5,13
**cetera** 42:5,5
43:9
**chain** 52:23
96:20 97:4
**chance** 96:18
**change** 51:1,7
**changed** 58:24
**changes** 57:20
59:3
**Chapter** 1:6,9
2:6,9 3:3 4:7
4:24 6:7 12:24
13:4 66:9
80:18,22
**charge** 70:16
94:11
**chat** 10:8 48:14
55:14 105:5

**check** 82:16
92:25 93:18
109:16
**checked** 83:21
**checking** 81:13
**Chi** 1:13 2:13
4:8 5:7 66:2
**chief** 81:15
**children** 69:12
69:15
**Chinese** 100:1,2
103:12,22
104:5
**Chip** 101:20,24
**Chris** 5:6 65:24
**CHRISTOPH...**
3:13
**Church** 80:20
**city** 71:20,21
75:5,9,15
77:15,20 78:5
78:11,15 82:3
**CJM@MSF-...**
3:12
**clarification**
15:13 59:21
**clarify** 7:3 87:9
114:7
**clear** 31:8,12
45:4 47:17
88:6 107:14
**client** 17:1
101:11
**clients** 34:22
101:13
**close** 8:5 64:20
**closed** 47:18
**closer** 46:4
**closing** 15:25
42:21,21 47:14
53:7 56:11,12
57:7 59:22
67:2 89:10
104:16
**Coast** 20:14
**codes** 114:6
**Coldwell** 8:25

9:1 20:17
24:13,19 33:8
33:11,19 79:15
80:15 81:14,24
82:20 87:1
109:17
**colleague** 5:3
10:7 17:23
27:14 48:14
55:13 105:4
**colleagues** 51:24
82:20
**combination**
12:3,6
**come** 16:23
34:18 38:22
47:4 54:20
63:22 70:18
78:24 83:8
87:12 100:20
108:17
**comfortable** 7:9
**coming** 86:16
**commencing**
2:19
**comments** 38:4
**commission**
23:21 86:18,22
87:3,7,10,11
**commonalities**
102:18
**communicate**
27:2
**communicated**
26:24
**communicating**
103:4
**communication**
8:7 14:25 27:6
27:7 33:2
44:22 63:1
71:15 72:8
73:21 78:18
79:11 91:15
**communicatio...**
31:25 32:3
44:16 73:19

communicator
46:21
community
11:18,20
companies 19:6
21:15 99:3
company 21:21
22:2 59:25
60:5 99:7
Compass 5:25
8:24 9:3 10:18
10:23 112:10
compensate
20:4
compensated
23:14,18
compensation
20:2 22:10
23:9,16
complete 106:17
108:9
complies 76:18
computer 8:4
28:14,17 79:22
Conboy 52:24
concern 26:10
concerned 88:24
89:3
concerning 25:4
26:24
concluded
110:24
concludes 110:7
conference 4:13
4:18
confidential
24:23 25:6
confidentiality
16:4
confirm 39:17
65:2 69:2
75:15 83:7
confirmed 35:10
36:10 39:25
40:11 45:13
47:10,11
confirms 61:18

conform 114:7
Connecticut 1:2
2:2 4:11 5:25
6:2 8:16,18
17:15 20:14,16
74:20 80:21
81:8 85:18
86:7,20 87:22
88:10 91:21
92:5,20 94:13
95:5 100:7,14
104:14
connection 25:2
86:18 101:8
considerably
42:12
consistent 35:2
consists 29:17
contact 16:23
33:11 76:19
83:8 93:7
contacted 67:18
76:21 106:2
contract 15:24
49:22 56:6
81:22 85:12
100:6,10,12
conversation
30:4 70:2,25
77:12 96:13,16
98:20 102:13
102:14 103:11
103:21,24
109:14
conversations
38:19
cooperate 24:19
copied 72:4
copy 15:16
60:15 76:4
79:20,22 94:14
94:15,23 100:5
110:11
corner 22:12,20
49:1 52:16
55:24
corporation

99:11
correct 8:12
13:5 17:17,22
21:1,2 23:23
24:4 25:21
28:22 29:8,12
30:20 31:7,10
31:17,20,21
34:7 35:20
44:14,19 50:1
50:5,25 51:5
51:13 52:22
53:9 56:9,24
57:7 58:1,4,15
58:16 73:12
75:5,10 82:13
84:15,18,22,25
85:5 88:1 89:5
91:22,23 92:1
92:6,7 94:7,8
97:14,19,25
99:5 103:17
104:2,8 105:22
106:3,5,22
107:3,6,7,23
108:6,10,13,14
114:8
corrected 36:20
counsel 4:17
7:15 80:21
81:15 97:6
couple 6:16 24:2
24:15 41:11
48:13 60:21
80:25
course 23:21
court 1:1 2:1
4:10 5:12,15
5:20 10:15
18:5 27:22
30:10 48:21
52:5 110:10,14
110:18
courthouse
72:14,16 73:10
73:24
covered 20:21

32:21
covering 66:3
coworkers 81:13
crossed 20:1
23:10 84:5
currently 34:5
custom 30:4

D

D 112:1
D-E 5:24
date 4:2 10:20
16:5 18:12
27:20 32:9
37:18 41:22,24
48:19 52:3
55:19 56:11,19
75:14 78:7
80:7,12 81:4
82:3,11 91:12
105:10 114:4
dated 18:23
30:21 36:2
43:24 49:24
53:4,22 55:8
56:7 81:8
dates 37:9 59:10
81:12
daughter 69:23
92:6,14 102:7
102:15 103:4,9
103:25 104:4
104:16 107:16
day 33:10 37:12
37:21,24 42:9
42:10,10 46:6
52:11,11 60:6
77:15,20 78:11
78:25 82:2
111:6
days 110:19
de 1:17 2:17 4:5
5:17,23 6:6,11
7:21 8:10 10:9
10:16,17,21
12:22 15:7
18:6 24:5

27:23,24 29:24
30:14 48:12,22
49:2 52:6,7,14
52:19 55:22
56:3 60:1,8
65:13,23 88:25
89:24 100:4,18
101:4 102:5
104:13,20,24
105:6,12 111:3
112:2,10 114:5
114:25
deadlines 42:19
deal 13:24 49:20
dealt 94:8
Deane 3:19 4:15
Dear 53:23
debtor 12:23
13:4
Debtors 1:6 2:6
decided 42:22
46:5,11 75:14
decides 10:4
decision 38:24
39:5 46:24
50:22 51:12
108:3
decision-maker
46:13,19
decisions 108:19
defendants 1:14
2:14,18 3:9 5:8
6:21 66:1
definitely 12:5
36:15 101:17
delete 97:22,22
deleted 79:14
97:12,17
deleting 97:19
97:25
department
33:11 109:17
depose 70:20
deposed 33:13
deposition 1:16
2:17 4:5,12
6:12 7:25 8:8

60:18 66:17
68:12 70:24
72:5 75:18
76:25 84:18
89:24 91:17
110:7 114:4
**describe** 9:13
11:9 13:15,18
14:5 37:22
42:2 45:24
58:10,18 106:7
**described** 43:7
44:4 64:16
**describing** 106:9
107:15
**description** 11:8
112:9
**designer** 57:18
**designers** 57:17
58:2,12,20
**Despins** 1:9 2:9
3:3 4:7,25 6:7
71:9 74:3
77:16 78:10,15
**detail** 27:13
31:23
**details** 14:13
25:8 32:21
34:23 47:11
54:25 70:16
74:10,22 75:16
86:11
**determine** 76:10
77:22 82:11
90:22 99:17
**develop** 13:11
**device** 28:21
**Diamond** 19:2,3
19:15 20:23
21:8,20 84:8
84:21 85:8
**different** 21:15
41:23,25
100:14
**difficult** 24:5
**diligence** 86:5
87:2,6,20

