**Exhibit 48**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

In Re                          * Chapter 11
                               *
                               *
   HO WAN KWOK,                * Case 22-50073(JAM)
                               *
             Debtor.           *
                               *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CONTINUED

341 MEETING OF CREDITORS

APRIL 6, 2022

Electronically Recorded by the
Office of the United States Trustee

Transcript Prepared By:

Christine Fiore, CERT

Fiore Reporting and Transcription Service, Inc.

4 Research Drive, Suite 402

Shelton, CT  06484

(203)929-9992

Ho Wan Kwok - April 6, 2022

APPEARANCES:


For the Debtor:            WILLIAM R. BALDIGA, ESQ.
                           BEN SILVERBERG, ESQ.
                           Brown Rudnick, LLP
                           Seven Times Square
                           New York, NY  10036


For the U.S. Trustee:      HOLLEY E. CLAIBORN, ESQ.
                           STEVEN MACKEY, ESQ.
                           Office of the U.S. Trustee
                           150 State Street
                           New Haven, CT  06510


For Logan Cheng,           JAY MARSHALL WOLMAN, ESQ.
 Creditor:                 Randazza Legal Group
                           100 Pearl Street, 14th Floor
                           Hartford, CT 06103


For Pacific Alliance       DAVID V. HARBACH, II, ESQ.
 Asia Opportunity Fund,    O'Melveny & Myers, LLP
 LP, Creditors:            1625 I Street NW
                           Washington, DC  20006

                           STUART SARNOFF, ESQ.
                           MAKENZIE RUSSO
                           O'Melveny & Myers, LLP
                           Times Square Tower
                           7 Times Square
                           New York, NY  10036

                           ANNECCA SMITH, ESQ.
                           Robinson and Cole
                           280 Trumbull Street
                           Hartford, CT  06103


For Bruno Wu, Weican       KRISTEN MAYHEW, ESQ.
 Meng and Rui Ma,          McElroy, Deutsch, Mulvaney &
 Creditors:                 Carpenter
                           One State Street
                           Hartford, CT  06103


For the Official           STEVEN STAFSTROM, ESQ.
 Committee of Unsecured    Pullman & Comley
 Creditors:                850 Main Street
                           Bridgeport, CT  06601

1          MS. CLAIBORN:  Good morning.  Today is

2    Wednesday, April 6th, 2022.  We are gathered for the

3    continued meeting of creditors in the Chapter 11

4    case of Ho Wan Kwok, case no. 22-50073.

5          My name is Holley Claiborn. I'm a trial

6    attorney in the Office of the United States Trustee

7    and I will be conducting today's meeting.  Today's

8    meeting is being recorded on a digital recorder and

9    is also available for parties to participate on the

10   phone.  And there are parties, including the debtor

11   and counsel and other professionals, gathered here

12   in person.

13         Today's meeting is being interpreted, as

14   you can hear and our interpreter today is Jeff and

15   I'm going to ask Jeff to respond to this oath.

16         (The interpreter is sworn.)

17         THE COURT:  On behalf of Mr. Kwok we have

18   William Baldiga and Ben Silverberg.

19         Also on behalf of the debtor we have

20   financial professionals Craig Gelbert and Matthew

21   Flynn.

22         Present here today on behalf of the

23   Committee of Unsecured Creditors is Steven Stafstrom

24   from Pullman and Comley.

1              Mr. Stafstrom is the lawyer for the

2     Official Committee of Unsecured Creditors.

3              Also present today on behalf of PAACS

4     Stuart Sarnoff, David Harbach and MacKenzie Russo.

5     They represent PAACS.

6              On behalf of certain creditors, including

7     Rui Ma, we have Kristen Mayhew.

8              On behalf of creditor, Logan Cheng, we

9     have Jay Wolman.

10             Also on behalf of PAACS we have Annecca

11     Smith, from Robinson and Cole.

12             And then also for the debtor today we have

13     Josh Klein and Aaron Mitchell.

14             Today's meeting will feature me asking

15     questions first, followed by the opportunity for

16     creditors to come up and ask questions.

17             Is anyone on the telephone conference

18     line?

19             MR. MACKEY:  Steven Mackey from the U.S.

20     Trustee's Office is on the conference line.

21             Thank you, Mr. Mackey.  Anyone else

22     besides Mr. Mackey.

23             Hearing none, I'm going to proceed to

24     swearing in Mr. Kwok.

25             (The debtor is sworn.)

1           MS. CLAIBORN:  Mr. Kwok, as you know,

2     today's meeting is being recorded and Mr. Jeff here

3     is our official interpreter for today.

4           Jeff will be interpreting the questions

5     that I ask and your answers, and I ask that you wait

6     until Jeff has made a full translation before you

7     answer my questions.

8     EXAMINATION BY MS. CLAIBORN:

9        Q    Mr. Kwok, we're going to pick up today in

10    an area that we left off in general from the last

11    meeting of creditors that was held back on March

12    21st, 2022.

13          Has anything changed in your employment

14    status since March 21st, 2022?

15       A    No.

16       Q    Has anything changed with respect to your

17    residence?

18       A    No.

19       Q    During the meeting held on March 21st,

20    2022 I asked you about the accuracy of your

21    bankruptcy schedules and your bankruptcy statement

22    of financial affairs.

23       A    No change.

24       Q    Thank you.

25          MS. CLAIBORN:   Jeff, for purposes of my

1    questions I'm going to be following the documents

2    that are in front of you. When I say schedules, it's

3    this document.  And then this document is the

4    statement of financial affairs.  Okay?  And when I

5    refer to an ECF number, it's at the top of the page.

6              THE OFFICIAL INTERPRETER:  ECF number.

7    Okay.

8              MS. CLAIBORN:  Okay?  That should allow

9    you to follow along and start on this page.

10   EXAMINATION BY MS. CLAIBORN:

11        Q    Okay.  Mr. Kwok, I'm going to ask you to

12   make sure you have in front of you, which you appear

13   to do, Schedules A-B through J.

14             THE PRIVATE INTERPRETER:  He has Mandarin

15   translations in front of him.

16   BY MS. CLAIBORN:

17        Q    I see that Mr. Baldiga, who is seated next

18   to you, has English versions.  But in front of you,

19   Mr. Kwok, appear to be translations.  Is that

20   accurate?

21        A    Just on Schedule A-B.

22        Q    Okay.  So, Mr. Kwok, when you're answering

23   my questions today, you're going to be taking a look

24   at your own translated versions of the bankruptcy

25   schedules.

1        A     Okay.

2        Q     Okay.

3              THE PRIVATE INTERPRETER:  Just a minute,

4    Your Honor.

5              MS. CLAIBORN:  Yes.

6              THE PRIVATE INTERPRETER:  I'm having a

7    little difficulty hearing the interpreter when he

8    interprets the witness's answers.

9              MS. CLAIBORN:  Okay.  So, Jack, if you

10   could speak up.  I'm going to move the microphone.

11             THE OFFICIAL INTERPRETER:  Oh, okay.

12             MS. CLAIBORN:  See if that works.

13   BY MS. CLAIBORN:

14       Q     Okay.  Mr. Kwok, starting at Question No.

15   1 on Schedule A-B.  With respect to Schedule A-B at

16   Question No. 1, that asks if you own any legal or

17   equitable interest in any real estate residence or

18   building or similar property.  Your answer to that

19   Question No. 1 was no, Mr. Kwok.  Is that an

20   accurate answer?

21       A     Yes.

22       Q     Mr. Kwok, have you owned any real estate

23   between the year 2018 and your bankruptcy filing in

24   February of 2022?

25             THE OFFICIAL INTERPRETER:  Can you repeat

1    that one?

2    BY MS. CLAIBORN:

3        Q    Have you owned any real estate between the

4    year 2018 and your bankruptcy filing in February

5    2022?

6             THE OFFICIAL INTERPRETER:  Can you repeat

7    that one?  He said he didn't hear that.

8    BY MS. CLAIBORN:

9        Q    Mr. Kwok --

10            MR. BALDIGA:  I'm sorry.  I couldn't hear.

11            THE OFFICIAL INTERPRETER:  He said that he

12   didn't understand the translation.  I just want to

13   make sure I understand first.

14            MS. CLAIBORN:  I'll repeat the question.

15            THE OFFICIAL INTERPRETER:  Yes.

16   BY MS. CLAIBORN:

17       Q    Mr. Kwok, have you owned any real estate

18   between 2018 and February of 2022?

19       A    No.

20       Q    Mr. Kwok, as of the bankruptcy filing in

21   February 2022, did you have any equitable interest

22   in any real estate anywhere in the world?

23       A    No.

24       Q    Mr. Kwok, as of the bankruptcy filing in

25   February 2022, did you have any legal interest in

1    any real estate anywhere in the world?

2        A    No.

3        Q    Mr. Kwok, have you ever owned any real

4    estate in Hong Kong?

5        A    No.

6             THE PRIVATE INTERPRETER:  What was the

7    answer?

8             THE OFFICIAL INTERPRETER:  No.

9    BY MS. CLAIBORN:

10       Q    Mr. Kwok, have you ever owned the property

11   located at 16A South Bay Road, Hong Kong?

12       A    No.

13       Q    Mr. Kwok, do you currently own an

14   apartment at the Sherry Netherland in New York City?

15            THE OFFICIAL INTERPRETER:  I didn't get

16   it.  Can I ask him repeat the -- repeat the answer?

17            MR. BALDIGA:  You have to say -- whatever

18   you're going to say, you have to -- you're talking

19   to everybody, not just Holley, so I need to hear

20   what you're saying.

21            THE OFFICIAL INTERPRETER:  Okay.  I just -

22   - I just want to ask him to repeat -- repeat the

23   answer.

24            MR. BALDIGA:  Okay.

25            THE OFFICIAL INTERPRETER:  Okay?

1        THE WITNESS:  I don't own that real estate

2   in New York, the Sharon -- the Sharons -- at that

3   address I don't remember, and I own -- I own 50

4   percent the stock -- the stock and --

5        THE PRIVATE INTERPRETER:  No.

6        THE OFFICIAL INTERPRETER:  No?

7        THE PRIVATE INTERPRETER:  No.

8        THE OFFICIAL INTERPRETER:  Okay.

9        THE WITNESS:  For the family.

10       MS. CLAIBORN:  Can I ask you not to

11  interrupt?  Can you just wait until the end and then

12  --

13       THE PRIVATE INTERPRETER:  Okay.

14       MS. CLAIBORN:  -- you can express whatever

15  it is you want to say?

16       THE PRIVATE INTERPRETER:  Okay.

17       MS. CLAIBORN:  Can you please just

18  translate Mr. Kwok's answer again?

19       THE OFFICIAL INTERPRETER:  Yeah.  I just

20  want to repeat, make sure -- and I said it right,

21  you know, what he said.

22       THE WITNESS:  So, yeah, he -- he said, I

23  owe -- I own 50 percent of the -- 50 percent, but I

24  don't own the whole real estate, but I just

25  represent the family.

```
 1     BY MS. CLAIBORN:

 2         Q     Mr. Kwok, what do you own 50 percent of?

 3         A     Bravo Luck, 50 percent of the stock powder

 4     -- power.  I don't know.  I don't understand.

 5              THE PRIVATE INTERPRETER:  (Indiscernible.)

 6              THE OFFICIAL INTERPRETER:  He owned -- he

 7     said he owns the 50 percent of it.

 8              THE PRIVATE INTERPRETER:  -- we can hear

 9     you fine, Holley.

10              MS. CLAIBORN:  Okay.  I'm going to ask --

11     I'm going to --

12              THE PRIVATE INTERPRETER:  I don't know if

13     the microphone is connected to anything.

14              MS. CLAIBORN:  It is.  It is.  Jeff, if

15     you can speak up?

16              THE OFFICIAL INTERPRETER:  Mr. Kwok said

17     he owe -- he owns 50 percent of -- of the stock.  Is

18     it like the stock of the real estate or something?

19     I don't know.  I don't get it.  But you can help if

20     she wants to help.  Do you want him to help a little

21     bit?

22              MS. CLAIBORN:  I'd rather not.

23              THE OFFICIAL INTERPRETER:  Okay.

24              MS. CLAIBORN:  So, I'll just -- I'll ask

25     follow-up questions.
```

1          THE OFFICIAL INTERPRETER:  Okay.

2          MR. BALDIGA:  All right.  But I need to

3    hear if it's a misinterpretation, so --

4          MS. CLAIBORN:  I'm going to ask a

5    clarifying question, if I could.

6    BY MS. CLAIBORN:

7      Q    Mr. Kwok, do you own 50 percent of a

8    company called Bravo Luck?

9      A    I represent my family to hold 50 percent

10   of the stock.

11     Q    Mr. Kwok, when you use the term --

12         MR. BALDIGA:  Could I hear that back?

13   Could you repeat that?

14         THE OFFICIAL INTERPRETER:  Yeah.  I

15   represent my family to hold 50 percent of the stock

16   of the -- of the company.

17         MR. BALDIGA:  Okay.

18   BY MS. CLAIBORN:

19     Q    Mr. Kwok, when you say family, what do you

20   mean?

21     A    My family is a big family and that

22   includes a lot of people.  My kids and my sister-in-

23   laws, and all people together.  A lot of people.

24     Q    Mr. Kwok, who owns an interest --

25         MR. BALDIGA:  Excuse me.  We do have an

1    interpretation question.

2              THE PRIVATE INTERPRETER:  I just want to

3    ask that, is there supposed to be summary of the

4    (indiscernible) the interpretation?

5              MS. CLAIBORN:  To the best of Mr. Jeff's

6    ability, it should be verbatim.

7              THE PRIVATE INTERPRETER:  Right.  So if

8    Mr. Kwok said, my son, my daughter, my brother, my

9    sister-in-law, my nephew, my niece, many people,

10   then if the interpreter say, well, a lot of my

11   families and my brother, many people, then should it

12   be correct or not?

13             MS. CLAIBORN:  I would prefer that Mr.

14   Jeff translate as literally as possible.  So with

15   that instruction, can we --

16             THE OFFICIAL INTERPRETER:  Yeah.

17             MS. CLAIBORN:  -- do a specific job as

18   best we can going forward?  Thank you.

19             MR. BALDIGA:  Thank you.

20    BY MS. CLAIBORN:

21        Q    So, Mr. Kwok, who owns the company called

22   Bravo Luck?

23        A    My son.

24        Q    And what is your son's name?

25        A    Cheng Wu.

1          Q     How long has your son owned Bravo Luck?

2          A     I don't remember.

3                THE PRIVATE INTERPRETER:  Say again,

4     please.

5                THE OFFICIAL INTERPRETER:  I don't

6     remember.

7      BY MS. CLAIBORN:

8          Q     So, Mr. Kwok, what do you own 50 percent

9     of when you explained your ownership interest in the

10    Southern Sherry Netherland?

11               MR. BALDIGA:  Objection.  You may

12    interpret.

13               THE OFFICIAL INTERPRETER:  Can you repeat

14    that one again, Holley?

15     BY MS. CLAIBORN:

16         Q     Mr. Kwok, you testified that you owned 50

17    percent of some company, and that was in response to

18    my question if you owned the Sherry Netherland

19    apartment.  Can you please explain what you meant?

20         A     Sherry is a co-op.  It doesn't have the --

21    it doesn't have the -- it doesn't have the

22    ownership.

23               THE PRIVATE INTERPRETER:  May I, Ms.

24    Holley?

25               MR. BALDIGA:  Yes, of course.

1          THE PRIVATE INTERPRETER:  You've got to

2     speak louder.

3          MS. CLAIBORN:  Okay.  I'm going to put

4     ourselves on pause for a second here.

5          (Off the record)

6          MS. CLAIBORN:  All right.  We're back on

7     the record after a short break, and, Mr. Kwok, you

8     remain under oath.

9          Jeff, could you please retranslate?

10          THE OFFICIAL INTERPRETER:  Yeah.

11          MS. CLAIBORN:  The last question.  You

12     want me to ask it again?

13          THE OFFICIAL INTERPRETER:  Yeah.  Would

14     you ask it again?

15          MS. CLAIBORN:  All right.  I'll try it

16     again.

