**<u>Exhibit 88</u>**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): 23-6421 _____    _____ Caption [use short title] _____

Motion for: Relief from the District Court's April 20, 2023

Order Denying Release Pending Trial _____

_____    United States of America,
                                                      Appellee
Set forth below precise, complete statement of relief sought:

The undersigned moves for reversal of the District Court's    v.

Order denying the pre-trial release of Defendant Ho Wan Kwok    Ho Wan Kwok, Defendant-
                                                                 Appellant

_____

_____

_____

_____

MOVING PARTY: Ho Wan Kwok _____    OPPOSING PARTY: United States of America _____

☐ Plaintiff        ☑ Defendant

☑ Appellant/Petitioner    ☐ Appellee/Respondent

                                                      Juliana N. Murray; Micah F. Fergenson;
MOVING ATTORNEY: Stephen R. Cook _____    OPPOSING ATTORNEY: Ryan B. Finkel _____
                [name of attorney, with firm, address, phone number and e-mail]

Brown Rudnick LLP _____    U.S. Dept' of Justice; Criminal Division, SDNY _____

2211 Michelson Drive, 7th Floor _____    One Saint Andrew's Plaza, New York, NY 10007 _____

(949) 752-7100; scook@brownrudnick.com _____    (212) 637-6612/ 2314 / 2190;juliana.murray@usdoj.gov;
                                                  micah.fergenson@usdoj.gov; Ryan.Finkel@usdoj.gov

Court- Judge/ Agency appealed from: Hon. Analisa Torres, U.S. District Court for the Southern District of New York _____

Please check appropriate boxes:                    **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                    INJUCTIONS PENDING APPEAL:**
Has movant notified opposing counsel (required by Local Rule 27.1):    Has this request for relief been made below?    ☐ Yes ☐ No
    ☑ Yes  ☐ No (explain):_____    Has this relief been previously sought in this court?    ☐ Yes ☐ No
    _____    Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:             _____
    ☐ Unopposed ☑ Opposed ☐ Don't Know            _____
Does opposing counsel intend to file a response:    _____
    ☑ Yes ☐ No ☐ Don't Know                        _____

Is oral argument on motion requested?    ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No If yes, enter date:_____

Signature of Moving Attorney:

_/s/ Stephen R. Cook_____ Date: _5/5/2023_____ Service by: ☐ CM/ECF ☑ Other [Attach proof of service]

# United States Court of Appeals
## for the
## Second Circuit

◆●◆

———————————

No. 23-6421

———————————

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

HO WAN KWOK, *et al.,*

*Defendant-Appellant.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## MOTION FOR RELIEF FROM ORDER

## DENYING PRE-TRIAL RELEASE

Stephen R. Cook
BROWN RUDNICK LLP
2211 Michelson Drive
Irvine, CA 92612
(949) 752-7100

William R. Baldiga
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Counsel for Defendant-Appellant*

May 5, 2023

## PRELIMINARY STATEMENT

Mr. Kwok is not a flight risk. For years, he has been the target of a campaign by the Chinese Communist Party ("CCP") to dismantle the pro-democracy movement that he has led, and to force Mr. Kwok's return to the People's Republic of China ("PRC") where he will face politically motivated charges and likely execution. The Court need not take Mr. Kwok's word for this. The United States Department of Justice ("DOJ") has recounted the elaborate schemes directed at Mr. Kwok—devised and funded by the Chinese Communist Party ("CCP")—in a series of recent criminal prosecutions that read like spy novels.[1]

Four things make this case unique:

- The CCP has gone to great lengths to secure Mr. Kwok's repatriation to China by any means necessary—by coercion, force, or act of state. The PRC has issued INTERPOL Red Notices to law enforcement worldwide seeking Mr. Kwok's detention pending extradition to China. Mr. Kwok is a fugitive from the PRC and he is being actively pursued.

---

[1] *See generally,* Exhibit 1, Ho Wan Kwok's Memorandum in Support of Application for Release on Bail Pending Trial filed March 31, 2023, ECF No. 24 ("Ex. 1—Bail Memorandum"); Exhibit 2, Ho Wan Kwok's Supplement to Application for Release on Bail Pending Trial filed April 19, 2023, ECF No. 50 ("Ex. 2—Supplement to Bail Memorandum"); Exhibit 10, Complaint and Affidavit in support of Application for an Arrest Warrant, *United States v. Jin*, Case No. 20-MJ-1103 (E.D.N.Y. Apr. 17, 2023) ("Ex. 10—Jin Complaint and Affidavit"); Exhibit 11, Complaint and Affidavit in support of Application for an Arrest Warrant, *United States v. Yunpeng*, Case No. 23-MJ-0334 (E.D.N.Y. Apr. 6, 2023) ("Ex. 11—Yunpeng Complaint and Affidavit").

- The CCP's campaign against Mr. Kwok *explicitly* involves spreading *disinformation to discredit* Mr. Kwok, and to *incite and pressure U.S. law enforcement* against him. This has been sworn to in an affidavit executed by a FBI Special Agent. There has been an active disinformation campaign against Mr. Kwok for years, and any evidence proffered in this case is due close scrutiny.

- In reviewing Mr. Kwok's Bail Application, the District Court was required to "ensure the reliability of the evidence by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." *United States v. LaFontaine*, 210 F. 3d 125, 131 (2d Cir. 2000). The District Court failed to do so, and instead accepted without scrutiny the Government's vague, misleading, and incorrect proffers of evidence concerning numerous legal and factual issues that may have been material to the District Court's determination.

- The Government contends that Mr. Kwok presents a serious risk of flight, obstruction, and danger of economic harm to the community. Mr. Kwok disagrees, but nonetheless proposed a set of bail conditions that reasonably address the Government's concerns, and that are "extraordinary." *See United States v. Sabhnani*, 493 F.3d 63, 77-78 (2d Cir. 2007). Various combinations of substantially similar conditions have

been found sufficient to ameliorate the risks of flight, obstruction, and
danger presented by other wealthy defendants facing serious criminal
fraud charges. For example, courts in this Circuit released Bernard
Madoff and Sam Bankman-Fried subject to conditions less restrictive
than those proposed by Mr. Kwok—even *after* Mr. Madoff and Mr.
Bankman-Fried violated their *initial* conditions of release. Neither Mr.
Madoff nor Mr. Bankman-Fried would have been in the unenviable
position of being a wanted fugitive in both the United States and China
were they to abscond, and yet the Government was able to agree to
reasonable conditions of release. Comparatively speaking, Mr. Kwok is
no flight risk at all.

The District Court was required to evaluate whether the Government met its
burden of proving that (1) Mr. Kwok poses a serious danger of flight, obstruction,
or danger to the community, and (2) that no condition or combination of conditions
of pre-trial release can reasonably mitigate those risks. *See Sabhnani,* 493 F.3d at
75. In making this evaluation, the District Court was required to "ensure the
reliability of the evidence by selectively insisting upon the production of the
underlying evidence or evidentiary sources where their accuracy is in question."
*LaFontaine*, 210 F.3d at 131 (internal quotation marks and citations omitted). It
failed to do so, and instead accepted without scrutiny the Government's vague,

misleading, and incorrect proffers of evidence to deny Mr. Kwok's Application for

Bail. Ensuring the reliability of the evidence proffered by the Government was

particularly important here, where the Defendant is the victim of a well-

documented disinformation campaign aimed at discrediting him and subjecting

him to criminal prosecution.

This Court must reverse.

## JURISDICTIONAL STATEMENT[2]

Defendant Ho Wan Kwok appeals from an order entered on April 20, 2023,

in the United States District Court for the Southern District of New York, by

United States District Judge Analisa Torres, detaining the Defendant before trial.

[Ex.  8, Order Denying Pretrial Release ("Order"), ECF No. 51.] This Court has

jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3145(c). Defendant-

Appellant filed a timely notice of appeal on May 4, 2023. [Exhibit 15, Notice of

Appeal filed on May 4, 2023, ECF No. 62.]

## RELEVANT BACKGROUND

Mr. Kwok, a persistent and outspoken critic of the CCP, emigrated to the

United States in 2015 and applied for political asylum two years later. [Exhibit 1,

Ho Wan Kwok's Memorandum in Support of Application for Release on Bail

Pending Trial filed March 31, 2023, ECF No. 24 ("Ex. 1—Bail Memorandum") at

---

2 Defendant-Appellant requests oral argument.

Case: 23-6421, 05/05/2023, DktEntry: 6.1, Page 7 of 446

p. 7-9]. Mr. Kwok's personal and professional life are detailed in Defendant's

Memorandum in Support of Application for Release on Bail Pending Trial, filed in

the lower court on March 31, 2023, and will not be repeated at length here. [*Id.* at

p. 5-11].

As perhaps *the* most prominent and globally recognized leader of the anti-

CCP and Chinese pro-democracy movement, Mr. Kwok has been subjected to a

relentless barrage of threats, harassment, surveillance, and electronic hacking

attempts since at least 2017. [Exhibit 2, Ho Wan Kwok's Supplement to

Application for Release on Bail Pending Trial filed April 19, 2023, ECF No. 50

("Ex. 2—Supplement to Bail Memorandum") at p. 2.] These schemes reveal three

apparent objectives: to spread malicious misinformation discrediting Mr. Kwok in

the United States, China, and abroad; to use the U.S. civil and criminal legal

system as a lever to pressure Mr. Kwok's return to China; and to force Mr. Kwok's

extradition from the United States.

The CCP's objectives are laid bare in in two criminal complaints unsealed

just last month in the United States District Court for the Eastern District of New

York. [*See* Exhibit 10, Complaint and Affidavit in support of Application for an

Arrest Warrant, *United States v. Jin*, Case No. 20-MJ-1103 (E.D.N.Y. Apr. 17,

2023) ("Ex. 10—Jin Complaint and Affidavit"); Exhibit 11, Complaint and

Affidavit in support of Application for an Arrest Warrant, *United States v.*

Case: 23-6421, 05/05/2023, DktEntry: 6.1, Page 8 of 446

*Yunpeng*, Case No. 23-MJ-0334 (E.D.N.Y. Apr. 6, 2023) ("Ex. 11—Yunpeng

Complaint and Affidavit").]  In these cases, the U.S. Attorney's Office for the

Eastern District of New York has charged 40 defendants with various crimes

related to an elaborate scheme by the PRC to silence and harass Chinese nationals

residing in the United States. [Ex. 2—Supplement to Bail Memorandum at p. 2-3.]

**Mr. Kwok is designated as "Victim-1" of this scheme.** The complaints detail the

creation and use of fake social media accounts by agents of the PRC to harass and

intimidate Chinese dissidents residing abroad, and a scheme to suppress the

dissidents' free speech on the platform of a U.S. telecommunications company.

[*See generally* Ex. 10—Jin Complaint and Affidavit at 1-2; Ex. 11—Yunpeng

Complaint and Affidavit].

Far from being limited to social media propaganda, the CCP's attacks

against Mr. Kwok included attempts to incite and pressure U.S. law enforcement

action against him, including criminal prosecution and/or forceful extradition to

China. [Ex 2—Supplement to Bail Memorandum at p. 3]. The Yunpeng Complaint

and Affidavit, executed by an FBI Special Agent, describes in striking detail how

Mr. Kwok has been the victim of virtually every conceivable form of attack short

of outright assassination by the CCP.  [*Id.*]  As the Yunpeng Complaint and

Affidavit demonstrates, the DOJ is cognizant of the CCP's disinformation

Case: 23-6421, 05/05/2023, DktEntry: 6.1, Page 9 of 446

campaign, ***seeking to discredit Mr. Kwok and to incite U.S. law enforcement action*** against him:

- The CCP's Ministry of Public Security ("MPS") "routinely monitors, among others, Chinese political dissidents who live in the United States . . . . The MPS regularly uses cooperative contacts both inside the PRC and around the world to influence, threaten and coerce political dissidents abroad. Indeed, ***I am aware that the PRC government has threatened and coerced Chinese political dissidents living in the United States in an effort to silence them.***" [*Id.* (emphasis added).]

- A task force within the MPS, defined in the FBI Affidavit as "the Group," "***seeks to undermine the credibility of these [CCP] critics living in the United States*** and elsewhere. [*Id.* (emphasis added).]

- The Group was expressly tasked with creating and posting internet content targeting and maligning Mr. Kwok, who was a ***"primary focus of the Group's harassment scheme."*** [*Id.* (emphasis added).]

- The CCP agents were tasked ***"to call on U.S. law enforcement to take prompt action against Victim-1."*** [ *Id.* (emphasis added).]

- "Since Victim-1 fled the PRC, the PRC government has sought his/her return for prosecution in the PRC and has ***employed numerous***

***methods to effect Victim-1's capture or arrest.***" [*Id.* (emphasis added).]

But this is just the latest in a series of shocking criminal prosecutions charging agents of the PRC in connection with schemes to secure Mr. Kwok's extradition to China, where he would almost certainly be executed. [Ex. 1—Bail Memorandum at p. 9.] The record shows that a cast of political operatives, lobbyists, and even a senior DOJ official infiltrated the United States government at the highest levels and took millions of dollars in illegal payments in connection with a 2017-2018 scheme orchestrated by the CCP to force Mr. Kwok's extradition to the PRC:

- On November 18, 2018, former DOJ attorney ***George Higginbotham*** pleaded guilty to conspiracy to make false statements to a bank about the source and purpose of millions of dollars sent from overseas to finance an unregistered lobbying campaign on behalf of foreign interests. [Ex. 1—Bail Memorandum at p. 10, fn. 11; Ex 2— Supplement to Bail Memorandum p. at 2.] One purpose of the lobbying campaign "was an attempt to persuade high-level U.S. government officials to have [Mr. Kwok], who was residing in the United States on a temporary visa at the time, removed from the

United States and sent back to his country of origin." [Ex. 1—Bail
Memorandum at p. 10, fn. 11.]

- On October 6, 2020, former Republican National Committee chair
  *Elliott Broidy* was charged with conspiracy to serve as an unregistered
  agent of a foreign principal, in connection with the 2017-2018
  scheme. [Ex. 2—Supplement to Bail Memorandum at p. 2.] Broidy
  pleaded guilty on October 20, 2020. [Ex. 1—Bail Memorandum at p.
  10, fn. 10.]

- On August 31, 2020, American businesswoman **Nickie Lum Davis**,
  pleaded guilty for her role in facilitating the 2017-2018 scheme. [Ex.
  1—Bail Memorandum at p. 10.]

- **Prakazrel Michel**, best known as part of the 90s hip-hop group the
  Fugees, was convicted on April 26, 2023 on charges related to the
  unregistered back-channel lobbying campaign aimed, in part, at
  seeking Mr. Kwok's extradition to China. [U.S. DEP'T OF JUST., U.S.
  ENTERTAINER CONVICTED OF ENGAGING IN FOREIGN INFLUENCE
  CAMPAIGN (Apr. 26, 2023) https://www.justice.gov/opa/pr/us-
  entertainer-convicted-engaging-foreign-influence-campaign.] He
  faces a maximum penalty of 20 years in prison. [*Id.*]

There can be no doubt that the CCP is intent on securing Mr. Kwok's return to the

PRC.

It is also well-documented that the CCP has used civil litigation in the

United States as a lever to discredit Mr. Kwok and force his return to China.

[Exhibit 3, Transcript of Bail Proceedings held as to Ho Wan Kwok on April 4,

2023 ("Ex. 3—4/4/23 Bail Hearing Trans.") at 29:03-17.] In July 2000, the Wall

Street Journal published an article, "China's New Tool to Chase Down Fugitives:

American Courts" that reports how "Beijing is turning to lawsuits to pressure

expatriates to return home and face corruption charges as an end run around U.S.

law." [*Id.*] Mr. Kwok knows this all too well—the civil litigation that ultimately

led to his bankruptcy filing was instigated and financed by the CCP. [*Id.*]

## SUMMARY OF PROCEEDINGS BELOW

Mr. Kwok was arrested and arraigned on March 15, 2023 on an eleven-count

indictment charging wire fraud, securities fraud, and money laundering. [Ex. 4—

3/15/23 Arraignment Trans.; Ex. 1—Bail Memorandum at 3; Ex. 5—Superseding

Indictment.] That same day, the Government submitted a letter brief seeking Mr.

Kwok's pretrial detention, contending that Mr. Kwok poses a significant risk of

flight and of danger to the community. [Exhibit 6, United States' March 15, 2023

Letter Brief re: Detention, ECF No. 7 ("Ex. 6—Detention Memorandum") at 1].

On March 31, 2023, Mr. Kwok filed his Application for Release on Bail Pending

Trial ("Application for Bail"), setting forth the facts and circumstances counseling his release, and proposing a robust bail package. [Ex. 1—Bail Memorandum.] The Government filed its opposition on April 3, 2023. [Exhibit 7—Government's Opposition to Ho Wan Kwok's Memorandum in Support of Pretrial Release, filed April 3, 2023, ECF No. 26 ("Ex. 7—Opposition to Bail Memorandum").] On April 4, 2023, the District Court arraigned Mr. Kwok on the Superseding Indictment returned by the grand jury on March 29, 2023, and reserved decision on Mr. Kwok's bail application (the "Bail Hearing"). [Ex. 3—4/4/23 Bail Hearing Trans.]

On April 19, 2023, Mr. Kwok submitted to the District Court a letter supplementing his Application for Bail with additional information requested by the District Court and providing new information concerning the recently charged, PRC-directed scheme to discredit Mr. Kwok and incite U.S. law enforcement action against him, detailed on pages 5-8, *supra*. [Ex. 2—Supplement to Bail Memorandum.] The next day, on April 20, 2020, the District Court issued its opinion denying Mr. Kwok's Application for Bail (referred to herein as the "Opinion"), finding that the Government had met its burden of showing by a preponderance of the evidence that Mr. Kwok presents a serious risk of flight and obstruction, and by clear and convincing evidence that Mr. Kwok poses a risk of economic harm to the community, and concluding that no condition or set of

conditions would ensure Mr. Kwok's return to court or the safety of the community. [Ex. 8—Opinion at 5-12.]

