UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In Re | * | Case No. 22-50073 (JAM) |
| | * | |
| HO WAN KWOK and GENEVER | * | |
| HOLDINGS CORPORATION, | * | |
| | * | |
| Debtors. | * | |
| * * * * * * * * * * * * * * * * | | |
| LUC A. DESPINS, CHAPTER 11, | * | Adv. Proc. No. 23-05005 |
| TRUSTEE, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| GREENWICH LAND, LLC, et al., | * | |
| | * | |
| Defendants. | * | |
| * * * * * * * * * * * * * * * * | | |
| LUC A. DESPINS, CHAPTER 11 | * | Adv. Proc. No. 23-05008 |
| TRUSTEE, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | |
| GUO, | * | |
| | * | |
| Defendant. | * | |
| * * * * * * * * * * * * * * * * | | |
| LUC A. DESPINS, et al., | * | Adv. Proc. No. 23-05013 |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| HCHK TECHNOLOGIES, INC., | * | |
| et al., | * | |
| | * | |
| Defendants. | * | |
| * * * * * * * * * * * * * * * * | | |
| LUC A. DESPINS, et al., | * | Adv. Proc. No. 23-05017 |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| TAURUS FUND LLC, et al., | * | |
| | * | |
| Defendants. | * | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JULIE A. MANNING
UNITED STATES BANKRUPTCY JUDGE

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

#2270      ORDER SCHEDULING HEARING REGARDING G CLUB
              DOCUMENTS
#2279      ORDER GRANTING CHAPTER 11 TRUSTEE'S EMERGENCY
              MOTION FOR STATUS CONFERENCE TO DISCUSS
              PRESERVATION OF PROPERTY OF ESTATE AND ORDERING
              CERTAIN COUNSEL TO APPEAR AT STATUS CONFERENCE
#  90      ORDER GRANTING CHAPTER 11 TRUSTEE'S EMERGENCY
              MOTION FOR STATUS CONFERENCE TO DISCUSS
              PRESERVATION OF PROPERTY OF ESTATE AND ORDERING
              CERTAIN COUNSEL TO APPEAR AT STATUS CONFERENCE
#  32      MOTION TO COMPEL
# 157      ORDER SCHEDULING HEARING REGARDING G-CLUB
              DOCUMENTS
#  71      ORDER GRANTING CHAPTER 11 TRUSTEE'S EMERGENCY
              MOTION FOR STATUS CONFERENCE TO DISCUSS
              PRESERVATION OF PROPERTY OF ESTATE AND ORDERING
              CERTAIN COUNSEL TO APPEAR AT STATUS CONFERENCE

APPEARANCES:


Chapter 11 Trustee:             LUC A. DESPINS, ESQ.
                                Paul Hastings LLP
                                200 Park Avenue
                                New York, NY  10166

For the Chapter 11 Trustee:     AVRAM EMMANUEL LUFT, ESQ.
                                Paul Hastings LLP
                                200 Park Avenue
                                New York, NY  10166

                                DOUGLAS S. SKALKA, ESQ.
                                Neubert Pepe and Monteith
                                195 Church Street,13th Floor
                                New Haven, CT  06510

For the Creditors Committee:    JONATHAN KAPLAN, ESQ.
                                Pullman & Comley
                                850 Main Street
                                Bridgeport, CT  06601

For the Creditor, Pacific       STUART M. SARNOFF, ESQ.
 Alliance Asia Opportunity      O'Melveny & Myers LLP
 Fund L.P.:                     Times Square Tower
                                7 Times Square
                                New York, NY  10036

                                ANNECCA H. SMITH, ESQ.
                                Robinson & Cole LLP
                                280 Trumbull Street
                                Hartford, CT  06103

For Taurus Fund, LLC:           MICHAEL T. CONWAY, ESQ.
                                Lazare Potter Giacovas &
                                 Moyle, LLP
                                747 Third Avenue
                                New York, NY  10017

For Hing Chi Ngok and           CHRISTOPHER J. MAJOR, ESQ.
 Greenwich Land, LLC:           Meister Seelig & Fein LLP
                                125 Park Avenue
                                New York, NY  10017

4

```
APPEARANCES:  (Cont'd)

For the Plaintiff,          MELISSA F. WERNICK, ESQ.
 HK International Funds and  Chiesa Shahinian &
 Mei Guo:                     Giantomasi, PC
                            105 Eisenhauer Pkwy
                            Roseland, NJ  07068

                            JAMES M. MORIARTY, ESQ.
                            ERIC A. HENZY, ESQ.
                            Zeisler & Zeisler, P.C.
                            10 Middle Street, 15th FL
                            Bridgeport, CT  06604

For HCHK Creditors:         PAUL FENAROLI, ESQ.
                            Pastore, LLC
                            4 High Ridge Park, Third Floor
                            Stamford, CT  06905

For G Clubs Operations, LLC: JEFFREY M. SKLARZ, ESQ.
                            Green & Sklarz, LLC
                            One Audubon Street
                            New Haven, CT  06511

                            CAROLINA FORNOS, ESQ.
                            Pillsbury Winthrop Shaw Pittman
                            31 West 52nd Street
                            New York, NY  10019
```

1      (Proceedings commenced at 1:44 p.m.)

2            THE COURTROOM DEPUTY:  22-50073, Ho Wan Kwok and

3      Genever Holdings, LLC; 23-05005, Luc A. Despins, Chapter 11

4      Trustee, vs. Greenwich Land, LLC, et al.; 23-05008, Luc A.

5      Despins, Chapter 11 Trustee vs. Guo; 23-50 -- excuse me,

6      5013, Despins, et al. vs. HCHK Technologies, Inc., et al.;

7      23-05017, Despins, et al. vs. Taurus Fund, LLC, et al.

8            THE COURT:  Okay.  Good afternoon.  If we could

9      have appearances for the record, please, starting with the

10     Chapter 11 Trustee.

11           MR. DESPINS:  Good afternoon, Your Honor.  Luc

12     Despins, Chapter 11 Trustee.  I'm here with my counsel, Avi

13     Luft, from Paul Hastings.

14           THE COURT:  Good afternoon.

15           MR. SKALKA:  Good afternoon, Your Honor.  I'm

16     sorry.  Good afternoon, Your Honor.  Douglas Skalka also

17     here on behalf of the Chapter 11 Trustee as his local

18     counsel.

19           THE COURT:  Good afternoon.

20           MR. FENAROLI:  Good afternoon, Your Honor.  Paul

21     Fenaroli on behalf of Pastore, LLC.  I'm just here to

22     observe this afternoon.

23           MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

24     Sklarz, Green & Sklarz, for G Club together with lead

25     counsel, Carolina Fornos of Pillsbury Winthrop.

1        MS. FORNOS:  Good afternoon, Your Honor.

2        THE COURT:  Good afternoon.

3        MR. SARNOFF:  Good afternoon, Your Honor.  Stuart

4   Sarnoff, O'Melveny & Myers, on behalf of Creditor PAX.

5        MR. MAJOR:  Good afternoon, Your Honor.  Chris

6   Major, Meister Seelig & Fein.  We represent Greenwich Land,

7   LLC and Ms. Hing Chi Ngok.

8        MS. SMITH:  Good afternoon, Your Honor.  Annecca

9   Smith, Robinson+Cole, also on behalf of PAX along with

10  Mr. Sarnoff.

11       MS. WERNICK:  Good afternoon, Your Honor.  Melissa

12  Wernick from Chiesa Shahinian & Giantomasi on behalf of

13  Ms. Guo in the 5008 adversary proceeding.

14       MR. MORIARTY:  Good afternoon, Your Honor.  James

15  Moriarty from Zeisler & Zeisler, local counsel for Ms. Guo

16  in that same adversary proceeding, 23-05008.

17       MR. HENZY:  Your Honor, Eric Henzy of Zeisler &

18  Zeisler for the debtor.

19       MR. KAPLAN:  Good afternoon.  Jonathan Kaplan on

20  behalf of the creditors' committee.

21       THE COURT:  Mr. Conway, for some reason, we can't

22  hear you, although I can see that you're speaking.

23       I'm not sure why we can't hear Mr. Conway.  He

24  doesn't appear to be muted.

25       Mr. Conway, can you hear us?  You can nod your

1    head if you can.

2                See, I don't even think he can hear us.

3        (Counsel confer)

4                THE COURT:  All right.  Mr. Conway appears to be

5    connecting to audio, but he hasn't connected yet.

6                Attorney Claiborn from the Office of the United

7    States Trustee is in the courtroom.  Do you wish to note

8    your appearance?

9                MS. CLAIBORN:  No, Your Honor.

10                THE COURT:  Okay.  Oh, you can see her, though.

11    There she is.  Okay.

12                And a member of the public is here, too, to

13    observe the hearing.

14                So there are several matters on the calendar

15    today.  I see that something was filed, I believe, late last

16    night with regard to Adversary 23-5008 regarding a joint

17    motion to modify the pretrial order in that adversary.  Is

18    that correct, Trustee Despins?

19                MR. DESPINS:  Mr. Skalka is handling that, Your

20    Honor.  I think --

21                THE COURT:  Okay.

22                MR. DESPINS:  I think that's correct.  But I'll

23    let him address it.

24                MR. SKALKA:  Your Honor, that is correct.  The

25    purpose of the motion was to advise the Court that it

1    appears the -- an agreement has been reached between the

2    trustee and counsel for Ms. Guo, at which -- under which she

3    would agree to appear at a deposition next Wednesday,

4    November 1st.  And the parties are requesting that the

5    existing pretrial order be modified to allow for this

6    discovery to take place.

7            So we've asked for the discovery deadline to be

8    moved to December -- excuse me, November 10th and that the

9    deadline for filing dispositive motions be moved to November

10   28th.  And I think if that's acceptable to Your Honor, then

11   today's motions to compel can be denied as moot.

12           THE COURT:  Okay.  Attorney Wernick, are you --

13   you had indicated you where here on that matter as well.

14           MS. WERNICK:  Correct.  And the motion filed

15   accurately reflects the parties' agreement.

16           THE COURT:  Okay.  I note -- I just note for the

17   record that, Attorney Wernick, your office is the only

18   office that signed this joint motion on behalf of Ms. Guo,

19   but there are -- the Zeisler firm still has appearances on

20   behalf of Ms. Guo in this adversary, correct?

21           MS. WERNICK:  Correct.

22           THE COURT:  Okay.  All right.  I've looked at

23   your -- the motion, the joint motion.  I have to say, I

24   looked at it very briefly since it was filed last night.

25   But it does appear to be fine.  It seems to me all you're

1    asking to do is extend the deadlines to complete fact

2    discovery by 23 days and for the filing of motions for

3    summary judgment by 11 days.  And you've put the dates in

4    the ordered paragraphs and that the -- if this order

5    granting the joint motion to modify the pretrial order is

6    entered, excuse me, then the motion to compel will be denied

7    as moot.

