UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

-------------------------------------------------------x
                                                       :
In re:                                                 :    Chapter 11
                                                       :
HO WAN KWOK, *et al.*,[1]                              :    Case No. 22-50073 (JAM)
                                                       :
                    Debtors.                           :    (Jointly Administered)
                                                       :
-------------------------------------------------------x

**TRUSTEE'S MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND
363, BANKRUPTCY RULES 2002, 6004(c), AND 9014, AND LOCAL RULES 6004-1 AND
6004-2, SEEKING ENTRY OF ORDER: (I) AUTHORIZING AND APPROVING SALE
OF THE LADY MAY II FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, (II) AUTHORIZING AND APPROVING PURCHASE AND SALE
AGREEMENT, AND (III) GRANTING RELATED RELIEF**

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case of Ho Wan Kwok (the "Debtor"), by and through his undersigned counsel,

hereby files this motion (the "Motion") seeking entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "Proposed Sale Order"), pursuant to sections 105, 363(b), and

363(f) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004(c), and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1

and 6004-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court

for the District of Connecticut (the "Local Rules"), (i) authorizing and approving the Trustee's

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The
mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings
LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok
(solely for purposes of notices and communications).

sale (the "Sale") of the Lady May II[2] to Patrick Cloppenburg (the "Buyer") free and clear of all

liens, claims, interests, and encumbrances pursuant to that certain purchase and sale agreement,

dated November 22, 2023, by and among the Buyer and the Trustee, attached hereto as

**Exhibit B** (together with the related addenda, the "PSA"), (ii) authorizing and approving the

PSA, and (iii) granting related relief.  In support of the Motion, the Trustee relies upon and

incorporates by reference the declaration of Dirk Johnson (the "Johnson Declaration"), attached

hereto as **Exhibit C**.  In further support of the Motion, the Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Trustee seeks approval of the sale of the Lady May II for a

purchase price of $375,000 on an ***"as is, where is"*** basis, pursuant to the terms of the PSA.  The

PSA represents the highest and best bid obtained after an extensive marketing campaign

conducted by the Trustee's broker, Edmiston and Company Limited ("Edmiston"), followed by a

competitive bidding process.[3]  The Trustee submits that the Sale of the Lady May II to the Buyer

pursuant to the PSA is in the best interest of the Debtor's estate, and, accordingly, the Trustee

requests authorization to proceed with the Sale.

2.      As detailed below and in the Johnson Declaration, Edmiston has actively

marketed the Lady May II following its retention in late April 2023.  These marketing efforts

were initially focused on residents outside of the United States and, following the Lady May II

being formally imported into the United States on July 30, 2023, Edmiston expanded its efforts

to also include U.S. residents.  Consistent with best industry practices for marketing a vessels

---

[2]     For purposes of the Sale under the PSA, the term "Lady May II" consists all assets to be sold pursuant to the PSA, including all gear, machinery, equipment, furniture, fuel, consumables, all registered or unregistered tenders, toys, articles and appurtenances on board the Lady May II and/or included on the Lady May II's listing specification as of the date of the PSA (*i.e.*, November 22, 2023).

[3]     Subject to approval of this Court, Edmiston's 5% sales commission (*i.e.*, $18,750) would be funded out of the purchase price.

such as the Lady May II, Edmiston has actively canvassed the market for potential buyers, both within its own network of potential buyers and through numerous other brokers in the industry, as well as advertised the Lady May II both online and in print. Furthermore, the Lady May II was displayed during the Newport boat show, which took place from Thursday, September 14, 2023, through Sunday, September 17, 2023.

3.      Unfortunately, during the marketing process, it became apparent that the list price of $950,000 was simply not obtainable. Initially, six parties expressed an interest in the Lady May II, such that the Trustee decided, after consultation with Edmiston, to set a deadline of October 4, 2023, at 5:00 p.m. (ET) to submit best and final bids. This bid deadline was designed to maintain maximum momentum with the Initial Bidders and other interested parties. As part of the bidding process, the Trustee also required that such best and final bids satisfy certain conditions, including that (a) the purchase price must exceed $550,000 million, (b) bids must be based on the Trustee's form of purchase agreement, (c) the winning bid must provide a 25% deposit of the purchase price within 48 hours after the bid has been selected as the winning bid, (d) the purchase agreement must be executed by October 9, 2023, and (e) while the purchaser may conduct a survey, the purchaser would only be able to reject the Lady May II if the surveyor certifies that survey revealed a defect affecting the operational integrity of the Lady May II or her machinery or her systems or renders the Lady May II unseaworthy. The Trustee also advised bidders that all bids would be subject to review and approval of this Court.

4.      As of the October 4, 2023 bid deadline, the Trustee received no qualified bids— and, in fact, the Trustee received only one bid, with a proposed purchase price ($150,000) far below the minimum bid. Nevertheless, following receipt of these bids, the Trustee engaged in further negotiations with parties that had expressed an interest in the Lady May II. As a result of

these negotiations, the Trustee was able to secure a bid from the Buyer for a purchase price of $375,000, which bid the Trustee accepted, subject to Court approval of the PSA.

5.      The Trustee recognizes that the aforementioned bidding process was not pre-approved by the Court pursuant to a separate bidding procedures order and that the Trustee did not conduct a public auction.  Nevertheless, given that (a) the Court previously approved the sale of the Lady May (which was the subject of a nearly identical sale process), (b) the Lady May II has been the subject of significant marketing, and (c) the PSA reflects a substantial improvement in the purchase price over the sole bid received by the October 4, 2023 bid deadline, the Trustee believes that formal bidding procedures and/or a public auction would not result in higher bids. Indeed, the Trustee, after consultation with Edmiston, determined not to pursue a formal auction process, as such a process would likely have deterred interested buyers and/or resulted in lower bids, including because of the delays associated with an auction process and bidders' concerns about overpaying in an auction.  In any event, there is no requirement, whether under the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules that estate property must be sold through a public sale.

6.      The Trustee also recognizes that the Local Rules require a "description of the means by which the movant determined the fair market value of the property to be sold."  Local Rule 6004-2(b)(4).  While under different circumstances this may have required a formal valuation by an appraiser, the Trustee submits that, in light of the extensive marketing and bidding process, the purchase price under the PSA reflects the best measure of the fair market value of the Lady May II and, thus, no formal valuation is necessary.[4]

---

[4]     In the interest of full disclosure, the Trustee notes that, as part of importing the Lady May II into the United States in July 2023, the Trustee obtained an appraisal of the Lady May II indicating an estimated appraised value of $480,000.

7.      Another important consideration in selecting the Buyer as the winning bidder is that the Buyer has accepted all modifications the Trustee made to the standard form of purchase agreement published by the International Yacht Brokers Association (the "IYBA Form")— modifications that were designed for the benefit of the estate.  Most importantly, however, the Buyer has further agreed to accept the Trustee's request that the Lady May II be sold on an ***"as is, where is"*** basis, *i.e.*, the estate is not giving any warranty, either expressed or implied, and makes no representation as to the condition of the Lady May II, its fitness for any particular purpose or merchantability, all of which are disclaimed.  In other words, ***the sale is not subject to the completion or a survey or other inspection***.

8.      Furthermore, given the impending winter season and the need to winterize the Lady May II, Buyer has agreed that the Trustee may, prior to Closing, proceed with winterizing the Lady May II and placing it into winter storage at the Newport shipyard, with the Buyer agreeing to pay the Trustee, at closing, (a) the pro-rated portion of the post-Closing winter storage costs (*i.e.*, from the date of Closing until April 15, 2023)[5] and (b) the cost of winterizing the Lady May II (subject to a $3,000 cap).[6]

9.      Finally, and to be clear, the Trustee is serving copies of this Motion on all parties that have expressed to Edmiston an interest in purchasing the Lady May II, in accordance with Local Rule 6004-2(g).  To the extent any additional superior offers are received before or at the hearing on this Motion, the Trustee understands that he is duty-bound to consider such offers.

---

[5]    The storage cost for the full winter season (which runs from November 15, 2023 through April 15, 2023, *i.e.*, 152 days) is $16,653.00, which must be paid to the Newport shipyard upfront.  As an example, if the sale were to close on December 20, 2023, then the Buyer's pro-rated share of such costs would be $12,818.43 (*i.e.*, $16,653.00 *times* 117 remaining days *divided by* 152 days).

[6]    The Trustee is informed that it will cost approximately $3,000 to winterize the Lady May II.

10.     For all these reasons, and as further detailed below, the Trustee requests that the Court approve this Motion and authorize the Trustee to proceed with the Sale of the Lady May II to the Buyer.

## JURISDICTION, VENUE, AND STATUTORY BASES

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

12.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The statutory bases for the relief requested in this Motion are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004(c), and 9014, and Local Rules 6004-1 and 6004-2.

## BACKGROUND

### A.    Procedural Background

14.     On February 15, 2022 (the "Petition Date"), the Debtor filed with the Court a voluntary petition for relief under chapter 11 of Bankruptcy Code.

15.     On March 21, 2022, the United States Trustee appointed an Official Committee of Unsecured Creditors ("Committee") in the Debtor's chapter 11 case (the "Chapter 11 Case"). No examiner has been appointed in the Chapter 11 Case.

16.     On June 15, 2022, the Court entered a memorandum of decision and order [Docket No. 465] (the "Trustee Order") directing the United States Trustee to appoint a chapter 11 trustee in the Chapter 11 Case.  Pursuant to the Trustee Order, the United States Trustee selected Luc A. Despins as the Trustee.

17.     On July 8, 2022, the Court entered an order granting the appointment of Luc A. Despins as the Trustee in the Chapter 11 Case [Docket No. 523].

6

B.      **Lady May and Lady May II**

18.     On March 27, 2023, the Court entered an order [Docket No. 172 in Adv. Proc.

No. 22-5003] (the "Lady May I Order") finding, among other things, that the Lady May is the

property of the Debtor's estate.  On March 31, 2023, the Court entered the Amendment to Order

Granting Motion of Chapter 11 Trustee for Estate of Ho Wan Kwok for Partial Summary

Judgment [Docket No. 182 in Adv. Proc. No. 22-5003] to also include a finding that the Lady

May II is property of the Debtor's estate (the "Lady May II Order," and together with the Lady

May I Order, the "Lady May Order").  On April 10, 2023, HK USA and Ms. Guo filed a notice

of appeal to the United States District Court for the District of Connecticut from the Lady May

Order, but did not seek a stay pending appeal.  Additional background regarding the Lady May

can be found in the Trustee's Motion regarding the Sale of the Lady May [Docket No. 1858] and

is incorporated herein by reference.

19.     On June 27, 2023, the Court entered an order approving the sale of the Lady May

to Herb Chambers Yachting, LLC (the "Lady May I Sales Order") for a purchase price of

$23,150,000.00.  On June 30, 2023, the sale of the Lady May closed.

20.     The Lady May II is currently located at the Safe Harbor shipyard in Newport,

Rhode Island.  Unlike the Lady May, the Lady May II was not placed in the foreign trade zone,

but instead was formally imported into the United States on July 30, 2023, so that it could be

marketed to U.S. residents (in addition to non-U.S. residents).

C.      **Marketing of Lady May II**

21.     As set forth in detail in the Johnson Declaration, Edmiston has been engaged in an

extensive marketing campaign to sell the Lady May II to the highest bidder.  Edmiston has

canvassed for potential buyers, both within its own network of potential buyers as well as

throughout the industry, as well as advertised the Lady May II both online and in print.  These

marketing efforts were focused on residents both inside and outside of the United States.

22.     Among other things, as part of its marketing efforts:

(1)   Edmiston created an electronic brochure of the Lady May II, including
photographs and listing its specifications, which brochure was included
in industry-wide announcements to other yacht brokers as well as posted
on Edmiston's website and social media;

(2)   Edmiston engaged in a direct client email marketing campaign, which
featured the Lady May II in its monthly mailer update (distributed to
approximately 10,000 clients and other potentially interested parties);
and

(3)   Edmiston used extensive digital advertising to market the Lady May II
on its website and social media accounts, including Instagram,
Facebook, LinkedIn and YouTube,

23.     Edmiston also connected the Lady May II with its network of industry brokers

through single and multi-yacht mailers and listed the Lady May II on multiple brokerage listing

pages and business-to-business search facilities, which centralize broker information for the

yacht industry.  Further, the Lady May II was displayed, in a premium slip (to increase visibility)

at the Newport International Boat Show—one of the most prominent boat shows in the United

States—which took place over four days from Thursday, September 14, 2023 through Sunday,

September 17, 2023.  Edmiston also invited the buyer of the Lady May to see Lady May II

(including arranging for a sea trial) in hope he would purchase the tender and rejoin the Lady

May II to the Lady May (now called the Excellence V), but he declined to purchase the Lady

May II.

