```
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF CONNECTICUT
 2                        BRIDGEPORT DIVISION

 3
     IN RE:                        .  Chapter 11
 4                                 .  Case No. 22-50073 (JAM)
     HO WAN KWOK AND GENEVER       .
 5   HOLDINGS CORPORATION AND      .  (Jointly Administered)
     GENEVER HOLDINGS, LLC,        .
 6                                 .
              Debtors.             .
 7                                 .
     . . . . . . . . . . . . . . . .
 8                                 .
     LUC A. DESPINS, CHAPTER 11    .  Adversary Proceeding
 9   TRUSTEE,                      .  No. 23-05008 (JAM)
                                   .
10            Plaintiff,           .
                                   .  Courtroom 123
11   v.                           .  Brien McMahon Federal Building
                                   .  915 Lafayette Boulevard
12   MEI GUO,                      .  Bridgeport, Connecticut 06604
                                   .
13            Defendant.           .  Monday, December 18, 2023
     . . . . . . . . . . . . . . . .  2:36 p.m.
14

15

16                       TRANSCRIPT OF HEARING
                   BEFORE THE HONORABLE JULIE A. MANNING
17                  UNITED STATES BANKRUPTCY JUDGE

18

19

20   Audio Operator:          Electronically recorded

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1 | APPEARANCES:

2 | For the Chapter 11
Trustee:                    Patrick R. Linsey, Esquire
3 |                         NEUBERT PEPE & MONTEITH, P.C.
                            195 Church Street
4 |                         13th Floor
                            New Haven, Connecticut 06510
5 |
                            -and-
6 |
                            Georg A. Bongartz, Esquire
7 |                         Luc A. Despins, Esquire
                            PAUL HASTINGS, LLP
8 |                         200 Park Avenue
                            New York, New York 10166
9 |

10 | For the U.S. Trustee:    Holley, L. Claiborn, Esquire
                            OFFICE OF THE UNITED STATES TRUSTEE
11 |                        Robert N. Giaimo Federal Building
                            150 Court Street
12 |                        Room 302
                            New Haven, Connecticut 06510
13 |

14 | For Mei Guo:            James M. Moriarty, Esquire
                            ZEISLER & ZEISLER, P.C.
15 |                        10 Middle Street
                            Bridgeport, Connecticut 06604
16 |
                            -and-
17 |
                            Melissa F. Wernick, Esquire
18 |                        CHIESA SHAHINIAN & GIANTOMASI, P.C.
                            105 Eisenhower Parkway
19 |                        Roseland, New Jersey 07068

20 | For Taurus Fund LLC,
Scott Barnett as
21 | trustee of Taurus Fund
LLC, and Taurus
22 | Management LLC, as
trustee of Taurus
23 | Fund LLC:               Michael T. Conway, Esquire
                            LAZARE POTTER GIACOVAS & MOYLE
24 |                        747 Third Avenue
                            16th Floor
25 |                        New York, New York 10017

1                                    INDEX

2    MOTIONS:                                                      PAGE

3    Matter
     No. 2375   Motion to Sell / Trustee's Motion, Pursuant to        5
4               Bankruptcy Code Sections 105 and 363,
                Bankruptcy Rules 2002, 6004(c), and 9014, and
5               Local Rules 6004-1 and 6004 2, Seeking Entry
                of Order: (I) Authorizing and Approving Sale
6               of the Lady May II Free and Clear of Liens,
                Claims, Interests, and Encumbrances, (II)
7               Authorizing and Approving Purchase and Sale
                Agreement, and (III) Granting Related Relief
8               Filed by Georg Alexander Bongartz on behalf of
                Luc A. Despins, Chapter 11 Trustee.
9
                Court's Ruling:                                      18
10
     Matter
11   No. 2429   Order Scheduling Status Conference on Notice         23
                Regarding Motion for Return of Property Filed
12               by Alleged Customers of Himalaya Exchange in
                Debtor's Criminal Proceedings
13
                Court's Ruling:                                      --
14
     Matter
15   No. 67     Order Scheduling Status Conference Regarding         23
                Order Compelling Anton Development Limited,
16               Whitecroft Shore Limited, and the Defendant to
                Comply with Subpoenas and Awarding Sanctions
17               and Authorizing Chapter 11 Trustee to File
                Documents Under Seal.
18
                Court's Ruling:                                      --
19
20   Transcriptionists' Certificate                                 83

21

22

23

24

25

1         (Proceedings commenced at 2:36 p.m.)

2         THE CLERK:  Case Number 22-50073, Ho Wan Kwok, and

3  Adversary Number 23-05008, Despins v Guo.

4         THE COURT: Good afternoon.  If we could have

5  appearances for the record, starting with the Chapter 11

6  Trustee, please.

7         MR. DESPINS:  Good afternoon, Your Honor.  Luc

8  Despins, Chapter 11 trustee.

9         THE COURT:  Good afternoon.

10        MR. BONGARTZ:  Good afternoon, Your Honor.  Alex

11  Bongartz of Paul Hastings for the Chapter 11 trustee.

12        THE COURT:  Good afternoon.

13        MR. LINSEY:  Good afternoon, Your Honor.  Patrick

14  Linsey for the trustee.

15        THE COURT:  Good afternoon.

16        MS. CLAIBORN:  Good afternoon.  Holley Claiborn

17  for the U.S. Trustee.

18        THE COURT:  Good afternoon.

19        MR. MORIARTY:  Good afternoon, Your Honor.  James

20  Moriarty from Zeisler & Zeisler for the debtor in 22-50037

21  and as local counsel for Ms. Guo in 23-05008.

22        THE COURT:  Good afternoon.

23        MR. MORIARTY:  Good afternoon.

24        MS. WERNICK:  Good afternoon, Your Honor.  Melissa

25  Wernick from CSG Law, on behalf of the defendant Mei Guo in

1  the adversary proceeding.

2           THE COURT:  Good afternoon.

3           Is there anyone else that wishes to note their

4  appearance this afternoon?

5           (No verbal response)

6           THE COURT:  Okay.  Thank you.

7           All right.  There are certain matters on the

8  calendar this afternoon that, I'm not sure, Trustee Despins,

9  how you want to proceed, so how would you like to proceed?

10          MR. DESPINS:  It would probably make sense, Your

11 Honor, to start with the sale of the small (indiscernible) --

12          THE COURT:  It seems to make sense, yes; although,

13 that is scheduled for 3:00 p.m., but there are no objections

14 and you had no other bids is my understanding.

15          Is that correct?

16          MR. DESPINS:  That's --

17          MR. BONGARTZ:  That is -- I'm sorry -- that is

18 correct.

19          May I approach?

20          THE COURT:  Yes, please, thank you.

21          So right now, we're going to be addressing ECF

22 Number 2375.

23          MR. DESPINS:  Yes.

24          MR. BONGARTZ:  Thank you, Your Honor.

25          Good afternoon.  This is, again, Alex Bongartz of

1  Paul Hastings for the Chapter 11 trustee.

2           Just one small housekeeping matter before I get

3  started.  Dirk Johnson, who is the declarant in support of

4  the sale motion at Docket 2375 had not -- unfortunately was

5  not able to travel down here due to the weather and I saw

6  that Your Honor granted our request to have him appear

7  remotely.

8           He is available, although, I think because the

9  time -- the schedule start time was 3 o'clock, he may not yet

10 be on the Zoom, but if Your Honor does have questions, I

11 would be more than happy to contact him and he can join

12 sooner than that.

13           THE COURT:  Okay.

14           MR. BONGARTZ:  In any event, let me just right

15 into the motion.  The motion, we filed on November 27 at

16 Docket 2375 seeks the approval of the proposed sale of the

17 Lady May II to Patrick Cloppenburg.  I will refer to him as

18 "the buyer."  The proposed sale will be free and clear of all

19 liens, claims, and encumbrances, pursuant to the purchase

20 agreement, dated November 22nd, 2023, and the related

21 addenda, thereto.

22           A few things to highlight, the sale would be on an

23 "as-is, where-is" basis, no representations or warranties as

24 to the condition of the Lady May II would be given by the

25 estate.  The proposed purchase price is $375,000.  The buyer

1    has already made a good faith deposit in the amount of 25

2    percent of the purchase price, which is $93,750.

3              Your Honor has already correctly noted, no

4    objections have been filed to the motion and I'd be happy to

5    walk Your Honor through the marketing process, the sale

6    agreement, or any other questions that you have, but in light

7    of the lack of objections, I would request that the Court

8    grant the motion.

9              THE COURT:  The only thing I would like you to do,

10   counsel, is just walk through the marketing and the service

11   of the motion.  I know there was a notice of sale posted on

12   the Court's website, but I do think the record should contain

13   representations, with regard to the marketing of the asset

14   and the service of the motion and the objection deadlines and

15   that so that the record is complete, okay?

16             MR. BONGARTZ:  Absolutely.  Thank you, Your Honor.

17             THE COURT:  Thank you.

18             MR. BONGARTZ:  So let me take a step back and

19   actually start with the marketing process, prior to the

20   filing of the motion.  Edmiston engaged in an extensive

21   marketing campaign.  They've canvassed the market of

22   potential buyers and sent out mailers and emails to their

23   distributions of their entire network of brokers and parties

24   that might be potentially interested.

25             The Lady May II was also displayed at the Newport

1  Boat Show in mid-September 2023.  There were some initial

2  expressions of interest and we reached out to each of those

3  parties and provided them with a copy of the proposed -- the

4  form of proposed purchase-and-sale agreement.  Unfortunately,

5  by the proposed October 4 bid deadline, the trustee did not

6  receive any qualified bids from any of the parties that had

7  expressed tentatively, an interest.

8          The only bid that was received was for $150,000,

9  which was far below what our expectation was and also, in

10  fact, far below the minimum bid that we had asked from those

11  parties who had expressed interest.

12          Following the bid deadline, the trustee did not

13  stop there.  We continued to engage both, with the one bidder

14  that had submitted a bid for $150,000, as well as the

15  purchaser of the Lady May, as you will recall, earlier this

16  year, but that buyer had no interest in purchasing the Lady

17  May II.

18          As far as the service of the motion is concerned,

19  I should note that we served it on the ECF list, obviously,

20  and those who did not seek or did not agree to accept

21  services by email, we served a hard copy on those parties on

22  the ECF list.  We also served, in accordance with Your

23  Honor's order, we served a copy of the sale notice on the

24  Committee and I believe copy of the sale notice, as well as

25  your hearing notice, were also served on everyone on the ECF

1    list.

2          I would like to make one clarification, and I

3    apologize for any oversight, but due to some

4    miscommunication, the underlying motion was not served,

5    again, on the proposed -- on the handful of parties that had

6    initially expressed an interest, but never submitted a bid.

7    They did get a copy of the PSA, though, as part of the

8    bidding process and, I should also note as we explained in

9    the supplemental declaration this morning, the broker, after

10   the motion had been filed, sent a global notice to this

11   entire network of brokers with the -- with all of the

12   relevant information, the purchase price, the -- sorry, let

13   me -- the proposed purchase price, as well as the hearing

14   date, as well as the December 15 requested deadline for any

15   further and final bids.  And on top of all of that, the

16   broker also updated the YATCO and YachtWorld listings, both

17   of which also have now included the additional information

18   about the hearing date.  To be super clear, all these things,

19   the email distributions, as well as the updates to the YATCO

20   and YachtWorld listings were done on November 30th.  So

21   that's -- has been now, 19 days ago.

22          I should also note that certificate of service

23   that described the service of the motion was filed at Docket

24   2418.

25          Thank you, Your Honor.

1          THE COURT:  Thank you.

2          And I haven't seen yet, but I'm looking at a

3   supplemental declaration of Dirk Johnson, who is not going to

4   be here in person, because he had travel issues.  That was

5   filed at 9:48 this morning.

6          MR. BONGARTZ:  Yes, that is correct, Your Honor.

7          THE COURT:  And I'm looking at that, because I'm

8   taking that into account as evidence in support of the

9   marketing of the Lady May II and the service and discussions

10  that were made in connection with the sale of the Lady May

11  II.  And it has several exhibits attached to it, including a

12  brochure of the boat.

13         MR. BONGARTZ:  Yes, just to explain really brief

14  what the declaration shows, is that, as I mentioned earlier,

15  there was a global email distribution to 1875 brokers, that's

16  on Exhibit A, and that includes on the very first page, to do

17  so hearing date, the proposed sale price, as well as the

18  request for any final bids by December 15th.  And then the

19  other exhibits are just the updates to the YATCO and

20  YachtWorld listing to include the same information.

21         THE COURT:  I'm just reviewing the document right

22  now, so if you will just bear with me for a moment, please.

