```
 1                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF CONNECTICUT
 2                       BRIDGEPORT DIVISION

 3
       IN RE:                     .  Chapter 11
 4                                .  Case No. 22-50073 (JAM)
       HO WAN KWOK AND GENEVER    .
 5     HOLDINGS CORPORATION AND    .  (Jointly Administered)
       GENEVER HOLDINGS, LLC,     .
 6                                .
                Debtors.          .
 7                                .
       . . . . . . . . . . . . . .  .
 8                                .
       LUC A. DESPINS, CHAPTER 11 .  Adversary Proceeding
 9     TRUSTEE,                   .  No. 23-05008 (JAM)
                                  .
10              Plaintiff,        .
                                  .
11     v.                         .
                                  .
12     MEI GUO,                   .
                                  .
13              Defendant.        .
                                  .
14     . . . . . . . . . . . . . .  .
                                  .
15     LUC A. DESPINS, CHAPTER 11 .  Adversary Proceeding
       TRUSTEE,                   .  No. 23-05017 (JAM)
16                                .
                Plaintiff,        .
17                                .
       v.                         .
18                                .
       TAURUS FUND LLC, SCOTT     .  Courtroom 123
19     BARNETT, as trustee of     .
       TAURUS FUND LLC, and TAURUS .  Courtroom 123
20     MANAGMENET LLC, as trustee .  Brien McMahon Federal Building
       of TAURUS FUND, LLC,       .  915 Lafayette Boulevard
21                                .  Bridgeport, Connecticut 06604
                Defendant.        .
22                                .  Thursday, December 21, 2023
       . . . . . . . . . . . . . .  .  12:04 p.m.
23

24

25                       (CONTINUED)
```

```
 1

 2

 3

 4

 5

 6
                          TRANSCRIPT OF HEARING
 7            BEFORE THE HONORABLE JULIE A. MANNING
                   UNITED STATES BANKRUPTCY JUDGE
 8

 9

10

11

12   APPEARANCES:

13   For the Chapter 11
     Trustee:                    Patrick R. Linsey, Esquire
14                               NEUBERT PEPE & MONTEITH, P.C.
                                 195 Church Street
15                               13th Floor
                                 New Haven, Connecticut 06510
16
     For Mei Guo:                James M. Moriarty, Esquire
17                               ZEISLER & ZEISLER, P.C.
                                 10 Middle Street
18                               Bridgeport, Connecticut 06604

19

20   Audio Operator:            Electronically recorded

21   Transcription Company:     Reliable
                                The Nemours Building
22                               1007 N. Orange Street, Suite 110
                                 Wilmington, Delaware 19801
23                               Telephone: (302)654-8080
                                 Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1                                  INDEX

2  <u>MOTIONS</u>:                                                    <u>PAGE</u>

3  Matter
   No. 1      Chapter 11 Trustee's Emergency Motion          4
4             for Temporary Restraining Order and for
              Preliminary Injunction Pursuant to Federal
5             Rule of Bankruptcy Procedure 7065 to Preserve
              Property of the Estate
6
              Court's Ruling:                                53
7
   Matter
8  No. 2      Emergency Motion of Chapter 11 Trustee to      54
              Order Preservation of Evidence
9
              Court's Ruling:                                62
10
   Transcriptionists' Certificate                            67
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 12:04 p.m.)

2        THE COURTROOM DEPUTY:  Adversary No. 23-05008

3    *Despins v. Guo*, and Adversary No. 23-05017 *Despins v. Taurus*

4    *Fund LLC.*

5        THE COURT:  Good afternoon.  If we could have

6    appearances for the record starting with counsel to the

7    Chapter 11 Trustee.

8        MR. LINSEY:  Good afternoon, Your Honor.  Patrick

9    Linsey, counsel to the Chapter 11 Trustee.

10       THE COURT:  Good afternoon.

11       Mr. Moriarty.

12       MR. MORIARTY:  Good afternoon, Your Honor.  James

13   Moriarty from Zeisler & Zeisler for the defendant, Mei Guo in

14   Adversary 23-05008.

15       THE COURT:  Good afternoon.

16       MR. MORIARTY:  Good afternoon.

17       THE COURT:  Is anyone else going to be making an

18   appearance this afternoon?  None that you are aware of,

19   Attorney Linsey?

20       MR. LINSEY:  No, Your Honor.

21       THE COURT:  Okay.  All right.  There is a matter

22   on at twelve that involves Mr. Moriarty and a matter on at

23   one that does not.  The matter at one seems to have more

24   consent then the matter on at twelve.  Is that correct,

25   Attorney Linsey?

1          MR. LINSEY:  That is correct, Your Honor.

2          THE COURT:  You haven't talked -- there is no one

3   that you are aware of that would be appearing at the one

4   o'clock matter other than the people in this courtroom?

5          MR. LINSEY:  I can't say for sure that Mr. Conway

6   would not appear. I can't even say for sure that counsel for

7   the storage facility would not appear. I don't expect counsel

8   for the storage facility to appear.

9          THE COURT:  Do you have the ability to ask someone

10  in Your office if they can find out if Mr. Conway or counsel

11  for the -- because I can take the -- I don't want to take the

12  one o'clock matter first if there is a possibility someone is

13  going to show up.

14         MR. LINSEY:  That is a good point.  Could I just

15  have one moment to make a call?

16         THE COURT:  Yes, you may.

17         MR. LINSEY:  Thank you, Your Honor.

18      (Pause in hearing)

19         MR. LINSEY:  Thank you, Your Honor.

20         THE COURT:  You, obviously, don't have an answer

21  to Your question yet, but you made the inquiries.

22         MR. LINSEY:  I made the inquiry and I know that

23  counsel from the storage company is not coming.  We don't

24  expect Mr. Conway to come; however, the HGA entity, which is

25  the lessee or licensee with respect to storage facility, they

1  are on notice.  We don't -- it is -- I doubt it, but its

2  possible that they could show up and try to make an

3  objection.

4          THE COURT:  All right.  Well, let's take the first

5  matter then in Adversary 05008 --

6          MR. LINSEY:  Thank you, Your Honor.

7          THE COURT:  -- in *Despins v. Guo*.  So, Mr. Linsey

8  and Mr. Moriarty have noted their appearances for the record.

9  So, Mr. Linsey, this is the Trustee's application for a

10 temporary restraining order.  I didn't study, but I know

11 things have been filed in the last hour or so.  So, go ahead

12 and please tell me where things stand.

13         MR. LINSEY:  Thank you, Your Honor.

14         Since the last hearing, the Trustee's counsel has

15 spoken with counsel for the defendant.  The Trustee

16 understands that the defendant consents to injunctive relief,

17 but not to -- does not consent to moving the funds back to

18 the United States and away from JNFX which is that foreign

19 exchange operation where the funds have diminished

20 substantially over the last ten months.

21         Even after -- we understand from a call last

22 night, even after defendant's counsel apparently spoke with

23 JNFX they do not claim to know how the $1 million in

24 principal was lost or why $500,000 in fees were charged. The

25 defendant concedes that the existing injunction in the HK

1  case covers these funds and yet some substantial portion of

2  them has clearly been dissipated while that injunction is in

3  place. The existing injunction required the defendants funds

4  to be preserved. The defendant's counsel say that Ms. Guo

5  gave no explicit direction to do specific trades, but may

6  have given instruction or permissions to trade on account

7  prior to the entry of the injunction.  Regardless, once the

8  injunction entered, Ms. Guo had an affirmative obligation to

9  make sure that her agent, the exchange was not dissipating

10  the funds.

11         So, the concession that the defendant instructed

12  JNFX pre-injunction that they could trade her funds, assuming

13  that is what occurred, nothing else really makes sense is

14  totally inconsistent with the defendants Rule 2004 testimony

15  that she did not know who held those funds.  Fees for foreign

16  exchange trading are typically charged or generated when

17  trades are made and are based on the amounts traded.  To

18  generate $500,000 in fees there would need to be substantial

19  trading on this account.  There is also a $60,000 fee that is

20  labeled a pharos fee, P-H-A-R-O-S.  We have asked about these

21  fees and why they were generated at Whitecroft's Rule 2004 --

22  I'm sorry, Whitecroft's 30(b)(6) deposition and the corporate

23  representative improperly refused to answer those questions.

24         THE COURT:  Meaning Ms. Guo?

25         MR. LINSEY:  Correct, Your Honor.

1            The million-dollar loss, which is a little -- you

2    know, the million dollar in principal, and I am separating

3    that from the more then $500,000 in fees cannot be exchanged

4    by fluctuations between the Euro and the dollar during the

5    time period at issue.  Those two currencies simply don't move

6    against each other that much.

7            So, you know, what we have here is $13.5 million

8    sale price and now we have proceeds that we understand to be

9    just above $10 million in remaining funds.  It is very

10    important to the Trustee that those funds be preserved, but

11    we have not heard any principal reason why the funds should

12    need to remain offshore.  Again, this is a sale that took

13    place in the US, a US buyer, funds were sent offshore.  We

14    have not heard any principal reasons why the funds should

15    need to remain offshore.  There is a substantial deficit in

16    trust when it comes to what this JNFX operation is going to

17    do, who they are taking orders from.

18            I want to be clear, Your Honor, this is not a

19    brick-and-mortar bank.  This is not from our brief review and

20    investigation a brick and mortar anything.  You know, this

21    could be people operating out a garage somewhere for all the

22    Trustee knows. The Truste does not know who they are aligned

23    with.  They are not in the US jurisdiction.  These funds

24    should be brought back to the US where they are safe and

25

1   secure and in compliance with an injunction pending the

2   Court's adjudication of this case.

3           The Trustee's counsel has had conversations with

4   the defendant's counsel.  We have offered that the funds

5   could be held by defendant's counsel in trust accounts who

6   said pick an escrow agent and we will take a look.  All we

7   have heard is no, the defendant insists the funds stay

8   offshore with this operation that Whitecroft refuses to

9   answer questions about.  We saw an email between Ms. Guo and

10  someone at this operation where they say they received

11  instructions from here that she agreed the terms and

12  conditions.  They can't provide us where those instructions

13  were.  They can't provide us a copy of those terms and

14  conditions.

15          Keeping these funds where they are is just,

16  frankly, an unacceptable risk to the Trustee.  So, I think

17  it's a positive step that we have agreement that an

18  injunction may enter, but it is --

19          THE COURT:  A preliminary injunction.

20          MR. LINSEY:  Correct, Your Honor, a preliminary

21  injunction.  You know, I labeled it a preliminary injunction

22  because we would not be in a posture where the parties would

23  have to come back in fourteen days for a hearing is my

24  understanding.  It is substantially important to the trust.

25  The Trustee is not trying to do anything more then make sure

1   there is no further dissipation in these funds.  So, that is

2   the Trustee's position.

3             I am happy to answer any questions.

4             THE COURT:  The exhibits that you attached to the

5   temporary restraining order, now I have to find out which one

6   it is so give me a second, please, okay.

7             MR. LINSEY:  Yes, Your Honor.

8             THE COURT:  As you know, most of these documents

9   were filed within the last day or two.  So, it does take some

10  time to review them.

11            MR. LINSEY:  Of course.

12            THE COURT:  So, 30-A, which is not a sealed

13  document, to ECF No. 35 --

14            MR. LINSEY:  I'm looking at it now, Your Honor.

15            THE COURT:  -- the first page of 30-A says JNFX at

16  the top, the beginning of the address is covered by the ECF

17  information, but then it says 75 King William Street, London,

18  December 12th, 2023, to whom it may concern.  Where did you

19  get this document, Attorney Linsey?

20            MR. LINSEY:  This document was produced by

21  defendant's counsel.  This is one of the documents that was

22  produced approximately one hour before Whitecroft's

23  deposition.

24

25

1        THE COURT:  Okay.  It doesn't have any stamp on it

2   or anything, but you are telling me this was produced by

3   defendant Guo's counsel.

4        MR. LINSEY:  Yes, Your Honor.

5        THE COURT:  The deposition was held on what day?

6        MR. LINSEY:  On Friday, December 15th.

7        THE COURT:  On December 15th.  So, on December

8   12th somehow this document -- well, this document is dated

9   December 12th and it says to whom it may concern.  We can

10  confirm Whitecroft Shore Ltd., has the following balances

11  with JNFX Ltd.  The account had US dollar balance on 12/12/23

12  as below.  Below it says 12/5/12, which is, obviously, 12/5,

13  that there is a running balance of zero.

14        MR. LINSEY:  Well, we have been advised since

15  receiving --

16        THE COURT:  I can't hear you, Attorney Linsey.

17        MR. LINSEY:  I apologize, Your Honor.  What we

18  have been advised since having filed the TRO motion is that

19  the -- the reason that this says a running balance of zero is

20  that this is a statement of US dollar funds.

21        THE COURT:  Yes.  Who advised you of that?

22        MR. LINSEY:  We have been advised by the

23  defendant's counsel.  We have also -- Paul Hasting's London

24  office sent correspondence to JNFX advising that we were

25  pursuing relief with the Court and that funds should not be

1  moved.  Both the defendant and JNFX have advised the Trustee

2  that there are -- that there is a Euro balance in the account

3  of, I believe -- I don't have the number in front of me, but

4  I believe it is $9.1 million.

5          UNIDENTIFIED SPEAKER:  Its $9.3.

6          MR. LINSEY:  $9.3 million in Euro which is just

7  above $10 million equivalent in US dollars.

8          THE COURT:  Well, this document talks about above

9  the 5/12/23 which is 12/5/23 in this country, right.  It

10 talks about US/Euro exchange. That is what FX is, right, an

11 exchange?

12         MR. LINSEY:  Correct, Your Honor.

13         THE COURT:  So, why does it have a zero balance on

14 12/5 when the other dates, which are not the same dates,

15 meaning there aren't two transactions in one day changing

16 from Euros to US dollars or US dollars to Euros, at least

17 according to this statement.  The only transaction that

18 occurs on the same day in this statement is a credit on

19 February 22nd, 2023 of $12,017,995.86 and it doesn't tell

20 whether its in Euros of US dollars, number one.

21         Number two, the next entry on that statement is a

22 fee of $300,000 which is apparently a debit because above it

23 is a credit. I assume that is what those things mean.  Then

24 there is this on March 3rd $60,000 debit again to a Ferris

25 Capital and then there is another fee on July 3rd to JNFX.

1  Then nothing happens until there are these US dollar/Euro

2  exchange on July 28th, 2023 and Euro to US dollar exchange on

3  October 19th, 2023.  Then on December 5th, 2023 it says US

4  dollar to Euro debit, not credit, and it says zero.

5          So, what information do you have.  I am going to

6  ask Mr. Moriarty the same question about what money -- what

7  do you have in writing that shows that there are funds in

8  this account -- that are being held, I should say, by JNFX?

9          MR. LINSEY:  We have an email from someone who

10  purports to be affiliated with JNFX saying that there is a

11  Euro balance in the account. I think Your Honor put the

12  Court's finger on what is an issue of substantial frustration

13  to the Trustee which is we have a lot of questions about this

14  statement.  So, at Whitecroft's deposition we asked a number

15  of questions about the statement and were constantly met with

16  invocations in the Fifth Amendment.

17          THE COURT:  Okay.  What email are you talking

18  about, that the Trustee received from JNFX?

19          MR. LINSEY:  That Trustee's counsel received from

20  JNFX. I can probably pull it up on my phone.

21          THE COURT:  I don't need to see it necessarily. I

22  want to understand the date of it, please.

23          MR. LINSEY:  My --

24          THE COURT:  I would assume or, at least, hope that

25  its after December 12th, 2023.

1          MR. LINSEY:  It was on December -- it was on

2    Monday, because it was after we filed the TRO motion that we

3    got this; otherwise, we would have told the Court in the TRO

4    motion that we gotten that notice.

5          THE COURT:  I just want to understand --

6          MR. LINSEY:  Sure.

7          THE COURT:  -- you are asking -- that's fine,

8    parties are asking for a consent of a preliminary injunction,

9    right.  Under the rules I am supposed to state with

10    specificity why there is a preliminary injunction entering.

11    There is a document here that has been submitted that is not

12    sealed.  So, it is not subject to any asserted

13    confidentiality or anything else in this case that shows a

14    zero balance.

15          If I am -- well, any person that would read this

16    would think that there was somehow an exchange of US dollars

17    to Euro and there was a debit or withdrawal of the dollar

18    amount above that was in there on October 19th, 2023 that

19    resulted in a zero balance.

20          MR. LINSEY:  I hope so, Your Honor, because that

21    is what I thought when I saw this on Friday shortly before

22    the deposition was supposed to begin.  That is why we tried

23    to organize a call with defendant's counsel.  Those events

24    are described in the TRO motion and we were told that,

25    basically, defendant's counsel didn't know what this meant,

 1    was trying to find out.  We tried to inquire about it at the

 2    Whitecroft deposition.

 3              THE COURT:  No, I understand all that.  So, you

 4    are telling me that there is an email to Paul Hastings or is

 5    it Your office?

 6              MR. LINSEY:  Its to Paul Hastings -- one of Paul

 7    Hastings counsel in London.

 8              THE COURT:  In London from someone purporting to

 9    act with authority from JNFX that says that Whitecroft Shore

10    Ltd. has a balance with JNFX Ltd. in a Euro amount that is

11    somehow -- that is equal to approximately $9. What million

12    dollars?

13              MR. LINSEY:  I believe that the -- it is

14    equivalent to a little bit more than $10 million.

15              THE COURT:  Oh, $10 million.  Okay.

16              MR. LINSEY:  Its hard to be precise because the

17    precise fluctuates by the day.

18              THE COURT:  I understand that.  I am not asking

19    you to be precise.

20              MR. LINSEY:  Thank you, Your Honor.  If Your Honor

21    would like, I think I can get the email.

22              THE COURT:  No, I don't need the email at the

23    moment.  You asked if I had any questions, that is my first

24    question.

25              MR. LINSEY:  Understood.

1          THE COURT:  Then also 30-B and 30-C are unsealed

2   documents to the application for a temporary restraining

3   order.  There are emails between the defendant's counsel, Mr.

4   Vartan, and apparently -- oh, Mr. Romney is cc'd as well from

5   Zeisler & Zeisler.  Apparently someone named James Sadoh, I

6   don't know if am pronouncing his name properly, S-A-D-O-H, at

7   JNFX cc'ing Julia Shaminy Chase (ph) at Gold Leaf BVI.com.

8   Attorney Wernick and Attorney Romney about this account.

9          Apparently, the statement that is 30-A dated

10  December 12th, 2023, although it says to whom it may concern,

11  but according to Attorney Vartan's email that statement was

12  provided to Ms. Guo's BVI counsel.  Who is Ms. Guo's BVI

13  counsel, Mr. Moriarty?

14          MR. MORIARTY:  May I just look at Attorney

15  Linsey's documents?

16          THE COURT:  Sure.  We can pull up 30-A, and B, and

17  C if you would like us to.

18          MR. MORIARTY:  I don't think that that is

19  necessary.  So, its Julia Shaminy Chase who is cc'd on the

20  emails.

21          THE COURT:  So, that is Ms. Guo's BVI counsel?

22          MR. MORIARTY:  It is Whitecroft Shore's BVI

23  counsel and I believe also --

24          THE COURT:  Well, Your own colleagues said that

25  Ms. Guo's BVI counsel, that is what Your own colleague wrote.

1        MR. MORIARTY:  I have no reason to disagree with

2   what Attorney Vartan wrote, Your Honor. I can tell you that

3   Julia Shaminy Chase is BVI counsel.

4        THE COURT:  BVI counsel to what?

5        MR. MORIARTY:  As far as I know to Whitecroft and

6   to Ms. Guo.

7        THE COURT:  Is there a firm in the British Virgin

8   Islands called Gold Leaf?

9        MR. MORIARTY:  I believe so.

10        THE COURT:  That is the law firm?

11        MR. MORIARTY:  I believe so.

12        THE COURT:  Okay.  With regard to the exhibits

13   that are attached to Your declaration, Attorney Linsey, there

14   is a declaration in support of the temporary restraining

15   order, the emergency motion for temporary restraining order

16   filed under seal in this adversary proceeding at ECF No. 73.

17   Then there is a redacted version as well, but I am looking at

18   the sealed version.

19        MR. LINSEY:  Yes, Your Honor.

20        THE COURT:  The sealed version, as does the

21   redacted version, list 32 exhibits in support of the

22   temporary restraining order, request for a temporary

23   restraining order.  Then Your chart indicates whether they

24   are sealed or unsealed.  In the chart that I have reviewed

25   the sealed documents that I see, every one of them are sealed

1    because of an assertion that they are highly confidential,

2    not that they are subject to a privileges order.

3              MR. LINSEY:  That is correct. In light of the

4    pending motion, we intentionally excluded anything that was

5    potentially privileged from this motion.

6              THE COURT:  Right.  So my clarification is just

7    what you just said. I wanted to ensure that my review of

8    these exhibits, 1 through 32, none of those exhibits, not

9    one, is subject of the motion that the Trustee filed in the

10   main case seeking some relief in connection with the

11   privileges order.

12             MR. LINSEY:  Correct, Your Honor.  We are not

13   going to file anything of that nature pending Your Honor's

14   decision.

15             THE COURT:  I just want to make sure I have the

16   record correct.  So, when I look, and I have looked by the

17   way, at all 32 of these exhibits, it took me some time as I'm

18   sure you can appreciate, but I did look at these exhibits.

19   The only thing that wasn't attached, and I don't know why,

20   but it might have just been -- I don't know if it was in the

21   redacted version, but it wasn't in the sealed version, was

22   the final contempt decision in *PAX v. Kwok* Exhibit 1, for

23   some reason that is not part of the sealed document.  That is

24   not a problem, I am familiar with it.  So, I can find it if I

25   need to find it. I have read it before.

1     MR. LINSEY:  Sounds like that was an oversight. I

2 apologize.

3     THE COURT:  No, that is what I said, it's not a

4 problem.  First of all, its unsealed and its already part of

5 the record in the main Chapter 11 case and/or in some of the

6 many related adversary proceedings.  So, I am not at all

7 concerned about that. I just wanted you to know, when I

8 looked at Exhibit 73 -- excuse me, ECF No. 73, that for

9 whatever reason wasn't there.

10     MR. LINSEY:  Thank you, Your Honor.

11     THE COURT:  That's all. Not a problem.  There is

12 no reason for you to refile it.

13     MR. LINSEY:  Okay.  Thank you, Your Honor.

14     THE COURT:  With regard to the other exhibits that

15 are from 2 through 32, I have reviewed those exhibits.  I

16 understand the information contained in those exhibits.  The

17 overwhelming majority of which I have not seen before this

18 temporary restraining order, but now I have.

19     So, I just wanted that to be clear that, number

20 one, all of these documents, the 32 exhibits listed in ECF 73

21 that are presently under seal -- not all of the exhibits are

22 under seal, you have clarified which are sealed and which are

23 not sealed.  I have reviewed all of the documents, whether

24 they are unsealed or sealed, in connection with the request

25 for a temporary restraining order because I, obviously, had

1   no idea whether or not there would be any form of consent to

2   this application for a temporary restraining order prior to

3   this hearing.

4         So, when you ask about the issues related to the

5   location of the funds the reason I asked the first question

6   that I did ask about whether there really are any monies in

7   the possession and, I don't even know if can say, control,

8   but in the possession of JNFX.

9         Attorney Moriarty, you agree with Attorney Linsey

10  that there was some communication from JNFX after this

11  temporary restraining order was filed in which they represent

12  or it represents that it is holding funds on behalf of

13  Whitecroft in an amount of approximately $10 million?

14        MR. MORIARTY:  Your Honor, I don't know the exact

15  time that the TRO application was filed.

16        THE COURT:  Well, you do because it's on the

17  document. I can tell you exactly when it was filed. That is

18  not hard.  So, we can do that.  That is not a problem.  Just

19  give me a minute and then I will be able to tell you exactly

20  when it was filed.

21        MR. MORIARTY:  Sure.

22      (Pause)

23        THE COURT:  It was filed on December 18th -- I'm

24  sorry, you just have to give me one more minute. I got the

25  wrong screen.

1       (Pause)

2          THE COURT:  At ECF No. 74, December 18th -- I am

3  not sure why this is continuing to -- oh, because its sealed.

4  I apologize. I can't look at that one.

5          MR. MORIARTY:  I had the same issue, Your Honor.

6          THE COURT:  Okay. Hold on a second, that is my

7  mistake.

8       (Pause)

9          THE COURT:  I am looking at the courtroom deputy.

10  Can you see the time because this I sealed. So, the problem

11  is the -- although, I am looking at 73 and it has the time on

12  it.  So, I don't know why 74 doesn't have the time on it. I

13  guess because 73 is 74 and 75.  So, 73 was filed, which is

14  the sealed document with all the exhibits, Attorney Moriarty,

15  and that was filed at 1:48 p.m. on the 18th of December.

16          MR. MORIARTY:  Your Honor, there is an email that

17  I was copied on, it's from Jonathan Green at JN-FX.com and it

18  is addressed to Luc A. Despins 1:46 p.m. on December 18th. It

19  is in response to an email from the Trustee stating what is

20  the amount held and the response is Euros $9,359,720.99.

21  That is at 1:46 p.m. on December 18th.

22          THE COURT:  So, two minutes prior to the filing of

23  the application for a temporary restraining order they said

24  that, but we have no idea whether three minutes later there

25  were any funds there.  Is that accurate?

 1          MR. MORIARTY:  Your Honor, I was on a phone call

 2   yesterday with representatives of JNFX where they confirmed

 3   that that amount is still in the account.  JNFX also

 4   confirmed that they agree that nothing will be done with

 5   those funds absent a further order of this Court or joint

 6   instructions from Ms. Guo and the Trustee.

 7          THE COURT:  Does the -- I don't think the

 8   preliminary injunction order that you submitted says that

 9   though.  That is one of the concerns that I had, Mr.

10   Moriarty.  I don't think that this -- maybe I am wrong, by

11   the way, because this just got filed in the last hour. So, I

12   could have missed it.  So, when I say that understand I could

13   be wrong, okay.  So hold on a second, let me see where I am.

14   There is quite a lot of things that were filed.  That is

15   fine, but I am just saying could I be wrong; yes, I could be

16   wrong.

17          (Pause)

18          THE COURT:  All right.  Give me a moment,

19   Mr. Moriarty.  I may be wrong.  I might be looking at the

20   wrong thing.  There were quite a flurry of things and that's

21   fine. All right, here is Your proposed order.  Let me look at

22   Your proposed order.  My understanding is you had redline --

23   you submitted something that said we will agree to -- I mean,

24   you took their order and you marked it up, right?

25          MR. MORIARTY:  Yes, Your Honor.

1      THE COURT:  Okay.  So, hold on a second.  Its

2  taking a moment to open, so I'm sorry.

3      (Pause)

4      THE COURT:  Okay. I've got it now.  So, I am

5  looking at this order with Your redline comments and I don't

6  see anywhere in here that JNFX agrees to be preliminarily

7  enjoined.  All I see is that Bombardier proceeds may not be

8  transferred from or by JNFX except upon joint written

9  instruction of Ms. Guo and the Trustee. It doesn't say that

10  they're affirmatively agreeing to be enjoined and that is

11  what I think it needs to say.

12      MR. MORIARTY:  I agree with you, Your Honor, that

13  it does not say that and I have not had a discussion with

14  anybody at JNFX where JNFX has indicated that they would

15  agree to be enjoined. They have agreed that they would not

16  transfer the funds, but as far as being enjoined and subject

17  to this Court's jurisdiction that is not a discussion that I

18  have had.

19      THE COURT:  Okay.  When you talk about subject to

20  this Court's jurisdiction I understand Your point; however, I

21  think there has been a lot of decision that the Second

22  Circuit has approved in the Madoff case where once an asset

23  is -- once it is determined that there can be an interest in

24  an asset regardless of whether its outside of this country

25  that this Court has jurisdiction over it and I think the

1  Second Circuit decisions in the <u>Madoff</u> case would support

2  that.

3        So, I understand what you are saying.  You may not

4  have had a discussion with them, but I think where we left

5  this on Tuesday the two of you said if you couldn't agree you

6  would submit Your competing orders which you have done,

7  right?  I will then enter whatever order I think is

8  appropriate.  That is what you agreed to.

9        So, if I enter something you didn't consent to or

10  JNFX didn't consent to that doesn't mean that you are still

11  not bound by what you consented to.

12        MR. MORIARTY:  Your Honor, I agree that whatever

13  order this Court enters binds whomever the Court has

14  jurisdiction over.  So --

15        THE COURT:  It's not just whoever the Court has

16  jurisdiction over, its whatever the Federal Rules of Civil

17  Procedure provide with regard to an injunction which this

18  order, I would specifically refer to, Rule 65(a) and Rule

19  65(c), I believe, that says who is bound by the order.  The

20  order, Rule 65 -- I'm sorry, its (d).  It says:

21        "Every order granting an injunction and every

22  restraining order must state the reasons why it issued, state

23  its terms specifically, and describe in reasonable detail and

24  not by referring to the complaint or other document the acts

25  or acts to be restrained.  That is (d)(1).

1           (d)(2) says:

2           "The order binds the following who receive actual

3  notice of it by personal service or otherwise.  The parties,

4  the parties officers, agents, servants, employees, and

5  attorneys, and other persons who are in active concert or in

6  participation with anyone described in Rule 65(d)(2)(a) or

7  (b)".

8           So, it's not just jurisdiction, it's what the

9  Federal Rules of Civil Procedure provide. And as I stated,

10  there are plenty of decisions in the Madoff case where the

11  Second Circuit has held that the Trustee had the right to

12  seek and obtain assets and relief for assets located outside

13  of the United States because, as we know, property of estate

14  is a broad term and it says all assets wherever located,

15  right. It doesn't say within the United States.

16           MR. MORIARTY:  Yes, Your Honor.

17           THE COURT:  So, I don't think that Your

18  jurisdiction thoughts are persuasive at this time.

19           MR. MORIARTY:  Your Honor, just if I may clarify,

20  I wasn't suggesting one way or another who would be bound,

21  who wouldn't be bound.  When I spoke of jurisdiction, I

22  agree, 65(d) specifically enumerates who is covered by an

23  injunction.  There's a reference to Federal Rule of Civil

24  Procedure 65(d) in the fourth ordered paragraph.

25           And when I say "jurisdiction," maybe I misspoke

1  and I should have said "notice," because 65(d) is --

2          THE COURT:  Well, it's not notice.  That's not

3  what the rule says.

4          MR. MORIARTY:  65(d)(2)(c):

5          "Other persons who are in active concert or party

6  or participation with anyone described in 65(d)(2)(a) or

7  (b)."

8          THE COURT:  Yes, but it says that you have to

9  actually receive actual notice.  So it's not notice, it's

10  "actual notice."

11          MR. MORIARTY:  Right.  By certainly service or

12  otherwise.

13          THE COURT:  Well, there's a big difference between

14  "notice" and "actual notice."

15          All right.  So let's talk about the marked-up

16  order, Mr. Linsey and Mr. Moriarty, both of you.

17          MR. LINSEY:  Yes, Your Honor.

18          THE COURT:  So the second ordered paragraph, the

19  debtors' -- excuse me -- the defendant's counsel has changed

20  that ordered paragraph to say that the Bombardier proceeds

21  may not be transferred, which, by the way, the Bombardier

22  proceeds are not defined in this preliminary injunction

23  order.

24          But, in any event, may not be transferred from or

25  by -- from or by JNFX.  So if they're not restrained from

1  doing that, then what's the point of this order?  What's the

2  point of this paragraph?  Or is the trustee comfortable with

3  that language?

4         MR. LINSEY:  The trustee is decidedly not

5  comfortable with the language, Your Honor.  Your Honor put,

6  again, the Court's finger on a point that is of a substantial

7  concern to the trustee, which is that this language does not

8  bind -- JNFX is not expressly agreeing to be bound by the

9  order of the Court.

10        But to take a step further from that, what we had

11 originally drafted requires the funds to be returned to the

12 U.S. and I want to be clear, returned to the U.S.  The sale

13 occurred in the U.S.  There was a U.S. buyer.  The defendant

14 caused the money to be sent overseas.  The trustee believes

15 that the funds, pending the adjudication of this case, should

16 be brought back.

17        And the trustee has, you know, candidly, Your

18 Honor, the trustee would have comfort with a reputable escrow

19 agent holding funds.  The trustee would even have comfort

20 with Mr. Moriarty's firm holding the funds; however, we don't

21 know who JNFX is.

22        Even if they did say, Okay, we'll be bound, the

23 trustee does not know who these people are.  They're not

24 within the United States and the trustee would be depending

25 on the representations of people we don't know who they are.

1   We don't know what assets they have that we could recover

2   from to comply with the Court's order.  Or, you know, to the

3   extent that they're acting at the behest of the defendant,

4   the debtor, or others, we'd be depending upon, you know, what

5   word those people are going to give at any given time.

6        And, respectfully, Your Honor, I don't mean to be

7   needlessly argumentative, but the trustee certainly does not

8   have confidence in the defendant or the debtor when it comes

9   to comply with court orders.  The entire reason this

10  Bankruptcy Court case was filed is because the defendant and

11  the debtor flouted Justice Ostrager's orders to return an

12  asset to the United States for a year and racked up a

13  contempt fine in excess of a hundred million dollars.

14       So, unless the funds are held by an escrow agent,

15  by someone the trustee has confidence they will respect this

16  Court's orders -- not what the trustee says; just what the

17  Court says they have to do -- the trustee is going to have no

18  security in this regard.  And the trustee's concern is not

19  hypothetical.  The trustee's concern is based on the fact

20  that we had a sale that occurred with a purchase price of $13

21  and a half million.  It's a little bit more than a year since

22  the sale closed and we have -- we're now down almost $3 and a

23  half million and we don't want to see it go down any further.

24       Assuming that money is real, as Your Honor also

25  pointed out, all we have is this email.  I don't know who

1  Mr. Green is.  I've seen an email from someone named

2  Mr. Green.  I'll be comfortable that there are funds when I

3  hear from an escrow agent I can trust in the U.S. that they

4  received those funds.

5         THE COURT:  I don't recall, Attorney Linsey,

6  because as I said, you know, these have all been filed in the

7  last 48 hours, right, and there's a lot of documents to look

8  at --

9         MR. LINSEY:  Yes, Your Honor.

10         THE COURT:  -- as part of the 32 exhibits that you

11  attached to the application for a temporary restraining

12  order, is there a document that shows -- that establishes

13  from the trustee's perspective -- and the defendant may

14  disagree, but I'm asking you -- the disposition of the sale

15  proceeds being deposited into an account in the United States

16  before it went to London?

17         MR. LINSEY:  Yeah.  What we have is an asset

18  purchase agreement which reflects that the buyer was in the

19  United States, so that is sufficient to us to indicate that

20  the purchase price originated in the United States.  Our

21  understanding based on circumstances --

22         THE COURT:  The aircraft purchase agreement --

23         MR. LINSEY:  Correct, Your Honor.

24         THE COURT:  -- Exhibit 19?

25         MR. LINSEY:  Correct, Your Honor.

1           THE COURT:  Okay.

2           MR. LINSEY:  So, from the trustee's perspective,

3     to the extent that defendant received the funds in the U.S.

4     or sent them elsewhere or the defendant just told the buyer,

5     Hey, send my sale proceeds overseas, it's the same thing.

6     It's sale proceeds coming from the U.S. that the defendant

7     has caused to be sent overseas.

8           And let's be clear about why.  It's to keep them

9     away from the trustee.  It's to conceal and remove property

10    of the estate the trustee is trying to obtain.

11          THE COURT:  The asset purchase agreement that I'm

12    looking at right now, which is Exhibit 19 of the trustee's

13    exhibits, which is filed under seal, but is only designated

14    as "highly confidential."  It was produced by Whitecroft or

15    at least it has a Whitecroft Bates stamp on it.  It says:

16          "This aircraft purchase agreement is made and

17    entered into as of August 2nd, 2022, the effective date by

18    and between Whitecroft shore Ltd., seller, a British Virgin

19    Islands corporation with its permanent legal address at care

20    of Golden Spring New York Ltd., P.O. Box 2120, New York, New

21    York, Golden Spring, who's already been found to be the

22    alter-ego of the debtor, and ACASS USA, Inc., purchaser, a

23    Delaware corporation, with a principal address at 601

24    Bayshore Boulevard, suite 700, Tampa, Florida."

25          The beginning of the agreement.  Now let's go down

1 to sale proceeds.  Let's find out how that all works.

2    The delivery location of the plane means Bradley,

3 Connecticut, USA, or such other tax-friendly location, as

4 mutually agreed upon by the parties.

5    MR. LINSEY:  And that's consistent with --

6    THE COURT:  "Deposit" means the purchase money sum

7 in the amount of $125,000 United States dollars.  Upon

8 execution of this agreement, the deposit or any part thereof

9 currently held by the escrow agent, becomes immediately non-

10 refundable.

11    The escrow agent is Insured Aircraft Title

12 Service, LLC, whose address and contact information is listed

13 in Section 8.12.

14    Well, I have to go to 8.12, but we'll see where

15 that is.  Let's see.

16    MR. LINSEY:  It's page 14, Your Honor.

17    THE COURT:  If to seller, Whitecroft -- these are

18 just notices.  This doesn't give me the escrow agent.  It

19 just says -- wait a minute, let's go beyond that.

20    Escrow agent, Joan Roberts, vice president,

21 Insured Aircraft Title Service, LLC, 2 East Main Street,

22 suite 100, Oklahoma City, Oklahoma.

23    So the definitions say the monies are deposited

24 with the escrow agent whose address is in Oklahoma City,

25 Oklahoma.  That's what the document, itself, says.

1          MR. LINSEY:  That's consistent --

2          THE COURT:  And in terms of agreements of the

3  escrow agent, are governed and construed by, in accordance

4  with the laws of the State of Oklahoma.

5          Okay.  So that's -- let's go back up to the

6  definitions section.

7      (Pause)

8          THE COURT:  Final payment in the definition

9  section on page 2 means the purchase price minus the deposit

10 received by the escrow agent, which we've just established is

11 an entity in Oklahoma.  I think I said Oklahoma City,

12 Oklahoma.  I have to go back and look, but I think that's

13 what it said.

14         All payments under this agreement shall be payable

15 by wire transfer in immediately available funds on the due

16 date thereof.

17         The purchase price is 13 million -- in the

18 definitions -- the purchase price is $13,500,000 United

19 States dollars.

20         Purchaser shall pay additional conditions, 3.2.

21 Upon execution of the agreement, purchaser shall pay the

22 $100,000 United States dollars.  Termination amount is set

23 forth in the termination agreement between seller and KK

24 Global Holdings, Inc.  This termination amount is in addition

25 to the purchase price.

1          Prior to the closing, purchaser will have made

2   arrangements with Bombardier, Bradley, Connecticut, for the

3   upcoming calendar maintenance.  Any out of phase task, now

4   completed.  The KA band upgrade to the aircraft allowing the

5   purchaser to take assignment of the seller's deposit with

6   Bombardier in the amount of $478,910 United States dollars

7   and purchaser shall deliver the Bombardier deposit to the

8   escrow agent, again, located in Oklahoma, prior to closing,

9   in addition to the purchase price.

10          Seller shall provide the purchaser with a document

11  from Bombardier, confirming the transfer of rights to the

12  Bombardier deposit from the seller to the purchaser.

13          Final payment in the closing procedures,

14  paragraph 8, Section 4.1.  At least one business day before

15  the closing date, purchaser shall deliver the final payment

16  to the escrow agent; again, the escrow agent located in

17  Oklahoma.  The escrow agent shall confirm receipt of final

18  payment by email to seller and purchaser.

19          Closing, Section 4.5.  Closing shall occur within

20  three business days and then it goes on.

21          And then Section 5 point -- 4.5.3 says that on the

22  closing date, the parties shall perform the following

23  actions, which shall be coordinated by email in the order

24  presented in which it collectively constitute the closing.

25          And 4.5.3 is escrow agent shall confirm to the

1   parties that the escrow agent has all funds, documents, and

2   authorizations necessary to transfer, free and clear of all

3   liens, title of the aircraft from seller to purchaser.

4           If all of the above communications are given,

5   4.5.5, then the parties shall be deemed to have irrevocably

6   instructed the escrow agent and the escrow agent will,

7   without any further instruction, shall undertake the

8   following actions, which shall be irrevocable once initiated.

9           4.5.5.1, release the purchase price to the seller,

10  per the seller's instruction, plus the Bombardier deposit to

11  the seller, per the seller's instruction, less shares of the

12  escrow fees and provide evidence of such payments to the

13  seller in the form of Fedwire confirmations.

14          Seller's representations and buyer's

15  representations, also, and Whitecroft is the seller.  ACASS

16  is the purchaser.  So the seller's representations that begin

17  in Section -- Article 5, representations and warranties.

18  This is 5.1:  seller's representations and warranties.

19          Seller is duly formed, validly existing, and in

20  good standing of the laws of the British Islands, having the

21  capacity to sue and be sued in its own name, having full

22  power or legal right and authority to carry on its business

23  as currently conducted and to execute, deliver, and perform

24  the provisions of this agreement.

25          The execution, delivery, and performance by seller

1 of this agreement and the sale of the aircraft, having been

2 duly authorized by all necessary action on behalf of seller,

3 and do not conflict with or result in any breach of any terms

4 or constitute a default under any document, instrument, or

5 agreement, to which the seller is a party.

6          5.1.3, the person executing this agreement on

7 behalf of the seller has full power and authority to do so.

8          MR. LINSEY:  And what happened with the closing,

9 specifically, the receipt of the funds by the escrow agent in

10 Oklahoma City --

11          THE COURT:  Which provision are you looking at?

12          MR. LINSEY:  Actually, I was going to refer the

13 Court to Exhibit 24, which is the escrow agent's confirmation

14 receipt of funds.

15          THE COURT:  Okay.  Let me finish this and we'll

16 get there.

17          MR. LINSEY:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Notices as to Whiteshore [sic] Ltd. are supposed

20 to go to, according to -- on page 14 of the agreement, to

21 attention Max Krasner at maxk@gnsyus.com, which is Golden

22 Spring New York U.S. dot com, who's already been found to be

23 the alter-ego of the debtor.

24          Seller, signature, in witness hereof, the

25 undersigned parties have caused this aircraft purchase

 1  agreement to be executed, delivered, and effective as of the

 2  date first written above, which is August 2nd, 2022.

 3          Page 17, signatures:  Seller, Whitecroft Shore

 4  Ltd. by Mei Guo; title, owner.

 5          And it's already been established in the record in

 6  the main case and possibly in this adversary proceeding, but

 7  in others, that the defendant has already testified that the

 8  aircraft was sold post-petition in August of 2022, prior to

 9  any deposition, in which the defendant attempted to invoke

10  her Fifth Amendment right to self-incrimination -- against

11  self-incrimination, I should say.

12          So you want me to go to 24, is that what you're

13  telling me, Attorney Linsey?

14          MR. LINSEY:  Yes, Your Honor.

15          THE COURT:  Okay.  Give me a minute, please.

16  It'll take a little bit of time to get there.

17      (Pause)

18          THE COURT:  Do you know what?  Hold on, I might

19  have just -- I'm sorry, give me -- there's quite a few

20  exhibits, so I'm almost there.

21      (Pause)

22          THE COURT:  Exhibit 24, which is attached to the

23  application, the emergency application for a temporary

24  restraining order is a document entitled "Insured Aircraft

25  Title Services, LLC, Oklahoma City, Oklahoma, confirmation of

1   funds re Bombardier, Inc. BD-700-1A11, serial number 9189

2   from Anna Stafford, October 19, 2022, page 1.

3           To whom it may concern, this will confirm Insured

4   Aircraft Title Services, LLC is holding proceeds in the

5   amount of $12,032,995.86 in escrow for the benefit of

6   Whitecroft Shore, Ltd. with respect to the sale of the above-

7   referenced aircraft.  Best regards, Anna Stafford, escrow

8   agent.  Signed, subject to IATS terms and conditions.

9           So that's the confirmation of the proceeds being

10  held by the escrow agent, who's holding monies in U.S.

11  dollars and whose offices and business is in Oklahoma City,

12  Oklahoma.

13          MR. LINSEY:  Yes, Your Honor.

14          And then Exhibit 25 shows what happens next.

15          THE COURT:  Exhibit 25 attached to the emergency

16  application for a temporary restraining order is a Whitecroft

17  Shore, Ltd. incorporated under the BVI Business Companies Act

18  with company number 1969460, the company, written resolutions

19  of the sole director of the company made in accordance with

20  the company's articles of association, dated the twenty-first

21  day of December.

22          The undersigned, being the sole director of the

23  company, a company incorporated and existing under the laws

24  of the British Islands, BVI, does hereby consent to the

25  adoption of the following resolutions.  It starts by saying,

1  "It was noted that," and then there are several paragraphs,

2  1.1 through 1.10.  1.5, noting that there was an escrow agent

3  confirmation of the -- that the escrow agent was holding

4  proceeds related to the purchase price of the aircraft in the

5  amount of $12,032,995.88 in escrow for the benefit of the

6  company Whitecroft and that, further, to Clause 4.5.5.1 of

7  the asset purchase agreement, the APA, the purchase price may

8  be released by the escrow agent to the seller, pursue the

9  seller's instructions.

10         So two months after the escrow agent confirmed

11  its -- that it was holding the proceeds in U.S. dollars for

12  the benefit of Whitecroft, according to Note 1.7, the company

13  has opened an account with JNFX, Ltd. of 75 King William

14  Street, London, EC4N7BE, ("JNFX"), to facilitate the purchase

15  price -- to facilitate -- excuse me, I read that wrong -- to

16  facilitate receipt of the purchase price.  JNFX is authorized

17  and regulated by the United Kingdom's Financial Conduct

18  Authority, reference 574489, and is also registered with the

19  United Kingdom's HM Revenue and Customs, money laundering

20  Registration Number 12277592.

21         The next note, the company provides account

22  details for a Whitecroft bank account and then the next note,

23  1.9, says the company desires to instruct the escrow agent to

24  remit the purchase price into the Whitecroft bank account.

25         And the next note says, The company's agents or

1  authorized representative must provide the company's

2  instructions to the escrow agent.

3           Now we get to the resolution.  Now, therefore, it

4  is resolved that in 1.1, it was in the best interests of the

5  company, the company that was described above in Notes 1.1

6  through 1.3, as a pure equity holding company, its only

7  purpose being to hold the title and ownership of the

8  aircraft.  Consequently, the Company did not maintain a bank

9  account or hold any other assets and for this reason, never

10  deemed it necessary or commercially practical to open or

11  maintain a bank account.

12           So the first resolution is that it was in the best

13  interests of the company to open the Whitecroft bank account

14  for the purpose of receiving the purchase price, which is

15  owed and outstanding to the company as of the day of this

16  resolution.

17           The second resolution is the company, 1.2,

18  authorizes, instructs the escrow agent to act on this

19  resolution to remit the purchase price to the Whitecroft bank

20  account.

21           1.3, all previous actions of the company or its

22  duly authorized agents, including, but not limited to Max

23  Krasner, legal accountant counsel [sic] and consultants of

24  the company engage to insist with the opening of the

25  Whitecroft bank account are hereby ratified.

1              And 1.4, these resolutions may be signed by

2   electronic signature or transition.

3              Below this, the 1.1 through 1.4 resolutions on

4   this Exhibit 25 is typed the names Mei Guo, sole director,

5   and then there's a signature line with a signature and the

6   date underneath it of 12/21/2022.  It appears to be the same

7   signature of Mei Guo that appears in other documents that

8   we've already discussed on the record today.

9              Now, what about Exhibit 20, Attorney Linsey?

10  There's an email introducing Max Krasner and then Exhibit 21,

11  there's an email from the buyer, ACASS, to Yvette Wang and

12  Max Krasner.

13             MR. LINSEY:  Yes, Your Honor.  These exhibits were

14  included to show that Golden Spring, the debtors' alter-ego

15  orchestrated the sale of the aircraft.  Max Krasner and --

16  Max Krasner having identified himself as the director of

17  operations of Golden Spring, Jetlaw having testified that Max

18  Krasner, in such capacity, was their contact for the "seller"

19  and then the ACASS letter of interest reflects that they were

20  addressing their letter of interest -- letter of intent, I

21  should say, they were addressing their LOI to Yvette Wang and

22  Max Krasner both, at Golden Spring email addresses.

23             THE COURT:  I just need a minute to get to those

24  exhibits.

25             (Pause)

1          THE COURT:  I'm sorry, somehow I've lost my place.

2     You'll have to bear with me for a moment.

3          (Pause)

4          THE COURT:  I don't know why, but I'm having

5     trouble locating 20 and 21 on this document.  And maybe I'm

6     skipping over it improperly, but I'm not seeing it on this

7     document.

8          I've looked at it, but I must be in the wrong

9     document.

10         MR. LINSEY:  I believe in our sealed filings --

11         THE COURT:  That's what I thought I was in.

12         MR. LINSEY:  No, no, we only filed the sealed

13    exhibits and I believe those are unsealed --

14         THE COURT:  Oh, they are unsealed.  That's why

15    they're not --

16         MR. LINSEY:  Yeah, so that's why they're omitted.

17         THE COURT:  I'm looking at the wrong version,

18    then.  Okay.  I'm sorry.

19         MR. LINSEY:  No, it's confusing.  It's confusing

20    to figure out the right way to do it, so we try our best.

21         THE COURT:  I understand.

22         All right.  So I should be able to see those two

23    exhibits, then, in a different document, because I did look

24    at it.  Yes, I think they're in this document.  I think

25    they're in 75.

1          Obviously, we didn't have these documents ready to

2   pull up the same way we would before an evidentiary hearing,

3   but I do think it's important to note these two documents

4   that are not sealed.

5          THE CLERK:  I think it's page 277.

6          THE COURT:  277?

7          THE CLERK:  I think so.

8          THE COURT:  Okay, thank you --

9          THE CLERK:  You're welcome.

10          THE COURT:  -- very much.

11          There we go, 277 in ECF Number 75, it's an

12   unsealed exhibit, which is an email introducing Max Krasner,

13   and it's dated January 25th, 2022, Whitecroft, in care of

14   Gold Spring, New York, attention Yvette Wang or Max Krasner.

15   This is a letter of intent to purchase the aircraft, the

16   Bombardier Global XRS Aircraft, Serial Number 9189, which is

17   the same number we read in the asset purchase agreement and

18   other documents that have already been described on the

19   record during this hearing.

20          And it does say -- the letter is addressed to

21   Whitecroft Shore Limited, in care of Golden Spring, New York,

22   New York, 162 East 64th Street, New York, New York, attention

23   Yvette Wang or Max Krasner, both of whom's email addresses is

24   GSNYUS, Golden Spring, New York U.S., which the Court has

25   already found that Golden Spring is the alter ego of the

1  debtor.

2  And then we go to Exhibit 21 --

3  MR. LINSEY:  I believe that is Exhibit --

4  THE COURT:  That was 21, I'm sorry.  I meant 20 is

5  what I wanted to look at.  I apologize, I went too far.

6  Exhibit 20 is an email from Kent Jackson to

7  Valerie Ericson, dated December 29, 2021, regarding Jetlaw

8  engagement, Global Express sale.  It says, "Valerie, good

9  morning.  Yes, I did send out a new engagement letter, here

10  it is signed, and we just received the $10,000 wire.  Please

11  enter into time slips and let Max know we received their

12  wire.  Thanks, Kent."

13  And then there's an email below from Max Krasner

14  to Christian Deputy at Liberty Jet, Kent Jackson at Jetlaw,

15  and Julian Schulman at Liberty Jet, re T7GTUMPA.  Attached is

16  a signed engagement letter.  And Max Krasner's email is

17  maxk@gsnyus.com, Golden Spring, New York, U.S.  Attached is

18  the signed engagement letter of confirmed wire instructions

19  with Valerie and the payment will be processed today.

20  Looking forward to working with you.

21  And then there is an email below that from

22  Christian Deputy at Liberty Jet to Mr. Jackson at Jetlaw,

23  CCing Mr. Krasner and Julian Schulman at Liberty Jet.  It

24  says, good morning, gents.  I wanted to write you this short

25  email to introduce Mr. Krasner, Max Krasner, to you, Kent.

1    Mr. Krasner is the direct contact between all parties

2    involved in the sale of T7-GQM and the principal.  I will

3    work with Max to get your engagement letter back.

4            And then a most -- there is now a redacted portion

5    of that email.  And then it just says Mr. Krasner is on

6    vacation and might be able to obtain some emails -- might be

7    able to entertain some emails, so expect the pace to be slow.

8    From Christian Deputy, President, Liberty Jet.

9            So those are the two other exhibits that are not

10   sealed that, Mr. Linsey, I think the trustee is relying on in

11   connection with the assertion that the funds were in the

12   United States, they were controlled by Whitecroft through

13   Golden Spring and that the trustee would like the preliminary

14   injunction to enjoin JNFX and to require the defendant to

15   cause the funds to be returned to the United States and

16   placed in escrow; correct?

17           MR. LINSEY:  That's correct, Your Honor.

18           THE COURT:  Okay.  Mr. Moriarty, do you have any

19   response?

20           MR. MORIARTY:  Your Honor, you had asked me a

21   little bit ago before we got into the documents how JNFX

22   would be bound by this order.  If the Court were to enter the

23   order that the defendant has proposed whereby the funds could

24   not be transferred except upon the joint written instruction

25   of the defendant and the trustee or further order of the

1   Court, one, the defendant is certainly going to be bound by

2   the order, and if we read 65 -- Federal Rule of Civil

3   Procedure 65 --

4        THE COURT:  The defendant has asserted her right

5   against self-incrimination with regard to every question

6   asked of her regarding Whitecroft, including whether or not

7   she's the principal of Whitecroft.  So I heard what you just

8   said, but what difference will that make?  She's just going

9   to assert her -- she's already asserted her Fifth Amendment

10   privilege, so she'll be what?  She'll be what?  She'll be in

11   violation of an order and then what?

12        MR. MORIARTY:  I don't anticipate that she'll be

13   in violation of an order, Your Honor, and obviously I don't

14   know, I can't predict the future.  What I do know is that --

15        THE COURT:  Well, she's your client.  So I'm sure

16   you've counseled her as to what that means; haven't you?

17        MR. MORIARTY:  I'm not going to discuss what I've

18   discussed with my client or haven't discussed --

19        THE COURT:  I'm not asking you --

20        MR. MORIARTY:  -- with my client, Your Honor.

21        THE COURT:  -- to discuss specifically.  You have

22   an obligation to the Court to explain whether or not you've

23   explained to your client what it means to be bound by this

24   order, Mr. Moriarty.

25        MR. MORIARTY:  I agree, Your Honor, and that has

1  been done.

2  THE COURT:  Okay.

3  MR. MORIARTY:  Okay?  So JNFX would be bound by

4  this order as somebody in active concert with the defendant.

5  THE COURT:  So you're consenting that -- you're

6  saying that JNFX is in active concert with your client?

7  MR. MORIARTY:  I'm saying that JNFX controls these

8  funds.  As far as I know, the only one that they can take

9  direction to as of -- from right now is Ms. Guo.  So I

10  believe that they --

11  THE COURT:  Well, you said as far as you know, but

12  all these documents talk about Yvette Wang and Max Krasner.

13  Nobody seems to know where Mr. Krasner is.

14  MR. MORIARTY:  I agree with you, Your Honor, and

15  we do know where Ms. Wang is, she's in federal lockup.  I'm

16  telling you that, as far as I know, the only person on this

17  account who can give instructions is Ms. Guo.

18  To the extent -- so I'm going to shift, Your

19  Honor -- to the extent --

20  THE COURT:  Well, shift to what?

21  MR. MORIARTY:  To the extent the Court is inclined

22  to grant the order that the trustee is proposing, which is to

23  have the funds brought back into the U.S., I have no

24  authority to consent to that, but what I would ask is, if the

25  Court is going to do that, that the Court give more than five

1  business days to effectuate that transfer, only because

2  Christmas Day is Monday, Boxing Day in the UK is on Tuesday,

3  we have New Year's Day on January 1st.  I don't know if that

4  can be accomplished in five days, which is what the trustee

5  is asking for.

6          THE COURT:  Okay, I understand that point.

7          MR. MORIARTY:  So JNFX has agreed that they will

8  not do anything with these funds.

9          THE COURT:  Well, you can say that, but there's no

10 proof in this record that they have --

11         MR. MORIARTY:  Okay.

12         THE COURT:  -- okay?

13         MR. MORIARTY:  I appreciate that, Your Honor.

14         So if I may just --

15         THE COURT:  I mean, if you have proof, that's

16 different, but you don't.  There's nothing that I can rely on

17 that says that they've agreed not to do anything.

18         MR. MORIARTY:  I have an email, Your Honor, to --

19         THE COURT:  But we don't -- I don't know who they

20 are, right?  It's not --

21         MR. MORIARTY:  Okay.

22         THE COURT:  -- there's nothing -- I mean, I could

23 write that email.  And I'm not suggesting you -- that's not

24 what I'm saying, Attorney Moriarty.  I'm saying, for purposes

25 of proof, right, and establishing who they are, I don't have

1    any proof in this record.

2    MR. MORIARTY:  Your Honor, all I have is email

3    correspondence --

4    THE COURT:  I understand.

5    MR. MORIARTY:  -- that's all I have.

6    THE COURT:  I understand.

7    MR. MORIARTY:  So if I may move on to two other

8    points in the order that we've redlined and just identify --

9    THE COURT:  Go right ahead.

10    MR. MORIARTY:  -- it for the Court?

11    So we've redlined the third ordered paragraph and

12    that's only out because that would require Ms. Guo's counsel

13    to file something on the docket indicating that the funds had

14    been transferred and, since we were proposing something that

15    wouldn't require the funds to be transferred, that's the

16    reason why that --

17    THE COURT:  Understood.

18    MR. MORIARTY:  -- would be out.

19    The fourth ordered paragraph refers to Federal

20    Rule 65(d) and Federal Rule of Bankruptcy Procedure 7065.

21    The proposed changes here are solely to have the order comply

22    with Rule 65(d) -- and when I say comply I mean read the same

23    way Rule 65(d) does.

24    So the trustee's proposed language would say

25    persons in active concert with the defendant and/or the

 1  debtor.  And, as I read 65(d), in its active concert with the

 2  parties, the parties' officers, agents, servants, employees,

 3  and attorneys.  I don't know that the debtor would fall into

 4  any of those categories.  So to say the defendant and/or the

 5  debtor, and then those in active concert, I don't know that

 6  that would be enforceable, maybe it would be.  I don't want

 7  to be in a position where something happens and it's -- and

 8  I'm not saying anything is going to, but I don't want to be

 9  in a position where something happens and there's an order

10  that's broader than maybe it should be.

11            THE COURT:  Well, what about waterfall, Max

12  Krasner, and Ms. Yvette Wang, given what we just read in the

13  record?

14            MR. MORIARTY:  I believe, Your Honor, that -- and

15  I shouldn't say I believe -- to the extent they're in active

16  concert with Ms. Guo, they're covered.  The way that this --

17            THE COURT:  Yeah, but that doesn't mean that the

18  Court can't delineate that.  There's nothing in the rule that

19  says the Court can't delineate people based upon the evidence

20  that's been submitted to the Court in support of an

21  application for a temporary restraining order.

22            MR. MORIARTY:  I agree, Your Honor.

23            THE COURT:  Okay.

24            MR. MORIARTY:  The reason for this change is

25  because the way that this order reads, it's that Ms. Guo is

1  in active concert with these individuals today.  So to the

2  extent the Court finds that Whitecroft, Ms. Guo was in active

3  concert with these individuals in January of 2023 or August

4  of 2022 or earlier for purposes of the sale of the jet, they

5  would fall under the active concert language.  There's an

6  implication by including them that they are in active concert

7  today, that's the reason for that change.

8            And then if I can just give the Court the last

9  proposed change and then, Attorney Linsey, I'll sit down.

10           The next ordered paragraph, it's ordered that no

11 assets subject to the order, including the JNFX assets, shall

12 be reduced, spent, or otherwise diminished.  So, on behalf of

13 our client, we added some language because the funds are

14 currently held in Euros.  If they're going to be --

15           THE COURT:  Well, we don't know that, but that's

16 what you believe to be true.

17           MR. MORIARTY:  Based on the representations that

18 have been made to both --

19           THE COURT:  Right --

20           MR. MORIARTY:  -- the trustee, his counsel, and

21 myself.

22           THE COURT:  -- a representation that has no

23 bearing because it's not based in any evidence before this

24 Court, but I understand -- all I'm saying to you is, go ahead

25 and say whatever you're going to say, but there's nothing

1   to -- I don't even have anything in front of me that proves

2   that there's any money being held by this entity anyway.

3   But, regardless, go ahead.

4         MR. MORIARTY:  All right.  So I'm going to make an

5   assumption that there's money there, okay?  And with that

6   assumption, assuming that those funds are held in Euros, if

7   they're going to be transferred onshore, they're going to

8   have to be converted to U.S. dollars.  So that conversion

9   could result in fees --

10        THE COURT:  You don't know that.  You don't know

11   that, number one; number two, you don't know that they're

12   going to have to be converted here or there; number three,

13   you don't know what the fee structure is upon conversion.

14        So I don't agree with that statement at all

15   because you don't know any of that.

16        MR. MORIARTY:  Your Honor --

17        THE COURT:  You can -- funds can be converted in

18   different currency to a U.S. bank, it happens all the time.

19        MR. MORIARTY:  Your Honor, the only thing that I'm

20   trying to say is I don't want my client to be in a situation

21   where there are fees or there is a downward fluctuation due

22   to the exchange rate and the client is in violation of this

23   order because there has been a reduction in the account

24   value.  That's all that this language is intended to do.  To

25   the extent that there's a conversion that has to be done if

1  the Court orders the funds into the U.S., and that conversion

2  results in fees and/or downward movement in the account

3  because of conversion rates, that's not a violation of the

4  order.

5          THE COURT:  Attorney Linsey, what's your position

6  on that language?

7          MR. LINSEY:  We are happy to talk with the

8  defendant about a workable mechanism to transfer the funds

9  back.  If we're talking about a commercially reasonable

10  transaction fee that is, you know, from our perspective

11  commercially reasonable, then I don't anticipate that would

12  be an issue.  If we're talking about JNFX fees of $300,000 or

13  $180,000, that is in no way commercially reasonable and that

14  would be a violation of the injunction from the trustee's

15  perspective.

16          And we have -- and I'm not -- you know, the

17  defendant's position is what the defendant's position is

18  coming in here today, so I'm not faulting Mr. Moriarty for

19  not having the conversation with me about specifics of how

20  the plumbing on this would work.  We're prepared to have a

21  conversation with the defendant about how to make this work

22  in a way so that this is not -- she's not unintentionally

23  falling into a trap of violating by compliance with the

24  order, that's not the intent.  The intent is to safeguard the

25  funds.

1          THE COURT:  Okay.  Anything further?

2          MR. MORIARTY:  Nothing from the defendant, Your

3   Honor.  Thank you.

4          MR. LINSEY:  No, Your Honor.

5          THE COURT:  Okay.  Well, I've looked at the orders

6   and I -- I'm not going to enter the order in the manner in

7   which the defendant has marked it up, although I will -- I

8   think you understand, Attorney Moriarty, that I think JNFX

9   needs to be bound by this order, they need to be constrained,

10  whether they consent or not, and that with regard to the

11  joint instructions, it's not going to be any joint

12  instructions, it's going to be further order of this Court.

13         With regard to the people acting in active concert

14  with the defendant, I'm going to think about that a little

15  bit, but I see no reason -- or I see every reason to include

16  Whitecroft, Max Krasner, and Ms. Wang as one of those parties

17  based upon the evidence that's been submitted to this Court,

18  and you haven't submitted any evidence to the contrary.

19         With regard to your issue about conversion and not

20  being in violation because of a fee, I think that's an issue

21  that can be addressed after today, and I'm going to instruct

22  the parties to try to come up with an agreed-upon manner in

23  which the funds will be transferred at some point in the

24  future, but soon, to the United States, and that they be

25  transferred in such a way that these fees that we don't even

1  understand how they were calculated could then just be

2  automatically deducted from the amounts that are in -- that

3  are apparently in the possession of JNFX at this moment.  And

4  then I will have to figure -- we'll have to figure out when

5  you're going to report back on that issue and how you're

6  going to report back on that issue.

7  So I think we should move on to the other issue

8  because this order is going to have to enter today.  The

9  court is not open tomorrow, the court is not open on Monday,

10  so this has got to enter today.

11  Anything further?

12  MR. LINSEY:  No, Your Honor, the trustee is

13  prepared to appear before Your Honor again or to file a

14  written report regarding a conference with the defendant at

15  any date that the Court would like.  The trustee is not

16  trying to force a transaction on an unworkable time frame,

17  but we do believe there's exigency in light of the unknowns

18  here.

19  THE COURT:  Mr. Moriarty?

20  MR. MORIARTY:  I have nothing to add, Your Honor,

21  other than happy holidays and Happy New Year to everybody.

22  THE COURT:  You as well.  Thank you.

23  MR. MORIARTY:  Thank you.

24  THE COURT:  So now we're going to move on to the

25  Adversary 5017, which involves the Taurus Fund and the motion

 1   to preserve evidence.

 2          So, Mr. Moriarty, you do not have to remain unless

 3   you choose to.

 4          MR. MORIARTY:  Thank you, Your Honor.

 5          THE COURT:  Okay, thank you.

 6          All right, go ahead, Attorney Linsey, with regard

 7   to the --

 8          MR. LINSEY:  Just a quick drink, please.

 9          THE COURT:  -- sure -- with regard to the Taurus

10   Fund adversary proceeding.

11          I did see the order that was submitted, I believe,

12   earlier this morning -- oh, no, it was late last night, I'm

13   sorry, on the issue of the preservation of evidence, and I

14   see the agreement that has been made with the Taurus Fund,

15   Mr. Barnett, and the other clients represented by Mr. Conway,

16   and I see that you have an agreement with, I'm not going to

17   call it the Westy Storage Facility, although I know they have

18   a corporate name.

19          And then the only party that hasn't consented to

20   this is HGA Property Management, but I have seen from the

21   documents that you've submitted that the registered agent for

22   HGA Property, which was not HGA Property, was apparently

23   created on April 18, 2023; is that correct, Attorney Linsey?

24          MR. LINSEY:  That's correct, Your Honor.

25          THE COURT:  The member and manager and the

1   registered agent is an individual who has been the subject of

2   evidence submitted in this main case and possibly in related

3   adversary proceedings.  I don't recall specifically, but I

4   recognize the name.  Is that correct?

5            MR. LINSEY:  That's also correct, Your Honor.

6            THE COURT:  Okay.  And that person has at some

7   point in time been shown to be physically present in the

8   debtor's apartment in the Sherry-Netherland, correct?

9            MR. LINSEY:  Correct, Your Honor.

10           THE COURT:  And were there other examples of this

11  individual being with the debtor?

12           MR. LINSEY:  Not that occur off the top of my

13  head.  I can -- I would have to inquire with colleagues about

14  further evidence, Your Honor.

15           THE COURT:  Was this defendant -- I'm sorry, I

16  apologize, the person isn't a defendant -- was the member of

17  HGA Property Management in any of the photographs in the

18  Mahwah mansion?

19           MR. LINSEY:  I believe that she was in a video

20  that we watched in connection with the HCHK proposed

21  intervenors' motion.

22           THE COURT:  Okay.  All right, so how would you

23  like to proceed then with regard to this order that you've

24  submitted that -- where you have everyone's consent other

25  than the HGA entity?

1          MR. LINSEY:  I'll just give a very brief outline

2   of what we're doing.

3          THE COURT:  Go ahead, please.

4          MR. LINSEY:  The Court is aware from the emergency

5   motion, obviously, that the trustee recently learned of the

6   storage facility in New Jersey, approximately a ten-minute

7   drive away from the Mahwah mansion.  The storage units in

8   question were initially leased to Scott Barnett, who is the

9   debtor's bodyguard and driver, and who is also allegedly or

10  nominally the manager of the Taurus Fund defendant.

11         Shortly after the FBI arrested the defendant, Mr.

12  Barnett signed an ownership change addendum assigning all of

13  the rights with respect to the storage facility to HGA

14  Property Operation.  The trustee understands that the owner

15  and manager of HGA Property Operation, as we've discussed,

16  are prominent supporters of the debtor.

17         We understand that the monthly rent or fee with

18  respect to the storage facility is $7,000.  The trustee has

19  been in touch with the owner of the storage facility, has

20  gotten some color.  This is a large -- these units are large,

21  it's apparently a suite of four rooms.  We know that they are

22  designed to survive bomb blasts and that they are guarded by

23  electronic security systems.  In short, this is a facility

24  that's designed to protect very valuable property.

25         The trustee has issued subpoenas to the owner of

1   the storage facility and to HGA.  The purpose of the

2   trustee's motion is to make sure that these storage units are

3   secured pending the completion of the trustee's inspection.

4           The facts known to the trustee suggest that the

5   reason these storage units exist is to conceal property that

6   was removed from the Greenwich mansion and the Sherry-

7   Netherland apartment, and potentially also the Mahwah

8   mansion.  There's every reason to think that the debtor's

9   associates would do the same thing with respect to what's in

10  these units now that they know that we know about their

11  existence, and they do know that because we've issued the

12  subpoena and because we have made the efforts that are

13  outlined in the notice to make sure that they have actual

14  notice of this hearing.

15          The trustee understands that based on the notice

16  that the owner of the storage facility has received, the

17  owner of the storage facility has, pending this hearing,

18  taken efforts to secure the storage units.  So really what

19  we'd be talking about is maintenance of the status quo for a

20  sufficient time for the trustee to complete that inspection.

21          The trustee is going to begin that inspection on

22  Friday.  So I don't think we're talking about a very long

23  time for the inspection to be completed, the trustee will

24  report back to the Court when the inspection is completed.

25          That's all I have, Your Honor, but I'm happy to

1  answer any questions.

2        THE COURT:  You're going to try to inspect the

3  property tomorrow; is that right?

4        MR. LINSEY:  We're going to begin the inspection

5  tomorrow.

6        THE COURT:  And Mr. Conway is going to be there,

7  is my recollection; correct?  He stated that on the record

8  the other day.

9        MR. LINSEY:  We've certainly offered him the

10  opportunity to be there, I can't speak for him --

11        THE COURT:  I think he said he was going to be

12  there.

13        MR. LINSEY:  Yes.

14        THE COURT:  Let me just take a look one moment.

15     (Pause)

16        THE COURT:  So you haven't made any changes to the

17  form of proposed order then, it's the same proposed order

18  that you submitted the other day?

19        MR. LINSEY:  Correct, Your Honor, the same one

20  with the original emergency motion.

21        THE COURT:  Okay.  Then if you would just give me

22  one second, please.

23        MR. LINSEY:  Of course.

24        THE COURT:  The one other thing I will say with

25  regard to the other matter that we just addressed, can you

1  submit -- can you have someone from your office submit that

2  order in Word to the Courtroom Deputy email box, please?

3          MR. LINSEY:  Yes, Your Honor.  I can actually do

4  it right now --

5          THE COURT:  That probably makes sense while I'm

6  looking for this.  Okay?

7          MR. LINSEY:  We sent it to Mr. Moriarty so he can

8  make his redline.

9          THE COURT:  Yes.

10     (Pause)

11          THE COURT:  In the proposed order that was

12  submitted, Attorney Linsey, granting this emergency motion to

13  preserve evidence --

14          MR. LINSEY:  Yes, Your Honor.

15          THE COURT:  -- the proposed order has some

16  redactions in it, the location of the storage units and some

17  other -- I'm not sure how you want that handled.

18          MR. LINSEY:  I'm looking at the sealed version, so

19  mine is unredacted.  I apologize, I didn't print out the

20  redacted version, so unfortunately -- is there any way it

21  could go up on screen what has been redacted?  I apologize

22  for that, Your Honor.

23          THE COURT:  Sure.  It's ECF Number 83 in 5017.

24     (Pause)

25          THE COURT:  Do you see where I am, Attorney

1  Linsey?

2         MR. LINSEY:  Oh, it's right in front of me.

3         THE COURT:  So, see, the address is redacted.

4  Then if you'd go to the next page --

5      (Pause)

6         THE COURT:  I think those are the people that --

7  do you see that?

8         MR. LINSEY:  I do, Your Honor.

9      (Pause)

10         MR. LINSEY:  I apologize, Your Honor.  I'm filling

11  in for someone and I had prepared, but I don't have an answer

12  on that.  Could I either have a moment or could I report back

13  to the Court?

14         THE COURT:  Yeah.  I mean, I think we just need to

15  -- I need to know what you want -- how you want that handled.

16  I mean, is that going to be still redacted or --

17         MR. LINSEY:  Well, I don't think that the Court's

18  order could be redacted --

19         THE COURT:  I don't think it can either --

20         MR. LINSEY:  -- if it were to be --

21         THE COURT:  -- but I'm not sure --

22         MR. LINSEY:  -- if it were to be effective, and I

23  believe that some --

24         THE COURT:  And I think the order needs to be

25  changed anyway because you have to say you have the consent

1  of the Taurus Fund and all the defendants and of the Westy --

2  and, again, I'm sorry, I don't remember their corporate

3  name -- right?

4          MR. LINSEY:  Yeah, it starts with an A.  I know.

5          So, with the Court's indulgence, could we do this:

6  Could I -- could I submit -- or Paul Hastings submit a

7  revised order that includes noting that we had the hearing

8  today and the consent of the defendants and the consent of

9  the owner of the storage facility?  And we will address the

10 redaction issue in that revised order that we submit.

11         THE COURT:  Yeah, because they're consenting to

12 all that.  They're consenting to not modify, remove, empty,

13 dispose of, and all that, that's what needs to be said,

14 right?

15         MR. LINSEY:  Understood, Your Honor.

16         THE COURT:  And that the only party that's not

17 consenting is HGA, and then you'll have to deal with that

18 somehow.

19         MR. LINSEY:  We will note their consent in the

20 revised form of order.

21         THE COURT:  Okay.  And because I'm prepared to

22 grant this motion and enter this order because Mr. Conway,

23 who was here the other day, the 19th, I believe, when we had

24 the first conference, stated on the record that he was going

25 to -- believed he was going to consent, and he asked me did

1   he have to appear if he consented and I said no.  And you

2   have his consent, so he's not here, and he represents all of

3   the defendants in the adversary proceeding.

4          Your notice that you filed this morning -- or last

5   night, I'm sorry, states that you have the consent of the

6   corporate entity of the storage unit and that the only party

7   who doesn't consent is HGA, which you've shown me in this

8   notice of additional information, ECF 89, that was filed last

9   night that the HGA Property Management, LLC was created, as

10  I've already stated on the record, on April 18, 2023, and

11  that Mr. Barnett transferred the interest in the storage

12  units to this entity, and that this entity is managed and has

13  a member of an individual whom we've seen in the main case

14  and/or in related adversary proceedings having communications

15  with the debtor, Mr. Kwok.

16         In any event, I'm prepared to do that, but the

17  order has to be revised.  Okay?

18         MR. LINSEY:  So, please -- I feel like we've

19  imposed more than enough on the Court and its staff this week

20  -- please tell me when we need to get you an order by in

21  order for it to be useful today and I'll make sure it

22  happens.

23         THE COURT:  Well, the staff is going to be gone by

24  5 o'clock.

25         MR. LINSEY:  Okay.

1      THE COURT:  So if you can get it here between --

2  by 4:00ish, that would be very helpful.  The Word document on

3  the other one, I'm sure you can get that here earlier because

4  all you have to do is have someone submit it by Word, okay?

5      MR. LINSEY:  I sent it from my phone while we --

6      THE COURT:  Okay, thank you.

7      And then the only other matter that we didn't

8  discuss today and you -- I'm asking you to report this to Mr.

9  Moriarty because I should have when he was here and I had

10  forgotten to -- is I'm not in a position to rule on the

11  trustee's motion regarding the privileges order that was

12  filed in the main case that impacts your summary judgment

13  motion that needs to be filed by tomorrow.

14      MR. LINSEY:  Yes, Your Honor.

15      THE COURT:  So you need to go ahead and file your

16  summary judgment motion and then -- in the adversary 5008,

17  the Bombardier adversary --

18      MR. LINSEY:  Yes, Your Honor.

19      THE COURT:  -- and then we will go from there.

20      MR. LINSEY:  So, to be clear, in the version we

21  file tomorrow, we won't include that other evidence --

22      THE COURT:  That is correct.

23      MR. LINSEY:  -- pending the Court's order?

24  Understood.

25      THE COURT:  That is correct.

 1              MR. LINSEY:  Understood, Your Honor.  I'll report

 2  that to Mr. Moriarty as well.

 3              THE COURT:  Yes, please.  I forgot to say that

 4  when he was here, so that was my mistake and I --

 5              MR. LINSEY:  I appreciate the notice, Your Honor.

 6  So we're -- right now we made a draft and we were just

 7  waiting to hear, so --

 8              THE COURT:  No, I understand.

 9              MR. LINSEY:  -- thanks.

10              THE COURT:  We've been attempting to review all

11  the documents --

12              MR. LINSEY:  Understood.

13              THE COURT:  -- as best we can that have been filed

14  in the last 48 hours --

15              MR. LINSEY:  Sure.

16              THE COURT:  -- Okay?

17              MR. LINSEY:  Understood.

18              THE COURT:  So I think then, Mr. Linsey, that

19  takes care of everything today --

20              MR. LINSEY:  It does, Your Honor.

21              THE COURT:  -- in these adversary proceedings?

22              MR. LINSEY:  Yes.

23              THE COURT:  Okay.  Then we will look for the

24  orders and then, obviously, tomorrow the court is closed, but

25  electronic filing is available.  So you'll file your motion

1   and then we'll -- in the 5008 for summary judgment and we

2   will proceed accordingly with regard to the schedule that's

3   in place with regard to that motion.  Okay?

4           MR. LINSEY:  Yes, Your Honor.  And I'll echo Mr.

5   Moriarty to say happy holidays to Your Honor and everyone

6   here.

7           THE COURT:  Same to you.  Thank you very much.

8           All right, that takes care of all the matters on

9   today's calendar.  So Court is adjourned.

10      (Proceedings concluded at 1:57 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling _____          December 26, 2023

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski _____          December 26, 2023

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams _____          December 26, 2023

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable