**<u>Exhibit 11</u>**

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          : Case No. 07-11757(KCF)
                                :
        SOLOMON DWEK,           : Trenton, New Jersey
                                : February 2, 2009
                Debtor.         : 10:18 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE KATHRYN C. FERGUSON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:          Broege, Neumann, Fischer &
                         Shaver, LLC
                         BY:  TIMOTHY P. NEUMANN, ESQ.
                         25 Abe Voorhees Drive
                         Manasquan, New Jersey  08736

For the Chapter 11       McCarter & English
Trustee:                 BY:  JEFFREY T. TESTA, ESQ.
                              BRIAN L. BAKER, ESQ.
                         Four Gateway Center
                         100 Mulberry Street
                         Newark, New Jersey  07102

For the Creditors        Duane Morris, LLP
Committee:               BY:  WALTER J. GREENHALGH, ESQ.
                         744 Broad Street
                         Newark, New Jersey  07102-3889

Audio Operator:     Geraldine Holley-Mack

Transcriber:        Kathleen Connolly
                    **COLE TRANSCRIPTION AND RECORDING SERVICE**
                    **Certified Court Transcribers**
                    **P.O. BOX 1216**
                    **OCEAN GATE, NEW JERSEY 08740-1216**
                    **1-877-245-4876**

Proceedings were electronically recorded, transcript produced
by transcription.

**2**

```
APPEARANCES:

For HSBC Bank:              Wolff & Samson, P.C.
                           BY:  KAREN L. GILMAN, ESQ.
                           The Offices at Crystal Lake
                           One Boland Drive
                           West Orange, New Jersey  07052

                           Cahill, Gordon & Reindel, LLP
                           BY:  ROBERT USADI, ESQ.
                           80 Pine Street
                           New York, New York  10005-1702

For Joseph Dwek,           Cole, Schotz, Meisel, Forman &
Mark Adjmi, Yeshuah,       Leonard, P.A.
LLC, Joseph Dwek Family    BY:  WARREN A. USATINE, ESQ.
Limited Partnership:       25 Main Street
                           Hackensack, New Jersey  07601

For Sun National          Wilentz, Goldman & Spitzer, P.A.
Bank:                     BY:  DEIRDRE WOULFE PACHECO, ESQ.
                          90 Woodbridge Center Drive
                          Woodbridge, New Jersey  07095

For Jack Hakim and        Stark & Stark
AJH Investments:          BY:  JEFFREY S. POSTA, ESQ.
                          P.O. Box 5315
                          Princeton, New Jersey  08534

For Bob Nelson            Shebell & Shebell, LLC
Plumbing & Heating:       BY:  DANIELLE S. CHANDONNET, ESQ.
                          1398 Highway 35 South
                          Ocean, New Jersey  07712-3543

For Isaac Franco:         King & Spalding, LLP
                          BY:  ARTHUR J. STEINBERG, ESQ.
                          1185 Avenue of the Americas
                          New York, New York  10076-4003

                          Wachtal & Masyr, LLP
                          BY:  DAVID YEGER, ESQ.
                          110 East 58th Street
                          New York, New York  10022
```

 1              THE COURT:  All right.  Come up on <u>Dwek</u>, please.

 2              All right.  May I have your appearances, please,

 3    Counsel?

 4              MR. TESTA:  Good morning, Your Honor.

 5              Jeffrey Testa, McCarter & English, on behalf of the

 6    Chapter 11 Trustee.

 7              MR. BAKER:  Good morning, Your Honor.

 8              Brian Baker, McCarter & English, on behalf of the

 9    Chapter 11 Trustee.

10              MR. GREENHALGH:  Your Honor, Walter Greenhalgh,

11    Duane Morris, counsel for the Creditors Committee.

12              MR. NEUMANN:  Timothy Neumann, Broege, Neumann,

13    Fischer & Shaver, for the Debtors.

14              MS. GILMAN:  Karen Gilman, Wolff & Samson, on behalf

15    of HSBC Bank.

16              MR. USADI:  Robert Usadi, Cahill, Gordon & Reindel,

17    on behalf of HSBC Bank.

18              MR. USATINE:  Warren Usatine, Cole, Schotz, Meisel,

19    Forman & Leonard on behalf of Joseph Dwek, Mark Adjmi,

20    Yeshuah, LLC, and Joseph Dwek Family, Limited Partnership.

21              MS. PACHECO:  Deirdre Pacheco, Wilentz, Goldman &

22    Spitzer, for Sun National Bank.

23              MR. POSTA:  Good morning, Your Honor.

24              Jeffrey Posta, Stark & Stark, for Jack Hakim and AJH

25    Investments on the Motion to toll time only.

**Colloquy** 4

1    MS. CHANDONNET:  Good morning.

2    Danielle Chandonnet from the firm Shebell & Shebell

3 on behalf of Bob Nelson Plumbing & Heating.  We did not file

4 papers in this matter.

5    THE COURT:  Okay.  Thank you.

6    MR. STEINBERG:  Arthur Steinberg from King &

7 Spalding on behalf of Isaac Franco.  And with me is David

8 Yeger from Wachtal & Masyr.

9    MR. YEGER:  Good morning, Your Honor.

10    THE COURT:  All right.  Thank you.

11    There are three matters on the calendar this

12 morning.  Let's go in -- and I also have a court call.

13    The Trustee wanted to participate by court call, as

14 well?

15    MR. TESTA:  Yes, Your Honor.

16    THE COURT:  All right.  We're obviously having a

17 problem with that.  We're working on it.

18    All right.  Let's begin with the Motion for relief

19 from the stay, Bullet No. 3704.

20    MR. BAKER:  Your Honor, with the consent of the

21 Movant, we can adjourn that for 30 days.

22    THE COURT:  Okay.  All right.  We can do March 2nd.

23    Next, I want to do the Order equitably tolling --

24 we're doing <u>Dwek</u> -- equitably tolling the time prescribed by

25 546.

1     What I have is the Trustee's paper, an objection by

2  Isaac Franco, a limited objection by Jack Hakim, and support

3  by the Debtor.

4     You want to take it from there, Mr. Testa?  Is

5  that --

6          MR. BAKER:  I'll do it.

7          THE COURT:  Mr. Baker.  Okay.

8          MR. BAKER:  Your Honor, we don't have much to add to

9  the papers.  With respect to the objections, we think that

10  they should be overruled, but if the Court is not so inclined,

11  as long as the Trustee can preserve his argument later on to

12  assert that the statute, if applicable if additional Causes of

13  Action are brought, to raise the argument that the statute

14  should be equitably tolled.  But I don't know that we have to

15  decide that today.

16          THE COURT:  Okay.  All right.  Thank you.

17          Anyone else in support of the Trustee's Motion?

18          All right.  Opposition?

19          MR. STEINBERG:  Good morning, Your Honor.

20          Isaac Franco filed an objection saying that if the

21  Trustee wants to equitably toll with regard to everybody else

22  in the world, that's fine.  But with regard to Mr. Franco, he

23  sued Mr. Franco over a year ago in this case and that there's

24  a pending adversary proceeding to whatever extent he's allowed

25  to amend based on the complaint that was filed, that is fine.

**Response/Steinberg/Posta** 6

1    But he's had two years.  He decided that he had enough to

2    bring a lawsuit against Mr. Franco a year ago.  And we don't

3    believe it's appropriate to extend with regard to Mr. Franco.

4            When you read the cases that the Trustee cites in

5    connection with equitable tolling, it's generally with regard

6    to whether the Defendant did something that would prevent the

7    Trustee from moving forward in this matter because the

8    Defendant engaged in dilatory tactics or was withholding

9    information.

10           In this case, Isaac Franco has met with the Trustee

11   on a number of occasions, has responded to whatever requests

12   were made, was the subject of a deposition already in this

13   case, and we don't believe that there's any grounds to

14   equitably toll with respect to him.

15           THE COURT:  Okay.  Thank you.

16           Mr. Posta?

17           MR. POSTA:  Your Honor, on behalf of Jack Hakim and

18   AJH Investments, we filed a limited objection, which I'm sure

19   you reviewed.  Trying to be concise.  We filed an adversary

20   proceeding in June of 2007, now over a year-and-a-half ago.

21   That adversary dealt with discharge, as well as claims to a

22   particular piece of property as a result of money that was put

23   up by Mr. Hakim and AJH Investments.  The discharge action

24   involves all of our transactions, which are very limited.

25   Dollar amounts are big, but the transactions were limited with

1   the Debtor.

2          In that adversary, shortly after we filed it, the

3   Trustee filed the Motion to Preserve all Claims and Causes of

4   Action relating to the underlying transactions, which are all

5   of our transactions.  That Motion has been carried since then,

6   which is fine because we consented to it, and it's returnable

7   in April, and there's a trial date at the end of April.  I

8   think the Motion is returnable perhaps the day before.

9          My understanding was our issues with respect to

10  preservation of actions and all of our, all Causes of Action

11  going back and forth, are dealt with by the adversary and by

12  that Motion.  And now we have another Motion that's filed.

13  Our simple position is that those issues are already before

14  the Court, and we shouldn't be subject to this Motion which is

15  yet another Motion dealing with the same subject matter.  It's

16  already covered.

17         The transactions are limited, as we said.  The

18  Debtor has been available and certainly has participated in

19  this case often to provide information to the Trustee.

20  There's nothing specific as far as our client is concerned

21  that I've seen where they can't get information.  If there's

22  more between the parties or they need additional time, you

23  know, there's nothing before the Court to say that they need

24  that.

25         But, essentially, this issue should be covered by

**Decision** 8

1 what's already before the Court, and we shouldn't be subject

2 to this Motion.

3       Thank you.

4       THE COURT: Okay. Thank you.

5       Anybody else? All right.

6       The Court has received two objections to the

7 Trustee's Motion. The objections essentially say that the

8 clients, their clients should not be singled out, and the

9 Motion should not apply to them.

10       No legal support is provided for that proposition.

11 The Court is of the opinion that if it finds that cause exists

12 to equitably toll the Statute of Limitation, then it applies

13 across the board.

14       Jack Hakim makes a sort of tangential point that his

15 matter is scheduled for trial on April 29th and, therefore,

16 the Federal Rules should govern the determination as to him,

17 rather than this Motion.

18       I can't agree with that proposition as a matter of

19 law, but I'm not adjourning the scheduled trial based on this

20 Motion. And the Trustee, it seems to me, would have a

21 difficult time convincing the Court that an amendment of the

22 complaint this close to the trial would be justified when a

23 Trustee brings a Motion seeking an extension until February of

24 2010 to bring avoidance actions.

25       The relief sought by the Trustee has been granted by

**Decision**                                                                 9

1    other Courts under 105 and on an equitable tolling theory.

2          And you can see <u>International Administrative</u>

3    <u>Services</u> at 408 Fed. 3rd 689, or <u>GI Holdings</u> at

4    313 Bankruptcy Reporter 612.  Those Courts reason that 546 is

5    a Statute of Limitation, rather than a Statute of Repose and,

6    therefore, it is subject to equitable tolling.

7          Although this is not the typical situation in which

8    equitable tolling is granted, that is, it's not a situation

9    where the Defendant has fraudulently prevented the Plaintiff

10   from timely bringing his Cause of Action, the Court,

11   nonetheless, finds that equitable tolling of the Statute of

12   Limitations is appropriate here given the recent activities by

13   the U.S. Attorney and the FBI in conducting their

14   investigations.  That has involved a lengthy delay of

15   continued 2004 deposition of the Debtor, and that's beyond the

16   control of the Trustee.  Therefore, the Court is going to

17   grant the Motion.

18         All right.  Let's move on to the Motion to approve

19   the settlement.  This is the meatiest one today.  I have the

20   Trustee's moving papers.  I have Sun National Bank's limited

21   objection.  I have Isaac Franco's objection.  I have the

22   Trustee's response.  I have the Creditors Committee support;

23   Mr. Franco's supplemental objection; support by Joseph Dwek

24   and the Adjmi Group.  I have a response by HSBC and a further

25   response by the Debtor.

1    That takes us up and through about 5:00 o'clock on

2  Friday.

3    Why doesn't Trustee's Counsel begin.

4    MR. TESTA:  Good morning, Your Honor.

5    The Chapter 11 Trustee is very pleased to be before

6  Your Honor today in what he views as the most significant

7  achievement to date during the course of these cases.

8    The Trustee has, as Your Honor has noted, filed a

9  Motion on proper notice to all Creditors.  He was compelled to

10  file a response to certain statements that were made by Mr.

11  Franco, a Defendant in an adversary action, whose claim has

12  been challenged.  We strongly believe that the settlement that

13  we set before Your Honor falls below the lowest point in the

14  range of reasonableness.  We are prepared procedurally to

15  present a proffer, if Your Honor would so like, or we can be

16  much briefer and just highlight the main points of the

17  settlement.

18    THE COURT:  Go ahead and do the proffer.

19    MR. TESTA:  Yes, Your Honor.

20    If Mr. Stanziale were to testify today, he would

21  testify as follows:

22    Mr. Stanziale would testify that he is the duly-

23  appointed, Chapter 11 Trustee of the Bankruptcy case of <u>In Re:</u>

24  <u>Solomon Dwek</u> and all of its 74 jointly-administered cases.

25    That prior to the bankruptcy proceeding, a State

1    court proceeding govern these Debtors where and among other

2    disputes that were not resolved was the transfer of title to

3    Joseph Dwek and Yeshuah of 129 real properties which Joseph

4    Dwek asserted were properly transferred to him as a settlement

5    of claims.

6            That on May 7, 2007, the Trustee, Joseph Dwek and

7    Yeshuah entered into an interim Settlement Agreement which was

8    properly noticed and approved by this Court in which allowed

9    the Trustee to sell the 129 disputed properties, but which

10   expressly held that the issue of ownership of the disputed

11   properties would be resolved at a later date, that Joseph and

12   Yeshuah expressly retain their right to assert an equitable

13   lien on the net proceeds of the disputed properties, and

14   preserve Joseph and Yeshuah's right to file a Proof of Claim.

15           That on March 4 of 2008, the Trustee filed an

16   adversary proceeding against Joseph Dwek, Dwek, L.P., and Mark

17   Adjmi asserting claims of fraudulent transfer, common law

18   fraud, conspiracy to commit fraud, and related claims.

19           That the Defendants filed an Answer and Counterclaim

20   which they sought, among other relief, the establishment of a

21   constructive trust.

22           That the matter was withdrawn to the District Court

23   by the Defendants where a trial on the merits would determine

24   the outcome.

25           That as Trustee, Mr. Stanziale met and conferred

1    with Joseph Dwek and his professionals and caused his own

2    professionals to review documents, bank statements, deposition

3    transcripts, the HSBC loan documents, and other relevant

4    materials relating to the adversary proceeding.

5            That Mr. Stanziale met and conferred with his

6    retained professionals, including his accountants, with regard

7    to this matter, and determined that Joseph Dwek's allegation

8    that he was owed at least $60 million as a result of the Dwek

9    Ponzi Scheme, coupled with his other affirmative defenses, had

10   significant merit and hampered the Trustee's fraudulent

11   conveyance claims set forth in the adversary proceeding.

12           That, to date, the Trustee has sold 67 of the 129

13   disputed properties representing approximately $17.6 million

14   in net proceeds, all of which has been sold pursuant to

15   publically-filed documents which will be available for the

16   bankruptcy estates upon approval of this Settlement Agreement.

17           That the reduction of $43 in asserted claims, as

18   well as a potential claim of Joseph Dwek in the amount of at

19   least $60 million; two, an allowed unsecured claim of $20

20   million to HSBC, represents significant, real value to these

21   bankruptcy estates.

22           That prior to filing this Settlement Motion, the

23   Trustee sought and obtained the support of the Creditors

24   Committee for the settlement and included the Committee in the

25   drafting of the settlement documents.

1    That the Settlement Motion included, as an exhibit,

2    the entire Settlement Agreement and was filed and served on

3    all Creditors on January 5, 2009.

4    Mr. Stanziale would testify that the settlement is

5    supported by both the Committee and the Debtor and various

6    other parties in interest.

7    That the lone objector to the settlement is a

8    defendant in an adversary proceeding, which in addition to the

9    return of $87 million, seeks the expungement of the objector's

10   alleged claims against the estates.

11   And Mr. Stanziale would testify that after careful

12   review and due diligence that the Trustee has determined, in

13   his business judgment, that the settlement is in the best

14   interests of all Creditors of the estates and is well above

15   the lowest point in the range of reasonableness necessary for

16   this Court to approve this settlement.

17   THE COURT:  Okay.  Thank you.

18   Mr. Stanziale, I gather you're on the line now.

19   (Whereupon, Mr. Stanziale appeared by phone.)

20   MR. STANZIALE:  Yes, Judge.

21   THE COURT:  And have you heard the proffer made by

22   your counsel?

23   MR. STANZIALE:  Yes, I have, Judge.

24   THE COURT:  And would you attest to all of the

25   statements that he just made?

1        MR. STANZIALE:  I do attest, Judge.

2        THE COURT:  Okay.  Thank you.

3        All right.  Anything else?

4        MR. TESTA:  That's it, Your Honor.  Thank you.

5        THE COURT:  Okay.  Thank you.

6        Anyone else in support of the settlement?

7        MR. GREENHALGH:  Good morning, Your Honor.

8        Walter Greenhalgh, Duane Morris, counsel for the

9   Creditors Committee.

10       Your Honor, I will be brief.  We did submit a

11  response to the objection filed by Mr. Franco.

12       And I want to stress to the Court, the Creditor

13  Committee involvement, once this business deal and the

14  elements of the settlement were agreed to by the Trustee and

15  his attorneys with the attorneys for Joe Franco, Your Honor,

16  once the Committee passed upon the business deal -- and the

17  Committee did -- we went into and analyzed the proposal that

18  was being made.  We then were involved, quite extensively, in

19  negotiating the terms of the Settlement Agreement.

20       The Creditors Committee wanted to insure that

21  certain interests that the Trustee could possibly pursue at a

22  later date would not be included in the settlement.  And the

23  Committee did take an active role in these negotiations.

24       Once that was completed, the Settlement Agreement

25  was then submitted and finalized by all the parties, and the

1  Motion was then filed with this Court for the approval.

2          Your Honor, we stress the fact that this Settlement

3  Agreement, first of all, brings in over 129 properties into

4  this estate.  It also will resolve any cloud or dispute that

5  revolve around those properties, and it also resolves

6  significant litigation which would result in extensive further

7  costs to this estate for counsel fees and professional fees.

8          Your Honor, it's clear that what the Trustee has

9  submitted goes far beyond the minimum standards of the range

10  of reasonableness which this Court would use as the standard,

11  which we noted the Franco objection completely fails to

12  address.  The Franco objection is fraught with unsubstantiated

13  allegations by counsel.  The statement is not certified.

14  There was no affidavit.  There is nothing from a factual

15  standpoint that Mr. Franco and his attorneys have submitted to

16  this Court that would substantiate their allegations.

17          Therefore, Your Honor, the burden, which has been

18  met by this Trustee, has not been rebutted by Mr. Franco.  And

19  we would request, for the benefit of this estate, that you

20  approve the settlement.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Anyone else in support?

24          MR. USATINE:  Good morning, Your Honor.  Very, very

25  briefly and just to add some color to our letter and the

1   Trustee and the Committee's position.

2          The settlement that's before Your Honor was

3   probably, I would say, every bit of a year in the making.

4   There were some starts and stops.  It will avoid -- but it was

5   always conducted in good faith.  The Committee was brought

6   under the tent and made substantive requests for change that

7   were accommodated through additional negotiation.  The

8   settlement obviously will avoid what would otherwise be a

9   very, very hotly-contested litigation before the District

10  Court, likely resulting in a jury trial, because some of the

11  claims are clearly not easily disposed of on Summary Judgment,

12  and it would avoid all of that expense, all of that delay, and

13  end litigation with probably the estate's largest Creditor, in

14  my view, Mr. Dwek, who was a net loser on his investments of

15  more than $60 million.

16         The negotiations that I made reference to, Your

17  Honor, resulted in a deal that I think is abundantly fair from

18  my client's perspective and results in benefits to the estate,

19  both in terms of the clearing of title on the properties and

20  the ending of litigation that are abundantly clear.

21         And for that reason, we join in the Trustee's and

22  the Committee's responses to Mr. Franco's objection and

23  request that they be overruled.

24         Thank you.

25         THE COURT:  Okay.  Thank you.

1          MR. USADI:  Your Honor, Robert Usadi for HSBC.

2          HSBC, which has made a substantial contribution to

3     the settlement, strongly supports the settlement for the

4     reasons stated by the Trustee and the Committee.

5          THE COURT:  Okay.  Thank you.

6          MR. NEUMANN:  Good morning, Your Honor.  Timothy

7     Neumann for the Debtors.

8          It occurred to me driving over here one thing that I

9     didn't put into my 5:00 o'clock submission last week.  The

10    objector indicates that one of the reasons for not approving

11    the settlement is because there are certain claims that the

12    Trustee is preserving which could create conflicts in the

13    future.

14         This case, by virtue of its complexity and the

15    number of entities, is certainly replete with potential

16    conflicts, but the remedy for that is not to kill this

17    settlement.  That would certainly have the tail wagging the

18    dog.  If those potential conflicts become actual, then the

19    appropriate remedy is that the Trustee can hire Special

20    Counsel if and when the need arises.

21         Thank you, Your Honor.

22         THE COURT:  Okay.  Thank you.

23         Anyone else in support?

24         Miss Pacheco, I was led to believe by some of the

25    submissions that Sun National's limited objection was

1    resolved?

2              MR. PACHECO:  They are, Your Honor.

3              THE COURT:  Okay.  All right.  Let's hear from the

4    loyal opposition.

5              MR. STEINBERG:  Good morning, again, Your Honor.  I

6    probably can't promise to be brief, but I think there's a lot

7    that needs to be said, things that were not said in the Motion

8    papers and, to the extent that people believe that the

9    citations were made up, or the statements made were made out

10   of whole cloth, then I will be citing to the pleadings filed

11   in these cases in support of those assertions.

12             I represent Isaac Franco, who is one of the largest

13   individual Creditors of the Solomon Dwek bankruptcy estates.

14   When we filed the pleading in this case in response to the

15   Trustee's Motion for approval of the Joey Dwek settlement

16   which essentially requested two things:  One, we request an

17   adjournment of the Court's consideration of the Joey Dwek

18   settlement on multiple grounds.  And two, we expressed

19   concerns with regard to certain elements of the settlement,

20   including the elimination of specific language which we

21   believe highlighted a conflict of interest for the Trustee,

22   and that Franco is criticized because, that the pleadings that

23   were filed in this case, that he filed, didn't have specific

24   citations to the record.  And, again, I will fill that in.

25             And, in reality, as will be elaborated today, most

1   of the statements that we made did come from the pleadings,

2   and the reality is that Franco was asking for the opportunity

3   to develop the factual record in this case to properly assess

4   whether this settlement should be approved.  The Trustee has

5   the burden of approval on the settlement, and it wasn't until

6   the Creditors Committee filed this pleading on Friday that we

7   were aware that the Committee had a position on this matter.

8   The Trustee's Motion to approve this settlement does not say

9   anything about what the Creditors Committee's position was.

10          Now, the grounds for adjournment, I've said, are

11  multiple, and I'd like to go through them with Your Honor.

12          THE COURT:  Okay.

13          MR. STEINBERG:  The first is the Motion to approve

14  did not contain what we believe to be critical information

15  which Creditors are entitled to know in order to assess

16  whether the settlement was reasonable and should be approved.

17  And because of these omissions, Franco suggested that the

18  settlement needed to be re-noticed to include the missing

19  information so that all Creditors would know what was going

20  on.

21          In addition, Franco was concerned about the

22  information contained in the settlement and, therefore,

23  indicated in his pleading that he would serve discovery in

24  order to try to flesh out those concerns.  And, indeed, he did

25  serve that discovery, which is attached to our supplemental

1    pleading which we filed on Friday.  And we believe that he

2    should be entitled to take that discovery to further develop

3    the record in this case and to address the concerns which I'll

4    speak about later on.

5          As an aside, before filing this pleading regarding

6    the settlement, Franco's counsel did meet with the Trustee and

7    discussed some of the terms which he thought needed further

8    elaboration.  The Trustee did provide certain general

9    information, promised to give other information, and did not,

10   even today through his pleadings, file additional information,

11   which we believe is required in order to assess the

12   reasonableness of a settlement.

13         We asked the Trustee for an adjournment of this

14   hearing in order to be able to try to better assess the

15   factual record, and the Trustee turned down that request.

16         The resolution of this dispute between the Debtor's

17   estate and the Joey Dwek estate is an important issue in this

18   case.  And there is no reason why, and there is no prejudice

19   to anyone, giving Franco additional time to fully assess the

20   grounds and whether the settlement should be approved or not.

21         Franco is looking for a 60-day adjournment.  That's

22   not a long time in the context of this case which is

23   approaching its two-year anniversary.  The Trustee indicated

24   in his pleadings that Joey Dwek, that the settlement with Joey

25   Dwek has been negotiated for a long period of time.  That's

1  Paragraph 19 of the Trustee response to the Franco objection

2  to the settlement.

3         Counsel for Joey Dwek said today that these

4  negotiations have been going on for a year.  He also indicated

5  that there were a number of discussions with the Creditors

6  Committee over months regarding the settlement.  That's

7  contained in the same paragraph, on Paragraph 19 of the

8  Trustee's objections.

9         Counsel for the Committee stood up today and said

10 that he's been involved in these discussions for a period of

11 time.  Franco has known about the settlement for less than

12 four weeks, and he's looking to play catchup.  And he's

13 entitled to have a reasonable period of time in order to do

14 so.

15        During this 60-day interval, there will be a number

16 of additional pieces of information that Creditors will have

17 and that the Court will have.  And each of those circumstances

18 will give a better and complete record as to whether this

19 settlement is reasonable and should be approved.  And the

20 additional information will be coming from a number of

21 sources.  And I'd like to elaborate what I think is going to

22 happen over the next 60 days.

23        First, Franco will be taking the discovery that he's

24 requesting, which is the document production by the Trustee,

25 and the deposition of the Trustee.  And Franco should have the

1   opportunity to be able to prepare, if necessary, for a trial,

2   as the Trustee puts in his evidentiary record, as compared to

3   doing it in this manner.

4          Second, for months there's been an outstanding

5   deposition request for Solomon Dwek, the Debtor.  And that has

6   been adjourned at the request of the government to accommodate

7   a criminal investigation.  We believe that during the 60-day

8   period that we may very well have Solomon Dwek testify in this

9   case, or at least saying something in this case.  There's been

10  a schedule that's been circulated among the parties to have

11  that deposition heard towards the end of February.

12         There's clearly something that will be relevant,

13  that will be developed during the examination.  Frankly, the

14  Trustee said that the failure of Solomon Dwek to testify was

15  one of the reasons why he wanted to have an equitable tolling

16  of the two-year Statute of Limitations.  We believe that

17  whatever Solomon Dwek says may have a bearing on the Court's

18  assessment of the settlement of the case.  Certainly, people

19  will have the opportunity to ask questions of Solomon Dwek.

20  To date, the only one who seems to have had that opportunity

21  has been the Trustee, and Solomon Dwek has been paid for

22  almost two years for that opportunity.

23         In addition, if and when Solomon Dwek testifies, it

24  would also signify that there is a further development in the

25  criminal proceeding and that that information that will come

1    out from the U.S. Attorney may very well have relevance to the

2    Court's assessment of the settlement.  As the Trustee's

3    counsel say, the Joey Dwek settlement is a big settlement in

4    this case.  He's an important actor for what happened in this

5    case.

6         In response to the proposed plan -- next, in

7    response to the proposed plan filed by the Debtor, the Trustee

8    committed to filing a plan in this case sometime during the

9    month in February.  That's Paragraph 14 of the Trustee's

10   objection to Solomon's Plan of Reorganization.  That plan,

11   whatever it will be, should contain information as to the

12   following issues, which each of which has relevance to aspects

13   of the settlement.

14        First, whether the Debtor cases will be

15   substantively consolidated and why.  That issue affects many

16   of the Trustee's claims against Joey Dwek.  It also affects

17   the claims against HSBC.  It also affects the claims of other

18   investors.

19        Two, whether investor claims will be treated pari

20   passu with other unsecured Creditor claims.  In Solomon Dwek's

21   plan, he suggests that there is a basis to subordinate the

22   claims in full, and he was offering to pay them 25 percent of

23   their claims after they had been reduced by any distribution

24   that has been had in this case.  Franco has submitted a

25   pleading in connection with that plan which said that

1    settlement, which is entirely unreasonable and wrong, is a

2    skewing of this estate for the benefit of the non-investor

3    Creditors.

4          It's important to know what the Trustee and the

5    Creditors Committee will be doing on that issue.  And when the

6    Trustee files its Plan of Reorganization, we will know.  And

7    that issue underlies an important element of the settlement.

8    It relates to the claims that Joey Dwek is giving up, and it

9    also relates to the claim which is being recognized in favor

10   of HSBC.  Is that $20 million claim going to be treated as an

11   investor claim, a non-investor claim; will it make a

12   difference or not make a difference?  We'll know within the

13   three-week period when the Trustee files his plan.

14         Next, are investors' claims being reduced by any

15   amounts returned to them prior to the bankruptcy?  Also, are

16   investors still going to be requested to return, on a dollar-

17   for-dollar basis, any amounts paid to them by Solomon Dwek

18   prior to the bankruptcy?  This issue underlies the release

19   being given for Joey Dwek of the $91 million paid to him prior

20   to the bankruptcy.  That $91 million figure is in Paragraphs

21   41 and 42 of the Trustee's complaint against Joey Dwek.

22         Significantly, the fact that the Trustee had sued

23   Joey Dwek for $91 million in a return of cash is not contained

24   in this Motion for approval of the settlement.  It also

25   affects the assessment as to what claim, if any, Joey Dwek

1   ever had against the bankruptcy estate.  It also has the same

2   impact as to what claim HSBC ever had with regard to the $25

3   million claim and the $18 million loan which are the subject

4   of the settlement.  Of the $91 million paid for Joey Dwek, in

5   excess of $30 million was paid to Dwek to his account at HSBC

6   after the $25 million loan was paid.  That information about

7   the $31 (sic) million is contained in Paragraph 41 of the

8   Trustee's complaint.

9           I will say that I made a mistake in the objection

10  that was filed.  I used the number $23 million.  It was

11  actually a larger amount.

12          How those payments were accounted for is not

13  described in the Motion.  The Trustee, in his proffer, says he

14  believes that Joey Dwek is a potential Creditor for $60

15  million in this case.  We want to challenge that assertion.

16          We're wondering if $91 million was received by Joey

17  Dwek, what actually did he advance, and what did he advance

18  versus other entities advance, and whether that $60 million

19  includes the HSBC claim for $43 million.  And I will elaborate

20  later on in my presentation with citations to affidavits that

21  Joey Dwek filed in the State Court proceeding to illustrate

22  why this is of concern -- this has not been spelled out in the

23  Motion -- and why we think this needs to be developed and a

24  better record through discovery.

25          Next, whether Joey Dwek had any claims against the

1  Trustee, which the Trustee is seeking to enforce against

2  Debtor's estates other than the Solomon Dwek estate.  That's

3  an element of this settlement.  That will have an impact on

4  some Creditors in some Debtor's estates.  So which Debtor's

5  estates are being advantaged, and at whose expense, and why?

6  That is not explained in this Motion.  We raised it twice.

7  They've had an opportunity to respond, and they say we'll

8  figure it out later on.  I don't think they have the

9  opportunity to say I'll let you know later on.  This is the

10  time that they're supposed to tell us what that's about.

11         And what is a Joey Dwek claim -- why is a Joey Dwek

12  claim being asserted in any estate if they're trumpeting the

13  fact that Joey Dwek is entitled for release, is releasing

14  these estates?  So why is the Trustee asserting a claim of

15  Joey Dwek -- and the same thing with regard to HSBC with

16  respect to the $43 million claim -- why is he asserting it

17  against certain other estates?  Someone's ox is being gored

18  for a particular purpose.  We don't know.

19         Frankly, the plan that will be filed in the next

20  three weeks should explain it.  We're entitled to know it.

21  The Court should be entitled to know it.  And I understand

22  that this is a settlement that everybody else wants.  But you

23  might as well have it on a good record.  You might as well

24  explain the things that you should have explained the first

25  time.  And all Creditors will have an opportunity to see how

1   they're being impacted by the settlement, because we believe

2   that the Motion that was filed did not properly describe it.

3          Franco said that this provision highlights a

4   conflict of interest.  A Trustee who is a Creditor of all

5   estates can't take a claim that he acquires in connection with

6   one settlement, assert it against the estate.  And for what

7   purpose, who's going to get the derivative benefit for it?

8          The next point is whether any investor will be given

9   an additional recovery based on the constructive trust theory

10  as against any property of the Debtor's estates.  The Trustee

11  indicates that this argument may have some vitality as a basis

12  for his reasons in settling with Joey Dwek.  That's in

13  Paragraph 8 of the Trustee response to the Franco objection

14  which was filed on Friday.

15         This argument is very similar to that held by many

16  of the community investors.  Indeed, it appears Joey Dwek

17  advanced his largest amounts in connection with the Meridian

18  Hospital buy/sell flip deals, which is the basis upon which

19  Solomon Dwek essentially swindled most of the Deal community.

20  And the recitation of why I make that statement that it

21  usually relates to the Meridian deals is contained in

22  Paragraphs 20 through 24 in the Joey Dwek Answer filed in the

23  State Court action.

24         And after this hearing today, if Your Honor wants to

25  see all the pleadings that I filed for -- because they're not

1   readily available -- and for me to assemble a compendium of

2   these exhibits, I'm happy to do so.

3           The next point is that the Trustee filed a pleading

4   in this case -- the next point for an adjournment is that the

5   Trustee filed a pleading in this case to extend the two-year

6   period for him to bring avoiding power claims, and he gave

7   two, essentially two reasons why this information is what he

8   needed.  One, he says his information is not complete and that

9   he needs more time to evaluate what happened, A, because

10  Solomon has not formally testified in this case, and B,

11  because he's not finished with the docketing review which is

12  slowly coming back to him in connection with the seizure of

13  documents by the government.

14          Well, during this 60-day period of time, I think

15  Solomon is going to testify.  A lot of these documents will be

16  coming back.  And there's a reasonable likelihood that this

17  additional information will be revealed.  And if all these

18  things were relevant for the Trustee as a basis to decide who

19  to sue and not to sue, and to ask this Court for an equitable

20  tolling, then they're probably relevant for decisions to be

21  made as to who to settle with.  And even if he's firmly

22  deciding that that's relevant, it is relevant for the other

23  Creditors of this estate who are impacted by the settlement to

24  assess any settlement proposal made by the Trustee.

25          Now, those are the bases upon which I think we're

1   entitled to a 60-day adjournment.  But I'd like to now go

2   through the concerns and elaborate on the concerns made with

3   regard to the settlement.  The settlement describes what the

4   Trustee is getting.  And I'll go through a little why it's

5   incomplete to understand what the Trustee is getting.  And,

6   believe me, I tried very hard to go through this.

7          But what is the Trustee giving up in the settlement?

8   The Trustee is giving up -- is getting a release -- is giving

9   a release to Joey Dwek, and he's recognizing an HSBC claim in

10  the reduced amount of $20 million.  The Motion never really

11  describes the claims with any specificity of what he's giving

12  up against Joey Dwek.  He brought an adversary proceeding.  He

13  references the proceeding.  But he never really describes in

14  the Motion that he sued Joey Dwek for $90 million to bring

15  back.

16         It's the same legal theory that he sued every

17  community investor in this case.  You got a dime back from

18  Solomon Dwek, you got sued.  The $90 million request is Counts

19  1 through 5 of the complaint filed against Joey Dwek.

20         Now, how much of the $90 million that he got reduced

21  the claims of Joey Dwek?  You don't know the answer.  You do

22  have the Trustee saying I think it may be $60 million.  But

23  based on the snippets of what I've been able to glean from

24  these documents, it's hard to tell why he believes that to be

25  the case.  And whatever he thinks, I'm entitled to test it.

 1   And I'm really entitled to test it first with documents and a

 2   deposition before having to try to do it based on a proffer

 3   that he just makes that one statement.

 4          And did any of that $90 million reduce the HSBC

 5   claims in any way?  The Trustee says the Joey Dwek claim is

 6   $60 million.  Franco wants to test it.  Joey's State Court

 7   papers that he filed, because he never filed a Proof of Claim

 8   in this case other than the $1.5 million forgery claim, and he

 9   never really filed a claim in the State Court proceeding

10   because the involuntary came before the bar date happened.

11          So you have to glean this from reading the State

12   Court papers that Joey Dwek filed his certifications.  He

13   talked about that he started his business dealings with

14   Solomon in around 2000, which is earlier than almost everybody

15   else involved in this case; that he had somewhere between $10

16   million to $14 million that he advanced between 2003 and

17   August of 2005.  Then the HSBC loan started where he borrowed

18   the money, and that was the $43 million.  And, plus, he gave

19   $7 million in March of 2006.

20          So that's all I can count up.  That information is

21   contained in the Third-Party Complaint filed in November 2006

22   in the State Court action by Joey Dwek.  So you have an HSBC

23   claim, which is a double count, if Joey Dwek and HSBC are

24   asserting the same claims against the estate, you have

25   somewhere around $10 million to $14 million.  In some

1   pleadings, he says it's 10; in another pleading says it's 14.

2   Plus, you got the $7 million in March of 2006.  And you have

3   the Trustee alleging in his complaint that he got back $91

4   million and $30 million of which came after August of 2005.

5          So was Joey Dwek a net Creditor?  Was he a

6   profiteer?  Did he get back more than he was entitled to?  I

7   think what I'd like to know, the State Court pleadings said

8   that he gave -- his deal with Solomon was that Solomon would

9   find properties and that he would give money to Solomon's

10  Yeshiva or the Yeshiva that Solomon worked for as a sort of a

11  commission.  Solomon would then be the Property Manager for

12  the properties that he acquired.

13         And in the State Court pleadings, he said that, at a

14  minimum, he gave $2 million to a Yeshiva based on his deal

15  with Solomon.  That information is contained in the May 2006

16  certification of Joey Dwek, Footnote 1 on Page 2.  Trustee

17  alleged that Solomon was entitled, that Solomon said that he

18  was entitled to 20 percent of the profits of the Joey Dwek

19  deal.

20         So you pay $2 million to Yeshiva, and he was

21  entitled to 20 percent of the profits, that would suggest that

22  there was a $10 million profit that was made.  Maybe not.  I'm

23  just trying to do math, trying to deal with this information.

24         Joey said that he paid taxes on alleged profits.

25  That's Paragraph 9 of a supplemental certification of Joey

1   Dwek dated June 5, 2006.

2           Well, that's all I know, Judge.  I'm entitled to

3   test it.  And I'm entitled to get the documents as a

4   fundamental assumption before I go through with it.

5           Now, the adversary proceeding complaint says, in

6   Paragraph 43, that prior to the bankruptcy, several entities

7   presumably associated with Joey Dwek advanced monies to SEM.

8   So in the complaint that the Trustee filed against Joey Dwek

9   where he sued them because he said SEM is a separate entity

10  from other Dwek entities, and it just so happens that Joey

11  Dwek got his money from SEM, but SEM didn't owe anything to

12  him and, therefore, Joey Dwek was liable for $91 million.

13          And that's why I said the substantive consolidation

14  issue was relevant, because if SEM is consolidated with some

15  of the other Dwek entities, then he won't be able to play the

16  game of you advanced with this debtor, but you got paid from

17  that debtor, so you're a creditor of one debtor and you have a

18  fraudulent conveyance issue with another debtor.  So that's

19  why the substantive consolidation issue is entirely relevant.

20          But he said, you know, I recognize that Joey got $91

21  million, but there's some money that came back during this

22  course of this six-year history that they had.  And he said

23  they came back from the following entities -- and this, again,

24  is in Paragraph 43 of the Trustee's complaint -- Consolidated

25  Children's Apparel, Inc., Sports Product of America, LLC, IFG

1   Corporation, and Sister-Sister, Inc., now when you actually

2   read the settlement that the Trustee filed in this case, he's

3   preserving these claims against these entities because he

4   feels like he has claims against these entities, and that's a

5   carve-out of the release in Paragraph 5A of the release.

6           But when you look to see what releases the Trustee

7   is getting, he's not getting a release from these entities.

8   The entities that actually put money into the estates, he's

9   not getting a release from as part of the Joey Dwek

10  settlement.  I don't know why that's the case.  It would seem

11  to me that that an omission.  He's setting himself up.  But

12  Joey Dwek releases his claim, but Joey Dwek wasn't the entity

13  who put the money into the estate.  It's these entities that

14  put these monies into the estate.  And whether these entities

15  did it because they're related to Joey Dwek and they did it on

16  his behalf or not, I don't know.

17          But I will tell you that when you look to see how

18  the Trustee presents this as part of the release, it looks

19  like these entities are entities not related to Joey Dwek, but

20  they're related to Jack Adjmi.  So when you look at Paragraph

21  5A, these entities seem to be defined as Adjmi affiliates, not

22  really Dwek affiliates.

23          Now, there could be an explanation for this, but I

24  don't know what it is right now.  It's one of the reasons why

25  we asked for discovery.  It's one of the reasons why we asked

1    to take the deposition.  And we tried to get it informally.

2    We got some pieces of information; we didn't get other pieces

3    of information.

4          Now, what is Joey Dwek's claims against the other

5    estates?  I referred to this before.  And why are they being

6    assigned to the Trustee?  How does that not represent a

7    conflict for the Trustee?  If the settlement is approved and

8    Joey Dwek did not file claims against these entities prior to

9    the bar date, how are these claims being preserved?  Because

10   Joey Dwek reserved the right to file claims if he had to give

11   back the properties, but he now has a deal.  The bar date is

12   gone in this case.  So now we're preserving these claims that

13   are past the bar date because we're giving them to the Trustee

14   to assert against certain estates when he's supposed to be the

15   representative of all the estates?  And who's going to get the

16   recovery on those claims?  And why am I the only one who

17   thinks that's not a conflict of interest, and why does anybody

18   think that's something that could be waived with a Special

19   Counsel?  Who's making the decisions?

20         I can get ten counsel in this world.  I need a

21   special Trustee to handle that, because every lawyer who works

22   works for the benefit of a client.  And the client is the one

23   who makes the business decision.  And the client is the one

24   who directs the attorney what to do.  He has this inherent

25   conflict that he's creating himself by virtue of how he's

1    constructed the settlement.

2            Now, the HSBC claim is being reduced from $43

3    million to $20 million.  Trustee did not say in his Motion

4    when he filed this what the aggregate claims were against the

5    consolidated estate.  We raised that as an issue.  And on

6    Friday, he indicated that he thought it was going to be around

7    $120 million.  That's in Paragraph 29 of his response.  So I'd

8    like to verify that information.  I'd like to know what the

9    impact of it is.  And I bet you when he files his plan within

10   the next three weeks, I'll get a hell of a lot more

11   information that I'll be able to assess how he came up with

12   that number.

13           And what's not said is that the $43 million claimage

14   of HSBC is probably being counted twice with the Joey Dwek

15   claim.  I don't really know for sure.  I'm only trying to add

16   what the -- how Joey Dwek has presented his claim in the State

17   Court, and it looks like it must be being counted twice.

18           The $25 million claim -- because the 43 is composed

19   of a $25 million claim and an $18 million claim -- the $25

20   million claim appears to have been made based on the fact that

21   a loan was made by HSBC to Joey Dwek which was guaranteed by

22   Solomon Dwek.  So it's not a direct obligation; it's a Solomon

23   guarantee.

24           And although it's not set forth in the Motion, when

25   you go back to the State Court, you realize that originally,

1  this was a $15 million loan made in June, and in August of

2  '05, it became a $25 million loan.  And for the life of me, in

3  reviewing the State Court papers, I can't tell whether the

4  original $15 million was just a Joey Dwek obligation, and then

5  it was in August of '05 where it became a Joey Dwek obligation

6  guaranteed by Solomon.

7          So the Trustee raised in his complaint that the $25

8  million guarantee by Solomon of the Joey Dwek obligation was a

9  fraudulent conveyance, that there was no consideration

10 received by Solomon for guaranteeing the obligations of his

11 uncle and the loans made to his uncle.  So why wasn't that a

12 good claim?  Because if that was a good claim or a reasonably

13 good claim, then a $20 million give-up off a $43 million

14 claim, when there's a $25 million aspect of it, may not seem

15 like a good deal.

16         So what are the incidental benefits that would

17 support this type of guarantee?  I don't know.  That's what I

18 want to ask for discovery for, to get a sense of why the

19 Trustee, in analyzing these issues, decided that he wanted to

20 give up on this thing.

21         Now, the $18 million claim, which is the other

22 aspect of the 43, was made to Solomon and Joey, but that claim

23 is secured by other collateral.  So what's that collateral

24 worth?  Has it been sold?  I, truthfully, can't do what the

25 Committee does in this case on behalf of an individual client,

1  which is to track every element.  I can't ask for it in

2  discovery.  I can see it when I see a Plan of Reorganization.

3       There's collateral that supports that $18 million

4  loan.  Both sides in the settlement have reserved the right as

5  to whether HSBC should be entitled to get that collateral

6  which will reduce that $18 million exposure or not.  If HSBC

7  is right -- and I think HSBC usually is right on the claims

8  that they assert in these cases -- then there's not really an

9  $18 million claim in this case.  It's a lesser amount.

10 There's a deficiency -- $18 million, the full amount, with the

11 secured claim -- so what's the deficiency in this case?  I

12 don't know.  It's not in the Motion.  It's not in the

13 information that's relevant for purposes of determining what

14 is the give-up in this claim.

15       Now, were there payments made against the $43

16 million claim?  As I've said now, I know, a couple of times,

17 that Joey got $30 million since August, and I didn't track

18 what he got since June when the original $15 million were

19 advanced and they went into an HSBC bank account -- that's set

20 forth by the Trustee in his complaint in Paragraph 43 -- so

21 where did the money go?  The money went into a Joey Dwek bank

22 account.  It was actually a Dwek, L.P. bank account.  So where

23 was it applied?  It has to be applied somewhere.  Was it

24 applied against these loans?  Was it applied against other

25 Joey Dwek obligations?  $30 million after August of 2005 went

1    to Joey Dwek.  Is the $20 million considered an investor claim

2    or a financial institution claim?  It emanates from loans made

3    essentially to do these Meridian flip deals.  Is that going to

4    be an issue in this case?  I don't think it should be an

5    issue, but Solomon did.  And I don't know what the Trustee's

6    position is.

7            But if it is an issue in this case, and if someone

8    is going to discount that claim, is this HSBC claim going to

9    be considered an investor claim?  I know they're not an

10   institution, but it derives from a loan made to an investor.

11   If that's going be the rule in this case and Your Honor is

12   going to go against what I will be urging you, but that's what

13   you're going to determine, then that will affect what the

14   consideration that's going to be exchanged in connection with

15   the settlement.

16           Again, I'm not looking to delay this thing forever.

17   I've been a critic of this Trustee and this Committee about

18   moving this case forward, moving this case forward in a global

19   way that impacts all investors.  When we originally filed our

20   objection and did not have the Trustee's statement as to when

21   he filed a plan, so I had the objection phased in general

22   terms of, we all would like to know, we need to see the macro-

23   picture in order to assess an important settlement in this

24   case.  Well, he gave me somewhat of a gift, because in

25   response to Solomon's plan, he said I'm going to do something

1  in 30 days.  And after two years in this case, he should do

2  something in 30, within the next 30 days.

3        But when we know what he's going to do, we'll be

4  able to assess how really the settlement is either valuable or

5  not valuable and how Joey Dwek is standing apart from how the

6  Trustee wants to treat the remaining community investors in

7  this case.  I know that in the context of the response to my

8  papers, they said that Ike Franco sued for $87 million.  Yeah,

9  Ike Franco gave back more than 87.  He gave back closer to 98,

10 or whatever the number is.  Ike Franco gave back somewhere

11 between $9 million and $10 million more.  And then if you

12 count the Jubilee transactions, it's between $5.5 million and

13 $6 million more than he ever got back over a two-year period

14 with no return on his money.  And we documented that three

15 times to the Trustee already.

16       Solomon -- Joey Dwek has been characterized up and

17 through this settlement as a $91 million Creditor to this

18 estate.  And we just heard today in the proffer made for the

19 Trustee that Joey Dwek is really a $60 million Creditor.  So

20 things move rather quickly depending on where you are in the

21 stage of your negotiation.

22       Why is HSBC being considered a good-faith claim

23 holder for these claims, the $20 million, when at the same

24 time they're being sued for their bad-faith conduct in

25 connection with the PNC transaction?  How does a holder in a

1   case get to be a good-faith holder in connection with one

2   transaction and a bad-faith holder in connection with a

3   different transaction when the transactions happened around

4   the same time?  What line is the Trustee trying to draw in

5   this case?  I think there should be a global resolution of

6   those HSBC issues.  It's kind of strange to have the notation

7   that they're an allowed Creditor, incapable of being

8   challenged by any other Creditor in this case for all times.

9   And now he's still going to continue to sue HSBC for what he

10  alleges, and I do not believe, is their bad-faith conduct.

11          Let me be clear, I think HSBC conducted themselves

12  properly in this case.  But the back and forth shifting of how

13  the Trustee wants to conduct this case is strange.  And that

14  is a concern that we want to flesh out in a deposition.

15          HSBC claims that it has $43 million against other

16  entities and that's going to be assigned to the Trustee.  And

17  my question is, why aren't those claims being released?  It's

18  the same issue that I've articulated with regard to Joey Dwek.

19          Now, the settlement, which hasn't been discussed,

20  has another element of it, which is that Joey Dwek is being

21  reimbursed $1.484 million as an administrative claim in this

22  case.  And that's relating to advances that Joey Dwek made

23  with regard to the 129 properties before they were turned back

24  to the Trustee in accordance with the interim settlement that

25  he was referring to before.

1   First, you can't tell unless you do some math and

2   you try to compare numbers -- and I'm not sure if Your Honor

3   did that -- the interim settlement said that Joey Dwek had

4   advanced $1.473 million.  The administrative claim is $1.484

5   million, greater than what Joey Dwek said he got back.

6   The Trustee also filed a pleading in Paragraph 30 of

7   the Motion that he filed in support of the Joey Dwek

8   settlement which said that Joey Dwek got paid back under the

9   interim settlement 26,800-and-some-odd dollars.  So if you

10  take the $1.473, subtract almost $27,000, you're at $1.446,

11  and the administrative claim that's being recognized is about

12  $38,000 more.  Maybe that's because they're paying legal fees

13  for Joey Dwek's lawyers and maybe that's the $38,000

14  difference.  I don't know.  They never say what the legal

15  counsel is getting as part of the settlement, why.

16  The interim settlement said we're going to reimburse

17  Joey Dwek to the extent that there was a net equity in the

18  properties.  So to the extent Joey Dwek advanced monies on

19  properties and the properties had a value that would have

20  otherwise flowed to the estate, and he supported the

21  properties, they're going to reimburse him.  And that's

22  presumably why he got $26,800 during the period of time that

23  the Trustee has been selling these properties, which meant

24  that most of the properties that were sold that came back

25  didn't have this opportunity to reimburse Joey Dwek.

1      Most of his advances must be for the properties that

2   were under water that needed him to support it, which is

3   consistent with the logic, which is that you have a property

4   that needs additional cash support which is not self-

5   sustaining, then that would be a reason to advance money.

6      But you can't tell any of this.  The Trustee says in

7   his response, yeah, that's what we agreed to in the interim

8   settlement, but as part of the overall deal, I'm giving Joey

9   Dwek some more money because he had the argument that if

10  there's any equity from any of these properties, he should get

11  reimbursed even if it's for a property where there was no

12  equity value.

13      Well, I think if that's his argument that he's now

14  conceding that Joey Dwek was correct, then he's revising a

15  position that he had otherwise staked out on the interim

16  settlement, and I think I'd like to ask him about that in the

17  context of a deposition.

18      The settlement describes what the Trustee is

19  getting.  And the settlement fundamentally mis-describes what

20  the Trustee is getting.  He's saying he's getting the

21  properties back.  And that's true.  And he says that he sold

22  60-some-odd properties, and he has close to 60-some-odd

23  properties that he still hasn't sold in the last 18 months.

24  But in his Motion -- and, Your Honor, I apologize because I'm

25  a little out of order in my script, but this is an important

1  point.  In his Motion, he says that the benefits of this deal

2  is that he's getting back properties that will have hundreds

3  of millions of potential, hundreds of millions -- what

4  paragraph --

5          MALE VOICE:  51.

6          MR. STEINBERG: -- Paragraph 51, hundreds of millions

7  of dollars of value for the estate, not even for the -- I

8  don't think that means the secured Creditors; I think it means

9  the estates -- hundreds of millions of dollars, that's what

10 every Creditor saw when they saw this Motion being filed.

11 Okay.  So he never said how much he got on the properties he

12 sold.  That information didn't come out until Friday.

13         So he got 62 properties that he sold.  He got $17.6

14 million.  So the other properties that he hasn't sold, either

15 they're loaded with a hell of a lot of value, or that hundreds

16 of millions of dollars of value statement is incorrect that's

17 in his Motion.  And if it's incorrect, it's a fundamental

18 mistake and needs to be corrected on notice to all of the

19 Creditors.

20         One of the things I want to challenge in the

21 deposition is to find out which properties haven't been sold,

22 what's the valuations on those properties, try to figure out

23 why they haven't been sold in 18 months, because I've made a

24 lot of bad personal business decisions in my own regard, and

25 every personal decision stems from the same fact that I held

1    onto something in a deteriorating market, whether it's the

2    stock market or the real estate climate.  And that's what's

3    happened in this case.

4          The Trustee says he, under the settlement, he's

5    getting title to 13 properties.  Well, in Paragraph 15 of the

6    Dwek, May 2006 certification, Dwek says he got 15 properties.

7    So what happened to the two that are covered here?  I don't

8    know.  We can't tell from reading these papers.

9          The Trustee's response, but not in the Motion, gives

10   the information of $17.6 million, 62 properties not sold, and

11   that there are other -- and he doesn't really say what those

12   other properties are worth.  And, again, it's Paragraph 51,

13   the exact quote, "A potential value in the hundreds of

14   millions of dollars to the estate."

15         The Trustee raises the defense that Joey would

16   assert for giving back these properties -- and on the surface,

17   it would seem that Joey Dwek was the subject of a classic

18   insider preference claim.  I don't know why they keep on

19   talking about it in terms of a fraudulent transfer.  It could

20   be a fraudulent transfer.  But if Joey Dwek claimed that he

21   was owed money because his nephew swindled him, and he got

22   back these properties in satisfaction of having been swindled,

23   and he did it within the one year prior to the bankruptcy

24   filing in this case, that seems to me, as I've said before,

25   not a difficult insider preference claim that wouldn't require

**Response/Steinberg**                                                      45

1    a lot of activity to be taken.

2              And when you look at the April 26, 2006 first

3    agreement -- I think Joey and his nephew did three agreements

4    within a week as they were struggling to figure out how to

5    make the uncle whole at the expense of every other Creditor in

6    this case -- the April 26th agreement spells out that there

7    was a covenant that Solomon would not file for bankruptcy

8    within one year of the transfer of the properties.  It's

9    Paragraph 8 of that April 26th and April 27th sidelights.

10             Significantly also, those letters in Paragraph 3

11   said Solomon, you shouldn't tell anybody that I'm giving back

12   all these properties to you; I'm contractually prohibiting you

13   from discussing it with everyone.  What was the fundamental

14   premise of that entire agreement if you try to read these

15   papers is that Solomon only swindled one person in this world,

16   other than maybe PNC Bank -- because they eventually knew

17   about that -- they swindled, he swindled his uncle.  Every

18   other dollar that Solomon got in his hands was fundamentally

19   good money.  So Joey was saying to his nephew you had your

20   good money, and you put the properties in your name; you

21   should have put them in my name.

22             But it assumes that what Solomon had gotten was his

23   money.  Solomon had swindled the rest of the community on

24   essentially the same deals as Joey Dwek was being

25   theoretically swindled, which was the Meridian Hospital

1   buy/sell locked-in flip deals.

2            So Joey does these deals where he's telling his

3   nephew don't tell anybody and don't file for bankruptcy within

4   a year.  Trustee says that the best element of the settlement,

5   the reason why I'm doing this is because I'm getting back

6   these properties.  But when you take a step back, what that

7   means is that the uncle, the insider, the person with the

8   greatest influence in this case used that influence to grab

9   the properties as a preference ahead of everyone else.  And

10  now the entire community is still being sued in this case, but

11  Joey gets the advantage of getting out because he did the grab

12  beforehand.

13           And what did he do in his grab?  Solomon was so

14  anxious -- and this comes from the Trustee's complaint --

15  Solomon was so anxious to give Joey these properties that he

16  signed deeds in blank.  And Joey, lawyer, filled in the blanks

17  over a course, a period of time, to be able to memorialize it.

18  And when you read the Joey Dwek certifications in the State

19  Court, Joey Dwek says it was hard to tell what Solomon was

20  doing; he should have put the properties in my name; he

21  didn't; I had a hard time trying to track what he was doing,

22  therefore, I'm getting back these properties in order to make

23  me whole.

24           Every community investor who gave Solomon money has

25  the same argument.  Joey Dwek couldn't have a constructive

1    trust claim any better than any of these other investors in

2    this case.  Joey Dwek took the properties and now this

3    settlement is being reached because he took those properties

4    ahead of everybody else and trying to swear his nephew to

5    secrecy in the process of doing that.  And that stinks.

6          And what Franco is screaming about in this case is

7    that the other investors in this community, all of whom think

8    they were victims in this case, are all being sued under the

9    same theory that Joey Dwek is being sued.  Joey Dwek is

10   escaping from having received $90 million in this case because

11   he jumped ahead of the line of everybody else, and quickly got

12   caught for doing it, but he jumped the line.

13         And somehow, he's using this process at a time when

14   all the other investors in this case don't know whether

15   they're going to be hurt or not hurt.  Most of the investors

16   don't have, especially in this climate, the legal fees to

17   continuously do this battle.  And they're hoping that justice

18   ultimately will be preserved.  So many of them are religious,

19   and I spoke to them and they said, God will be -- if Judge

20   Ferguson doesn't watch out for me, God will watch out for me;

21   God will make sure that justice is going to be done in this

22   case.  And I say to them I'm glad you have this faith, and I

23   hope to have that same faith in Judge Ferguson, but Judge

24   Ferguson needs to know what's going on; someone needs to shout

25   out and say what's going on.

1      You can see me saying in the objection to the

2  Solomon Dwek pleading and the plan all of the things that

3  concern me about the case and all the fees that are going on

4  in this case.  This settlement concerns me greatly.  And I

5  think that Isaac Franco should have the opportunity to give

6  you a fully-developed record in this case, and then you could

7  decide whether this thing is reasonable or not reasonable.

8      It's hard to value what the reduction of the HSBC

9  claim of $20 million is worth.  The settlement with HSBC is

10  subject to a separate deal between Joey Dwek and HSBC.  I

11  looked for it -- but I sometimes miss it -- I didn't see it in

12  the settlement.  But in Paragraph 46D of the Motion, they say

13  that whatever HSBC is given in this deal, the reduction of its

14  claim, it's subject to a Joey Dwek HSBC deal.  It doesn't

15  describe what that deal is.  I guess they assume it's two

16  third parties working out their own arrangement.  But it does

17  say that the consideration is conditioned on that deal

18  actually happening.  And I guess I probably would want to know

19  what the deal is and whether that deal is ever going to happen

20  because that will be an element of whether this settlement

21  will ever close.

22      Your Honor, to conclude, and I thank you for giving

23  me the time to make my presentation, we believe that there are

24  multiple grounds -- and I'm not going to list them again --

25  multiple grounds for an adjournment, which ensures that this

1   procedural due process in this case and that will allow the

2   Court -- forget about even me -- will allow the Court to have

3   a more fully-developed record on the reasonableness of the

4   settlement.

5         There are numerous questions that I've raised about

6   this settlement which raise an issue as to whether it's

7   reasonable and whether the Trustee has included a provision

8   which gives him a conflict of interest.  We haven't asked for

9   a deferral for a long period of time.  No one is prejudiced by

10   the deferral.  The additional time may actually be helpful in

11   resolving disputes.  It may actually be that I either am

12   convinced by something that happens in this case, or that I

13   finally have the breakthrough where I've convinced other

14   people about how I think this case should go.

15         I will note that the transaction is subject to a

16   final and non-appealable Order.  And it would behoove

17   everybody to see whether they can get a fully-consensual deal.

18         I will say, Your Honor, that the Trustee has been

19   good in giving time to Mr. Franco and his counsel in

20   discussing the case.  I'm not sure always whether I get all

21   the information that I ask, and I'm not sure sometimes whether

22   the Trustee has fully developed his thinking.  I have asked

23   though, Your Honor, what I believe to be a large Creditor in

24   this case to have a greater involvement with the Creditors

25   Committee, because I am an active investor who's willing to

1    put in the time and the effort to see that justice is done in

2    this case.

3            And in that context, I have been politely told that

4    now is not the right time.  Well, with a plan being filed, I'm

5    sure the time will be coming pretty soon.  I'm pretty good at

6    trying to work through issues and not having to do it in this

7    way.  I was criticized in the response papers for not citing

8    law to Your Honor with regard to what happens in the

9    settlement.  I said to my co-counsel that I was pretty sure

10   that Judge Ferguson was familiar with the standards of how

11   settlements are supposed to be approved, that everybody cites

12   the same canned parts of their brief, that these are all

13   factual issues, and that the problem in this case is that my

14   factual information is coming in dribs and drabs.  I file an

15   objection, and then I get responses 20 -- you know, a

16   business, one business day ago, giving me more information

17   which answers some questions and raises new questions, all of

18   which are central and fundamental to the settlement that

19   happened in this case.

20           There is no doubt that part of the reason why Isaac

21   Franco was concerned about the Joey Dwek settlement is because

22   Isaac Franco is being sued.  Let me be clear.  I'm not trying

23   to hide that.  Joey Dwek has been sued under the same theories

24   that Isaac Franco has been sued.  All the community investors

25   have been sued under those same grounds.  We're asking for an

1   even playing field and an understanding as to the Trustee's

2   year of analysis as to how he came to these conclusions, how

3   he's decided that HSBC was a good-faith lender when they deal

4   with Joey Dwek and not a good-faith lender when they deal with

5   Isaac Franco; why Joey Dwek doesn't have to give back $91

6   million, but today, every other community investor has to deal

7   with the expense and the trauma of being sued by the Trustee

8   in this case on a sort of a shotgun approach across the board.

9           I'm not surprised that Isaac Franco is the only

10  person that's objecting, because after two years in the case

11  where people see the return being continually dwindled down

12  and never sure whether they're ever going to get anything in

13  this case, and being sued at the same time, it's hard to

14  figure out whether you want to spend more money and have

15  someone make court appearances except in the context of trying

16  to defend themselves.

17          I have recommended to Isaac Franco that you cannot

18  run a case that way; you need to participate; you need to

19  participate, not at the end, but at the beginning; and you

20  need to be able to tell the judge that something is going

21  wrong.  There's something that's wrong when a Creditors

22  Committee supervises a Chapter 11 Trustee and they both do an

23  investigation of the Debtor.  There's something wrong with a

24  Debtor's counsel getting paid with the Debtor when you have a

25  Chapter 11 Trustee for the amounts of monies that are going on

 1  in this case, for the amounts of accruals of administrative

 2  expenses in this case.

 3         I don't know why no one is shouting about it.  I've

 4  tried to be able to raise those issues.  And I will raise

 5  those issues in the context of a plan, Disclosure Statement,

 6  and how this case is being run.  In this particular case, I've

 7  convinced my client it's worth the investiture of time to

 8  review documents, to take a deposition and, if necessary, come

 9  back as the Trustee will testify with an evidentiary record to

10  be subject to cross-examination after I have my documents,

11  after I have whatever information I think is relevant to bring

12  before Your Honor with a handful book of exhibits, and then

13  let Your Honor rule as to whether the settlement is

14  reasonable.

15         Thank you, Judge.

16         THE COURT:  Okay.  Thank you.

17         Anyone else in opposition to the settlement?

18         Any reply?

19         MR. STANZIALE:  Your Honor?

20         THE COURT:  Yes?

21         MR. STANZIALE:  Charles Stanziale.

22         I couldn't possibly reply on an assertion-by-

23  assertion basis, but I must say a couple of things.  First of

24  all, it's obvious to me that Mr. Franco is attempting, through

25  his counsel, of course, is attempting to, first of all,

Response/Stanziale                                          53

1    bolster his defenses to the litigation that I brought against

2    his client.  Moreover -- and to get the point in now that at a

3    trial he may or may not get in (sic).

4              Moreover, it should be known that there are at least

5    40 other lawsuits in this case, and there are some other

6    additional lawsuits to come prior to the tolling period, and

7    let's say that none of those other litigants stepped up to say

8    that, to question what was questioned by Mr. Franco's counsel.

9              But the thing is that the litigation against Mr.

10   Franco is based on the fact, more so than the other Defendant,

11   that he was, in effect, a co-conspirator here, that he knew

12   what was going on, and that he received $90 million back from

13   Dwek, Solomon Dwek, by virtue of threats and bodily harm, and

14   much of the money that went out HSBC Bank to Joseph Dwek

15   immediately, on the same day, went to pay down Mr. Franco as a

16   result of, and because of his threats to Solomon Dwek who,

17   indeed, feared for his life in this situation.

18             So to take Franco as the good-faith victim is not

19   the direction that we're going into in the lawsuit against Mr.

20   Franco.  There were others that do have a case as to whether

21   they were, in fact, good-faith victims or not.  And we're

22   certainly willing to talk to them and to hear their defenses

23   either before or at trial.

24             With regard to Mr. Franco, however, we consider him

25   complicit in this entire matter.  And to step up here and to

1    talk about we want discovery as to Joseph Dwek and to what

2    caused this -- and the Court has insufficient information --

3    is absolutely something that is asserted for the purpose of,

4    to frame the defenses of the allegations in the Trustee's

5    complaint against Franco.

6              That's basically what I'm saying, that to lay out

7    all of these requests and these allegations to delay a

8    settlement that will bring in substantial funds in this case

9    where, indeed, there was, there probably would be a trial, a

10   jury trial, there are factual issues with regard to Joseph

11   Dwek that are not factual with regard to Isaac Franco.  And in

12   my judgment, both in my capacity as the Trustee in using a

13   reasonable standard, lowest reasonable range, I've come to the

14   conclusion that this, indeed, is a case that should be

15   settled.

16             The monies that -- we're preserving our rights

17   against HSBC with regard to other loans from this case, the

18   $15 million loan, the $20 million that, indeed, probably

19   initiated this action, the kited check at PNC Bank which went

20   for the benefit of, again, of Isaac Franco based upon the

21   record he had made just three or four days prior to the

22   issuance of this check.  I think that, in itself, says that

23   we're not giving Causes of Action away in the case.

24             So based upon what I've seen, what I've done, I

25   think that this Motion should not be delayed; that it's

1   important to the case; that it's going to save the estate an

2   enormous amount of litigation cost, which both the Committee

3   and the Court have been concerned with for quite some time.

4           Many of the items and the issues raised by Mr.

5   Steinberg are properly raised in a Disclosure Statement.  He

6   spent a good deal of time discussing what a plan should be and

7   how it affected other litigants and other investors.  Indeed,

8   we question whether, what the status of Mr. Franco really is

9   in this case, certainly in regard to his claim or the quality

10  of his claim.

11          In any event, I just wanted to say that I didn't

12  want some of these allegations that are just simply across the

13  board with no substantiation to just go by with an effort to

14  influence the Court's decision at this time or in future

15  litigation which this Court will, indeed, see.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. USATINE:  Your Honor, I was hopeful, as I

19  listened to Mr. Franco's counsel present his case to Your

20  Honor that I wouldn't have to respond.  But I don't know,

21  somewhere around 20 minutes in, I think I lost all hope in

22  that regard.

23          Mr. Steinberg and his client claim that they were

24  not surprised that they were the only objector in light of

25  what he sees as the landscape of the case.  No one else was

Response/Usatine                                                56

1   surprised either.  What I am surprised about is the assertion

2   that somehow there was surprise as to whether the Committee

3   had a position in the case.  In fact, I think Mr. Steinberg

4   said that Mr. Franco had no idea the Committee had an opinion

5   in the case on this settlement until Friday.  Well, that's

6   startling.  That is surprising.

7            First of all, the objection deadline came and went

8   Monday without the Committee objecting.  That should have been

9   some hint to the extent there wasn't some indication of the

10  Committee's prior to that.  But the community investors that

11  Mr. Steinberg and Mr. Franco purport to speak on behalf of at

12  various points in time, certainly, some of them serve on the

13  Committee.  Certainly, others of them have a free sharing of

14  information with the Committee and probably knew -- and I

15  won't seek to impute any knowledge further than saying some of

16  them probably knew, Judge, that the Committee had, in fact,

17  been part of the negotiation with Joseph Dwek, carved out some

18  language and releases to preserve claims that had yet been

19  investigated by the Committee -- which I'll refer to later

20  because there was reference to it in Mr. Steinberg's

21  presentation -- and knew that the Committee supported the

22  settlement.

23           That being said, Judge, I have to touch -- and I

24  won't attempt to touch on some of the issues that Mr.

25  Steinberg raises in his presentation as requiring discovery.

gationCase 07-21207-RG Doc 2603-16 Filed 02/18/09 Entered 02/18/09 17:25:08 Desc Main Document of 87 Page 57 of 85

**Response/Usatine** 57

1 I will say a few things, though.  Joseph Dwek never filed a

2 Proof of Claim, true statement.  The reason Joseph Dwek never

3 filed a Proof of Claim -- and we're on record both before Your

4 Honor and in the State Court prior to the cases being filed

5 before Your Honor -- the reason why was, just what Mr.

6 Steinberg said, Joseph Dwek, the position was, was satisfied

7 in his transaction that occurred immediately on the eve of the

8 State Court proceeding being commenced through the transfer of

9 properties that he thought should have been titled in his name

10 because they were bought with his dollars and were not.

11 There's no Proof of Claim to file, Judge, when that's your

12 position.

13          That being said, when we did our interim settlement

14 with Mr. Stanziale, Joseph Dwek expressly reserved the right

15 to file a Proof of Claim in the event there was ever an

16 adversary proceeding brought before Your Honor which resulted

17 in a give-back of those properties.  Until then, there was no

18 reason to file a Proof of Claim.

19          However, Joseph Dwek is on record ad nauseam in

20 grotesque detail in affidavits filed before the State Court

21 where he lays out, chapter and verse, the derivation of every

22 dollar he claimed he was owed by Solomon Dwek and the reasons

23 for it.  The Trustee had those.  Mr. Steinberg obviously has

24 them.  The Committee has them.  The Trustee did additional due

25 diligence.  The Trustee had forensic accountants do additional

1    due diligence.  The Committee did the same.

2            They're satisfied, Your Honor, that the dollars are

3    what they were, and that the settlement, that the compromise

4    on those dollars is reasonable.  I'm not familiar with any

5    case law authority -- there certainly is none in Mr. Franco's

6    papers -- that said every Creditor in the case also needs to

7    have done that same extent of complete investigation on every

8    settlement presented to this Court by way of R. 9019 before

9    Your Honor can rule.  I'm not aware of that case.

10           Mr. Steinberg hasn't cited that case.  It cannot be

11   the way that the Court does business on R. 9019 settlements.

12   We would be here in the Solomon Dwek proceeding well into the

13   next century if that's the way we had to proceed on every

14   settlement that presumably Mr. Stanziale will bring before you

15   as he continues to conduct his business on these adversary

16   proceedings.

17           Judge, on the issue of -- there's a claim in Mr.

18   Franco's position that Mr. -- and I'm assuming this is the

19   argument -- Joey Dwek is essentially getting too much credit

20   for giving back the properties, is the phrase he uses, re-

21   titling them in Solomon's name, call it what you want, because

22   the claim to recover those was so clean.  It was so easy that

23   how could you really give a discount or bargain anything

24   against what is a lay-up Summary-Judgment-type preference

25   claim.

1       And I submit, Your Honor, that is certainly not true

2    from my perspective.  The Trustee understands the realities of

3    trying to bring that claim.  The theory of the case from

4    Joseph Dwek's perspective was there was a constructive trust

5    over those properties.  They were purchased with his money.

6    Dollars could be traced.  Maybe they couldn't be traced.  It

7    was a litigation issue.  Forensic accountants could sit in the

8    box all day long and spew different theories on whether you

9    can trace the dollars or not, but it was not Summary Judgment,

10   probably.  It was a contested piece of litigation on that

11   issue.  It was not -- first of all, the preference claim, we

12   would think, would fail on the basis of a lack of an

13   antecedent debt because the theory was they were dollars that

14   were Joseph Dwek dollars that were supposed to purchase Joseph

15   Dwek properties.  There was no antecedent debt.  It was a

16   constructive trust theory that was no way a lay-up in the way

17   Mr. Steinberg frames it.

18       On the issue of the extent of the administrative

19   expense claim that's being given to Yeshuah and Joseph Dwek

20   under the Settlement Agreement, Your Honor, first of all, Mr.

21   Steinberg is absolutely correct, it wasn't -- he's a smart

22   man, but it didn't take a whole lot of analysis to understand

23   that the differential is, in fact, the legal fee that was

24   referenced in the interim Settlement Agreement.

25       There were transactions teed-up for closing by Mr.

1   LoMurro before the cases were filed that were approved

2   transactions of what we called the Joey properties for which

3   Mr. LoMurro had my firm doing the legal work.  The cases were

4   filed.  Those projects were never closed.  Those sales were

5   never closed.  But the legal fees were incurred, we thought,

6   in good faith at Mr. LoMurro's direction.  We made that

7   argument to Mr. Stanziale.  We reserved the right in the

8   interim Settlement Agreement to come back either by consent or

9   on application before you to seek reimbursement for those.

10  They were dollars really spent by Joseph Dwek.

11          The other issue, though, Your Honor, is Mr.

12  Steinberg has argued to Your Honor that Mr. Stanziale somehow

13  won the issue in the interim Settlement Agreement that Joseph

14  Dwek would limit his reimbursement of these advanced dollars,

15  $1.5 million that Joseph Dwek actually put into the properties

16  before the cases were filed before Your Honor to keep them

17  afloat.  And the argument that's been put before you, Your

18  Honor, is that in the interim Settlement Agreement, Joseph

19  Dwek agreed to limit himself to reimbursement on those dollars

20  only where there's net equity in the properties.

21          That is flat wrong.  He did not agree to that.  That

22  was the mechanism that was agreed to in the interim Settlement

23  Agreement to attempt to get dollars flowing back for which

24  Joseph Dwek had already waited more than a year to get repaid.

25  But there was an express reservation for Joseph Dwek to, like

1   the agreement was where Mr. LoMurro and the agreement that was

2   signed off on by the State Court, essentially treat the Joseph

3   Dwek properties as a portfolio because he was advancing on

4   them on the portfolio, and they were being segregated as a

5   portfolio, that if the portfolio had net equity, Joseph Dwek

6   can be reimbursed.

7             And that express reservation, Judge -- and there was

8   an error in the Trustee's response that was filed Friday under

9   Footnote 2 where he cited to the interim Settlement Agreement

10  for that reservation.  It wasn't where the Trustee said it

11  was.  It was, in fact, in Paragraph 5F, which said to the

12  extent Joseph or Yeshuah advance funds for the disputed

13  properties with no net equity or for which the mortgagee

14  agreed to a short sale, Joseph and Yeshuah, nonetheless, still

15  reserve the right to seek reimbursement of such advanced funds

16  on an administrative priority basis payable from the net

17  equity of other disputed properties.

18            In other words, we reserve the right to treat them

19  as a portfolio.  That was not a re-trade.  That was not

20  something Mr. Stanziale won forever more when we did the

21  interim Settlement Agreement.  It was a live issue.  It was

22  put back on the table when we negotiated this deal, and it was

23  one that went into the Joseph Dwek column at the end of the

24  day when you negotiate a complex and global settlement,

25  sometimes you get some things not correct, the way it was

1   portrayed in the papers and in Mr. Steinberg's presentation.

2           Mr. Steinberg also made reference to this carve-out

3   from the release of certain claims against Adjmi-related

4   entities.  I, frankly, didn't understand the reference.  There

5   was a carve-out.  The Committee asked for the carve-out.  When

6   we had reached an agreement in principle with Mr. Stanziale,

7   Mr. Stanziale went to the Committee and said here's the

8   settlement we have with Joseph Dwek, what do you think.  And

9   when the document was created, it was given to the Committee

10  for comment.

11          And one of the comments from the Committee was, this

12  release language for the -- we want to make sure the release

13  doesn't cover Adjmi-related entities against which we have

14  done no investigation yet, against whom the estates may have

15  claims.  And there was an agreement among everyone who

16  negotiated this deal, that's fine; if you think you have

17  claims, they're certainly not parties to this agreement; we

18  were never purporting to have them be parties to this

19  agreement; if you want to carve out from your release claims

20  against those entities to the extent you think you have claims

21  against them, we're okay with that.

22          So they're not released.  Of course, they don't give

23  a release, which I think is the criticism from Mr. Steinberg.

24  Why would they?  They've never been sued.  They weren't

25  getting a release in this.  Why would they ever give a

1   release?  Those claims, to the extent this side of the table

2   has them, are preserved.  It certainly does no harm to Mr.

3   Franco's position.  If anything, it can only help Mr. Franco,

4   presumably, if more dollars are brought into the estate.

5          The other issue, Judge, is this $25 million

6   guarantee.  Again, Mr. Franco takes the position that Solomon

7   Dwek's $25 million guarantee of the $25 million loan from HSBC

8   is so clearly avoidable that how could anybody possibly have

9   been given any settlement credit for it in a negotiation.

10  Judge, no consideration?  Solomon got the money.  In fact, I

11  don't think, contrary to what Mr. Steinberg said, I don't

12  think the Trustee even brought that claim to set aside that

13  guarantee.  And the reason -- and there's no citation to it in

14  the papers.  The reason I don't think the estate ever brought

15  the claim is because it lacks any merit.  The money,

16  indisputably, went from HSBC to Solomon Dwek.  Consideration

17  for a guarantee, I think so.

18         Your Honor, you know, I hate to say this, but Mr.

19  Franco's position really seems like a dressed-up, whole lot of

20  sour grapes.  I don't know why, by the way.  Why would he have

21  sour grapes?  Does he really -- I mean, is there anything

22  precluding Mr. Franco from settling his case tomorrow?  I

23  don't understand it.  There's nothing in the settlement that

24  precludes a deal from happening tomorrow with the Trustee.

25         Every case, Judge, stands on its own facts.  Our

1   case, the facts have been delved into <u>ad nauseam</u>, in thorough

2   detail.  We've negotiated a deal that took a year to

3   negotiate.  I don't know how many sessions they've had.  The

4   courtroom doesn't know.  The record doesn't know,

5   appropriately so.  We don't bring those communications into

6   the record.  All we know is that it hasn't happened yet.  I

7   assume it's the Trustee's intention to settle all the cases.

8   That certainly was our experience.  Maybe if positions are

9   taken that are reasonable, maybe they'll be back here next

10  year, or next month, or next week on a settlement.

11          I have no knowledge of the existence of settlement

12  discussions, nor do I think it's terribly relevant, Your

13  Honor.  The fact is, there's no deal, that's fine.  Our deal

14  is before the Court.  The issue is whether it falls below the

15  lowest point on the range of reasonableness.  Mr. Steinberg is

16  absolutely correct, he didn't cite that case law authority

17  from the Third Circuit.  We did.  We don't think that there's

18  any way a deal that provides this much benefit to the estate

19  could ever be thought of as falling below that point.

20          Discovery, Your Honor, for what?  I don't

21  understand.  Does Mr. Franco want to take discovery so that he

22  can then argue to Your Honor that Joseph Dwek got too good a

23  deal?  That wouldn't seem to be in his interest.  Does he want

24  to argue that Joseph Dwek didn't get a good enough deal?  Who

25  cares?  Why does he care about that?

1          Much of Mr. Steinberg's presentation, Your Honor,

2    really seemed like a foreshadowing of a hearing to consider

3    the adequacy of a Disclosure Statement that hasn't been filed

4    yet.  I don't know how we do that here.  I don't know how we

5    do it in the context of a settlement.  There's nothing in the

6    settlement, in my reading of it, other than the fact that it

7    brings in 17-million-plus dollars and freeze up title to those

8    dollars, which is clearly to Mr. Franco's benefit if, in fact,

9    he is a Creditor, and reduces claims against the estate,

10   clearly to Mr. Franco's benefit if he is a Creditor.

11          Other than that, Judge, there's nothing that I see

12   in the settlement that affects Mr. Franco's rights at all, or

13   at least nothing that can't be fleshed out in the context of a

14   Disclosure Statement hearing, that I think they tried to have

15   before Your Honor today.  For example, is it an investor

16   claim; is it a financial institution claim?  We don't even

17   know what the plan is going to say.  We don't know if the plan

18   is even going to make a distinction between the two the way

19   the Debtor's plan did.

20          How could we possibly rule on a settlement today --

21   which I think Your Honor should do -- when we don't even know

22   the plan that Mr. Franco is arguing could prejudice rights if

23   the settlement was ruled on, but we don't know what the plan

24   is going to say.  I don't get it, Judge.  I don't get what

25   discovery on the issue of settlement, if it truly was to be

1    narrowly confined to 9019 issues, I don't understand what

2    discovery does in advancing that ball.

3           Your Honor, this is so clearly -- and I have no

4    stake in the litigation -- but it is so clearly a litigation

5    tactic by Mr. Franco that I really think that Your Honor

6    should not allow the settlement with Joseph Dwek that's been

7    negotiated over a year-long period to be a prop in the dispute

8    that Ike Franco is having with the Trustee.  It should not go

9    down that way.  I think you should overrule the objection.  I

10   don't think there should be any discovery, certainly not

11   withstanding that the Motion was filed on January 5th, Mr.

12   Franco waited until January 30th to serve the discovery on the

13   Friday morning before a Monday hearing.  If there was truly an

14   interest in discovery, it would have come the day after the

15   Motion was filed on notice to Mr. Franco.

16          I think Your Honor should overrule the objection and

17   grant the Motion.

18          THE COURT:  Thank you.

19          MR. GREENHALGH:  Your Honor, Walter Greenhalgh,

20   Duane Morris, counsel for Creditors Committee.

21          Your Honor, in essence, the objection filed on

22   behalf of Mr. Franco by Mr. Steinberg is a request for an

23   adjournment.  But then he goes through an entire list of

24   issues that he wants to raise before this Court and starts to

25   reference the, to pleadings filed both in the State Court by

1   Joe (sic) Franco and also pleadings filed in this proceeding.

2        And in listening to Mr. Steinberg recite all of

3   these questions that he's raised, I can't ignore the fact that

4   he has a huge amount of information on the record which has

5   been made public for all parties in this case to review.  He's

6   gone through, in detail, the Joe Dwek complaint or the

7   complaint by Mr. Stanziale against Joseph Dwek and also the

8   counterclaim and other pleadings in that litigation.

9        Now, what I found interesting is that there's a

10  claim by this Trustee against Isaac Franco for approximately

11  $87 million.  And as the Trustee pointed out in his comments

12  this morning, that Mr. Franco is a co-conspirator.  He's

13  complicit in the Ponzi Scheme and the fraud that was

14  perpetrated upon the Creditors of this estate, which the

15  Trustee is pursuing.

16       I wrote down two words while I was listening to Mr.

17  Steinberg's presentation, and I found it humorous when I heard

18  counsel for Joe Dwek state that it sounds like sour grapes.

19  And that's exactly what I wrote down.  Because when I go

20  through and listen to all these arguments, I believe that what

21  we're hearing is that Isaac Franco wants to be treated like

22  Joe Dwek in terms of this settlement.

23       Now, the Trustee conducted his investigation over a

24  year to determine how to proceed in this litigation.  What Mr.

25  Franco would have this Court do is try, for purposes of

1    determining this settlement, to try the case against Joe

2    Franco, to go through a trial which this Settlement Agreement

3    will basically solve and obviate.

4           I also found it interesting Mr. Steinberg comments

5    that he is the lone voice in the wilderness pleading to the

6    Court on behalf of all of the investors.  Mr. Franco allegedly

7    was complacent in taking $87 million out of the pockets of all

8    of these poor investors.

9           Well, Your Honor, the investors, many are

10   represented by very competent counsel.  And, in fact, on this

11   Creditors Committee, there are three individuals who are, or

12   who would fit into the category of investor, and they are well

13   represented by counsel who have participated in the activities

14   of this Creditors Committee.  And there's a fourth individual

15   who is not part of the, what has been referenced as the

16   "community," but is also an individual who faces the same

17   allegations and claims that the Trustee has brought against

18   over 38 complaints alleging the Ponzi -- which we've referred

19   to as the Ponzi Scheme complaints.  And those individuals are

20   all represented by counsel.

21          It is unbelievably telling that, at a minimum, not

22   one other person who's being sued by this Trustee, except Mr.

23   Franco, has filed opposition and an objection to this

24   settlement.  Why -- and they are represented by counsel.  Mr.

25   Franco is trying to get a leg up on his litigation which is

1    proceeding, and whatever settlement discussions he's had with

2    the Trustee -- that I'm not privy to -- is not happy with the

3    way those settlement discussions are going forward.

4           I want just to go right through what this tactic is.

5    It is a litigation tactic.  It's a tactic to delay this

6    settlement so that Mr. Franco can try to get a leg up on his

7    discussions with the Trustee.  He's made allegations that a

8    plan is going to be filed by this Trustee and that the plan

9    should basically deal with this settlement.

10          So what Mr. Franco is requesting is that this

11   settlement should not be delayed for purposes merely for

12   discovery, but should also be delayed when the Trustee files

13   his plan, which he's committed to this Court he intends to do

14   by the end of this month, and he's going to turn his

15   objections to the plan and to a Disclosure Statement into his

16   objections to this settlement.

17          It's a litigation tactic.  It's a tactic to delay

18   things.  If he really wanted to conduct discovery when he was

19   served with this Motion, there are two very competent, very

20   experienced bankruptcy attorneys sitting here -- to the

21   Court's left and my right -- representing Mr. Franco.  I can't

22   conceive that when they were served with this Motion for this

23   settlement, and they looked at it in their monitoring of this

24   case, they did not decide we ought to conduct discovery; we

25   ought to find out how the Trustee made this determination.

1    And they should have served that discovery weeks ago.

2          No, what did they do?  They served it on Friday,

3    this past Friday.  Your Honor, look at it for what it is.

4    It's a tactic to derail this settlement so that Mr. Franco can

5    get a leg up.  That's exactly what it is.

6          I urge the Court to approve this settlement.

7          Thank you, Your Honor.

8          THE COURT:  Thank you.

9          Anybody else?

10         MR. TESTA:  Your Honor, the Trustee, as he has

11   spoken, certainly agrees with the statements of Mr. Usatine

12   and Mr. Greenhalgh.

13         Just to reiterate, there isn't one member of the

14   community who the Trustee has litigation pending against in

15   this courtroom today.  We were served with the discovery

16   request on Friday at 10:30.  We certainly believe the proffer.

17   The Settlement Agreement and the Settlement Motion provided a

18   full disclosure.  And our Notice of Auction and Sale hearing

19   and our certification of auction results are probably, give

20   full disclosure to everyone, including Mr. Franco.  He

21   certainly has had a list of the disputed properties which were

22   attached to the interim Settlement Agreement for some time.

23         And as Your Honor is aware, our notices provide

24   enormous disclosures as to value of the properties and the

25   equity that we're receiving from the sales as we move forward.

1        Thank you.

2        THE COURT:  Thank you.

3        MR. STEINBERG:  Your Honor, I don't know why when

4   people file an objection to a pleading, they're always being

5   attacked for it being a litigation tactic.  When people file a

6   pleading, it's part of a litigation.  It's part of -- they try

7   to address the merits of what's in front of the Judge, and

8   lawyers act for the benefit of their clients.

9        In this particular case, I have not really addressed

10  anything with regard to the differences between Franco and the

11  Trustee.  I confined substantially all of my remarks as to the

12  settlement that's being presented by the Trustee.  I thought

13  that in the context of a case where the Trustee has been

14  negotiating for a year and where the Creditors Committee has

15  had some months in analyzing what it is, to ask for a 60-day

16  adjournment so that we can catch up to speed and to be able to

17  understand what is going on was a reasonable request.

18       I don't understand why someone thinks that if I

19  filed a document request within ten days and then asked to

20  have it shortened and then somehow then take a deposition with

21  the Trustee, I did try to get this information from the

22  Trustee on an informal basis.  I didn't get all of the

23  information.  I did get further information.  I think it's

24  unusual for someone to sit there and scream that I'm sort of

25  sandbagging someone when I get papers in reply the day before

1    the hearing on a late Friday afternoon.

2            The Creditors Committee, the Trustee's Motion in

3    support of the settlement did not reflect what the Creditors

4    Committee's position was.  So I don't know why anybody thinks

5    I would know what the Creditors Committee's position was.  If

6    I was supposed to intuit that the failure to object meant that

7    they supported the deal, I could just as very well intuit that

8    the Committee couldn't take a position in this case because

9    they have investors, they have financial institutions, and

10   they don't always necessarily agree and that they're

11   deadlocked, or they felt that they didn't feel strongly enough

12   to take a position.

13           Certainly, if they had a position -- because I've

14   been a Trustee, I usually say that my Creditors Committee

15   supports it, and I get a moving paper in the context of making

16   my application so that the Judge knows when I'm filing my

17   application that this has the support of a Creditors

18   Committee.

19           I think that Mr. Greenhalgh was right that my

20   request was for an adjournment.  My request was for a limited

21   adjournment so that I could take discovery.  Please don't try

22   to take what I say, other counsel, and misconstrue it.  I'm

23   not looking to replicate how to do an investigation of Joey

24   Dwek.  I'm looking to see what the Trustee did in connection

25   with analyzing the issues to see how he came to his

1    determination of the reasonableness.  The notion that a

2    Creditor is not entitled to take discovery about that really

3    has to accept the fact that he did the investigation and

4    should just accept that he did it right, and I should just

5    rely on his judgment is, I think, a falsity.  It happens,

6    well, I don't have to cite one case, I can cite lots of cases.

7    Any time that there's a settlement, if there's an objection,

8    you're entitled to take discovery as to what the Trustee did

9    in order to canvas the issues to see whether it found it came

10   within the lowest range of reasonableness.

11        What I did in my presentation today was to say that

12   when I looked at the issues as presented, I saw a failure to

13   present all of the issues, I saw a mis-description of the

14   benefits of the settlement, and I said I wanted the

15   opportunity to be able to go to the Trustee and determine what

16   went on in this case because I didn't have the information.  I

17   didn't say Joey Dwek had to file a claim in the case.  I said

18   that he was prevented, they didn't have to file a claim.  I

19   didn't say that on the administrative claim point that Joey

20   Dwek didn't reserve his right to argue that he's entitled for

21   every dollar that he advanced.  All I said was that the

22   Trustee conceded the issue in the context of the negotiation

23   and that they hadn't really specified what were the legal fees

24   and what the basis was.

25        Counsel now wanted to fill that information as if it

1   should have been self-evident and that every other Creditor in

2   this case went through the time that I did in trying to

3   analyze those issues.  I did look at the State Court

4   pleadings.  And I know from looking at the State Court

5   pleadings that there's, in my view, a double count between the

6   HSBC claim and the Joey Dwek claim.  So how does Joey Dwek get

7   to be a full Creditor in this case?  I don't know.  I wasn't

8   pretending.  I don't know.  But, presumably, Mr. Stanziale

9   knows, because presumably Mr. Stanziale will be able to say

10  that at a deposition.

11         I will say that -- and I meant to say it in my

12  opening presentation -- I had made the mistake in my pleading

13  by saying that HSBC had agreed to give Joey Dwek $20 million

14  if Joey Dwek got the properties back.  And the Trustee called

15  me to task for that, and he was right.  It wasn't HSBC who

16  committed to give Solomon Dwek back $20 million if there was a

17  transfer of properties.  According to the Trustee's complaint,

18  it was Joey Dwek.  In Paragraph 120 of his complaint, he said

19  that one of the reasons why Joey Dwek got these properties

20  back was because he committed to Solomon to give him $20

21  million to get out of the PNC issue.  And then after he gave

22  him the properties, Joey Dwek reneged on that promise.

23         By the way, I have no idea whether that promise is

24  true or not true.  All I'm doing now is citing the Trustee's

25  own allegations against Joey Dwek in the complaint that he

1    filed against Joey Dwek to highlight his bad-faith claim.

2          The Trustee said that I was trying to use, as a

3    litigation tactic, the introduction of trying to get before

4    Your Honor claims and issues relating between Franco and the

5    Trustee.  And I'm not going to do that here other than to say

6    two things.  One, I can unquestionably demonstrate that Isaac

7    Franco put in more money than he got out of this case so that

8    he's a net Creditor in this case.  Two, I can unquestionably

9    demonstrate that some of the Isaac Franco money that went in

10   went to Joey Dwek and other Creditors.  I mean, if he gave

11   $100 million back to the Solomon Dwek estate, it went

12   somewhere.  And we can demonstrate by looking at account

13   balances that a lot of this went actually to Joey Dwek.

14         On the same token, a lot of what Joey Dwek came in

15   through the HSBC loans went for the benefit of Isaac Franco.

16   That doesn't mean that Joey Dwek is necessarily a bad guy.  It

17   just means that his claims and what he's asserting is

18   essentially the same thing.

19         I won't try to debate what Joey Dwek's counsel said

20   about what the definition of antecedent debt is in a

21   preference.  But if you've been swindled, you have a fraud

22   claim, and in satisfaction of your fraud claim of what you

23   otherwise should have gotten, you get consideration, whether

24   it be dollars or property, then that is satisfaction, in my

25   view, of an antecedent debt.  And if they want me to try to

1   find cases on that to be able to demonstrate that point, I'm

2   pretty sure that I can find cases on it.

3          The bottom line is that in my presentation, I did

4   give a number of reasons why that the factual record in this

5   case will be better-developed over the next 60 days.  And one

6   of those reasons was that the Trustee was going to file a

7   plan, and that plan would shed light on how the Trustee is

8   dealing with issues generally which are embedded in the

9   settlement, and when that plan is viewed, you'd be able to

10  better assess the benefits, or the lack of benefits, of the

11  settlement.  And all I've asked for is some restraint.

12         At the end of the day, Franco will have to defend

13  the merits of the Trustee's allegations against him in his

14  complaint.  And at the end of the day, the Trustee will have

15  to carry his burden of the reasonableness of the settlement.

16         But I do think that you cannot send out a Motion to

17  people, fail to tell them that you sued Joey Dwek for $90

18  million of cash; you cannot send out a Motion saying that the

19  benefits of this deal is that you'll get hundreds of millions,

20  potentially hundreds of millions of dollars of value from the

21  estate for the return of the properties when I believe that

22  that's not true.

23         You cannot say that you get a benefit because Joey

24  Dwek has a $60 million claim when I believe it's the

25  questionable (sic) double-count of the HSBC claim.  I'm

Response/Steinberg                                                          77

1    entitled to test that.  I'm entitled to put the Trustee to his

2    burden and to be able to backstop in the same way as I will do

3    on his comment that somehow Ike Franco put in no money and was

4    the drain to keep on, for getting all this money from Solomon

5    Dwek.  That's clearly not true.  And I will be able to test

6    this co-conspirator rant that he just made and be able to

7    demonstrate to Your Honor that within 30 days before this

8    whole thing blew up that somehow Ike Franco put in over $10

9    million back to Solomon Dwek.  Clearly, not the actor (sic) of

10   someone who's a co-conspirator.

11          But in either event, Your Honor, what I've asked for

12   here, and I had backed up today with citations to the State

13   Court record.  I've been simultaneously complimented by my

14   review and criticized for not having created citations.  There

15   are things here that need to be fleshed out.  It's a big

16   enough settlement.  Everybody agrees to it.  It's an important

17   enough settlement.  And I do think, unless they think they're

18   going to spend $16 million or $17 million in the next 60 days,

19   they can achieve this settlement in 60 days after they've been

20   put to the test.

21          And the idea that somehow on an important settlement

22   in this case that Your Honor should be able to take the

23   evidentiary record within 30 days and not give a party, even

24   if it's one party, the opportunity to test the record, is, I

25   think, unfair.

**Decision** 78

1          Thank you.

2          THE COURT:  All right.  Thank you.

3          The Trustee seeks approval of a settlement among the

4    Trustee, Joseph Dwek, Yeshuah, LLC, Joseph Dwek Family,

5    Limited Partnership, Mark Adjmi, and HSBC Bank.  The proposed

6    settlement is supported by the Official Creditors Committee.

7    Opposition to the settlement was filed by Sun National Bank

8    and Isaac Franco.  The Trustee reports that the limited

9    objection of Sun National has been resolved.

10         The standards for approval of a settlement in this

11   jurisdiction are well established.  <u>R.</u> 9019 provides that

12   after notice and a hearing, the Court may approve a compromise

13   or settlement.  Although compromises are a normal part of the

14   bankruptcy process, the Court must determine whether the

15   settlement is fair and equitable and in the best interest of

16   the estate.

17         And that's from <u>Protective Commission for</u>

18   <u>Independent Stockholders of TMT Trailer Ferry vs. Anderson</u> at

19   390 U.S. 414.

20         Courts in this Circuit have repeatedly emphasized

21   that settlement is favored in bankruptcy because the interest

22   of Creditors are advanced through minimizing litigation and

23   expediting the administration of the bankruptcy estate.

24         And you can see, for example, <u>In Re: Nutraquest</u> at

25   434 Fed. 3rd 639.  You can also see <u>In Re: Martin</u> at

1  91 Fed. 3rd 389, and its progeny.

2          The Third Circuit has also identified four criteria

3  that should be used in evaluating a settlement:  One, the

4  probability of success in the litigation.  Two, any

5  difficulties to be encountered in collection.  Three, the

6  complexity of the litigation, and the expense, inconvenience,

7  and delay necessarily attending it.  And, four, the paramount

8  interest of Creditors.

9          And that's from <u>RFE Industries</u> at 283 Fed. 3rd 159,

10  citing the <u>Martin</u> decision.

11          In examining a settlement, the Court's role is

12  limited.  The responsibility of the bankruptcy judge is not to

13  decide the numerous questions of law and fact, but rather to

14  canvas the issues and see whether the settlement falls below

15  the lowest point in the range of reasonableness.

16          And that's from the <u>W.T. Grant Company</u> case at

17  699 Fed. 2nd 599.  You can also see the matter of <u>Jasmine</u>

18  <u>Limited</u> at 258 Bankruptcy Reporter 119 in this jurisdiction.

19          In examining this proposed settlement, the Court is

20  mindful that a Trustee bears the burden to show that a

21  proposed settlement is in the best interest of the estate and

22  of the debtor.

23          And that's from <u>In Re: McDermott</u> at

24  2008 <u>Westlaw</u> 877964.

25          Mr. Franco's objection to the settlement is not

1   explicitly tied to the standards under R. 9019.  Rather, it is

2   a generalized objection based on two themes, lack of

3   information, an unequal treatment of similarly situated

4   Creditors.  First, Mr. Franco claims that the settlement

5   should be re-noticed because Creditors did not have adequate

6   information.  Specifically, in Paragraph 14 of his initial

7   objection, Mr. Franco states that the Trustee failed to

8   mention the adversary proceeding against Joseph Dwek which

9   sought the return of $90 million from Joseph.

10         While that claim was not highlighted in the

11   Trustee's Motion, and perhaps should have been, it was not

12   concealed from a Creditor that wanted to further investigate

13   the legitimacy of this settlement.  That claim against Joseph

14   Dwek is contained in Adversary No. 08-1209, and that adversary

15   case is mentioned throughout the Motion.

16         The Trustee has also responded that Mr. Dwek has

17   countervailing claims for $60 million against the estate.

18   While the release of a potential $90 million claim in return

19   for release of a potential $60 million claim does not line up

20   exactly.  That's not how Courts are supposed to review

21   settlements.

22         Commentators on R. 9019 have astute point-by-point

23   analysis of any particular settlement provision, reasoning

24   that to do so would defeat the purpose of a settlement and

25   that the parties might as well go ahead and try the case.

1       And that's from <u>Collier on Bankruptcy</u> at 9019.02 in

2    the Fifteenth Edition.

3       Mr. Franco also complains about the unequal

4    treatment of what he refers to as the community investors.

5    Even taking that allegation at face value, the Court fails to

6    see how that's a valid objection to this proposed settlement.

7    That may or may not be a valid objection to the plan to be

8    proposed by the Trustee, but has little or no bearing in this

9    context.  Each settlement must be evaluated on its individual

10   merits.

11      That ties in to the request for an adjournment of

12   this Motion so Mr. Franco may obtain discovery from the

13   Trustee.  The Court would ordinarily not be opposed to a

14   limited adjournment to seek limited information about the <u>bona</u>

15   <u>fides</u> of a settlement.  Keeping in mind that the standard for

16   approval of a settlement, however, is the threshold of the

17   lowest range of reasonableness, the high point or the lowest

18   range of reasonableness, the scope of discovery that Mr.

19   Franco is seeking is patently unreasonable.  He seems to want

20   to engage in litigation almost as broad in scope as the

21   litigation that the Trustee proposes to settle.

22      The discovery sought, as indicated by the document

23   request attached to Mr. Franco's papers filed on Friday,

24   indicates that Mr. Franco fundamentally mis-perceives the

25   limited nature of the questions that can arise in connection

1   with the settlement.  For example, I suppose discovery would

2   be appropriate if there were some allegation that the Trustee

3   entered into this particular settlement in bad faith.  While

4   Mr. Franco is obviously unhappy with the manner in which the

5   Trustee has administered the estate to date, he has not

6   alleged any bad faith or collusion in connection with the

7   settlement.

8        I suppose discovery might be appropriate if the

9   Trustee did not describe the efforts that he undertook to

10  reach the settlement as relevant to reasonableness.  That is

11  not necessary where the Trustee has laid out both the nature

12  of his efforts to settle and the structure of his reasoning,

13  especially as supplemented by the proffer.

14       The discovery that Mr. Franco seeks at this time is

15  relevant to the underlying causes being compromised, but on a

16  settlement where the Trustee's burden is merely to show that

17  the settlement falls above the lowest point in the range of

18  reasonableness, and the Court has been directed not to conduct

19  a mini-trial, the discovery requests are extremely over-broad.

20  General information is enough, given the lowest range of

21  reasonableness standard.

22       The Trustee's papers give the Court and the

23  Creditors a fair sense of the effort that went into this

24  settlement and of the analysis of the issues that the Trustee

25  employed.  Every other Creditor that has taken a position,

**Decision** 83

1  including the Unsecured Creditors Committee, supports the

2  settlement.

3        I have, in the past and on rare occasions, rejected

4  settlements supported by some, but not all, interested

5  parties, but usually on the basis that the Trustee has

6  overlooked some aspect of the matter being settled.  That is

7  simply not the case here.  The Trustee has conducted extensive

8  review, and while Mr. Franco doesn't agree with the Trustee's

9  conclusions, he doesn't say that the Trustee has overlooked

10  issues or overlooked facts.

11        The Court, like the Trustee, has canvassed the

12  issues and find that the settlement proposed meets the

13  appropriate standard without the need for further inquiry.

14        I want to add that it remains my primary hope that

15  we can get to justice for investor Creditors like Mr. Franco

16  and others.  I recognize that justice in the context of a

17  settlement in bankruptcy may not look like justice from their

18  perspective, but it's the settlement, settlement is in the

19  context in which I've been asked to rule.

20        The standards for approval of settlements will apply

21  equally to any and all settling investor Creditors, and that

22  is the justice to which they're entitled.  This settlement

23  will be approved.

24        Thank you.

25        MR. TESTA:  Thank you, Your Honor.

Decision                                                    84

1            MALE VOICE:  Thank you.

2            MR. BAKER:  Your Honor, we will submit a revised

3    form of Order that correctly shows Miss Pacheco's ordered

4    paragraphs.

5            THE COURT:  Okay.

6            MR. BAKER:  Thank you.

7            THE COURT:  Thank you.

8            MS. PACHECO:  Thank you, Your Honor.

9            THE COURT:  And, Counsel, I don't mean to rush you,

10   but I do have another matter that will probably take two

11   minutes when they've been waiting for two hours.

12           MR. BAKER:  Okay.

13           MALE VOICE:  Sorry.

14           THE COURT:  Okay.

15           MR. STANZIALE:  Thank you, Judge.

16           THE COURT:  Sure.

17                         *  *  *  *  *

                         I N D E X

MOTION

By Mr. B. Baker                    5        Granted:   8

RESPONSE

By Mr. A. Steinberg                5

    Mr. J. Posta                   6

<u>MOTION</u>

By Mr. J. Testa                10        Granted:  78

<u>RESPONSE</u>

By Mr. W. Greenhalgh           14/66

    Mr. W. Usatine             15/55

    Mr. R. Usadi               17

    Mr. T. Neumann             17

    Mr. A. Steinberg           18/71

    Mr. C. Stanziale           52

    Mr. J. Testa               70

    Mr. B. Baker               70


CERTIFICATE:

        I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in the
above-entitled matter.


\s\Kathleen Connolly
Kathleen Connolly                AOC #441
**COLE TRANSCRIPTION AND RECORDING SERVICE**

Dated:  February 11, 2009

Form tsntc

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

_____

                          Case No.:  07−11757−KCF
                          Chapter:  11
                          Judge:  Kathryn C. Ferguson

In Re: Debtor(s) (name(s) used by the debtor(s) in the last 8 years, including married, maiden, trade, and address):
    Solomon Dwek
    311 Crosby Avenue
    Deal, NJ 07723
Social Security No.:
    xxx−xx−5021
Employer's Tax I.D. No.:

_____


### Notice That a Transcript Has Been Filed


        You are Noticed that a Transcript has been filed on February 17, 2009. Pursuant to the Judicial Conference
Policy on Privacy, access to this transcript is restricted for a period of ninety days from the date of filing. The
transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the
transcriber, please call the Clerk's Office] All parties have seven business days to file a Request for Redaction of any
social security numbers, financial account data, names of minor−age children, dates of birth, and home addresses. If
redaction is requested, the filing party has twenty−one calendar days from the date the transcript was filed to file a
list of items to be redacted indicating the location of the identifiers within the transcript with the court and to provide
the list to the transcriber. The transcriber has thirty−one days from the date the list of items to be redacted was filed
to file the redacted version of the transcript with the court . If no request is filed, the transcript will be made
electronically available to the general public after the ninety days.



Dated: February 17, 2009
JJW:

                                                      James J. Waldron
                                                      Clerk