```
                    UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF CONNECTICUT
                        BRIDGEPORT DIVISION

In Re                         *   Case No. 22-50073 (JAM)
                              *
HO WAN KWOK and GENEVER       *
 HOLDINGS CORPORATION,        *
                              *
              Debtors.        *


LUC A. DESPINS, CHAPTER 11    *   Adv. Proc. No. 23-05023
 TRUSTEE,                     *
                              *
              Plaintiff,      *
      v.                      *
                              *   Bridgeport, Connecticut
LAMP CAPITAL LLC, et al.,     *   January 23, 2024
                              *
              Defendants.     *
                              *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JULIE A. MANNING
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:


For the Chapter 11 Trustee:   NICHOLAS A. BASSETT, ESQ.
                              Paul Hastings LLP
                              200 Park Avenue
                              New York, NY  10166

Chapter 11 Trustee:           LUC A. DESPINS, ESQ.
                              Paul Hastings LLP
                              200 Park Avenue
                              New York, NY  10166




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

```
APPEARANCES:   (Cont'd)

For Lamp Capital and         ROBERT J. GRAND, ESQ.
 Infinity Treasury           ROBERT RUSH MILLER, ESQ.
 Management:                 Lax & Neville LLP
                             350 Fifth Avenue
                             Suite 4640
                             New York, NY  10118


For the U.S. Trustee:        HOLLEY L. CLAIBORN, ESQ.
                             Office of U.S. Trustee
                             The Giaimo Federal Building
                             150 Court Street, Room 302
                             New Haven, CT  06510


For Hudson Diamond NY, LLC,  JAMES M. MORIARTY, ESQ.
 Hudson Diamond Holding, LLC AARON ROMNEY, ESQ.
 Leading Shine NY Ltd. and   Zeisler & Zeisler, P.C.
 Mei Guo:                    10 Middle Street, 15th FL
                             Bridgeport, CT  06604
```

```
#  2475   Interim Application for Compensation First Interim
          Fee Application for Pallas Partners, LLP, Other
          Professional, Fee: $318,591.60, Expenses: $4,953.04
#   4     Pretrial Conference
#  18     Motion for Default Judgment by the Court Pursuant
          To Fed R. Civ. P.55(b)(2) against Lamp Capital LLC
          And Infinity Treasury Management, Inc.
#  30     Motion to Set Aside Default Filed by Aaron Romney
#  42     Motion to Set Aside Default Filed by Robert J. Grand
```

1          (Proceedings commenced at 1:05 p.m.)

2          THE COURTROOM DEPUTY:  Case No. 22-50073, Ho Wan

3    Kwok, and Adversary No. 23-5023, Despins versus Lamp

4    Capital, LLC, et al.

5          THE COURT:  All right.  Good afternoon, everyone.

6          If we could have appearances for the record,

7    starting with the Chapter 11 Trustee, please.

8          MR. DESPINS:  Good afternoon, Your Honor.  Luc

9    Despins, Chapter 11 Trustee.

10          MR. BASSETT:  Good afternoon, Your Honor.  Nick

11   Bassett from Paul Hastings, counsel for the Chapter 11

12   Trustee.

13          And Your Honor, I wanted to note that our co-

14   counsel, Mr. Lindsey, was planning to be here, but

15   unfortunately was in a car accident on the way to the

16   courtroom.

17          THE COURT:  Oh.

18          MR. BASSETT:  He is okay.

19          THE COURT:  Well, that's good.  I'm glad to hear

20   that.

21          MR. BASSETT:  But due to that, unable to be here

22   like he had planned to be.

23          THE COURT:  Okay.  Thank you.

24          MS. CLAIBORN:  Good afternoon.  Holley Claiborn

25   for the U.S. Trustee.

1          THE COURT:  Good afternoon.

2          MR. GRAND:  Good afternoon.  Robert Grand from Lax

3    & Neville, for Lamp Capital and Infinity Treasury

4    Management.

5          THE COURT:  Good afternoon.

6          THE COURTROOM DEPUTY:  I'm sorry.  I didn't catch

7    your last name?

8          MR. GRAND:  Grand, G-R-A-N-D.

9          THE COURT:  And Mr. Grand, we, in this courtroom,

10   everything is audio.  So if I can't hear you, I'm going to

11   ask you to speak up because it's the only way we can keep a

12   record in this case.  All of our records are audio

13   recordings.  Okay?

14         MR. GRAND:  Yes.  Thank you.

15         THE COURT:  Thank you.

16         MR. MILLER:  Your Honor, by video, Robert Miller,

17   of Lax & Neville, for Lamp Capital and Infinity Treasury.

18         THE COURT:  Good afternoon.

19         MR. MORIARTY:  Good afternoon, Your Honor.

20         MR. ROMNEY:  Good afternoon.

21         MR. MORIARTY:  Sorry.

22         Good afternoon, Your Honor.  James Moriarty, from

23   Zeisler & Zeisler, for Hudson Diamond New York, LLC, Hudson

24   Diamond Holding, LLC, Leading Shine New York, Limited, and

25   Mei Guo.

1          THE COURT:  Good afternoon.

2          MR. ROMNEY:  Good afternoon, Your Honor.  Aaron

3    Romney, Zeisler & Zeisler, for the same parties.

4          THE COURT:  Good afternoon.

5          Mr. Moriarty, Mr. Romney, is anyone from Mr.

6    Vartan's office going to be here today?

7          MR. ROMNEY:  No, Your Honor.

8          THE COURT:  Okay.  Then I just wanted to note for

9    the record that Mr. Vartan and Ms. Wernick filed notices of

10   appearance on behalf of Holdings and Ms. Guo, but not on

11   behalf of New York, Hudson Diamond New York, even though

12   they filed -- they signed a pleading recently, I think it

13   was the response, where they filed -- it was signed on

14   behalf of all three parties, all three defendants, Hudson

15   Diamond Holdings, Hudson Diamond New York, and Ms. Guo, so

16   we need that to be remedied.  Okay?

17         MR. ROMNEY:  Understood, Your Honor.

18         THE COURT:  All right.

19         MR. ROMNEY:  We'll get their appearances in I

20   imagine by the end of the day.  Thank you.

21         THE COURT:  That's fine.  I just want to make

22   sure, because the notices of appearance only appear -- they

23   only reflect an appearance on behalf of Holdings and Ms.

24   Guo, where the subsequently filed pleading is signed by Mr.

25   Vartan on behalf of all three of the defendants.

1      MR. ROMNEY:  Understood, Your Honor.

2          I believe, just the background of that, was that

3      their pro hac applications for Holdings and Ms. Guo had been

4      granted prior, whereas, the pro hac application for New York

5      was just granted yesterday.

6          THE COURT:  Well, maybe.  Okay.  Maybe that's the

7      reason then.  Okay.  Fine.  Thank you.  Just when you -- we

8      just want to make that -- we want to have that remedied so

9      that the record is accurate.

10         MR. ROMNEY:  Thank you, Your Honor.

11         THE COURT:  Okay.  Thank you.

12         All right, then, on the calendar today, in the

13     matter, are -- is the interim application for compensation.

14     And then the originally scheduled pretrial conference, which

15     is always scheduled by the Court Clerk's Office when a

16     summons is issued in connection with an adversary

17     proceeding.  And obviously we then have motions to address

18     in the adversary proceeding.

19         So Mr. Bassett, are we proceeding with the

20     application for compensation first?

21         MR. DESPINS:  Yes, Your Honor.  I'll handle that.

22         THE COURT:  Oh, okay.  Sorry.  Okay.  Go ahead,

23     Trustee Despins.

24         MR. DESPINS:  Okay.  Your Honor, this is the

25     application, docket No. 2475, of Pallas Partners, that was

1    filed on December 27th.  And the relief sought in that

2    application of compensation, the amount of 318,591.  But

3    that was for practically a one-year period from January to

4    November, end of November.  And also reimbursement of

5    expense of 4,952.80.

6         Now, the U.S. Trustee had some comments on the

7    application and she actually negotiated a reduction of the

8    fees for Pallas from 318,591 to 305,791, a reduction of

9    12,800, and a reduction of expenses of 4,927, because those

10   expenses were the expenses of the barrister and that he will

11   seek reimbursements for his fees separately.

12        And, Your Honor, you never deal with that firm,

13   Pallas, so I think it's worth spending just two minutes on

14   it, you know -- they're our U.K. counsel in the UBS

15   litigation.

16        And over the last year, you know, they've assisted

17   us in trying, you know, trying to get attorney-client

18   privileged reports from the law firm that represented Mr.

19   Kwok and the other -- the other plaintiffs in that

20   litigation against to UBS.

21        They've also assisted us recently in filing a

22   motion to seek a stay of that litigation.

23        Because the point that we're making is that it

24   makes no sense to go forward with that litigation in a

25   situation where there's a disagreement as to who controls

1    that litigation, in the sense that our view, based on your

2    decision, is that the Trustee owns Ace Decade and Dawn

3    State.  But there's a law firm in the U.K. appearing on

4    behalf of Ace Decade.  They won't say who's -- who they're

5    taking instructions from, but they say they represent Ace

6    Decade and they're opposing us.

7           So we filed this motion for a stay in the U.K.

8    courts basically saying we need to resolve this issue once

9    and for all as to who owns Ace Decade, and also to avoid the

10   transfer that Yvette Wang did of the shares of Ace Decade

11   back in January of 2023.  You may recall that.

12          So we filed an adversary proceeding before Your

13   Honor seeking that relief that will take its own course.

14          You know, I don't know if Ms. Wang will default or

15   not, but -- so the defendants are Ace Decade, Ms. Wang, and

16   also a gentleman that is now the holder of the stock of Ace

17   Decade who is located in Switzerland.

18          So that's what's happening.  That's the worst that

19   they've enjoined for us in the U.K.

20          And unless Your Honor has questions, we would ask

21   the Court to approve the application as modified per the

22   U.S. Trustee discussions.

23          THE COURT:  I do not have any questions at the

24   moment.  Thank you.

25          Ms. Claiborn?

1    MS. CLAIBORN:  Your Honor, just to add to the

2    record, the statement that I filed that confirms the

3    presentation Trustee Despins just gave is at ECF 2502.

4         And to put a finer point on the heart of it that

5    deals with expenses, the barrister, Paul Wright, will be

6    seeking reimbursement of those expenses with his own fee

7    application that will be filed in the future.  So it's not

8    going to be awarded as part of this fee application.

9         THE COURT:  Is there a revised, proposed order?

10        MS. CLAIBORN:  I haven't yet seen one.  I'm

11   assuming that Trustee Despins' camp is in the process of

12   putting them together.

13        MR. DESPINS:  Yeah.  Your Honor, we don't have one

14   right now, but we'll submit it to the Court after showing it

15   to Attorney Claiborn.

16        THE COURT:  Okay.

17        MS. CLAIBORN:  Thank you.

18        THE COURT:  That's fine.

19        With regard to the interim application for

20   compensation, I have reviewed the application for

21   compensation and the fees.

22        And now the expenses are going to be sought

23   separately, so I'm just dealing with the fees, Attorney

24   Claiborn, is that correct?

25        MS. CLAIBORN:  There is a small award of expenses.

1   It's $26.

2              THE COURT:  Okay.  So I think that's reasonable.

3              MS. CLAIBORN:  But the rest of it will be subject

4   to a future application by the barrister, Paul Wright.

5              THE COURT:  Okay.  Thank you.

6              Then the fees and the $26 in expenses that are

7   going to be sought to be approved, that are sought to be

8   approved, not going to be, that are sought to be approved, I

9   find are reasonable and necessary under the circumstances of

10  this case and the related proceedings in the U.K.

11             The application was properly served.  The notice

12  of hearing was served.  No one filed any objection to the

13  application for compensation.  The objection deadline was

14  January 16, 2024.  There were no objections filed.  There

15  was no -- there were no responses filed.  Nothing was filed

16  in connection with the interim application for compensation.

17             As noted on the record by the Chapter 11 Trustee

18  and the Office of the United States Trustee, there is a

19  reduction in the fees that were sought in dollar amount in

20  the application and that the parties will be submitting a

21  revised proposed order that will memorialize that agreement.

22             And I did see that the United States Trustee's

23  Office did file a statement of no objection with regard to

24  the reduced fees that appears at 2502 on the docket of this

25  Chapter 11 case.

1        So for all those reasons, the interim application

2   for compensation is granted and the revised proposed order

3   will be submitted to the Court.  You can submit it to the

4   courtroom deputy email box.  You don't need to file it on

5   the docket.

6        But just make sure, as I think Trustee Despins

7   already said he would, that Attorney Claiborn will be shown

8   the order and cc'd on the submission of the order to the

9   Court.  So that application is granted.

10       MR. DESPINS:  Thank you, Your Honor.

11       THE COURT:  Thank you.

12       So then the pretrial conference that's on the

13   calendar, really, as I said already with regard to the

14   adversary proceeding commenced against the defendants Lamp

15   Capital and others, that's the original, scheduled, pretrial

16   conference.

17       Obviously, there's a lot of things that have

18   already happened in this pretrial -- in this adversary

19   proceeding, excuse me, and we don't necessarily have to have

20   a pretrial conference in the vein that we would normally

21   talk about, has anybody filed a responsive pleading, what

22   are discovery issues, and are we going to enter into a

23   pretrial order, when we have other matters.

24       I already know what the status of the adversary

25   proceeding is in general.  Obviously, defaults have entered.

1       And now on the calendar is a motion for a default

2  judgment and two motions to set aside default.

3       So Attorney Bassett, I assume that you would

4  obviously like the Court to enter a default judgment, but

5  you also acknowledge that motions to set aside the defaults

6  have been filed and are on the calendar, correct?

7       MR. BASSETT:  Yes.  That's correct, Your Honor.

8       Obviously, we'll take up the motion for default

9  judgment against Lamp Capital and Infinity Treasury

10  Management today, as well as their response to that,

11  accompanied by a Rule 55(c) motion to set aside default.

12     And we also, as the Court noted, had the motion to set

13  aside default by Defendant Leading Shine.

14       There are also the other three defendants, Mei Guo

15  and the two Hudson Diamond entities, who have filed a motion

16  to dismiss.

17       I have actually conferred with Attorney Moriarty

18  and we have -- we're both in agreement that pending that

19  motion to dismiss, the case should proceed forward as to

20  those defendants in both of our views and, therefore, our

21  plan was to coordinate as to a litigation schedule and have

22  something to submit to the Court shortly.

23       But other than that, I don't think there's

24  anything else that needs to be done today by way of a

25  pretrial conference.

1          THE COURT:  Okay.  Thank you.

2          Does anyone else wish to be heard on the pretrial

3     conference issues as opposed to the specific motions on the

4     calendar?

5          MR. ROMNEY:  No, Your Honor.

6          THE COURT:  Thank you.

7          All right.  So I'm not going to schedule any

8     further pretrial conferences at this time.  The parties can

9     always request a conference, which may or may not be

10    granted, but, there's no need, given the activity in the

11    adversary proceeding, to schedule a further pretrial

12    conference at this time.

13         So Attorney Bassett, obviously, the calendar

14    appears -- the motion for default judgment appears first,

15    but there's the motions to set aside default as well, so how

16    do you propose to proceed?

17         MR. BASSETT:  I would propose, Your Honor, and,

18    obviously, subject to the Court's preferences, to go ahead

19    and proceed with the motion for default judgment because

20    sequentially that's how the pleadings were filed, the papers

21    were filed on the docket.

22         The response to that motion by Lamp Capital and

23    Infinity Treasury Management really sort of responds by

24    raising the 55(c) issue, so, therefore, I can address the

25    default, you know, the response, the arguments and response

1  to the 55(c), and then, you know, counsel could respond to

2  that, and then we could address Leading Shine second, if

3  that works for the Court.

4  THE COURT: All right. Go right ahead then.

5  MR. BASSETT: Your Honor, may I approach the

6  podium?

7  THE COURT: Yes, please.

8  MR. BASSETT: Again, Good afternoon, Your Honor.

9  And for the record, it's Nick Bassett from Paul Hastings on

10  behalf of the Chapter 11 Trustee.

11  Your Honor, the -- I would say both of the matters

12  that we have before the Court today are unfortunately part

13  of what is becoming a disturbing trend in these cases.

14  It is a trend in which an entity that the Trustee

15  has alleged to be a shell company of the debtor, and which

16  has all kinds of connections to the debtor and to other

17  parties and individuals who have appeared in pleadings and

18  in evidence throughout the course of the year plus of these

19  cases, are selectively deciding when to participate in these

20  cases and when not to.

21  In both cases, we have defendants here who were

22  previously served with 2004 discovery, were previously

23  served with subpoenas, those subpoenas were ignored.

24  In the case of Lamp Capital, they were held in

25  contempt of court and liable for the Trustee's fees. They

1    never appeared.  They never did anything.  And Lamp Capital,

2    by the way, is a company that, as the Court will recall and

3    as we have put out in our papers, actually paid the debtor's

4    counsels' fees to file this bankruptcy case.  They remain

5    silent.  They refuse to participate.  They did not allow the

6    Trustee to get discovery to which he was entitled.  We

7    served a complaint and, again, nothing, no response.

8             They now belatedly appear and ask to be heard late

9    when convenient for them.

10            This trend, Your Honor, shows an utter contempt

11   for the rule of law, for the procedures of this court, and

12   for the Court's authority.  It has to stop.

13            The motion for default judgment that the Trustee

14   filed as to Lamp Capital and Infinity Treasury Management

15   should be granted because all of the requirements for a

16   default judgment have been satisfied.

17            First of all, and I don't think there's any

18   question about this, the complaint was properly served.  The

19   complaint was filed on October 26th, 2023.  The summons was

20   issued on October 31st, 2023.

21            And the complaint was served the same day,

22   pursuant to Federal Rule of Civil Procedure 4(b)(1)(B),

23   which authorizes service on a -- on a corporation or an LLC

24   by delivering service of process to its agent authorized by

25   appointment or law to receive process.

1      Here, the Trustee served the complaint and summons

2  on each of Lamp Capital's and Infinity Treasury Management's

3  registered agents.

4      In the case of, this is out in the papers, in the

5  case of Infinity Treasury Management, the Trustee did

6  received correspondence from the registered agent in

7  response saying that Infinity Treasury Management was no

8  longer licensed to do business in Delaware.

9      But that registered agent remained the registered

10  agent of Infinity Treasury Management according to Delaware

11  State Records and, therefore, pursuant to Delaware law, a

12  statute which we cite in our papers, service is effective

13  because that registered agent remained the registered agent

14  at the time of service.

15      And again, I don't believe there's really a

16  dispute about that, so service was proper.

17      It's also no dispute that a default occurred.  The

18  answer deadline, based on the service of the summons and the

19  complaint and their issuance on October 31st, was November

20  30th, 2023 under Federal Rule of Bankruptcy Procedure 12.

21  That deadline was unquestionably not met.

22      Now, the last element for a default judgment is

23  for the Trustee to demonstrate that its complaint makes a

24  prima facie showing that its claims are sufficient as a

25  matter of law.  And the Trustee's complaint here far exceeds

1    that showing to demonstrate that Lamp Capital is both -- or

2    is the alter ego of the debtor, or alternatively that the

3    debtor beneficially owned and controlled Lamp Capital.

4            The Court is familiar with this standard from many

5    past adversary proceedings we've already had in this case,

6    but the standard for determining whether or not an alter ego

7    exists under Delaware law includes two primary elements.

8            The first of which is to show that the entity in

9    question operated as a single economic unit with the person

10   who allegedly uses that entity as its alter ego.  As the

11   Court is aware, there are a list of factors that are

12   considered.  None of those factors is dispositive and they

13   are also not exhaustive.

14           The second element of the alter ego analysis under

15   Delaware law is to show that there's an element of injustice

16   or unfairness that has been perpetuated by the use of the

17   entity as the alter ego.

18           Both of those requirements are amply satisfied by

19   the allegations in the Trustee's complaint as to Lamp

20   Capital and Infinity Treasury Management.

21           First of all -- and by the way, the thrust of the

22   claim in the complaint is that Lamp Capital is the debtor's

23   alter ego -- and I'll get to this later -- but Infinity

24   Treasury Management is named as a defendant because it is

25   nominally the sole member of Lamp Capital and, therefore, we

1    need an order from this court causing Infinity Treasury

2    Management to turn over its interest in Lamp Capital to the

3    estate.

4              As to Lamp Capital and the allegations that it

5    operated as a single economic unit with the debtor, Lamp

6    Capital was created by the debtor with his own counsel in

7    September 2020.  As I said, the sole member of Lamp Capital

8    is Infinity Treasury Management.  A sole shareholder of

9    Infinity Treasury Management is the debtor's son.

10             Lamp Capital at all times operated from the same

11   address as the debtor's other shell companies, including

12   Golden Spring and HK (USA), both of which have already been

13   adjudged to be the debtor's alter egos.

14             Lamp Capital, as alleged in the complaint,

15   operated through the same individuals acting at the debtor's

16   direction, who have taken instruction from the debtor for

17   his other shell companies.  That includes Daniel Podowsky

18   and Max Krasner with whom the Court is intimately familiar

19   based on other allegations and other evidence presented in

20   this case.

21             The complaint alleges that Lamp Capital did not

22   operate as a business or generate any revenue.  The sole

23   purpose of Lamp Capital rather was to make and receive

24   transfers on behalf of the debtor.  It effectively was a

25   shell company used to fund the debtor's lavish spending and

1    his shell game that he has used to keep assets from

2    creditors.  It's essentially his piggy bank.

3           Lamp Capital, as alleged in the complaint, in

4    fact, made transfers to fund the debtor's luxurious

5    lifestyle, including transfers that funded the debtor's use

6    of the Bombardier private jet, which is the subject of

7    another adversary proceeding, and also the Lady May, which

8    this court has already determined the debtor owns.

9           In addition, Lamp Capital has funded prepaid debit

10   cards for the debtor's family.

11          And finally, as I mentioned before, Your Honor,

12   Lamp Capital, in fact, funded the debtor's own expenses to

13   commence this Chapter 11 case.

14          Based on those allegations and others in the

15   complaint, I think there's no doubt that we've more than

16   satisfied our pleading burden to demonstrate that Lamp

17   Capital is, in fact, the alter ego of the debtor.

18          And by the way, the second requirement of the

19   alter ego analysis that the entity be used for a fraudulent

20   or otherwise unjust purpose is also satisfied.

21          Again, Lamp Capital, consistent with a number of

22   the other entities that this court is familiar with that are

23   involved in this case, was used as an instrumental part of

24   the debtor's shell game in order to help fund his lifestyle,

25   pay his expenses, transfer funds to his other companies, to

1    his family, to his relatives.  It was an instrumental part

2    of keeping assets from his creditors and that more than

3    satisfies that second requirement of the alter ego analysis.

4          In response to the motion for default judgment,

5    Your Honor, the defendants I would say don't really -- they

6    don't really respond to the motion for a default judgment

7    per se other than to assert their Rule 55(c) motion to

8    vacate the default.

9          And as the Court is now well familiar from

10   argument we've had in the HK -- HCHK adversary proceeding,

11   there, in the Second Circuit, are three primary elements

12   that a court will consider in determining whether a movant

13   has satisfied its burden of demonstrating good cause to

14   vacate a default.

15         The first is whether the default was willful.  The

16   second is whether the movant has a meritorious defense.  And

17   the third, which need not be considered if there is no

18   meritorious defense, is whether there is prejudice to the

19   plaintiff.  I'll take each of those elements quickly in

20   turn.

21         As to willfulness, despite what you would see in

22   the papers and despite arguments that have been made by

23   others, under Second Circuit law there is no requirement to

24   show bad faith, which I don't know that that matters,

25   because I would argue there is bad faith here anyway.  But

1    clearly under Second Circuit law bad faith is not required.

2            Rather, what the courts look at, and you can look

3    at the *Bricklayers* case, Second Circuit from 2015 that we

4    cite in our papers, is it requires conduct that is, quote,

5    "Not satisfactorily explained deliberate conduct.  Conduct

6    that is not excusable based on mere mistake or negligence."

7            In response -- in their motion for -- to vacate

8    the default judgment, Your Honor, all Lamp Capital and

9    Infinity Treasury Management do is they have asserted in a

10   brief filed by counsel, with no supporting affidavit, no

11   statement from any individual, no sworn testimony from any

12   representative of these entities, they have simply stated

13   that notwithstanding that service was proper, they did not

14   have actual notice of the complaint and, therefore, they

15   were unable to respond on time.

16           Your Honor, under the circumstances of these

17   defendants and of this case, that is woefully insufficient

18   for these defendants to satisfy their burden to demonstrate

19   that the default was not willful.

20           Again, service was proper.

21           And critically here, Your Honor, these defendants

22   are not at all strangers to this Chapter 11 case.  They are

23   ultimately owned by the debtor's son who undoubtedly, no

24   question, has knowledge about this Chapter 11 case.  Lamp

25   Capital also funded the case by paying Brown Rudnick's legal

1    fees prior to the case's commencement.

2           Lamp Capital and Infinity Treasury Management have

3    been named in numerous pleadings that the Trustee has filed

4    in adversary proceedings and otherwise.

5           Based on those circumstances, there is no credible

6    argument that these entities had no idea that this

7    litigation was commenced.

8           And what's most telling about all of this is that

9    not only is there no affidavit, no sworn declaration, but

10   the brief submitted by counsel that simply says they didn't

11   have actual notice doesn't contain any of the background or

12   surrounding information.

13          There is nothing at all in the brief about how or

14   when these defendants ultimately did receive actual notice

15   of the complaint because obviously they have it now, they're

16   here.

17          There's no statement about who all of a sudden

18   alerted, allegedly, Lamp Capital and Infinity Treasury

19   Management to this complaint.

20          We had a meet and confer with counsel on December

21   22nd I believe it was, or thereabouts, when he first

22   contacted the Trustee, after the deadline to respond to the

23   complaint, and we asked when were you first contacted about

24   this engagement, and by whom, and the response was they had

25   no answer.

1          Your Honor, there are basic details that

2    absolutely need to be explained for these defendants to even

3    come close to meeting their burden on the first factor.

4          Turning to the second factor, Your Honor, this is

5    whether there's a meritorious defense to the causes of

6    action, the case law on this element is very clear that

7    something more than a conclusory denial is required.

8    Defendants, rather, must come forward with evidence to show

9    their defense.

10         You can look at the *Bailey's Express* case that we

11   cite, quote, "Formulaic recitations of affirmative defenses

12   fall short."  In that case, the defendant filed an answer

13   with its motion to lift the default, along with nine

14   affirmative defenses, the Court still said that was not

15   enough because it was simply boilerplate denials.

16         Cases are legion in supporting that same

17   proposition.  *State Street Bank*, Second Circuit 2004, 374

18   F.3d. 158, same concept.  *Sony Corporation*, Second Circuit

19   1986, all these are cited in our papers, same concept.

20         Here, Your Honor, we don't have any facts of any

21   kind to suggest that, you know, Lamp Capital and Infinity

22   Treasury Management are actual operating companies that have

23   independence from the debtor, that have, you know, bank

24   accounts that they use for particular purposes or, you know,

25   lines of operations that they use for investing, employees,

1    all the basic facts that any real, legitimate, independent

2    entity would know, you see none of that.

3            I think that's extremely telling because there is

4    no person there.  There is no individual who could come and

5    testify to those facts, both because that person doesn't

6    exist and because it wouldn't be true.  Because it didn't do

7    anything.  It was a slush fund for the debtor.

8            What you have instead in response to the complaint

9    in the 55(c) motion, are effectively 12(b)(6) failure to

10   state a claim arguments.

11           And I think that's significant because A, it's

12   telling about the fact that there's no defense on the facts,

13   and B, it is absolutely 100 percent appropriate for the

14   Court to consider and decide those types of arguments on a

15   55(c) motion.  Courts do it all the time.  That's the entire

16   point.

17           In determining whether a meritorious defense

18   exists as a matter of law, the Court has to look at if these

19   defenses that are raised, legal defenses, whether they

20   actually have merit or not.

21           If you look at the *State Street Bank* case that I

22   cited, Second Circuit 2004, there is an extensive, several-

23   page analysis of the legal issues and arguments raised by

24   the movant in its 55(c) motion.  The Court analyzed them and

25   said that denial of the motion was proper because a thorough

1    analysis of those defenses reveals that they fail.  And

2    that's the case for each of the defendant's arguments here.

3         They argue that Infinity Treasury Management is

4    not a proper defendant to the complaint because the Trustee

5    pleads few allegations against it.

6         But Your Honor, as I described, the Trustee's

7    argument and theory in the case is that Lamp Capital is the

8    debtor's alter ego and that Infinity Treasury Management is

9    the nominal owner of Lamp Capital.

10        Infinity Treasury Management is obviously a

11   defendant in the complaint because the Trustee needs relief

12   against it.  It is holding property, i.e., an ownership

13   interest in Lamp Capital that has to be turned over.  That's

14   fundamental bankruptcy turnover law.  Of course they're a

15   defendant.

16        The defendants also argue, they make -- they make

17   a couple of arguments that this court has heard in the past

18   and already rejected.

19        One of them is the argument that under Delaware

20   law, there, by definition, cannot be an alter ego finding

21   here because the debtor is not alleged to have been the

22   nominal owner or an officer or director of these entities.

23        The Court already addressed that in HK (USA) and

24   rejected it.  There is no such requirement under Delaware

25   law that that type of relationship exist in order for an

1    entity to be found to be the alter ego of another.

2         They also argue, Your Honor, that this case is

3    distinguishable from the HK (USA), and they argue that that

4    must be some reason for the claims here to fail.  But this

5    argument, Your Honor, proves nothing.

6         As they correctly point out, yes, the cases are

7    different.  HK (USA) was a shell company that held title to

8    a single asset of the debtor.  Lamp Capital is an entity

9    that the debtor used as a shell company to fund his lavish

10   lifestyle, to use it as his personal piggy bank.

11        The debtor had at least two types of shell

12   companies that he used as part of his shell game to avoid

13   creditors.  One classic entity is HK (USA), which held title

14   to an asset.  Or Greenwich Land, which we've alleged did the

15   same for his home in Connecticut.  Or Bravo Luck, which held

16   title to the apartment in New York.

17        Other types of entities are those that he used as

18   his slush funds to transfer assets to and from other shell

19   companies to pay for expenses.  One of those, a significant

20   one of those, is Lamp Capital.  Different facts, but no less

21   an alter ego.

22        The final defense that they raise in the nature of

23   a motion to dismiss for failure to state a claim is the in

24   pari delicto in *Wagoner* rule defenses, which, again, this

25   court has already considered and rejected in the HK (USA)

1     adversary proceeding.

2          As the Court correctly concluded, those defenses

3     do not apply to a defense, sorry, to a claim brought by the

4     Trustee under Section 544(c) of the Bankruptcy Code on

5     behalf of creditors.  Moreover, the insider exception to the

6     in pari delicto doctrine also applies in this case.

7          So Your Honor, for all of those reasons, there is

8     no meritorious defense.  All the arguments essentially have

9     either been rejected by this court previously, or very

10    clearly fail on their merits because the Trustee has more

11    than satisfied his pleading burden of demonstrating that if

12    his allegations are true, he is entitled to relief as a

13    matter of law.

14         Because of that, the case law is very clear that

15    the Court need not even consider whether there's prejudice

16    to the Trustee.  Cases, again, are legion in that regard.

17    The *Bricklayers* case that I mentioned before.  The *Bailey's*

18    *Express* case.  *Global Metallurgical* cited in our papers, 327

19    B.R. 182.  All of those cases, and many others, stand for

20    that proposition.

21         However, if the Court were to consider prejudice,

22    I think there is no doubt that there is, in fact, prejudice

23    to the Trustee here.  And what you'll see in the papers is,

24    well, delay alone cannot be prejudice.

25         But, here, we're talking about a lot more than

1  simply delay.  We're talking about gamesmanship by parties,

2  as I said at the outset, who are selectively deciding when

3  to avail themselves of this court, when to participate in

4  the legal process, and when not to.

5        And that's especially significant here where you

6  have defendants who are asserting, essentially pleading,

7  arguments that the Trustee has failure -- has failed to

8  state a claim for relief in his complaint.

9        And those same defendants are the ones who ducked

10  2004 discovery and subpoenas previously, which the Trustee

11  is entitled to as a matter of law and pursuant to court

12  orders, and would have been able to use the results of in

13  pleading his complaints.

14        They can't duck the discovery obligations that

15  they owe to this court and to the Trustee and then come in

16  belatedly later and ask for the mercy of the Court and to

17  participate.

18        Notably, we heard nothing from the defendants when

19  they first reached out to us, or through today, about how

20  they were going to cure the contempt order that they're

21  already under, which they obviously can't do at this point

22  anyway.

23        But Your Honor, there is real prejudice if the

24  Court allows this type of conduct to persist.  The

25  obstruction that the Trustee has seen from day one in this

1    case is only going to continue and it's only going to get

2    worse.

3           And we also have significant concerns about

4    spoliation of discovery given that these parties have

5    refused to comply in the past.

6           I don't know why the Court would think that

7    they're likely to comply with their discovery obligations in

8    this adversary proceeding, so there is prejudice under these

9    circumstances.

10          But, as I said, it need not be found by the Court

11   to enter a default given that the other elements have not

12   been satisfied.

13          Your Honor, that's all I have at the moment,

14   unless the Court has any questions.

15          THE COURT:  I'm just looking to see if I have any

16   questions.  I think I do not, but I would just like to

17   confirm that.  I do not have any questions at this time,

18   Attorney Bassett.  Thank you.

19          MR. BASSETT:  Thank you, Your Honor.

20          THE COURT:  Who's going to respond first.

21          MR. GRAND:  Your Honor, Robert Grand --

22          THE COURT:  Okay.

23          MR. GRAND:  -- from Lax & Neville on behalf of

24   Lamp and Infinity Treasury.

25          THE COURT:  You just need to speak more clearly

1  and closely to the microphone, sir, because I cannot hear

2  you.

3          MR. GRAND:  Sure.  I can approach over there if

4  that makes it easy.

5          THE COURT:  Sure.  Thank you.

6          MR. BASSETT:  And Your Honor, just to be clear, I

7  did not address the Leading Shine 55(c) motion yet because

8  that's not --

9          THE COURT:  Right.

10          MR. BASSETT:  -- subject to our motion for a

11  default judgment.

12          THE COURT:  We're just dealing with the default

13  judgment motion right now.

14          MR. BASSETT:  Thank you, Your Honor.

15          MR. GRAND:  Do you want me to respond to that

16  part, or do you want to have --

17          THE COURT:  Well --

18          MR. GRAND:  -- Trustee's counsel address the

19  Leading Shine motion?

20          THE COURT:  -- I want the parties who should be

21  responding to the motion for a default judgment to respond,

22  which are Lamp Capital and Infinity.

23          MR. GRAND:  Good afternoon, Your Honor.  Again,

24  Robert Grand from Lax & Neville on behalf of Lamp Capital

25  and Infinity Treasury Management.

1      So I just want to start with Trustee's counsel's

2   first assertion that these defendants did not essentially

3   respond to the default judgment motion, but only advocated

4   in favor of the application to set aside the default.

5      The reason why the arguments were set forth that

6   way is because the law is clear that when a motion for -- to

7   set aside a default is filed before the default judgment is

8   entered, the standard that the Court should apply in

9   determining whether the default should be set aside is

10   governed by Rule 55(c), not Rule 60(b), which governs

11   default judgment.

12      And the law, Second Circuit law, is clear from the

13   *Enron* case 20 years ago, through cases in this court, and in

14   the District of Connecticut issued within the last year,

15   that the standards, while the factors are the same, whether

16   or not the default was willful, whether or not the plaintiff

17   will suffer prejudice if the default is set aside, and

18   whether or not the defendant has asserted a meritorious

19   defense, all the factors are the same, when addressing a

20   Rule 55(c) motion, the Court applies those standards much

21   less rigorously than if a judgment had already been entered

22   and the defendant is seeking to set aside a default

23   judgment.

24      So from that framework, the motion to set aside

25   the default addresses those factors, and also was submitted,

1    the brief that we submitted was submitted also in opposition

2    to the default judgment.

3            But really we don't need to get to the default

4    judgment aspect of it because we first need to decide

5    whether or not the default should be set aside.  It's a two-

6    step process.

7            So as we set forth in our papers, it seems clear

8    that when applying those standards and giving the deference

9    that courts give to resolving cases on their merits, rather

10   than through defaults, that these defendants have met each

11   of those -- have satisfied each of those factors and that

12   they weigh in their favor.

13           There's no possible way that the failure to

14   respond to the complaint in this case can be determined to

15   be willful because, as we set forth in our papers, the

16   defendants had no notice of the complaint.

17           THE COURT:  What do you mean by that, had no

18   notice of the complaint, they were served with the

19   complaint.

20           MR. GRAND:  Well, with respect to Infinity

21   Treasury Management, the Trustee alleges that he served

22   their registered agent in New Jersey -- in Delaware.  The

23   registered agent in Delaware responded to the Trustee's

24   counsel and said --

25           THE COURT:  I understand.

Ho Wan Kwok - January 23, 2024                                    34

1            MR. GRAND:  -- that Infinity Treasury Management

2    is not active.  We don't have any contact information for

3    them.  We can't find them.

4            THE COURT:  I understand.

5            MR. GRAND:  We can't deliver this complaint to

6    them, so we're returning it to you.

7            THE COURT:  I understand that.

8            MR. GRAND:  So Infinity Treasury Management --

9            THE COURT:  But under law, your corporation has an

10   obligation to have an agent for service of process.  And if

11   your corporation, your client, didn't correct that issue,

12   then that's your client's problem.

13           The law doesn't say that that doesn't result --

14   show me a case where it says the law says that that equals

15   your argument, that it's not notice even though this agent

16   was served, the agent that your client listed as the agent

17   for service of process?

18           MR. GRAND:  The issue is notice, not service.

19   Nobody --

20           THE COURT:  No.  The issue isn't notice.  Where's

21   the issue of notice, Counsel?  It was served.

22           MR. GRAND:  Right.

23           THE COURT:  It has to be served under the Federal

24   Rules of Civil Procedure --

25           MR. GRAND:  Right.

1          THE COURT:  -- with a complaint, which you were

2     under Rule 4, right?

3          MR. GRAND:  Correct.

4          THE COURT:  Okay.  So where do you get to notice?

5          MR. GRAND:  Notice is the -- is whether or not the

6     default was willful, you have to have notice of a complaint.

7          THE COURT:  You were served with the -- are you --

8          MR. GRAND:  But nobody from the company ever

9     received it, so they didn't --

10          THE COURT:  And who -- that's your company's

11    problem.

12          Show me a case that says what you just said.  I'd

13    like to see it.

14          MR. GRAND:  Sure.  In *Nature's First* case that we

15    cite, which is at --

16          THE COURT:  Okay.  Hold on a second.  I really --

17    I'm serious.  It's no problem.  I want to see exactly what

18    you're citing, so I want to make sure we're all on the same

19    page.

20          MR. GRAND:  Page 5 of our brief, Your Honor.

21          THE COURT:  I don't want the brief.  I'm going to

22    look at the case --

23          MR. GRAND:  Okay.

24          THE COURT:  -- so hold on a second.

25          MR. GRAND:  Sure.

1          THE COURT:  Okay.  So what is the cite of your --

2     of the case, please.

3          MR. GRAND:  436 F. Supp. 2nd. 368 at 374-375, it's

4     a District of Connecticut case from 2006 in which --

5          THE COURT:  Hold on a second.  Let me get there.

6     *Nature's First*.

7          MR. BASSETT:  Could I have the paragraph number of

8     the brief, please.

9          MR. GRAND:  It's on page 5.  I think it's

10    paragraph 12 where this argument is addressed.

11         THE COURT:  Okay.  So tell me where in the brief,

12    I'm sorry, Counsel, in the opinion --

13         MR. GRAND:  On pages 374-375.

14         THE COURT:  Okay.  Give me one second, please.

15         MR. GRAND:  And that case was a default judgment

16    actually, and that default judgment was vacated, where the

17    defendant was aware that the action had been filed against

18    -- was not aware, excuse me, that the action had been filed

19    against it until after the plaintiff had obtained a default

20    judgment.

21         THE COURT:  Okay.  Hold on a second, please.  373

22    and 374?

23         MR. GRAND:  374-375.

24         THE COURT:  So I'm looking at 373 where it says

25    the affidavit submitted by the defendant, and there were no

1   affidavits submitted by the defendant in connection with

2   these motions, denied that service was made.  That's what

3   the -- on page 373, this decision says, before you get to

4   your 374 and 375.

5           So Judge Dorsey found that he relied on an

6   affidavit by a defendant that denied service was made.  I'm

7   looking at the first, full paragraph on page 373 of *Nature's*

8   *First, Inc. vs. Nature's First Law*, *Inc.*

9           So that's a factual issue that's not present in

10   this case.  You haven't denied that service was made.  No

11   one has denied that service was made.  And none of the

12   defendants have filed any affidavits to support the

13   assertions in response to the motion for default judgment.

14          So go ahead, what else have you got?

15          MR. GRAND:  Well, there's another case that we

16   cited there too, the *Global Mining, Global Gold Mining* case.

17          THE COURT:  Okay.  Give me a moment.  What's the

18   cite on that?

19          MR. GRAND:  That case is 983 F. Supp. 2d. 378 --

20          THE COURT:  983 --

21          MR. GRAND:  -- at 387.  There are also several

22   other cases, Your Honor.

23          THE COURT:  Hold on.  983 F. Supp. 2d at what?

24          MR. GRAND:  387.  It's a Southern District of New

25   York case which was affirmed by the Second Circuit.

1        THE COURT:  Well, there was a lack of personal

2    jurisdiction in that case according to this decision that

3    I'm looking at, so there was a finding that there was a lack

4    of personal jurisdiction.

5        Where in this case do you want me to look?

6        MR. GRAND:  They're showing that -- that case held

7    that a showing under default was inadvertent, is sufficient

8    to --

9        THE COURT:  Tell me where, what page?

10       MR. GRAND:  387.

11       THE COURT:  Okay.  Just give me a moment, please.

12       So 387, the bottom of 386 onto page 387, starts

13   because the lack of personal jurisdiction mandates vacature

14   of the default judgment under Rule 60(b)(4), the remaining

15   arguments are rendered moot.  That's the -- that's the

16   section that you're citing me to.

17       So what else do you want me to read there?

18       MR. GRAND:  Your Honor, I don't have that case in

19   front of me unfortunately, but I -- there are multiple

20   cases, multiple cases, that I'm happy to bring to Your

21   Honor's attention that --

22       THE COURT:  Well, you've already brought them to

23   my attention in your brief.

24       MR. GRAND:  Well, I have --

25       THE COURT:  I'm asking you right now, I asked you

1    specifically, what case holds what you just stated, which is

2    that you have a -- you have to have a lack of notice, not

3    service?  That was my question to you.

4            Because there is no assertion in any of these

5    pleadings that you've filed, that any of the defendants have

6    filed, that they weren't served with the complaint.  And

7    there's no -- and there are no affidavits of any of the

8    defendants.  And the time to do all that has already passed.

9            MR. GRAND:  Respectfully, there's no -- there's no

10   requirement under --

11           THE COURT:  Well, how am I going to find a fact

12   that your client didn't have notice if your client isn't

13   going to swear that they didn't get notice and that they

14   weren't served?  How am I going to find --

15           I already found, the default already entered based

16   upon the review of how service was made under the Federal

17   Rules of Civil Procedure and the applicable rules of the

18   state law governing how service needed to be made on these

19   defendants.

20           So your job then would be to controvert that.  And

21   your argument to the Court at this point is not that you --

22   it's not that you weren't served, it's that you didn't have

23   actual notice.

24           And so I asked you where in the cases that you've

25   cited does it hold, does the Second Circuit Court of Appeals

1    hold, that you have to have actual notice, and you haven't

2    been able to show me one yet.

3              MR. GRAND:  Your Honor, if -- I can -- I can

4    certainly deliver those cases.  We did not have --

5              THE COURT:  It's not an issue of delivery.  You're

6    here right now.

7              MR. GRAND:  I understand.

8              THE COURT:  This is the argument.

9              MR. GRAND:  We didn't have an opportunity to

10   submit a reply.  We got these opposition papers on Friday

11   night and, you know, that was one day, one business day,

12   before the hearing.  I'm happy to --

13             THE COURT:  The default entered -- when did the

14   default enter, Counsel?  The default entered --

15             MR. GRAND:  In the middle of December I believe.

16             THE COURT:  I'll tell you.  We'll go back and

17   figure it out.

18             MR. GRAND:  I think the default entered on

19   December 14th.

20             MR. BASSETT:  That's right.

21             THE COURT:  Yeah.  December 14th.  It's January

22   23rd.

23             MR. GRAND:  Yes.

24             THE COURT:  So you've had time.

25             MR. GRAND:  To?  As soon as we were engaged, we

1    reached out to the Trustee's counsel and conversing with

2    them.

3              THE COURT:  We don't know when you were engaged.

4              And by the way -- and Lamp Capital already

5    appeared in the main case.  They were represented by counsel

6    at the beginning of this case in 2022.

7              So when you say as soon as you were -- you know,

8    you have to think a lot about --

9              MR. GRAND:  In this -- not in -- in this case?

10             THE COURT:  In the main case, Counsel.  The

11   adversary proceeding is another case within the main case.

12             MR. GRAND:  Right.  Right.  In a proceeding in New

13   York before it was transferred here.

14             THE COURT:  No, no, no, no, no, no.  In here in

15   Connecticut.  I can go back to the main case in this -- in

16   Mr. Kwok's Chapter 11 case and I can find for you, it will

17   take me a few minutes, but I can find for you the notice of

18   appearance that was filed on behalf of Lamp Capital.  Okay?

19   They already appeared in Mr. Kwok's case and then suddenly

20   decided to withdraw their appearance.

21             So no, not when it was in New York.  When it was

22   in this court when Mr. Kwok was the -- was the debtor in

23   possession before the Trustee was appointed.

24             MR. GRAND:  I mean, look, Your Honor, as I

25   explained, we were engaged at the end of December --

1    THE COURT:  I'm not suggesting anything about you.

2    MR. GRAND:  We're new.  We're getting --

3    THE COURT:  I'm saying the facts are what the

4 facts are, right?

5    MR. GRAND:  Right.

6    THE COURT:  When you came into the world to become

7 part of this, the facts surrounding Lamp Capital already

8 existed.  You had no control over that.  I understand that.

9    MR. GRAND:  Right.

10    THE COURT:  I'm not suggesting anything to the

11 contrary.  However, facts existed.  Lamp Capital funded the

12 retainer of the debtor's in possession's counsel.  That was

13 all disclosed to this court in pleadings filed under penalty

14 of perjury.  Okay.  Then Lamp Capital also had appearance of

15 counsel in Mr. Kwok's case.

16    So I understand the arguments that you're making.

17    But my question to you was, which I still don't

18 have an answer to, so I'm beginning to believe there isn't

19 an answer, which is where is a case that says that you have

20 to have actual notice, because I have never seen one.

21 Because otherwise --

22    MR. GRAND:  I can supply you with one.

23    THE COURT:  -- you would defeat the whole purpose

24 --

25    MR. GRAND:  I don't have --

1      THE COURT:  -- you'd defeat the whole purpose of

2   Rule 55, that's what you'd be --

3      You're saying I have to have actual notice?  Then

4   what's the point of Rule 55?  There's no point.

5      You're taking the policy of Rule 55 and throwing

6   it out the window and saying -- and there's nothing in any

7   Second Circuit case that I've seen that says that the

8   defendant has to have actual notice.  It makes no sense,

9   Counsel.  It makes absolutely no sense.

10      Because that's the whole reason you have an agent

11   for service of process.  You are a corporate entity.  You

12   have to file certain documents and follow corporate

13   regulations and statutes in order to be granted the benefits

14   of being a corporate entity.  And one of those burdens of

15   being a corporate entity is you have to have an agent for

16   service of process.

17      And to be -- and to come here and say, well, we

18   didn't have an agent for service of process in place

19   anymore, that's the company's problem.

20      MR. GRAND:  That's not what I -- that's not what

21   --

22      THE COURT:  Well, that's what you just said.

23      MR. GRAND:  No.

24      THE COURT:  You just said --

25      MR. GRAND:  No.

1          THE COURT:  No, you did.  Because you said

2     counsel's even admitted that he got a response from the

3     agent of service of process who says they don't have a --

4     they're not their registered agent anymore.

5          MR. GRAND:  No.  That's not what they said.

6          THE COURT:  What did they say then?

7          MR. GRAND:  They said that we can't find Infinity

8     Treasury Management.  They are no longer active in Delaware.

9     And we don't have any contact information for -- to deliver

10    the complaint --

11         THE COURT:  Right.

12         MR. GRAND:  -- that you served on us.

13         THE COURT:  All right.  But that doesn't mean that

14    it wasn't served.

15         MR. GRAND:  So they're a defunct entity.  I didn't

16    --

17         THE COURT:  It doesn't mean it wasn't served.

18         MR. GRAND:  We're not contesting service.

19         THE COURT:  Well, then you don't --

20         MR. GRAND:  I can --

21         THE COURT:  -- have an argument on notice.

22    Where's the -- show me a case.

23         MR. GRAND:  I don't have it in front of me today.

24         THE COURT:  Well, that's --

25         MR. GRAND:  Your Honor --

1          THE COURT:  -- today's the day.

2          MR. GRAND:  -- we did not have an opportunity to

3     submit --

4          THE COURT:  Today's the day.

5          MR. GRAND:  I can happily supply you with --

6          THE COURT:  I don't want you -- I don't -- this --

7          MR. GRAND:  -- multiple cases that stand for that

8     proposition.

9          THE COURT:  Okay.  Well, I think you're wrong.

10    And you go ahead and make the rest of your argument then.

11         MR. GRAND:  Okay.  So that argument is, obviously,

12    those two defendants, which we believe are inactive

13    companies, could not have responded to a complaint that they

14    never actually received, so the failure to do so was not

15    willful.

16         And then it's upon learning about that complaint,

17    they, the entities, sought to retain counsel and immediately

18    sought to defend against the merits of the case.

19         So when it comes to the next factor, legal

20    prejudice, there's really no meaningful delay here in this

21    case that would fall under -- that would cause that factor

22    to weigh in favor of the Trustee.

23         Excuse me for one minute.

24         As we explained in our papers, as soon as we were

25    engaged, reached out to Trustee's counsel, and sought to get

1    more time to respond to the complaint.  This was Friday, on

2    December 22nd, the Friday before the Christmas holiday.  And

3    when we finally did connect later in that day, my colleague

4    was unavailable.

5         And in any event, Mr. Lindsey, Trustee's counsel,

6    said that if we wanted to discuss any of the merits in terms

7    of getting more time, the default, any of the procedural

8    posture of the case, we'd need to loop in New York counsel,

9    the Paul Hastings folks.

10        So Mr. Lindsey followed up with an email to me on

11   Saturday night, the next night, looping in Trustee's

12   counsel.  We reached out to them on the 26th, the day after

13   Christmas, sought to have a conversation.  And I think I

14   sent an email.  And 15 or 20 minutes after I sent the email,

15   before I heard a response, the motion for default judgment

16   was filed.

17        We did speak the next day.  And when we conferred

18   the next day, we, you know, said that we were appearing on

19   behalf of Infinity and on behalf of Lamp, sought additional

20   time to respond to the complaint, sought to have the Trustee

21   withdraw the default because the defendants were intending

22   to defend the case on the merits, and the Trustee declined

23   to do that.

24        We then filed our move to get admitted as quickly

25   as we could during the holiday week, filed our appearances

1    as quickly as we could, and timely filed our motion for --

2    to set aside the default well in advance of the deadline

3    that the Court had set to respond to the motion for a

4    default judgment.

5          So there's really no meaningful delay here that

6    would cause any prejudice to the Trustee should they have to

7    reopen the default and prosecute the case on the merits.

8    And, indeed, the case law is clear that having to prosecute

9    a case on the merits is not sufficient prejudice when

10   opposing a motion to vacate a default.

11         And so, you know, the other prejudice that the

12   Trustee argues it will suffer in terms of what the standard

13   is, excuse me, is that the non-defaulting party here must

14   show that it will -- its ability to prosecute its case will

15   be impeded by either the loss of evidence, or increased

16   difficulties with discovery, or a greater opportunity for

17   fraud and collusion, and there's no showing here of any of

18   those things.  I mean, the --

19         THE COURT:  Hasn't your client already been held

20   in contempt by this court for failure to comply with

21   discovery, Counsel?

22         MR. GRAND:  Yes.

23         THE COURT:  Okay.

24         MR. GRAND:  And if we -- and that's -- I

25   understand that, but that hasn't -- but opening the default

1    won't -- the Trustee needs to show that opening the default

2    will result in additional, you know, loss of discovery, and

3    that sort of makes no sense.

4            I don't have -- you know, I don't -- we were not

5    involved, you know, a year ago when Infinity -- or when Lamp

6    was served was this Rule 2004 subpoena.  I don't know why it

7    didn't respond one way or another.

8            But we're here now.  We're happy to respond to

9    those discovery requests and to do discovery in the context

10   of the case as a party.  So I -- there's really no evidence

11   or showing that -- that there's going to be any -- just the

12   opposite.  Now that -- now that -- you know, I mean, look,

13   the Trustee has already, you know, uncovered --

14           THE COURT:  Couldn't your client have already

15   provided all the information to the Trustee in order to

16   purge itself of contempt?

17           You now -- you now want the default set aside so

18   that they're going to have to serve discovery requests to

19   which you're going to oppose?  That's what your -- that's

20   what your argument is?

21           MR. GRAND:  No.  My argument is that we will -- we

22   will participate in discovery and comply with whatever's

23   ordered.

24           THE COURT:  Well, you're already in contempt of

25   court with regard to discovery, so when are you going to

1    comply?

2              MR. GRAND:  If the -- if Your Honor wants Lamp to

3    comply, we can --

4              THE COURT:  Wait a minute.  Let me just stop you

5    right there.  If I want?  I have -- there's a court order

6    holding your client in contempt for failure to comply with

7    discovery.  Don't you think that burden's on you?

8              MR. GRAND:  Yeah.  And I'm -- what I'm saying is

9    that Lamp Capital will produce documents --

10             THE COURT:  When?  When?

11             MR. GRAND:  I mean, we have -- we're -- I have to

12   find out what's there.  We have to --

13             THE COURT:  Shouldn't you have done that already?

14             MR. GRAND:  We're barely in this case, Your Honor.

15   The first thing we need to do is try and set aside the

16   default.

17             THE COURT:  It doesn't matter.  Under the Federal

18   Rules of Civil Procedure you have initial disclosure

19   obligations, don't you?

20             MR. GRAND:  Yes.  But --

21             THE COURT:  Yeah.

22             MR. GRAND:  -- we're -- I mean, we can -- we're

23   happy to produce those documents.  We're happy to look at

24   it.  We were not involved when that subpoena was served.

25   I'm not even --

Ho Wan Kwok - January 23, 2024

50

1    THE COURT: I didn't say you were. Counsel, I

2    started by saying before, I understand there are facts that

3    were here in effect that you had nothing to do with. I

4    understand that. But the problem is that doesn't help you.

5    It's there's still the facts. And you can't ignore that

6    those facts exist.

7    MR. GRAND: I'm not trying to ignore them. We

8    need to wrap our hands around them --

9    THE COURT: Well, then -- but you -- but you

10   haven't --

11   MR. GRAND: -- which we haven't had sufficient

12   time to do that.

13   THE COURT: What's your -- what's your plan to get

14   your client out of default -- out of contempt?

15   MR. GRAND: Our first plan is to get the client

16   out of default, as Your Honor just mentioned. Once the --

17   THE COURT: Well, you've already been in contempt

18   well before default.

19   MR. GRAND: I recognize that.

20   And again, I appreciate that there's a lot that's

21   happened in this case before we came on the scene. And I

22   agree we can't control what happened in the past. All we

23   can say is that we are here now on behalf of those two

24   entities and will comply with court orders. We'll comply

25   with discovery obligations. And we'll participate in

1    discovery in a meaningful way.  We have -- we're here.

2            THE COURT:  Well, I don't know what you mean by

3    that, because you're already subject to a court order.

4            This isn't going to be a situation where the

5    Trustee's going to have to propound discovery and then

6    you're going to get to seek a protective order or a quash,

7    that's not going to happen, Counsel.  Your client is already

8    in contempt.

9            MR. GRAND:  We understand.

10            THE COURT:  So then I don't know what you mean --

11            MR. GRAND:  In other words --

12            THE COURT:  --  when you say you're going to

13    participate in meaningful discovery.  I don't understand

14    what that means.  You either turn over everything they've

15    already requested, which is subject of the contempt, or you

16    don't.  I mean, that, it's that simple.

17            MR. MILLER:  Your Honor, may I be heard?

18            THE COURT:  No, you may not.

19            MR. MILLER:  This is Robert Miller.

20            THE COURT:  You've already got one lawyer

21    representing your clients.  No.

22            So go ahead, Counsel.

23            MR. GRAND:  I mean, as I said, we're just in this

24    case.

25            If the default is not going to be vacated then I'm

1    -- then, you know, I don't know, you know.  If there's a

2    judgment that's going to be entered, you know, I don't know

3    where that leaves the discovery obligations.  If we're in

4    the case --

5         THE COURT:  The motion -- the contempt order was

6    issued in the main case, so it has nothing to do with

7    whether or not the default gets set aside in this case.

8    Your client is in contempt of this court for failing to

9    comply with discovery obligations under the Federal Rules of

10   Bankruptcy Procedure.

11        MR. GRAND:  If Your Honor sets a time, we will do

12   our best to comply with discovery obligations.

13        THE COURT:  We don't need -- I don't need to set a

14   time.

15        MR. GRAND:  We'll do --

16        THE COURT:  I already set a time --

17        MR. GRAND:  So we will --

18        THE COURT:  -- by the way I think in the original

19   order.

20        MR. GRAND:  So we'll do our best to obtain those

21   documents now.

22        But the first thing that we're trying to do in

23   this case, in this adversary proceeding, is set aside the

24   default so that the clients, the entities, can defend the

25   case on the merits.  And in that context, we will provide

1    discovery as soon as we can get our hands on this case.  We

2    just -- we just appeared.  We've just been put in this case.

3              We recognize that a lot has gone on.

4              THE COURT:  You didn't just appear though.

5              MR. GRAND:  We did.

6              THE COURT:  You did.  You as lawyers, I agree.

7              MR. GRAND:  Yeah.  Yes.

8              THE COURT:  But Lamp Capital didn't.

9              MR. GRAND:  I understand that.  And as I said, I

10   can only control what we can control as lawyers now that

11   we're in the case.  So I -- we are here.  The entities

12   intend to defend the case.  And the entities --

13             THE COURT:  And, okay, so let's get to that.

14   What's your meritorious defense?

15             MR. GRAND:  So the meritorious defense in this

16   case is that it's -- when it comes to piercing the corporate

17   veil under Delaware law it's very difficult to do.  The

18   Trustee in this case tries to sort of lump Lamp and Infinity

19   in with the HK case, and the facts are completely different,

20   as the Trustee acknowledges.

21             In the HK case, the entity had one asset that had

22   already been judicially determined to be beneficially owned

23   by the debtor.  That case and that decision was a summary

24   judgment decision after discovery had taken place.  There

25   was no dispute that the entity had no officers, directors,

1   didn't -- it did not comply with any corporate formalities.

2   It's completely different than the facts of this case.

3          THE COURT:  And what has your client done?

4          MR. GRAND:  Lamp has officers and directors.  Lamp

5   has had bank accounts.

6          THE COURT:  Where is that?

7          MR. GRAND:  HK didn't.

8          THE COURT:  Where is that in the record by the

9   way?  Where is any evidence that that's -- it's accurate.

10          MR. GRAND:  It's alleged in the complaint.

11          THE COURT:  Okay.  So you're going to stand on the

12   allegations in the complaint.  You're not going to submit

13   any other kind of evidence.  You're not going to have anyone

14   from Lamp Capital come testify to support the assertions

15   that this wasn't just an entity that just -- that funds

16   flowed through?

17          MR. GRAND:  That's not required for purposes of

18   this motion.

19          THE COURT:  I didn't say it was required.  I asked

20   you whether you were going to do that?

21          MR. GRAND:  We'll defend the merits of the case

22   when we get into it.

23          THE COURT:  That's why I asked you what's your

24   meritorious defense?  I still don't know what it is.  What

25   is it?

1          MR. GRAND:  That they have -- that they -- that

2     the Trustee will not necessarily be able to establish that

3     Lamp Capital is an alter ego of the debtor.

4          THE COURT:  That's not a defense.  That's just a

5     denial.  What's your defense?

6          MR. GRAND:  That's a -- that's a defense.

7          THE COURT:  No.  That's a denial, Counsel.

8          MR. GRAND:  Yeah.

9          THE COURT:  What's your defense?

10          MR. GRAND:  But that's -- that's sufficient.

11          THE COURT:  No.  I don't think it is actually

12     under the law.  You can't just come in and say they're not

13     going to be able to prove it.  That's just a denial.

14          MR. GRAND:  Well, we didn't say that.  We made the

15     argument based on the different -- the different facts and

16     under the law.  Certainly --

17          THE COURT:  What facts?

18          MR. GRAND:  The facts that -- the facts that in

19     the complaint -- the facts in the --

20          THE COURT:  The facts in the complaint right now

21     are --

22          MR. GRAND:  Are alleged allegations in the --

23          THE COURT:  -- are true until and unless the

24     default gets set aside.

25          MR. GRAND:  Yes.  And even under those --

1      THE COURT:  What evidence have you got to prove

2  that they're not true?

3      You have to -- the Second Circuit says you can't

4  just come forward and say they're not going to be able to

5  prove it.  And that's what you're saying.  Your meritorious

6  defense is they're not going to be able to prove it.

7      Well, right now it's proven under the Federal

8  Rules of Civil Procedure.  It is -- those are the facts.

9  Unless and until the default gets set aside, those are the

10  facts.  That's what the law -- the law is very clear about

11  that.

12      So your job is to show the Court what is your

13  meritorious defense?  And if -- and if your answer is that

14  they aren't going to be able to prove it, fine, then that's

15  your answer.

16      MR. GRAND:  Yes.

17      THE COURT:  Okay.  Fine.

18      MR. GRAND:  Our answer is that they will need to

19  make that showing that it's -- that there's -- alter ego

20  liability will attached, and we don't believe that they're

21  going to make -- be able to prove that.  And the facts as

22  alleged in the complaint are insufficient, as we say in our

23  papers under Delaware law, to pierce the veil under -- and

24  obtain alter ego liability.

25      Secondly, there's -- there's an in pari delicto

1    defense that can be asserted by both defendants in this case

2    as we argue in our papers.

3         And more than that, there's also the allegations

4    in the complaint are -- there's no allegation of wrongdoing

5    on behalf of Infinity Treasury Management.  They're only

6    identified in here as the sole member of Lamp.  But Infinity

7    Treasury is not accused of -- of any wrongful conduct.

8         So as we set forth in our papers, you know, under

9    the law, those allegations are deficient as well.

10        THE COURT:  Okay.  Anything further, Counsel?

11        MR. GRAND:  I'll add only that the cases mentioned

12   by the Trustee that they relied on in their papers, the

13   *Bailey's Express* case, and the -- and the *Bricklayers* case,

14   are not relevant to this motion because both of those cases

15   involved seeking to set aside default judgments.

16        And in the *Bricklayers* case, there was no dispute

17   that the defendant was aware of the complaint because its

18   counsel sought additional time to respond, but yet failed to

19   file a responsive pleading for nine months.

20        And that's certainly not the case here.  You know,

21   we sought to appear and assert defenses almost as soon as we

22   were engaged and very shortly after the defendants learned

23   of the existence of the complaint.

24        And as well, the *Bailey's Express* case, the Court

25   found that the default to be willful where the defendant

1    failed to appear for five court conferences and months after

2    its counsel had been discussing the case with the

3    plaintiff's counsel in that case.

4           And again, you know, those facts are just not what

5    we have here.  You know, as we say in our papers, you know,

6    we understand that shortly after the client learned about --

7    that the defendants learned about the complaint, we were

8    contacted and sought immediately to step in and try and

9    defend the case on the merits.  So I don't think that there

10   could be a finding of willfulness.

11          There's certainly no prejudice as a result of

12   opening the default.  There's no evidence or showing that

13   any additional documents are going to be lost or not

14   discoverable.  You know, we've said the opposite.  And

15   certainly we believe that their defenses to the underlying

16   alter ego claims are -- are meritorious in that the facts of

17   -- the facts in Lamp are not all the same as the facts set

18   forth in HK.

19          And again Your Honor, given that we received the

20   opposition papers late Friday night, I'm happy by the end of

21   the day today to supply the Court with --

22          THE COURT:  No.  There'll be no need for any

23   further briefing.

24          MR. GRAND:  -- with the evidence, Your Honor.

25          THE COURT:  No need for a briefing.  I know what

1      the standards are.  I know what the issues are.

2              And I would note for the record that the

3      *Bricklayers* case was a default, not a default judgment.

4              MR. GRAND:  I understand, Your Honor.

5              THE COURT:  Well, you said just the opposite.

6              MR. GRAND:  I understand.  I misstated.  I meant

7      to say the *Bailey's Express* case and not the *Bricklayers*

8      case.

9              But the fact remains that the -- the *Bricklayers*

10     case was -- there was no responsive pleading filed for nine

11     months after the defense lawyer acknowledged receiving the

12     complaint.  That's certainly not anywhere close to the delay

13     that we have in this case.

14             THE COURT:  Okay.  Anything further, Counsel?

15             MR. GRAND:  Nothing, Your Honor.  Thank you.

16             THE COURT:  Okay.  Thank you.

17             Who's going to argue for the remaining defendants,

18     Mr. Romney or Mr. Moriarty?

19             MR. ROMNEY:  I am, Your Honor --

20             THE COURT:  Okay.

21             MR. ROMNEY:  -- but it's a separate motion, Your

22     Honor.

23             THE COURT:  Well, yes, it is.  I understand.  I

24     just want to make sure I understand who's arguing.

25             MR. ROMNEY:  It will be me, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          MR. ROMNEY:  Thank you.

3          THE COURT:  Any further response, Attorney

4    Bassett?

5          MR. BASSETT:  Just very briefly, Your Honor.  May

6    I approach?

7          THE COURT:  Yes.

8          MR. BASSETT:  So again, for the record, Nick

9    Bassett from Paul Hastings on behalf of the Chapter 11

10   Trustee.  Your Honor, just a few brief points in response.

11         First, on the willfulness prong of the analysis,

12   obviously the Court had a back and forth with counsel as to

13   whether or not, you know, it matters if his clients received

14   actual notice of the complaint.

15         I would submit for the reasons that Your Honor

16   articulated it does not because their clients unquestionably

17   were served.  And as the Court correctly noted, it is their

18   obligation as corporations to have registered agents who are

19   able to accept service of process.

20         But I don't think that the analysis needs to end

21   there.  Because even if it didn't matter whether or not they

22   had actual notice, they have to remember that it is their

23   burden to come to this court under Rule 55(c) and

24   demonstrate that their default was not willful.

25         If they're going to come and argue that they did

1    not have actual notice, it is incumbent upon them to come

2    forward to the Court and to present a credible explanation

3    sufficient to carry their burden of demonstrating how

4    somehow, despite service being complete and effective, they

5    did not get actual notice and there is absolutely none of

6    that here.

7           There's no affidavit from anyone.  There's no

8    specificity even, setting aside the absence of an affidavit,

9    which I think is fatal in and of itself under the

10   circumstances of this case where there's a real question as

11   to whether there's even an individual behind this company.

12          The briefing simply says they didn't have notice.

13   There's no discussion whatsoever as to, okay, well, what are

14   the circumstances that led to no actual notice.  If service

15   was complete on the register agents, why is that actual

16   notice was not transmitted to Lamp Capital and to Infinity

17   Treasury Management?

18          Is the argument that, you know, the mail got lost

19   by the mail carrier, that somebody who was supposed to turn

20   it over to the right person at Lamp Capital threw it in the

21   trash, there's none of that.

22          And that's the only situation in which courts ever

23   show lenience in this situation is where there is some

24   credible, detailed explanation as to why they were unable to

25   respond to the complaint.  Here, there's none of that.

1    And moreover, again, in counsel's explanation in

2    the briefing we still have no idea when his clients

3    actually, sorry, when his clients and he actually became

4    aware of the complaint.

5         They obviously have actual notice now.  When did

6    that happen?  There's zero statement in the briefing that

7    explains that.  They could have had notice for months as far

8    as we know.  I mean, I guess they're alleging that notice

9    came sometime after the answer deadline, but they're not

10   saying when and they're not saying how.

11        I'd also note that it's interesting that the same

12   counsel appeared in this case as counsel for another entity

13   that the debtor, sorry, that the Trustee served with 2004

14   discovery, an entity called G.S. Security, which is an

15   entity owned by Scott Barnett, whom the Court understands

16   from other proceedings in this case to be the debtor's

17   bodyguard, and whom the Trustee has alleged is another

18   person the Trustee relies upon to nominally hold interest in

19   shell companies for the debtor of which we believe G.S.

20   Security is another.

21        And I say that, and by the way, this was I think

22   in October or November of 2023, and I say that because I'd

23   be curious to know if the person who contacted counsel was

24   the same person for both G.S. Security and for Lamp Capital?

25   I think that would be telling, because the only possible

1    relationship between those entities is the debtor.

2              There's nothing, again Your Honor.  No details.  I

3    couldn't imagine a set of facts where the burden has been so

4    -- where the movant has come so far away from meeting their

5    burden.

6              As to prejudice, Your Honor, the first thing I

7    would note is that Your Honor had said that, you know, Lamp

8    Capital, through counsel, had entered an appearance in this

9    case.

10             I will be candid, I don't recall that.  Your

11   Honor's memory is much better than mine.  And I don't doubt

12   that you're correct.

13             But even if -- even if that weren't the case, even

14   it hadn't entered an appearance through counsel, Lamp

15   Capital funded the debtor's case, as the Court noted, by

16   paying Brown Rudnick's expenses.

17             The discovery in 2004 that the Trustee served on

18   Lamp Capital was in August of 2022, over a year ago, almost

19   a year and a half ago.  The Court ordered Lamp Capital to

20   comply with that discovery in January of 2023.  It found

21   Lamp Capital in contempt of court in April 2023.  Absolutely

22   nothing has been done.

23             To the extent Lamp Capital is going to decide to

24   get counsel and appear in this case, the first thing it

25   should have done, before it even thought about filing a

1  55(c) motion or appearing in this adversary proceeding, is

2  purge itself of contempt.  It hasn't done that.  And that's

3  a prejudice that cannot be cured because that was pre-

4  complaint discovery you're supposed to get under Rule 2004.

5  It's not happened.  And I have zero confidence,

6  and I don't think the Court should have any confidence at

7  all, that if this adversary proceeds this defendant, given

8  the history of the case, would actually comply with its

9  discovery obligations.

10  Lastly, Your Honor, as to the meritorious defense

11  prong, essentially what they're arguing, as the Court noted,

12  it's conclusory denials.  What they're really arguing is

13  that we're not going to be able to prove our alter ego

14  allegations.

15  The case law on that is crystal clear, that you

16  can't have a conclusory denial and that some specific

17  evidence to support your defense to the allegations in the

18  complaint is required.

19  I will just end by citing to the *Sony* case which I

20  mentioned before.  That was a case where the

21  defendant/movant actually submitted affidavits by

22  individuals/principals denying the allegations of the

23  complaint and the Court still said that was insufficient.

24  There they had sworn affidavits saying this isn't

25  true and the Court said, sorry, all you're doing is

1   submitting an affidavit denying the allegations.  That's not

2   enough under Rule 55(c).

3           Here, the defendants haven't even done that.  They

4   haven't come close, Your Honor, and, therefore, the Rule

5   55(c) motion should be denied, and we would respectfully

6   request that the motion for a default judgment be granted.

7           That's all I have, Your Honor, unless the Court

8   has questions.

9           THE COURT:  All right.  Thank you.

10          With regard to your statement about Lamp Capital

11  appearing, you could be correct there wasn't a formal

12  appearance, but there was -- but, there might have been.  I

13  might be correct.  You know.  There's 3,000 docket entries.

14          MR. BASSETT:  I just wanted to point out that I

15  didn't recall.

16          THE COURT:  And in addition to that, however,

17  whether they appeared through counsel or not, they -- it was

18  represented in the DIP financing motion that was filed back

19  in April of 2022 that Lamp Capital was the funding source

20  for the -- may not have been the funding source for the 8.8

21  million, but was definitely the funding source for the

22  payment of the million dollar retainer to Brown Rudnick.

23          Which had to be disclosed because the United

24  States Trustee's Office and others required the Court, and

25  under the rules, the debtor's counsel, even if the debtor

1    wasn't being paid by the debtor individually, the disclosure

2    of compensation that's required under the rules, the Federal

3    Rules of Civil Procedure -- Federal Rules of Bankruptcy

4    Procedure, excuse me, 2016, and our local rules in the

5    United States Bankruptcy Court for the District of

6    Connecticut requires such disclosure.

7            And so if we go back to the beginning of the case,

8    you know, in the very early days of the case, you would find

9    in the disclosure of compensation for counsel that the --

10   when I say counsel, I'm talking about Brown Rudnick -- that

11   the -- that the funds were, according to Brown Rudnick,

12   provided by Lamp Capital.

13           And so I'm trying to find it as we talk.

14           But Attorney Claiborn can remember that because

15   the United States Trustee's Office was one of the parties

16   that requested that that disclosure be made.

17           Now, this could be it.  Yes.  ECF No. 54 filed on

18   March 1st, 2022 in the main Chapter 11 case of Ho Wan Kwok,

19   case number 22-50073.

20           So less than two weeks after the case was filed,

21   the firm was retained, agreed to a retainer of $1 million.

22   The retainer was paid by wire in two equal installments of

23   500,000.  The first on February 14, 2022, which was the day

24   before the filing, and the second early in the day on

25   February 15th, 2022, prior to the commencement of this case.

1   And the source of the retainer was Lamp Capital, LLC.

2          Lamp Capital, LLC made a million dollar loan to

3   Mr. Kwok.  And Mr. Kwok directed Lamp Capital, LLC to remit

4   the proceeds directly to the firm.  A signed engagement

5   letter between the firm and Mr. Kwok is attached as Exhibit

6   A.

7          The Exhibit A letter from Brown Rudnick dated

8   February 14, 2022, the day before the filing, talks about

9   you shall deliver to the firm a retainer of $1 million.  You

10  being defined as Mr. Kwok, actually Guo Wengui, also known

11  as Miles Guo.  That is the document attached to a pleading

12  that's signed by Guo Wengui, a/k/a Miles Guo, on February

13  15, 2022.

14         And that was filed, as I said, even in the first

15  -- the case was filed on February 15, this was March 1st,

16  and it was already up to ECF No. 54, and that's the -- from

17  very beginning of the case Lamp Capital was involved.

18         In fact, prior to the case, according to the

19  letter from the debtor's counsel, the first retainer payment

20  was made the day before the case.  And then -- and that had

21  -- and that was arranged before the filing of the case.

22         So whether I could have been mistaken, and I very

23  well could have been that there was actually notice of

24  appearance, but I still thought there was.  And maybe I'm

25  wrong.

Ho Wan Kwok - January 23, 2024                                    68

1          But regardless of that, within two weeks of the

2    commencement of the case, Lamp Capital was disclosed as the

3    funding source to Mr. Kwok for the payment of a million

4    dollars of attorneys fee retainer to his Chapter 11 counsel

5    in this court from them.

6          So if I misspoke about the appearance, then I want

7    to correct the record.

8          But I also note for the record that that document

9    that I just referred to, ECF 55, filed in the main case on

10   March 1st, 2022, is an admission that Lamp Capital funded

11   the debtor's attorneys fees for this Chapter 11 case in the

12   amount -- the retainer in the amount of a million dollars.

13         Okay?

14         MR. BASSETT:  Thank you, Your Honor.

15         THE COURT:  So I just wanted to clarify that for

16   the record.

17         MR. BASSETT:  Thank you very much, Your Honor.

18         THE COURT:  Thank you.

19         Any further response, Counsel?

20         MR. GRAND:  Just to address, briefly, it's -- the

21   initial point that Trustee's counsel made was that it

22   couldn't figure out how the defendants could not have

23   received notice when service was effected on the registered

24   agent.

25         Again, the registered agent literally took that

1    complaint that it received it and sent it back to Trustee's

2    counsel and said we don't know where -- the defendant is

3    inactive and we have no forwarding information.

4           So we're not contesting that service was properly

5    effected or was effected on the registered agent, but when

6    Trustee's counsel says it makes no sense that the defendants

7    can argue they didn't receive it, well, the registered agent

8    is telling Trustee's counsel that they didn't receive it

9    because they didn't sent it to them.  So there's just --

10           THE COURT:  Then how did you become aware of it?

11   How did you become aware of the complaint then?  How did

12   Lamp Capital ever become aware then?

13           MR. GRAND:  My understanding is that --

14           THE COURT:  Or Infinity.  How did they ever become

15   aware?

16           MR. GRAND:  -- Lamp Capital became aware of it

17   through the grapevine of other --

18           THE COURT:  Other matters in these cases?

19           MR. GRAND:  -- other matters in these cases, not

20   through directly receiving it.

21           THE COURT:  Why would they be in the grapevine of

22   other matters in these cases?

23           MR. GRAND:  You mentioned that -- there's not a

24   dispute that Infinity --

25           THE COURT:  Well, Brown Rudnick's been gone since

1    July of 2022.

2              MR. GRAND:  Right.

3              THE COURT:  Right.

4              MR. GRAND:  There's not a dispute that Infinity is

5    owned by -- by the debtor's son and that -- and that

6    Infinity is the sole member of Lamp.  Those allegations in

7    the complaint, we understand to be true.

8              And as Your Honor mentioned, the debtor's son, and

9    as the Trustee mentioned in the papers, has been in their

10   other, I guess other shell companies that he's been

11   affiliated with.  There are other ways that, you know, I

12   guess some information has been transmitted to him.  I'm not

13   privy to it, nor do I think my colleagues are, but at some

14   point he was made aware of this.

15             And my understanding is that he wasn't made aware

16   of it and didn't see it --

17             THE COURT:  Who is he?

18             MR. GRAND:  The debtor's son, who is the --

19             THE COURT:  So is that who retained you, the

20   debtor's son?

21             MR. GRAND:  I believe so, yes.

22             THE COURT:  Okay.

23             MR. GRAND:  I mean, on behalf of the entities.

24   But that's my understanding.

25             THE COURT:  Okay.

1        MR. GRAND:  So it was my understanding that at

2    some point through -- he learned about it or he was told

3    about it, but that was after the time to respond to the

4    complaint had already lapsed.  And when he was -- when he

5    learned about it --

6        THE COURT:  But there's no facts in the record

7    supporting anything you're saying.  There's no affidavit or

8    anything.  I mean, you're telling me what you believe to be

9    true, but there's no facts to support that.

10       MR. GRAND:  It's the representation of counsel

11   based on --

12       THE COURT:  I understand.

13       MR. GRAND:  -- based on those communications.

14   Yeah.  But there's no requirement -- there's no requirement

15   under the law that an affidavit be supplied.  I mean --

16       THE COURT:  I didn't say there was.

17       MR. GRAND:  -- I just want that to be clear.

18       THE COURT:  I just said you're asking me to find

19   facts that aren't in the record.  That you're asking me to

20   find facts that are not in the record.

21       You're saying we didn't -- we learned about it

22   sometime through the grapevine, and he heard it through

23   different places, and he retained us on behalf of the

24   entities after the response date passed.

25       MR. GRAND:  I'm not --

1        THE COURT:  That's a lot of facts that don't have

2   any support in the record.

3        MR. GRAND:  But I'm not suggesting that Your Honor

4   needs to necessarily find those facts to be true.

5        The issue is when there's a dispute over when or

6   whether notice of a complaint was issued -- was received --

7        THE COURT:  Well, that's where you're -- that's

8   where we, you and I, that's where I asked you the question

9   where is the case that says you have to have actual notice?

10  The two cases you pointed me to don't say that.

11       MR. GRAND:  And as I -- as I --

12       THE COURT:  And as I said, I don't --

13       MR. GRAND:  -- I can supply those cases --

14       THE COURT:  That doesn't make any sense.

15       MR. GRAND:  -- this afternoon.

16       THE COURT:  That doesn't make any sense to me why

17  you would have to have actual notice, because then there

18  would be no reason for Rule 55.

19       MR. GRAND:  But Rule -- but it's a two-step

20  process.  In other words --

21       THE COURT:  I understand it's a two-step process.

22       MR. GRAND:  -- you're not getting the default

23  judgment immediately.  You're getting --

24       THE COURT:  I understand it's a two-step process.

25       But if you had notice before the response date and

1    you chose, your client chose not to respond, then that's a

2    willful act.

3              MR. GRAND:  I would agree, but that's not the

4    facts here.  That's not what happened.

5              THE COURT:  Well, how do we know that's not the

6    facts.  You don't have any facts to the contrary.

7              MR. GRAND:  The facts to the contrary are that --

8    are representations of counsel based on those

9    communications.

10             THE COURT:  No.  Based upon your assertion that

11   there has to be actual knowledge and that service isn't

12   enough.  That's your assertion.  That's your argument.  Your

13   argument is that there had to be actual knowledge of the

14   complaint.

15             And I would like to know where in the Federal

16   Rules of Civil Procedure it says that, because that would be

17   new to me.

18             MR. GRAND:  As I said, Your Honor, there are --

19   there are multiple cases in this district, in the Second

20   Circuit, that --

21             THE COURT:  That say actual notice, you have to

22   have actual notice.

23             MR. GRAND:  Yes.  That hold that where there's a

24   dispute as to whether the defendants actually received

25   notice of a complaint --

1         THE COURT:  No, no, no, no, no.

2         MR. GRAND:  -- even where service is alleged to

3    have been properly effected --

4         THE COURT:  Okay.  All right.

5         MR. GRAND:  -- that's sufficient.

6         THE COURT:  I'll read your cases.  I don't think

7    that that's what any of them say.

8         MR. GRAND:  As I said, I can -- if --

9         THE COURT:  I don't want any further briefing.

10   The time to brief has already passed.

11        MR. GRAND:  Okay.  Thank you, Your Honor.

12        MR. BASSETT:  Your Honor, very quickly, just two

13   seconds, if I may?

14        I just wanted to reiterate even if actual notice

15   were a requirement, it is still the movant's burden to show

16   that they did not receive actual notice.

17        Given that he has conceded, as he must, that Lamp

18   Capital is connected to the grapevine of this case, which

19   they're, in fact, deeply imbedded in, cannot demonstrate a

20   lack of actual notice because it doesn't necessarily mean

21   actual notice by getting it from a registered agent.

22        They could have actual notice by checking the

23   docket, by the son talking to other people involved in the

24   case.  There are a million different ways when you have an

25   entity that has connected as Lamp Capital to this case were

1    you could have actual notice.  But under those

2    circumstances, to satisfy your burden, you have to do a lot

3    more than what was done here.

4            The second thing I would just like to point out is

5    that I don't believe there's been any suggestion -- counsel

6    keeps talking about how Infinity Treasury Management's

7    registered agent said we don't know where to find Infinity

8    Treasury Management.  A, that's irrelevant to service and

9    also irrelevant to actual notice under the circumstances.

10   But B, I don't think there's been any allegation that Lamp

11   Capital's registered agent didn't find Lamp Capital.  And

12   Lamp Capital is really the entity that we're all talking

13   about here primarily.

14           So there's simply no basis to find that the

15   default was anything other than willful, Your Honor.  Thank

16   you.

17           THE COURT:  Okay.  Thank you.

18           I'm going to take the motion for default judgment

19   under advisement.

20           MR. ROMNEY:  Your Honor, if I may, Aaron Romney,

21   please?

22           THE COURT:  Sure.  What are you asking, and then

23   I'll tell you if you may.

24           MR. ROMNEY:  Based on statements that were just

25   made, obviously in my presence, I've been sitting here the

1   whole time, I do feel compelled to make I wouldn't use the

2   word disclosures to the Court, but to provide certain facts

3   for the record since I do have knowledge of certain things

4   that were -- that were just discussed.  And I'm happy to put

5   them on the record.  I'm happy not to.

6         But what I don't want to be accused of ever is

7   having sat in this room and had it been suggested that I

8   should have spoken up because, as I've said, I have personal

9   knowledge of some of the events that were just the subject

10  of questioning over the last hour.

11        THE COURT:  Well, unless you're going to take the

12  stand, I don't really see what the point is, right?  I mean

13  -- right?

14        MR. ROMNEY:  Your Honor, what I'm saying is I'm

15  making a disclosure to the Court that I have personal

16  knowledge of certain facts that were just discussed.  And so

17  that if anyone were to ever ask about my silence, I've made

18  that disclosure.  I'm happy to say nothing or answer any of

19  the Court's questions, but that's all.

20        THE COURT:  I don't have any questions.

21        MR. ROMNEY:  Thank you, Your Honor.

22        THE COURT:  Thank you.

23        All right.  With regard to the motion for default

24  judgment, as I just noted, I will take that under

25  advisement.

1            MR. MILLER:  Your Honor, Robert Miller.  If I

2      could be excused, I have another engagement, if you're

3      finished with Lamp Capital.

4            THE COURT:  Yes.  Thank you.

5            MR. MILLER:  I just wanted to let Your Honor know.

6      Thank you.

7            THE COURT:  All right.  Then the motion to set

8      aside default has been filed by Attorney Romney on behalf of

9      Leading Shine New York, Limited, Defendant, is the next

10      matter on the calendar.

11            Attorney Romney, you indicated you'd be making the

12      argument?

13            MR. ROMNEY:  I will be, Your Honor.

14            THE COURT:  All right.  Go right ahead, please.

15            MR. ROMNEY:  Aaron Romney, Zeisler & Zeisler, on

16      behalf of Leading Shine, Limited.  May I deliver argument

17      from counsel's table, Your Honor?

18            THE COURT:  Certainly.

19            MR. ROMNEY:  Your Honor, as been discussed at

20      length this morning, the standard on a Rule 55(c) motion is

21      -- the three prongs are willfulness, a meritorious defense,

22      and prejudice.

23            Beginning with willfulness, the standard in this

24      circuit, as well as this district, is something more than

25      negligence and deliberate conduct.  Both of those cases are

1    cited on page 4 of Leading Shine's motion to set aside.

2            Here, there was no willful conduct, no motive for

3    willful conduct, to avoid participating in this adversary

4    proceeding on behalf of Leading Shine.

5            What there was, in light of the Trustee's

6    allegations, as well as the history of this case, was a need

7    to determine that the individual who believed correctly that

8    she had the authority to defend on behalf or direct a

9    defense on behalf of Leading Shine, in fact, had that

10   authority.

11           In this case, there has been an instance, which is

12   discussed as nauseam in my papers as well as has been

13   discussed ad nauseam in this courtroom, where at the

14   direction of the same principal of this company, I filed an

15   appearance.

16           I was then informed by the general counsel of

17   Hodgson Russ that my client did not have that authority.  I

18   relied on a verbal representation at that time.  And once I

19   was informed by the general counsel of Hodgson Russ, I took

20   what I believed to be a required action on my part to

21   disclose what had happened to opposing counsel and to the

22   Court.

23           I was not -- I was not about, on my watch, to

24   allow a rerun of that which would have served nobody's

25   interest, not the Court's, not the Trustee's, not mine, not

1    Leading Shine's, not Ms. Guo's.

2              We received, meaning Ms. Guo received, and her

3    counsel, an unredacted version --

4              THE COURT:  Well, you're her counsel?

5              MR. ROMNEY:  Correct.

6              THE COURT:  Okay.

7              MR. ROMNEY:  To be clear, yes, I was one of them,

8    but Mr. --

9              THE COURT:  Well, you still are, right?

10             MR. ROMNEY:  I am.

11             THE COURT:  Okay.  Well, you just said Ms. Guo and

12   her counsel as if it was somebody that's not you.

13             MR. ROMNEY:  No.  No.  I apologize.  I meant to

14   indicate that it was not just me.  It was me, it was Mr.

15   Moriarty, it was Ms. Wernick, it was Mr. Vartan, I believe

16   are the ones that received those documents.  And I believe

17   the date was November 27th.

18             That was the first time that we had an unredacted

19   version of the complaint as well as the sealed exhibits that

20   were the first piece of any sort of evidence that actually

21   tied Ms. Guo to Leading Shine, although it was conflicting

22   because there was evidence that tied another individual to

23   Leading Shine.

24             And in fact, the public version of the complaint

25   identifies that the Trustee, with all of his resources and

1    all -- the scope of his investigation, does not know who the

2    owner of Leading Shine was.  And those particular

3    circumstances and allegations required a particularly -- a

4    particular level of due diligence particularly in light of

5    the history that happened with the Hudson Diamond entities.

6            At that point, I directed my staff, my team at --

7    within my firm, to undertake a review of the records that

8    were at our disposal to indicate if we had anything one way

9    or another to actually verify who was in control of Leading

10   Shine.

11           We did not -- we were unable to locate anything

12   despite the voluminous number of documents that we have

13   received, both from the Trustee in this case, some from

14   third parties, which have been produced by us to the

15   Trustee.

16           At that point, I undertook to personally speak

17   with several individuals who I knew to have represented the

18   debtor, various members of the debtor's family, and various

19   entities that are owned -- were owned by various members of

20   the debtor's family.  Not one of those individuals had any

21   documentation that they could provide to me one way or

22   another who controlled this entity.

23           Again, until I had that documentation, I was not

24   about to file an appearance.  And I know of no other

25   attorney who was willing to under the circumstances of the

1    history of this file.

2              I reached out to Ms. Guo's personal accountant

3    directly.  I received information from her that was

4    suggestive that Ms. Guo was the control person of Leading

5    Shine, but it was not definitive.

6              However, I then learned the name of the law firm

7    that formed Leading Shine.  I don't recall the year.  I

8    believe it was either 2018 or 2019.  I contacted that firm.

9    I was told that the attorney who represented Leading Shine

10   was no longer with the firm.  I contacted the attorney at

11   his successor firm.

12             We're now getting ourselves into mid, late

13   December and the holidays.  And obviously the world is not

14   operating at the same pace as then, although certainly I was

15   doing my best to operate at that pace.

16             Upon speaking with the counsel who formed Leading

17   Shine, he informed me he no longer had access to his

18   records, but verified to me that Ms. Guo was his natural

19   person affiliated with Leading Shine, Ltd.  He referred me

20   back to his prior firm that had the file.  The file had to

21   be retrieved from storage.  I had several discussions with

22   his former associate.

23             And at that point, I satisfied myself that Ms. Guo

24   did have authority to direct me and my firm, and Mr. Vartan

25   and his firm, and Ms. Wernick, and Mr. Moriarty, to appear

1    on behalf of Leading Shine, which we did, and we promptly,

2    the second day of the year, the first business day, filed a

3    motion to set aside default.

4            There was no intentional desire to evade.  In

5    fact, there was the exact opposite of a desire to evade, but

6    there was an equal desire to ensure that nothing happened

7    that could cause either Ms. Guo, myself, my firm, or anybody

8    else to have done something that lacked corporate authority

9    that would have resulted in a waste of the Trustee's

10   resources, and this court's resources, and most importantly

11   this court's time.

12           As is evidenced by Ms. Guo's participation in this

13   litigation, which was timely, as well as Hudson Diamond

14   Holdings and Hudson Diamond New York, which was timely,

15   there was no desire to evade the process in this litigation.

16           There was the opposite.  There was a desire to

17   appear and assert defenses and that is what they're going to

18   do, and that's what they have done to date.  And the

19   defenses are meritorious.

20           The standards in a -- in alter ego action are

21   quite different from the standards in certain other actions

22   that are the subject of a number of the decisions that have

23   been cited by both parties.  This is not an account-stated.

24   This is not a failure to fund an ERISA account where the

25   money is simply gone.  This is a very fact-intensive case

1    that has implications that are very broad reaching,

2    particularly in a case like this.

3         The Trustee's allegations, as they concern Leading

4    Shine, are threadbare.  The Trustee hasn't alleged who --

5    even contends is the actual owner of Leading Shine.

6         The Trustee identifies a number of allegations,

7    excuse me, I misspoke, a number of transfers that were made

8    to or from Leading Shine.  But the law is clear that

9    transfers alone, there's a distinction between fraudulent

10   transfers, even if they're fraudulent, and we're certainly

11   not conceding that they are, but transfers, even if they are

12   fraudulent, do not establish alter ego.

13        The law is equally clear that common officers and

14   agents do not establish alter ego successor liability.

15        There's simply nothing in the complaints that even

16   if true would establish that Leading Shine is the alter ego

17   of anyone other than its legal owner Ms. Guo.  And actually,

18   as stated in the complaint, with the allegations taken as

19   true, that there isn't even that because the complaint

20   doesn't even allege who the legal owner of Leading Shine is.

21        With respect to the merits, if the Trustee

22   believes that there is no dispute that Leading Shine is the

23   alter ego of the debtor, then it should be very easy for the

24   Trustee to immediately file a summary judgment.  There won't

25   be a distraction.  There won't be an expense.  But the

1    Trustee has not done that to date.  And until he establishes

2    his case, Leading Shine should be able to put forth a

3    defense.

4            Moving on to prejudice, clearly there is not even

5    an allegation that evidence has been lost or destroyed in

6    the several weeks since the initial response date.  And even

7    less time since the extended response date that the Trustee

8    was courteous enough to extend to Ms. Guo in light of the

9    fact that we initially received a redacted complaint that

10   would have been near impossible to respond to.  Only several

11   weeks has passed.  No discovery has been served or

12   transpired with anyone.  And there's no basis to believe

13   that any evidence has been lost.

14           Second, Rule 54(b) precludes the entry of default

15   judgments that could be inconsistent with the allegations

16   against appearing defendants who are prepared to defend on

17   the merits.

18           Ms. Guo has timely appeared and is defending on

19   the merits.

20           Clearly a finding, a default finding, that --

21   against Leading Shine would be inconsistent with a judgment

22   that Ms. Guo is the owner of Leading Shine, Ltd.

23           Ms. Guo cannot be defaulted because she timely

24   appeared.  And under that basis alone, there's no -- a

25   default judgment cannot enter against Leading Shine at this

1  time and, therefore, there would be no prejudice from

2  allowing it to fully and -- fully participate in its

3  defense.

4          With that, unless the Court has any questions, I

5  would rest on my -- on my initial brief as well as my reply.

6          THE COURT:  I do not have any questions at this

7  time.  Thank you.

8          MR. ROMNEY:  Thank you, Your Honor.

9          THE COURT:  Mr. Bassett?

10          MR. BASSETT:  Your Honor, may I approach the

11  podium?

12          THE COURT:  Sure.

13          MR. BASSETT:  Again Your Honor, Nick Bassett from

14  Paul Hastings on behalf of the Chapter 11 Trustee.

15          Attorney Romney started his argument by walking

16  through a lengthy recitation of all the sort of detailed and

17  convoluted steps he had to take to determine, over the

18  course of more than two months, if his client, Mei Guo, is

19  actually the nominal owner of Leading Shine.

20          That story, Your Honor, is irrelevant, and beside

21  the point, for reasons I'll explain as to the willfulness

22  inquiry.  And it absolutely, 100 percent, supports beyond a

23  reasonable doubt the Trustee's position as to whether there

24  could possibly be meritorious defenses in this adversary

25  proceeding.

1      As to the willfulness inquiry, Your Honor, I'm

2   having trouble even understanding the logic behind the

3   argument because I have heard nothing in the papers or in

4   argument today to explain why anyone would ever decide,

5   under these circumstances, to just allow -- again, there's

6   no argument or suggestion that Mei Guo and Leading Shine did

7   not have notice of this complaint and the answer deadline.

8      And this is critical for the case law.

9      There was a deliberate decision under those

10   circumstances to simply ignore the answer deadline.  Whether

11   or not Attorney Romney and his client couldn't figure out

12   somehow if she owned this legal entity or not for two

13   months, there has been zero explanation, and again, there's

14   no affidavit, nothing from Mei Guo herself, zero explanation

15   for why they decided to just remain silent and do nothing.

16      Now, Attorney Romney says, well, we got into this

17   big mess in the past with the Hudson Diamond entities, and I

18   couldn't appear and purport to represent an entity unless I

19   had authority, Your Honor, there are a million things that

20   could have been done.

21      How about starting with simple transparency and

22   openness and communication?  How about calling the Trustee

23   and saying you know what, we had this issue before, we're

24   having an issue again, this entity does not want to default

25   on the complaint, but I'm trying to figure out, as

1    implausible as it might be, that Ms. Guo -- I'm trying to

2    figure out if she owns this company.  There was none of

3    that.  Not to the Trustee's counsel.

4            And beyond that, I feel for Attorney Romney in

5    some respects here, but this is not his problem.

6            It is Leading Shine's and Mei Guo's problem.  If

7    she and Leading Shine were on notice of this complaint and

8    couldn't figure out if they owned the entity or not, that is

9    on them.  She could have reached out to the Trustee.  She

10   could have sent the letter to the Court.  Somebody could

11   have done something prior to the answer deadline rather than

12   simply sit there and let it pass by.

13           And again, with Leading Shine, like the other

14   defendants, they're no strangers to this case.  The Trustee

15   sought and obtained 2004 discovery from Leading Shine in

16   April of 2023 I believe it was and they defaulted on the

17   subpoena.

18           Now, the immediate question that comes to my mind

19   is, I mean, wouldn't that have been the time for Mei Guo and

20   Attorney Romney to start conducting their lengthy journey to

21   figure out if she owned the company so they could comply

22   with 2004 discovery?  No.  They sat around and did nothing.

23           And then somehow, for some reason, somebody on

24   that, you know, abyss side of the Kwok universe said you

25   know what, we should probably do something about this

1    Leading Shine complaint.  And that's when this exercise

2    started.

3          But it doesn't change the fact that the default

4    was clearly willful.  They had knowledge of the complaint.

5    They sat there.  They did nothing.

6          Mr. Romney said there was, quote, "No intentional

7    desire to evade," end quote.  That is absolutely not the

8    standard.  The standard is whether the default was willful

9    and whether they've come forward with some explanation to

10   demonstrate to the Court as to why their failure to respond

11   should be excused.  They have utterly failed to do that.

12         As to the meritorious defense argument, Your

13   Honor, again, no affidavit, no facts, just legal arguments.

14         And why is there no affidavit and why are there no

15   facts, because his client until a week ago or so didn't even

16   know that she owned this entity.  Of course she is going to

17   be entirely incapable of ever putting forth a defense on the

18   merits to show that Leading Shine is an alter ego of the

19   debtor if she didn't even know and had to take two months to

20   figure out if she nominally owned it.

21         There is next to zero possibility of her ever

22   setting forth a meritorious defense, and that's exactly why

23   there's no affidavit, there's no facts, there's nothing

24   talking about, hey, Leading Shine is not the debtor's alter

25   ego because it does X, Y and Z.  It actually operates in

1    this industry, but does these types of things on a regular

2    basis, has these employees, has these officers and

3    directors, there's none of that, because there's no source

4    of that information here.

5            Mr. Romney, again, essentially raises a 12(b)(6)

6    motion to dismiss argument saying -- he raises in pari

7    delicto and other arguments that have already been directed,

8    and then today he spent most of his time alleging that the

9    allegations of the complaint are insufficient to demonstrate

10   that Leading Shine is, in fact, the debtor's alter ego.

11           First of all, as I noted before, if that's the

12   defense that they're going to raise, that there's no

13   evidence and it's just 12(b)(6) type arguments, that's

14   exactly what is appropriate for the Court to consider on a

15   motion to vacate a default under 55(c).

16           And those arguments that he has raised all fail

17   because the complaint more than sufficiently meets the

18   requirements to allege alter ego under Delaware law.

19           Mr. Romney took issue with the fact that the

20   complaint doesn't specifically allege who exactly is the

21   nominal owner of the entity.

22           It's mystifying how that can be turned around and

23   put on the Trustee given that Mei Guo, the defendant, is the

24   purported owner.

25           But in any event, the reason why the Trustee said

1     what he said in the complaint is because in discovery the

2     Trustee has found account opening statements, which are

3     cited to in the complaint, where both Yvette Wang, the

4     debtor's co-conspirator in the criminal fraud case, and Mei

5     Guo, have both opened accounts on behalf of Leading Shine.

6     So I would think that supports the Trustee's allegations.

7            The Trustee also alleges in the complaint that an

8     individual the Court knows as the family chef has taken

9     actions on behalf of Leading Shine.

10           Leading Shine has the same address of the debtor's

11    other shell companies, including Golden Spring, which is now

12    the debtor's alter -- which is now owned by the Trustee as

13    the debtor's alter ego, as well as HK (USA), for which the

14    same finding has been made.

15           Again, Leading Shine, like Lamp Capital, is a

16    different kind of shell company used by the debtor from HK

17    (USA).  It is of the funding kind.  It is another entity

18    that the debtor used as his personal piggy bank to move

19    around funds to and from his companies and to pay for his

20    expenses and those of his family.

21           There's allegations in the complaint about

22    transfers from Gold Spring, Saraca, Hudson Diamond, ACA

23    Capital, transfers to other shell companies, Golden Spring,

24    Greenwich Land, Gypsy Mei, a company owned by the debtor's

25    daughter.

1          The debtor also, as alleged in the complaint, used

2     Leading Shine to pay his personal expenses, including his

3     personal counsel in the United Kingdom in the Ace Decade

4     litigation, including other counsel in the U.K., Berkeley

5     Rowe, which is the same counsel who represented the Himalaya

6     entity, purportedly owned by William Je, and the $37 million

7     loan made to HK (USA).

8          There's allegations in the complaint that the

9     debtor transferred -- that Leading Shine transferred funds

10    to an aircraft design company on behalf of the debtor.

11         And of course there's also the mention in the

12    complaint that the debtor, when asked about Leading Shine,

13    took the Fifth on all relevant questions.

14         Your Honor, there is an abundance of evidence in

15    the complaint to support, at this stage, a 55(c) denial and

16    an ultimate finding of default judgment in favor of the

17    Trustee.

18         The Trustee does not, as Attorney Romney insists,

19    need to prove its allegations right now.

20         The posture of this case is they have defaulted,

21    the Trustee has alleged what he has alleged in the

22    complaint, and it's their burden to come forward with

23    evidence on a meritorious defense and they've failed to do

24    that.

25         Lastly Your Honor, on prejudice, I would just go

1    back to some of the comments I made at the outset, and which

2    we've sort of discussed ad nauseam here today, this is not

3    an entity or a purported owner of such entity who are

4    strangers to this case.

5            Mei Guo has been a participant in this case from

6    the beginning, has her own history of issues complying with

7    discovery requests.

8            Lamp, Leading Shine, rather, was served with a

9    subpoena back in April.  Failed to comply with it.  Nobody

10   bothered to take any steps at that time to determine who

11   owned it and whether they were going to respond.

12           Your Honor, for this court to maintain order and

13   the rule of law and to make sure that the Trustee can

14   continue his investigations unobstructed, it cannot be that

15   parties can pick and choose when they participate in these

16   cases.

17           And therefore, allowing parties such as Lamp

18   Capital, such as Leading Shine, to decide belatedly that

19   they want to participate and be able to do so is, in fact,

20   prejudicial to the Trustee and should not be permitted.

21           But again, I will reiterate, the prejudice

22   element, as very clear under Second Circuit law, does not

23   need to be satisfied; whereas, here, the defendant has

24   fallen extraordinarily short of demonstrating a meritorious

25   defense.

1          That's all I had, Your Honor, unless the Court has

2    questions.

3          THE COURT:  I do not have any questions at the

4    moment.  Thank you.

5          MR. BASSETT:  Thank you, Your Honor.

6          THE COURT:  Any response, Attorney Romney?

7          MR. ROMNEY:  Yes, briefly, Your Honor.

8          Your Honor, Mr. Bassett said a moment ago that

9    there was a deliberate decision to ignore.

10         There is absolutely no evidence of that or

11   plausible basis to believe that in light of the

12   representations that I have made, as well as Ms. Guo's

13   active participation individually, in a timely manner.

14         There was a deliberate decision to ensure that Ms. Guo

15   had the authority to direct Leading Shine to avoid another

16   circus, for lack of a better word, that occupied

17   considerable amounts of time and resources.

18         Mr. Bassett says someone could have reached out to

19   the Trustee.

20         That is 100 percent wrong according or based upon

21   the events that have happened in this case.

22         With the Hudson Diamond issue, Attorney Vartan

23   reached out to the Trustee.  He did not appear.  And when

24   there were questions of authority, he was the subject of an

25   order to show to cause.

1          Everyone, Ms. Guo, her counsel, including myself,

2     are viewing this case and how we should conduct ourselves

3     with an eye towards how this -- how we have gotten here

4     today, and trying to avoid circumstances where our clients

5     and our arts are put in a position where it might appear or

6     has appeared that we're trying to be evasive or, you know,

7     impede the process.

8          What we're trying to do is avoid distractions,

9     make sure that we have our facts straight, before we take

10    action.

11         The same applies to Ms. guo personally.

12         The issue was not whether I or my firm or Mr.

13    Vartan or his firm were willing to take direction from Ms.

14    Guo.  The issue that both Ms. Guo had, as well as what we

15    had, is that given the allegations in the complaint, given

16    the lack of documentation at either of our fingertips at the

17    time, we determined, given the options of taking action and

18    then having allegations made, accusations made, that we

19    shouldn't have taken that accusation -- or the action, and

20    that we somehow did so for some nefarious purpose, that it

21    made more sense, would be less distraction, less

22    distracting, and less wasteful, to get our ducks in a row,

23    and do it the right way, and appear now, some three weeks

24    later.

25         The Trustee has not identified any case, because

1    there is none, where a Rule 55(c) motion has been denied

2    within weeks of the answer date, and a coherent,

3    comprehensive, explanation as to why it took a little bit

4    more time has been placed on the record.  I am unaware of

5    any, and I don't believe there are any.

6             Everything that the Trustee has said, Mr. Bassett

7    as his counsel, with regard to the merits, exclusive of what

8    I began by acknowledging, that there are some alleged

9    transfers and that there are alleged common agents of

10   Leading Shine and third-party entities, everything else is

11   pure speculation and conjecture.  Hypothetical questions,

12   why don't we have this, why don't we have that.

13            The complaint was filed on October 30th.  It was

14   heavily redacted.

15            There are many moving parts in this case.  I think

16   Your Honor said something like we're up to 3,000 docket

17   entries.  We're all human beings.  We're doing our best.

18   But we can't focus on everything at one time.  This is not

19   the only case on this court's docket.  It's not the only

20   case on my firm's docket.

21            We have the right, Leading Shine has the right,

22   Ms. Guo has the right, to present a defense.  That's what

23   she wants to do.  And at this point, articulation, our

24   defense is, as well as the weaknesses in the Trustee's own

25   allegations and the failure to satisfy the elements that is

1    his burden to satisfy, is sufficient for a Rule 55(c)

2    motion.

3            And Judge Tancredi wrote a very articulate

4    decision stating exactly just that in the *Walnut Hill* case

5    that's cited on page 6 of our reply.

6            With that, I have nothing further.  Thank you,

7    Your Honor, for your time.

8            THE COURT:  Okay.  Thank you.

9            Anything further, Mr. Bassett?

10           MR. BASSETT:  Yeah.  Just very briefly, Your

11   Honor.  Your Honor, again for the record, Nick Bassett from

12   Paul Hastings on behalf of the Chapter 11 Trustee.

13           I don't think much more needs to be said on the

14   willfulness element.  The fact of the matter is there was --

15   there no questionably was service of the complaint, an

16   actual notice, and it was not responded to knowingly.

17   There's no allegation at all that there was some mistake or

18   other extraneous factor that presented -- that prevented any

19   kind of response.

20           Again, it's not up to Attorney Romney.  Mei Guo,

21   and Leading Shine, they're the party.  They're the ones who

22   had the obligation to meet their deadline.  They decided to

23   take no action, to sit there and do nothing.  So the

24   willfulness -- and again, it's their burden on willfulness.

25   They have not satisfied it.

1        As to meritorious, the meritorious defense prong,

2   I won't rehash what's been said before other than to note

3   again there is zero evidence in the record to show that

4   there's a meritorious defense that could be offered.  That's

5   not surprising, because the only actual party involved here

6   is Mei Guo, who knows nothing about this entity.

7        And the last point I would make on that, Your

8   Honor, is that I think it's a little convenient for Mr.

9   Romney to rest his entire argument on the meritorious

10  defense prong on the idea, incorrect as it may be, that the

11  Trustee has not included sufficient allegations of the alter

12  ego relationship in his complaint, when his client, the

13  party here, ducked the Trustee's 2004 discovery that he was

14  entitled to.

15       The entire purpose of 2004 discovery made

16  available to a trustee is to allow the Trustee to uncover

17  the facts necessary to bring potential causes of action to

18  acquire and recover assets for the estate.

19       They cannot have it both ways.  It's entirely

20  improper and indicative of the gamesmanship that has been

21  occurring.

22       I have nothing further, Your Honor.  Thank you

23  very much.

24       THE COURT:  Thank you.

25       All right.  I do not have any further questions

1    with regard to the motion to set aside default on behalf of

2    Leading Shine, Inc., ECF 30, so I will take that matter

3    under advisement.

4            And then we'll move to the final matter on today's

5    calendar, which is the motion to set aside default filed on

6    behalf --

7            Well, I mean, you've argued it in some respects,

8    Attorney Grand, but I suppose you can argue again.

9            We were arguing the motion for default judgment,

10   but you also argued the motion to set aside default,

11   although I'm happy to let you argue again if you'd like to.

12           MR. GRAND:  Well, Your Honor, it wasn't clear that

13   our -- that Lamp Capital and Infinity Treasury Management

14   motions to set aside the default was --

15           THE COURT:  Yeah.

16           MR. GRAND:  -- going to be --

17           THE COURT:  So then go ahead and argue.

18           MR. GRAND:  -- heard today, so.

19           THE COURT:  What do you mean it wasn't clear.

20   It's on the calendar.

21           MR. GRAND:  I did not see it on the calendar.

22           THE COURT:  It's on the calendar.

23           MR. GRAND:  I only saw Infinity's, I'm sorry, the

24   Trustee's motion for default judgment and Leading Shine's

25   motion to set aside a default.

1    THE COURT:  It's on the calendar.

2    MR. GRAND:  That's what I'm saying.  When I looked

3    at Your Honor's calendar for today, I didn't see the motion

4    there.

5    THE COURT:  Am I -- I'm looking at the courtroom

6    staff.  Isn't there -- aren't there -- isn't there another

7    motion to set aside default on ECF 42?

8    MR. GRAND:  Yeah.

9    THE COURT:  Okay.

10   MR. GRAND:  It may be there now.  I'm just saying,

11   when I looked at it yesterday when I was trying to figure

12   out whether or not it was on the calendar, I didn't -- I

13   didn't see it on the Court's calendar.

14   MR. BASSETT:  Your Honor, if I may?

15   I mean, so the Rule 55(c) motion was filed in

16   response to the motion for a default judgment sort of as --

17   I think it was styled as a cross-motion.

18   And I pointed this out earlier.  And the real

19   reason I pointed it was just to help the Court sort of

20   understand the process to help us decide how to proceed

21   today, which is that there wasn't so much a response

22   separately to the motion for a default judgment that the

23   Trustee filed --

24   THE COURT:  Yeah.  They filed -- instead they --

25   MR. BASSETT:  -- it was really just a 55(c) as a

1    response to the default judgment.

2              So what I had thought we were doing, and thought

3    made sense, was for me just to address that.  Counsel would

4    address the 55(c) and respond, as I think he did --

5              THE COURT:  Well, he did address the 55(c).  Yeah.

6              MR. BASSETT:  -- and, therefore, I don't --

7              THE COURT:  Yeah.

8              MR. BASSETT:  -- I don't think we need to further

9    --

10             THE COURT:  I don't think there's any further need

11   for any further argument.  I mean, he's correct, if you look

12   at the docket, Counsel, of the adversary proceeding.

13             MR. GRAND:  I'm not suggesting that we not handle

14   it all today or that I want to come back again and argue

15   another time, I'm only pointing out that it was a bit

16   unclear.

17             In other words, the motion to set aside the

18   default, there was a notice of hearing that the Court issued

19   in response setting today as the hearing date to hear that.

20             The motion for a default judgment, there was a

21   notice of hearing setting today as the hearing date to

22   address that, our motion to set aside the default, and I

23   understand that it was a motion to set aside the default.

24             And our brief that we submitted in support of that

25   motion was submitted for two purposes, both in support of

1    that motion, but also in opposition to the Trustee's motion

2    for a default judgment.  So it served two purposes.

3         But all I'm -- I'm only pointing out that I just

4    didn't see a notice of hearing saying it was going to be

5    addressed today.

6         THE COURT:  There wasn't a notice of hearing --

7         MR. GRAND:  Right.

8         THE COURT:  -- because that was your response to

9    the motion to set aside the motion --

10        MR. GRAND:  It was both.

11        THE COURT:  -- for default judgment.

12        MR. GRAND:  Right.  It was both.  It was both.

13   And --

14        THE COURT:  And you've made the argument.  You

15   made the argument.

16        MR. GRAND:  I have.  I mean -- but I appreciate

17   Your Honor's, you know, offering me another, you know,

18   additional time.

19        I mean, I only point out that, you know, a couple

20   of case cites on the issue we addressed before on the notice

21   point, and I can provide those to you, a few of them, now --

22        THE COURT:  You can provide --

23        MR. GRAND:  -- that I was able to just find in the

24   last few minutes.

25        THE COURT:  Okay.  Go ahead.  Give me a --

1          MR. GRAND:  I know Your Honor didn't want

2     additional briefing.

3          THE COURT:  Give me a -- give me the cites then.

4          MR. GRAND:  Sure.

5          THE COURT:  Please, when you get a chance.

6          MR. GRAND:  Sure.  An Eastern District case.  It

7     can be found at 2023 Westlaw 170595.

8          THE COURT:  That's the full cite?  *Decor Holdings,*

9     *Inc.*?

10         MR. GRAND:  Yes.  Which was affirmed by the Second

11    Circuit.

12         THE COURT:  Well, it's an unreported decision, so,

13    but let's -- it's an unreported slip opinion according to

14    this.  So where -- what am I looking at here?

15         MR. GRAND:  So --

16         THE COURT:  What page?

17         MR. GRAND:  You can look to page, I believe it's 4

18    and 5 where, hang on, I'm doing this on my phone, so I

19    appreciate --

20         THE COURT:  This appeal turns on whether B&J was

21    an authorized agent for service of process of the Bankruptcy

22    Rule 7004(b)(3).  That's what the District Court, the United

23    States District Court of Eastern District of New York said.

24    So the case was about whether or not there was an entity

25    that was actually the agent for service of process.

1      MR. GRAND:  Yes.  But further up, I believe, in

2  that case, the Court distinguished on a motion to vacate a

3  default judgment, based on improper service where the

4  defaulting defendant had actual notice of the original

5  proceeding but delayed in response, is different than a

6  situation where the Court said, however, whereas, here, it

7  is in dispute whether defendant had actual notice before the

8  entry of default judgment courts have found that the burden

9  of proof properly remains with the plaintiff.

10      THE COURT:  This was the burden of proof for

11  vacating a default judgment --

12      MR. GRAND:  Right.  Which is --

13      THE COURT:  -- depends upon whether the defendant

14  had actual notice.

15      We're not dealing a default judgment.  We're

16  dealing with a default.

17      MR. GRAND:  I understand.  And the willfulness

18  standard is applied even less rigorously in that

19  circumstance.

20      THE COURT:  Well, it says on a motion to vacate a

21  default judgment, based upon improper service of process,

22  where the defaulting defendant had actual notice of the

23  proceeding but delayed in bringing the motion.  And this was

24  based on --

25      You have -- you haven't alleged that there wasn't

1    improper service of process.

2              MR. GRAND:  Right.  I'm talking about the --

3              THE COURT:  You just alleged you --

4              MR. GRAND:  This decision said that where service

5    -- even where service is -- it doesn't --

6              THE COURT:  No.  It says when improper service was

7    made and the defendant had actual notice, the defendant

8    bears the burden of proof to establish that the purported

9    service did not occur.

10             MR. GRAND:  Right.  The next sentence.

11             THE COURT:  Okay.  However, whereas, here, it is

12   in dispute whether the defendant had actual notice --

13             MR. GRAND:  Yes.

14             THE COURT:  -- of the entry of the default

15   judgment, Counsel.  Not the default, the default judgment.

16             MR. GRAND:  I understand that.  And in this

17   circumstance, when we're only dealing with the default and

18   not a judgment, the willfulness standard is even less

19   rigorously applied.

20             THE COURT:  It doesn't say that, Counsel.  I

21   disagree.  That's not what it says.

22             MR. GRAND:  That's the stuff along the Second

23   Circuit for --

24             THE COURT:  That's not what it says.

25             MR. GRAND:  -- 20 years.

1          THE COURT:  It says the burden of proof for

2     vacating a default judgment.  And this whole case was about

3     whether the entity that was supposedly the agent of service

4     really was the agent of service.

5          MR. GRAND:  But that's not what it -- right.  But

6     the point was that irrespective of whether the agent was

7     proper or not, the point was that the defendant never

8     received notice.

9          THE COURT:  No, that's -- no, it's not.  That's

10    not what it says.  That's not what it says.

11         MR. GRAND:  It was.  Due process does --

12         THE COURT:  No.  It's citing to another -- another

13    case.  It doesn't say --

14         MR. GRAND:  We can look at that case as well if

15    that's where the quote comes from.

16         THE COURT:  Okay.  Let's look at it.  Again, an

17    unreported decision from the Eastern District of New York,

18    so there has no precedential value.  And it's -- and it's

19    under Rule 60(b)(1), which is a default judgment, not a

20    default.

21         MR. BASSETT:  Your Honor, I don't have -- I don't

22    have access to that case, so if I could just have the --

23         MR. GRAND:  I'll give you the cite.

24         MR. BASSETT:  Thank you.

25         THE COURT:  The second one?

1          MR. BASSETT:  Yeah.  The second one that we're now

2     --

3          THE COURT:  22 Westlaw -- 2022 Westlaw 16754744.

4          MR. BASSETT:  Thank you.

5          THE COURT:  This whole case, the second, is

6     dealing with the vacature under Rule 60(b), not 55(c).

7     That's what the Court says.

8          MR. GRAND:  Your Honor, I recognize that.  The

9     point is that if all the factors are the same, they're

10    applied even less rigorously in --

11         THE COURT:  Where does it say that, Counsel?  It

12    doesn't say that --

13         MR. GRAND:  It says that throughout our papers.

14    In the *Enron* case.  In the -- in the --

15         THE COURT:  Okay.  Well, I'll look at your papers

16    then --

17         MR. GRAND:  I can point you to that if you'd like.

18         THE COURT:  -- but it doesn't say that.  I asked

19    you specifically and that -- and those are the cases that

20    you cited to, so I'll look.

21         MR. GRAND:  Judge, I'm not sure what you're

22    asking.  If you're asking whether or not --

23         THE COURT:  I'm not asking anything.  You said --

24         MR. GRAND:  -- the standard under Rule 55(c) is --

25         THE COURT:  I'm not asking anything.  You said you

1    wanted to cite to me additional cases and so you are.

2              MR. GRAND:  There's also the *U.S. Commodity*

3    *Futures Trading Commission vs. McCrudden* case which

4    addresses some of these issues.

5              THE COURT:  What's the cite to that case?

6              MR. GRAND:  That cite is 2015 Westlaw 5944229.

7              THE COURT:  Okay.  Anything else?

8              MR. GRAND:  I just want to confirm that that's all

9    I have.  I appreciate one minute, and then I think I'll

10   either have more or not.  I think that is --

11             THE COURT:  Okay.  That prior case that you cited

12   that we just to, talked about, is actual notice, is broader

13   because there was an improper service.  There's no assertion

14   in this case that there's improper service.

15             MR. GRAND:  That's not the point.

16             THE COURT:  No assertion whatsoever.

17             MR. GRAND:  The point is that because they didn't

18   receive notice.  That's what those cases hold.

19             THE COURT:  No, they don't, Counsel.  They don't.

20             MR. GRAND:  Okay.

21             THE COURT:  Because if they did then Rule 55 would

22   not need to be in existence.  They don't.  They do not hold

23   that.

24             And the case that I'm looking at mow, *U.S.*

25   *Commodity Future Trading vs. McCrudden*, they talk about the

1    elements in *Wang*, the request for an entry of default

2    judgment, the elements we've gone over today, which we all

3    know what they are.

4              MR. GRAND:  I understand.  And they articulate

5    that the elements are to be applied less rigorously --

6              THE COURT:  Where does it say that?  I haven't

7    seen it once, not once, not in any of the cases that you

8    cited.

9              MR. GRAND:  In all of the -- in all of the cases

10   that I've cited.  Our brief has many of those cases.

11             THE COURT:  Okay.  Then I think we've -- I'm happy

12   to -- I will go back and read them, Counsel, but not one of

13   the cases say that there -- it's applied less -- it doesn't

14   say what you say.

15             None of them say that when you acknowledge that

16   service is proper you also have to have actual notice.  So

17   none of them say that.  Not one.  And they couldn't.

18   Because then it would render Rule 55's purpose, there would

19   be no reason for Rule 55.

20             Then every single defendant would have to have

21   actual notice of a complaint.  In your argument, if you take

22   it to its -- every single person, there would be no reason

23   that you could ever seek a default.

24             MR. GRAND:  Your Honor, the default is premised on

25   service.

1            THE COURT:  That's correct.

2            MR. GRAND:  Correct.  Nobody is suggesting here

3      that the default that was entered --

4            THE COURT:  Okay.  And where does it say that you

5      can set aside a default because you didn't get actual

6      notice?

7            MR. GRAND:  That's what the --

8            THE COURT:  Where does it say that in Rule 55,

9      Counsel?  Where does it say that?

10           MR. GRAND:  It said it in the cases that I just

11     cited to Your Honor.

12           THE COURT:  No, it doesn't.  No, I'm sorry, it

13     doesn't.

14           MR. GRAND:  Okay.

15           THE COURT:  I disagree with you.

16           MR. GRAND:  Okay.

17           THE COURT:  It doesn't say that.  Okay?

18           MR. GRAND:  Yeah.  Thank you.

19           THE COURT:  All right.  Well, then I'm -- all

20     these matters have been addressed by the Court.  I will go

21     back and review all the matters and I will take all the

22     matters that were on the calendar, other than the interim

23     application for compensation, which is granted, for which a

24     revised, proposed order will be submitted, there will be no

25     further pretrial conferences set, and the matters will all

1    be taken under advisement.

2              Is there anything further we need to address this

3    afternoon, Trustee Despins?

4              MR. DESPINS:  Just a few seconds, Your Honor.

5              Mr. Shaiban (ph) sent a letter to the Court asking

6    to get permission to sue the assignee for the benefit of

7    creditors.  We want to make sure that we'll have enough

8    (indiscernible) to respond to that.  I assume Your Honor

9    will enter an order --

10             THE COURT:  If he sends a letter asking for

11   permission to do something, I will take no action on it.

12   You file a motion in this court.  That's how it works.

13             MR. DESPINS:  I understand.  Okay.  Thank you,

14   Your Honor.

15             THE COURT:  Okay.  All right.  Then that concludes

16   today's hearings, this afternoon's hearings.  Thank you,

17   all.  Court is adjourned.

18         (Proceedings concluded at 3:36 p.m.)

19

20

21

22

23

24

25

1          I, CHRISTINE FIORE, court-approved transcriber and

2     certified electronic reporter and transcriber, certify that

3     the foregoing is a correct transcript from the official

4     electronic sound recording of the proceedings in the above-

5     entitled matter.

6

7

8     _____          January 29, 2024

9         Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24