```
              UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF CONNECTICUT
                   BRIDGEPORT DIVISION

In Re                        *   Case No. 22-50073 (JAM)
                             *
HO WAN KWOK and GENEVER      *   Bridgeport, Connecticut
 HOLDINGS CORPORATION,       *   February 13, 2024
                             *
              Debtors.       *
                             *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JULIE A. MANNING
             UNITED STATES BANKRUPTCY JUDGE

#2509  MOTION FOR ENTRY OF ORDER EXTENDING DEADLINE FOR
       TRUSTEE TO FILE AVOIDANCE ACTIONS UNDER BANKRUPTCY
       CODE SECTIONS 108, 546(a) and 549

APPEARANCES:

```
For the Chapter 11 Trustee:    NICHOLAS A. BASSETT, ESQ.
                               SHLOMO MAZA, ESQ,
                               Paul Hastings LLP
                               200 Park Avenue
                               New York, NY  10166

                               PATRICK R. LINSEY, ESQ.
                               Neubert Pepe and Monteith
                               195 Church Street,13th Floor
                               New Haven, CT  06510

Chapter 11 Trustee:            LUC A. DESPINS, ESQ.
                               Paul Hastings LLP
                               200 Park Avenue
                               New York, NY  10166

For the U.S. Trustee:          HOLLEY L. CLAIBORN, ESQ.
                               Office of the United States
                                Trustee
                               The Giaimo Federal Building
                               150 Court Street, Room 302
                               New Haven, CT  06510
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

APPEARANCES: (Cont'd)


For the Creditors Committee:      JONATHAN KAPLAN, ESQ.
                                  Pullman & Comley
                                  850 Main Street
                                  Bridgeport, CT  06601


For the Creditor, Pacific         STUART M. SARNOFF, ESQ.
 Alliance Asia Opportunity        O'Melveny & Myers LLP
 Fund L.P.:                       Times Square Tower
                                  7 Times Square
                                  New York, NY  10036

                                  ANNECCA H. SMITH, ESQ.
                                  Robinson & Cole
                                  28 Trumbull Street
                                  Hartford, CT  06103


For Mei Guo:                      SAM DELLA FERA, JR., ESQ.
                                  Chiesa Shahinian &
                                   Giantomasi, PC
                                  105 Eisenhauer Pkwy
                                  Roseland, NJ  07068

                                  JAMES M. MORIARTY, ESQ.
                                  Zeisler & Zeisler, P.C.
                                  10 Middle Street, 15th FL
                                  Bridgeport, CT  06604


For Defeng Cao:                   MICHAEL A. CARBONE, ESQ.
                                  Parrett Porto Parese &
                                   Colwell, P.C.
                                  2319 Whitney Avenue Suite 1D
                                  Hamden, CT  06518
                                  (Excused)

                                  KATHERINE E. MATEO, ESQ.
                                  ADAM FRIEDMAN, ESQ.
                                  Olshan Frome Wolosky, LLP
                                  1325 Avenue of the Americas
                                  New York, NY  10019


For UBS:                          LISA FRIED, ESQ.
                                  Herbert Smith Freehills
                                   New York, LLP
                                  450 Lexington Avenue
                                  New York, NY  10017

```
APPEARANCES:  (Cont'd.)

For DBS Bank Ltd.:              GENEVIEVE G. WEINER, ESQ.
                                Sidley Austin, LLC
                                555 West Fifth Street
                                Los Angeles, CA  90013


For Taurus Fund, LLC,           MICHAEL T. CONWAY, ESQ.
 Taurus Management, LLC,        Lazare Potter Giacovas &
 and Scott Barnett:             Moyle, LLP
                                747 Third Avenue
                                New York, NY  10017


For G Club Operations, LLC:     JEFFREY M. SKLARZ, ESQ.
                                Green & Sklarz, LLC
                                One Audubon Street
                                New Haven, CT  06511

                                CAROLINA A. FORNOS, ESQ.
                                Pillsbury Winthrop Shaw
                                 Pittman LLP
                                31 West 52nd Street
                                New York, NY  10019

For Rule of Law Foundation      DOUGLAS M. EVANS, ESQ.
 III, Inc. and Rule of Law      Shapiro, Dorry & Masterson LLC
 Society, IV, Inc.:             71 Raymond Road
                                West Hartford, CT  06107

For Chris Lee and Qidong        JON P. NEWTON, ESQ.
 Xia:                           Reid and Riege PC
                                One Financial Plaza
                                Hartford, CT  06103
                                (Excused)

                                ERIC T. SCHMITT, ESQ.
                                The Quinlan Law Firm, LLC
                                233 S. Wacker Drive
                                Suite 6142
                                Chicago, IL  60606

For Greenwich Land, LLC         CHRISTOPHER J. MAJOR, ESQ.
 and Hing Chi Hgok:             Meister Seelig & Fein LLP
                                125 Park Avenue
                                New York, NY  10017
```

4

APPEARANCES:  (Cont'd.)

```
 For GS Security Solutions,     ROBERT J. GRAND, ESQ.
   Inc.:                        Lax & Neville LLP
                                350 Fifth Avenue
                                New York, NY  10118


 For Yingying Wang:            DAVID H. WANDER, ESQ.
                                Tarter Krinsky & Drogin LLP
                                1350 Broadway
                                New York, NY  10018


 For Sotheby's International    STEVEN BROWN, ESQ.
   Realty, Inc.:                Wilson Else Moskowitz Dicker
                                1010 Washington Blvd.
                                Stamford, CT  06901

                                MARY AUGUSTINE, ESQ.
                                A.M. Saccullo Legal LLC
                                27 Crimson King Drive
                                Bear, DE  19701


 For Yongbing Zhang:           JAMES EDWARD NEALON, ESQ.
                                Nealon Law LLC
                                1266 East Main Street
                                Suite 700
                                Stamford, CT  06902
```

1        (Proceedings commenced at 2:06 p.m.)

2             THE COURTROOM DEPUTY:  Case No. 22-50073, Ho Wan

3   Kwok.

4             THE COURT:  Okay.  Good afternoon.  Obviously,

5   there are many people on this remote hearing due to the

6   weather today that we are experiencing.

7             And I can see that some people have their cameras

8   on and some people don't, and some people don't have their

9   full names and some do.  I would like everyone to have their

10  cameras on, have their full names on.  And if you can't do

11  that, then I'm -- you're not going to participate in this

12  hearing, because it's too distracting otherwise to the

13  Court.

14            And I'm going to ask everyone to file -- I'm going

15  to have everyone announce their appearance for the record

16  starting -- first, I'm going to ask the Chapter 11 Trustee

17  and his counsel.  But then I'm going to take the appearances

18  of the parties who have filed objections to the motion

19  that's on for hearing this afternoon, the motion for entry

20  of order extending the deadline for the trustee to file

21  avoidance actions, which is ECF Number 2509.

22            And then after I take the trustee's appearance and

23  his counsel, I'll take the appearance of the United States

24  Trustee, if the United States Trustee is on.  And I believe

25  I did see someone from the United States Trustee's office

1     on.

2              And then we will go through each ECF number and

3     have everyone note their appearance.  And if you haven't

4     filed an objection and you are appearing, you're going to

5     note your appearance as well, and we will go from there.

6              So we will first take the appearance of Trustee

7     Despins and his counsel.

8              MR. DESPINS:  Good afternoon, Your Honor.  Luc

9     Despins, Chapter 11 Trustee.

10             THE COURT:  Good afternoon.

11             MR. BASSETT:  Good afternoon, Your Honor.  Nick

12    Basset is from Paul Hastings, counsel to the Chapter 11

13    Trustee.

14             MR. MAZA:  Hi, Your Honor.  Shlomo Maza with Paul

15    Hastings, also for the trustee.

16             MS. CLAIBORN:  Holley Claiborn for the U.S.

17    Trustee.

18             THE COURT:  Okay.  The only people, Attorney

19    Despins, that are appearing on your behalf today have

20    noticed their appearance?

21             MR. DESPINS:  Well, I was expecting Mr. Linsey,

22    but I -- we can proceed without him, but I was expecting

23    him.  I don't know.  Maybe he's having technical --

24             THE COURT:  Okay.  We'll proceed for now, and

25    we'll come back.  Thank you.

1          All right.  The first objecting parties that have

2     filed -- that have responded to the trustee's motion is Mei

3     Guo, ECF Number 2551.  So I'd like the counsels that are

4     appearing on behalf of Mei Guo to note their appearance for

5     the record, please.

6          MR. MORIARTY:  Good afternoon, Your Honor.  James

7     Moriarty from Zeisler & Zeisler for Ms. Guo.

8          MR. DELLA FERA:  Good afternoon, Your Honor.  Sam

9     Della Fera, Chiesa Shahinian & Giantomasi, for Ms. Guo.

10          THE COURT:  Anyone else on behalf of Ms. Guo?

11          Okay.  Then the next objecting party is Defeng

12     Cao, ECF Number 2553.  I would ask people to -- who are

13     representing that objecting party to please note their

14     appearance for the record.

15          MR. CARBONE:  Good afternoon, Your Honor.  Michael

16     Carbone from Parrett Porto on behalf of Defeng Cao.

17          MS. MATEO:  Good afternoon, Your Honor.  Katherine

18     Mateo from Olshan Frome Wolosky on behalf of Mr. Cao.  And

19     I'll also note just that in yesterday's request to appear

20     remotely, we also included a request to excuse our local

21     counsel, Mr. Carbone, from having to participate in today's

22     hearing.

23          THE COURT:  Okay.  I didn't see that request.

24     Because, as I said, when I set the hearing remotely, all of

25     the motions were moot, because we were having this remote

1   hearing.  So you're asking if Mr. Carbone may be excused?

2            MS. MATEO:  Yes, Your Honor.

3            THE COURT:  Okay.  Mr. Carbone, you may be

4   excused.

5            MR. CARBONE:  Thank you, Your Honor.

6            THE COURT:  You're welcome.

7            Anybody else then representing -- Ms. Mateo,

8   anybody besides yourself?  There's an Adam Friedman, I

9   think, also has an appearance on record.  Is he

10  participating in this hearing?

11           MR. FRIEDMAN:  Correct, Your Honor.  Adam

12  Friedman's here.  I'm on the phone.  Ms. Mateo will be

13  leading the argument for us, however.  Thank you very much.

14           THE COURT:  You're welcome.

15           The next objecting party was UBS AG, but I saw a

16  withdrawal of an objection.  But I don't know if I saw

17  Attorney -- I don't remember if Attorney Fried is on this

18  call or not.

19           MS. FRIED:  Good afternoon, Your Honor.  Yes, this

20  is Lisa Fried of Herbert Smith Freehills for UBS.  And

21  I'm -- Your Honor correctly noted that we have withdrawn our

22  objection.  But I did want to appear in the event that the

23  Court had any questions for us.

24           THE COURT:  Okay.  Thank you.

25           The next objecting party then is DBS Bank, which

1    is ECF Number 2556.  Who is appearing on behalf of DBS Bank?

2              MR. WEINER:  Good afternoon, Your Honor.  This is

3    Genevieve Weiner with Sidley Austin on behalf of DBS Bank

4    Limited.

5              THE COURT:  Good afternoon.  And, Ms. Weiner,

6    you're the only party that is here on behalf of DBS Bank

7    this afternoon?

8              MS. WEINER:  That's correct.  We had understood --

9    and our local counsel, Bill Fish, is not on.  We had

10   understood his appearance wasn't necessary since this was

11   just being done over Zoom.

12             THE COURT:  Well, that's not exactly true, but

13   that's fine.  Okay?

14             MS. WEINER:  Okay.  Okay.

15             THE COURT:  (Indiscernible) local counsel at least

16   introduces the counsel, and then -- the visiting counsel,

17   and then there's a request such as what was made by

18   Ms. Mateo to excuse local counsel.  And that's fine.  That's

19   fine.

20             MS. WEINER:  Okay.

21             THE COURT:  Okay?  That's fine.

22             MS. WEINER:  Okay.  All right.

23             THE COURT:  Okay.

24             MS. WEINER:  Well, thank you for the

25   accommodation.  We'll make note of that in the future.

1              THE COURT:  Thank you.

2              The next objecting party is Taurus Fund, LLC, ECF

3     2557.  Attorney Conway, I think I saw you somewhere in this

4     screen.

5              MR. CONWAY:  You did, Your Honor.  Thank you, and

6     good afternoon.  Michael Conway, Lazare Potter Giacovas &

7     Moyle for Taurus Fund, LLC; Taurus Management, LLC; and

8     Scott Barnett.

9              THE COURT:  Good afternoon.  Anybody else with you

10    this afternoon, Attorney Conway?

11             MR. CONWAY:  No, just me.

12             THE COURT:  Okay.  Thank you.

13             All right.  Then the next objecting party is G

14    Club Operations, LLC, which is ECF Number 2563.

15             MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

16    Sklarz, Green & Sklarz, for G Club Operations, LLC.

17             THE COURT:  Good afternoon.

18             MS. FORNOS:  Good afternoon.

19             MR. SKLARZ:  And Ms. Fornos will introduce

20    herself.

21             MS. FORNOS:  Yes.  Good afternoon, Your Honor.

22    Carolina Fornos with Pillsbury Winthrop.

23             THE COURT:  Good afternoon, Attorney Fornos.  I

24    see you there.  Thank you.

25             The next objecting party -- I'm not sure if

1   these -- there are -- there were two separate objections,

2   but I think 2565, Rule of Law Foundation III, Inc.  I think,

3   Attorney Evans, is that you?

4            MR. EVANS:  Yes, Your Honor.  Douglas Evans

5   representing Rule of Law Foundation and Rule of Law Society,

6   Your Honor.  We filed an objection and a declaration.  So

7   the objection is 2565.  The declaration at 2568.

8            THE COURT:  Oh, thank you.  Okay.  All right.

9   Thank you very much.

10           MR. EVANS:  Thank you.

11           THE COURT:  And you're by yourself, Attorney

12  Evans?  No one else appearing on behalf of those parties?

13           MR. EVANS:  Correct, Your Honor.

14           THE COURT:  Okay.  Thank you.

15           MR. EVANS:  Thank you.

16           THE COURT:  Then the next objecting party is Chris

17  Lee and Qidong Xia, 2566.  Attorney Newton, are you

18  appearing?  Do I see you?

19           MR. NEWTON:  Yes, Your Honor, with one

20  qualification.  So good afternoon.  Jon Newton for Mr. Lee

21  and Mr. Xia.  I do have lead counsel on with me.  In the

22  motion pro hoc, I did request to be excused from this

23  hearing.  That was denied.  But after Mr. Schmitt's

24  appearance now -- he has been admitted pro hoc -- I would

25  ask if you would reconsider and then allow me to be excused.

1          THE COURT:  I think that's fine.  I think the only

2     reason you weren't excused was because Mr. Schmitt didn't

3     have an appearance in the case.

4          MR. NEWTON:  Understood.

5          THE COURT:  Okay?  So that's fine, Attorney

6     Newton.  You may be excused.

7          And Attorney Schmitt?  I don't --

8          MR. SCHMITT:  Yes.

9          THE COURT:  Okay.  I'm sorry.

10         MR. SCHMITT:  Yes.

11         THE COURT:  I don't see you yet, but I'm sure I

12    will.

13         MR. SCHMITT:  Yes.  Eric Schmitt on behalf of

14    Mr. Xia and Mr. Lee.

15         THE COURT:  Thank you.  Welcome.

16         Okay.  Then the next objecting party is Greenwich

17    Land, LLC, and Ms. Hgok, 2569.  And, Attorney Major, I think

18    I saw you.

19         MR. MAJOR:  Yes.  Good afternoon, Your Honor.

20    Chris Major of Meister, Seelig & Fein.  We represent Hing

21    Chi Hgok and Greenwich Land, LLC.

22         THE COURT:  Good afternoon.

23         Then the next objecting party is GCS (sic)

24    Security Solutions, Inc.  2571 is the ECF number.  And,

25    Attorney Schurr, you're local counsel?  Or is it --

1          MR. GRAND:  This is Robert Grand from --

2          THE COURT:  Oh, okay.  Attorney Grand, you're

3    right.  Attorney Schurr has already been excused in prior

4    proceedings.  So I apologize.

5          MR. GRAND:  Yes.

6          THE COURT:  I understand.  Are you alone, Attorney

7    Grand, or is your colleague with you?

8          MR. GRAND:  I am alone.

9          THE COURT:  Okay.  Thank you.

10         The next objection is Yingying Wang, 2582.  And

11   Michael (indiscernible) is local counsel.

12         MR. WANDER:  Good afternoon, Your Honor.  This is

13   David Wander.  My pro hoc vice motion was approved, and then

14   I filed my notice of appearance.  And with Your Honor's

15   permission, I'll be -- I'm from Tarter Krinsky & Drogin, and

16   I'll be appearing on behalf of my client.

17         THE COURT:  That's fine.  So, Attorney

18   (indiscernible) isn't here today, which is fine, correct?

19         MR. WANDER:  Correct, Your Honor.

20         THE COURT:  Okay.  All right.  Thank you.

21         The next objecting party is Sotheby's

22   International Realty.  Steven Brown is local counsel.  Is

23   Attorney --

24         MR. BROWN:  Yes, Your Honor.  Steven Brown on

25   behalf of Sotheby's, and I'll be -- I'm here on my own at

1    the moment.

2              THE COURT:  I thought I saw Attorney Augustine.

3              MR. BROWN:  No.  Yeah.

4              THE COURT:  Where is she?

5              MR. BROWN:  She's having trouble with her camera,

6    Your Honor, so she's looking to just be observing.  And I

7    think we might even have an agreement when we get into the

8    case.

9              THE COURT:  Okay.  So just Attorney Augustine,

10   though, would be local counsel, not her colleague?

11             MR. BROWN:  Correct, Your Honor.

12             THE COURT:  All right.  But she's having trouble

13   with her camera.

14             MR. BROWN:  Yes.

15             THE COURT:  Okay.  Thank you.

16             MR. BROWN:  Thank you.

17             THE COURT:  Then the last objecting party, I

18   believe, that I have today, and someone can obviously

19   correct the record if I'm incorrect, is Yongbing Zhang, ECF

20   Number 2591.  Attorney Nealon?

21             MR. NEALON:  Yes, Your Honor.  I'm here for

22   Attorney Zhang.

23             THE COURT:  All right.  Would you note your full

24   appearance for the record, please?

25             MR. NEALON:  Sure.  James Nealon, Nealon Law, LLC.

1          THE COURT:  Okay.  Good afternoon.  Thank you.

2          All right.  Now, I believe that I have now stated

3    for the record all the parties that have filed objections to

4    the trustee's tolling motion.  Is there anyone else that has

5    filed an objection that I have not noted for the record?

6    Okay.  Thank you.  Hearing none.  I think that we've gotten

7    everybody then.

8          MR. LINSEY:  Your Honor, this -- I had a technical

9    glitch.  This is Patrick Linsey, also counsel for the

10   trustee.

11         THE COURT:  Good afternoon.

12         MR. LINSEY:  Good afternoon, Your Honor.

13         MR. KAPLAN:  Good afternoon, Your Honor.  Jonathan

14   Kaplan on behalf of the committee.

15         THE COURT:  Good afternoon.

16         And then we have other people.  I know there --

17   counsel for PAX, I think, is on the -- is participating in

18   this virtual hearing.  So if you could note your appearance

19   for the record, please.

20         MR. SARNOFF:  Yes.  Good afternoon, Your Honor.

21   Stuart Sarnoff, O'Melveny & Myers, on behalf of Creditor

22   PAX.  And with me is local counsel, Annecca Smith of

23   Robinson Cole.

24         THE COURT:  Good afternoon.

25         MR. SMITH:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.

2          So Attorney Keller.  Oh, I'm sorry.  That's not

3   Attorney Keller.  That's Mr. Keller.  He's here.  Okay.

4   Sorry.  I'm looking to make sure I have everyone noted for

5   the record.

6          Attorney Claiborn, did we miss you?

7          MS. CLAIBORN:  I announced myself at the very

8   beginning, Your Honor, but I'll happily do it again.

9          THE COURT:  Okay.

10         MS. CLAIBORN:  Holley Claiborn for the U.S.

11  Trustee.

12         THE COURT:  Okay.  Thank you.  I just wanted to

13  make sure everybody's on the record.  That's all.

14         I also see someone name -- whose name is Jackie

15  Marasco.  And who -- where is Jackie Marasco and who are you

16  representing, please?

17         MS. MARASCO:  Good afternoon, Your Honor.  Jaclyn

18  Marasco, Faegre Drinker Biddle & Reath.  We are just

19  observing today on behalf of potential interested parties,

20  (indiscernible) Aircraft.

21         THE COURT:  Okay.  Well, you're not -- did you

22  file an appearance?

23         MS. MARASCO:  We did not, Your Honor.  We were

24  just --

25         THE COURT:  Well, this was a hearing for appearing

1   parties only.  I will let you listen, but you will not be

2   allowed to speak.  This was not a hearing where people were

3   going to just appear, because this was a hearing about a

4   motion for which there were objections.  So in any event,

5   that's fine.  You'll just mute yourself, please.

6          MS. MARASCO:  Understood, Your Honor.

7          THE COURT:  Attorney Wolman?  If you could please

8   note your appearance for the record and who you are

9   representing?  Attorney Wolman?  I can see that you're

10  connected, but you're on mute, and your camera's off.  You

11  need to announce who you're here for.

12         All right. I'm going to come back to Attorney

13  Wolman.  He may be removed from the hearing in a moment if I

14  don't hear from him.

15         Lisa Fried?  Did I speak with someone already this

16  morning -- or this afternoon?  I don't believe I have.

17  Who's Lisa Fried?

18         MS. FRIED:  Yes.  Good afternoon again, Your

19  Honor.  I'm counsel for UBS in connection with --

20         THE COURT:  Oh, I'm sorry.  You know what?  I

21  marked you -- I didn't mark you as present because of the

22  withdrawal of the objection.  I apologize.

23         MS. FRIED:  Understood.

24         THE COURT:  All right.  So I think that I have

25  been -- everyone has announced their appearance for the

1    record.  Is that correct?  All right.

2          Then, Trustee Despins, this is your motion, so

3    please proceed.

4          MR. BASSETT:  Your Honor, I was going to proceed

5    on behalf of Trustee Despins.  Again, for the record --

6          THE COURT:  Go right ahead.

7          MR. BASSETT:  Thank you, Your Honor.  And, by the

8    way, thank you for accommodating us all on Zoom.  I know it

9    can be technologically difficult, but everybody appreciates

10   it, that's for sure.

11         I wanted to begin, if I could, by giving the Court

12   a bit of an update as to some other filings leading up to

13   this hearing that have been relevant, kind of the current

14   state of play with respect to objecting parties.  And then,

15   after doing that, we did plan to present evidence, including

16   the testimony of the trustee, so I would then move into that

17   portion of the hearing, if that's okay for the Court.

18         THE COURT:  That's fine.

19         MR. BASSETT:  Thank you, Your Honor.  So in terms

20   of updates, as the Court knows, we are conducting this

21   hearing pursuant to a set of notice procedures that were

22   ordered by the Court.  I did just want to reference ECF

23   Docket Number 2540.  That is the certificates of service.

24   That document contains the various certificates of service

25   that the trustee has filed.  And just by way of a quick

1    summary on that note, I think, overall, at this point, the

2    trustees across Paul Hastings and Neubert Pepe have served,

3    I believe, more than 840 parties with the motion either by

4    email, by ECF, and/or by address where available.

5    Basically, if there was an email, we served it.  If they

6    were signed up for ECF, they got notice.  And if we had a

7    mailing address, we mailed it.

8         In addition to that, we had BVI counsel serve a

9    total of 55 entities in the BVI.  So I think, in total,

10   we're up to around 900 entities that got some form of notice

11   along the lines that I described.

12        In addition to that, we've done publication notice

13   across five different publications, including USA Today, and

14   two BVI publications, as well as two publications circulated

15   in the U.S. and internationally in Mandarin.  So I wanted to

16   provide that update in terms of the notice that's been

17   provided, which I think dovetails into where we are with the

18   objections for today's hearing.

19        So a total of, I believe, 13 objections were filed

20   in response to the trustee's motion.  At this point, two of

21   those have been resolved, which leaves 11, although one of

22   the 11, by DBS Bank, is actually just a reservation of

23   rights.  And DBS Bank, according to that reservation of

24   rights, does not object to the trustee's request for a

25   six-month period of the tolling of the statute of

1    limitations, but reserves its rights thereafter.  That

2    leaves 12 objections.

3            Two of the remaining objections by DBS, and then

4    also an objection by Sotheby's, those have both been

5    resolved.  And there is a revised proposed order, which we

6    have filed on the docket at point 803, which adds some

7    language that addresses those parties and carves them out of

8    the order.  They are no longer objecting, as I understand

9    it.

10           The last point I would note is that -- well, two

11   more points, actually.  One, the ten remaining objections --

12   and I'll get to this later through the evidentiary

13   presentation and also in argument.  But, you know, that

14   leaves ten people who really the Court would recognize as

15   having been involved in this case in various capacities,

16   people who are defendants, people who are associated with

17   the debtor, et cetera.  There are no remaining objecting

18   parties who are sort of banks or vendors or parties who are

19   sort of unrelated to the course of events that has

20   transpired thus far in this case.  Again, I'll save most of

21   those remarks for later and during the evidentiary portion

22   as to the relevance of that.

23           But then the last point I wanted to note for the

24   Court was that we have also filed a motion at ECF 2801,

25   filing -- excuse me -- approximately 30 stipulations,

1    tolling agreements to be entered by the Court.  Those are

2    all being filed under seal pursuant to agreements with the

3    parties and the request that we've made with the Court.  I

4    mention that because, obviously, those tolling stipulations

5    would resolve, you know, any issue as to all of those 30

6    parties, because the statute of limitations as to those

7    parties is going to be tolled by consent.

8            So with that, that's all I had by way of updates.

9    I'll pause there to see if the Court has any questions.

10   Then after that, I -- we will plan to move into our

11   evidentiary presentation.

12           THE COURT:  Thank you.  I have no questions.

13   Please proceed.

14           MR. BASSETT:  Thank you, Your Honor.  So yesterday

15   morning, I believe it was, at ECF 2763, the trustee filed a

16   proposed witness and exhibit list listing the trustee as a

17   witness.  And then I think we have approximately 130 or so

18   odd exhibits.  Your Honor, we filed that exhibit list, I

19   think, primarily as a helpful guide and summary for the

20   Court as to all of the various documents that we've

21   mentioned in our briefing and that we otherwise think are

22   particularly relevant to the relief that we are requesting.

23   But every single document on that exhibit list is actually a

24   docket item in the main Chapter 11 case for an adversary

25   proceeding.  And for that reason, I don't think it is

1    necessary to move all of those into evidence as exhibits.  I

2    think they are all documents of which the Court can take

3    judicial notice, and that's what we would ask the Court to

4    do.

5          Again, the real reason for filing that is to just

6    put in one place a lot of the exhibits we will be

7    referencing.  But, of course, this is a very lengthy

8    bankruptcy case thus far with thousands upon thousands of

9    docket entries and related events.  And, you know, it's

10   really the entire record in this case that we will be

11   relying upon.

12         So in terms of that exhibit list, I don't think we

13   need to have it moved into evidence, but we would ask the

14   Court to take judicial notice of all of those documents and,

15   of course, any others on the docket of this case that we

16   might direct the Court's attention to.

17         THE COURT:  Well, that's fine, except that if you

18   want me to look at certain provisions in those -- in any of

19   those pleadings that are on the docket of the case, then I'm

20   going to ask you to direct me to those, because -- I can

21   certainly take judicial notice that they've all been filed.

22   And I have some -- under the federal rules of civil -- of

23   evidence, have some recollection as to what they may

24   include.

25         But if there are very specific things that you

1    would like the Court to take judicial notice of in those

2    documents, I will need you to point me to those documents.

3    So I think if you are asking the Court to make findings with

4    regard to specific information in a specific pleading,

5    you're going to need to point me to that pleading and

6    whatever it is in it that you think is relevant.  I can

7    certainly take judicial notice of the fact that they've all

8    been filed.  And I know generally what they are.

9              MR. BASSETT:  Understood.  Understood, Your Honor.

10             THE COURT:  All right.  Thank you.

11             MR. BASSETT:  With that, Your Honor, the trustee

12    would call Attorney Despins, the trustee himself, to the

13    witness stand.

14             THE COURT:  Well, as there isn't a witness stand,

15    we just have to improvise a little bit.  So we -- I'm going

16    to ask the courtroom deputy -- and, obviously -- I don't

17    even see Mr. Despins at the moment, but I might have to go

18    to a different page.

19             Mr. Despins, oh, there you are.  So, obviously,

20    you understand that even though we are not in a courtroom,

21    the courtroom deputy is authorized to swear you in and ask

22    you to swear about the truth of what you are going to

23    testify to.  You can't see the courtroom deputy, but you'll

24    be able to hear the courtroom deputy.  And I believe,

25    although I shouldn't say that -- I would ask you, Trustee

1    Despins, I think you'd recognize the courtroom deputy's

2    voice in any event.  You will not, obviously, see her raise

3    her right hand, but she's going to ask you to raise yours,

4    and I'm going to see you raise yours, and then we will

5    proceed accordingly.  Is that okay with you, Trustee

6    Despins?

7              MR. DESPINS:  Yes, Your Honor.

8              THE COURT:  Okay.  Thank you.

9              MR. DESPINS:  Understood.

10             THE COURT:  Thank you.  All right.  Then I would

11   ask the courtroom deputy to please swear in the witness.

12             THE COURTROOM DEPUTY:  Okay, thank you.  Sorry.

13   Excuse me.  I'm sorry.  I just lost my voice for a minute.

14                   LUC DESPINS, TRUSTEE, SWORN

15             THE COURTROOM DEPUTY:  Okay.  State your name and

16   address for the record, please.

17             THE WITNESS:  Luc Despins.  My business address is

18   200 Park Avenue, New York, New York, 10166.

19             THE COURTROOM DEPUTY:  Thank you.

20             THE COURT:  Okay, Attorney Bassett, you may

21   proceed.

22             MR. BASSETT:  Thank you, Your Honor.

23                       DIRECT EXAMINATION

24   BY MR. BASSETT:

25   Q    Trustee Despins, could you please start by just

1    reminding the Court and everyone else on the line when you

2    were appointed as the trustee in this case?

3    A    Early July 2022.

4    Q    Okay.  And then the Chapter 11 petition was originally

5    filed by the debtor in February of 2022, I believe.  So is

6    it the case that you were not appointed until approximately

7    five months into the case?

8    A    That's correct.

9    Q    Trustee Despins, could you please tell the Court,

10   generally, what did you do upon your appointment to start

11   getting up to speed in this case?

12   A    Obviously, I involved my counsel, Paul Hastings, to try

13   to get our arms around the information that was available at

14   the time we were appointed.

15   Q    And when you say information that was available, what

16   are you referring to?  What types of --

17   A    Well, we were looking for books and records, for the

18   schedules of assets and liabilities, statements of financial

19   affairs, those types of documents.

20   Q    And what did you find after you had undertaken those

21   initial efforts to sort of get your arms around the

22   information available?

23   A    That there were no books and records, that -- it became

24   clear that the schedules of assets and liabilities and the

25   statements of financial affairs were fraudulent.  So,

1   basically, there was no real information.  And on top of

2   that, there was no money in the estate.  Zero.  Well, that's

3   not true.  There was about $15,000 in the estate at that

4   time.

5   Q    So what did the -- you mentioned the schedules of

6   assets and statements of financial affairs.  What did those

7   list as it relates to the debtor's assets that he was

8   identifying to the Court?

9   A    $3,850 in assets, basically.

10  Q    So then you mentioned that there was, well -- the

11  $3,800 in assets, what were you to do about funding costs

12  and expenses of the work that you undertake in this case?

13  A    Well, we have no choice but to go forward and try to

14  identify assets that could be liquidated to cash to fund the

15  estate and, at the same time, conduct a broad Rule 2004

16  investigation.

17  Q    Can you please talk a little bit more about the

18  investigation that you began to undertake after getting your

19  arms around the lay of the land, so to speak, as you just

20  noted?

21  A    Yeah.  I think that within a month or less, we filed

22  our first Rule 2004 motion.  And, basically, you know, that

23  was targeted to the family -- debtor's family members or

24  close associates that -- basically that we have been able to

25  identify as being involved with the debtor in the debtor's

1    various transactions.

2    Q    And after those -- that initial -- or initial 2004

3    motions, you have since filed others, correct?

4    A    Yeah.  We filed a total of 15 Rule 2004 motions to

5    date.

6    Q    And across those 15, how many parties have you

7    subpoenaed?

8    A    About 250 subpoenas were issued.

9    Q    And in response to those subpoenas, do you have a sense

10   of approximately the total number of documents that your

11   team has received in response?

12   A    Yes.  If we're talking about documents, which is not

13   pages, but documents, it's about 700,000 documents.  And

14   that's a bit misleading, because it's more than that.

15   Because there -- if you look at number of pages, it would be

16   more like 2 million pages.  And it's even more than that,

17   because some documents are produced in the live format,

18   native format, so that means that those have not been

19   printed and cataloged.  You can look at them on a computer

20   screen, but -- so they still need to be reviewed, but yet

21   you can't count those pages.  So that would be in addition

22   to that.

23   Q    So when you're saying native documents, you mean like

24   spreadsheets and things like that that have to be reviewed

25   sort of on a computer and have multiple tabs and things like

1    that?

2    A    Correct.

3    Q    Now, were all of these documents in English?

4    A    No.  A number of them were in Mandarin.

5    Q    And, by the way, when did you get all of these

6    documents?  Was it one dump at the beginning of your

7    investigation, over time?  Trying to get a sense of the

8    timing.

9    A    Yeah.  I would say there was very slow initial

10   production trickling through.  I would say that from a

11   number of pages point of view that the bulk of this was

12   received in the fall of 2023.

13   Q    And what has your team done with the documents that

14   have been received in response to the subpoenas?

15   A    Well, attempt to, you know, review them all and

16   understand them.  As I pointed out, there are no books and

17   records to tell us what -- how this worked, really.  So

18   you -- you're reviewing documents, but you have no way of

19   knowing whether the document is a critical document, because

20   you -- the best way to look at this would be like the

21   equivalent of a puzzle.  You don't know if that -- does that

22   piece go in the middle of the puzzle, on the border, or not?

23   So that -- so what we tried to do is get our arms around

24   this and, you know, get as much of an understanding of what

25   has -- what transpired in the, you know, ten years or so

1    before the filing through these documents -- that document

2    review.

3    Q    So have you actually -- has your team actually reviewed

4    all of the 700,000 or so documents at this point?

5    A    I would say that most, if not all of them, have been

6    reviewed.  Yes.

7    Q    But then you mentioned sort of it being a puzzle.  And

8    would it be fair to say that just because a document has

9    been reviewed once, it doesn't mean that you've necessarily

10   been able to appreciate the significance of that document at

11   that time?

12   A    Yeah.

13            MR. SKLARZ:  Objection to leading.

14            THE COURT:  Who is objecting?

15            MR. SKLARZ:  I'm sorry, Your Honor.  This is

16   Jeffrey Sklarz.  Leading.

17            THE COURT:  You're objecting to a leading

18   question, as to that's a leading question?

19            MR. SKLARZ:  Yes.  He --

20            THE COURT:  All right.  Overruled.  Thank you.

21            Go ahead, Attorney Bassett.

22   BY MR. BASSETT:

23   Q    So you had said that it was sort of like putting

24   together a puzzle.  And my question for you is, that comment

25   that you made, you know, how does that relate to the

1    document review process and what your team is able to learn

2    from that process?

3    A    That there are very rarely, in today's environment,

4    like documents where somebody says, I did it, I did this, or

5    it's a fraud or something like that.  There's none of that.

6    So you have to piece -- put the pieces together.  And so you

7    know parts of the story, but you need them to verify all of

8    this, because some of those may be false leads.  I've talked

9    to the Court about false leads before, because we've got a

10   lot of documents that were not produced to us through the

11   2004 process but rather by people who had been previously or

12   alleged to have been previously involved in the debtor's

13   affairs.  And we -- you know, when you review this, you

14   can't take this for what's asserted there.  You need to

15   verify that.  So there's a whole process of reviewing these

16   documents, testing the various theories that are there.  And

17   so it's a fairly lengthy and burdensome process.

18   Q    Other than reviewing the documents that you've received

19   in response to Rule 2004 subpoenas, has your team reviewed

20   any other information?

21   A    Yes.  You know, the debtor was a prolific user of

22   social media, so there's tons of videos of him that he

23   posted on social media.  And so they're all -- I would say

24   they're mostly all in Mandarin.  Most of them do not have

25   translation.  So obviously the part of the team that speaks

1    Mandarin needed to review those.

2          And as I said, we had people who believed they had been

3    defrauded by the debtor, and, therefore, they were providing

4    us with information voluntarily.  And we reviewed those as

5    well.  And as I said, you can't assume that anything that is

6    provided either by the debtor or by these folks is accurate,

7    so we need to test them and challenge every assumption

8    there.

9    Q    Other than your legal counsel, have any other

10   professionals assisted in the trustee's investigation?

11   A    Yes.  We hired Kroll to do the forensic and accounting

12   investigation -- part of the investigation.

13   Q    And when did you retain Kroll?

14   A    Very early.  August 2nd or August 3rd of 2023.

15   Q    And so that was approximately a year after your

16   appointment.  Why did you not hire Kroll earlier?

17   A    Because -- and I have already testified to this.

18   Because, given that we had not been able to capture assets

19   and sell them so that we had cash on hand, it was

20   practically impossible to hire a forensic accountant in the

21   sense that I did approach one to see if they wanted to do

22   under contingency.  They turned me down.  I know my

23   colleague, Mr. Avi Luft, also approached some -- another

24   firm, a forensic investigator, who also turned him down.

25         And I think that people say, well, you could have found

1    somebody on a contingency basis.  But I think it's very

2    important to understand that it's not only the contingency

3    that was an issue.  It's the fact that we, meaning

4    Mr. Linsey's firm and ourselves, were already in the hole

5    for probably $8 million by the time we were in May of '23.

6         And even a contingency firm would not agree to be

7    behind us.  They would want to share or pari-passu with us

8    over any recoveries.  And, of course, I -- you know, I want

9    to get paid first because that -- obviously, we've been

10   funding the case for a long period of time.

11        So that -- so it's not only the contingency.  Even if

12   you could find somebody on a contingency basis, they would

13   say that -- by experience, I'm sure that they would say,

14   fine, but we're pari-passu with you.  And that created a

15   huge issue until we had funding in the case, which was in

16   late June 2023.

17   Q    So what -- and that was what I was going to ask you.

18   What was it that happened sort of before August when you

19   said you retained Kroll that finally gave you the means and

20   the funding to be able to hire Kroll?

21   A    It was the sale of the Lady May in late June 2023.

22   Q    So that was late June of 2023.  I think you said Kroll

23   was retained as of early August.  Just is there a reason why

24   there was sort of a month gap between selling the Lady May

25   and retaining Kroll?

1    A    Yeah, because we had to have an interview process.  We

2    went out to a number of firms to interview them.  They had

3    to themselves do their conflicts check, which takes -- given

4    the number of parties involved in this case takes a lot of

5    time.  And we needed to decide which way to go.  And that

6    took -- basically, if you put away July 4th and, you know,

7    summer, you know, vacation for some of the team, not all,

8    that took basically 30 days to select and hire and -- and

9    it's not only select but also negotiate the engagement

10   letter and all that.  So that took 30 days.

11   Q    So at the outset of this discussion about Kroll, you

12   very briefly talked about, you know, the kind of work that

13   Kroll has performed.  But could you talk about that in a

14   little more detail, that since Kroll's appointment, what

15   kind of investigation and analysis has it assisted you with?

16   A    Yes.  Basically, it's a forensic but also tracing

17   analysis of how -- you know, how did money flow, which

18   accounts did it go into, et cetera, et cetera.  But also

19   they do investigative work in terms of are there assets in

20   country X or country Y.  So they do some of that.  But I

21   would say that 80 percent plus of their work has been

22   focused, since their retention, on the review and analysis

23   of the flow of funds, reviewing, you know, hundreds of bank

24   accounts.

25   Q    So on that particular point, to help give the Court a

1    sense -- and it's not a memory test here, but do you have a

2    ballpark idea of -- just to give the Court a sense of the

3    scope of the work, the number of accounts, transactions, et

4    cetera, that Kroll has identified and has been

5    investigating?

6    A    Yes.  So there's more than 330 accounts.  And by that,

7    I would say that we're still discovering accounts this week,

8    but so it's just -- it's a yardstick.  It's more than 300

9    accounts.  There are something like 85 -- I could be off by

10   2,000 or 3,000 -- but 85,000 transactions.  More than

11   3 billion transiting through these accounts that Kroll has

12   been reviewing.

13        And I would say just -- Your Honor, just to -- I always

14   like to use this example of the Russian doll.  I mean, you

15   start with one bank account, and it shows you a number of

16   transfers.  So the first one is you open that doll, so

17   that's the bank account.  The bank account leads you to

18   other smaller Russian dolls.  Because what happens is that

19   there are transfers from that account to other accounts.

20   Sometimes the account is completely closed, because the

21   banks, you know, got wind of, you know, bad things going on,

22   and they closed the account.  So it goes to another account.

23        But even if the account is not closed, during a period

24   of six months, there could be thousands of transfers to

25   other accounts that are similarly controlled by the Kwok

1    enterprise.  And so you need to go -- now Mr. Linsey needs

2    to go to those new banks, get 2004 discovery from them, and

3    have them produce their accounts.  And then what you find

4    often is that you go to that second layer, and there are

5    payment transfer companies like PayPal.

6              So people know what PayPal is.  And there's a

7    transfer, let's say, of 100,000 to PayPal.  By the way, it's

8    not PayPal.  It's other competitors of PayPal, but.  So now

9    Mr. Linsey has to go back to the equivalent of PayPal and

10   say please produce all the documents regarding this -- these

11   transfers.  Then you open that Russian doll.  Then there are

12   hundreds of transfers.

13        And then you have information regarding the bank

14   opening accounts.  Like who opened that account at -- again,

15   it's not PayPal.  I'm using that as shorthand.  Who opened

16   the account at PayPal?

17        And then you have all sorts of things you're

18   discovering through that process.  But that takes -- as I

19   explained, that Mr. Linsey has to go back again and again

20   and again to different banks.  On top of that, these banks

21   are not all -- meaning if the production is due on June 1st,

22   to give an example, I would say 90 percent of these banks

23   don't produce on June 1st.  You know, they're taking their

24   time, not in a nefarious way, but because they're not happy

25   to do this work.  They don't make money that way.  So they

1    are slow producers.

2           And, of course, I can't send Mr. Linsey to court every

3    week to file a motion to compel, because we're going to be

4    broke very soon.  So, therefore, we need to have some

5    tolerance.  And, therefore, the banks take time to produce.

6           Not only that, they don't do a good job of producing.

7    Meaning that we looked at the documents they produced.

8    That's good.  Thank you very much.  But we're missing, you

9    know, like probably six months of statements.  So we have to

10   go back to them and get them to produce that.  So it's a

11   huge, complex, and time-consuming effort to do all of this.

12   Q    So you've now talked about -- thank you for that -- for

13   the explanation.  But you've now talked about Kroll's

14   investigation.  You also talked about your team's Rule 2004

15   investigation.  Through that investigation collectively,

16   what are you doing once you have determined that there is

17   information that may give you a cause of action?  What are

18   you doing at that point?

19   A    Well, we -- as I said, we test it to make sure that it

20   holds together.  But once we're -- we have enough, we draft

21   the complaint, and we are filing them.  And as you can -- as

22   Your Honor has seen in the last -- since Friday, I think

23   we've probably filed 180 complaints.  So when we have the

24   information, we are filing the complaints.

25          And I would say most of the people who are objecting

1   are in complaints.  Now, they are named as a defendant in

2   complaints already filed or to be filed between now and

3   Thursday.

4   Q    So you mentioned 100 and some complaints that have been

5   filed since Friday.  How would you characterize those

6   complaints?  Is there a particular type of complaint?  What

7   are the ones that have been filed recently?

8   A    The ones that have been filed since Friday by

9   Mr. Linsey's firm are typically avoidance actions

10  complaints, fraudulent transfer, actual intent fraudulent

11  transfer, generally.

12  Q    And prior to the filing of those complaints, had you

13  and your team filed other complaints previously in the

14  Chapter 11 case?

15  A    Yeah.  We had filed about ten or so complaints to try

16  to recover assets like the Lady May, HCHK funding, the

17  funds, the UBS fund, the Bombardier jet, all of these.

18  Sherry Netherland.  I'm sorry, I forgot to mention Sherry

19  Netherland.

20  Q    Understood.  So other than these complaints and other

21  than the avoidance action complaints that you just talked

22  about, are there any additional complaints that you and your

23  team intend to file prior to February 15th or prior to the

24  end of the day on February 15th of 2024?

25  A    Yes.  There are two other categories.  We're still

1    continuing with the filing of the avoidance actions.  But

2    other than those, we're going to file a very broad alter ego

3    complaint that basically seeks to have the Court find that

4    the debtor equitably owns or a -- the alter ego -- or that a

5    number of entities are the alter ego of the debtor.  The way

6    the Court has found with respect to some of these entities

7    so far.  But this is a much broader list.  So that's one.

8         And the second complaint that's, you know, a very broad

9    complaint is a civil RICO complaint which alleges that a

10   number -- I would say most of the people who are objecting

11   today are part of a fraudulent scheme that the debtor was

12   running to hide assets, to obstruct justice, bankruptcy

13   fraud, et cetera, et cetera.

14   Q    Are any of the potential objecting parties going to be

15   named defendants in either of those two complaints that you

16   just described?

17   A    I would say most, if not all.

18   Q    Okay.  Now I'd like to shift gears a little bit and ask

19   you about some of the challenges or difficulties you've

20   experienced along the way in your investigation.  Before I

21   do that, please remind the Court, I know we've talked about

22   this in the past, but how long you've been practicing

23   bankruptcy law and have been involved in Chapter 11 cases.

24   A    Over 35 years now.

25   Q    And sort of, you know, within the context of that

1    experience of yours, were there any unique challenges that

2    you faced during your investigation that you've described

3    that have affected your ability to complete that

4    investigation by the February 15th deadline?

5    A    Yes.  I would say this is unprecedented in the sense

6    that I've seen fraud cases before, very sophisticated fraud

7    cases before I've been involved in, but this -- in terms of

8    the brazenness of what's going on and the fact that it

9    continued post-bankruptcy in spades and with renewed vigor

10   is -- I've never seen something like this.  And yet, the

11   level of obstruction and the lack of any shame in doing it

12   is unprecedented.  Sorry to say.

13   Q    So we're in the thousands of docket entries in this

14   case.  A lot has gone on.  Again, it's not a memory test,

15   but can you just highlight for the Court some of the

16   particular issues or challenges that arose?

17   A    Well, if we focus for a minute on -- well, from the

18   beginning, you know, the debtor tried to disqualify the

19   firm, tried to get me removed, appealed that, did it again,

20   then withdrew it.  So that's just a little segment.

21        And then it went on from there to -- I mean, I don't

22   want to take too much of the Court's time, because the Court

23   has lived this probably more than we have.  But, you know,

24   there just -- it was nonstop, like the -- not producing any

25   documents.  For example, the debtor, I think, produced --

1    the total was, I could be off by a few, but 45 documents.

2    Mei Guo produced like 47 documents.  There was a, you know,

3    constant battle, for example, on the yacht where, you know,

4    even though there was a finding by a New York judge, there

5    was just constant fighting over all the assets.  And it's

6    just silly.  There was nonstop obstruction both on the

7    discovery front but also on the asset recovery front.

8    Q    So in addition to that, you said the debtor tried to

9    have you and your firm disqualified.  You mentioned the

10   discovery challenges.  How about outside of that?  Anything

11   else that occurred that interfered with your investigation?

12   A    Well, the whole protest that took a lot of time.  And

13   there was the distraction, intentional distraction, I'm

14   sure, to try to get us off of our appointed work so that,

15   you know, the whole protest thing.

16        The lawsuit filed against us by one of the parties

17   present here that's objecting to this that -- where this

18   person was sanctioned by -- against us but also against PAX

19   and the counsel, et cetera, so much so that one of the

20   district court judges ordered this gentleman to always

21   file -- attach to any pleading he files in any court a copy

22   of the sanction order that he was -- basically, that he was

23   found to be -- have committed -- or had, you know, been

24   sanctioned for.  Now, the reason why it wasn't filed with

25   this Court is because he's retained a lawyer to represent

1    him.

2         But if he had appeared here himself as a lawyer, he

3    would have had to attach a sanction order by -- I forget

4    which judge, by the Southern District of New York judge.  So

5    that's just another level of, you know, obstructionism

6    and -- that took, you know, time away from what should have

7    happened.

8    Q    Now, you mentioned it was one of the objecting parties.

9    Is that Mr. Yongbing Zhang?

10   A    That's correct.

11   Q    Now, when the bankruptcy court has issued decisions,

12   whether it's on a motion to compel or in a litigation, what

13   typically happens following that from an appellate

14   perspective?

15   A    Well, appeals.  Numerous appeals.  But on top of that,

16   stay pending appeal, both before Your Honor and before Judge

17   Dooley, all of them denied.  But that takes time, and it's

18   incredibly time-consuming.  Very expensive.  So there have

19   been a number of those as well.

20   Q    So recently -- and this is in the adversary proceeding

21   that relates to the Mahwah mansion, there was a subpoena

22   that you filed with respect to a storage unit to

23   investigate.  And as has been reported to the Court, the

24   trustee has been going through the contents of that.  Can

25   you talk about how that may have affected your investigation

1    and the timing of it?

2    A    Yes.  There are dozens of boxes in these storage units

3    that are basically Golden Springs documents, documents that

4    should have been produced to us months ago.  And, obviously,

5    we're trying to go through them, but it's not like an easy

6    task.  And, obviously, Your Honor knows that Golden Springs

7    defaulted on their production obligations.  They were held

8    in contempt.

9        But now we know that those documents that we're looking

10   for, now we found them, but we found them in -- I forget.

11   Is it December of last year?  Something along those lines.

12   And by the way, I am sure there are other storage units,

13   maybe not in the U.S. but around the world that contain

14   other documents or artwork.

15   Q    So before we leave the sort of topic of the challenges

16   that you face -- and I think you've given some examples of

17   what you view as obstruction of your investigation -- can

18   you talk about any particular instances of obstruction that

19   stick out in your mind as it relates to the particular

20   objecting parties to this motion?

21   A    Sure.  Well, the leader of the group, Mei Guo, I mean,

22   I just -- I don't know how to say this, but is a poster

23   child for obstruction and for, you know, misrepresentation

24   and perjury.  There's no other way to describe it.  You

25   know, she, for example, said that she had stopped using a

1    smartphone because of the concern with the Chinese Communist

2    Party.  That wasn't true.  Because later, we got all her

3    WhatsApp -- or not all of it, but some of her WhatsApp or

4    text messages sent with a smartphone, an iPhone.  So that's

5    number one.

6        Two, she was deposed.  This is incredible.  She was

7    deposed in January.  January 20, 2023.  And she said, oh,

8    yeah, the airplane that I owned, even though she was a

9    teenager when it was bought, that I owned was sold during

10   the case in August 2022, and I don't know where the money

11   is.  I don't know.  Okay.

12       So that complete lie.  We know now from documents that

13   she was emailing the entity that got those funds, the

14   $13 million.  It's an entity in London called JMFX.  It's a

15   foreign exchange entity.  She was emailing, communicating

16   with them as late as December 17, 2022.  And she said in her

17   deposition that she had no idea where these funds were.

18       It's just -- you know, that is just a -- that's why I

19   said, she's a poster child for what is going on in this

20   case.

21   Q    And how has that affected your investigation and the

22   need for your --

23   A    Well --

24   Q    -- request for tolling that's set forth in the motion

25   before the Court today?

1    A    Well, that -- you know, that's -- because we were -- we

2    had to spend a lot of time chasing all of this instead of,

3    you know, being able to review all of the claims that should

4    be brought.  We were -- we had to chase this asset that was

5    right under our nose, but we didn't know it.  Our nose --

6    you know, I guess London is not under our nose, but close

7    enough.  But she knew that.

8         And, of course, that is just an example of the

9    obstructionism that we faced throughout the case.  The

10   more -- that's a more blatant one.

11   Q    So you mentioned Mr. Yongbing Zhang.  But, again, not a

12   memory test.  We don't need to go down the line.  But

13   anything else from any of the other objecting parties that

14   stands out to you as a problem?

15   A    Well, you know, G Club.  I mean, that was a drag-down

16   fight to get documents from them.  Again, appeals, stay

17   pending appeals, all denied.  I mean, the appeal on the

18   merits has not been heard, but stay pending appeal was

19   denied.

20        Just, you know, Defendant Cao, C-A-O, that we just sued

21   last week, because he is the title owner to three luxury

22   motorcycles that are the debtor's motorcycles, obviously.

23   In his deposition, I -- because it's confidential, I have to

24   be careful.  But, basically, I invite anyone to read that

25   deposition.  And it's just -- the evasiveness of this

1    person.  You know, he says that a person, Max, called me to

2    sign title, to get title to these motorcycles.  But who's

3    Max?  Don't know.  Don't know his name.  Of course we know

4    who Max is.  It's Krasner.  But, you know, the concept that

5    somehow he doesn't know that.

6         And then he gets money from a Chinese company that he

7    hasn't worked for for 12 years or 15 years.  He doesn't know

8    why he's getting the money.  I just -- the level of

9    obstructionism -- it's all very subtle, I mean, in the sense

10   that you might say, well, that's -- how do you know that

11   he's lying?  Okay.  Fair enough.  But it's -- once you've

12   done like 15 of these depositions, I think you get a pretty

13   clear pattern of what's going on.

14   Q    The Court is familiar with, from one of the adversary

15   proceedings in this case, a group of individuals known as

16   the HCHK Creditors Committee.  Has your team identified any

17   relationship between that committee and any of the objecting

18   parties?

19   A    Yeah.  There are -- and we pointed that out in our

20   reply.  There's a few of them that are members of that

21   creditors committee which was headed by Mr. Yongbing Zhang.

22   Who, by the way, visits the debtor in prison all the time.

23   We know that from maybe a social media posting.  So he's the

24   debtor's counsel on immigration matters, apparently.  So,

25   you know, so they're -- again, they're in contact.  They're

1   part of the creditors committee for HCHK.  They were

2   involved in the protests, et cetera, et cetera.

3        Some of them, I believe, got money from the Rule of Law

4   Foundation.  So that I'm not 100 percent sure of, but I know

5   that a number of protesters are getting sued in the next two

6   days for receiving substantial sums from the Rule of Law

7   Foundation.

8   Q    Which is another objecting party, correct?

9   A    That's correct.

10  Q    So you talked a little bit earlier about how you're

11  planning to file -- or you're continuing to file avoidance

12  action complaints and then planning to file two additional

13  complaints prior to the 15th.  And you also mentioned that

14  you're going to be naming, you think, most if not all of

15  these objecting parties in one or both of those complaints.

16  My question for you is, if you are able to file all of these

17  complaints that you talked about prior to the February 15th

18  deadline, why do you need the tolling that you are seeking

19  through your motion?

20  A    Yeah.  So let me take two very specific examples.  The

21  first one is when I know that there's an issue, but I don't

22  have enough information to bring a claim.  So I'll give --

23  you know, I mentioned the Russian doll analogy when talking

24  about bank accounts.  But we have a very specific issue here

25  where going through the first account leads us to a second

1    account, which leads us to a PayPal type of entity.  It's

2    not PayPal.  I'm just using that as a shorthand for a

3    payment transfer entity.  So we go to that entity.

4    Mr. Lindsay asked them to produce their documents, including

5    the account opening documents.

6         Well, what do we find in there?  We find a passport for

7    one of the persons that is very close to the debtor,

8    involved in many of the schemes, asset hiding schemes.  And

9    it's a passport for a country in Europe that, how shall I

10   say this, was very liberal in granting passports to

11   foreigners that bought real estate in the past and maybe

12   five, six years ago.

13        And so you might say, well, so what does that tell you?

14   What that tells me is that there's probably real estate in

15   that country.  And it's not owned by that person, because

16   that person has no money.  It's the debtor's real property.

17        Now, do I know that enough to file a complaint?  No,

18   absolutely not.  There's no -- we discovered that

19   information in late November.  There's no way we -- there's

20   no central real estate registry, Your Honor, that we have in

21   all our states here in the states, so you can't go and do a

22   search like that.

23        So we're absolutely looking through that issue, but

24   I -- there's no way I can file a complaint saying I think

25   there's a house in that country, but I don't know where it

1    is.  By the way, it could have been sold, so I have no -- so

2    the point is, we have a number of these nuggets, if you

3    will, that we cannot pursue because we don't know enough.

4         And then the next type of claim is, as I said -- I

5    don't want to sound pedantic about this.  I'm 100 percent

6    sure that there are other claims of asset transfers that we

7    don't know about, because that's just the nature of what

8    we're dealing with.  And there we don't even have a tip.  So

9    that is why, I'm sorry to say this, but why all of these

10   objectors are coming here, because there's real benefit for

11   them to have a strict statute of limitations of February

12   15th, because they could actually benefit tremendously from

13   that.

14        And that's the second example.  And that's why it's

15   critical to get the tolling -- equitable tolling of statute

16   of limitations in this case.

17   Q    So some of the objecting parties have said in their

18   papers that they usually just wait and seek equitable

19   tolling later if you decide to bring a complaint against a

20   particular party.  What's your response to that suggestion?

21   A    In this extraordinary case with these extraordinary

22   circumstances, that doesn't work, because it puts the estate

23   at incredible risk.  It's the risk of going down the --

24   continuing our investigation, spending real money

25   investigating real leads, only to find out later after you

1    spend all that money that you're time barred.

2         Basically, the people that are objecting here should

3    not benefit from the obstructionism of either the debtor or

4    other people.  They don't have to cause the obstruction

5    themselves, although I would say in most cases they have.

6         The point is that the estate should not be at risk of

7    spending hundreds of thousands of dollars continuing the

8    investigation that might be found to be time barred six

9    months from now.  That's really the crux of the issue.

10   Q    And you've mentioned six months, and that's the length

11   of the extension that you're seeking in your motion.  Why

12   six months?

13   A    Because, as I said, we have a number of -- I call them

14   nuggets or potential leads.  We believe that six months is

15   a -- there's a balancing here.  So, I mean, we could have

16   asked for a year, but the point is we -- we're conscious

17   that we're asking the Court to enter an order that affects

18   people's rights.  And so we're trying to balance that

19   against the issue of protecting the estate and maximizing

20   recovery for unsecured creditors.

21        So we believe that six months is a good -- certainly a

22   good check-in point.  It may be the last extension, because

23   we will have concluded that these nuggets are not worth

24   pursuing, too costly or too complicated, because they

25   involve foreign jurisdictions, or we may have filed them the

1    same way we filed -- we will have filed 230 complaints now

2    by February 15th.  Because we will have -- you know, those

3    were ready to be filed.

4         There's no strategic waiting here.  We're not sitting

5    on a complaint that's ready to go, and we're not filing it

6    for strategic reasons.  I think there was some allegation of

7    that.  But, no, none of that.  When a complaint is ready, we

8    have the information, it passes Rule 11, we're filing it.

9    And but we think that six months is going to put us in a

10   very good position to file more or say that's the end of it.

11   Q    Thank you.  I think I have just one final question, and

12   that's to ask you if you have any response to the assertion

13   that's been made by not all but I think several of the

14   objecting parties that they don't believe you and your team

15   have acted diligently in pursuing your investigation of

16   potential claims by the deadline.  Do you have a response to

17   that?

18   A    Well, I -- again, I don't want to be pedantic, but I

19   think we've been working around the clock.  And I would say

20   especially on the (indiscernible), Mr. Linsey's team have

21   been working around the clock for the last six months on

22   this process.  We've been as diligent as -- I've done a lot

23   of these, and I think we've explored every possibility.

24   We've captured any possibility by filing complaints when we

25   had enough information to do so.  And, therefore, it's not a

1    question of lack of diligence.  It's a question of the

2    impossibility of knowing the full universe of what happened

3    here in the period since the appointment of the trustee.

4    It's just impossible.

5            MR. BASSETT:  Thank you, Trustee Despins.

6            Your Honor, I have no additional questions at this

7    time.

8            THE COURT:  Okay.  Thank you.

9            Now, we have several objecting parties.  And I'm

10   sure people would like to cross-examine Trustee Despins, but

11   I'm not going to allow parties to ask the same questions

12   someone else already asked.  So I'm just letting people

13   understand that before we begin with any cross-examination

14   of Mr. Despins.

15           So I'm going to start with counsel for Mei Guo,

16   who is in the -- Mr. Moriarty or Mr. Della Fera.  Obviously,

17   just one of you is going to question -- cross-examine

18   Trustee Despins, not two of you.  So I assume you've already

19   worked that out prior to this hearing this afternoon.

20           MR. DELLA FERA:  Yes, Your Honor.  Sam Della Fera.

21   I'll be asking --- I'll be cross-examining the trustee.

22   Thank you.

23           THE COURT:  Okay.  Thank you.  You may proceed.

24           MR. DELLA FERA:  Okay.  Thank you, Your Honor.

25                         CROSS-EXAMINATION

1    BY MR. DELLA FERA:

2    Q    Mr. Despins, you testified about the risk to the estate

3    of bringing -- trying to bring a claim in the absence of the

4    requested extension that may ultimately be time barred.

5              THE COURT:  Mr. Della Fera, unfortunately, you're

6    frozen.  Is that true for everyone else?

7              MR. BASSETT:  Yeah.

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Okay.  Hold on a second.  Let's see if

10   we can get him back.

11             THE WITNESS:  I think he's back now.

12             MR. DELLA FERA:  I'm sorry, Your Honor.  Can you

13   hear me?

14             THE COURT:  I'm sorry.  Yeah.  We could.  You were

15   just asking a question about what Trustee Despins just

16   testified about.  And then you kind of --

17             MR. DELLA FERA:  Right.

18             THE COURT:  So you may want to ask the question

19   again.

20             MR. DELLA FERA:  I will do that, Your Honor.

21   Again, I apologize.

22   BY MR. DELLA FERA:

23   Q    Mr. Despins, you testified as to -- regarding the risk

24   to the estate that a claim that is brought down the road in

25   the absence of the requested extension of the deadline, that

1      the -- that that claim would be time barred for the estate.

2      Do you recall that testimony?

3      A      The risk to the estate of incurring, you know, hundreds

4      of thousands in fees, you know, direct from that process,

5      yes.

6      Q      And, ultimately, spending that money, bringing the

7      claim, and ultimately that claim might be found to be time

8      barred, correct?

9      A      That's the risk unless we get a tolling decision today,

10     yes.

11     Q      Well, isn't it -- but is it a risk if -- isn't it only

12     a risk if the equities at the time you bring that claim are

13     unfavorable to you and the estate?

14     A      I don't know what could transpire at that hearing.  But

15     it's hard to believe that Mei Guo can argue today that the

16     equities would favor -- are you saying that equities would

17     favor us in that context?

18     Q      I'm not arguing that the equities are favoring you.

19     You're arguing that the equities favor you today.  And we

20     don't know what those claims are that you're -- that you

21     potentially could bring against my client, correct?

22     A      We don't know precisely what they are.  That's correct.

23     Q      Okay.  So it seems to me, I'm wondering if you agree

24     with me, the risk to the estate that the claim is time

25     barred, that risk only arises if the equities do not favor

1    the estate when that claim is brought.  Isn't that correct?

2    A    No, because there could be many things.  The Court

3    could find that we had sufficient information to bring the

4    claim or that we waited too long.  Or I -- you know, there

5    are multiple -- it's a multifaceted analysis.  So,

6    therefore, there's no way to predict how that ruling would

7    be.

8         But the point is that when you're faced with people who

9    have obstructed justice, as your client has, they -- we

10   should not be in a position where we have any risk --

11   Q    So it sounds --

12   A    -- on that issue.

13   Q    Sounds like you're not a big fan of my client.  Is that

14   fair to say?

15   A    Well, I don't know, but I think that we've come to know

16   what she stands for.  Yes.

17   Q    Do you consider her a bad actor?

18   A    Well, it depends how you view perjury.

19   Q    Well, it sounds like you do.  Are perjurers -- are bad

20   actors entitled to due process, in your opinion?

21              MR. BASSETT:  Objection.  This is legal -- this is

22   argumentative, and it's legal argument, Your Honor.

23              THE COURT:  Mr. Della Fera, I understand your

24   question.  You've gotten the trustee to answer your

25   question.  But if you want to ask about due process, I think

1    you need to ask the question a different way.  Okay?

2              MR. DELLA FERA:  That's okay.  Thank you, Your

3    Honor.  I'll withdraw that question.

4    BY MR. DELLA FERA:

5    Q    How many attorneys are at your law firm, Mr. Despins?

6    A    You mean all attorneys?

7    Q    All attorneys.

8    A    Yeah.  Something like 1,200 or maybe more.

9    Q    Right.  And how many appeals have been filed in this

10   bankruptcy case, more or less?

11   A    At least ten, if not more.

12   Q    Okay.  So is it your testimony that those ten appeals

13   have prevented you and your firm of 1,200 lawyers from

14   efficiently and expeditiously investigating claims you may

15   have against certain individuals and entities?

16   A    Yeah.  Let me address that.  That's a fundamental

17   issue, which is that you cannot run a case like this with 50

18   lawyers.  I could throw 50 lawyers or 70 lawyers at this.

19   We cannot do, that because the cost would be incredible, and

20   you would lose all efficiency.  So we're operating with a

21   team that is large enough to handle a case like this without

22   being wasteful.  So, of course, we could put 1,200 lawyers

23   working on all these things, but the -- it would not be an

24   efficient case, and it would be impossible to manage a case

25   like that with that number of lawyers.  And also the costs

1    would be prohibitive.

2          So the answer is, it makes no sense whatsoever to have

3    a larger team than we have.  When you think about our team,

4    it's fairly large as it is.  But we have also Mr. Linsey's

5    team that's working on this.  So that's a fairly large

6    group.  And it's very expensive, very expensive.

7          And, you know, I understand that from the debtor's

8    point of view, you would like the -- basically to have us

9    run the most inefficient process possible, but we cannot do

10   that.

11   Q    I don't represent the debtor, Mr. Despins, but that may

12   or may not be true.  But now I'm thinking back to your

13   testimony regarding the circumstances surrounding the

14   retention of a forensic accountant.  Do you recall that

15   testimony generally?

16   A    Yes, generally.

17   Q    And I believe you testified that one of the problems in

18   retaining a forensic accountant was that they wanted to be

19   paid, like other administrative creditors, pari-passu with

20   you and your firm.  Is that correct?

21   A    That's one of the issues with retaining a forensic

22   accountant, even on a contingency basis, assuming that they

23   would be willing to do that.  They would honestly say, well,

24   then if there's a $20 million pot, we're sharing pari-passu,

25   and that's not -- in the context where we were then,

1    which -- where we're already owed, I think, 7 or $8 million,

2    that's just not realistic.

3    Q    Do you think you could have retained a forensic

4    investigator sooner than 13 -- sooner than the 13 or 14

5    months that it took you to retain one if you weren't

6    concerned about the protection and priority of your -- of

7    the fees of you and your firm?

8    A    No, that's not the way I would put it.  I would put it

9    in the way that the financial advisor would be obviously

10   looking at that issue.  And so, as I said, assuming they're

11   willing to do contingency -- which I've already testified we

12   were turned down as to two of those.  So understanding --

13   assuming that you find someone who can do it on a

14   contingency basis, you face the other issue, which is they

15   want to be sharing pari-passu with us.

16           MR. DELLA FERA:  Okay, thank you, Mr. Despins.

17           Your Honor, I have no further questions.

18           THE COURT:  Okay.  Thank you, Attorney Della Fera.

19           The next objecting party, I think -- Attorney

20   Mateo, are you going to be cross-examining, if you are going

21   to ask any questions?

22           MS. MATEO:  Yes, Your Honor.

23           THE COURT:  Go right ahead.

24                        CROSS-EXAMINATION

25   BY MS. MATEO:

1    Q    Good afternoon, Trustee Despins.  I will be asking you

2    a few questions about Mr. Defeng Cao, C-A-O, one of the

3    objectors.  As a shorthand, I'll refer to Mr. Cao -- to

4    Mr. Defeng Cao as Mr. Cao.  Is that okay?

5    A    Sure.

6    Q    When did you first learn about Mr. Cao?

7    A    I don't remember specifically.  I mean, I -- I've

8    learned about him.  Of course, the question is putting a

9    time frame on that about him.  It's what I -- actually,

10   yeah, I can put a frame on this.  It's after our visit to

11   the Mahwah mansion.  So Mahwah mansion, I want to say that

12   it was July 4th.  Maybe I'm mixing -- is it Memorial Day or

13   July 4th?  Anyway, so -- wait.  No, no.  Actually, it was

14   Labor Day.  Sorry.  Labor Day weekend.

15   Q    I'll help you out, because it sounds like maybe you're

16   doing a little bit of speculating.  You filed a Rule 2004

17   motion to seek discovery for Mr. Cao on May 15th, 2023,

18   correct?

19   A    Okay.  So it would have been, yeah, around that time.

20   Okay.  Sure.

21   Q    Isn't it correct that in that Rule 2004 motion, you

22   stated that you identified Mr. Cao's name from a list of

23   proposed shorters in a proposed bond package for a defendant

24   in the parallel criminal action?  Isn't that correct?

25   A    That's probably right.  Yeah.

1        THE COURT:  May I just interrupt?

2        THE WITNESS:  We had no idea about the

3    motorcycles --

4        THE COURT:  May I interrupt for one second?

5    Attorney Mateo, I didn't hear your question.  One part of

6    your question didn't come across.  And because we do

7    everything on audio, if I didn't hear it right, that means

8    it didn't get picked up.  You said, didn't you identify

9    Mr. Cao's name from a list of -- and I didn't hear the word.

10        MS. MATEO:  Of proposed shorters.

11        THE COURT:  Shorters?

12        MS. MATEO:  Yeah, shorters.

13        THE COURT:  Okay.  Okay.  Thank you.  I'm sorry.

14        MS. MATEO:  No, it's okay.

15        THE COURT:  I appreciate that.  I appreciate that.

16    Go ahead.

17        MS.  MATEO:  It's a tricky word.  No worries.

18    BY MS. MATEO:

19    Q    Okay.  And Mr. Cao did not file an objection to your

20    Rule 2004 motion, correct?

21    A    I don't know.  To be candid with you, I have no

22    involvement -- I mean, I -- yes, I'm involved, because I'm

23    the trustee.  But I hope it comes as no surprise to anyone

24    that I don't follow every 2004 target.  So I -- my first

25    recollection of him, why I was interested in him, was after

1    the visit with the Mahwah mansion.  And I think that was in

2    Labor Day or July 4th.  I remember it was a big holiday.

3    And because we found motorcycles there they eventually

4    turned out that he was the registered owner of.  But sorry

5    to interrupt your line of questioning.

6              MS. MATEO:  Objection to strike as non-responsive.

7    BY MS. MATEO:

8    Q    My question was, Mr. Cao did not file a motion -- an

9    objection to your Rule 2004 motion, correct?

10   A    And I said I don't know.

11   Q    Okay.  I'll help you out that Mr. Cao did not, in fact,

12   file an objection or a motion to quash the Rule 2004

13   subpoena.  Mr. Cao voluntarily accepted service of your Rule

14   2004 subpoena.  Isn't that correct?

15   A    I don't know.

16   Q    He did.  And Mr. Cao also served timely written

17   responses to your Rule 2004 subpoena.  Isn't that right?

18   A    That's possible, but I have no personal knowledge of

19   that.

20   Q    And Mr. Cao also timely served you and Paul Hastings

21   with documents responsive to your Rule 2004 subpoena.  Isn't

22   that right?

23   A    He did produce some documents.  Whether all documents

24   that are responsive were produced, that I would -- I have

25   severe doubts about.

1          MS. MATEO:  Motion to strike as non-responsive.

2     BY MS. MATEO:

3     Q    I also did not ask you whether he produced all

4     documents.  I asked you whether he timely served you with

5     documents responsive to your Rule 2004 subpoena.  Isn't that

6     right?

7     A    I don't know whether they were timely filed or not.

8     Q    Isn't it correct that Paul Hastings did not schedule

9     Mr. Cao's deposition until October 20, 2023?

10    A    I know we scheduled it in October, but I don't know

11    more details of that.

12    Q    And after Mr. Cao's deposition, isn't it correct that

13    you and your counsel did not seek any additional discovery

14    from Mr. Cao?

15    A    That may be.  I don't know.  Again, I don't follow the

16    250, you know, 2004 targets on a daily basis.  I don't know

17    precisely in that case whether he did or not.

18    Q    Well, I'm just probing here.  Because a moment ago in

19    your testimony, you testified that Mr. Cao was someone who

20    had obstructed your search for discovery, and so I'm just

21    trying to tease out here that that, in fact, is not the

22    case.  Isn't it correct that subsequent Rule 2004 subpoenas

23    to other third parties list Mr. Cao as an associated

24    individual?

25    A    That's certainly possible.

1    Q    And isn't it correct that Mr. Cao has not objected to

2    any of those Rule 2004 subpoenas seeking information about

3    him as one of the numerous individuals identified as

4    associated individuals?

5    A    That may very well be.  I don't know.

6    Q    Isn't it correct that your counsel only began drafting

7    the adversary proceeding complaint against Mr. Cao last week

8    after they saw that he objected to the tolling motion?

9    A    No.  That's completely false.

10   Q    Isn't it correct that the adversary proceeding

11   complaint against Mr. Cao only relies on his deposition

12   testimony and documents he produced to you four months ago?

13   A    I'm not sure if -- I'm not sure that's the case.

14   Q    It is.

15   A    Okay.

16   Q    Isn't it correct that your counsel --

17        MR. BASSETT:  Objection.  Objection.  Objection to

18   counsel testifying.  If she gets an answer to the question,

19   that's fine, but following up with providing testimony is

20   inappropriate.

21        THE COURT:  Sustained.

22   BY MS. MATEO:

23   Q    Isn't it correct that your counsel filed the adversary

24   proceeding complaint against Mr. Cao the day after they saw

25   that he objected to the tolling motion?

1    A    I don't know that, but I know we've been working on

2    that complaint for at least two months.

3    Q    Isn't it correct that the adversary proceeding against

4    Mr. Cao was only filed to try to moot his objection to the

5    tolling motion?

6    A    Absolutely not.  And, by the way, that wouldn't

7    accomplish that, because I want to be able to assert other

8    claims against him that we don't know enough about.  So it

9    doesn't moot it.

10   Q    You talked earlier about having to balance the needs of

11   the estate with the right to due process of the more than

12   900 potential defendants.  Do you recall that?

13   A    No, I didn't say that.  Sorry.  I think you're talking

14   about the 900 defendants.  And I said that -- I didn't talk

15   about due process.  I said that we're affecting some

16   people's rights, and we want to balance that against the

17   need to protect the estate to maximize value for creditors.

18   Q    I believe when we started this hearing, your counsel

19   provided an update to the Court where he identified that

20   more than 900 potential defendants had been noticed in

21   connection with the tolling motion.  Isn't that right?

22   A    He didn't say potential defendants.  He said 900

23   entities were notified.

24   Q    And those entities and individuals have been identified

25   in the tolling motion as "potential defendants."  Isn't that

Ho Wan Kwok - February 13, 2024                                    64

1    correct?

2    A    That I -- I don't recall whether the 900 were

3    identified as potential defendants.  But we tried to

4    cast --- in terms of notice, we tried to cast as wide a net

5    as we could so that we didn't fall, you know, outside of --

6    from a noticed point of view that they had accurate notice

7    of the proceedings that are going on before the Court.

8    Q    Well, if they're not potential defendants, then how

9    would you classify or describe who the -- these 900

10   individuals and entities are?

11   A    Because they are people who had dealings with the

12   debtors, but it doesn't mean that they're going to get sued,

13   actually.  The notice expressly said, I think at my request

14   we put that in, that it's not because you're getting that

15   notice that you will get sued.  It's because we don't have

16   all the facts, and that's really the crux here.

17   Q    How would the equity serve by infringing the right of

18   due process of parties that have cooperated with you in your

19   counsel?

20          MR. BASSETT:  Objection.  Argumentative.

21          THE COURT:  Sustained.

22   BY MS. MATEO:

23   Q    Is it possible that you may get to the six months that

24   you're asking for and that your -- you and your counsel will

25   have to request another extension?

1    A    That definitely is possible, but no -- it will be my

2    job to make sure that, to the extent possible, this doesn't

3    happen.  I mean, I really want to wrap up this part of the

4    case as expeditiously as possible.  So we're going to go

5    full steam ahead, you know, provided we can get the relief

6    here with what we're doing.  And hopefully we'll not have to

7    ask the Court for more.

8    Q    And how can the potential defendants have any assurance

9    that their due process rights won't be further infringed by

10   additional extensions that you may seek to the statute of

11   limitations?

12        MR. BASSETT:  Objection.  Argumentative.  Assumes

13   facts not in evidence.

14        THE COURT:  Sustained.

15        MS. MATEO:  I have nothing further, Your Honor.

16        THE COURT:  Okay.  Thank you, Attorney Mateo.

17        The next objecting party then would be DBS Bank,

18   and that's Attorney Weiner, I believe?

19        MS. WEINER:  Yes.  Thank you, Your Honor.  I have

20   no questions for the witness but would just like to reserve

21   for a brief statement later, if possible.

22        THE COURT:  Yes, you may.  Thank you.

23        MS. WEINER:  Thank you.

24        THE COURT:  All right.  Then the next objecting

25   party is Taurus Fund, LLC, and that's you, Mr. Conway.

1  Mr. Conway, if you can give me one moment before you start

2  your questioning, please.  I just need to catch up with

3  where I am.  Just give me one second.  Well, maybe more than

4  one second.  About 30 seconds, please.

5            MR. CONWAY:  Sure.

6            THE COURT:  Okay.  Go right ahead, Mr. Conway,

7  whenever you're ready.

8            MR. CONWAY:  Thank you, Your Honor.  Michael

9  Conway, for the record, representing Taurus Fund, LLC;

10 Tourist Management, LLC; Scott Barnett.

11                     CROSS-EXAMINATION

12 BY MR. CONWAY:

13 Q    Good afternoon, Mr. Despins.

14 A    Good afternoon.

15 Q    Just a couple follow-ups.  There was a statement about

16 900 folks were served with this motion, but about how many

17 potential defendants are you aware of?

18 A    Well, that assumes I know the universe.  I know we're

19 going to file approximately 230 complaints.  Don't hold me

20 to that number.  It could be 10 more, 20 more, or 15 less,

21 you know, depending on the tolling agreements we were able

22 to obtain from people.  But so that's one universe, but

23 that's known.

24      If you're asking me to speculate as to, on the other

25 side of February 15th, the potential defendants, I don't

1    know.  I know that -- I shouldn't say I know.  I believe

2    that it's very likely that additional claims will be filed

3    against most of the objectors, just because I know that we

4    don't have the full picture yet.  But I can't tell you 15,

5    20, 12, 50.  I can't assess that.  I'm sorry.

6    Q    That's all right.  We don't want you to speculate.  I

7    want to ask you a little bit about the exhibits that we

8    heard about before you started testifying.  Were they -- we

9    didn't really hear you testify about any of the exhibits,

10   but were they listed as examples of obstructive conduct?

11   A    Well, but, I mean, they were -- they're docketed

12   documents.  So I'm sure there are like motions to compel,

13   motions for sanction, motions or orders by the Court, so --

14   Q    Relating to obstructive conduct?

15   A    I assume that's the case.  Yeah.

16   Q    Okay.  Were there any instances of obstructive conduct

17   which did not make their way into your exhibit list?

18   A    Well, yes.  If we're talking about your clients, you

19   know, Mr. Barnett, for example, well, we just learned -- and

20   that's what just shows, you know, to the Court, you know,

21   how we learn things all the time -- that, in fact, he was

22   the owner of the motorcycles before Mr. Cao became the

23   owner.

24        So that's another example of what's going on there.  Of

25   course, he was not the real owner.  He was used by the

1    debtor to have ownership of the motorcycles the debtor was

2    using.

3        And also, we just learned probably two months ago that

4    as to the storage units in Mahwah, who was the tenant of

5    that?  Mr. Barnett or his company.  So that -- these are

6    other examples of obstructionists, obviously.  He's there to

7    make sure the debtor is not the tenant of the facility, or

8    he's not the owner of the motorcycles.  He's part of the

9    scheme.  So that would be more obstruction, yes.

10   Q    Those are allegations about misconduct.  He didn't hide

11   any of these facts from you, did he?

12   A    Well, he didn't disclose them.  That's for sure.

13   Q    When did you ask him about it?

14   A    I didn't -- I don't -- as I said, I don't handle every

15   aspect of discovery, so I couldn't say.

16   Q    Okay.  You're not aware of any requests to him where

17   that information was solicited but withheld, correct?

18   A    I don't know.  The answer is I don't know.

19   Q    Okay.  But my question was broader than just

20   Mr. Barnett.  I'm asking whether you're aware of whether

21   there are instances where somebody was requested -- you made

22   a request to somebody, they refused to respond to your

23   request, and you didn't raise the issue with the Court.

24   A    Again, I -- there are 250 subpoenas, targets.  So I

25   cannot give you -- I think generally we try to follow up

1    with the Court.  Although there are instances where either

2    it's too time-consuming or the target is too small or we're

3    going to get the target in some other way.  And Barnett may

4    be in that category, because we're suing him in the

5    adversary proceeding regarding Mahwah.

6         So there are many reasons why we may not have followed

7    up with the Court in getting motion -- or an order of

8    contempt.  Because to get an order of contempt against

9    someone with no money or an entity that's been liquidated

10   may not be attractive.

11        So I wouldn't conclude, Mr. Conway, that every time

12   somebody did not produce something that we filed something

13   with the Court.  It may be in the works that we're about to

14   file it, or we decided not to file it now because we're

15   going to get it in some other way.

16   Q    Okay.  And just to clarify, you mentioned you had a

17   couple of teams working on this matter.  How many attorneys

18   in your -- in Paul Hastings are working on this bankruptcy?

19   A    About 10, 12.

20   Q    We would be able to see essentially all the attorneys

21   working on this bankruptcy from looking at your invoices

22   that are submitted to the Court for approval, correct?

23   A    That's correct.

24   Q    Okay.  Now, have you been receiving information from

25   the Department of Justice related to their investigations

1    and the criminal prosecution of the debtor?

2    A    No.  Actually, we -- that's another reason where we're

3    seeking equitable tolling is, after a lot of fighting, this

4    Court found that the debtor should ask the criminal court to

5    provide to us whatever documents the DOJ gave to them.  And

6    we had -- we basically had to withdraw that request, and

7    therefore we don't have that.  So the answer to your

8    question -- sorry for the long way of getting there -- is,

9    no, we're not getting anything from the DOJ.

10   Q    So and you say we're not getting -- you have not

11   received any information from the DOJ relating to the

12   debtor?

13   A    Well, that's -- actually, I spoke without nuance there.

14   In your case, in the Mahwah case, we did obtain pictures

15   that FBI agents took of certain items such as the debtor's

16   prescription drugs or family photos or -- I forget.  There

17   were others.  But you know what they are.  Other things like

18   that.  So we did get that from the DOJ.  But that -- to my

19   knowledge, that's the only information that we got from them

20   regarding the debtor's documents or anything regarding the

21   debtor.

22   Q    Okay.  And they didn't provide you with anything that

23   related to someone other than the debtor, the bank account

24   records, for instance, of any of the --

25   A    No, not --

1   Q    -- BVI entities that you're noticing?

2   A    No.  So too I would say, tongue in cheek, but our -- to

3   our great frustration, no, we're not getting anything from

4   them.

5   Q    You asked for it?  They said no?

6   A    No, we didn't ask for it, but it was -- we asked for it

7   through the motion we filed with the Court where the Court

8   directed the debtor to seek from the criminal court to give

9   us access to the documents.  And so that's frustrating,

10  because we assumed there would be a lot of very good

11  documents there.  But that's why I'm saying it's frustrating

12  to us, because we didn't --

13  Q    Just to clarify, the motion was made in which court?

14  A    We filed the motion to compel the debtor, that was a

15  long saga, but to compel the debtor to produce all documents

16  that the debtor would have received in the criminal case

17  from the DOJ on the theory that it's coming from the DOJ.

18  So we should be able -- if the debtor has it, there's no

19  harm with us seeing it.  And, obviously, that didn't happen,

20  so --

21  Q    Okay.  And just to clarify, my question was did you ask

22  the DOJ for documents?

23  A    Yes.  And it -- well, we asked for the -- early on, we

24  said we wanted access to that, and they told us no way.  Not

25  from them, we couldn't get it.

1           MR. CONWAY:  I have no further questions.

2           THE COURT:  Okay.  Thank you, Attorney Conway.

3           Then the next objecting party is G Club

4    Operations.  And Attorney Sklarz, Attorney Fornos, which one

5    of you, if either of you, are going to be cross-examining

6    Mr. Despins?

7           MR. SKLARZ:  Thank you, Your Honor.  I will.

8           THE COURT:  Go right ahead.

9                        CROSS-EXAMINATION

10   BY MR. SKLARZ:

11   Q    Good afternoon, Trustee Despins.  My name is Jeff

12   Sclarz, and I represent G Club.  G Club's produced more than

13   140,000 documents in this matter, correct?

14   A    I don't know the precise number.  I know they produced

15   documents, but I don't have a count of exactly what they

16   produced.

17   Q    And the documents were produced beginning in June of

18   2023, correct?

19   A    What I recall is that there was months of back and

20   forth until we moved to compel, and then we got some

21   documents.  Whether it was June 2023, I could not say for

22   sure.

23   Q    Right.  And you mentioned a motion to compel.  You're

24   familiar with the rules of bankruptcy procedure and the

25   federal rules of civil procedure?

1    A    Yes, generally.

2    Q    And they permit parties to object to discovery

3    requests, correct?

4    A    Yes, of course.

5    Q    And those are promulgated by the Supreme Court?

6    A    That's correct.

7    Q    So the Supreme Court feels that it's appropriate for

8    parties to object to discovery and for courts to rule on

9    those objections, correct?

10        MR. BASSETT:  Objection.  Argumentative.

11   Relevance.

12        MR. SKLARZ:  The relevance is Mr. Despins, when

13   asked a yes or no question about production of documents in

14   June, gave a little speech about how we fought discovery.

15   We used the rules, which is appropriate.  So I think the

16   question is appropriate.

17        MR. BASSETT:  I don't think it's appropriate to be

18   asking the witness how the Supreme Court feels about

19   something, Your Honor.

20        MR. SKLARZ:  I didn't ask how the Supreme Court

21   feels.

22        MR. BASSETT:  That's what you did.

23        MR. SKLARZ:  Let me rephrase the --

24        THE COURT:  Why don't we just ask a different

25   question?

1     MR. SKLARZ:  Yeah.  I'll rephrase.

2     BY MR. SKLARZ:

3     Q    G Club followed the rules of civil procedure.  Is that

4     correct?

5     A    I couldn't say whether they did or not.  I know that

6     you objected to production.  Of course, everyone is entitled

7     to object.  That's -- but that's not what went on.  That

8     went on for many months.

9     Q    Okay.

10    A    And also --

11    Q    There's no question.  There's no question pending.

12    A    Okay.

13    Q    You have no question pending.  But regardless of your

14    opinion on the matter, by October of 2023, G Club produced

15    over 140,000 documents, correct?

16    A    As I said, I know you produced documents.  I cannot

17    tell you the exact count.

18    Q    Do you have any reason to disbelieve me when I say G

19    Club produced over 140,000 documents?

20    A    I -- well, no more than somebody asking me whether you

21    produced 125,000.  I don't know the count.  I'm sorry.

22    Q    Okay.  And just two weeks ago, your co-counsel,

23    Mr. Linsey, asked G Club for a affidavit authenticating

24    documents produced by G Club in an adversary proceeding

25    related to Mei Guo and the summary judgment motion.  Is

1    that -- you would agree with that?

2    A    I -- to be candid, I knew there was some of that going

3    on, but I didn't know precisely what it was about.  But,

4    okay.

5    Q    And --

6    A    And --

7    Q    -- G Club facilitated the production of that document

8    affidavit, correct?

9    A    I'm sorry.  I don't know precisely what happened.  I

10   have no reason to believe that's not true, but I don't know

11   the details.

12   Q    And, unfortunately, the record is sealed, Your Honor,

13   but I believe -- and counsel -- Attorney Linsey can correct

14   me if the record is wrong, because I don't have access to

15   this.  But I believe the document was produced in Adversary

16   Proceeding 23-5008 and probably is in ECF Number 116, which

17   contains some sealed documents.  And I believe this is a

18   sealed record.  But the question -- and so I believe the

19   Court will have access to the sealed documents.  I don't,

20   but I believe it's in there.  And the question for

21   Mr. Despins is, do you have any reason to believe that G

22   Club did not facilitate the production of the document

23   affidavit?

24   A    I couldn't say whether you facilitated it or not.

25   There's a -- it's an -- I can't -- you know, I would have to

1    talk to Mr. Linsey to confirm that.  I was not close enough

2    to this aspect to really tell you whether it was

3    facilitated.  And, you know, he would have to opine on that,

4    because he's handling it, so.

5    Q    Okay.  Well, you've retained Mr. Linsey's firm,

6    correct?

7    A    That's correct.

8    Q    And he's your agent, correct?

9    A    Correct.

10   Q    Okay.  So if we put Mr. Linsey on the stand to confirm

11   this, would that be helpful to you?  Or perhaps counsel can

12   just stipulate that this has occurred.

13           THE COURT:  Mr. Sklarz -- Attorney Sklarz, so let

14   me just ask you a question.  You're talking about a document

15   that you're saying G Club helped to authenticate, right?

16           MR. SKLARZ:  Correct.

17           THE COURT:  Is that what you're -- okay.  And

18   you've told me I can figure that out by looking at a sealed

19   document, correct?

20           MR. SKLARZ:  I think that's the case, because I --

21           THE COURT:  Okay.

22           MR. SKLARZ:  -- can't personally --

23           THE COURT:  So just tell me -- okay.  So just tell

24   me why you -- well, I mean, I understand why you're asking

25   the question.  But I think we can move on insofar as you've

Ho Wan Kwok - February 13, 2024                    77

1   either -- you either did or didn't help authenticate a

2   document.  And I understand your questions about production.

3   And I think Trustee Despins has said that he knows that

4   you've produced these documents.

5        So why don't we move on to -- I completely

6   understand what you're saying, but I do have familiarity

7   with this issue.  So I think the question then is -- let's

8   get to your objection as to -- and I think you already have.

9   I'm not suggesting that you haven't.  But I think your

10   objection is based upon the fact -- or at least your

11   questioning right now is that you have complied with what

12   the trustee has asked.

13        MR. SKLARZ:  Yes.  The trustee said in direct

14   testimony that G Club -- I think the words were something

15   along the lines of it was a knock-down, drag-out fight.  And

16   while -- my point is that, while we may have had a discovery

17   dispute, we went by the rules.  Your Honor ruled on the

18   dispute, and we complied with Your Honor's ruling.  And I

19   just want to make sure that that's clear, because -- and

20   I'll reserve oral argument on our legal positions.  But I

21   just want to make sure I have a factual predicate to make

22   that argument.  And it sounds like Your Honor

23   (indiscernible).

24        THE COURT:  As far as what I think you're trying

25   to accomplish on cross-examination, I think you have done

1   that.  But I -- but that doesn't mean you should stop asking

2   questions.  I just want us to move on to any other parts of

3   objection that you may have, if you would, please.

4           MR. SKLARZ:  So, yes.  So, Your Honor, I'm

5   prepared to present our legal argument at this time, but I

6   assume you want me to reserve that until after everybody's

7   cross-examined?

8           THE COURT:  Yes, please.  I'm sorry, but I think

9   that's the better way to handle the matter, even though I --

10          MR. SKLARZ:  I agree.  Absolutely.

11          THE COURT:  Okay.  Okay.

12          MR. SKLARZ:  And so, my last point.  I don't have

13   any additional questions at this time, but I would like

14   to -- I am going to make a motion to strike Attorney

15   Despins' -- I'm sorry, Trustee Despins' direct testimony for

16   two reasons.  First, it's irrelevant on the legal issues

17   presented, which is equitable tolling and the applicability

18   of Rule 9006.  Those are purely legal issues, and there's

19   been no evidence offered on the elements of equitable

20   tolling.

21          And the second ground is that much of Attorney --

22   Trustee Despins' testimony was legal argument, including why

23   they -- why the trustee and his team took certain steps.

24   Again, this issue is related to equitable tolling and Rule

25   9006, and his strategy did not relate to either of those

1    elements.

2            So with that, I move to strike his direct

3    testimony.

4            MR. BASSETT:  Your Honor, may I respond?

5            THE COURT:  Yes.

6            MR. BASSETT:  First of all, all of Trustee

7    Despins' testimony relates directly to the issues before the

8    Court.  As the Court knows, and as we will get into in

9    arguments, as already been articulated in the papers, it is

10   absolutely relevant to a request for equitable tolling

11   whether or not the party seeking equitable tolling, in this

12   case the trustee, acted reasonably, diligently.

13           The other element of the test is whether there

14   have been extraordinary circumstances that have prevented

15   the trustee from otherwise meeting the deadline.  All of the

16   testimony he gave about the efforts that he and his team

17   undertook, factual testimony, factual testimony about the

18   obstruction that he faced, the way that that obstruction

19   impacted his investigation, all of that is centrally

20   relevant to that standard.

21           Second of all, to the extent counsel had an

22   objection to any of the testimony that Trustee Despins was

23   providing during direct, he should have objected during

24   direct, not waited until the entire testimony was finished

25   and raising his objection at this time.  So, the objection,

1    Your Honor, we respectfully ask be overruled.

2            THE COURT:  Okay.  Attorney Sklarz, with regard to

3    your motion to strike, there were two prongs I heard.  The

4    first is that you would like to strike Trustee Despins'

5    direct testimony with regard to his statements that -- and I

6    recall -- I believe you are accurate, Attorney Sklarz, that

7    Trustee Despins said it was a drag-down fight or something

8    along those lines.  With regard to that, you're asking me to

9    strike that.

10           I'm going -- not -- I'm going to deny that.  I'm

11   going to allow that in the record, but I'll give that

12   whatever weight I think is appropriate.

13           With regard to your second prong, I'd like you to

14   explain it to me one more time, please.

15           MR. SKLARZ:  Sure.  The thrust of the trustee's

16   motion was really, at least as I saw it, in two ways.

17   First, that equitable tolling can be applied prospectively.

18   And to do that, there has to be evidence offered on the

19   elements of equitable tolling, not a summary of what may

20   happen as to many cases.

21           So, for example, with respect to my client, G

22   Club, the only thing he said was we had a knock-down,

23   drag-out discovery fight.  So, I'm not sure how that

24   addresses any of the elements of equitable tolling.

25           Secondly, under Rule -- the second basis for --

1    for tolling the statute limitations is Rule 9006 of the

2    bankruptcy rules.  That's a purely legal argument.  Attorney

3    Bassett and the rest of counsel will certainly have

4    significant arguments over that issue coming up, but there

5    can't be evidence authored on why this Court -- why your

6    Honor should apply a particular rule in a particular way.

7    It either applies or it doesn't apply as a matter of law.

8    So, Attorney -- I'm sorry, Trustee Despins' testimony on the

9    applicability of what he said is really just argument but

10   through a witness.

11          And then what I didn't mention is, obviously,

12   yesterday we were served with the witness and exhibit list

13   with 132 exhibits 24 hours before trial that references

14   exhibits that would have taken two days to download.  I

15   understand that they're on the docket, but there's no

16   possible way that we could have reviewed all those exhibits

17   and properly prepared a cross-examination.

18          So I think that the offer of testimony is just

19   generally unfair given the nature of what's -- of these

20   proceedings.

21          THE COURT:  All right.  Well, I understand your

22   objection on the second part then.  And I'm going to

23   overrule your -- well, your motion to strike, I'm going to

24   deny your motion.  Whether or not you are correct that this

25   is a legal argument is something I will have to consider,

1    right, as the finder of fact and the trier of fact and the

2    party who makes the conclusions of law.  So I do understand

3    your argument, and I will consider it, but I'm not going to

4    strike the testimony of the trustee.  So that motion is

5    denied.

6              MR. SKLARZ:  Understood, Your Honor.  And I don't

7    have any further questions for the trustee.

8              THE COURT:  Okay.  And you would like to be heard,

9    obviously, for a -- you would like to make, excuse me, an

10   argument at the end of the hearing, as I will allow other

11   objecting parties to do as well.

12             MR. SKLARZ:  Yes, Your Honor.

13             THE COURT:  But I -- yeah.  But that's fine.  So

14   you'll reserve some time.  We'll talk about that.  Now --

15             MR. SKLARZ:  Thank you.

16             THE COURT:  -- we've been going at this hearing

17   for a few hours now.  And I'm going to give the courtroom

18   deputy a five-minute break.  Because we're not even halfway

19   through the objecting parties' objections yet and the

20   cross-examination of Mr. Despins.  And then we're going to

21   have legal arguments made by the parties.

22             So it is 3:50.  We are going to come back -- well,

23   it's 3:51.  Now that I've said that, I've already used a

24   minute.  So we'll come back at 3:56.  I need to give the

25   courtroom staff a five-minute break.  Okay?  So we will --

1    the Court is in recess until 3:56.

2              THE WITNESS:  Thank you.

3              MR. BASSETT:  Thank you, Your Honor.

4              THE COURTROOM DEPUTY:  Court is in recess until

5    3:56.

6         (Recess from 3:51 p.m. to 3:58 p.m.)

7              THE COURTROOM DEPUTY:  Court is in session after

8    recess.  The Honorable Julie Manning is presiding.

9              THE COURT:  Okay.  So before we took a recess,

10   G Club Operations finished their cross-examination.

11             So the next party that has objected to the tolling

12   motion is the Rule of Law Foundation, Inc. and the Rule of

13   Law Society, Inc.  And, Attorney Evans, will you be

14   conducting any cross-examination, if there is any

15   cross-examination to be conducted?

16             MR. EVANS:  Your Honor, in order, I guess, to

17   really address that, I'd like to inquire on whether the

18   trustee is objecting to our declaration.  As I indicated

19   before, on behalf of the Rule of Law Foundation and Rule of

20   Law Society, we filed a written objection.  And it's not

21   dissimilar to other objecting parties.  We also included a

22   declaration and set forth certain facts concerning our

23   discovery compliance.  And if the trustee accepts that as

24   part of the record, then I really won't need to ask any

25   questions.

Ho Wan Kwok - February 13, 2024                84

1            THE COURT:  Okay.  Thank you.  I don't know if

2      Trustee Despins is with us.  I should have asked that before

3      I even asked you, Attorney Evans.

4            THE WITNESS:  I am here, but I don't know if

5      Mr. Bassett will address this question or --

6            THE COURT:  Okay.

7            MR. BASSETT:  Your Honor, I'm all for expediting

8      the proceedings today, if we can.  I had assumed that if

9      anything were going to be offered into evidence today, there

10     would be a witness supporting it.  That said, I'm happy to

11     consider the request.  Would it be possible if we modified

12     the order, and I could have a colleague sort of take a look

13     at this while we are having some other individuals or other

14     parties ask questions?

15           THE COURT:  That's fine with me.

16           Attorney Evans, I think that's fair.  We can come

17     back to you after --

18           MR. EVANS:  Of course.

19           THE COURT:  -- they are able to look at -- to

20     consider and respond to your request, okay?

21           MR. EVANS:  Of course.  No problem.  Thank you.

22           THE COURT:  All right.  Thank you.

23           Then the next objecting party is Mr. Lee and

24     Mr. Xai.  And, Mr. Schmitt, are you going to be

25     cross-examining Trustee Despins?

1          MR. SCHMITT:  No, Your Honor.  We have no

2    questions for the witness, although we will reserve some

3    time at the end.

4          THE COURT:  Okay.  Thank you.

5          All right.  Then we can move on to Mr. Major --

6    Attorney Major for Greenwich Land and Ms. Hgok.

7    Mr. Major -- or Attorney Major, are you going to be

8    cross-examining Mr. Despins, Trustee Despins?

9          MR. MAJOR:  Your Honor, I'm not going to ask any

10   questions of the witness.  Thank you.

11         THE COURT:  Okay.  Thank you.

12         Then, Mr. Grand -- Attorney Grand, I believe

13   you're next for GS Security Solutions, Inc.?

14         MR. GRAND:  Yes.  I have no questions for the

15   witness either, Your Honor.

16         THE COURT:  Okay.  Thank you.

17         And then we're -- the objecting party, Wang.

18   Attorney Wander, are you going to be cross-examining Trustee

19   Despins?

20         MR. WANDER:  Yes, Your Honor.  I have a few

21   questions.

22         THE COURT:  Go right ahead.

23         MR. WANDER:  Yes.

24                        CROSS-EXAMINATION

25   BY MR. WANDER:

1    Q    Mr. Despins, in paragraph 12 of the motion -- of the --

2    well, of the trustee's reply, that's the only place it gives

3    any specifics about my client.  And it says, "Finally,

4    Yingying Wang, Chris Lee, and Qidong Xia are members of the

5    purported HCHK Creditors Committee led by Objector Yongbing

6    Zhang, who has been sanctioned multiple times for frivolous

7    litigation against the trustee and others.  My question is,

8    the motion does not and you're not making any claim that

9    Ms. Wang hindered or obstructed your investigation, are you?

10   A    Well, clearly the committee -- the informal committee

11   that is referred to did.

12   Q    Correct.  But is it possible that a person could have

13   had involvement with the HCHK Creditors Committee without

14   engaging in any improper conduct that would support the

15   filing of an adversary complaint?

16   A    I think the sole purpose of that committee was to

17   obstruct the trustee's work on HCHK.  And I believe that --

18   if it's your client -- or, well, there are two people

19   involved here, and one of them was clearly involved in the

20   protest as well.  But certainly in terms of the HCHK

21   Committee, the sole goal of that, because it was run by

22   Mr. Yongbing Zhang, was to obstruct the trustee's work on

23   the HCHK adversary proceeding.  So, you know, I don't think

24   they were discussing the Super Bowl at these meetings.  They

25   were there to try to impede the trustee's work.  That's the

1   goal of the -- of this organization.

2   Q    Right.  But my question was more nuanced.  And I don't

3   represent Yongbing Zhang.  I'm only concerned about

4   Ms. Wang, who seems to have been caught up in things.  And,

5   again, my question is, is it possible that she or anyone

6   could have been involved with this committee without having

7   done anything that would justify the filing of an adversary

8   complaint?  Was it simply the guilt by the association with

9   this committee?

10  A    Yeah.  I'm sorry.  I think now I understand your

11  question better.  I thought you were asking me is it

12  possible that that person did nothing wrong that would

13  justify tolling, and I was responding to that.  Now you're

14  asking me whether it's possible that somebody could be a

15  party to or involved with that committee, and that full

16  activity being the basis to get sued -- and I think that's

17  now your -- if I got it right, tell me.  If I -- so --

18  Q    Yes.

19  A    Okay.  I don't think anyone is going to -- I shouldn't

20  say that.  I think that that could be part of allegations

21  made with respect to the civil RICO complaint.  The question

22  is, is that the only allegation, though, being made against

23  some of the people involved?  I don't think so.  But now I'm

24  speculating, so.  But there's no -- there's not going to be

25  an avoidance action brought against your client because she

1    or he participated in the committee -- informal committee

2    meetings.  If that helps?

3    Q    Yes.  Well, see the only allegation about my client in

4    the papers is that she was a member of this committee.  And

5    that's why I'm asking, is the membership in the committee

6    alone sufficient to justify the view that this person

7    engaged in some kind of improper conduct that would bring

8    them under the tolling motion?

9    A    No.  But by the way, so just again to be precise, our

10   argument is not that everyone that will be covered by the

11   tolling needs to have engaged in bad conduct.  No.  The

12   extraordinary circumstances that Mr. Bassett described can

13   be brought on by the debtor, the debtor's daughter, the

14   debtor's son, et cetera.  And it's possible to have people

15   who've had no involvement in that but that still will be

16   subject to the tolling.  Why?  Because that's an

17   extraordinary circumstance that precluded the trustee from

18   reaching the conclusion before the expiration of the statute

19   of limitation that a claim should be brought even against

20   people not involved in the -- so I know that everyone is

21   trying to prove that they didn't do anything wrong.

22       That's not -- sorry, but that's -- Mr. Bassett will

23   argue this, but that's not our view of the test.  The test

24   is, one, was the trustee diligent?  Two, are there

25   extraordinary circumstances?  And those circumstances do not

1    need to apply to each individual party subject -- that the

2    tolling will apply to.  So --

3    Q    I appreciate the argument you're making.  I'm simply

4    trying to see what is in the record about my client.  Now,

5    you testified before that, I believe, with respect to the

6    three people that in paragraph 12 are identified as being

7    connected with this committee, I believe you testified that

8    two of the three are going to be sued in the next two days.

9    Do you recall that?

10   A    That's correct.  But only as to what we have ready to

11   go in the next few days.  There may be other claims.  That's

12   the whole point of this is we don't need relief to file

13   something in the next two days.  We are doing that.  The

14   question is what we don't know or don't know sufficiently to

15   bring later.

16   Q    I appreciate that.  It's just that you filed the motion

17   against 331 individuals and entities, and 10 of them filed

18   an objection, approximately 10.  And so that means there's

19   321 of the people who are subject to the motion that there's

20   no issue about.  So that brings us down to the 10.

21        And I've heard your testimony.  And I'm not going to

22   say which one you were talking about, but several of them

23   you may have made a good case for, for your tolling motion.

24        That brings it down to three people.  And I only

25   represent one.  And I'm submitting that of the 331 people

1    subject to your motion and of the objectors -- and, frankly,

2    if my client didn't object, we are deemed to consent.  If

3    there's one person that the Court denies the motion to, and

4    if that's my client, based upon the showing that's been

5    made, is that in any way going to cause any type of

6    significant damage to the estate or to your investigation,

7    assuming my client is cooperating with whatever else you may

8    ask from our Rule 2004 exam?

9    A    The point is we don't know.  That's the whole point of

10   tolling is that we know that your client was involved in

11   this committee.  We know that the committee was not up to

12   any good.  But the point is, we're seeking (indiscernible)

13   tolling because of extraordinary circumstances brought on by

14   the debtor and other associates.  And you're saying, my

15   client had such a tiny little roll in this, why don't you

16   leave her alone.  My point is, she may not get sued.  She

17   may get sued in the next two days, but she may not get sued

18   later.  We don't know.  But we certainly don't want to give

19   her a bye or pass now, because, for all we know, she was

20   heavily involved in something we don't know about today.

21   That's the entire relief we're seeking.

22   Q    But you were able to determine that some people

23   involved with this committee received funds, and you're

24   going to sue them, correct?

25   A    Correct.

1    Q    And you also have articulated facts about several

2    objectors who you claim hindered or obstructed your

3    investigation, correct?

4    A    Yes.  But that's not necessary to the relief we're

5    seeking.  It was obstruction --

6    Q    I appreciate that.

7    A    -- across the board.

8    Q    No, I appreciate that.  And I understand all the

9    difficulties that you've been involved in with regard to the

10   investigation.  And I'm only -- I only want to make the

11   record clear for the Court with respect to my client, who

12   seems to be, in my view, of the 331 people subject to the

13   motion -- at least to my client, I don't see -- can you say

14   in any way how, if the Court denies the motion to my client,

15   that would adversely affect your investigation just with

16   regard to my client?

17   Q    And that's the whole point here is that given -- two

18   things.  One is that, based on the record of these cases,

19   there are more claims that should be brought.  And the

20   involvement of your client in that is yet to be determined.

21   And the reason it cannot be determined is because the

22   trustee was not able to complete his work on this.  That's

23   really what this is.

24        And so your client may be completely uninvolved going

25   forward or could be the center or one of the main elements

1    of something that we have yet to discover.  That's the whole

2    issue.

3    Q    Yet with regard to all of the other objectors, it seems

4    that my client, assuming she's not one of the two people who

5    are going to get sued in the next day, that my client is the

6    one person that there's nothing in the record that would

7    indicate that she has had any involvement whatsoever with

8    anything that might result in a claim against her.  I just

9    want to make sure that the record is clear on that.

10              MR. BASSETT:  Objection, Your Honor.  I think this

11   is now argumentative, if it hasn't been already.  I also

12   think we're treading over the same ground, asking the same

13   questions multiple times.  Obviously, counsel can make the

14   point that he's trying to make in argument, but the utility

15   of trying to do it during direct examination has run --

16   during cross-examination has run its course.

17   BY MR. WANDER:

18   Q    Well, let me ask you.  You had testified that one

19   person went to Europe with apparent nefarious intentions.

20   That's not my client, correct?

21   A    I don't know.  I don't recall.  I mean, there are a lot

22   of parties involved, but it could very well be.  And I'm not

23   saying, by the way, that she's not going to get sued in the

24   next two days.  She -- I don't recall this particular

25   example, whether she will or not.  So I -- Mr. Linsey would

1     know that, but I don't know that offhand.  So I don't want

2     to mislead you in thinking that she is not going to get sued

3     in the next two days.

4          But, regardless, that has nothing to do with what we're

5     asking for, because we don't need the Court's approval to

6     sue people in the next two days.  That's not what we're

7     talking about.

8               MR. WANDER:  I have no further questions, Your

9     Honor.

10              THE COURT:  Okay.  Thank you, Attorney Wander.

11              The next objecting party is Sotheby's

12    International Realty.  And, Attorney Brown, are you going to

13    be conducting a cross-examination, if there is any

14    cross-examination to conduct?

15              MR. BROWN:  Yes.  There's going to be no

16    cross-examination at this time, Your Honor, for the trustee.

17    But we would, depending on what we hear, reserve some time

18    at the end of the hearing, please.

19              THE COURT:  Okay.  Give me one moment then.  Thank

20    you.

21              MR. BROWN:  Thank you.

22              THE COURT:  All right.  Then the last objecting

23    party on my list is Mr. Zhang.  And, Mr. Nealon, are you

24    going to be conducting cross-examination?

25              MR. NEALON:  Yes, Your Honor.  I have a few

1    questions, if I could.

2              THE COURT:  Go right ahead.

3              MR. NEALON:  Thank you.

4                        CROSS-EXAMINATION

5    BY MR. NEALON:

6    Q    Trustee Despins, how many adversary proceedings have

7    you brought in the last four days?  Am I correct that it's

8    around 200, maybe plus or minus 10 percent?

9    A    Yeah.  The last time I checked, it was 180.  But while

10   we're talking, they're getting filed every, you know, 20

11   minutes or so.  So 200 might be the right number right now.

12   Q    And assuming this motion isn't granted, hypothetically,

13   your deadline is Thursday, correct, to file the rest of

14   them?

15   A    That's correct.

16   Q    And how many more, you know, ballpark, should we expect

17   over the next two days?

18   A    Around -- well, assuming that your number of 200 is

19   correct for -- just for sake of argument, I think we could

20   expect another 30 or so.

21   Q    Okay.  So what we're talking about with this tolling

22   extension is you're expecting you'd like to bring other

23   adversary proceedings over the -- up until the August

24   proposed extended deadline, correct?

25   A    That's correct.

1    Q    All right.  And do you have a ballpark sense as to how

2    many more we should expect if you're given that extension?

3    A    No.

4    Q    Okay.

5    A    Sorry.

6    Q    Now, you mentioned that we can expect a RICO suit to be

7    forthcoming over the next couple of days.  Is that tied to

8    this extension in any way?  Or are you planning -- in other

9    words, do you need to file that within this time period, or

10   does that have its own time --

11   A    We're filing it before Thursday, whether we have to or

12   not.  We're filing it before Thursday.

13   Q    Okay.

14   A    Or on Thursday.

15   Q    All right.  And are any of those planned RICO claims

16   specifically tied to or going to be based on an obstruction

17   of your investigation as a trustee?

18   A    In part, yes.

19   Q    Okay.  And is Mr. Zhang, my client, a planned defendant

20   in that suit?

21   A    I think so.

22   Q    Okay.  And what is it that Mr. Zhang did that would

23   cause you to believe he's an appropriate defendant in terms

24   of obstructing your investigation?

25   A    That's not the scope of this hearing.  We're not

1    litigating a complaint that's yet to be filed.

2    Q    Okay.  Well, I'll ask you the question in the abstract.

3    You have the floor here.  What is it that my client,

4    Attorney Zhang, did that has obstructed your investigation

5    and has required you to seek additional time?

6    A    No, I -- so I want to be clear.  He will be sued on

7    certain counts, certain claims by Thursday.  No doubt about

8    that.  But we want to have the ability to bring other claims

9    against him in the future.

10   Q    Right.  But my question, Trustee Despins, is what is

11   it, if anything, that my client has done that has obstructed

12   your investigation to date and caused you or contributed to

13   the need for you to file for this extension?

14   A    Well, clearly, the whole HCHK informal committee,

15   that's his creation, and he was the quarterback there.

16   That's one thing.  And that cost a fortune, and it took --

17   it was a very time-consuming side show in the case.  That's

18   number one.

19        Two, the whole -- all these claims that he filed where

20   he was sanctioned, you know, that's -- it's an effort to

21   intimidate a court officer.  And, of course, that takes

22   time.  We need to deal with that.  And it costs money.  So

23   that's another basis whereby he should -- one of the last

24   people that should get the benefit of the statute of

25   limitation given his conduct.

1          And we know, based on informants, that he visits the

2      debtor prison and that he professes to tell people after

3      these visits what debtor's directions are.

4      Q    And what are those directions?

5      A    Well, to organize the HCHK committee to do this or to

6      do that.

7      Q    Well, what are the other things besides organizing the

8      HCHK committee?

9      A    I don't recall them at this point.  But the point is

10     that he's as involved in this as Mei Guo or the debtor's

11     son.

12     Q    So you indicated when you were being examined by one of

13     the prior counsels that -- I think you said that HCHK

14     committee was plainly not up to any good.  Was that your

15     testimony?

16     A    Correct.  The purpose of that committee was to find

17     people to appear in court, file false documents, documents

18     that have been backdated, provide testimony that was not

19     credible, et cetera, et cetera.  Their sole goal was to stop

20     this, stop the trustee's effort to get control of HCHK.

21     Q    So is it your view, Trustee Despins, that anyone who --

22     anyone who comes into court and objects to your motion --

23     and I believe you had a motion to approve a settlement

24     agreement, a motion for an injunction, a motion to take

25     control of approximately 38 million -- anyone who

1   obstructs -- or objects is an obstructor?  Is that your

2   view?

3   A    No.  Of course not.

4   Q    Okay.  Specifically, what is it that Attorney Zhang did

5   that you consider improper relative to that committee?  Are

6   you saying he had knowledge that a frivolous or false claim

7   would be brought?  Do you have any evidence of that?

8   A    No.  No.  We're not going to litigate claims against

9   him right now.

10   Q    But you have no evidence of that, do you, sir?

11   A    Well, we know that he spearheaded the committee, and

12   the committee caused the folks to appear in court and file,

13   you know, false documents that were backdated, et cetera, et

14   cetera.  So --

15   Q    Okay.  But you have no evidence that Attorney Yongbing

16   Zhang had anything to do with that witness who testified

17   about backdating a document, do you?

18   A    I'm not going to go through the claims we're going to

19   bring against him in the next few days.

20   Q    All right.  So the answer is no then.  Let me ask you a

21   true or false question if I could, okay?  Is it true or

22   false the number one overriding reason why you're filing

23   this motion is it took you a long period of time to hire

24   Kroll to investigate all these avoidance claims because the

25   estate simply didn't have the resources until the Lady May

1    was solved in June of 2023?  Isn't that a fact?  That is the

2    primary overarching reason why you need more time?

3    A    No.  That's one of the reasons.  As I said, this whole

4    enterprise with -- that have no books and records, no

5    reliable documents, was so convoluted.  And, you know, as I

6    said, 330 bank accounts that have to be completely analyzed,

7    et cetera, et cetera, that no one could have conducted -- or

8    completed the investigation and the prosecution of the

9    claims in the two-year period.

10   Q    Well, wouldn't it be fair to say, though, that the bank

11   records that you referenced, the 330 bank accounts, are the

12   principal source of information that Kroll is analyzing in

13   order to make recommendations as to what claims to make?

14   Isn't that a fact?

15   A    That's a very important source of the documents.  Yes.

16   Q    Well, it's the most important source, right?  Because

17   you testified earlier there were no reliable ledgers or

18   accounting systems.

19   A    Well, the bank accounts are good, because they don't

20   lie.  But they don't tell you the full story.  So you need

21   to actually do more analysis.  And as I said, it's the

22   Russian doll concept, which is that one bank account leads

23   you to another, to another, to another.  And that's what

24   makes this impossible to complete in the time frame statute.

25   Q    Isn't it a fact, Trustee Despins, that the -- you as

1    trustee have had the vast majority of these banking records

2    for many years prior to --

3    A    No, no.  That's completely not accurate.

4    Q    What percentage of the 330 bank accounts did you get

5    after Kroll was hired in August of 2023?

6    A    I can't give you a precise percentage, but it's

7    certainly more than half.

8    Q    More than half?  And that's through the 2004 exam?

9    A    Correct.

10   Q    So then you'd agree with me that if you got those

11   records late, that's the principal reason you need more

12   time, correct?

13   A    No.  So I don't -- no.

14   Q    Okay.

15   A    Because these -- because of the complexity of the

16   scheme.  And, as I said, you know, you go to one bank.  They

17   give you documents.  As I said, they don't give it to you on

18   the spot.  You need to press them, press them.  And they

19   eventually produce.  They don't produce completely -- the

20   complete set of documents.  You need to follow up again.

21        And then that opens up, like the example I gave about

22   the PayPal, although it's not PayPal but the equivalent of

23   PayPal, opens up that whole line of inquiry.  And there's

24   that multiplied by, you know, 300 accounts.  I'm

25   exaggerating when I say that, but it's exponential.

1          And, therefore, all of that takes a lot of time and a

2     lot of work.  And we need -- as I said, bank accounts are

3     great.  They don't give you the full story.  You need to go

4     and figure out when the payments were made and in what

5     context, et cetera, et cetera.

6          So now the lawyers get involved, not only Kroll.  And

7     it's the combination of the two teams that get us where we

8     are now, which is a fairly, I would say, incredible

9     accomplishment to be able to file 230 complaints regarding

10    avoidance actions by the deadline is -- is amazing.  But

11    that's not the full story.

12    Q    Now, we talked about or you mentioned that Mr. Zhang

13    was sanctioned by at least two federal courts for -- I think

14    he brought a complaint against you or your firm for

15    supposedly being an unregistered foreign lobbyist or

16    something to that effect.  Is that correct?

17    A    He was actually -- I think he was sanctioned three

18    times --

19    Q    Okay.

20    A    -- by three Southern District of New York judges.

21    Q    Okay.  Well, I'm not -- maybe we'll agree to disagree

22    about that.  But it --

23    A    Okay.

24    Q    -- doesn't matter.  Is it not a fact that all of those

25    are on appeal at the moment?

1    A    I'm not sure about that.  I thought that the plaintiffs

2    were dropping out or, at least in our case, that they were

3    trying to drop out.  So I -- so the answer is I don't know.

4    Q    Okay.  But it's fair to say that in all of those cases,

5    whether it's two or three, that was handled by a law firm

6    other than Paul Hastings, correct?  Davis Polk was counsel

7    in one.  I forget who the counsel was in the other.  Isn't

8    that a fact?

9    A    Yes.  But that doesn't involve us, because Davis Polk

10   is handling --

11   Q    But those were back in 2022, correct?

12   A    I'm not so sure about that.  I think it was in 2023,

13   actually.

14   Q    So but it is your testimony as you sit here today,

15   under oath, that that was one of the major reasons why you

16   need an extension on these -- the disruption caused by that

17   is one of the major reasons you need more time?

18   A    No.  I wouldn't put (indiscernible) major.  It's one --

19   it's -- as I said during the direct, there's just tons of

20   these events that occurred.  And that's one of them.  So I'm

21   not going to say it's 50 percent of it or -- no, I can't put

22   a percentage on it.  But it was certainly a massive

23   distraction.

24        Also, the protests were a massive distraction to deal

25   with that.  They took the Court -- I think there was a full

1    week or maybe a seven-day evidentiary hearing, et cetera, et

2    cetera.  It's a huge distraction from the work that should

3    have gone on in this case.

4    Q   And what were these protests, just in brief, because

5    we're short on time?

6          THE COURT:  I just want to know how all this is

7    relevant at this point, Mr. Nealon.  You've had many

8    questions that you've asked.  Your objection says that --

9    and you've established what you believe is your case on

10   cross-examination that Trustee Despins has not met his

11   burden with -- vis-a-vis your client.  So what's the point

12   about asking about the protests at --

13         MR. NEALON:  Okay.  That's fine, Your Honor.  I

14   know we're short on time, so I'll move on.

15         THE COURT:  Okay.

16   BY MR. NEALON:

17   Q   Just a couple more questions for you, and I'll be done.

18   Now, you mentioned that one of your concerns, Trustee

19   Despins, was that my client frequently visits Miles Guo in

20   prison.  Is that correct?

21   A   It's a concern, but it's a fact.

22   Q   Okay.  Has that obstructed your ability to investigate

23   avoidance actions that might be available to the trustee?

24   A   The visit in itself is wonderful.  He's going there for

25   the right reason.  The question is, is he going there to get

1    instructions from the debtor about what to convey to the

2    team outside of prison, is really the issue.  Which time

3    will tell exactly what went on there.

4    Q    Okay.  But you have no specific evidence that he has

5    gotten any instructions to hide assets or do any other

6    things as you sit here today, do you?

7    A    I'm not going to share.  That's work product.  That's

8    ongoing.

9    Q    Well, okay.  I don't agree with that.  But a final

10   question here.  So is it your belief -- your -- well, strike

11   the question.  Mr. Zhang, you're aware that he is the

12   immigration lawyer who's trying to process a political

13   asylum request by Miles Guo, correct?

14   A    No, I don't agree with that.  He filed a notice of

15   appearance in the immigration case, but the immigration case

16   was handled by a famous immigration firm, Wildes & Weinberg.

17   And, actually, the gentleman passed away recently.  It was

18   very sad.  But that's that immigration lawyer.

19        But that appearance in that case allows Zhang to go to

20   prison and not have his conversations with the debtor

21   recorded.

22   Q    Okay.  And you don't know what those communications

23   are, obviously, correct?

24   A    We've been through this already.  I am not going to

25   give you what our work product (indiscernible).

1          MR. NEALON:  No further questions, Your Honor.

2          THE COURT:  Okay.  Thank you.

3          All right.  Attorney Bassett?  I don't know if

4    Attorney Bassett has had a chance to look at the request

5    that Attorney Evans made with regard to the declaration of

6    the Rule of Law Foundation and the Rule of Law Society.

7          MR. BASSETT:  We have, Your Honor.  You know, some

8    of it is just innocuous attachments of pleadings that were

9    filed on the docket.

10         But I, unfortunately, can't agree that the

11   entirety of the declaration (indiscernible) which contains

12   representations about completeness of production, et cetera.

13   So, unfortunately, I'm going to have to decline that

14   request.

15         MR. EVANS:  Your Honor, may I be heard on that?

16         THE COURT:  Yes.

17         MR. EVANS:  I was unaware when we filed our

18   objection that this was going to be taken as an evidentiary

19   matter.  I'm not sure if it's assigned as a contested matter

20   under the rules.  One of the primary objections, Your Honor,

21   we had asserted in our objection here was that the trustee's

22   motion was unsupported by declaration, affidavit, wasn't

23   verified.  And then we made a point to make sure that we

24   supported our objection with a declaration.  It's strictly

25   factual as to my client's efforts to comply with a subpoena

1    that was attached -- the subpoenas that were served, the

2    objections, email communications between the trustee's

3    lawyers in regards to our efforts to comply with that

4    subpoena, along the lines that other parties have argued to

5    this Court.  That we have endeavored to comply.  There's no

6    motion to compel.

7            I think under the circumstances under which the

8    motion -- the tolling motion was presented to this Court, it

9    would be appropriate for the Court to take an affidavit in

10   lieu of live testimony of a lawyer whose licensed and barred

11   in New York City.

12           THE COURT:  Attorney Basset, do you have any

13   response?

14           MR. BASSETT:  I do, Your Honor.  Like I said, the

15   declaration in many respects seeks to, I suppose, have the

16   Court take notice of the subpoenas that the trustees served

17   on the Rule of Law Foundation, responses and objections that

18   were served on particular dates, et cetera.  Again, I don't

19   have a problem with that.

20           And to the extent that counsel is, you know,

21   attempting to support his position factually that -- you

22   know, that his client has not been the subject of any, you

23   know, adverse orders by the Court with respect to discovery,

24   et cetera, I think he can make that argument and showing, to

25   the extent he thinks it is an accurate one, by simply

1    pointing the Court to the docket in this case.

2              It's when this declaration, which is not subject

3    to cross examination, there is no witness here to support

4    it, starts saying that the Rule of Law Foundation has

5    complied fully with all of their discovery obligations, they

6    produced voluminous emails -- there are statements like that

7    in the declaration that simply can't come in unrebutted.

8              So I think we -- it was clear from our papers that

9    this is a motion that we intended to make an evidentiary

10   showing in support of.  And that's what we are doing today.

11   If counsel thought that he needed to make an evidentiary

12   showing on behalf of the clients, you know, they should have

13   done the same.  So that's our view, Your Honor.

14             THE COURT:  Well, what I would note for the record

15   is that this motion is a motion for extension of time and/or

16   statute of limitations, which under our local rules is not a

17   contested matter.  It does -- it is an exception to the

18   contested matter procedure.  It does not follow the

19   contested matter procedure.  And the trustee filed a motion

20   to expedite the hearing on this motion, which is also not a

21   contested matter under our local rules.

22             It was -- both of those types of motion would

23   appear on Appendix M to our local rules.  And it says

24   motions, applications that do not follow the contested

25   matter procedure and may be scheduled for a hearing.  And

1    two of those motions are a motion for extension of time and

2    a motion to expedite the hearing.  So I did not view this

3    matter in connection with the filings made by the trustee as

4    a contested matter, number one.

5             Number two, there is an order that was entered --

6    if you give me a moment, I will find it -- on January 19th,

7    almost a month ago, ECF Number 2515, that granted the

8    trustee's emergency motion for an entry of the order

9    approving the form and manner of trustee's forthcoming

10   tolling motion and scheduling the hearing on that.  That

11   order entered on January 19th, and that order has been in

12   place since that time.

13            No one has raised any issues.  None of the

14   objecting parties, until Attorney Evans, has raised any

15   issues about putting forth evidence until today.  The

16   trustee indicated in the motion for which the order applies

17   that they would establish the reason for their requested

18   relief.

19            So what I'm going to do, Attorney Evans, is I'm

20   going to take a look at the declaration that you submitted,

21   and I'll determine -- I have not looked at it other than to

22   know it exists.  And then I will determine whether or not I

23   will consider it and, if I consider it, what weight I will

24   give it.  Okay?

25            MR. EVANS:  Understood.  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          All right.  Attorney Bassett, would you like to

3     make your closing argument on the legal and evidentiary

4     issues related to the trustee's tolling motion?

5          And then I, obviously, will let the objecting

6     parties make a statement as well.  I'm going to say that,

7     you know, we're going to have to be cognizant of time.  I

8     understand that every objecting party should be able to make

9     a statement, if they care to.  The overwhelming majority --

10    well, I shouldn't say that.  That's not fair, the

11    overwhelming majority.  But the majority of objectors did

12    cross-examine Trustee Despins.  But others reserved their

13    right to speak.  So that's fine.

14         So, Attorney Bassett, are you ready to proceed?

15         MR. BASSETT:  Your Honor, I was actually looking

16    to determine whether I had any redirect testimony for the

17    trustee and --

18         THE COURT:  Oh, okay.  That's fair.  Go ahead

19    then.

20         MR. DESPINS:  Your Honor, before Mr. Bassett does

21    that, I was a bit confused, because counsel for Sotheby's

22    said, oh, I may have some comments at the end.  I thought

23    Sotheby's had been carved out of the order, so I --

24         THE COURT:  I didn't see any withdrawal of -- of

25    their objection, though, Trustee Despins.

1          MR. DESPINS:  I know, but I --

2          THE COURT:  I did see an objection of the

3    withdrawal by UBS, though.

4          MR. DESPINS:  No, I understand, Your Honor.  But,

5    obviously, they were carved out of the order.  That was --

6    part of the deal is that they would go away if their --

7          THE COURT:  I didn't look at your order, so I

8    don't know.  I mean, it was filed.

9          But, Attorney Bassett and Attorney Brown, why

10   don't you address that issue, please.

11         MR. BASSETT:  Sure.  Your Honor, as I had said in

12   my comments at the outset, we had understood, and I have

13   emails in my inbox that I thought confirmed it, that we had

14   resolved Sotheby's objection with revised language to the

15   order, which I believe references them specifically, carves

16   them out.  They're no longer affected by it.

17         So I don't understand there to be any basis for an

18   objection or other comments by their counsel.  If they do

19   feel the need to object, then I think we would  --

20         THE COURT:  Well, let's let --

21         MR. BASSETT:  I think we would need to revisit --

22         THE COURT:  Why don't we hear from Attorney Brown?

23         MR. BASSETT:  Thank you, Your Honor.

24         MR. BROWN:  All right.  And hearing some of the

25   trustee's comments and Attorney Bassett's concerns, I --

1    just that we didn't see anything.

2            And we were working on it literally just, you

3    know, moments before this hearing.  So I -- you know, I

4    would have figured I would (indiscernible).  That's the only

5    reason why I asked.  Because as I was sitting here, I see

6    complaint after complaint after complaint.  So I wanted to

7    make sure we did have a (indiscernible).

8            I have no reason to believe, Attorney Bassett,

9    you're not -- you're going  --

10           THE COURT:  Well, Attorney Brown, let me stop you

11   right there.

12           MR. BROWN:  Okay.

13           THE COURT:  There is a revised proposed order that

14   was filed on the docket.  Have you not seen that?

15           MR. BROWN:  I'm going through it as we sat here,

16   Your Honor.  I didn't see it.  Unless  --

17           THE COURT:  Well, it was put -- it was filed on

18   the docket before the hearing today.  And I'll tell you

19   where it is if you give me a second.

20           MR. BROWN:  Okay.

21           THE COURT:  Actually, it was filed yesterday.

22           MR. BROWN:  I don't --

23           THE COURT:  It was filed -- but it was filed at

24   10:20 last night, so I'll give you that.  But it has been on

25   the docket since 10:20 last night.  It's ECF Number 2803.

1    And there's a -- the pages with the redline changes, which

2    are pages 8 through 10 of the document, have language about

3    your client in it.  Let's see.  What, the second page of the

4    order, fourth ordered paragraph relates to UBS and

5    Sotheby's.  And look at those pages.  You can see it in

6    redline.

7              MR. BROWN:  Yep.  I will just say there were

8    emails which are related to this afternoon's discussion.  So

9    we -- it's not, I think, anything that holds up this hearing

10   (indiscernible).  I don't (indiscernible).

11             THE COURT:  Well, I need to know whether you agree

12   to that.  So I'm going to tell you to -- why don't you turn

13   off your camera and go talk to people.  And let's get that

14   worked out.  Okay?

15             MR. BROWN:  Thank you.

16             THE COURT:  One way or another.

17             MR. BASSETT:  Your Honor, if I may, because it may

18   be helpful for Attorney Brown.  I have an email in my inbox

19   from Meg Augustine, who I believe is his co-counsel --

20             THE COURT:  Well, she's here.  She --

21   Ms. Augustine, you're here, so --

22             MR. BROWN:  Yeah, she's here.

23             MR. BASSETT:  -- at 12:05 p.m. just indicating

24   that they were signed off on the language of the revised

25   proposed order.  So I just am a little confused.  There was

1  a miscommunication.

2          THE COURT:  Attorney Augustine?

3          MR. BROWN:  That was today?

4          THE COURT:  I see that you're here.

5          MS. AUGUSTINE:  Yes, Your Honor.  This is Mary

6  Augustine at Sotheby's.  And I'm looking at the proposed

7  order on the docket.  I think the confusion, which it's not

8  really that important at this point, was that after that was

9  filed there was still back and forth about whether the

10 language was agreed upon.  And I can tell you, having read

11 the order right now, it is agreed upon.  And we agreed to

12 withdraw our objection based on this language.

13         THE COURT:  Okay.  Great.  Thank you very much.

14 Then the objection 2584 is withdrawn on the record, and

15 Sotheby's agrees with -- I'm not saying that the order --

16 you know, there aren't other issues if we have -- but the

17 language in the order that the trustee submitted at 10:20

18 last night, ECF number 2803, is acceptable to Sotheby's, and

19 that resolves their objection, which is now withdrawn on the

20 record.

21         All right.  So, Attorney Brown, you're all set.

22 You don't need to worry about anything.

23         MR. BROWN:  Thank you.

24         THE COURT:  All right.  So let's go back to you,

25 Attorney Bassett.  You're correct.  If you'd like to ask,

1    redirect, you are entitled to do so.  So go right ahead.

2           MR. BASSETT:  Your Honor, I've actually decided

3    that I don't think it will be necessary, so I'm happy to

4    proceed with closing arguments.

5           THE COURT:  Okay.  Then you go right ahead and

6    proceed.

7           MR. BASSETT:  Thank you, Your Honor.  Your Honor,

8    the trustee's position is that the evidentiary record, which

9    has been established not only by his testimony but by the

10   record on the docket of this case over the past two years

11   with thousands of docket entries, establishes that this --

12   establishes that if there was ever a case, Your Honor, in

13   which equitable tolling for claims held by a chapter trustee

14   is warranted, it is this one.

15          The case law, Your Honor, that applies to this

16   motion provides that a trustee, such as Attorney Despins,

17   may equitably toll the statute of limitations if, despite

18   all due diligence, he is unable to obtain vital information

19   bearing on the existence of his claim.  That's the Valdez v.

20   United States case we cite in our papers, Second Circuit,

21   2008.

22          The case law bears out that there are two showings

23   a trustee must make to obtain that release.  The first is

24   that he has acted with reasonable diligence during the time

25   period that he seeks to have tolled.  And second, that he

1    has proved that circumstances are so extraordinary that the

2    doctrine should apply.  That's the In Re Anderson case from

3    Bankruptcy Court in Connecticut, District of Connecticut,

4    2020.

5            Your Honor, the facts of this case, as established

6    by the testimony and the record more generally, blow that

7    standard out of the water.  To be clear, on the first prong,

8    whether the trustee has exercised reasonable diligence, it

9    is just that: reasonable diligence.  The case law has

10   established, Supreme Court, the Holland v. Florida case, it

11   is not maximum feasible diligence.  That's a quote from the

12   Supreme Court.  It is not maximum feasible diligence.  It is

13   reasonable diligence.

14           No one can credibly look at the record in this

15   case, which the Court has lived through painstakingly at

16   times, and possibly contend that this trustee has not acted

17   reasonably diligently in trying to pursue his investigation

18   and identify and timely pursue all claims that he holds.

19   The trustee today demonstrated that through his testimony

20   when he talked about all of the various work his team has

21   performed, the hundreds of thousands of documents his team

22   has tried to review, the difficulty in this -- in that

23   process.

24           It's not merely laying eyes on a document.  It's

25   getting the puzzle pieces together.  The fact that the

1    trustee may have had hundreds of thousands of documents for

2    a long period of time, may have been able to have some

3    people lay eyes on those documents, does not mean that the

4    review and analysis and the investigation has concluded.

5    Far from it.  It is a puzzle and, in this case, a very

6    complicated one given the financial affairs of this debtor,

7    the web of shell companies, bank accounts, et cetera, that

8    we have to sort through.

9           You know, in fact, I think -- one thing that

10   occurred to me as I was thinking about the hearing today is

11   it's a bit ironic, too, to hear some of the parties here

12   object as to the trustee's diligence.  I just -- I think

13   it's absolutely not credible.  And one of the reasons for

14   that is, as the Court well knows, you know, for the first

15   year, at least, of this case, all you heard from the debtor

16   and those who followed him and were perpetuating his

17   protests across the globe is how overzealous the trustee was

18   being.  They can't have it both ways.

19          This is a trustee who has obviously very

20   passionately investigating claims, pursuing his

21   investigations diligently, and there's no credible basis to

22   contend otherwise.

23          The second component of the standard that I

24   mentioned at the outset, Your Honor, is whether there are

25   extraordinary circumstances that justify equitable tolling

1    in a particular situation.  I would submit, Your Honor, that

2    the circumstances in this case are not only extraordinary,

3    they are essentially the perfect storm of things that have

4    happened, of circumstances that have not only slowed and

5    delayed the trustee's investigation but at times have

6    derailed it entirely and required him and his team to focus

7    on work that has no real bearing on what he has been

8    appointed to do.

9            To start with, and the trustee testified about

10   this, this is a case where the trustee was appointed to

11   oversee an estate that had effectively zero money.  Zero

12   money to fund the trustee's legal fees, zero money to fund

13   additional expenses, zero money for the trustee to use to

14   hire advisors who are necessary to complete his work.  Yet

15   on top of that, a debtor who prior to the case had been

16   found to have been operating a shell game across the world

17   to hide his assets from creditors by tucking them into the

18   pockets of his family members and associates and shell

19   companies across the world, a tangled web that the trustee

20   has to investigate and get to the bottom of.

21           You add on top of that the near constant

22   obstruction, which despite the objecting parties'

23   protestations to the contrary, the docket in this case and

24   the Court's own experiences in this case make clear has

25   happened repeatedly and over and over again.  It's the

1    debtor.  It's close family members, including Mei Guo, who's

2    one of the objecting parties.  G Club, one of the objecting

3    parties.  Have constantly delayed producing documents in

4    response to Rule 2004, have altogether refused to produce

5    categories of documents, have forced the trustee to come to

6    the Court, filed motions to compel.  And even motions to

7    compel, as the Court knows, were not complied with, forcing

8    the trustee to bring motions for sanctions.

9            That has happened time and time again.  I don't

10   need to chronicle every instance, because it's right there

11   on the docket, and this Court knows all of it all too well.

12           In addition to that, we have the overlay of the

13   criminal case, Your Honor.  And, of course, that has caused

14   complications for a variety of reasons, including that the

15   debtor, his daughter, others involved in that case have

16   asserted the Fifth Amendment when the trustee attempts to

17   obtain testimony from them.  The debtor, of course, has

18   filed a motion to stay this bankruptcy case in its entirety,

19   forcing the trustee and his attorneys to spend all kinds of

20   time and effort in the criminal case.

21           And then, finally, Your Honor, and this is what,

22   among many, many other things, makes this case so

23   unprecedented, is the worldwide harassment campaign that the

24   debtor and his followers engaged in for months.  I don't

25   need to recount all of that for the Court, the vile and

1    disgusting images and signs outside of the trustee's office,

2    outside of his family members' homes and offices, outside of

3    PAX's offices and their counsel.  That required the trustee

4    and his counsel, including myself, to spend over a week

5    conducting a trial in this court to deal with those types of

6    issues instead of focusing on the investigation.  That's not

7    to mention the delay and obstruction, as set forth in the

8    testimony at that hearing, that the harassment was itself

9    causing.

10           I cannot -- I'm not aware of, from all the case

11   law we've looked at prior to this hearing, Your Honor, of

12   any case that involves all of these different elements that

13   set forth a truly extraordinary set of circumstances where

14   you have people who are determined at every step of the way

15   to prevent the trustee from conducting his investigation and

16   delaying it in any way possible.

17           And, Your Honor, when it comes to these two

18   elements, to diligence and whether there are extraordinary

19   circumstances, none of the objectors seriously argue

20   otherwise.  There are legal arguments, which I'll get to

21   later, which are incorrect, that some of the objectors say,

22   you know, you have to look at a case-by-case,

23   entity-by-entity, or objector-by-objector analysis to figure

24   out, you know, whether each party has engaged in particular

25   obstructionist activities, et cetera.  That's not a correct

1  articulation of the law.  But what they really don't argue,

2  none of them, is that, generally, the trustee has not acted

3  diligently and that there are not overall extraordinary

4  circumstances that have affected his ability to complete his

5  investigation in a timely manner in this case.

6        I won't go through all of the testimony and

7  recount it for the Court, because the Court just heard it,

8  about particular actions that have been taken by particular

9  objecting parties.  I do, however, want to briefly respond

10  to some of the points that G Club's counsel was making

11  during the trustee's testimony when he was, you know,

12  trying, I think, to make the point that all G Club had done

13  is complied with its rules -- with the rules of civil

14  procedure and the federal rules of bankruptcy procedure and

15  had not done anything to delay the trustee's investigation.

16  I just want to reference, in response to that particular

17  argument, the Court order granting the trustee's motion to

18  compel as to G Club at ECF 1960 filed on June 28, 2023.

19  This is a quote from that order: "It is clear that the

20  production of documents by G Club is several months overdue.

21  The production of 300 documents in three weeks is not an

22  encouraging sign, and an additional 60-day extension of time

23  is not reasonable."  That was in response to an extension

24  request.

25        Your Honor, the Court has already found that

1    G Club delayed by several months in producing its documents,

2    which necessarily delayed the trustee's investigation.  Your

3    Honor, having no real ability to respond to the robust

4    factual record established through the trustee's testimony,

5    and the record more generally, that he's been diligent and

6    that there have been extraordinary circumstances impeding

7    his investigation, what we're left with is the legal

8    arguments that all of the objectors, I think, uniformly

9    raise, the primary one being that, in their view, this Court

10   is incapable as a matter of law of entering an order tolling

11   the statute of limitations before adversary complaints have

12   been filed.

13        Obviously, as the Court is aware from the papers,

14   there has been much focus placed on Judge Tancredi's

15   decision in the Walnut Hill case in this bankruptcy court

16   from June 2018.  We've addressed that decision in our

17   papers, and I'll address it again, Your Honor.

18        A few quick notes first.  Although from another

19   bankruptcy judge, a former bankruptcy judge in this

20   district, that decision is not binding on this Court, of

21   course.  Second, there are a number of other decisions which

22   we cite in our papers in which courts have, in fact,

23   equitably tolled the statute of limitations prior to the

24   expiration of the deadline and prior to the filing of

25   complaints.  These cases are listed in paragraph 30 of our

1    motion.

2            One of those cases, which we spent some time

3    discussing, of course, is the International Administrative

4    Services case out of the Eleventh Circuit in 2005.  That

5    case, Your Honor, I think is highly relevant to the analysis

6    before the Court today, because its facts are, in many

7    ways -- I would say identical, but I think they are -- they

8    share similarities, but they are far less extraordinary than

9    the facts we have at issue here.

10           This is from the Second -- from the Eleventh

11    Circuit decision in that case.  The Eleventh Circuit

12    observed that the debtor there had engaged in a fraud and

13    then had took steps to hide his assets in "a tangled and

14    complex web of multi-step international transactions."  And

15    then it described the trustee's investigation as "The

16    trustee began the unenviable task of unraveling the knotted

17    trail of transfers.  The trustee's ability to investigate

18    the transfers was hampered by the debtor and his associates

19    who, among other things, delayed document production,

20    withheld discovery responses, and simply 'lost' records of

21    the asset transfers.  As a result, the trustee filed a

22    motion to hold the debtor and his professionals assisting

23    him in covering their tracks in contempt of court."

24           Your Honor, that's just one aspect of the

25    extraordinary circumstances and obstruction that this

1    trustee has faced in this case.  And yet, on that record,

2    the court, in fact, extended the statute of limitations

3    twice prior to the expiration of the deadline.  It did that

4    both under Federal Rule of Bankruptcy Procedure 9006 and

5    based on the doctrine of equitable tolling.

6            Now, Judge Tancredi, in the _Walnut Hill_ case, he

7    attempted to discredit that Eleventh Circuit decision on

8    what he described as his reading of that decision, that the

9    equitable tolling requested in that case did not occur until

10   after the adversary proceeding was filed.  But I would

11   submit if you look at the _International Administrative_

12   _Services_ decision, that is simply not the record.  That is

13   not how that case transpired.

14           In fact, as I said before, the request to toll the

15   statute of limitations to extend it beyond the initial

16   deadline was made twice prior to the expiration of the

17   deadline and granted by the court.  The Eleventh Circuit

18   separately analyzed equitable tolling in its decision.  But,

19   again, it does not affect the fact that that decision was

20   one in which equitable tolling was granted on a prospective

21   basis.

22           Now, the objectors argue that, well, look, why

23   does it matter?  Why can't the trustee just file his

24   complaints and then seek equitable tolling after the fact?

25   Your Honor, you heard from the trustee why that doesn't

1    work.

2              And the reason it doesn't work is because of the

3    sheer volume of additional investigative tasks before the

4    trustee and his need to pour resources into those tasks at

5    significant cost and expense to the estate.  This is not a

6    situation where the trustee only has one or two leads that

7    he needs to run down, and he can do that and then seek

8    equitable tolling as to those claims later.  This is a

9    situation where the trustee has all kinds of things that he

10   continues to need to investigate and things he needs to

11   start investigating from scratch, because he hasn't had the

12   opportunity to get all the discovery prior to the deadline

13   that he needs.

14             What all that means is that this is an

15   extraordinarily large undertaking and an extraordinarily

16   expensive one.  And what these objectors are asking the

17   trustee to do is to force this estate to bear all of the

18   costs of investigating, of pursuing that investigation, not

19   having any clarity and any certainty as to whether or not

20   those claims will, in fact, be -- whether the statute of

21   limitations governing those claims will, in fact, be tolled.

22             In addition, what the trustee is asking for is a

23   breathing spell, Your Honor, of six months through -- I

24   believe it's August 15th, to try to complete his

25   investigation and pursue additional claims.  What the

1    objectors are asking for is for the Court to not allow that

2    to happen.  And the result would be the trustee is

3    essentially forced to operate for every day after February

4    15th that he's conducting his investigation and trying to

5    find additional claims with, essentially, a gun to his head

6    where he has to finish that investigation as fast as he

7    possibly can or else any party who argues that the statute

8    of limitations has lapsed on claims that he brings is going

9    to say he didn't bring them fast enough.

10           That is unfair and inequitable to the trustee and

11   to this estate under these circumstances where he's been

12   unable to complete his investigation the way he needs to

13   prior to the deadline.  He is entitled to an additional

14   period to finish his investigation, the investigation that

15   he should have been able to complete prior to the deadline

16   absent the extraordinary circumstances that existed.  And

17   it's a modest six-month extension that he's looking for.

18           The second major legal argument that several of

19   the objectors raised, Your Honor, that I want to address

20   briefly is the argument which you've heard -- or you saw

21   previewed time and time again during cross-examination, and

22   that's the argument that equitable tolling as against

23   particular defendants is not appropriate because they claim

24   that their particular defendants or potential defendants or

25   objectors did not themselves engage in any obstruction or

1    other behavior contributing to the circumstances that

2    prevented the trustee from completing his investigation.

3    And that argument, Your Honor, fails on two bases.

4          First, as the record has demonstrated, with

5    respect to the lion's share, if not all, of the defendants,

6    that's just factually wrong.  The defendants have either

7    been directly involved in failing to timely produce

8    documents, to providing testimony under oath that turned out

9    to be inaccurate in the case of Mei Guo, to being held in a

10   contempt of court, which is the case for several of the

11   defendants, to being members of the creditors committee with

12   which the Court is familiar.  That's just simply not true

13   factually.

14         But legally, Your Honor, more importantly, it's

15   irrelevant.  And I think the Taurus Funds spend a lot of

16   time in their objection citing to case law which they

17   suggest stands for the proposition that it is the defendants

18   or the potential defendants at issue who has to have engaged

19   in wrongful conduct.  And they even cite a case saying that

20   it's sort of unsettled in some jurisdictions as to whether

21   the conduct needs to be on behalf or brought by the

22   particular defendant or not.

23         I don't think there's any dispute that it doesn't,

24   Your Honor.  And the case that I would direct the Court to

25   is the Second Circuit's decision in the Valdez case from

1    2008, which we cite in our reply papers at paragraph 20.  I

2    think that decision removes any doubt as to the standard and

3    as to whether or not the trustee on a motion for equitable

4    tolling has to show some sort of wrongful conduct on behalf

5    of each of the potential defendant parties.  And what the

6    Court said in that case was "Equitable tolling permits a

7    plaintiff to avoid the bar of the statute of limitations if,

8    despite all due diligence, he is unable to obtain vital

9    information bearing on the existence of his claim.

10   Equitable tolling is frequently confused both with

11   fraudulent concealment on the one hand and with the

12   discovery rule governing accrual on the other.  It differs

13   in that the former" -- sorry.  The accrual prong of the

14   analysis differs from the former, i.e. fraudulent consumer,

15   in that it does not assume a wrongful or any effort by the

16   defendant to prevent the plaintiff from suing.

17         The court then goes on and says, "Because

18   equitable tolling is often confused with fraudulent

19   concealment, cases may be found holding that equitable

20   tolling applies where the defendants have engaged in such

21   concealment.  Nevertheless, we," i.e. the Second Circuit,

22   "have held explicitly that the application of the doctrine

23   of equitable tolling is not limited to such cases."

24         So, Your Honor, there is no requirement that the

25   defendants at issue be the ones who have engaged in

1    concealment of information, obstruction of justice, et

2    cetera.  What is relevant is whether there are extraordinary

3    circumstances generally that have presented -- have

4    prevented, rather, the trustee from completing his

5    investigation in general and pursuing claims against any

6    parties, including the parties who are objecting.

7              With that, Your Honor, the last point I would make

8    is that there's -- two things.  First of all, there's a lot

9    of mention in several of the objections to the number of

10   parties who would be affected by this motion and efforts by

11   the objecting parties to assert their rights and sort of

12   make arguments on behalf of parties who are not here

13   objecting today.  I don't think there should be any

14   reasonable dispute about this, although from some of the

15   papers it appears there might be.

16             But the parties who are here today objecting can

17   assert their rights and only their rights.  They have no

18   ability to appear and object on behalf of other parties.

19   And the consequence of that, Your Honor, is that even if the

20   Court were inclined to sustain any of the objections of the

21   objecting parties, which we don't think it should, that

22   would not affect the ability of the Court to grant the

23   motion as to all other parties who have not appeared and

24   have not objected.

25             Lastly, again, if the Court were inclined to

1    sustain any of the objections, which the trustee does not

2    think it should be, I think it goes without saying that that

3    would have to be without prejudice to the trustee's ability

4    to seek equitable tolling in the future.  Although, for all

5    the reasons I've said, we think that the law supports it now

6    and the record before the Court supports it now as well.

7            That's all I had, Your Honor, unless the Court has

8    any questions.

9            THE COURT:  Thank you.  No, I have no questions.

10   Thank you.

11           Okay.  Mr. Della Fera, would you like to make a

12   closing statement on behalf of the objection that was filed

13   on behalf of Mei Guo?

14           MR. DELLA FERA:  Yes, Your Honor.  Thank you.  Of

15   course, we will rely primarily on our -- on the arguments in

16   our filed objection, but just to supplement briefly there,

17   there is little, if any, dispute that equitable tolling is

18   available if this two-part test that the Court has heard

19   much about is satisfied, i.e. extraordinary circumstances

20   and reasonable diligence.  Contrary to trustee's counsel's

21   argument, however, with respect to reasonable diligence,

22   Ms. Guo does contest the reasonableness of the trustee's

23   failure, for example, to retain a forensic accountant until

24   13 or 14 months after his appointment, apparently primarily

25   because the potential forensic accountants had the temerity

1    to seek pari-passu treatment as administrative expense

2    creditors with the trustee and his firm.

3          Be that as it may, there is a dispute as to when

4    that two-part test should be applied.  We submit that that

5    test should only be applied to specific claims when they are

6    asserted, after they are asserted, and when the parties

7    against whom those claims are asserted are known.

8          Picking up on a point that Mr. Sklarz made during

9    the hearing, no amount of testimony, Your Honor, can

10   authorize this Court to do what the law does not authorize

11   it to do.  And what the trustee is asking the Court to do

12   today is to find and to enter essentially a declaratory

13   judgment against every individual and corporate entity on

14   the planet that today the trustee has made an adequate,

15   equitable argument to excuse his filing of presently unknown

16   avoidance actions against presently unknown defendants for,

17   you know, up to six months from now, by the way.  And we

18   submit that the Court should not grant that relief.

19         Although the requested relief is not

20   unprecedented, it is extraordinary.  And as Judge Tancredi

21   explained in Walnut Hill, and Your Honor has read enough

22   about that and probably knows enough about it anyway, it

23   finds no support -- that relief finds no support in the

24   Bankruptcy Code, the bankruptcy rules, or in the ideals of

25   due process.

1          The trustee ignores the declaratory judgment

2     nature of the relief requested, as well as the fact that he

3     is not prejudiced in the least if the relief requested is

4     denied.  Like other trustees, he may have to impair costs to

5     pursue claims.  But, frankly, Your Honor, if equity dictates

6     after those claims are asserted that the trustee should not

7     be permitted to assert those claims due to the expiration of

8     the statute of limitations, well, if equity doesn't support

9     the relief at that time, it certainly doesn't support it up

10    to six months prior to that time, which is the trustee's

11    request.

12         The trustee goes so far as to say in his motion

13    papers that he would be left with no recourse if the

14    extraordinary relief he seeks is denied.  And he knows

15    better than that, Your Honor.  He knows that he retains the

16    ability after avoidance actions are filed -- to the extent,

17    by the way, a statute of limitations defense is raised, he

18    retains the ability at that time to seek equitable relief,

19    likely from this Court, based on the actual and demonstrable

20    facts and circumstances associated with that specific claim

21    against that specific defendant.

22         There is no prejudice, at least no material

23    prejudice, to the trustee or the estate if the motion is

24    denied.  And we respectfully request that the Court deny the

25    motion.  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Attorney Mateo, did you wish to make a closing

3    argument on behalf of your client, Mr. Cao?

4          MS. MATEO:  Yes, Your Honor.

5          THE COURT:  Go right ahead.

6          MS. MATEO:  We join in Mr. Della Fera's argument.

7    The tolling motion is a thinly veiled request for a

8    declaratory judgment that the trustee can equitably toll the

9    statutory deadline for filing avoidance actions, carte

10   blanche, as against hundreds of potential defendants without

11   any case or controversy before the Court.  Nothing justifies

12   the imposition of such a blanket extension.

13         The trustee's counsel refers to this additional

14   six months as a "breathing spell," but his counsel ignores

15   the cost to due process to -- of hundreds of potential

16   defendants.  Aside from listing the names of what appear to

17   be any and all entities and associates with any connection

18   to the debtor, no matter how remote, the tolling motion is

19   noticeably silent on the specifics of what claims the

20   trustee intends to bring and specifically against whom.  The

21   trustee referred to it as casting a wide net, and that it

22   is.

23         And as you heard from the trustee directly, six

24   months is not the most that he may seek, testifying that he

25   may seek additional extensions in the future.  To justify

1    his acts now, the trustee conflates Federal Rules of

2    Bankruptcy Procedure Rule 9006(b) and the doctrine of

3    equitable tolling.  Neither authorizes the trustee's

4    requested extension.

5         First, Rule 9006(b) cannot be used to extend

6    statutory deadlines.  As <u>Walnut Hill</u> and its progeny

7    confirm, judicial modification of substantive deadlines

8    established by Congress would violate the separation of

9    powers preserved in the Constitution (indiscernible) the

10   legislature has spoken authoritatively, it is not within the

11   province of the judiciary to modify its determination.  And

12   even assuming that Rule 9006(b) could be used to extend the

13   Section 546(a) deadline or any other of the statutory

14   deadlines, such an enlargement would be inappropriate on the

15   facts as against Mr. Cao because the decision to enlarge a

16   deadline under Rule 9006(b) must be for "cause shown," and

17   the trustee has not demonstrated any basis that justifies

18   extending the deadline to file an avoidance action against

19   Mr. Cao.

20        The trustee seeks to paint a broad stroke when

21   describing the objectors, as well as the other potential

22   defendants, claiming that all the objectors have been

23   complicit in their efforts to obstruct and delay the

24   trustee's investigation.  But as you heard today from the

25   questioning from the objectors' counsel, that is certainly

1    not the case with many of the objectors and definitely not

2    the case with regard to the hundreds of potential defendants

3    that have been served with this motion.

4              As Your Honor learned from my cross-examination,

5    Trustee Despins has virtually no knowledge of my client and

6    did not challenge, because he can't, that Mr. Cao has fully

7    cooperated with the trustee since first being served with

8    the Rule 2004 subpoena.  For one, Mr. Cao voluntarily

9    accepted service of the Rule 2004 subpoena.  He timely

10   served written responses and produced documents.  And he sat

11   for more than seven hours for a deposition on October 20,

12   2023.  Unlike what Mr. Despins' counsel claims, Mr. Cao did

13   not plead the fifth, and he did not refuse to answer any

14   questions substantively.

15             Further highlighting the lack of diligence by the

16   trustee, he has never sought any additional information from

17   Mr. Cao following his deposition.  Highlighting Mr. Cao's

18   cooperation, on the other hand, at no point has Mr. Cao

19   attempted to quash any of the Rule 2004 subpoenas seeking

20   information from him or about him, and in no way has wasted

21   the trustee's time, money, or resources with any motion

22   practice or by filing litigation against the trustee, as the

23   trustee claims that others have allegedly done.

24             This is yet another example of how the trustee is

25   attempting to leverage allegedly obstructive behavior by a

1    few others to trample on the rights of hundreds of potential

2    defendants.  Alternatively, the trustee availed himself of

3    the equitable tolling doctrine to warrant his extension.

4    While statutory deadlines are subject to equitable tolling,

5    any such arguments are procedurally premature at this

6    juncture, as there are no actual identified defendants and

7    no pending adversary proceedings ripe for consideration.

8         As the case law makes abundantly clear, the Court

9    can only properly consider whether equitable tolling is

10   appropriate after a belated adversary proceeding is

11   commenced and a statute of limitations defense is asserted.

12   This is logical, since application of equitable tolling

13   requires a fact-based assessment.  Indeed, the Court would

14   need to analyze whether the trustee, despite his diligence,

15   was unable to commence the action against that defendant due

16   to extraordinary circumstances.

17        The trustee does not dispute this in his motion,

18   even though he claims to do so today.  He concedes in

19   paragraph 45 of his opening brief that "Equitable tolling

20   must be decided on a case-by-case basis."  That's exactly

21   what Walnut Hill says is required, and only after filing an

22   adversary proceeding, knowing the claims, knowing the

23   defendant, and knowing the trustee's diligence with regard

24   to those claims.

25        The trustee's lack of diligence was further

1   confirmed when we served the trustee with discovery requests

2   seeking documents and information as to any other

3   investigation into Mr. Cao since his deposition.  And we did

4   that in connection with this tolling motion.  The trustee

5   merely responded with broad and improper objections and

6   pointed us back to Mr. Cao's deposition transcript and

7   documents that we produced to the trustee four months ago.

8   That is because the trustee has been sitting on his hands

9   for months, and now, seeing the impending deadline, wants

10  the Court to preemptively excuse his negligence by giving

11  him an additional six months to do what he should have been

12  doing since his appointment.

13          That is not diligence and is certainly not what is

14  required for equitable tolling.  The trustee vaguely claims

15  that forcing him to have to meet the relevant standard for

16  equitable tolling only after filing an adversary proceeding,

17  which is exactly what the law requires, will prejudice him,

18  because he may not be able to make the requisite showing

19  then and may waste resources.  But if the trustee is unable

20  to make that showing then, when the claims are more

21  crystallized and the defendants are known, it is

22  inappropriate to give the trustee a blank check now with no

23  known claims or actual defendants on the basis that

24  equitable tolling justifies that.

25          For the reasons explained and discussed further in

1    our opposition, as well as the other arguments that the

2    objectors will make in their closing arguments, Mr. Cao

3    respectfully requests that the Court deny the tolling

4    motion.  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              All right.  Moving to DBS Bank.  Attorney Weiner?

7    I might be mispronouncing your name.  I'm not sure if you

8    pronounced it --

9              MS. WEINER:  No.  That's correct, Your Honor.

10   Genevieve Weiner.  Thank you.  And, yes, I'll be very brief.

11             As noted, we did just file a reservation of

12   rights.  And just two points to clarify quickly.  There's

13   been a number of references throughout the hearing today

14   referring to sort of the objecting parties sort of lumped

15   together.  And I don't think this is meant to refer to DBS,

16   which, again, just filed a reservation of rights.  But just

17   noting for the record that DBS Bank has been cooperating

18   with the trustee.  And this has been noted in two consensual

19   continuances, which are at Docket Numbers 2438 and 2517.

20             And then very briefly, and I'm hoping this is

21   non-controversial, we had one requested change to the second

22   proposed order which was filed last night.  And this is

23   consistent with our reservation of rights.  Right now, the

24   order says that the ordered extension, the new defined term,

25   which date may be further extended.  I'm quoting there.  We

1    would just ask that that be clarified that it can only be

2    further extended after notice and a hearing.  So we should

3    all be before Your Honor again if there is going to be

4    further continuances or extensions.

5              THE COURT:  You're looking at the order that was

6    submitted, was the second ordered paragraph on the second

7    page?

8              MS. WEINER:  Yeah.  Yes, Your Honor.  Well, I was

9    looking at the redlines.  I'm looking at page 9 of the PDF

10   at 28 --

11             THE COURT:  Yeah.  No, I'm looking at the same

12   page.  It's just the second page of the order is what I'm

13   saying.

14             MS. WEINER:  Correct.  Yes.

15             THE COURT:  In the second ordered paragraph where

16   you're saying which date may be further extended, you're

17   saying it should say after notice and a hearing?

18             MS. WEINER:  Correct, Your Honor.

19             THE COURT:  Okay.  I just -- I'm making a note

20   that that's what you are requesting.

21             MS. WEINER:  Okay.  I appreciate that.

22             MR. DESPINS:  And, Your Honor, we have no issue

23   with that.  It's very reasonable.  Thank you.

24             THE COURT:  Okay.  Thank you.

25             MS. WEINER:  And that's it.

1    THE COURT:  All right.  Anything further?  Okay.

2  All right.  Great.  Thank you very much.

3    Then we will move on to Mr. Conway for Taurus

4  Fund.  Do you have a closing statement that you'd like to

5  make, Attorney Conway?

6    MR. CONWAY:  Yes.  Thank you, Your Honor.  Michael

7  Conway for Taurus Fund, LLC.

8    I'm not going to get into the case law.  It's

9  cited in our brief.  It's been discussed by a lot of folks

10  here today.  I know we're short of time.

11    But I do want to just point out that one of the

12  reasons why the Walnut Hill case comes down the way it does

13  is that that's the way the statutes are written.  That's the

14  way every court and almost universally around the country

15  has interpreted these statutes.  The reason is to protect

16  from the very problem we have here.  And that is -- and

17  there's been no case cited by the trustee that comes

18  anywhere close to this case.

19    This case has what is estimated to be more than

20  900 potential defendants.  We don't know how many potential

21  defendants there really are.  And we have a handful of

22  situations where there may have been folks during the course

23  of the last two years who have not been complying with

24  discovery requests.

25    There is no way of knowing whether, one, any of

1    those potential defendants have been obstructing the

2    trustee's investigation or, two, whether any of the people

3    who were obstructing the trustee's investigation result --

4    caused the result of them not being able to bring a case

5    against these hundreds and hundreds of possible defendants.

6    And the reason we don't know that, we don't know who the

7    defendants are or what the claims are.  We would know that

8    if they followed the correct procedure, which is file the

9    claims and then deal with the equitable tolling defense as

10   part of that case.

11        You know, and the trustee says, well, we don't

12   want to run the risk here.  You know, what if we get there

13   six months down the road and find out that Your Honor

14   doesn't believe that what we had for a defense is

15   sufficient?  Well, you know what?  It's the same today as it

16   is six months from now.

17        And right now, what we don't know in order to

18   dispute this motion is what it is they -- you know, they

19   claim that these hundreds of defendants did to obstruct.

20   And I would guess that most of them did zero.  There's been

21   little evidence.

22        There's just -- the evidence that was presented on

23   behalf of my clients consisted of, well, we found out that

24   Mr. Barnett's name was on title to a motorcycle.  Well, he

25   didn't do anything to obstruct you from doing your

1    investigation.  That's not the same thing.

2           You know, and you've already got a claim against

3    my clients.  So, you know, you could have amended if you

4    thought there was a claim based on the fact that he had his

5    name on the title to a motorcycle.  You could have amended

6    well before the statute of limitations came away, which

7    obviously doesn't come for another couple of days.

8           But the fact of the matter is, this is the same

9    problem that everybody has.  And I wanted to respond to a

10   comment by, you know, Mr. Bassett, but also Mr. Wander.  I

11   wasn't sure why he was making this argument when he was

12   questioning the trustee.  But there is no law that -- or

13   case or statute that says that if Your Honor decides this

14   motion is inappropriate with respect to one defendant, it

15   can find it appropriate with respect to everybody else.

16          It's an all or nothing deal here.  Either they

17   have a valid motion to extend or they don't.  The law

18   doesn't say you can pick and choose when to violate the law.

19   Either this can be extended as to everybody or it can be

20   extended as to nobody.

21          And the fact that there are only 10 people or 12

22   people or 14 people who file objections is irrelevant.  The

23   fact of the matter is that most of these people probably

24   have no idea we're here today.  And the reason that Your

25   Honor is -- you know, has precedent and case law and

1    statutes to rely on is because, you know, it's your job to

2    protect these folks that don't know that we're here today.

3              And so it's not fair to say, oh, well, you know

4    what, they could have been here and they weren't.  And,

5    therefore, I'm going to just sort of tweak the statute here

6    and say I can extend it.  That's just not the way it works.

7    And I just wanted to make that clear, because both

8    Mr. Bassett and it sounded like Mr. Wander thought that you

9    could do that on a case-by-case basis.

10             That's all I have to say.

11             THE COURT:  Okay.  Thank you.

12             Attorney Sklarz for G Club?

13             MR. SKLARZ:  Thank you.  Thank you, Your Honor.

14             To be clear, this is a motion that has never been

15   presented to any court that I can possibly find.  Over 900

16   people, according to Trustee Despins, this applies to.  The

17   IAS case or IBT case, whatever you want to call it, applied

18   to two defendants, not 900.

19             Both the Court -- and I concede that, perhaps, me

20   standing on a soapbox representing G Club looking out to

21   protect other people may or may not be relevant.  But

22   certainly, the U.S. Trustee has that obligation.  And

23   certainly, the Court has an obligation to look at that.

24             So I commend the Court to consider the

25   extraordinary motion.  This is a class action extension of

1    time motion to change a statute of limitations written by

2    Congress.  There are constitutional ramifications.  There

3    are statutory ramifications.  And there are rules

4    interpretations here.

5         First, Stern vs. Marshall says that private rights

6    of actions, which are avoidance actions -- all avoidance

7    actions are Stern claims.  Wellness says that.

8    Executive Benefits says that.  Hundreds of cases in the

9    Madoff case say that.  It's not controversial.  These are

10   all Stern claims.

11        To extend a Stern claim, you certainly can't just

12   ignore Stern.  So first of all, the Court, I believe -- I

13   believe it's correct that the Court would have to write

14   reports and recommendations, and then this matter would need

15   to be considered by the district court.

16        These are clearly private rights of actions.

17   There's no such thing as a public rights claim under Chapter

18   5.  The one exception I possibly may have found is 502(d)

19   claims.  There is one case that says 502(d) claims may be

20   public rights claims.

21        But that's not at issue here.  We're talking about

22   fraudulent transfer actions.  I saw some 549 actions and

23   possibly some preference actions, but no public rights

24   claims.

25        Second, we need to look at the enabling act that

1    created the bankruptcy rules.  Again, during my

2    cross-examination of the trustee, we spoke -- we -- I

3    mentioned there are two primary bases for tolling.  One is

4    the rule, 9006, and one is the concept of equitable tolling.

5             Turning first to the rule.  28 U.S.C. 2075 is the

6    enabling act, and it says such rules shall not abridge,

7    enlarge, or modify any substantive right.  The IAS case is

8    the only case that has addressed Rule -- Rule 9006 and said

9    you can use that to toll.  However, that court doesn't even

10   look at the enabling act.  That court doesn't consider the

11   arguments raised in <u>Walnut Hill</u>.  It just assumes without

12   analyzing the issue.  It only cites Rule 9006, I think, four

13   times.  And, moreover, Rule 2000 -- I'm sorry, 28 U.S.C.

14   2075 is not even reviewed.

15            Congress has -- legislatures are very capable of

16   giving courts authority to extend statutes of limitations.

17   One example from our brief is that the Connecticut

18   legislature affords a court -- the Superior Court the

19   ability to extend the statute of limitations upon petition

20   for med mal action.

21            Let's think about if this case was upstairs in

22   district court as opposed to in bankruptcy court.  We'd be

23   operating under Rule 6.  The Second Circuit has held Rule

24   6 -- Rule 6(a) is a rule of procedure relating to acts done

25   or proceedings had after commencement of the action and any

1    statute expressly applicable to such proceedings.  It is not

2    intended to modify and change existing statutes of

3    limitations.

4             And that's the Dining Car Employees case, 157 F.2d

5    417, pinpoint site 420.  It's a 1946 case that's still good

6    law.

7             And here's two additional citations.

8             THE COURT:  Are these cites in your brief?

9             MR. SKLARZ:  No.  These are in response to the

10   reply that doesn't -- trustee's reply doesn't really address

11   our argument on the enabling act or our Rule 6 district

12   court argument.

13            Ward v. Hudson City Department of Corrections,

14   2015 U.S. Dist. LEXIS 147383, page 11, note 4.  And that's a

15   District of New Jersey case from 2015.  And In Re Vermont

16   Knitting Company 98 B.R. 184, page 186, note 2.  And that's

17   a District of Vermont case, 1989.  And they both cite the

18   Dining Car case.

19            Again, let's think about this.  If the trustee

20   walked into Judge Bolden's chamber upstairs and said I'm

21   filing a class action lawsuit to extend the statute of

22   limitations for a fraudulent transfer action, that wouldn't

23   even be a case that anyone would consider legitimate.

24   There's just no analog outside of this action.  There's no

25   district court case that I could find that consider this

1    type of ruling.

2           And again, remember, we're not talking extensions

3    to one or two recalcitrant defendants.  We're talking

4    hundreds and hundreds of people who, as counsel just

5    indicated, could be anyone in the world.

6           Now, the cases -- and it's not just Judge

7    Tancredi's case in <u>Walnut Hill</u>.  It's Judge Krechevsky's

8    case in <u>Damage</u> (ph).  There, he looked at extending the

9    statute of limitations.  Actually, that was under public

10   rights before that concept existed in bankruptcy law.  It

11   talked -- <u>Damage</u> addressed extending lease assumption.  And

12   he said you can't extend that statute of limitations.

13   There's a statute of limitations.  The statute applies.  You

14   can't use Rule 9006 to move it.

15          So IAS is the only thing they have to rely on.

16   And that case doesn't analyze the issue.  It just assumes it

17   in its two parties.

18          Now, turning to the equitable tolling argument,

19   the other ground for extension.  The Second Circuit is very

20   clear here.  The term "extraordinary" does not refer to the

21   uniqueness of a party's circumstance, but rather to the

22   severity of the obstacle impeding compliance with

23   limitations period.  And that's from a case called <u>Harper</u>,

24   648 F.3d 132, page 137, Second Circuit, 2011.

25          And there's a number of cases that specifically

1  say limited financial means are not extraordinary.  In fact,

2  in a case called Djurdjevich, a 2020 U.S. Dist. LEXIS case,

3  223295, at page 16, the court -- the Southern District held

4  "The law is clear that lack of education, limited financial

5  means, and ignorance of the law are not extraordinary

6  circumstances that justify equitable tolling."

7          So here, there is no causation between the

8  diligence and the extraordinary circumstances.  And the

9  diligence needs to be throughout the period.  It can't just

10  be once we got money we could hire Kroll, because we wanted

11  to make sure we got paid before everybody.  Attorney Bassett

12  gave his number one reason for extraordinary circumstances,

13  no money.  Limited financial means are not extraordinary

14  circumstances.

15          Now, finally, the trustee could have filed this

16  motion months ago.  It is not fair to Your Honor and to the

17  parties here that we're doing this two days before the

18  statute of limitations run.  There was a status report

19  given, I think, in September/October time frame indicating

20  that this motion was coming.  And now we're here two days

21  before statute of limitations dealing with it.

22          I can't remember the wise man that once said

23  someone's delay is not everybody else's emergency, or some

24  version of that.  This emergency could have been averted.

25  We could have had a proper evidentiary hearing.  We could

1    have had a proper briefing schedule.  We could have had

2    proper -- more time to consider this.  This is

3    extraordinarily relief.  Never been done as far as I can

4    tell.

5             We were then handed 132 exhibits.  Actually, not

6    handed 132 exhibits.  We were handed a list of 132 exhibits,

7    some of which we can't even access, about 24 hours before

8    the hearing.

9             There was no reason to create this level of fire

10   drill.  Due process has to matter.  Due process for the

11   objectors, but also due process for the process.

12            Now, lastly, addressing counsel's suggestion that

13   in ECF 1960, in June of '23, that G Club delayed on several

14   matters.  We've complied.  The Court has ruled, and we have

15   followed the Court's ruling.

16            I do not -- and counsel is right.  There doesn't

17   have to -- this is not a claim for fraudulent concealment.

18   This is a claim for equitable tolling.  They know everything

19   they need to know about G Club.  They said they're going to

20   sue us, so I guess they're going to sue us.

21            But this case is not like IBT.  This case is --

22   has no reason for it to have played out this way.  And the

23   Court should deny this motion, because it's simply

24   constitutionally improper.  There's no statutory basis to

25   grant the relief, and the relief is unnecessary.

1      They have to show it on a particular basis with

2      respect to each claim.  There's no such thing as

3      class-action relief for equitable tolling.  Thank you, Your

4      Honor.

5              THE COURT:  Okay.  Thank you, Attorney Sklarz.

6              Attorney Evans?  Is Attorney Evans still with us,

7      or did he leave?

8              MR. EVANS:  Yes, Your Honor.  Thank you.  Attorney

9      Sklarz broke up there at the end.  Can the Court hear me

10      okay?

11              THE COURT:  Yes, I can hear you fine.  Go right

12      ahead.  Can you not hear us?

13              MR. EVANS:  I can now.  It just came back.

14              THE COURT:  Okay.  Okay.

15              MR. EVANS:  I'll be brief, Your Honor.  Thank you.

16      And I'm not going to repeat the arguments in our objection

17      and those other objections that have been made here, which

18      urge the Court to deny the tolling motion on the basis that

19      the Court does not have the authority to issue a prospective

20      blanket tolling order, whether under Rule 9006(b) or under

21      the equitable tolling doctrine.

22              I just wanted to focus the Court for just a brief

23      moment on just the unfairness, the unfairness to a party

24      like my client who, despite, I think, what Attorney Bassett

25      had opened up about, said that we're, as an objecting party,

1    someone who's recognized by this Court has been involved in

2    this case.  That's really not true.  And as Your Honor

3    knows, this is the first time I've appeared before the Court

4    on this case.  We haven't been involved.  There's been

5    (indiscernible) filings.  And the trustee supports his

6    motion.  We know very little about the case.

7         And so my objection, primarily, that I want to

8    focus the Court on goes really to process, the process of a

9    party like the Rule of Law entities not having a meaningful

10   opportunity to defend the motion.  We were entitled to go

11   through no discovery on the assertions in the trustee's

12   motion.  As I indicated earlier, it's not supported by an

13   affidavit or declaration.

14        Normally, the way affidavits would happen, and

15   other parties have alluded to this, is the statute of

16   limitations gets pled as an affirmative defense, and then

17   the trustee would, I guess, assert as a matter of avoidance

18   in the adversary proceeding that there's been -- there's

19   some grounds for equitable tolling.  In that case, the party

20   would be entitled to discovery, specific discovery on

21   whether equitable tolling applies to that case.

22        Be seeking it in this context prior to filing of

23   the adversary proceeding, a client like Rule of Law entities

24   who've not been involved at all, we -- we're deprived of any

25   opportunity to rebut any of the testimony offered by the

1    trustee today.  I learned a lot about what's going on in

2    this case from the trustee's testimony, all of which was

3    information not known to me before.

4          We have -- from my client's perspective, we have

5    to accept it as true for purposes of the motion, because I

6    have no way to meaningfully cross-examine him on whether his

7    assertions are true.  I have no doubt that he is speaking

8    truthfully to the Court, but (indiscernible) --

9          THE COURT:  We lost you there for --

10         MR. EVANS:  -- can't meaningfully challenge it.  I

11   can't refute those --

12         THE COURT:  We lost you there for --

13         MR. EVANS:  -- allegations without having --

14         THE COURT:  We lost you there for a second --

15         MR. EVANS:  For how long?

16         THE COURT:  -- Attorney Evans.

17         MR. EVANS:  Okay.

18         THE COURT:  You said -- I think the last thing we

19   heard is we have no doubt the trustee is testifying as to

20   what he's doing.  And then I -- we lost you.

21         MR. EVANS:  Okay.  And then from there, we have no

22   opportunity to meaningfully address his assertions.  Without

23   the benefit of discovery, without being able to go through a

24   process with a scheduling order to be able to protect

25   parties against the one-sided approach, we're here with one

1    arm tied behind our back.

2                And we've provided the Court with our declaration

3    saying that we fully cooperate.  And there's been no motion

4    to compel as to my client.  We dutifully responded to a

5    subpoena by providing thousands of documents as early as

6    October of 2022.  And then we provided supplemental

7    discovery in, I think, April and May of 2023 and, since

8    then, did not hear back from the trustee until December 20

9    of 2023 asking for additional documents, which we'll

10   provide.

11               So we would urge the Court on the basis of that to

12   deny the motion as to our clients, the Rule of Law entities.

13   Thank you.

14               THE COURT:  Okay.  Thank you, Attorney Evans.

15               Then Attorney Schmitt?

16               MR. SCHMITT:  Yes, Your Honor.  I'll be extremely

17   brief.  You know, I'll initially say I just join in the

18   legal arguments of counsel for our fellow objectors, which

19   are well stated.  And I'll say I am -- we were limited in

20   our response here factually, because, like counsel just

21   said, we're new to this case as well.

22               And I will note that I didn't hear the trustee

23   actually discuss my clients, Mr. Lee or Mr. Xia,

24   specifically today either.  I will note, you know, that in

25   the reply brief, both Mr. Lee and Mr. Xia were accused of

1    having obstructed the trustee's investigation.  Expected to

2    hear something about that specifically.  We didn't hear

3    anything about that.

4              And I will note that they're -- the way they were

5    alleged, and this is in paragraph 12 of the reply, was by

6    being members of the HCHK Creditors Committee.  I think it

7    has already been discussed it's not clear exactly how any

8    individual member of that committee obstructed the trustee.

9    And I think the trustee conceded it's not clear it's even

10   legally significant.

11             But I will note, because it is such a serious

12   allegation, that that -- based on the evidence here, I just

13   believe it is -- it's factually incorrect that Mr. Xia was a

14   member of that creditors committee.  And I would just direct

15   the Court to the Trustee's Exhibit 12, which is the

16   memorandum opinion in the HCHK case.  And at paragraph 27,

17   and the findings of fact of that opinion, Your Honor lays

18   out -- and I believe it was pursuant to a stipulation by the

19   trustee and the other parties in that case -- who exactly

20   the members of the creditors committee were.  And they do

21   not include Mr. Xia.

22             And, again, I'm not sure that the trustee is even

23   saying that that's legally relevant, but I will just note

24   that, you know, it's a pretty serious accusation against

25   someone if they were -- obstructed the trustee's

1    investigation.  I think the reply also says that both my

2    clients were complicit in the fraudulent scheme because they

3    were members of the creditors committee.  And I will say,

4    with respect to Mr. Xia, at least, the trustee's own

5    exhibits made clear that that is not true, that he was not a

6    member of the creditors committee.

7             And, like I said, I'd be brief, Your Honor.

8    That's all I have to say.

9             THE COURT:  Okay.  Thank you very much.

10            Mr. Major?

11            MR. MAJOR:  Thank you very much, Your Honor.  I

12   will be brief as well, because I will join in the arguments

13   of counsel who have already gone and in the various written

14   objections, including ours, that are on file.

15            So I just want to start on -- and I'm going to be

16   very careful to not retread the same ground you've just been

17   hearing.  But I want to start with the proposed order.  The

18   language of the proposed order is exceedingly broad and

19   makes it clear that the trustee is not looking for equitable

20   tolling, but rather for the Court to amend Congress's

21   statute.  He's asking that the statute of limitations be

22   moved from this week until mid-August of 2024.  Because

23   under his proposed language in the order, he could file a

24   claim -- if this order gets -- if this order is approved, he

25   could file a claim two months from now that he knew about on

1   December 1st.  And I'm not suggesting he's going to do that.

2   I'm saying that's what the order would -- says.  And that's

3   proof to me that what he's really asking is to extend the

4   six-month statute of limitations.

5          I can give you another example of something he

6   could do that has nothing to do with equitable tolling.  He

7   could have decided on December 1st that a particular

8   avoidance action wasn't worth the expense because of

9   collection risk, right?  The statute of limitations gets

10  extended, and he determines a different analysis of

11  collection risks in a few months and decides now it is

12  worthwhile to bring the action.  That's a problem.  And

13  that's an order that I think would be unprecedented and,

14  obviously, would violate the separation of powers.

15         Another problem that this is creating is the

16  trustee is asking the Court to make a finding of equitable

17  tolling without any sort of causation.  Because he's asking

18  for you to extend the statute of limitations, it will never

19  get revisited, never have -- he'll never have to demonstrate

20  that a particular claim or case could not have been filed by

21  him in reasonable diligence by this week.  That would all

22  get swept under the rug if he gets the order that he's

23  looking for.

24         And that means that the Court has not had an

25  opportunity to hear any evidence or reason as to why he

1     can't bring a particular claim.  That's why Judge Tancredi

2     issued the decision he issued, which everyone has cited and

3     discussed.  That's another critical problem with this entire

4     process.

5          Finally, I want to touch on some cases that were

6     cited, and particularly the Valdez case that counsel for the

7     trustee read from during his closing argument.  The Valdez

8     case -- and this deals with the issue of whether or not the

9     defendant has to be in some way responsible for the delay.

10    At a minimum, a court would have to examine a particular

11    claim or case to determine whether it -- there should be

12    equitable tolling.  But on top of that, Valdez, I don't

13    think, stands for the proposition that counsel alluded to.

14         It was a federal tort claim act case.  And in that

15    case, the U.S. government, which was the defendant, failed

16    to inform the mother of a deceased infant that the doctor

17    that the mother wanted to sue for medical malpractice was a

18    federal employee, which changes the statute of limitations

19    from what she and her lawyer anticipated, not knowing it

20    thought a federal employee, would -- they thought they were

21    going to apply the state law statute of limitations in New

22    York.  And there -- and for that reason, there was tolling

23    there.  But, again, you have conduct by the defendant that

24    led to the delay.

25         And the quote that Mr. Bassett read to the Court

1    today cites to -- in that Valdez decision cites to another

2    decision called Veltri, V-E-L-T-R-I.  It's in the Valdez

3    decision that the trustee cited in his reply.  That was an

4    ERISA case.  And, again, in that case, the defendant failed

5    to inform the plaintiff of their -- of its right and the

6    procedure for challenging the denial of benefits, and that's

7    what led to the delay.  So that's why there was equitable

8    tolling.

9              So, yes, it's true; it doesn't necessarily have to

10   be fraudulent concealment in order to have equitable

11   tolling, but there has to be some conduct that, A, caused

12   the delay -- and we have no way of measuring that right now,

13   because the trustee who testified for a long time this

14   afternoon didn't identify a single action that he's being

15   impeded from filing.  And he jumped the gun by filing this

16   motion now before he had such an action.  And then, number

17   two, there does have to be some conduct.  It's equitable

18   tolling, so I don't know how a Court could possibly balance

19   the equities if you don't know who the defendant is and

20   what, if anything, they did to impede the progress of the

21   lawsuit.

22             So I'd just like to add those things into the

23   record, and I thank the Court for its time.

24             THE COURT:  Okay.  Thank you, Attorney Major.

25             Attorney Grand?

1          MR. GRAND:  Thank you, Your Honor.  I also, on

2     behalf of GS Security, just will join in the

3     well-articulated legal arguments advanced by counsel for the

4     other objectors and only wish to add -- or highlight the

5     points articulated about the fact that the equities need to

6     be addressed on a case-by-case basis.  The trustee in his

7     moving papers cites Supreme Court precedent that basically

8     holds that equitable tolling decisions need to be made on a

9     case-by-case basis and, I think it's just three or four

10    paragraphs later, argues that despite that authority that

11    this Court should determine that equitable tolling decision

12    based on the entirety of the factual record.

13         So I -- again, I urge the Court to take note

14    that -- you know, that that's the standard, and that's what

15    should be applied in this case as to each defendant or

16    potential defendant.  And I don't have -- beyond that, I

17    don't have anything more to add.

18         THE COURT:  Okay.  Thank you.

19         So I think now it's Attorney Wander, if I'm

20    correct?

21         MR. WANDER:  Thank you, Your Honor.  I also will

22    be brief.  And in large part, I'm going to echo some

23    statements by the last two counsel, Major and Grand.  My

24    argument, focusing on my particular client, Yingying Wang,

25    was not intended to undercut the arguments by other counsel

1    that the motion should be denied to all 331 noticed parties.

2    I'm just here to speak to my client, whose situation is

3    different.

4          If this Court finds that the trustee has overcome

5    the first hurdle, which many of the objectors argue he has

6    not, that equitable tolling is permissible under the

7    applicable law and the facts of this case, in that

8    situation, then I submit that the Court should only grant

9    the trustee 99 percent of the relief requested.  Judge, they

10   noticed 331 people, and 221 of them there's no issue with,

11   unless you can't have this motion granted to anyone.  And if

12   that's correct, then what I say next doesn't matter.

13         But if the Court finds that we have to go to the

14   next step, that equitable tolling is permissible under

15   certain facts, then we have to look at the facts, and there

16   are only ten people left.  And the trustee, arguably, on an

17   individualized basis, has made a showing to seven of those

18   ten.  Three of them, of which my client is one, are

19   categorically different than everyone else.

20         The only evidence in the record against my client

21   and two others is that they were members of a committee.  If

22   that is the only thing that the trustee can hang his hat on,

23   then that has grave implications if the Court grants the

24   motion to everyone, first amendment implications.  No one

25   can be a member of this committee without becoming a target

1    of this type of motion.

2              And, again, the only evidence in the record as to

3    my client and two others is that they were members of a

4    committee.  Not that they did anything wrong, but that the

5    committee did.  And because this motion is in the nature of

6    a class action type of request for relief, the Court needs

7    to drill down on who is affected.  And when you get to the

8    individual people who will be affected and who are asking

9    for a minimum amount of due process, the Court should

10   consider the particular facts and the lack of any support

11   for the motion against my client.  Thank you.

12             THE COURT:  Thank you.

13             All right.  Then I think the final objecting party

14   to argue would be Attorney Nealon, correct?

15             MR. NEALON:  Yes, Your Honor.  I'll be brief.  So,

16   you know, what was -- I don't think it matters,

17   particularly, consistent with the arguments of the other

18   objectors, what all of these individuals did.  I think it's

19   more of a macro question, as was very articulately put by

20   the other parties.  Is it appropriate to effectively have a

21   class action declaratory judgment in a vacuum that permits

22   the trustee to bring future avoidance actions out of time

23   against potentially hundreds or thousands of new parties?

24             I spent some time dealing with Mr. Zhang's

25   circumstances, because the trustee likes to use him as a bit

1    of a piñata in the various pleadings he files throughout

2    this case.  I went through three or four particular points

3    that were raised by Trustee Despins.  And let's just focus

4    on those real briefly.  Again, I don't think they're central

5    to anything.

6           But the idea that Mr. Zhang might have attended a

7    protest and been carrying around a sign in 2022, while

8    although I would think that's probably ill-advised and is

9    ill-advised, it has nothing to do with the trustee's ability

10   to discover avoidance actions.  Same thing with the

11   sanctions motions that were brought against Attorney Zhang

12   in his capacity as co-counsel for -- from -- for some other

13   parties.  What in the world, if anything, does that have to

14   do with the trustee's ability to discover the facts that

15   would support avoidance actions against third parties?  Nor

16   is there any evidence that's been presented that

17   Mr. Yongbing Zhang did anything to conceal or hide any facts

18   that might relate to any monetary payments, if any, that he

19   received.  As in nothing.

20          And then when I pressed the trustee on some of the

21   other points about this HCHK Creditors Committee -- I'm

22   like, here's your opportunity.  Tell us specifically what it

23   is Mr. Zhang did.  We get nothing.  Because there's no proof

24   of anything.  It's just a big innuendo.

25          Oh, and what's the other thing?  Well, Attorney

1   Zhang went to visit Miles Guo in prison, so therefore --

2   well, therefore what?  It has nothing to do with the

3   trustee's ability to pursue avoidance actions.

4        Attorney Bassett did a great job in the afternoon,

5   and there almost should have been a drum roll in front of

6   it, when he set up the question for the trustee that I

7   interpreted as, look, the fundamental reason why we're doing

8   this so late is we couldn't afford to hire Kroll until we

9   got some money in when we sold the Lady May.  That's the

10  thrust of why we're here.  Not all these shiny objects that

11  are getting thrown out, innuendos and insinuations, which

12  are really all irrelevant.

13       But I think Attorney Evans hit on a good point

14  here and another reason to deny this motion.  This is, from

15  what I've observed -- albeit my powers of observation are

16  limited, because I've been on the periphery.  This is not a

17  very transparent situation we have here.  What do we know

18  about what Kroll's been doing?  I don't think we know very

19  much.

20       And, again, when I asked questions today saying,

21  let's hear your evidence, that's work product; I'm not going

22  to tell you that.  Well, that's been a theme of this

23  trustee's operation.  And maybe Kroll's been super diligent.

24  Maybe it'll be proven that the trustee's been super

25  diligent.  But that should be evaluated later in the context

1   of individual cases and not decided now in a vacuum,

2   particularly when the trustee tends to operate like a black

3   box.

4          Thank you, Your Honor.

5          THE COURT:  I don't understand what you mean, when

6   the trustee operates like a black box.  What do you mean?

7          MR. NEALON:  Well, I'll give you an example.  In the

8   HCHK proceedings, all the relevant -- most of the relevant

9   documents, as I understand it, that relate to those entities

10  are in the possession of the trustee.  And I know some of

11  the parties in that case have been trying to get access to

12  those.  And --

13         THE COURT:  Well, there's -- there are protective

14  orders and confidentiality orders in place in this case for

15  almost two years, Mr. Nealon.  And so you can make that

16  argument.  And that's fine.  But you also need to understand

17  the other side of that argument --

18         MR. NEALON:  Right.

19         THE COURT:  -- which is the requirements and the

20  positions taken by the debtors since the beginning of the

21  time that the trustee was appointed that everything had to

22  be confidential and that there were all kinds of

23  requirements with regard to documents.

24         So all I'm saying to you is, you're correct;

25  you're on the periphery.  And so when you make a statement

1   that -- when you say a trustee, any trustee, is operating in

2   a black box when you haven't been involved in the case, I

3   think you need to be careful about that.  Okay?

4           MR. NEALON:  I'll modify my statement.  I didn't

5   intend to describe any intentionality to it.  I'm just

6   saying, at the moment, there's not a lot of visibility --

7           THE COURT:  Well, there can't be if there are

8   confidentiality agreements, Mr. Nealon.  Do you want people,

9   including people that are affiliated with the debtor,

10  violating those confidentiality agreements and that

11  protective order that the debtor's counsel fought so hard

12  for?

13          What I'm saying to you is, I understand your

14  arguments, and you are absolutely entitled to make them.

15  But to say -- to make that statement at the end of this

16  hearing, I think, is inappropriate in that you have not been

17  involved.  And maybe you need to go read those protective

18  orders and confidentiality orders to understand what's been

19  going on in this case.

20          I don't -- I have no problem with legal arguments.

21  I have no problem with you making any kind of arguments on

22  behalf of your clients.  But I do have problems when lawyers

23  make arguments that are not supported by the record that is

24  before a court.  So that's all I wanted to say on that

25  point, okay?

1     MR. NEALON:  All right.  I'll withdraw the

2     argument, Your Honor.  Thank you.

3          THE COURT:  Okay.  Thank you.

4          All right.  Well, that concludes -- Attorney

5     Bassett, I'm not going to have another round of arguments.

6     I'm sure you want one, but we'll be here until 8:00 at that

7     point.  And I have to let the courtroom staff go.

8          Plus, I have to rule on this motion.  And I would

9     assume I have to rule on this motion by the close of

10    business tomorrow.  Is that -- isn't that correct?

11         MR. BASSETT:  I'm thinking about that in real --

12         THE COURT:  Well, the close of business could be

13    11:59 p.m., I suppose.  But, in any event, I mean, I -- it

14    might be the 15th.  But what I'm saying to you is, I'm not

15    going to -- I am going to -- I need to go now and listen

16    to -- go back to what everything -- everything was said

17    today.  Obviously, we've been doing this for about four

18    hours.  I have to take into account Trustee Despins'

19    testimony, the cross-examination by various counsel on

20    behalf of the objecting parties.

21         And then I have to make a determination.  So I

22    don't want to put any party in a position where the Court is

23    somehow impacting this issue in one way or another.  It has

24    to be decided.  So that's what I'd like to spend the time

25    doing.

1          MR. BASSETT:  Understood, Your Honor.

2          THE COURT:  Okay?  So I -- there -- I will take

3     into consideration what everyone has said today, of course,

4     and what has been said in the pleadings that have also been

5     filed, which I have read, but I'm going to go back and

6     re-read.  I need to do that in light of the issues raised

7     today.  And there were some cases cited today that aren't in

8     the briefs, so I have to look at that.  I have to take

9     everything into consideration, which I will do.

10         And some -- I anticipate that something will be

11    issued tomorrow.  But if for some reason it's not, we'll

12    notify everyone.  Everyone that's on -- participated in this

13    hearing today is a CM/ECF filer, so you will have notice of

14    what the Court does when the Court does it.  Okay?

15         Does anyone have any questions?

16         MR. LINSEY:  I just have a one-line update about

17    the tolling stipulations, if that's all right, Your Honor.

18         THE COURT:  About the what?

19         MR. LINSEY:  The tolling stipulations that we

20    filed -- that we had filed yesterday.  Could I just update

21    the Court about something?

22         THE COURT:  Yeah.  Go ahead.

23         MR. LINSEY:  So there was a motion to approve

24    tolling stipulations that was filed yesterday.  In footnote

25    two, we indicated that more may come in and that, if so, we

1    would file those on a supplemental basis.  We did receive

2    three additional tolling stipulations today.  I will file

3    those this evening in the same manner as we filed the

4    others.

5         We would just ask that the Court please rule one

6    way or the other on those tomorrow as well, because we

7    have --

8         THE COURT:  Well, I have to ask you --

9         MR. LINSEY:  Yes, Your Honor.

10        THE COURT:  I haven't looked.  I haven't looked,

11   because, obviously, we've been in court.  And we had other

12   hearings as well this week.  If you have a tolling

13   stipulation, there -- no -- who's going to -- there's no one

14   that's going to object to that.  What would be the basis to

15   object to it?  If the party against whom the trustee is

16   going to file a cause of action has agreed to toll the

17   statute of limitations, what would be a basis for any party

18   to object to that?

19        MR. LINSEY:  I don't expect that any party would

20   object to it, but they're drafted as stipulated orders to be

21   approved by the Court.

22        THE COURT:  Okay.  That's fine.  I'll take a look

23   at them.  I will --

24        MR. LINSEY:  So I don't I just wanted to let Your

25   Honor know the extras were coming, because there's a lot of

1    stuff hitting the docket right now.  That was all.  I

2    appreciate the Court taking the time to listen.

3              THE COURT:  That's fine.  Thank you very much.

4              All right.  Thank you all very much.

5              MR. DESPINS:  Thank you.

6              MR. BASSETT:  Thank you, Your Honor.

7              THE COURT:  That concludes today's hearing.  And

8    you will -- you'll know what the Court decides when there's

9    something that is filed on the docket.

10             IN UNISON:  Thank you, Your Honor.

11             THE COURT:  Thank you all.  Court is adjourned.

12             THE COURTROOM DEPUTY:  Court is adjourned.

13         (Proceedings concluded at 6:05 p.m.)

14

15

16

17

18

19

20

21

22

23

24

1          I, CHRISTINE FIORE, court-approved transcriber and

2     certified electronic reporter and transcriber, certify that

3     the foregoing is a correct transcript from the official

4     electronic sound recording of the proceedings in the above-

5     entitled matter.

6

7

8     _____                 February 21, 2024

9          Christine Fiore, CERT

10            Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2       WITNESS

3       FOR THE

4       PLAINTIFF:          <u>Direct</u>    <u>Cross</u>

5       Luc Despins          25       52/58/66/72/86/94

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24