### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### BRIDGEPORT DIVISION

```
-------------------------------------------------------x
                                          :
In re:                                    :   Chapter 11
                                          :
HO WAN KWOK, et al.,[1]                   :   Case No. 22-50073 (JAM)
                                          :
                    Debtors.              :   (Jointly Administered)
                                          :
-------------------------------------------------------x
```

**GENEVER HOLDINGS LLC'S MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b) AND 554 AND BANKRUPTCY RULE 6007(a), FOR ENTRY OF ORDER (I) AUTHORIZING GENEVER HOLDINGS LLC TO OBTAIN SERVICES NECESSARY TO CLEAN REMAINING AREA OF SHERRY NETHERLAND APARTMENT AND (II) GRANTING OTHER RELATED RELIEF**

Genever Holdings LLC (the "Debtor" or "Genever US"), by and through its undersigned counsel, hereby files this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "Proposed Order"), pursuant to sections 363(b) and 554 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule"), authorizing Genever US to obtain the services necessary to remediate soot, char, and other combustion by-products ("CBPs") in the Sherry Netherland Apartment (as defined below) as a result of a fire on March 15, 2023, including related ancillary services, such as abating asbestos in the affected areas, moving furniture into storage, and disposing of certain items of inconsequential value (collectively, and as further detailed below, the "Cleaning Project"). In connection with obtaining such services,

---

[1]   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

Genever US seeks authorization to (a) hire DryFast DKI ("DKI") to undertake the principal aspects of the Cleaning Project, including deconstruction and removal of the ceiling and corridor, cleaning out the plenum (*i.e.*, the interstitial space between the ceiling drywall and the ceiling concrete), and cleaning the walls, millwork, and floors, (b) select and hire related contractors and other third-party service providers in the ordinary course of the Cleaning Project (such as construction monitoring, electrical services, air quality monitoring, asbestos abatement, and clearance testing), including Sciame Homes ("Sciame"), Gallagher Bassett Services, Inc. ("GBTS"), ABF Environmental, Inc. ("ABF"), and Hillmann Consulting, LLC ("Hillmann"), (c) expand the scope of the architect consulting agreement with Acheson Doyle Partners Architects, P.C. ("Acheson Doyle") to cover limited architectural services related to the Cleaning Project, (d) select and hire contractors to clean, package, and move into storage furniture and other related items, including Montvale Moving Services ("Montvale"), Cleaning Contractors Corp. ("CCC"), and The Light Touch ("Light Touch"), (e) pay such contractors and other third-party service providers in the ordinary course of the Cleaning Project, subject to certain procedural safeguards,[2] and (f) abandon and dispose of items of no or inconsequential value located in the Sherry Netherland Apartment (including used mattresses, box springs, and kitchen/cleaning supplies).

In support of this Motion, Genever US respectfully states as follows:

---

[2]  As it relates to the compensation of Acheson Doyle, Genever US proposes to continue the streamlined fee review process already in place for Acheson Doyle, *i.e.*, Genever US would be authorized to pay their fees and expenses if no party in interest objects to such fees and expenses within a 14-day review period.

## PRELIMINARY STATEMENT[3]

1.        As the Court is well aware, on March 15, 2023, a fire at the Sherry Netherland Apartment (the "March 15 Fire") caused significant damage to an area of approximately 2,000 square feet of the apartment (the "Source Area"), thereby bringing to a halt Genever US's efforts to sell or rent the Sherry Netherland Apartment.  To address the fire damage in the Source Area, at the request of Genever US, the Bankruptcy Court previously entered an order [Docket No. 2213] (the "Remediation Order") authorizing Genever US to remediate the Source Area (the "Remediation Project").  As of the date of filing of this Motion, the Remediation Project is underway, and Genever US anticipates that the Remediation Project will be completed in the next three (3) months.[4]

2.        In February 2024, in connection with Hillmann conducting tests in the Source Area for soot, char, and other CBPs from the March 15 Fire, Hillmann also performed such testing in the area of the Sherry Netherland Apartment not directly affected by the March 15 Fire (such area, the "Remaining Area").  The Remaining Area is approximately 5,300 square feet and represents approximately 72% of the total 7,300 indoor square footage of the Sherry Netherland Apartment.  For illustrative purposes, the Remaining Area has been shaded (in blue) in the following floor plan of the Sherry Netherland Apartment:

---

[3]    Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them later in the Motion.

[4]    For additional information regarding the status of the remediation project, Genever US refers to the five monthly status reports previously filed with the Court.  *See* Docket Nos. 2303, 2436, 2510, 2942, and 3043.



3.     On February 29, 2024, Hillmann issued a report (the "Hillmann Report") which, among other things, identified (a) soot deposition and other smoke damage throughout the common hallway running between the Source Area and the Remaining Area, and (b) CBP surface deposition in various areas below and above the ceiling plenum from smoke traveling into the Remaining Area, all of which requires cleaning and remediation.

4.     To be clear, after the smoke of the March 15 Fire had dissipated, the insurer of the Sherry Netherland Apartment, *i.e.*, AIG Property Casualty Company ("AIG"),[5] agreed to and

---

[5]    All references and descriptions in this Motion related to matters involving AIG and insurance coverage with respect to the Sherry Netherland Apartment have been provided by O'Sullivan McCormack Jensen & Bliss PC ("OMJB"), Genever US' special insurance coverage counsel. In addition, prior to the filing of this Motion, counsel for AIG was contacted by OMJB regarding the matters addressed in this Motion. For the avoidance of doubt, Genever US will also serve a copy of this Motion on counsel for AIG.

arranged for an initial cleaning of the Sherry Netherland Apartment and payment for such

cleaning.  Because of this initial cleaning, Genever US believed that the Remaining Area of the

Sherry Netherland Apartment did not require further cleaning at the time and, to the extent

further cleaning was required, this could be done by a potential future buyer in connection with

the (anticipated) renovation of the Sherry Netherland Apartment.  However, as a result of the

Hillmann Report, Genever US now understands that this initial cleaning did not adequately

address CBP deposition and infiltration.

5.      Genever US also discussed the results of the Hillmann Report with the Sherry

Netherland.  During these discussions, the Sherry Netherland made clear that it insists on

Genever US addressing the smoke damage now (as opposed to deferring the issue until after an

eventual sale of the apartment) given that CBPs could affect other apartments or common areas

in the building—via interstitial spaces, chases, plenums, air bands, and elevators.  The Sherry

Netherland does not support deferring the Cleaning Project until after an eventual sale because it

believes the potential harm to other apartments is immediate, while, at this time, no potential

buyer has been identified.

6.      In light of these developments, Genever US has determined to proceed now with

removing soot and other CBPs in the Remaining Area.  To that end, Genever US has obtained a

proposal from DKI regarding the scope of cleaning services to undertake the Cleaning Project.

A copy of the DKI proposal is attached hereto as **Exhibit 2** (the "DKI Proposal").

7.      As detailed in the DKI Proposal, DKI estimates that the cleaning services will

take approximately two months to complete.  Cleaning will proceed in multiple stages, with the

cost of the services related to the "outer shell" of the apartment, including the concrete ceiling, to

be covered by the Sherry Netherland, and the cost of the services related to the interior space,

including the plenum between the drywall ceiling and the concrete ceiling, to be covered by Genever US. In particular, Genever US would be responsible for the cost of the following services: (a) environmental control measures for containment of additional CBP or fire-related odor infiltration, (b) removal of ceiling for cleaning, (c) cleaning of plenum and conduit, (d) cleaning of walls, millworks, drawers, and floors, and (e) demobilizing, which services DKI estimates will cost a total of approximately $509,088.20 (without taxes). And, as noted, the Sherry Netherland would cover the cost of cleaning the outer shell of the Sherry Netherland Apartment, which is estimated to cost approximately $238,700.20 (without taxes).

8.      DKI is the obvious and best choice to undertake the Cleaning Project. For one, DKI has extensive expertise in remediating CBPs and comes highly recommended by the Sherry Netherland. In fact, DKI has not only conducted cleaning projects in other apartments in the Sherry Netherland building, but DKI is currently removing CBPs in the Source Area—as previously discussed in Genever US's fifth monthly status report [Docket No. 3043]. Accordingly, DKI is already familiar with the Sherry Netherland Apartment. Hiring DKI to perform the cleaning services will also streamline the overall process, as it avoids having two different contractors on a single worksite to conduct what is, in essence, similar cleaning services. Utilizing the same cleaning company will facilitate the process of handling the Cleaning Project concurrently with the ongoing Remediation Project, with the goal of completing projects by the end of the summer of 2024.

9.      In addition to the services of DKI, the Cleaning Project will also require various related services, including the following:

- Sciame: Sciame will handle construction supervision, debris removal, and certain electrical services (related to removal of chandeliers and sconces). Sciame estimates that the total cost of such services is $31,384.00. A copy of the proposal from Sciame is attached hereto as **Exhibit 3** (the

"Sciame Proposal").  As the Court will recall, Genever US previously selected Sciame as the general contractor for the Remediation Project in the Source Area, and, accordingly, is already familiar with the Sherry Netherland Apartment and the building.

- ABF: ABF will handle removing asbestos containing insulation from horizontal pipes (located above the drop ceiling in the Sherry Netherland Apartment).  Because the insulation on horizontal pipes is covered in soot and other CBPs resulting from the March 15 Fire, removing such CBPs from the asbestos containing insulation will necessarily require abatement of the asbestos as well.  ABF estimates that the total cost for its services is $72,400.00 (plus taxes).  A copy of the proposal from ABF is attached hereto as **Exhibit 4** (the "ABF Proposal").  ABF is well-qualified to conduct the asbestos removal.  Not only does ABF have extensive experience in removing asbestos at the Sherry Netherland, but it previously handled the asbestos abatement in the Source Area.

- GBTS: GBTS will conduct an asbestos survey and testing, air monitoring services during the abatement process, and the final clearance testing.  GBTS estimates that the total cost for such services is approximately $15,100.00.  A copy of the proposal from GBTS is attached hereto as **Exhibit 5** (the "GBTS Proposal").  GBTS is well-qualified to conduct the asbestos survey and related services.  GBTS has substantial experience working in the Sherry Netherland building and, indeed, previously conducted the same services in connection with the Remediation Project in the Source Area.

- Acheson Doyle: Acheson Doyle will prepare the plans for the ceiling removal, coordinate filing of permits with New York City Department of Buildings and Landmarks Preservation Commission, assist Genever US in coordinating vendor proposals, and provide construction administration services.  For these services, Acheson Doyle will charge (i) a fixed fee of $7,000 to prepare the plans and coordinate vendor proposals plus (ii) an hourly fee for construction administration services (subject to a $10,000 monthly cap).  A copy of the proposal from Acheson Doyle is attached hereto as **Exhibit 6** (the "Acheson Doyle Proposal").  Acheson Doyle is ideally situated to provide these services as it already conducting the equivalent services with respect to the remediation of the Source Area.  Moreover, Acheson Doyle is already intimately familiar with the Sherry Netherland building and the various rules and procedures for conducting work in that building.

- Hillmann: Hillmann will conduct clearance testing and inspection services during and at conclusion of Cleaning Project.  Hillmann estimates that the total cost for such services is $11,852.13.  A copy of the proposal from Hillmann is attached hereto as **Exhibit 7** (the "Hillmann Proposal").  Hillmann is well-qualified to conduct these

7

services, and comes recommended by the Sherry Netherland.  Also, Hillmann is already familiar with the Sherry Netherland Apartment, as it previously conducted the testing for soot and other CBPs (as noted above).

10.     Furthermore, as part of the Cleaning Project, and in order to prepare the Sherry Netherland Apartment for DKI's cleaning services, Genever US will also need to clear out furniture and related items from the apartment.  In particular, Genever US intends to package and move furniture, household items, and personal items currently located in the Remaining Area (as further detailed below, the "Storage Items") into the warehouse facility located in Branchburg, New Jersey (the "Warehouse Facility"), which is already utilized by the Trustee to store other furniture and boxes—pending further analysis for a future disposition.  The Storage Items consist of the following: (a) furniture, such as sofas, chairs, tables, consoles, cabinets, sofa pillows, and bed frames and headboards, (b) rugs, (c) chandeliers and light fixtures, (d) household items and kitchenware, such as bowls and plates, drinkware, (e) artworks and decorations, such as paintings, china, decorative books, (f) electronic appliances such as TVs, telephones, dry-cleaning machine, and coffee machines, and (g) other personal items such as clothes, photo, business cards, and papers.  Moving the Storage Items into storage will require services from the following vendors, among others:

- Montvale: Montvale will package, shrink-wrap, and move the Storage Items into storage at the Warehouse Facility.  Montvale estimates that the total cost of such services is approximately $8,055.00.  A copy of the proposal from Montvale is attached hereto as **Exhibit 8** (the "Montvale Proposal").[6]

- CCC: In order to prepare the furniture for packaging and shrink-wrapping, CCC will perform a surface clean of all furniture and dust off

---

[6]     In accordance with the Court's *Order Granting Motion of Chapter 11 Trustee for Order Enforcing Judgment and Requiring Turnover of Storage Unit Contents to Chapter 11 Estate* [Docket No. 3046], the Trustee previously utilized Montvale to move the contents of certain storage units to the Mahwah Mansion and other storage content to the Warehouse Facility.  In addition, the Warehouse Facility is also being used to store furniture and equipment from the offices of HCHK Technologies, Inc., HCHK Property Management, Inc., and Lexington Property and Staffing, Inc.  *See e.g.*, Adv. Proc. 23-05013, Docket Nos. 237, 284.

hard coverings.  CCC estimates that the total cost for its services is approximately $1,900.00.  A copy of the proposal from CCC is attached hereto as **Exhibit 9** (the "CCC Proposal").

- Light Touch: Light Touch will remove light fixtures, including chandeliers and sconces.  While the chandeliers will be crated and moved to the Warehouse Facility (together with the other Storage Items), the sconces will be temporarily stored by Light Touch and then reinstalled at the conclusion of the Cleaning Project.  Light Touch estimates that the total cost for its services is approximately $4,800.00.  A copy of the proposal from Light Touch is attached hereto as **Exhibit 10** (the "Light Touch Proposal").

11.     Given the need to move forward expeditiously with the Cleaning Project, including to ensure that DKI and other contractors can commence their work as soon as possible after this Court has authorized their services, Genever US intends to proceed with moving the Storage Items to the Warehouse Facility as early as next week.  While Genever US believes that no Court approval is required to package and move the Storage Items into storage—including because the safekeeping of these items constitutes an ordinary course activity of Genever US—it nevertheless seeks, out of an abundance of caution, such Court approval by this Motion.[7]  For the avoidance of doubt, Genever US will *not* dispose of the Storage Items absent further approval from this Court.

12.     Furthermore, in order to prepare the apartment for the Cleaning Project, Genever US also seeks authorization to dispose of various items in the Sherry Netherland Apartment that presently have inconsequential value (the "Disposable Items") (including because of the exposure to soot and other CBPs), such as (a) mattresses, box springs, and drapery, (b) food items, condiments, and opened bottles of liquor, (c) used pots and pans, (d) cleaning supplies and bathroom items, (e) clothes hangers, and (f) other similar items, such as plastic bags and empty

---

[7]     Genever US will take pictures of and prepare an inventory of the Storage Item to be packed and moved to the Warehouse Facility for storage.  Also, to be clear, the Storage Items will be separately marked and physically segregated from other items stored in the Warehouse Facility.

packing boxes.  For the avoidance of doubt, while Genever US will collect and bag the Disposable Items as early as next week, these items will ***not*** be removed from the Sherry Netherland Apartment until after the Court has granted the Proposed Order authorizing Genever US to dispose of these items.

13.    To be clear, by this Motion, Genever US seeks Court authorization to hire and pay DKI, Sciame, GBTS, ABF, Hillmann, Montvale, CCC, Light Touch, as well as other related contractors and third-party service providers (including electrical and plumbing services) in the ordinary course of the Cleaning Project, subject to certain procedural safeguards.  These safeguards include that (a) Genever US will provide updates to the Court and parties in interest as to the progress of the Cleaning Project (including updates regarding Genever US's expenditures on the project) as part of the monthly status report it files in connection with the Remediation Order, (b) Genever US will provide the Sales Officer, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), the Committee,[8] the U.S. Trustee, and the Sherry Netherland (collectively, the "Consultation Parties") with copies of all invoices received in an amount greater than $25,000 before paying such invoices, and (c) with respect to Acheson Doyle, Genever US will file a notice with the Court attaching Acheson Doyle's invoices, and, unless a party in interest objects within fourteen (14) days of such notice, Genever US will be authorized to pay such invoices without further Court order.  In addition, the Trustee, including as a holder of a proxy for Genever US, will supervise and monitor the Cleaning Project, including so as to

---

[8]    Genever US is aware that no official committee has been appointed in Genever US's chapter 11 case.  However, in the interest of full transparency, Genever US proposes to also consult with the Committee appointed in the Individual Debtor's chapter 11 case, solely because the funding under the DIP facility would be provided by the Individual Debtor's estate.  However, to be clear, the Committee shall not be deemed to have any other rights or interests in Genever US's estate by virtue of the Committee receiving consultation rights under this Motion.

ensure that Genever US only pays for cleaning services that are, in fact, the responsibility of Genever US, as opposed to the Sherry Netherland.

14.    Furthermore, Genever US expressly reserves its right to seek reimbursement from its insurer, AIG, with respect to the cost incurred with respect to the Cleaning Project.  Genever US will seek reimbursement of the costs for the Cleaning Project from AIG if it is determined that AIG must provide insurance coverage for Genever's property damage from the March 15 Fire under the insurance policy covering the Sherry Netherland Apartment (in accordance with Genever US' pending motion for summary judgment for declaratory relief in the adversary proceeding Genever US filed against AIG, Adversary Proceeding No. 23-05007).[9]

15.    For the avoidance of doubt, by this Motion, Genever US is ***not*** seeking to "white box" or restore the Remaining Area of the Sherry Netherland Apartment to its condition prior to the March 15 Fire.  Instead, Genever US merely seeks to undertake the cleaning necessary to obtain a clearance letter from Hillmann and thereby remediate the CBPs in the Sherry Netherland Apartment from the March 15 Fire (as they could potentially affect other apartments and common areas in the building).  Obviously, successful completion of the Cleaning Project will also further Genever US's principal goal of successfully marketing the Sherry Netherland Apartment for sale or rent.

16.    For all these reasons, and as further detailed below, Genever US requests entry of an order authorizing Genever US to (a) hire DKI to undertake the Cleaning Project, (b) select and hire contractors and other third-party service providers in the ordinary course of the Cleaning

---

[9]    On October 6, 2023, Genever US filed a motion for summary judgment seeking declaratory relief as to AIG's obligation to provide coverage for Genever US' property damage losses under the all-risk property coverage section of the insurance policy that AIG issued to Genever US for the Sherry Netherland Apartment.  AIG filed an opposition to the motion. The motion remains pending after oral argument on the motion on January 30, 2024.

Project (including testing and air monitoring, electrical and plumbing services, and asbestos abatement), (c) expand the scope of the architect consulting agreement with Acheson Doyle to cover related services, (d) select and hire contractors to clean, package, and move into storage the Storage Items, (e) pay contractors and other third-party service providers in the ordinary course of the Cleaning Project, subject to certain procedural safeguards, and (f) abandon and dispose of the Disposable Items.

### JURISDICTION, VENUE, AND STATUTORY BASES

17.     The United States Bankruptcy Court for the District of Connecticut (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference* from the United States District Court for the District of Connecticut. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

18.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19.     The statutory bases for the relief requested in this Motion are sections 363 and 554 of the Bankruptcy Code.

### BACKGROUND

**I.     Chapter 11 Cases**

20.     On October 12, 2020, Genever US filed its chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy Court") thereby commencing case number 20-12411 (JLG) (the "SDNY Bankruptcy Case"). The 18th floor apartment and auxiliary units (collectively, the "Sherry Netherland Apartment") in the Sherry Netherland Hotel located at 781 Fifth Avenue, New York, New York 10022, is Genever US's principal assets (in addition to the related security deposit).

21.     On February 15, 2022, Ho Wan Kwok (the "Individual Debtor") filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Court.

22.     On March 21, 2022, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Individual Debtor's chapter 11 case.  No examiner has been appointed in the Individual Debtor's chapter 11 case.

23.     On June 15, 2022, the Court entered a memorandum of decision and order [Docket No. 465] (the "Trustee Order") directing the United States Trustee to appoint a chapter 11 trustee in the Individual Debtor's chapter 11 case.  Pursuant to the Trustee Order, the United States Trustee selected Luc A. Despins (the "Trustee") as the trustee.  On July 8, 2022, the Court entered an order [Docket No. 523] granting the appointment of the Trustee as the chapter 11 trustee in the Individual Debtor's chapter 11 case.  On August 10, 2022, the Court entered an order [Docket No. 717] finding that the Trustee holds all of the Individual Debtor's economic and governance rights with respect to Genever BVI, which, in turn wholly owns Genever US.

24.     On September 30, 2022, the Trustee and Genever US filed a joint motion [Docket No. 211 in Case No. 22-50592] seeking an order from the SDNY Bankruptcy Court transferring the SDNY Bankruptcy Case to the Court.  On November 3, 2022, the SDNY Bankruptcy Court entered an order [Docket No. 225 in Case No. 22-50592] granting the motion and the SDNY Bankruptcy Case was transferred to this Court.

25.     On October 11, 2022, Genever Holdings Corporation ("Genever BVI") filed its voluntary chapter 11 petition in this Court.

26.     By order dated November 21, 2022 [Docket No. 1141], the Court approved the joint administration of the chapter 11 cases of Genever US, Genever BVI, and the Individual Debtor.

## II.     <u>Sherry Netherland Apartment Sale Process</u>

27.     On September 24, 2021, Genever US filed a motion [Docket No. 131 in Case No. 22-50592] (the "Settlement Motion") seeking approval of a settlement agreement (the

13

"Settlement Agreement") between Genever US, PAX, and Bravo Luck Limited ("Bravo Luck"),[10] establishing, among other things, a framework for the sale of the Sherry Netherland Apartment with Melanie L. Cyganowski as Sales Officer to be employed by Genever US in accordance with an engagement letter dated September 24, 2021.  On October 8, 2021, the SDNY Bankruptcy Court entered (i) an order approving the Settlement [Docket No. 141 in Case No. 22-50592] (the "Settlement Order") and (ii) an order approving Genever US's hiring of Melanie L. Cyganowski [Docket No. 142 in Case No. 22-50592] (the "Sales Officer Order").

28.     On December 15, 2021, Genever US filed its *Application to Employ and Retain Sotheby's International Realty as its Real Estate Broker and Sales Agent* [Docket No. 160 in Case No. 22-50592] (the "Sotheby's Application"), in which Genever US sought to retain Sotheby's as Genever US's sales agent in accordance with the engagement agreement [Docket No. 162-1 in Case No. 22-50592].  On January 13, 2022, the SDNY Bankruptcy Court entered an order [Docket No. 168 in Case No. 22-50592] approving the Sotheby's Application.

29.     After the SDNY Bankruptcy Case was transferred to the Court, on December 12, 2022, the Trustee, Genever US, and Genever BVI filed a motion [Docket No. 1257] (the "Extension Motion") seeking to extend the sale process for the Sherry Netherland Apartment and retain Sotheby as broker.  On February 1, 2023, the Court granted the Extension Motion (the "Sales Process Order"), extending the sale process through April 30, 2023.

---

[10]    As the Court is aware, on August 4, 2023, Genever US, Genever BVI, and the Trustee filed their motion [Docket No. 2049] seeking approval of a settlement with Bravo Luck, pursuant to which, among other things, Bravo Luck and the Individual Debtor's son, Qiang Guo, relinquish any beneficial interest they may have in the Sherry Netherland Apartment, Genever US, and Genever BVI, such that Genever US is the full and exclusive owner of the Sherry Netherland Apartment.

30.     In accordance with the Sales Process Order, the parties agreed to a further extension of the sales process regarding the Sherry Netherland Apartment through April 30, 2024.

31.     Relatedly, the Trustee, Genever US, and Genever BVI also requested authority for the Sales Officer and Sotheby's to market the Sherry Netherland Apartment for rent.  *See* Docket No. 1446.  The Court granted that by order dated March 21, 2023.  *See* Docket No. 1577.  In accordance with that order, the parties agreed to a further extension of Sotheby's retention through April 30, 2024.

### III.    Fire at Sherry Netherland Apartment and AIG Litigation

32.     On March 6, 2015, Genever US executed a proprietary lease (the "Proprietary Lease") with the Sherry Netherland Inc., a cooperative housing corporation through which Genever US owns a number of shares that are assigned to the Sherry Netherland Apartment leased by Genever US.

33.     Genever US holds certain insurance policies, purchased from AIG, providing Genever US property insurance coverage in excess of $28 million to protect the Sherry Netherland Apartment and the valuable property therein, covering "all risk" of property loss subject to certain carve outs and certain liability coverage with limits of $1 million, and providing Genever US excess insurance of up to $11 million for liability coverage for claims arising out of its ownership of the Sherry Netherland Apartment, including damage to adjacent properties (such policies, together, the "AIG Policy").

34.     On March 15, 2023, the Individual Debtor was arrested by federal law enforcement in the Sherry Netherland Apartment.  Later that same day, the March 15 Fire broke out in the Sherry Netherland Apartment and damaged the Source Area and the property therein.

35.     The March 15 Fire (including the efforts to extinguish the fire as well as law enforcement's investigation into its cause) has caused significant damage to an area of approximately 2,000 square feet of the apartment, *i.e.*, the Source Area, representing approximately 28% of the total 7,300 indoor square footage of the apartment.

36.     Following the March 15 Fire, AIG agreed to pay, and paid, approximately $220,000 for minimal clean-up and removal of debris in the Sherry Netherland Apartment.

37.     On April 25, 2023, AIG issued "Notices of Cancellation of Insurance" purporting to cancel the AIG Policy.

38.     On May 12, 2023, Genever US filed its *Complaint Under Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 7001 of Genever Holdings LLC Against AIG Property Casualty Company Under Various Insurance Policies for Breach of Contract and Declaratory Judgment* [Docket No. 1 in Adv. Proc. No. 23-05007], initiating litigation with respect to breach of contract claims (including denial of coverage) in connection with the AIG Policy (the "AIG Litigation").[11]

39.     On July 13, 2023, the Bankruptcy Court issued a preliminary injunction enjoining AIG from cancelling the AIG Policy and directing AIG to rescind prior notice of cancellation. (the "Preliminary Injunction Order").  *See* Docket No. 32 in Adv. Proc. No. 23-05007.  On July 27,  2023, AIG filed a motion in the United States District Court for the District of Connecticut for leave to appeal the Preliminary Injunction Order, which motion the District Court denied on August 17, 2023.  *See* Docket No. 17 Case No. 3:23-cv-01003-KAD.

40.     For the avoidance of doubt, Genever US seeks to reserve its right in seeking reimbursement from AIG of all expenses incurred in connection with the Remediation Project

---

[11]    For the avoidance of doubt, Paul Hastings does not represent Genever US in the AIG Litigation.

and the Cleaning Project following a ruling on Genever US's pending motion for summary judgment in the insurance coverage adversary proceeding filed against AIG.  See note 6, *supra*, and Docket No. 51 in Adversary Proceeding No. 23-05007.

## IV.     Remediation Project

41.     On August 23, 2023, Genever US filed its *Motion, pursuant to Bankruptcy Code Section 363(b), for Entry of Order Authorizing Genever Holdings LLC to Obtain Services Necessary to Remediate Areas of Sherry Netherland Apartment Affected by March 15, 2023 Fire* [Docket No. 2113] (the "Remediation Motion").  On September 8, 2023, Genever US filed a supplement in further support of the Remediation Motion [Docket No. 2183].

42.     On September 19, 2023, the Bankruptcy Court entered an order granting Genever US's Remediation Motion, *i.e.*, the Remediation Order.  The Remediation Order provides, among other things, that Genever US is authorized to enter into an architect consulting agreement and select and hire contractors, engineers, consultants, and other third-party service providers in the ordinary course of the remediation project.  The Remediation Order further directs Genever US to file monthly status reports to update the Court and parties in interest as to the progress of the remediation project.

## V.     Monthly Reports and Progress of Remediation Project

43.     To date, Genever US has filed five monthly reports regarding the progress of the Remediation Project in the Source Area (collectively, the "Remediation Status Reports", and each a "Remediation Status Report").  As detailed in these reports, the asbestos removal in the Source Area has been completed, and Sciame (i.e., the general contractor) has recently begun its work in the Source Area.

44.     As further noted in these reports, the Sherry Netherland has selected DKI to remove soot and other CBPs in the Source Area.  The removal of soot and other CBPs in the

Source Area is the responsibility of the Sherry Netherland, as such materials are located on the concrete surfaces (*i.e.*, the "outer shell" of the apartment). Similarly, in the Remaining Area, to the extent that soot and other CBPs are located on concrete surfaces, removal thereof is the responsibility of the Sherry Netherland. However, to the extent such CBPs are located on the interior space (including drywalls and interstitial spaces), removal thereof is the responsibility of Genever US.

## VI.    **Hillmann Report**

45.    In connection with the Remediation Project in the Source Area, Hillmann also performed an investigation of the extent of any smoke damage and CBPs associated with the March 15 Fire in the Remaining Area. On February 29, 2024, Genever US received the Hillmann Report, which sets forth Hillmann's analysis and findings of soot deposition and other CBP infiltration in the Remaining Area. In short, the Hillman Report, among other things, identified (a) soot deposition and other smoke damage throughout the common hallway running between the Source Area and the Remaining Area and (b) confirmed CBP surface deposition in various areas below and above the ceiling plenum from smoke travel in the Remaining Area, all of which requires cleaning and remediation. The Hillman Report identified the following locations in the Remaining Area as having confirmed CBP surface deposition concentration exceeding the 3% background threshold level:

- Common Hallway: above and below ceiling plenum
- Study: above and below ceiling plenum
- Dining Room:  above and below ceiling plenum
- Sitting Room: below ceiling plenum
- Breakfast Area/Kitchen: above and below ceiling plenum
- Office: above and below ceiling plenum
- Housekeeper's Suite: above and below ceiling plenum
- Primary Bedroom & Bath: above and below ceiling plenum

46.     Because of the initial cleaning arranged by AIG, Genever US previously understood that the Sherry Netherland Apartment had been sufficiently cleaned and that Genever US need not burden the estate with unnecessary expenses to further clean the apartment—especially, given that a potential buyer would likely renovate the apartment anyway.  However, as a result of the Hillmann Report, Genever US has now learned that this initial cleaning was inadequate in addressing CBPs.  AIG has yet to accept coverage for Genever US's property damage loss under the all-risk property policy that AIG issued for the Sherry Netherland Apartment.

47.     In late March 2024 and early April 2024, Genever US and the Sherry Netherland discussed next steps in light of the Hillmann Report.  Among other things, the Sherry Netherland expressed concerns about potential effects of the CBPs on other apartments in the building—via interstitial spaces, chases, plenums, air bands, and elevators—and insisted that Genever US immediately address the cleaning of the CBPs to mitigate any such issues.

**VII.   DKI Proposal**

48.     In light of these developments, Genever US has determined to proceed now with removing the soot and other CBPs in the Remaining Area.  To that end, on April 11, 2024, Genever US obtained a proposal from DKI covering the services required to undertake the Cleaning Project.

49.     Pursuant to the DKI Proposal, DKI estimates the cleaning services will take approximately two months to complete, and the cleaning services are scheduled into seven (7) stages, including, among other things, the following:

- Stage 1 – Environmental Controls for Containment (3 days): (i) set up containment barriers to isolate the source area from the rest of the floor to restrict additional CBP or fire-related odor infiltration, (ii) cover all PTAC units until after proper cleaning is conducted, and (iii) install HEPA and charcoal filter equipped air filtration devices both inside and

19

outside of the work areas. The air filtration devices should operate during all work and continue to run until post-cleaning clearance is obtained;

- Stage 2 – Deconstruction, Removal of Ceiling and Corridor (12 days): (i) remove and discard the gypsum board, plaster ceilings, or any associated insulation throughout the apartment after the apartment is cleared of valuable furniture and arts and after critical barriers have been set up; (ii) seal any pathways or penetrations between isolated areas after plenums are open to prevent cross contamination during the course of the remediation and cleaning, and (iii) remove all large physical debris from cavities and remove and discard any remaining paper-wrapped and/or canvas-wrapped fibrous glass pipe insulation, or BATT fibrous glass insulation in ceiling plenums;

- Stage 3 – Ceiling Concrete Cleaning and HEPA Vacuuming and Degreaser (7 days): (i) HEPA vacuum all surfaces within the plenum and any subsequently exposed wall cavity to remove all lose particulate, (ii) damp wipe with a general-purpose cleaner and/or degreaser and allow air dry, (iii) HEPA vacuum a second time to remove any particulate or debris dislodged by the wet wiping; (iv) conduct additional inspection of electrical wiring (AV cables and BC) and cables within the interstitial spaces, with any damaged or corroded wiring or cable recommended for replacement;

- Stage 4 – Odor Sealant (10 days): (i) provide smoke odor control services after concrete substrate decontamination is completed, (ii) spray on the prescribed primer and order sealing topcoat, and (iii) arrange for a painter to follow behind the sprayer to inspect coverage and brush into all crevices not completed covered by the spray pass on the concrete surface decontaminated;

- Stage 5 – Cleaning Plenum, Conduit (12 days): (i) conduct additional inspection of electrical wiring (AV cables and BC) and cables within the interstitial spaces, with any damaged or corroded wiring or cable recommended for replacement; (ii) HEPA vacuum to remove all lose particulate, (iii) damp wipe with a general-purpose cleaner and/or degreaser and allow air dry, and (iv) HEPA vacuum a second time to remove any particulate or debris dislodged by the wet wiping;

- Stage 6 – Cleaning Walls, millwork, Drawers, and Floor (12 days): (i) HEPA vacuum all horizontal and vertical surfaces outside the chase and wall cavity to remove all loose particulate, (ii) damp wipe with a general-purpose cleaner and/or mild degreaser and allow air dry, (iii) HEPA vacuum a second time to remove any particulate or debris dislodged by the wet wiping, (iv) use dry chem-sponges to address

20

painted surfaces or any other surface susceptible to damage by damp wiping to the extent applicable, and (v) open each cabinet or drawer contained within the remaining millwork and clean each surface to ensure all hard-to-reach cracks and/or crevices are addressed;

- Stage 7 – Demobilizing (1 day);

- Other Services: (i) clean each PTAC unit in place, (ii) consumables floor/wall protection, huck rags, filters, plastic, and (iii) remove all debris from ceiling.

50.     To be clear, not all stages of the above services are the responsibilities of Genever US.  Indeed, the DKI Proposal provides for the following allocation of responsibilities as between Genever US and the Sherry Netherland:  Genever US is responsible for Stages 1, 2, 5, 6, and 7 of the proposed Cleaning Project, and the Sherry Netherland is responsible for Stages 3 and 4.

51.     DKI estimates the total cost of the services to Genever US is approximately $509,088.20 (without taxes).

52.     DKI is the obvious and best choice to undertake the Cleaning Project.  For one, DKI has extensive expertise in addressing CBP contamination and comes highly recommended by the Sherry Netherland.  In fact, DKI has not only conducted cleaning projects in other apartments in the Sherry Netherland building, but DKI is currently removing CBPs in the Source Area—as previously discussed in Genever US's fifth monthly status report [Docket No. 3043]. Accordingly, DKI is already familiar with the Sherry Netherland Apartment.  Hiring DKI to perform the cleaning services will also streamline the overall process, with the goal of completing both the Cleaning Project and the ongoing Remediation Project by the end of the summer of 2024.

53.     Finally, while Genever US has determined to proceed with DKI, it continues to explore means to reduce the cost of the Cleaning Project.  To the extent such cost savings can be obtained, it will update the Court prior to, or at the hearing on, this Motion.

## VIII.   Sciame Proposal

54.     The Cleaning Project also requires construction and related services to be performed.  On April 12, 2024, Genever US received a construction proposal from Sciame to provide construction and related services in connection with the Cleaning Project.  In particular, as detailed in the Sciame Proposal, Sciame will handle construction supervision, debris removal, and certain electrical services related to the removal of chandeliers and sconces.  Sciame estimates that the total cost of such services is $31,384.00.

55.     Sciame is well-qualified to provide such services.  As the Court will recall from Genever US's fourth Remediation Status Report [Docket No. 2942], Genever US previously selected Sciame as the general contractor for the Remediation Project in the Source Area, and, accordingly, is already familiar with the Sherry Netherland Apartment and the building.

## IX.   ABF Proposal

56.     Another critical aspect of the Cleaning Project is the asbestos abatement of the insulation of the horizontal pipes (which insulation contains asbestos-containing materials) located above the drop ceiling in the Sherry Netherland Apartment (*i.e.*, the plenum).  Because that insulation is covered in soot and other CBPs from March 15 Fire, removal of such soot and other CBPs will necessarily require addressing the asbestos as well.

57.     On April 12, 2024, Genever US received a proposal from ABF in connection with asbestos abatement services for the Cleaning Project.  As set forth in the ABF Proposal, ABF will handle removing asbestos containing insulation from horizontal pipes in the plenum.  ABF estimates that the total cost for such services is $72,400.00 (plus taxes).

58.    ABF is well-qualified to conduct the asbestos removal and is similarly familiar with the Sherry Netherland Apartment.  Not only does ABF have extensive experience in removing asbestos at the Sherry Netherland, but it previously handled the asbestos abatement in the Source Area, as noted in Genever US's Remediation Status Reports [Docket Nos. 2303, 2436, and 2942].  The asbestos removal project in the Remediation Project was recently concluded on January 26, 2024.

**X.    GBTS Proposal**

59.    Pursuant to the GBTS Proposal, GBTS will undertake the (a) asbestos survey and testing and (b) third party air monitoring and project management.   For air monitoring and project management, GBTS will have a properly certified project monitor/air sampling professional provide daily oversight of the abatement activities for compliance with local, state, and federal requirements as well as, to the extent applicable, specifications of the Cleaning Project.   In addition, GBTS will conduct a final air clearance sampling after the work area has passed a final visual inspection performed by a certified asbestos professional.  At the completion of all work, GBTS will provide final clearance results to Genever US and will prepare a formal report which documents the oversight services provided and will include air monitoring results, construction logs and floor plans (if applicable).  For the asbestos-related services to be provided, GBTS charges the following fees: (a) a fixed fee of $2,950 for the asbestos survey and testing, (b) $900 per shift during the air monitoring and project management phase, (c) a fee for project management equal to $240 per shift, and (d) $750 for the final report. Assuming 10 shifts to complete the abatement, the total estimated cost would be $15,100.

60.    GBTS is well-qualified to conduct the asbestos survey and related services. GBTS has substantial experience working in the Sherry Netherland building and has previously

conducted the same asbestos-testing and related services in connection with the Remediation Project in the Source Area.

## XI. **Acheson Doyle Proposal**

61.     The Cleaning Project also requires certain limited architectural services.  To that end, on April 12, 2024, Genever US received a proposal from Acheson Doyle, which amends the existing architect consulting agreement with Acheson Doyle as attached to the Remediation Motion.   As detailed in the Acheson Doyle Proposal, Acheson Doyle will prepare the plans for removing the ceiling, coordinate filing of permits with New York City Department of Buildings and Landmarks Preservation Commission, assist Genever US in coordinating vendor proposals, and provide construction administration services.  For these services, Acheson Doyle will charge (a) a fixed fee of $7,000 to prepare the plans and coordinate vendor proposals plus (b) an hourly fee for construction administration services (subject to a $10,000 monthly cap).

62.     As set forth in greater detail in the Remediation Motion, Acheson Doyle is ideally situated to provide these services as it already conducting the equivalent services with respect to the remediation of the Source Area.  Moreover, Acheson Doyle is already intimately familiar with the Sherry Netherland building and the various rules and procedures for conducting work in that building.

## XII. **Hillmann Proposal**

63.     One of the principal objectives of the Cleaning Project is to obtain a clearance report after proper inspection at the conclusion of the Cleaning Project.  On April 12, 2024, Genever US received the Hillmann Proposal, which describes the clearance testing and inspection services to be provided, which include, among other things:

- Conduct Visual Observations: conducting visual observations to verify areas with remaining post-fire and smoke odors, or associated fire and smoke related physical damage and particulate deposition

24

- <u>Inspections</u>: conduct inspections to ascertain if CBP cleaning was effective, and collect surface samples for CBPs and submit to an accredited lab for analysis

- <u>Clearance Letter</u>:  collect CBP samples and once results are received and interpreted, issue a fully documented clearance that outlines all findings and any additional recommendations

64.     Hillmann estimates that the total cost for the services to be provided is $11,852.13.

65.     Hillmann is well-qualified to conduct these services, and comes recommended by the Sherry Netherland.  Also, Hillmann is already familiar with the Sherry Netherland Apartment, as it previously conducted the testing for soot and other CBPs in the apartment.

## XIII.   <u>Storage Items</u>

66.     As part of the Cleaning Project, Genever US will also need to remove the Storage Items from the Sherry Netherland Apartment.  Cleaning, packaging, and moving the Storage Items to the Warehouse Facility will require the services of (a) Montvale (which will package, shrink-wrap, and move the Storage Items to the Warehouse Facility, for an estimated total cost of approximately $8,055.00, *see* Montvale Proposal, (b) CCC (which will perform a surface clean of all furniture and dust off hard coverings) for a total cost of approximately $1,900.00, *see* CC Proposal, and (c) Light Touch (which will remove and re-install light fixtures, including chandeliers and sconces) for a total cost of approximately $4,800.00, *see* Light Touch Proposal.

## XIV.   <u>Insurance Coverage</u>

67.     As noted, Genever US will seek reimbursement of the costs relating to the Cleaning Project (including for the work of DKI, Sciame, ABF, GBTS, Acheson, and Hillman) from AIG if it is determined that AIG must provide insurance coverage for Genever's damage from the March 15 Fire, in accordance with Genever's pending motion for summary judgment

for declaratory relief as to AIG's property loss insurance coverage obligations in the adversary proceeding Genever filed against AIG.

### RELIEF REQUESTED

68.    Genever US respectfully requests authorization for Genever US to obtain the services necessary to conduct the Cleaning Project.  In connection with obtaining such services, Genever US seeks authorization to (a) hire DKI to undertake the principal aspects of the Cleaning Project, including deconstruction and removal of the ceiling and corridor, cleaning out the plenum (*i.e.*, the interstitial space between the ceiling drywall and the ceiling concrete), and cleaning the walls, millwork, and floors, (b) select and hire related contractors and other third-party service providers in the ordinary course of the Cleaning Project (including construction monitoring, electrical services, air quality monitoring, asbestos abatement, and clearance testing), including Sciame, GBTS, ABF, and Hillmann, (c) expand the scope of the architect consulting agreement with Acheson Doyle to cover services related to the Cleaning Project, (d) select and hire contractors to clean, package, and move into storage the Storage Items, including Montvale, CCC, and Light Touch, (e) pay such contractors and other third-party service providers in the ordinary course of the Cleaning Project, subject to certain procedural safeguards, and (f) abandon and dispose of the Disposable Items (including used mattresses, box springs, and kitchen/cleaning supplies).

69.    Furthermore, Genever US expressly reserves its right to seek reimbursement from AIG regarding the cost incurred with respect to the Cleaning Project.  Genever US also reserves its right with respect to the allocation of the cleaning and related costs (including as it relates to the asbestos abatement) as between the Sherry Netherland and Genever US.

**BASIS FOR RELIEF**

70.     Section 363(b)(1) of the Bankruptcy Code provides in pertinent part, that a debtor in possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

71.     Section 554(a) of the Bankruptcy Code provides in pertinent part, that a debtor in possession may, after notice and a hearing, "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." Bankruptcy Rule 6007(a) further provides that unless otherwise directed by the court, the debtor in possession "shall give notice of a proposed abandonment or disposition of property to the United States Trustee, all creditors, indenture trustees, and committees." *See e.g., In re MF Glob. Inc.*, 535 B.R. 596, 606 (Bankr. S.D.N.Y. 2015) ("Abandonment may not be authorized without the requisite showing that the asset in question was of inconsequential value and benefit to the estate, and without ascertaining that the trustee's determination to that effect reflected a

business judgment made in good faith, upon a reasonable basis and within the scope of his authority under the Code") (internal quotation marks omitted).[12]

72.     Genever US has a duty to maximize the value of its estate and has determined the best way to do that is by selling and/or renting the Sherry Netherland Apartment, its primary asset.  In fact, this is Genever US's key objective in its chapter 11 case.  However, based on the Hillmann Report, Genever US understands that the deposition of soot and other CBPs in the Remaining Area requires cleaning and remediation.  The Sherry Netherland also made clear that it insists on Genever US immediately addressing the CBP contamination (as opposed to deferring the issue until after an eventual sale of the apartment) given the Sherry Netherland's concerns that CBPs could potentially affect other apartments or common areas in the buildings— via interstitial spaces, chases, plenums, air bands, and elevators.

73.     While Genever believed, after the initial cleaning handled through AIG, that the Remaining Area did not require further cleaning at the time and, to the extent further cleaning was required, this could be done by a potential future buyer in connection with the (anticipated) renovation of the Sherry Netherland Apartment, the Hillmann Report revealed that the initial cleaning did not adequately address CBP deposition and infiltration, which the Sherry Netherland insists needs to be remediated immediately.

74.     In light of these developments, Genever US has determined to proceed now with removing soot and other CBPs from in the Remaining Area.  Moreover, successful completion of the Cleaning Project will also further Genever US's principal goal of successfully marketing the Sherry Netherland Apartment for sale or rent.

---

[12]    By separate motion, Genever US is requesting authorization to shorten the 14-day notice period under Bankruptcy Rule 6007(a) as well as the requirement that such notice be served on all creditors in these chapter 11 cases.

75.    For the reasons already detailed, DKI is the obvious and best choice to undertake the Cleaning Project, given its extensive expertise in addressing CBP contamination and its experience in handling such projects in the Sherry Netherland building.  In addition to the services of DKI, the Cleaning Project will also require Genever US to obtain various related services from Sciame, GBTS, ABF, Hillmann, Acheson Doyle, and other related contractors and third-party service providers (including electrical and plumbing services) in the ordinary course of the Cleaning Project.  As detailed above, each of Sciame, GBTS, ABF, Hillmann, and Acheson Doyle have the relevant expertise and experience in the Sherry Netherland building as it relates to their respective work streams.

76.    By this Motion, Genever US seeks Court authorization to hire and pay DKI, Sciame, GBTS, ABF, Hillmann, Montvale, CCC, and Light Touch, as well as other related contractors and third-party service providers (including electrical and plumbing services) in the ordinary course of the Cleaning Project, subject to several procedural safeguards.  These safeguards include that (a) Genever US will provide updates to the Court and parties in interest as to the progress of the Cleaning Project (including updates regarding Genever US's expenditures on the project) as part of the monthly status report it already files in connection with the Remediation Order, (b) Genever US will provide the Consultation Parties with copies of all invoices received in an amount greater than $25,000 before paying such invoices, and (c) with respect to Acheson Doyle, Genever US shall file a notice with the Court attaching Acheson Doyle's invoices, and, unless a party in interest objects within fourteen (14) days of such notice, Genever US will be authorized to pay such invoices without further Court order.

77.    Genever US submits that due to the potentially large number of service providers (many of which are unknown at this time) that may need to be hired over the course of the

Cleaning Project, it is not feasible to seek separate Court approval each time an appropriate

service provider is identified.  As a practical matter, having to seek separate Court approval

every time the services of contractors and other service providers become necessary would cause

substantial delays, as the cleaning work would come to a standstill for several weeks each time

Genever US prepares, files, and presents a motion to hire a new service provider.  In any event,

by this Motion, Genever US is only seeking authorization to hire and pay service providers in the

ordinary course of the Cleaning Project, including, to the extent necessary, as it relates to any

asbestos abatement.

78.     Genever US further notes that, given the need to move forward expeditiously with

the Cleaning Project, Genever US intends to move forward with moving the Storage Items to the

Warehouse Facility as early as next week.  As noted above, Genever US does not believe that

Court approval is required to package and move the Storage Items into storage, including

because the safekeeping of these items constitutes an ordinary course activity of Genever US.

However, out of an abundance of caution, Genever US is requesting Court approval of these

services by this Motion.

79.     Finally, in connection with preparing the apartment for the Cleaning Project,

Genever US seeks authorization to abandon and dispose of the Disposable Items, such as (a)

mattresses, box springs, and drapery, (b) food items, condiments, and opened bottles of liquor,

(c) used pots and pans, (d) cleaning supplies and bathroom items, (e) clothes hangers, and (f)

other items of no value, such as plastic bags and empty packing boxes.  Genever US, in good

faith, has determined that the Disposable Items are of inconsequential value and benefit to the

estate (including because of the exposure of such items to soot and other CBPs).  For the

avoidance of doubt, while Genever US intends to proceed with collecting and bagging the

Disposable Items as early as next week, these items will ***not*** be removed from the Sherry Netherland Apartment until after the Court has entered the Proposed Order.

80.     For all these reasons, Genever US submits that conducting the Cleaning Project is a sound exercise of Genever US's business judgment.  In light of the foregoing, Genever US submits that the relief requested herein is appropriate and necessary and in the best interests of the estate.

## WAIVER OF BANKRUPTCY RULE 6004(h)

81.     Genever US requests a waiver of the fourteen-day stay requirements under Bankruptcy Rule 6004(h), such that the Proposed Order be effective immediately upon entry thereof.  For all the reasons set forth above, it is critical to begin cleaning the Remaining Area of the Sherry Netherland Apartment as soon as possible to facilitate a value-maximizing transaction for the benefit of Genever US's estate.


*[Remainder of page intentionally left blank.]*

WHEREFORE, for the foregoing reasons, Genever US respectfully requests that the

Court enter the Proposed Order granting the relief requested herein.

Dated: April 24, 2024
New York, New York

By: */s/ Luc A. Despins*
Luc A. Despins (admitted *pro hac vice*)
G. Alexander Bongartz (admitted *pro hac vice*)
Douglass Barron (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6079
lucdespins@paulhastings.com
alexbongartz@paulhastings.com
douglassbarron@paulhastings.com

    *and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

    *and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for Genever Holdings LLC*

    *and*

By: */s/ Michael T. McCormack*
Michael T. McCormack (ct13799)
Timothy P. Jensen (ct18888)
Amy E. Markim (ct27974)

O'Sullivan McCormack Jensen & Bliss PC
180 Glastonbury Boulevard, Suite 210
Glastonbury, CT 06033
Tel: 860-258-1993
Fax: 860-258-1991
mmccormack@omjblaw.com
tjensen@omjblaw.com
amarkim@omjblaw.com

*Special Insurance Coverage Counsel for Genever Holdings LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------------x
                                            :
In re:                                      :     Chapter 11
                                            :
HO WAN KWOK, et al.,[1]                     :     Case No. 22-50073 (JAM)
                                            :
                Debtors.                    :     (Jointly Administered)
                                            :
-------------------------------------------------------x
```

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 24, 2024, the foregoing Motion was electronically filed. Notice of this filing was sent by e-mail to all parties to the above-captioned chapter 11 case by operation of the Court's electronic filing ("CM/ECF") system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing as well as counsel for AIG. Parties may access this filing through the Court's CM/ECF system.

Dated:    April 24, 2024         By: */s/ G. Alexander Bongartz*
        New York, New York          G. Alexander Bongartz (admitted *pro hac vice*)
                            PAUL HASTINGS LLP
                            200 Park Avenue
                            New York, New York 10166
                            (212) 318-6079
                            alexbongartz@paulhastings.com

                            *Counsel for Genever Holdings LLC*

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

## EXHIBIT 1

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
:
In re:                                         :    Chapter 11
:
HO WAN KWOK, *et al.*,[1]                       :    Case No. 22-50073 (JAM)
:
Debtors.                         :    (Jointly Administered)
:
-------------------------------------------------------x

### [PROPOSED] ORDER GRANTING GENEVER HOLDINGS LLC'S MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b) AND 554 AND BANKRUPTCY RULE 6007(a), FOR ENTRY OF ORDER (I) AUTHORIZING GENEVER HOLDINGS LLC TO OBTAIN SERVICES NECESSARY TO CLEAN REMAINING AREA OF SHERRY NETHERLAND APARTMENT AND (II) GRANTING OTHER RELATED RELIEF

Upon the motion (the "Motion")[2] of debtor Genever Holdings LLC ("Genever US"), for

an order (this "Order") authorizing Genever US to obtain the services necessary to clean the

Remaining Area of the Sherry Netherland Apartment, including authorization for Genever US to

(a) hire DKI to undertake the principal aspects of the Cleaning Project, including deconstruction

and removal of the ceiling and corridor, cleaning out the plenum (*i.e.*, the interstitial space

between the ceiling drywall and the ceiling concrete), and cleaning the walls, millwork, and

floors, (b) select and hire related contractors and other third-party service providers in the

ordinary course of the Cleaning Project (including construction monitoring, electrical services,

air quality monitoring, asbestos abatement, and clearance testing), including Sciame, GBTS,

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

ABF, and Hillmann, (c) expand the scope of the architect consulting agreement with Acheson Doyle to cover services related to the Cleaning Project, (d) select and hire contractors to clean, package, and move into storage furniture and other related items, including Montvale, CCC, and Light Touch, (e) pay such contractors and other third-party service providers in the ordinary course of the Cleaning Project, subject to certain procedural safeguards, and (f) abandon and dispose of items of inconsequential value located in the Sherry Netherland Apartment (including used mattresses, box springs, and kitchen/cleaning supplies), all as further detailed in the Motion; and the Court having reviewed the Motion and having considered the statements of counsel before the Court at a hearing held on _____, 2024 (the "<u>Hearing</u>"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) good and sufficient notice of the Motion having been given; and no other or further notice being required; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested by the Motion, as modified by the terms of this Order is in the best interest of Genever US's estate and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.       The Motion is GRANTED as set forth herein.

2.       Genever is authorized to select and hire contractors and other third-party service providers in the ordinary course of the Cleaning Project (including, to the extent necessary, as it relates to asbestos abatement), as may be necessary to clean the Sherry Netherland Apartment, subject to the procedures set forth in paragraphs 4 and 5 of this Order.  For the avoidance of

doubt, Genever US is also authorized to (a) enter into, and perform under, agreements with DKI, Hillmann, GBTS, ABF, Sciame, Montvale, CCC, and Light Touch to undertake the Cleaning Project, in accordance with their respective proposals, and (b) pay their fees and expenses in the ordinary course of the Cleaning Project, without further Court approval.

3.     Genever US is authorized to enter into, and perform under, the Acheson Doyle Proposal.  As it relates to the payment of Acheson Doyle's fees and expenses, Genever US shall file a notice with the Court attaching Acheson Doyle's invoices for its services.  Parties in interest will then have fourteen (14) days to object to such invoices.  If no timely objections are filed with the Court, Genever US is authorized to pay such invoices without further Court order. If any timely objections are filed, (i) Genever US may file a response to such objection(s) within seven (7) days thereafter and (ii) pay the portion of the fees and expenses that are not subject to such objection.  To the extent that an objection cannot be consensually resolved among the parties, the Court will rule on the matter.

4.     Genever US shall provide all invoices received from the contractors and other third-party service providers in connection with the Cleaning Project in an amount greater than $25,000 to Sales Officer, PAX, the Committee, the U.S. Trustee, and the Sherry Netherland (the "Consultation Parties") before paying such invoices.

5.     Genever US is authorized to abandon and dispose of the Disposable Items located in the Sherry Netherland Apartment.

6.     Notwithstanding the provisions of Bankruptcy Rule 6004(h) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rule 6004(h) is hereby expressly waived and shall not apply.

3

7.      Genever US is authorized and empowered to take all actions necessary to effectuate the relief granted in this Order.

8.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **Exhibit 2**

**DKI Proposal**

| Stages | Total |
|---|---|
| | $46,056.00 |
| Stage 1 Containment | 3 Days. Environmental Controls for Containment: <br><br> • The 18th Floor, excluding Unit 1801, (hereafter, "the Unit") should have the Source area fully isolated from the rest of the floor and all other areas of concern put under containment to ensure any additional combustion by-product (CBP) or fire-related odor infiltration is restricted. Critical barriers should be erected at unit entry points framing wood pressure fitted  in conjunction with 6 mil polyvinyl sheeting sealed using tape and/or spray adhesive as necessary. Entries shall be zippered and any temporary sealed barriers shall have a pressure relief air pathway installed using HEPA filters and charcoal filters to control particulates and odors. <br><br> • Once containment barriers are erected, all PTAC units will be covered til proper cleaning is conducted. <br><br> • Install a sufficient quantity of HEPA and charcoal filter equipped air filtration devices (AFDs) inside, and outside of the work area(s) to affect the appropriate number of air exchanges as determined by the Contractor to effectively filter the work area and Unit. AFDs should be operated during all work and should continue to run until post-remediation clearance is obtained. | |
| | 12 Days | $109,581.00 |
| Stage 2 : Deconstruction- Removal  Ceiling and Corridor | 12 Days <br> • Unit demolition should be staged to begin following the completion of any pre-restoration recommendations, as well as the pack out of any fine art or contents as outlined above, and after critical barriers have been erected. <br><br> • Remove and discard the gypsum board or plaster ceilings, any associated insulation throughout whole unit.  IH report contains diagram marked for ceiling removals.  Based on DKI findings during removal, additional areas of removal may be warranted, and can be further evaluated once the demolition phase has been initiated. <br><br> • Once plenums are open and accessible, pathways or penetrations between isolated areas should be sealed to prevent cross contamination during ongoing remediation by unit General Contractor <br><br> • Once all penetrations and gaps have been sealed, any and all large physical debris should be removed from cavities and any remaining paper-wrapped and/or canvas-wrapped fibrous glass pipe insulation, or BATT fibrous glass insulation in ceiling plenums should be removed and discarded. If additional known or suspect damaged asbestos containing materials are exposed during demolition, STOP WORK and contact Hillmann to discuss next steps. | |

| | | |
|---|---|---|
| Stage 3 : Ceiling Concrete Cleaning Hepa Vac and Degreaser | 7 Days<br>Building<br>• When PTAC cleaning, as well as the removal of porous items and any residual debris is complete, all surfaces within the plenum, and any subsequently exposed wall cavity, should be HEPA vacuumed to remove all loose particulate, damp wiped with a general-purpose cleaner and/or degreaser (as determined by the Contractor) and allowed to air dry, then HEPA vacuumed a second time to remove any particulate or debris dislodged by the wet wiping. Additional inspection should be made to electrical wiring (AV cables and BX) and cable within the interstitial spaces, with any damaged or corroded wiring or cable recommended for replacement. If damp wiping is not effective on concrete or other rough semi-porous surfaces within the plenum, consider using dry chem sponge wiping as an alternative. | |
| Stage 4 : Odor Sealant | 10 Days<br>Building<br>• Concrete Substrate decontamination is completed DKI will provide the following smoke odor control services.  DKI will  spray on the prescribed primer and odor sealing topcoat. Once ceilings are sprayed, an additional painter will follow behind the sprayer to inspect coverage and brush into all crevices not completely covered by the spray pass on the concrete surface decontaminated. This methodology will ensure quality control and total coverage of both the penetrating primer and odor sealer.<br><br>There will be a lot of encumbrances and appurtenances on the ceilings to work around and maneuver in and out of small area cavities within the overall Unit 1804<br><br>The approximate size of the entire ceiling is up to 7,000 sf inclusive of the beams. | |
| Stage 5: Cleaning Plenum, Conduit, Electric | 12 Days<br>Inspection should be made to electrical wiring (AV cables and BX) and cable within the interstitial spaces, with any damaged or corroded wiring or cable recommended for replacement. HEPA vacuum to remove all loose particulate, damp wipe with a general-purpose cleaner and/or degreaser (as determined by the Contractor) and allowed to air dry, then HEPA vacuumed a second time to remove any particulate or debris dislodged by the wet wiping | $164,985.60 |

2

| | | |
|---|---|---|
| Stage 6: Clean Walls, millwork, drawers and Floor | 12 Days<br>All horizontal and vertical surfaces outside the chase and wall cavity should be HEPA vacuumed to remove all loose particulate, damp wiped with a general-purpose cleaner and/or mild degreaser where applicable (as determined by the Contractor) and allowed to dry, then HEPA vacuumed a second time to remove any particulate or debris dislodged by the wet wiping. Painted surfaces or any other surface susceptible to damage by damp wiping should be addressed using dry chem-sponges unless the art/antique appraisal indicates the surface or material should be left alone. Additionally, ensure all hard-to-reach cracks and/or crevices are addressed by opening each cabinet or drawer contained within the remaining millwork and cleaning each surface. | $164,985.60 |
| Stage 7: Demobilising | 1 Day | $2730.00 |
| Cleaning PTAC | Provident will clean each PTAC unit in place | $9750.00 |
| | Consumables Floor/Wall Protection, Huck Rags , Filters, Plastic, etc. | $10,000.00 |
| | Dumpster ..Remove all debris from ceiling | $1000.00 |
| | | $509,088.20 |

3

**Exhibit 3**

**Sciame Proposal**

# SciameHomes

CONSTRUCTION ESTIMATE

**Sherry Netherland - Apt 1804**
781 5th Ave
New York, NY 10022

Construction Estimate 1.0 - For Review

4/12/2024

Prepared For:

Alex Bongartz
Luc A. Despins

# SciameHomes

Construction Estimate 1.0 - For Review                                          4/12/2024
Sherry Netherland - Apt 1804
781 5th Ave

## CONSTRUCTION ESTIMATE SUMMARY

| DIV | DESCRIPTION | TOTAL |
|-----|-------------|-------|
| 01000 | GENERAL REQUIREMENTS | 20,400 |
| 16000 | ELECTRIC | 7,300 |
| | **TOTAL TRADE COSTS** | **27,700** |
| | OVERHEAD 5% | 1,385 |
| | CM FEE 5% | 1,385 |
| | **SUBTOTAL** | **30,470** |
| | INSURANCE 3.0% | 914 |
| | **PROJECT TOTAL** | **31,384** |

**Sciame**Homes

Construction Estimate 1.0 - For Review                                                            4/12/2024
Sherry Netherland - Apt 1804
781 5th Ave

**CONSTRUCTION ESTIMATE DETAIL**

| DIV | # | DESCRIPTION | AMOUNT | TOTAL |
|---|---|---|---|---|
| 01000 | | GENERAL REQUIREMENTS | | $ 20,400.00 |
| | 1 | Site Supervision | $ 5,000.00 | |
| | 2 | Labor - Removal of all Misc. Items, Mattresses and Spring Boxes, etc. | $ 10,400.00 | |
| | 3 | Construction Cleaning | $ 4,000.00 | |
| | 4 | Carting | $ 1,000.00 | |
| | | | | |
| 16000 | | ELECTRIC | | $ 7,300.00 |
| | 1 | Removal and Safe-Off of all Chandeliers and Sconces throughout Apartment | $ 7,300.00 | |
| | | **SUBTOTAL OF TRADE COSTS** | | **$ 27,700** |

## Exhibit 4

**ABF Proposal**



Tel: 973-777-0203
Fax: 973-777-8939

18 Hathaway St.
Wallington, NJ 07057

mbielawski@abfenv.com

April 12, 2024

Genever Holdings, LLC
c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok
Paul Hastings LLP
200 Park Avenue
New York, New York 10166

**Re: the Sherry Netherland, 781 Fifth Avenue**

Attn: G. Alexander Bongartz

ABF is pleased to submit our proposal to provide asbestos abatement work at the referenced premises. Our quote includes union labor, material, insurance, paying NYC DEP and NYS DOL filing fees and disposal of asbestos waste at an approved landfill.

**SCOPE OF WORK**

ABF will remove all ACM insulation from horizontal pipes located above drop ceiling in the apartment 1804 and 18th floor corridor at the referenced premises.

This asbestos abatement will be performed for the sum of Seventy Two Thousand Four Hundred Dollars ($72,400).

The Owner is required to provide air monitoring service, electric and water connection during the abatement work at no cost to ABF Environmental, Inc.
Pricing does not included sales tax (Client to provide Certificate of Capital Improvement or Tax Exempt Certificate).

If you have any questions, please contact me.

Sincerely,

Martin Bielawski
Operations Manager

AGREED BY _____

*as proxy holder*
*for Genever Holdings LLC*

## **Exhibit 5**

**GBTS Proposal**



April 19, 2024

**Genever Holdings LLC**
**c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok**
**Paul Hastings LLP**
200 Park Avenue
New York, NY 10166
Attn: G. Alexander Bongartz, Paul Hastings LLP (via email: _alexbongartz@paulhastings.com_)

Re:    Environmental Consulting Services
       781 Fifth Avenue, Suite 18th Floor
       New York, NY 10022
       GBTS Proposal No. 23005-0251-P2

Dear Mr. Bongartz:

Gallagher Bassett Services, Inc., Technical Services Division (GBTS) is pleased to submit this proposal to **Genever Holdings LLC c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok (Genever Holdings)** to provide environmental consulting services in relation to the asbestos abatement work being conducted within Suite 1804 at 781 Fifth Avenue, New York, NY 10022 (Subject Property).

## Scope of Work

**Task 1 – Survey and Testing**

**Task 2 – Third Party Air Monitoring**

Inspections of the abatement process
A properly certified/licensed project monitor/air sampling professional shall provide daily oversight of abatement activities for compliance with project specifications (if applicable) and local, state and federal requirements. Activities shall include:

1.  The proper placement and collection of air samples as required;
2.  The completion of daily construction logs which document contractor activities;
3.  The recording of notes regarding non-conforming activities;
4.  The verification that all engineering controls are in place; and
5.  The review of daily air sampling results with the Senior Project Manager/Account Executive, client, and contractor.

Project Management
A Project Manager shall be assigned to each project and shall provide daily management support to the field technician(s) as well as daily interface with the contractor and client. Responsibilities of the Project Management team might include any of the following:

G. Alexander Bongartz
April 19, 2024
Page 2

1. Review contractor notifications and pre-construction (pre-abatement) submittals;
2. Review and establish the necessary insurance requirements;
3. Review contractor submitted Health and Safety Plans;
4. Review submittals during the abatement project;
5. Prepare contracts for asbestos abatement;
6. Prepare and review contractor schedule of values, review contractor applications for payment against pre-established schedules and recommend approval or modifications to same;
7. Mediate weekly on site meetings to discuss activities on site and prepare weekly meeting minutes for distribution to all parties;
8. Interface (including site inspections and correspondence) as required with all regulatory agencies;
9. Assist with the site management of site workers;
10. Assign certified/licensed asbestos professionals as required to adequately monitor the contractors abatement activities;
11. Assist in the verification of certifications for all workers on site;
12. Manage the air monitoring effort including daily review and distribution of the air sampling results;
13. Obtain copies of daily construction logs for review on a daily basis;
14. Coordinate all final work area inspections and acceptance;
15. Secure and issue "clearance letters" for each work area which has been cleared for re-occupancy;
16. Review and address accident reports if applicable;
17. Review all contractor Change Orders, if appropriate; and
18. Compile all of the site documentation to prepare a final close-out report.

**Air Monitoring**

Local, state and federal agencies have differing requirements as relates to air monitoring prior to, during and following abatement. When required, GBTS provides for this sampling using personnel certified/licensed by the states in which the work is executed. The sampling programs are designed in accordance with local, state, and federal requirements and normally involve air sample collection and analysis via Phase Contrast Microscopy (PCM), NIOSH Method 7400, Issue 3: 29 April 2019 or the latest edition. Phase Contrast Microscopy samples shall be analyzed by a laboratory proficient in the American Industrial Hygiene Association Proficiency Analytical Testing (AIHA PAT) Program or by an analyst who is a successful participant in the AIHA Asbestos Analyst Registry (AAR). For sample analysis via Transmission Electron Microscopy (TEM), laboratories shall be accredited under the National Voluntary Laboratory Accreditation Program (NVLAP) and shall certify that the analysis they performed was according to the protocol listed in Appendix A to Subpart E of 40 CFR 763. The maximum turnaround times for sample analysis and the reporting of results vary based on federal, state, and local requirements.

All sampling equipment shall be calibrated traceable to a primary standard. Pumps shall be recalibrated with a minimum of a secondary standard before and after each sample is collected. Records shall be kept of all calibrations and shall be part of the daily log.

Pre-abatement Air Sampling (If Required)
If required by local, state, and/or federal requirements, prior to commencement of work, air samples shall be collected for analysis by PCM and/or TEM. The sampling and analysis methodologies shall be governed as described above and consistent with state and local requirements. These samples shall be collected prior to the commencement of any abatement related activities in areas inside and outside of

G. Alexander Bongartz
April 19, 2024
Page 3

the proposed containment(s). Timing of the background sampling shall be consistent with the applicable regulations.

Abatement Air Monitoring

1. Samples shall be collected at locations in accordance with applicable regulations, including (if required):
    a. Outside the work area at critical barriers;
    b. In the clean room of the worker and waste decontamination units;
    c. On floors above and below the work area;
    d. At locations where negative air filtration devices (AFDs)/negative air machines (NAM) exhaust into tenant or occupied areas;
    e. At locations where AFDs exhaust to the ambient environment;
    f. Outside the building (ambient air samples); and
    g. For abatement personnel, if local or state regulations require.
2. Sample collection shall be in strict accordance with local, state, and federal requirements regarding sample locations, rate of flow, and required volumes to achieve the necessary analytical sensitivity.
3. Sample analysis turnaround times (TAT) shall be consistent with the appropriate regulatory authority.

Final Clearance Testing

Following a successful final inspection performed by the certified/licensed asbestos professional and given the appropriate waiting periods between the final cleaning and visual inspection, aggressive clearance air sampling shall be performed. Final air clearance sampling shall not be performed until the work area has passed the final visual inspection.

1. Number and placement of samplers shall be consistent with local, state, and federal requirements.
2. Final air clearance sampling analytical methods shall comply with the appropriate standards, whether PCM or TEM.
    a. For PCM analysis, the project shall be considered complete when the results of samples collected in the affected work area show that the concentration of fibers for each of the samples is less than or equal to 0.01 fibers per cubic centimeter (f/cc).
    b. For TEM analysis, the clearance standard has been established as a fiber density of less than 70 structures per millimeter squared ($s/mm^2$) for the average concentration of all samples collected inside the work area.
3. Failure to achieve these clearance standards will obligate the contractor to re-clean the work area and have the work area retested.
4. Final clearance results shall be conveyed to the client and the contractor once available.

**Final Visual Inspection Process**

Final air clearance sampling shall not be performed until the work area has passed a final visual inspection performed by a properly qualified (certified/licensed) individual. This individual is normally independent of the contractor and retained by the owner to verify the remedy.

The visual inspection process is used to evaluate all four aspects of an asbestos abatement project as follows:
1. The extent of ACM removal within the scope of work;
2. The project work performance/contractor execution;

G. Alexander Bongartz
April 19, 2024
Page 4

3. The completeness of abatement; and
4. The completeness of the clean-up.

GBTS's process includes the following:
1. The certified/licensed asbestos professional shall have a complete understanding of the scope of the abatement program;
2. Work area inspections are performed by both the GBTS asbestos professional and the Project Manager or Supervisor for the abatement firm;
3. The inspection confirms that all containerized waste has been removed from the work area and unremoved materials have been addressed;
4. All equipment, with the exception of negative air filtration devices, has been removed from the work area;
5. The inspection verifies the complete removal of all visible ACM debris or residue on or about all abated surfaces. The presence of residue, visible without the use of magnifying devices, on surfaces and components from which asbestos has been removed indicates that additional cleaning of these surfaces is required. It is important to note that the visible debris is not limited to suspect ACM. The work area should be free of all debris and dust;
6. An entry shall be made into the asbestos abatement contractor supervisor's daily log by both the supervisor and the GBTS representative detailing the findings of the visual inspection; and
7. An acceptable visual inspection for completeness of abatement and clean-up improves the chances, but does not guarantee, that the area will pass final air testing for clearance.

GBTS's final visual inspections shall follow federal, state and local regulations as well as recognized standards (guidelines) which might include:

1. ASTM Standard E1368 "Standard Practice for Visual Inspection of Asbestos Abatement Projects;" and/or
2. Asbestos-Containing Materials in Schools Rule (40 CFR Part 763, Subpart E).

At the completion of the work, a formal report shall be prepared which documents the oversight services provided, and will include air monitoring results, construction logs, and floor plans (if applicable).

## COST

GBTS proposes to perform the services outlined above according to the following fee schedule:

**Task 1 – Survey and Testing of ceiling and wall suspect ACM** ...................................................... **$2,950**

**Task 2 – Third Party Air Monitoring and Project Management based on estimated 10 shifts to complete abatement.**
@ $900 per shift x 10 shifts.......................................................................................................$ 9,000
Project Management – 1.5 hours per shift at $160............................................................................$ 2,400
Final Report – Lump Sum ........................................................................................................ $750

**Total Estimated Cost for Task 2**..............................................................................................**$12,150**

G. Alexander Bongartz
April 19, 2024
Page 5

## ASSUMPTIONS AND CLARIFICATIONS

Tasks that are based on time and materials/hourly rates are to be considered estimates and are based on an estimated not to exceed value without client authorization. Actual site conditions may affect the final cost. Tasks based on a lump sum value are specific to the scope of work described above. Additional work requested and approved by the Client shall be on an hourly rate basis. All work shall be performed in accordance with the attached Fee Schedule and Terms and Conditions.

In the event that we do not receive a Tax Exemption Notice or Certificate of Capital Improvement, invoices shall include the applicable NY Sales Tax. Payments are due 30 days from receipt of invoice. Payment is the sole responsibility of **Genever Holdings LLC c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok** and is not contingent upon third party funding, transactional closing, or insurance recovery.

## SCHEDULE

GBTS shall complete the field work within one working day, with verbal results within two business days, and a full report within 10 business days following receipt of the laboratory reports.

## AUTHORIZATION

We trust that this proposal will meet your expectations. These services shall be provided in accordance with the Gallagher Bassett Services, Inc. Standard Terms and Conditions, version 3/22/2023, attached hereto and made a part hereof. If the foregoing scope is in accordance with your understanding, please sign below to confirm your acceptance and agreement and return the original that will thereupon constitute the agreement between us. The Proposal and the Gallagher Bassett Services, Inc. Standard Terms and Conditions shall be deemed effective upon the earlier of (i) the effective date of this Proposal if expressly defined therein; or (ii) the date the Client executes the Proposal.

If you have any questions or comments, or require clarification on any item, please do not hesitate to contact me at 310.261.9727.

Respectfully submitted,
Gallagher Bassett Services, Inc.

Prepared by:                                        Reviewed by:

Greg Chomenko                                    Eric M. Telemaque
Senior Consultant                                  Managing Director, Environmental Consulting

c. Files
Enclosures
**Accepted by the Authorized Representative of:**
**Genever Holdings LLC**
**c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok**

Luc A. Despins, as Proxyholder
for Genever Holdings LLC                          April 24, 2024
Print Name and Title                              Date



GALLAGHER BASSETT | TECHNICAL SERVICES

**STANDARD CLIENT TERMS AND CONDITIONS**

**1. SCOPE AND PERFORMANCE OF THE WORK**

As used herein, "Agreement" means the GBTS Proposal and these Standard Client Terms and Conditions. As used herein, the term "Client" refers to the party signing the GBTS Proposal. Client hereby retains Gallagher Bassett Services, Inc., Technical Services Division ("GBTS") to perform the services described in GBTS's Proposal ("Services"), attached hereto, and GBTS agrees to provide said Services. Any additional terms and conditions proposed by Client are objected to and will not be binding upon GBTS unless specifically assented to in writing by GBTS's authorized representative. The Services provided are not of a legal nature, and GBTS shall in no event give, or be required to give, any legal advice or legal representation to Client. This Agreement shall not create any rights or benefits to parties other than Client or GBTS. GBTS will have no authority over decisions or actions affecting project production, scheduling, quality, workmanship, or the correction of hazardous conditions and practices. Such responsibility, including the correction of hazardous conditions and practices will remain with the Client project superintendent, project manager and the appropriate contractor or subcontractor personnel. GBTS shall only have the authority to observe, advise and make recommendations.

**2. PAYMENT TERMS**

Client recognizes that timely payment of GBTS's invoices is a material part of the consideration GBTS requires to perform the Services. For the performance of Services described in the GBTS Proposal and Section 1 herein, Client agrees to pay GBTS in accordance with these Terms and Conditions and the fees, rates, charges and reimbursement terms as set forth in GBTS's Proposal and/or COST AND FEE SCHEDULE, either of which is attached hereto. Each Proposal and/or Cost & Fee Schedule shall be effective for the period stated therein. Any additional services or work required by Client shall be performed on a time-and-materials ("T&M") basis, in accordance with the cost and fee schedule effective at the time of performance of such services or work.

GBTS may revise its pricing from time to time to the extent required by alterations in the services or changes in regulations and applicable law. The revised COST AND FEE SCHEDULE shall apply only to Services performed after the effective date. invoices will be submitted by GBTS on a monthly basis and shall be due and payable within thirty (30) calendar days of invoice date.

If Client objects to any portion of an invoice, Client shall notify GBTS within fourteen (14) calendar days from the date of the invoice, identify the cause of the objection, and pay when due the undisputed portion of the invoice. Payment of invoices is in no case subject to unilateral discounting or set-offs by Client. Payment shall not be conditioned on reimbursement or other recovery of funds from any third party, including insurance carriers.

GBTS shall provide the Services as an independent contractor. Nothing in this Agreement shall be deemed to be construed as creating an agency, partnership or joint venture relationship between GBTS and the Client.

**3. CHANGE ORDERS**

Client and/or GBTS shall have the right to modify the scope of Services, specifications and time requirements set forth in the Proposal, along with an equitable adjustment of the cost and fees for such Services, as deemed appropriate and agreed to by the Parties hereto. Such modification of Services shall be in writing, attached hereto and incorporated by reference ("Change Order"). Any requests by Client for deviations from the Services specified in the Proposal involving increased time, costs or expenses to GBTS shall be performed only upon execution of a Change Order. Client will pay GBTS for all satisfactorily rendered Services set forth in GBTS's Proposal.

**4. STANDARD OF CARE/WARRANTY**

While performing the Services under this Agreement, GBTS shall exercise that degree of care and skill ordinarily exercised under similar circumstances by members of the safety, environmental, construction, claims and risk management consulting profession performing the kind of services to be performed hereunder and practicing in the same or similar locality at the same period of time. GBTS will provide its best professional judgement, if required under the Proposal, concerning safety and risk management best practices. Reasonable people may disagree on matters involving professional judgment and, accordingly, a difference of opinion on a question of professional judgment shall not excuse Client from paying for services rendered or result in liability to GBTS. Except for the express promise set forth above, GBTS neither makes, nor offers, nor warrants to Client any express or implied warranties or guarantees with respect to GBTS's Services. Without limiting the foregoing and by way of example only, GBTS expressly makes no representation, guarantee, promise or other warranty that Client will not be issued any violations, citations, stop work orders or other governmental citations, fines or penalties. Client and

1 of 6



Client's contractors shall promptly notify GBTS of any actual or suspected defects in GBTS's Services to help GBTS take corrective measures to cure such defects and/or help minimize the consequences of any such defect. GBTS shall not be liable to Client for any damages without being given a reasonable opportunity to correct the Services.

### 5.   CLIENT RESPONSIBILITIES

In addition to other responsibilities described herein, the Client shall: (i) provide all information and criteria as to the Client's requirements, objectives, and expectations for the project, including all numerical criteria that are to be met and all standards of development, design, or construction and all other information reasonably necessary for completion of the Services, prior to the commencement of the Services; (ii) provide prompt, complete disclosure of known or potential hazardous conditions or health and safety risks; (iii) provide to GBTS all previous studies, plans, or other documents pertaining to the project and all new data decisions pertaining thereto within a reasonable time so as not to delay the Services; (iv) furnish approvals, consents and permits from governmental authorities, third parties including but not limited to the owner, lender, etc. and notice to GBTS whenever the Client becomes aware of any development that affects said approvals and consents from other parties as may be necessary for completion of GBTS's Services; (v) give prompt written notice to GBTS whenever the Client becomes aware of any development that affects the scope and timing of GBTS's Services or any defect or noncompliance in any aspect of the project; and (vi) bear all costs incident to the responsibilities of the Client. The Client agrees that to the extent GBTS is required to perform intrusive and invasive activities as part of the Services, including but not limited to, intrusive soil & groundwater tests, dig test pits and clearing pathways of trees, etc., the Client takes responsibility for all such intrusive and invasive activities, and has made all disclosures and obtained all necessary permits, approvals and consents from all interested third parties, including but not limited to, the owner, lender or any financing party, government authority, etc. for GBTS's performance of such intrusive and invasive activities. GBTS will have the right to reasonably rely upon the accuracy and completeness of all disclosures made and information and approvals obtained by the Client.

Client shall provide all studies, reports, data and other information in its control which may be relevant to performance of the Services. GBTS shall be entitled to use and rely upon all such information. Client accepts sole responsibility for errors in Services resulting from information supplied to GBTS.

### 6.   SAFETY

Client shall be obligated to inform GBTS of any applicable site safety procedures and regulations known to Client as well as any special safety concerns or dangerous conditions at the site. GBTS and its employees and/or subcontractors will be obligated to adhere to such procedures and regulations once notice has been given.

Unless specifically provided in the Proposal, GBTS shall not have any responsibility for overall job safety for others at the work site. Work site safety and authority to take corrective action and address dangerous work site conditions and dangerous worker practices shall remain the responsibility of the Client, the construction permit holder, and the trade contractors and subcontractors. If in GBTS's opinion, its field personnel are unable to access required locations or perform required Services in conformance with applicable safety standards, GBTS may immediately suspend performance, without any breach or liability hereunder, until such safety standards can be attained. If, within a reasonable time, site operations or conditions are not brought into compliance with such safety standards, GBTS may in its discretion terminate its performance in accordance with the termination provision found herein, in which event Client shall pay for Services and termination expenses as provided herein.

Unless specifically provided in the Proposal, GBTS has no authority to direct, supervise or control any of the trade contractors and trade contractor workers, including the means and methods employed by such trade contractors and trade contractor workers.

### 7.   INSURANCE

If an owner-controlled insurance program ("OCIP") and/or contractor-controlled insurance program ("CCIP") is implemented on the project, GBTS shall be enrolled and afforded the coverages provided thereunder without any additional cost or expense to GBTS, and without giving credits for the cost of associated insurance program coverages.

GBTS shall procure and maintain, at its own expense, during the term of its engagement with Client, insurance of the following types and amounts or as legally required: commercial general liability, contractors' pollution liability, professional liability (Errors & Omissions) at limits of $1,000,000 per occurrence/$2,000,000 in the aggregate; automotive liability insurance with a combined single limit

GALLAGHER BASSETT | TECHNICAL SERVICES

of $1,000,000; workers' compensation and employer's liability insurance as required by state law (all 50 states). GBTS shall furnish Certificates of Insurance of such coverage to Client upon request. Additional coverages may be obtained on a project-by-project basis upon request by Client and at the sole cost and expense of Client.

## 8. INDEMNIFICATION

GBTS shall defend (but only to the extent covered by GBTS's insurance), indemnify and hold harmless Client and its officers, directors, employees, agents, representatives, affiliates and successors from any and all third-party claims, demands, suits, causes of action, proceedings, judgments and liabilities for property damage and/or personal injury, damages, losses and expenses, including, but not limited to reasonable legal expenses and attorneys' fees connected therewith (collectively, "Claims"), sustained by Client, its officers, directors, employees, affiliates and successors resulting from or arising out of GBTS's negligent acts, errors or omissions in the performance of Services under this Agreement.

Client shall indemnify, defend and hold harmless GBTS and its officers, directors, employees, affiliates and successors from any and all Claims sustained by GBTS, its officers, directors, employees, affiliates and successors, resulting from or arising out of Client's direction or instruction, breach of the Terms and Conditions, and negligent acts, errors or omissions.

To the extent the Services include performance by GBTS of intrusive ground work, Client shall indemnify GBTS from and against any and all Claims, damages, losses and expenses (including reasonable legal expenses and attorneys' fees) resulting from or arising out of damages to subsurface or underground utilities or structures, including but not limited to, gas, telephone, electric, water or sewer utilities whose locations were not designated or identified to GBTS prior to performance of the Services.

## 9. LIMITATION OF LIABILITY

In no event shall Client and GBTS and their respective officers, directors, employees, agents, representatives, affiliates and successors be liable to the other or any third party for any special, incidental, consequential, indirect or punitive damages including, without limitation, lost, delayed and/or diminished profits or revenue, loss of data, or interruption of business, whether arising under theory of contract, tort or other theory of liability, including negligence, and the Parties hereby mutually release and

waive any and all such claims against the other. The indemnification obligations and mutual waiver and release herein shall survive termination or completion of this Agreement.

Under no circumstances will GBTS be liable to Client for any amount in excess of the total amount of fees paid by Client to GBTS for Services performed under this Agreement, or $100,000, whichever is greater. This limitation shall apply to any and all injuries, damages, claims, losses, expenses, or claim expenses (including attorney's fees and expert witness' fees) arising from or related to Services performed under this Agreement from any cause or causes. Such causes include, but are not limited to, GBTS's negligence, errors, omissions, strict liability, statutory liability, breach of contract, breach of warranty, negligent misrepresentation, or other acts giving rise to liability based on all types of legal theories, including but not limited to contract, tort, professional liability, product liability, warranty or otherwise.

Client agrees that any claim for damages filed against GBTS, by Client or by any contractor or subcontractor hired directly or indirectly by Client, will be filed solely against GBTS or its successors or assigns, and that no individual shall be held personally liable for damages, in whole or in part.

## 10. DISPUTE RESOLUTION

If any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall occur, Client and GBTS shall endeavor to reach resolution through good faith direct discussions between representatives of the parties with authority to resolve the matter. If direct discussions do not result in resolution of the matter, the parties shall endeavor in good faith to resolve the matter via mediation. If the parties choose mediation, either party may terminate the mediation at any time after the first session by written notice to the other party and mediator. The cost of the mediation shall be shared equally by the parties. The parties agree that the sole proper venue for the determination of any litigation arising under this Agreement shall be in a court of competent jurisdiction which is located in Cook County, Illinois. Each party shall bear its own litigation costs and fees, including expert and attorneys' fees.

## 11. NOTICE AND PURSUIT OF CLAIMS

Any claims of Client, whether based upon contract, tort, breach of warranty, or otherwise, shall be deemed waived

GALLAGHER BASSETT | TECHNICAL SERVICES

unless written notice of such claim is received in writing by GBTS within one (1) year after Client knew or reasonably should have known of its existence.

## 12. COLLECTION

Should the Client's account, after payment default hereunder, be referred by GBTS to an attorney or collection agency for collection, then Client shall pay all of GBTS's expenses incurred in such collection efforts including, but not limited to, collection agency fees, court costs and reasonable attorneys' fees. Notwithstanding the above or any other terms provided herein, GBTS may institute proceedings to collect payment in any court of competent jurisdiction in the United States.

## 13. USE OF REPORTS/NO THIRD-PARTY RELIANCE

Any documents provided by GBTS as part of the Services provided herein are provided for the use and reliance of Client. Any third-party use of or reliance on the documents is subject to the terms and conditions of this Agreement and GBTS's report. Client's payment of GBTS invoices, as provided for herein, shall not be made contingent upon GBTS's agreement to permit third-party reliance contrary to the terms and conditions agreed to herein.

## 14. CONFIDENTIALITY

In connection with this Agreement, the parties acknowledge that it may be necessary for each of them to provide to the other information that is confidential to the disclosing party ("Confidential Information"). As used herein the term "Confidential Information" shall mean all business, technical or scientific data and information, in any form, not previously known to or generated by the receiving party that is of a confidential or competitively-sensitive nature, or information that is marked "Confidential" by the disclosing party. Without limitation, and by way of example only, Confidential Information shall include software, systems, processes, designs, plans, engineering files, price information, business plans, business methods, financial data, and any other competitively-sensitive information or data belonging to the disclosing party. Each party shall secure and maintain the Confidential Information of the other party in strictest confidence and shall not disclose or make available to others the Confidential Information of the other party without the express written consent, in advance, of that party. Confidential Information shall not include information which: (a) is or becomes a part of the public

domain through no act or omission of the receiving party; (b) was in the receiving party's lawful possession prior to the disclosure and had not been obtained by the receiving party either directly or indirectly from the disclosing party; (c) is lawfully disclosed to the receiving party by a third party without restriction on disclosure; (d) is independently developed by the receiving party; or (e) is disclosed by operation of law. This provision shall not be interpreted in any way to restrict a party from complying with a legally enforceable order to provide such information or data, provided that notice of such obligation is promptly given, in advance, to the other party. Client agrees that GBTS may use and publish Client's name and a general description of services rendered under the Agreement for purposes of describing GBTS's experience and qualifications to others.

## 15. NON-SOLICITATION

To the extent permitted under applicable law, without the prior written consent of GBTS, the Client agrees that it shall not solicit or hire employees of GBTS during the term of this Agreement or for a period of 6 months after termination of the Agreement. General solicitations of employment by means of recruiters, the internet, newspaper, periodical or trade publication advertisements not directed at employees of GBTS and its affiliates shall not be deemed to constitute "solicitation" for purposes of this provision. Further, nothing in this Agreement shall prohibit Client from hiring any person, including an employee of GBTS, who contacts Client on his or her own initiative without any direct or indirect solicitation by, or encouragement from, Client.

## 16. DELAYS

If GBTS's Services are interrupted by circumstances beyond GBTS's control, Client shall compensate GBTS for the labor, equipment, and other costs GBTS incurs in order to maintain continuity of GBTS's project team for Client's benefit during the interruption. Alternatively, and at Client's option, Client shall compensate GBTS for the various costs GBTS incurs for demobilization and subsequent remobilization. GBTS's compensation shall be based upon GBTS's current prevailing COST AND FEE SCHEDULE. Except for the foregoing provision, neither party shall hold the other responsible for damages or performance delays caused by circumstances beyond the control of the other party, and which could not reasonably have been anticipated or prevented. For purposes of this Agreement, such circumstances include, but are not limited to: unusual weather; floods; epidemics; wars; riots;

GALLAGHER BASSETT | TECHNICAL SERVICES

strikes; lockouts or other industrial disturbances; protest demonstrations; unanticipated site conditions; inability (despite reasonable diligence) to supply personnel, equipment, or material to the project; or the action or inaction of government. Should such circumstances transpire, Client and GBTS shall exert a best effort to overcome the resulting difficulties and resume performance of the Services as soon as reasonably possible. Delays within the scope of this provision that cumulatively exceed forty-five (45) calendar days shall, at the option of either party, make this Agreement subject to renegotiation or termination.

**17.     TERMINATION**

This Agreement shall become effective on the date of Client's acceptance of GBTS's Proposal. Client may terminate this Agreement for convenience without penalty, by providing written notice to GBTS. Client or GBTS may terminate the Agreement for cause. The party initiating termination shall so notify the other party, and termination shall become effective fourteen (14) calendar days after receipt of the termination notice. Irrespective of which Party effects termination or the cause thereof, Client shall, within thirty (30) calendar days from receipt of GBTS's termination invoice, pay GBTS's fees for Services satisfactorily rendered and costs incurred, in accordance with the COST AND FEE SCHEDULE. Client shall pay GBTS for costs reasonably stemming from termination and post-termination activities including, but not limited to, demobilization, equipment decontamination and/or disposal, and disposal and replacement of contaminated consumables.

**18.     NOTICE**

All notices, requests and other communications concerning termination or indemnification ("Formal Notice") under this Agreement shall be in writing and delivered: (i) personally; (ii) by certified mail, return receipt requested; or (iii) by nationally recognized express courier service. Notices will be deemed given as of the earlier of (i) the date of actual receipt when notice is given by personal delivery, (ii) three (3) days after mailing in the case of certified U.S. mail or (iii) the next business day when notice is sent via express courier. Any Formal Notice shall be addressed as follows:

**If to GB**
Legal Department
Gallagher Bassett Services, Inc.
2850 Golf Road
Rolling Meadows, IL 60008

With a copy to:
Carolyn Bailey
VP Administrative Operations
Gallagher Bassett Services, Inc., Technical Services Division
14361 Commerce Way, Suite 206, Miami Lakes, FL 33016

**If to Client:**

_____

_____

_____

_____

**19.     SURVIVAL**

Obligations arising before the expiration or termination of this Agreement, and all provisions of this Agreement allocating responsibility or liability between Client and GBTS, shall survive the completion of Services described herein and termination of this Agreement.

**20.     GOVERNING LAW**

Unless otherwise provided, the substantive law of the state in which the Services take place will govern the validity of this Agreement, its interpretation and performance, and remedies for contract breach or other claims related to this Agreement.

Any litigation between Client and GBTS arising out of or relating to the Services, this Agreement or the breach thereof, shall be conducted via a bench trial, WITH THE PARTIES EXPRESSLY WAIVING ANY RIGHT THEY MAY HAVE TO A JURY TRIAL.

**21.     ELECTRONIC SIGNATURES**

Each Party agrees that the electronic signatures of the parties, whether digital or encrypted, are intended to authenticate this writing and have the same force and effect as manual signatures. Electronic signature means any electronic symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including, without limitation, Adobe e-signature, DocuSign, E-sign, facsimile, or e-mail electronic signatures.

GALLAGHER BASSETT | TECHNICAL SERVICES

**22.    ENTIRE AGREEMENT**

This Agreement shall serve as a continuing service agreement which shall apply to all services and work rendered to Client that fall within the general scope of Services described herein. This Agreement and all exhibits, appendices, and attachments, as well as all terms and conditions incorporated by reference, constitute the entire Agreement between Client and GBTS, by which all prior understandings and negotiations are superseded and replaced. This Agreement and all exhibits, appendices, and attachments may be amended, supplemented, modified or canceled only by a duly executed written instrument by the Parties. Terms and conditions, on the Client's internet site or included with a Purchase Order or other such document issued by Client, shall be null and void and of no legal effect on GBTS unless agreed upon in writing by both Parties.

Notwithstanding anything to the contrary in the GBTS Terms and Conditions and Professional Rate Sheets, (a) the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), in which court the chapter 11 case of Genever Holdings LLC is pending [Case No. 22-50592]), shall have exclusive jurisdiction over any claim or dispute in respect of or arising out of this Agreement and (b) in no event shall GBTS be indemnified from any liability, loss, costs, or claim that is found by the Bankruptcy Court to be the result of GBTS's willful misconduct or gross negligence. All requests of GBTS for payment of indemnity pursuant to this Agreement will be made by means of an application with the Bankruptcy Court and served upon all parties in interest in Genever Holdings LLC's chapter 11 case. All parties' rights to object to any request of GBTS for payment of indemnity pursuant to this Agreement shall be preserved.

**<u>Exhibit 6</u>**

**Acheson Proposal**

# Acheson
# Doyle
# Partners Architects
ARCHITECTURE DESIGN PLANNING PRESERVATION

April 12, 2024

Genever Holdings LLC
c/o Luc A. Despins, as Chapter 11 Trustee for the Estate of Ho Wan Kwok
Paul Hastings LLP
200 Park Avenue, New York, NY 10166
Attn: G. Alexander Bongartz, Paul Hastings LLP (via email: _alexbongartz@paulhastings.com_)

**Re:** **Genever Holdings LLC Apt 1804 – Ceiling Removal Project**
**The Sherry-Netherland, Inc.**
**781 Fifth Avenue, New York, NY**
**ADP Project No. 52402.02**

Dear Mr. Despins:

Acheson Doyle Partners Architects, P.C. submits the following proposal for architectural consulting services regarding ceiling removal project at Apt. 1804 due to smoke infiltration. This agreement is submitted per April 10, 2024 walk-through at Apt. 1804 with Alex Bongartz.

When accepted, this proposal can be inserted into existing Apt. 1801 White Box AIA Owner/Architect Agreement as an Amendment to the Agreement.

**I.**     **Scope of Services:**

     A.     Prepare filing plans for ceiling removal as amendment to Apt. 1801 New York City Department of Buildings (DOB) and Landmarks Preservation Commission (LPC) applications; coordinate with filing consultant, Burnham Nationwide.

     B.     Assist in coordinating vendor proposals and respective scopes of work.

     C.     Provide Construction Administration Phase Services; including, review of vendor proposals, review of project schedule, review of vendor Payment Applications, attendance of job meetings, preparation of Meeting Minutes; preparation of punch list, review of close-out documents.

**II.**     **Compensation:**

| Scope A | Prepare Filing Plans | $ 5,000 | Lump sum per % completion |
|---------|---------------------|---------|---------------------------|
| Scope B | Coordinate Proposals | $ 2,000 | Lump sum per % completion |
| Scope C | Construction Admin. | $ 10,000/month | Hourly Billing |

Proposal Letter to Genever Holdings LLC
April 12, 2024
Page 2 of 7

**Hourly Rates**

| | |
|---|---|
| Principal | $400.00/hr. |
| Project Manager | $320.00/hr. |
| Senior Project Architect | $280.00/hr. |
| Project Architect | $200.00/hr. |
| Administrative | $120.00/hr. |

<u>Reimbursable Expenses</u> shall be billed in addition to fee and shall include in-house reprographics, blueprints, messenger service, overnight mail, transportation, photography, presentation materials, and shall be billed at 1.1 x cost.

The fees listed above are based on a reasonable estimate of services, based on the scope of work inferred from the preliminary review of existing data. If the project requires additional services due to scope changes by the Owner, field conditions, or other reasons, ADP shall submit a written estimate of additional services.

**III.    Consultants/Vendors:**

The following Consultants/Vendors shall be engaged directly by the Owner on an as-required basis; fees for these Consultants shall be in addition to architectural fee and shall be billed directly to the Owner by the Consultant:

A.    New York City Department of Buildings (DOB) Filing Representative/Code Consultant.

B.    Hazardous Materials Engineer (required for materials testing and ACP-5 Form for filing with DOB).

C.    Accredited Special Inspections agency for required DOB Chapter 19 inspections of selected materials, equipment, installation, fabrication, erection or placement of components and connections; these inspections confirm compliance with approved construction documents and referenced standards.

D.    Industrial Hygienist.

E.    Soot Removal Company.

F.    Professional Cleaning Company.

G.    Moving and Storage Company.

H.    ACM Abatement Company.

I.    Chandelier and Sconce Removal Company.

J.    General Contractor.

**IV.    Exclusions:**

A.    Owner-direct consultants and associated fees per Item III above.

Proposal Letter to Genever Holdings LLC
April 12, 2024
Page 3 of 7

**V.**    <u>**Terms & Conditions:**</u>

Refer to attached which is part of this Letter Agreement.

If you find this proposal acceptable, please sign on authorization line below and return a copy to our office for record purposes. A signed proposal must be received before any work may commence.

Please contact our office if you have any questions concerning this proposal. We look forward to working with you.

Very truly yours,

David C. Acheson, AIA
Principal

Authorization                                                    Date

as proxy holder
for Genever Holdings LLC

Proposal Letter to Genever Holdings LLC
April 12, 2024
Page 4 of 7

**V.**   <u>**Terms & Conditions**</u>

   **A.**   <u>**Form of Contract:**</u>

   The Architect will begin substantive work on the Project only after the Scope
   of Work is agreed by Owner and Architect.

   The Agreement is subject to approval of the United States Bankruptcy Court
   for the District of Connecticut (the "Bankruptcy Court"), in which court the
   chapter 11 case of the Owner is currently pending. For the avoidance of
   doubt, the "Owner" of the Apartment is Genever Holdings LLC.

   The following paragraphs of this Proposal outline some, but not all of the
   provisions for inclusion in the Agreement to be signed by the parties.

   **B.**   <u>**Period of Service:**</u>

   The fee schedules in Section II shall apply to an Agreement signed within
   ninety (90) days from the date of this Proposal.

   If the services covered by the Agreement have not been completed within
   one (1) year of the date of the Agreement, through no fault of the Architect,
   the Architect shall be compensated for all services rendered after that time
   on an hourly basis in accordance with the rates and multiples of Direct
   Personnel Expense and multiples or Reimbursable Expenses then generally
   quoted by Architect in respect of similar projects initiated at that time.

   Fee rates and multiples are subject to adjustment during the course of the
   Project in accordance with the Architect's normal salary review practices.

   **C.**   <u>**Additional Services:**</u>

   The Agreement will provide for appropriate adjustments in the
   compensation of the Architect and the Architect's consultants in the event of
   changes in the scope of the Project, changes requested by Owner that
   necessitate revision in completed drawings or specifications, and other
   circumstances outside the control of the Architect.

   **D.**   <u>**Payment Schedule:**</u>
   Payments are due within 30 days following receipt of invoices. If payment is
   not received within 30 days, the Architect reserves the right to stop work.
   Any invoice unpaid after 30 days shall be charged with interest at the rate of
   2.0% per month until paid in full.
   Notwithstanding the foregoing, payment shall be deemed timely if made in
   accordance with the terms of the Bankruptcy Court order approving the
   Owner's engagement of the Architect. For the avoidance of doubt, the

Proposal Letter to Genever Holdings LLC
April 12, 2024
Page 5 of 7

Owner will request, as part of its motion seeking to approve the engagement of the Architect, that Owner is authorized to pay invoices to the extent that no objections are raised to such invoice within 14 days after such invoices have been filed on the Bankruptcy Court's docket.

**E.    Hidden Conditions:**

Unless specifically provided in the Agreement, neither the Architect nor its consultants shall be required to perform or to have others perform destructive testing or to investigate concealed or unknown conditions.  In the event unanticipated or hidden conditions are uncovered, the Architect shall immediately notify the Owner of same.  Any additional design requirements or other change in services or additional services of the Architect or its consultant's attendant to such conditions shall entitle the Architect and is consultants to additional compensation.

**F.    Hazardous Materials:**

Notwithstanding any provisions in the Agreement to the contrary, the Architect and its consultants are not responsible for the discovery, presence, handling, removal, disposal, or performance of any other services relating to, or the escape of or exposure of persons to ,any hazardous or toxic materials or pollutants, including but not limited to asbestos, asbestos-related materials, PCBs, petroleum, hazardous waste, radioactive material, mold, and lead-based paint that may be at, on, or under the Project site ("Hazardous Materials").  The Owner hereby agrees to directly retain an expert or experts to arrange for the promptly identification and/or removal or treatment of any Hazardous Materials discovered during the course of the Project.  To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Architect and Architect's consultants and their principals, employees, agents and consultants from any claims, costs, damages, losses, demands, lawsuits, causes of action, injuries, or expenses (including attorney fees and other disputer resolution costs) caused by, arising out of or in any way related to the presence, discharge, release, or escape of Hazardous Materials.

**G.    Standard of Practice:**

Services performed by the Architect under the Agreement will be conducted in a reasonably skillful and prudent manner exercising that level of care and skill ordinarily exercised by members of the profession currently practicing in the same locality under similar conditions.  No other representations expressed or implied, and no warranty or guarantee is included or intended in the Agreement, or in any report, opinion, document, or otherwise.

**H.    Ownership of Documents:**

Proposal Letter to Genever Holdings LLC
April 12, 2024
Page 6 of 7

Drawings, specifications and reports prepared by the Architect are instruments of professional service to be used only by Owner for the Project, and not for any other purpose. If Owner permits Architect's drawings, specifications or reports to be used for any purpose, Owner agrees to indemnify and hold the Architect harmless against all damages, claims and losses, including defense costs arising out of any reuse without written authorization of the Architect, including reasonable attorney's fees.

**I.    Publication:**

The Architect shall have the right to photograph the Project covered by the Agreement and to use the photos in the promotion of its professional practice through advertising, public relations, brochures or other marketing materials. The Owner also agrees to cite the Architect in its publicity, job site signage, presentation, and public relations activities when mentioning this Project.

**J.    Relationship Between the Parties:**

It is understood that the Architect is an independent contractor and that is professional relationship with Owner shall terminate for this specific Project at such time as the Architect's final invoice is delivered to the Owner. This shall not be construed to limit any remedies or rights the Owner may have at law or in equity arising out of Architect's performance of services under the Agreement.

**K.    Insurance:**

The Architect shall maintain Worker's Compensation, General Liability, and Professional Liability Insurance through the period of the Agreement. Certificates of Insurance are available on request.

**L.    Claims:**

The Bankruptcy Court shall have exclusive jurisdiction to resolve any claim, dispute or other matter in questions between the parties arising out of or related to the Agreement, The execution of the Agreement by a party shall constitute consent of said party to the jurisdiction of the **Bankruptcy Court** and waiver of any objection to the venue of such action in the Bankruptcy Court.

**M.    Limitation of Liability:**

To the fullest extent permitted by law, neither the Architect, Architect's consultants, nor their principals, agents or employees shall be jointly, severally or individually liable to the Owner for an amount (including attorney's fees) in excess of the total fees paid to the Architect under the

Proposal Letter to Genever Holdings LLC
April 12, 2024
Page 7 of 7

Agreement by reason of any act or omission, including breach of contract or negligence not amounting to a willful or intentional wrong, regardless of the legal theory under which such liability is imposed.

**N.**    **Termination:**

The Agreement may be terminated by either party upon not less than seven (7) days' written notice should the other party materially breach the Agreement or fail substantially to perform in accordance with the terms of the Agreement through no fault of the party initiating the termination. The Owner's failure to pay the Architect any monies due pursuant to the Architect's invoices for more than 30 days after date of such invoice(s) shall be deemed a material breach of the Agreement. In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with reimbursable expenses then due.

**O.**    **Suspension:**

If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension.

**P.**    **Americans with Disabilities Act:**

The Architect shall use reasonable professional effort and judgments in interpreting and advising the Owner as to the necessary requirements for the Project to comply with the Americans with Disabilities Act (ADA). The Architect shall rely on the local building department for interpretations of the ADA at the time the service is rendered. The Architect does not warrant or guarantee that the Project will fully comply with interpretations of ADA requirements by regulatory or judicial bodies.

*X:\Vol1_T\Sherry\2024 Sherry\52402.00_SN 2024 Tenant Alt Reviews\52402.02_Genever Holdings LLC Apt 1804\01.0 Proj Mgmt\1.3 Proposal to Client\52402.02_2024.04.12_Proposal Genever Holdings LLC Apt 1804.docx*

226 West 26th Street, 5th Floor New York, NY 10001-6700   |   TEL 212.414.4500   |   EMAIL info@adparchitects.com
Acheson Doyle Partners Architects, P.C.   www.achesondoyle.com

## Exhibit 7

**Hillmann Proposal**



# HILLMANN
## CONSULTING

## CONTRACT AGREEMENT

| Date: April 24, 2024   Revised: April 24, 2024 | |
|---|---|
| This contract is by and between: | |
| Hillmann Consulting, LLC (hereinafter "Hillmann")<br>1600 Route 22 East - Suite 107<br>Union, NJ 07083                                              **and:**<br>Phone: (908) 688-7800 | Genever Holdings, LLC c/o Luc A. Despins, as Chapter 11<br>Trustee for the Estate of Ho Wan Kwok (hereinafter "Client")<br>Paul Hastings, LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn: Luc A Despins<br>Phone: (212) 318-6000<br>Email: lucdespins@paulhastings.com |

| Project<br>Name/Address: | 781 Fifth Avenue<br>18th Floor, Outside Source<br>New York, New York 10022 | Project Type: | Post Fire Clearance- Shareholder Finishes |
|---|---|---|---|
| Time of<br>Performance: | Hillmann anticipates the orderly and continuous progress of the Project through completion. The<br>completion of Hillmann's scope of work shall be performed in a reasonably expected period of time. | | |

Hillmann and Client wish to enter into an Agreement for Hillmann to provide the services described in Exhibit "A", Scope of Work, which is specifically made a part hereof, for the compensation set forth in Exhibit "B", Cost and in consideration of the mutual promises herein, Client and Hillmann agree as follows:

In consideration of these services, client shall compensate Hillmann as set forth in Cost Proposal attached as Exhibit "B" and specifically made a part hereof.

Hillmann and Client agree to be bound by the provisions of Hillmann's General Terms and Conditions attached as Exhibit "C" and specifically made a part hereof.

| Genever Holdings, LLC c/o Luc A. Despins, as Chapter<br>11 Trustee for the Estate of Ho Wan Kwok | Hillmann Consulting, LLC |
|---|---|
| Signature: *[signature]* | Signature: *[signature]* |
| Printed Name: __Luc A. Despins__ | Benjamin A Hildebrand<br>Senior Project Manager |
| Title: __Proxyholder for Genever Holdings LLC__ | Date: __April 24, 2024__ |
| Date: __April 24, 2024__ | |

In witness whereof, the parties hereto have duly executed and delivered this Agreement, as of the dates and year first written above.

# HILLMANN
## CONSULTING

Contract Agreement                                                     April 24, 2024

**ENVIRONMENTAL HEALTH & SAFETY / BUILDING SCIENCES + LAB ANALYSIS**

- Asbestos, Lead, & Mold - Investigation, Remediation Design, & Monitoring
- Indoor Air Quality (IAQ)
- Community Right-to-Know (RTK) & GHS Safety Data Sheet Compliance
- Risk Management & Loss Control
- Training / Occupational Safety
- Disaster / Emergency Services
- Industrial Hygiene
- Analytical Lab Testing for Asbestos, Mold, Total Coliform/E.Coli, Legionella, and Sewage Swabs

**DUE DILIGENCE & REMEDIATION MANAGEMENT**

- Phase I Environmental Site Assessment (ESA)
- Phase II Environmental Site Assessment (ESA)
- Environmental Assessment (HUD Part 50/58, CEQR/SEQR)
- Hazardous Materials Surveys
- Property Condition Assessment (PCA)
- Seismic Risk Assessment (PML)
- Groundwater Testing
- Soil Testing & Delineation
- Remediation Design & Management
- UST/AST Decommissioning & Compliance

**CONSTRUCTION RISK MANAGEMENT**

- Construction Loan Monitoring
- Plan & Cost Review (PCR)
- Site Observation Report (SOR)
- Freddie Mac / Fannie Mae Compliant Reporting
- Integrated Physical Needs Assessments (IPNA)
- Zoning Reports
- Construction Disbursement Reviews
- Cost to Complete Analysis

**CONSTRUCTION ADVISORY / DEVELOPMENT MANAGEMENT**

- Development Management
- Owner's Rep / Program Management
- Entitlement / Expediting Services
- Cost Consultancy
- Design Management
- Demolition Management

**CONSTRUCTION SITE SAFETY**

- Site Safety Management
- Construction Safety Audits
- Site Specific Safety Plans (SSSP)
- Health & Safety Plans (HASP)

**ENERGY SERVICES**

- Energy Consulting
- Energy Audits
- Commissioning (Cx) / Retro-Commissioning (RCx)
- Measurement and Verification Services
- Energy Management & Assessment Software

Discover Hillmann's diverse family of companies, united by innovation and driven by a commitment to excellence. Together, we are making a better future for all the communities we touch.







Contract Agreement

# HILLMANN
## CONSULTING

April 24, 2024

## EXHIBIT "A"
## SCOPE OF WORK:

**Post Fire Clearance Sampling:**

- Combustion By-Products Level 1 (PLM analysis + presumptive soot ID via Optical Microscopy)
- Combustion By-Products Level 2 (PLM analysis + TEM analysis w/ verification of soot)

**Scope of Work:**

Visual observations will be made throughout the remediated fire impacted spaces under the Shareholder's purview, including accessible portions of the wall cavities and ceiling cavities, as well as all spaces with shareholder installed finishes, to verify areas with remaining post-fire and smoke odors, or associated fire and smoke related physical damage and particulate deposition are addressed in accordance with Hillmann's previously issued cleaning protocol.

Inspections will be completed in a representative number of locations throughout the unit to ascertain if CBP remediation was effective. Surface samples for combustion by-Products (soot, char, and ash) will be collected from representative locations within the areas subject to investigation via tape lift, wipe, or micro-vacuum, and submitted to an accredited lab under chain of custody for analysis.

Combustion by product samples will be collected from various representative locations or surfaces as determined by the on-site professionals on a case-by-case basis. Once results are received and interpreted, a fully documented clearance letter will be issued outlining all findings and any additional recommendations.

# HILLMANN
## CONSULTING

Contract Agreement

April 24, 2024

## EXHIBIT "B"
## PROJECT COSTS

**Project Fees and Estimated Costs:** The following fees will apply to the work:

| Units | Rate | Qty. | Type | Cost |
|-------|------|------|------|------|
| A.  Sr. Industrial Hygienist | $1,320.00 | 1.00 | Shift | $1,320.00 |
| B.  IH Senior Project Management | $225.00 | 4.00 | Hourly | $900.00 |
| C.  IH Letter Report | $500.00 | 1.00 | Flat | $500.00 |
| D.  Combustion Byproduct PLM (3 day TAT) | $417.00 | 10.00 | Sample | $4,170.00 |
| E.  Combustion Byproduct PLM/TEM (3 day) | $999.00 | 4.00 | Sample | $3,996.00 |
| | | | NYC Sales Tax (8.875%)* | $966.13 |
| | | | **Estimated Cost for Services:** | **$11,852.13** |

**\*Please note sales tax will be charged unless tax exempt status and associated paperwork is provided**

**Assumptions and Clarifications:**
1. **The asbestos-containing materials (ACM) to be abated during this project were identified and quantified by others. Hillmann has not performed an asbestos survey for this space and did not develop the ACM abatement scope of work. Additional ACM may be present that is not included in the abatement scope of work.**
2. **All finishes associated with shareholder build out, are excluded from this survey as these spaces/materials are under the purview of building shareholders.**
3. **This proposal assumes a single shift for a Sr. Industrial Hygienist, working Monday through Friday between 8 AM and 5 PM to verify the efficacy of remediation from previously identified combustion by-product contamination**
4. **A separate proposal shall be issued, at the Client's request, to address additional air monitoring for any proposed asbestos abatement resulting from suspect material bulk sampling results. Hillmann requires the contractor abatement schedule to provide a valid estimate regarding the number of shifts and samples needed for the monitoring.**

The project fees and Estimated Cost for Services are based upon the information received and conditions known to Hillmann at the time of this writing. The cost estimate had been developed based on an anticipated project scope and duration typical for these types of projects.

PLEASE NOTE: Only costs for the actual number of units assessed/sampled will be invoiced. If fewer units are assessed, the total cost will be reduced accordingly. If additional units are required to be assessed to complete the project objectives, they will be invoiced in accordance with the above cost schedule, under the "rate" column. Each additional site visit for Post-fire or Asbestos survey work would include additional Sr. Industrial Hygienist time billed at the above listed hourly rate and approximately two (2) hours of respective project management time. Additional unforeseen costs may include, but are not necessarily limited to:

- Changes in the work schedule;
- Changes to the scope of work, including methods of abatement or size of work areas;
- Unanticipated meetings on or off site; and,
- The discovery of additional suspect ACM during the demolition/abatement.

Additional services, not specifically addressed in this proposal, including any requests related to Asbestos Containing Material (ACM) testing, will be performed in accordance with Hillmann's Standard Fee Schedule and will require client approval. If unforeseen costs exceed the rate(s) referenced above, Hillmann has the right to bill the client for the additional services rendered.

Please note that due to new NYS taxation laws, these services are taxable.  If your firm is tax-exempt, please forward the ST-119.1 form.  If this project is part of a Capital Improvement project, please forward the applicable ST-124 form. If these services are resale services, please forward the ST-120.1 Contractor Exempt Purchase Certificate for the project. Otherwise, Hillmann will be required to add the appropriate tax to the invoice.

# HILLMANN
## CONSULTING

Contract Agreement                                                April 24, 2024

## EXHIBIT "C"
## GENERAL TERMS AND CONDITIONS

**1. INDEMNIFIED AND ADDITIONAL INSURED PARTIES.** For purposes of this Agreement, the following individuals and/or entities shall be "Indemnified Parties" and the Indemnified Parties shall each be added to Hillmann's general liability, auto, pollution, and excess policies of insurance as addition insureds; The Client identified above and its Managing Agent, if any, any entity or individual required by contract to be indemnified by Hillmann in connection with work performed under this Contract , and _____

_____

**2. PAYMENT:** Unless the parties agree upon a billing schedule, monthly invoices will be submitted to Client and a final invoice will be submitted upon completion of the services. Invoices will include charges for hours worked and expenses incurred, or will be Lump Sum as agreed upon in the Project Cost Proposal. Each invoice is due on presentation and is considered past due thirty (30) days from the invoice date. Client agrees to notify Hillmann of any questions concerning an invoice or any reason for non-payment within the initial thirty-day period, and failure to provide notification shall be a waiver of such issues. Client agrees to pay a finance charge of the statutory interest rate for the state where the work is performed per month on past due accounts. Hillmann reserves the right to suspend or terminate work under this agreement if Client is delinquent in making payment when due. Client shall pay reasonable attorneys' fees or other reasonable costs incurred by Hillmann in collection of delinquent amounts.

**3. COST INCREASES, DELAY, NON-PERFORMANCE, SITE CONDITIONS:** If Hillmann's performance under this agreement extends beyond twelve (12) months, or if Hillmann is required to modify the Scope of Work at Client's request or to comply with regulatory changes, or in the event of changed conditions, Hillmann shall have the right to request a cost increase. Upon notice of a cost increase request, the parties shall confer and seek agreement. If the parties cannot reach an agreement, either party shall have the right to terminate this agreement.

Hillmann reserves the right to refuse to perform work or provide services if conditions exist that, in Hillmann's opinion, pose a risk of serious injury or a danger to life and/or health of workers. If an unsafe condition is identified, Hillmann will notify Client and suspend operations until the unsafe condition is corrected or abated. Hillmann reserves the right to modify the Scope of Work if, in its opinion, the stated Scope of Work poses a risk of serious injury or a danger to life and/or health of workers. Hillmann will notify Client for agreement prior to performing the modified scope of work.

Services under this agreement may be delayed by seasonal conditions and/or site conditions that prevent or inhibit performance, or if unanticipated hazardous materials or conditions are encountered. These delays and any delays caused by Client and/or its subcontractors, consultants, agents, officers, directors or employees, or delays caused by the permitting process or governmental/municipal employees, shall extend the contract completion date and Hillmann shall be paid for Services performed to the delay start date plus reasonable delay fees. Delay fees include, but are not limited to, personnel and equipment deferment and reschedule modifications; labor and material escalation; and extended overhead costs directly attributable to the delay. Delays within the scope of this section in excess of thirty (30) days shall render the agreement subject to renegotiation or termination, at the option of either party.

Hillmann shall not be responsible or liable for damages allegedly arising from non-performance or delays beyond the reasonable control of Hillmann including acts of God, actions of Federal, State and local governmental authorities and regulatory agencies, storms, floods, epidemics, war, riot, strikes, lockouts, pandemic or any inability to supply personnel, information or equipment to the project. In the event of any of the foregoing, Hillmann shall make reasonable efforts to resume operations as soon as reasonably possible.

If Hillmann encounters unexpected conditions that will materially impair Hillmann's ability to complete the Scope of Work or that would result in a material change relative to the price Proposal for the Scope of Work, Hillmann will notify the Client and may temporarily cease work and seek a modification of this Agreement pursuant to the following paragraph. Unexpected conditions include, but are not limited to: unexpected impediments to site access such as dense vegetation, clear-cut areas, stored materials and/or equipment, highly disturbed ground, site boundaries not clearly marked, inaccurate topographic base maps, lack of ground control, unanticipated contamination, an unknown or abandoned underground storage tank(s) or line(s) and associated equipment that demonstrate that they have caused a release of oil and/or hazardous material to the

environment and this release causes a substantial increase in the Scope of Work and costs, construction or reconfiguration of the Site (by forces or entities outside the control of Hillmann) to the extent that it interferes with the Scope of Work, promulgation of new, or a change in interpretation of existing, federal, state, or local law, or regulation, ordinance, or written policy, other limitations of access to the Site or adjacent properties, changes in access, significant changes in access agreements, access that requires the institution of administrative or legal action, or access that requires unreasonable or uncustomary monetary expenditures, or demands, claims, lawsuits, and the like that impact the progress of or require additional effort not accounted for in the Scope of Work (collectively "Unexpected Condition").

If an Unexpected Condition occurs, the parties shall then have the right to amend or modify this Agreement, including extending the time for performance or changing cost, provided, however, that if the parties cannot agree on such an amendment or modification within seven (7) days of such notification to the Client by Hillmann, either party may terminate this Agreement.

**4. CLIENT'S RESPONSIBILITIES:**  Client agrees to undertake the following:

(A)  Designate a representative having authority to give instructions, receive information, define Client's policies, make decisions and take action with respect to the Project.

(B)  Client will provide, or obtain from the appropriate party, site access for Hillmann, its subcontractors, and all personnel and equipment required to complete the services under this Agreement.  If Hillmann's Scope of Work requires destructive testing or destruction of any material to gain access to certain areas, Hillmann will take all necessary precautions to minimize damage to the property, but Hillmann shall not assume responsibility for restoration of damage that may occur during the normal course of project performance.

(C)  Provide all criteria and information as to Client's requirements for the Project, including design objectives and constraints, space, capacity and performance requirements, and any budgetary limitations.

(D)  Provide all available information, including previous reports and any other data in possession of Client relevant to the Project.  These data may include: (a) data prepared by others, including building surveys for hazardous materials, air quality testing, subsurface borings and/or testing of subsurface media, hydrographic surveys, and laboratory tests and inspections of samples, materials and equipment; (b) appropriate professional interpretations of such data; (c) environmental assessments and impact statements; (d) property, boundary, easement, right-of-way, topographic and utility surveys; (e) property descriptions, zoning, deed and other land use restrictions; and (f) other necessary special data or consultations.  Hillmann may rely on the accuracy and completeness of the supplied data.

(E)  Provide adequate lighting, access and information to allow for a meaningful evaluation, inspection and observation, where applicable.

(F)  Furnish approvals and permits from governmental authorities or other entities having jurisdiction over the Project and approval from others as may be necessary for the timely completion of the Project, unless the Client has directed Hillmann to prepare applicable submittals on the Client's behalf within the Hillmann's Scope of Work.

(G)  Give prompt written notice to Hillmann whenever Client observes or otherwise becomes aware of any development that affects the scope or timing of Hillmann's services.

**5. HILLMANN'S RESPONSIBILITIES:** Hillmann agrees to undertake the following:

(A) Hillmann shall perform the services described in the Scope of Work attached hereto as Exhibit A in the manner customary for competent and prudent professionals performing such services at the time and place where the services are provided.

(B) Hillmann shall provide all services as an independent contractor. Personnel performing Services will be Hillmann's employees or personnel that are subcontracted by Hillmann.

(C) With respect to Hillmann employees, Hillmann shall be responsible for: (i) the payment of compensation and the provision of any employee benefits; (ii) the payment of workers' compensation, disability benefits, and unemployment insurance; and, (iii) withholding and payment of all applicable Federal, State, and local income taxes and social security.

(D) Hillmann shall be responsible for training its employees and for the safety of Hillmann's employees and worksite conditions under Hillmann's direct control.

(E) Hillmann shall, at its sole expense, maintain in full force and effect during its performance under this Agreement the insurance coverages set forth below ("Required Coverages").  Hillmann shall cause the individuals and/or entities identified in Paragraph 1 hereof to be added as an additional insured under its General Liability, Auto, Pollution and Excess policies of insurance described below.  If requested, Hillmann shall provide to Client Certificates of Insurance and/or specific policy endorsements evidencing that the insurance policies described as follows are in effect.

HILLMANN
CONSULTING

Contract Agreement                                                                 April 24, 2024

Client must advise Hillmann prior to the execution of this Agreement if other entities should be added to Hillmann's General Liability, Auto, Pollution and Excess policies as additional insured(s).

**General Liability:** $1,000,000 per occurrence and $2,000,000 General Aggregate with Contractual Coverage, Products & Completed Operations. $2,000,000 aggregate applies per project.

**Automobile Liability:** Combined Single Limit of $1,000,000 per occurrence or primary/excess policies with this amount or greater in coverage. Limit of $1,000,000 for Owned, Non-Owned & Hired Auto Liability.

**Workers Compensation:** Statutory limits for the state in which the project is located and Employers Liability of $1,000,000 bodily injury by accident; $1,000,000 bodily injury by disease policy limit; and $1,000,000 bodily injury by disease each employee.

**Professional Liability and Pollution Liability:** $1,000,000 per claim / $2,000,000 aggregate. Professional claims made/contractors pollution occurrence/site pollution claims made.

**Excess Liability:** $15,000,000 per occurrence / $15,000,000 aggregate; excess over General Liability, Pollution Liability, Professional Liability, Auto Liability and Employers Liability.

Pollution deductible $15,000
Professional deductible $25,000
General Liability deductible        None

All insurance policies required to be carried by Hillmann shall; a) be provided at the sole cost and expense of Hillmann; b) be written on an occurrence, not a claims-made basis, with the exception of Professional Liability; c) be written by companies duly licensed to transact the prescribed coverages in each jurisdiction in which the work or any portion thereof is to be performed; d) be primary and non-contributory; e) cover Hillmann for both ongoing operations and completed operations; f) waive subrogation rights and; g) provide that the prescribed coverages may not be reduced, cancelled, or non-renewed without at least 30 days' prior written notice to the Owner, except in the case of a cancellation for non-payment of premium, in which case 10 days' prior written notice shall be sufficient.

Deviations from these contract provisions or our standard insurance may incur additional costs to the Client.

**6. DUTIES AND RESPONSIBILITIES NOT UNDERTAKEN:** The Parties agree that Hillmann shall not have the authority to perform and shall not perform the following duties or tasks:

(A) Direct the employees of construction manager, owner or contractors or any entity other than Hillmann, concerning the means and methods of their work, safety issues or any other matters.
(B) Enforce job site safety plan or plans. Hillmann will not be responsible for the health and safety practices performed by others on the Site.
(C) Exert control over the work site.
(D) Resolve disputes between contractors or direct their work.
(E) Stop or direct the work being performed by parties other than Hillmann at the project site.
(F) Enter into contracts on behalf of owner.
(G) Prepare accident reports or investigate accidents occurring on site unless involving Hillmann employees.

**7. AGENCY/REGULATORY FILINGS/COSTS:** Unless otherwise stated in the scope of work, any costs, charges or assessments imposed by any federal, state, local or municipal agency in connection with the filing or review of any reports or documents or charges assessed based upon the transportation, removal and/or disposal of any hazardous materials shall be paid by the Client and not by Hillmann.

If client receives written notice from a municipal or regulatory agency or entity stating that a report or communication has not been received or is late or defective in any manner, client shall forward a copy of the notice to Hillmann at 1600 Route 22 East, Union, N.J. 07083, within 2 days of receipt. Should client fail to provide a copy of the notice to Hillmann as required herein, Hillmann shall not be responsible for any fine, penalty or cost assessed against client, and client shall indemnify,

# HILLMANN
## CONSULTING

defend and hold Hillmann harmless from and against any fines, penalties or costs associated with the deficiency identified in the notice.

**8. RELIANCE:** No individual or entity other than Client shall be permitted to rely upon any data, interpretation, opinions, reports or other information or documentation produced by Hillmann under this agreement. Unless a party or entity obtains Hillmann's expressed written consent for reliance, any such reliance shall be at such party's or entity's sole risk. Hillmann may, in its sole discretion, withhold its consent to such reliance and/or Hillmann may condition consent for reliance upon payment of a fee or other conditions, but in any event, any individual or entity seeking the right to rely must agree to be bound by the provisions of this agreement relating to the limitation of Hillmann's liability hereunder.

Client assumes responsibility for business decisions that it makes utilizing information in the report provided by Hillmann. Hillmann shall not be responsible for any conclusions, interpretations and/or decisions of Client.

**9. LIMITATION OF LIABILITY:** No warranty, expressed or implied, is made or intended by our proposal for consulting services, by our furnishing oral or written reports, or by our observation of work. Client recognizes that actual conditions may vary from those encountered at the location where visual observations, measurements, borings, surveys or explorations are made by us or provided by others, and that our data, interpretations and recommendations are based solely on the information available. Hillmann will be responsible for such data, interpretations and recommendations, but shall not be responsible for the interpretation by others of the information developed. Client also recognizes that monitoring of construction by a qualified professional is essential to verify that designs are appropriate for actual site conditions.

Should Hillmann or any of our professional employees be found or alleged to have been negligent in the performance of professional services or to have made and breached any expressed or implied warranty or made any misrepresentation, or breached this agreement in any way, the Client agrees for itself and its successors and assigns that the maximum aggregate amount of Hillmann's liability to all parties and/or that of said professional employees, including, without limitation, any indemnity obligation or attorney's fees to enforce this, or any provision of this agreement, shall be limited to one million dollars ($1,000,000). Notwithstanding the number of claimants or the number of claims or basis or theories of liability, Hillmann's liability under this Agreement is capped at one million dollars ($1,000,000).

Neither party shall be liable to the other for any special, indirect or consequential damages, where caused or alleged to be caused by negligence, professional negligence, strict liability, statutory violation, breach of contract or warranty under this Agreement.

**10. UNDERGROUND STRUCTURES/CONDITIONS**: If subsurface explorations are performed, Hillmann will contact the appropriate government or private agency that informs applicable subsurface utilities. Client will provide Hillmann with all plans and other information in Client's possession or control concerning the Site's underground structures, and the Client will provide a representative that is familiar with the Site that will work with Hillmann to verify that all underground utilities are marked and to aid in locating the proper place(s) for drilling or excavation. If the Scope of Work includes services that are to be performed on property not owned by Client, including any adjacent or nonadjacent third-party property owners, Hillmann will request utility locations and other plans from the third-party property owner or other person(s) designated by the Client. The Client agrees to indemnify, defend and hold harmless Hillmann against any claim of damage or loss associated with the repair or restoration of any improvements that are incorrectly marked, not located on plans, or not identified in the information provided by the Client to Hillmann.

**11. HAZARDOUS MATERIALS, WASTES AND CONTAMINATED MEDIA:** Hillmann assumes no responsibility or liability for the existence of any hazardous or toxic waste, material, chemical, compound, substance or any other type of environmental hazard or pollution existing at the premises or for the release thereof, unless caused by the negligence of Hillmann. Client agrees to indemnify, defend and hold Hillmann harmless from and against any liability based upon the presence or release of hazardous materials pursuant to the Indemnification provision below.

Client agrees that title to all hazardous materials originating at or removed from Client's premises will remain in and with Client and that Client will not challenge said title by any means, including actions in state or federal court or any other forum. Hillmann shall not be considered an owner or generator of any hazardous materials at the site.

# HILLMANN
### CONSULTING

Contract Agreement                                                                April 24, 2024

Client further agrees that, if this Agreement requires the containerization, transportation, or disposal of any hazardous or toxic wastes, material or substances, Hillmann is not, and has no authority to act as a generator, arranger, transporter or disposer of any hazardous or toxic wastes, materials or substances that may be found or identified on, at or around Client's premises.

Unless otherwise indicated in the Scope of Work, costs associated with the testing, storage, transportation and/or disposal of any samples and associated media which could be considered hazardous under state or federal law or regulation have not been included in cost estimates provided to the Client. The Client, at the Client's expense, shall make arrangements for transport, treatment, storage and disposal. Client will indemnify, defend, and hold Hillmann harmless from any loss or damage resulting from any claim that arises, in whole or in part, as a result of the handling, storage, transportation, or disposal of any contaminated media by Hillmann while performing under this Agreement.

**12. PERMITS:**  Unless otherwise specified by the Scope of Work, Hillmann does not obtain permits on behalf of the Client but will assist the Client in obtaining permits at Client's sole cost and expense.

**13. REGULATORY COMPLIANCE**: Based upon the Scope of Work, Hillmann may present opinions with respect to the environmental conditions of the Site. The parties acknowledge and agree that the actual determination of compliance with federal or state regulations, for both the present operator and the former operators, can only be made by the appropriate regulatory agencies. Client acknowledges and agrees that it, or the owner, operator, occupant, or other responsible party under the local, state, or federal laws (hereinafter "Responsible Party"), may incur additional costs in order to be in compliance based on any regulatory agencies determination of compliance or interpretation of regulations, and that Client or the Responsible Party will be responsible for such additional costs. These costs may include, but are not limited to, annual compliance fees charged by a regulatory agency. Nothing in the Agreement shall be deemed to establish that the Client is a Responsible Party; such a designation is established by statute, regulations, or the governing regulatory agency.

In states where Hillmann employees may act as a licensed professional interpreting existing state regulations and guidelines as prescribed by the applicable state, Client acknowledges that Hillmann's licensed professionals may be bound by state law to meet regulatory requirements. Client further acknowledges that Hillmann's duty to comply with state law may in some instances conflict with the Client's interests; in which case, Hillmann will seek to comply with the law.

Hillmann's licensed professional opinions are not a guarantee of acceptance by the state regulatory agency. Each state may conduct audits of environmental decisions, which include deed restrictions as an institutional control to limit access to known contamination at a property. Client acknowledges that any costs that arise from Hillmann's actions to comply with the governing regulatory agency's requests during such an audit, including Hillmann's fees for time and materials used in preparing responses, unless the Scope of Work specifically states otherwise, shall be paid by Client. Client acknowledges and agrees that it will be responsible to reimburse Hillmann for any such costs, and that the Client will be solely responsible to seek any and all reimbursements from third parties at its own expense.

**14. CHEMICAL CONDITIONS**: If included in the Scope of Work, chemical analyses may be performed for certain parameters during this assessment. Client acknowledges that additional chemical constituents not searched for during the study may also be present in soil or groundwater at the Site. Chemical conditions reported by Hillmann reflect conditions only at the locations tested, at the time of testing, and within the limitations of the methods used and the Scope of Work. Such conditions can vary rapidly from area to area and from time to time; in particular, groundwater and vapor intrusion evaluations are subject to seasonal variations. The Client acknowledges and agrees that it will be responsible for the cost of Hillmann returning to the site and any subsequent testing or re-testing to satisfy regulatory requirements, unless expressly provided for in the Scope of Work.

**15. ASBESTOS INVESTIGATIONS OF ROOFING MATERIALS:** If the Scope of Work calls for an inspection of roofing materials for asbestos containing material, the following shall apply. In order to conduct an asbestos survey of roofing materials, core samples of the roofing material will be taken.  The owner shall be responsible to provide and pay a certified roofing contractor to repair any penetrations in the roofing system made during the survey.  Hillmann will not be responsible for any damage to the roofing systems and will not make repairs to damage caused during the sampling process.

**16. INDEMNIFICATION OBLIGATIONS:**

(A)    HAZARDOUS MATERIALS: To the fullest extent permitted by law, Client shall indemnify, defend and hold Hillmann, its officers, directors, employees, consultants and subcontractors harmless from and against all liabilities, obligations, claims,

# HILLMANN
## CONSULTING

Contract Agreement                                                                                     April 24, 2024

potential claims, alleged claims, demands, suits, losses, damages, judgments, penalties, fines, costs and expenses, including, without limitation, reasonable attorneys' fees, court costs and other defense expenses allegedly caused by the testing, storage, transportation and/or disposal, presence of, exposure to or release of hazardous material or contaminated media.

(1)   Such obligation to defend shall begin upon notice by Hillmann to Client of a claim, action, or proceeding.
(2)   Such obligation to defend shall include, without limitation, payment of Hillmann's reasonable costs incurred for labor and other expenses in responding to such claim or claims and the costs of enforcing the terms of this section.

(B)   NEW YORK STATE LABOR LAW - STATUTORY VIOLATION:   The parties agree that Hillmann is a consultant without authority or responsibility to direct or control the work.   Hillmann's role at the site and the nature and level of its presence at the site require that Hillmann not be subject to liability in the absence of its actual negligence.   Where a claim or potential claim for personal injuries or wrongful death is based upon an alleged violation of the New York State Labor Law, sections 200, 240 or 241(6) or any statute that imposes liability without proof of negligence, to the fullest extent permitted by law, Client shall indemnify, defend and hold Hillmann, its officers, directors, employees, consultants and subcontractors harmless from and against all liabilities, obligations, claims, potential claims, alleged claims, demands, suits, losses, damages, judgments, penalties, fines, costs and expenses, including, without limitation, reasonable attorneys' fees, court costs and other defense expenses resulting from, arising out of or occasioned by the alleged New York State Labor Law violation as aforesaid, whether or not there is also a claim of active negligence on Hillmann's part.

(1)   Such obligation to defend shall begin upon notice by Hillmann to Client of a claim, action, or proceeding.
(2)   Such obligation to defend shall include, without limitation, payment of Hillmann's reasonable costs incurred for labor and other expenses in responding to such claim or claims and the costs of enforcing the terms of this section.

(C)   UNDERGROUND STRUCTURES/CONDITIONS: If, in the absence of negligence on Hillmann's part, property damage, personal injury or wrongful death occurs as a result of an incident involving a subsurface risk, to the fullest extent permitted by law, Client shall indemnify, defend and hold Hillmann, its officers, directors, employees, consultants and subcontractors harmless from and against all liabilities, obligations, claims, potential claims, alleged claims, demands, suits, losses, damages, judgments, penalties, fines, costs and expenses, including, without limitation, reasonable attorneys' fees, court costs and other defense expenses allegedly caused by the subsurface incident.

(1)   Such obligation to defend shall begin upon notice by Hillmann to Client of a claim, action, or proceeding.
(2)   Such obligation to defend shall include, without limitation, payment of Hillmann's reasonable costs incurred for labor and other expenses in responding to such claim or claims and the costs of enforcing the terms of this section.

(D)   NEGLIGENCE OF HILLMANN:   To the fullest extent permitted by law, HILLMANN shall indemnify, defend and hold harmless the individuals and/or entities identified in Paragraph 1 hereof, their its officers, directors, employees from and against all liabilities, obligations, claims, potential claims, alleged claims, demands, suits, losses, damages, judgments, penalties, fines, costs and expenses, including, without limitation, reasonable attorneys' fees, court costs and other defense expenses allegedly caused by the negligence of Hillmann.

(1)   Such obligation to defend shall begin upon notice by Client to Hillmann of a claim, action, or proceeding.
(2)   Such obligation to defend shall include, without limitation, payment of Client's reasonable costs incurred for labor and other expenses in responding to such claim or claims.
(3)   The parties agree that the duty to defend any indemnified party hereunder for alleged professional negligence shall be limited to the amounts paid under Hillmann's General Liability policy of insurance, if any.

(E)   NEGLIGENCE OF CLIENT:   To the fullest extent permitted by law, Client shall indemnify, defend and hold Hillmann, its officers, directors, employees, consultants and subcontractors harmless from and against all liabilities, obligations, claims, potential claims, alleged claims, demands, suits, losses, damages, judgments, penalties, fines, costs and expenses, including, without limitation, reasonable attorneys' fees, court costs and other defense expenses allegedly caused by the negligence of Client.
(1)   Such obligation to defend shall begin upon notice by Hillmann to Client of a claim, action, or proceeding.
(2)   Such obligation to defend shall include, without limitation, payment of Hillmann's reasonable costs incurred for labor and other expenses in responding to such claim or claims and the costs of enforcing the terms of this section.

# HILLMANN
### CONSULTING

Contract Agreement                                                                                                April 24, 2024

---

Should any of the indemnity obligations of any party to this agreement be unenforceable in any jurisdiction regarding the duty to defend or the duty to indemnify, or both, it is the intent of the parties that the obligations be enforced to the extent permitted in the jurisdiction.

The indemnity obligations contained in this Paragraph 15 shall survive the termination of this Agreement.

**17. OWNERSHIP OF DOCUMENTS:** Any written materials and test results prepared for Client by Hillmann ("Deliverables") shall be the property of Client. Hillmann is hereby granted a lifetime unlimited license to utilize the Deliverables in accordance with the terms of this agreement. Hillmann shall maintain the Deliverables as Confidential Information and shall not disclose the Deliverables to any third party without Client's written consent. Notwithstanding the foregoing, Client shall not have the right to extend or expand the right to rely upon the facts, opinions, data or reports of Hillmann to third parties without the prior written consent of Hillmann, which consent may be conditioned upon additional payments to Hillmann.

Notwithstanding anything to the contrary in this Agreement, Hillmann retains the right to use its knowledge and experience, including processes, ideas, concepts, and techniques that it developed prior to, or independently from, this Agreement in providing services to other Clients.

All reports, drawings, boring logs, plans, specifications, field data, field notes, calculations, estimates and other documents prepared, including electronic media, as instruments of service, shall remain the property of Hillmann.

**18. LITIGATION SERVICES:** If Client requires Hillmann's services either as a witness in, or support of, litigation or other dispute resolution procedures between Client and a third party, Hillmann will provide such services in accordance with Hillmann's Standard Fee Schedule.

**19. NO PROMOTION:** If specifically requested, Hillmann agrees that it and its employees, agents and personnel will not, without prior written consent of Client in each instance, unless Client specifies in writing otherwise: (a) use in advertising, publicity or otherwise, the name of Client, or any affiliate of Client, or any partner or employee of Client or any trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned by Client or its affiliates; or (b) represent, directly or indirectly, that any product or any service provided by Hillmann has been approved or endorsed by Client.

**20. COOPERATION:** Hillmann and Client agree to cooperate fully with each other and to provide any assistance necessary in connection with any investigation of illegal or fraudulent activities, security breaches or similar situations which may involve Hillmann, Client or their employees.

**21. RESOLUTION OF DISPUTES:** All claims, disputes and other matters in controversy arising out of or in any way related to this agreement will be resolved through litigation. If a litigation arises from matters related to the services provided under this agreement, then the parties waive trial by jury and agree that any litigation shall be the subject of a bench trial by a single judge.

**22. NOTICES:** Any notice or communication required to be given by either party hereunder shall be in writing and shall be hand delivered or overnight delivery by a nationally recognized delivery service or sent certified mail, return receipt requested to the party receiving such communication at the address specified as follows:

If to Hillmann:                                                      If to Client:

                                                           _____

       1600 Route 22 East                              _____

       Union, New Jersey, 07083                      _____

       Attn:  Ryan Mosher                              Attn: _____

       Telephone: 908-688-7800                     Telephone: _____

       Facsimile:  908-686-2636                      Facsimile: _____

With email copy to: Rmosher@hillmann.com

---

HILLMANN
CONSULTING

Contract Agreement                                                                    April 24, 2024

**23. TERMINATION:** This agreement may be terminated by either party upon seven (7) days written notice. In the event of termination, Hillmann shall be paid for the services performed through the termination notice date plus reasonable termination expenses. Hillmann may terminate this agreement immediately in the event of non-payment.

**24. SUCCESSORS:** This Agreement is binding on the successors and assigns of Client and Hillmann. The Agreement may not be assigned in whole or in part to any third parties by either Party without the prior written consent of the other Party.

**25. ENTIRE AGREEMENT:** This Agreement, including any schedules, attachments and referenced documents, is the entire agreement between Client and Hillmann. Any prior or contemporaneous agreements, promises, negotiations or representations not expressly stated herein are of no force and effect. Any changes to this Agreement shall be in writing and shall make specific reference to this Agreement and must be signed by Client and Hillmann.

**26. WAIVERS AND SEVERABILITY:** A waiver or breach of any term, condition, or covenant by a party shall not constitute a waiver or breach of any other term, condition, or covenant. If any court of competent jurisdiction declares a provision of this Agreement invalid, illegal or otherwise unenforceable, the remaining provisions of the Agreement shall remain in full force and effect. However, Client and Hillmann will in good faith attempt to replace an invalid or unenforceable provision with one that is valid and enforceable and which comes as close as possible to expressing the intent of the original provision.

Notwithstanding completion or termination of this Agreement for any reason, all rights, duties and obligations of the parties to this Agreement shall survive such completion or termination and remain in full force and effect until fulfilled.

**27. GOVERNING LAW:** This Agreement shall be construed and enforced in accordance with the laws of the state where the work is performed without giving effect to the principles of conflicts of law.

**28. INTERPRETATION:** No provision of this Agreement shall be construed by any arbitrator, court, or other judicial or quasi-judicial authority against any party hereto by reason of such party being deemed to have drafted or structured such provision.

**29. AUTHORITY:** The person executing this Agreement on behalf of each party represents and warrants that such party has duly authorized this Agreement.

**30. BANKRUPTCY COURT**: Notwithstanding anything to the contrary in this Agreement, (a) the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), in which court the chapter 11 case of Client is pending [Case No. 22-50592]), shall have exclusive jurisdiction over any claim or dispute in respect of or arising out of this Agreement and (b) in no event shall Hillman be indemnified from any liability, loss, costs, or claim that is found by the Bankruptcy Court to be the result of Hillman's willful misconduct or gross negligence. All requests of Hillman for payment of indemnity pursuant to this Agreement will be made by means of an application with the Bankruptcy Court and served upon all parties in interest in Client's chapter 11 case. All parties' rights to object to any request of Hillmann for payment of indemnity pursuant to this Agreement shall be preserved.(END OF AGREEMENT)

## **Exhibit 8**

**Montvale Proposal**

ESTIMATED COST OF SERVICES FOR MOVING OR WAREHOUSING
NONBINDING

## MONTVALE MOVING SERVICES
4 ROBIN HOOD COURT
MONTVALE, NJ 07645
OFFICE# 201.391.3743  CELL# 201.788.8568

**IMPORTANT NOTICE:** The charges indicated herein are estimated charges only. All charges are subject to actual time plus travel or actual weight, whichever is applicable. The mover agrees to accept payment for services by the following method(s):

☒ Cash    ☒ Money Order    ☒ Certified Check    ☒ Credit Card    ☒ Other _personal check_

DATE OF ESTIMATE _4-10-24_    REQUESTED PACKING DATE _Apel/may_    REQUESTED MOVING DATE _Storage_    PHONE _212-318-6937_

CONSUMER _Genever Holdings LLC c/o Luc Designs_    TO _storage_

FROM _791  5Th  Ave_    APT. _18Th FP_    ADDRESS    APT.

CITY _New York_    STATE _NY_    CITY _Beach bvey_    STATE _NJ_

OTHER STOPS _Estate of Ho Wan Kwok_

### TIME BASIS

| | |
|---|---|
| FURNISH _1_ VAN AND _6_ MEN @ _320_ PER HOUR (ESTIMATED _12_ HOURS) | 3840.00 |
| TRAVEL TIME | |
| PACKING AND UNPACKING (SEE BELOW) _materials needed_ | 765.00 |
| LABOR CHARGES _____ MEN FOR _____ HOURS @ _____ PER MAN PER HOUR | |
| HOISTING OR LOWERING | |
| OTHER _Day 1 wrap + pack contents of Apt 1 Text 6 mon 320 (10)_ | 3200.00 |

TRANSIT INSURANCE $ _____ @ _____ PER HUNDRED DOLLARS

**ESTIMATED TOTAL CHARGES**

### WEIGHT BASIS

ESTIMATED WEIGHT _____ MILES _____ RATE PER 100 LBS. _____

ADDITIONAL TRANSPORTATION _____ _Fuel + Tolls_    250.00

EXTRA PICK UP OR DELIVERY AT _____

PACKING AND UNPACKING (SEE BELOW)

LABOR CHARGES _____ MEN FOR _____ HOURS @ _____ PER MAN PER HOUR

ELEVATOR OR STAIR CARRY CHARGES

OVERTIME LOADING OR UNLOADING

SPECIAL SERVICES

HOISTING OR LOWERING

OTHER

TRANSIT INSURANCE $ _____ @ _____ PER HUNDRED DOLLARS

**ESTIMATED TOTAL CHARGES**

### ESTIMATE STORAGE

DETERMINATION OF METHOD/COST 1) WEIGHT _____ 2) CUBIC FOOTAGE _____ 3) PALLET _____

ACCESS (PLATFORM) FEE

HANDLING IN FEE

HANDLING OUT FEE

ADDRESS OF STORAGE FACILITY

**ESTIMATED TOTAL CHARGES**    8055.00

### ESTIMATED COST OF PACKING AND UNPACKING SERVICES

| QTY. | PACKED BY | UNPACK BY | CU. FT. | RATE | EXTENSION |
|---|---|---|---|---|---|
| 15 | BARRELS - DISH PACKS _Frayles_ | | 5 | 10.50 | 157.50 |
| 4 | BOXES, WOODEN _unpainted newprint_ | | | 25.00 | 100.00 |
| 15 | CARTONS | | 1½ | 2.50 | 37.50 |
| 10 | CARTONS | | 3 | 3.50 | 35.00 |
| 10 | CARTONS | | 4½ | 400 | 40.00 |
| | CARTONS | | 6 | | |
| 10 | MIRROR CARTONS | | | 10.00 | 100.00 |
| | WARDROBES | | | | |
| 40 | MATTRESS CARTON _paper pads_ | | | 3.00 | 120.00 |
| 5 | CRATES _Shrinkwrap_ | | | 35.00 | 175.00 |

TOTAL ESTIMATED PACKING CHARGES   765.00

### SPECIAL INSTRUCTIONS

We will wrap Every item + shrinkwrap
AND will be Totally sealed. Select
pieces will be paperpadded + shrinkwrapped
Day 1 pack + prep. Day 2 move.
All movers are Highley Qual. Fied.
Dollies + CBins USED For elevator.

SIGNATURE OF SHIPPER _____ DATE _____

SIGNATURE AND TITLE OF ESTIMATOR _____

THIS ESTIMATED COST OF SERVICES IS TO BE SIGNED BY SHIPPER.

MILBURN PRINTING · 800-999-6690 · www.milburnprinting.com

SO #89126

## Exhibit 9

**CCC Proposal**



- Construction Clean-ups
- Building Maintenance
- Floor Waxing
- Carpet Cleaning
- Window Cleaning
- Flood Damage

**CLEANING**

**CONTRACTORS CORP**

- Laborer Service
- Power Washing
- Debris Removal
- Concrete/Marble/
- Terrazo Restoration
- Fire Restoration

**April 17, 2024**
**(Revised)**

**Genever Holdings LLC**

**Sherry Netherland**
New York, NY 10022

Attn: Alex Bongartz & Luc A. Despins

We propose to complete the specialty clean-up as per our walk-though and the scope of work provided for the above referenced project. The cleaning will include, but will not be limited to cleaning the following areas in their entirety, including leaving them as free as possible of all stickers, protection, labels, paint, stains, dust, dirt, compounds & other construction debris:

**Scope of work:**  Specialty Apartment Cleaning on a T&M Basis

1. Complete Wipe down of furniture- We will wipe down all furniture, including All House Good items and dusting of hard covering.

The cost to complete the above on a T&M Basis 2 Men up to 8 hours for 2 Days, including **NON-UNION** labor, equipment & supplies will be $1,900.00

**Additional Terms:** Sale tax not including in above price. Please provide a certificate of capital improvement to exclude sales tax. "This proposal is used as a template for most of our standard proposals and may inadvertently contain items not listed in your individual scope. These items were not used to determine the cost and therefore this proposal excludes credit for them if they are not completed" Final construction clean-up proposals are based on a construction site in a "final broom swept condition", including the removal of all large construction debris, & floor protection. Excludes re-cleaning of areas already cleaned due to continued construction. Excludes weekend &/or premium time. Items not listed in scope are expressly excluded. Terms: Net 30.

Sincerely,
*Jennifer Schimmel*
Owner
Julne Pagan-Operations Manager
JS/jp

April 24, 2024
_____   _____
Acceptance of Proposal        Date

Luc A. Despins      Proxyholder for Genever Holdings LLC
_____   _____
Print                             Title

43-14 54th Road, Maspeth, NY 11378 ● 718-784-7025 ● Fax 718-784-7028

## **Exhibit 10**

**Light Touch Proposal**

**THE LIGHT TOUCH**
60 Bridge Rd
Islandia, NY  11749 US
(516) 524-1518
thelighttouch.ny@gmail.com

| **ADDRESS** | **SHIP TO** |
|---|---|
| GENEVER HOLDINGS, LLC. | GENEVER HOLDINGS, LLC. |
| APARTMENT 1804 | APARTMENT 1804 |

**Estimate Q-042420**

**DATE** 04/19/2024

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | INSTALLATION | TIME TO REMOVE AND SAFELY CRATE LIGHTING FIXTURES | 10 | 250.00 | 2,500.00 |
| | INSTALLATION | TIME TO REINSTALL FIXTURES | 8 | 250.00 | 2,000.00 |
| | STORAGE | STORAGE FEE | 3 | 100.00 | 300.00 |

| TOTAL | **$4,800.00** |
|---|---|

Accepted By

*as proxy holder for Genever Holdings LLC*

Accepted Date  4/24/2024