1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF CONNECTICUT
2                        BRIDGEPORT DIVISION

3   IN RE:                        .  Chapter 11
                                  .  Case No. 22-50073 (JAM)
4   HO WAN KWOK, *et al.*,        .
                                  .  (Jointly Administered)
5          Debtors.              .
                                  .
6   . . . . . . . . . . . . . .  .
                                  .
7   GENEVER HOLDINGS LLC and      .  Adversary Proceeding
    LUC A. DESPINS, CHAPTER 11   .  No. 23-05002 (JAM)
8   TRUSTEE,                      .
                                  .
9          Plaintiff,            .
                                  .
10     v.                         .
                                  .
11  HO WAN KWOK, HING CHI NGOK,  .
    QIANG GUO, AND MEI GUO,      .
12                                .
           Defendants.           .
13  . . . . . . . . . . . . . .  .
                                  .
14  LUC A. DESPINS, *et al.*,     .  Adversary Proceeding
                                  .  No. 23-05017 (JAM)
15         Plaintiffs,           .
                                  .
16     v.                         .  Courtroom 123
                                  .  Brien McMahon Federal Building
17  TAURUS FUND, LLC, *et al.*,  .  915 Lafayette Boulevard
                                  .  Bridgeport, Connecticut 06604
18         Defendants.           .
                                  .  Tuesday, August 13, 2024
19  . . . . . . . . . . . . . .  .  1:12 p.m.

20
                          TRANSCRIPT OF HEARING
21            BEFORE THE HONORABLE JULIE A. MANNING
                   UNITED STATES BANKRUPTCY JUDGE
22

23

24

25                            (Continued)

1    APPEARANCES:

2    For the Chapter 11
     Trustee:                    Patrick Linsey, Esquire
3                                NEUBERT PEPE & MONTEITH, P.C.
                                 195 Church Street
4                                13th Floor
                                 New Haven, Connecticut 06510
5
                                 -and-
6
                                 Luc A. Despins, Esquire
7                                Shlomo Maza, Esquire
                                 PAUL HASTINGS, LLP
8                                200 Park Avenue
                                 New York, New York 10166
9
                                 Nicholas A. Bassett, Esquire
10                               2050 M Street, NW
                                 Washington, DC 20036
11

12   For the U.S. Trustee:       Holley L. Claiborn, Esquire
                                 OFFICE OF THE UNITED STATES TRUSTEE
13                               The Giaimo Federal Building
                                 150 Court Street, Room 302
14                               New Haven, Connecticut 06510

15

16

17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Electronically recorded

21   Transcription Company:     Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

```
 1   APPEARANCES (CONTINUED):

 2   For Pacific Alliance
     Asia Opportunity Fund:    Annecca H. Smith, Esquire
 3                             ROBINSON & COLE, LLP
                               280 Trumbull Street
 4                             Hartford, Connecticut 06103

 5                             -and-

 6                             Stuart M. Sarnoff, Esquire
                               O'MELVENY & MYERS, LLP
 7                             Times Square Tower
                               7 Times Square
 8                             New York, New York 10036

 9   For the Official
     Committee of
10   Unsecured Creditors:      Kristin B. Mayhew, Esquire
                               PULLMAN & COMLEY, LLC
11                             850 Main Street
                               8th Floor
12                             Bridgeport, Connecticut 06601

13   For G Club Operations,
     Weddle Law PLLC, FFP BVI
14   Limited, Ogier, and
     Pillsbury Winthrop Shaw
15   Pittman, LLP:             Jeffrey M. Sklarz, Esquire
                               GREEN & SKLARZ, LLC
16                             One Audubon Street
                               3rd Floor
17                             New Haven, Connecticut 06511

18   For Yankwitt, LLP;
     Ganfer Shore Leeds &
19   Zauderer, LLP; Brune
     Law, P.C.; and
20   Petrillo Klein +
     Boxer, LLP:               Anthony J. Proscia, Esquire
21                             KAUFMAN DOLOWICH, LLP
                               40 Exchange Place
22                             20th Floor
                               New York, New York 10005
23

24

25
```

1    APPEARANCES (CONTINUED):

2    For Meta
     Platforms, Inc.,
3    and Apple, Inc.:            Jin Yan, Esquire
                                 ARENTFOX SCHIFF, LLP
4                                1717 K Street NW
                                 Washington DC 20006
5
     For Hing Chi Ngok and
6    Greenwich Land, LLC         Austin D. Kim, Esquire
                                 MEISTER SEELIG & FEIN, LLP
7                                125 Park Avenue
                                 7th Floor
8                                New York, New York 10017

9    For Morvillo
     Abramowitz Grand
10   Iason & Anello, P.C:        Rowena A. Moffett, Esquire
                                 BRENNER, SALTZMAN & WALLMAN, LLP
11                               271 Whitney Avenue
                                 New Haven, Connecticut 06511

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

MOTIONS:                                                                                  PAGE

**In re:  Ho Wan Kwok, *et al.***
**Main Case no. 22-050073 (JAM)**

Matter
No. 1:      Motion to Extend Time to Extend Deadline to            14
            File Avoidance Actions (First Supplemental
            Motion) to 02/15/2025 (RE:  3329)

            Court's Ruling:                                        80

Matter
No. 2:      Amended Emergency Motion of Chapter 11                 81
            Trustee, Pursuant to Bankruptcy Code Section
            363(b), for Entry of Order Authorizing Trustee
            to Fund Maintenance of Mahwah Mansion and for
            Related Relief (RE: 3381)

            Court's Ruling:                                        86

**Genever Holdings LLC and Luc A. Despins,**
**Chapter 11 Trustee v Ho Wan Kwok, Hing Chi**
**Ngok, Qiang Guo, and Mei Guo**
**Adversary Case No. 23-05002 (JAM)**

Matter
No. 3:      Pretrial Conference Hearing                           89

            Court's Ruling:                                        90

**Luc A. Despins, *et al*. v Taurus Fund, LLC,**
***et al.***
**Adversary Case No. 23-05017 (JAM)**

Matter
No. 4:      Status Conference                                     90

            Court's Ruling:                                        94

1                                INDEX

2

WITNESSES CALLED
3   BY THE TRUSTEE:                                          PAGE

4        LUC A. DESPINS

5        Direct examination by Mr. Bassett                18

6        Cross-examination by Mr. Yan                     30

7        Cross-examination by Mr. Sklarz                  34

8

9   Transcriptionist's Certificate                        96

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 1:12 p.m.)

2               THE CLERK:  Case Number 22-50073, Ho Wan Kwok;

3     Adversary 23-50002, Genever Holdings, LLC, *et al.* v Kwok, *et*

4     *al.*, and Adversary 23-05017 Despins, *et al.*, v Taurus Fund

5     LLC*, et al.*

6               THE COURT:  Okay.  Good afternoon.

7               If we could have appearances for the record,

8     please, starting with the Chapter 11 Trustee.

9               Trustee Despins?

10        (No verbal response)

11              THE COURT:  Is he frozen?  Maybe.

12              THE CLERK:  No.

13              THE COURT:  Okay.  They can't hear me?

14              Apparently, they can't hear me.

15              THE CLERK:  Trustee Despins?

16        (No verbal response)

17              THE CLERK:  Oh, you know what?  I'm sorry, I'll

18    call him.  I'm sorry, Judge.

19              THE COURT:  So I think we have to start all over

20    again, because I don't think that was recording or anyone

21    could hear us.

22              THE CLERK:  Yes.

23              Case Number -- the United States Bankruptcy Court

24    for the District of Connecticut is now in session after

25    recess.  Judge -- the Honorable Julie Manning is presiding.

1          THE COURT:  Good afternoon, everyone.

2          There are matters on the calendar beginning at

3  1:00 p.m., so I ask the courtroom deputy to please call the

4  calendar.

5          THE CLERK:  Case Number 22-50073, Ho Wan Kwok;

6  Adversary 23-05002, Genever Holdings, LLC, *et al*. v Kwok, *et*

7  *al.*; and Adversary 23-05017, Despins, *et al*. v Taurus Fund,

8  LLC, *et al*.

9          THE COURT:  Good afternoon.  I'm going to take

10 appearances to the record.  We are on remote.  This was

11 supposed to be a remote hearing, which was not evidentiary.

12 Whether it will be or not, we will see, because I don't

13 conduct evidentiary hearings remotely.

14          But when everyone notes their appearance, I'd like

15 to make sure that whoever is noting their appearance, notes

16 whether they have actually filed a notice of appearance in

17 the case or in the adversary proceeding, because if you have

18 not done so, you will need to do so.  So, in any event, we

19 will start with the Chapter 11 Trustee.

20          MR. DESPINS:  Good afternoon, Your Honor.  Luc

21 Despins, Chapter 11 Trustee.

22          MR. BASSETT:  Good afternoon, Your Honor.  Nick

23 Bassett from Paul Hastings, on behalf of the Chapter 11

24 Trustee.

25          MR. MAZA:  Good afternoon, Shlomo Maza of Paul

1 │ Hastings, as well.

2 │       MR. LINSEY:  Good afternoon, Your Honor --

3 │       THE COURT:  I'm sorry, sir.  I couldn't hear what

4 │ you said.  Let's go back to the gentleman who just spoke,

5 │ please.

6 │       MR. MAZA:  Shlomo Maza with Paul Hastings for the

7 │ trustee, as well.

8 │       THE COURT:  Good afternoon.

9 │       MR. MAZA:  Sorry, Your Honor.

10 │       THE COURT:  Sorry, I could not hear you.  I

11 │ apologize.

12 │       MR. LINSEY:  Good afternoon, Your Honor.  Patrick

13 │ Linsey of Neubert Pepe & Monteith for the trustee, and

14 │ trustee's counsel do have appearances entered.

15 │       THE COURT:  Thank you.

16 │       MS. CLAIBORN:  Good afternoon.  Holley Claiborn

17 │ for the U.S. Trustee.

18 │       MR. SARNOFF:  Good afternoon, Your Honor.  Stuart

19 │ Sarnoff, O'Melveny & Myers, on behalf of creditor PAX in the

20 │ main case.  I'm not sure if I filed a notice of appearance in

21 │ the adversary proceeding that's under discussion today, but I

22 │ don't expect to be participating.

23 │       THE COURT:  Thank you.

24 │       I don't think you need a file a notice in the

25 │ adversary proceeding unless you choose to, but you do need to

1   have an appearance in the main case, which you already do and

2   have for some time, so thank you.

3           MR. SARNOFF:  Thank you.

4           MS. SMITH:  Good afternoon, Your Honor.  Annecca

5   Smith of Robinson & Cole, Connecticut counsel to creditor

6   PAX.

7           MS. MAYHEW:  Good afternoon, Your Honor.  Kristin

8   Mayhew, Pullman & Comley, on behalf of the Creditors

9   Committee.  I have an appearance in the main case, but I do

10  not believe we have an appearance in the adversary

11  proceeding.

12          MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

13  Sklarz of Green & Sklarz, for certain objecting parties.  I

14  have an appearance in the main case, as well as the

15  applicable adversaries where some of the objections were

16  filed.  Also online is my associate Michelle Antao.  I don't

17  recall if she has an appearance, and she won't be arguing.

18  But if she doesn't, we'll get an appearance for her in the

19  main case.

20          I'll also note that my client, one of my clients,

21  Justin Weddle of Weddle Law is also viewing proceedings; he

22  is a party to one of the adversaries, or his law firm is a

23  party to one of the adversaries.

24          THE COURT:  Okay.  Thank you.

25          There is no hearing in the adversary proceedings

1   today, though, just so the record is clear.

2            MR. SKLARZ:  Understood, Your Honor.

3            MR. YAN:  Good afternoon, Your Honor.  Jin Yan on

4   behalf of Meta Platforms, Inc. and Apple, Inc.  We do have

5   appearances on in the adversary cases.  I don't recall if we

6   have appearances in the main bankruptcy case.

7            THE COURT:  Okay.  Thank you.

8            MR. PROSCIA:  Good afternoon, Your Honor.  Anthony

9   Proscia from Kaufman Dolowich.  We represent four law firms

10  in the related adversary proceedings.  We will not be

11  speaking; we're just monitoring for the today.

12           THE COURT:  What related adversary proceeding are

13  you speaking of, Counsel?

14           MR. PROSCIA:  Sure.  It's the adversary

15  proceedings against Yankwitt, against Ganfer Shore, against

16  Brune Law, and against Petrillo Klein.

17           THE COURT:  You're going to have to spell every

18  one of those, Counsel.  Our record is only kept by audio and

19  if the person who, then, creates the transcript can't

20  understand -- and that's not your fault.  It's not your

21  fault; it's just the way it is -- you know, then there's a

22  lot of blanks in the transcript.  So I'm going to ask you, if

23  you would, please, spell all the names of the Defendants you

24  just named in adversary proceedings.

25           MR. PROSCIA:  Sure, Your Honor.

1          The first law firm is Yankwitt, which Y-a-n-k-w-i-

2   t-t.  The second law firm is Ganfer Shore, G-a-n-f-e-r S-h-o-

3   r-e.  The third law firm is Brune Law, B-r-u-n-e.  The fourth

4   one is Petrillo Klein, P-e-t-r-i-l-l-o K-l-e-i-n.

5          THE COURT:  Thank you.

6          MR. KIM:  Good afternoon, Your Honor.  Austin Kim

7   from Meister Seelig & Fein, and we have an appearance in

8   both, the main proceeding and adversary proceeding on behalf

9   of the Greenwich Land Defendants, that's Hing Chi Ngok and

10  Greenwich Land, LLC.

11         THE COURT:  Thank you.

12         MS. MOFFETT:  Your Honor, Rowena Moffett from

13  Brenner Saltzman & Wallman.  I represent another of the

14  adversary Defendants, a law firm called Morvillo Abramowitz

15  Grand Iason & Anello, spelled M-o-r-v-i-l-l-o A-b-r-a-m-o-w-

16  i-t-z G-r-a-n-d I-a-s-o-n & A-n-e-l-l-o, P.C.

17         THE COURT:  Thank you.

18         Have I taken everyone's appearance for the record,

19  then?

20      (No verbal response)

21         THE COURT:  Okay.  The first -- I'm not sure,

22  Trustee Despins, how you want to proceed, but I would just

23  note that the matters on the calendar today, the first two

24  matters, the first motion -- first supplemental motion to

25  extend deadline and the amended emergency motion authorizing

1   funding, were filed in the main case, as they should be,

2   because that's relief that's related to the estate as a

3   whole.  The two final matters on the calendar are really with

4   regard to a pretrial conference in a specific adversary

5   proceeding, 23-05002, and then a request for a status

6   conference in another adversary proceeding, 23-05017.

7   Trustee Despins, I do not know how you intend to proceeding,

8   but I will hear from you with regard to your intentions.

9         MR. DESPINS:  Yes, and first, a clarification.  I

10  thought we also had a motion in with Mahwah adversary

11  proceeding to authorize us to spend money to maintain, maybe

12  even you covered that, but there's a hearing on that today, I

13  believe to authorize us to spend money to pay taxes and

14  security services and all of that, I believe.  That should be

15  on the agenda for today.

16        THE COURT:  You may be correct about that.  I'll

17  take a look at that.

18        MR. DESPINS:  Okay.

19        THE COURT:  I see what you're saying.  You filed

20  an emergency motion that we -- yes, I understand what you're

21  saying.  Okay.  I'll take a look while you're speaking.

22        MR. DESPINS:  But, in any event, Your Honor, I

23  think that given the number of people on the phone that are

24  here for the, what I refer to as the August 15th extension

25  motion, it probably makes sense to cover that first so that

1   the people are free to stay on for the rest, but at least

2   they don't have to; otherwise, they'll have to stay on for

3   everything and there'll be nothing productive and

4   (indiscernible).  So, I would recommend starting with the

5   August 15th extension motion.

6          THE COURT:  Go right ahead, which is just for the

7   record, ECF 3329.

8          MR. DESPINS:  Mr. Bassett is handling that motion,

9   Your Honor.

10          THE COURT:  Mr. Bassett, you're on -- there you

11   go -- you were on mute, but please proceed.

12          MR. BASSETT:  My apologies.

13          Good afternoon, Your Honor.  Again, for the

14   record, it's Nick Bassett from Paul Hastings on behalf of the

15   Chapter 11 Trustee.

16          To address Your Honor's question at the outset, we

17   did intend, obviously, with the Court's permission, to have a

18   very limited evidentiary presentation today and it is

19   certainly our apologies for assuming we would be able to do

20   that via Zoom.  I think the reason we had proceeded in that

21   manner is because at the hearing on this motion that occurred

22   in February, it was done remotely and we did have the trustee

23   provide some testimony.

24          I realize now in thinking back on that particular

25   hearing, that I think we did that one remotely due to

1  unanticipated weather issues.  So maybe there was an

2  exception made to the Court's general policy in that

3  instance.

4         Be that as it may, Your Honor, again, obviously,

5  we're at the Court's mercy, but subject to your permission,

6  we did intend to have the trustee present limited testimony.

7  I think most of the record that we would rely on in support

8  of the motion is the record indicates, which we would ask the

9  Court to take judicial notice, so I don't think the

10 evidentiary presentation would be long, but that was our

11 intention, Your Honor.

12        THE COURT:  Well, the only reason I raise the

13 issue is because there's going -- if Trustee Despins

14 testifies, then there's going to be five different lawyers

15 that are going to cross-examine him, is that what we're going

16 to do, because there's a number of objections filed to this

17 motion, so I would assume all those lawyers are going to want

18 to cross-examine him.

19        MR. BASSETT:  I can't speak for him, Your Honor.

20        I would note that I think each of those parties,

21 or at least some of those parties, reserved the right

22 expressly in their objections to cross-examine the trustee to

23 the extent he testified.  I don't know if they intend to or

24 not.  As I said, the testimony will be limited.  I would

25 expect 10 or so minutes, which I would hope you would cabin

1  and eliminate the scope of their cross, but, again, I can't

2  speak for the opposing parties' counsel.

3              THE COURT:  I understand you can't speak for them;

4  I'm not suggesting you should.

5              But I'm saying I am virtually certain that they're

6  going to want to cross-examine him, so then we're going to

7  have direct examination and cross-examination remotely and

8  the courtroom deputy has to then swear the parties in

9  remotely.  The courtroom deputy is not on a camera.  You

10 know, there are issues with that; that's why I don't do that

11 unless it's determined in advance and there's a reason for

12 it.  Because, as you know, the Federal Rules of Evidence

13 still require in-court hearings for testimony.

14             In any event, if that's how we're going to

15 proceed, we'll see how we do, but I do think that, you know,

16 it is necessary to understand that there's no reason why if

17 testimony and exhibits are going to be introduced, why

18 parties can't be here in the courtroom or work out an

19 arrangement in advance so the Court is aware of what's

20 happening.  And that's what I would say with regard to that.

21             MR. BASSETT:  Understood, Your Honor.  I will take

22 the blame for not having dealt with this appropriately in

23 advance.

24             THE COURT:  All right.  Well, let's see how things

25 proceed, so go right ahead.

1          Are you calling Trustee Despins as a witness right

2   now?

3          MR. BASSETT:  So, Your Honor, we would.  I think

4   the ladies of the jury Calloway to proceed would be for us to

5   complete our limited evidentiary presentation, which really

6   will only consist of the trustee testifying and the Court

7   can, obviously, take notice of other filings in the record,

8   which we refer to in our papers and they refer to, again, in

9   argument, but it's really just the trustee taking the stand,

10  which I think would be the appropriate way to proceed right

11  now.

12         THE COURT:  Okay.  Given what I've stated for the

13  record, the courtroom deputy does not have a camera, so I am

14  going to have to say for the record that I am sitting next to

15  the courtroom deputy.  I can see her.  She is going to swear

16  in the witness, Trustee Despins, and then we will have to go

17  from there, okay.

18         So I'm going to ask -- Trustee Despins, are ready

19  to be sworn in?

20         MR. DESPINS:  Yes, Your Honor.

21         THE COURT:  Okay.  So as if we can pretend we're

22  in the courtroom and, Attorney Bassett just called you to the

23  witness stand.  So, now, we need to turn this over to the

24  courtroom deputy, whose duty it is to swear in the witness.

25         THE CLERK:  Thank you.

```
1              Attorney Despins, please raise your right hand.

2              THE COURT:  We can't see your right hand, Trustee

3    Despins.  We need to see it.

4              MR. DESPINS:  Sorry, Your Honor.

5              THE COURT:  The other way.

6              MR. DESPINS:  Yes.

7              THE CLERK:  Okay.

8              MR. DESPINS:  Hold on a second.  I don't know why

9    that's not -- okay.  That's my right hand.

10             THE COURT:  Okay.

11             MR. DESPINS:  Yes.

12             THE CLERK:  Okay.

13             LUC A. DESPINS, TRUSTEE'S WITNESS, SWORN

14             THE WITNESS:  I do.

15             THE CLERK:  State your name and address for the

16   record, your business address, of course.

17             THE WITNESS:  Luc Despins, 200 Park Avenue, New

18   York, New York 10166.

19             THE COURT:  Okay.  Mr. Bassett, you may proceed.

20             MR. BASSETT:  Thank you, Your Honor.

21                       DIRECT EXAMINATION

22   BY MR. BASSETT:

23   Q    Trustee Despins, you understand we are here today on

24   the trustee's motion to extend avoidance action deadlines; is

25   that right?
```

1  A     I do.

2  Q     Now, this is the second motion, such motion you have

3  filed in this case; is that right?

4  A     That's correct.

5  Q     Now, do you recall, Trustee Despins, testifying at the

6  hearing on the first motion, which I believe was on

7  February 13th of this year?

8  A     Yes, I do.

9  Q     And have you reviewed that testimony, again, in

10  anticipation of your testimony today?

11  A     Yes, I have.

12  Q     Was that testimony that you gave them, Trustee Despins,

13  true and accurate to the best of your recollection?

14  A     It was.

15  Q     Okay.  So what I'd like to do today is just briefly ask

16  some questions about events that have happened and transpired

17  since you last testified in February of 2024.

18        Now, Trustee Despins, can you just generally describe

19  what you have been doing in your investigation in this

20  Chapter 11 case since we've last had that hearing in February

21  of this year?

22  A     A number of things.  First, continuing to review

23  documents we have received, analyzing them, bank account

24  statements, et cetera, with the help of Kroll.  Then, we also

25  sought what we call "follow-up 2004 discovery" for a limited

1  number of parties to advance our investigation.

2  Q    Okay.  When you say Rule 2004 discovery, how many

3  additional Rule 2004 motions that you recall, have you filed

4  since the hearing in February?

5  A    Four.

6  Q    And do you know how many additional parties, or

7  discovery targets, if you will, that those motions covered?

8  A    47.

9  Q    And do you have a general sense of approximately how

10  many documents were obtained through those Rule 2004 motions

11  from those parties?

12  A    Just from those parties with the new 2004, around 700

13  documents.

14  Q    Okay.  Now, in addition to the 2004 discovery that you

15  just described, have you and your team obtained additional

16  documents by other means or from other sources?

17  A    Yes.  The first source is pursuing the existing 2004,

18  the ones that were existing before (indiscernible) to obtain

19  more information from the targets of that investigation.

20      Nobody ever produces all of their documents on the

21  first go-around, so we have to pursue this case.  It was

22  mostly Mr. Linsey's firm that did this.  So that was one

23  source of a very voluminous source of documents that we

24  received.

25      In addition to that, we obtained access to documents

1   that were in a warehouse in Jersey and, also, they were

2   iPhones and the like, computers, in that facility that we

3   obtained and we analyzed.  So that's, generally, the

4   additional work that was done in terms of obtaining

5   documents.

6   Q     And do you have a ballpark sense of the volume of

7   documents that we're talking about when you pull together

8   these additional sources with the 2004 discovery that you

9   described?

10  A     Well, putting aside the 700 documents that exist for

11  the new -- for 2004, there would be in excess of 20,000

12  documents from the sources I've described, which is the

13  previous, the initially previously granted 2004, the New

14  Jersey warehouse, and the computers, and the iPhones that we

15  found in that facility.

16  Q     Now, what is your team, if anything, doing with this

17  documents as you receive them?

18  A     Well, not to go into a lot of details, but, basically,

19  we have a software program that allows us to search by name,

20  so they're downloaded to that so everyone can actually search

21  a specific term.  Then, they're also given, that access is

22  given to the Kroll team so they can also look at that, and

23  that gives them a lead as to new bank accounts and the like.

24        So there's a whole process that goes on, that's still

25  ongoing, as to those documents.

1  Q    So you mentioned Kroll and their bank account analysis,

2  which was a topic that came up at the hearing in February.

3      Can you talk more about the additional work, any

4  additional discoveries that the Kroll team has made, with

5  respect to bank accounts since February?

6  A    Yeah, as I described when I testified, you know, these

7  bank accounts, they're really almost the only key documents

8  we have, or at least documents that we're sure of their

9  authenticity because they come from banks.  And every time

10  you look at a bank account, there's dozens, if not hundreds

11  of transfers that lead you to other bank accounts, and that's

12  what Kroll does.

13      So what they did is that through this additional

14  discovery that Mr. Linsey's firm produced, we're able to --

15  they were able to identify 200 additional bank accounts that

16  they started analyzing and are still analyzing at this stage.

17  Q    And do you have a ballpark sense at all as to how many

18  transfers within those accounts have been analyzed?

19  A    Not precisely.  It's thousands and thousands, but I

20  would hesitate to give a precise number.

21  Q    And how long does it take Kroll to go through this sort

22  of exercise?

23      MR. SKLARZ:  Objection; hearsay.

24      He's asking what somebody else is not in court is

25  doing.

 1              MR. BASSETT:  Your Honor, the trustee --

 2              THE COURT:  So, hold on a second.

 3              Attorney Sklarz, I didn't hear you, so you're

 4  going to have to do that again.

 5              MR. SKLARZ:  I'm sorry.

 6              THE COURT:  That's not your fault.

 7              MR. SKLARZ:  Objection.

 8              THE COURT:  That's not your fault.  I'm just

 9  saying that's one of the downsides to remote, right.  I can't

10  hear you when you start to talk, so I'm going to ask you to

11  do that again, please.

12              MR. SKLARZ:  Fair enough, Your Honor.

13              My objection is on account of hearsay.  The

14  trustee is testifying about what Kroll, who is a party not in

15  court today, is doing, so it's hearsay.

16              THE COURT:  Do you have a responses, Attorney

17  Bassett?

18              MR. BASSETT:  Your Honor -- yes, Your Honor.

19              I don't understand how the question calls for

20  hearsay.  The trustee has retained Kroll as his advisor in

21  this case; he's testified about that at length, including at

22  the last hearing.  The trustee, obviously, has firsthand

23  knowledge of how long it has taken Kroll, at his direction,

24  to perform certain tasks.

25              MR. SKLARZ:  That is classic hearsay.  Kroll isn't

1  here.

2          THE COURT:  I'm going to overrule the objection,

3  but give the testimony whatever weight I think is

4  appropriate.

5          So please continue.

6  BY MR. BASSETT:

7  Q    So approximately how long, Trustee Despins, does it

8  take Kroll to perform the type of bank account analysis that

9  you just described?

10 A    It's impossible to give a precise, you know, number of

11 days answer to that because it depends on how many transfers

12 are in the accounts.  But as to those 200, there are still --

13 that analysis is still ongoing, because as I said, every

14 account opens the door to another account and that analysis

15 is still ongoing.  It's not the same degree that it was going

16 on, let's say, in January or February, but it's still

17 ongoing, as we speak.

18 Q    Now, Trustee Despins, you're aware that the debtors'

19 criminal trial has taken place in the United States District

20 Court for the Southern District of New York, correct?

21 A    Correct, yes.

22 Q    And do you recall, approximately, when that trial

23 started?

24 A    In late May; May 22nd, something along those lines.

25 Q    And, approximately, when it concluded?

1    A        In mid-July; July 16th or 17th.

2    Q        And did your team monitor that trial as it was

3    transpiring?

4    A        Yes, we did, either through attendance when there were

5    key witnesses that could be key to our case and we wanted to

6    gauge their credibility as a witness or by reading

7    transcripts when they were routine witnesses like FBI

8    testimony where, like, we didn't need to be there for that.

9    Q        And so how, if at all, was the criminal trial relevant

10   to your investigation in this case?

11   A        Incredibly relevant.  As I said, testified before, the

12   government has better tools than we do.  They have all sorts

13   of ways of getting information.

14        And what could be learned through that trial,

15   basically, is it just opened up a whole new dimension as to a

16   number of the things that we've been analyzing.

17   Q        And do you know, Trustee Despins, approximately how

18   many witnesses there were in the criminal trial altogether?

19   A        The government had over 30 and the Defendant has

20   something like 8 or 10.  Not more than 10.

21   Q        And do you have a ballpark sense for how many exhibits

22   were introduced into evidence during the criminal trial?

23   A        There's thousands.  My memory was 2900 and something,

24   so thousands of exhibits.

25   Q        And do you have access to those exhibits?

1  A      No.

2        Before trial begins, in theory, when the government

3  uses an exhibit, it's supposed to post them promptly, but as

4  of today, there's still hundreds of exhibits that have not

5  been downloaded so that we can have access to them.  So we

6  did not have access to them before -- most of them.  Some of

7  them we did, but most of them, we did not have access.  Since

8  they were posted, we've had access, but that's not the

9  complete list.  There's hundreds of exhibits that, for some

10  reason, have not been posted yet.  Of course, we've been

11  following up with the government to make sure they do post

12  them promptly.

13  Q      And what is your team doing with the exhibits from the

14  criminal trial, if they are able to access them?

15  A      Same routine as putting this on our software database,

16  giving it to Kroll, because there are references to bank

17  accounts.  There's actually analysis of bank transfers in

18  government exhibits.  So we're feeding all of that to them so

19  they can update their analysis.

20  Q      Now, Trustee Despins, are you aware that this Court

21  entered an order staying certain litigation and certain

22  litigation activities, including depositions, during the

23  pendency of the criminal trial?

24  A      Yes, I am.

25  Q      How, if at all, did that stay impact your investigation

1   progress over the last few months?

2   A     Well, there was an absolute prohibition on depositions

3   during that time period, so -- obviously, there are a number

4   of witnesses that we were about to depose that, in fact, were

5   potentially going to be testifying at the criminal trial and,

6   therefore, we could not depose until, you know, last week or

7   something like that.  So, clearly, it had a major impact on

8   our ability to depose the key witnesses.

9   Q     Now, that stay was granted, pursuant to a motion that

10  you filed; is that right?

11  A     That's correct.

12  Q     Why did you file that motion?

13  A     Two reasons.  The first one is that the debtor was

14  filing a renewed motion before the criminal court to stay the

15  entire bankruptcy case, so, obviously, we did not want that

16  to happen; that would have been a disaster and, therefore,

17  that was part of the reason.  But the other part of the

18  reason is that the witnesses that we were scheduling for

19  depositions were saying, Hey, I'm going to be a witness or,

20  I'm talking with the Government, and I will complain to them

21  that you're trying to depose us.  And, of course, the impact

22  of that would have -- could have been that the government

23  would have said, Well, actually, we think the bankruptcy case

24  should be stayed completely.

25       And that's why we filed this motion, which was kind of

1  (indiscernible), in attempt that we were still able to get

2  documents, but no depositions, so that we would not interfere

3  with the criminal trial or the witnesses that could or have

4  appeared at the criminal trial.

5  Q    Now, since February 15th of 2024, have you filed any

6  additional avoidance actions?

7  A    Yes.

8  Q    Approximately how many?

9  A    We filed four, but we're about to file, or we're in the

10  process -- they're just appearing on the docket today -- of

11  filing an additional 30 or so.

12  Q    And how are you deciding when to file these complaints?

13  A    As soon as we're ready to file them, in the sense that

14  we have enough information to file them and we've verified

15  all the information to the best of our ability.  We're not

16  holding anything back.  We're filing all the ones that we can

17  right now and that's how we have decided, if we have enough

18  information.  That process is led mostly by Mr. Linsey's

19  firm, but, you know, I'm involved with reviewing the

20  complaints.  But, basically, we file them when we have enough

21  information to go ahead.

22  Q    Trustee Despins, you testified in February about some

23  of the obstruction that had occurred at the hands of the

24  debtor and others in this case, do you recall that testimony?

25  A    Yes.

1  Q     Now, that obstruction that you talked about then, has

2  that continued to affect your investigation in your view?

3  A     Sure, because as I said, the only reliable source we

4  have are bank accounts, but that doesn't show you the full

5  picture; it just shows you transfers.  We have no books and

6  records.

7       You know, the debtor testified many times he didn't

8  have an iPhone.  And now, of course, we know he had an

9  iPhone, because that came out in the criminal trial; he had

10 many iPhones, but with data.  And, obviously, the inability

11 to have books and records to tie all of this makes this case,

12 I would say, unprecedented in terms of the amount of work

13 that needs to be done to tie everything together.

14            MR. BASSETT:  No further questions, Your Honor.

15            THE COURT:  Okay.  Thank you.

16 Does anyone wish to cross-examine Trustee Despins?

17            MR. YAN:  Your Honor, I have just a few questions

18 for Trustee Despins.

19            THE COURT:  Okay.  Would you just -- I can see

20 you, but would you please state your name for the record,

21 again, and who you represent, because, again, as I said at

22 the beginning of the hearing, we only have audio for our

23 transcripts, so it would be helpful to make the record as

24 clear as possible.  Thank you.

25            MR. YAN:  Sure.  My name is Jin Yan, J-i-n, last

 1 | name, Y-a-n.  I represent Apple, Inc. and Meta Platforms,
 2 | Inc.
 3 | CROSS-EXAMINATION
 4 | BY MR. YAN:
 5 | Q     Trustee Despins --
 6 |          THE COURT:  Go right ahead.
 7 |          I'm sorry, I didn't mean --
 8 |          MR. YAN:  Thank you, Your Honor.
 9 |          THE COURT:  -- to speak over you.  I apologize.
10 |          But you may proceed.
11 |          MR. YAN:  Thank you, Your Honor.
12 | BY MR. YAN:
13 | Q     Trustee Despins, you testified earlier that you issued
14 | four new 2004 (indiscernible) targeting 47 parties.
15 |       Did I state that correctly?
16 | A     That's correct.
17 | Q     Was Apple one of those targets?
18 | A     I don't recall.
19 | Q     Do you recall if Meta was one of those targets?
20 | A     I don't recall.
21 | Q     What actions have you taken, specifically, to
22 | investigate additional avoidance claims against Apple or
23 | Meta?
24 | A     There's -- they're part of, meaning that we searched,
25 | generally, for all transfers through these bank accounts that

1  we keep getting these 200 additional bank accounts, so if

2  Meta or Apple appears in there, we're going to pursue that.

3  So that's part of the analysis.

4      But we don't go -- our analysis is not Defendants-

5  targeted, in the sense that we are looking for transfers,

6  because we have this running clock that we're trying to

7  comply with and, therefore, we're looking at all transfers.

8      And if it happens that Meta or Apple is on that list,

9  then we will chase that.

10  Q    Trustee Despins, you're aware that you've already sued

11  Apple, correct?

12  A    Correct.

13  Q    And you're also aware that you've already sued Meta,

14  right?

15  A    Correct.

16  Q    Have you identified any additional claims, other than

17  the ones in your current lawsuit against Meta?

18  A    There are some smaller claims that we found, but not --

19  nothing material, you know, in the thousands of dollars, not

20  in the hundreds of thousands of dollars.  So, at this time,

21  the answer would be, no, nothing material.

22  Q    What about against Apple?

23  A    Same answer.

24  Q    And you said the additional claims that you found that

25  are not material, are those already asserted in the claims in

1  the lawsuit that's been brought?

2  A    I don't think so.  I think these would be added to

3  that, but, again, not in -- it wouldn't move the dial in a

4  material way.

5  Q    Do you intend to serve those claims against Apple or

6  Meta?

7  A    I need to talk to counsel about that.  You know,

8  (indiscernible) litigation, so I need to confer with them to

9  decide whether it's worth doing that.

10 Q    Okay.  And when did you identify those additional

11 claims that are not part of the existing lawsuits?

12 A    I don't know when.  Obviously after February 15th, but

13 when between February 15th and now, I couldn't say.

14 Q    Can you explain why you haven't sought to amend your

15 existing lawsuit to add those claims?

16 A    Because Apple and Meta is not the only thing we're

17 focusing on.  We're focusing on, you know, more than 300

18 Defendants and now we're adding another 50 or so and 30, plus

19 another potential 20, so that's 50.  So, we -- I understand

20 from your perspective, you're concerned about those two only,

21 but there are a lot of balls in the air and we go to the most

22 material and the most critical aspects first.

23      And that's why I said I'm aware of additional

24 transfers, but I don't think they move the dial and certainly

25 not in the way that we would put everything to the side and

 1  amend to add the, at this time, to amend to add these amounts

 2  that are not material.

 3      If we find something that's really material, then we

 4  would, obviously, amend it as quickly as we can.  So there's

 5  no strategy *vis-a-vis*, Apple or Meta; it's a global strategy

 6  of dealing with hundreds of Defendants and we go to the most

 7  pressing, you know, because there's a limited number of hours

 8  in the day.

 9          MR. YAN:  I have no further questions.

10          Thank you, Trustee Despins.

11          THE COURT:  Thank you.

12          Does anyone else wish to cross-examine Trustee

13  Despins?

14          MR. SKLARZ:  Yes, Your Honor.

15          THE COURT:  Attorney Sklarz, will you just, again,

16  state your name for the record and who you represent, because

17  we need that for the record, please.  Thank you.

18          MR. SKLARZ:  Yes, Jeffrey Sklarz and for purposes

19  of this hearing, my clients are G Club; FFP (BVI) Limited,

20  which is sued in Adversary Proceeding 24-506 -- 5056;

21  Ogier, 24 -- sued in Adversary 24-05012; Pillsbury Winthrop

22  Shaw Pittman, sued in Adversary 24-05014; and Weddle Law,

23  sued in Adversary 24-05188.

24  //

25  //

CROSS-EXAMINATION

BY MR. SKLARZ:

Q     Trustee Despins, you indicated that you received additional information, which, much like the proverbial Russian nesting doll, every time you open one layer, you get more and more.

      Is that fair to say?

A     As a general characterization, yes.

Q     Okay.  So to the extent you continue to get more and more information, are you indicating there's a possibility that your investigation could go on, effectively, in perpetuity for years and years and years?

A     No, at one point, we need to, you know, wrap up this case and move on to other things in our lives and that's the intent here.  From our point of view, we're not at that stage yet, but, clearly, the goal is to get to that stage so that we can move on.  We have to balance that desire of leaving potential targets, you know, without a claim, so, that's, really, the balancing act there.

Q     And you also indicated earlier, I believe, that you had moved to stay your own pursuit of cases based on the criminal proceeding.

      Did I understand that correctly?

A     No, we did that in the past.

Q     You did that in the past?

1    A      Yes.

2    Q      And there were pending discovery examinations, I

3    believe you said, that were stayed as a result of your

4    motion, correct?

5    A      Correct.

6    Q      And some of those folks you were going to take exams of

7    were witnesses in the criminal proceeding, correct?

8    A      I said witnesses or could have been witnesses so, the

9    government had to decide to use them.  Now, they would be in

10   one of those two categories.

11   Q      Okay.  So, you -- and no one opposed your motion to

12   stay; is that the testimony?

13   A      I don't think anybody did; that's right.

14   Q      So you self-stayed cases for your own reasons; that's

15   fair to say?

16   A      No.

17   Q      You self-stayed the case for other people's reasons?

18   A      No, we filed a motion, but it was not in a vacuum; it's

19   not just for our own reasons.

20          It's that because we were attempting to depose people

21   who said, Wait a minute, I'm a witness or I've been asked to

22   be a witness in a criminal trial and they were going to

23   complain about it, what we were trying to do, to the DOJ,

24   that's when we decided we needed to halt this during the

25   duration of the trial.  So, we did that on our own, but it

1  was taking into account a number of factors, including not

2  interfering with a criminal proceeding.

3  Q    Have you coordinated witness testimony with the

4  government?

5  A    Never.

6          MR. BASSETT:  Objection; irrelevant.

7          THE COURT:  Sustained.  So we'll strike that from

8  the record, that answer.

9  BY MR. SKLARZ:

10  Q    In terms of my clients who've objected today, G Club,

11  FFP, Ogier, Pillsbury Winthrop, and Weddle Law, they were all

12  sued prior to the February extension order; is that correct?

13  A    Well, I know about G Club for sure, on both, on alter-

14  ego and what we would call a precautionary transfer

15  complaint.  Ogier, I know, as well.  Pillsbury, yes.

16  The other entity you mentioned, I'm sorry, I don't recall

17  them.

18  Q    Okay.  With respect to all of those entities, are there

19  any other claims you discovered between February and today

20  that you're intending to bring?

21  A    I want to be careful, because, remember, as to G Club,

22  our first cause of action is to seek alter-ego or alter

23  (indiscernible) ruling.  The fraudulent transfer would only

24  be if we don't succeed in that and, therefore, there has been

25  no focus on the fraudulent transfer claims against G Club,

1  because we first want to try to obtain a ruling of alter-ego.

2  So, you know, I cannot say that there's not more in terms of

3  fraudulent transfer, because that's not our focus against G

4  Club.

5       As to the other entities, I really hesitate in giving

6  you a definite answer, because there's 280 Defendants, so I

7  don't know each one of them.  But nothing comes to mind in

8  terms of, oh, there's another (indiscernible) against

9  (indiscernible) or something like that.  Nothing comes to

10 mind along those lines.

11 Q    So as you sit here today, you're not aware of any

12 additional claims that could be brought -- let's put G Club

13 aside and we'll go through it one by one -- as you sit here

14 today, you're not aware of any additional claims that could

15 be brought against FFP?

16 A    Against, there's 280 Defendants, so I can't -- I don't

17 know, so I hesitate to give you an answer that there's

18 definitely not.  I (indiscernible).

19 Q    So, the question, again, as to Ogier, as you sit here

20 today, are you aware of any additional claims against Ogier?

21 A    None that are material or that have been brought to my

22 attention.

23      I want to be clear, there's -- you know, Mr. Linsey's

24 firm is running that process, generally, and so they may be

25 reviewing and finding additional transfers and they don't

1  bring every dollar to my attention until it's time to file an

2  amended complaint.  So I have not been approached by them to

3  file an amended complaint at this time against

4  (indiscernible).

5          THE COURT:  Attorney Sklarz, before you continue,

6  I just want to make sure that the record is clear.  The two

7  parties you just asked about, the first was FFP; is that

8  correct?

9          MR. SKLARZ:  Correct, Your Honor.  Yes.

10          THE COURT:  And the second was Ogier; is that

11  correct?

12          MR. SKLARZ:  Ogier is O-g-i-e-r.

13          THE COURT:  Okay.  That's -- we do need to do

14  that, unfortunately, for the record, so I may have to ask you

15  to -- I mean, now that you've said those two, that's very

16  helpful.

17          MR. SKLARZ:  Sure.

18          THE COURT:  If you talk about other Defendants

19  that you represent, I would ask you to please spell their

20  names for the record.

21          MR. SKLARZ:  No problem, Your Honor.

22          THE COURT:  Thank you.

23  BY MR. SKLARZ:

24  Q    So the next Defendant would be Pillsbury Winthrop, P-i-

25  l-l-s-b-u-r-y W-i-n-t-h-r-o-p.  It's a New York law firm.

1          Are you aware of any additional claims against

2   Pillsbury?

3   A     Again, I -- what I'm aware of is nobody has asked me to

4   sign off on an amended complaint being filed.  That's the

5   best information I can give you at this stage.

6   Q     With respect to Weddle Law, W-e-d-d-l-e, are you aware

7   of any additional claims against Weddle Law?

8   A     I would give you the same answer; there's no current

9   plan, to my knowledge, to file an amended complaint asserting

10  additional claims.

11  Q     Thank you.

12        Now, you mentioned the debtor, post-February has

13  continued to obstruct your getting books and records.

14        Is that -- did I understand your testimony correctly?

15  A     I think the question that was asked was whether the

16  obstruction by the debtor affected us, continued to affect us

17  post-February and the answer was yes.

18  Q     Okay.  So let's break it down a little bit.

19        Has the debtor obstructed you in your investigation

20  since the February extension order came out?

21  A     Well, every day that they're not producing their books

22  and records, they're obstructing us; that's one way of

23  looking at it.

24  Q     What --

25  A     Not when -- sorry.

1  Q    What precisely has the debtor himself done?  He's been

2  sitting in jail, correct?

3  A    Correct.

4  Q    What has he done since the February extension order,

5  which, just for reference, is dated -- it's ECF 2921 --

6  dated, February 15, 2024.  What, since February 15th, 2024,

7  has the debtor done to obstruct your investigation, other

8  than not cooperating when you asked him to?

9  A    He's continued to fail to produce his books and

10  records.

11  Q    Okay.  Now, you have obtained various books and

12  records, correct, related to debtor entities?

13       Strike that question.  Let me ask again.

14       You have obtained various books and records from both,

15  the debtor and entities that you claim are controlled by the

16  debtor; is that fair to say?

17  A    No, I wouldn't say that there's any books and records

18  from the debtor and as to other entities, what qualifies as

19  books and records is unclear.  We did obtain business

20  documents from other entities, yes.

21  Q    So, for example, with respect to -- there were a number

22  of entities that have the letters HGHK preceding them, you

23  obtained books and records from certain HK -- HGHK entities,

24  like HGHK Technologies; is that correct?

25  A    I hesitate to say books and records.  We obtained

1    documentation from them showing transactions.  Whether these

2    were really accurate, complete books and records, I could not

3    say.  I actually would not say that.

4    Q    Okay.  There was a gentleman, a receiver appointed in

5    an action by the name of Hofmeister, H-o-f-m-e-i-s-t-e-r, do

6    you remember him?

7    A    Yes, I do.

8    Q    And there was a settlement entered into, whereby he

9    turned over or gave access to you, with respect to the

10   entities that he was appointed receiver over, do you recall

11   that?

12   A    He gave me access to what?

13   Q    I'm asking, did he give you access to information?

14   A    He gave us access to information that he had received,

15   yes.

16   Q    Okay.  And you entered into a settlement that was

17   approved by this Court with Mr. Hofmeister; is that right?

18   A    That's correct.

19   Q    What did you get from Mr. Hofmeister?

20   A    A series of documents purporting to show some

21   transfers, some payments, but I don't think there were

22   balance sheets.  Nothing that was pass muster, in terms of a

23   true accounting.

24   Q    And --

25   A    We got what he got from Mr. Kwok's associates.  He

1    didn't prepare any books and records.  He just gave us what

2    they gave him.

3    Q     So Mr. Kwok's associates turned over information to

4    Mr. Hofmeister, who then turned it over to you?

5    A     They gave some information, yes, that's correct.  Yes.

6    Q     And did Mr. Hofmeister obstruct your investigation?

7    A     Sorry, did he obstruct our investigation?  No.

8    Q     Let me just have a moment.

9         (Pause)

10          MR. SKLARZ:  Thank you, Trustee.  I don't have

11    further questions at this time.

12          THE WITNESS:  Thank you.

13          THE COURT:  Thank you.

14          Does anyone else wish to cross-examine Trustee

15    Despins?

16        (No verbal response)

17          THE COURT:  All right.  Hearing nothing, Attorney

18    Bassett, do you have any redirect?

19          MR. BASSETT:  No redirect, Your Honor.

20          THE COURT:  Okay.  Thank you, Trustee Despins.

21          Your testimony is concluded.  You're excused as a

22    witness.

23        (Witness excused)

24          THE COURT:  I know you're going to continue to be

25    at the hearing, but you're excused as a witness.

1            MR. DESPINS:  Thank you, Your Honor.

2            THE COURT:  Thank you.

3            Attorney Bassett, did you wish to proceed,

4   continue?

5            MR. BASSETT:  Yes, Your Honor, thank you.

6            THE COURT:  You're welcome.

7            MR. BASSETT:  Again, for the record, Nick Bassett

8   from Paul Hastings on behalf of the Chapter 11 Trustee.

9            Your Honor, that -- in addition, as I said before,

10  in addition to Trustee Despins' testimony, we believe that

11  the record generally in this Chapter 11 case and the related

12  adversary proceedings is highly relevant to the motion before

13  the Court today, as it was to the motion before the Court

14  back in February and the Court can, then, you know, take

15  judicial notice of that docket and of that record.

16           So, you know, coupling the record before --

17  coupling the record in this case with Trustee Despins'

18  testimony, that concludes our evidence in support of the

19  motion.  And with that, I would propose proceeding to

20  argument.  I'm happy to do that, Your Honor.

21           THE COURT:  Go right ahead.

22           MR. BASSETT:  Thank you very much.

23           So, Your Honor, I'll try to be brief in my

24  remarks, because I don't think there is really any new ground

25  to cover that we did not already cover when we had the

1   hearing back in February on the first motion to extend the

2   trustee's time to file avoidance actions.  The Court, in that

3   order, which was issued on February 15th, 2024, and is at

4   ECF 2921, the Court reached two main conclusions.  First, it

5   granted the trustee's request for an extension of his

6   deadline to file avoidance actions from February 15th, 2024,

7   through August 15th, 2024, under Federal Rule of Bankruptcy

8   Procedure 9006(b).  Second, the Court determined in that

9   order that it disagreed and denied the trustee's requests for

10  equitable tolling on the statute of limitations deadline;

11  however, it expressly did so without prejudice to the

12  trustee's ability to raise equitable tolling in response to

13  any argument that a particular adversary Defendant may raise

14  as to the statute of limitations in the future.

15          Your Honor, there is no reason, based on either

16  the passage of time, the intervening facts and circumstances

17  that have occurred since February, or anything in the

18  objections that the Court has received, that would militate

19  in favor of any other outcome that's different from what the

20  Court already concluded back in February.  I do want to

21  emphasize that the trustee absolutely intends to argue

22  equitable tolling at the appropriate time if a Defendant

23  raises a statute of limitations issue in an adversary

24  proceeding, but we respect the Court's ruling as to that and

25  will reserve all rights accordingly.

 1          Your Honor, I'll spend the balance of my time just

 2   responding to the particular arguments that certain of the

 3   objecting parties have raised.  Again, in my view, there is

 4   nothing new.  I think the arguments generally fall into two

 5   buckets.  The first is the objecting parties reiterate

 6   arguments they made previously that the Court should not be

 7   able to use Federal Rule of Bankruptcy Procedure 9006(b) to

 8   extend the deadline for filing avoidance actions.  And then

 9   the second argument is one that's really based on the factual

10   record, with parties taxes the position that nothing has

11   occurred or that there were no facts in the record that would

12   justify extending the deadline to file avoidance actions

13   further.

14          On the first of those arguments, on 9006(b), Your

15   Honor, again, I think it's already been decided.  The Court

16   carefully analyzed this issue and the relevant case law in

17   its first extension order.  The Court, after conducting that

18   analysis, ultimately concluded correctly that limitations

19   periods are generally not substantive and, therefore, the

20   Court has the power to use Rule 9006(b) to extend the

21   limitations period set forth in 546(a), based on principles

22   of equity.

23          In reaching that decision, the Court expressly

24   considered and declined to follow contrary case law,

25   including, specifically, Judge Tancredi's decision in the In

1  re Walnut Hill case, which the objecting parties continue to

2  rely upon.  The Court also specifically noted in his

3  decision, which granted the trustee's request to extend the

4  deadline for filing avoidance actions to August 15th, 2024,

5  that, (indiscernible) for the order, but which date may be

6  further extended upon notice and a hearing, and that's why

7  we're here today, Your Honor, to have a further hearing on

8  extending that deadline through February of 2015 [sic].

9         Everything the Court decided in its prior order on

10 this issue, Your Honor, remains correct today and it should

11 not be disturbed.  The only argument that certain of the

12 objecting parties attempt to characterize as a new argument

13 is an argument based on the Supreme Court's recent decision

14 in the Purdue Pharma case, but nothing about that decision,

15 Your Honor, impacts the Court's analysis.

16         In Purdue, the Supreme Court concluded that

17 bankruptcy courts -- the Bankruptcy Court in that case could

18 not prove the nonconsensual, third-party release because

19 Congress had not authorized such releases under the

20 Bankruptcy Code and it undeniably would have affected the

21 substantive rights of parties who held claims against other

22 parties.  It's important to note, and there's an entire

23 section of the Court's opinion at the end where the Court is

24 very clear to caution the narrowness of its holding.

25         And the Court said, quote, "As important as the

1  question we decide today are the ones we do not decide."  The

2  Court then concluded, quote, "Consigning ourselves to the

3  question presented, we hold only that the Bankruptcy Code

4  does not authorize the release and injunction that, as part

5  of a plan of reorganization under Chapter 11, effectively

6  seeks to discharge claims against a nondebtor without the

7  consent of the affected claimants."

8        So, Your Honor, the decision to the issue before

9  the Court today obviously does not involve nonconsensual

10 third-party releases and, therefore, in our view, Purdue has

11 no bearing on the Court's decision.

12       Now, to the extent and notwithstanding the Court's

13 very careful attempt to clarify the narrowness of its

14 holding, Purdue can be said to stand for broader principles.

15 At most, I would submit it could stand for the proposition

16 that bankruptcy courts are not allowed to use their equitable

17 powers in a way that affects substantive rights in a manner

18 that is inconsistent with the Bankruptcy Code.

19       And, again, the Court addressed this issue and

20 already decided it, and we make this point in our reply

21 brief, the point being that the statute of limitations here

22 are not substantive, therefore, the Court is not modifying

23 substantive rights.

24       Now, if the Defendants' broad ruling of Purdue are

25 correct, the implications of that would be far broader than

1  they suggest, because as I read their objection, they're

2  effectively saying that a Court could never use equitable

3  powers to effect statutes of limitation, would that would

4  apply to equitable tolling, as well.  That also applies

5  outside of the bankruptcy context.

6          I don't think there's any possible reasonable

7  reading of the Purdue case, which could be said that -- where

8  the Supreme Court could have been said to have intended to do

9  away with equitable tolling of statutes of limitations, like,

10 that's a far too broad reading of that decision and I think

11 that it certainly was not intended to be -- that it was not

12 intended to have that effect.

13         Your Honor, aside from the 9006(b) arguments and

14 the Purdue overlay, as I'll call it, the only other argument

15 that the objectors really make is that, in their view, the

16 circumstances don't justify an extension of time.  Your

17 Honor, I would submit based on the testimony that the trustee

18 gave today, based on the record in this case, and based on

19 the testimony that he gave back in February, the record amply

20 supports the limited, further extension that the trustee is

21 seeking.

22         And you can tell from the cross-examination today

23 one of the points that the objectors are making is that,

24 Well, this obstruction, this all occurred at the beginning of

25 the case and the debtor has been in prison.  He hasn't been

1   actively obstructing the trustee's investigation since, but

2   that's just not true, because the obstruction that occurred

3   and the unique and extraordinary cases of this case are that

4   we have a debtor and we have an individual associated with

5   the debtor who has never cooperated with the trustee's

6   investigation.  They've never provided the books and records

7   that ordinarily should be provided in any case.  That

8   continues to impede the trustee's investigation.  All the

9   issues arising out of that lack of cooperation does not

10  magically disappear after February 15th of this year, Your

11  Honor.

12          And the trustee testified about the diligent

13  efforts that he is continuing to undertake.  He testified

14  about thousands of documents that his team has received from

15  2004 investigations, from a warehouse belonging to Golden

16  Spring that his team obtained access to, to the thousands of

17  exhibits in a criminal trial, all of which he does not even

18  have access to yet.  He talked about his team's process for

19  going through those documents as diligently as they can.

20          The trustee also talked about his monitoring of

21  the criminal trial more generally and the relevance that has

22  to his investigation.  He talked about the bank account

23  analysis being undertaken by Kroll, which was the subject of

24  extensive testimony back in February.

25          Your Honor, all of that is ongoing.  All of it

1  takes time.  All of it continues to be affected by the unique

2  and extraordinary circumstances of this case.

3        The last point I will address, Your Honor, as to

4  the trustee's diligence with his investigation is the

5  argument that (indiscernible) surrounding the motion to stay

6  the bankruptcy case.  Your Honor, that was a motion that the

7  trustee presented.  You heard from him today the reasons why

8  it was filed.  The Court granted that motion.  In doing so,

9  I'd submit that the Court found that that motion was in the

10  best interests of the estate.  Other parties, including the

11  objectors who are here today, had the opportunity to object

12  to that if they thought it was not appropriate.

13        And, again, Your Honor, the trustee had very good

14  reasons for doing that.  The potential consequences of not

15  proceeding in that manner would have been to fight with the

16  debtor about a global stay of the bankruptcy case, which

17  would have been a disaster if the trustee had been unable to

18  continue to do any of his work during the pendency of the

19  criminal trial, that would have been a disaster and,

20  therefore, he made the recent decision to file that motion

21  and it was granted by the Court.

22        The last argument I'll briefly address, Your

23  Honor, is the argument by Meta and Apple, where they say

24  that, again, there's no evidence that they, themselves, are

25  done anything to obstruct the trustee's investigation.  And

1   on that, Your Honor, I would just simply point the Court to

2   the decision already issued in the first extension order at

3   paragraph 14, where the Court said, quote, "The bankruptcy

4   case presents a rather different (indiscernible) on equitable

5   tolling and the typical situation, it would have been

6   debtors' conduct, rather than the Defendants' conduct, which

7   invokes equitable tolling.  In some senses, this is unfair to

8   the Defendant."

9         And the Court cited cases in support of that,

10   including the <u>Fundamental Long Term Care</u> case from the Middle

11   District of Florida Bankruptcy Court, cited in this opinion.

12         So, Your Honor, the point is not whether a

13   particular individual, avoidance action Defendant obstructed

14   the trustee's investigation; it is whether or not there has

15   been an obstruction, generally, that has prevented the

16   trustee from being able to complete his investigation within

17   the time that ordinarily exists under the Bankruptcy Code.

18         So, Your Honor, for all those reasons, we would

19   respectfully request that the Court grant an extension of the

20   deadline to file avoidance actions by another six months

21   through February 15th, 2025.  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         And who wishes to go, to proceed first with their

24   objection?  We have counsel for -- we have Attorney Yan,

25   Attorney Sklarz.  Is anyone else going to be making an

1   argument, in objection to the motion?

2           MR. KIM:  Your Honor, there's also an objection

3   filed by the Greenwich Land Defendants, so I'll reserve until

4   the end and if the --

5           THE COURT:  Oh, yes.

6           MR. KIM:  -- and if Mr. Yan and Mr. Sklarz cover

7   all the ground, then I have no need to retread.

8           THE COURT:  Thank you, Attorney Kim.  I just

9   missed -- I misplaced your objection for a second, there.  I

10  apologize.

11          All right.  So, Attorney Sklarz, Attorney Yan, who

12  would like to proceed first?

13          MR. SKLARZ:  By all means, go ahead, Attorney Yan.

14          MR. YAN:  Thank you.

15          Thank you, Your Honor.

16          As Your Honor noted in her prior order granting

17  the trustee's requested extension, an (indiscernible) concern

18  under Rule 9006(b) is prejudice to the Defendant.  Now, I'll

19  say that we disagree with the Court's analysis, but I don't

20  think we need to retread on 9006(b) arguments.

21          Here, we have a case where we're differently

22  situated from some of the other Defendants that are going to

23  be Defendants and potential Defendants that might be affected

24  by the order that the trustee's asking the Court to enter.

25  And we're differently situated because Meta and Apple have

 1  already been sued; they were sued before the prior extension

 2  that was granted.  And in those cases, we have spent the

 3  money and expense to move to dismiss and filed a number of

 4  other things.

 5        And so, we're differently situated than those

 6  people who don't even though that they're targets and haven't

 7  had to do anything yet.

 8        UNIDENTIFIED SPEAKER:  (Indiscernible.)

 9        MR. YAN:  I'm sorry, go ahead.

10        The other thing is kind of related to that is,

11  here, we've come before the Court and we've objected to it

12  and I don't see how we're differently situated from some of

13  the other Defendants or parties that have been carved out of

14  the last order, such as UBS and Sotheby's, who also filed

15  objections and were carved out.

16        Here, as you've heard the trustee say, he has

17  identified potential, additional claims against Meta and

18  Apple that he says are non-material, but it's been six

19  months.  He filed it before the last extension and he hasn't

20  done anything with those claims.  We don't know.  He hasn't

21  said whether he needs additional time beyond the six-month

22  extension already, another six months to file anything

23  additional against Apple.

24        And there's a fundamental fairness point where the

25  trustee gets to reserve all of his arguments, with respect to

 1  equitable tolling and all of the (indiscernible) arguments

 2  and on top of that, he gets this order saying, Yeah, he can

 3  timely file in another six months; whereas, we are prejudiced

 4  because we can't make that argument anymore after this order.

 5  And so why does he get belts-and-suspenders and we, who have

 6  done nothing wrong, we get cut off at the knees, with respect

 7  to our arguments relating to why the trustee's claims are

 8  time-barred.

 9          And so for those reasons we would just ask that --

10          THE COURT:  Wait.  May I stop you just right there

11  for one second so I make sure I understand your argument?

12          MR. YAN:  Sure.

13          THE COURT:  When you say you get cut off at the

14  knees on his equitable tolling argument, is that the point

15  that you're making, Counsel?  I just want to make sure I

16  understand.

17          MR. YAN:  Not the equitable tolling argument.

18          I'm just saying he gets to make his equitable --

19  if we -- if he makes an equitable tolling argument -- we'll

20  get to that -- I don't think the order affects that, but he

21  will already have an advantage in that he can wave the order

22  around and say, If we make an argument that his claims are

23  time-barred, he can say, Well, look, I have an order from the

24  judge saying that that argument no longer flies, with respect

25  to you.

1           THE COURT:  Well, I don't think it's true.

2           MR. YAN:  So, I'm just --

3           THE COURT:  I don't think that's what the order

4    says.  So maybe I need you to point me in that direction,

5    because I believe what the order says is that there's an

6    extension of time granted under these very specific and

7    unusual circumstances of these complex, consolidated,

8    administratively consolidated Chapter 11 cases and adversary

9    proceedings and that I was not going to prospectively order

10   that the trustee can assert equitable tolling.

11          I believe the order says that the trustee can

12   assert equitable tolling when someone raises it in a motion

13   to dismiss or another pleading.  And so I don't see how that

14   cuts you off at the knees at all, so I would like to make

15   sure I'm not missing your point.

16          MR. YAN:  Sure.  I guess my point, Your Honor, is

17   why does he need that?  He can always make an equitable

18   tolling argument because his rights are preserved.

19          THE COURT:  What does he need what, though; I

20   didn't give him what he wanted, so I don't know what

21   you're -- I guess that's what I'm struggling with.  I didn't

22   give him what he wanted in the original order.  I didn't say

23   that he prospectively has the right to assert equitable

24   tolling; I didn't say that.

25          I said that under the cases that all the parties

1  cited, the application of equitable tolling does not come

2  into play or does not become an issue unless and until it's

3  raised in connection with a motion to dismiss the case

4  because the statute of limitations has passed.  That's what

5  the order says.

6          MR. YAN:  Understood.  Understood, Your Honor.

7          And my point is, why does he need more than that?

8  He can -- that argument is preserved.  If he can make that --

9          THE COURT:  I don't know that he does need more

10 than that.

11         MR. YAN:  That's my point, Your Honor, why does he

12 need this additional order?

13         THE COURT:  Well, that's time.  Time is different

14 from equitable tolling, Counsel.  He's asking for additional

15 time.

16         I didn't -- he's asking for an additional time to

17 commence causes of action, okay.  I didn't hear Attorney

18 Bassett -- but maybe I missed it and that's why I'm stopping

19 to ask these questions -- I didn't hear Attorney Bassett, and

20 I don't think I read in the papers, but maybe I'm -- you

21 know, I could have missed it, because as you can, I'm sure,

22 appreciate, there are a lot of papers filed in this case and

23 in the adversary proceedings, but I didn't hear Attorney

24 Bassett ask me to prospectively order from this point forward

25 that equitable tolling, the trustee is entitled to assert

1  that.  I didn't hear him.

2          Attorney Bassett, did you ask me to do that,

3  because if you did, I missed it.

4          MR. BASSETT:  I did not, Your Honor; in fact, the

5  Court has already ruled on that issue.

6          THE COURT:  Okay.  Thank you.

7          So, that's my question to you, Attorney Yan.  The

8  only issue that I see and is right now in the papers is, the

9  trustee is asking for an extension of time to commence causes

10 of action.  I've ruled on the issue of equitable tolling.

11         So I'm a little confused as to your statement that

12 somehow you've been -- and I apologize -- I think the words

13 were that you're cut off at the knees.  I don't see how you

14 are.

15         So, please explain to me.  I don't want you to not

16 tell me.  I'm just not sure that I understand your argument.

17         MR. YAN:  Sure, Your Honor.

18         And I think this -- let me go back to the

19 argument.  I think the point I was really trying to make is

20 we're differently situated because he doesn't need more time;

21 he's already asserted claims against us, so I don't think

22 it's equitable for him to get additional time to add on to

23 claims that he's already asserted against us.

24         THE COURT:  Well, don't you think the Federal

25 Rules of Civil Procedure will address that?  If he tries to

1 add on claims or bring a new cause of action, you can do

2 whatever you need to do, if he even does that.

3          And I think you asked him -- and I understand why

4 you did -- were there any additional claims against Apple and

5 metal -- Meta, excuse me -- and his answer was "not material

6 claims that he could think of" and that was the answer I

7 heard.

8          But the Federal Rules of Civil Procedure will deal

9 with it one way or another; either he'll move to amend the

10 complaint that was, as you already admitted, was filed before

11 the expiration of the statute under the applicable statutes

12 or he'll file a new cause of action.  And in either case,

13 you're going to either oppose the motion to amend or you're

14 going to move to dismiss.  And that's how the Federal Rules

15 of Civil Procedure work, right?

16          I mean, I guess I'm a little confused by your

17 argument, because you -- I agree with you, though, that you

18 are differently situated insofar as your clients were sued

19 before any applicable statute ran.  So, from that

20 perspective, I think whatever happens, happens and the

21 Federal Rules of Civil Procedure will -- do apply and you and

22 the trustee will assert whatever arguments you have under the

23 applicable Federal Rules of Civil Procedure and then the

24 Court will address those accordingly.

25          MR. YAN:  I think that makes sense if he's going

1  to assert them in the same case.  What we're concerned about,

2  and what we didn't see in the papers or hear from the trustee

3  is that they intend to assert civil litigation.  So, eight

4  months down the line, does he intend to file a new claim

5  against us?  We don't know, and so we want to preserve our

6  right to object to that.

7        THE COURT:  Well, I think you vaccinate right.  I

8  don't see how you would -- my prior order does preserve that

9  right for you, in my opinion.  Maybe I'm wrong, but it says

10 that the trustee is not entitled to prospective, equitable

11 tolling and that issue will come up, if at all, when a party

12 raises and files a motion to dismiss, asserting that a

13 statute of limitations has passed.

14        MR. YAN:  Understood, Your Honor.

15        THE COURT:  So, I don't see how your right isn't

16 preserved.  But that doesn't mean I'm right, Counsel; I'm

17 just telling you, that's the Court's perspective.  You can do

18 with that what you feel is appropriate.

19        But the prior order was very -- I tried to be very

20 clear in a very short amount of time to say that the

21 trustee's right to bring causes of action was extended

22 because I felt and I found and held that Rule 9006 did not

23 bar that extension because those statutes were statutes of

24 repose, which did not affect substantive rights of parties.

25 And I found that, based upon many things, including the

 1  Supreme Court case of <u>Young</u>, in which Justice Scalia, writing

 2  for the majority, said that those statutes are not

 3  substantive statutes; they don't affect substantive rights.

 4          So, in any event, what I'm saying to you is, I

 5  understand what you're saying, but I believe you are

 6  protected.  You may think otherwise, and I completely respect

 7  that, but that is the reason why I proceed -- the decision

 8  says what it says.

 9          MR. YAN:  Understood, Your Honor.

10          THE COURT:  I didn't foreclose on any Defendant

11  from asserting that there was some kind of statute of

12  limitations issue.

13          MR. YAN:  Understood, Your Honor.

14          And then that, perhaps, is the issue where we

15  didn't see that level of protection that you just

16  articulated, which is why we asked to just be carved out from

17  the ambit of the order.

18          THE COURT:  So, what you're saying is you would

19  like me to rule -- and I just want to make sure -- with

20  regard to Apple and Meta that if there's an extension

21  granted, it doesn't apply to them?

22          MR. YAN:  That's correct, Your Honor.

23          THE COURT:  Well, if I agreed with you, which I

24  don't know that I will, but I would not agree with you with

25  regard to the existing causes of action being amended.  Now,

1   that doesn't mean you couldn't oppose amendment, but,

2   obviously, the Federal Rules of Civil Procedure allow for

3   amendments to an existing cause of action.  They allow to it

4   up until after trial.

5            So, with regard to that issue, the only issue that

6   I think, then, I would decide with regard to Meta and Apple

7   are whether Meta and Apple are carved out from any new causes

8   of action.  That's what I would decide.

9            MR. YAN:  I think your articulation is exactly

10  right, Your Honor.  I agree with that.

11           THE COURT:  Okay.  Great.  I appreciate that.

12           I didn't mean to cut you off, so if there's more

13  that you want to argue, please do.  I just wanted to be -- I

14  wanted to make sure I understood what you were arguing.

15           MR. YAN:  No, we appreciate that, Your Honor, and

16  that's all that I have.

17           THE COURT:  Okay.  Thank you.

18           Attorney Sklarz, did you wish to proceed next?

19           MR. SKLARZ:  Yes, please, Your Honor.

20           Your Honor, in nearly 40 years of an unbroken line

21  of cases, running from Northern Pipeline to Granfinanciera to

22  Stern to Purdue, cited just a few months ago, our Supreme

23  Court has held that unless the Bankruptcy Code clearly

24  permits relief, Bankruptcy Courts cannot fashion substantive

25  relief based on either gap-fillers or a lack of Congress

1  saying that they can't be done.

2          So in Purdue, there's nothing in 1123 that says

3  Bankruptcy Courts can't authorize nonconsensual third-party

4  releases.  But the Supreme Court was still clear that they're

5  not allowed because of the Code silence and allowing such

6  relief would countermand specific provisions of the Code,

7  namely, Section 1141 and the discharge provisions.

8          Here, and, certainly in light of Your Honor's

9  ruling, Purdue came out afterward, but in light of Purdue,

10  and analyzed against that backdrop, the applicable section

11  that provides the statute of limitations, Section 546, says

12  it's two years.  It is silent on whether you can or cannot

13  extend it.  There's nothing in the Bankruptcy Code that says

14  you can extend it or you can't extend it.

15          So the trustee looks to Rule 9006 and refers to

16  what they're requesting under 9006, listed on page 5 of their

17  reply brief -- I'm sorry, paragraph 5 of their reply brief as

18  a "equitable extension."  This is definitely not an equitable

19  extension.

20          As Your Honor just discussed with Attorney Yan,

21  equity, as to statutes of limitation, we know of three main

22  extending doctrines of statutes of limitations:  equitable

23  tolling, fraudulent concealment, and the discovery rule.

24          What this is, very specifically, is the use of a

25  rule, not a statute, but we'll just say a provision, not a

1  common law provision, not something that exists in the

2  equitable ether, but a written rule that has general

3  application to extend a statute of limitations, 546, that

4  have a specific statement.  So this is precisely what Purdue

5  warns against.

6          Again, the dissent in Purdue makes exactly the

7  same observations as the trustee.  Over 40 times, the dissent

8  refers to equitable relief or some variance of the word

9  "equity" and their argument is the releases and the

10 settlement payments solve those problems and ensure fair and

11 equitable recovery for the opioid victims.  It's certainly a

12 good argument, but it wasn't the majority.

13         The majority says otherwise.  It says, faced with

14 so many marks against its interpretation of the law, plan

15 proponents in the dissent resort to a policy argument.

16         That is exactly what occurs here.  It's a policy

17 argument saying that because of all these other things, other

18 than what is written down, that the statute can be extended.

19 The trustee's request for an equitable extension has to fail

20 for exactly the reasons stated in Purdue.  The Code provides

21 absolutely no mechanism for a prospective extension of a

22 written-down statutes of limitations.

23         And I think in light of Purdue and now specific it

24 was, it's important that I briefly just turn to three of the

25 Court's main holdings in the February ruling.  I don't want

1   to -- Your Honor ruled and I just -- I think in the context

2   of Purdue, it's a little bit different.  So the three main

3   rulings as to why, as I understand it, Your Honor ruled

4   that 9006 applies is the Rules Enabling Act doesn't apply to

5   stop 9006 from applying because of traditional principles of

6   equity.  In light of Purdue, it is unclear.  So that's number

7   one.  Number two, statutes of limitations are procedural, and

8   that's subject to the Bankruptcy Rules.  And third, the

9   statutes of limitations provisions of the Code come into

10  existence, only once a Title 11 case is filed.

11          Turning back -- let me expand on that a little

12  bit.  So, turning back to the Rules Enabling Act question.

13  Essentially, the Rules Enabling Act and the jurisprudence

14  thereunder says, as long as there isn't something specific

15  that says you can't -- you can't do it, you can apply this --

16  you can apply traditional tolling doctrines.  Traditional

17  tolling doctrines, as we discussed, are equitable tolling,

18  discovery rule, and fraudulent concealment.

19          Using Rule 9006 to prospectively extend the

20  statute, in other words, as Your Honor explained, an

21  extension of time to commence causes of action are different

22  than equitable tolling.  I agree 100 percent.  This has

23  nothing to do with equity.

24          This has to do with, can you graft on an extension

25  provision that is written nowhere in the Code by gap-filling

1   with the Rules?  In light of _Purdue_, is it unclear how an

2   arguably equitable approach can be applied to pull gap-filler

3   from the Rules and apply here.  There's no argument that

4   there's a right to equitable tolling at this time; that

5   argument has been reserved, as we just discussed.  There's no

6   argument that there's been a prospective, fraudulent

7   concealment, or discovery rule violations, or some other

8   traditional, common law tolling doctrine.

9          The trustee cites 9006.  He doesn't cite equity to

10   support his 9006 argument.

11          Turning to the question of whether statutes of

12   limitations are procedural or substantive.  I apologize, I

13   don't -- so, first, we cite -- and I'll just refer to the G

14   Club brief, because that's in the main case.  The arguments

15   that we submitted in our briefing in the four adversaries are

16   essentially the same, just the structure is a little bit

17   different.

18          On page 6 of G Club, we cite to the Second

19   Circuit's ruling in _Enterprise Mortgage_, which explains that

20   substantive and procedural for how the rights affect somebody

21   in the case is a different analysis than whether something is

22   substantive or procedural for choice of law purposes, which

23   is where that substantive, procedural analysis comes from.

24   We briefed this in our case.

25          And then _Enterprise Mortgage_, the Second Circuit

1  explains that procedural versus substantive, you have to look

2  at it through the eyes of the Defendant.  So, here, the

3  Defendant, my clients, or anybody else who hasn't been sued

4  or who doesn't even know they're going to be sued -- perhaps

5  anybody else in the room, we don't know -- the -- from their

6  eyes, the two years has passed.  So they -- to them, to that

7  unsued party as of today, they're -- that is a substantive,

8  not a procedural right under Enterprise Mortgage.

9           And then we also cite the case of Aetna Life --

10 and the citation there is 391 F.3d 401, and that's on page,

11 mainly on page 6 of our brief in G Club -- that case applied

12 the Sarbanes-Oxley (indiscernible) was -- looking at the

13 Sarbanes-Oxley Act, but it also references a Supreme Court

14 case of Landgraf and it explains that the resurrection of

15 previously time-barred claims has an impermissible,

16 retroactive effect extending the statute of limitations

17 retroactively, increasing the Defendant's liability for past

18 conduct.

19          Now, there, there was a law -- the question was

20 whether the law was retroactively applied.  Here, the law

21 can't be retroactively applied.  There's been no change in

22 the law.  What there is, is a gap-filler provision, 9006, to

23 extend the statute of limitations prospectively.

24          If Congress can't do it with an act and not make

25 it specific, we can't do it otherwise.  That is exactly what

1   Purdue says.

2         Finally, whether 546 is subject to tolling because

3   it doesn't come into existence until it's a Title 11 case is

4   filed; again, under that the Court has ruled.  Your Honor

5   applied IDB (phonetic) over Butcher, but again, I think we

6   need to view those cases now in light of Purdue.  And it

7   appears in my view that the Purdue case says that is not the

8   analysis, that the Butcher analysis should be applied.

9         And we cited --

10        THE COURT:  But the Purdue case doesn't say

11  anywhere in it that the Butcher analysis should be applied --

12        MR. SKLARZ:  Oh, no, no, no, no.

13        THE COURT:  -- and, in fact, in Butcher, all the

14  courts in Butcher in the circuit in Butcher don't follow

15  Butcher.  If Purdue says that, please tell me, because I

16  don't believe that it says anything at all about Butcher.  It

17  never mentions it.

18        MR. SKLARZ:  Oh, I agree, Purdue doesn't cite

19  Butcher.

20        THE COURT:  Okay.

21        MR. SKLARZ:  What it does is apply a similar

22  analysis, which is textual.  You read the text.  The text is

23  clear.  The text applies.

24        And then we cited additional cases in our brief in

25  that regard, more than we cited in the previous brief, using

1  other provisions of the Code.

2          I'm sorry, Your Honor?

3          THE COURT:  No, I don't have anything.  Go ahead.

4          MR. SKLARZ:  Okay.  So -- if I may just have one

5  moment, Your Honor?

6          THE COURT:  Certainly.

7          MR. SKLARZ:  I just need to check if I have

8  anything else.

9      (Pause)

10          MR. SKLARZ:  Just turning briefly to the factual

11  argument justification.  Regardless of whether Your Honor

12  agrees with me or agrees with the trustee, I think we can all

13  agree prospectively extending statutes of limitations is very

14  unusual.  It's already been done once in this case.

15          Your Honor found, as Your Honor noted, on very

16  specific facts that that extraordinary relief was probative.

17  If Your Honor disagrees with me on the Purdue argument and

18  the arguments we've set forth, I still believe that they

19  cannot meet the burden Your Honor imposed upon them under

20  Your Honor's February ruling.  There's no longer

21  extraordinary that Mr. Kwok did or did not do anything; in

22  fact, on examination, we know a lot of information has been

23  turned over.  It may not have been turned over as quickly as

24  the trustee had hoped, but that is not some kind of

25  obstruction.

1          For example, the trustee said the government

2   hasn't turned over the information.  Is that obstruction by

3   the government, of not turning over information?  Of course

4   not.

5          On cross-examination, the trustee indicated that

6   more information occurs daily.  That is true in almost every

7   financial fraud investigation.

8          There were -- Your Honor found extraordinary facts

9   the first time.  We have to look at what's occurred since

10  then.  And we have not heard anything today that is of the

11  nature of extraordinary.  There was no further protesting or

12  other actions that Mr. Kwok's retainers took.  There was no

13  lack of funds, which was the major reason the last time

14  around, to toll the statute.

15         THE COURT:  Well, I just want to stop you there.

16  I don't even think there was any mention of protesting in the

17  prior ruling and I'm not sure that there was any mention of a

18  lack of funds, other than that was an argument made by the

19  objecting parties that somehow that should persuade the Court

20  that the trustee didn't act diligently because he didn't have

21  funds to retain a forensic accountant.

22         So, just to be clear, when you say the factual

23  basis and that the trustee can't meet its burden, the

24  argument about the protesting, I don't even think that was

25  mentioned.  I could be wrong, though; it could have been

1   mentioned in the order.

2           MR. SKLARZ:  I --

3           THE COURT:  But with regard to the funding, the

4   lack of funding, that was a claim that was raised by the

5   objecting parties to try to establish for the Court or

6   persuade the Court that the trustee did not act diligently

7   and I found just the opposite, in fact.  I found that it was

8   clear to the Court that the trustee has been more than

9   reasonably diligent.

10          So I don't think the argument about funds and/or

11  protesting is persuasive.

12          MR. SKLARZ:  And that's my -- I'm not saying it

13  is; what I'm saying is those facts do not exist today.

14          And I recall Kwok's examining the trustee on the

15  lack of funds.  What he indicated, as I recall, and we could

16  do back to the record, is that he did not hire a forensic

17  accountant because his firm didn't want to share payments

18  *pari passu* with the forensic accountant, so he deferred

19  hiring.  But we make --

20          THE COURT:  No, that wasn't the testimony at all;

21  in fact, the testimony was that he didn't hire the accountant

22  because the forensic accountant wanted to be paid --

23          MR. SKLARZ:  Right.

24          THE COURT:  -- and there weren't funds in the

25  estate to pay the forensic accountant and the forensic

1   accountant didn't want to take the risk that the forensic

2   accountant would have to share with all the other

3   administrative claimants in an insolvent estate.  That was --

4   that's my recollection of the testimony.

5           MR. SKLARZ:  I suppose I have a different

6   recollection, but --

7           THE COURT:  Oh, you could be right, but I'm just

8   saying that's my recollection.

9           MR. SKLARZ:  -- it probably doesn't matter.  It's

10   written down for a reason --

11           THE COURT:  Right.

12           MR. SKLARZ:  -- and my point is it's not terribly

13   relevant right now.

14           What the trustee presented today was, I have a lot

15   of work to do and it's hard and there's lots of it.  And I

16   have great sympathy that there is a lot of work to do, but

17   what we're talking about is meeting the standards Your Honor

18   set in the ruling, which is extraordinary circumstances.

19           I guess the first time is if it happened.  The

20   second time is a coincidence.  If we get to a third time,

21   perhaps that's a mode of operation.  I don't know when

22   extraordinary stops becoming extraordinary.  But, certainly,

23   we're -- I'm not sure why we're now adding a full year under

24   the trustee's motion to what Congress said should be the

25   statute of limitations of two years.

1          So I don't think that even if Your Honor reaches

2    the factual issue, it rises to the level of extraordinary as

3    Your Honor ruled in your prior (indiscernible).

4          But, Your Honor, I'm happy to answer any

5    questions; otherwise, that concludes my presentation.

6          THE COURT:  Thank you.  I do not have any

7    questions at the moment, Attorney Sklarz, thank you.

8          Attorney Kim, did you wish to be heard?

9          MR. KIM:  Thank you, Your Honor.

10         Austin Kim for the Greenwich Land Defendants.

11   Just a few finer points to pick up on what Attorney Yan had

12   mentioned.  You know, what's -- from our position, what's

13   going on here is the trustee is seeking to obtain the relief

14   of equitable tolling without having to seek it, one, and

15   then, two, with equitable tolling is done on a case-by-case

16   basis, because it is factually dependent, what the trustee is

17   seeking is an omnibus order that sort of avoids the trustee

18   having to establish on a case-by-case basis, why they should

19   effectively obtain the relief of equitable tolling.

20         So, with equitable tolling, you know, it's a case-

21   by-case, fact-specific analysis.  What the trustee is seeking

22   is essentially a six-month equitable toll the first time

23   around and now they're seeking a second, six-month equitable

24   toll the second time around, based, essentially, on the same

25   facts.

1          And so, you know, the constitute did provide some

2     testimony as to what, you know, additional efforts have been

3     made since February, but the bulk of what the trustee has put

4     forth as to why an additional six months is necessary are

5     facts that existed a year ago, or facts that already existed

6     six months ago.  So, I'm not here to doubt the diligence of

7     the trustee in, you know, the efforts made to do the

8     investigation, but it's not just confined to the trustee's

9     diligence; it's the, so what?  What has come out since

10    February that is so extraordinary that the Court should

11    exercise its discretion to grant to extend the statute of

12    limitations by another 25 percent on an omnibus basis without

13    the trustee demonstrating what's new.

14          Vague statements of, Well, we have received 400

15    documents or 700 documents or 20,000 documents, that's great,

16    but so what, right?  We don't know when these documents were

17    received, you know, where the progress is, and I just think

18    it's inequitable to allow the trustee to continue to, on a

19    piecemeal basis, obtain equitable tolling relief across the

20    board and as to, you know, frankly, parties that are not here

21    or who haven't been named yet or based on some speculation

22    that there could be something there.

23          So, on that basis, we do stand by our initial

24    objection that, you know, we do disagree with the Court's

25    prior ruling that, you know, the statute of limitations, 546,

1  can be extended for the same reasons that my prior colleagues

2  have mentioned, and we rest there.

3           THE COURT:  Okay.  Thank you.

4           Attorney Bassett, do you have any reply?

5           MR. BASSETT:  Yes, Your Honor, briefly.

6           So, I'll start by responding to some of Attorney

7  Sklarz's arguments, which I think almost exclusively for the

8  first half of his presentation focused on the Purdue case.

9  And, look, I understand, Your Honor, the inclination to cease

10 upon a high-profile ruling of the Supreme Court and sort of

11 turn that into something significant to this motion, but I

12 really just do not think it is.

13          Purdue could not be a more different case than

14 this case, as much as Attorney Sklarz tries to characterize

15 it otherwise.  Purdue dealt with giving a discharge to a

16 nondebtor; an issue that's fundamental to the Bankruptcy Code

17 and I would submit (indiscernible) whether one talks about

18 these issues.

19          In this case, the Court has been asked to extend

20 the statute of limitations, which it has found is procedural,

21 non-substantive.  There should not be a wider gulf between

22 those scenarios, Purdue on the one hand and what the Court is

23 confronted with in the context of this motion.  That also

24 needs to be considered in the context of what the Supreme

25 Court specifically said about the narrowness of its decision.

1  It was very careful to say that it was talking about third-

2  party releases and their permissibility on a nonconsensual

3  scenario in that case.

4         And what I think Attorney Sklarz did not say,

5  because he could not say, or maybe he will come back and

6  argue this down the line if we do have a dispute about

7  equitable tolling, but if you take his argument to its

8  logical extension, he's basically saying the Supreme Court,

9  in a Purdue decision about nonconsensual third-party releases

10 intended to say that equitable tolling of a statute of

11 limitation as set forth in a statute of Congress is never

12 permissible.  That's the logical extension of what he's

13 saying.  He talks about the dissent and the equitable

14 arguments that the Supreme Court's majority did not consider.

15 That's essentially where he is taking that argument.  And I

16 submit there is no logical reading of the Purdue decision

17 that could be read that broadly, Your Honor.

18        Now, as to the facts -- and just to round out,

19 Your Honor, the 9006(b) and all the legal arguments

20 surrounding whether or not the Court has the authority to

21 extend the deadline, nothing else is new.  The Court's

22 analysis, its decision was correct.  No intervening cases

23 have been issued.  There's no other reason as to why that

24 analysis should be revisited and, therefore, we would ask

25 that the same order, again, be entered.

1         As to the factual arguments that the parties have

2  raised, Attorney Sklarz, as to the (indiscernible) Attorney

3  Kim, I believe, as well, had -- I think the way Attorney

4  Sklarz characterized it is the circumstances of this case

5  are, quote, no longer extraordinary.

6         Your Honor, I'm not sure what that means.  The

7  circumstances of this case are either extraordinary or they

8  are not and I don't think anyone could, with a straight face,

9  take the position that this case is anything but incredibly

10 extraordinary based on the level of obstruction the trustee

11 has faced from the beginning of the case, based on the fact

12 that this is a debtor who purported to file bankruptcy in

13 this case with, I think, 3,000 or some odd dollars in cash to

14 his name, despite having lived the life of a billionaire.

15 He's had to peel back every layer of the onion to try to

16 figure out where the shell companies, where these assets were

17 really held and whose names are they nominally held.  Where

18 are the bank accounts and other transactions located that

19 explain the true nature of the debtors' financial affairs?

20        The debtor has never cooperated.  He never

21 provided books and records and that continues to affect the

22 trustee's investigation today.  This case is, and always has

23 been extraordinary.  That did not stop on February 15th.  The

24 fallacy in the objectors' arguments is that all the

25 obstruction, all the unique circumstances of this case

1  necessarily could have been overcome in the six months that

2  have occurred since February 15th until now, but as the

3  trustee has testified, that just hasn't been the case.

4           And the inquiry, Your Honor, for extending the

5  statute of limitations in the context of the order that the

6  Court issued is whether the trustee has been diligent.  And

7  Your Honor found that he has been.  I think the testimony

8  today only demonstrates that that diligence has continued.

9  The trustee has said that he's filing complaints as soon as

10 he possibly can.  He and his team are diligently working to

11 pursue additional 2004 targets.  They are viewing documents

12 from the criminal case:  twenty-plus-thousand documents that

13 the trustee and his team are going through.  The Kroll team

14 is continuing to analyze bank accounts, all of which should

15 have been provided if they were -- if this were a normal case

16 where the debtor is cooperating, he'd provide access to his

17 books and records.

18           But the trustee is continuing to do all of those

19 things.  He's testified clearly that he's been diligent in

20 his efforts and, Your Honor, I think that factual record,

21 again, together with the context of this case from the

22 beginning, amply supports the further extension that the

23 trustee is seeking.

24           Subject to any questions the Court may have, I

25 don't have any further remarks at this time.  Thank you, Your

1  Honor.

2          THE COURT:  Thank you.  I do not have any

3  questions.

4          Anything further, Attorney Yan?  Attorney Sklarz?

5  Or -- did I lose everybody?  Oh, no, Attorney Sklarz is still

6  there.  Or Attorney Kim, that you'd like to state for the

7  record?

8          MR. SKLARZ:  Only, Your Honor, I don't know if you

9  want me to submit -- I don't know that it's necessary, but I

10  certainly will -- of any of the prior transcripts references

11  that we discussed during my argument related to what the

12  trustee was doing back at the inception of the case.

13          THE COURT:  That is not necessary, from my

14  perspective, thank you.

15          MR. SKLARZ:  And just very briefly, I never made

16  the argument that Purdue removes equitable tolling; to the

17  contrary, I said that the trustee's argument is not equitable

18  in nature.  It's made on the basis of a rule and doesn't

19  invoke the Court's equitable, true equitable jurisdiction,

20  which would be invoked through common law doctrines, such as

21  equitable tolling.  So, I just want to make sure that that is

22  clear.

23          Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Anyone else wish to be heard any further?

1          MR. KIM:  Your Honor, I would just be remiss

2    (indiscernible) to mention one point --

3          THE COURT:  Attorney Kim, I'm just going to stop

4    you for a second, just so it's clear that it's you that's

5    speaking.

6          So, Attorney Kim, you go right ahead.

7          MR. KIM:  Yes, Austin Kim for the Greenwich Land

8    Defendants.  I apologize, Your Honor.

9          THE COURT:  No, that's okay.

10          MR. KIM:  Austin Kim for the Greenwich Land

11    Defendants.

12          The one last point that I wanted to raise is that

13    the bulk of what the trustee has presented are vague claims

14    of obstruction or of concealment, but those are precisely why

15    the equitable doctrines of equitable tolling or fraudulent

16    concealment, those doctrines already exist.  So the trustee

17    is totally protected if, for example, some of the 700

18    documents or whatever documents do uncover some basis for an

19    additional adversary proceeding after the 15th of August.  So

20    the trustee does not need the Court's additional order,

21    basically granting him a six-month reprieve from having to

22    justify an equitable toll for any particular case because

23    they have it for every case, brought or not brought.

24          So, we would just say that as a matter of equity

25    to the objectors and for individuals who are not yet here,

1   that there's no need for the trustee to get the additional

2   sort of protection of not having to establish their burden

3   based on some claim of obstruction, because that same

4   argument that was raised in February is the same argument

5   being raised today.  I mean, it'll probably be raised against

6   next February.

7           At a certain point -- I'm not saying this case is

8   going to last forever -- but at a certain point, I think the

9   two-year statute of limitations was made for a particular

10  reason.  They've already received a 25 percent extension.

11  Now, they're seeking a 50 percent extension.  At a certain

12  point, you know, I think that the Court should hold the

13  trustee to its tasks and let him know, Hey, you already have

14  these rights if you can show that that was, in fact, observe

15  instruction that caused a delay and having the information to

16  bring the adversary proceeding, instead of prospectively

17  saying, Well, you know, we think there's obstruction and

18  we're looking at information and Kroll is spending some time

19  digging around.

20          I think it's insufficient to justify a cause basis

21  for essentially granting them equitable tolling on an omnibus

22  basis, and that's all I have, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          All right.  With regard to the motion for

25  extension of time, the first supplemental motion to extend

1   deadline to file avoidance actions, ECF 3329, I will take the

2   matter under advisement and rule accordingly.

3          Thank you all very much.

4          Now, we'll move to the mentioned emergency motion

5   for order authorizing funding to maintain the Mahwah Mansion.

6          And parties who were here on the first matter, if

7   you do not want to stay, you are absolutely excused, but

8   you're also welcome to stay throughout the entire hearing.

9   Thank you.

10         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11         MR. LINSEY:  Thank you, Your Honor.  I'll be

12  addressing the amended emergency motion.  This is Patrick

13  Linsey for the Chapter 11 Trustee.

14         THE COURT:  Yes.

15         MR. LINSEY:  The amended emergency motion was

16  filed in the main case, but addresses facts that are at issue

17  in the Taurus Fund LLC adversary proceeding 23-5017.  That

18  adversary proceeding was filed against Taurus Fund and its

19  co-defendants involving a $26-and-a-half-million mansion in

20  Mahwah New Jersey, which the debtor purchased in December

21  of 2021.

22         Since the Court entered a preliminary injunction

23  in that adversary proceeding and until the debtors' criminal

24  trial, the Defendants have been funding security and other

25  expenses for the Mahwah Mansion.  These expenses are

1   substantial.  The Mahwah Mansion is approximately 50,000

2   square feet in interior size and has approximately 12 and a

3   half acres of grounds.  The cost of the security services for

4   the Mahwah Mansion is approximately $14,200 a week.  The cost

5   of the real estate taxes for the property, which the

6   Defendants have also been funding, is approximately $70,000

7   per quarter.

8           The trustee expects there will be other expenses,

9   as well (indiscernible) and the like.  It's important for the

10  value of the Mahwah Mansion to be preserved for the benefit

11  of the estate, hence the trustee's motion requesting

12  authority under the Bankruptcy Code to fund these expenses.

13          The Court has already found in its ruling on the

14  preliminary injunction that it is administer likely than not

15  that the debtor is the beneficial owner of and controls the

16  Mahwah Mansion.  The Court also noted in the preliminary

17  injunction that for a period of time, the debtor had made the

18  Mahwah Mansion available to other individuals and entities,

19  such that it was frequented by third parties.  This

20  highlights the importance that security be maintained in

21  light of the threat of damage by people who had previously

22  frequented the property.

23          The preliminary injunction, as the Court is aware,

24  requires that the Defendants employ the security services.

25  Following the debtors' criminal trial, Taurus Fund informed

1 | the manager of the security services that Taurus Fund would
2 | no longer be providing funding.  While the trustee believes
3 | that Taurus Fund is violating a preliminary injunction, it is
4 | important that the value of this property is preserved in
5 | light of the trustee's expectation that through the adversary
6 | proceeding, the mansion will be confirmed by judgment of the
7 | Court to be property of the estate.

8 | In fact, from the evidence from the debtors'
9 | criminal trial, the trustee's case that this is property of
10 | the estate is even stronger now than it was when the Court
11 | entered the preliminary injunction order and made those
12 | findings there.

13 | One additional thing I neglected to mention, what
14 | we know from proceedings in the Mahwah adversary proceeding
15 | is that the Mahwah Mansion is presently not insured, which,
16 | again, is further reason that measures need to be taken to
17 | ensure that the property is secured.

18 | The trustee's motion requests authority under
19 | Section 363(b) of the Bankruptcy Code to use property of the
20 | estate to pay expenses of the Mahwah Mansion up to a cap of
21 | $300,000.  We're seeking this relief because we don't yet
22 | have that judgment saying this is property of the estate.

23 | The trustee is hopeful that the $300,000 cap will
24 | provide adequate funding for any expenses over the period of
25 | time necessary to obtain judgment as to ownership of the

1    property.  To the extent the cap requires adjustment, there's

2    a mechanism built into the proposed order to do that.

3              To be clear and for the purpose of the record,

4    we're filing a 363(b) motion because the property is not, by

5    the Court's ruling yet, property of the estate; however, once

6    that ruling enters, the trustee understands that we would no

7    longer need to be under the relief sought in this order

8    under 363(b), because at that point, the payments to maintain

9    the property would be ordinary course.

10             The motion also provides that the trustee does not

11   obtain judgment in the adversary proceeding to the extent

12   that, or to the effect, rather, that the Mahwah Mansion is

13   property of the estate, that the estate will then have a

14   claim against Taurus Fund in the amount of the expenses

15   advanced to be secured by the value of the Mahwah Mansion.

16   This is because right now, Taurus Fund is obligated under the

17   preliminary injunction to be funding expenses.  It's not

18   doing so.  And under a hypothetical scenario, just to be

19   clear, we don't think it's going to come to pass, but under a

20   hypothetical scenario where the estate's claims do not

21   prevail, Taurus Fund would have been unjustly enriched by the

22   estate's funding of these expenses.

23             The trustee would also note that the relief he is

24   seeking does not reveal the Defendants of their obligations

25   under the preliminary injunction; again, this motion is one

1  of practicality.  Your Honor can enter further orders and we

2  may proceed with further orders in regards to those matters,

3  but from a practical perspective, the trustee has an

4  obligation to preserve the value for the estate and that's

5  what we're doing by this motion.

6          Yesterday, Taurus Fund filed a response to the

7  motion consenting to the relief requested by the trustee, as

8  provided in the proposed order that's at ECF 3392.  Since

9  filing the motion, the trustee has consulted with counsel for

10  the United States Trustee, who suggested that terms in the

11  proposed order that rely on incorporated definition be

12  expressly defined in the proposed order and the trustee

13  agrees that makes sense.

14          So what the trustee would propose to do, to the

15  extent the Court is inclined to grant the motion, is that we

16  submit a revised proposed order that expressly defines the

17  capitalized terms for which definitions are incorporated.

18  That we note that the Taurus Fund filed a response saying

19  that it does not object to the relief sought in the order.

20  And that we say, explicitly, that there was a hearing today.

21          We can submit that order -- the trustee can submit

22  that order, certainly, by tomorrow, if not by later today,

23  and can send it to the courtroom deputy with the Mahwah

24  Defendants and the U.S. Trustee CCed, in the Court would

25  prefer we submit it otherwise.

1          With that, I'm happy to answer any questions that

2  the Court may have.

3          THE COURT:  I do not have any questions at this

4  time, thank you.

5          MR. LINSEY:  Thank you, Your Honor.

6          THE COURT:  Does anyone else wish to be heard on

7  this motion?

8       (No verbal response)

9          THE COURT:  Attorney Claiborn, do you agree with

10  what Attorney Linsey said, with regard to the proposed order?

11          MS. CLAIBORN:  Yes, Your Honor.  And the U.S.

12  Trustee has no objection to the motion.

13          THE COURT:  Okay.  I have looked at the proposed

14  order -- does anybody else wish to be heard?  I'm sorry, I

15  don't want to cut anyone off?

16       (No verbal response)

17          THE COURT:  Okay.  I had looked at the proposed

18  order and I understand that you're going to be making some

19  changes, Attorney Linsey, assuming I'm going to grant the

20  motion.  I think the changes that you've just stated are

21  fine.  I find that no one has filed any written objection to

22  your motion.

23          The Taurus Fund did file something yesterday, I

24  belief it was yesterday, that says they do not object to the

25  motion, but they object to certain language in what it

1   believes is a mischaracterization of the Taurus Fund's

2   behavior set forth in the motion.

3         I think under the very specific circumstances of

4   this case and the issues related to the Mahwah Mansion that

5   have been brought to the Court's attention, both in the main

6   case and in the adversary proceeding that the trustee has

7   commenced against the Taurus Fund and related Defendants,

8   that the relief sought is reasonable and necessary under the

9   circumstances.  We've gone through the issues in the

10  adversary proceeding, including the fact that there is no

11  insurance at the property and that the security firm was

12  retained as part of a preliminary injunction order.  I know

13  that the trustee is not pressing any issues with the

14  preliminary injunction at this time.

15        For all those reasons, the amended motion for

16  order is granted and, Attorney Linsey, you'll have the order

17  in by tomorrow or the next day?  I just need to give a date

18  to the Clerk's Office so that they will be on the lookout for

19  it.

20        MR. LINSEY:  We'll have it in by tomorrow, Your

21  Honor.

22        THE COURT:  Thank you.

23        And you can just submit it to the courtroom deputy

24  email box for Bridgeport.  You do not need to docket it on

25  the case docket.

1          So the motion is granted and the revised proposed

2   order will be submitted on or before August 14th.

3          MR. LINSEY:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          Now, with regard to the two -- now, Trustee

6   Despins, I forget now, and I apologize.  I think I've been

7   sitting here for a few hours, but you had said something at

8   the beginning that you thought there was something that

9   needed to be on the calendar and now I can't recall what that

10  was, because this was the Mahwah Mansion issue.

11         Was there something else?

12         MR. DESPINS:  Well, no.  There's the status

13  conference on --

14         THE COURT:  Right, the status conference.  Yeah,

15  that's fair.

16         MR. DESPINS:  -- the scheduling.

17         THE COURT:  That's the fourth matter on the

18  calendar.

19         There are two other -- the status conference was

20  granted; it is on the calendar.

21         But let's just take a moment with regard to the

22  Genever adversary proceeding versus Kwok; that's been

23  continued a few times before, but it was not continued today.

24         MR. DESPINS:  Yeah.

25         THE COURT:  Did you anticipate oh did you plan to

1   go forward with this matter?

2           MR. DESPINS:  No, we dropped the ball, Your Honor,

3   on that.  We should have extended that, as well.  So we'll

4   make sure that that happens.  So, that should not go forward.

5   We apologize for that.

6           THE COURT:  That's fine.

7           So you're going to be filing a motion to set a

8   new -- to adjourn the pretrial conference to a new date in

9   the future?

10          MR. DESPINS:  Correct, Your Honor.

11          THE COURT:  All right.  So we're just going to

12  note that the conference was held, but that the Plaintiff

13  will be submitting, I suppose, a motion or something -- will

14  be submitting -- what did you file last time, was it an

15  actual motion?  I think it might have been, yeah, a motion

16  to --

17          MR. DESPINS:  A consent, yeah.

18          THE COURT:  -- adjourn hearing upon consent.

19          MR. DESPINS:  Yeah.

20          THE COURT:  So I think you'll be submitting

21  another motion and suggest an adjourned pretrial conference

22  date, okay?

23          MR. DESPINS:  Yes, Your Honor.

24      (Pause)

25          THE COURT:  All right.  So the pretrial conference

1  was held, but it will be adjourned, again, to a date to be

2  determined, okay?

3          MR. DESPINS:  Thank you, Your Honor.

4          THE COURT:  All right.  So the last matter on the

5  calendar is the status conference, so go right -- in the --

6  with regard to the Taurus Fund adversary proceeding.

7          So go right ahead, Trustee Despins.

8          MR. DESPINS:  Mr. Bassett will handle that, Your

9  Honor.  Thank you.

10         THE COURT:  Okay.

11         MR. BASSETT:  Your Honor, yes, again, Nick Bassett

12  from Paul Hastings, on behalf of the Chapter 11 Trustee.

13         Your Honor, it's a bit of an odd situation to be

14  in for a status conference.  We, as the Court will recall, we

15  outlined this in our request for the status conference, the

16  order saying various litigation, including the Mahwah

17  adversary proceeding provided that upon the conclusion of the

18  criminal trial, the debtor could file a notice indicating his

19  intent to resume the adversary proceeding, following which

20  the parties had seven days to confer about a proposed

21  schedule.

22         We sent our proposed schedule to Attorney Conway,

23  counsel for the Defendants.  He confirmed receipt, but did

24  not give us his position on the schedule.  We followed up

25  with him prior to the seven-day deadline to request a status

1   conference and still did not hear anything, so we then

2   requested the status conference.  We've still not heard from

3   him.

4           All we have heard is that he sent a response to

5   the other motion that we just finished discussing, stating

6   that he was occupied today and, therefore, would not be

7   attending the hearing.  So we are having a status conference

8   with only one of the parties present.

9           From the trustee's perspective, Your Honor, our

10  intent, which we have expressed to the Defendants' counsel is

11  to move forward with summary judgment in the adversary

12  proceeding as expeditiously as possible.  We have undertaken

13  some discovery.  We have also very intently followed the

14  criminal trial and gathered additional information from that

15  trial that we would intend to use in support of summary

16  judgment.  We see no delay in moving ahead in that -- we see

17  no reason to delay moving ahead in that direction and we've

18  received no opposition, no response at all, from counsel to

19  the Defendants.

20          So, that's what we intend to do.  I think what we

21  had said in the, in what we filed that requested the status

22  conference, Your Honor, that we had anticipated filing our

23  motion by the 19th and then giving the Defendants two weeks

24  to respond and then we'd reply in a week.  I think what we

25  may do, and we can submit a proposed scheduling order, but

1   out of respect for colleagues on me team that are working on

2   that motion, we may need a couple of extra days, so I think

3   we would just propose a schedule that says we will file the

4   motion and there'll be a 14-day response deadline and then

5   a 7-day reply deadline.

6            That's how we intend to proceed --

7            THE COURT:  No, I think were usually give a 21-day

8   response deadline, though, on motions; that's the District

9   Court's Local Rule.

10           MR. BASSETT:  That's fine, Your Honor.

11           THE COURT:  Okay.

12           MR. BASSETT:  We had proposed to Defense counsel

13  moving quickly under the circumstances, given the funding and

14  other issues, but we're happy to do 21 days.

15           The only other point I wanted to make, just so the

16  Court is aware, although we did not hear back from counsel

17  regarding our request for, regarding our proposed schedule,

18  we did get notice that they filed a motion to withdraw the

19  reference --

20           THE COURT:  Yeah, I saw that.

21           MR. BASSETT:  -- Friday night.

22           THE COURT:  And it's been transmitted to the

23  District Court.  I think it might have been transmitted

24  today.

25           MR. BASSETT:  Correct, Your Honor.

1          Okay.  I just wanted to make sure the Court was

2    aware of that.  And, obviously, in our view, if there's

3    summary judgment briefing before Your Honor and that leads to

4    the decision that would be reviewed by the Appellate Court,

5    in any event, so we'll deal with the motion to withdraw the

6    reference as we need to, but we don't see that as, you know,

7    creating any issue with respect to how we proceed before Your

8    Honor.

9          THE COURT:  I understand.  Mr. Conway may

10   disagree, but I'm sure we'll do that in his papers or not.

11   So we'll see how things proceed.

12         MR. DESPINS:  Your Honor, if I may?  Luc Despins,

13   Chapter 11 Trustee.

14         On the 21 days, can we -- because I have the

15   feeling that we're not going to hear from Mr. Conway again.

16   I could be wrong, but --

17         THE COURT:  You can ask for the time to be

18   shortened; yes, in your scheduling, you can ask for that.

19         MR. DESPINS:  Or that if he intends to file

20   something, then he should have his 21 days, but if he's not

21   going to do it, I don't want to wait 21 days for nothing.

22         THE COURT:  Well, I --

23         MR. DESPINS:  So I can't promise --

24         THE COURT:  Under the District Court Local Rules

25   it's 21 days so, if you want a shorter time, you'll have to

1  ask for it.

2          MR. DESPINS:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Attorney Bassett, is there anything else, then, we

5  can do this afternoon with regard to this status conference?

6          MR. BASSETT:  No, Your Honor.  Thank you very

7  much.

8          THE COURT:  Okay.  I'm not going to schedule

9  another status conference at this point.  You will just take

10  whatever action you think is appropriate, including, as you

11  mentioned, the likelihood of proceeding forward with summary

12  judgment, okay?

13          MR. BASSETT:  Thank you, Your Honor.

14          THE COURT:  All right.  Then, with regard to -- we

15  have now addressed everything that is on today's calendar,

16  but as we often do at the end of hearings when there are

17  several matters, I ask the trustee or any parties, are there

18  any other issues that the parties wish to discuss with the

19  Court?

20          MR. DESPINS:  The only point, Your Honor -- thank

21  you, Luc Despins, Chapter 11 Trustee -- is that we may need,

22  and I don't know that yet, assistance in terms of getting

23  title to Greenwich Land transferred in my name as trustee; to

24  put insurance on, I need to have an insurable interest.

25  We're working on that, the technical aspects of that, but we

1  may need, like, a court order that directs, you know, like,

2  the Town (indiscernible) or something like that, but we hope

3  to avoid all of that.

4          And we are working on a stipulation with the

5  Greenwich Land Defendants where, I think everything has been

6  agreed to, where there'll be a transfer of possession on

7  August 20th.  So, if anything happens, it will need to be

8  between now and August 20th, but hopefully, we won't.  We'll

9  just be submitting to Your Honor a stipulated or a consent

10  order.

11          THE COURT:  Okay.  Thank you.

12          Anyone else --

13          MR. DESPINS:  Thank you.

14          THE COURT:  -- wish to be heard on any matters

15  this afternoon?

16      (No verbal response)

17          THE COURT:  All right.  Well, thank you, all.

18  That concludes today's hearings and those were the last

19  matters on today's calendar, so Court is adjourned.

20          COUNSEL:  Thank you, Your Honor.

21          THE CLERK:  Court is adjourned.  Excuse me.

22      (Proceedings concluded at 3:24 p.m.)

23

24

25

1        <u>CERTIFICATION</u>

2             I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    <u>/s/ William J. Garling</u>                    <u>August 19, 2024</u>

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25