**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------------x
          :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| HO WAN KWOK, *et al.*,[1] | : | Case No. 22-50073 (JAM) |
| | : | |
| Debtor. | : | (Jointly Administered) |

---------------------------------------------------------x
          :

| | | |
|---|---|---|
| LUC A. DESPINS, Chapter 11 Trustee, | : | Adv. Proceeding No. 23-05017 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TAURUS FUND LLC, | : | |
| SCOTT BARNETT, as trustee of TAURUS | : | |
| FUND LLC, and | : | |
| TAURUS MANAGEMENT LLC, as trustee | : | |
| of TAURUS FUND LLC, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------x

**MOTION OF CHAPTER 11 TRUSTEE FOR ENTRY OF ORDER AUTHORIZING**
**TRUSTEE TO SELL MAHWAH MANSION AND ITS CONTENTS, SUBJECT TO**
**ENTRY OF FURTHER ORDERS, INCLUDING AS TO RETENTION OF BROKER,**
**TERMS OF SUCH SALES, AND PARTIES' ENTITLEMENT TO SALE PROCEEDS**

       Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor"), hereby respectfully

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtors is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

submits this motion (the "Motion"), pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "Cival Rules"), as made applicable through Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Court's *Memorandum of Decision and Order Granting in Part Motion for Preliminary Injunction* [Adv. ECF No. 47][2] (as modified, the "PI Order")[3] entered in the above-captioned adversary proceeding (the "Adversary Proceeding"), requesting entry of an order, substantially in the form of the Proposed Order attached hereto as **Exhibit 1** (the "Proposed Order"), authorizing the Trustee to sell (a) the real property located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "Mahwah Mansion") and (b) all personalty and/or fixtures in, on, or at the Mahwah Mansion (the "Contents"), subject to further orders of this Court (i) approving the Trustee's retention of real estate brokers and/or auctioneers to market and/or facilitate such sales, (ii) authorizing the terms and conditions of such sales to one or more prospective buyers, and (iii) determining the parties' entitlements to the net proceeds from such sales.  In support of the Motion, the Trustee respectfully states the following:

**PRELIMINARY STATEMENT**

1.    The Defendants' continued violation of their clear obligations under the PI Order and other orders of this Court has put the Trustee in the unsustainable position of having to fund the enormous carrying cost—in the amount of approximately $300,000 each quarter—of the Mahwah Mansion, even though such property has yet to be determined to be property of the Debtor's chapter 11 estate (the "Estate").  This significantly prejudices the Trustee because, in the likely event that the Court determines that the Mahwah Mansion and the Contents are property of the Estate, the Trustee will have no recourse to recover these carrying costs from the

---

[2]    "Adv. ECF No." refers to documents filed in the Adversary Proceeding.

[3]    Capitalized terms not expressly defined herein adopt the definitions set forth in the PI Order.

Defendants because the Defendants have already told the Court they have no ability to pay such costs.[4]  Accordingly, the enormous costs of maintaining the Mahwah Mansion and the Contents will serve to reduce the net value ultimately to be realized by the Estate.  The only way to reduce this burden is to authorize the Trustee now to sell the Mahwah Mansion and the Contents, thereby shortening the period over which such costs will have to be incurred.

2.     Defendants will suffer no prejudice from an order authorizing the Trustee to sell these assets now, subject to further orders of the Court concerning the terms of such sales and the parties' respective entitlements to the net sale proceeds.  The Defendants have never controlled or occupied the Mahwah Mansion and have no current possessory interest in the mansion, nor is the mansion occupied by anyone else at this time.  In fact, in July 2024, the Defendants discontinued paying the maintenance costs after they apparently recognized—following the Debtor's conviction in the Criminal Case—that the Mahwah Mansion and the Contents would become either property of the Estate (if the Trustee prevails in this Adversary Proceeding) or subject to the Government's forfeiture proceedings in the Criminal Case.  For these reasons, unlike other situations involving real estate, the sale of the Mahwah Mansion will not cause irreparable harm to its purported owner.  Moreover, the net cash proceeds from the sale of the Mahwah Mansion and personal property located within it will be available to the Defendants if they prevail, and such proceeds are a perfectly acceptable substitute for the assets themselves.

---

[4]     The Trustee is also seeking an order in this Adversary Proceeding that Taurus Fund is the Debtor's alter ego, such that all of its property is the Estate's property.  If the Court grants this relief, the Trustee will be unable to recover the carrying costs from Taurus Fund for the additional reason that any claim for such costs would necessarily have to be asserted against assets the Estate already owns by virtue of the alter ego ruling.  The only scenario in which the Trustee would be able to obtain reimbursement for the carrying costs from the Defendants is in the unlikely event that the Court were to conclude that the Mahwah Mansion is not property of the Estate, in which case the Trustee would have a reimbursement claim secured by the value of the Mahwah Mansion.

3.      The relief requested in this Motion is also justified as sanctions for the Defendants' clear and continued violation of this Court's orders.[5]  Among other things, the PI Order required the Defendants to: (a) not impair, in any way, any asset or property of Taurus Fund, including the Mahwah Mansion and any personalty and/or fixture in, on, or at the Mahwah Mansion; (b) file proof of insurance for (i) all assets and property of Taurus Fund, including the Mahwah Mansion, and (ii) all personalty and/or fixtures in, on, or at the Mahwah Mansion; and (c) employ the Security Services.  The Defendants are in breach of all of these obligations, as they failed to obtain insurance, failed to fund the Security Services, and failed to pay real estate taxes or other charges with respect to the Mahwah Mansion.  As noted, the Defendants' actions have forced the Trustee to take on the obligation to pay for the Security Services and other maintenance expenses, including utilities and real estate taxes, to preserve the value of these assets.  In addition, as further detailed below, the Defendants are also in clear violation of this Court's order requiring them to (a) explain why they are no longer complying with the PI Order and (b) identify an individual who as the authority to make decisions for the Defendants.

4.      Under these circumstances, the Trustee submits that authorizing him now to proceed with a sale of the Mahwah Mansion and the Contents is an appropriate form of sanctions for the Defendants' continued noncompliance with this Court's orders.  Merely imposing monetary sanctions on the Defendants would not be an effective remedy because the Defendants have taken the position that they do not have the resources to fund the carrying costs in the first place (a dubious position given that the Defendants were perfectly capable of paying such costs until the Debtor was convicted in his criminal trial).  That said, if the Defendants were to fund

---

[5]      The Trustee previously made clear, and the Court recognized, that he reserved his right to seek relief against the Defendants for their continuing violation of the PI Order and other orders.

the carrying costs for the Mahwah Mansion and the Contents, the Trustee would be prepared to stand down and not seek the relief requested in this Motion.

5.     To be clear, the Trustee does not seek a blank check to sell the Mahwah Mansion and the Contents.  To the contrary, the Trustee recognizes that he will need to come back to this Court to retain a broker and/or auctioneer to market and/or facilitate the sale of such assets, as well as for approval of the terms of one or more such sales to prospective buyers.  Pending an order determining the parties' entitlements to the net proceeds from such sales, the Trustee will hold such net proceeds in escrow, with all parties' rights thereto fully preserved.[6]

6.     Finally, the Trustee acknowledges that, in theory, an alternative remedy could be authorize him to *market* the Mahwah Mansion and the Contents, leaving the question as to his authority to *sell* such assets for another day.  However, such alternative relief would be ineffective here, because, absent a grant of authority to sell these assets, no serious broker or prospective buyer would expend time and resources engaging with the Trustee on the sale or sales of such significant assets.

7.     In sum, given the Defendants' clear and continuing violation of the PI Order and other orders, the only avenue to mitigating the harm caused by the Defendants' noncompliance is to minimize the period during which the Estate is compelled to pay for the carrying costs of the Mahwah Mansion and the Contents and authorize the Trustee now to commence a sale process. The Trustee therefore respectfully submits that this Motion should be granted.

---

[6]   For the avoidance of doubt, the Trustee's security interest in the Mahwah Mansion for the amount of Mahwah expenses advance by the Estate in accordance with the Funding Order (as defined below) shall continue in the net proceeds from the sale of the Mahwah Mansion.

## BACKGROUND

### I.    Adversary Proceeding

8.    The Mahwah Mansion is one of the largest mansions in the United States, a 21-bedroom, 50,000 square foot, castle-styled private residence with 12.5-acre grounds located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430.  The Debtor purchased the Mahwah Mansion through Taurus Fund LLC ("Taurus Fund") in December 2021 for $26.5 million for his personal and family use, employing Taurus Fund and his associates to conceal his ownership of the property.

9.    On July 11, 2024, the Trustee commenced this Adversary Proceeding by filing his *Complaint* [Adv. ECF No. 1] (the "Complaint") against Taurus Fund, and Scott Barnett and Taurus Management LLC as trustees of Taurus Fund (together with Taurus Fund, collectively, the "Defendants"), seeking (a) a declaratory judgment that: (i) the Debtor is the equitable owner of the Mahwah Mansion; (ii) the Debtor is the equitable owner of Taurus Fund; and (iii) Taurus Fund is the Debtor's alter ego; and (b) on these respective bases, an order under 11 U.S.C. §§ 541, 542, and 544 requiring turnover to the Estate and delivery to the Trustee of: (i) the Mahwah Mansion and all fixtures and personal property inside the Mahwah Mansion; (ii) any membership interest or other ownership interest in Taurus Fund; and (iii) all Taurus Fund's assets.

10.    Together with the Complaint, the Trustee filed his Ex Parte *Motion for Temporary Restraining Order and Preliminary Injunction* [Adv. ECF No. 4] (the "PI Motion").

11.    On August 1, 2023, the Court entered its *Order Granting in Part* Ex Parte *Motion for Temporary Restraining Order* [Adv. ECF No. 17] and, pursuant thereto, on August 14, 2023 held a hearing on the PI Motion, including evidence and argument from the Trustee and the corporate Defendants.

12. On August 24, 2023, the Court entered its PI Order. The PI Order determined, among other things, that it is more likely than not that: (a) the Debtor is the beneficial owner of and controls the Mahwah Mansion (PI Order at p. 16); and (b) Taurus Fund is the Debtor's alter ego and/or is beneficially owned and controlled by the Debtor (*id.* at 20). The PI Order further determined "the Mahwah Mansion is being made available to myriad individuals who are members of entities other than Taurus Fund" (*id.* at 10), and that:

> absent a preliminary injunction, Taurus Funds' assets are likely to be damaged and/or dissipated by the Defendants and/or the NFSC, the Whistleblower Movement, and/or the Himalaya "farms" and/or other parties affiliated with the Individual Debtor's interests. Damage to the Mahwah Mansion is particularly concerning given that, as established by Exhibit 10, it is on the National Register of Historic Places and must be maintained and repaired according to applicable standards.

(*Id.* at 11.)

13. In order to preserve the value of the Mahwah Mansion, the PI Order provided, among other things, that access to the Mahwah Mansion shall be restricted and that the Defendants "shall employ [Security Services] for the Mahwah Mansion," which Security Services must:

> (i) log all persons entering and exiting grounds, interior, and all property of the Mahwah Mansion; (ii) supervise visitors to the grounds, interior, and all property of the Mahwah Mansion; (iii) secure and safeguard any and all assets or property of Taurus Fund, including the Mahwah Mansion, and/or any and all any and all personalty and/or fixtures in, on, or at the Mahwah Mansion; and (iv) notify the Defendants and the Trustee of any damage or dissipation of any assets or property of Taurus Fund, including the Mahwah Mansion, and/or any personalty and/or fixtures in, on, or at the Mahwah Mansion

(*Id.* at 24.)

14. The PI Order required that, on or before 4:00 p.m. on August 28, 2023, the Defendants file proof of insurance for (i) all assets and property of Taurus Fund, including the

Mahwah Mansion; and (ii) all personalty and/or fixtured in, on, or at the Mahwah Mansion

("Proof of Insurance").  (*Id.* at 47.)

15.    The Defendants failed to file Proof of Insurance by the deadline set by the Court,

nor have they filed any Proof of Insurance since that time.  The Trustee understands that the

Mahwah Mansion and its contents remain uninsured, which makes the Security Services

particularly critical to preserve the value of this property.

16.    On August 31, 2023, in light of the Defendants' failure to insure the property, the

Court entered its *Order Granting Emergency Motion to Modify Preliminary Injunction* [Adv.

ECF No. 58] (the "PI Mod. Order"), restricting access to the Mahwah Mansion solely to:

> (a) the Security Services; (b) the Trustee and his representatives and/or
> professionals; (c) the United States Department of Justice and its
> employees and representatives; (d) the FBI and its employees and
> representatives; (e) other federal, New Jersey state, or Mahwah municipal
> law enforcement agencies and their employees and representatives; (f) any
> other persons expressly authorized by the Trustee in writing (which can
> include email); and (g) any other person expressly authorized by the
> United States District Court for the Southern District for New York or this
> Court

(PI Mod. Order at 2-3.)

17.    The PI Order (as modified by the PI Mod. Order) remains in full force and effect.

## II.    Settlement Agreement with Government and Debtor's Criminal Trial

18.    The United States of America (the "Government") in its criminal case against the

Debtor [Case No. 1:23-cr-00118-AT] (the "Criminal Case") in the U.S. District Court for the

Southern District of New York has asserted forfeiture claims, including with respect to the

Mahwah Mansion.  To avoid risk to the Estate based on the outcome of forfeiture proceedings as

to the resources expended prosecuting the Adversary Proceeding and preserving the value of the

Mahwah Mansion, the Trustee entered into the *Stipulation Between Chapter 11 Trustee and*

*United States of America* (the "Settlement Agreement") with the Government, which the Court

has authorized and approved in the Chapter 11 Case pursuant to Bankruptcy Rule 9019.  *See Order Approving, Pursuant to Bankruptcy Rule 9019, Motion of Chapter 11 Trustee Regarding Settlement with United States of America* [ECF No. 2849 in Case No. 22-50073] (the "Settlement Order").[7]

19.     The Settlement Agreement provides, among other things, for any "expenses to ensure safekeeping and custody of the [Mahwah Mansion] (including security service at or around the premises)" incurred by the Estate to be paid from the proceeds of the eventual sale of the Mahwah Mansion.  (Settlement Agreement ¶¶ 2, 3.)  The Settlement Agreement also provides that the Government "shall not oppose . . . any effort by the Trustee to obtain control of and/or sell the [Mahwah Mansion]."  (Settlement Agreement ¶ 1.)

20.     On July 16, 2024, following the trial (the "Criminal Trial") in the Debtor's Criminal Case, the Debtor was convicted of nine felony counts, *i.e.*, racketeering conspiracy, conspiracy to commit wire fraud and bank fraud, money laundering conspiracy, conspiracy to commit securities fraud, wire fraud in connection with the Farm Loan Program, securities fraud in connection with the Farm Loan program, wire fraud in connection with G|CLUBS, securities fraud in connection with G|CLUBS, and wire fraud in connection with the Himalaya Exchange.

21.     During the Criminal Trial, the Government offered extensive evidence that the Debtor, through his agents and network of shell companies, funded the purchase and renovation of the Mahwah Mansion for himself and his family, including (a) causing, through his agents, the transfer of funds to purchase the mansion, (b) selecting furnishings and artwork for the mansion, and (c) directing multi-million-dollar renovations to its floor plan.  In addition, Defendant Scott Barnett testified, among other things, that he had accepted the role of managing member of

---

[7]     The Settlement Agreement is appended to the Settlement Order.

Taurus Fund without knowing what Taurus Fund was or what his position entailed, thinking "they just meant [for Mr. Barnett] to manage the property and install the security services." (*See* Criminal Trial Transcript, July 8, 2024, at 5514:5-16, a true and accurate copy of which is attached hereto as **Exhibit 2**.) Mr. Barnett further testified that he became managing member of the Taurus Fund after Aaron Mitchell (the Debtor's personal attorney) asked him to sign some paperwork. Mr. Barnett did not understand what he was signing, and when he later realized "[t]hey put me down as the owner of [Taurus Fund] [it] took me a little bit by surprise . . . ." (*See* Ex. 2 at 5515:5-12, 5516:4-15.)[8]

### III.    Defendants Violate PI Order by Refusing to Fund Security Services

22.     On July 28, 2024, a representative of Taurus Fund contacted the manager of the Security Services via email erroneously stating that, because of the verdict following the Debtor's Criminal Trial, the "Mahwah Mansion belong[s] to the Gover[n]ment" and further stating that "[s]ince July 29, 2024, the security service costs can [n]o longer be paid."[9] This violated the PI Order, which requires the Defendants to employ the Security Services. Although the statement that the Mahwah Mansion belongs to the Government is erroneous, the email conveyed loud and clear the message from the Kwok enterprise that it makes no sense to fund the costs of the Mahwah Mansion because he will not end up occupying it.

23.     As discussed at a status conference held in the Adversary Proceeding on July 30, 2024, the Trustee has assured payment of the Security Services and other necessary expenses of the Mahwah Mansion to preserve the value of this asset while the Trustee addresses the

---

[8]    In the PI Order, the Court found that Taurus Fund's Articles of Organization had listed its managers and/or managing members as Taurus Management and Mr. Barnett and that Mr. Barnett had signed the articles as "Manager" or "Member." (PI Order at 19.) The Court further found that Mr. Barnett "is or was the ... Debtor's chauffeur and bodyguard." (*Id.* at 20.) Mr. Barnett failed to appear at the PI Hearing personally or through counsel. (*Id.* p. 4.)

[9]    A true and accurate copy of this email is attached hereto as **Exhibit 3**.

Defendants' violation of the PI Order with the Court.  In fact, this Court observed that "if these payments aren't made, then they're going to be in violation of an existing order and they could be subject to sanctions, including jail."  (*See* Transcript, July 30, 2024, at 18:18-30, a true and accurate copy of which is attached hereto as **Exhibit 4**; *see also id.* at 19:9-12.)  Moreover, the Court warned the Defendants that it "can issue orders that are supplemental to orders that are already in existence in this adversary proceeding."  (*Id.* at 30:14-15.)

24.     Following this status conference, at which the Defendants' counsel offered no explanation for the email by Taurus Fund's representative and could not assure that the Defendants would fund the Security Services or other expenses (including real estate taxes) of the Mahwah Mansion going forward, the Court ordered:

> [A]t or before 5:00 p.m. on August 1, 2024, the Defendant shall file on the docket of this adversary proceeding a Statement regarding whether the Defendant will continue to comply with existing orders entered in this adversary proceeding including, but not limited to, paying all expenses of the Defendant due and owing to Hawk Eye Security and all real estate taxes due and owing, including those due and owing on August 1, 2024. The Statement shall include the name, home and business addresses, and position of the individual who holds the authority to decide whether the Defendant will continue to comply with existing orders entered in this adversary proceeding and pay all expenses of the Defendant.

Docket Entry Order [Adv. ECF No. 108] (July 30, 2024) (the "Disclosure Order").

25.     On August 1, 2024, the Defendants' counsel filed the *Fourth Amended Response re: Preliminary Injunction* [Adv. ECF No. 109] (the "Response to Disclosure Order"), which states that Defendant Taurus Fund will not pay for the Security Services or real estate taxes for the Mahwah Mansion, because Taurus Fund purportedly does not have funds to make such payments.  (Response to Disclosure Order at 3.)   In that response, counsel also stated that there is no individual associated with Taurus Fund who can make decisions as to compliance with court orders.  (*Id.* ("there is no individual affiliated with a Defendant who has the authority to

decide 'whether' the Defendant will continue to comply with existing orders entered in this adversary proceeding and pay all expenses of the Defendant").)

26.    At this time, the cost of the Security Services is approximately $14,200 per week, and the cost of the real estate taxes for the Mahwah Mansion is approximately $70,000 per quarter.  In addition, utilities, including electricity, gas, and internet, cost approximately $6,300 per month.  In the aggregate, these expenses alone[10] amount to more than $280,000 per quarter.

## IV.    Trustee's Emergency Motion to Approve Estate Funding to Maintain Mahwah Mansion

27.    On August 5, 2024, the Trustee filed his *(I) Reply to Defendants' Fourth Amended Response re: Preliminary Injunction and (II) Emergency Motion Pursuant to Sections 363(b) and 105(a) of Bankruptcy Code to Approve Estate Funding to Maintain Mahwah Mansion* [Adv. ECF No. 113] (the "Initial Funding Motion").  The Initial Funding Motion discussed why the Response to Disclosure Order did not comply with the Disclosure Order and why the excuses in that response are not credible, and the Initial Funding Motion further requested the Court to approve the Trustee's funding of the expenses of the Mahwah Mansion while the Trustee addresses the Defendants' conduct with the Court.

28.    On August 7, 2024, the Trustee filed an amended motion [ECF No. 3381 in Case No. 22-50073] (the "Amended Funding Motion") supplementing and amending the Initial Funding Motion.  As detailed in the Amended Funding Motion, the Trustee requested that the Court authorize the Trustee to fund the reasonable and necessary expenses of the Mahwah Mansion, including, without limitation, payment of the Security Services, the utilities, and any real estate taxes owing with respect to the property (the "Mahwah Expenses"), up to the

---

[10]    The enumerated expenses do not include other costs that may need to be incurred to maintain the Mahwah Mansion, including pool maintenance and landscaping, or to bring it to a condition necessary to make it suitable for sale.

maximum amount of three hundred thousand dollars ($300,000.00) (the "Expenses Cap") until further order of the Court. The Amended Funding Motion further requested that, to the extent the outcome of the Adversary Proceeding does not result in the entry of a judgment confirming that the Mahwah Mansion is property of the Estate (because it is beneficially owned by the Debtor and/or because Taurus Fund is the Debtor's alter ego), the Trustee (for the benefit of the Estate) shall then have a claim against Taurus Fund in the amount of the Mahwah Expenses advanced by the Estate secured by the value of the Mahwah Mansion.

29.     Taurus Fund filed a response to the Amended Funding Motion [ECF No. 3392 in Case No. 22-50073], but did not object to the relief requested in the Amended Funding Motion.

30.     As counsel for the Trustee made clear at the August 13, 2024 hearing on the Amended Funding Motion, the Trustee reserved its right to seek further relief in regard to the Defendants' violation of the PI Order. (*See* Transcript, Aug. 13, 2024, at 84:23-85:2, a true and accurate copy of which is attached hereto as **Exhibit 5**.) The Court acknowledged that "the trustee is not pressing any issues with the preliminary injunction at this time." *Id.* at 87:13-14.

31.     On August 15, 2024, the Court entered an order [ECF No. 3422 in Case No. 22-50073] (the "Funding Order") granting the relief requested in the Amended Funding Motion. Among other things, the Funding Order confirmed that nothing therein "shall relieve the defendants in the Adversary Proceeding of their obligations under the [PI Order] or the [Disclosure Order], which remain in full force and effect." Funding Order ¶ 5.

**V.      Trustee's Summary Judgment Motion**

32.     On September 11, 2024, the Trustee filed its motion for summary judgment in the Adversary Proceeding [Adv. ECF No. 124] (the "Summary Judgment Motion") as well as his related memorandum of law (the "Memo of Law"), the *Declaration of Douglass E. Barron in Support of Memorandum of Law in Support of Motion of Chapter 11 Trustee for Estate of Ho*

13

*Wan Kwok for Summary Judgment*, and the *Local Rule 56(a)(1) Statement of Undisputed Material Facts*, all of which are incorporated herein by reference.

33.    As detailed in the Memo of Law and the related filings, the evidence, including the evidence submitted at the Debtor's criminal trial, establishes that there is no dispute of material fact with respect to the Trustee's claims in the Adversary Proceeding and the Trustee is entitled to a summary judgment ruling that the Debtor is the equitable owner of the Mahwah Mansion, the Debtor is the equitable owner of Taurus Fund, and Taurus Fund is the Debtor's alter ego.  The Trustee's filings detail the evidence uncovered since entry of the PI Order which confirms and strengthens the Trustee's claims against the Defendants.

34.    For example, as detailed in the Memo of Law and the related filings:

- Like all of his other valuable assets, the Debtor hid the Mahwah Mansion under the ostensible ownership of a shell company nominally managed by a trusted confidant—in this case, his bodyguard, Scott Barnett (the purported manager of Taurus Fund and a co-defendant in this Adversary Proceeding).

- As revealed by a voicemail the Government presented to the jury during the Criminal Trial, in late November 2021, the Debtor instructed his personal counsel, Aaron Mitchell, to negotiate the purchase of the Mahwah Mansion. Thereafter, through his agents, the Debtor caused funds purportedly belonging to G Club Operations LLC ("G Club")— one of the Debtor's *alter egos* and one of the key instruments of his criminal enterprise—to be transferred to Hamilton Opportunity Fund— another entity he controlled—to complete the mansion's purchase.

- Upon acquiring the Mahwah Mansion, the Debtor picked out furnishings and artwork and directed multi-million-dollar renovations to its floor plan, including plans to build a wing for each of himself, his wife, his daughter, and his son.

- Until his arrest, the Debtor used the Mahwah Mansion as one of his residences, as shown by his personal belongings found strewn throughout the property, including a large collection of $10,000 Brioni suits in the master bedroom closet labeled "Brioni for Miles Kwok" on the inside pocket.

14

- During questioning in the Criminal Trial, the Debtor's own counsel referred to the Debtor as the buyer of the mansion.

- No evidence has surfaced that Taurus Fund (or anyone else) is the mansion's true beneficial owner.  Barnett is the only one who could theoretically provide testimony in support of Taurus Fund, but he offered no testimony in the criminal trial to refute the Debtor's ownership of the Mahwah Mansion.  Indeed, he testified that he knew nothing at all about Taurus Fund's assets and business operations.

- When asked how he became the manager of Taurus Fund, Barnett admitted he simply signed paperwork that Aaron Mitchell told him to sign, and he was surprised when he later learned of his supposedly prominent role at Taurus Fund.

- Like many other individuals in the Debtor's orbit—such as his wife, his son, his daughter, and his daughter's boyfriend, among others—Barnett was a mere puppet for the Debtor who served no purpose other than to hold nominal title to the Debtor's assets.[11]

35.    The Defendants' deadline to respond to the Summary Judgment Motion has been set for October 16, 2024.  (*See* ECF No. 133.)  However, it is neither feasible nor desirable to wait until the outcome of that matter to proceed with marketing the Mahwah Mansion and the Contents for sale.

## **RELIEF REQUESTED**

36.    By this Motion, the Trustee respectfully requests entry of the Proposed Order authorizing the Trustee to sell the Mahwah Mansion and the Contents for the benefit of the Estate, subject to further orders of this Court (i) approving the Trustee's retention of a real estate broker and/or auctioneers to market and/or facilitate such sales, (ii) authorizing the terms and

---

[11]    No one other than Barnett could credibly provide testimony to support Taurus Fund's position, either.  As noted above, Taurus Fund's counsel informed the Court that there is no individual associated with Taurus Fund who can make decisions as to compliance with court orders. This is not surprising given that the real owner and decision-maker of Taurus Fund—the Debtor—is behind bars and will likely be for a long time.

conditions of such sales to one or more prospective buyers, and (iii) determining the parties'
entitlement to the net proceeds from such sales.[12]

37.     For the avoidance of doubt, pending any order concerning the parties' entitlement
to such net sale proceeds, such proceeds shall be held by the Trustee in escrow, with the rights of
all parties to such proceeds fully preserved.[13]

38.     The Motion requests an expansion of the injunctive relief granted in the PI Order
pursuant to Civil Rule 65, made applicable by Bankruptcy Rule 7065, given the Defendants'
continued non-compliance with the Court's orders.

### JURISDICTION, VENUE, AND STATUTORY BASIS

39.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and
1334 and the Standing Order of Reference from the United States District Court for the District
of Connecticut.[14]  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue in
this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

40.     The statutory basis for the relief requested herein is Rule 65 of the Federal Rules
of Civil Procedure, as made applicable through Rule 7065 of the Federal Rules of Bankruptcy
Procedure.

### ARGUMENT

41.     The Trustee should be authorized now to conduct a sale of the Mahwah Mansion
and the Contents.  While the Trustee recognizes that such relief is perhaps unusual prior to entry

---

[12]    Capitalized terms not expressly defined herein adopt the definitions set forth in the PI Order.

[13]    As noted, the Trustee's security interest in the Mahwah Mansion for the amount of Mahwah expenses advance
by the Estate in accordance with the Funding Order shall continue in the net proceeds from the sale of the
Mahwah Mansion.

[14]    While the Defendants have filed a motion to withdraw the reference [Adv. ECF No. 116], this Court retains
jurisdiction over this Adversary Proceeding pending a ruling on that motion.

of summary judgment in favor of the Trustee, the Trustee respectfully submits that such relief is appropriate under the extraordinary circumstances of this case.

42.     As an initial matter, the Trustee submits that the relief requested in this Motion should be viewed as supplementing and enforcing the preliminary injunctive relief previously granted by the Court in the PI Order.[15]  Such supplementation and enforcement is appropriate here given the Defendants' willful and continuing noncompliance with the clear mandates of the PI Order and the Disclosure Order and given the lack of any other effective remedy and/or sanctions to enforce compliance with this Court's orders.

**I.      Relief Sought in Motion Is Appropriate Expansion of PI Order**

43.     To obtain preliminary injunctive relief, a plaintiff must establish (i) it is likely to succeed on the merits, (ii) it is likely to suffer irreparable harm absent preliminary relief, (iii) the balance of equities is in its favor, and (iv) an injunction is in the public interest.  *Winter v. Natural Res. Defense Council*, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008); *see also In re Motors Liquidation Co.*, 513 B.R. 467, 479 (Bankr. S.D.N.Y. 2014).  As detailed below, the relief requested in the Motion satisfies each of these requirements.

A.      Trustee Will Likely Succeed on Merits

44.     A party seeking injunctive relief need only show a likelihood of success on the merits of at least one of its claims.  *In re Homaidan*, 640 B.R. 810 (Bankr. E.D.N.Y. 2022) (citing *3M Co. v. CovCare, Inc.*, 2021 WL 7162292, at *2 (E.D.N.Y Apr. 7, 2021)). A plaintiff need not show that success is an absolute certainty; he need only make a showing that the

---

[15]     As noted above, the Court cautioned Defendants at the July 30, 2024 status conference that it had the authority to issue "orders that are supplemental to order that are already in existence in this adversary proceeding."  (July 30, 2024 H'g Tr. at 30:14-15.)

probability of his prevailing is better than fifty percent. *Id.* (citing *Home It, Inc. v. Wen*, 2020 WL 353098, at *5 (E.D.N.Y. Jan. 21, 2020)).

45.      Here, the Court has already determined, for the reasons set forth in the PI Order, that the Trustee is likely to succeed on the merits of his claims against the Defendants.  (PI Order at 22.)  Since entry of that order, the evidence in support of the Trustee's claims (including evidence introduced in the Debtor's Criminal Trial) has grown considerably, establishing beyond any doubt that the Mahwah Mansion and the Contents are property of the Estate.

B.      Debtor's Estate Is Likely to Suffer Irreparable Harm

46.      The Estate will likely suffer irreparable harm unless the Trustee is authorized to commence, as soon as possible, the process of selling the Mahwah Mansion and the Contents. The carrying costs of the Mahwah Mansion are enormous.  In light of Defendants' failure to comply with their obligations under the PI Order, the Estate is incurring approximately $300,000 each quarter to maintain the Mahwah Mansion and the Contents—and this assumes there are no other unforeseen expenses in connection with maintaining these assets (which, as the Court is well aware, remain uninsured).  Worse, at this time, the Trustee is incurring these costs with respect to assets that are not property of the Estate—although, as noted, the Trustee submits that such assets will very likely be determined to be property of the Estate.  In the interim, however, the Trustee is expending an enormous amount of Estate resources.  Only by authorizing the Trustee now to commence a sale process will the Trustee be able to shorten the period over which such costs will be incurred.

47.      Moreover, while the Trustee would be able to seek reimbursement of these carrying costs from Taurus Fund in the unlikely event that the Court were to conclude that the Mahwah Mansion is not property of the Estate (with such reimbursement claim secured by the

value of the Mahwah Mansion), he will have no ability to recover these costs in the far more likely event that the Trustee prevails in this Adversary Proceeding. Such costs would simply reduce the net proceeds to be realized by the Estate upon a successful sale or sales of such assets.

C.    Balance of Equities Favors Trustee

48.    The balance of equities strongly favors granting the requested relief. As shown above, the passage of time will cause irreparable harm to the Estate. On the other hand, there is no prejudice to the Defendants from permitting the Trustee to sell the Mahwah Mansion and the Contents, subject to further order of this Court as to the terms of such sales and the parties' respective entitlements to the net proceeds from such sales. The net cash proceeds from the sale of the Mahwah Mansion and personal property located within it will be available to the Defendants if they prevail, and such proceeds are a perfectly acceptable substitute for the assets themselves. As noted, the parties' rights to such net cash proceeds would be fully preserved.

49.    Notably, the Defendants have never controlled or occupied the Mahwah Mansion and have no current possessory interest in the mansion, nor is the mansion occupied by anyone else at this time. In fact, in July 2024, the Defendants discontinued paying the maintenance costs after they apparently recognized—following the Debtor's conviction in the Criminal Case—that the Mahwah Mansion and the Contents would become either property of the Estate (if the Trustee prevails in this Adversary Proceeding) or subject to the Government's forfeiture proceedings in the Criminal Case. Thus, unlike other situations involving real estate, the sale of the Mahwah Mansion will not cause irreparable harm to its purported owner.

D.    Public Interest Favors Injunction

50.    Finally, the public interest favors expanding the injunction as requested, because doing so will help maximize the net proceeds to be realized from the sale of assets that are very

likely to be determined to be property of the Estate, thereby maximizing the recovery by the

Debtor's creditors.  This objective can only be accomplished by minimizing the period over

which the Estate will be forced to incur the enormous carrying costs associated with these assets,

which, in turn, requires the Trustee to commence the sale process as soon as possible.

**II.**      **Requested Relief Is Appropriate as Sanction for Violation of Court Orders**

51.      The relief requested in this Motion is also justified as an appropriate form of

sanction for the Defendants' clear and continuing violation of the PI Order and the Disclosure

Order.  As noted, the Trustee previously reserved its right to seek sanctions for the Defendants'

violations of these orders, and the Court acknowledged that it had the authority to issue sanctions

for such violations.

      A.      <u>Defendants Are in Violation of PI Order and Disclosure Order</u>

52.      This Court has the express authority to compel compliance with its orders.  *See*

*U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McLean Indus.)*, 68 B.R. 690, 695 (Bankr.

S.D.N.Y. 1986) ("The duty of any court to hear and resolve legal disputes carries with it the

power to enforce the order."); *Milner v. Duncklee*, 460 F. Supp. 2d 360, 375 (D. Conn. 2006)

("[A] court has the power, under appropriate circumstances, to enforce its own orders . . . .").

53.      Among other things, the PI Order required the Defendants to

- not impair, in any way, any asset or property of Taurus Fund, including the Mahwah Mansion, and any personalty and/or fixture in, on, or at the Mahwah Mansion (PI Order at 22-23);

- file proof of insurance for (i) all assets and property of Taurus Fund, including the Mahwah Mansion; and (ii) all personalty and/or fixtures in, on, or at the Mahwah Mansion (*id.* at 23); and

- employ the Security Services (*id.* at 24).

54.      At this time, the Defendants are in clear breach of the PI Order, having failed to

continue to fund the carrying costs of the Mahwah Mansion—most notably the Security Services

and real estate taxes—thereby forcing the Trustee to pay approximately $300,000 per quarter to maintain an asset that the Court has not (yet) determined to be property of the Estate.

55.      In addition, the Defendants are also in violation of the Disclosure Order.  The Defendants' response to that order is evasive, incomplete, and noncompliant.  Notably, it fails to explain why the Defendants are no longer complying with the PI Order and does not identify any individual who as the authority to make decisions for the Defendants.

B.      Issuing of Sanctions Is Appropriate

56.      A bankruptcy court has the ability under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Pursuant to section 105(a), the Court has the authority to hold a party in contempt, which "inherently include[s] the ability to sanction a party."  *In re Dickerson*, No. 08-33071, 2009 WL 4666457, at *9 (Bankr. N.D.N.Y. Dec. 8 2009) (internal quotations omitted) (quoting Ameriquest Mortgage Co. v. Nosek (In re Nosek), 544 F.3d 34, 43-44 (1st Cir. 2008)); *see also In re Chauteaugay Corp.*, 920 F.2d 183, 187 (2d. Cir. 1990); *In re Ditech Holding Corp.*, No. 19-10412 (JLG); 2021 WL 3716398, at *7 (Bankr. S.D.N.Y. Aug. 20, 2021); *In re Bambi*, 492 B.R. 183, 191 (Bankr. S.D.N.Y. 2013).  In addition, Bankruptcy Rule 9020 expressly contemplates that a bankruptcy court may issue an order of contempt under the appropriate circumstances.

57.      A party "may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.  It need not be established that the violation was willful." *Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Technologies, Inc.*, 369

F.3d 645, 655 (2d Cir. 2004) (internal quotation marks and citation omitted).  Sanctions for civil contempt "may be imposed both to coerce future compliance with a court order issued for another party's benefit and to 'compensate for any harm that previously resulted' from the noncompliance." *In re 1990's Caterers Ltd. d/b/a Vina de Villa Caterers*, 531 B.R. 309, 319 (Bankr. E.D.N.Y. 2015) (quoting *In re Chief Executive Officers Clubs, Inc.*, 359 B.R. 527, 534 (Bankr. S.D.N.Y. 2007)).  The sanctions a bankruptcy court may impose in response to civil contempt are "many and varied." *In re Vaso Active Pharms.*, Inc., 514 B.R. 416, 423 (Bankr. D. Del. 2014) (citation omitted).

58.    Here, the terms of the PI Order and the Disclosure Order are clear and unambiguous.  There can also be no serious dispute that the Defendants are in violation of these orders.  Nor have the Defendants diligently attempted to comply in any reasonable manner.  While the Defendants have asserted that they do not have the resources to comply with the PI Order, *see* Response to Disclosure Order at 3, no explanation has been given as to why resources allegedly dried up only after the Debtor had been convicted in the Criminal Case—instead, the Defendants have placed blame on asset seizures by the Government.  Response to Disclosure Order at 2 (contending two affiliates of Taurus Fund, *i.e.*, Hamilton Taurus Fund SP and G Club International Ltd. BVI ("G-Club International"), have had their assets frozen by the Government.)  But as the Government's *Superseding Indictment* of the Debtor makes clear, the Government's seizures of cash occurred mostly in September and October of 2022 and at the latest in March 2023—well before the PI Order entered in August 2023 and the funding of the Security Services and other expenses that has occurred in the ensuing year.[16]  Thus, it is apparent

---

[16]    A true and accurate copy of the Superseding Indictment [S.D.N.Y. Case No. 23-cr-118 ECF No. 307] is attached hereto as **Exhibit 6**.  The Government's seizure of G-Club International's cash account is described on p. 42 and the seizure of various accounts of "Hamilton" entities is described on pp. 41-44.

that the Government's seizures are not the real reason the Defendants have terminated funding for the Security Services as required by the PI Order. The reason for such termination is that the Debtor will not occupy the Mahwah Mansion following the guilty verdict in his Criminal Case.

59.     Moreover, the Response to Disclosure Order does not disclose the identity of the individual principal who has authority to decide what payments Taurus Fund does or does not make (or otherwise exercises management authority with respect to this entity). The Response instead evasively claims that "there is no individual affiliated with a Defendant who has the authority to decide 'whether' the Defendant will continue to comply with existing orders entered in this adversary proceeding and pay all expenses of the Defendant." (Response to Disclosure Order at 3.)

60.     Finally, the Trustee submits that the requested form of sanction (*i.e.*, authorizing the Trustee to sell the Mahwah Mansion and the Contents) is appropriate under the circumstances. Alternatives, such as imposing monetary sanctions—whether in the amount of the carrying costs or some greater amount—would be utterly pointless under the circumstances, as the Defendants are taking the position that they do not have the resources to fund any such payments in the first place. ***If the Defendants did have the ability to fund the carrying costs and agreed to do so, the Trustee would not seek the relief in this Motion.***

61.     The only avenue to mitigating the harm caused by the Defendants' noncompliance with the PI Order and the Disclosure Order (namely, forcing the Estate to fund the carrying costs of the Mahwah Mansion and the Contents) is to minimize the period during which the Estate is compelled to pay for such costs by authorizing the Trustee to commence a sale process now.

62.     To be clear, the Trustee, in theory, would be content with merely seeking authorization to ***market*** the Mahwah Mansion and the Contents, and leaving the question as to his authority to ***sell*** such assets for another day.  However, such more limited relief would be ineffective here because, absent a grant of authority to sell these assets, no broker or prospective buyer would expend time and resources engaging with the Trustee on any such sale or sales.

63.     Finally, as noted, the Trustee is not seeking blanket authority to sell the Mahwah Mansion and the Contents.  Any such sale or sales would remain subject to further orders of the Court (a) authorizing the retention of a real estate broker and/or auctioneers to market and/or facilitate the sale of the Mahwah Mansion and the Contents, (b) authorizing the terms and conditions of such sales to one or more prospective buyers, and (c) determining the parties' entitlement to the net proceeds from such sales.  Moreover, the Trustee is not seeking, at this time, authorization to retain a real estate broker and/or auctioneer to market and/or facilitate any such sales.

64.     For all these reasons, the Court should grant the relief requested in this Motion as sanctions for Defendants' non-compliance with the PI Order and the Disclosure Order.

## **NO PRIOR REQUEST**

65.     The Trustee has not previously sought the relief requested herein from this or any other court.

## **CONCLUSION**

66.     For all these reasons, the Trustee submits that the Court authorize the Trustee to sell the Mahwah Mansion and the Contents, subject to terms of the Proposed Order.

[*Remainder of page intentionally left blank*.]

WHEREFORE, the Trustee respectfully requests entry of the Proposed Order granting

the relief requested herein and such other and further relief as the Court may deem just and

proper.

Dated: October 1, 2024
New Haven, Connecticut

LUC A. DESPINS, CHAPTER 11 TRUSTEE

By: */s/ Patrick R. Linsey*
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
plinsey@npmlaw.com

and

G. Alexander Bongartz (admitted *pro hac vice*)
Douglass Barron (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
alexbongartz@paulhastings.com
douglassbarron@paulhastings.com

and

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------------x
:
In re:                                                      :        Chapter 11
:
HO WAN KWOK, *et al.*,[1]                                    :        Case No. 22-50073 (JAM)
:
        Debtor.                                     :        (Jointly Administered)
---------------------------------------------------------x
:
LUC A. DESPINS, Chapter 11 Trustee,                         :        Adv. Proceeding No. 23-05017
:
        Plaintiff,                                  :
:
v.                                                          :
:
TAURUS FUND LLC,                                            :
SCOTT BARNETT, as trustee of TAURUS                         :
FUND LLC, and                                               :
TAURUS MANAGEMENT LLC, as trustee                           :
of TAURUS FUND LLC,                                         :
:
        Defendants.                                 :
---------------------------------------------------------x

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the date hereof, the foregoing Motion was

electronically filed in the above-captioned chapter 11 case (the "Chapter 11 Case") and

adversary proceeding (the "Adversary Proceeding").  Notice of this filing was sent by e-mail to

all parties to the Chapter 11 Case and Adversary Proceeding by operation of the Court's

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202), and Genever Holdings Corporation. The mailing address for the Trustee and the Genever Debtors is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

electronic filing ("CM/ECF") system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

Dated: October 1, 2024                    By: */s/ Patrick R. Linsey*
   New Haven, Connecticut              Patrick R. Linsey (ct29437)
              NEUBERT, PEPE & MONTEITH, P.C.
              195 Church Street, 13th Floor
              New Haven, Connecticut 06510
              (203) 781-2847
              plinsey@npmlaw.com

              *Counsel for the Chapter 11 Trustee*

## **EXHIBIT 1**

**(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

------------------------------------------------------x
                                              :

In re:                        :    Chapter 11
                                              :

HO WAN KWOK, *et al.*,[1]      :    Case No. 22-50073 (JAM)
                                              :

           Debtors.         :    (Jointly Administered)
                                              :

------------------------------------------------------x

**[PROPOSED] ORDER AUTHORIZING TRUSTEE TO SELL**
**MAHWAH MANSION AND ITS CONTENTS, SUBJECT TO ENTRY OF**
**FURTHER ORDERS, INCLUDING AS TO RETENTION OF BROKER, TERMS**
**OF SUCH SALES, AND PARTIES' ENTITLEMENT TO SALE PROCEEDS**

Upon the motion (the "Motion"),[2] filed Luc A. Despins, in his capacity as the chapter 11

trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor"),

requesting entry of an order, pursuant to Rule 65 of the Federal Rules of Civil Procedure (the

"Cival Rules"), as made applicable through Rule 7065 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and the PI Order entered in this Adversary Proceeding,

authorizing the Trustee to sell (a) the real property located at 675 Ramapo Valley Road,

Mahwah, New Jersey 07430 (the "Mahwah Mansion") and (b) all personalty and/or fixtures in,

on, or at the Mahwah Mansion (the "Contents") for the benefit of the Estate, all as detailed in the

Motion; and the Court having found that (a) the Court has jurisdiction over this matter pursuant

to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c)

---

[1]    The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

[2]    Capitalized terms not expressly defined herein adopt the definitions set forth in the Motion.

venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) good and sufficient notice of the Motion having been given; and no other or further notice being required and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested by the Motion, as modified by the terms of this Order is in the best interest of the Debtors' estates and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED THAT:

1.     The Motion is GRANTED as set forth herein.

2.     The Trustee is authorized to sell the Mahwah Mansion and the Contents subject to the terms of this Order.

3.     Any sale or sales of the Mahwah Mansion or the Contents shall be subject to further orders of this Court (a) authorizing the retention of any real estate brokers and/or auctioneers to market and/or facilitate the sale of such assets, (b) authorizing the terms and conditions of such sales to one or more prospective buyers, and (c) determining the parties' entitlements to the net proceeds from such sales.

4.     The net proceeds from such sales shall be held in escrow, with all parties' rights as to their entitlement to such proceeds preserved.  For the avoidance of doubt, the Trustee's security interest in the Mahwah Mansion for the amount of Mahwah Expenses (as defined in the Funding Order) advanced by the Estate shall continue in the net proceeds from the sale of the Mahwah Mansion.

5.      For the avoidance of doubt, nothing in this Order shall relieve the Defendants of their obligations under the PI Order or the Disclosure Order, which remain in full force and effect.

6.      Nothing in this Order shall modify the terms of the Settlement Order, which remains in full force and effect.

7.      The Trustee is authorized and empowered to take all actions necessary to effectuate the relief granted in this Order.

8.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# EXHIBIT 2

**Criminal Trial Transcript, July 8, 2024**

O78VGUO1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
              v.                        23 Cr. 118 (AT)
4
    MILES GUO,
5
              Defendant.               Trial
6   ------------------------------x
                                       New York, N.Y.
7                                      July 8, 2024
                                       9:00 a.m.
8
    Before:
9

10                 HON. ANALISA TORRES,

11                                     District Judge
                                       -and a Jury-
12
                        APPEARANCES
13
    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  MICAH F. FERGENSON
         RYAN B. FINKEL
16       JUSTIN HORTON
         JULIANA N. MURRAY
17       Assistant United States Attorneys

18  SABRINA P. SHROFF
         Attorney for Defendant
19
    PRYOR CASHMAN LLP
20       Attorneys for Defendant
    BY:  SIDHARDHA KAMARAJU
21       MATTHEW BARKAN
         JOHN KILGARD
22

23  ALSTON & BIRD LLP
         Attorneys for Defendant
24  BY:  E. SCOTT SCHIRICK

25
```

O78VGUO1

Also Present:

Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Jorge Salazar, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)
Barbara Robertson, Interpreter (Mandarin)
Tuo Hung, Interpreter (Mandarin)
Peter Ginsberg, Attorney for Witness Jianhu Yi

O78VGUO1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.

3           Please make your appearances.

4           MR. HORTON:  Good morning, your Honor.

5           Justin Horton, Micah Fergenson, Juliana Murray, and

6    Ryan Finkel, for the United States.

7           MR. SCHIRICK:  Good morning, your Honor.

8           Scott Schirick, Sidhardha Kamaraju, and Matthew

9    Barkan, for the defendant, Mr. Guo, together at counsel's table

10   with Mr. Guo.

11          THE COURT:  Please be seated.

12          On June 25, 2024, the parties submitted their proposed

13   revisions and additions to the Court's draft jury charge.

14   Yesterday, July 7, 2024, the government filed a letter

15   requesting additional revisions.  I also received a letter from

16   the defense at 12:13 a.m. today.

17          I will address each of the parties' proposed edits in

18   the order they appear in the jury charge that my law clerks

19   have just provided to you.

20          Starting on page 6, in the first paragraph of the

21   burden of proof and presumption of innocence section — this

22   also applies to page 14 in the first paragraph of the summary

23   of indictment section.  The government requests that the Court

24   add language stating that the government is not required to

25   prove every allegation in the indictment, but instead only the

O78VGUO1

1   elements of the charges.  The defense does not oppose the

2   addition of this language.  I will add the requested language

3   to the burden-of-proof and presumption-of-innocence section,

4   but I will not repeat it in the summary of the indictment

5   section.

6           On page 13, in the second paragraph of the section

7   titled "Government as a Party," the government asks that I add

8   the words "United States" to the sentence beginning "This case

9   is important to the government," which I will do.

10          In the following paragraph, which begins with "The

11  fact that the prosecution," the government requests that I

12  include the following language:  "This prosecution was lawfully

13  brought by the United States of America, and the decision to

14  bring this case was in no way influenced by the Chinese

15  government or the Chinese Communist Party."  I do not believe

16  these sentences are necessary.  The evidence thus far has not

17  left the jurors with the impression that the prosecution was

18  unlawful or influenced by the CCP.

19          On page 14, in the first paragraph under 14, summary

20  of the indictment, the government requests that next to the

21  defendant's name, I include that he is also known as Ho Wan

22  Kwok, Guo Wengui, Brother 7, The Principal, and Boss.  I will

23  include that Miles Guo is also known as Ho Wan Kwok and Guo

24  Wengui.

25          In the last paragraph on page 14, which begins with

O78VGUO1

"The indictment contains," and on page 15 in the second

paragraph, which begins with "In a moment," the defense

requests that I include the words "against the defendant" after

"12 counts."  Because the indictment contains one count against

Mr. Je alone, I will include the defense's language.

On page 15, paragraph 1, the government requests that

the phrase "lifestyle membership company known as G/CLUBS" be

revised to "purported online membership club known as G/CLUBS."

The government states that this tracks the language in the

indictment.  At this point I do not believe that the additional

descriptors are necessary and shall simply state "in connection

with G/CLUBS."

Page 15 contains a sentence in paragraph 2 stating:

"Each count constitutes a separate crime."  I grant the

defense's request to add the word "alleged" in between

"separate" and "crime."

On page 16, in the second paragraph, under "16.

Elements of Wire Fraud," in the last full sentence which begins

with "Count Nine," the government requests that the phrase "how

their membership dues would be used" be revised to the more

neutral description "how the money individuals sent to G/CLUBS

would be used."  I will make this revision.

In the same paragraph, in a subsequent sentence, the

government requests that the phrase "how the funds raised would

be used" be revised to "how the money sent to the Himalaya

O78VGUO1

Exchange or spent on its credits would be used."  The clause

beginning with the word "or" is duplicative, so I will state:

"How the money sent to the Himalaya Exchange would be used."

On page 17, the third full paragraph, and page 19,

paragraphs 5 and 6, the government contends that "willfully" is

not an element of the wire fraud statute and requests its

omission throughout.  As authority, the government cites Judge

Oetken's decision in *United States v. Middledorf*, 18 Cr. 36, as

well as an Eastern District of New York case.

But in *Middledorf*, although Judge Oetken rejected the

instruction from the Sand treatise, he still gave a willfulness

instruction; other judges in this district have done the same.

*See United States v. Bankman-Fried,* 22 Cr. 673; *United States*

*v. Avenatti*, 19 Cr. 374; and *United States v. Constanzo Recio*,

22 Cr. 281.  The Second Circuit has not explicitly disavowed

the willfulness element.  *See United States v. Petrossi*, 786 F.

App'x 286, 289 (2d Cir. 2019).

However, the definition of "willfully" in my first

draft of the charge implies that the defendant needed to know

that his action was "unlawful" as opposed to, more generally,

"wrong."  Accordingly, I will amend the definition which

appears on page 19 in the fourth and fifth paragraphs of the

section titled "b.  Second Element:  Knowledge and Intent to

Defraud" to state:  "To act 'willfully' means to act

voluntarily and with a wrongful purpose.  An act is done

O78VGUO1

knowingly and willfully if it is done purposefully and

deliberately."  This accords with the more limited instructions

that other judges in this district have used, as well as the

Second Circuit's decision in *United States v. Kaiser*, 609 F.3d

556, 567-68 (2d Cir. 2010).

On page 17, in the first paragraph under "a.  First

Element:  Scheme to Defraud," the defense asks that I state

that a scheme or artifice is a "plan to accomplish a fraudulent

objective."

The proposed addition of "fraudulent" is incorrect and

I will not include it.

In the last paragraph on page 17, the defense asks in

addition to stating that a statement "is fraudulent if it was

made with intent to deceive," that I also state that "the

intent to deceive must exist at the time the statement was

made."

This addition is not necessary because it is redundant

and I will not include it.

On page 17, after the first full paragraph in the

section titled "a, First Element:  Scheme to Defraud," the

government asks that I include a paragraph stating:  "It is not

necessary that a false or fraudulent pretense, representation,

or promise be made prior to a victim's decision to part with

money or property; rather, if after having obtained money or

property the defendant devises or participates in a fraudulent

1  scheme to keep that money or property by making a subsequent

2  false or fraudulent representation as to a material fact, that

3  is sufficient to establish the existence of a scheme to

4  defraud."

5          I do not agree that this instruction is necessary or

6  helpful and will not include it.

7          On page 17, after the last full paragraph, the defense

8  requests that I include a paragraph stating:  "Fraud requires

9  more than simply proof that a promise was made and then not

10 fulfilled.  Failing to maintain a promise or to abide by a term

11 in a contract or other document is not by itself fraudulent.

12 Instead, the government must prove beyond a reasonable doubt

13 that the defendant, at the time they made the statement or

14 promise, never intended to honor.  A subsequent decision by a

15 defendant not to abide by the terms of a promise, contract, or

16 document, even one that is willful, cannot be the basis for a

17 conviction."

18         I do not agree that this instruction is necessary or

19 helpful and will not include it.

20         On page 18, paragraph 1, the third sentence states:

21 "That means that if you find that a particular sentence was

22 false, you must determine whether that statement was one that a

23 reasonable person might have considered important in making his

24 or her decision."

25         The defense requests that "might" be changed to

O78VGUO1

1    "would."  I will make this change.

2            After the third "that," the defense also requests that

3    I include the clause "was capable of influencing the decision."

4            The addition of that language would confuse the jury

5    and I will not include it.

6            On page 18, before the paragraph that begins with "in

7    determining whether a scheme to defraud exists," the defense

8    requests the insertion of a new paragraph that states:  "To

9    establish a scheme to defraud, the government must prove beyond

10    a reasonable doubt that the defendant contemplated depriving

11    another of money or property.  It is not enough that some other

12    person or company could have acquired money or property.  To

13    prove the scheme to defraud element, a defendant must have

14    contemplated actual harm would befall victims due to his

15    deception.  A scheme to defraud need not be shown by direct

16    evidence, but may be established by the circumstances and facts

17    in the case."

18            This paragraph duplicates the intent element and I

19    will not include it.

20            On page 19, in the second-to-last full paragraph, the

21    defense requests that I rephrase the intent to defraud

22    definition as follows:  "Put differently, to find specific

23    intent to defraud or fraudulent intent, you must find that the

24    defendant had the intent to cheat or steal money from others at

25    the time the misrepresentation or false promise was made."

1          I do not believe that this rephrasing adds clarity and

2    will not include it.

3          On page 20, the government requests that I include two

4    instructions stating that:  One, a defendant's belief that no

5    ultimate harm would result is not a defense to fraud; and that,

6    two, a defendant need not be solely motivated by fraud.  I

7    agree that these two instructions offer important clarification

8    and shall include them.

9          I will state at the end of the second full paragraph

10   on page 20:  "Additionally, it is not necessary for the

11   government to prove that the defendant was motivated solely by

12   improper considerations.  The defendant may have the required

13   intent to defraud even if the defendant was motivated by other

14   lawful purposes as well."

15         Also on page 20, in the last paragraph, in the

16   instruction on good faith, I will state:  "However, in

17   considering good faith, the fact that a defendant believes,

18   rightly or wrongly, that he will ultimately be able to work

19   things out so that no individual suffers a loss, is no excuse

20   for the real and immediate loss resulting from the defendant's

21   fraudulent conduct."

22         The government requests the addition of the following

23   language to the no-ultimate-harm instruction, arguing that it

24   is necessary to address testimony about the Himalaya Exchange.

25         They would like me to state:  "Nor is it a defense

O78VGUO1

1    that certain people were offered or received refunds.  Whether

2    any of the companies involved continued to operate is also not

3    a defense."

4         I believe that the no-ultimate-harm instruction is

5    sufficient as is and will not include the proposed language.

6         The government requests that the Court add the

7    following language at the end of the final paragraph on page

8    20:  "All of that said, you have heard evidence that Miles Guo

9    and certain of the entities in this case had lawyers.  A

10   lawyer's involvement with an individual entity or transaction

11   does not itself constitute a defense to any charge in this

12   case.  The defense has not claimed and it cannot claim that the

13   defendant's allegedly unlawful conduct as charged in the wire

14   fraud counts was lawful because he engaged in such conduct in

15   good faith reliance on the advice of lawyers."

16        I'm going to add a new section under "V.  Final

17   General Instructions," titled "31.  Involvement of the

18   Lawyers."  The section will read as follows:

19        "You have heard evidence that the defendant and

20   certain entities were represented by attorneys.  A lawyer's

21   involvement with an individual or entity does not make that

22   individual or entity's actions legal."

23        Following the final paragraph on page 20, the defense

24   requests an additional paragraph stating:  "If you find that

25   the defendant was not a knowing and willful participant in the

O78VGUO1

scheme or lacked the required intent to defraud at the time of the operative false statement or false promise, then you should find the defendant not guilty.  On the other hand, if you find that the government has established beyond a reasonable doubt not only the first element, namely, the existence of the scheme to defraud, but also the second element, that the defendant was a knowing participant and acted with specific intent to defraud, then you should proceed to the third element."

I do not agree that this paragraph is necessary and will not include it.

On page 21, in the "Third Element" section, the government asks for a clarification that a wire communication can be made after the relevant funds were obtained.  The government requests this specific language:  "A wire communication can also include a communication made after an individual's funds were obtained if the communication was designed to lull that person into a false sense of security to postpone his or her complaint to the authorities or to keep the money obtained from the scheme."

I shall include a portion of this language.  But I do not believe that the examples cited by the government are necessary.  Accordingly, I will state at the end of the second full paragraph on page 21:  "A wire communication can also include a communication made after an individual's funds were obtained."

O78VGUO1

          On page 24, the defense asks that I include at the end

of the first paragraph in the materiality subsection the

following sentence:  "Expressions of corporate optimism and

puffery are not material."

          I reject this addition as confusing and unhelpful to

the jury.

          On page 24, after the second paragraph in the

materiality subsection, the defense requests that I include:

"However, you may not assess materiality from the perspective

of hindsight, nor is a misrepresentation material simply

because it may have been important to an investor."

          As to the sentence regarding hindsight, I will instead

add the following sentence at the end of the first full

paragraph on page 24:  "Materiality is judged as of the time

the information was disclosed."

          The second proposed sentence, which aims to

distinguish between importance and materiality, is needlessly

confusing and I will not include it.  The definition of

materiality is sufficient and does not equate materiality with

mere importance.

          On page 24, in the charge's definition of a security,

the defense proposes the addition of a paragraph that provides

a separate definition of a security if the government takes the

position that the farm loans and G CLUB memberships are

themselves securities.

O78VGUO1

1          I do not understand the government to be taking this

2   position.  Am I correct?

3          MR. HORTON:  If I can have one second your Honor.

4          THE COURT:  Yes.

5          (Counsel conferred)

6          MR. HORTON:  That's right, your Honor.

7          THE COURT:  Going to page 25.

8          In the "in connection with" section, the defense

9   requests the addition of the following paragraph after

10  paragraph 2:  "However, the 'in connection with' element is not

11  met simply because an alleged fraud happens to involve the sale

12  of securities; it requires something more.  The government must

13  prove beyond a reasonable doubt both that the deceptive conduct

14  coincided with particular securities sales, and that the

15  deceptive conduct was material to the investors' decision to

16  buy particular securities.  If the alleged deceptive conduct

17  did not coincide with the particular sale of the securities,

18  then the 'in connection with' requirement is not satisfied.

19          "In addition, if the defendant's alleged

20  misrepresentations did not concern the value, nature, or

21  investment characteristics of the securities, then the 'in

22  connection with' requirement is not satisfied.  Moreover,

23  alleged misrepresentations that occurred after a security sale

24  cannot have coincided with such purchase or sale and,

25  therefore, cannot have been material to such sale."

O78VGUO1

1        I reject the proposed language, first finding that

2   "deceptive conduct coincided with particular securities sales,"

3   is only one way of finding that deceptive conduct "touches

4   upon" a securities transaction.  The addition of this sentence

5   would be confusing and could limit the definition, when the

6   Supreme Court and the Second Circuit have "espoused a broad

7   interpretation" of the phrase "in connection with."  *Merrill,*

8   *Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 85

9   (2006).  The remainder of the proposed paragraph imports

10  aspects of the materiality inquiry into the "in connection

11  with" definition.

12       On page 25, in the first paragraph of the "in

13  connection with" section, the government requests the addition

14  of the following sentence:  "It is not necessary that any

15  actual securities be sold or delivered so long as purported

16  securities were offered as an inducement to transact, and

17  promises that someone will receive stock in the future

18  constitute a sufficient connection with a purchase or sale of

19  securities."

20       Based upon this proposed addition, the Court will add

21  the following sentence before the last sentence in the first

22  paragraph:  "Nor is it necessary that any security was ever

23  issued or sold."

24       On page 26, in the first paragraph, the defense

25  requests the addition of the following sentence:  "Therefore,

however misleading or deceptive a plan may be, it is not

fraudulent if it was devised or carried out in good faith.

This includes the defendant's honest belief in the truth of the

representations made by the defendant."

I will not include this language but, instead, after

the first sentence of that paragraph, I will repeat the

following definition of "good faith" that I provided earlier in

the wire fraud section:  "A defendant acts in good faith when

he honestly believed at the time that the representations he

was making were true, even if they turned out to be inaccurate

or false."

Also on page 26, after the first paragraph, the

government requests the addition of the following paragraph:

"In considering whether a defendant acted in good faith,

however, you are instructed that a belief by the defendant — if

such belief existed — that ultimately everything would work out

so that no investors would lose any money does not necessarily

constitute good faith.  No amount of honest belief on the part

of a defendant that the scheme will ultimately make a profit

for the investors will excuse fraudulent actions or false

representations by him."

I will not include the proposed language, but will

repeat the following instruction that I provided in the wire

fraud section:  "However, the fact that a defendant believes,

rightly or wrongly, that he will ultimately be able to work

O78VGUO1

1    things out so that no individual suffers a loss is no excuse

2    for the real and immediate loss resulting from the defendant's

3    fraudulent conduct."

4          The government at the end of that same paragraph again

5    requests an instruction regarding lawyers' involvement with the

6    defendant and related entities.  Because I have now added the

7    involvement of lawyers instruction, I will not include the

8    instruction here.

9          On page 34, in the "Second Element:  Participation"

10   section at the bottom of the page, at the end of the paragraph

11   that begins with "it is not necessary for the government," the

12   defense asks that I add the following two sentences:  "If you

13   find that the defendant did not have a financial interest in

14   the outcome of the scheme, that is also a factor you may

15   properly consider in determining whether or not the defendant

16   was a member of the conspiracy.  Ultimately, the defendant's

17   participation in the conspiracy must be established by

18   independent evidence of his own acts or statements."

19         I will add the following sentence to the end of that

20   paragraph:  "Conversely, if you find that the defendant did not

21   have a financial interest in the outcome of the scheme, that is

22   also a factor you may properly consider in determining whether

23   or not the defendant was a member of the conspiracy."

24         On page 36, paragraph 1, I grant the defense's request

25   to omit the word "also" before "co-conspirators of the

O78VGUO1

1    defendant," in the second pull paragraph.

2           On page 50, the government asks that I refrain from

3    characterizing the RICO count as "complicated," which I will

4    do.

5           On page 51, in the second paragraph of the subsection

6    titled "a.  First Element:  Racketeering Enterprise," the

7    defense asks that I delete the sentence:  "Of course, proof

8    that the objective of the conspiracy was accomplished, if you

9    find that it was, may be most persuasive evidence or the most

10   persuasive evidence of the existence of the conspiracy."

11          This is a standard conspiracy instruction that I

12   believe is helpful to the jury, so I will not omit it.

13          On page 52, in the final two paragraphs, and page 58,

14   paragraph 1 of "i, Enterprise v. Pattern of Racketeering

15   Activity," the defense asks that I specify that "G Enterprise"

16   is a term used by the government, which I will do.

17          In the final paragraph on page 52, the defense asks

18   that I rephrase the first component of finding a RICO

19   enterprise to state "a common purpose to conduct a racketeering

20   enterprise" instead of only "a common purpose."

21          I do not agree that that is a correct statement of the

22   law.  So that edit is rejected; however, I shall rephrase the

23   last clause to state that:  "Then you may find that the first

24   element of a racketeering conspiracy has been satisfied" rather

25   than suggesting that the whole crime has been proven.

O78VGUO1

1          In that same paragraph, the government asks that I

2     include the phrase "during a substantial period within the time

3     frame charged in the indictment" after "a continuing unit."

4     The charge already includes substantially similar language on

5     page 52 in the first full paragraph on that page, and I do not

6     agree that the additional language is necessary.

7          On page 55, in the first paragraph under "Fourth

8     Element:  Pattern of Racketeering Activity," the defense asks

9     that I move the sentence beginning "The government must prove

10     that the defendant agreed" to earlier in the paragraph.  I will

11     do so.

12          In that same sentence on page 55, the government asks

13     that I clarify that the defendant is also responsible for the

14     acts of agents committed within the scope of their agency.

15          The government's proposed sentence reads:

16          "The government must prove that the defendant agreed

17     to participate in the enterprise with the intent that he or

18     another member or members of the conspiracy or their agents

19     commit two or more racketeering acts which I will describe."  I

20     believe that this instruction will confuse the jury and I will

21     not add it.

22          On page 56, in the third full paragraph which begins

23     with "First," the government asks that I give examples of types

24     of racketeering crimes after the underlined sentence.  I think

25     that this is helpful and will add the government's suggested

O78VGUO1

language to the end of that paragraph.

On page 57, at the start of the second full paragraph, the government asks that I delete the statement that "a substantial period of time is at least two years."  I will omit the "two years" language, which although the circuit has never approved a shorter period of time, is not a bright-line rule.  However, the government's suggested language is also likely to confuse the jurors.  I will follow the model of other RICO conspiracy charges and omit an explanation of "substantial period" in the charge.

The defense asks that I delete the conscious avoidance instruction.  This instruction may only be given if there is evidence that, one, the defendant asserts the lack of some specific aspect of knowledge required for conviction; and two, there's evidence that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.  *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000).  I find that these requirements have not been met and I will omit the instruction.

The defense asks that I add a "multiple conspiracies" instruction.  I will not include such an instruction.  The multiple conspiracies charge is designed to assist the jury in determining whether or not a particular charged conspiracy was truly a single conspiracy, not to remind them separately to consider each charged conspiracy.  *United States v. Aguilar*,

O78VGUO1

1    352 F. App'x 522, 525 (2d Cir. 2009).  It appears that the

2    defense wants me to emphasize that the conspiracies charged in

3    Counts One through Four should be considered separately.  I

4    believe that a multiple conspiracy instruction would confuse

5    the jury.  The charge states on page 15 that the jury "must

6    consider each count of the indictment separately," which I find

7    sufficient.  Therefore, I will not add the multiple

8    conspiracies charge.

9            On page 62, in the "28.  Law Enforcement and

10   Government Witnesses" instruction, the defense asks that I add

11   a sentence stating that:  "It is perfectly appropriate for

12   defense counsel to attempt to attack the credibility of such a

13   witness on the ground that his or her testimony may be colored

14   by a personal or professional interest in the outcome of the

15   case."

16           I find that this is duplicative of the existing

17   credibility of witnesses instruction and I will not include it.

18           The defense asks that I delete the

19   accomplice/cooperating witness testimony, immunized witness,

20   and similar acts instructions as inapplicable.  The government

21   does not object and I agree that they should be excluded.

22           On page 64, the defense asks that I add language to

23   the "nonprosecution agreements" instruction, stating that a

24   witness testifying under an NPA should be closely scrutinized.

25           I will omit the sentence that states:  "It may not be

O78VGUO1

1    used by you in any way for or against the defendant," which I

2    agree may be confusing.  And I will add a sentence to the end

3    of that paragraph stating:  "Of course, you may consider

4    whether the fact that the witness entered into this agreement

5    affects the credibility of their testimony."

6           The defense requests an instruction that "the fact

7    that the charges in this case may have involved large sums of

8    money does not mean that the defendant is held to a greater

9    standard of conduct."

10          I do not agree that this instruction is necessary or

11   helpful and will not include it.

12          The defense also asks for an instruction that the jury

13   may not consider Saraca's settlement with the SEC as evidence

14   of criminal conduct.

15          Does the government intend to make the argument that

16   the settlement is evidence of criminal conduct?

17          (Counsel conferred)

18          MR. HORTON:  Your Honor, the answer is no.  It is a

19   relevant fact in the narrative, but the answer to the Court's

20   question is no.

21          THE COURT:  The government asks that the jury be

22   instructed that the defendant has not raised a duress excuse or

23   justification defense.

24          I don't see that the defense has implied this thus

25   far.  Accordingly, I will not give this instruction.

O78VGUO1

1          My law clerks have provided you with a copy of the

2     verdict form.

3          Finally, in preparation for deliberations, the parties

4     are reminded of my May 7th, 2025 order concerning the provision

5     of exhibits to the jury.  For jury deliberations, the parties

6     shall provide a clean laptop containing only the exhibits

7     admitted into evidence.  The laptop must be prepared prior to

8     the start of deliberations.  And the parties shall also provide

9     the required cables to connect the laptop to the monitor in the

10    jury room.

11         During summations, if either party believes that there

12    has been a clear misstatement of a fact or misstatement of the

13    law, certainly you may object.  And if you feel that a sidebar

14    is necessary, you may request that.  But I want to keep that

15    absolutely to a minimum because that interferes with the flow

16    of the attorneys' summation.

17         I'm now going to go to the issue regarding the

18    testimony of Mr. Dragon.

19         By letter dated July 2nd, 2024, the government moves

20    to strike a portion of defense expert Raymond Dragon's

21    testimony from earlier that day, ECF No. 389.  The government

22    raised two issues.  The first issue, which concerned the

23    interpretation of Dragon's testimony concerning "very large

24    investor interest," was resolved by agreement of the parties on

25    July 3rd, 2024.  See transcript at page 5032, lines 1 to 17.

O78VGUO1

1          As to the second issue, I directed the defense to

2     respond to the government's motion by July 5th, 2024.

3          Mr. Dragon testified that $200 million of new GTV

4     shares were sold in the GTV private placement.  During his

5     testimony, which appears on page 4893 of the transcript,

6     Mr. Dragon stated that Saraca sold some of its own GTV shares

7     as part of the GTV private placement, which resulted in the

8     sale of $350 million of GTV shares, exceeding the $200 million

9     of shares initially advertised in the GTV private placement

10    memorandum.

11         The government contends that Mr. Dragon has no

12    personal knowledge that Saraca was the source of the excess

13    shares; and that this information was not in any of the

14    materials that Dragon disclosed as having reviewed.

15         By letter dated July 5th, 2024, the defense opposes

16    the government's motion, stating that Mr. Dragon's

17    understanding is based on the GTV private placement memorandum

18    which is in evidence, ECF No. 390.

19         The defense states that because the private placement

20    memorandum discloses Saraca's ownership percentage of GTV as

21    100 percent, Mr. Dragon reasonably concluded that any excess

22    shares beyond what the GTV private placement initially sought

23    to sell would necessarily come from Saraca's equity holdings.

24    *Id.* at 1.

25         I'm satisfied with the defense's explanation of

O78VGUO1

1    Mr. Dragon's testimony, which the government had the

2    opportunity to probe on recross examination.  Accordingly, the

3    government's motion to strike is denied.

4            We are missing Juror No. 4 -- oh, I'm sorry, Juror No.

5    10.  She says that she is experiencing nausea and diarrhea;

6    that she consulted a doctor who told her to stay home and take

7    certain medication and rest.

8            How would you like me to handle this?

9            MR. HORTON:  If we could have just one moment, your

10   Honor.

11           THE COURT:  Yes.

12           (Counsel conferred)

13           MR. HORTON:  Thank you, your Honor.

14           Given the number of alternates available, the

15   government proposes that we move forward with the trial.

16           THE COURT:  Does the government believe that I have

17   the discretion to substitute the alternate without the consent

18   of the defense?

19           MR. HORTON:  Yes.

20           THE COURT:  I'll hear from the defense.

21           MR. KAMARAJU:  Thank you, your Honor.

22           First of all, I do believe — and I think this has come

23   up before — that the Court has the discretion to excuse the

24   juror and impanel an alternate, even over the defense's

25   objection.

O78VGUO1

1          We recognize that the trial needs to move along, but

2     we do think that it's possible that not giving one of the

3     jurors a sick day, in essence, could constitute an abuse of

4     that discretion, particularly given that we have now reported

5     that Mr. Guo does not intend to testify; and so that, I think,

6     relieves some of the time pressure.

7          So from our perspective, it is certainly within the

8     Court's discretion to do so if it believes it's appropriate to

9     move it along.  We do think that creates a risk.

10          THE COURT:  So although I don't believe that

11     substituting the alternate would be abuse of discretion, I'm

12     having my clerks look at that question in an abundance of

13     caution.

14          In the meanwhile, I have some questions for Mr. Guo.

15          So Mr. Kamaraju, you have said that Mr. Guo will not

16     be taking the stand, is that right?

17          MR. KAMARAJU:  Yes, that is our belief at this time,

18     your Honor.  He's not planning to take the stand.  I just want

19     to be clear that he does have the right to change his mind at

20     the end of the defense case, but he does not plan to take the

21     stand.

22          THE COURT:  Okay.  So you understand, Mr. Guo, that

23     you have the right to take the stand and testify in your own

24     defense?

25          THE DEFENDANT:  Yes, your Honor.  Saturday and Sunday,

O78VGUO1

```
 1    the attorney Kamaraju and Sabrina has discussed this with me

 2    and I made my decision of not testifying.

 3              THE COURT:  And are you satisfied that your attorneys

 4    have spent enough time with you and answered all your questions

 5    about their advice concerning whether or not you should

 6    testify?

 7              THE DEFENDANT:  Yes, your Honor.

 8              THE COURT:  And you understand that the decision

 9    whether or not to testify is yours, and yours alone?

10              THE DEFENDANT:  Yes, your Honor.

11              THE COURT:  So am I correct that you, on your own,

12    have made the decision that you do not want to testify?

13              THE DEFENDANT:  Yes, your Honor.

14              THE COURT:  All righty.

15              So moving forward, I'm looking for simultaneous

16    translation.

17              Are there any other issues that the parties would like

18    to raise at this time?

19              MS. SHROFF:  Your Honor, we did have an issue with the

20    translation.  The witness who was on the stand described the

21    experience as having to parse out information as though he were

22    in the middle of a playground and many, many voices were being

23    heard all at the same time.

24              Over the weekend, I did reach out to the interpreters'

25    office to try and resolve this because the witness was -- this
```

O78VGUO1

1    is how exactly how the witness described it, like being on a

2    playground having to parse through many voices.

3         So I ask the Court to consider allowing consecutive

4    translation for the witnesses, which I think is the norm; but

5    if not, I guess it will have to be what it will have to be.

6    But he did describe the experience that way.  And I raised it

7    with the interpreters.

8         THE COURT:  Does the government wish to be heard on

9    this question?

10        MS. MURRAY:  Your Honor, I think on this point we

11   would defer to the Court.  We would note the witness seemed

12   able to answer the questions that were posed during the two and

13   a half hours of direct examination we've had so far.

14        MS. SHROFF:  The witness described the experiences

15   exactly the way I recited it.  I then reached out to the

16   interpreters' office.

17        The reason I called for a side break is because

18   throughout the testimony he kept tugging at one ear and had

19   difficulty with the number of voices going in.  So as I

20   understand it, he's not just listening to the English, which

21   he's partially fluent in, then he's listening to one

22   interpreter and at the same time the English voice is

23   continuing.  So there's an overlay.

24        Whether or not he managed to make do for two hours

25   isn't the point.  I've just laid out what the witness said,

O78VGUO1

1    your Honor, that's all.  Thank you.

2         THE COURT:  So my strong impression was that he fully

3    understood the questions.  He did not protest at that time

4    about the simultaneous translation.  There was a point at which

5    he said that there was maybe a problem with one of the

6    earphones, but he also stated that it had been corrected.

7         In my 24-plus years on the bench, I've always had

8    simultaneous translation.  That is the norm.

9         Anything further?

10        MS. MURRAY:  Just a few brief points, your Honor.

11        With respect to the witness who was on the stand at

12   the end of the day Wednesday, the government yesterday received

13   26.2 materials from the defense which indicated that they met

14   with him this weekend, yesterday, and prepared him.

15        We would note he's in the middle of his testimony.

16   The Court has advised every witness in this case up to this

17   point that they should not discuss their testimony.  The

18   defense team is certainly well aware of that rule, that order

19   by the Court.

20        And so we just wanted to raise for the Court's

21   attention we don't know the content of that prep, it simply

22   indicated that there was a prep session.  But we think it's

23   important to note for the Court.

24        MS. SHROFF:  Your Honor, may I have a second?

25        THE COURT:  Yes.

1          (Counsel conferred)

2          MS. SHROFF:  Your Honor, I believe the rule is that if

3     the witness is on direct, he's free to talk to whoever is

4     taking his questioning.  In any event, we did not discuss any

5     part of his past testimony.  The rule is when he's on cross, I

6     think that's pretty clear.  But, in any event, I've conferred

7     and we had no discussion at all with any of his past testimony.

8          MS. MURRAY:  I would just note, your Honor, the

9     government has taken the approach, consistent with the Court's

10    instructions, throughout this entire five-and-a-half-week trial

11    that we have not spoken with any of our witnesses, even if they

12    were on direct testimony.  We have taken the Court's request

13    that the witness not discuss their testimony at its word, and

14    we have not prepped witnesses when they have been on direct

15    either over a break or over an evening or over the weekend

16    during the entire trial.

17         THE COURT:  So, Ms. Shroff, are you providing me with

18    a particular rule in the rules of evidence or --

19         MS. SHROFF:  No, I think that's the general rule.

20    But, in any event, we did not discuss his testimony.

21         THE COURT:  Okay.  I'm glad to hear that.  And I will

22    have my clerks look into that rule.  This is the way that I've

23    been doing it.

24         MS. SHROFF:  Just to be extremely clear, we certainly

25    did not give him a copy of his prior testimony.  We did not --

O78VGUO1

1     I personally didn't even review it, if that matters to the

2     Court.  I did not go back and read the transcript.  And I say

3     that to you as an officer of the Court:  I did not open it, I

4     did not download it, I didn't do anything with it.

5                THE COURT:  All righty.

6                MS. MURRAY:  Your Honor, just based on the 26.2

7     materials, I don't believe Ms. Shroff met with the witness.

8     Unless the materials omitted the presence of somebody, we

9     believe it was other members of the defense team, but just

10    another note.

11               One other thing I would like to note for the Court,

12    just with respect to the timing of certain exhibits the defense

13    has produced, the government received exhibits for Leanne Li,

14    who is a witness who is expected to testify, at approximately 1

15    a.m. on Sunday.  Those include a number of exhibits that have

16    Mandarin translations the government has not yet been able to

17    verify.

18               We're going to have various hearsay objections and

19    relevance objections to those exhibits, which are WhatsApp

20    chats that are clearly hearsay out-of-court statements of

21    Mr. Guo or of the witness that are being offered for their

22    truth, in the government's view.  We just wanted to note the

23    timing issue.  They produced additional exhibits for Ms. Li at

24    4 a.m. this morning.  And again, she's expected to testify

25    today.

O78VGUO1

1          THE COURT:  All right.  So that is what you call sharp

2     practice.  You do not produce exhibits so late that -- this is

3     when you expect people to be asleep.

4          MS. SHROFF:  Your Honor, there was a problem

5     yesterday.  Once the government reached out, we sent them a

6     chart of what we anticipated using.  Mr. Schirick and I were

7     together at the office where there was an actual human and

8     computer problem that caused the delay.

9          THE COURT:  What kind of a human and computer problem

10    caused the delay?

11         MS. SHROFF:  Your Honor, may we just have a sidebar on

12    this?

13         THE COURT:  I want you to give me the explanation now.

14         MS. SHROFF:  The person who was working on it couldn't

15    put it together.  The person couldn't put it together and had

16    to take a break and so that delayed it.

17         THE COURT:  Okay.  I've told you before that you need

18    to have enough people on your team who are competent in order

19    to handle the trial.  You cannot have somebody who falls apart

20    at a crucial moment.  You need steady, stable people.

21         MS. SHROFF:  Your Honor, a large amount of Ms. Li's

22    exhibits are photographs.  We've moved Ms. Li down on the

23    testifying chain.  She's not likely to take the stand; she's

24    the second to the last witness.

25         THE COURT:  All right.

O78VGUO1

1           MS. SHROFF:  That's what happened.

2           There was no sharp practices.  We did not purposely

3    delay anything.  I think you have two lawyers were at the

4    physical location, others were not.  And we tried to get the

5    paperwork together.

6           THE COURT:  You need to hire competent people.

7    Manhattan is full of them; full of people who are prepared to

8    carry those types of tasks.  Don't let this happen again.

9           All righty.  I'd like to bring out Alternate No. 1.

10          (Juror present)

11          THE COURT:  Good morning, sir.  You may sit down.

12          I just wanted to let you know that you are now going

13   to become Juror No. 10.

14          JUROR:  Okay.

15          THE COURT:  All righty?  You may step back inside.

16          (Juror not present)

17          THE COURT:  Please have the jurors brought in.

18          MR. SCHIRICK:  Your Honor, may I address just one

19   brief other thing before we bring the jury?

20          THE COURT:  Why are we having this feedback problem?

21          MR. SCHIRICK:  I think that's taken care of it, your

22   Honor.

23          I just wanted to mention a couple of things that are

24   relevant to what we expect to be the defense's final witness,

25   hopefully later this afternoon.

1          The witness's name is George Higginbotham.  And he is

2     a former Department of Justice lawyer who pleaded guilty to

3     engaging in a conspiracy to lobby officials in the Trump

4     Administration on behalf of the PRC government to extradite

5     Mr. Guo.  And as part of the agreement to enter into Defense

6     Stip 1, with which I'm sure the Court is familiar, the Fox Hunt

7     stip, the defense agreed not to call several other witnesses

8     who were related to this conspiracy, as well as other Fox

9     Hunt-related witnesses, and only to call Mr. Higginbotham.

10          We expect Mr. Higginbotham to testify, among other

11     things, that he joined the conspiracy in April of 2017, at the

12     time that he was a lawyer for DOJ; that as part of the

13     conspiracy, Mr. Higginbotham, who lives in Washington, went to

14     the Chinese Embassy in Washington in July of 2017, to meet with

15     the Chinese Ambassador to the United States.  He also traveled

16     to China in September of 2017 to meet with several

17     co-conspirators.  And he facilitated the transfer of tens of

18     millions of dollars into the United States as part of the

19     conspiracy.  Ultimately, he pled guilty to conspiracy in

20     November of 2018 in the District of D.C.

21          We have not, your Honor, had an opportunity to -- the

22     defense has not had an opportunity to meet with this witness.

23     He is still under a cooperation agreement with the government,

24     with the District of D.C. U.S. Attorney's Office.  And his

25     lawyers would not give us access to him, so we have not met

1    with him to prepare him today.  And the events at issue date

2    back approximately seven years.  I just want to bring that to

3    the Court's attention.

4          And lastly, as part of Mr. Higginbotham's testimony,

5    the defense will enter a stipulation into evidence between the

6    parties relating to certain recordings of conversations between

7    Mr. Guo and a Chinese government official Liu Yanping.  And we

8    will read select portions of those transcripts to the jury at

9    the conclusion of Mr. Higginbotham's testimony.  I just wanted

10   the Court to have this for reference in terms of what we expect

11   from Mr. Higginbotham, again, not having had the opportunity to

12   meet with him or prepare him today.

13         THE COURT:  So is there an application?

14         MR. SCHIRICK:  No, your Honor.  I just wanted to make

15   the Court aware of those facts.

16         THE COURT:  Very well.

17         MS. MURRAY:  Your Honor, if I may, just with respect

18   to Mr. Higginbotham, since Mr. Schirick brought it up, one

19   component of Mr. Higginbotham's situation, as Mr. Schirick

20   mentioned, is that he had entered into a cooperation agreement

21   with the government.  To be clear, he did not enter into that

22   agreement with this office; he entered into that agreement with

23   the Public Integrity Unit and MLARS in D.C.

24         We have spoken with the defense.  We understand they

25   are not going to elicit the fact of his cooperation agreement;

O78VGUO1

1     and they are not going to elicit details about his -- things

2     relating to his cooperation with the government on direct;

3     that, in our view, would be inappropriate.  They've agreed to

4     that.  So that is a component of what we understand to be part

5     of his testimony.

6          With respect to the timing here -- or, actually, one

7     other point on Mr. Higginbotham.

8          As Mr. Schirick mentioned, he was a DOJ employee at

9     the time that he participated in the entirely separate

10    conspiracy that they are looking to elicit.  We assume that

11    they are not going to highlight that fact.  We've discussed

12    that with the Court at length.  That would be inappropriate

13    because it would be intended only to suggest that the front

14    table has in any way something to do with the communist party

15    or, again, this separate conspiracy to repatriate Mr. Guo,

16    which we've already stipulated to.  It's been introduced into

17    evidence a number of times.

18         Mr. Doran, their expert, said that that paragraph 7 of

19    Defense Stip 1 adequately summarized the entire case that

20    Mr. Higginbotham was involved with.

21         We understand his testimony is coming in.  We will

22    cross-examine him as appropriate.  But that fact has been

23    covered, the fact of that 2017 conduct, which predates any of

24    the charged conduct in this case has been covered.  So, again,

25    we assume that the defense won't elicit the fact that he is a

O78VGUO1

1    DOJ employee and we will object as appropriate.

2              Another component that the defense said that they

3    would not elicit is his sentence in his case.  That relates to,

4    again, his cooperation.  So to the extent that he received a

5    minimal sentence for his involvement in, again, the separate

6    conspiracy from 2017, they are not going to bring that out on

7    direct.

8              And then the last point I would note, Mr. Schirick

9    just indicated that he expects to call Mr. Higginbotham today.

10   That suggests to the government that they expect to get through

11   all of their witnesses today, as he is scheduled to be last.

12             We may reserve the right at the break this morning to

13   request that they instead call Leanne Li last, in light of the

14   late production of these exhibits, including approximately 44

15   audio files that they produced at 4 this morning.

16             THE COURT:  Mr. Schirick, you are not going to elicit

17   testimony about the cooperation agreement or about his

18   sentence, right?

19             MR. SCHIRICK:  Your Honor, we have no plans to elicit

20   that testimony on direct; but obviously, depending on what the

21   government's cross is, reserve the right to raise that, should

22   it become necessary.

23             THE COURT:  And you're not going to be implying at any

24   point that the government is being manipulated by the Chinese

25   government or the Chinese Communist Party; correct?

O78VGUO1

1            MR. SCHIRICK:  No, your Honor.  The defense has been

2     clear that we don't plan to make that argument.

3            I would note, however, that it is a fact — a simple

4     fact — that Mr. Higginbotham was employed by the Department of

5     Justice at the time of the conspiracy and at the time that he

6     had the meetings that I described to the Court earlier today.

7     And, in fact, it is part of the narrative, your Honor, because

8     he was asked to go to those meetings in part because he was an

9     attorney for the Department of Justice.

10           So while we have no plans to make the argument that,

11    you know, your Honor just described, we would ask for some

12    latitude to be able to elicit the narrative, which is important

13    and is, frankly, just part of the factual landscape here,

14    without placing undue emphasis on it.

15           MS. MURRAY:  Your Honor, we strenuously, strenuously

16    object to that.

17           The statement of facts in connection with

18    Mr. Higginbotham's guilty plea in the D.C. case make it very

19    clear that he was not acting in his DOJ capacity when he

20    conducted any of the conduct that was the offense conduct.  He

21    made it clear when he went to the embassy in D.C. and when he

22    went to visit the Chinese official in China, that he was not

23    acting in an official capacity.  It is entirely improper for

24    the defense to bring that out as part of the narrative of what

25    happened in 2017.

1          THE COURT:  You're saying to bring out his employment.

2          MS. MURRAY:  That's correct.

3          THE COURT:  So I'm directing you to not bring out the

4     fact that he was a DOJ employee.  I'm directing you to tell him

5     that he may not volunteer that information.  Clearly bringing

6     that up is merely a rather clumsy way of trying to link the

7     prosecution in this case with corruption and the Chinese

8     government.

9          MS. MURRAY:  Your Honor, if I may make one

10    clarification, because we have had certain discussions with the

11    defense about the protest signs that have been produced into

12    evidence in this case that suggested that the DOJ had been

13    influenced by the CCP.

14         We don't object to one factual question about whether

15    at the time he had been employed by DOJ, if that's what the

16    defense would like to elicit.  We would object to any further

17    questioning that would suggest in any way that his employment

18    had something to do with his offense conduct.

19         MR. SCHIRICK:  And, your Honor, Ms. Murray anticipated

20    where I was going to go.  To an extent, the government did open

21    the door on this by showing the jury the signs that Ms. Murray

22    referenced.  And I believe we had an understanding with the

23    prosecution team that we would be permitted to do what

24    Ms. Murray just described.  Again, that goes to the point that

25    I was attempting to make, your Honor, which is we have no plan

O78VGUO1

1    to unduly emphasize this.  But it is a fact that he was

2    employed by DOJ.  And you know, as Ms. Murray said, we have an

3    agreement to be able to at least elicit that fact, you know, as

4    part of his direct, again, without unduly emphasizing it or --

5            THE COURT:  Well, is the prosecution asking for some

6    type of a curative instruction?

7            MS. MURRAY:  Your Honor, not at this time; although

8    subject to how the direct testimony comes in, it might be

9    possible.

10           As Mr. Schirick said, we've had certain discussions.

11   We don't have an objection.  We understand that the view is

12   that the government might have opened the door to this by

13   showing protest signs that Mr. Guo's enterprise had, you know,

14   posted up against the bankruptcy trustee that mentioned DOJ.

15           A curative instruction might be appropriate.  We can

16   discuss that.

17           But, again, fine with their establishing the fact that

18   he was a DOJ employee.  Any further questioning, and just kind

19   of reacting to Mr. Schirick, because we don't intend to push

20   the issue or emphasize, feels a little wishy-washy, so we just

21   wanted to bring it to the Court's attention.  If it goes down

22   the path, we might object.

23           THE COURT:  I want the parties to agree on the exact

24   question that's going to be posed regarding this photograph.

25   And I want you to instruct him that he is not to elaborate on

1  his relationship with the Department of Justice.

2          MR. SCHIRICK:  Thank you, your Honor.

3          We will speak to the prosecution and agree on the

4  question.

5          Just to be clear, again, I and the defense team do not

6  have access to Mr. Higginbotham.  I will do my best to

7  communicate what your Honor has just instructed to his lawyer

8  before he testifies.

9          THE COURT:  Anything further?

10          MS. MURRAY:  Not from the government.  Thank you.

11          THE COURT:  All right.

12          Please have the jurors brought out.

13          (Jury present)

14          THE COURT:  Please be seated.  Good morning, jurors.

15          THE JURY:  Good morning.

16          THE COURT:  It is 10:07.  And I am sorry that I did

17  not bring you out promptly at 9:30.

18          THE INTERPRETER:  We need some help here.  I'm sorry.

19          Your Honor, the witness is asking to test the device.

20  May we test the device with him now?

21          (Pause)

22          THE COURT:  As I was saying, I'm sorry that I didn't

23  get you out promptly at 9:30.  There were a couple of issues.

24          One issue is that Juror No. 10 has now been replaced

25  by Alternate No. 1.  In addition, I had to discuss some

1   important legal matters with the attorneys.  And so I am very

2   mindful that you're waiting.  And I don't want to waste your

3   time; I know your time is important, so I apologize.  I will

4   try to keep that to a minimum.

5          So now we're going to continue with the direct

6   examination of Mr. Lai Dai.

7          You may inquire.

8          MS. SHROFF:  Thank you, your Honor.

9          Your Honor, perhaps the Court would like to remind

10  Mr. Dai he's still under oath.

11         THE COURT:  Yes, that is a good idea.

12         Sir, remember that you're still under oath.

13   LAI DAI,

14      called as a witness by the Defendant,

15      having been previously duly sworn, testified as follows:

16  DIRECT EXAMINATION (continued)

17  BY MS. SHROFF:

18  Q.  Good morning, Mr. Dai.

19  A.  Good morning.

20  Q.  Mr. Dai, was the functionality of the H Pay app in 2022 the

21  same as that of what we saw in the video and pictures last

22  week?

23  A.  Yes, it is the same.

24         THE INTERPRETER:  Your Honor, I apologize.  I'm having

25  a device issue.  I cannot hear him very well.  Can you give me

O78VGUO1                          Dai  Direct

1    one second to switch my device?  I apologize.  I'm so sorry.

2              THE COURT:  Go ahead.

3              All right.  So we're having a failure here of the

4    audio equipment.  And we'll take a five-minute break.

5              Remember that you're not allowed to discuss the case

6    amongst yourselves or with anyone else.  Don't permit anyone to

7    discuss the case in your presence.  Don't read, listen to, or

8    watch anything from any source concerning the subject matter of

9    this case.

10             (Jury not present)

11             THE COURT:  We will recommence when the interpreter

12   returns.

13             (Recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O78BGUO2                        Dai - Direct

```
 1              THE COURT:  Please have the jurors brought in.

 2              THE LAW CLERK:  Jury entering.

 3              (Jury present)

 4              THE COURT:  Please be seated.  Remember, sir, that you

 5    are still under oath.  You may inquire.

 6    BY MS. SHROFF:

 7    Q.  Mr. Dai, was the functionality of H Pay in 2022 the same as

 8    we saw in the videos and pictures last week?

 9    A.  Yes, the same.

10    Q.  Was the user experience of the H Pay app in 2022 the same

11    as we saw in those videos and pictures last week?

12    A.  Yes, the same.

13    Q.  Was the functionality of the Exchange's website in 2022 the

14    same as we saw in the videos last week?

15    A.  All functions are the same, however, two functions were

16    restricted.

17    Q.  Mr. Dai, please try and answer my question, okay.  Whatever

18    restrictions there were is not -- I'll withdraw that, your

19    Honor.

20              Was the experience of the Exchange's website in 2022

21    the same as those that we saw in the video last week?

22    A.  Yes, the same.

23    Q.  Mr. Dai, what is the New Federal State of China?

24    A.  New Federal State of China, it is to overthrow the CCP, to

25    build the democracy and the Rule of the Law, and it is to build
```

O78BGUO2                          Dai - Direct

1    a new regime in China.

2    Q.  When did you first hear about the New Federal State of

3    China?

4    A.  The first time it was June 4, 2020.

5    Q.  Where were you when you heard it?

6    A.  I was in Germany.

7    Q.  And how did you hear it?

8    A.  I heard it from Mr. Guo's live stream that day.  He was --

9    Mr. Guo was with Mr. Steve Bannon in New York and announce the

10   funding of the New Federal State of China.

11   Q.  Was there anyone else on the broadcast?

12   A.  Yes.

13   Q.  Who?

14   A.  It should be other people who were in the live stream

15   because there were in the boat on the ocean.

16   Q.  Mr. Dai, if you could listen to my question.

17          Do you know if anybody else was present at the

18   broadcast?

19          MR. HORTON:  Objection, asked and answered.

20          THE COURT:  Sustained.

21   Q.  Did anyone else speak about the New Federal State of China?

22          MR. HORTON:  Asked and answered.

23          MS. SHROFF:  He did not answer that question.

24          THE COURT:  You may answer that question.

25   A.  Everyone was discussing the New Federal State of China, a

O78BGUO2                          Dai - Direct

1    lot of news media reported.

2    Q.  Who read the declaration of the New Federal State of China?

3    A.  Mr. Hao Haidong.

4    Q.  And who is that?

5    A.  He was a famous soccer player in China.  You can say that

6    he was the mister football in China.

7    Q.  Was his wife also part of the broadcast?

8              MR. HORTON:  Objection.

9              THE COURT:  Was there anyone else on the broadcast?

10   A.  Should be.  I don't recall clearly --

11   Q.  All right.

12   A.  -- because it was long.  During the broadcast live mainly

13   were Mr. Guo, Steve Bannon and Mr. Hao Haidong.

14   Q.  Mr. Dai, did there come a time that you became aware that

15   the New Federal State of China had a base?

16   A.  Yes, I believe the earliest was 2020.

17   Q.  And what is your understanding of what the base was

18   supposed to be?

19   A.  The base will provide for member of New Federal State of

20   China and G/Club member a place for events.  They can live

21   there for a period of time like a vacation.  They can also host

22   friends of New Federal State of China, famous people, media,

23   senators.

24             MR. HORTON:  Objection.  Move to strike for hearsay.

25             MS. SHROFF:  That's his understanding, your Honor.

O78BGUO2                         Dai – Direct

1          THE COURT:  Overruled.  Go ahead.

2   A.   Also during the time of emergency, this place can provide

3   help for G/Club members.

4   Q.   Did you learn if in fact a base had been found?

5          MR. HORTON:  Objection, calls for hearsay, your Honor.

6   He has no personal knowledge.  He's describing what he heard

7   from other people.

8          THE COURT:  If you'll step up, please.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO2                          Dai - Direct

1          (At the sidebar)

2          THE COURT:  So aside from what he may have heard on a

3   broadcast, did he personally have contact with the location?

4          MS. SHROFF:  I don't believe that would be the

5   testimony, your Honor.  But imagine if you're part of a member

6   club, say you're part of the union club or the Harvard club,

7   are you going to really talk to the executive of the Harvard

8   club and each day he's going to call you and say, hey, listen,

9   you know what, I'm going to put this new service in place; but

10  all of you come to the executive meeting, and we'll all sit

11  down and learn about this.  And how else does one learn other

12  than by listening to what the membership of the executive

13  committee tells you is a benefit offered by a membership club.

14  That's how you learn.  That's the whole point of a membership

15  club.  We're not going to the truth of the matter asserted.

16  They can say no such basis existed.

17          But I note here again, your Honor:  One, if you're a

18  member of Netflix, the only way you're going to know what

19  Netflix has to offer next is by looking at the Netflix website,

20  of getting an advertisement, of getting a notification and

21  reading about it.  That's the way it work.  Netflix's CEO is

22  not calling me to say, hey, you know what, this show is going

23  to stream again tomorrow, make sure you watch.  And even that

24  according to them would be hearsay, so how would a member know?

25          THE COURT:  Why can't he testify about what he heard

O78BGUO2                    Dai - Direct

1    on these broadcasts?

2            MR. HORTON:  Because they're offering it for its

3    truth, your Honor.  There's a difference between the Netflix

4    member saying, well, the CEO told me that Netflix does X, Y and

5    Z, and as a member I used this service and this is my

6    experience in using the service.  He's not saying he went to

7    the base.  He's not saying he experienced it personally.  He

8    said I heard from other people what it was.  They can call

9    somebody who's at the base, who operated the base, who operated

10   G/Clubs to testify from their personal knowledge, but this

11   witness doesn't have personal knowledge.

12           THE COURT:  So when the prosecution have witnesses on

13   the stand and they asked them about all of the promised

14   services and benefits, it was certainly not for their truth.

15   The prosecution is not claiming that any of these services were

16   offered, but my sense is that your witness is here in order to

17   say that they did exist.

18           MR. KAMARAJU:  I think there's a difference between

19   saying that the statement is being offered in fact for

20   something existing versus the topic is being discussed that it

21   is something that people are addressing.  It is something that

22   members understand.  It is something even the defendant

23   understands.  That's *United States v. DiMaria*.

24           THE COURT:  You're saying that you're not offering it

25   for the truth?

O78BGUO2                           Dai – Direct

1            MR. KAMARAJU:  This is for their understanding, your

2    Honor. Whether they are right or wrong as to whether that was a

3    base or not, it's a question of what they believed, and that's

4    the question.  It's an intent case. It's a fraud question.  If

5    we're not allowed to introduce evidence of statements, if we're

6    not allowed to introduce evidence of understanding, then the

7    only way that a fraud defendant can ever defend themselves is

8    by taking the stand.  Because otherwise, you're never going to

9    be permitted.  That's why you have a state of mind hearsay

10   exception. That's why you have a present sense impression.

11   That's why you have all of these exceptions.  So we have no

12   problem with any of this testimony with an instruction that

13   says it's not being offered for the truth, which that's the

14   standard way that you deal with a hearsay issue. It is not to

15   preclude the testimony in its entirety.

16           THE COURT:  Certainly this has come in already through

17   other witnesses, hasn't it?

18           MR. HORTON:  The context matters for the hearsay rule,

19   your Honor.  When we bring in something that the defendant or

20   his agents or his co-conspirator says, the rule allows us to

21   admit an opposing parties' statements.  What Mr. Kamaraju was

22   just talking about Miles Guo's intent, which we agree is the

23   only intent that matters.  This witness can't testify about

24   Miles Guo's intent.  The state of mind exception is about the

25   declarant's state of mind, and your Honor we had a pre-trial

O78BGUO2                        Dai - Direct

1    argument about this a few weeks ago.  This witness cannot

2    testify, I heard this thing from somebody else, and so

3    therefore it's Miles Guo's state of mind.  That's not how it

4    works.

5            MR. KAMARAJU:  Mr. Horton is correct.  The state of

6    mind exception is not specific to the defendant.  It's specific

7    to a declarant.  With respect to Mr. Guo's intent, it can be

8    corroborated by independent evidence, including the

9    understanding of other people.  They're allowed to challenge

10   that weight.  They're allowed to challenge whether that's how

11   significant the jury should afford that.  Your Honor has

12   already ruled that Mr. Guo's intent corroborated by

13   reasonable -- sorry corroborated to be proven reasonable by

14   objective evidence.  The fact that they were being discussed is

15   evidence.

16           THE COURT:  So you're saying that you want to

17   introduce Mr. Guo's statements.  I don't understand how you get

18   around the hearsay problem.

19           MR. KAMARAJU:  That's exactly what's in *DiMaria*, your

20   Honor, and I have a copy of the case which I'll bring up.  In

21   *DiMaria*, the facts of DiMaria were, the defendant was present

22   in a place to buy illegal cigarettes.  It was either FBI or DHS

23   agents -- I don't know specifically -- showed up and the

24   defendant said, Why are you guys here?  I just came for some

25   cheap cigarettes.  And the prosecution move to exclude that

500

O78BGUO2                          Dai – Direct

1    statement on hearsay grounds.

2              The Court -- the district court agreed with the

3    exclusion on hearsay grounds.  The Second Circuit reverse and

4    called it wasn't harmless.  Because what they said was, it goes

5    to the state of the mind of the defendant, his then existing

6    belief as to why he was there, which was relevant to the mind.

7    And they also rejected arguments about it being a false

8    exculpatory statement, about the exception swallowing the rule

9    because the hearsay state of mind exception already has a carve

10   out in between.  I can hand it up, your Honor.  That's the

11   difference.  We are allowed to say that Mr. Guo's statement --

12   we're allowed to say that Mr. Guo's intent is proveable by one

13   of Mr. Guo's statements if it is a then existing statement of

14   his mental state.  And that's what *DiMaria* says, and I have it

15   here for your Honor.

16             MR. HORTON:  Ms. Shroff's question wasn't about

17   Mr. Guo's statements. The hearsay that the witness is

18   testifying about wasn't attributed to anybody in particular.

19   This case is about a defendant at a crime scene making a

20   contemporaneous statement that comes in for his then

21   existing -- his then existing state of mind.  That's not what

22   is happening here, your Honor.

23             THE COURT:  Are you going to limit it to only

24   Mr. Guo's statements?

25             MS. SHROFF:  Sure.

O78BGUO2                          Dai - Direct

1           MR. FERGENSON:  That's not permissible.

2           THE COURT:  It seems to me that you're arguing they

3      can bring in the defendant's statement?

4           MR. HORTON:  My point is that the case they're hinging

5      all this onto a single parallel purpose.  Mr. Fergenson wants

6      to supplement what I said.  I certainly didn't mean to suggest

7      that they just bring in Mr. Guo's statements it's fair game and

8      hearsay and what they're aiming for is not nearly that broad.

9           THE COURT:  I remember looking at this case, and I

10     don't recall interpreting it the way that you do, but I am

11     going to take a second look at the case.  So let us move onto

12     something while I -- well, my clerks will look at this.

13          MR. KAMARAJU:  Would your Honor like the hard copy?

14          THE COURT:  That's terrific.  Thank you.

15          MR. KAMARAJU:  She's almost done at this point.

16          THE COURT:  We can always recall the witness if I

17     don't come up with an answer soon enough.

18          MS. SHROFF:  That's fine.  Whatever you want to do.

19          THE COURT:  Okay.

20          (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may continue.

3    BY MS. SHROFF:

4    Q.  Mr. Dai, let me show you what is marked not yet in evidence

5    as Government Exhibit VD-6.  You could take a look at that

6    document for me, please.

7              MR. HORTON:  Your Honor, is there a question pending?

8    A.  Yes, I see it.

9    Q.  Are you done, Mr. Dai, reading the document?

10   A.  Yes, I finish it.

11   Q.  Mr. Dai, do you recognize that document?

12   A.  Before today, I haven't seen this before.

13   Q.  I couldn't hear him?

14   A.  Before today I didn't see it.  I didn't see it before.

15             MS. SHROFF:  I have no further questions at this time

16   pending the Court's ruling.

17             THE COURT:  Understood.  All righty.  Cross

18   examination.

19   CROSS-EXAMINATION

20   BY MR. HORTON:

21   Q.  Good morning, Mr. Dai.

22   A.  Good morning.

23   Q.  You're a supporter of Miles Guo, correct?

24   A.  Yes.

25   Q.  You found him through his online videos, right?

Dai  Cross

```
1    A.  Yes.

2    Q.  And you understood from watching Miles Guo's videos you

3    thought he was a successful business person; isn't that right?

4    A.  Yes.

5    Q.  And when you met with Mr. Guo's lawyers earlier this year,

6    you told them that you thought Miles Guo had a lot of

7    credibility on investments; isn't that true?

8    A.  To whom I met?

9    Q.  You met with Mr. Guo's lawyers earlier this year, do you

10   remember that?

11   A.  Yes, I told them that I like Mr. Guo's courage and his

12   honesty.

13           THE COURT:  Sir, I want you to limit your answer to

14   the question that's being asked.  The answer that you just gave

15   was not responsive to the question that was just asked, so I'm

16   going to ask the reporter to read back the question and you

17   answer only the question that's been asked.  I'm going to

18   strike the answer.

19           (The record was read)

20   A.  Yes, I remember.

21   Q.  And you told Mr. Guo's lawyers that you thought Mr. Guo was

22   credible when he spoke about investments, right?

23   A.  Yes.

24   Q.  You believe Miles Guo when he talks about GTV, don't you?

25   A.  You mean he mention GTV investment?
```

1    Q.  Yes.  When Miles Guo talks about GTV investments, you

2    believe what he's saying, don't you?

3    A.  Yes, before my investment, I had not heard about GTV

4    investment by Mr. Guo.

5    Q.  But then you heard him talk about it, and ever since you

6    believed what he said; isn't that right?

7    A.  No, I didn't hear him mention about GTV investment.  I,

8    through the group, the chat group of my fellow fighters, I got

9    that information.

10   Q.  Well, but after that, Mr. Dai, didn't you exchange WhatsApp

11   messages with Miles Guo about investing in GTV?

12        MS. SHROFF:  Your Honor, the witness testified he did

13   so after the investment.  The government should be clear.

14   A.  Yes.

15   Q.  And after that you watched GTV for five hours a day, that

16   was your testimony, right?

17   A.  No, not like that.  When I watching the video that was five

18   hours a day, that was before, before I got information about

19   investment.  I started -- the information I got from the

20   investment in May, late May 20 something, by then I already

21   watched GTV for over a month.

22   Q.  But you heard Miles Guo talk about GTV stocks, for example,

23   in his broadcast, for example, didn't you?

24   A.  No.  He has not mention anything GTV investment or stocks

25   during his live stream --

```
 1    Q.  Mr. Dai --

 2    A.  -- therefore I learn this much later.

 3              THE COURT:  You need to stop answering.  Once you've

 4    answered the question that been's asked, you just stop.  So if

 5    I ask you what is today's date, you tell me today's date, but

 6    you don't also tell me what time it is.  You understand?  Go

 7    ahead.

 8    Q.  Mr. Dai, over the last several years you've watched Miles

 9    Guo's live streams, haven't you?

10    A.  Yes.

11    Q.  And on those live streams you heard Miles Guo talk about

12    G/Club, didn't you?

13    A.  Yes.

14    Q.  And you heard on those live streams Miles Guo talk about

15    the Himalaya Exchange; isn't that right?

16    A.  Yes.

17    Q.  Is it your testimony that on those live streams Miles Guo

18    never talked about GTV stocks?

19              MS. SHROFF:  Your Honor, objection.

20              THE COURT:  Overruled.  Overruled.  Please answer.

21    A.  G/Club and Himalaya Exchange were all in 2020, after

22    October of 2020.  About GTV investment was from April, and I

23    learned this was May of 2020, so how could I learn about GTV

24    investment by watching the other live stream on the other --

25              THE COURT:  Once again you have not answered the
```

O78BGUO2                        Dai - Cross

```
 1   question.  I'm going to ask the reporter to read the question

 2   back and only answer the question that has been asked.

 3             (The record was read)

 4   A.  Before my investment, no, he didn't mention that.

 5   Q.  Mr. Dai, my question is, you testified that you've watched

 6   Miles Guo's live streams for the last several years.  Over that

 7   period when you watched his live streams, isn't it true that

 8   Miles Guo talked about GTV shares?

 9   A.  Yes, he did mention that.

10   Q.  And you believed everything he said about it, isn't that

11   true?

12   A.  Yes.

13   Q.  And he talked about other investments as well; isn't that

14   right?

15   A.  Yes.

16   Q.  And you believed everything he said about those investments

17   as well; isn't that true?

18   A.  After I read the document, yes, I believe that.

19   Q.  And GTV the "G" in that stands for Guo; isn't that right?

20   A.  No.

21   Q.  The "G" in G/Clubs, that "G" stands for Guo doesn't it?

22   A.  No.

23   Q.  And the "G" in G Fashion, that "G" stands for Guo, doesn't

24   it?

25   A.  No.
```

O78BGUO2                              Dai - Cross

1    Q.  And the "G" in the G Series investment that Miles Guo

2    talked about in those broadcast, that "G" stands for Guo,

3    doesn't it?

4    A.  To me I wouldn't say the G Series, I wouldn't say that.  I

5    don't know what it represented.

6    Q.  Your testimony, Mr. Dai, is that after investing in GTV and

7    in G/Clubs and in other G Series investments, you don't know

8    what the "G" stands for?

9             MS. SHROFF:  Objection.  That's not what he said.

10   That misstates his answer completely.

11            THE COURT:  You may answer.

12            THE WITNESS:  May I answer now?

13            THE COURT:  Yes.  Go right ahead.

14   A.  I know what "G" means.  It doesn't mean Guo.  It means

15   global.

16   Q.  Your testimony is that when Miles Guo promoted GTV, G/Club,

17   G Fashion and the G Series investments that "G" stood for

18   global?

19            MS. SHROFF:  Asked and answered.

20            THE COURT:  Overruled.  You may answer.

21   A.  That's correct, it means global.  This is very obvious.

22   Can I explain?

23            THE COURT:  No.  Go ahead.

24   Q.  You've heard of Guo Media, Mr. Dai, haven't you?

25   A.  Guo Media did you say?  I've heard of it.

1   Q.  And the "Guo" in Guo Media, that refers to Miles Guo,

2   right?

3   A.  Or maybe, but he's not what you just mentioned earlier.

4   Q.  Mr. Dai, your testimony is that "Guo" in Guo Media only

5   maybe refers to Miles Guo; is that right?

6   A.  I don't know.  I didn't invest in Guo Media.  I have never

7   seen certain documents or explanation or description of what it

8   means.

9   Q.  Okay.  You heard Miles Guo talk in his broadcast about the

10  Himalaya Exchange; isn't that right?

11  A.  Yes.

12  Q.  And when Miles Guo said that the Himalaya Exchange is a

13  cryptocurrency exchange, you believe that, right?

14  A.  I heard this, but I believe the content is because when I

15  read the relevant information, at that point I couldn't decide

16  it was true or not.

17  Q.  Well, you heard Miles Guo talk about the Himalaya Exchange

18  and H Coin and H dollar on his live streams that you watched,

19  didn't you?

20  A.  Yes.

21  Q.  And when Miles Guo talked about Himalaya Coin or Himalaya

22  Dollar, you believe what he said on his broadcast that you

23  watched, didn't you believe it?

24  A.  No, I didn't believe that at the time.  I was only

25  interested.

1   Q.  Mr. Dai, it's your testimony that there were times when you

2   heard Miles Guo talk about the Himalaya Exchange and you did

3   not believe what he was saying?

4   A.  Correct.

5   Q.  And there were times that Miles Guo talked about GTV and

6   you did not believe what he was saying?

7            MS. SHROFF:  Your Honor --

8   A.  I had no way to judge.  I just heard some interesting

9   information, and then I was waiting to have more information

10  come up in order for me to decide if that's true or should I

11  believe it.

12  Q.  You agree with me, don't you, that H Coin is not backed by

13  gold?

14  A.  H Coin does not have gold as backup.

15  Q.  Right.  And when Miles Guo said that it did, was he lying?

16  A.  I don't believe he was lying.  I was thinking that he was

17  expressing his understanding of H Coin.  But obviously in the H

18  Exchange in his white paper, he didn't specify that the H Coin

19  was backed by gold, so I think the H Coin is independent

20  platform so he can do his -- he can decide or design to decide

21  how to do this cryptocurrency.

22  Q.  Mr. Dai, you agree with me don't you, that Miles Guo

23  designed H Coin?

24  A.  I don't know.

25           MR. HORTON:  Ms. Loftus, can we pull up what's in

O78BGUO2                          Dai - Cross

1    evidence as GX9 and go to page 120.

2    Q.  Mr. Dai, the Himalaya Exchange launched on November 1,

3    2021; isn't that right?

4    A.  Yes, the formal launch, yes.

5    Q.  On the screen in front of you there's a document called

6    GX9, if you look at the top of this page.  Mr. Dai, you see the

7    date September 29, 2021, top left in highlight.

8             Mr. Dai, the question is, do you see the date in the

9    top left corner?

10   A.  Yes, I see it.

11   Q.  By the way, G News, is your testimony that G news, the "G"

12   doesn't stand for Guo either?

13   A.  That obviously is not representing Guo.  You can enlarge

14   it.

15   Q.  Your testimony is that --

16             MS. SHROFF:  Your Honor, may we ask for the document

17   to be enlarged.

18             THE COURT:  We haven't heard the question.

19             MS. SHROFF:  The witness asked for the document to be

20   enlarged.

21             THE COURT:  Absolutely, it should be enlarged.

22   Absolutely.

23   Q.  Mr. Dai, the G News --

24   A.  As you can see, the G News --

25             THE COURT:  One moment.  You have to wait for the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O78BGUO2                          Dai - Cross

1    question in order to offer an answer.

2    Q.  Mr. Dai, the question is whether your testimony today is

3    that the "G" in G News doesn't stand for Guo neither?

4    A.  Does not represent Mr. Guo.

5    Q.  You see that this document is entitled highlights of Miles

6    Guo's live broadcast on September 29, 2021.  Do you see that?

7    A.  Yes, I can see the title.

8    Q.  And do you see Mr. Guo in the middle of the screenshot

9    there on the top of the page?

10   A.  Yes, I see it.

11   Q.  Thank you.

12          MR. HORTON:  If you could zoom out, please, Ms.

13   Loftus.

14   Q.  Mr. Guo's statement on this date, Mr. Dai, September 29,

15   2021, that was just a few weeks before the Himalaya Exchange

16   launched; isn't that right?

17   A.  I think maybe over a month prior, yes.

18   Q.  And Mr. Guo says "The safest virtual coin at the moment is

19   the Himalaya Coin because 20 percent of the value is anchored

20   to gold."  Do you see that right there?

21   A.  Yes, I see that.

22   Q.  So when Mr. Guo said that, that was not true, was it?

23          MS. SHROFF:  Your Honor, I have an objection under

24   Federal Rule of Evidence 609, and if I need to elaborate, I'm

25   happy to have a sidebar.  608, I'm sorry.

O78BGUO2                         Dai - Cross

1              THE COURT:  All right.  Let's have a sidebar.

2              (Continued on next page)

1              (At the sidebar)

2              THE COURT:  Are you going to tell me about Mr. 608,

3      Mr. Kamaraju?

4              MR. KAMARAJU:  I'm going to do that with another rule

5      in combination, your Honor.  Rule 608 precludes specific

6      instances of conduct being used to attack a witness's

7      testimony.  Basically you cannot ask another witness whether

8      somebody lied.  And because Mr. Guo's statements are being

9      offered for as an out-of-court declarant, he falls under those

10     same rules.

11             THE COURT:  So aren't you looking to impeach Mr. Guo

12     essentially?

13             MR. FERGENSON:  The question was whether this

14     statement that he just read was true.  It doesn't bring up --

15     it's not character evidence under 608.

16             MR. KAMARAJU:  It's 609(b).

17             MR. HORTON:  Your Honor, I admit, I'm confused.  This

18     is a fraud case.  What's at issue is whether Mr. Guo lied when

19     talking about investments.  The witness testified that he

20     watched Mr. Guo's broadcast where he made statements about

21     investments.  The witness also testified H Coin was not backed

22     to gold.  He agreed with me on that.  Mr. Guo said repeatedly

23     H Coin is backed to gold.  The question of this fraud case is,

24     that's not true, right?

25             MR. KAMARAJU:  You still can't ask a witness to

O78BGUO2                           Dai Cross

1     impeach another witness's credibility in specific instances.

2     Mr. Guo is an out-of-court declarant who can be impeached.  It

3     is a fraud case.  They are allowed to prove that he lied, but

4     the way you do that is not saying to one witness, did he lie on

5     this instance.

6              MS. SHROFF:  You cannot ask about specific instances.

7              MR. HORTON:  It cannot be the case that they can bring

8     in a witness for the purpose of bolstering the credibility of

9     Mr. Guo, talking about materiality pro and con, and then we

10    can't ask that this particular statement wasn't true based on

11    the witness's prior testimony that H Coin was in fact backed by

12    gold.

13             MS. SHROFF:  Actually, the witness testified that he

14    read the white paper and that is what he relied on.  He has

15    repeatedly told you that he has not relied on Mr. Guo's video.

16    You ignored all of his answers and you keep pummeling down this

17    video road. And the rule has no exception to a fraud case -- I

18    think the statute is the very clear -- you may not ask about

19    specific instances and ask somebody who is in court whether

20    those are true or false.  If the statute says, and by the way,

21    we're making an exception in a fraud case, I would be delighted

22    to hear that.

23             THE COURT:  What's the other rule, Mr. Kamaraju?

24             MR. KAMARAJU:  If you give me a second.  It's an

25    impeachment of out-of-court declarant statements.  I have to

1    remember the rule number.

2           MR. FERGENSON:  If I may, your Honor.  I think just

3    going back to sort of fundamental building blocks. This is a

4    case about representations made to investors and whether

5    they're true.  That's not about -- there's no, like, the

6    entire -- if Mr. Kamaraju was correct, then the government's

7    entire case in chief was improper because we're impeaching an

8    out-of-court declarant, meaning the defendant.  Of course in a

9    fraud case you're going to say the things the defendant said

10   are untrue.  That's the entire basis for the prosecution. This

11   rule, well it's sort of nuanced, it has no application here.

12   And we're asking the witness if he agrees this representation

13   was not factually true.  That's the question pending.  The

14   objection should be overruled.

15          THE COURT:  My recollection is the prosecution asked

16   the same question of their witnesses.  Why didn't you object

17   then?

18          MR. KAMARAJU:  I did.

19          THE COURT:  Why didn't you bring up the rule then?

20          MR. KAMARAJU:  I did.  I did, your Honor, but I do

21   think there is a difference -- and I want to draw this

22   distinction.  There's a difference between whether it's in a

23   fraud case or any other case asking a witness for the

24   underlying facts that show the defendant's statement is not

25   true.  They are undoubtedly permitted to do that.  There's no

1    bar to that.  The point that I'm objecting to is asking the

2    witness his opinion as to whether Mr. Guo lied in a specific

3    instance.  That is what the rule bars.  This does not hamstring

4    the Southern District of New York from bringing fraud cases in

5    the future, they just have to do it consistent with the rules

6    of evidence.

7              MR. FERGENSON:  That's not the question pending.  The

8    question pending is whether that factual representation is

9    true.  There's no reason the witness can't answer that, and I

10   don't think Mr. Horton needs to ask, and Miles Guo was

11   knowingly lying when he said that, right?  He's not going to

12   ask that.  He can just ask was this representation true, which

13   is the question pending, and it should be overruled.

14             THE COURT:  Is there anything further?

15             MR. KAMARAJU:  I just note, I don't think that was the

16   question before. If that's going to be the question, that's a

17   different answer.

18             THE COURT:  My recollection is that that was the

19   question.

20             MR. KAMARAJU:  Just so I understand the ruling, it's

21   not that he can say did Miles Guo lie in that instance.  He can

22   say is that factual statement that Miles Guo said is true?

23             THE COURT:  That's what he asked.

24             MR. KAMARAJU:  I'm just making sure that I understand

25   the Court going down this road.

1              THE COURT:  And you're not objecting to that question?

2              MR. KAMARAJU:  I won't continue to.

3              THE COURT:  I said you're not objecting to that

4    question?

5              MS. SHROFF:  We are.

6              THE COURT:  You are?

7              MR. KAMARAJU:  To the factual predicate of his

8    understanding if it's true?

9              THE COURT:  Yes.

10             MR. KAMARAJU:  I don't think I can object to that,

11   your Honor.  I've made my objection.

12             THE COURT:  Okay.  If you can just hold on a second.

13   I just want to talk to my clerk about the other issue.

14             MS. SHROFF:  Your Honor, there was also a whole stream

15   of questions that were asked prior to this one as to whether or

16   not Mr. Guo had lied about specific instances.  I didn't

17   interrupt, but those questions are also improper to the extent

18   they talk about specific instances that the witness is being

19   asked about.  And the record should be clear, the witness has

20   repeatedly said, he did not rely on the video in determining

21   whether to invest.  He said that over and over again.

22             THE COURT:  Did you ask questions that contain the

23   word "lie?"

24             MS. SHROFF:  Yes.

25             MR. FERGENSON:  He did, and they were not objecting

1    to. We're not going to keep asking those questions.  We'll ask

2    about factual representations, which is what was objected to,

3    and I think is not objectionable.

4              THE COURT:  Wait one moment, please.

5              MS. SHROFF:  The question about him lying should be

6    stricken.

7              THE COURT:  Wait a minute.  I want to go back to the

8    *DiMaria* issue.  I think that the defense is offering Mr. Guo's

9    statement for the purposes of showing his state of mind.

10   *DiMaria* is different.  It's a different circumstance where the

11   defendant was saying something in the moment, so I'm not going

12   to permit these questions about the location of the club shall

13   we say.

14             MR. KAMARAJU:  Just two points.  You asked me

15   previously about what rule I was citing in terms of attacking

16   an out-of-court declarant's credibility.  That's rule 806 which

17   says that the declarant's credibility may be attacked if

18   supported by any evidence that would be admissible for those

19   purposes if the declarant had testified as a witness, so it is

20   subject to 608's limitations.

21             And then the other thing I would say about *DiMaria*,

22   your Honor, is I believe -- I could be wrong, but I believe

23   that that was not admitted as a present sense impression.  I

24   believe that was admitted as a state of mind exception because

25   the Court specifically addressed the carve out in that case and

1    the distinguish other Second Circuit cases that had addressed

2    the carve out.   So that case is certainly in my reading a

3    state of mind case not a present sense impression case.  So I

4    suspect we are going to have this issue come up again, so I

5    just wanted to flag that point because I think we're going to

6    cite it again.

7              THE COURT:  All righty.  I'm not going to permit the

8    statement with regard to the location.

9              MR. KAMARAJU:  With this witness or with any

10   questioning?

11             THE COURT:  With this witness so far. I don't know

12   what the others are going to talk about.  They may say they

13   visited the location.  I don't know.

14             MR. KAMARAJU:  Understood.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O78BGUO2                        Dai - Cross

 1              (In open court)

 2              THE COURT:  You may continue.

 3              MR. HORTON:  Thank you, your Honor.

 4      BY MR. HORTON:

 5      Q.  Mr. Dai, just redirecting your attention back to Mr. Guo's

 6      statement on the screen.

 7              Mr. Guo's statement on September 29, 2021, on G News

 8      that the safest virtual coin at the moment is the Himalaya Coin

 9      because 20 percent of the value is anchored to gold. That

10      statement was not true, was it?

11      A.  You mean compared with the white paper from the H Exchange,

12      whether that's true?  If that's the case, that's not true

13      because it's not linked to gold.

14      Q.  Right.

15              MR. HORTON:  Ms. Loftus, can you scroll down, please

16      to the second paragraph on page 121.  And, actually, if you

17      could stop at the bottom of 120.

18      Q.  You see the date on the left-hand side October 20, 2021?

19      A.  Yes, I see it.

20      Q.  And that's just 12 days before the launch of the Himalaya

21      Exchange, correct?

22      A.  Yes.

23      Q.  And that's Mr. Guo in the middle of the screenshot, isn't

24      it?

25      A.  Yes.

1           MR. HORTON:  Ms. Loftus, if you could scroll down to

2      the excerpt.  It's the second paragraph on this page, and

3      highlight starting at, What is called the next three lines,

4      four lines, please.

5      Q.  Mr. Dai, on October 20, 2021, Mr. Guo said, "What is

6      called?  I am talking about your H Coins.  Brother Seven

7      designed it at that time."

8           Do you agree that Brother Seven is Miles Guo, correct?

9      A.  Yes.

10     Q.  And so Miles Guo designed H Coin; isn't that right?

11          MS. SHROFF:  Objection.  Is he asking for his

12     understanding or is he asking what that document states?

13          MR. HORTON:  My question, your Honor, to Mr. Dai is --

14     Q.  Mr. Dai, didn't Miles Guo design H Coin?

15          MS. SHROFF:  Objection.  He has no personal knowledge.

16          THE COURT:  You may answer.

17     A.  At this place that says so, but I wasn't sure who was the

18     real designer behind it.

19     Q.  Well, was Miles Guo -- is this statement true what Miles

20     Guo said --

21          MS. SHROFF:  Objection.

22          THE COURT:  You may answer.

23          MS. SHROFF:  We discussed this at the sidebar, and he

24     also said he doesn't know.

25          THE COURT:  You may answer.

1   A.  Can you repeat your question because I was interrupted.

2   Q.  Is Miles Guo's statement that H Coin has 20 percent gold

3   and it is linked to gold, not the others, clear gold directly.

4   Is that statement true, Mr. Dai?

5   A.  This particular sentence he did say that.  He did say that

6   sentence, but it's not inconsistent with the white paper from

7   the Himalaya Exchange.

8   Q.  Mr. Dai, your testimony is that this statement is not

9   inconsistent with the white paper?

10  A.  That's correct, inconsistent.

11  Q.  Just so I make sure I understand, Mr. Dai, Mr. Guo's

12  statement on October 20, 2021 that H Coin has 20 percent gold,

13  your testimony is that that is consistent or inconsistent with

14  the white paper?

15  A.  Inconsistent.

16  Q.  This statement on your screen from Miles Guo is not true,

17  is it?

18            MS. SHROFF:  Objection, asked and answered.

19            THE COURT:  He didn't answer.  You can answer now.

20  Q.  This statement on your screen from Miles Guo, Mr. Dai, is

21  not true, is it?

22  A.  I believe that's his understanding of H Coin.

23  Q.  It's not true, is it?

24            MS. SHROFF:  Objection, asked and answered.

25            MR. HORTON:  He did not answer the question.

O78BGUO2                          Dai - Cross

1            THE COURT:  The question was not answered.  Sir,

2    answer the question.

3    Q.  This statement, Mr. Dai, from Miles Guo is not true, isn't

4    that right?

5    A.  The content was not true, but I don't understand -- do you

6    mean to say --

7            THE COURT:  I want you to answer exactly what is being

8    asked.  Is there something that you don't understand about the

9    question?

10           THE WITNESS:  I understood the question.

11   A.  He did say that.  But if you ask me whether he said this

12   thing, yes, he did say that.

13           MR. HORTON:  Your Honor, the government would move to

14   strike the answer after "the content is not true."

15           MS. SHROFF:  He answered the government's question.

16           THE COURT:  What comes after the word "true" is

17   stricken.

18   Q.  Last week, Mr. Dai, Ms. Shroff ask you some questions.

19           MR. HORTON:  We can take this down please, Ms. Loftus.

20   Q.  Ms. Shroff ask you some questions about -- last week --

21   whether buying a G/Club membership would get you GTV stock, do

22   you remember that?

23   A.  Yes, I remember.

24   Q.  And your testimony last week was that G/Club and GTV seems

25   not to be related at all, do you remember testifying to that?

```
 1   A.  Yes, I remember.

 2              MR. HORTON:  Ms. Loftus, can we show Mr. Dai what's in

 3   evidence as GX29 at page 113.

 4   Q.  That's Miles Guo in this screenshot; isn't it, Mr. Dai?

 5   A.  Yes.

 6   Q.  And it's from July 30, 2021.  Do you see the date on the

 7   top left?

 8   A.  Yes, I see it.

 9   Q.  And it's recorded on GTV, do you see that in the URL?

10   A.  Yes.

11   Q.  And you watched GTV; isn't that right?

12   A.  Yes.

13              MR. HORTON:  And, Ms. Loftus, can we scroll down to --

14              MS. SHROFF:  Your Honor, the government hasn't

15   established that the witness has seen this particular video.

16              MR. HORTON:  It's in evidence.

17              MS. SHROFF:  That's not the question.

18              THE COURT:  So I haven't heard a question so I'd like

19   to hear the question.

20              MR. HORTON:  If I could have, Ms. Loftus, scroll down

21   to the right part of the document.  It's the part that

22   straddles 114 and 115.

23              THE COURT:  I'm just realizing that it's 11:33, so

24   it's time for the half hour break.  Remember you're not

25   permitted to discuss this case amongst yourselves.  Don't
```

O78BGUO2                        Dai 500 Cross

```
1    permit anyone to discuss it in your presence.  Don't read,

2    listen to or watch anything from any source that touches on the

3    subject matter of this case.

4             THE LAW CLERK:  Jury exiting.

5             (Jury not present)

6             THE COURT:  Sir, you may step out.  Don't discuss your

7    testimony.

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Jury not present)

2          THE COURT:  You may be seated.  Is there anything

3     before we reconvene at noon?

4          MR. HORTON:  Very briefly from the government.  Just

5     before the break I didn't have a question pending.  I don't

6     believe Ms. Shroff made an objection.  There was just an

7     interruption and an assertion from Ms. Shroff.  Just ask that

8     she not be permitted to do that. She can make objections.  She

9     can wait for the Court's rulings and she can follow them.

10         THE COURT:  So you've been testifying, Ms. Shroff, as

11    opposed to merely making objections.  Don't do that.

12         MS. SHROFF:  Yes, your Honor.  I do have a matter to

13    raise though.  The government is purposely not asking the

14    witness whether or not the document that is being shown is

15    something that this witness ever saw before or ever looked at

16    before or has even viewed before.  It is consistently asked --

17    could you sit down, Mr. Horton, so I may finish?  Thank you.

18         THE COURT:  Whether someone is standing or sitting is

19    up to me, Ms. Shroff.

20         MS. SHROFF:  I can't see.

21         THE COURT:  Don't be directing them what to do.

22         MS. SHROFF:  Your Honor, could I ask that the

23    government not stand while I'm speaking cause I can't see.  I'm

24    rather short.

25         THE COURT:  Well, I can see you well.  There's a space

1   in between Mr. Horton and Mr. Fergenson, so limit yourself to

2   purely legal issues.

3          MS. SHROFF:  I object to the way the government is

4   asking the witness questions.  The government is deliberately

5   skipping the step of asking the witness whether or not the

6   witness is ever seen this particular video before, or whether

7   he's even heard it before.  And what they're saying is, this is

8   a document in evidence, and now read from it.  Now tell me if

9   what you're reading is true.  That is what the government is

10  doing, and that is why I have a continuing objection to the

11  manner in which they're asking that question.  Thank you, your

12  Honor.

13         MR. HORTON:  Your Honor, that's what redirect is for.

14  There's no rule that says if a document is in evidence I need

15  to establish some personal relationship from the witness to the

16  document.  The witness has also testified that he watched five

17  hours of GTV a day.

18         MS. SHROFF:  Your Honor, that is exactly what

19  Mr. Schirick did and what --

20         THE COURT:  Ms. Shroff, don't speak over me.

21  Mr. Horton has stated the law correctly.  If you want to ask

22  him on redirect whether he's looked at a document or video, you

23  can do that.  We'll return at noon.

24         (Recess)

25

O78VGUO3                        Dai - Cross

```
 1                  A F T E R N O O N   S E S S I O N

 2                          12:05 P.M.

 3           THE COURT:  Please have the jurors brought in.

 4           (Jury present)

 5           THE COURT:  Please be seated.

 6           And please continue with your inquiry.

 7           MR. HORTON:  We're just awaiting the witness, your

 8   Honor.

 9           (Witness present)

10           THE COURT:  Sir, remember that you're still under

11   oath.

12           MR. HORTON:  May I inquire?

13           THE COURT:  Yes, you may.

14   BY MR. HORTON:

15   Q.  Mr. Dai, can you hear me okay?

16   A.  Yes, I can hear you.

17   Q.  Before the break, I asked you whether you remembered

18   testifying last week that G CLUB and GTV seems not to be

19   related at all.  Do you remember that?

20   A.  Yes.

21   Q.  And if someone were to say that G CLUB and GTV were

22   related, that would not be true, right?

23   A.  But for my testimony, I was only talking about my fellow

24   fighters, and I didn't know what else you were talking about,

25   no.
```

1          MR. HORTON:  Ms. Loftus, if we could please put up

2    what's in evidence as GX-9 at page 113.

3    Q.  Do you see, Mr. Guo?

4    A.  I was talking about a private -- sorry.

5          THE COURT:  So we don't have any question.  So just

6    wait for the question.

7    Q.  Do you see Mr. Guo in the screenshot here, Mr. Dai?

8    A.  Yes.

9    Q.  And do you see this is from GTV?  Do you see the URL on the

10   left?

11   A.  Yes, I can see.

12         MR. HORTON:  Ms. Loftus, can you go down to the bottom

13   of 114 and the top of 115, please.  You can scroll down just a

14   few more lines, please.  Oh, can we publish it to the jury,

15   please.

16         Can the jury see the screen?

17   Q.  This is a statement of Miles Guo on July 30th, 2021.  Do

18   you see that, Mr. Dai?  Can you see the statement on the

19   screen?

20   A.  Yes, I can see.

21   Q.  There are still many people asking questions, Miles Guo

22   said, including Brother Long Island.

23         And you know who Brother Long Island is, Mr. Dai?

24   A.  Yes, I know who Long Island Brother is.

25   Q.  He was the leader of the Himalaya Farm Alliance, right?

O78VGUO3                        Dai - Cross

1    A.  Yes.

2    Q.  In your answer to my question a moment ago, you referred to

3    fellow fighters, isn't that right?

4    A.  Yes.

5    Q.  Miles Guo says here in July 2021:  There's still many

6    people asking questions, including Brother Long Island.  And

7    Kai told me that some of the fellow fighters asked, Will I

8    still get a stock offer when I buy a G CLUB membership.  And

9    Miles Guo says 100 percent.  Because I said that I have to

10   promise that anyone who buys G CLUB membership before

11   September 17th must be allotted shares, which is exactly the

12   same.  Because we said that anyone can choose whether to use

13   your money to buy G CLUB before September 17, G CLUB and the

14   stock shares.  You'll get both.

15           Do you see that, Mr. Dai?

16   A.  Yes.

17   Q.  And you believe that Miles Guo tells the truth, don't you?

18           MS. SHROFF:  Objection.

19           Asked and answered several times.

20           THE COURT:  I believe so.  Sustained.

21   Q.  Last week, Mr. Dai, you were shown some screenshots and

22   videos that you recorded before you testified.  Do you remember

23   that?

24   A.  Yes, I do.

25   Q.  And Mr. Guo's lawyers asked you to make those recordings,

1    didn't they?

2    A.  I recorded.

3    Q.  And you recorded videos for Mr. Guo's lawyers of your H Pay

4    and Himalaya Exchange accounts, isn't that right?

5    A.  Yes.

6    Q.  And earlier today, Ms. Shroff asked if all the features on

7    your account were the same last week as they were in 2022, do

8    you remember that?

9    A.  I remember.

10   Q.  And you said under oath that two features were different,

11   they were restricted.  Do you remember that?

12   A.  I remember.

13   Q.  And one of those restricted features was redemptions,

14   wasn't it?

15   A.  What do you mean by "redemption"?

16   Q.  You said that two features were not accessible to you in

17   2022, one of those features --

18          MS. SHROFF:  Objection.  That is not what he

19   testified.

20          THE COURT:  Overruled.

21   Q.  One of those restricted features was redemptions, isn't

22   that true?

23   A.  When you say "redemption," do you mean transfer HDO into

24   U.S. dollar to bank account?

25   Q.  Exactly right.  That was one of the restricted features for

1    some time, wasn't it?

2          MS. SHROFF:  Objection to "some time."

3          THE COURT:  Overruled.

4    A.  Yes, the redemption amount went down.

5    Q.  Mr. Dai, you have a Twitter account, don't you?

6          MR. HORTON:  I'm sorry, if the interpreter could read

7    the answer please.

8          THE COURT:  I'm waiting.

9          THE INTERPRETER:  Do you want the interpreter

10   reading --

11         MR. HORTON:  Mr. Dai answered it.

12   A.  Yes, I do.

13   Q.  And you follow some cryptocurrency-related accounts, don't

14   you?

15   A.  Yes.

16   Q.  And you know that the Himalaya Exchange has a Twitter

17   account, isn't that right?

18   A.  Yes.

19   Q.  Do you know that while you were testifying last Wednesday,

20   the Himalaya Exchange tweeted that its site was down for

21   maintenance?

22         MS. SHROFF:  Objection.  Hearsay.

23         THE COURT:  Overruled.  You may answer.

24   A.  This maintenance is to accurate and it will end shortly and

25   goes back to normal.  It happen a few times before previously.

1    It does not affect usage.

2    Q.  Mr. Dai, do you know that the Himalaya Exchange deleted

3    that July 3rd tweet?

4    A.  I don't know.

5    Q.  In between your testimony last week and your testimony

6    today, there was a break in these proceedings.  Do you remember

7    that?

8            THE INTERPRETER:  Interpreter repeat.

9    A.  Did I rest?  I rest.

10   Q.  And between your testimony last week and your testimony

11   today, you met again with Miles Guo's lawyers, isn't that

12   right?

13   A.  Yes.

14   Q.  You met with Ms. Shroff?

15   A.  Yes.

16   Q.  You met with Mr. Schirick over there?

17   A.  Yes.

18   Q.  You met with Mr. Barkan, who's not in the room, isn't that

19   right?

20   A.  Yes.

21   Q.  There are other lawyers for Miles Guo in those meetings,

22   right?

23   A.  I have.

24   Q.  This was after you started testifying last week, isn't that

25   right?

```
 1    A.  Yes.

 2    Q.  And Miles Guo's lawyers gave you advice on how to finish

 3    your testimony, isn't that right?

 4    A.  No, they did not give me advice.

 5    Q.  Well, they talked to you about your testimony, didn't they?

 6    A.  Testimony.  They ask me questions; I answered.

 7    Q.  They gave you feedback on your answers, didn't they?

 8    A.  No, they mention that my voice was low last time.

 9    Q.  Are you aware that today is July 8th, Mr. Dai?

10    A.  I know.

11    Q.  You know that last night the Himalaya Exchange once again

12    shut down for maintenance?

13    A.  Yes, I know.

14    Q.  You want to help Miles Guo if you can, isn't that right,

15    Mr. Dai?

16    A.  Yes.

17    Q.  And you flew here from your home in Germany back on

18    June 28th to try to help Mr. Guo, isn't that true?

19    A.  Yes.

20    Q.  You've been here for almost two weeks now to try to help

21    Mr. Guo, isn't that right?

22    A.  Yes, ten days.

23    Q.  And this morning, before you resumed your testimony, while

24    you were sitting in that chair, Mr. Dai, and Miles Guo was

25    sitting in the seat where he is in right now, Miles Guo looked
```

1   at you and went like this, and nodded and smiled; isn't that

2   right?

3   A.  I did not see.

4   Q.  Your testimony under oath, Mr. Dai, is that earlier this

5   morning, before you resumed your testimony, Miles Guo didn't

6   look over to you, standing where he's now sitting, while you

7   sat in that chair, and Miles Guo did not look at you and go

8   like this?

9   A.  I saw he smiled at me, but I did not see the hand gesture.

10  Q.  You still believe in Miles Guo, don't you, sir?

11  A.  Yes, I believe him.

12          MR. HORTON:  Your Honor, if I could just have one

13  moment, please.

14          THE COURT:  Okay.

15          (Counsel conferred)

16          MR. HORTON:  Thank you.  We have no further questions.

17          THE COURT:  Redirect.

18  REDIRECT EXAMINATION

19  BY MS. SHROFF:

20  Q.  Mr. Dai, let me show you G-9 that was -- I'm sorry,

21  apparently it's GX CC-9 or Z-9.

22          MS. SHROFF:  May I have the first part made bigger for

23  him.

24  Q.  Mr. Dai, you were asked questions about what the "G" stands

25  for in G News; correct?  By Mr.  -- by the government lawyer

1    here?

2    A.   Yes.

3    Q.   And your answer was interrupted; correct?

4            MR. HORTON:  Objection.

5            THE COURT:  Overruled.  You can answer.

6    A.   "G" stands for global.

7    Q.   Okay.  Could I just point out your answer was interrupted

8    and you said it is obvious why the "G" is global.  Do you

9    remember saying that?

10           MR. HORTON:  Your Honor, objection.  First part of the

11   question was Ms. Shroff's testimony.

12           THE COURT:  Don't testify.

13   Q.   Do you remember saying that it's obvious?

14   A.   Yes.

15   Q.   And could you tell the jury why it is obvious to you that G

16   News stands for Global News?

17   A.   It was obviously from the design of the logo, this was the

18   globe, it was a circle and its symbolic design.

19           MS. SHROFF:  All right.  So could we just --

20   A.   Obviously represent global.

21           MS. SHROFF:  Could I have that blown up, please.

22   Q.   Do you see Miles Guo's face in the middle of the G?

23   A.   No.

24           MS. SHROFF:  Thank you, Jorge.

25           You may take that down.

O78VGUO3                    Dai - Redirect

```
1    Q.  Mr. Dai, when did you first hear about GTV?
2    A.  Are you referring to the GTV Media platform or the GTV
3    private placement?
4    Q.  Let's start with the platform.  When did you first learn
5    about the platform?
6    A.  April 2020.
7    Q.  And how about the private placement?
8    A.  Whenever private placement information, that was May 2020.
9    Q.  And you remember being asked questions by the government
10   lawyer about you listening to Miles Guo's videos about GTV?
11   A.  I do.
12   Q.  Do you remember watching each and every one of Miles Guo's
13   videos that mentions the words "GTV"?
14   A.  Could you repeat the question?
15         THE INTERPRETER:  Interpreter can repeat.
16   A.  I cannot be certain if I remember all of them.  But if I --
17   Q.  Are you finished, Mr. Dai, or are you still speaking?
18         THE INTERPRETER:  Could you repeat your response one
19   more time.
20         MS. SHROFF:  I'll rephrase the question.
21   BY MS. SHROFF:
22   Q.  Mr. Dai, did you watch each and every video that Miles Guo
23   ever made?
24   A.  I cannot be certain, but I believe I saw most of it.
25   Q.  And before you invested through the private placement, had
```

O78VGUO3                           Dai - Redirect

1   you seen each one of his GTV discussions on live broadcasts?

2   A.  Before I finish the private placement, I did not saw

3   Mr. Guo did the private placement livestream investment.

4   Q.  Did you read the private placement, all the accompanying

5   documents, in English and in Mandarin?

6   A.  Yes.

7   Q.  Mr. Dai, you were asked questions about the phrase "G

8   Series," you recall that?

9   A.  Yes.

10  Q.  Before today in court when the government lawyer used the

11  phrase "G Series," had you ever used that phrase yourself?

12  A.  I don't remember if I used this phrase.

13  Q.  Do you know what he meant when he asked you the question, G

14  Series?

15  A.  I know what it meant.

16  Q.  You were asked questions about Guo Media, do you remember

17  that?

18  A.  Yes.

19  Q.  Did you invest in Guo Media?

20  A.  No.

21  Q.  Did you research Guo Media?

22  A.  No.

23  Q.  You were asked questions of the Himalaya Exchange, H Pay, H

24  Coin and H Dollar; correct?

25  A.  Yes.

1   Q.  And then you were asked questions about what happened to

2   the exchange while you were actually testifying in court last

3   week; correct?

4   A.  Yes.

5   Q.  Do they allow you to bring your cell phone into this

6   building?

7   A.  No.

8   Q.  Do they allow you to bring a computer into this building?

9   A.  No.

10  Q.  Is there any other way for you to check what is going on on

11  the Himalaya Exchange other than through the internet?

12  A.  No.

13  Q.  When you invested in H Pay, H Coin, H Dollar, and the

14  Himalaya Exchange, did you read the white paper?

15  A.  Yes, I did.

16  Q.  Have you ever reviewed that white paper with me?

17  A.  No.

18  Q.  Have you reviewed that white paper with any lawyer from

19  Mr. Guo's legal team?

20  A.  No.

21  Q.  Between July 3rd or whenever it was that you last

22  testified, and here today, did anyone on the Guo team show you

23  a single piece of paper?

24  A.  No.

25  Q.  On July 4th, did we tell you to go watch the fireworks and

1    celebrate Independence Day?

2              MR. HORTON:  Objection.

3              THE COURT:  You may answer.

4    A.  Yes, they told me that there were fireworks.  And I went to

5    the Brooklyn Bridge Park to saw the fireworks.

6    Q.  You were asked questions about Mr. Guo designing H Coin;

7    correct?

8    A.  Yes.

9    Q.  And you said you did not believe that he designed it

10   himself; correct?

11   A.  I said I am not certain if he designed it.

12   Q.  And do you recall, sitting here today, if Mr. Guo talked

13   about how he had consulted with professionals before the coin

14   was designed?

15             MR. HORTON:  Objection.  Issue raised at sidebar.

16             THE COURT:  Sustained.

17   Q.  You were asked questions about having a Twitter account;

18   correct?

19   A.  Yes.

20   Q.  And on your Twitter account you follow Himalaya Exchange;

21   correct?

22   A.  Yes, I follow.

23   Q.  And do you think that Elon Musk's upgrading of Twitter is

24   any less or more frequent than the ones being done on Himalaya

25   Exchange?

O78VGUO3                          Dai - Redirect

```
 1              MR. HORTON:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  You were asked questions about the two restrictions, do you

 4   remember that?

 5   A.  Yes.

 6   Q.  What are these two restrictions that you were talking

 7   about?

 8   A.  Redeem and top out cannot transfer -- cannot transfer U.S.

 9   dollar into Himalaya Exchange to purchase.  And you want to --

10   you want to convert the HDO into U.S. dollar, the amount limit

11   went down.

12   Q.  And when did the amount limit go down, what year?

13   A.  Sometime -- I believe sometime in 2023.

14   Q.  So it was better in 2022; correct?

15              MR. HORTON:  Objection, your Honor.

16   Q.  The redemption amount was higher --

17              THE COURT:  Sustained.

18   Q.  The restriction was not in place in 2022; correct?

19              MR. HORTON:  Objection.

20              Mischaracterizes the testimony.

21              THE COURT:  Sustained.

22   Q.  In 2022, could you redeem more or less than in 2023?

23   A.  More.  At that time -- at the time it was $100,000 limit

24   redemption.

25   Q.  And what is it in 2023?
```

O78VGUO3                        Dai - Redirect

1    A.  5,000.

2    Q.  And you were asked questions, were you not, about

3    statements made by Mr. Guo regarding the gold; correct?  The

4    gold package; correct?

5    A.  Yes.

6    Q.  Did you take those statements into account while

7    considering your decision in whether or not to purchase H Coin

8    or H Dollar?

9    A.  Those statement, that's not, in fact, my investment into

10   Himalaya Exchange.

11   Q.  Why not?

12   A.  Because I saw one versus one ratio with a U.S. dollar

13   bonding.  This ratio was good enough for me.

14   Q.  Mr. Dai, you were asked questions about you having flown

15   all the way from Germany to come here to help Mr. Guo; correct?

16   A.  Correct.

17   Q.  The testimony that you've given here last week and today,

18   has it been truthful?

19   A.  Truthful.

20   Q.  Has it been complete?

21   A.  Complete.  You mean did I tell everything?

22   Q.  Yes.

23   A.  Yes, all that I know, I disclose.

24   Q.  And did any one of us tell you how to answer these

25   questions?

1    A.  No.

2    Q.  And other than me telling you to keep your voice up and

3    annunciate, did I give you any other advice?

4    A.  And as a matter of fact, I complained to Ms. Shroff about

5    the headphone device.  And she tried to help me resolve this

6    issue.  And she wanted me to listen to the question clearly and

7    tell the truth and speak up.

8    Q.  Mr. Dai, would you lie for Mr. Guo here today?

9    A.  No.

10   Q.  Do you have a full-time job today?

11   A.  Yes.

12   Q.  Do you have a wife and children?

13            MR. HORTON:  Objection.  Relevance.  Scope.

14            THE COURT:  Sustained.

15            MS. SHROFF:  I have nothing further.

16            THE COURT:  Recross.

17            MR. HORTON:  We have nothing further, your Honor.

18            THE COURT:  Thank you, sir.  You may step out of the

19   courtroom.

20            (Witness excused)

21            (Continued on next page)

22

23

24

25

1          THE COURT:  And the defense may call its next witness.

2          MR. KAMARAJU:  The defense calls Thomas Bishop, your

3   Honor.

4    THOMAS BISHOP,

5        called as a witness by the Defendant,

6        having been duly sworn, testified as follows:

7          THE COURT:  You may inquire.

8          MR. KAMARAJU:  Thank you, your Honor.

9   DIRECT EXAMINATION

10  BY MR. KAMARAJU:

11  Q.  Afternoon, Mr. Bishop.

12  A.  Afternoon.

13  Q.  Sir, where did you go to school?

14  A.  I graduated from Penn State University with a bachelor's

15  degree in accounting.

16  Q.  And after your time at Penn State, did you work?

17  A.  Yes.  I was hired by the Internal Revenue Service, criminal

18  investigation division.

19  Q.  What is the criminal investigations division of the IRS?

20  A.  The IRS criminal investigation division is the criminal

21  enforcement arm of the Internal Revenue Service.

22  Q.  And what kind of investigations, generally speaking, did

23  you work on?

24  A.  Income tax, money laundering, and currency crimes under the

25  Bank Secrecy Act.

1    Q.  In your time at the IRS, did you hold any supervisory

2    positions?

3    A.  Yes, I held four.

4    Q.  Let's just start with the first one.  What was the first

5    one?

6    A.  The first one was a supervisory special agent.

7    Q.  And could you just tell the jury what your general

8    responsibilities were in that role?

9    A.  I supervised the operational day-to-day activities of a

10   group of 10 to 12 special agents or criminal investigators in

11   their investigations.

12   Q.  And approximately how long were you in that role?

13   A.  Approximately six years in that role.

14   Q.  And after that role came to an end, where did you go next?

15   A.  I was promoted to a policy position in IRS headquarters

16   dealing with offshore banking issues and ensuring consistency

17   among that program in the IRS.

18   Q.  And can you just tell us generally what your

19   responsibilities were in that role.

20   A.  In that role, it was to ensure consistency and uniformity

21   in the investigation of foreign offshore bank account-type

22   cases.

23   Q.  And about how long were you in that role?

24   A.  About 16 months.

25   Q.  What did you do next?

1    A.   I came back to New York, the New York field office, as an

2    assistant special agent in charge.

3    Q.   And could you just describe generally what your

4    responsibilities were there.

5    A.   Sure.  It's an operational role.  And you oversee the

6    investigative program of four groups -- four to five groups of

7    special agents.

8    Q.   And how long were you in that role for?

9    A.   About four years.

10   Q.   What did you work on after that?

11   A.   I went to headquarters, Washington, D.C., and I was the

12   director of international field operations.

13   Q.   And just give us a general sense of your responsibilities

14   there.

15   A.   In that role, I supervised our foreign posted employees —

16   the IRS has special agents posted across the world — along with

17   supervising global investigations.

18   Q.   Can you give the jury an example of a global investigation

19   you supervised?

20   A.   The last one that I did before I retired was the Panama

21   Papers.

22   Q.   Was that a money laundering investigation?

23   A.   There were components of it, yes.

24   Q.   Now, how much time did you spend at the IRS in total?

25   A.   A little bit more than 25 years.

O78VGUO3                        Bishop - Direct

1    Q.  Did you work anywhere else after that?

2    A.  I did.

3    Q.  What did you do after?

4    A.  I went to work in the forensics practice of Baker Tilly

5    U.S., which is a top ten accounting firm.

6    Q.  And what were your responsibilities in that practice?

7    A.  In that practice we provided forensic accounting,

8    investigative and litigation support, legal and regulatory

9    compliance services to our clients.

10   Q.  And about how long were you at Baker Tilly?

11   A.  Four years, a little bit more.

12   Q.  And did you work any more after that?

13   A.  I did.  I went to BDO.

14   Q.  What's BDO?

15   A.  BDO is another large accounting firm, a little bit bigger

16   than Baker Tilly.  I worked in that forensic practice as well.

17   Q.  Were your responsibilities at BDO similar to Baker Tilly?

18   A.  They were virtually identical.

19   Q.  Sir, where do you work now?

20   A.  About 18 months ago I started my own firm.

21   Q.  And what kind of work generally does your firm do?

22   A.  The same type of work I just described.

23   Q.  And as a general matter, are there kinds of matters that

24   you consult on?

25   A.  Yes.  I consult predominantly on white-collar litigation

1    matters, tax controversy and advocacy-type engagements.

2    Q.  Have you ever testified at a trial before?

3    A.  Yes, I have.

4    Q.  Have you testified previously as an expert witness?

5    A.  I have.

6    Q.  And how about as a summary witness?

7    A.  Yes, I have.

8    Q.  And have you testified before on behalf of the United

9    States government?

10   A.  I have.

11   Q.  And how about on behalf of criminal defendants?

12   A.  Yes, I have.

13   Q.  I'd like to talk about this case.

14        Now, were you retained in this case?

15   A.  I was retained.

16   Q.  Who retained you?

17   A.  Mr. Guo's counsel.

18   Q.  And are you compensated for your work?

19   A.  I am.

20   Q.  How are you compensated?

21   A.  I'm paid by the hour.

22   Q.  What is your hourly rate?

23   A.  425, $425 per hour.

24   Q.  Now, sir, just generally speaking, can you tell the jury

25   what you were retained to do?

 1   A.  In general, I was retained to review bank records and data.

 2   Q.  Now, were those bank records provided to you by Mr. Guo's

 3   lawyers?

 4   A.  Yes.

 5   Q.  And did Mr. Guo's lawyers direct you as to which accounts

 6   to look at?

 7   A.  They did.

 8   Q.  And did Mr. Guo's lawyers provide feedback on your work?

 9   A.  Yes, they did.

10         MR. KAMARAJU:  I'd like to pull up what's already in

11   evidence, DX 11598, please.

12   Q.  Sir, do you recognize this type of record?

13   A.  Yes.

14   Q.  Generally speaking, how would you describe it?

15   A.  It is an Excel spreadsheet containing transactional bank

16   data.

17   Q.  Do you know which bank it's a record for?

18   A.  I believe it's FV Bank.

19   Q.  All right.  And so let's just go through as an example some

20   of these columns.

21         So what's the date column there?

22   A.  Column A is the date.

23   Q.  What's that intended to reflect?

24   A.  The date of the transaction.

25   Q.  All right.

 1              If we go over to column C, what's that intended to

 2    reflect?

 3    A.   That is the originating transactor.

 4              MR. KAMARAJU:  All right.  We could scroll over a

 5    little bit.  There's a lot of columns.  Let's go over to column

 6    I real quick.

 7    Q.   What's column I reflect?

 8    A.   Column I reflects the amount of the transaction.

 9    Q.   Okay.  So if we can go back over, do you see column G,

10    where it says "payment type"?

11    A.   Yes.

12    Q.   What's that reflect?

13    A.   That reflects the type of transaction.

14              MR. KAMARAJU:  We could scroll over to column T,

15    please.

16    Q.   What's that reflect?

17    A.   Column T is the beneficiary company name.

18    Q.   What's the beneficiary company?

19    A.   That's the recipient entity account name.

20    Q.   And do you see what's listed in row 2 there?

21    A.   Yes.

22    Q.   Do you know what that is?

23    A.   Row 2, Sharps Pixley, is a gold dealer in London.

24              MR. KAMARAJU:  We could take that down.

25              Can we pull up what's already in evidence as GX AS-18,

 1   please.  And we can publish that.  Could we go to page 10,

 2   please.  All right.  And if we could blow up the paragraph that

 3   says "Additionally."

 4   Q.  Do you see that, sir?

 5   A.  I do.

 6   Q.  Okay.  Would you mind reading that to the jury, please.

 7   A.  Sure.

 8           "Additionally, a member may make a request to the

 9   Himalaya Exchange to accept a transfer of Himalaya dollar

10   credits in exchange for an equivalent payment in U.S. dollars

11   to be paid to the bank account of the member.  However, such

12   exchanges are at the discretion of the Himalaya Exchange and

13   the Himalaya Coin.  A new coin issued by Himalaya International

14   Financial Group, 'HCN,' or Himalaya Coin, HDO, or any other

15   type of asset on account at the Himalaya Exchange or through

16   the Himalaya Pay app are references to credits corresponding to

17   that asset."

18   Q.  Thank you, sir.

19           MR. KAMARAJU:  Could we go to page 12, please.

20   Q.  All right.  Do you see the blown-up language here that

21   starts with "The issuer"?

22   A.  I do.

23   Q.  Would you mind reading that, please.

24   A.  "The issuer is not obliged to provide liquidity support and

25   the Himalaya Exchange is not obliged to agree to any request

1   from a member to exchange HDO credits for U.S. dollars.  And

2   such actions are at the sole discretion of the issuer and the

3   Himalaya Exchange respectively.  Members do not have any direct

4   or indirect claim on the issuer or the reserve."

5   Q.  Thank you.

6        MR. KAMARAJU:  Could we take that down and please go

7   to DX 11431, which is in evidence.

8        (Counsel conferred)

9   Q.  Now, sir, I'd like you to take a look at this record.  Have

10  you seen it before?

11  A.  I have.

12  Q.  And is it a summary of bank data?

13  A.  Yes, it is.

14  Q.  And do you see the date column at the left there?

15  A.  Yes, column A.

16  Q.  What's the first date there?

17  A.  January 12, 2022.

18       MR. KAMARAJU:  All right.  Can we go down to the last

19  row, please.  Sorry, the last row down.

20  Q.  All right.  And do you see the date listed -- it's actually

21  the third row up, but 62951?

22  A.  Yes.

23  Q.  All right.  What's the date listed there?

24  A.  June 21, 2022.

25       MR. KAMARAJU:  If we could scroll back up to the top,

1   please.

2   Q.  All right.  Now, do you know who the account holder is for

3   this account, sir?

4   A.  This is a Himalaya bank account.  I just don't think the

5   screen is scrolled up enough.

6   Q.  Thank you.

7           MR. KAMARAJU:  Why don't we take a look at a couple of

8   specific rows.  We look at row 62187, please.

9   Q.  All right.  Do you see the date of that?

10  A.  Yes, it's November 22, 2021.

11          MR. KAMARAJU:  Could we scroll over to column H,

12  please.

13  Q.  All right.  And do you see what's listed in the description

14  there?

15  A.  Yes, it says "client redemption."

16          MR. KAMARAJU:  All right.

17          Can we go over to column J, please.

18  Q.  All right.  And what's listed there?

19  A.  Client redemption.

20  Q.  And do you see an amount column?

21  A.  Yes, I; column I.

22  Q.  And how much is the redemption there?

23  A.  30,000.

24          MR. KAMARAJU:  Okay.  Could we go now to row 59802.

25  Q.  Okay.  What's the date of that transaction?

O78VGUO3                        Bishop - Direct

1   A.  June 17, 2022.

2           MR. KAMARAJU:  Okay.  And if we can scroll over again

3   to the description column.

4   Q.  All right.  What's listed there?

5   A.  Client redemption.

6           MR. KAMARAJU:  And if we could scroll over to column

7   S, please.

8   Q.  Who's listed as the beneficiary, once we pull it up for

9   you?

10  A.  The beneficiary first name is Lai.  I'm presuming that's

11  the way you pronounce it.  L-A-I.

12  Q.  Do you see the last name, too?

13  A.  Yes.  It's D-A-I, Dai.

14  Q.  Thank you.

15          MR. KAMARAJU:  And if we could scroll now to row

16  62057, please.

17  Q.  All right.  What's the date of that transaction?

18  A.  February 4, 2022.

19  Q.  All right.  And is that also a client redemption?

20  A.  Yes.

21          MR. KAMARAJU:  And could we scroll over to the amount

22  column, please.

23  Q.  What's the amount of the redemption?

24  A.  $23,468.40.

25          MR. KAMARAJU:  Okay.  And if we can scroll over now to

Bishop - Direct

1  the beneficiary columns, columns S and T.

2  Q.  And who's identified as the beneficiary there?

3  A.  Lai Dai.

4        MR. KAMARAJU:  All right.

5        Could we now go to row 62579.

6  Q.  And what's the date of this transaction, sir?

7  A.  4/19/2022.

8  Q.  Okay.  And is this also a client redemption?

9  A.  Yes.

10        MR. KAMARAJU:  And let's go over to the amount.

11  A.  $53,261.68.

12        MR. KAMARAJU:  All right.

13        And can we go to column S and T, please.

14  Q.  And who's listed as the beneficiary?

15  A.  Zhiwei Jia, J-I-A.

16  Q.  All right.

17        MR. KAMARAJU:  And last one, could we go to row 62678,

18  please.

19  Q.  Okay.  What's the date there?

20  A.  6/28/2022.

21        MR. KAMARAJU:  All right.  And let's scroll over to

22  the -- sorry.  Withdrawn.

23  Q.  Is this a client redemption?

24  A.  Yes, it is.

25        MR. KAMARAJU:  And let's look at the amount.

O78VGUO3                          Bishop - Direct

1   A.  $79,890.00.

2   Q.  Okay.

3        MR. KAMARAJU:  And could we scroll over to column S

4   and T, please.

5   A.  The beneficiary first name is Feng, F-E-N-G; beneficiary

6   last name is Tian, T-I-A-N.

7   Q.  Okay.  Now, Mr. Bishop, did you review the data contained

8   in this exhibit?

9   A.  Yes.

10  Q.  Did you summarize it in any form?

11  A.  Yes.

12        MR. KAMARAJU:  I'd like to pull up just for the

13  witness, the parties, and the Court what's been marked as DX

14  Z-02.

15  Q.  Sir, do you recognize this document?

16  A.  I do.

17  Q.  What is it?

18  A.  It's a summary bar graph of the data contained in the chart

19  we just saw, the Excel spreadsheet.

20  Q.  Is it a fair and accurate summary?

21  A.  It is.

22        MR. KAMARAJU:  The government offers -- sorry.  The

23  defense offers DX Z-02 please.

24        MS. MURRAY:  No objection.

25        MR. KAMARAJU:  Could we publish it please.

1          THE COURT:  Go ahead.

2          (Defendant's Exhibit DX Z-02 received in evidence)

3  Q.  So, sir, this is a bar graph of the redemption activity

4  that we looked at?

5  A.  Yes.

6  Q.  Okay.  And what's the first month that it starts in?

7  A.  November 2021.

8  Q.  And across how many months does it continue?

9  A.  Continues through June of 2022.

10 Q.  Okay.  And is June 2022 when the bank records cut off that

11 we looked at?

12 A.  Yes.

13 Q.  And now just looking at it, approximately what is the high

14 watermark for redemptions in terms of dollar value?

15 A.  Roughly $11 million in December 2021.

16 Q.  Okay.  And in terms of transactions, what's roughly the

17 high watermark?

18 A.  The same month, 561.

19          MR. KAMARAJU:  Okay.  Now, could we go to the next

20 slide, please.

21 Q.  So based on your review, sir, during that time period,

22 approximately how many redemption transactions were made to

23 customers?

24 A.  3680.

25 Q.  And the total dollar amount was approximately how much?

1   A.   Slightly more than 64 million.

2               MR. KAMARAJU:  Your Honor, at this time I'd like to

3   read a stipulation between the parties.

4               THE COURT:  Go ahead.

5               MR. KAMARAJU:  Thank you.

6               This is Defense Exhibit Stip 3.  If we could just pull

7   that up.  And I'll offer it, your Honor, so that the jury can

8   see it, if that's all right.

9               THE COURT:  Okay.

10              (Defendant's Exhibit Stip 3 received in evidence)

11              MR. KAMARAJU:  It is hereby stipulated and agreed by

12  the United States of America and Miles Guo, the defendant, that

13  the exhibits listed below in columns B and C were lawfully

14  obtained by the government, and are authentic records of the

15  entity listed in column A, that were made at or near the time,

16  by or from information transmitted by a person with knowledge

17  of the matters set forth in the records.  Such records were

18  kept in the course of a regularly conducted activity, and it

19  was the regular practice of that entity to make the records.

20              And then there are a number of exhibits listed, your

21  Honor, which I can go through or I can just offer them all

22  together, whatever the Court would prefer.

23              THE COURT:  You're asking that I admit them all?

24              MR. KAMARAJU:  Yes, your Honor.

25              THE COURT:  They are admitted.

1            MR. KAMARAJU:  Thank you.

2            No further questions at this time.

3            THE COURT:  Cross-examination.

4            MS. MURRAY:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MS. MURRAY:

7    Q.  Mr. Bishop, you're testifying as a summary witness today;

8    correct?

9    A.  Correct.

10   Q.  You haven't set up an account at the Himalaya Exchange,

11   have you?

12   A.  No, I have not.

13   Q.  You've never logged into an account at the Himalaya

14   Exchange, have you?

15   A.  No, I have not.

16   Q.  And you've never purchased HDO, right?

17   A.  That's correct.

18   Q.  You've never purchased HCN?

19   A.  That's correct.

20   Q.  You only looked at bank records for certain accounts, isn't

21   that right?

22   A.  That's correct.

23   Q.  And those were the bank records that defense counsel

24   provided to you; correct?

25   A.  Yes, yes.

O78VGUO3                      Bishop - Cross

1    Q.  And those were bank records for accounts held at FV Bank,

2    right?

3    A.  Yes.

4           MS. MURRAY:  Now, if we can pull up, Ms. Loftus, DX

5    Z-02.

6    Q.  While we're waiting, Mr. Bishop, you testified about some

7    of your background.  Do you recall that?

8    A.  Yes.

9    Q.  You said, for example, you worked on money laundering cases

10   when you were at the IRS CI?

11   A.  Yes.

12   Q.  And a money mule is someone who receives and transfers

13   criminal proceeds, isn't that right?

14   A.  I agree, yes.

15   Q.  All right.  Now we've got DX Z-02 up.

16          This is a chart that you prepared for your testimony

17   today; correct?

18   A.  Correct.

19   Q.  DX Z-02 doesn't clearly identify which bank accounts it

20   summarizes, does it?

21   A.  It summarizes the records at the bottom, which records were

22   used.

23   Q.  Right.  But it doesn't clearly identify what accounts at

24   which bank it's summarizing, isn't that right?

25   A.  It's what we just went through, yes.

Bishop - Cross

1   Q.   Now, the defense didn't give you records for Himalaya

2   Exchange accounts at Mercantile Bank, did they?

3   A.   For this examination, no, I don't think so.

4   Q.   And the defense didn't give you records for this

5   examination for Hamilton accounts at Silvergate Bank; correct?

6   A.   I don't recall that bank, no.

7   Q.   The bank records that you reviewed to put together this

8   chart reflect withdrawals, right?

9   A.   This chart, yes.  Client redemptions.

10  Q.   Those bank records also reflect deposits into the bank

11  accounts; correct?

12  A.   Yes.

13  Q.   And those deposits are not summarized in DX Z-02, right?

14  A.   That's correct.

15  Q.   And DX Z-02 only reflects withdrawals that were categorized

16  as redemptions; is that correct?

17  A.   Yes.

18  Q.   Now, you didn't choose the title of this slide, did you?

19  A.   This particular -- no, I don't think that's the -- that's

20  the -- the basis for the chart, the redemptions from the prior

21  screen.

22  Q.   Well, the defense chose to call this "Himalaya Exchange

23  Client Redemptions," correct?

24  A.   We did, yes.

25  Q.   The determination of redemption for purposes of your

1    summary chart is based on those wire transaction details we saw

2    in one of the columns; is that right?

3    A.   That's what the bank records stated.

4    Q.   And you don't have any personal knowledge whether those

5    withdrawals were, in fact, redemptions; correct?

6    A.   We know what the bank records said.

7    Q.   That was not my question, sir.  I asked if you had personal

8    knowledge whether those withdrawals were, in fact, redemptions?

9            MR. KAMARAJU:  Asked and answered.

10            THE COURT:  You may answer.

11   A.   Well, can you describe what you mean by "personal

12   knowledge"?

13   Q.   Sure.  To your understanding, what is a redemption of a

14   Himalaya Exchange account?

15   A.   Someone asking for their money back.

16   Q.   How is that your understanding?

17   A.   That's just through my basis in this case.

18   Q.   And what records did you study that described or defined

19   redemption that way?

20   A.   These bank records and my collaboration with the defense

21   team.

22   Q.   All right.  Let's take one of the withdrawals categories

23   categorized as a redemption as an example.

24            MS. MURRAY:  Ms. Loftus, if we could pull up DX 11605.

25   Q.   While we're waiting for that, Mr. Bishop, do you know

Bishop - Cross

1    what's in all those boxes at the front table?

2    A.   I didn't see -- well, no, I don't know.

3    Q.   The records that you reviewed to put together your summary

4    chart, was that just the one Excel file that Mr. Kamaraju went

5    through with you?

6    A.   No.  We looked at the FV Bank records, the statements.

7    Q.   Excuse me.  Do you remember what the last four digits of

8    the accounts that you looked at were?

9    A.   589 -- I can't remember.  367 -- I had them on the Excel

10   spreadsheet.  There were 94 accounts that we've looked at,

11   so --

12   Q.   All right.  Now that we have this up, this is a record from

13   FV Bank; correct?

14   A.   Mm-hmm.

15   Q.   And if we look at this, what is the time period covered in

16   this particular bank record?

17   A.   I can see the first date.

18        MS. MURRAY:  We can scroll down, Ms. Loftus.

19   A.   Go all the way to the bottom.

20   Q.   Generally speaking, what month do these records cover?

21   A.   April 2022.

22   Q.   Okay.

23        MS. MURRAY:  And Ms. Loftus, if we could scroll to the

24   right a little bit.  Little further, please.  And let's go up

25   to the top again.

1    Q.  In the description column, Mr. Bishop, is that where you

2    went to identify the transactions that you described as

3    redemptions?

4    A.  Yes.

5         MS. MURRAY:  And Ms. Loftus, if we could just scroll

6    down a little bit until we get one of those client redemption

7    descriptions that Mr. Bishop testified to.  There we go.

8    Q.  So, for example, Mr. Bishop, row 60, you don't know who

9    populates that transfer ID, do you?

10   A.  I know that this came from -- it's my understanding that

11   this came from the bank.

12   Q.  Right.  But with respect to the wire description, you don't

13   know who populates that transfer ID; is that correct?

14   A.  No.

15   Q.  You don't know what that information reflects?

16   A.  No.

17   Q.  You don't know whether that information accurately reflects

18   the purpose of these wires out of the account, do you?

19   A.  No.

20        MS. MURRAY:  All right.

21        And Ms. Loftus, if we could go back again to DX Z-02,

22   please.

23   Q.  Mr. Bishop, there are no withdrawals described as

24   redemptions from August 2021 through October 2021, right?

25   A.  Not that we -- not that we located in that spreadsheet, no.

O78VGUO3                              Bishop - Cross

1   Q.  And to be clear, sir, you looked at the actual bank

2   records; correct?

3   A.  Our team did, yes.

4   Q.  And you didn't identify any redemptions during that period?

5   A.  There might have been one, I believe, that's not captured

6   early on in August for a very small amount of money.

7   Q.  So that redemption is not reflected on your summary chart;

8   is that correct?

9   A.  No, because it was considered immaterial.

10  Q.  You're aware that the Himalaya Exchange didn't officially

11  launch until November 1, 2021, right?

12  A.  I'm not aware of when it exactly did that.

13  Q.  Are you aware that there were deposits into these FV

14  Himalaya Exchange bank accounts before November 1, 2021?

15  A.  Yes.

16  Q.  Mr. Bishop, the source documents cited on the bottom right

17  here, this exhibit cites a number of different source documents

18  for the information here; is that correct?

19  A.  That's correct.

20  Q.  Including about 50 documents in the last section, 6,001

21  through 6,050, right?

22  A.  Correct.

23  Q.  None of the information summarized on this chart actually

24  was sourced from those 50 documents; correct?

25  A.  You'd have to give me -- I don't know exactly what the

O78VGUO3                          Bishop - Cross

1   numbers are.

2            MS. MURRAY:  Okay.  Let's pull up Defense Exhibit

3   6,002, please.

4   Q.  This is one of those documents that was cited in that last

5   group of source documents, right?

6   A.  6,002, yes.

7   Q.  And this is a page 1 of 1 bank record; correct?

8   A.  Correct.

9   Q.  There's nothing reflected here about any redemptions,

10  right?

11  A.  That's correct.  This is also dated 1/1/23.

12  Q.  Right.  So it's inaccurate to cite this as one of the

13  source documents for your summary chart; correct?

14  A.  That was not in the summary chart, no.

15           MS. MURRAY:  We could go back to DX Z-02.

16  Q.  So looking at the bottom right where it identifies source

17  documents, a number of those documents that are reflected as

18  the source for this chart are not, in fact, the source of any

19  information; correct?

20  A.  Again, you'd have to -- the one you had showed me, correct.

21  You'd have to go back through.

22           MS. MURRAY:  We can zoom out on that.

23  Q.  Now, you established that you didn't have bank records for

24  the FV Bank accounts after June 2022, right?

25  A.  I think it's December '22.

```
 1   Q.  Looking at your chart, sir --

 2   A.  I'm sorry, I'm sorry.  June '22.

 3   Q.  So you don't know whether withdrawals as they're defined

 4   here as redemptions continued, do you?

 5   A.  No, that was the end of the bank records.

 6   Q.  You're aware the government seized more than $608 million

 7   in Himalaya Exchange money in October 2022 correct?

 8   A.  I know there was a seizure, just don't know the amounts.

 9   Q.  Did you know that those seizures included money that was

10   held at FV Bank accounts that you summarized?

11   A.  No, I don't.

12   Q.  You weren't aware that William Je submitted a request to

13   withdraw 48 million of his own money from a Himalaya Exchange

14   bank account at Mercantile Bank in October 2022, were you?

15   A.  No.

16   Q.  You don't know whether those wires that were requested were

17   paid out to William Je, do you?

18   A.  No.

19            MS. MURRAY:  Ms. Loftus, can you please publish what's

20   in evidence as Government Exhibits MER-5 and MER-6

21   side-by-side.

22   Q.  While we're waiting, Mr. Bishop, you were asked some

23   questions about the white paper for the Himalaya Exchange.  Do

24   you recall those?

25   A.  Yes.
```

1  Q.  Did you review the entire Himalaya Dollar white paper?

2  A.  No.

3  Q.  Did you review the entire Himalaya Coin white paper?

4  A.  No.

5  Q.  What portions, if any, of those did you review in

6  connection with your summary chart?

7  A.  The pages from which I read from.

8  Q.  All right.  So looking on the left here, we'll get it

9  published, this is Government Exhibit MER-6.  Do you see that,

10  sir?

11  A.  Yes.

12  Q.  Have you reviewed these documents in connection with your

13  redemptions summary chart?

14  A.  No.

15  Q.  Do you recognize what type of document this is from the

16  materials the defense gave you for your redemption summary

17  chart?

18  A.  I didn't see these documents.  I didn't look at them, no.

19  Q.  And you didn't review similar OTC transaction forms for

20  each of the withdrawals reflected on your chart; correct?

21  A.  No, just the bank record.

22  Q.  You haven't seen any Himalaya Exchange redemption forms at

23  all; correct?

24  A.  No.

25  Q.  You don't know whether such redemption forms exist for all

1  the withdrawals that are reflected on your chart, isn't that

2  right?

3  A.  Like this, what you're showing me here?  No.

4  Q.  You're not aware of any other visual type of redemption

5  form that exists for the transactions reflected on your chart,

6  right?

7  A.  There was a review of Himalaya Exchange computer records.

8  Q.  In what format did you review those records?

9  A.  They were reviewed in a computer format, on location and

10  site.

11  Q.  Do you know whether the defense provided those records to

12  the government?

13  A.  I don't know what the defense provided.

14       MS. MURRAY:  We can take that down, Ms. Loftus.  And

15  we can pull up government Exhibit AS-18.

16  Q.  This is the Himalaya Dollar white paper dated January 2022,

17  right, Mr. Bishop?

18  A.  I presume so, yes.

19  Q.  Well, if we look at the top, that's the date on this;

20  correct?

21  A.  Yes, yes.

22  Q.  Okay.  You're aware the word "redemption" only appears once

23  in this entire white paper; correct?

24  A.  No.

25       MS. MURRAY:  Let's go to page 33, please, Ms. Loftus.

O78VGUO3                              Bishop - Cross

1    Q.  This heading is titled "Switzerland," right?

2    A.  Yes.

3    Q.  The language in this portion of the white paper relates to

4    customers of the exchange who are located in Switzerland;

5    correct?

6    A.  I'd have to read it.

7             MS. MURRAY:  We could zoom in on the text here,

8    Ms. Loftus, just to make it larger.

9    Q.  Are you aware that this section relating to Switzerland

10   customers is the only place where the word "redemption" appears

11   in the entire white paper?

12   A.  If that's what you're telling me, I have no reason not to

13   believe you.

14   Q.  All right.

15            MS. MURRAY:  And, Ms. Loftus, if we could now go to

16   page 10, please.

17   Q.  This is a portion that Mr. Kamaraju showed you, do you

18   recall that?

19   A.  Yes.

20            MS. MURRAY:  And if we focus on the paragraph that

21   begins with "Additionally."

22   Q.  This portion of the white paper says:  Exchanges of

23   Himalaya Dollar credits for U.S. dollars are at the discretion

24   of the Himalaya Exchange.  Right?

25   A.  Yes, that's what it says.

1    Q.  It further says:  The Himalaya Exchange is not obliged to

2    fulfill any such request.  Correct?

3    A.  Yes.

4    Q.  Himalaya Exchange customer withdrawal requests that the

5    Himalaya Exchange denied are not reflected on your summary

6    chart; is that right?

7    A.  No.

8         MS. MURRAY:  We can take this down, Ms. Loftus.

9    Q.  And Mr. Bishop, you don't know where the money that was

10   wired out of the FV Bank accounts as redemptions ultimately

11   went, do you?

12   A.  Only to where -- according to the bank records, what

13   accounts it was sent to.

14   Q.  You don't know whether it went along to other accounts

15   after making that first transfer, right?

16   A.  That's correct.

17   Q.  You don't know whether the money that was withdrawn was

18   reinvested into Guo's other investment offerings, do you?

19   A.  I do not.

20        MS. MURRAY:  May I have a moment, your Honor?

21        THE COURT:  Go ahead.

22        (Counsel conferred)

23        MS. MURRAY:  Nothing further.

24        THE COURT:  Redirect.

25        MR. KAMARAJU:  Just briefly, your Honor.

 1   REDIRECT EXAMINATION

 2   BY MR. KAMARAJU:

 3   Q.  Now, Mr. Bishop, you remember being asked some questions on

 4   cross-examination about whether you could verify whether

 5   certain transactions were redemptions?

 6   A.  Yes.

 7   Q.  And you were asked about whether you had personal knowledge

 8   as to whether they were redemptions?

 9   A.  That's correct.

10   Q.  Do you remember that one of the transactions I asked you

11   about on direct was a redemption related to a man named Lai

12   Dai?

13   A.  Yes.

14   Q.  Are you aware that Lai Dai testified in this courtroom to

15   making that redemption?

16   A.  I know that he testified; I don't know exactly what he

17   testified to.

18   Q.  Okay.  You remember another one of the redemptions that I

19   asked you about was for a person named Dia Li?

20   A.  Yes.

21   Q.  Are you aware that Ya Li testified in this courtroom before

22   this jury as to making that redemption?

23   A.  That's the same answer I'd give you, I don't know.

24   Q.  Now, do you remember you were asked about slides and the

25   sources for slides?  Do you remember that?

```
 1    A.  Yes.

 2    Q.  Now, just because you review something, does that mean you

 3    put it on a slide?

 4    A.  No.

 5    Q.  You make discretionary choices; correct?

 6    A.  Correct.

 7    Q.  And you remember you were asked whether you had ever opened

 8    a Himalaya Exchange account?

 9    A.  Yes.

10    Q.  And you were asked whether you had ever bought HCN, right?

11    A.  Yes.

12    Q.  And you were asked whether you had ever bought HDO, right?

13    A.  Correct.

14    Q.  You answered no to all those questions, right?

15    A.  Correct.

16    Q.  Mr. Bishop, are you a high-net Chinese individual who's

17    dedicated to overthrowing the Chinese Community Party?

18              MS. MURRAY:  Objection, your Honor.

19              This is a summary witness.

20              THE COURT:  Sustained.

21              MR. KAMARAJU:  No further questions.

22              THE COURT:  Any recross?

23              MS. MURRAY:  Yes.

24    RECROSS EXAMINATION

25    BY MS. MURRAY:
```

O78VGUO3                      Barnett - Direct

1   Q.  Mr. Bishop, do you know what else Ya Li testified to during

2   this trial?

3   A.  I don't know what she testified or he testified to.

4            MS. MURRAY:  Nothing further, your Honor.

5            THE COURT:  Sir, you may step out of the courtroom.

6            THE WITNESS:  Thank you, your Honor.

7            THE COURT:  The defense may call its next witness.

8            (Witness excused)

9            MS. SHROFF:  Your Honor, the defense calls Scott

10   Barnett.

11    GERALD SCOTT BARNETT,

12        called as a witness by the Defendant,

13        having been duly sworn, testified as follows:

14            THE COURT:  Go ahead.

15            MS. SHROFF:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MS. SHROFF:

18   Q.  Good afternoon, Mr. Barnett.

19   A.  Afternoon.

20   Q.  Mr. Barnett, could you tell the jury what you do for a

21   living?

22   A.  Currently, I am the owner of GS Security Solutions.  And I

23   provide executive protection for celebrities, dignitaries, and

24   high-net-worth individuals.

25   Q.  What does "GS" stand for?

O78VGUO3                          Barnett - Direct
                                     500

1   A.  Well, it was supposed to stand for Global Solutions, but

2   that was taken.  So I guess it just stands for Gerald Scott

3   Security really, unfortunately.

4   Q.  And when did you start your company?

5   A.  That company was started in June of 2022.

6                 (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO4                          Barnett - Direct

1    BY MS. SHROFF:

2    Q.  And by what time was it up and running?

3    A.  January 2 -- I don't recall the exact dates, January of

4    '23.

5    Q.  Mr. Barnett, who provided the funding or the finances to

6    start GS Security?

7    A.  HCHK.

8    Q.  And how much money did HCHK provide to set up GS Security?

9    A.  Originally they provided approximately give or take about

10   400,000 I believe.

11   Q.  And was there additional funding that was provided?

12   A.  There was in the beginning, correct.  In -- excuse me.  I'm

13   sorry.  I'm trying to remember the date.  In December I think

14   of 2022, they provided monies for insurance, and I believe it

15   was just insurance if I recall, but I have to look back.

16   Q.  And did you have any agreement as to this funding?

17   A.  Yes.  At first we had a verbal agreement.  It was going to

18   be a written agreement, but that never came to pass so it stood

19   as a verbal agreement.

20   Q.  Mr. Barnett, could you tell the jury why you wanted to set

21   up a separate company called GS Security?

22   A.  In order to have proper security for anybody, you really

23   need to have insurance.  You have to have -- due to certain

24   liabilities for the client that you're protecting, God forbid

25   something were to happen.  If it's just either the client

O78BGUO4                          Barnett - Direct

themselves or any other entity, they're liable.  God forbid we

had to put our hands on somebody or anything worse than that or

even anything minor, any lawsuit would go directly to that

company instead of to a properly insured security company.  But

I guess the real reason is for legal reasons.  You legally have

to have a license in order to conduct security.

Q.   Does your company still exist today?

A.   Yes, it does.

Q.   And who is your largest client now?

A.   My largest client is Mei Guo.

Q.   And who is Mei Guo?

A.   That's the daughter of Miles Guo.

Q.   What does your job entail regarding Mei Guo?

A.   Right now it just entails house security.  At first it was

for complete protection.  But as, I guess, money got tighter,

we had to scale back, but now it's basically house security.

We just monitor their house and, you know, do canvassing around

their house, that kind of stuff.  We no longer transport or

provide executive protection, personal bodyguard protection for

that.

Q.   And who other than Mei Guo do you protect?

A.   It varies.  We get contracts, very minimal contracts, but I

had one for an executive in the city.  We did four-hour

security detail for them.  I've done security for other

companies as well.  We had one gentleman who needed security

O78BGUO4                          Barnett - Direct

1   for jewelry, was showing at a, like, a showcase, and that's

2   really it.

3   Q.  Mr. Barnett, going back to Mei Guo, have you discussed your

4   testimony with her?

5   A.  No, I have not.

6   Q.  Has she ever asked you about what you would be testifying

7   to?

8   A.  No, she has not.

9   Q.  Have you ever talked to her about the details of this case?

10  A.  No, I have not.

11  Q.  Have you ever talked to her about the arrest of her father?

12  A.  Yes.

13  Q.  And in discussing that, did you discuss anything that had

14  to do with your testimony today?

15  A.  No.

16  Q.  And when was the last time you spoke to her about the

17  arrest of her father?

18  A.  Maybe about a week ago.  I think I asked her how her father

19  was doing.

20  Q.  And other than that, have you had any substantive

21  discussions with her?

22  A.  Not in regards to this case, no.

23  Q.  Mr. Barnett, did you ever work for Miles Guo?

24  A.  Not directly, no.

25  Q.  So describe for us how you worked for him indirectly?

O78BGUO4                          Barnett - Direct

1    A.   I worked for, originally, for a company called Golden

2    Spring.  Part of that job was guarding Miles Guo, the company

3    later switched over to --

4    Q.   Let me stop you there. When did you start with Golden

5    Spring?

6    A.   October of 2020.

7    Q.   And prior to being hired by Golden Spring, did you have

8    experience doing private security?

9    A.   Yes.  So once I retired from the police department in 2013,

10   I went into security in executive protection.  Basically the

11   gentleman that I trained with, we work with celebrities and

12   dignitaries, and I did that for a number of years.  And then

13   branched off to another company called pro-protection which was

14   basically for --

15            THE COURT:  Sir, I'd like you to draw the microphone

16   close to you so that everyone can hear you.  Speak right into

17   the microphone.

18   A.   And then I went to pro-protection which is a company out in

19   Long Island.  It was just an easier commute.  I got tired of

20   guarding celebrities.  That wasn't really something that I

21   enjoyed very much, and then I had applied online. I can't

22   remember where I applied through -- whether it was Indeed, one

23   of those websites -- for a company looking for executive

24   protection.  That was -- I don't remember it saying the name of

25   the company, but they were offering a certain salary, so I

O78BGUO4                    Barnett - Direct

1    applied to it.  And then I think in October -- well, little

2    before that, beginning of October of 2020 is when they called

3    me for that particular job in regards to Miles.

4    Q.  Were you hired at the first try?

5    A.  No, I was not.

6    Q.  What was the reason why you weren't hired?

7    A.  Well, this was a recruiting company.  The reason that I was

8    not hired was because of my date of birth, and that it was the

9    year of the boar, and that was found to be -- at least they

10   told me -- it was unlucky, so I was not hired for that reason.

11   Q.  And then subsequently were you hired despite being born in

12   the year of the boar?

13   A.  I think that was a year prior.  So a year later I got a

14   call.  I actually didn't apply again.  I just received a call,

15   ask if I was still interested in the position.

16   Q.  And, Mr. Barnett, prior to this, were you an officer of the

17   NYPD?

18   A.  I was.

19   Q.  For how long were you an officer of the NYPD?

20   A.  From 1997 to 2013.

21   Q.  And I won't ask you for all the details, could you just

22   tell us, just summarize very briefly what your experience was

23   as an NYPD officer?

24   A.  I started out as a regular police officer in East Flatbush,

25   Brooklyn, spent most of my time there, went to narcotics in

O78BGUO4                        Barnett - Direct

1    Brooklyn North for a while, then went back to the 67.  I don't

2    remember what year it was.  And then I got my first -- I think

3    I was injured the first time in 2008, and then went back to

4    work.  And then again I was injured in 2011, where my shoulder

5    was torn out again after struggling with somebody and the

6    department decided to retire me at that time.

7    Q.  Mr. Barnett, did you serve for the United States?

8    A.  Yes, ma'am.

9    Q.  Where did you serve?

10   A.  The U.S. Navy.

11   Q.  And for how long?

12   A.  I was only in for a year and two months.  I fell 20 feet

13   and shattered my wrist, broke a bone in my left leg and my back

14   and they basically retired me at that point.

15   Q.  Mr. Barnett, do you have a lawyer?

16   A.  Yes, I do.

17   Q.  And through your lawyer were you served with a subpoena to

18   testify here today?

19   A.  Yes, I was.

20   Q.  And was the subpoena from Mr. Kamaraju's office?

21   A.  I believe so.

22   Q.  And before you were served with the subpoena in this case,

23   had you met with these four prosecutors who are seated at the

24   table here?

25   A.  Yes, I did.

O78BGUO4                        Barnett - Direct

1   Q.  And how many times did you meet with these four

2   prosecutors?

3   A.  Twice.

4   Q.  Did you have phone calls with these four prosecutors?

5   A.  Yes, once.

6   Q.  Let me show you what is marked as DX60761.

7        Do you recognize this document, and can I show

8   Mr. Barnett the last page of this document as well.

9   A.  Yes, I recognize it.

10        MS. SHROFF:  Defense moves DX60761 into evidence.

11        MR. FERGENSON:  Objection.

12        THE COURT:  Is this a document that he authored?

13        MS. SHROFF:  He signed it, your Honor.

14   Q.  Mr. Barnett, let's look at the last page.  Is your

15   signature there?

16   A.  Yes.

17   Q.  Did you review this document?

18   A.  I did with my attorney.

19   Q.  And did you also sign it several times, if you look at the

20   right side?

21   A.  I signed it in -- it looks like -- I only see one spot

22   where I signed it.

23   Q.  Well, let's look at the date on the top.  It's dated --

24   look at the date.  And you signed it on that date, correct?

25   A.  Yes.

O78BGUO4                        Barnett - Direct

1   Q.  And you signed it on a second date at the corner, right?

2   A.  I don't see where you're pointing to.  Where it says

3   4/11/24?

4   Q.  Yes.

5   A.  That's correct.

6           MS. SHROFF:  Your Honor, the defense moves the

7   document into evidence.

8           MR. FERGENSON:  No objection.  It's fine.

9           THE COURT:  It is admitted.

10          (Defendant's Exhibit 67061 received in evidence)

11          THE COURT:  Did you assign a number to that?

12          MS. SHROFF:  Yes, your Honor, DX67061.  And may I

13   please publish it to the jury?

14          THE COURT:  Go ahead.

15          MS. SHROFF:  Thank you.

16  Q.  Mr. Barnett, prior to meeting with these prosecutors, did

17  you review this document with your attorney and sign it?

18  A.  Yes, I did.

19  Q.  And when you met with the prosecutors, did you tell them

20  the truth?

21  A.  Yes, I did.

22  Q.  And on April 11, 2024, did you tell the prosecutors that

23  when the Mahwah property was purchased, Mr. Guo told you --

24          MR. FERGENSON:  Objection, your Honor.  He could

25  testify.  She can't ask him about out-of-court statements.

O78BGUO4                         Barnett - Direct

1              THE COURT:  Sustained.

2    Q.  What did you tell the prosecutors on April 11 of 2024?

3              MR. FERGENSON:  Objection, it's hearsay.

4              THE COURT:  It's hearsay.

5    Q.  On April 11, of 2024 --

6              MR. FERGENSON:  Objection.

7              MS. SHROFF:  I have not finish the question.

8    Q.  -- did the prosecutors ask you your understanding of

9    certain events when you were working for and with Miles Guo?

10             MR. FERGENSON:  Objection to relevance.

11             THE COURT:  You can answer that question.  It's a yes

12   or no answer or I don't know or I don't remember.

13             THE WITNESS:  Yes, your Honor.

14   A.  Can you repeat that question.

15   Q.  Sure.  I'll actually ask you a different question,

16   Mr. Barnett.

17             For the times that you met with the prosecutors, did

18   they ask you questions about what you did for Miles Guo?

19   A.  Yes, I believe so, yes.

20   Q.  Did they ask you questions about your understanding of

21   certain events?

22   A.  Yes.

23   Q.  Did they ask you for your understanding about the purchase

24   of Mahwah?

25   A.  I believe so.  I can't remember exactly what was asked, but

O78BGUO4                    Barnett - Direct

1    I believe so.

2    Q.  Well, let's see if we can refresh your recollection.

3           THE COURT:  Keep in mind, sir, that you cannot repeat

4    the statements of others.

5           THE WITNESS:  Yes, ma'am.

6           MS. SHROFF:  Let's show 006.  Could you go down

7    please.

8           MR. FERGENSON:  Is there a question pending, your

9    Honor?

10           THE COURT:  Ms. Shroff.

11           MS. SHROFF:  We're trying to highlight the refresher

12    portion of the document for the witness, and here we go.

13    Q.  Does that document -- just the question of whether or not

14    this document refreshes your recollection as to whether or not

15    you told these prosecutors?

16           MR. FERGENSON:  Objection, he cannot say that.

17           THE COURT:  He said he forgot or that he didn't

18    remember.

19           MS. SHROFF:  I'm sorry.

20    Q.  Does this document refresh your recollection as to whether

21    or not you were asked questions about why Mr. Miles purchased

22    the Mahwah property?

23    A.  Yes.

24    Q.  It does?

25    A.  Yes.

500

O78BGUO4                         Barnett - Direct

1    Q.  Thank you.  You can take that down.

2            Mr. Barnett, let's go to Miles Guo.  When was the

3    first time you met Miles Guo?

4    A.  It would have -- probably the first time that I met Mr. Guo

5    was at a residence in Connecticut when I was first got hired

6    doing security there.  I couldn't give you a exact date.  I

7    would assume it was about two weeks, maybe two and a half weeks

8    after I started.

9    Q.  And, Mr. Barnett, what was your salary when you started?

10   A.  I believe it was $100,000 a year.

11   Q.  And when you started the job, did you know who Miles Guo

12   was?

13   A.  No, I had looked it up, did a internet search before I was

14   hired.

15   Q.  And did other people work security with you?

16   A.  Yes, they did.

17   Q.  And who were those people?

18   A.  The first gentleman was Greg Burnhart was one of them.  The

19   second one was -- we just called him Johnny, and the other one

20   was Henry.  I couldn't tell you their last names off the top of

21   my head.

22   Q.  Mr. Barnett, did all of them have experience as prior NYPD

23   officers?

24   A.  One was ex-correction.  I believe that was Johnny.  Henry

25   was ex-NYPD, and I believe Greg was ex-Nassau County police

500

O78BGUO4                    Barnett - Direct

1   department.

2   Q.  Mr. Barnett, at that time who did you consider your boss to

3   be?

4   A.  Grace Yang was my boss at this time.

5   Q.  And if somebody gave you direction, who did you confirm

6   those directions with?

7   A.  At that time I would have confirmed something with Grace

8   unless I was directly told either by Mr. Guo in regards to

9   security.  But anything that had to do with a direction, that

10  we had to go in or we had to take somebody somewhere, it would

11  have been by Grace at that time.

12  Q.  Mr. Barnett, after Covid did your job duties change?

13  A.  Yes, it did.

14  Q.  Could you tell us how?

15  A.  It was more now executive protection where we were driving

16  Mr. Guo to the office at 64th Street in New York, and then

17  either back home or to the residence in Connecticut or the

18  residence in New York City.

19  Q.  And how many cars did you use to transport Mr. Guo?

20  A.  Two.

21  Q.  What were the two cars?

22  A.  It depends, but the first car was -- I'm trying to think at

23  that time.

24  Q.  It's all right.  Did you have a general protocol as to how

25  to transport Mr. Guo?

500

O78BGUO4                      Barnett - Direct

1   A.  Mr. Guo was transported in one car.  There was one arms

2   security officer with him in the car, and then there was a

3   driver.  And then there was a backup car behind that car, and

4   that was an armored Lexus.

5   Q.  Mr. Barnett, you testified that you would drive him to East

6   64th Street; is that correct?

7   A.  That's correct.

8   Q.  What was at East 64th Street?

9   A.  Office building.  It was called the Himalaya Exchange I

10  believe.

11  Q.  Did you ever hear anyone refer to that building as the

12  townhouse?

13  A.  No.

14  Q.  Did there come a time when you were promoted to director of

15  security?

16  A.  Yes.

17  Q.  When was that?

18  A.  I believe it was June -- it was after I want to say

19  mid-June of 2021 I believe.

20  Q.  And did you get a raise along with that promotion?

21  A.  I did.

22  Q.  And as part of your promotion, did your job

23  responsibilities shift?

24  A.  Yes, they did.

25  Q.  Did they expand?

O78BGUO4                    Barnett - Direct

 1  A.  Yes.

 2  Q.  And as part of -- what was your position then and what was

 3  your job title?

 4  A.  My job was overall security of the office building.  I

 5  can't remember.  I believe at that time we had just -- they had

 6  just moved into 3 Columbus Circle, but I can't be sure of the

 7  date on that.  I was responsible for the security of that.

 8  There was security for a small warehouse in Manhattan that I

 9  had to oversee the guard there.  I wasn't in charge of anybody

10  else in there except for the security guard and his executive

11  protection detail.

12  Q.  Mr. Barnett, let me show you what is marked as GXSB8.

13          Do you recognize that document?

14  A.  Yes, I do.

15  Q.  What is this document?

16  A.  That's just the security assessment I did.  This was prior

17  to given the role of director of security.

18  Q.  And did you -- what is it?  Is it a report?

19  A.  It's just a report stating there were a lot of problems

20  with the security as it was when I first started.  There was a

21  lack of organization where it -- there was -- there was really

22  basically a lack of leadership.  The person who was my boss at

23  this time, her name was Grace, had no security experience at

24  all, and she was not very good at kind of managing security and

25  managing her other duties.  So we were kind of doing things on

O78BGUO4                        Barnett - Direct

1   our own, and it just -- it was a little chaotic.  It was not

2   organized security which was what I was use to.

3   Q.  Did you send this report -- did you send this document to

4   anyone?

5   A.  Yes, I did.

6   Q.  To whom?

7   A.  I believe I sent it to Grace and I believe I sent it to

8   Yvette.

9   Q.  And where did Grace work?

10  A.  Grace worked at the office at 64th Street.

11  Q.  And what was at 64th Street, what company?

12  A.  That was Golden Spring in the beginning.

13  Q.  And where did Yvette work?

14  A.  The same office.

15  Q.  Did Golden Spring keep records like this at part of its

16  business?

17  A.  I have no idea.

18          MS. SHROFF:  Your Honor, we move Government Exhibit

19  SB8 into evidence.

20          MR. FERGENSON:  Objection, lack of foundation.

21          THE COURT:  Sustained.

22  Q.  Did you prepare documents that were security assessments on

23  a regular basis?

24  A.  At first there was only one security assessment that I did.

25  After that, I did -- if we had like an event coming up, I would

O78BGUO4                        Barnett - Direct

 1   do basically a small assessment of what was needed for that

 2   event.  And then after a while, it just didn't -- I didn't need

 3   the security assessment anymore because of the promotion that I

 4   received.  We started to have a chain of command, so it wasn't

 5   really necessary at that time.

 6   Q.  Mr. Barnett, did you refer to -- let me ask you an easier

 7   question.  What did you call Mr. Guo?

 8   A.  Usually for the most part I called him sir.  If I was

 9   texting with someone, usually it would have been symbolized

10   with the letter "P."  If I was talking to Yvette directly, it

11   would have been use the letter "P" and that stood for

12   principal.  I've called him boss, usually those three.  Most of

13   the time it was sir .

14   Q.  Who came up with the word "principal?"

15   A.  That I don't know.

16   Q.  How about who came up with the word "boss?"

17   A.  I don't know if anybody came up with that word.  I think it

18   was just common knowledge.  Anybody that I would protect or

19   anybody that was above me, I probably would have just called

20   them boss.  That may have been something from my earlier days

21   in the police department.  It was nothing.

22   Q.  So if you were protecting me, you'd call me boss?

23   A.  Probably.

24   Q.  Mr. Barnett, as part of your security job, did you access

25   different levels of risk?

500

O78BGUO4                         Barnett - Direct

1    A.  At times I did, yes.

2    Q.  What are the different levels of risk in your opinion?

3    A.  When we first started, I didn't really have much

4    assessment.  We had over the time.  We started to see more and

5    more of different individuals coming, trying to get into the

6    office on 64th Street without any type of authority, so we had

7    most of that problem.  We had a few people that would follow in

8    cars when we were driving.  You would see one car in particular

9    was like a giant billboard that would drive around the block

10   all the time.

11   Q.  Did you consider that to be a serious, medium or low risk

12   threat?

13   A.  At that time it was more of a medium threat.  I didn't see

14   anything severe.  I was more concerned about the people showing

15   up to the office trying to get in.  That would have been more

16   of a serious threat.

17   Q.  And while you worked there, were there occasions when

18   people just left suspicious packages at the East 64th location?

19   A.  I remember one in particular there was one bag that we

20   called the NYPD for.  And I think one of my security guys, I

21   think he actually donned a helmet and went out there to look

22   into the bag, but I don't believe there was anything of serious

23   note in it.

24   Q.  Do you recall if there were any times when people who were

25   armed tried to get into East 64th Street?

O78BGUO4                        Barnett - Direct

1   A.  Not that I know of, no.

2   Q.  Mr. Barnett, how long did you work for Miles Guo?

3   A.  I started in October of 2020 and worked for him all the way

4   up to, I guess that would be March of 2023.

5   Q.  And how would you describe him as an employer?

6   A.  In all honesty, one of the better people that I worked for.

7   And the reason I say that is because he's very cordial, very

8   courteous, thought about.  He seem to care about his security

9   detail.  You don't see that a lot when you do executive

10  protection, especially for high net worth individuals.  They

11  tend to treat you subpar.  I don't know if that's the best word

12  to use.  He was never like that.  He was always very courteous.

13  He was a gentleman.

14  Q.  How did you communicate with him?

15  A.  Usually we'd have sporadic conversation.  It was not

16  anything at length.  If I had to really talk to him, I would

17  have to use someone to translate.

18  Q.  How was his English?

19  A.  It was okay.  It took me a while to get an ear for it.  It

20  wasn't great, so it took me a little while to understand what

21  he was saying sometime, especially if he was behind me in the

22  back seat in the car and I'm in the front.  It was hard.

23  Q.  Mr. Barnett, did you use any sort of apps to communicate

24  with Mr. Guo?

25  A.  Yes, we used WhatsApp.

500

O78BGUO4                        Barnett - Direct

1    Q.  And did Mr. Guo have the same number throughout the time

2    that you worked for him, the same phone number?

3    A.  No, I don't believe so.

4    Q.  And what was your experience with his phone numbers, could

5    you tell the jury?

6    A.  Well, Mr. Guo would switch his phones.  He would explain

7    that his phones had been hacked by the Chinese government, so

8    he would switch his phone semi-regularly.  It wasn't that

9    often, but it was semi-regularly.

10   Q.  Mr. Barnett, did there come a time when you learned about

11   something called the New Federal State of China?

12   A.  Yes.

13   Q.  And what did you understand it to be?

14   A.  Basically my understanding of it was that Miles was trying

15   to create a new order for a Chinese people.  He wanted to take

16   down basically the Chinese Communist Party based on, you know,

17   different issues.  But in regards to the New Federal State of

18   China, that was kind of his -- it's going to be his new

19   foundation for all the Chinese people.

20   Q.  Did you believe he was sincere in his efforts?

21          MR. FERGENSON:  Objection, he can't testify to the

22   sincerity of the defendant.

23          MS. SHROFF:  I'm asking about his understanding of

24   what he viewed of Miles Guo, your Honor.

25          THE COURT:  You can answer.

O78BGUO4                        Barnett - Direct

1    A.  Yes, I thought he was sincere about it, yes.

2    Q.  Mr. Barnett, do you recall if you provided security for an

3    event at the World Trade Center?

4    A.  Yes, I did.

5    Q.  What year was that?

6    A.  I believe that was June 4 of 2021, don't quote me on the

7    date, but I thought that's what it was.

8    Q.  Do you recall who was present there?

9    A.  Yes, for the most part I couldn't tell you everybody.

10   That's for sure.

11   Q.  And, Mr. Barnett, on June 4 of 2021, did the Mahwah

12   property exist?

13   A.  No, not that I know of, no.

14   Q.  Mr. Barnett, did your job require you to go to Sherry

15   Netherlands?

16   A.  Yes, it did.

17   Q.  What was Sherry Netherlands?

18   A.  That was a residence, one of the residences that Miles

19   stayed at.

20   Q.  Mr. Barnett, did you provide security in that -- is it an

21   apartment building?

22   A.  Yes, it is.  It's a hotel/apartment building.

23   Q.  Did you provide security within that building?

24   A.  Sometimes, not all the time.  We weren't there 24-7 because

25   they had security downstairs.  There was no need for us to stay

O78BGUO4                         Barnett - Direct

1   there overnight.

2   Q.  Mr. Barnett, and part of your duties or job description was

3   to drive Mr. Guo, correct?

4   A.  That's correct.

5   Q.  And did there come a time when there were two cars that

6   were purchased to ensure the security of Mr. Guo?

7          MR. FERGENSON:  Objection to the leading.

8   BY MS. SHROFF:

9   Q.  Were two cars purchased?

10          THE COURT:  You may answer that question.

11  A.  I don't know which two cars you're referring to.

12  Q.  You tell us which cars were purchased?

13  A.  There's two cars that my company purchased.

14  Q.  Which were those?

15  A.  Two BMWs.

16  Q.  And when was that?

17  A.  I believe that was January of 2023.

18  Q.  Do you know who ordered those two BMWs?

19  A.  Yes, I did.

20  Q.  And who paid for them?

21  A.  Well, it was -- I paid for them out of the funding from

22  HCHK.

23  Q.  Do you know how much it cost?

24  A.  Each car was -- with tax I believe was about $165,000.

25  Q.  Were those two BMWs used to transport anyone, any other

O78BGUO4                          Barnett - Direct

1  people?

2  A.  Yes, at different times, but for the most part they were

3  used to transport Miles.

4  Q.  And who other than Miles did they transport?

5  A.  I've transported Yvette in those cars.  If we had an event

6  we probably would have transported someone from that event, but

7  I can't give you an exact name on that.

8  Q.  How many events do you recall -- I'll withdraw that.

9        Was part of your job to transport people back and

10 forth from events?

11 A.  Yes.

12 Q.  And were these events related to the New Federal State of

13 China?

14       MR. FERGENSON:  Objection to the leading again, your

15 Honor.

16       THE COURT:  What were the events related to?

17 Q.  What were these events related to?

18 A.  The first one that we did was New Federal State of China.

19 There was an event for Himalaya Coin.  There was another event

20 for the -- I believe it was after the purchase of the house in

21 Mahwah if I'm not mistaken, and there were a few other events

22 here and there, but I couldn't tell you what they were for.

23 Q.  Mr. Barnett, did Miles Guo know how to drive?

24 A.  I believe he did.  I seen him drive.

25 Q.  Where did you see him drive?

O78BGUO4                          Barnett - Direct

1   A.  I saw him drive once when we were looking at a property.

2   He drove a car around the property, that's about the only time

3   I've seen him drive.

4   Q.  Did you ever see him drive on a road?

5   A.  Maybe once, but I can't recall when that was.

6   Q.  Mr. Barnett, do you recall seeing any motorcycles while you

7   guarded Mr. Guo?

8            MR. FERGENSON:  Objection to the leading.

9   Q.  Did you see any other vehicles while you were guarding

10  Mr. Guo?

11  A.  Yes.

12  Q.  What other vehicles did you see?

13  A.  I saw motorcycles.  There was other cars.  There was a

14  Rolls-Royce.  There was a Lamborghini.  There was a other

15  Mercedes, a van.

16  Q.  Let's start with the motorcycle.  Do you know what the

17  motorcycles were used for?

18  A.  They weren't used.  They were -- originally they were going

19  to be purchased to use for --

20  Q.  Could you keep your voice up for me.

21  A.  They were going to be used for, originally, for like the --

22  he was doing a lot of music videos, like that kind of stuff.

23  The reason that no one use them was because they were in my

24  name.

25  Q.  And why was that a problem for other people to use

O78BGUO4                         Barnett - Direct

1    something that was in your name?

2    A.  The main reason why they were put in my name, not only, was

3    I ask, I was the only one that had a motorcycle license.  The

4    problem I had with it was that anybody that wanted to use them

5    didn't have a motorcycle license and it was under my name, and

6    God forbid something were to happen, I would be liable.

7    Q.  Did you watch any videos in which these motorcycles

8    features?

9    A.  No, because the first video that I was actually privy to

10   was -- didn't have the motorcycle at that time.

11   Q.  And were these motorcycles purchased for just use by

12   Mr. Guo or for other people as well?

13             MR. FERGENSON:  Objection.

14             THE COURT:  Overruled.  You may answer.

15   A.  Originally they were purchased for Mr. Guo from what I

16   remember.

17   Q.  And did that ever change?

18   A.  It did.  So it came to -- I was -- I believe I was

19   approached by Yvette.  And I can't remember if Max was there or

20   not.  But, anyway, they wanted to rent out the motorcycles,

21   meaning they wanted to have some of the supporters be able to

22   rent these.  Not really rent them, but sign them out and use

23   them.  And I immediately put a stop to that because, again,

24   they were in my name, and it wasn't a rental service.

25   Q.  Where were these motorcycles initially kept?

O78BGUO4                        Barnett - Direct

1   A.   Initially they were kept in Connecticut.

2   Q.   Were they moved?

3   A.   Yes, we moved them.  I moved them to the house in New

4   Jersey.  Scratch that, I believe I drove one of them to the

5   house in New Jersey, and the other ones we had the trailer.

6   Q.   So these motorcycles, Mr. Barnett, are they now still in

7   your name?

8   A.   I believe one still is according to what an attorney told

9   me the other day.

10  Q.   And where is the other one?

11  A.   Say again.

12  Q.   And whose name is the other one in now?

13  A.   I have no idea.  I turn those over to Max Krasner.  I don't

14  remember what the date was.  I want to say it was sometime in

15  2023, but I couldn't tell you what date that was.

16  Q.   You mention a Lamborghini, correct?

17  A.   Yes.

18  Q.   What was the plan with the Lamborghini?

19  A.   I have no idea.  At one point I know when they were talking

20  about the motorcycle being rented -- sorry, I keep use the word

21  "rented."  It was meant to be signed out, almost like someone

22  wanted to use something.  It's the same thing with the

23  Lamborghini.  That's the only time I ever heard plans with that

24  Lamborghini.  Otherwise, it wasn't really discussed that I know

25  of.

O78BGUO4                              Barnett - Direct

 1   Q.  When you say signed out, were you ever given like a

 2   sign-out sheet that someone would have to fill out to --

 3   A.  That never came to fruition.  I was not having that.

 4   Q.  You were not having that?

 5   A.  No.

 6   Q.  Mr. Barnett, do you recall learning anything about a

 7   Bugatti?

 8   A.  I remember hearing about it, but I didn't really have much

 9   to do in regards to purchase or anything like that with it.

10   Q.  Do you know what it was for, whom it was bought?

11   A.  No, I don't.

12   Q.  Mr. Barnett, do you have any knowledge of an entity called

13   G/Clubs?

14   A.  Yes, I know about it.

15   Q.  What is G/Clubs?

16   A.  I can only tell you the way it was explained to me.  It's

17   basically a club that you paid for, almost like any type of

18   country club or anything, and you receive services for that,

19   whether it be -- I believe it was money off of clothing.  I

20   thought there was something about there were trips that you

21   could win or something like that.  I don't know the full extent

22   of what it entailed.

23   Q.  Mr. Barnett, did you know anything about any boats while

24   you worked for Mr. Guo?

25   A.  Yes.

O78BGUO4                          Barnett - Direct

1   Q.   What boats did you know about?

2   A.   There was the -- the only boat that I had any dealings with

3   was, I believe it was the Lady May Two, and there was a boat

4   that came later that was called Liberty.

5   Q.   What do you recall about the Liberty?

6   A.   I don't know much about the purchase of the Liberty.  I

7   remember when we it actually arrived, it had massive amounts of

8   problems with it.  It was not very seaworthy.  And the only

9   reason I know that was from speaking to the captain of the boat

10  at that time.

11  Q.   Did the fellow fighters or supporters use the Liberty?

12  A.   Yes.

13  Q.   When?

14  A.   It was different occasions to do broadcasting.  I couldn't

15  tell you the dates.

16  Q.   Do you know somebody named Prince Li?

17  A.   Yes, I do.

18  Q.   Who was Prince Li or is Prince Li?

19  A.   I don't know his official title.  To me he was kind of

20  almost what I would consider like a team lead for the

21  supporters.

22  Q.   And did he take the Liberty out with the supporters?

23  A.   I believe so, yes.

24  Q.   Now, Mr. Barnett, are you familiar with a property called

25  Mahwah?

O78BGUO4                        Barnett - Direct

1    A.  Yes.

2    Q.  Did you ever visit Mahwah?

3    A.  Yes, many times.

4    Q.  And when was your first visit to Mahwah?

5    A.  I don't believe I know the date, but it had to be early of

6    2022.  I don't recall the date.

7    Q.  Was that before or after its purchase?

8    A.  I went there once before I believe it was purchased.  I

9    don't know the date it was actually purchased, but I believe I

10   was there before.

11   Q.  Do you recall who you were there with?

12   A.  I was there with I believe -- well, I know it was Miles.  I

13   thought Yvette was there, and the owner of the Mahwah residence

14   was there.  I can't remember his name.

15   Q.  Did you ask Mr. Guo if he was going --

16           MR. FERGENSON:  Objection to the leading, your Honor.

17           MS. SHROFF:  It's a question.

18   Q.  Did you ask Mr. Guo if he was going to buy that property?

19   A.  No, I did not ask him that, no.

20   Q.  Did Mr. Guo ever volunteer to you for whom he was buying

21   that property?

22           MR. FERGENSON:  Objection to the hearsay.

23           THE COURT:  So, once again, this would be a yes or no

24   or I don't know or I don't recall kind of a question.  It's not

25   a question where you repeat what you were told.  You

O78BGUO4                    Barnett - Direct

1   understand?

2            THE WITNESS:  Yes, ma'am.

3            THE COURT:  Go ahead.

4   A.  Yes.

5   Q.  Were you surprised when Mr. Guo purchased that property?

6   A.  Yes.

7   Q.  Why?

8   A.  It just didn't seem like his type of property, but that's

9   just my own personal take on it.

10  Q.  And why did it not seem like his type of property?

11  A.  I always felt that Mr. Guo like properties that had an

12  intense amount of land.  This was, in this particular property,

13  even though it was on 12 acres, it was surrounded basically by

14  a neighborhood.  It wasn't very easily -- it wasn't easy to

15  secure due to that problem.  And for those reasons, it was

16  very, very ornate.  It just didn't seem like a property that I

17  felt that something he would purchase.

18  Q.  Did Mr. Guo ever tell you whether the property was for him

19  or for someone else?

20           MR. FERGENSON:  Objection.

21           THE COURT:  Here we go again.  This is one of those

22  questions where you can't say what he said.  You can say yes,

23  no, I don't recall.  I don't know.

24           THE WITNESS:  Yes, ma'am.

25  A.  Yes.

O78BGUO4                           Barnett - Direct

1    Q.  Mr. Barnett, were you asked similar questions such as the

2    ones I've just asked you by the government when you met with

3    them during proffer sessions?

4              MR. FERGENSON:  Asked and answered.

5              MS. SHROFF:  Not these questions.

6              THE COURT:  Overruled.  You may answer.

7    A.  I believe so, but I can't remember everything that I was

8    asked.

9              MS. SHROFF:  Well, let's show him 006 again.

10             MR. FERGENSON:  Your Honor, we'll stipulate that we

11   asked him about Mahwah just to speed things along.

12             MS. SHROFF:  Are they going to stipulate to what he

13   said back?

14             MR. FERGENSON:  No, because it's hearsay.

15             THE COURT:  I don't think so.

16   Q.  When you met with the government and you were asked these

17   questions, was your lawyer present?

18   A.  Yes, he was.

19   Q.  And after you answered all of their questions, did they

20   accuse you of not telling the truth?

21   A.  Not to me, or at least not to my attorney, not that I know

22   of.

23   Q.  And how many times did the government talk to you about

24   these topics?

25             MR. FERGENSON:  Asked and answered.

O78BGUO4                    Barnett - Direct

 1              THE COURT:  Sustained.

 2   Q.  Mr. Barnett, were you anticipating being a witness at this

 3   trial for the United States Attorney's office?

 4              MR. FERGENSON:  Objection.

 5              THE COURT:  Sustained.

 6   Q.  Were you told by the United States Attorney's office that

 7   you would be called as a witness?

 8              MR. FERGENSON:  Objection.

 9              THE COURT:  Sustained.

10   Q.  Mr. Barnett, when did I first reach out to you?

11   A.  I believe it was after I received a subpoena to testify.

12   Q.  I know, but when, this month, last month?

13   A.  Last month, right, yeah, June I believe.

14   Q.  You remember which week of June?

15   A.  No, I don't.  I'm sorry.

16   Q.  Mr. Barnett, in all the times that you worked for Mr. Guo,

17   did he live at the Mahwah facility?

18   A.  No, he did not live there.  He stayed there, but he did not

19   live there.

20   Q.  What was the longest period of time that he ever stayed

21   there?

22   A.  I believe about four or five days at most.

23   Q.  And what did he do during those four or five days?

24   A.  Mostly he would broadcast for the most part.

25   Q.  Did you ever see Mr. Guo's wife at Mahwah?

O78BGUO4                          Barnett - Direct

1   A.  Yes.

2   Q.  And what was your perception of her at Mahwah?

3   A.  In my perception she did not like it very much.

4   Q.  And did she look happy while she was there?

5   A.  Not that I know of.  I didn't think that she looked it

6   there.  I couldn't tell you whether she looked happy or not.  I

7   got the impression she did not like it.

8   Q.  What is your impression based on?

9   A.  Just communication between kind of husband and wife.  It

10  doesn't really matter what language it is.  Sometimes you can

11  just tell.

12  Q.  Body language?

13  A.  Body language and verbal cues.  My wife gives them to me

14  all the time.

15  Q.  Sorry about that.

16      Mr. Barnett, did you ever see Mr. Guo's son at Mahwah?

17  A.  No.

18  Q.  Have you seen Mr. Guo's son in all the time that you've

19  ever worked for him?

20  A.  Yes, I saw him one time.

21  Q.  What time, in which year?

22  A.  It was when I first started in 2020.  I believe he was at

23  the residence in Connecticut, but we did not know that he was

24  there.  I was actually surprised when I saw him walking up the

25  driveway.  I didn't know who he was.

O78BGUO4                        Barnett - Direct

1    Q.   And after that have you ever seen him at the Connecticut

2    residence?

3    A.   No.

4    Q.   How about Sherry Netherland?

5    A.   No.

6    Q.   How about Mahwah?

7    A.   No.

8            MR. FERGENSON:  Objection, your Honor.

9            THE COURT:  Overruled.

10   Q.   How about at 3CC?

11           THE COURT:  He has stated that he never saw him again.

12   Q.   Did you see Mr. Miles Guo's daughter at these places?

13   A.   I saw his daughter at the house in New Jersey in Mahwah.

14   Q.   And how many days did you see her there for?

15   A.   Not many, maybe she would visit for a day, maybe two at

16   most, but I believe it wasn't more than a day, and she would

17   leave.

18   Q.   Do you know somebody name Wayne?

19   A.   Yes, I do.

20   Q.   Who is Wayne?

21   A.   Wayne is the fiancee' of Mei.

22   Q.   Did he live there?

23   A.   No, he did not.

24   Q.   Now, Mr. Barnett, is it fair to say that it's a pretty big

25   house?

O78BGUO4                           Barnett - Direct

1    A.  Yes, it is.

2    Q.  Could you describe the house for us?  It might be less

3    leading?

4    A.  The house sits on 12 acres.  It's up on a hill.  When you

5    pull around the driveway, as you come up the driveway, there's

6    a security house on the right.  As you pull up the gate, you go

7    up a hill.  As you go up the hill and you enter on the front of

8    the residence as you walk in, it's just a giant living room.

9    Basically there's a giant living in the front.  And then off to

10   the right would have been where the kitchen is, and then off to

11   the left was where there was an office, and then that was the

12   main floor.

13        I'm sorry.  Are you asking me what it was like when I

14   first went there or what it's like after some of the renovation

15   were done?

16   Q.  I was asking you what it was like when you first went

17   there.  I can interrupt you if I may.

18   A.  Okay.

19   Q.  Mr. Barnett, were there cameras at Mahwah when you first

20   saw it?

21   A.  Yes, there were.

22   Q.  And as part of your -- did you have a job at Mahwah at some

23   point?

24   A.  Yes.  So I was task with redoing all the security at

25   Mahwah.  The security cameras and the equipment there were very

O78BGUO4                    Barnett - Direct

1  substandard.  And for something that size, you really needed to

2  have a complete overhaul of all the security systems, cameras,

3  internet and stuff like that.

4  Q.  Mr. Barnett, do you need some water?  Do you have water

5  there?

6  A.  I don't know.  Do I have water here?  I'm good.  Go ahead.

7  Q.  Were you in charge of installing the camera system?

8  A.  No, I was not.

9  Q.  And did you pick the vendors who would install the camera

10  system?

11  A.  Yes, I did.

12  Q.  And which vendor did you pick?

13  A.  Company was called Prevenitas.

14  Q.  Was that a company -- it's fine.

15       How long -- did you supervise the installation of the

16  cameras?

17  A.  Some days.  I wasn't there everyday, so.

18  Q.  Could you tell us what was the rest of your work while you

19  were in charge of Mahwah?

20  A.  So at first it was really just doing the security system.

21  Unfortunately what end up happening, the amount of construction

22  that was going on with all the different vendors that were

23  coming in, all my security guys had to keep track of which

24  vendors were coming in.  And then we had to worry about who was

25  coming in with those vendors.  We had one MS-13 gang member

O78BGUO4                        Barnett - Direct

1   that had to be removed, stuff like that.  But for the most part

2   I had left that to another one of my team leads to kind of

3   oversee that.

4   Q.  Now, when you -- for how long were you in charge of

5   overseeing things at Mahwah?

6   A.  I guess when it first started, I don't remember the date of

7   start.  I know it ended in September of 2023 for me.

8   Q.  Mr. Barnett, what were the types of things -- was the house

9   in good shape?

10  A.  No, it was not.

11  Q.  Could you use that mic for me.

12  A.  It was not in good shape.

13  Q.  Was authority of your job to put it in shape?

14  A.  No.  My job was to oversee the construction, make sure that

15  the contractors were doing what they're supposed to do,

16  basically just keeping track of the -- make sure nobody was

17  doing anything wrong, more of like a security role than it was

18  overseeing contractors.

19  Q.  Mr. Barnett, were there names attributed to different rooms

20  within the facility?

21  A.  Yes.

22  Q.  What were the names?

23  A.  I'd have to look at the map, but the ground floor I don't

24  remember that having a name.  The second floor, one side was

25  Miles' wing.  The other side was madam's wing, which was

500

O78BGUO4                    Barnett - Direct

 1  Miles's wife.  And I believe on the third floor one side was

 2  for Mei, and the other side was for his son.

 3  Q.  Were those the names given to the four areas of the two

 4  floors?

 5  A.  I believe so, on the security map they were I believe.

 6  Q.  Did you have a security map?

 7  A.  I did, yes.

 8  Q.  Who created the security map, do you know?

 9  A.  Prevenitas, they did a security assessment.

10  Q.  And they created the map?

11  A.  Yes, it was taken off of blueprints, but they created the

12  name on the map, correct.

13  Q.  Was there construction done to create more bedrooms on the

14  first floor?

15  A.  On the first floor.

16          MR. FERGENSON:  Objection, your Honor.

17          THE COURT:  What was the nature of the construction on

18  the first floor.

19  Q.  Or any floor for that matter while you worked there?  Go

20  ahead and tell us.

21  A.  There wasn't a whole lot of construction at first.  On the

22  first floor, the main floor, most the construction was on the

23  second and third floor I believe.

24  Q.  How many bathrooms all told were on the second floor, do

25  you know?

```
O78BGUO4                    Barnett - Direct
```

1    A.   There was definitely two.  It might have been three, but I

2    know there definitely were two.

3    Q.   And did there come a time when there were meetings held at

4    Mahwah?

5    A.   Yes.

6    Q.   And who was present for those meetings?

7            MR. FERGENSON:  Your Honor, objection.  I think we may

8    need a sidebar.

9            THE COURT:  All righty.  Step up.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO4                    Barnett – Direct

1            (At the sidebar)

2            MR. FERGENSON:  I assume this is post-indictment,

3    post-arrest meetings what you're getting at?

4            MR. KAMARAJU:  No.  No.  It's pre-arrest,

5    pre-indictment.

6            MR. FERGENSON:  Sorry.

7            THE COURT:  Okay.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO4                       Barnett - Direct

1              (In open court)

2              THE COURT:  You may answer.

3              MS. SHROFF:

4    A.   Yes.

5    Q.   Mr. Barnett, was Miles Guo present for that meeting?

6    A.   For that particular meeting I'm thinking of, yes.

7    Q.   Who else was there with Miles Guo just generally, try and

8    describe for us who was there?

9    A.   The meeting I'm thinking of is more of in the beginning of

10   the residence, but I'm pretty sure there were certain

11   supporters there.  And I thought Yvette was there, I'm almost

12   positive, but that's all I can remember.  I don't remember who

13   else was there.

14   Q.   And during that meeting was there a broadcast that was

15   undertaken?

16   A.   There may have been.  That I don't recall.

17   Q.   Mr. Barnett, do you know which entity bought the property

18   that has been referred to as Mahwah?

19   A.   Yes, Taurus Fund purchased the property.

20   Q.   Did you have a role at the Taurus Fund?

21   A.   I did not have a role at the Taurus Fund.

22   Q.   Did you have a signatory role at the Taurus Fund?

23   A.   Yes, I did.  I was unaware of that; but yes, I did.

24   Q.   And what was the signatory role that you had?

25   A.   Well, apparently, which I didn't find out until much later,

500

O78BGUO4                          Barnett - Direct

1   that I was the manager, one of the managers of that, of the

2   fund.

3   Q.  Did you sign a document that made you a manager of the

4   Taurus Fund?

5   A.  Yes, I did.

6   Q.  Did there come a time when that property was to be

7   transferred out of the Taurus Fund into another fund?

8   A.  Yes, for my understanding it was to be transferred to HCHK

9   Properties.

10  Q.  Mr. Barnett, while you worked at the Mahwah facility, did

11  you do any work with the guard house?

12  A.  I'm sorry.

13  Q.  Did you have any work done on the guard house?

14  A.  Yes.

15  Q.  What work did you have done?

16  A.  The guard house was basically, it was gutted.  We had to

17  create what's called a security operation center inside that

18  house, and then the rest of the house basically was just being

19  redone.  The house was in complete disarray.  There was mold in

20  it.  It was in really bad shape.

21  Q.  Could you tell the jury what is a license plate reader?

22  A.  A license plate reader is basically a camera that picks up

23  a license plate.  If it was a police department, it would

24  actually pick up the license plate and tell you all the

25  information registered to that particular license plate.

O78BGUO4                    Barnett - Direct

1   Civilian wise, you can't do that, so basically it reads the

2   actual license plate, lets you know how many times that license

3   plate's been there.  And you can actually, on a computer, you

4   can make it so that if that license plate appears, it will

5   notify you that there is a problem if you don't want that

6   particular car in your area.

7   Q.  Did you install a license plate reader in Mahwah?

8   A.  It was installed.  I didn't personally install it.

9   Q.  Do you know when it was installed?

10  A.  I believe it was later.  I want to say more towards August

11  or September of '23.  That I don't know for sure.

12  Q.  Mr. Barnett, do you recall that people -- do you know what

13  a non-disclosure agreement is?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  That's basically an agreement stating that whatever you --

17  the gist of it is whatever you see or hear, whatever, it's to

18  be kept confidential.

19  Q.  Did you sign one?

20  A.  Not for -- for Mahwah, no, I did not.

21  Q.  Did vendors who came to the Mahwah facility sign them?

22  A.  Yes, everybody had to sign them.

23  Q.  And was there a reason -- did you have an understanding of

24  why there was such a focus on security at Mahwah?

25  A.  Well, it was just because of basically the size of the

O78BGUO4                          Barnett - Direct

1   property, and we were more concerned with the safety of the

2   property and Miles' safety for the most part.

3   Q.   And why were you concerned about Miles' safety?

4   A.   That was my job, to make sure that he was protected.

5   Q.   Do you know somebody name Sean Jing?

6   A.   I'm sorry.

7   Q.   Do you know somebody named Sean?

8   A.   Yes.  I'm sorry.

9   Q.   Who did he work for?

10  A.   I believe he worked for HCHK.  I don't know whether it was

11  properties or technologies.  I don't have that answer.

12  Q.   Mr. Barnett, in January of 2023, did you perceive a

13  security threat?

14  A.   January of 2023, I don't recall that date.

15         MS. SHROFF:  Well, let me show you something that

16  might help you recall.  Let me show you DX60686.  Could you

17  scroll down for him, please.  It's just for the witness.  Thank

18  you, and the Court and the government.  If you could just

19  scroll down.

20  Q.   Does that document refresh your recollection?

21  A.   Yes, it does.

22         MS. SHROFF:  You could take that down, please.

23  Q.   And could you tell us what security threat you perceived in

24  January of 2023?

25  A.   I received a call from my team lead, his name is Tom Carino

500

O78BGUO4                           Barnett - Direct

1    (sic).  He stated that he had received a call.  I don't

2    remember whether it was from Yvette or it was from --

3              MR. FERGENSON:  We object to the hearsay, your Honor.

4              MS. SHROFF:  It's not being offered for the truth of

5    the matter.

6              MR. FERGENSON:  Really.

7              THE COURT:  If he is -- sir, don't repeat anything

8    that was said to you.

9              THE WITNESS:  Okay.

10   Q.  What did you do?

11   A.  Basically we had -- I instructed them to take Mrs. Guo and

12   Mei to New Jersey, the New Jersey residence, because I felt

13   like that would be the most secure place if someone was

14   following them.

15   Q.  How long did they stay at the secure place in New Jersey?

16   A.  I believe a few hours.  I don't have an exact time.

17   Q.  And then where did you take them back?

18   A.  Back to their residence in Connecticut.

19   Q.  Mr. Barnett, moving forward to June 2022, was the

20   construction still going on at the Mahwah facility?

21   A.  Yes.

22   Q.  And how focus -- was it light construction work or heavy

23   construction work?

24   A.  It was always heavy construction work going on.

25   Q.  Now, Mr. Barnett, sitting here today, do you recall if

O78BGUO4                    Barnett - Direct

1  around June of 2022, whether there was another meeting at

2  Mahwah residence that you supervised?

3  A.  I don't recall that.  There may have been.  I just don't

4  recall.

5  Q.  Sitting here today, do you recall if there was a Lunar

6  celebration at Mahwah?

7  A.  Yes.

8  Q.  When was that?

9  A.  I don't know the date of that, but there was, yes.

10 Q.  Could you describe what the celebration looked like over

11 there?

12 A.  I don't think I was present at that celebration.

13 Q.  Did you provide security for the celebration?

14 A.  Yes.

15 Q.  And what security did you provide?

16 A.  I believe it was security that was already there that would

17 have been my team lead Tom Carino and who was on duty that day.

18        THE COURT:  Speak into the microphone.

19 A.  Tom Carino and whoever was on duty that day that was

20 securing the estate.

21 Q.  Mr. Barnett, as part of your job duty for Mr. Guo, did you

22 scout out properties for him to view?

23 A.  Yes, I scouted out offices and warehouses.

24 Q.  Could you keep your voice up.

25        You scouted out offices and what?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
       O78BGUO4                        Barnett - Direct
 1     A.   Offices and warehouse.

 2     Q.   What else?

 3     A.   I scouted out homes as well.

 4     Q.   Where did you scout out homes?

 5     A.   Most of the scouting I did, it was online.  One was in

 6     Arizona.  One was in Colorado.  I think there was one in Texas

 7     as well.

 8     Q.   And were these properties that you were scouting, can

 9     out -- was it your understanding that they were for?

10               MR. FERGENSON:  Objection.

11               THE COURT:  Sustained.

12     Q.   Describe what directions you --

13               THE COURT:  Sustained.

14               MR. FERGENSON:  Objection.

15               THE COURT:  Don't repeat anything that was said to

16     you.

17               MS. SHROFF:  Your Honor, may we have a sidebar?

18               THE COURT:  Okay.

19               (Continued on next page)

20

21

22

23

24

25
```

O78BGUO4                        Barnett - Direct

1            (At the sidebar)

2            MR. KAMARAJU:  I wasn't sure what the basis of the

3    hearsay objection is to a direction from Mr. Guo.  Under *U.S.*

4    *v. DiMaria*, a direction is not hearsay.

5            THE COURT:  I'm waiting for the direction to be, get

6    me a house for G/Club, something hike that.

7            MR. KAMARAJU:  He didn't even -- she didn't even get a

8    chance to ask the question as to what the direction was.

9            THE COURT:  Anticipating what his answer would be, I

10   sustained an objection.

11           MR. KAMARAJU:  I'm sorry, your Honor.  I'm being slow

12   on this.  If the objection is to hearsay, then don't we have to

13   hear what the direction was going to be.

14           THE COURT:  Well, then, the jury would hear that, and

15   that can be a problem.

16           MR. KAMARAJU:  I'm not sure how we can ever get to it

17   if the direction was for G/Club or for fellow fighters or for

18   anybody else, I don't know how to ask that question I guess is

19   my point.

20           MS. SHROFF:  Your Honor, we have to be candid.  We

21   have no idea what his answer is going to be.  We didn't have

22   the level of access to Mr. Barnett that the government did.

23   They know what he is going to say.  We don't know.  We were not

24   allowed to prep these witnesses.

25           MR. FERGENSON:  Your Honor, my understanding is that

O78BGUO4                        Barnett - Direct

1   he has prepped with them.  I think that's superly incorrect.

2   They also have the 302s.  But that aside, I think your Honor is

3   exactly right.  There can be mix statements where what is sort

4   of clothed as a command is really an assertion of truth.

5   Meaning, these are for G/Clubs like your Honor's example.  That

6   is still hearsay.  It isn't permissible.  It is a proper

7   objection that the question calls for hearsay because that is

8   like your Honor clearly discerned what is coming.

9          THE COURT:  You want to get out that these potential

10  properties had a certain purpose.  That is the reason you're

11  asking these questions?

12         MR. KAMARAJU:  We are entitled to get out that Mr. Guo

13  directed people to look for properties for a certain purpose.

14  That's not hearsay.  That's both his state of mind and his

15  direction.

16         THE COURT:  You can ask did you receive directions to

17  look for properties for certain purposes without his naming the

18  purpose.

19         MR. KAMARAJU:  Your Honor, maybe I'm not

20  understanding.  If part of the hearsay exception is for his

21  state of mind as well as his direction, then I don't understand

22  how the purpose is not appropriate.

23         THE COURT:  You want to get this in for the truth of

24  the matter.  That's the reason that I don't buy any other

25  reason.

O78BGUO4                           Barnett - Direct

1          MR. KAMARAJU:  That's why I come back to the *DiMaria*

2    case.  He was here to buy cheap cigarettes.  That was the

3    intention that was expressed in the statement that the Second

4    Circuit said.  So the Second Circuit said, even though there is

5    some argument that that could be viewed as he's really there

6    for the purpose of buying cigarettes, it went to his state of

7    mind.  It's the same concept.

8          THE COURT:  So he's acting as a scout, and what

9    exactly did you expect that he would say about what he was

10   thinking about?

11         MS. SHROFF:  He was told to look for properties that

12   were large, that had land attached to them, that had height to

13   them so that there would be dwellings on the top and dwellings

14   below.  The point of the properties was to make sure that there

15   was room for everyone to live if they so wanted.  The property

16   was such to have zoning that would allow for the building of

17   new structures.  And I want to be clear because the government

18   just said that what I said was superly incorrect or something

19   like that.

20         The defense has had one meeting with his lawyer and

21   him, and we have not had access to him after that because his

22   lawyer has been on vacation in the Poconos and has no phone

23   service, and we have not spoken to somebody who is represented

24   by counsel without them being present.  This is what I am

25   surmising would be his answer.  More importantly under *DiMaria*,

O78BGUO4                    Barnett - Direct

the fact that he has a state of mind and he knows that Miles

Guo is looking for property that is of a certain type and for a

certain purpose is properly admissible, your Honor.

THE COURT:  As a generality, absolutely.  Were you

given certain criteria with respect to the property?  He's

going to say yes.  Did you apply that criteria when you

searched online?  He's going to say yes.

MR. KAMARAJU:  Your Honor, I'm going to maintain the

objection because I think the appropriate solution is a

limiting instruction.  It's not the exclusion of the testimony.

If the Court has concerns that the testimony could be taken by

the jury or even argued by defense counsel, then I believe that

the proper course is not exclusion.  It's a limiting

instruction, or an objection by the government if I try to do

that in summation.

THE COURT:  Are you telling me that in summation you

will not be trying to use his testimony about the purpose of

the properties for the truth?

MR. KAMARAJU:  I'm going to be saying, this is what

Miles Guo thought.  That's a classic state of mind statement.

That's what I'm going to say.  You want to know what Miles Guo

thought?  This is how you know what Miles Guo thought.  If

Miles Guo was wrong, he was wrong, but that's what he thought.

That's what I'm going to say in summation.

MR. FERGENSON:  I think your Honor's proposal was

O78BGUO4                          Barnett - Direct

1    correct.  I think your Honor recognized earlier, this case is

2    in a different universe than the *DiMaria* case, and it just

3    doesn't have any traction in a case like that.  And

4    particularly the context like this, this person is just

5    following orders.  The purpose is the effect.  It's not what he

6    was told about why, it's what he did.

7              MS. SHROFF:  He was told why.

8              THE COURT:  He was told why, and so he took certain

9    steps.  He put certain words into the search bar when he was

10   looking at these properties.  He put it in a certain price.  He

11   put in certain criteria concerning use of the property.

12             MS. SHROFF:  Right.  Is the Court's ruling that I may

13   not inquire into what the purpose of the property was?

14             THE COURT:  Correct.

15             MS. SHROFF:  And I may not inquire about the specific

16   terms that he put into the search?

17             THE COURT:  Correct.

18             MS. SHROFF:  And I could not inquire as to what this

19   witness's understanding is of Mr. Guo's state of mind at the

20   time he gave those directives?

21             THE COURT:  Correct.

22             MS. SHROFF:  So I think that is in conflict with

23   *DiMaria*. That's our position, your Honor.

24             (Continued on next page)

25

O78BGUO4                          Barnett - Direct

1           (In open court)

2    BY MS. SHROFF:

3    Q.  Mr. Barnett, were you given certain criteria when you were

4    directed to look for properties, just yes or no?

5    A.  Yes.

6    Q.  And who gave you those directives or directions criteria?

7    A.  Miles Guo.

8    Q.  And did you, without telling us what they were, did you use

9    that criteria to look for properties?

10   A.  Yes, I did.

11   Q.  And what properties did you find?

12   A.  Again, I found a property in Texas.  I found a property --

13   Q.  Could you take a minute and describe for the jury the

14   property that you found in Texas?

15   A.  The one that I found in Texas was extremely large property.

16   I believe it was about 600 acres.  It was -- I believe it

17   already had an airstrip on it, and I don't recall much about

18   the residence on the property.  I just remember it being very

19   large.

20   Q.  What other states did you -- did you look for properties

21   in -- that was a bad question, but I think you get it?

22   A.  I looked for properties in Arizona as well as Colorado.

23   Q.  Tell us about the property that you found in Arizona?

24   A.  The properties that I found in Arizona, actually visited

25   that property with Miles Guo.

O78BGUO4                    Barnett - Direct

 1   Q.  I'm sorry.

 2   A.  I visited that property with Miles Guo.

 3   Q.  And could you describe the property for us?

 4   A.  It was a large property.  One part of it was up on a hill

 5   and it cascaded down almost like into a valley and it was in

 6   Sedona.

 7   Q.  What other state did you look for property in?

 8   A.  Colorado was the other state that I found property.

 9   Q.  Did you look for property in Connecticut?

10   A.  I looked at properties in Connecticut.  I believe that was

11   with Mr. Guo though.

12   Q.  Without telling us what it was, did you have an

13   understanding of what the purpose of these properties was?

14   A.  Yes.

15   Q.  And from whom did you get that understanding?

16   A.  Mr. Guo.

17   Q.  After you found these properties, did you communicate

18   information about these properties to others?

19   A.  Yes.

20   Q.  To whom?

21        THE COURT:  All right.  It's now 2:30, so we'll take

22   our half hour break.  Remember that you're not allowed to

23   discuss the case amongst yourselves.  Don't permit anyone to

24   discuss it in your presence.  Don't read, listen to or watch

25   anything from any source that touches on the subject matter of

O78BGUO4                          Barnett – Direct

1   this case.  Sir, you can step out.  Don't discuss your

2   testimony.

3           THE LAW CLERK:  Jury exiting.

4           (Jury not present)

5           THE COURT:  Please be seated.  Is there anything

6   before we return at 3 p.m.?

7           MR. FERGENSON:  Not from the government.

8           MS. SHROFF:  Not from us, your Honor.  Thank you.

9           THE COURT:  Okay.

10          (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                THE COURT:  Please be seated.

2                MS. SHROFF:  Your Honor, may I run to go get the

3       witness?

4                THE COURT:  Yes, go ahead.  Except, Ms. Shroff?

5                MS. SHROFF:  Yes, your Honor.

6                THE COURT:  I want to make a ruling before you do

7       that.  Can someone else get the witness?

8                MS. SHROFF:  Sure.

9                THE COURT:  All righty.

10               I have reviewed the transcript and case law.  And I

11      will permit the defense to pursue a broader line of

12      questioning, broader than what I had indicated at the sidebar.

13               The defense seeks to ask Scott Barnett what directions

14      he received from Mr. Guo when searching for a property.

15      Mr. Barnett may testify that Mr. Guo told him to look for a

16      property with certain characteristics.  Such instructions

17      constitute commands and are, therefore, not hearsay.

18               Oh, would the witness please exit.

19               THE WITNESS:  Oh, I'm sorry.

20               THE COURT:  *See United States v. Bellomo*, 176 F.3d

21      580, 586, (2d Cir. 1999).

22               I will permit the defense to elicit the specific

23      criteria that Mr. Guo gave to Mr. Barnett.  Mr. Barnett may

24      also testify that Mr. Guo told him why he was seeking a

25      property with those criteria.  Although this would not

Barnett - Direct

```
 1    constitute a command, such a statement would be indicative of
 2    Guo's "then-existing state of mind, such as motive, intent, or
 3    plan" under Rule 803(3).
 4            So long as the statement is forward-looking and not
 5    backward-looking, it is admissible under the state of mind
 6    hearsay exception pursuant to United States v. DiMaria, 727
 7    F.2d, 265, 270-71 (2d Cir. 1984).
 8            So now you may bring the witness back.
 9            MR. KAMARAJU:  Thank you, your Honor.  We'll get him.
10            (Witness present)
11            THE COURT:  All righty.
12            Let's have the jurors come in, please.
13            (Jury present)
14            THE COURT:  Please be seated.
15            Remember, sir, that you're still under oath.
16            THE WITNESS:  Yes, ma'am.
17            THE COURT:  You may continue the inquiry.
18            MS. SHROFF:  Thank you, your Honor.
19    BY MS. SHROFF:
20    Q.  Mr. Barnett, before we broke, we were discussing the
21    criteria you were given when looking for these properties.
22            Do you recall that?
23    A.  Yes.
24    Q.  And could you tell the jury what criteria you were given
25    while searching for these properties?
```

1    A.   The basic criteria had to be a large -- a large property;

2    had to be able to house numerous people, over 1,000 is really

3    the extent of it; it had to have the capabilities of being able

4    to have -- being able to have numerous houses on it; as well as

5    having access both by vehicle and airplane.

6    Q.   And did you look for properties that met that criteria?

7    A.   Yes.

8    Q.   And Mr. Barnett, did Mr. Guo tell you why it is that he was

9    looking for these types of properties?

10   A.   Yes, he did.

11   Q.   Why?

12   A.   It was explained to me that Mr. Guo felt that the -- best

13   way to put it is the world as we know it was not going to be

14   sustainable with COVID and the vaccines.  He felt like that

15   there would be a lot of deaths, there would be a lot of chaos,

16   the world would go into massive turmoil.  And he wanted to have

17   places set up for, as he called it, his people, so that they

18   would have places to go when this happened.

19   Q.   And who were his people?

20   A.   The Chinese people, meaning his supporters.

21   Q.   His what?

22   A.   Supporters.

23   Q.   And did he tell you what other reasons he was looking for

24   these properties?

25   A.   Well, primarily it was for that reason.  The reason for the

1   access for airplanes and that nature was to be able to go to

2   and from these properties, as well as bring in supplies, you

3   know, as needed.

4   Q.  And you mentioned it had to have space for 1,000 people.

5   Did you have an understanding of who these thousand people

6   would be?

7   A.  My understanding was -- for the way it was described to me,

8   was over 50,000 supporters.  But I don't have exact names or --

9   of who it would be or, you know, which people would go where.

10  Q.  Mr. Barnett, you testified about a property that you looked

11  at in Colorado; correct?

12  A.  That's correct.

13  Q.  And could you describe that property for me.

14  A.  It was a large property.  I don't recall the acreage.  It

15  had already had a runway on it.  I believe it was a grass

16  runway, if I remember correctly.  It had -- I believe it

17  already had different homes on it, but I'm a little fuzzy about

18  the details of the exact property.  I just remember it being

19  very large.  And I don't know, I remember the price tag being

20  quite big from -- I couldn't tell you exact amount, but it was

21  definitely 200 million, give or take.  I don't know the exact

22  amount.

23          MS. SHROFF:  Your Honor, could I just have a minute?

24          (Counsel conferred)

25  Q.  Mr. Barnett, did you visit the Colorado property or did you

1   just research it online?

2   A.  I just saw it online.  I did not visit it.

3   Q.  Mr. Barnett, you testified about the property in New

4   Jersey, you remember that?

5   A.  Yes.

6   Q.  Okay.  And were you aware of an anticipated purchase of a

7   restaurant also close to that property?

8            MR. FERGENSON:  Objection.

9            THE COURT:  Sustained.  Don't lead.

10  Q.  Mr. Barnett, were you told to look for the purchase of any

11  other property in Mahwah, New Jersey, the area of Mahwah, New

12  Jersey?

13  A.  Yes, I looked at other properties in Mahwah.

14  Q.  And what were those properties?

15  A.  The properties I looked at was mostly like office space and

16  warehouses.

17  Q.  And what else?

18  A.  There was one restaurant that I think that -- referring to,

19  but it was -- I don't believe it was for sale.

20  Q.  Mr. Barnett, as part of your job description at Mahwah, do

21  you recall purchasing any ready-to-eat meals in large

22  quantities?

23            MR. FERGENSON:  Objection to leading.

24            THE COURT:  You may answer.

25  A.  I personally purchased not in large quantities basic

1   different types of meals to kind of show Mr. Guo, you know,

2   what they were.  And then if he had approved those, and it was

3   approved by Yvette, then we would have purchased a bunch of

4   them.  We were looking into it, but we never purchased them.

5   Q.  And who were you going to purchase them for?

6   A.  For the plan that Mr. Guo had already wanted to do in

7   regards to having like different survival areas for the

8   supporters.

9          THE COURT:  What do you mean by "survival areas"?

10          THE WITNESS:  I considered those -- the properties in

11   regards to what he was looking for, was almost like survival

12   areas for what the -- for what his vision was as to what the

13   world was going to become.  That's kind of why I call it that.

14          THE COURT:  So in case there were some crisis, is that

15   what you're saying?

16          THE WITNESS:  That's correct.

17          THE COURT:  Go ahead.

18   BY MS. SHROFF:

19   Q.  Mr. Barnett, let me show you what is Defense Exhibit

20   60678A.  Do you recognize this document?

21   A.  Yes.

22   Q.  What is it?

23   A.  I believe it's one of the properties that we were looking

24   at.

25   Q.  And where is this property located, do you recall?

1   A.  I believe that one was in Arizona.

2           MS. SHROFF:  Your Honor, the defense moves DX 60678A

3   into evidence.

4           MR. FERGENSON:  May we briefly voir dire, your Honor?

5           THE COURT:  You may.

6           MR. FERGENSON:  Who prepared this document?

7           THE WITNESS:  I have no idea.

8           MR. FERGENSON:  We object.

9   BY MS. SHROFF:

10  Q.  Do you recognize the document regardless of who prepared

11  it?

12  A.  I recognize the property from seeing it before, but I never

13  visited the property, nor did I pick out that property myself.

14          MS. SHROFF:  Okay.  Let's scroll down.  Scroll down.

15  And keep going.

16  Q.  Do you recall reviewing this property for purchase by

17  Mr. Guo for fellow supporters?

18  A.  Yes, that I remember.  I remember that specific picture

19  that you're showing now.

20          MS. SHROFF:  Your Honor, we move again to have the

21  document admitted.

22          THE COURT:  Are you saying that it consists of only

23  those two pages that he just identified?

24          MS. SHROFF:  No, no, it's a larger document.  I'm

25  happy to have him scroll through it to see if he recognizes the

 1   entire document.

 2              THE COURT:  He would need to do that before it's

 3   admitted.

 4              MS. SHROFF:  Okay.  Can you keep scrolling down,

 5   please, Jorge.  Keep scrolling down.

 6   Q.  Do you recognize that document now, Mr. Barnett?

 7   A.  Yes, I do.

 8              MS. SHROFF:  Okay.  The defense moves to admit it into

 9   evidence.

10              THE COURT:  I just don't know how far you've gotten

11   through the document.  There's some photographs.  I don't know

12   if there's written language.

13   Q.  Do you recognize the document as it's unfolding before you?

14   A.  I do recognize it.  I can't tell you that I recognize every

15   single picture, but I do recognize the document.

16              MS. SHROFF:  Your Honor, we renew the motion to admit

17   the document into evidence.

18              THE COURT:  Was that the full document?

19              MS. SHROFF:  Yes, your Honor.

20              THE COURT:  And do you recognize the full document?

21              THE WITNESS:  Your Honor, I recognize some of the

22   photos in that document.  I can't tell you that I recognize all

23   the photos.

24              THE COURT:  What percentage do you recognize?

25              THE WITNESS:  It's definitely over 50 percent, your

1    Honor.

2              THE COURT:  I'll admit it.  Go ahead.

3              (Defendant's Exhibit DX 60678A received in evidence)

4              MS. SHROFF:  Your Honor --

5    Q.  Is this the property that you scouted, Mr. Barnett?

6    A.  It's one of the properties that was shown to me.  I did not

7    find this property personally.

8              MS. SHROFF:  And may we publish it to the jury,

9    please.  We can just keep scrolling, please.

10   Q.  Mr. Barnett, sitting here today, do you recall sending this

11   brochure to someone?

12   A.  I believe I sent this to Yvette.  I know -- I know it was

13   shown to Miles, and also I think it was sent to Anthony

14   Dibatista.

15   Q.  Mr. Barnett, was zoning one of the criterias that you were

16   asked to consider when looking for properties?

17   A.  Meaning what?  I don't know what that --

18   Q.  Whether property was zoned for a single dwelling or

19   multiple dwellings?

20   A.  No, it had to be -- some of the properties had to be

21   multiple dwellings, but there was always -- if it was just

22   regular like land, straight land, then there would have to

23   be -- there wasn't any zoning consideration at the time, it was

24   more of showing the property.  And then it would have to be

25   zoned for multiple -- multiple homes on the property.

1  Q.  Mr. Barnett, were you present -- let me try it a different

2  way.

3          MS. SHROFF:  You can take that down for me.

4          Thank you.

5  Q.  Mr. Barnett, were you aware of something called the Rule of

6  Law Foundation?

7  A.  Yes, I was aware of it.

8  Q.  And as part of your security experience, were you asked to

9  respond to protests undertaken by the Rule of Law Foundation

10  supporters?

11  A.  I didn't respond to -- well, I responded to one protest,

12  and that was in Grand Central Station.  I responded to that.

13  Q.  And who contacted you?

14  A.  I believe it was the -- the MTA police.  I can't remember

15  the -- I can't remember his name off the top of my head, but

16  I -- be honest with you, I can't remember how he got my phone

17  number.  But he had called me and asked me to come down to

18  speak with the protesters.

19  Q.  And did you do that?

20  A.  Yes, I did.

21  Q.  And what did you do as a result of being down there?

22  A.  Basically, alls I did was I talked to, I believe it was,

23  Prince Li at the time; explained to him, you know, about

24  following the rules of whatever the police department required.

25  And then after that, I spoke with -- I left a business card

1    with the two police officers that were in the train station,

2    and then spoke to the deputy after.  I believe it was on the

3    phone; I don't recall it being in person.  And he asked me, you

4    know -- I said, If they don't follow the rules then, they're

5    subject to be either summonsed or arrested.  It's just the way

6    it is.

7    Q.  Mr. Barnett, you testified about having been employed for

8    Mr. Guo for more than a year; correct?

9    A.  Yes.

10   Q.  And during that time, did you see him interact with fellow

11   supporters?

12   A.  Yes.

13   Q.  And what is your impression of his attitude towards the

14   fellow supporters?

15   A.  My impression of it is he loved them very much.  He was --

16   he was always talking to them.  They were like his primary

17   concern.

18   Q.  Mr. Barnett, on the Mahwah property, there is a part that

19   is called the gazebo; is that correct?

20   A.  There is a gazebo on the property; correct.

21   Q.  And were there plans to do something with the area that is

22   the gazebo?

23   A.  There may have been.  I don't know what those plans were.

24   Q.  Do you recall at all what the plans were for that area?

25        MR. FERGENSON:  Objection.  He just said he doesn't

1   know.

2           THE COURT:  Sustained.

3   Q.  Do you recall if there was ever a plan to have a

4   spaceship --

5           MR. FERGENSON:  Objection.

6           THE COURT:  Sustained.  Don't lead.

7   Q.  Do you recall of any other plans that you were aware of for

8   the building at Mahwah?

9   A.  I'm sorry?

10  Q.  Were you aware of any other plans for -- that were going to

11  be put in place at Mahwah?

12  A.  Yes, I was aware of other plans.

13  Q.  What were they?

14  A.  The only -- the only plan -- other plan that I'm aware of

15  was the -- the changing of a kitchen for the office space that

16  was going to be created on the first floor.

17  Q.  How about the outside area of Mahwah, were you aware of any

18  other plans?

19  A.  No, not in regards to the gazebo, I wasn't aware of that

20  plan.  I don't know when that plan was initiated because I was

21  out -- I left Mahwah in late August/early September.

22  Q.  Were there drones at Mahwah?

23  A.  No, there was an anti-drone system.  There were no drones

24  at Mahwah.

25  Q.  Okay.  What was the anti-drone system at Mahwah?

1   A.   Basically, the anti-drone system was a system that was

2   installed on the roof of the house in Mahwah.  And its

3   capabilities were that it can detect a drone, a launch of any

4   drone, I want to say about 15 to 20 miles out.  As soon as a

5   drone is launched, it will tell you exactly what that drone is,

6   what its capabilities were, where the person who was actually

7   flying the drone was standing.  And that's really the main --

8   its main capabilities.  There was supposed to be a camera that

9   would actually zoom into the location of that drone, but it was

10   never -- it was never installed.

11   Q.   Mr. Barnett, did you install this anti-drone equipment?

12   A.   No, I did not.

13   Q.   Was it already there when you got there?

14   A.   No, it was not.

15   Q.   Do you know who installed it?

16   A.   It was contracted through Prevenitas.  They hired a company

17   that installed it.  I don't recall the name of it.  I'd have to

18   see the paperwork for it.

19   Q.   Mr. Barnett, sitting here today, do you have any doubt

20   about the fealty Mr. Guo felt for his fellow supporters?

21            MR. FERGENSON:  Objection, your Honor.

22            THE COURT:  Sustained.

23            MS. SHROFF:  I have nothing further.

24            THE COURT:  Cross-examination.

25            MR. FERGENSON:  Thank you, your Honor.

1    CROSS-EXAMINATION

2    BY MR. FERGENSON:

3    Q.  Good afternoon, Mr. Barnett.

4    A.  Afternoon.

5    Q.  You were Miles Guo's head of security, right?

6    A.  That's correct.

7    Q.  You were -- in layman's terms, you were a bodyguard for

8    Miles Guo?

9    A.  Yes, that's correct.

10   Q.  You called him at times the principal, right?

11   A.  Yes.

12   Q.  And at times you called him boss, right?

13   A.  Correct.

14   Q.  Starting in October 2020, you were paid by Golden Spring,

15   right?

16   A.  That's correct.

17   Q.  You understood that that was Miles Guo's money; correct?

18   A.  No, I didn't understand that at that time, no, sir.

19   Q.  And you thought other people were paying for Miles Guo's

20   bodyguard?

21   A.  I wouldn't have had knowledge of that.  It was basically

22   hired by a company to do security services for an individual,

23   so I wouldn't have access to whoever funded that.

24   Q.  And then after Golden Spring, Lamp Capital paid you;

25   correct?

1   A.   Yes, that was switched from Golden Spring to Lamp Capital.

2   I don't remember the date though when that was done.

3   Q.   And Lamp Capital was another Guo family company, right?

4   A.   That I had no knowledge of.  We only received a couple of

5   paychecks from Lamp Capital, and I never really asked about why

6   the switch was done.

7   Q.   And fair to say you don't even know what Lamp Capital was,

8   right?

9   A.   I honestly have no idea what Lamp Capital was.

10  Q.   But you know you got money from it; correct?

11  A.   That's correct.

12  Q.   And then after that, HCHK paid you, right?

13  A.   Yes, I believe it was HCHK Technologies; and then later,

14  HCHK Properties, something like that.

15  Q.   And HCHK, those companies were run by Guo and Yvette?

16  A.   Yes.  So my immediate boss was Yvette, that's who I

17  reported to.  At that time that's pretty much her and Anthony

18  are who I reported to every day.

19  Q.   And HCHK had offices at Columbus Circle?

20  A.   Correct.

21  Q.   Guo had an office in HCHK's floor?

22  A.   Right.

23  Q.   And Yvette had an office on HCHK's floor?

24  A.   Yes, she did.

25  Q.   They were on opposite sides of the floor, right?

O78VGUO5                          Barnett - Cross

1   A.  No, I believe -- I believe Yvette's office -- I guess that

2   was later on.  So initially, yes.  And then eventually Yvette

3   had moved up to an upper floor.

4   Q.  And Guo and Yvette, they were together a lot, right?

5   A.  Yes.

6            MS. SHROFF:  Objection to what is a lot.

7            THE COURT:  You can ask him to gauge.

8   Q.  They were together every week, right?

9   A.  Yes, to my knowledge, when I was with them, yes.

10  Q.  Fair to say they worked closely together?

11  A.  Yes.

12  Q.  And now after -- withdrawn.

13           There came a point where you started your own company;

14  correct?

15  A.  That's correct.

16  Q.  Its name was -- tell me if I have this right.  Was it GS

17  Security Solution?

18  A.  That's correct.  It's called GS Security Solutions.

19  Q.  And you started that company with the help of Guo and

20  Yvette, right?

21  A.  Well, I started that company with the permission of Yvette.

22  Miles didn't really have any say in that.  I never had a

23  discussion with him in regards to that company; was with

24  Yvette, Max Krasner and Anthony Dibatista is who I discussed

25  that with.

O78VGUO5                        Barnett - Cross

1   Q.  And Yvette approved the plan for --

2   A.  That's correct.

3   Q.  For that company.

4        And Anthony Dibatista, you also discussed that plan

5   with him, right?

6   A.  I did.

7   Q.  Max Krasner, he had access to your company's books, right?

8   A.  Yes, he did.

9   Q.  And he was kind of a finance guy for the Guo family

10  companies, fair to say?

11  A.  Yes, he -- when I first met Max, he was the finance guy for

12  Golden Spring.

13  Q.  Max called Miles Guo boss, right?

14  A.  I believe so.

15  Q.  And Anthony called Miles Guo boss, right?

16  A.  Yes, I believe so.

17  Q.  And Yvette called Miles Guo the principal, right?

18  A.  Well, the only term she used with me was the P.  She never

19  used the full term "principal," just so you know.

20  Q.  You understood --

21  A.  That's correct.

22  Q.  -- that that meant principal; correct?

23  A.  Yes.

24  Q.  And they weren't the only employees who called Miles Guo

25  boss, right?

O78VGUO5                          Barnett - Cross

1    A.  No, a lot of people called him boss.

2    Q.  And they weren't the only employees -- Yvette wasn't the

3    only employee -- you and Yvette weren't the only employees who

4    called him the principal, right?

5    A.  That I don't know.  I don't -- that wasn't a common term.

6    It was a term that me and Yvette used with each other.  I

7    don't -- I don't remember -- I don't know if it was used with

8    my other team members, but I know it was used between me and

9    Yvette.  I don't remember anybody else calling him the

10   principal, but they may have, but I don't recall that.

11   Q.  But you and your team members also referred to him as

12   principal or P, right?

13   A.  Yeah.  Most of the time it would have been boss, but I

14   referred to him as P with Yvette all the time.

15   Q.  Now, after you started your company, your company received

16   money from HCHK, right?

17   A.  Correct.

18   Q.  And HCHK sent your company money on multiple occasions,

19   right?

20   A.  For payroll until it was fully -- fully switched over.  So

21   there was an agreement in regards to how the company was going

22   to be run and what services that I would be giving and getting

23   in return.

24   Q.  And in December 2022, your company received $50,000 from

25   HCHK Property Management?

1    A.   That's correct.

2    Q.   And in January 2023, your company received $400,000 from

3    HCHK, right?

4    A.   That's correct.

5    Q.   In February 2023, your company received $200,000 from HCHK,

6    right?

7    A.   That's correct.

8    Q.   So sir, in the three months leading up to Miles Guo's

9    arrest, your company received $650,000 from HCHK; correct?

10   A.   Correct.

11   Q.   And that was after Miles Guo had declared bankruptcy;

12   correct?

13   A.   I didn't know Miles Guo had declared bankruptcy.

14   Q.   He never told you that?

15   A.   No, he did not.

16   Q.   Sir, didn't you take him --

17        MS. SHROFF:   Objection as to hearsay that the

18   government is seeking to elicit.

19        MR. FERGENSON:   He's an opposing party, your Honor.

20        THE COURT:   Overruled.

21   Q.   Didn't you take him to court proceedings in Connecticut in

22   connection with bankruptcy?

23   A.   I did.  That's correct.

24   Q.   So what did you think he was going there for?

25   A.   I didn't know it was in regards to anything that was

Barnett - Cross

1    current, meaning HCHK.  I had no knowledge of that.

2    Q.  But you knew he had declared bankruptcy because you took

3    him to court --

4    A.  From a previous company, that's correct.

5            MS. SHROFF:  Your Honor, could Mr.  --

6            THE COURT:  Just allow him to answer.

7            MS. SHROFF:  Thank you.

8    Q.  But you understood that it was Miles Guo -- Miles Guo had

9    declared bankruptcy; correct?

10   A.  My understanding is the company declared bankruptcy.  I

11   don't know if it was Miles Guo personally.  But I did take him

12   to court, that's correct.

13   Q.  Was it Miles Guo who told you that the company declared

14   bankruptcy?

15   A.  No.

16   Q.  Did he ever tell you that he himself had declared

17   bankruptcy in early 2022?

18   A.  Not that I remember, not personally.

19   Q.  Now, Mr. Barnett, since Miles Guo's arrest, you've

20   continued working for the Guo family, right?

21   A.  That's correct.

22   Q.  You still work for the Guo family, right?

23   A.  Yes, I do.

24   Q.  Miles Guo's daughter is your client?

25   A.  That's correct.

1    Q.  Mei Guo is her name?

2    A.  Yes, it is.

3    Q.  Mei Guo is your most important client, right?

4    A.  That's correct.

5    Q.  And that's just -- you know, before Miles Guo's arrest, he

6    was your most important client, right?

7    A.  He was one of them, that's correct.  The companies also.

8    The whole -- the whole entity was the most important company.

9    Q.  And, in fact, Mei Guo is your only major client, right?

10   A.  That's constant client, that's correct.

11   Q.  And I think you testified -- I think you testified on

12   direct, but correct me if I'm wrong, that your other client

13   engagements were very minimal?

14   A.  That's correct.

15   Q.  Now, since Miles Guo's arrest, you've received money sent

16   by individuals who are not your actual clients; correct?

17   A.  I guess so, yes.  I mean, meaning my invoices, how they are

18   paid, is that what you're asking, sir?

19   Q.  Well, individuals who are not your actual clients have sent

20   your company money since Miles Guo's arrest; correct?

21        MS. SHROFF:  Objection to the form.

22        THE COURT:  Overruled.  You may answer.

23   A.  I don't know if they are individuals.  I just give an

24   invoice to Mei, and then she has whatever, pays the invoice.

25   Q.  And since Miles Guo's arrest, you've received monies sent

O78VGUO5                           Barnett - Cross

 1    by companies who are not your actual clients; correct?

 2    A.  I'm unaware of who is actually sending the money; I just

 3    know it does arrive in my bank.  I don't have an exact name of

 4    each person or how Mei sends the money.

 5          THE COURT:  But the question is whether those

 6    individuals or entities are actually your clients.

 7          THE WITNESS:  No, they are not my clients.  Mei Guo is

 8    my client.

 9    Q.  And sir, on May 4th, 2023, your company received $152,000

10    approximately from an individual named Jingrui Sun, right?

11    A.  Yeah, I did receive that money.  I couldn't tell you if

12    that's who it was from, but I did receive that money.

13    Q.  And the next month, on June 12, 2023, your company received

14    over $25,000 from a company called HGA Property Operation LLC,

15    right?

16    A.  Yes.

17    Q.  And that same month, on the next day, on June 13, 2023,

18    your company received an incoming wire of $105,000 from an

19    individual named Shengxu Wang; correct?

20    A.  I did receive that money.  Again, I don't know who those

21    were from.  Those are all invoices for securities services.

22    Q.  And, sir, you work for the NYPD, right?

23    A.  Yes, sir.

24    Q.  And you know a money mule is someone who receives and

25    transfers fraud proceeds, right?

1            MS. SHROFF:  Objection.

2            THE COURT:  Overruled.  You may answer.

3  A.  Yes.  Provides services for that money.  It's not -- I

4  don't just get money; I provide service for that, sir.

5  Q.  No, no, I'm talking about money mules.

6  A.  Oh, in general.  I thought you were calling me one.  I'm

7  sorry.

8  Q.  No, no.  But you're aware that that's what a money mule is,

9  right?

10 A.  Yes.

11 Q.  And on July 6, 2023, your company received over $107,000

12 from an individual named Xuehong Zhang; correct?

13 A.  I did receive that money, yes, sir.

14 Q.  And then on September 5th, 2023, your company received over

15 $49,000 from an individual named Desheng Yin; correct?

16 A.  Again, I received that money.

17 Q.  And then the next month, on October 30, 2023, your company

18 received $10,000 from that same entity, HGA Property

19 Operations; correct?

20 A.  That's correct.  That was for an invoice for legal fees;

21 correct.

22 Q.  And then after that, the next month, on November 10, 2023,

23 your company received over $55,000 from a wire that was from an

24 individual named Yu Xuanlin; correct?

25 A.  That's correct.

O78VGUO5                          Barnett - Cross

1   Q.  And that was transferred through the Overseas Chinese

2   Banking Corporation Ltd. in Singapore; correct?

3   A.  I assume so.  You know better than I would.

4   Q.  And then the next month, on December 7th, 2023, your

5   company received another $55,000, approximately, from that same

6   individual; correct?

7   A.  Yes, I received that money for invoices; correct.

8   Q.  And then coming into this year, on January 16th, your

9   company received — again from this same individual — over

10  $55,000; correct?

11  A.  Correct.

12  Q.  And then the next day, on January 17th, your company

13  received $55,000 from a different individual, Wei Lai; correct?

14          THE COURT:  Counsel, please step up.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O78VGUO5                         Barnett - Cross

1            (At sidebar)

2            THE COURT:  So I need to protect him from

3    self-incrimination.  Is his lawyer here?

4            MR. FERGENSON:  I'm not sure, your Honor.

5            MS. SHROFF:  No, he's not, your Honor.  We told him

6    that he was going to testify today.  And his lawyer is away, as

7    best as I can tell.  But he's had somebody in -- who can step

8    in.  But I'm happy to take a break and call.

9            But I think the government knows about all of this and

10   the government never asked him any of these questions when they

11   proffered him several, several times.

12           THE COURT:  Have you asked these questions of him

13   beforehand?

14           MR. FERGENSON:  No.

15           MS. SHROFF:  No, they didn't ask.

16           MR. FERGENSON:  He's not our witness, your Honor.

17           THE COURT:  No, no, no.  I just don't know whether or

18   not you've had any contact with him.

19           I think I need to take a little recess and talk to

20   him.

21           MS. SHROFF:  Sure.

22           (Continued on next page)

23

24

25

O78VGUO5                          Barnett - Cross

1              (In open court)

2              THE COURT:  Members of the jury, we're going to take a

3    brief break.  I will call you back in a few minutes.

4              (Jury not present)

5              THE COURT:  Please be seated.

6              Sir, you have been asked a series of questions

7    concerning an inflow of a considerable amount of money into

8    your account.  I am concerned that you may be answering these

9    questions without the proper advice of an attorney.

10             THE WITNESS:  Okay.

11             THE COURT:  And so I want you to know that you have

12   the right to not answer these questions and you have the right

13   to consult an attorney.  Do you have somebody who is on call?

14             THE WITNESS:  I do have someone I can call.

15             THE COURT:  All righty.  I'd like you to take a break

16   and to make a call and to express to your attorney my concern

17   about this line of questioning.

18             THE WITNESS:  Okay.

19             THE COURT:  And then ask for his or her advice about

20   whether you should continue to answer questions about the

21   subject matter.

22             THE WITNESS:  Okay.

23             THE COURT:  All righty?

24             THE WITNESS:  Yup.

25             THE COURT:  Okay.

1          So go ahead and we will wait for you to come back.

2     He'll have to get his phone.

3          In the meantime, we can call another witness.  You may

4     go downstairs.  And just when you're finished, come back and --

5          MS. SHROFF:  Your Honor, may we just confer with him

6     about if he can use -- if he knows the phone number, he can

7     certainly use one of our phones.  That's the only thing I was

8     going to offer.

9          THE COURT:  Or maybe the name of the attorney can be

10    put into Google and you can find that phone number.

11         MS. SHROFF:  I do have his attorney's name.  I'm happy

12    to get in touch with the attorney and hand over the phone to

13    Mr. Barnett.  I'll just give him my phone so he can call his

14    attorney after I give him the number.

15         THE COURT:  Okay.  Mr. Fergenson?

16         MR. FERGENSON:  That's fine, your Honor.

17         We also have the cell phone number of his attorney.

18         MS. SHROFF:  That attorney is not around today, that

19    particular attorney.

20         We'll figure it out, your Honor.  But I'm just going

21    to give him the number of the contact attorney and let him call

22    him.

23         THE COURT:  Okay.

24         MS. SHROFF:  Okay.

25         THE COURT:  And in the meantime, I'd like you to call

1    another witness.  Is there somebody at the ready?

2              MR. KAMARAJU:  We do have someone.  I just want to

3    swap out with Ms. Shroff.

4              THE COURT:  Okay.

5              MS. SHROFF:  Your Honor, Mr. Barnett is on the phone

6    with his counsel.  Would the Court prefer to just give him five

7    minutes or should we start and interrupt again?

8              THE COURT:  I want to get as much in as possible.  So

9    if we could have your next witness.

10             MS. SHROFF:  She's right here.

11             THE COURT:  All righty.  If you'll come to the stand,

12   please.  And if you'll have the jurors brought in.

13             MS. SHROFF:  Your Honor, could we ask for a standby

14   interpreter for Ms. Li?

15             She has requested a standby interpreter.  She has

16   English and Mandarin fluency of --

17             THE COURT:  One second.

18             The answer is yes on the standby interpreter.

19             You can have the jurors brought in, please.

20             (Jury present)

21             THE COURT:  Please be seated.

22             Members of the jury, in the interest of efficiency, I

23   have decided that, for logistical reasons, we're going to take

24   the testimony of another witness.

25             You may swear the witness.

1     LEANNE LI,

2          called as a witness by the Defendant,

3          having been duly sworn, testified as follows:

4               THE COURT:  All right.  You can make the inquiry.

5     DIRECT EXAMINATION

6     BY MS. SHROFF:

7     Q.  Good afternoon, Ms. Li.

8     A.  Good afternoon.

9     Q.  Ms. Li, where were you born?

10    A.  I was born in China.

11    Q.  And how long did you live in China?

12    A.  Until I was 11, 12 years old.

13    Q.  And where in China did you live?

14    A.  I lived in Beijing.

15    Q.  And in Beijing, did you attend elementary school?

16    A.  Yes.

17    Q.  What school did you go to?

18    A.  I don't remember the name.

19    Q.  Ms. Li, did there come a time when you left China?

20    A.  Yes.

21    Q.  And how old were you when you left?

22    A.  Eleven or 12 years old.

23    Q.  And with whom did you leave China?

24    A.  My parents.

25    Q.  Do you recall what year that was?

O78VGUO5                          Leanne Li - Direct

1    A.   2001 or 2002, around that time.

2    Q.   Ms. Li, after you left China, where did you move to?

3    A.   I moved to Vancouver, Canada.

4    Q.   And did your parents move with you?

5    A.   Yes.

6    Q.   Did you attend school in Vancouver?

7    A.   Yes.

8    Q.   Where did you go to school?

9    A.   Fairview.

10   Q.   And did you attend college?

11   A.   Yes.

12   Q.   Where did you go to college?

13   A.   I went to University of Ottawa.

14   Q.   And did you graduate from University of Ottawa?

15   A.   Yes.

16   Q.   And with what degree did you graduate?

17   A.   Business degree.

18   Q.   Did you attend any other schooling after you graduated from

19   the University of Ottawa?

20   A.   Yes.

21   Q.   Where did you go to school?

22   A.   UBC.

23   Q.   What is UBC?

24   A.   Sorry.  Let me clarify that, okay.  So it's University

25   British Columbia.

O78VGUO5                     Leanne Li - Direct

```
 1    Q.  And what did you study there?

 2    A.  Real estate.

 3    Q.  And for how long did you study real estate?

 4    A.  For a year.

 5    Q.  And as a result of those studies, did you get a license?

 6    A.  Yes.

 7    Q.  And what are you licensed to do?

 8    A.  To become a Realtor agent.

 9    Q.  And were you, in fact, working as a Realtor agent in

10    Canada?

11    A.  Yes.

12    Q.  We'll come back to that.  But first let me ask you, Ms. Li,

13    are you currently employed?

14    A.  Yes.

15    Q.  And who do you work for now?

16    A.  I work for Heran Hao.

17    Q.  Ms. Li, what company do you work for?

18    A.  I work for G Fashion.

19    Q.  And G Fashion what?

20    A.  I'm sorry, I don't understand the question.

21    Q.  Okay.  Where do you live now?

22    A.  I live in Milan.

23    Q.  Milan as in what country?

24    A.  Italy.

25    Q.  And what is your title right now?
```

O78VGUO5                              Leanne Li - Direct

```
 1    A.  CEO.

 2    Q.  CEO of what?

 3    A.  Of G Fashion.

 4    Q.  Ms. Li, when did you first hear of Miles Guo?

 5    A.  In 2017.

 6    Q.  And where did you first hear of Miles Guo?

 7    A.  I heard him on YouTube.

 8    Q.  And could you describe what kind of program was it on

 9    YouTube where you first saw him.

10    A.  I'm sorry, can you rephrase that?

11    Q.  Sure.

12         On YouTube, was it a live broadcast or a replay?

13    A.  At that time it was a replay, I think.

14    Q.  And do you recall sitting here today when you heard that

15    replay what it is that Mr. Guo was talking about?

16    A.  He was talking about corruptions of the CCP and -- and let

17    me think.  And CCP was using BGY strategies to the future is

18    the west.  And he was talking about the love scandals between

19    the high-rank Chinese government officials with -- yes, with

20    all the celebrities in China.

21    Q.  So let's break that down, Ms. Li.

22         What is BGY?

23    A.  BG --

24    Q.  Could you see if you can adjust the mic so you don't have

25    blowback.
```

Leanne Li - Direct

1    A.   Is it better now?

2    Q.   I think so.

3    A.   Okay.  So B represented blue, means networking, monitoring,

4    and controlling.  So the Chinese government say they can

5    manipulate the social medias and work towards to their favor.

6         BG -- BGY -- okay.  G means gold, represent gold.  So

7    they're using -- they are using money to bribe all the

8    political -- political figures and influencing people around

9    the world so that these people -- so will do whatever they are

10   asking for.

11        And BG -- Y stands for yellow.  So they are using

12   sexually bribing the political figures and also the influential

13   people.  And after that, they use that videos or message to

14   blackmail them so that these people will -- will listen to

15   whatever they're asking them to do.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

500

O78BGUO6                         Leanne Li - Direct

1   BY MS. SHROFF:

2   Q.  And then you said -- I had a little trouble there.  Ms. Li,

3   were you trying to say they were "infiltrating" the media; is

4   that the word?

5   A.  Yes, correct.

6   Q.  Now, Ms. Li, have you ever met Miles Guo in person?

7   A.  No.

8   Q.  Is this the first time you're seeing Miles Guo in person?

9   A.  Yes.

10  Q.  And after seeing Miles Guo in the 2017 YouTube, did you

11  continue to watch broadcasting by Mr. Guo?

12  A.  Yes.

13  Q.  And for how many years did you watch the broadcast, from

14  what year to what year?

15  A.  From 2017 to 2020, first half of year.

16  Q.  First half of 2020?

17  A.  Correct.

18  Q.  Why did you stop watching after the first half of 2020?

19  A.  Because I went to LA to work for G Fashion.

20  Q.  And what did that have to do with you stopping to watch

21  videos?

22  A.  Because I was so busy, I do not have time to watch his live

23  broadcast.

24  Q.  Ms. Li, did there come a time after 2017 when you were

25  contacted by Miles Guo?

O78BGUO6                        Leanne Li – Direct

1    A.  Yes.

2    Q.  When was that, do you remember?

3    A.  I think it was 2018.

4    Q.  And how did Mr. Guo contact you?

5    A.  He contact me through Guo Media.

6    Q.  Through what?

7    A.  Guo Media.

8    Q.  And could you explain how that came about?

9    A.  What do you mean by that?  I'm sorry.  Can you rephrase

10   your question again?

11   Q.  So did he call you through Guo media?

12           Did he DM you?

13           How did the contact happen?

14   A.  So he send me a direct message on Guo Media.

15   Q.  And what is a direct message?

16   A.  He said hi.

17   Q.  No, what is it?  I understand what his direct message was.

18   My question is, what is a direct message?

19   A.  Direct message is private chat, so he send me a message

20   through private chat.

21   Q.  Okay.  And were you active on Guo Media at that time?

22   A.  Yes.

23   Q.  And do you know -- could you describe Guo Media for the

24   jury?

25   A.  Okay.  Guo media was social platform like a Twitter, like a

O78BGUO6                    Leanne Li - Direct

1   app that people can exchange information, upload videos.

2   Q.  Did you have an account on Guo Media?

3   A.  Yes.

4   Q.  And what language was Guo Media available in or in what

5   language was Guo Media available?

6   A.  I think it was Chinese and English.

7   Q.  And which language did you use?

8   A.  I use English.

9   Q.  And why did you use the English version of the app?

10  A.  Because that was the default mode.

11  Q.  Because that was the what?

12  A.  The default mode.

13  Q.  The default mode?

14  A.  Yes.

15  Q.  Ms. Li, are you fluent in both English and Mandarin?

16  A.  Well, I don't know how to say that because I was born in

17  China, study until 11, 12, and then afterwards I move to

18  Canada.  I speak English.  Now living Italy, I'm learning

19  Italian right now, so my language system is all messed up.  So.

20  Q.  Okay.  Ms. Li, what did you use -- what did you primarily

21  use Guo media for?

22  A.  I was use to upload the videos that I made.

23  Q.  And what videos did you make, videos yourself?

24  A.  Yes.

25  Q.  Of what?

O78BGUO6                    Leanne Li - Direct

1    A.  I translate some parts of Mr. Guo's live broadcast, and I

2    add the subtitle, English and Chinese subtitle on video club.

3    Q.  Hold on, Ms. Li.

4            When you just testified that you made videos, you

5    don't mean you made videos.  Let me try this again.  They

6    weren't videos about you that you made, correct?

7    A.  Sorry.  I don't understand your question.

8    Q.  The videos that you made, describe the process of how you

9    made these videos?

10   A.  Okay.  So I will watch Mr. Guo's live broadcast.  After I

11   finish his live broadcast, I will pick, myself, the most

12   important part, or the part I think the western people need to

13   know, the whole world need to know.  So I would download those

14   part, only that part, and then afterwards I add the subtitle,

15   English subtitle, so people can able to understand.

16   Q.  And after you did that, did you upload the video?

17   A.  Yes, I upload the video.

18   Q.  To where?

19   A.  To Guo Media.

20   Q.  Did somebody ask you to do this or did you do this by

21   yourself?

22   A.  I did it by myself.

23   Q.  And why?

24   A.  Because I think whatever what Mr. Miles said, you know, it

25   is very important for people to know these things are really

O78BGUO6                          Leanne Li – Direct

1    happening in China, and then they try to infiltrate the west.

2    So I think the western people need to know about this.  This is

3    very important.

4    Q.  Did you post these translated videos on any other social

5    media other than Guo Media?

6    A.  YouTube.

7    Q.  As a result of posting of these videos, Ms. Li, did

8    anything happen to your own account on Guo Media?

9    A.  Can you ask that question again?

10   Q.  Sure.  After you posted these videos, did you gain

11   followers on your account?

12           MS. MURRAY:  Objection, your Honor.  She's testifying.

13           THE COURT:  I'll allow the question.  Go ahead.

14   A.  Yes.

15   Q.  How many followers did you have?

16   A.  I don't remember.

17           MS. SHROFF:  Your Honor, may we have one quick

18   sidebar?

19           THE COURT:  Yes.

20           (Continued on next page)

21

22

23

24

25

O78BGUO6                    Leanne Li – Direct

1              (At the sidebar)

2              MS. SHROFF:  I just receive Mr. Barnett is squared

3      away, and he has some work whatever issues.  I don't know if

4      you wanted to finish --

5              THE COURT:  Yes, we can finish with him.  We'll bring

6      him back.

7              MS. SHROFF:  We don't even have to leave the jury.

8              THE COURT:  No. We'll just leave them in place.  Sure.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO6                        Barnett- Cross

```
 1              (In open court)

 2              THE COURT:  Members of the jury, we are going to go

 3    back to the prior witness now.  You can go out of the

 4    courtroom.  Don't discuss your testimony.

 5              THE WITNESS:  Okay.

 6              THE COURT:  We're going to go back to the cross

 7    examination of Mr. Barnett.

 8              (Witness entered the courtroom)

 9              THE COURT:  And, sir, remember that you're still under

10    oath.

11              THE WITNESS:  Yes, ma'am.

12

13    GERALD SCOTT BARNETT,

14    CROSS-EXAMINATION CONTINUED

15    BY MR. FERGENSON:

16    Q.  Mr. Barnett, when we broke we were talking about certain

17    payments your company had received.  Do you recall that?

18    A.  Yes, I do.

19    Q.  It's a fact, sir, that you've received at least over

20    $500,000 from individuals or companies who are not your actual

21    clients, right?

22    A.  That's correct.

23    Q.  And you said you provided services for that money, right?

24    A.  That's correct, I provided security services for all that

25    money.
```

1   Q.  But you didn't provide services to those people who sent

2   you that money, right?

3   A.  No, sir.

4   Q.  You provided those services to Miles Guo's daughter, right?

5   A.  That's correct.

6   Q.  And then you sent Miles Guo daughter's invoices, right?

7   A.  That's correct.

8   Q.  And then these other people whom you don't even know sent

9   you hundreds of thousands of dollars, right?

10  A.  Yes, sir.

11  Q.  Now, the Guo family has helped pay for your lawyers as

12  well, right?

13  A.  No, I had to do a Go Fund Me for that.

14  Q.  Before the Go Fund Me, sir, didn't you ask Mei Guo for help

15  paying for your bankruptcy lawyers?

16  A.  I did. That's correct.

17  Q.  And you needed a lawyer because you got sued for the money

18  your company had received from HCHK, right?

19  A.  That's correct.

20  Q.  You were sued by the U.S. bankruptcy trustee in Miles Guo's

21  bankruptcy?

22  A.  That's correct.

23  Q.  And you talked to Victor Cerda about that, right?

24  A.  Yes, I did.

25  Q.  Victor Cerda is a lawyer for the Guo family, right?

1    A.  Yes.

2    Q.  And you knew Cerda from your work for the Guo family,

3    correct?

4    A.  Yes.

5    Q.  And Victor Cerda helped you find the bankruptcy lawyer who

6    represented you in that proceeding, right?

7    A.  I believe Mei Guo found that attorney for me.  I'm not sure

8    who found that attorney.

9    Q.  And Victor Cerda help pay for that attorney?

10   A.  Originally for the initial $10,000 that I invoiced for,

11   that was from Victor, correct, his law firm.

12   Q.  And Victor Cerda helped pay for your criminal lawyers too,

13   right?

14   A.  I think in the beginning, I believe so.

15   Q.  And Victor Cerda asked that you talk to Miles Guo's defense

16   lawyers, right?

17   A.  I don't recall that.

18   Q.  And you did talk to Miles Guo's defense lawyers, right?

19   A.  I did in the very, very beginning, but I don't think Victor

20   ask me to do that.  I don't recall that, but I remember having

21   that conversation in New Jersey.

22   Q.  And Victor Cerda also wanted you to testify in this trial,

23   right?

24   A.  Yes, I believe he did, correct.

25   Q.  And you did that too, right?

| | |
|---|---|
| 1 | A.  I was subpoena to.  I said, if you want me to testify, you |
| 2 | have to subpoena me. |
| 3 | Q.  And you mention a Go Fund Me a few moments ago, right? |
| 4 | A.  That's correct. |
| 5 | Q.  Victor Cerda help you set up your Go Fund Me, right? |
| 6 | A.  Well, I set up my own Go Fund Me, and I shared it with him, |
| 7 | correct? |
| 8 | Q.  You did that because he was going to help you get donations |
| 9 | to that Go Fund Me? |
| 10 | A.  I had hoped so, correct? |
| 11 | Q.  That was your understanding, right? |
| 12 | A.  That's why I sent it to him, yes. |
| 13 | Q.  You understood that Victor Cerda was going to send your Go |
| 14 | Fund me to a guy name Long Island David, right? |
| 15 | A.  That I didn't have that conversation with him.  I didn't |
| 16 | know who he sent it to. |
| 17 | Q.  You knew he was going to send it to Miles Guo's supporters, |
| 18 | right? |
| 19 | A.  That's correct, yes. |
| 20 | Q.  And, in fact, it was sent to Miles Guo's supporters, right? |
| 21 | A.  Yes. |
| 22 | Q.  And you raised tens of thousands of dollars in your Go Fund |
| 23 | Me from them, right? |
| 24 | A.  That's correct, all spent on attorneys. |
| 25 | MS. SHROFF:  Your Honor, could the government please |

1   let Mr. Barnett finish.

2          THE COURT:  So permit him to answer before the next

3   question.

4   Q.  You don't know who those people are either, right?

5   A.  I don't recognize the names on there, I do not.

6   Q.  But you know they sent you money, right?

7   A.  Of course.  I get a thing from Go Fund Me that shows who

8   sent money.

9   Q.  Now, Mr. Barnett, you testified about various large

10  properties that you looked at in person or online, right?

11  A.  That's correct.

12  Q.  Now, nobody actually bought those properties, right?

13  A.  Nope.

14  Q.  And when you were looking at those properties, Miles Guo

15  had already purchased Mahwah, right?

16  A.  Yes, this was after Mahwah.

17  Q.  And you went on at least one trip, correct?

18  A.  Trip?

19  Q.  Like you went in person to one of the properties, correct?

20  A.  That's correct.

21  Q.  And was part of that trip a vacation for the Guo family?

22  A.  It was a vacation/business trip.  Any trip that we went on

23  regarding Miles was always really 80 percent of his business,

24  but the family did come along on that trip, correct.

25  Q.  You and Miles Guo were on that trip, right?

1    A.  Yes.

2    Q.  And other of your security team were on that trip, right?

3    A.  That's correct, the whole security team.

4    Q.  And Gladys Chow went on that trip?

5    A.  Yes, she did.

6    Q.  And Gladys Chow was Miles Guo's translator, right?

7    A.  Yeah, she translated for me.  I don't know if that was her

8    exact title, but she did translate.

9    Q.  Her formal company she worked for was HCHK, right?

10   A.  Yes.

11   Q.  In terms of what she actually did, she was Miles Guo's

12   personal translator, right?

13            MS. SHROFF:  Objection.

14            THE COURT:  You may answer.

15   A.  Yes, she translated.  That's correct.

16   Q.  And she was also performing kind of personal assistant type

17   task as well, right?

18   A.  That's correct.

19   Q.  And in addition to you, security guys, Gladys Chow, Miles

20   Guo's wife went on that trip, right?

21   A.  On that trip, yes.

22   Q.  And Miles Guo's daughter's fiancee' went on that trip,

23   right?

24   A.  I don't remember him being on that particular trip.

25   Q.  Wayne Cao is --

1   A.  I don't remember him being there, but I can't say that he

2   wasn't.  I'm trying to remember who went on that trip.  Sorry.

3   I went on a few trips.  I'm just trying to remember what trip

4   that was.

5   Q.  Just on Mei Guo's fiancee', that's Defeng Cao, right?

6   A.  Yes.

7   Q.  He also goes by Wayne Cao?

8   A.  I call him Wayne, correct.

9   Q.  And after looking at that property in person, nobody bought

10  it, right?

11  A.  No.

12  Q.  Now, it wasn't just large properties that you looked at as

13  part of your work for Miles Guo, right?

14  A.  That's correct.

15  Q.  You also looked at penthouse apartments in Manhattan,

16  correct?

17  A.  Yes, that's correct.

18  Q.  They were worth tens of millions of dollars, correct?

19  A.  I guess.

20  Q.  Some of them only had four bedrooms, correct?

21  A.  Yes.  The one that I went on, yes, that's correct.

22  Q.  And there are four people in Miles Guo's immediate family,

23  correct?

24  A.  As far as I know, correct.

25  Q.  There's Miles Guo, right?  There's Miles Guo's wife, right?

O78BGUO6                    Barnett- Cross

```
1    A.  Yeah, as far as I know that's correct.

2    Q.  And then there's Miles Guo's son, right?

3    A.  Yes.

4    Q.  And then there's Miles Guo's daughter?

5    A.  That's correct.

6    Q.  Now, those penthouse apartments, they weren't purchased

7    either, right?

8    A.  No, not that I know of.

9    Q.  What was purchased was a property earlier in Mahwah, New

10   Jersey, right?

11   A.  That's correct.

12   Q.  And you had a role with that property, fair to say?

13   A.  Yes.

14   Q.  And you discussed that role with Yvette, right?

15   A.  That's correct.

16   Q.  And you discussed Taurus Fund with Yvette, right?

17   A.  I didn't discuss Taurus Fund with Yvette, but I did discuss

18   if we had like an invoice, it would go to Yvette.

19          MR. FERGENSON:  If we could pull up, Ms. Loftus,

20   what's in evidence and publish it GX Buck 1234.

21   Q.  Sir, you know what Taurus Fund LLC is, right?

22   A.  Do I know that they purchase the house in New Jersey,

23   that's correct.

24   Q.  And the entity held title to the Mahwah mansion, it was

25   Taurus Fund LLC?
```

O78BGUO6                         Barnett- Cross

 1   A.  That's correct.

 2            MS. SHROFF:  Is he showing something?

 3            MR. FERGENSON:  It's being fulled up.

 4   Q.  And while we're waiting, I'll just ask a few questions.

 5            You were one of the managing members of Taurus Fund,

 6   LLC?

 7   A.  So, on paper they had me down as a manager.  That wasn't my

 8   idea of what my job role was.  So when they ask me to be a

 9   manager, I just thought they just meant to manage the property

10   and install the security services.  It wasn't to manage Taurus

11   Fund because I would have no experience, nor would I undertake

12   something like that.

13   Q.  Did you know what Taurus Fund was?

14   A.  No, I just assume it was a company.

15   Q.  But you were given paperwork by Aaron Mitchell to sign?

16   A.  Yes.

17   Q.  And Aaron Mitchell was another lawyer for the Guo family,

18   right?

19   A.  Yes, he was.

20   Q.  He was close with the Guo family, right?

21   A.  Yes.

22   Q.  Fair to say he was a trusted person in the inner circle?

23            MS. SHROFF:  Objection.

24            THE COURT:  You may answer.

25   A.  I don't have an answer for you on that.

1           THE COURT:  I need for you to speak into the

2    microphone so everyone can hear you.

3    A.  He was friendly with them.  I don't know how close he was.

4    I wasn't that close with Aaron, so I don't know.

5    Q.  And you signed the paperwork that Aaron Mitchell gave you,

6    right?

7    A.  I did.

8    Q.  And you thought the paperwork made you some kind of

9    property manager, right?

10   A.  So when I signed it, I didn't really understand.  I just

11   thought it meant to manage the property, and I didn't really

12   understand the whole ins and outs of it until later on.

13   Q.  And, Mr. Barnett, we got the document up now.  Do you see

14   towards the middle of the page it says on the right, it says

15   entity name?

16   A.  Yes, I do.

17   Q.  And it says Taurus Fund LLC to the right of that?

18   A.  Yep.

19   Q.  If we could go to page three, please.  Why don't we zoom on

20   the boxes four, five and six.  You see on number six it says

21   name and address of each manager or managing members?

22   A.  Yes.

23   Q.  And number two is Scott Barnett, that's you, right?

24   A.  That's correct.

25   Q.  Do you live in Las Vegas, Nevada?

O78BGUO6                    Barnett- Cross

 1  A.  No, I do not.

 2  Q.  Is that your correct address?

 3  A.  No, it is not.

 4  Q.  Now, you didn't think you were actually the owner of the

 5  Taurus Fund LLC, correct?

 6  A.  No, I did not.

 7  Q.  You learned what the paperwork you signed actually meant

 8  after filing bankruptcy, right?

 9  A.  After I showed it to my attorney, he explained it to me.

10  Q.  And that was when you got sued in the bankruptcy, right?

11  A.  That's correct.  They put me down as the owner of it which

12  took me a little bit by surprise, correct.

13  Q.  Because that's not true, sir, you're not the actual owner

14  of the Mahwah mansion, right?

15  A.  No, I'm not.

16        MR. FERGENSON:  And we can take that down, Ms. Loftus.

17  Q.  That wasn't your house, right?

18  A.  No.

19  Q.  But you did take Miles Guo there, correct?

20  A.  Yes, I did take him there.

21  Q.  And he was there two to three times a week?

22        MS. SHROFF:  Objection, misstates testimony.

23        THE COURT:  Overruled. You may answer.

24  A.  I took him there.  I don't think it was two or three times

25  a week, maybe in the beginning when it first started.  Other

O78BGUO6                          Barnett- Cross

1   than that, it was sporadic.  And I wasn't with him everyday so

2   I don't have an actual accounting of how many times he was

3   there.

4   Q.  Sure.  You didn't have a bedroom there?

5   A.  No, I did not.

6   Q.  Miles Guo had a bedroom there, right?

7   A.  Yes, on the second floor.

8   Q.  And Miles Guo's wife had a bedroom there?

9   A.  That's correct.

10  Q.  Miles Guo's son had a bedroom there?

11  A.  Yes.

12  Q.  Miles Guo's daughter had a bedroom there?

13  A.  That's correct.

14  Q.  Miles Guo daughter's fiancee' had a bedroom there?

15  A.  That I don't know.

16  Q.  And, in fact, the Guo family did not just have bedrooms

17  there; is that correct?

18          MS. SHROFF:  Objection, what's the question.

19  Q.  The question was, the Guo family didn't just have bedrooms

20  at Mahwah mansion, correct?

21          MS. SHROFF:  Objection to form.

22          THE COURT:  You can answer.  Did they have something

23  in addition to bedrooms.

24  A.  I don't understand the question.  I know what you're

25  asking, but I don't know what you're referring to.

Barnett- Cross

```
 1   Q.  Let me rephrase.  These weren't just bedrooms.  They were
 2   whole wings, correct?
 3   A.  That's correct.
 4   Q.  They were multi-rooms portions of this mansion were just
 5   for --
 6   A.  Yes, one side like the -- I don't know what direction that
 7   is, but if you walk into the right, one side was Miles' area.
 8   The other side was the miss's area.  That's correct.
 9   Q.  And you didn't keep a set of Brioni suits at Mahwah
10   mansion, correct?
11              MS. SHROFF:  Objection.
12              THE COURT:  Overruled.  You may answer.
13   A.  If you're asking if I kept them personally?
14   Q.  Yes, sir.
15   A.  No.
16   Q.  Do you own a whole set of Brioni suits?
17   A.  I own Brioni suits, but they're from the Real Real, so
18   they're used.  I can't afford Brioni suits, sir.
19   Q.  But Miles Guo kept a whole set of Brioni suits at the
20   Mahwah mansion, correct?
21   A.  I don't know.
22   Q.  And, sir, you didn't pick the renovation to those wings,
23   correct?
24   A.  I did not, no.
25   Q.  Miles Guo was the one who designed that, correct?
```

O78BGUO6                         Barnett- Cross

1            MS. SHROFF:  Objection.

2            THE COURT:  You may answer if you know.

3    A.  I don't know.  I don't know if he was the only one that

4    picked.  I don't know.

5    Q.  He had a role in designing them?

6    A.  Yes, he did.

7    Q.  In fact, you walked through sort of the wing with Miles Guo

8    at a time, correct?

9    A.  Yes, I have.

10   Q.  And there were also renovations just not to bedrooms, but

11   to closets, correct?

12   A.  That's correct.

13   Q.  And Miles Guo picked the renovations done to his closet,

14   right?

15   A.  I believe so, but I can't confirm that.

16           MS. SHROFF:  Could you keep your voice up,

17   Mr. Barnett.  I missed what you said after I believe so.

18   A.  I said I believe so.  I can't confirm that.  I believe so.

19   Q.  And you didn't pick out the beds that were in the Guo

20   family's bedroom?

21   A.  No, I did not.

22   Q.  Miles Guo did that, right?

23   A.  That I don't know cause I didn't have anything to do with

24   that part of the construction.

25   Q.  Do you know if the Guo family more generally picked out the

O78BGUO6                     Barnett- Cross

1  beds in their bedrooms?

2  A.  I don't know.

3  Q.  You didn't pick out the furnishing in their bedroom, right?

4  A.  No, I did not.

5  Q.  Miles Guo did that, correct?

6  A.  Again, I don't know.  I didn't have -- I wasn't privy to

7  that part of it.  Unless we went to a specific store and he

8  pick something out, then I could confirm that, but I wasn't

9  with him when they were picking out anything in regards to

10  bedroom furniture or I wasn't privy to that.

11  Q.  Now, you did know though that that wing when you took -- I

12  think you said it was to the right?

13  A.  That's correct.

14  Q.  The wing to the right was Miles Guo's wing?

15  A.  That's right, on the second floor, correct.

16  Q.  And you knew that because you were helping him with that

17  property, correct?

18          MS. SHROFF:  Objection.

19          THE COURT:  You may answer.

20  A.  As part of the construction plans then, yes, I knew that.

21  Q.  You became aware that there was a bankruptcy proceeding,

22  correct?

23  A.  In regards to HCHK?

24  Q.  Involving Miles Guo at least.

25  A.  Yes.

O78BGUO6                        Barnett- Cross

1   Q.  Are you aware that Miles Guo did not mention this mansion

2   in Mahwah in his bankruptcy filings at all?

3   A.  No, I did not.

4   Q.  Are you aware that he didn't mention any of the money spent

5   on the renovations at this mansion?

6   A.  No.

7   Q.  Are you aware he didn't mention any of the $35,000 beds

8   bought for this mansion?

9   A.  No, I did not.

10  Q.  Are you aware he didn't mention any of the furniture, the

11  hundreds of thousands of dollars in furniture or millions

12  bought for this mansion?

13  A.  No, I did not have knowledge.

14  Q.  Are you aware he didn't mention --

15          MS. SHROFF:  Your Honor, I think Mr. Barnett has no

16  knowledge of what Mr. Miles Guo mentioned in his bankruptcy.

17          THE COURT:  Ms. Shroff, I have said to you in the past

18  that you are not to testify. If you want to make an objection,

19  make an objection.

20          MS. SHROFF:  Objection, your Honor, cumulative.

21          THE COURT:  Overruled. you may answer.

22  Q.  Are you aware he didn't disclose the millions or thousands

23  at least of dollars spent on artwork for this mansion where his

24  family had wings?

25  A.  No, I'm not aware of that.

O78BGUO6                        Barnett- Cross

1    Q.  Now, the money that went to Mahwah it was passed through a

2    woman named Amy Buck, correct?

3    A.  That's correct.

4    Q.  It was pass through her attorney --

5          MS. SHROFF:  Objection to the form of the question as

6    to pass through.  It's inappropriate, your Honor.

7          THE COURT:  Well, if you could be more specific.

8    Q.  Amy Buck was paying the expenses for the Mahwah mansion,

9    correct?

10   A.  That's who I sent the invoices to, correct.

11   Q.  She was paying it through her attorney trust account,

12   correct?

13   A.  Yes, I believe so, yes.

14   Q.  Now, you testified on direct about a man name Sean or Sean

15   Jing?

16   A.  Yes.

17   Q.  And Sean Jing you said worked for HCHK, right?

18   A.  I believe so, yes.

19   Q.  That was the company that he worked for, correct?

20   A.  I believe so.

21   Q.  Same company that you believe Gladys Chow formally worked

22   for?

23   A.  That's correct.

24   Q.  Sean Jing was another personal assistant to the Guo family,

25   right?

O78BGUO6                          Barnett- Cross

1    A.  I don't -- he was at one time.  I think when -- are you

2    asking in regards to Mahwah?

3    Q.  Well, he performed kind of personal assistant type task for

4    the Guo family?

5    A.  Yes, he did.

6    Q.  And he also acted as a property manager for the mansion in

7    Mahwah, right?

8    A.  Yes.

9    Q.  And in the personal assistant type work, he did things for

10   Miles Guo, right?

11   A.  That I don't know.  I know he did assistant stuff, but I

12   don't know what jobs he did or didn't do.

13   Q.  And he did things for the Guo family more generally,

14   correct?

15          MS. SHROFF:  Objection, he just said he answered the

16   question.

17   Q.  One was to Miles Guo.  This is the Guo family more

18   generally.

19          THE COURT:  So you may answer the question.

20   A.  Sorry.  Can you ask that again.

21   Q.  Of course.  Sean Jing, he performed -- he did things for

22   the Guo family more generally?

23   A.  Yes.

24   Q.  There were other people who did personal assistant type

25   work for the Guo family, correct?

1              MS. SHROFF:  Form.

2              THE COURT:  You may answer.

3    A.  Yes.

4    Q.  One of them was named Hank, right?

5    A.  Yes.

6    Q.  He had a Chinese name, but in English he went by Hank,

7    right?

8    A.  I don't know his Chinese name.

9    Q.  And another one was named Jason, right?

10   A.  Yes.

11   Q.  And you describe them before as kind of like indentures

12   servants, right?

13             MS. SHROFF:  Objection.

14             THE COURT:  Overruled.

15   Q.  You described them before as kind of like indenture

16   servants, right?

17   A.  That's how I classified it as more of a joking manner.

18   That's how I classified it, sorry.

19   Q.  You said that, right?

20   A.  I did.

21   Q.  And they did whatever personal stuff the family needed,

22   right?

23   A.  Yes, I believe so.

24   Q.  They did shopping?

25   A.  Yes.

1    Q.  They did cooking?

2    A.  Yes.

3    Q.  They chauffeured the family around?

4    A.  Yes, sometimes, yes.

5    Q.  And they would buy things the family wanted, right?

6    A.  I guess.  I wouldn't be privy to what they bought for the

7    family except for groceries.

8    Q.  Now, at times Miles Guo had you buy things for him, right?

9    A.  Me personally, sir?  Yeah, if it was mostly like anything,

10   like, if he needed a pair of I-pods for your ears, but

11   nothing -- anything of real expense I had to ask.

12   Q.  He had you buy motorcycles for him, right?

13   A.  Yes, they had me buy motorcycles.  No, they didn't have me

14   buy it.  They ask.

15   Q.  And you did that, right?

16   A.  I did.

17   Q.  How many was it, four or five?

18   A.  I believe in the end it was five.

19   Q.  And each one cost a few tens of thousands of dollars?

20   A.  They varied in price.

21   Q.  And the motorcycles were in your name, right?

22   A.  Yes, they were.

23   Q.  But those were not really your motorcycles?

24   A.  No, they were not.

25   Q.  You weren't the real owner of those motorcycles, correct?

O78BGUO6                    Barnett- Cross

```
 1   A.  No, I wasn't.

 2   Q.  Miles Guo asked you to do this after he filed for

 3   bankruptcy, correct?

 4           MS. SHROFF:  Objection, your Honor, assumes facts not

 5   in evidence.

 6           THE COURT:  Overruled.  You may answer.

 7   A.  I don't know.  I don't know when as far as a bankruptcy and

 8   when they ask, I don't know.

 9   Q.  You testified on direct that at a certain point Yvette

10   wanted you to rent them to supporters?

11   A.  We had a discussion about it, that's correct.

12   Q.  And that was in late 2022, right?

13   A.  I believe so.

14   Q.  Were you aware that shortly before that the United States

15   had seized hundreds of millions of dollars from the entities

16   associated with Miles Guo?

17   A.  No, I was not.

18   Q.  Did Guo ever say that the department of justice had just

19   done that?

20   A.  No.

21   Q.  Did Yvette ever say that the department of justice had just

22   done that before she had this conversation about renting out

23   these assets?

24   A.  No.

25           MR. FERGENSON:  If we could pull up, Ms. Loftus,
```

1    what's in evidence as Government Exhibit WA26.  Ms. Loftus, why

2    don't we just zoom in on the bottom half, please.

3    Q.  Now, sir, this list several vehicles.  Do you see the

4    pictures of the vehicles?

5    A.  I do.

6    Q.  Some of them are the motorcycles you purchased, correct?

7    A.  Yes, that's correct, the two at the top there.

8    Q.  For instance, the Ducati, in the bankruptcy proceedings

9    when that came up, you didn't even know that was still in your

10   name, right?

11   A.  I did not.

12          MS. SHROFF:  Objection, your Honor.  I think we've

13   established what his knowledge basis is about the bankruptcy.

14          THE COURT:  Overruled.  You may answer.

15   A.  I did not.

16   Q.  You didn't know that that was still in your name, correct?

17   A.  I did not, correct.

18   Q.  And if we could zoom out.

19          Now, the person listed under owner, do you see that in

20   the second to right column?

21   A.  Barely.

22   Q.  We can blow it up.  You see that says owner?

23   A.  Yep.

24   Q.  And then in the person listed there is Defeng Cao, correct?

25   A.  Correct.

1   Q.  He wasn't the actual owner of these motorcycles either,

2   correct?

3           MS. SHROFF:  Objection to form.

4           THE COURT:  You may answer.

5   A.  I was the original owner.  I don't know who the second

6   owner of those motorcycle was or became.

7   Q.  If we can just scroll down.  Let's zoom on the Lamborghini.

8           Mr. Barnett, you see under the owner column for the

9   Lamborghini it says Defeng Cao.  You see that?

10  A.  That's correct.

11  Q.  And there's an address for 373 Taconic Road in Greenwich

12  Connecticut.  You see that?

13  A.  Yes.

14  Q.  That was one of the Guo family homes, correct?

15  A.  That's where I currently do security, yes.

16  Q.  And do you see in the notes column it says G/Club

17  International LTD?

18  A.  Yes.

19  Q.  Do you know why it says that?

20  A.  I have no idea.

21  Q.  You also testified in your discussions with Yvette about

22  signing out certain of the assets to supporters they mention

23  the Lamborghini too?

24  A.  That was mentioned, correct.

25  Q.  In discussing the Lamborghini, did Yvette say that the

 1   United States government had just seized hundreds of millions

 2   of dollars from G/Clubs?

 3   A.  No, she did not.

 4        MR. FERGENSON:  If we can go to Government Exhibit

 5   WA27, if we can zoom on the text here.

 6   Q.  Mr. Barnett, you see how in the notes column you're listed

 7   as Scott Barnett driver?

 8   A.  Yes, that's correct.  I see that.

 9   Q.  And then under owner it says HCHK Technologies for the

10   first two?

11   A.  That's correct.

12   Q.  And in the bottom two it says GS Security Solutions, right?

13   A.  That's correct.

14   Q.  GS Security Solutions that's your company, right?

15   A.  That's correct.

16   Q.  These are the BMWs that you purchased, correct?

17   A.  Yes.

18   Q.  And you purchased them with money from HCHK Technologies,

19   correct?

20   A.  I did.

21   Q.  And that was in January of 2023, right?

22   A.  Correct.

23   Q.  That's nearly a year after Miles Guo had declared

24   bankruptcy, right?

25   A.  Apparently.

1           MS. SHROFF:  Objection, assumes knowledge that this

2   witness has disclaimed.

3           THE COURT:  Do you know what year he declared

4   bankruptcy?

5           THE WITNESS:  No, ma'am, I do not.

6           THE COURT:  Sustained.

7   Q.  Sir, you used money from HCHK to buy those BMWs, right?

8   A.  That's correct.  The money was apart of the startup

9   agreement, that's correct.

10          MR. FERGENSON:  Now, we can take that down,

11  Ms. Loftus.

12  Q.  You also had a role in managing a yacht, correct?

13  A.  No.

14  Q.  You received emails from the Liberty yacht captain, right?

15  A.  Yes, that's correct.  That was in regards to repairs that

16  were being done because I guess Max Krasner was inundated with

17  whatever he was doing and couldn't keep up with the constant

18  emails from the captain, so Yvette ask me to join in on that to

19  make sure that the repairs were getting done.

20  Q.  Now, your attorneys produced some of those emails to the

21  government, right?

22  A.  Yes.

23  Q.  Max Krasner who you just mention, he also received those

24  emails, right?

25  A.  Yes, as far as I know.

O78BGUO6                        Barnett- Cross

1    Q.  Sir, you didn't work for G/Club, right?

2    A.  No, I did not.

3    Q.  Max Krasner, he didn't work for G/Club either, right?

4    A.  I have no idea.

5          MR. FERGENSON:  Ms. Loftus, can we show the witness

6    what's marked as Government Exhibit SB212.

7          THE COURT:  Mr. Fergenson.

8          MR. FERGENSON:  I'm waiting for an exhibit, your

9    Honor.  It's okay, your Honor.  I'll just move on.

10         THE COURT:  Okay.

11         MR. FERGENSON:  Thank you for the indulgence.

12   Q.  Sir, you also talked a bit about Miles Guo's supporters on

13   direct, right?

14   A.  Yes.

15   Q.  And sometimes the supporters would go to 3 Columbus Circle,

16   right?

17   A.  Yes.

18   Q.  They would listen to Miles Guo talk?

19   A.  Yes.

20   Q.  They would clap for him?

21   A.  Yes.

22   Q.  Fair to say they idolized him?

23   A.  Yes.

24   Q.  They would ask him to hold babies, right?

25   A.  I've seen that.  I don't know if they asked or not.  It

O78BGUO6                         Barnett- Cross

 1    would have been in Chinese.  I wouldn't have understood.

 2              MS. SHROFF:  What you did say.

 3    A.  I've seen him hold people's babies.  I don't know if they

 4    asked or not.  They were speaking in Chinese, so I don't know.

 5    Q.  Sometimes they would bring their children with them to 3

 6    Columbus Circle?

 7    A.  Yes, I've seen that.

 8    Q.  And they would bring their children and give those children

 9    an I-pad, right?

10    A.  Yes, I've seen that.

11    Q.  And then those supporters would just work all day, right?

12              MS. SHROFF:  Objection.

13              THE COURT:  Overruled.  You can answer.

14    A.  I wasn't there all day, but, yes, they worked.

15    Q.  And these supporters when they were working, they didn't

16    listen to other workers, right?

17              MS. SHROFF:  Objection as to form.

18              THE COURT:  Well, it's impossible for him to say

19    whether others were listening.  He can't perceive that.

20              MR. FERGENSON:  I can rephrase, your Honor.

21              THE COURT:  Okay.

22    Q.  You're aware of instances -- withdrawn.

23              Your impression, Mr. Barnett, being in 3 Columbus

24    Circle when this was happening was that these supporters didn't

25    always listen to other workers, correct?

O78BGUO6                         Barnett- Cross

1   A.  I can't speak for other workers, but I have seen instances

2   where if there was issues with other workers, I had spoken with

3   other workers in regards to it.

4   Q.  And these supporters, they always listen to Miles Guo,

5   right?

6   A.  Again, all the conversation were in Chinese.  I could tell

7   you that they did listen to him, but I can't tell you what was

8   said.

9   Q.  And, look, your impression was that this stuff with the

10  supporters was weird, fair to say?

11        MS. SHROFF:  Objection.

12        THE COURT:  You may answer.

13  A.  Weird, I guess -- I don't know if I'd use the word "weird."

14  I guess it was just different for me because I've never seen it

15  before.  Usually I would say that with like celebrities where

16  people were kind of in awe of a celebrity.  That's kind of the

17  impression I got from it.

18  Q.  Sir, you testified about how Miles Guo was one of the

19  better people you been a bodyguard for, right?

20  A.  That's correct.

21  Q.  You like him, right?

22  A.  I like him very much.

23  Q.  And you testified about how you thought he was sincere with

24  the stuff he was doing with the NFSC, right?

25  A.  That's correct.

 1   Q.  Sir, you didn't watch his live broadcast in Mandarin,

 2   correct?

 3   A.  No, I did not.

 4   Q.  You didn't follow him online, correct?

 5   A.  No, I did not.

 6   Q.  You didn't invest in any of those investment projects, did

 7   you?

 8   A.  No, I did not.

 9   Q.  You didn't send companies affiliated with Miles Guo your

10   personal money, correct?

11   A.  No, sir.

12   Q.  You didn't send him your retirement money, correct?

13              MS. SHROFF:  Objection, asked and answered.

14              THE COURT:  Overruled.  You may answer.

15   A.  No, I did not.

16   Q.  You didn't send him money you had borrowed from your home

17   equity, correct?

18              MS. SHROFF:  Objection, asked and answered.

19              THE COURT:  Overruled.  You can answer.

20   A.  No, I did not.

21   Q.  You didn't send him your families' money, correct?

22   A.  No, sir, I did not.

23   Q.  And it's true, sir, that actually you got money from

24   working for Miles Guo, right?

25   A.  Meaning for services, sir?  I don't know what you're

O78BGUO6                    Barnett  - Redirect

1    asking.

2    Q.  We talked about all the money you got paid earlier?

3    A.  For services, correct.

4              MS. SHROFF:  Objection to the form, your Honor.

5              THE COURT:  Sustained.

6              MR. FERGENSON:  May I just have a moment, your Honor?

7              THE COURT:  Yes.

8    Q.  Sir, you didn't lose money after sending it to Miles Guo,

9    correct?

10   A.  I'm sorry.

11             MS. SHROFF:  Assumes facts that are clearly not

12   verified.

13             THE COURT:  He stated he did not send money.

14   Sustained.

15             MR. FERGENSON:  Nothing further, your Honor.

16             THE COURT:  Redirect.

17   REDIRECT EXAMINATION

18   BY MS. SHROFF:

19   Q.  Mr. Barnett, good afternoon again.

20   A.  Hello.

21   Q.  Mr. Barnett, for how many years did you honorably serve the

22   People of the City Of New York as an NYPD officer?

23             MR. FERGENSON:  Objection.

24             THE COURT:  It's all right.  How long did you serve as

25   a police officer.

O78BGUO6                         Barnett  - Redirect

1   A.  For 17 and a half years, ma'am.

2   Q.  And for 17 years did you testify on behalf of the City of

3   New York or the State of New York?

4   A.  Yes, I have testified.

5   Q.  Did you take an oath as you've taken here today?

6   A.  Yes, I have.

7   Q.  Have you ever lied under oath?

8   A.  No.

9   Q.  Today did you ever lie under oath?

10  A.  No, ma'am.

11  Q.  And would you lie under oath for Miles Guo?

12  A.  No, ma'am.

13  Q.  Would you lie for Miles Guo because he had HCHK send you

14  $15,000 or $30,000 or $650,000 or 600 and a million dollars?

15           MR. FERGENSON:  Argumentive.

16           THE COURT:  Overruled.  You can answer.

17  A.  No, ma'am, I would not.

18  Q.  Mr. Barnett, you got money for the work you did for Mei

19  Guo, correct?

20  A.  That's correct.

21  Q.  I'm not going to go through all of the iterations, but you

22  got that money into a bank account, correct?

23  A.  That's correct, my company's bank account.

24  Q.  And the company's bank account is at a real bank, right?

25  A.  Chase Bank, that's correct.

O78BGUO6                    Barnett  – Redirect

```
 1   Q.  And Chase bank has never flagged your account, correct?

 2             MR. FERGENSON:  Objection, your Honor.

 3             THE COURT:  You may answer.

 4   A.  No, they have not.

 5   Q.  These are wire transfers, correct?

 6   A.  Yes, ma'am.

 7   Q.  And do you know who these people were that wired the money?

 8   A.  I do not.

 9   Q.  Do you know if they were Mei Guo's uncles?

10             MR. FERGENSON:  Objection.

11             THE COURT:  You may answer.

12             MR. FERGENSON:  He said he doesn't know, your Honor.

13   Q.  Were they her uncles?

14   A.  I don't know.

15   Q.  Were they her family in China?

16             MR. FERGENSON:  Objection again, asked and answered.

17   Same question.

18             THE COURT:  You can answer.

19   A.  I don't know.

20   Q.  You were asked about a person name Jian Wu Zhang, correct?

21   A.  I believe so, yes.

22   Q.  Do you know if he's related to Mei Guo?

23   A.  I don't.

24   Q.  You were asked about a transfer of a $105, 000 by Su Zu

25   Wang, correct?
```

O78BGUO6                    Barnett  - Redirect

1    A.  Yes, I believe so.

2    Q.  Do you know if Su Zu Wang is related to Mei Guo?

3    A.  I don't know.

4    Q.  You were asked about a $107,000 transferred again by

5    Mr. Zhang, correct?

6    A.  Yes, I believe so.

7    Q.  Do you know that Mr. Zhang is related to Mei Guo?

8    A.  I don't know.

9    Q.  Do you know who Desheng Yin is?

10   A.  I do not.

11   Q.  Do you know if Desheng Yin is related to Mei Guo?

12   A.  I do not.

13   Q.  You were asked about some money that came from Singapore,

14   correct?

15   A.  Yeah.

16   Q.  Do you know if Mei Guo has a uncle, aunt or cousin in

17   Singapore?

18   A.  I don't know.

19   Q.  You were asked many questions about a man name Victor

20   Cerda, correct?

21   A.  Yes.

22   Q.  Did Mr. Cerda assist you when you needed a lawyer?

23   A.  Yes, he did.

24   Q.  Did he give you a referral?

25   A.  I don't know if he gave me the referral or it came from

1    Mei.  I don't recall who gave me the referral.

2    Q.  Did Mr. Cerda ever tell you, I'll give you the money if you

3    testify for Miles Guo?

4    A.  No, he did not.

5    Q.  Did Mr. Cerda tell you I'll give you the money if you talk

6    to Ms. Shroff?

7    A.  No, he did not.

8    Q.  Did Mr. Cerda tell you, I'll only give you the money if you

9    talk to Ms. Shroff and not talk to the government?

10              MR. FERGENSON:  Objection.

11              THE COURT:  Overruled.  You can answer.

12   A.  No, he did not.

13   Q.  Did Mr. Cerda attach any strings to the help he gave you?

14   A.  No, he did not.

15   Q.  You were asked questions about a criminal lawyer that you

16   hired or you were helped hire, correct?

17   A.  I hired a criminal lawyer, that's correct.

18   Q.  Who chose that criminal lawyer?

19   A.  I did.

20   Q.  Let me rephrase that.  I apologize.  I should know better.

21   Criminal defense lawyer, who chose him?

22   A.  I did.

23   Q.  Did Mr. Cerda have anything to do with him?

24   A.  Not in picking him out, no.

25   Q.  Did I have anything to do with him?

```
 1   A.  No.

 2   Q.  Did any of Mr. Guo's lawyers have anything to do with the

 3   lawyer you chose?

 4   A.  No, it did not.

 5   Q.  You were asked about a Go Fund Me page, correct,

 6   Mr. Barnett?

 7   A.  Yes, that's correct.

 8   Q.  Why did you need a Go Fund Me page?

 9   A.  Because the lawyers that I've had to retain were requesting

10   their money, and I had nowhere else to turn to get the money.

11   I don't have that kind of money personally.

12   Q.  Victor Cerda didn't give you that money, correct?

13   A.  No, he did not.

14   Q.  Mei Guo didn't give you that money, correct?

15   A.  No, she did not.

16   Q.  Wayne Cao didn't give you that money, correct?

17   A.  No.

18   Q.  Yvette Wang didn't you give that money, correct?

19   A.  No.

20   Q.  Miles Guo didn't give you that money, correct?

21   A.  No, he didn't.

22   Q.  By the way the money that you got all those wire transfers

23   that the government asked you about, you declared that on your

24   income tax, correct?

25   A.  Yes.
```

O78BGUO6                    Barnett  - Redirect

1   Q.  And you declared the Go Fund Me money on your income tax,

2   correct?

3           MR. FERGENSON:  Objection, relevance and scope.

4           THE COURT:  You may answer.

5   A.  Not on this year tax. It would be next year tax that would

6   be claimed on.

7   Q.  Now, you were asked many questions about other properties

8   in New York City that you saw, correct?

9   A.  Yes.

10  Q.  And one of the properties that they asked you about was a

11  penthouse that had four bedrooms, correct?

12  A.  Yes.

13  Q.  Did you know if Mr. Guo's son has been here in the year of

14  2024?

15  A.  I have no idea.

16  Q.  When was the last time you saw his son?

17  A.  The only time that I ever met him was in 2020, and I think

18  it was October or November.  I couldn't tell you what month it

19  was.

20  Q.  Is it fair to say, sir, other than that one time you have

21  never seen Mr. Mileson in this country?

22  A.  I never seen him except that one time.

23  Q.  These four bedroom penthouses, do you know the reason why

24  it wasn't purchased?

25  A.  I don't.

O78BGUO6          Barnett  - Redirect

1   Q.  You were asked questions about Aaron Mitchell, correct?

2   A.  Yes.

3   Q.  Did you ever observe Aaron Mitchell and Miles Guo have a

4   conversation?

5   A.  Yes.

6   Q.  Did they seem to understand each other without an

7   interpreter?

8   A.  I don't know.  I wasn't privy to the conversation.  I

9   witness them talking, but I couldn't tell you what the

10  conversation was, nor what it was about.

11  Q.  Now, you were asked questions about the Taurus Fund,

12  correct?

13  A.  Yes.

14  Q.  Was your signature on the Taurus Fund forged?

15  A.  No, it was not.

16  Q.  Did you sign it without understanding what the role was?

17  A.  Yes, I did.

18  Q.  You were asked questions, were not you not, Mr. Barnett,

19  about Brioni suits, correct?

20  A.  Yes.

21  Q.  Do you know how many suits Mrs. Miles Guo owns?

22  A.  I don't.

23  Q.  Do you know how many suits there are at the Sherry

24  Netherlands?

25  A.  I do not.

O78BGUO6                    Barnett  -  Redirect

1   Q.  Do you know how many there are in Connecticut?

2   A.  No, ma'am, I don't.

3   Q.  For all you know, the suits at Mahwah are one third of the

4   suits he owns, you just don't know, correct?

5   A.  I don't know.

6   Q.  At Mahwah did he broadcast from there?

7   A.  Yes, he did.

8   Q.  Did he wear the same suit for every broadcast?

9   A.  I didn't watch the broadcast.  I can't answer that.  I

10  don't know.

11  Q.  You were asked many, many questions about Mr. Guo's

12  bankruptcy, correct?

13  A.  Yes.

14  Q.  Did you know when he declared bankruptcy?

15  A.  I did not know.

16  Q.  Do you know if he declared bankruptcy?

17  A.  I didn't know.  No, I don't.

18  Q.  Do you know sitting here today what he did or did not

19  disclose in his bankruptcy petition?

20  A.  No, I don't know that.

21  Q.  Do you know if he consulted a lawyer who decided what to

22  put in the petition?

23  A.  I don't know.  No, I don't.

24  Q.  You were asked questions about Sean Jing, Hank and Jason,

25  correct?

500

 1  A.  That's correct.

 2  Q.  And the government said that you called them indentured

 3  servants, correct?

 4  A.  That's correct.

 5  Q.  And you said you were joking when you said that, correct?

 6  A.  I said I was using it as a joke, but, um, they did serve

 7  the family.  That's correct.

 8  Q.  Let's talk about this.  Did you see Miles Guo interact with

 9  Hank?

10  A.  I've seen it, yes.

11  Q.  How would you describe that interaction?

12  A.  More family -- the best way to describe is family like, but

13  he was a -- he was basically someone who did a lot of the work.

14  He's a very hard worker.

15  Q.  Do you know sitting here today if Hank and Miles left China

16  together when he left?

17  A.  I have no idea.

18  Q.  Do you know if they escaped China together?

19          MR. FERGENSON:  He just said he doesn't know, your

20  Honor.

21          THE COURT:  Sustained.

22  Q.  Do you know if they were in Hong Kong together?

23  A.  I don't.

24  Q.  Do you know if they came from Hong Kong to the United

25  States together?

1   A.  I don't know.

2   Q.  Do you know how much Mr. Miles has supported Hank?

3   A.  I don't.

4   Q.  Do you know if he supports Hank's wife?

5   A.  I don't know.

6   Q.  Do you know if he supports Hank's child?

7   A.  I don't know.

8   Q.  You were asked several questions about motorcycles,

9   correct?

10  A.  Yes.

11  Q.  Lamborghini, correct?

12  A.  Yes.

13  Q.  And then you were told or you were asked whether or not you

14  were aware of DOJ's seizing assets, correct?

15  A.  That's correct.

16  Q.  Do you know when the DOJ seized any asset of Mr. Guo's?

17  A.  No, I don't.

18  Q.  So you would have no way to place your conversation with

19  Yvette about renting these instrumentalities versus the DOJ's

20  seizure, correct?

21  A.  Yes, correct.

22  Q.  You don't know if the conversation was months before the

23  seizure, correct?

24          MR. FERGENSON:  Objection, asked and answered.

25          THE COURT:  Sustained.

1    Q.  You simply don't know, correct?

2              MR. FERGENSON:  Asked and answered.

3              THE COURT:  Sustained.

4    Q.  You were asked question after question about incidents and

5    the seizure, correct?

6    A.  Yes.

7    Q.  You have no knowledge of the timeline between the two,

8    correct?

9              MR. FERGENSON:  Objection, asked and answered.

10             MS. SHROFF:  I could go through each of the

11   instrumentalities.  It will just take us a lot longer.

12             MR. FERGENSON:  He said he doesn't know.

13   Q.  Okay.  Do you know any correlation of the renting of the

14   motorcycle and the seizure by DOJ?

15   A.  No, I don't.

16   Q.  How about renting the Lamborghini and the seizure of DOJ?

17             THE COURT:  All righty.  It's 5:00.

18             MR. FERGENSON:  Your Honor, may I have a very brief

19   moment before you dismiss the jury, very brief.

20             THE COURT:  Yes.

21             (Continued on next page)

22

23

24

25

1              (At the sidebar)

2              MR. FERGENSON:  I'm having a child tomorrow.  If

3    there's anyway I would be able to finish this witness today,

4    I'll do very brief recross.  I have very limited questions, if

5    there is anyway we can finish the witness.

6              THE COURT:  How long do you have?

7              MS. SHROFF:  Since he objected, quite a bit.

8              THE COURT:  Oh God, this is terrible.

9              MS. SHROFF:  Nobody comes before the client.  Sorry.

10             THE COURT:  Do you know when the baby is suppose to

11   come?

12             MR. FERGENSON:  It's a scheduled C-section.  You have

13   to leave at nine to be there.

14             MS. SHROFF:  I'm sure one of his colleagues can step

15   in.

16             MR. FERGENSON:  It's fine, your Honor, if Ms. Shroff

17   is not going to accommodate.  We'll sort it out.

18             THE COURT:  I'm so happy for you.

19             (Continued on next page)

20

21

22

23

24

25

O78BGUO6                    Barnett  - Redirect

1              (In open court)

2              THE COURT:  Members of the jury, it's time to stop our

3     work.  We'll continue tomorrow morning as usual.  Remember that

4     you're not allowed to discuss the case amongst yourselves or

5     with anyone else. Don't permit anyone to discuss the case in

6     your presence.  Don't listen to, watch, or read anything from

7     any source about this trial.  Have a good evening.

8              THE LAW CLERK:  Jury exiting.

9              (Jury not present)

10              THE COURT:  Please be seated.  Sir, you may step out.

11              (Witness temporarily excused)

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  So how much more do we have on the defense

3     case?

4          MS. SHROFF:  Your Honor, we have Ms. Li, and I think

5     we have one last witness after that and then we're done.

6          THE COURT:  How long do you think all of that will

7     take?

8          MS. SHROFF:  Your Honor, I'm hoping that the direct

9     will be no more than an hour, hour and a half.  I'm hoping

10    shorter.

11         THE COURT:  You're saying total?

12         MS. SHROFF:  I don't know the second witness.  He's

13    not mine, your Honor.  Sorry.

14         MR. SCHIRICK:  Your Honor, the final witness I would

15    expect to be maybe an hour on direct.

16         THE COURT:  So it's not looking like we will have the

17    prosecution sum up tomorrow.  Okay.  Well, I hope that you can

18    be efficient so that we can get this done.

19         MS. MURRAY:  Your Honor, if I may, one proposal.  We

20    had the chance to speak with the defense on timing and on

21    summations.  I think the parties are in agreement that,

22    assuming the timing is what we expect, which is the defense

23    will rest tomorrow assuming that Mr. Guo does not testify as

24    they've indicated, we would do summation on Wednesday, but

25    perhaps we could take some of the time tomorrow afternoon with

1  the jury for the Court to instruct them just on the law part of

2  the instructions so we don't waste too much time in the

3  afternoon.

4           THE COURT:  You mean the substantive instruction?

5           MS. MURRAY:  Correct.

6           THE COURT:  I think that's a great idea.  You both

7  agree to that?

8           MR. KAMARAJU:  That's fine, your Honor.

9           THE COURT:  Sure.  Absolutely.

10          MR. KAMARAJU:  I think -- and you'll correct me -- I

11 think part of your Honor's instruction turns on deliberation

12 specifically, so that might just come after summations, but all

13 the substantive legal stuff would be out of the way.

14          THE COURT:  So I just want to get a letter from you as

15 to from what section to what section you'd like me to charge

16 the jury.

17          MR. KAMARAJU:  Absolutely, your Honor.  That proposal

18 is generally fine with us.

19          THE COURT:  Okay.  Have a good evening.

20          (Adjourned to July 9, 2024 at 9 a.m.)

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                         Page

 3     LAI DAI

 4    Direct By Ms. Shroff . . . . . . . . . . . .5326

 5    Cross By Mr. Horton  . . . . . . . . . . . .5338

 6    Redirect By Ms. Shroff . . . . . . . . . . .5372

 7     THOMAS BISHOP

 8    Direct By Mr. Kamaraju . . . . . . . . . . .5381

 9    Cross By Ms. Murray  . . . . . . . . . . . .5396

10    Redirect By Mr. Kamaraju . . . . . . . . . .5409

11    Recross By Ms. Murray  . . . . . . . . . . .5410

12     GERALD SCOTT BARNETT

13    Direct By Ms. Shroff . . . . . . . . . . . .5411

14    Cross By Mr. Fergenson . . . . . . . . . . .5480

15     LEANNE LI

16    Direct By Ms. Shroff . . . . . . . . . . . .5495

17    GERALD SCOTT BARNETT

18    Cross By Mr. Fergenson . . . . . . . . . . .5506

19    Redirect By Ms. Shroff . . . . . . . . . . .5535

20                      DEFENDANT EXHIBITS

21    Exhibit No.                          Received

22     67061   . . . . . . . . . . . . . . . . . .5420

23     DX 60678A  . . . . . . . . . . . . . . . . .5475

24     DX Z-02  . . . . . . . . . . . . . . . . . .5394

25     Stip 3   . . . . . . . . . . . . . . . . . .5395
```

## **EXHIBIT 3**

**Email dated July 28, 2024**

| | |
|---|---|
| **From:** | Song, Luyi |
| **To:** | Song, Luyi |
| **Subject:** | FW: [EXT] Re: Urgent : Mahwah Mansion issues |
| **Date:** | Monday, September 30, 2024 11:32:03 AM |

Begin forwarded message:

> **From:** Franco DiPaolo <hawkeyeservices1540@gmail.com>
> **Date:** July 29, 2024 at 2:46:36 AM GMT+2
> **To:** "Despins, Luc A." <lucdespins@paulhastings.com>
> **Subject: [EXT] Re: Urgent : Mahwah Mansion issues**

| **This Message Is From an Untrusted Sender** | Report Suspicious |
|---|---|
| You have not previously corresponded with this sender. | |

Hello Luc,

Can you take a phone call?

Thank you ,
Franco DiPaolo
Hawk Eye Security
201.259.6340

On Sun, Jul 28, 2024 at 8:26 PM Johnson Qi <johnsonfalcon7@gmail.com> wrote:

> Dear Franco,
>
> Hope you are well.
>
> The case about this Mansion has already been a verdict.
>
> On July 16, 2024. The criminal trial conclude. The Mahwah Mansion belong to the Goverment.
> See transcript announcement in Documnet 395 of case 1:23-cr-00118-AT on US Court of Southern District of New York.
>
> From that date, this property has been handed over to the US Department of Justice Attorney's office, Southern District of New York.
>
> The previous Owner of this Mansion No need to pay anything more.
>
> Lawyer is communicating with the Court and the Trustee for further follows-ups.

So that reason,
Since July 29 ,2024. the security service costs can No longer be paid.

The last invoive 07282024 was made by ACH wire tranfer and will arrive on Tuesday.
Please check.

Thanks for your understanding!

# **EXHIBIT 4**

**July 30, 2024 Hearing Transcript**

```
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF CONNECTICUT
 2                        BRIDGEPORT DIVISION

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-50073 (JAM)
 4   HO WAN KWOK, et al.,        .
                                 .  (Jointly Administered)
 5           Debtors.            .
                                 .
 6   . . . . . . . . . . . . . . .
                                 .
 7   LUC A. DESPINS, CHAPTER 11  .  Adversary Proceeding
     TRUSTEE,                    .  No. 23-05005 (JAM)
 8                               .
             Plaintiff,          .
 9                               .
         v.                      .
10                               .
     GREENWICH LAND, LLC,        .
11   et al.,                     .
                                 .
12           Defendants.         .
     . . . . . . . . . . . . . . .
13                               .
     LUC A. DESPINS, et al.,     .  Adversary Proceeding
14                               .  No. 23-05017 (JAM)
             Plaintiffs,         .
15                               .
         v.                      .
16                               .
     TAURUS FUND, LLC, et al.,   .
17                               .
             Defendants.         .
18                               .
     . . . . . . . . . . . . . . .
19                               .
     GENEVER HOLDINGS, LLC,      .  Adversary Proceeding
20                               .  No. 23-05007 (JAM)
             Plaintiff,          .
21                               .
         v.                      .
22                               .  Courtroom 123
     AIG PROPERTY CASUALTY       .  Brien McMahon Federal Building
23   COMPANY,                    .  915 Lafayette Boulevard
                                 .  Bridgeport, Connecticut 06604
24           Defendant           .
                                 .  Tuesday, July 30, 2024
25   . . . . . . . . . . . . . . .  1:39 p.m.
```

1   APPEARANCES:

2   For the Chapter 11
    Trustee:                    Patrick Linsey, Esquire
3                               NEUBERT PEPE & MONTEITH, P.C.
                                195 Church Street
4                               13th Floor
                                New Haven, Connecticut 06510
5
                                -and-
6
                                Luc A. Despins, Esquire
7                               PAUL HASTINGS, LLP
                                200 Park Avenue
8                               New York, New York 10166

9                               Nicholas A. Bassett, Esquire
                                2050 M Street, NW
10                              Washington, DC 20036

11  For Taurus Fund LLC,
    Taurus Fund Management,
12  and Scott Barnett:          Michael T. Conway, Esquire
                                LAZARE POTTER GIACOVAS & MOYLE, LLP
13                              747 Third Avenue, 16th Floor
                                Fifth Floor
14                              New York, New York 10017

15

16                      TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE JULIE A. MANNING
17                UNITED STATES BANKRUPTCY JUDGE

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:             Electronically recorded

21  Transcription Company:      Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

```
 1   APPEARANCES (CONTINUED):

 2   For Pacific Alliance
     Asia Opportunity Fund:    Annecca H. Smith, Esquire
 3                             ROBINSON & COLE, LLP
                               280 Trumbull Street
 4                             Hartford, Connecticut 06103

 5                             -and-

 6                             Stuart M. Sarnoff, Esquire
                               O'MELVENY & MYERS, LLP
 7                             Times Square Tower
                               7 Times Square
 8                             New York, New York 10036

 9   For Hing Chi Ngok and
     Greenwich Land, LLC       Austin D. Kim, Esquire
10                             Christopher J. Major, Esquire
                               MEISTER SEELIG & FEIN, LLP
11                             125 Park Avenue
                               7th Floor
12                             New York, New York 10017

13   For Genever Holdings:     Michael T. McCormack, Esquire
                               O'SULLIVAN MCCORMACK JENSEN
14                               & BLISS, P.C.
                               180 Glastonbury Boulevard
15                             Suite 210
                               Glastonbury, Connecticut 06033
16
     For AIG Property
17   Casualty Company:         Michael P. Thompson, Esquire
                               GORDON & REES SCULLY MANSUKHANI
18                             95 Glastonbury Boulevard
                               Suite 206
19                             Glastonbury, Connecticut 06033

20                             -and-

21                             John O'Connor, Esquire
                               John J. Kavanagh, Esquire
22                             STEPTOE, LLP
                               1330 Connecticut Avenue, NW
23                             Washington, DC 20036

24

25
```

4

1                                INDEX

2   MOTIONS:                                              PAGE

3   Matter          **Luc A. Despins, *et al.* v Taurus Fund, LLC,**
    No. 1:                          ***et al.***
4                       **Adversary Case no. 23-05017 (JAM)**

5           Status Conference                                7

6
    Matter         **Luc A. Despins, Chapter 11 Trustee v Greenwich**
7   No. 2:                    **Land, LLC, *et al.***
                        **Adversary Case No. 23-05005 (JAM)**
8
            Status Conference                               30
9

10  Matter          **Genever Holdings, LLC v AIG Property Casualty**
    No. 3:                        **Company**
11                      **Adversary Case No. 23-05007 (JAM)**

12          Status Conference                               46

13
    Transcriptionist's' Certificate                         52
14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 1:39 p.m.)

2            THE CLERK:  Thank you.  Case Number 23-5005

3   Despins, Luc A., Chapter 11 Trustee v Greenwich Land, LLC, *et*

4   *al.*, and 23-5017, Despins, *et al.* v Taurus Fund, LLC, *et al.*

5            THE COURT:  Okay.  Good afternoon.

6            If we could have appearances for the record,

7   please, starting with the Chapter 11 Trustee.

8            MR. DESPINS:  Good afternoon, Your Honor.  Luc

9   Despins, Chapter 11 Trustee.

10            THE COURT:  Good afternoon.

11            MR. BASSETT:  Good afternoon, Your Honor.  Nick

12   Bassett from Paul Hastings, on behalf of the Chapter 11

13   Trustee.

14            THE COURT:  Good afternoon.

15            MR. LINSEY:  Good afternoon, Your Honor.  Patrick

16   Linsey of Neubert Pepe & Monteith, Connecticut counsel for

17   the trustee.

18            THE COURT:  Good afternoon.

19            MR. SARNOFF:  Good afternoon, Your Honor.  It's

20   Stuart Sarnoff at O'Melveny on behalf of creditor PAX.  I

21   don't expect that I'll be speaking, but I'm attending.  Thank

22   you.

23            THE COURT:  Thank you.

24            MS. SMITH:  Good afternoon, Your Honor.  Annecca

25   Smith, Connecticut counsel for creditor PAX with the same

 1  caveat as Mr. Sarnoff, that I don't expect speaking today.

 2          THE COURT:  Good afternoon.

 3          MR. MAJOR:  Good afternoon, Your Honor.  Chris

 4  Major from Meister Seelig & Fein, on behalf of Ms. Hing Chi

 5  Ngok in the 23-05005 adversary proceeding.

 6          THE COURT:  Good afternoon.

 7          MR. KIM:  Afternoon, Your Honor.  Austin Kim, also

 8  from Meister Seelig & Fein, representing Ms. Hing Chi Ngok

 9  and Defendant Greenwich Land.

10          THE COURT:  I don't see you, Attorney Kim.  Are

11  you on video?

12          MR. KIM:  Dialed in, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          Attorney Conway?

15          MR. CONWAY:  Yes.  Good afternoon, Your Honor.

16  Michael Conway on behalf of Taurus Fund, LLC, Taurus Fund

17  Management LLC, and Scott Barnett.

18          THE COURT:  All right.  The matters -- I think

19  that is everyone's appearance, by the way.

20          Am I -- did I miss anyone?

21          MR. DESPINS:  That's correct, Your Honor.

22          THE COURT:  Okay.  So the two matters on for a

23  status conference at 1:30 today are the adversary proceeding

24  against Greenwich Land and the adversary proceeding against

25  Taurus Fund.

```
 1              So, Trustee Despins, how would you like to
 2   proceed?
 3              MR. DESPINS:  I think, Your Honor, we should start
 4   with Taurus Fund and then I'll pass the baton to Mr. Bassett.
 5              THE COURT:  Go right ahead.
 6              MR. DESPINS:  Nick?
 7              MR. BASSETT:  Okay, I'm sorry.  The status
 8   conference on Taurus Fund?
 9              THE COURT:  Yes, why don't we proceed with the
10   Taurus Fund status conference first.
11              MR. BASSETT:  Absolutely, Your Honor.  Nick
12   Bassett from Paul Hastings on behalf of the Chapter 11
13   Trustee.
14              So, Your Honor, and I'll -- and I think the
15   trustee, I thought he was suggesting that he was going to
16   address the Court on this topic, I will certainly let him
17   chime in.  As to Taurus Fund, the reason for the status
18   conference, as set forth in our status conference request, is
19   that we found out, I believe it was two nights ago now,
20   through a letter or actually an email that was forwarded to
21   us by the security company for the mansion, which as you
22   know, this Court had under the revised preliminary injunction
23   order, put in place and required the security company to be
24   present and to monitor you know, the Mahwah Mansion premises,
25   monitor people who are coming and going, all the things of
```

1   that nature, to make sure that this potentially very, very

2   valuable asset of the estate is protected.

3        We received a note indicating that Taurus Fund was

4   no longer going to continue to pay the fees or the costs of

5   that security firm.  The note indicated that the reason for

6   the determination to discontinue payment is that in light of

7   the debtor's conviction, they believe they no longer had an

8   interest in the property; again, that's what the note said.

9        We immediately responded.  Obviously this, is of

10  great concern and, you know, assured the security company

11  that we would make sure the, you know, that the, that they

12  were paid and that their services are not discontinued.  We

13  also have had, since then, a further conversation with

14  Attorney Conway about other issues, for example, what about

15  ongoing maintenance costs for the property.  Certainly, our

16  impression from the note that we received was that the

17  decision to discontinue paying the security firm was not

18  isolated and that that would apply to all costs.  So there's

19  maintenance, there's utilities, there's taxes.  There's, I

20  think, a $70,000 tax bill coming due on August 1st.  All of

21  that, in our mind, is potentially in jeopardy.

22        So we have had an initial call with Attorney

23  Conway yesterday, where he, I think, indicated -- and I'll

24  let him speak for himself -- I think he indicated that he was

25  still gathering information.  But the reason for the status

1   conference is really to apprise the Court of this development

2   which is inconsistent with the preliminary injunction order

3   that's in place, to let the Court know that we believe the

4   estate has to step in, and, you know, immediately begin

5   paying for the security firm is Taurus Fund is not going to

6   do it, and also to, you know, address other issues that are

7   important to the preservation of value of this property going

8   forward.

9           So that's the update, Your Honor.  Again, from our

10  perspective, the main thing was to make sure the Court is

11  aware that the estate, in our view, has to step in and start

12  covering these costs, but I'll leave it there and let the

13  trustee add anything he would like to add and then,

14  obviously, I'm happy to answer any questions or to respond to

15  any comments that Mr. Conway may offer.

16          MR. DESPINS:  So, Your Honor, good afternoon.

17          The cost of the security is $14,200 a week and as

18  Mr. Bassett mentioned, there's a seventy-five or $77,000 tax

19  bill coming due August 1st.  And, obviously, the estate

20  cannot be in a position where it's funding an entity that

21  claims that we don't own.  You know, it's okay for us to fund

22  it if we own it, but not when we're in limbo.

23          So, you know, obviously, Mr. Conway will express

24  Taurus Fund's view, but my view is that if that's going to be

25  the game, then we need to go, and we're ready to go relief

1   with regard to summary judgment on that property, given what

2   has been said about the property and how it was purchased and

3   all that in the criminal trial, but I'll let Mr. Conway

4   address whether they're actually going to start paying again

5   or whatever the plan is.  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              Attorney Conway?

8         (No verbal response)

9              THE COURT:  You're on mute.

10             MR. DESPINS:  Mike, you're on mute.

11             THE COURT:  There you go.

12             MR. CONWAY:  Thank you.  Rookie mistake, Your

13  Honor.

14             I was copied on the note that went out Sunday

15  night to the security company and it said that there was a

16  finding that the house had been forfeited to the government

17  and, therefore, there was no ownership apparently left.  I

18  asked -- this came from the manager that had been hired by

19  Taurus Fund.

20             After I spoke with Mr. Bassett, I reached out to

21  the manager -- actually, I think I reached out to him, I

22  probably talked to him after I spoke with Mr. Bassett and

23  said, Why would you send such an email?

24             And he said, Well, the Court found that the house

25  was forfeited; that's their understanding.

1     And I said, Well, you need to get back in touch

2  with the client and the person who has the purse strings and

3  find out whether we're still paying, because the house hasn't

4  been forfeited.

5     And he said, Well, I don't understand.  I read

6  that it was forfeited.

7     So that's where we left it.  I'm still waiting for

8  other information.  There was a miscommunication and, you

9  know, obviously, (indiscernible) read the proceedings

10  differently and as Mr. Despins points out, we've been funding

11  14,000 and change every week for some time now with no access

12  to the property, mind you.  So, you know, there's certainly

13  no dispute on our part that it's important, given the fact

14  that there's property, personal property in the property,

15  which belongs to our client, mind you, and we want that

16  protected.  But we also do believe that there is a little bit

17  of injustice here that our client is unable to use its own

18  property and is expected to maintain the costs of the trustee

19  in protecting that property.

20     So -- and I'm just responding to the comments that

21  there's some inequity here of the estate having to pay for

22  anything.  Right now, the estate is the reason why our client

23  can't use its own property.

24     So, that said, I wish I had more information, Your

25  Honor.  All I have is that our client's manager, I think,

1  erroneously sent an email saying that we no longer own the

2  property, because it's been forfeited to the government, and

3  that's where we stand.

4          MR. DESPINS:  Your Honor, if I may?

5          The concept that a manager, the loan-level person

6  who is actually in charge of paying the bill went on his own

7  made that determination is interesting, but, you know, I have

8  serious doubt about that.

9          And the reason his client can't use the property

10  is because the client is in jail; that's why he can't use the

11  property.  That's a (indiscernible) of the state of facts.

12  So, I don't get it.

13          THE COURT:  Say that again.  I missed the second

14  thing you said, Trustee Despins.

15          MR. DESPINS:  The reason -- you said the client

16  can't use the property.

17          The reason the client cannot use the property is

18  because the client is in jail.  Mr. Kwok is the owner of the

19  property.  He can't use the property because he's in jail,

20  the same way he can't use the (indiscernible) property or The

21  Sherry-Netherland.

22          So, in any event, the point is, I think that

23  what's happening here is -- we'll hear a little more about

24  this in Greenwich Land -- is that they're holding up the

25  purchase.  They understand what's going on with Mr. Kwok and

1  I think that this is not an action that somehow a manager, on

2  his own, made the decision, decided to cut off their funding.

3  Somebody else decided that (indiscernible).

4          The point I'm making --

5          MR. CONWAY:  I don't know if Your Honor wants me

6  to respond to any of that, but none of it was based on fact;

7  it's all Mr. Despins' opinion and it's all inaccurate.

8          And, frankly, I don't represent Mr. Kwok.  When we

9  got involved in this case, I had to ask them who Mr. Kwok

10 was.  I had no idea who he was.  We're talking about Taurus

11 Fund LLC and to this day, I haven't seen a shred of evidence

12 that anybody under Taurus Fund LLC owns the property and, in

13 fact, in my recent conversation yesterday, I was told, oh,

14 well, there was evidence at the criminal trial that Taurus

15 Fund was trying to lease a portion of the property to the

16 wife of Mr. Kwok.  If that's not evidence that he doesn't own

17 it, I'm not sure what it, because why would he lease --

18         THE COURT:  Well, we don't need to worry about all

19 that because none of it is in the record, okay.

20         MR. CONWAY:  Okay.  Thank you, Your Honor.

21         THE COURT:  What we do need to worry about is --

22         MR. CONWAY:  And I would just ask that Mr. Despins

23 be reminded that neither of us should be making assertions

24 based on evidence that's not in the record.

25         THE COURT:  Well, let's talk a minute, first of

1  all, Mister -- Attorney Conway.  You've talked -- I think

2  I've asked you more than once who is your client and who are

3  you getting direction from.  I don't think I've ever gotten

4  an answer to that question, but you obviously talked to

5  somebody yesterday about something.  I still don't know who

6  your client is and who you take direction from.

7  But the email -- and it wasn't a note; it was an

8  email, according to what I've seen that was filed on the

9  docket of this case -- is saying that the house was

10  forfeited.  It's not a house, but the mansion was forfeited

11  to the government.

12  There's no information that I can see on the

13  docket of this case or this adversary proceeding that would

14  support that conclusion by this person named -- hold on a

15  second -- the email came from --

16  MR. CONWAY:  Qi Yong, Your Honor.

17  THE COURT:  What?

18  MR. CONWAY:  His name is Qi Yong; he's the

19  manager.

20  THE COURT:  Okay.  So what did he base his belief

21  on, because there's nothing that I've seen that would say

22  that anything's been forfeited to the government.  So where

23  does that come from?  There has to be some basis for that

24  belief and I don't see anything that would support that

25  belief.

1             Did he show you anything --

2             MR. CONWAY:  It's an incorrect belief.

3             THE COURT:  -- that would support that belief?

4             MR. CONWAY:  No.  I did speak with him, as I

5     mentioned, Your Honor, and he told me -- I asked him, Where

6     did you get that belief?

7             He said he read it in the paper.

8             THE COURT:  Okay.  Well, that seems somewhat

9     extreme to then say, We're not going to pay anything, because

10    of that, without talking to you.

11            You're his lawyer, right?  You're the lawyer for

12    Taurus Fund and he is the manager of Taurus Fund.

13            That seems somewhat extreme, don't you think?

14            MR. CONWAY:  Well, it seemed inappropriate to me

15    and I let him know that.

16            THE COURT:  Okay.  Good.

17            All right.  So, then, you've let him know it's

18    inappropriate, number one.  Number two, did you ask him about

19    this last invoice that was paid where there was going to be

20    an ACH transfer that was going to be received today according

21    to his email?  I don't know for what services that covers.

22            Does that cover just last week or does it cover

23    beyond that?  I don't know what the invoice is for, so it's a

24    little difficult to understand what's been paid to the

25    security company, okay.

```
 1            MR. DESPINS:  Your Honor, they were payments
 2   through Monday at midnight; meaning, Monday at midnight or
 3   Sunday night, midnight, and then, so that's why I received a
 4   call from this gentleman saying, We're pulling out, you know,
 5   we're getting paid until Sunday night.
 6            And I had to tell him, Don't do that.  I'll cover
 7   what needs to be covered until further notice.  So, it was
 8   until Sunday night that just passed.
 9            THE COURT:  All right.  Well, his -- the email
10   from a person who's name is Johnson Qi -- K -- Q-i, is that
11   who you're talking about, Attorney Conway?
12            MR. CONWAY:  His name is Qi Yong in his email.  I
13   guess whoever reads these uses the name "Johnson," but his
14   name is Qi Yong, Y-o-n-g.
15            THE COURT:  His first name is Q-i?
16            MR. CONWAY:  Q-i Y-o-n-g.
17            THE COURT:  Okay.  Q-i, is his first name and his
18   last name is Y-o-u -- say it again, please.  I'm sorry.
19            MR. CONWAY:  Y-o-n-g.
20            THE COURT:  Y-o-n-g.
21            Who sent an email from an email address:
22   Johnsonfalcon7@gmail.com to hi -- to Hawkeye Security, to
23   Franco at Hawkeye Security at 8:26 p.m. on Sunday, July 28th,
24   okay.
25            So, what you're saying is -- I believe what you're
```

1  saying is that that's a mistake.  He acted erroneously, and

2  that the payments are going to continue to be made to pay the

3  security.

4              Is that what you're saying, Attorney Conway?

5              MR. CONWAY:  That's what I asked him to find out.

6  I haven't heard back yet.  He expressed a concern about the

7  ability to make the payments going forward, given the fact

8  that he thought that the -- Your Honor, I can't speak to his

9  state of mind, but he acted as if I was telling him an

10  indirect fact when I told him that this house had not been

11  forfeited.  It was as if he didn't believe me.

12             So I've asked him to confirm for me, you know,

13  what, if anything, we can expect going forward, with respect

14  to payments.  At the same time, I conferred with Mr. Bassett

15  and agree with Mr. Bassett that, you know, if we don't have

16  money coming in, you know, we think it's important to either

17  protect the personal property within the house there, or move

18  it someplace elsewhere it can be protected.

19             The house, itself, obviously, isn't going to be

20  stolen and, frankly, it's not being used.  It hasn't been

21  used since Your Honor put the order in effect.

22             So there are ways to try to fix the problem, but

23  right now, I'm not sure what to tell you, other than I'm

24  waiting for information.

25             THE COURT:  And when do you expect to have this

 1  information?

 2         MR. CONWAY:  I have no expectations, Your Honor,

 3  other than I've asked for it.  I've been -- I will continue

 4  to push as hard as I can to get information as quickly as I

 5  can say.  That's all I can say.

 6         THE COURT:  Where's Mr. Johnson located or

 7  Mr. Yong, where is he located?

 8         MR. CONWAY:  I believe he's -- the reason he was

 9  hired is because he lives somewhere near the property.

10         THE COURT:  Who hired him?

11         MR. CONWAY:  Taurus Fund.

12         THE COURT:  Who at Taurus Fund made that decision?

13         MR. CONWAY:  Well, I can't tell for sure, but the

14  contract is signed by David Fallon.  You know, if there was

15  somebody else that helped David Fallon, I can't tell you

16  that.  It's a fund, so -- but David Fallon is the one who

17  formally engaged him.

18         THE COURT:  Okay.  Well, if these payments aren't

19  made, then they're going to be in violation of an existing

20  order and they could be subject to sanctions, including jail.

21         Do they understand that?

22         MR. CONWAY:  I got it.

23         THE COURT:  I think you need to make sure that you

24  communicate that to them.  I mean, this is a very odd

25  situation, Attorney Conway, and I'm hearing you say you don't

1  know when you're going to get a response.

2          I understand you didn't cause the issue, but the

3  problem is that's not an acceptable answer.  This is an

4  asset.  Whether you agree or not, this is subject to an order

5  of this Court, with regard to this being an asset of the

6  estate.  And I understand if you don't agree -- that's fine;

7  I'm not quarrelling with that at all -- but the status is,

8  right now, that this property is subject to an order of this

9  Court and if your client isn't going to abide by that, then

10  they're going to be subject to sanctions, which could

11  include, you know, possible jail if they're not going to pay

12  what they're ordered to pay.

13          I mean, we've been through this before; this isn't

14  new.  I don't mean about payment, but what I'm saying is,

15  this is the order.  Whether they like it or not, it's the

16  order, and to somehow cause a commotion by saying it's

17  been -- he believes, because he read in the paper that -- and

18  he didn't talk to anybody and he just sends an email saying,

19  We're not going to pay you anymore, that doesn't sound like a

20  thing that -- that doesn't sound like an action that a

21  manager would take, exercising reasonable business judgment,

22  to me.

23          And that's your client.  Your client is what your

24  client is.  So I think you need to -- we need to have an

25  answer, not "I don't know when."  And I'm not -- I'm saying

1   to you, I understand that what you said to me, but you need

2   to have an answer to that question.  I'm going -- I will have

3   an answer by tomorrow or Thursday.

4         We've been through this on "there's no insurance";

5   we've already been through this.  I mean, this isn't going to

6   work.  You represent this client.  If I have to have an order

7   bringing your client into court to explain to me what is

8   going on and from whom they're getting their authority, I

9   will do so and that can be as soon as tomorrow or Thursday.

10         So I don't know how you want to proceed, but that

11   this is -- you know, you're saying it's incorrect; well,

12   then, they've got to pay.  So I need to know that they're

13   going to pay, otherwise, they're going to be in this

14   courtroom tomorrow or Thursday and I'll have the United

15   States Marshals go get them, Mr. Fallon and Mr. Yong.

16         So I don't know if you want to have a conversation

17   with your client this afternoon, but I would certainly

18   suggest that you do.

19         MR. CONWAY:  I will do my best, Your Honor, as

20   I've been doing so far.

21         THE COURT:  Well, I need their addresses.  I need

22   to know where they are so I can send the U.S. Marshals to

23   where they need to go to get these people to come into court,

24   and you need -- you have an address for them, you have to.

25   So I need that information.

1        MR. CONWAY:  Okay.  Well, do you want me to give

2   that to you now, because I don't have that now?  I've given

3   that information to the trustee, so the trustee can give it

4   to you just as easily as I can.

5        THE COURT:  Yeah, but they're your clients --

6        MR. DESPINS:  I'm not sure that --

7        THE COURT:  -- Mr. Conway.  They're your clients.

8        MR. CONWAY:  Excuse me?

9        THE COURT:  They're your clients.

10       MR. CONWAY:  They're my clients, Your Honor, but

11  remember, what we're doing here today is a status conference.

12  This was not a motion.  This was not a hearing on contempt.

13  This is not something that I even had time to --

14       THE COURT:  Mr. Conway --

15       MR. CONWAY:  -- I just got out of court, Your

16  Honor.

17       THE COURT:  Mr. Conway -- there's already orders

18  in place --

19       MR. CONWAY:  Yes, there are, Your Honor.

20       THE COURT:  -- that your client needs to abide by.

21  And if they're not abiding by them, then I will take whatever

22  action I think is appropriate.

23       MR. CONWAY:  That's fine, Your Honor.  And you

24  have the -- you're the judge.

25       THE COURT:  This is a valuable lesson.  As we all

1   know, we already had this whole thing about insurance.  We

2   went through this many, many, many months ago.

3          If your clients are going to assert that they are

4   not going to pay and you don't have an answer that they

5   actually are going to pay, then I will do what I think is

6   appropriate under the circumstances of this case.  So --

7          MR. CONWAY:  Well, all we can do, Your Honor, is

8   find out.  Right now, all we have is counsel coming to you

9   asking for a status conference before anybody had time to

10  figure out what was going on.

11         So if you'll give me the benefit of the doubt and

12  let me try and reach my client, then I can report back.  But,

13  Your Honor --

14         THE COURT:  I think I just suggested that to you.

15  I'm not suggesting I'm not --

16         MR. CONWAY:  Okay.  And I'm hearing you, Your

17  Honor --

18         THE COURT:  -- giving you the opportunity --

19         MR. CONWAY:  -- loud and clear.

20         THE COURT:  Hold on a second, Attorney Conway.

21  Let me finish my statement, please.

22         I didn't suggest that you didn't have the

23  opportunity to contact you client; in fact, I said, I think

24  you better call them this afternoon.  That's exactly what I

25  said, so I don't know what your argument is.  You need to get

1   an answer.

2          MR. CONWAY:  I'm not sure -- okay, my point only

3   is, Your Honor, I hear you and I'm going to do what you

4   asked.

5          THE COURT:  Okay, good.  Because I need an answer.

6   I need to know whether or not they're going to make these

7   payments, including the real estate taxes.

8          This is not -- you know, this is a bankruptcy

9   estate, Mr. Conway -- and I'm not suggesting you think

10  anything to the contrary -- however, the Court has to make

11  sure that the assets of the bankruptcy estate, and unless and

12  until they're not, if you win on appeal and all those other

13  things, are secure.  And if payments aren't going to be made

14  by your client, who's bound by an existing order to do so,

15  then appropriate steps will be taken.

16         We can't -- this isn't a situation where we

17  have 21 days to file a response; that's not going to happen.

18  There's already an existing order in place and that existing

19  order needs to be complied with, and if it's not going to be

20  complied with, I need it in writing that it's not going to be

21  custom replied with and why, and who provided you with the

22  authority to say that.  Because you represent a corporate

23  entity, you have -- there has to be somebody with authority;

24  that's how it works, we all know that.

25         So, Trustee Despins and Attorney Conway, I think

 1  what we need to do is establish a time frame by which

 2  Attorney Conway is going to get back to the Court on this

 3  issue.  Right now, supposedly, the security has been paid

 4  through Sunday night.

 5          Trustee Despins, that's what you're telling me?

 6          MR. DESPINS:  That's correct.  Your Honor, I

 7  become liable from Monday.

 8          THE COURT:  And that's the normal course; they pay

 9  at the end of each week?

10          MR. DESPINS:  Correct.

11          THE COURT:  So the week of July 29th through

12  August 3rd would be paid on August 3rd?

13          MR. DESPINS:  Correct, Your Honor.

14          THE COURT:  Okay.  And that's 14,000-some-odd

15  dollars.  I don't need to know the exact amount, but that's

16  what you're telling me, correct?

17          MR. DESPINS:  Correct, Your Honor.

18          THE COURT:  And those amounts have been paid,

19  without interruption, during the course of this adversary

20  proceeding, correct?

21          MR. DESPINS:  That's correct, Your Honor.

22          THE COURT:  Okay.  Have real estate taxes been

23  paid at all during the course of this adversary proceeding?

24          MR. DESPINS:  Real estate taxes have been paid,

25  but as I said, there's a payment of seventy-five or $77,000

1   coming due on August 1st.

2           THE COURT:  I understand.

3           MR. DESPINS:  But to date, the other payments --

4           THE COURT:  I'm just asking, have there been real

5   estate payments made to date --

6           MR. DESPINS:  Yes --

7           THE COURT:  -- by Taurus Fund with regard to this

8   house?

9           MR. DESPINS:  -- yes, Your Honor.

10          THE COURT:  Okay.  And do you have --

11          MR. DESPINS:  I don't know who made the payments,

12  but payments were made.

13          THE COURT:  Okay.  Do you happen to know the

14  approximate amount?  I mean, is this -- does New Jersey work

15  as a two times a year you pay the taxes and they're $75,000

16  twice a year or how does it work?

17          MR. DESPINS:  I don't recall precisely, but I

18  thought there were two payments in 2024 already made, much

19  smaller, and now I'm really speculating, but I thought they

20  were in 20,000 range.  Mr. Bassett may have (indiscernible)

21  who listed that.

22          So it's -- so I think some payments were made

23  in 2024.  I think there were two payments, in the fifteen-to-

24  twenty-thousand-dollar range, but I -- this is where I'm a

25  little bit -- you know, I can't be that precise.

1          Mr. Bassett?

2          MR. BASSETT:  Actually, yeah, the records that

3   looking at, I mean, they're just publicly available, you

4   know, county records, they actually show that two payments of

5   approximately $69,000 were made this year; one on May 1st,

6   2024, and another on February 21st, 2024.  There was also

7   payments of approximately $70,000 made in, you know, November

8   of 2023 and August of 2023, May of 2023, February of 2023.

9   So, Your Honor, it looks like there are quarterly payments

10  due of approximately $70,000 each.

11         THE COURT:  Right.  It sounds like quarterly

12  payments, that's right.

13         So they've been made through May of 2024,

14  according to the records you're looking at, Attorney Bassett?

15         MR. BASSETT:  That's correct, Your Honor.

16         THE COURT:  Okay.  Thank you.

17         So, Attorney Conway and Trustee Despins, there's

18  two ways we can go.  You can come up and tell me what works

19  for both of you on agreement or I can tell you when, Attorney

20  Conway, you need to file some kind of document, or we can

21  have another status conference and you can tell me.

22         But I'm telling you right now, I need to know if

23  these payments are going to be made to the security company

24  and the real estate taxes and that Taurus Fund has told you,

25  through an authorized representative, whomever that is -- and

1  I want to know who it is -- that they are going to be made.

2  And if they're not going to be made and the decision is that

3  they're not going to be made, then I want to know what

4  representative of Taurus Fund has decided not to comply with

5  the order and not to meet its obligations as a business, as

6  an entity, and then I will bring that person into court and

7  they will be subject to an examination.

8         So, how do you want to proceed?  Do you two want

9  to talk after this or do you want me to set a date right now?

10         MR. DESPINS:  Your Honor, as much as we'd like to

11  talk to Mr. Conway, who's a real gentleman, the issue is a

12  pretty simple one:  they'll make the payment or not make the

13  payment.  There should be a date by which they report to the

14  Court that they will or will not make the payment.  That date

15  should be pretty short, like Thursday morning, 9:00 a.m.,

16  something like that.

17         THE COURT:  Okay.  I will do that with the

18  understanding that if you and Mr. Conway come to some

19  agreement or he provides something satisfactory to you in the

20  meantime --

21         MR. DESPINS:  Sure.

22         THE COURT:  -- then there won't be a need to file

23  something.

24         MR. DESPINS:  Absolutely.  Thank you.

25         THE COURT:  So I will set the time frame for

 1  Mr. Conway to report to you -- well, maybe he's going to --

 2  actually, it's going to be something filed on the docket,

 3  much like -- didn't we do that with regard to the insurance,

 4  the fact that there was no insurance on the property, wasn't

 5  it filed on the docket of the case --

 6          MR. DESPINS:  Yes, Your Honor.

 7          THE COURT:  -- of the adversary, I should say?

 8          MR. DESPINS:  Yes.

 9          THE COURT:  Then, by noon -- I'm going to say

10  by 11:00 a.m. on Tuesday, August 1st, Attorney Conway --

11          MR. DESPINS:  That's Thursday, Your Honor.

12          THE COURT:  What did I just say, Tuesday?  I'm

13  sorry.

14          MR. DESPINS:  Tuesday.

15          THE COURT:  I'm sorry.

16          By 11:00 a.m. --

17          MR. CONWAY:  Your Honor, if I may?

18          THE COURT:  Yes?

19          MR. CONWAY:  If I may have until 5:00?  I'm in

20  court in Texas on Thursday, so it would be very helpful to me

21  to have until 5:00.

22          THE COURT:  I'll give you until 5:00 --

23          MR. CONWAY:  Thank you, Your Honor.

24          THE COURT:  -- till 5:00 p.m. on Thursday,

25  August 1st, you'll have to file something on the docket of

1  this adversary proceeding that indicates that the Taurus Fund

2  will make all payments, due and owing, with regard to the

3  property, including, but not limited to the weekly security

4  services payment and the real estate taxes, and you will tell

5  me who provided you with that authority, their name and their

6  address, where they can be served and/or the United States

7  Marshals Service can come, bring them into this court, or you

8  can -- and/or you can say that you're not going -- that

9  Taurus Fund is not going to make the payments and the same

10 information will be necessary.

11          Who is the person that was authorized to make that

12 decision on behalf of Taurus Fund and what is their -- where

13 is the address that they are located, both home and business

14 addresses, so that they can be served and the United States

15 Marshals can bring them into this court.

16          Are there any questions, with regard to that?

17          MR. CONWAY:  No, Your Honor.

18          I would just point out that my not objecting on

19 the record doesn't mean that I waive the right to state that

20 I don't believe that's an appropriate remedy for a

21 corporation who decides that they can't do something or can

22 do something.  It's just, with that said, I don't know if

23 it's an appropriate time to raise objections.

24          THE COURT:  I think it's completely appropriate

25 for you to raise your objection, but that's overruled.

1          MR. CONWAY:  Well, then, for the record, Your

2    Honor, I object to the idea that a marshal can go out and

3    arrest an officer of a corporation simply because the

4    corporation makes the determination it can or can't do

5    something.  I don't know what the determination --

6          THE COURT:  I didn't say anything about arrest,

7    Attorney Conway; I never used that word.

8          MR. CONWAY:  Well, having a marshal go out and put

9    somebody in whatever they have to put them in to drag them

10   into court, sounds like an arrest.

11         THE COURT:  Well, we'll see.  We see how you do

12   and what you file by the -- I never used the word; that's

13   your word, so you can figure out how you want to interpret

14   that.  I can issue orders that are supplemental to orders

15   that are already in existence in this adversary proceeding.

16         All right.  So I think that concludes the Taurus

17   Fund status conference; is that correct?

18         MR. DESPINS:  Yes, Your Honor.

19         THE COURT:  All right.  So then, let's move to --

20   thank you, Attorney Conway.  You do not need to stay, but

21   you're welcome to if you'd like to.

22         MR. CONWAY:  Thank you, Your Honor.

23         THE COURT:  Then let's move to the Greenwich Land

24   status conference, please.

25         MR. BASSETT:  Yes, Your Honor.  Again, Nick

1  Bassett from Paul Hastings, on behalf of the Chapter 11

2  Trustee, for the record.

3          So, Your Honor, again, this is -- the general

4  background here is set forth in the request for the status

5  conference that we filed on the docket of the adversary

6  proceeding.  In short, this relates to the motion for stay

7  pending appeal that the Defendants have filed with Your

8  Honor.  Your Honor has entered a scheduling order that sets

9  the trustee's objection deadline for, I believe, August 6th,

10  and I believe there's a hearing currently scheduled for

11  August 20th or the 22nd, one of those two dates.  I

12  apologize.

13          We -- it's the 20th -- we, last Monday, so eight

14  days ago, served very narrow discovery requests, and we had

15  also previewed to counsel that we would be serving such

16  discovery requests before we did, we served discovery

17  requests on the 22nd and, again, they were very narrow.  We

18  had six requests for documents.  We also sought a limited

19  deposition.

20          The information that we're seeking, we believe, is

21  directly relevant to the request for the stay.  We're seeking

22  information that we need an order to test the various

23  assertions that Defendants are making in their motion to

24  evaluate the factors, including prejudice to, alleged

25  prejudice to the Defendants, potential harm to the estate, et

 1  cetera, that the Court needs to evaluate when considering a

 2  stay motion.

 3         In brief, if I can just summarize, quickly, the

 4  six requests?  So, Your Honor, we're asking for, first,

 5  copies of any documents related to bills, invoices, upkeep --

 6  and this is kind of a common refrain, you know, going back to

 7  the status conference we just had on the Taurus Fund to

 8  understand what types of payments are due to maintain the

 9  property, whether it be taxes, utilities, et cetera, and

10  documentation showing whether those things are being paid,

11  and if so, from what source; obviously, that's critically

12  necessary to know if the property is going to be maintained

13  if the stay that's being requested is granted.

14         We also have asked for bank statements so that we

15  can evaluate, you know, where the source of these funds are

16  coming and also see if there's been any dissipation of

17  Greenwich Land assets, i.e., funds in bank accounts, either

18  before or after the Court's summary judgment ruling, which

19  obviously would be highly relevant to prejudice to the estate

20  in the event of a stay.

21         We're also seeking documents concerning the

22  Defendant -- the debtor's wife's -- I'm sorry -- her alleged

23  ownership of personal property and other assets located in

24  the house, because that's been one of the issues that has

25  arisen on the motion for stay; the assertion being that there

1   would be prejudice if we tried to sell the house with its

2   contents because some of those contents allegedly belong to

3   Ms. Ngok, so we sought documents on that issue.

4         We've also sought documents related to any

5   movement of property to or from the mansion; again, it goes

6   to whether or not the property that's located there is truly

7   owned by the Defendant.  It also goes to the potential

8   dissipation of assets.

9         And then, lastly, Your Honor, we sought copies of

10  insurance policies and related documents, such as any

11  appraisals, that would help us understand the value of the

12  house; obviously, insurance is critical.  We also want to

13  understand what the land is worth versus what the house and

14  the developments on the land are worth; all of that is

15  essentially relevant to, not only the request for the stay,

16  but also to the extent that the Court were to entertain the

17  stay request, the appropriate level of bond that would be

18  required to ensure that the estate is fully protected for the

19  duration of any stay.

20        So, Your Honor, that's the narrow discovery we

21  sought.  We also want to ask Ms. Ngok questions in a

22  deposition about those narrow topics.  We sent the discovery

23  requests, as I said, on the 22nd; eight days ago.

24  Immediately, in that same email, which is attached to our

25  status conference request, offered to meet and confer.  We

 1  didn't hear anything.  I followed up two days later with

 2  Attorney Major and said, Just following up, we are obviously

 3  under a tight timeline here.  We need this information.  I'm

 4  happy to meet and confer.  Again, didn't hear back.  We then,

 5  had no choice but to file a status conference request on

 6  Friday and now, here we are.

 7           We still have not had an opportunity to meet and

 8  confer.  We still have not been assured that any discovery is

 9  being provided.  Again, we don't see how we can go forward at

10  a hearing upon, you know, at which the Defendants bear the

11  burden to seek a stay if we are unable to test their

12  assertions and fully understand, based on, you know, some

13  underlying documentation and testimony, et cetera, as to the,

14  you know, the facts relevant to the various considerations

15  that the Court must take into account in evaluating their

16  motion.

17           So, Your Honor, again, the purpose of the

18  conference today, we would ask the Court is to make clear

19  what we think we are entitled to already, which is responses

20  to our discovery.  I'm obviously happy to hear from counsel

21  to the Defendants and I'm happy to answer any questions, but

22  that's kind of the description of the purpose of the

23  conference today, Your Honor.

24           MR. DESPINS:  Your Honor, before we go there, if I

25  may, just two minutes?

1          THE COURT:  Go ahead.

2          MR. DESPINS:  I've always had doubts about this,

3    but I think now it's pretty clear:  there's no insurance on

4    that house.  And I'm really -- well, I'll just say it's

5    bankruptcy malpractice for me not to raise this.

6          You know, this is a six million, $7 million asset

7    with no insurance -- I hope Mr. Major will correct me, but I

8    don't think he can -- and my point is they're dead on arrival

9    on the stay hearing.  So we're going to spend a lot of money

10   preparing for this, but if they know -- and I guarantee they

11   will not pay the taxes due on August 1st, because it's not --

12   they don't have insurance and they know they're dead on

13   arrival at a stay hearing because -- and I don't want to

14   presume what Your Honor will do -- but I know from prior

15   cases, as you mentioned, insurance is number one always, and

16   they can't get insurance now; they're uninsurable.

17         So, to me, that's changed the circumstances.  You

18   gracefully gave them more time for a stay hearing, et cetera,

19   et cetera, but if we had known that there is no insurance on

20   that property, I'm not sure it would have played out that

21   way.  So we ask the discovery issues that Mr. Bassett raised

22   and (indiscernible) address that, but I really wanted to

23   address the issue of no insurance.  And I question the idea

24   of going to a full stay evidentiary hearing when they're

25   going to show up with no insurance for that property.  Thank

1   you, Your Honor.

2         THE COURT:  Okay.  Thank you.

3         Attorney Major?

4         MR. MAJOR:  Thank you, Your Honor.

5         I think for a variety of reasons, including my

6   client's condition, that I agree with -- and I'm saying this

7   without prejudice to my client's rights and arguments and

8   where this all may go -- but I agree with the trustee that

9   perhaps we should not be going through the stay litigation.

10  And I'd like an opportunity, if the Court will give it to me,

11  and if the trustee will oblige, if I could try to convince

12  the trustee through private negotiation over the next couple

13  of days, to come to some resolution of the stay litigation

14  that would balance his concerns and I think help my client,

15  given the condition that she's in.

16        And so, I don't want to say too much more than

17  that in terms of, you know, where I want to try to take this.

18  I would love if we could do it with a mediator.  I don't

19  think there's sufficient time, but I'd like to have a little

20  bit of time with an audience on behalf of the trustee,

21  whether it be one of his lawyers or himself -- whatever his

22  team can accommodate -- to see if we could reach some form of

23  a resolution of the stay motion.  I think we can, but I'd

24  like to have that opportunity if I could.

25        MR. DESPINS:  And, Your Honor, I would say the

1  same thing I said to Mr. Conway.  Mr. Major is a gentleman.

2  He's in an awful position, unfortunately.

3          And for the trustee to accept the concept that

4  somebody who has been found not to be the owner would stay in

5  the house that's uninsured, they're not paying taxes, Your

6  Honor, they're pulling (indiscernible).  They know that as a

7  result of the criminal conviction, the game is over.  That's

8  why they're stopping to pay at Taurus, because they know they

9  will lose Taurus, regardless if they lose it to me or to the

10  government; they will lose it and the same thing for this

11  house.

12          Mr. Major has no argument on the stay.  He knows

13  that.  He's trying to do the best for his client, and I

14  respect that, but if something happened to that property on

15  my watch and I allowed this to happen, somebody would say,

16  You should have your head examined, trustee, for having

17  allowed that.

18          So I don't want to sound like a horrible person.

19  I understand what he's saying, but we're dealing with a

20  criminal enterprise.  That's not -- you remember, this whole

21  thing was a criminal enterprise and in that context, where

22  there's no insurance, there should be zero tolerance in your

23  court.  And I really feel bad about putting you, Your Honor,

24  on the spot like this, but we just cannot allow this to go

25  on; it's too dangerous and they know it's too dangerous.

1          MR. MAJOR:  Your Honor, if I may?

2          THE COURT:  Go right ahead.

3          MR. MAJOR:  So, the Court set -- and this was, you

4    know, a schedule that the trustee asked to be moved -- but

5    upon the consent motion that trustee filed, the Court set a

6    deadline of this coming Friday, August 2nd, for my client to

7    file a statement regarding property insurance and taxes.  And

8    so only after that order was entered did the trustee seek to

9    unilaterally move that date through the discovery request.

10          What I'm proposing is a negotiation this week that

11   does not alter the timeline that the Court set, with input

12   from the trustee.  And I don't think that it is too much to

13   ask for, under the circumstances, for the trustee to

14   negotiate with us during that window.  We're already -- our

15   client is already under an obligation to file on Friday, that

16   information.

17          And so -- and we've reached out to the trustee,

18   albeit, shortly before the hearing, because I just recently

19   met with the client yet again and, you know, went to proceed

20   on this path and that's why I reached out to the trustee

21   today and started that process.  And I understand it's got to

22   be done very quickly and we're prepared to do that.  And

23   that's -- I don't think we should deviate from the original

24   schedule, with the exception that I'm going to do my best to

25   try to reach some consensual resolution of the stay

 1  litigation.

 2         THE COURT:  So just, Attorney Major, so I

 3  understand -- I think I understand what you're saying, but

 4  I'd like to make sure that I do.  So you would like to have

 5  discussions, ongoing discussions with the trustee this week

 6  to try to resolve the issue of a motion for stay pending

 7  appeal without having to deal with discovery issues and the

 8  actual hearing on the stay pending appeal; is that what

 9  you're saying?

10         MR. MAJOR:  So, Your Honor, the hearing on the

11  stay is set for August 20th.

12         THE COURT:  Right.

13         MR. MAJOR:  The discovery issues, you know, I

14  think would be necessary to resolve if that hearing is going

15  forward.  Well, what I'm suggesting is that we discuss

16  resolving the stay motion so that there wouldn't be a

17  hearing.

18         THE COURT:  Right.

19         MR. MAJOR:  I understand, for sure, not just from

20  what you've said today during this status conference, but

21  from what the trustee has said to me during phone calls, that

22  some of what's in their discovery requests would have to be

23  part of some resolution of the stay litigation.  And so I

24  think that that is something that we understand in terms of

25  information that the trustee is going to want as part of any

1   sort of a resolution of the stay litigation.

2           And, again, I'm saying this without prejudice to

3   the arguments in our stay motion and so forth, but I just --

4   again, being with my client, I think it's in her best

5   interests, given her physical condition, that I work

6   something out with the trustee, and maybe it's not possible,

7   but I'd like to try.

8           THE COURT:  All right.  So let's --

9           MR. DESPINS:  Your Honor, consensually --

10          THE COURT:  Hold on a second, Trustee Despins.

11          So let's assume that you both agree that that

12  makes sense to have a conversation between now and Friday;

13  let's just make that assumption.  And then let's also assume

14  you don't work anything out.

15          You still have to file something on the docket of

16  this adversary proceeding on Friday as to whether or not

17  there's insurance and taxes have been paid; do you understand

18  that?

19          MR. MAJOR:  Yes, Your Honor.

20          THE COURT:  All right.  And you're not asking for

21  that date to change?

22          MR. MAJOR:  No, Your Honor.

23          THE COURT:  Okay.  Because it can't.  I don't see

24  any way that that can change unless there's an agreement with

25  the trustee.  Okay.  I think that's what I -- that's all I'm

1  going to say for now.

2          Attorney -- Trustee Despins, were you going to

3  respond to Attorney Major?

4          MR. DESPINS:  Your Honor, consensually, I'm always

5  happy to talk to people, but the insurance is a deal-breaker.

6  I cannot -- you can overrule me, and if that's your

7  determination, that's perfectly fine -- but I cannot

8  consensually agree that it's okay to have somebody who's been

9  found not to own the house to live in the house without

10 insurance.

11         So, I'm happy to talk, but I don't want to mislead

12 anyone about what's going to happen.

13         MR. BASSETT:  And, Your Honor, if I may?  The only

14 other observation I would make is that if we were to proceed

15 down this path of trying to have discussions this week while

16 keeping in place the deadline for counsel to file proof of

17 insurance and other information on the docket, the other

18 issue, of course, we run into if we don't have a resolution

19 is we would, then, still, as counsel noted, need responses to

20 the discovery.  So I think at that juncture, we would maybe

21 have some wiggle room with the objection deadline of the 6th

22 and a hearing date of the 20th to potentially move out our

23 objection deadline to allow for discovery to take place, you

24 know, next week in advance of that.  But I think we would

25 have to deal with that issue of the timing and sequencing

1   under the current schedule, Your Honor.

2            THE COURT:  I understand.

3            So what are we -- how are we concluding this today

4   as far as there is an order in place, ECF 147, that extended

5   out the deadlines, including the deadline for the Greenwich

6   parties to file the insurance and taxes notice to August 2nd,

7   which is Friday.  I just asked Attorney Major that he knows

8   he's got to file that, even if there isn't an agreement with

9   the trustee.

10           If there is an agreement with the trustee, I don't

11  know what it's going to be, so you all will have to figure

12  that out.

13           But Attorney Major, I know I heard you clearly.

14  I've asked you the question on the record.  You understand

15  you have to file it.

16           If you don't -- if you do not file anything on

17  August 2nd, then, you know, we'll see where things go.  If

18  there isn't an agreement and the trustee is requesting --

19  well, already has requested discovery, under the

20  circumstances of this specific adversary proceeding and the

21  circumstances of the larger Chapter 11 cases, I think the

22  discovery is warranted and I, you know, do not see any reason

23  why it shouldn't be complied with.

24           I understand what you're saying about your

25  client's health; obviously, we don't know anything about

1    that, other than what you've said, and I'm not suggesting you

2    have to prove anything at this point in time, but you, as --

3    you're in -- you have to decide how that's going to go after

4    conversations with your client.  If there isn't some

5    resolution, I haven't been persuaded that the Federal Rules

6    of Civil Procedure somehow do not support discovery in this

7    situation, and so that's how I see things from the Court's

8    standpoint right now.

9         MR. DESPINS:  Your Honor, thank you for those

10   comments.  You know, my only point is let's assume that they

11   file something saying there's no insurance and they haven't

12   paid taxes.  There needs -- well, they need -- there should

13   be a mechanism to shortcut this because the costs involved --

14   and I need to retain an expert, I've already found a

15   (indiscernible) guy -- having a full-blown hearing on this

16   when we know, I think, that the outcome without any insurance

17   and without the taxes being paid, we know what the outcome

18   is.

19        So I'm not asking you to rule on that today, but I

20   think we may come back to Your Honor very soon to say that

21   there should be -- this hearing should not go forward.

22             THE COURT:  I understand.

23             MR. DESPINS:  If that is --

24             THE COURT:  I understand that clearly.

25             MR. DESPINS:  Okay.  Thank you.

1          THE COURT:  We'll see what gets filed on Friday.

2          MR. DESPINS:  Thank you, Your Honor.

3          THE COURT:  And if there isn't insurance and taxes

4   aren't being paid, then we'll probably be having another

5   status conference Monday or Tuesday of next week, because

6   we -- it can't be -- I mean, Attorney Major, you were here

7   before.  I'm not saying anything you haven't already heard.

8   There can't be an asset, whether you agree it's an asset or

9   not, that is uninsured.  It is not -- the Bankruptcy Code

10  even references that as a basis for a debtor who had sought

11  affirmative relief not to be in the Bankruptcy Court before.

12          We all know what happened.  The debtor sought

13  affirmative relief, but the trustee was appointed.

14          So that's where things stand.  So, from the

15  Court's perspective, I'm not sure there's anything else we

16  can do in connection with this adversary proceeding this

17  afternoon.  We will see what happens.

18          I encourage you to talk.  I have no idea whether

19  it will produce anything, but I obviously encourage you to

20  talk.  There isn't a lot of time, obviously, between now and

21  Friday, so, obviously -- and, I mean, I don't need to say it,

22  but I will -- I'll be not happy to hear that the

23  conversations start at 4:00 p.m. on Friday, if that's when

24  the conversation starts.  I understand that everybody has a

25  lot of things to deal with, and I'm not suggesting anything

1  to the contrary, but this is a critical issue in this

2  adversary proceeding.

3           And I understand that you, Attorney Major, would

4  like a stay pending appeal, and you're absolutely entitled to

5  seek that, but you have burdens associated with that, as

6  well, as does the trustee.  You both do.

7           So we need to handle it appropriately under the

8  Federal Rules, applicable Federal Rules in this situation.

9  So we will see what happens on Friday and depending upon what

10 is or is not filed, we will take the next step.  And if that

11 means the trustee requests on, you know, which you could do,

12 too, Attorney Major, either one of you could request a status

13 conference over the weekend.  I mean, it's not likely that

14 it'll be held on the weekend, but it would be held on Monday

15 or Tuesday at the latest.

16          So, does anyone have any questions?

17          MR. DESPINS:  No, Your Honor.  Thank you.

18          THE COURT:  Attorney Major, is there anything else

19 that you want to add this afternoon while we're here?

20          MR. MAJOR:  Not at this time, Your Honor.  Thank

21 you for the time.

22          THE COURT:  Okay.  Thank you.

23          That concludes the status conference in the

24 Greenwich Land, adversary 23-05005.

25          Attorney Major, obviously, you are not required to

 1   stay -- we have another conference in another matter -- but

 2   you are welcome to stay if you would like to; that's your

 3   choice.

 4            MR. MAJOR:  Thank you, Your Honor.  I'll leave.

 5   Thank you.

 6            THE COURT:  All right.  Thank you.

 7            All right.  So, now, I'll have the -- I think the

 8   people for the 2 o'clock status conference are in the waiting

 9   room.

10            THE CLERK:  Yes, they are here.

11            THE COURT:  You can go ahead and bring them in,

12   please, and then we'll call that matter.  Thank you.

13            THE CLERK:  Thank you.

14        (Pause)

15            THE CLERK:  I think that's it.

16            UNIDENTIFIED MALE SPEAKER:  And, Your Honor, this

17   is in the AIG matter?

18            THE CLERK:  Case Number 23-5007, Genever Holdings

19   LLC v AIG Property Casualty Company.

20            THE COURT:  Okay.  Good afternoon.

21            If we could have appearances for the record?

22            MR. DESPINS:  Your Honor, I'm not appearing.  I'm

23   not -- this is Genever, so I'm really appearing just to

24   monitor, but I am not really appearing.  I'm not --

25            THE COURT:  Okay.  Well, go ahead and appear

1 anyway and we'll go from there, okay?

2           MR. DESPINS:  Okay.  Luc Despins, Chapter 11

3 Trustee, in the Kwok case.  Thank you, Your Honor.

4           THE COURT:  Okay.  Thank you.

5           MR. MCCORMACK:  Good afternoon, Your Honor --

6           THE COURT:  Go ahead, Attorney McCormack.  Go

7 ahead.

8           MR. MCCORMACK:  Good afternoon, Your Honor.  On

9 behalf of Genever Holdings, LLC, I am Michael McCormack from

10 O'Sullivan McCormack Jensen & Bliss.

11           THE COURT:  Good afternoon.

12           MR. O'CONNOR:  Good afternoon, Your Honor.  John

13 O'Connor and John Kavanagh from Steptoe, LLP, for AIG, and

14 Michael Thompson, our Connecticut counsel, is present, as

15 well.

16           THE COURT:  Good afternoon to all of you.

17           UNIDENTIFIED MALE SPEAKER:  Good afternoon.

18           THE COURT:  All right.  I looked at the joint

19 response that was filed in connection with the status

20 conference order and I understand the parties' positions,

21 obviously.  It wasn't clear to me whether the parties were

22 going to be going forward with discovery, given the fact that

23 the pretrial order had just been amended, I think, maybe two

24 days before the order entered in the main case, staying

25 matters.  So, obviously, that's what happened.

1          But now we're going to proceed, so I want to know

2  what the parties' plan is, with regard to -- if you've had a

3  discussion, and what your plan is with regard to discovery.

4          MR. O'CONNOR:  Your Honor, this is John O'Connor

5  for AIG.

6          I think at this point, we've had discussions, but

7  we've agreed that we need to discuss a revised pretrial

8  schedule, now that the deposition stay is over.  I would

9  think, and we worked cooperatively with Genever's counsel on

10  these things, I would think that we could get together,

11  hammer out a proposed, a revised order and submit it to the

12  Court.  I don't know if Mr. McCormack agrees or disagrees

13  with that, but that's how I see it.

14          THE COURT:  Attorney McCormack?

15          MR. MCCORMACK:  Thank you, Your Honor, and good

16  afternoon.

17          I don't disagree with Attorney O'Connor's

18  statements.  We're happy to have discussions about an amended

19  pretrial form.  I just will stay, though, that I think as we

20  indicated in our motion for summary judgment, we don't

21  believe that additional discovery is necessary to the pending

22  motion for summary judgment.  The discovery that would be

23  necessary relates to damages and the other claims in the

24  amended complaint that are not before the Court on the

25  summary judgment motion.

1          MR. O'CONNOR:  And Your Honor is aware that our

2    view is that there is appropriate discovery going towards the

3    summary judgment motion.  But I think we are all in agreement

4    that there is some discovery that needs to be taken and we

5    should work out that schedule and submit it to the Court.

6          THE COURT:  Well, I'd like -- and I appreciate the

7    comments of both counsel -- I'd like the discovery schedule

8    to be the same time frame as the schedule that you all agreed

9    to when you amended the pretrial order back in March.  So I

10   think the time frame should be the same and, you know, just

11   change the dates and I think we need to move forward.

12          Whether or not I -- as you know, the motion for

13   summary judgment is under advisement.  I will decide what, if

14   anything, I will do while you can proceed with discovery with

15   regard to that motion for summary judgment.  But I would like

16   the pretrial order to be presented to the Court by next

17   Friday, August 9th, and I'd like the dates to be the same

18   time frames that were in this existing, first-amended

19   pretrial order, just with different dates.

20          Does that make sense to everyone or does anyone

21   have any questions?

22          MR. O'CONNOR:  It makes sense to AIG, Your Honor.

23          And I don't think anybody proposed that there was

24   going to be a lengthy -- nobody is going to suggest a year of

25   discovery, let's put it that way.

1          THE COURT:  That's fine, thank you.

2          MR. MCCORMACK:  I agree, Your Honor.

3          THE COURT:  Okay.  Thank you, both.

4          So, again, I dragged you in here because I wasn't

5    sure what the status was.  You've told me in your joint

6    report, and I appreciate that, and now we just need to have

7    that, what will be a second-amended pretrial order enter --

8    submitted to the Court by August 9th.  And whether I see it

9    on August 9th or the next week, it'll enter shortly

10   thereafter, unless there's some concern, which I doubt there

11   will be, that the Court has with regard to the pretrial

12   order.

13         Is there anything else we should discuss this

14   afternoon?

15         MR. MCCORMACK:  Nothing from the Plaintiff, Your

16   Honor.

17         THE COURT:  All right.  Sorry to have --

18         MR. O'CONNOR:  Nothing --

19         MR. DESPINS:  Not from the --

20         THE COURT:  Oh, I'm sorry, Trustee Despins.  Go

21   ahead.

22         MR. DESPINS:  No, I was just going to say, not

23   from our perspective, and then thank you to the Court for

24   making yourself available on all of these status conferences;

25   I really appreciate it, thank you.

 1              THE COURT:  Okay.  And I, again, I'm sorry for all

 2  of you on this adversary that you had to wait.  The other

 3  status conferences went a little longer than anticipated.

 4              But as I noted to people last week, at least you

 5  didn't have to be here when there was no air-conditioning in

 6  our building, so that's kind of helpful for all of you,

 7  hopefully.

 8          (Laughter)

 9              UNIDENTIFIED MALE SPEAKER:  That was my thought,

10  Your Honor, that at least we were (indiscernible).  Thank

11  you.

12              THE COURT:  Okay.  All right.

13              Thank you all very much.  That concludes today's

14  hearings, so Court is adjourned.

15              COUNSEL:  Thank you, Your Honor.

16              THE COURT:  Thank you.

17              THE CLERK:  Court is adjourned.

18          (Proceedings concluded at 2:46 p.m.)

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.


/s/ William J. Garling                    August 1, 2024

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable

## **EXHIBIT 5**

**August 13, 2024 Hearing Transcript**

```
 1                 UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF CONNECTICUT
 2                      BRIDGEPORT DIVISION

 3  IN RE:                     .  Chapter 11
                               .  Case No. 22-50073 (JAM)
 4  HO WAN KWOK, et al.,       .
                               .  (Jointly Administered)
 5          Debtors.           .
                               .
 6  . . . . . . . . . . . . . .
                               .
 7  GENEVER HOLDINGS LLC and   .  Adversary Proceeding
    LUC A. DESPINS, CHAPTER 11 .  No. 23-05002 (JAM)
 8  TRUSTEE,                   .
                               .
 9          Plaintiff,         .
                               .
10      v.                     .
                               .
11  HO WAN KWOK, HING CHI NGOK,.
    QIANG GUO, AND MEI GUO,    .
12                             .
            Defendants.        .
13  . . . . . . . . . . . . . .
                               .
14  LUC A. DESPINS, et al.,    .  Adversary Proceeding
                               .  No. 23-05017 (JAM)
15          Plaintiffs,        .
                               .
16      v.                     .  Courtroom 123
                               .  Brien McMahon Federal Building
17  TAURUS FUND, LLC, et al.,  .  915 Lafayette Boulevard
                               .  Bridgeport, Connecticut 06604
18          Defendants.        .
                               .  Tuesday, August 13, 2024
19  . . . . . . . . . . . . . .   1:12 p.m.

20
                       TRANSCRIPT OF HEARING
21           BEFORE THE HONORABLE JULIE A. MANNING
                 UNITED STATES BANKRUPTCY JUDGE
22

23

24

25                        (Continued)
```

```
 1   APPEARANCES:

 2   For the Chapter 11
     Trustee:                   Patrick Linsey, Esquire
 3                              NEUBERT PEPE & MONTEITH, P.C.
                                195 Church Street
 4                              13th Floor
                                New Haven, Connecticut 06510
 5
                                -and-
 6
                                Luc A. Despins, Esquire
 7                              Shlomo Maza, Esquire
                                PAUL HASTINGS, LLP
 8                              200 Park Avenue
                                New York, New York 10166
 9
                                Nicholas A. Bassett, Esquire
10                              2050 M Street, NW
                                Washington, DC 20036
11

12   For the U.S. Trustee:      Holley L. Claiborn, Esquire
                                OFFICE OF THE UNITED STATES TRUSTEE
13                              The Giaimo Federal Building
                                150 Court Street, Room 302
14                              New Haven, Connecticut 06510

15

16

17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Electronically recorded

21   Transcription Company:     Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1   APPEARANCES (CONTINUED):

 2   For Pacific Alliance
     Asia Opportunity Fund:    Annecca H. Smith, Esquire
 3                             ROBINSON & COLE, LLP
                               280 Trumbull Street
 4                             Hartford, Connecticut 06103

 5                             -and-

 6                             Stuart M. Sarnoff, Esquire
                               O'MELVENY & MYERS, LLP
 7                             Times Square Tower
                               7 Times Square
 8                             New York, New York 10036

 9   For the Official
     Committee of
10   Unsecured Creditors:      Kristin B. Mayhew, Esquire
                               PULLMAN & COMLEY, LLC
11                             850 Main Street
                               8th Floor
12                             Bridgeport, Connecticut 06601

13   For G Club Operations,
     Weddle Law PLLC, FFP BVI
14   Limited, Ogier, and
     Pillsbury Winthrop Shaw
15   Pittman, LLP:             Jeffrey M. Sklarz, Esquire
                               GREEN & SKLARZ, LLC
16                             One Audubon Street
                               3rd Floor
17                             New Haven, Connecticut 06511

18   For Yankwitt, LLP;
     Ganfer Shore Leeds &
19   Zauderer, LLP; Brune
     Law, P.C.; and
20   Petrillo Klein +
     Boxer, LLP:               Anthony J. Proscia, Esquire
21                             KAUFMAN DOLOWICH, LLP
                               40 Exchange Place
22                             20th Floor
                               New York, New York 10005
23

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2   For Meta
     Platforms, Inc.,
 3   and Apple, Inc.:           Jin Yan, Esquire
                                ARENTFOX SCHIFF, LLP
 4                              1717 K Street NW
                                Washington DC 20006
 5
     For Hing Chi Ngok and
 6   Greenwich Land, LLC        Austin D. Kim, Esquire
                                MEISTER SEELIG & FEIN, LLP
 7                              125 Park Avenue
                                7th Floor
 8                              New York, New York 10017

 9   For Morvillo
     Abramowitz Grand
10   Iason & Anello, P.C:       Rowena A. Moffett, Esquire
                                BRENNER, SALTZMAN & WALLMAN, LLP
11                              271 Whitney Avenue
                                New Haven, Connecticut 06511
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    <u>INDEX</u>

2   <u>MOTIONS</u>:                                                    <u>PAGE</u>

3                      **In re:  Ho Wan Kwok, *et al*.**
                     **Main Case no. 22-050073 (JAM)**

4
    Matter
5   No. 1:    Motion to Extend Time to Extend Deadline to        14
              File Avoidance Actions (First Supplemental
6             Motion) to 02/15/2025 (RE:  3329)

7             Court's Ruling:                                    80

8   Matter
    No. 2:    Amended Emergency Motion of Chapter 11             81
9             Trustee, Pursuant to Bankruptcy Code Section
              363(b), for Entry of Order Authorizing Trustee
10            to Fund Maintenance of Mahwah Mansion and for
              Related Relief (RE: 3381)
11
              Court's Ruling:                                    86
12

13                **Genever Holdings LLC and Luc A. Despins,**
              **Chapter 11 Trustee v Ho Wan Kwok, Hing Chi**
14                **Ngok, Qiang Guo, and Mei Guo**
                  **Adversary Case No. 23-05002 (JAM)**
15
    Matter
16  No. 3:    Pretrial Conference Hearing                        89

17            Court's Ruling:                                    90

18
                  **Luc A. Despins, *et al*. v Taurus Fund, LLC,**
19                        ***et al*.**
                  **Adversary Case No. 23-05017 (JAM)**
20
    Matter
21  No. 4:    Status Conference                                  90

22            Court's Ruling:                                    94

23

24

25

6

1                                  INDEX

2

  WITNESSES CALLED
3 BY THE TRUSTEE:                                          PAGE

4        LUC A. DESPINS

5        Direct examination by Mr. Bassett            18

6        Cross-examination by Mr. Yan                 30

7        Cross-examination by Mr. Sklarz              34

8

9 Transcriptionist's Certificate                     96

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commenced at 1:12 p.m.)

 2              THE CLERK:  Case Number 22-50073, Ho Wan Kwok;

 3    Adversary 23-50002, Genever Holdings, LLC, et al. v Kwok, et

 4    al., and Adversary 23-05017 Despins, et al., v Taurus Fund

 5    LLC, et al.

 6              THE COURT:  Okay.  Good afternoon.

 7              If we could have appearances for the record,

 8    please, starting with the Chapter 11 Trustee.

 9              Trustee Despins?

10         (No verbal response)

11              THE COURT:  Is he frozen?  Maybe.

12              THE CLERK:  No.

13              THE COURT:  Okay.  They can't hear me?

14              Apparently, they can't hear me.

15              THE CLERK:  Trustee Despins?

16         (No verbal response)

17              THE CLERK:  Oh, you know what?  I'm sorry, I'll

18    call him.  I'm sorry, Judge.

19              THE COURT:  So I think we have to start all over

20    again, because I don't think that was recording or anyone

21    could hear us.

22              THE CLERK:  Yes.

23              Case Number -- the United States Bankruptcy Court

24    for the District of Connecticut is now in session after

25    recess.  Judge -- the Honorable Julie Manning is presiding.
```

1              THE COURT:  Good afternoon, everyone.

2              There are matters on the calendar beginning at

3   1:00 p.m., so I ask the courtroom deputy to please call the

4   calendar.

5              THE CLERK:  Case Number 22-50073, Ho Wan Kwok;

6   Adversary 23-05002, Genever Holdings, LLC, *et al*. v Kwok, *et*

7   *al.*; and Adversary 23-05017, Despins, *et al*. v Taurus Fund,

8   LLC, *et al*.

9              THE COURT:  Good afternoon.  I'm going to take

10  appearances to the record.  We are on remote.  This was

11  supposed to be a remote hearing, which was not evidentiary.

12  Whether it will be or not, we will see, because I don't

13  conduct evidentiary hearings remotely.

14             But when everyone notes their appearance, I'd like

15  to make sure that whoever is noting their appearance, notes

16  whether they have actually filed a notice of appearance in

17  the case or in the adversary proceeding, because if you have

18  not done so, you will need to do so.  So, in any event, we

19  will start with the Chapter 11 Trustee.

20             MR. DESPINS:  Good afternoon, Your Honor.  Luc

21  Despins, Chapter 11 Trustee.

22             MR. BASSETT:  Good afternoon, Your Honor.  Nick

23  Bassett from Paul Hastings, on behalf of the Chapter 11

24  Trustee.

25             MR. MAZA:  Good afternoon, Shlomo Maza of Paul

1  Hastings, as well.

2          MR. LINSEY:  Good afternoon, Your Honor --

3          THE COURT:  I'm sorry, sir.  I couldn't hear what

4  you said.  Let's go back to the gentleman who just spoke,

5  please.

6          MR. MAZA:  Shlomo Maza with Paul Hastings for the

7  trustee, as well.

8          THE COURT:  Good afternoon.

9          MR. MAZA:  Sorry, Your Honor.

10         THE COURT:  Sorry, I could not hear you.  I

11 apologize.

12         MR. LINSEY:  Good afternoon, Your Honor.  Patrick

13 Linsey of Neubert Pepe & Monteith for the trustee, and

14 trustee's counsel do have appearances entered.

15         THE COURT:  Thank you.

16         MS. CLAIBORN:  Good afternoon.  Holley Claiborn

17 for the U.S. Trustee.

18         MR. SARNOFF:  Good afternoon, Your Honor.  Stuart

19 Sarnoff, O'Melveny & Myers, on behalf of creditor PAX in the

20 main case.  I'm not sure if I filed a notice of appearance in

21 the adversary proceeding that's under discussion today, but I

22 don't expect to be participating.

23         THE COURT:  Thank you.

24         I don't think you need a file a notice in the

25 adversary proceeding unless you choose to, but you do need to

 1  have an appearance in the main case, which you already do and

 2  have for some time, so thank you.

 3          MR. SARNOFF:  Thank you.

 4          MS. SMITH:  Good afternoon, Your Honor.  Annecca

 5  Smith of Robinson & Cole, Connecticut counsel to creditor

 6  PAX.

 7          MS. MAYHEW:  Good afternoon, Your Honor.  Kristin

 8  Mayhew, Pullman & Comley, on behalf of the Creditors

 9  Committee.  I have an appearance in the main case, but I do

10  not believe we have an appearance in the adversary

11  proceeding.

12          MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

13  Sklarz of Green & Sklarz, for certain objecting parties.  I

14  have an appearance in the main case, as well as the

15  applicable adversaries where some of the objections were

16  filed.  Also online is my associate Michelle Antao.  I don't

17  recall if she has an appearance, and she won't be arguing.

18  But if she doesn't, we'll get an appearance for her in the

19  main case.

20          I'll also note that my client, one of my clients,

21  Justin Weddle of Weddle Law is also viewing proceedings; he

22  is a party to one of the adversaries, or his law firm is a

23  party to one of the adversaries.

24          THE COURT:  Okay.  Thank you.

25          There is no hearing in the adversary proceedings

1   today, though, just so the record is clear.

2           MR. SKLARZ:  Understood, Your Honor.

3           MR. YAN:  Good afternoon, Your Honor.  Jin Yan on

4   behalf of Meta Platforms, Inc. and Apple, Inc.  We do have

5   appearances on in the adversary cases.  I don't recall if we

6   have appearances in the main bankruptcy case.

7           THE COURT:  Okay.  Thank you.

8           MR. PROSCIA:  Good afternoon, Your Honor.  Anthony

9   Proscia from Kaufman Dolowich.  We represent four law firms

10  in the related adversary proceedings.  We will not be

11  speaking; we're just monitoring for the today.

12          THE COURT:  What related adversary proceeding are

13  you speaking of, Counsel?

14          MR. PROSCIA:  Sure.  It's the adversary

15  proceedings against Yankwitt, against Ganfer Shore, against

16  Brune Law, and against Petrillo Klein.

17          THE COURT:  You're going to have to spell every

18  one of those, Counsel.  Our record is only kept by audio and

19  if the person who, then, creates the transcript can't

20  understand -- and that's not your fault.  It's not your

21  fault; it's just the way it is -- you know, then there's a

22  lot of blanks in the transcript.  So I'm going to ask you, if

23  you would, please, spell all the names of the Defendants you

24  just named in adversary proceedings.

25          MR. PROSCIA:  Sure, Your Honor.

1          The first law firm is Yankwitt, which Y-a-n-k-w-i-

2     t-t.  The second law firm is Ganfer Shore, G-a-n-f-e-r S-h-o-

3     r-e.  The third law firm is Brune Law, B-r-u-n-e.  The fourth

4     one is Petrillo Klein, P-e-t-r-i-l-l-o K-l-e-i-n.

5          THE COURT:  Thank you.

6          MR. KIM:  Good afternoon, Your Honor.  Austin Kim

7     from Meister Seelig & Fein, and we have an appearance in

8     both, the main proceeding and adversary proceeding on behalf

9     of the Greenwich Land Defendants, that's Hing Chi Ngok and

10    Greenwich Land, LLC.

11         THE COURT:  Thank you.

12         MS. MOFFETT:  Your Honor, Rowena Moffett from

13    Brenner Saltzman & Wallman.  I represent another of the

14    adversary Defendants, a law firm called Morvillo Abramowitz

15    Grand Iason & Anello, spelled M-o-r-v-i-l-l-o A-b-r-a-m-o-w-

16    i-t-z G-r-a-n-d I-a-s-o-n & A-n-e-l-l-o, P.C.

17         THE COURT:  Thank you.

18         Have I taken everyone's appearance for the record,

19    then?

20        (No verbal response)

21         THE COURT:  Okay.  The first -- I'm not sure,

22    Trustee Despins, how you want to proceed, but I would just

23    note that the matters on the calendar today, the first two

24    matters, the first motion -- first supplemental motion to

25    extend deadline and the amended emergency motion authorizing

1   funding, were filed in the main case, as they should be,

2   because that's relief that's related to the estate as a

3   whole.  The two final matters on the calendar are really with

4   regard to a pretrial conference in a specific adversary

5   proceeding, 23-05002, and then a request for a status

6   conference in another adversary proceeding, 23-05017.

7   Trustee Despins, I do not know how you intend to proceeding,

8   but I will hear from you with regard to your intentions.

9           MR. DESPINS:  Yes, and first, a clarification.  I

10  thought we also had a motion in with Mahwah adversary

11  proceeding to authorize us to spend money to maintain, maybe

12  even you covered that, but there's a hearing on that today, I

13  believe to authorize us to spend money to pay taxes and

14  security services and all of that, I believe.  That should be

15  on the agenda for today.

16          THE COURT:  You may be correct about that.  I'll

17  take a look at that.

18          MR. DESPINS:  Okay.

19          THE COURT:  I see what you're saying.  You filed

20  an emergency motion that we -- yes, I understand what you're

21  saying.  Okay.  I'll take a look while you're speaking.

22          MR. DESPINS:  But, in any event, Your Honor, I

23  think that given the number of people on the phone that are

24  here for the, what I refer to as the August 15th extension

25  motion, it probably makes sense to cover that first so that

 1  the people are free to stay on for the rest, but at least

 2  they don't have to; otherwise, they'll have to stay on for

 3  everything and there'll be nothing productive and

 4  (indiscernible).  So, I would recommend starting with the

 5  August 15th extension motion.

 6          THE COURT:  Go right ahead, which is just for the

 7  record, ECF 3329.

 8          MR. DESPINS:  Mr. Bassett is handling that motion,

 9  Your Honor.

10          THE COURT:  Mr. Bassett, you're on -- there you

11  go -- you were on mute, but please proceed.

12          MR. BASSETT:  My apologies.

13          Good afternoon, Your Honor.  Again, for the

14  record, it's Nick Bassett from Paul Hastings on behalf of the

15  Chapter 11 Trustee.

16          To address Your Honor's question at the outset, we

17  did intend, obviously, with the Court's permission, to have a

18  very limited evidentiary presentation today and it is

19  certainly our apologies for assuming we would be able to do

20  that via Zoom.  I think the reason we had proceeded in that

21  manner is because at the hearing on this motion that occurred

22  in February, it was done remotely and we did have the trustee

23  provide some testimony.

24          I realize now in thinking back on that particular

25  hearing, that I think we did that one remotely due to

1  unanticipated weather issues.  So maybe there was an

2  exception made to the Court's general policy in that

3  instance.

4         Be that as it may, Your Honor, again, obviously,

5  we're at the Court's mercy, but subject to your permission,

6  we did intend to have the trustee present limited testimony.

7  I think most of the record that we would rely on in support

8  of the motion is the record indicates, which we would ask the

9  Court to take judicial notice, so I don't think the

10  evidentiary presentation would be long, but that was our

11  intention, Your Honor.

12         THE COURT:  Well, the only reason I raise the

13  issue is because there's going -- if Trustee Despins

14  testifies, then there's going to be five different lawyers

15  that are going to cross-examine him, is that what we're going

16  to do, because there's a number of objections filed to this

17  motion, so I would assume all those lawyers are going to want

18  to cross-examine him.

19         MR. BASSETT:  I can't speak for him, Your Honor.

20         I would note that I think each of those parties,

21  or at least some of those parties, reserved the right

22  expressly in their objections to cross-examine the trustee to

23  the extent he testified.  I don't know if they intend to or

24  not.  As I said, the testimony will be limited.  I would

25  expect 10 or so minutes, which I would hope you would cabin

1  and eliminate the scope of their cross, but, again, I can't

2  speak for the opposing parties' counsel.

3        THE COURT:  I understand you can't speak for them;

4  I'm not suggesting you should.

5        But I'm saying I am virtually certain that they're

6  going to want to cross-examine him, so then we're going to

7  have direct examination and cross-examination remotely and

8  the courtroom deputy has to then swear the parties in

9  remotely.  The courtroom deputy is not on a camera.  You

10  know, there are issues with that; that's why I don't do that

11  unless it's determined in advance and there's a reason for

12  it.  Because, as you know, the Federal Rules of Evidence

13  still require in-court hearings for testimony.

14        In any event, if that's how we're going to

15  proceed, we'll see how we do, but I do think that, you know,

16  it is necessary to understand that there's no reason why if

17  testimony and exhibits are going to be introduced, why

18  parties can't be here in the courtroom or work out an

19  arrangement in advance so the Court is aware of what's

20  happening.  And that's what I would say with regard to that.

21        MR. BASSETT:  Understood, Your Honor.  I will take

22  the blame for not having dealt with this appropriately in

23  advance.

24        THE COURT:  All right.  Well, let's see how things

25  proceed, so go right ahead.

1    Are you calling Trustee Despins as a witness right

2  now?

3    MR. BASSETT:  So, Your Honor, we would.  I think

4  the ladies of the jury Calloway to proceed would be for us to

5  complete our limited evidentiary presentation, which really

6  will only consist of the trustee testifying and the Court

7  can, obviously, take notice of other filings in the record,

8  which we refer to in our papers and they refer to, again, in

9  argument, but it's really just the trustee taking the stand,

10  which I think would be the appropriate way to proceed right

11  now.

12    THE COURT:  Okay.  Given what I've stated for the

13  record, the courtroom deputy does not have a camera, so I am

14  going to have to say for the record that I am sitting next to

15  the courtroom deputy.  I can see her.  She is going to swear

16  in the witness, Trustee Despins, and then we will have to go

17  from there, okay.

18    So I'm going to ask -- Trustee Despins, are ready

19  to be sworn in?

20    MR. DESPINS:  Yes, Your Honor.

21    THE COURT:  Okay.  So as if we can pretend we're

22  in the courtroom and, Attorney Bassett just called you to the

23  witness stand.  So, now, we need to turn this over to the

24  courtroom deputy, whose duty it is to swear in the witness.

25    THE CLERK:  Thank you.

1          Attorney Despins, please raise your right hand.

2          THE COURT:  We can't see your right hand, Trustee

3  Despins.  We need to see it.

4          MR. DESPINS:  Sorry, Your Honor.

5          THE COURT:  The other way.

6          MR. DESPINS:  Yes.

7          THE CLERK:  Okay.

8          MR. DESPINS:  Hold on a second.  I don't know why

9  that's not -- okay.  That's my right hand.

10          THE COURT:  Okay.

11          MR. DESPINS:  Yes.

12          THE CLERK:  Okay.

13          LUC A. DESPINS, TRUSTEE'S WITNESS, SWORN

14          THE WITNESS:  I do.

15          THE CLERK:  State your name and address for the

16  record, your business address, of course.

17          THE WITNESS:  Luc Despins, 200 Park Avenue, New

18  York, New York 10166.

19          THE COURT:  Okay.  Mr. Bassett, you may proceed.

20          MR. BASSETT:  Thank you, Your Honor.

21                    DIRECT EXAMINATION

22  BY MR. BASSETT:

23  Q    Trustee Despins, you understand we are here today on

24  the trustee's motion to extend avoidance action deadlines; is

25  that right?

1    A    I do.

2    Q    Now, this is the second motion, such motion you have

3    filed in this case; is that right?

4    A    That's correct.

5    Q    Now, do you recall, Trustee Despins, testifying at the

6    hearing on the first motion, which I believe was on

7    February 13th of this year?

8    A    Yes, I do.

9    Q    And have you reviewed that testimony, again, in

10    anticipation of your testimony today?

11    A    Yes, I have.

12    Q    Was that testimony that you gave them, Trustee Despins,

13    true and accurate to the best of your recollection?

14    A    It was.

15    Q    Okay.  So what I'd like to do today is just briefly ask

16    some questions about events that have happened and transpired

17    since you last testified in February of 2024.

18        Now, Trustee Despins, can you just generally describe

19    what you have been doing in your investigation in this

20    Chapter 11 case since we've last had that hearing in February

21    of this year?

22    A    A number of things.  First, continuing to review

23    documents we have received, analyzing them, bank account

24    statements, et cetera, with the help of Kroll.  Then, we also

25    sought what we call "follow-up 2004 discovery" for a limited

1  number of parties to advance our investigation.

2  Q    Okay.  When you say Rule 2004 discovery, how many

3  additional Rule 2004 motions that you recall, have you filed

4  since the hearing in February?

5  A    Four.

6  Q    And do you know how many additional parties, or

7  discovery targets, if you will, that those motions covered?

8  A    47.

9  Q    And do you have a general sense of approximately how

10  many documents were obtained through those Rule 2004 motions

11  from those parties?

12  A    Just from those parties with the new 2004, around 700

13  documents.

14  Q    Okay.  Now, in addition to the 2004 discovery that you

15  just described, have you and your team obtained additional

16  documents by other means or from other sources?

17  A    Yes.  The first source is pursuing the existing 2004,

18  the ones that were existing before (indiscernible) to obtain

19  more information from the targets of that investigation.

20      Nobody ever produces all of their documents on the

21  first go-around, so we have to pursue this case.  It was

22  mostly Mr. Linsey's firm that did this.  So that was one

23  source of a very voluminous source of documents that we

24  received.

25      In addition to that, we obtained access to documents

1  that were in a warehouse in Jersey and, also, they were

2  iPhones and the like, computers, in that facility that we

3  obtained and we analyzed.  So that's, generally, the

4  additional work that was done in terms of obtaining

5  documents.

6  Q    And do you have a ballpark sense of the volume of

7  documents that we're talking about when you pull together

8  these additional sources with the 2004 discovery that you

9  described?

10  A    Well, putting aside the 700 documents that exist for

11  the new -- for 2004, there would be in excess of 20,000

12  documents from the sources I've described, which is the

13  previous, the initially previously granted 2004, the New

14  Jersey warehouse, and the computers, and the iPhones that we

15  found in that facility.

16  Q    Now, what is your team, if anything, doing with this

17  documents as you receive them?

18  A    Well, not to go into a lot of details, but, basically,

19  we have a software program that allows us to search by name,

20  so they're downloaded to that so everyone can actually search

21  a specific term.  Then, they're also given, that access is

22  given to the Kroll team so they can also look at that, and

23  that gives them a lead as to new bank accounts and the like.

24       So there's a whole process that goes on, that's still

25  ongoing, as to those documents.

1  Q     So you mentioned Kroll and their bank account analysis,

2  which was a topic that came up at the hearing in February.

3       Can you talk more about the additional work, any

4  additional discoveries that the Kroll team has made, with

5  respect to bank accounts since February?

6  A     Yeah, as I described when I testified, you know, these

7  bank accounts, they're really almost the only key documents

8  we have, or at least documents that we're sure of their

9  authenticity because they come from banks.  And every time

10 you look at a bank account, there's dozens, if not hundreds

11 of transfers that lead you to other bank accounts, and that's

12 what Kroll does.

13      So what they did is that through this additional

14 discovery that Mr. Linsey's firm produced, we're able to --

15 they were able to identify 200 additional bank accounts that

16 they started analyzing and are still analyzing at this stage.

17 Q     And do you have a ballpark sense at all as to how many

18 transfers within those accounts have been analyzed?

19 A     Not precisely.  It's thousands and thousands, but I

20 would hesitate to give a precise number.

21 Q     And how long does it take Kroll to go through this sort

22 of exercise?

23           MR. SKLARZ:  Objection; hearsay.

24           He's asking what somebody else is not in court is

25 doing.

 1              MR. BASSETT:  Your Honor, the trustee --

 2              THE COURT:  So, hold on a second.

 3              Attorney Sklarz, I didn't hear you, so you're

 4  going to have to do that again.

 5              MR. SKLARZ:  I'm sorry.

 6              THE COURT:  That's not your fault.

 7              MR. SKLARZ:  Objection.

 8              THE COURT:  That's not your fault.  I'm just

 9  saying that's one of the downsides to remote, right.  I can't

10  hear you when you start to talk, so I'm going to ask you to

11  do that again, please.

12              MR. SKLARZ:  Fair enough, Your Honor.

13              My objection is on account of hearsay.  The

14  trustee is testifying about what Kroll, who is a party not in

15  court today, is doing, so it's hearsay.

16              THE COURT:  Do you have a responses, Attorney

17  Bassett?

18              MR. BASSETT:  Your Honor -- yes, Your Honor.

19              I don't understand how the question calls for

20  hearsay.  The trustee has retained Kroll as his advisor in

21  this case; he's testified about that at length, including at

22  the last hearing.  The trustee, obviously, has firsthand

23  knowledge of how long it has taken Kroll, at his direction,

24  to perform certain tasks.

25              MR. SKLARZ:  That is classic hearsay.  Kroll isn't

1   here.

2            THE COURT:   I'm going to overrule the objection,

3   but give the testimony whatever weight I think is

4   appropriate.

5            So please continue.

6   BY MR. BASSETT:

7   Q    So approximately how long, Trustee Despins, does it

8   take Kroll to perform the type of bank account analysis that

9   you just described?

10  A    It's impossible to give a precise, you know, number of

11  days answer to that because it depends on how many transfers

12  are in the accounts.  But as to those 200, there are still --

13  that analysis is still ongoing, because as I said, every

14  account opens the door to another account and that analysis

15  is still ongoing.  It's not the same degree that it was going

16  on, let's say, in January or February, but it's still

17  ongoing, as we speak.

18  Q    Now, Trustee Despins, you're aware that the debtors'

19  criminal trial has taken place in the United States District

20  Court for the Southern District of New York, correct?

21  A    Correct, yes.

22  Q    And do you recall, approximately, when that trial

23  started?

24  A    In late May; May 22nd, something along those lines.

25  Q    And, approximately, when it concluded?

1  A      In mid-July; July 16th or 17th.

2  Q      And did your team monitor that trial as it was

3  transpiring?

4  A      Yes, we did, either through attendance when there were

5  key witnesses that could be key to our case and we wanted to

6  gauge their credibility as a witness or by reading

7  transcripts when they were routine witnesses like FBI

8  testimony where, like, we didn't need to be there for that.

9  Q      And so how, if at all, was the criminal trial relevant

10  to your investigation in this case?

11  A      Incredibly relevant.  As I said, testified before, the

12  government has better tools than we do.  They have all sorts

13  of ways of getting information.

14        And what could be learned through that trial,

15  basically, is it just opened up a whole new dimension as to a

16  number of the things that we've been analyzing.

17  Q      And do you know, Trustee Despins, approximately how

18  many witnesses there were in the criminal trial altogether?

19  A      The government had over 30 and the Defendant has

20  something like 8 or 10.  Not more than 10.

21  Q      And do you have a ballpark sense for how many exhibits

22  were introduced into evidence during the criminal trial?

23  A      There's thousands.  My memory was 2900 and something,

24  so thousands of exhibits.

25  Q      And do you have access to those exhibits?

1  A      No.

2        Before trial begins, in theory, when the government

3  uses an exhibit, it's supposed to post them promptly, but as

4  of today, there's still hundreds of exhibits that have not

5  been downloaded so that we can have access to them.  So we

6  did not have access to them before -- most of them.  Some of

7  them we did, but most of them, we did not have access.  Since

8  they were posted, we've had access, but that's not the

9  complete list.  There's hundreds of exhibits that, for some

10  reason, have not been posted yet.  Of course, we've been

11  following up with the government to make sure they do post

12  them promptly.

13  Q     And what is your team doing with the exhibits from the

14  criminal trial, if they are able to access them?

15  A     Same routine as putting this on our software database,

16  giving it to Kroll, because there are references to bank

17  accounts.  There's actually analysis of bank transfers in

18  government exhibits.  So we're feeding all of that to them so

19  they can update their analysis.

20  Q     Now, Trustee Despins, are you aware that this Court

21  entered an order staying certain litigation and certain

22  litigation activities, including depositions, during the

23  pendency of the criminal trial?

24  A     Yes, I am.

25  Q     How, if at all, did that stay impact your investigation

1  progress over the last few months?

2  A     Well, there was an absolute prohibition on depositions

3  during that time period, so -- obviously, there are a number

4  of witnesses that we were about to depose that, in fact, were

5  potentially going to be testifying at the criminal trial and,

6  therefore, we could not depose until, you know, last week or

7  something like that.  So, clearly, it had a major impact on

8  our ability to depose the key witnesses.

9  Q     Now, that stay was granted, pursuant to a motion that

10 you filed; is that right?

11 A     That's correct.

12 Q     Why did you file that motion?

13 A     Two reasons.  The first one is that the debtor was

14 filing a renewed motion before the criminal court to stay the

15 entire bankruptcy case, so, obviously, we did not want that

16 to happen; that would have been a disaster and, therefore,

17 that was part of the reason.  But the other part of the

18 reason is that the witnesses that we were scheduling for

19 depositions were saying, Hey, I'm going to be a witness or,

20 I'm talking with the Government, and I will complain to them

21 that you're trying to depose us.  And, of course, the impact

22 of that would have -- could have been that the government

23 would have said, Well, actually, we think the bankruptcy case

24 should be stayed completely.

25       And that's why we filed this motion, which was kind of

1  (indiscernible), in attempt that we were still able to get

2  documents, but no depositions, so that we would not interfere

3  with the criminal trial or the witnesses that could or have

4  appeared at the criminal trial.

5  Q    Now, since February 15th of 2024, have you filed any

6  additional avoidance actions?

7  A    Yes.

8  Q    Approximately how many?

9  A    We filed four, but we're about to file, or we're in the

10  process -- they're just appearing on the docket today -- of

11  filing an additional 30 or so.

12  Q    And how are you deciding when to file these complaints?

13  A    As soon as we're ready to file them, in the sense that

14  we have enough information to file them and we've verified

15  all the information to the best of our ability.  We're not

16  holding anything back.  We're filing all the ones that we can

17  right now and that's how we have decided, if we have enough

18  information.  That process is led mostly by Mr. Linsey's

19  firm, but, you know, I'm involved with reviewing the

20  complaints.  But, basically, we file them when we have enough

21  information to go ahead.

22  Q    Trustee Despins, you testified in February about some

23  of the obstruction that had occurred at the hands of the

24  debtor and others in this case, do you recall that testimony?

25  A    Yes.

1    Q    Now, that obstruction that you talked about then, has

2    that continued to affect your investigation in your view?

3    A    Sure, because as I said, the only reliable source we

4    have are bank accounts, but that doesn't show you the full

5    picture; it just shows you transfers.  We have no books and

6    records.

7         You know, the debtor testified many times he didn't

8    have an iPhone.  And now, of course, we know he had an

9    iPhone, because that came out in the criminal trial; he had

10   many iPhones, but with data.  And, obviously, the inability

11   to have books and records to tie all of this makes this case,

12   I would say, unprecedented in terms of the amount of work

13   that needs to be done to tie everything together.

14             MR. BASSETT:  No further questions, Your Honor.

15             THE COURT:  Okay.  Thank you.

16   Does anyone wish to cross-examine Trustee Despins?

17             MR. YAN:  Your Honor, I have just a few questions

18   for Trustee Despins.

19             THE COURT:  Okay.  Would you just -- I can see

20   you, but would you please state your name for the record,

21   again, and who you represent, because, again, as I said at

22   the beginning of the hearing, we only have audio for our

23   transcripts, so it would be helpful to make the record as

24   clear as possible.  Thank you.

25             MR. YAN:  Sure.  My name is Jin Yan, J-i-n, last

1   name, Y-a-n.  I represent Apple, Inc. and Meta Platforms,

2   Inc.

3                        CROSS-EXAMINATION

4   BY MR. YAN:

5   Q     Trustee Despins --

6              THE COURT:  Go right ahead.

7              I'm sorry, I didn't mean --

8              MR. YAN:  Thank you, Your Honor.

9              THE COURT:  -- to speak over you.  I apologize.

10             But you may proceed.

11             MR. YAN:  Thank you, Your Honor.

12  BY MR. YAN:

13  Q     Trustee Despins, you testified earlier that you issued

14  four new 2004 (indiscernible) targeting 47 parties.

15         Did I state that correctly?

16  A     That's correct.

17  Q     Was Apple one of those targets?

18  A     I don't recall.

19  Q     Do you recall if Meta was one of those targets?

20  A     I don't recall.

21  Q     What actions have you taken, specifically, to

22  investigate additional avoidance claims against Apple or

23  Meta?

24  A     There's -- they're part of, meaning that we searched,

25  generally, for all transfers through these bank accounts that

1  we keep getting these 200 additional bank accounts, so if

2  Meta or Apple appears in there, we're going to pursue that.

3  So that's part of the analysis.

4      But we don't go -- our analysis is not Defendants-

5  targeted, in the sense that we are looking for transfers,

6  because we have this running clock that we're trying to

7  comply with and, therefore, we're looking at all transfers.

8      And if it happens that Meta or Apple is on that list,

9  then we will chase that.

10 Q     Trustee Despins, you're aware that you've already sued

11 Apple, correct?

12 A     Correct.

13 Q     And you're also aware that you've already sued Meta,

14 right?

15 A     Correct.

16 Q     Have you identified any additional claims, other than

17 the ones in your current lawsuit against Meta?

18 A     There are some smaller claims that we found, but not --

19 nothing material, you know, in the thousands of dollars, not

20 in the hundreds of thousands of dollars.  So, at this time,

21 the answer would be, no, nothing material.

22 Q     What about against Apple?

23 A     Same answer.

24 Q     And you said the additional claims that you found that

25 are not material, are those already asserted in the claims in

1   the lawsuit that's been brought?

2   A    I don't think so.  I think these would be added to

3   that, but, again, not in -- it wouldn't move the dial in a

4   material way.

5   Q    Do you intend to serve those claims against Apple or

6   Meta?

7   A    I need to talk to counsel about that.  You know,

8   (indiscernible) litigation, so I need to confer with them to

9   decide whether it's worth doing that.

10  Q    Okay.  And when did you identify those additional

11  claims that are not part of the existing lawsuits?

12  A    I don't know when.  Obviously after February 15th, but

13  when between February 15th and now, I couldn't say.

14  Q    Can you explain why you haven't sought to amend your

15  existing lawsuit to add those claims?

16  A    Because Apple and Meta is not the only thing we're

17  focusing on.  We're focusing on, you know, more than 300

18  Defendants and now we're adding another 50 or so and 30, plus

19  another potential 20, so that's 50.  So, we -- I understand

20  from your perspective, you're concerned about those two only,

21  but there are a lot of balls in the air and we go to the most

22  material and the most critical aspects first.

23       And that's why I said I'm aware of additional

24  transfers, but I don't think they move the dial and certainly

25  not in the way that we would put everything to the side and

1  amend to add the, at this time, to amend to add these amounts

2  that are not material.

3       If we find something that's really material, then we

4  would, obviously, amend it as quickly as we can.  So there's

5  no strategy *vis-a-vis*, Apple or Meta; it's a global strategy

6  of dealing with hundreds of Defendants and we go to the most

7  pressing, you know, because there's a limited number of hours

8  in the day.

9            MR. YAN:  I have no further questions.

10           Thank you, Trustee Despins.

11           THE COURT:  Thank you.

12           Does anyone else wish to cross-examine Trustee

13  Despins?

14           MR. SKLARZ:  Yes, Your Honor.

15           THE COURT:  Attorney Sklarz, will you just, again,

16  state your name for the record and who you represent, because

17  we need that for the record, please.  Thank you.

18           MR. SKLARZ:  Yes, Jeffrey Sklarz and for purposes

19  of this hearing, my clients are G Club; FFP (BVI) Limited,

20  which is sued in Adversary Proceeding 24-506 -- 5056;

21  Ogier, 24 -- sued in Adversary 24-05012; Pillsbury Winthrop

22  Shaw Pittman, sued in Adversary 24-05014; and Weddle Law,

23  sued in Adversary 24-05188.

24  //

25  //

CROSS-EXAMINATION

BY MR. SKLARZ:

Q     Trustee Despins, you indicated that you received

additional information, which, much like the proverbial

Russian nesting doll, every time you open one layer, you get

more and more.

      Is that fair to say?

A     As a general characterization, yes.

Q     Okay.  So to the extent you continue to get more and

more information, are you indicating there's a possibility

that your investigation could go on, effectively, in

perpetuity for years and years and years?

A     No, at one point, we need to, you know, wrap up this

case and move on to other things in our lives and that's the

intent here.  From our point of view, we're not at that stage

yet, but, clearly, the goal is to get to that stage so that

we can move on.  We have to balance that desire of leaving

potential targets, you know, without a claim, so, that's,

really, the balancing act there.

Q     And you also indicated earlier, I believe, that you had

moved to stay your own pursuit of cases based on the criminal

proceeding.

      Did I understand that correctly?

A     No, we did that in the past.

Q     You did that in the past?

1    A      Yes.

2    Q      And there were pending discovery examinations, I

3    believe you said, that were stayed as a result of your

4    motion, correct?

5    A      Correct.

6    Q      And some of those folks you were going to take exams of

7    were witnesses in the criminal proceeding, correct?

8    A      I said witnesses or could have been witnesses so, the

9    government had to decide to use them.  Now, they would be in

10   one of those two categories.

11   Q      Okay.  So, you -- and no one opposed your motion to

12   stay; is that the testimony?

13   A      I don't think anybody did; that's right.

14   Q      So you self-stayed cases for your own reasons; that's

15   fair to say?

16   A      No.

17   Q      You self-stayed the case for other people's reasons?

18   A      No, we filed a motion, but it was not in a vacuum; it's

19   not just for our own reasons.

20          It's that because we were attempting to depose people

21   who said, Wait a minute, I'm a witness or I've been asked to

22   be a witness in a criminal trial and they were going to

23   complain about it, what we were trying to do, to the DOJ,

24   that's when we decided we needed to halt this during the

25   duration of the trial.  So, we did that on our own, but it

1  was taking into account a number of factors, including not

2  interfering with a criminal proceeding.

3  Q     Have you coordinated witness testimony with the

4  government?

5  A     Never.

6           MR. BASSETT:  Objection; irrelevant.

7           THE COURT:  Sustained.  So we'll strike that from

8  the record, that answer.

9  BY MR. SKLARZ:

10 Q     In terms of my clients who've objected today, G Club,

11 FFP, Ogier, Pillsbury Winthrop, and Weddle Law, they were all

12 sued prior to the February extension order; is that correct?

13 A     Well, I know about G Club for sure, on both, on alter-

14 ego and what we would call a precautionary transfer

15 complaint.  Ogier, I know, as well.  Pillsbury, yes.

16 The other entity you mentioned, I'm sorry, I don't recall

17 them.

18 Q     Okay.  With respect to all of those entities, are there

19 any other claims you discovered between February and today

20 that you're intending to bring?

21 A     I want to be careful, because, remember, as to G Club,

22 our first cause of action is to seek alter-ego or alter

23 (indiscernible) ruling.  The fraudulent transfer would only

24 be if we don't succeed in that and, therefore, there has been

25 no focus on the fraudulent transfer claims against G Club,

1   because we first want to try to obtain a ruling of alter-ego.

2   So, you know, I cannot say that there's not more in terms of

3   fraudulent transfer, because that's not our focus against G

4   Club.

5        As to the other entities, I really hesitate in giving

6   you a definite answer, because there's 280 Defendants, so I

7   don't know each one of them.  But nothing comes to mind in

8   terms of, oh, there's another (indiscernible) against

9   (indiscernible) or something like that.  Nothing comes to

10  mind along those lines.

11  Q    So as you sit here today, you're not aware of any

12  additional claims that could be brought -- let's put G Club

13  aside and we'll go through it one by one -- as you sit here

14  today, you're not aware of any additional claims that could

15  be brought against FFP?

16  A    Against, there's 280 Defendants, so I can't -- I don't

17  know, so I hesitate to give you an answer that there's

18  definitely not.  I (indiscernible).

19  Q    So, the question, again, as to Ogier, as you sit here

20  today, are you aware of any additional claims against Ogier?

21  A    None that are material or that have been brought to my

22  attention.

23       I want to be clear, there's -- you know, Mr. Linsey's

24  firm is running that process, generally, and so they may be

25  reviewing and finding additional transfers and they don't

1   bring every dollar to my attention until it's time to file an

2   amended complaint.  So I have not been approached by them to

3   file an amended complaint at this time against

4   (indiscernible).

5         THE COURT:  Attorney Sklarz, before you continue,

6   I just want to make sure that the record is clear.  The two

7   parties you just asked about, the first was FFP; is that

8   correct?

9         MR. SKLARZ:  Correct, Your Honor.  Yes.

10         THE COURT:  And the second was Ogier; is that

11   correct?

12         MR. SKLARZ:  Ogier is O-g-i-e-r.

13         THE COURT:  Okay.  That's -- we do need to do

14   that, unfortunately, for the record, so I may have to ask you

15   to -- I mean, now that you've said those two, that's very

16   helpful.

17         MR. SKLARZ:  Sure.

18         THE COURT:  If you talk about other Defendants

19   that you represent, I would ask you to please spell their

20   names for the record.

21         MR. SKLARZ:  No problem, Your Honor.

22         THE COURT:  Thank you.

23   BY MR. SKLARZ:

24   Q    So the next Defendant would be Pillsbury Winthrop, P-i-

25   l-l-s-b-u-r-y W-i-n-t-h-r-o-p.  It's a New York law firm.

 1      Are you aware of any additional claims against

 2 Pillsbury?

 3 A     Again, I -- what I'm aware of is nobody has asked me to

 4 sign off on an amended complaint being filed.  That's the

 5 best information I can give you at this stage.

 6 Q     With respect to Weddle Law, W-e-d-d-l-e, are you aware

 7 of any additional claims against Weddle Law?

 8 A     I would give you the same answer; there's no current

 9 plan, to my knowledge, to file an amended complaint asserting

10 additional claims.

11 Q     Thank you.

12      Now, you mentioned the debtor, post-February has

13 continued to obstruct your getting books and records.

14      Is that -- did I understand your testimony correctly?

15 A     I think the question that was asked was whether the

16 obstruction by the debtor affected us, continued to affect us

17 post-February and the answer was yes.

18 Q     Okay.  So let's break it down a little bit.

19      Has the debtor obstructed you in your investigation

20 since the February extension order came out?

21 A     Well, every day that they're not producing their books

22 and records, they're obstructing us; that's one way of

23 looking at it.

24 Q     What --

25 A     Not when -- sorry.

1   Q    What precisely has the debtor himself done?  He's been

2   sitting in jail, correct?

3   A    Correct.

4   Q    What has he done since the February extension order,

5   which, just for reference, is dated -- it's ECF 2921 --

6   dated, February 15, 2024.  What, since February 15th, 2024,

7   has the debtor done to obstruct your investigation, other

8   than not cooperating when you asked him to?

9   A   He's continued to fail to produce his books and

10   records.

11   Q    Okay.  Now, you have obtained various books and

12   records, correct, related to debtor entities?

13        Strike that question.  Let me ask again.

14        You have obtained various books and records from both,

15   the debtor and entities that you claim are controlled by the

16   debtor; is that fair to say?

17   A    No, I wouldn't say that there's any books and records

18   from the debtor and as to other entities, what qualifies as

19   books and records is unclear.  We did obtain business

20   documents from other entities, yes.

21   Q    So, for example, with respect to -- there were a number

22   of entities that have the letters HGHK preceding them, you

23   obtained books and records from certain HK -- HGHK entities,

24   like HGHK Technologies; is that correct?

25   A    I hesitate to say books and records.  We obtained

1  documentation from them showing transactions.  Whether these

2  were really accurate, complete books and records, I could not

3  say.  I actually would not say that.

4  Q    Okay.  There was a gentleman, a receiver appointed in

5  an action by the name of Hofmeister, H-o-f-m-e-i-s-t-e-r, do

6  you remember him?

7  A    Yes, I do.

8  Q    And there was a settlement entered into, whereby he

9  turned over or gave access to you, with respect to the

10  entities that he was appointed receiver over, do you recall

11  that?

12  A    He gave me access to what?

13  Q    I'm asking, did he give you access to information?

14  A    He gave us access to information that he had received,

15  yes.

16  Q    Okay.  And you entered into a settlement that was

17  approved by this Court with Mr. Hofmeister; is that right?

18  A    That's correct.

19  Q    What did you get from Mr. Hofmeister?

20  A    A series of documents purporting to show some

21  transfers, some payments, but I don't think there were

22  balance sheets.  Nothing that was pass muster, in terms of a

23  true accounting.

24  Q    And --

25  A    We got what he got from Mr. Kwok's associates.  He

1    didn't prepare any books and records.  He just gave us what

2    they gave him.

3    Q    So Mr. Kwok's associates turned over information to

4    Mr. Hofmeister, who then turned it over to you?

5    A    They gave some information, yes, that's correct.  Yes.

6    Q    And did Mr. Hofmeister obstruct your investigation?

7    A    Sorry, did he obstruct our investigation?  No.

8    Q    Let me just have a moment.

9         (Pause)

10            MR. SKLARZ:  Thank you, Trustee.  I don't have

11    further questions at this time.

12            THE WITNESS:  Thank you.

13            THE COURT:  Thank you.

14            Does anyone else wish to cross-examine Trustee

15    Despins?

16        (No verbal response)

17            THE COURT:  All right.  Hearing nothing, Attorney

18    Bassett, do you have any redirect?

19            MR. BASSETT:  No redirect, Your Honor.

20            THE COURT:  Okay.  Thank you, Trustee Despins.

21            Your testimony is concluded.  You're excused as a

22    witness.

23        (Witness excused)

24            THE COURT:  I know you're going to continue to be

25    at the hearing, but you're excused as a witness.

1            MR. DESPINS:  Thank you, Your Honor.

2            THE COURT:  Thank you.

3            Attorney Bassett, did you wish to proceed,

4  continue?

5            MR. BASSETT:  Yes, Your Honor, thank you.

6            THE COURT:  You're welcome.

7            MR. BASSETT:  Again, for the record, Nick Bassett

8  from Paul Hastings on behalf of the Chapter 11 Trustee.

9            Your Honor, that -- in addition, as I said before,

10  in addition to Trustee Despins' testimony, we believe that

11  the record generally in this Chapter 11 case and the related

12  adversary proceedings is highly relevant to the motion before

13  the Court today, as it was to the motion before the Court

14  back in February and the Court can, then, you know, take

15  judicial notice of that docket and of that record.

16            So, you know, coupling the record before --

17  coupling the record in this case with Trustee Despins'

18  testimony, that concludes our evidence in support of the

19  motion.  And with that, I would propose proceeding to

20  argument.  I'm happy to do that, Your Honor.

21            THE COURT:  Go right ahead.

22            MR. BASSETT:  Thank you very much.

23            So, Your Honor, I'll try to be brief in my

24  remarks, because I don't think there is really any new ground

25  to cover that we did not already cover when we had the

1    hearing back in February on the first motion to extend the

2    trustee's time to file avoidance actions.  The Court, in that

3    order, which was issued on February 15th, 2024, and is at

4    ECF 2921, the Court reached two main conclusions.  First, it

5    granted the trustee's request for an extension of his

6    deadline to file avoidance actions from February 15th, 2024,

7    through August 15th, 2024, under Federal Rule of Bankruptcy

8    Procedure 9006(b).  Second, the Court determined in that

9    order that it disagreed and denied the trustee's requests for

10   equitable tolling on the statute of limitations deadline;

11   however, it expressly did so without prejudice to the

12   trustee's ability to raise equitable tolling in response to

13   any argument that a particular adversary Defendant may raise

14   as to the statute of limitations in the future.

15            Your Honor, there is no reason, based on either

16   the passage of time, the intervening facts and circumstances

17   that have occurred since February, or anything in the

18   objections that the Court has received, that would militate

19   in favor of any other outcome that's different from what the

20   Court already concluded back in February.  I do want to

21   emphasize that the trustee absolutely intends to argue

22   equitable tolling at the appropriate time if a Defendant

23   raises a statute of limitations issue in an adversary

24   proceeding, but we respect the Court's ruling as to that and

25   will reserve all rights accordingly.

1        Your Honor, I'll spend the balance of my time just

2   responding to the particular arguments that certain of the

3   objecting parties have raised.  Again, in my view, there is

4   nothing new.  I think the arguments generally fall into two

5   buckets.  The first is the objecting parties reiterate

6   arguments they made previously that the Court should not be

7   able to use Federal Rule of Bankruptcy Procedure 9006(b) to

8   extend the deadline for filing avoidance actions.  And then

9   the second argument is one that's really based on the factual

10  record, with parties taxes the position that nothing has

11  occurred or that there were no facts in the record that would

12  justify extending the deadline to file avoidance actions

13  further.

14       On the first of those arguments, on 9006(b), Your

15  Honor, again, I think it's already been decided.  The Court

16  carefully analyzed this issue and the relevant case law in

17  its first extension order.  The Court, after conducting that

18  analysis, ultimately concluded correctly that limitations

19  periods are generally not substantive and, therefore, the

20  Court has the power to use Rule 9006(b) to extend the

21  limitations period set forth in 546(a), based on principles

22  of equity.

23       In reaching that decision, the Court expressly

24  considered and declined to follow contrary case law,

25  including, specifically, Judge Tancredi's decision in the In

1   re Walnut Hill case, which the objecting parties continue to

2   rely upon.  The Court also specifically noted in his

3   decision, which granted the trustee's request to extend the

4   deadline for filing avoidance actions to August 15th, 2024,

5   that, (indiscernible) for the order, but which date may be

6   further extended upon notice and a hearing, and that's why

7   we're here today, Your Honor, to have a further hearing on

8   extending that deadline through February of 2015 [sic].

9         Everything the Court decided in its prior order on

10  this issue, Your Honor, remains correct today and it should

11  not be disturbed.  The only argument that certain of the

12  objecting parties attempt to characterize as a new argument

13  is an argument based on the Supreme Court's recent decision

14  in the Purdue Pharma case, but nothing about that decision,

15  Your Honor, impacts the Court's analysis.

16        In Purdue, the Supreme Court concluded that

17  bankruptcy courts -- the Bankruptcy Court in that case could

18  not prove the nonconsensual, third-party release because

19  Congress had not authorized such releases under the

20  Bankruptcy Code and it undeniably would have affected the

21  substantive rights of parties who held claims against other

22  parties.  It's important to note, and there's an entire

23  section of the Court's opinion at the end where the Court is

24  very clear to caution the narrowness of its holding.

25        And the Court said, quote, "As important as the

1   question we decide today are the ones we do not decide."  The

2   Court then concluded, quote, "Consigning ourselves to the

3   question presented, we hold only that the Bankruptcy Code

4   does not authorize the release and injunction that, as part

5   of a plan of reorganization under Chapter 11, effectively

6   seeks to discharge claims against a nondebtor without the

7   consent of the affected claimants."

8            So, Your Honor, the decision to the issue before

9   the Court today obviously does not involve nonconsensual

10  third-party releases and, therefore, in our view, Purdue has

11  no bearing on the Court's decision.

12           Now, to the extent and notwithstanding the Court's

13  very careful attempt to clarify the narrowness of its

14  holding, Purdue can be said to stand for broader principles.

15  At most, I would submit it could stand for the proposition

16  that bankruptcy courts are not allowed to use their equitable

17  powers in a way that affects substantive rights in a manner

18  that is inconsistent with the Bankruptcy Code.

19           And, again, the Court addressed this issue and

20  already decided it, and we make this point in our reply

21  brief, the point being that the statute of limitations here

22  are not substantive, therefore, the Court is not modifying

23  substantive rights.

24           Now, if the Defendants' broad ruling of Purdue are

25  correct, the implications of that would be far broader than

1  they suggest, because as I read their objection, they're

2  effectively saying that a Court could never use equitable

3  powers to effect statutes of limitation, would that would

4  apply to equitable tolling, as well.  That also applies

5  outside of the bankruptcy context.

6          I don't think there's any possible reasonable

7  reading of the Purdue case, which could be said that -- where

8  the Supreme Court could have been said to have intended to do

9  away with equitable tolling of statutes of limitations, like,

10 that's a far too broad reading of that decision and I think

11 that it certainly was not intended to be -- that it was not

12 intended to have that effect.

13         Your Honor, aside from the 9006(b) arguments and

14 the Purdue overlay, as I'll call it, the only other argument

15 that the objectors really make is that, in their view, the

16 circumstances don't justify an extension of time.  Your

17 Honor, I would submit based on the testimony that the trustee

18 gave today, based on the record in this case, and based on

19 the testimony that he gave back in February, the record amply

20 supports the limited, further extension that the trustee is

21 seeking.

22         And you can tell from the cross-examination today

23 one of the points that the objectors are making is that,

24 Well, this obstruction, this all occurred at the beginning of

25 the case and the debtor has been in prison.  He hasn't been

1   actively obstructing the trustee's investigation since, but

2   that's just not true, because the obstruction that occurred

3   and the unique and extraordinary cases of this case are that

4   we have a debtor and we have an individual associated with

5   the debtor who has never cooperated with the trustee's

6   investigation.  They've never provided the books and records

7   that ordinarily should be provided in any case.  That

8   continues to impede the trustee's investigation.  All the

9   issues arising out of that lack of cooperation does not

10  magically disappear after February 15th of this year, Your

11  Honor.

12          And the trustee testified about the diligent

13  efforts that he is continuing to undertake.  He testified

14  about thousands of documents that his team has received from

15  2004 investigations, from a warehouse belonging to Golden

16  Spring that his team obtained access to, to the thousands of

17  exhibits in a criminal trial, all of which he does not even

18  have access to yet.  He talked about his team's process for

19  going through those documents as diligently as they can.

20          The trustee also talked about his monitoring of

21  the criminal trial more generally and the relevance that has

22  to his investigation.  He talked about the bank account

23  analysis being undertaken by Kroll, which was the subject of

24  extensive testimony back in February.

25          Your Honor, all of that is ongoing.  All of it

1  takes time.  All of it continues to be affected by the unique

2  and extraordinary circumstances of this case.

3          The last point I will address, Your Honor, as to

4  the trustee's diligence with his investigation is the

5  argument that (indiscernible) surrounding the motion to stay

6  the bankruptcy case.  Your Honor, that was a motion that the

7  trustee presented.  You heard from him today the reasons why

8  it was filed.  The Court granted that motion.  In doing so,

9  I'd submit that the Court found that that motion was in the

10  best interests of the estate.  Other parties, including the

11  objectors who are here today, had the opportunity to object

12  to that if they thought it was not appropriate.

13          And, again, Your Honor, the trustee had very good

14  reasons for doing that.  The potential consequences of not

15  proceeding in that manner would have been to fight with the

16  debtor about a global stay of the bankruptcy case, which

17  would have been a disaster if the trustee had been unable to

18  continue to do any of his work during the pendency of the

19  criminal trial, that would have been a disaster and,

20  therefore, he made the recent decision to file that motion

21  and it was granted by the Court.

22          The last argument I'll briefly address, Your

23  Honor, is the argument by Meta and Apple, where they say

24  that, again, there's no evidence that they, themselves, are

25  done anything to obstruct the trustee's investigation.  And

1  on that, Your Honor, I would just simply point the Court to

2  the decision already issued in the first extension order at

3  paragraph 14, where the Court said, quote, "The bankruptcy

4  case presents a rather different (indiscernible) on equitable

5  tolling and the typical situation, it would have been

6  debtors' conduct, rather than the Defendants' conduct, which

7  invokes equitable tolling.  In some senses, this is unfair to

8  the Defendant."

9          And the Court cited cases in support of that,

10  including the Fundamental Long Term Care case from the Middle

11  District of Florida Bankruptcy Court, cited in this opinion.

12          So, Your Honor, the point is not whether a

13  particular individual, avoidance action Defendant obstructed

14  the trustee's investigation; it is whether or not there has

15  been an obstruction, generally, that has prevented the

16  trustee from being able to complete his investigation within

17  the time that ordinarily exists under the Bankruptcy Code.

18          So, Your Honor, for all those reasons, we would

19  respectfully request that the Court grant an extension of the

20  deadline to file avoidance actions by another six months

21  through February 15th, 2025.  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          And who wishes to go, to proceed first with their

24  objection?  We have counsel for -- we have Attorney Yan,

25  Attorney Sklarz.  Is anyone else going to be making an

1  argument, in objection to the motion?

2          MR. KIM:  Your Honor, there's also an objection

3  filed by the Greenwich Land Defendants, so I'll reserve until

4  the end and if the --

5          THE COURT:  Oh, yes.

6          MR. KIM:  -- and if Mr. Yan and Mr. Sklarz cover

7  all the ground, then I have no need to retread.

8          THE COURT:  Thank you, Attorney Kim.  I just

9  missed -- I misplaced your objection for a second, there.  I

10 apologize.

11         All right.  So, Attorney Sklarz, Attorney Yan, who

12 would like to proceed first?

13         MR. SKLARZ:  By all means, go ahead, Attorney Yan.

14         MR. YAN:  Thank you.

15         Thank you, Your Honor.

16         As Your Honor noted in her prior order granting

17 the trustee's requested extension, an (indiscernible) concern

18 under Rule 9006(b) is prejudice to the Defendant.  Now, I'll

19 say that we disagree with the Court's analysis, but I don't

20 think we need to retread on 9006(b) arguments.

21         Here, we have a case where we're differently

22 situated from some of the other Defendants that are going to

23 be Defendants and potential Defendants that might be affected

24 by the order that the trustee's asking the Court to enter.

25 And we're differently situated because Meta and Apple have

1   already been sued; they were sued before the prior extension

2   that was granted.  And in those cases, we have spent the

3   money and expense to move to dismiss and filed a number of

4   other things.

5         And so, we're differently situated than those

6   people who don't even though that they're targets and haven't

7   had to do anything yet.

8         UNIDENTIFIED SPEAKER:  (Indiscernible.)

9         MR. YAN:  I'm sorry, go ahead.

10        The other thing is kind of related to that is,

11  here, we've come before the Court and we've objected to it

12  and I don't see how we're differently situated from some of

13  the other Defendants or parties that have been carved out of

14  the last order, such as UBS and Sotheby's, who also filed

15  objections and were carved out.

16        Here, as you've heard the trustee say, he has

17  identified potential, additional claims against Meta and

18  Apple that he says are non-material, but it's been six

19  months.  He filed it before the last extension and he hasn't

20  done anything with those claims.  We don't know.  He hasn't

21  said whether he needs additional time beyond the six-month

22  extension already, another six months to file anything

23  additional against Apple.

24        And there's a fundamental fairness point where the

25  trustee gets to reserve all of his arguments, with respect to

```
 1   equitable tolling and all of the (indiscernible) arguments
 2   and on top of that, he gets this order saying, Yeah, he can
 3   timely file in another six months; whereas, we are prejudiced
 4   because we can't make that argument anymore after this order.
 5   And so why does he get belts-and-suspenders and we, who have
 6   done nothing wrong, we get cut off at the knees, with respect
 7   to our arguments relating to why the trustee's claims are
 8   time-barred.
 9              And so for those reasons we would just ask that --
10              THE COURT:  Wait.  May I stop you just right there
11   for one second so I make sure I understand your argument?
12              MR. YAN:  Sure.
13              THE COURT:  When you say you get cut off at the
14   knees on his equitable tolling argument, is that the point
15   that you're making, Counsel?  I just want to make sure I
16   understand.
17              MR. YAN:  Not the equitable tolling argument.
18              I'm just saying he gets to make his equitable --
19   if we -- if he makes an equitable tolling argument -- we'll
20   get to that -- I don't think the order affects that, but he
21   will already have an advantage in that he can wave the order
22   around and say, If we make an argument that his claims are
23   time-barred, he can say, Well, look, I have an order from the
24   judge saying that that argument no longer flies, with respect
25   to you.
```

1           THE COURT:  Well, I don't think it's true.

2           MR. YAN:  So, I'm just --

3           THE COURT:  I don't think that's what the order

4    says.  So maybe I need you to point me in that direction,

5    because I believe what the order says is that there's an

6    extension of time granted under these very specific and

7    unusual circumstances of these complex, consolidated,

8    administratively consolidated Chapter 11 cases and adversary

9    proceedings and that I was not going to prospectively order

10   that the trustee can assert equitable tolling.

11          I believe the order says that the trustee can

12   assert equitable tolling when someone raises it in a motion

13   to dismiss or another pleading.  And so I don't see how that

14   cuts you off at the knees at all, so I would like to make

15   sure I'm not missing your point.

16          MR. YAN:  Sure.  I guess my point, Your Honor, is

17   why does he need that?  He can always make an equitable

18   tolling argument because his rights are preserved.

19          THE COURT:  What does he need what, though; I

20   didn't give him what he wanted, so I don't know what

21   you're -- I guess that's what I'm struggling with.  I didn't

22   give him what he wanted in the original order.  I didn't say

23   that he prospectively has the right to assert equitable

24   tolling; I didn't say that.

25          I said that under the cases that all the parties

1   cited, the application of equitable tolling does not come

2   into play or does not become an issue unless and until it's

3   raised in connection with a motion to dismiss the case

4   because the statute of limitations has passed.  That's what

5   the order says.

6           MR. YAN:  Understood.  Understood, Your Honor.

7           And my point is, why does he need more than that?

8   He can -- that argument is preserved.  If he can make that --

9           THE COURT:  I don't know that he does need more

10  than that.

11          MR. YAN:  That's my point, Your Honor, why does he

12  need this additional order?

13          THE COURT:  Well, that's time.  Time is different

14  from equitable tolling, Counsel.  He's asking for additional

15  time.

16          I didn't -- he's asking for an additional time to

17  commence causes of action, okay.  I didn't hear Attorney

18  Bassett -- but maybe I missed it and that's why I'm stopping

19  to ask these questions -- I didn't hear Attorney Bassett, and

20  I don't think I read in the papers, but maybe I'm -- you

21  know, I could have missed it, because as you can, I'm sure,

22  appreciate, there are a lot of papers filed in this case and

23  in the adversary proceedings, but I didn't hear Attorney

24  Bassett ask me to prospectively order from this point forward

25  that equitable tolling, the trustee is entitled to assert

1   that.  I didn't hear him.

2           Attorney Bassett, did you ask me to do that,

3   because if you did, I missed it.

4           MR. BASSETT:  I did not, Your Honor; in fact, the

5   Court has already ruled on that issue.

6           THE COURT:  Okay.  Thank you.

7           So, that's my question to you, Attorney Yan.  The

8   only issue that I see and is right now in the papers is, the

9   trustee is asking for an extension of time to commence causes

10  of action.  I've ruled on the issue of equitable tolling.

11          So I'm a little confused as to your statement that

12  somehow you've been -- and I apologize -- I think the words

13  were that you're cut off at the knees.  I don't see how you

14  are.

15          So, please explain to me.  I don't want you to not

16  tell me.  I'm just not sure that I understand your argument.

17          MR. YAN:  Sure, Your Honor.

18          And I think this -- let me go back to the

19  argument.  I think the point I was really trying to make is

20  we're differently situated because he doesn't need more time;

21  he's already asserted claims against us, so I don't think

22  it's equitable for him to get additional time to add on to

23  claims that he's already asserted against us.

24          THE COURT:  Well, don't you think the Federal

25  Rules of Civil Procedure will address that?  If he tries to

1  add on claims or bring a new cause of action, you can do

2  whatever you need to do, if he even does that.

3          And I think you asked him -- and I understand why

4  you did -- were there any additional claims against Apple and

5  metal -- Meta, excuse me -- and his answer was "not material

6  claims that he could think of" and that was the answer I

7  heard.

8          But the Federal Rules of Civil Procedure will deal

9  with it one way or another; either he'll move to amend the

10 complaint that was, as you already admitted, was filed before

11 the expiration of the statute under the applicable statutes

12 or he'll file a new cause of action.  And in either case,

13 you're going to either oppose the motion to amend or you're

14 going to move to dismiss.  And that's how the Federal Rules

15 of Civil Procedure work, right?

16         I mean, I guess I'm a little confused by your

17 argument, because you -- I agree with you, though, that you

18 are differently situated insofar as your clients were sued

19 before any applicable statute ran.  So, from that

20 perspective, I think whatever happens, happens and the

21 Federal Rules of Civil Procedure will -- do apply and you and

22 the trustee will assert whatever arguments you have under the

23 applicable Federal Rules of Civil Procedure and then the

24 Court will address those accordingly.

25         MR. YAN:  I think that makes sense if he's going

1    to assert them in the same case.  What we're concerned about,

2    and what we didn't see in the papers or hear from the trustee

3    is that they intend to assert civil litigation.  So, eight

4    months down the line, does he intend to file a new claim

5    against us?  We don't know, and so we want to preserve our

6    right to object to that.

7            THE COURT:  Well, I think you vaccinate right.  I

8    don't see how you would -- my prior order does preserve that

9    right for you, in my opinion.  Maybe I'm wrong, but it says

10   that the trustee is not entitled to prospective, equitable

11   tolling and that issue will come up, if at all, when a party

12   raises and files a motion to dismiss, asserting that a

13   statute of limitations has passed.

14           MR. YAN:  Understood, Your Honor.

15           THE COURT:  So, I don't see how your right isn't

16   preserved.  But that doesn't mean I'm right, Counsel; I'm

17   just telling you, that's the Court's perspective.  You can do

18   with that what you feel is appropriate.

19           But the prior order was very -- I tried to be very

20   clear in a very short amount of time to say that the

21   trustee's right to bring causes of action was extended

22   because I felt and I found and held that Rule 9006 did not

23   bar that extension because those statutes were statutes of

24   repose, which did not affect substantive rights of parties.

25   And I found that, based upon many things, including the

1   Supreme Court case of <u>Young</u>, in which Justice Scalia, writing

2   for the majority, said that those statutes are not

3   substantive statutes; they don't affect substantive rights.

4           So, in any event, what I'm saying to you is, I

5   understand what you're saying, but I believe you are

6   protected.  You may think otherwise, and I completely respect

7   that, but that is the reason why I proceed -- the decision

8   says what it says.

9           MR. YAN:  Understood, Your Honor.

10          THE COURT:  I didn't foreclose on any Defendant

11  from asserting that there was some kind of statute of

12  limitations issue.

13          MR. YAN:  Understood, Your Honor.

14          And then that, perhaps, is the issue where we

15  didn't see that level of protection that you just

16  articulated, which is why we asked to just be carved out from

17  the ambit of the order.

18          THE COURT:  So, what you're saying is you would

19  like me to rule -- and I just want to make sure -- with

20  regard to Apple and Meta that if there's an extension

21  granted, it doesn't apply to them?

22          MR. YAN:  That's correct, Your Honor.

23          THE COURT:  Well, if I agreed with you, which I

24  don't know that I will, but I would not agree with you with

25  regard to the existing causes of action being amended.  Now,

1   that doesn't mean you couldn't oppose amendment, but,

2   obviously, the Federal Rules of Civil Procedure allow for

3   amendments to an existing cause of action.  They allow to it

4   up until after trial.

5         So, with regard to that issue, the only issue that

6   I think, then, I would decide with regard to Meta and Apple

7   are whether Meta and Apple are carved out from any new causes

8   of action.  That's what I would decide.

9         MR. YAN:  I think your articulation is exactly

10   right, Your Honor.  I agree with that.

11         THE COURT:  Okay.  Great.  I appreciate that.

12         I didn't mean to cut you off, so if there's more

13   that you want to argue, please do.  I just wanted to be -- I

14   wanted to make sure I understood what you were arguing.

15         MR. YAN:  No, we appreciate that, Your Honor, and

16   that's all that I have.

17         THE COURT:  Okay.  Thank you.

18         Attorney Sklarz, did you wish to proceed next?

19         MR. SKLARZ:  Yes, please, Your Honor.

20         Your Honor, in nearly 40 years of an unbroken line

21   of cases, running from Northern Pipeline to Granfinanciera to

22   Stern to Purdue, cited just a few months ago, our Supreme

23   Court has held that unless the Bankruptcy Code clearly

24   permits relief, Bankruptcy Courts cannot fashion substantive

25   relief based on either gap-fillers or a lack of Congress

1   saying that they can't be done.

2          So in _Purdue_, there's nothing in 1123 that says

3   Bankruptcy Courts can't authorize nonconsensual third-party

4   releases.  But the Supreme Court was still clear that they're

5   not allowed because of the Code silence and allowing such

6   relief would countermand specific provisions of the Code,

7   namely, Section 1141 and the discharge provisions.

8          Here, and, certainly in light of Your Honor's

9   ruling, _Purdue_ came out afterward, but in light of _Purdue_,

10  and analyzed against that backdrop, the applicable section

11  that provides the statute of limitations, Section 546, says

12  it's two years.  It is silent on whether you can or cannot

13  extend it.  There's nothing in the Bankruptcy Code that says

14  you can extend it or you can't extend it.

15         So the trustee looks to Rule 9006 and refers to

16  what they're requesting under 9006, listed on page 5 of their

17  reply brief -- I'm sorry, paragraph 5 of their reply brief as

18  a "equitable extension."  This is definitely not an equitable

19  extension.

20         As Your Honor just discussed with Attorney Yan,

21  equity, as to statutes of limitation, we know of three main

22  extending doctrines of statutes of limitations:  equitable

23  tolling, fraudulent concealment, and the discovery rule.

24         What this is, very specifically, is the use of a

25  rule, not a statute, but we'll just say a provision, not a

1  common law provision, not something that exists in the

2  equitable ether, but a written rule that has general

3  application to extend a statute of limitations, 546, that

4  have a specific statement.  So this is precisely what Purdue

5  warns against.

6          Again, the dissent in Purdue makes exactly the

7  same observations as the trustee.  Over 40 times, the dissent

8  refers to equitable relief or some variance of the word

9  "equity" and their argument is the releases and the

10  settlement payments solve those problems and ensure fair and

11  equitable recovery for the opioid victims.  It's certainly a

12  good argument, but it wasn't the majority.

13          The majority says otherwise.  It says, faced with

14  so many marks against its interpretation of the law, plan

15  proponents in the dissent resort to a policy argument.

16          That is exactly what occurs here.  It's a policy

17  argument saying that because of all these other things, other

18  than what is written down, that the statute can be extended.

19  The trustee's request for an equitable extension has to fail

20  for exactly the reasons stated in Purdue.  The Code provides

21  absolutely no mechanism for a prospective extension of a

22  written-down statutes of limitations.

23          And I think in light of Purdue and now specific it

24  was, it's important that I briefly just turn to three of the

25  Court's main holdings in the February ruling.  I don't want

1   to -- Your Honor ruled and I just -- I think in the context

2   of Purdue, it's a little bit different.  So the three main

3   rulings as to why, as I understand it, Your Honor ruled

4   that 9006 applies is the Rules Enabling Act doesn't apply to

5   stop 9006 from applying because of traditional principles of

6   equity.  In light of Purdue, it is unclear.  So that's number

7   one.  Number two, statutes of limitations are procedural, and

8   that's subject to the Bankruptcy Rules.  And third, the

9   statutes of limitations provisions of the Code come into

10  existence, only once a Title 11 case is filed.

11          Turning back -- let me expand on that a little

12  bit.  So, turning back to the Rules Enabling Act question.

13  Essentially, the Rules Enabling Act and the jurisprudence

14  thereunder says, as long as there isn't something specific

15  that says you can't -- you can't do it, you can apply this --

16  you can apply traditional tolling doctrines.  Traditional

17  tolling doctrines, as we discussed, are equitable tolling,

18  discovery rule, and fraudulent concealment.

19          Using Rule 9006 to prospectively extend the

20  statute, in other words, as Your Honor explained, an

21  extension of time to commence causes of action are different

22  than equitable tolling.  I agree 100 percent.  This has

23  nothing to do with equity.

24          This has to do with, can you graft on an extension

25  provision that is written nowhere in the Code by gap-filling

1   with the Rules?  In light of _Purdue_, is it unclear how an

2   arguably equitable approach can be applied to pull gap-filler

3   from the Rules and apply here.  There's no argument that

4   there's a right to equitable tolling at this time; that

5   argument has been reserved, as we just discussed.  There's no

6   argument that there's been a prospective, fraudulent

7   concealment, or discovery rule violations, or some other

8   traditional, common law tolling doctrine.

9          The trustee cites 9006.  He doesn't cite equity to

10  support his 9006 argument.

11         Turning to the question of whether statutes of

12  limitations are procedural or substantive.  I apologize, I

13  don't -- so, first, we cite -- and I'll just refer to the G

14  Club brief, because that's in the main case.  The arguments

15  that we submitted in our briefing in the four adversaries are

16  essentially the same, just the structure is a little bit

17  different.

18         On page 6 of G Club, we cite to the Second

19  Circuit's ruling in _Enterprise Mortgage_, which explains that

20  substantive and procedural for how the rights affect somebody

21  in the case is a different analysis than whether something is

22  substantive or procedural for choice of law purposes, which

23  is where that substantive, procedural analysis comes from.

24  We briefed this in our case.

25         And then _Enterprise Mortgage_, the Second Circuit

1    explains that procedural versus substantive, you have to look

2    at it through the eyes of the Defendant.  So, here, the

3    Defendant, my clients, or anybody else who hasn't been sued

4    or who doesn't even know they're going to be sued -- perhaps

5    anybody else in the room, we don't know -- the -- from their

6    eyes, the two years has passed.  So they -- to them, to that

7    unsued party as of today, they're -- that is a substantive,

8    not a procedural right under Enterprise Mortgage.

9         And then we also cite the case of Aetna Life --

10    and the citation there is 391 F.3d 401, and that's on page,

11    mainly on page 6 of our brief in G Club -- that case applied

12    the Sarbanes-Oxley (indiscernible) was -- looking at the

13    Sarbanes-Oxley Act, but it also references a Supreme Court

14    case of Landgraf and it explains that the resurrection of

15    previously time-barred claims has an impermissible,

16    retroactive effect extending the statute of limitations

17    retroactively, increasing the Defendant's liability for past

18    conduct.

19         Now, there, there was a law -- the question was

20    whether the law was retroactively applied.  Here, the law

21    can't be retroactively applied.  There's been no change in

22    the law.  What there is, is a gap-filler provision, 9006, to

23    extend the statute of limitations prospectively.

24         If Congress can't do it with an act and not make

25    it specific, we can't do it otherwise.  That is exactly what

1  Purdue says.

2         Finally, whether 546 is subject to tolling because

3  it doesn't come into existence until it's a Title 11 case is

4  filed; again, under that the Court has ruled.  Your Honor

5  applied IDB (phonetic) over Butcher, but again, I think we

6  need to view those cases now in light of Purdue.  And it

7  appears in my view that the Purdue case says that is not the

8  analysis, that the Butcher analysis should be applied.

9         And we cited --

10        THE COURT:  But the Purdue case doesn't say

11 anywhere in it that the Butcher analysis should be applied --

12        MR. SKLARZ:  Oh, no, no, no, no.

13        THE COURT:  -- and, in fact, in Butcher, all the

14 courts in Butcher in the circuit in Butcher don't follow

15 Butcher.  If Purdue says that, please tell me, because I

16 don't believe that it says anything at all about Butcher.  It

17 never mentions it.

18        MR. SKLARZ:  Oh, I agree, Purdue doesn't cite

19 Butcher.

20        THE COURT:  Okay.

21        MR. SKLARZ:  What it does is apply a similar

22 analysis, which is textual.  You read the text.  The text is

23 clear.  The text applies.

24        And then we cited additional cases in our brief in

25 that regard, more than we cited in the previous brief, using

1   other provisions of the Code.

2           I'm sorry, Your Honor?

3           THE COURT:  No, I don't have anything.  Go ahead.

4           MR. SKLARZ:  Okay.  So -- if I may just have one

5   moment, Your Honor?

6           THE COURT:  Certainly.

7           MR. SKLARZ:  I just need to check if I have

8   anything else.

9       (Pause)

10          MR. SKLARZ:  Just turning briefly to the factual

11  argument justification.  Regardless of whether Your Honor

12  agrees with me or agrees with the trustee, I think we can all

13  agree prospectively extending statutes of limitations is very

14  unusual.  It's already been done once in this case.

15          Your Honor found, as Your Honor noted, on very

16  specific facts that that extraordinary relief was probative.

17  If Your Honor disagrees with me on the Purdue argument and

18  the arguments we've set forth, I still believe that they

19  cannot meet the burden Your Honor imposed upon them under

20  Your Honor's February ruling.  There's no longer

21  extraordinary that Mr. Kwok did or did not do anything; in

22  fact, on examination, we know a lot of information has been

23  turned over.  It may not have been turned over as quickly as

24  the trustee had hoped, but that is not some kind of

25  obstruction.

1           For example, the trustee said the government

2    hasn't turned over the information.  Is that obstruction by

3    the government, of not turning over information?  Of course

4    not.

5           On cross-examination, the trustee indicated that

6    more information occurs daily.  That is true in almost every

7    financial fraud investigation.

8           There were -- Your Honor found extraordinary facts

9    the first time.  We have to look at what's occurred since

10   then.  And we have not heard anything today that is of the

11   nature of extraordinary.  There was no further protesting or

12   other actions that Mr. Kwok's retainers took.  There was no

13   lack of funds, which was the major reason the last time

14   around, to toll the statute.

15          THE COURT:  Well, I just want to stop you there.

16   I don't even think there was any mention of protesting in the

17   prior ruling and I'm not sure that there was any mention of a

18   lack of funds, other than that was an argument made by the

19   objecting parties that somehow that should persuade the Court

20   that the trustee didn't act diligently because he didn't have

21   funds to retain a forensic accountant.

22          So, just to be clear, when you say the factual

23   basis and that the trustee can't meet its burden, the

24   argument about the protesting, I don't even think that was

25   mentioned.  I could be wrong, though; it could have been

1  mentioned in the order.

2           MR. SKLARZ:  I --

3           THE COURT:  But with regard to the funding, the

4  lack of funding, that was a claim that was raised by the

5  objecting parties to try to establish for the Court or

6  persuade the Court that the trustee did not act diligently

7  and I found just the opposite, in fact.  I found that it was

8  clear to the Court that the trustee has been more than

9  reasonably diligent.

10          So I don't think the argument about funds and/or

11  protesting is persuasive.

12          MR. SKLARZ:  And that's my -- I'm not saying it

13  is; what I'm saying is those facts do not exist today.

14          And I recall Kwok's examining the trustee on the

15  lack of funds.  What he indicated, as I recall, and we could

16  do back to the record, is that he did not hire a forensic

17  accountant because his firm didn't want to share payments

18  *pari passu* with the forensic accountant, so he deferred

19  hiring.  But we make --

20          THE COURT:  No, that wasn't the testimony at all;

21  in fact, the testimony was that he didn't hire the accountant

22  because the forensic accountant wanted to be paid --

23          MR. SKLARZ:  Right.

24          THE COURT:  -- and there weren't funds in the

25  estate to pay the forensic accountant and the forensic

1  accountant didn't want to take the risk that the forensic

2  accountant would have to share with all the other

3  administrative claimants in an insolvent estate.  That was --

4  that's my recollection of the testimony.

5          MR. SKLARZ:  I suppose I have a different

6  recollection, but --

7          THE COURT:  Oh, you could be right, but I'm just

8  saying that's my recollection.

9          MR. SKLARZ:  -- it probably doesn't matter.  It's

10  written down for a reason --

11          THE COURT:  Right.

12          MR. SKLARZ:  -- and my point is it's not terribly

13  relevant right now.

14          What the trustee presented today was, I have a lot

15  of work to do and it's hard and there's lots of it.  And I

16  have great sympathy that there is a lot of work to do, but

17  what we're talking about is meeting the standards Your Honor

18  set in the ruling, which is extraordinary circumstances.

19          I guess the first time is if it happened.  The

20  second time is a coincidence.  If we get to a third time,

21  perhaps that's a mode of operation.  I don't know when

22  extraordinary stops becoming extraordinary.  But, certainly,

23  we're -- I'm not sure why we're now adding a full year under

24  the trustee's motion to what Congress said should be the

25  statute of limitations of two years.

1          So I don't think that even if Your Honor reaches

2     the factual issue, it rises to the level of extraordinary as

3     Your Honor ruled in your prior (indiscernible).

4          But, Your Honor, I'm happy to answer any

5     questions; otherwise, that concludes my presentation.

6          THE COURT:  Thank you.  I do not have any

7     questions at the moment, Attorney Sklarz, thank you.

8          Attorney Kim, did you wish to be heard?

9          MR. KIM:  Thank you, Your Honor.

10          Austin Kim for the Greenwich Land Defendants.

11    Just a few finer points to pick up on what Attorney Yan had

12    mentioned.  You know, what's -- from our position, what's

13    going on here is the trustee is seeking to obtain the relief

14    of equitable tolling without having to seek it, one, and

15    then, two, with equitable tolling is done on a case-by-case

16    basis, because it is factually dependent, what the trustee is

17    seeking is an omnibus order that sort of avoids the trustee

18    having to establish on a case-by-case basis, why they should

19    effectively obtain the relief of equitable tolling.

20          So, with equitable tolling, you know, it's a case-

21    by-case, fact-specific analysis.  What the trustee is seeking

22    is essentially a six-month equitable toll the first time

23    around and now they're seeking a second, six-month equitable

24    toll the second time around, based, essentially, on the same

25    facts.

1    And so, you know, the constitute did provide some

2    testimony as to what, you know, additional efforts have been

3    made since February, but the bulk of what the trustee has put

4    forth as to why an additional six months is necessary are

5    facts that existed a year ago, or facts that already existed

6    six months ago.  So, I'm not here to doubt the diligence of

7    the trustee in, you know, the efforts made to do the

8    investigation, but it's not just confined to the trustee's

9    diligence; it's the, so what?  What has come out since

10   February that is so extraordinary that the Court should

11   exercise its discretion to grant to extend the statute of

12   limitations by another 25 percent on an omnibus basis without

13   the trustee demonstrating what's new.

14   Vague statements of, Well, we have received 400

15   documents or 700 documents or 20,000 documents, that's great,

16   but so what, right?  We don't know when these documents were

17   received, you know, where the progress is, and I just think

18   it's inequitable to allow the trustee to continue to, on a

19   piecemeal basis, obtain equitable tolling relief across the

20   board and as to, you know, frankly, parties that are not here

21   or who haven't been named yet or based on some speculation

22   that there could be something there.

23   So, on that basis, we do stand by our initial

24   objection that, you know, we do disagree with the Court's

25   prior ruling that, you know, the statute of limitations, 546,

1  can be extended for the same reasons that my prior colleagues

2  have mentioned, and we rest there.

3              THE COURT:  Okay.  Thank you.

4              Attorney Bassett, do you have any reply?

5              MR. BASSETT:  Yes, Your Honor, briefly.

6              So, I'll start by responding to some of Attorney

7  Sklarz's arguments, which I think almost exclusively for the

8  first half of his presentation focused on the Purdue case.

9  And, look, I understand, Your Honor, the inclination to cease

10 upon a high-profile ruling of the Supreme Court and sort of

11 turn that into something significant to this motion, but I

12 really just do not think it is.

13             Purdue could not be a more different case than

14 this case, as much as Attorney Sklarz tries to characterize

15 it otherwise.  Purdue dealt with giving a discharge to a

16 nondebtor; an issue that's fundamental to the Bankruptcy Code

17 and I would submit (indiscernible) whether one talks about

18 these issues.

19             In this case, the Court has been asked to extend

20 the statute of limitations, which it has found is procedural,

21 non-substantive.  There should not be a wider gulf between

22 those scenarios, Purdue on the one hand and what the Court is

23 confronted with in the context of this motion.  That also

24 needs to be considered in the context of what the Supreme

25 Court specifically said about the narrowness of its decision.

1  It was very careful to say that it was talking about third-

2  party releases and their permissibility on a nonconsensual

3  scenario in that case.

4         And what I think Attorney Sklarz did not say,

5  because he could not say, or maybe he will come back and

6  argue this down the line if we do have a dispute about

7  equitable tolling, but if you take his argument to its

8  logical extension, he's basically saying the Supreme Court,

9  in a Purdue decision about nonconsensual third-party releases

10 intended to say that equitable tolling of a statute of

11 limitation as set forth in a statute of Congress is never

12 permissible.  That's the logical extension of what he's

13 saying.  He talks about the dissent and the equitable

14 arguments that the Supreme Court's majority did not consider.

15 That's essentially where he is taking that argument.  And I

16 submit there is no logical reading of the Purdue decision

17 that could be read that broadly, Your Honor.

18        Now, as to the facts -- and just to round out,

19 Your Honor, the 9006(b) and all the legal arguments

20 surrounding whether or not the Court has the authority to

21 extend the deadline, nothing else is new.  The Court's

22 analysis, its decision was correct.  No intervening cases

23 have been issued.  There's no other reason as to why that

24 analysis should be revisited and, therefore, we would ask

25 that the same order, again, be entered.

1        As to the factual arguments that the parties have

2   raised, Attorney Sklarz, as to the (indiscernible) Attorney

3   Kim, I believe, as well, had -- I think the way Attorney

4   Sklarz characterized it is the circumstances of this case

5   are, quote, no longer extraordinary.

6        Your Honor, I'm not sure what that means.  The

7   circumstances of this case are either extraordinary or they

8   are not and I don't think anyone could, with a straight face,

9   take the position that this case is anything but incredibly

10  extraordinary based on the level of obstruction the trustee

11  has faced from the beginning of the case, based on the fact

12  that this is a debtor who purported to file bankruptcy in

13  this case with, I think, 3,000 or some odd dollars in cash to

14  his name, despite having lived the life of a billionaire.

15  He's had to peel back every layer of the onion to try to

16  figure out where the shell companies, where these assets were

17  really held and whose names are they nominally held.  Where

18  are the bank accounts and other transactions located that

19  explain the true nature of the debtors' financial affairs?

20       The debtor has never cooperated.  He never

21  provided books and records and that continues to affect the

22  trustee's investigation today.  This case is, and always has

23  been extraordinary.  That did not stop on February 15th.  The

24  fallacy in the objectors' arguments is that all the

25  obstruction, all the unique circumstances of this case

1  necessarily could have been overcome in the six months that

2  have occurred since February 15th until now, but as the

3  trustee has testified, that just hasn't been the case.

4          And the inquiry, Your Honor, for extending the

5  statute of limitations in the context of the order that the

6  Court issued is whether the trustee has been diligent.  And

7  Your Honor found that he has been.  I think the testimony

8  today only demonstrates that that diligence has continued.

9  The trustee has said that he's filing complaints as soon as

10 he possibly can.  He and his team are diligently working to

11 pursue additional 2004 targets.  They are viewing documents

12 from the criminal case:  twenty-plus-thousand documents that

13 the trustee and his team are going through.  The Kroll team

14 is continuing to analyze bank accounts, all of which should

15 have been provided if they were -- if this were a normal case

16 where the debtor is cooperating, he'd provide access to his

17 books and records.

18         But the trustee is continuing to do all of those

19 things.  He's testified clearly that he's been diligent in

20 his efforts and, Your Honor, I think that factual record,

21 again, together with the context of this case from the

22 beginning, amply supports the further extension that the

23 trustee is seeking.

24         Subject to any questions the Court may have, I

25 don't have any further remarks at this time.  Thank you, Your

1  Honor.

2              THE COURT:  Thank you.  I do not have any

3  questions.

4              Anything further, Attorney Yan?  Attorney Sklarz?

5  Or -- did I lose everybody?  Oh, no, Attorney Sklarz is still

6  there.  Or Attorney Kim, that you'd like to state for the

7  record?

8              MR. SKLARZ:  Only, Your Honor, I don't know if you

9  want me to submit -- I don't know that it's necessary, but I

10  certainly will -- of any of the prior transcripts references

11  that we discussed during my argument related to what the

12  trustee was doing back at the inception of the case.

13              THE COURT:  That is not necessary, from my

14  perspective, thank you.

15              MR. SKLARZ:  And just very briefly, I never made

16  the argument that Purdue removes equitable tolling; to the

17  contrary, I said that the trustee's argument is not equitable

18  in nature.  It's made on the basis of a rule and doesn't

19  invoke the Court's equitable, true equitable jurisdiction,

20  which would be invoked through common law doctrines, such as

21  equitable tolling.  So, I just want to make sure that that is

22  clear.

23              Thank you, Your Honor.

24              THE COURT:  Thank you.

25              Anyone else wish to be heard any further?

1        MR. KIM:  Your Honor, I would just be remiss

2   (indiscernible) to mention one point --

3        THE COURT:  Attorney Kim, I'm just going to stop

4   you for a second, just so it's clear that it's you that's

5   speaking.

6        So, Attorney Kim, you go right ahead.

7        MR. KIM:  Yes, Austin Kim for the Greenwich Land

8   Defendants.  I apologize, Your Honor.

9        THE COURT:  No, that's okay.

10       MR. KIM:  Austin Kim for the Greenwich Land

11  Defendants.

12       The one last point that I wanted to raise is that

13  the bulk of what the trustee has presented are vague claims

14  of obstruction or of concealment, but those are precisely why

15  the equitable doctrines of equitable tolling or fraudulent

16  concealment, those doctrines already exist.  So the trustee

17  is totally protected if, for example, some of the 700

18  documents or whatever documents do uncover some basis for an

19  additional adversary proceeding after the 15th of August.  So

20  the trustee does not need the Court's additional order,

21  basically granting him a six-month reprieve from having to

22  justify an equitable toll for any particular case because

23  they have it for every case, brought or not brought.

24       So, we would just say that as a matter of equity

25  to the objectors and for individuals who are not yet here,

1   that there's no need for the trustee to get the additional

2   sort of protection of not having to establish their burden

3   based on some claim of obstruction, because that same

4   argument that was raised in February is the same argument

5   being raised today.  I mean, it'll probably be raised against

6   next February.

7          At a certain point -- I'm not saying this case is

8   going to last forever -- but at a certain point, I think the

9   two-year statute of limitations was made for a particular

10  reason.  They've already received a 25 percent extension.

11  Now, they're seeking a 50 percent extension.  At a certain

12  point, you know, I think that the Court should hold the

13  trustee to its tasks and let him know, Hey, you already have

14  these rights if you can show that that was, in fact, observe

15  instruction that caused a delay and having the information to

16  bring the adversary proceeding, instead of prospectively

17  saying, Well, you know, we think there's obstruction and

18  we're looking at information and Kroll is spending some time

19  digging around.

20          I think it's insufficient to justify a cause basis

21  for essentially granting them equitable tolling on an omnibus

22  basis, and that's all I have, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          All right.  With regard to the motion for

25  extension of time, the first supplemental motion to extend

1  deadline to file avoidance actions, ECF 3329, I will take the

2  matter under advisement and rule accordingly.

3        Thank you all very much.

4        Now, we'll move to the mentioned emergency motion

5  for order authorizing funding to maintain the Mahwah Mansion.

6        And parties who were here on the first matter, if

7  you do not want to stay, you are absolutely excused, but

8  you're also welcome to stay throughout the entire hearing.

9  Thank you.

10       UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11       MR. LINSEY:  Thank you, Your Honor.  I'll be

12  addressing the amended emergency motion.  This is Patrick

13  Linsey for the Chapter 11 Trustee.

14       THE COURT:  Yes.

15       MR. LINSEY:  The amended emergency motion was

16  filed in the main case, but addresses facts that are at issue

17  in the Taurus Fund LLC adversary proceeding 23-5017.  That

18  adversary proceeding was filed against Taurus Fund and its

19  co-defendants involving a $26-and-a-half-million mansion in

20  Mahwah New Jersey, which the debtor purchased in December

21  of 2021.

22       Since the Court entered a preliminary injunction

23  in that adversary proceeding and until the debtors' criminal

24  trial, the Defendants have been funding security and other

25  expenses for the Mahwah Mansion.  These expenses are

1   substantial.  The Mahwah Mansion is approximately 50,000

2   square feet in interior size and has approximately 12 and a

3   half acres of grounds.  The cost of the security services for

4   the Mahwah Mansion is approximately $14,200 a week.  The cost

5   of the real estate taxes for the property, which the

6   Defendants have also been funding, is approximately $70,000

7   per quarter.

8        The trustee expects there will be other expenses,

9   as well (indiscernible) and the like.  It's important for the

10   value of the Mahwah Mansion to be preserved for the benefit

11   of the estate, hence the trustee's motion requesting

12   authority under the Bankruptcy Code to fund these expenses.

13        The Court has already found in its ruling on the

14   preliminary injunction that it is administer likely than not

15   that the debtor is the beneficial owner of and controls the

16   Mahwah Mansion.  The Court also noted in the preliminary

17   injunction that for a period of time, the debtor had made the

18   Mahwah Mansion available to other individuals and entities,

19   such that it was frequented by third parties.  This

20   highlights the importance that security be maintained in

21   light of the threat of damage by people who had previously

22   frequented the property.

23        The preliminary injunction, as the Court is aware,

24   requires that the Defendants employ the security services.

25   Following the debtors' criminal trial, Taurus Fund informed

1  the manager of the security services that Taurus Fund would

2  no longer be providing funding.  While the trustee believes

3  that Taurus Fund is violating a preliminary injunction, it is

4  important that the value of this property is preserved in

5  light of the trustee's expectation that through the adversary

6  proceeding, the mansion will be confirmed by judgment of the

7  Court to be property of the estate.

8          In fact, from the evidence from the debtors'

9  criminal trial, the trustee's case that this is property of

10 the estate is even stronger now than it was when the Court

11 entered the preliminary injunction order and made those

12 findings there.

13         One additional thing I neglected to mention, what

14 we know from proceedings in the Mahwah adversary proceeding

15 is that the Mahwah Mansion is presently not insured, which,

16 again, is further reason that measures need to be taken to

17 ensure that the property is secured.

18         The trustee's motion requests authority under

19 Section 363(b) of the Bankruptcy Code to use property of the

20 estate to pay expenses of the Mahwah Mansion up to a cap of

21 $300,000.  We're seeking this relief because we don't yet

22 have that judgment saying this is property of the estate.

23         The trustee is hopeful that the $300,000 cap will

24 provide adequate funding for any expenses over the period of

25 time necessary to obtain judgment as to ownership of the

1  property.  To the extent the cap requires adjustment, there's

2  a mechanism built into the proposed order to do that.

3           To be clear and for the purpose of the record,

4  we're filing a 363(b) motion because the property is not, by

5  the Court's ruling yet, property of the estate; however, once

6  that ruling enters, the trustee understands that we would no

7  longer need to be under the relief sought in this order

8  under 363(b), because at that point, the payments to maintain

9  the property would be ordinary course.

10          The motion also provides that the trustee does not

11  obtain judgment in the adversary proceeding to the extent

12  that, or to the effect, rather, that the Mahwah Mansion is

13  property of the estate, that the estate will then have a

14  claim against Taurus Fund in the amount of the expenses

15  advanced to be secured by the value of the Mahwah Mansion.

16  This is because right now, Taurus Fund is obligated under the

17  preliminary injunction to be funding expenses.  It's not

18  doing so.  And under a hypothetical scenario, just to be

19  clear, we don't think it's going to come to pass, but under a

20  hypothetical scenario where the estate's claims do not

21  prevail, Taurus Fund would have been unjustly enriched by the

22  estate's funding of these expenses.

23          The trustee would also note that the relief he is

24  seeking does not reveal the Defendants of their obligations

25  under the preliminary injunction; again, this motion is one

1    of practicality.  Your Honor can enter further orders and we

2    may proceed with further orders in regards to those matters,

3    but from a practical perspective, the trustee has an

4    obligation to preserve the value for the estate and that's

5    what we're doing by this motion.

6              Yesterday, Taurus Fund filed a response to the

7    motion consenting to the relief requested by the trustee, as

8    provided in the proposed order that's at ECF 3392.  Since

9    filing the motion, the trustee has consulted with counsel for

10   the United States Trustee, who suggested that terms in the

11   proposed order that rely on incorporated definition be

12   expressly defined in the proposed order and the trustee

13   agrees that makes sense.

14             So what the trustee would propose to do, to the

15   extent the Court is inclined to grant the motion, is that we

16   submit a revised proposed order that expressly defines the

17   capitalized terms for which definitions are incorporated.

18   That we note that the Taurus Fund filed a response saying

19   that it does not object to the relief sought in the order.

20   And that we say, explicitly, that there was a hearing today.

21             We can submit that order -- the trustee can submit

22   that order, certainly, by tomorrow, if not by later today,

23   and can send it to the courtroom deputy with the Mahwah

24   Defendants and the U.S. Trustee CCed, in the Court would

25   prefer we submit it otherwise.

1      With that, I'm happy to answer any questions that

2  the Court may have.

3      THE COURT:  I do not have any questions at this

4  time, thank you.

5      MR. LINSEY:  Thank you, Your Honor.

6      THE COURT:  Does anyone else wish to be heard on

7  this motion?

8      (No verbal response)

9      THE COURT:  Attorney Claiborn, do you agree with

10  what Attorney Linsey said, with regard to the proposed order?

11      MS. CLAIBORN:  Yes, Your Honor.  And the U.S.

12  Trustee has no objection to the motion.

13      THE COURT:  Okay.  I have looked at the proposed

14  order -- does anybody else wish to be heard?  I'm sorry, I

15  don't want to cut anyone off?

16      (No verbal response)

17      THE COURT:  Okay.  I had looked at the proposed

18  order and I understand that you're going to be making some

19  changes, Attorney Linsey, assuming I'm going to grant the

20  motion.  I think the changes that you've just stated are

21  fine.  I find that no one has filed any written objection to

22  your motion.

23      The Taurus Fund did file something yesterday, I

24  belief it was yesterday, that says they do not object to the

25  motion, but they object to certain language in what it

 1  believes is a mischaracterization of the Taurus Fund's

 2  behavior set forth in the motion.

 3          I think under the very specific circumstances of

 4  this case and the issues related to the Mahwah Mansion that

 5  have been brought to the Court's attention, both in the main

 6  case and in the adversary proceeding that the trustee has

 7  commenced against the Taurus Fund and related Defendants,

 8  that the relief sought is reasonable and necessary under the

 9  circumstances.  We've gone through the issues in the

10  adversary proceeding, including the fact that there is no

11  insurance at the property and that the security firm was

12  retained as part of a preliminary injunction order.  I know

13  that the trustee is not pressing any issues with the

14  preliminary injunction at this time.

15          For all those reasons, the amended motion for

16  order is granted and, Attorney Linsey, you'll have the order

17  in by tomorrow or the next day?  I just need to give a date

18  to the Clerk's Office so that they will be on the lookout for

19  it.

20          MR. LINSEY:  We'll have it in by tomorrow, Your

21  Honor.

22          THE COURT:  Thank you.

23          And you can just submit it to the courtroom deputy

24  email box for Bridgeport.  You do not need to docket it on

25  the case docket.

1          So the motion is granted and the revised proposed

2   order will be submitted on or before August 14th.

3          MR. LINSEY:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          Now, with regard to the two -- now, Trustee

6   Despins, I forget now, and I apologize.  I think I've been

7   sitting here for a few hours, but you had said something at

8   the beginning that you thought there was something that

9   needed to be on the calendar and now I can't recall what that

10  was, because this was the Mahwah Mansion issue.

11         Was there something else?

12         MR. DESPINS:  Well, no.  There's the status

13  conference on --

14         THE COURT:  Right, the status conference.  Yeah,

15  that's fair.

16         MR. DESPINS:  -- the scheduling.

17         THE COURT:  That's the fourth matter on the

18  calendar.

19         There are two other -- the status conference was

20  granted; it is on the calendar.

21         But let's just take a moment with regard to the

22  Genever adversary proceeding versus Kwok; that's been

23  continued a few times before, but it was not continued today.

24         MR. DESPINS:  Yeah.

25         THE COURT:  Did you anticipate oh did you plan to

1  go forward with this matter?

2          MR. DESPINS:  No, we dropped the ball, Your Honor,

3  on that.  We should have extended that, as well.  So we'll

4  make sure that that happens.  So, that should not go forward.

5  We apologize for that.

6          THE COURT:  That's fine.

7          So you're going to be filing a motion to set a

8  new -- to adjourn the pretrial conference to a new date in

9  the future?

10          MR. DESPINS:  Correct, Your Honor.

11          THE COURT:  All right.  So we're just going to

12  note that the conference was held, but that the Plaintiff

13  will be submitting, I suppose, a motion or something -- will

14  be submitting -- what did you file last time, was it an

15  actual motion?  I think it might have been, yeah, a motion

16  to --

17          MR. DESPINS:  A consent, yeah.

18          THE COURT:  -- adjourn hearing upon consent.

19          MR. DESPINS:  Yeah.

20          THE COURT:  So I think you'll be submitting

21  another motion and suggest an adjourned pretrial conference

22  date, okay?

23          MR. DESPINS:  Yes, Your Honor.

24      (Pause)

25          THE COURT:  All right.  So the pretrial conference

 1 | was held, but it will be adjourned, again, to a date to be

 2 | determined, okay?

 3 | MR. DESPINS:  Thank you, Your Honor.

 4 | THE COURT:  All right.  So the last matter on the

 5 | calendar is the status conference, so go right -- in the --

 6 | with regard to the Taurus Fund adversary proceeding.

 7 | So go right ahead, Trustee Despins.

 8 | MR. DESPINS:  Mr. Bassett will handle that, Your

 9 | Honor.  Thank you.

10 | THE COURT:  Okay.

11 | MR. BASSETT:  Your Honor, yes, again, Nick Bassett

12 | from Paul Hastings, on behalf of the Chapter 11 Trustee.

13 | Your Honor, it's a bit of an odd situation to be

14 | in for a status conference.  We, as the Court will recall, we

15 | outlined this in our request for the status conference, the

16 | order saying various litigation, including the Mahwah

17 | adversary proceeding provided that upon the conclusion of the

18 | criminal trial, the debtor could file a notice indicating his

19 | intent to resume the adversary proceeding, following which

20 | the parties had seven days to confer about a proposed

21 | schedule.

22 | We sent our proposed schedule to Attorney Conway,

23 | counsel for the Defendants.  He confirmed receipt, but did

24 | not give us his position on the schedule.  We followed up

25 | with him prior to the seven-day deadline to request a status

1  conference and still did not hear anything, so we then

2  requested the status conference.  We've still not heard from

3  him.

4           All we have heard is that he sent a response to

5  the other motion that we just finished discussing, stating

6  that he was occupied today and, therefore, would not be

7  attending the hearing.  So we are having a status conference

8  with only one of the parties present.

9           From the trustee's perspective, Your Honor, our

10  intent, which we have expressed to the Defendants' counsel is

11  to move forward with summary judgment in the adversary

12  proceeding as expeditiously as possible.  We have undertaken

13  some discovery.  We have also very intently followed the

14  criminal trial and gathered additional information from that

15  trial that we would intend to use in support of summary

16  judgment.  We see no delay in moving ahead in that -- we see

17  no reason to delay moving ahead in that direction and we've

18  received no opposition, no response at all, from counsel to

19  the Defendants.

20           So, that's what we intend to do.  I think what we

21  had said in the, in what we filed that requested the status

22  conference, Your Honor, that we had anticipated filing our

23  motion by the 19th and then giving the Defendants two weeks

24  to respond and then we'd reply in a week.  I think what we

25  may do, and we can submit a proposed scheduling order, but

1  out of respect for colleagues on me team that are working on

2  that motion, we may need a couple of extra days, so I think

3  we would just propose a schedule that says we will file the

4  motion and there'll be a 14-day response deadline and then

5  a 7-day reply deadline.

6          That's how we intend to proceed --

7          THE COURT:  No, I think were usually give a 21-day

8  response deadline, though, on motions; that's the District

9  Court's Local Rule.

10          MR. BASSETT:  That's fine, Your Honor.

11          THE COURT:  Okay.

12          MR. BASSETT:  We had proposed to Defense counsel

13  moving quickly under the circumstances, given the funding and

14  other issues, but we're happy to do 21 days.

15          The only other point I wanted to make, just so the

16  Court is aware, although we did not hear back from counsel

17  regarding our request for, regarding our proposed schedule,

18  we did get notice that they filed a motion to withdraw the

19  reference --

20          THE COURT:  Yeah, I saw that.

21          MR. BASSETT:  -- Friday night.

22          THE COURT:  And it's been transmitted to the

23  District Court.  I think it might have been transmitted

24  today.

25          MR. BASSETT:  Correct, Your Honor.

 1              Okay.  I just wanted to make sure the Court was

 2    aware of that.  And, obviously, in our view, if there's

 3    summary judgment briefing before Your Honor and that leads to

 4    the decision that would be reviewed by the Appellate Court,

 5    in any event, so we'll deal with the motion to withdraw the

 6    reference as we need to, but we don't see that as, you know,

 7    creating any issue with respect to how we proceed before Your

 8    Honor.

 9              THE COURT:  I understand.  Mr. Conway may

10    disagree, but I'm sure we'll do that in his papers or not.

11    So we'll see how things proceed.

12              MR. DESPINS:  Your Honor, if I may?  Luc Despins,

13    Chapter 11 Trustee.

14              On the 21 days, can we -- because I have the

15    feeling that we're not going to hear from Mr. Conway again.

16    I could be wrong, but --

17              THE COURT:  You can ask for the time to be

18    shortened; yes, in your scheduling, you can ask for that.

19              MR. DESPINS:  Or that if he intends to file

20    something, then he should have his 21 days, but if he's not

21    going to do it, I don't want to wait 21 days for nothing.

22              THE COURT:  Well, I --

23              MR. DESPINS:  So I can't promise --

24              THE COURT:  Under the District Court Local Rules

25    it's 21 days so, if you want a shorter time, you'll have to

1  ask for it.

2          MR. DESPINS:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Attorney Bassett, is there anything else, then, we

5  can do this afternoon with regard to this status conference?

6          MR. BASSETT:  No, Your Honor.  Thank you very

7  much.

8          THE COURT:  Okay.  I'm not going to schedule

9  another status conference at this point.  You will just take

10 whatever action you think is appropriate, including, as you

11 mentioned, the likelihood of proceeding forward with summary

12 judgment, okay?

13         MR. BASSETT:  Thank you, Your Honor.

14         THE COURT:  All right.  Then, with regard to -- we

15 have now addressed everything that is on today's calendar,

16 but as we often do at the end of hearings when there are

17 several matters, I ask the trustee or any parties, are there

18 any other issues that the parties wish to discuss with the

19 Court?

20         MR. DESPINS:  The only point, Your Honor -- thank

21 you, Luc Despins, Chapter 11 Trustee -- is that we may need,

22 and I don't know that yet, assistance in terms of getting

23 title to Greenwich Land transferred in my name as trustee; to

24 put insurance on, I need to have an insurable interest.

25 We're working on that, the technical aspects of that, but we

1    may need, like, a court order that directs, you know, like,

2    the Town (indiscernible) or something like that, but we hope

3    to avoid all of that.

4             And we are working on a stipulation with the

5    Greenwich Land Defendants where, I think everything has been

6    agreed to, where there'll be a transfer of possession on

7    August 20th.  So, if anything happens, it will need to be

8    between now and August 20th, but hopefully, we won't.  We'll

9    just be submitting to Your Honor a stipulated or a consent

10   order.

11            THE COURT:  Okay.  Thank you.

12            Anyone else --

13            MR. DESPINS:  Thank you.

14            THE COURT:  -- wish to be heard on any matters

15   this afternoon?

16       (No verbal response)

17            THE COURT:  All right.  Well, thank you, all.

18   That concludes today's hearings and those were the last

19   matters on today's calendar, so Court is adjourned.

20            COUNSEL:  Thank you, Your Honor.

21            THE CLERK:  Court is adjourned.  Excuse me.

22       (Proceedings concluded at 3:24 p.m.)

23

24

25

1                             CERTIFICATION

2              I certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of my

5   knowledge and ability.

6

7   /s/ William J. Garling                    August 19, 2024

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **EXHIBIT 6**

**Superseding Indictment**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MILES GUO,<br>  a/k/a "Ho Wan Kwok,"<br>  a/k/a "Miles Kwok,"<br>  a/k/a "Guo Wengui,"<br>  a/k/a "Brother Seven,"<br>  a/k/a "The Principal,"<br>  a/k/a "Boss,"<br><br>KIN MING JE,<br>  a/k/a "William Je,"<br>  a/k/a "Yu Jianming," and<br><br>YVETTE WANG,<br>  a/k/a "Yanping,"<br>  a/k/a "Y,"<br><br>                    Defendants. | **SUPERSEDING INDICTMENT**<br><br>S3 23 Cr. 118 (AT)<br><br><br><br>ORIGINAL |

**COUNT ONE**
**(Racketeering Conspiracy)**

The Grand Jury charges:

**Overview of the "G Enterprise"**

1.      From at least in or about 2018 through at least in or about March 2023, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, conspired to defraud thousands of victims of more than approximately $1 billion, including victims located in the Southern District of New York.  KWOK, JE, WANG, and their co-conspirators operated the G Enterprise through a series of complex fraudulent and fictitious businesses and

investment opportunities that connected dozens of interrelated entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds (collectively, the "G Enterprise" as defined in paragraph 3b. below).

2.     MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "YanpingYVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, took advantage of GUO's prolific online presence and hundreds of thousands of online followers to solicit investments in various entities and programs by promising outsized financial returns and other benefits.  In truth and in fact, and as GUO, JE, and WANG well knew, the entities were instrumentalities that GUO, JE, and WANG created and used to perpetrate their fraud, strengthen the G Enterprise, and exploit GUO's followers.  The scheme allowed GUO, JE, and WANG to enrich themselves, their family members, and their co-conspirators, and to fund GUO's extravagant lifestyle.

3.     To effectuate their scheme, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, created and maintained several interrelated and overlapping entities—*i.e.*, the G Enterprise.  The G Enterprise obtained fraud proceeds, laundered those proceeds, spent fraud proceeds on expensive and luxury items, vehicles, and property for the benefit of GUO and his family, used fraud proceeds to promote the G Enterprise, and used fraud proceeds to operate and manage the G Enterprise.

a.   The interrelated and overlapping entities that form the G Enterprise include: ACA Capital Group Limited, ACA Investment Management Limited, Freedom Media Ventures

Limited, G Club International Limited, G Club Operations LLC, G Fashion LLC, G Fashion International Limited, GF Italy, LLC, GFNY, Inc., G Music LLC, GETTR USA, Inc., Golden Spring (New York) Limited, Greenwich Land, LLC, GTV Media Group, Inc., Guo Media, G News LLC, Hamilton Capital Holding Limited, Hamilton Investment Management Limited, Hamilton Opportunity Fund SPC, HCHK Property Management, Inc., HCHK Technologies, Inc., the Himalaya Exchange, the Himalaya Farm Alliance, Himalaya Currency Clearing Pty Ltd., Himalaya International Clearing Limited, Himalaya International Financial Group Limited, Himalaya International Reserves Limited, Holy City Hong Kong Ventures Ltd., Hudson Diamond NY LLC, Infinity Treasury Management, Inc., Jovial Century International Limited, Lamp Capital LLC, Leading Shine NY Limited, Lexington Property and Staffing Inc., Major Lead International Limited, Mountains of Spices LLC (d/b/a New York Farm), the New Federal State of China, O.S.C. Orbit Service Company LLC, Rule of Law Foundation III, Inc., Rule of Law Society IV, Inc., Saraca Media Group, Inc., Taurus Fund LLC, Taurus Management LLC, and Voice of Guo Media Inc., among others.

b. The defendants and the entities set forth in paragraph 3a., together with others known and unknown, were members and associates of a criminal organization (the "G Enterprise") that engaged in criminal activity, to include wire fraud, bank fraud, money laundering, and securities fraud. The G Enterprise, including its leaders, members, and associates, constituted an enterprise as defined in Title 18, United States Code Section 1961(4); that is, a group of entities and individuals associated in fact, consisting of GUO, JE, WANG, the entities set forth in paragraph 3a., and others known and unknown. The G Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. The G Enterprise operated in the Southern District of New York

3

and elsewhere. The G Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

4.     To further effectuate their scheme, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, laundered hundreds of millions of dollars of fraud proceeds. To conceal the illegal source of the funds, GUO, JE, and WANG transferred, and directed the transfer of, money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals, including entities that are part of the G Enterprise. Hundreds of millions of dollars of the fraudulent scheme's proceeds were transferred, either directly or indirectly, to bank accounts in the United States, the Bahamas, Switzerland, and the United Arab Emirates ("UAE"), among other places, and held in the name of entities owned or otherwise controlled by JE, including ACA Capital, Hamilton Investment Management Ltd., and Hamilton Opportunity Fund SPC.

5.     MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, used more than approximately $300 million of the fraudulent scheme's proceeds for their and their families' benefit. For example, GUO used fraudulently-obtained victim money to purchase, fund, or finance: a $26.5 million approximately 50,000-square-foot mansion in New Jersey for GUO and his family; luxury vehicles, including an approximately $3.5 million Ferrari and an approximately $4.4 million custom Bugatti for one of GUO's close family members and co-conspirators ("Relative-1"); an approximately $37 million luxury yacht that was used by GUO and his family and purchased in the name of one of GUO's

4

close family members ("Relative-2"); a piano valued at approximately $140,000; two approximately $36,000 mattresses; and a $100 million investment in a high-risk hedge fund for the ultimate benefit of Relative-1, among other things. For his part, among other things, JE transferred at least $10 million of the fraud proceeds into his and his spouse's personal bank accounts. For her part, among other things, YVETTE WANG, a/k/a "Yanping," a/k/a "Y," was paid at least approximately $500,000 per year, was gifted an approximately $1.1 million-dollar Manhattan condominium, and was promised millions of dollars' worth of a purported cryptocurrency.

6.     MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, operated the scheme for years, and continued to do so through at least March 2023. They did so by, among other things, expanding the G Enterprise to include additional entities and individuals; continually adapting the scheme's means and methods to evade the enforcement of investor-protection, anti-money laundering, and bankruptcy laws in the United States; and retaliating against individual victims, and others, who complained, requested return of invested funds, or criticized the G Enterprise.

<u>Purposes of the Enterprise</u>

7.     The purposes of the G Enterprise included, but were not limited to, the following:

  a.   Enriching the members and associates of the enterprise;

  b.   Obtaining the money and property of victims;

  c.   Concealing and laundering fraud proceeds;

    d. Purchasing, with fraud proceeds, expensive and luxury items, vehicles, and property for the benefit of the defendants and their co-conspirators; and

    e. Promoting, increasing, and preserving the standing of the G Enterprise, entities that are part of the G Enterprise, and members of the G Enterprise, including MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," in order to solicit additional victims, as well as to exert influence over, or to intimidate, those who criticized or threatened the G Enterprise.

<u>Means and Methods of the Enterprise</u>

    8. The means and methods by which the members and the associates of the G Enterprises conducted their affairs included, but were not limited to, the following:

    a. Causing the G Enterprise to amass significant assets through false and fraudulent misrepresentations;

    b. Obstructing and circumventing law enforcement and civil regulatory authorities;

    c. Obstructing and ignoring court orders;

    d. Concealing fraud proceeds through, among other things, monetary transfers between entities within the G Enterprise; and

    e. Harassing, threatening, and silencing critics of MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, and the G Enterprise.

**Relevant Persons and Entities**

9.      At all relevant times, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, was the leader of, and directed, the G Enterprise.

a.  GUO is an exiled Chinese businessman who fled to the United States in or about 2015 and purchased a penthouse apartment at a New York City hotel for approximately $67.5 million.  Starting at least in or about 2017, GUO, who then purported to be a billionaire, garnered a substantial online following.  GUO granted numerous media interviews and posted on social media, claiming to advance a movement against the Chinese Communist Party.

b.  In or about 2018, GUO founded two purported nonprofit organizations, namely, the Rule of Law Foundation and the Rule of Law Society.  The Rule of Law Society's website listed GUO as its "founder, a promot[e]r, and a spokesperson."  Both organizations feature photographs of GUO on their websites.  GUO used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe GUO's statements regarding investment and money-making opportunities.  In truth and in fact, and as GUO well knew, he and others provided false and materially misleading information to promote these "opportunities" and to defraud GUO's followers and other victims.  GUO directed others to create and maintain a variety of corporate entities that would come to make up the G Enterprise over which GUO was in charge.

10.      At all relevant times, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, was a dual citizen of Hong Kong and the United Kingdom who principally resided in the United Kingdom, while traveling to the United States and elsewhere.  JE owned and operated

numerous companies and investment vehicles central to the scheme and served as the financial architect and key money launderer for the G Enterprise.

11. At all relevant times, YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendant, was a citizen of China who principally resided in New York, New York and has had a close relationship with MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant. In particular, WANG has worked for GUO and GUO's family for several years, since at least in or about 2018, and has operated as a "chief of staff" for GUO and the G Enterprise. In that capacity, WANG has held titles in, and exercised control over, a variety of entities that were part of the G Enterprise and instrumentalities of the fraud described herein. For example, WANG has served as the President, Treasurer, and Secretary of entities that purportedly managed GUO's money, and exercised control over other entities within the G Enterprise, even where she held no formal position or title.

12. At certain times relevant to this Indictment, Saraca Media Group, Inc. ("Saraca") was a corporation based in New York, New York. Relative-1 was its ultimate beneficial owner.

13. At certain times relevant to this Indictment, GTV Media Group, Inc. ("GTV") was a purported news-focused social media platform based in New York, New York. GTV was functionally owned and controlled by MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, although GUO held no formal position or title at GTV. KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, likewise held no formal position or title at GTV, but in fact exercised control over its finances. Saraca was the parent company of GTV. YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendant, was an "Executive Director" of GTV.

8

14.     At certain times relevant to this Indictment, G Club Operations, LLC ("G|CLUBS") was a purported membership organization based in Puerto Rico and in New York, New York. G|CLUBS was functionally owned and controlled by MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, although GUO held no formal position or title at G|CLUBS.  KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, likewise held no formal position or title at G|CLUBS, but exerted influence over its finances and laundered its proceeds.  YVETTE WANG, a/k/a "Yanping," a/k/a "Y," similarly held no formal position or title at G|CLUBS, but in fact exercised control over its day-to-day operations and ensured that GUO's instructions were implemented across the organization.  G|CLUBS was formally owned by a coconspirator ("CC-1") who worked in concert with GUO, WANG, Relative-1, and others known and unknown to further the goals of the G Enterprise.

15.     At certain times relevant to this Indictment, the "Himalaya Exchange" was a purported cryptocurrency "ecosystem" that KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, founded and operated through various entities he owned, which were based abroad. Entities functionally owned and controlled by MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, such as G|CLUBS and G|Fashion, had purported business relationships with the Himalaya Exchange.  GUO promoted the Himalaya Exchange and claimed to be the designer of its purported cryptocurrency, although GUO held no formal position or title at the Himalaya Exchange.  WANG likewise held no formal position or title at the Himalaya Exchange but, among other things, was allocated millions of dollars in its purported cryptocurrencies, assisted in the

9

recruitment of Himalaya Exchange personnel, and worked to transfer fraud proceeds to the Himalaya Exchange.

**The G Enterprise's Fraud**

*The GTV Private Placement*

16.     Between in or about April 2020 and in or about June 2020, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, fraudulently obtained more than $400 million in victim funds through an illegal private stock offering related to GTV (the "GTV Private Placement"). The GTV Private Placement scheme included, but was not limited to, the following:

     a.    On or about April 21, 2020, GUO posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV common stock via a private placement. In that video, GUO described, in substance and in part, the investment terms for the GTV Private Placement, and directed people to contact him, via a mobile messaging application, with any questions about the GTV Private Placement. The video and GTV Private Placement materials—including the written "Confidential Information Memorandum" (the "Private Placement Memorandum" or "PPM"), Subscription Agreement, and Investment Procedure Guidelines—were transmitted to thousands of potential investors, including those in the Southern District of New York, via mobile messaging applications, social media, and text messages.

     b.    The PPM promoted GTV as the "first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication."

c. According to the PPM's metadata, JE was the "author" of the PPM. The PPM disclosed the terms of the GTV Private Placement and identified GUO as GTV's "Sponsor and Adviser." According to the PPM, among other GTV materials, neither GUO nor JE held any formal management position with GTV. YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendant, was identified in the PPM as an "Executive Director" of GTV.

d. The PPM also contained the following representations, in substance and in part, among others:

i. The GTV Private Placement was for investors who were "interested in evaluating an opportunity to invest capital into GTV;"

ii. GTV planned to use the proceeds raised from the GTV Private Placement "to expand and strengthen the business;" and

iii. The PPM included a chart itemizing the "contemplated use of proceeds" raised from the GTV Private Placement:

| Description | Percentage of Proceeds |
|---|---|
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

e. Between on or about April 20, 2020 and on or about June 2, 2020, approximately $452 million worth of GTV common stock was sold to more than 5,500 investors

11

located in the United States, including in the Southern District of New York, and abroad. Investors participated in the GTV Private Placement based, in part, on the belief that their money would be invested into GTV to develop and grow that business, as the PPM promised.

  f. The vast majority of the proceeds derived from investors in the GTV Private Placement were not used to develop and grow the GTV business, but instead were deposited directly into bank accounts held in the name of Saraca, GTV's parent company, which is beneficially owned by Relative-1.

  g. The GTV Private Placement was not made pursuant to a registration statement filed with the U.S. Securities and Exchange Commission ("SEC"). Rather, the offering was purportedly made pursuant to SEC regulations that permit the sale of unregistered securities subject to limitations on the type of investors to whom the securities are offered and the manner in which their investments may be solicited. To evade these limitations, however, GUO and others under his control used at least one intermediary entity to purchase GTV stock on behalf of pools of investors who did not individually qualify to participate in the GTV Private Placement.

  h. In or about early June 2020, and only days after the GTV Private Placement closed, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, misappropriated approximately $100 million raised from investors in the GTV Private Placement and directed that those funds be placed with a high-risk hedge fund ("Fund-1") for the benefit of Saraca and its ultimate beneficial owner, Relative-1. This transaction was contrary to the PPM's representations to prospective GTV investors about how investments in GTV would be used. Indeed, the $100 million investment into Fund-1 was not made "to strengthen

and grow" GTV's business or to benefit GTV, but rather was made for the benefit of Saraca and Relative-1. The victims who supplied the $100 million invested into Fund-1 did not own any shares of Saraca. Ultimately, the investment into Fund-1 lost approximately $30 million in value.

      i.   After directing $100 million of GTV victim funds into Fund-1, HO WAN GUO, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, continued to promote GTV using false and misleading representations.

*The Farm Loan Program*

17.    Beginning in or about June 2020—the same month that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators misappropriated money from the GTV Private Placement for the benefit of Saraca and Relative-1—GUO, JE, and their co-conspirators fraudulently obtained more than approximately $150 million in victim funds through the "Himalaya Farm Alliance." The Himalaya Farm Alliance, which GUO organized and promoted, was a collective of informal groups (each known as a "Farm") located in various cities around the world. GUO, JE, WANG and others working on their behalf and at their direction, obtained these funds by making further misrepresentations to the investors in the GTV Private Placement and fraudulently soliciting further investments, this time in the form of "loans" to a Farm, and promising that such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned (the "Farm Loan Program"). The Farm Loan Program scheme included, but was not limited to, the following:

a.   Starting in or about June 2020, domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV-associated bank accounts because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced an unregistered stock offering.

b.   These bank account closures frustrated the ability of GUO, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV.

c.   On or about July 22, 2020, in a video distributed via social media, GUO promoted the Farm Loan Program, stating, in substance and in part, "the money has been changed to a new way of cooperation, signing a loan contract with a local farm, with 6% interest, giving you equity. . . . [i]n this case, it is a loan, and then you can ask for stocks . . ." According to GUO and those working on his behalf, individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program.

d.   After launching the Farm Loan Program, GUO continued to promote GTV and to falsely represent the value of GTV.  For example, on or about August 2, 2020, in a video distributed via social media, GUO falsely stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars." [1]  In truth and in fact, and as GUO well knew, GTV's market value was far less because, among other things, GTV was a new business that generated no revenue.

e.   Thousands of victims "loaned" money to the Farms by sending money to bank accounts controlled by the Farms (and not GTV).  According to the "Loan Agreements," which the Farms frequently did not countersign, these funds were to be used for a Farm's "general working capital purposes."

---

[1] All statements attributed herein to KWOK have been translated from Mandarin to English.

   f. GUO and JE misappropriated funds that were raised through the Farm Loan Program. For example:

     i. Approximately $20 million was transferred to Relative-1, approximately $950,000 of which was used to pay for flight crew services on a private jet;

     ii. Approximately $5 million was transferred to an entity owned by GUO's spouse;

     iii. Approximately $2.3 million was used to cover maintenance expenses associated with an approximately 145-foot luxury yacht worth approximately $37 million, nominally owned by Relative-2 and used by GUO; and

     iv. Approximately $10 million was transferred to personal bank accounts in the name of JE and/or JE's spouse.

<em>G|CLUBS</em>

  18. While making misrepresentations regarding the Farm Loan Program, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, fraudulently induced GUO's followers to transfer additional funds to a purported online membership club called G|CLUBS. From at least in or about June 2020 through at least in or about March 2023, GUO, JE, WANG, and others known and unknown, fraudulently obtained more than approximately $250 million in victim funds through G|CLUBS. The G|CLUBS scheme included, but was not limited to, the following:

a.  Starting at least on or about June 20, 2020, in a video distributed via social media, GUO promoted and encouraged individuals to purchase what GUO referred to as a "G Club . . . membership card."

b.  Formally launched in or about October 2020, G|CLUBS claimed, on its website, to be "an exclusive, high-end membership program offering a full spectrum of services" and "a gateway to carefully curated world-class products, services and experiences."

c.  To join G|CLUBS, a member was required to make a one-time payment to purchase a "membership," in addition to an annual membership fee. The cost of the membership varied based on the membership tier selected by the prospective member:  a Tier 5 Membership cost $50,000; a Tier 4 Membership cost $40,000; a Tier 3 Membership cost $30,000; a Tier 2 Membership cost $20,000; and a Tier 1 Membership cost $10,000.

d.  On or about July 5, 2021, in a video distributed via social media, GUO stated, in substance and in part, that there were "25,000 [G|CLUBS] member[s] . . . $100 million dollars, the cash [in] the bank account. Then we have the 111 million . . . [who] want to join." By contrast, G|CLUBS internal documents reflected approximately 5,900 active members as of in or about August 2021.

e.  In truth and in fact, and as GUO, JE, and WANG well knew, G|CLUBS provided nothing close to "a full spectrum of services" and "experiences" to its members. Despite collecting hundreds of millions of dollars in purported membership fees, G|CLUBS maintained a relatively small number of employees and provided its members few to no discernable membership benefits. As of on or about March 8, 2021—months after G|CLUBS launched and began to collect "membership" fees—G|CLUBS did not have a business plan or a board of directors.

f. GUO, JE, and WANG also used G|CLUBS as a mechanism to continue fraudulent private placement stock offerings. GUO, and others known and unknown, told GUO's online followers that their purchase of G|CLUBS memberships would entitle them to stock in GUO-affiliated entities, such as GTV and G|Fashion.

i. In a conversation regarding G|CLUBS membership funds on or about May 4, 2021, JE stated, in substance and in part, that "first of all, [prospective members] are buying the G|CLUBS membership, but they are expecting they would probably receive some shares, you know, on, on, on the future GTV, I think this is their expectation."

ii. On or about July 30, 2021, in a video distributed via social media, GUO stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%. Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both."

g. GUO, JE, WANG, and others known and unknown, asked investors to purchase multiple memberships in G|CLUBS, enabling GUO, JE, and WANG to increase the amount of money solicited. In this regard, the G|CLUBS website stated, in substance and in part, that members with multiple memberships would "receive additional benefits" when, in truth and in fact, and as GUO, JE, and WANG well knew, multiple memberships did not provide members with commensurate additional benefits.

h. All told, investors purchased hundreds of millions of dollars' worth of G|CLUBS memberships. However, most of this money did not fund the business of G|CLUBS. Rather, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a

"Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, misappropriated a substantial portion of the funds victims had paid G|CLUBS for "memberships" using, among other things, a complex web of entities and bank accounts to do so. For example:

    i. G|CLUBS funds, which had been funneled through bank accounts in other entities' names, were used to pay personal expenses for GUO and his family, including luxury purchases of an approximately $2.6 million yacht and luxury automobiles that together cost more than $5 million.

    ii. In or about November 2021, JE directed approximately $26.5 million of G|CLUBS funds, which had been funneled through bank accounts in other entities' names, toward the purchase of GUO's 50,000-square-foot New Jersey mansion.

    iii. JE directed the transfer of an additional $13 million of G|CLUBS membership payments to an escrow account. The funds were subsequently used to pay for extravagant renovations to GUO's New Jersey mansion, including to a wing for Relative-1 and to a wing for Relative-2, and to purchase various furniture and decorative items including, among other items, Chinese and Persian rugs worth approximately $978,000, a $62,000 television, and a $53,000 fireplace log cradle holder.

    iv. On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of G|CLUBS membership payments into a bank account that JE controlled.

    v. G|CLUBS used membership fees to purchase luxury automobiles, including a custom-built Bugatti sports car for approximately $4.4 million. While the car's signed

18

purchase agreement listed G|CLUBS as the customer, the initial specifications documentation for the custom-built car named Relative-1 as the customer. Relative-1 had no official position with G|CLUBS.

*The Himalaya Exchange*

19.     From at least in or about April 2021 through at least in or about March 2023, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, and others known and unknown, fraudulently obtained more than approximately $262 million in victim funds through the Himalaya Exchange, a purported cryptocurrency "ecosystem" accessible on the internet. The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin"). The Himalaya Exchange claimed that the "stablecoin" was a digital asset with a fixed 1-to-$1 value backed by reserves, and that the "trading coin" was a cryptocurrency with valuation based on supply and demand. JE was the founder and Chairman of the Himalaya Exchange. The Himalaya Exchange scheme included, but was not limited to, the following:

        a.  In videos distributed via social media, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, trumpeted the prospects and valuation of the Himalaya Exchange and both HCN and HDO, which he publicly described as cryptocurrencies. For example, in a video posted on the Internet on or about October 20, 2021, GUO falsely stated the following, among other things, and in substance and in part:

19

     i.  "I am talking about your H Coins, 'Brother Seven' [*i.e.*, GUO] designed it . . . .[I]t has the attribute of currency, why? It has 20% gold. Awesome[.] [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."

     ii.  "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money. Or take all the value of 20% gold and ask everyone to unify it and make it yours."

     iii.  "If anyone loses money, I can say that I will compensate 100%. I give you 100%. Whoever loses money, I will bear it."

     iv.  "I can sell the H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money unit. . . . [A]nd you can buy anything immediately."

    b.  The initial coin offering of HCN and HDO occurred on or about November 1, 2021. HCN began trading at 10 cents and, within approximately two weeks, the Himalaya Exchange website claimed that each HCN purportedly was worth approximately 27 HDO (*i.e.*, $27), which represented a 26,900% increase in value. That is, approximately two weeks after the initial coin offering, the Himalaya Exchange website indicated that HCN purportedly had an approximately $27 billion valuation.

    c.  At the time of the Himalaya Exchange launch, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, marketed HCN to his online followers and others. For example, on or about November 1, 2021—the day of the initial coin offering—GUO released an official music video for an original song called "HCoin To the Moon" via social media. The phrase "to the

moon" is popularly associated with cryptocurrencies and implies a sharp increase in value. The music video depicted GUO in various luxurious locations and depicted imagery of gold and wealth.

        d. At times, including following the Himalaya Exchange launch, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, misleadingly marketed the Himalaya Exchange. For example, in or about June 2022, JE attempted to create the impression that a €3,561,127 purchase of a Ferrari (the "Ferrari") from a particular auction house was completed with HDO. JE stated, in substance and in part, that he was "extremely pleased that [a] buyer decided to purchase [a] world-class car using HDO." Contrary to JE's claim, the Ferrari was not purchased using HDO. In truth and in fact, and as JE well knew, a Himalaya Exchange employee sent the auction house an international bank wire to cover the cost of the Ferrari, while also processing a corresponding "transaction" on the Himalaya Exchange to create the false appearance that the purchase had taken place using HDO. JE's statement was also misleading in that, among other things, the unidentified "buyer" of the Ferrari was, in fact, Relative-1.

        e. Contrary to representations of MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, and others known and unknown, HCN and HDO were not cryptocurrencies. In particular, and contrary to the defendants' representations that HCN and HDO were cryptocurrencies, transactions using HCN and HDO were—unlike real cryptocurrencies—not recorded on a "blockchain," which is an electronic, publicly accessible, decentralized ledger that uses cryptography to record cryptocurrency transactions. Instead of using a publicly accessible blockchain, transactions in HCN and HDO were recorded in an internal database, which was not subject to public review.

f. Moreover, HCN and HDO could not be traded anywhere other than (purportedly) on the Himalaya Exchange. Nor could HCN be traded for, or converted into, other currencies. HCN purportedly could be traded for only HDO (and only on the Himalaya Exchange), and HDO purportedly could be converted only to or from fiat currency (and only on the Himalaya Exchange).

i. Indeed, the HDO and HCN Whitepapers, available on the Himalaya Exchange website, provided in fine print that, contrary to GUO's representations, HCN and HDO were merely "Credits." According to the HCN Whitepaper, the "operation of the Himalaya Exchange and associated applications and infrastructure will be facilitated through the use of 'Credits.'" Those credits (i) could "only be used on the Himalaya Exchange or within the Himalaya Ecosystem," and (ii) did "not carry any right to require their exchange for fiat currency or crypto-assets."

ii. Moreover, while Himalaya Exchange members could request to exchange their "HDO" credits for an equivalent payment in U.S. dollars, the HDO Whitepaper stated that the Himalaya Exchange had the "discretion" to deny any such request.

g. In or about April 2022, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, arranged for the transfer of approximately $37 million in Himalaya Exchange funds from a Himalaya Exchange bank account to a particular escrow account. The $37 million was structured as a purported "loan" to personally guarantee the cost of a luxury yacht that GUO had previously purchased and used, which yacht was then-owned by an entity held in the name of Relative-2.

*Concealment of Ownership and Control*

20.     Despite his extravagant lifestyle and his control of hundreds of millions of dollars in fraud proceeds, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, filed for bankruptcy on or about February 15, 2022. GUO's claim of bankruptcy was based on years-long efforts to obscure the funds used and controlled by GUO, which was a means and method of the G Enterprise. For example, GUO, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, regularly moved funds within the G Enterprise and for the benefit of GUO, his family, and his associates, by disguising the money movements as "loans" or "investments." As another example, the defendants installed figurehead executives and/or straw owners at the entities within the G Enterprise, while the entities within the G Enterprise were, in reality, owned and/or controlled by GUO, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown.

*Government Seizure of Proceeds of the G Enterprise*

21.     On or about September 20, 2022 and September 21, 2022, U.S. authorities served judicially-authorized seizure warrants on several domestic banks, and subsequently seized approximately $335 million of proceeds from bank accounts held in the names of Himalaya Exchange entities and other entities associated with the G Enterprise. Following the September 2022 judicially authorized seizures, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant,  attempted to transfer approximately $46 million from domestic bank accounts associated with the Himalaya Exchange, which had not yet been seized by the United States, to a bank account in the UAE that JE controlled.

    a.   Within approximately two days of the first judicially authorized seizures of Himalaya Exchange-related funds, on or about September 22, 2022, JE contacted the management of a domestic bank that held Himalaya Exchange bank accounts. JE sought to implement a wire transfer, which he and a Himalaya Exchange executive claimed to the domestic bank was needed to effectuate a "redemption" from HDO to U.S. dollars for an unnamed "VIP" (*i.e.*, very important) client of the Himalaya Exchange.

    b.   In subsequent communications with the domestic bank, JE revealed that the VIP was, in fact, JE himself. JE provided the domestic bank with documents reflecting two purported HCN sales by JE on or about September 22, 2022—totaling 46 million HDO—which JE was attempting to "convert" into $46 million. In an attempt to protect the assets of the G Enterprise from a judicially authorized seizure, JE twice emphasized to the domestic bank's management, in substance and in part, that the $46 million transfer needed to happen "today or it is meaningless."

22.    On or about October 16, 2022, pursuant to a judicially authorized warrant, U.S. authorities seized an additional approximately $274 million of proceeds from several Himalaya Exchange and G|CLUBS accounts at the domestic bank from which KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, requested the $46 million transfer.

23.    As a result of the judicially-authorized seizures, U.S. authorities seized more than approximately $634 million of fraud proceeds, including approximately $278 million from bank accounts held in the names of the Himalaya Exchange entities that purported to hold the Himalaya Exchange's HDO cash reserves.

a. Following the seizures, the Himalaya Exchange website continued to represent that HDO was backed by a "Reserve consisting of USD and cash-equivalent assets" when, in truth and in fact, it was not.

b. Despite the seizure of the Himalaya Exchange's cash reserves, the purported price of HCN had not suddenly and sharply declined as of in or about March 2023.

## STATUTORY ALLEGATIONS

24.     From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, being persons employed by and associated with the enterprise described above, namely, the G Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18 , United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the G Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple:

a. Acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud);

b. Acts indictable under Title 18, United States Code, Section 1344 (relating to financial institution fraud);

c. Acts indictable under Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments);

d. Acts indictable under Title 18, United States Code, Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and

e. Offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j (b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

25. It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

26. MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, sought to advance the purposes of the racketeering conspiracy, and to conduct and participate, directly and indirectly, in the conduct of the affairs of the G Enterprise, through various unlawful means and methods, including:

a. The defendants caused the G Enterprise to amass significant assets through false and fraudulent misrepresentations.

b. The defendants caused the G Enterprise to conceal its fraud proceeds through, among other things, monetary transfers between entities within the G Enterprise.

c. The defendants caused the G Enterprise to silence its critics through threats and intimidation directed at its opponents.

d. The defendants obstructed, influenced, and interfered with an official proceeding.

e. The defendants obstructed and interfered with court orders.

(Title 18, United States Code, Section 1962(d).)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud and Bank Fraud)

The Grand Jury further charges:

27. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

28. From at least in or about 2018, up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

29. It was a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, GUO,

JE, WANG, and others known and unknown, fraudulently induced victims to send money by providing materially false and misleading information and representations.

30.     It was further a part and an object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, GUO, JE, WANG, and others known and unknown, made false representations, and caused others to make false representations, to financial institutions to, among other things, open and maintain bank accounts used in furtherance of their fraud and obtain funds under the custody and control of those financial institutions.

(Title 18, United States Code, Section 1349.)

### COUNT THREE
### (Money Laundering Conspiracy)

The Grand Jury further charges:

31.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

32.     From at least in or about 2018, up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss,"

KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping,"

a/k/a "Y," the defendants, and others known and unknown, willfully and knowingly combined,

conspired, confederated, and agreed together and with each other to commit money laundering, in

violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(a)(2)(A), and

1956(a)(2)(B)(i).

33.     It was a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok,"

a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a

"Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a

"Yanping," a/k/a "Y," the defendants, and others known and unknown, knowing that the property

involved in a financial transaction represented the proceeds of some form of unlawful activity,

would and did conduct and attempt to conduct such a financial transaction, which transaction

affected interstate and foreign commerce and involved the use of a financial institution which was

engaged in, and the activities of which affected, interstate and foreign commerce, and which in

fact involved the proceeds of specified unlawful activity, to wit, Counts Five through Eleven of

this Indictment, knowing that the transaction was designed in whole and in part to conceal and

disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful

activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

34.     It was further a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan

Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal,"

a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG,

a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown would and did

transport, transmit, and transfer, and attempted to transport, transmit, and transfer, a monetary

instrument and funds from a place in the United States to and through a place outside the United

States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represent the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, the offenses alleged in Counts Five through Eleven of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

35.     It was further a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, the offenses alleged in Counts Five through Eleven of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

## COUNT FOUR
### (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

36.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

37.     From at least in or about 2018, up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (2) making false statements to a financial institution, in violation of Title 18, United States Code, Section 1014.

38.     It was a part and an object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of a national securities exchange, used and employed, in connection with the purchase and sale of securities registered on a national securities exchange and any security not so registered, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, to wit, GUO, JE, and WANG agreed to fraudulently induce investors to participate in the GTV Private Placement, the Farm Loan Program,

and G|CLUBS by providing materially false and misleading information and representations in connection with purported shares of GTV common stock and purported companies affiliated with GTV.

Overt Acts

39.     In furtherance of the conspiracy and to effect its illegal objects, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about April 21, 2020, GUO posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV stock via the GTV Private Placement.

b.   On or about May 20, 2020, WANG opened a particular bank account in the name of GTV and, in documents submitted to the bank, indicated that the intended balance of the account would be between $25,000 to $50,000.  On or about June 2, 2020, WANG transferred approximately $200,000,000 into that account.

c.   On or about June 5, 2020, WANG, while located in the Southern District of New York, authorized a wire transfer of $100 million from Saraca to Fund-1.

d.   On or about July 22, 2020, in a video distributed via social media, GUO promoted the Farm Loan Program, stating, in substance and in part, "the money has been changed to a new way of cooperation, signing a loan contract with a local farm, with 6% interest, giving you equity. . . . [i]n this case, it is a loan, and then you can ask for stocks . . .".

e.   On or about August 2, 2020, in a video distributed via social media, GUO stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."

f.   On or about July 30, 2021, in a video distributed via social media, GUO stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G-Clubs membership?' 100%. Because I said that I have to promise that anyone who buys G-Clubs membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Clubs before September 17, G-Clubs and the stock shares. You'll get both."

g.   On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of funds victims had sent to G|CLUBS in exchange for "memberships" to a bank account that JE controlled.

(Title 18, United States Code, Section 371.)

### COUNT FIVE
### (Wire Fraud – GTV Private Placement)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

41.   From at least in or about April 2020 up to and including at least in or about September 2021, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted

33

by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GUO, JE, and WANG conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SIX
### (Securities Fraud – GTV Private Placement)

The Grand Jury further charges:

42.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

43.     From at least in or about April 2020 up to and including at least in or about September 2021, in the Southern District of New York, and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in

34

order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, GUO, JE, and WANG conducted the GTV Private Placement to sell GTV stock and obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SEVEN
### (Wire Fraud – Farm Loan Program)

The Grand Jury further charges:

44.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

45.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GUO, JE, and WANG conducted the Farm Loan Program to fraudulently obtain money from victims

through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT EIGHT**
**(Securities Fraud – Farm Loan Program)**

The Grand Jury further charges:

46.  The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

47.  From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York, and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, GUO, JE, and WANG conducted the Farm Loan Program to

36

obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT NINE
### (Wire Fraud – G|CLUBS)

The Grand Jury further charges:

48.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

49.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GUO, JE, and WANG promoted and marketed G|CLUBS to fraudulently obtain money from victims through false statements and misrepresentations, to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TEN
### (Securities Fraud – G|CLUBS)

The Grand Jury further charges:

50.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

51.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York, and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, GUO, JE, and WANG promoted and marketed G|CLUBS to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was

furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT ELEVEN
### (Wire Fraud – The Himalaya Exchange)

The Grand Jury further charges:

52. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

53. From at least in or about April 2021 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jiaming," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GUO and JE operated the Himalaya Exchange to fraudulently obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWELEVE
### (Unlawful Monetary Transactions)

The Grand Jury further charges:

54.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

55.     On or about June 5, 2020, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, GUO, JE, and WANG made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Five and Six to Fund-1.

(Title 18, United States Code, Sections 1957 and 2.)

## COUNT THIRTEEN
### (Obstruction of Justice)

The Grand Jury further charges:

56.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

57.     From at least on or about September 20, 2022 through at least the date of the filing of this Indictment, in the Southern District of New York and elsewhere, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, corruptly obstructed, influenced, and impeded an official proceeding and attempted so to do, to wit, JE attempted to transfer money to

the UAE, beyond the jurisdiction of the United States, to impede and interfere with a federal grand jury investigation in the Southern District of New York of the offenses alleged in Counts One through Eleven of this Indictment, and proceedings before the United States District Court for the Southern District of New York concerning the seizure and forfeiture of criminally derived proceeds.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

## FORFEITURE ALLEGATIONS

58.    As a result of committing the offense alleged in Count One of this Indictment, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

a.    any interest acquired or maintained in violation of Section 1962;

b.    any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise the defendants and their co-conspirators established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962; and

c.    any property constituting , or derived from, any proceeds obtained, directly or indirectly, from the racketeering activity charged in Count One including the following specific property:

(1)    $64,826.87 in United States currency formerly on deposit in Account Number 5090037713 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(2)     $75,000,000.00 in United States currency formerly on deposit in Account Number 5090037705 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(3)     $467,343.00 in United States currency formerly on deposit in Account Number 5090037754 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(4)     $89,992,861.75 in United States currency formerly on deposit in Account Number 5090042770 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(5)     $1,683,077.40 in United States currency formerly on deposit in Account Number 5090042762 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(6)     $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

(7)     $48,230,709.62 in United States currency formerly on deposit in Account Number 5090030288 at Silvergate Bank held in the name of "Hamilton Investment Management" Ltd., seized by the Government on or about September 18, 2022;

(8)     $1,800,000.00 in United States currency formerly on deposit in Account Number 5090037739 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(9) $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

(10) $4,643,744.70 in United States currency formerly on deposit in Account Number 7801000590 at FV Bank held in the name of "Himalaya International Reserves, Ltd.," seized by the Government on or about September 20, 2022;

(11) $14,599,257.25 in United States currency formerly on deposit in Account Number 7801000254 at FV Bank held in the name of "Himalaya International Clearing, Ltd.," seized by the Government on or about September 20, 2022;

(12) $11,538,579.87 in United States currency formerly on deposit in Account Number MBI10103-0000 at Mercantile Bank International held in the name of "G Club International Ltd.," seized by the Government on or about October 16, 2022;

(13) $10,008,284.04 in United States currency formerly on deposit in Account Number MBI10133-0000 at Mercantile Bank International held in the name of "Himalaya International Clearing Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(14) $3,090,856.54 in United States currency formerly on deposit in Account Number MBI10137-0000 at Mercantile Bank International held in the name of "Hamilton Capital Holding Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(15) $272,350,313.76 in United States currency formerly on deposit in Account Number MBI10138-0000 at Mercantile Bank International held in the name of "Himalaya

International Reserves Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(16)    $310,594.31 in United States currency formerly on deposit in Account Number MBI10139-0000 at Mercantile Bank International held in the name of "Himalaya International Financial Group Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(17)    $1,187,278.87 in United States currency formerly on deposit in Account Number MBI10171-0000 at Mercantile Bank International held in the name of "Hamilton Investment Management Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(18)    $43,782.71 in United States currency formerly on deposit in Account Number MBI10172-0000 at Mercantile Bank International held in the name of "G Fashion International Limited," seized by the Government on or about October 16, 2022;

(19)    $7,715.00, in United States currency formerly on deposit in Account Number 7801000589 at FV Bank held in the name of "Himalaya International Financial Group, Ltd.," seized by the Government on or about September 20, 2022;

(20)    $161,809.47 in United States currency formerly on deposit in Account Number MBI10183-0000 at Mercantile Bank International held in the name of "Himalaya Currency Clearing Pty Ltd.," seized by the Government on or about October 16, 2022;

(21)    $2,745,377.75 in United States currency formerly on deposit in Account Number 9878904409 at Manufacturers & Traders Trust Co. held in the name of "GETTR USA, Inc.," seized by the Government on or about September 18, 2022;

(22)     $9,899,659.19 in United States currency formerly on deposit in Account Number 157525208185 at US Bank held in the name of "G Fashion," seized by the Government on or about September 18, 2022;

(23)     All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430, Parcel No. 3300021-03-00001-02 and described as Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality, Township: MAHWAH TWP;

(24)     A Bugatti Chiron Super Sport, bearing Vehicle Identification Number VF9SW3V3XNM795047;

(25)     A Lamborghini Aventador SVJ Roads, bearing Vehicle Identification Number ZHWUN6ZD2MLA10393;

(26)     A Rolls Royce Phantom EWB, bearing Vehicle Identification Number SCATT8C08MU206445;

(27)     A 46m 2014 Feadship superyacht "Lady May" (ex Como), bearing IMO Number 112359, MMSI Number 319059500, and Callsign ZGDQ9;

(28)     A Bösendorfer 185VC Porsche #49539 piano with custom bench, purchased for approximately $140,938.69;

(29)     A Railis Design Iceland Contemporary Poseidon Bed with Nightstands, Ebony Veneer, Brass, Velvet, purchased for approximately $31,413.71;

(30)     A Hästens 2000T md mattress, purchased for approximately $36,590.00;

(31)     A Hästens 2000T sf mattress, purchased for approximately $36,210.00;

(32)    A Wembe watch storage box, purchased for approximately $59,392.91;

(33)    A Samsung Q900 Series QN98Q900RBF 98" QLED Smart TV – 8K, purchased for approximately $62,787.54;

(34)    A Louis XV Style French Ormolu-Mounted Mahogany Commode by Joseph Émmanuel Zweiner;

(35)    A "K'ang Hsi" extension table in etched and patinated pewter and bronze with hand-painted enamel colors by Philip & Kelvin LaVerne, purchased for approximately $180,000.00; and

(36)    A "Punto '83" table in stainless steel with mesh tabletop with adjustable height and adjustable petals by Gabriella Crespi, Italy 1982, purchased for approximately $180,000.00.

(1) through (36), collectively, the "Specific Property."

59.    As a result of committing the wire fraud and securities fraud offenses alleged in Counts Two, Four, and Five through Eleven of this Indictment, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the Specific Property.

46

60.     As a result of committing the money laundering offenses alleged in Counts Three and Twelve of this Indictment, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offenses and the Specific Property.

### Substitute Assets Provision

61.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third person;

    c.     has been placed beyond the jurisdiction of the Court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to

seek forfeiture of any other property of the defendants up to the value of the above forfeitable

property.

(Title 18, United States Code, Sections 981, 982, and 1963;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney