```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF CONNECTICUT
 2                         BRIDGEPORT DIVISION

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-50073 (JAM)
 4   HO WAN KWOK, et al.,        .
                                 .  (Jointly Administered)
 5         Debtors.              .
                                 .
 6   . . . . . . . . . . . . . . .
                                 .
 7   LUC A. DESPINS, et al.,     .  Adversary Proceeding
                                 .  No. 23-05017 (JAM)
 8         Plaintiffs,           .
                                 .
 9      v.                       .
                                 .
10   TAURUS FUND, LLC, et al.,   .
                                 .
11         Defendants.           .
                                 .
12   . . . . . . . . . . . . . . .
                                 .
13   GENEVER HOLDINGS, LLC,      .  Adversary Proceeding
                                 .  No. 23-05007 (JAM)
14         Plaintiff,            .
                                 .
15      v.                       .
                                 .
16   AIG PROPERTY CASUALTY       .
     COMPANY,                    .
17                               .
           Defendant             .
18                               .
     . . . . . . . . . . . . . . .
19                               .
     LUC A. DESPINS              .  Adversary Proceeding
20                               .  No. 24-05225 (JAM)
                                 .
21         Plaintiff,            .
                                 .
22      v.                       .
                                 .
23   CURTIS DESIGN CORPORATION,  .
     et al.,                     .
24                               .
           Defendants.           .
25   . . . . . . . . . . . . . . .
```

```
 1
 2   . . . . . . . . . . . . . . . . .  .
                                        .
 3   LUC A. DESPINS, CHAPTER 11  .   Adversary Proceeding
     TRUSTEE,                     .   No. 24-05273 (JAM)
 4                                .
             Plaintiff,           .
 5                                .
        v.                        .
 6                                .
     NGOK, et al.,                .
 7                                .
                                  .
 8           Defendants.          .
     . . . . . . . . . . . . . . . . .
 9                                .
     LUC A. DESPINS, CHAPTER 11  .   Adversary Proceeding
10   TRUSTEE,                     .   No. 24-05318 (JAM)
                                  .
11           Plaintiff,           .
                                  .
12      v.                        .   Courtroom 123
                                  .   Brien McMahon Federal Building
13   ALFA GLOBAL VENTURES         .   915 Lafayette Boulevard
     LIMITED et al.,              .   Bridgeport, Connecticut 06604
14                                .
             Defendants.          .   Tuesday, November 19, 2024
15   . . . . . . . . . . . . . . . .   1:05 p.m.
```

```
16                    TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JULIE A. MANNING
17                UNITED STATES BANKRUPTCY JUDGE

18
     Audio Operator:          Electronically recorded
19
     Transcription Company:   Reliable
20                            The Nemours Building
                              1007 N. Orange Street, Suite 110
21                            Wilmington, Delaware 19801
                              Telephone: (302)654-8080
22                            Email:  gmatthews@reliable-co.com

23   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
24

25
```

```
 1   APPEARANCES:

 2   For the Chapter 11
     Trustee:                    Patrick Linsey, Esquire
 3                               NEUBERT PEPE & MONTEITH, P.C.
                                 195 Church Street
 4                               13th Floor
                                 New Haven, Connecticut 06510
 5
                                 -and-
 6
                                 Luc A. Despins, Esquire
 7                               PAUL HASTINGS, LLP
                                 200 Park Avenue
 8                               New York, New York 10166

 9                               Nicholas A. Bassett, Esquire
                                 Doug Barron, Esquire
10                               2050 M Street, NW
                                 Washington, DC 20036
11
     For Taurus Fund LLC,
12   Taurus Fund Management,
     and Scott Barnett:          Michael T. Conway, Esquire
13                               LAZARE POTTER GIACOVAS & MOYLE, LLP
                                 747 Third Avenue, 16th Floor
14                               Fifth Floor
                                 New York, New York 10017
15
     For Genever Holdings:       Michael T. McCormack, Esquire
16                               O'SULLIVAN MCCORMACK JENSEN
                                   & BLISS, P.C.
17                               180 Glastonbury Boulevard
                                 Suite 210
18                               Glastonbury, Connecticut 06033

19   For AIG Property
     Casualty Company:           Michael P. Thompson, Esquire
20                               GORDON & REES SCULLY MANSUKHANI
                                 95 Glastonbury Boulevard
21                               Suite 206
                                 Glastonbury, Connecticut 06033
22
                                 -and-
23
                                 John O'Connor, Esquire
24                               John J. Kavanagh, Esquire
                                 STEPTOE, LLP
25                               1330 Connecticut Avenue, NW
                                 Washington, DC 20036
```

```
 1   For G-Club International
     Limited and G-Club        Jeffrey Sklarz, Esquire
 2   Operations:               GREEN & SKLARZ LLC
                               One Audubon Street, Third Floor
 3                             Hew Haven, Connecticut 06511

 4
     For Hing Chi Ngok,
 5   Mei Guo, Hudson Diamond
     New York, Gypsy Mei
 6   Food Services, Leading
     Shine New York, and
 7   Hudson Diamond Holdings: Steven Kindseth, Esquire
                               Zeisler & Zeisler
 8                             10 Middle Street, 15th Floor
                               Bridgeport, Connecticut 06604
 9
     For Rule of Law
10   Foundation 3 Inc. and
     Rule of Law Society 4
11   Inc.:                     Bryan Ha, Esquire
                               John Newton, Esquire
12                             BRYAN HA, ATTORNEY AT LAW
                               455 Tarrytown Road, #1244
13                             White Plains, New York 10607

14   For Victor Cerda:         Jason Swergold
                               YANKWITT LLP
15                             140 Grand Street, Suite 705
                               White Plains, New York 10601
16

17   For Beile Li:             Ivan Ladd-Smith, Esquire
                               SPEARS, MANNING & MARTINI
18                             2425 Post Road, Suite 203
                               Southport, Connecticut 06890
19
     For Yongbing Zhang:       James Edward Nealon, Esquire
20                             NEALON LAW LLC
                               1266 East Main Street, Suite 700R
21                             Stamford, Connecticut 06902

22   For Gladys Chow:          Emily McDaniels, Esquire
                               SHER TREMONTE LLP
23                             90 Broad Street, 23rd Floor
                               New York, New York 10004

24

25
```

1                              INDEX

2    MOTIONS:                                                    PAGE

3    Matter              **Genever Holdings LLC v. AIG Property**
     No. 136:                   **Casualty Company**
4                          **Adversary Case no. 23-05007**

5             Order Scheduling Status Conference on Motion
              To Modify Scheduling Order
6

7    Matter           **Luc A. Despins *et al*. v. Taurus Fund LLC**
     No. 124:                         ***et al*.**
8                          **Adversary Case No. 23-05017**

9             Motion for Summary judgment Filed by Patrick
              R. Linsey on behalf of Luc A. Despins,
10            Plaintiff

11
     Matter           **Despins v. Cirrus Design Corporation *et al.***
12   No. 23:                  **Adversary Case No. 24-05225**

13            Motion for Default Judgment by Court pursuant
              to Fed.R.Civ.P.55(b)(2) and Fed.R.Bankr.P.7055
14            against Qiang Guo.  Filed by Patrick R. Linsey
              On behalf of Luc A. Despins, Plaintiff
15

16   Matter           **Despins, Luc A., Chapter 11 Trustee v NGOK et**
     No. 94:                           **al.**
17                         **Adversary Case 24-05273**

18            Order setting Status Conference

19   Matter           **Despins, Luc A., Chapter 11 Trustee v. Alfa**
     No. 106:              **Global Ventures Limited et al.**
20

21            Order Scheduling Status Conference on
              Stipulated Judgment
22

23   Transcriptionist's' Certificate

24

25

1          (Proceedings commenced at 1:05 p.m.)

2          THE CLERK:  Adversary Number 23-05007, Genever

3    Holdings LLC versus AIG Property Casualty Company; 23-05017,

4    Despins versus Taurus Fund LLC, *et al.*; 24-05225, Despins

5    versus Cirrus Design Corporation, *et al.*; 24-05273, Despins

6    versus Ngok, *et al.;* 24-05318, Despins versus Alpha Global

7    Ventures Limited, *et al.*

8          THE COURT:  Okay.  Thank you.  If we could have

9    appearances for the record, starting with the Chapter 11

10   Trustee, please.

11         MR. DESPINS:  Good afternoon, Your Honor.  Luc

12   Despins, Chapter 11 Trustee.

13         THE COURT:  Good afternoon.

14         MR. BASSETT:  Good afternoon, Your Honor.  Nick

15   Bassett.  Excuse me.  Nick Bassett from Paul Hastings,

16   counsel for the Chapter 11 Trustee.

17         THE COURT:  Good afternoon.

18         MR. LINSEY:  Good afternoon, Your Honor.  Patrick

19   Linsey, Neubert, Pepe & Monteith, counsel for the Chapter 11

20   Trustee.

21         THE COURT:  Good afternoon.

22         MR. BASSETT:  And Your Honor, my colleague, Doug

23   Barron from Paul Hastings is also on the Zoom today.

24         THE COURT:  Great.  Good afternoon.

25         MR. BARRON:  Thank you.

1          MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

2    Sklarz for G-Club Operations and G-Club International in

3    Adversary 24-5273.

4          THE COURT:  Good afternoon.

5          MR. KINDSETH:  Good afternoon, Your Honor.  Steven

6    Kindseth for Hing Chi Ngok, Mei Guo, Hudson Diamond New York,

7    Gypsy Mei Food Services, Leading Shine New York, and Hudson

8    Diamond Holdings.

9          THE COURT:  Good afternoon.

10         MR. HA:  Good afternoon, Judge.  This is Bryan Ha

11   for Defendant Rule of Law Foundation 3 Inc, and Rule of Law

12   Society 4 Inc.  And also on the call is my colleague, John

13   Newton.  Good afternoon, Judge.

14         THE COURT:  Good afternoon.

15         MR. O'CONNOR:  Good afternoon, Your Honor.  John

16   O'Connor, joined by Michael Thompson representing AIG in

17   matter 23-5007.

18         THE COURT:  Good afternoon.

19         MR. MCCORMACK:  Good afternoon, Your Honor.

20   Michael McCormack on behalf of Genever Holdings LLC in the

21   Genever Holdings versus AIG matter, No. 23-05-007

22         THE COURT:  Good afternoon.

23         MR. SWERGOLD:  Good afternoon, Your Honor.  Jason

24   Swergold, Yankwitt LLP, on behalf of Victor Cerda in 24-

25   05273.

1          THE COURT:  Good afternoon.

2          MR. CONWAY:  Good afternoon, Your Honor.  Michael

3  Conway, Lazare, Potter, Giacovas & Moyle.  I'm here on behalf

4  of Taurus Fund LLC, Taurus Fund Management LLC, Scott

5  Barnett, and a host of others in the status conferences.  Did

6  you want me to recite every one of them?

7          THE COURT:  You do not need to do that, Attorney

8  Conway.  Thank you.  We have your -- I mean, we can indicate,

9  for any recording purposes or transcript purposes, the

10 parties for whom you are counsel of record.

11         MR. CONWAY:  I appreciate that, Your Honor.

12         THE COURT:  Okay.  Is there anyone else whose

13 appearance we haven't taken yet?

14         MR. LADD-SMITH:  Yes, Your Honor.  Ivan Ladd-Smith

15 from Spears, Manning & Martini on behalf of Beile Li in the

16 24-5273 matter.

17         THE COURT:  Thank you.

18         MR. NEALON:  (Inaudible) for Defendant Yongbing

19 Zhang in the 5273 matter.

20         THE COURT:  I'm sorry, counsel.  I spoke over you.

21 Would you announce your appearance again?

22         MR. NEALON:  Sure.  James Nealon for the Defendant

23 Yougbing Zhang in the 5273 adversary proceeding.

24         THE COURT:  Thank you.

25         MR. NEALON:  Thank you, Your Honor.

1          MS. MCDANIELS:  And good afternoon, Your Honor.

2    I'm Emily McDaniels on behalf of Defendant Gladys Chow in 24-

3    5273.

4          THE COURT:  Good afternoon.  Does that include

5    everyone's appearance now?  Okay.  Hearing nothing to the

6    contrary then, there are, as you all know, many matters on

7    the calendar this afternoon.  So I'm going to turn to the

8    Chapter 11 Trustee to see what your suggestion is as to how

9    to handle these matters.

10         MR. DESPINS:  Thank you, Your Honor.  I was

11   thinking that we should start with the AIG matter, so that

12   would allow Mr. O'Connor and Mr. McCormack to leave after

13   because I'm not really interested in the rest of the case, if

14   that's okay with Your Honor.

15         THE COURT:  That makes complete sense to me.  Go

16   right ahead.  Well, I can tell you why I scheduled the status

17   conference, actually.  You as far as the AIG adversary, 23-

18   5007.  Because I know you filed a motion with regard to

19   extending the discovery deadline.

20         And when we had our last hearing, I was, you know,

21   we had talked about some final deadlines, and I was concerned

22   that the supplemental brief on summary judgment relating to

23   fact discovery, the extended deadlines might have an impact

24   on discovery being delayed.

25         And maybe I'm wrong, but that's why I set it for a

1   status conference.  Because when we had our last status

2   conference, the representations on the record was -- were

3   that there was no need for delay, and that's why we had set

4   those deadlines.

5        So I just want to hear from the parties to make

6   sure I'm not missing something, with regard to these issues

7   related to fact discovery.

8        MR. O'CONNOR:  Yeah.  Your Honor -- Your Honor,

9   this is John O'Connor for AIG.  I can -- I can speak to that.

10  The request for an extension came about because of two things

11  that occurred about a week before the close of discovery.

12  One, we had a deposition set for a third party witness who

13  concluded that he needed to change counsel because he needed

14  to put his -- it's a broker.

15       He needed to put his carrier on notice and let the

16  carrier select counsel.  And so, in speaking with Genever's

17  counsel, there was, you know, we wanted to be able to

18  accommodate that because someone should -- you know, we don't

19  want to jam someone so they can't have their counsel of

20  choice.

21       Also, one week before the close of discovery,

22  Genever sent us over, for the first time, a 30(b)(6) notice.

23  And at the time, I was in the middle of a federal court trial

24  in Virginia.  And it just wasn't going to be practical to get

25  a notice on the 1st and have a witness by 8th.

1        So as we talked about it with counsel, it we

2   thought it made sense to modestly extend the deadline to

3   allow those things to occur.  And Genever wants a -- wants to

4   depose a former AIG employee that, you know, they will --

5   they'll pursue it or they won't.

6        But it seemed to make sense to put a little

7   breathing room there for those things to occur.  I will say,

8   you know, the motion we filed asked to extend the discovery

9   deadline to December 6.  Actually, we'd like to extend it to

10  December 13th, if we could, just to allow for the scheduling

11  of those couple of matters.  There's no additional discovery.

12  It's just getting those things scheduled.

13       Your Honor had asked about the briefing on summary

14  judgment.  We would like -- and I'm speaking just for AIG --

15  to move those dates back by just one week.  And I think if we

16  -- if we're able to extend the discovery to December 13, I

17  think, just a week move back on the briefing would be fine.

18       That would involve us filing -- AIG filing its

19  supplemental paper.  That would move from November 26th to

20  December 3rd, and then Genever would have two weeks, they'd

21  have until the 17th.  But it would not meaningfully affect

22  the briefing on summary judgment.

23       THE COURT:  Okay.  Have you talked with, Genever's

24  counsel about that?  Or about

25       MR. O'CONNOR:  Talked about everything in the

1  briefing?  The proposed one week move back on briefs, which

2  occurred to me as I was preparing, but everything else is

3  agreed to.

4           THE COURT:  Okay.

5           Debtor Good afternoon, Your Honor.  Michael

6  McCormack.  Yes.  We have had discussions with Attorney

7  O'Connor about the extension to complete the outstanding

8  depositions.  With respect to the brief, one-week extension

9  for briefing, I don't see an issue with that if Attorney

10 Despins does not, my client.

11          THE COURT:  Okay.  Yeah.  Trustee Despins?

12          MR. DESPINS:  No.  No.  No.  No.  No issues, Your

13 Honor.  Thank you.

14          THE COURT:  All right.  So then what I need you to

15 do, Attorney O'Connor and Attorney McCormack, is submit a

16 joint, you know, consent order with all that, please?

17          MR. O'CONNOR:  Okay, Your Honor.

18          THE COURT:  Because I just thought we were very

19 clear, and it's fine.  I have no problem doing what you want

20 to do.  I just wanted to make sure that this wasn't having

21 some kind of an impact on what was going forward, being, you

22 know, having it be delayed.  But if everyone's in agreement,

23 that's fine.

24          So if you can just submit an order to that effect,

25 do you think you can submit an order by this Friday?

 1            MR. O'CONNOR:  I'm sure we can, Your Honor.  I

 2   will -- I'll take the first stab, and I'll send it to Mr.

 3   McCormack no later than tomorrow.

 4            THE COURT:  Okay.  All right.  Then unless I'm

 5   missing something, which is possible, I think that does

 6   address all the issues I wanted to address in the status

 7   conference in this adversary proceeding.

 8            But obviously, if anyone else wishes to be

 9   heard -- meaning Attorney O'Connor, Attorney McCormack, or

10   Trustee Despins -- on any other issues in the adversary

11   proceeding, you're welcome to raise them now.

12            MR. O'CONNOR:   Nothing from AIG, Your Honor.

13   Thank you.

14            THE COURT:  Thank you.

15            MR. MCCORMACK:  Nothing from me, Your Honor,

16   Attorney McCormack, at the time.

17            THE COURT:  Thank you.  All right.  Well, then I

18   think that concludes the status conference in the AIG

19   adversary proceeding, and they -- the parties will submit a

20   joint, or a consent order, whatever you want to call it,

21   modifying the scheduling order by on or before November 22nd.

22   Okay?

23            MR. O'CONNOR:  Yes, Your Honor.  Thank you.

24            MR. MCCORMACK:  Thank you, Your Honor.

25            THE COURT:  All right.  Thank you both.  And

1   obviously, you're welcome to leave.  You don't have to stay

2   unless you would like to.  That's up to you.

3           MR. O'CONNOR:  Thank you, Your Honor.

4           THE COURT:  All right.  Thank you.

5           MR. DESPINS:  So, Your Honor, with your

6   permission, we would like to move on to the RICO status

7   conference.  By the way, if I could ask everyone that's not

8   speaking on these things to go -- to turn down their cameras.

9   I think it makes it easier for everyone in the court to see

10  exactly who's addressing the Court.  But I think Mr. Bassett

11  will handle the RICO status conference if that's okay, Your

12  Honor.

13          THE COURT:  That's fine.  Thank you.

14          MR. BASSETT:  Good afternoon, Your Honor.  Again,

15  Nick Bassett from Paul Hastings on behalf of the Chapter 11

16  Trustee.

17          Your Honor, we were last before the Court on, I

18  believe, October 15th, for a status conference in the civil

19  RICO adversary proceeding, which I believe is 24-5273.  At

20  that hearing, as the Court will recall, we requested that the

21  Court enter an order staying the civil RICO adversary

22  proceeding pending developments and ultimately the outcome of

23  the omnibus alter ego adversary proceeding, the basis for

24  that request being that there is substantial overlap in

25  parties and that all -- and that legal theories in the two

1  adversary proceedings are asserted in the alternative.

2        It's the Trustee's view that developments in the

3  omnibus alter ego adversary proceeding could significantly

4  limit and/or focus what would ultimately need to be litigated

5  in the civil RICO adversary proceeding.  And for that reason,

6  we think a stay makes good sense for the parties and for the

7  Court.

8        At that last status conference, a few of the

9  defendants appeared.  Based on my review of the transcript

10  and recollection, there were, I think, ultimately, maybe

11  three defendants who actually were continuing to oppose any

12  stay of the litigation.  Those defendants are -- it was

13  Victor Cerda, whose counsel is on the line.  And I'm getting

14  the other names in a moment, Your Honor.  My apologies.

15        It was counsel it was Victor Cerda, Your Honor,

16  Defendant Gladys Chow, and Defendant Beile Li.  We have had

17  discussions with their counsel since the last hearing, and I

18  believe we have resolved their objection to this day.  I'll

19  describe how we've done that in a moment.  And with that

20  objection being -- with those objections being resolved, I

21  think there is no longer any party opposing the Trustee's

22  requested stay.

23        Now, the way we had resolved the objection, as the

24  Court may recall, those defendants had asserted that at the

25  last hearing that they wanted to have the opportunity to be

1    heard on their motions to dismiss.  They explained that they

2    thought the Trustee should file an amended complaint, and one

3    of the reasons they opposed the stay is because they said

4    they didn't want -- that it was harmful for them to have the

5    complaint pending.

6           Well, what we've done to resolve that, Your Honor,

7    is we have agreed with those defendants, to enter into a

8    stipulation that will dismiss the Trustee's claims against

9    them without prejudice.  And to be very clear, the reason we

10   are doing this is because it simply preserves the status quo.

11          We are dismissing the claims without prejudice to

12   our ability to add them back in to the adversary proceeding

13   in an amended complaint, which, as we've described

14   previously, the Trustee does, in fact, intend to file once

15   this adversary proceeding moves forward.

16          And the Defendants, in exchange, have agreed that

17   they will not raise any statue of limitations or other time-

18   based defenses as a result of the Defendants having been

19   temporarily dismissed from the complaint and then added back

20   in, which we fully expect will be the case when the Trustee

21   refiles.

22          So, basically, it will, you know, result in those

23   three Defendants no longer being a part of the case in the

24   interim.  But if and when the Trustee amends and decides to

25   add them back in, he can do that, and they have agreed to

1  not, you know, argue that the Trustee is unable to do that

2  based on the statute of limitations or other similar

3  defenses.

4          We have a stipulation that we've agreed upon with

5  those Defendants, that we are prepared to submit to the Court

6  today.  Subject to having done that, as I said, I believe

7  there is no longer any opposition to the Trustee's request to

8  stay the adversary proceeding.

9          THE COURT:  Okay.  I understand what you're

10  saying.  And so and I'll obviously hear from any of the

11  Defendants' counsels who wish to be heard.  But my question,

12  Attorney Bassett, is just logistics, I suppose.

13          So the stipulation that you're talking about that

14  you're going to present to the Court, that will dismiss the

15  specific Defendants from the adversary proceeding without

16  prejudice when you file an amended complaint to add them back

17  in.  You're going to submit that to the Court, and then after

18  that enters, then an order enter -- staying the adversary

19  proceeding would enter?  Is that how you would --

20          MR. BASSETT:  That's -- yes, Your Honor.  That's

21  how I envision the sequencing, and I believe we still owe the

22  Court a proposed order staying the adversary --

23          THE COURT:  On the stay.  Right.  Right.  Okay.

24  All right.  That's what -- that's what I thought you were --

25  you meant, so that's good that I've understood what you said.

1  So thank you.

2        Do any of the Defendants' counsel wish to be heard

3  with regard to the comments and agreements that Attorney

4  Bassett has noted on the record?  Okay.  Well, then that's

5  fine.  And I think that's --

6        MR. NEALON:  Excuse me, Your Honor.  I'm sorry.  I

7  was on mute.

8        THE COURT:  That's okay.

9        MR. NEALON:  James Nealon for Defendant Yongbing

10  Zhang.

11        THE COURT:  Yes.

12        MR. NEALON:  You know, I think it's fine that

13  three of the defendants entered into this stipulation, but I

14  think there are 57 other defendants.  And the same

15  stipulation or arrangement should, in theory, be open to

16  them.

17        THE COURT:  Well, if they didn't object initially,

18  Attorney Nealon, when they had the opportunity to do so and

19  they were unnoticed, then I don't agree with you.

20        MR. NEALON:  Okay.  Well, the other thing is I

21  think that the Trustee should actually file a motion to stay

22  with the proposed order.

23        THE COURT:  I think he -- I think he's already

24  filed the motion to stay, hasn't he?

25        MR. BASSETT:  Your Honor, I believe the way that

1  this transpired was the Court had requested a status

2  conference on both the civil RICO and the omnibus alter ego

3  adversary proceedings on October 15th.  At that conference,

4  we made an oral request on the motion to stay.  Obviously,

5  that conference was on notice to all the Defendants.  So

6  there has not been, I don't believe, a formal written motion

7  filed.

8           We are happy to give -- you know, to upload a

9  proposed order on the docket and give parties the opportunity

10  to, you know, respond or comment on it if the Court would

11  like, but there's not been an actual written motion filed.

12           MR. NEALON:  Well, Your Honor, there's potential

13  moving parts that were discussed, none of which were run to

14  ground at the last status conference.  Was there going to be

15  a stay?  What was going to happen with the defaulting

16  Defendants?  When would an amended complaint be filed.  And

17  that's why I think all of that should be put into a motion.

18           It could be heard on an expedited basis.  Attorney

19  Bassett could attach his order.  But there were some elements

20  or concepts that were being thrown around that were

21  problematic.

22           THE COURT:  Well, I don't think you would -- I

23  don't think it's fair to say that they were being thrown

24  around.  It's the status conference on the adversary

25  proceeding.  All of the Defendants were made aware of it.

1   I'm not going to have every issue be heard seven times to

2   make sure that every Defendant asserts whatever rights they

3   feel they have.  They had an opportunity to be at a -- at a

4   status conference.  You were there.  Your client was there,

5   and I'm not going to accept other Defendants making arguments

6   on behalf of other Defendants.

7           So that's -- so just so that's clear, I don't

8   think it's fair to say that it was thrown around.  It was a

9   status conference on an adversary proceeding in which all the

10  claims are submitted in an -- in a complaint.  Everybody's on

11  notice as to what the claims are.

12          MR. NEALON:  Right.  Your Honor, respectfully,

13  Attorney Bassett laid out for the 1st time at that hearing a

14  whole bunch of different ideas about how the stay could work,

15  some of which had not been raised previously.  And there's

16  questions about at least the legality of part of those.

17          For example, one of the concepts was you could

18  sever off the defaulting Defendants and somehow put them into

19  a separate action or adversary proceeding, and that's

20  contrary to Supreme Court precedent.  That came up for the

21  first time at that conference.

22          So my only point is -- and I understand what Your

23  Honor is saying is this should be put in a motion and parties

24  should have a chance to weigh in on it, whatever the final

25  form of order is.

1          Your Honor, I believe counsel may actually be

2    confusing the two adversary proceedings.  The Court already

3    entered an order severing Defendants from the omnibus alter

4    ego adversary proceeding.  That has already happened.  So

5    that's done, over with.

6          The only issue that we raised at the last hearing

7    with respect to the civil RICO litigation was a request to

8    stay the litigation.  I don't believe there were any

9    permutations on that.  It was simply a request to stay.

10          THE COURT:  Right.

11          MR. NEALON:  Okay.  I'll accept that

12    representation, Your Honor.  But there was also some

13    discussion that the Trustee was giving thought as to what

14    they were going to propose on an amended complaint.

15          THE COURT:  Well, exactly.  But they haven't

16    amended their complaint yet.  And so when they amend their

17    complaint, you can act accordingly under the Federal Rules of

18    Civil Procedure.  Correct?

19          MR. NEALON:  Right, Your Honor.  Based on Attorney

20    Bassett's representation, I withdraw my objection.

21          THE COURT:  Okay.  Thank you.

22          MR. HA:  Your Honor, if I may, at the last

23    conference, on behalf of the Rule of Law Foundation 3 and the

24    Rule of Law Society 4, Inc., I did reserve our right to

25    object to the stay after consulting with my clients and to

1  object on the same substantially the same grounds as raised

2  by the other Defendants who objected.

3       And on that basis, Your Honor, we would also

4  request the same situation that the Trustee's counsel is

5  extending to those objecting Defendants and have our clients

6  dismissed without prejudice as well.

7       THE COURT:  Sorry.  Did you have any discussions

8  with Attorney Bassett about that, counsel?

9       Rule of Law Foundation 3 and the Rule of Law

10 Society 4, Inc:  We haven't discussed that, Your Honor.

11      THE COURT:  Okay.

12      MR. BASSETT:  Your Honor, to the extent to the

13 extent that the Rule of Law Foundation entities had a

14 continuing objection to the motion, I think it was very clear

15 on the record at the last status conference that the parties

16 were to meet and confer.  We did that with the two parties

17 who had indicated clearly to us that they were objecting.

18 And therefore, we had to meet and confer with them to see if

19 those objections could be resolved.

20      We did not have any reason to meet and confer with

21 the Rule of Law entities.  If they had decided they were

22 going to press their objection, they obviously could have

23 reached out to us.  But we're not, you know, we're not

24 agreeing to -- the Trustee is not in a position to agree to

25 dismiss all of these entities from the complaint.

1    We've done that on a case by case basis to resolve

2    objections that were asserted.  But again, we could have met

3    and conferred about this in advance of today, but that didn't

4    happen.  We didn't receive any communication from counsel.

5    MR. HA:  Well, Judge, I mean, we stand in the same

6    position as to those other objecting Defendants.  So I mean,

7    it's for the same reasons, the same grounds we're dismissing

8    those.  I mean, it would apply to us.

9    MR. BASSETT:  The other thing I would note, Your

10   Honor, is that the other three people who have raised this

11   issue, and which the Trustee was willing to talk to them

12   about, was the fact that they had asserted that there was a

13   long stay as entity or as individuals who, you know, have

14   professional reputations, et cetera.  They had expressed to

15   us that, you know, they may incur some form of hardship in

16   the event that this complaint remain pending against them.

17   We don't agree with that.  But in in response to

18   that concern, we worked out an arrangement that ultimately

19   preserves everybody's rights and works for all involved.  I

20   don't think the same issue at all applies to the Rule of Law

21   entities.  These are parties that are, you know, components

22   of the Debtor's fraudulent activities.  I believe their

23   websites have been shut down.  I mean, they're not -- they're

24   not individuals who have a reputation to protect.  It's just

25   not -- it's apples and oranges.

1    MR. HA:  But we strongly disagree with that, Your

2  Honor.  Those are allegations.  The Rule of Law entities are

3  nonprofit organizations.  They continue to operate, and they

4  continue to raise funds, and having this complaint is

5  extremely prejudicial.

6    THE COURT:  But weren't you involved in the last

7  status conference, counsel?  You were there?

8    MR. HA:  I was, Your Honor.

9    THE COURT:  Okay.  So why didn't you reach out to

10  Attorney Bassett or somebody else?  I don't mean it

11  necessarily has to be Attorney Bassett, but the Trustee or

12  his counsel.

13    MR. HA:  I was discuss -- I was in discussion with

14  my client about the issue and what to do.  And --

15    THE COURT:  I think you even made a statement that

16  you wanted to discuss it with your client on the record.

17  It's my recollection.  I could be wrong, though.  I don't

18  have the transcript in front of me.  But I could be wrong.

19    MR. HA:  That's -- yes.  That's my recollection as

20  well.

21    THE COURT:  Okay.

22    MR. HA:  I think I do have the right to object

23  after consulting with my client, Your Honor.

24    THE COURT:  Right.  But you didn't object.  You

25  and you didn't tell Attorney Bassett or anybody, the

1  Trustee's counsel, what you -- how you consulted with your

2  client.  Right?  You didn't say anything before today.

3         MR. HA:  Correct, Your Honor.  Correct.  I have

4  not spoken to Attorney Bassett.

5         THE COURT:  Okay.  Well, I'll think about it then.

6  I mean, the long story short is we had a conference.  These

7  issues were raised.  Defendants, including you, counsel,

8  raised concerns about the stay.  And the -- at the conclusion

9  of that conference, we continued the hearings of today, the

10 conference of today, and that the Trustee and the Defendants

11 were to discuss the Trustee's proposal to stay.

12        You didn't have that conversation, apparently, but

13 other Defendants did.  The Trustee's counsel has agreed to

14 enter into stipulation, and I guess you can try to talk about

15 that with Attorney Bassett after the status conference.

16        But as I said to Attorney Nealon, you know, I'm

17 not going to have Defendants raise issues for other

18 Defendants and/or if they have issues that they want to

19 raise, then they have to raise them, and they have to deal

20 with them.

21        So at this point in time, what I'm going to do is

22 have the parties who have agreed with the Trustee's counsel

23 about dismissal with prejudice -- without prejudice, excuse

24 me -- to have that stipulation submitted, and then you can

25 talk with Attorney Bassett and/or whomever else, you know,

1  Trustee or the Trustee's counsel, about what position they

2  may take with regard to you.  But at this point, I'm not

3  going to have any more discussion about it today.  It is what

4  it is, and you'll see where things stand.  Okay?

5          MR. HA:  Understood, Your Honor.  Thank you.

6          THE COURT:  All right.  Thank you.

7          So Attorney Bassett, when do you believe you'll be

8  submitting this stipulation?

9          MR. BASSETT:  I believe we could do that later

10 today, Your Honor.

11         THE COURT:  Okay.  I'm not sure we're going to get

12 to it today, but that's fine.

13         MR. KINDSETH:  Your Honor, can I be heard with

14 respect to the proposed order?

15         THE COURT:  What proposed order?

16         MR. KINDSETH:  For the stay.  My clients are not

17 opposing the stay, generally, but we would like, as Attorney

18 Bassett had stated on the record, to have the opportunity to

19 just review and comment upon the form of the proposed order.

20         THE COURT:  I think that's what Attorney Bassett

21 said.  Right?  He's going to be submitting some form of an

22 order.  So we'll -- all right.  So let's figure out the

23 logistics with regard to that, Attorney Bassett.

24         MR. KINDSETH:  Sure, Your Honor.

25         MR. NEALON:  And Your Honor, if I could just

1  clarify on behalf of Mr. Zhang, we're not opposing a stay.

2  That really wasn't the basis for me to raise it.  It was only

3  a question about what the fine print of that stay would

4  include.  So just want to clarify that.  We don't have an

5  objection to a stay of the RICO case.

6         THE COURT:  Okay.  Thank you.  Did I lose all of

7  you or are you still there?

8         MR. BASSETT:  No, we're here, Your Honor.

9         THE COURT:  It must be me.

10        MR. BASSETT:  So, Your Honor, I think, as I said,

11  we should be able to submit the stipulation that we've

12  reached with three of the Defendants by the end of the day

13  today, and then, we could follow that with a proposed order

14  that we could submit, I would say, certainly, by the end of

15  the week.

16        And I think, you know, we could do whatever Your

17  Honor would like.  We could file that proposed order on the

18  docket.  We could submit it to chambers, copying counsel, on

19  the -- on the conference today.  Happy to proceed it however

20  the Court would like.

21        THE COURT:  Well, I think we have to set up a way

22  for people to be able to respond to the order staying the

23  adversary proceeding.  And I suppose what would be the best

24  thing to do is to -- well, I'm not sure.  My thought process

25  is to docket the order in this adversary proceeding.

1 | Therefore, every Defendant that's already appeared, including
2 | Defendant's counsel that are participating in this status
3 | conference, will see the order.  And then I think you could
4 | say -- you could say notice of filing of proposed order and
5 | with an objection deadline, Attorney Bassett.
6 |           And I would give, depending upon when you have the
7 | order filed, I would probably give, you know, 14 days for an
8 | objection period.
9 |           MR. BASSETT:  That's fine with the Trustee, Your
10 | Honor.
11 |           THE COURT:  Does any of -- do any of the appearing
12 | Defendants have an issue with the 14 days for an objection
13 | proposed by the Court?
14 |           MR. NEALON:  No issue, Your Honor.  Thank you.
15 |           MALE VOICE:  No objection.  Okay.
16 |           THE COURT:  All right.  So I think that's the way
17 | we should proceed in the -- in this adversary proceeding.  Is
18 | there anything else that we need to address in this adversary
19 | proceeding this afternoon?
20 |           MR. SKLARZ:  Your Honor, Jeff Sklarz for G-Club
21 | International.  I just want to make sure that my silence
22 | doesn't mean I don't want to look at the order as well.
23 |           THE COURT:  Are you a defend -- you're a Defendant
24 | in this adversary proceeding?
25 |           MR. SKLARZ:  Yes.  Yes.

1              THE COURT:  Then you can look at that order.

2              MR. SKLARZ:  Thank you.

3              THE COURT:  I thought you were.  I'm not

4    suggesting otherwise.  I just --

5              MR. SKLARZ:  I don't have to be if Attorney

6    Bassett wants to dismiss the case, but I assume he doesn't.

7              THE COURT:  If you're a Defendant in the adversary

8    proceeding, you will see it and you will be -- there'll be an

9    objection deadline set.

10             MR. SKLARZ:  Thank you, Your Honor.

11             THE COURT:  Okay.  Thank you.  All right.  Is

12   there anything else that we need to address on this adversary

13   proceeding then?

14             MR. BASSETT:  I don't believe so, Your Honor.

15             THE COURT:  All right.  Then a notice of proposed

16   order saying adversary proceeding will be submitted with an

17   objection deadline of 14 days after the submission.

18             MALE VOICE:  Thank you, Your Honor.

19             MR. DESPINS:  All right.  Thank you all.  And I

20   think we can move on to the next -- whatever matter, Attorney

21   Despins, you think we should address next.

22             MR. DESPINS:  So the next one that should not be

23   too extensive either is the -- that you'll recall that we

24   commenced the alter ego proceeding.  We call that alter ego

25   part 1 proceeding in February, and there were a series of

1   defaulted parties.  One of them was Karen Mastriello

2   (phonetic), and there was, you know, these were severed from

3   the main proceedings so we could deal with the default

4   separately.  And there is a resolution with, Ms. Mastriello,

5   and Mr. Bassett will handle this matter, Your Honor.

6           THE COURT:  Okay.  Thank you.

7           MALE VOICE:  I apologize, Your Honor.  May I be

8   excused?

9           THE COURT:  Oh, of course.  Yes.  Anyone that is

10  not involved in any other matters may absolutely be excused.

11  Thank you.

12          MALE VOICE:  Thank you, Your Honor.  Have a good

13  day.

14          THE COURT:  You too.

15          MR. BASSETT:  So, Your Honor, as the Trustee

16  indicated, today the filing of issue is Docket No. 104 in the

17  omnibus alter ego adversary proceeding, which is adversary

18  proceeding number 24-5318.

19          THE COURT:  Yes.

20          MR. BASSETT:  As the Trustee indicated, the

21  Trustee has entered into an agreement through discussions

22  with counsel for one of the Defendants, Karen Mastriello, in

23  that adversary proceeding, pursuant to which -- and I guess,

24  by way of background first, Your Honor.

25          It it's alleged in the complaint that Defendant

1    Mastriello is the nominal sole owner of an entity called

2    Alpha Global Ventures Limited, which is also a Defendant in

3    the alter ego litigation and one of the entities that the

4    Trustee alleges is an alter ego of the Debtor.

5            Counsel for Ms. Mastriello had reached out to us,

6    Your Honor, to see if a resolution of the adversary

7    proceeding was possible.  She indicated to her counsel

8    indicated to us that Ms. Mastriello does not believe that she

9    has any interest in that entity, and to the extent that she

10   does, she is willing to relinquish that interest to the

11   Trustee and to the Chapter 11 estate.

12           So the stipulation that we ended up reaching is

13   simply a stipulation which says that to the extent Ms.

14   Mastriello holds any interest in that entity, for example, to

15   the extent that she is the nominal record shareholder of that

16   entity, which the Trustee has, you know, believes that she is

17   based on documentation the Trustee has obtained, she will

18   relinquish that interest to the Chapter 11 estate and will

19   take whatever actions are reasonably necessary to ensure that

20   ownership of the entity is transferred to the estate.

21           And we believe, you know, as far as the Federal

22   Rules of Civil Procedure are concerned, Your Honor, Rule 54

23   as an example, I mean, there is, in our view, no just reason

24   for delaying entry of this judgment.  It's, as the Court

25   knows from, you know, past requests that the Trustee has made

1    to resolve portions of adversary proceedings, this is very

2    important for the Trustee to --

3              THE COURT:  Right.

4              MR. BASSETT:  -- move expeditiously and where he

5    can, you know, obtain orders of ownership over entities so he

6    can proceed accordingly to protect the estate assets.  So,

7    happy to answer any questions --

8              THE COURT:  Understood.

9              MR. BASSETT:  -- but that's just the background of

10   where we are.

11             THE COURT:  I under- -- yeah.  Attorney Bassett, I

12   understand completely.  And the reason that this was

13   scheduled for a hearing was status conference was just

14   because of the 54(b) issue.  Right?  We need to say somewhere

15   in that judgment that there's no just reason for delay and

16   that, you know, cite to cases that approved that because I

17   have to make, at least from all of the case law that I have

18   seen and on appeals and issues where there have not been that

19   finding by the Court, that express finding.  But there's been

20   a remand and things for the Court to make that express

21   finding under Rule 54(b).

22             So what my point is I think you need to do that in

23   order for the Court to enter the judgment.  Otherwise,

24   someone could try to attack it at some point in the future,

25   and we could have an appeal on it.  And I do find that under

1   the specific facts and circumstances, as you've described

2   with regards to the Defendant Karen Mastriello, that there is

3   no just reason for delay for the entry of a judgment with

4   regard to that specific Defendant.

5          And I think that the rules support that finding,

6   but I -- but the judgment itself, and the order granting the

7   judgment has to say that.  Otherwise, we could have issues in

8   the future that none of us would want to spend any time on.

9          MR. BASSETT:  Understood, Your Honor.  And we

10  should have anticipated as much.  We will certainly submit a

11  revised proposed order that includes that language.

12         THE COURT:  Okay.  Thank you.  That would be very

13  helpful.  So how much time, again, Attorney Bassett, you can

14  have as much time as you would like.  I just do this -- we do

15  this for the -- it's helpful for the clerk's office to be

16  able to track things if we have a date by which a revised

17  proposed order will be submitted.

18         MR. BASSETT:  Certainly, Your Honor.  By the end

19  of the week would be more of a time.

20         THE COURT:  Thank you.  Then I'll note that the

21  revised proposed order will be submitted on or before

22  November 22nd.

23         MR. KINDSETH:  Your Honor, I'd like to make a very

24  brief statement, with respect to this matter.

25         THE COURT:  You don't represent the Defendant

1  though, Attorney Kindseth.

2          MR. KINDSETH:  It's -- very briefly and it's

3  really just a courtesy to the Court.  And just to alert, and

4  I've already alerted the Trustee and just to make sure not in

5  the future accused of sitting on our hands, Ms. Mei Guo

6  believes adamantly that she is the sole shareholder of Alpha

7  Global Ventures.  We're not seeking any relief here, we're

8  not objecting, we're not -- we just felt as a courtesy to the

9  Court, it should put on the record.  And just so Your Honor

10  knows --

11          THE COURT:  What information does your client have

12  to support that belief?

13          MR. KINDSETH:  Well, we've requested records from

14  BBI, the corporate body.  And we've also requested records

15  from the Trustee, and we're going to be looking into it

16  further.  Again, we're not seeking any relief now.  We're not

17  in a specific case --

18          THE COURT:  What records would you be seeking from

19  the -- you mean Trustee Despins?

20          MR. KINDSETH:  Yeah.  As to what records he's

21  relying upon to establish that Ms. Mastriello, who actually

22  does not believe she is the sole shareholder, is, in fact,

23  the sole shareholder, which was the basis for the allegation

24  in the complaint.

25          There's no allegation against Ms. Guo.  And again,

 1  Your Honor, I'm not -- we're not interfering.  We're just --

 2  I don't want to be accused of not advising the Court of such

 3  an issue.  We intend to gather what information we can,

 4  provide it to the Trustee, find out what information the

 5  Trustee has to establish the ownership of Alpha Global, and

 6  then we'll take whatever action we feel is appropriate.

 7          But I don't want -- I just didn't want to be

 8  accused of sitting on my hands.  And so we're just advising

 9  the Court that Ms. Mei Guo adamantly believes she's the sole

10  shareholder and that Ms. Mastriello is not the sole

11  shareholder of Alpha Global.

12          MR. BASSETT:  Your Honor, we had the, exact same

13  questions as the Court.  You know, to the extent that Ms. Guo

14  believes she is the owner of this entity and has evidence to

15  support that position, we are happy to see it.

16          As far as any request for information from the

17  Trustee as to the Trustee's allegations in the complaint, I

18  don't see any basis for that request.  As it stands, as far

19  as I'm concerned, Ms. Guo has no standing to contest claims

20  that we have asserted against other parties.  The stipulation

21  that we are asking the Court to enter is only going to

22  resolve the claims as to Ms. Mastriello.  It's not going to

23  prejudice Ms. Guo.  Again, she has evidence she owns the

24  entity, happy to see it from Attorney Kindseth, and we can go

25  from there.

1          MR. KINDSETH:  Your Honor, we agree.  We don't

2     have any standing to oppose claims against other parties.

3     We're not trying to interfere.  It really is just both a

4     courtesy to the Court and to avoid an accusation that we

5     should have brought it to the Court's attention sooner.  And

6     we will file whatever is necessary in the future should I be

7     able to gather the documentation necessary to prove the

8     ownership interest.

9          THE COURT:  Okay.  Thank you.

10          MR. KINDSETH:  Thank you, Judge, for hearing me.

11          THE COURT:  All right.  Then I think with regard

12     to adversary 24-05318, we've done all we can do in that

13     matter today.  Is that correct, Attorney Bassett?

14          MR. BASSETT:  That's correct, Your Honor.

15          THE COURT:  All right.  So then the only thing

16     left on the calendar today, if I'm correct, is the motion for

17     summary judgment in the Taurus Fund adversary and then the

18     motion for default judgment in the Cirrus Design Corporation

19     adversary.  Is that correct?

20          MR. DESPINS:  That's correct, Your Honor.  And we

21     would propose to go to the Cirrus matter.  Mr. Linsey would

22     handle because it should be shorter.

23          MALE VOICE:  Your Honor, may I be excused?  I'm

24     not --

25          THE COURT:  Yes.  Yes.  You may.  Thank you.

1              MALE VOICE:  Thank you, Judge.

2              MR. HA:  And may I be excused as well, Your Honor?

3              THE COURT:  Absolutely.  Anybody that is not

4    involved in any other matters.  I did say that at the

5    beginning, but I should have said it again.  You're

6    absolutely welcome to leave, when your matter is resolved.

7    Thank you.

8              MR. HA:  Thank you, Judge.

9              MR. LINSEY:  Thank you, Your Honor.  For the

10   record, Patrick Linsey for the Chapter 11 Trustee.  This is

11   on an adversary proceeding that the Trustee commenced against

12   Cirrus Design Corporation and Qiang Guo on February 14, 2024.

13   The only one of the Trustee's five claims in the adversary

14   proceeding is at issue.

15             The first four claims are fraudulent transfer

16   claims, actual and constructive fraudulent transfer claims

17   against Cirrus under Section 548 of the Bankruptcy Code and

18   applicable state law.

19             The fifth claim is the claim issue in the motion

20   for default judgment.  That is the claim the Trustee has

21   asserted against Qiang Guo to recover the value of the

22   transfers from Qiang Guo because he is the party for whose

23   benefit the transfers were made.  That claim was brought

24   pursuant to Section 550(a)(1) of the Bankruptcy Code.

25             The clerk issued a summons on February 24th.  And

1   on March 21st, 2024, the Trustee caused Qiang Guo to be

2   served via Federal Express at his address in London, England.

3            Pursuant to the summons and the procedures

4   governing avoidance actions, Qiang Guo had a deadline of May

5   20, 2024, to respond to the complaint.  He did not respond to

6   the complaint by the deadline, and he's not responded to the

7   complaint since.

8            On September 17th, 2024, the Trustee requested

9   entry of default against Qiang Guo, and the clerk entered

10  that default on September 23, 2024.  On October 28, the

11  Trustee filed this motion.

12           I will briefly describe the factual allegations in

13  the complaint, which in the posture of a motion for default

14  judgment are taken as proved.  As discussed in the complaint

15  and the Trustee's memorandum of law, the complaint involves

16  transfers to Cirrus Design Corporation by the Debtor via Lamp

17  Capital LLC, HCHK Technologies, and Leading Shine, New York.

18           As to the first two of those entities, Lamp

19  Capital and HCHK Technologies, the Court has already entered

20  judgments determining that these were among the Debtor's

21  alter egos.  As to Leading Shine New York, the Trustee has a

22  pending summary judgment motion to establish that.  And the

23  Trustee has incorporated by reference his claims for that

24  declaratory relief into his complaint against Qiang Guo --

25  Cirrus and Qiang Guo.

1          The complaint describes five transfers totaling

2    approximately $3.9 million made between September 2019 and

3    the petition date.  All of these transfers fall within the

4    lookback period under applicable state law, that's New York

5    law.  All but one of them fall within the two-year lookback

6    period under Section 548 of the Bankruptcy Code.

7          The Debtor's fraudulent intent in connection with

8    these transfers is readily apparent based on facts discussed

9    in the complaint.  Those include that the transfers were

10   effectuated by the Debtor's alter ego shell companies, which

11   -- and operated as part of the Debtor's shell game.

12         The Debtor organized his financial affairs as a

13   shell game for the purpose of concealing and dissipating

14   millions of dollars of assets in order to live like a

15   billionaire and allow his family to live like billionaires

16   while creating poverty to his creditors.

17         The assets the Debtor concealed and dissipated

18   included funds that the Debtor obtained from the victims of

19   his cryptocurrency securities and other fraudulent sweepings.

20   And the Debtor knew that by concealing and dissipating his

21   assets in this manner, there would not be sufficient assets

22   remaining to pay his creditors.

23         In particular here, Qiang Guo, the Debtor's son,

24   is a close family member, an insider of the Debtor, and

25   participated in many of the Debtor's fraudulent schemes.  At

1  the time of the transfers, the Debtor was facing significant

2  creditor claims, including, among others, by tax.  These

3  transfers, it's further discussed in the complaint and in our

4  memorandum of law, were made for the benefit of Qiang Guo.

5       As the Court is well aware, Qiang Guo is the

6  Debtor's son, who's played a critical role in the Debtor's

7  shell game.  The Court has already determined that Qiang Guo

8  received other direct fraudulent transfers from the Debtor.

9  Qiang Guo was also involved in efforts to -- attempts to

10  falsely claim an interest in the Debtor's apartment at the

11  Sherry-Netherland Hotel in Manhattan, and in similar efforts

12  involving an apartment in London.

13       Specifically, the transfers at issue here funded

14  the purchase of two aircraft from Cirrus Design Corporation,

15  an SR 22 propeller aircraft, and an SS 50 single-engine,

16  personal, private jet.  The value of those transfers went to

17  Qiang Guo.  Qiang Guo was the one, not the Debtor, who

18  enjoyed the use of those aircraft, after the aircraft were

19  delivered.  And as mentioned, the Debtor received no

20  consideration for the transfers.

21       The Trustee explained in the memorandum of law

22  that the motion is intended to be solely seeking relief as to

23  Qiang Guo and not relief with respect to Cirrus Design

24  Corporation.  After the Trustee filed the motion, counsel for

25  Cirrus contacted the Trustee and requested that the Trustee

1   add language to the proposed order, making, I guess, further

2   formalizing that fact.  And the Trustee has filed a revised

3   form of order under the docket, which is at Docket No. 27 of

4   this adversary proceeding.  And that adds language to

5   paragraph 13, which language has been agreed upon with

6   Cirrus.

7          The Trustee's memorandum of law also addresses by

8   final judgment should enter under 54(b) solely as to the

9   Trustee's claim against Qiang Guo.  Entry of judgment on this

10  claim will benefit the estate so that the Trustee may take

11  steps to seek to enforce the judgment against Qiang Guo

12  before he further dissipates assets.

13         As the Court is aware, Qiang Guo is abroad, is

14  possessed of substantial resources and ability to dissipate

15  assets and to endeavor to frustrate the Trustee's claims.  As

16  the Trustee has further advised the Court, the Trustee is

17  involved in litigation abroad and obtaining judgment against

18  Qiang Guo will bolster the Trustee's efforts to protect the

19  estate's interests abroad.

20         With that, I'm happy to answer any questions the

21  Court may have.

22         THE COURT:  I'm looking at your -- thank you.  I'm

23  looking at your revised proposed order, and I don't see any

24  reference to Rule 54(b) in the revised proposed order.  I

25  know you said -- you recited some issues about 54(b), but

1  maybe I'm missing something.  But obviously, this is only a

2  judgment against one defendant and one count of the

3  complaint.

4          So, I think we need to -- I don't know what

5  language necessarily because I didn't compare what Cirrus

6  asked you to add to this revised proposed order, but that's

7  fine.  Whatever you've agreed to with them is fine.  But I

8  don't see any language about Rule 54(b) and that there's no

9  just cause for delay in connection with this matter, and I do

10 think we need that.

11         I mean, I'm not -- regardless of what I think, I'm

12 going to insist that on it because, otherwise, this judgment

13 could be, you know, appealed and said that I was -- it was an

14 improper entry of a judgment without that express finding.

15         MR. LINSEY:  Understood, Your Honor.  So the

16 answer to the one issue, the language that was added that was

17 agreed upon with Cirrus was --

18         THE COURT:  Paragraph 6?

19         MR. LINSEY:  Paragraph -- it's paragraph 13.

20         THE COURT:  Oh.

21         MR. LINSEY:  And it's the final sentence of the

22 revised paragraph 13, which is the Trustee will not use this

23 order or any other order on the motion, whether as law of the

24 case or otherwise against Cirrus or against the other --

25         THE COURT:  Yeah.  That's paragraph 6 in the

1  proposed order I'm looking at anyway.  Are you looking at the

2  motion?  Or I'm looking at a proposed order, revised proposed

3  order that I think is what I should be looking at, 27?

4        MR. LINSEY:  Oh, that's correct, Your Honor.  I

5  apologize.  So we filed the -- we filed the revised order and

6  we filed a red line together with it.

7        THE COURT:  Oh, I see.  I'm looking at the red

8  line.  Yeah.

9        MR. LINSEY:  Well, yeah.  It it's less helpful

10 than it should be, Your Honor, because for some reason, where

11 the numbering of the decretal paragraph picks up in the red

12 line --

13        THE COURT:  Oh, I see.

14        MR. LINSEY:  -- starts where the prior version --

15        THE COURT:  Right.  Right.

16        MR. LINSEY:  -- writes off.  Which is why I'm

17 saying -- we're looking at the same paragraph.  Just the red

18 line version.

19        THE COURT:  Okay.  Okay.

20        MR. LINSEY:  So in any event, we would -- we would

21 appreciate the opportunity to file or provide the Court with

22 a revised order, and we'll use language that is in keeping

23 with the other orders where the Court has entered final

24 judgment on less than all of the claims at issue in the

25 adversary proceeding.

1          MR. DESPINS:  And we cannot be at the same the

2    same language that that was used in the last milestone, the

3    Qiang Guo default judgment.

4          THE COURT:  Yeah.  It's necessary because

5    otherwise, the whole -- the whole judgment could become --

6    could come undone.  And I have found on the record that there

7    is no just reason for delay in connection with this specific

8    claim and other matters with those specific claims as you've

9    recited in your motions and in the motion to expedite the

10   hearing and under the specific facts and circumstances of the

11   case.  So that's fine.  You can submit a revised proposed

12   order.  And I do see the language that you've added that with

13   Cirrus's request, so that's fine as well.

14         MR. LINSEY:  We will submit that by the end of the

15   week, Your Honor.

16         THE COURT:  All right.  Just give me one moment,

17   please.  So then -- I'm just -- I'm sorry.  Just a little

18   delayed here.  Just give me a second.

19         MR. LINSEY:  I hope Your Honor feels better.

20         THE COURT:  I do too, but thank you.  Here we go.

21   I'm just -- I don't know why I'm just a little delayed.  In

22   any event -- oh, I got -- I'm just having a little computer

23   problem.  If you just bear with me for a second.

24         Okay.  So the motion for default judgment, ECF 23,

25   is granted as against the Defendant Guo, and the -- a revised

1  proposed order will be submitted on or before November 22nd.

2  I'm sorry.  That's Friday.  November 22nd.

3          So I think that concludes that adversary

4  proceeding that is on the calendar this afternoon as well.

5          MR. LINSEY:  That does, Your Honor.  One thing I

6  just wanted to mention, Your Honor entered an order approving

7  my firm's fee application.  My colleagues at Paul Hastings

8  pointed out there was an arithmetical error in one of the

9  paragraphs of my firm's fee application.

10         If it's all right with Your Honor, we'll send a

11  revised form of order and a red line --

12         THE COURT:  Sure.  And just cite to Rule 60 in

13  9024 that there was some clerical error you discovered, and

14  that's the reason for an amended order.  Okay?

15         MR. LINSEY:  I just wanted to let the Court know

16  that that will be coming.  Thank you, Your Honor.

17         THE COURT:  Okay.  Thank you.

18         All right.  So then we're moving to the Taurus

19  Fund adversary.  Is that correct?

20         MR. DESPINS:  That's correct, Your Honor.  And Mr.

21  Bassett will take the lead.  Thank you.

22         THE COURT:  Okay.  Thank you.

23         MR. BASSETT:  May I proceed, Your Honor?

24         THE COURT:  Yes.  You may.

25         MR. BASSETT:  Thank you.  Again, for the record,

 1  Nick Bassett from Paul Hastings on behalf of the Chapter 11

 2  Trustee.

 3           Your Honor, one logistical item, I have my

 4  colleague Doug Barron, who is on the line at some point, not

 5  right at the beginning, I'm going to ask him to share on the

 6  screen if he can, some slides that we prepared to help walk

 7  through some of the evidence.  So I just want to make sure he

 8  has the technological capability to do that.

 9           THE COURT:  Has Mr. Conway seen these slides yet?

10           MR. BASSETT:  Yeah.  We sent them this morning,

11  Your Honor, and they are -- they do nothing other than

12  highlight for the Court evidence that is already in the

13  record as attachments to our Rule 56 statement and cited it

14  on memorandum of law.

15           THE COURT:  Okay.  I just want to make sure Mr.

16  Conway has seen them.

17           MR. CONWAY:  And Your Honor, Michael Conway of

18  Lazare, Potter, Giacovas & Moyle for the Defendants in this

19  adversary.  Yeah.  I got them a few hours ago.  I've been

20  able to peruse them, somewhat, and they do look like they are

21  a compilation of things that were produced by counsel in the

22  motion for summary judgment.

23           I will note that I object to every one of these

24  slides on the grounds that every piece of information in them

25  lacks foundation and is -- constitutes hearsay.  And so,

1   while I suspect you're going to let them use the slides, I

2   want to make sure the record is clear that we do not consent

3   to their use and we -- nor do we consent to, as you know, any

4   of the exhibits that they produced.

5         So we're not -- they're not part of the record is

6   what I'm saying.  They're documents that they wish to be part

7   of the record.  They've not been admitted into the record

8   yet.

9         THE COURT:  They're not -- they've never been --

10  what's contained in the slides have not been submitted in

11  support of summary judgment?

12        MR. CONWAY:  They've been submitted.  They've been

13  filed on the record, but they've not been admitted is what I

14  -- it's accepted over objection.

15        MR. BASSETT:  Your Honor, they are part of the

16  record on summary judgment.  They're submitted with the

17  Trustee's statement of undisputed facts.  They are admissible

18  on summary judgment for a variety of reasons.  I'm happy to

19  discuss all of that in the context of responding to Attorney

20  Conway's evidentiary objections.

21        I would note that his evidentiary objections are

22  actually waived because, per the local rule, he did not

23  articulate those objections in his opposition to the

24  Trustee's motion for summary judgment, did not provide any

25  basis other than one line in his response to the Trustee's

1   statement of undisputed facts and why he objects to many of

2   the Trustee's exhibits.  It's all admissible.

3        Most of the testimony that we're going to

4   introduce in support of summary judgment is testimony under

5   oath in a criminal trial citing case law in paragraph 67 of

6   our motion for summary judgment, the memorandum of law

7   talking about how courts routinely consider sworn testimony

8   from other proceedings, including criminal proceedings on

9   summary judgment, has the exact same effect as a declaration

10  because that testimony under oath could be elicited at trial.

11  Case law is ironclad on that.

12        To the extent that we're citing to exhibits, those

13  are exhibits that were authenticated by evidence in the

14  criminal trial and/or otherwise are admissible because they

15  fall within a hearsay objection.  They have been properly

16  authenticated by deposition testimony taken in this adversary

17  proceeding or otherwise.

18        I'm happy to go through as to every document that

19  Attorney Conway wants to talk about as to why they're

20  admissible, but we think there's no question about that.  And

21  again, I think the argument over admissibility has been

22  waived anyway.

23        THE COURT:  Let me ask you a question, Attorney

24  Bassett.  Oh, I'm sorry, Attorney Conway.  Let me ask

25  Attorney Bassett a question first, and then I'll hear back

1   from you.

2          So are you asking the Court -- and I haven't seen

3   whatever your -- you know, these slides yet.  Are these just

4   demonstratives, or are you asking them to be admitted as

5   evidence?

6          MR. BASSETT:  Your Honor, we're asking them to be

7   considered by the Court on summary judgment.  I think there

8   may be some confusion created by Attorney Conway's objection.

9   The slides are simply demonstratives.  We are not asking for

10  the slides themselves to be admitted into evidence.  They are

11  designed to help aid the Court, in understanding the evidence

12  that we have presented.

13         Every single document that is excerpted on these

14  slides has been independently put into the record as part of

15  the Trustee's statement of undisputed facts and/or as an

16  exhibit to one of the declarations that we submitted with

17  that.

18         We followed the exactly correct procedure that is

19  always followed in offering evidence to the Court in support

20  of the motion for summary judgment, which is to submit that

21  evidence as part of the statement of undisputed facts, task

22  the declarations as necessary.  And again, in this case, much

23  of it does come from the criminal trial, but that is all

24  information that the Court can and should consider.

25         But it's all in the record as part of our exhibits

1   submitted to the Court.  We're not asking the Court to,

2   separately accept in the evidence the demonstrative.  I think

3   it's simply an aid, to help facilitate the argument today.

4          THE COURT:  Okay.  Thank you.

5          Attorney Conway, I cut you off before.  I'm sorry.

6   Go right ahead with what your point is.

7          MR. CONWAY:  And yeah, the point that I was going

8   to make is that there were a host of comments made by

9   Attorney Bassett, one of which was that there were documents

10  authenticated in other proceedings.  There's only there's

11  only a handful of those, and those we didn't object to,

12  frankly.

13         But the entirety of the 280 or so documents that

14  were produced in this motion were authenticated by Mr.

15  Barron, with the following: attached are a true and correct

16  copy of the following documents.  That's the entirety of the

17  authentication in our -- in both in our memorandum where we

18  say we find that these are not authenticated broadly and not

19  -- and they are hearsay, and in the accompanying list of

20  specific objections, we've reserved properly our objections

21  to these documents.

22         Frankly, like I say, with respect to -- even

23  though Mr. Barron didn't actually authenticate anything, we

24  just didn't object to certain things because I know that I

25  was there or one of my partners was there when they were

1  authenticated, and we're not going to make frivolous

2  objections.

3          So even though they weren't properly presented to

4  Your Honor in this motion, we didn't object to the things

5  that we know could have been properly authenticated.  But for

6  the most part, we've got a bunch of information that, you

7  know, there's actually no attempt to offer foundation for it.

8  And just saying it came from a criminal trial is not enough.

9  That's always hearsay, didn't involve us.  We didn't have an

10 opportunity to cross examine.  We weren't invited to that

11 criminal trial.

12         And frankly, even if we had been, none of the

13 information that's been produced was authenticated something

14 that went into evidence at the criminal trial.  Not even the

15 transcripts.  They're not even certified.  So that said, Your

16 Honor, I think we should probably move on to the actual crux

17 of why we're here because I'd anticipate we'd get to

18 objections to evidence, but it's really not the heart of the

19 presentation I think Mr. Bassett wants to make.

20         MR. BASSETT:  Your Honor, let me just briefly

21 respond.  Attorney Conway is wrong across the board.  First

22 of all, they submitted a 15-page objection to summary

23 judgment that maybe has the word we object to evidence in it.

24 There's absolutely no articulation in that opposition as to

25 the basis for any of these evidentiary objections.  We cite

1    the local rule in our reply brief.  Any objection that is not

2    articulated in an opposition to the motion for summary

3    judgment is waived.  These have absolutely been waived.

4    We've not been put on any notice of these arguments, number

5    one.

6              Number two, all of these documents have been

7    authenticated.  I'll give you an example.  He says that the

8    exhibits that are attached to the Barron declaration have not

9    been authenticated.  That is categorically untrue.  We've

10   attached to the Barron declaration things like the criminal

11   trial testimony of the broker who represented the buyer of

12   the Mahwah Mansion.

13             She testified in the criminal trial about, for

14   example, text messages that she sent and received with Aaron

15   Mitchell (phonetic).  She authenticated those text messages

16   as part of the criminal trial testimony that we are also

17   offering.  That is the exact same thing as submitting a

18   declaration and a sworn testimony where the witness who is

19   able to authenticate the underlying exhibits has done so.

20             It's no different than if we had the broker submit

21   a declaration to the Court attaching those documents that is

22   all in the record.  We cited case law in paragraph 67 of our

23   motion for summary judgment talking about how courts

24   routinely consider sworn testimony from other proceedings.

25   That's exactly what we've done here.  All the exhibits were

1  properly authenticated through that testimony.  I think we

2  should just move on, Your Honor.

3          THE COURT:  All right.  Well, why don't you

4  proceed, and we will see where we stand after each party

5  makes their respective arguments.

6          MR. CONWAY:  Thank you, Your Honor.

7          MR. BASSETT:  So, just to just to level set,

8  obviously, Your Honor, in this adversary proceeding, we are

9  here on the Trustee's motion for summary judgment that the

10  Chapter 11 estate is the beneficial owner, reference for the

11  Debtor having been the beneficial owner, of the property

12  known as the Mahwah Mansion.  We also seek summary judgment

13  on our claim that Defendant Taurus Fund LLC, which as the

14  nominal owner of the mansion, is the Debtor's alter ego.

15          Now, Your Honor, as the Court is aware, there's a

16  criminal trial this past summer in which the Debtor, Mr.

17  Kwok, was convicted for orchestrating multiple massive

18  fraudulent schemes and leading a criminal racketeering

19  enterprise, all for the purpose of lining his pockets and

20  funding his and his family's over-the-top, extravagant

21  lifestyle.  The Court has heard a lot about that.  It's very

22  familiar with it.

23          The Court may not know is that a major focal point

24  of the Government's case in the criminal trial was showing

25  how Mr. Kwok directed monies within his controls to be used

1    to purchase, renovate, and furnish the Mahwah Mansion as a

2    home for his family.  The Government spent days on this topic

3    across multiple witnesses and numerous exhibits.

4           By the end of the trial, this evidence convinced a

5    federal jury beyond a reasonable doubt of Mr. Kwok's guilt.

6    Of course, that is a much higher standard than the

7    preponderance of the evidence standard that applies to

8    proceedings before this Court.

9           Now, I want to be clear.  The Trustee is not

10   asking Your Honor to find that the guilty verdict in the

11   criminal trial has a binding effect in this adversary

12   proceeding.  It does not.

13          But what I am asking you to do is to look at the

14   same evidence, which is properly before this Court, that was

15   presented to that jury and more evidence that the Trustee has

16   uncovered in his litigation that the Government didn't even

17   have access to and conclude from that evidence that there

18   cannot possibly be a genuine dispute of material fact that

19   Mr. Kwok beneficially owns the mansion and that Taurus Fund

20   is Mr. Kwok's alter ego.

21          I'll get to this in a moment with the slides, Your

22   Honor.  The evidence supporting these conclusions is

23   absolutely overwhelming.  In fact, I would have a hard time

24   imagining a record more definitive on this issue in a case

25   involving these claims than the one the Trustee has put

 1  before the Court.

 2          Now, to briefly summarize the legal standard, Your

 3  Honor, which I won't spend too much time on because I know

 4  the Court is very familiar with it from this and other cases,

 5  but I do think it is important to briefly recap what is

 6  required to defeat summary judgment.

 7          Under Rule 56, Your Honor, a movant who has

 8  presented competent evidence supporting his claims is

 9  entitled to summary judgment unless the opposing party can

10  show through its own evidence that there is no genuine

11  dispute of material fact -- or sorry.  The opposing party has

12  to show that there is a genuine dispute of material fact.

13          And in that standard, Your Honor, the words

14  genuine and material are both critical because what they show

15  is that not just any dispute of fact will suffice to defeat

16  summary judgment.  The disputed fact must first be a material

17  one, and what that means according to the case law is that

18  the fact might affect the outcome of the suit under governing

19  law.

20          If the outcome of the suit under the applicable

21  law would be the same, regardless of whether the fact is

22  true, then the fact is not material.

23          And in addition, Your Honor, even if the fact is

24  material, in order to defeat summary judgment, the dispute

25  about that fact must also -- must also be genuine.  And that

1  means, Your Honor, that the evidence must be such that a

2  reasonable jury, a reasonable finder of fact, could return a

3  verdict for the nonmoving party.

4        Not just any dispute will suffice.  It needs to be

5  one that could genuinely support a decision by the fact

6  finder for the nonmovant.  So, again, here, which we'll come

7  back to, the jury found beyond a reasonable doubt that Mr.

8  Kwok was guilty in this criminal trial.

9        Your Honor, we also have in our papers, and I will

10  not address it at the moment, but the law of governing the

11  substance of the Trustee's claims.  In short, under New

12  Jersey law, which we believe applies here, courts will look

13  past nominal title and look at who actually exhibits the

14  characteristics of beneficial ownership and control over an

15  asset.  Court system that they quote, will not be concerned

16  with the technicalities of title in bankruptcy when it comes

17  to determining what is property in the estate.

18        In addition, Your Honor, I won't spend too much

19  time with it.  And by the way, I would just say, too, that,

20  you know, the Court has already applied, you know, similar

21  law or similar jurisdictions to reach conclusions that other

22  property nominally owned by the Debtor's relatives or others

23  close to him is actually property of the estate.  The Court

24  did that in the adversary proceeding involving the Debtors

25  from (inaudible), the Lady May adversary proceeding, and of

1  course, the adversary proceeding involving the Debtor's home

2  in Greenwich, Connecticut, the Greenwich Land adversary

3  proceeding.

4          Your Honor, we also have our alter ego claims with

5  respect to the Debtor's ownership and control over Taurus

6  Fund LLC.  The law there is similar to that which the Court

7  has applied in other adversary proceedings, including, again,

8  the Greenwich Land adversary proceeding.  I won't repeat that

9  in detail again today.

10         What I would like to do now because, I do think

11  the evidence is critical -- I know from past experience the

12  Court does focus on the evidence on summary judgment -- is

13  walk through it.  And I would like, at this point, to see if

14  my colleague, Mr. Barron, could put the slides on the screen.

15         MR. BARRON:  And this is Doug Barron, Your Honor.

16  I have requested the ability to share my screen.  Thank you.

17         THE COURT:  Certainly.  I'm sure the courtroom

18  deputy is working on that right now.

19         COURT OFFICER:  (Inaudible) he should be able to

20  share right now.

21         MR. BASSETT:  All right.  Thank you for that.  So,

22  Your Honor, if the Court will indulge me, there are a large

23  number of slides here.  I will not dwell on each one of them.

24  Part of the reason there's a large number of slides is

25  because there is so much evidence of the Debtor's ownership

1    of the mansion.  And frankly, Your Honor, it is from really

2    beginning to end all aspects of ownership that one would look

3    to in determining who is the actual beneficial ownership of a

4    property.

5              The evidence that we will go through in a moment

6    shows that Mr. Kwok was intimately involved in every aspect

7    of purchasing the home, renovating the home, and living in

8    the home.  Everything that an owner would do with respect to

9    a property, Mr. Kwok did.

10             And to the contrary, there is no evidence that

11   anyone else, including the Defendants, ever took any actions

12   that would be consistent with them and not the Debtor owning

13   the property.

14             If we could please move to the third slide.

15             And by the way, is this large enough on Your

16   Honor's screen for the Court to see?

17             THE COURT:  I can see it.  Yes.  Thank you.

18             MR. BASSETT:  Okay.  Great.

19             So, Your Honor, what this slide shows, this is

20   sort of the beginning of the process.  This is November,

21   approximately, of 2021, early December 2021.  There was

22   testimony in the criminal trial from Christine Prostini

23   (phonetic), who is the buy side broker, and also from Amy

24   Buck (phonetic), who is the attorney for the buyer of the

25   property.

1              What this testimony from both of these witnesses

2    shows is that the Debtor's personal counsel within the Court

3    is very familiar reached out to both of them about the Mahwah

4    Mansion to start the process of potentially purchasing the

5    property in December of 2021.

6              You'll see according to Ms. Prostini's testimony,

7    Mr. Mitchell said he had a client who "wanted to see a couple

8    of homes" including the Crocker Mansion.  Again, referring to

9    this property as a home.  Amy Buck, the lawyer, said

10   essentially the same.  She went on to also refer to Mr.

11   Mitchell's clients as clients who were "like family" to Mr.

12   Mitchell's wife.  I don't know about the Court, but I don't

13   think that sounds like a reference to a bunch of G-Club

14   investors.

15             If Mr. Barron could please go to the next slide.

16             This slide, Your Honor, and again, there are

17   references to the exhibits which are attached to the

18   Trustee's statement of undisputed facts, which are before the

19   Court.  This is merely summarizing the documents that have

20   already been submitted.  Just want that to be very clear, and

21   the exhibit references are on all of the slides.

22             This slide, Your Honor, shows that initially, when

23   Mr. Mitchell reached out about the property, he suggested

24   that Mei Guo, the Debtor's daughter, and her "family trust"

25   were going to be buying the property.  No reference to G-

1  Club, no reference to Hamilton, no reference to other of the

2  entities that now form the basis for the Defendant's story to

3  the contrary.

4           This is also shown in a text message from Mr.

5  Mitchell on the right hand of the page, talking about how the

6  Debtor's daughter initially was the one who was purportedly

7  interested in buying the property.

8           If we go to the next slide, Your Honor, slide 5.

9           This slide talks about the first visit that

10  occurred for the first showing of the property on November

11  28, 2021.  Who attended that showing of the property?  Of

12  course, it was Mr. Kwok and his wife.

13           Slide 6, please, Doug.

14           This slide shows that following the first visit,

15  Mr. Kwok through Mr. Mitchell reached out and asked questions

16  about the property, including whether it had any ghosts,

17  other questions that somebody looking to purchase a property

18  for themselves might want to ask.

19           Please go to slide 7, Doug.

20           This slide, Your Honor, shows that in late

21  November of 2021, the Debtor communicated an offer of $26

22  million to buy the property.  The Debtor himself was the one

23  who came up with this offer.  We know this because the Debtor

24  asked his top lieutenant, Ya Li (phonetic), who testified at

25  the criminal trial, to transcribe and translate his voice

1   memo that he gave to her and have it sent to Mr. Mitchell.

2   That was an exhibit in the criminal trial, and the testimony

3   that we've attached, sworn testimony, the Court has

4   considered on summary judgment, talks about that voice memo,

5   authenticates that voice memo.  All of it is admissible and

6   can be considered by the Court.

7           Notably, in his transcribed voice memo that was

8   sent to Mr. Mitchell, the Debtor says that the "family fund"

9   will buy the property.  And he says that William G, the

10  Debtor's close friend and criminal coconspirator, is the one

11  who should be contacted about it, Your Honor.  Family fund,

12  there's no reference to the G-Club.  There's no reference to

13  the story the Defendants would now have the Court believe.

14          Slide 8.

15          This slide, Your Honor, shows that after

16  formulating the offer, the Debtor visited the mansion for a

17  second time on December 2nd, 2021.  And if you look at these

18  text messages, it's very telling.  You have, Mr. Mitchell

19  texting the real estate agent, saying would it be possible

20  for the father to come back to the house tomorrow?  And then

21  he talks about how there's -- that how the mother had a

22  concern about the air conditioning.

23          Your Honor, this is Mr. Kwok visiting a project,

24  visiting a property that he wanted to purchase, and it's Mr.

25  Kwok's wife asking questions about the air conditioning,

1  something that somebody who is going to live in that house

2  would want to ask.

3          And the testimony from Ms. Prostini at the

4  criminal trial on the right hand side of the page describes

5  who she understood the buyers to be, the father of Ms. Guo

6  and the mother, his wife.

7          The next page, please.

8          This slide, Your Honor, is more testimony from Ms.

9  Prostini at the criminal trial, talking about what happened

10  at the second visit on December 2nd.  During that visit, Mr.

11  Kwok and his wife went through every room in the house.

12  Again, the behavior of somebody looking to buy a home for

13  themselves.

14          Next slide, please.

15          Your Honor, this is, another excerpt from the

16  voice memo that we discussed previously, which it's, I think,

17  the same excerpt but it shows that the Debtor, not only did

18  he send the offer memo to Mr. Mitchell communicating his $26

19  million offer price, but on the right hand side of the page,

20  you see that on December 3rd, 2021, Mr. Mitchell sent a

21  letter to the seller formally conveying that offer.  It's the

22  exact same offer.  The $26 million offer that the Debtor

23  relayed was the one that Mr. Mitchell sent to the seller.

24  Again, the Debtor controlling every aspect of the process.

25          On the next page, slide 11, we see that Mr.

1  Mitchell begins texting the real estate agent, asking for

2  copies of the floor plans for the mansion, saying that they,

3  referring to the buyers, were focused on getting it ready for

4  their case.  She then said in the next -- in a subsequent

5  text message on the left hand side of the page at the bottom

6  that Mei and the mother really want to see them, referring to

7  the floor plans.

8          Again, it is obvious to anyone who the buyer of

9  this property is going to be.  And sure enough, on the right

10  hand side of the page, Ms. Prostini, the real estate agent

11  who interacted with the buyers, said that the buyers were,

12  "the Guo family" at the bottom of the page.

13          The next slide, Your Honor, I won't belabor the

14  details, but what this shows, these are, again, exhibits

15  authenticated and entered into evidence at the criminal

16  trial, is that the Debtor's assistant, Gladys Chow, who has

17  an email address of HGHK Technologies, which, of course, is

18  one of the Debtor's alter egos, sent floor plans to the real

19  estate agent, to the real estate broker, highlighting certain

20  things that she would like to have done, including,

21  rearranging certain rooms.

22          And there's a corresponding invoice from a design

23  firm which talks about creating a wing for the son on the 3rd

24  level and a wing for the daughter also on the 3rd level.

25  That's at the bottom of the page.  Again, Your Honor, from

1  all this evidence, very clear who's going to be living in

2  this house.

3          The next page, page 13.

4          Who else visited the property?  The Debtor's

5  criminal coconspirator, agent, and employee, Yvette Wang.  As

6  Ms. Prostini testified, she, of course, worked with Mr. Guo.

7  She also visited the property.

8          The next slide, Your Honor.  These are the actual

9  documents that were put together by Mr. Mitchell initially

10  identifying Taurus Fund SP as the purchaser of the property.

11  I will get into in a moment how that changed.

12          If you look at page 15, the next slide, there is

13  language from the purchase contract, indicating that the

14  property would be used "as a single-family residential

15  dwelling".  We have that highlighted on the page, not as a

16  clubhouse for G-Club members, as Defendants claim.

17          The next slide, Your Honor, is the buyer's

18  affidavit from the transaction.  This, again, if you look at

19  the bottom of the page, we have it highlighted, designated as

20  residential property.

21          The next slide, Your Honor, slide 17.  This shows

22  testimony from Amy Buck, the lawyer for the buyer at the

23  criminal trial, talking about how at closing, in fact, on the

24  day of closing, an LLC, Taurus Fund LLC, was created to

25  acquire the property.  Again, this shows very clearly, Taurus

1  Fund LLC is an entity that does nothing and never has done

2  anything other than serve as a vehicle to acquire this

3  property for the Debtor.

4         The next slide, Your Honor, corporate formation

5  documents for Taurus Fund LLC shows how it was structured,

6  its two managers in the document on the left, bottom of the

7  page, for Taurus Management LLC and another defendant to the

8  adversary proceeding, and Scott Barnett, also a Defendant.

9  Mr. Barnett, of course, is the Debtor's bodyguard and

10  acknowledged head of security.

11         Mr. Barnett's signature appears on the formation

12  document, which is also exhibited on the right hand of the

13  page.

14         Now, interestingly, Your Honor, if you look at

15  slide 19, despite Mr. Barnett's role in signing the documents

16  and serving as a manager of Taurus Fund LLC, he testified at

17  the criminal trial that he basically knew nothing about it.

18  When he was asked if he had a role at Taurus Fund, he said he

19  did not have a role.

20         He acknowledged that he was a signatory, and then

21  he says, well, he didn't find that out until much later.  And

22  on the right hand side of the page, he said they had me down

23  on paper as a manager.  And what that amounted to, Your

24  Honor, and how he explained that, as well, and this is the

25  bottom of the right hand side of the page, Mr. Mitchell gave

1  him paperwork.  Mr. Mitchell, the Debtor's personal attorney,

2  well known to the Court, gave him paperwork to sign, and Mr.

3  Barnett simply signed it.

4          Your Honor, this bears all the hallmarks of the

5  other activity we have seen the Debtor engage in when a

6  company -- when he tries to take assets that are really his

7  and put them in the nominal control of others.  He has people

8  like his bodyguard, his wife, his daughter's boyfriend,

9  others, stand in and put their names on documents.

10         The next slide, Your Honor, this is after the home

11 was purchased.  Further communications which, again, make

12 crystal clear to anyone that the buyers of the home were, in

13 fact, Mr. Kwok and his family and not G-Club or anyone else.

14 You have Ms. Prostini, the real estate agent, texting Mr.

15 Mitchell, saying that she wants to congratulate the buyers,

16 saying the buyers are so nice and so is their staff.

17         I want to do -- I want to talk to you about what I

18 can do to thank them.  In the last text, she wanted to talk

19 about them, talk about buying them a nice holiday gift, a

20 floral arrangement.  And she says, tellingly, she wants to

21 know where to send something, and asking if she could send it

22 to their Connecticut home.  Who has a home in Connecticut,

23 Your Honor?  Of course, the Debtor.  That's the home at

24 Taconic Road that the estate now owns.  Testimony from Ms.

25 Prostini on the right hand side of the page refers

1  definitively to the Debtor as the buyer.

2          The next slide, Your Honor, and it's hard to

3  imagine something more telling than this.  This is testimony

4  of Mr. Barnett from the criminal trial.  And again, you can

5  take, you know, all of Attorney Conway's evidentiary

6  objections for what they are worth, which I think is,

7  frankly, nothing.

8          But this one is his client testifying at the

9  criminal trial in response to questioning from Mr. Kwok's

10  counsel.  Were you surprised when Mr. Guo purchased the

11  property?  Referring to the Mahwah Mansion.  Yes.  What does

12  this show, Your Honor?  He didn't even fight the suggestion

13  that Mr. Guo is the one who purchased the property.

14  Everybody knew that.  That was baked into the question, and

15  he acknowledged it, didn't question it in his response.

16          So, Your Honor, next -- to the next slide, we've

17  now sort of summarized evidence, and that's just a portion of

18  the evidence to be clear.  All the evidence is discussed in

19  our -- in our papers and then set forth in the statement of

20  undisputed facts, relating to the Debtor's purchase of the

21  property.

22          The next slide, which I'll try to go through,

23  hopefully, relatively quickly, detail how after purchasing

24  the property and while he was still in the process of

25  purchasing it, in fact, the Debtor worked with his assistant

1  to buy furnishings for the property.  The documents that

2  are -- the messages that are exhibited on slide 22, these are

3  all text messages, which were authenticated in the criminal

4  trial through testimony that is in the record in support of

5  the Trustee's motion for summary judgment.

6         Mr. Kwok is texting with Gladys Chow, his

7  assistant, talking about all the things that he wanted to buy

8  -- lampshades, custom furniture, et cetera.  And in the

9  highlighted text there, he said it's all to be used in New

10 Jersey.  Talked about ordering a bed and furnishings for his

11 wife's room and his daughter's room at the bottom of the

12 page.

13        The next slide, Your Honor, this actually details

14 testimony from a deposition that occurred in this adversary

15 proceeding in the Bankruptcy Court, where the Trustee deposed

16 the owner of La Belle Modern, which is one of the outlets

17 from which Mr. Kwok bought furnishings for the home.  The

18 witness testified that an individual resembling Mr. Kwok came

19 in, acquired pieces for his home, and that that home was

20 located in Mahwah.  He confirmed that that picture on the

21 right, which the Court can see based on her experience in

22 this case, is Mr. Kwok.  He's the individual who came in and

23 made the purchases.

24        On the next slide, Your Honor, slide 24, this is

25 sort of more of the same.  I won't go over this in detail,

1  but it is Gladys Chow, communicating with the owner of La

2  Belle Modern concerning purchases.  Gladys Chow is using a

3  Golden Spring address in her signature block, and she is

4  making purchases of these furnishings to go to the Mahwah

5  Mansion.  Your Honor, Golden Spring is already an adjudicated

6  alter ego of the Debtor, and the connection there is very

7  clear.

8         The next slide, Your Honor, slide 25.  This is an

9  account statement of La Belle Modern, again, showing that Amy

10 Buck's escrow account that was used for furnishings at the

11 mansion was actually used to make purchases.

12         Slide 26, Your Honor, I'm going to go through

13 these fairly quickly.  But I would actually ask the Court to

14 focus on these, as well, because they are, in my view,

15 incredibly compelling.  These are excerpts from text messages

16 where the Debtor actually attached videos that he sent to Ms.

17 Chow, which he was going through in painstaking detail and

18 marking up the floor plan of the Mahwah Mansion, talking

19 about where he wanted to place his daughter's bathroom, where

20 he wanted to place her bedroom.  He marked up a spot for the

21 Debtor's boyfriend's room.

22         On the next slide, on slide 27, he's marking up

23 where he wants Miles' room, Qiang Guo's room to be, talking

24 about his dressing room.

25         The next slide, slide 28, this is his wife's wing

1  of the house, talking about where he wanted her bedroom to

2  be, what he wanted her bathroom -- where he wanted her

3  bathroom to be, et cetera.  Again, this is all coming

4  directly from the Debtor.

5          The next slide, more of the same, Your Honor.

6          Finally, if you get to slide 30, this is further

7  compelling evidence of the Debtor's ownership, as if what

8  we've seen already were not enough.  This is testimony in the

9  bankruptcy case of the -- of an individual with, Pro Memoria,

10  which is a high end design company that does renovations for

11  projects such as this.  And as we'll see on the next page,

12  they've done renovations for Mr. Kwok in the past.

13          Over here on page 30, he testified that somebody

14  reached out to him on behalf of Mr. Kwok to do a project in

15  the New York area.  And he just testified that it was for a

16  renovation project at the Mahwah Mansion in New Jersey.

17          He was contacted by Gladys Chow, the Debtor's

18  assistant, to come up with a bid for the project.  And when

19  it came time to talk about the project in detail on the right

20  hand side of the page, what did he do?  In September, he

21  met -- in September of 2022, he met with the Debtor in his

22  offices in Columbus Circle and discussed the plan in detail.

23  Where else -- where else did he meet with the Debtor?  He

24  knows the Debtor at his home at Taconic Road in Greenwich.

25  Again, the Debtor controlling intimately every aspect of the

1   process.

2           The next page, Your Honor, I won't spend too much

3   time on it, but this is demonstrating that this isn't the

4   first time Pro Memoria had worked for Mr. Kwok personally.

5   They also did work on Mr. Kwok's home in Beijing.

6           Slide 32.  If it weren't already clear who the

7   client was, who the person controlling the renovation of this

8   home was, here is the offer proposal submitted by -- and this

9   is an exhibit to the deposition transcript.  She's

10  authenticated.  There's no evidentiary objection whatsoever.

11  This is Pro Memoria is sending the offer to Dear MK,

12  addressing the offers for the renovations to Mr. Kwok

13  himself.

14          And then when you look at the details of the offer

15  of the proposal, does it say anything about a meeting room

16  for members of a club?  No.  It's the daughter's room, the

17  mother's room, the son's room, to the tune of millions of

18  dollars.  This is Mr. Kwok and Mr. Kwok alone controlling a

19  renovation of this house so it would suit him and his family

20  as their home.

21          If it weren't painfully obvious enough what was

22  going on here, Your Honor, on slide 33, what happens in April

23  of 2023 after the Debtor gets arrested?  Pro Memoria reaches

24  out to Gladys Chow, the Debtor's assistant, and says, it is

25  with great regret what happened in Miles Kwok.  At this

1  point, we can consider definitively the project canceled.

2          Why would the project be canceled if this was a G-

3  Club house?  Of course not.  It was a house for Mr. Kwok, and

4  when he was arrested, the project no longer needed to go

5  forward.

6          The next slide, Your Honor, I won't spend time on

7  it because we've covered over and over again more evidence of

8  furnishings for the Debtor's family's rooms in the house.

9          Slide 35, this is Amy Buck testifying at the

10  criminal trial, again, the lawyer, who worked on the

11  purchase, talking about how she used funds from her trust

12  account belonging, ostensibly, to Taurus Fund to purchase,

13  among other items, a $36,000 mattress, which ultimately went

14  into the daughter's bedroom.  Again, more overwhelming

15  evidence of the Debtor's ownership.

16          Scott Barnett, the Defendant in this case at the

17  criminal trial, slide 36.  Your Honor, he acknowledged all of

18  this.  That Mr. Kwok had a bedroom in the mansion, his wife

19  had a bedroom in the mansion, his son had a bedroom there,

20  his daughter did.  Not only did they have bedrooms, they had

21  whole wings.  All of that acknowledged by Mr. Barnett in his

22  testimony.

23          Slide 37, Your Honor.  In addition to having

24  orchestrated the purchase process from beginning to end and

25  controlling the renovation and furnishing process from

1  beginning to end, Mr. Kwok also directed the flow of funds

2  used to purchase the mansion.  On slide 37 here, we have a

3  diagram showing how the funds flowed.

4        The funds ultimately were at Crane Advisory Group.

5  They were transferred to an account, a trust account at Mr.

6  Mitchell's law firm, then they flowed through William G's

7  Hamilton entities and ultimately to the recipients of funds

8  on behalf of the sellers of the mansion.

9        Now, the next slide, slide 38, this is Mr.

10  Collette's (phonetic) testimony at the criminal trial.  Mr.

11  Collette was a key witness at the criminal trial.  All this

12  testimony is admissible, Your Honor, on summary judgment.

13        What did Mr. Collette say?  That Mr. Kwok was the

14  principal.  All this testimony shows that Crane was simply an

15  entity that Mr. Kwok used to do his bidding.  Mr. Kwok was

16  the boss.  When Mr. Collette was hired originally, he met

17  with Yvette Wang, and this is on the right hand side of the

18  page.

19        And he -- whether he was going to be hired

20  depended upon Mr. Kwok approving him being hired.  His offer

21  letter when he was hired was from Saraca Media Group, one of

22  the Debtor's alter egos.  Who paid Mr. Collette's salary?  Of

23  course, it was Lexington Properties, another adjudged alter

24  ego of the Debtor.

25        You go to the next page, and the Defendants

1  will -- I'm sure you'll hear from Attorney Conway that all

2  these funds were not Mr. Kwok's funds.  What did Mr. Collette

3  say at the criminal trial?  On the right hand side of the

4  page, the wires that you received for G-Clubs, Mr. Guo, Mr.

5  Kwok had control over those.  Correct?  Correct.

6          And if he had control over them, he had a

7  financial -- did you believe he had a financial interest in

8  those wires?  Yes.  This is Mr. Collette at Crane saying that

9  the Debtor had control over the funds.

10          Further evidence of the Debtor's control over

11 funds at Crane on slide 40.  This is a recorded phone call,

12 which is -- which was authenticated as part of testimony, but

13 it's also part of the record on summary judgment.

14          This is Mr. Kwok not just asking, not just

15 demanding, but screaming at the top of his lungs to force Mr.

16 Collette and others to transfer funds to Mr. William G's

17 foundation.  That's exactly what he did in this case as well,

18 Your Honor.

19          The next slides I will flip through quickly.  It

20 just -- it keeps piling on top of each other.  If we need

21 more evidence of the Debtor's use of the Mahwah Mansion as

22 its own, let's look at what we seized from the residence.

23 Again, all these images were authenticated in the criminal

24 trial.  That testimony is admissible here.  These images are

25 admissible here.

1         You have the Debtor's medication on slide 41.

2         You have a club membership card of the Debtor on

3    slide 42.

4         On slide 43, you have a picture of the Debtor's

5    Brioni suits found in the closet.  You have his New York

6    learner's permit.  You have a Hong Kong passport.  You have

7    the Debtor's Hong Kong ID.

8         On slide 44, you have more of the same, a credit

9    card of the Debtor's wife, the Debtor's Social Security card,

10   health insurance card.

11        Slide 45, you have images of the Debtor's family

12   members, all found in the mansion.

13        Slide 46, pictures of the closets, showing that

14   they're stocked full of clothes, including the Debtor's

15   suits.  Obviously, this is not a place that was used as

16   something other than a home for the Debtor and his family.

17        More of the same on page 47.  We have, certificate

18   to the Debtor's son concerning his participation in a Ferrari

19   challenge program.  You have Legos that were found in one of

20   the rooms, and there's Scott Barnett's -- again, the

21   Defendant's testifying in a criminal trial talking about how

22   much the Debtor's daughter likes Legos and that these were

23   for her.  All the indications of what one would do with a

24   home they live in.

25        Slide 48, Your Honor.  This is a full list, so I

1   won't go through in detail of what we found in the criminal -

2   - in the mansion when it was raided in connection with the

3   criminal proceedings.

4           We have on slide 49, a receipt from an antique

5   dealer, talking about certain items that were going to be

6   used for Madame's bed living maid's bedroom.

7           Slide 50, Your Honor.  This shows that the Debtor

8   had property moved from his current home, or his -- one of

9   his homes in Greenwich, the Taconic Road property, which is

10  now property of the estate, to the Mahwah Mansion.  This is

11  signed by the Defendant, Mr. Barnett.  Again, the common

12  thread was Debtor's house.  He's moving things from one of

13  his houses to the other.

14          The next few slides, Your Honor, these really go

15  to beyond everything that we've already talked about.  What

16  additional indicia are there that the Debtor controlled

17  Taurus Fund LLC and that Taurus Fund LLC was the Debtor's

18  alter ego.  Well, the evidence we have with that, Your Honor,

19  is that were all -- there are all kinds of things that Taurus

20  Fund LLC did, and this is just in addition to help the

21  overwhelming evidence of the Debtor actually controlling the

22  mansion and owning the mansion and using Taurus Fund as a

23  novel owner of it.

24          In addition to all of that, the Debtor used Taurus

25  Fund to buy items unrelated to the mansion and do other

1  things for his other alter egos.  For example, he caused

2  Taurus Fund to buy a $130,000 piano and have it shipped to

3  his office on Columbus Circle, care of Gladys Chow.  That's

4  on page 51.

5          On page 52, this shows that the Debtor had

6  invoices due to Golden Spring billed to Taurus Fund, for

7  items shipped to Columbus Circle.  Again, this is the Debtor

8  using Taurus Fund to fund the Golden Spring expenses.

9          It gets even worse on slide 53.  This is Taurus

10 Fund paying an invoice for plumbing work at the Debtor's home

11 in Connecticut.  Now, if correspondence with the Defendants

12 claim it to be, there's absolutely no logical explanation for

13 why making payments to satisfy plumbing invoices for work

14 done at the Taconic Road property.

15         And Your Honor, if we needed any further evidence

16 that Taurus Fund existed for no purpose other than to do the

17 Debtor's bidding, I think we all saw that play out in real

18 time.

19         On Slide 54, this is an excerpt of the email that

20 the Court has already seen where, shortly after the Debtor

21 was convicted, a representative of Taurus Fund reached out to

22 the security company and said, in light of the verdict in the

23 criminal trial, they were no longer going to fund the

24 expenses of the Mahwah Mansion.

25         Once Mr. Kwok went down, Taurus Fund no longer had

1  a reason to continue existing and no reason to continue

2  maintaining the property.  That much is obvious from the

3  correspondence and from everything else that we've seen.

4      I'll pause there, Your Honor, and briefly I know

5  I've been going on for a while, but like I said, I appreciate

6  the Court's indulgence, and I think that it is important to

7  really understand just how extensive the evidence is in

8  support of the Trustee's claims.

9      And before concluding, I do want to briefly be,

10  you know, more directly responsive to some of the arguments

11  that the Defendants have made in response to the Trustee's

12  motion.  And we can keep this -- we can take the slides down

13  for now and just leave it there, I guess.

14      But briefly, Your Honor, you know, the Defendants

15  filed an objection to the motion.  The Court, I'm sure, has

16  read it.  It's a 15-page objection which, frankly, in my

17  view, barely puts up a fight.  And I say that because it does

18  virtually nothing to address the mountain of evidence that we

19  just went through, and there's more, supporting the Debtor's

20  ownership of the mansion.

21      The Defendants raised some factual arguments and

22  some legal ones.  I'll address the factual ones first and

23  then briefly the legal ones at the end, although I won't

24  spend much time on those because they're standing arguments

25  that the Court has heard before and overruled on multiple

1  occasions.

2           In terms of their attempts to create a genuine

3  dispute of material fact, Your Honor, the Defendants -- I

4  can't believe they say this, but they make the remarkable

5  contention in their brief that the Trustee "has failed to

6  present any evidence that the Debtor has an interest in the

7  mansion".

8           The evidence is absolutely overwhelming.  And what

9  makes this assertion all the more remarkable is if you

10 actually look at the substance of the Defendant's objection

11 and their response to the Trustee's Rule 56 statement, they

12 dispute virtually none of the Trustee's facts.  They simply

13 try to ignore them and I guess, ask the Court to ignore them.

14          I won't go over this in in detail because it's in

15 our paper.  We do this in paragraph 16 to 21 of our reply

16 brief.  But there, we talk about how the Defendants only even

17 purport to dispute 6 of these 56 paragraphs in the Trustee's

18 statement of undisputed facts.

19          Now, having no ability to actually dispute the

20 Trustee's facts, what do the Defendants do?  They do two

21 things.  First, they try to come up with a gotcha moment by

22 arguing that the Trustee has admitted virtually every fact in

23 the case based on the Defendant's request for admissions.

24          And then second, they put forward two declarations

25 that are, for reasons I will discuss, wholly deficient to

1  create a genuine dispute of material fact.

2         First, on the request for admissions, I won't

3  spend too much time on this, Your Honor, because it's laid

4  out very clearly in our reply brief.  The Trustee never had a

5  deadline to respond to those requests for admissions because

6  they were served shortly before the Court granted its order

7  staying this litigation pending the conclusion of the

8  Debtor's criminal trial.  The Court very clearly directed the

9  parties within seven days following the termination of that

10  stay to file a joint proposed order proposing modification of

11  existing scheduling deadlines or in the absence of an

12  agreement to request a status conference.

13         I would note that in correspondence prior to the

14  motion for that stay being filed, after the request for

15  admission had been served, defense counsel had initially

16  suggested setting a deadline in the order which would say

17  that the Trustee would have a certain number of days

18  following the expiration of the stay by which to respond to

19  request for admissions, but that did not actually end up

20  being in the order.

21         Instead, the order entered by the Court contained

22  no deadline, but rather established a meet-and-confer

23  requirement.  And after the criminal trial, when it came time

24  to meet and confer as required by the order, the Trustee

25  reached out to Attorney Conway twice, once on August 7th and

1   once on August 8th, to meet and confer and telling him that

2   we plan to file for summary judgment.

3           In response to that, we got no response, other

4   than asking if we believe discovery would be closed.  And we

5   said we didn't think further discovery was necessary.  Zero

6   mention of request for admissions or Defendant's position

7   that they were entitled to have a deadline set for response

8   to those.

9           To make matters worse, after that, in accordance

10  with the order when we had a status conference before the

11  Court, which I'm sure the Court will recall, on August 13th,

12  Taurus Fund did not even appear.  The Defendants did not even

13  appear at that status conference.  By their own preference,

14  it occurred only between the Trustee and the Court with

15  Defendants not showing up, raising any issue about further

16  discovery, any issue about their request for admissions, et

17  cetera.

18          So, Your Honor, if they wanted a deadline, they

19  could have asked for it.  They could have met deferred as

20  they were required to do it.  They didn't.  Even if there was

21  a deadline, the Court is well within its discretion under

22  Federal Rule of Civil Procedure 36(b) to permit the Trustee

23  to amend his responses.  There's no prejudice to the

24  Defendants.

25          Most of the requests for admissions were central

1   issue type requests, like admit that the Debtor is not the

2   owner of the mansion or admit the Taurus Fund is not the

3   Debtor's alter ego.  The Defendants obviously knew that the

4   Trustee had taken the opposite position in the litigation, so

5   they were not prejudiced by not seeing that in writing in

6   response to a request for admission.

7          To the extent required, we've attached to my

8   declaration in support of the reply at ECF 147 responses to

9   the requests for admission.

10         Your Honor, once that straw man argument is cast

11  to the side, the Defendants are left with two declarations

12  that they submitted in support of their counternarrative in

13  their opposition that what really happened here is that

14  Taurus Fund and the William G-controlled Hamilton entities

15  located in the BVI, they helped G-Club, which again is the

16  Debtor's fraudulent membership organization, acquire this

17  mansion as a clubhouse for members that they could use and

18  enjoy as part of their G-Club membership, which again was

19  proven to be a big fraud in the criminal trial.

20         And they say that the Debtor has no interest in

21  the property and indeed no relationship to it whatsoever than

22  having helped G-Club find the property and then assist with

23  renovations.

24         Two declarations, Your Honor.  The declaration of

25  Mr. Mohammed, who purports to be, I think, I believe the

 1   corporate secretary of one of the Hamilton entities, and then

 2   a declaration from Defendant Barnett.  The Mohammed

 3   declaration talks about the purported process that was

 4   followed to find a clubhouse for members and the entities

 5   that were formed in accordance with that effort.

 6           But Your Honor, the Mohammed declaration, first,

 7   shouldn't be considered by the Court for two reasons, which I

 8   will discuss.  And then even if it were considered, it is not

 9   even close to sufficient to create a genuine dispute of

10   material fact.

11           First, the declaration should not be considered

12   because Mr. Mohammed was not identified anywhere in the

13   Defendant's initial disclosures.  Had they listed Mr.

14   Mohammed, the Trustee could have taken his deposition.  They

15   didn't, and we have this -- we have the case law and the

16   authority for this in our papers.  Because they didn't, the

17   Court can and should exclude his declaration on that basis.

18   And by the way, this is an individual that we have never

19   heard of prior to receiving his declaration.

20           In addition, if the declaration were not excluded

21   for that reason, it should be excluded because it is not

22   based on personal knowledge and relies entirely on hearsay.

23   Mr. Mohammed admits in the first paragraph of the declaration

24   that he was not personally involved in any of the

25   transactions that he discusses.  Instead, he said he reviewed

1  Hamilton documents, in the ordinary course of business, but

2  he never describes what those records are.

3          And there are some cases, Your Honor, which has

4  said that on summary judgment, a corporate representative can

5  testify on matters outside of his personal knowledge if that

6  person says that the testimony is based on his review of

7  particular corporate records.

8          But at a minimum, that business must reasonably

9  identify what those records are and show that there's a

10  plausible connection between those records and the testimony

11  that the witness is offering.  For example, a chief financial

12  officer could say that he reviewed financial statements

13  created prior to his involvement with the company to testify

14  about obligations that a company owes.

15          But here, Mr. Mohammed simply says, I reviewed all

16  of the records of Taurus Fund, and all of these records told

17  me that Taurus Fund purchased the Mahwah Mansion as a

18  clubhouse for members.  That's essentially the thrust of his

19  testimony.

20          There is zero citation to a single record.  Not a

21  single one of these records that allegedly supports this

22  story was produced to the Trustee in discovery.  You would

23  think that if the Defendants were serious about opposing

24  summary judgment and Mr. Mohammed had access to documents

25  which supported his story, he would have attached those to

1   his declaration.  He did no such thing.

2          And even if the Court were to consider this

3   testimony, Your Honor, it is flatly contradicted by the

4   mountain of evidence to the contrary.  The idea that G-Club

5   purchased a mansion and a clubhouse for members cannot

6   remotely be reconciled with all the evidence of the Debtor

7   having controlled the purchase process from the very

8   beginning, worked with the broker, worked with counsel,

9   formulated the offer, designed whole wings of the property

10  for his wife, filled the house with his own personal items

11  from his medication to his suits.

12         All of the evidence overwhelmingly indicates that

13  this was a personal residence of the Debtor, and none of it

14  supports this fantastical theory to the contrary.

15         Your Honor, in the interest of time, I'm not going

16  to go over some additional slides at the end of the deck that

17  sort of compare and contrast some of the testimony that the

18  Debtor's witnesses offered in their declarations with the

19  evidence to the contrary.  But suffice it to say that

20  everything they said is simply not supportable by the other

21  evidence in the record, including Mr. Barnett's own testimony

22  where he talks about how this is not a home of the Debtor.

23         In the criminal trial, he talked about how the

24  Debtor -- this is all on the record -- sometimes, you know,

25  in the first few weeks after its purchase was there two to

1  three times a week.  Sometimes, he stayed there for four or

2  five nights in a row.  He acknowledged that the Court saw in

3  response to questioning from the Debtor's counsel that it

4  was, in fact, the Debtor who purchased the property.  None of

5  that can be reconciled with the story that he's now trying to

6  tell the Court in his declaration, Your Honor.  And that is

7  not, in that situation, sufficient to create a genuine

8  dispute of any material fact.

9          Lastly, Your Honor, before wrapping up, I will

10  very briefly address the legal arguments, and I'll do this

11  briefly because there are arguments that have been raised

12  before.  The Defendants argue that the Trustee lacks standing

13  under both Section 541 and Section 544(a) of the Bankruptcy

14  Code.  Those arguments should be rejected.  The Court has

15  already considered this in prior adversary proceedings.

16          For example, on the motion to dismiss the

17  Trustee's counterclaims in the HCHK USA adversary proceeding

18  the Court correctly found there that Wagner and in pari

19  delicto do not bar the Trustee's claims under Section 541

20  because the insider exception applies.

21          That same exception applies here, Your Honor.

22  Taurus Fund, as alleged by the Trustee, is an insider of the

23  Debtor.  It'd be inequitable, to say the least, to permit

24  Taurus Fund to keep the mansion after having assisted the

25  Debtor and hiding it from his creditors.

1          In addition, Your Honor, even if the Trustee lacks

2   standing under Section 541 of the Bankruptcy Code, due to the

3   Wagner rule or the in pari delicto doctrine, he can get

4   around that as the Court has recognized in other adversary

5   proceedings by pursuing his claims under Section 544 of the

6   Bankruptcy Code as claims are brought on behalf of all

7   creditors equally.

8          The Court reached the same conclusion in the Lamp

9   Capital and the Greenwich Land adversary proceedings.  And I

10  would also direct the Court, Your Honor, to a case that we

11  cite in our papers, the new Second Circuit decision from

12  2024, the In Re Nordlicht case, which completely undermines

13  all the arguments that Defendants have made in their papers

14  to the effect that an alter ego claim is not a claim that can

15  be pursued on behalf of creditors generally, and that's an

16  individual claim.  That case held squarely to the opposite.

17         Your Honor, with that, again, I think that was a

18  lengthy presentation, but I thought it was important to go

19  through the evidence in detail.  Appreciate the Court's

20  indulgence.  I'm happy to answer any questions.

21         THE COURT:  Thank you.  I do not have any

22  questions at the moment.  I may later, but I don't at the

23  moment.  Thank you.

24         Mr. Conway, do you wish to be heard?

25         MR. CONWAY:  Yes.  Thank you, Your Honor.  Michael

1  Conway on behalf of the Defendants.  We heard a lot just now.

2  Most of it is concerning because the Trustee has taken two

3  positions in this case.  Now he's taking one, granted.  But

4  it at the outset, couldn't come up with the theory that he

5  would ultimately rely on.

6          The two theories under which a Trustee can say

7  that this -- here, the Taurus Fund property is estate

8  property, one being that it was new -- it was purchased or

9  acquired using funds that come from the bankruptcy estate,

10  come from the Debtor.  Okay?  And you know, there have been

11  times where the Trustee has said, he was a billionaire.  Of

12  course, it was his money.

13          They're not doing that now, and for obvious

14  reason.  They can't find any evidence.  They've gone around

15  the world.  They've gotten every bank account they can find,

16  they prosecuted cases around the world, but there's not a

17  single shred of evidence that ties any dollar that the Debtor

18  may have ever touched with the Taurus Fund property.

19          So they changed course.  They changed course by

20  saying that, well, the Taurus Fund property was acquired

21  through this fraud.  I use Trustee's counsel's language.

22  These facts are proven beyond a reasonable doubt in a

23  criminal trial, which resulted in the Debtor's conviction

24  for, among other things, using G-Club as a fraudulent

25  membership organization to fleece victims out of hundreds of

1  millions of dollars.

2        Okay.  That's theory two.  It's not his money.

3  It's somebody else's money that he defraud -- he defrauded

4  these people into investing their money or contributing their

5  money, and then he misused their money so that he could live

6  like a billionaire.  He wasn't a billionaire.  He used

7  somebody else's money to live like a billionaire.  That's

8  what they've settled on in this motion.

9        And in order to prove their motion, they -- and I

10  got to say, I'll get to this issue of whether we had a meet-

11  and-confer.  It's a flatly false statement.  The Trustee has

12  argued that there was a criminal trial in which the Debtor,

13  not our clients, but the Debtor was faced with evidence.  And

14  he's gone through, as he points out, mountains of evidence

15  that came into that criminal trial.

16        Now, we don't have any evidence that's actually

17  provided to Your Honor in a way that's admissible.  In other

18  words, there's no trial transcript that's certified.  There's

19  no -- there's been no exhibit from the criminal trial where

20  we can show that it was actually admitted in the criminal

21  trial, as opposed to the judge in the criminal trial saying,

22  well, that's hearsay.

23        Now, we don't know what these documents are.  The

24  audio recordings in Chinese with some translation that's not

25  authenticated.  We don't know what those documents are.  We

1  can't, as Mr. Bassett rightly stated, we state in a lot of

2  our responses, we can't really address those because we don't

3  know why those people testified, where those allegations come

4  from.

5          What we can say, though, is that they're all

6  irrelevant.  And what is relevant is what happened here, not

7  what somebody else thought might have happened, what somebody

8  heard from their brother, sister's cousin.  What really

9  happened here is what's important.  And what is it that

10  really happened here?

11          We have -- and there -- and I just want to -- I

12  don't want to belabor this point, but I got to say, all of

13  this testimony that we just saw, you know, if I had been

14  invited to the criminal case, I would have asked for follow-

15  up questions such as, well, why do you think that?  To see

16  whether there's any basis for any foundation for making a

17  statement.

18          You know, statements by, Scott Barnett.  You know?

19  Well, were you surprised when Mr. Guo bought the house?  But

20  of course, somebody on the witness stand is not going to say,

21  well, you can't ask me a question like that.  He didn't buy

22  the house.  No.  The response was, it made no sense to me.

23  The allegation of him buying the house made no sense to him

24  because it didn't happen.  Okay?  That's why it made no sense

25  to him.

1         But moving along, Your Honor, we've got a fairly,

2    I'll call it, simple but distressing fact pattern here.  And

3    either the Debtor was engaged in a massive fraud that

4    ultimately hurt the G-Club members, or this is his money.  We

5    know there's no evidence it's his money.  So let's focus on

6    the latter because that's consistent with what we have

7    presented as what happened here.

8         What happened here is a bunch of members of the

9    New Federal State of China, who put the Debtor as their

10   figurehead, much like the United States puts their president

11   as their figurehead, they put him in a position where he

12   could utilize their property.

13        In G-Club's case, they brought in memberships.

14   The membership money was used at first to buy a casino in

15   London.  That casino in London didn't work out because of

16   circumstances that are not really relevant here.  Only -- the

17   only thing that's really relevant here is had they really

18   been doing this for the benefit of the Debtor, they wouldn't

19   have done it in a -- in a country where the Debtor couldn't

20   actually travel to, which is, you know, common knowledge on

21   you just Google it, and he says he can't do that.  He's stuck

22   here.

23        Now, when that fell through, according to our

24   evidence that's been presented here, they came to United

25   States.  Now, who in the United States has an understanding

1   based on their relationships with their -- the person who

2   developed their homes, the person from whom they bought their

3   antiques, the people who manage their properties, who has

4   those connections?  The Debtor.

5             So they go to the Debtor, and they say, look.  You

6   helped us with our purchase of the Mahwah House, and we let

7   you use it as your home base for the New Federal State of

8   China.  That's in the record.  There's no reason to

9   believe --

10            THE COURT:  Where is that in the record, Attorney

11  Conway?

12            MR. CONWAY:  That's in the record --

13            THE COURT:  I listened to everything you just said

14  except for that last sentence.  You said it's in the record

15  that people from G-Club or the New Federal State of China

16  came to Mr. Kwok and said, help me purchase this mansion?

17            MR. CONWAY:  It's in the --

18            THE COURT:  Is that what you said?

19            MR. CONWAY:  I did.  Your Honor.  And that's the

20  declaration of Mr. Mohammed and the declaration of Mr.

21  Barnett.

22            THE COURT:  Mr. Barnett -- but I have -- I have to

23  be honest about Mr. Mohammed.  I looked at it once, but I

24  don't recall all of it right now as we're talking.  But Mr.

25  Barnett testified that the New Federal State of China came to

1  Mr. Kwok and asked that him to help them buy the Mahwah

2  Mansion?

3           MR. CONWAY:  Would you like me to read it?

4           THE COURT:  Yeah.  I would, please.

5           MR. CONWAY:  Okay.  Let me find his -- okay.

6           The Debtor was an asylum -- this is the Barnett

7  declaration paragraph 2.  The Debtor was an asylum seeker in

8  the United States and leader of political movement known as

9  the New Federal State of China, the movement.  He required

10  security due to the issues with Chinese government monitoring

11  his communications and the attempts for the Chinese

12  operatives to physically remove him from the United States.

13           In December 2021, I learned that a property been

14  purchased in Mahwah, New Jersey, which is the subject of a

15  case, the Mahwah property, and that in exchange for his

16  assistance with locating the Mahwah property in the first

17  place, construction and remodeling, the movement would be

18  allowed to use this location as a home base of sorts.

19           THE COURT:  Well, that's a little bit different

20  than what you just said, first of all.  First of all, it says

21  he learned that.  So I don't know who he learned it from,

22  number one.  But number two, he said in exchange, they'd be

23  allowed to use it.  He didn't -- it didn't say what you said,

24  which is they came to Mr. Kwok and asked him to help them buy

25  that.  That's a different -- those are two -- that's a -- in

1   my opinion, that's a -- that's a distinction with a

2   difference.

3           MR. CONWAY:  Okay.  Fair enough, Your Honor.  I

4   move on.  And I would note that a good majority of what was

5   stated by Trustee's counsel was characterizations that I

6   would consider to be false.  So if I have offended you by

7   saying --

8           THE COURT:  No, no, you haven't offended me at

9   all.  No, no, don't -- don't get me wrong, Mr. Conway.  You

10  haven't offended me at all.  I'm trying to remember what I've

11  looked at, right, as far as this motion for summary judgment

12  and everything in the -- in the record.  Don't -- not at all.

13  I probably sound odd because I'm not feeling well.  My voice

14  is weird.  All that kind of stuff.

15          But what I was asking you was not about Mr.

16  Mohammad's declaration, but Mr. Barnett's, which I have

17  looked at.  I didn't recall him testifying in his declaration

18  to what you said, which was that -- that he -- that Mr.

19  Barnett testified that he had firsthand knowledge that the --

20  that the movement came to Mr. Kwak to help -- have Mr. Kwok

21  help them buy the Mahwah Mansion.  That's what you had said.

22  And I didn't recall that being in Mr. Barnett's declaration

23  anywhere.  That was my question.

24          MR. CONWAY:  Okay.

25          THE COURT:  So go ahead.  I wasn't -- I wasn't --

1  I'm not taking offense to anything.  Don't worry about that.

2  I'm asking questions based upon what I have reviewed prior to

3  this hearing.

4          MR. CONWAY:  Correct.

5          THE COURT:  Okay?

6          MR. CONWAY:  So we can sort of summarize the bulk

7  of what you saw from Mr. Bassett as Mr. Kwok going out.  At

8  least we can assume it was Mr. Kwok.  There's no, you know,

9  there's certain testimony that somebody had made that Mr.

10  Kwok did this or, you know, resembled Mr. Kwok did that.

11          But let's just assume for the moment, arguendo,

12  that Mr. Kwok is going out and buying things for the mansion,

13  that he's going -- that he's talking to people about

14  renovating the mansion.  He's doing that, as testified by Mr.

15  Barnett and Mr. Mohammed, in exchange for using the Mahwah

16  property as a home base for the movement, which as we heard

17  from Mr. Mohammed, the G-Club members are 90 percent members

18  of the movement.

19          So we have a rationale for why they would do this,

20  and we know that simply living -- let's just say for a moment

21  that he's living in the house.  We argue in our papers that's

22  not proven.  In fact, Mr. Barnett says that's just not true.

23          He went to the -- to the house a few times a week

24  or a month.  He went there mainly because that's where the

25  broadcast facility was that he was broadcasting on behalf of

1   the movement for.  It's very rare for him to spend the night.

2            And you know, again, Mr. Bassett has repeatedly

3   said, and it's in other papers as well, that the main

4   residence of the Debtor is in Taconic -- the Taconic house in

5   in Greenwich.

6            So we're not -- there's no dispute here as to what

7   whether or not the Debtor lived in Connecticut.  The Trustee

8   admits that.  The dispute is whether or not his occasional

9   use of the Mahwah house gives him an ownership interest.

10  That -- because that's what's really at stake here.

11           And again, I go back to if the Trustee were to

12  come to you four years from now and say that the president of

13  the United States has been living in the White House for four

14  years, he and his wife helped redecorate it, and his suits

15  are there, his driver's license is there, his medications are

16  there, you would look at the Trustee and say, are you crazy?

17  He's the president of the United States.  That's where he's

18  expected to spend his time.  He's expected to do all these

19  things.

20           Well, that's the position that our clients are

21  taking here, that Mr. Kwok was the putative leader, the

22  president, so to speak, of the movement.  And while we never

23  got to the point where this house was completed because this

24  case was filed, and then Your Honor issued an injunction, and

25  it was no longer possible for our clients to complete the

1  construction, there was activity at the house, but not the

2  activity that was intended because it was never completed.

3          And frankly, the idea that, at the end of the

4  criminal case, the manager, not Mr. Barnett, the manager for

5  Taurus Fund, Mr. Barnett has never been a manager for Taurus

6  Fund.  In fact, as the Trustee cannot dispute, we've given a

7  list of all the managers throughout time for Taurus Fund.

8          And the current one indicated that after reading

9  in the newspaper that the Government was taking the house, he

10 was under the impression he had to leave the house.  Yeah.

11 That's -- we brought this to Your Honor's attention in a

12 court filing.  Your Honor said we need to do something about

13 this and figure out who's going to pay for everything

14 because, on this emergency motion by the Trustee, we have

15 this email from the manager saying that they want to stop

16 funding.  Well, that's not evidence that Mr. Kwok owned the

17 house.

18         So we what we have here is Mr. Kwok using the

19 house, being involved in the location of the house, being

20 involved in the -- in the decoration of the house.  What we

21 don't have is a single shred of evidence that ties into the

22 ownership of the house.

23         Now, what we also have is a problem for the

24 Trustee.  Because if what they're saying now is that the

25 reason they should have this control of the house, the reason

1  they should have the ownership of the house is that it

2  belonged -- it was purchased by these -- using the money of

3  these defrauded victims, well, that's going to mean that the

4  defrauded victims get defrauded twice because they can't --

5  if they -- if their house, which they feel like they own, is

6  now presented to the Trustee, that means that not only were

7  they, it's in the words of the Trustee, policed by putting

8  their money into G-Clubs, but now the property that was

9  purchased with their money is given to somebody else.

10          And this brings us, in part, to this point about

11  standing.  I don't want to spend a lot of time on this

12  because I've seen Your Honor's response to the standing

13  issues when they've been raised in other cases.  But I do

14  want to point one thing out.

15          The Trustee makes it clear in their papers that

16  under 541, it's not enough to say that there is a

17  hypothetical creditor, and that's -- which Your Honor found

18  in Lamp Capital, et cetera.  You have to go beyond that and

19  find that that hypothetical creditor has the same claim as

20  the people across the board in the bankruptcy.

21          And that's something that when this construct was

22  created was fairly reasonable because what they're doing is

23  they're saying if a Debtor -- in other words, if a CEO of a

24  corporation takes property from the corporation and puts it

25  in his own pocket, all the creditors in the corporation are

1  hurt equally.

2          Here, you've got a hands -- I don't want to call

3  it a handful because it's a number of people, but it is a

4  discernible group who put their money in the G-Club.  That

5  money was put into the Hamilton Opportunity Fund, which was

6  then put into the Taurus Fund, and then the property was

7  purchased.

8          What the Trustee wants to do is take the proceeds

9  of the sales of all this property and distribute it amongst

10  all the creditors, maybe including them if you give them an

11  opportunity to file a proof of claim, but to everybody else

12  who might have a claim for -- personal injury claim against

13  the Debtor, for all of the administrative claims of the

14  Debtor.  All that money is going to be gone.  None of these

15  putative victims are going to see a penny of it.

16          I pointed this out to the Trustee, you know, that

17  they -- I don't represent them, and so they wouldn't -- and

18  the Trustee didn't want to talk to me about this, but they

19  all said, look.  Just give the property to the DOJ where they

20  can then sell it and give us back our property.

21          But no.  What they're trying to do here is give

22  this property to everybody, not just this group that was

23  defrauded, not these putative victims, but to everybody who

24  might have a claim for any reason against the Debtor.  That's

25  not a 541 claim.  That is not acceptable under 541 because

1  these are different people with different creditors,

2  different claims.  They're separate and apart from all the

3  other creditors in the estate.

4         But moving all the way from that, I want to

5  just -- I want to -- I want to talk about the Rule 26 issue.

6  You know, these requests for admissions and this idea that

7  there's no set date for response.

8         Rule 26 actually does set a date for response.

9  It's 30 days.  I offered, when I served these documents, the

10  opportunity to get a potential number of days after there was

11  a recommence of the case.  That didn't happen.

12         So we're stuck with the 30 days.  And even if it

13  had happened, we had said 10 days.  So that would have put us

14  at August 11th.  We did not get a response by August 11th.

15  We did not get a response at all.

16         Now, counsel says, well, this is a sandbag moment.

17  Well, no.  It's not a sandbag moment, and Your Honor yourself

18  said that if you don't respond to requests for admission,

19  they're admitted, and they can be used against you in summary

20  judgment.  And that's what we're doing here.  Counsel says,

21  well, we should be allowed to just, you know, have a do over

22  and say, well, no.  We didn't -- we didn't fail to respond.

23  Mr. Conway didn't meet and confer with us.

24         We did meet and confer.  And this is what's --

25  it's one of several things that's very frustrating about

1  these papers and by what was said here today.  On July 29th,

2  we specifically met and conferred about all the discovery

3  issues, about the fact that we're going to put together a

4  scheduling order, finish discovery, and present it to Your

5  Honor in conjunction with the recommencement of the case.

6          And on August -- I'll call it August 8th, I get an

7  email saying, we want to set up a briefing schedule for

8  summary judgment.  I was shocked.  We'd already gone through

9  a substantial meeting confer on exactly what was left to be

10 done.  And counsel for the Trustee said, we're going to take

11 this deposition, this deposition.  They could've taken the

12 deposition of each of these witnesses at the criminal trial.

13         But you know what?  They didn't do it because they

14 thought, well, we can just get this in under the radar

15 without an actual foundation, where Mr. Conway could actually

16 cross examine and get the actual facts into the record.  They

17 didn't do that.  They completely turned everything on its

18 head and said, we're not going to give you any more

19 opportunity to discover, Mr. Conley.  We're just going to set

20 this for summary judgment.  I was shocked.

21         There's no reason, though, for me to meet and

22 confer on that.  We met and conferred on discovery, and there

23 was not any discussion at that point in time about a request

24 by Mr. Bassett for more time to put in responses to the

25 request to admit.  He still had time at that point.  He

1    didn't say I'm going to need more time, and he didn't respond

2    when the time came and went.

3         So now he says, well, let me just say, Judge,

4    that, you know, we deny everything.  Well, what does that do

5    to me?  I'm now in a position where I didn't press the issue

6    of discovery because we had admissions from him.  When he

7    made his motion for summary judgment, we had admissions from

8    him on multiple points that win the case for us.

9         And now he's saying, well, you know what?  We want

10   to say that we deny all those, and at the same time, deny Mr.

11   Conway's client the right to do any discovery here.  So at

12   the very least, one, we don't think there's any basis for

13   them making this oral motion now to put in responses to our

14   request to admit.  They haven't made a motion.  They're

15   asking you informally for this right, and there's no basis

16   for that.  There's no basis in the papers for that.

17        If Your Honor is willing to give them that, which

18   we object to, we certainly should have the right to then

19   proceed with discovery on all these points that we thought

20   were admitted.

21        Now, that said, we also make the point that the

22   Trustee had no standing under 541.  And the response to

23   that -- and again, I don't want to belabor this because I

24   know Your Honor has dealt with this in other cases.  And by

25   no means do we concede that any other case is relevant here,

1  you know, that we were not a part of.  And I'm just saying

2  this to the record, Your Honor.  We object to this repeated

3  construct that if it's been decided somewhere else, it's

4  binding on Mr. Conway's clients.  That's not the way

5  collateral estoppel works.

6         We didn't -- if we didn't have a chance to

7  participate, it's not binding on us.  But that said, the idea

8  that there is a -- this exception to the Wagner doctrine for

9  insiders, what counsel is saying is this case involves an

10  individual debtor, not a corporation, where insiders is

11  appropriate to take into consideration, but an individual.

12  And they can provide no evidence that the individual debtor

13  has an ownership interest in any of the entities that are

14  relevant or the entities are relevant here -- there's the --

15  the only one they really care about is Taurus Fund.  Let's

16  face it.  (Inaudible) and Taurus Management are irrelevant to

17  this proceeding.  They don't own the property that's being

18  requested.

19         But there's no evidence that the Debtor has any

20  interest in Taurus Fund LLC.  So what they -- what they're

21  saying is, what you should do, Judge, you should say, we win,

22  that he has an interest in Taurus Fund LLC, and therefore,

23  Taurus Fund LLC is an insider.  And therefore, going back now

24  to the case, as an insider, they're entitled to a defense

25  under the Wagner doctrine.  That's basically this -- the

1  bootstrap logic there doesn't work.  And the reason you

2  shouldn't let it work is for the -- it's a logical reason.

3        You don't employ this insider's theory to an

4  individual Debtor.  It's meant to be used when you've got

5  insiders to a corporation, and the corporate -- the corporate

6  entity is a Debtor.

7        So I guess I'm going to finish off by just saying

8  that, again, just to be more clear on the objections to

9  evidence, what we have here is Mr. Barron stating that he's

10  throwing a bunch of documents together, and they're true and

11  correct copies.  That's it.  You know, their objections here

12  to the evidence of Mr. Mohammed and Mr. -- and Mr. Barnett

13  and their declarations, they're talking about what they have

14  either reviewed in records and seen in records, what they

15  know for a fact on their own, what they're entitled to

16  testify about in terms of corporate ownership.

17        What we have from the other side is Mr. Barron

18  saying, hey.  I got a bunch of documents here.  Check them

19  out.  It's -- they're legit.  We don't know why he's saying

20  that because he doesn't tell us.  And what we do know is that

21  they didn't even go so far as to explain any individual

22  exhibits what the foundation was, such as a certified copy of

23  the transcript, a certified interpretation of the Chinese

24  audio piece.

25        The fact of the matter is, though, it's not

1  critical because none of that information, in our opinion, is

2  relevant to the issue at hand.  The fact that Mr. Kwok was

3  involved in some way, shape, or form in locating and

4  decorating, even the renovation of the house is no different

5  from when the president of the United States does it with the

6  White House.

7       If we're saying that Mr. Kwok owns this house, I

8  guess what we're saying is that the president of the United

9  States owns the White House.  It makes no sense.  Nobody

10 would agree to that, and god forbid, in four years, that's

11 the argument that's made.  And somebody says, yeah.  You know

12 what?  We got a point.

13       I'm just -- I think that, Your Honor, we've been

14 here a long time.  I feel bad, and you feel bad.  I also -- I

15 think I have the same thing.  Our whole family does.  And so,

16 I've -- as soon as this is over, I'm going to probably lay

17 down and feel exactly as bad as you do.  So I know what

18 you're feeling.

19       THE COURT:  Okay.  Thank you, Attorney Conway.  I

20 understand your argument, and obviously, we'll go back and

21 review some of the information.

22       Attorney Bassett, is there anything you'd like to

23 add?

24       MR. BASSETT:  I know it's been a very long day,

25 Your Honor, so maybe just a few very, very brief points.

1          I just want to correct the record of the responses

2     to a couple of arguments that Attorney Conway made.  First of

3     all, he started with this notion that the Trustee has

4     shifting theories of the case.  That's just categorically

5     untrue.

6          The Trustee's theory has always been that the

7     Debtor acquired this property as a home for him and his

8     family to live in, using funds that he was able to direct and

9     had control over, and that he is the equitable owner of this

10    mansion by all the evidence in the record.  There's never

11    been a change in that theory.

12         Now, what Attorney Conway focuses so much on is

13    the, you know, idea that these funds, originally, were given

14    to G-Club by members of G-Club.  Your Honor, the fact that

15    the Debtor may have acquired funds through fraudulent means

16    does not mean they're not funds that he controlled and then

17    deployed for his own benefit.

18         There's no bank account.  The Court knows that the

19    Debtor filed for Chapter 11 in February of 2022 claiming to

20    have $0.  That's why we're here.  If the Debtor had bank

21    accounts with hoards of cash in them that he used to buy

22    things like his Mahwah Mansion, his property in Connecticut,

23    his Sherry-Netherland residence, his jets, his yacht, we

24    wouldn't even have this case.

25         We're here because the Debtor never owns anything

1  himself.  He takes funds that are really his, that he has

2  control of, or they're tucked in other companies and with

3  other individuals, and deploys them for his own benefit.

4  That's exactly what he did here.  He took G-Club funds, and

5  he bought the mansion.

6         You heard all this, you know, recitation from

7  Attorney Conway, the story of how Mr. Mohammed says that this

8  is really a club for members.  I mean, Mr. Conway did not

9  because he can't actually respond to the evidence that we

10  presented.

11         How do you possibly explain if Mr. Kwok is using

12  this property simply as a place to host members of the

13  movement that he developed entire wings of the property for

14  his wife, for his daughter, for his son, kept all of his

15  belongings there?  There's no logical response to any of

16  that.

17         Your Honor, to briefly go through some of the

18  other -- so the idea that we've admitted that the Debtor's

19  home was in Connecticut, no, we haven't.  The Debtor had

20  multiple homes.  It's been established.  The Debtor had an

21  apartment at the Sherry-Netherland Hotel.  He had a home in

22  Connecticut, and he had a mansion in New Jersey.

23         And he had, I'm sure, other homes as well.  It

24  doesn't mean that any one of them is any less his property.

25  In fact, the Court has already found that he owned the

1  Connecticut home, and the Sherry-Netherland apartment is also

2  property of the estate.

3          And Your Honor, this -- I can't believe Attorney

4  Conway is making this White House analogy.  I don't think

5  time is required on that.  I'm pretty sure that Joe Biden did

6  not defraud people and use the funds to buy the White House

7  and design it from the ground up for his purposes.  It's not

8  even a remotely close analogy.

9          The case law that we cited in our papers, Your

10  Honor, stands exactly for the proposition that even though

11  nominal title to a property may be held by somebody else,

12  that the law will look through that, particularly in

13  bankruptcy, and look if you actually beneficially own and

14  control the property, and then that person is the one who has

15  actual recognizable ownership rights.  We cited the cases in

16  our papers.  They're there for the Court to review.

17          The idea that the Trustee's Section 541 and 544

18  theories somehow fail, first of all, the Court has decided

19  this in a number of other contexts.  I don't think we need to

20  go through it all again, but Attorney Conway raised an

21  argument that I was trying to follow about how it doesn't

22  work here because the members of G-Club who initially gave

23  funds to G-Club that were later used, potentially, to buy the

24  mansion that they somehow have different claims.  I don't

25  even follow that argument.

1          What I do know is that whatever claims people have

2    will be determined later.  To the extent that Attorney Conway

3    is raising an argument that the G-Club members have something

4    other than an unsecured claim against the estate, A, that's

5    premature, and, B, he cited zero case law or any other laws

6    for that proposition.

7          Our theory and what we've proven is that the

8    Debtor took funds over which he had control and bought an

9    asset, a mansion in New Jersey, that he equitably owns.  If

10   the Court agrees with that, then that property is property of

11   the estate.  Attorney Conway has cited zero law to suggest

12   that there would be any other result in that situation and

13   that the Bankruptcy Code would operate how it normally

14   operates.

15         And all of Mr. Kwok's creditors who have claims

16   against the estate could assert those claims, and as part of

17   the claims reconciliation process, will have an ability to

18   receive a distribution or not from all of these assets,

19   including assets of the mansion.  To the extent that Attorney

20   Conway wanted to argue otherwise, he could have articulated

21   that in his papers, and he didn't.  I don't know what the

22   argument would be.

23         Lastly, Your Honor, on the request for admissions,

24   we've stated what we stated in our papers.  I've submitted a

25   declaration.  I categorically disagree with Attorney Conway's

1  suggestion that we, following the conclusion of the criminal

2  trial, met and conferred about taking additional depositions.

3  Our position had always been that we didn't believe further

4  discovery was necessary following the criminal trial.

5          And the bottom line is Attorney Conway never once

6  mentioned wanting responses to his request for admissions

7  when we talked about moving for summary judgment.  He just

8  said, do you think discovery is closed?  And we said, yes.

9  We don't think there's any more discovery necessary.  That

10 was a perfectly appropriate time for Attorney Conway to raise

11 his hand and say something about his request for admissions.

12         He also could have attended the status conference,

13 which he decided simply to sit home for with no advance

14 notice whatsoever.  And finally, it's well within the Court's

15 discretion to allow the Trustee to amend his responses.

16 There's absolutely no prejudice.  If you look at the request

17 for admissions, Attorney Conway said things like -- he asked

18 for admissions on things like whether or not Taurus Fund LLC

19 is the Debtor's alter ego.  Literally, the ultimate issue in

20 the case.

21         For him to sit here and suggest that he believed

22 based on that, that we were conceding, that Taurus Fund is

23 not the Debtor's alter ego is just not credible.

24         Finally, Your Honor, there's virtually no response

25 to the issues that we raised with the declaration that

1    Attorney Conway submitted from Mr. Mohammed, zero response to

2    the fact that he was not identified in their initial

3    disclosures, and no response to the fact that he shockingly

4    doesn't attach a single document and relies entirely on

5    hearsay.

6            It's -- if you look at the balance of the scales

7    of the evidence in this case, you look at the slide deck that

8    we showed to Your Honor today of all the evidence that

9    absolutely is admissible based on the case law that we cite

10   in our motion and for the reasons I explained, if you look at

11   that and you weigh that against this declaration that says

12   there were unknown documents that support this fantastical

13   story, it's not even remotely close, Your Honor.  It's not a

14   closed call.

15           Trustee is entitled to summary judgment.  This

16   case is what summary judgment is for, to prevent the parties

17   from having to go further down the path of disputing issues

18   of fact that are simply not subject to dispute.

19           So with that, Your Honor, unless the Court has

20   questions, I have nothing further.

21           THE COURT:  I have nothing further.  Thank you.

22           Attorney Conway, anything further?

23           MR. CONWAY:  Yeah.  I want to make three

24   responsive points.  One, with respect to the 544 issue that

25   confused counsel, I hope we didn't confuse Your Honor, but it

1   is something that they put in their own papers, so I'm not

2   sure why they're confused.  You have to have a claim that's

3   identical to -- for all creditors to have standing, not just

4   a hypothetical creditor.

5          And my point was, very clearly put, I thought,

6   that these particular claims by the G-Club members who put

7   the money in to buy the mansion are different from all the

8   other claims in the estate such as, I believe they're even,

9   you know, auto accident claimants.  I don't -- you know,

10  there are lots of different categories of claimants.

11         But unless they're all the same, which is why the

12  rule was created where CEOs taking money from a corporation,

13  putting it in his own pocket to the detriment of every

14  creditor, they're all the same.  Unless you have that fact,

15  544 standing does not exist.

16         Now, the second point is with respect to the Rule

17  26 issue, the request for admissions issue.  Counsel should

18  understand -- I know he wasn't being sarcastic, but he should

19  understand that if he denies a request to admit, which they

20  didn't do here, it's not sufficient to simply say deny.  You

21  have to say we deny because and explain why you deny, which

22  allows us to then say, okay.  We better deal with something

23  about that.  The because is what's important that they deny.

24         We have to go out and do further discovery in the

25  event of a denial or request for admission.  And so

1  sandbagging by saying nothing, and then later saying, well,

2  we deny is inappropriate.

3          Third, and this was not raised before.  I raised

4  this as an afterthought because it just seems like it needs

5  to be addressed on the record.  There's a comment made in the

6  reply brief that I somehow used some other law firm to assist

7  me in our opposition, which is categorically false.  And had

8  counsel actually taken the time to call me and ask me, and I

9  would have said, that's categorically false.  That law firm

10  didn't even know that I was doing this.

11          I, as a matter of practice, will take the last

12  pleading in my file to start the next pleading.  And the last

13  pleading, as you may recall, Your Honor, that I was involved

14  with was the motion to dismiss in the civil RICO action where

15  that law firm did assist me.

16          And in this case, counsel made the allegation that

17  I somehow secretly used another law firm to assist in my

18  opposition.  I can say to you, Your Honor, that no law firm,

19  including the law firm mentioned by counsel, had any

20  knowledge I was even working on in opposition to a summary

21  judgment motion here.

22          And the fact that I'm hearing now that they're

23  raising this in other matters as if it's true is something

24  that's very distressing.  You know, it's like, you know, they

25  start saying, no.  Mr. Barnett was the chauffeur or the

1  driver for the Debtor.  They said that early on.  And then it

2  became an every document occurrence.  And now I'm sure Your

3  Honor believes Mr. Barnett somehow is a driver for the

4  Debtor, which is absolutely false.  Never driven the car for

5  the Debtor in his life.

6          But it's these little things, and I say this only

7  because they add up, Your Honor.  These little misstatements

8  in these briefs add up, and they get used in other cases as

9  if they're fact.  And I just want to make that point for the

10  record.  It's just untrue.

11          THE COURT:  Okay.  Thank you.

12          MR. BASSETT:  May I just respond to that last --

13          THE COURT:  Very briefly.

14          MR. BASSETT:  Very, very briefly.  Your Honor, as

15  the Court well knows, we've had -- this case has a long and

16  tortured history where people aren't who they say they are,

17  people aren't representing who they say they are.  We've seen

18  this time and time again, the HCHK case.  We've seen it

19  elsewhere.  It all played out in front of Judge Dooley

20  recently.

21          What the Trustee discovered was that the metadata

22  and the PDF that Attorney Conway filed said that it had been

23  prepared by attorneys at another law firm.  As always,

24  indicated, it is the facts supporting that.  I'll take

25  Attorney Conway's representation today that they had no

1   involvement.  But you know, that's what the Trustee had

2   learned from what he uncovered, and we're taking discovery

3   from the other law firm, who has volunteered to comply with

4   our 2004 request.  And we'll see where that goes.  That's

5   what 2004 discovery is for.

6           But I take exception to the fact that or to the

7   allegation that the Trustee or his counsel is intentionally

8   misleading the parties or the Court.  We absolutely have not

9   done that.  I think the record in this case is 100 percent

10  clear to the extent that there's been obstruction and other

11  games that have been played throughout this case, it's come

12  from only one direction.  I'll just leave it at that, Your

13  Honor.

14          THE COURT:  Okay.  Thank you.  I'm going to take

15  the motion for summary judgment under advisement, as I think

16  you both can understand.  There is a lot of information that

17  is in the motion, the opposition, the attachments, and what

18  we talked about today.  So I have to review that, and I will

19  rule accordingly.  I have no idea on the timing, but I will

20  do what I can, obviously, with regard to the motion.

21          So is there anything further we need to address

22  this afternoon?

23          MR. DESPINS:  Not from the Trustee's point, Your

24  Honor.  Thank you.

25          MR. CONWAY:  I think we're good from the

1    Defendant's side too, Your Honor.  I feel better.

2              THE COURT:  Okay.  Thank you.  All right.  I

3    believe then, Trustee Despins, that takes care of all the

4    matters on today's calendar.  Is that correct?

5              MR. DESPINS:  That's correct, Your Honor.

6              THE COURT:  Okay then.  Thank you then.  Thanks to

7    all of you, and Court is adjourned.

8              MR. DESPINS:  Thank you.

9              MR. CONWAY:  Thank you, Your Honor.

10         (Proceedings concluded at 3:49 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ Wendy K. Sawyer                    November 23, 2024

8    WENDY K. SAWYER, CDLT

9    Certified Court Transcriptionist

10   For Reliable