```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF CONNECTICUT
 2                        BRIDGEPORT DIVISION

 3   IN RE:                      .   Chapter 11
                                 .   Case No. 22-50073 (JAM)
 4   HO WAN KWOK, et al.,        .
                                 .   (Jointly Administered)
 5          Debtors.            .
                                 .
 6   . . . . . . . . . . . . . . .
                                 .
 7   LUC A. DESPINS, et al.,     .   Adversary Proceeding
                                 .   No. 23-05017 (JAM)
 8          Plaintiffs,          .
                                 .
 9      v.                       .
                                 .
10   TAURUS FUND, LLC, et al.,   .
                                 .
11          Defendants.          .
                                 .
12   . . . . . . . . . . . . . . .
                                 .
13   LUC A. DESPINS, CHAPTER 11  .   Adversary Proceeding
     TRUSTEE,                    .   No. 23-05023 (JAM)
14                               .
                                 .
15          Plaintiff,           .
                                 .
16      v.                       .
                                 .
17   LAMP CAPITAL LLC et al      .
                                 .
18          Defendants.          .
     . . . . . . . . . . . . . . .
19                               .
     LUC A. DESPINS, CHAPTER 11  .   Adversary Proceeding
20   TRUSTEE,                    .   No. 24-05187 (JAM)
                                 .
21          Plaintiff,           .
                                 .
22      v.                       .   Courtroom 123
                                 .   Brien McMahon Federal Building
23   WILDES & WEINBERG, P.C.     .   915 Lafayette Boulevard
                                 .   Bridgeport, Connecticut 06604
24                               .
            Defendants.          .   Tuesday, December 10, 2024
25   . . . . . . . . . . . . . . .   1:08 p.m.
```

```
 1                        TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE JULIE A. MANNING
 2                  UNITED STATES BANKRUPTCY JUDGE

 3
      Audio Operator:            Electronically recorded
 4
      Transcription Company:     Reliable
 5                               The Nemours Building
                                 1007 N. Orange Street, Suite 110
 6                               Wilmington, Delaware 19801
                                 Telephone: (302)654-8080
 7                               Email:  gmatthews@reliable-co.com

 8    Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.
 9

10

11
      APPEARANCES:
12
      For the Chapter 11
13    Trustee:                   Patrick Linsey, Esquire
                                 NEUBERT PEPE & MONTEITH, P.C.
14                               195 Church Street
                                 13th Floor
15                               New Haven, Connecticut 06510

16                               -and-

17                               Luc A. Despins, Esquire
                                 PAUL HASTINGS, LLP
18                               200 Park Avenue
                                 New York, New York 10166
19
                                 Nicholas A. Bassett, Esquire
20                               Doug Barron, Esquire
                                 2050 M Street, NW
21                               Washington, DC 20036

22    For Taurus Fund LLC,
      Taurus Fund Management,
23    and Scott Barnett:         Michael T. Conway, Esquire
                                 LAZARE POTTER GIACOVAS & MOYLE, LLP
24                               747 Third Avenue, 16th Floor
                                 Fifth Floor
25                               New York, New York 10017
```

```
 1   For the U.S. Trustee:      Holley Claiborn, Esquire
                                The Giaimo Federal Building
 2                              150 Court Street, Room 302
                                New Haven, Connecticut 06510
 3
     For G-Club International
 4   Limited and G-Club        Jeffrey Sklarz, Esquire
     Operations:               GREEN & SKLARZ LLC
 5                             One Audubon Street, Third Floor
                               Hew Haven, Connecticut 06511
 6

 7   For Hing Chi Ngok,
     Mei Guo, Hudson Diamond
 8   New York, Gypsy Mei
     Food Services, Leading
 9   Shine New York, and
     Hudson Diamond Holdings: Steven Kindseth, Esquire
10                             Zeisler & Zeisler
                               10 Middle Street, 15th Floor
11                             Bridgeport, Connecticut 06604

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                              INDEX

 2  MOTIONS:                                          PAGE

 3  Matter                    Ho Wan Kwok
    No.                   Case No. 22-50073
 4  3849:

 5          Application to Employ Peter Shaw as Barrister
            in United Kingdom Filed by Luc A. Despins on
 6          behalf of Luc A. Despins, Chapter 11 Trustee

 7

 8  Matter                    Ho Wan Kwok
    No.                   Case No. 22-50073
 9  3559:

10          Sealed Motion to Compromise Filed by Patrick
            R. Linsey on behalf of Luc A. Despins, Chapter
11          11 Trustee

12
    Matter          Despins v. Wildes & Weinberg, P.C.
13  No. 14:              Case No. 24-05187

14          Sealed Motion to Compromise Filed by Patrick
            R. Linsey on behalf of Luc A. Despins,
15          Plaintiff

16
    Matter                    Ho Wan Kwok
17  No.                   Case 22-50073
    3855:
18          Application to Employ (Compass New Jersey,
            LLC) as Real Property Broker for Sale of
19          Mahwah Mansion Filed by Luc A. Despins on
            behalf of Luc A. Despins, Chapter 11 Trustee
20

21  Transcriptionist's' Certificate

22

23

24

25
</pre>

```
 1              (Proceedings commenced at 1:08 p.m.)

 2              THE COURT:  Okay.  And so there are people in the

 3  waiting room?  Okay.  There's Trustee Despins.  Is there

 4  anyone else that's participating remotely or just Trustee

 5  Despins?

 6              All right.  So then if you could please call the

 7  calendar, please.

 8              THE CLERK:  Okay.  Case Number 22-50073, Ho Wan

 9  Kwok.

10              THE COURT:  Good afternoon.  If we could have

11  appearances for the record, please.

12              THE CLERK:  Did you want me to call --

13              THE COURT:  Oh, I'm sorry.  I cut you off.  I

14  apologize.

15              THE CLERK:  It's okay.

16              THE COURT:  I'm ahead of myself.

17              THE CLERK:  Okay.

18              THE COURT:  Go ahead.

19              THE CLERK:  Also, we have 24-5187, Despins versus

20  Wildes & Weinberg, P.C.; 23-5017, Despins versus Taurus Fund

21  LLC, et al; and 23-5023, Despins versus Lamp Capital LLC --

22  LLC, et al.

23              THE COURT:  Okay.  Thank you very much.

24              THE CLERK:  You're welcome.

25              THE COURT:  If we could have appearances for the
```

 1  record, please, starting with the Chapter 11 Trustee.

 2          MR. DESPINS:  Good afternoon, Your Honor.  Luc

 3  Despins, Chapter 11 Trustee, and thank you for allowing me to

 4  appear remotely.

 5          THE COURT:  Good afternoon, and you're welcome.

 6          MR. BASSETT:  Good afternoon, Your Honor.  Nick

 7  Bassett from Paul Hastings, counsel to the Chapter 11

 8  Trustee.  Today, I'm joined by my colleague, Douglass Barron,

 9  also from Paul Hastings.

10          THE COURT:  Good afternoon.

11          MR. LINSEY:  Good afternoon, Your Honor.  Patrick

12  Linsey of Neubert, Pepe, & Monteith for the Chapter 11

13  Trustee.

14          THE COURT:  Good afternoon.

15          MS. CLAIBORN:  Good afternoon.  Holley Claiborn

16  for the U.S. Trustee.

17          THE COURT:  Good afternoon.

18          MR. KINDSETH:  Good afternoon, Your Honor.

19  Stephen Kindseth, Zeisler & Zeisler, with respect to

20  Adversary Proceeding Number 23-50234 Mei Guo, Hudson Diamond,

21  New York, and Leading Shine, New York (phonetic).

22          THE COURT:  Good afternoon.

23          MR. CONWAY:  Good afternoon, Your Honor.  Michael

24  Conway, Lazare Potter Giacovas & Moyle.  I'm here on behalf

25  of Taurus Fund LLC.

1              THE COURT:  Good afternoon.

2              MR. SKLARZ:  Good afternoon, Your Honor.  Jeffrey

3  Sklarz for G Club Operations LLC.

4              THE COURT:  Good afternoon.  Has everyone noted

5  their appearance that wishes to note their appearance?

6              Okay.  Thank you.  Then we have several matters on

7  the calendar today, some in the main case, some in the

8  adversaries.  Trustee Despins, how would you like to proceed

9  this afternoon?

10              MR. DESPINS:  I think probably it makes sense to

11  start with the two professional retention applications and --

12  and Mr. Linsey will handle these.

13              THE COURT:  Okay.  Thank you.  Go ahead, Attorney

14  Linsey.

15              MR. LINSEY:  May I approach, Your Honor?

16              THE COURT:  Yes.  Thank you.

17              MR. LINSEY:  Thank you.  Patrick Linsey for the

18  Chapter 11 Trustee.  If it's all right with Your Honor, I'll

19  start with the application to employ Peter Shaw as barrister.

20              THE COURT:  Go right ahead.

21              MR. LINSEY:  That's ECF number 3855.  This

22  application is to retain Peter Shaw as barrister in the

23  United Kingdom.  Mr. Shaw will act under the instruction of

24  the Trustee's UK counsel, Palace Partners.  Mr. Shaw's

25  leading barrister in the United Kingdom who bears the

1  distinction King's Counsel.  As the Court is aware, the

2  Trustee is already employing a barrister in the UK by the

3  name of Paul Wright (phonetic).  Paul Wright will continue to

4  work cooperatively with Mr. Shaw.  Mr. Wright is a more

5  junior barrister.  Mr. Shaw is a more senior barrister.

6  However, they work in the same chambers, and they have

7  experience working together cooperatively.

8          The Trustee is determined that he requires a

9  King's Counsel to represent him in connection with certain

10 litigation matters that are ongoing in the United Kingdom,

11 including the administration proceedings of Hamilton Capital

12 Hamilton Capital Holding, Limited.

13          The application in the order provide that Mr.

14 Shaw will charge his ordinary hourly rates and will bill the

15 state -- the estate for out-of-pocket expenses.  Mr. Shaw

16 will submit fee applications under Section 330 in accordance

17 to the normal process.

18          There are no objections that have been filed with

19 respect to this application.  The U.S. Trustee filed a

20 statement of no objection, which is at Docket Number 3859.

21 And I'm happy to answer any questions the Court may have.

22          THE COURT:  I don't -- I do not have any questions

23 at this point in time.  Thank you.  Attorney Claiborn?

24          MS. CLAIBORN:  Your Honor, I have nothing to add.

25          THE COURT:  Okay.  Thank you.  Does anyone else

1   wish to be heard on the application to employ Peter Shaw as a

2   barrister in the United Kingdom?

3           I'm just looking at the proposed order, Attorney

4   Linsey.

5           Attorney Claiborn, you -- the Office of the United

6   States Trustee reviewed the proposed order; is that correct?

7           MS. CLAIBORN:  I did.  I can't say that I recall

8   looking at it --

9           THE COURT:  Okay.  But you didn't have --

10          MS. CLAIBORN:  -- in the last 24 hours.

11          THE COURT:  -- any comments?

12          MS. CLAIBORN:  No, I did not then.

13          THE COURT:  Okay.  Give me one moment then,

14  please.  I don't think I have any comments either, but I want

15  to make sure I don't.

16          All right.  I've reviewed the application and the

17  information submitted with the application and the proposed

18  order granting the application for the Trustee to employ

19  retain and employ Peter Shaw as barrister in the United

20  Kingdom.  I note that no one has filed any written objections

21  to the application, and there is no one participating in this

22  hearing that is objecting to the application.  The Office of

23  the United States Trustee filed a statement of no objection.

24          And I -- the reasons for the retention are set

25  forth in the application.  And the Court understands the

1   reason why the Trustee is seeking to employ the barrister in

2   the United Kingdom.  For all those reasons, the application

3   to employ is granted, and the proposed order attached to the

4   application can enter.

5         MR. LINSEY:  Thank you, Your Honor.  That brings

6   us to the Trustee's application to employ Compass New Jersey

7   LLC, which is at ECF Number 3855 in the Chapter 11 case and

8   ECF Number 154 in the Taurus Fund LLC adversary proceeding.

9   The Trustee has moved for authority to employ a broker for

10  the sale of the Mahwah Mansion.  The Trustee has selected

11  Compass New Jersey LLC, which is an affiliate of Compass,

12  Inc. to act in this capacity.  The Court will recall and is

13  familiar that Compass, Inc. acted as broker with respect to

14  the successful sale of the Debtor's former residence in

15  Greenwich, Connecticut.

16        The Mahwah Mansion was purchased for $26 million.

17  In light of the property's substantial value, it's important

18  to the Trustee to ensure that an experienced and highly

19  qualified broker is engaged.  The Trustee interviewed Compass

20  New Jersey, as well as several other potential brokers with

21  all of which had expertise in the luxury real estate market

22  and determined that Compass New Jersey was best suited to

23  market and sell the property.

24        In selecting Compass New Jersey, the Trustee

25  consulted with counsel for Taurus Fund and its codefendants,

1  as contemplated under the Court's order authorizing the

2  Trustee to undertake the sale of the mansion.  I understand

3  that such counsel, Mr. Conway, is here today.

4          Compass New Jersey and its five listing agents,

5  each of whom has submitted a declaration in support of the

6  application, are experienced and have a proven track record

7  in New Jersey selling luxury properties and in the Tri-State

8  Area selling ultra luxury properties.  Compass is the largest

9  residential real estate broker in the country by sales volume

10 for the last three runnings and is currently marketing

11 approximately 190 other properties in New Jersey.

12          The listing agents for this project together have

13 more than 50 years of experience in the Tri-State Area, and

14 each specializes in the marketing of single family homes.

15 They have sold several dozens of million-dollar properties.

16 And the aggregate number was -- it surprised me; it was a big

17 one -- together have closed more than $2 billion in

18 residential sales.

19          The broker services in this engagement will

20 include preparing for the marketing of the Mahwah Mansion,

21 which the broker's already doing, promoting the Mahwah

22 Mansion and actively marketing it, including by executing

23 that marketing campaign, advertising, public relations, and

24 undertaking digital outreach, and then managing the sale

25 process for the Mahwah Mansion under the supervision of the

1   Trustee.  As set forth in the application and the engagement

2   agreement, which is attached to the application at Exhibit B,

3   the broker will be compensated with -- with a fee of 4.5

4   percent of the sale price of the Mahwah Mansion.  And -- and

5   I'll explain a little bit further how that works.

6        The agreement provides -- the broker is to share 2

7   percent of this fee with any buyer's broker.  However, if the

8   buyer is not represented by a broker, Compass's fee will then

9   be reduced to 3 percent of the sale price.  Cost of marketing

10  the property, unless approved by the Trustee in writing, will

11  be borne by the broker.  The agreement's term runs through

12  January 2nd, 2026.

13       I do want to note one detail.  Under certain

14  limited circumstances, namely the Trustee's cancellation of

15  the engagement prior to the expiration date or the -- there

16  is one potential buyer that is carved out from the -- the

17  scope of this engagement because the Trustee had been

18  contacted by this buyer independently of the broker.

19       So if the -- if the property is to be sold to that

20  buyer or if the engagement is cancelled prior to the

21  expiration of the term, then the estate will be responsible

22  for the broker's reasonable document -- reasonable documented

23  out-of-pocket expenses.

24            After the Trustee filed this application --

25            THE COURT:  What does that mean in, insofar as

1  that somebody has to justify those expenses, right?  I mean,

2  is that going to be before the Court, or is it just going to

3  be a payment made to that broker?

4          MR. LINSEY:  Your Honor, the U.S. Trustee had the

5  same question.

6          THE COURT:  Okay.

7          MR. LINSEY:  And we engaged with the U.S. Trustee

8  after filing the retention application and have filed an

9  amended proposed order that provides that an application

10 shall be submitted to the Court to request reimbursement --

11         THE COURT:  Okay.

12         MR. LINSEY:  -- of -- of any fees.

13         THE COURT:  Thank you.

14         MR. LINSEY:  And that application is at ECF number

15 3869.

16         THE COURT:  The order?  That revised order?

17         MR. LINSEY:  The revised order.  I apologize.

18         THE COURT:  Right.  That's -- okay.

19         MR. LINSEY:  The Trustee understands that the U.S.

20 Trustee does not object to the application being granted by

21 entering the revised proposed order.

22         THE COURT:  Okay.  Thank you.  I'm holding the

23 revised proposed order because I think it was filed

24 yesterday.  So Attorney Claiborn?

25         MS. CLAIBORN:  Yes, Your Honor.  The revised order

1    contains a change to Paragraph 4 to provide that mechanism

2    for the approval of expenses, should they be requested, and

3    allows for an objection to those expenses.  And so with that

4    change, the U.S. Trustee is fine and has no objection to the

5    approval of the employment of Compass.

6              THE COURT:  Okay.  Thank you.

7              Does anyone else wish to be heard on the

8    application to employ the broker for the sale of the Mahwah

9    Mansion and related relief?

10             Okay.  Hearing nothing from anyone in the

11   Courtroom and there being no written objections to the

12   application and no one's participating in this hearing today

13   that's objecting.  I'm looking at this revised proposed

14   order.  I just need a moment, please.

15             All right.  The only thing I would ask the

16   Courtroom deputy to do with regard -- the proposed order is

17   3869.  Okay?

18             THE CLERK:  Yes.

19             THE COURT:  The only thing I would ask you to do

20   on Page 3, right before the -- right above, it is hereby

21   ordered that, it says, and at a hearing held before this

22   court, but it just doesn't have the date.  So add -- if you

23   would please add today's date.

24             THE CLERK:  Okay.

25             THE COURT:  December 10, 2024.

1            THE CLERK:  Yes.

2            THE COURT:  I've reviewed the application.  I

3  understand the reason the Trustee is seeking to employ the

4  brokers for the sale of the Mahwah Mansion.

5            As I noted, no one has filed any written objection

6  to the application.  There is no one participating in this

7  hearing today or that's in the Courtroom today that's

8  objecting to the relief sought.  The United States Trustee's

9  Office made some comments to a revised proposed order, which

10  appears at ECF Number 3869, which I have now reviewed.  And

11  that order appears to be fine to the Court.  So for all those

12  reasons, the application to employees granted in the proposed

13  order that is at 3869 can enter.

14            MR. LINSEY:  Thank you, Your Honor.

15            THE COURT:  Thank you.

16            So how -- what -- what are we proceeding with

17  next, Trustee Despins?

18            MR. DESPINS:  The -- what I refer to as the

19  sealing issue, with -- with -- you know, the background for

20  that is -- is the Wildes & Weinberg settlement agreement, but

21  really the -- that nobody is really questioning that -- that

22  settlement issues.  The sealing issue is we have reach a

23  resolution with U.S. Trustee, but Mr. Bassett will handle

24  this matter, Your Honor.

25            THE COURT:  Okay.  Thank you.  Mr. Bassett?

1                MR. BASSETT:  May I approach, Your Honor?

2                THE COURT:  Yes.  Thank you.

3                MR. BASSETT:  Thank you.

4                So Your Honor, the motion before the Court, as the

5     Trustee indicated is the Trustee's motion pursuant to Rule

6     9019 of the Federal Rules of Bankruptcy Procedure to approve

7     the Trustee's settlement with Wildes & Weinberg.  That

8     appears at ECF 3559.

9                Your Honor, this is a settlement that the Trustee

10    reached with the Wildes & Weinberg firm after extensive

11    negotiations.  The claims asserted against Wildes & Weinberg

12    are similar to those that are asserted against many, many

13    other Defendants, either Defendants who have actually, been

14    the subject of a filed adversary complaint or other parties

15    who the Trustee has tolling agreements against.

16                As the Court is aware -- I can't recall the full

17    count off the top of my head, but I think we are around 200

18    or so adversary proceedings that assert similar types of

19    claims.

20                The settlement agreement, as proposed by the

21    Trustee is submitted under seal.  The reason for that is --

22    is obvious in the Trustee's view, and also, a very important

23    reason, which is that, as I said, the Trustee has -- is in

24    the midst of litigation, either actively with other parties,

25    mediating with other parties, or may soon be in litigation

1  with other parties who are going to be the subject of, you

2  know, the exact same types of claims involving the exact same

3  types of issues.

4          And to the extent that the Trustee has to reveal

5  at this time where he is settling with certain parties, that

6  is going to have a very obvious impact on the Trustee's

7  ability to maximize value for the estate in his negotiation -

8  - negotiations with and litigation against other similarly

9  situated Defendants.

10         Now, Your Honor, there is only one objection, that

11 remains to the motion.  That is the objection filed by G Club

12 Operations.  Nobody -- no other party in the case objects.

13 The United States Trustee had filed an objection.  That

14 objection has been resolved pursuant to the terms of a

15 revised proposed order, which I will highlight for the Court.

16 The other -- other key constituents in the case, including

17 the Official Committee of Unsecured Creditors, are on board

18 and supportive of the settlement.

19         Your Honor, the -- the G Club objection relates

20 only to one aspect of the settlement, as the Trustee

21 indicated, which is the Trustee's request to have the

22 settlement submitted under seal.  The U.S. Trustee, as I

23 said, submitted an objection on similar grounds, but that

24 objection has been resolved, and that is pursuant to the

25 revised proposed order that we submitted with the Court on

1   December 5th, which appears at Docket 3865.

2           The immaterial part, Your Honor -- a new provision

3   was added to the proposed order -- this is Paragraph 5 --

4   which states that, the although the settlement agreement may

5   be filed under seal, the Trustee shall have    and I'm just

6   reading from the language:

7           The Trustee shall have until 180 days after the

8   entry of the order to file a notice, which settlement notice

9   shall refer to the docket numbers and dates of the original

10  motion on this order, attach and unredacted copy of the

11  settlement agreement, and contain certain information

12  regarding the settlement agreement, including the parties,

13  the settlement amount, and other information as set out in

14  Paragraph 5 of the revised proposed order.

15          With -- with that change, Your Honor, the U.S.

16  Trustee is supportive of the settlement.  Obviously, I will

17  let the U.S. Trustee speak for itself to the extent that I

18  have that wrong, and then therefore the only remaining

19  objection is the objection filed by G Club Operations.

20          Your Honor, the G Club Operations objection should

21  be overruled in our view.  This is true for several reasons,

22  the first of which is G Club has no legitimate pecuniary

23  interest in this settlement for -- from -- to support its

24  objection.

25          Although G Club and its counsel may sometimes wish

1    it to be the case, they have not been appointed the protector

2    of the integrity of the bankruptcy process.  There are other

3    parties to do that, in particular the U.S. Trustee.  To have

4    a valid basis to object to the settlement, G Club Operations

5    has to show that it has a pecuniary interest in the outcome

6    of that motion, for example, as a Creditor of the estate.  G

7    Club is not a Creditor of the estate.

8             I think if one takes a step back and looks at the

9    role that G Club and Attorney Sklarz are playing in this case

10   more generally, it becomes clear what likely is motivating

11   the request to have this settlement not filed under seal.  G

12   Club obviously is a Defendant in a number of other adversary

13   proceedings.  Attorney Sklarz represents a host of other

14   defendants and avoidance actions very similar to the Wildes &

15   Weinberg action.

16            And I would imagine that any of those Defendants

17   in those actions would love to understand where the Trustee

18   is settling with other Defendants because it obviously gives

19   them leverage in negotiations and allows them to -- it gives

20   them an advantage going forward, whether it's in negotiations

21   or in litigation.

22            What -- what I want to point out, which is sort of

23   ironic about the objection, too, Your Honor, is that to have

24   for -- for one to have a legitimate interest in objecting to

25   a 9019 motion as a purported Creditor, one would presumably

1   want to evaluate the settlement to determine if the estate is

2   settling at too low of a figure.  Because if one does have a

3   claim and has a pecuniary interest in the bankruptcy estate,

4   they would want to make sure that the Trustee is, in fact,

5   maximizing value.

6          What's ironic about that here, I think, and

7   exposes the true motivation of G Club, is that G Club and all

8   the other avoidance action Defendants represented by Attorney

9   Sklarz have taken the position throughout this case that the

10  Trustee's alter ego claims and that the Trustee's avoidance

11  action claims are meritless.  They've objected to them.  They

12  believe they don't comply with applicable law.  They believe

13  those claims are not viable.

14         So from their standpoint, any settlement that the

15  Trustee has reached with Wildes & Weinberg above zero should

16  be a windfall from the perspective of a Creditor of the

17  estate.  So they, by definition, don't actually need to see

18  the settlement information in order to evaluate whether to

19  object to the quantum of the settlement being reached.

20         In addition, Your Honor, the -- the arguments that

21  have been made about Section 107 and the Court's authority

22  are not to seal the agreement, those arguments likewise

23  should be overruled, in large part in the papers.  The cases

24  that G Club has cited to are cases where settlement

25  agreements were proposed to the Court to be filed under seal

1  for the purpose of protecting a party other than the

2  bankruptcy estate.  So, for example, where, the -- the

3  settling party had said, look, we're in negotiations with a

4  bunch of other litigants, or we're subject to ongoing

5  litigation with other parties, and if our settlement with the

6  Trustee in the bankruptcy case is revealed publicly, that

7  could affect our, the non-Debtors, leverage and interest in

8  those other ongoing litigations.

9         And what courts have said in that situation is

10  that is not a legitimate basis from the perspective of the

11  bankruptcy estate to seal the settlement.  Here, Your Honor,

12  there's a very clear purpose that is in the best interest of

13  the bankruptcy estate, and that is to help maximize value.

14         If the Trustee is forced to file publicly all the

15  settlements that he reaches with parties in his avoidance

16  actions, that will undoubtedly have a negative impact on his

17  ability to maximize value in all of his remaining, ongoing

18  adversary proceedings, and those that he has not yet filed.

19         So I'm happy to answer questions, happy to discuss

20  any of the issues in further detail, Your Honor, but from the

21  Trustee's perspective, sealing the settlement agreement is

22  appropriate, and we believe G Club's -- G Club's objection

23  should be overruled.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.  Attorney Claiborn, I just

1  want to ask you about -- before I hear from Attorney Sklarz

2  about the issue of the United -- the United States Trustee

3  had and -- and its resolution from your perspective, please.

4            MS. CLAIBORN:  Your Honor, the U.S. Trustee --

5            THE COURT:  What's going on with this thing?

6            MS. CLAIBORN:  -- remains opposed to the permanent

7  sealing of settlement agreements.  We are sensitive to the

8  issues in the case, and the U.S. Trustee has agreed that when

9  we reach the six-month mark following the approval of a

10 settlement agreement, that it will be made public.  And the

11 mechanism of the notice provision we put into the new order

12 does direct the parties in the right place and the right time

13 to find the information that they are currently being

14 deprived of.

15            They also -- the expectation is that going

16 forward, this mechanism will be the model on which future

17 motions will be predicated, and future motions to compromise

18 and settle with parties will include within those motions

19 notifications to parties that the sealing is only temporary

20 and lasts six months.  And after that, they can see it on the

21 docket, and they'll be alerted to how they can find it on the

22 docket.

23            So based on -- on those comments, the U.S. Trustee

24 is prepared to accept the proposed order that has been filed

25 at ECF 3865.

1          THE COURT:  I have a question about what you've

2   said.  What -- what is the -- how did you arrive at a 180

3   days as somehow being the proper time frame?  There are

4   hundreds of adversary proceedings pending, right?  So --

5          MS. CLAIBORN:  There are.  It was a consensual

6   resolution reached with the U.S. Trustee and the Chapter 11

7   Trustee.  Certainly, the U.S. Trustee's position was that you

8   cannot have sealing in perpetuity.  It's not appropriate.

9   And this was an attempt to balance the -- the issues in the

10  case and yet preserve transparency on some level for

11  Creditors and others who wish to monitor what's happening.

12         I don't think I can provide Your Honor with any

13  more of an explanation than that.

14         THE COURT:  Okay.  Thank you.

15         MR. DESPINS:  But, Your Honor, I -- I -- if I may,

16  Your Honor, I -- I could, with your permission, some -- some

17  put some color on that if you want to.

18         THE COURT:  Go right ahead.

19         MR. DESPINS:  So I had the discussion with U.S.

20  Trustee with Mr. Harrington (phonetic) and -- and basically

21  from my perspective, I would like to have permanent sealing

22  so -- but that -- that was not in the cards to the U.S.

23  Trustee.  And the thinking is that hopefully in six months,

24  we will have -- and this may be wishful thinking, but we have

25  had made a lot of progress in settling, and we're settling

1   those -- a bunch of those every two/three days or so.  So

2   each of them will have a six-month period.  So it's not

3   today, six months for everyone.  It's everyone will have a

4   rolling six months.

5         And hopefully by then, the release of information

6   will not have the same damaging effect that it would have

7   today because the others will have -- we will have settled

8   with over the next six months or so.  So that's the hope, the

9   thinking.  That's where the six months -- you know, how we

10  ended up at six months.

11        THE COURT:  Well, as you probably can understand,

12  I'm not necessarily aware, unless a motion to compromise is

13  filed, about settlements.  So I don't know how many cases

14  have settled.  This maybe is only the second, or is it the

15  first that's come forward --

16        MS. CLAIBORN:  I think this is the first one of

17  the --

18        THE COURT:  -- with a compromise?

19        MS. CLAIBORN:  -- avoidance.  Yes.

20        THE COURT:  This is the first one?

21        MS. CLAIBORN:  Of the avoidance.  There is --

22  there were --

23        MR. DESPINS:  Yeah.

24        MS. CLAIBORN:  -- earlier settlements at the

25  beginning of this case for different issues and different

1  concepts, but this is the first of the --

2         THE COURT:  The settlement of the actual --

3         MS. CLAIBORN:  -- avoidance actions.

4         THE COURT:  -- claims asserted.

5         MR. DESPINS:  That's true, Your Honor, because we

6  go through this process, right, where Judge Tancredi is

7  involved in the settlement process and issues a -- it's not a

8  ruling because he's not acting as a judge, but it issues a

9  some -- some kind of statement that he said that he believes

10 that the summons is within the range of reasonableness under

11 9019.  And then that's presented to Your Honor.

12        You're right; it's the first one.  There are, I

13 would say, a number of others, but not a majority to -- just

14 to give you a sense -- not a majority of the charges that are

15 pending.  And a lot of those are settlements of actions that

16 we've never brought, like we -- that we entered into a

17 (inaudible) agreement with the counterparty, and we're

18 settling with them before an action is brought.

19        THE COURT:  Okay.  I understand.

20        All right.  Attorney Sklarz, do you wish to be

21 heard?

22        MR. SKLARZ:  Thank you, Your Honor.  The -- the

23 First Amendment guarantees public access to -- to the Court's

24 docket and judicial records.  The Second Circuit case of

25 Mirlis versus Greer is binding on this.  We've cited in our

1   briefs as well as Local Rule 5.  To seal any judicial

2   document, which a 9019 motion is, the Court must make very

3   particular findings in accordance with LOCAL RULE 5 and,

4   Bankruptcy Code Section 107.

5         With respect to standing -- that is an argument

6   raised by Attorney Bassett -- that is a red herring.  The

7   public has an absolute right to court -- court records

8   subject to the -- the Court's sealing powers under 107.

9   There is absolutely no case that is cited in the briefing

10  that permits sealing of settlement agreements.

11        The one case that allegedly supports the Trustee's

12  position In Re Farmland is not a 9019 case.  It had to do

13  with a sale motion.  Other circuits including the -- in

14  addition to the Second Circuit and Mirlis, have held that the

15  public has an absolute right to look at court documents in

16  Doe versus Public Citizen, which is a Fourth Circuit case,

17  749 F.3d 246, and the Seventh Circuit Bond versus Utreras,

18  U-T --

19        THE COURT:  You've got to go back.  Okay?

20        MR. SKLARZ:  I'm sorry.

21        THE COURT:  Because I can't keep up with that.

22  You have to just go a little more slowly on that.

23        MR. SKLARZ:  I apologize, Your Honor.

24        THE COURT:  That's okay.  Okay.  Doe versus what?

25        MR. SKLARZ:  Doe versus Public Citizen, 749 F.3d

1   246, and that's the Fourth Circuit, and Bond versus Utreras,

2   U-T-R-E-R-A-S, 585 F.3d 1061.

3          Again, this is not controversial.  I think the --

4   in their briefing, the Trustee says, yes, you typically do

5   get a right to look at court records.  They're saying they

6   are super special -- they have a super special case.  The

7   Michael Goldberg case was a big Ponzi scheme case, hundreds

8   of adversary proceedings.  None of those were -- none of

9   those settlement motions were filed under seal.  That's

10  pending in front of this case.

11         This is a highly, highly unusual request.  We've

12  cited a number of cases from within the Second Circuit as to

13  why this is not allowed.  It doesn't meet the requirements of

14  107.  This -- there is not a special rule for sealing

15  settlement agreements because the Trustee wants to settle --

16  seal a settlement agreement.

17         The Local Rule -- Local Rule 5 requires again --

18  this is a gatekeeping function of the -- of the Court to

19  afford the effect of the First Amendment.  Any such order

20  sealing a judicial document shall include particularized

21  findings demonstrating that the sealing is supported by clear

22  and compelling reasons and is narrowly tailored.

23         So there was no evidence put on to meet Rule 5.

24  They -- essentially, the argument is we don't want to -- we

25  think G Club or any other litigation counterparty could have

1    a litigation advantage if they know this.  Well, that -- that

2    issue has been endlessly litigated in the cases we cite in

3    the brief, and every court to address this issue has said

4    that is not a reason to seal a document.

5            Section 107 says the reasons for sealing a

6    document.  And the only -- and the only reason to seal a

7    document is commercial -- it -- it's -- it's either

8    disparaging.  And that's why in Mirlis, the -- the Second

9    Circuit sealed -- or -- or denied a Gadfly's efforts to

10   obtain video depositions related to a sex abuse case.  So

11   that was appropriate for sealing.

12           But the -- but that's an entirely different

13   situation.  The only possible exception under 107 would be

14   comer commercially sensitive information.  And -- and the

15   cases, as we cite in our brief and as the Trustee concedes in

16   his brief, generally say, settlement information is not

17   commercially sensitive.

18           The Hempel (phonetic) -- another case cited by the

19   Trustee, Hempel, which is cite -- which is cited on Page 12

20   of the reply brief indicates that the Court should follow the

21   Hempel standard.  Well, Hempel denied sealing.  The court

22   held, in this case, the Trustee has not demonstrated that

23   filing the settlement agreement falls within the articulated

24   exceptions to the Bankruptcy Code General rules and denied

25   and denied the motion.

1          There's just no legal support for the Trustee's

2    position.  There's no factual support for the Trustee's

3    position.  This is just a settlement in a bankruptcy case

4    like happens every day in every bankruptcy quarter around the

5    country from small cases to mega cases.  And you -- you just

6    don't see Trustees seeking to do this because it's not

7    allowed.

8          Again, for -- we first look to the First

9    Amendment.  We then look to Rule -- I'm sorry -- Code Set 11

10   U.S.C. 107.  We then look to Mirlis, which is a binding

11   Second Circuit authority, and then we look to our Local Rule

12   5.  And none of the standards have been met.

13         The -- the fact that -- any -- any citizen could

14   bring this bring -- this motion.  Anyone -- I could bring

15   this as Jeffrey Sklarz on my own.  I -- citizens have a

16   public right to see the judicial docket, and that's -- and

17   that's what G Club is -- is standing up for here.

18         And that -- that's my presentation, Your Honor.

19   If you have any questions, happy to answer.

20         THE COURT:  Thank you.  No, I do not --

21         MR. SKLARZ:  Thank you, Your Honor.

22         THE COURT:  -- have any questions.  Thank you.

23   Any reply, Attorney Bassett?

24         MR. BASSETT:  Yes, Your Honor, just briefly.  So,

25   first of all, on the standing point, I -- I would submit that

1  G Club absolutely lacks standing to assert the objection that

2  it's asserting.  G Club is, according to Attorney Sklarz, I

3  guess, trying to advance the public interest generally.  G

4  Club does not have standing to do that.

5          G Club has standing in this case to advance its

6  own interests, of which it has none.  It has no interest in

7  the subject matter underlying the motion before the Court for

8  the reasons I articulated.  It's not a Creditor.  Its

9  interest could not possibly be affected by whether or not the

10 settlement that the Trustee has reached is fair and

11 reasonable in terms of the level at which the Trustee has

12 agreed to settle.

13          The only plausible explanation, which Attorney

14 Sklarz, of course, did not address, but it is so obvious as

15 to why they want to see the settlement agreement, is because

16 they want to use it to their advantage.  Attorney Sklarz is

17 the, by far, I think, the -- the one attorney who has the

18 most engagements in this case, including with avoidance

19 action Defendants.

20          All those Defendants would love nothing more than

21 to -- than to disrupt the Trustee's litigation process and

22 its attempt to negotiate settlements.  And by understanding

23 where the Trustee is settling agreements and using that as a

24 benchmark and using that as leverage in their negotiations.

25          That's what's going on here.  There's no attempt

1  to just advance the public interest generally and ensure the

2  integrity of the process.  The U.S. Trustee has weighed in,

3  and we have resolved the U.S. Trustee's objection.

4         As to the -- as to the merits of the request for

5  sealing, Your Honor, Attorney Sklarz references the First

6  Amendment.  Look, there's no dispute.  The case law is clear.

7  The Court does have discretion to authorize the sealing of

8  settlement agreements; it has discretion to authorize the

9  sealing of proceedings before this Court.  It has that

10  ability when necessary to protect the interests of the

11  Chapter 11 estate.

12         We cited cases, Your Honor, where this has

13  happened.  It's not uncommon.  We cited the 5050 Offshore's

14  case, not a 9019 case, but a case where the hearing was

15  sealed because the discussion was about a motion, I believe,

16  to retain litigation counsel, and the subject matter of that

17  hearing would have revealed issues related to the strategy of

18  the litigation to potential defendants, which would obviously

19  prejudice the estate.  Therefore, the Court authorized

20  sealing.

21         Your Honor, there are numerous examples of courts

22  sealing settlement agreements specifically.  We've cited

23  these -- and -- and this has happened in cases that I've been

24  involved in, that the Trustee has been involved in.  We cite

25  these in Footnote 9 of our reply brief, Your Honor, the

1    Adelphia case, the Cap Mart (phonetic) case, the Lyondell

2    case (phonetic), Footnote 10, GT Advanced Technologies case.

3            Your Honor, it is common for courts to impose

4    whole processes, whether it's mediation or avoidance action

5    procedures or otherwise, that is part of that process involve

6    a mechanism for the Trustee, or whoever is a litigation

7    Trustee, whoever it might be, to file settlements under seal

8    in order to protect the integrity of that process and to

9    maximize the value for the estate that can be generated as

10   part of those litigation processes.

11           The other thing I would point out, Your Honor, in

12   this case is, you know, what -- what one should look at and

13   consider and what the Court should consider in determining

14   whether or not is appropriate to seal the 9019 motion is

15   whether there is sufficient indicia of the reasonableness of

16   the settlement and whether there are things that people who

17   might maybe evaluating the settlement can point to determine

18   whether it has -- whether -- whether it's reasonable.

19           And in that regard, Your Honor, I think it is

20   highly significant that the Court has put in place the

21   mediation process overseen by Judge Tancredi.  And pursuant

22   to that process, Judge Tancredi has reviewed this settlement,

23   just like he'll review every other settlements, and determine

24   or not that the settlement is reasonable in his view in the

25   best interest of the estate.  He has done that here.  The

1   U.S. Trustee has seen the settlement and knows what the

2   settlement amount is, as has the committee.

3           Your Honor, those are the parties who have a

4   vested interest in acting out for the overall constituents of

5   this bankruptcy case, the committee, the U.S. Trustee, not G

6   Club.  Both those parties are fine with the proposal before

7   the Court as modified by the revised proposed order and have

8   no other objection to the settlement.  Your Honor, for all

9   those reasons, we think it is critical for this motion to be

10  granted, including the request to have the agreement kept

11  under seal.  Thank you.

12          THE COURT:  Thank you.  Any response, Attorney

13  Sklarz?

14          MR. SKLARZ:  The cases cited by the Trustee are

15  located on Page 7 of their brief Footnote 9 and 10, and

16  they're all non-substantive orders.  They don't have any law.

17  There's no support.  I'm not sure how they amount to

18  anything.  The 50-Off case says -- and this is -- I'm reading

19  -- this is 213 B.R. 646 on page 545:

20          Similarly, the Court's order sealing the record

21  does not bar the movements from seeking anything they may

22  legitimately obtain via discovery.  In other words, there's

23  another mechanism to get the information they're seeking.

24  There is no such -- accessing the Court document -- a docket

25  cannot occur by discovery.  It occurs through PACER.

1          G Club is a member of the public and has a right

2    to see the -- see the docket.  Anyone -- anyone can bring a

3    motion like -- like this or oppose the sealing of the -- of -

4    - of a document.  This goes beyond a specific issue.  And,

5    again, Rule 5 applies, Section 107 applies, Mirlis applies,

6    and the First Amendment applies, and the Trustee has not

7    complied with any of them.  Thank you.

8          THE COURT:  Okay.  Thank you.  All right.  With

9    regard to the motion -- actually, motions, right?  I mean,

10   one was filed in the main case, and one was filed in the

11   adversary.  So in the main case, it's 3559.  And in the

12   adversary, it's Adversary 2405187.  And it's ECF 14.  The

13   Court will take those motions under advisement.

14         MR. SKLARZ:  Your Honor, I don't have any matters

15   before the Court.  May I be excused?

16         THE COURT:  Yes.  Thank you.

17         MR. SKLARZ:  Thank you, Your Honor.

18         THE COURT:  So we are now proceeding to the motion

19   for summary judgment?  Is that the next matter, Trustee

20   Despins?

21         MR. DESPINS:  That's correct.  Mr. Bassett will

22   handle that.  Thank you, Your Honor.

23         THE COURT:  Okay.  Thank you.

24         MR. BASSETT:  Your Honor, can I approach?

25         THE COURT:  Yes, certainly.

1         MR. BASSETT:  Your Honor, again, for the record,

2   Nick Bassett from Paul Hastings on behalf of the Chapter 11

3   Trustee.

4         So, Your Honor, we're here today on the Trustee's

5   motion for summary judgment, that two shell companies

6   nominally owned by the Debtor's daughter -- that's Hudson

7   Diamond New York, LLC, which I'll refer to generally as

8   Hudson Diamond or maybe Hudson Diamond New York, and Leading

9   Shine New York Limited, which I will likely refer to as

10  Leading Shine, are alter egos of the Debtor, and each of

11  those entities and its assets are equitably owned by the

12  Debtor.

13        Now, Your Honor, as I've often said at hearings

14  like this one before the Court, it seems like we've been here

15  before.  And the reason I said that is because on numerous

16  occasions in this case, we have re-argued issues that are

17  either the same or similar to issues that we've already

18  argued in the past in contested matters and adversary

19  proceedings.

20        I'm going to make that same comment again today,

21  Your Honor.  But I will tell you that this time I really mean

22  it because here we are dealing with a situation where the

23  very same Defendants in this very same adversary proceeding

24  have already raised, and the Court has rejected, the very

25  same arguments they are making today.

1          Each of the moving Defendants filed either a

2    motion to dismiss or a motion to vacate a default judgment,

3    raising arguments similar to the motion to dismiss, in this

4    adversary proceeding.

5          Those motions raise the exact same arguments,

6    namely and specifically, the argument that the Trustee lacks

7    standing to pursue his alter ego and beneficial ownership

8    claims under Section 544 of the bankruptcy code or otherwise.

9    And the Court, after holding a hearing, overruled those

10   arguments.

11         In addition, the Court has already decided these

12   same issues against Defendant Mei Guo in another adversary

13   proceeding on I think two or maybe three occasions in that

14   adversary proceeding.  That's in the HK USA adversary

15   proceeding where the Court denied Mei Guo's motion to

16   dismiss, and then granted summary judgment in favor of the

17   Trustee's subsequently.

18         So, today, Your Honor, Defendants are here taking

19   what is at least their fourth bite at the apple.  And that's

20   not to mention that the Court has, of course, decided these

21   same issues, including the Section 544 standing issue and a

22   host of other adversary proceedings involving other

23   Defendants while the Defendants in this adversary proceeding

24   and their counsel have been highly involved in the case

25   during that entire time.

1          So, Your Honor, I -- at some point -- I mean,

2     we'll -- we'll keep coming back here; we'll keep having these

3     arguments, but at some point, enough is enough.  The

4     Defendants have tried.  They've made the best arguments they

5     think they can make, unless they're conceding today that they

6     didn't do the job they wanted to do previously, and they

7     failed.  And -- and the Court should reaffirm its prior

8     rulings, and -- and we should all move on.

9          Now, Your Honor -- and I -- and I'll re-argue the

10    issues.  I'm happy to do it.  I'll respond to specific

11    statements that the Defendants have made in their papers.

12    But I felt compelled to say that at the outset.

13         Now, on a motion for summary judgment, which is

14    why we're here, Your Honor, you would think that the thrust

15    of such a motion, instead of re-arguing legal issues that

16    have already been decided by the Court, you would think that

17    the Defendants would contend that the Trustee has not

18    satisfied the Rule 56 standard, that the Trustee has failed

19    to demonstrate that there is no genuine dispute of material

20    fact on -- on the claims that he has asserted, namely his

21    alter ego and his beneficial ownership claims.

22         Notably, Your Honor, the Defendants here do not

23    make that argument at all.  They paid lip service to it at

24    one point, but they don't dispute virtually any of the facts

25    set forth in the Trustee's statement of undisputed facts.

1   And if you look at their counter statement of facts in their

2   brief at Page 3, it is two sentences long.  There was

3   legitimately no dispute of fact with a few minor evidentiary

4   objections which I can address at the appropriate time.  But

5   there is virtually no dispute whatsoever about the facts

6   underlying the Trustee's claims.

7          And despite the fact that those -- that the record

8   is -- is largely uncontested, I do want to briefly start

9   there with walking the Court through the factual record

10  submitted by the Trustee that supports his request for

11  summary judgment under Rule 56.  And then after that, I will

12  address some of the moving Defendant's recycled legal

13  arguments.

14         What the evidence shows, Your Honor -- and this is

15  all thoroughly set forth in the Trustee's Statement of

16  Undisputed Facts, and the numerous exhibits cited in that

17  statement -- is that these Defendants, Hudson Diamond New

18  York and Leading Shine, although they are nominally owned by

19  the Debtor's daughter, just like many other shell companies

20  throughout this case including HK USA, another shell company

21  owned by the Debtor's daughter, these entities are really

22  shell companies owned and controlled at all relevant times

23  and acting at the direction of the Debtor.

24         I'll briefly run through some of the salient facts

25  starting with Hudson Diamond.  And, Your Honor, really the

1   record shows from beginning to end, from formation of the

2   company through whatever it has done in its existence, every

3   step of the way, it has been controlled by the Debtor or his

4   agents, and then used to support the Debtor's personal

5   interests.

6          Hudson Diamond was formed on May 30th, 2018.  When

7   it was formed, it was formed with the assistance of Hodgson

8   Russ, which is the Debtor's personal counsel.  The evidence

9   in the record shows that Hodgson Russ took direction from

10  Yvette Wang, the Debtor's agent and his criminal co-

11  conspirator.

12         Also notable, Your Honor, is that actually at the

13  inception of -- of Hudson Diamonds forming in   at the

14  conception of its formation on May 30th, 2018, its sole

15  member at that time was actually a different entity.  Today,

16  it is Hudson Diamond Holdings, LLC.  In 2018, the sole member

17  was Hudson Diamond Holding Inc., a BVI entity.  That BVI

18  entity was owned solely by the Debtor's son, Mileson or Chang

19  Guo.  That's also in the Statement of Undisputed Facts.

20         In January 2019, Hudson Diamond and the BVI

21  transferred its membership interest in Hudson Diamond New

22  York to Hudson Diamond Holdings, LLC, which is the current

23  holding company owned by the Debtor's daughter, Mei Guo.  So

24  original structure, Hudson Diamond New York, Holding Company,

25  Mileson.  Current structure after 2019, Hudson Diamond New

1  York, Holding Company, Mei Guo.  Went from the son to the

2  daughter.

3          Again Hodgson Russ, the Debtor's personal counsel,

4  assisted with the transfer of the interest in Hudson Diamond

5  New York from one entity to the other in 2019.  And, Your

6  Honor, in both internal Hodgson Russ emails and in emails

7  with Yvette Wang, the Debtor in those emails is referred to

8  as the "Principal."

9          After its formation, what did Hudson Diamond New

10  York do?  Well, it set up shop at 162 East 64th Street in

11  Manhattan.  The Debtor's well-known address for himself,

12  which he listed on his petition, the address used by his

13  Attorney Aaron Mitchell, the address used by other entities

14  that this Court has found to be the Debtor's alter egos,

15  Greenwich Land, Golden Spring, and many others.

16          Hudson Diamond was managed by the Debtor's agents,

17  specifically Yvette Wang, Max Kradner -- Krasner (phonetic),

18  and Daniel Podaski (phonetic), all of whom the Court is very

19  familiar with, at various times served as officers and/or

20  account signatories for Hudson Diamond.  The evidence in the

21  record, which we've cited to in our Statement of Undisputed

22  Facts, shows that these people, that Ms. Wang, Mr. Krasner,

23  and Mr. Podaski, refer to the Debtor as the "Boss" or the

24  "Principal."

25          What, if anything, did Hudson Diamond do?  Well,

1  one thing it did is, first of all, Yvette Wang opened bank

2  accounts on behalf of Hudson Diamond, and then used those

3  accounts to pursue the debtor's interests, in particular, by

4  purchasing real estate for the debtor.  Not just any real

5  estate, but the Taconic Road property which this Court has

6  already found to be the Debtor's personal home, and which the

7  Trustee, now owns and I believe has sold.

8          Yvette Wang signed the agreement for the purchase

9  of that property with the real estate broker on behalf of

10  Hudson Diamond.  That agreement, part of the record, says

11  Miles Guo in a stamp at the corner.

12          What else did Hudson Diamond do, Your Honor?

13  Hudson Diamond was -- it received funding from other Debtor

14  controlled shell companies, including ACA Capital Group and

15  Saraca.  It also transferred funds that it received to other

16  -- to either the Debtor's family members or to other Debtor-

17  controlled entities.

18          For example, in 2019, $600,000 transferred to the

19  Debtor's wife.  Also in 2019, a $1,000,000 transferred to Mei

20  Guo.  During an approximately 14-month period it transferred

21  more than $16 million to Golden Spring.  During the second

22  half of 2021, it sent more than $17 million to Lamp Capital.

23  And during an 11-month period from 2019 through 2020, it

24  transferred more than $4.5 million to Greenwich Land.

25          Your Honor, all of the evidence in the record

1   demonstrates that Hudson Diamond existed for no other purpose

2   than to be managed and controlled by the Debtors and his --

3   by the Debtor and his agents and to serve the Debtor's

4   purposes, including by funding his interests.

5           Your Honor, I want to stress again that there is

6   no contrary evidence whatsoever in in the record.  And

7   perhaps that's not surprising because the Defendants, in

8   particular Mei Guo, who purports to be the ultimate owner of

9   these entities, has no ability to put on that evidence.  And

10  this is where her Fifth Amendment invocation comes in.

11          Now, Defendants take issue with the Court's

12  ability to consider that, but again, we're not asking the

13  Court -- this is the same as in the Greenwich Land adversary

14  proceeding.  We're not asking the Court to draw a negative

15  inference;  we're simply pointing out that when a defendant

16  when a litigant has taken the Fifth Amendment in response to

17  an issue, they're not going to be capable of reversing course

18  and offering testimony to support their position to the

19  contrary.

20          That's the point, Your Honor.  She's asserted --

21  she's taken the Fifth Amendment.  She couldn't present

22  evidence to the contrary, but it doesn't matter because she

23  hasn't.  The record before the Court is the Trustee's

24  evidence, and no evidence from the other side.

25          Briefly on Leading Shine, Your Honor.  Leading

1 | Shine's story is very similar to that of Hudson Diamond and
2 | so many of the other shell companies of the Debtor.  Again,
3 | from it's from inception all the way through.  Leading Shine
4 | was established on January 2nd, 2019.  The Debtor's
5 | accounting firm this time, Janover LLC, assisted with the
6 | formation of Leading Shine, taking direction from the
7 | Debtor's agent, Max Krasner.

8 | Again, like with Hudson Diamond, Yvette Wang
9 | played an integral role.  She, as set forth in our Statement
10 | of Undisputed Facts, opened bank accounts on behalf of
11 | Leading Shine, and she is listed as the owner, in fact, of
12 | Leading Shine's bank accounts.

13 | Leading Shine was funded by Debtor-controlled
14 | entities just like Hudson Diamond.  For example, it received
15 | $6 million from ACA Capital, $350,000 from Golden Spring,
16 | $900,000 from Saraca Media Group.  What did it do with those
17 | funds?  Of course, it again engaged in facilitating transfers
18 | to other Debtor-controlled entities and to his relatives.

19 | On July 3rd, 2019, Leading Shine transferred
20 | $57,000 to the Debtor's son.  In another one-year period, it
21 | transferred more than $5.4 million to Golden Spring.  In
22 | August and September of 2020 Leading Shine transferred a
23 | total of $450,000 to Greenwich Land.

24 | Your Honor, that's -- that's only some of the
25 | evidence that we have set forth in our Statement of

1  Undisputed Facts because I'm trying to be somewhat concise in

2  my remarks.  The last point I want to make, Your Honor, is if

3  the Court needed any other evidence of the fact that

4  Defendant Mei Guo does not actually serve as the beneficial

5  owner and controller of Leading Shine, it need look no

6  further than what happened when Leading Shine, as the Court

7  will recall, I think it was in January of 2024, filed a

8  motion to vacate the default in this case.

9          And the -- and Leading Shine's counsel had told

10  the Court at that time that the reason Leading Shine had been

11  unable to file a timely answer was because his client, Ms.

12  Guo, could not determine whether or not she owned Leading

13  Shine.  And the Court astutely recognized in its order in

14  response to that motion that one cannot have it both ways.

15  One cannot take the position that they beneficially own and

16  control an entity when they're claiming that they have no

17  idea if they do or not.  And that's where we are, Your Honor.

18          So I think there should be no dispute based on the

19  record before the Court that there is no genuine issue of

20  material fact as to the substance of the Trustee's claims.  I

21  don't -- I don't think the Defendants have made any

22  legitimate argument to the contrary.

23          So what we're left with are the recycled legal

24  arguments that this Court has heard time and time again.  The

25  argument that they put at the forefront of their papers and

1   spend approximately seven pages on is the argument that the

2   Trustee lacks standing under Section 544 of the Bankruptcy

3   Code to pursue these claims, and they say that if the Trustee

4   lacks standing under Section 544 of the Bankruptcy Code, then

5   the Trustee could only pursue the claims under Section 541,

6   and if the Trustee pursues the claims under Section 541, the

7   in pari delicto and Wagoner Rule defenses would bar the

8   Trustee's claims.

9           So again, just to level set, at the outset, the

10  Court has already decided this issue three times in this

11  adversary proceeding.  It's decided the issue numerous times

12  in other adversary proceedings including HK USA, Greenwich

13  Land, and the HCHK adversary proceeding.

14          In deciding the issue in those adversary

15  proceedings, the Court recognized that Section 544(a) of the

16  Bankruptcy Code -- and now I'm actually quoting from the

17  Court's decision in the motion to dismiss in this case -- it

18  says, while Section 544(a) provide the motion to dismiss

19  order, Section 544(a) provides a Bankruptcy Trustee with

20  general powers to assert certain rights and powers of certain

21  classes of hypothetical creditors.

22          Your Honor then went on to say, the limiting

23  principle of Section 544(a) is that the rights and powers

24  must be those the creditors at large could bring, rather than

25  the particularized claims belonging to particular creditors.

1          The Court then further recognized that alter ego

2    and beneficial ownership claims are, in fact, generalized

3    claims that could be brought by any hypothetical creditor, in

4    contexts such as, for example, post-judgment proceedings

5    where a hypothetical creditor seeks assets upon which to

6    execute its judgment.

7          Based on that reasoning, with citation to cases

8    such as Judge Tancredi's decision in the Titan Real Estate

9    Ventures case, and to the Second Circuit decision in Saint

10   Paul Fire and Marine v. PepsiCo, the Court appropriately

11   concluded that the Trustee has standing to pursue his claims

12   under Section 544(a) of the Bankruptcy Code.

13         So in their opposition brief, despite having the

14   opportunity to have made these arguments previously, and

15   despite the Court having overruled them in the manner that I

16   just described, the Defendants argue forcefully across seven

17   pages that the Trustee's veil-piercing claims, I should say

18   reverse veil-piercing claims, cannot be pursued under Section

19   544(a), because in Defendants' view those claims are more

20   appropriately considered property of the estate under Section

21   544(a) of the Bankruptcy Code.  They highlight that and bold

22   it numerous times in their seven pages.

23         What the Defendants failed to recognize, Your

24   Honor, is that even if they are correct in that assertion,

25   they still lose.  Because the reason, if it's true, that

1 | these claims are property of the estate under Section 541(a),
2 | the reason the claims would be considered property of the
3 | estate under Section 541(a) is because they are general
4 | claims of creditors that inure to the benefit of all the
5 | Debtor's creditors equally.
6 |       And in this regard, Your Honor, the Second
7 | Circuit's decision in August of 2024, in the In Re Nordlicht
8 | case, which we cite in our papers, is particularly
9 | instructive.
10 |       Now, that case involves circumstances that are
11 | remarkably similar to ours.  There was an individual Chapter
12 | 11 Debtor who was accused of using shell cubbies to hide his
13 | assets to keep him from -- keep those assets from creditors.
14 | And I saw this in the decision, I just wanted to quote it
15 | because it's almost eerie in some ways.
16 |       This is the way the claims were described, or the
17 | Debtor scheme that underlie the claims was described.  Said,
18 | quote, to allow him to claim poverty to creditors while
19 | controlling substantial assets, the Debtor has adopted a
20 | specific modus operandi in his financial arrangements.
21 | First, the Debtor organizes a shell company with his wife,
22 | who has nominal ownership and control.
23 |       Second, notwithstanding his ownership,
24 | notwithstanding wife's ownership and name, the Debtor, in
25 | fact, controls and dominates the shell company, directing or

1   participating in substantially all financial decisions for

2   it.

3           Third, any funds or interests in the shell company

4   are extracted to accounts held by the Debtor's wife or

5   another closely affiliated party such as a family-owned LLC

6   or trust.  By conducting his affairs in this way, the Debtor

7   enjoys all the benefits of owning very significant assets

8   while telling creditors they are not his.  Sounds like we're

9   describing Mr. Kwok.

10          Now, what happened in that case, Your Honor, is a

11  creditor of the Debtor had pursued a reverse veil-piercing

12  claim against some of these alter ego entities in state

13  court.

14          And then after the Debtor filed for bankruptcy and

15  a Chapter 11 Trustee was appointed, the Trustee said, hey,

16  that claim that was asserted in state court is actually a

17  claim of the estate that I have the sole ability to prosecute

18  and settle.  And the Trustee, in fact, entered into a

19  settlement to settle that claim with the alter ego shell

20  companies and other parties involved.

21          So the issue for the Bankruptcy Court, which was

22  the Southern District of New York, Judge Drain, at the

23  District Court in the Second Circuit, and they all agreed,

24  was whether or not that claim, that reverse veil-piercing

25  claim, was, in fact, a claim that the Trustee had the

1  exclusive authority to settle.

2         The Court found that it was, and the basis for

3  that decision was that the claims according to the Second

4  Circuit were, quote, general claims of creditors, and not

5  specific claims of particular creditors.  The claims as

6  observed by the Second Circuit are capable of increasing the

7  basket of assets that could be used to satisfy any and all

8  liabilities owed by the Debtor.

9         And on that basis, the Court found that under

10  Section 541, those claims, which are general claims of

11  creditors, not claims that the Debtor himself would have been

12  able to assert pre-petition, but claims of creditors, those

13  claims become property of the estate under Section 541(a).

14         And what's important about that analysis, Your

15  Honor, is that because those are creditor claims that become

16  property of the estate, they are not subject to the Wagoner

17  Rule or to the in pari delicto defense.  In fact, Your Honor

18  already recognized that on two occasions, both in the UK --

19  the HK USA motion to dismiss decision, and in the motion to

20  dismiss decision in this case.

21         In the HK USA decision page 15 footnote 6, the

22  Court was observing how prior to Nordlicht, there was --

23  there were case law in other circuits, including specifically

24  the Third Circuit, that went through this exact same

25  analysis, where the Third Circuit had found that a reverse

1  veil-piercing claim was property of the estate because it was

2  a general claim that could be asserted by creditors.

3       And what the Court observed is if we were in the

4  Second Circuit, there would be, quote, a different basis for

5  largely the same result in the Second Circuit.  And the point

6  there was that you'd get to the same place.  You still would

7  not have a Wagoner defense or an in pari delicto defense.

8  It's just a different way of getting there, it's either

9  through that 541 route that I just described, or through

10 Section 544(a).  Either way, because we're talking about

11 creditor claims, those defenses do not apply.

12       The Court recognized the same thing in the motion

13 to dismiss decision in this case.  I am missing the page

14 reference, but it is a -- what the Court said was, again,

15 citing to the Third Circuit authority that I just mentioned,

16 that, quote, in the Third Circuit, bankruptcy trustees can

17 bring alter ego and beneficial ownership claims under Section

18 541 as generalized claims of creditors, not as claims of the

19 Debtor, which would also avoid the Wagoner doctrine.

20       So, Your Honor, even if the Defendants are correct

21 that these are 541 claims, they're still not subject to the

22 defenses that they seek to assert for the reasons Your Honor

23 already recognized.  And Your Honor's decision is consistent

24 with another case, In Re Harmon.  It's 529 B.R. 352.  This is

25 Bankruptcy Northern District of Georgia 2015, that is

1  squarely on point.

2         The Court, in that case, was dealing with alter

3  ego claims that could have been brought by the Debtor's

4  creditors outside of bankruptcy, but inside of bankruptcy

5  could only be brought by the Trustee, because it found that

6  they were part -- they were property of the standard of

7  Section 541.

8         And what the Court said was, quote, the defense of

9  in pari delicto is not applicable here.  As discussed above,

10  binding Eleventh Circuit precedent informs that the Trustee

11  has authority under Section 541 to bring alter ego claims,

12  which could be brought by the Debtor's creditors.

13         The Court went on to say because the Trustee

14  stands in the shoes of creditors whose claims are unable to

15  proceed because of the bankruptcy, it would be inequitable to

16  prevent creditors from asserting their claims due to the

17  existence of the bankruptcy while simultaneously imputing the

18  Debtor's alleged conduct on the Trustee.  The doctrine of in

19  pari delicto would not apply to the Debtor's creditors,

20  therefore it should not apply to the Trustee.

21         So Your Honor, the Defendants lose either way.

22  They lose if these are claims that are brought under Section

23  544(a), they lose if their claims are brought under Section

24  541.  They also lose for a third reason, which is that even

25  if there were claims under Section 541, to which the Wagoner

1   Rule and the in pari delicto doctrine might apply, then they

2   would lose because the insider exception to the in pari

3   delicto and Wagoner Rule would apply in this situation as it

4   has in past situations in the same Chapter 11 case.

5           Your Honor, I've been speaking for a while, so I'm

6   going to go through some of the other arguments more briefly.

7   Again, I think the Section 544 argument was the focal point

8   of their papers, and I wanted to make sure I addressed that

9   at some length.

10          They also argue, Your Honor, that the Trustee's

11  alter ego claim cannot be asserted and must fail because

12  alter ego under New York law is a remedy and not a

13  substantive claim.  Again, I'd point the Court to the

14  Nordlicht case.  That argument was made there.  The Second

15  Circuit's response to that was, quote, the contention that

16  alter ego theories of liability are not claims under New York

17  State law at all, but remedies is baseless.  Under New York

18  law, one can assert alter ego as a claim, as the Trustee has

19  done here.

20          Your Honor, they also argue that the Trustee's

21  claims, for beneficial ownership of assets fail, because

22  under the nominee doctrine, they say the Trustee has to

23  identify each asset with specificity and explain his

24  ownership over that asset.  It's an ironic argument to make

25  in a scenario where the only assets that have been identified

1  that these entities have are bank accounts, which the Trustee

2  has shown extensive evidence of the Debtor's ownership and

3  control over.

4         So, I don't really understand where that argument

5  is coming from, but I think it can be projected on that

6  basis.  Your Honor, the Defendants also argue that the relief

7  the Trustee seeks should not be granted on a nunc pro tunc

8  basis.  We've addressed this argument time and time again as

9  well.

10        By my count, the Court has rejected this argument

11  and granted the Trustee, has issued orders that as a result

12  of the Trustee's alter ego rulings, the assets of the alter

13  egos are and always have been the property of the estate.

14  The Court has issued that ruling in the HCHK adversary

15  proceeding, and the -- or in the, sorry, the HK USA adversary

16  proceeding, the Golden Spring adversary proceeding, the Lamp

17  Capital adversary proceeding, the Greenwich Land adversary

18  proceeding, and the HCHK adversary proceeding.

19        The argument that the Defendants make here is

20  that, according to them, the only way nunc pro tunc relief

21  can be granted is to, quote, correct a clerical mistake or a

22  ministerial defect, and then they accuse the Trustee of

23  seeking to rewrite history.

24        Your Honor, what we're doing is the exact

25  opposite.  And in fact, we're not seeking nunc pro tunc

1  relief at all.  What we are seeking is to prevent history

2  from being rewritten by the Debtor and those who aided the

3  Debtor in perpetuating his long running fraudulent shell

4  game.

5           The reality, economically and substantively, has

6  always been that the Trustee beneficially owned and

7  controlled Hudson Diamond and Leading Shine and their assets.

8  The declaratory judgment that we're seeking, the order that

9  we're seeking, is simply affirming that reality.  We're not

10  trying to rewrite history; we're trying to prevent it from

11  being rewritten by the Debtor.

12           Therefore, Your Honor, not only is that entirely

13  appropriate to do, but it is also not seeking nunc pro tunc

14  relief at all.  So all the cases they cite about that are

15  completely inapposite.

16           I would also point the Court to numerous cases

17  that we cited on this topic and another brief filed in this

18  case, the joint briefing in the avoidance actions that's on

19  the main docket at ECF 3803.  Extensive discussion of that

20  issue there.

21           Your Honor, another argument that Defendants make

22  is that Delaware law follows the identity -- or sorry,

23  follows the vicarious liability theory of liability and not

24  the identity theory.  So according to the Defendants, all the

25  Trustee's alter ego ruling would do is make these Defendants'

1  assets available to satisfy claims of the Debtor's creditors,

2  but would not actually render the assets property of the

3  estate.

4          That, too, has been thoroughly briefed elsewhere,

5  including in the other briefing that I just referenced.  Your

6  Honor, it's also an issue the Court has decided on multiple

7  occasions, including specifically in the HK USA proceeding

8  against Mei Guo, where the Court said in that order, quote,

9  in conjunctions with -- in conjunction with Sections 541 and

10 542, alter ego accomplishes the transfer of assets into the

11 bankruptcy estate, end quote.  Again, that's against Mei Guo,

12 who's a defendant here, binding on her.  No question.  The

13 issue has been decided and settled.

14          To the extent -- you know what, Your Honor, I'm

15 going to skip to last couple of arguments to speed this up.

16          Your Honor, I think -- I think that actually

17 covers the landscape.  I'm happy to drill down either on the

18 issue of the identity theory versus the vicarious liability

19 theory, or any of these other arguments that the Defendants

20 make.

21          But in closing, I just want to, again, stress that

22 there is no dispute, let alone a material dispute or a

23 genuine dispute about the relevant facts in this case.  I

24 think they are almost entirely agreed upon.

25          The only issue is whether the Court should revisit

 1  and reverse itself on decisions that it already made on the

 2  legal issues that the Defendants raise in response to the

 3  motion for summary judgment.  For the reasons that I've

 4  articulated and as we have set forth in our papers, we do not

 5  think there's any basis for the Court to do that, and

 6  therefore, we would ask for our motion to be granted.  I'm

 7  happy to answer any questions the Court may have.

 8          THE COURT:  Thank you, I do not have any questions

 9  at this time.  Thank you.

10          MR. BASSETT:  Thank you, Your Honor.

11          THE COURT:  Attorney Kindseth.

12          MR. KINDSETH:  Thank you, Your Honor.  Steven

13  Kindseth, Zeisler & Zeisler for Mei Guo, Leading Shine New

14  York, and Hudson Diamond New York.

15          Your Honor, first and foremost, these issues

16  largely have been fully briefed, and I'm not going to try to

17  regurgitate the arguments in the briefing, and as counsel

18  pointed out, this Court has considered and decided these

19  issues on multiple occasions.  Arguments were made in favor

20  of summary judgment, we opposed summary judgment, and we

21  believe it is appropriate that summary judgment be denied for

22  the reasons set forth in our briefing.

23          I would also acknowledge, Your Honor, with respect

24  to the legal issues that you've decided in this adversary

25  proceeding, those are obviously law of the case.  And the

1  Court has the discretion not to reconsider the prior

2  decisions of this Court, in which we respect.  But for the

3  reasons set forth in our briefing, we are asking the Court as

4  to some discrete legal issues to reconsider those decisions.

5          Before I get into argument, I'll also point out,

6  Your Honor, as Your Honor is aware, many of these issues have

7  been briefed on an omnibus basis pursuant to this Court's

8  order, and those briefs have been filed.  I have the docket

9  numbers for Your Honor, if you want them to -- I don't think

10  it's necessary.

11          THE COURT:  I don't need the docket numbers.

12  Thank you.

13          MR. KINDSETH:  Okay.  And those are going to be

14  argued on January 15th, and --

15          THE COURT:  Those are all in avoidance actions,

16  though, Attorney Kindseth.  This isn't an avoidance action.

17  Those issues are -- you can argue that they're the same, but

18  summary judgment is based upon the facts.  And the facts of

19  those cases are that those are avoidance actions.  This case

20  is about alter ego.

21          MR. KINDSETH:  Correct.  The similarity -- there

22  is distinctions, of course, Your Honor.  The similarity is

23  that, as Attorney Bassett pointed out, we're relying upon

24  legal arguments largely.  And some of those legal arguments

25  are identical.

1    And so actually just to be clear, Your Honor, the

2  Trustee incorporates by reference arguments made in his

3  briefing with respect to the omnibus briefing into the

4  proceeding here today.  And so I just wanted to point that

5  out to this Court.  Considering the extensive briefing, I'm

6  going to limit my comments to a couple points, Your Honor.

7    First, with respect to standing, again, Your Honor

8  has decided this issue.  Your Honor decided that the Trustee

9  had standing under 544(a) of the Bankruptcy Code, the strong-

10  arm statute.  And I would like to point out in asking the

11  Court to reconsider that, I'm not rearguing it, I'm just

12  pointing out the --

13    THE COURT:  How do you ask a court to reconsider a

14  ruling in opposition to summary judgment?  Wouldn't you have

15  to file a motion for reconsideration?

16    MR. KINDSETH:  Well, the Trustee's argument that

17  he is entitled to judgment as a matter of law because there

18  are no genuine issues of material fact rely upon the

19  argument.  And this Court can incorporate its prior argument,

20  but the argument that the Trustee needs to incorporate is

21  that the Trustee has standing.

22    And if Your Honor applies law of the case, we

23  respect that.  We are simply pointing out that Picard v.

24  JPMorgan Chase limited the PepsiCo decision based upon the

25  alleged claim constituting property of the estate rather than

1  relying upon the strong-arm powers under 544(a).

2              And because of that, we are arguing that the

3  Trustee does not have the authority under 544(a) to bring

4  generalized claims of creditors.  Similarly, with respect to

5  the --

6              THE COURT:  What about with the Second Circuit

7  case that was -- the decision that was issued after decisions

8  of this Court in August of this year that addressed all these

9  issues?  What about that decision?

10             MR. KINDSETH:  Correct.  I'm going to address that

11  next, Your Honor.

12             THE COURT:  Go right ahead.

13             MR. KINDSETH:  And because that is new, the

14  parties did not -- or we did not brief that issue.

15             THE COURT:  Well, I'm not sure it's -- that

16  decision is new.

17             MR. KINDSETH:  Yep.

18             THE COURT:  But the issues are the same.

19             MR. KINDSETH:  And Your Honor, the distinction in

20  Nordlicht, Nordlicht held that fraudulent conveyance and

21  alter ego claims constitute property of the estate that could

22  be sold pursuant to Section 363 and also settled by the

23  Trustee.

24             So once again, Your Honor, we have, cases that are

25  being cited to rely upon, to establish the Trustee's power

1  under 544(a), the strong-arm statute, when those cases are

2  actually saying that the claim at issue constitutes property

3  of the estate.

4          And Your Honor, specifically, in Your Honor's

5  decisions, and there's been multiple decisions, where Your

6  Honor said that the Wagoner Rule and in pari delicto did not

7  need to be considered because those applied to arguments that

8  the Trustee has standing because it's property of the estate.

9  And Your Honor circumvented that issue, rightful -- I mean,

10  the reasoning made sense because Your Honor was saying under

11  544(a), the Trustee could exercise his strong-arm powers to

12  pursue the claim.  And so Your Honor's basis was to reject

13  the issue of it constituting property of the estate and

14  focusing on 544(a).

15          When PepsiCo, JPMorgan Chase, Picard, and

16  Nordlicht all say that the claim constitutes -- the claim

17  constitutes property of the estate.  And so our argument to

18  Your Honor, with respect to in response to law of the case

19  and asking respectfully to --

20          THE COURT:  But they -- it says that they are

21  claims of -- they're general claims that can be asserted by

22  creditors.

23          MR. KINDSETH:  Yes.

24          THE COURT:  Not a specific claim asserted by a

25  specific creditor.

1          MR. KINDSETH:  Correct.  So, and this has been our

2     point.  So generalized claims of creditors -- and in fact, it

3     seems as though the Trustee is stepping back from the

4     argument that the claim can be brought under 544(a) and seems

5     to be arguing that now, notwithstanding the Court's numerous

6     prior decisions, the Trustee could bring the claim under

7     544(a), it sounds like the Trustee is now arguing that the

8     claim constitutes property of the estate.

9          And so and I would also point out, Your Honor,

10    that this is the first time in this adversary proceeding at

11    oral argument that the Trustee is now arguing that the

12    Trustee has standing because the claim is property of the

13    estate.  Now, arguments in response, but --

14         THE COURT:  I don't think that's what he argued,

15    but you can go right ahead.

16         MR. KINDSETH:  Okay.  So, and, Your Honor, if the

17    Trustee's not making that argument, then we'll just live with

18    544(a) in the Court's prior decision.  And we are asking the

19    Court to reconsider the prior decision based upon our

20    explanation and the Second Circuit's decision in JPMorgan

21    Chase and the decision in Nordlicht, which again did not rely

22    upon strong-arm powers under 544(a).

23         Expanding on the point with respect to the

24    Nordlicht and the arguments made today, the Trustee has

25    argued today that the Wagoner rule and in pari delicto do not

1  apply.  Well, that issue hasn't been briefed.

2       We haven't been arguing that these claims, and the

3  Trustee has not relied upon the argument that these claims

4  constitute property of the estate.  And so summary judgment

5  should not be granted based upon a legal argument raised for

6  the first time at oral argument, which the parties have not

7  even briefed, based upon a standing argument, which hasn't

8  been the Trustee's standing argument throughout this case or

9  any of the other cases.

10       And so I'm -- I was prepared to just simply stand

11  with the consequence of this Court's prior decision on that

12  the Trustee's standing is under 544.  We respectfully

13  disagree.  We pointed out the reasons why in our brief, and

14  we would ask the Court to reconsider that decision based on

15  its discretion under law of the case.

16       And we think that the Court should not hold that

17  the Trustee has standing under 544(a) to pursue the causes of

18  action that have been brought in this case.  That's the first

19  point.

20       And the second point I'd like to bring to the

21  Court's attention is with respect to the alter ego claim

22  under New York law.  Nordlicht specifically acknowledges that

23  alter ego is not a cause of action under New York law.  And,

24  therefore, the claim asserted by the Trustee, upon which it

25  is seeking summary judgment, is not a valid cause of action

 1   upon which judgment can enter, and therefore, summary

 2   judgment should be denied.

 3        What Nordlicht held for very specific purposes,

 4   whether a claim can be sold under 363, is that the alter ego

 5   claim is a claim under the Bankruptcy Code.  And so the Court

 6   held that it could be sold and settled.

 7        What's critical, Your Honor, also about Nordlicht,

 8   is that the Second Circuit recognized that the alter ego

 9   theory is a claim under the Bankruptcy Code, but it's

10   actually a claim within a claim.  And the claim within a

11   claim is under New York law, first and foremost, that there's

12   liability and then they're based upon that claim, in

13   conjunction with the alter ego claim, that liability could be

14   imposed upon the alter ego.  And so --

15        THE COURT:  Where exactly in the decision does it

16   say what you just said, Attorney Kindseth?

17        MR. KINDSETH:  Can I get the case, please?

18        THE COURT:  Yes.

19        MR. KINDSETH:  So I have the Lexis number, Your

20   Honor.  The printed version that I have does not have the

21   reported number.  I'm not sure what -- do you have a Westlaw

22   or Lexis version?  I can say where --

23        THE COURT:  I don't have any version in front of

24   me right now.

25        MR. KINDSETH:  So it's in the --

1          THE COURT:  But you're telling me that this case

2    says something that my recollection of looking at it, it

3    doesn't say.  So I'm asking you to tell me where in the

4    case --

5          MR. KINDSETH:  It's head note 22 --

6          THE COURT:  Well, head note 22 doesn't help me.  I

7    want the language from the decision.

8          MR. KINDSETH:  It says before a court or jury can

9    decide whether to impose liability on an entity or

10   individual's alter ego, it must first be persuaded that

11   liability ought to be imposed on the entity or individual in

12   the first place.  And --

13         THE COURT:  But it doesn't say that liability is

14   imposed.  It says -- you just read.  It says it ought to

15   consider whether it ought to be.  Those are two different

16   things.  You said that liability has to be established.

17         MR. KINDSETH:  It clearly states that it's not --

18   that alter ego is not a cause of action.

19         THE COURT:  No, I don't think it does.

20         MR. KINDSETH:  It says that -- what Nordlicht says

21   is it's not a remedy.  But it acknowledges that under New

22   York law --

23         THE COURT:  Can somebody just give me the cite,

24   please, of the case --

25         MR. KINDSETH:  Sorry.  The cite of the case is 115

1   F.4th 90.

2           THE COURT:  All right.  Give me a second, please.

3   115 F.4th what?

4           MR. KINDSETH:  115 F.4th. 90.

5           THE COURT:  So you cited to head note 22.  So I'm

6   reading in the reported decision from the West decision that

7   appears in a book, 115 F.4th 90, page 105.  Head notes 20 to

8   22.  Personal claims, on the other hand, are claims for

9   injury that are particular to the creditor, In Re Tronox and

10  in which other creditors generally have no interest.  In Re

11  Emoral, citing board of Trustees of Teamsters Local 863

12  Pension Fund versus Foodtown, Third Circuit 2022 2002.

13          Personal claims, therefore, are in the legal or

14  equitable interest only of the creditor, Board of Trustees of

15  Teamsters Local 833.  Creditors are exclusively entitled to

16  pursue personal claims, and the bankruptcy Trustee is

17  precluded from doing so, Hirsch versus Arthur Andersen Second

18  Circuit 95.

19          The distinction between general and personal

20  claims promotes the orderly distribution of assets in

21  bankruptcy by funneling all asset recovery litigation through

22  a single plaintiff, the Trustee, In Re Wilton Armetale Inc.,

23  Third Circuit 2020.

24          Now going on, in distinguishing general claims

25  from personal claims, labels are not conclusive since

1  plaintiffs often try but are not permitted to plead around

2  the bankruptcy.  Instead, we inquire into whether the factual

3  origins of the injury, more importantly, into the nature of

4  the claims asserted.  For this analysis, we look to estate

5  law applicable to each claim.

6           That goes through this whole thing.  It doesn't

7  say under New York law it's not a claim.  That's not what it

8  says.

9           MR. KINDSETH:  Unfortunately, there's the head

10 notes are not in line to what I have.  There must be -- Lexis

11 must have its own set of head notes.

12          THE COURT:  What footnote are you -- headnote are

13 you talking about?  Where are you in the case?  Give me a

14 page number.

15          MR. KINDSETH:  I have a Lexis number of 36.  It's

16 right -- it's in Section C, alter ego, reversed veil-piercing

17 theory of liability.  At the very end of Section C, before

18 Section D starts, so there's the holding, right before

19 Section D --

20          THE COURT:  I'm not there yet.  So because I don't

21 know where you are because I'm at Westlaw.

22          MR. KINDSETH:  I apologize.  I have a pre-reported

23 decision printout.  My apologies, Your Honor.

24          THE COURT:  I have -- are you at the Stadtmauer's

25 reverse veil-piercing claim as general?  Because that's what

1  it says.  The Stadtmauer's reverse veil-piercing claim is a

2  general claim under New York law.  Because we observed in

3  Tronox claims on allegations of a general failure to adhere

4  to corporate formalities and abuse of corporate form

5  generally qualify as general claims if they are capable of

6  increasing the basket of assets that would be used to satisfy

7  any and all liabilities owed by the Debtor.  That is the case

8  here.  That's what they say.

9        MR. KINDSETH:  Correct.  And we don't dispute

10  that.

11        THE COURT:  Then what's your -- what's your point?

12  I don't understand your point at all.  Because if you don't

13  dispute that, then it's a general claim that the Trustee can

14  bring on behalf of all the creditors, whether it's property

15  of the estate or not.  So what -- it doesn't even -- your

16  point -- I don't understand the point you're making.

17        MR. KINDSETH:  The Court had previously held that

18  it is a generalized claim that can be pursued under 544(a).

19        THE COURT:  Okay.

20        MR. KINDSETH:  That's law of the case.  That

21  argument -- and we dispute that argument but it's law of the

22  case.  And the Court has discretion --

23        THE COURT:  Well, I think it's more than law of

24  the case.  I think it's binding law in the Second Circuit at

25  this point.  But go ahead.

1          MR. KINDSETH:  Okay, so we respectfully ask the

2    Court to look at JPMorgan Chase, and --

3          THE COURT:  That was cited -- that was decided

4    before Nordlicht.

5          MR. KINDSETH:  Correct.  And Nordlicht does not

6    rely upon 544(a).  So, Judge, I'm trying to be --

7          THE COURT:  Because it didn't have to.  But it

8    still raised the -- it still went through the analysis of

9    whether or not it's a general claim that's available to be

10   prosecuted and pursued only by a Trustee.  And that's what

11   the -- that's what the case found.

12         It found that the reverse veil-piercing claim

13   under New York law, which is what you're arguing, is a

14   general claim and that the only proper party to bring that

15   claim is the Trustee.  That's what they're saying.  That's --

16   I'm reading the Second Circuit opinion.  That's what it says.

17         MR. KINDSETH:  Your Honor, if I may, there's two

18   options to the Trustee.  One is to argue under 544(a).  The

19   other is to argue that it's property of the estate.  They're

20   different arguments entirely.  Okay?

21         So just step by step, Judge, 544(a) or --

22         THE COURT:  I understand.  I understand.  You

23   don't have to go through it.  I don't agree with you.

24         MR. KINDSETH:  Okay.  So we've been -- this entire

25   case, all the avoidance actions, alter ego arguments have all

1  been premised upon --

2          THE COURT:  The avoidance actions are different

3  than the alter ego actions.  You keep trying to make them the

4  same.

5          MR. KINDSETH:  But they depend upon -- since all

6  the transferors were alleged alter egos, then it -- there's

7  the predicate argument that the alter egos actually

8  constitute property of the estate and therefore their

9  transfers may be avoided.  And so the same issue exists in

10 those avoidance actions as they do in the other proceedings.

11         And so, the question is, is the Trustee entitled

12 to standing under 544(a) exercising strong strong-arm powers

13 or is the Trustee standing in the shoes of the Debtor because

14 these claims are property of the estate?

15         And the reason why the Court and the Trustee

16 originally did not want to -- or the Trustee did not want to

17 argue and the Court held that these were not property of the

18 estate claims is because of Wagoner and in pari delicto and

19 other arguments and holdings that the Second Circuit has

20 held.

21         And so, for quite some time, we've been -- the

22 Court has been sustaining the Trustee's actions and alter ego

23 arguments based on 544(a).  And so -- and I had no intention

24 of going into this issue at this length because the Court has

25 decided it and decided it many, many times, and it's law of

1  the case in 544(a) is the Court's holding the Trustees is

2  proceeding under 544(a) under strong-arm powers.  Fine.  And

3  we said you should reconsider that based upon JPMorgan Chase.

4           Now, what the Trustee seems to be arguing is,

5  well, just now it's the Trustee saying, oh, no.  It's

6  property of the estate and Wagoner Rule and in pari delicto

7  don't apply.

8           THE COURT:  I don't think that's what he's saying.

9           MR. KINDSETH:  Okay.  Well, then you know what?

10          THE COURT:  He didn't say that.  He made three or

11  four different arguments in response to what you've argued

12  about standing.

13          MR. KINDSETH:  Okay.  So, Your Honor, I believe --

14  I I'm confident Your Honor understands the point that I'm

15  making.  If Your Honor is going to stand by 544(a), so be it,

16  but not --

17          THE COURT:  And when we -- and the argument was

18  that the claims were claims under 541, property of the

19  estate.  And we made a finding, or the decision says it

20  doesn't matter whether it was 544 or 541.  This Trustee still

21  has standing.  And that's the point.

22          MR. KINDSETH:  I don't, respectfully, Your Honor,

23  my recollection of the Court's decision --

24          THE COURT:  Well, you -- then fine.  You go find

25  it, because I think you're wrong.

1          MR. KINDSETH:  Okay.  So --

2          THE COURT:  And you should have -- if you think

3    that, then --

4          MR. KINDSETH:  Well, I wasn't interested --

5          THE COURT:  -- I'm not going to spend a lot of

6    time on this.  We have gone through this.  What's your

7    argument?  Nordlicht says that they're general claims, that

8    the only person that can bring those claims is the Trustee.

9    That's what it says.  Tell me where it doesn't say that.

10         MR. KINDSETH:  It says -- it says there are

11   generalized claims that are -- constitute property of the

12   estate.

13         THE COURT:  No.  That's not all that it says.  It

14   says there are general claims, and the only proper plaintiff

15   is the Trustee.  That's what it says.  I just read it.

16         MR. KINDSETH:  The -- correct.  I agree with that.

17   And the issue then, if the -- if the Trustee's bringing this

18   claim based upon the fact that it's allegedly property of the

19   estate, so now the question is, does the Wagoner Rule or in

20   pari delicto preclude the Trustee from making that argument?

21   That in fact --

22         THE COURT:  No, it doesn't preclude the Trustee

23   from making any argument.  It's only if you have a valid

24   defense under those doctrines.  That's the issue.

25         MR. KINDSETH:  And you know what?  That argument

1  has never been made.

2         THE COURT:  It's been made 12 times.  I've gone

3  through the Wagoner and in -- every single time, we've gone

4  through it.  We've gone through it every single time.  I

5  can't -- I mean, that's fine.  If you think it hasn't been

6  made, then I don't know what to tell you, because it's been

7  made.

8         MR. KINDSETH:  Okay.  I would point out, in

9  conjunction with the motion for summary judgment, there was

10 no argument in the motion for summary judgment with respect

11 to the claim constituting property of the estate and the

12 inapplicability of the Wagoner Rule or in pari delicto.

13        And so, we argue -- in fact, we argue that 544

14 does not provide the Trustee with standing.  And so, Your

15 Honor, I --

16        THE COURT:  You've already started by saying

17 you're asking the Court to reconsider all its rulings.  So

18 now you're making an argument, too, that you've already made

19 because you're saying, you know, Judge, we made these

20 arguments already, but you didn't agree with us, so we're

21 going to make them again.  And we now ask you to reconsider

22 that ruling.

23        And then in the interim, there's been a Second

24 Circuit decision, which this Court is bound by, that says

25 that the claims are general claims that can be brought only

1  by the plaintiff, Trustee.  That's what it says.

2          MR. KINDSETH:  But not based on 544(a).

3          THE COURT:  Okay.  So then, even if I agree with

4  you, which -- then I can let them bring it under something

5  else according to the Second Circuit.  And in our motion --

6  in the motion to dismiss, they were asserted under 541.  If

7  you -- if you want to go back to what happened, they were

8  estate claims.  They were property of the estate.

9          And we said in the decision, it doesn't matter

10  whether it's 541 or 544.  You don't have a defense to that on

11  standing.  That's what we said.  It doesn't matter.  So, you

12  know, who has standing then, Attorney Kindseth, if it isn't

13  the Trustee?

14          MR. KINDSETH:  The creditors would have standing -

15  -

16          THE COURT:  What creditors?

17          MR. KINDSETH:  Whatever creditor --

18          THE COURT:  Who creditor?  What creditor?  No.

19  No.

20          MR. KINDSETH:  Whatever creditor --

21          THE COURT:  No.  It has to be a specific creditor,

22  if you're right, Attorney Kindseth.  So who's the -- who's

23  the specific creditor?

24          MR. KINDSETH:  PAX.

25          THE COURT:  PAX?  PAX already brought all those

1  claims in state court.

2          MR. KINDSETH:  And you asked me who has standing.

3  PAX has standing --

4          THE COURT:  No.  I didn't ask you who was

5  standing.  I said, who's the right creditor?  Who's the --

6  you said all creditors.  I said, no, no.  What creditor?

7  What creditor?  You need to explain.  You need to identify.

8  You need to say to me there's only one creditor that can

9  bring this cause of action.  And if there's more than one,

10 then your argument fails.

11         MR. KINDSETH:  Okay.

12         THE COURT:  So, PAX -- your answer is PAX is the

13 only creditor that can bring an alter ego action against

14 these entities?

15         MR. KINDSETH:  So I understand your point, Your

16 Honor.

17         THE COURT:  That's -- I have a question pending.

18 Is that your answer?

19         MR. KINDSETH:  No.  That's not the only one.  It

20 is a --

21         THE COURT:  Okay.  Then you lose.

22         MR. KINDSETH:  Okay.  So, Your Honor --

23         THE COURT:  On that issue.

24         MR. KINDSETH:  I agree.  It is a generalized

25 claim.

1          THE COURT:  Okay.  So then let's move on.  What

2    are your other arguments?

3          MR. KINDSETH:  Can I make one --

4          THE COURT:  Yes?  Go ahead.  You can make one.

5          MR. KINDSETH:  One point.  If even if it's a

6    generalized claim, it's subject to the Wagoner Rule and in

7    pari delicto.  That's my only point, Your Honor.

8          THE COURT:  Okay.  Let's move on to your next

9    argument.

10         MR. KINDSETH:  Thank you, Your Honor.  With

11   respect to the alter ego claim under New York, I was pointing

12   out about Nordlicht acknowledging that it's not a cause of

13   action under New York law and said it's a claim under the

14   Bankruptcy Code, and, therefore, my argument is that the

15   Trustee has brought it as an independent cause of action.

16   It's not an independent cause of action under New York law.

17         With respect to equitable ownership and the

18   nominee doctrine, Your Honor, as held by the Second Circuit

19   in Ahmed, it merely identifying, you know, a series of assets

20   or grouping of assets is insufficient, that the Nominee

21   doctrine and equitable ownership require an asset by asset

22   analysis.  There must be a nexus between all the factors

23   necessary to establish equitable ownership and the actual

24   transfer of funds into the account.

25         So, our argument with respect to the equitable

1  ownership and the nominee doctrine, Your Honor, is it's not

2  sufficient to just point at accounts.  There has to be some

3  showing of the interrelationship between the factors

4  necessary to establish equitable ownership and the particular

5  transfers to show that this particular transfer, in fact, the

6  Debtor was the owner considering these factors.

7          You can't just point at an account, and it was, as

8  pointed out by counsel, there were significant transfers into

9  the account.  There's not some sweeping principle that says,

10  well, then everything in the account is equitably owned by

11  the Debtor.  There must be a showing based on the Second

12  Circuit's decision, as to each particular transfer

13  establishing that, in fact, the true owner of that transfer

14  was the Debtor.

15          Highlighting this point, Your Honor, while the

16  Trustee's -- apparently concedes this as he has to, the

17  Second Circuit's decision at Ahmed concerning the asset by

18  asset analysis that's required, the proposed order

19  accompanying the motion for summary judgment asks this Court

20  to make a sweeping determination that all assets owned by

21  these entities are equitably owned, or were equitably owned

22  by the Debtor and therefore are property of the estate, which

23  is directly antithetical to the Second Circuit decision in

24  Ahmed.

25          Your Honor, for these reasons, we're arguing and

1  believe that summary judgment is not appropriate.  Again,

2  we've briefed these issues extensively.  Your Honor is very

3  familiar with these issues, and we stand by the briefs that

4  we have filed.  Thank you, Your Honor.

5        THE COURT:  All right.  The only other thing I

6  want to say to you is, with regard to the Nordlicht case.

7  The Court -- the Second Circuit in this decision goes

8  through, an entire section of this decision starting on page

9  109 of the West Reporter.  The official reporter.

10        Says as an alternate theory, the Stadtmauers argue

11  that New York law does not classify alter ego theories of

12  liabilities as claims at all, but as remedies.  They based

13  their argument on an apparent inconsistency in Tronox's

14  reasoning, which was pointed out and discussed by United

15  States Bankruptcy Judge Wiles in In Re Stage Presence.

16        While recognizing that he was bound by Tronox,

17  Judge Wiles observed that the New York Court of Appeals has

18  made clear that under New York law, an alter ego or veil-

19  piercing argument is not a separate, standalone cause of

20  action.  Instead, piercing the corporate veil or awarding

21  alter ego relief is a remedy that a plaintiff may pursue.

22  And then it -- they continue.

23        Trading alter ego and veil-piercing theories

24  purely as remedies, however, seems inconsistent with the case

25  law that addresses the issue of whether an alter ego claim

1   belongs to individual creditors as opposed to a bankruptcy

2   trustee.  If alter ego theories and veil-piercing theories

3   are not standalone claims at all and instead are just

4   remedies for other claims, then it is difficult to see how

5   they could belong exclusively to a bankruptcy estate.

6           I understand the theory under which a claim may be

7   brought, but I know of no theory under which a remedy belongs

8   exclusively to an estate.  The Second Circuit then concludes

9   this entire discussion by saying, therefore, to the extent

10  that New York law anywhere states or implies that an alter

11  ego theory of liability is a remedy, that notion is trumped

12  by the Bankruptcy Code.  See BFP Resolution Trust Corp.

13  Where the meaning of the Bankruptcy Code text in itself is

14  clear, its operation is unimpeded by contrary state law.

15  That's what the Second Circuit says.

16          So I just want to make the record clear that your

17  argument about it being a remedy as opposed to a claim has

18  been soundly rejected by the Second Circuit.

19          MR. KINDSETH:  Correct, Your Honor.  And I

20  would --

21          THE COURT:  So then why are you making the

22  argument?

23          MR. KINDSETH:  So, Your Honor, there's a --

24  there's a cause of action.  There's a claim under the

25  Bankruptcy Code.  And there's a remedy.  Okay?  So --

1            THE COURT:  I just told you that there isn't a

2    remedy.

3            MR. KINDSETH:  There's not a remedy.

4            THE COURT:  There isn't a remedy.  That's what the

5    Second Circuit just said.  It's not a remedy.

6            MR. KINDSETH:  So putting aside alter ego, just

7    for purposes of this discussion --

8            THE COURT:  The whole -- the whole -- this is what

9    the whole summary judgment is about.

10           MR. KINDSETH:  Your Honor, can I make a point,

11   please?

12           THE COURT:  Yes, you can.  But you can make a --

13   you have to make a point that's a valid one, and not one

14   that's designed to delay or not supported by the law.  And

15   there's a Second Circuit case that was issued less than three

16   months ago that is completely against everything that you're

17   arguing and that I'm bound to follow.

18           So you go ahead and make your argument.  But I'm

19   not going to let you make more argument because it's now 3

20   o'clock, and we're going over -- you're talking in circles,

21   and you're ignoring what is binding case law.

22           MR. KINDSETH:  We're not arguing that it's a

23   remedy.

24           THE COURT:  You just did.

25           MR. KINDSETH:  No.  I'm saying it's not a cause of

1  action.  Judge, it's not a cause of --

2          THE COURT:  What is it then?  An air balloon?

3          MR. KINDSETH:  Actually, what the Second Circuit

4  held in Nordlicht is that it's a claim under the Bankruptcy

5  Code that could be sold and settled.  It's not a --

6          THE COURT:  Then if it's a claim, it's a cause of

7  action.

8          MR. KINDSETH:  That's not what the Second Circuit

9  held, Your Honor.

10          THE COURT:  How could a claim not be a cause of

11  action?  Mr. Kindseth, a claim is a right to a payment, isn't

12  it?  Isn't that what the Bankruptcy Code defines a claim as?

13  I think it does.  Shall we look at 101?

14          MR. KINDSETH:  Your Honor --

15          THE COURT:  So if it's a right to a payment,

16  there's a cause of action associated with that right to the

17  payment.  Because if someone doesn't pay it, there's a right

18  for someone to sue to get paid.

19          MR. KINDSETH:  Your Honor, as I interpret

20  Nordlicht, and I appreciate you permitting me to say this,

21  the Second Circuit said it may not be a cause of action under

22  New York law, but it's a claim under the Bankruptcy Code, and

23  therefore it can be settled.  It's not a remedy.  It's not a

24  remedy.  It may not be an independent cause of action, but

25  it's a claim that may be settled and sold.  That's how I read

1 | the decision.

2 |         THE COURT:  The term "claim" means a right to

3 | payment, whether or not such right is reduced to a judgment,

4 | liquidated, unliquidated, fixed, contingent, matured,

5 | unmatured, disputed, undisputed, legal, equitable, secured,

6 | or unsecured, or a right to an equitable remedy for a breach

7 | of performance if such breach gives right to a right of

8 | payment, whether or not such right to an equitable remedy is

9 | reduced to judgment, fixed, contingent, matured, unmatured,

10 | disputed, undisputed, secured, or unsecured.

11 |         So if it's a right to payment, Mr. Kindseth, then

12 | there's a cause of action associated with that claim.

13 |         MR. KINDSETH:  Thank you, Your Honor.

14 |         THE COURT:  Okay.  Thank you.

15 |         Mr. Bassett, is there anything you'd like to add?

16 |         MR. BASSETT:  very briefly, Your Honor, may I

17 | approach?

18 |         THE COURT:  Yes.

19 |         MR. BASSETT:  Just a few very, very brief points,

20 | just by way of clarifying the record on some of the arguments

21 | that Attorney Kindseth raised.

22 |         In discussing the 544/541 issue, counsel suggested

23 | that this is a new argument or a new theory that we are sort

24 | of pivoting to midstream that has not been the subject of any

25 | arguments or causes of action that the Trustee has pursued

1  previously in this case.  That's just completely not true.

2         In this adversary proceeding, as in every other

3  alter ego adversary proceeding we have filed in this case, we

4  have pursued our claims under both Section 541 and Section

5  544.  In fact, the Court will recall a ruling in the HK USA

6  adversary proceeding, went through an analysis of both of

7  those.  It found that we had standing to pursue the claim

8  under Section 544(a), the Court also analyzed the issue under

9  Section 541, and found that the insider exception to in pari

10 delicto applied.

11        What I would submit has changed, and what we are

12 now pointing out to the Court, in light of the Nordlicht

13 ruling, is that if you go down the Section 541 path, you can

14 then assert what Nordlicht says is that the claim can be

15 asserted as a general claim of creditors.

16        And to address Attorney Kindseth's other point,

17 which he says at that point you have to consider whether or

18 not in pari delicto and Wagoner would apply, again, Your

19 Honor has already decided that twice.

20        Your Honor considered that possibility in her

21 motion to dismiss in the HK USA case and in the motion to

22 dismiss decision in this case, both times, the Court

23 recognizing that if a cause of action is pursued under

24 Section 541 because it is a generalized claim of creditors,

25 then in pari delicto and Wagoner would not apply.

1          It's also exactly what I cited to the Court in the

2    Harmon case that I read out during my opening argument from

3    Georgia.  The Court there squarely addressed that issue and

4    said in that case, in that situation, obviously, those claims

5    are not barred by in pari delicto or the Wagoner Rule because

6    any other result would be extraordinarily inequitable.

7          It would mean that a creditor can't pursue the

8    claim on its own, the claim becomes part of a Chapter 11

9    estate, and then the Trustee is not able to pursue the claim

10   because of the in pari delicto and Wagoner doctrine.  That

11   makes zero sense.  And therefore that's just a nonissue.

12         Under Nordlicht, if the claims are property of the

13   estate as generalized claims, in pari delicto and Wagoner do

14   not apply.

15         The other comment I want to just briefly respond

16   to or address is the most recent one that we were talking

17   about.  I think the Court read the exact right language from

18   Nordlicht, where there was the discussion of Tronox and the

19   other cases, where it's very clear from that discussion of

20   Tronox that the issue the Court was focused on in response to

21   the argument made in that case was whether or not an alter

22   ego claim can be considered a cause of action.  That's

23   exactly the language quoted from Tronox.

24         And then as Your Honor went through and read the

25   rest of it, the Court said in bankruptcy, it wouldn't make

1   sense to say that an alter ego claim cannot exist as a

2   standalone cause of action.

3          Now, what Attorney Kindseth is trying to say is

4   that an alter ego claim generally is used outside of

5   bankruptcy to supplement or serve as a companion to another

6   claim.  So if outside of bankruptcy, a creditor brought a

7   breach of contract claim against a party, and then, in order

8   to satisfy that judgment, sought to pierce the corporate

9   veil, that alter ego claim would be tacked on.

10          That is completely irrelevant and unnecessary

11  bankruptcy as Nordlicht pointed out.  The reason being, the

12  Trustee stands in the shoes of all the thousands of creditors

13  of the estate.  All of those creditors of the estate have

14  claims.  They've all asserted claims.  PAX has asserted a

15  claim.  Other creditors have asserted claims.  To the extent

16  it's necessary to have a predicate claim to which alter ego

17  or reverse veil-piercing attaches, it is those claims.

18          So in bankruptcy, the Trustee absolutely has, as

19  the Nordlicht Court recognized, can pursue alter ego as a

20  claim.  We're talking about bankruptcy.  We're not talking

21  about outside of bankruptcy.

22          Your Honor, there were some other points I was

23  going to respond to, but in the interest of time, I think we

24  have it covered.  Again, we respectfully would request that

25  our motion be granted, and thank you very, very much for your

1  Court's time and patience -- for Your Honor's time and

2  patience.  Thank you.

3            THE COURT:  Thank you.

4            Attorney Kindseth, would you like to respond?

5            MR. KINDSETH:  Nothing further, Your Honor.

6            THE COURT:  Okay.  Thank you.  Okay.  With regard

7  to the motion for summary judgment in the adversary 23-05023

8  that is pending before the Court, the Court will take the

9  matter under advisement and will rule accordingly.

10            Is there any further business that we need to

11  address this afternoon?  I think we've taken care of

12  everything on the calendar.  Is that correct?

13            MR. DESPINS:  That's correct, Your Honor.

14            THE COURT:  All right.  Thank you.  Then, there

15  being no further hearings on the calendar this afternoon,

16  thank you all.  Court is adjourned.

17        (Proceedings concluded at 3:07 p.m.)

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ Wendy K. Sawyer                    December 12, 2024

8    WENDY K. SAWYER, CDLT

9    Certified Court Transcriptionist

10   For Reliable