B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS Luc A. Despins, Chapter 11 Trustee | DEFENDANTS See Schedule 1 |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.) Paul Hastings LLP, 200 Park Avenue New York, NY 10166, 212-318-6000 | ATTORNEYS (If Known) See Schedule 2 |
|---|---|

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☒ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Declaratory Judgment pursuant to Bankruptcy Code sections 541, 542, and 544 that certain Defendants are the Debtor's alter egos and ordering turnover of their assets to Trustee; Declaratory Judgment pursuant to Bankruptcy Code sections 541, 542, and 544 that Debtor is equitable/beneficial owner of certain Defendants and/or their assets and ordering turnover of ownership of those entities and their assets to Trustee.

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought
Declaratory relief regarding alter ego and equitable and/or beneficial ownership

B1040 (FORM 1040) (12/15), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Ho Wan Kwok, et al. | BANKRUPTCY CASE NO.<br>22-50073 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Connecticut | DIVISION OFFICE<br>Bridgeport | NAME OF JUDGE<br>Julie A. Manning |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Douglass E. Barron | | |
| DATE<br>December 23, 2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Douglass E. Barron | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## SCHEDULE I

AA Global Ventured Limited,

AAGV Limited,

Alzarro Enterprises Ltd.,

Ampleforth Capital Ltd.,

Anton Development Limited,

Assets Sino Limited,

Auspicious Coast Limited,

BSA Capital Management Limited,

BSA Strategic Fund I,

Canadian Agri-product Monetary Investments Limited,

Crane Advisory Group LLC,

Delta Konsult Limited,

Eagle Eye Investments Limited,

Feibo Jiang,

Fiesta Investment Ltd.,

Glory Asia (H.K.) Limited,

Gold Perfect Limited,

Group Dynasty Limited,

GS Security Solutions Inc.,

Guang Hong Limited,

H Reserve Management Limited,

Haitham Khaled,

Haoran He,

Head Win Group Limited,

HGA Property Operation LLC,

Hing Chi Ngok,

Holy City Hong Kong Ventures Limited,

Hong Kong International Funds Investments Limited,

Hudson Diamond Holdings, Inc.

Infinity Treasury Management Inc.

Insight Phoenix Fund,

Joincorp International Limited,

Joy Chance Holdings Limited,

Kesen Yang,

Kun Ma,

Kingdom Rich Limited,

Le Qiao,

Lichun Guo,

Lihong Guo,

Long Gate Limited,

Max Krasner,

Mei Guo,

New Federal State Corporation,

New Miracle Limited,

Pacific King Investment Limited,

Phoenix Capital Management (Cayman) Limited,

Qiang Guo,

Qin Li,

Rich Group Development Limited,

Rising Sun Capital Ltd.,

River Valley Operations LLC,

Sail Victory Limited,

Scott Barnett,

Strong Country Holdings Group Limited,

Thousand Stars Company Limited,

Wencun Guo,

Xinfang Zhang,

Yan Su,

Yumei Hao

Zhang Wei,

Zongchao Yue.

## SCHEDULE II

### Crane Advisory Group

Jon-Jorge Aras, Esq.
Warren Law Group
14 Penn Plaza, 9th Floor
New York NY 10122
212-580-2303
jj@warren.law

David Rosenfield, Esq.
Warren Law Group
14 Penn Plaza, 9th Floor
New York NY 10122
212-580-2303
drosenfield@warren.law

### Scott Barnett & GS Security Solutions Inc.

Aaron Romney
Lax & Neville, LLP
2425 Post Road
Suite 200
Southport, CT 06890-1267
Tel.: (646) 328-1566
Fax: (212) 566-4531
aromney@laxneville.com

Barry R. Lax, Esq.
Lax & Neville, LLP
350 Fifth Avenue, Suite 4640
New York, NY 10118
Tel: (212) 696-1999
Fax: (212) 490-3332
blax@laxneville.com

Robert J. Grand, Esq.
Lax & Neville, LLP
350 Fifth Avenue, Suite 4640
New York, NY 10118
Tel: (212) 696-1999
Fax: (212) 490-3332
rgrand@laxneville.com

Robert R. Miller, Esq.
Lax & Neville, LLP

350 Fifth Avenue, Suite 4640
New York, NY 10118
Tel: (212) 696-1999
Fax: (212) 490-3332
rmiller@laxneville.com

**Hing Chi Ngok**

Christopher J. Major, Esq.
Meister Seelig & Fein PLLC
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
cjm@msf-law.com

Austin D. Kim, Esq.
Meister Seelig & Fein PLLC
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
adk@msf-law.com

**Infinity Treasury Management Inc.**

Barry R. Lax, Esq.
Lax & Neville, LLP
350 Fifth Avenue, Suite 4640
New York, NY 10118
Tel: (212) 696-1999
Fax: (212) 490-3332
blax@laxneville.com

Robert J. Grand, Esq.
Lax & Neville, LLP
350 Fifth Avenue, Suite 4640
New York, NY 10118
Tel: (212) 696-1999
Fax: (212) 490-3332
rgrand@laxneville.com

Robert R. Miller, Esq.
Lax & Neville, LLP
350 Fifth Avenue, Suite 4640
New York, NY 10118
Tel: (212) 696-1999
Fax: (212) 490-3332
rmiller@laxneville.com

**Max Krasner**

Ronald Ian Chorches
Law Offices of Ronald I. Chorches
82 Wolcott Hill Road - 2nd. Flr. Suite 2
Wethersfield, CT 06109
860-563-3955
860-513-1577 (fax)
ronchorcheslaw@sbcglobal.net

**Mei Guo**

Stephen M. Kindseth
ZEISLER & ZEISLER PC
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Tel: (203) 368-4234
Fax: (203) 368-5485
skindseth@zeislaw.com

James M. Moriarty
ZEISLER & ZEISLER PC
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Tel: (203) 368-4234
Fax: (203) 368-5485
jmoriarty@zeislaw.com

**Qiang Guo**

Arethusa Forsyth
arethusaf@proton.me

**River Valley Operations LLC**

Ross G. Fingold
Stokesbury & Fingold, LLC
10 Waterside Drive, Suite 204
Farmington, CT 06032
(860)606-1709
rfingold@lawssf.com

Michael T. Conway
Lazare Potter Giacovas & Moyle LLP
747 Third Ave., 16th Floor
Fifth Floor

New York, NY 10017
917-242-1597
212-430-8062 (fax)
mconway@lpgmlaw.com

**Yumei Hao**

Ross G. Fingold
Stokesbury & Fingold, LLC
10 Waterside Drive, Suite 204
Farmington, CT 06032
(860)606-1709
rfingold@lawssf.com

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

---------------------------------------------------------------x

In re:                                                      :   Chapter 11
                                                            :
HO WAN KWOK, *et al.*,[1]                                    :   Case No. 22-50073 (JAM)
                                                            :
                Debtors.    :   (Jointly Administered)
                                                            :
--------------------------------------------------------------:
                                                            :
LUC A. DESPINS, CHAPTER 11                                   :
TRUSTEE,                                                     :
                                                            :   Adv. Proceeding No. [_____]
                Plaintiff,    :
                                                            :
v.                                                          :
                                                            :
AA GLOBAL VENTURES LIMITED, AAGV                            :
LIMITED, ALZARRO ENTERPRISES LTD.,                          :
AMPLEFORTH CAPITAL LTD, ANTON                               :
DEVELOPMENT LIMITED, ASSETS SINO                            :
LIMITED, AUSPICIOUS COAST LIMITED, BSA                      :
CAPITAL MANAGEMENT LIMITED, BSA                             :
STRATEGIC FUND I, CANADIAN AGRI-                            :
PRODUCT MONETARY INVESTMENTS LIMITED,:
CRANE ADVISORY GROUP LLC, DELTA                             :
KONSULT LIMITED, EAGLE EYE INVESTMENTS :
LIMITED, FEIBO JIANG, FIESTA INVESTMENT                     :
LTD., GLORY ASIA (H.K.) LIMITED, GOLD                       :
PERFECT LIMITED, GROUP DYNASTY LIMITED, :
GS SECURITY SOLUTIONS INC., GUANG HONG                      :
LIMITED, H RESERVE MANAGEMENT LIMITED, :
HAITHAM KHALED, HAORAN HE, HEAD WIN                         :
GROUP LIMITED, HGA PROPERTY OPERATION :
LLC, HING CHI NGOK, HOLY CITY HONG KONG :
VENTURES LIMITED, HONG KONG                                 :
INTERNATIONAL FUNDS INVESTMENTS                             :

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and the Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

LIMITED, HUDSON DIAMOND HOLDINGS, INC.,   :
INFINITY TREASURY MANAGEMENT INC.,        :
INSIGHT PHOENIX FUND, JOINCORP            :
INTERNATIONAL LIMITED, JOY CHANCE         :
HOLDINGS LIMITED, KESEN YANG, KUN MA,     :
KINGDOM RICH LIMITED, LE QIAO, LICHUN     :
GUO, LIHONG GUO, LONG GATE LIMITED, MAX   :
KRASNER, MEI GUO, NEW FEDERAL STATE       :
CORPORATION, NEW MIRACLE LIMITED,         :
PACIFIC KING INVESTMENT LIMITED, PHOENIX  :
CAPITAL MANAGEMENT (CAYMAN) LIMITED,      :
QIANG GUO, QIN LI, RICH GROUP             :
DEVELOPMENT LIMITED, RISING SUN CAPITAL   :
LTD., RIVER VALLEY OPERATIONS LLC, SAIL   :
VICTORY LIMITED, SCOTT BARNETT, STRONG    :
COUNTRY HOLDINGS GROUP LIMITED,           :
THOUSAND STARS COMPANY LIMITED,           :
WENCUN GUO, XINFANG ZHANG, YAN SU,        :
YUMEI HAO, ZHANG WEI, and ZONGCHAO YUE,   :
                                          :
                     Defendants.          :
-------------------------------------------------------------------x

**SECOND COMPLAINT OF CHAPTER 11 TRUSTEE FOR ESTATE OF HO WAN
KWOK, PURSUANT TO BANKRUPTCY CODE SECTIONS 541, 542, AND 544,
SEEKING (I) DECLARATORY JUDGMENT THAT CERTAIN ENTITIES
ARE ALTER EGOS OF DEBTOR AND (II) RELATED RELIEF**

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the

chapter 11 case (the "Chapter 11 Case") of Ho Wan Kwok (the "Debtor" or "Kwok"), files this

adversary complaint (the "Complaint") against the above-captioned defendants (collectively, the

"Defendants").  In support of this Complaint, the Trustee states as follows:

**NATURE OF ACTION**

1.      "Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze

of corporate entities and with family members. This scheme has enabled Kwok to assert that he

has no assets despite his lavish lifestyle," wrote Justice Ostrager of the Supreme Court of the

State of New York in his final contempt decision issued on February 9, 2022 in litigation brought

2

by Pacific Alliance Asia Opportunity Fund L.P. ("PAX") against the Debtor.[2]  Justice Ostrager

found that the Debtor had played a "shell game"—"a game of evasion" involving

"machinations" "to avoid and deceive his creditors by parking his substantial personal assets

with a series of corporations, trusted confidants, and family members."  Justice Ostrager imposed

a $134 million contempt fine against the Debtor, triggering the filing of the Debtor's bankruptcy

petition on February 15, 2022.  But the Debtor's efforts to hide his assets continued, in spite of

the Chapter 11 Case and the Debtor's criminal conviction and prosecution, and the Trustee has

diligently sought to unravel the Debtor's shell game to this day.

2.    This Complaint follows in the footsteps of the *Complaint of Chapter 11 Trustee
for Estate of Ho Wan Kwok, Pursuant to Bankruptcy Code Sections 541, 542, and 544, Seeking
(I) Declaratory Judgment that Certain Entities Are Alter Egos of Debtor and (II) Related Relief*
[Adv. Proc. No. 24-05249, Docket No. 1] (the "First Omnibus Alter Ego Complaint"), the

*Amended Complaint of Chapter 11 Trustee for Estate of Ho Wan Kwok, Pursuant to Bankruptcy
Code Sections 541, 542, and 544, Seeking (I) Declaratory Judgment that Certain Entities Are
Alter Egos of Debtor and (II) Related Relief* [Adv. Proc. No. 24-05249, Docket No. 106] (the

"Amended First Omnibus Alter Ego Complaint"), and the other complaints filed by the Trustee

asserting Alter Ego Claims (as defined below) that have resulted thus far in numerous orders

adjudging entities to be the Debtor's alter egos and/or to be beneficially or equitably owned,

together with their assets, by the Debtor.

3.    The Trustee's continued investigation, together with new information made public

during the Debtor's criminal trial (which, on July 16, 2024, resulted in a federal jury finding the

Debtor guilty on racketeering, conspiracy, fraud, and money laundering charges), now allows the

---

[2]    *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181 (the "Final Contempt Decision").

Trustee to assert Alter Ego Claims with respect to numerous additional entities that, despite being nominally separate from the Debtor, are dominated and controlled by him.

4.    The distinct entities with respect to which this Complaint asserts Alter Ego Claims (the "Debtor Entities," and each a "Debtor Entity") are[3]:

a.   **Crane Advisory Group LLC ("Crane")**, a company organized in New York, nominally held by Haitham Khaled, that the Debtor used, among other things, to assist in opening bank accounts for various of the Debtor's shell companies and to facilitate the collection of G Club membership funds from the Debtor's supporters.

b.   **GS Security Solutions Inc. ("GS Security")**, an entity organized in New York and nominally owned by the Debtor's bodyguard, Scott Barnett, which the Debtor has used to hold title to multiple luxury vehicles and provide transportation and security services for himself and his family members.

c.   **HGA Property Operation LLC ("HGA Property Operation")**, an entity organized in New Jersey and nominally held by the Debtor's supporters Qin Li and Feibo Jiang.  The Debtor used HGA Property Operation, among other things, to maintain his mansion in Mahwah, New Jersey (the "Mahwah Mansion") and employ his chef, Han Chunguang, as well as numerous employees of the Debtor's alter ego HCHK Property (as defined below).

d.   The **Haoran He Entities,** comprised of **Rising Sun Capital Ltd. ("Rising Sun Capital")**, and **Fiesta Investment Ltd. ("Fiesta Investment")**, entities organized in the United Kingdom and nominally held by Haoran He (collectively, the **"Haoran He Entities"**), whom the Debtor used as the straw man owner of his G Club Entities, including G Club International Limited ("G Club International") and G Club Operations LLC ("G Club Operations," and together with G Club International, the "G Club Entities")).  Testimony from the Criminal Trial indicates that Haoran He has a longstanding friendship with the Debtor's son dating to their time as students together.  One witness at the Criminal Trial testified that she understood Haoran He to be part of the Debtor's family.  The Haoran He Entities were used by the Debtor, among other things, to funnel money from his G Club scheme to the Debtor's son.

---

[3]    The Trustee asserts Alter Ego Claims herein with respect to certain entities that are also defendants in other actions commenced by the Trustee asserting avoidance claims against such defendants pursuant to sections 544, 548, and/or 549 of the Bankruptcy Code (the "Avoidance Claims").  The Trustee asserts the Alter Ego Claims herein in the alternative to the Avoidance Claims and reserves all his rights with respect to both his Alter Ego Claims and Avoidance Claims based upon further progress in the Trustee's investigation.

4

e. The **UAE Entities**, comprised of **Thousand Stars Company Limited ("Thousand Stars"), Delta Konsult Limited ("Delta Konsult"), and H Reserve Management Ltd. ("H Reserve Management")**, entities organized in the Abu Dhabi Global Market ("ADGM"), in Abu Dhabi, United Arab Emirates (collectively, the "**UAE Entities**"). The Debtor has used the UAE Entities in order to, among other things, continue his G Club and Himalaya Exchange schemes and activities overseas in reaction to the investigation and prosecution of the Debtor by the United States Government.

f. **River Valley Operations LLC ("River Valley")**, an entity organized in Indiana, and nominally owned by Yumei Hao, a prominent supporter of the Debtor and member of the Debtor's New Federal State of China ("NFSC") and of the Debtor's Iron Blood Group of the Himalaya Global Alliance organizations (the "Iron Blood Group"). Upon information and belief, Yumei Hao is in charge of the finance department of the Debtor's Himalaya Global Alliance organizations. The Debtor used River Valley to transfer funds to and from other entities he controlled and to pay for such entities' expenses, as well as to transfer funds to his daughter and prominent supporters.

g. **Ampleforth Capital Ltd. ("Ampleforth Capital")**, an entity organized in the BVI and nominally owned, upon information and belief, by Kun ("Kevin") Ma, a prominent supporter of the Debtor and member of the NFSC and Iron Blood Group. The Debtor used Ampleforth Capital to funnel money from his supporters to Himalaya International Clearing Limited ("**Himalaya International Clearing**"), a company controlled by the Debtor that is one of the companies named as a defendant in the Amended First Omnibus Alter Ego Complaint.

h. Certain holding companies (the "**Debtor Holding Companies**") whose sole purpose was to hold ownership interests in companies that have already been adjudged to be, or that the Trustee has already alleged to be, alter egos of and/or beneficially owned and controlled by the Debtor.

i. Numerous shell companies incorporated in Hong Kong, BVI, and other offshore jurisdictions (the "**Hong Kong Shell Companies**," "**BVI Shell Companies**," and "**Other Shell Companies**" respectively), at which the Debtor's family members, employees, controlled companies, or other agents served as nominal shareholders and/or directors and that the Debtor used to engage in financial transactions and/or hold assets on his behalf.

5. Based on the facts set forth below, the Trustee seeks rulings pursuant to sections 541, 542, and 544 of the Bankruptcy Code declaring that each Debtor Entity is an alter ego of and equitably owned by the Debtor (or similar relief under applicable law).

5

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this adversary proceeding pursuant

to 28 U.S.C. §1334(b).

7.      This adversary proceeding has been referred to this Court pursuant to 28 U.S.C.

§157(a).  Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

8.      The Trustee is the chapter 11 trustee in the Chapter 11 Case pursuant to the

Court's order entered on July 8, 2022 [Main Case Docket No. 523].

9.      AA Global Ventures Limited is a BVI entity.

10.     AAGV Limited is a BVI entity.

11.     Alzarro Enterprises Ltd. is a BVI entity.

12.     Ampleforth Capital Ltd is a BVI entity.

13.     Anton Development Limited is the nominal owner of AA Global Ventures

Limited.

14.     Assets Sino Limited is a BVI entity.

15.     Auspicious Coast Limited is a BVI entity.

16.     BSA Capital Management Limited is the nominal owner of BSA Strategic Fund I.

17.     BSA Strategic Fund I is a Cayman Islands entity.

18.     Canadian Agri-product Monetary Investments Limited is a Hong Kong entity.

19.     Crane Advisory Group LLC is a New York entity.

20.     Delta Konsult Limited is an ADGM entity.

21.     Eagle Eye Investments Limited is a Hong Kong entity.

22.     Feibo Jiang is a nominal owner of HGA Property Operation LLC.

23.    Fiesta Investment Ltd. is a United Kingdom entity.

24.    Glory Asia (H.K.) Limited is a Hong Kong entity.

25.    Gold Perfect Limited is a Hong Kong entity.

26.    Group Dynasty Limited is a Hong Kong entity.

27.    GS Security Solutions Inc. is a New York entity.

28.    Guang Hong Limited is a BVI entity.

29.    H Reserve Management Limited is an ADGM entity.

30.    Haitham Khaled is the nominal owner of Crane Advisory Group LLC.

31.    Haoran He is the nominal owner of Fiesta Investment Ltd., Rising Sun Capital

Ltd., and Thousand Stars Company Limited.

32.    Head Win Group Limited is a BVI entity.

33.    HGA Property Operation LLC is a New Jersey entity.

34.    Hing Chi Ngok, the Debtor's wife, is the nominal owner of Gold Perfect Limited,

Group Dynasty Limited, Joy Chance Holdings Limited, and Pacific King Investment Limited.

Hing Chi Ngok is also the nominal 5% owner of Strong Country Holdings Group Limited.

35.    Holy City Hong Kong Ventures Limited is a BVI entity.

36.    Hong Kong International Funds Investments Limited is a Hong Kong entity.

37.    Hudson Diamond Holdings, Inc. is a BVI entity.

38.    Infinity Treasury Management Inc. is a Delaware entity.

39.    Insight Phoenix Fund is a Cayman Islands entity.

40.    Joincorp International Limited is a Hong Kong entity.

41.    Joy Chance Holdings Limited is a Hong Kong entity and is the nominal owner of

New Miracle Limited.

7

42.     Kesen Yang is the nominal owner of Eagle Eye Investments Limited.

43.     Kun ("Kevin") Ma is the nominal owner of Ampleforth Capital Ltd.

44.     Kingdom Rich Limited is a Hong Kong entity.

45.     Le ("Ingrid") Qiao is the nominal owner of H Reserve Management Limited.

46.     Lichun Guo is the nominal owner of Auspicious Coast Limited.

47.     Lihong Guo is the nominal owner of Assets Sino Limited.

48.     Long Gate Limited is a BVI entity.

49.     Max Krasner is the nominal owner of Long Gate Limited.

50.     Mei Guo, the Debtor's daughter, is the nominal owner of AAGV Limited, Joincorp International Limited, and Hong Kong International Funds Investments Limited.

51.     New Federal State Corporation is a Nevis entity and is the nominal owner of Holy City Hong Kong Ventures Limited.

52.     New Miracle Limited is a Hong Kong entity.

53.     Pacific King Investment Limited is a Hong Kong entity.

54.     Phoenix Capital Management (Cayman) Limited is the nominal owner of Insight Phoenix Fund.

55.     Qiang Guo, the Debtor's son, is the nominal owner of Alzarro Enterprises Ltd, Canadian Agri-product Monetary Investments Limited, Hudson Diamond Holdings, Inc., Infinity Treasury Management Inc., Kingdom Rich Limited, and Sail Victory Limited.  Qiang Guo is also the nominal 95% owner of Strong Country Holdings Group Limited.

56.     Qin Li is a nominal owner of HGA Property Operation LLC.

57.     Rich Group Development Limited is a Hong Kong entity.

58.     Rising Sun Capital Ltd. is a United Kingdom entity.

8

59.     River Valley Operations LLC is an Indiana entity.

60.     Sail Victory Limited is a BVI entity.

61.     Scott Barnett is the nominal owner of GS Security Solutions Inc.

62.     Strong Country Holdings Group Limited is a Hong Kong entity.

63.     Thousand Stars Company Limited (formerly G Clubs ME Limited) is an ADGM

entity.

64.     Wencun Guo (a/k/a Man Chuen Kwok) is the nominal owner Guang Hong

Limited.

65.     Xinfang ("Sarah") Zhang is the nominal owner of Delta Konsult Limited.

66.     Yan Su is the nominal owner of Rich Group Development Limited.

67.     Yumei Hao is the nominal owner of River Valley Operations LLC.

68.     Zhang Wei is the nominal owner of Head Win Group Limited.

69.     Zongchao Yue is the nominal owner of Glory Asia (H.K.) Limited.

## **FACTS**

### I.     **Debtor's Prolific Use of Shell Companies**

70.     As discussed in the Amended First Omnibus Alter Ego Complaint, incorporated

by reference herein, the Debtor is a prolific user of shell companies, nominally owned by family

members or business subordinates, to conceal and shield his assets and activities from creditors.

The Debtor's "shell game" has allowed him to continue to deny ownership of assets, refuse to

pay debts, and—until his arrest by the FBI and subsequent criminal conviction—live a life of

extreme luxury.

71.     The Trustee has been steadily unraveling the Debtor's shell game and has already

asserted claims alleging that numerous shell companies are the Debtor's alter egos and/or that

such shell companies and their assets are beneficially owned by the Debtor, or similar claims under applicable law (collectively, the "Alter Ego Claims").  Numerous actions commenced by the Trustee in this regard (the "Alter Ego Actions") have resulted in rulings in the Trustee's favor on his Alter Ego Claims (the "Alter Ego Rulings"), while several of the Alter Ego Actions remain pending.

72.    For example, prior to the filing of the First Omnibus Alter Ego Complaint, the Court had already issued Alter Ego Rulings with respect to HK International Funds Investments (USA) Limited ("HK USA"), Golden Spring (New York) Ltd. ("Golden Spring"), Lamp Capital LLC ("Lamp Capital"), and Ace Decade Limited ("Ace Decade").

73.    Subsequent to the filing of the First Omnibus Alter Ego Complaint, the Court issued Alter Ego Rulings with respect to Whitecroft Shore Limited ("Whitecroft"), HCHK Technologies, Inc. ("HCHK Technologies"), HCHK Property Management, Inc. ("HCHK Property"), Lexington Property and Staffing, Inc. ("Lexington Property" and together with HCHK Technologies and HCHK Property, the "HCHK Entities"), Greenwich Land LLC ("Greenwich Land"), and K Legacy Ltd. ("K Legacy").  The Trustee's Alter Ego Actions with respect to Hudson Diamond NY LLC ("HDNY"), Leading Shine NY Limited ("Leading Shine NY"), and Taurus Fund LLC ("Taurus Fund") remain pending, as does the Amended First Omnibus Alter Ego Complaint, which asserts Alter Ego Claims with respect to numerous different entities organized in the United States, British Virgin Islands ("BVI"), Hong Kong, and other jurisdictions, including among others entities prominently involved in the Debtor's purported membership club (G Club) and cryptocurrency (Himalaya Exchange) schemes.[4]

---

[4]    In addition to the Trustee's Alter Ego Claims, the Trustee has also asserted claims that various assets nominally owned by the Debtor's shell companies or family members were in fact owned by the Debtor, resulting in rulings that the Debtor was the beneficial owner of, among other things, his *Lady May* yacht, Bombardier private jet, and various luxury motorcycles.  *See Supplemental Memorandum of Decision in Support of Oral*

74.     As noted in the Amended First Omnibus Alter Ego Complaint, the Debtor has spent at least the last ten years creating shell companies to hide and move his assets out of creditors' reach, and these shell companies tend to exhibit a number of similar characteristics, such as: (a) nominal ownership of an entity by someone with a close relationship to the Debtor, such as a family member, employee or devoted follower; (b) the lack of observance of corporate formalities including through the siphoning of assets for personal use; (c) the entity holding title to an asset beneficially owned by the Debtor; (d) the entity being formed at the direction of the Debtor; (e) the entity providing funding for the Debtor's expenses; (f) the entity being staffed by employees of the Debtor; (g) the entity sharing an office address with the Debtor and other entities associated with the Debtor; and (h) the entity having no independent business purpose (other than to own and hold assets of and for the Debtor) or source of funds (other than the Debtor).  As discussed further herein, numerous of the Debtor Entities that are the subject of this Complaint share, if not all of these characteristics, enough of them so as to make apparent the Debtor's domination and control over such entities.  Moreover, the Debtor Entities cannot be viewed in a vacuum, but must be assessed in light of an established pattern of behavior whereby the Debtor places loyal individuals in charge of purportedly independent companies to administer vast sums of money and execute multi-million-dollar transactions for the benefit of himself and his family.

A.     **Trustee's Avoidance Actions and Civil RICO Complaint**

75.     In addition to the Alter Ego Claims asserted by the Trustee, the Trustee has commenced hundreds of adversary proceedings seeking the avoidance of fraudulent and post-

---

*Ruling Granting Motion for Partial Summary Judgment*, Adv. Proc. No. 22-05003, Docket No. 177; *Memorandum of Decision and Order Granting in Part Motion for Summary Judgment*, Adv. Proc. No. 23-05008, Docket No. 126; *Memorandum of Decision Granting Motion for Judgment on the Pleadings*, Adv. Proc. No. 24-05001, Docket No. 33.

petition transfers made by the Debtor through his alter ego shell companies (the "Avoidance Litigation"), seeking in excess of $600 million in recoveries.

76.     Separately, the Trustee has filed a complaint against 57 defendants, including the Debtor's son, Qiang Guo, and the Debtor's daughter, Mei Guo, seeking damages for violations of the Racketeering Influenced Corrupt Organizations Act and conspiracy to violate the Racketeering Influenced Corrupt Organizations Act (the "Civil RICO Complaint").[5]  In the Civil RICO Complaint, the Trustee has alleged with particularity that the Debtor created and managed a complex criminal enterprise to conspire and act with (among others) numerous of his shell companies and their nominal owners to intentionally (i) use those entities as a means of engaging in criminal activity to enrich the Debtor and (ii) do so in such a way as to hide the Debtor's misbegotten assets from his creditors.  The Debtor's use of these shell companies to enact his scheme, while concealing the badges of ownership and control of the entities holding and managing his assets, is a bedrock pillar of the Debtor's illicit enterprise.

**B.     Debtor's Criminal Case**

77.     On March 15, 2023, United States federal authorities arrested the Debtor and Yvette Wang on fraud and money-laundering charges.  Also on March 15, 2023, United Kingdom law enforcement in London, working in partnership with U.S. authorities, attempted to arrest the Debtor's financial advisor, William Je, and executed a judicially authorized search of Je's London residence.  Since then, William Je has not returned to the United Kingdom and remains a fugitive believed to be in the United Arab Emirates ("UAE").

---

[5]     The Civil RICO Complaint was filed in connection with *Despins v. Ngok, et al.*, Adv. Proc. No. 24-05273, which is currently stayed.

78.     The U.S. Government alleged that, in the period between 2018 and 2023, the Debtor devised and led, with the assistance of his co-defendants William Je and Yvette Wang, a massive billion-dollar fraud and money-laundering scheme as part of which the Debtor and his co-defendants systematically raised money from the Debtor's online followers for a series of purported investment schemes, laundered the funds through a vast network of shell companies and bank accounts, and then used such funds for their own personal benefit and to perpetuate their fraudulent schemes.  Among other things, the U.S. Government contended that the Debtor and his co-defendants utilized "more than approximately 500 accounts held in the names of at least 80 different entities or individuals" to launder fraud proceeds[6] and that "[h]undreds of millions of dollars of the fraudulent scheme's proceeds were transferred, either directly or indirectly, to bank accounts in the United States, the Bahamas, Switzerland, and the UAE, among other places."[7]

79.     In addition to fraud and money-laundering charges, the U.S. Government's indictment accused the Debtor and his co-defendants of a criminal racketeering conspiracy in violation of the Racketeering Influenced Corrupt Organizations Act (the "Criminal RICO Charge").  The Criminal RICO Charge asserted that the Debtor is the leader of a criminal enterprise (the "Kwok Enterprise") "operated through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds."[8]  The U.S. Government named dozens of entities as part of the Kwok Enterprise,[9]

---

[6]     *Superseding Indictment* ¶ 4, Criminal Case Docket No. 307. Reference to "Criminal Case Docket No. __" mean and refer to items on the docket of *United States v. Kwok et al.*, No. 1:23-cr-00118 (AT) (S.D.N.Y)..

[7]     *Id.*

[8]     *Id.* ¶ 1.

[9]     *Id.* ¶ 3a.

many of which have already been made the subject of pending Alter Ego Claims or with respect

to which the Court has issued Alter Ego Rulings.  Notably, the U.S. Government highlighted the

participation of several of the Debtor's family members in the Debtor's billion-dollar fraud,

including the Debtor's son, Qiang Guo, who was referred to by the U.S. Government as an

unindicted co-conspirator and agent of the Debtor.[10]

80.    In connection with its investigation of the Debtor, the U.S. Government seized

bank accounts held in the name of various entities forming part of the Kwok Enterprise and

holding over $630 million.

81.    The Debtor's criminal trial (the "Criminal Trial") commenced on May 22, 2024

and resulted in the Debtor being found guilty on multiple counts, including racketeering,

conspiracy, fraud and money laundering, per the jury's verdict reached on July 16, 2024.  The

Criminal Trial resulted in a large amount of information regarding the Debtor's shell companies

being made public, including trial exhibits and the testimony of individuals connected to the

Debtor's shell companies.  These individuals included Scott Barnett, the Debtor's bodyguard and

driver, who testified regarding his role at Taurus Fund, the company holding title to the Debtor's

mansion in Mahwah New Jersey; Ya Li, a former high-ranking supporter of the Debtor, who

testified regarding, among other things, her role as director of the parent company to the HCHK

Entities; and Haitham Khaled, the nominal owner of Crane, who testified in connection with his

role working for the Debtor and the Debtor's control over G Club Operations LLC and its funds.

As discussed further below with respect to particular Debtor Entities, information brought to

light during the Criminal Trial has provided the basis for many of the allegations made in this

Complaint regarding the nature of the Debtor's control over his shell companies and his

---

[10]    *See* The Government's Motions *in Limine*, at 8, Criminal Case Docket No. 273.

relationships with the individuals who nominally owned these entities and managed them on his behalf.

82.    At the Criminal Trial, the Debtor's own defense counsel essentially confirmed the basic key fact that the Trustee has been pressing for over two years—that (consistent with his public depictions of himself) the Debtor is in reality a wealthy and powerful tycoon, and that the image the Debtor presented in his bankruptcy schedules as a pauper with less than $4,000.00 was pure fiction.  Putting the lie to the Debtor's obvious and repeated misrepresentations to this Court, the Debtor's criminal counsel stated at his trial, among other things, that the Debtor was actually a wealthy businessman who built a massive business enterprise.  Indeed, the Debtor's counsel acknowledged during the Criminal Trial that the Debtor had purchased the mansion in Mahwah, New Jersey nominally owned by Taurus Fund.[11]

**C.    <u>Key Individuals</u>**

83.    The Amended First Omnibus Alter Ego Complaint discussed in detail the network of family members, employees, and loyal lieutenants who took instruction from the Debtor and acted as the Debtor's agents on his behalf in connection with the operation of his shell companies. These individuals, who served on the Debtor's behalf as, among other things, nominal owners, authorized signatories, directors, officers, and key employees of his various shell companies, included the Debtor's children.

84.    Numerous of these individuals discussed in the Amended First Omnibus Alter Ego Complaint reappear in this Complaint acting on the Debtor's behalf in purported ownership and/or management roles with respect to the Debtor Entities.  These reappearing key individuals

---

[11]    Crim. Trial Tr., at 5441:5-9 (asking Scott Barnett whether he was "surprised when Mr. Guo purchased that property [*i.e.*, the Mahwah Mansion]").

15

include, among others, Qiang ("Mileson") Guo (the Debtor's son),[12] Mei Guo (the Debtor's daughter), Hing Chi Ngok (the Debtor's wife), William Je (the Debtor's financial advisor, agent and co-criminal defendant),[13] Yvette Wang (the Debtor's chief of staff and convicted co-criminal defendant),[14] Natasha Qu (the Debtor's former executive assistant), Han Chunguang (the Debtor's chef), Max Krasner (the Debtor's employee), Scott Barnett (the Debtor's bodyguard), as well as various other family friends and relatives of the Debtor, such as Haoran He, and Zhang Wei, purportedly the husband of one of the Debtor's nieces.  Upon information and belief, each of the Debtor's son, the Debtor's daughter, and the Debtor's wife has never had gainful employment outside of the Debtor's shell companies and has no source of wealth other than from the Debtor.

85.    This Complaint also introduces a number of the Debtor's other family members, employees, and lieutenants who, although not discussed in the Amended First Omnibus Alter Ego Complaint, play leading "strawman" roles in connection with the Debtor Entities discussed herein.  These individuals include one of the Debtor's brothers, another of the Debtor's nieces, the Debtor's sister-in-law, several employees of the Debtor, including Haitham Khaled of Crane

---

[12]    The U.S. Government alleged that the Debtor's son was a co-conspirator and agent of his father and that he was the recipient of millions of dollars of fraudulently obtained funds.  *See* The Government's Motion *in Limine,* at 7-8, Criminal Case Docket No. 273, and The Government's Letter, at 4, Criminal Case Docket No. 382. Notably, the court overseeing the Debtor's criminal trial (the "Criminal Court") found that "the Government has met its burden to show by a preponderance of the evidence that Mileson was a member of several of the charged conspiracies," thus allowing into evidence Qiang Guo's statements as an exception to the hearsay rule for coconspirator statements, observing that "Mileson's role within the alleged conspiracies was multifaceted."  *See* Order, at 7, Criminal Case Docket No. 388.

[13]    Statements of William Je, the Debtor's criminal co-defendant, were also allowed into evidence by the Criminal Court as coconspirator statements.  *See Order,* at 6, Criminal Case Docket No. 388 ("The Government established by at least a preponderance of the evidence that Je was chiefly responsible for laundering the proceeds of the charged fraud schemes, implicating him as a coconspirator.").

[14]    On May 3, 2024, prior to the commencement of the Debtor's Criminal Trial, Yvette Wang, the Debtor's criminal co-defendant, pled guilty with respect to one count of conspiracy to commit wire fraud and one count of conspiracy to commit money laundering.  *See* Exhibit A to *Notice of Chapter 11 Trustee Updating Parties in Interest with Respect to Debtor's Criminal Proceedings Pending in United States District Court for Southern District of New York*, Main Case Docket No. 3169.

who handled banking transactions on the Debtor's behalf, and several prominent supporters of the Debtor involved in his NFSC organization.[15] These supporters include a number of individuals involved in the Debtor's activities in the UAE, where the Debtor began to move his activities in the period leading up to his arrest in response to the Government's investigation (which included bank account seizures beginning in September 2022). Such individuals include Yumei Hao, her husband Kun ("Kevin") Ma, Le ("Ingrid") Qiao, Kangdi Wang, and Xinfang ("Sarah") Zhang, who, upon information and belief, are (or at one time were) members of the Iron Blood Group. The Criminal Court has found that the Iron Blood Group "consisted of the core, highest level leaders of the Himalaya Alliance" and "[g]roup members managed the Alliance, were selected by [the Debtor], and followed his directives."[16] Each of Yumei Hao, Kevin Ma, Ingrid Qiao, Kangdi Wang, and Sarah Zhang is alleged herein to be an agent of the Debtor who acted on his behalf.

## II.     Debtor Entities Are Alter Egos of and Equitably or Beneficially Owned by Debtor

86.     As discussed further herein, the Trustee is entitled to Alter Ego Rulings with respect to each of the Debtor Entities based on the Debtor's control and domination over these entities and their assets. The Debtor Entities that are the subject of this Complaint exhibit many of the same characteristics that the Trustee has alleged with respect to entities as to which the Court has already issued Alter Ego Rulings or for which Alter Ego Claims remain pending. For example, numerous of these entities, at all relevant times, were controlled by the Debtor through family members and employees, served the Debtor's purposes, and were operated out of the

---

[15]    The Court has found that the Debtor "is the leader" of the NFSC, along with various other entities and organizations "which serve the purposes of" the Debtor, "serve as business vehicles for" the Debtor, and whose "members are personally loyal to the Debtor." *Corrected Memorandum of Decision Granting in Part Motion for Preliminary Injunction* ¶ 7, Adv. Proc. No. 22-05032, Docket No. 133 (the "PI Decision").

[16]    *See* Order, n.4, Criminal Case Docket No. 388.

Debtor's offices.

A.     **Crane**

87.     Crane is a New York entity formed in 2020, nominally owned by its sole member,

Mr. Haitham Khaled.

88.     At the Debtor's Criminal Trial, Mr. Khaled, testified, among other things, that:

a.   Mr. Khaled worked for Saraca, GTV, Yvette Wang and the Debtor.  In his work for Yvette Wang and the Debtor, he was "in charge of banking relationships" and of "opening bank accounts for various entities and individuals."[17]  As part of his employment, he lied to banks to "make sure that accounts get opened and stay open."[18]

b.   Yvette Wang interviewed Mr. Khaled at 162 E. 64th Street in New York City, where she told him she worked for "the big boss principal."[19]  After his interview with Yvette Wang, he conducted a video call with the Debtor, whom Yvette Wang referred to as the "boss"; Yvette Wang told Khaled that whether he would work for the Debtor would depend on whether the Debtor liked him and approved of his work.[20]

c.   He received his employment offer letter from Saraca, dated July 10, 2020, and the letter said he would be "VP of banking relations and strategy at Saraca Media Group, Inc., and its subsidiary entities."[21]  Initially, GTV paid Mr. Khaled's salary, and subsequently it was paid by Lexington Property.[22]

d.   Mr. Khaled's office was located at 162 E. 64th Street, and his direct manager was Yvette Wang.  Some of the other companies that operated out of the 162 E. 64th Street location were Golden Spring, Rule of Law Foundation, and GTV, and the Debtor also worked out of an office on the top floor of the same townhouse.  Mr. Khaled and others at the 162 E. 64th Street office reported to Yvette Wang, but the Debtor was the "top boss," and "everybody needed to be either working or busy with something," when the Debtor was present.[23]

e.   Mr. Khaled created Crane within the first month of his employment, and testified that the idea to establish Crane "was [a] combination" between Yvette Wang,

---

[17]   Crim. Trial Tr., at 1902.
[18]   *Id.*, at 1903.
[19]   *Id.,* at 1918.
[20]   *Id.,* at 1923-24; *see also* Government's Criminal Trial exhibit, GXBR399 (Government Criminal Trial exhibits are publicly available upon request from Press Office of U.S. Attorney's Office, Southern District of New York).
[21]   *Id.*
[22]   Crim. Trial Tr., at 1936.
[23]   *Id.*, at 1941.

Victor Cerda (the Debtor's counsel), and himself, with the initial purpose of Crane being to apply for a bank license, acquire a bank, or set up an online digital bank.

f. Crane was a single member LLC with Mr. Khaled as its only member. Following Crane's establishment, Mr. Khaled continued to be paid by Lexington and his employment contract continued to be with Saraca. He had an assistant with a Crane email address who was also paid by Lexington.[24]

g. While Crane nominally had an office address at One World Trade Center, this was merely a virtual office, as Khaled continued to work out of 162 E. 64th Street. Similar virtual office addresses were established for Lexington, G Club, G Music, G News, and G Fashion. The reason for setting up these virtual addresses was to deceptively disassociate these companies from negative publicity related to GTV, Saraca, and Golden Spring and the SEC's investigation of GTV and Saraca.[25]

h. Mr. Khaled set up bank accounts for Golden Spring, Hudson Diamond NY, Lamp Capital, and Greenwich Land, which entities paid the expenses of the Debtor's family.[26]

i. Mr. Khaled represented to banks that he was merely "a consultant to these [G series] entities."[27] However, "Crane was related to these entities, and [Khaled] was working for these entities."[28]

j. In March and April of 2021, Crane received approximately $100 million in payments for G Club membership fees. The funds were transferred to G Club's bank account, and a portion was transferred to an attorney who represented G Club. The Debtor controlled the money Crane received for G Club and thus the Debtor had a financial interest in such funds.[29]

k. On multiple occasions, Mr. Khaled made representations to banks that the Debtor was merely a spokesperson and brand ambassador of G Club and other G series entities such as G Fashion, G Music, and G News, and that the promoters of the G series entities "are hired only to promote and bring in subscribers…they are not owners nor are they in management positions."[30] However, such representations were false, because the Debtor "was involved with the creation of the companies and the day-to-day operations."[31] Mr. Khaled did not reveal the Debtor's true

---

[24] *Id.*, at 1936, 1942, 1943.

[25] *Id.*, at 1949.

[26] *Id.*, at 1959. In addition, according to exhibits presented in connection with the trial, Mr. Khaled also was involved in opening or attempting open bank accounts for G Club, Jovial Century, Lexington Property, and the Rule of Law Foundation.

[27] *Id.*, at 1990.

[28] *Id.*

[29] *Id.*, at 2211.

[30] *See e.g.*, Government Criminal Trial exhibits GXSW2027, GXSW2040, GXSW2042.

[31] Crim. Trial Tr., at 1977.

role to the banks because that would "jeopardize the possibility" of opening an account.[32]

89.     Mr. Khaled's testimony makes clear that Crane had no separate existence apart from the entities that have already been subject to Alter Ego Rulings or pending Alter Ego Claims, such as Golden Spring, Lexington Property, Lamp Capital, Greenwich Land, Hudson Diamond NY, G Club Operations, and others.  Mr. Khaled was simply another of the Debtor's employees working together with Yvette Wang, Max Krasner, and other Debtor employees from the Debtor's office at 162 E. 64th Street, and his nominal ownership of Crane was merely an aspect of his employment in furtherance of the Debtor's fraudulent scheme.  That employment consisted of opening bank accounts and moving millions of dollars in funds at the Debtor's behest.  Those funds, as demonstrated by bank records and other criminal trial exhibits, included, among others, the funds transferred from G Club members to Crane, then to the Debtor's counsel Lawall & Mitchell LLC, and then to Hamilton Opportunity Fund SPC, before eventually being used to purchase the Debtor's Mahwah Mansion.  Given these circumstances, and in light of the Debtor's track record in establishing alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to Crane.

**B.     GS Security**

90.     GS Security is an entity organized in New York and nominally owned by the Debtor's bodyguard, Scott Barnett.

91.     At the Debtor's Criminal Trial, Mr. Barnett testified, among other things, that:

a.   Mr. Barnett began to work for Golden Spring in October of 2020, and part of his work for Golden Spring was guarding the Debtor.[33]  Subsequently, Mr. Barnett's employer was switched from Golden Spring to Lamp Capital, and, later, to HCHK Technologies and HCHK Property.  Mr. Barnett worked for the Debtor from October 2020 through March 2023. Mr. Barnett's "immediate boss" was

---

[32]   *Id.*, at 1977-78.
[33]   *Id.*, at 5416.

20

Yvette Wang, and Mr. Barnett reported to her and Anthony DiBattista.[34] In addition, Mr. Barnett at times referred to the Debtor as "principal" and "boss."[35]

b. Mr. Barnett was the Debtor's head of security and his bodyguard. He provided security for the Debtor at the Sherry Netherland apartment, the Mahwah Mansion, and the Debtor's home on Taconic Road in Greenwich, Connecticut (the "Taconic Property"). Mr. Barnett also acted as the Debtor's driver and assisted the Debtor in connection with the *Liberty* Yacht[36] and the management of construction occurring at the Mahwah Mansion.[37]

c. The Debtor had Mr. Barnett buy motorcycles for him, and at one point Mr. Barnett held title to five motorcycles which he testified he did not really own. At the time of the Criminal Trial, one of these motorcycles was still under Mr. Barnett's name.[38]

d. Mr. Barnett testified as follows with respect to the Mahwah Mansion and Taurus Fund, the entity holding title to the Mahwah Mansion:

> Q. Mr. Barnett, do you know which entity bought the property that has been referred to as Mahwah?
>
> A. Yes, Taurus Fund purchased the property.
>
> Q. Did you have a role at the Taurus Fund?
>
> A. I did not have a role at the Taurus Fund.
>
> Q. Did you have a signatory role at the Taurus Fund?
>
> A. Yes, I did. I was unaware of that; but yes, I did.
>
> Q. And what was the signatory role that you had?
>
> A. Well, apparently, which I didn't find out until much later that I was the manager, one of the managers of that, of the fund.[39]

---

[34] *Id.*, at 5481.

[35] *Id.*, at 5480.

[36] *Id.*, at 5530. The *Liberty* was the $2 million Bering yacht held by G Fashion Hold Co B Limited, an entity subject to Alter Ego Claims asserted in the Amended First Omnibus Alter Ego Complaint. The yacht was sold in November 2022.

[37] *Id.*, at 5448.

[38] This is the Ducati motorcycle that is the subject of the consent order declaring the motorcycle property of the estate and requiring Mr. Barnett to transfer title of the motorcycle to the Trustee. *See* Main Case Docket No. 3220. Title to the other four motorcycles (three Harley Davidsons and a BMW) were subsequently transferred from Scott Barnett to Defeng Cao, the boyfriend of Mei Guo. The Court has ruled that these four motorcycles were beneficially owned by the Debtor. *See Memorandum of Decision Granting Motion for Judgment on the Pleadings* [Adv. Proc. No. 23-05001, Docket No. 33].

[39] *Id.*, at 5452-53.

e.   Mr. Barnett explained that: "[O]n paper they had me down as a manager [of Taurus Fund]. That wasn't my idea of what my job role was. So when they ask me to be a manager, I just thought they just meant to manage the property and install the security services. It wasn't to manage Taurus Fund because I would have no experience, nor would I undertake something like that."[40]   The paperwork Mr. Barnett signed related to Taurus Fund was given to him by the Debtor's counsel Aaron Mitchell.

f.   One of the Debtor's counsel, Victor Cerda, provided funds to help Mr. Barnett pay for his legal counsel.  In addition, Mr. Barnett established a GoFundMe page to raise money for his legal expenses, and Mr. Cerda, working with prominent Kwok supporter "Long Island David," distributed the GoFundMe information to the Debtor's supporters, who donated tens of thousands of dollars to the GoFundMe page.

92.     Mr. Barnett further testified that he established GS Security with the "permission" of Yvette Wang, and that he discussed starting the company with Yvette Wang, Max Krasner, and Anthony DiBattista.[41] GS Security was established as a separate company, according to Mr. Barnett, because "you really need to have insurance due to certain liabilities for the client that you're protecting, God forbid something were to happen. If it's just either the client themselves or any other entity, they're liable. God forbid we had to put our hands on somebody or anything worse than that or even anything minor, any lawsuit would go directly to that company instead of to a properly insured security company."[42]

93.     According to Mr. Barnett's testimony, GS Security's initial funding came from HCHK.[43]  GS Security was paid $650,000.00 by HCHK between December 2022 and February 2023.  Those funds were used to purchase, among other things, two BMW vehicles that cost approximately $165,000 each, and which were used to transport the Debtor and Yvette Wang.

---

[40]   *Id.*, at 5514.
[41]   *Id.*, at 5482.
[42]   *Id.*, at 5413-14.
[43]   *Id.*, at 5413.

22

94.    GS Security has been funded by the Debtor through his alter ego HCHK Property. As alleged in an adversary proceeding complaint filed by the Trustee, and consistent with the testimony of Mr. Barnett, GS Security received no less than $650,000.00 after the Petition Date from HCHK Property, the subject of an Alter Ego Ruling. GS Security was further funded by the Debtor's supporters, who paid Mei Guo's security bills to GS Security.

95.    GS Security's current largest client is Mei Guo. Previously its largest client was the Debtor. Upon information and belief, GS Security has no clients other than the Debtor and his family and associates. GS Security received $500,000.00 from individuals or companies that were not its clients to pay for security services for Mei Guo and legal fees incurred by Mr. Barnett and GS Security. Mr. Barnett stated: "I just give an invoice to Mei, and then she has whatever, pay[] the invoice."[44]

96.    In addition, ███████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████.

97.    In summary, similar to Crane, GS Security provides another example of a company that is independent of the Debtor in name only. GS Security was formed by one of the Debtor's employees, Scott Barnett, in consultation with the Debtor's agent Yvette Wang and counsel Victor Cerda, to provide security services for the Debtor and his family; GS Security was then funded by the Debtor through his alter ego HCHK Property or by funds directed to GS Security from the Debtor's supporters, in the same way the Debtor has funded other alter egos, like G Club Operations, by turning to his followers as a funding source; GS Security has no

---

[44]    *Id.*, at 5487.

clients other than the Debtor and his family and associates; and ██████████████

████████████████████████████. In addition, Scott Barnett is more than a

typical employee; he has been used by the Debtor separately as the straw-man masking the

Debtor's ownership of Taurus Fund and, hence, the Mahwah Mansion. Given these

circumstances, and in light of the Debtor's track record in establishing alter ego shell companies,

the Trustee is entitled to an Alter Ego Ruling with respect to GS Security.

### C.    HGA Property

98.    HGA Property filed its certificate of formation in New Jersey on April 19, 2023.

Upon information and belief, "HGA" stands for "Himalaya Global Alliance," one of the terms

used to describe the world-wide network of the Debtor's supporters.[45] At the time of its

formation, the sole member of HGA Property was Ms. Qin Li, who is also listed on HGA

Property's certificate of formation as the company's registered agent. Upon information and

belief, Ms. Li is a prominent supporter of the Debtor who has worked for the Debtor at GNews,

the Debtor's media platform. Ms. Li has also participated in the harassment against the Trustee

and Paul Hastings LLP both in front of the Trustee's residence and at Grand Central Terminal in

New York.[46] On June 20, 2023, HGA Property filed a certificate of amendment to its certificate

of formation that identified Qin Li as president and Feibo Jiang as member, with Qin Li

remaining as a member and registered agent. Feibo Jiang is also, upon information and belief, a

supporter of the Debtor and member of the Debtor's Himalaya Global Alliance and NFSC

organizations.

---

[45]    The Court has found that the Debtor is the leader of Himalaya Global Alliance, and that Himalaya Global
Alliance "serve[s] the purposes of the Debtor, serve[s] as business vehicle for the Debtor, and their members are
personally loyal to the Debtor. *See* PI Decision ¶ 7.

[46]    *See e.g.*, Himalaya Global Alliance, @GlobalAlliance, GETTR (December 10, 2022),
https://gettr.com/post/p21avwp8a44 (showing Qin Li, Qidong Xia (a/k/a Chang Dao Brother), and others
protesting in front of Trustee's residence on November 26, 2022).

99.     On May 10, 2023, HGA Property sent an offer letter to Han Chunguang, the Debtor's chef, offering to employ Han Chunguang as Communication Manager at an annual salary of $120,000.00.  In addition, HGA Property paid the salaries of numerous individuals who, upon information and belief, were officially employees of HCHK Property, the Debtor's alter ego.

100.    Beginning in or around its formation in April 2023,[47] HGA Property began paying for expenses relating to the Mahwah Mansion.  Expenses paid by HGA Property included those related to utilities, maintenance, security services, and property taxes.  HGA Property paid both GS Security, the entity nominally owned by Scott Barnett discussed above, as well as Hawk Eye Security, a new security company hired by Taurus Fund to comply with the Court's August 23, 2023 preliminary injunction order.

101.    HGA Property also paid for certain hotel expenses of Yongbing Zhang, the Debtor's attorney who, as the Court knows, helped orchestrate and was involved in the harassment against the Trustee and the frivolous litigation efforts against the Trustee, PAX's senior executive and PAX's counsel, including those related to Adversary Proceeding 23-05013 (the "HCHK Adversary Proceeding") as well as lawsuits in the District Court for the Southern District of New York for which he was sanctioned three separate times.[48]  As with Qiang Guo, William Je, and Yvette Wang, the Criminal Court ruled that there was sufficient evidence to find that Mr. Zhang and other farm leaders were unindicted co-conspirators whose statements could

---

[47]    It is no accident that HGA Property began funding Mahwah Mansion expenses in April 2023, the same month in which the HCHK Entities, which had previously funded various expenses related to the Mahwah Mansion, were assigned via deeds of assignment to Brian Hofmeister, as assignor (as more fully discussed in Trustee's pleadings filed in the HCHK Adversary Proceeding).

[48]    *See Memorandum of Decision and Order Denying Motion to Intervene and Motion to Clarify Temporary Restraining Order*, at 14-16, Adv. Proc. No. 23-05013, Docket No. 239.

be admitted into evidence under the co-conspirator statement exception to the hearsay rule.[49] Specifically, the Criminal Court found Mr. Zhang to have directed another of the Debtor's supporters to sign a false affidavit to sue the Trustee (and to have threatened her when she refused to do so).[50]

102.    In addition, HGA Property is the lessee of four storage units at Westy Self Storage in Upper Saddle River, New Jersey, which had previously been leased to Scott Barnett and Taurus Fund.  More specifically, Taurus Fund began leasing two storage units on January 11, 2022, began leasing a third storage unit on April 5, 2022, and began leasing a fourth storage unit on May 1, 2022.  Taurus Fund's tenancy of the four storage units was then transferred from Taurus Fund to Scott Barnett on April 18, 2023 and from Scott Barnett to HGA Property on April 27, 2023.  The Trustee's counsel visited the four storage units and confirmed, among other things, that "of the approximately 640 boxes we inspected and inventories, approximately 475 of them either (i) bear a Golden Spring label or (ii) otherwise bear handwritten annotations or contents relating directly to the Debtor."[51]  The circumstances related to these storage units were explained to the Court by the Trustee in a February 23, 2024 motion requesting turnover of their contents,[52] resulting in an objection by Taurus Fund in which Taurus Fund acknowledged that two of the four storage units "were utilized by an entity or entities other than Taurus Fund" beginning in April 2022.[53]  On March 26, 2024, the Court issued an order requiring turnover to the Trustee of the contents of the two storage units not used by Taurus Fund.[54]

---

[49]    *See* Order, at 8-9, Criminal Case Docket No. 388.

[50]    *Id.*, at 8.

[51]    *See Declaration of Luyi Song* ¶ 8, of *Motion of Chapter 11 Trustee for Order Enforcing Judgment and Requiring Turnover of Storage Unit Contents to Chapter 11 Estate*, Main Case Docket No. 2955.

[52]    *Id.*

[53]    *Limited Objection to The Chapter 11 Trustee's Motion for Order Enforcing Judgment and Requiring Turnover of Storage Unit Contents to Chapter 11 Estate* ¶ 5, Adv. Proc. 23-05018, Docket No. 43.

[54]    *Order Granting Motion of Chapter 11 Trustee for Order Enforcing Judgment and Requiring Turnover of Storage Unit Contents to Chapter 11 Estate,* Main Case Docket No. 3046.

103.    HGA Property and Taurus Fund entered into a property management agreement dated October 17, 2023 (authored, upon information and belief, by the Debtor's counsel Aaron Mitchell), under which HGA Property would manage, maintain, and operate the Mahwah Mansion and would be compensated $3,000 per month in addition to reimbursement it would receive from Taurus Fund for expenses incurred in managing the Mahwah Mansion. Ms. Li signed the agreement on behalf of HGA Property as its purported owner, and Mr. Yong Qi signed on behalf of Taurus Fund as its purported authorized representative. Taurus Fund never disclosed this arrangement to the Court or to the Trustee, despite the prior entry of the Court's August 23, 2023 preliminary injunction order, which stated, among other things, that Taurus Fund and the other defendants in the Taurus Fund Alter Ego Action "shall not transfer, encumber, move, dispose of, or in any way impair . . . any asset or property of Taurus Fund."[55]

104.    HGA Property has produced invoices purportedly billed to Taurus Management (nominal owner of Taurus Fund) to seek reimbursement of expenses for, among other categories, "repair and maintenance," "warehouse rent," "payroll," "meals," "contract labor," "office expense," and "utility," as well as payment of the $3,000 per month "service fee" under the management agreement with Taurus Fund. However, HGA Property has not produced any evidence that these expenses were ever reimbursed. Instead, the evidence demonstrates that HGA Property was funded by entities associated with the "Himalaya Farm" organizations of the Debtor's supporters.[56]

---

[55]    *Memorandum of Decision and Order Granting in Part Motion for Preliminary Injunction*, at 22-23, Adv. Proc. No. 23-05017, Docket No. 47.

[56]    The Court has found that, as with other Himalaya entities, the Debtor is the leader of Himalaya Farms, and that Himalaya Farms "serve the purposes of the Debtor, serve as business vehicle for the Debtor, and their members are personally loyal to the Debtor." *See* PI Decision ¶ 7.

105.    HGA Property was dominated and controlled by the Debtor.  His loyal followers were placed in nominal ownership of HGA Property.  HGA Property then paid the Debtor's expenses for the Mahwah Mansion and a storage facility for the Debtor's property.  The Debtor provided for the funding of HGA Property in a manner similar to the way he provided funding for G Club Operations or GS Security, by having his followers transfer funds to HGA Property so that its expenses (that is, the Debtor's expenses), would be covered.  Given these circumstances, and in light of the Debtor's track record in establishing alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to HGA Property.

### D.    Haoran He Entities

106.    As discussed below, the function of the Haoran He Entities was to transfer the Debtor's funds to his son in the United Kingdom.[57]

### i.    Fiesta Investment

107.    Fiesta Investment was incorporated in the United Kingdom on August 5, 2019, initially under the name of Fiesta Property Developments Ltd., which changed its name to Fiesta Investment Ltd. on July 13, 2021.

108.    The nominal owner and sole director of Fiesta Investment, as well as its only known employee, is Haoran He, the individual used by the Debtor as the straw man owner of

---

[57] This was, of course, part of a larger trend.  Indeed, the Trustee's avoidance action litigation includes an adversary proceeding against Qiang Guo seeking the avoidance and recovery of over $90 million in transfers to Qiang Guo as an initial transferee, and other Trustee adversary proceedings seek the avoidance of transfers made to other parties (including the vendors of private aircraft and luxury vehicles) for Qiang Guo's benefit. Notably, one of the transfers that is the subject of such adversary proceedings was the purchase by the Debtor, through a shell company, of a Cirrus propeller aircraft that was then nominally owned by Qiang Guo, and which was subsequently sold in early March 2024, a clear example of the dissipation of potential estate property. More recently, in its April 3, 2024, summary judgment decision holding that the Bombardier jet as well as Whitecroft were beneficially owned by the Debtor, this Court found that Whitecroft attempted to have over $12 million in proceeds of the October 2022 sale of the Bombardier jet wired to Qiang Guo at an account at Kyrgyz-Swiss Bank. *See Memorandum of Decision and Order Granting in Part Motion for Summary Judgment* ¶ 42, Adv. Proc. 23-05008, Docket No. 126.

numerous entities with respect to which the Trustee has asserted Alter Ego Claims, as described

in the Amended First Omnibus Alter Ego Complaint, including among others G Club Operations

and its sole member, G Club International.  In addition to the information regarding Haoran He's

connections to the Debtor, particularly his connections to the Debtor's son, that were presented

in the Amended First Omnibus Alter Ego Complaint, other information and testimony regarding

Haoran He was presented in the Debtor's Criminal Trial, including testimony from prominent

former Kwok supporter Ya Li that Haoran He was part of the Debtor's family and that the

Debtor controlled Freedom Media Ventures Limited, a company nominally owned by Haoran He

and of which Mr. He was sole director.  Moreover, Haitham Khaled testified that, based on a

conversation with Qiang Guo, he understood that Mr. He was only the ultimate beneficial owner

of G Club "on paper."  Mr. Khaled also testified that it was the Debtor who directed what to do

with G Club's funds.

109.    Fiesta Investment served as a vehicle for the Debtor to purchase for his son a $4

million Ferrari via a June 2021 consignment sale brokered by Ferrari Beverly Hills, a Ferrari

dealership owned by a legal entity called Passione Rossa LLC.  The Debtor's alter ego G Club

Operations transferred approximately $13.7 million to Fiesta Investment in 2021,[58] $10 million

of which were transferred in January and February of 2021.  In May 2021, Mileson emailed

personnel at Ferrari that "[t]he invoice company will be Fiesta property development" in

connection with the purchase of the Ferrari vehicle, which Ferrari personnel described to

Mileson as "your car."[59]  Fiesta Investment then transferred $4 million of those funds to Passione

Rossa LLC on June 16, 2021.  Communications and documents related to this consignment sale

---

[58]    This transfer was papered over by a purported £10 million loan agreement in which Jovial Century International Limited, sole member of G Club International, was named as borrower and Fiesta Investment was named as recipient of the funds.  Upon information and belief, this purported loan was never repaid.

[59]    GXUK95.

identify Qiang Guo as the buyer or "new owner" of the Ferrari, and it is Qiang Guo who made decisions regarding the details of the purchase such as the paint scheme and accessories of the vehicle and the delivery of the vehicle to Switzerland.[60]  As seen in the images below, Qiang Guo's choice of a grey color scheme, which he described as "my colors," was matched by the design on his personalized helmet.[61]

 

110.    In addition to allowing G Club to purchase a $4 million Ferrari for Qiang Guo, Fiesta Investment also funneled no less than £240,000 to Qiang Guo's account at the Wise payment platform between January and November 2022.  Fiesta Investment also transferred no less than £1 million to Rising Sun Capital.  In addition, on June 24, 2021, Fiesta Investment transferred approximately £2.8 million to a solicitor account of Berkeley Rowe Limited, a law firm that the Court will recall was counsel to Himalaya International Financial Group Ltd. in connection with its purported $37 million loan to HK USA as collateral for the return of the *Lady*

---

[60]    *See* Government Criminal Trial exhibits, GXUK98 (showing Qiang Guo signing documents relating to purchase of Ferrari racing car as "Purchaser"), GXUK168 (email chains between Ferrari personnel and Qiang Guo about details of Ferrari racing car), GXUK108 (June 2021 email chain where Ferrari personnel wrote "operations for the transfer of the FXXK car to Switzerland will begin as early as tomorrow morning per contract"), and GXUK172 (Qiang Guo discussing rendering of racing suit and helmet in relation to purchase of Ferrari racing car).

[61]    *See* Government Criminal Trial exhibits, GXUK127, GXUK128 (in email titled "Re: FNE – FXX-K EVO 240860 – Call with Mileson Guo," Qiang Guo wrote to Matteo Gandini at Ferrari in response to Gandini's comments that car was cool that "[y]es and I can't wait [t]o see in my colors.").

*May* to the United States.  Berkeley Rowe has also represented ACA Capital Group Limited ("ACA Capital") and Bravo Luck Limited, each of which, together with Himalaya International Financial Group Ltd., are the subject of pending Alter Ego Claims in the Amended First Omnibus Complaint, and Berkeley Rowe has had its fees paid by entities such as the Debtor's alter ego Golden Spring as well as Leading Shine NY, the subject of another pending Alter Ego Claim.[62]

111.    Based on these facts, it is clear that Fiesta Investment is just another company, like G Club Operations and G Club International, that is purportedly owned by Haoran He but acting as a node in a network of entities working to move funds from the Debtor's followers to the Debtor and his family members.  Given these circumstances, and in light of the Debtor's track record in establishing alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to Fiesta Investment.

### ii.    Rising Sun Capital

112.    Rising Sun Capital was incorporated in the United Kingdom on October 26, 2017, and Haoran He became the nominal owner of Rising Sun Capital on May 18, 2020.

113.    The official address of Rising Sun Capital is 1053 Great West Road, Brentford, London (the "Brentford Address").  Until recently, Rising Sun Capital was the lessee of premises at the Brentford Address.

---

[62]    The transfer of such a large sum to Berkeley Rowe is likely an indication that the Debtor has used Berkeley Rowe as the middleman to move money, pay expenses, make an investment, or purchase an asset.  This would fit a pattern whereby the Debtor has used law firms as intermediaries in transactions.  Examples of this practice include, among others, the 2016 purchase of the Debtor's apartment in London through the law firm of Mishcon de Reya, the 2016 purchase of an apartment in Cyprus through the law firm of Christodoulos G. Vassiliades & Co. LLC, the 2021 purchase of the Mahwah Mansion, in which funds flowed through the account of Lawall & Mitchell LLC, and the payment of millions of dollars of expenses for the renovation of the Mahwah Mansion through the law firm of Amy Buck, Esq. in 2021 and 2022.

114.    Qiang Guo used the Brentford Address as his own address, and, upon information and belief, the Brentford Address was the location of Qiang Guo's "'man cave' in Brentford," where Qiang Guo maintained a fleet of luxury vehicles.[63]  Upon information and belief, these vehicles included a part of the vast collection of "hundreds of race cars" that the Debtor—despite representing to this Court that he had less than $4,000—proudly claimed belonged to him.[64]  These vehicles are believed to include, among others, a 2016 Pagani Zonda (plate MON22A (UK)), a Ferrari Monza SP1 (plate V12GUO (UK)), a 2016 Ferrari LaFerrari (plate F1GUO (UK)) (visible in photo below on the left), and a McLaren P1 (plate P1GUO (UK)), along with other vehicles that can be glimpsed in the photos below.

 

115.    Essentially, Rising Sun Capital operated as the Debtor's "family office" in the United Kingdom, where assistants and personal counsel to Qiang Guo were employed to work for "Mileson Guo/Rising Sun Capital Ltd."[65]

116.    Rising Sun Capital has been funded by the Debtor through his alter egos.  As alleged in adversary proceeding complaints filed by the Trustee, Rising Sun Capital received no less than $3,723,302.12 prior to the Petition Date from Lamp Capital, the subject of an Alter Ego Ruling, and Leading Shine NY, the subject of an Alter Ego Claim.  Rising Sun Capital also has

---

[63]   *See* Government Criminal Trial exhibit, GXUK195.
[64]   *See* VICE News, *Exiled Chinese Billionaire Uses YouTube to Wage a War on Corruption*, YouTube, at at 7:00 (original air date on HBO, Nov. 15, 2017), https://www.youtube.com/watch?v=LkOsgh5kcgQ.
[65]   See Government Criminal Trial exhibit, GXZ25 citing GXUK415.

received no less than $1 million from Fiesta Investment.  In February 2021, when asked by a

bank about Lamp Capital's transfers to Golden Spring and Rising Sun Capital, Daniel Podhaskie,

a former employee of the Debtor, described that Lamp Capital "acts as an advising firm for

[Golden Spring] and [Rising Sun Capital]," both of which are "real estate holding companies"

and "clients of ACA Capital Group."[66]  Podhaskie further explained that the transfers from Lamp

Capital to Golden Spring and Rising Sun Capital were "draw downs on their client accounts with

ACA" and that "ACA requested that Lamp advanced these funds to Golden Spring and Rising

Sun," noting that "Lamp handles U.S. business relations for high net-worth individuals and

families and pays bill on behalf of ACA clients."[67]  In reality, Lamp Capital—like Golden

Spring, ACA Capital, and Rising Sun Capital—"handled" the "business relations" and "paid bills

on behalf of" only one high net-worth individual: the Debtor and his family.

117.    Rising Sun Capital transferred no less than £150,000.00 to Qiang Guo's account

at the Wise payment platform in March 2023.

118.    Rising Sun Capital exhibits numerous of the qualities of an alter ego of the

Debtor.  Though purportedly controlled by the Debtor's agent Haoran He, Rising Sun Capital

was funded by the Debtor's alter ego Lamp Capital, transferred money to the Debtor's son, and

rented and shared an office/garage with the Debtor's son.  Given these circumstances, and in

light of the Debtor's track record in establishing alter ego shell companies, the Trustee is entitled

to an Alter Ego Ruling with respect to Rising Sun Capital.

---

[66]    GXBR1517.

[67]    *Id.*

E.    **UAE Entities**

119.    As discussed below, the function of the UAE entities was, among other things, to continue the Debtor's G Club and Himalaya Exchange schemes and activities overseas so that the Debtor could continue to profit from these schemes despite the United States Government's investigation into and subsequent arrest of the Debtor.

120.    The Debtor and his co-conspirator William Je have significant ties to the UAE, where William Je is believed to currently reside (the Debtor's son, Haoran He, and other associates of the Debtor are also believed to spend significant time in the UAE).  Indeed, just one Abu Dhabi, UAE bank account alleged to be controlled by the Debtor has received over $100 million in proceeds from the Debtor's criminal fraud.  The Debtor has held a UAE passport and at one time obtained more than a billion dollars from UAE sources that were transferred through the Debtor's shell companies such as Alfa Global Ventures Limited and Alfonso Global Ventures Limited to other Debtor-controlled companies and then spent on, among other things, high-value Debtor assets such as the *Lady May*, Sherry Netherland apartment, and the Debtor's London Apartment, among others.[68]

121.    Indeed, in pleadings filed with the Criminal Court shortly after the Debtor's arrest, the Government reported that William Je "remains at large and is likely in the UAE,

---

[68]    Each of these assets is the subject of orders of this Court ruling such assets to property of the Debtor.  *See Supplemental Memorandum of Decision in Support of Oral Ruling Granting Motion for Partial Summary Judgment*, Adv. Proc. No. 22-05003, Docket No. 177 (finding Debtor beneficially owned *Lady May* yacht); *Order Granting, Pursuant to Bankruptcy Rule 9019, Motion of Chapter 11 Trustee, Genever Holdings LLC, and Genever Holdings Corporation Regarding Settlement with Bravo Luck Limited and Mileson Guo (a/k/a Qiang Guo and/or Guo Qiang)*, Adv. Proc. No. 22-05027, Docket No. 118 (holding Genever Holdings LLC is full and exclusive owner of Sherry Netherland Apartment); and *Order Granting Motion of Chapter 11 Trustee for Estate of Ho Wan Kwok for Entry of Default Judgment Against K Legacy Ltd. and Qiang Guo*, Adv. Proc. No. 24-05249, Docket No. 76 (finding K Legacy Ltd. and its assets including Apartment 6 and Apartment G3 at 5 Princes Gate, London, United Kingdom SW7 1QJ (the "London Apartment") are and were at all relevant times property of Debtor or Debtor's chapter 11 estate).

where he and Kwok have access to substantial resources and fraud proceeds and are believed to be establishing the new operational and financial base of their fraudulent operations."[69]

122.    As described in U.S. Government pleadings and other documents and evidence obtained by the Trustee, during the months leading up to the Debtor's arrest in March 2023, the Debtor made efforts to move his activities to Abu Dhabi in the UAE.  The Debtor even boasted to his followers shortly before his arrest that HPay, a payment app related to the Himalaya Exchange was "based in Abu Dhabi, the only offshore country that even Americans dare not touch," because it was a jurisdiction where funds would be secure "against the long-arm jurisdiction of the United States."[70]  In addition, the Debtor's agent Yvette Wang participated in efforts to move activities to Abu Dhabi by instructing two of the Debtor's employees, Anthony DiBattista[71] and Alex Hadjicharalambous[72] to travel from the United States to Abu Dhabi where they spent over a month in early 2023 establishing an Abu Dhabi location for the Debtor's G Club scheme. Abu Dhabi is also where other associates of the Debtor have travelled or relocated since his arrest, including a number of members of the Debtor's Iron Blood Group.  The Debtor's son spends months at a time in Abu Dhabi, as does Haoran He, who, among other things, has or had a bank account at Abu Dhabi Commercial Bank which has been used to pay purported payroll expenses of the Debtor's alter ego G Club Operations.

123.    The Debtor, through his agents, also made efforts to move significant assets to Abu Dhabi, and directed those activities with and through Yvette Wang from the United States.

---

[69]    See Government's Letter, at 18, Criminal Case Docket No. 10 (filed March 29, 2023).
[70]    Government Criminal Trial Exhibit GXWA5.
[71]    Mr. DiBattista has served the Debtor as an employee of Golden Spring, minority owner and corporate officer of the HCHK Entities, and corporate officer, authorized signatory, and/or high-level employee of GTV, GFashion Media Group Inc., and G Fashion (CA).
[72]    Alex Hadjicharalambous served the Debtor as, among other things, an employee of the Debtor's alter egos G Club Operations LLC, GFashion Media Group Inc., and HCHK Technologies, Inc.

Indeed, as alleged in the Government's indictment and established by testimony in the Criminal Trial, within two days of the U.S. Government's first judicially authorized seizures of funds, William Je contacted the management of a U.S. domestic bank and attempted to implement a transfer of $46 million of Himalaya Exchange funds to a bank account of ACA Capital in Abu Dhabi. William Je insisted twice to the domestic bank representative that the transfer had to happen "today or it is meaningless." The domestic bank representative testified at the Criminal Trial that Je's request "felt uncomfortable. It appeared to be an attempt to move money outside of the jurisdiction of the United States." In addition, chat messages recovered by the U.S. Government between Yvette Wang and an individual the Government referred to as the "HCHK Financial Controller" or "Controller" show that:[73]

    a. On March 6, 2023, the Controller wrote to Yvette Wang: "Notes: I was advised this morning; [another individual] came to me given feedback to boss on Daily . . . plus monthly writing a report to boss about the office and all moving parts and observation."

    b. Approximately 20 minutes later, the Controller wrote to Yvette Wang: "We have been approved FAB!!! / Account numbers tomorrow / Just opened another bank account NBF! Should have account numbers soon too."

    c. Later that day, the Controller informed Yvette Wang that the entities were "Moving money into ADCB [*i.e.*, Abu Dhabi Commercial Bank PJSC]" and sent a screenshot of what appears to be a bank account balance screen reflecting several incoming deposits of $750,000 into an account that had grown to approximately $8.25 million as of March 6, 2023. Approximately two hours later, the Controller sent Yvette Wang a screenshot of a UAE entity account at a fourth UAE financial institution, reflecting a balance of approximately 41,831,801 AED (UAE Dirham), or approximately $11,389,308 USD.

    d. On March 7, 2023, Wang directed the Controller to secure funds associated with Himalaya Exchange, writing, in part: "Stay calm, focus on what you can get from

---

[73] *See Memorandum of Law of the United States of America in Opposition to Defendant Yanping Wang's Motion for Pretrial Release*, at 28-29, Criminal Case Docket No. 89 (quoted bracketed texts in original). As explained by the U.S. Government, in the captured chat messages, "boss" refers to the Debtor, "FAB" refers to First Abu Dhabi Bank, and "NFB" refers to National Bank of Fujairah, the latter two being financial institutions located in the UAE.

H Reserve's bank for now" and indicating that she was "working on adding
[Controller] as an extra bank signer."

e.   On March 9, 2023, Wang asked the Controller to "pls find out the SWIFT code
for FAB [*i.e.*, First Abu Dhabi Bank] bank of [UAE entity]? I do have their IBAN
here." The Controller provided the SWIFT code, and Yvette Wang responded,
"I'll use this one for the sender bank."

f.   The next day, the Controller reported back to Wang: "Good day lots of laughs a
lot accomplished with [UAE entity] . . . / And gclubs."

g.   On March 11, 2023, four days before her arrest by the FBI, Yvette Wang wrote to
the Controller: "I'm thinking: you probably better no[t] bring any uae devices
back to us. Think about how to work as basic levels from here." Later that day,
she added: "Yes, I thinking you come back home with less info better, or even
zero info from there. Including devices. / Advise [another individual who was in
the UAE ("Employee-1")] the same my advice also pls."

124.   As discussed below each of the UAE Entities that are the subject of this

Complaint have played a key role in the movement of the Debtor's schemes and activities to Abu

Dhabi in the UAE.   Thousand Stars, formerly known as G Clubs ME Limited, represents a

continuation or branch of the Debtor's G Club scheme.   H Reserve Management represents a

continuation or branch of the Debtor's Himalaya Exchange scheme and operates HPay, the

payment application linked to Himalaya Exchange.   Finally, Delta Konsult, like the HCHK

Entities, provides services to Thousand Stars and H Reserve Management as well as to

potentially other Debtor-affiliated entities.   The Debtor, through Yvette Wang and his other

agents and associates, managed the UAE Entities from the United States.

### i.   **Thousand Stars**

125.   Thousand Stars is the current name of the entity formerly known as G Clubs ME

Limited.   Thousand Stars operates a branch, offshoot, or continuation of the Debtor's G Club

membership scheme from Abu Dhabi, where it was established to avoid the regulatory scrutiny

of United States authorities.   As explained by the Debtor himself, Thousand Stars "is a

completely independent G|Club company established in Abu Dhabi, but it is also a G|Club of the

whistleblowing revolution, and it has the same benefits and functions."  In the words of a

Debtor's close associate Fay Fay in February 2023 when introducing the Debtor's "A10"

investment scheme (from which Thousand Stars received funding from the Debtor's supporters),

"GClubs is the core asset, so it moved to Abu Dhabi for operation."

126.    Thousand Stars was incorporated in the ADGM of Abu Dhabi, UAE.  The

nominal of owner of Thousand Stars is Haoran He, agent and family friend of the Debtor and his

son and nominal owner of numerous other G Club and G Fashion entities.  The director and

account signatory of Thousand Stars is Kevin Ma, agent of and prominent supporter of the

Debtor who also serves as the nominal owner of Ampleforth Capital (discussed below).  Kevin

Ma is also heavily involved together with his wife, Yumei Hao (another prominent supporter of

the Debtor and member of the purported HCHK creditors' committee that guided efforts to stall

the HCHK Adversary Proceeding) in operating River Valley (discussed below) on behalf of the

Debtor.  According to the testimony of Jesse Brown, the Debtor chose Kevin Ma to replace

Brown as nominal "strawman" CEO of Himalaya Exchange.  Other prominent supporters of the

Debtor involved with Thousand Stars include Kangdi Wang, former director of Thousand Stars,

whom, upon information and belief, is in charge of the finance department of the Debtor's

Himalaya Global Alliance organizations together with Yumei Hao, Sarah Zhang, another former

director of Thousand Stars, and Ingrid Qiao, former director and shareholder of Thousand Stars.

127.    Upon information and belief, Ingrid Qiao served as CEO of Thousand Stars while

being employed at H Reserve Management, received instruction from the Debtor, who she

referred to as "boss," and fulfilled her role as CEO while being unfamiliar with Haoran He

despite Haoran He's nominal ownership of most of the "G Club" entities.  Upon information and

belief, Ingrid Qiao was also involved in Yvette Wang's efforts to direct the movement of fraud

proceeds from prison.  As alleged by the U.S. Government, weeks after Yvette Wang's arrest, in April 2023, Yvette Wang—from prison—directed an alleged co-conspirator to work with others to retrieve from a Manhattan PO Box under the name of G Club Operations checks worth approximately $7.1 million of fraud proceeds.  According to additional evidence collected by the Government, Yvette Wang instructed this co-conspirator to have someone nicknamed "Cherry Blossom" "authorize[] [Employee-1] [*i.e.*, a G-Club employee who had traveled to the UAE in 2023] to give the check to [3 Columbus Circle]."  Upon information and belief, "Cherry Blossom" is the nickname of Ingrid Qiao.

128.    In addition, upon information and belief, the Debtor's financial agent William Je and those working under him at the Hamilton and/or Himalaya Exchange Entities, such as Ehsan Masud and Georgette Adonis-Roberts, were also involved with Thousand Stars and the other UAE Entities.

129.    In early 2023, Alex Hadjicharalambous and Anthony DiBattista travelled to Abu Dhabi, UAE for an extended period in order to assist in the establishment of Thousand Stars' activities there, including by instructing Ingrid Qiao in the activities of G Club.  Thousand Stars shares or has shared offices with the other UAE Entities.

130.    Thousand Stars has or had a bank account under its name at National Bank of Fujairah in the UAE that is, upon information and belief, controlled by the Debtor.  Indeed, ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████ .

131.    Upon information and belief, the Debtor funded Thousand Stars through money that he solicited from his followers; these included one of his top lieutenants, Ya Li, who testified at the Criminal Trial that she had been instructed to send money raised as part of the Debtor's "A10" investment project to an Abu Dhabi bank account of G Clubs ME Limited (i.e., Thousand Stars).  Notably, Ms. Li testified that she was initially instructed to send the money to GFNY, Inc., an alleged alter ego in the Amended First Omnibus Alter Ego Complaint, and following the arrest of the Debtor and Yvette Wang, she was refunded the money she wired to GFNY, Inc. and was instructed to transfer the fund to G Clubs ME Limited's account in Abu Dhabi.  Moreover, the Debtor's alter ego River Valley, discussed further below, an Indiana LLC, paid for numerous Abu Dhabi expenses, including for the leasing of luxury hotel rooms and office space, that were, upon information and belief, related to Thousand Stars and the other UAE Entities.

132.    In sum, agents of the Debtor served in nominal owner and director roles at Thousand Stars, the company shared an office with other Debtor-controlled companies, and the Debtor funded Thousand Stars.  Moreover, agents of the Debtor travelled to Abu Dhabi at the direction of Yvette Wang to establish Thousand Stars' activities there as an offshoot or continuation of the Debtor's G Club scheme at exactly the moment when the Debtor was facing scrutiny from authorities in the United States leading up to his arrest.  Given these circumstances and the Debtor's pattern and practice of conducting his affairs and holding his assets through alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to Thousand Stars.

### ii.    H Reserve Management

133.    H Reserve Management operates a branch, offshoot, or continuation of the Debtor's Himalaya Exchange cryptocurrency scheme, in particular the payment application known as "HPay," from Abu Dhabi, where it was established to avoid the regulatory scrutiny of United States authorities.  In the Debtor's own words in a live broadcast in June 2022, "Himalaya Exchange will have other coins (Abu Dhabi coins), and free from the long arm of the dollar."

134.    H Reserve Management was incorporated in the ADGM of Abu Dhabi, UAE on September 2, 2022.  The Debtor himself gave instructions regarding the establishment of H Reserve Management and conceived of the company's name.  The initial sole director and shareholder of H Reserve Management was the Debtor' supporter Kevin Ma, who was replaced as shareholder by the Debtor's supporter Ingrid Qiao on February 21, 2023.  The sole shareholder of H Reserve Management became Sarah Zhang, another prominent supporter of the Debtor, on April 4, 2023.  Upon information and belief, Sarah Zhang referred to the Debtor as "Uncle Guo," dined with him at his Sherry Netherland residence (along with Yumei Hao and another prominent supporter of the Debtor, Fay Fay), sailed on one of his yachts, and participated in the Debtor's protest activities.  Another individual involved with H Reserve Management is the Debtor's employee Anthony DiBattista, who, upon information and belief, at one point served as a director of H Reserve Management.

135.    The Debtor, through Yvette Wang, managed affairs of H Reserve Management from the United States.  For instance, as discussed above, on March 7, 2023, Yvette Wang instructed the HCHK Financial Controller to "[s]tay calm, focus on what you can get from H Reserve's bank for now."  Additional chat messages recovered by the U.S. Government from

Yvette Wang's devices show Kevin Ma reported to Yvette Wang regarding finances of the UAE Entities, and that Yvette Wang asked Kevin Ma to "walk [her] through" the reconciliation of "the 8 million USD original funding to H Reserve."

136.    In addition, upon information and belief, the Debtor's financial agent William Je and those working under him at the Hamilton and/or Himalaya Exchange Entities, such as Ehsan Masud and Georgette Adonis-Roberts, were also involved with H Reserve Management and the other UAE Entities.

137.    H Reserve Management shares or has shared office space with the other UAE Entities.

138.    H Reserve Management has or had bank accounts under its name in the UAE at First Abu Dhabi Bank, WIO Bank (Abu Dhabi), and National Bank of Fujairah, and each account, upon information and belief, is controlled by the Debtor.

139.    H Reserve Management's business application submitted to the ADGM Registration Authority in August 2022 stated that the company would conduct "management consultancy activities" and "other professional, scientific and technical activities."   In a heavily redacted letter dated April 23, 2024 addressed to Sarah Zhang, the ADGM authorities explained that the ADGM Registrar had decided to cancel H Reserve Management's ADGM License because H Reserve Management had carried out "business activities of software development for its client ("Company A"), over the period from around October 2022 to around June 2023 without obtaining the appropriate commercial licence."   While the letter does not identify "Company A," it appears that Company A is a reference to the Himalaya Exchange or a related company controlled by the Debtor.   The ADGM Letter also notes, among other things, that employees of H Reserve Management "were assigned to Company A and were primarily using

Company A email accounts and shared drive accounts," and that employees interviewed by

ADGM identified H Reserve Management's software development activities as including,

among other things, "[d]evelopment of software for a mobile application-based payment

solution," "[d]evelopment of blockchain software related to managing accounts and wallets," and

"[d]evelopment of software to enable a new crypto currency system."  Upon information and

belief, these activities were all related to the Debtor's cryptocurrency scheme, the Himalaya

Exchange.

140.    Consistent with the allegations above, the ADGM letter also noted that "H

Reserve Management had permitted two companies to occupy and operate from their ADGM

Offices," a reference to H Reserve Management sharing office space with Thousand Stars and

Delta Konsult, as discussed above.

141.    Indeed, according to a notice issued by ADGM to H Reserve Management in June

2023, in connection with the ADGM investigation into H Reserve Management's potential

contraventions of certain ADGM regulations, ADGM requested, among other things, "[c]opies

of any and all documents evidencing H Reserve's dealing with or on behalf of Hamilton Capital,

the Himalaya Exchange or any other related entities," and a complete forensic copy of all data

stored on any computer and mobile device assigned to or used by, among others, William Je,

Ehsan Masud, Georgette Adonis-Roberts.

142.    In addition, H Reserve Management was funded by the Debtor through his shell

companies.  In particular, millions of dollars were transferred from ACA Capital to the Debtor's

alter ego River Valley, from which such funds were transferred to H Reserve Management.  The

Debtor's alter ego River Valley paid for numerous Abu Dhabi expenses, including for the leasing

of luxury hotel rooms and office space, that were, upon information and belief, expenses related to H Reserve Management and the other UAE Entities.

143. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████. As the Court may recall, Hamilton Opportunity Fund SPC is another defendant subject to Alter Ego Claims in the Amended First Omnibus Alter Ego Complaint.

144. Moreover, Hamilton Capital Holding Ltd., a defendant in the Amended First Omnibus Alter Ego Complaint, represented in its purported administration proceeding in the United Kingdom that one of its largest creditors is H Reserve Management, purportedly holding a claim of more than £3.2 million against Hamilton Capital Holding Ltd. Other purported creditors of Hamilton Capital Holding Ltd. include ACA Capital with a purported claim of more than £13.3 million and Hamilton Investment Management Ltd. with a purported claim of more than £17.6 million, both of which are also defendants in the Amended First Omnibus Alter Ego Complaint. Notably, River Valley (as discussed below) is also listed as a creditor to Hamilton Capital Holding Ltd. As noted in the Amended First Omnibus Alter Ego Complaint, the Trustee believes that Hamilton Capital Holding Ltd.'s administration proceeding in the United Kingdom is an attempt to recycle funds and redistribute them to the Debtor, William Je, and associated entities by using the administration proceeding to "cleanse" such funds. As the Court will recall, the Debtor and his associates attempted a similar strategy to recycle and redistribute funds from the HCHK Entities that commenced a New York state assignment proceeding in April 2023, which the Trustee successfully sought to enjoin.

44

145.    In sum, agents of the Debtor served in nominal owner and director roles at H Reserve Management, H Reserve Management shared an office with other Debtor-controlled companies, and the Debtor funded H Reserve Management.  Moreover, agents of the Debtor travelled to Abu Dhabi at the direction of Yvette Wang to establish H Reserve Management's activities there as an offshoot or continuation of the Debtor's Himalaya Exchange scheme at exactly the moment when the Debtor was facing scrutiny from authorities in the United States in the period leading up to his arrest.  Given these circumstances and the Debtor's pattern and practice of conducting his affairs and holding his assets through alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to H Reserve Management.

### iii.    Delta Konsult

146.    Delta Konsult, incorporated in the ADGM, is another company established in Abu Dhabi's ADGM to avoid the regulatory scrutiny of United States authorities.  Delta Konsult ostensibly provided services for the other UAE Entities, Thousand Stars and H Reserve Management.  Although it is not yet clear what precise services these were, the Debtor has in the past designated certain alter ego entities to act as ostensible service providers for others, such as occurred with HCHK Technologies, which provided management and other services for numerous of the Debtor's alter egos, as discussed in the Amended First Omnibus Alter Ego Complaint.

147.    The same Debtor agents involved in the staffing of Thousand Stars and H Reserve Management have also staffed Delta Konsult.  The current nominal shareholder of Delta Konsult is Sarah Zhang, and former shareholders of Delta Konsult include Anthony DiBattista and Kevin Ma. ███████████████████████████████████, was also involved in Delta Konsult's affairs, as was the Debtor's agent Yvette Wang.  For instance, in the chat messages

between Yvette Wang and Kevin Ma in March 2023, Ma reported to Yvette Wang: "The $9 million (8 million + 1 million, I explained to you before) cover 3 things: H Reserve, Delta Konsult, and AD Reserve. Tony [*i.e.*, Anthony DiBattista] possesses financial records of the first two." Later, Yvette Wang wrote: "Can you pls clarify how the 8 million USD was deployed in which companies and which banks? I remember the 1 million in DK [*i.e.*, Delta Konsult], that one is fine."

148.    Moreover, upon information and belief, in or around August 2023, Delta Konsult entered into a service agreement with G Music LLC ("G Music"), another alleged alter ego in the First Omnibus Alter Ego Complaint, such that Delta Konsult would provide various services to G Music, including: (i) finances and accounting, (ii) human resources, (iii) IT support, engineering, design, and software development, (iv) legal and advisory services, (v) real estate and facility management services, and (vi) payments of invoices. This showcases Delta Konsult's role as a replacement "service company" for HCHK Technologies, ███████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

149.    In addition, upon information and belief, the Debtor's financial agent William Je and those working under him at the Hamilton and/or Himalaya Exchange Entities, such as Ehsan Masud and Georgette Adonis-Roberts, were also involved in the affairs of Delta Konsult, and the other UAE Entities.

150.    Delta Konsult shares or has shared office space with the other UAE Entities.

151.    Delta Konsult has or had bank accounts under its name at First Abu Dhabi Bank and Wio Bank in Abu Dhabi, and each account, upon information and belief, is controlled by the Debtor.

152.    The Debtor funded Delta Konsult by directing transfers of funds to Delta Konsult from one or more companies he controlled, including River Valley, discussed below.  These funds included millions of dollars transferred from one or more banks in the United States to Delta Konsult's bank account at Wio Bank, another financial institution located in the UAE.

153.    In sum, agents of the Debtor served in nominal owner and director roles at Delta Konsult, and Delta Konsult shared an office with other Debtor-controlled companies, and Delta Konsult was funded through transfers from the Debtor's Himalaya Farm organizations.  Given these circumstances and the Debtor's pattern and practice of conducting his affairs and holding his assets through alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to Delta Konsult.

**F.    River Valley**

154.    River Valley is an entity organized in Indiana that is nominally owned by Yumei Hao, a prominent supporter of the Debtor whose husband is Kevin Ma.  The signatories on River Valley's bank accounts included Yumei Hao, Kevin Ma, and Rong Hu, another known supporter of the Debtor.

155.    River Valley's only discernible purpose was to launder money by receiving money from entities controlled by the Debtor and then transferring those funds to other entities controlled by the Debtor and to his family members to pay for the expenses of such entities and individuals.

156.     In particular, the Debtor used River Valley to fund H Reserve Management and to
pay Abu Dhabi expenses associated with the UAE Entities.  On August 10, 2022, River Valley
received a transfer of approximately $8 million from ACA Capital's account at First Abu Dhabi
Bank into River Valley's account at Lake City Bank in the United States.  River Valley
subsequently transferred $4.5 million to H Reserve Management's bank accounts in the UAE
and transferred millions more in the aggregate to the UAE to pay landlords, a luxury hotel,
providers of consulting, IT, legal, and other services, and a BMW dealership.  It is with respect
to these transfers, upon information and belief, that Yvette Wang asked Kevin Ma to "walk [her]
through" the reconciliation of "the 8 million USD original funding to H Reserve" and "clarify
how the 8 million USD was deployed in which companies and which banks."

157.     Indeed, the suspicious nature of these transfers of funds combined with
unsatisfactory explanations provided by Yumei Hao and Kevin Ma caught the attention of
compliance personnel at Lake City Bank as potential money laundering, and Lake City Bank
closed River Valley's account in May 2023.

158.     In addition, River Valley paid certain expenses of the Debtor's alter ego GFNY,
Inc. (one of the entities comprising the Debtor's G Fashion scheme), and provided funding to the
Debtor's daughter, presumably to support her lifestyle and legal expenses.  For example, on
November 7, 2022, River Valley wired $100,000.00 from an account of River Valley at Bank of
America to an account of Mei Guo at Citizens Bank.  Mei Guo used these funds, among other
things, to pay Zeisler & Zeisler $20,000.00 on December 8, 2022.

159.     River Valley received funds from Rule of Law Entities, and paid numerous
leading supporters of the Debtor, including Leanne Li (purported G Fashion CEO), Chris Lee
(one of the purported HCHK creditors' committee members), Yanming Wang (a prominent

48

supporter of the Debtor who has transferred funds to Mei Guo), as well as law firms in the BVI and the ADGM Registration Authority. During the period when the Debtor's followers were protesting at the residence and workplaces of the Trustee and his family, River Valley continued to receive funding from Rule of Law entities and then made numerous payments to individuals via Zelle transfers which, upon information and belief, were payments to protestors and reimbursement of expenses relating to protests against the Trustee.

160.    In addition, as mentioned above, River Valley is one of the purported creditors—alongside other Debtor's alter egos including ACA Capital, Hamilton Investment Management Ltd., and H Reserve Management—of Hamilton Capital Holding Ltd. in its purported administration proceeding in the United Kingdom. According to Hamilton Capital Holding Ltd., River Valley purportedly holds a claim of approximately £360,000.

161.    In sum, River Valley was controlled by the Debtor's agents, funded by the Debtor, and transferred funds to entities controlled by the Debtor, to the Debtor's family members, and to pay expenses of such entities and/or individuals. Given these circumstances, the Trustee is entitled to an Alter Ego Ruling with respect to River Valley.

### G.    Ampleforth Capital

162.    Ampleforth Capital is an entity organized in the BVI and nominally owned, upon information and belief, by Kevin Ma. As discussed above, Kevin Ma is a prominent supporter of the Debtor and member of the Debtor's NFSC and Iron Blood Group who has, upon information and belief, assisted the Debtor in establishing overseas entities in the UAE.

163.    ███████████████████████████████████████████

████████████████████████████████████████████.

Mercantile Bank is based in Puerto Rico and is a domestic U.S. bank. In short, Ampleforth

Capital opened at least one bank account in the United States.  Upon information and belief, the Debtor controlled the account.

164.    Upon information and belief, and consistent with testimony at the Criminal Trial from a former supporter of the Debtor, Ya Li, the Debtor directed his followers to transfer funds to Ampleforth Capital as part of investment scams known as the A10 Project and A15 Project.

165.    

166.    Ampleforth again demonstrates the key traits of a Kwok alter ego.  A loyal follower of the Debtor was placed in charge of Ampleforth, money was directed from the Debtor's followers to Ampleforth, and then Ampleforth transferred those funds to a Himalaya entity controlled by the Debtor.  Given these circumstances, and in light of the Debtor's track record in establishing alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to the Ampleforth.

### H.    Debtor Holding Companies

167.    The Debtor Holding Companies consist of several entities whose sole purpose was, essentially, to hold ownership interests in companies with respect to which the Trustee has already obtained Alter Ego Rulings or asserted pending Alter Ego Claims.  These entities have not engaged in any meaningful financial or business activity but have instead acted merely as

mechanisms for the Debtor to hold formal legal title to, and exercise control over, his alter egos through individuals serving as his agents, including Qiang Guo and Yvette Wang. As such, the Trustee is entitled to Alter Ego Rulings with respect to the Debtor Holding Companies.

168. The Debtor Holding Companies consist of the following entities:

### i. **Holy City Hong Kong Ventures Limited**

169. Holy City Hong Kong Ventures Limited ("Holy City"), is an entity organized in the BVI and currently nominally owned by a Nevis entity called New Federal State Corporation, which is, upon information and belief, controlled by the Debtor through one or more of his agents. Holy City was previously nominally owned by the Debtor's assistant and co-conspirator, Yvette Wang. As of June 2023 when the Trustee commenced the HCHK Adversary Proceeding, Yvette Wang remained the nominal owner of Holy City. Holy City was used by the Debtor to hold nominal ownership of 99.9999%[74] of the HCHK Entities, which this Court has ruled were alter egos of the Debtor and equitably owned by the Debtor. Upon information and belief, Holy City engaged in no business activities or other actions other than to hold title to the HCHK Entities, commence the assignment proceeding of the HCHK Entities which was the subject of the HCHK Adversary Proceeding, and litigate against the Trustee in such adversary proceeding.

170. Holy City was one of the Defendants in the HCHK Adversary Proceeding and defaulted on its obligation to respond to the Trustee's complaint. Holy City then appeared before the Court along with the HCHK Entities to litigate against the Trustee, including by seeking to set aside the entry of default in the HCHK Adversary Proceeding and to object to the Court's subsequent entry of a default judgment, which efforts were unsuccessful. Notably, in its decision

---

[74] The remaining 0.0001% of each HCHK Entity was nominally owned by the Debtor's employee, Anthony DiBattista.

denying the motion of Holy City and the HCHK Entities (collectively, the "HCHKV Entities") to set aside the entry of default, the Court found the HCHKV Entities to have acted in bad faith based on the involvement of the Debtor's attorney, Yongbing Zhang, as the point of contact between the HCHKV Entities and their counsel.[75]

171.    Filings in the HCHK Adversary Proceeding and testimony in the Debtor's criminal trial have also revealed, among other things, that the directors of HCHKV at the time it was litigating against the Trustee were Yvette Wang and two prominent supporters of the Debtor, Feng Zhu and Ya Li, the latter of whom was then in the process of resigning her position. Notably, Feng Zhu and Ya Li did not really direct HCHKV's litigation efforts, which were instead orchestrated by (unindicted co-conspirator) Yongbing Zhang on behalf of the Debtor. Ya Li subsequently testified at length as a government witness at the Criminal Trial, stating, among other things, that in April 2023 while in federal custody, Yvette Wang, through her counsel, instructed Ya Li to sign documents relating to the HCHK Entities' purported New York State assignment proceeding. Ms. Li also testified that Yongbing Zhang had asked her to sign a false affidavit in connection with the HCHK Adversary Proceeding.

### ii.    Hudson Diamond Holdings, Inc.

172.    Hudson Diamond Holdings, Inc. ("Hudson Diamond BVI") is an entity organized in the BVI and nominally owned by the Debtor's son, Qiang Guo, who is also the sole director. Upon information and belief, Yvette Wang and Max Krasner coordinated the formation of Hudson Diamond BVI. Hudson Diamond BVI was used by the Debtor to hold nominal ownership of Saraca Media Group, Inc., which the Trustee has alleged in the Amended First

---

[75]    *Memorandum of Decision and Order Denying Motion to Set Aside Default*, at 16-19, Adv. Proc. No. 23-05013, Docket No. 264.

Omnibus Alter Ego Complaint to be an alter ego of and equitably owned by the Debtor. Upon information and belief, Hudson Diamond BVI has engaged in no business activity or any other actions other than holding title to Saraca Media Group, Inc., and, for a brief period of time following the initial creation of Hudson Diamond NY, holding title to Hudson Diamond NY prior to transferring such ownership interest to Hudson Diamond Holding.

### iii. Infinity Treasury Management Inc.

173. Infinity Treasury Management Inc. ("Infinity Treasury") is an entity organized in Delaware and nominally owned by the Debtor's son, Qiang Guo. Infinity Treasury was used by the Debtor to hold nominal ownership of Lamp Capital, which this Court has ruled was an alter ego of the Debtor and equitably owned by the Debtor.[76] Upon information and belief, Infinity Treasury engaged in no business activities or other actions other than to hold title to Lamp Capital and to litigate against the Trustee in the Lamp Capital Adversary Proceeding.

174. The Debtor asserted the Fifth Amendment when asked at his March 2023 deposition whether Infinity Treasury was one of a group of entities held in the name of his son but in fact owned and controlled by the Debtor.[77]

175. Infinity Treasury was one of the Defendants in the Lamp Capital Adversary Proceeding and defaulted on its obligation to respond to the Trustee's complaint. Subsequently, Infinity Treasury appeared before the Court along with Lamp Capital to object to the Court's entry of a default judgment in the Lamp Capital Adversary Proceeding, which objection was unsuccessful.[78]

---

[76] *Memorandum of Decision and Order Granting Motion for Default Judgment and Denying Cross-Motion to Set Aside Default*, Adv. Proc No. 23-05023, Docket No. 63.
[77] Debtor's March 2, 2023 Depo. Tr., at 54.
[78] *Memorandum of Decision and Order Granting Motion for Default Judgment and Denying Cross-Motion to Set Aside Default*, Adv. Proc No. 23-05023, Docket No. 63.

I.    **Hong Kong Shell Companies**

176.    The Debtor has controlled numerous entities organized in Hong Kong at which the Debtor's family members, employees, controlled companies, or other agents of the Debtor served as nominal shareholders and/or directors and that the Debtor used to engage in financial transactions and/or hold assets on his behalf, each as defined below (collectively, the "Hong Kong Shell Companies").

a.    **Strong Country Holdings Group Limited ("Strong Country")** is a Hong Kong entity that is nominally owned 95% by the Debtor's son, Qiang Guo, and 5% by the Debtor's wife, Hing Chi Ngok. The director of Strong Country is Max Krasner and the company secretary of Strong Country is Annie Lau Lai Chun, both employees of the Debtor, and the company's registered address is at 22 South Bay Road in Hong Kong, a property that is owned, upon information and belief, by the Debtor. Strong Country was used by the Debtor to hold title to real property located at 19 Houhai Beiyan, Xicheng District, in Beijing China. Strong Country provided a security pledge in connection with the loan agreement whereby an entity called Roscalitar2 issued a loan to the Debtor (the "Roscalitar Loan") in exchange for pledges on numerous of the Debtor's assets, including among others Strong Country and Genever Holdings Corporation, parent company of Genever Holdings LLC, the entity that holds title to the Sherry Netherland apartment. As discussed in pleadings filed by the Trustee in connection with its litigation against Bravo Luck Limited related to the Sherry Netherland apartment, Genever Holdings Corporation's pledge to Roscalitar2 became a contentious issue during the Debtor's litigation against PAX when the Debtor for a period of time falsely asserted, based on this pledge, that the Sherry Netherland somehow was not subject to execution by PAX.[79] Upon information and belief, the proceeds of the Roscalitar Loan included over $1 billion of funds transferred by Roscalitar2 to the Debtor's entities Alfa Global Ventures Limited and Alfonso Global Limited which were subsequently transferred to other Debtor-controlled entities and used to purchase, among other things, assets such as the Sherry Netherland apartment, *Lady May* yacht, and the Debtor's London Apartment.

b.    **Joincorp International Limited ("Joincorp International")** is nominally owned by the Debtor's daughter, Mei Guo, who also served as the company's sole

---

[79]    *See Chapter 11 Trustee's Amended Adversary Complaint Against Bravo Luck and Qiang Guo Seeking (I) Invalidation of Purported Trust Agreement in Favor of Bravo Luck and, (II) in Alternative, Ruling That Debtor Effectuated Fraudulent Transfer in Favor of Bravo Luck and Qiang Guo Pursuant to Section 276 of New York Debtor and Creditor Law, Made Applicable by Section 544 of Bankruptcy Code* ¶¶ 61-64, Adv. Proc No. 22-05027, Docket No. 40.

director.[80]  Upon information and belief, Joincorp International was used by the Debtor to establish one or more business ventures in Taiwan.  According to the company's most recent annual return filed with the Hong Kong Companies Registry, the company's records were kept at the same address on the 49th Floor of Bank of China Tower in Hong Kong that was used as an address by numerous other Debtor-controlled companies, as discussed in the Amended First Alter Ego Complaint.

c. **Canadian Agri-product Monetary Investments Limited ("Canadian Agri-product")** is nominally owned by the Debtor's son, Qiang Guo, who also served as the company's sole director.  Canadian Agri-product's registered address is the 20 South Bay Road address of the Debtor's mansion in Hong Kong that is nominally owned by Leading Shine Limited, a company that is the subject of an Alter Ego Claim asserted in the First Omnibus Alter Ego Complaint.  The Debtor used Canadian Agri-product to hold title to various vehicles in Hong Kong, including a Toyota, a Maybach, and Land Rover.

d. **Eagle Eye Investments Limited ("Eagle Eye Investments")** is nominally owned by the Debtor' employee, Kesen Yang, who also served as the company's sole director.  The Debtor used Eagle Eye Investments to, among other things, hold ownership of a company organized in the People's Republic of China ("PRC") called Eagle Eye (Zheng Zhou) Investments Service Co. Ltd.

e. **Glory Asia (H.K.) Limited ("Glory Asia")** is nominally owned by the Debtor's family member, Zongchao Yue, who also served as the company's sole director.  Upon information and belief, the Debtor used Glory Asia to operate an oil business and to fund New Dynamic Development Limited, an entity that is the subject of an Alter Ego Claim pursuant to a separate complaint.

f. **Gold Perfect Limited ("Gold Perfect")** is nominally owned by the Debtor's wife, Hing Chi Ngok, who also served as the company's sole director.  Gold Perfect was used by the Debtor to hold title to a separate PRC company of the same name.  According to the company's most recent annual return filed with the Hong Kong Companies Registry, the company's records were kept at the same address on the 49th Floor of Bank of China Tower in Hong Kong that was used as an address by numerous other Debtor-controlled companies, as discussed in the Amended First Omnibus Alter Ego Complaint.

g. **Group Dynasty Limited ("Group Dynasty")** is nominally owned by the Debtor's wife, Hing Chi Ngok, who also served as the company's sole director.  Group Dynasty was used by the Debtor to hold title to a separate PRC company of the same name.  According to the company's most recent annual return filed with the Hong Kong Companies Registry, the company's records were kept at the

---

[80]    As discussed in the First Omnibus Alter Ego Complaint, ███████████████████████████
███████████████████████████████████████████

same address on the 49th Floor of Bank of China Tower in Hong Kong that was used as an address by numerous other Debtor-controlled companies, as discussed in the Amended First Omnibus Alter Ego Complaint.

h. **Hong Kong International Funds Investments Limited ("HK International")** is nominally owned by the Debtor's daughter, Mei Guo. This is the entity that, as discussed in the First Omnibus Alter Ego Complaint and in pleadings filed by the Trustee in Adversary Proceeding No. 22-05003 (the "HK USA Adversary Proceeding"), previously held title to the *Lady May* yacht. As the Court may recall, Natasha Qu transferred her purported ownership in HK International for no consideration to Mei Guo in June of 2017, and in April 2020, HK International transferred its purported ownership of the *Lady May* to HK USA for no consideration. Moreover, as discussed in the Amended First Omnibus Alter Ego Complaint, the Debtor used HK International to transfer hundreds of millions of dollars between his shell companies. A portion of these funds was then used to purchase the *Lady May* in February 2015 (approximately € 25.2 million) and the Sherry Netherland apartment in March 2015 (approximately $70 million), as well as to fund the establishment of Golden Spring ($19 million).

i. **Kingdom Rich Limited ("Kingdom Rich")** is nominally owned by the Debtor's son, Qiang Guo, who also served as the company's sole director. The Debtor used Kingdom Rich to hold title to his smaller yacht, the *Lady May II*, prior to the *Lady May II* being transferred to HK USA, which held title to the *Lady May II*, when it was discovered by the Trustee during the Debtor's bankruptcy case.

j. **New Miracle Limited** is nominally owned by Joy Chance Holdings Limited, a company that is nominally owned by the Debtor's wife, Hing Chi Ngok, who also served as one of the company's two directors, the other being the Debtor's son, Qiang Guo. Upon information and belief, the Debtor used New Miracle Limited to make one or more investments in Taiwan. According to the company's most recent annual return filed with the Hong Kong Companies Registry, the company's records were kept at the same address on the 49th Floor of Bank of China Tower in Hong Kong that was used as an address by numerous other Debtor-controlled companies, as discussed in the Amended First Omnibus Alter Ego Complaint.

k. **Pacific King Investment Limited ("Pacific King")** is nominally owned by the Debtor's wife, Hing Chi Ngok, who also served as the company's sole shareholder. Upon information and belief, the Debtor used Pacific King to handle transactions related to the management of the crew of his private airplanes. According to the company's most recent annual return filed with the Hong Kong Companies Registry, the company's records were kept at the same address on the 49th Floor of Bank of China Tower in Hong Kong that was used as an address by numerous other Debtor-controlled companies, as discussed in the Amended First Omnibus Alter Ego Complaint.

56

l. **Rich Group Development Limited ("Rich Group")** is nominally owned by the Debtor's employee, Yan Su, who also served as the company's sole shareholder. Upon information and belief, the Debtor used Rich Group to enter into agreements related to construction projects in Beijing. According to the company's most recent annual return filed with the Hong Kong Companies Registry, the company's registered address is the same address on the 49th Floor of Bank of China Tower in Hong Kong that was used as an address by numerous other Debtor-controlled companies, as discussed in the Amended First Omnibus Alter Ego Complaint.

177. Each of the Hong Kong Shell Companies shares the key traits of a company dominated and controlled by the Debtor: a pliant strawman, whether a family member, employee, or other subordinate is formally in charge, but the business purpose is entirely the Debtor's. Moreover, in each case, upon information and belief, these companies operate from the Debtor's offices, where lists of the companies have been kept by the Debtor's assistants (first Natasha Qu, and later Yvette Wang), making it clear that they are the Debtor's companies. Given these circumstances, and in light of the Debtor's track record in establishing alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to each of the Hong Kong Shell Companies.

**J.    BVI Shell Companies**

178. The Debtor has controlled numerous entities organized in the BVI at which the Debtor's family members, employees, controlled companies, or other agents of the Debtor served as nominal shareholders and/or directors and that the Debtor used to engage in financial transactions and/or hold assets on his behalf, each as defined below (the "BVI Shell Companies").

a. **AA Global Ventures Limited ("AA Global Ventures")** is nominally owned, upon information and belief, by Anton Development Limited ("Anton Development"), a company controlled by the Debtor and one of the companies subject to Alter Ego Claims in the Amended First Omnibus Alter Ego Complaint. Anton Development also served, according to BVI corporate documents, as director of AA Global Ventures. The Debtor used AA Global Ventures to hold

57

title to AAGV, another BVI Shell Company (discussed below), prior to AAGV being placed under the nominal ownership of the Debtor's daughter, Mei Guo.

b. **AAGV Limited ("AAGV")** is nominally owned, upon information and belief, by the Debtor's daughter, Mei Guo, who served as the company's sole director. Upon information and belief, the Debtor used AAGV as a vehicle for investing in securities on the Hong Kong Stock market and transferring funds to Anton Development. In the October 5, 2018, Hong Kong Police report (the "Hong Kong Police Report") and October 23, 2018, Hong Kong restraint order (the "Hong Kong Restraint Order"), the assets of AAGV were identified as being subject to the Debtor's effective control.

c. **Assets Sino Limited ("Assets Sino")** is nominally owned, upon information and belief, by the Debtor's niece, Lihong Guo, who served as the sole director. Upon information and belief, the Debtor used Assets Sino as a vehicle to engage in transactions on the Hong Kong stock market. The Hong Kong Police Report states that, despite being director of Assets Sino, Lihong Guo did not operate the company's bank accounts, which were opened at the Debtor's instructions and controlled by the Debtor's assistant, Natasha Qu.

d. **Auspicious Coast Limited ("Auspicious Coast")** is nominally owned, upon information and belief, by the Debtor's sister in-law, Lichun Guo. Lichun Guo and another debtor-controlled company, Next Tycoon Investments Limited (which was nominally owned by the Debtor's chef Han Chunguang) served as directors of Auspicious Coast. Upon information and belief, the Debtor used Auspicious Coast as a vehicle to engage in transactions on the Hong Kong stock market. The Hong Kong Police Report states that, despite being director of Auspicious Coast, Lichun Guo did not operate the company's bank accounts, which were opened at the Debtor's instructions and controlled by the Debtor's assistant, Natasha Qu.

e. **Guang Hong Limited ("Guang Hong")** is nominally owned, upon information and belief, by the Debtor's brother, Wencun Guo (a/k/a Man Chuen Kwok), who also served as the company's sole director. Guang Hong is identified in documents recovered by the FBI from Yvette Wang's apartment as an investment vehicle.

f. **Head Win Group Limited ("Head Win")** is nominally owned, upon information and belief, by the Debtor's relative Zhang Wei, with Zhang Wei and the Debtor's employee Ren Meizi serving as directors of Head Win. Head Win was used by the Debtor to hold title to his Bombardier private jet prior to the Bombardier being transferred to Anton Development in 2016. As discussed in the Court's summary judgment decision in Adversary Proceeding No. 23-05008 (the "Mei Guo Adversary Proceeding"), Head Win was, among other things, represented by

the Debtor to be a "Single Purpose Company with the only purpose of holding the aircraft."[81]

g. **Joy Chance Holdings Limited ("Joy Chance")** is nominally owned, upon information and belief, by the Debtor's wife, Hing Chi Ngok, who also served as the company's sole director.  Upon information and belief, the Debtor used Joy Chance to hold title to New Miracle Limited, one of the Hong Kong Shell Companies discussed above, which, upon information and belief, the Debtor used to make one or more investments in Taiwan.

h. **Long Gate Limited ("Long Gate")** is nominally owned, upon information and belief, by the Debtor's employee, Max Krasner.  The company's director was the Debtor's relative Zhang Wei.  Upon information and belief, the Debtor used Long Gate as borrower under the Roscalitar Loan (discussed above).

i. **Sail Victory Limited ("Sail Victory")** is nominally owned, upon information and belief, by the Debtor's son, Qiang Guo, who served as the company's sole director.  The Debtor used Sail Victory as a vehicle for making investments in the Reverence Capital Partners Fund, which account is now held in the name of Lamp Capital.[82]

179.    As with the Hong Kong Shell Companies, each of the BVI Shell Companies shares the key traits of a company dominated and controlled by the Debtor: a pliant strawman, whether a family member, employee, or other subordinate, is formally in charge, but the business purpose is the Debtor's.  Moreover, in each case, upon information and belief, these companies operate from the Debtor's offices, where lists of the companies have been kept by the Debtor's assistants (first Natasha Qu, and later Yvette Wang), making it clear that they are the Debtor's companies.  Given these circumstances, and in light of the Debtor's track record in establishing alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect to each of the BVI Shell Companies.

---

[81]    *See Memorandum of Decision and Order Granting in Part Motion for Summary Judgment* ¶ 7, Adv. Proc. No. 23-05008, Docket No. 126.

[82]    *See Chapter 11 Trustee's Motion for Entry of Order Pursuant to Sections 105(a), 363(b), 541, and 542 of Bankruptcy Code Approving Liquidation of VCTR Shares, Distribution of Proceeds, and Related Relief*, Main Case Docket No. 3203.

### K.    Other Off-Shore Shell Companies

180.    The Debtor has controlled a number of entities organized in other offshore jurisdictions at which the Debtor's family members, employees, controlled companies, or other agents of the Debtor served as nominal shareholders and/or directors and that the Debtor used to engage in financial transactions and/or hold assets on his behalf, each as defined below (collectively, the "Other Shell Companies").

   a.   **Alzarro Enterprises Ltd.** ("**Alzarro**") is an entity organized in Nevis that is, upon information and belief, nominally owned by the Debtor's Son, Qiang Guo, with Qiang Guo and Lam Teck Hua, an employee of the Debtor, serving as directors.  Alzarro is borrower under a facility agreement with Blue Capital Limited, as lender, in connection with a $560 million loan (the "Blue Capital Loan").  The Debtor and Qiang Guo each are guarantors of the Blue Capital Loan, and pledges were provided under the facility agreement by Leading Shine Limited (BVI), an entity subject to Alter Ego Claims in the Amended First Omnibus Alter Ego Complaint and title holder to the Debtor's Hong Kong mansion, as well as Genever Holding Corporation, sole member of Genever Holding LLC, the title holder of the Sherry Netherland apartment.  As discussed in pleadings filed by the Trustee in connection with its litigation against Bravo Luck Limited related to the Sherry Netherland apartment, Genever Holdings Corporation's pledge to Blue Capital became a contentious issue during the Debtor's litigation against PAX when the Debtor for a period of time falsely asserted, based on this pledge, that the Sherry Netherland somehow was not subject to execution by PAX.[83]

   b.   **BSA Strategic Fund I** ("**BSA Fund**") is an entity organized in the Cayman Islands that is, upon information and belief, nominally owned by BSA Capital Management Limited.  Upon information and belief, the Debtor used BSA Fund to engage in transactions on the Hong Kong stock exchange by collecting investments from a collection of other Debtor-controlled companies.  According to the Hong Kong Restraint Order, BSA Fund's assets were effectively controlled by the Debtor.

   c.   **Insight Phoenix Fund** is an entity organized in the Cayman Islands that is, upon information and belief, nominally owned by Phoenix Capital Management (Cayman) Limited.  Upon information and belief, the Debtor used Insight Phoenix Fund, to engage in transactions on the Hong Kong stock exchange by collecting

---

[83]    *See Chapter 11 Trustee's Amended Adversary Complaint Against Bravo Luck and Qiang Guo Seeking (I) Invalidation of Purported Trust Agreement in Favor of Bravo Luck and, (II) in Alternative, Ruling That Debtor Effectuated Fraudulent Transfer in Favor of Bravo Luck and Qiang Guo Pursuant to Section 276 of New York Debtor and Creditor Law, Made Applicable by Section 544 of Bankruptcy Code ¶¶ 61-64, Adv. Proc No. 22-05027, Docket No. 40.*

investments from a collection of other Debtor-controlled companies.  According
to the Hong Kong Restraint Order, Insight Phoenix Fund's assets were effectively
controlled by the Debtor.

181.    The Other Shell Companies were dominated and controlled by the Debtor.

Alzarro presents a classic pattern with the Debtor's son serving as the pliant strawman at a

company engaging in a transaction of the Debtor involving a pledge of the value of the Debtor's

luxurious homes in Hong Kong and New York.  For BSA Fund and Insight Phoenix Fund,

strawman ownership is not yet confirmed, but these entities' assets are, based on a judgment of a

court in Hong Kong, controlled by the Debtor.  Indeed, the Debtor funded BSA Fund and Insight

Phoenix Fund with his other companies so that they could invest in the Hong Kong stock market

on his direction.  Given these circumstances, and in light of the Debtor's track record in

establishing alter ego shell companies, the Trustee is entitled to an Alter Ego Ruling with respect

to each of the Other Shell Companies.

## III.    <u>Tolling Order</u>

182.    On February 15, 2024, the Court entered its *Memorandum of Decision and Order
Granting in Part Motion to Extend Deadlines* [Main Case Docket No. 2921] (the "<u>Tolling
Order</u>"), in which the Court, pursuant to Bankruptcy Rule 9006(b), extended the time limitations
set forth in Sections 108, 546, and 549 of the Bankruptcy Code for the Trustee to commence
avoidance actions through and including August 15, 2024.

183.    In the Tolling Order, the Court found that since the Petition Date, the Debtor has,
among other things, filed incomplete or inaccurate schedules and statements of financial affairs,
failed to provide books and records to the Trustee, and otherwise failed to cooperate with the
Trustee, all in flagrant disregard for his obligations as a debtor under the Bankruptcy Code.[84]

---

[84]    Tolling Order, at 14.

184.    The Debtor's family members and other individuals and entities associated with him have likewise obstructed the Trustee's investigation, as evidenced by the Court's entry of "at least eight orders holding the … Debtor, his daughter, [Mei] Guo, and entities allegedly controlled by the … Debtor in contempt for failure to turn over assets and discovery abuse."[85] The Court found that the "noncompliance with this Court's orders in these jointly administered chapter 11 cases, is extraordinary,"[86] and that, in the face of such obstruction, the Trustee's investigation has been "more than reasonably diligent."[87]

185.    On August 14, 2024, the Court entered its *Order Granting Second Motion or Extension of Deadline for Trustee to File Avoidance Actions* [Main Case Docket No. 3417] (the "Second Tolling Order"), in which the Court, pursuant to Bankruptcy Rule 9006(b), extended the time limitations set forth in Sections 108, 546, and 549 of the Bankruptcy Code for the Trustee to commence avoidance actions and other actions on behalf of the estate, as well as for amending any pending complaints, through and including February 15, 2025.

186.    In the Second Tolling Order, the Court found that the Trustee has established cause exists under Bankruptcy Rule 9006(b), which includes without limitation: (1) the pendency of the Debtor's criminal case, (2) the Debtor's ongoing contempt of court and failure to perform his statutory duties under Bankruptcy Code section 521, (3) other parties' ongoing contempt of court, (4) the complexity of the Debtor's financial affairs, (5) the Trustee's diligence in his investigation.[88]

187.    The Trustee has acted diligently in investigating and pursuing the claims asserted in this Complaint.

---

[85]    *Id.* at 15.
[86]    *Id.*
[87]    *Id.* at 17.
[88]    Second Tolling Order, at 3.

188.    In light of, among other things, the extraordinary obstruction that the Trustee has faced in conducting his diligent investigation, the balance of the equities strongly favors equitable tolling of any statutes of limitations applicable to the claims asserted herein.

## **FIRST CLAIM**

### **(Declaratory Judgment that Crane is Debtor's Alter Ego and Ordering Turnover of Crane's Assets to Trustee)**

189.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

190.    New York law applies to this alter ego claim because Crane is a New York entity.[89]

191.    Crane is an alter ego of the Debtor, because, among other reasons:

a.    Crane's nominal owner and manager was an agent of the Debtor, and his salary was paid by other companies controlled by the Debtor.

b.    Crane used the same office as the Debtor and other Debtor shell companies.

c.    Crane's only business was to create bank accounts and move money on behalf of the Debtor and his shell companies.

d.    The Debtor controlled the funds in Crane's bank accounts.

---

[89]    Under New York law, a party seeking an alter ego ruling must show "'(1) the alleged alter ego 'exercised complete domination over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil.'" *Sentry Ins. v. Brand Mgmt. Inc.*, 120 F. Supp. 3d 277, 286 (E.D.N.Y. 2015), *aff'd sub nom. Sentry Ins. a Mut. Co. v. Weber*, 720 F. App'x 639 (2d Cir. 2017) (quoting *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F.Supp.3d 267, 296 (E.D.N.Y.2014)). The domination referenced in this first prong is determined based on considering ten equitable factors: "(1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm['s] length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Id.* (quoting *Liberty* Synergistics, 50 F.Supp.3d at 296).

192.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

193.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times Crane was an alter ego of the Debtor; (b) any and all of the assets held by Crane at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Crane at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of Crane to the Trustee.

## SECOND CLAIM

### (Declaratory Judgment that Debtor Is Equitable Owner of Crane and Its Assets and Ordering Turnover of Ownership of Crane and Its Assets to Trustee)

194.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

195.    The same facts, discussed above, establishing that Crane is an alter ego of the Debtor, also support the conclusion that the Debtor is the equitable owner of Crane and its assets.[90]

196.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

---

[90]    *See Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (equitable ownership established where defendant "exercised considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and ***acting as though [its] assets were his alone to manage."***) (emphasis added).

64

197.    Accordingly, the Trustee seeks a ruling, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Crane, and the assets of Crane, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in Crane, and the assets of Crane, to the Trustee.

## THIRD CLAIM

### (Declaratory Judgment that GS Security is Debtor's Alter Ego and Ordering Turnover of GS Security's Assets to Trustee)

198.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

199.    New York law applies to this alter ego claim because GS Security is a New York entity.[91]

200.    GS Security is an alter ego of the Debtor, because, among other reasons:

a.    GS Security's nominal owner and manager was an agent of the Debtor.

b.    GS Security's business was to provide security for the Debtor and his family.

c.    GS Security's work was conducted at the Debtor's residences.

d.    GS Security was funded by the Debtor through his shell companies and supporters.

---

[91]    Under New York law, a party seeking an alter ego ruling must show "(1) the alleged alter ego 'exercised complete domination over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil.'" *Sentry Ins. v. Brand Mgmt. Inc.*, 120 F. Supp. 3d 277, 286 (E.D.N.Y. 2015), *aff'd sub nom. Sentry Ins. a Mut. Co. v. Weber,* 720 F. App'x 639 (2d Cir. 2017) (quoting *Liberty Synergistics, Inc. v. Microflo Ltd*., 50 F.Supp.3d 267, 296 (E.D.N.Y.2014)). The domination referenced in this first prong is determined based on considering ten equitable factors: "(1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm['s] length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Id.* (quoting *Liberty* Synergistics, 50 F.Supp.3d at 296).

201.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

202.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times GS Security was an alter ego of the Debtor; (b) any and all of the assets held by GS Security at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by GS Security at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of GS Security to the Trustee.

## FOURTH CLAIM

**(Declaratory Judgment that Debtor Is Equitable Owner of GS Security and Its Assets and Ordering Turnover of Ownership of GS Security and Its Assets to Trustee)**

203.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

204.    The same facts, discussed above, establishing that GS Security is an alter ego of the Debtor, also support the conclusion that the Debtor is the equitable owner of GS Security and its assets.[92]

205.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

---

[92]    *See Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (equitable ownership established where defendant "exercised considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and ***acting as though [its] assets were his alone to manage.***") (emphasis added).

66

206.    Accordingly, the Trustee seeks a ruling, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in GS Security, and the assets of GS Security, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in GS Security, and the assets of GS Security, to the Trustee.

## FIFTH CLAIM

**(Declaratory Judgment that HGA Property is Debtor's Alter Ego and Ordering Turnover of HGA Property's Assets to Trustee)**

207.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

208.    New Jersey law applies to this alter ego claim because HGA Property is a New Jersey entity.[93]

209.    HGA Property is an alter ego of the Debtor, because, among other reasons:

    a.    HGA Property's nominal owners and managers were agents of the Debtor.

    b.    The Debtor used HGA Property to manage his Mahwah Mansion property.

    c.    The Debtor used HGA Property to pay his expenses.

    d.    The Debtor funded HGA Property through his supporters.

---

[93]    *State Cap. Title & Abstract Co. v. Pappas Bus. Servs.*, LLC, 646 F. Supp. 2d 668, 679 (D.N.J. 2009) ("In New Jersey, two elements must be shown to pierce the corporate veil: First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice… In determining whether a unity of interest and ownership exists under the first prong, the Third Circuit has applied six non-binding factors to guide this inquiry: [1] gross undercapitalization ... [2] "failure to observe corporate formalities, non-payment of dividends, [3] the insolvency of the debtor corporation at the time, [4] siphoning of funds of the corporation by the dominant stockholder, [5] non-functioning of other officers or directors, absence of corporate records, and [6] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. . . With respect to the second element, a plaintiff need not prove common law fraud but instead demonstrate that the defendants, via the corporate form, perpetrated a fraud, injustice, or the like, a less exacting standard.") (internal citations omitted).

210.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

211.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times HGA Property was an alter ego of the Debtor; (b) any and all of the assets held by HGA Property at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by HGA Property at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of HGA Property to the Trustee.

## SIXTH CLAIM

### (Declaratory Judgment that Debtor Is Equitable Owner of HGA Property and Its Assets and Ordering Turnover of Ownership of HGA Property and Its Assets to Trustee)

212.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

213.    The same facts, discussed above, establishing that HGA Property is an alter ego of the Debtor, also support the conclusion that the Debtor is the equitable owner of HGA Property and its assets.[94]

---

[94]    *See Kartzman v. Beiman (In re Beiman),* No. 15-10488 (JKS), 2018 WL 6978705, *4 (Bankr. D. N. J. Mar. 19, 2018) (Courts have found that debtor had equitable interest in property upon one or more of following grounds: (1) debtor's funds were used to acquire property; (2) debtor represented that he had interest in property or used property to obtain credit; or (3) they involved property that was once owned by debtor and then transferred to third party (usually in face of creditor pressure)); *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, *8 (Bankr. D.N.J. June 29, 2006) (finding debtor to be equitable owner of property under New Jersey law based on patterns and practices of debtor's fraudulent behaviors, where debtor, funding purchase of properties, placed title to properties in name of third parties while maintaining de facto control and ownership).

214.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

215.    Accordingly, the Trustee seeks a ruling, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in HGA Property, and the assets of HGA Property, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in HGA Property, and the assets of HGA Property, to the Trustee.

## SEVENTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Thousand Stars and Its Assets and Ordering Turnover of Ownership of Thousand Stars and Its Assets to Trustee)**

216.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

217.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Thousand Stars and its assets.

218.    Among other things:

   a.    Thousand Stars was controlled by the Debtor through his agents.

   b.    The Debtor used Thousand Stars to operate his G Club scheme from Abu Dhabi.

   c.    Thousand Stars was funded by the Debtor.

219.    Under ADGM law, these facts and circumstances warrant the conclusion that (a) Haoran He has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in Thousand Stars only for the benefit of the Debtor; and that (b) Thousand Stars has been at all relevant times a mere

nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor.[95]

220.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

221.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Thousand Stars and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Thousand Stars, and all related rights of corporate control, to the Trustee.

## EIGHTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of H Reserve Management and Its Assets and Ordering Turnover of Ownership of H Reserve Management and Its Assets to Trustee)**

222.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

223.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of H Reserve Management and its assets.

224.    Among other things:

---

[95]    *See e.g.* Adv. Proc No. 23-05008 [Docket No. 126], at 30-31 ("English common law recognizes that a legal owner may be a "bare trustee", holding an asset for the benefit and at the discretion of a beneficial owner who has complete control over the asset. *Inland Revenue Commissioners v. Silverts Ld.* [1951] 1 Ch 521 (EWCA) at 526 (Eng.); *Jenkins v. Walker (In re Blandy Jenkins' Estate)* [1917] 1 Ch 46; *Christie v. Ovington* (1875) 1 Ch. D. 279; Meaning of 'bare trustee', 92 HALSBURY'S LAWS OF ENGLAND ¶ 194 (5th ed. 2019). The relationship between bare trustee and beneficial owner need not be formalized in writing and may be determined based on the facts and circumstances of the case. *Pleshakov v. Sky StreamCorporation* [2021] UKPC 15 [¶¶ 47–48]; *Tang v. Revenue and Customs Commissioners* [2019] UKFTT 81 (TC); *Purba v. Purba [*2000] 1 FLR 444 (EWCA) (Eng.)."); *Prest v Petrodel* [2013] 2 AC 415 at [52] (resulting trust arose where individual improperly used an offshore structure to evade their liabilities); *Cobussen v Akbar* [2020] EWHC 2805 (QB) (resulting trust imposed to enforce a judgment against a London property, despite judgment debtor denying he held a beneficial interest in the property, where court concluded that judgment debtor funded purchase of property held through offshore company whose shareholder was instructed by judgment debtor).

    a.   H Reserve Management was controlled by the Debtor through his agents.

    b.   The Debtor used H Reserve Management to operate his Himalaya Exchange
        scheme from Abu Dhabi.

    c.   H Reserve Management was funded by the Debtor.

225.    Under ADGM law, these facts and circumstances warrant the conclusion that (a)

Le ("Ingrid") Qiao has been at all relevant times a mere nominee, "bare trustee," and/or trustee

pursuant to a resulting trust considered to hold legal title to ownership interests in H Reserve

Management only for the benefit of the Debtor; and that (b) H Reserve Management has been at

all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust

considered to hold legal title to ownership interests in assets held under its name only for the

benefit of the Debtor.[96]

226.    At all relevant times, the Debtor was indebted to one or more creditors.  Such

creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'

rights.

227.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of

the Bankruptcy Code (1) declaring that H Reserve Management and its assets are and were at all

relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2)

ordering the surrender of such assets, ownership interests in H Reserve Management, and all

related rights of corporate control, to the Trustee.

## NINTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Delta Konsult and Its
Assets and Ordering Turnover of Ownership of Delta Konsult and Its Assets to Trustee)**

228.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

---

[96]   *See* note 96, *supra*.

229. The facts set forth herein demonstrate that the Debtor is the beneficial owner of Delta Konsult and its assets.

230. Among other things:

    a. Delta Konsult was controlled by the Debtor through his agents.

    b. The Debtor used Delta Konsult to operate his Himalaya Exchange and G Club schemes from Abu Dhabi.

    c. Delta Konsult was funded by the Debtor.

231. Under ADGM law, these facts and circumstances warrant the conclusion that (a) Xinfang ("Sarah") Zhang has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in Delta Konsult only for the benefit of the Debtor; and that (b) Delta Konsult has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [97]

232. At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

233. Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Delta Konsult and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Delta Konsult, and all related rights of corporate control, to the Trustee.

---

[97] *See* note 96, *supra*.

## TENTH CLAIM

**(Declaratory Judgment that River Valley is Debtor's Alter Ego and Ordering Turnover of River Valley's Assets to Trustee)**

234.     The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

235.     Indiana law applies to this alter ego claim because River Valley is an Indiana entity.[98]

236.     River Valley is an alter ego of the Debtor, because, among other reasons:

    a.  River Valley's nominal owner and account signatories were agents of the Debtor.

    b.  River Valley was funded by the Debtor.

    c.  River Valley transferred funds on behalf of the Debtor to the Debtor's family members and controlled companies.

237.     At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

238.     Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times River Valley was an alter ego of the Debtor; (b) any and all of the assets held by River Valley at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by River Valley at any time from the date of the Debtor's February 15, 2022 chapter 11

---

[98]     *See JMB Mfg., Inc. v. Child Craft, LLC*, 939 F. Supp. 2d 909, 918-19 (S.D. Ind. 2013) ("The party seeking to pierce must show by a preponderance of evidence that the corporate form was so ignored, controlled, or manipulated that it was merely the instrumentality of another and that not piercing would constitute fraud or injustice. There are eight practices that most often result in a court deciding to disregard the corporate form: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.") (internal citations removed).

petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of River Valley to the Trustee.

## ELEVENTH CLAIM

**(Declaratory Judgment that Debtor Is Equitable Owner of River Valley and Its Assets and Ordering Turnover of Ownership of River Valley and Its Assets to Trustee)**

239.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

240.    The same facts, discussed above, establishing that River Valley is an alter ego of the Debtor, also support the conclusion that the Debtor is the equitable owner of River Valley and its assets.[99]

241.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

242.    Accordingly, the Trustee seeks a ruling, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in River Valley, and the assets of River Valley, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in River Valley, and the assets of River Valley, to the Trustee.

---

[99]    *See In re Miles*, 652 B.R. 320, 334-35 (Bankr. N.D.Ill. 2023) (addressing absence of Indiana authority on equitable ownership issue by applying "federal common law five-factor test," under which "(1) there is a close personal relationship between the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and, (5) the transferor continues to exercise dominion and control over the property.") (citing *United States v. Szaflarski*, 614 F. App'x 836, 838-39 (7th Cir. 2015) and *Paloian v. Dordevic (In re Dordevic)*, 67 F.4th 372 (7th Cir. 2023)).

## TWELFTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Fiesta Investment and Its Assets and Ordering Turnover of Ownership of Fiesta Investment and Its Assets to Trustee)**

243.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

244.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Fiesta Investment and its assets.

245.    Among other things:

    a.  Fiesta Investment was controlled by the Debtor through his agent.

    b.  The Debtor used Fiesta Investment to transfer funds to and purchase assets for his son.

    c.  The Debtor funded Fiesta Investment through his shell companies.

246.    Under English law, these facts and circumstances warrant the conclusion that (a) Haoran He has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in Fiesta Investment only for the benefit of the Debtor; and that (b) Fiesta Investment has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [100]

247.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

248.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Fiesta Investment and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2)

---

[100]    *See* note 96, *supra*.

75

ordering the surrender of such assets, ownership interests in Fiesta Investment, and all related rights of corporate control, to the Trustee.

## THIRTEENTH CLAIM

### (Declaratory Judgment that Debtor Is True Beneficial Owner of Rising Sun Capital and Its Assets and Ordering Turnover of Ownership of Rising Sun Capital and Its Assets to Trustee)

249.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

250.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Rising Sun Capital and its assets.

251.    Among other things:

    a.    Rising Sun Capital was controlled by the Debtor through his agent.

    b.    The Debtor used Rising Sun Capital to transfer funds to his son.

    c.    Rising Sun Capital shared an address with the Debtor's son.

    d.    The Debtor funded Rising Sun Capital through his shell companies.

252.    Under English law, these facts and circumstances warrant the conclusion that (a) Haoran He has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in Rising Sun Capital only for the benefit of the Debtor; and that (b) Rising Sun Capital has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [101]

253.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

---

[101]    *See* note 96, *supra*.

254.     Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Rising Sun Capital and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Rising Sun Capital, and all related rights of corporate control, to the Trustee.

## FOURTEENTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Ampleforth Capital and Its Assets and Ordering Turnover of Ownership of Ampleforth Capital and Its Assets to Trustee)**

255.     The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

256.     The facts set forth herein demonstrate that the Debtor is the beneficial owner of Ampleforth Capital and its assets.

257.      Among other things:

a.   Ampleforth Capital was controlled by the Debtor through his agent.

b.   The Debtor used Ampleforth Capital to transfer funds to his shell company.

c.   The Debtor funded Ampleforth Capital through his supporters.

258.     Under BVI law, these facts and circumstances warrant the conclusion that (a) Kun Ma (a/k/a Kevin Ma) has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in Ampleforth Capital only for the benefit of the Debtor; and that (b) Ampleforth Capital has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [102]

---

[102]   *See* note 96, *supra*.

259.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

260.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Ampleforth Capital and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Ampleforth Capital, and all related rights of corporate control, to the Trustee.

## FIFTEENTH CLAIM

### (Declaratory Judgment that Debtor Is True Beneficial Owner of Holy City and Its Assets and Ordering Turnover of Ownership of Holy City and Its Assets to Trustee)

261.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

262.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Holy City and its assets.

263.     Among other things:

a.    Holy City was controlled by the Debtor through Yvette Wang and New Federal State Corporation.

b.    The Debtor used Holy City to hold title to his alter egos, the HCHK Entities.

c.    Holy City's only purpose is to hold title to the HCHK Entities and litigate against the Trustee.

264.    Under BVI law, these facts and circumstances warrant the conclusion that (a) Yvette Wang and New Federal State Corporation have been, as applicable, at all relevant times mere nominees, "bare trustees," and/or trustees pursuant to a resulting trust considered to hold legal title to ownership interests in Holy City only for the benefit of the Debtor; and that (b) Holy City has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a

78

resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [103]

265.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

266.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Holy City and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Holy City, and all related rights of corporate control, to the Trustee.

## SIXTEENTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Hudson Diamond BVI and Its Assets and Ordering Turnover of Ownership of Hudson Diamond BVI and Its Assets to Trustee)**

267.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

268.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Hudson Diamond BVI and its assets.

269.    Among other things:

    a.  Hudson Diamond BVI was controlled by the Debtor through his son, Qiang Guo.

    b.  The Debtor used Hudson Diamond BVI to hold title to his alter ego, the Saraca Media Group, Inc.

    c.  Hudson Diamond BVI only purpose is to hold title to Saraca Media Group, Inc.

---

[103]  *See* note 96, *supra*.

270.     Under BVI law, these facts and circumstances warrant the conclusion that (a) Qiang Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in Hudson Diamond BVI only for the benefit of the Debtor; and that (b) Hudson Diamond BVI has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [104]

271.     At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

272.     Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Hudson Diamond BVI and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Hudson Diamond BVI, and all related rights of corporate control, to the Trustee.

## SEVENTEENTH CLAIM

**(Declaratory Judgment that Infinity Treasury Is Debtor's Alter Ego and Ordering Turnover of Infinity Treasury's Assets to Trustee)**

273.     The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

274.     Delaware law applies to this alter ego claim because Infinity Treasury is a Delaware entity. [105]

---

[104]  *See* note 96, *supra*.

[105]  Under Delaware's two-pronged test for piercing the corporate veil, a court applying Delaware's alter ego analysis to the Debtor's relationship with Infinity Treasury will focus on (1) whether the Debtor and Infinity Treasury operated as a single economic unit and (2) whether there was an overall element of injustice or unfairness. In determining whether the Debtor and Infinity Treasury operated as a single economic unit, a court

275. Infinity Treasury is an alter ego of the Debtor, because, among other reasons:

    a. The Debtor controlled Infinity Treasury through his son.

    b. The Debtor used Infinity Treasury to hold title to his alter ego Lamp Capital.

    c. Infinity Treasury's only purpose was to hold title to Lamp Capital and to litigate against the Trustee.

276. At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

277. Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times Infinity Treasury was an alter ego of the Debtor; (b) any and all of the assets held by Infinity Treasury at any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held Infinity Treasury at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of Infinity Treasury to the Trustee.

## EIGHTEENTH CLAIM

**(Declaratory Judgment that Debtor Is Equitable Owner of Infinity Treasury and Its Assets and Ordering Turnover of Ownership of Infinity Treasury and Its Assets to Trustee)**

278. The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

---

applying Delaware law would consider a number of factors, including, among others, whether Infinity Treasury was adequately capitalized, observed corporate formalities, and was a facade for the Debtor. *Blair v. Infineon Tech., AG*, 720 F. Supp.2d 462, 470-71 (D. Del. 2010). This "list of factors is not exhaustive and no single factor is dispositive." *Id.* at 471.

279. The same facts, discussed above, establishing that Infinity Treasury is an alter ego of the Debtor, also support the conclusion that the Debtor is the equitable owner of Infinity Treasury and its assets.[106]

280. At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

281. Accordingly, the Trustee seeks a ruling, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Infinity Treasury, and the assets of Infinity Treasury, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in Infinity Treasury, and the assets of Infinity Treasury, to the Trustee.

## NINETEENTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Strong Country and Its Assets and Ordering Turnover of Ownership of Strong Country and Its Assets to Trustee)**

282. The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

283. The facts set forth herein demonstrate that the Debtor is the beneficial owner of Strong Country and its assets.

284. Among other things:

    a. Strong Country was controlled by the Debtor through the Debtor's wife, Hing Chi Ngok and the Debtor's son, Qiang Guo.

---

[106] *See Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (equitable ownership established where defendant "exercised considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and ***acting as though [its] assets were his alone to manage.***") (emphasis added).

82

b.  The Debtor used Strong Country hold title to real property in Beijing, China
and pledged assets in connection with the Roscalitar Loan.

c.  Strong Country was operated from the Debtor's offices.

285.   Under Hong Kong Law, these facts and circumstances warrant the conclusion that
(a) Hing Chi Ngok and Qiang Guo have been at all relevant times mere nominees or "bare
trustees," considered to hold legal title to ownership interests in Strong Country only for the
benefit of the Debtor; and that (b) Strong Country has been at all relevant times a mere nominee,
"bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to
ownership interests in assets held under its name only for the benefit of the Debtor. [107]

286.   At all relevant times, the Debtor was indebted to one or more creditors.  Such
creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'
rights.

287.   Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of
the Bankruptcy Code (1) declaring that Strong Country and its assets are and were at all relevant
times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the
surrender of such assets, ownership interests in Strong Country, and all related rights of
corporate control, to the Trustee.

**TWENTIETH CLAIM**

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Joincorp International
and Its Assets and Ordering Turnover of Ownership of Joincorp International and Its
Assets to Trustee)**

288.   The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

289.   The facts set forth herein demonstrate that the Debtor is the beneficial owner of
Joincorp International and its assets.

---

[107]  *See* note 96, *supra*.

83

290.     Among other things:

    a.   Joincorp International was controlled by the Debtor through the Debtor's daughter, Mei Guo.

    b.   The Debtor used Joincorp International to establish business ventures in Taiwan.

    c.   Joincorp International was operated from the Debtor's offices.

291.     Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Mei Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in Joincorp International only for the benefit of the Debtor; and that (b) Joincorp International has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [108]

292.     At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

293.     Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Joincorp International and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Joincorp International, and all related rights of corporate control, to the Trustee.

---

[108]   *See* note 96, *supra*.

## TWENTY-FIRST CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Canadian Agri-product and Its Assets and Ordering Turnover of Ownership of Canadian Agri-product and Its Assets to Trustee)**

294.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

295.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Canadian Agri-product and its assets.

296.    Among other things:

    a.  Canadian Agri-product was controlled by the Debtor through the Debtor's son, Qiang Guo.

    b.  The Debtor used Canadian Agri-product to hold title to motor vehicles.

    c.  Canadian Agri-product was operated from the Debtor's offices.

297.    Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Qiang Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Canadian Agri-product only for the benefit of the Debtor; and that (b) Canadian Agri-product has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [109]

298.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

299.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Canadian Agri-product and its assets are and were at all

---

[109]    *See* note 96, *supra*.

relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2)

ordering the surrender of such assets, ownership interests in Canadian Agri-product, and all

related rights of corporate control, to the Trustee.

## TWENTY-SECOND CLAIM

### (Declaratory Judgment that Debtor Is True Beneficial Owner of Eagle Eye Investments and Its Assets and Ordering Turnover of Ownership of Eagle Eye Investments and Its Assets to Trustee)

300.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

301.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of

Eagle Eye Investments and its assets.

302.    Among other things:

a.  Eagle Eye Investments was controlled by the Debtor through the Debtor's
    employee, Kesen Yang.

b.  The Debtor used Eagle Eye Investments to hold title to a PRC company.

c.  Eagle Eye Investments was operated from the Debtor's offices.

303.    Under Hong Kong law, these facts and circumstances warrant the conclusion that

(a) Kesen Yang has been at all relevant times a mere nominee, "bare trustee," and/or trustee

pursuant to a resulting trust considered to hold legal title to ownership interests Eagle Eye

Investments only for the benefit of the Debtor; and that (b) Eagle Eye Investments has been at all

relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust

considered to hold legal title to ownership interests in assets held under its name only for the

benefit of the Debtor. [110]

---

[110]  *See* note 96, *supra*.

304.     At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

305.     Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Eagle Eye Investments and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Eagle Eye Investments, and all related rights of corporate control, to the Trustee.

## TWENTY-THIRD CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Glory Asia and Its Assets and Ordering Turnover of Ownership of Glory Asia and Its Assets to Trustee)**

306.     The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

307.     The facts set forth herein demonstrate that the Debtor is the beneficial owner of Glory Asia and its assets.

308.      Among other things:

   a.  Glory Asia was controlled by the Debtor through the Debtor's family member, Zongchao Yue.

   b.  The Debtor used Glory Asia to operate an oil business and fund his shell company New Dynamic Development Limited.

   c.  Glory Asia was operated from the Debtor's offices.

309.     Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Zongchao Yue has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Glory Asia only for the benefit of the Debtor; and that (b) Glory Asia has been at all relevant times a mere

87

nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [111]

310.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

311.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Glory Asia and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Glory Asia, and all related rights of corporate control, to the Trustee.

## **TWENTY-FOURTH CLAM**

### **(Declaratory Judgment that Debtor Is True Beneficial Owner of Gold Perfect and Its Assets and Ordering Turnover of Ownership of Gold Perfect and Its Assets to Trustee)**

312.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

313.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Gold Perfect and its assets.

314.     Among other things:

a.  Gold Perfect was controlled by the Debtor through the Debtor's wife, Hing Chi Ngok.

b.  The Debtor used Gold Perfect to hold title to a PRC company.

c.  Gold Perfect was operated from the Debtor's offices.

315.    Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Hing Chi Ngok has been at all relevant times a mere nominee, "bare trustee," and/or trustee

---

[111]    *See* note 96, *supra*.

pursuant to a resulting trust considered to hold legal title to ownership interests Gold Perfect only for the benefit of the Debtor; and that (b) Gold Perfect has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [112]

316.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

317.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Gold Perfect and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Gold Perfect, and all related rights of corporate control, to the Trustee.

## TWENTY-FIFTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Group Dynasty and Its Assets and Ordering Turnover of Ownership of Group Dynasty and Its Assets to Trustee)**

318.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

319.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Group Dynasty and its assets.

320.     Among other things:

  a. Group Dynasty was controlled by the Debtor through the Debtor's wife, Hing Chi Ngok.

  b. The Debtor used Group Dynasty to hold title to a PRC company.

  c. Group Dynasty was operated from the Debtor's offices.

---

[112] *See* note 96, *supra*.

321.    Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Hing Chi Ngok has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Group Dynasty only for the benefit of the Debtor; and that (b) Group Dynasty has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [113]

322.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

323.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Group Dynasty and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Group Dynasty, and all related rights of corporate control, to the Trustee.

**TWENTY-SIXTH CLAIM**

**(Declaratory Judgment that Debtor Is True Beneficial Owner of HK International and Its Assets and Ordering Turnover of Ownership of HK International and Its Assets to Trustee)**

324.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

325.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of HK International and its assets.

326.    Among other things:

---

[113]    *See* note 96, *supra*.

a. HK International was controlled by the Debtor through his daughter, Mei Guo.

b. The Debtor used HK International to hold title to the *Lady May* and move money on his behalf.

c. HK International was operated from the Debtor's offices.

327.     Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Mei Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests HK International only for the benefit of the Debtor; and that (b) HK International has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [114]

328.     At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

329.     Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that HK International and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in HK International, and all related rights of corporate control, to the Trustee.

## TWENTY-SEVENTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Kingdom Rich and Its Assets and Ordering Turnover of Ownership of Kingdom Rich and Its Assets to Trustee)**

330.     The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

---

[114]  *See* note 96, *supra*.

91

331.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Kingdom Rich and its assets.

332.    Among other things:

    a.  Kingdom Rich was controlled by the Debtor through his son, Qiang Guo.

    b.  The Debtor used Kingdom Rich to hold title to the *Lady May II*.

    c.  Kingdom Rich was operated from the Debtor's offices.

333.    Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Qiang Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Kingdom Rich only for the benefit of the Debtor; and that (b) Kingdom Rich has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [115]

334.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

335.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Kingdom Rich and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Kingdom Rich, and all related rights of corporate control, to the Trustee.

---

[115]  *See* note 96, *supra*.

## TWENTY-EIGHTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of New Miracle Limited and Its Assets and Ordering Turnover of Ownership of New Miracle Limited and Its Assets to Trustee)**

336.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

337.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of New Miracle Limited and its assets.

338.    Among other things:

    a.    New Miracle Limited was controlled by the Debtor through his shell company Joy Chance Holdings Limited.

    b.    The Debtor used New Miracle Limited to invest in Taiwan.

    c.    New Miracle Limited was operated from the Debtor's offices.

339.    Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Joy Chance Holdings Limited has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests New Miracle Limited only for the benefit of the Debtor; and that (b) New Miracle Limited has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [116]

340.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

341.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that New Miracle Limited and its assets are and were at all

---

[116]   *See* note 96, *supra*.

93

relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in New Miracle Limited, and all related rights of corporate control, to the Trustee.

## TWENTY-NINTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Pacific King and Its Assets and Ordering Turnover of Ownership of Pacific King and Its Assets to Trustee)**

342.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

343.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Pacific King and its assets.

344.     Among other things:

    a.  Pacific King was controlled by the Debtor through his wife, Hing Chi Ngok.

    b.  The Debtor used Pacific King to manage the crews of his private airplanes.

    c.  Pacific King was operated from the Debtor's offices.

345.    Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Hing Chi Ngok has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Pacific King only for the benefit of the Debtor; and that (b) Pacific King has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [117]

346.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

---

[117] *See* note 96, *supra*.

347.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Pacific King and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Pacific King, and all related rights of corporate control, to the Trustee.

### THIRTIETH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Rich Group and Its Assets and Ordering Turnover of Ownership of Rich Group and Its Assets to Trustee)**

348.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

349.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Rich Group and its assets.

350.    Among other things:

    a.  Rich Group was controlled by the Debtor through his employee, Yan Su.

    b.  The Debtor used Rich Group to enter into agreements related to construction projects in Beijing.

    c.  Rich Group was operated from the Debtor's offices.

351.    Under Hong Kong law, these facts and circumstances warrant the conclusion that (a) Yan Su has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Rich Group only for the benefit of the Debtor; and that (b) Rich Group has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [118]

---

[118]  *See* note 96, *supra*.

352.    At all relevant times, the Debtor was indebted to one or more creditors.  Such

creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'

rights.

353.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of

the Bankruptcy Code (1) declaring that Rich Group and its assets are and were at all relevant

times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the

surrender of such assets, ownership interests in Rich Group, and all related rights of corporate

control, to the Trustee.

## THIRTY-FIRST CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of AA Global Ventures and
Its Assets and Ordering Turnover of Ownership of AA Global Ventures and Its Assets to
Trustee)**

354.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

355.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of

AA Global Ventures and its assets.

356.    Among other things:

      a.    AA Global Ventures was controlled by the Debtor through his shell company,
          Anton Development Limited.

      b.    The Debtor used AA Global Ventures to hold title to AAGV, another of his
          BVI Shell Companies.

      c.    AA Global Ventures was operated from the Debtor's offices.

357.    Under BVI law, these facts and circumstances warrant the conclusion that (a)

Anton Development Limited has been at all relevant times a mere nominee, "bare trustee,"

and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests

AA Global Ventures only for the benefit of the Debtor; and that (b) AA Global Ventures has

been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting

96

trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [119]

358.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

359.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that AA Global Ventures and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in AA Global Ventures, and all related rights of corporate control, to the Trustee.

## THIRTY-SECOND CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of AAGV and Its Assets and Ordering Turnover of Ownership of AAGV and Its Assets to Trustee)**

360.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

361.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of AAGV and its assets.

362.     Among other things:

    a.    AAGV was controlled by the Debtor through his daughter, Mei Guo.

    b.    The Debtor used AAGV as a vehicle to invest in securities in the Hong Kong stock market.

    c.    AAGV was operated from the Debtor's offices.

363.    Under BVI law, these facts and circumstances warrant the conclusion that (a) Mei Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a

---

[119]    *See* note 96, *supra*.

97

resulting trust considered to hold legal title to ownership interests AAGV only for the benefit of the Debtor; and that (b) AAGV has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [120]

364.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

365.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that AAGV and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in AAGV, and all related rights of corporate control, to the Trustee.

## THIRTY-THIRD CLAIM

### (Declaratory Judgment that Debtor Is True Beneficial Owner of Assets Sino and Its Assets and Ordering Turnover of Ownership of Assets Sino and Its Assets to Trustee)

366.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

367.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Assets Sino and its assets.

368.     Among other things:

a.    AAGV was controlled by the Debtor through his niece, Lihong Guo.

b.    The Debtor used Assets Sino as a vehicle to invest in securities in the Hong Kong stock market.

c.    Assets Sino was operated from the Debtor's offices.

---

[120]   *See* note 96, *supra*.

98

369.    Under BVI law, these facts and circumstances warrant the conclusion that (a) Lihong Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Assets Sino only for the benefit of the Debtor; and that (b) Assets Sino has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [121]

370.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

371.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Assets Sino and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Assets Sino, and all related rights of corporate control, to the Trustee.

## THIRTY-FOURTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Auspicious Coast and Its Assets and Ordering Turnover of Ownership of Auspicious Coast and Its Assets to Trustee)**

372.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

373.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Auspicious Coast and its assets.

374.    Among other things:

   a.   Auspicious Coast was controlled by the Debtor through his sister-in-law, Lichun Guo.

---

[121]  *See* note 96, *supra*.

b. The Debtor used Auspicious Coast as a vehicle to invest in securities in the Hong Kong stock market.

c. Auspicious Coast was operated from the Debtor's offices.

375. Under BVI law, these facts and circumstances warrant the conclusion that (a) Lichun Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Auspicious Coast only for the benefit of the Debtor; and that (b) Auspicious Coast has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [122]

376. At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

377. Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Auspicious Coast and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Auspicious Coast, and all related rights of corporate control, to the Trustee.

**THIRTY-FIFTH CLAIM**

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Guang Hong and Its Assets and Ordering Turnover of Ownership of Guang Hong and Its Assets to Trustee)**

378. The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

379. The facts set forth herein demonstrate that the Debtor is the beneficial owner of Guang Hong and its assets.

---

[122] *See* note 96, *supra*.

100

380.    Among other things:

a.  Guang Hong was controlled by the Debtor through his brother, Wencun Guo (a/k/a Man Chuen Kwok).

b.  The Debtor used Guang Hong as an investment vehicle.

c.  Guang Hong was operated from the Debtor's offices.

381.    Under BVI law, these facts and circumstances warrant the conclusion that (a) Wencun Guo (a/k/a Man Chuen Kwok) has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Guang Hong only for the benefit of the Debtor; and that (b) Guang Hong has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [123]

382.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

383.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Guang Hong and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Guang Hong, and all related rights of corporate control, to the Trustee.

---

[123]  *See* note 96, *supra*.

## THIRTY-SIXTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Head Win and Its Assets and Ordering Turnover of Ownership of Head Win and Its Assets to Trustee)**

384.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

385.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Head Win and its assets.

386.    Among other things:

　　a.　Head Win was controlled by the Debtor through his relative, Zhang Wei.

　　b.　The Debtor used Head Win to hold title to his Bombardier private jet.

　　c.　Head Win was operated from the Debtor's offices.

387.    Under BVI law, these facts and circumstances warrant the conclusion that (a) Zhang Wei has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Head Win only for the benefit of the Debtor; and that (b) Joy Chance has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [124]

388.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

389.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Head Win and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the

---

[124]    *See* note 96, *supra*.

surrender of such assets, ownership interests in Head Win, and all related rights of corporate

control, to the Trustee.

## THIRTY-SEVENTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Joy Chance and Its Assets
and Ordering Turnover of Ownership of Joy Chance and Its Assets to Trustee)**

390.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

391.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of

Joy Chance and its assets.

392.     Among other things:

a.  Joy Chance was controlled by the Debtor through his wife, Hing Chi Ngok.

b.  The Debtor used Joy Chance to hold title to New Miracle Limited, one of his
Hong Kong Shell Companies.

c.  Joy Chance was operated from the Debtor's offices.

393.    Under BVI law, these facts and circumstances warrant the conclusion that (a)

Hing Chi Ngok has been at all relevant times a mere nominee, "bare trustee," and/or trustee

pursuant to a resulting trust considered to hold legal title to ownership interests Joy Chance only

for the benefit of the Debtor; and that (b) Joy Chance has been at all relevant times a mere

nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title

to ownership interests in assets held under its name only for the benefit of the Debtor. [125]

394.    At all relevant times, the Debtor was indebted to one or more creditors.  Such

creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors'

rights.

---

[125]    *See* note 96, *supra*.

395.     Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Joy Chance and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Joy Chance, and all related rights of corporate control, to the Trustee.

## THIRTY-EIGHTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Long Gate and Its Assets and Ordering Turnover of Ownership of Long Gate and Its Assets to Trustee)**

396.     The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

397.     The facts set forth herein demonstrate that the Debtor is the beneficial owner of Long Gate and its assets.

398.      Among other things:

     a.   Long Gate was controlled by the Debtor through his employee, Max Krasner.

     b.   The Debtor used Long Gate as a borrower under the Roscalitar Loan.

     c.   Long Gate was operated from the Debtor's offices.

399.     Under BVI law, these facts and circumstances warrant the conclusion that (a) Max Krasner has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Long Gate only for the benefit of the Debtor; and that (b) Long Gate has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [126]

---

[126]   *See* note 96, *supra*.

400.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

401.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Long Gate and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Long Gate, and all related rights of corporate control, to the Trustee.

## THIRTY-NINTH CLAIM

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Sail Victory and Its Assets and Ordering Turnover of Ownership of Sail Victory and Its Assets to Trustee)**

402.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

403.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Sail Victory and its assets.

404.    Among other things:

   a.   Sail Victory was controlled by the Debtor through his son, Qiang Guo.

   b.   The Debtor used Sail Victory as a vehicle for making investments in the Reverence Capital Partners Fund.

   c.   Sail Victory was operated from the Debtor's offices.

405.    Under BVI law, these facts and circumstances warrant the conclusion that (a) Qiang Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Sail Victory only for the benefit of the Debtor; and that (b) Sail Victory has been at all relevant times a mere nominee,

"bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [127]

406.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

407.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Sail Victory and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Sail Victory, and all related rights of corporate control, to the Trustee.

## **FOURTIETH CLAIM**

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Alzarro and Its Assets and Ordering Turnover of Ownership of Alzarro and Its Assets to Trustee)**

408.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

409.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Alzarro and its assets.

410.     Among other things:

    a.    Alzarro was controlled by the Debtor through his son, Qiang Guo.

    b.    The Debtor used Alzarro as a borrower under the Blue Capital Loan.

    c.    Alzarro was operated from the Debtor's offices.

411.    Under Nevis law, these facts and circumstances warrant the conclusion that (a) Qiang Guo has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Alzarro only for the

---

[127]    *See* note 96, *supra*.

benefit of the Debtor; and that (b) Alzarro has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [128]

412.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

413.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Alzarro and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Alzarro, and all related rights of corporate control, to the Trustee.

## **FOURTY-FIRST CLAIM**

**(Declaratory Judgment that Debtor Is True Beneficial Owner of BSA Fund and Its Assets and Ordering Turnover of Ownership of BSA Fund and Its Assets to Trustee)**

414.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

415.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of BSA Fund and its assets.

416.    Among other things:

    a.  BSA Fund was controlled by the Debtor through BSA Capital Management Limited.

    b.  The Debtor used BSA Fund as a vehicle to engage in transactions on the Hong Kong stock exchange.

    c.  BSA Fund was operated from the Debtor's offices.

---

[128] *See* note 96, *supra*.

417.    Under Cayman law, these facts and circumstances warrant the conclusion that (a) BSA Capital Management Limited has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests BSA Fund only for the benefit of the Debtor; and that (b) BSA Fund has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [129]

418.    At all relevant times, the Debtor was indebted to one or more creditors.  Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

419.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that BSA Fund and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in BSA Fund, and all related rights of corporate control, to the Trustee.

## **FORTY-SECOND CLAIM**

**(Declaratory Judgment that Debtor Is True Beneficial Owner of Insight Phoenix Fund and Its Assets and Ordering Turnover of Ownership of Insight Phoenix Fund and Its Assets to Trustee)**

420.    The Trustee repeats and realleges the allegations contained in paragraphs 1-188.

421.    The facts set forth herein demonstrate that the Debtor is the beneficial owner of Insight Phoenix Fund and its assets.

422.    Among other things:

---

[129]  *See* note 96, *supra*.

    a.   Insight Phoenix Fund was controlled by the Debtor through Phoenix Capital Management (Cayman) Limited.

    b.   The Debtor used Insight Phoenix Fund as a vehicle to engage in transactions on the Hong Kong stock exchange.

    c.   Insight Phoenix Fund was operated from the Debtor's offices.

423.    Under Cayman law, these facts and circumstances warrant the conclusion that (a) Phoenix Capital Management (Cayman) Limited has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests Insight Phoenix Fund only for the benefit of the Debtor; and that (b) Insight Phoenix Fund has been at all relevant times a mere nominee, "bare trustee," and/or trustee pursuant to a resulting trust considered to hold legal title to ownership interests in assets held under its name only for the benefit of the Debtor. [130]

424.    At all relevant times, the Debtor was indebted to one or more creditors. Such creditors could have pursued the relief sought herein by the Trustee in exercise of such creditors' rights.

425.    Accordingly, the Trustee seeks a ruling pursuant to sections 541, 542, and 544 of the Bankruptcy Code (1) declaring that Insight Phoenix Fund and its assets are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable, and (2) ordering the surrender of such assets, ownership interests in Insight Phoenix Fund, and all related rights of corporate control, to the Trustee.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, the Trustee respectfully requests that judgment be entered as follows:

---

[130]  *See* note 96, *supra*.

1.      On the First Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times Crane was an alter ego of the Debtor; (b) any and all of the assets held by Crane any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Crane at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of Crane to the Trustee;

2.      On the Second Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Crane, and the assets of Crane, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in Crane, and the assets of Crane, to the Trustee;

3.      On the Third Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times GS Security was an alter ego of the Debtor; (b) any and all of the assets held by GS Security any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by GS Security at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of GS Security to the Trustee;

4.      On the Fourth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in GS Security, and the assets of GS Security, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of

110

corporate control in GS Security, and the assets of GS Security, to the Trustee;

5.      On the Fifth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times HGA Property was an alter ego of the Debtor; (b) any and all of the assets held by HGA Property any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by HGA Property at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of HGA Property to the Trustee;

6.      On the Sixth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in HGA Property, and the assets of HGA Property, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in HGA Property, and the assets of HGA Property, to the Trustee;

7.      On the Seventh Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Thousand Stars purportedly held by Haoran He, and the assets of Thousand Stars, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Thousand Stars, and all related rights of corporate control, to the Trustee;

8.      On the Eighth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in H Reserve Management purportedly held by Le Qiao, and the assets of H Reserve Management, are and were at all

111

relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in H Reserve Management, and all related rights of corporate control, to the Trustee;

9.      On the Ninth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Delta Konsult purportedly held by Xinfang Zhang, and the assets of Delta Konsult, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Delta Konsult, and all related rights of corporate control, to the Trustee;

10.      On the Tenth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times River Valley was an alter ego of the Debtor; (b) any and all of the assets held by River Valley any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by River Valley at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of River Valley to the Trustee;

11.      On the Eleventh Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in River Valley, and the assets of River Valley, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in River Valley, and the assets of River Valley, to the Trustee;

12.      On the Twelfth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Fiesta Investment purportedly

held by Haoran He, and the assets of Fiesta Investment, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Fiesta Investment, and all related rights of corporate control, to the Trustee;

13.     On the Thirteenth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Rising Sun Capital purportedly held by Haoran He, and the assets of Rising Sun Capital, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Rising Sun Capital, and all related rights of corporate control, to the Trustee;

14.     On the Fourteenth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Ampleforth Capital purportedly held by Kun Ma, and the assets of Ampleforth Capital, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Ampleforth Capital, and all related rights of corporate control, to the Trustee;

15.     On the Fifteenth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Holy City purportedly held by New Federal State Corporation, and the assets of Holy City, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Holy City, and all related rights of corporate control, to the Trustee;

16.     On the Sixteenth Claim, an order, pursuant to sections 541, 542, and 544 of the

113

Bankruptcy Code, (1) declaring that the ownership interests in Hudson Diamond BVI purportedly held by Qiang Guo, and the assets of Hudson Diamond BVI, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Hudson Diamond BVI, and all related rights of corporate control, to the Trustee;

17.    On the Seventeenth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that: (a) at all times Infinity Treasury was an alter ego of the Debtor; (b) any and all of the assets held by Infinity Treasury any time prior to the Debtor's petition date of February 15, 2022 constituted property of the Debtor; and (c) any and all assets held by Infinity Treasury at any time from the date of the Debtor's February 15, 2022 chapter 11 petition to the present, constituted and constitute, as applicable, property of the Debtor's chapter 11 estate; and (2) ordering the turnover of any and all of the assets of Infinity Treasury to the Trustee;

18.    On the Eighteenth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Infinity Treasury, and the assets of Infinity Treasury, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of ownership interests and related rights of corporate control in Infinity Treasury, and the assets of Infinity Treasury, to the Trustee;

19.    On the Nineteenth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Strong Country purportedly held by Hing Chi Ngok and Qiang Guo, and the assets of Strong Country, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Strong Country, and all related rights of

114

corporate control, to the Trustee;

20.    On the Twentieth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Joincorp International purportedly held by Mei Guo, and the assets of Joincorp International, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Joincorp International, and all related rights of corporate control, to the Trustee;

21.    On the Twenty-First Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Canadian Agri-product purportedly held by Qiang Guo, and the assets of Canadian Agri-product, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Canadian Agri-product, and all related rights of corporate control, to the Trustee;

22.    On the Twenty-Second Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Eagle Eye Investments purportedly held by Kesen Yang, and the assets of Eagle Eye Investments, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Eagle Eye Investments, and all related rights of corporate control, to the Trustee;

23.    On the Twenty-Third Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Glory Asia purportedly held by Zongchao Yue, and the assets of Glory Asia, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such

115

assets, ownership interests in Glory Asia, and all related rights of corporate control, to the Trustee;

24.    On the Twenty-Fourth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Gold Perfect purportedly held by Hing Chi Ngok, and the assets of Gold Perfect, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Gold Perfect, and all related rights of corporate control, to the Trustee;

25.    On the Twenty-Fifth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Group Dynasty purportedly held by Hing Chi Ngok, and the assets of Group Dynasty, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Group Dynasty, and all related rights of corporate control, to the Trustee;

26.    On the Twenty-Sixth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in HK International purportedly held by Mei Guo, and the assets of HK International, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in HK International, and all related rights of corporate control, to the Trustee;

27.    On the Twenty-Seventh Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Kingdom Rich purportedly held by Qiang Guo, and the assets of Kingdom Rich, are and were at all relevant times property

of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of

such assets, ownership interests in Kingdom Rich, and all related rights of corporate control, to

the Trustee;

28.     On the Twenty-Eighth Claim, an order, pursuant to sections 541, 542, and 544 of

the Bankruptcy Code, (1) declaring that the ownership interests in New Miracle Limited

purportedly held by Joy Chance Holdings Limited, and the assets of New Miracle Limited, are

and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as

applicable; and (2) ordering the surrender of such assets, ownership interests in New Miracle

Limited, and all related rights of corporate control, to the Trustee;

29.     On the Twenty-Ninth Claim, an order, pursuant to sections 541, 542, and 544 of

the Bankruptcy Code, (1) declaring that the ownership interests in Pacific King purportedly held

by Hing Chi Ngok, and the assets of Pacific King, are and were at all relevant times property of

the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such

assets, ownership interests in Pacific King, and all related rights of corporate control, to the

Trustee;

30.     On the Thirtieth Claim, an order, pursuant to sections 541, 542, and 544 of the

Bankruptcy Code, (1) declaring that the ownership interests in Rich Group purportedly held by

Yan Su, and the assets of Rich Group, are and were at all relevant times property of the Debtor

or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets,

ownership interests in Rich Group, and all related rights of corporate control, to the Trustee;

31.     On the Thirty-First Claim, an order, pursuant to sections 541, 542, and 544 of the

Bankruptcy Code, (1) declaring that the ownership interests in AA Global Ventures purportedly

held by Anton Development Limited, and the assets of AA Global Ventures, are and were at all

relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2)
ordering the surrender of such assets, ownership interests in AA Global Ventures, and all related
rights of corporate control, to the Trustee;

32.    On the Thirty-Second Claim, an order, pursuant to sections 541, 542, and 544 of
the Bankruptcy Code, (1) declaring that the ownership interests in AAGV purportedly held by
Mei Guo, and the assets of AAGV, are and were at all relevant times property of the Debtor or
the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets,
ownership interests in AAGV, and all related rights of corporate control, to the Trustee;

33.    On the Thirty-Third Claim, an order, pursuant to sections 541, 542, and 544 of
the Bankruptcy Code, (1) declaring that the ownership interests in Assets Sino purportedly held by
Lihong Guo, and the assets of Assets Sino, are and were at all relevant times property of the
Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such
assets, ownership interests in Assets Sino, and all related rights of corporate control, to the
Trustee;

34.    On the Thirty-Fourth Claim, an order, pursuant to sections 541, 542, and 544 of
the Bankruptcy Code, (1) declaring that the ownership interests in Auspicious Coast purportedly
held by Lichun Guo, and the assets of Auspicious Coast, are and were at all relevant times
property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the
surrender of such assets, ownership interests in Auspicious Coast, and all related rights of
corporate control, to the Trustee;

35.    On the Thirty-Fifth Claim, an order, pursuant to sections 541, 542, and 544 of the
Bankruptcy Code, (1) declaring that the ownership interests in Guang Hong purportedly held by
Wencun Guo (a/k/a Man Chuen Kwok), and the assets of Guang Hong, are and were at all

118

relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2)
ordering the surrender of such assets, ownership interests in Guang Hong, and all related rights
of corporate control, to the Trustee;

36.    On the Thirty-Sixth Claim, an order, pursuant to sections 541, 542, and 544 of the
Bankruptcy Code, (1) declaring that the ownership interests in Head Win purportedly held by
Zhang Wei, and the assets of Head Win, are and were at all relevant times property of the Debtor
or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets,
ownership interests in Head Win, and all related rights of corporate control, to the Trustee;

37.    On the Thirty-Seventh Claim, an order, pursuant to sections 541, 542, and 544 of
the Bankruptcy Code, (1) declaring that the ownership interests in Joy Chance purportedly held
by Hing Chi Ngok, and the assets of Joy Chance, are and were at all relevant times property of
the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such
assets, ownership interests in Joy Chance, and all related rights of corporate control, to the
Trustee;

38.    On the Thirty-Eighth Claim, an order, pursuant to sections 541, 542, and 544 of
the Bankruptcy Code, (1) declaring that the ownership interests in Long Gate purportedly held
by Max Krasner, and the assets of Long Gate, are and were at all relevant times property of the
Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such
assets, ownership interests in Long Gate, and all related rights of corporate control, to the
Trustee;

39.    On the Thirty-Ninth Claim, an order, pursuant to sections 541, 542, and 544 of the
Bankruptcy Code, (1) declaring that the ownership interests in Sail Victory purportedly held by
Qiang Guo, and the assets of Sail Victory, are and were at all relevant times property of the

119

Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Sail Victory, and all related rights of corporate control, to the Trustee;

40.    On the Fortieth Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Alzarro purportedly held by Qiang Guo, and the assets of Alzarro, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Alzarro, and all related rights of corporate control, to the Trustee;

41.    On the Forty-First Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in BSA Fund purportedly held by BSA Capital Management Limited, and the assets of BSA Fund, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in BSA Fund, and all related rights of corporate control, to the Trustee;

42.    On the Forty-Second Claim, an order, pursuant to sections 541, 542, and 544 of the Bankruptcy Code, (1) declaring that the ownership interests in Insight Phoenix Fund purportedly held by Phoenix Capital Management (Cayman) Limited, and the assets of Insight Phoenix Fund, are and were at all relevant times property of the Debtor or the Debtor's chapter 11 estate, as applicable; and (2) ordering the surrender of such assets, ownership interests in Insight Phoenix Fund, and all related rights of corporate control, to the Trustee;

43.    Reasonable attorneys' fees, costs, and expenses incurred in this action; and

44.    Such other and further relief as the Court may deem just, proper, or equitable under the circumstances.

Dated:    December 23, 2024        LUC A. DESPINS,
         New York, New York       CHAPTER 11 TRUSTEE

By: */s/ Douglass Barron*
    Douglass Barron (*pro hac vice* pending)
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, New York 10166
    (212) 318-6000
    douglassbarron@paulhastings.com

     *and*

    Nicholas A. Bassett *(pro hac vice* pending)
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C., 20036
    (202) 551-1902
    nicholasbassett@paulhastings.com

     *and*

    Patrick R. Linsey (ct29437)
    NEUBERT, PEPE & MONTEITH, P.C.
    195 Church Street, 13th Floor
    New Haven, Connecticut 06510
    (203) 781-2847
    plinsey@npmlaw.com

    *Counsel for the Chapter 11 Trustee*