

<u>Neutral Citation Number: [2023] EWHC 801 (Comm)</u>

<u>Case No: CL-2021-000556</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**
**<u>BUSINESS AND PROPERTY COURTS</u>**
**<u>OF ENGLAND AND WALES</u>**
**<u>COMMERCIAL COURT (KBD)</u>**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 05/04/2023</u>

**Before**:

**<u>Peter MacDonald Eggers KC</u>**
**<u>(sitting as a Deputy Judge of the High Court)</u>**

- - - - - - - - - - - - - - - - - - - -

**Between:**

**DR MARKUS BOETTCHER**

**<u>Claimant</u>**

**- and -**

**(1) XIO (UK) LLP (in liquidation)**
**(2) CARSTEN GEYER**
**(3) JOSEPH PACINI**
**(4) ATHENE LI**
**(5) MURPHY QIAO**

**<u>Defendants</u>**

- - - - - - - - - - - - - - - - - - - -

**William Day and Anca Bunda** (instructed by **Stewarts Law LLP**) for the **Claimant**
**Paul Lowenstein KC and Maria Kennedy** (instructed by **Willkie Farr & Gallagher (UK) LLP**) for the **Second and Third Defendants**

Hearing date: 1st and 2nd February 2023

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**I direct that no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic**.

.............................
PETER MACDONALD EGGERS KC

This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and released to The National Archives. The date and time for hand-down is deemed to be 5 April 2023 at 10:00am

**Peter MacDonald Eggers KC:**

**Introduction**

1.   On 1st October 2021, the Claimant, Dr Boettcher, served a Claim Form in these proceedings within the jurisdiction on the Defendants, including the Second Defendant (Mr Geyer) and the Third Defendant (Mr Pacini). Dr Boettcher claims damages for misrepresentations allegedly made to induce him to enter into a contract of employment with the First Defendant ("Xio UK"). The claim is made in deceit, under the Misrepresentation Act 1967 and for breach of a duty of care.

2.   On 19th October 2021, Mr Geyer and Mr Pacini both acknowledged service and indicated that they intended to contest jurisdiction. On 26th October 2021, Waksman, J made an order permitting Dr Boettcher (on his without notice application) to serve the proceedings on Mr Geyer and Mr Pacini outside the jurisdiction.

3.   Mr Geyer and Mr Pacini dispute that the Court has or should exercise jurisdiction over Dr Boettcher's claims against them.

**The Parties**

4.   Dr Boettcher was employed by Xio UK as the "*Global Head of Value Creation*" from 1st January 2016 to 31st October 2016. Xio UK was the UK arm of the Xio Group, a global alternative investments firm, which was described as being headquartered in London, with operations in Germany, Switzerland, Hong Kong and China.

5.   The Claimant has commenced the present proceedings against Xio UK and four individuals all of whom had significant roles within Xio UK or the Xio Group being senior executives or partners.

    (1)   The Second Defendant (Mr Carsten Geyer) was Head of Europe and is a German national and has residency in Switzerland.

    (2)   The Third Defendant (Mr Joseph Pacini) was the Chief Executive Officer and is an Italian national.

    (3)   The Fourth Defendant (Ms Athene Li) was Chairperson and is a Chinese national resident in the People's Republic of China. Ms Li and the Claimant have agreed a confidential settlement and Ms Li is no longer a defendant in these proceedings.

(4)    The Fifth Defendant (Mr Murphy Qiao) was Head of China and is a Chinese national. Mr Qiao has not taken an active part in these proceedings to date.

6.    After he left Xio UK's employment, Dr Boettcher maintains that he was unemployed until 1st June 2019, when he was appointed a partner at EY-Parthenon in Germany.

7.    From 15th February 2021, Xio UK has been in liquidation.

8.    Mr Geyer and Mr Pacini are now co-managing partners at SGT Capital Group, an alternative investments firm which was founded with other former colleagues from the Xio Group. SGT Capital is registered in the Cayman Islands and operates out of Germany and Singapore.

## The Claim

9.    Prior to his employment with Xio UK, Dr Boettcher was until 2015 a partner at Bain & Company Germany, Inc ("Bain") based in Munich, Germany and had substantial experience in the private equity industry.

10.    From September to November 2015, Dr Boettcher negotiated for employment by Xio UK. These negotiations involved a number of meetings and conference calls. In particular,

(1)    On 29th September 2015, Dr Boettcher attended a meeting at the Sheraton Hotel in Munich, where he was interviewed by the Xio Group's managing director, Mr Marcel Normann.

(2)    On 20th October 2015, Dr Boettcher attended a meeting at Xio UK's offices at The Shard in London, where he was interviewed by Mr Tim Robson, who was also a managing director of the Xio Group.

(3)    On 4th November 2015, Dr Boettcher attended a meeting at Maritim Hotel at Düsseldorf Airport, Germany, where he was interviewed by Mr Geyer.

(4)    On 6th November 2015, Dr Boettcher attended a conference call with Ms Li. Dr Boettcher participated in the call from Germany and Ms Li participated in the call from Hong Kong or elsewhere in China.

(5)    On 6th November 2015, Dr Boettcher alleges that he attended a conference call from Germany with Mr Pacini. Mr Pacini disputes this and maintains that this call was rescheduled to 17th November 2015.

(6)    On 7th November 2015, Dr Boettcher attended a further conference call from Germany during which he was interviewed by Mr Qiao, who participated in the call from China.

(7)    On 13th November 2015, Dr Boettcher (as alleged by him) participated in a conference call with Mr Pacini. Mr Pacini maintains that he has no recollection of this conference call and that he was in Israel at this time.

(8)    On 17th November 2015, Dr Boettcher emailed Mr Pacini stating that he - Dr Boettcher - could not travel to London that day because of tonsillitis and

suggested "*that we just use the scheduled time to have a call instead to discuss next steps regarding on-boarding at Xio ... during my remaining time at Bain*". Dr Boettcher's case is that, during their call on 17 November 2015, Mr Pacini confirmed the alleged representations made during earlier meetings and calls. Mr Pacini maintains that this conference call was the rescheduled call which had been arranged to take place on 6th November 2015. It is unclear on the evidence whether Mr Pacini accepts that the call on 17 November 2015 in fact took place, but in any event he stated that he had no recollection of what was said during this call (Mr Pacini's first witness statement, paragraphs 7 and 18).

11.   Interposed within these meetings and conference calls were the following events:

(1)   On 11th November 2015, Xio UK sent an offer letter to Dr Boettcher setting out the key terms of Dr Boettcher's employment ("the Offer Letter"). The Offer Letter provided that a further service agreement would be entered into in due course. It stated: "*You should signify your acceptance of these terms by signing and returning to me one copy of the letter by that date*".

(2)   On 16th November 2015, at 1414 hours UTC, Dr Marcel Normann, a managing director at the Xio Group, informed other Xio partners that Dr Boettcher "*has accepted our offer and will join starting Jan 1st 2016 as Head of Value Creation*". Soon afterwards (at 1418 hours UTC), Dr Boettcher returned a pdf of the countersigned Offer Letter to Mr Normann on behalf of Xio UK, stating that he was very much looking forward to joining Xio UK (although the counter-signature is dated 17th November 2015). That day, 16th November 2015, Dr Boettcher gave notice of his resignation from his position at Bain.

(3)   On 24th November 2015, Dr Boettcher signed a separation agreement with Bain, having tendered his resignation on 16th November 2015.

12.   On 1st January 2016, Dr Boettcher commenced his employment with Xio UK.

13.   While the Offer Letter envisaged that a service agreement would be entered into by Dr Boettcher, no such service agreement was in fact agreed, although a draft service agreement had been received by Dr Boettcher in March 2016.

14.   On 1st October 2016, Dr Boettcher gave Xio UK notice of his resignation and his employment was terminated on 31st October 2016.

15.   Dr Boettcher alleges that he was induced to leave his employment at Bain in 2015 and to join Xio UK by a series of alleged misrepresentations that the Xio Group was a private equity fund with funds of committed capital under management of US$3 billion from a diversified investor base. Dr Boettcher's case is that these representations were false because the Xio Group was set up as a vehicle for anonymous investment by or on behalf of a single Chinese billionaire, Mr Xie Zhikun, who committed capital to the Xio Group of less than US$900 million. Dr Boettcher's claim for damages is based on these alleged misrepresentations.

16.   On 22nd December 2017, Dr Boettcher sent a letter of claim addressed only to Xio UK, setting out his claims against Xio UK, but making the allegations in substance which are now made by Dr Boettcher in the current proceedings.

17. In February 2021, Xio UK was placed into creditors' voluntary liquidation.

18. On 20th May 2021, Dr Boettcher's solicitors (Stewarts Law) wrote to the liquidators of Xio UK enclosing a draft Particulars of Claim and proof of debt.

19. On 15th June 2021, Dr Boettcher's solicitors sent a letter of claim by email to Mr Geyer and Mr Pacini. The letter of claim referred to Mr Geyer's address as (1) "*Flat 10, Savile Row, London, W1S 3PZ*", and (2) 16 Ennismore Gardens, London SW7 1AA.

20. On 16th June 2021, Dr Boettcher's solicitors sent a letter of claim to the liquidators of Xio UK, enclosing draft Particulars of Claim.

21. On 18th June 2021, Dr Boettcher's solicitors sent the letter of claim to Mr Geyer at two addresses, one in Savile Row and the other in Ennismore Gardens. However, the address referred to in the letter of claim did not record the full address, including the building number, but merely stated "*Flat 10, Savile Row, London W1S 3PZ*".

22. On 22nd June 2021, the letter of claim sent to "*Flat 10, Savile Row, London W1S 3PZ*" was returned with the note "*Address incomplete*".

23. On 16th July 2021, Xio UK's solicitors informed Dr Boettcher's solicitors that they wished to engage constructively with Dr Boettcher.

24. On 2nd August 2021, Dr Boettcher's solicitors sent emails to Mr Geyer and Mr Pacini inviting them to accept service by email and offering pre-action mediation.

25. On 2nd September 2021, Dr Boettcher's solicitors sent a letter of claim to Mr Geyer's addresses in Germany and Switzerland. Mr Geyer has confirmed in his evidence that he received this letter of claim in Switzerland (Mr Geyer's first witness statement, paragraph 46).

26. On 3rd September 2021, Dr Boettcher's solicitors sent a further letter of claim to Mr Geyer by post to Flat 10, 33 Savile Row, London, W1S 3PZ ("33SR").

27. On 14th September 2021, having had no response from Mr Geyer, Dr Boettcher's solicitors wrote both to Mr Geyer's current business address (SGT Capital) and also to the solicitors that Mr Geyer had instructed in certain Cayman Island proceedings, enclosing the letter of claim.

28. On 24th September 2021, Dr Boettcher commenced these proceedings by the issuance of a Claim Form against all of the Defendants claiming damages for deceit, under section 2(1) of the Misrepresentation Act 1967 and for breach of a duty of care. Dr Boettcher claims approximately €4,556,609 for loss of earnings as well as unquantified damages for mental distress and/or disappointment and/or damage to his reputation and professional career.

**Service of the Proceedings**

29. On 1st October 2021, Dr Boettcher's solicitors purported to serve the Claim Form and related documents on Mr Geyer at 33SR by way of first class post. Mr Geyer disputes that this was valid service.

30.     On the same day, 1st October 2021, Dr Boettcher's solicitors also served the proceedings on Mr Pacini at The Shard, Suite 1502, 32 London Bridge Street, London SE1 9SG, care of the Xio Group, pursuant to section 1140 of the Companies Act 2006 on the basis that Mr Pacini was a registered director of Henry Street Properties Limited (a dormant England registered company). Mr Pacini does not challenge that the proceedings were validly served upon him at The Shard.

31.     On 13th October 2021, Xio UK filed an acknowledgment of service indicating its intention to defend the claim.

32.     On 13th October 2021, Dr Boettcher applied to the Court without notice for permission to serve these proceedings outside the jurisdiction upon Mr Geyer at his address in Switzerland and upon Mr Pacini at his address in the United States of America (Utah).

33.     On 19th October 2021, both Mr Geyer and Mr Pacini filed acknowledgments of service, indicating that they intended to contest jurisdiction.

34.     On 26th October 2021, Waksman, J granted permission for Dr Boettcher to serve Mr Geyer in Switzerland and Mr Pacini in the United States.

35.     On 30th November 2021, Mr Geyer applied to set aside the service of the proceedings on him at 33SR in this jurisdiction.

36.     Following orders made by the Court extending the time within which applications to contest jurisdiction could be made, on 5th September 2022, Mr Geyer and Mr Pacini filed their applications contesting the Court's jurisdiction and for an order to set aside the order of Waksman, J.

**The issues arising in connection with the challenge to the Court's jurisdiction**

37.     With the very helpful assistance from the parties' counsel, the issues which arise for determination by the Court in connection with Mr Geyer's and Mr Pacini's applications to contest the Court's jurisdiction over the claim brought by Dr Boettcher have been clearly identified.

38.     With respect to the proceedings served upon Mr Geyer and Mr Pacini within the jurisdiction, the issues are as follows:

    (1)     Was the service of the proceedings on Mr Geyer at 33SR valid? If not, then the Court has no jurisdiction over Mr Geyer by reason of such service. If it was valid, then the following issues arise in respect of the service on Mr Geyer, as they also arise in respect of the service on Mr Pacini (who does not challenge the validity of service upon him within the jurisdiction).

    (2)     Are Mr Geyer and Mr Pacini entitled to challenge the Court's jurisdiction on *forum non conveniens* grounds or have they submitted to the jurisdiction by reason of a statutory waiver (pursuant to CPR rule 11(5)(b)) or a common law waiver because they did not challenge the Court's jurisdiction in time? If they have submitted to the jurisdiction, then the Court has jurisdiction and the application by Mr Geyer and Mr Pacini to contest jurisdiction must be dismissed. If, however, there has been no such waiver, then the following issues arise.

    (3)    Are Mr Geyer and/or Mr Pacini entitled to a stay of the proceedings on the grounds that there is another jurisdiction (Germany) which is clearly and distinctly more appropriate as the forum for the determination of this dispute?

39.    If the Court concludes that the service of the proceedings on Mr Geyer and Mr Pacini within the jurisdiction was valid and that such proceedings should not be stayed, the issues arising in connection with the service of the proceedings outside the jurisdiction do not arise. If relevant, the following issues arise with respect to the proceedings served upon Mr Geyer and Mr Pacini outside the jurisdiction:

    (1)    Are Mr Geyer and Mr Pacini entitled to challenge the Court's jurisdiction or have they lost the right to contest jurisdiction because they did not file a fresh acknowledgment of service in accordance with CPR rule 11(2) after service of the proceedings outside the jurisdiction? If they have lost the right to challenge the Court's jurisdiction, then the Court has jurisdiction and the application by Mr Geyer and Mr Pacini to contest jurisdiction must be dismissed. If, however, they have not lost the right to contest the Court's jurisdiction, then the following issues arise.

    (2)    Can Dr Boettcher establish that there is a good arguable case that the relevant jurisdictional gateways have been satisfied pursuant to CPR PD 6B, para. 3.1 having regard to whether:

        (a)    Mr Geyer and Mr Pacini are necessary or proper parties (para. 3.1(3))? and/or

        (b)    The damage alleged to have been suffered by Dr Boettcher was sustained within the jurisdiction or resulted from an act committed within the jurisdiction (para. 3.1(9))?

    If the jurisdictional gateways are not satisfied, then the application to contest jurisdiction must be allowed.

    (3)    Can Dr Boettcher demonstrate that he has a real as opposed to a fanciful prospect of success on the claim (*i.e.* is there a serious issue to be tried)?

    (4)    If the jurisdiction gateways are met, is England the proper place in which to bring the claim (CPR rule 6.37(3)) or is Germany the appropriate forum for the determination of this dispute? If England is not the proper place in which to bring the claim, the application to contest jurisdiction must be allowed.

    (5)    If England is the proper place in which to bring the claim, should the Court's permission to serve the proceedings outside the jurisdiction be set aside by reason of an alleged breach by Dr Boettcher of the duty of full and frank disclosure which rests on the applicant when such permission is sought on a without notice basis?

40.    I shall consider each of these issues in turn.

41.    It is worth noting that insofar as a good arguable case must be established, the meaning of good arguable case has been clarified by the Supreme Court in *Four Seasons Holdings Inc v Brownlie* [2017] UKSC 80; [2018] 1 WLR 192, para. 7 and by the Court

of Appeal in *Kaefer Aislamientos SA de CV v AMS Drilling Mexico SA de CV* [2019] EWCA Civ 10; [2019] 1 WLR 3514, para. 72-80, and entails the following requirements:

(1)     The claimant must supply a plausible evidential basis for his or her position.

(2)     If there is a dispute of fact about or some other reason for doubting the claimant's position, the Court must take a view on the material available if it can reliably do so.

(3)     However, if the nature of the issue and limitations of an interlocutory application are such that no reliable assessment can be made, the good arguable case threshold is met by the plausible evidential basis even if it is contested. In this respect, where evidence is provided at an interlocutory hearing in the form of witness statements, such evidence generally should not be disbelieved unless it is incontrovertibly or manifestly wrong (*Kireeva v Bedzhamov* [2022] EWCA Civ 35; [2022] 3 WLR 1253, para. 34). Where, therefore, there is conflicting evidence provided by different witnesses, either that evidence is to be reconciled or, if it cannot be reconciled, the claimant's evidence is to be accepted for the purposes of the determination to be made at the interlocutory hearing, assuming it is plausible.

**Service within the jurisdiction**

42.     There is no dispute that the service of the proceedings on Mr Pacini at The Shard was valid. However, an issue arises as to the validity of the service of the proceedings on Mr Geyer at 33SR.

43.     Both Mr Geyer and Mr Pacini seek a stay of the proceedings on the grounds that Germany is clearly and distinctly more appropriate than England as the forum for the determination of this dispute.

<u>(1)     Validity of service on Mr Geyer at 33SR</u>

44.     CPR rule 6.9(2) provides that the Claim Form must be served on an individual at his or her "*Usual or last known residence*".

45.     However, CPR rule 6.9(3) provides that "*Where a claimant has reason to believe that the address of the defendant referred to in [CPR rule 6.9(2)] is an address at which the defendant no longer resides …, the claimant must take reasonable steps to ascertain the address of the defendant's current residence … ('current address')*".

46.     CPR rules 6.9(4)-(6) then set out what the claimant may and must do upon taking such reasonable steps:

(1)     If the claimant ascertains the defendant's current address, the Claim Form must be served at that address (CPR rule 6.9(4)(a)).

(2)     If the claimant is unable to ascertain the defendant's current address, the claimant must consider whether there is (i) an alternative place where; or (ii) an alternative method by which, service may be effected (CPR rule 6.9(4)(b)). If

there is such a place or method, the claimant must make an application under CPR rule 6.15 (CPR rule 6.9(5)).

(3)     If the claimant cannot ascertain the defendant's current residence and cannot ascertain an alternative place or an alternative method, the claimant may serve on the defendant's usual or last known residence in accordance with CPR rule 6.9(2) (CPR rule 6.9(6)).

47.     In this case, Dr Boettcher purported to serve the proceedings on Mr Geyer within the jurisdiction at 33SR on 1st October 2021. Mr Geyer's evidence (paragraph 8 of his first witness statement) and the evidence of his then solicitor, Ms Lydia Danon (her first witness statement, at paragraphs 33-36), is that Mr Geyer ceased to reside at 33SR from 31st January 2018 and surrendered his lease of the flat on 31st March 2018 (which lease was due to expire on 11th September 2018). Although Dr Boettcher does not admit this evidence, other than the evidence referred to below, there is no evidence contradicting it. Furthermore, Swiss residence cards and official correspondence evidence Mr Geyer's residence in Switzerland from on or around 1st March 2021 (Ms Danon's second witness statement, paragraph 18). Accordingly, 33SR was not Mr Geyer's usual residence.

48.     Mr William Day, who appeared with Ms Anca Bunda on behalf of Dr Boettcher, however, does not put his case on the basis that 33SR was Mr Geyer's usual residence, but that instead it was his last known residence.

49.     I was referred to a number of authorities which address the concept of "*last known residence*", in particular *Mersey Docks Property Holdings v Kilgour* [2004] EWHC 1638 (TCC), para. 62-64; *Marshall v Maggs* [2006] EWCA Civ 20; [2006] 1 WLR 1945, para. 66, 68 and 71; *Relfo Ltd (in liquidation) v Varsani* [2009] EWHC 2297 (Ch), para. 20 and 34; *Ivanchev v Velli* [2020] EWHC 1917 (QB), para. 36-38. Based on these authorities, the following observations may be made about the concept of the defendant's last known residence in order to test the validity of service at that address:

(1)     The claimant must establish that there is a good arguable case that the address at which service was effected was the defendant's last known residence. This means that, on the evidence available, the claimant has the better of the argument on this issue than the defendant.

(2)     The defendant's last known residence need not be the defendant's usual residence.

(3)     The defendant may have more than one last known residence.

(4)     The defendant's last known residence may be a residence at which the defendant is residing or no longer resides (having once resided there) at the time of the purported service of process. It cannot be an address at which the defendant never resided.

(5)     Knowledge of the defendant's residence in this context refers to the claimant's actual knowledge or constructive knowledge, *i.e.* knowledge which the claimant could have acquired exercising reasonable diligence. An honest or even

9

reasonable belief is not sufficient if the defendant never resided at the relevant address.

(6)    The claimant's state of knowledge is to be assessed as at the date on which the proceedings were served at the address in question.

50.    With these principles in mind, I turn to the evidence in connection with Dr Boettcher's case that 33SR was Mr Geyer's last known residence and Dr Boettcher had no reason to believe that Mr Geyer no longer resided there. Of course, Mr Geyer's evidence is that he had resided at 33SR but he ceased to reside at 33SR since January 2018.

51.    Mr Day on behalf of Dr Boettcher relied on the following matters:

(1)    Dr Boettcher understood that Mr Geyer lived at 33SR because in December 2015 (immediately before he was due to start in his new role at Xio UK) he and Mr Geyer were to fly to Germany together and they shared a taxi from Central London (where Mr Geyer was collected at 33SR) to Heathrow Airport after the Xio Christmas party (Dr Boettcher's first witness statement, paragraph 5).

(2)    After Dr Boettcher joined Xio UK in January 2016, Mr Geyer had informed him that he lived at 33SR and that it was his correct postal address and that the address had been entered into Dr Boettcher's Outlook details for Mr Geyer, although he was also aware that Mr Geyer had a property (and family) in Frankfurt (Dr Boettcher's first witness statement, paragraphs 6 and 9(i)).

(3)    In February 2021, Dr Boettcher obtained, via a subscription data service, two writs of summons dated April and May 2019 from Cayman Island Court proceedings that referred to Mr Geyer. The first of these writs referred to Mr Geyer's address as "*16 Ennismore Gardens, London SW7 1AA, United Kingdom and/or Flat 10, Savile Row, London W1S 3PZ, United Kingdom*" (Dr Boettcher's first witness statement, paragraphs 7-9).

(4)    On 15th June 2021, Dr Boettcher's solicitors sent a letter of claim by email to Mr Geyer. The addresses given on that letter were "*Flat 10, Savile Row, London W1S 3PZ*" and the Ennismore Gardens address. Mr Geyer must have received the letter of claim because there was no "bounce-back" or any automated response that the email address was no longer active and because, although Mr Geyer did not reply directly to Dr Boettcher's solicitors, he sent a text to a mutual contact at EY (where Dr Boettcher has worked since June 2019) with a message to pass on to Dr Boettcher; Dr Boettcher told the mutual contact that this was a matter between him and Mr Geyer and he did not want to get EY involved (the first witness statement of Ms Lorraine Lanceley, of Stewarts Law, at paragraph 25). Mr Geyer did not state that he no longer resided at 33SR. The letter of claim was sent by post to "*Flat 10, Savile Row, London W1S 3PZ*" (*i.e.* without the building or street number) on 18th June 2021, but was returned on 22nd June 2021, because the address was incomplete.

(5)    On 2nd August 2021, Dr Boettcher's solicitors (Stewarts Law) sent an email to Mr Geyer, referring to the letter of 15th June 2021, inviting him to accept service of proceedings by email and offering pre-action mediation. Stewarts Law stated that they have "*made the reasonable assumption that you have safely*

*received and considered the Letter of Claim …*". In that email, a request was made that Mr Geyer "*confirm your preferred postal address at your earliest convenience. This information is required for the purposes of formal service of our client's claim*". Mr Geyer did not respond to this letter nor informed Dr Boettcher's solicitors that he no longer resided at 33SR (Ms Lanceley's first witness statement, para. 35).

(6)     On 3rd September 2021, Dr Boettcher's solicitors sent a further letter of claim to Mr Geyer by Royal Mail Special Delivery to 33SR, because the letter of claim sent on 18th June 2021 had been returned marked "*Address incomplete*". This letter of claim was successfully delivered, because it was not returned and delivery was confirmed by the Royal Mail tracking information (Ms Lanceley's second witness statement, paragraphs 11, 15-16).

(7)     On 14th September 2021, having had no response from Mr Geyer, Dr Boettcher's solicitors wrote both to Mr Geyer's current business address (SGT Capital) and also to the solicitors that Mr Geyer had instructed in the Cayman Island proceedings, enclosing the letter of claim, noting that correspondence was being sent to 33SR, and requesting acknowledgment of receipt. Mr Geyer did not respond to that letter.

(8)     During September 2021, Dr Boettcher engaged a private investigation firm (Phoenix Consultancy), who identified non-specific connections in data sources from September 2014 to September 2021, with a "*confirmed connection*" on 6th June 2021 (Ms Lanceley's second witness statement, paragraph 23).

(9)     On 21st September 2021, a search also suggested that SGT Capital (Mr Geyer's employer) had a presence at serviced offices in Stratton Street, Mayfair, a short walk from 33SR (Ms Lanceley's second witness statement, paragraph 25).

(10)    Importantly, also on 21st September 2021, a senior paralegal at Stewarts Law (Dr Boettcher's solicitors), Ms Aarti Chadda, gave evidence that she obtained the telephone number for the porter at 33SR from an estate agency, she telephoned the porter's desk at 33SR (a call which lasted about one minute), and the porter on duty confirmed that Ms Geyer rented Flat 10, that he was "*often seen coming and going*", and that any letter sent to Mr Geyer by Royal Mail would have been placed in the post box for that flat (Ms Chadda's first witness statement, paragraphs 14-20).

(11)    On 1st October 2021, Dr Boettcher's solicitors purported to serve the Claim Form and related documents on Mr Geyer at 33SR by way of first class post; these documents were not returned (Ms Lanceley's second witness statement, paragraph 26).

52.     Mr Day therefore submitted that:

(1)     There is at least a plausible evidential case (if not significantly more than a plausible case) that Dr Boettcher served the proceedings at the place that he actually understood to be Mr Geyer's last known residence within the meaning of CPR rule 6.9(2), and he undertook more than reasonable diligence when seeking to verify that understanding.

(2)     Dr Boettcher had received no information which contradicted his understanding of what was Mr Geyer's last known residence. Therefore, Dr Boettcher had no reason to believe that Mr Geyer no longer resided at 33SR.

(3)     Dr Boettcher, by his solicitors, attempted to contact Mr Geyer on a number of occasions, and sought confirmation of his preferred address for the service of process, and while it is likely that Mr Geyer received this correspondence, he did not reply directly to Dr Boettcher or his solicitors and did not correct any mistake as to his residence.

53.     Mr Paul Lowenstein KC, who appeared with Ms Maria Kennedy on behalf of Mr Geyer (and Mr Pacini), submitted that there was no valid service of the Claim Form and the Particulars of Claim within the jurisdiction because 33SR was not Mr Geyer's "*usual or last known residence*". Mr Lowenstein KC contended that 33SR was not Mr Geyer's last known residence, because:

(1)     Even on Dr Boettcher's own evidence, 33SR was not Mr Geyer's last known residence:

(a)     After the letter of claim was returned to Dr Boettcher on 22nd June 2021 because the address was incomplete, Dr Boettcher did not then persist with service in London, but instead on 26th July 2021 submitted a request to Frankfurt City Hall for Mr Geyer's registered address in Frankfurt and was sent confirmation the next day that Mr Geyer had an address at Hansaalee 7, 60322, Frankfurt am Main, Germany (Dr Boettcher's first witness statement, paragraph 21; Ms Lanceley's second witness statement, paragraph 12). Dr Boettcher sent the letter of claim to Mr Geyer at the Frankfurt address (Dr Boettcher's first witness statement, paragraph 21).

(b)     On 29th and 30th August 2021, Dr Boettcher identified a further address for Mr Geyer in Wilen bei Wollerau, Switzerland from about 1st March 2021 and arranged to have the letter of claim sent to Mr Geyer to the Swiss address (Dr Boettcher's first witness statement, paragraph 22 and 24).

(c)     By no later than late August/early September 2021, Dr Boettcher knew that Mr Geyer resided in Switzerland, having previously resided in Germany, Mr Geyer did not reside at 33SR and thus 33SR was not Mr Geyer's usual or last known residence.

(d)     When, on 1st October 2021, Dr Boettcher purported to serve the proceedings on Mr Geyer at 33SR (which documents were also forwarded by email), Mr Geyer responded on 8th October 2021 to say that he did not live at 33SR, he was resident in Switzerland and not in the United Kingdom and had not provided Dr Boettcher with an address for service in the United Kingdom. Mr Geyer repeated that he did not live at 33SR on 16th October 2021 and subsequently (Ms Danon's first witness statement, paragraphs 18 and 22; Ms Lanceley's second witness statement, paragraph 27).

(2)  The Cayman Islands writ of summons dated 8th April 2019 relied on by Dr Boettcher as evidence of his knowledge of Mr Geyer's residence provides no evidential basis to establish that 33SR was Mr Geyer's usual or last known residence because:

    (a)  It was two and a half years old by the time Dr Boettcher purported to serve process at 33SR.

    (b)  It was not prepared by Mr Geyer, but by a law firm acting for the plaintiff in the Cayman Islands proceedings.

    (c)  It provides two possible addresses for Mr Geyer: (i) "*Flat 10 Savile Row, London W1S 3PZ*", which is incomplete lacking the building number and (ii) 16 Ennismore Gardens, London SW7 1AA.

    (d)  A later writ of summons in different Cayman Islands proceedings dated 8th May 2019 gives Mr Geyer's address only as that at Ennismore Gardens.

    (e)  The address at Ennismore Gardens was the address which Mr Geyer had provided in his affidavits filed in the Cayman Islands proceedings in June 2019 (Ms Danon's first witness statement, paragraph 44.2).

(3)  As to Ms Chadda's evidence of her conversation with the porter at 33SR:

    (a)  On 20th October 2021, Mr Geyer's former solicitor (Ms Danon of Cooke Young & Keidan) spoke to the porter (named "*Hassam*") who checked his computer and confirmed that he was, in fact, on duty in the building at 33SR on 3rd and 21st September 2021. The porter confirmed that he would not have accepted a document on behalf of Mr Geyer because he was not resident at 33SR at that time, he did not recall any conversation with anyone on 21st September 2021 concerning Mr Geyer's residency at 33SR and that he was "*doubtful*" that any conversation with Stewarts Law took place, he had an up-to-date list of residents in the building and knew that Mr Geyer was not one of them (Ms Danon's first witness statement, paragraph 53).

    (b)  There are a number of gaps in Ms Chadda's evidence about her telephone conversation with the porter at 33SR, including the name of the porter, confirmation that the person with whom she spoke was the porter on duty, the telephone number she used to call the porter, the words used in her conversation and the questions put to the porter (Ms Danon's first witness statement, paragraphs 55-57).

    (c)  Ms Chadda's evidence does not establish that Dr Boettcher has the better of the argument as to Mr Geyer's last known residence.

(4)  The evidence that 33SR was a short distance from the offices of SGT Capital provides no support for any conclusion that Mr Geyer resided at 33SR. Further, Mr Geyer has confirmed that SGT Capital has no office in Mayfair or indeed England (Mr Geyer's first witness statement, paragraph 44.1).

(5)     The report by Phoenix Consultancy does not identify the instructions given by Dr Boettcher and further was produced in January 2022 three months after the purported service took place (Mr Geyer's first witness statement, paragraphs 50.1-50.3).

(6)     Dr Boettcher therefore had good reason to believe that Mr Geyer's last known residence was in Switzerland and not in London.

(7)     Alternatively, to the extent that the evidence of what was Mr Geyer's last known residence was inconclusive, it was open to Dr Boettcher to apply to the Court to undertake service by an alternative method, such as by email in accordance with CPR rules 6.9(4)-(5) and 6.15, but no such application was made.

(8)     On any view, purported service on Mr Geyer at 33SR on 1st October 2021 was not good service on him.

54.     In my judgment, the evidence establishes a good arguable case that 33SR was Mr Geyer's last known residence, as far as Dr Boettcher was aware or ought to have been aware by the exercise of reasonable diligence, within the meaning of CPR rule 6.9(2) for the following reasons.

55.     First, Mr Geyer had resided at 33SR until January 2018 and Dr Boettcher had been informed by Mr Geyer, whilst Dr Boettcher worked at Xio UK, that he lived at 33SR but also had a property (and family) in Germany. However, it appears that Mr Geyer did not then reside in Germany (Mr Geyer's first witness statement, paragraph 46).

56.     Second, Dr Boettcher made a number of inquiries, by means of contacting Mr Geyer directly, the use of a private investigation consultant, obtaining information about Mr Geyer's address in Germany and Switzerland, and instructing his solicitors to make enquiries with the porter at 33SR. Those inquiries revealed that Mr Geyer still had a residence at 33SR, even if that was not accurate, and also had a residence in Germany and/or Switzerland. The only evidence which Dr Boettcher obtained which might be said to indicate that Mr Geyer no longer resided at 33SR was the evidence that Mr Geyer now had a residence in Switzerland. However, the fact that Mr Geyer had multiple residences is not a reason why 33SR could not be a last known, or even a usual, residence (*Relfo Ltd (in liquidation) v Varsani* [2009] EWHC 2297 (Ch), para. 34).

57.     CPR rule 6.9(5) applies only if Dr Boettcher had reason to believe that Mr Geyer no longer resided at 33SR. However, Dr Boettcher's inquiries did not give him reason to believe that Mr Geyer no longer resided at 33SR, especially having regard to the third and fourth reasons below.

58.     Third, a critical step in Dr Boettcher's conclusion that 33SR was Mr Geyer's last known residence is the conversation between Ms Chadda and the porter at 33SR. It is fair to say that this was a short telephone conversation, but the contents of the conversation reinforced, rather than contradicted, the conclusion that Mr Geyer continued to reside at 33SR. Ms Chadda's evidence was of course inconsistent with the evidence of Ms Danon's evidence of her own conversation with the porter at 33SR, assuming it was the same person (Ms Danon's conversation of course took place after service). I am not in a position to decide which of these accounts is to be preferred, assuming that there is an inconsistency. In my judgment, Ms Chadda's evidence affords a plausible basis on

14

which to conclude that Dr Boettcher had no reason to conclude that Mr Geyer was no longer resident at 33SR and that any conflict in the evidence cannot be resolved for the purposes of this application.

59.     Fourth, Dr Boettcher through his solicitors had sent letters of claim to Mr Geyer by email which included 33SR (or "*Flat 10, Savile Row, London, W1S 3PZ*") as his identified address. The evidence suggests that Mr Geyer had received these letters of claim (and there is no evidence to suggest that Mr Geyer did not receive these letters of claim) but took no steps to inform Dr Boettcher or his solicitors that he no longer resided at 33SR, even though in one of the emails sent by Dr Boettcher's solicitors, Mr Geyer was asked to identify his preferred address for service. Dr Boettcher is entitled to rely on Mr Geyer's failure to correct any impression that Dr Boettcher had that 33SR was Mr Geyer's last known residence.

60.     Of course, Dr Boettcher became aware soon after the purported service of the Claim Form on Mr Geyer at 33SR on 1st October 2021 that Mr Geyer's position was that he was no longer resident at 33SR (Ms Lanceley's second witness statement, paragraph 27). That is of course irrelevant as the question whether 33SR was Mr Geyer's last known residence is to be determined as at the date of service (1st October 2021).

61.     Therefore, in my judgment, the service of the proceedings on Mr Geyer was valid service in accordance with CPR rule 6.9.

62.     However, the question arises whether the Court should accede to a stay of the proceedings on the grounds that there is a more appropriate forum than England for the determination of this dispute. Mr Geyer and Mr Pacini - who were validly served with process in England - apply for such a stay.

<u>(2)     Have Mr Geyer and Mr Pacini submitted to the jurisdiction?</u>

63.     Dr Boettcher contends that Mr Geyer and Mr Pacini have submitted to the jurisdiction and are therefore precluded from applying for a stay of the proceedings on *forum non conveniens* grounds.

64.     On 19th October 2021, Mr Geyer and Mr Pacini each filed an acknowledgment of service in respect of the proceedings served on them within the jurisdiction. In their acknowledgments of service, Mr Geyer and Mr Pacini indicated that they intended to contest jurisdiction. Pursuant to CPR rule 58.7(2), any application to contest jurisdiction had to be filed within 28 days of the acknowledgment of service, *i.e.* by 16th November 2021.

65.     On 26th October 2021, Waksman, J made an order allowing Dr Boettcher's application to serve proceedings on Mr Geyer and Mr Pacini outside the jurisdiction.

66.     On 10th November 2021, Cooke Young & Keidan on behalf of Mr Geyer and Mr Pacini wrote to Dr Boettcher's solicitors (Stewarts Law) indicating that they intended to challenge "*domestic service*" and to seek to set aside the order of Waksman, J.

67.     On 14th November 2021, by separate letters, Dr Boettcher's solicitors (Stewarts Law) wrote to Mr Geyer's and Mr Pacini's solicitors (Cooke Young & Keidan) inviting them to agree to accept service of the proceedings by email addressed to Ms Danon in order

to save the costs of service under the Hague Service Convention on the basis that this was without prejudice to Mr Geyer's and Mr Pacini's right to apply to set aside the Court's order dated 26th October 2021, and in exchange Dr Boettcher would agree to extend the time for the filing of any challenge to the Court's jurisdiction to 29th April 2022. In any event, Dr Boettcher was content to agree to extend the time for the making of any application to contest jurisdiction from 16th November 2021 to 30th November 2021.

68.   On 16th November 2021, Mr Geyer's and Mr Pacini's solicitors responded to the proposal of 14th November 2021, stating that they were considering it, and also agreed to the extension of time to 30th November 2021 for Mr Geyer and Mr Pacini to file their "*evidence to challenge domestic service*".

69.   On 18th November 2021, Mr Geyer rejected Dr Boettcher's proposal for the service of process by email, but Mr Pacini accepted Dr Boettcher's proposal.

70.   On 30th November 2021, Mr Geyer filed an application notice seeking an order that "*there has not been valid service of the Claim Form and Particulars of Claim on the Second Defendant in the jurisdiction*". The draft order accompanying the application provided that "*This order shall not prejudice any application the Second Defendant makes under CPR Part 11 nor shall it be construed as a submission by the Second Defendant to the jurisdiction of the Court*". The first witness statement of Ms Danon served in support of this application stated at paragraph 63 that "*For the avoidance of doubt, this Witness Statement and the Application more generally are made without prejudice to D2's objection to the jurisdiction of the Courts of England and Wales. Nothing in this Witness Statement is intended to suggest that D2 submits to this jurisdiction. By making this Application D2 should not be regarded to have taken any step in the claims against him*".

71.   On 8th December 2021, Stewarts Law on behalf of Dr Boettcher sent a letter to Mr Geyer's solicitors stating that "*if it is established that Dr Boettcher has validly served Mr Geyer in the jurisdiction, Mr Geyer has lost his right to challenge jurisdiction*". Stewarts Law made the same point again by email on 10th December 2021.

72.   On 15th December 2021, the Court made an order, with the parties' consent, extending the time within which Mr Geyer and Mr Pacini could file and serve their application to challenge jurisdiction and/or set aside the Court's order of 26th October 2021 giving permission to Dr Boettcher to serve the proceedings outside the jurisdiction. It is plain from the terms of the order that the extension of time was limited to preserving the parties' positions as regards the service of proceedings outside the jurisdiction, and was not concerned with the service of the proceedings on Mr Geyer at 33SR. That order expressly provided that:

> "*Neither this order nor the Second or Third Defendants' consent thereto shall prejudice any application the Second or Third Defendant makes under CPR Part 11 (in respect of the Second Defendant challenging service out of the jurisdiction and save for any argument as to whether the Third Defendant could properly be served at the relevant address identified in the Order) or be construed as a submission by the Second or Third Defendant to the jurisdiction of the Court, or of acceptance by the Second Defendant of service in these proceedings.*"

73.  On the same day, 15th December 2021, another order was made by the Court in respect of the dates for the filing of evidence in response to Mr Geyer's application dated 30th November 2021. That order also recorded that:

> "*Neither this order nor the Second Defendant's consent thereto shall prejudice any application the Second Defendant makes under CPR Part 11 challenging service out of the jurisdiction, or be construed as a submission by the Second Defendant to the jurisdiction of the Court, or of acceptance of service by the Second Defendant in these proceedings.*"

74.  There followed a number of orders made by the Court with the consent of the parties extending the deadline for Mr Geyer and Mr Pacini "*to challenge jurisdiction and/or set aside the Order of 26 October 2021*".

75.  On 5th September 2022, Mr Geyer and Mr Pacini issued an application notice seeking an order setting aside Waksman, J's order dated 26th October 2021 permitting service outside the jurisdiction and an order "*Declaring that the English court has no jurisdiction to try the claim brought against either the Second or Third Defendant or that it will not exercise its jurisdiction*".

76.  By reference to these matters, Mr Day on behalf of Dr Boettcher submitted that Mr Geyer had to file an application for a stay of the proceedings on *forum non conveniens* grounds by 30th November 2021, but as no such application was made by that time, Mr Geyer is "*to be treated as having accepted that the court has jurisdiction to try the claim*" (CPR rule 11(5)). Mr Day contended that this was a statutory submission to the jurisdiction (*Deutsche Bank AG London Branch v Petromena ASA* [2015] EWCA Civ 226; [2015] 1 WLR 4225, para. 36). Mr Day made a similar submission in respect of Mr Pacini's failure to file an application to contest the Court's jurisdiction on *forum non conveniens* grounds by 5th September 2022 in respect of the proceedings served on Mr Pacini at The Shard on 1st October 2021. In support of this argument, Mr Day relied on the following circumstances:

(1)  The first occasion on which Mr Geyer and Mr Pacini purported to contest the Court's jurisdiction by seeking on *forum non conveniens* grounds a stay of the proceedings instituted by the service of the process on Mr Geyer on 1st October 2021 at 33SR was on 23rd December 2022 in the second witness statement of Mr Duncan Speller of Willkie Farr & Gallagher (UK) LLP (Mr Geyer's and Mr Pacini's solicitors), at paragraphs 11 and 13(a). This was after the deadlines of 30th November 2021 (in respect of Mr Geyer) and 5th September 2022 (in respect of Mr Pacini).

(2)  By December 2022, however, Mr Geyer and Mr Pacini had submitted to the jurisdiction pursuant to CPR rule 11(5).

(3)  If necessary, Mr Geyer's and Mr Pacini's agreement to the order made on 15th December 2021, having been informed of the consequences of having not applied to contest the Court's jurisdiction in respect of the proceedings served on 1st October 2021 within the jurisdiction, would constitute a common law submission to jurisdiction (*Deutsche Bank AG London Branch v Petromena ASA* [2015] EWCA Civ 226; [2015] 1 WLR 4225, para. 32).

(4)     No application has been made by Mr Geyer or Mr Pacini for the extension of time within which to make such an application to contest the Court's jurisdiction in respect of the proceedings served on them within the jurisdiction.

77.     I do not accept that Mr Geyer and Mr Pacini submitted to the jurisdiction pursuant to CPR rule 11(5) or at common law, and were therefore precluded from applying for a stay of proceedings on *forum non conveniens* grounds, for the following related reasons.

78.     First, CPR rule 11(5) requires only that an application be made by the defendant to dispute the Court's jurisdiction within the time period specified in the Civil Procedure Rules, as extended by the Court. In the present case, both Mr Geyer and Mr Pacini had filed and served an application to contest the Court's jurisdiction.

79.     The Court's orders extending time for the filing of the applications expressly referred to an application to "*challenge jurisdiction*" in addition to referring to any application to set aside Waksman, J's order dated 26th October 2021. The first of the orders dated 15th December 2021 expressly provided that it did not prejudice "*any application the Second or Third Defendant makes under CPR Part 11 (in respect of the Second Defendant challenging service out of the jurisdiction and save for any argument as to whether the Third Defendant could properly be served at the relevant address identified in the Order) or be construed as a submission by the Second or Third Defendant to the jurisdiction of the Court, or of acceptance by the Second Defendant of service in these proceedings*". Similarly, the other order made on 15th December 2021 provided that "*Neither this order nor the Second Defendant's consent thereto shall prejudice any application the Second Defendant makes under CPR Part 11 challenging service out of the jurisdiction, or be construed as a submission by the Second Defendant to the jurisdiction of the Court, or of acceptance of service by the Second Defendant in these proceedings*". On my reading of these provisions, it was agreed and ordered that Mr Geyer and Mr Pacini were not prevented from contesting jurisdiction (save that Mr Pacini could not contest that he was validly served within the jurisdiction) and that they were not submitting to the jurisdiction.

80.     The applications contesting jurisdiction were lodged by Mr Geyer (on 30th November 2021 in respect of the service of process on him at 33SR) and by Mr Geyer and Mr Pacini (on 5th September 2022). It is true that the applications did not refer to seeking a stay of the proceedings on *forum non conveniens* grounds in respect of the proceedings served within the jurisdiction, but once Mr Geyer and Mr Pacini made the applications to dispute jurisdiction within the permitted time periods, it could not be said that the parties submitted to the jurisdiction. Accordingly, I do not see how the statutory submission to jurisdiction referred to in CPR rule 11(5) could have any part to play. Similarly, I do not consider that any "*disinterested bystander*" with knowledge of the case would have concluded that Mr Geyer's and Mr Pacini's conduct amounted to unequivocal renunciation of their right to challenge the jurisdiction so as to give rise to a common law submission to jurisdiction (of the type identified by the Court of Appeal in *Deutsche Bank AG London Branch v Petromena ASA* [2015] EWCA Civ 226; [2015] 1 WLR 4225, para. 32).

81.     Once Mr Geyer and Mr Pacini contested jurisdiction by filing the relevant application to dispute jurisdiction in time, the fact that they later deployed additional arguments in support of their applications does not mean that they have surrendered the right to rely on such additional arguments in further support of their application as may occur to

them after the making of the applications (of course, separate considerations arise if the additional arguments arise very late in day which may prejudice the opposing parties or fall foul of the overriding objective, but there is no such suggestion in the present case).

82. Therefore, in my judgment, Mr Geyer and Mr Pacini have not lost the right to contend that the Court should stay the proceedings served on the parties within the jurisdiction on *forum non conveniens* grounds.

(3)  Is Germany the more appropriate forum?

*The law*

83. Mr Geyer and Mr Pacini both were served with the proceedings within the jurisdiction. Accordingly, in support of their application for a stay on *forum non conveniens* grounds, it is incumbent on them to demonstrate that there is a clearly and distinctly more appropriate forum for the determination of the dispute between the parties than England. This represents the first stage in the disposal of any application by a defendant for a stay of such proceedings as laid down by the House of Lords in *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460, 476-478 (see also *VTB Capital plc v Nutritek International Corp* [2013] UKSC 5; [2013] 2 AC 337, para. 190). This test looks to where the case should be tried "*more suitably for the interests of all the parties and for the ends of justice*" (*Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460, 474, 482-484).

84. Even if the defendant discharges this burden, it is open to the Court to refuse a stay if the claimant demonstrates that there are other factors which would entail a real risk that the claimant would be denied justice in the alternative forum. This is the second stage in the Court's consideration of the application as laid down in *Spiliada Maritime Corp v Cansulex Ltd*.

85. The position was recently summarised by the Court of Appeal in *Município de Mariana v BHP Group (UK) Ltd* [2022] EWCA Civ 951, [2022] 1 WLR 4691, at para. 333:

> "*The basic principles which apply where a defendant seeks a stay on forum non conveniens grounds of an action in which it has been served here as of right, were authoritatively identified in Spiliada [1987] AC 460 and Kyrgyz Mobil [2012] 1 WLR 1804. The defendant must discharge the evidential burden of satisfying the court that there is another available forum of competent jurisdiction which is clearly and distinctly more appropriate as the forum in which the case may be tried more suitably for the interests of all the parties and the ends of justice: Spiliada at pp 476c, 476E, 477E. This is stage one. If the defendant satisfies the burden, the court will nevertheless refuse a stay if the claimant satisfies it, by cogent evidence, that there are circumstances by reason of which justice requires such refusal, including in particular if it is established by cogent evidence that there is a real risk that the claimant will not obtain justice in the foreign forum: Spiliada at p 478D-E, Kyrgyz Mobil at paras 91-95. This is stage two.*"

86. The first stage of this approach requires the defendant to demonstrate to the Court that there is a forum other than England which is demonstrably a more appropriate jurisdiction for the trial of the parties' dispute. The fact that the defendant has been

served in the jurisdiction "*as of right*" is a significant consideration (Fentiman, *International Commercial Litigation* (2nd ed.) para. 13.39), but it does not mean that it will only be a rare case where a stay should be ordered; on the other hand, the stay is not one which should be lightly granted. The Court must be satisfied clearly that there is a jurisdiction other than England where the parties should have their dispute determined justly. The significance of the fact that the defendant was served within the jurisdiction is the greater where the defendant has a substantial connection with the jurisdiction, but that connection may also be more insubstantial. The depth of that connection forms part of the Court's consideration of the first stage of the *Spiliada* approach.

87.    In *Spiliada Maritime Corp v Cansulex Ltd*, Lord Goff said at page 477:

> "*In my opinion, the burden resting on the defendant is not just to show that England is not the natural or appropriate forum for the trial, but to establish that there is another available forum which is clearly or distinctly more appropriate than the English forum. In this way, proper regard is paid to the fact that jurisdiction has been founded in England as of right (see MacShannon's case [1978] A.C. 795, per Lord Salmon); and there is the further advantage that, on a subject where comity is of importance, it appears that there will be a broad consensus among major common law jurisdictions. I may add that if, in any case, the connection of the defendant with the English forum is a fragile one (for example, if he is served with proceedings during a short visit to this country), it should be all the easier for him to prove that there is another clearly more appropriate forum for the trial overseas.*"

88.    Having regard to the authorities and commentaries (which include *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460, 477-478, 481-482; *Konkola Copper Mines plc v Coromin* [2006] EWCA Civ 5; [2006] 1 All ER (Comm) 437, para. 27; *VTB Capital plc v Nutritek International Corp* [2013] UKSC 5; [2013] 2 AC 337, para. 10; *Tugushev v Orlov* [2019] EWHC 645 (Comm), para. 263-264; *Lungowe v Vedanta Resources Plc* [2019] UKSC 20; [2020] AC 1045, para. 66, 75, 82-84; Briggs, *Civil Jurisdiction and Judgments* (7th ed.), para. 22.12-22.15; *Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), para. 12.034-12.035), the factors which the Court can take into account in determining the question whether England is the more appropriate forum or another jurisdiction is the more appropriate include, but are by no means limited to:

(1)    The connection between the factual elements of the dispute to the competing jurisdictions.

(2)    The law governing the transaction.

(3)    The location of the parties to the dispute both at the time of the events giving rise to the dispute and also during the course of the proceedings.

(4)    Whether proceedings relating to the dispute between the applicant and the respondent would be fragmented by any order for or against a stay which the Court might make, and whether there would be concurrent proceedings in more than one jurisdiction, with the risk of inconsistent judgments being obtained in those jurisdictions.

(5)    The location and availability of documentary evidence (although whether this is a material practical consideration depends on the ease with which such documents can be digitally copied and transferred and whether there are caches of documents which require review only at particular locations).

(6)    The location and availability of witnesses (bearing in mind that this last consideration may be mitigated if evidence can or is to be given remotely consistent with the requirement of a just and fair proceeding).

89.    A consideration of the relevant factors will assist the Court in deciding where the warp in the litigation fabric leads to the location of the weight of the dispute, but the review of each of these factors should also be evaluated by a holistic view of the matter (*Erste Group Bank AG (London) v JSC 'VMZ Red October'* [2015] EWCA Civ 379; [2015] 1 CLC 706, para. 149; Briggs, *Civil Jurisdiction and Judgments* (7th ed.), para. 22.17).

90.    Even if the dimensions and weight of a case indicate, clearly, that the dispute should be determined in a jurisdiction other than England, the Court might still refuse a stay if there is a real risk that any of the parties would not be justly dealt with or if the dispute would not be justly dealt with in that other jurisdiction, meaning in either case that there is a real risk of a substantial injustice in the other forum. This second stage enquiry goes beyond, although may well include, consideration of the factors which connect the dispute with that other jurisdiction (*Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), para. 12-041). This inquiry is not concerned with a mere difference of approach, whether as a matter of procedure or substantive law, without more, to the resolution of a dispute. This may involve consideration whether the claimant would be unjustly deprived of a legitimate personal or juridical advantage if the stay were ordered (*Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460, 482-484).

*The application of the law*

91.    Mr Geyer's and Mr Pacini's case is that Germany is clearly and distinctly the more appropriate forum for the resolution of the current dispute.

92.    Mr Lowenstein KC on behalf of Mr Geyer and Mr Pacini submitted that England is not, and Germany is, clearly or distinctly the most appropriate forum because:

(1)    None of the participating parties is based in England.

(2)    The alleged damage was suffered in Germany, not England.

(3)    None of the alleged representations made by Mr Geyer and Mr Pacini is said to have been made in England. It is not alleged that Mr Geyer made any of the pre-contractual representations in or from England; Mr Geyer's and Dr Boettcher's only material interaction was at Dusseldorf Airport. It is alleged that Mr Pacini attended a conference call from England on 6th November 2015, but this was - according to Mr Pacini - postponed. In fact, Dr Boettcher attended all relevant meetings and conference calls from Germany, with the exception of a meeting at The Shard with Mr Robson (who is not a defendant in these proceedings) on 20th October 2015.

(4)    It is alleged that Mr Pacini made the relevant representations on three occasions on 6th, 13th and 17th November 2015, but none of these representations can be actionable in that:

(a)    The alleged call on 6th November 2015 was postponed to 17th November 2015 (Mr Pacini's first witness statement, paragraphs 7-11 and 13; Mr Pacini's second witness statement, paragraphs 6-9, 11), although this is disputed by Dr Boettcher (Dr Boettcher's second witness statement, paragraphs 7-11).

(b)    The alleged call on 13th November 2015 is not pleaded in paragraph 18 of the Particulars of Claim (where the alleged representations made to Dr Boettcher are pleaded), was first alleged late in the day (by Dr Boettcher's second witness statement, paragraph 13, on 28th November 2022), and Mr Pacini was in Israel that day and has no recollection of the call (Mr Pacini's second witness statement, paragraph 10).

(c)    The alleged call on 17th November 2015, if it had happened at all, took place after Dr Boettcher had agreed to employment by Xio UK by signing and returning the Offer Letter on 16th November 2015, and so was made too late to be actionable.

(5)    Dr Boettcher's previous role at Bain was based in Germany and, after leaving Xio UK, his next role (from 2019) at EY-Parthenon was also in Germany.

(6)    Whilst he was at Xio UK, Dr Boettcher's role was centred largely in Germany, where he lived and was paid, although he carried out some work for Xio UK in London, Tel Aviv and California. The unsigned service agreement stated that "*the place of ordinary and habitual residence of [Dr Boettcher] is Germany*".

(7)    The Xio Group's primary office was in Hong Kong and most of its operational activity took place in Asia and a substantial proportion of the Xio Group's board meetings took place in Germany, Israel and the Netherlands (Mr Pacini's second witness statement, paragraphs 24-25). The IT and HR functions of Xio UK were managed from China and Hong Kong respectively and team-building exercises took place in France, Shanghai and London (Mr Geyer's second witness statement, paragraphs 11-14).

(8)    The law governing Dr Boettcher's claims is German law pursuant to Article 4(1) of the Rome II Regulation because Dr Boettcher was domiciled and/or resident in Germany, worked at Bain Germany for approximately fifteen years prior to accepting a job at Xio UK, worked from Germany for a substantial portion of his time at Xio UK, and then accepted a position at EY in Germany, and Dr Boettcher's pecuniary loss was suffered in the place where the relevant receiving bank account is located (*Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 CLC 706, para. 94-96) and Dr Boettcher admits that his bank accounts were located in Germany (Dr Boettcher's second witness statement, paragraph 20). Article 4(3) of the Rome II Regulation does not assist Dr Boettcher because it cannot be shown that the misrepresentations were "*manifestly more closely connected*" with England than Germany. Article 12(1) is inapplicable because there was no direct actual

or intended contractual relationship between Dr Boettcher on the one hand and Mr Geyer and/or Mr Pacini on the other hand. In the present case, the contract of employment was only ever between Dr Boettcher and Xio UK.

(9)    There is no or no real risk of inconsistent decisions being reached by courts in different jurisdictions on effectively the same issues because Mr Geyer and Mr Pacini have offered to submit to the jurisdiction of the German courts.

(10)    As Xio UK is in liquidation, it will not participate in the dispute and so it is more likely that disclosure will focus on records held personally by Dr Boettcher, Mr Geyer and Mr Pacini.

93.    Mr Lowenstein KC further submitted that Dr Boettcher will not suffer any injustice in Germany, the state of his domicile, because the longer six year limitation period applicable under English law (compared to the three year limitation period under German law) is not a legitimate juridical advantage, given that Dr Boettcher acted unreasonably in failing to issue protective proceedings in Germany in circumstances where he was considering a claim against Xio UK in December 2017, when he sent a letter of claim to Xio UK, and where even if the proceedings in England were not stayed, the limitation period applicable in Germany would be applied in England as German law is the applicable law. Further, Dr Boettcher has indicated a willingness to take action in Germany where it suits him in that, in December 2021, his German lawyers by letter threatened legal action in Germany if Mr Geyer did not undertake to refrain from making false statements about Dr Boettcher in the English proceedings (Mr Geyer's first witness statement, paragraphs 25-31; Mr Geyer's second witness statement, paragraph 15; Mr Geyer's third witness statement, paragraphs 9-13).

94.    Mr Day on behalf of Dr Boettcher submitted that Mr Geyer and Mr Pacini had not discharged the burden of demonstrating that Germany is clearly and distinctly the more appropriate forum than England, having regard to the following considerations:

(1)    Mr Geyer and Mr Pacini are not currently domiciled in Germany. If proceedings were commenced against Mr Geyer and Mr Pacini in Germany, there are real questions as to whether the German Court would exercise jurisdiction, as they are not domiciled there and there are no grounds for special jurisdiction. Indeed, they have not offered to submit to the jurisdiction of the German Courts.

(2)    Mr Geyer resided in England at the time of the events giving rise to the claim. Mr Pacini's evidence is that he was not resident in England in 2015 (Mr Pacini's second witness statement, paragraphs 15-18); Dr Boettcher's evidence was that Mr Pacini's wife told him in December 2015 that she lived in England at that time, suggesting that Mr Pacini was likewise resident in England at that time (Dr Boettcher's second witness statement, paragraph 33).

(3)    All of the witnesses are fluent in English. The only custodian of documents and witness who is domiciled in Germany is Dr Boettcher, who wishes to continue these proceedings in England rather than issue fresh proceedings in Germany.

(4)    The Xio Group has and had no presence in Germany. Mr Day referred me to a press release describing the Xio Group as follows: "*Headquartered in London, XIO Group is a global alternative investments firm that employs an*

*international team of more than 70 professionals. Representing more than 15
nationalities among its employees and its network of advisors, the firm has
operations in the United Kingdom, Germany, Switzerland, Hong Kong and
mainland China*" (see also Ms Danon's first witness statement, paragraph 10).

(5)     All of the underlying documents that will be the focus of the trial are likely to
be in the English or Chinese language (Ms Lanceley's first witness statement,
paragraph 151).

(6)     Dr Boettcher's claim against the Defendants is based on a number of fraudulent
misrepresentations allegedly made on different occasions during the recruitment
of Dr Boettcher leading to his agreeing to a contract of employment with Xio
UK. The occasions were either conference calls where the participants were in
London or Germany (although there is no evidence that Mr Geyer and Mr Pacini
were in Germany on those occasions) or elsewhere, during an interview in
London and during a meeting at Dusseldorf Airport between Mr Geyer and Dr
Boettcher.

(7)     The alleged fraudulent misrepresentations were all directed at inducing Dr
Boettcher to leave Bain and take a senior position at Xio UK in London. London
was where Dr Boettcher's dedicated office and personal assistant were located,
although Dr Boettcher travelled to Germany, Israel and latterly the United States
to perform his duties (Dr Boettcher's second witness statement, paragraphs 41-
42). Mr Geyer and Mr Pacini also had offices in London and then resided in
London and Surrey respectively, but also travelled; Xio UK's other employees
were mainly based in London and mostly lived in or near London (Dr
Boettcher's second witness statement, paragraphs 43-48).

(8)     Dr Boettcher's employment contract and the draft service agreement were
subject to English law and jurisdiction and identified London as Dr Boettcher's
"*normal place of work*" (Dr Boettcher's second witness statement, paragraph
40; Ms Lanceley's first witness statement, paragraph 77).

(9)     If the proceedings against Mr Geyer and Mr Pacini were stayed, this would
result in a fragmentation of the proceedings against them on the one hand and
Xio UK and Mr Qiao on the other hand.

(10)    Dr Boettcher has a good arguable case that his claims are governed by English
law pursuant to Article 12(1) of the Rome II Regulation, because the
misrepresentations were made to induce the signing of Dr Boettcher's
employment contract with Xio UK which was to be governed by English law;
alternatively, pursuant to Article 4(1) of the Rome II Regulation, because that
is where Dr Boettcher's damage was sustained. If, however, German law was
the applicable law, the Court is well practised in considering evidence and
submissions based on foreign law.

95.    Mr Day further submitted that even if Mr Geyer and Mr Pacini have demonstrated that
Germany is clearly and distinctly the more appropriate forum than England, it would
result in an injustice to Dr Boettcher in that he would have to start fresh proceedings in
Germany, but those proceedings might be time-barred because there is a three year
limitation period applicable in Germany and time had started to run from December

2020 (*Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), para. 12-049; Fentiman, *International Commercial Litigation* (2nd ed.) para. 13.82). This factor might however be neutralised if the applicant were to undertake to waive the time bar as a defence in the foreign proceedings (Fentiman, *International Commercial Litigation* (2nd ed.) para. 13.83), but no such waiver has been offered in this case. That all said, Dr Boettcher's case is that even if German law is applicable, there should be no limitation defence because the running of time for this purpose had been suspended.

96.   Given that proceedings were served in England as of right, the question is not whether England is the most appropriate forum, but whether Germany is clearly and distinctly a more appropriate forum than England.

97.   In my judgment, Mr Geyer and Mr Pacini have not demonstrated that Germany is clearly and distinctly the more appropriate forum for the determination of this dispute than England. My reasons are as follows.

98.   First, as regards the timing and making of the alleged misrepresentations, as matters communicated to Dr Boettcher, they cannot be said to be connected with Germany in any greater sense than they are connected with England.

99.   The significant factors connecting the making of the alleged representations with Germany is the fact that Dr Boettcher is currently located and domiciled in Germany, that there were two meetings in Germany (in Munich and Dusseldorf) at which pre-contractual representations are alleged to have been made (one of which involved Mr Geyer), and the conference calls which are alleged to have taken place involved Dr Boettcher in Germany. However, neither Mr Geyer and Mr Pacini, nor indeed anyone else on behalf of Xio UK or the Xio Group, participated in these calls from Germany.

100.   The significant factor connecting the making of the alleged representations with England is the fact that the representations allegedly made to Dr Boettcher were made on behalf of Xio UK. Xio UK was based in England and the Xio Group's European headquarters were in England. Some of those representations were made in England, during a meeting at The Shard, and possibly from England (that is, by Mr Pacini on 6th November 2015).

101.   On Dr Boettcher's case, there were a number of representations made both before and after the Offer Letter was signed. They were made and received in England, Germany, and/or elsewhere. In such circumstances, it is difficult to attribute these representations as a whole to one jurisdiction. Certainly, they cannot be attributed to having taken place solely or predominantly in Germany.

102.   There was much debate about whether the evidence supported the timing and making of these representations; however, the content of the representations was not the subject of the parties' submissions. I am unable to decide who has the better of the argument in respect of the timing and making of the representations and would wish not to do so, as I do not consider that it would help in establishing whether Germany, as opposed to England, is the more appropriate forum. However, I do comment on two of the representations:

(1)   The first is the representation alleged to have been made on 13th November 2015. There is currently no pleaded case by Dr Boettcher as to this

representation. Accordingly, I take no account of it for the purposes of the present applications. If Dr Boettcher wishes to rely on this representation as part of his claim, then he must apply for permission to amend his Particulars of Claim. If this representation had been pleaded, it would not have altered the decision I have reached on the present applications.

(2)   The second is the representation alleged to have been on 17th November 2015. Mr Lowenstein KC fairly pointed out that this representation was made after the conclusion of Dr Boettcher's employment contract with Xio UK on 16th November 2015. However, Dr Boettcher's claim is based on his having relied on this and the other alleged representations, not only in concluding this contract and giving notice of resignation to Bain on 16th November 2015, but also in signing a separation agreement with Bain on 24th November 2015 and commencing his employment with Xio UK on 1st January 2016 (Particulars of Claim, para. 21). In his second witness statement, Dr Boettcher said at paragraph 15 that "*The Representations were repeated during the 17 November 2015 call and they influenced my decision to join [Xio UK]. I accept that I signed and returned the offer letter on 16 November 2015. However, this was only one step towards my departure from Bain and the damage that I subsequently suffered by joining [Xio UK]. I only signed the exit agreement with Bain on 24 November 2015. All of the discussions with the Defendants before that influenced my decision to join [Xio UK]*".

103.   Second, the case advanced by Dr Boettcher is concerned with the truth or falsity of the representations allegedly made by or on behalf of the Defendants, including Mr Geyer and Mr Pacini, that the Xio Group was a private equity fund with funds of committed capital under management of US$3 billion from a diversified investor base. An inquiry into the truth of any alleged representations would not be focussed solely or principally on the source of funds or investments in Germany.

104.   Third, in my view, a significant connecting factor is that Dr Boettcher was being recruited to work for Xio UK and the representations were made for the purpose of engaging Dr Boettcher to work for Xio UK in England. Xio UK's operations were based in London. Although Dr Boettcher also carried out his duties in other countries, including Germany, the primary location for the purposes of the performance of his duties as an employee of Xio UK was to be, and was, in England. The Offer Letter was conditional on Dr Boettcher "*being lawfully entitled to work in the United Kingdom*" and made reference to no other country. The unsigned service agreement provided that "*The Employee's normal place of work shall be the LLP's primary offices in London. The Employee shall, however, attend and work at any places of business in the United Kingdom or elsewhere as required or determined from time to time by the LLP …*". The employment contract was intended to be governed by English law in that the Offer Letter referred to English legislation (Working Time Regulations 1998). There appeared to be no dispute that English law was the governing law of Dr Boettcher's employment contract.

105.   Of course, I also understand that Dr Boettcher lived in Germany during his employment with Xio UK, but that on its own does not make Germany a more appropriate forum than England for the determination of this dispute.

106.    Further, Mr Geyer and Mr Pacini also had a presence in Xio UK's London office at least in the sense that they had an office and a personal assistant in London.

107.    Fourth, the practical considerations underlying the trial of the action in England, such as the location of witnesses and documentary evidence, do not gravitate towards Germany, or England for that matter. Dr Boettcher was and is domiciled in Germany, but the other witnesses are located elsewhere. The location of witnesses is less a matter of practical convenience to the extent that evidence fairly can be given remotely. The operations of Xio UK were conducted in England and so a substantial number of documents which may have to be disclosed could be said to have been originally located in England. Of course, the operations of the Xio Group were conducted in a number of jurisdictions and the digital copying of documents suggest that such documents could be located in other jurisdictions as well as in England for this purpose. I also note that the documentary evidence will be in the English or Chinese language, but I do not regard that as a matter which connects the dispute with one jurisdiction or another.

108.    Fifth, it is significant that, as matters stand, there is one set of proceedings against Xio UK, Mr Geyer, Mr Pacini and Mr Qiao. If the current proceedings against Mr Geyer and Mr Pacini were stayed, there would or might be two sets of proceedings - in England and, perhaps, in Germany - all concerned with the same factual issues. Of course, it might be said that it is open to question whether the proceedings against Xio UK, who is in liquidation and apparently without substantial assets, and against Mr Qiao, who has not taken an active part in these proceedings to date, would continue. However, at this juncture, that is speculative. Indeed, Xio UK has filed an acknowledgment of service form, presumably on the instructions of the liquidators, indicating an intention to defend the claim, and indeed has been represented by counsel and solicitors in these proceedings.

109.    Sixth, there is the matter of the law governing Dr Boettcher's claims against Mr Geyer and Mr Pacini. There was substantial dispute between the parties as to whether the applicable law was English law in accordance with Article 12(1), alternatively Article 4(1), of the Rome II Regulation (on Dr Boettcher's case), or German law in accordance with Article 4(1) (on Mr Geyer's and Mr Pacini's case).

110.    In my judgment, there is a good arguable case that English law is the applicable law:

    (1)    Dr Boettcher has the better of the argument that English law is applicable to his claims against Mr Geyer and Mr Pacini, at least pursuant to Article 4(1) of the Rome II Regulation, which provides that "… *the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur*". In this case, the damages claimed by Dr Boettcher for the alleged misrepresentations arose as a result of his entering into the contract of employment with Xio UK, in particular his claims for loss of earnings and damages for mental distress and/or disappointment and/or reputational damage. It was therefore his entry into the contract of employment with Xio UK, and his subsequent employment with Xio UK, in reliance on the alleged misrepresentations which constituted the relevant damage. That contract of employment was concluded by the receipt by Xio UK of Dr Boettcher's emailed acceptance of the Offer Letter - which was

communicated by Dr Boettcher returning by email a pdf of the countersigned Offer Letter to Xio UK on 16th November 2015 - either on Xio UK's email server or upon being read by the named recipient (*Chitty on Contracts*, (34th ed., 2021), para. 4-061, 4-099, 4-100). That contract of employment was therefore concluded in England (*Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), para. 35-026; *MX1 Ltd v F* [2018] EWHC 1041 (Ch); [2018] 1 WLR 5553, para. 39(8); this is analogous to the occurrence of a harmful event in England where the relevant contract was signed in the context of Article 7(2) of the Brussel Regulation Recast: *Aspen Underwriting Ltd v Credit Bank Europe NV* [2018] EWCA Civ 2590; [2019] 1 Lloyd's Rep 221, para. 136-138; reversed on appeal but not on this ground: [2020] UKSC 11; [2021] AC 493). Moreover, that contract between Dr Boettcher and Xio UK was to be governed by English law and was to be performed to a substantial extent in England. There is no different conclusion to be drawn by reference to Article 4(3), because I do not consider that the alleged misrepresentations were "*manifestly more closely connected with*" Germany.

(2)    Contrary to Mr Lowenstein KC's submission, I do not consider that for the purposes of Article 4(1) the location of Dr Boettcher's bank accounts represented the location of the damage suffered by Dr Boettcher, because unlike the position in *Dolphin Maritime & Aviation Services Ltd v Sveriges Angfartygs Assurans Forening* [2009] EWHC 716 (Comm); [2010] 1 All ER (Comm) 47, para. 57-58 and *Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 CLC 706, para. 94-96, where the relevant moneys were due to be contractually paid into a nominated bank account, Dr Boettcher's claimed losses in the present case do not relate to moneys which should have been paid by the Defendants to Dr Boettcher. In any event, it was the conclusion of the employment contract with Xio UK which constituted the "*direct damage*" allegedly sustained by Dr Boettcher (Recital (16) of the Rome II Regulation; *Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), para. 35-024).

(3)    The application of Article 4 of the Rome II Regulation presupposes that Article 12(1) does not apply. Article 12(1) provides that the law applicable to non-contractual obligations (such as those in the making of representations) arising out of dealings or negotiations leading to the conclusion of a contract shall be the law applicable to the contract. In this respect, I have concluded that Mr Geyer and Mr Pacini have the better of the argument that Article 12 is not applicable in respect of the claims against Mr Geyer and Mr Pacini (*Angola v Perfectbit Ltd* [2018] EWHC 965 (Comm), para. 200; *Avonwick Holdings Ltd v Azitio Holdings Ltd* [2020] EWHC 1844 (Comm), para. 160-164; *Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), para. 35-090; Dickinson, *The Rome II Regulation*, para. 12.07-12.08). That said, I note the potential oddity that one law may be applicable to claims made against a contracting party who has made misrepresentations to induce the claimant to enter into a contract, but a different law might be applicable to the claim made against agents on behalf of the contracting party in respect of the same misrepresentations. In this case, this potential oddity does not arise, whether Article 4 or Article 12 applies, because, in my view, there is a good arguable case that English law would be applicable.

(4)     I would add that the issue of applicable law may have to be determined finally at trial and that my conclusions in this respect are for the purposes of the current application alone. The parties are of course free to advance their respective cases on the applicable law at trial.

111.    In these circumstances, I am not satisfied that Germany is clearly and distinctly a more appropriate forum for the determination of this dispute than England. If I had reached the contrary conclusion, save in one respect, I would not have concluded that, having regard to the second stage of the approach to addressing the matter of *forum non conveniens*, there is a real risk that Dr Boettcher would not be justly dealt with in Germany. In this respect, Dr Boettcher relied on the fact - which is common ground - that if English law is applicable the claims against Mr Geyer and Mr Pacini are not time-barred but if German law is applicable, there is a shorter limitation period, but there is a dispute as to whether the claims are time-barred under German law.

112.    It may well be that the existence of a limitation defence in Germany, which would not apply in England, is a legitimate advantage of which Dr Boettcher might be deprived if the current proceedings were stayed (see *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460, 482-484; *Dicey, Morris & Collins on the Conflict of Laws* (16th ed.), para. 12-049). However, the Rome II Regulation is applicable in England and in Germany, and so the law for the determination of the applicable law is, at least in theory, the same. This is not a case where the law determining the applicable law is different in the two jurisdictions; it is the same. Moreover, if the English Court were to hold at trial that German law is the applicable law, the shorter limitation period under German law might well be applicable under the Foreign Limitation Periods Act 1984. Any risk therefore arising from the possible limitation defence is the risk of two different courts coming to a different conclusion by applying the same law. However, an injustice might have occurred where the Claim Form instituting the English proceedings would not be regarded as stopping time for the purposes of the German law of limitation (insofar as it applies) where the law is applied in German proceedings, but would be so regarded in the English proceedings. In that event, even though Dr Boettcher's arguments that time is suspended under German law may not save Dr Boettcher from a limitation defence in Germany, it might save Dr Boettcher from a limitation defence in England.

(4)     Conclusion with respect to service within the jurisdiction

113.    For these reasons, as both Mr Geyer and Mr Pacini were served with the proceedings as of right within the jurisdiction and because Germany is not the clearly and distinctly more appropriate forum for the determination of the dispute, I decline to stay the current proceedings. The English Court is therefore entitled to and should exercise jurisdiction over Dr Boettcher's claims against Mr Geyer and Mr Pacini.

114.    This makes it unnecessary to consider Mr Geyer's and Mr Pacini's application to set aside the order of Waksman, J on 26th October 2021 granting permission to Dr Boettcher to serve the proceedings out of the jurisdiction. Nevertheless, as the parties presented full arguments on this application, I will address them.

**Service outside the jurisdiction**

115.    On 26th October 2021, Waksman, J granted an order permitting service outside of the jurisdiction of the proceedings on Mr Geyer (in Switzerland) and Mr Pacini (in the United States). The order was made upon a without notice application by Dr Boettcher.

116.    On 5th September 2022, following consent orders extending time within which such an application could be made, Mr Geyer and Mr Pacini applied for orders declaring that the English Court has no jurisdiction, or will not exercise jurisdiction, to try the claim brought against either of them and setting aside Waksman, J's order on the grounds that there is no serious issue to be tried against either Defendant, Dr Boettcher is unable to show a good arguable case that his claim against Mr Geyer and Mr Pacini falls within any of the grounds set out in CPR PD 6B, para. 3.1 on which Dr Boettcher relies, and because England is not the proper place in which to bring the claim against either Defendant. Mr Geyer and Mr Pacini also contended that Waksman, J's order should be set aside because Waksman, J did not benefit from full disclosure which Dr Boettcher was obliged to provide on his application for permission to serve the proceedings outside the jurisdiction.

117.    I shall consider this application. However, it is relevant only if my conclusion in the previous section (relating to the service of proceedings within the jurisdiction) is wrong.

118.    For this purpose, it is important to bear in mind the requirements to be satisfied in order that service may be legitimately served outside the jurisdiction (see *AK Investments CJSC v Kyrgyz Mobil Tel Ltd* [2021] UKPC 7; [2012] 1 WLR 1804, para. 71). In *Soriano v Forensic News LLC* [2021] EWCA Civ 1952; [2022] QB 533, Warby, LJ summarised the law on service outside the jurisdiction and *forum conveniens*, at para. 11-12, as follows:

> "*11. This is well established. For present purposes, it can be adequately distilled as follows. The court can only give permission to serve a claim on a defendant outside the jurisdiction if it meets three conditions.*
>
> *(1)    The first is that the claim is of a kind that falls within one of the "gateways" set out in CPR PD 6B ("the Gateway Requirement"). On this question, the claimant has to satisfy the court that he has a good arguable case or, as it is sometimes put, the better of the argument. This connotes "more than a serious issue to be tried or a real prospect of success, but not as much as proof on the balance of probabilities": AstraZeneca UK Ltd v Albemarle International Corpn [2011] 1 All ER (Comm) 510, para 24 (Hamblen J).*
>
> *(2)    Secondly, the claimant must satisfy the court that he has a real as opposed to a fanciful prospect of success on the claim ("the Merits Test"). One way this has been put is that the claimant has to show that any "reverse" summary judgment application would fail.*
>
> *(3)    Thirdly, "The court will not give permission unless it is satisfied that England and Wales is the proper place in which to bring the claim": CPR r 6.37(3) ("the Forum Test"). This is normally resolved by reference to the "Spiliada" principles as to the appropriate forum or (in the classic*

*language) forum conveniens for the trial of the claim: see Spiliada Maritime Corpn v Cansulex Ltd (The Spiliada) [1987] AC 460, 478-480 (Lord Goff of Chieveley). The question is whether this jurisdiction is "clearly or distinctly" the most appropriate. The appropriate forum is the one in which the case "may most suitably be tried for the interests of all the parties and for the ends of justice". The first thing to consider is what is the "natural forum", namely the one "with which the action [has] the most real and substantial connection". If the court concludes that another forum is as suitable or more suitable than England, it will normally refuse permission. Again, the issue is not determined on the balance of probabilities; the claimant's task is to show that he has the better of the argument on the point. If he fails to do so, the application will be dismissed.*

*12. A claimant seeking permission to serve outside the jurisdiction always bears the legal burden of proof on all these issues. That is so whether the matter is being considered on an application by the claimant at the initial, without notice stage, or at the hearing of a subsequent application by the defendant to set aside an order permitting service outside the jurisdiction. But a defendant challenging such an order needs to identify some other forum which does have jurisdiction; and even the initial application requires there to be another candidate with the requisite jurisdiction: Unwired Planet International Ltd v Huawei Technologies (UK) Ltd [2020] Bus LR 2422, paras 96-97. Where the claimant's contention that the case is a proper one for service out is disputed by the defendant on a specific ground the defendant bears an evidential burden in relation to that ground: see AstraZeneca (above) at paras 33–39 (Hamblen J).*"

119.    Dr Boettcher, however, has a prior objection to this application, namely that Mr Geyer and Mr Pacini have lost the right to contest the Court's jurisdiction in respect of the service of the proceedings outside the jurisdiction, because - although both Defendants filed an acknowledgment of service after the proceedings were served within the jurisdiction - neither of them filed an acknowledgment of service after and in respect of service out of the jurisdiction. I shall consider this prior objection first.

<u>(1)    Have Mr Geyer and Mr Pacini lost the right to contest jurisdiction?</u>

120.    On 1st October 2021, Dr Boettcher served the proceedings on Mr Geyer and Mr Pacini within the jurisdiction.

121.    On 19th October 2021, both Mr Geyer and Mr Pacini filed acknowledgments of service, indicating that they intended to contest jurisdiction.

122.    On 26th October 2021, Waksman, J made an order permitting service of the proceedings on Mr Geyer and Mr Pacini outside the jurisdiction.

123.    No (additional) acknowledgement of service was filed by Mr Geyer and Mr Pacini after the proceedings were served outside the jurisdiction.

124.    Mr Day on behalf of Dr Boettcher submitted that CPR Part 11 only permits a jurisdiction challenge by a defendant who files an acknowledgment of service in accordance with CPR Part 10. CPR rule 11(2) provides that "*A defendant who wishes*

*to make such an application [i.e. for orders disputing the Court's jurisdiction or that the Court should not exercise jurisdiction] must first file an acknowledgment of service in accordance with Part 10*". CPR rule 10.1(3)(b) likewise provides that "*A defendant must file an acknowledgment of service if … they wish to dispute the court's jurisdiction*". So, Mr Day argued, as Mr Geyer and Mr Pacini never acknowledged service of the proceedings out of the jurisdiction (as opposed to the acknowledgment of service of proceedings within the jurisdiction), that debars Mr Geyer and Mr Pacini from contesting jurisdiction based on service outside the jurisdiction, because these provisions of the CPR are mandatory (*Mansard Mortgages 2007-2 plc v Beyat Holdings Ltd* [2021] EWHC 3355 (Ch), para. 37-39).

125.   I do not accept this submission for the simply stated reason that Mr Geyer and Mr Pacini have each filed an acknowledgment of service indicating their intention to contest jurisdiction. I have addressed the significance of their acknowledgments of service in another context above. In the present context, the significance of the filing of the acknowledgment of service was to respond to the service of process, enter an appearance (including providing details of their representatives), and to signal their intentions (whether to defend the claim or to contest jurisdiction). This Mr Geyer and Mr Pacini have done by reason of their acknowledgment of service forms filed on 19th October 2021.

126.   I do not see that this position would have been advanced by the filing of a second acknowledgment of service. Indeed, CPR Part 11 or CPR Part 10 or CPR rule 58.6 do not envisage the filing of more than one acknowledgment of service, except in the special case where an application to dispute the Court's jurisdiction has been unsuccessful (CPR rule 11(7)), in which case the first acknowledgment of service ceases to have effect.

127.   I also observe that Waksman, J's order required Mr Geyer and Mr Pacini to "*file an acknowledgment of service by the date that is [21 or 22 days respectively] after service of the Particulars of Claim*" or to file an admission or to file a defence. It is not obvious to me that Waksman, J was aware that an acknowledgment of service had already been filed by Mr Geyer and Mr Pacini (bearing in mind that the application for permission to serve out was made before, but the order was made after, the acknowledgments of service were filed). In any case, the order made by Waksman, J sets an end date for the filing of an acknowledgment of service, but not a date for the beginning of the period by which such an acknowledgment might have been filed. Moreover, the consent orders thereafter made by the Court extended the time within which Mr Geyer and Mr Pacini were to file their application to contest jurisdiction, if such an application were to be made; however, those orders made no provision for extending time in which to file a second acknowledgment of service. If the Court's or the parties' intention had been to require the filing of a second acknowledgment of service, provision would have been made in these consent orders.

128.   Therefore, in my judgment, Mr Geyer and Mr Pacini did not lose the right to contest jurisdiction in respect of the proceedings served outside the jurisdiction by reason of not having filed a second acknowledgment of service.

(2)      Are the jurisdiction gateways satisfied?

129.    In making his application for permission for service outside the jurisdiction, Dr Boettcher relied on the following bases of jurisdiction in CPR PD 6B, para. 3.1.

130.    First, CPR PD 6B, para. 3.1(3) provides that the claimant may serve a claim form out of the jurisdiction with the permission of the Court where:

> "*A claim is made against a person ('the defendant') on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and –*
>
> (a)      *there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and*
>
> (b)      *the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim*."

131.    Second, CPR PD 6B, para. 3.1(9)(a) and (b) provide that the claimant may serve a claim form out of the jurisdiction with the permission of the Court where:

> "*A claim is made in tort where –*
>
> (a)      *damage was sustained, or will be sustained, within the jurisdiction; [or]*
>
> (b)      *damage which has been or will be sustained results from an act committed, or likely to be committed, within the jurisdiction ...*"

(a)      *Are Mr Geyer and Mr Pacini necessary or proper parties?*

132.    In order that a claimant may rely on CPR PD 6B, para. 3.1(3) to secure the Court's jurisdiction as against a defendant (see *The Libyan Investment Authority v Credit Suisse International* [2020] EWHC 1387 (Comm), para. 9), the claimant must have a good arguable case (the better of the argument) that:

(1)      The claimant has made a claim against another defendant, the "*anchor defendant*", upon whom proceedings have been or will be served.

(2)      There is a real issue between the claimant and the anchor defendant which it is reasonable for the Court to try.

(3)      The defendant is a necessary or proper party to that claim against the anchor defendant.

133.    These matters are to be assessed as at the date on which the application for permission to serve the proceedings outside the jurisdiction was made (*Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 CLC 706, para. 44; *Satfinance Investment Ltd v Athena Art Finance Group* [2020] EWHC 3527 (Ch), para. 43).

134.   The matter in contention between the parties was the second of the above requirements, namely whether there is a real issue between Dr Boettcher and Xio UK which it is reasonable for the Court to try.

135.   Mr Day on behalf of Dr Boettcher submitted that:

(1)   Assuming that jurisdiction can be established against Mr Pacini, he can be the anchor defendant for the purposes of any proceedings to be served on Mr Geyer outside the jurisdiction; similarly, Mr Geyer can be the anchor defendant for the purposes of any claim against Mr Pacini, assuming jurisdiction can be established as against Mr Geyer.

(2)   In any event, Xio UK as the First Defendant can be the anchor defendant for the purposes of the proceedings to be served on Mr Geyer and/or Mr Pacini, given that Xio UK was served with the Claim Form within the jurisdiction, given Xio UK's intention to defend the claim, and given Dr Boettcher's determination to take the claim against Xio UK to trial, even though Xio UK is in liquidation. In this respect, it is to be noted that (a) Xio UK filed an acknowledgment of service - a week before the date of Waksman, J's order - which indicated an intention to defend the claim against it, (b) in March 2022, Xio UK applied by solicitors instructed on its behalf for an order staying the proceedings against it or an extension of time for the service of a defence, which application was dismissed by a consent order on 4th November 2022 in which Xio UK was ordered to serve its defence, if any, by 16th November 2022, but no such defence has been served, and although Xio UK's solicitors have been asked to explain the reasons for no defence being served, no answer to this correspondence has been received; (c) Xio UK's liquidators have refused to admit Dr Boettcher's claim as a debt in the insolvent estate (by contrast, in *Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 CLC 706, para. 78(i), the claimant had been admitted to the list of creditors), (d) Dr Boettcher will seek to hold the liquidators to account to investigate and pursue claims against those who used Xio UK as a "*front*" to hide the true nature of the investment being carried on through the company, and (e) Dr Boettcher has real concerns about the validity of the other proofs of debt lodged in the liquidation and will seek appropriate disclosure of such debts, but this has been refused by the liquidators (Ms Lanceley's fifth witness statement, paragraphs 44-49).

136.   Mr Lowenstein KC on behalf of Mr Geyer and Mr Pacini submitted that:

(1)   Because CPR PD 6B, para. 3.1(3) is not based on any territorial connection of the claim, "*caution must always be exercised in bringing foreign defendants within our jurisdiction under [this gateway]*", especially where an anchor defendant is sued only for the purposes of exercising jurisdiction over a foreign defendant (*AK Investments CJSC v Kyrgyz Mobil Tel Ltd* [2021] UKPC 7; [2012] 1 WLR 1804, para. 73, 79).

(2)   Xio UK is not an appropriate anchor defendant because there is no real issue between Xio UK and Dr Boettcher which it is reasonable for the Court to try in circumstances where (a) Xio UK is aware of the proceedings but is in liquidation and is taking no steps to dispute the proceedings (*Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 CLC 706,

para. 78(i) and 79), (b) it is relevant to consider the likelihood of Xio UK being active defendants in the proceedings and it is unlikely that Xio UK will be an active defendant because it has few assets (Mr Speller's first witness statement, paragraph 30) (Briggs, *Civil Jurisdiction and Judgments* (7th ed.), para. 24.10, fn. 105).

137.    In my judgment, Dr Boettcher has the better of the argument that jurisdiction can be exercised on the ground set out in CPR PD 6B, para. 3.1(3) insofar as Xio UK is the anchor defendant. This is because Dr Boettcher's claim is that he was induced to enter into a contract of employment with Xio UK by reason of representations made by or on behalf of Xio UK and the other Defendants, including Mr Geyer and Mr Pacini. Accordingly, the claim against Xio UK is integrally connected with the claim made against Mr Geyer and Mr Pacini. Importantly, both Dr Boettcher and Xio UK indicated an intention to litigate the dispute between them. Indeed, less than a week after Dr Boettcher's application leading to Waksman, J's order, Xio UK by its solicitors, presumably on the instructions of the liquidators, filed an acknowledgment of service which indicated an intention to defend the claim. Further, the reasons given by Ms Lanceley on behalf of Dr Boettcher for pursuing the claim explain why Dr Boettcher intended, at the relevant date, to pursue Xio UK in these proceedings.

138.    I would add that, if I had concluded that the service of proceedings on Mr Geyer at 33SR was not valid, I would also have concluded that Mr Geyer would have been a necessary or proper party to the claim made by Dr Boettcher against Mr Pacini, who was served as of right within the jurisdiction.

*(b)      Was the alleged damage sustained in, or by reason of acts, in the jurisdiction?*

139.    In order that Dr Boettcher can secure jurisdiction in respect of his claims in tort against Mr Geyer and Mr Pacini under CPR PD 6B, para. 3.1(9), he must have a good arguable case that:

(1)      damage was sustained, or will be sustained, within the jurisdiction; or

(2)      damage which has been or will be sustained results from an act committed, or likely to be committed, within the jurisdiction.

140.    With respect to the first of these requirements (para. 3.1(9)(a)), it is sufficient if substantial damage was sustained in England, whether or not damage was also sustained outside the jurisdiction (*Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391, 437). In *FS Cairo (Nile Plaza) LLC v Lady Brownlie* [2021] UKSC 45; [2021] 3 WLR 1011, at para. 74, Lord Lloyd-Jones was careful to explain that this requirement is not to be interpreted with the strictness adopted for the purposes of the Brussels Regulation Recast, especially in cases of claims for pure economic loss (such as the present). On the other hand, if the financial loss is too remote, that would not be sufficient. At para. 75, Lord Lloyd-Jones said:

"… *there is an important difference in this regard between physical damage and "the financial consequences of a tort which itself is wholly economic in nature". The nature of pure economic loss creates a need for constraints on the legal consequences of remote effects and can give rise to complex and difficult issues as to where the damage was suffered, calling for a careful analysis of*

*transactions. As a result, the more remote economic repercussions of the causative event will not found jurisdiction*."

141.    In the present case, Dr Boettcher has the better of the argument that damage was sustained in England, at least where his contract of employment with Xio UK, as the result of the alleged misrepresentations, was concluded in England upon receipt by Xio UK of Dr Boettcher's emailed acceptance of the Offer Letter. This is the same reasoning which led to the identification of English law as the applicable law for the purposes of Article 4 of the Rome II Regulation (see above), although the requirements of the relevant statutory provisions are of course different.

142.    As regards the second of the requirements, namely that there were acts committed in the jurisdiction which gave rise to the relevant damage (para. 3.1(9)(b)), as there were a number of representations alleged and each of them were made and/or received in different locations, this is a more intricate inquiry. Obviously, insofar as the representations were made during an in-person meeting in England (in particular, the meeting at The Shard), this requirement is satisfied. The requirement is not satisfied in respect of the meetings held in Germany. The position in respect of the representations made during conference calls is more complex. As a result, as I do not need to address this question, I would prefer not to do so, given my decision on the basis of para. 3.(1)(9)(a).

*Conclusion on the jurisdiction gateways*

143.    For the reasons given above, I have concluded that Dr Boettcher has a good arguable case that the requirements of CPR PD 6B, para. 3.1(3) and 3.1(9)(a) are satisfied in this case.

(3)    Does Dr Boettcher have a real prospect of success on the claim?

144.    The requirement that a claimant has a real prospect of success on the claim is to be judged on the same basis as a summary judgment application. This issue is often expressed in terms of there having to be a "*serious issue*" to be tried on the merits (*AK Investments CJSC v Kyrgyz Mobil Tel Ltd* [2021] UKPC 7; [2012] 1 WLR 1804, para. 71; *The Libyan Investment Authority v Credit Suisse International* [2020] EWHC 1387 (Comm), para. 8).

145.    Mr Lowenstein KC submitted that there was no such serious issue for the following independent reasons:

(1)    With regard to both Mr Geyer and Mr Pacini, the law applicable to the claims is German law and the claim was time-barred by December 2020 under German law.

(2)    With regard to Mr Pacini, Dr Boettcher cannot show that any actionable misrepresentations were made.

146.    As to the first of these arguments, I have reached the view - for the purposes of these applications alone - that Dr Boettcher has the better of the argument that English law, not German law, is applicable. However, even assuming German law was applicable, although it is common ground that there is a three year limitation period applicable

under German law, Dr Boettcher disputes that his claim is time-barred under German law.

147. Dr Boettcher's case is that, as a matter of German law, time was suspended for part of the standard limitation period for at least the nine days required to overcome the limitation defence, so that the claim was issued in time, because:

    (1)    There is a rule that limitation is suspended during periods of negotiation and Dr Boettcher entered into protracted pre-action correspondence with Xio UK whilst Mr Geyer and Mr Pacini were still executive officers of the Xio Group. This is a factual question to be resolved at trial.

    (2)    A change of address can suspend the running of time. However, the parties' experts on German law disagree whether a change of address after time has started to run will result in suspension of time running. That disagreement between German law experts underlines the point that this is a triable issue.

148. Accordingly, even if I had concluded that Mr Geyer and Mr Pacini had the better of the argument that German law was the applicable law, I would have also concluded that there was a serious issue to be tried on the matter of limitation.

149. As to the second of the arguments that there is no serious issue to be tried with respect to the allegations of misrepresentation made against Mr Pacini, Mr Lowenstein KC submitted that:

    (1)    Dr Boettcher has alleged that Mr Pacini participated in conference calls with him on 6th, 13th and 17th November 2015. None of these allegations has a real as opposed to fanciful chance of founding a claim for misrepresentation, in that:

        (a)    Dr Boettcher has no real prospect of showing that the 6th November 2015 call took place, because this call was postponed to 17th November 2015.

        (b)    There is no evidence that any actionable representations were made on the 13th November 2015 call, if it happened. The alleged call was not pleaded and was not alleged until Dr Boettcher's second witness statement of 28th November 2022. Therefore, there is no real prospect of Dr Boettcher showing on the evidence that this call is actionable.

        (c)    The 17th November 2015 call, if it happened at all, took place after the Offer Letter was signed and returned. Accordingly, Mr Pacini could not have intended Dr Boettcher to rely on any representations said to have been made on 17th November 2015 to induce him to enter employment with Xio UK.

150. As to the first of these points, this is a substantial factual issue. Mr Day on behalf of Mr Boettcher states that Mr Pacini has advanced no documentary evidence to demonstrate the call of 6th November 2015 was cancelled and did not take place. Accordingly, I consider that there is a serious issue to be tried in this regard.

151. As to the call alleged to have taken place on 13th November 2015, I have considered this above. The alleged representation has not been pleaded and so I take no account of it for the purposes of the current applications.

152. As regards the 17th November 2015 call, as mentioned above, although Mr Lowenstein KC is right to point out that it took place after the Offer Letter was accepted, Dr Boettcher's claim is based on his having relied on the representation in entering into a separation agreement with Bain on 24th November 2015 and commencing his employment with Xio UK on 1st January 2016. Accordingly, there is a serious issue to be tried in this respect.

153. Therefore, in my judgment, there is a serious issue to be tried and Dr Boettcher has a real prospect of success on his pleaded claims against Mr Geyer and Mr Pacini.

(4)    Is England the proper forum?

154. CPR rule 6.37(3) provides that "*The court will not give permission [for service outside of the jurisdiction] unless satisfied that England and Wales is the proper place in which to bring the claim*".

155. In *Soriano v Forensic News LLC* [2021] EWCA Civ 1952; [2022] QB 533, Warby, LJ said with respect to CPR rule 6.37(3), at para. 11(3), "*This is normally resolved by reference to the "Spiliada" principles as to the appropriate forum or (in the classic language) forum conveniens for the trial of the claim ... The question is whether this jurisdiction is "clearly or distinctly" the most appropriate. The appropriate forum is the one in which the case "may most suitably be tried for the interests of all the parties and for the ends of justice". The first thing to consider is what is the "natural forum", namely the one "with which the action [has] the most real and substantial connection". If the court concludes that another forum is as suitable or more suitable than England, it will normally refuse permission. Again, the issue is not determined on the balance of probabilities; the claimant's task is to show that he has the better of the argument on the point. If he fails to do so, the application will be dismissed*".

156. Mr Day on behalf Dr Boettcher submitted that:

(1)    If the claim is going to proceed against either Mr Geyer or Mr Pacini as of right, that will be because Mr Geyer and Mr Pacini have failed to show that Germany is clearly and distinctly the more appropriate forum. In those circumstances, the test under CPR rule 6.37(3) necessarily will be satisfied. The Court cannot regard itself as not the proper place in which to bring the claim, if the claim is continuing as of right. And there will be no alternative forum left in play; Mr Geyer and Mr Pacini have suggested none beyond Germany.

(2)    If, on the other hand, Mr Geyer and Mr Pacini are able to satisfy the Court at the prior stage of the analysis that Germany is clearly and distinctly the more appropriate forum, Dr Boettcher would accept that England is not the proper place in which to bring the claim and this means that the test under CPR rule 6.37(3) cannot be satisfied when the burden of proof is reversed and placed on him at this later stage of the analysis.

157. Mr Day's binary position is not quite accurate, in my assessment. That is because although the relative appropriateness of England as the forum for the determination of the dispute is critical to an application for a stay where the proceedings are served as of right within the jurisdiction and is critical to the application for permission to serve proceedings outside the jurisdiction, the burden of proof is materially different (*Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460, 480-481). Where proceedings are served as of right within the jurisdiction, the burden is on the defendant to prove that another forum is the clearly and distinctly more appropriate forum for the determination of the dispute between the parties than England. Where proceedings are to be served, with the Court's permission, outside the jurisdiction, the burden is on the claimant to prove that England is the forum where the case may most suitably be tried for the interests of all the parties and for the ends of justice, although it is incumbent on the defendant to identify an alternative forum (*Unwired Planet International Ltd v Huawei Technologies (UK) Ltd* [2020] UKSC 37; [2021] 1 All ER 1141, para. 94, 96).

158. The parties addressed the issue of *forum [non] conveniens* in the context of the application for a stay of the proceedings served within the jurisdiction and in the context of the application for permission for service outside the jurisdiction by reference to the same considerations.

159. I have concluded, with respect to the proceedings served as of right in England, that Mr Geyer and Mr Pacini were unable to demonstrate that Germany was clearly and distinctly the more appropriate forum for the determination of the dispute than England. The question now is whether Dr Boettcher can demonstrate that England is the more appropriate forum - where the case may most suitably be tried - than Germany (Germany being the forum identified by Mr Geyer and Mr Pacini).

160. In my judgment, England is the jurisdiction where the case may most suitably be tried for the interests of all the parties and for the ends of justice. Having regard to the conclusion I reached in connection with the application for a stay, my reasons in summary are as follows:

(1) Although there were a number of alleged representations made to Dr Boettcher in a variety of jurisdictions, they were made for the purpose of recruiting Dr Boettcher as an employee of Xio UK where the normal place of work was to be in London.

(2) The contract of employment which was concluded between Dr Boettcher and Xio UK, allegedly as a result of the misrepresentations said to have been made by the Defendants, was to be governed by English law.

(3) There is a good arguable case that Dr Boettcher's claims against Mr Geyer and Mr Pacini are governed by English law.

(4) Dr Boettcher's claims against Xio UK, Mr Geyer, Mr Pacini and Mr Qiao are best tried together in one set of proceedings, rather than being fragmented between England and Germany.

(5)    Has there been a breach of the duty of full and frank disclosure?

161.   There is a duty upon the applicant for permission to serve proceedings outside the jurisdiction where the application is made without notice to make full, fair and accurate disclosure of material information (significant factual, legal and procedural matters) which might reasonably be thought to weigh against the making of the order sought (Commercial Court Guide, Appendix 9, para. 6(c); *Memory Corporation v Sidhu (No 2)* [2000] 1 WLR 1443, 1460; *Tugushev v Orlov* [2019] EWHC 2031 (Comm), para. 7; *Valbonne Estates Ltd v Cityvalue Estates Ltd* [2021] EWCA Civ 973).

162.   The breach of the duty must concern the withholding of a substantial matter. As Sir Michael Burton said in *PJSC 'Pharmaceutical Firm Darnitsa' v Metabay Import/Export Ltd* [2021] EWHC 1441 (Comm) at para. 17:

   "*There will be cases where the consequence of a non-disclosure can be shown to be that the order would not, or at least might not, have been made, had the truth been told. There may also be cases in which, even if the order would still have been made, the seriousness of a non-disclosure must be marked either by a discharge of the order or at any rate by a suitably penal order for costs. But in the ordinary case a judge on the return day or on a discharge application must really have his timbers shivered by something serious that has gone wrong, rather than a litany of matters that could have been put differently or could have been expanded. My timbers have not been shivered in this case …*"

163.   It is generally inappropriate to seek to set aside an order for non-disclosure where it depends on proof of facts which are themselves in issue in the action, unless the facts are truly so plain that they can be readily and summarily established (*Tugushev v Orlov* [2019] EWHC 2031 (Comm), para. 7(viii)).

164.   If material non-disclosure is established, the court will be astute to ensure that a claimant who obtains the order sought without full disclosure is deprived of any advantage that party may thereby have derived. This is so even if the Court would have made the order had there been full and frank disclosure of the information not disclosed. Whether or not the non-disclosure was innocent is an important consideration, but not necessarily decisive (*Brink's-Mat Ltd v Elcombe* [1988] 1 WLR 1350, 1356-1357). Where the non-disclosure is deliberate, it will only be in exceptional circumstances that an order would not be discharged (*Tugushev v Orlov* [2019] EWHC 2031 (Comm), para. 7(ix)-(xi)).

165.   If a material non-disclosure is established, the Court has a discretion to (a) set aside the order without renewal, (b) set aside the order and require a fresh application (to be considered in the light of new facts which have arisen since the original application for service-out was first made), or (c) treat the claim form as validly served, and deal with the non-disclosure by a costs order (*NML Capital Ltd v Republic of Argentina* [2011] UKSC 31; [2011] 2 AC 495, para. 136 and *Punjab National Bank (International) Ltd v Srinivasan* [2019] EWHC 3495 (Ch), para. 68(1)-(3)). The Court inclines towards the first of these options (*Evison Holdings Limited v International Company Finvision Holdings LLC* [2020] EWHC 239 (Comm), para. 60-61).

166.   Mr Lowenstein KC submitted that:

(1) The service out order should be set aside and not reinstated because Dr Boettcher was guilty of two material breaches of the duty of full and frank disclosure on his without notice application. The application was determined by Waksman, J on paper on the basis of a witness statement (the first witness statement of Ms Lanceley), without the benefit of a skeleton argument.

(2) The first breach of the duty was a material misstatement of the *forum conveniens* test. The test is that Dr Boettcher, as the applicant, must "*satisfy the court that in all the circumstances England is clearly or distinctly the appropriate forum for the trial of the dispute*". The significance of the "*clearly and distinctly*" element was emphasised by Lord Goff in *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460. However, at paragraph 148 of Ms Lanceley's first witness statement stated that "*CPR 6.37(3) requires Dr Boettcher to satisfy the Court that England is the proper place in which to bring the claim. In particular, the Court must be satisfied that the case can suitably be tried for the interests of all the parties and for the ends of justice*". This evidence did not explain, as it should have done, the appropriate legal test as established in *Spiliada Maritime Corp v Cansulex Ltd* and subsequent cases, namely that England is clearly and distinctly the more appropriate forum.

(3) The second breach of duty was that there was a material misstatement of the evidence and/or failure to set out an obvious defence, namely that the Offer Letter was accepted by Dr Boettcher on 16th November 2015 before the representations alleged on 17th November 2015 and any actionable representation had to be pre-contractual; therefore, the conclusion of the contract between Xio UK and Dr Boettcher could not have been influenced by the representations alleged to have been made on 17th November 2015. In addition, this alleged representation was relied on to justify the Court exercising its discretion to allow service of the proceedings outside the jurisdiction.

(4) These non-disclosures and misrepresentations were serious going to material matters at the heart of the service out application and culpable, being of such gravity as to warrant the exercise of the discretion to set aside the service out order. Dr Boettcher also failed to return to the Court to correct the position.

167. Mr Day on behalf of Dr Boettcher submitted that:

(1) The complaint in this case is that, although Dr Boettcher correctly referred to CPR rule 6.37(3) in the without notice application, there was a material non-disclosure because the three words "*clearly or distinctly*" from *Spiliada Maritime Corp v Cansulex Ltd* were not used in that application. There is nothing in this. The Court was not misled as to where the burden of proof lay, or what was involved. Ms Lanceley's description of the law is impossible to criticise. It tracks the language of CPR rule 6.37(3). Indeed, CPR rule 6.37(3) was designed to be the statutory encapsulation of the *Spiliada* formulation (*VTB Capital plc v Nutritek International Corp* [2013] UKSC 5; [2013] 2 AC 337, para. 13; *Lungowe v Vedanta Resources Plc* [2019] UKSC 20, [2020] AC 1045, para. 66).

(2) As regards the non-disclosure relating to the alleged representations on 17th November 2015 (an allegation first raised in Mr Geyer's and Mr Pacini's

skeleton argument), this is only relevant if the Court does not accept Dr Boettcher's case as to the representations made during the call on 6th November 2015 (which call is said by Mr Pacini to have been postponed to 17th November 2015). Even then, Dr Boettcher's case on inducement (causation) goes beyond the acceptance of the Offer Letter and extends to the separation agreement on 24th November 2015 and the commencement of Dr Boettcher's employment with Xio UK on 1st January 2016. Further, it is inappropriate to seek to set aside an order for non-disclosure where it depends on proof of facts which are themselves in issue in the action (*Tugushev v Orlov* [2019] EWHC 2031 (Comm), para. 7(viii)).

168.   In my judgment, there has been no breach by Dr Boettcher of his duty of disclosure in connection with the application for permission to serve the proceedings outside the jurisdiction. The alleged misstatement of the *forum conveniens* test was no misstatement at all. Ms Lanceley on behalf of Dr Boettcher referred to and quoted CPR rule 6.37(3). Indeed, I consider that any Commercial Judge determining such an application will have well understood the meaning and effect of this requirement. Similarly, there has been no breach of the duty of disclosure in connection with the representations alleged to have been made on 17th November 2015 for the reasons submitted by Mr Day.

(6)   Conclusion with respect to service outside the jurisdiction

169.   For the reasons explained above, I am satisfied that Waksman, J's order dated 26th October 2021 was properly made in that Dr Boettcher demonstrated that there was gateway jurisdiction under CPR PD 6B, para. 3.1(3) and 3.1(9)(a), that he has a real prospect of success on his claim, and that England is the appropriate forum within the meaning of CPR rule 6.37(3).

**Conclusion**

170.   For the reasons explained above, I am satisfied that the Court has and should exercise jurisdiction over Dr Boettcher's claims against Mr Geyer and Mr Pacini.

171.   Accordingly, I dismiss Mr Geyer's application dated 30th November 2021 and Mr Geyer's and Mr Pacini's applications dated 5th September 2022, as well as the application to stay the proceedings served as of right within the jurisdiction.

172.   I am grateful to counsel for their clear and helpful submissions.