90:21,25
**direct** 43:22
55:2
**direction** 9:23
40:22
**directly** 25:25
61:16 62:24
66:20 92:18
**discuss** 83:4
**discussed** 41:3
44:4 82:21
86:12 108:1
**discussing** 49:12
**discussion** 59:2
86:15
**discussions**
106:14
**District** 1:2 2:2
4:10
**Division** 1:3 2:3
4:11
**docket** 72:19,24
73:4
**document** 10:13
10:16 15:10,12
15:25 18:6,14
19:24 24:10,12
24:13 26:7
27:25 28:6,11
29:14 30:19,25
31:16 32:23
41:1 48:22,24
49:3 52:8,14
52:19 55:13
60:9 76:8 79:6
79:10 80:23
81:7 84:2,9,21
**documents** 15:7
15:15,21 16:1
16:10,11,13,16
33:20,22 48:13
72:10 73:5
74:8 79:3,5,24
80:1 81:10,16
81:19,25 82:1
82:4,7,12,17
**doing** 15:17 60:6

**driver** 35:14
36:12 42:5
**driveway** 47:16
**duly** 5:17 113:8

---

**E**

**E** 3:1,1 112:1,8
113:1,1 114:2
114:2,2
**earlier** 51:11
68:11 86:1
91:17 92:16
95:18
**easier** 51:10
**Eastern** 4:4
**Eight** 110:18
**either** 28:14
61:16 88:19
97:13
**electronic** 80:11
**Electronically**
82:9
**eluded** 42:25
**email** 3:6,12
7:23 8:1 15:14
15:18 27:4,5
31:25 32:3
33:1,9 34:17
34:19 52:1,13
52:23 53:3,6
53:11,22 54:12
56:17,17 79:14
82:9,13 112:16
**emails** 15:13,20
31:19 32:10,15
32:18 33:5,10
71:16,24 79:13
81:18
**Emile** 1:17 2:17
4:5 5:17,23
10:17 41:3
111:3 112:2,10
114:5,25
**ended** 17:10
**engagement**
25:3,23 26:23
26:25

**English** 38:20
43:13,20 47:7
100:3
**enter** 26:16
**entire** 29:13
**entity** 20:25
26:18 51:3,19
89:19 90:5,9
90:12
**entourage** 42:4
**errors** 114:8
**escrow** 53:17
54:1
**ESQ** 3:7,13,14
**essence** 41:7
42:25 43:2
**essentially** 53:15
**estate** 8:11,20
9:7,10 11:9
15:25 21:25
46:8 48:17
49:7,9 51:15
55:16 94:6
101:9 112:15
112:17
**et** 1:5 2:5 42:5,5
43:9
**evaluate** 24:21
**everything's**
95:1
**evidence** 88:12
**exact** 24:10,11
81:12,25
**exactly** 33:6
37:20 72:7
74:15
**examination** 6:3
65:21 104:25
105:24 110:23
112:3 113:7
**examined** 5:19
**example** 8:4
**exception** 27:7
**exchange** 72:1
**exchanged**
71:25
**exclusive** 15:22

18:1,8,17
32:24 83:15
84:1,4,13
112:11
**execute** 18:19
**executed** 57:6
**executing** 93:20
**exhibit** 10:16,19
18:7,11 19:19
20:10 27:19,23
28:1 32:25
34:1 48:18,22
52:2,6,15 55:3
55:18,23 56:3
56:14,15,15
60:22 84:17
95:8 105:5,7,9
112:9,10,11,13
112:14,16,17
112:19
**expenses** 25:19
25:23 26:2
**experience** 17:3
22:1 94:6
108:8
**expertise** 11:22
**explain** 31:22
41:4
**explanation**
23:11
**expressed** 61:16
**extent** 60:10,11

---

**F**

**F** 113:1
**fact** 23:7 39:19
51:2 57:9
66:17 78:23
84:5 106:14
**facts** 66:19
114:7
**familiar** 10:23
12:22 83:6,7
**family** 41:6
42:14,18
**far** 30:19 88:23
89:3 98:16

farm 61:8 63:5
  63:18 64:2,4,7
  64:8
fashion 102:9
fast 47:25
February 15:4
  43:24 44:18
  45:18 49:24
  55:8 56:8,12
  56:17 57:10
  59:6,18 95:20
FedEx 80:6
feedback 14:15
  38:6
Fein 3:10 5:6,11
  65:25
figured 79:21
file 1:22 15:16
  33:21 81:18
  94:25
filed 4:9 73:5
filled 26:15
film 102:16,17
  102:19,19
final 110:17
financial 24:23
  25:6,13
find 9:24 17:14
  17:19 21:5
  26:11 59:21
  63:5 76:22
  106:3
fine 60:8 70:21
  95:1
finish 30:6,7
  66:7
finished 16:12
firm 65:24 67:20
  70:7 75:15
  80:13 86:17,23
  87:1,8,20
first 5:17 6:13
  6:14 11:4
  14:25 15:1
  16:6,23 18:15
  19:1 20:11
  23:4 24:17

33:12 34:15
  36:15 41:13
  42:7 44:12
  49:1 52:9,16
  55:25 62:23
  66:23 69:18
  70:8,23 74:4
  74:23 80:2,5,9
  81:6,12 102:7
five 20:6,7 48:4
  64:25
flip 80:8
Floor 3:10 80:21
focus 8:15 11:21
  54:8
focused 45:3
focusing 33:25
followed 56:5
following 41:8
follows 5:19
followup 14:11
  65:18
footprint 8:16
foregoing 113:9
forever 97:23
form 13:14,22
  14:7 17:16,21
  21:12 22:5,7
  23:3 26:19
  28:3 29:23
  32:6,17 33:7
  35:5 38:1 39:1
  39:6 40:6,14
  40:18,23 43:3
  43:17 44:20,25
  46:2,14,18
  47:1,5,21
  49:15,18 50:8
  50:15,24 51:4
  51:8,21 53:19
  54:13,18,22
  57:13 58:13,22
  59:9 61:14,24
  62:5,9 64:5,23
  67:1 70:5
  72:22 74:6
  78:16 79:4

84:24 85:4,14
  85:20 86:9
  87:4,17 88:3
  89:7 90:7 93:3
  93:10,16 96:7
  96:11,22 97:6
  98:6,23 99:25
  101:15,21
  104:1 105:14
  106:4,12,21
  108:5,15,22
formal 49:16
  56:5
former 82:20
forth 37:10 58:8
  58:25 73:10
  75:17 76:23
  93:7 109:19
  113:8
forward 36:17
  44:8 74:1
  95:25
found 10:1
  39:14 68:7,13
  83:13 94:25
four 20:7 104:2
Friday 47:15
  61:7,20
friend 101:11
front 11:7,15,22
  17:3,4,9 70:2
  77:23
froze 33:9
full 68:4,7
function 34:19
  86:10
funds 53:16
  85:24 86:4,5
  86:15 87:3,7
  87:14,15 88:8
  88:14,16,17,18
  88:21 95:3
  98:8,14,15
further 101:23
  104:21 113:13
future 70:21

**G**

gain 38:22
gap 44:16
gather 35:20
generally 7:15
  10:1 32:18,21
  33:17 35:2
  46:22 47:23
  49:20 53:18
  58:10,18
getting 97:16
give 9:23 14:15
  18:4 38:17
  66:14
given 25:8 44:2
  113:10
gives 41:14
giving 6:16
Gladys 63:4,9
  63:10
glasses 39:13
go 7:5 9:2,24,24
  13:9 22:11
  29:14 30:18
  38:2 40:25
  53:21 55:6,12
  60:21 63:2
  72:16 75:16
  76:22 102:23
goes 7:19 39:12
going 6:18 7:19
  8:1 16:9 21:8
  21:16 23:1,10
  36:11 45:2
  48:2,6 54:24
  55:7 60:6 65:7
  72:6 95:7
  100:23 102:20
  110:8
Gold 20:14
good 4:22 5:5
  64:6,11 65:23
government
  68:22
Grand 77:3
GREE002323

18:10,15
  112:12
GREE002327
  48:25
GREE002328
  56:1
GREE02327
  48:17 112:15
GREE02328
  55:17 112:18
Greenwich 1:12
  2:12 4:8 5:8,25
  6:1,1 11:21
  12:8 17:6,15
  50:3,7,10,14
  50:18 51:3,16
  51:19 52:9
  53:25 54:7,16
  66:2 83:17
  85:18 86:7,19
  87:22 88:9
  91:20 92:4,19
  94:13 95:5
  98:3,13 99:1
  99:14,18 100:7
  100:11,13
  104:14 107:21
  108:12 114:3
greeted 102:8
ground 66:6,11
grounds 104:9
guess 11:12 21:6
  22:10 64:7
  99:12
Guo 12:25 22:14
  105:8 112:19
guys 72:4

**H**

H 112:8 114:2
half 9:2,8 14:9
hand 8:2 12:21
  93:12,17
handled 54:25
happen 19:23
  71:22 104:16
happened 22:6,8

36:9 71:21
102:16
**happening**
75:20 108:12
**happy** 7:2
**Harbor** 63:6,19
**hard** 15:16
**Hastings** 3:4
4:24 5:4 67:17
67:19,20 70:8
70:9 71:12,25
73:14,22 76:9
76:12,20 77:6
77:25 78:14,23
80:1 81:10
82:5,8,18,21
101:8 109:5,8
**he'll** 39:14
**head** 75:14
**hear** 13:22 34:9
**heard** 52:9
68:21 70:23
83:20
**held** 53:17
**help** 106:17
**helped** 101:18
**helping** 64:20
106:2
**hereinbefore**
113:8
**hereto** 19:20
**hesitate** 7:7
**Hi** 61:1,6 63:4
**high-end** 57:19
**higher** 42:12
**Hill** 37:16
**Hing** 1:13 2:13
4:8 5:7 66:1
**Ho** 1:5 2:5 12:23
13:2,3
**hold** 36:13 76:16
**holder** 89:14
90:3
**home** 9:15 10:4
17:14 61:9
62:2,3,6,18
77:1 88:16

**homes** 8:15
11:15,18
**Honestly** 71:5
81:11
**hope** 74:16
**hoped** 21:20
**hoping** 21:23
26:11
**horse** 61:8
**hour** 48:2
**house** 45:3,6
57:10,21 59:1
75:13 83:11,13
83:14 94:3
102:21,23
103:1,8 104:7
**houses** 32:20
**Hudson** 19:2,3
19:15 20:23
21:8,20 84:8
84:21 85:7

—————

**I**
**idea** 17:4 21:16
91:3
**identification**
10:19 18:11
27:20 48:19
52:3 55:18
68:23 86:2
105:10
**identify** 4:18
69:6
**identity** 69:2
89:13 99:13
**images** 28:1
**imagine** 64:1
91:4,6,13
**iMessage** 28:19
**iMessages** 28:20
**impacted** 109:25
**important** 15:15
66:15
**impression**
21:14 38:23
**in-person** 69:3
72:7

**included** 31:16
**including** 24:22
25:5 70:11
**incurred** 25:23
26:2
**independent**
92:24
**Indian** 63:5,19
**individual** 22:2
37:10 89:19
90:5 106:1
**individuals**
52:25
**industry** 94:6
**info** 34:3
**information**
24:20,23 25:3
25:6,13 47:22
61:18 64:13
80:17 93:7
**initials** 22:14
**ink** 80:10
**inside** 102:23,25
**inspected** 94:23
**inspection** 16:1
26:1 59:16
92:18,23 94:12
94:18,19
**inspector** 92:24
92:25 93:8,13
93:18,21,24
94:9 95:4
**inspectors** 59:13
**instructed** 40:15
40:17 50:17
52:12 85:25
93:6 98:15,19
**instruction**
66:15
**intentions** 46:21
**interaction** 42:3
42:14
**interactions**
37:24 38:21
43:14 58:10,19
106:6 107:25
108:16

**interest** 21:23
34:11 35:1
44:7 61:16
63:20 95:24
**interested** 14:19
17:1 26:12
42:16 45:2
61:22 113:15
**interior** 57:18
104:7
**internet** 68:17
**interpreter**
43:15
**introduced** 58:8
63:10 68:6
69:18
**introduction** 6:5
96:7
**investment** 64:7
**involved** 67:11
67:13 74:9
**involving** 52:23
67:4,7,10,16
74:8
**irrelevant** 83:24
**island** 20:14
**issue** 8:1,6
**issued** 68:23
**items** 82:17

—————

**J**
**J** 3:13
**JAM** 1:7 2:7
**January** 18:24
35:8,14 36:3,5
36:9,18,22,24
39:22 41:1
44:17 95:12,13
95:15 109:9
**Jeffrey** 83:5
**joined** 5:2,10
**Julie** 53:3
**jumps** 95:18
**June** 75:25

—————

**K**
**kept** 97:23

**key** 15:21
**Kiara** 1:21 2:20
5:13 113:3,20
**Kim** 3:14 5:10
26:19
**kind** 6:16 7:18
9:16 29:1
**knew** 23:4 68:24
83:13,18 85:17
**know** 6:22 7:2,8
10:10 13:1
15:9 19:16,17
26:8 29:2,15
30:2 33:16
36:3,25 37:1
38:7,16 39:13
47:24 62:17
63:13 65:3
66:20,20,23
67:12,21,24,25
68:1,1,3,7,9,10
68:20 69:7,11
69:14 70:22
71:8 72:10,18
73:1,16 74:17
75:1 76:7 79:7
79:13,19 80:3
83:3,19 88:23
89:8,13,18,25
89:25 90:1,8
90:11 91:1,7,7
93:6,11,24
94:24 95:2
98:3,12,15,16
99:13,21,23
100:2,3 105:20
107:12,19
109:7,16
**knowledge**
19:23 31:12
67:13 87:24
88:8,19,20
109:22
**known** 69:17
89:22
**Krasner** 14:12
17:13 20:25

21:4 26:22,23
29:7,11,18,19
31:2 32:1,4,11
32:16 34:25
35:3,14 39:24
40:11,21 44:5
44:17 52:23
56:19 60:24
84:7 90:15,18
90:23 91:1,10
91:21 92:10,13
94:17 105:24
106:2,10,17
107:1,4,25
108:17
**Kruger** 101:10
101:12,24
109:4,12,25
**Kwok** 1:5 2:5
12:23,25 13:2
13:3 114:3

**L**

**label** 48:24
52:15 55:25
**labeled** 18:14
**Laff** 78:19
**land** 1:12 2:12
4:8 5:8 6:17
50:3,7,14,19
51:3,16,19
52:10 53:25
54:7,17 64:7
66:2 98:4,9,13
99:14,18
100:11 107:21
108:13 114:3
**language** 38:18
43:11,19 99:23
102:9 103:12
103:22
**languages** 99:24
**Lapin** 70:15
77:10 80:18
**large** 64:10
**law** 65:24 67:20
70:7

**lawsuit** 67:22
**lawyer** 73:2
80:15 88:15,15
89:10,15 90:4
90:11 98:7,21
**lawyers** 13:24
47:17 49:21
86:13
**lay** 6:17
**left** 9:1 29:3,19
33:8,16 36:19
39:9 86:14
**left-hand** 28:25
29:5 44:3
**legal** 33:11
81:15 109:17
**legitimate** 21:21
**let's** 98:17,17
**liability** 99:3,7
**license** 9:7
**licensed** 8:11
**liked** 14:10,14
25:9 38:4,7
58:23 64:17
**likes** 17:3
**limit** 26:8,14
**limited** 70:11
99:3,6 100:3
**Lindsay** 80:19
**Lindsay's** 81:5
**line** 19:1,13
24:17 25:17
53:5 62:12
71:9 114:9,11
114:13,15,17
114:19,21
**lines** 74:16
**list** 12:13,15,18
20:6 37:14
73:5
**listed** 14:18 19:2
41:10 84:20
100:14
**listing** 34:23
38:14,17 83:12
**listings** 34:11,15
34:17 35:2

101:18
**lists** 11:24
**literally** 33:9
**litigation** 6:9
**little** 22:9 27:12
31:22 92:3
**live** 11:17,17
17:5
**lived** 42:15
**LLC** 1:12 2:12
4:8 5:8 22:3
50:3,7,12,14
50:18 51:3,16
51:19 52:10
54:17 66:2
98:4,9,13
99:10,14,19
100:11 107:21
**LLCs** 108:8
**local** 11:19
**location** 2:18
74:25 76:9
**locations** 74:23
**long** 7:5 8:19
77:17
**longer** 14:23,24
31:19 33:6
**look** 10:23 11:6
22:11 23:24
36:6,11,16
37:6,7,14 53:2
53:2 56:11
74:21 75:1
91:12 95:8,11
102:21
**looked** 56:2 64:9
72:19 95:17
106:24
**looking** 9:15,23
15:10 17:2,10
19:13 24:10,11
45:2 54:3
59:20 60:1
63:11,18,24
64:3,6,9 76:10
77:23 82:12
83:12

**looks** 11:1 28:24
96:3
**lot** 11:19 14:14
80:23 81:1,16
81:19
**low** 11:15
**lowered** 46:4
**Luc** 1:9 2:9 3:3
4:6,25 6:7
70:14,14 77:10
80:18
**Luft** 73:19,20
77:19
**luxury** 11:7,14
**Luyi** 5:3

**M**

**Mac** 28:15 97:14
97:24
**Major** 3:13 5:5
5:6 6:20 13:14
13:21 14:7
17:16,21 21:12
22:5,7 23:3
28:3 29:22
32:6,17 33:7
35:5 38:1 39:1
39:6 40:6,14
40:18,23 43:3
43:17 44:20,25
46:2,14,18
47:1,5,21
49:15,18 50:8
50:15,24 51:4
51:8,21 53:19
54:13,18,22
57:13 58:13,21
59:9 61:14,24
62:5,9 64:5,23
65:5,18,22,24
87:4 100:16
104:19 105:14
105:24 106:4
106:12 108:5
108:15,22
112:5
**majority** 33:2

**making** 38:24
39:4 50:21
108:3,19
**man** 23:17
**managers** 59:13
59:14
**Mandarin** 69:24
70:3 100:2
103:13,23
**March** 60:23
81:8
**Margaret** 52:24
53:23
**mark** 10:16 18:6
27:22 48:21
52:5
**marked** 10:18
18:10 27:19,25
48:18 52:2,14
55:17,22 84:17
105:6,9
**market** 34:5
**marriage** 113:15
**married** 69:9
**Martha** 83:5
**matter** 4:6 12:21
50:11 66:4
71:13 113:16
**matters** 85:25
**Matthew** 57:1
**Max** 14:12,25
15:1 16:25
19:5 27:7 29:4
35:10 38:7
40:19 45:5,13
46:5,10,12,16
46:20,22 47:11
50:17 53:23
56:19,21 61:1
61:6,17 62:23
63:4 84:7
88:14,15 93:5
93:5,6 94:16
**mean** 9:5 11:12
19:9 23:4 25:7
33:6 47:13
50:9 62:2

63:25 67:7,24
70:21 72:23
76:14 78:2
80:13,22 83:22
85:21 88:22
**Meaning** 9:6
**means** 12:2
**meant** 8:3 23:6
40:13
**media** 10:11
13:7
**meet** 35:16 41:6
57:16,20 90:18
**meeting** 35:24
36:4,24 37:2
41:16 45:17,21
45:25 57:9,15
57:25 58:3,6
58:15 59:6,17
59:19,24 92:8
104:13 107:14
107:15
**meetings** 59:7
59:11 60:12
69:3 91:19
**Meister** 3:10 5:6
5:11 65:25
**member** 99:7,10
99:14,18
107:20
**members** 99:8
99:18 107:20
107:21
**memory** 37:20
75:2 78:8
**mentioned** 23:9
68:11 70:7,15
72:12 74:18
75:3 81:2,2,7
104:2
**mentioning**
109:15
**message** 30:19
34:1,24 35:7
35:13 36:2
39:8,23 41:2
41:12,14 42:15

43:23 44:4,13
45:11 55:8
56:18,19 60:24
61:12 62:22
63:3 95:12
96:4
**messages** 27:18
28:15,16,24
29:6,10,18
30:24 31:1,15
32:12 36:8,18
55:4 56:16
60:23 91:17
95:9 96:9,19
97:3,3,12,17
97:19,22,23,23
97:25 106:23
112:13
**met** 27:9 36:15
68:8 69:20
73:20 91:4
92:5 105:20
**middle** 29:2,10
29:20 43:23
**Mile's** 103:9
107:12
**Miles** 12:25,25
13:1,3,8,10,12
14:6 15:1
16:24 17:14,20
19:10,10 20:5
21:1,5,8,19
22:14 23:4,7
26:18 27:3,9
32:5 34:5,10
35:1,22 36:10
36:15,19 37:4
37:24 38:9,17
38:18 39:2,4,9
40:8,24 41:5
41:19 42:3,22
43:2,7,15 44:7
45:7,20 46:16
46:20 47:2,8
47:23 49:12
50:14,21 51:11
51:20 53:25

54:6,16 57:24
57:25 58:11,19
59:17 61:9,15
61:22 62:2,3,6
62:16,20,23,24
63:6,11,15,17
64:20 67:10,16
68:3,6,6,18,24
69:4,8 70:10
70:19 83:14
84:1,3,6,10,13
85:1,12,17
88:24 89:3
91:24 92:18
93:12,17,20
95:24 98:15,19
98:21 104:3
105:8,15,18
106:3,7,11,15
107:9,17,25
108:2,13,17,19
108:23 112:19
**Miles'** 25:13
35:4 46:21
92:5,13 99:21
99:24 102:6,12
103:24
**Miles's** 102:8
103:4 104:15
**Miller** 1:21 2:20
5:13 113:3,20
**million** 12:11
39:25 40:16
42:12 46:5,7
64:17
**mind** 37:13
**minutes** 6:16
48:4 64:25
**missing** 96:19
97:2,3
**mistake** 76:24
77:13
**MLS** 34:19,20
**moment** 18:5
27:13 30:9
104:12 110:3
**Monday** 47:14

**money** 47:17
64:18 87:25
89:9,14 98:10
**Monteith** 80:20
**months** 33:17
**morning** 4:22
5:5 36:10
65:15 105:25
**moving** 47:15
59:24 60:5
**multiple** 39:19
64:11 105:21

―――――――

**N**

**N** 3:1 112:1
**N-E-R-E-E** 5:24
**nailed** 26:9
**name** 4:15 5:21
19:15 23:5
35:15 36:12
52:9 63:13
65:24 68:4,7,8
70:14,18 73:16
74:8 83:2 98:8
107:12 114:3,5
**named** 12:23
50:18 51:2
68:3,18 84:2
85:1,12
**names** 13:8 68:9
68:11,14,19,20
69:14,19,19
78:2 83:20
**narrow** 20:3
**nature** 14:5
**near** 63:5,19
80:12
**nearby** 61:23
**necessarily**
12:18 64:8,9
**necessary** 24:20
**need** 7:6,10
78:24 79:11
**needed** 36:13
71:22 73:9
**needs** 24:21 25:4
**Neere** 55:23

56:3
**negotiated** 86:12
**negotiation**
69:21
**Neree** 1:17 2:17
4:6 5:17,23 6:6
6:11 7:21 8:10
10:9,16,21
12:22 15:7
18:7 24:5
27:23,24 29:24
30:14 48:12,22
49:2 52:6,7,14
52:20 60:1,8
65:14,23 88:25
89:24 100:4,18
101:4 102:5
104:13,20,24
105:6,12 111:3
112:2 114:5,25
**Neree's** 10:17
112:10
**Neuberg** 80:19
**never** 10:25 20:9
22:22,25 25:16
46:19 68:21
73:20 83:20,22
86:2 91:24
97:22
**New** 1:18,18
2:18,19 3:5,11
5:18 71:20,21
75:4,8 77:14
77:20 78:5,10
78:15 82:3
102:16,17
113:5
**Newhaven** 80:21
81:8
**Ngok** 1:13 2:13
4:9 5:7 66:2
**nice** 41:6 64:12
**NICHOLAS** 3:7
**nicholasbasset...**
3:6
**Nick** 4:23 6:6
**nine** 33:17

nonbinding 49:19
nondisclosure 16:4
noon 35:10,17 45:13 56:21
Notary 5:18 111:9 113:4
notes 71:6
notice 23:5
noticed 81:1
notices 73:6
notifications 71:16
notified 72:2
notwithstandi... 102:9
November 30:15 31:6,13 34:2
number 27:5 35:15 36:13 42:13
numbers 55:7
NY 3:5,11

**O**

oath 6:24 101:5
object 26:19 29:22 30:1 74:6 78:16 79:4 89:7 99:25 101:21 104:1
objection 7:16 13:14,20,21,22 14:7 17:16,21 21:12 22:5,7 23:3 28:3 30:9 32:6,17 33:7 35:5 38:1 39:1 39:6 40:6,14 40:18,23 43:3 43:17 44:20,25 46:2,14,18 47:1,5,21 49:15,18 50:8 50:15,24 51:4

51:8,21 53:19 54:13,18,22 57:13 58:13,21 59:9 61:14,24 62:5,9 64:5,23 66:25 70:4 72:21 76:13 78:1 84:23 85:3,13,19 86:8 87:4,16 88:2 89:6,11 89:16,20 90:6 90:13,24 93:2 93:15,22 96:10 96:21 97:5,15 97:20 98:1,5 98:22 101:14 105:14 106:4 106:12,20 108:5,15,22
objections 7:14 66:10 88:11
obligated 25:18
obligations 23:25 24:18
observe 58:9 103:3
observed 58:19
obtain 28:5
obtained 10:22
obvious 6:19 11:14
obviously 11:3 60:15 84:7
occasion 91:18
occasions 105:21
occur 45:17
occurred 6:23 35:24 36:4 37:3 45:25 47:20 57:10 58:11 59:7
October 15:2 16:7,20
offer 10:4 15:21 15:23 38:25

39:24 40:15 42:20,23 46:5 46:11,24 47:7 47:9,13 48:16 49:6,8,12,16 49:17,19 51:15 52:12 54:24 56:3 81:20,23 86:11 112:14
offered 46:6
office 63:5,11,18 63:24,25 78:25
official 33:22 72:10 86:2
Oh 72:2
okay 6:15 8:10 8:14,23 10:7 12:17 16:9,18 17:18 19:11 20:22 23:20 26:4,16 29:5 35:12 36:16 37:2 38:18 40:20 41:16 42:1,24 43:6 46:23 50:2 56:7 59:5 60:20 63:2 65:5 66:11,14 66:21,23 67:21 71:24 75:3 91:16 94:10 95:16 98:17 100:19 105:2 109:11 110:6
old 91:1,7
once 10:10 13:23 16:12 69:20 71:18,19 71:19 74:18 86:10
one-year 44:16
ones 29:9 32:24 72:3,3,9
open 10:10 26:6 32:20 83:11
openable 34:21

opposed 72:6
options 95:24
order 21:5
ordering 110:11
orient 28:23
oriented 29:9
original 12:15 22:24,24
originally 26:22
out-of-pocket 25:18,22 26:2
outcome 113:16
Outlook 8:5
outside 30:24
overlooking 64:11
owned 19:6,8,10 21:1,15 90:9 99:3,7
owners 41:4
owning 85:17
owns 90:12 98:3 98:12

**P**

P 3:1,1
p.m 61:7,19 95:12 100:24 110:9
page 11:4 18:15 22:12,21 28:25 29:5 40:25 43:24 49:1 52:17 53:4 55:7,25 56:12 63:3 95:13 112:3,9 114:9 114:11,13,15 114:17,19,21
pages 29:15 60:22 80:25
paid 25:24,25 87:8,10 92:18 92:25 93:4,8 93:25 94:16,20
pains 97:7
paragraph

19:19 24:1,3
paraphrase 53:14
Park 3:4,10
part 23:25 58:14 79:5,9,24
participants 4:14
participate 85:6
participated 85:8
particular 26:7 94:12 99:1
parties 113:14
partner 5:10 101:8,10 109:4 109:8
parts 58:9,17
pass 65:20
passage 96:8
Patrick 80:19
Paul 3:4 4:23 5:3 67:17,19 67:20 70:7,9 71:12,25 73:13 73:22 76:9,12 76:19 77:6,24 78:14,22 80:1 81:10 82:4,8 82:18,21 101:8 109:5,8
pause 30:8
pay 25:18
payment 85:23 95:3
Pecksland 20:11 35:11,17,21 37:7,13,16
pending 7:11
people 81:1 107:5 108:7
Pepe 80:20
perfect 34:4
performed 92:22
period 14:9,23 45:4

**person** 12:23 26:23 27:9 46:8 68:23 69:3,7 70:19 73:17,20,22 78:14,19,22 83:23 84:2 85:16,22,22 90:19,22 105:13,16 106:9,15,16
**person's** 68:4
**personal** 24:22 25:5 60:2,17
**persons** 107:8
**perspective** 9:21 18:20
**phone** 27:5 28:12,13,18 35:15 36:13 71:6 97:13,18
**photo** 68:23
**pick** 39:10,14
**picture** 11:4 105:5,8,13 112:19
**pin** 55:11
**place** 4:12 15:4 16:3 41:17 47:14 70:2 71:1,5 84:11 103:12,22
**plaintiff** 1:10 2:10 5:1 6:8 67:22
**please** 4:18 5:20 7:2 10:15 13:18 14:5 17:24 18:6 27:22,23 29:25 30:7 41:3 44:8 48:15,21 51:24 51:25 52:5 55:14 58:18 66:7 76:17 95:25 104:12 105:4 110:4

**pleasure** 6:12 41:6
**PLLC** 3:10
**PM** 65:10 101:1 101:1 110:24
**point** 13:11 20:15 38:10 40:19 41:15 67:18 69:17,20 70:14 71:16 79:12,17,20 82:24
**possibility** 97:2
**possible** 24:8 37:11 47:25 58:25 78:17 97:11
**postponed** 73:25
**potential** 32:19 101:9,13
**potentially** 61:22
**practice** 11:10
**preferences** 9:20
**presence** 73:23
**present** 3:18 37:4 38:15 41:19 43:16 45:20 58:7,14 58:17 59:2 107:16
**presents** 20:17
**presumably** 73:8
**previous** 59:13 81:13
**previously** 82:4
**price** 12:19 42:11 45:8 46:3,6
**priced** 11:15
**prices** 12:13,16
**primarily** 8:15
**print** 79:23
**printed** 28:17 78:3
**prior** 49:11

72:17 86:17,23 87:1,8,20
**Private** 20:14
**privy** 98:20
**probably** 12:15 26:9 36:5 60:13 80:12 82:14 96:12,14 110:21
**proceed** 5:16 6:18 16:15 21:24
**proceeding** 1:13 5:2,9 66:1 67:4 74:10 96:4
**proceeds** 87:21 90:4,10
**process** 35:4 44:22
**produced** 28:7
**professional** 13:12
**profile** 10:22
**promise** 23:15
**promoted** 101:17
**proof** 86:1
**properly** 109:18
**properties** 11:25 11:25 14:8,18 14:20 17:2,11 20:4,7,7,10,16 21:24 23:12 27:8,10 32:19 34:4,20 35:22 36:11,21 37:8 37:14 39:10,19 40:9 41:23 44:7 61:23 64:14,21 67:12 99:2 106:25 109:3
**property** 9:19 9:22 10:5 11:7 12:7,8,10 15:3 15:23 16:2 17:19 18:20

20:13 21:5,9 21:17 22:3 35:25 37:7,13 37:20 38:13,25 40:5 41:14,17 42:9,17,22 43:8 45:16 46:3 49:13,17 50:12,22 51:13 51:20 56:4 59:8,12,13,14 59:18 60:12 61:8 64:10 67:4,7 69:21 70:10 85:18 86:6 88:1 91:20 92:14 102:6 104:10 106:3,18 107:2 108:4,9,20,25
**property's** 67:11
**proposals** 41:9
**proposing** 41:7
**protection** 20:20
**provide** 9:17 60:14
**provided** 16:16 79:25 82:4 87:25
**providing** 24:20
**provision** 23:9
**Public** 5:18 111:9 113:4
**purchase** 9:15 15:21,24 21:16 48:16 49:6,8 49:20 51:15,20 53:8 57:6 64:21 74:9 81:21 86:6,18 87:21,25 88:9 88:16 90:4,10 98:8,10,16,20 99:16 100:6 104:17 106:18 108:20 112:14
**purchased** 83:14

**purchases** 108:9
**purchasing** 61:21 108:24
**purpose** 57:14 57:16 59:15 63:23
**purposes** 13:25
**pursuant** 75:9
**push** 74:1
**put** 10:8 27:14 30:10 48:14 49:21 50:18 51:24 55:11,14 105:4

---

**Q**

**qualifications** 24:22 25:5
**question** 7:1,11 7:13,18 14:1,3 14:4 21:6 25:1 30:6,8 31:24 38:15 44:12 51:9 66:7 87:19 92:17 97:9 102:7
**questioning** 4:21 89:1
**questions** 6:20 6:22,25 7:15 24:2,15 30:2 38:10,12 41:11 43:8 52:8 65:1 65:16,18,19 66:3,5,11 80:23 92:3 102:4 104:21 104:24 109:2 110:5
**quick** 24:15 42:20 47:13 48:3
**quickly** 14:3 42:18 43:5 47:20,24
**quote** 62:13

## R

R 3:1 80:19
113:1 114:2,2
Raft 78:19
range 32:9
reached 21:4
reaches 63:4
read 80:24,25,25
reading 53:11
real 8:11,19 9:7
9:9 11:9 15:24
21:25 46:8
48:17 49:6,8
51:15 55:15
94:6 101:9
112:14,17
really 15:20
25:7 42:18
83:3 90:23
realtor 5:24
73:3 108:8
reason 7:7 19:25
36:14 66:18
74:2 94:24
96:23 97:10,22
106:8 114:6,9
114:11,13,15
114:17,19,21
recall 31:5 37:23
41:13 49:13
59:17 71:2
74:15 75:12,21
77:6 78:12
79:25 92:22
93:4 94:1
recalling 94:11
receive 23:21
25:2,12 94:14
100:5
received 75:4
82:22 86:17,23
86:23 98:7
receiving 8:7
76:20
recess 48:8 65:9
100:25

recognize 49:2
52:19 96:8
105:12
recollect 37:9
recollection
16:21 28:7
39:18 40:10
42:2 45:24
46:4 57:11
75:24 103:7
recommended
102:2
reconstruct
15:19
record 4:2 5:22
7:20 18:13
24:6 48:6,11
48:23 52:15
55:22 65:7,12
88:6 100:20,23
101:3 110:8
113:10 114:7
redact 60:16
refer 13:10 16:7
60:12 69:3
reference 40:4
41:14 62:15
referenced 25:4
referrals 101:23
referred 68:5
78:19 101:13
referring 18:1
57:23 62:7,11
68:2 69:8
84:15 105:17
106:1,17
refers 36:23
42:16
refresh 39:18
regarding 16:1
25:13 70:9
95:4
regardless 23:17
regards 33:21
related 26:18
49:16 109:13
113:13

relationship
13:12,15,19
14:6 16:19
17:12 21:10
50:13 109:3,24
release 54:1
released 53:17
remember 19:14
28:16 45:6
61:17 62:22,25
69:16,19 77:8
77:10,11 78:21
81:11,12 83:2
96:15 101:16
101:25 102:13
102:14 103:5
107:2,22 109:5
109:20
remind 97:6
Remote 2:18
remotely 4:14
renovations
57:19
rephrase 7:3
51:9
report 9:25
59:16 94:15,16
94:18,24
REPORTED
1:21
reporter 5:13,15
5:20 10:15
18:5 27:22
30:10 48:21
52:5 110:10,14
110:18 113:4
represent 4:20
5:7 6:7 9:10
15:22 18:2,9
18:18 32:25
65:25 84:9,13
112:12
representation
81:21
represented
101:7 109:18
representing

4:16 5:14 9:14
21:19 46:9
66:9 84:12
request 79:6,10
requested 80:17
81:17
required 73:23
research 21:21
reserve 65:17
residential
55:15 99:2
112:17
respect 108:12
108:19
respectfully
41:4
respond 30:5
responded 80:14
responds 35:12
response 28:8
92:2,17
responsibilities
88:18
responsive
60:13
retaining 18:21
retired 109:9
review 44:8
95:25
reviewable
34:22
rid 33:17
ridiculous 97:16
right 4:3 8:24
15:22 18:1,8
18:17 23:22
29:4 32:24
44:18 49:25
50:23 51:16
56:8,13 65:16
65:17 73:11
74:20 76:8
77:4,16,25
79:6 83:15
84:13,16,19
85:2 86:20,21
86:24,25 87:14

89:4,19 91:25
94:13 96:4
99:4,11 103:16
103:25 104:3
106:19 108:4
112:11
right-hand
22:12,20 48:25
52:16 55:24
road 12:8 20:11
20:12 35:17,21
37:7 39:25
40:3,5,9,16
45:14,18 46:25
49:10 53:6,8
56:4 59:8 61:8
62:1,2 64:16
70:12 86:6,19
87:22 88:9
92:4,9,19
94:12 95:4
100:6,13 102:6
104:14,17
106:19 108:4
108:20,25
room 7:21 38:2
76:23
rough 110:15,21
roughly 8:21
16:20
Round 37:16
Roundhill 20:12
rules 66:6,11

## S

S 3:1 80:19
112:8 114:2
sailor 11:16
sale 12:4 23:17
23:19,20 87:15
sales 10:12 11:2
11:24 55:16
56:5 112:17
salesperson 8:13
8:14,20 9:10
21:25
Saturday 36:7

**saw** 22:22,25
72:3 81:20
**saying** 53:15,18
57:22
**says** 11:6,24
19:14,19 22:13
23:25 24:17,18
26:15 28:19
30:15 34:2
35:12,14,16
36:18,19 39:8
39:24 41:2
42:24 44:5
45:12,15 50:2
50:3,3 56:12
56:20,25 60:5
61:5,15 63:3
76:8 95:22
**scanned** 79:23
**scenarios** 22:1
**scheduled** 61:1
61:6
**scratch** 76:14
**screen** 8:4,4
10:8 24:7
51:25
**scroll** 52:18
**search** 9:18
**second** 12:7
36:17 42:7
53:4 62:12
69:22 74:24
**section** 20:1
**security** 42:5
57:2
**see** 7:18 14:2,13
18:24 19:19
22:15,19,22
24:24 25:20
30:16 34:6,7
34:13 35:18
36:6 39:15
40:1 43:25
44:10 45:9
50:4 54:2,9
56:23 57:3
59:10,21 61:3

61:9,10 62:14
62:18,23,25
63:7 67:3
68:22 80:4
82:17 93:12,17
95:20 96:1
100:12 107:1
**seeing** 34:11
35:1
**Seelig** 3:10 5:6
5:11 65:25
**seen** 10:25 22:1
74:7
**sell** 12:11
**seller's** 59:23
86:13 87:10,13
89:9,15 90:4
90:11
**sellers** 9:11
42:14 46:8,9
53:15,24
**selling** 8:15
86:13
**send** 32:19
34:20 79:2
81:9 82:7
**sending** 87:14
87:15
**sent** 29:6 32:22
34:1,12,16,17
34:25 39:24
61:17 79:23
82:12,16,17
89:9,14 90:3
90:10
**sentence** 62:12
96:6
**separately** 94:19
94:21
**septic** 94:19
**sequence** 44:13
**series** 6:20
**serve** 78:6
**served** 71:17
75:12,13 78:4
**services** 9:16
18:21

**set** 14:16 61:19
73:10 113:8
**setting** 30:3
**share** 86:23
**short** 23:17
42:19
**Shorthand**
113:4
**show** 14:20
16:10 17:6,8
17:23 23:13
37:15 40:8
48:12 55:12
74:19 75:4
76:7 107:5
**showed** 14:8
20:12 37:20
45:7 85:22
107:8
**showing** 27:10
35:22 37:10
61:2,7 106:25
**showings** 14:17
23:16 90:16
**shown** 16:14
20:5,9 30:25
31:2 32:24
37:11 39:20
41:23 91:16
**shows** 28:1,16
**sic** 70:15 77:11
**side** 12:4,6 28:25
44:3
**signature** 19:13
78:3 80:10,10
80:11,11 81:5
**signed** 16:5
32:23 76:11
77:24 84:2,7
**signifies** 23:2
**similar** 32:11
**sir** 76:17 95:7
97:9 104:13
**sitting** 6:12
**situation** 25:15
41:5
**six** 24:1,3

**size** 80:5
**sky** 45:5
**slower** 42:21
**small** 22:16
**social** 10:11 13:7
**sold** 12:1 109:4
**somebody** 75:12
76:22
**son** 69:23 92:5
92:13 102:6,12
102:14,17
103:3,9,24
104:3,15
107:16
**Song** 5:3
**soon** 34:9 81:9
**sorry** 13:17
22:18 46:17
52:13 55:6
56:15 76:24
77:12
**sort** 14:15 16:6
21:7 32:23
55:11
**sounds** 56:13
83:6,7
**source** 86:5 87:2
87:7,21 88:8
95:2 98:14,14
**space** 63:5,12,18
63:24,25
**speak** 69:24
102:12
**speaking** 7:16
38:19 78:21
82:19 90:22
**speaks** 99:24
**specialist** 11:8
**specializing**
57:19
**specific** 77:11
103:6
**specifically**
81:15 94:10
101:16 102:1
103:6
**speculate** 66:18

97:8
**speculating** 89:2
**spend** 6:16
**spoke** 22:9 70:8
77:7,8 80:14
91:9 104:4
**spoken** 43:12,20
71:11 77:15,19
78:9 109:11
**Stamford** 71:19
74:19,25 77:5
**standard** 18:19
24:12,13
**start** 66:8 105:3
**started** 17:12
**starting** 75:7
**starts** 55:23
60:24 96:6
**state** 4:19 5:18
5:20 6:19
67:25 113:5
**statement** 54:11
**States** 1:1 2:1
4:9
**sticks** 37:12
**stockholder**
99:11
**stopped** 44:23
**stories** 68:16,17
**stream** 64:12
**Street** 80:20
**strike** 31:23
**strong** 37:19
**student** 102:16
102:17
**study** 102:20
**stuff** 60:17
72:11 86:16
**subject** 20:13
53:5 66:4
**submitted** 20:6
82:1
**subpoena** 28:8
60:14 71:17
72:11 73:11
74:13 75:4,9
75:13 76:5,11

76:20 77:23
80:3
**subpoenaed**
72:13 74:19
82:24 83:1,10
109:15
**subpoenas**
82:22
**Subscribed**
111:6
**subsequently**
20:8 38:6
42:22 102:3
**substance**
109:12,21
**suggest** 36:23
**sunglasses** 36:19
39:9
**supplied** 33:20
79:15 80:16
**supposedly**
68:19
**sure** 7:5,8 22:23
28:13 67:25
73:2 88:5
103:5 109:18
**surmised** 62:21
**surprise** 102:1
**swear** 5:15
**sworn** 5:17
111:6 113:8
**system** 94:20

**T**
**T** 112:8 113:1,1
114:2,2
**tab** 10:8 17:24
27:15 48:14
51:24 55:14
95:10
**Taconic** 12:7
20:13 37:16
39:25 40:3,5,9
40:16 45:7,14
45:18 46:1,25
49:10 53:6,8
53:24 54:5,16

56:4,22 57:1
59:8 60:5 61:2
61:7,21 62:8
62:11 69:23
70:11 74:9
86:6,19 87:22
88:9 92:4,8,19
94:12 95:4
100:6,13 102:6
104:14,17
106:18 108:3
108:20,25
**take** 7:13 15:4
44:13 48:3
52:17 64:24
70:25 100:17
101:12
**taken** 2:17 15:14
48:8 65:9 71:5
100:25 103:21
**talk** 60:18 83:23
98:17
**talked** 58:23
102:19
**talking** 12:9
15:3 41:22
59:3 106:24
**talks** 25:17
**technically**
37:17 60:13
**telephone** 33:3
96:12,15
**tell** 9:16,22
14:10 30:20
47:17 73:8,23
74:4 76:15
78:23 108:23
**tend** 11:21
**term** 26:8,15
49:21
**terminate** 26:5,5
**terms** 6:17 9:20
**testified** 5:19
20:24 21:3
50:20 51:11
66:4 83:25
92:2,16 98:25

105:23 107:19
108:7
**testify** 66:16,19
74:14
**testifying** 67:23
**testimony**
105:17 107:11
110:1 113:10
**text** 7:24 27:4,18
28:1,14,16
29:17 30:24
31:1,5,8,15
32:12,21 33:3
34:1 35:7 36:8
36:18 39:8,22
41:2 43:23
44:16 55:3,8
56:16,17,18
60:23,23 61:12
63:3 91:16
95:8,11,18
96:19 97:2,3
97:25 106:23
112:13
**texted** 91:24
**texting** 91:21
106:25
**texts** 15:19
79:19,20,23
91:12
**thank** 14:21
18:3 27:17
30:11,13 31:18
65:14 104:19
**thanks** 6:9 23:11
35:13
**thing** 7:10 20:2
52:18 80:5,24
**things** 17:7
32:25 47:23
59:14 60:4
66:19 73:6
**think** 16:11,14
20:24 21:3
24:4,6 36:20
37:3 42:15
44:6 46:10

48:1 56:18
60:9,9 70:14
71:18 75:7,11
77:21 80:8
84:14 91:11
95:23
**thought** 14:19
64:17 74:25
83:22
**thousand** 94:2
**three** 27:15
71:18
**time** 4:3,4 6:9,13
6:14 7:6 9:1,4
12:19 15:17
17:10 19:13
21:17,22 26:5
26:10 29:25
36:15 37:15,18
39:14,20 40:16
41:6 42:24
43:1 48:6,11
52:9,18 64:15
65:2,7,12,14
65:19 69:2,22
70:8 74:4
77:17 79:17
80:9 88:17
91:9,11 99:16
100:23 101:3
101:11 102:5
104:20,22
107:5 110:17
**times** 22:4 52:24
71:18 104:5
107:1
**timing** 72:5 74:1
75:16
**title** 85:17
**today** 4:17 5:13
6:10 7:6,15,21
12:9 13:10,23
16:10,11 45:14
56:22 60:19
66:4 68:3
71:12 75:18,20
76:25 81:20

84:18 110:1
**today's** 4:2 6:17
110:7
**told** 19:5,12
20:25 47:6,8
54:23 62:19,24
63:17 67:11,15
67:17 79:12
81:23 102:15
105:25 106:15
107:4
**Tom** 101:10
109:4
**top** 28:19 30:14
41:1 88:25
**totally** 31:11
**train** 77:4
**transaction**
12:19 15:3
26:6 33:22
47:12,20 84:10
85:7 101:9
**transactions**
10:11,18 11:20
85:11 101:20
112:10
**transcript**
110:12 113:9
**transcription**
114:8
**transfer** 85:23
86:4 93:1,21
**translating**
103:18
**TransPerfect**
4:17 5:14
**traveled** 75:8
77:14 82:3
**traveling** 77:20
78:10,15
**trucks** 47:16
**true** 29:13 31:4
113:10
**Trustee** 1:9 2:9
3:3 4:7,25 6:8
28:7 66:9
80:19,22

truthfully 6:25
truthfulness
  110:1
try 7:3 24:6
  28:23
trying 12:1
  21:11 59:10
  96:25
Tuesday 30:21
turn 77:2
turnaround
  110:17
turned 76:25
turning 12:21
twice 69:20
two 19:19 21:10
  37:12 41:9
  42:8 69:23
  78:7 83:19
  86:12
type 9:22
types 38:12
typically 10:3

**U**
ultimate 15:2
ultimately 15:24
  38:23 39:4
  81:14,22 84:10
  108:2
uncommon 99:2
underneath
  22:13
understand 7:2
  12:2 13:3,6
  17:2 21:11
  27:24 40:4,21
  46:23 51:18
  70:1 99:6
  101:4 103:15
understanding
  19:3 21:7 23:2
  28:2 30:22
  32:9 39:3
  40:12 43:1
  44:21 45:1
  46:12 47:4,19

50:6 51:1,6
54:15,19,21
63:23 64:3
108:1,18
understood 9:9
  11:23 12:17
  13:9 14:2 15:6
  16:9 17:18
  20:22 21:18
  23:8,24 24:14
  32:5 33:4,25
  37:22 49:23
  50:21 64:19
  73:4 108:11
United 1:1 2:1
  4:9
unnatural 30:3
unrecognizable
  19:15
unusual 50:10
unusually 47:13
upcoming 32:19
use 21:8 22:2
  24:7 108:8
usual 42:4

**V**
v 114:3
verses 42:21
versus 4:7
video 4:5
videographer
  3:19 4:1,16
  5:12 48:5,10
  65:6,11 100:22
  112:1 110:6
VIDEOTAPED
  1:16
view 20:18 38:3
views 64:11
visit 10:5 42:3,7
  42:7,8 43:7,9
visits 37:25 42:8
volume 32:14

**W**
waiting 34:3

47:16
walk 102:25
  103:8
walking 45:15
  104:6
Wallacks 20:15
  41:15 69:20
want 7:8 24:9,14
  48:12 54:8
  55:12 66:14,18
  88:5 89:1,24
  91:6 102:4
  110:14
wanted 14:13
  24:1 42:17
  43:5 47:23,24
  54:24 57:20,21
  61:9 62:14,17
  62:23,25
wanting 17:14
Warren 35:15
  36:12
wasn't 17:9
  26:10 58:6
  59:2 64:8
  71:22
water 11:7,15,17
  11:19,22 17:3
  17:4,5,9 94:22
way 6:5 16:15
  21:16 24:8
  93:5 109:25
  113:15
WBAM_009051
  52:1,17 112:16
we'll 7:5 12:9
  16:15 27:12
  100:19 105:3
we're 7:24 15:3
  24:10,11 31:11
  71:4 76:24
  77:13 89:23
we've 48:1 74:7
wear 106:24
web 4:13
website 10:23
week 16:2 34:12

34:16 47:15
  78:7
went 13:7 17:7
  47:12 68:10,14
  71:21 77:1
  83:11 98:11
weren't 64:14
wife 42:6 69:20
  92:5,13 99:21
  99:24 102:6,8
  103:4,9,24
  104:3,15
  107:12,16
  108:24
willing 47:7,8
wire 93:1,21
withdrawn
  99:22
withdrew 42:23
witness 5:16,23
  30:12 65:20
  66:17 76:18
  93:20 100:21
  103:11 112:2
  113:7,11 114:5
Won 1:5 2:5
  12:23 13:2,3
words 14:18
  33:23 71:23
  89:8
work 8:23 63:25
  101:19 106:16
worked 8:25
  63:15 83:16
working 35:11
  63:11 64:8
works 10:1
wouldn't 96:5,7
  102:1
write 60:4 96:5
wrong 30:20
  35:21 44:14
wrote 54:12

**X**
X 1:4,8,15 2:4,8
  2:15 112:1,8

**Y**
yeah 13:1,6 15:8
  17:25 18:16,25
  19:21 22:22
  23:6 24:3 29:3
  33:14 49:19
  53:12,13 54:4
  54:4,10 55:5,9
  56:6,13 60:3
  61:4 63:20,21
  68:16 76:2,21
  79:5,9 81:7
  95:10,10,21
  100:21 110:20
year 9:2,7 14:9
  14:22 33:15
  44:23 76:2
  84:11 91:14,14
  95:19 96:6,8
  109:10
years 11:2
Yep 10:14
  102:11
yesterday 36:21
  36:23 39:10
York 1:18,18
  2:18,19 3:5,11
  5:18 71:20,21
  75:4,8 77:14
  77:20 78:5,11
  78:15 82:3
  102:16,18
  113:5

**Z**
zoom 22:16 72:6
zooming 24:7

**0**

**1**
1 10:16,19 53:5
  53:10 112:10
  114:7
1,200 94:3
1:00 100:24
  101:1

**1:19** 101:1,3
**1:34** 110:9,24
**10** 48:4 64:25
  110:19 112:10
**10-minute**
  100:18
**10:00** 76:8
**10:09** 2:19 4:4
**100** 11:18
**10017** 3:11
**10166** 3:5
**104** 112:6
**105** 112:19
**11** 1:6,9 2:6,9
  3:3 4:7,24 6:7
  8:21,22 12:24
  13:4 43:24
  44:18 45:18
  49:24 66:9
  80:18,22 95:20
**11:11** 48:7,9
**11:23** 48:9,11
**11:50** 65:8,10
**11:54** 65:12
**12** 8:22 35:8,14
  36:3,5,9 42:12
  76:9
**12:04** 65:10
**125** 3:10 20:11
  35:11,16,21
  37:6,15
**13** 18:24
**13th** 36:24 80:20
**14** 36:18,22
  39:22 56:8
  64:17
**15** 55:8,9 56:17
  57:10 59:6
**17th** 59:11,22,24
**18** 112:11
**18th** 59:25
**19** 41:1 53:22
**196** 80:20

―――――――
**2**
**2** 17:24 18:7,11
  84:17 112:11

**114:7**
**2:00** 61:7,19
**200** 3:4 6:1
**2000** 15:5
**2011** 8:21
**2018** 15:2 16:8
  16:20 30:15
  31:6,13 34:2
**2019** 18:24 35:8
  36:3,18 39:22
  41:2 44:18
  95:12,15
**2020** 43:24
  44:18 49:24
  53:5,10,22
  55:8,9 56:8,12
  56:17 57:10
  59:6,18 60:23
  63:3 95:20
**2022** 30:21 31:9
  31:14
**2023** 1:19 2:20
  4:3 71:3 76:1
  81:8 114:4
**21** 56:12 63:3
**22** 16:7 44:17
  95:12,15
**22-50073** 1:7 2:7
**23** 30:21 31:9,14
  71:5 91:13
**23-05005** 1:13
**24** 1:19 2:19 4:3
  81:8 114:4
**27** 112:13

―――――――
**3**
**3** 27:19,23 28:1
  34:1 55:3
  56:14,15,15
  60:22 95:8,10
  112:13 114:8
**3:38** 95:12
**323** 12:7
**371** 45:16
**373** 20:12 37:16
  40:4 45:7,14
  45:18,25 46:25

**49:10** 53:5,8
  53:24 54:5,16
  56:4,22 57:1
  59:7 60:5
  61:21 62:8
  69:22 70:11
  74:9 86:6,19
  87:21 88:9
  92:4,19 94:12
  95:4 100:6,13
  102:5 104:13
  104:17

―――――――
**4**
**4** 39:25 40:16
  48:14,18,22
  56:3 112:14
**4.6** 46:7
**429** 61:2,7 62:11
**48** 112:14

―――――――
**5**
**5** 30:15 31:6,13
  34:2 46:5 52:2
  52:6,15 55:14
  112:16
**52** 112:16
**55** 112:17
**586** 20:12 37:16
**5th** 60:23

―――――――
**6**
**6** 51:24 55:18,23
  112:4,17
**65** 112:5

―――――――
**7**
**7** 105:7,9 112:19
**7.495** 12:11
**7808** 1:22
**7th** 3:10