17      BY MS. CLAIBORN:

18          Q    Mr. Kwok, you testified today that you own

19     50 percent of an interest in some company, and that

20     was the answer you gave me in response to my

21     question if you own an apartment at the Sherry

22     Netherland.  Can you please explain your answer?

23          MR. BALDIGA:  Objection.

24          THE WITNESS:  I don't know how to explain

25     it.  He said the Sherry Netherland is a co-op.  I

1    don't have a deed on that property and I just

2    represent my family to own 50 percent of the right.

3              MR. BALDIGA:  Excuse me.  Go ahead.

4              THE PRIVATE INTERPRETER:  Because that --

5    Mr. Kwok did mention the company name Bravo Luck, so

6    Mr. Interpreter did not say the word Bravo Luck, the

7    company that holds the interest of Sherry

8    Netherland, and Mr. Kwok represents the family owns

9    50 percent of Bravo Luck, which is the holding

10   company of owning the Sherry Netherland. The Sherry

11   Netherland is a co-op.

12             MR. BALDIGA:  So I'm going to make a

13   continuing objection to the extent that the

14   interpreter is not providing the exact words used by

15   the witness.  I'm not ascribing any faults or

16   anything, but obviously that's critical to the

17   quality of the testimony and that's necessary.

18             MS. CLAIBORN:  We need --

19             MR. BALDIGA:  We have to use the words

20   used by the witness.

21             MS. CLAIBORN:  I'm sure that Jeff is going

22   to do his best job today to try to translate

23   everything literally.

24             MR. BALDIGA:  Thank you.

25             MS. CLAIBORN:  But please understand that

1      there is a familiarity with terms in this room that

2      Mr. Jeff does not have.  So to the extent that

3      people are answering questions with shorthand

4      versions of company names or just one words, the

5      answer should be as specific as possible --

6                    THE OFFICIAL INTERPRETER:  Yeah, I --

7                    MS. CLAIBORN:  -- if you could translate

8      that.

9                    THE OFFICIAL INTERPRETER:  -- my best but

10     probably that interpreter honestly, Holley, the

11     interpreter probably know the case more, the

12     details.

13                   MS. CLAIBORN:  I agree.  Can you just --

14                   THE OFFICIAL INTERPRETER:  But if he --

15                   MS. CLAIBORN:  -- can you translate what I

16     just said to Mr. Kwok, because I want to make sure

17     --

18                   THE OFFICIAL INTERPRETER:  Oh.

19                   MS. CLAIBORN:  -- he answers questions in

20     a way that are easily translatable.

21                   THE OFFICIAL INTERPRETER:  I just tell him

22     and the answer let -- you know short and clear, but

23     I pretty much understand what he says and --

24                   MS. CLAIBORN:  And can you please

25     translate Mr. Kwok's answers or comments to your

1    comments?

2              THE OFFICIAL INTERPRETER:  He said he will

3    try to make it a shorter and clear and -- but he

4    needs to explain the details as much as he can

5    because it's a -- it's related to his lifeline.

6              MS. CLAIBORN:  Mr. Sarnoff?

7              MR. SARNOFF:  Yeah.  I just wanted to make

8    clear that to the extent there is a discrepancy

9    between the interpreter -- the translator, the

10   official translator and Mr. Kwok's interpreter, that

11   the translator is the final arbiter and that unless

12   the translator agrees with the translation

13   difference that the interpreter is putting forth,

14   they have to work that out before we can defer to

15   the -- to Mr. Kwok's personal interpreter as what

16   Mr. Kwok said.

17             MR. BALDIGA:  I don't accept that.

18             MR. SARNOFF:  That's fine.

19             MR. BALDIGA:  That can be your position.

20             MR. SARNOFF:  Okay.  The position has to

21   be that the translator has to agree with the

22   interpreter about what Mr. Kwok said for the record

23   to be accurate.

24             MR. BALDIGA:  That -- I understand your

25   position.

1          THE OFFICIAL INTERPRETER:  So, Holley, if

2   I miss anything that his personal interpreter wants

3   to make up whatever I'm missing, some of the detail

4   information, and is it okay for her to add on and if

5   I agree what -- you know, what I'm missing or what

6   he said, maybe I'm missing some detail information

7   and some --

8          MS. CLAIBORN:  I think the better route

9   for today --

10          THE OFFICIAL INTERPRETER:  Yeah.

11          MS. CLAIBORN:  -- and for purposes of a

12   clear translation and a clear record --

13          THE OFFICIAL INTERPRETER:  Okay.

14          MS. CLAIBORN:  -- is for you, Jeff, to

15   interpret --

16          THE OFFICIAL INTERPRETER:  Uh-huh.

17          MS. CLAIBORN:  -- my questions and to

18   interpret Mr. Kwok's answers.

19          THE OFFICIAL INTERPRETER:  Okay.

20          MS. CLAIBORN:  And if Mr. Kwok thinks,

21   based on your interpretation, that you have not

22   translated properly, then he can testify again and

23   you can try again.

24          But I would like to restrict the

25   interaction that happens between translators and

1    between Mr. Kwok's personal translator so that we

2    have an official record where the person asking the

3    question is me, it's being officially translated,

4    and Mr. Kwok is giving the answers, and that also is

5    being officially translated.

6         MR. BALDIGA:  But, Holley, the problem

7    with that is the witness doesn't know whether Jeff's

8    English report is in fact accurate.  You can't leave

9    it up to the witness.  That's why we have a check

10   interpreter.  If he spoke English, then we wouldn't

11   need any interpreters.  He can't do that.

12        MS. CLAIBORN:  I think as a practical

13   matter, Mr. Kwok speaks enough English to know

14   whether or not he's answered his question.

15        MR. BALDIGA:  No, he doesn't.  I object.

16        MS. CLAIBORN:  Well, I -- I think that

17   that has been what I have seen from my own personal

18   experience.

19        That said, we're going to try and do the

20   best we can --

21        MR. BALDIGA:  I agree.

22        MS. CLAIBORN:  -- and we'll see where we

23   go.

24        MR. BALDIGA:  Okay.

25        MS. CLAIBORN:  Okay?

1    BY MS. CLAIBORN:

2        Q    So back to questions and answers.  Mr.

3    Kwok, do you own an interest in Genever Holdings

4    Corporation?

5        A    I just have -- in reality, I don't, but I

6    just held -- I just represent my family to hold some

7    interest.

8        Q    Is anyone authorized to act on behalf of

9    Genever Holdings Corporation aside from you?

10       A    My son.

11       Q    Is there a document that memorializes your

12   ownership interest, whatever it is, in Genever

13   Holdings Corporation?

14            MR. BALDIGA:  Objection.  You -- you may

15   answer.

16            THE WITNESS:  No.

17            THE PRIVATE INTERPRETER:  Ms. Holley, can

18   I -- first of all, the last time that -- when he was

19   saying -- instructing the witness about his

20   testimony, what should it be, I don't think the

21   interpreter -- the official interpreter interpreted

22   your instruction.  He is telling the witness what he

23   should be doing, but not what you were saying.

24            And then, now that the witness is saying

25   that he asked the interpreter twice that -- you were

```
 1    talking about ownership, you were talking about

 2    ownership interest.  Now he used twice these words,

 3    and then at the end, Mr. Jeff said, yes.  And then,

 4    so he answered no, but then the interaction was not

 5    interpreted.

 6              MS. CLAIBORN:  Mr. Jeff, could you

 7    translate?

 8              THE OFFICIAL INTERPRETER:  I don't know

 9    what she just said.  I don't know.  I didn't

10    understand what she's saying.

11              THE PRIVATE INTERPRETER:  I mean, every

12    word should be interpreted.  The witness -- every

13    word the witness says should be interpreted.  Ms.

14    Holley's words should be interpreted, right?

15              MS. CLAIBORN:  Yes.

16              THE PRIVATE INTERPRETER:  Right.  But he

17    will -- not interpreted Ms. Holley's -- and you did

18    not interpret everything Mr. Kwok said.

19              THE OFFICIAL INTERPRETER:  Okay.  Maybe --

20    maybe we should have her to interpret.  I'm going to

21    excuse myself.  I don't know --

22              MS. CLAIBORN:  I'm going to put the --

23              THE OFFICIAL INTERPRETER:  -- I'm not

24    familiar with --

25              MS. CLAIBORN:  -- I'm going to put the
```

1    matter on pause for a moment.

2             THE OFFICIAL INTERPRETER:  Yeah, yeah,

3    yeah.

4         (Off the record)

5             MS. CLAIBORN:  All right.  We are back on

6    the record after a short break.

7             Mr. Kwok, you remain under oath.

8     BY MS. CLAIBORN:

9         Q    Mr. Kwok, do you have any United States

10   currency with you today?

11        A    No.

12        Q    When you filed your bankruptcy case, did

13   you have any United States currency?

14        A    No.

15        Q    Mr. Kwok, do you own any foreign currency?

16        A    No.

17        Q    Mr. Kwok, do you own any digital currency?

18        A    No.

19        Q    Mr. Kwok, do you have any financial

20   accounts of any kind in the United States?

21        A    No.

22        Q    Mr. Kwok, do you have any financial

23   accounts of any kind outside of the United States?

24        A    No.

25        Q    On March 21st, you testified you have no

Ho Wan Kwok - April 6, 2022

1      job and no source of income.  Who pays for your

2      household expenses?

3             A      Sometimes my son, sometimes my wife, or

4      sometimes my other family member.

5             Q      Do you have access to any credit cards?

6             A      No.

7             Q      Do you have access to any debit cards

8      attached to a bank account?

9             A      No.

10            Q      How do you pay for groceries?

11            A      My son, my wife, my family members'

12     company pay for.

13            Q      Where does your son live?

14            A      London.

15            Q      How does your son send you money?

16            A      He has a family office in a company, New

17     York.

18            Q      Does the family office give you money?

19            A      They pay the expenses above.

20            Q      What does the term family office mean?

21                   MR. BALDIGA:  Objection.  You may answer.

22                   THE OFFICIAL INTERPRETER:  Can I ask to --

23     ask him to repeat?

24                   MS. CLAIBORN:  Yes.

25                   THE OFFICIAL INTERPRETER:  Okay.  Can you

1    --

2              MR. BALDIGA:  Right.  He also have to

3    interpret for the witness what I say.

4              MS. CLAIBORN:  You haven't said anything

5    yet and he's going to ask him to repeat his answers

6    so then he's going to translate, and then we can

7    have whatever discussion you want to have.

8              THE PRIVATE INTERPRETER:  The counsel

9    raised objection.  The interpreter did not interpret

10   the objection.

11             MS. CLAIBORN:  I can happily repeat the

12   question, but we are not going to get anywhere today

13   in a meaningful fashion if people are interrupting

14   on basic questions.

15             MR. BALDIGA:  No, I didn't interrupt, but

16   --

17             MS. CLAIBORN:  So let me try again.

18             MR. BALDIGA:  Okay.  But hold on.  If I

19   object or if I say anything else, that has to be

20   interpreted.

21             MS. CLAIBORN:  You're not waiting for

22   space to interpret.  So, Mr. Jeff, can you interpret

23   that exchange that just happened?

24             THE OFFICIAL INTERPRETER:  Okay.  I don't

25   know.  It's just too much interruption.

1           MS. CLAIBORN:  Right.

2           THE OFFICIAL INTERPRETER:  Holley, I can't

3     do -- keep doing this.  I just too distracted and I

4     don't know.  It just a simple -- ask the witness

5     just a simple repeat and then --

6           MS. CLAIBORN:  Let me try --

7           THE OFFICIAL INTERPRETER:  -- it gets all

8     these people involved.

9           MS. CLAIBORN:  Correct.  Let me --

10          THE OFFICIAL INTERPRETER:  We're not going

11    anywhere.

12          MS. CLAIBORN:  Let me try the question

13    again.

14     BY MS. CLAIBORN:

15       Q    Mr. Kwok, what do you mean by the term,

16    family office?

17          MR. BALDIGA:  Objection.  You may answer.

18          MS. CLAIBORN:  Mr. Baldiga, that term is

19    all over the papers.  Can you repeat -- translate?

20          THE OFFICIAL INTERPRETER:  No, I'm not

21    going anywhere.  Holley, I just excuse myself.  I'm

22    sorry.  It's -- it's not going --

23          MS. CLAIBORN:  I'm going to put it on

24    pause, please.

25          THE OFFICIAL INTERPRETER:  -- this is too

 1   much.

 2        (Off the record)

 3             MS. CLAIBORN:  We're back on the record

 4   after a short break.

 5             Mr. Kwok, you remain under oath.  During

 6   the break, I spoke with Attorney Baldiga and we have

 7   agreed that all objections as to form of the

 8   question are reserved.

 9             I'm going to go back to my questions.

10   BY MS. CLAIBORN:

11        Q    The question we left off after the break

12   was what do you mean by the term family office?

13        A    They are representing my big family.  It's

14   a company my son, my daughter, my wife, and it's a

15   company representing my family for investment.

16        Q    What is the name of the company?

17        A    Golden Spring Europe.

18        Q    Do you mean Golden Spring New York?

19        A    Roughly the name.

20        Q    Who pays for the meals that you eat?

21        A    Sometimes my wife's company, sometimes my

22   family office, my son's company.

23        Q    Mr. Kwok, when you use the term family

24   office, are you referring to the company known as

25   Golden Spring New York Limited?

```
 1              THE OFFICIAL INTERPRETER:  What's the name
 2    of the company?  Can I -- can you repeat it?
 3              MS. CLAIBORN:  The name is Golden Spring
 4    New York Limited.
 5              THE WITNESS:  Yes.
 6    BY MS. CLAIBORN:
 7         Q    In your bankruptcy case, you filed a
 8    report covering your expenses for the month of
 9    February.
10              THE OFFICIAL INTERPRETER:  May I repeat
11    again?
12              MS. CLAIBORN:  Maybe I'll try it again.
13              THE OFFICIAL INTERPRETER:  Thank you.
14    BY MS. CLAIBORN:
15         Q    Mr. Kwok, you filed a monthly operating
16    report covering the month of February 2022, and that
17    report shows you spent approximately $160,000.
18              MR. BALDIGA:  Objection.  I object.
19    BY MS. CLAIBORN:
20         Q    Who funded the disbursements of $160,000?
21         A    Some from the Golden Spring family office
22    and the company, some were paid by my wife and my
23    wife's company.
24         Q    What is the name of your wife's company?
25         A    Greenwich, in Connecticut.
```

1        Q      Are you referring to the company?

2        A      Yes, the company name.

3        Q      What expenses does your wife company,

4   Greenwich, pay for?

5        A      Mostly food, because I live in my wife's

6   house.  We share the cleaning, the expenses because

7   -- and also the garden maintenance expenses.

8               UNIDENTIFIED SPEAKER:  Okay.  Can we take

9   a quick time out so I can speak with my co-counsel?

10  Or with my partner.

11              MR. BALDIGA:  No, let's just wait.

12  BY MS. CLAIBORN:

13       Q      Where does your wife's company, Greenwich,

14  get its money from?

15       A      I don't know.

16       Q      Did your wife's company, Greenwich, pay

17  for any professional expenses?

18       A      I don't know.

19       Q      Is your wife the person who actually makes

20  the payments?

21       A      Yes.

22       Q      Does your wife have a checking account?

23       A      I don't know.

24       Q      Does your wife have a debit card?

25       A      I don't know.

1          Q       When you eat in a restaurant with your

2     wife, who pays the bill?

3          A       I never went to a restaurant with my wife.

4          Q       Ever?

5          A       I think I was chased by these people and I

6     never went.  Thinks I -- you know, I think I was

7     chased by these people.

8          Q       Does your wife buy groceries?

9          A       Sometimes.

10         Q       How does she pay for them?

11         A       I don't know.

12         Q       Why does Golden Spring New York pay for

13    some of your personal expenses?

14         A       Because I'm one of the family member, and

15    my son is very successful and he loves me very much.

16         Q       Is there any other reason?

17         A       I don't know.

18         Q       What personal living expenses of yours

19    does Golden Spring pay for?

20         A       The expense from security because I was

21    chased by the people in the back, and the

22    transportation, clothing, and some items for living.

23         Q       Who is the person at Golden Spring New

24    York --

25                 MS. CLAIBORN:  Wait a minute.  I'm going

1    to ask a full question.

2     BY MS. CLAIBORN:

3         Q    So who is the person at Golden Spring New

4    York who authorizes the payment of your personal

5    living expenses?

6         A    My son.

7         Q    Please explain how your son authorizes

8    those payments.

9         A    I usually communicate with Golden Spring,

10   the company's manager and CEO.

11             THE PRIVATE INTERPRETER:  (Indiscernible)

12   director, not manager.

13             THE OFFICIAL INTERPRETER:  Could you --

14   okay.  Director, not a manager.

15             MR. BALDIGA:  Thank you.

16    BY MS. CLAIBORN:

17        Q    Mr. Kwok, who is the director or manager

18   that you just referred to?

19        A    Wang Yanping.

20        Q    Is Ms. Ping a officer of Golden Spring New

21   York?

22        A    She is a Miss.  She's a lady.

23        Q    Is Ms. Ping a corporate officer of Golden

24   Spring New York?

25        A    Yes.

1          Q     What is her title?

2          A     She is a officer or director.

3          Q     Does she have a position title?

4          A     I don't know.

5          Q     Mr. Kwok, are you a corporate officer of

6    Golden Spring New York?

7          A     Now?

8          Q     Yes.

9          A     No.

10         Q     Mr. Kwok, have you ever been in the past,

11   a corporate officer of Golden Spring New York?

12         A     I seem to hold a title when the company

13   was established in 2015.  I forgot what title was it

14   then.

15         Q     Mr. Kwok, do you own any interest in

16   Golden Spring New York?

17         A     No.

18         Q     In the past, have you ever had any kind of

19   ownership interest in Golden Spring New York?

20         A     No.

21         Q     Were you involved in the formation of

22   Golden Spring New York?

23         A     Yes.

24         Q     What was your role in the formation of

25   Golden Spring New York?

1       A       Consultant and giving advice, suggestions.

2       Q       Was your son involved in the formation of

3   Golden Spring New York?

4       A       He is the main person.  He -- he was the

5   main person.

6       Q       When Golden Spring New York was created,

7   who had the ownership interest in New York -- Golden

8   New -- Golden Spring New York?

9       A       My son.

10      Q       Did Golden Spring Hong Kong have any

11  ownership interest in Golden Spring New York?

12      A       I don't know the detail of the interest

13  and because this -- these two combined, it's

14  considered one thing.

15      Q       Is Golden Spring Hong Kong a separate

16  company from Golden Spring New York?

17      A       I don't know.

18      Q       Who owns Golden Spring Hong Kong?

19      A       My son.

20      Q       In 2015, when Golden Spring New York was

21  formed, who owned Golden Spring Hong Kong?

22      A       I don't know.

23      Q       Are you a corporate officer of Golden

24  Spring Hong Kong?

25      A       I don't remember.

1        Q      Have you ever been a cooperate officer of

2    Golden Spring Hong Kong?

3        A      I don't remember.

4        Q      Do you have any ownership interest in

5    Golden Spring Hong Kong?

6        A      No.

7        Q      Have you ever in the past, had an

8    ownership interest in Golden Spring Hong Kong?

9        A      No.

10       Q      What type of business is Golden Spring New

11   York engaged in?

12       A      I don't know.

13       Q      How does Golden Spring New York generate

14   revenue?

15       A      I don't know.

16              THE PRIVATE INTERPRETER:  Ms. Holley, I

17   don't know if this -- the (indiscernible) he said,

18   how does Golden Spring New York generate revenue,

19   not how does Golden Spring New York making money,

20   right?

21              MS. CLAIBORN:  That was basically my

22   question.

23              THE PRIVATE INTERPRETER:  Yeah, so the

24   interpreter should not say -- interpret it in such a

25   way that Golden Spring New York -- how does Golden

1    Spring New York make money, to the -- to the -- to

2    Mr. Kwok.

3              THE OFFICIAL INTERPRETER:  Generate money,

4    yeah.  Generate revenue, generate money.

5              THE PRIVATE INTERPRETER:  No, but you said

6    --

7              MS. CLAIBORN:  I'm happy to ask it

8    specifically.

9     BY MS. CLAIBORN:

10         Q    How does Golden Spring New York make

11   money?

12         A    I don't know.

13         Q    In the year 2015, were you involved in

14   Golden Spring New York's business?

15         A    I don't remember.

16         Q    Have you ever given a gift of money to

17   Golden Spring New York?

18         A    No.

19         Q    Have you ever given any money to Golden

20   Spring New York?

21         A    No.

22         Q    Have you ever transferred any property of

23   any kind to Golden Spring New York?

24         A    No.

25         Q    Have you ever funded Golden Spring New

1    York in any way?

2         A    No.

3         Q    Have you ever loaned money to Golden

4    Spring New York?

5         A    No.

6         Q    Have you ever invested any of your own

7    money in Golden Spring New York?

8         A    No.

9         Q    What corporate position does Yanping Wang

10   Hold?

11        A    Officer and director.

12        Q    Is Yanping Wang the president of Golden

13   Spring New York?

14        A    Yes.

15        Q    Does Golden Spring New York have any other

16   corporate officers?

17        A    Yes.

18        Q    Who are they?

19        A    I don't remember clearly about their

20   names.

21        Q    Please tell me what you remember.

22        A    What -- I don't remember their names

23   clearly and -- because I don't even remember

24   attorney's names.  I don't want to misleading you,

25   Holley.

1      Q      How many officers does Golden Spring New

2  York have?

3      A      I don't remember.  Oh, I don't know.

4  Sorry.  I don't know.

5      Q      Does Golden Spring New York have any

6  directors?

7      A      Yanping Wang.

8      Q      Is Ms. Wang the only director of Golden

9  Spring New York?

10     A      I don't know.

11     Q      Where does Golden Spring New York get the

12  money that it uses to pay your personal expenses?

13     A      I don't know.

14     Q      Does Golden Spring New York have any

15  employees?

16     A      Yes.

17     Q      How many?

18     A      I don't know.

19     Q      Are you currently involved in any way in

20  the business of Golden Spring New York?

21     A      No.

22     Q      What does Golden Spring New York own?

23     A      I don't know.

24     Q      Golden Spring New York is willing to loan

25  you the sum of $8 million.  Where is it getting that

1    $8 million from?

2         A    I don't know.

3         Q    Are you the person who asked Golden Spring

4    New York to loan you $8 million?

5         A    No.

6         Q    Who asked Golden Spring New York to loan

7    you $8 million?

8         A    My attorney.

9         Q    Which attorney?

10        A    Aaron Mitchell here.

11        Q    Are you referring to Aaron Mitchell?

12        A    Now I remember his name now.

13             UNIDENTIFIED SPEAKER:  Just for the

14   record, I'm not sure Mr. Mitchell has registered an

15   appearance yet.  It would be appropriate if he's

16   going to be here representing the debtor, if he

17   (indiscernible) his appearance.

18             MS. CLAIBORN:  I believe I did read Mr.

19   Mitchell's name earlier today.

20             UNIDENTIFIED SPEAKER:  He hasn't filed --

21             MS. CLAIBORN:  He did sign --

22             UNIDENTIFIED SPEAKER:  -- an appearance in

23   this matter.

24             MS. CLAIBORN:  Thank you.  Can you

25   translate that?

1           THE OFFICIAL INTERPRETER:  I didn't hear

2    totally clearly.  I know it's some distance.  I

3    don't --

4     BY MS. CLAIBORN:

5        Q    Does Golden Spring New York have any bank

6    accounts?

7        A    I don't know.

8        Q    Do you have access to Golden Spring New

9    York's financial accounts?

10       A    No.

11       Q    Do you have authority to enter into

12   financial transactions on behalf of Golden Spring

13   New York?

14       A    No.

15           THE PRIVATE INTERPRETER:  No.  No, that's

16   not the question.

17           THE OFFICIAL INTERPRETER:  What was it?

18           MS. CLAIBORN:  I'm happy to repeat the

19   question.

20    BY MS. CLAIBORN:

21       Q    Do you have authority to enter into

22   financial transactions on behalf of Golden Spring

23   New York?  Mr. Kwok, if you don't answer -- if you

24   don't understand my question --

25           THE OFFICIAL INTERPRETER:  He's asking if

1    he -- if I was asking if he has the right to use the

2    -- the Golden Spring New York, the accounts for

3    transactions.  You know.

4            MS. CLAIBORN:  That was not my question.

5    BY MS. CLAIBORN:

6        Q    Mr. Kwok, are you authorized to enter into

7    any kind of financial transactions on behalf of

8    Golden Spring New York?

9        A    No.

10           MR. BALDIGA:  Excuse me, the interpreter

11   might have a comment.

12           MS. CLAIBORN:  Can you translate that,

13   please?

14           THE OFFICIAL INTERPRETER:  Yeah.  She said

15   that it's the trading -- trading of the financial

16   trading --

17           THE PRIVATE INTERPRETER:  Transaction.

18           THE OFFICIAL INTERPRETER:  -- transaction

19   to --

20           THE PRIVATE INTERPRETER:  Not trading.

21           THE OFFICIAL INTERPRETER:  He said that,

22   no, he was not -- I was not authorized to do the

23   transactions, financial transactions.

24   BY MS. CLAIBORN:

25       Q    What, if anything, do you currently do for

41

1       Golden Spring New York?

2            A    No.

3            Q    Is Golden Spring New York funding your

4       son's personal living expenses?

5            A    I don't know.

6            Q    Is Golden Spring New York funding your

7       daughter's personal living expenses?

8            A    I don't know.

9            Q    Do you owe any money to Golden Spring New

10      York?

11           A    Yes.

12           Q    How much?

13           A    Like more than $21 million.

14           Q    How do you owe more than $21 million to

15      Golden Spring New York?

16           A    Because in the past five years and I was

17      sued by a lot of creditors.

18           Q    Did Golden Spring New York --

19                MS. CLAIBORN:  I apologize.

20                THE OFFICIAL INTERPRETER:  I just ask him

21      to repeat.

22                THE WITNESS:  In the past five years, I

23      was chased by Chinese Communist Party.

24                THE OFFICIAL INTERPRETER:  I didn't get

25      it.  Ask -- I'm asking him to repeat it one more

1    time.

2              MR. BALDIGA:  Short -- short answer.

3              THE WITNESS:  In the past five years I was

4    trapped -- trapped by some of the cases from Chinese

5    Communist Party, designed by the Chinese Communist

6    Party, including the case past, that case.  I need

7    to -- need to pay a large amount of legal fees so

8    that's why I got the support from the Golden Spring

9    New York.  This is the main reason I owe $21

10   million.

11             THE PRIVATE INTERPRETER:  Interpreter

12   missed that, the legal -- legal fee.

13             THE OFFICIAL INTERPRETER:  Yeah, I said

14   the legal fee.  I said that.  Did I say legal fee?

15             THE PRIVATE INTERPRETER:  I didn't think

16   so, but as long as you say that.

17   BY MS. CLAIBORN:

18        Q    How much of the $21 million is comprised

19   of legal fees?

20             THE OFFICIAL INTERPRETER:  Can you repeat

21   that one again?

22   BY MS. CLAIBORN:

23        Q    How much of the $21 million --

24             THE OFFICIAL INTERPRETER:  Okay.

25   BY MS. CLAIBORN:

1        Q    -- is comprised of legal fees?

2        A    I think most of it is legal fee.

3        Q    Why is Golden Spring New York paying your

4   legal fees?

5        A    Because the Golden Spring New York is my

6   son and my family's company and they love me very

7   much.  They hope -- they hoping me to live, not be

8   killed by the people behind me.

9        Q    Do you have any written agreement with

10   Golden Spring New York?

11        A    Yes.

12        Q    What legal -- sorry.  What written

13   agreements do you have with Golden Spring New York?

14        A    It's agreement for borrowing -- borrowing

15   money.

16        Q    When did you enter into that agreement to

17   borrow money?

18        A    A few years ago.  I know -- I don't know

19   rough time.

20             THE PRIVATE INTERPRETER:  I don't recall.

21             MS. CLAIBORN:  What --

22             THE OFFICIAL INTERPRETER:  What -- yeah, I

23   don't remember the time.

24    BY MS. CLAIBORN:

25        Q    What are the terms of the legal agreement

1     with Golden Spring New York?  Sorry.  Let me

2     rephrase that.  What are the terms of the written

3     agreement with Golden Spring New York?

4          A    I don't remember.

5               UNIDENTIFIED SPEAKER:  Sorry.  Could you

6     repeat the English, please?

7               MS. CLAIBORN:  Go ahead and say that --

8     repeat.

9               THE OFFICIAL INTERPRETER:  I don't

10    remember.

11     BY MS. CLAIBORN:

12          Q    Are you obligated under that written

13    agreement with Golden Spring New York to pay back

14    all of the money?

15          A    Yes.

16               MR. BALDIGA:  There's more to the

17    question.

18     BY MS. CLAIBORN:

19          Q    That Golden Spring paid to lawyers on your

20    behalf.

21          A    Yes.

22               THE PRIVATE INTERPRETER:  It was only

23    (indiscernible) of a difference in the interpreting.

24    For example, the interpreter did not interpret under

25    the agreement, are you obligated to make them all --

1    to pay back all the money.  All the money that is,

2    you know --

3              MR. BALDIGA:  Okay.

4              THE PRIVATE INTERPRETER:  -- spent on the

5    lawyer.

6              MR. BALDIGA:  Maybe Holley can clarify

7    that.

8              THE PRIVATE INTERPRETER:  Yeah.

9     BY MS. CLAIBORN:

10       Q    I'm going to ask a long question.  I'm

11   going to break it into parts.

12             Mr. Kwok, are you obligated to pay back

13   Golden Spring New York for all of the money that

14   Golden Spring New York paid to lawyers on your

15   behalf?

16       A    Yes.

17       Q    Is that agreement with Golden Spring New

18   York in writing?

19       A    Yes.

20       Q    Is that the same written agreement you

21   mentioned a few minutes ago?

22       A    Yes.

23       Q    Do you have more than one written

24   agreement with Golden Spring New York?

25       A    Yes.

1        Q     What are your other written agreements

2    with Golden Spring New York?

3        A     In the past week, I had a case with Logan

4    Cheng.  The settlement with Logan Cheng, the money

5    from -- for the settlement is the money I borrow

6    from Golden Spring New York.

7        Q     Do you have any other written agreements

8    with Golden Spring New York?

9        A     I don't remember.

10        Q     Does Golden Spring New York have a fee

11    agreement with any of the attorneys who represent

12    you in litigation?

13           Can you -- can you answer, Mr. Kwok?

14           THE OFFICIAL INTERPRETER:  Any agreement

15    with -- can you repeat one more time?

16    BY MS. CLAIBORN:

17        Q     Does Golden Spring New York have a -- any

18    kind of a fee agreement with any of the lawyers who

19    represent Mr. Kwok in litigation?

20        A     I don't know.

21        Q     Mr. Kwok, who represents you in the

22    litigation you filed against UBS in London?

23        A     Attorney -- attorney office in London.

24        Q     What is the name?

25        A     I don't remember completely about the

1    English name.

2         Q    Does Golden Spring New York have a fee

3    agreement with that attorney in London?

4         A    There should be.

5              MR. BALDIGA:  I'm sorry.  What was the

6    answer?

7              THE OFFICIAL INTERPRETER:  Should have.

8     BY MS. CLAIBORN:

9         Q    Do you know if it does have enough -- have

10   a fee agreement?

11        A    I'm not sure.

12        Q    Who is the person at Golden Spring New

13   York who authorized payment of your litigation

14   expenses?

15        A    My son.

16        Q    Does your son have to speak with anyone

17   else in order to use Golden Spring New York money

18   for your benefit?

19        A    Yes.

20        Q    Who does your son need to speak with?

21        A    He needs to talk to my family member,

22   which includes more than 100 family members, and

23   that because they have a fund.

24              THE PRIVATE INTERPRETER:  That -- the

25   number is 181.

 1    BY MS. CLAIBORN:

 2        Q    Mr. Kwok, if your son wanted to give you

 3    $100, would he have to seek authority from someone

 4    at Golden Spring New York?

 5        A    I don't know.

 6        Q    When you say your son has to speak with

 7    someone at Golden Spring New York, how many people

 8    does he need to speak with?

 9        A    I don't know details.

10        Q    With respect to the $8 million that Golden

11    Spring New York is willing to loan you, did your son

12    have to obtain consent of other people at Golden

13    Spring New York for that transaction?

14        A    I don't know.

15        Q    Have you ever been to the office of Golden

16    Spring New York in New York City?

17        A    Yes.

18        Q    How often do you go to the Golden Spring

19    New York office in New York City?

20        A    Not -- not fixed.  Sometimes I go there a

21    few times a month.  Sometimes I haven't -- I haven't

22    gone there for a few months.

23        Q    When was the last time you went to the

24    Golden Spring New York office?

25        A    Yesterday.

1     Q     Why did you go?

2     A     For preparing today's meeting.

3     Q     Did your son speak with Yanping Wang about

4   the $8 million loan?

5     A     I don't know.

6     Q     Did you negotiate the terms of the $8

7   million loan from Golden Spring New York?

8     A     No.

9     Q     Who was the person who negotiated the $8

10  million loan on your behalf?

11    A     My attorney.

12    Q     Which attorney?

13    A     Aaron Mitchell.

14    Q     Who did Attorney Aaron Mitchell negotiate

15  with at Golden Spring New York?

16          THE OFFICIAL INTERPRETER:  Can you repeat

17  one?

18   BY MS. CLAIBORN:

19    Q     Who did Attorney Aaron Mitchell negotiate

20  with at Golden Spring New York?

21    A     I don't know.  My son.

22    Q     Did you borrow the sum of $1 million from

23  Lamp Capital, LLC in February 2022?

24    A     Yes.

25    Q     Is that loan from Lamp Capital, LLC in

1    writing?

2         A    No.

3         Q    What are the loan terms of the loan from

4    Lamp Capital?

5         A    I don't know detail.

6         Q    Who are the members of Lamp Capital, LLC?

7         A    My son.

8         Q    Are there any other members of Lamp

9    Capital, LLC?

10        A    I don't know.

11        Q    Who is the managing member of Lamp

12   Capital, LLC?

13        A    I don't know.

14        Q    Who was the person at Lamp Capital who

15   authorized the loan?

16        A    My son.

17        Q    What are the assets of Lamp Capital, LLC?

18        A    I don't know.

19        Q    What does Lamp Capital own?

20        A    I don't know.

21        Q    Have you ever funded Lamp Capital in any

22   way?

23        A    No.

24        Q    Have you ever invested any money in Lamp

25   Capital, LLC?

```
 1        A     No.

 2        Q     Why did Lamp Capital loan you the $1

 3   million and not Golden Spring New York?

 4        A     I don't know.

 5        Q     What is the source of the $1 million that

 6   Lamp Capital loaned to you?

 7        A     I don't know.

 8              MS. CLAIBORN:  Why don't we take a five-

 9   minute break for the restroom?  We'll reconvene

10   actually, at 12:10.

11        (Recess)

12              MS. CLAIBORN:  We are back on the record

13   after a short break.

14              Mr. Kwok, you remain under oath.

15    BY MS. CLAIBORN:

16        Q     Mr. Kwok, were you involved in the

17   selection of the lawyers who represent you in your

18   action in London?

19        A     Yes.

20        Q     Did your counsel in London request a

21   retainer?

22        A     Yes.

23        Q     And did you pay your counsel in London a

24   retainer?

25        A     Yes.
```

```
 1        Q    How much?

 2        A    300,000 pound.

 3        Q    And when was that 300,000 pound retainer

 4   paid?

 5        A    Roughly two years ago.

 6        Q    Who funded the retainer?

 7        A    My son helped to pay -- pay that.

 8        Q    Did your son pay all of the retainer?

 9        A    Yes.

10        Q    Did your son pay the retainer out of his

11   personal funds?

12        A    Should be from the company, England.

13        Q    What was the name of the company who paid

14   the retainer?

15        A    I don't remember.

16        Q    Did Golden Spring New York pay the

17   retainer to your London counsel?

18        A    I don't remember details because other

19   than the retainer and the other -- a few more

20   payments in -- you know, after.

21        Q    Mr. Kwok, if you wanted to go buy a pair

22   of shoes, how would you pay for a pair of shoes?

23        A    I will ask Golden Spring New York to pay

24   for it.

25        Q    And how would that process work?
```

Ho Wan Kwok - April 6, 2022                          53

```
 1        A    And I will talk to the director and E Wa

 2   Wang (ph) and ask her to contact -- talk to my son

 3   and to pay for the shoes.

 4        Q    How does the shoe company get the money?

 5   The shoe store.

 6        A    I don't know.  Usually, it's E Wa Wang and

 7   communicate, because my English ability is not

 8   capable to communicate.

 9        Q    If you went to a store, tried on shoes,

10   and wanted to take them home from the store, how

11   would you pay for the shoes?

12        A    In the recent few years I basically never

13   bought a pair of shoes.

14        Q    What was the last thing you paid for?

15        A    Recently, I didn't go to buy anything.

16             MR. BALDIGA:  I'm sorry.  Could you repeat

17   that?

18             THE OFFICIAL INTERPRETER:  Recently, I

19   didn't go to buy anything.

20   BY MS. CLAIBORN:

21        Q    My question wasn't recently.  My question

22   was, what was the last thing that you purchased?

23        A    I don't remember.

24        Q    Do you ever eat in a restaurant?

25        A    Recent years, I didn't.
```

Ho Wan Kwok - April 6, 2022                                          54

1        Q      Before COVID 19, did you eat in

2    restaurants?

3        A      Very rare because I was afraid to be

4    killed by the people behind me, because I was always

5    in the process getting chased.

6        Q      When you ate in a restaurant, were you the

7    person who paid the bill?

8        A      I don't have money to pay, so that's why I

9    don't go there.

10       Q      Mr. Kwok, if you wanted to go buy a cup of

11   coffee, how would you pay for it?

12       A      I never bought a cup of coffee.  I was --

13   I'm afraid the people behind me might poison me in

14   the coffee.

15       Q      Mr. Kwok, if you wanted to buy water,

16   you're out and about and you want to buy water, how

17   would you pay for it?

18       A      Well, since 2107, I don't -- I didn't go

19   out to buy water outside.

20              THE PRIVATE INTERPRETER:  There was a

21   (indiscernible) difference in the nuance.

22              THE OFFICIAL INTERPRETER:  Can you -- can

23   you repeat it -- can you repeat --

24              THE WITNESS:  Since 2017, I never went

25   outside, walk around, and then buy water or coffee.

1    BY MS. CLAIBORN:

2         Q    Mr. Kwok, do you have any interest in any

3    mutual funds?

4         A    No.

5         Q    Do you own any bonds?

6         A    No.

7         Q    Do you own any publically traded stock in

8    any company?

9         A    No.

10        Q    Do you own any cars?

11        A    No.

12        Q    Do you have access to any cars?

13        A    Yes.

14        Q    And whose cars do you have access to?

15        A    My son's and Golden Springs.

16        Q    Does Golden Spring provide you with a car

17   that's yours to use?

18        A    Yes.

19        Q    What kind of car is that?

20        A    Maybach

21             THE PRIVATE INTERPRETER:  Maybach.

22             THE OFFICIAL INTERPRETER:  Huh?

23             THE PRIVATE INTERPRETER:  Maybach.

24             THE OFFICIAL INTERPRETER:  Maybach?  Okay.

25   I don't know the name of it.

1          THE WITNESS:  Maybach.

2     BY MS. CLAIBORN:

3          Q     Mr. Kwok, do you have a driver's license?

4          A     I have a Hong Kong's driver's license.

5          Q     Do you drive in the United States?

6          A     Almost no.

7          Q     When you do drive, whose car do you drive?

8          A     Golden Spring's.

9          Q     Do you keep a car at your Greenwich

10    residence?

11         A     Yes.

12         Q     And what car is that?

13         A     Maybach.

14         Q     Do you own any aircraft?

15         A     No.

16         Q     Have you ever owned any aircraft?

17         A     Before, yes.

18         Q     When did you own aircraft?

19         A     Probably 2010 to 2016.

20         Q     How many air craft did you own?

21         A     One.

22         Q     And what was it?

23         A     Airbus 319.  319.

24         Q     And what happened to the Airbus 319?

25         A     It was confiscated by UBS and the Chinese

1    Communist Party.

2          Q     Okay.  Do you own any water craft?

3          A     No.

4          Q     Who owns the yacht known as the Lady May?

5          A     My daughter.

6          Q     Does your daughter own the Lady May in her

7    personal name?

8          A     Should be from a company.

9          Q     And what is the name of the company that

10   owns the Lady May?

11         A     I don't know.

12         Q     Where is the Lady May currently?

13         A     I don't know.

14         Q     Since the bankruptcy filing, have you

15   asked your daughter to return the Lady May to New

16   York?

17         A     I did ask her and asked her to talk to her

18   attorney to return the boat back to New York.

19         Q     When did you have that conversation?

20         A     Last month, after the court date.  After

21   met with you.

22         Q     And what did your daughter say?

23         A     She said that she would talk to her

24   attorney and then talk to my attorney.

25         Q     Did your daughter agree to have the Lady

1    May return to New York?

2         A    She was not willing to talk to me in any

3    detail.  She want -- she wanted to talk to her

4    attorney.

5         Q    Did your daughter say no to your request

6    that she return the Lady May to New York?

7         A    No, he didn't -- she didn't.

8              THE PRIVATE INTERPRETER:  The question was

9    not completely interpreted.

10             THE OFFICIAL INTERPRETER:  I know, but she

11   -- she already -- he already answered and --

12             MR. BALDIGA:  Wait until he finishes.

13             THE WITNESS:  No, he -- no.

14    BY MS. CLAIBORN:

15        Q    Mr. Kwok, do you own or have an interest

16   in any trust?

17        A    No.

18        Q    Are you the beneficiary of any trusts?

19        A    No.

20        Q    This is a long question.  Mr. Kwok, where

21   is the $12,000 check paid to you in connection with

22   your lawsuit against Baosheng Guo?

23        A    It's in attorney's escrow account.

24        Q    What is the name of the attorney who is

25   holding the check?

```
 1        A    I can't pronounce the attorney's name
 2   completely.
 3        Q    What is the attorney's first name?
 4        A    I cannot -- I'm not able to read out the -
 5   - the pronounce his name.
 6        Q    Is the attorney who's holding the check
 7   the same attorney who represented you in that
 8   lawsuit?
 9        A    It should be.
10        Q    On your Schedule A-B, you did not disclose
11   that $12,000 check.  Why?
12             MR. BALDIGA:  Wait for a question.  No.
13   Could he interpret that?
14    BY MS. CLAIBORN:
15        Q    Why did you not disclose that $12,000
16   check?
17        A    My attorney thinks because the money is
18   not in my account, so I'm not allowed to -- we're
19   not -- I'm not supposed to disclose that.
20        Q    Okay.  Mr. Kwok, do you have any patents?
21        A    No.
22        Q    Do you have any copyrights?
23        A    No.
24        Q    Do you have any intellectual property of
25   any kind?
```

Ho Wan Kwok - April 6, 2022                              60

1      A    No.

2              MR. BALDIGA:  Excuse me.  Holley, I'm not

3    sure if you're going to come back to it, but there

4    is a reference to the $12,000.

5              MS. CLAIBORN:  I did see that.

6              MR. BALDIGA:  Oh, you said he didn't

7    disclose it.

8              MS. CLAIBORN:  He did not.  It's not in

9    response to the questions on Schedule A-B.

10             MR. BALDIGA:  It's right there.

11             MS. CLAIBORN:  We can disagree about

12    whether or not it's disclosed, but it's my position

13    that it's not disclosed.  I understand you might

14    take a different position.

15    BY MS. CLAIBORN:

16      Q    Mr. Kwok, do you own any interest in a

17    company called Ace Decade Holdings Limited?

18      A    Yes.

19      Q    What is the nature of your ownership

20    interest in Ace Decade Holdings Limited?

21      A    So I have the interest and ask for UBS to

22    pay back $500 million.  That kind of interest.

23      Q    Are you the only legal owner of Ace Decade

24    Holdings Limited?

25             THE OFFICIAL INTERPRETER:  Are you the

1      only -- can you repeat that question?

2       BY MS. CLAIBORN:

3           Q     Are you the only legal owner of Ace

4      Decades?

5           A     I am a legal representing owner.

6           Q     Are there any other owners of Ace Decade?

7           A     No.

8           Q     When did you become an owner of Ace Decade

9      Holdings Limited?

10          A     At the end of 2014.

11          Q     This is a long question.  In your

12     litigation in London against UBS, you are an

13     individual plaintiff.  What is the basis for your

14     claim as an individual plaintiff?

15          A     Because I'm the 100 percent representative

16     for Ace Decade.

17          Q     In the litigation against UBS in London,

18     there is an allegation that Ace Decade gave $500

19     million to Dawn State Limited.  Where did Ace Decade

20     get the $500 million?

21          A     I loan from my family.

22          Q     Did you borrow money from your family and

23     give it to Ace Decade?

24          A     Yes.

25               MS. CLAIBORN:  I don't think that was --

 1    let's start over, because I don't think that was --

 2    that was --

 3              THE PRIVATE INTERPRETER:  Yeah, I thought

 4    that it was --

 5              MS. CLAIBORN:  -- that was the question,

 6    because it didn't involve Dawn State --

 7              THE PRIVATE INTERPRETER:  Yes.

 8              MS. CLAIBORN:  -- so I'm going to start

 9    over.

10    BY MS. CLAIBORN:

11        Q    Where did you get the money to give to Ace

12    Decade, the 500 million?

13              MR. BALDIGA:  I don't think he said he did

14    that.  I think he said his family did that, but you

15    can ask that, but I --

16              THE WITNESS:  From my family.

17    BY MS. CLAIBORN:

18        Q    Who specifically in your family gave you

19    money that you then gave to Ace Decade?

20        A    John Way (ph).

21        Q    Who is John Way?

22        A    A member from my family.

23        Q    Is he a relative of yours?

24        A    It's my older brother's cousin or --

25              THE PRIVATE INTERPRETER:  Son-in-law.

1          THE OFFICIAL INTERPRETER:  Son-in-law?

2     Okay.  Sorry.

3      BY MS. CLAIBORN:

4          Q    On your Schedule A-B, you list a possible

5     malpractice claim against Boise Schiller.  Can you

6     please explain what that is?

7          A    He was the one -- he was the one

8     represented me in New York to have a lawsuit against

9     UBS.  He gave a lot of forced documents to the Court

10    and without my permission.  He also threatened my

11    family.  He also threaten myself after drinking.  He

12    brought a lot of loss to us, including providing any

13    English/Chinese translated documents to me before

14    present them to the -- to the lawyer, or to the

15    judge.  That's why I -- that's why we sue him.

16         Q    Have you hired an attorney to represent

17    you in that malpractice action?

18         A    My son is in the process of dealing with

19    that.

20         Q    Why is your son talking to lawyers about

21    your malpractice claim?

22         A    Because I need to borrow money from him.

23         Q    Has a lawyer been selected?

24         A    Not yet.

25         Q    Mr. Kwok, do you own an interest in any

1    company aside from Ace Decade?

2         A    No, but the -- I own the Bravo Luck, the

3    apartment, only for a few months, some of the

4    interest.  And because the apartment is a co-op, so

5    they used my name to buy the apartment after I --

6    after we bought apartment, and then we returned the

7    stock interest back.

8              UNIDENTIFIED SPEAKER:  I'm sorry.  He must

9    have spoken for 30, 40 seconds.  Clearly said more

10   than that.  Is there a more fulsome translation?

11             THE OFFICIAL INTERPRETER:  Did I miss

12   anything?

13             MS. CLAIBORN:  Let me see if I can follow

14   up.

15    BY MS. CLAIBORN:

16        Q    Mr. Kwok, do you own, currently, an

17   interest in Bravo Luck?

18        A    No.

19        Q    Mr. Kwok, do you own an interest in any

20   limited liability company?

21        A    No.

22        Q    Mr. Kwok, do you own an interest in any

23   partnership?

24        A    I used to own the plane company called the

25   Orange or Shiny Time, but that was before and

```
 1    doesn't exist anymore.
 2         Q     Mr. Kwok, do you currently own an interest
 3    in any partnership?
 4         A     No.
 5         Q     Mr. Kwok, do you currently own an interest
 6    in any joint venture?
 7         A     No.
 8         Q     Other than Ace Decade, do you own an
 9    interest in any other company right now?
10         A     No.  I only owned the Orange and Shiny
11    Time before, but not right now.
12         Q     Does Golden Spring New York have a
13    security interest in any of your litigation?
14         A     I owe them money.
15         Q     Have you granted to Golden Spring New
16    York, any interest in any of your assets, anything
17    that you own?
18         A     No.
19         Q     So if you were to win a lawsuit against
20    Golden Spring -- sorry.  Wrong name.  So if you were
21    to win a lawsuit against UBS, would any of the money
22    that you win have to be paid to Golden Spring?
23         A     Yes.
24         Q     And how much would that be?
25         A     Before it was 2,200 1 million, or --
```

```
 1                THE PRIVATE INTERPRETER:  21 million.

 2                THE WITNESS:  21 million.  21 million and

 3      plus now.  Probably it's about 300 million.  30

 4      million.  Or 30 million.  Yeah.

 5      BY MS. CLAIBORN:

 6           Q    Is there a document that says that any

 7      litigation winnings you receive need to be paid to

 8      Golden Spring?

 9           A    Yes.

10           Q    What is the name of that document?

11                THE OFFICIAL INTERPRETER:  I'm going to

12      ask him to repeat it.

13                I didn't get it.  I just ask him to break

14      it down, then I didn't hear what --

15                THE WITNESS:  I have a case in DC.  There

16      is a attorney office representing me for political

17      asylum and it was attacked by the cyber attack from

18      the Chinese Communists, and so they -- the attorney

19      office was closed, and they gave my personal

20      information to the communist party, and then I sue

21      them.  And that litigation fee, attorney fee, came

22      from Golden Spring New York.

23                I ask for the settlement for 50,000 -- $50

24      million.  If I won that money, I will give the money

25      back to Golden Springs for the money they supported
```

1    me for attorney fees.

2              THE PRIVATE INTERPRETER:  Mr. Kwok did not

3    say settlement.  Mr. Kwok just say, for a claim, not

4    a settlement.

5              THE OFFICIAL INTERPRETER:  You're asking

6    for $50 million.  Yeah.  He ask for $50 million for

7    that lawsuit, and if he win -- if he wins the money,

8    then he will return the money back to the Golden

9    Spring New York.

10   BY MS. CLAIBORN:

11        Q    My question was, what was the name of the

12   document under which you would be repaying Golden

13   Spring for your litigation?

14        A    The document is the document I --

15             THE OFFICIAL INTERPRETER:  Can you repeat

16   that one?

17             THE WITNESS:  The agreement is -- it's the

18   agreement, I borrowed the money from Golden Spring

19   New York to sue the attorney office.

20   BY MS. CLAIBORN:

21        Q    And what is the name of the agreement?

22        A    I don't remember.

23        Q    Is it a promissory note?

24        A    I don't remember.

25        Q    Is it a contract?

1         A     I don't remember clearly.

2         Q     Who prepared the document?

3         A     Attorney.

4         Q     What was the name of the attorney who

5    prepared the document?

6         A     Melissa.

7         Q     What is Melissa's last name?

8         A     I don't know.

9         Q     Did Melissa the attorney represent you in

10   drafting that document?

11        A     Yes.

12        Q     And who represented Golden Spring in

13   drafting that document?

14        A     I don't know.

15        Q     Did Golden Spring have any attorney?

16        A     Yes.

17        Q     You just don't remember who it was?

18        A     They have a lot of attorneys.

19        Q     Is there more than one written agreement

20   under which you owe money to Golden Spring New York?

21        A     Yes.

22        Q     How many agreements are there?

23        A     Kind of two or three, or three or four.  I

24   don't remember clearly.

25        Q     And does someone keep track of the money

```
 1    that you borrow from Golden Spring New York?

 2         A    My attorney will write it down.  We record

 3    it.

 4         Q    What's the name of that attorney?

 5         A    Aaron Mitchell.

 6         Q    Did you say Aaron Mitchell?

 7         A    Oh, yes.

 8         Q    And how does Aaron Mitchell keep track of

 9    the monies that you borrow from Golden Spring New

10    York?

11         A    In detail, I don't know.

12         Q    Does anyone who is employed by Golden

13    Spring New York keep track of the money that you

14    borrow from Golden Spring New York?

15         A    I don't know.

16         Q    Have you ever seen a document from

17    Attorney Aaron Mitchell showing how much you owe to

18    Golden Spring New York?

19         A    This is the thing I -- it's something

20    between me and my attorney I shouldn't answer.

21              MR. BALDIGA:  Can I -- I mean --

22              MS. CLAIBORN:  I don't think the question

23    involves --

24              MR. BALDIGA:  You can --

25              MS. CLAIBORN:  -- a privileged answer.
```

1          MR. BALDIGA:  That's -- give me a second.

2     You could answer that last question yes or no, so if

3     you ask again, I think he will say yes or no, and

4     then we can take it step by step.

5     BY MS. CLAIBORN:

6          Q    Have you ever seen a document prepared by

7     Attorney Mitchell that shows you how much money you

8     have borrowed from Golden Spring?

9          MR. BALDIGA:  Wait.  Wait, my instruction

10    needs to be interpreted.

11          THE OFFICIAL INTERPRETER:  What?

12          MS. CLAIBORN:  Can you --

13          MR. BALDIGA:  You need to instruct --

14          MS. CLAIBORN:  Just please state it and

15    he'll reinterpret.

16          MR. BALDIGA:  Please, tell the witness

17    what -- I am telling the witness he may answer yes

18    or no only.

19          THE WITNESS:  Yes.

20          MS. CLAIBORN:  I have other questions, but

21    given the hour of the day, I thought that we could

22    take a short break and then reconvene with creditors

23    being given the opportunity to ask questions.

24          I suggest we reconvene at 1:15.

25          MR. BALDIGA:  Is that okay?

1           MS. CLAIBORN:  Okay.  Thank you.  We'll

2   reconvene at 1:15.

3        (Recess.)

4           MS. CLAIBORN:  The recording has been

5   reconvened.  We are back in session after a short

6   break and Mr. Kwok, you remain under oath.

7           And that this point, Mr. Wolman has some

8   questions for you, Mr. Kwok.

9   EXAMINATION BY MR. WOLMAN:

10       Q    Good afternoon, Mr. Kwok.

11          On March 21st I was asking you some

12  questions about a prior deposition, specifically

13  about the times you had invoked your rights under

14  the Fifth Amendment of the U.S. Constitution.

15          On April 1st, 2021, were you being

16  investigated for any crime?

17          THE OFFICIAL INTERPRETER:  April 21st?

18          MR. WOLMAN:  April 1st, 2021.

19          THE OFFICIAL INTERPRETER:  Can you repeat

20  that question, sir?

21       Q    Were you being investigated for any crime?

22       A    From SET -- American SET and the

23  investigating GTV and they can communicate with our

24  attorney.

25       Q    Are you referring to the Securities and

1    Exchange Commission?

2         A    Yes.

3         Q    And what exactly were they investigating?

4              MR. BALDIGA:  Objection.

5              I need to ask whether this would reveal

6    privileged information.

7              Would your answer to the last question be

8    information from your attorneys?

9              THE PRIVATE INTERPRETER:  Can I just --

10             THE OFFICIAL INTERPRETER:  She wants to

11   help.

12             THE PRIVATE INTERPRETER:  Because he's not

13   --

14             MS. CLAIBORN:  I think you should just try

15   again. Mr. Baldiga, maybe you can just repeat

16   yourself and Mr. Jack, you can try again.

17             THE OFFICIAL INTERPRETER:  Can you repeat

18   what you want to say?

19             MR. BALDIGA:  Mr. Wolman asked you what

20   you were being investigated for.  Is the information

21   that you know, was that provided to you by your

22   attorneys?

23             THE WITNESS: Yes.

24             MR. BALDIGA:  And to answer the question

25   would you have to divulge what you were told by your

1    attorneys?

2              THE OFFICIAL INTERPRETER: Have to be what?

3    Divulged?

4              MR. BALDIGA:  Would you have to say what

5    you were told by your attorneys?

6              THE WITNESS:  Yes.

7              MR. BALDIGA:  Then I instruct the witness

8    not to answer on the basis of the attorney/client

9    privilege.

10             MR. WOLMAN:  That is not attorney/client

11   information.

12             MR. BALDIGA:  Hold on.  Let it be

13   interpreted.

14             MR. WOLMAN:  Information learned from an

15   attorney that is not specifically a communication

16   for the purpose of giving advice or receiving

17   information is not privileged information.  If your

18   attorneys says the sky is blue, that is not a

19   privileged communication.

20             MR. BALDIGA:  His is arguing with me.

21   There is not question to you.

22             MR. WOLMAN:  Mr. Baldiga, will you

23   continue to instruct your client to improperly

24   invoke the attorney/client privilege?

25             MR. BALDIGA:  I'll instruct on a question

1    by question basis.

2              MR. WOLMAN:  And this question, will you

3    maintain the instruction?

4              Mr. Kwok, are you refusing to answer my

5    question?

6              THE WITNESS:  Yes.

7              MR. WOLMAN:  And on what basis are you

8    refusing to answer my question?

9              MR. BALDIGA:  On the basis of instruction

10   from counsel on account of attorney/client

11   privilege.

12             THE WITNESS:  Because I can't answer the

13   question because of the privilege between the

14   attorney and me.

15    BY MR. WOLMAN:

16        Q    Have you been formally charged by the

17   Securities and Exchange Commission?

18        A    No.

19        Q    Has the Securities and Exchange Commission

20   closed its investigation of you?

21             MR. BALDIGA:  I have to ask again, you can

22   answer that yes or no, if you know.

23        A    No.

24        Q    Has the Securities and Exchange Commission

25   brought any charges against GTV?

Ho Wan Kwok - April 6, 2022                           75

```
 1        A    I don't know.

 2        Q    Have you been in the past five years

 3   subject to an audit by the U.S. Internal Revenue

 4   Service?

 5        A    No.

 6        Q    In the last five years have you been

 7   subject to an audit by the New York State taxing

 8   authority?

 9        A    No.

10        Q    When did you become a resident of

11   Connecticut?  On what date?

12        A    The beginning of March, 2020, roughly.

13        Q    To be clear, you say you were a resident

14   of Connecticut in March of 2020?

15        A    Yes.

16        Q    So how come in Mr. Cheng, my client's,

17   lawsuit against you you signed a statement under

18   oath indicating that you were a resident of the

19   Sherry Netherlands Hotel?

20             THE OFFICIAL INTERPRETER:  Can you repeat

21   that, counsel?

22        Q    If you were a resident of Connecticut in

23   March of 2020, you signed a statement under oath in

24   Mr. Cheng's lawsuit against you that you resided at

25   the Sherry Netherlands Hotel.
```

1      A     I don't 100 percent live in Connecticut,

2    but sometimes I live in New York also.

3      Q     When did you start living in Connecticut

4    more than 50 percent of the time?

5      A     Since March, 2020.

6      Q     You had some assets you claim seized by

7    China, correct?

8      A     It's not mine. It's from my family.  It's

9    my family's.

10     Q     Have you ever had assets seized by China?

11     A     You're talking about under my name?

12     Q     Yes.

13     A     No.

14     Q     All right.  In 2010, what was your

15   personal net worth?

16     A     No.

17     Q     That wasn't a yes or no question.

18           THE OFFICIAL INTERPRETER:  Can I repeat

19   your question again?

20           MR. WOLMAN:  Yes.

21     Q     In 2010 what was your personal net worth?

22     A     I didn't have any property.

23     Q     Have you ever had property in your name

24   over $1 million and by that I include where you

25   owned an interest in a company that interest,

1    therefore, contributes to your work?

2         A    Before 2000, yes.

3         Q    Okay.  What was your net worth in 1999?

4         A    I never calculate in detail.

5         Q    What would you estimate it as?

6         A    Roughly around 100 million.

7         Q    And what happened to that $100 million

8    worth of assets?

9         A    Because in 2000 I got a Hong Kong passport

10   and in China and they don't allow me to have any

11   property, asset.

12        Q    Have you abandoned all claims to whatever

13   assets you had in 1999?

14        A    Yes.

15        Q    Why have you abandoned your claims?

16             THE OFFICIAL INTERPRETER:  Abandoned what?

17        Q    Your claim to those assets?

18        A    Because I was not allowed to have any

19   assets in China.

20        Q    If China changed its policy, would you

21   have any right or ability to get those assets back?

22             MR. BALDIGA:  Objection.  If you know, you

23   can answer.

24        A    I don't know.

25        Q    What was your largest asset in 1999?

1      A      There was the assets from a hotel, equity

2  interest of a hotel in China.

3      Q      And who holds that interest now?

4      A      Chinese Community Party.

5      Q      Is it held in the name of the Party?

6      A      China only has one autocrat government,

7  the party, and our family's assets were taken --

8  were seized by them.

9      Q      How did your son become wealthy enough to

10  fund Golden Spring and Lamp Capital?

11      A      Because he started very early to do

12  investment and also bring brand names to China.

13      Q      Where did he get the money for his

14  investment?

15      A      I don't know.

16      Q      Ms. Claiborn asked you about agreements

17  with Golden Spring and you could not identify who

18  the lawyer was for Golden Spring.  Do you remember

19  that?

20      A      True.

21      Q      I'd like to try to refresh -- to ask you

22  potentially to refresh your memory was it a lawyer

23  named Daniel?

24          THE OFFICIAL INTERPRETER:  He's asking

25  Daniel?

1        Q     Yes, Daniel Pedolsky.

2        A     Yes, probably and he used to be Golden

3   Spring attorney and my personal attorney.

4        Q     Did you execute a waiver of conflict of

5   interest with Mr. Pedolsky?

6              THE OFFICIAL INTERPRETER:  Can you repeat

7   that?

8        Q     Did you execute a waiver of conflict of

9   interest with Attorney Daniel Pedolsky?

10       A     I don't remember.

11       Q     You mentioned two or three -- or three or

12  four agreements with Golden Spring. Can you identify

13  each of those agreements?

14       A     I'm not sure.

15       Q     Can you describe the purpose of each of

16  those agreements?

17       A     That loan from Golden Spring is to have a

18  settlement with Logan Cheng.

19       Q     And did you take out a loan to pay the

20  lawyers to sue Logan Cheng?

21       A     I don't remember.

22       Q     And what were the other agreements, other

23  than with Mr. Cheng?

24       A     From D.C. -- the attorney's office from

25  D.C. collect (indiscernible)  I don't remember the

1    name.

2              MR. WOLMAN:  All right.  Thank you and

3    this time I have to go but thank you. I'll try to

4    dial in.

5              MS. CLAIBORN:  Thank you.

6              Can I ask whoever is on the line if they

7    could mute themselves, because they can hear you

8    typing.

9              All right.  Who else would like to ask

10   questions?

11             Mr. Harbach.  Go ahead, Mr. Harbach.

12             MR. HARBACH:  Thank you.  For the record,

13   I'm David Harbach with O'Melveny and Meyers and I

14   represent PAACS.

15    EXAMINATION BY MR. HARBACH:

16        Q    Mr. Kwok, I'd like to ask some clarifying

17   questions based on questions that Ms. Claiborn asked

18   you today.

19             Earlier today she asked you if you owned

20   any foreign currency and you said no.  She also

21   asked you if you owned any digital currency and you

22   said no.

23             My question is have you ever ordered or

24   directed the purchase of either foreign currency or

25   digital currency on behalf of any entity?

1          THE OFFICIAL INTERPRETER:  Can you repeat

2     that?

3          MR. HARBACH:  Sure.

4     Q     My question is whether you have ordered or

5     directed the purchase of any foreign currency or any

6     digital currency on behalf of any entity?

7     A     What you mean direct?

8     Q     Have you directed anyone to purchase

9     foreign currency or digital currency?

10    A     No.

11    Q     Ms. Claiborn asked you a couple of

12    questions about access to credit cards and debit

13    cards. And I want to make sure that we have your

14    answer clear, because she asked you not whether you

15    had any credit cards but whether you had any access

16    to credit cards. I want to make sure that you

17    understand the difference.

18         THE OFFICIAL INTERPRETER: He's just asking

19    why you want to represent Ms. Holley's asked

20    questions.

21         MR. HARBACH:  I'm just trying to remind

22    you of a question she asked you earlier today, sir.

23         THE PRIVATE INTERPRETER:  I don't

24    understand the question.

25         MR. BALDIGA:  Mr. Baldiga's right.

 1     There's not a question pending.

 2          Q    The question is do you understand the

 3     difference between having a credit card and having

 4     access to a credit card?

 5          A    I believe I don't have.

 6          Q    You don't understand the difference?

 7          A    I don't know much.

 8          Q    Okay.  Well, let me give you an example.

 9     Let's talk about the Maybach.

10               I believe that you represented to us today

11     that you have access to the Maybach for

12     transportation.  Is that correct?

13          A    Yes.

14          Q    But I believe it's also your position that

15     you do not own the Maybach.  Isn't that right?

16          A    Yes.

17          Q    In other words, your position is the

18     Maybach is not yours, right?

19          A    Yes.

20          Q    Okay.  So I use that example to illustrate

21     the example between owning something and having

22     access to something.  Does that help you?  Do you

23     understand the difference?

24          A    Now I understand you.

25          Q    Okay.  Thank you.  So returning to the

1    question about credit cards and debit cards.  Do you

2    have access to any credit cards or debit cards,

3    whether or not they are yours?

4        A    I don't understand the difference what he

5    means, access like if I use it myself or if I have

6    somebody else use it.

7        Q    Well, let's take those one at a time.

8    Let's begin with using it yourself.  Has any member

9    of your family ever provided you a credit card or a

10   credit card number to use for yourself?

11       A    I never used.

12       Q    The other example you mentioned was

13   perhaps a member of your family using a credit card

14   on your behalf.  Is that something that has

15   happened?

16       A    What do you mean represent me to use?

17       Q    I'm asking about whether to your knowledge

18   any member of your family has ever used a credit

19   card or a debit card to purchase things for you?

20       A    My son, my daughter, my wife.  They all

21   have credit card to buy things for me.

22            THE PRIVATE INTERPRETER:  The witness did

23   not say that, use the credit card to buy things for

24   me.  The witness said that my son, my wife bought

25   things for me.

1          THE OFFICIAL INTERPRETER:  Yeah, they used

2    their card and they both -- they all have it.  They

3    all have the cards.  That's what he said.

4          (Repeats interpretation)

5          THE OFFICIAL INTERPRETER:  Yes, I did it

6    right.

7          THE WITNESS:  And so my wife and my son

8    and my daughter have their own cards and also other

9    family members use their cards to buy things for me.

10        Q    Is that ever at your direction?

11        A    No.

12        Q    Never.

13        A    No.

14        Q    Is it at your request?

15        A    No.

16        Q    Is Yan Ping Wang, the same as Yvette Wang?

17        A    Yes.

18        Q    Earlier Ms. Claiborn asked you about

19   Golden Spring Hong Kong.

20             You told her that your son owns it.  Do

21   you recall that?

22        A    Yes.

23        Q    My question for you is since when has your

24   son owned Golden Spring Hong Kong?

25        A    I don't know.

1          Q     Has anyone else besides your son ever

2    owned an interest in Golden Spring Hong Kong?

3          A     I don't remember.

4          Q     You also said that you didn't remember

5    whether you were ever a corporate officer of Golden

6    Spring Hong Kong?

7                THE OFFICIAL INTERPRETER:  Can you repeat

8    that one?

9          Q     You also said that you did not remember

10   whether you were ever a corpora officer of Golden

11   Spring Hong Kong?  Does that mean that it is

12   possible that you were and you're just not certain?

13         A     I don't remember.

14         Q     Ms. Claiborn asked you in a few different

15   ways about whether you know how Golden Spring New

16   York is funded or makes money.

17               Since when has Golden Spring been paying

18   your personal living expenses?

19         A     2015.

20         Q     So six or seven years approximately?

21         A     Since 2015 and that there was a person

22   called Bruno Wu from Mainland China and called my

23   family, my son, daughter and wife and so since then

24   I start spending money coming from Golden Spring New

25   York.

1          THE PRIVATE INTERPRETER:  I don't think

2     the witness says some.

3          THE OFFICIAL INTERPRETER:  What?

4          THE PRIVATE INTERPRETER:  I don't think

5     the witness said some.

6          THE WITNESS:  Not including the son that

7     they caught, my wife and daughter and a lot of my

8     family members, but not my son.

9          Q    So approximately six or seven years that

10    Golden Spring has been paying your personal

11    expenses.  Is that right?

12         A    Yes.

13         Q    During those six or seven years did you

14    never discuss with any of your family members where

15    the money was coming from?

16         A    Because a lot of my family members were

17    caught by -- were arrested by your client, Bruno Wu,

18    and so I have no communication. I cannot communicate

19    with him.

20         THE PRIVATE INTERPRETER:  Not exactly. The

21    partner of PAACS -- the partner who the counsel was

22    represented, PAACS -- partner of PAACS --

23         THE OFFICIAL INTERPRETER:  I don't know.

24    He didn't mention anything about PAACS.

25         THE WITNESS:  So it's the other attorney

1    representing the client, Bruno Wu, arrested a lot of

2    your family members.  Your client's past partner,

3    one of the partners, (indiscernible)  Bruno Wu and

4    arrested a lot of your family members so you can't

5    communicate with them.

6         Q    At any time since 2015 have you been in

7    communication with your daughter, or your wife, or

8    your son?

9         A    Yes.

10        Q    At any time that you've been in

11   communication with any of those three individuals

12   did you ever ask them about where Golden Spring's

13   money was coming from?

14        A    Yes, I asked.

15        Q    And who did you ask?

16        A    I asked all three of them.

17        Q    And what did they say?

18        A    They told me because I was in the position

19   of being chased so don't ask our own financial

20   information.  Don't ask me for anything and we will

21   help you to -- we will help you as much as we can.

22        Q    When was that?

23        A    After 2017.

24        Q    How long after 2017?

25        A    I don't remember.

1      Q     And when you had this conversation with

2    your family were the three of them together or where

3    these separate conversations?

4      A     Separate.

5      Q     And each of the three of them said more or

6    less the same thing?

7      A     Similar.

8      Q     So I want to make sure I have this

9    correct.  You asked each of them where Golden

10   Springs money was coming from and each of them said

11   to you don't ask me about that because -- finish the

12   sentence for me.

13     A     So you are making a story I don't

14   understand.

15     Q     I'm trying to ask you to help me

16   understand.  I'm trying to understand the reason why

17   your family members told you not to ask why your

18   family members told you not to ask about where

19   Golden Spring got the money.

20           MR. BALDIGA:  Let him ask you a question.

21     Q     Please tell me why each of your family

22   members told you not to ask them about where Golden

23   Spring money came from?

24           MR. BALDIGA:  Objection.  If you know.

25           THE OFFICIAL INTERPRETER:  You're asking

1    to object the question?

2              MR. BALDIGA:  I objected.

3              THE OFFICIAL INTERPRETER:  Oh, you

4    objected.

5              MR. BALDIGA:  I permit him to answer if he

6    knows.

7              THE OFFICIAL INTERPRETER:  Okay.

8              THE WITNESS:  My daughter and wife were

9    arrested by his partner and got released 2017 and

10   released to New York.  They were tortured

11   tremendously by communist party.  The person

12   tortured them is this attorney's partner.  They all

13   have their own attorneys.  They told me don't ask me

14   or communicate with me about their own financial and

15   personal information.  Anything you want to do it's

16   better go through attorneys.

17             This is the doctrine, the thing, my family

18   members told them before they came to New York.  I

19   just want to tell you it's the meaning, very similar

20   meanings, but I can't tell you word by word.

21             So I don't want this counsel make any

22   stories about my daughter -- about my daughter's

23   forgery, giving false testimony.  That kind of

24   story.

25             The last time when we were here with Ms.

1    Holley and he was making false lies and saying I'm

2    using my Twitter account and saying that the judge

3    in New York was communist party and I didn't even

4    have a Twitter account.

5         MR. HARBACH:  Just so the record's clear

6    today is the first that I've uttered a word in

7    connection with this litigation in court.  So I

8    don't think you're talking about me, sir.

9         THE WITNESS:  I was saying last time was

10   from attorney in your office.  The prior attorney

11   before you called Andy Morse (ph) and was kicked out

12   by the judge because he was making false claims for

13   five years and was kicked out by the judge.  So the

14   law office was always making false claims.

15        MR. BALDIGA:  Just answer his question

16   because I can't know whether to object unless you're

17   just trying to answer his question.

18        THE WITNESS:  I didn't talk to my family,

19   daughter and wife individually to say the same

20   thing. If I say the same thing, same words, that

21   will be making false story.

22        MR. HARBACH:  I understand.

23        THE WITNESS:  You cannot use your

24   imagination and put it into my head.  This is why

25   the New York South District and the judge was

1    (indiscernible)  by them and they give me the wrong

2    sentencing.

3              UNIDENTIFIED:  Can you say that last --

4              THE WITNESS:  Because of their false

5    claims, so that's why the judge from the south

6    district of New York, the judge, gave me the wrong

7    sentencing.

8              THE PRIVATE INTERPRETER:  And also the

9    interpreter did not interpret fully counsel's

10   instruction to the witness previously about his

11   objection.

12             MS. CLAIBORN:  If you want to repeat it,

13   go ahead.

14             MR. BALDIGA:  I think you just have to

15   listen to these questions and answer just these

16   questions.

17             MR. HARBACH:  Sorry.  Counsel will move to

18   a different topic.

19    BY MR. HARBACH:

20      Q    Mr. Kwok, Ms. Claiborn asked you today

21   about a $21 million debt that you owe to Golden

22   Spring.  She asked you how much of that 21 million

23   was legal fees and your answer was I think most of

24   it.

25        I'd like to know what you meant by most of it.

1    Did you mean $11 million or do you mean close to $21

2    million.

3         A    I don't remember.

4         Q    Do you still believe that most of it was

5    for legal fees?

6         A    I don't remember.

7         Q    You also mentioned the Logan Cheng

8    settlement and that there was money borrowed from

9    Golden Spring in connection with that.

10        A    Yes.

11        Q    How much money was that loan for?

12        A    I don't remember exactly.  Probably like

13   200.  Two -- $300,000.

14        Q    What were the terms of that loan from

15   Golden Spring?

16        A    I don't remember.

17        Q    When Ms. Claiborn asked you if you had

18   ever been to Golden Spring's offices in New York,

19   you said yes.

20        What's the address of those offices?

21        A    Yes.

22        Q    What is the address of those offices?

23        A    64th Street, 162.

24        Q    You also mentioned that the last time you

25   were there was yesterday and that the reason you

1    went there was to prepare for today's meeting.

2             Who did you meet with there?

3        A    My attorney.

4        Q    Did you meet with anyone else besides your

5    attorney to prepare for today's meeting while you

6    were at the office?

7        A    I don't know what you mean, the other

8    people.

9        Q    Well, did you meet with anyone who works

10   for Golden Spring?

11       A    Yes, I met Yvonne Wang.

12       Q    And this was yesterday?

13       A    Yes, I met her yesterday.

14       Q    Did you ask some questions of her

15   yesterday?

16       A    No.

17       Q    And tell me about your conversation with

18   Ms. Wang?

19       A    What do you mean?

20       Q    Well, I'd like to know what you talked

21   about with her.

22       A    I ask her to arrange the food to eat and

23   the coffee.

24       Q    Is that all?

25       A    And also we talked about how to abolish

 1    communist party.

 2         Q    I want to make sure I get this right. I

 3    think you said --

 4              MR. BALDIGA:  Excuse me. Can I hear the

 5    last thing again.

 6              THE WITNESS:  We talk about how to abolish

 7    communist party.

 8              MR. BALDIGA:  Thank you.

 9         Q    Ms. Wang is an officer of Golden Spring,

10    correct?

11         A    Yes.

12         Q    And you directed her to bring coffee,

13    right?

14         A    No, I didn't direct her. I'm just hoping

15    her to bring some coffee.

16         Q    You were hoping or helping?

17         A    Help.

18         Q    You were helping.  Because my question to

19    you was what you talked about with Ms. Wang.  And I

20    thought you said you asked her to bring some coffee

21    or maybe even told her to bring some coffee.

22         A    No, your attorney office -- you attorney

23    office making and imagining things again.

24         Q    I'll ask the question again.

25              MR. BALDIGA:  Please ask a question. Don't

1    put words in his mouth.

2         Q    What did you discuss with Ms. Wang

3    yesterday?

4         A    Do you want me to talk about in detail? I

5    can talk about this for hours.

6         Q    Well, no, not if the detail concerns how

7    to overthrow the Chinese Communist Party. So I'll be

8    more precise.

9         A    So you don't want us to abolish Chinese

10   Community Party.  Our job is to abolish Chinese

11   Communist Party.

12             MR. BALDIGA:  Just answer the question.

13             THE WITNESS:  You don't have a question.

14   You're just directing something.

15        Q    Sometimes I speak in segments to allow the

16   interpreter to translate.

17             MR. BALDIGA:  I think it would be helpful

18   if you just ask question and then the witness --

19   I'll instruct him to answer your questions.  That

20   would be helpful.

21        Q    Did you discuss with Yvette [sic]

22   yesterday anything related to preparing for the

23   meeting today?

24        A    Yes.

25        Q    What did you discuss?

Ho Wan Kwok - April 6, 2022                    96

1      A    I ask her to bring those documents here.

2      Q    Anything else?

3      A    I don't remember.

4      Q    When was Lamp Capital created?

5      A    I don't know.

6      Q    Why was Lamp Capital created?

7      A    I don't know.

8      Q    Who created Lamp Capital?

9      A    My son.

10     Q    How do you know that?

11     A    Because I borrow money from my son to pay

12  attorney fee.

13     Q    The question is how do you know that your

14  son created Lamp Capital?

15     A    Because my son said it.

16     Q    He told you himself.

17     A    Yes.

18     Q    Did he ask for any advice from you about

19  whether to create Lamp Capital?

20     A    No.

21     Q    Did he ask you your opinion on whether he

22  should create Lamp Capital?

23     A    No.

24     Q    Did he tell you why he was creating Lamp

25  Capital?

1      A    No.

2      Q    When you were talking about your

3 malpractice claim against Boise Schiller, you

4 mentioned someone you kept referring to as he. I'd

5 like to know who that person is?

6      A    I don't know what you mean.

7      Q    Yes, that was a bad question. I apologize.

8           You stated that there was someone who gave

9 false documents to the court without your

10 permission.  That this person threatened your

11 family, that this person threatened you after

12 drinking and that this person brought lots of loss

13 to you and your family, including not providing

14 translated documents before presenting them to the

15 judge.

16          My question is who is that person?

17     A    Schiller.  The Attorney Schiller.

18     Q    So Mr. Schiller of the Boise Schiller law

19 firm.  Have I got that right?

20     A    Yes.

21     Q    Thank you. Do you have an understanding of

22 what business Lamp Capital is engaged in, if any?

23     A    No.

24     Q    Different subject.  You said several times

25 today in connection with your answers that the

1    people behind me have done certain things.

2     Who are you talking about?

3         A    One person behind me, there is a boss

4    called Bruno Wu.  He paid the case that -- the rape

5    case from (indiscernible)  rape case.  Also there is

6    a creditor here and that also was paid by Bruno Wu.

7    That attorney fee was paid by Bruno Wu.  And Bruno

8    Wu is also his partner and he invested $800 million.

9    Bruno Wu's partner is also (indiscernible)  previous

10   officer and they were investigating and they

11   combined a partner with them to investigate my case.

12        So April 18, 2017, so this (indiscernible)

13   start suing me, bring the lawsuit.  Within this 24

14   hours Bruno Wu is sending me the red note and they

15   start bringing the lawsuit.

16             MR. HARBACH:  Can I stop --

17             THE WITNESS: The Chinese Communist Party

18   stopped the interview, the VOA interview with me.

19   They happened at the same time.

20             MR. HARBACH:  Or I can let him go.

21             THE WITNESS:  All the documents made by

22   this attorney firm were all false.  They provide a

23   false document to the South District of New York

24   court.  They even false claim on my daughter's

25   yacht.  The boat is mine.  They sought the judge

1    from the South District Court and I file the

2    bankrupt -- personal bankruptcy case twice and the

3    day -- they (indiscernible)  twice including Ms.

4    Holley.  And Ms. Holley was present.

5            The first time when Ms. Holley was present

6    in the court and they false testified saying -- and

7    they said my daughter was giving false testimony for

8    the Sherry bankruptcy case because my daughter never

9    participated in that case.

10           And Ms. Holley was there, was present the

11   second co date and Ms. Holley was there also.  The

12   attorney from the firm was telling the judge and

13   they said that I used the Twitter account to -- and

14   they said on the Twitter and I was saying on the

15   Twitter the south district judge was communist party

16   member.

17           You can see here all the people behind me

18   and one is Bruno Wu and one person paid in many

19   cases --

20           MR. HARBACH:  I'd like to ask another

21   question.

22    BY MR. HARBACH:

23       Q    Are you aware one way or the other whether

24   your bankruptcy counsel, the Brown Rudnick law firm,

25   has ever previously represented Bruno Wu?

1          THE OFFICIAL INTERPRETER:  Can I take a

2    little break?  I just can't concentrate as much.

3    Just too much.  Can I take a break?

4          MS. CLAIBORN:  Can I ask you to ask that

5    question and then we'll take a break?

6          THE OFFICIAL INTERPRETER:  Yes.  Can you

7    repeat that question?

8          MR. HARBACH:  I'd be happy to.

9      Q    Are you aware one way or the other of

10   whether your bankruptcy counsel, the Brown Rudnick

11   law firm, previously represented Bruno Wu?

12         THE OFFICIAL INTERPRETER:  Represent

13   somebody else you said?

14         MR. HARBACH:  Yes.  Bruno Wu.

15     A    No.

16         MS. CLAIBORN:  I'm going to take a short

17   break. We're going to be back here at 2:45.

18     (Break)

19         MS. CLAIBORN:  All right.  We are back on

20   the record after a short break.

21         Mr. Harbach, the floor is yours.

22         MR. HARBACH:  Thank you.

23   BY MR. HARBACH:

24     Q    Ms. Kwok, among the documents in front of

25   you, document 78 filed in this case.

1          THE OFFICIAL INTERPRETER:  Which document?

2     This one?

3          MR. HARBACH:  Yes. My apologies. Counsel

4     advises me that your copies are not stamped.

5     Q     I'm talking about your official from 106.

6     So my question for you starts on page 9, which

7     contains a heading that says Schedule D, creditors

8     who have claimed (indiscernible)  by the property.

9     Are you with me?

10          You checked the box yes.  And were

11     directed to Schedule D, so that's where I would like

12     you to flip to, please.  And it's at page 18.

13          MR. BALDIGA:  What's the title?  He can

14     maybe find it better with the title.

15          MR. HARBACH:  Okay. It's the little chart

16     that is Schedule D, which is a list of creditors

17     with secured claims.

18     BY MR. HARBACH:

19     Q     Mr. Kwok, you'll see that there are five

20     separate entries for Golden Spring New York Limited.

21     The data in each column is identical for all five

22     rows.

23          So my question is why are there five

24     identical entries on this schedule?

25          The question is why are there five

1    identical entries on this schedule?

2         A    I don't know what that means five --

3         Q    Well, each row is exactly the same.  And

4    I'm just asking why there are five rows with the

5    same information?

6         A    I don't know.

7         Q    Among that documents that you filed were

8    some specific notes and one of those notes discusses

9    the residence on Taconic Road.

10             MR. HARBACH:  And for counsel I'm at

11   document 77, page 4.

12             THE OFFICIAL INTERPRETER:  Which page?

13             MR. HARBACH:  Page 4.

14             THE OFFICIAL INTERPRETER:  84?

15             MR. HARBACH:  No, Page 4.

16             THE OFFICIAL INTERPRETER:  Oh, page 4.

17   Okay.

18    BY MR. HARBACH:

19        Q    My question really isn't so much about the

20   exact test as it is the substance.

21        So first question, is it true that all expenses

22   related to the Taconic Road House are paid directly

23   by family and family controlled enterprises?

24        A    Yes.

25        Q    Okay.  Which family members?

1       A     My wife, sometimes by my son.

2       Q     Which family controlled enterprises?

3       A     Which country -- my wife.

4       Q     Your wife's not an enterprise.  I'm trying

5   to ask which family controlled enterprises pay the

6   expenses for the Taconic House?

7       A     Greenwich LLC.

8       Q     Okay.  Incidentally, how do you know that

9   your wife and sometimes you son pay these expenses?

10      A     Because I live there.

11      Q     Do you observe them pay the expenses?

12      A     Yes.

13      Q     Is that ever at your request?

14      A     I don't remember I request anything.

15      Q     Does Greenwich Land LLC -- yes Greenwich

16  Land LLC own any other real estate besides 373

17  Taconic Road?

18      A     I don't know.

19      Q     Do you know anything about the property

20  located at 33 Ferncliff in Cos Cob, Connecticut?

21            THE OFFICIAL INTERPRETER:  Can you repeat

22  that?

23            MR. HARBACH:  Yes.

24      Q     33 Ferncliff in Cos Cob, Connecticut.

25            THE OFFICIAL INTERPRETER:  31, right?

```
 1              MR. HARBACH:  No, 33.

 2         A    Yes, now I remember it. It's also owned by

 3    my wife's company.

 4         Q    That being Greenwich Land?

 5         A    Maybe.

 6         Q    Do you know?

 7         A    I'm not sure.

 8         Q    Have you ever been to 33 Ferncliff?

 9         A    Yes.

10         Q    How recently?

11         A    No.  Not recently.

12         Q    Do you know when Greenwich Land purchased

13    33 Ferncliff?

14         A    I don't remember.

15         Q    Do you know approximately how much money

16    it cost?

17         A    Probably more that $1 million.

18         Q    Does $1.37 million sound about right?

19         A    I'm not sure.

20         Q    And does the approximate purchase date of

21    September, 2019 sound about right to you?

22         A    Not sure.

23         Q    Turning back to 373 Taconic for a moment.

24    How much was that property purchased for?

25         A    Probably 400 to 500,000.
```

| 1 | THE PRIVATE INTERPRETER:  No, no, no. |
| 2 | THE OFFICIAL INTERPRETER:  4 to 5 million. |
| 3 | I'm sorry. |
| 4 | Q    Approximate time of purchase of 373 |
| 5 | Taconic, if you know? |
| 6 | A    I don't know. |
| 7 | Q    Have you ever resided at 33 Ferncliff? |
| 8 | A    No. |
| 9 | Q    Do you know whether anyone currently lives |
| 10 | there? |
| 11 | A    Before there is another comrade maybe, you |
| 12 | know, for disjoined Chinese Communist Party and he |
| 13 | was to live there. |
| 14 | Q    How long ago? |
| 15 | A    Probably one to two years ago. |
| 16 | Q    DO you remember that person's name? |
| 17 | A    Yes. |
| 18 | Q    What is it? |
| 19 | A    Wong Din Gong (ph). |
| 20 | Q    Does anyone currently live there, if you |
| 21 | know? |
| 22 | A    I don't know. |
| 23 | Q    Talking about 373 Taconic, where did the |
| 24 | money come from to purchase that property? |
| 25 | A    I don't know. |

1      Q     Do you know whether the house was

2   purchased with cash or financing?

3      A     I don't know.

4      Q     Same questions for 33 Ferncliff.  Do you

5   know where the money came from to purchase that

6   house?

7      A     I heard it was purchased by cash.

8      Q     From whom -- sorry. From whom did you hear

9   that?

10     A     I don't remember.

11     Q     Do you know where that money came from?

12     A     I don't know.

13     Q     Do you know what Saraca Media Group is?

14     A     Saraca?

15     Q     Saraca.

16     A     Saraca Media Group.  I do.

17     Q     What is Sirraca Media Group?

18     A     Just Saraca.  It's a company.

19     Q     What kind of company?

20     A     I'm not sure.

21     Q     Have you ever had any relationship with

22   Saraca personally?

23     A     No.

24     Q     Do you know anything about the type of

25   business that Saraca conducts?

1        A      I remember they are related to GTV Media

2    platform, or they invested on the GTV Media

3    platform.

4        Q      How do you know that?

5        A      Because I was their consultant, who owned

6    the consultant.  And also I was the GTV host.  And

7    also this is one of the input and platform for

8    disjoined communist party.

9        Q      When you said you were a consultant a

10   moment ago was that for Saraca or for GTV?

11       A      GTV.

12       Q      Has Saraca ever been -- ever had the 162

13   East 64th Street address associated with it?

14              THE OFFICIAL INTERPRETER:  Which address?

15   Can you repeat that one.

16       Q      Yes.  162 East 64th Street.  The question

17   is whether Saraca has ever been associated with that

18   address?

19       A      I don't know.

20       Q      That is the family office address,

21   correct?

22       A      It's one of them.

23       Q      Where are the other ones?

24       A      I don't know.

25       Q      Are there any others in New York City?

1          A      I just want to clarify.  Golden Spring is

2     one of the companies in this building, 162.

3          Q      Understood and thank you.

4                 We've referred to the family office during

5     your questioning and I just want to be clear.  When

6     we talk about the family office are we referring to

7     that address on East 64th Street?

8          A      Yes.

9          Q      Has GTV ever been associated with the

10    family office address?

11         A      I don't know.

12         Q      Who owns Saraca?

13         A      My son.

14         Q      Since when?

15         A      I don't know.

16         Q      Does Saraca currently exist?

17         A      I don't know.

18         Q      Do you have any idea how many -- do you

19    know anything about the value of Saraca's assets?

20         A      I don't know.

21         Q      Do you know anything about payments Saraca

22    has made to GTV?

23         A      No, I don't know.

24         Q      Has your wife ever told you about any

25    multi-million dollar payments from Saraca to

1      Greenwich Land?

2          A    I don't know.

3          Q    You don't know whether he's ever told you

4      or you don't know about the payments?

5          A    She never told me and I don't even know

6      how much.

7          Q    Do you know a company called Ziba Limited,

8      Z-I-B-A?

9               THE OFFICIAL INTERPRETER:  Ziba, Z-I-B-A?

10              MR. HARBACH:  Yes.

11         A    I don't know.

12         Q    I'm sorry if I've already asked this.

13     What is the relationship, if any, between Saraca and

14     GTV?

15         A    Saraca is the investor for GTV.

16         Q    Do you know how much money Saraca invested

17     in GTV?

18         A    I don't know.

19         Q    When was GTV founded?

20         A    2020.  Maybe 2019.  Not very sure.

21         Q    Do you know the names of any of the

22     officers or directors of Saraca?

23         A    I don't know.

24         Q    Do you know whether Yvette Wang is an

25     officer or director of Saraca?

```
 1        A    I don't know.

 2        Q    Do you know someone called Hong Chung

 3   Wang?

 4        A    Yes.

 5        Q    Who is that?

 6        A    He's my partner and also comrade for

 7   disjoined Communist Party.

 8        Q    Is he a friend of yours?

 9        A    Friend, comrade and a partner.

10        Q    What do you mean by partner?

11        A    Because we had a business corporation.

12        Q    Tell me about that.

13        A    Well, I don't remember the name of that

14   company.  It's a company for investigating Communist

15   Party in USA doing money laundering and committing

16   crimes.

17        Q    Was it a for profit company?

18        A    I don't know.

19        Q    You don't know?

20        A    I don't know.

21        Q    What was the name of the company?

22        A    I don't remember when getting to English.

23   I don't remember the name.

24        Q    Approximately what time frame where you

25   partners with Hong Chung Wang in this company?
```

1      A    I don't remember.

2      Q    Within the last three years?

3      A    It must be more than three years ago.

4      Q    More than ten years?

5      A    No.

6      Q    Did Hong Chung Wang ever have any

7   connection to Saraca?

8      A    I don't know.

9      Q    Was he ever an officer or director of

10  Saraca?

11     A    I don't know.

12     Q    What does the G in GTV stand for?

13     A    God.  The Goal, like in -- G-O-A-L.

14     Q    The English word "goal"?

15     A    Yea.  Goal or God.

16     Q    Okay.  How long have you known Hong Chong

17  Wang?

18     A    I don't remember.

19     Q    More than ten years?

20     A    Roughly.

21     Q    And do you still consider him a friend

22  today?

23     A    Yes.

24          MR. HARBACH:  Just a moment, please.

25     Q    There's been many questions today about

1      Golden Spring funding your living expenses.

2          Is it correct that as far as your living

3      expenses are concerned that none of that is expected

4      to be repaid?

5          A    Yes, true.

6          Q    And so those monies are not the subject of

7      any formal agreement, correct?

8          A    No.

9          Q    And those monies essentially then are a

10     gift to you, correct?

11         A    Yes.

12         Q    What's the Rule of Law Foundation?

13         A    What does that mean?

14         Q    The question is what is it?

15             THE OFFICIAL INTERPRETER:  The Rule of Law

16     Foundation?

17             MR. HARBACH:  Yes, sir.

18             THE OFFICIAL INTERPRETER:  I didn't get

19     it.  Can you ask it another way?

20         Q    There's an entity called --

21             THE OFFICIAL INTERPRETER:  Oh.

22         Q    -- the Rule of Law Foundation.

23             THE OFFICIAL INTERPRETER:  Okay.

24             MR. HARBACH:  I'll hopefully save some

25     time by just asking this question instead.

1      Q      Are you familiar with the Rule of Law

2   Foundation?

3      A      Yes.

4      Q      Were you involved in its establishment?

5      A      Yes.

6      Q      Did you contribute any money to it when it

7   was formed?

8      A      Not myself.

9      Q      Did you direct any entity to contribute to

10   the Rule of Law Foundation?

11      A      Suggestion in a direct and suggesting any

12   difference --

13      Q      If there was a suggestion, please tell me

14   it was a suggestion.

15      A      I didn't direct anybody or order anybody.

16   I just always suggest people to make donations for

17   the Foundation.

18              THE PRIVATE INTERPRETER:  As an

19   interpreter, I think that if the witness is asking

20   the interpreter questions, the interpreter should

21   interpret the question asked by the witness instead

22   of answer that question.

23              THE OFFICIAL INTERPRETER:  I can answer

24   anything.

25              THE PRIVATE INTERPRETER:  The witness said

1    are you talking about the (indiscernible)  --

2              THE OFFICIAL INTERPRETER:  That's why I

3    relayed the questions to the attorney.

4              THE PRIVATE INTERPRETER:  You answer him

5    yes, and then you say that.

6              THE OFFICIAL INTERPRETER:  Oh, for God's

7    sake.  I didn't say -- did I miss anything?

8         (Interpretation.)

9              THE OFFICIAL INTERPRETER:  Okay.  No

10   question.  He said no question was not answered.

11    BY MR. HARBACH:

12        Q    Did you ever suggested to any of your

13   family members that they donate to the Rule of Law

14   Foundation?

15        A    Yes, I did suggest.

16        Q    Did any of your family members or the

17   family controlled enterprises contribute money to

18   the Rule of Law Foundation?

19        A    Yes.

20        Q    How much money?

21        A    For cash there is one -- over $1 million.

22             From Hong Kong, Japan and Mainland -- in

23   China and all combined it should be more than 30

24   million.

25        Q    And just focusing for the moment on

1    contributions from your family at your suggestion.

2    Approximately, how much money is that?

3         A    I don't know the details.  Because of

4    security reasons they don't want me to know.

5         Q    Did you say a moment ago that your family

6    contributed over a million dollars?

7         A    One million cash is in New York here.

8         Q    When was that?

9         A    I don't remember.

10        Q    Is the reason -- well, let me ask it this

11   way.  Did you suggest an amount to your family

12   members that they should contribute to the Rule of

13   Law Foundation?

14        A    I want them to donate the more the better.

15        Q    Is that what you told them?

16        A    Yes.

17        Q    Do you know whether the Rule of Law

18   Foundation is associated with the family office

19   address on 64th Street?

20        A    Yes.

21        Q    Did you ever make a $100 million donation

22   to the Rule of Law Foundation in November of 2018?

23             THE OFFICIAL INTERPRETER:  Can you repeat

24   that again?

25        Q    Did you ever make a $100 million donation

1    to the Rule of Law Foundation in November, 2018?

2         A    No. In the live stream like I want --

3    tried to collect the funds, in the live stream show.

4         Q    Did you ever --

5              MR. BALDIGA:  Wait.  Was that his whole

6    answer?

7              THE OFFICIAL INTERPRETER:  Yeah. Something

8    wrong?

9              THE PRIVATE INTERPRETER:  Not quite

10   exactly what the witness said.

11             (Indiscernible)  broadcasting is okay.

12   Live stream is okay.  But collect money --

13             THE OFFICIAL INTERPRETER:  Asking for

14   donation, right?

15        (Interpretation)

16             THE PRIVATE INTERPRETER:  Raise --

17             THE WITNESS:  Raising money, raise

18   donations.  Yeah, in the live stream broadcast

19   thing, or whatever, you know, asking for donations

20   to -- you know, to raise funds, to raise money.

21        Q    Did you ever promise to donate $1 billion

22   to the Rule of Law Fund?

23             THE OFFICIAL INTERPRETER:  10 billion you

24   said?

25             MR. HARBACH:  No, sir.  1 billion.

```
 1              THE OFFICIAL INTERPRETER:  Oh, one
 2    billion.
 3         A    I don't remember.  I don't remember.
 4         Q    Do you mean that it's possible that you
 5    made that promise?
 6         A    So we could reach that goal if we combine
 7    the organizations all over the world.
 8         Q    Understand.  And it's a simple question.  I
 9    just don't know the answer.
10              Did you yourself ever promise to donate $1
11    billion to the Rule of Law fund?
12         A    In the past five years I did the live
13    stream over 5,000 times.  Some of the live stream
14    could have reached four or five hours.  It's hard
15    for me to remember every sentence I said.
16         Q    Well, I understand that, but I'm only
17    asking about one issue.  And it is whether you ever
18    promised publicly, or privately or anyhow to donate
19    $1 billion to the Rule of Law Fund?
20              THE PRIVATE INTERPRETER:  He did not say
21    invest.
22              MR. HARBACH:  Donate
23              THE OFFICIAL INTERPRETER:  Yeah, donate.
24         A    I don't remember.
25         Q    I'll ask this one one more time.
```

1          Are you saying that it is possible that

2   you made such a promise.  You just can't be sure?

3       A    In front of Ms. Holley I wouldn't say

4   anything is possible but this is a very serious

5   issue.  Now they start the scheme again.

6       Q    Well, this isn't what did you have for

7   breakfast three days ago.  This is did you promise

8   to donate $1 billion and if the answer is you don't

9   know, that's okay.

10          MR. BALDIGA:  I think that's what the

11  answer has been.

12          MR. HARBACH:  No, the answer has been I

13  don't remember.

14          MR. BALDIGA:  Don't remember.

15          MR. HARBACH:  Yes, sir. That's a little

16  different.

17      Q    So the answer might be no, but you're not

18  saying no.  You're saying you don't remember.

19      A    I said it three times, I don't remember.

20          MR. BALDIGA:  There's no question --

21      A    Because in the past five years

22  (indiscernible)  always making these kind of answers

23  for me so that's why the judge from the South

24  District were fooled by you and you started again --

25      Q    I'll move on.

Ho Wan Kwok - April 6, 2022

1     A     In the South District court I only met
2   judge 20 seconds. I didn't say one sentence within
3   this five years and I was fined a total about $300
4   million because that's what they did.
5          MR. BALDIGA:  All right. Let's stop it.
6   Let's wait for a question and we'll answer the
7   question.
8          MR. HARBACH:  Bill, I appreciate your
9   patience.  I'll move on.
10          MR. BALDIGA:  Translate what I said,
11   please.
12          THE OFFICIAL INTERPRETER:  Can you repeat
13   that?  Everybody's saying at the time.
14          MR. BALDIGA:  Ask a question and he'll
15   answer a question.
16     Q     Have you made any donations to the Rule of
17   Law Foundation in the last two years?
18     A     Myself, right?
19     Q     Yes, sir.
20     A     No.
21     Q     Have you suggested to any of your family
22   that they make donations to the Rule of Law
23   Foundation within the last two years?
24     A     I don't remember.
25     Q     Would you ever have made a promise to

1    donate $1 billion to the Rule of Law Foundation if

2    you did not actually have that money?

3              MR. BALDIGA:  Objection to form.

4              THE OFFICIAL INTERPRETER:  I didn't get

5    it.  Can you repeat one more time.

6         Q    Would you have ever made a promise to

7    donate $1 billion to the Rule of Law Foundation if

8    you did not actually have that money.

9              MR. BALDIGA:  And I objected.

10             MR. HARBACH:  And then Bill objected.

11             THE OFFICIAL INTERPRETER:  He said are you

12   -- want to sentencing me to death sentence?

13        Q    Approximately how much is the Lady May

14   worth?

15        A    I don't know.

16        Q    Over the years that you have been aboard

17   the Lady May, approximately how many times have you

18   invited friends to join you?

19             THE OFFICIAL INTERPRETER:  Can you repeat

20   that question one more time?

21             MR. HARBACH:  Yes.

22        Q    Over the years that you had been aboard

23   the Lady May, approximately how many times have you

24   invited friends out to join you?

25             MR. BALDIGA:  Hold on.

 1              MR. HARBACH:  Sorry, Bill.

 2              MR. BALDIGA:  David, you have a deposition

 3     on the Lady May issues coming up.  You can choose

 4     today or then.  Either one is fine.

 5              MR. HARBACH:  That's a fair point.  I'll

 6     move on.

 7              MR. BALDIGA:  Okay.  No question.

 8              MR. HARBACH:  If I could direct counsel's

 9     attention again to document 77.  And I want to focus

10     on question 19.

11         Q    Mr. Kwok, let me know when you're read

12     that question. It's no. 19.

13         (Pause.)

14         A    Finished.

15         Q    Okay.  So for the benefit of the record,

16     the question says within ten years before you filed

17     for bankruptcy did you transfer any property to a

18     self settled trust or similar device of which you

19     are a beneficiary?

20         A    No.

21         Q    And that is indeed what you checked on the

22     form.  My question for you is if you turn -- if

23     changed the word you to a family member as the

24     beneficiary, what would the answer be?

25              MR. BALDIGA:  Objection.

1          A     I cannot answer questions with if.

2          Q     I'll ask it a different way.

3                MR. HARBACH:  And, Jack, I'll ask you to

4    bear with me.

5          Q     Within ten years before you filed for

6    bankruptcy did you transfer any property to a self

7    settled trust or similar device of which a member of

8    your family is a beneficiary?

9          A     No.

10         Q     Sticking with that same document going

11   forward to question 27.  Just let me know when

12   you're read it, sir.

13         (Pause.)

14         A     Okay. I'm finished.

15         Q     So you see there you have checked the box

16   next to the word yes.  And then the instructions say

17   check all that apply above and fill in the details

18   below for each business.

19               MR. HARBACH:  Do you see where that is,

20   Jack?

21               THE OFFICIAL INTERPRETER:  I didn't see

22   that.

23               MR. HARBACH:  Next -- Holley can show you.

24         (Pause.)

25               MR. HARBACH:  So I was just pointing out

1    to the witness -- for the benefit of the translator

2    I'll say it again.

3         Q    Next to the box that is checked yes, the

4    instructions say check all that apply above and fill

5    in the details below for each business.  None of the

6    boxes above is checked and that's my question.

7              Which box or boxes should be checked for

8    each of those three entities that you have listed?

9         A    I cannot determine which one.

10        Q    Is that something you would need more time

11   to figure out or you just don't know the answer?

12        A    I could answer one by one.

13        Q    Okay. Let's do that.  Let's start with

14   Genever.

15        A    Which Genever?

16        Q    Well, the one that's listed is Genever

17   Holdings Corporation.

18             Which of those boxes would you check for

19   Genever Holdings Corporation, if any?

20        A    It was one time -- it was a member of LLC.

21   The above don't apply and should transfer to no. 12

22   -- transfer to 12.

23             It used to be an LLC.

24        Q    Are you saying that you would check the

25   box for a member of an LLC but it should be in the

1     past tense?

2          A     Yes.  Used to be.

3          Q     Do any of the other boxes apply to your

4     relationship to Genever Holdings Corporation?

5          A     The last row seems like appropriate for

6     me. I'm not very sure.

7          Q     The last row being an owner of at least

8     five percent of the voting or equity securities of a

9     corporation?

10         A     I owned 50 percent for a very short period

11    of time.

12         Q     Okay.  What about for Shiny Time?

13         A     Shiny Time already went away.

14         Q     I understand.  When it was in existence,

15    which of those boxes was accurate?

16         A     Number one.

17         Q     A sole proprietor?

18         A     Yes.

19         Q     Any of the others?

20         A     Not sure.

21         Q     Okay.  What about for Well Origin Limited?

22         A     It went away.

23         Q     Okay.  Same question though.  Which of

24    those boxes applied when it was in existence?

25         A     Number one.

1    Q    Any of the others?

2    A    Not sure.

3    Q    One last point about this question.

4         For Genever Holdings Corporation the block

5    for the dates that the business existed is blank.

6    Do you know what those dates should be?

7    A    2015.  Probably March, April to June,

8    July.

9    Q    Of which year?

10   A    2015.

11   Q    So from approximately March or April until

12   approximately July all in 2015?

13   A    Yes.

14   Q    Okay.  And is that the entire duration

15   that that corporation existed?

16   A    I was in the company for a few months, for

17   this period of time, a few months and with holding -

18   - in stock holding.  And the company still existed

19   after I left.

20   Q    I understand.  And does it still exist

21   today?

22   A    I believe it still exists.

23   Q    Okay.  In what year did you get married?

24   A    1918 -- or 1985.

25   Q    What year was your son born?

1       A     1986.

2       Q     And how old are you, sir?

3       A     54.

4       Q     How old was your son when your family

5    began working with Uda Property Company?

6       A     11.  Oh, five years -- five years old.

7       Q     And so that would have been in

8    approximately 1991 that your family began working

9    with Uda?

10      A     Yes.

11      Q     When was the Henan Uda Hotel completed?

12      A     In 1997.

13      Q     And what about the Uda International Trade

14   Center.  When was it completed?

15      A     At pretty much the same time.

16      Q     In your declaration in this case you

17   stated that both of those were successful ventures.

18      A     Yes.

19      Q     That allowed your family to start amassing

20   significant wealth.

21      A     Yes.

22      Q     So recognizing that this is in the early

23   '90's how much money approximately did those

24   ventures bring to your family?

25      A     I don't remember.

```
 1         Q    More than $50 million?

 2              THE OFFICIAL INTERPRETER:  50 or 15?

 3              MR. HARBACH:  5-0.

 4              THE OFFICIAL INTERPRETER:  Oh, okay.

 5         A    I don't remember.

 6         Q    What about the Pengu Plaza?  When was it

 7    completed?

 8         A    July 2008.

 9         Q    So between the early '90's and 2008 what

10    other projects of significant did the Guo family

11    invest in or participate in?

12              THE OFFICIAL INTERPRETER:  Since 1990's to

13    --

14         A    Between the early 1990's and 2008.

15         Q    Do you remember any of them?  Any of the

16    significant ventures?

17         A    Beijing Golden Spring.

18         Q    What was that?

19         A    It's a property company.  Real estate.

20    It's a real estate company.

21         Q    Was this a development company or a --

22    like a buying and selling agency?

23         A    Developing company.

24         Q    When was the Pangu Plaza project started,

25    approximately?
```

1        A    Roughly 1999.

2        Q    Okay. So let's use that as a point in

3   time.

4             At the beginning of the Pangu Plaza

5   project approximately how much had the family

6   amassed in wealth?

7             THE PRIVATE INTERPRETER:  Ask that

8   question again?

9             MR. HARBACH:  Sure.

10       Q    As of 1999, which was the beginning of the

11  Pangu Plaza project, approximately how much wealth

12  had the family earned or amassed by that time?

13            THE OFFICIAL INTERPRETER:  You're talking

14  about after 1999?

15            MR. HARBACH:  No, I'm talking about as of

16  1999?

17            THE OFFICIAL INTERPRETER:  Oh, as of 1999.

18       Q    How much money had the family made by

19  1999?

20       A    I don't remember.

21       Q    More than $100 million?

22       A    I don't remember.

23       Q    More than $500 million?

24       A    I don't remember.

25       Q    More than a billion dollars?

```
 1        A    I don't remember.

 2        Q    Were you personally involved in the work

 3   with Uda Property Company?

 4        A    Yes.

 5        Q    Were you personally involved in the

 6   development of the Henan Uda Hotel?

 7        A    Yes.

 8        Q    Were you personally involved in the Uda

 9   International Trade Center in Zhengzhou?

10        A    Yes.

11        Q    Were you personally involved in the

12   development of the Pengu Plaza?

13        A    Yes.

14        Q    Who was in charge of the Beijing Golden

15   Spring Real Estate Development firm?

16        A    A professional group.

17        Q    Were you a member of that group?

18        A    At that time I was a consultant.

19        Q    For Beijing Golden Spring?

20        A    Yes.

21        Q    During what time frame was that,

22   approximately that you were a consultant for them?

23        A    After 2000.

24        Q    After 2000.  Okay.

25             MS. CLAIBORN:  Mr. Harbach, I just want to
```

1    note that it is 4:18 and I know we've had a long day

2    -- and I wanted to give -- I apologize for

3    interrupting you, first of all.

4              MR. HARBACH:  That's all right.

5              MS. CLAIBORN:  But I wanted to give

6    counsel for the committee a chance to ask a few

7    questions today before we conclude.

8              MR. HARBACH:  Of course.  Sure.

9              MR. STAFSTROM:  I'll be very brief.

10   EXAMINATION BY MR. STAFSTROM:

11        Q    I noticed your hair is very short. I like

12   it.  Have you gotten a haircut recently?

13        A    Yes.  I had a haircut.

14        Q    Where did you get it cut?

15        A    My wife.

16        Q    Oh, your wife.  Okay.

17             Does she always cut your hair?

18        A    After the virus until now.

19        Q    Okay.  All right. I have no further

20   questions then.

21             MS. CLAIBORN:  I'm going to put the

22   recording on pause while we work on selecting a new

23   date.

24        (Off the record.)

25             MS. CLAIBORN:  We're back on the record

1    after a short break.  We have selected a continuance

2    date of April 29th, beginning at 10:00 a.m.   We are

3    concluded for today.  Thank you.

4              (Meeting adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          I, CHRISTINE FIORE, court-approved

2     transcriber and certified electronic reporter and

3     transcriber, certify that the foregoing is a correct

4     transcript from the official electronic sound

5     recording of the proceedings in the above-entitled

6     matter.

7

8

9     _____        April 15, 2022

10        Christine Fiore, CERT

11          Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

1                          INDEX

2

3                                                        <u>Page</u>

4    Examination by Ms. Claiborn              6

5    Examination by Mr. Wolman               71

6    Examination by Mr. Harbach              80

7    Examination by Mr. Stafstrom           130

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25