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's judgment with respect to conclusions of law. *See United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004). The factual findings underlying those conclusions are reviewed for clear error. *See United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011). Although this Court's review is deferential, it is guided by a presumption in favor of release and the principle that bail may be denied only in a "rare case of extreme and unusual circumstances." *See United States v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986). Because the district court's "determination of the viability of alternatives to detention must be, in every case, a mixed question of fact and law . . . [s]uch questions are subject to flexible appellate review." *Id.*

## ARGUMENT

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, codifies the Eighth Amendment's guarantee of bail, requiring district courts to order the pre-trial release of the defendant "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." *United States v. Boustani,* 932 F.3d 79, 81 (2d Cir. 2019) (quoting 18 U.S.C. § 3142(b)); *Sabhnani,*

493 F.3d at 78 (noting that even where a court determines that a defendant poses a flight risk, there remains a statutory presumption in favor of the defendant's release "unless the government demonstrates that no conditions of release can be imposed to assure the defendant's appearance in court").

The trial court's analysis is therefore twofold. First, the court must determine whether the Government has met its burden and established by a preponderance of the evidence that the defendant "presents a risk of flight or obstruction of justice." *United States v. Madoff*, 586 F.Supp.2d 240, 247 (2d Cir. 2009). If the court finds that the Government has met this initial burden, the court must then evaluate whether there are reasonable conditions of release that can ameliorate the risk. *Id.; see also Sabhnani*, 493 F.3d at 75.

In determining whether there are conditions of release that will reasonably assure the appearance of the defendant and the safety of the community, courts evaluate four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to the community posed by the defendant. *See* 18 U.S.C. § 3142(g); *Boustani*, 932 F.3d at 81. "An order of detention based on the safety of other persons and the community must rest on a finding supported by clear and convincing evidence," *United States v. Stein*, No. S1 05 Crim. 0888 (LAK), 2005 WL 8157371, at *1 (S.D.N.Y. Nov.

14, 2005), while detention based on the defendant's perceived flight risk must be supported by a preponderance of the evidence. *See Boustani*, 932 F.3d at 81; *Sabhnani*, 493 F.3d at 75.

## I.   The District Court Made an Error of Law Regarding the Effect of Pending Criminal Charges on Mr. Kwok's Ability to Legally Remain in the U.S.

Based on no more than the Government's conclusory arguments, the District Court improperly adjudicated the impact of pending criminal charges on Mr. Kwok's eligibility to remain in the United States. In the Opinion, the District Court found that if Mr. Kwok's asylum "application is denied, he will no longer be legally present in the United States" and that "the charges in this case may be grounds for denial of Defendant's asylum application." [Ex. 8—Opinion at 5.] The District Court repeated this assertion later, opining that "the charges in this case seriously undermine Defendant's eligibility for asylum." [*Id.* at 7.] The District Court's reasoning here is properly subject to clear error reversal for at least two separate reasons.

First, while in some cases, a *conviction* for a criminal offense that occurred in the United States may have an effect on an asylum application, *see* 8 U.S.C. § 1158(b)(2)(A)-(B); 8 C.F.R. § 208.13(c)(6), the mere *filing* of criminal charges—without a further evidentiary showing by the Government—does not serve as a statutory bar to a grant of asylum. [*See* Ex. 6—Detention Memorandum at 2.] The

District Court's bare assertion that "the charges in this case may be grounds for denial of Defendant's asylum application" is a misstatement of law. With only a single inapplicable exception,[3] the asylum statute and its associated regulations, in accordance with principles of due process under the Fifth and Fourteenth amendments, require that the government *prove* that a defendant is guilty before secondary consequences, such as denial of asylum, become mandatory. But even if Mr. Kwok's application were denied, as set forth below, Mr. Kwok will not necessarily be removed from the United States.

The initial denial of a pending asylum application does not necessarily terminate an alien's legal right to be present in the United States. Rather, the initial denial of an asylum application is just the first in a series of legal steps whereby an alien may be afforded the opportunity to challenge an asylum determination or deportation order while lawfully remaining in the United States. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 425 (2009) (noting parties' agreement that the court of appeals considering a petition for review of a removal order may prevent that order from taking effect and therefore block removal while adjudicating the petition). Mr. Kwok raised this issue to the District Court below, citing potential appeals

---

3 *See* 8 C.F.R. § 208.13(c)(6) (providing asylum ineligibility for an alien who "has been convicted" of certain crimes or when an asylum officer "knows or has reason to believe that the alien has engaged … in acts of battery or extreme cruelty as defined in 8 C.F.R. 204.2(c)(1)").

under the Convention Against Torture ("CAT"), which the District Court summarily dismissed as "speculative" in a footnote. [*See* Ex. 8—Opinion at 7, fn. 2.] Importantly, in light of the CCP's serious persecution of Mr. Kwok, both in the PRC and abroad, a successful CAT application is probable. Furthermore, alternative routes and appeals exist that would readily allow for Mr. Kwok to remain in the United States while adjudication of these claims is ongoing. For example, should the Department of Homeland Security–United States Citizenship and Immigration Service ("DHS-USCIS") deny Mr. Kwok's asylum application, he would have the ability to appeal the order denying asylum status.

In any case, it was improper for the District Court to rely upon Mr. Kwok's immigration status as a factor weighing in favor of his pre-trial detention. As the Tenth Circuit noted, "although Congress established a rebuttable presumption that certain defendants should be detained, it did not include removable aliens on that list." *See United States v. Ailon-Ailon*, 875 F.3d 1334, 1338 (10th Cir. 2017).

Mr. Kwok also seeks reversal because of the potential that the District Court's reliance on the Government's misstatement of the law could unjustly affect Mr. Kwok's pending application for asylum. To the extent that the DHS-USCIS is following Mr. Kwok's case, the District Court's Order has the potential to misinform and misdirect that tribunal regarding the proper impact the pending criminal charges may have on Mr. Kwok's application for asylum. Allowing the

Order to stand in its current form risks unjustly prejudicing Mr. Kwok's

application.

The District Court erred as a matter of law and this Court must reverse.

## II.     The District Court Committed Reversible Error in Relying Upon the Government's Vague and Misleading Proffer Without Reference to the Substantial Countervailing Evidence Presented by Mr. Kwok

The law in this Circuit is clear: while "it would [not] be an abuse of

discretion for the district court to permit the government to proceed by proffer

alone," *United States v. Davis*, 845 F.2d 412, 415 (2d Cir. 1988), "[a]n order of

detention based on the safety of other persons and the community must rest on a

finding supported by clear and convincing evidence." *United States v. Stein*, No.

S1 05 Crim. 0888 (LAK), 2005 WL 8157371, at *1 (S.D.N.Y. Nov. 14, 2005). The

district judge must "ensure the reliability of the evidence, 'by selectively insisting

upon the production of the underlying evidence or evidentiary sources where their

accuracy is in question.'" *LaFontaine*, 210 F.3d at 131 (quoting *United States v.*

*Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986)). It is not sufficient for the

Government's proffer to simply state in conclusory terms what it hopes to prove,

and the District Court was required to look deeper.

The District Court's obligation to put the Government to its proof was

*critical* here—the DOJ itself has proclaimed Mr. Kwok to be "Victim-1" in a

campaign by the CCP to spread disinformation to discredit Mr. Kwok and to incite

U.S. law enforcement action against him. The District Court clearly erred by accepting the Government's vague and misleading proffer, without reference to the substantial countervailing evidence presented by Mr. Kwok, in connection with the following inaccurate findings of fact material to the District Court's order of detention:

i.    *The Passports*

The District Court wholesale adopted the Government's unsupported contention that the "[d]efendant is able to obtain travel documents with ease," (Ex. 8—Opinion at 6) but the Government's own filing fails to provide sufficient or adequate support for this proposition. The District Court correctly notes that law enforcement officials confiscated the passports recovered during a March 15, 2023 search, and Mr. Kwok previously surrendered his passport from the UAE, but nonetheless reaches the flawed conclusion that because Mr. Kwok *previously* had travel documents "it is clear that [he] is able to obtain travel documents with ease," further stating without *any* factual support that "a clever defendant with sufficient resources could figure out a way to leave the country without travel documents." [Ex. 8—Opinion at 6.] Of course, even if that conclusory statement could be credited, it would apply to innumerable defendants, nearly all of whom have been granted bail.

Importantly, the Government has not demonstrated that Mr. Kwok currently possesses *any* travel documents, and the District Court's summary conclusion that Mr. Kwok *does possess* travel documents is clearly erroneous. The Government has seized Mr. Kwok's Hong Kong passport, and it is currently inaccessible to him. [Ex. 2—Supplement to Bail Memorandum at 1.] The Government also seized a Vanuatu passport that was expired, and in any event, is no longer accessible to Mr. Kwok. [*Id.*] Finally, Mr. Kwok submitted the sworn testimony of his immigration counsel attesting that, as part of Mr. Kwok's asylum application process, his UAE citizenship had been renounced and his UAE passport surrendered to officials of that country. [*Id.* at 2.] The *only* evidence proffered by the Government and cited by the District Court in support of the contention that Mr. Kwok has (or ever had) *any* additional travel documents is the purported transcript of an April 4, 2017 media interview, translated from Mandarin to English and filed in connection with nuisance litigation brought against Mr. Kwok by a Chinese conglomerate with ties to the CCP. [Ex. 8—Opinion at 6.] Even, assuming *arguendo*, that Mr. Kwok had access to travel documents, the problem of Mr. Kwok being a wanted fugitive in both the United States and China would remain—Mr. Kwok simply isn't a flight risk.

ii.   *The Yacht*

The District Court improperly accepted the Government's proffer that Mr. Kwok has the means to escape because he purportedly "has access to a yacht." [Ex. 8—Opinion at 6.] As set forth in evidence submitted *by the Government* to the Court, on March 27 and March 31, 2023, the bankruptcy court ordered that ownership of the "Lady May," and "Lady May II," be transferred to Luc A. Despins, as Chapter 11 Trustee (the "Trustee") for the estate of Ho Wan Kwok (the "Bankruptcy Estate"). [Ex. 7—Opposition to Bail Memorandum at Exhibit G.]  To the extent he ever did, Mr. Kwok clearly has no access to these assets now because they are in the custody of the Trustee.

iii.   *The Jet*

The District Court incorrectly relied on the Government's misleading contention that Mr. Kwok has access to a jet. [Ex. 8—Opinion at 6.] This argument is especially misleading. The Government knows that the "jet" in question is a Cirrus SF50—a small, single engine aircraft with an average range of 950 miles and a maximum range of 1,275 miles[4]—located in the United Kingdom. [*See* Ex. 7—Opposition to Bail Memorandum at 21.] It is implausible to suggest that an aircraft located in the United Kingdom—*an aircraft that could not make it halfway across the Atlantic Ocean*—could offer Mr. Kwok a means to abscond from New York.

---

4 https://cirrusaircraft.com/aircraft/vision-jet/

iv.    *Mr. Kwok's Family*

The District Court adopted the Government's logically and factually incoherent argument that Mr. Kwok's "incentive to remain in the United States due to his daughter's presence is tantamount to his incentive to flee to the United Kingdom, where his son resides." [Ex. 8—Opinion at 5.] This is nonsensical—as a fugitive from the United States, Mr. Kwok would be cut off from *both of his children and his wife*. Mr. Kwok's son is free to travel from the United Kingdom; there is presently no bar to him visiting Mr. Kwok in the United States. The same cannot be said of Mr. Kwok's wife and daughter who require authorization to travel outside of the United States while their applications for asylum are pending. If Mr. Kwok were to flee, it is likely that he would never see his wife and daughter again. It is *not* the case that Mr. Kwok will never again see his son if he stays in the United States to defend himself.

v.    *Mr. Kwok's Personal Characteristics*

The Government and the District Court both make much of Mr. Kwok's immigration status, his perceived resources, and his purported motive to flee. The simple fact is that Mr. Kwok has known that he is a target of a federal criminal investigation for the better part of a year ***and did not flee***. [Ex. 4—3/15/23 Arraignment Trans. at 21:19-21]. He did not flee in June 2020, when "domestic banks began freezing and closing accounts associated with GTV." [Ex. 8—

Opinion at 3.] He did not flee in the wake of the United States Securities and

Exchange Commission ("SEC") Order. [Exhibit 9, Order Denying Pretrial Release

entered April 20, 2023, ECF No. 51 ("Ex. 9—SEC Order).] He did not flee in

September 2022, when U.S. authorities served seizure warrants on domestic banks,

"seizing approximately $355 million from Himalaya Exchange and other entities

associated with [Mr. Kwok]." [Ex. 8—Opinion at 4]. He did not flee when "many

of his entities received [grand jury] subpoenas." [Ex. 3—4/4/23 Bail Hearing

Trans. at 18:14-15]. Mr. Kwok did not flee in October 2022, when the Government

notified his immigration counsel that he was a target of the grand jury investigation

that culminated in the present charges against him.

In contrast, the Government alleges that Mr. Kwok's co-defendant, Mr. Je,

took advantage of this notice and absconded to the UAE. [Ex. 8—Opinion at 5.]

Despite having the same notice available to Mr. Je, Mr. Kwok went *nowhere*. He

continued to reside in the same residences he had occupied for years, he did

nothing to conceal the multiple cellphones, cellphone scrambler, Faraday bags, and

cash that the Government attempts to spin as evidence that Mr. Kwok presents a

flight risk. [Ex. 3—4/4/23 Bail Hearing Trans. At 22:03-11.] This is not evidence

of a man seeking to flee; it is evidence of a man who had decided to stay in the

face of the criminal charges that he knew were coming any day.

vi.   *Mr. Kwok's UAE Connections*

The District Court also appears to credit the Government's contention that Mr. Kwok is likely to flee to the UAE which has no extradition treaty with the United States. [Ex. 8—Opinion at 5-6.] This is absurd. While it is true that the UAE would not be required by treaty to extradite Mr. Kwok to the United States, it *would* extradite him to China. In addition to an extradition treaty, China and the UAE share extensive financial connections: of all of the Gulf states, the UAE is China's number one beneficiary of foreign investment. [Ex. 3—4/4/23 Bail Hearing Trans. at 72:03-14.] As Mr. Kwok's counsel explained at the Bail Hearing, the UAE is probably the worst place Mr. Kwok could go, second only to China itself. [Ex. 3—4/4/23 Bail Hearing Trans. at 72:12-13.]

The District Court clearly erred in relying upon the Government's vague and misleading proffer without reference to the substantial countervailing evidence Presented by Mr. Kwok. This Court must reverse.

## III.   The District Court Clearly Erred in Concluding that Mr. Kwok Presents a Danger to the Community

The District Court committed reversible error in finding that Mr. Kwok presents a danger to the community. In the Opinion, the District Court concluded that Mr. Kwok presents an economic danger to the community based only on the Government's vague assertion that in March 2022, Mr. Kwok "encouraged" recipients of Fair Fund disbursements "to re-invest their disbursements in the fraud

scheme alleged in this case," and the allegation that in February 2023, Mr. Kwok announced a new stock offering involving Himalaya Exchange. [Ex. 8—Opinion at 12.] This is not evidence, much less evidence that is clear and convincing of Mr. Kwok's serious danger to the community.

    A.    *The Evidence Proffered by the Government Does Not Support the District Court's Finding That Mr. Kwok Encouraged Recipients of Fair Fund Disbursements to Invest in a Fraud Scheme Charged in this Case*

The Government offered absolutely no detail concerning the reports it claims to have received from Fair Fund disbursement recipients who were allegedly "encouraged" by Mr. Kwok to "re-invest their disbursements in the fraud scheme alleged in this case." [Ex. 6—Detention Memorandum at 10.] The Government has not disclosed when, where, or how Mr. Kwok "encouraged" these individuals. It has not offered any information as to their number, their credibility, or the specifics of their individual reports. The Government has not specified whether it alleges that Mr. Kwok contacted these individuals personally, or whether they simply happened upon content he posted on social media. Moreover, neither the Government nor the District Court identify which "fraud scheme alleged in this case" Mr. Kwok allegedly "encouraged" "victims" to re-invest in.[5]

---

5    Such evidence would be particularly important here, where the DOJ has already acknowledged, under oath, that CCP agents routinely attempt to infiltrate Mr. Kwok's organizations (and those of other dissidents) in order to undermine from within, and to make false complaints to regulators and law enforcement. [Ex. 11—Yunpeng Complaint and Affidavit.]

Far from clear and convincing, the Government's own allegations in the Superseding Indictment raise questions as to which "fraud scheme alleged in this case" the Government and the District Court could possibly be referring. The Government alleges four fraud schemes in the Superseding Indictment: (1) The GTV Private Placement, (2) The Farm Loan Program, (3) G|CLUBS, and (4) The Himalaya Exchange. [Ex. 5—Superseding Indictment at ¶¶ 13-23.] The fraud alleged in connection with the GTV Private Placement arises out of the same facts charged in the SEC Order that gave rise to the settlement and the subsequent Fair Fund disbursements, beginning in April 2022. [Ex. 5—Superseding Indictment at ¶ 13; Ex. 9—SEC Order.] Clearly, this cannot be the fraud scheme the Government and the District Court believe Mr. Kwok "encouraged" individuals to re-invest in in April 2022. The Government alleges that the Farm Loan Program began in or around June 2020. [Ex. 5—Superseding Indictment at ¶ 14.] The Superseding Indictment makes no mention of *any* conduct related to the Farm Loan Program that post-dates 2020, making it improbable that the District Court could have understood this to be the "fraud scheme alleged in this case" for which Mr. Kwok solicited investments in April 2022. Similarly, the Superseding Indictment represents that Mr. Kwok fraudulently obtained victim funds through G|CLUBS from "at least in or about October 2020 through at least in or about March 2023," but alleges no specific conduct later than August 2021. [Ex. 5—Superseding

Indictment at ¶¶ 15-16.] No evidence proffered by the Government in its brief or at the Bail Hearing could reasonably have formed the basis for the District Court's understanding that *this* is the "fraud scheme alleged in this case." [Ex. 8—Opinion at 12.]

The Government alleges the Himalaya Exchange fraud scheme ran from at least April 2021 through at least March 2023. [Ex. 5—Superseding Indictment at ¶ 17.] It is possible that the alleged Himalaya Exchange fraud is the scheme for which the District Court believes Mr. Kwok solicited investments in April 2020. It is nonetheless worth noting that the most recent conduct alleged related to the Himalaya Exchange fraud occurred "[i]n or about April 2022" when Mr. Kwok's co-defendant "arranged for the transfer of approximately $37 million in Himalaya Exchange funds" for a "purported 'loan' to cover the cost of a luxury yacht." [*Id.* at ¶¶ 17-23.] It is far from obvious, however, that this is the "clear and convincing evidence" the District Court believes supports its conclusion that Mr. Kwok "will continue to cause economic harm to the community if released." [Ex. 8—Opinion at 12.]

B.    *Mr. Kwok Did Not Violate Established Law and Was Not Bound by the SEC Order*

 Setting aside the factual infirmities in the District Court's analysis, ***even if accepted as true***, the Government's allegations do not support a finding by clear and convincing evidence that Mr. Kwok presents a serious danger of economic

harm to the community. The SEC Order indicates that it is the product of settlement negotiations between the SEC and Respondents, and that Respondents consented to the entry of the SEC Order "[s]olely for the purpose" of "proceedings brought by or on behalf of the Commission, or to which the Commission is a party," "without admitting or denying the findings" therein. [Ex. 9—SEC Order at 1.] The District Court's reliance upon the SEC Order in its analysis of the alleged danger Mr. Kwok poses to the community is therefore improper.

The Second Circuit has previously noted that the Federal Rules of Evidence ("FRE") prohibit "a plea of nolo contendere from being later used against the party who so pleaded" and that such pleas "have been equated with 'consent decrees.'" *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). Because consent decrees and pleas of nolo contendere are "not true adjudications on the underlying issues," their relevance and use are necessarily limited: "[A] prior judgment can only be introduced in a later trial for collateral estoppel purposes if the issues sought to be precluded were actually adjudicated in the prior trial." *Id*. at 893-94. In the years after *Lipsky* was decided, the Second Circuit clarified that because civil consent decrees with administrative agencies are "the settlement of a civil suit," their use "is governed by Fed. R. Evid. 408" and that litigants are therefore barred from using that "evidence of a compromise to prove liability for the claim," but that they may be used "for other purposes" under FRE 408. *United*

*States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981). Federal Rule of Evidence 408 provides specific examples of how such compromises may be used, including "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b). In all of these examples of other permissible purposes, the consistent thread is that the use must be limited to establishing some ancillary fact ultimately unrelated to any alleged legal liability.

In the order denying release, however, the District Court explicitly accepted, affirmed, and utilized the unproven allegations of wrongdoing found in the SEC Order. For example, the Order notes that the SEC set up a fund that issued disbursements to "victims," (Ex. 8—Opinion at 12) and that "[d]espite the SEC's order in September 2021 . . . , Defendant has *continued to promote* fraudulent investment opportunities to his followers and *attempted to revictimize those who received disbursements from the SEC fund*." [*Id.* (emphasis added).] Using the consent decree in this manner conflicts with the permissible uses provided under FRE 408 and Second Circuit precedent. *See, e.g.*, *In re Platinum and Palladium Commodities Litig.*, 828 F.Supp.2d 588, 593-94 (S.D.N.Y. 2011) (striking allegations of a manipulative trading scheme because "those allegations simply recast the CFTC's findings and are derived wholesale from the CFTC order, and that

such "allegations are paradigms of the type of pleadings prohibited by *Lipsky* and its progeny").

Moreover, while the SEC Order includes an undertaking by Respondents to "[n]ot participate, directly or indirectly, in any offering of a digital asset security," *Mr. Kwok is not a party to the SEC Order*. [Ex. 9—SEC Order.] The Government alleges in the Superseding Indictment that Mr. Kwok exercised control over GTV's finances but admits that he held "no formal position or title" at GTV. [Ex. 5— Superseding Indictment at ¶ 10]. As for GTV's parent company, Saraca, the Government alleges that "Relative-1"—not Mr. Kwok—is the ultimate beneficial owner. [*Id.* at ¶ 9.] Further, as explained above, the only "fraud charged in this case" for which Mr. Kwok plausibly could have solicited investments in April 2022 relates to the allegations concerning Himalaya Exchange. And, like Mr. Kwok, Himalaya Exchange was not among the Respondents to the SEC Order. [Ex. 9—SEC Order.] There is no precedent in this Circuit for denying bail to a defendant under these circumstances.

It is unconscionable to deem Mr. Kwok a serious danger to the community such that the presumption of pre-trial release is set aside on the basis of conduct that, at best, reflects a disagreement between Mr. Kwok and the SEC as to the state of the law. This Court must reverse.

**IV.    The District Court Committed Reversible Error in Concluding Without Analysis or Explanation That There is No Set of Conditions That Will Reasonably Alleviate Any Risks Presented by Mr. Kwok's Release**

The Government must also prove that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court and the safety of the community. *United States v. Salerno*, 481 U.S. 739, 742 (1987).  It is incumbent upon the court to consider all possible alternatives to preventative detention and "to explain on the record the extent to which it considered any alternatives to incarceration and, if so, on what basis they were rejected." *Berrios-Berrios*, 791 F.2d at 251 (noting that consideration of these factors is important even where the district court has found a defendant poses a risk of flight, because "many courts have set bail for defendants despite their propensity to flee").

The District Court failed to adequately explain on the record the extent to which it considered alternatives to Mr. Kwok's pre-trial detention, and, if applicable, on what basis they were rejected. The District Court also erred in concluding that there is no condition or set of conditions available that will reasonably alleviate any risks posed by Mr. Kwok's pre-trial release. This is reversible error.

i.    *Appearance Bond and Co-Signers*

Mr. Kwok proposed an appearance bond of $25 million, to be signed by Mr.

Kwok and two financially responsible adults, one of whom is not a family member,

$5 million of which would be secured by cash deposited with the Court, real estate

assets, or a combination of both. [Ex. 1—Bail Memorandum at 11]. Echoing the

Government's objections, the District Court noted that the Government would be

"one in a long line of creditors" in Mr. Kwok's bankruptcy proceedings if the

Government ultimately had to enforce the bond. [Ex. 8—Opinion at 12]. This is

incorrect. As he has stated in sworn testimony many times, and as the District

Court acknowledged in its Opinion, Mr. Kwok has no substantial property of his

own. [*Id.* at 12]. He has proposed an appearance bond of $25 million, $5 million of

which will be secured by a combination of cash deposited with the Court and/or

real estate assets. [Ex. 1—Bail Memorandum at 11].

The District Court also erred in rejecting Mr. Kwok's proposal to have "two

financially responsible adults, one of whom is not a family member" sign his

appearance bond. [Ex. 8—Opinion at 12; Ex. 1—Bail Memorandum at 11.] The

District Court noted that "several of Defendant's family members, including his

wife and daughter, are referred to in the Superseding Indictment as recipients of

fraud proceeds" and objected to the bond proposal on the grounds that Mr. Kwok

had not identified any co-signers that the Government and the District Court find

acceptable. [Ex. 8—Opinion at 13.]

*Mr. Kwok was not required to identify co-signers in his Bail Proposal.* It

was not his burden to prove that there are conditions of release that would mitigate

any risk of flight, obstruction, or danger. *The Government* bears the burden of

proving—by a preponderance of the evidence with respect to risk of flight or

obstruction and by clear and convincing evidence with respect to risk of economic

danger to the community—the *absence* of a combination of conditions that would

reasonably assure Mr. Kwok's presence in court and the safety of the community.

*See United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987); *Sabhnani*, 493

F.3d at 75 ("[A]t times, the government may have thought that this second burden

fell on the defendant, or that it had the benefit of a statutory presumption of

detention that the defendant was required to rebut . . . Plainly, such a view would

be incorrect.").

The question before the District Court was not whether Mr. Kwok can

*satisfy* any given condition of release, but rather whether there *exists* a condition or

combination of conditions that will reasonably assure Mr. Kwok's presence in

court and the safety of the community. The answer is "yes." Despite the

Government's concerns, Mr. Kwok is confident that he can secure his appearance

bond with assets *not* encumbered by his bankruptcy proceedings and *not* tainted by

the Government's fraud allegations, and that he can identify two financially

responsible adults *not* connected to the alleged fraud to co-sign.

ii.   *Electronic Monitoring and Home Detention with Private Security*

The District Court flatly rejected Mr. Kwok's proposal for home detention subject to 24/7 surveillance because "it is not as reliable as federal jail." [Ex. 8—Opinion at 13.] The district court likewise rejected Mr. Kwok's proposal to include location monitoring as a condition of his release, stating that "GPS monitoring is inadequate, as ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee." [Ex. 8—Opinion at 13.]

Setting aside Mr. Kwok's family wealth, there is no reason to consider him a flight risk; indeed, the facts described in Mr. Kwok's Bail Memorandum demonstrate the exact opposite. [*See generally* Ex.1—Bail Memorandum.] In effect, the Government's argument boils down to the contention that Mr. Kwok presents a risk of flight because he possesses the means to flee. [Ex. 7—Opposition to Bail Memorandum at 12-13]. And in the Opinion, the District Court opined that "a clever defendant with sufficient resources could figure out a way to leave the country without travel documents." [Ex. 9—SEC Order at 6]. In short, Mr. Kwok is a flight risk simply because he is believed to have the resources to flee.

This is the precise circumstance in which this Circuit has endorsed the use of home detention with private security. *See Boustani*, 932 F.3d at 82 (holding that home confinement with private security is appropriate where the defendant's wealth *is the reason* the defendant is deemed a flight risk). Pre-trial detention is

intended to serve a regulatory purpose, not a punitive one. *See, e.g., United States v. Millan*, 4 F.3d 1038, 1043 (2d Cir. 1993). Courts in this Circuit have released defendants on bail subject to home confinement with private security monitoring in other cases—there is no reason it can't also be done here.

vii.     *Restrictions on Technology and Communications*

During the Bail Hearing, Mr. Kwok's counsel explained that Mr. Kwok's conditions of release can be structured to deal with any concern the Government or the District Court may have about Mr. Kwok contacting victims, setting up new businesses, or perpetrating additional frauds. [Ex. 3—4/4/23 Bail Hearing Trans. at 31:15-32:03.] Counsel noted that the U.S. Attorney's Office frequently works with defendants to negotiate bail conditions sufficient to alleviate the Government's reasonable concerns, while also preserving the liberty of the defendant awaiting trial. [*Id.*] Up to this point, however, the Government has been unwilling to even have a conversation with Mr. Kwok's counsel about potential conditions of release. [Ex. 3—4/4/23 Bail Hearing Trans. at 31:25-32:3]. As both the Government and the District Court know, this is atypical. [*See* Ex. 3—4/4/23 Bail Hearing Trans. at 7:6-7 ("As this Court knows, pretrial services doesn't often recommend detention in a fraud case.").] The Government *routinely* negotiates bail conditions—even in cases alleging massive fraud, featuring wealthy defendants, and presenting ongoing concerns about the safety of the community—as demonstrated by that office's

recent handling of Sam Bankman-Fried's conditions of pre-trial release. [Ex. 3—

4/4/23 Bail Hearing Trans. at 31:17-32:03].

In December 2022, Samuel Bankman-Fried, charged with a multi-billion-

dollar securities fraud, was released on a $250 million bond and subject to home

detention with location monitoring technology and various other financial and

physical conditions. [*See* Exhibit 12, *U.S. v. Bankman-Fried*, Appearance Bond,

filed Dec. 22, 2022, Case No. 22-00673 (S.D.N.Y. 2022), ECF No. 14.]

While bail was initially agreed to between the Government and defense

counsel, issues later arose regarding the sufficiency of those conditions for Mr.

Bankman-Fried, particularly with respect to his use of the internet, messaging

applications, and a Virtual Private Network ("VPN"). The Government argued that

this conduct raised potential concerns, such as hiding online activities, covertly

accessing cryptocurrency exchanges, and transferring data without detection. [*See*

Exhibit 12, *U.S. v. Bankman-Fried*, Supplement to Government's Motion

Regarding Conditions of Release, filed Feb. 13, 2023, Case No. 22-00673

(S.D.N.Y. 2022), ECF No. 66.] But the court did not revoke Mr. Bankman-Fried's

bail; instead, it imposed additional conditions to address these concerns and

permitted the parties to work together to devise further ameliorative conditions.

[*Compare* Minute Entry in Connection with Arraignment dated Jan. 3, 2023, *U.S.*

*v. Bankman-Fried,* 22-cr-673 (S.D.N.Y. 2022), (ordering that defendant remain on

bail and imposing restriction prohibiting him "from accessing or transferring any FTX or Alameda assets or cryptocurrency, including assets or cryptocurrency purchased with funds from FTX or Alameda"); *with* Exhibit 13, *U.S. v. Bankman-Fried*, Order entered Feb. 14, 2023, Case No. 22-00673 (S.D.N.Y. 2022), ECF No. 68 (imposing additional condition prohibiting the defendant's use of a VPN).] Recognizing Mr. Bankman-Fried's need to use a computer and VPN to prepare his defense, the Government agreed to an additional bail condition that permitted Mr. Bankman-Fried access to a laptop under the control and supervision of his attorneys, restricted to the approved programs and applications necessary for Mr. Bankman-Fried to assist in his defense. [Exhibit 14, *U.S. v. Bankman-Fried*, Order entered Mar. 28, 2023, Case No. 22-00673 (S.D.N.Y. 2022), ECF No. 116.]

In Mr. Bankman-Fried's case the Government and the court implicitly recognized the critical importance of preserving the defendant's ability to assist in preparing his defense. The Government was willing to work with the defendant's counsel to arrive at a creative solution, using technology to limit the defendant's communications with the outside world to *no more and no less* than he needed to prepare his defense. Mr. Kwok's needs are no less important. Moreover, unlike Mr. Bankman-Fried, the language barrier between Mr. Kwok and his counsel and the Government's representation that it will soon produce *terabytes of data*—much of which will be in Mandarin—further restricts Mr. Kwok's ability to assist counsel

in preparing his defense while he remains incarcerated. The District Court's

disparate treatment of Mr. Kwok, and its failure to fully evaluate whether there is

*any combination of conditions* that will reasonably assure the safety of the

community is reversible error. Moreover, the District Court's conclusory rejection

of Mr. Kwok's argument that this combination of circumstances deprives him of

his Sixth Amendment right to counsel must be reversed.

Assuming *arguendo* that these contentions rise to the level of a "serious

risk" that Mr. Kwok "will obstruct or attempt to obstruct justice," 18 U.S.C. §

3142(f)(2), it is unclear how the Government believes Mr. Kwok's *detention* will

ameliorate these purported risks. Pre-trial incarceration would not greatly restrict

Mr. Kwok's ability to file legal actions or to have content posted on social media.

While the Government has stated unequivocally that it believes Mr. Kwok's

proposed bail conditions to be inadequate, it also contends that Mr. Kwok

"operates through agents," and "issues directives to his co-conspirators and

followers, who then act on his wishes." [Ex. 7—Opposition to Bail Memorandum

at 15]. And, in any case, Mr. Kwok has already agreed to restrictions on his ability

to communicate while on home detention.

The Government's speculation that Mr. Kwok will engage in future

obstructive conduct is just that—speculation. In the event Mr. Kwok is released on

bail and is subsequently believed to engage in acts of obstruction, the Government

will have the opportunity to seek his detention. From home confinement, Mr. Kwok would have every incentive to avoid that outcome.

## CONCLUSION

The District Court committed clear error: (1) in finding that the Government established by a preponderance of the evidence that Mr. Kwok poses a serious risk of flight; (2) in finding that the Government established by clear and convincing evidence that Mr. Kwok poses a serious danger to the community; (3) in failing to adequately explain on the record the extent to which it considered alternatives to Mr. Kwok's pre-trial detention, and, if applicable, on what basis they were rejected; and (4) in concluding that no condition or set of conditions would ensure Mr. Kwok's return to court or the safety of the community. This Court must reverse and remand.

Respectfully submitted,

/s/ Stephen R. Cook
Stephen R. Cook
BROWN RUDNICK LLP
2211 Michelson Drive
Irvine, CA 92612
(949) 752-7100

William R. Baldiga
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Counsel for Defendant-
Appellant Ho Wan Kwok*

Dated: May 5, 2023

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.      This Motion contains 8,730 words according to the word count feature of Microsoft Word.  Concurrently filed with this Motion is a Motion for Leave to File an Oversized Motion.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type.


*/s/ Stephen R. Cook*
Stephen R. Cook

Dated: May 5, 2023

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that true and correct copies of this Brief for

Defendant-Appellant were served electronically on the parties at the addresses

listed below on this 5th day of May, 2023.


*/s/ Stephen R. Cook*
Stephen R. Cook


Juliana N. Murray
Micah F. Fergenson
Ryan B. Finkel
U.S. Department of Justice
Criminal Division, SDNY
The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007
juliana.murray@usdoj.gov
micah.fergenson@usdoj.gov
Ryan.Finkel@usdoj.gov

# United States Court of Appeals
## for the
## Second Circuit

◆—●—◆

————————————

No. 23-6421

————————————

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

HO WAN KWOK, *et al.,*

*Defendant-Appellant.*

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

# EXHIBITS FOR MOTION FOR RELIEF FROM ORDER DENYING PRE-TRIAL RELEASE

| EXHIBIT | CONTENTS |
|---|---|
| 1 | Ho Wan Kwok's Memorandum in Support of Application for Release on Bail Pending Trial filed March 31, 2023, ECF No. 24.[1] |
| 2 | Ho Wan Kwok's Supplement to Application for Release on Bail Pending Trial filed April 19, 2023, ECF No. 50. |
| 3 | Transcript of Bail Proceedings held as to Ho Wan Kwok on April 4, 2023. |
| 4 | Transcript of Arraignment held as to Ho Wan Kwok on March 15, 2023. |
| 5 | Superseding Indictment, ECF No.  19. |
| 6 | Government's March 15, 2023 Letter Brief re: Detention ECF No. 7. |
| 7 | Government's Opposition to Ho Wan Kwok's Memorandum in Support of Pretrial Release, filed April 3, 2023, ECF No. 26. |
| 8 | Order Denying Pretrial Release entered April 20, 2023, ECF No. 51. |
| 9 | Securities and Exchange Commission Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-And-Desist Order dated Sept. 13, 2021. |
| 10 | Complaint and Affidavit in support of Application for an Arrest Warrant, *United States v. Jin*, Case No. 20-MJ-1103 (E.D.N.Y.). |
| 11 | Complaint and Affidavit in support of Application for an Arrest Warrant, *United States v. Yunpeng*, Case No. 23-MJ-0334 (E.D.N.Y. Apr. 6, 2023). |
| 12 | *U.S. v. Bankman-Fried*, Supplement to Government's Motion |

[1] Unless otherwise noted, all citations to the docket are to *U.S. v. Kwok*, Case No. 23-cr-118-1 (AT) pending in the United States District Court for the Southern District of New York.

| | |
|---|---|
| | Regarding Conditions of Release, filed Feb. 13, 2023, Case No. 22-00673 (S.D.N.Y. 2022), ECF No. 66. |
| 13 | *U.S. v. Bankman-Fried*, Order entered Feb. 14, 2023, Case No. 22-00673 (S.D.N.Y. 2022), ECF No. 68. |
| 14 | *U.S. v. Bankman-Fried*, Order entered Mar. 28, 2023, Case No. 22-00673 (S.D.N.Y. 2022), ECF No. 116. |
| 15 | Notice of Appeal, dated May 4, 2023 |

# EXHIBIT 7

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 3, 2023

**VIA ECF**
Hon. Analisa Torres
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

> Re: *United States v. Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal,"* **S1 23 Cr. 118 (AT)**

Dear Judge Torres:

The Government writes in opposition to the memorandum in support of pretrial release submitted by Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("Kwok" or the "defendant"). ("Def. Mem." or "defendant's Memorandum") (Dkt. 24.) As detailed in the Government's March 15, 2023 letter seeking detention ("Gov't. Ltr." or the "Letter") (Dkt. 7), Kwok is a unique defendant with extensive foreign contacts and tens of millions of dollars in resources that he can leverage to flee the United States. The defendant also poses a significant ongoing danger to the community and his obstructive acts and intimidation present a clear threat to the judicial process.

Indeed, since the Government filed its Letter, the evidence supporting detention has continued to mount. Kwok lied to Pretrial Services in an effort to conceal his wealth and employment. Kwok even violated the rules and regulations at the Brooklyn Metropolitan Detention Center ("MDC"), where he is currently detained. Moreover, the judicially authorized searches of his co-defendant's condominium and Kwok's multi-million-dollar residences revealed additional evidence of the defendant's significant resources and abilities to flee. The defendant's Memorandum largely ignores these facts, and draws (false) equivalencies with other cases. Kwok's proposed defense bail package is woefully inadequate to address his substantial foreign contacts and the strong incentives and significant resources he has to flee. It does not at all mitigate the pervasive danger Kwok's release presents to the community and to the judicial process. No bail package could.

Pretrial Services is correct. There are no conditions, or combination of conditions, that can reasonably assure the Court that the defendant will appear in court and that the public will be safe from harm. The Court should adopt the recommendation of Pretrial Services. Pretrial detention is absolutely appropriate this in this case.

I.     **The Pretrial Services Report**

On March 15, 2023, during his Pretrial Services interview, Kwok advised that he has been "unemployed since the end of 2016." He claimed total assets in the "approximate amount of $10,000 . . . that was *not* liquid cash," but comprised of the value of "two cellphones and clothing" (emphasis added). Kwok denied owning property or vehicles. He claimed that his Greenwich, Connecticut estate, which he valued at $9 million, is owned by his wife, and that his Manhattan penthouse is owned by his son. Kwok estimated his monthly expenses (food, clothes, cellphones and "bodyguards") to be $100,000, which expenses he represented were paid for by his family. The defendant also stated that he filed for bankruptcy in 2022. Kwok stated that, before he became "unemployed," he worked as a "grand representative" for his family businesses, from approximately 2000 through 2014. As Pretrial Services noted in its report, Kwok was unable to "estimate his income" for his work as a "grand representative."

Regarding his connections to the United States, Kwok informed Pretrial Services that he had not left the country for the past six years, but said that he had traveled to approximately "fifty" different countries between 1991 and 2017. Kwok noted that his wife and daughter live in the United States and emigrated from China, while his son lives in London. No members of Kwok's immediate family are U.S. citizens. Further, Pretrial Services was unable to corroborate the information Kwok provided about his family, because Kwok did not provide the correct phone number for his daughter.

Pretrial Services identified nine risk factors evidencing Kwok's risk of nonappearance: possession of a passport, extensive history of foreign travel, family ties outside the United States, his status as a foreign citizen who may be subject to removal, mental health history, use of aliases, multiple reported residences, unemployment, and the presence of unverified assets. Pretrial Services also identified the nature of the charged offenses as a risk factor suggesting danger to the community.

Pretrial Services concluded that there are "no conditions or combination of conditions that will reasonably assure the appearance of the defendant at future proceedings . . . . [and] respectfully recommend[ed] the defendant be detained."

II.     **Materials Recovered on March 15, 2023 Pursuant to Search Warrants**

On March 15, 2023, the Federal Bureau of Investigation executed a series of search warrants at premises, including (i) Kwok's Manhattan Penthouse (where he was arrested); (ii) Kwok's 50,000 square-foot mansion in Mahwah, New Jersey; and (iii) Kwok's seven-bedroom, approximately 12,000 square-foot estate in Greenwich, Connecticut. The FBI also executed a search warrant at the Manhattan condominium of Kwok's co-defendant, Yanping Wang, who was arrested the same day. Among other things, the FBI recovered the following materials:

- <u>Kwok's Mahwah Mansion:</u>

  o Approximately $394,000, €5000, HK$188,05,[1] and ¥250 in cash, and approximately 156 gold coins (alongside a receipt, which indicated that the coins were valued at approximately $109,555), which were found inside a safe located in a closet that was attached to what appears to be Kwok's dressing room. (Ex. A.) That dressing room stored approximately 30 Brioni custom-made suits, each of which bore the hand-stitched words "Brioni for Miles Kwok" inside the jackets.

  o A copy of Kwok's expired United Arab Emirates passport. (Ex. B.)

  o A cellphone scrambler.[2]

  o 10 computers or laptops; 16 external media storage devices (USB and hard drives); and nine cellphones.

- <u>Kwok's Manhattan Penthouse</u>

  o Inside Kwok's bedroom, the FBI discovered a cellphone that was concealed underneath Kwok's Duxiana-brand mattress. (Ex. C.)

  o 15 other cellphones, 14 external media storage devices (USB and hard drives), and four computers.

  o Gold pins with symbols of the Chinese Communist Party. (Ex. D.)

- <u>Kwok's Greenwich Estate:</u>

  o A 2021 a Lamborghini Aventador, which was purchased with fraud proceeds.

  o Three computers or laptops, five cellphones, and 13 USB drives.

- <u>Co-defendant Wang's Condominium:</u>

  o Kwok's expired Republic of Vanuatu Passport and Vanuatu non-citizen identification card, which were kept in Wang's safe. (Ex. E.) Stamps in the passport reflect that Kwok traveled to England in March 2017 using his Vanuatu Passport, and further reflect that Kwok was entitled to remain in

---

[1] HK$188,050 is worth approximately $23,900.

[2] A cellphone scrambler is an external device that attaches to a cellphone. Cellphone scramblers are designed to defeat Government wiretaps and other eavesdropping technologies. Scramblers work by converting voice into non-interpretable analog noises for transmission over the phone network. A receiver on the other end of a call re-converts the analog signals to understandable speech.

Case: 23-6421, 05/05/2023, DktEntry: 6.1, Page 204 of 446
Case 22-5007-1:23-cr-20928-AT Filed 10/26/23 Entered 10/26/23 20:46:01:216 Page 52 of 98

Page 4

England for six months. Wang's safe also contained Kwok's expired and currently valid Hong Kong passports. The expired Hong Kong passport reflected substantial foreign travel by Kwok. The valid Honk Kong passport reflects travel to England, Scotland, the Bahamas, and Japan in 2016.

o   Approximately $138,000 in U.S. currency and additional foreign currency, located in the above-described safe.

o   Printed documents that reflect bank account balances as of March 13, 2023 (*i.e.*, two days before the defendants' arrests) for various entities that the Government alleges Wang managed and controlled, which are all associated with the charged fraud. Those documents reflect balances of at least approximately $34 million.

### III.   The Defendant's Arguments for Release Should be Rejected

The defendant's Memorandum responds to the Government's March 15, 2023 Letter by proposing a set of conditions pursuant to which Kwok believes pretrial release would be appropriate. The defendant's Memorandum further seeks to draw parallels between this case and other fraud cases where pretrial detention was not ordered. Finally, the defendant attempts to rebut the Government's detailed recitation of factors outlined in its March 15, 2023 Letter demonstrating that Kwok is a risk of flight, poses a danger to the community, and is likely to obstruct justice. As explained below, the defendant's arguments should be rejected.

### A. The Defendant's Proposed Bail Package Is Inadequate

Kwok proposes a bail package of eight conditions: (i) home detention at his Greenwich estate or an "other" unidentified location approved by the Court; (ii) a $25 million bond secured by $5 million cash and two unidentified adult cosigners, "one of whom is not a family member;" (iii) "24/7 surveillance by a security company" with "at least one licensed and qualified guard;" (iv) GPS monitoring; (v) surrender of travel documents and surrender of his wife and daughter's travel documents; (vi) limitation on Kwok's ability to enter financial transactions; and (vii) no communications with co-defendants outside the presence of counsel.

*First*, the defendant proposes that he be released on "home detention" to his seven-bedroom, 12,000 square-foot Greenwich, Connecticut estate, pictured below, which has a pool, private tennis court, "living pavilion," and three external fireplaces:



The Greenwich estate was purchased in February 2020 by Greenwich Land, LLC—*an entity that has received millions of dollars in fraud proceeds*. Specifically, the Government's investigation has revealed that between August 2020 and April 2021, co-defendant Kin Ming Je, a/k/a "William Je" (the financial architect of the fraud) transferred approximately $34 million of fraud proceeds, primarily raised through the Farm Loan Program (*see* Indictment ¶ 14), to entities that are 100% owned by Kwok's family members; those transfers included an approximately $5 million transfer in October 2020 to Greenwich Land, LLC.[3] To say the least, it would be inappropriate for Kwok to live in the palatial Greenwich estate that he maintained with the proceeds of his fraud as a means of avoiding pretrial detention.

     *Second*, the defendant's bail proposal does not identify the source of the $5 million in cash that he intends to use to secure the proposed $25 million bond. That omission is significant, given that the defendant filed for bankruptcy and informed Pretrial Services that he only has assets worth $10,000, consisting of "two cellphones and clothing." Given those representations, the fact that the defendant now claims to have access to such a large amount of cash raises questions about the legitimacy of those funds and is further evidence of the defendant's lies to Pretrial about his assets. As noted above, although the defendant told Pretrial Services that he did not have any cash assets he in fact had $394,000 in his safe in his Mahwah Mansion. In any event, given Kwok's bankruptcy filing and his extensive subterfuge in hiding his fraud proceeds, any bond amount—

---

[3] Notably, in Kwok's bankruptcy proceeding, the court-appointed Chapter 11 Trustee filed for a declaratory judgment that Greenwich Land is nothing more than another alter ego used by Kwok to conceal his assets. *In re Ho Wan Kwok, et al.*, No. 22-05003 (JAM), Dkt. 1604 (D. Conn. Bankr. Mar. 27, 2023.) In support of the motion, among other things, the Trustee cited an August 2020 email from Greenwich Land's real estate broker in which the broker stated that the Greenwich estate was "bought by Miles [Kwok] under Greenwich Land." (*Id*. Ex. 41.)

secured or not—is likely to be based entirely on assets that are encumbered by bankruptcy proceedings, forfeitable as proceeds of his fraud, or both.[4] The defendant's bond proposal is therefore meaningless. Kwok pledging money that is not his (or is subject to the Chapter 11 proceedings) does not any provide "moral suasion" against his flight. *See United States v. Zhang*, No. 22-CR-208-4 (CBA), 2022 WL 17420740, at \*4 (E.D.N.Y. Aug. 3, 2022) ("Giving up investment property with unclear ownership that may already be in some jeopardy may seem like a small price to avoid life imprisonment") (citing *United States v. Martinez*, 151 F.3d 68, 71 (2d Cir. 1998) (discussing bond package in terms of its "ability to exercise moral suasion" over the defendant "should he decide to flee"), *aff'd*, 55 F.4th 141 (2d Cir. 2022)).[5]

*Third*, the defendant proposes that he be monitored—at all times—by private security. Kwok's argument that pretrial release would be appropriate only if he were always surveilled by armed guards is tantamount to a concession that he must be detained. He is simply arguing that he be detained in his Greenwich estate, rather than in the federal system, where those without access to his level of resources are held. *United States v. Banki*, 369 Fed. App'x 152, 154 (2d Cir. 2010) (explaining private security "conditions might be best seen not as specific conditions of release, but simply as a less onerous form of detention available only to the wealthy"). Thus, this Court should be troubled by the defendant's private jail proposal which, "at best 'elaborately replicate[s] a detention facility without the confidence of security such a facility instills.'" *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (quoting *United States v. Gotti*, 776 F. Supp. 666, 672 (E.D.N.Y. 1991) (rejecting private jail proposal)).

In support of his private armed-security proposal, the defendant points to *United States v. Sabhani*, 493 F.3d 63 (2d Cir. 2007), but that case is distinguishable. (Def. Mem. at 23-24.) In *Sabhani*, the Government identified conditions it believed would mitigate against a risk of flight, which included armed security. *Id.* at 65. The Government does not similarly agree here. Moreover, since the 2007 *Sabhani* decision, the Second Circuit and district courts have cast doubt on the feasibility of private security arrangements.[6] Even the defendant concedes that the Court

---

[4] Indeed, recently the federal bankruptcy court has issued a series of orders temporarily restraining and enjoining a series of Kwok-related entities (generally held in the names of is children) from encumbering, transferring, alienating, dissipating, paying over, or assigning any property and/or assets. (Ex. G (collecting orders).)

[5] It is also telling that that the defendant has not yet identified any proposed co-signers to the Court or the Government. Sureties must have a "net worth which shall have sufficient unencumbered value to pay the amount of the bail bond." 18 U.S.C. § 3142(c)(1)(B)(xii); *see United States v. Batista*, 163 F. Supp. 2d 222, 225-26 (S.D.N.Y. 2001) ("a defendant must [also] show that the proposed sureties exercise moral suasion to ensure the defendant's presence at trial.").

[6] The defendant relies on *Sabhani*, claiming that case supports the defendant's contention that a defendant may not be subject to pretrial detention "where the defendant's wealth *is the reason* the defendant is deemed a flight risk." (Def. Mem. at 24.) This argument is a strawman. The Government is not contending that Kwok's wealth is the only reason he is a flight risk, nor is risk of flight the only reason he should be detained. For similar reasons, the defendant's reliance on *United States v. Weigand*, 492 F.Supp.3d 317, 319 (S.D.N.Y. 2020), should be discounted. *Weigand* concerned a foreign-national who was initially detained and later released because the primary risk of flight concerned his wealth. *Id.* at 318. There were no allegations of ongoing

of Appeals is clear that the "Bail Reform Act does *not* permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) (emphasis added); *Banki*, 369 Fed. App'x at 153-54 (stating the Court was "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail."); *United States v. Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) ("'it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the Government, even if carefully selected'" (quoting *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001))); *United States v. Valerio*, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) (Bianco, J.)  ("There is nothing in the Bail Reform Act that would suggest that a defendant (or even, hypothetically, a group of defendants with private funding) has a statutory right to replicate or construct a private jail in a home or some other location.").

It is reasonable for courts to be reluctant to allow wealthy defendants to finance their own security as an alternative to pretrial detention.[7]  That reluctance is also driven by real-world uncertainties, such as whether defendant-funded private security would, as a practical matter, be accountable to the courts, and whether the guards would have the authority to use force to prevent the defendant from escaping, which could expose them to civil liability.  *See Valerio*, 9 F. Supp. 3d at 294 ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail.").  As the Government argued in its March 15, 2023 Letter, if the defendant's appearance can only be assured through use of round-the-clock armed guards, the defendant belongs in a federal detention center, not released under bail conditions that effectively create a private prison for one in a luxurious Greenwich estate.  *See United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 3681423, at *12 (S.D.N.Y. June 16, 2016) ("What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance?" (quotation and citation omitted).)

*Fourth*, as the Government argued in its March 15, 2023 Letter, GPS monitoring is substantially inadequate. The technology is far from foolproof and will do little to prevent Kwok's flight—a sophisticated international traveler with reams of cash, cellphone scramblers, private aircraft, and a network of supporters located across the globe.  *See United States v. Freeman,* 21 Cr. 88 (JSR) (S.D.N.Y. Feb. 19, 2021) (ordering detention in $2.3 million money laundering case and noting "electronic monitoring and the like, as indicated previously, those are far from perfect devices for preventing flight"); *see also* Gov't Ltr. at 22 (collecting cases).

*Fifth*, this Court should have little faith that the defendant will surrender all of his travel documents and refrain from obtaining new ones.  Kwok's access to travel documents is

---

danger or obstruction, and Judge Rakoff's October 5, 2020 opinion cited the "unique circumstances of the COVID-19 pandemic" as the basis for pretrial release.  *Id.* at 319.

[7] Here, and generally in his Memorandum, the defendant does not identify the source of funds he intends to use to finance 24/7 private security or other aspects of his proposed pretrial detention.

remarkable.  During an interview on April 19, 2017, Kwok claimed that he "own[s] about 11 passports," including "three passports of some middle-east countries."[8]  Kwok's statement is corroborated by the copy of the UAE passport that the FBI located in Kwok's Mahwah Mansion (although the actual passport has not been not located), and Kwok's Republic of Vanuatu passport located in his co-defendant's safe.[9]  Although the Vanuatu and UAE passports are expired and other recovered documents suggest Kwok may no longer have Vanuatu citizenship, these materials demonstrate Kwok's ability to acquire travel documents when he needs them.  The defense is simply wrong to suggest that Kwok (and his wife and daughter) could not "logistically manage" to travel outside the United States based on a court order to surrender travel documents and not obtain new ones.  (Def. Mem. 13).  Given Kwok's one-time access to up to 11 passports, and the fact that Kwok and his family have historically traveled internationally on various private air- and seacrafts, the defendant's assurances to this Court are meritless.  Notably, and particularly troubling, Kwok did not inform Pretrial Services about his Vanuatu or UAE passports.  Concealing his travel documents from Pretrial Services is reason enough to order pretrial detention, and it puts to lie any claim that the Court can trust the defendant to abide by conditions of release.

Further, it is not credible for the defense to contend that Kwok cannot travel at all, due to his fear of repatriation to China.  According to the defense's motion, Kwok fled Hong Kong on January 1, 2015, has never returned due to the danger that his returning to China would pose, and cannot travel internationally due to fear of repatriation to China.  (Def. Mem., at 7.)  But Kwok *has* traveled *internationally* since he fled China—including using his Vanuatu passport.  The claim that Kwok can be nowhere except the United States, to avoid "the long reach of the CCP," is overblown and contravened by Kwok's extensive travel history.  (Def. Mem. at 13.)

*Sixth*, the condition that the defendant refrain from any financial transactions (without permission from the Government or the Court) is hollow and does nothing to insulate the public from Kwok's ongoing economic harm.  Due to his bankruptcy, Kwok is already effectively subject to this condition.  However, as a review of the bankruptcy docket indicates, Kwok has acted through others and a network of shell companies to conceal his assets and finances.  Indeed, the Indictment itself establishes that Kwok engaged in financial transactions by directing others to act on his behalf.  Moreover, Kwok has demonstrated a willingness to flout and undermine court orders, providing little assurance that this condition would have any impact on him.  *In re: Ho Wan Kwok, et al.,* Chapter 11 Case No. 22-50073 (JAM) (Bankr. D. Conn. Jan. 11, 2023) (Dkt. 7, Ex. C, at 23 -29 (detailing interference with the Chapter 11 bankruptcy proceedings by Kwok and his followers despite the issuance of a temporary restraining order prohibiting such actions).  Kwok's bankruptcy filing was, itself, an attempt to circumvent a New York State Supreme Court Judge's order subjecting Kwok to sanctions for failing to follow that court's orders.  *See* PAX

---

[8] Complaint Exhibit 1B, *HNA Grp. Co., Ltd.*, *v. Guo Wengui*, No. 653281/2017, Dkt. No. 7 (NY Sup. Ct. Aug. 30, 2017) (English translation of April 19, 2017 interview between Kwok and Voice of America).

[9] Vanuatu is a small island nation in the South Pacific.  It has been publicly reported that Vanuatu permits foreign nationals to acquire Vanuatu citizenship in exchange for investments in the country.  *See* "Citizenship for sale: fugitives, politicians and disgraced businesspeople buying Vanuatu passports," The Guardian, dated July 14, 2021 (available at https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports)

Lawsuit, No. 652077/2017, 2018 BL 236400, Dkt. 716. (N.Y. Sup. Ct. Feb. 9, 2022) (order directed Kwok to pay $134 million contempt fine). Indeed, the defendant has already violated this proposed condition by lying to Pretrial Services about his assets—during his interview, Kwok did not disclose the nearly $400,000 in cash and foreign currency he kept in a safe in his Mahwah Mansion, nor did he disclose other bank accounts he controls through intermediaries. Kwok's long and documented history of undermining the judicial process and his deception during his Pretrial Services interview demonstrate that this condition would have no impact on Kwok.

## B. Detention in this Case is Consistent with Precedent

The defendant cites to several fraud cases where defendants were subject to pretrial conditions, even though substantial losses were alleged.[10] (*See, e.g.,* Def. Mem. at 1-2, 21-22.) The Government does not dispute that there are examples of cases in which defendants charged with serious economic crimes were granted bail. But the cases the defendant relies on are starkly different from the circumstances presented here by (1) Kwok's extensive foreign ties and minimal ties to the United States, and (2) the ongoing danger posed by Kwok's release. Courts in this District regularly order pretrial detention in cases concerning financial crimes where, such as here, the Government demonstrates that no conditions provide reasonable assurance the defendant will appear in court or the community will be safe. All the cases cited by the defense are distinguishable because they involved the Government's *consent* to pretrial release at the time of arrest,[11] and

---

[10] Several of the defendant's cited cases are an order of magnitude different in terms of alleged economic harm than the instant case. *United States v. Gulkarov, et al.*, No. 22 Cr. 20, (S.D.N.Y. 2022) concerned a $30 million healthcare fraud. *See id.*, Dkt. 1, at 3. The $100 million figure Kwok cites pertains to several interrelated cases. *See United States v. Akbar, et al.*, No. 20 Cr. 563, Dkt. 1, at 4 (S.D.N.Y. 2020) ("potential loss to USPS of up to $15 million"); *United States v. McFarland*, No. 17 Cr. 600 (NRB), Dkt. 20, at 4 (S.D.N.Y. 2017) ("defendant caused losses to at least seventy victim-investors, totaling more than $20 million dollars"). Kwok is charged with defrauding thousands of victims of more than $1 billion.

[11] The cases cited by Kwok where the Government ultimately sought pretrial remand were *United States v. McFarland, United States v. Madoff,* and *United States v. Belfort*. In *McFarland*, after the Government consented to pretrial release, on June 18, 2018, it sought detention because McFarland was charged with additional crimes while on release. Judge Buchwald granted the Government's motion. (*Id.*, Dkt. 43.) In *Madoff*, the Government consented to pretrial release on the day of Madoff's arrest. Nearly two weeks later, the Government sought remand, because it learned that Madoff had mailed expensive items to relatives and friends. When seeking remand, the Government conceded that mailing items did not violate "the specific conditions of bail" set in Madoff's criminal case. No. 09 Cr. 213, Dkt. 15, at 5 (SDNY Jan. 12, 2009). Ultimately, Magistrate Judge Ellis denied the Government's motion because, *inter alia*, "the Parties had agreed that the measures in place were adequate" to address concerns about flight. *Id.* at 9. In declining to find a serious risk of obstruction, the court considered only whether Madoff's mailing of assets to others constituted obstruction and whether those acts suggest a serious risk of future obstruction. *Id.* at 12. As to the potential ongoing danger, the court considered merely whether the "potential future dissemination of Madoff's assets would rise to the level of an economic hard cognizable under § 3142," not whether Madoff would continue to commit further crimes. *Id.* at 19. The record before this Court is starkly different. Kwok's obstructive efforts extend far beyond mailing some assets to family and friends. He has threatened witnesses, orchestrated harassment

involve defendants with substantially more ties to the United States.[12]  By contrast, Kwok has continually lived in the United States for just five years (several of which were during the height of the COVID-19 pandemic, when international travel was limited).  For more than four of those five years, Kwok used the United States as the staging ground to run a billion-dollar fraud enterprise.  Further, none of the cases Kwok cites concern defendants with the extensive history of harassment and deception that Kwok has exhibited,[13] let alone the ongoing economic harm Kwok seems adamant to continue inflicting, including by relocating his fraud operations and proceeds abroad to the UAE.   Nor do those cases concern defendants with foreign ties anywhere close to the extent that Kwok has.  As discussed above, Kwok claims to have had access to 11 foreign passports, has substantial foreign assets, has family abroad, has access to planes and seacraft, and is likely to be helped by his co-defendant, William Je, who is himself an international fugitive hiding in the UAE.

        Nonetheless, there are ample examples of individuals charged with fraud and other similar crimes that have been detained over the last several years.  Many such cases concern economic losses far smaller, and less complex, than Kwok's billion-dollar fraud.  For example:

---

campaigns directed at court-appointed officials, and circumvented court orders. (Gov't Lt. 12-16.) Moreover, here, the Government does not believe—as it did in Madoff—that conditions can be set which can ameliorate the risk of flight or danger.  The *Belfort* docket is unclear as to why the Government ultimately sought detention and the disposition of the request.

[12] *See United States v. Bankman-Fried,* 22-cr-673 (S.D.N.Y. 2022) (American citizen born in the United States); *United States v. Hwang*, 22-cr-240 (S.D.N.Y. 2022) (58-year old naturalized American citizen present in the United States since childhood with a family of American citizens located in New Jersey); *United States v. Gulkarov, et al.*, No. 22-cr-20 (S.D.N.Y. 2022) (present in the United States for over 20 years with family in the U.S. including young children in the United States); *United States v. McFarland*, No. 17-cr-600 (S.D.N.Y. 2017) (American citizen born in the United States); *United States v. Tucker, et al.*, No. 16-cr-91 (S.D.N.Y. 2016) (same); *United States v. Madoff*, No. 1:09-cr-00213-DC-1 (S.D.N.Y. Dec. 11, 2008) (same); *United States v. Holmes et al*, No. 5:18-cr-00258-EJD-1 (N.D. Cal. June 15, 2018) (same); *United States v. Causey et al.*, No. 4:04-cr-00025-2 (S.D. Tex. Feb. 19, 2004) (same regarding Jeffrey Skilling); *United States v. Belfort, et al.*, No. 1:98-cr-00859-AMD-1 (E.D.N.Y. Sept. 4, 1998) (same).

[13] For these reasons *United States v. Bankman-Fried* is not analogous.  In *Bankman-Fried*, during an appearance before Magistrate Judge Gorenstein, the Government consented  to pretrial release due to the following factors, none of which are present here: (i) defendant waived extradition and voluntarily returned to the United States; (ii) no history of flight; (iii) family and community ties; (iv) diminished assets frustrating flight ability; and (v) a "marginal" concern of ongoing harm to the community because the defendant is no longer associated with FTX.  No. 22 Cr. 673, Dkt. 36, at 6-8 (S.D.N.Y. Jan. 20, 2023) (transcript of initial appearance).  Magistrate Judge Gorenstein found that the weight of the evidence favored pretrial detention but permitted pretrial release, given the parties' agreement, the defendant's U.S. citizenship with "very strong ties to this country in terms of growing up here and having family who currently lives here," and his inability to conduct future financial transactions due to his notoriety mitigating harms. *Id.*, at 13-14.  Bankman-Fried's later use of a VPN and improper contact with a single witness does not come close to Kwok's obstructive conduct, concealment of assets, and danger presented by Kwok.

Case 22-5007:23-Doc-2292881 Filed 10/26/26 Entered 10/26/23 20:46:12 Page 59
of 98
Case: 23-6421, 05/05/2023, DktEntry: 6.1, Page 211 of 446

Page 11

- *United States v. Celvin Freeman*, 21 Cr. 88 (JSR) (S.D.N.Y.) (defendant who resided in New Jersey was charged for laundering approximately $2.3 million in fraud proceeds for Ghanaian criminal enterprise and detained because of lack of legal status, strong ties to Ghana, attempted flight during arrest, and significant potential jail time). When ordering detention, Judge Rakoff observed, with respect to co-signers: "We're not relying on his assets; we're relying on the assets of others, and the kind of scheme that he has involved himself in suggests that his regard for other human beings is modest at most. As for electronic monitoring and the like, as indicated previously, those are far from perfect devices for preventing flight." (Feb. 19, 2021, Bail Hearing Tr. at 19-20)).

- *United States v. Fred Asante*, 21 Cr. 88 (JSR) (S.D.N.Y.) (defendant who resided in Virginia with his family was charged for laundering approximately $6.7 million in fraud proceeds for Ghanaian criminal enterprise and detained because of prior drug felony, prior flight to Ghana using a fake passport, access to substantial sums of money, and lack of disclosure to pretrial services).

- *United States v. Sheng-Wen Cheng*, 21 Cr. 261 (AJN) (S.D.N.Y.) (defendant who resided in Manhattan was charged with $7 million COVID-19 pandemic loan fraud and detained because defendant had no legal status, substantial access to financial means, strong family ties abroad, and crime involved use of stolen identities).

- *United States v. Muge Ma,* 20 Cr. 407 (RMB) (S.D.N.Y.) (defendant who resided in Manhattan and had legal permanent resident status in the United States was charged with attempted $20 million COVID-19 pandemic loan fraud and detained because he was a Chinese national with strong ties abroad, faced substantial prison time, and the crime involved fabricated documents).

- *United States v. Malhotra*, No. 19 Cr. 411 (ALC) (S.D.N.Y. May 7, 2020) (defendant, an Indian-national, charged with defrauding victims out of more than $3 million by promising false computer repair services, was detained based on defendant's risk of flight and lack of contacts to the United States).

- *United States v. Raniere*, 18-CR-204 (NGG), 2018 WL 3057702, at *7-8 (E.D.N.Y. June 20, 2018) (detaining defendant based upon flight risk where defendant had no declared assets but appeared to have access to enormous resources offered to be guarded by a private security company).

- *United States v. Ho*, No. 18-1641-cr, (Aug. 30, 2018 2d Cir. 2018) (affirming denial of pretrial release where Chinese-national defendant charged with $2.5 million bribery scheme).

- *United States v. Zarrab,* No. 15 Cr. 867 (RMB), Dkt. 41 (S.D.N.Y. June 16, 2016) (denying pretrial release and rejecting proposal of armed guards, $50 million PRB secured by $10 million cash, and GPS monitoring. Defendant was charged with various crimes related to violations of sanctions laws).

As with the above defendants, detention is appropriate here in light of Kwok's substantial means and motive to flee, his demonstrated history of obstruction, and the ongoing danger he poses if released.

### C. The Government Has Demonstrated by a Preponderance of the Evidence that Kwok is a Flight Risk

The defense's attempts to frame Kwok's personal circumstances as reasons why he is unlikely to flee are unavailing and ignores or minimizes key facts. The defense ignores, and therefore does not significantly dispute, the strength of the Government's evidence and the seriousness of the charges in the Indictment. The defense pays little attention to the decades-long potential prison sentence Kwok faces as a result of his crimes and the powerful motive this creates for him to flee the United States, especially since his connections here are tenuous. At most, Kwok claims that the presence of his wife and daughter in the United States incentivizes him to remain. (Def. Mem. 13.) But this overlooks the fact that in 2015 Kwok left his wife and daughter to enter the United States, *see* Def. Mem. at 7 and 22, and ignores that Kwok's son presently lives in the United Kingdom. Kwok cannot claim on the one hand that his daughter's and wife's presence in the United States incentivizes him to remain and that, on the other hand, his son's presence in a foreign country does exert any pull to leave.

Kwok's argument that he will remain in the United States relies on the proposition that he will not travel, at all, because of security concerns due to the threat posed to him and his family by the CCP. (*See* Def. Mem. at 14 ("Kwok [has] real and substantial security concerns about the threat posed by the CCP were he to travel abroad."), *id.* at 22 ("threats that are far more likely to become realities should Mr. Kwok flee the United States").) This argument does not withstand scrutiny. Kwok claims to have fled China in 2015 because he feared arrest by the CCP. Yet Kwok continued to travel internationally, despite the CCP's attempts to repatriate him. (*See* Gov't Ltr. at 2.) It may be that Kwok has not traveled internationally since applying for asylum in 2017, since the application precludes it, but Kwok's asylum application is seriously jeopardized in light of the Indictment. With an asylum denial looming, his incentive to remain in the United States completely dissolves.[14]

Next, the defense argues that Kwok lacks the financial means to flee. This argument also collapses under closer inspection. If it is true, as the defense claims, that Kwok has the ability to put forth a $5 million cash bond, cover the expenses of round-the-clock armed guards, and cover

---

[14] Kwok conclusory suggests that, even if he were convicted, he would be "eligible" to remain in the United States pursuant to the Convention Against Torture. (Def. Mem., at 15.) Even if granted that protection, which is not certain, the Convention does not require that those eligible remain in the United States. *See Lin v. U.S. Dep't of Just.*, 432 F.3d 156, 161 (2d Cir. 2005) (affirming denial of application for relief under the CAT to prevent return to China). Those protected under CAT may be removed to third-party countries. *Mudiangomba v. Holder*, 372 F. App'x 161, 164 (2d Cir. 2010) (affirming decision removing individual to alternative country). In any event, the theoretical possibility that Kwok, after conviction, and after serving a prison term, *might* be eligible to remain in the United States hardly suggests he is incentivized to remain now while subject to substantial criminal consequences. Kwok's theoretical CAT protection does not come close to rebutting the factors offered by the Government demonstrating by a preponderance Kwok's extraordinary flight risk.

$100,000 of monthly expenses, he has the finances to escape from this country. Indeed, the Government found more than $500,000 in United States currency, foreign currency, and gold coins in one of his homes—all assets that he did not disclose to Pretrial Services. His co-defendant Wang had another $138,000 in cash in her apartment. And William Je, the financial architect of the fraud, *is a fugitive* believed to be hiding in the UAE. Je is believed to have access to millions of dollars of fraud proceeds in foreign accounts that can be used to facilitate Kwok's and his family's flight. The bank documents found in Wang's condominium corroborate the presence of other assets. Those documents reflect balances, as of March 13, 2023, of at least approximately $34 million held in the names of entities associated with the fraud. Given this backdrop, the defense argument that Kwok's bankruptcy filing means he lacks the finances to flee is simply wrong. (Def. Mem. at 28-29.) If anything, Kwok's bankruptcy further supports his pretrial detention, because it is evidence of the extreme lengths, and judicial gamesmanship, that Kwok undertakes to conceal his wealth.

Further, as described above, Kwok has stated he held *eleven* passports. The Government presently possesses his Hong Kong and Republic of Vanuatu passports. Kwok appears to hold a UAE passport that is unaccounted for, and it is not clear what other countries provided Kwok with travel documents. The fact that Kwok has obtained travel documents from at least three countries—and possibly as many as eleven—demonstrates that no court order can prevent Kwok from obtaining additional travel documents for himself and his family members. Kwok is also believed to have a private plane in Europe under the control of his son. As evidenced by the many stamps in his Hong Kong passport, and his admission to pretrial of traveling to more than "fifty" countries, Kwok is a deeply experienced international traveler who is comfortable in many locations throughout the world. *Zarrab*, 2016 WL 3681423, at *8 (citing "lack of ties to the United States; his significant wealth and his substantial resources; his extensive international travel; and his strong ties to foreign countries" as relevant considerations when ordering pretrial detention). Kwok's support is not limited to his son. As the bankruptcy court decisions have made clear, Kwok has a vast network of supporters willing to harbor and assist him should he request their help. Kwok has access to a deep well of resources—finances, documents, and a global network of supporters. No court-imposed conditions can ameliorate that.

While the Government believes there are many locations to which Kwok can flee, the United Arab Emirates is an obvious destination for several reasons. G|CLUBS and the Himalaya Exchange have offices and personnel in the UAE. Indeed, earlier this year, two American citizens associated with G|CLUBS and other entities used in the fraud obtained visas to work, and stay, in the UAE. If G|CLUBS personnel can obtain visas, then certainly Kwok—*i.e.* "The Principal" of the fraud—can do so as well. The defense ignores that Kwok has promoted sending funds to the UAE as a way to avoid the "long arm jurisdiction of the U.S." (Gov't Ltr. at 19.) Thus, Kwok knows the UAE is a relatively safe place for him to hide his assets, his family, and himself. Indeed, as noted, Kwok's co-defendant is believed to be hiding there right now. It is not credible for the defense to summarily claim there "is not evidence that Kwok would or could flee to the UAE." (Def. Mem. at 13-14.)

### D. The Government Has Demonstrated that Kwok is a Danger to the Community and the Judicial Process

The defendant generally ignores the substantial evidence the Government has put forth demonstrating Kwok's propensity to inflict further economic harm on the community. As

described in the Government's March 15 Letter, the defendant's fraud has escalated over the course of years.  Kwok has not stopped despite intervention by the SEC, closing of his accounts, receipt of grand jury subpoenas by entities affiliated with him, seizure of $630 million dollars, contempt rulings by a New York Supreme Court judge, and similar findings by a federal bankruptcy judge.  (*See* Gov't Ltr. at 19-20.)  The potential for ongoing harm is not theoretical.  Just one month before his arrest, Kwok started promoting the "A10" offering—a purported investment opportunity that is consistent with the hallmarks of all of Kwok's other fraudulent offerings.  (*Id.* at 10.)  This Court can have no reasonable assurances that Kwok will simply stop his fraud efforts because he is ordered to do so, nor that he will not engage in financial transactions if this Court so directs him—particularly where the defendant has demonstrated extraordinary sophistication.[15]  The defendant uses dozens of different cellphones and cellphone scramblers; he has relied on an intricate and dense web of shell corporations, middle men, and subterfuge.  Kwok's ability to conceal his actions is not speculative.  Federal and state court judges have found as much.  *See e.g.*, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631 at *1 (finding by Judge Liman that "Eastern Profit Corporation," nominally held by Kwok's daughter, was "in essence, a shell corporation" for Kwok); February 9, 2022 Decision and Order, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181 (finding Kwok used shell companies to shield his assets); *In re: Ho Wan Kwok, et al.*, Chapter 11 Case No. 22-50073 (JAM), at 10 (Bankr. D. Conn. Jan. 11, 2023) (Filed at Dkt. 7, Exhibit C) (identifying five organizations and movements which "serve as business vehicles for [Kwok], and their members are personally loyal to the [Kwok]").

The defense does little to contend with the mountain of evidence demonstrating Kwok's risk of obstruction of justice if he were released.  Indeed, Kwok already appears to be engaged in such efforts.  On March 29, 2023, the Government was advised by MDC staff that Kwok's "family members have been manipulating the [legal call] system and providing false information to circumvent the legal call system."  (Ex. F.)  On at least two occasions, Kwok communicated with individuals who appear to be family members using the legal call system, which is intended to be used only by inmates and their counsel.  One occasion was after Kwok and his family were warned that the legal call system may not be used for social calls.  Virtual legal calls are not recorded, whereas calls between an inmate and their family members are generally subject to monitoring.  It appears that Kwok circumvented the rules of the MDC in an effort to avoid law enforcement

---

[15] Kwok relies on *United States v. Stein* in support of the argument that a defendant's past involvement in criminal activity is not itself sufficient to demonstrate an ongoing danger.  In *Stein*, unlike here, the Government did not undertake any "real effort to suggest that there is a substantial risk that [the defendant] will continue to [commit crimes] if released pending trial."  No. S1 05 Cr. 888 (LAK), 2005 WL 8157371, at *8 (S.D.N.Y. Nov. 14, 2005).  Here, the Government has shown that, no matter the circumstances, Kwok continues to flout court orders and law enforcement actions and continues to commit fraud.  In any event, *Stein* is a case in which the defendant charged with economic crimes *was detained pending trial* because, *inter alia*, the defendant was a flight risk whose financial disclosure was misleading.  *Id.*; *see also id.* at *2 ("nonviolent witness tampering and obstruction poses a danger to the community and that the risk of such activities, in an appropriate case, would support pretrial detention" (citing *United States v. LaFontaine*, 210 F.3d 125, 132 (2d Cir. 2000)).

monitoring his activities. As a result, Kwok was temporarily banned from remote attorney visits.[16] If Kwok cannot abide by the rules of the MDC, there is no reasonable assurance that he will follow any conditions of pretrial release.

Tellingly, the defense does not meaningfully respond to or refute the many examples of obstruction described in detail in the Government's March 15, 2023 Letter, including: (i) Kwok's use of civil lawsuits to avoid payments to creditors; (ii) Kwok's February 15, 2022 bankruptcy filing to avoid a contempt ruling by a New York State Judge; (iii) the January 2023 findings by a federal bankruptcy judge that Kwok, despite the issuance of a TRO, continued to harass (through intermediaries) a court-appointed bankruptcy Trustee, his law firm Paul Hastings, and the law firm of O'Melveny & Meyers who represents one of Kwok's largest creditors, where those involved in the bankruptcy have received death threats from Kwok's supporters; (iv) Kwok's statements, in a January 23, 2023 video on his Gettr page following the bankruptcy court's preliminary injunction, in which Kwok encouraged his followers to obstruct the bankruptcy court and flood the docket with unsupported claims; (v) Kwok's video presentation in November 2022, explaining to his followers how to avoid subpoenas issued in connection with the bankruptcy[17]; (vi) Kwok's attacks against Individual-2, branding that person a "demon" and CCP spy, thereby subjecting Individual-2 to attacks by Kwok's followers; (vii) threats against victims who have complained about Kwok's fraud; (viii) Kwok's attacks against his critics, including calling for violence against a pastor who criticized Kwok; and (ix) Kwok's mobilization of his followers against a journalist in Canada, which resulted in physical assault of the journalist's friend.

At most, the defense generalizes these facts and suggests that they do "not constitute obstruction of justice." (Def. Mem. at 18.) The defense is wrong. While Kwok is not presently charged with obstruction-of-justice crimes, that does not mean the Court should excuse Kwok's substantial and dangerous obstructive conduct described in the Government's letters. That conduct includes many instances of Kwok using his power and his followers to interfere and pressure those who have instigated judicial proceedings against him. It includes Kwok's threatening of victims, encouraging witnesses to avoid legal process, encouraging thousands to disrupt bankruptcy proceedings, and mobilizing a pressure campaign that relies on violent threats (and sometimes actual violence) to dissuade others from acting against him. These are definitionally obstructive acts. The defense alternatively asserts that, even if these actions are obstructive, none of them are attributable to Kwok. The defense is again mistaken. Among other things, Kwok is literally on video engaging in obstructive conduct.

Finally, the defendant's contention that his proposed conditions would "eliminate any risk of obstruction" is unsupported and unpersuasive. (Def. Mem. at 18.) *First*, for all the reasons outlined above, this Court can have no reasonable assurance that Kwok will follow its orders (as opposed to the other court orders Kwok has defied). *Second*, Kwok is called "The Principal," by his co-conspirators for a reason. He operates through agents. Kwok issues directives to his co-conspirators and followers, who then act on his wishes while enabling Kwok to disclaim

---

[16] The Government subsequently advised the MDC the identity of Kwok's counsel and will work with the MDC to ensure that remote attorney visits with Kwok's counsel may resume. The Government will also work with the MDC to ensure Kwok has access to case materials and can meaningfully assist in the preparation of his defense.

[17] https://www.youtube.com/watch?v=KkKFfGzb7jE

involvement. Already, while incarcerated Kwok appears to have evaded the Bureau of Prison's rules. And already, Kwok's associates appear intent on obstructing justice in *this* case (as they have in others). For example, on March 30, 2023, Kwok's Gettr account posted false accusations about members of the undersigned prosecution team and an attorney with the Securities and Exchange Commission.[18] This post was made in Kwok's name, and on his account; it strains credulity to believe it was not authorized by Kwok himself.

While this Court can have no assurance that Kwok would abide by conditions of release, the Court can be reasonably assured that, if Kwok were released, his ability to coordinate a burgeoning campaign to obstruct these proceedings and to intimidate and endanger witnesses as well as Government employees merely performing their jobs, would increase exponentially.

## IV.   Conclusion

Pretrial Services was right to recommend detention. This Court should order the same. The Government has met its burden and demonstrated there are no conditions or combination of conditions that can satisfy this Court that the defendant will appear in court as required or that the community will be safe.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/_____
   Ryan B. Finkel
   Juliana N. Murray
   Micah F. Fergenson
   Assistants United States Attorney
   (212) 637-6612 / 2314 / 2190

Enclosures

Copy to:   William R. Baldiga, Stephen R. Cook, and Stephen A. Best, *counsel for the defendant*
   Stephen Boose, Pretrial Services, Southern District of New York

---

[18] https://gettr.com/post/p2cy7sycdbf

# Exhibit G

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

-------------------------------------------------------x
                              :

In re:                           :          Chapter 11
                              :

HO WAN KWOK, *et al.*,[1]     :          Case No. 22-50073 (JAM)
                              :

        Debtor.          :          (Jointly Administered)
-------------------------------------------------------x
                              :

HK International Funds Investments  :
(USA) Limited, LLC         :
                              :          Adv. Proceeding No. 22-05003
        Plaintiff       :
v.                         :
                              :

Ho Wan Kwok               :
                              :

        Defendant      :
                              :
-------------------------------------------------------x
                              :

Chapter 11 Trustee Luc A. Despins   :
                              :

        Counter-Plaintiff   :
v.                         :
                              :

HK International Funds Investments  :
(USA) Limited, LLC, and Mei Guo   :
                              :

        Counter-Defendants.  :
-------------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

## ORDER GRANTING CHAPTER 11 TRUSTEE'S MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7065 FREEZING ASSETS OF COUNTER-DEFENDANTS

WHEREAS, Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee"), is the counterclaim-plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), has moved for a preliminary injunction (the "Motion") freezing certain assets of counterclaim-defendants HK INTERNATIONAL FUNDS INVESTMENTS (USA) Limited LLC ("HK USA") and MEI GUO ("Ms. Guo" and, together with HK USA, collectively, the "Counterclaim-Defendants"); and

WHEREAS, on the basis of the papers submitted, following a hearing, and upon the consent of the Counterclaim-Defendants, the Trustee has demonstrated an entitlement to the requested preliminary injunction, and all objections to the Motion having been overruled;

NOW, THEREFORE, it is hereby ORDERED that:

(a) Counter-Defendants shall not transfer, encumber, move, dispose of, or in any way impair the *Lady May* until further order of the Court;

(b) Counter-Defendants shall not withdraw, transfer, encumber, move, dispose of, or in any way impair the Escrowed Funds[2] until further order of the Court;

(c) Counter-Defendant Mei Guo shall not transfer, encumber, move, dispose of, or in any way impair her interest(s) in HK USA until further order of the Court; and

(d) Counter-Defendants shall identify to the Trustee and to the Court within five days of entry of this Order any other property in which they hold an interest, and Counter-Defendants shall not transfer, encumber, move, dispose of, or in any way impair their interest(s) in such property until further order of the Court.

It is further ORDERED that:

1. The Motion is GRANTED in all respects.

2. The Trustee shall NOT be required to give a bond in connection with the preliminary injunction.

3. The Trustee is authorized to take all actions necessary to implement the terms of this Order.

4. This Order is immediately enforceable.

---

[2] "Escrowed Funds" means the funds deposited pursuant to that certain Escrow Agreement, dated as of April 28, 2022, by and among HK International Funds Investments (USA) Limited, LLC, the Official Committee of Unsecured Creditors appointed in the chapter 11 case of Ho Wan Kwok, and U.S. Bank National Association.

5.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Dated at Bridgeport, Connecticut this 17th day of March, 2023.


*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

```
---------------------------------x
                                 :
In re:                           :        Chapter 11
                                 :
HO WAN KWOK, et al.,¹            :        Case No. 22-50073 (JAM)
                                 :
             Debtor.             :        (Jointly Administered)
---------------------------------x
                                 :
HK International Funds Investments :
(USA) Limited, LLC               :
                                 :
                                 :        Adv. Proceeding No. 22-05003
             Plaintiff           :
v.                               :        Re: ECF No. 146
                                 :
Ho Wan Kwok                      :
                                 :
             Defendant           :
                                 :
---------------------------------x
                                 :
Chapter 11 Trustee Luc A. Despins :
                                 :
             Counter-Plaintiff   :
v.                               :
                                 :
HK International Funds Investments :
(USA) Limited, LLC, and Mei Guo  :
                                 :
             Counter-Defendants. :
---------------------------------x
```

## ORDER GRANTING MOTION OF CHAPTER 11 TRUSTEE FOR ESTATE OF HO WAN KWOK FOR PARTIAL SUMMARY JUDGMENT

---

¹ The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

Upon the motion (the "Motion")[1] of Luc A. Despins, as chapter 11 trustee (the "Trustee")

for the estate of Ho Wan Kwok (the "Debtor"), pursuant to Rule 56 of the Federal Rules of Civil

Procedure, made applicable to this adversary proceeding under Rules 7001 and 7056 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order granting

summary judgment in the Trustee's favor; and this Court having found that the Court has

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334; the relief requested therein is core proceeding pursuant to 28 U.S.C. § 157(b);

venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; due and sufficient notice

of the Motion having been given under the particular circumstances; and it appearing that no

other or further notice need be given; and there is no genuine issue as to any material fact

entitling the Trustee to summary judgment in his favor on the First Counterclaim; after due

deliberation and sufficient cause appearing therefor, and for the reasons stated on the record

during a hearing held on March 27, 2023, it is hereby ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Debtor is the beneficial owner of, and controls, the yacht the Lady May (as

defined below).

3.      Effective as of 2:55 p.m. on March 27, 2023, the Lady May (as defined below) is

property of the Debtor's chapter 11 estate (the "Estate") pursuant to 11 U.S.C. § 541(a) to be

administered by the Trustee.  In particular, the sole owner of the Lady May is:

> Name: Luc A. Despins, as the chapter 11 trustee for the estate of Ho Wan Kwok
> Address: c/o Paul Hastings LLP, 200 Park Avenue, New York, New York 10166

---

[1]    Capitalized terms used but not otherwise defined have the meanings set forth in the Motion.

4.      The "<u>Lady May</u>" refers to the following yacht:

<u>Name</u>: Lady May
<u>Number, Year and Port of Registration</u>: 39 in 2014, George Town, Cayman Islands
<u>IMO/LR Number</u>: 1012359
<u>Official Number</u>: 745195
<u>Signal Letters</u>: ZGDQ9

5.      Pursuant to 11 U.S.C. § 542(a), the Counter-Defendants, *i.e.*, HK International Funds Investments (USA) Limited, LLC and Mei Guo, shall deliver the Lady May to the Trustee immediately, and, moreover, shall provide any and all assistance reasonably necessary to (i) enable the Trustee to register the ownership of the Lady May in the name of the Trustee (on behalf of the Estate) and (ii) transition operation and maintenance of the Lady May to the Estate (on behalf of the Estate), including as it relates to procuring appropriate insurance coverage for the Lady May.

6.      The Trustee is authorized to take all actions necessary or appropriate to effectuate this Order, including filing all necessary or appropriate registrations to reflect that the Trustee (on behalf of the Estate) is the registered owner of the Lady May.

7.      Entry of this Order is without prejudice to the Trustee pursuing the other Counterclaims in the Answer and Counterclaims upon notice and entry of a scheduling order by the Court.

8.      This Order is effective immediately, and no stay pursuant to Rule 7062 of the Federal Rules of Bankruptcy Procedure shall be effective, and the Court hereby waives any limitations set forth in Rule 7062 of the Federal Rules of Bankruptcy Procedure on the Trustee's ability to enforce this judgment upon its entry.

9.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Dated at Bridgeport, Connecticut this 27th day of March, 2023.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 22-50073 (JAM) |
| HO WAN KWOK, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors.[1] | ) | |
| | ) | |
| LUC A. DESPINS, CHAPTER 11 TRUSTEE | ) | Adv. P. No. 23-05005 (JAM) |
| FOR THE ESTATE OF HO WAN KWOK, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Re: ECF No. 12 |
| GREENWICH LAND, LLC and | ) | |
| HING CHI NGOK, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING IN PART *EX PARTE* MOTION
## FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Upon consideration of the *ex parte* motion dated March 27, 2023 (the "Motion") filed by

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee"), pursuant to Rule 65 of

the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of

Bankruptcy Procedure, for injunctive relief to restrain defendant Greenwich Land, LLC

("Greenwich Land") and Hing Chi Ngok ("Defendant Ngok" and, together with Greenwich

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

Land, collectively, the "Defendants") from encumbering, transferring, dissipating or otherwise interfering with their property and/or assets, and upon the certification of counsel why notice should not be required pursuant to Fed. R. Civ. P. 65(b), and upon all other pleadings filed in this adversary proceeding and the related jointly administered Chapter 11 cases of Ho Wan Kwok, et al., Case No. 22-50073 (the "Main Case"); it is hereby

**ORDERED**: Sufficient reason has been shown for the issuance of a temporary restraining order pursuant to Fed. R. Civ. P. 65(b) pending the hearing of the Trustee's Motion for Preliminary Injunction because immediate and irreparable injury, loss, or damage will result to the Trustee before the Defendants can be heard in opposition, and the Trustee has certified in writing that he gave notice to counsel for the Defendants who has appeared on behalf of the Defendants in the Main Case; and it is further

**ORDERED:** Pursuant to Fed. R. Civ. P. 65(b), the Defendants, and pursuant to Fed. R. Civ. P. 65(d)(2), their officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with the foregoing upon receipt of actual notice of this Order by personal service or otherwise, are temporarily restrained and enjoined from encumbering, transferring, alienating, dissipating, paying over or assigning any property and/or assets of the Defendants; and it is further

**ORDERED:** Pursuant to Fed. R. Civ. P 65(b), the Defendants, and pursuant to Fed. R. Civ. P. 65(d)(2), their officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with the foregoing upon receipt of actual notice of this Order by personal service or otherwise, are temporarily restrained and enjoined from directing any of the Defendants' banking institutions to encumber, transfer, alienate, dissipate, pay over or assign any property and/or assets of the Defendants until further order of this Court; and it is further

2

**ORDERED**:  The terms and conditions of this Temporary Restraining Order shall be immediately effective and enforceable upon its entry; and it is further

**ORDERED:**  A hearing on the Motion for Preliminary Injunction shall be held on April 11, 2023, at 3:00 p.m. and will continue until concluded; and it is further

**ORDERED**:  Pursuant to this Court's discretion to set or waive the amount of any bond to be posted under Fed. R. Civ. P. 65, the Trustee need not post a bond; and it is further

**ORDERED**:  The Trustee shall serve this Temporary Restraining Order on the Defendants and the Defendants' counsel, who have not yet appeared in this adversary proceeding; and it is further

**ORDERED:**  This Temporary Restraining Order shall remain in effect until further order of the Court and the Court shall retain jurisdiction over this adversary proceeding to ensure compliance with this Order and for all other purposes related to this adversary proceeding.

Entered at Bridgeport, Connecticut at 6:34 p.m. on March 28, 2023.

BY THE COURT

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

-------------------------------------------------x
:
In re: : Chapter 11
:
HO WAN KWOK, *et al.*,[1] : Case No. 22-50073 (JAM)
:
Debtors. : (Jointly Administered)
:
-------------------------------------------------x
:
LUC A. DESPINS, CHAPTER 11 :
TRUSTEE, :
: Adv. Proceeding No. 23-05005
Plaintiff, :
v. :
:
GREENWICH LAND, LLC and : Re: ECF No. 11
HING CHI NGOK, :
:
Defendants. :
:
-------------------------------------------------x

## ORDER GRANTING CHAPTER 11 TRUSTEE'S AMENDED
## APPLICATION FOR *EX PARTE* PREJUDGMENT REMEDY

WHEREAS, Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee"), is the counterclaim-plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), has made an application for an *ex parte* prejudgment remedy (the "Application") to secure his claims against defendants Greenwich Land, LLC ("Greenwich Land") and Hing Chi Ngok ("Defendant Ngok" and, together with Greenwich Land, collectively, the "Defendants"); and

WHEREAS, the requirements of section 52-278e(a) of the Connecticut General Statutes having been shown, on the basis of the papers submitted, including but not limited to the supporting

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

affidavit(s), there is probable cause that a judgment in the amount equal to or greater than $6.8 million, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the Trustee, and there is a reasonable likelihood that the Defendants (1) have hidden or will hide themselves so that process cannot be served on them or (2) are about to remove themselves or their property from this state or (3) are about to fraudulently dispose of or have fraudulently disposed of any of their property with intent to hinder, delay or defraud their creditors or (4) have fraudulently hidden or withheld money, property or effects which should be liable to the satisfaction of their debts.

NOW, THEREFORE, it is hereby ORDERED that the Trustee shall be authorized, to the amount of $8,314,200;

> (a)    To attach sufficient property of the Defendants, as known, including that certain real property commonly known as 373 Taconic Rd, Greenwich, CT 06831, or as may hereafter be identified, or as otherwise discovered by the Trustee, to secure such sum;

> (b)    To garnish the Defendants' accounts at any financial institution, as known, including without limitation the accounts identified at exhibits 42, 43, 44, 45, 49, and 50 to the Complaint, or as may hereafter be identified, or as otherwise discovered by the Trustee;

> (c)    To attach any stock, membership, or other equity interests of the Defendants in any entity(ies), as known, including Defendant Ngok's membership interest in Greenwich Land, or as may hereafter be identified, or as otherwise discovered by the Trustee;

> (d)    To attach any personal property (including but not limited to automobiles, boats, aircraft, art, jewelry, and collectibles) and any currency or negotiable instruments in which the Defendants have any interest, as known, including personal property of the Defendants located at 373 Taconic Rd, Greenwich CT 06831, or as may hereafter be identified, or as otherwise discovered by the Trustee;

> (e)    To attach property of the Defendants in possession of any third persons, as known or as may hereafter be identified, or as otherwise discovered by the Trustee; and/or

> (f)    To garnish third persons in possession of other property of the Defendants or owing debts to the Defendants, as known or as may hereafter be identified, or as otherwise discovered by the Trustee.

It is further ORDERED that:

1.    The Trustee shall NOT be required to give a bond in connection with the prejudgment remedy.

2.    The Trustee is authorized to take all actions necessary to implement the terms of this Order.

2

3.     The Court will schedule a hearing at a time convenient to the Defendants where the Court will consider the continuation of the prejudgment relief granted herein, with the burden remaining on the Trustee to justify the continuation of such prejudgment relief without relying on the prior issuance of such relief.

4.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated at Bridgeport, Connecticut this 28th day of March, 2023.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

```
-------------------------------------------------x
                                                 :
In re:                                           :         Chapter 11
                                                 :
HO WAN KWOK, et al.,¹                            :         Case No. 22-50073 (JAM)
                                                 :
                 Debtor.                         :         (Jointly Administered)
-------------------------------------------------x
                                                 :
HK International Funds Investments               :
(USA) Limited, LLC                               :
                                                 :         Adv. Proceeding No. 22-05003
                 Plaintiff                       :
v.                                               :
                                                 :
Ho Wan Kwok                                      :
                                                 :
                 Defendant                       :
                                                 :
-------------------------------------------------x
                                                 :
Chapter 11 Trustee Luc A. Despins               :
                                                 :
                 Counter-Plaintiff              :
v.                                               :
                                                 :
HK International Funds Investments               :
(USA) Limited, LLC, and Mei Guo                  :
                                                 :
                 Counter-Defendants.             :
-------------------------------------------------x
```

---

¹     The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

**AMENDMENT TO ORDER GRANTING CHAPTER 11 TRUSTEE'S MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7065 FREEZING ASSETS OF COUNTER-DEFENDANTS**

WHEREAS, Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee"), is the counterclaim-plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), moved for a preliminary injunction (the "Motion") freezing certain assets of counterclaim-defendants HK INTERNATIONAL FUNDS INVESTMENTS (USA) Limited LLC ("HK USA") and MEI GUO ("Ms. Guo" and, together with HK USA, collectively, the "Counterclaim-Defendants"); and

WHEREAS, on March 17, 2023, the Court entered the *Order Granting Chapter 11 Trustee's Motion for Preliminary Injunction Pursuant to Federal Rule of Bankruptcy Procedure 7065 Freezing Assets of Counter-Defendants* [Docket No. 142] (the "Original Order");

WHEREAS, a status conference was held on March 30, 2023 (the "Status Conference") concerning certain developments related to the Original Order;

NOW, THEREFORE, for the reasons discussed on the record during the Status Conference, including the Counter-Defendants' consent to the relief provided for herein, it is hereby ORDERED that the Original Order remains in full force and effect, except that it is amended to provide as follows:

1. Counter-Defendants shall not transfer, encumber, move, dispose of, or in any way impair their interest(s) in any property or assets wherever located, regardless of whether such interest(s) have been disclosed to the Trustee pursuant to paragraph (d) of the Original Order or otherwise;

2. This amendment to the Original Order is immediately enforceable and shall be effective retroactive to the time of entry of the Original Order;

3. The Trustee is authorized to take all actions necessary to implement the terms of this amendment to the Original Order.

4. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this amendment to the Original Order.

Dated at Bridgeport, Connecticut this 31st day of March, 2023.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

```
-------------------------------------------------x
                                                 :
In re:                                           :        Chapter 11
                                                 :
HO WAN KWOK, et al.,[1]                          :        Case No. 22-50073 (JAM)
                                                 :
           Debtor.                               :        (Jointly Administered)
-------------------------------------------------x
                                                 :
HK International Funds Investments               :
(USA) Limited, LLC                               :
                                                 :        Adv. Proceeding No. 22-05003
           Plaintiff                             :
v.                                               :
                                                 :
Ho Wan Kwok                                      :
                                                 :
           Defendant                             :
                                                 :
-------------------------------------------------x
                                                 :
Chapter 11 Trustee Luc A. Despins                :
                                                 :
           Counter-Plaintiff                     :
v.                                               :
                                                 :
HK International Funds Investments               :
(USA) Limited, LLC, and Mei Guo                  :
                                                 :
           Counter-Defendants.                   :
-------------------------------------------------x
```

## AMENDMENT TO ORDER GRANTING MOTION OF CHAPTER 11 TRUSTEE FOR ESTATE OF HO WAN KWOK FOR PARTIAL SUMMARY JUDGMENT

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

The Court having entered the *Order Granting Motion of Chapter 11 Trustee for Estate of Ho Wan Kwok for Partial Summary Judgment* [Docket No. 172] (the "<u>Original Order</u>")[1] on March 27, 2023; and the Court having held a hearing on March 30, 2023, at which hearing, for the reasons stated on the record, counsel to HK International Funds Investments (USA) Limited, LLC and Mei Guo (the "<u>Counterclaim-Defendants</u>") consented to an amendment to the Original Order adding the Lady May II (as defined below) to the relief set forth in the Original Order,[2] it is hereby ORDERED THAT:

1.      The Original Order remains in full force and effect, except that it is amended to add the following.

2.      The Debtor is the beneficial owner of, and controls, the yacht the Lady May II (as defined below).

3.      Effective immediately upon entry of this Order, the Lady May II (as defined below) is property of the Debtor's chapter 11 estate (the "<u>Estate</u>") pursuant to 11 U.S.C. § 541(a) to be administered by the Trustee.  In particular, the sole owner of the Lady May II is:

> <u>Name</u>: Luc A. Despins, as the chapter 11 trustee for the estate of Ho Wan Kwok
> <u>Address</u>: c/o Paul Hastings LLP, 200 Park Avenue, New York, New York 10166

4.      The "<u>Lady May II</u>" refers to the following yacht:

> <u>Name</u>: Lady May II
> <u>Number, Year and Port of Registration</u>: 52 in 2015, George Town, Cayman Islands
> <u>Official Number</u>: 746230
> <u>Signal Letters</u>: ZGEW5

5.      All references in the Original Order to the Lady May shall include the Lady May II.

---

[1]     Capitalized terms used but not otherwise defined in this Order have the meanings set forth in the Original Order.

[2]     Such consent is limited to adding the Lady May II to the Original Order and does not constitute a waiver of any right the Counterclaim-Defendants may have to appeal the Original Order (as amended by this Order), other than with respect to the addition of the Lady May II to the Original Order.

6.      Entry of this Order is without prejudice to the Trustee pursuing the other Counterclaims in the Answer and Counterclaims upon notice and entry of a scheduling order by the Court.

7.      This Order is effective immediately, and no stay pursuant to Rule 7062 of the Federal Rules of Bankruptcy Procedure shall be effective, and the Court hereby waives any limitations set forth in Rule 7062 of the Federal Rules of Bankruptcy Procedure on the Trustee's ability to enforce this judgment upon its entry.

8.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


        Dated at Bridgeport, Connecticut this 31st day of March, 2023.


                                        *Julie A. Manning*
                                *United States Bankruptcy Judge*
                                    *District of Connecticut*

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

HO WAN KWOK,

                              Defendant.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __4/20/2023_____

23 Cr. 118-1 (AT)

**ORDER**

ANALISA TORRES, District Judge:

On March 29, 2023, Defendant, Ho Wan Kwok, was indicted by a grand jury on charges of conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; international promotional money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2; international concealment money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2; and unlawful monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2. Superseding Indictment, ECF No. 19. On March 15, 2023, the Honorable Katharine H. Parker arraigned Defendant on the initial indictment dated March 6, 2023, ECF No. 2, and he was detained on consent, ECF No. 8. On March 31, 2023, Defendant filed a motion for release on bail pending trial. ECF No. 23. On April 4, 2023, the Court arraigned Defendant on the Superseding Indictment and reserved decision on Defendant's bail application. Dkt. Entries 4/4/2023. For the reasons stated below, Defendant's motion for release pending trial is DENIED.

**DISCUSSION**

I.      <u>Allegations Against Defendant</u>[1]

Defendant and two co-defendants are charged with defrauding thousands of victims out of over $1 billion by using a series of fraudulent businesses and investment opportunities; misappropriating victims' funds by laundering those funds through approximately 500 bank accounts associated with at least eighty entities or individuals in several countries; and improperly using those funds to enrich themselves.  Superseding Indictment ¶¶ 1–3.  Defendant used the fraud proceeds to purchase extravagant goods and assets for himself and his family, including homes and vehicles.  *Id.* ¶ 4.  Defendant operated this scheme from 2018 through March 2023.  *Id.* ¶ 1.

In 2017, Defendant attracted a large online following after claiming to advance a movement against the Chinese Communist Party (the "CCP").  *Id.* ¶ 6(a).  In 2018, he founded nonprofit organizations aligned with his purported campaign and amassed more followers.  *Id.* ¶ 6(b).  Defendant subsequently advertised fraudulent investment opportunities to his followers.  *See, e.g.*, *id.* ¶¶ 14(a), 15.

During the relevant time period, Defendant functionally owned and controlled GTV Media Group, Inc. ("GTV"), a news-focused social media platform, and G Club Operations, LLC ("G Club"), a membership organization.  *Id.* ¶¶ 10–11.  He also designed purported cryptocurrencies offered on Himalaya Exchange, a platform that has business relationships with entities functionally owned and controlled by Defendant.  *Id.* ¶ 12.

Between April and June 2020, Defendant obtained more than $400 million from victims through an illegal private stock offering related to GTV.  *Id.* ¶ 13.  Defendant announced and promoted the offering on social media, directly contacted potential investors, and issued written

---

[1] The following facts are taken from the Superseding Indictment.

2

materials regarding the offering. *Id.* Contrary to Defendant's representations to investors, the vast majority of the funds raised were deposited directly into bank accounts in the name of GTV's parent company, which is owned by one of Defendant's family members. *Id.* ¶¶ 13(e)–(f). Another $100 million in raised funds was invested in a high-risk hedge fund for the benefit of the parent company. *Id.* ¶ 13(h).

In June 2020, domestic banks began freezing and closing accounts associated with GTV, in part because the accounts had received large wire transfers that referenced an unregistered stock offering. *Id.* ¶ 14(a). Defendant then began encouraging victims to invest in "collectives of informal groups" known as "farms" by promising that those investments would be convertible to stock in GTV, and by misrepresenting GTV's market value. *Id.* ¶ 14. Defendant obtained over $150 million by doing so. *Id.* Defendant misappropriated these funds by transferring millions of dollars to family members. *Id.* ¶ 14(f).

In October 2020, Defendant began inducing his followers to purchase online memberships in G Club by making false statements about the services included in such memberships. *Id.* ¶ 15. Defendant also used the membership organization to continue to induce his followers to invest in GTV, and other businesses affiliated with Defendant. *Id.* ¶ 15(f). The majority of the funds raised through the membership organization were used to pay Defendant's and his family's personal expenses, and purchase high-priced goods and real property, such as Defendant's mansion in New Jersey. *Id.* ¶ 16.

In April 2021, Defendant began promoting to his followers and making false statements about purported cryptocurrencies traded on Himalaya Exchange. *Id.* ¶¶ 18–20, 22. Defendant obtained over $262 million in funds through Himalaya Exchange, $37 million of which was used to purchase a luxury yacht in the name of one of Defendant's relatives. *Id.* ¶¶ 17, 23.

On September 20 and 21, 2022, U.S. authorities served seizure warrants on several domestic banks, seizing approximately $335 million from Himalaya Exchange and other entities associated with Defendant.  *Id.* ¶ 24.  One of Defendant's co-conspirators then attempted to transfer $46 million from domestic bank accounts associated with Himalaya Exchange to a bank account in the United Arab Emirates.  *Id.*  On October 16, 2022, U.S. authorities seized an additional $274 million from Himalaya Exchange and G Club.  *Id.* ¶ 25.  Following the seizures, Himalaya Exchange continued to misrepresent the value of its purported cryptocurrencies.  *Id.* ¶ 25(b).

II.   Legal Standard

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, requires the Court to release a defendant pending trial subject to the least restrictive conditions that will reasonably assure the defendant's appearance as required and the safety of any other person and the community.  18 U.S.C. § 3142(c)(1)(B).  The Court may order that a defendant be held without bail only if there are no conditions that will reasonably assure the defendant's appearance and the safety of any other person and the community, after considering the factors set forth in 18 U.S.C. § 3142(g).  18 U.S.C. § 3142(e)(1).  Those factors are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, financial resources, length of residence in the community, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

To support pretrial detention, the Government must establish by a preponderance of the evidence that the defendant presents a serious risk of flight or obstruction of justice, 18 U.S.C. § 3142(f)(2); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988), or by clear and convincing evidence that the defendant poses a danger to another person or the community, 18 U.S.C.

§ 3142(f)(2). If the Government carries its burden, then the Court must determine whether there are reasonable conditions of release that can be set to ensure the defendant's appearance and the safety of any other person or the community. 18 U.S.C. § 3142(e)(1).

III.   Analysis

A. Flight Risk

The Court finds that the Government has shown by a preponderance of the evidence that Defendant presents a serious risk of flight.

First, Defendant has limited connections to the United States. He has a pending application for asylum, and if his application is denied, he will no longer be legally present in the United States. *See* Def. Mem. at 9, 15, ECF No. 24; Gov. Mem. at 2, ECF No. 7. The charges in this case may be grounds for denial of Defendant's asylum application. *See* Def. Mem. at 15; Gov. Mem. at 2. Defendant's wife and daughter reside in the United States and also have pending applications for asylum. Def. Mem. at 13. Defendant has a son who resides in the United Kingdom. Gov. Mem. at 21. Although Defendant claims that he would not leave behind "two of the most important people in his life," who cannot leave the United States due to their pending applications for asylum, Def. Mem. at 13, Defendant told Pretrial Services that he has "irregular" contact with his children, Pretrial Services Report at 3. The Court concludes, therefore, that Defendant's incentive to remain in the United States due to his daughter's presence is tantamount to his incentive to flee to the United Kingdom, where his son resides. And, Defendant previously left his family members, including his wife and daughter, in Hong Kong when he fled to the United States. *See* Def. Mem. at 7.

Second, Defendant has substantial connections and resources abroad, including his son and a co-defendant who resides in the United Kingdom, but is currently believed to be a fugitive in the United Arab Emirates. Gov. Mem. at 21; Gov. Reply at 10, ECF No. 26; Apr. 4, 2023 Tr. 7:18-20.

Defendant's businesses have bank accounts in various countries, including the United Arab Emirates, and two of Defendant's businesses have offices and personnel in the United Arab Emirates. Gov. Reply at 13. Defendant has an extensive network of devoted followers around the world. Gov. Mem. 5, 12, 15–16, 20–21, 23; *see also In re: Ho Wan Kwok, et al.*, No. 22-50073 (Bankr. D. Conn. Jan. 11, 2023) ("Bankruptcy Opinion"), ECF No. 7-3 (finding that Defendant's followers are "personally loyal" to him and have referred to him as a "spiritual leader").

Third, Defendant has the means and know-how to flee. In a search of Defendant's residences pursuant to a warrant on March 15, 2023 (the "March 15 Search"), law enforcement officers recovered two passports, including a Hong Kong passport which is still valid, and copies of a passport from the United Arab Emirates. Gov. Reply at 4, 8; ECF No. 26-2; ECF No. 26-5; Apr. 4, 2023 Tr. 21:6-9, 25:4-14; 32:19–33:14. Defendant previously claimed during an interview on April 19, 2017, that he had eleven passports. Complaint Exhibit 1B, *HNA Grp. Co., Ltd., v. Guo Wengui*, No. 653281/2017, Dkt. No. 7 (N.Y. Sup. Ct. Aug. 30, 2017) (English translation of April 19, 2017, interview between Defendant and Voice of America). Although law enforcement officials have confiscated the passports recovered during the March 15 Search, and Defendant previously surrendered his passport from the United Arab Emirates, *see* Apr. 4, 2023 Tr. 32:19–33:14, it is clear that Defendant is able to obtain travel documents with ease. Moreover, a clever defendant with sufficient resources could figure out a way to leave the country without travel documents. *See, e.g.*, Rupert Neate, *Ghosn 'Hid in Musical Instrument Case' During Escape from Japan*, GUARDIAN (Dec. 31, 2019), https://www.theguardian.com/business/2019/dec/31/carlos-ghosn-escaped-japan-hiding-in-a-musical-instrument-case. Defendant has access to a yacht and a jet owned by his family members that were allegedly purchased with fraud proceeds derived from the charged scheme. Gov.

Case: 23-6421    05/05/2023    DktEntry: 6.1    Page 243 of 446
Case 1:22-cr-00231-AT    Document 88    Filed 10/26/23    Entered 10/26/23 20:46:01    Page 91 of 214

Mem. at 5, 21; Superseding Indictment ¶¶ 4, 14(f)(i), 14(f)(iii).  And, the Government need not show that Defendant is likely to flee internationally, but only that Defendant is not likely to return to court.

Fourth, Defendant has much incentive to flee.  He is facing a maximum sentence of more than 100 years' imprisonment, Gov. Mem. at 21, and the evidence against him is strong.  He may also face deportation proceedings.  Defendant argues that he would not risk leaving the United States for fear of persecution by the CCP.  Def. Mem. at 13–14.  But, Defendant engaged in extensive international travel after leaving China in 2015, prior to filing his application for asylum in the United States.  Def. Mem. at 7, 9, 14; Gov. Reply at 3–4.  In other words, it is more likely than not that the pendency of Defendant's asylum application prevented him from traveling internationally between 2017 and the present, rather than his fear of persecution.  *See* TRAVEL DOCUMENTS, uscis.gov/green-card/green-card-processes-and-procedures/travel-documents (stating that individuals with a pending application for asylum must apply for and receive particular travel documents before leaving the United States, or else the application is deemed abandoned).  And, the charges in this case seriously undermine Defendant's eligibility for asylum.[2]

Therefore, the Court finds that the Government has met its burden of showing that Defendant poses a serious risk of flight.

### B.  Obstruction of Justice

The Court also finds that the Government has shown by a preponderance of the evidence that Defendant poses a serious risk of obstruction.  *See United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009) (considering whether a defendant posed a serious risk of obstruction in the future);

---

[2] Defendant insists that he would still be eligible to remain in the United States pursuant to the Convention Against Torture, Def. Mem. at 15, but the success of such a future application is speculative, and, in any case, Defendant may still be removed to a third country other than China even if he is granted relief based on the Convention Against Torture, 8 C.F.R. § 1208.17(b)(2).

*United States v. Stein*, No. S1 05 Crim. 0888, 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 4, 2005) (same).

Other courts have previously found that Defendant engaged in obstructive behavior by hiding his assets and failing to obey court orders. On February 9, 2022, Justice Barry Ostrager entered an order of civil contempt against Defendant for avoiding and deceiving his creditors by hiding substantial personal assets with corporations, trusted confidants, and family members. *Pac. All. Asia Opportunity Fund L.P. v. Kwok Ho Wan et al.*, No. 652077/2017, Dkt. 1181 (N.Y. Sup. Ct. Feb. 9, 2022); *id.* at 10 (finding that Defendant was "knowingly and intentionally violati[ng]" court orders). Six days after being ordered by Justice Ostrager to pay the judgment owed to the plaintiff in *Pacific Alliance Asia Opportunity Fund*, Defendant filed for bankruptcy. *Pac. All. Asia Opportunity Fund L.P. v. Kwok Ho Wan et al.*, No. 652077/2017, Dkt. 1190 (N.Y. Sup. Ct. Feb. 15, 2022); *In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1 (D. Conn.).

During the bankruptcy proceeding, Bankruptcy Judge Julie A. Manning issued a temporary restraining order on November 23, 2022, restraining Defendant from posting false and harassing materials about people associated with the Pacific Alliance Asia Opportunity Fund, their counsel, and their relatives; publishing online the home addresses and personal information of those individuals; encouraging, inciting, suggesting, or financing protests at the homes or offices of those individuals; and interfering with the integrity of the pending bankruptcy proceedings. Bankruptcy Opinion at 5. The order also required Defendant to take down existing social media posts that published the home addresses and personal information of those individuals, or encouraged, incited, or suggested protests at their homes or offices. *Id.* at 5–6.

On January 11, 2023, Judge Manning found that:

(1) Defendant used burner phones to communicate with members of his various businesses, including for communications related to his bankruptcy proceeding. *Id.* at 11.

(2) Defendant instructed his followers, who were protesting outside the home of the bankruptcy trustee, to avoid service of process. *Id.* at 23.

(3) Defendant told his followers in an internet broadcast that, "to deal with this rogue [the trustee], we have our rogue's ways. In a few days you will see what would happen to him. Calamities, I can tell you guys. They will suffer calamities!" *Id.*

(4) Defendant posted videos and social media posts encouraging his followers to "persevere" with protests at the homes and offices of the trustee and his counsel, and called the trustee and his counsel "enablers of" or "worse than" the CCP. *Id.* at 23–25.

(5) Defendant, or someone else at Defendant's direction, breached a nondisclosure agreement by publicly releasing documents from a settlement conference. *Id.* at 29.

(6) The protests Defendant publicly encouraged and supported resulted in threats against the trustee, false accusations against the trustee and his counsel, including accusations of association with the CCP, and harassment of individuals not involved with the bankruptcy proceeding, including the trustee's family and colleagues. *Id.* at 25, 27, 29–31.

(7) The protests and harassment delayed the bankruptcy proceedings and caused creditors to fear filing claims due to the protestors' actions. *Id.* at 33.

Judge Manning issued a preliminary injunction prohibiting Defendant and those acting in concert with him from continuing to threaten and harass the plaintiff and related employees, as well as the trustee, his family, and his counsel. *Id.* at 60. Two days after Judge Manning's order, Defendant posted a message on one of his social media accounts, encouraging followers to file claims in his bankruptcy proceeding. *See* Miles Guo (@MilesGuo), Gᴇᴛᴛʀ (Jan. 13, 2023), https://gettr.com/post/p24ybdca10b (last accessed Apr. 11, 2023).[3] Defendant later posted a video encouraging his followers to file claims in order to drive up the trustee's attorneys' fees. Gov. Mem. at 15.

_____

[3] It appears that the name associated with this account has since been changed, on some date after April 4, 2023, from "Miles Guo," one of Defendant's aliases, *see* Superseding Indictment, to "NFSC Today" (@NFSC_today).

Defendant continues to engage in obstructive behavior. On March 30, 2023, after Defendant was detained in this case, a message posted on one of Defendant's social media accounts accused the prosecutors in this case of "represent[ing] the CCP kleptocrats." *See* Miles Guo (@MilesGuo), GETTR (Mar. 30, 2023), https://gettr.com/post/p2cy7sycdbf (last accessed Apr. 11, 2023). The Government also alleges that victims of Defendant's fraud scheme have reported that, when they sought reimbursement or complained about fraudulent practices, Defendant branded them "CCP spies" on social media to incite his followers to harass them, or threatened to post on social media that members of the victims' families who were residing in China were associated with Defendant's anti-CCP movement, which would place those family members at risk of Chinese government retaliation. Gov. Mem. at 15. And, Defendant falsely represented to Pretrial Services that he had a total of $10,000 in assets, including two phones and his clothing. Pretrial Services Report at 3. But, the March 15 Search recovered substantial assets that Defendant had not disclosed: over $500,000 in cash in various currencies in a safe in Defendant's dressing room, thirty Brioni custom-made suits with "Brioni for Miles Kwok"[4] stitched into the jackets, seventeen computers, forty-three external media storage devices, and thirty cellphones. Gov. Reply at 3.[5]

Moreover, Defendant is technologically sophisticated and likely to delete, encrypt, or transfer electronic evidence and fraud proceeds if released. He has previously used burner phones to conceal communications with co-conspirators. Gov. Mem. at 20; Bankruptcy Opinion at 11. He has used Faraday bags to block the passage of radio frequency emissions and prevent electronic devices from electronic surveillance, as well as cellphone scramblers. Gov. Mem. at 20; Apr. 4, 2023 Tr.

---

[4] "Miles Kwok" is one of Defendant's aliases. *See* Superseding Indictment.
[5] Defendant claims that the cash does not belong to him, despite the fact that most of it was found in his dressing room. Apr. 4, 2023 Tr. at 27:22–28:3, 35:2-8. However, Defendant admits that he owns the cellphones and other devices found in his residences. *Id.* at 23:20-24. He did not disclose these to Pretrial Services, and the value of these devices and the clothing found in one of his residences far exceeds $10,000.

23:20–24:2.  He has previously advised his followers via live web broadcast to use services provided by one of his businesses, Himalaya Reserve, which is involved in the alleged fraud scheme in this case, *see, e.g.*, Superseding Indictment ¶ 17, in order to secure money "against the long-arm jurisdiction of the United States," *The U.S. Is Planning to Sanction Singapore; Himalaya Wallet Is the Only Secure Option*, G NEWS (Feb. 21, 2023), gnews.org/article/949854 (last accessed Apr. 17, 2023).  And, one of Defendant's co-conspirators, who is still a fugitive, was indicted for attempting to move fraud proceeds outside the jurisdiction of the United States after the Government began seizing funds from the businesses involved in the alleged fraud scheme.  Superseding Indictment ¶¶ 24, 53–54.

Defendant's history of obstructive behavior in prior cases and his conduct in this matter establish that he is likely to continue this pattern if released.[6]

### C.  Danger to the Community

The Court further finds that the Government has shown by clear and convincing evidence that Defendant poses a risk of economic harm to the community.  *See United States v. Gulkarov*, No. 22 Cr. 20, 2022 WL 205252, at *3 (S.D.N.Y. Jan. 24, 2022) (considering the risk of economic harm to the community); *Madoff*, 586 F. Supp. 2d at 253 (same); *United States v. Persaud*, No. 05 Cr. 368, 2007 WL 1074906, at *1–3 (N.D.N.Y. Apr. 5, 2007) (same).

On September 13, 2021, the U.S. Securities and Exchange Commission (the "SEC") filed a cease-and-desist order against GTV and its parent company with respect to the unregistered private stock offering described in the Superseding Indictment.  *See In the Matter of GTV Media Group, Inc.*,

---

[6] On March 29, 2023, Metropolitan Detention Center ("MDC") staff notified the Government that Defendant's family members had been improperly accessing a telephone line known as the "legal call system," which is intended to be used only by defendants and their counsel. Gov. Reply at 14.  Defendant claims that this was a mistake, and the result of language barriers and miscommunication.  Apr. 4, 2023 Tr. 31:4-20.  But, the MDC staff stated that multiple family members "manipulat[ed]" the system and "provid[ed] false information to circumvent the legal call system."  ECF No. 26-6.  This behavior fits Defendant's pattern of obstructive behavior; nonetheless, the Court need not rely on this incident to support its finding that Defendant has engaged and will continue to engage in obstructive behavior if released.

*et al. Admin. Proc. File No. 3-20537*, U.S. SEC. & EXCH. COMM'N (Jan. 19, 2023), https://www.sec.gov/enforcement/information-for-harmed-investors/gtv-mediagroup. The SEC ordered disgorgement of funds collected through the improper stock offering and established a fund to reimburse those who purchased stock. *Id.* In April 2022, when the fund began issuing disbursements, *id.*, victims began reporting to the Government that Defendant encouraged them to re-invest their disbursements in the fraud scheme alleged in this case. Gov. Mem. at 10. And, in February 2023, Defendant announced a new stock offering to his followers that involves Himalaya Exchange, one of the entities involved in the fraud scheme charged in the Superseding Indictment. Gov. Mem. at 10.

Despite the SEC's order in September 2021 and the seizure of funds from Defendant's businesses in September 2022, Defendant has continued to promote fraudulent investment opportunities to his followers and attempted to revictimize those who received disbursements from the SEC fund. The Court finds that this conduct constitutes clear and convincing evidence that Defendant will not abide by court orders and will continue to cause economic harm to the community if released.

### D. Conditions that Would Ensure Defendant's Appearance and the Safety of Others

The Court finds that no condition or set of conditions would ensure Defendant's return to court or the safety of the community. Defendant's proposed bail package is insufficient. Defendant has proposed a bond of $25 million, $5 million of which is to be secured by cash or real estate. As noted, Defendant has filed for bankruptcy and claims to have assets worth only $10,000. In attempting to enforce the bond against Defendant, the Government would be one in a long line of creditors. Defendant has also proposed that the bond be signed by two adults, one of whom is not a family member. But, several of Defendant's family members, including his wife and daughter, are

referred to in the Superseding Indictment as recipients of fraud proceeds. *See, e.g.*, Superseding Indictment ¶¶ 4, 9; Apr. 4, 2023 Tr. 8:11-18. Moreover, Defendant has not identified any co-signers, let alone co-signers unrelated to the alleged fraud, with a net worth of sufficient unencumbered value to pay the bond, who have sufficient ties to the United States such that the Government would have a meaningful ability to enforce the bond against those individuals, and who would have moral suasion over Defendant.

Defendant has also proposed location monitoring. GPS monitoring is inadequate, as ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee. *See United States v. Freeman*, No. 21 Cr. 88, ECF No. 50 at 5:4-6 (S.D.N.Y. Oct. 5, 2021) ("Anyone who knows the technology of electronic monitoring knows that it is far from foolproof."); *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (stating that electronic monitoring "at best . . . limits a fleeing defendant's head start"). The Court also rejects Defendant's proposal regarding the use of private security because it is not as reliable as a federal jail.

Further, Defendant's past obstructive conduct in civil litigation, in his bankruptcy proceeding, and in this case, as well as his actions following the SEC order and the seizure of funds, demonstrate that the Court does not have reasonable assurance that Defendant will abide by any conditions of pretrial release.

Finally, the Court is not persuaded by Defendant's due process arguments. Def. Mem. at 2–4. Defendant's continued pretrial detainment will not deny him the ability to meaningfully participate in his own defense, the right to the effective assistance of counsel, or a fair trial.

## CONCLUSION

For these reasons, Defendant's motion for release on bail pending trial is DENIED.  The

Clerk of Court is directed to terminate the motions at ECF Nos. 7 and 23.

SO ORDERED.

Dated: April 20, 2023
New York, New York

_____
ANALISA TORRES
United States District Judge