8              Does anyone else wish to be heard on this issue?

9              So are you conducting the deposition of the

10   defendant or not, Attorney Skalka?  I'm just -- you are but

11   sometime in that --

12             MR. SKALKA:  Yes.

13             THE COURT:  -- in that period, that extended

14   period of time?

15             MR. SKALKA:  Yes, Your Honor.  The parties have

16   agreed that she will appear on November 1st in my offices in

17   New Haven.

18             THE COURT:  Okay.  All right.  Then I will -- what

19   was submitted as ECF Number 37 in this Adversary 23-05008, I

20   will enter that order granting the joint motion to modify

21   the pretrial order, which will then render the motion to

22   compel as moot -- denied as moot.  Okay?

23             So is that the only issue that we need to address

24   in that adversary proceeding?

25             MR. SKALKA:  I believe so, Your Honor.

1         MS. WERNICK:  Yes, Your Honor.

2         THE COURT:  Okay.  All right.  Thank you, both,

3    then.  I thought we should address that first since it does

4    resolve these issues.  So the motion to compel is denied as

5    moot due to the modification of the pretrial order.

6         MR. SKALKA:  Thank you, Your Honor.

7         THE COURT:  Thank you, both.

8         MS. WERNICK:  Thank you, Your Honor.

9         THE COURT:  Okay.  Thank you.

10        Trustee Despins, what matter would you like to

11   turn to next?

12        MR. DESPINS:  I believe the G Club matter is the

13   next one on the agenda in terms of order of appearance.

14        THE COURT:  Then go right ahead.  Whoever is going

15   to proceed with that matter, please proceed.

16        MR. DESPINS:  Mr. Luft is going to represent me on

17   that matter, Your Honor.

18        THE COURT:  Okay.  Go right ahead.

19        MR. LUFT:  Good afternoon, Your Honor.

20        THE COURT:  Good afternoon.

21        MR. LUFT:  Avi Luft with Paul Hastings on behalf

22   of the Chapter 11 Trustee.  Your Honor, we're here following

23   up with regard to the 9019 settlement and the term of it

24   which provided for the trustee to have access to HCHK's

25   documents.  This term was important.  It was provided in

1    part to address -- deal with cost and also because of the

2    need for that information.

3           Those documents, what HCHK has in its files, go

4    directly to the issues that play into the adversary

5    proceeding, which is an alter ego claim against HCHK.  And,

6    clearly, documents that show connections between the debtor,

7    his finances, and entities related to him are exactly the

8    type of evidence that would go towards a finding of alter

9    ego.  And G Club clearly falls within that category, being

10   an entity that this Court has already found to be controlled

11   by the debtor.

12          Now, as I said, the assignee estate and the

13   debtor's estate agreed to this term in part because it would

14   save substantial resources and costs that would otherwise

15   burden both estates if there was adversarial discovery.  But

16   there's no question, Your Honor, had we not reached that

17   agreement, we would have pursued discovery on these very

18   same topics, including, and in particular, related to

19   G Club, who has routinely appeared at the heart of issues

20   related to the debtor.

21          Previously, we had served HCHK with a 2004

22   subpoena.  Prior counsel for HCHK, before it was taken over

23   by the assignee, clearly did not give accurate information

24   or comply, because it only produced 148 documents total for

25   HCHK as having any connection with regards to the debtor.

1          Now we are learning that there are literally

2     hundreds of thousands of such responsive documents.  Those

3     would have been pursued.

4          Similarly, had we not reached agreement, we

5     certainly would have used Rule 26 in this adversary

6     proceeding to seek documents showing the connection between

7     HCHK and the debtor as part of the alter ego.

8          Now, in response, G Club came to this Court and

9     said initially that the issue was that it did not have

10    access to its emails because they were -- they were at HCHK,

11    and it wanted access to them so that it could comply with

12    its separate Rule 2004 subpoena.  And then somewhere along

13    the line that got shifted.  And then it became about

14    G Club's ownership of the documents.  And what they said was

15    that those documents which were in HCHK's possession and

16    systems, A, included privileged material and, B, should not

17    be handed over to the trustee, because they were

18    non-responsive to the subpoena to G Club in the 2004, not,

19    notably, that they were not responsive to discovery related

20    to HCHK.

21         Now, and the foundation of that argument, Your

22    Honor, has always been what I believe is a straw mat: that

23    HCHK's only relation to the G Club documents was as an

24    administrator of the cloud-based computing system.  And,

25    Your Honor, if you look at G Club's brief on this, which is

1    at Docket 2244 -- or Document 2244 in, I believe, the main

2    case, you see at page 6 they say, "HCHK was simply the

3    administrator of a cloud-based enterprise (indiscernible)."

4              A little further down: G Club did not "share its

5    purportedly privileged information with HCHK.  It simply

6    contracted for the operation of a document management system

7    with a third party."

8              Then on page 7 they say, "The trustee performed

9    some sleight of hand, characterizing G Club as giving HCHK

10   access to its documents."

11             And then on page 8 it says, "HCHK merely hosted

12   G Club data."

13             So, Your Honor, where I'd like to start with this

14   is to actually look at the master services agreement, which

15   in this adversary is at Document 88, in which G Club

16   predicates its claims on its -- or the basis upon which it

17   can claim these documents but studiously never cites to.

18   And I think it's quite clear from this document that HCHK

19   was not merely hosting G Club data.

20             THE COURT:  Just hold on a second.  You're in the

21   master services agreement that's somewhere on the docket --

22             MR. LUFT:  Yep.

23             THE COURT:  -- of the adversary proceeding?  Is

24   that what you said?

25             MR. LUFT:  Yes, Your Honor.  It's Document 88, I

1    believe.

2              THE COURT:  All right.  Give me a moment, please.

3              MR. LUFT:  Of course, Your Honor.

4              THE COURT:  In Adversary 5013, right?

5              MR. LUFT:  Yes, Your Honor.

6              THE COURT:  Okay.  Hold on.  I don't think it's

7    88.  If it's 88, I'm not seeing anything.

8              MR. LUFT:  I will double check that, Your Honor.

9    I was told that that's where the unredacted copy was.  I

10   know it was Exhibit A to the brief we filed at Exhibit -- at

11   Document Number 86.

12             THE COURT:  Okay.  Let me get back to that.

13                        (Court confers)

14             THE COURT:  All right.  Give me one minute.  Then

15   I can get there.  You just have to be patient, if you would,

16   please, for a moment.

17             MR. LUFT:  Of course.

18                             (Pause)

19             THE COURT:  All right.  So you want me to go to

20   page 20 of that document.  Is that what you're saying,

21   Attorney Luft?

22             MR. LUFT:  No, Your Honor.  Just to the first page

23   of the master service agreement.

24             THE COURT:  Okay.  Hold on.  Then I got --

25             MR. LUFT:  That's where I'll start.

1          THE COURT:  I have to find it.  I think it's on

2     page 20 --

3          MR. LUFT:  Of course.

4          THE COURT:  -- is the first page.  All right.  I'm

5     there on the first page of the master services agreement.

6          MR. LUFT:  Thank you, Your Honor.  And,

7     unfortunately, I have to note that, once again, this

8     document was stamped by G Club as highly confidential, so we

9     need to take precautions.  I know you mentioned that there

10    was -- I believe everyone on the phone is a assignee of the

11    protected order, but you did mention there was a member of

12    the public there.

13         THE COURT:  Well, what are you -- are you going to

14    be talking about specific things?  Or why don't you just

15    refer me to whatever it is, and I can read it, so we don't

16    have to make it part of the record.

17         MR. LUFT:  Sure, Your Honor.  Let's try to do it

18    that way.  So if we look in the first whereas clause --

19         THE COURT:  Uh-huh.

20         MR. LUFT:  -- with regard to what they were

21    contracting to do, Your Honor, I think it's clear what the

22    agreement was for.

23         I would next direct the Court down to Section 1.1,

24    which expresses what the scope of services is and directs

25    the reader to Exhibit A, which sets out those services.

1          And if one turns to Exhibit A of the document,

2     which is immediately after the signature page --

3          THE COURT:  Give me a second, if you would,

4     please, to get there.

5          MR. LUFT:  Of course, Your Honor.

6          THE COURT:  Okay.  I am at the -- I'm at the

7     exhibit you just mentioned.

8          MR. LUFT:  And if Your Honor looks at A through F,

9     you can see the long litany of services that are to be

10    provided by HCHK to G Club.

11         THE COURT:  Okay.

12         MR. LUFT:  Then, Your Honor, if we can go back to

13    that first page of the master services agreement under

14    client duties and responsibilities.  Broadly speaking, Your

15    Honor can read the provisions herself, but one can see about

16    the types of information and documentation that was to be

17    provided by G Club to HCHK to perform its services.  I'll

18    note the word "all" there.

19         THE COURT:  Okay.  I see that.

20         MR. LUFT:  Okay.  Your Honor, if we turn on to the

21    confidential information section under 6.2.  Again, Your

22    Honor will be able to read it for herself.  But broadly

23    speaking, what you'll see is what we all know to be an

24    extremely common provision dealing with parties' agreements

25    about making information available when there is a subpoena

1    or legal service.

2              THE COURT:  Okay.  I see that.

3              MR. LUFT:  And finally, Your Honor, I direct you

4    to Section 7.3 under client materials, which again talks

5    about the provision of information, data, work, and whatnot

6    to HCHK in connection with its provision of services, with

7    the definition of the word "technology" as pertinent being

8    defined in 7.1D.

9              THE COURT:  Okay.  Thank you.  I see that.

10             MR. LUFT:  And, Your Honor, at this point, I think

11   I can take us off the NSA, and I'll try to keep it broad

12   in -- when I reference it.  So I think it's clear that HCHK

13   was doing far more for G Club than merely hosting its data.

14   And that, of course, is backed up by HCHK's own filings in

15   which it explained the services it performed for G Club.  If

16   Your Honor is interested, I could provide you with that ECF

17   information as well in connection with an order to show

18   cause in connection with the assignment itself where the

19   assignee explained what HCHK did and specifically listed

20   G Club as one of the companies it did it for.

21             THE COURT:  Yes, if you could cite --

22             MR. LUFT:  And that's a public document.

23             THE COURT:  If you could cite to what you're

24   speaking to -- about, that would be helpful.

25             MR. LUFT:  So this is in the Adversary Proceeding

1    23-05013.  Is that -- I'm going to ask my colleague.

2                        (Counsel confer)

3              MR. LUFT:  113.  1-13 in that adversary.  And it's

4    Mr. Hoffmeister's affidavit.

5              So, Your Honor, as I was saying, clearly they did

6    far more for G Club than merely host its data.  To perform

7    those services, HCHK needed broad access to swaths of G Club

8    documents and information.  G Club gave them that access.

9    I'll keep that broad.  But Your Honor has seen the

10   provisions.

11             And, notably in that document, nowhere is there

12   any restriction on -- by G Club on HCHK's to access the

13   privileged information or even making any distinction

14   between its privilege and its non-privilege materials.

15             So against that background, we get to our two

16   questions.  The first is this argument that G Club should be

17   able to restrict the trustee's access to HCHK information

18   because it's not responsive to a subpoena to G Club.  Your

19   Honor, that's the tail wagging the dog.

20             The issue that -- in this adversary is HCHK's

21   alter ego status.  That's what the settlement was reached

22   about.  There was no discovery dispute with regard to

23   G Club's 2004 subpoena in this adversary.  Rather, it's

24   inserted itself.

25             The issue with this action goes to the alter ego

1    of HCHK which goes to -- links to the debtor, his finances,

2    his loans, his personnel, which, as Your Honor just looked

3    at the service agreement, you know the NSA and what was done

4    for G Club by HCHK is directly pertinent to that.

5          Now, Your Honor, G Club's documents have shown in

6    what we looked at that G Club has deep connections to the

7    debtor.  Your Honor has already found they're connected.

8    And moreover, we have found numerous loans that connect the

9    debtor.  We have found numerous documentations related to

10   purchases for assets which are now in the debtor's

11   possession.  And all of these services handled by HCHK would

12   presumably directly go to that topic.  So they're all

13   responsive.

14         Quite simply, Your Honor, the mere fact that HCHK

15   has all these G Club documents is quite compelling evidence

16   as to the alter ego status of the debtor and HCHK.  And

17   G Club should not be able to stop proper discovery of HCHK

18   based on whether or not that information would otherwise

19   separately be responsive to a 2004 subpoena to G Club.

20         Moreover, G Club can't now claim that it's unfair

21   for the documents to be produced in this manner, because it

22   gave them to G Club (sic).  And, in fact, it expressly gave

23   them with an understanding of what would happen if a

24   subpoena or other legal process was served.  And that's also

25   in the MSA.

1      So demanding that its documents be removed from

2   HCHK and returned to it and only produced if it's responsive

3   to a 2004 to G Club, fundamentally, Your Honor, they would

4   be altering the evidence in the case.  What documents HCHK

5   has in its possession, particularly ones that relate to

6   debtor, are clearly pertinent to alter ego.  That should be

7   the question, not whether or not something is responsive to

8   G Club subpoenas.  That's not what we're here for.

9      Now, Your Honor, I want -- at this point, I'd like

10  to turn to privilege unless you have any questions with

11  regard to responsiveness.

12      THE COURT:  I have no questions.  Thank you.

13      MR. LUFT:  Okay.  So let's talk about this

14  assertion of privilege.  G Club gave HCHK access to its

15  files, its emails, and its documents.  It specifically

16  contracted for services that required HCHK to access and

17  review that information.  G Club did nothing to segregate or

18  protect that privileged information.

19      Now, the law is clear that to maintain privilege

20  for an attorney/client communication, it must have been

21  intended to be or was, in fact, kept confidential.  That's

22  set out in <u>Strougo v. BEA Associates</u>, 199 F.R.D. 515 at page

23  519.  That's Southern District of New York 2001.

24      And the party seeking the protection of the

25  attorney/client privilege must affirmatively act to protect

1    their communications.  That's the Niceforo case v. UBS, 20

2    F. Supp. 3d 428 at page 437, again Southern District of New

3    York in 2014.

4            We know from the case law that voluntary

5    disclosure of privileged information to service providers,

6    if not for the purpose of helping comprehend legal advice,

7    you waive that privilege.  That's Acker (phonetic) and the

8    AMPA case that we cite.

9            But the case I think is most pertinent to what

10   we're talking about here, Your Honor, is Judge Friendly's

11   decision in the Horowitz case.  That's at 482 F.2d 72, page

12   82, 1973.  In that decision, Judge Friendly found that a

13   privilege is waived when documents are intermingled with

14   non-privileged documents, and no special protections are

15   made for privileged documents.  There, and they point out,

16   an accountant had free reign if they wanted to, to look

17   through the -- whatever documents it wanted, and didn't do

18   that.

19           Your Honor, that is what we have here.  G Club, by

20   its own admissions, gave all its documents over to HCHK.

21   They told you they didn't know where the privileged

22   documents were.  They'd have to go through and review all

23   the documents to pick out where they were.  They were

24   directly intermingled.  And accounting services is one of

25   the many services that HCHK had reason to go into the files

1    and look for.  There was no segregation.  HCHK had access

2    and use.  That is exactly what Horowitz speaks to.

3              Now, you compound that, Your Honor, by the fact

4    that this was done three times over.  This happened with

5    HCHK.  Then HCHK transferred all its information to the

6    assignee.  Again, they had access to look at whatever files

7    they needed to, both operating under the MSA.  At no point

8    did HCHK -- did G Club come to it and say that's our

9    privileged information, you can't do that.  Moreover, they

10   had already waived it.

11             And then, finally, Your Honor, it happened a third

12   time when the assignee entered into a potential deal with an

13   entity called G News, who is not allegedly affiliated with

14   G Club.  And as part of that agreement gave them access to

15   all of HCHK's system.  So three times over, there was a

16   waiver.  In each case, G Club did nothing to secure its

17   documents and, more importantly, had always basically just

18   handed over all of its files to HCHK and said go through,

19   get what you need.

20             Now, G Club's only response to this is, one, to

21   take the claim and say all they did for us is cloud

22   computing.  That's what you're going to see when you go

23   through their brief.  There is not a mention of a single

24   other service.  But as Your Honor sees in the MSA and one

25   can see in Mr. Hoffmeister's declaration, they did far, far

1    more for them.  So any assertion that no one would have

2    access to G Club's documents fails.

3           The second thing they do is they cite to a single

4    case, the Metro Services (sic) case.  Now -- out of the

5    chancery court in Delaware.  Now, first, Your Honor, Metro

6    Services doesn't address the issue of where a third party

7    has access to the information.  It merely speaks to

8    third-party hosting and confidentiality.  So whereas here,

9    the entity who's hosting has reason to go in and actually

10   access the information, that is not something that Metro

11   Service speaks to.

12          Moreover, I'll note Metro Service does not speak

13   to the issue of privilege at all.  It merely speaks to the

14   notion of whether something can be held confidential.  Nor

15   does the underlying article that it cites as a basis for

16   even that proposition.

17          Now, the only other argument that they have, Your

18   Honor, is to say that we have not proven that someone

19   specifically asked us that information.  Now, not only is

20   that inconsistent with Mr. Hoffmeister's affidavit and the

21   clear terms of the NSA and how it would work, but this is

22   blatant burden shifting, Your Honor.  The party asserting

23   privilege has the obligation to prove it, so it is on G Club

24   to prove that no one ever accessed its information, not on

25   the trustee to go and try to show that someone actually did,

1    although, as I said, any reading of this agreement and what

2    they -- the services they provided for them or

3    Mr. Hoffmeister's affidavit clearly indicate that such

4    access would have had to have happened.

5          Your Honor, this is a dispute about HCHK and its

6    adversary.  That information about G Club's involvement with

7    HCHK is clearly pertinent to that adversary.  We should have

8    access to it.  And to the extent that any of that

9    information was ever privileged, when they gave HCHK

10   unfettered access to it, they waived such privilege, and we

11   should get those documents as well.

12         Your Honor, do you have any questions that I can

13   answer on this point?

14         THE COURT:  I do not.  Thank you.

15         MR. LUFT:  Thank you, Your Honor.

16         THE COURT:  Attorney Fornos, would you like to

17   respond?

18         MS. FORNOS:  Yes, Your Honor, I would.  But I

19   think there's a number of misstatements that need to be

20   corrected, so I'll take them one at a time.  First, I want

21   to frame the issue.  The Court already ruled on this, and we

22   submit that the Court had it right in July -- on July 28th

23   when the Court issued a procedure that protected G Club's

24   (indiscernible) rights and, at the same time, balanced any

25   prejudice to the trustee.  So the Court has already created

1    a mechanism by which G Club should have access to its

2    documents.

3            Now, one of the issues that I think is being --

4    perhaps creating confusion -- and understandably so, because

5    these are complex technical issues.  So I don't fault the

6    trustee for not appreciating that this is not documents that

7    are being commingled in an office or in a cabinet.  This is

8    a cloud service.  This is wholesale Microsoft 365.  That's

9    where the documents and, in particular, the commingling of

10   G Club is held.

11           Now, Your Honor, I don't represent HCHK.  I do not

12   know how HCHK (indiscernible) documents.  I don't -- I do

13   not know as counsel for G Club what else HCHK

14   (indiscernible).

15           What I do know is that for a very limited period

16   of time, G Club was not able to access its G Club domain.

17   In other words, the user on the cloud using the G Club

18   domain name were not able to access it.

19           The trustee paints this picture of documents

20   commingled, of things being shared, but I don't believe that

21   the trustee has fully understood that this is just

22   documents, domain names, a Gclub.com domain name on the

23   cloud that maintains users.

24           If we take the trustee's position, that means

25   everyone on this call who has used Microsoft 365 and uses

1    the cloud has arguably waived their rights.  Microsoft has

2    access to the cloud.  It's truly an untenable position.

3            HCHK acted as IT.  So to be more precise, a new

4    employee joins G Club; they need to get an email assigned to

5    them.  An employee leaves G Club; they need to have their

6    account terminated, their email access.  That's what we're

7    talking about.

8            Now, since the Court's order, I -- we worked with

9    the assignee, and the assignee did exactly what the Court

10   ordered.  We were able to restore our access.  And since the

11   Court's order, we were able to get our domain name, review

12   the documents, and we have produced to the trustee another

13   20,000 documents that are responsive.  That's in addition,

14   Your Honor, to the other 120,000 documents that were

15   previously produced.

16           So two things.  They have had -- they've had in

17   excess of 140,000 documents and bank records.  And if they

18   have any issues of what else it is that they feel that they

19   need, they can certainly come and talk to us.  But we have

20   complied with the Court's order.  We have worked with the

21   assignee to produce documents.  We have produced a privilege

22   log and a redaction log.

23           So at this point, Your Honor, we have complied.

24   The Court's order of July 28th appropriately managed this.

25   We are providing the information pursuant to the Rule 2004.

1    And there is absolutely no prejudice to the trustee to

2    continue to follow the proper protocol.

3           What the trustee is complaining -- and, again, we

4    don't represent HCHK.  If they have issues about HCHK's

5    domain, that's Hchk.com or whatever their domain name is, or

6    HCHK documents, that's an issue that they need to take up

7    with HCHK.

8           We as G Club have access to our documents.  We

9    have (indiscernible).  We have produced responsive

10   documents.  And we've produced a privilege log.  And,

11   accordingly, we think that the -- this motion is a colossal

12   waste of judicial resources.  It should be denied at length,

13   and the Court's original order of July 28th should be deemed

14   (indiscernible).

15          I'm happy to answer any questions the Court will

16   have.

17          THE COURT:  I do not have any questions at the

18   moment.  Thank you.

19          MR. LUFT:  Your Honor, may I respond?

20          THE COURT:  Yes.

21          MR. LUFT:  All right.  Well, let's start --

22   Ms. Fornos says that I somehow mischaracterized the Court's

23   ruling.  I would direct her to the -- Part B of the ruling

24   which was the Court specifically said that the trustee shall

25   file a brief in support of the trustee's argument that

1   G Club has waived any privilege and has no right to object

2   to responsiveness.

3          So I'm sorry Ms. Fornos finds that to be a

4   colossal waste of time, but there was no final ruling on

5   this.  The Court specifically set out that we were to brief

6   it, and I think appropriately so.  I do not find it a waste

7   of time.

8          And I do find it quite telling that -- what did we

9   not here from Ms. Fornos?  There was no mention of the NSA.

10  There was no mention of all the services that had to be

11  provided under the MSA.  There was no mention that G Club

12  had access to all these HCHK documents.

13         Instead, she keeps talking about domain names.

14  HCHK had all the documents, had to provide all the services

15  for it.  She says, well, we produced documents that were

16  responsive to G Club's 2004.  Well, that's good.  They are

17  required to do it.  It took many months to get her to do

18  that.  But that has no bearing on whether HCHK's Rule 2004

19  is at issue.

20         Now, as to this -- to the extent she is trying to

21  suggest what's the big deal, Your Honor, you get it for one,

22  you get it for the other, she's -- it's true that she

23  produced recently 20,000 documents.  I called HCHK to say

24  how many documents did you send them originally that would

25  have been responsive if we just had our access, and I was

1    told by HCHK's counsel that they produced hundreds upon

2    hundreds of thousands of documents.  So the fact that we got

3    2,000 -- sorry, 20,000 of those documents means there -- we

4    are getting a fraction of what are the responsive documents

5    to discovery with regard to HCHK both with regard to the

6    2004 it was served that it never properly responded to or

7    that we would have -- absolutely have sought if we had not

8    reached this settlement.

9            Now, as to the final -- where she started and

10   where I'd like to end is she said I am not understanding how

11   the cloud works; it's not a filing cabinet.  No, it's not a

12   physical filing cabinet.  But in the modern world, Your

13   Honor, it is a virtual filing cabinet.  That is what we are

14   talking about.  It is a place where you store all your

15   documents.

16           And Judge Friendly, who while not deciding today,

17   as is often the case foresaw what is to come and understands

18   what is at issue.  What Judge Friendly speaks to in the

19   Horowitz decision is when someone just hands someone a giant

20   filing cabinet or box of documents or virtual container of

21   documents and makes no effort to distinguish which are the

22   privileged ones and which are not the privileged ones, then

23   they are not complying with their obligations to protect

24   those documents and, thus, they've waived the privilege.

25           That is what we are talking about here.  So the

1      fact that it is -- nothing about the fact that it is now

2      kept on the "cloud" makes it any different.  If anything,

3      when you consider that I'm sure Judge Friendly was not

4      envisioning a filing cabinet that could hold a million

5      documents, it makes it all the more telling how little

6      effort was done.

7            We have not heard any explanation that someone --

8      that they have evidence that no one complied with the MSA,

9      that the work wasn't done or anything else.

10           And, finally, I'll just have a note, Your Honor,

11     with regard to this question of the apocalyptic all law

12     firms will have waived everything.  That is not a question

13     before the Court today.  No one is talking about a

14     hermetically sealed world where it is just on the cloud, no

15     one accessed the information, and the legal question is, is

16     the mere fact that you contracted with a third party to

17     provide cloud services, if they are not otherwise given

18     access to them, does that create a privilege waiver.  That's

19     not something we need to decide today.

20           What we're talking about is, when someone gives

21     someone access to all their documents, they hold the

22     documents and specifically contracts to them and says go

23     look at that information to do the work you have to do,

24     exactly what they are talking about Acker and -- I'll find

25     the name, Your Honor -- the AMPA decision where they talk

1    about accountants going in and looking at information, being

2    provided information.

3            That's the question we have.  If something is on

4    the cloud and you say to someone, a third party, hey, go

5    take what you need, go look at my information, does that

6    constitute a waiver.  And also, Your Honor, that is

7    textbook, that is exactly when there is a waiver.  When you

8    give third parties access to your privileged information,

9    you waive.  When you don't work to protect your information,

10   you waive.  And the fact that it is on the cloud does not

11   change that.

12           MS. FORNOS:  Your Honor?

13           THE COURT:  Hold on just a second.  I just want to

14   make sure Attorney Luft is completing his statements.

15           MR. LUFT:  Your Honor, if you have no questions, I

16   am complete.

17           THE COURT:  Okay.  Thank you.

18           All right.  Hold on a second, Attorney Fornos.

19   Just hold on a second.

20           All right.  Go ahead, Attorney Fornos.

21           MS. FORNOS:  Thank you, Your Honor.  Your Honor,

22   the master services agreement is not what's at issue here.

23   And Mr. Luft is making a lot of conclusory jumps, conclusory

24   jumps from access to possession, possession to waiver.  And

25   that's a very slippery slope, and it is an untenable

1    position.  The fact of the matter is, we have our documents.

2    We reviewed them, and we have produced responsive documents.

3          Now, Mr. Luft is saying hundreds of thousands of

4    documents.  Well, that's -- to be fair, we've produced

5    140-plus-thousand documents.  As the Court will recognize,

6    in (indiscernible) 2004, a party need not go through 30

7    employees' email -- emails when we can identify specific

8    custodians that are most likely to have (indiscernible) the

9    trustee we have identified the custodians that have the

10   information.  We have applied search terms, and we have

11   reviewed those documents, and we have reviewed quite a

12   number of documents at a great cost to our company.

13   Responsive documents have been produced.

14         And the trustee cannot possibly stand before Your

15   Honor and say that we haven't complied with that Rule 2004.

16   We have produced the banking records.  We have produced the

17   emails (indiscernible).  We have produced the loan

18   documents.  They have the information.

19         What he's talking about here is conflating the

20   scope with responsiveness and privilege.  And on the

21   privilege end, Your Honor, there is absolutely no evidence

22   whatsoever that anyone at HCHK reviewed these emails,

23   reviewed privileged communication, had access to every

24   single document and actually reviewed it such that there

25   would be an intentional waiver.

1    We ask the Court to deny this motion simply

2    because the Court has already created a mechanism that is

3    working.  And I have yet to hear -- I haven't had a request

4    for a meet and confer for any documents that they feel are

5    missing.  I haven't heard a meet and confer for anything

6    from them since we produced these documents.

7         So to the extent that there is (indiscernible)

8    that's a different matter.  The issue here is, is there a

9    waiver simply because we had cloud services and HCHK acted

10   as an IT department to help with the technological issue?

11   The answer is no.

12        The Court's order appropriately sets forth the

13   mechanism, and we simply ask that the Court adhere to that

14   original order and deny the request by the trustee to just

15   have a wholesale waiver of every and any email and every and

16   any document that exists on the cloud that HCHK may have had

17   access to simply by being an IT manager.

18        THE COURT:  I didn't hear the last thing you said.

19   I'm sorry.  Would you say that again?

20        MS. FORNOS:  Sure.  Yes, Your Honor.  G Club does

21   not waive its rights simply because an IT manager may have

22   had access.  There is no evidence of that.  And, in fact, it

23   would have been inappropriate for them to access any of our

24   records.  They simply acted as an IT department to assist

25   with technological -- technical issues associated with the

Ho Wan Kwok - October 24, 2023                    34

1    cloud and with creating domain names and email addresses.

2    There's no evidence, and it's a bit conclusory for the

3    trustee to simply said that they had -- they have the right

4    to every piece of paper, every email, every document that

5    has been -- exists in the cloud simply because we had an IT

6    manager.

7              THE COURT:  Well, I do have one question for you

8    now that you've --

9              MS. FORNOS:  Yes, Your Honor.

10             THE COURT:  -- Attorney Fornos.  So you started

11   off your -- this -- your response to Attorney Luft's reply

12   after you both made your initial arguments to say that the

13   MSA, the master service agreement, is not at issue here.

14   But then you just said that there's no waiver simply because

15   an IT manager had access to G Club's documents.

16             So isn't the MSA at issue then?  Because what

17   evidence do I have other than that document to determine,

18   rightly or wrongly, what services were provided by HCHK to

19   G Club?

20             MS. FORNOS:  The Court is correct, Your Honor.

21   And my apologies.  The trustee's presentation focused on far

22   beyond what the master services agreement allegedly

23   provided.  The issue of confidentiality was maintained by

24   the master services agreement.  The master services

25   agreement did specifically say that HCHK would provide IT

1    services and all information was to be maintained

2    confidential.

3         What I'm referring to and the reason that I just

4    want to make sure that we all understand, whatever the MSA

5    and confidentiality restrictions apply to HCHK, the fact of

6    the matter is they were an IT manager for our domain name.

7    There is absolutely no evidence in the record that HCHK

8    logged on and searched all of these emails and reviewed

9    these emails or had the authority to simply cart blanche

10   review these emails.  That's just not in evidence.

11        And what the trustee is painting is this picture

12   of HCHK -- and I still even know who at HCHK.  There's no

13   names mentioned.  There's no individuals that are being

14   identified that allegedly rummaged through all of these

15   emails and domain names as if they were rummaging in a

16   cabinet maintained, physically possessed in their offices.

17        And that's the part that I'm concerned about.

18   There's conflating of issues here.  These are digital

19   records maintained on the cloud that only belong to G Club.

20   And no one had a right to access that other than G Club.

21   And the master services agreement did specifically say our

22   information is confidential, period.

23        MR. LUFT:  Your Honor, if I may?

24        THE COURT:  Just briefly.  Yes, you may.

25        MR. LUFT:  Okay.  Just to clear this up.  Again,

1    Your Honor, I'll direct you -- I won't say it, but if one

2    looks at Exhibit A, IT, by my estimation, is one of 20

3    services provided by HCHK to G Club.  And the agreement

4    explicitly called in two places for G -- HCHK to use the

5    information of G Club to perform those 20 services.

6           So I don't know where Ms. Fornos can continually

7    just say all they were, were IT managers or that I'm wildly

8    speculating that people would be accessing the information.

9    I'll point again to the affidavit again of Mr. Hoffmeister

10   who also explicitly states those are the services they

11   performed for G Club.

12          Your Honor, that's all I have.

13          MS. FORNOS:  Your Honor?

14          THE COURT:  Yes?

15          MS. FORNOS:  May I just clarify?  Providing a

16   service doesn't mean and it's not the same as simply saying

17   I'm going to log into your domain and look at your emails

18   and email addresses and the contents of those email

19   addresses.  I'm baffled by the trustee's position, because

20   to provide accounting services, even if it's being done at

21   HCHK, HCHK may then email communications to G Club.  Well,

22   those communications, if they're responsive, have already

23   been produced from our end to the trustee.

24          I am still not -- I think he's conflating issues

25   and making it a lot more complicated than it needs to be.

1   Because the fact of the matter is, those documents belong to

2   G Club and only G Club.  And he cannot do an end run around

3   that situation simply because he's trying to get HCHK

4   documents, documents held on an HCHK.com domain name.

5           Those belong to HCHK.  Documents that HCHK had are

6   theirs.  And I can't respond for their documents or how they

7   kept them or what they did.  What I can say is we, G Club,

8   do have access to our documents and have produced what's

9   responsive.

10          THE COURT:  Okay.  I'm going to take the matter

11   under advisement and will rule accordingly.  Thank you.

12          MR. LUFT:  Thank you, Your Honor.

13          MS. FORNOS:  Thank you, Your Honor.

14          THE COURT:  So with regard to the order scheduling

15   the hearing on the issue of the G Club documents, which

16   appears in the main case at ECF 2270 and in the adversary at

17   157, those matters are taken under advisement.

18          So then I believe, Trustee Despins, the only other

19   matters on today's calendar are related to the trustee's

20   request for a status conference regarding preservation of

21   property of the estate.  Is that correct?

22          MR. DESPINS:  That is correct, Your Honor.

23          THE COURT:  Okay.  Please proceed.

24          MR. DESPINS:  Well, first I want to make sure that

25   Mr. Conway was able to resolve his audio issues.

1          MR. CONWAY:  I will give you a test now.  Can you

2     hear me?

3          THE COURT:  Okay.  Yes, we can hear you.

4          MR. DESPINS:  Yes.  Yes.

5          THE COURT:  Thank you.

6          MR. CONWAY:  I'm not sure what happened, but I'm

7     on the phone now.

8          THE COURT:  Okay.  Thank you.

9          MR. DESPINS:  So, Your Honor, I will try to make

10    this relatively brief.  And the request itself was very

11    short, because the pictures are really worth a thousand

12    words here.  And I would say at the outset that we're doing

13    this in the main case but also in the Greenwich Land case

14    and the Taurus Management Mahwah case, because it's all --

15    for reasons we'll explain in a second, is all related.

16         So the first thing I'd like to do is just briefly

17    go through the exhibits, Your Honor.  And the first thing to

18    keep in mind, I believe, is the key dates here, which are

19    February 2020, the purchasing of the Taconic house; October

20    12, 2020, Genever Holdings filing for Chapter 11; and

21    December 2021, the closing of the Mahwah mansion; and

22    February 15, 2022, the debtor's Chapter 11 filing date.

23         I would say at the outset, Your Honor, that as we

24    have done with status conferences in the past, this is not

25    an evidentiary hearing.  I'm saying this not because we

1    cannot prove these various links that we've used and the

2    pictures.  We can put that into evidence eventually if we

3    need to, so we have no doubts about that.  But I want to

4    make sure that, you know, people don't feel the need that --

5    to object to say, well, this link to Mr. Kwok's, you know,

6    statement on this page has not been admitted.  You know,

7    we'll -- we can deal with evidentiary issues later.

8           But the basic issue here is that I asked -- after

9    the visit on September 1st, I asked members of the team

10   to -- in my mind, I thought the issue was are there missing

11   items.  And, of course, they did that.  But they went beyond

12   what I asked for, and they said you should also know that a

13   number of these items, like a lot, that are Mahwah mansion

14   came from The Sherry Netherland.

15          And this is what, Your Honor, Tabs 1 through 8

16   show is that you have various videos showing Mr. Kwok at The

17   Sherry Netherland with a number of items that are now at the

18   Mahwah mansion.  And so you can see those through the

19   presentation where -- and because eventually we get in the

20   presentation in the various tabs to the Mahwah mansion

21   itself where we show these items, where they are by picture

22   or by videos or, you know, screenshots of videos.

23          And we also show on Tabs 11, 12, 35, and 48 items

24   that either were at The Sherry Netherland or the Taconic

25   house, were at the Mahwah mansion at one point but don't

1    appear to be there anymore.  So and, you know, this is

2    pretty telling that this has -- it had to happen between

3    March 15th and September 1st, because there's a video that

4    you've seen that actually is admitted as evidence in -- at

5    the Mahwah hearing where the two Kwok affiliates basically

6    are going through the mansion to show how the -- beautiful

7    the mansion is and all that.

8         But through that, you see various pieces of arts

9    on the wall, vases and things like that that we have

10   screenshots of.  And those are no longer there on September

11   1st.

12        I would say at the outset that the I have no --

13   and I hope I don't live to regret this -- but at this time,

14   I have no concerns about the current security at the Mahwah

15   mansion, meaning from September 1st going forward, I've had

16   various discussions with this gentleman.  You know, I can

17   never be a hundred percent sure, but I have a high degree of

18   confidence that nothing is disappearing under his watch.

19        But there are a number of issues here.  One is

20   clearly things did "disappear" or are no longer on the walls

21   where they were based on the September 12th video.  We know

22   that from the September 1st video.  And so that's number

23   one.

24        Number two, there are a number of items that are

25   still at the mansion but that came from Mr. Kwok through The

1    Sherry Netherland or that transmitted from The Sherry

2    Netherland to the Taconic house, Taconic to Mahwah.  And

3    some of those have disappeared as well.

4           So the issues are as follows.  The first thing is,

5    Your Honor, there was allegedly a manager for the alleged

6    owner of Mahwah, and that was the driver -- the debtor's

7    driver or bodyguard, Mr. Barnett.  Yes.  This person should

8    be -- come into court and testify as to his knowledge of

9    what happened to these items or not.

10          And the same thing -- you know, Mr. Conway at the

11    first day hearing, after a question from Your Honor -- you

12    asked who is the human being you're dealing with who's

13    running this, who's in control, and said Mr. -- I forget his

14    name now.  Yeah.  Mr. Fallon, Mr. David Fallon.  So that

15    person should also come to court to tell us what they know

16    or not about these items that disappeared under their watch.

17    So that's number one.

18          Number two, it's obvious that there's a movement

19    of assets between these three properties.  And now I'm

20    focusing on Taconic Road.  It's clear there's some items

21    that were there that are now at Mahwah.  And I would say

22    shame on me for not asking for this before, but I think we

23    were -- we did not know when we started the Greenwich Land

24    adversary proceeding what we know now, which is, you know,

25    pretty bad if you look at the summary judgment motion we

1    filed in that case in terms of dissipation of assets, cash,

2    tons of cash, hundreds of thousands of dollars from that

3    entity to all sorts of affiliates of the debtor, including

4    Zeisler getting payments from that entity and the debtor's

5    daughter, et cetera, et cetera.

6          So I'm not here to argue this, but the point is,

7    going back to the shame on me, I should have asked for a

8    video tour of that property right at the time.  But I

9    thought it was -- would have been perceived as heavy-handed

10   because, you know, what proof do I have that these people

11   would do things like that.  Well, now we have the proof in

12   spades that they would do that.

13         And, therefore, Your Honor, we believe there

14   should be an immediate video tour so we establish a

15   benchmark as we did for the Mahwah mansion on September 1st

16   of what's in that house.  The reason I'm saying this is I

17   don't want to be overly confident, but I'm pretty sure we're

18   going to get title to that house.  And I don't want to get

19   it and then end up with an -- you know, "missing items" as

20   we have now experienced with Mahwah.

21         And then there's another category which is not

22   necessarily an emergency, but there are things that were

23   moved from Taconic to Mahwah.  For example, four

24   motorcycles.  And these are not like, you know, a Yamaha

25   250, Your Honor.  These are high-end motorcycles, including

1    a Maserati Ducati.  And we have pictures in there of

2    Mr. Kwok riding motorcycles.  Those were taken, and we have

3    evidence of that, at the Taconic house.

4            And, obviously, these motorcycles are now at the

5    Mahwah mansion.  And I don't think Mr. Conway is going to

6    say that the motorcycles are there so that the members of

7    the New Federation of the State of China can use the

8    motorcycles for recreational purposes.  Okay?

9            So these are clearly Kwok assets.  These are worth

10   thousands and thousands of dollars.  They're okay where they

11   are.  As I said, I'm not concerned at this time with the

12   security at the Mahwah mansion.  I want to be clear about

13   that.

14           But, clearly these are not under any circumstance

15   Taurus Management assets.  They're not on the list of assets

16   by Taurus Management.  We know who is the title owner of

17   these motorcycles.  And, you know, that would probably

18   surprise you, but it's somebody who's related or has a close

19   degree of relationship with a member of the Kwok family.

20           So the point, Your Honor, is we need to address

21   the immediate issue, which is what happened to the stuff at

22   the Mahwah mansion.  Two, we need a video tour of the

23   Greenwich land property as soon as possible.  And, three, we

24   need to discuss eventually a procedure to extract from the

25   Mahwah mansion things that even Taurus itself does not say

1   it owns but that are located at the Mahwah mansion such as

2   the motorcycles and tons of other assets of Mr. Kwok in that

3   property that are not listed on the Taurus Management assets

4   and that we have pictures of at The Sherry Netherland.

5           So I could take you, you know, through a

6   painstaking review of a vase here or a couch there, but I

7   think the pictures are pretty telling.  And at this point,

8   I'll stop and answer any questions Your Honor may have.

9           THE COURT:  So I do have a question or two just

10  based upon what you've said in both the document that you

11  filed requesting the status conference and what you've just

12  said on the record.  So this is a status conference.  So are

13  you planning on filing some kind of motion to require the --

14  you're talking about Mr. Kwok's bodyguard and Mr. Fallon,

15  whom I believe Mr. Conway had mentioned at some point during

16  a hearing in the Taurus Fund adversary proceeding.

17          How are you -- how -- what is it that you are

18  expecting the Court to do?

19          MR. DESPINS:  Yeah.  Frankly, Your Honor -- and

20  you might think we're cutting corners, but we're trying to

21  save fees wherever we can.  I believe the Court can sua

22  sponte direct Taurus Management to produce those people at a

23  hearing in court to answer these questions given the

24  circumstances here.  We're not talking about, you know, a

25  briefing on the issue of alter ego.  We're talking about

1    assets not being there.

2           By the way, if we find them, great.  That's

3    wonderful.  But I think -- and also I want to point out,

4    there's a very expensive, expensive security system in

5    Mahwah with cameras everywhere.  So there should be --

6    somebody would control that, right?  The "owner," Taurus,

7    would have access to these videos.  And that would show who

8    took these paintings down and the vases and all that.

9           So therefore, yes, we could file a motion, Your

10   Honor.  But we think that the Court sua sponte can order

11   the -- these people to appear in court to answer these

12   questions the same way you've directed Mr. Mitchell to

13   appear and answer some questions in the past.  And, you

14   know, they're parties.  Barnett is a defendant.  Taurus

15   Management is a defendant.

16          And in the case of Greenwich Land, I think the

17   Court also has the power sua sponte to order -- and I would

18   think that, frankly, Mr. Major would consent to that,

19   because if he doesn't consent, how does that look that,

20   what, there's a concern here?  I mean, this would be a

21   two-hour video.  We would do this very professionally.  So I

22   would hope that either they would consent to that or the

23   Court would order it.  Thank you.

24          THE COURT:  All right.  Well, that's only the

25   first part.  Then the second part is that -- well, I guess

1    that is both.  That's bringing the people into court and

2    also seeking a video.

3            But let's turn to the Taurus Fund situation first,

4    because I think that's a little more direct insofar as,

5    Mr. Conway, I ordered you and you did supply a list of

6    assets owned by the Taurus Fund.  And the debt -- the

7    trustee is asserting that there are other assets located --

8    and I -- I'm fairly certain that I don't have it in front of

9    me at the moment, that that order, you know, included a list

10   of everything on the grounds or in the mansion, so

11   everywhere associated with that property.

12           And, apparently, the assertion is that there is

13   many other -- there are many other items of property in the

14   Mahwah mansion or on the grounds of the Mahwah mansion that

15   are not listed in your list of assets.  So have you had an

16   opportunity to review what the trustee's saying versus what

17   has been filed on behalf of the Taurus Fund in this

18   adversary proceeding as to the assets that are owned by the

19   Taurus Fund?

20           MR. CONWAY:  Good afternoon, Your Honor.  Michael

21   Conway.  And since I didn't get my appearance on the record

22   earlier, Michael Conway, Lazare Potter Giacovas & Moyle.  I

23   represent the defendants in the Taurus Fund matter.

24           Your Honor, I have obviously not had time to go

25   through item by item these picture.  I truly don't

1    understand what the emergency is.  I gathered from this

2    motion that the trustee find -- found that there is

3    additional objects at the Mahwah house that were not on our

4    list.  And my understanding is that that was not an uncommon

5    thing for the New Federal State of China's events.  They

6    would bring in to stage -- whether it be for that video we

7    watched in court or for the fundraising events, what have

8    you.

9          I do know this, that when I got involved, Your

10   Honor, which was literally the -- a day or two before the

11   hearing, I instructed the folks not to remove anything.  It

12   didn't matter if it was on our list or otherwise.  I felt

13   that the -- this Court's injunction was fairly expansive and

14   that nothing should be removed from the premises, whether we

15   owned it or not.

16         So I think you'll find that that might be one

17   reason why if there is anybody out here who claims this

18   other property they haven't removed it, because you said

19   don't.  And as the trustee has indicated, we have a security

20   force in place that's not letting anybody in, not letting

21   anybody remove anything.

22         So, yeah, there are -- is property on the premises

23   that's not -- that does not belong to Taurus Fund.  It was

24   brought there to stage for various events.  But that does

25   not seem to be a Taurus Fund issue.  It seems to be an issue

1     related to whatever entity the trustee says owns that

2     property.

3              THE COURT:  Well, I'm not sure that's accurate.  I

4     mean, you're -- right now, the Taurus Fund, you've come in

5     and said the Taurus Fund owns the property, that -- and that

6     you're in control of the property.

7              Well, if -- and it wasn't just about removal.  It

8     was about bringing things to the Mahwah mansion, apparently.

9     That's the assertion since the March 15 events of this year.

10             So I'm not sure I would agree with you that it's

11    somebody else's problem.  You're in control.  Your clients

12    are in control of this property.  You've agreed to the

13    security firm.  I've ordered that there be a security firm

14    given what all the assertions were.

15             And I'm not sure why you can't, as counsel to

16    Mahwah -- I mean, excuse me, to the Taurus Fund indicate

17    what is on the property or at the property that you don't

18    own.  Remember, we've got insurance issues here too.  We

19    have no insurance on this property.

20             So the trustee says --

21             MR. CONWAY:  There's no reason to --

22             THE COURT:  And, wait, let me --

23             MR. CONWAY:  I'm sorry.

24             THE COURT:  -- let me just finish my thought for a

25    second, and then I'm happy to hear from you.  But the

1    trustee says -- and I have no -- you know, I'm listening to

2    what the trustee says.  There isn't anything before me that

3    establishes what he's saying.

4         But he's saying that, for example, there were four

5    expensive motorcycles removed from the house in Greenwich

6    that are in Mahwah.  Now, if that's in Mahwah or on the

7    property or in the premises, your people should know that.

8    And I don't see what the burden would be for them to tell me

9    that.  I want to know what's there at the property, not just

10   what you own.

11        I mean, you could -- for -- because, for

12   example -- I mean, you're saying they bring stuff in to

13   stage things.  Well, I don't think they ever did that before

14   March 15, 2023, number one.  Number two, that's like saying

15   somebody could pull up to the Mahwah mansion with a -- I

16   don't know, a Ferrari and let it sit there, and you could

17   say, yeah, well, it's not ours.

18        Well, you know, you'd have to account to -- for

19   that to this Court at this point given the events that have

20   occurred and the orders that are in place in the adversary

21   proceeding.  I think that's -- I don't -- I think that is

22   important.

23        I mean, the -- we asked you for a list of all -- I

24   didn't ask you.  I ordered a list of all assets.  I didn't

25   understand that that meant that there were a lot of other

1    assets there that you don't own, that your clients claim

2    they don't own.  Well, if they claim they don't own them, I

3    want to know what it is they claim they don't own that's on

4    the property.

5            I think that's more than reasonable under the

6    circumstances of the case, considering that none of them

7    have come forward to the Court individually and -- even

8    though we've been told or I've been told once or twice --

9    there's two different names I've heard.  So I want that

10   done.  That's easy.

11           And I'll give you a week to do that.  No more than

12   a week.  I want it by noontime on the 31st of October.  I

13   want to know what else --

14           MR. CONWAY:  (Indiscernible).

15           THE COURT:  -- is at the property besides the list

16   of the assets that you were already required to file with

17   this Court, even if they're not owned by Taurus Fund.

18   Because then why are they there if you don't own them?  It's

19   not about --

20           MR. CONWAY:  May I respond?

21           THE COURT:  It's not about a company coming in and

22   setting up an event.

23           MR. CONWAY:  May I respond, Your Honor?

24           THE COURT:  Yes, you may.

25           MR. CONWAY:  I don't think that there's any

1    question in the trustee's mind as to what's there.  The

2    trustee has done extensive inventory.  Now, if what you're

3    saying is you want us to do a walkthrough and say, okay,

4    that item is not ours, that item is not ours, that item is

5    not ours, I -- we're happy to do that.

6         The problem is going to be -- well, I mean, it's

7    not really a problem.  It's we know what's there, and we

8    know what's ours.  And so we can deduce what's not ours.

9         But I'm not sure still what the emergency is.  It

10   sounds like what the trustee is saying -- and this was --

11   and I -- you mischaracterized it, with all due respect, Your

12   Honor.  I didn't say it wasn't our problem.  I said that

13   there's persons with more knowledge.

14        If, for instance, the Taconic house was the place

15   that was originally the location for a piece of art, then

16   they can produce somebody who says, yes, that piece of art

17   belongs to X.  All I can do is it does not belong to Taurus

18   Fund.  There's a difference, and it's of limited value for

19   us to say --

20        THE COURT:  Well --

21        MR. CONWAY:  -- that doesn't belong to us.

22        THE COURT:  You may think --

23        MR. CONWAY:  What you want is to know who it

24   belongs to.

25        THE COURT:  You may think it's of limited value to

1    you, but it's not as limited value to these bankruptcy

2    cases.  So, yes, you're going to do that.  And it's not this

3    item.  It's the -- let's presume the trustee's correct.  I

4    don't know what kind of motorcycle he said.  He said some

5    word I've heard before about an expensive motorcycle brand.

6    Then you need to say that the red Maserati motorcycle, which

7    it isn't that, but whatever it was, that's located --

8                MR. CONWAY:  Understood.

9                THE COURT:  -- in the garage or in -- somewhere on

10   the land is not ours.  I mean, you know, what's what you're

11   going to do.  And I'm -- and the trustee can be there with

12   you or have a representative or your security guards take

13   pictures.

14               I mean, I thought we had a detailed log of all

15   comings and goings at the property.  So where is that?

16               MR. CONWAY:  We do, Your Honor.  No.  There's been

17   nothing nefarious or anything like that.  We got involved in

18   this case.  It's been status quo ever since.  There's

19   nothing that's happened.  And there's nothing in the motion

20   that suggests that anything has happened since you got

21   involved with this house.

22               MR. DESPINS:  No.

23               THE COURT:  Yes, there is.

24               MR. DESPINS:  No, you --

25               MR. CONWAY:  No, there's not.

1          THE COURT:  There's a lot of things that have

2     suggested things have happened, that there are things that

3     have come into --

4          MR. CONWAY:  Okay.  Well, I'm just saying, Your

5     Honor, I read their motion very thoroughly, and I didn't see

6     a single thing that had anything to do with anything that's

7     happened since this case was filed.

8          MR. DESPINS:  Well, Your Honor, he's correct, but

9     that doesn't change the analysis.  Meaning Taurus was the

10    owner all along.  So the issue -- he wants to talk about

11    what's not there is what's on the list.  But critically

12    here, items have disappeared from the walls at the mansion

13    owned -- allegedly owned by Taurus.

14          That is the first order of business from the

15    trustee's point of view.  Where is that stuff?  And they

16    should come and testify as to that.

17          MR. CONWAY:  So, Your Honor, the other thing I was

18    going to mention is that if you want us to go to the

19    property and walk through even with the trustee, I don't

20    think that the order as written even allows me to go to the

21    property.  So we'd need something that says that Mr. Conway

22    and whoever he needs to go can go and do the walkthrough on

23    the property.

24          MR. DESPINS:  And, Your Honor, if I may?  I think

25    we should stage this.  The first order of business is the

1    missing items.

2            THE COURT:  Well, you need to --

3            MR. DESPINS:  We need evidence.

4            THE COURT:  You need to have a list of the missing

5    items, Trustee Despins, right?

6            MR. DESPINS:  We have -- they're all listed in the

7    pictures with big circles and the pages.  I can, just for

8    the record, give them again.  Tab 11, 12, 35, 48.  Those are

9    the tabs that contain the missing items.  And I don't

10   expect --

11           THE COURT:  That you say should be in the Mahwah

12   mansion?  That's what you're saying?

13           MR. DESPINS:  Yes.  That --

14           THE COURT:  They should be in the Mahwah mansion?

15           MR. DESPINS:  That we're -- we have pictures of

16   those items in the Mahwah mansion.  But on September 1st,

17   those pictures show an empty wall or a empty desk where

18   there was a vase or, you know, other things that are

19   missing.

20           That's very clear from -- and I -- you know, to be

21   fair to Mr. Conway, he may not have had a chance to review

22   what we filed.  But it's clearly laid out there exactly

23   what's missing or -- and I hope it will be found, like the

24   piano.  I don't know where it's -- it's floating somewhere.

25   That's worth $250,000.  I mean, the point is, that should be

1    at the Mahwah mansion, and it's not there anymore per the

2    September 1st visit.

3            So that happened between March 15th and September

4    1st.  And Taurus was the owner.  Mr. Fallon or whoever was

5    in charge at that time, Mr. Barnett, should come and explain

6    to the Court what happened to those items or where they are.

7    Or maybe they can return them.

8            MR. CONWAY:  And with respect to that, Your Honor,

9    there's no item that was owned by Taurus that's missing.

10   What he's suggesting is that there's items that appeared for

11   a limited period of time that belong to someone else that

12   are no longer there.  So we're going to have to find

13   somebody who can explain to us who owned those items and

14   where are they now.  But it's not --

15           MR. DESPINS:  No, no.

16           MR. CONWAY:  -- on Taurus' person.

17           MR. DESPINS:  No.  Who owns it is -- I know who

18   owns it.  It's Kwok.  But the point is, that's irrelevant.

19   They were in the Taurus house, and they're no longer there.

20   And that happened under Taurus management.  They should

21   know, because that's their house, right?  They controlled it

22   and all that.  They should know what happened to it.  And if

23   they don't, that speaks for itself.

24           But they should at least know about the videos,

25   how to retrieve the data from the extensive security system

1      that is there to show who was in the house, you know, after

2      March 15th, who took these paintings and artwork from the

3      premises.  That should be in the videos.  And at least they

4      should be able to tell us that they checked that and that

5      they don't know.

6              But the point is that, Your Honor, that is the

7      first order of business.  Because the other items, Your

8      Honor, that are there and are Kwok's -- clearly Kwok's -- I

9      think it's all Kwok's.  But for the record, that are clearly

10     from Kwok, you know, they're not going to be stolen now.  I

11     feel comfortable.  But right now, there's no emergency as to

12     that, although we should get to that, and Taurus should be

13     providing the information we've asked for, Your Honor.

14             But the first order of business is, what happened

15     to the missing items?  And Taurus cannot say, well, I'm

16     sorry, it's not my stuff.  It was at the property.  That's

17     clearly established from the evidence we produced.

18             MR. CONWAY:  And just to be clear -- keep the

19     record absolutely complete on that, Your Honor, it is not

20     the responsibility of a homeowner if somebody brings a piece

21     of property to their home to then keep an inventory of it

22     thereon -- thereafter wherever they might take it.  Just

23     because somebody --

24             THE COURT:  We don't --

25             MR. CONWAY:  -- brought something to the

1    property --

2              THE COURT:  Mr. Connolly?  I mean, Mr. Conway?

3              MR. CONWAY:  -- and then took it off the

4    property --

5              THE COURT:  Mr. Conway?

6              MR. CONWAY:  Pardon?

7              THE COURT:  We're not talking about somebody

8    bringing something to a homeowner's house.  So let's move on

9    from that.  These are -- we all know what we're talking

10   about.

11             MR. CONWAY:  Okay.  We are, Your Honor.  I'm

12   sorry, Your Honor, but we are.

13             THE COURT:  We're talking about serious issues

14   here with regard to assets.  So, look, this is what I'm

15   going to --

16             MR. CONWAY:  We're talking about a couple of

17   vases --

18             THE COURT:  This is what -- no.  Excuse me.

19             MR. CONWAY:  -- and one calligraphy --

20             THE COURT:  Excuse me.

21             MR. CONWAY:  -- and that's it.

22             THE COURT:  Excuse me.  This is what I'm going to

23   do.  You and Trustee Despins are going to have a conference

24   after this hearing, and you're going to figure out how this

25   is going to work out or not.  And we're going to continue --

1     and then I will have a further conference with both of you

2     on this issue.

3          I'm not going to listen to it doesn't matter if

4     somebody else brought some property to this property, and

5     it's not our problem.  That's not going to work.  So you

6     need to figure out whether you can come to some form of an

7     agreement on how this is going to work or not.

8          But that is not going to happen.  We're not going

9     to have a situation where there is property other than what

10    it is owned by the Taurus Fund at that mansion during the

11    pendency of this adversary proceeding.  You need to see if

12    you can work this out.  And if you can't, then the Court

13    will make some determination.

14         But I'm not doing -- I'm not going to listen to

15    these arguments about if somebody brings somebody --

16    something to your house, you don't have to worry about it.

17    That's ridiculous.  Okay?  We're not dealing with that.

18         MR. CONWAY:  It's not ridiculous, Your Honor.  But

19    that aside, Your Honor is suggesting that you don't want

20    these extra property to be at the house?  Because that's an

21    issue that the trustee and I can clearly work out.

22         THE COURT:  That's not what I'm suggesting at all.

23    I didn't say anything to that -- to --

24         MR. CONWAY:  Well, that's what I heard.  That's

25    why I'm asking the question, Your Honor.

1          THE COURT:  I didn't ask -- I said to you, I want

2     to know what other property is there that your client claims

3     it doesn't own.  And I want to know specifically what other

4     property is there that your client claims it doesn't own and

5     where exactly it's located.

6          And maybe you and Mr. Despins are going to go

7     through it together this week and go to the house and get

8     that done.  Because I'm not going to spend my time on this.

9     This is a waste of the Court's time.

10          MR. CONWAY:  Your Honor, that's clear.  That's

11     clear.  My confusion was when you said that you didn't want

12     the property there during the pendency of the case that

13     confused me.

14          THE COURT:  No.  I said during the pendency of the

15     case, we're not going to have arguments about property

16     that's at the property that you don't -- your client doesn't

17     own.  I want to know what property is at the property that

18     your client doesn't own, and I want your client to swear to

19     it.

20          Where is the person?  There's never a person for

21     Taurus Fund who signs or does anything.  So your client's

22     going to swear that they went through this property, and

23     this is the property that they don't own, and this is what

24     it is, and this is where it's located.

25          And they're going to swear it's never going to be

1    removed until further order of the Court.  And that could be

2    on many ways.  Somebody who claims they own it could come in

3    and ask for the Court to allow it to be removed.  There's

4    many different ways that could be accomplished.  But with

5    regard to this situation, that's how it's going to work.

6            So I'm going to give you 48 -- I'm going to give

7    you less than 48 hours to report back to me on how it's

8    going to work.  And then if it -- there isn't an agreement,

9    then I'll do whatever I think is appropriate under the

10   circumstances.  I don't know what that's going to be yet,

11   because I want to hear what you both have to say after

12   you've had this conversation.

13           But you can't have somebody -- you filed a list.

14   I don't believe, Mr. Conway, it was ever signed by your

15   client.  I think it was -- you submitted it under your -- as

16   counsel.  And that's fine.  But now things have changed.

17   And I want your client to sign under penalty of perjury the

18   assets that are at the property that it claims it does not

19   own specifically by item and location.

20           Do you have any questions about that?

21           MR. CONWAY:  No.  It just seems like we need to

22   get the total inventory to -- as the house is today, which

23   means that the trustee and I need to go there and do that.

24   And then we can sign the appropriate piece of paper.

25           THE COURT:  That's fine.  So you can talk about

1      that.

2             Now, Mr. Major, the trustee's making

3      representations that there are -- there is property in the

4      Greenwich house that's been removed from the Greenwich house

5      as well, and he wants to go in and take a video.  What's

6      the -- what's your position with regard to his wanting to go

7      into the Greenwich property and inventory what is in the

8      Greenwich property?

9             MR. MAJOR:  Your Honor, I'd like an opportunity to

10     confer with my client and to review the trustee's motion --

11     not -- well, it was in a motion to set the status conference

12     which was filed yesterday and filed as an emergency.

13            Now, I don't think it's fair to my client for the

14     trustee, who no doubt -- I mean, these videos -- or, you

15     know, I guess they're still shots from videos which are now

16     three-plus years old, are being relied upon to set an

17     emergency to then ask for substantive relief today.  And the

18     motion was filed by the trustee yesterday knowing for sure

19     that the Court already had In Re Kwok matters scheduled

20     today and that the status conference would be scheduled

21     right away.

22            I haven't had time to address the assertions in

23     the trustee's motion.  And I'm going to need time to do that

24     with my client in the first instance and an interpreter so

25     that I can understand what the assertions are.

1    But just to set the stage here, what the trustee

2    has apparently done -- and I'm sure the time records that

3    the trustee attaches with his various fee applications will

4    reflect when his team first started looking at these Kwok

5    videos online.  But I'm sure it was quite a while ago.

6    I think that to call -- with respect to Greenwich

7    Land, to call this an emergency motion and then to ask us in

8    less than 24 hours to respond when there's no motion pending

9    seeking any relief other than setting the status conference

10    is not fair to my client, and it doesn't give me an adequate

11    opportunity, frankly, to address the Court.

12    I think that the most important thing for me to be

13    able to do is to review the motion and the various

14    photographs with my client and understand what the position

15    is.  But the idea for the trustee to say that I would just

16    come on and consent and if I don't consent to him invading

17    my client's home and videoing her home and that if I don't

18    consent that that somehow is a tell that we're concerned

19    about something is not -- is, frankly, not a reasonable

20    position to take.

21    I'd like to know when the trustee first came to

22    the conclusion that property had been moved from Taconic to

23    the Mahwah property as he asserts in his motion and why I

24    wasn't approached about that.  Because we're now in front of

25    the Court.  I'm not in a position where I can respond

1    substantively for the Court, because I haven't been given an

2    opportunity to do the research I need to do.  And I don't

3    know what my client's position would be after I, you know,

4    get a better understanding of the facts.

5            I think the best thing to do would be to continue

6    this as to Greenwich land and Mrs. Guo, my client, for a

7    week.  Let me get to the bottom of it.  I'm happy to confer

8    with a trustee in the meantime.  But, frankly, we've been,

9    you know, hit with this, and I haven't had any time to get

10    to the bottom of it.

11            So, Your Honor, I don't know what to say.  I tried

12    watching some of the videos from which they took the still

13    shots.  They're not in English, so I can't determine, you

14    know, what was said by the speaker on those videos.  I

15    just -- I'm not in a position to respond substantively for

16    the Court.

17            I can't imagine, though, that there's an emergency

18    created by these three-plus-year-old videos that would

19    require me to respond substantively in less than 24 hours.

20            MR. DESPINS:  Your Honor, if I may?

21            THE COURT:  Well, the status conference motion

22    didn't require a response, Attorney Major.  So I just -- it

23    didn't require a response.  But I asked you what your

24    position would be, and I understand your position that

25    you've just articulated that you'd like at least this to be

1    continued for a week so you can talk -- you can look at

2    information, you can discuss it with your clients, and then,

3    I assume, have a follow-up conversation with the trustee.

4    Not a follow-up.  You haven't had a conversation.  But what

5    I'm saying is, after you discuss this with your clients, and

6    you review this information, you would have a discussion

7    with the trustee.

8            That's your request, correct?

9            MR. MAJOR:  Yes, Your Honor.  Just to put a little

10   bit of context on why I'm asking for a week, which I think

11   in the normal case would be a perfectly fine amount of time.

12   But it's not a situation where I can just call up the

13   general counsel and say here's the situation, I just emailed

14   you some pictures, let's talk about it.

15           I have to set a meeting in person with my client

16   and with an interpreter who has a day job in the courts.

17   And so I have to logistically arrange that meeting.  It's

18   the only way I'm able to effectively communicate with my

19   client.  And so I need a little bit of time to be able to

20   have that meeting, get to the bottom of it, and then have an

21   initial discussion with the trustee or his lawyers to figure

22   out the best way forward.

23           THE COURT:  Okay.

24           MR. DESPINS:  And, Your Honor, if I may?  We

25   obtained confirmation that the motorcycles were at the

1    Taconic property for the first time on Friday of last week.

2    And, you know, Mr. Major's position sounds -- would be

3    incredibly reasonable.  I would agree with it in every case.

4    Except in this case, there's an injunction that said that

5    Greenwich Land should not deplete their bank accounts.  Of

6    course they did.  We know that.

7          Look at the summary judgment.  I'm not asking you

8    to rule on that.  But, you know, they did that.  They

9    actually depleted the bank accounts.

10          And so, therefore, this is not like a gentlemanly

11   dispute between two groups here.  There's bad conduct, bad

12   actions.  And so a week in this case is a year, because a

13   lot of things can happen in a week.

14      Not the debtor, but the debtor's wife here doesn't

15   work.  We can get an interpreter there tomorrow.  And it's a

16   pretty simple issue.  We're not asking them to admit to

17   anything.  It's just preservation of evidence, which is a

18   video.

19          So, Your Honor, I wouldn't give them a week given

20   the bad behavior here.  Hundreds of thousands of dollars

21   were siphoned out of this company from the sale of an asset

22   that PAX had issued a notice of -- it's not -- it was not a

23   lis pendens, but the equivalent of that under Delaware law.

24   And the -- all that money went to affiliates, went to

25   Zeisler, among other people.

1          And now we're supposed to say, well, you know,

2     let's be reasonable and all that.  We're beyond that point,

3     Your Honor.  This is -- the reason it's an emergency is that

4     we just discovered that confirmation on Friday.

5          We're dealing with bad actors.  I'm sorry to say

6     that.  I apologize.  I wish I never had to say that.  But

7     bad actors who do bad things that defy court orders all the

8     time, including Greenwich Land depleting its bank accounts

9     while there was an injunction by Your Honor to do -- not to

10    do that.

11         So I don't know.  I don't want to be dramatic

12    about it, but it's of concern.  So he doesn't need a week to

13    do that.  It's a simple procedure.  So we'd ask Your Honor

14    not to agree to the week extension.

15              THE COURT:  Mr. Major, do you have any response?

16              MR. MAJOR:  Your Honor, just -- yeah.  I'm sorry.

17              THE COURT:  No.  Go right ahead.

18              MR. MAJOR:  Your Honor, I'm not asking for a week

19    extension for anything.  The only thing that the trustee

20    asked for was for a status conference.  And I appeared at

21    the status conference in less than 24 hours.

22         Now what the trustee is saying is let's dispense

23    with motion practice, let's dispense with due process, and

24    let me invade this woman's home and videotape it, even

25    though they know that she has legitimate security concerns.

1   And there have been disputes in the past about what the

2   trustee has done with photographic and videographic pictures

3   relating to the debtor's family members.

4           I'm not asking for an extension.  Right now,

5   there's nothing pending that would require us to respond

6   other than appearing here today.  What I am asking for is an

7   opportunity to speak with my client and show her the

8   pictures and understand what the assertions by the trustee

9   are.

10          The trustee, he was careful in his response.  He

11  said he just got confirmation that the motorcycles were, in

12  fact, at the Taconic property.  Well, he knew they were in

13  Mahwah, New Jersey, I think if I understand the papers

14  correctly, as of about six or seven weeks ago on September

15  1st.

16          MR. DESPINS:  That's right.

17          MR. MAJOR:  And the pictures that the trustee says

18  are the debtor riding those motorcycles at the Taconic Road

19  property, those appear to be -- from the plain language of

20  the trustee's submission yesterday, appear to be videos that

21  date back to 2021.  It doesn't -- it's nothing that has

22  happened recently.

23          And so I don't understand why I can't have a

24  little bit of time to speak with my client, to confer with

25  the trustee's lawyers, because they didn't reach out to me

1    before their filing yesterday, and see if this is something

2    that can be resolved.  And if not, we could probably come up

3    with a -- I think a streamlined procedure to put the issue

4    to the Court.

5            But I'm just asking for an opportunity to be able

6    to speak with my client intelligently and understand what

7    the assertions are here.  But I just want to be clear, I'm

8    not asking for an extension, because there's nothing that

9    exists right now that requires me to do anything than I've

10   already done.

11           THE COURT:  Anything further from anyone?  Okay.

12   Mr. Conway and Mr. Despins, you're going to meet and confer

13   and then report to the Court in a written report by 2 p.m.

14   on Thursday whether or not you've reached some form of an

15   agreement with regard to the assets that are at the property

16   that are not owned by the Taurus Fund.

17           And the Taurus Fund, regardless of whether there's

18   an agreement reached or not, is going to file a list signed

19   by a representative of the Taurus Fund, under penalty of

20   perjury, by next Tuesday, the 31st of October, specifically

21   delineating all the assets that are at the estate in Mahwah,

22   regardless of whether they're owned by the Taurus Fund.

23           So the trustee and Mr. Conway, your first

24   requirement is to meet and confer and then file by 2 p.m. on

25   Thursday a report with regard to that meet and confer and to

1    see what, if anything, you've agreed to with regard to the

2    issues raised in the status request.

3              And then, Mr. Conway, as I said, regardless of

4    that, your client has to sign under penalty of perjury by

5    Tuesday, you know, as far as an affidavit or a declaration

6    by Tuesday the 31st, a list of all assets on or in the

7    Mahwah mansion.  And I think we've, in prior orders, been

8    very clear about that it includes something that could be on

9    the grounds of the Mahwah mansion.  It doesn't need to be

10   inside the Mahwah mansion.

11             Mr. Major and Mr. Despins, you're going to meet

12   and confer and file a report by Friday at 2 p.m. as to

13   whether you have any form of an agreement with regard to the

14   Greenwich property.  And if you don't, then I'll act -- I

15   don't know what I will do, but I'll see what I -- what I'll

16   figure out.

17             But, Mr. Major, I understand that you need some

18   time to talk to your client.  But today's Tuesday.  It's

19   3:00.  And I'm giving you until Friday at 2 p.m. to try to

20   have those conversations and see what, if anything, you can

21   accomplish between now and Friday.  And then we will go from

22   there.

23             Does anyone have any questions?

24             MR. CONWAY:  Just one, Your Honor.  After we file

25   whatever we file with you on Thursday, I'm going to -- I

1    anticipate I'm going to need some sort of a -- an order that

2    just says that whatever the plan is for making a visit is

3    ordered by Your Honor so the -- you know, the security

4    doesn't stop us.  I anticipate they're going to need --

5              THE COURT:  Yes.

6              MR. CONWAY:  -- to bring in the manager --

7              THE COURT:  Yes.

8              MR. CONWAY:  -- and so on.  And but we can work

9    that out.  The trustee and I can work that out and put it in

10   our report to you.  I just want to give you the heads-up

11   that I'm anticipating, based on the injunction, that that --

12   I'll need that.

13             MR. DESPINS:  I believe, Your Honor, under the

14   order the trustee may authorize people to give access.  So

15   I'm sure I can authorize Mr. Conway to have access or one of

16   his colleagues or -- so we can work that out.

17             THE COURT:  Well, you -- exactly.  You can talk

18   about that during your meet and confer.  And if the existing

19   order already can provide for that without a further order,

20   fine.  And if it can't, then a further order can enter.

21   Okay?

22             MR. DESPINS:  Thank you, Your Honor.

23             MR. CONWAY:  Thank you, Your Honor.

24             THE COURT:  Okay.  So that'll be the filing on --

25   with Mr. Conway and Trustee Despins.

1           And then Mr. Major and Mr. -- and Trustee Despins,

2     you'll file your filing on Friday by 2 p.m.  And then we'll

3     see where we go from there.

4           But you're all ordered to meet and confer and see

5     what you can accomplish with regard to these issues.  I

6     understand that you may not be able to accomplish everything

7     or anything, but we'll -- I'm ordering you to try to -- to

8     see what you can do.  And then we will take the next steps.

9           So is there anything further we need to address

10    this afternoon in the Kwok Chapter 11 jointly administered

11    cases or any of the adversary proceedings that are on the

12    docket today?

13          MR. DESPINS:  Not from the trustee, Your Honor.

14          THE COURT:  Okay.  Then thank you, all.  That was

15    our last hearing today, so Court is adjourned.

16          IN UNISON:  Thank you, Your Honor.

17          THE COURTROOM DEPUTY:  Court is adjourned.

18          MR. DESPINS:  Thank you.  Thank you, Your Honor.

19      (Proceedings concluded at 2:49 p.m.)

20

21

22

23

24

25

1          I, CHRISTINE FIORE, court-approved

2     transcriber and certified electronic reporter and

3     transcriber, certify that the foregoing is a correct

4     transcript from the official electronic sound recording of

5     the proceedings in the above-entitled matter.

6

7          *Christine Fiore*

8

9     _____          November 1, 2023

10         Christine Fiore, CERT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25