## COMPETITIVE BIDDING PROCESS

24.     As set forth in the Johnson Declaration, there was, unfortunately, not a significant

interest in the Lady May II.  Still, by mid-September 2023, six parties informally expressed

interest in the Lady May II.  In order to stimulate a competitive bidding process, the Trustee

decided to pursue the same bidding process as had been employed for the sale of the Lady May.
In particular, the Trustee (through Edmiston) advised the interested parties (and other parties)
that the deadline to submit best and final bids was of Wednesday, October 4, 2023, at 5:00 p.m.
(ET).  This deadline was chosen to maintain maximum momentum with the interested parties.
Commencing on September 26, 2023, Edmiston sent emails to these six interested parties and
other parties, advising them of the October 4, 2023 bid deadline.  In that email, interested bidders
were also advised that (a) due to the fact that the Trustee had received offers for the Lady May II
from several potential buyers, Edmiston was inviting all interested parties to present their best
and final offer prior to the October 4, 2023 bid deadline and (b) any such bid would have to
comply with the following requirements:

- Only bids with a purchase price in excess of $550,000 would be considered by the Trustee;

- Offers must be based on the Trustee's form of purchase agreement;

- To the extent the prospective buyer intended to modify the form of purchase agreement, mark-up of the agreement should be included as part of the bid (and advising the parties that such modifications, if any, would be evaluated in determining the highest and/or best offer);

- The winning bid must provide for a 25% deposit of the purchase price, which deposit must be received within 48 hours after such bid has been selected as the winning bid;

- The 25% deposit would be forfeited if the winning bidder fails to close on purchase of Lady May II in accordance with terms of purchase agreement (subject to the right to reject the Lady May II if the survey reveals a defect affecting the operational integrity of the Lady May II or her machinery or her systems or renders the Lady May II unseaworthy);

- The purchase agreement must be executed by October  9, 2023;

- The Lady May II must be accepted or rejected (based on results of survey) by October 18, 2023;

- In the event the winning bidder does not close on the purchase at the price set forth in the purchase agreement, the Trustee may, at his option, purchase the survey from the buyer, at cost;[7]

- Closing would take place as soon as practical on or before November 17, 2023;

- All bids would be subject to bankruptcy court review and approval; and

- All bids had to be sent directly to the Trustee.

25.    In addition, also on September 28, 2023, Edmiston circulated emails to more than 1,875 other yacht brokers advising them of the deadline to submit best and final bids and that such bids would be subject to certain conditions, including a minimum bid of $550,000.  As with the email to the interested parties, the email distribution advised the brokers that the Trustee was setting October 4, 2023 as the deadline to submit best and final bids due to multiple offers received to date.  Furthermore, Edmiston also updated the Yatco.com and Yachtworld.com listings for the Lady May II to advise interested parties of the bid deadline and the minimum bid requirement.

26.    As of 5:00 p.m. (ET) on October 4, 2023, only one (1) formal bid was received from prospective buyers.  That bid was not a qualified bid, as the proposed purchase prices ($150,000) was well below the minimum bid requirement.  Following receipt of this bid, the Trustee engaged in further discussions with parties who had previously expressed an interest in the Lady May II.  During these discussions, the Buyer indicated that he would be interested in purchasing the Lady May II for $350,000.  Ultimately, after further negotiations, the Buyer

---

[7]    The Trustee included this provision in order to avoid the delay of potential second survey in the event that the sale with the winning bidder does not close (for whatever reason) and the Trustee has to proceed with another purchaser.  In that event, the Trustee would provide the survey results to such other purchaser, instead of such purchaser having to conduct another survey.

agreed to increase the purchase price for the Lady May II to $375,000 million and, moreover, agreed to purchase the Lady May II on an "as is, where is" basis.

## SUMMARY OF MATERIAL TERMS OF PSA

27.    The chart below sets forth the materials terms of the PSA[8] between the Trustee and the Buyer for the Lady May II.

| Provision | Summary Description |
|---|---|
| **Parties** | <u>Seller</u>: Luc A. Despins, solely in his capacity as chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity. <br><br> <u>Buyer</u>: Patrick Cloppenburg |
| **Purchase Price** | $375,000 |
| **Property to Be Sold** (PSA §1) | The Lady May II and all gear, machinery, equipment, furniture, fuel, consumables, and all registered or unregistered tenders, toys, articles and appurtenances on board the Lady May II and/or included on the Lady May II's listing specification as of the date of the PSA (*i.e.*, November 22, 2023). |
| **Deposit** (PSA §2) | On November 27, 2023, the Trustee received the amount of $93,750 (25% of the Purchase Price), as a deposit toward the Purchase Price to be held in escrow subject to the terms of the PSA.[9] |
| **Acceptance of Lady May II** (PSA §3) | Buyer agrees to purchase the Vessel on an "as is, where is" basis, *i.e.*, neither Seller nor the Brokers give any warranty, either expressed or implied, and make no representation as to the condition of the Vessel, its fitness for any particular purpose or merchantability, all of which are disclaimed.  For the avoidance of doubt, Buyer may not reject the Vessel for any reason, and by signing this PSA, Buyer agrees to accept the Vessel on an "as is, where is" basis. |
| **Closing** (PSA §4) | The transfer of the Lady May II's ownership (the "<u>Closing</u>") will occur on or before December 31, 2023 (the "<u>Closing Date</u>"). <br><br> At Closing, the Buyer will pay the balance of the Purchase Price (*i.e.*, $281,250) to the Trustee (subject to Paragraph 6 of the PSA) and the Deposit will be released to the Trustee, subject to deductions the Trustee owes to the Brokers for the commission, storage, insurance, repairs and/or other items (which are subject to approval of this Court). |
| **Sellers Representations/ Requirements for Closing** | The Trustee represents and warrants that it will transfer to the Buyer good and marketable title to the Lady May II, free and clear of all debts, claims, |

---

[8]    The terms of the PSA are summarized herein for the convenience of the Court and parties in interest.  To the extent that there are any discrepancies, the terms of the PSA shall govern.  Capitalized terms used in this summary that are not defined herein shall have the meanings ascribed to them in the PSA.

[9]    As of the filing of this motion (and due to the Thanksgiving Holiday weekend), the funds have not yet been received by the Trustee.

| | |
|---|---|
| (PSA §6) | maritime or common law liens, security interests, encumbrances, excise taxes, and other applicable taxes, customs' duties, or tariffs due to any state, country, regulatory and/or taxing authority of any kind whatsoever (collectively the "<u>Encumbrances</u>").<br><br>No less than two (2) business days before Closing, the Trustee will deliver to the Buyer (a) satisfactory evidence of title, (b) proof of payment or removal of all Encumbrances (except for those encumbrances that will be paid in full at closing), which proof may be the order entered by the Bankruptcy Court approving the sale of the Lady May II (and which order shall provide the Lady May II is being sold to Buyer free and clear of any Encumbrances), and (c) copies of any other documents necessary for transfer of good and marketable title to Buyer. |
| **Risk of Loss**<br>(PSA §7) | The Trustee will bear the risk of loss of or damage to the Lady May II prior to Closing.<br><br>If the Lady May II is damaged subsequent to the Buyer's acceptance and the necessary repairs will cost less than five percent (5%) of the Purchase Price and require fewer than 30 days to complete, then, at the Trustee's option, the Trustee may repair the damage prior to Closing in accordance with sound marine practices to the standard of the Lady May II immediately prior to the damage and the Buyer may inspect such repair, in which case (a) the Buyer shall pay the Balance and take delivery of the Lady May II as repaired and (b) the Closing Date will be extended by the length of the repair period. If the Lady May II is damaged to a greater extent subsequent to the Buyer's acceptance or the Trustee does not exercise the option in the foregoing sentence, either party may terminate the PSA with the same consequences as if the Buyer had rejected the Lady May II. |
| **Default**<br>(PSA §8) | If Closing is not consummated due to the Buyer's non-performance, including, without limitation, failure to pay the Balance or execute all documents necessary for completion of the purchase by the Closing Date: (i) the Deposit will be retained by the Trustee as liquidated and agreed damages, as consideration for the execution of the PSA, in full settlement of all claims between the parties; (ii) the Selling Broker (*i.e.*, the broker for the Buyer) shall return to the Buyer any other funds received from the Buyer, and (iii) the parties will be relieved of all obligations under the PSA.[10]<br><br>If the Closing is not consummated due to the Trustee's non-performance (which, for the avoidance of doubt, shall not include this Court declining to approve the PSA), the Deposit, and any other money paid or deposited by the Buyer pursuant to the PSA, will be returned to Buyer upon demand. If the Closing is not consummated due to the Trustee's non-performance, the Trustee shall forthwith pay the Brokers the same commission otherwise payable had the transaction closed; <u>provided</u>, <u>however</u>, that the Bankruptcy Court declining to approve the PSA will not constitute non-performance on the part of the Trustee. |

---

[10]   The PSA also provides that in the event that, after this Court has approved the PSA, the Closing is not consummated due to the Buyer's non-performance, the Trustee shall pay to the Listing Broker (*i.e.*, Edmiston) an amount equal to $5,500 out of the Deposit, which amount will count against, and reduce, any commission that the Listing Broker may earn (in accordance with its engagement letter with the Trustee) if a sale of the Lady May II is consummated with a different buyer.

| | |
|---|---|
| | In the event this Court does not approve the PSA, the PSA will be deemed terminated with the same consequences as if the Buyer had rejected the Lady May II in accordance with the PSA.<br><br>If the Closing is not consummated for any reason, the Trustee will have the option to purchase the survey from the Buyer at cost and, if the Trustee exercises this option, the Buyer will provide the complete survey to the Trustee immediately upon payment of the cost of such survey. |
| **Sales and Use Taxes** (PSA §9) | Sales or use taxes payable on the Buyer's purchase of the Lady May II, if applicable, are the Buyer's responsibility, and the Buyer shall pay the taxes due to the Trustee at Closing.  The Buyer will indemnify and hold harmless the Trustee and Brokers against and from any sales or use taxes for which the Buyer is responsible. |
| **Financing** (PSA §11) | The Buyer's obligations are not contingent upon Buyer's obtaining financing.  The Buyer represents that it will arrange financing, if necessary.  The Buyer also represents and warrants that it has sufficient cash and/or financing to fund the Purchase Price at Closing. |
| **Reimbursement** (PSA §16) | In the event any dispute between the parties hereto arising out of the subject matter of the PSA, the prevailing party (including the Brokers) will be reimbursed for their reasonable expenses, costs and attorney's fees, at all pretrial, trial and appellate levels, unless such prevailing party is found, in a final non-appealable judgment of this Court, to have engaged in willful misconduct or acted with gross negligence. |
| **Bankruptcy Court Approval** (First Addendum §2) | The PSA and all terms in the PSA are subject to approval of this Court. |
| **Exclusive Bankruptcy Court Jurisdiction** (First Addendum §3) | Notwithstanding anything in the PSA to the contrary, this Court will have exclusive jurisdiction over any claim or dispute in respect of or arising out of the PSA, and the parties and the Brokers irrevocably submit to the exclusive jurisdiction of this Court, waive any objection they now or hereafter may have to venue or convenience of forum, agree that all claims relating to the PSA will be decided in this Court, and, further, not to bring any claim relating to the PSA in any other court. |
| **Winterization and Storage of Lady May II** (Second Addendum §§ 2, 3) | Buyer agrees that the Trustee may, prior to Closing, winterize the Lady May II and place the Lady May II into winter storage at Safe Harbor Newport Shipyard in Newport Rhode Island.<br><br>Furthermore, Buyer agrees to pay the Trustee, at Closing, (a) the pro-rated portion of storage costs for the remainder of the winter storage at the Newport Shipyard (*i.e.*, from the Closing Date to April 15, 2024) and (b) the cost of winterizing the Lady May II (subject to a $3,000 cap for such cost of winterizing).  For the avoidance of doubt, the Trustee will not be responsible for any post-Closing costs of transferring or relocating the Lady May II after it has been placed into winter storage at the Newport Shipyard. |

## **COMPLIANCE WITH LOCAL RULE 6004-2(c)**

28.     In accordance with Local Rule 6004-2(c), the Trustee further states:

| Local Rule 6004-2 Disclosure | Terms of Sale |
|---|---|
| **Sale to Insider**<br>(Local Rule 6004-2(c)(1)) | The Buyer is not an insider within the meaning of section 101(31) of the Bankruptcy Code.  Indeed, the Buyer has represented and warranted that it is not affiliated with or related to the Debtor and/or is not acting on behalf of or at the behest of the Debtor.  PSA §11. |
| **Agreements with Management**<br>(Local Rule 6004-2(c)(2)) | Not applicable. |
| **Releases**<br>(Local Rule 6004-2(c)(3)) | The PSA contains no releases. |
| **Private Sale/No Competitive Bidding**<br>(Local Rule 6004-2(c)(4)) | While the Trustee is not contemplating conducting an auction, the PSA reflects the result of a competitive marketing process (as detailed in this Motion).<br><br>Nor has the Trustee agreed not to solicit competing offers for the Lady May II or otherwise limit shopping of the Lady May II.  Indeed, the Trustee will consider any offers made at any prior to or at the hearing on the Sale Motion.  Moreover, in accordance with Local Rule 6004-2(g), the Trustee will serve a copy of this Motion on all parties that have expressed an interest in the Lady May II during the marketing process. |
| **Closing Deadline**<br>(Local Rule 6004-2(c)(5)) | The closing of the Sale will take place on or before December 31, 2023. |
| **Good Faith Deposit**<br>(Local Rule 6004-2(c)(6)) | The Buyer has made a good faith deposit of 25% of the Purchase Price, which deposit is being held by the Trustee in escrow subject to the terms of the PSA. |
| **Interim Arrangements with Proposed Buyer**<br>(Local Rule 6004-2(c)(7)) | There are no interim arrangements with the Buyer. |
| **Use of Proceeds**<br>(Local Rule 6004-2(c)(8)) | The proceeds from the Sale will be deposited into the Trustee's account and will be used and/or distributed by the Trustee in accordance with the Bankruptcy Code.<br><br>To the extent there are any liens on the Lady May II, such liens will attach to the proceeds.[11] |
| **Tax Exemption**<br>(Local Rule 6004-2(c)(9)) | The Trustee is not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.<br><br>As noted above, sales or use taxes payable on the Buyer's purchase of the Lady May II, if applicable, are the Buyer's responsibility, and the Buyer shall pay the taxes due (if any) to the Trustee at Closing. |

---

[11]    The Trustee is not aware of any liens on the Lady May II.

| | |
|---|---|
| **Record Retention**<br>(Local Rule 6004-2(c)(10)) | Not applicable. |
| **Sale of Avoidance Actions**<br>(Local Rule 6004-2(c)(11)) | The Trustee is not seeking to sell any avoidance actions. |
| **Requested Findings and Order as to Successor Liability**<br>(Local Rule 6004-2(c)(12)) | The Trustee is not requesting any findings as to successor liability claims. |
| **Sale Free and Clear of Unexpired Leases**<br>(Local Rule 6004-2(c)(13)) | The Trustee is not seeking to convey any real property. |
| **Credit Bid**<br>(Local Rule 6004-2(c)(14)) | Not applicable. |
| **Relief from Bankruptcy Rule 6004(h)**<br>(Local Rule 6004-2(c)(15)) | The Trustee seeks relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) to permit the sale to close immediately upon approval by this Court. |
| **Carve-Outs and/or "Gifts"**<br>(Local Rule 6004-2(c)(16)) | Not applicable. |
| **Residual Assets**<br>(Local Rule 6004-2(c)(17)) | The Sale is not a sale of substantially all of the assets of the estate. Additional assets will exist following the Sale Closing. |

## RELIEF REQUESTED

29.     By this Motion, the Trustee seeks entry of the Proposed Order,[12] pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rules 6004-1 and 6004-2 (i) approving and authorizing the Sale of the Lady May II, (ii) authorizing and approving the PSA, and (iii) granting related relief.

## BASIS FOR RELIEF

**A.      Sale Should Be Approved Pursuant to Section 363(b) of the Bankruptcy Code**

30.     Section 363(b) of the Bankruptcy Code authorizes a trustee to sell assets other than in the ordinary course of its business after notice and hearing.  *See* 11 U.S.C. § 363(b).

---

[12]   The Proposed Sale Order is substantially in the same form as the order approving the sale of the Lady May.

15

Additionally, Bankruptcy Rule 6004(f) authorizes a trustee to sell estate property outside of the ordinary course of business by private sale or public auction. Fed. R. Bankr. P. 6004(f).

31.     The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the trustee.  *See e.g. In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Security Holders v. Lionel Corp (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir 1983).  The trustee has broad discretion to determine the manner in which its assets are sold and private sales outside the ordinary course of business are permissible pursuant to section 363(b) of the Bankruptcy Code. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting trustee has authority to conduct a sale of estate property through private sale); *see, e.g., Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D. P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re MF Glob. Inc.*, 535 B.R. 596 608 (Bankr. S.D.N.Y. 2015) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met). Courts have approved private sales where the benefit of such outweighs the delay and expense of conducting a public sale.  *See In re Dewey & Leboeuf LLP*, No. 12-12321 MG, 2012 WL 5586278, at *6 (Bankr. S.D.N.Y. Nov. 1, 2012) (finding good business justification to sell property through a private sale where public sale would be more costly).

32.     A court-approved auction process is not required to establish a sale is within the business judgment of the trustee under the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules.  *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc*., 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[T]here is no rule that . . . asset sales are . . . conditioned on such a requirement [a formal

auction], which does not appear in the Bankruptcy Code or Bankruptcy Rules.") (internal citations and quotations omitted).[13]

33.    Once a court is satisfied that there is a sound business justification for a proposed sale, the court must then determine whether (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012); *In re Betty Owens Sch., Inc.*, No. 96 Civ. 3576, 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997).

34.    As detailed in this Motion, there is a strong business justification for the Sale of the Lady May II to the Buyer.  The Trustee submits that, in light of the extensive marketing and the competitive bidding process, the proposed Sale to the Buyer is in the best interests of the Debtor's estate and should be approved.  There would have been no incremental benefit to first seeking approval of formal bidding procedures and running a public auction.  To the contrary, conducting an auction would likely have discouraged the Buyers from bidding and/or making their best offer.  Potential buyers would likely not have participated in a process that would have exposed them to the risk of overpaying (if selected as the winning bidder in an auction), and, to the extent they would have participated in such a process, they would likely have discounted their bids to reflect that risk.  Moreover, despite the extensive marketing to date, there is only one

---

[13]    The Local Rules only require a public sale process with respect to the sale of real estate, unless otherwise ordered by the Court.  Local Rule 6004-1(a) ("Unless otherwise ordered by the Court upon a showing of good cause, a party proposing to sell real property must do so by public sale.").

potential buyer at this time (*i.e.*, the Buyer), thus calling into question the utility of conducting an auction.

35.     In addition, the delay associated with pursuing an auction process would also require the Trustee to continue incurring the substantial cost of maintaining the Lady May II. While winter storage costs (approximately $3,000 per month) is obviously less than the monthly dockage fee during the summer months (approximately $11,000 per month), these costs are substantial.  Moreover, if the Lady May II is not sold now, it is highly uncertain whether it could be sold before the spring of 2024, at which time the Lady May II would have to be returned to the water (and higher dockage fees would have to be incurred again), in order to market it to other interested parties.  In addition, once returned to the water, the Trustee would have to re-hire a part time captain, at a cost of $2,000 to $3,000 per month.  To be clear, the Trustee is not suggesting that these costs justify selling the Lady May II below fair market value; however, the substantial cost of maintaining and storing the Lady May II needs to be considered as part of the overall cost/benefit analysis of proceeding with the Sale to the Buyer now compared to seeking approval of bidding procedures and pursuing a public auction.

36.     Furthermore, as detailed above, the Sale is the result of a competitive bidding process (even if not pre-approved by the Court), which process resulted in a Purchase Price that the Trustee submits is fair and reasonable for the Lady May II.  As part of that process, the Trustee also utilized a seasoned broker (*i.e.*, Edmiston).  In any event, in accordance with Local Rule 6004-2(g), the Trustee is serving copies of this Motion on all parties that have expressed to Edmiston an interest in purchasing the Lady May II, and, if superior bids are received before the hearing this Motion, the Trustee understands that he is duty-bound to consider such bids.

37.     Finally, as noted, the winning bid submitted by the Buyer did ***not*** modify the terms of the Trustee's form of proposed PSA (including the terms set forth in the addendum), except that the Buyer has agreed to purchase the Lady May II on an "as is, where is" basis.  In other words, the Buyer does not have the ability to reject the Lady May II (whether as a result of a sea trial, inspection, or otherwise), thereby eliminating any risk on the part of the Trustee that the Buyer would reject the Lady May II after inspection.

38.     For the reasons stated above, the Trustee submits that the Sale of the Lady May II to the Buyer is in the best interest of the estate and should be approved under section 363(b) of the Bankruptcy Code.

**B.     Sale of Lady May II Free and Clear of Liens, Claims, Interests, and Encumbrances Should Be Authorized Pursuant to Section 363(f) of the Bankruptcy Code**

39.     Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests, and encumbrances if:

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;
(2)     such entity consents;
(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4)     such interest is in bona fide dispute; or
(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of the five requirements will suffice to permit the sale of the Lady May II "free and clear" of liens and interests.  *See In re Dundee Equity Corp.*, 1992 WL 53743 at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[S]ections 363(f) is in the disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of Section 363(f) have been met").

40. The Trustee is not aware of any liens or other encumbrances with respect to the Lady May II.[14] However, to the extent there are any liens, claims, interests, or encumbrances against the Lady May II, the Trustee submits that the Sale should be approved free and clear of any such liens, claims, interests, and encumbrances because one or more of the requirements under section 363(f) of the Bankruptcy Code are satisfied. In this regard, the absence of an objection to the relief sought in this Motion is, or should be deemed, consent within the meaning of section 363(f)(2) of the Bankruptcy Code. *See Borders Group*, 453 B.R. 477, 484 (Bankr. S.D.N.Y. 2011) ("Under 363(f)(2), a lienholder who receives notice of a sale but does not object within the prescribed time period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear of liens.").

41. Further, to the extent there is any lien holder, it will be adequately protected by having its lien attach to the proceeds of the Sale, subject to any claims and defenses that the Trustee may have with respect thereto. *See, e.g.*, *In re Healthco Int'l, Inc.*, 174 B.R. 174, 177 (Bankr. D. Mass. 1994) ("I therefore conclude the Trustee may sell the property pursuant to section 363(f)(5), free of the County's lien, with the lien transferred to the sales proceeds. Transfer of the lien to the proceeds provides adequate protection for the lien."); 3 Collier on Bankruptcy P 363.06 (16th 2023) ("Section 363(f) permits a sale of property of the estate free and clear of an interest in the property, including a lien, under a number of circumstances. It has long been recognized that the bankruptcy court has the power to authorize the sale of property free of liens with the liens attaching to the proceeds, with or without the consent of the lienholder.").

---

[14] The Trustee previously conducted a UCC search with respect to HK USA and, moreover, is in the process of conducting a search for maritime liens (with the Cayman Island registry). If any such liens are identified, the Trustee will also serve a copy of this Motion and the related sale notice upon the holders of any such liens.

42.     For all these reasons, the Trustee requests that the Court authorize the Trustee to

sell the Lady May II free and clear of any liens, claims, interests, and encumbrances.

**C.    Sale of Lady May II Should Be Subject to Protections of Section 363(m) of the Bankruptcy Code**

43.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest

in property purchased from the estate notwithstanding that the sale conducted under section

363(b) of the Bankruptcy Code is later reversed or modified on appeal.  Specifically, section

363(m) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

44.     Although "good faith" is not defined in the Bankruptcy Code, the Second Circuit

has stated that:

> Good faith of a purchaser is shown by the integrity of his conduct
> during the course of the sale proceedings . . . A purchaser's good
> faith is lost by fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

*In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (internal quotations omitted).  Section 363(m) of

the Bankruptcy Code "fosters the 'policy of not only affording finality to the judgment of the

bankruptcy court, but particularly to give finality to those orders and judgments upon which third

parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting

*In re Abbots Dairies of Penn., Inc.*, 788 F.2d 143, 147); *see also Allstate Ins. Co. v. Hughes*, 174

B.R. 884, 888 (S.D.N.Y. 1994); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y.

1990).

45.    The Buyer was selected by the Trustee as having submitted the highest and best bid following an extensive marketing effort by Edmiston and a competitive bidding process, including arms' length negotiations.  The Trustee has no reason to believe that the Buyer colluded with other interested parties or otherwise attempted to obtain an unfair advantage over other parties in the process.  Moreover, the Buyer has no affiliation with the Debtor nor is the Buyer acting on behalf of or at the behest of the Debtor, all as reflected in the Buyer's representations and warranties in the PSA.  All payments to be made by the Buyer, and other agreements or arrangements entered into by the Buyer in connection with the Sale set forth in the PSA, have been disclosed.  Accordingly, the Trustee submits that the Buyer is a good faith purchaser entitled to the protections pursuant to section 363(m) of the Bankruptcy Code.

**D.    Trustee Should Be Authorized to Pay Commission to Edmiston**

46.    Pursuant to the Edmiston Retention Order, the Court previously approved Edmiston's compensation structure, including a fixed fee of 5% of the purchase price in the event of an in-house deal not involving a Sub-Listing Broker (as defined in the Edmiston Retention Application).  In light of Edmiston's substantial efforts in marketing the Lady May II, which efforts culminated in the selection of the Buyer as the winning bidder, the Trustee submits that the Court should authorize the payment of such fee, in the amount of $18,750 to Edmiston upon the Closing of the Sale.

47.    In addition, pursuant to the PSA, if following entry of the Proposed Sale Order, the Sale is not consummated due to the Trustee's non-performance, the Trustee is required to pay the aforementioned Full Fee (as defined in the Edmiston Retention Order) to Edmiston.  The Trustee submits that this provision is reasonable including because, in that event, Edmiston will have performed the same services and the Closing would have occurred but for the Trustee's non-performance.  Accordingly, the Trustee submits that it is reasonable for the Trustee to agree,

as part of the PSA, to pay the 5% fee to Edmiston in that scenario, and the Court should approve the payment of such fee.  That said, and to be clear, the Trustee has no intention not to perform his obligations under the PSA and proceed to consummation of the Sale to the Buyer (assuming, of course, that this Court approves the Sale).

48.     Finally, the PSA provides that if, after the Court has approved the Sale, the Closing is not consummated due to the Buyer's non-performance, the Trustee shall pay to Edmiston an amount equal to $5,500 out of the Deposit, which amount will count against, and reduce, any commission that Edmiston may earn (in accordance with its engagement letter with the Trustee) if a sale of the Lady May II is consummated with a different buyer.  The Trustee submits that this provision is reasonable and should be approved as well, including because the Trustee believes that, if the Sale fails due to the Buyer's non-performance, the Trustee will be able to sell the Lady May II to another interested buyer, for a purchase price that would result in a commission to Edmiston well in excess of $5,500—and, accordingly, there would be no net loss to the estate.

## **WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

49.     The Trustee requests that the Court waive any applicable stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

50.     As noted, it is a condition to the proposed Sale to the Buyer that the Closing occur on or before December 31, 2023.  Unless the default stay period set forth in Bankruptcy Rule 6004(h) is waived, the Closing deadline could not be met and the Buyer may attempt to walk and terminate the Buyer's obligations to purchase the Lady May II, in which case the Trustee would

lose the highest bid on the Lady May II, to the detriment of the Debtor's estate. Accordingly, the Trustee respectfully requests that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## **WAIVER OF LOCAL RULE 6004-2 REGARDING VALUATION**

51.     Pursuant to Local Rule 6004-2(b), sale motions must include a description of the means by which the movant determined the fair market value of the property to be sold, unless otherwise provided by order of the Court. The Trustee has determined that under the facts of this case, the best evidence of the fair market value of the Lady May II is the result of the marketing process conducted by Edmiston and the subsequent competitive bidding process. Accordingly, the Trustee believes that it was not necessary to obtain (and pay for) a separate fair market valuation from an appraiser. Thus, to the extent necessary, the Trustee requests that the requirements of Local Rule 6004-2(b) be waived.

## **NOTICE**

52.     Notice of this Motion will be served upon (i) the Office of the United States Trustee for the District of Connecticut, (ii) the Buyer, (iii) counsel for the Debtor, (iv) the Committee, (v) all entities and individuals, if any, known to have expressed to Edmiston an interests in the Lady May II, (vi) all parties who have requested notice in the Debtor's case pursuant to Bankruptcy Rule 2002, and (vii) the creditor matrix.

53.     The parties identified in clauses (i) through (vi) will receive a full copy of the Motion and the parties identified in clause (vii) will receive only a copy of the sale notice (appended to this Motion), as soon as the Court has scheduled a hearing and objection deadline with respect to the Motion.[15]

---

[15]     The sale notice is based on the Notice of Proposed Private Sale of Estate Property included in Appendix O to the Local Rules, but modified to also include the hearing date to be scheduled by the Court on the Motion and

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that the

Bankruptcy Court enter the Proposed Sale Order granting the relief requested herein.


Dated: November 27, 2023
      New York, New York

By: */s/ G. Alexander Bongartz*
Luc A. Despins (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
Douglass Barron (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
alexbongartz@paulhastings.com
douglassbarron@paulhastings.com

    *and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

    *and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for the Chapter 11 Trustee*

---

the deadline to object to the Motion.  By separate motion, the Trustee requests that the hearing on the Motion be schedule for the week of December 18, 2023, and the objection deadline be set for December 15, 2023.

<u>**EXHIBIT A**</u>

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                :

In re:                          :     Chapter 11
                                :

HO WAN KWOK, *et al*.,[1]        :     Case No. 22-50073 (JAM)
                                :

           Debtors.        :     (Jointly Administered)
                                :
-------------------------------------------------------x

**[PROPOSED] ORDER, PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND
363, BANKRUPTCY RULES 2002 AND 6004(c) AND LOCAL RULES 6004-1 AND
6004-2, (I) AUTHORIZING AND APPROVING SALE OF THE LADY MAY II FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,
(II) AUTHORIZING AND APPROVING PURCHASE AND SALE
AGREEMENT, AND (III) GRANTING RELATED RELIEF**

Upon  the motion (the "Motion")[2] of Luc A. Despins, in his capacity as the chapter 11

trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"),

pursuant to pursuant to sections 105, 363(b), and 363(f) of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004(c), and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6004-2 of the Local Rules of

Bankruptcy Procedure of the United States Bankruptcy Court for the District of Connecticut (the

"Local Rules"), seeking entry of an order (i) authorizing and approving the Trustee's sale (the

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    Capitalized terms used but not defined herein shall having the meanings set forth in the Motion or the PSA, as applicable; provided, however, no capitalized terms used herein shall in any way be modified, amended, or supplemented in the PSA after this Order becomes final.

"Sale") of the Lady May II[3] to Patrick Cloppenburg (the "Buyer") free and clear of all liens, claims, interests and encumbrances pursuant to that certain purchase and sale agreement, dated November 22, 2023, by and among the Buyer and the Trustee (together with the related addendum, the "PSA"), (ii) authorizing and approving the PSA, and (iii) granting related relief, all as further detailed in the Motion; and hearing on the Motion having been held on _____, 2023 (the "Hearing"), during which the Trustee's Exhibits and the testimony of Mr. Johnson and the Trustee were admitted into evidence in support of the Sale; and this Court having reviewed and considered the Motion, the declaration of Dirk Johnson (the "Johnson Declaration") in support of the requested relief, and all objections thereto, and the arguments made by counsel and evidence adduced at the Hearing; and it appearing the terms of the PSA are in the best interests of the Debtor, the estate, creditors and other parties in interest; and after due deliberation thereon, and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT**:[4]

<u>**Jurisdiction and Final Order**</u>

A.      This Court has jurisdiction to hear and determine the approval of the Sale and the PSA under 28 U.S.C. §§ 1334 and 157, and the *Standing Order of Reference* from the United States District Court for the District of Connecticut.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[3]     For purposes of the sale under the PSA, the term "Lady May II" consists all assets to be sold pursuant to the PSA, including all gear, machinery, equipment, furniture, fuel, consumables, all registered or unregistered tenders, toys, articles and appurtenances on board the Lady May II and/or included on the Lady May II's listing specification as of the date of the PSA (*i.e.*, November 22, 2023).

[4]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

Notwithstanding Bankruptcy Rules 6004(h), and to any extent necessary under Bankruptcy Rule

9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy

Rule 7054, this Court expressly finds that there is no just reason to delay the implementation of

this Order, and expressly directs entry of judgment as set forth herein.  The Buyer, being a good

faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated

by the PSA at any time after the entry of this Order and shall not be subject to the stay provided

by Bankruptcy Rules 6004(h).

## Notice of Sale

C.      Actual written notice of the Motion, the Hearing, and a reasonable opportunity to

object or be heard with respect to the Motion and the relief requested therein, has been afforded

to all known interested persons or entities.

D.      As evidenced by the certificates of service previously filed with this Court:

(i) due, proper, timely, adequate and sufficient notice of the Motion, the Hearing, the entry of

this Order, the Sale, and the relevant objection deadlines has been provided to all parties-in-

interest; (ii) such notice was, and is, good, sufficient and appropriate under the circumstances of

this chapter 11 case, provided a fair and reasonable opportunity for parties-in-interest to object,

and to be heard, with respect thereto, and was provided in accordance with the Bankruptcy Code,

Bankruptcy Rules, and the applicable Local Rules; and (iii) no other or further notice of such

matters is necessary or shall be required.

## Business Judgment

E.      The Trustee has demonstrated good, sufficient, and sound business purposes and

justifications for, and compelling circumstances to promptly consummate, the Sale and such

action is an appropriate exercise of the Trustee's business judgment and in the best interests of the Debtor, his estate, and his creditors. Such business reasons include, but are not limited to, the facts that: (i) the Purchase Price and the other terms set forth in the PSA constitute the highest or otherwise highest and best offer received for the Lady May II; (ii) the Sale on the terms set forth in the PSA presents an orderly and expeditious sale of the Lady May II and the best opportunity to maximize the value of the Lady May II; and (iii) unless the Sale is concluded expeditiously as provided for in this Order and pursuant to the PSA, potential creditor recoveries may be substantially diminished.

### Marketing Process

F.      As demonstrated by the Motion, the Johnson Declaration, the testimony and other evidence proffered or adduced at the Hearing, and the representations of the Trustee and his counsel made on the record at the Hearing: (i) the Trustee and his broker, Edmiston and Company Limited ("Edmiston"), engaged in a robust and extensive marketing and sale process; (ii) the Trustee and his advisors conducted a fair and open sale process; (iii) the sale process was non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Lady May II; and (iv) the process conducted by the Trustee obtained the highest and best value for the Lady May II for the Trustee and the Debtor's estate.

### Fair Consideration; Highest or Best Value

G.      The consideration to be provided by the Buyer under the PSA is fair and reasonable consideration for the Lady May II and constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of

4

the United States, any state, territory or possession or the District of Columbia. Such consideration constitutes the highest and best bid for the Lady May II. No other person or entity or group of persons or entities has offered to purchase the Lady May II for an amount that would give equal or greater value to the Debtor's estate than the value provided by the Buyer pursuant to the PSA. Prompt approval of the Sale is the only means to maximize the value of the Lady May II.

## **Good Faith**

H.      The PSA and the Sale were negotiated, proposed, and entered into, and are being undertaken by the Trustee and the Buyer in good faith, without collusion, and from arms' length bargaining positions. Likewise, the value that the Debtor's estate will receive on consummation of the Sale is the product of arms' length negotiations between the Trustee, the Buyer, and their respective representatives and advisors.

I.      The Buyer is purchasing the Lady May II in good faith, and is a good faith purchaser, within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full rights, benefits, privileges, and protections of that provision and any other applicable or similar bankruptcy and non-bankruptcy law.

J.      Neither the Buyer nor the Trustee have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code to the PSA or to the consummation of the Sale.

K.      The Buyer proceeded in good faith in all respects in connection with the Sale and this proceeding in that, among other things: (a) the Buyer's bid was the result of a competitive bidding process; (b) all payments to be made by the Buyer, and other agreements or arrangements entered into by the Buyer in connection with the Sale set forth in the PSA, have

5

been disclosed; and (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.

      L.      The Buyer is not an insider or an affiliate (as that term is defined in sections 101(2) and 101(31) of the Bankruptcy Code) of the Debtor.

### Section 363(f) of the Bankruptcy Code Is Satisfied

      M.      The Trustee is authorized to sell the Lady May II free and clear of liens, claims, interests, and encumbrances against the Debtor or his estate, because one of more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

      N.      Those holders of liens, claims, interests, or encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Sale or the Motion have either consented to or are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  In addition, one or more of the other subsections of section 363(f) of the Bankruptcy Code apply and, therefore, holders of liens, claims, interests, or encumbrances in the Lady May II are adequately protected by having their liens, claims, interests, or encumbrances in the Lady May II attach solely to the proceeds of the Sale in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale.

      O.      The Buyer would not have entered into the Sale and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtor's estate and his creditors, (i) if the sale of the Lady May II was not free and clear of all liens, claims, interests, and encumbrances or (ii) if the Buyer would, or in the future could, be liable for any such liens, claims, interests, and encumbrances.  The total consideration to be provided under the PSA reflects the Buyer's reliance on this Order to provide it with title to and possession of the Lady

May II free and clear of all liens, claims, interests, and encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.

<u>**Validity of Transfer**</u>

P.      The transfer of the Lady May II to the Buyer will be a legal, valid, and effective transfer of the Lady May II, and will vest the Buyer with any legal, equitable and beneficial right, title, and interest of the Debtor in and to the Lady May II, free and clear of all liens, claims, interests, and encumbrances.  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), and 363(m) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.  Subsequent to the Closing, the Debtor's estate will be relieved of all liability or other obligation of any kind with respect to claims arising from or related to the Buyer's post-Closing operation and/or ownership of the Lady May II.

<u>**Waiver of Bankruptcy Rules 6004(h)**</u>

Q.      The sale of the Lady May II must be approved and consummated promptly.  The Trustee and the Buyer intend to close the Sale on or before December 31, 2023.  The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale as contemplated by the PSA.  Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) with regard to the transactions contemplated by this Order.

**THE COURT HEREBY ORDERS, ADJUDGES, AND DECREES:**

1.      The Motion is GRANTED and approved in all respects, and any objections are overruled.

7

2.      The PSA is hereby approved as set forth herein.

3.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Sale of the
Lady May II to the Buyer pursuant to the PSA free and clear of all liens, claims, encumbrances,
and other interests is approved in all respects.

4.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the
Trustee is authorized to transfer the Lady May II in accordance with the terms of the PSA and
this Order.  The transfer of the Lady May II by the Trustee to the Buyer in accordance with the
PSA shall: (a) be valid, legal, binding, and effective; (b) vest the Buyer with all right, title, and
interest of the Trustee in and to the Lady May II; and (c) be free and clear of all liens, claims,
interests, and encumbrances against the Lady May II, in accordance with section 363(f) of the
Bankruptcy Code.

5.      Pursuant to section 363 of the Bankruptcy Code, this Order shall and does, as of
the Closing, divest the Trustee and the Debtor's estate of all right, title, and interest in and to the
Lady May II.

6.      The consideration provided by the Buyer for the Lady May II under the PSA is
fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent
value, fair value, and fair consideration under the Bankruptcy Code and any other applicable law,
and the Sale may not be avoided or rejected, or costs or damages imposed or awarded against the
Buyer, under section 363(n) or any other provision of the Bankruptcy Code.

7.      The Trustee is authorized and directed to take any and all actions necessary or
appropriate to (a) consummate the Sale concerning the transfer of the Lady May II to the Buyer
at a closing in accordance with the Motion, the PSA and this Order, (b) perform, consummate,
implement, and close fully the PSA together with all additional instruments and documents that

8

may be reasonably necessary or desirable to implement this Order, and the PSA, and (c) perform the obligations contemplated by this Order, and the PSA, including all actions reasonably requested by the Buyer in regard thereto.

8.       The sale of the Lady May II by the Trustee to the Buyer shall constitute a legal, valid and effective transfer of the Lady May II, notwithstanding any requirement for approval or consent by any person, and vest the Buyer with all rights, title, and interests in the Lady May II, subject to the terms of the PSA.

9.       All liens, claims, interests, and/or encumbrances in, on, or against the Lady May II shall automatically attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Lady May II, subject to any claims and defenses the Trustee or the Debtor's estate may possess with respect thereto; *provided*, *however*, that such provision shall not preclude the Trustee's use of such proceeds, provided further that such use to pay the Trustee's professionals shall be subject to adjustment and/or disgorgement (other than Edmiston) in the event a final and no longer appealable order enters determining that the Lady May II and/or its proceeds are property of HK USA, in which case HK USA shall be entitled to receive payment from the proceeds and/or the Debtor's estate to the extent of such finally determined interest; such adjustment and/or disgorgement shall only be ordered by this Court in the event and to the extent the Debtor's estate lacks the ability to independently satisfy the HK USA's liens, claims, interests and/or encumbrances, if any, from the proceeds of the Sale or other assets of the Debtor's estate.  The Trustee acknowledges and agrees that the Sale authorized by this Order shall not equitably moot the appeal from this Court's Order Granting Partial Summary Judgement in *HK International Funds Investments (USA) Limited, LLC v. Luc A. Despins, Trustee*, Adv. Proc. No. 22-05003 (JAM).  Notwithstanding anything in this Order,

9

nothing herein shall preclude the Trustee's right to object to the standing of HK USA and Mei Guo to be heard in the Debtor's chapter 11 case. This Order shall be effective as a determination that, on and as of the Closing, all liens, claims, interests, and/or encumbrances of any kind or nature whatsoever in, on, or against the Lady May II have been unconditionally released, discharged, and terminated. The provisions of this Order authorizing and approving the transfer of the Lady May II free and clear of liens, claims, encumbrances, and other interests shall be self-executing, and neither the Trustee nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order and the PSA.

10.     Subject to the terms, conditions, and provisions of this Order, all persons and entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere, or that would be inconsistent (a) with the ability of the Trustee to sell and transfer the Lady May II to the Buyer, (b) with the ability of the Buyer to acquire, take possession of, use and operate the Lady May II in accordance with the terms of the PSA and this Order, and (c) with the ability of the Trustee and the Buyer to perform their respective obligations thereunder; provided, however, that the foregoing restriction shall not impair the right of any party in interest with the requisite standing to appeal this Order in accordance with applicable law or opposing any appeal of this Order.

11.     The Buyer is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code. The Sale contemplated by the PSA and this Order are undertaken by the Buyer in good faith, as that term is used in section 363(b) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale unless such authorization is duly

10

stayed pending such appeal prior to the Closing.  For the avoidance of doubt, the pendency of an

appeal of this Order, absent a stay of this Order pending appeal, shall not constitute a basis not to

consummate the Sale.

12.     The failure specifically to include any particular provisions of the PSA in this

Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court

that the PSA and each and every provision, term, and condition thereof (including, for the

avoidance of doubt, the addendum thereto) be, and therefore is, authorized and approved in its

entirety; provided, however that the PSA may be modified, amended, or supplemented by the

parties thereto, in a writing signed by all parties, without further notice to or order of this Court,

provided that any such modification, amendment, or supplementation does not have a material

adverse effect on the Debtor's estate, unless approved by order of this Court.

13.     The provisions of this Order, the PSA, and any actions taken pursuant hereto or

thereto, shall survive entry of any order which may be entered confirming or consummating any

chapter 11 plan, or which may be entered converting this chapter 11 case from chapter 11 to

chapter 7 of the Bankruptcy Code or dismissing this chapter 11 case, and the terms and

provisions of the PSA, as well as the rights and interests granted pursuant to this Order, the PSA,

shall continue in this chapter 11 case or any superseding cases and shall be specifically

performable and enforceable against and binding upon the Trustee, the Debtor, his estate, all

creditors, all holders of claim(s) (whether known or unknown) against the Debtor, all holders of

liens, claims, interests, and/or encumbrances (whether known or unknown) against, in, or on all

or any portion of the Lady May II, the Buyer and its respective successors and permitted assigns,

and any other trustee or other fiduciary hereafter appointed or elected as a legal representative of

the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code, including without limitation

11

plan fiduciaries, plan administrators, litigation or liquidation trustees appointed during the pendency of, or upon confirmation of a chapter 11 plan in this chapter 11 case.

14.     This Order is and shall be binding upon and govern the acts of all persons and entities (including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, and secretaries of state, federal and local officials) who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Lady May II.  Each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge, and terminate any of the liens, claims, interests, and encumbrances against the Lady May II or to otherwise consummate the Sale contemplated by this Order, and the PSA.  All liens, claims, interests, and encumbrances of record as of the date of this Order shall be forthwith deemed removed and stricken as against the Lady May II.  All persons and entities described in this paragraph are authorized and specifically directed to strike all such recorded liens, claims, interests, and encumbrances against the Lady May II from their records, official and otherwise.

15.     The terms and provisions of the PSA and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Trustee, the Debtor's estate and its creditors, the Buyer and its affiliates, successors, and assigns, and any affected third parties, including all persons asserting liens, claims, interests, or encumbrances in, on, or against the Lady May II, notwithstanding any subsequent appointment of any other trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall

likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or

avoidance by the Trustee, the Debtor, his estate, his creditors or any such trustee, examiner, or

receiver.

16.     Upon the Closing, the Trustee is authorized to pay the Full Fee (as defined in the

Edmiston Retention Order) equal to 5% of the Purchase Price, *i.e.*, $18,750 to Edmiston.  In

addition, (a) if the Closing is not consummated due to the Trustee's non-performance, the

Trustee shall pay the aforementioned Full Fee to Edmiston and (b) if the Closing is not

consummated due to the Buyer's non-performance, the Trustee shall pay to Edmiston an amount

equal to $5,500 out of the Deposit, which amount will count against, and reduce, any

commission that Edmiston may earn (in accordance with its engagement letter with the Trustee)

if a sale of the Lady May II is consummated with a different buyer.

17.     For the avoidance of doubt, no estate causes of action are being sold as part of the

Sale.

18.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) or any applicable

provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be

effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy

Rules 6004(h) is hereby expressly waived and shall not apply.  The Trustee and the Buyer intend

to close the Sale on or before November 30, 2023.  Any party objecting to this Order must

exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law

and prior to the Closing, or risk its appeal will be foreclosed as moot.

19.     Nothing in this Order shall modify or waive any closing conditions or termination

rights in the PSA, and all such conditions and rights shall remain in full force and effect in

accordance with their terms.

20.     As of the Closing, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the Sale, including, without limitation, the transfer of the Lady May II to the Buyer and the occurrence of the Closing.

21.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

22.     To the extent necessary, the requirements of Local Rule 6004-2(b) are hereby waived.

23.     A closing statement shall be filed on the Court's docket within 10 days of closing of the Sale.

24.     To the extent that there is a conflict between the provisions of this Order and the PSA, this Order shall prevail.

25.     This Court shall retain jurisdiction to, among other things, (a) interpret, enforce, and implement the terms and provisions of this Order and the PSA (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith) and (b) adjudicate disputes related to this Order and the PSA (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

14

## **EXHIBIT B**

**PSA**

 **INTERNATIONAL YACHT BROKERS ASSOCIATION**

# PURCHASE AND SALE AGREEMENT FOR BROKERAGE VESSEL

| BUYER: Patrick Cloppenburg | SELLER: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok |
|---|---|
| Address: ~~Werdingbunof~~ UNTERE ROOSTMATT 12 | Address: c/o Paul Hastings LLP, 200 Park Avenue |
| ~~Ruestlocapplegiendel~~ 6300 RUG, SWITZERLAND | New York, New York 10166 |
| Nationality: Canada | Nationality: U.S. |
| **VESSEL NAME: Lady May II** | **MANUFACTURER: Windy Scaninavia AB** |
| Model: motor yacht | Length Overall: 14.95 m |
| Year: 2013 | ☐ Doc or ☑ Reg No.: 746230        Flag: Cayman Is. |
| Hull No.: | Engine Description: Internal combustion (Volvo) |
| Selling Broker: | Listing Broker: Edmiston & Company Limited |
| **IMPORTANT DATES** | **PURCHASE PRICE** |
| Offer Date: | Purchase Price: 375,000.00 $ |
| Offer Expiration Date: | Less Deposit: [25% of Purchase Price] |
| Accept/Reject Date: | Less Trade Allowance (see Addendum): Not applicable |
| Closing Date: 31.12.2023 | Balance: |

Delivery Location: Newport, Rhode Island

NOTE: *If Vessel is to be moved to the Delivery Location, such location must be specified with precision. The mere listing of a port or city is insufficient.*

ADDITIONAL REGISTERED VESSELS INCLUDED ☐ Yes ☑ No

1. **Agreement**. Buyer agrees to purchase, and Seller agrees to sell, all right, title and interest to and in the Vessel described above on the terms and conditions set forth in this Purchase and Sale Agreement ("PSA"). Capitalized terms used in this PSA refer to the corresponding terms in the table above unless otherwise defined herein. The "Effective Date" of this PSA is the date on which is has been signed by both parties. "Vessel" also includes all gear, machinery, equipment, furniture, fuel, consumables, and all registered or unregistered tenders, toys, articles and appurtenances on board the Vessel and/or included on the Vessel's listing specification as of the date of this Agreement, except for items listed on the Exclusions List provided by the Seller or Listing Broker on the earlier of (a) five days from the Effective Date or (b) the Accept/Reject Date, which items are not included in the sale. Buyer will be deemed to have accepted the Exclusion List if it accepts the Vessel. Listing Broker and Selling Broker shall be referred to herein as the "Brokers." If there is a Trade Allowance, the conditions of the trade-in will be governed by the attached Trade-In Vessel Addendum. If either party fails to sign this PSA and deliver it to the other party on or before the Offer Expiration Date, this PSA will be ineffective.

2. **Deposit**. Within _____ business days (3 business days if left blank) following Seller's signature of this PSA, Buyer shall pay the Deposit to the Selling Broker's account, as acknowledged below, as a deposit toward the Purchase Price to be held subject to the terms of this PSA. Seller may refuse to permit Buyer to proceed with the trial run, survey and other inspections of the Vessel until the Deposit has cleared into the Selling Broker's escrow account.

3. **Survey Option; Acceptance of Vessel; Conditions of Survey**. Buyer's obligation to purchase the Vessel is subject to Buyer's satisfaction, in Buyer's sole discretion, with a trial run and survey of the Vessel though Buyer may elect not to have the Vessel inspected. If inspected: (a) Buyer will select the surveyor, (b) the surveyor, and not the Brokers, will be the sole party responsible for any errors or omissions with respect to the survey, notwithstanding that the Brokers may have provided information to and assisted Buyer with hiring the surveyor, (c) *Seller shall make the Vessel available and Buyer shall complete the trial run and survey as soon as practicable*, (d) Seller shall pay all running expenses for, and assume the risks associated with, the trial run, and Buyer shall pay *all* costs of the survey, including associated costs, e.g., haul-out, dry dock, and subcontractors' charges, (e) Buyer and its surveyor will be solely responsible for determining the scope of the survey and the trial run to assess the Vessel's conformity with Buyer's requirements and (f) Buyer shall deliver written notice of rejection or acceptance of the Vessel to Seller or the Listing Broker on or before the Accept/Reject Date. *Whether or not Buyer has inspected the Vessel, Buyer will be deemed to have rejected the Vessel if it fails to give timely written notice of its acceptance.* Upon Buyer's acceptance of the Vessel, Seller will not make any use of the Vessel pending Closing (defined in Paragraph 4) except to move the Vessel to the Delivery Location. If Buyer

Buyer's Initials: _____

Seller's Initials: _____

Page 1 of 4          ©2020 International Yacht Brokers Association. All rights reserved.          Rev.3.10.20

*This form was prepared for the exclusive use and benefit of the members of the IYBA. The parties and Brokers hereby release the IYBA from any liability for damages resulting from or related to its use. The IYBA expressly disclaims any and all warranties, including merchantability and fitness for a particular purpose, related to the use of this form.*

rejects or is deemed to reject the Vessel, after all expenses incurred on Buyer's behalf have been paid, (i) the Selling Broker shall return the Deposit to Buyer, (ii) this PSA will terminate, and (iii) the parties and the Brokers will be released from any further liability hereunder. The Brokers will not be responsible for the cost to correct any defects or deficiencies noted during the trial run and survey.

4. **Closing**. The transfer of Vessel's ownership ("Closing") will occur on the Closing Date at the Delivery Location simultaneously with payment of all funds due from the Buyer and delivery of originals of all other documents necessary for transfer of good and marketable titleto Buyer. If the Vessel must move to the Delivery Location, Seller should not deliver Vessel to the Closing Location unless funds have been paid in full or are being held subject to an escrow conditioned only upon delivery of the Vessel to the Delivery Location and release of title documents to the Buyer. Closing may be facilitated by overnight courier or electronic means. Seller shall deliver the Vessel (as defined in Paragraph 1) to Buyer at the Delivery Location except for fuel consumed during the trial run and any voyage to the Delivery Location. On or before the Closing Date, Seller must deliver to the Selling Broker all documents necessary to transfer title to the Vessel (and all other items hereby required to be delivered) to Buyer. At Closing, Buyer shall pay the Balance to Seller (subject to Paragraph 6) and/or to the Selling Broker for onward transfer to Seller by wire transfer. Any funds Seller owes to (i) the Brokers for the commission, storage, insurance, repairs and/or other items or (ii) the holder of any other Encumbrance, will be deducted from the amount due Seller by the Selling Broker prior to disbursement of funds to Seller, which hereby irrevocably instructs any Deposit holder to pay the Commission from the Deposit to the Brokers pursuant to the terms hereof.

5. **Brokers.** The parties acknowledge that the Selling Broker and Listing Broker are the only brokers that procured this PSA. If the Listing Broker and the Selling Broker are the same brokerage, the parties consent to that Broker acting as a dual-agent in this transaction, i.e., representing both Buyer and Seller, and the Broker may disclose to both parties facts known to the Broker materially affecting the Vessel's value or desirability; provided, however, that in such instance the Broker shall not, without Seller's consent, disclose to Buyer that Seller is willing to sell the Vessel for an amount less than the asking price or, without Buyer's consent, disclose to Seller that Buyer is willing to pay a price greater than the offering price. If the Listing Broker and the Selling Broker are different, the Listing Broker will represent Seller only and owe no duties, fiduciary or otherwise, to Buyer, and the Selling Broker will represent Buyer only and owe no duties, fiduciary or otherwise, to Seller (though paid by Seller). The Brokers are obligated to perform only the duties expressly set forth herein and no implied duties or obligations may be read into this PSA. Seller shall be solely responsible for payment of commission due to the Brokers in connection with the sale of the Vessel as set forth herein. Each party represents and warrants to the other that he has not employed or dealt with any other broker, agent or finder in carrying out the negotiations relating to the sale of the Vessel to Buyer and acknowledges that the Brokers are third-party beneficiaries to this PSA.

6. **Seller's Representations; Requirements for Closing**. Seller represents and warrants that it will transfer to Buyer good and marketable title to the Vessel, free and clear of all debts, claims, maritime or common law liens, security interests, encumbrances, excise taxes, and any other applicable taxes, customs' duties, or tariffs due to any state, country, regulatory and/or taxing authority of any kind whatsoever (collectively, "Encumbrances"). No less than two (2) business days before Closing, Seller shall deliver to Buyer (a) satisfactory evidence of title, (b) proof of payment or removal of all Encumbrances (except for those encumbrances that will be paid in full at closing), (c) a guaranty and indemnification from Seller guaranteeing Seller's representations and warranties in this Paragraph 6, (d) if Seller is a legal entity, a personal guaranty and indemnification from Seller's beneficial owner(s) guaranteeing Seller's representations and warranties in this Paragraph 6, and (e) copies of any other documents necessary for transfer of good and marketable title to Buyer. Seller shall pay any cost associated with, and shall cooperate fully to obtain, any authorization for sale required from any governing authority. Any party which is a legal entity will provide to the other prior to Closing (i) proof that it is in good standing under the laws of the State or other jurisdiction under which the entity has been formed, (ii) a consent action or resolution demonstrating the entity's duly authorized decision to purchase or sell the Vessel as well as the authority of the individual delivering or accepting the Vessel and/or executing this PSA and/or purchase and sales documents,(iii) a power of attorney demonstrating the authority of the individual delivering or accepting the Vessel and (iv) as to Seller, its wire transfer information.

7. **Risk of Loss; _Force Majeure_.** Seller will bear the risk of loss of or damage to the Vessel prior to Closing. If the Vessel is damaged subsequent to Buyer's acceptance and the necessary repairs will cost less than five percent (5%) of the Purchase Price and require fewer than 30 days to complete, then (a) Seller must repair the damage prior to Closing in accordance with sound marine practices to the standard of the Vessel immediately prior to the damage and Buyer may inspect such repair, (b) Buyer must pay the Balance and take delivery of the Vessel as repaired, and (c) the Closing Date will be extended by the length of the repair period. If the Vessel is damaged to a greater extent subsequent to Buyer's acceptance, either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel. Either party's obligation to perform will be suspended to the extent required to accommodate unforeseeable events beyond that party's reasonable control ("_Force Majeure_ Events"), including, without limitation, acts of God, acts of terrorism, strikes, lockouts, riots, acts of war, fire, communication line failures, computer viruses, power failures, accidents, tropical storms, hurricanes, earthquakes, or other natural disasters. If a _Force Majeure_ Event occurs, the time periods referred to in this PSA, including, without limitation, the Closing Date, will be deemed extended by the time necessary to permit the affected party to perform in accordance with this PSA; provided, however, if the _Force Majeure_ Event delays the Closing Date for a period of at more than 30 days, either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel.

8. **Default**. _Notwithstanding anything herein to the contrary, if the Deposit is not paid when due_ or Closing is not consummated due to Buyer's non-performance, including, without limitation, failure to pay the Balance or execute all documents necessary for completion of the

Buyer's Initials: _____    Seller's Initials: _____

Page 2 of 4        ©2020 International Yacht Brokers Association. All rights reserved.        Rev. 3.10.20

purchase by the Closing Date: (i) the Deposit shall be retained by (or if the Deposit was not paid, Buyer shall pay a like amount to) Seller and the Brokers as liquidated and agreed damages, as consideration for the execution of this PSA, in full settlement of all claims between the parties, (ii) the Selling Broker shall return to Buyer any other funds received from Buyer, and (iii) the parties will be relieved of all obligations under this PSA. Buyer and Seller agree that the Deposit will be applied first to payment of any unpaid costs or expenses that Buyer or Broker incurred against the Vessel and then divided fifty percent (50%) to the Seller and fifty percent (50%) to the Brokers, which the Brokers shall divide in the same proportions as the commission would have been divided had a sale been consummated. If the Closing is not consummated due to Seller's non-performance, the Deposit, and any other money paid or deposited by Buyer, pursuant to this PSA will be returned to Buyer upon demand or Buyer will have the right of specific performance. Seller agrees that specific performance is reasonable in light of the uniqueness of the Vessel, difficulty of proof of loss, and the inconvenience or impossibility of otherwise obtaining an adequate remedy. On Seller's default, Seller shall forthwith pay the Brokers the same commission otherwise payable had the transaction closed.

9. **Sales and Use Taxes.** Sales or use taxes payable on Buyer's purchase of the Vessel, if applicable, are Buyer's responsibility, and Buyer shall pay the taxes due to the Selling Broker at Closing. Buyer hereby indemnifies and holds harmless Seller and the Brokers against and from any sales or use taxes for which Buyer is responsible.

10. **REPRESENTATIONS AND WARRANTIES.** SELLER AND THE BROKERS BELIEVE THAT ANY INFORMATION ANY OF THEM HAS PROVIDED ON THE VESSEL IS GOOD AND CORRECT AND OFFER THE INFORMATION IN GOOD FAITH, BUT DO NOT AND CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION. BUYER WARRANTS AND REPRESENTS, AS OF THE TIME OF CLOSING, THAT IT (A) WILL HAVE FULLY INSPECTED AND MADE A TRIAL RUN OF THE VESSEL (OR HAVE VOLUNTARILY WAIVED THESE RIGHTS) AND (B) IS NOT RELYING ON ANY ADVERTISEMENTS, PROMISES, DESCRIPTIONS, AFFIRMATIONS, OR REPRESENTATIONS (WHETHER ORAL OR WRITTEN, PRIOR TO OR CONTEMPORANEOUS WITH THIS PSA) PROVIDED BY THE SELLER OR BROKERS. UPON CLOSING, BUYER WILL BE DEEMED TO HAVE ACCEPTED THE VESSEL IN ITS *"AS IS"* CONDITION. SELLER AND THE BROKERS HAVE GIVEN NO WARRANTY, EITHER EXPRESSED OR IMPLIED, AND MAKE NO REPRESENTATION AS TO THE CONDITION OF THE VESSEL, ITS FITNESS FOR ANY PARTICULAR PURPOSE OR MERCHANTABILITY, *ALL OF WHICH ARE DISCLAIMED.*

11. **Financing.** Buyer's obligations are not contingent upon Buyer's obtaining financing. Buyer represents that it will arrange financing, if necessary. Buyer and Seller acknowledge that the Brokers have made no representations or warranties with respect to Buyer's ability to obtain financing, Buyer's qualifications to obtain any type of mortgage on the Vessel, or Buyer's ability to document or register the Vessel in any jurisdiction.

12. **Counterparts.** The parties may sign this PSA in any number of identical counterparts, each of which will be deemed an original (including signatures evidenced via facsimile, email or other electronic means) as if the signatures were upon the same instrument.

13. **Binding Effect; Contemporaneous Contracts; Future Sales.** This PSA is binding on all parties, their heirs, personal representatives and/or assigns. Seller shall not sell the Vessel or enter into any contract for the sale of the Vessel while this PSA is in effect. If a sale is not consummated in accordance with the terms of this PSA, and Buyer and Seller enter into a contract between themselves for the sale of the Vessel, whether directly or through an entity under a party's ownership or control, within two years after this PSA is terminated, Seller agrees to pay the Brokers an amount identical to the commission the Brokers would have received had the transaction contemplated under this PSA closed.

14. **Escrowed Funds.** The parties acknowledge that (a) the Selling Broker will not be responsible for the Deposit until the funds have cleared into the Selling Broker's account, (b) the Selling Broker shall hold the Deposit in escrow once the funds have cleared and any other funds received by either Broker from any party will be held in trust for that party, (c) the Selling Broker may retain the commission due the Brokers prior to disbursement of the Deposit or Balance to Seller, and (d) in any dispute involving any funds held by the Brokers, Buyer and Seller will indemnify the Brokers for legal fees and costs relating in any way to the dispute, including those incurred in any appeals (which obligation is secured by a lien on the escrowed funds) and those relating to a claim for a commission, except as to a Broker found, in a final non-appealable judgment, to have engaged in willful misconduct or acted with gross negligence.

15. **Additional Terms.** See Addendum.
_____

16. **Miscellaneous.** This PSA, including its exhibits and schedules, is the *entire agreement* between the parties pertaining to the subject matter hereof and *supersedes* all prior and contemporaneous negotiations, agreements, representations, warranties, and understandings pertaining thereto, be they in writing, oral, or otherwise. If a Broker becomes a party to any litigation involving this PSA, the Broker shall be reimbursed for their costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this PSA. In the event of any dispute between the parties hereto arising out of the subject matter of this PSA, the prevailing party (including the Brokers) shall be entitled to recover reasonable expenses, attorney's fees and costs for all pretrial, trial and appellate proceedings. If any term, condition, or provision of this PSA is held to be unenforceable for any reason, it shall be interpreted to achieve the intent of the parties to this PSA to the extent possible rather than avoided. In any event, all other terms, conditions and provisions of this PSA shall be deemed valid and enforceable. There are no other duties, obligations, liabilities, or warranties, implied or otherwise, except as set forth herein. This PSA may not be amended or modified, except in writing, signed by Buyer and Seller. Notice and delivery given by or to the attorney or Broker representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by personal delivery, overnight courier, facsimile, email, or other electronic means, and shall be effective upon delivery with proof of delivery retained. Buyer may assign this PSA to

Buyer's Initials: _____     Seller's Initials: _____

©2020 International Yacht Brokers Association. All rights reserved.
Rev. 3.10.20

any member(s) of Buyer's immediate family or any entity owned or controlled by Buyer and/or any member(s) of his immediate family. Otherwise, neither party may assign this PSA without the other party's consent, which consent shall not be unreasonably withheld. No claim or right arising out of this PSA can be waived or discharged by one party, in whole or in part, unless in writing, nor shall any waiver be applicable except in the specific instance for which it is given. Paragraph headings are informational and included only for convenience.

**17.** __Governing Law and Dispute Resolution__. **Check (a), (b) or (c). If none checked, (a) will apply.** Any dispute involving this Agreement will be resolved: **(a)** ☐ in the courts located in the State of _____ (Florida, if left blank), **(b)** ☐ by binding arbitration in the State of _____ (Florida, if left blank), **(c)** ☐ by binding arbitration in London, England. *If (a) or (b) is selected:* (i) this Agreement will be governed by and interpreted according to the law of the State of _____ (Florida, if left blank) regardless of its principles of conflicts-of-laws and (ii) the proceedings will be conducted in the county of the main office of the Selling Broker, or if the Selling Broker has no office in Florida, in _____ (Fort Lauderdale, Florida, if no other city indicated). *If (b) is selected*, the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in force when the arbitration is commenced will apply unless the following rules apply: _____. If the amount in controversy including counterclaims is not more than USD $1,000,000.00, the parties shall jointly select a single arbitrator from the list of arbitrators maintained by the International Yacht Brokers Association ("IYBA") within twenty (20) days of the giving of notice of arbitration. If the parties are unable to agree upon the arbitrator, the IYBA shall have the power to make the appointment of the single arbitrator. If the amount in controversy is greater, the parties shall each appoint one arbitrator and the two arbitrators will jointly appoint a third arbitrator. If they cannot agree on the third arbitrator within 14 days, either party may request that the IYBA appoint the third arbitrator from the list of arbitrators maintained by the IYBA. The decision of the single arbitrator, or if a three abitrator panel, any two of them will be final and binding on the parties. An action may be brought in any court of competent jurisdiction to enforce any arbitral award or compel arbitration. If (c) is selected: (i) this Agreement will be governed by and interpreted in accordance with English law regardless of its principles of conflicts-of-laws, (ii) the parties irrevocably agree that any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Paragraph, (iii) the arbitration shall be conducted in accordance with the rules of London Maritime Arbitrators Association ("LMAA") current when the arbitration is commenced, (iv) if the amount in dispute (including counterclaims) is less than USD$100,000, its Small Claims Procedure will apply, while if greater than or equal to USD$100,000 and less than USD$400,000, its Intermediate Claims Procedure will apply. Whatever option is selected, the parties irrevocably submit to the exclusive jurisdiction of such court or arbitral forum, waive any objection they now or hereafter may have to venue or convenience of forum, agree that all claims relating to the proceeding will be decided only in such court or arbitral forum and, further, not to bring any claim relating to this Agreement in any other court or arbitral forum. The parties, having had the opportunity to seek legal counsel, waive trial by jury for claims arising under this Agreement, whether against each other or any Broker.

**BUYER:** _signature_

Print: Patrick Cloppenburg
Title: _____
Date: _____

**SELLER:** _signature_, as Trustee

Print: _Luc Despins_
Title: _Chapter 11 Trustee_
Date: _11/22/2023_

**SELLING BROKER DEPOSIT CONFIRMATION (Subject to clearance of funds)**

Print: _____
Title: _____

Amount: _____
Date: _____

Buyer's Initials: _initials_                                                    Seller's Initials: _initials_

                 ©2020 International Yacht Brokers Association. All rights reserved.          Rev. 3.10.20

*This form was prepared for the exclusive use and benefit of the members of the IYBA. The parties and Brokers hereby release the IYBA from any liability for damages resulting from or related to its use. The IYBA expressly disclaims any and all warranties, including merchantability and fitness for a particular purpose, related to the use of this form.*

**Addendum to Purchase and Sale Agreement for Brokerage Vessel, executed on November 22, 2023, Between (i) Luc A. Despins, as the Chapter 11 Trustee for the Estate of Ho Wan Kwok and (ii) Patrick Cloppenburg (the "Addendum")**

Capitalized terms used but not defined herein have the meanings set forth in the Purchase and Sale Agreement for Brokerage Vessel, executed on November 22, 2023, with respect to the Lady May II (the "PSA"). For the avoidance of doubt, any reference to the PSA (whether in this PSA or the Addendum) shall be to the PSA as modified by this Addendum.

1. Luc A. Despins is party to the PSA solely in his capacity as the chapter 11 trustee for the estate of Ho Wan Kwok, and not in his personal capacity. Accordingly, no claim whatsoever may be asserted by Buyer against Mr. Luc A. Despins in his personal capacity or Paul Hastings LLP.

2. Seller's obligations are subject to approval of the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), in which court the chapter 11 case of Ho Wan Kwok, Case No. 22-50073 (the "Chapter 11 Case"), is pending.

3. Notwithstanding anything in the PSA to the contrary, the Bankruptcy Court shall have exclusive jurisdiction over any claim or dispute in respect of or arising out of the PSA, and the parties and the Brokers irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court, waive any objection they now or hereafter may have to venue or convenience of forum, agree that all claims relating to the PSA will be decided in such court, and, further, not to bring any claim relating to the PSA in any other court. For the avoidance of doubt, all provisions in Section 17 of the PSA regarding the arbitration of any dispute involving the PSA are hereby deleted.

4. Notwithstanding anything in the PSA to the contrary, the PSA is governed by and interpreted according to the law of the State of New York regardless of its principles of conflicts-of-laws.

5. The fourth and fifth sentences in Section 1 of the PSA are hereby modified as follows:

> "Vessel" also includes all gear, machinery, equipment, furniture, fuel, consumables, and all registered or unregistered tenders, toys, articles and appurtenances on board the Vessel and/or included on the Vessel's listing specification as of the date of this **PSA. There will be no Exclusions List.**Agreement, except for items listed on the Exclusions List provided by the Seller or Listing Broker on the earlier of (a) five days from the Effective Date or (b) the Accept/Reject Date, which items are not included in the sale.  Buyer will be deemed to have accepted the Exclusion List if it accepts the Vessel.

1

6. The eighth sentence in Section 1 of the PSA is hereby modified as follows:

> **There shall be no** ~~If there is a~~ Trade Allowance **in connection with the sale of the Vessel pursuant to this PSA**, ~~the conditions of the trade-in will be governed by the attached Trade-In Vessel Addendum~~.

7. Section 2 of the PSA is hereby modified as follows:

> ~~Within ____ business days (3 business days if left blank)) following Seller's signature of this PSA,~~ **On [----], 2023,** Buyer ~~paid~~**shall pay** the Deposit to the **Seller's**~~Selling Broker's~~ account, as acknowledged below, as a deposit toward the Purchase Price to be held **in escrow** subject to the terms of this PSA. Seller may refuse to permit Buyer to proceed with the trial run, survey and other inspection of the Vessel until the Deposit has cleared into the **Seller's**~~Selling Broker's~~ escrow account.

8. Section 3 of the PSA is hereby modified as follows:

> **Buyer agrees to purchase the Vessel on an "as is, where is" basis, i.e., neither Seller nor the Brokers give any warranty, either expressed or implied, and make no representation as to the condition of the Vessel, its fitness for any particular purpose or merchantability, all of which are disclaimed. For the avoidance of doubt, Buyer may not reject the Vessel for any reason, and by signing this PSA, Buyer agrees to accept the Vessel on an "as is, where is" basis.** ~~Buyer's obligation to purchase the Vessel is subject to Buyer's satisfaction, in Buyer's sole discretion, with a trial run and survey of the Vessel though Buyer may elect not to have the Vessel inspected. If inspected: (a) Buyer will select the surveyor, (b) the surveyor, and not the Brokers, will be the sole party responsible for any errors or omissions with respect to the survey, notwithstanding that the Brokers may have provided information to and assisted Buyer with hiring the surveyor, (c) Seller shall make the Vessel available and Buyer shall complete the trial run and survey as soon as practicable, (d) Seller shall pay all running expenses for, and assume the risks associated with, the trial run, and Buyer shall pay all costs of the survey, including associated costs, e.g., haul-out, dry-dock, and subcontractors' charges, (e) Buyer and its surveyor will be solely responsible for determining the scope of the survey and the trial run to assess the Vessel's conformity with Buyer's requirements and (f) Buyer shall deliver written notice of rejection or acceptance of the Vessel to Seller or the Listing Broker on or before the Accept/Reject Date. Whether or not Buyer has inspected the Vessel, Buyer will be deemed to have rejected the Vessel if it fails to give timely written notice of its acceptance. Upon Buyer's acceptance of the Vessel,~~ Seller will not make any use of the Vessel pending

Closing (defined in Paragraph 4) except to move the Vessel to the Delivery Location. ~~If Buyer rejects or is deemed to reject the Vessel, after all expenses incurred on Buyer's behalf have been paid, (i) the Selling Broker shall return the Deposit to Buyer, (ii) this PSA will terminate, and (iii) the parties and the Brokers will be released from any further liability hereunder. The Brokers will not be responsible for the cost to correct any defects or deficiencies noted during the trial run and survey.~~

9. The sixth sentence in Section 4 of the PSA is hereby modified as follows:

At Closing, Buyer shall pay the Balance to Seller (subject to Paragraph 6) **and the Deposit shall be released to Seller, subject to the deduction in the immediately following sentence**~~and/or to the Selling Broker for onward transfer to Seller by wire transfer~~. Any funds Seller owes to ~~(i)~~ the Brokers for the commission, storage, insurance, repairs and/or other items **(which are subject to approval of the Bankruptcy Court)**~~or (ii) the holder of any other Encumbrance,~~ will be deducted from the ~~amount due Seller by the Selling Broker prior to disbursement of funds to Seller, which hereby irrevocably instructs any Deposit holder to pay the Commission from the Deposit to the Brokers pursuant to the terms hereof~~**Deposit and paid to the Brokers prior to the release of the Deposit to Seller. For the avoidance of doubt, the order of the Bankruptcy Court approving the sale of the Vessel to Buyer shall provide that the Vessel is being sold free and clear of any Encumbrances, with any Encumbrances attaching to the proceeds of the sale.**

10. The second sentence of Section 5 of the PSA is hereby modified as follows:

If the Listing Broker and the Selling Broker are the same brokerage, the parties consent to that Broker acting as a dual-agent in this transaction, i.e., representing both Buyer and Seller~~, and the Broker may disclose to both parties facts known to the Broker materially affecting the Vessel's value or desirability~~; provided, however, that in such instance **(a)** the Broker shall not, without Seller's consent, disclose to Buyer that Seller is willing to sell the Vessel for an amount less than the asking price **and (b) the Broker have no duties to the Buyer in connection with the sale of the Vessel**~~or, without Buyer's consent, disclose to Seller that Buyer is willing to pay a price greater than the offering price~~.

11. The second sentence of Section 6 of the PSA is hereby modified as follows:

No less than two (2) business days before Closing, Seller shall deliver to Buyer (a) satisfactory evidence of title, (b) proof of payment or removal of all Encumbrances (except for those encumbrances that will be paid in

3

full at closing)**, which proof may be the order entered by the Bankruptcy Court approving the sale of the Vessel (and which order shall provide that the Vessel is being sold to Buyer free and clear of any Encumbrances)**, ~~(c) a guaranty and indemnification from Seller guaranteeing Seller's representations and warranties in this Paragraph 6, (d) if Seller is a legal entity, a personal guaranty and indemnification from Seller's beneficial owner(s) guaranteeing Seller's representations and warranties in this Paragraph 6,~~ and (**c**~~e~~) copies of any other documents necessary for transfer of good and marketable title to Buyer.

12. The second and third sentences of Section 7 of the PSA are hereby modified as follows:

If the Vessel is damaged subsequent to Buyer's acceptance and the necessary repairs will cost less than five percent (5%) of the Purchase Price and require fewer than 30 days to complete, then**, at the Seller's option,** (~~a~~) Seller **may**~~must~~ repair the damage prior to Closing in accordance with sound marine practices to the standard of the Vessel immediately prior to the damage and Buyer may inspect such repair, **in which case** (**a**~~b~~) Buyer **shall**~~must~~ pay the Balance and take delivery of the Vessel as repaired~~,~~ and (**b**~~c~~) the Closing Date will be extended by the length of the repair period. If the Vessel is damaged to a greater extent subsequent to Buyer's acceptance **or Seller does not exercise the option in the foregoing sentence**, either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel.

13. Section 8 of the PSA is hereby modified as follows:

Notwithstanding anything herein to the contrary, if ~~the Deposit is not paid when due or~~ Closing is not consummated due to Buyer's non-performance, including, without limitation, failure to pay the Balance or execute all documents necessary for completion of the purchase by the Closing Date: (i) the Deposit shall be retained by ~~(or if the Deposit was not paid, Buyer shall pay a like amount to)~~ Seller ~~and the Brokers~~ as liquidated and agreed damages, as consideration for the execution of this PSA, in full settlement of all claims between the parties, (ii) the Selling Broker shall return to Buyer any other funds received from Buyer, and (iii) the parties will be relieved of all obligations under this PSA**, provided, however, that in the event that, after the Bankruptcy Court has approved this PSA, the Closing is not consummated due to Buyer's non-performance, Seller shall pay to the Listing Broker an amount equal to $5,500 out of the Deposit, which amount shall count against, and reduce, any commission that the Listing Broker may earn (in accordance with its engagement letter with Seller) if a sale of the Vessel is consummated with a different buyer**. ~~Buyer and Seller agree that the Deposit will be applied first to payment of any~~

4

~~unpaid costs or expenses that Buyer or Broker incurred against the Vessel and then divided fifty percent (50%) to the Seller and fifty percent (50%) to the Brokers, which the Brokers shall divide in the same proportions as the commission would have been divided had a sale been consummated.~~ If by the Closing Date the Closing is not consummated due to Seller's non-performance **(which, for the avoidance of doubt, shall not include the Bankruptcy Court declining to approve this PSA)**, the Deposit, and any other money paid or deposited by Buyer~~,~~ **,** pursuant to this PSA, will be returned to Buyer upon demand ~~or Buyer will have the right of specific performance. Seller agrees that specific performance is reasonable in light of the uniqueness of the Vessel, difficulty of proof of loss, and the inconvenience or impossibility of otherwise obtaining an adequate remedy.~~ **If by the Closing Date the Closing is not consummated due to Seller's non-performance**~~On Seller's default~~, Seller shall forthwith pay the Brokers the same commission otherwise payable had the transaction closed**; provided, however, that the Bankruptcy Court declining to approve this PSA shall not constitute non-performance on the part of Seller. In the event the Bankruptcy Court does not approve this PSA, this PSA shall be deemed terminated with the same consequences as if Buyer had rejected the Vessel in accordance with this PSA. Notwithstanding anything in this PSA to the contrary, if the Closing is not consummated for any reason (including (a) due to the Buyer's non-performance of its obligations under this PSA, (b) the Bankruptcy Court does not approve this PSA, or (c) the Buyer rejects the Vessel in accordance with this PSA), Seller shall have the option to purchase the survey from Buyer at cost and, if the Seller exercises this option, Buyer shall provide the complete survey to Seller immediately upon payment of the cost of such survey.**

14. The first sentence of Section 9 of the PSA are hereby modified as follows:

Sales or use taxes payable on Buyer's purchase of the Vessel, if applicable, are Buyer's responsibility, and Buyer shall pay the taxes due to the **Trustee**~~Selling Broker~~ at Closing.

15. The following sentence is hereby added after the first sentence of Section 11 of the PSA:

**Buyer represents and warrants that it has sufficient cash and/or financing to fund the Purchase Price at Closing. Buyer also represents and warrants that it is not affiliated with or related to Ho Wan Kwok and/or is not acting on behalf of or at the behest of Ho Wan Kwok.**

16. Section 14 of the PSA are hereby modified as follows:

5

The parties acknowledge that (a) the **Seller**~~Selling Broker~~ will not be responsible for the Deposit until the funds have cleared into the **Seller's**~~Selling Broker's~~ account, (b) the **Seller**~~Selling Broker~~ shall hold the Deposit in escrow once the funds have cleared and any other funds received by either Broker from any party will be held in trust for that party, (c) the **Seller**~~Selling Broker~~ **shall pay, in accordance with this PSA,**~~may retain~~ the commission due the Brokers prior to **the release**~~disbursement~~ of the Deposit ~~or Balance~~ to Seller, and (d) in any dispute involving any funds held by the Brokers, Buyer and Seller will indemnify the Brokers for legal fees and costs relating in any way to the dispute, including those incurred in any appeals (which obligation is secured by a lien on the escrowed funds) and those relating to a claim for a commission, except as to a Broker found, in a final non-appealable judgment **of the Bankruptcy Court**, to have engaged in willful misconduct or acted with gross negligence.

17. The second and third sentences of Section 16 of the PSA are hereby modified as follows:

If a Broker becomes a party to any litigation involving this PSA, the Broker shall be reimbursed for their reasonable costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this PSA**, unless such Broker is found, in a final non-appealable judgment of the Bankruptcy Court, to have engaged in willful misconduct or acted with gross negligence**. In the event of any dispute between the parties hereto arising out of the subject matter of this PSA, the prevailing party (including the Brokers) shall been titled to recover reasonable expenses, attorney's fees and costs for all pretrial, trial and appellate proceedings**, unless such prevailing party is found, in a final non-appealable judgment of the Bankruptcy Court, to have engaged in willful misconduct or acted with gross negligence**.

18. The ninth and tenth sentences of Section 16 of the PSA are hereby modified as follows:

~~Buyer may assign this PSA to any member(s) of Buyer's immediate family or any entity owned or controlled by Buyer and/or any member(s) of his immediate family. Otherwise, n~~**N**either party may assign this PSA without the other party's consent~~, which consent shall not be unreasonably withheld~~.

19. In the signature block on page 4 of the PSA, the phrase "Selling Broker Deposit
    Confirmation (Subject to clearance of funds)" is hereby modified to read: "Seller Deposit
    Confirmation (Subject to clearance of funds)".

**Seller**

By: _____

Name: Luc A. Despins, as chapter 11 trustee
for the estate of Ho Wan Kwok

Date: _____

**Buyer**

By: _____

Name: Patrick Cloppenburg

Title: _____

Date: _____

7

**Second Addendum to Purchase and Sale Agreement for Brokerage Vessel, executed on November 22, 2023, Between (i) Luc A. Despins, as the Chapter 11 Trustee for the Estate of Ho Wan Kwok and (ii) Patrick Cloppenburg (the "Second Addendum")**

Capitalized terms used but not defined herein have the meanings set forth in the Purchase and Sale Agreement for Brokerage Vessel, executed on November 22, 2023, with respect to the Lady May II (the "PSA") and the addendum thereto, executed on the same date (the "First Addendum").

1. Buyer agrees that Seller may, prior to Closing, winterize the Vessel and place the Vessel into winter storage at Safe Harbor Newport Shipyard in Newport, Rhode Island (the "Newport Shipyard").

2. Buyer agrees to pay to the Seller, at Closing, (a) the pro-rated portion of storage costs for the remainder of the winter storage at the Newport Shipyard (*i.e.*, from the Closing Date to April 15, 2024) and (b) the cost of winterizing the Vessel (subject to a $3,000 cap for such cost of winterizing). For the avoidance of doubt, Seller shall not be responsible for any post-Closing costs of transferring or relocating the Vessel after it has been placed into winter storage at the Newport Shipyard.

3. The Parties agree to proceed with Closing as soon as practicable after the PSA (as amended by the First Addendum and this Second Addendum) has been approved by the Bankruptcy Court.

**Seller**

By: _Luc Despins, as trustee_

Name: Luc A. Despins, as chapter 11 trustee for the estate of Ho Wan Kwok

Date: _____

**Buyer**

By: _Klopp_

Name: Patrick Cloppenburg

Title: _____

Date: _23.11. 2023_

1

<u>**EXHIBIT C**</u>

**Johnson Declaration**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

------------------------------------------------------x
                           :

In re:                         :    Chapter 11
                           :

HO WAN KWOK, *et al.*,[1]   :    Case No. 22-50073 (JAM)
                           :

         Debtors.    :    (Jointly Administered)
                           :
------------------------------------------------------x

**DECLARATION OF DIRK JOHNSON IN SUPPORT OF TRUSTEE'S MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363, BANKRUPTCY RULES 2002, 6004(c), AND 9014, AND LOCAL RULES 6004-1 AND 6004-2, SEEKING ENTRY OF ORDER: (I) AUTHORIZING AND APPROVING SALE OF LADY MAY II FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) AUTHORIZING AND APPROVING PURCHASE AND SALE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

       I, Dirk Johnson, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

       1.     I am a Yacht Broker at Edmiston and Company Limited ("Edmiston"), maintaining offices at (a) 2 Marina Plaza, Newport, Rhode Island, 02840, and (b) Burleigh Manor, Peel Road, Douglas, Isle of Man, IM1 5EP.

       2.     I am duly authorized to make this declaration (this "Declaration") on behalf of Edmiston and submit this Declaration in support of the *Trustee's Motion, Pursuant to Bankruptcy Code Sections 105 and 363, Bankruptcy Rules 2002, 6004(c), and 9014, and Local Rules 6004-1 and 6004-2, Seeking Entry of Order: (i) Authorizing and Approving Sale of the*

---

[1]   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

*Lady May II Free and Clear of Liens, Claims, Interests, and Encumbrances, (ii) Authorizing and*
*Approving Purchase and Sale Agreement, and (iii) Granting Related Relief* (the "Motion")[2] in
the chapter 11 case of Ho Wan Kwok (the "Debtor"), seeking an order approving and authorizing
the sale of the Lady May II to Patrick Cloppenburg (the "Buyer").

3.      I am a Yacht Broker based in Newport, Rhode Island, since 1991, and have been
employed by Edmiston for 3 years.  I have approximately 15 years of experience in the
brokerage industry.  Edmiston is a broker specializing in the sale of yachts.  Edmiston currently
is the broker for numerous yachts in the United States and worldwide. In addition, in the past 24
months, approximately, Edmiston has sold more than 70 yachts, more than double the industry
average of deals per broker.

4.      On April 18, 2023, Edmiston was retained by the Trustee to market and sell the
Lady May and the Lady May II, which retention was approved by order of the Court, dated April
27, 2023.  On June 27, 2023, the Court approved the sale of the Lady May by the Trustee for a
purchase price of $23,150,000.  The sale of the Lady May closed on June 30, 2023.

5.      Unless otherwise indicated below, I have personal knowledge of the matters set
forth below, and if called to testify, I could and would testify competently thereto.

### Marketing of Lady May II

6.      Since its retention, Edmiston has engaged in an extensive marketing campaign to
sell the Lady May II to the highest bidder.  Edmiston has canvassed for potential buyers, both
within its own network of potential buyers as well as throughout the industry, as well as
advertised the Lady May II both online and in print.  These marketing efforts were initially
focused on residents outside of the United States and, following the Lady May II being formally

---

[2]    Capitalized terms used but otherwise not defined herein shall have the meaning ascribed to them in the Motion.

imported into the United States on July 30, 2023, Edmiston expanded its efforts to also include

U.S. residents.

7.      Among other things, as part of its marketing efforts:

(1)    Edmiston created an electronic brochure of the Lady May II, including
       photographs and listing its specifications, which brochure was included
       in industry-wide announcements to other yacht brokers as well as posted
       on Edmiston's website and social media;

(2)    Edmiston engaged in a direct client email marketing campaign, which
       featured the Lady May II in its monthly mailer update (distributed to
       approximately 10,000 clients and other potentially interested parties);

(3)    Edmiston used extensive digital advertising to market the Lady May II
       on its website and social media accounts, including Instagram,
       Facebook, LinkedIn and YouTube; and

(4)    Shortly after the Lady May II was imported into Newport, Rhode Island,
       Edmiston issued further announcements regarding the Lady May II on
       its website and social media.

8.      In order to connect the Lady May with Edmiston's network of industry brokers,

Edmiston emailed single and multi-yacht mailers for new yacht listings, sales updates, location

updates, price reductions and yachting events.  In addition, the Lady May II has been featured in

six business email distributions since Edmiston's retention, each of which was sent to

approximately 1,875 brokers in the yacht industry.  Furthermore, beginning in mid to late August

2023, the Lady May II was also listed on Yatco.com and Yachtworld.com, which are online

business-to-business (B2B) search facilities that centralize brokerage information for the yacht

industry—similar to MLS (multiple listing service) for real estate sales.

9.      Edmiston also invited the buyer of the Lady May to see Lady May II (including

arranging for a sea trial) in hope he would purchase the tender and rejoin the Lady May II to the

Lady May (now called the Excellence V), but he declined to purchase the Lady May II.

3

10.    Furthermore, Edmiston entered the Lady May II in the Newport Brokerage boat show from September 14, 2023 through Sunday, September 17, 2023, which showcased the Lady May II, in a premium slip (to increase visibility), along with approximately 60 other high quality yachts being offered for sale.  During the four-day event, there were approximately thirty visits of the Lady May II, with six parties expressing potential continued interest in the Lady May II.

11.    Edmiston is also the title sponsor of the London Heliport and used this platform to advertise the Lady May by featuring it in Edmiston's brand collateral (*i.e.*, Edmiston's branded marketing materials) that is deployed throughout the London Heliport.  Similarly, the Lady May was featured in Edmiston's brand collateral deployed across private aviation terminals in the East Hamptons and Cabo St. Lucas.  Edmiston has also teamed up with Europe's leading private jet airport, Farnborough, to provide a fully immersive experience for guests traveling through the airport and Edmiston utilized this platform to further advertise the Lady May.

12.    In addition to all of the foregoing, I reached out, and received calls from, numerous other brokers as well as prospective buyers about the Lady May II.

**Bidding Process**

13.    In order to stimulate a competitive bidding process, including among those who had informally expressed interest in the Lady May II, the Trustee decided to pursue a similar bidding process as had been employed for the sale of the Lady May.  In particular, the Trustee (through Edmiston) advised the interested parties (and other parties) that the deadline to submit best and final bids was of Wednesday, October 4, 2023, at 5:00 p.m. (ET).  This deadline was chosen to maintain maximum momentum with the interested parties.  Commencing on September 26, 2023, Edmiston sent emails to the parties that had previously express an interest

4

in the Lady May II, as well as other parties, advising them of the October 4, 2023 bid deadline.

In that email, interested bidders were also advised that (a) due to the fact that the Trustee had

received interest for the Lady May II from several potential buyers, Edmiston was inviting all

interested parties to present their best and final offer prior to the October 4, 2023 bid deadline

and (b) any such bid would have to comply with the following requirements:

- Only bids with a purchase price in excess of $550,000 would be considered by the Trustee;

- Offers must be based on the Trustee's form of purchase agreement;

- To the extent the prospective buyer intended to modify the form of purchase agreement, mark-up of the agreement should be included as part of the bid (and advising the parties that such modifications, if any, would be evaluated in determining the highest and/or best offer);

- The winning bid must provide for a 25% deposit of the purchase price, which deposit must be received within 48 hours after such bid has been selected as the winning bid;

- The 25% deposit would be forfeited if the winning bidder fails to close on purchase of Lady May II in accordance with terms of purchase agreement (subject to the right to reject the Lady May II if the survey reveals a defect affecting the operational integrity of the Lady May II or her machinery or her systems or renders the Lady May II unseaworthy);

- The purchase agreement must be executed by October 9, 2023;

- The Lady May II must be accepted or rejected (based on results of survey) by October 18, 2023;

- In the event the winning bidder does not close on the purchase at the price set forth in the purchase agreement, the Trustee may, at his option, purchase the survey from the buyer, at cost;[3]

- Closing would take place as soon as practical on or before November 17, 2023;

---

[3]   The Trustee included this provision in order to avoid the delay of potential second survey in the event that the sale with the winning bidder does not close (for whatever reason) and the Trustee has to proceed with another purchaser. In that event, the Trustee would provide the survey results to such other purchaser, instead of such purchaser having to conduct another survey.

- All bids would be subject to bankruptcy court review and approval; and

- All bids had to be sent directly to the Trustee.

14.     In addition, on September 28, 2023, Edmiston circulated emails to more than

1,875 other brokers advising them of the deadline to submit best and final bids and that such bids

would be subject to certain conditions, including a minimum bid of $550,000. As with the email

to the interested parties, the email distribution advised the brokers that the Trustee was setting

October 4, 2023 as the deadline to submit best and final bids due to multiple offers received to

date. Furthermore, Edmiston also updated the Yatco.com and Yachtworld.com listing for the

Lady May II to advise interested parties of the bid deadline and the minimum bid requirement.

15.     Unfortunately, there was not significant additional interest in the Lady May II.

As of 5:00 p.m. (ET) on October 4, 2023, only one (1) formal bid was received from prospective

buyers. That bid was not a qualified bid, as the proposed purchase prices was well below the

minimum bid requirement.

16.     Following receipt of this bid, the Trustee engaged in further discussions with

prospective buyers and other interested parties. During these discussions, the Buyer indicated

that he would be interested in purchasing the Lady May II for $350,000. Ultimately, after further

negotiations, the Buyer agreed to increase the purchase price for the Lady May II to $375,000

million and, moreover, agreed to purchase the Lady May II on an "as is, where is" basis.

17.     I believe that the Buyer's bid (a) is the highest and best bid (including because the

Buyer does not require any modifications to the form of purchase agreement proposed by the

Trustee (other than that closing of the Sale occurs by December 31, 2023)), (b) provides for a

sale on an "as is, where is" basis, and (c) is the product of an arms' length negotiation process.

In addition, based on my interactions with the Buyer, I believe that the Buyer has proceeded in

good faith during the entirety of the bidding and negotiation process.

18.    Finally, I believe that the purchase price offered by the Buyer pursuant to the PSA is the best available price for the Lady May II and that implementing formal bidding procedures and running a public auction process would not increase the purchase price, but rather would risk losing the Buyer.  Accordingly, I believe that proceeding with the Sale under the PSA is in the best interest of the Debtor's estate.

## Auction Process Would Not Have Been Beneficial

19.    I believe that there would have been no incremental benefit to first seeking approval of formal bidding procedures and running a public auction, in light of the nature of the property to be sold and the pool of potential buyers.  To the contrary, conducting an auction would likely have discouraged the Buyer from bidding and/or making their best offer.  Potential buyers would likely not have participated in a process that would have exposed them to the risk of overpaying (if selected as the winning bidder in an auction), and, to the extent they would have participated in such a process, they would likely have discounted their bids to reflect that risk.  Moreover, despite the extensive marketing to date, there is only one potential buyer at this time (*i.e.*, the Buyer), thus calling into question the utility of conducting an auction.

20.    Moreover, it is unlikely that an auction process would have attracted any additional interest beyond the parties that Edmiston (through its extensive network of clients and connections to other brokers) was able to attract.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 27, 2023

Dirk Johnson
Broker
Edmiston and Company Limited