23      (Pause)

24         THE COURT:  All right.  I have reviewed the

25  supplemental declaration of Mr. Johnson in support of the

1 motion to sell the Lady May II and I see that the documents

2 filed on the docket of the case are what you described on the

3 record here today, including information regarding the

4 marketing and service and continued communications, with

5 regard to the sale of the Lady May II for $350,000 -- three

6 hundred and seventy-five, I'm sorry, thousand dollars.

7            Now, with regard to the purchase and sale

8 agreement itself, I was looking at this before and I'm

9 probably just looking in the wrong space.  I know it has a

10 closing date of the 31st of December 2023, but I'm actually

11 looking at the date that this document was signed and I just

12 don't see that, but I'm probably missing it somewhere.

13            MR. BONGARTZ:  It's actually on the very first

14 page.  There is a little -- if you go to the purchase-and-

15 sale agreement for brokerage vessel, which is the standard

16 form --

17            THE COURT:  Uh-huh.

18            MR. BONGARTZ:  -- there's a box at the top and if

19 you look at the sub box that reads "important dates," there's

20 a -- it says 31.12.2023; that's the European version of

21 writing the date.

22            THE COURT:  Right.  But I don't know the date this

23 agreement was signed, I'm saying.

24            MR. BONGARTZ:  Oh, I'm --

25            THE COURT:  I saw that date.

1          MR. BONGARTZ:  No, it's on the signature block to

2   the addendum.  It's ECF page 52 of 62.

3          I'm sorry, I misunderstood, Your Honor.

4          THE COURT:  That's okay.

5          Okay.  There it is.  I didn't see it.  That's all

6   I was looking for.

7          MR. BONGARTZ:  No, it's okay.

8          It's also on the form itself on page 45 of 62, but

9   it's in multiple places.

10          THE COURT:  And this was on, obviously, of the

11   docket of the case, so it was available for -- if someone has

12   the ability to view, electronically, and/or, obviously, to

13   come to the Clerk's Office and review this purchase and sale

14   agreement.  So, I don't know why I couldn't find that date

15   before, but now I see it.  Okay.

16          So if this sale is approved today, there are a

17   couple of provisions, obviously, that may change the actual

18   amount that is delivered by the buyer to the seller,

19   depending upon the date of closing, correct?

20          MR. BONGARTZ:  That is correct.  There is a cost

21   allocation with respect to the winterization and storage at

22   the Newport shipyard, which depends on the scheduled date of

23   closing.

24          THE COURT:  And have you -- are you able to report

25   to the Court what day you think the closing may occur at this

1  point?  I'm not --

2          MR. BONGARTZ:  No, we are preparing for a closing

3  either Thursday or Friday this week.

4          THE COURT:  Of this week?

5          MR. BONGARTZ:  Yes.

6          THE COURT:  Okay.  Does anyone else wish to be

7  heard, with regard to the sale, the proposed sale of the Lady

8  May II to the buyer identified in the purchase and sale

9  agreement, as Patrick Cloppenburg?

10      (No verbal response)

11          THE COURT:  All right.  Hearing nothing, then I

12  think the only thing we need -- I have a few questions about

13  the proposed order.

14          MR. BONGARTZ:  Okay.

15          THE COURT:  You might need to revise it.

16          MR. BONGARTZ:  Okay.

17          THE COURT:  Is that -- you should have -- I mean,

18  we can put in the hearing date today, but it says during

19  which -- I'm sorry, I'm on page 2 of the order --

20          MR. BONGARTZ:  Okay.

21          THE COURT:  -- and probably the sixth or seventh

22  line down, it says, "During which the trustee's exhibits and

23  the testimony of Mr. Johnson were admitted into evidence."

24          I mean, he really isn't testifying, but you can

25  say his affidavit and supplemental declaration were reviewed

1    by the Court --

2              MR. BONGARTZ:  Yep.

3              THE COURT:  -- and no party raised any objection

4    to that admission as evidence in support of the sale.

5              MR. BONGARTZ:  We will make that change, Your

6    Honor.

7              THE COURT:  Okay.  Then in three lines down or two

8    lines down, depending upon which line you're looking at

9    there --

10             MR. BONGARTZ:  Uh-huh.

11             THE COURT:  -- and it says, "And all objections

12   thereto."  I think I'd rather you say, "There being no

13   objections filed" --

14             MR. BONGARTZ:  Okay.

15             THE COURT:  -- or however you want to say it.

16             MR. BONGARTZ:  We'll put that there.

17             THE COURT:  But it's clear that there were no

18   objections filed, okay?

19             MR. BONGARTZ:  Yes.

20             THE COURT:  And then on page 11 of the proposed

21   order, paragraph 12.

22             MR. BONGARTZ:  Yes?

23             THE COURT:  It says, "It being the intent of the

24   Court," in the second sentence --

25             MR. BONGARTZ:  Uh-huh.

 1          THE COURT:  -- I think it would just say -- I

 2  mean, what you're trying to say is just because we don't

 3  identify a specific provision in the PSA doesn't mean it's

 4  not enforceable, right.

 5          Isn't that what you're trying to say?

 6          MR. BONGARTZ:  Correct, the entire agreement is

 7  approved by the Court and all provisions are enforceable;

 8  that is correct.

 9          THE COURT:  I don't think we need it being the

10  intent of the Court, right.  It's not my intent.

11          MR. BONGARTZ:  Okay.

12          THE COURT:  I mean, it's what it says and that's

13  what I'm approving.  So I would just say, you know:

14          "All the terms and conditions are in effect and

15  enforceable and, therefore, authorized and approved."

16          Okay?

17          MR. BONGARTZ:  Okay.

18          THE COURT:  Now, the one thing I noticed in

19  paragraph 12 that might be different from the purchase-and-

20  sale agreement itself, but I think you have a provision that

21  says the order will --

22          MR. BONGARTZ:  We do.

23          THE COURT:  -- will govern?

24          MR. BONGARTZ:  Uh-huh.  Yes, we do.

25          THE COURT:  But in paragraph 12, it says the --

1   isn't that saying just a few lines down, it says:

2        "Provided, however, that the PSA may be modified,

3   amended, or supplemented by the parties thereto in a writing

4   signed by all the parties without further notice to or order

5   of this Court."

6        But then there is something -- I mean, I don't

7   think it's -- I just thought there was something that said

8   there might have to be further order of the Court if there

9   was an amendment.

10       MR. BONGARTZ:  I think it's the last phrase,

11  "Unless approved by order of the Court," I believe, refers to

12  modifications that do have material and adverse effect.

13       THE COURT:  Okay.  That's fine.

14       All right.  Then the only other question I had --

15  I think it's the only other question I have -- so Florida law

16  is going to govern this contract?  That's what the purchase-

17  and-sale agreement says.

18       MR. BONGARTZ:  If that's what it says, then

19  that --

20       THE COURT:  Well, it says, "State of blank," and

21  then it says, "Florida," if left blank.

22       So that's what I'm assuming?

23       MR. BONGARTZ:  That's the correct assumption; yes,

24  Your Honor.

25       THE COURT:  Okay.

1          MR. BONGARTZ:  Actually, Your Honor, let me

2    double-check, because it may be that that provision was

3    modified in the addendum, now that I focused on this

4    question.  Just give me a second, let me double-check.  I

5    just don't want to misstate.

6          THE COURT:  Yeah, I didn't see that, but you could

7    be right.  I mean, I don't know.

8        (Pause)

9          THE COURT:  You're right, it's paragraph 4.

10          MR. BONGARTZ:  Yeah, I believe we --

11          THE COURT:  On page 1 of the first addendum, it

12    says, "Notwithstanding in the PSA --"

13          MR. BONGARTZ:  Yes, sorry.

14          THE COURT:  -- "to the contrary, the PSA is

15    governed by and interpreted, according to the laws of the

16    State of New York."

17          MR. BONGARTZ:  Yes, I apologize.  I should have

18    remembered that --

19          THE COURT:  That's okay.  That's fine.

20          MR. BONGARTZ:  -- we modified that.

21          THE COURT:  I saw it, so that's fine.  We now

22    understand that it's governed by the laws of the State of New

23    York.

24          All right.  Does anyone else wish to be heard on

25    the proposed order with regard to the sale of the Lady

1   May II?

2        (No verbal response)

3            THE COURT:  All right.  Hearing nothing, then I am

4   prepared to grant the motion for the reasons that we've just

5   gone through on the record, including the representations

6   made in the motion, the evidence that support the marketing

7   of the Lady May II, which includes prior pleadings, but also

8   the affidavit of Mr. Johnson that was filed today at ECF

9   2441.  I also reviewed information when the motion was filed

10  and I know that the notice of sale was also posted on the

11  Court's website, which indicated today would be the hearing

12  on the approval of the sale and then an objection deadline

13  was set at December 15 and no objections were filed with

14  regard to the motion.

15            I also find that service was appropriately made in

16  accordance with the applicable rules and the order entered by

17  this Court with regard to a hearing and objection deadlines

18  concerning the sale of the Lady May II.

19            No one has filed any written objections to the

20  motion and there is no one participating in this hearing

21  today that is objecting in any way to the motion or the

22  proposed order, although, the Court has inquired and received

23  no response from anyone in the courtroom.

24            So, for all those reasons, the motion to sell is

25  granted and the proposed order, as we discussed, will just be

1  a modified and submitted.  I know you want to close soon, so

2  I would assume you'll get that proposed order back to the

3  Court tomorrow, at the latest, maybe even today.  I have no

4  idea.

5          MR. BONGARTZ:  We will get it back to chambers

6  today.

7          THE COURT:  Actually, you don't have to get it

8  back to the chambers.  You can submit it to the courtroom

9  deputy -- the Bridgeport courtroom deputy email box,

10  please --

11          MR. BONGARTZ:  Understood, Your Honor.

12          THE COURT:  -- and then please CC everyone in the

13  courtroom that has noted their appearance for the record on

14  that email, please, with the final changes to the proposed

15  order.

16          MR. BONGARTZ:  Understood, Your Honor.

17          THE COURT:  Okay.

18          MR. BONGARTZ:  Thank you.

19          THE COURT:  All right.  Thank you very much.

20          Obviously, Mr. Johnson does not need to -- well,

21  no one has asked Mr. Johnson to appear.  I've looked at his

22  affidavit.  He would have testified about what he said in his

23  affidavit and so if you need to tell Mr. Johnson he doesn't

24  need to appear, that's fine with the Court.

25          MR. BONGARTZ:  Thank you, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          All right.  Then, aside from the motion to sell

3    the Lady May II, Trustee Despins, you've asked for a status

4    conference that was filed in both, the main case and

5    Adversary Proceeding 5008, with regard to compelling certain

6    parties to comply with subpoenas and award sanctions.

7          So, how would you like to proceed on that matter,

8    Trustee Despins?

9          MR. DESPINS:  Mr. Linsey is handling this matter,

10   Your Honor.

11         THE COURT:  Okay.  Thank you.

12         MR. LINSEY:  Thank you, Your Honor.

13         There are two things that I'll be addressing --

14   Patrick Linsey for the trustee -- one is the privilege motion

15   that was filed in the main case.  The other is the discovery

16   disputes and just a general update that exists in the

17   adversary proceeding.  I would propose to take the privilege

18   motion first if that's acceptable to the Court?

19         THE COURT:  Go right ahead.

20         MR. LINSEY:  Thank you.

21         MR. MORIARTY:  Your Honor, may I just confer with

22   Attorney Linsey for one second on the motion that he's about

23   to argue?

24         THE COURT:  I can't hear anything you said,

25   Attorney Moriarty.

1          MR. MORIARTY:  I apologize, because I'm not

2    speaking into a microphone.

3          THE COURT:  That's okay.

4          MR. MORIARTY:  May I just confer with Attorney

5    Linsey for one second on the motion --

6          THE COURT:  Certainly.

7          MR. MORIARTY:  -- he's about to argue?

8          THE COURT:  Go right ahead.

9          MR. MORIARTY:  Thank you, Your Honor.

10       (Counsel confers)

11         MR. MORIARTY:  Thank you, Your Honor.

12         THE COURT:  Yeah, just give me one moment.

13         MR. LINSEY:  Sure.

14       (Pause)

15         THE COURT:  Sorry.  Go ahead, Attorney Linsey.

16         MR. LINSEY:  Thank you, Your Honor.  No problem.

17         So what Mr. Moriarty wanted to ask me about is

18   what I was coincidentally about to say, which is that in

19   order to discuss the content of potentially privileged

20   materials, I think we would probably need to have a sealed

21   hearing and close the courtroom.  I'm going to endeavor to --

22         THE COURT:  Well, who's in the courtroom that

23   hasn't signed the protective order yet?

24         MR. LINSEY:  I think this would go beyond the

25   protective order, Your Honor, to the privileges order.

 1                    THE COURT:  Well, and the privileges -- I mean,

 2    all right.  So who you tell me who needs to leave the

 3    courtroom, then.

 4                    MR. DESPINS:  Everyone.

 5                    MR. LINSEY:  Everyone, other than Mr. Moriarty and

 6    trustee's counsel --

 7                    THE COURT:  Okay.

 8                    MR. LINSEY:  -- and Your Honor can stay.

 9        (Laughter)

10                    THE COURT:  The creditors have to leave?  The

11    creditors also have to leave?

12                    MR. LINSEY:  Yes, Your Honor.

13                    THE COURT:  And did you say the U.S. Trustee has

14    to leave?

15                    MR. LINSEY:  It's privileged, Your Honor, so

16    the -- or, I should say it's potentially privileged and I'll

17    get into why that "potential" word is there, but I do think

18    there is some privileged material here.  So, yes, Your Honor.

19                    THE COURT:  What's the U.S. Trustee's -- I don't

20    know that "position" is the right word -- but response to

21    that request?

22                    MS. CLAIBORN:  Your Honor, I'm in a bit of a

23    difficult spot, as I believe Attorney Linsey is in, which is

24    that the statute that provides for the U.S. Trustee's

25    participation and that we're able to review anything that

1  gets filed on docket would also include the idea that we

2  could be here today and participate and hear what's said in

3  today's hearing.

4        That said, there is the other issue of the

5  privilege and to the extent that the problem really gets

6  elevated by my participation here, I will step into the

7  hallway, but I will not agree that we have waived any

8  argument that we're not entitled to be here.  I'm making the

9  decision to be in the hallway based on practical

10 considerations, not because I don't think that it's

11 appropriate.

12        THE COURT:  Okay.  Well, this is what we're going

13 to do.  We're going to take a short recess and you're all

14 going to chat and then we're going to come back and you're

15 going to tell me where everyone stands, okay, and we'll make

16 that record accordingly.

17        So it's 3:05.  I'm come back at 3:15, all right.

18        The Court is in recess until 3:15.

19        THE CLERK:  All rise.

20        The Court is in recess until 3:15.

21    (Recess taken at 3:05 p.m.)

22    (Proceedings resumed at 3:23 p.m.)

23        THE COURT:  The scheduling order and issues

24 related to the privileges order.

25        So where do things stand?

1          MR. LINSEY:  Counsel for everyone present

2    discussed, and we think it makes the most sense to deal with

3    the privileges motion at the end of the day, such that

4    everyone else can leave.

5          THE COURT:  Okay.

6          MR. LINSEY:  And Mr. Moriarty and I and the

7    trustee, I assume, will all stick around and deal with that.

8          So, then, I would propose to move on to the

9    discovery status conference in the Whitecroft, rather the Mei

10   Guo/Bombardier adversary proceeding.  I'm going to step back

11   a bit further than some of the other discovery motions that

12   have been filed in this case, because the trustee has learned

13   certain information in the last couple of weeks that has

14   given rise to substantial concern.

15          In August of 2022, the trustee served the

16   defendant with a Rule 2004 subpoena.  That Rule 2004 subpoena

17   called --

18          THE COURT:  In the main case --

19          MR. LINSEY:  That's correct, Your Honor.

20          THE COURT:  -- the Rule 2004?

21          Go ahead.  I just want to make sure I'm completely

22   following you.

23          MR. LINSEY:  I appreciate it.

24          The Rule 2004 subpoena included, as an associated

25   entity, Whitecroft Shore Ltd. and numerous of the requests

1  called for documents and records that are a lot of the

2  evidence that we're seeing more recently, documents that

3  exist, but were not produced 16 months ago.  As the Court is

4  well aware, there was a pattern of obstruction with respect

5  to the Rule 2004 subpoena, which eventually led to an order

6  holding the defendant and others in contempt.

7        Thereafter, the defendant filed the declaration,

8  wherein the defendant said that the defendant had complied

9  and purported to detail her compliance.  What we have seen

10  recently is documents that prove that either one of two

11  alternatives.  Either the defendant had responsive

12  information, knew about responsive information and lied about

13  it or the defendant didn't know about the responsive

14  documents and information, because someone other than the

15  defendant is conducting the business that the defendant

16  purports is beneficially owned by her.

17        Moving forward to this adversary proceeding, as

18  the Court has seen from several of the recent filings, it's

19  been pulling teeth for the trustee to try to obtain discovery

20  in this adversary proceeding.  Agreeing on a deposition date

21  for the defendant required a motion to compel.  Enforcing

22  subpoenas against the shell companies, Whitecroft Shore Ltd.

23  and Anton Development, likewise, required a motion to compel.

24        The Court entered an order on that motion to

25  compel and set deadlines for the shell companies, Whitecroft

1  and Anton Development, and the defendant, in her capacity

2  with respect to those shell companies, to provide documents

3  to the trustee.  The trustee received nine documents from

4  Whitecroft on the day of the deadline and nothing from Anton

5  Development.

6          The documents, we have sort of a confidentiality

7  issue again.  This one, just a confidentiality issue.

8  They've all been marked "highly confidential," so I won't get

9  into the subject matter of those documents, but I will say --

10 and this is -- the specifics of these facts are discussed in

11 the emergency motion for a temporary restraining order that

12 my office filed shortly before this hearing.

13         The content of those documents reflects that there

14 are other documents out there; in particular, there is an

15 account that was opened, a financial institution in the

16 United Kingdom called "JNFX."  Approximately $12 million of

17 proceeds from the sale of a private jet that the trustee

18 believes is the debtors' private jet, was deposited into that

19 account.

20         The best case, based on the trustee's

21 investigation to date, that amount in that account has

22 substantially diminished.  And we're not talking about a long

23 time frame here.  The sale of the Bombardier was post-

24 petition.  The sale apparently closed in between August and

25 October of 2022.  Funds were originally transmitted, sale

1 proceeds were originally transmitted to an escrow agent.  The

2 funds show as depositing in this U.K. financial institution,

3 JNFX, in February of 2023.  That's why -- you know, that's

4 well into a number of things; among them, the trustee's

5 efforts to obtain Rule 2004 compliance from the defendant.

6          In the relatively short time, six months, that --

7 ten months -- that the funds have been in the JNFX account,

8 best case, they have diminished substantially, going from, as

9 far as the trustee can discern -- and this is, information is

10 coming in literally minute to minute here -- there is

11 approximately $10.1 million U.S. worth of assets left in the

12 account, which had started around $12 million.  That's in

13 less than a year.

14          So the trustee is substantially concerned about

15 the safety of the funds in this account.  The trustee is also

16 concerned about who may give orders, the defendant or others,

17 that funds in the account may be moved or that other things

18 may happen.

19          Prior to the shell companies appearing for their

20 30(b)(6) deposition, prior -- one hour prior to the shell

21 companies appearing for their 30(b)(6) deposition, the

22 trustee received a statement from JNFX through defendant's

23 counsel and received email correspondence.  The email

24 correspondence reflects JNFX telling one of the defendant's

25 agents that the defendant had made agreements that allowed

1   JNFX to engage in certain transactions with these funds.

2          The trustee was obviously substantially concerned

3   to see the content of these emails, particularly concerned

4   when the one statement that we have seen reflected a zero

5   balance in the account.  The trustee called the defendant's

6   counsel and was told that defendant's counsel was unsure what

7   the statement meant.

8          The trustee then sought to take the 30(b)(6)

9   deposition of Whitecroft and, unfortunately, the defendant,

10  appearing as the 30(b)(6) representative for Whitecroft,

11  invokes the -- I should say, sought to invoke the Fifth

12  Amendment, with respect to almost every substantive question

13  that was posed to her.

14         And as I think the Court is aware at this point,

15  corporations do not enjoy a Fifth Amendment privilege.  It

16  was incumbent upon the corporation to provide a witness who

17  could intelligently testify with respect to the facts at

18  issue in this adversary proceeding, none more important than

19  what is going on with these Bombardier proceeds.  And yet,

20  when I asked question after question, What agreements were

21  made with JNFX?  What is this agreement that the

22  representative from JNFX is referring to in the email?

23         All the trustee's counsel heard was "Fifth

24  Amendment.  Fifth Amendment.  Fifth Amendment."

25         That isn't proper, but it's also prejudicial.

 1  It's prejudicial that discovery has been delayed.  At this

 2  point, if we go back to Rule 2004 discovery, we would have

 3  known about the funds before they even made it to JNFX,

 4  before that two million dollars turned into vapor.

 5          And I do want to caution, we're getting more

 6  information about the JNFX, but that 10.1 -- and the funds,

 7  but that 10.1 million is the best information I have right

 8  now, and the trustee is substantially concerned to the point

 9  that trustee's counsel sent, this morning, are correspondence

10  to JNFX and spent the weekend preparing an emergency motion

11  for a temporary restraining order to ensure that the funds of

12  JNFX are not further diminished or dissipated.

13          So, in terms of discovery disputes that exist

14  right now, I would say that the primary discovery dispute is

15  what the trustee views as improper invocation of the Fifth

16  Amendment by the shell companies and the shell companies' if

17  failure to provide documents and information, which it

18  appears to the trustee, must exist.

19          I will also -- I want to add one more element to

20  the frustration that came from the deposition on Friday.  The

21  trustee sought to inquire about when the shell companies

22  sought to obtain documents responsive to the subpoena and the

23  30(b)(6) witness, the defendant, was unable to testify about

24  those facts, either because she asserted that she did not

25  know or because she was invoking the Fifth Amendment.

1          But there are material facts that the trustee is

2     entitled to explore in discovery.  That's something that Your

3     Honor will see.  In this TRO motion is evidence the debtor

4     has uncovered -- evidence the trustee has uncovered that it

5     was the debtors' alter-ego Golden Spring that orchestrated

6     the sale of the Bombardier jet.  It was Max Krasner

7     identifying himself in emails as the director of operations

8     of Golden Spring, who was the client contact for Jetlaw,

9     which was the law firm that purported to represent Whitecroft

10    in the sale of the jet.

11         So the trustee is entitled to information from the

12    shell companies about those facts or entitled to a 30(b)(6)

13    representative who will testify knowledgeably.  And if for

14    some reason that can't happen in a closed conference room,

15    then it should happen in open court and the defendant should

16    come to open court and Your Honor can rule about which

17    invocations of the Fifth Amendment are proper and which

18    invocations are not.

19         And just very briefly, Your Honor, I want to read

20    from one of the JNFX representative's emails to Ms. Guo and

21    an agent that the trustee had never heard of until last

22    Friday.  The email reads:

23         "The statements are in U.S. dollars and Euro,

24    reflecting the FX conversion from U.S. dollars to Euro that

25    Ms. Guo agreed to previously, and which JNFX are entitled to

1  do, pursuant to our terms and conditions.  Funds have been

2  converted back to U.S. dollars in anticipation of returning

3  U.S. dollar sums to the account from which they were

4  received, but you made it clear, this step would be

5  unwelcome."

6          Someone is plainly giving JNFX instructions about

7  what to do with this money and the trustee is profoundly

8  concerned that someone is going to give JNFX the wrong

9  instructions and that JNFX is going to listen.

10          So we're not here today to argue a TRO motion, but

11  I couldn't, in good conscience, not -- in light of these

12  facts, not discuss it.  The trustee's primary interest from a

13  discovery perspective is getting through these shell company

14  depositions without further delay and getting testimony to

15  which the trustee is entitled.

16          THE COURT:  So right now, with regard to the

17  depositions of the shell companies, the answers to the

18  30(b)(6) representative, who's the defendant in adversary

19  5008 is either "I don't know" or "the Fifth Amendment."

20          That's what you're telling me?

21          MR. LINSEY:  Yes, Your Honor, with very, very few

22  exceptions.  There were some basic questions, and I mean very

23  basic about document production that were answered, but

24  anything that became, you know, who specifically was reached

25  out to or when was anyone reached out to, then we were in "I

1   don't know" or sometimes we were in the territory of the

2   "Fifth Amendment."

3          And Your Honor can read the deposition transcript

4   in its entirety.  It's attached as an exhibit to the TRO

5   motion.

6          THE COURT:  And this was the deposition that took

7   place on Friday, December 15th; is that what you're telling

8   me?

9          MR. LINSEY:  Correct, Your Honor.  It was the

10  Whitecroft deposition.

11         In light of having received the information about

12  the JNFX account one hour before the deposition began, the

13  deposition was delayed in getting started.  We didn't even

14  finish that deposition.

15         It's also -- it was an unwieldy practice to

16  continuously ask the 30(b)(6) representative to continually

17  instruct that from the trustee's perspective, the

18  representative needed to answer the questions and was not

19  invoking properly, a Fifth Amendment privilege.

20         But, Your Honor --

21         THE COURT:  You're saying that -- who conducted

22  the deposition on behalf of the trustee?

23         MR. LINSEY:  I did, Your Honor.

24         THE COURT:  So you said -- you're saying -- I

25  obviously haven't looked at what you're talking about -- but

1  what you're saying is that when the defendant, as the

2  30(b)(6) representative of Whitecroft invoked the Fifth

3  Amendment privilege, you stated on the record that it's the

4  trustee's position that such an invocation is improper?

5          MR. LINSEY:  That's correct, Your Honor.

6          THE COURT:  Okay.

7          MR. LINSEY:  We got to a pattern.  I would ask a

8  question.  The defendant would say -- I should say the

9  30(b)(6) representative would say, "Fifth Amendment."

10          I would say, "Are you invoking the Fifth Amendment

11  in your individual capacity?"

12          The witness would say, "Fifth Amendment."

13          I would say, "Please answer the question on behalf

14  of Whitecroft."

15          The defendant or representative would say, "Fifth

16  Amendment."

17          And I would say, "Is Whitecroft refusing to answer

18  the question?"

19          And the witness would say, "Fifth Amendment."

20          Eventually, we agreed that her initial invocation

21  of Fifth Amendment could be taken as her continued responses

22  to that colloquy and incorporated it into all of the

23  questions.  But the trustee wished to be very clear that the

24  trustee disagrees that a corporation may assert the Fifth

25  Amendment.

1        The trustee has cited Second Circuit case law to

2   the effect that corporations do not enjoy a Fifth Amendment

3   privilege against self-incrimination and the trustee is

4   entitled to a witness who can testify knowledgeably,

5   particularly, where there is evidence; and evidence now that

6   the Court has access to; evidence, which the trustee has

7   recently just gotten access to, that there are instructions

8   going.  There is business happening.  People are doing

9   things, purportedly, on behalf of Whitecroft.

10        So, you know, the Fifth Amendment cannot

11   completely insulate a corporation, allow it to do business,

12   allow it to, you know, potentially dissipate funds that a

13   trustee believes are property of the estate, without any

14   remedy for the trustee to obtain information about that,

15   because the corporation's chosen 30(b)(6) representative is

16   invoking the Fifth Amendment.

17        THE COURT:  Didn't you attempt to conduct these

18   depositions once before, following the deposition of the

19   defendant and those depositions did not occur?

20        MR. LINSEY:  We did, Your Honor.  On November --

21        THE COURT:  Who represented the defendant as the

22   30(b)(6) representative at the deposition on December 15?

23        MR. LINSEY:  Ms. Wernick was counsel for the

24   defendant and was counsel for Whitecroft.

25        The defendant's personal criminal counsel was

1  Matthew Leder (phonetic) of Depeny (phonetic).

2         THE COURT:  And both parties invoked -- interposed

3  objections and questions and things, both counsel?

4         MR. LINSEY:  Mr. Leder of -- Mr. Leder primarily

5  advised the witness, with respect to her invocation of the

6  Fifth Amendment.

7         THE COURT:  What was his advice?

8         MR. LINSEY:  Well, generally, it was to invoke,

9  Your Honor.  I don't mean to make light of it.  It was a

10  frustrating afternoon.

11         But Your Honor will see in the transcript, the

12  vast majority of questions that were put to Whitecroft were

13  met with a Fifth Amendment, particularly, as I discussed Max

14  Krasner, the communications that he had with Jetlaw, was Max

15  Krasner an authorized agent of Whitecroft?

16         That was met with, "Fifth Amendment."

17         Yvette Wang also appears on documents related to

18  the sale of the Bombardier; for example, she's listed as an

19  addressee on the letter of intent that the buyer of the

20  Bombardier sent in, I believe it was February of 2022.

21  That's another exhibit to our TRO motion.  And when I sought

22  to ask about Yvette Wang and her role with respect to the

23  sale of the Bombardier, I was met with, "Fifth Amendment."

24         And there are exigencies that apply to this

25  information, Your Honor.  I mean, one of the reasons that the

1  trustee wants to be very clear about who was an authorized

2  agent for Whitecroft is because the trustee is concerned

3  about who is going to potentially be doing things that could

4  prejudice a recovery by further dissipating or diminishing

5  the money that, right now, may be held in that JNFX account.

6          THE COURT:  Well, when you say, Who is an

7  authorized representative, the counsel for the defendant

8  appointed an authorized representative under the Federal

9  Rules of Civil Procedure, correct?

10          MR. LINSEY:  Correct.

11          And I don't mean to use overlapping terminology; I

12  just meant it as a general principal of an agency; someone

13  who has the power to call the bank and tell the bank what to

14  do.

15          THE COURT:  No, no, I understand what you're

16  saying, but right now you're talking to me about discovery,

17  right?

18          MR. LINSEY:  Yes, Your Honor.

19          THE COURT:  That's the conversation were having.

20  We're having a conversation about discovery and the

21  conversation that we're having is that, first of all, the

22  status conference was requested because, I believe, and you

23  can please correct me if I'm wrong -- somebody will, I'm sure

24  -- because there was not compliance at the previous

25  deposition that was noticed and subpoenaed for the Rule 30(b)

1   representative of Whitecroft and Anton Development.  That was

2   number one, correct?  That was one of the reasons you wanted

3   to have a status conference.

4           Number two, you weren't sure whether they were

5   going to appear for a deposition on the 15th, right, and they

6   did, apparently.

7           MR. LINSEY:  Correct, Your Honor.

8           THE COURT:  You're telling me.  I'm sure that's

9   accurate.

10          So, now, they did and they -- and when I say

11  "they," I shouldn't say that.  So, now, a Rule 30(b)

12  representative who happens to be the defendant, Ms. Guo,

13  appeared as the Rule 30(b)(6) representative on behalf of

14  Whitecroft, you didn't get to Anton Development; is that

15  correct?

16          MR. LINSEY:  That's correct, Your Honor.

17          THE COURT:  And Ms. Guo was represented by

18  counsel, who is in this courtroom at that deposition in her

19  capacity as the Rule 30(b)(6) representative of Whitecroft

20  and then represented by criminal counsel, which I don't know

21  if I understand why there was criminal counsel there, because

22  she was testifying as the Rule 30(b)(6) representative.

23          So, now, you're asking the Court to make a ruling.

24  I'm asking you, this is what you're asking me to do, to rule

25  on whether or not there was a proper invocation of the Fifth

1   Amendment by Ms. Guo as the Rule 30(b)(6) representative

2   while she was represented by counsel, both, in her capacity

3   as a Rule 30(b)(6) representative and, I guess, as potential

4   -- for potential exposure, although, I don't know how she has

5   criminal exposure as the Rule 30(b)(6) representative.  But

6   in any event, and she -- you're telling me that she was

7   counseled and instructed to invoke the Fifth Amendment.

8            Is that what you're telling me?

9            MR. LINSEY:  That's my understanding, Your Honor.

10            THE COURT:  Well, when you say your understanding,

11   isn't that what -- that's what they said?  Does the

12   deposition transcript reflect that?

13            MR. LINSEY:  No, there were breaks where counsel

14   spoke with the witness.  Sometimes, Mr. Leder would gesture,

15   which I understood those gestures to be suggesting the Fifth

16   Amendment be invoked.

17   Mainly, the witness invoked the Fifth Amendment on her own,

18   but it was my understanding that counsel -- that it was a

19   strategy that was employed --

20            THE COURT:  Did counsel ever tell her that it was

21   improper to invoke the Fifth Amendment --

22            MR. LINSEY:  Certainly not.

23            THE COURT:  -- on the record.

24            MR. LINSEY:  Certainly not.  Trustee's counsel was

25   emphatic repeatedly that the invocations were improper and

1  should cease.

2      THE COURT:  Okay.  So, you are asking this Court

3  to enter an order compelling her, the representative, who was

4  designated as the Rule 30(b)(6) representative of Whitecroft,

5  to answer those questions because there was an improper

6  invocation of the Fifth Amendment?

7      MR. LINSEY:  That is correct, Your Honor.

8      THE COURT:  You are asking for an order from the

9  Court to say that?

10     MR. LINSEY:  Yes, Your Honor.  I would suggest, if

11 the Court would entertain it, that we would be in a more

12 effective environment to obtain the discovery if there were a

13 way to obtain a resolution to disagreements that would occur

14 during the deposition.  One way to resolve that would be to

15 have the deposition occur in open Court. I am not eager to

16 take Your Honor's time if we don't need to.  Another way

17 could be to take the deposition at a time where, potentially,

18 Your Honor might be available by phone to the extent that

19 there is a dispute that arises during the deposition.

20     One of the things that I have tried to emphasize

21 is that there is a lot of exigencies here.  We have already

22 burned a month obtaining the shell company's compliance such

23 as it is; compliance such that the walk-through, the

24 threshold of Trustee's counsel's office, but not

25 substantively testify.  So, the Trustee wants to move this

1 | forward -- wants to move this case forward expeditiously.

2 | THE COURT:  Okay.  So, aside from the privileges

3 | issue, is that the discovery issue that you are asking me to

4 | review and determine?  Is there any other discovery issue

5 | that you are asking me -- well, Anton hasn't even appeared

6 | apparently.

7 | MR. LINSEY:  That is correct, Your Honor.  I

8 | would --

9 | THE COURT:  And is Ms. Guo the -- isn't she the

10 | 30(b)(6) representative of that corporation as well.

11 | MR. LINSEY:  She was.  I would anticipate that if

12 | we had -- we stayed until seven o'clock Friday night.  So, we

13 | didn't knock off early.  The interpreter had to drive back to

14 | New Jersey.  So, at a certain point I wanted to let her go.

15 | If we had stayed till ten and gotten into Anton my sense is

16 | that it would have gone the same way.

17 | THE COURT:  So, I just want to make sure, from the

18 | Trustee's perspective that is Your -- those are Your

19 | discovery issues that you asked for a status conference on,

20 | which we already had discussions about because of the prior

21 | deposition of the defendant in this adversary proceeding in

22 | which she was also -- Ms. Guo was also subpoenaed to testify

23 | on behalf of the two corporations as the representative and

24 | she and her criminal counsel refused to do so, correct?

25 | MR. LINSEY:  Yes, Your Honor.  Look, if we're not

1  going to get compliance then at a certain point the Trustee

2  believes that the Court just needs to enter -- to order

3  sanctions, whether they be negative inferences, whether they

4  be -- given the pattern of obstruction here, and that is why

5  I started with the Rule 2004 subpoena, the long -- these few

6  documents that the Trustee got were dated in the fall of 2022

7  and the winter of 2023.  Had the defendant --

8         THE COURT:  What is the representation from the

9  defendant's counsel as to when they came into possession of

10  those documents?

11        MR. LINSEY:  I don't have a representation from

12  defendant's counsel. I asked the witness, the 30(b)(6)

13  witness, at the deposition on Friday whether Ms. Guo sought

14  to obtain responsive documents from Whitecroft and in

15  response to that question, like so many others, the witness

16  invoked the Fifth Amendment.

17        THE COURT:  Okay.  Thank you.

18        MR. LINSEY:  Thank you, Your Honor.

19        THE COURT:  Counsel, I assume you would like to be

20  heard.

21        MS. WERNICK:  Yes, Your Honor.  Thank you.

22        I want to begin as to, you know, how we are here

23  today and why we are here today in the frame of the requested

24  status conference.  Much of Mr. Linsey's presentation or

25  Attorney Linsey's presentation are of events that have

1  transpired on Friday or earlier today including a TRO motion

2  that was filed moments before Court began.

3      From defendant's perspective the issues that had

4  been addressed previously included appearance at depositions

5  which occurred.  We made clear that we were -- that Ms. Guo

6  was prepared to testify as a 30(b)(6) representative for both

7  Anton Development and Whitecroft on Friday in compliance with

8  the Court's order.  Documents have been produced --

9      THE COURT:  Well, how did you make that clear

10  because my understanding is that you filed a motion, an

11  emergency motion, for a protective order.  So, how did you

12  make it clear that you were going to appear for a deposition

13  on December 15th?

14      MS. WERNICK:  Through conversations with Attorney

15  Linsey.  And to back up, I want to make sure the stage is

16  appropriate set, Ms. Guo appeared for her deposition, in her

17  individual capacity, at the beginning of November. On that

18  same day she was served with subpoenas for Whitecroft and

19  Anton Development, and requested --

20      THE COURT:  Well, wasn't that because you wouldn't

21  accept service? I mean, you know, I do know what happened.  I

22  read the papers.

23      MS. WERNICK:  Certainly, but there is no

24  obligation for anyone to accept service.  There a request

25  for --

1      THE COURT:  But you knew that she was going to be

2  served.  If you are not going to accept service how else is

3  she going to be served?

4      MS. WERNICK:  Well, but certainly not for a

5  deposition to occur moments later that same day.

6      THE COURT:  My recollection of that is that that

7  was well-known by you and Attorney Twardy, I believe, who was

8  there.  I mean I understand, okay.  I understand, but you

9  have obligations under the Federal Rules of Civil Procedure

10  and if you don't want to comply with those then that is Your

11  choice.  That is Your choice.

12      I know where you are going, okay, but to say to

13  the Court, any Court no matter who it is, that the Rule

14  30(b)(6) representative, the Rule 30(b)(6) representative of

15  a corporation, has the right to invoke the Fifth Amendment

16  privilege, please, please, show me Your case because I have

17  seen about -- I have seen numerous cases to the contrary.

18  So, where do you have a case that says that the person that

19  you, as counsel because you counseled this person, designated

20  as the Rule 30(b)(6) representative with Your understanding

21  of Your obligations, Your personal obligations as a lawyer,

22  under the Federal Rules of Civil Procedure that its -- that

23  there is law that supports the claim that ta 30(b)(6)

24  representative of a corporation can invoke the Fifth

25  Amendment privilege.  Show me that.

1        MS. WERNICK:  Your Honor, we are happy to brief

2    the issue.  There is --

3        THE COURT:  No, no, no.  Stop, stop.  Show me that

4    right now.  That is what you are here for, right.  We all

5    know why we are here.  This is -- we all know why we are

6    here, right.  We are here because Your client was served with

7    a 2004 examination motion last August, August of 2022. I had

8    to go back and look at it because at first I thought is that

9    right and then I said, yeah, that is right.  August of 2022

10   and we are now -- its December 18th of 2023 and I am having

11   an argument about whether -- I mean if that is the path you

12   want to go down that is you choice.  That is Your choice.

13       I would urge you to think about that choice very

14   long and hard because for you to say we will brief the issue

15   it doesn't need to be briefed.  I can show you twelve cases.

16   Show me one.  If you show me one I will listen to you. I

17   haven't seen one.  It's Your obligation.  You filed a motion

18   for a protective order, emergency motion to stop the

19   deposition from happening. I guess because I didn't see it

20   you then appeared on the 15th somehow to try to be in

21   compliance with the Court order, but you still are not in

22   compliance because the other entity hasn't been deposed,

23   number one.

24       Number two, if this is accurate, which I haven't

25   seen everything, okay, to be fair I haven't seen what

1  Attorney Linsey said about this deposition, but apparently

2  there is a deposition transcript that I will be able to look

3  at.  If -- you need to tell me that what Attorney Linsey said

4  is inaccurate that Your client, as the 30(b)(6)

5  representative of Whitecroft, didn't invoke the Fifth

6  Amendment privilege with regard to questions about

7  Whitecroft.

8          MS. WERNICK:  Ms. Guo does not cease to be a

9  natural person simply because she appeared in her capacity as

10 a 30(b)(6) witness.  Ms. Guo was accompanied by her personal

11 criminal attorney throughout the course of the deposition.

12 Certainly, I am not going to disagree with her invocation.

13 It's in the transcript. It is what transpired on Friday and

14 was instructed by her personal criminal counsel to invoke the

15 Fifth Amendment.

16          I think the Court, and I would respect the Trustee

17 as well, has to recognize a real tension here with respect to

18 the complaint that the Trustee has brought and then --

19          THE COURT:  You know what, none of that matters.

20 What matters is you are the lawyer who represents the

21 defendant who agreed and counseled her to be designated as

22 the Rule 30(b)(6) representative.  This Court has spent an

23 enormous amount of time and every time you all complain about

24 how much money the Trustee spends in fees you lose.  You know

25 why, because you're fighting a fight that its clear what the

1  answer is yet you continue to fight the fight.

2  So, you are now fighting a fight that you're

3  saying she -- nobody said she ceases to be an individual, but

4  that is not what she was being deposed about.  She was being

5  deposed as a Rule 30(b)(6) representative of Whitecroft.

6  You, as the lawyer, counseled her to be that party.  If there

7  is somebody else then that is Your mistake for brining

8  that person forward.  You can't use the process to delay the

9  process.  You can't use the process to suit Your desires at a

10  time that it works for you.  You are making a decision and

11  that decision is going to have ramifications.  So, I urge you

12  to seriously think about what you just said.

13  No one is suggesting that Ms. Guo isn't an

14  individual.  She wasn't being asked any questions in her

15  individual capacity.  If that is the case, counsel, then

16  every single time a Rule 30(b)(6) representative is deposed

17  they should have a criminal lawyer there with them.

18  MS. WERNICK:  No, but certainly this is not every

19  single case.  Here Ms. Guo has been told by the Department of

20  Justice that she is a subject or a target of --

21  THE COURT:  I am not involved with the Department

22  of Justice.

23  MS. WERNICK:  -- a criminal investigation.

24  THE COURT:  I am involved with a Trustee whose

25  assets -- there are assets here, correct?  Ms. Guo testified

1  already that the plane was sold, but she doesn't know to whom

2  and she doesn't remember when.

3         MS. WERNICK:  Documents have been produced by the

4  entity and we have been real time producing --

5         THE COURT:  When did you get the document about

6  the bank account?

7         MS. WERNICK:  We sent it last week, as soon as it

8  was received.

9         THE COURT:  No, no, no, that wasn't my question. I

10  didn't ask you when you sent it.

11         MS. WERNICK:  No, I --

12         THE COURT:  I asked you when you got it.

13         MS. WERNICK:  Within days of receipt and the

14  email -- we sent our email correspondence from JNFX to the

15  Trustee so they could see in real time as they were being --

16         THE COURT:  So, you had no idea that there was

17  money being taken out of a bank account?

18         MS. WERNICK:  And what we believe the record will

19  show there was a single statement.  We were extremely

20  forthcoming to the Trustee that we have been trying to get

21  information from JNFX.  We were providing them with

22  information in real time.  And what we believe, when

23  additional information from JNFX is obtained, that it will

24  show that it's just fees from JNFX itself being withdrawn

25  from the account.  Remember --

1          THE COURT:  $10 million?

2          MS. WERNICK:  No, no, no, that is not what

3    Attorney Linsey said.  There is $10 million in the account.

4          THE COURT:  I think I heard that the account is

5    depleted.

6          MS. WERNICK:  No, no, that there had been

7    withdrawals from the account that we understand to be JNFX

8    fees for holding the funds.  There is $10 million presently

9    sitting in the account today which we would agree, Your

10   Honor, we would agree with the Trustee, that that is subject

11   to the preliminary injunction that was --

12         THE COURT:  So, they don't need a temporary

13   restraining order?  Those funds aren't going to --

14         MS. WERNICK:  Exactly.  So, the instruction

15   provided --

16         THE COURT:  Wait a minute, hold on.  That may be

17   progress, hold on.  So, you are saying that you have

18   evidence, today, that there is $10 million in a bank account

19   in -- where is it: Europe, London?

20         MS. WERNICK:  In London.

21         THE COURT:  Okay.

22         MS. WERNICK:  The Trustee received the same email

23   that we did earlier today.

24         THE COURT:  And you are going to agree what?

25         MS. WERNICK:  The position, and I think what

1 | further discovery on the communications that the Trustee
2 | reference would show, is that the reason why there couldn't
3 | be movement of the funds from that account is because they
4 | have been subject to the injunction this whole time.  So, the
5 | funds were in that account prior to the entry of the
6 | preliminary injunction, prior to the complaint in this
7 | adversary proceeding, and they have been with JNFX per the
8 | direction of Whitecroft's corporate counsel in the British
9 | Virgin Islands that we have identified -- that was identified
10 | during the course of the deposition and on the direction of
11 | Ms. Guo that they be preserved in that account.

12 | It is our understanding that any deduction in the
13 | account is fees being charged by the holder of the funds.
14 | And, you know, I don't want to be speaking out of turn,
15 | but --

16 | THE COURT:  I'm sorry, I'm interrupting you just
17 | because I want to get the timing right.  Are you saying the
18 | fees that were deducted were deducted before the preliminary
19 | injunction, is that what you are saying, or were they
20 | deducted after the preliminary injunction?

21 | MS. WERNICK:  I couldn't speak to that
22 | specifically.

23 | THE COURT:  I think I would need to know that,
24 | wouldn't I?

25 | MS. WERNICK:  Certainly, but it's not under the

1  direction of Ms. Guo, right.  So, the preliminary

2  injunction --

3        THE COURT:  Well, if Ms. Guo was served with a

4  preliminary injunction and it applies to Whitecroft then why

5  would a bank take out money if they knew that there was a

6  preliminary injunction with regard to Whitecroft that says

7  you can't transfer, dispose of; I mean, I can go through the

8  language.

9        MS. WERNICK:  Right, exactly, which is why the

10  funds weren't moved.  So, they pre-existed in that account.

11  They remained in that account.  We would agree that they were

12  subject to the preliminary injunction that was imposed by the

13  Court.

14        MR. DESPINS:  Your Honor, just for the record,

15  $1.5 million in fees on a $12 million investment --

16        THE COURT:  We haven't even gotten to that point.

17        MR. DESPINS:  Okay.

18        THE COURT:  I understand.

19        MS. WERNICK:  So, I understand the concern over

20  the assets, but I raise it just to note just that the assets,

21  we would agree, have been part of the --

22        THE COURT:  All right.  Let's just go back to what

23  this is about, at least what it was about when the order was

24  granted scheduling a status conference, right.  This was

25  about the failure of Your client to testify as the Rule

1  30(b)(6) representative and produce documents, subject to a

2  subpoena, of both Whitecroft and Anton Development.  So, as

3  we stand here today that still hasn't happened.

4          MS. WERNICK:  Again, Your Honor, I would

5  respectfully disagree that documents were produced, all

6  documents.  We contacted -- and as Ms. Guo testified during

7  the course of her deposition, she requested counsel reach out

8  to any identifiable parties to seek documents.  That was

9  done.

10         THE COURT:  What counsel?

11         MS. WERNICK:  She asked --

12         THE COURT:  The British Virgin Islands counsel?

13         MS. WERNICK:  -- both BVI counsel, our office.  We

14  made efforts to reach out and I think, again, this is where

15  we need to contextualize where we are in this case.  Folks

16  don't answer to us.  We tried to reach out to Max Krazner.  I

17  would like to reach out to Max Krazner and ask him to give

18  us, you know, whatever documents or materials he has.  We

19  have attempted phone numbers, we have attempted emails. I'm

20  sure, certainly, all the methods of communication that the

21  Trustee himself perhaps has attempted to reach this

22  individual.

23         So, we don't receive responses from Mr. Krazner.

24  We don't receive responses from the jet management company.

25  We reached out to AKAS (ph), which is another entity that was

1  identified, and they say we will give you all the documents

2  we have already provided to the Trustee.  We reach out to

3  former counsel that we understand would have documents and we

4  provide to the Trustee whatever was able to be obtained.

5          So, I truly don't want there to be any thought

6  that efforts haven't been made to comply with a subpoena

7  because they certainly have and any documents obtained were

8  provided to the Trustee.  So, I would want to note for the

9  record that it's not lack of compliance with a subpoena when

10  there are no documents received in return for these various

11  endeavors.

12          THE COURT:  Well, but Your client won't testify

13  that there are no other documents.  She has taken the Fifth,

14  for a corporation.  So, you can't say that.  You can't say

15  what you just said because you have no evidence to back it

16  up.  If Your client testified as to that and then the

17  documents are found, well then, Your client has got another

18  problem apparently.  That is not the point, counsel.  There

19  is no evidence that there aren't other documents.  I have no

20  idea, but if the documents that you produced, including

21  something from some bank, like where is the bank statements?

22          MS. WERNICK:  So, again, this is not a typical

23  bank.  My understanding is -- again, we have to go back to

24  the --

25          THE COURT:  Again, you can say whatever you want,

1 but without evidence it really doesn't matter what you say.

2 Okay.  So, I don't have any evidence for you to say it's not

3 a typical bank. I have no idea what that means.  You have

4 nothing to support that.  You have nothing to prove what you

5 just said.

6          So, if Your client isn't going to testify under

7 oath about these issues then there is no evidence to support

8 Your claims.  There is no evidence.

9          MS. WERNICK:  Well, I would respectfully disagree.

10 Ms. Guo testified during the course of the deposition that

11 she requested -- she sought, through counsel, that documents

12 be requested.  That is --

13          THE COURT:  So what.  That doesn't mean anything.

14 I can request through counsel something too.  That doesn't

15 mean documents don't exist.  You have an obligation.  You, as

16 the lawyer, have an obligation to counsel Your client and the

17 client has an obligation under the subpoena powers.  So, I

18 mean you can make these arguments, and you go right ahead,

19 and you create whatever record you want to create, but you

20 don't have a record that has any proof in it.

21          All you have, at this point, is you and Your

22 client, subject to the Federal Rules of Civil Procedure, and

23 the sanctions that are also imposed in the Federal Rules of

24 Civil Procedure not complying with an order of this Court and

25 a subpoena.  So, I think that you need to think about that.

1  That is a problem.

2         MS. WERNICK:  Frankly, Your Honor, and I want

3  to -- you know, when Mr. Linsey, you know, appeared before

4  the Court there was a notion that we're having a discussion

5  which is, you know, my understanding of what we are here for

6  today in terms of a status conference there is no pending

7  motion, there wasn't a request for entry of an order prior

8  to --

9         THE COURT:  Well, there has been a pending motion

10  for sanctions and to compel compliance.  So, I am not sure

11  what you mean about that.  And I entered an order that said

12  the deposition had to happen by the 15th.  Now, I didn't look

13  at the -- I shouldn't say I didn't look at, I saw -- I don't

14  remember exactly what was put in the emergency motion for a

15  protective order, but you didn't want to go through with

16  that, it's pretty clear.

17         MS. WERNICK:  Well, it was only a matter of

18  scheduling.  We had originally proposed to Attorney Linsey

19  that the depositions proceed either today or tomorrow given

20  the scheduling reason.  When it was not agreed with and made

21  the application to the Court --

22         THE COURT:  I understand, but I entered an order

23  and it said the date.

24         MS. WERNICK:  Understood.

25         THE COURT:  It said, very clearly, by

1  December 15th.

2      MS. WERNICK:  Which is why we respected that and

3  appeared by December 15th.

4      THE COURT:  Well, only because, I guess, there was

5  no protective order entered.  You wouldn't have respected it

6  if there was a protective order.

7      MS. WERNICK:  But there was -- then the order

8  would have been modified.  So, I mean to suggest that, you

9  know, we should be any way penalized for violating the order.

10      THE COURT:  First of all, I don't even know how

11  you could have asked for a protective order. It was a Court

12  order ordering Your client to appear.  You don't get

13  protection from a Court order.  Where in the Federal Rules of

14  Civil Procedure does it say, oh, and if I don't like the

15  order and it has to do with discovery I can ask for a

16  protective order.  First of all, there is no basis in law for

17  that, counsel, okay.  Number one.

18      Number two, I still don't have any basis in law

19  from anything you are telling me about Your client invoking

20  the Fifth Amendment privilege when she was designated and

21  counseled by you and Your colleagues to be the Rule 30(b)(6)

22  representative.  So, when you say there is no motion pending

23  that is not accurate.  There is a motion pending.  There

24  absolutely is a motion pending and I issued an order for

25  compliance.

1          I just want to be very clear, I am not going to

2     spend a lot of time on discovery.  You are just going to have

3     to deal with the results of the rulings.  This is -- we have

4     gone through this, okay. I may be old, but I'm not that old.

5     I remember things, okay.  I have gone through this since the

6     beginning of this -- since the time the Trustee was

7     appointed.  And all it is, is a constant barrage of

8     roadblocks, that is the attempt; road-block after road-block.

9          If you have a case that says what you are telling

10    me then you should have already filed that.  You should have

11    filed a protective order in the first place with regard to

12    the subpoenas.  You didn't do that.  You filed a motion for a

13    protective order with regard to a Court order compelling

14    compliance.  There is no such thing.  You cannot do.  There

15    is no law.  You had no basis in statute, or law, or rule to

16    seek the relief that you were seeking for a protective order.

17          MS. WERNICK:  Respectfully, I would submit that

18    that application was mooted because we did, in fact, appear.

19          THE COURT:  Respectfully, you wasted the Court's

20    time of having to read something that you filed under

21    Rule 11, which says I don't -- you are not going to file

22    anything for the cause of delay or the purpose of delay that

23    there is no basis in law to grant the relief that you

24    requested, none.

25          So, if there is no basis in law to grant the

1  relief that you are requesting then the issue becomes

2  sanctions.  If that is the path you want to go down that is

3  the path we will have to go down.  I am not going to spend

4  hours, and hours, and hours on discovery that when you have

5  an obligation as an officer of the Court to address those

6  issues and when you file a motion, and I'm not saying just

7  you, I know it was colleagues and whatever, that says that

8  you want a protective order from a Court's order compelling

9  compliance you lost.  You have lost.

10         MS. WERNICK:  Which is why out of respect for the

11  order, again, I would just repeat that --

12         THE COURT:  When you say that, you should have had

13  respect for the order in the first place.  There was no basis

14  for Your request.  So, you didn't have respect for the order

15  because if you did you wouldn't have made a baseless,

16  meritless request that has no support in the code, the rules,

17  the Federal Rules of Civil Procedure, the Federal Rules of

18  Bankruptcy Procedure, our Local Rules of Procedure, nothing.

19  You had nothing.  You didn't even have anything.

20         MS. WERNICK:  I mean, again, Your Honor, I would

21  agree entirely that there is no need to spend additional time

22  on the motion for a protective order. I don't want to --

23         THE COURT:  Then produce Your client and have her

24  testify appropriately.  Your client cannot -- and I have seen

25  no case that says the Rule 30(b)(6) representative of a

 1  corporation can properly invoke the Fifth Amendment;

 2  otherwise, what would be the point of Rule 30(b)(6).  There

 3  is no point.

 4          MS. WERNICK:  But, Your Honor, again, I would

 5  respectfully disagree.  Any statements made by Ms. Guo or

 6  anyone who is under the subject of a real serious criminal

 7  investigation --

 8          THE COURT:  Then appoint someone else.

 9          MS. WERNICK:  We would be happy to.  So, if there

10  is not going to be any objection to appoint an agent or some

11  other individual then --

12          THE COURT:  Who is it going to be and when you are

13  going to do it?

14          MS. WERNICK:  Exactly.

15          THE COURT:  Isn't she the only person who --

16          MS. WERNICK:  So, that is the real --

17          THE COURT:  Wait a minute. Isn't she the only

18  person that has the authority to do so for both of these

19  corporations?  I thought she testified there is nobody else?

20          MS. WERNICK:  Exactly.

21          THE COURT:  Then how can you appoint somebody

22  else?

23          MS. WERNICK:  So, this is the real tension.  If we

24  can --

25          THE COURT:  Well, it's not a tension, counsel.

1   It's not a tension. It's the reality and you have to deal

2   with the reality.  It's time to deal with the reality.  It's

3   not a tension.  Its specifically how Your client setup these

4   corporations or was instructed to setup these corporations.

5   You can't now hide behind it by saying, well, she is an

6   individual and she has been told that she might be the

7   subject of a criminal inquiry and, therefore, she can invoke

8   her Fifth Amendment privilege when she is -- I mean, that is

9   ludicrous.  What you are saying is actually ludicrous because

10  then every single time that any party is a Rule 30(b)(6)

11  representative they could have criminal counsel.

12          MS. WERNICK:  I am not here to suggest that there

13  shouldn't be potentially an adverse inference or whatever

14  legal arguments would be made as a result of the

15  implication --

16          THE COURT:  Well, then why don't you stipulate to

17  that?

18          MS. WERNICK:  I understand.

19          THE COURT:  Why don't you stipulate to all the

20  facts.  Trustee said that, why don't you stipulate to all

21  these facts.  Just stipulate to them.  What is the problem

22  with that?

23          MS. WERNICK:  I am not aware of that proposal

24  having been presented.

25          THE COURT:  It's in writing. I have read it.  So,

1   nobody came and told me about it.  It's in one of the

2   pleadings.

3           MS. WERNICK:  I am not familiar with the -- again,

4   what I --

5           THE COURT:  I don't know how you can't be familiar

6   with that proposal, counsel. You represent the defendant and

7   the defendant, in the defendant's capacity, as the

8   Rule 30(b)(6) representative for both Whitecroft and Anton.

9   I don't know you can't be familiar with that.

10          So, in any event, did you want to add anything

11  else to the record?

12          MS. WERNICK:  If Your Honor has any questions, I

13  am happy to answer them.  I would repeat that our position is

14  that there has been compliance.  I am happy to provide the

15  Court with a further and supplemental information with

16  respect to the invocation.

17          THE COURT:  Thank you.

18          MS. WERNICK:  Thank you.

19          THE COURT:  Anything else, Mr. Linsey?

20          MR. LINSEY:  No, Your Honor.

21          THE COURT:  So, then that takes care of the

22  discovery issues.  With regard to the privileges issue we

23  need to clear the courtroom because we are going to have a

24  sealed hearing, is that --

25          MR. DESPINS:  We were thinking of doing the status

1    conference on the other matter first if everyone can leave.

2              THE COURT:  That's fine.

3              MR. DESPINS:  Is that okay with Your Honor?

4              THE COURT:  That's fine.

5              MR. DESPINS:  May I approach, Your Honor?

6              THE COURT:  Yes, you may.

7              MR. DESPINS:  So, Your Honor, about ten days ago

8    or so -- first of all, for the record, Luc Despins,

9    Chapter 11 Trustee.  About ten days ago we filed with the

10   Court a copy of a motion that had been filed in the criminal

11   case for the return of customer funds.  That motion had been

12   filed by counsel for, I will say in quotes, "alleged" group

13   of customers represented by Mr. Giar (ph). I will come back

14   to why I am saying "alleged" in quotes.

15             Basically, we had said in that filing that we were

16   available for a status conference and Your Honor did schedule

17   the status conference.  The first thing I want to say is why

18   we are saying "alleged" in quotes is because, and I want to

19   be very clear about this, it is obvious that there are

20   victims of the various transactions that transpired around

21   Mr. Kwok.  Those victims need to be compensated at one point.

22             The challenge is who are those victims, who

23   decides that they are victims, and how much are they owed.

24   That is why we are emphasizing the word "alleged".  The

25   reason I may sound defensive about this is that there is a

1  supplemental pleading filed by Mr. Giar on Friday that,

2  basically, takes a very strident attack on the DOJ and the

3  Trustee on the basis that -- you know, there is basis, but

4  the lead one is that the DOJ or the Trustee are hostile to

5  victims. I want to debunk that myth from the beginning.

6         So, I'm glad the Court gave us an opportunity to

7  be heard on this.  As you can see from the notice we filed

8  this morning, I'm not sure you had time to look at it, but

9  there was this extensive reply, I would say premature reply

10 filed by Mr. Giar.  By the way, we invited Mr. Giar to attend

11 the hearing today, but he had a conflict. He was not

12 available.  Basically, we wanted to address what we are going

13 to file with the criminal court and we will come back to that

14 in a second.

15        First, I want to give you a bit of background.

16 So, as I said on Friday, counsel for the "alleged" claimant

17 filed a, what we call, somehow premature response because we

18 had not filed our substantive response in the criminal court.

19 As I said, filed a very aggressive pleading attacking the

20 Chapter 11 process and the DOJ.  So, this is remarkable for

21 various reasons.

22        First, the reply rehashes that Paul Hastings is a

23 tool of the CCP argument and attaches, for the criminal

24 court, a copy of Mr. Kwok's motion to disqualify the Trustee

25 based on the fact that Paul Hastings had offices in China.

1          Second, it takes the position that there is no

2    jurisdiction over the Himalaya Exchange because it is a

3    company, a BVI company, therefore not a US company, and

4    because Kwok is not an officer or director of that company.

5    Obviously, we know that that is not the law.  The reply

6    pushes really hard on the concept that the Himalaya Exchange

7    is entirely separate from Mr. Kwok. It doesn't mention at all

8    that William Je, who is a co-defendant of Mr. Kwok, is the

9    registered owner of the Himalaya Exchange.  It also fails to

10   mention that, Your Honor may recall, that in this case the

11   defendant and the airplane adversary proceeding, also the

12   defendant in the Lady May adversary proceeding the debtor's

13   daughter, referred to Mr. Je as Uncle William.  You recall

14   that he is the one that used the Himalaya Exchange to provide

15   $37 million for the Lady May escrow.  So, there is a direct

16   connection to the debtor and to this case.

17          Then the reply makes a number of fascinating legal

18   pronouncements such as the Trustee has no greater right then

19   a bank would have with respect to deposits left with a bank

20   by customers, meaning that customers own deposits with a

21   bank. It's been Hornbook law in this country for at least a

22   hundred years, Your Honor, that banks own the deposits that

23   customers leave with them and that the customers are

24   unsecured creditors of the bank.

25          Other allegations are that this is the victim's

1  money, we will come back to that.  The key allegations is

2  that Himalaya Exchange is a foreign entity and, therefore, no

3  one has jurisdiction over it.  Again, its Hornbook law, as

4  Your Honor knows, that this Court has jurisdiction over

5  property of the estate wherever you are located in the world

6  and by whomever.

7          THE COURT:  You are talking about a filing that

8  was made by someone who says they represent the Himalayan

9  investors?

10          MR. DESPINS:  Correct, 3,700 of these.

11          THE COURT:  In the…

12          MR. DESPINS:  In the criminal case.

13          THE COURT:  Okay.  It was filed here today, you

14  are saying.

15          MR. DESPINS:  Well, we filed a copy of that

16  ourselves, basically, so that you would have it.  I didn't

17  expect you to have a chance to read it before the hearing,

18  but, basically, their theory is that we represent these

19  37,000 people –- no, sorry, 3,700 claimants and we can't tell

20  you who they are because they could be at risk for physical

21  aggression if their identity is known, but trust us, criminal

22  court, give us the money and we will make sure that the money

23  is given to the right people.  That is really the nature of

24  this motion.

25          So, they attacked the Chapter 11 Trustee for

 1   being -- for requesting to be heard by the criminal court on

 2   the basis that this is a foreign company and, therefore, the

 3   Trustee has no jurisdiction over it or this court has no

 4   jurisdiction over it. Obviously, we know that that is not the

 5   case.  They also pushed really hard on the fact that because

 6   Mr. Kwok is not a director or an officer of the Himalaya

 7   Exchange that company is totally independent and, of course,

 8   we know from tons of findings that have been made by this

 9   Court that it's possible to have a company that, on the

10   surface, doesn't look like it has anything to do with Mr.

11   Kwok, but, in fact, is controlled and owned by him.

12          So, I am not going to repeat all this because you

13   know this in spades, but in addition to that it's not only

14   the Court's finding but its (indiscernible), but also in

15   2023.  Three District Courts in the Southern District of New

16   York sanctioned a number of claimants or plaintiffs that sued

17   the Trustee, PAX, O'Melveny.  Didn't sanction them just

18   because they alleged meritless claims, but because those

19   three separate District Courts found that the plaintiffs in

20   there were bringing this litigation for improper purposes,

21   i.e. on behalf of Mr. Kwok.  So, this whole allegation that

22   somehow if you are foreign company, if Mr. Kwok is not a

23   director or an officer, then you are independent and,

24   therefore, we're off to the races is, as you know, Your

25   Honor, not credible.

1          Then, and again I want to be very clear about

2   this, they say that the victims it's their money, why is the

3   DOJ and the Trustee trying to preclude the victims from

4   receiving their money.  Of course, there are victims here.

5   Of course they need to be compensated.  As I said at the

6   beginning, the issue is who is a victim, who is a real

7   victim, who is not, and how much are they owed.

8          As Your Honor knows, in this case tons of

9   claimants have filed claims saying I was defrauded by the

10  Himalaya Exchange scheme.  So, how would we turn over, you

11  know, $200 million plus to Mr. Giar based on unnamed

12  claimants and leave these other people alone or on their own,

13  I don't know, but the point is it makes no sense.

14         So, there needs to be a determination by a Court

15  about who is a claimant, who is not, and for how much.

16  Obviously, the issue of property of the estate is key here

17  and there is only one Court that has jurisdiction to

18  determine that and it's this Court.  I also want to point

19  out, as Your Honor knows, we have seen many "victims" show up

20  in this Court, swear under oath that they had no contacts or

21  no alignment with Mr. Kwok, only to be confronted by my

22  partners with videos of them giggling with Mr. Kwok, or

23  selling G clothes, or WhatsApp chats where they were involved

24  with Mr. Kwok.

25         So, that is why the Trustee has grave concern when

1  people show up and say we represent the real victims here

2  because we were not aligned with Mr. Kwok.  In light of our

3  position that we need to be extremely careful before anyone

4  reaches a final determination as to who is a victim and for

5  how much its very relevant that in this particular case, and

6  I mean by that Mr. Giar's movement which is called the

7  Himalaya Exchange Restoration Program.  That was started in

8  August of this year on the internet by someone named Little

9  Sara. Of course, that is not her real name, that is a "Kwok

10  world name".  Little Sara can be seen, Your Honor, on several

11  postings either calling the debtor Uncle, dining with the

12  debtor (indiscernible) apartment, being on the Lay May II

13  that we just are in the process of selling, or protesting at

14  the house of PAX's chairman.  So, you might say, well, they

15  are entitled to free expression and that's great, we respect

16  that, except that that post said, "Call Mr. Giar".

17         So, with all due respect, and we give the benefit

18  of the doubt of anyone that comes to this Court saying they

19  represent victims, but we have to say our antennas are up

20  about this one because the first mention of Mr. Giar was by

21  Little Sara in that posting in August where she said call

22  this guy to get Your money back.  Of course, you know, more

23  on that later.

24         Now in terms of process going forward Mr. Giar's

25  request was twofold.  One, to tell the criminal court the

1 forfeiture was inappropriate or the forfeiture should be

2 undone. So, that is one part.  The second part is criminal

3 court, please, direct the DOJ to give Mr. Giar the money.

4 So, we are going to file something tomorrow, its due

5 tomorrow, telling the criminal court that we are not taking a

6 position on whether the forfeiture was appropriate or not,

7 that is not for us to say.  The Government has already filed

8 an extensive letter explaining why this makes no sense, but

9 we are not going to take a position on that.

10        We are taking a position on the second part, which

11 is, please, criminal court, once you have determined that the

12 forfeiture should be undone order the transfer of these funds

13 to Mr. Giar and on that, Your Honor, we are going to tell the

14 District Court that this Court should be given an opportunity

15 to rule on the issue of property of the estate and other

16 relief before that second part of the relief is considered.

17 We are not stipulating or conceding in any way that the first

18 part will be granted, meaning that the Court will find that

19 forfeiture was not appropriate, but only that if the Court

20 reaches that conclusion then the Court should not order the

21 return of funds to anyone until this Court has the ability to

22 look at property of the estate, the impact of the automatic

23 stay, etc., etc.

24        So, I wanted to alert the Court to this.  I know

25 that you have had some concerns in the past about issuing an

1  injunction involving the defendant in a criminal case, but

2  these people are not defendants.  We are talking about people

3  attempting to grab money that we believe is property of the

4  estate.  It's possible that some of these people are true

5  victims of Mr. Kwok.  We are not debating that today.  We are

6  only debating that there is an organized process to determine

7  that and that on the issue of whether this is property of the

8  estate or not only this Court should be able to determine

9  that.

10        So, that is the update on that, Your Honor.  We

11  wanted you to have the benefit of that before we file our

12  response with the criminal court tomorrow.

13        THE COURT:  There is nothing in front of this

14  Corut right now with regard to these issues.

15        MR. DESPINS:  No.  The only communication I had

16  with Mr. Giar, he sent me some text or emails saying I was

17  hoping not to have to deal with the Bankruptcy Court.  It was

18  like, okay, good luck with that.  So, there is nothing before

19  the Court today.  There may very well be later some type of

20  motion to enforce the automatic stay or something along those

21  lines if the proceeding is going forward before the District

22  Court beyond the issue of whether the forfeiture was

23  appropriate or whether the forfeiture or freezing of these

24  sums should be undone.

25        THE COURT:  The United States Government froze

1 those funds as part of the criminal indictment?

2       MR. DESPINS:  Yes.  So, they are arguing that they

3 have a right to forfeiture and they filed a pleading to that

4 effect.  We are not debating that with them at this stage.

5 So, it may be that this goes nowhere from our point of view

6 in the sense that the Court will say, no, the forfeiture or

7 the temporary forfeiture, the pre-conviction forfeiture, is

8 appropriate and, therefore, it ends there in which case we

9 don't have to do anything at this point. But if it went to

10 the next level where the Court said actually I think that

11 these funds should be unfrozen then we will be back in front

12 of Your Honor for the next stage which is those funds should

13 certainly not go back to the BVI or to anyone until this

14 Court has had a chance to review the automatic stay and

15 property of the estate issues.

16       THE COURT:  Okay.  I understand.

17       All right.  With regard to the issue that we just

18 discussed prior to what I reported or has been reported will

19 be a closed courtroom, I heard a lot of things today about

20 Whitecroft and this deposition, and now apparently a

21 temporary restraining order, a motion for a temporary

22 restraining order or an application.  That is something you

23 want soon, I would have to assume.

24       MR. DESPINS:  Yes; although, I heard, through Your

25 questioning, counsel for the defendant, I don't want to push

1  that too hard, volunteering to agree to a consensual TRO

2  meaning that none of these funds would be moved in any way.

3  We would like to loop in the holder of the funds to something

4  along those lines.

5        So, we understand that Your docket is full, so if

6  we don't have to go through the temporary restraining order

7  we would also rather avoid that, Your Honor.  So --

8        THE COURT:  All I am asking you is what are the

9  dates you are looking for if there isn't some agreement.  I

10  would assume, and I don't know this, that you are asking for

11  something soon.  So, I would have to go look at these

12  documents and then it was filed, so you are not seeking an ex

13  parte TRO.

14        MR. DESPINS:  Correct.

15        THE COURT:  The other side already knows that you

16  are seeking it, right?

17        MR. DESPINS:  Yes.

18        THE COURT:  So, then it would have to be some kind

19  of a deadline for a response; although, I would, again,

20  assume that that you would like it to be as soon as possible.

21  So, today is the 18th.

22        MR. DESPINS:  Yes, Your Honor, but if we -- I

23  think the next matter would be the privilege issue, but

24  perhaps we would take a -- in any event, the courtroom has to

25  be cleared for that.  We could take a short recess.  We could

1  talk to counsel about stipulating to --

2           THE COURT:  Let me just ask the courtroom staff

3  because I don't remember -- are we closed this Friday?

4           MR. DESPINS:  Yes.

5           THE COURT:  So, we are closed this Friday and then

6  when are we closed again?

7           MR. DESPINS:  Monday.

8           THE COURT:  Okay.  Well, you know better than I.

9  Obviously Monday makes sense, but then are we closed another

10 day before the 1st of January and next Friday.  So, we are

11 closed the 23rd, the 25th and the 29th, is that right -- or

12 the 22nd, sorry.  The 22nd, the 25th, and the 29th.  So, that

13 is not a lot of time, obviously.

14          MR. DESPINS:  Based on what I heard and maybe I

15 misheard that, but I think we may be able to resolve this

16 consensually short term.  So, maybe a five-minute break if

17 that is acceptable to Your Honor.

18          THE COURT:  Well, whatever you want. All I am

19 saying is if you want me to enter an order setting up a

20 hearing on a temporary -- granting a temporary restraining

21 order and then having a preliminary injunction hearing, you

22 know, I need to understand timeframes.

23          MR. DESPINS:  Well, if they did not consent to

24 this we would want this to be heard as soon as possible, Your

25 Honor.  I mean the issues are not complicated.  We know where

1  the funds are.  We know she has testified that these funds

2  are hers.  We don't buy that for a second, but at least they

3  are not somebody else's funds.  It's just the issue is

4  freezing those funds until Your Honor has ruled on the

5  adversary proceeding.

6            So, if they are not going to stipulate to those

7  funds that are frozen, we are not going to get the formal

8  agreement from the foreign exchange entity that holds this

9  then we would need to proceed as soon as possible and maybe

10 as early as Wednesday.  Your Honor, there is another

11 emergency motion that you may not have seen that was filed.

12 It's a motion to preserve evidence regarding a storage

13 facility that is a few miles from the (indiscernible).  We

14 are asking that to be heard on shortened notice and on

15 Wednesday of this week.

16            Just to set the stage, we have discovered that

17 there is a storage facility that is not just a cubicle. They

18 are paying $7,000 a month for that facility.  So, it must

19 have a certain size.  And we know that its related to the

20 Mahwah mansion because the bodyguard, Barnett, was the lessee

21 on the storage facility lease.  He then transferred that to

22 another entity which is a Kwok entity.

23            What we want is just to be able to go to the

24 facility and no one else can access the facility in the

25 meantime because we don't want stuff to be taken out of that

1  facility.  This does not disrupt anyone in the sense that

2  it's a facility where there are objects in there or maybe

3  not.  To answer an order that says nobody will go to that

4  storage facility until the Trustee has had a chance to visit

5  it should be not disruptive to anyone.  We are not asking

6  anything beyond that, but that was an emergency motion that

7  was filed in the Mahwah mansion adversary proceeding this

8  morning because we discovered the existence of this storage

9  facility.

10        As you remember, there are assets that disappeared

11  from the Mahwah mansion.  So, they could be there, we don't

12  know that.  Certainly, if they are paying $7,000 a month for

13  storage there has to be something there, but we don't know.

14  So, that is another matter.  And we filed a motion to

15  expedite the hearing on that so it would be heard on

16  Wednesday of this week.  So, with my apologies we are

17  discovering all of this on the fly.

18        THE COURT:  So, we are talking about the Taurus

19  Fund adversary proceeding?

20        MR. DESPINS:  Yes.

21        THE COURT:  Mr. Conway, I see you are in the

22  courtroom.

23        MR. CONWAY:  I am, Your Honor. Michael Conaway,

24  Taurus Fund LLC.

25        THE COURT:  Okay.

1        MR. CONWAY:  I will just --

2        THE COURT:  We can't hear you. It's not Your

3  fault, but we can't hear you because everything has to be

4  picked up by a microphone.

5        MR. CONWAY:  Michael Conway.  I represent Taurus

6  Fund LLC.  I did speak with the Trustee about this.  That is

7  one of the reasons I am here because I got that while I was

8  in the neighborhood.  I got a copy of the unredacted motion.

9  I was reading it while we were sitting here. I suspect that

10 as long as it says I can go in and do an inventory as well in

11 the order I think we would stipulate to what the Trustee is

12 asking for.  So, to the extent that the Trustee is concerned

13 about timing, I think we can get that one off Your plate.

14       THE COURT:  Okay.  Thank you. Again, these were

15 filed today so I haven't seen what it is, but it sounds like

16 you might be able to agree to an order which should be fine.

17       MR. CONWAY:  It sounds like he just doesn't want

18 anything to move, which is fine with me.  I just want to be

19 able to see what is there myself.

20       THE COURT:  Is -- well, I will let you both talk

21 about it.  I am not going to worry about the facts because I

22 don't need to at the moment.

23       MR. DESPINS:  So, Your Honor, Mr. Linsey is

24 correcting me.  The -- what we are asking you on the TRO is

25 to enter it without a hearing; meaning that fourteen days

1  thereafter there will be a hearing.  Again, it's just to

2  freeze funds, nothing more than that.  Again, I would hope

3  that we can --

4        THE COURT:  This is what I am going to do, we are

5  going to have more of a hearing this afternoon.  We have

6  other hearings scheduled tomorrow, but my understanding is

7  there were things in this case that have been continued.  So,

8  I am not sure there is anything on the calendar in this case

9  or any related adversary proceeding tomorrow afternoon.  I am

10  not sure about that.

11        MR. DESPINS:  No, you are correct.

12        THE COURT:  Then I need to know by tomorrow

13  afternoon -- at least as far as this temporary restraining

14  order is concerned, I don't know what Mr. Conway just said

15  about the Taurus Fund adversary proceeding. It sounds like

16  that could be resolved.

17        MR. DESPINS:  Absolutely.  We have no problem with

18  him coming with us.

19        THE COURT:  All right.  So, let's put that aside.

20  Then we have the temporary restraining order seeking to stop

21  any kind of transfer, withdrawal, or disposition the funds in

22  a bank account in London.

23        MR. DESPINS:  It's not a bank, it's a foreign

24  exchange.

25        THE COURT:  Whatever it is, somebody holding $10

1 million, right?

2          MR. DESPINS:  Yes.

3          THE COURT:  And counsel -- Attorney Wernick said

4 that she might agree to that.  Now she hasn't had a chance,

5 in fairness.  I mean I was asking questions or whatever and

6 she was responding.  So, in fairness she has hasn't had a

7 chance to talk about that, really, either.

8          So, I think that what we should do then is use the

9 time that was set aside for tomorrow for you to report to me

10 where we stand on the -- because if there isn't agreement

11 then I have to rule one way or another on the TRO.  I guess

12 that is what I will have to do.  That is fine, but I need to

13 understand what I am being asked to do.

14          MR. DESPINS:  Understood.

15          THE COURT:  So, Mr. Conway -- it sounds like you

16 and Mr. Conway, Your issue might be more directly resolved

17 and that can be something that I don't need to enter an order

18 until and unless you tell me you don't have an agreement.

19          MR. DESPINS:  There is only one wrinkle to this

20 which is the entity that is currently the lessee under that

21 storage facility, I forget the name of that entity, but

22 it's -- I am not sure if Mr. Conway represents them.  They

23 are a BVI entity.  Again, it's a Kwok related entity.  We

24 don't know necessarily where they are or who represents them.

25          So, in theory they are the ones who have the right

1   to say no or yes.  Mr. Conway is involved because it's in his

2   case, but he is not the lessee under that facility.  So, we

3   appreciate his consent and we are happy to have him come with

4   us to visit, but the other entity somehow would need to

5   acquiesce and I am not sure Mr. Conway represents them.

6           MR. CONWAY:  I have never heard of them until I

7   saw it in Your filing.

8           THE COURT:  Okay.  I will let you figure that out.

9           MR. DESPINS:  Well, the question is --

10          THE COURT:  Well, you will have to tell me

11  tomorrow.

12          MR. DESPINS:  Okay.

13          THE COURT:  I am not going to have time to look at

14  anything anyway tonight, right, and then we have -- well, I

15  mean I could have time, but I don't because we have other

16  hearings tomorrow that I have to look at.  Then I think we

17  need to use the time that was originally scheduled for

18  whatever hearings were on in the main case and adversaries

19  tomorrow which I think were one p.m.  I could do it remotely.

20  I don't have to bring people back into the courtroom.

21          MR. DESPINS:  Okay.

22          THE COURT:  I want to know where things stand on

23  what appears to be two matters that were filed today that

24  have associated with them the assertion that they are

25  emergencies.  So, I need to figure that out because you are

 1  not going to have people here over the next week.

 2          MR. DESPINS:  Understood.

 3          THE COURT:  Okay.

 4          MR. DESPINS:  So, therefore, the only thing that

 5  remains for today is the privilege discussion where we would

 6  clear the courtroom.

 7          THE COURT:  Before you do that the storage

 8  facility issue have you talked to the storage facility?

 9          MR. DESPINS:  They have been served with the

10  papers, but I don't think --

11          THE COURT:  Okay.  So, they --

12          MR. DESPINS:  So, they have been served with a

13  subpoena.  They know about this.

14          THE COURT:  -- have been served with this.  They

15  have some idea?

16          MR. DESPINS:  Yes.

17          THE COURT:  I don't think that --

18          THE COURT:  No, I am not suggesting they are the

19  problem. I just want to know whether not --

20          MR. DESPINS:  Yes, they have.

21          THE COURT:  All right.  So, Mr. Conway, Attorney

22  Wernick, and I don't know if Attorney Moriarty is going to be

23  available or how you are going to handle it as far as who is

24  going to appear tomorrow, but I need to know on the issues

25  that we discussed when I was talking with you about the

1  discovery issues where you stand on whether there is consent

2  to some kind of order, at least temporarily, with regard to

3  the funds in the accounts and Mr. Conway.

4          I understand what the Trustee just said, but even

5  if you consent its better than no one consenting.  So, I

6  would like to know if that is possible as well.  Okay.  So,

7  we will do it at one o'clock tomorrow.  We will -- I guess

8  you will have to contact the calendar connect, is that how

9  they should do it to get the Zoom information for the

10 1:00 p.m. because we don't even have it set up yet,

11 obviously.  So, you can do that.  I'm sure the courtroom

12 deputy will be able to get something together between

13 9:00 a.m. and 10:00 a.m. tomorrow morning when we have other

14 hearings in person here.  Then you will get that information.

15 You can all appear via Zoom and we can see where things

16 stand.

17         MR. DESPINS:  Your Honor, could we have that at

18 two o'clock by any chance?

19         THE COURT:  Sure.  We can have it at two o'clock.

20         MR. DESPINS:  Thank you.

21         MR. CONWAY:  Your Honor, if the Trustee and I come

22 to an agreement --

23         THE COURT:  No, you don't have to appear.  If you

24 have an agreement then you do what you need to do other then

25 be involved.  That is true with you too, Attorney Wernick.  If

1  all it is, is the Trustee reporting agreements then no one

2  else  has to appear. I have no problem with that, but I just

3  need to know what, if anything, I need to do between Tuesday

4  afternoon and Thursday when the staff is leaving for the

5  holidays.  That is what I need to know.

6          MR. LINSEY:  I thought of something, Your Honor.

7          THE COURT:  Yes.

8          MR. LINSEY:  I will be filing what looks like an

9  unremarkable consent motion to add an addendum to the

10  protective order based on an agreement reached between the

11  Trustee and the FDIC.  While it will not look important, it

12  is very important in order for the Trustee to get Rule 2004

13  discovery that directly bears on that February 15th deadline

14  which is the only reason I am standing up to mention it now.

15          THE COURT:  So, you are going to be filing

16  something is what you are saying that we need to take a look

17  out for.

18          MR. LINSEY:  Likely tomorrow, if not Wednesday.

19          THE COURT:  I just realized Wednesday, you know, I

20  am not going to make people stay on Thursday after the

21  regular close of business.  I mean I may be here, but they

22  are not going to be here.

23          MR. LINSEY:  Understood, Your Honor.  That is why

24  I wanted to mention it.  It will look very garden variety.

25  It's just further privacy protections that the FDIC wanted to

1  comply with some of the banking regulations that they are

2  subject to.

3          THE COURT:  Okay.  Thank you.

4          MR. LINSEY:  Thank you.

5          THE COURT:  So, everyone, do what you can do,

6  obviously, and if you need the information for a Zoom call at

7  2 o'clock tomorrow then you will contact the calendar connect

8  information to get that Zoom information.

9          MS. WERNICK:  Thank you, Your Honor.

10          THE COURT:  All right.  Thank you very much.

11          Now you all tell me who has to leave.

12          MR. DESPINS:  Mr. Moriarty is going to stay with

13  Mr. Linsey and myself.

14          THE COURT:  Okay.  Thank you.

15      (Recess taken at 4:48 p.m.)

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    December 26, 2023

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski                    December 26, 2023

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable